# FORTY-SIXTH REPORT
## Independent Monitor
## for the
## Maricopa County Sheriff's Office



Reporting Period: Third Quarter 2025

Chief (Ret.) Robert S. Warshaw

*Independent Monitor*

June 12, 2026

# Table of Contents

Section 1: Introduction……………………………………….………………....3

Section 2: Methodology and Compliance Summary…………………………..............5

***First Order***

Section 3: Implementation Unit Creation and Documentation Request……………...19

Section 4: Policies and Procedures……………………….…………………………..22

Section 5: Pre-Planned Operations……………………………..….….…………...46

Section 6: Training…………………………………………………………..............51

Section 7: Traffic Stop Documentation and Data Collection……………..…...............64

Section 8: Early Identification System (EIS)………….…………….…..…..............112

Section 9: Supervision and Evaluation of Officer Performance………….…................141

Section 10: Misconduct and Complaints……………………………………….................167

Section 11: Community Engagement……………………………………………...............171

***Second Order***

Section 12: Misconduct Investigations, Discipline, and Grievances………………..179

Section 13: Community Outreach and Community Advisory Board……………….285

Section 14: Supervision and Staffing………………………………………...............286

Section 15: Document Preservation and Production……………………………..293

Section 16: Additional Training…………………………………………….................297

Section 17: Complaints and Misconduct Investigations Relating to

Members of the Plaintiffs' Class……………………………...............298

***Third Order***……………………………………………………………..318

***Fourth Order***………………………………………………………………...340

Section 18: Concluding Remarks………………………………………….................346

Appendix 1: Acronyms…………………………………………………….................350

Endnotes…………………………………………………………………………353


**Exhibit 1:** Appendix 2: Reference Documents

**Exhibit 2:** Appendix 3: Transcripts of Interviews

## Section 1:  Introduction

This is the forty-sixth report issued in my capacity as the Court-appointed Monitor in the case of *Manuel de Jesus Ortega Melendres, et al., v. Gerard A. Sheridan, et al.* (No. CV-07-02513-PHX-GMS), and documents activities that occurred during the third quarter of 2025, July 1-September 30, 2025.

On May 24, 2013, the Court issued its Findings of Fact and Conclusions of Law after conducting a bench trial in this matter.  On October 2, 2013, the Court issued a Supplemental Permanent Injunction/Judgment Order (First Order) in this case, outlining the requirements which the Maricopa County Sheriff's Office (MCSO) must comply with as a result of the Court's findings.  On May 13, 2016, the Court issued its Findings of Fact in the civil contempt proceedings that commenced in April 2015.  This led to the issuance of a Second Supplemental Permanent Injunction/Judgment Order (Second Order) on July 20, 2016, significantly expanding the duties of the Monitor.  On November 8, 2022, the Court issued its Third Supplemental Permanent Injunction/Judgment Order (Third Order), adding requirements related to MCSO's Professional Standards Bureau (PSB) function, including addressing the backlog of internal investigations.  On August 30, 2024, the Court issued its Fourth Supplemental Permanent Injunction/Judgment Order (Fourth Order), as amended, which placed additional burdens on MCSO to reduce its backlog of internal investigations.

The Second Order delineates in great detail requirements in the areas of misconduct investigations, training, discipline and discipline review, transparency and reporting, community outreach, document preservation, and misconduct investigations involving members of the Plaintiffs' class.  The Court granted the Monitor the authority to supervise and direct all of the investigations that fall into the latter category.  The Third and Fourth Orders impose additional requirements on MCSO as they pertain to PSB.

The compliance Paragraphs of the Second Order commence where the First Order ends, and they are numbered from Paragraph 160 through and including Paragraph 337.  The compliance Paragraphs of the Third Order commence where the Second Order ends, and they are numbered from Paragraph 338 through and including Paragraph 368.  The Fourth Order amended Paragraphs 204, 356, 357, and 358.

Our reports cover the requirements of all four Orders and document MCSO's compliance efforts with these requirements.  Not all Order Paragraphs are subject to our review.  We provide summaries of compliance with all of the Orders separately, as well as a summary of MCSO's overall, or combined, compliance.

In this report, we disclose the findings of an inquiry which the Monitoring Team initiated in April 2025 pursuant to our authority under the Court Orders.  This inquiry principally related to the intake, routing, and processing of complaints and misconduct investigations, and filing of administrative and criminal complaints against then-PSB Commander, Captain Gregory Lugo, and other behaviors perpetrated by an array of senior agency officials.  The facts uncovered during the inquiry are of significant concern and have greatly impacted compliance with multiple Paragraphs of the Orders.  Contrary to MCSO's assertions, our inquiry commenced before any dispositive motions regarding the status of this case.

As of the last reporting period, MCSO asserted and was granted Full and Effective Compliance (FEC) with 172 Paragraphs of the First and Second Orders, as that term is defined in the First Order.  On December 12, 2025, MCSO asserted FEC with Paragraphs 56, 69, 165, 216, and 288.  In response to MCSO's assertions, we continued to defer our determination for FEC for Paragraphs 56 and 69, we concurred with MCSO's assertion for FEC for Paragraph 165, and we did not concur with MCSO's assertion of FEC for Paragraphs 216 and 288.  (See Section 2 of this report.)

In this report, for the second reporting period, we are continuing to defer our finding for Paragraph 46, which was previously in Full and Effective Compliance.  For this reporting period, following our special inquiry, we also found 14 Paragraphs that we previously found to be in Full and Effective Compliance to be no longer in compliance.  These Paragraphs include First Order Paragraphs 29, 30, and 102; and Second Order Paragraphs 167, 168, 169, 220, 221, 223, 226, 227, 228, 268, and 292.

MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with the Paragraphs so designated.

## Section 2: Methodology and Compliance Summary

The Monitor's primary responsibility is to determine the status of compliance of the Maricopa County Sheriff's Office (MCSO) with the requirements in the Orders. To accomplish this, the Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division (CID) and other Office personnel – at Headquarters, in Patrol District offices, or at the office that we occupy when onsite. We also observe Office practices; review Office policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, about the status of MCSO's compliance.

This report documents compliance with applicable Order requirements, or Paragraphs, in two phases. For Phase 1, we assess compliance according to whether MCSO has developed and approved requisite policies and procedures, and MCSO personnel have received documented training on their contents. For Phase 2 compliance, generally considered operational implementation, MCSO must demonstrate that it is complying with applicable Order requirements more than 94% of the time, or in more than 94% of the instances under review.

We use four levels of compliance: In compliance; Not in compliance; Deferred; and Not applicable. "In compliance" and "Not in compliance" are self-explanatory. We use "Deferred" in circumstances in which we are unable to fully determine the compliance status – due to a lack of data or information, incomplete data, or other reasons that we explain in the narrative of our report. We will also use "Deferred" in situations in which MCSO, in practice, is fulfilling the requirements of a Paragraph, but has not yet memorialized the requirements in a formal policy.

For Phase 1 compliance, we use "Not applicable" for Paragraphs where a policy is not required; for Phase 2 compliance, we use "Not applicable" for Paragraphs that do not necessitate a compliance assessment.

In April 2025, the Monitoring Team initiated an inquiry pursuant to our authority under the Court's Orders.[1] The methodology used for this inquiry included requests for and reviews of documents, as well as interviews with MCSO leadership and staff – including Sheriff Gerard Sheridan, Undersheriff Jeffrey Gentry, Executive Chief Melissa Palopoli, Deputy Chief Matthew Summers, Kenneth Holmes, and Captain Gregory Lugo, among others.[2] These interviews provided firsthand accounts of meetings and discussions involving the Sheriff, his command staff, and MCSO employees regarding MCSO's actions implicating the Court's Orders. Because this report details the findings of our special inquiry, some of the events that we describe occurred either before or after the third quarter of 2025.

The tables below summarize the compliance status of Paragraphs tracked in this report.[3] In this report, some of the Paragraphs that were implicated by the findings of our inquiry were requirements that we previously considered to be not applicable or administrative in nature – that is, we did not conduct assessments or issue compliance findings for them. However, in this report, we note that these particular Paragraphs were in some way implicated by MCSO's actions in the events that we examined as part of our special inquiry. These Paragraphs include First Order Paragraphs 14, 15, 16, and 17; Second Order Paragraphs 163, 166, 219, 289, 291, and 293; and Third Order Paragraphs 346 and 347.

During this reporting period, MCSO's Phase 1 compliance rate with the **First, Second, Third, and Fourth Orders** remained the same as the last reporting period, all at 100%.

During this reporting period, MCSO's Phase 2 compliance rate with the **First Order** decreased by six percentage points from the last reporting period, to 84%. This number includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. (See below for the list of Paragraphs that are in Full and Effective Compliance.) During this reporting period, MCSO's Phase 2 compliance rate with the **Second Order** decreased by 16 percentage points from the last reporting period, to 79%. This number also includes Paragraphs that we consider to be in compliance and those that are now in Full and Effective Compliance (FEC), as described above. During this reporting period, MCSO's Phase 2 compliance rate with the **Third Order** decreased by 20 percentage points from the last reporting period, to 68%. During this reporting period, MCSO's Phase 2 compliance rate with the **Fourth Order** remained the same as the last reporting period, at 75%.

| Forty-Sixth Quarterly Status Report **First Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 20 | 6 |
| Deferred | 0 | 2 |
| Not in Compliance | 0 | 14 |
| In Compliance | 80 | **82**[4] |
| **Percent in Compliance** | **100%** | **84%** |

| Forty-Sixth Quarterly Status Report **Second Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 19 | 6 |
| Deferred | 0 | 1 |
| Not in Compliance | 0 | 24 |
| In Compliance | 103 | 93[5] |
| **Percent in Compliance** | **100%** | **79%** |

| Forty-Sixth Quarterly Status Report<br>**Third Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 19 | 4 |
| Deferred | 0 | 0 |
| Not in Compliance | 0 | 6 |
| In Compliance | 4 | 13 |
| **Percent in Compliance** | **100%** | **68%** |

| Forty-Sixth Quarterly Status Report<br>**Fourth Order Summary** | | |
|---|---|---|
| **Compliance Status** | **Phase 1** | **Phase 2** |
| Not Applicable | 3 | 0 |
| Deferred | 0 | 0 |
| Not in Compliance | 0 | 1 |
| In Compliance | 1 | 3 |
| **Percent in Compliance** | **100%** | **75%** |

| MCSO's Compliance with the Requirements of the **First Order** *(October 2, 2013)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | 4% | 10% | 44% | 40% | 51% | 57% | 61% | 60% | 67% | 60% |
| **Phase 2** | 0% | 0% | 26% | 25% | 28% | 37% | 38% | 39% | 44% | 49% |
| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
| **Phase 1** | 63% | 79% | 88% | 85% | 85% | 85% | 85% | 97% | 97% | 97% |
| **Phase 2** | 50% | 57% | 67% | 62% | 65% | 64% | 66% | 77% | 75% | 78% |
| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
| **Phase 1** | 96% | 96% | 96% | 96% | 96% | 98% | 98% | 98% | 98% | 99% |
| **Phase 2** | 76% | 77% | 79% | 82% | 81% | 78% | 79% | 77% | 77% | 79% |
| | Report 31 | Report | Report 33 | Report 34 | Report 35 | Report 36 | Report 37 | Report 38 | Report 39 | Report 40 |
| **Phase 1** | 99% | 99% | 99% | 99% | 99% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 81% | 80% | 78% | 79% | 80% | 82% | 88% | 93% | 90% | 90% |
| | Report 41 | Report 42 | Report 43 | Report 44 | Report 45 | Report 46 | | | | |
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | | | | |
| **Phase 2** | 91% | 91% | 91% | 91% | 90% | 84% | | | | |

| MCSO's Compliance with the Requirements of the **Second Order** *(July 20, 2016)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | 1% |
| **Phase 2** | N/A | | | | | | | | | 43% |
| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
| **Phase 1** | 10% | 12% | 72% | 75% | 77% | 77% | 78% | 78% | 99% | 99% |
| **Phase 2** | 46% | 60% | 63% | 66% | 72% | 75% | 80% | 81% | 90% | 89% |
| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 91% | 90% | 92% | 93% | 90% | 91% | 92% | 90% | 89% | 91% |
| | Report 31 | Report 32 | Report 33 | Report 34 | Report 35 | Report 36 | Report 37 | Report 38 | Report 39 | Report 40 |
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 92% | 93% | 93% | 93% | 93% | 93% | 93% | 93% | 91% | 91% |
| | Report 41 | Report 42 | Report 43 | Report 44 | Report 45 | Report 46 | | | | |
| **Phase 1** | 100% | 100% | 100% | 100% | 100% | 100% | | | | |
| **Phase 2** | 92% | 92% | 93% | 94% | 95% | 79% | | | | |

| MCSO's Compliance with the Requirements of the **Third Order** *(November 9, 2022)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |

| | Report 31 | Report 32 | Report 33 | Report 34 | Report 37 | Report 36 | Report 37 | Report 38 | Report 39 | Report 40 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Phase 1** | N/A | | | | 25% | 20% | 25% | 25% | 25% | 25% |
| **Phase 2** | N/A | | | | 53% | 50% | 53% | 53% | 53% | 53% |

| | Report 41 | Report 42 | Report 43 | Report 44 | Report 45 | Report 46 |
|---|---|---|---|---|---|---|
| **Phase 1** | 25% | 100% | 100% | 100% | 100% | 100% |
| **Phase 2** | 59% | 82% | 88% | 88% | 88% | 68% |

| MCSO's Compliance with the Requirements of the **Fourth Order** *(August 30, 2024)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Report 1 | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 | Report 9 | Report 10 |
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |
| | Report 11 | Report 12 | Report 13 | Report 14 | Report 15 | Report 16 | Report 17 | Report 18 | Report 19 | Report 20 |
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |
| | Report 21 | Report 22 | Report 23 | Report 24 | Report 25 | Report 26 | Report 27 | Report 28 | Report 29 | Report 30 |
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |
| | Report 31 | Report 32 | Report 33 | Report 34 | Report 37 | Report 36 | Report 37 | Report 38 | Report 39 | Report 40 |
| **Phase 1** | N/A | | | | | | | | | |
| **Phase 2** | N/A | | | | | | | | | |
| | Report 41 | Report 42 | Report 43 | Report 44 | Report 45 | Report 45 | | | | |
| **Phase 1** | N/A | | 100% | 100% | 100% | 100% | | | | |
| **Phase 2** | N/A | | 75% | 75% | 75% | 75% | | | | |

Below is the list of Paragraphs for which MCSO asserted Full and Effective Compliance, and the Monitor's response to MCSO's assertion.

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 9 | 12/28/18 | Concurred on 1/28/19 |
| 10 | 12/28/18 | Concurred on 1/28/19 |
| 11 | 12/28/18 | Concurred on 1/28/19 |
| 12 | 12/28/18 | Concurred on 1/28/19 |
| 13 | 12/28/18 | Concurred on 1/28/19 |
| 19 | 3/31/23 | Concurred on 4/27/23 |
| 21 | 6/22/20 | Concurred on 7/17/20 |
| 22 | 9/25/23 | Concurred on 10/25/23 |
| 23 | 12/28/18 | Concurred on 1/28/19 |
| 24 | 6/18/21 | Concurred on 7/19/21 |
| 26 | 12/28/18 | Concurred on 1/28/19 |
| 27 | 3/22/19 | Concurred on 4/22/19 |
| 28 | 12/28/18 | Concurred on 1/28/19 |
| 29 | 12/28/18 | Concurred on 1/28/19; now Not in compliance |
| 30 | 12/28/18 | Concurred on 1/28/19; now Not in compliance |
| 31 | 9/9/19 | Concurred on 10/2/19 |
| 34 | 6/3/19 | Concurred on 6/25/19 |
| 35 | 12/28/18 | Concurred on 1/28/19 |
| 36 | 12/28/18 | Concurred on 1/28/19 |
| 37 | 12/28/18 | Concurred on 1/28/19 |
| 38 | 12/28/18 | Concurred on 1/28/19 |
| 39 | 3/16/21 | Concurred on 4/16/21 |
| 40 | 12/28/18 | Concurred on 1/28/19 |
| 43 | 6/17/22 | Concurred on 7/15/22 |

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 44 | 9/30/22 | Concurred on 10/31/22 |
| 45 | 12/9/19 | Concurred on 1/6/20 |
| 46 | 12/9/19 | Concurred on 1/6/20; now Deferred |
| 47 | 6/17/22 | Concurred on 7/15/22 |
| 48 | 4/1/22 | Concurred on 4/29/22 |
| 49 | 4/1/22 | Concurred on 4/29/22 |
| 50 | 4/1/22 | Concurred on 4/29/22 |
| 51 | 4/1/22 | Concurred on 4/29/22 |
| 52 | 6/18/21 | Concurred on 7/19/21 |
| 53 | 6/18/21 | Concurred on 7/19/21 |
| 55 | 12/28/18 | Concurred on 1/28/19 |
| 56 | Most recently on 12/12/25 | Deferred determination on 1/21/26 |
| 57 | 12/16/20 | Concurred on 1/15/21 |
| 58 | 6/22/20 | Concurred on 7/17/20 |
| 59 | 12/28/18 | Concurred on 1/28/19 |
| 60 | 12/28/18 | Concurred on 1/28/19 |
| 61 | 12/9/19 | Concurred on 1/6/20 |
| 62 | 1/6/23 | Concurred on 2/6/23 |
| 63 | 6/22/20 | Concurred on 7/17/20 |
| 66 | 3/31/23 | Concurred on 4/27/23 |
| 68 | 12/28/18 | Concurred on 1/28/19 |
| 69 | Most recently on 12/12/25 | Deferred determination on 1/21/26 |
| 71 | 12/28/18 | Concurred on 1/28/19 |
| 73 | 10/5/20 | Concurred on 11/4/20 |
| 74 | 9/25/23 | Concurred on 10/25/23 |
| 75 | 7/8/24 | Concurred on 10/15/24 |

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 76 | 12/16/20 | Concurred on 1/15/21 |
| 77 | 12/28/18 | Concurred on 1/28/19 |
| 78 | 3/16/21 | Concurred on 4/16/21 |
| 80 | 9/30/22 | Concurred on 10/31/22 |
| 83 | 9/30/22 | Concurred on 10/31/22 |
| 84 | 9/9/19 | Concurred on 10/2/19 |
| 85 | 10/5/20 | Concurred on 11/4/20 |
| 86 | 10/5/20 | Concurred on 11/4/20 |
| 88 | 12/28/18 | Concurred on 1/28/19 |
| 89 | 12/9/19 | Concurred on 1/6/20 |
| 90 | 12/19/23 | Concurred on 1/18/24 |
| 91 | 6/23/23 | Concurred on 7/21/23 |
| 93 | 3/17/20 | Concurred on 4/9/20 |
| 94 | 4/11/25 | Concurred on 5/12/25 |
| 101 | 12/28/18 | Concurred on 1/28/19 |
| 102 | 12/16/20 | Concurred on 1/15/21; now Not in compliance |
| 103 | 10/1/24 | Concurred on 10/15/24 |
| 104 | 3/17/27 | Concurred on 4/9/20 |
| 105 | 10/5/20 | Concurred on 11/4/20 |
| 106 | 6/3/19 | Concurred on 6/25/19 |
| 113 | 6/17/22 | Concurred on 7/15/22 |
| 114 | 6/17/22 | Concurred on 7/15/22 |
| 115 | Most recently on 7/25/25 | Did not concur on 8/27/25 |
| 116 | 12/19/23 | Concurred on 1/18/24 |
| 165 | 12/12/25 | Concurred on 1/21/26 |
| 167 | 12/23/21 | Concurred on 1/24/22; now Not in compliance |

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 168 | 12/23/21 | Concurred on 1/24/22; now Not in compliance |
| 169 | 12/23/21 | Concurred on 1/24/22; now Not in compliance |
| 170 | 12/23/21 | Concurred on 1/24/22 |
| 171 | 12/23/21 | Concurred on 1/24/22 |
| 172 | 12/23/21 | Concurred on 1/24/22 |
| 174 | 6/17/22 | Concurred on 7/15/22 |
| 175 | 10/1/24 | Concurred on 10/15/24 |
| 176 | 1/9/25 | Concurred on 2/10/25 |
| 177 | 6/18/21 | Concurred on 7/19/21 |
| 178 | 7/25/25 | Concurred on 8/27/25 |
| 179 | 6/17/22 | Concurred on 7/15/22 |
| 180 | 6/17/22 | Concurred on 7/15/22 |
| 181 | 4/8/24 | Concurred on 5/8/24 |
| 182 | 9/24/21 | Concurred on 10/25/21 |
| 184 | 6/18/21 | Concurred on 7/19/21 |
| 185 | 6/18/21 | Concurred on 7/19/21 |
| 186 | 6/18/21 | Concurred on 7/19/21 |
| 187 | 6/18/21 | Concurred on 7/19/21 |
| 188 | 6/18/21 | Concurred on 7/19/21 |
| 189 | 12/23/21 | Concurred on 1/24/22 |
| 190 | 9/30/22 | Concurred on 10/31/22 |
| 191 | 12/23/21 | Concurred on 1/24/22 |
| 192 | 9/30/22 | Concurred on 10/31/22 |
| 193 | 12/23/21 | Concurred on 1/24/22 |
| 196 | 12/23/21 | Concurred on 1/24/22 |
| 197 | 1/6/23 | Concurred on 2/6/23 |
| 198 | 9/30/22 | Concurred on 10/31/22 |

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 199 | 12/23/21 | Concurred on 1/24/22 |
| 200 | 9/30/22 | Concurred on 10/31/22 |
| 201 | 12/23/21 | Concurred on 1/24/22 |
| 202 | 9/30/22 | Concurred on 10/31/22 |
| 203 | 9/30/22 | Concurred on 10/31/22 |
| 205 | 6/23/23 | Concurred on 7/21/23 |
| 206 | 9/30/22 | Concurred on 10/31/22 |
| 207 | 12/19/23 | Concurred on 1/18/24 |
| 208 | 1/6/23 | Concurred on 2/6/23 |
| 209 | 9/25/23 | Concurred on 10/25/23 |
| 210 | 9/24/21 | Concurred on 10/25/21 |
| 212 | 6/23/23 | Concurred on 7/21/23 |
| 213 | 1/9/25 | Concurred on 2/10/25 |
| 214 | 9/24/21 | Concurred on 10/25/21 |
| 215 | 9/24/21 | Concurred on 10/25/21 |
| 216 | 12/12/25 | Did not concur on 1/21/26 |
| 217 | 9/24/21 | Concurred on 10/25/21 |
| 218 | 9/24/21 | Concurred on 10/25/21 |
| 220 | 4/8/24 | Concurred on 5/8/24; now Not in compliance |
| 221 | 9/24/21 | Concurred on 10/25/21; now Not in compliance |
| 222 | 9/30/22 | Concurred on 10/31/22 |
| 223 | 9/24/21 | Concurred on 10/25/21; now Not in compliance |
| 224 | 9/24/21 | Concurred on 10/25/21 |
| 225 | 9/24/21 | Concurred on 10/25/21 |
| 226 | 1/6/23 | Concurred on 2/6/23; now Not in compliance |

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
|---|---|---|
| 227 | 3/16/21 | Concurred on 4/16/21; now Not in compliance |
| 228 | 3/16/21 | Concurred on 4/16/21; now Not in compliance |
| 229 | 3/16/21 | Concurred on 4/16/21 |
| 230 | 3/16/21 | Concurred on 4/16/21 |
| 231 | 3/16/21 | Concurred on 4/16/21 |
| 232 | 3/16/21 | Concurred on 4/16/21 |
| 233 | 3/16/21 | Concurred on 4/16/21 |
| 234 | 3/16/21 | Concurred on 4/16/21 |
| 235 | 3/16/21 | Concurred on 4/16/21 |
| 236 | 3/16/21 | Concurred on 4/16/21 |
| 238 | 3/16/21 | Concurred on 4/16/21 |
| 239 | 3/16/21 | Concurred on 4/16/21 |
| 240 | 3/31/23 | Concurred on 4/27/23 |
| 241 | 1/6/23 | Concurred on 2/6/23 |
| 242 | 3/31/23 | Concurred on 4/27/23 |
| 243 | 9/30/22 | Concurred on 10/31/22 |
| 244 | 12/16/20 | Concurred on 1/15/21 |
| 245 | 12/16/20 | Concurred on 1/15/21 |
| 246 | 1/6/23 | Concurred on 2/6/23 |
| 247 | 12/16/20 | Concurred on 1/15/21 |
| 248 | 12/16/20 | Concurred on 1/15/21 |
| 249 | 12/16/20 | Concurred on 1/15/21 |
| 250 | 4/1/22 | Concurred on 4/29/22 |
| 251 | 4/1/22 | Concurred on 4/29/22 |
| 252 | 4/1/22 | Concurred on 4/29/22 |
| 253 | 4/1/22 | Concurred on 4/29/22 |
| 254 | 4/1/22 | Concurred on 4/29/22 |

| Paragraph | MCSO Asserted Full and Effective Compliance | Monitor's Determination |
| --- | --- | --- |
| 255 | 4/1/22 | Concurred on 4/29/22 |
| 256 | 4/1/22 | Concurred on 4/29/22 |
| 257 | 4/1/22 | Concurred on 4/29/22 |
| 258 | 4/1/22 | Concurred on 4/29/22 |
| 259 | 4/1/22 | Concurred on 4/29/22 |
| 260 | 4/8/24 | Concurred on 5/8/24 |
| 264 | 12/16/20 | Concurred on 1/15/21 |
| 265 | 4/11/25 | Concurred on 5/12/25 |
| 266 | 12/16/20 | Concurred on 1/15/21 |
| 268 | 1/6/23 | Concurred on 2/6/23; now Not in compliance |
| 271 | 4/11/25 | Concurred on 5/12/25 |
| 272 | 9/30/22 | Concurred on 10/31/22 |
| 273 | 12/16/20 | Concurred on 1/15/21 |
| 276 | 12/16/20 | Concurred on 1/15/21 |
| 278 | 12/16/20 | Concurred on 1/15/21 |
| 279 | 12/16/20 | Concurred on 1/15/21 |
| 282 | 1/6/23 | Concurred on 2/6/23 |
| 284 | 1/6/23 | Concurred on 2/6/23 |
| 286 | 1/6/23 | Concurred on 2/6/23 |
| 287 | 12/16/20 | Concurred on 1/15/21 |
| 288 | Most recently on 12/12/25 | Did not concur on 1/21/26 |
| 292 | 12/16/20 | Concurred on 1/15/21; now Not in compliance |
| 337 | 12/16/20 | Concurred on 1/15/21 |

## First Supplemental Permanent Injunction/Judgment Order

### Section 3: Implementation Unit Creation and Documentation Requests

**COURT ORDER III. MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT** *[Court Order wording in italics]*

***Paragraph 9.*** *Defendants shall hire and retain, or reassign current MCSO employees to form an interdisciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order. At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed the monthly personnel rosters for the Court Implementation Division (CID). CID includes a production team, which continues the traditional work required by this Paragraph, comprised of one Commander, one lieutenant, one sergeant, two deputies, one administrative assistant, and two management analysts. Patrol Analysis and TSAU are now part of CID. CID continues to be supported by Maricopa County Attorney's Office (MCAO) attorneys, as well as outside counsel, who frequently participate in our meetings and telephone calls with Division personnel. The CID Commander serves as the point of contact for the Monitor and the Parties.

During this reporting period, CID continued to provide documents through MCSO's counsel via an Internet-based application. We, the Plaintiffs, and the Plaintiff-Intervenor receive all files and documents simultaneously. CID effectively facilitates our and the Parties' access to MCSO's personnel.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 10.* *MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.*

**In Full and Effective Compliance**

CID has consistently been responsive to our requests; and the Division addresses any issues we identify in the samples we review – including technical problems, missing documents, or other deficiencies. In parallel, MCSO's Bureau of Internal Oversight (BIO) routinely audits Office work products, particularly in areas that directly affect compliance with the Court's Orders. In many cases, BIO reviews the same materials included in our samples and often identifies the same deficiencies we note, which BIO then takes steps to address.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 11.* *Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.*

**In Full and Effective Compliance**

To date, we have not received MCSO's quarterly report for the second quarter of 2025.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 12.    The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis.    The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations.    The first assessment shall be conducted within 180 days of the Effective Date.    Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.*

**In Full and Effective Compliance**

See Paragraph 13.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


*Paragraph 13.    The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion.    When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order.    If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the determination.    Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore.    The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).*

**In Full and Effective Compliance**

We and CID established that the schedule for the submission of comprehensive annual assessments as required by these Paragraphs will run according to MCSO's fiscal year cycle, July 1-June 30.  MCSO will submit reports on or before September 15 of each year.  Consistent with this agreement, MCSO filed its 2025 Annual Compliance Report on September 15, 2025.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## Section 4:  Policies and Procedures

**COURT ORDER IV. MONITOR REVIEW PROCESS**

*Paragraph 14. In any place where this Order provides for Defendants to submit policies, procedures, protocols or other materials to the Monitor for his or her review, Defendants shall submit such materials to the Monitor and provide a copy to Plaintiffs' representatives within the specified time.*

**Phase 1:**  Not applicable

**Phase 2:**  Not in compliance

See below.

*Paragraph 15. Plaintiffs shall have an opportunity to provide any comments or recommendations on the materials within 14 days of receipt. The Monitor shall thereafter communicate to the Parties the results of its review. If the Monitor has any concerns or recommendations regarding the materials, it will include those concerns or recommendations. The MCSO may then amend the materials and resubmit them to the Monitor within 14 days for further review. Either Party may apply to the Monitor for an extension of the deadlines in this Paragraph. In conducting its review, the Monitor may take into account industry best practices and the record in this litigation.*

**Phase 1:**  Not applicable

**Phase 2:**  Not in compliance

See below.

*Paragraph 16. If the Monitor approves the matter submitted, the Monitor will make a record of his or her approval and inform both parties. In cases where neither party objects to the Monitor's action, the Monitor's determination will be final. When the Monitor approves such matter, no further action is needed before the MCSO implements the relevant policies, procedures, protocols or materials. The MCSO shall do so promptly and without delay.*

**Phase 1:**  Not applicable

**Phase 2:**  Not in compliance

See below.

***Paragraph 17****. If either Party does not agree with the Monitor's determination, then the Party may make a motion directly to the Court for resolution of the dispute. The non-moving Party may respond to such motion within 14 days of filing. The moving Party may file a reply within 7 days after that. Any policies, procedures, protocols or other materials subject to the dispute need not be implemented until the Court makes a determination.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

We have previously considered Paragraphs 14-17 to be of an administrative nature, as they relate to the Court-ordered process for the review and approval of policies by the Monitor. Although we have not previously considered these Paragraphs for purposes of compliance, we include them now, given that our special inquiry found blatant disregard by MCSO of longstanding policies, their review and approval, and of the policy development process.

For a detailed description of the facts identified in our inquiry, see Second Order section on page 179. As it relates to Paragraphs 14-17, we found that MCSO violated Section IV of the First Order by ignoring the established agency policies that were approved by the Monitor and issued by the Court. These policies include:

1. GC-17 Attachment A (Discipline Matrix) and B (Categories of Offenses), which delineate the discipline for all misconduct offenses, including Driving Under the Influence (DUI).

2. GH-2 (Internal Investigations), which defines Appointing Authority as "the designated member of Office command staff, appointed by the Sheriff, whose duties include being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard." Nothing in the policy states that the Appointing Authority falls outside of the command staff.

3. GH-2 (Internal Investigations) (2)(B)(12) provides for the presence of an observer in the interview of a law enforcement officer when there is reasonable belief that the interview could result in dismissal, demotion or suspension: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." Accordingly, attorney presence as an observer in a PSB interview, as approved by the Sheriff and Executive Chief Palopoli, was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted.

4. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline. MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo.

## COURT ORDER V. POLICIES AND PROCEDURES

***Paragraph 18.*** *MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards. In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.*

***Paragraph 19.*** *To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.*

### In Full and Effective Compliance

MCSO has taken steps toward a comprehensive review of its Patrol Operations Policies and Procedures in four phases. First, on December 31, 2013, prior to my appointment as Monitor, MCSO filed with the Court all of its policies and procedures, with amendments, that MCSO believed complied with the various Paragraphs of the First Order. Second, in the internal assessment referenced above, MCSO discussed its ongoing evaluation of Patrol Operations and its development of policies and procedures. Third, in response to our requests, MCSO provided all of the policies and procedures it maintains are applicable to the First Order for our review and that of the Plaintiffs. We provided our feedback, which also included the Plaintiffs' comments, on these policies on August 12, 2014. Based on that feedback, MCSO made adjustments to many of the policies, concentrating first on the policies to be disseminated in Detentions, Arrests, and the Enforcement of Immigration-Related Laws Training; and the Bias Free Policing Training (often referred to as Fourth and Fourteenth Amendment Training) that commenced in early September. We reviewed MCSO's updated policies and provided our approval for several on August 25, 2014.

Fourth, in discussions during 2016, MCSO requested more specific guidance on what we considered to be Patrol-related policies and procedures. In response, we provided MCSO with a list of the Patrol-related policies for the purposes of Paragraph 19. We included on this list policies that were not recently revised or currently under review. Several policies required changes to comport with the First Order, Second Order, or both. In 2018, MCSO published the last of the outstanding policies, achieving compliance with this Paragraph.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 20.*** *The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.*

### a. Policies and Procedures to Ensure Bias-Free Policing

***Paragraph 21.*** *The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:*

a.  *define racial profiling as the reliance on race or ethnicity to any degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;*

b.  *prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;*

c.  *prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;*

d.  *specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and*

e.  *include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.*

### In Full and Effective Compliance

MCSO has developed and published the policies required by Paragraph 21. MCSO distributed these policies and has trained agency personnel during the required Fourth and Fourteenth Amendment training, on an annual basis, since 2014. MCSO's implementation of these policies is covered in other Paragraphs of this report.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 22.*** *MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.*

**In Full and Effective Compliance**

With input from the Parties, the reinforcement of CP-8 (Preventing Racial and Other Bias-Based Policing) was modified to a two-step process conducted annually. MCSO describes Part 1 of the process as the following: "On an annual basis, within the first six months of the calendar year, supervisors shall conduct a group or individual discussion with their assigned employees, reserve deputies, or posse members, which will in part, requires viewing videos from a library created by the Training Division. The supervisors shall use the message in the video and the approved discussion points, specific to the employee's job classification, to personalize the reinforcement that racial and bias-based profiling and/or discriminatory policing are unacceptable. The videos shall be announced by the Training Division through The Training Bulletin or an MCSO Administrative Broadcast and be accessible on TheHub." MCSO describes Part 2 of the process as the following: "On an annual basis, within the last six months of the calendar year, supervisors shall ensure that all employees, reserve deputies, and posse members assigned to them successfully complete their annual review and acknowledgment of this Office Policy, upon Office distribution through The Briefing Board announcement. In addition, employees will be required to view a video from the Sheriff or designee, which will reinforce that racial and bias-based profiling and/or discriminatory policing are unacceptable. Employees, reserve deputies, and posse members shall complete acknowledgement through TheHub."

As an additional measure, supervisors will have the latitude to review and discuss the policy with their employees and document their discussions in BlueTeam. MCSO will provide proof of compliance biannually, at the end of the six-month periods, when each of the elements of the process is completed. MCSO will also provide progress reports in the interim.

For the first three months of 2025, MCSO submitted training compliance reports for all employee classifications. For this report, we assess both the first and second quarters of 2025. The overall compliance rate for this Paragraph for the first and second quarter of 2025, was 99%. The training cycle for the first half of 2025 ended June 30, 2025.

During the third quarter of 2025, MCSO provided the second Semi-annual Briefing for CP-8, along with a new Sheriff's video. MCSO remains in compliance with this Paragraph.

On September 25, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 23.***  *Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.*

**In Full and Effective Compliance**

BIO uses a randomizing program to select samples for each inspection.  BIO reviews CAD messages to verify compliance with CP-2 (Code of Conduct), CP-3 (Workplace Professionalism: Discrimination and Harassment), and GM-1 (Electronic Communications, Data and Voice Mail). In its submission, MCSO includes the specific nature of any potential concerns identified during the audits.  We observed the processes BIO uses to conduct CAD and email audits, to ensure that we thoroughly understand the mechanics involved in conducting these audits.  For CAD and email audits, we receive copies of the audits completed by BIO, the details of any violations found, and copies of the memoranda of concern or BIO Action Forms that are completed.  Email and CAD/Alpha Paging inspections are completed on a quarterly basis.  For email inspections, MCSO will inspect 50 employees per quarter, and for CAD/Alpha Paging, MCSO will inspect 15 days per quarter.

During the third quarter of 2025, we reviewed the Quarterly Computer Aided Dispatch (CAD) and Alpha Paging BIO inspection BI2025-0083 and the Quarterly Emails Inspection BI2025-0090.

Inspection BI2025-0083, the Quarterly CAD/Alpha Paging Inspection, reviewed a total of 6,727 CAD and Alpha Paging messaging entries (6,716 CAD and 11 Alpha Paging) sampled which MCSO personnel transmitted during the selected dates available for inspection.  The inspection found 100% compliance among the inspected CAD and Alpha Paging messaging entries with Office Policies GM-1 Electronic Communications, Data and Voice Mail, CP-2 Code of Conduct; CP-3, Workplace Professionalism: Discrimination and Harassment; and CP-8, Preventing Racial and Other Biased-Based Profiling.

Inspection BI2025-0090, the Quarterly Email Inspection, examined 50 selected Office employees, with a combined total of 16,600 emails for the third quarter of 2025.  After the elimination of normal MCSO business-related emails, such as training announcements, Administrative Broadcasts, system-generated emails, and unsolicited junk-type emails, 7,788 emails remained.  The inspection found that 100% of the emails were in compliance with the inspection requirements.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 24.*** *The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.*

**In Full and Effective Compliance**

MCSO established the Sheriff's Intelligence Leads and Operations (SILO) Unit in the first quarter of 2016. The SILO Unit became operational on September 11, 2017. GI-7 requires that MCSO components must forward any tips it receives to the SILO Unit for recording and processing. The SILO Unit classifies this information by the type of alleged criminal activity, or service requested, and forwards it to the proper Unit for action and response. In some cases, community members email or call with requests for traffic enforcement, or for MCSO to address quality-of-life issues; these are considered calls for service rather than tips on criminal activity. If the information provided pertains to criminal activity in another jurisdiction, MCSO sends the information to the appropriate law enforcement agency and documents it in the SILO database. We review a monthly tip list report, noting the date received and a general description of each tip. We also review an audit report showing the disposition of tips received. If there is any bias noted in the information received for any tip, MCSO closes the tip and takes no action. We review all tips that MCSO closes due to bias.

During the third quarter of 2025, we reviewed 972 tips sent for July, 814 tips submitted for Aug, and 647 tips submitted for September. We sorted and documented 2,433 tips based on the type of alleged violation or service that was requested. The highest number of tips received for the third quarter continues to be associated with firearm violations (946). This number reflects approximately 38% of all tips received. Scams and drugs are now the second highest categories of tips received; those numbers have risen for the quarter. Warrants activities were the fourth highest category of tips reported; there were 193 warrant activity tips for the quarter. Tips reported that were related to crimes against children were down, as well as tips related to assaults. During the third quarter of 2025, MCSO did not close any tips due to bias.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### *b. Policies and Procedures to Ensure Bias-Free Traffic Enforcement*

***Paragraph 25.*** *The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:*

a. *prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;*

b. *provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;*

c. *prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;*

d. *prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;*

e. *prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;*

f. *require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;*

g. *prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;*

h. *require the duration of each traffic stop to be recorded;*

i. *provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and*

j. *instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 10, 2025.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 8, 2025.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on November 27, 2024.

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on January 23, 2025.
- EA-11 (Arrest Procedures), most recently amended on November 5, 2024.

**Phase 2:** In compliance

During the finalization of the Fourth and Fourteenth Amendment training curricula required by the Order, the Parties agreed to a list and/or description of forms of identification deemed acceptable for drivers and passengers, as required by this Paragraph. The data required for verification to ensure compliance with these policies is captured by the Traffic and Criminal Software (TraCS) system. The system documents the requirements of the Order and MCSO policies. MCSO has continued to make technical changes to the TraCS system to ensure that the mandatory fields on the forms used to collect the data are completed and that deputies are capturing the required information. TraCS is a robust system that allows MCSO to make technical changes to improve how required information is captured.

To verify Phase 2 compliance with this Paragraph, we reviewed MCSO's Vehicle Stop Contact Forms (VSCFs), Vehicle Stop Contact Form Supplemental Sheets, Incidental Contact Receipts, Written Warning/Repair Forms, Arizona Traffic Ticket and Complaint Forms, Internet I/Viewer Event Forms, Justice Web Interface Forms, CAD printouts, and any Incident Reports generated by traffic stops. MCSO developed many of these forms to capture the requirements of Paragraphs 25 and 54.

Since our July 2015 site visit, there has been significant improvement in the TraCS system that has enhanced the reliability and validity of the data provided by MCSO. This improvement has been buttressed by the introduction of data quality control procedures now being implemented and memorialized in the EIU Operations Manual. (This is further discussed in Paragraph 56, below.) We also compared traffic stop data between Latino and non-Latino drivers in the samples provided to us.

Paragraph 25.a. prohibits racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where a deputy has reasonable suspicion or probable cause to believe a violation is being or has been committed. The selection of the sample size and the sampling methodology employed for drawing our sample is detailed in Section 7: Traffic Stop Documentation and Data Collection.

We review a sample of 105 traffic stops each reporting period to assess this requirement. Our review of the sample of 105 traffic stops that occurred during this reporting period in Districts 1, 2, 3, 4, and 7, and Lake Patrol indicated that MCSO was following protocol, and that the stops did not violate the Order or internal policies. The District formerly known as District 6 no longer exists, as it is now patrolled by the Queen Creek Police Department, which commenced operating fully in that area on January 11, 2022.

Paragraph 25.b. requires MCSO to provide deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), Sections A-E, address these concerns. The policy specifies that driving under the influence and speeding are

the main causes of traffic collisions and should be the focus of traffic enforcement. In addition, during our site visits, MCSO has advised us that the various communities that contract law enforcement services from MCSO often request that traffic enforcement, including speeding violation enforcement, be conducted in various problem areas. Based on our review of the data provided for this reporting period, the most common traffic stop violations are as follows: 41 stops for speeding above the posted limit (39%); 14 stops for failure to obey official traffic control devices (13%); 19 stops for failure to possess valid registrations or tags (18%); 12 stops for equipment violations (11%); and 18 stops for other moving violations (17%).

As the policy specifically identifies speeding violations as one of the contributing factors of traffic accidents, MCSO deputies have targeted this violation. In our review, we break down the specific traffic violation for each stop and use each traffic stop form completed by deputies during the stop to determine if the stop is justified and fulfills the requirements of this Paragraph. MCSO remains in compliance with this Subparagraph.

Paragraph 25.c. requires MCSO to prohibit the selection of particular communities, locations, or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community. During our inspection, we document the location of every stop and note the GPS coordinates if available. Our review of the sample data covering all MCSO Districts during this reporting period did not indicate that MCSO was targeting any specific area or ethnicity to conduct traffic stops.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.d. requires MCSO to prohibit the selection of which motor vehicle occupants to question or investigate based, to any degree, on race or ethnicity. We reviewed the demographic data of Maricopa County (according to 2020 U.S. Census data, 32% of the population is Latino); and found that the ratio of Latino drivers stopped during this reporting period was lower in comparison to the ethnicity of the population in the County. (See Paragraph 54.e.)

A review of PSB's closed complaint investigations during this reporting period, in relation to traffic stops occurring within the last 12 months, revealed the following complaints that contained allegations that a MCSO deputy treated a driver and a passenger differently based on their race/ethnicity or that the traffic stop was improperly conducted:

- In one incident, in March 2025, it was alleged that a deputy was displaying aggressive behavior in a subtle manner during a traffic stop. PSB's investigation determined that the allegation was false.

- In one incident, in April 2025, it was alleged that a deputy conducted a traffic stop based on the driver's race/ethnicity. PSB's investigation determined that the allegation was false.

- In one incident, in June 2025, it was alleged that a deputy was rude and unprofessional during a traffic stop. PSB's investigation determined that the allegation was false.

We will continue to monitor the closed cases to assess the disposition of such cases.

MCSO has fully implemented body-worn cameras, and we review a sample of the recordings each reporting period to verify if deputies are questioning occupants to determine if they are legally in the country. We did not identify any such events during this reporting period.

During this reporting period, we observed that 28 of the 105 stops occurred during nighttime hours. Our review of the sample data indicated that generally, traffic stops were not based on race or ethnicity and reflected the general makeup of the population of the County. In most instances, the deputies document on the VSCF that they were unable to determine the race/ethnicity and gender of the vehicle occupants prior to the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.e. requires MCSO to prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity. We reviewed a sample of CAD audio recordings and CAD printouts where the dispatcher entered the reason for the stop when advised by the deputy in the field. We also reviewed body-worn camera recordings of deputies making traffic stops. The methodology that we employed to select our cases is described in detail in Section 7. In the cases we reviewed, the CAD audio recordings and the body-worn camera recordings revealed that deputies were not making traffic stops using tactics based on race or ethnicity. MCSO remains in compliance with this Subparagraph.

Paragraph 25.f. requires deputies at the beginning of each stop, before making contact with the vehicle, to verbally contact dispatch and state the reason for the stop unless exigent circumstances make it unsafe for the deputy to contact Communications. When the deputy advises Communications of the location, tag number, and reason for the stop, this information is digitally logged on the CAD printout and it is audio-recorded. (See Paragraph 54.e.) We reviewed 30 CAD audio recordings and the CAD printouts; in each, the deputy advised dispatch of the reason for the stop. Through our reviews of body-worn camera recordings and CAD printouts, we verified that the reason for the stop was voiced prior to contacting the drivers in 30 of the 30 cases we reviewed. For the 75 other cases that were part of our sample, we reviewed the VSCFs and the CAD printouts to ensure that deputies properly advised dispatch of the reason for the stop prior to contacting the violator. In all 75 stops, the deputy properly advised dispatch the reason for the stop. MCSO is in compliance with this Subparagraph.

Paragraph 25.g. prohibits deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed. MCSO employs a series of seven questions on the VSCF to document the circumstances that might require a stop to be prolonged. Deputies are to indicate whether they experienced technological difficulties; whether the stop required the towing of a vehicle; whether the stop involved training; whether the stop involved a language barrier; whether the stop involved a driving under the influence investigation; whether the stop involved issues related to the status of the drivers' license, insurance, or registration; or whether any other issues were experienced during the stop. In each of the stops where the deputies documented these events, the duration of the stop was determined to be reasonable.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.h. requires the duration of each traffic stop to be recorded. The time of the stop and its termination is now auto-populated on the VSCF by the CAD system. To ensure data entry accuracy, MCSO implemented a technical change to the TraCS system on November 29, 2016. The change automatically creates a red field in the stop contact times if the deputy manually changes these times on the VSCF. In our review, we determined that the duration was recorded accurately in all 105 traffic stops. MCSO is in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 25.i. requires that MCSO provide deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification. The Plaintiffs' attorneys and MCSO agreed on acceptable forms of identification, and this information has been included in the Fourth and Fourteenth Amendment training. EA-11 (Arrest Procedures) provides a list of acceptable forms of identification if a valid driver's license cannot be produced. During this reporting period's review of the sample of 105 traffic stops, we identified nine cases where the drivers did not present valid driver's licenses to the deputies. In two of the nine cases, a records check revealed that the drivers did have a valid driver's license. In seven of the nine cases, the drivers either presented an acceptable form of identification or had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses.

In our review of the sample of cases to assess compliance with Paragraph 54.k., searches of persons, we identified 34 cases where the drivers did not present a valid driver's license to the deputies. In 33 of the 34 cases, the drivers either presented an acceptable form of identification, or they had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses. In one case, the driver presented the deputy with an identification card; and a records check revealed that the driver had a valid driver's license.

In our review of the sample of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we identified 30 cases where the drivers did not present a valid driver's license to the deputies. In 28 of the 30 cases, the drivers either presented an acceptable form of identification or had no identification in their possession; and a records check revealed that the drivers did not have valid driver's licenses. In two cases, the drivers did not provide any identification to the deputies; however, a records check revealed that the drivers had valid driver's licenses.

MCSO remains in compliance with this Subparagraph.

Paragraph 25.j. requires MCSO to instruct deputies that they are not to ask for the Social Security Number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report. EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) prohibits deputies from asking for the Social Security Number of any motorist who has provided a valid form of identification. During this reporting period's review of the sample of 105 traffic stops, as well as for Paragraphs 54.k., 25.d., and 54.g., we identified that deputies requested a driver's Social Security Number in incidents that either involved the arrest of the driver for the purpose of completing an Incident Report, or incidents where the driver did not produce a valid form of identification, both of which are permissible under this Subparagraph. MCSO remains in compliance with this Subparagraph.

MCSO remains in compliance with Paragraph 25.

### c. Policies and Procedures to Ensure Bias-Free Detentions and Arrests

*Paragraph 26.* *The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:*

a.      *require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;*

b.      *require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;*

c.      *provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;*

d.      *require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;*

e.      *prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and*

f.      *prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).*

**In Full and Effective Compliance**

To assess compliance with Paragraph 26, we request documentation of arrests and investigations associated with the requirements specified in this Paragraph. In addition to the review of any reported cases, we receive booking lists and criminal citation lists for each month of the reporting period and request a random sample of cases to review.

For the third quarter of 2025, MCSO did not send any arrests that fell within the reporting requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws

**Paragraph 27.**  *The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.*

**In Full and Effective Compliance**

MCSO asserts that it does not have an agency LEAR policy.  We have verified through our document reviews and site compliance visits that MCSO does not have a LEAR policy.

On March 22, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 28.**  *The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:*

a.    *specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;*

b.    *prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more; prohibit officers from initiating a pre-textual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;*

c.    *prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description); prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;*

d.    *unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an*

*individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;*

e.    *prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;*

f.    *Require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.*

**In Full and Effective Compliance**

For this reporting period, there were no reported instances of deputies having contact with Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) for the purpose of making an immigration status inquiry, and there were no reported arrests stemming from any immigration-related investigations, or for any immigration-related crimes. The reviews of documentation submitted for this reporting period indicate that MCSO complied with the reporting requirements related to Paragraph 28. In our reviews of incidents involving contact with the public, including traffic stops, arrests, and investigative stops, we review deputies' actions to verify compliance with this Order.

In addition to the documentation requested from MCSO to determine compliance with this Paragraph, our reviews of documentation provided for other Paragraphs of the Order have found no evidence to indicate violations of this Paragraph. For this reporting period, we reviewed a total of 120 Arrest Reports, 608 traffic stops, 45 Non-Traffic Contact Forms (NTCFs), and 211 Incident Reports. We found no issues of concern as it relates to this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### e. Policies and Procedures Generally

**Paragraph 29.** *MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance due to its failure to comply with longstanding policies and procedures and the policy development process.  For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

MCSO violated this Paragraph by ignoring the established policies that were approved by the Monitor and issued by the Court.  These policies include:

1. GC-17 Attachment A (Discipline Matrix) and B (Categories of Offenses), which delineate the discipline for all misconduct offenses, including Driving Under the Influence (DUI).

2. GH-2 (Internal Investigations), which defines Appointing Authority as "the designated member of Office command staff, appointed by the Sheriff, whose duties include being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard."  Nothing in the policy states that the Appointing Authority falls outside of the command staff.

3. GH-2 (Internal Investigations) (2)(B)(12) provides for the presence of an observer in the interview of a law enforcement officer when there is reasonable belief that the interview could result in dismissal, demotion or suspension: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer."  Accordingly, attorney presence as an observer in a PSB interview, as approved by the Sheriff and Executive Chief Palopoli, was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted.

4. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline.  MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo.

**Paragraph 30.**  *Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV.  These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.*

**Phase 1:**  Not applicable

**Phase 2:**  Not in compliance

MCSO generally continues to provide us, the Plaintiffs' attorneys, and the Plaintiff-Intervenor with drafts of its Order-related policies and procedures prior to publication, as required by the Order.  We, the Plaintiffs' attorneys, and the Plaintiff-Intervenor review the policies to ensure that they define terms clearly, comply with applicable law and the requirements of the Order, and

comport with current professional standards. Once drafts are finalized, MCSO incorporates feedback from us, Plaintiffs' attorneys, and the Plaintiff-Intervenor, and then provides them to us for final review and approval.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that it is no longer in compliance. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

MCSO violated this Paragraph by ignoring the established policies that were approved by the Monitor and issued by the Court. These policies include:

1. GC-17 Attachment A (Discipline Matrix) and B (Categories of Offenses), which delineate the discipline for all misconduct offenses, including Driving Under the Influence (DUI).

2. GH-2 (Internal Investigations), which defines Appointing Authority as "the designated member of Office command staff, appointed by the Sheriff, whose duties include being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard." Nothing in the policy states that the Appointing Authority falls outside of the command staff.

3. GH-2 (Internal Investigations) (2)(B)(12) provides for the presence of an observer in the interview of a law enforcement officer when there is reasonable belief that the interview could result in dismissal, demotion or suspension: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." Accordingly, attorney presence as an observer in a PSB interview, as approved by the Sheriff and Executive Chief Palopoli, was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted.

4. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline. MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo.

*Paragraph 31. Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.*

**In Full and Effective Compliance**

GA-1 indicates that Office personnel shall be notified of new policies and changes to existing policies via Briefing Boards and via the HUB, Maricopa County's adaptation of the online training software program, Cornerstone, that MCSO implemented in July 2017 to replace its E-Policy system. Employees are required to complete personal attestations that indicate that they have read and understand policies; the HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors. Per GA-1, "Prior to some policies being revised, time-sensitive changes are often announced in the Briefing Board until the entire policy can be revised and finalized." As noted previously, we recognize the authority of Briefing Boards and understand their utility in publishing critical policy changes quickly; but we have advised MCSO that we generally do not grant Phase 1 compliance for an Order requirement until the requirement is memorialized in a more formal policy.

During this reporting period, MCSO issued or issued revisions of the following Order-related policies: CP-2 (Code of Conduct); ED-3 (Review of Cases Declined for Prosecution); GB-2 (Command Responsibility); GC-13 (Awards); and GF-5 (Incident Report Guidelines). The agency also issued several Briefing Boards and Administrative Broadcasts that touched on Order-related topics and revised the language of General Orders. MCSO did not publish any operations manuals during this reporting period.

On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 32. The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedural violations. The MCSO shall apply policies uniformly.*

**Phase 1:** In compliance

- CP-2 (Code of Conduct), most recently amended on September 3, 2025.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.
- GC-16 (Employee Grievance Procedures), most recently amended on January 16, 2025.
- GC-17 (Employee Disciplinary Procedures), most recently amended on February 22, 2024.
- Administrative Services Division (ASD) Operations Manual, most recently amended on November 26, 2024.
- Professional Standards Bureau (PSB) Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of administrative misconduct investigations submitted to our Team for this Paragraph. During our reviews, we have continued to note that the investigations conducted by PSB have generally been well-written and arrived at the appropriate findings. While investigations conducted by Districts have improved during some quarters, they have not, as of yet, maintained improved compliance over multiple reporting periods.

MCSO has trained all investigators who conduct misconduct investigations; and during our site visits, we have continued to meet with the Professional Standards Bureau (PSB) and District and Division command personnel to provide them with information regarding the cases that we have found deficient in structure, format, investigation, or reporting requirements.

During this and the last 21 reporting periods, we have also met during our site visits with the Deputy Chiefs responsible for oversight of Districts and Divisions outside of PSB to discuss our concerns with the quality of investigations being conducted by their personnel. These meetings have resulted in useful discussion about needed improvement in the quality of investigations and their timely completion.

During the last reporting period, we reviewed 80 administrative misconduct investigations to determine overall compliance with this Paragraph and made our compliance findings based on the investigative and administrative requirements for the completion of these investigations. PSB conducted 46 of these investigations, and District personnel outside of PSB conducted the remaining 34. Overall compliance for the 80 investigations we reviewed for this Paragraph was 31%.

During this reporting period, we reviewed 73 administrative misconduct investigations to determine compliance with this Paragraph. Sworn supervisors with the rank of sergeant or higher completed all the investigations conducted at the District level. Fifty-nine of the investigations resulted from external complaints. Fourteen were internally generated. All but one of the investigations were initiated after May 17, 2017, when MCSO revised its internal investigation policies; and after the completion of the 40-hour Misconduct Investigative Training that concluded in late 2017.

During this reporting period, we reviewed 20 investigations submitted for compliance with this Paragraph that had been completed by District or Division personnel outside PSB. Of the 20 investigations conducted outside of PSB and reviewed for this Paragraph, eight (40%) were completed and forwarded to PSB within the internally required 60-day timeframe, a decrease from 56% during the last reporting period. However, as noted throughout this report, compliance for the completion of investigations is no longer based on the investigative timeframe – but on the full completion of the investigation within 180 days, including notifications to complainants about the outcome. Twelve (60%) of the investigations were finalized within the 180-day timeline a slight decrease from 62% the last reporting period.

We found 16 (80%) of the 20 investigations we reviewed for this reporting period in investigative compliance. This is an increase in investigative compliance from 76% during the last reporting period. Based on the investigative compliance and timeliness, 10 (50%) of the 20 investigations were in full compliance, an increase from 44% the last reporting period.

During this reporting period, five of the investigations conducted outside of PSB were cases that would normally be assigned to Districts and Divisions by PSB. All five of these cases were in investigative compliance, an increase from 84% during the last reporting period.

Fifteen of the cases were backlog cases assigned as part of the PSB8 external training. This training included classroom training on the completion of administrative misconduct investigations and investigative plans and was followed with the assignment of a case to the attendees for completion. Of these 15, four 20% were not in investigative compliance, a decrease in noncompliance from 33% the last quarter. Again this quarter, none of these cases were identified as deficient in the Districts or Divisions, despite the fact that District lieutenants and Captains also attended some or all of the training and some of them have previously reviewed IA investigations. PSB provided investigative feedback on improvements needed in three of the four but stopped short of finding them deficient and requiring corrections. As we noted during the last reporting period, while these investigations were completed as part of training, they were also real complaints made by real people; and they deserved the same level of review and corrections as any other investigation, which did not happen. It is our understanding from PSB that class attendees were told that they would not receive deficiency memos for these cases but would instead be provided feedback only if there were any concerns. This is the reason PSB did not issue any deficiency memorandums. We will again discuss our concerns regarding the PSB8 cases during our next site visit. We also note that our intent was, and is, to review all of the PSB8 training cases for compliance with the Orders.

During our October 2024 site visit, the Executive Chief with oversight for Districts and Divisions advised us that moving forward, the review of District and Division misconduct investigations would end with the District/Division Commander; that is, cases would no longer be reviewed at the Deputy Chief level. According to the Executive Chief, although this oversight was necessary two-and-one-half years ago when it began, the process had evolved to the extent that this oversight was no longer necessary. The Executive Chief reported that MCSO would rely on District/Division Commanders to provide proper oversight. He went on to say that he did not believe it was necessary to have Bureau Chiefs continue to review misconduct investigations.

Since our October 2024 site visit, the command structure at MCSO has undergone some changes. During our February 2025 site visit, the new Executive Chief with oversight of Divisions and Districts outside of PSB reaffirmed the decision of the previous Executive Chief, that the review of investigations at the Deputy Chief would no longer be required, except on a case-by-case basis based on the judgment of the involved Deputy Chief.

We continue to believe that the increased oversight at the Deputy Chief level played a significant role in the overall improvement of District and Division cases; and on multiple occasions, noted that deficiencies had been identified, addressed, and corrected at this level. The proper completion of misconduct investigations remains one of the most significant compliance issues still facing MCSO, and we remain concerned that MCSO has not continued the same level of oversight that we have seen over the past several years, particularly given the positive results it achieved. We acknowledge that it was MCSO's decision to provide this increased level of oversight to attempt improve these investigations and that there is no requirement that the agency do so.

For this and the last reporting period, District command personnel have not provided any documentation that they identified or even attempted, where possible, to correct any of the investigations we have found deficient during these two quarters. We urge MCSO to take some action to again provide increased attention and oversight to cases completed outside of PSB. As there is again a new Executive Chief with oversight for Districts and Divisions, we will discuss this topic during our next site visit.

The overall investigative quality for cases investigated by PSB and reviewed by our Team for compliance with this Paragraph has remained high for many reporting periods. For this reporting period, PSB conducted 53 of the investigations we reviewed for compliance with this Paragraph, compared to 46 during the last reporting period. Except for timely completion, 47 (89%) of the investigations were found compliant compared to 96% during the last reporting period. This is the first time in numerous quarters that PSB has fallen below at least 95% investigative compliance. We will discuss this with MCSO during our next site visit to determine what factors may have led to this unusual decrease in compliance. Seven investigations (13%) were in full compliance with all requirements, including timelines. This is a decrease in compliance from 22% during the last reporting period. We note that compliance is now based on the 180-day timeline for full completion and closure of an investigation rather than the 85-day investigative timeline previously used to determine compliance with timeliness.

Of the 80 total investigations we reviewed to determine compliance with this Paragraph, eight (15%) were finalized and closed within the 180-day timeframe; a decrease from 31% during the last reporting period. As we have previously noted in our reports, general workload issues are insufficient justification for the failure to complete investigations in a reasonably timely manner. Overall compliance for the 73 investigations we reviewed for this Paragraph was 27% a decrease from 31% during the last quarter.

The Fourth Order modified timeline compliance determinations for administrative misconduct investigations. As noted here and in other sections of this report, for administrative misconduct investigations closed on or after September 1, 2024, timeline compliance is no longer based on investigative case completion – but on the full completion of the investigation including all findings, discipline, and complainant notifications. All of the investigations we reviewed for this Paragraph for this reporting period were finalized and closed on or after September 1, 2024.

During our April 2025 site visit, members of our Team visited District facilities. In general, District supervisors were complimentary of the efforts by PSB to provide feedback on investigations completed in the Districts and provide guidance when necessary. During these visits, we did not hear any concerns from District staff about the timelines in place for District cases. However, personnel in several Districts advised us that they believe that more cases should be converted to PSB Diversions – and they specifically cited rudeness complaints, in circumstances where they believed there was clear and convincing evidence that the violation did not occur. Yet externally generated rudeness/unprofessional conduct complaints are currently ineligible to be converted to Diversions, pursuant to GC-17 (Employee Disciplinary Procedures).

During our July 2025 site visit, members of our Team visited District facilities. A continuing theme in the Districts from our April 2025 site visit was the belief that more cases, particularly rudeness complaints, should be diverted when there is clear and convincing evidence that the violation did not occur. We discussed this with District and Division command personnel during our April 2025 site visit and asked that they remind their personnel that external rudeness complaints are not eligible to be diverted. In general, most of the District personnel contacted believed PSB provided sufficient feedback, but several referenced the ongoing delay in the completion of misconduct investigations, which has an adverse impact on their personnel.

During visits to District facilities during our October 2025 site visit, our Team again heard concerns from District personnel that more cases, particularly rudeness complaints, should be diverted when there is clear evidence the conduct did not occur. Again, we provided follow-up in our District/Division site visit meeting that, based on current MCSO policies, externally generated rudeness complaints are not eligible for diversion. We appreciate that in our recent review of the next PSB8 external training proposal, this concern will be addressed in the training. Generally, District personnel found their contact with PSB to be sufficient and did not identify concerns with either the timeframes for investigations or the use of the investigative plan.

This Paragraph also requires that personnel be held accountable for policy and procedural violations and that the MCSO apply policies uniformly. We have found through our inquiry that command staff committed policy and procedural violations and failed to uniformly apply policies. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

MCSO violated this Paragraph by ignoring the established policies that were approved by the Monitor and issued by the Court. These policies include:

1. GC-17 Attachment A (Discipline Matrix) and B (Categories of Offenses), which delineate the discipline for all misconduct offenses, including Driving Under the Influence (DUI).

2. GH-2 (Internal Investigations), which defines Appointing Authority as "the designated member of Office command staff, appointed by the Sheriff, whose duties include being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard." Nothing in the policy states that the Appointing Authority falls outside of the command staff.

3. GH-2 (Internal Investigations) (2)(B)(12) provides for the presence of an observer in the interview of a law enforcement officer when there is reasonable belief that the interview could result in dismissal, demotion or suspension: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." Accordingly, attorney presence as an observer in a PSB interview, as approved by the Sheriff and Executive Chief Palopoli, was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted.

4. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline. MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo.

**Paragraph 33.** *MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.*

**Phase 1:** In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on January 23, 2025.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 22, 2024.

**Phase 2:** Not in compliance

The investigations that we review for compliance with this Paragraph do not include biased policing complaints involving the Plaintiffs' class. Those investigations have additional compliance requirements; we discuss them in Paragraphs 275-283.

During this reporting period, we reviewed 25 investigations where alleged bias did not involve members of the Plaintiffs' class. Twenty-three of the investigations were conducted by PSB and two were completed by contract vendor Jensen Hughes. Five of these resulted in sustained findings of misconduct. Four were sustained for misconduct unrelated to bias, and we agree with these findings. One case was sustained by PSB for bias comments, and we agree with this finding. This sustained finding was later overturned and found not sustained by the Appointing Authority.

We disagree with his decision.  The remaining 20 investigations did not result in any sustained findings, and we agree with the findings in all 20.

Of the 25 investigations reviewed for this Paragraph, four (16%) were in full compliance with all requirements for conducting administrative misconduct investigations.  Sixteen (64%) were not compliant only due to timeliness.  Five (20%) were noncompliant due to investigative deficiencies including failures to conduct all necessary interviews, address all potential misconduct, and conduct a thorough investigation.  We will discuss these cases with MCSO during our next site visit.

While discriminatory policing allegations that involve members of the Plaintiffs' class are not reported in this Paragraph, MCSO completed three investigations for this reporting period that were determined to be Class Remedial Matters.  (See Paragraphs 275-288.)

*Paragraph 34.  MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews.  MCSO shall revise any deficient policy as soon as practicable.*

**In Full and Effective Compliance**

On an annual basis, MCSO reviews all critical policies and all policies relevant to the Court Orders for consistency with Constitutional policing, current law, and professional standards.

During this reporting period, MCSO continued its annual reviews, submitting 11 (23%) of the 48 required policies to our Team.  MCSO submitted ED-2 (Covert Operations); ED-3 (Review of Cases Declined for Prosecution); GB-2 (Command Responsibility); GC-4 (Detention/Civilian Employee Performance Appraisals); GC-4(S) (Sworn Employee Performance Appraisals and Management); GC-13 (Awards); GD-9 (Litigation Initiation, Legal Hold, and Document Production Notices); GF-5 (Incident Report Guidelines); GJ-3 (Search & Seizure); GJ-27 (Sheriff's Posse Program); and GJ-35 (Body-Worn Cameras).

On June 3, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

## Section 5: Pre-Planned Operations

***Paragraph 35.*** *The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we previously verified that the Criminal Employment Unit (CEU) was disbanded and removed from the Special Investigations Division organizational chart. The Human Smuggling Unit (HSU) was also disbanded, and personnel were reassigned to the Anti-Trafficking Unit (ATU).

During our review of the arrests made by the Special Investigations Division ATU between March 2015-March 2017, we did not note any arrests for immigration or human smuggling violations. The cases submitted by MCSO and reviewed for the ATU were primarily related to narcotics trafficking offenses.

MCSO reported in April 2017 that it had disbanded the Anti-Trafficking Unit and formed a new Unit, Fugitive Apprehension and Tactical Enforcement (FATE). The primary mission of FATE is to locate and apprehend violent fugitives. We reviewed FATE's mission statement and objectives, as well as the organizational chart for the Special Investigations Division. MCSO had removed the ATU from the organizational chart, and the mission of FATE did not include any reference to the enforcement of Immigration-Related Laws.

The revised organizational chart for SID and documentation MCSO provided regarding the implementation of FATE supported that the ATU no longer existed, and that there were no specialized Units in MCSO that enforced Immigration-Related Laws.

We previously received and reviewed the Special Investigations Division Operations Manual and organizational chart. Both confirmed that MCSO has no specialized Units that enforce Immigration-Related Laws, that the Human Smuggling Unit (HSU) was disbanded, and the Anti-Trafficking Unit (ATU) no longer exists.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 36.*** *The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MCSO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.*

**In Full and Effective Compliance**

Since the requirements for conducting Significant Operations were implemented, MCSO has reported conducting only one Significant Operation that invoked the requirements of this Paragraph. MCSO conducted "Operation Borderline" from October 20-27, 2014, to interdict the flow of illegal narcotics into Maricopa County. MCSO met all the requirements of this Paragraph during the operation.

In February 2016, we became aware of "Operation No Drug Bust Too Small" when it was reported in the media and requested details on this operation from MCSO. After reviewing the documentation MCSO provided, we were satisfied that it did not meet the reporting requirements of this Paragraph.

In October 2016, we became aware of "Operation Gila Monster" when it was reported in the media. According to media reports, this was a two-week operation conducted by a special operations Unit in MCSO and was intended to interdict the flow of illegal drugs into Maricopa County. We requested all documentation regarding this operation for review. The documentation indicated that MCSO conducted this operation from October 17-23, 2016. The documentation MCSO provided was sufficient for us to determine that this operation did not meet the reporting criteria for this, or other Paragraphs, related to Significant Operations. The Plaintiffs also reviewed the documentation submitted by MCSO on this operation and agreed that the operation did not invoke the requirements of this Paragraph. We and the Plaintiffs noted that "Operation Gila Monster" involved traffic stops of Latinos, and that those arrested were undocumented Latinos.

Since October 2014, MCSO has continued to report that it has not conducted any Significant Operations. In addition, we have not learned of any potential Significant Operation through media releases or other sources during this reporting period. We will continue to monitor and review any operations we become aware of to ensure continued compliance with this, and other Paragraphs related to Significant Operations.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 37.  The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in Section IV within 90 days of the Effective Date.  In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order.  Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.*

**In Full and Effective Compliance**

In late 2014, we reviewed all the documentation submitted by MCSO regarding the Significant Operation conducted from October 24-27, 2014.  This operation was intended to interdict the flow of illegal narcotics into Maricopa County and fully complied with the requirements of this Paragraph.

MCSO continues to report that it has not conducted any operations that invoke the requirements of this Paragraph since October 2014.

During this reporting period, we did not become aware of any Significant Operations conducted by MCSO.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**(Note: Unchanged language is presented in *italicized font*.  Additions are indicated by underlined font.  Deletions are indicated by ~~crossed-out font~~.)**

*Paragraph 38.  If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:*

a.     *documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);*

b.     *information that triggered the operation and/or selection of the particular site for the operation;*

c.     *documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;*

d.     *documentation of command staff review and approval of the operation and operations plans;*

e.     *a listing of specific operational objectives for the patrol;*

f.     *documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;*

g.      *any operations plans, other instructions, guidance or post-operation feedback or debriefing provided to participating MCSO Personnel;*

h.      *a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;*

i.      *arrest lists, officer participation logs and records for the patrol; and*

j.      *data about each contact made during the operation, including whether it resulted in a citation or arrest.*

**In Full and Effective Compliance**

Since the initial publication of GJ-33, MCSO has reported that it has conducted only one Significant Operation, "Operation Borderline," in October 2014. At the time of this operation, we reviewed MCSO's compliance with policy; attended the operational briefing; and verified the inclusion of all the required protocols, planning checklists, supervisor daily checklists, and post-operation reports. MCSO was in full compliance with this Paragraph for this operation. Since October 2014, MCSO has not reported that it conducted any Significant Operations invoking the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 39.**  *The MCSO shall hold a community outreach meeting no more than 40 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.*

**In Full and Effective Compliance**

The Amendments to the Supplemental Permanent Injunction/Judgment Order (Document 2100), issued on August 3, 2017, returned the responsibility for compliance with this Paragraph to MCSO.

During this reporting period, MCSO did not report conducting any Significant Operations that would invoke the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 40.***   *The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation.   In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs.   To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.*

**In Full and Effective Compliance**

Since MCSO first developed GJ-33 (Significant Operations) in 2014, MCSO has reported conducting only one operation, "Operation Borderline," that required compliance with this Paragraph.   We verified that MCSO employed the appropriate protocols and made all required notifications.   MCSO was in full compliance with this Paragraph during this operation.

Based on a concern raised by the Plaintiffs, and to provide clarification regarding the portion of this Paragraph that addresses the requirement for MCSO to notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operations involving "the arrest of or more persons," we requested during our October 2015 site visit that MCSO provide a statement regarding this requirement each month.   MCSO began including this information in November 2015.

MCSO has not reported conducting any operations that meet the reporting requirements for this Paragraph since October 2014.   During this reporting period, we did not learn of any traffic-related enforcement or Significant Operations conducted by MCSO that would invoke the requirements of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## Section 6: Training

**COURT ORDER VII.  TRAINING**

*a.  General Provisions*

***Paragraph 41.***  *To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.*

***Paragraph 42.***  *The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area.  Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.*

**Phase 1:**  In compliance

- GG-1 (Peace Officer Training Administration), most recently amended on November 26, 2024.

- GG-2 (Detention/Civilian Training Administration), most recently amended on November 26, 2024.

- Training Division Operations Manual, most recently amended on January 11, 2024.

**Phase 2:**  In compliance

MCSO uses three types of instructors to deliver Order-related training:  They are either assigned to the Training Division as full-time staff; assigned to field assignments outside of the Training Division; or are paid vendors.  We approve instructors presenting training on legal matters for their compliance with the requirements of this Paragraph.  The Training Division electronically maintains individual instructor folders for Training Division staff, field instructors, Field Training Officers (FTOs), and vendors.  MCSO policy requires that instructor folders include annually updated CVs, General Instructor (GI) certificates, and either an annual or 30-day Misconduct and Disciplinary Review, as applicable.  Additionally, instructors who have received prior sustained discipline or who are subject of a pending Professional Standards Bureau (PSB) investigation may request a Waiver of Presumptive Ineligibility for approval to teach from the Training Division Commander.  A waiver request should provide the Training Division Commander with ample justification to overcome presumptive ineligibility.  Waiver requests require the Training Division Commander and the PSB Commander to discuss and produce written justifications for the approval or denial of each request.  We verify compliance with this Paragraph by reviewing all instructor folders, waiver requests, and justifications.

During this reporting period, MCSO submitted 35 individuals for General Instructor (GI) and nine individuals for FTO consideration.  All 44 personnel met the GG-1 criteria.

During this reporting period, MCSO conducted PSB checks for instructors of Body-Worn Camera (BWC), BlueTeam 2 (BT2), Early Identification System (EIS), Employee Performance Appraisals (EPA), Effective Employee Performance Management (EEPM), and the MCSO Internal Investigation Training (PSB40). All personnel met GG-1 criteria. MCSO conducted third quarter PSB checks for 54 sworn FTOs. All personnel met the requirements of GG-1.

During this reporting period, the Training Division conducted five instructor observations.

MCSO remains in compliance with this Paragraph.


***Paragraph 43.*** *The Training shall include at least 60% live training (i.e., with a live instructor), which includes an interactive component, and no more than 40% on-line training. The Training shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.*

**In Full and Effective Compliance**

We verify compliance with this Paragraph by reviewing all individual test failures; individual retests; failure remediation efforts and test analyses by training class, for both live and HUB-delivered Order-related training.

During this reporting period, MCSO delivered the following programs: 2022 Fourth and Fourteenth Amendment and Bias-Free Policing classroom training; 2024 BlueTeam 1 Civilian (BT1) HUB training; 2021 BlueTeam 2 Sworn/Detention (BT2) classroom training; 2024 Early Identification System (EIS) classroom training; 2017 Employee Performance Appraisal (EPA) classroom training; 2024 Effective Employee Performance Management (EEPM); 2024 Body-Worn Camera (BWC) classroom training; and the 2023 TraCS.

MCSO delivered the 2022 Fourth and Fourteenth Amendment and Bias-Free Policing classroom training during this reporting period to 52 personnel (17 sworn, three civilian, five DSA, 27 Posse). Two personnel required test remediation.

MCSO did not deliver the 2025 ACT during this reporting period.

MCSO delivers the 2024 BT1 Civilian HUB training during all reporting periods.

MCSO delivered the 2021 BT2 Sworn/Detention classroom training six times during this reporting period to 176 personnel (17 sworn, 147 Detention, 12 DSA). Three personnel needed test remediation.

MCSO delivered the 2024 BWC classroom training twice during this reporting period to 21 personnel (15 sworn, 6 DSA). One person needed test remediation.

MCSO delivered the 2024 EEPM classroom training once during this reporting period to two personnel (one sworn, one civilian. No personnel needed test remediation.

MCSO delivered the 2024 EIS classroom training once during this reporting period to seven civilian personnel. No personnel needed test remediation.

MCSO delivered the 2023 EPA classroom training once during this reporting period to seven civilian personnel.  No personnel needed test remediation.

MCSO did not deliver the 2025 SRELE classroom training during this reporting period.

MCSO delivered the 2023 TraCS classroom training three times during this reporting period to 26 personnel (17 sworn, seven DSA, two civilians).  No personnel needed test remediation.

MCSO did not deliver the 2021 TraCS for Supervisors classroom training during this reporting period.

MCSO did not deliver the 2023 TraCS for Posse during this reporting period.

MCSO delivered eight of 14 Order-related training programs during this reporting period.  The BT1 Civilian is HUB delivered.  Each of these was delivered in the classroom (57% classroom training).

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


***Paragraph 44.*** *Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order.  Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training.  Attendees shall sign in at each live session.  MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.*

**In Full and Effective Compliance**

The Training Division keeps a three-month Training Calendar.  MCSO posts the Master Training Calendar to the agency's website to inform the public of tentative training dates, classes, and locations.  The calendar displays 90-day increments and includes a legend specifically naming Order-related training.

Master Personnel Rosters document the number of personnel requiring Order-related training.  MCSO reported that 555 sworn members, 53 reserve members, 191 Posse members (42 Qualified Armed Posse [QAP]), 39 Intermediate, 110 Basic), 18 DSAs, 1,366 Detention members, and 948 civilian employees should have received Order-related instruction by the end of this reporting period.  These categories vary by reporting period, due to attrition in the organization.  All MCSO employee categories are still within compliance assessment levels for all Order-related training.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 45.*    *The Training may incorporate adult-learning methods that incorporate roleplaying scenarios, interactive exercises, as well as traditional lecture formats.*

**In Full and Effective Compliance**

MCSO continues to look for and incorporate adult-learning methods in its curricula – including an increased use of videos, both externally and internally created.  We have also noted new learning activities designed to change with each iteration of the curriculum and address issues specific to the Plaintiffs' class and others.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 46.*  *The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV.  The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our virtual July site visit, we discussed the status of all Order-required training curricula.  The following curricula are under review or development for 2025 delivery:

The 2022 Fourth and Fourteenth Amendment and Bias-Free Policing Training received its 2025 review.

The 2025 ACT is under development.

The 2024 BWC is currently receiving it's 2025 review to update and include scenarios involving Posse and DSA personnel.  During our October site visit inspections of body-worn camera footage and related documentation at the Training Academy, we continued to note instances in which Posse members fail to activate and deactivate their body-worn cameras when required.  MCSO's continued delay revising this curriculum to cater to Posse and DSA personnel has adversely affected the agency's compliance with this Paragraph.

The 2024 BT1 HUB delivery received its 2025 review.

The 2023 BT2 is undergoing its 2025 review.

The 2024 EIS for Supervisors (10-hour) received its 2025 review.

The 2024 EPA is undergoing its 2025 review.

The 2024 EEPM received its 2025 review.

The 2025 SRELE is under development.

The 2023 TraCS is undergoing its 2025 review.

The 2021 TraCS for Supervisors is undergoing its 2025 review.

The 2023 TraCS for Posse is undergoing its 2025 review.

The 2021 Complaint Reception and Processing curriculum is receiving a 2025 review to include a PPT style upgrade.

The 2025 PSB40 was previously approved.

The 2025 PSB8 Internal is being developed.

The 2025 PSB8 External is being developed.

During our October site visit, we visited the Districts and the Training Academy to continue our reviews of BWC recordings of DSA and Posse personnel for compliance with GJ-35 (Body-Worn Cameras) and GJ-27 (Sheriff's Posse Program), Attachment A, and their BWC training. We provided the Training Academy with a list of 20 randomly selected Posse, and 15 randomly selected DSA BWC recordings by MC number. For each event, consistent with policy, we wished to see the activation of the BWC upon notification to the Communications Division when responding to aid on a call, the notification to the Communications Division when the member is relieved from the scene, and when the contact with members of the public has concluded, or the event has ended. Additionally, we look to see sworn deputy direction provided to Posse members aiding in a patrol function or the assist to a Division or District in Office-related functions. MCSO continues to disagree with our interpretation of the existing policy language. We continue to see and document failures by both DSA and Posse personnel to activate BWCs concurrent with the Communications Division advisement of assignment, and the required notification to the Communications Division before BWC deactivation. These failures adversely impact the ability of supervisors to ensure the appropriate wear and use of a body-worn camera during their shift participation. These failures to adhere to existing policy are the basis of our repeated recommendations to the Training Division to change the BWC training learning activities to be specific to the duties of the DSA and Posse personnel. The Training Division is currently revising the BWC Training curriculum.

During our October inspection, we again viewed these recordings, along with Training Division, Policy Division, CID personnel, defense counsel, and members of the Plaintiffs' team. Of the 20 Posse incidents selected, only eight, or 40%, had videos available. Of the eight videos we reviewed, none displayed satisfactory compliance with policy requirements by the Posse personnel. Additionally, we saw certain Posse personnel who we believe are not associated with the MCSO, responding to calls for service. We are requesting added documentation to confirm this observation and will revisit this issue during our upcoming site visit.

We continue to express concern about Patrol Assistance Posse personnel's failure to follow MCSO policy and some sworn deputy personnel's failure to direct the assisting Posse personnel's actions. These failures adversely affect the supervisory span of control – but we are also troubled that MCSO's interpretation of the relevant policy language adversely affects the proper training and use of these personnel. When aiding sworn law enforcement personnel in the delivery of Patrol Assistance services, there are no activities that can be classified as "non-law enforcement activities," and the policy specifies that it only applies to Posse volunteering in a patrol assistance function. MCSO incorrectly conflates the Patrol Assistance function (Intermediate and QAP Posse members who volunteer in a patrol environment) who are required to use a body-worn camera, with activities assigned to Community Based Assistance (Intermediate Posse members who volunteer in a "non-patrol environment" who are not required to use a body-worn camera.

We believe that, in every instance, there should be a BWC recording associated with an MC number unless there is a body-worn camera malfunction while a Posse member in a Patrol Assistance function. Posse members are volunteers who, by law, do not have enforcement authority. MCSO has elected to use individuals who are Intermediate Posse and who volunteer for a Patrol Assistance function. It is vital for safe law enforcement operations – not only for MCSO personnel, but for the public as well – that these Posse personnel assigned to the Patrol Assistance function consistently document their actions by their body-worn cameras.

When Posse members arrive on a call for service with sworn deputies, the Posse members must follow the directions given by the deputies and record all actions with their body-worn cameras. We continue to see instances of deputies and supervisors who do not provide any direction to Posse members; and it is clear that patrol supervisors, deputies and Patrol Assistance Posse members lack a clear understanding of this mandate.

During our October reviews, we continued to see Posse personnel responding to calls for service without any direction or instruction provided by patrol supervisors or sworn deputies present. This troubling failure was also seen during a body-worn camera review of a tactical clearing of a building where Patrol Assistance Posse members were allowed to take part and engage in tactical operations absent any patrol supervisor or sworn deputy direction.

We will continue to review BWC recordings for DSA and Posse personnel during our site visits.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion. As a result of our recent findings and concerns, we are continuing to defer compliance for this Paragraph.

***Paragraph 47.*** *MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.*

**In Full and Effective Compliance**

MCSO conducts annual curriculum revisions and updates to keep current with developments in the law and to address feedback from us, the Plaintiffs, the Plaintiff-Intervenor, and MCSO personnel.

The Training Division routinely supplies all new and revised lesson plans for our and the Parties' review. These reviews address the requirements of this Paragraph. During our July site visit, we reviewed a sample of Posse personnel's body-worn camera (BWC) recordings. The recordings continue to reinforce that Posse personnel are not versed in the activation and deactivation procedures as specified in GJ-27 (Sheriff's Posse Program), Attachment A. During our October site visit, we again discussed the existing learning activities contained within the BWC Lesson Plan. The Training Division advised us that a revised lesson plan was near completion with an expanded lesson plan and learning activities, which include specific activities associated with Posse and DSA personnel to reinforce activation and deactivation procedures as they apply to these personnel. We have advised MCSO that the agency's continued failure to revise this material will adversely affect the agency's compliance with this Paragraph. We recommend that MCSO consider the development and delivery of a refresher BWC curriculum specific to Patrol function Posse and DSA personnel to attempt to resolve this issue.

We will continue to advise MCSO upon first review of a training offering if we do not consider it to be enhanced, as referenced in the current Constitutional Policing Plan. (See Paragraph 70.) We remind MCSO that training programs developed in response to First Order requirements do not constitute enhanced training programs under the CPP and Paragraph 70.

MCSO should expect that we and the Parties will continue to observe training sessions and provide feedback.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### b. Bias-Free Policing Training

**Paragraph 48.** *The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training. MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSA) receive this Court-ordered training within the first 90 days of their employment or volunteer service.

As previously reported, MCSO delivered the 2022 Fourth and Fourteenth Amendment and Bias-Free Policing classroom training during this reporting period to 52 personnel (17 sworn, three civilian, five DSA, 27 Posse).

The 2025 ACT was not delivered during this reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 49.** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.    *definitions of racial profiling and Discriminatory Policing;*

b.    *examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;*

c.    *the protection of civil rights as a central part of the police mission and as essential to effective policing;*

d.    *an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;*

e.    *constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;*

f.    *MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

g.    *MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;*

h.    *police and community perspectives related to Discriminatory Policing;*

i.  *the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;*

j.  *methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;*

k.  *methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;*

l.  *methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;*

m.  *cultural awareness and how to communicate with individuals in commonly encountered scenarios;*

n.  *problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;*

o.  *the benefits of actively engaging community organizations, including those serving youth and immigrant communities;*

p.  *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

q.  *background information on the Melendres v. Arpaio litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio, the parameters of the Court's permanent injunction, and the requirements of this Order; and*

r.  *Instruction on the data collection protocols and reporting requirements of this Order.*

**In Full and Effective Compliance**

As previously reported, MCSO did not deliver the 2022 Fourth and Fourteenth Amendment and Bias-Free Policing classroom training during this reporting period.

During this reporting period, the 2025 ACT was approved for delivery and MCSO conducted a Train-the-Trainer.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### c. *Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws*

***Paragraph 50.*** *In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.*

**In Full and Effective Compliance**

MCSO has combined the Order required Bias-Free Policing Training and the Training on Detentions, Arrests, and the Enforcement of Immigration Laws into a single 20-hour training class titled Fourth and Fourteenth Amendment Training. MCSO mandates that all new deputies, Posse members, and Deputy Service Aides (DSAs) receive this Court-ordered training within the first 90 days of their employment or volunteer service.

As reported in Paragraph 43, MCSO delivered the 2022 Fourth and Fourteenth Amendment and Bias-Free Policing classroom training during this reporting period to 52 personnel (17 sworn, three civilian, five DSA, 27 Posse).

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 51.*** *The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:*

a.  *an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;*

b.  *guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;*

c.  *guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;*

d.  *constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;*

e.  *MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;*

f.  *the circumstances under which a passenger may be questioned or asked for identification;*

g.   *the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;*

h.   *the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;*

i.   *the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;*

j.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;*

k.   *a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;*

l.   *an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;*

m.   *the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;*

n.   *Provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in Melendres v. Arpaio and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and*

o.   *Instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.*

**In Full and Effective Compliance**

The Fourth and Fourteenth Amendment Training curriculum has undergone its 2025 annual review.

The 2025 ACT was approved for delivery during this reporting period.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### d. Supervisor and Command Level Training

***Paragraph 52.***   *MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order.  MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order.  In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter.  As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.*

**In Full and Effective Compliance**

The 2025 SRELE classroom training remains under development.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 53.***   *The Supervisor-specific Training shall address or include, at a minimum:*

a.      *techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;*

b.      *how to conduct regular reviews of subordinates;*

c.      *operation of Supervisory tools such as EIS;*

d.      *evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;*

e.      *how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;*

f.      *how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;*

g.      *incorporating integrity-related data into COMSTAT reporting;*

h.      *how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;*

i.      *how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;*

j.      *how to respond to and investigate allegations of Deputy misconduct generally;*

k.      *evaluating Deputy performance as part of the regular employee performance evaluation; and*

l.    *building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.*

**In Full and Effective Compliance**

As previously reported, the 2025 SRELE remains under development.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## Section 7: Traffic Stop Documentation and Data Collection

**COURT ORDER VIII.    TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW**

For Paragraphs 54 and 55, in particular, we request traffic stop data from MCSO. The following describes how we made that request and how we handled the data once we received it. These data may also be referred to in other areas of Section 7 and the report as a whole.

In selecting traffic stop cases for our compliance review, we select a sample of 35 cases per month (or 105 cases per quarter). Our original selection of a sample size of 35 cases was based on information from MCSO TraCS data that reported the average number of traffic stops per month was fewer than 2,000 during the April 2014-June 2015 period when TraCS data were first available. The selection of 35 cases reflects a sample based on this average per month. This gave us a 95 percent confidence level (the certainty associated with our conclusion).

We continue to pull our monthly sample of traffic stop cases from the MCSO's five Districts (Districts 1, 2, 3, 4, and 7) and Lake Patrol. As noted previously, District 6 is no longer operational as of January 11, 2022, as the Queen Creek Police Department commenced full operations and is now the primary law enforcement agency for that jurisdiction. Once we received files each month containing traffic stop case numbers from MCSO, denoting from which area they came, we selected a sample of up to 35 cases representing the areas and then selected a subsample averaging 10 cases, from the 35 selected cases, to obtain CAD audiotapes and body-worn camera recordings. Our sampling process involved selecting a sample of cases stratified by the areas according to the proportion of specific area cases relative to the total area cases. Stratification of the data was necessary to ensure that each area was represented proportionally in our review. Randomization of the cases and the selection of the final cases for CAD review were achieved using a statistical software package (IBM SPSS Version 22), which contains a specific function that randomly selects cases and that also allows cases to be weighted by the areas. Our use of SPSS required that we first convert the MCSO Excel spreadsheet into a format that would be readable in SPSS. We next pulled the stratified sample each month for the areas and then randomly selected a CAD audio subsample from the selected cases.

In February 2016, we began pulling cases for our body-worn camera review from the audio subsample.

On October 10, 2014, the Court issued an Order Granting Stipulation to Amend Supplemental/Permanent Injunction/Judgment Order (Document 748). The stipulation affects Paragraphs 57, 61, 62, and 1.r.xv.; and has been incorporated in the body of this report. The stipulation referenced amends the First Order and will be addressed in Section 7.

### a. Collection of Traffic Stop Data

**Paragraph 54.**  *Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest.  This system shall require Deputies to document, at a minimum:*

a.    *the name, badge/serial number, and unit of each Deputy and posse member involved;*

b.    *the date, time and location of the stop, recorded in a format that can be subject to geocoding;*

c.    *the license plate state and number of the subject vehicle;*

d.    *the total number of occupants in the vehicle;*

e.    *the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);*

f.    *the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);*

g.    *an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;*

h.    *the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;*

i.    *time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;*

j.    *whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;*

k.    *whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;*

l.    *whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and*

m.    *The final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.*

**Phase 1:**  In compliance

- CP-8 (Preventing Racial and Other Bias-Based Policing), most recently amended on January 23, 2025.

- EA-11 (Arrest Procedures), most recently amended on November 5, 2024.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 10, 2025.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 8, 2025.

- GI-1 (Radio and Enforcement Communications Procedures), most recently amended on November 27, 2024.

- GJ-3 (Search and Seizure), most recently amended on November 9, 2023.

**Phase 2:** Not in compliance

To verify the information required for this Paragraph, MCSO developed, and we reviewed, the Vehicle Stop Contact Forms (VSCFs), the Vehicle Stop Contact Form Supplemental Sheets, the Incidental Contact Receipts, and the Written Warning/Repair Orders, all in electronic form, for a sample of those motorists who, during this reporting period, committed a traffic violation or operated a vehicle with defective equipment and received a warning. We also reviewed the Arizona Traffic Ticket and Complaint Forms issued for violations of Arizona Statutes, Internet I/Viewer Event Unit printout, Justice Web Interface printout, and any Incident Report associated with these events. We selected a sample of 105 traffic stops conducted by deputies from July 1-September 30, 2025 for the purposes of this review; and assessed the collected data from the above-listed documents for compliance with Subparagraphs 54.a.-54.m.

The Paragraph requires that MCSO create a system for data collection. The data collected pursuant to this Paragraph is captured in the Early Identification System, which we discuss further in this report.

In our reviews of the following requirements, we consider whether any compliance issues were identified and addressed by supervisory personnel during the regular review of documents by supervisors. During this reporting period, we identified instances where supervisors identified compliance and/or policy-related issues and addressed the deputies by way of re-instruction and/or by requiring that the deputies correct the VSCF.

In the following cases, the corrective actions taken during the supervisory review process resulted in the cases being found to meet the compliance requirements during our review of those cases:

- In one case, the sergeant directed the deputy correct the VSCF to indicate the seizure of narcotics from a vehicle.

- In one case, the sergeant directed the deputy correct the VSCF to indicate the seizure of narcotic paraphernalia from a vehicle.

- In two cases, the sergeants directed the deputies correct the VSCFs to indicate the seizure of driver's licenses from the drivers.

- In one case, the sergeant directed the deputy correct the VSCF to indicate the seizure of a license plate from a vehicle.

Although there was no corrective action required in the following case, we noted that the supervisor took the appropriate follow-up step to ensure that the deputy properly documented the race/ethnicity of the driver on the VSCF:

- The sergeant reviewed a photograph of the driver and agreed with the deputy's decision to document the post-stop perception of the driver as being white, even though the driver had a surname that appeared to be Latino.

Also, as noted in our previous quarterly status report, there appears, generally speaking, to be increased awareness by supervisory personnel as they conduct their reviews of traffic stops to ensure that contacts with any passengers are documented properly and that the passengers receive the proper documents, as well.

Paragraph 54.a. requires MCSO to document the name, badge/serial number, and unit of each deputy and Posse member involved.

For this reporting period, each of the primary deputies documented their own badge numbers, serial numbers, and unit numbers for every stop that they initiated.  We review the VSCF, I/Viewer Event document, the Justice Web Interface, and the CAD printout to determine which additional units were on the scene.  If back-up units arrive on a scene and do not announce their presence to dispatch, CAD does not capture this information.  MCSO made a TraCS change to the VSCF during 2016 to secure this information.  MCSO added a drop-down box so the deputy could enter the number of units on the scene, and the appropriate fields would be added for the additional deputies.  While this addition is an improvement, if the deputy fails to enter the number of additional units on the form, the drop-down boxes do not appear.  In addition, MCSO policy requires deputies to prepare the Assisting Employee and/or Volunteer Log in instances where deputies respond and assist at a traffic stop.  The log contains the relevant information required by this Subparagraph for any additional deputies involved in a traffic stop other than the primary deputy.  During our April 2019 site visit, we discussed with MCSO, the Plaintiffs, and the Plaintiff-Intervenor the method of evaluating this requirement.  We determined that in instances where a deputy's name, serial number and unit number may have been omitted on the VSCF, yet the deputy prepared the Assisting Employee and/or Volunteer Log, the requirements of this Subparagraph will have been met.

During our review of the sample of 105 vehicle traffic stops, we identified 28 cases where the deputy's unit had another deputy assigned to the vehicle or one or more other deputy units or Posse members were on the scene.  In each of the 28 cases, the deputies properly documented the name, serial number, and unit number of the deputies and Posse members on the VSCF, or the information was captured on the Assisting Employee and/or Volunteer Log.

Of the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 50 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputy units or Posse members were on the scene.  In each of the 48 cases, the deputies properly documented the required information on the VSCFs, or the information was captured on the Assisting Employee and/or Volunteer Log.

Of the cases we reviewed for searches of persons under Subparagraph 54.k., there were 91 cases where the deputy's unit had another deputy assigned to the vehicle, or one or more other deputies or Posse members were on the scene. In 94 of the 97 cases, the deputies properly documented the required information on the VSCFs, or the information was captured on the Assisting Employee and/or Volunteer Log. In three cases, there were deputies assisting with the traffic stops; the VSCFs did not contain the deputies' required information; and the deputies did not prepare the Assisting Employee and/or Volunteer Log, as required by MCSO policy.

As mentioned above, we continue to identify cases where the assisting deputies have not prepared the Assisting Employee and/or Volunteer Log when required by MCSO policy. We encourage MCSO to provide guidance to supervisors to be attentive to this issue during their reviews of traffic stop documentation.

During this reporting period, MCSO achieved a compliance rating of 98%. MCSO remains in compliance with this requirement.

Paragraph 54.b. requires MCSO to document the date, time, and location of the stop, recorded in a format that can be subject to geocoding. Our reviews of the CAD printout for all 105 traffic stops in our sample indicated that the date, time, and location is captured with the time the stop is initiated and the time the stop is cleared. In previous reporting periods, we noted instances where the GPS coordinates could not be located on the documentation received (CAD printout/I/Viewer). We contacted MCSO about this issue, and MCSO now provides us with the GPS coordinates via a separate document that lists the coordinates for the traffic stop sample we provide. MCSO uses GPS to determine location for the CAD system. GPS collects coordinates from three or more satellites to enhance the accuracy of location approximation. The data from the satellites can be decoded to determine the longitude and latitude of traffic stop locations should that be necessary.

MCSO's CAD system was upgraded in 2014 to include geocoding of traffic stops. CID continues to provide us with a printout of all case numbers in the sample containing the associated coordinates. For this reporting period, the CAD or I/Viewer system contained the coordinates in 58% of the cases. In a separate spreadsheet, MCSO provided GPS coordinates for all 105 cases we reviewed, for 100% compliance with this portion of the Subparagraph.

When we review the sample traffic stops from across all Districts, we note the locations of the stops contained on the VSCF, the CAD printout, and the I/Viewer system to ensure that they are accurate. We continue to identify a limited number of instances where the location of the stop contained on the VSCF, and the location of the stop contained on the CAD printout are inconsistent. We noted that in many instances, that reviewing supervisors are identifying the issue and having the deputies address the deficiencies by making notations and corrections on the VSCFs. The number of inconsistencies did not affect MCSO's rate of compliance.

During our April 2016 site visit, we discussed with MCSO the possibility of using the CAD printout instead of the TraCS data to determine stop times. We determined that using the CAD system to determine stop end times caused additional challenges. However, MCSO decided to use the CAD printout to determine traffic stop beginning and ending times for data analysis. MCSO issued Administrative Broadcast 16-62 on June 29, 2016, which indicated that, beginning with the July 2016 traffic stop data collection, the stop times captured on the CAD system would be used for reporting and analytical purposes.

Occasionally, the CAD time of stop and end of stop time do not exactly match those listed on the Vehicle Stop Contact Form, due to extenuating circumstances the deputy may encounter. During this reporting period, we did not find any instances where the end time on the VSCF Contact differed significantly from the CAD printout. In monthly audits of traffic stop data, the Audits and Inspections Unit (AIU) reviews the beginning/ending times of the stops and requires that BIO Action Forms are generated by the Districts when there are discrepancies. The CAD system is more reliable than the VSCF in determining stop times, as it is less prone to human error. When the deputy verbally advises dispatch that s/he is conducting a traffic stop, the information is digitally time-stamped into the CAD system without human input; and when the deputy clears the stop, s/he again verbally advises dispatch.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.c. requires MCSO to document the license plate and state of the subject vehicle. During this reporting period, of the 105 stops that were reviewed, the license plate information was documented properly on the VSCF, and all related documents, prepared for the stop.

MCSO remains in compliance with this Subparagraph, with a compliance rate of 100%.

Paragraph 54.d. requires MCSO to document the total number of occupants in the vehicle when a stop is conducted. The VSCF, completed by the deputy on every traffic stop, is used to capture the total number of occupants and contains a separate box on the form for that purpose. EB-2 (Traffic Stop Data Collection) requires deputies to collect data on all traffic stops using the VSCF; this includes incidental contacts with motorists.

In our sample of 30 traffic stops that contained body-worn camera recordings, we determined that the deputies properly documented the total number of occupants in the vehicles.

In our review of cases to assess compliance with Paragraph 54.k., we determined that there was one traffic stop in which the deputy did not properly documented the presence of one passenger on the VSCF.

In our review of cases to assess compliance with Paragraphs 25.d. and 54.g., passenger contacts, we determined that there was one traffic stop in which the deputy included a person on the VSCF as a passenger although that person was not an occupant of the vehicle.

With a compliance rate of 99%, MCSO remains in compliance with this Subparagraph.

Paragraph 54.e. requires MCSO to document the perceived race, ethnicity, and gender of the driver and any passengers, based on the deputy's subjective impression. (No inquiry into the occupant's ethnicity or gender is required or permitted.)

Sixty-four, or 61%, of the 105 traffic stops involved white drivers. Twenty-seven, or 26%, of the 105 stops involved Latino drivers. Nine, or 9%, of the 105 traffic stops involved Black drivers. Four, or 4%, of the 105 traffic stops involved an American Indian/Alaskan Native driver. One, or 1%, of the 105 traffic stops involved an Asian or Pacific Islander driver.

Fifty-one traffic stops, or 49%, resulted in citations. The breakdown of those motorists issued citations is as follows: 28 white drivers (55% of the drivers who were issued citations); 12 Latino drivers (24% of the drivers who were issued citations); six Black drivers (12% of the drivers who were issued citations); three American Indian/Alaskan Native drivers (6% of the drivers who were issued citations); and one Asian or Pacific Islander driver (2% of the drivers who were issued citations).

Fifty-four, or 51%, of the 105 traffic stops we reviewed resulted in a written warning. The breakdown of those motorists issued warnings is as follows: 35 white drivers (65% of the drivers who were issued warnings); 14 Latino drivers (26% of the drivers who were issued warnings); and three Black drivers (6% of the drivers who were issued warnings).

Of the 105 traffic stops reviewed, there was one traffic stop, involving a white driver, who was not issued a citation or warning due to the deputy ending the traffic stop prematurely in order to respond to assist a deputy who was in pursuit of suspects and was no longer answering their radio. In that one case, the deputy stated that he provided his MCSO business card and the traffic stop case number to the driver. In one case, a Latino driver was issued a citation and a warning for two different traffic violations.

In our sample of 30 traffic stops that contained body-worn camera recordings, we determined that the deputies properly documented the perceived race/ethnicity and gender of the drivers and the passengers on the VSCFs in 29 of the 30 stops. In one stop, the documentation of the perceived race/ethnicity of the driver on the VSCF did not match the information documented on the citation.

In our review of cases to assess compliance with Paragraph 54.k., we determined that the deputies properly documented the perceived race/ethnicity and gender of the drivers and the passengers on the VSCFs in 97 of the 100 stops reviewed. In three of the 100 stops, we identified issues with the documentation of the perceived race/ethnicity and/or gender of the drivers and the passengers. In one stop, the documentation of the perceived race/ethnicity of a driver on the VSCF and the citation did not match the information documented on the Incident Report. In one stop, the documentation of the perceived gender of a passenger on the VSCF did not match the information documented on the Incident Report. In one stop, the documentation of the perceived gender of a juvenile passenger on the VSCF was listed as unknown-vision obscured; however, based on a review of the body-worn camera recordings, the passenger is visible.

In our review of cases to assess compliance with Paragraph 25.d. and 54.g., passenger contacts, we determined that the deputies properly documented the perceived race/ethnicity and gender of the drivers and the passengers on the VSCFs.

This Paragraph requires deputies to document the perceived race, ethnicity, and gender of any passengers whether contact is made with them or not. There were some instances where deputies indicated that they were unable to determine the gender and ethnicity of a passenger and listed the passenger as "unknown-vision obscured." During our review of the body-worn camera recordings, we were also unable to get a clear view of the some of the passengers, often due to vehicle being equipped with dark tinted windows combined with the stop occurring during nighttime hours; or due to vehicle being equipped with dark tinted windows combined with the glare of the sun during daytime hours. In some instances, there are infants in the vehicle that are not easy to observe when they are seated in car seats.

During the second quarter of 2019, AIU commenced conducting the Post-Stop Perceived Ethnicity Inspection. This inspection is conducted on a monthly basis and includes: 1) a review of traffic stops where the deputy documented the driver as being white and the driver's surname is Latino; 2) a review of traffic stops where the deputy documented that the driver has a Latino surname with a passenger listed as "unknown-vision obscured;" and 3) a review of traffic stops where the deputy documented that the driver was Latino and the passengers were listed with a designated ethnicity on the VSCF. AIU continues to conduct these inspections on a monthly basis. AIU requires that the Districts prepare BIO Action Forms to address any issues identified.

MCSO attained a compliance rate of 98% and remains in compliance with this requirement.

Paragraph 54.f. requires that MCSO record the name of any individual upon whom the deputy runs a license or warrant check (including the subject's surname). Our review determined that the deputies properly documented the name of each individual on the VSCF when a license or warrant check was conducted.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this Subparagraph.

Paragraph 54.g. requires the deputy to document whether contact was made with any passengers, the nature of the contact, and the reasons for the contact. During the third quarter of 2019, MCSO requested that we increase the number of cases reviewed to identify additional stops that fit the criteria of this Paragraph. The sample size of cases to be reviewed was increased from 10 stops each month to 35 stops each month, commencing with August 2019. During some months, the number of traffic stops that involve deputies having contact with passenger is fewer than 35 traffic stops.

During our assessment, we specifically review traffic stops that include any instance where the deputy asks any questions of a passenger beyond a greeting, including asking passengers to identify themselves for any reason or requesting that they submit to a Preliminary Breath Test. In such instances, we determine if the passenger was issued one of the following: Incidental Contact Receipt, citation, or a warning. If the passenger was not issued any one of the following documents, it adversely impacts MCSO's compliance with this requirement. It is also important to note that in such instances where a deputy fails to issue one of the required documents after being involved in a passenger contact, it is a violation of MCSO's policy.

To ensure that deputies are accurately capturing passenger information and to verify if passengers are contacted, we compare the number of passengers listed by the deputy with the number of passengers entered in the passenger drop-down box on the Vehicle Stop Contact Form. We also review any Incidental Contact Receipts, citations, or warnings issued to passengers by deputies. We also review the deputies' notes on the VSCF, the Arizona Citation, and the CAD printout for any information involving the passengers. We review MCSO's I/Viewer System and the Justice Web Interface (JWI) to verify if a records check was requested for the driver or any passengers.

MCSO continues to conduct internal inspections to review its own sample of passenger contacts during traffic stops. In any instances where issues are identified, AIU issues BIO Action Forms to the Districts to address those deficiencies.

During our October 2023 site visit, we discussed with MCSO the topic of Incidental Contact Receipts not being consistently issued to passengers. MCSO informed us that AIU had identified the same issue as we have regarding this issue. To attempt to address this, MCSO had developed a plan to make modifications to TraCS in relation to passenger contacts. During our February 2024 site visit, MCSO provided us with an overview of the proposed changes that are underway. During our July 2025 site visit, MCSO informed us that the proposed changes are still underway. We have noted that MCSO recently implemented a change to the TraCS to automatically print a contact receipt when the deputy prepares a VSCF that indicates that a passenger is present, and MCSO added a field on the VSCF to indicate if a contact receipt was provided to the passenger. This contact receipt is similar in format to the Incidental Contact Receipt. We have noted that the deputies are utilizing both forms since the implementation.

We reviewed a sample of traffic stops involving passenger contacts to assess MCSO's compliance with Paragraphs 25.d. and 54.g. For this reporting period, we identified 71 traffic stops where the deputy interacted with one or more passengers which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 71 stops, there was one stop where we determined that a passenger was not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. For the remaining 70 stops, the passengers were properly provided with either an Incidental Contact Receipt, a citation, or a warning.

We identified 33 cases in the stops that we reviewed for Paragraph 54.k. in which the passengers were contacted which required the issuance of either an Incidental Contact Receipt, a citation, or a warning. Of the 33 stops, there were three stops where we determined that a passenger, or passengers, were not provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy. For the remaining 30 stops, we determined that the passengers were provided with either an Incidental Contact Receipt, a citation, or a warning, as required by MCSO policy.

There were no cases identified in the stops that we reviewed for Paragraphs 25 and 54 in which a passenger was contacted that required the issuance of either an Incidental Contact Receipt, a citation, or a warning.

During the second quarter of 2025, MSCO provided the Incidental Contact Receipt, a citation, or a warning, when required, in 95% of the cases. During this reporting period, MCSO provided the Incidental Contact Receipt, a citation, or a warning, when required in 96% of the cases. MCSO remains in compliance with this requirement.

We encourage MCSO to continue its efforts to attain and maintain compliance with this requirement. We also recognize that MCSO is continuing to improve its documentation processes in an effort to sustain compliance with this requirement.

Paragraph 54.h. requires deputies to record, prior to the stop, the reason for the vehicle stop, including a description of the traffic or equipment violation observed, and any indicators of criminal activity developed before or during the stop. For this reporting period, we identified a random sample of 10 cases from the 35 cases we requested each month and requested CAD audio and body-worn camera footage for those cases. We listened to CAD dispatch audio recordings, reviewed the CAD printouts, and reviewed body-worn camera recordings for 30 traffic stops from the sample of 105 traffic stops used for this review; and found that the deputies advised Communications of the reason for the stop, location of the stop, license plate, and state of registration for all 30 stops.

For the remaining 75 traffic stops where body-worn camera recordings and CAD audiotapes were not requested, we review the CAD printout and the VSCF to ensure that the reason for the stop has been captured. These forms are included in our monthly sample requests. The dispatcher enters the reason for the stop in the system as soon as the deputy verbally advises Communications of the stop, location, and tag number. The VSCF and the CAD printout document the time the stop begins and when it is concluded – either by arrest, citation, or warning. Deputies need to be precise when advising dispatch of the reason for the traffic stop and entering that information on the appropriate forms.

MCSO's compliance rating for this Subparagraph is 100%.

Paragraph 54.i. requires deputies to document the time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; the time a release was made without a citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere, or the deputy's departure from the scene.

We conduct a review of the stop time and the time that the contact ended on the CAD printout and the VSCF, to ensure that the times are consistent. The VSCF contains a field to document the time of an arrest, in the event one takes place, as well as a field to document the transport time for any vehicle occupant that is arrested. The CAD printout also captures the time of any arrest and the time related to the transporting of any of the vehicle occupant that may have been arrested, which we compare to the VSCF. During this reporting period, we did not identify any issues with the times documented on the forms.

We review the circumstances of each stop and the activities of the deputies during each stop to assess whether the length of the stop was justified and documented properly. In our reviews of the traffic stops that include body-worn camera recordings, we review the activities of the deputies to assess whether they are consistent with the documentation from the VSCFs, the CAD

printouts, and any other documents that may have been prepared, such as citations or warnings. During this reporting period, we did not identify any stops that were extended for an unreasonable amount of time.  Based on our review of the VSCFs, CAD printouts, and body-worn camera recordings, we determined that MCSO is in compliance with this requirement.

MCSO remains in compliance with this Subparagraph.

Paragraph 54.j. requires MCSO to document whether any inquiry as to immigration status was conducted and whether U.S. Immigration and Customs Enforcement (ICE)/Customs and Border Protection (CBP) was contacted, and if so, the facts supporting the inquiry or contact with ICE/CBP, the time supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual.

On November 7, 2014, a United States District Court Judge issued an Order permanently enjoining enforcement of Arizona Revised Statute (A.R.S.) 13-2319, commonly referred to as the Arizona Human Smuggling Act.  On November 17, 2014, MCSO issued Administrative Broadcast 14-75, prohibiting deputies from enforcing the above state statute, including arresting, detaining, or questioning persons for suspected (or even known) violations of the act and from extending the duration of traffic stops or other deputy-civilian encounters to do so.

We reviewed 105 traffic stops submitted for this Paragraph and found that none of the stops involved any contacts with ICE/CBP.  Of the traffic stops that we reviewed, there were not any stops identified that involved inquiries as to the immigration status of the vehicle occupants.  In addition, our reviews of Incident Reports and Arrest Reports conducted as part of the audits for Paragraphs 89 and 101 revealed no immigration status investigations.  MCSO remains in compliance with this Subparagraph.

Paragraph 54.k. requires MCSO to document whether any individual was asked to consent to a search (and the response), whether a probable-cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual.

To assess compliance with this requirement, we assess whether the searches of the drivers and/or passengers were conducted within policy, and whether the deputies complied with policy when documenting the searches.

MCSO has only required that deputies to use the Consent to Search Form in situations where the body-worn camera is not operational.  MCSO does not currently require the use of Consent to Search Form in all instances where consent was requested to search either the driver or passenger(s), or the vehicle, during traffic stops.  We have previously communicated to MCSO our concerns that without the required use of the form, some important data was not being captured in relation to the consent searches of persons and vehicles, as well as having the data available for review and analysis as required under Paragraph 60.

During this reporting period, we noted that MCSO implemented revisions to the VSCF that now includes additional fields for capturing consent search data.  We were not informed of the specific changes to the VSCF before MCSO implemented them so that we could provide input and comments, as is the normal course.  In addition, there appears to have been a technical issue

during the implementation of the revised form – as we noted that several traffic stops that involved passengers that indicate that the passengers had been searched. However, based on the review of body-worn camera recordings, there was no search of the passengers. We will follow up with MCSO regarding this issue.

The method MCSO currently employs to identify our sample of cases to review is to identify the population of all traffic stops in which searches of individuals were documented on the VSCF. Once that population is identified, a random sample of 35 traffic stops from each month is identified for review. During some months, the number traffic stops that involve searches of persons is less than 35 traffic stops. In addition, we also review any cases in which deputies performed searches of individuals in the sample of 105 traffic stops reviewed to assess compliance with Paragraphs 25 and 54 and the sample of traffic stops reviewed to assess compliance with Subparagraphs 25.d. and 54.g. When we identify issues that impact compliance or where MCSO policy was not followed, we provide the list of cases to MCSO for review.

In the sample of traffic stops that we reviewed to assess compliance with Subparagraph 54.k., we identified three stops involving the search of the drivers and/or passengers. In two of the three stops, the deputies documented the conducting of a pat-and-frisk of the vehicle occupants. In one of the three stops, the deputy documented the consent search of the vehicle occupant. In that one stop, the deputy requested and obtained consent to search the occupant; however, the deputy did not inform the person of the right to refuse and the right to revoke the consent at any time, as required by MCSO policy.

We continue to identify stops in which the deputies incorrectly listed, or omitted, the types of searches conducted on drivers and/or passengers.

During this reporting period, there not any stops identified involving the searches of persons identified in the sample of traffic stops reviewed to assess compliance with Subparagraphs 25 and 54 and Subparagraphs 25.d. and 54.g.

MCSO continues to conduct internal inspections to review its own sample of searches of vehicle occupants during traffic stops. In any instances where issues are identified, AIU issues BIO Action Forms to the Districts to address those deficiencies.

During the third reporting period of 2024, MCSO attained a compliance rating of 77%. As we have done in the past, we continued to maintain MCSO in compliance with this requirement during that reporting period. We informed MCSO that it must achieve compliance with this requirement in the fourth quarter reporting period to maintain compliance. During the fourth reporting period of 2024, MCSO attained a compliance rating of 56%, at which time we determined that MCSO was no longer in compliance with this requirement. During the first reporting period of 2025, MCSO attained a compliance rating of 43%. During the second reporting period of 2025, MCSO attained a compliance rating of 83%. During this reporting period, MCSO attained a compliance rating of 67%. MCSO is not in compliance with this requirement.

We will continue to provide MCSO with a list of traffic stop cases where we identify compliance issues.

Paragraph 54.l. requires MCSO to document whether any contraband or evidence was seized from any individual, and the nature of the contraband or evidence. Generally, deputies seize the following types of contraband and/or evidence, which is documented on the VSCF, a Property Receipt, and an Incident Report: license plates; driver's licenses; alcoholic beverages; narcotics; narcotic paraphernalia; weapons; and ammunition. We have noted that one of the most frequent type of seizure involves drivers charged with driving while intoxicated, which, pursuant to state law, often requires that the deputy seize the driver's license. The other most frequent type of seizure involves drivers who are operating a vehicle with suspended license plate, which, pursuant to state law, requires that the license plate be seized. We conduct a review of the relevant documents and review the VSCF to ensure that deputies properly document the seizure of the evidence and/or contraband.

During our review of the collected traffic stop data (our sample of 105) during this reporting period, there were eight items seized and placed into evidence by deputies. Each of those eight items were properly listed on the VSCFs.

In the cases we reviewed for searches of individuals under Subparagraph 54.k., there were 59 items seized by deputies and placed into evidence. Of those 59 items, there were three items that were not properly listed on the VSCFs, as required by MCSO policy.

In the cases we reviewed for passenger contacts under Subparagraph 54.g., there were 16 items seized by deputies and placed into evidence. Each of those 16 items were properly listed on the VSCFs.

During the fourth reporting period of 2024, MCSO attained a compliance rating of 98%. During the first reporting period of 2025, MCSO attained a compliance rating of 96%. During the second reporting period of 2025, MCSO attained a compliance rating of 98%. During this reporting period, MCSO attained a compliance rating of 96%. MCSO remains in compliance with this requirement. In MCSO's 44th quarterly compliance report, MCSO expressed its concern that the low volume of contraband/evidence seized during traffic stops leaves little margin for error; and that this issue stands in the way of MCSO achieving and maintaining compliance with this requirement. However, MCSO has demonstrated that it is possible to attain compliance with the requirement and even maintain that compliance. We again commend MCSO for its efforts to attain and maintain compliance with this requirement.

Paragraph 54.m. requires the documentation of the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without a citation. In all 105 cases we reviewed, we found documentation indicating the final disposition of the stop; and whether the deputy made an arrest, issued a citation, issued a warning, or made a release without a citation. MCSO remains in compliance with this Subparagraph.

MCSO has failed to achieve compliance with all of the Subparagraphs of Paragraph 54. MCSO is not in compliance with Paragraph 54.

***Paragraph 55.*** *MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed a sample of the Vehicle Stop Contact Forms, CAD printouts, I/Viewer documentation, citations, warning forms, and any Incident Report that may have been generated as a result of the traffic stop.

The unique identifier "went live" in September 2013 when the CAD system was implemented. This number provides the mechanism to link all data related to a specific traffic stop. The number is automatically generated by the CAD software and is sent to the deputy's MDT at the time the deputy advises Communications of the traffic stop. The unique identifier is visible and displayed at the top of the CAD printout and also visible on the Vehicle Stop Contact Form, the Arizona Traffic Citation, and the Warning/Repair Form.

Once the deputy scans the motorist's driver's license, the system automatically populates most of the information into one or more forms required by the Order. If the data cannot be entered into TraCS from the vehicle (due to malfunctioning equipment), policy requires the deputy to enter the written traffic stop data electronically prior to the end of the shift. The start and end times of the traffic stop are now auto-populated into the Vehicle Stop Contact Form from the CAD system.

Since our first visit for monitoring purposes in June 2014, TraCS has been implemented in all Districts; and the unique identifier is automatically entered from the deputy's MDT. No user intervention is required.

In addition, we reviewed the Warning/Repair Forms, when applicable, for those stops where a warning was issued or the vehicle had defective equipment. The unique identification number assigned to each event was listed correctly on all CAD printouts for every stop. A review was conducted of the Tow Sheets prepared by deputies in instances where a driver's vehicle was towed. In each instance, the unique identification number assigned to each event was listed correctly on the Tow Sheet. A review of the Incident Reports prepared by deputies in instances where policy requires the preparation of the report was conducted. In each instance, the unique identification number assigned to each event was listed correctly on the Incident Report.

With a compliance rating of 100%, MCSO remains in compliance with this requirement.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 56.*** *The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.*

**Phase 1:** In compliance

- EB-2 (Traffic Stop Data Collection), most recently amended on April 8, 2025.
- Traffic Stop Analysis Unit (TSAU) Operations Manual, published on October 13, 2022.

**Phase 2:** In compliance

As discussed in Paragraph 25, improvements since 2015 to the TraCS system have enhanced the reliability and validity of the traffic stop data. These improvements were memorialized in the Traffic Stop Analysis Unit (TSAU) Operations Manual, which was finalized following the successful completion of the TSMR pilot program in October 2022 and the publication of all relevant sections of this document. The most significant portions of the manual that address data quality control processes – Sections 304, 305, and 306 – have been approved since 2018 and 2019. The data quality control processes include three distinct areas. The first is the data-handling procedures (Section 304), which involve the transfer of data files between administrative units with MCSO for the purpose of data analysis and reporting to ensure that data variables are properly understood. The second involves the software change control processes (Section 305), which are used by MCSO's Technology Bureau to manage software changes that affect traffic stop data variables. Finally, the third involves the data verification process (Section 306), which involves validating data variables used for the periodic analyses (monthly, quarterly, and annual) discussed in Paragraphs 64, 65, and 66.

TSAU and the Technology Bureau hold monthly meetings (deconfliction meetings) focused on data-handling procedures and software changes. In addition, each month, MCSO produces documents generated from the deconfliction meetings to apprise us and the Parties of any issues or modifications to the data processes. During the fourth quarter of 2023, MCSO began the process of changing who can approve VSCFs, added mandatory fields for passenger contact, added a warrant arrest field to the VSCF, among others. These changes were slated to take place during February 2024, but according to the documents submitted by MCSO since March 2024, these are being placed on hold until all relevant issues involving NTCFs and GJ-3 (Searches) are addressed. MCSO noted that the modifications to both the Vehicle Stop Contact Form (VSCF) and Non-Traffic Contact Forms (NTCFs) were published in August 2025 and both we and the Parties were provided copies following a request for them in October 2025. There were no additional modifications of significance.

With the advent of the TSMR pilot in 2021, TSAU refined its data-cleaning procedures to ensure a more timely review of the monthly data to correct problems with certain traffic stop location information (X,Y coordinates). Additionally, following months of discussions between representative experts, in February 2022, MCSO adopted alternative methods for refining stop location and the timing of stops (spline procedures) that make comparisons between deputy stops much more accurate. More recently, MCSO found that special assignment traffic stops were undercounted in past annual reports. In response, MCSO published an analysis (TSQR9)

discussing the undercount, its impact on past annual and monthly reports, and how to improve training and policy to identify such stops more easily in future analyses. The cleaning procedures MCSO has adopted are an enhancement of the quality control process and ensure timely reviews of data to support monthly analyses of traffic stop data. (See Paragraph 64.) MCSO has more recently published TSQR15, "Arizona Revised Statute 28-3151A," which suggests that, due to the significantly higher volume of Hispanic drivers operating vehicles without proper licenses, the analysis should include a matching option to ensure that white and Hispanic drivers are being appropriately compared. We have discussed these issues with MCSO and the Parties during subsequent quarterly site visit meetings and through analytic proposal review processes. We will continue to collaboratively explore these issues and report them in future publications as needed.

MCSO consistently advises us of problems it identifies from these reviews and actions it takes to ensure data veracity following the specific protocols delineated in the TSAU Operations Manual. As such, based upon findings from prior TSQRs (TSQR3 and TSQR4), MCSO added two new extended traffic stop indicators (ETSIs) to the drop-down box on VSCFs (license and "other issues") that identify issues that may elongate traffic stops. MCSO also amended the data dictionary to include a new special assignment field on the VSCF that will more accurately collect special assignment dates. Deputies are expected to explain these extended stops and special assignment stops with clarifying comments.

MCSO published new ETSI analyses in March 2024 (TSQR13) and March 2025 (TSQR17), and we and the Parties commented on issues related to the publication of TSQR13 during our April 2024 site visit and raised issues related to TSQR17 during our April 2025 site visit. In particular, we and the Plaintiffs were concerned regarding the proportion of all stops – over 50% in 2025 – that were extended and therefore eliminated from the analysis of stop length. MCSO promised to continue supplying a supplemental analysis of all stops in an appendix to the annual report. This allows for a comparison with the main analysis when extended stops are excluded from the analysis of stop lengths. The Plaintiffs have requested that MCSO include a discussion of these supplemental analyses in the body of the agency's annual report. In past TSARs, these differences were significant and fell mainly on minority driving populations. In TSAR10, this additional analysis yielded no significant disparities in stop length for Hispanic or minority drivers. Both TSQR13 and TSQR17 continue to show several disparities by race/ethnicity and ETSI use. The addition of documentation issues has helped to clarify why some of the disparities arise. However, we disagree with MCSO's a priori statement in TSQR17, "Absent deputy questions about immigration status, MCSO does not consider racial/ethnic inequality in ETSI use as indicia of potential bias as defined by the Second Order. Rather ETSIs identify and document circumstances which extend the length of a traffic stop." We argue that one cannot know the extent of potential bias without investigating individual stops – and believe that, to begin with, the assumption that significant differences between driver groups are not potential indicators of bias is not consistent with the Second Order.

Additionally, in response to TSQR13 "Extended Traffic Stop Indicator Use," MCSO published an action plan in June 2024 to ensure that deputies were continuing to use ETSIs appropriately. This plan included adding to the ETSI drop-down box on the VSCF to include a required dialogue box explaining the use of the "other" ETSI and examining any long stops that did not indicate an

ETSI, among other items.  In this vein, MCSO evaluates long stops (those over 20 minutes) that have no indicated ETSI to ensure that deputies are using ETSIs and dialogue boxes correctly.  During the October 2025 site visit, MCSO noted that the number of stops requiring evaluation has dropped dramatically during the past year; however, the agency reports that it will continue to conduct evaluations of long traffic stops as they arise.  The conclusions offered in TSQR17 reiterate much of what has been learned from prior ETSI analysis.  We will continue to examine the use of these fields in our reviews of the traffic stop samples selected each month.

MCSO also conducts audits of the 105 traffic stop sample that we request each reporting period.  MCSO conducts more expansive reviews of 30 of the 105 sample pulls we request each reporting period to include passenger contacts and persons searched by examining body-worn camera footage.  EB-2 (Traffic Stop Data Collection) also requires regularly scheduled audits of traffic stop data on a monthly basis.  We reviewed BIO's monthly audits of the traffic samples for this quarter and found them to be thorough.  Our compliance calculations for the Traffic Stop Data inspections for two of the three months during this reporting period were slightly lower, since we do not employ a matrix to assess compliance – but rather deem individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD data.  The Traffic Stop Data Inspection comprises the last month of the previous quarter and the first two months of the present quarter because of the timing of publications.  MCSO reported compliance rates exceeding 99% for each month during this reporting period, while our calculations for July and August were slightly lower: 97.1% for each month due to a contact conclusion being omitted in July and a BWC not recording a stop in August.

MCSO also conducts inspections of searches taking place during traffic stops each month.  During this quarter, the agency reported compliance ratings of 98.48 in July and 100.0% in August and September.  Our calculations were slightly lower for July, as we do not employ a matrix to determine compliance but evaluate each stop in which an issue arises as a deficiency.  Consequently, for July, our rating was 94.1%, due to two cases that found search reports were not consistent between the VSCF and the NTCF during these stops.  We maintain that requiring a Consent to Search Form pursuant to GJ-3 (Search and Seizure), and a more comprehensive inspection of all searches – traffic and non-traffic – would lead to a more comprehensive data process.  While these discussions with MCSO continue, we are deferring the request by MCSO to grant Full and Effective Compliance with this Paragraph.

Administrative Broadcast 15-96 addresses the security of paper traffic stop forms.  The procedure requires that paper forms (traffic stop documentation that may be handwritten by deputies in the field if the TraCS system is nonoperational due to maintenance or lack of connectivity) be stored in a locked cabinet and overseen by the Division Commander.  During our last several site visits, we verified the security of and access to these documents and reviewed the logs held at the District offices.  MCSO has consistently complied with this requirement, and we were able to review who had accessed these files in the Districts we visited.

On April 11, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we deferred our determination for this assertion. We noted, "While MCSO has made great strides in improving its' data handling processes, until the data related to searches and seizures are included in the data system and can be easily queried by data experts and supervisors alike, we will be holding MCSO in deferred status for Paragraph 56."

**Paragraph 57.** *MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on on-person recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed all TraCS forms for each traffic stop that were included in the sample. In addition, we reviewed a subset of CAD audio recordings and body-worn camera footage of the stops.

The system for providing "receipts" is outlined in EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance) and EB-2 (Traffic Stop Data Collection). GJ-35 addresses the requirement that supervisors review recordings to check whether deputies are accurately reporting stop length. In addition to GJ-35, BIO developed a Body-Worn Camera Matrix for its inspectors to review camera recordings.

The deputy should provide every person contacted on a traffic stop with an Arizona Traffic Ticket or Complaint (Citation), a Written Warning/Repair Order (Warning), or an Incidental Contact Receipt. For this reporting period, in 104 of the 105 cases reviewed, deputies provided either citations, written warnings or Incidental Contact Receipts to each of the drivers. In one case, the deputy terminated the traffic stop prematurely due to responding to a priority incident involving another deputy who was not responding to Communications. In that case, the deputy provided a business card and the traffic stop case number to the driver. We do not consider cases such as this as being not in compliance due to the exigent circumstances that existed.

For the cases reviewed under Subparagraphs 25.d. and 54.g., contact with passengers, we did not identify any issues with deputies providing citations, warnings, or Incidental Contact Receipts to drivers.

For the cases reviewed under Subparagraph 54.k., searches of persons, we did not identify any issues with deputies providing citations, warnings, or Incidental Contact Receipts to drivers.

MCSO's compliance rate with this requirement is 100%. MCSO remains in compliance with this portion of the Subparagraph.

The approved policies dictate that the CAD system will be used for verification of the recording of the initiation and conclusion of the traffic stop and that MCSO will explore the possibility of relying on the body-worn camera recordings to verify that the stop times reported by deputies are accurate. The deputy verbally announces the stop's initiation and termination on the radio, and then CAD permanently records this information. In May 2016, MCSO advised us that all deputies and sergeants who make traffic stops had been issued body-worn cameras and that they were fully operational. We verified this assertion during our July 2016 site visit; and since that time, we have been reviewing the body-worn camera recordings to determine if stop times indicated by CAD were accurate. The Audit and Inspections Unit (AIU) conducts monthly inspections of traffic stop data, which includes an assessment as to whether the body-worn camera video captured the traffic stop in its entirety; to verify the time the stop began; and to verify if all information on forms prepared for each traffic stop match the body-worn camera video. AIU conducts reviews of 30 body-worn camera recordings each reporting period.

During this reporting period, we requested from MCSO 30 body-worn camera recordings for our review. We are able to use the body-worn camera recordings that were provided for each stop to assess whether deputies are accurately reporting the stop length. The compliance rate for the sample of 30 cases selected from the 105 stops reviewed for using the body-worn camera recordings to determine if deputies are accurately reporting stop length is 100%. MCSO remains in compliance with this requirement.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 58. The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.*

**In Full and Effective Compliance**

To verify compliance for this Paragraph, we reviewed the applicable policies and requested that Technology Bureau personnel provide us with information regarding any unauthorized access and/or illegitimate access to any of MCSO's database systems that had been investigated by PSB. The policies state that the dissemination of Criminal History Record Information (CHRI) is based on federal guidelines, Arizona statutes, the Department of Public Safety (AZDPS), and the Arizona Criminal Justice Information System (ACJIS); and that any violation is subject to fine. No secondary dissemination is allowed. The policies require that the Professional Standards Bureau (PSB) provide written notification to the System Security Officer whenever it has been determined that an employee has violated the policy by improperly accessing any Office computer database system. Every new recruit class receives three hours of training on this topic during initial Academy training.

During this reporting period, we inquired whether there had been any instances of unauthorized access to and/or any improper uses of the database systems. MCSO reported that there were no PSB cases closed during the reporting period in relation to this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 59. Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.*

**In Full and Effective Compliance**

Electronic traffic stop data capture began on April 1, 2014. The forms developed by MCSO capture the traffic stop details required by MCSO policy and Paragraphs 25 and 54. BIO provides the traffic stop data monthly, which includes a spreadsheet of all traffic stops for the reporting period, listing Event Numbers as described at the beginning of Section 7. All marked patrol vehicles used for traffic stops are now equipped with the automated TraCS system, and all Patrol deputies have been trained in TraCS data entry. MCSO has provided full access to all available electronic and written data collected since April 1, 2014. MCSO did not collect electronic data before this time. During this reporting period, MCSO has continued to provide full access to the traffic stop data.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*b. Electronic Data Entry*

*Paragraph 60. Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.*

**In Full and Effective Compliance**

To verify compliance with this Paragraph, we reviewed the documents generated electronically that capture the required traffic stop data. The electronic data entry of traffic stop data by deputies in the field went online on April 1, 2015. If TraCS experiences a malfunction in the field, there is a protocol that requires the deputy to electronically enter the traffic stop data prior to the end of the shift.

MCSO continues to conduct monthly traffic stop inspections and forwards them for our review. Initially, the traffic stop data was captured on handwritten forms developed by MCSO, completed by the deputy in the field, and manually entered into the database by administrative personnel located at each District. Now all traffic stop data is entered electronically, whether in the field or at MCSO District offices. Occasionally, connectivity is lost in the field due to poor signal quality, and citations are handwritten. Per policy, deputies must enter electronically any written traffic stop data by the end of the shift in which the event occurred. As noted in our Paragraph 90 review, VSCFs are routinely entered into the system by the end of the shift.

As we have noted under Paragraph 54.k., MCSO currently only requires that deputies use the Consent to Search Form in situations where the body-worn camera is not operational. MCSO does not require the use of Consent to Search Form in all instances where consent was requested to search either the driver or passenger(s), or the vehicle, during traffic stops. We maintain that the required use of the form would ensure that more accurate data is collected by MSCO in relation to the searches of persons and vehicles, as well as having the data available for review and analysis as required by this Paragraph. However, we have noted that MCSO has recently implemented a revised VSCF that contains additional information to be collected from deputies during traffic stops in relation to consent to searches of persons and vehicles. MCSO did not provide us with the proposed changes before MCSO implemented the revised VSCF, as is the usual procedure, so that we could provide input on the changes.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion. However, we will consider MCSO's use of the Consent to Search Form in our future reviews.

### c. Audio-Video Recording of Traffic Stops

**Paragraph 61.** *The MCSO will issue functional video and audio recording equipment to all patrol deputies and sergeants who make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. Such issuance must be complete within 120 days of the approval of the policies and procedures for the operation, maintenance, and data storage for such on-person body cameras and approval of the purchase of such equipment and related contracts by the Maricopa County Board of Supervisors. Subject to Maricopa County code and the State of Arizona's procurement law, The Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.*

**In Full and Effective Compliance**

During our September 2014 site visit, we met with two MCSO Deputy Chiefs and other personnel to discuss MCSO's progress of acquiring in-car video and audio equipment for all patrol vehicles used to conduct traffic stops. MCSO had initially set out to purchase fixed in-car cameras as required by the Order, but the agency expressed an interest in acquiring body-worn video and audio recording devices for deputies. The Court issued an Order providing an amendment/stipulation on October 10, 2014, requiring on-body cameras. This was a prudent decision, in that it allows for capturing additional data, where a fixed mounted camera has limitations. We have documented MCSO's transition from in-car to body-worn cameras in our previous quarterly status reports.

Records indicate that MCSO began distribution of body-worn cameras on September 14, 2015, and full implementation occurred on May 16, 2016. The body-worn camera recordings are stored in a cloud-based system (on evidence.com) that can be easily accessed by supervisors and command personnel. The retention requirement for the recordings is three years. In July 2019, MCSO began distribution of the newer version of body-worn cameras to deputies. During our October 2019 site visit, MCSO reported that deputies assigned to the Districts have all been equipped with the new body-worn cameras; and that deputies in specialized assignments were being equipped with the new devices. The current version of body-worn cameras purchased by MCSO is mounted on the chest area via a magnetic mount.

To verify that all Patrol deputies have been issued body-worn cameras, and that they properly use the devices, we review random samples of the traffic stops as described in Paragraphs 25 and 54, as well as random samples of traffic stops to evaluate contacts with passengers and searches of vehicle occupants. In addition, during our District visits in October 2025, we observed that deputies were equipped with body-worn cameras. In addition, one Monitoring Team member visited District 1, and conducted a ride-along with a sergeant. We noted that the sergeant and deputies deployed to patrol duties were all equipped with body-worn cameras. We also observed that deputies were equipped with body-worn cameras as they responded to a call for service. We noted that the body-worn cameras appeared to be in the recording mode during the call or service, as required by MCSO policy.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 62.*** *Deputies shall turn on any video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is nonfunctioning within a reasonable time shall be subject to Discipline.*

**In Full and Effective Compliance**

MCSO evaluated on-person body cameras from other jurisdictions and selected a vendor (TASER International, now known as Axon). Body-worn cameras have been implemented in all Districts since May 2016 and are fully operational. As noted under Paragraph 61, MCSO has obtained and equipped deputies in the Districts with body-worn cameras, provided by Axon.

To verify compliance for this Paragraph, we reviewed the body-worn camera recordings included in our monthly samples. This includes the stops reviewed each month for Paragraphs 25 and 54; the stops reviewed each month for Subparagraph 54.k.; and the stops reviewed each month for Subparagraph 54.g. For purposes of calculating compliance, we exclude any stops where the deputies documented on the VSCF that the body-worn cameras malfunctioned during the stop.

For our selection of a sample to review body-worn camera recordings, we used the same sample of 30 cases we selected for the CAD audio request. In each of the 30 stops that were reviewed, the deputies properly activated the body-worn cameras during the traffic stop events.

In our sample of body-worn camera recordings reviewed for Subparagraph 54.k. and Subparagraph 54.g., the deputies properly activated the body-worn cameras during the traffic stop events.

MCSO's compliance rate for this requirement is 100%.

Our reviews of the body-worn camera recordings often reveal instances of deputies exhibiting positive, model behavior; and, at times, instances of deputies making errors, or exhibiting less than model behavior – all of which would be useful for training purposes. We also reviewed the Professional Standards Bureau's monthly summaries of closed cases for July-September 2025. There continue to be examples of body-worn camera recordings assisting the investigators in making determinations as to whether deputies acted in accordance with MCSO policy. In some instances, deputies were found to have acted inconsistent with policy; and in some instances, it was determined that the allegations against the deputies were false. Body-worn cameras recordings have proven to be invaluable in resolving complaints alleging misconduct by deputies.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 63.*** *MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a formal policy, to be reviewed by the Monitor and the Parties pursuant to the process described in Section IV and subject to the District Court, to govern proper use of the on-person cameras; accountability measures to ensure compliance with the Court's orders, including mandatory activation of video cameras for traffic stops; review of the camera recordings; responses to public records requests in accordance with the Order and governing law; and privacy protections. The MCSO shall submit such proposed policy for review by the Monitor and Plaintiff's counsel within 60 days of the Court's issuance of an order approving the use of on-body cameras as set forth in this stipulation. The MCSO shall submit a request for funding to the Maricopa County Board of Supervisors within 45 days of the approval by the Court or the Monitor of such policy and the equipment and vendor(s) for such on-body cameras.*

**In Full and Effective Compliance**

MCSO developed and issued a protocol and policy that requires the original hardcopy form of any handwritten documentation of data collected during a traffic stop to be stored at the District level and filed separately for each deputy. When a deputy is transferred, his/her written traffic stop information follows the deputy to his/her new assignment. During our October 2025 site visit, we visited the Districts to ensure that the hardcopies of traffic stop cases are stored for a minimum of five years. We found that the records were in order and properly secured.

During our October 2025 site visit, we met with MCSO to discuss the retention requirements of the body-worn camera video recordings. During the meeting, we requested that several specific traffic stop video recordings be identified to ensure that the retention of the recordings is being done consistent with this requirement. We provided MCSO with different traffic stop events. In each of the cases, the video recordings were located and were found to have been retained in accordance with this requirement.

On June 22, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### d. Review of Traffic Stop Data

**Paragraph 64.** *Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.*

**Phase 1:** In compliance

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 10, 2025.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 8, 2025.

- GJ-33 (Significant Operations), most recently amended on March 7, 2024.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on December 12, 2024.

- GH-5 (Early Identification System), most recently amended on December 12, 2024.

- Traffic Stop Analysis Unit (TSAU) Operations Manual, published on October 13, 2022.

**Phase 2:** In compliance

As a result of the incorporation of agreed-upon changes to GH-5 (Early Identification System) that stem from the completion of the TSMR pilot: Attachment A (Event Entry Types), and Attachment C (Supervisor EIS Alert Form), MCSO achieved Phase 1 compliance with this Paragraph during the first quarter of 2023. Since the completion of the TSMR pilot in October 2022, MCSO has continued to share the vetting decisions from the TSMR analysis in a timely fashion, as well as providing documentation each month for closed TSMR cases that proceed beyond the vetting stage. As a result, MCSO has achieved Phase 2 compliance with this Paragraph. We will continue to monitor the production of both the vetting and closed case documents as they are produced by MCSO. We discuss the results of these reviews during our quarterly site visit meetings with MCSO at which the Parties and CAB members are invited to participate.

***Paragraph 65.*** *MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.*

**Phase 1:** In compliance

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on December 12, 2024.

- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:** In compliance

The Traffic Stop Analysis Unit (TSAU) is directly responsible for analyses of traffic stop data on a monthly, quarterly, and annual basis to identify warning signs or indicia of possible racial profiling or other improper conduct as required by Paragraph 64. MCSO must report TSAU's findings from its analyses to the Monitor and the Parties.

Paragraph 65 requires annual analyses of traffic stop data. In June 2023, Traffic Stop Annual Report 8 (TSAR8) was published; and, as noted in the Sheriff's statement published in conjunction with the analytic report, the findings of disparities continue to identify possible systemic racial bias in MCSO's patrol function. The Sheriff's statement notes that some of the disparities have been reduced from prior years, and that no disparities were significantly worse than the prior year. The Sheriff's statement emphasized that investigating the presence of the continued disparities will remain a priority for TSAU in both quarterly and monthly analytic reports. TSARs are further discussed in Paragraph 66, which requires "one agency-wide comprehensive analysis of the data per year." MCSO also created a HUB training curriculum outlining the findings of TSAR8, along with relevant training on biased based policing and the use of internal guidelines for traffic stop activity. During our February 2024 site visit, MCSO reported that 99% of sworn personnel had completed the TSAR8 training.

More recently, MCSO published TSAR9 in June 2024. According to both the analysis and the Sheriff's statement, this report is the first time that MCSO has reported that there were no findings of significant disparity between white and Hispanic drivers for any of the traffic stop outcomes, however, there were findings of disparity for minority drivers, as a whole, for both stop length and citation rate when compared to white drivers. Additionally, the time trends, although not statistically significant, show fluctuating trends of increases and decreases in disparity levels for the outcomes of traffic stops. MCSO has subsequently published a response to the findings of TSAR9 and TSQR14 (District Analysis). MCSO has responded to this, and previous analytic reports, by examining ETSI use, disseminating guides to deputies regarding ETSI use, monitoring long non-extended stops, and more.

Finally, TSAR10, published in June 2025, indicated that the analysis revealed significant disparities in traffic stop outcomes for Hispanic, Black, and all minority drivers compared to white drivers. Key findings include longer stop lengths and differences in search and arrest rates:

- Black drivers experienced a 31-second longer stop length compared to white drivers.

- All minority drivers had a 0.45 percentage point higher search rate than white drivers.

- Arrest rates differed significantly for Hispanic, Black, and all minority drivers compared to white drivers.

While none of these differences prove the existence of bias, they do show that traffic stop outcome trends have fluctuated from year to year. We have not seen a consistent decrease in these trends over the past several years. As part of its response to several of the analytic findings, MCSO has begun to seek accreditation from the Arizona Law Enforcement Accreditation Process, evaluated enforcement priorities, continued to conduct Town Halls with District personnel and community groups, and created dashboards to assist supervisors to improve the monitoring of deputy activity. During our February 2025 site visit, MCSO noted that the agency had created a special unit and were hiring personnel to assist with accreditation issues. We have discussed these and other issues during our recent site visits with all Parties.

Paragraph 65 also requires quarterly analyses of traffic stop data. MCSO completed its first quarterly report (TSQR1) on October 22, 2020. MCSO has published 18 other quarterly reports since that time. Due to the complexity of the analysis proposed for TSQR12, we granted approval to MCSO to conduct the analysis and produce only one report during the third and fourth quarters of 2023.

MCSO published its latest quarterly report, TSQR19, Citations and Warnings, 2024 on September 30, 2025. The report analyzes the racial and ethnic composition of drivers receiving citations and warnings from MCSO deputies. According to the report, Hispanic drivers received citations 62.6% of the time; white drivers, 61.9%; and minority drivers, 60.7%. Citation rates among these groups were not statistically significant.

The District-level analysis revealed significant differences in citation rates for Districts 2, 4, 5, and 7.

The report also investigated citation rates for specific violations among different racial/ethnic groups. Disparities in citation rates were identified for seven Arizona Revised Statutes (ARS) between Hispanic and white drivers, and for four statutes between minority and white drivers at the Office level. At the District level, disparities were noted for 12 ARS statutes between Hispanic and white drivers.

The report analyzes the number of violations cited or warned during traffic stops. The report found that over 87% of stops involved only one violation. Hispanic drivers averaged 1.28 violations per stop, while white drivers averaged 1.11. Statistically significant differences were found in the number of violations between Hispanic and white drivers, and between minority and white drivers.

During our October site visit, we sought clarification of several issues found within the report and were satisfied with MCSO's responses. Both we and the Parties may provide further comments during our upcoming site visit, and MCSO's Internal Review Group (IRG) typically evaluates statistical publications and offers potential responses to the findings contained in the reports.

TSQR18, District Analysis, was published in conjunction with TSAR10 in June 2025. Much of the analysis mirrors that of the annual report but investigates the significant disparities that arise both within and among Districts. For example, District 1 had the highest rate (42.0%) of citations or warnings issued for driving documentation (license/insurance/registration); the highest number (N=51) and proportion (1.8%) of stops with discretionary searches; and Hispanic drivers were arrested at a rate 3.75 percent higher than white drivers. District 2, which has the highest proportion of Hispanics among the Districts, has the lowest citation rate of all Districts. District 2 does have the highest stop rate of Hispanic drivers (47.0%) and the lowest stop rate for white drivers (35.6%). The analysis also showed that District 2 had the lowest citation rate for all drivers (41.3%) but the longest average stop length at 20.6 minutes. Conversely, in District 6, the Motors Units had the highest citation rate for all drivers (69.8%); the lowest proportion of stops with equipment violations (2.7%); no discretionary searches and the shortest average stop lengths (12.3 minutes). In sum, the findings of TSQR18 explain some of the significant findings of the annual report in more detail; and in most ways, are similar to findings of past District comparisons.

TSQR17, Extended Stop Indicator Use, was published in March 2025. This is the third in the series of ETSI analysis, with the first published in 2020 and the second in 2023. The current ETSIs in the VSCF that document delays are Driving Documentation Issues, DUI Investigations, Language Barriers, Technical Issues, Vehicle Tows, Training Stops, and Other Delays. Several of the main findings mirror those of past ETSI analyses.

First, as described above, MCSO deputies documented delays to traffic stops during 10,607 traffic stops in 2024 (52.34% of traffic stops) in TSQR3 (2020), when 3,699 stops (or 18.2%) were extended; and in TSQR13 (2023), 7,332 traffic stops (or 39.35% of stops made in 2023) were extended. The trend, therefore, is that extended stops are increasingly common and a supplemental analysis of all stops is fundamental to a clear understanding of the disparities in traffic stop length, as noted above. It is important to note that two new ETSIs were introduced in the latter part of 2022: Documentation Issues and Other Issues (which requires comment on what the delay entails).

Second, the most common ETSI used for the Office and among all Districts was Driving Documentation Issues. It should be noted that Driving Documentation Issues had the least impact on stop time but occurred most often.

Third, MCSO deputies documented delays for each ETSI at a statistically significant higher rate for Black, Hispanic, and minority drivers than white drivers for all ETSI types, with the exception of stops with Technical Issue experienced by Black drivers.

Fourth, Stops with Black, Hispanic, and minority drivers experiencing Driving Documentation Issues were longer than stops of white drivers experiencing the same issue. These differences were statistically significant.

Fifth, Districts 1, 2, and 4 have the highest proportion of ETSIs – which is likely due to population make-up.

Sixth, the three ETSIs that created the longest delays – DUI, Search, and Tow – are related and likely overlapping.

Seventh, MCSO did note, "Additional limitations in reviews of BWC footage must be acknowledged. Reviewers observed several situations that could not be easily coded in the BWC reviews."

Eighth, most of the recommendations made are already in place, since this is the third ETSI analysis conducted by MCSO. MCSO also makes a startling claim for this analysis in both the Executive Summary and Introduction, "MCSO does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order." We agree that one cannot know the extent of potential bias without investigating individual stops; however, while we agree that ETSIs provide the ability to document why stops are extended, this does not mitigate the potential for bias. To begin an analysis with that supposition, we believe, is inappropriate.

TSQR16, Contract Cities, published in December 2024, noted that while three jurisdictions (Cave Creek, Fountain Hills and Carefree) have requested dedicated traffic cars as part of their contracts with MCSO, the analysis shows that these traffic cars did not result in any significant disparities with contract cities that do not have dedicated traffic cars. MCSO did report several significant findings between Hispanic, minority, and white drivers. In Anthem/Desert Hills, there was a statistically significant difference in citation rates between minority and white drivers. In Gila Bend, there was a statistically significant difference for stop length between Hispanic and white drivers; and for arrest rates between minority and white drivers. There was a second statistically significant difference for arrest rates between white and Hispanic drivers in Guadalupe. There were also additional significant findings for all other MCSO traffic stops not conducted within a particular contract city.

There were no statistically significant disparities in stop length, citations, search rates, or arrest rates for the communities of Sun City, Sun City West, and Youngtown. Additionally, there were no statistically significant differences in stop length, citation rates, search rates, and arrest rates for Goodyear/Mobile. MCSO also found no statistically significant disparity in stop length, citation rates, or search rates in Guadalupe. There were also no statistically significant differences for stop length, citation rates, search rates, or arrest rates for the towns of Carefree, Cave Creek, and Fountain Hills.

Although not significant, MCSO also reported that the discretionary search rate is three times the average for MCSO in Guadalupe and Goodyear and two times the average in Youngtown. MCSO noted that there appeared to be no pattern to these disparities, and the rates hover around one percent of all stops in those jurisdictions.

We have discussed earlier TSQRs in detail in our previous quarterly status reports.

Paragraph 65 also requires MCSO to conduct monthly analyses of traffic stop data. MCSO's original monthly process to analyze traffic stop data began in 2015 but was suspended in May 2016 due to our determination that the original process lacked statistical validity and required significant refinement to improve the identification of potential alerts in EIS. That commenced nearly a seven-year effort to identify the best methodology to identify potential bias in traffic stops at the individual deputy level, which is the focus of the monthly analysis. The process to finally arrive at an agreed-upon and approved methodology has been documented in great detail in our prior quarterly status reports.

In April 2021, MCSO began testing what was then the best version of the methodology in a pilot project. One of the key components of the methodology is using the prior 12 months of traffic stop data in the analysis each month. This "rolling" 12-month period was chosen to provide the most recent data available – but also to provide a sufficient number of traffic stops for meaningful analysis. MCSO conducted 15 review cycles during the pilot period ending in October 2022. MCSO performed this every month, except when agreed to by us and the Parties so that MCSO could make modifications based upon experiences from earlier cycles. During this time, the methodology was collaboratively modified based on the input of experts from our Team, MCSO, the Plaintiffs, and the Plaintiff-Intervenor.

At the conclusion of the pilot, MCSO began the process of finalizing the policies that govern the implementation of the TSMR process. These policies were approved during the first quarter of 2023 and include updates pertaining to the TSMR process to both the TSAU Operations Manual and GH-5 (Early Identification System).

MCSO continues to share the monthly vetting of traffic stop data with us and the Parties. During the current quarter, all vetting materials were received within the timelines laid out in the TSAU Operations Manual. For this reporting period, MCSO evaluated 42 flags pertaining to 33 deputies, as the result of the statistical analysis (monthly vetting). Of these, eight flags were forwarded for a more complete review; and 31 were discounted. We concurred with the findings of the vetting process and notified MCSO within days of receiving the vetting materials each month. We will continue to monitor and report on these issues.

During this reporting period, MCSO also continued sharing the closure documents for those cases that were flagged as a result of the analysis. During the post-vetting review, MCSO can discount additional cases if it determines that the potential bias found in the statistical analysis is explained by a thorough review of similar stops (speeding, non-moving, licensure, etc.) when compared across ethnic/racial categories. For example, when five mile-per-hour speed categories are examined, the statistical difference may be due to one or more categories where only Hispanics or other minority groups are found to receive citations and others where white and minority drivers have been treated equally. This is only one potential example. However, even for those cases that are discounted, MCSO can recommend that a memo be sent to the District, if the in-depth review discovers minor policy or process issues. These issues, however, cannot be related to the race/ethnicity of the persons stopped. MCSO can recommend an intermediate intervention if the reviewer finds that while the statistical differences are minimized, there are still potential concerns regarding how individual drivers are treated that may be based on race or ethnicity. Finally, MCSO can recommend a full intervention if the more in-depth review of stops does not mitigate the potential bias found during the statistical analyses.

During the third quarter of 2025, we reviewed seven closed TSMR investigations and one which was continued for a full intervention following the second review. The seven flags were discounted at the second stage review, as the earlier discrepancies were explained during this review. Six of the seven cases resulted in a memo to the District, as the TSAU review uncovered minor issues that needed to be addressed with the deputy. There was one case in which the deputy received a memo in the month prior, and all of the issues had been addressed. Most of the issues pertained to completing paperwork properly, activation/deactivation of BWCs, ETSI use, and deputies' description of how internal guidelines were employed, or radio codes not aligning across forms and CAD, among others. All supervisors held individual meetings with the deputies to address the respective issues raised by the TSAU review. We believe that MCSO's practice prompts the immediate supervisor to intervene as soon as any issues arise as a result of this in-depth review that may not have been addressed as quickly otherwise.

We will continue to provide specific feedback regarding our review of completed TSMR cases during our site visits, as we have done since April 2023.

MCSO remains in Phase 2 compliance with this Paragraph.

***Paragraph 66.***  *MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV.  The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval.  The MCSO may hire or contract with an outside entity to conduct this analysis.  The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.*

**In Full and Effective Compliance**

MCSO has completed 10 comprehensive Traffic Stop Annual Reports (TSARs) analyzing traffic stop data to look for systemic evidence of racial profiling or other bias-based policing.  MCSO's first contract vendor, Arizona State University, produced the first three TSARs.  MCSO's current vendor, CNA, produced the TSARs since that time.

TSAR8 was published on June 30, 2023, and, as noted in the Sheriff's statement published in conjunction with the analytic report, the findings of disparities continue to identify possible systemic racial bias in MCSO's patrol function.  The Sheriff's statement notes that some of the disparities were reduced from the prior year, and that there were no significantly worse indicators in comparison to 2021.  The statement emphasizes that investigating the presence of the continued disparities will remain a priority for TSAU in both quarterly and monthly analytic reports.  The statement also notes a dramatic reduction in stop length for Hispanic drivers when compared to white drivers, but we note that two new extended traffic stop indicators (ETSIs) were added during 2022.  The addition of these two indicators resulted in a 7% increase in stops being classified as justified extended stops.  Moreover, in the calculation of average stop length, all stops with extended traffic stop indicators are removed from the annual analysis of stop length.  According to TSQR13, "2023 Extended Stop Indicator Use," all ETSIs independently increased the length of stops in a significant way when other ETSIs were held constant – but the analysis did not "explore how different delays interact with each other and acknowledge that interactions among certain events during traffic stops play an important role in predicting how long a traffic stop might last."

MCSO proposed some changes to the methodology employed in TSAR8 that were accepted by us and the Parties after review.  Many of these changes resulted from analytic findings from the TSMRs and others have been the result of TSQRs.  The modifications adopted show the ability of MCSO to expand and broaden its methodology when new information uncovers potential improvements in the investigation of disparities in traffic stop outcomes, including findings from TSMR and TSQR analyses.

During our October 2023 site visit, MCSO acknowledged that comments the agency had received regarding TSAR8 had prompted MCSO to plan future TSQR analyses to overcome some of the issues raised – in particular, extended traffic stop indicators (ETSIs), stop length calculations and presentations, and jurisdictional analyses.  (We will explore these in other Paragraphs as they are produced.)  MCSO personnel commented that the agency planned to propose enhanced training for personnel that covers the details of TSAR8.  During our February 2024 site visit, MCSO advised us that 99% of all sworn personnel had completed the TSAR8 training via the HUB.

TSAR9 was published in June 2024, and represents the first annual review, according to the Sheriff's statement accompanying the report, in which there were no significant findings of disparity in traffic stop outcomes between the Plaintiffs' class members and white drivers, however, there were findings of significant differences for stop length and citation rate for all minority groups as a whole and white drivers. Additionally, the time trends included in TSAR9 show fluctuating trends of increasing and decreasing levels of disparity for the traffic stop outcomes from TSAR4 to TSAR9. While these trends cannot be judged for statistical significance they do show that there is not a uniform increase or decrease in outcomes over the time period. MCSO has subsequently published a response to the findings of TSAR9 and TSQR14 (District Analysis). In addition to responses that had begun following previous analytic reports – for instance, scrutinizing ETSI use, disseminating guides to deputies regarding ETSI use, monitoring long non-extended stops, among others. MCSO is also seeking accreditation from the Arizona Law Enforcement Accreditation Process (LEAP), evaluating enforcement priorities, continuing with Town Halls, and created a dashboard to assist supervisors to improve the monitoring of deputy activity. We have discussed these and other issues during our recent site visits with all Parties. During our February site visit, nearly all Districts were able to access these dashboards without the assistance of TSAU members that also attended the meetings.

Finally, TSAR10, published in June 2025, indicated that the analysis revealed significant disparities in traffic stop outcomes for Hispanic, Black, and all minority drivers compared to white drivers. Key findings include longer stop lengths and differences in search and arrest rates. Specifically, Black drivers experienced a 31-second longer stop length compared to white drivers; all minority drivers had a 0.45 percentage point higher search rate than white drivers; and arrest rates differed significantly for Hispanic, Black, and all minority drivers compared to white drivers.

While none of these differences prove the existence of bias, they do show that traffic stop outcome trends have fluctuated from year to year; and we have not seen a consistent decrease in these trends over the past several years. We will continue to evaluate MCSO's responses to its analytic reports as they are made available.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 67.** *In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:*

a.      *racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;*

b.      *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

c.      *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

d.      *indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and*

e.      *other indications of racial or ethnic bias in the exercise of official duties.*

**Phase 1:**  In compliance

- Early Intervention Unit (EIU) Operations Manual, most recently amended on December 3, 2024.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 10, 2025.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 8, 2025.

- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:**  In compliance

MCSO has conducted monthly and annual analyses of traffic stop data and provided documents discussing how the benchmarks required by this Paragraph are used to set alerts for possible cases of racial profiling or other deputy misconduct involving traffic stops.  (Further discussion on the monthly and annual analyses are incorporated into Paragraphs 65 and 66.)

We have discussed in our previous quarterly status reports that MCSO has achieved Phase 1 compliance with this Paragraph due to the publication of appropriate guiding policies for both the TSMR and TSAR.  The benchmarks are highlighted below and are generally referred to as post-stop outcomes in the TSMR and TSAR methodologies.

Paragraph 67.a. identifies three benchmarks pertaining to racial and ethnic disparities.  The first benchmark references disparities or increases in stops for minor traffic violations (Benchmark 1).  The second benchmark addresses disparities or increases in arrests following traffic stops (Benchmark 2).  The third benchmark addresses disparities or increases in immigration status inquiries (Benchmark 3).  During this quarter, there were no reported immigration inquiries.  Since these three benchmarks are incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.a.

Paragraph 67.b. identifies a benchmark pertaining to evidence of an extended traffic stop involving Latino drivers or passengers (Benchmark 4).  Since this benchmark is now incorporated into the EIU Operations Manual and is incorporated in the TSMR methodology, MCSO is in compliance with Paragraph 67.b.

Paragraph 67.c. identifies three benchmarks.  The first benchmark pertains to the rate of citations (Benchmark 5):  MCSO is required to identify citation rates for traffic stops that are outliers when compared to a deputy's peers.  The second benchmark (Benchmark 6) pertains to seizures of contraband.  MCSO is required to identify low rates of seizures of contraband following a search

or investigation.  The third benchmark in Paragraph 67.c. (Benchmark 7) is similar to Benchmark 6, but it pertains to arrests following a search or investigation.  Since the three benchmarks are now incorporated into the EIU Operations Manual and are incorporated as post-stop outcomes in the TSMR methodology, MCSO is in compliance with Paragraph 67.c.  However, we and the Parties continue to discuss with MCSO how to best capture searches and seizures related to both traffic and non-traffic events to ensure that they are searchable and can be analyzed.

Paragraph 67.d. establishes a benchmark pertaining to agency, unit, or deputy noncompliance with the data collection requirements under the First Order (Benchmark 8).  This benchmark requires that any cases involving noncompliance with data collection requirements results in an alert in EIS.  During this quarter, there were five such alerts.  EIU published an Administrative Broadcast on November 28, 2016 to instruct supervisors how to validate data in TraCS for those cases involving duplicate traffic stop records to deliver timely data validation for our review.  MCSO's draft EIS Project Plan 4.0 reported that MCSO began the data validation process for this benchmark on November 28, 2016.  Therefore, MCSO is in compliance with Paragraph 67.d.

Paragraph 67.e. allows for other benchmarks to be used beyond those prescribed by Paragraph 67.a.-d.  MCSO has three benchmarks under Paragraph 67.e.  Benchmark 9 is defined as racial or ethnic disparities in search rates.  Benchmark 10 is defined as a racial or ethnic disparity in passenger contact rates.  Benchmark 11 is defined for non-minor traffic stops.  Benchmarks 9-11 are incorporated into the EIU Operations Manual, as well as the TSMR methodology.  Therefore, MCSO is in compliance with Paragraph 67.e; however, we continue to monitor the discussion surrounding GJ-3 (Search and Seizure) as it may impact these Subparagraphs.

As noted earlier, the TSMR methodology, which incorporates these benchmarks, was approved following the completion of a lengthy pilot project in October 2022.  MCSO finalized the guiding documents (TSAU Operations Manual and GH-5, including Attachment A [Definitions and Event Entry Types] and Attachment C [Supervisor EIS Traffic Stop Alert Form]) late in quarter 1 of 2023.  MCSO regularly publishes inspections for several of these benchmarks in addition to continuing to produce the monthly TSMR according to the guiding documents.  As a result, MCSO has Phase 2 compliance with this Paragraph.

**Paragraph 68.**  *When reviewing collected patrol data, MCSO shall examine at least the following:*

a.    *the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;*

b.    *the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;*

c.    *the tactics employed during the Significant Operation and whether they yielded the desired results;*

d.    *the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by*

> *Deputy, geographic area, and the actual or perceived race and/or ethnicity and the surname information captured or provided by the persons stopped, detained or arrested;*

e.     *the resource needs and allocation during the Significant Operation; and*

f.     *any Complaints lodged against MCSO Personnel following a Significant Operation.*

**In Full and Effective Compliance**

MCSO has not conducted a Significant Operation that met the requirements of the Order since Operation Borderline in December 2014. Subsequent activities have not met the criteria for review under this or other Paragraphs.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

As a result of this determination, MCSO District command staff – as well as Investigations and Enforcement Support – will no longer be required to submit monthly statements that they have not participated in Significant Operations as defined by this and other Paragraphs; however, MCSO is required to notify us should staff become involved in a Significant Operation. We will continue to assess Phase 2 compliance through interviews with command and District staff during our site visits.

During our most recent site visits, we inquired of administrative staff and District personnel whether any Significant Operations had occurred since our prior site visit. There is no indication that MCSO has conducted any operations that meet the reporting requirements for this Paragraph since October 2014. (MCSO updated GJ-33 [Significant Operations) on March 7, 2024.)

**Paragraph 69.** *In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on April 8, 2025.
- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:** In compliance

MCSO has placed into production database interfaces with EIS, inclusive of Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Administrative Office of Courts (AOC) records, and the Cornerstone software program (referred to as "the HUB"), that includes training and policy records for MCSO. Supervisors have demonstrated the ability to access these during our site visits, most recently in October 2024 and February 2025. Most audits and inspections of supervisory oversight activities indicate compliance, but several continue to show fluctuating trends of use or completion over time which we regularly monitor.

MCSO continues to provide access each month to all Non-Traffic Contact Forms (NTCFs) involving investigative stops and field information. At times over the past year, our review of the NTCFs provided each month indicated that a higher proportion of Latinos are being contacted in particular areas of the County for relatively minor infractions. Over the last two quarters, we noted that one incident in March indicated a search incident to an arrest, but there was no IR, and the subject was released from the area. In another stop of a bicycle, the subject was contacted, but the deputy did not add the date of birth and related personal information to the form. When queried about these, MCSO was able to provide information that was missing through site visit requests made in April 2025. Similarly, we found that two NTCFs in April did not include sufficient identification of persons contacted.

During our July site visit, MCSO advised us that the agency would be publishing an Appendix to EA-3 describing how to adequately complete the new forms. For the current quarter, we found 12 instances where the deputy marked "white" on the NTCF and "white/Hispanic" on either the Incident Report or VSCF. We believe this occurred because the new NTCF has only one box for Race/Ethnicity, while the VSCF and IR have a Race box and an Ethnicity box. We raised this with MCSO during our October site visit, and the agency will be investigating these issues. We will continue to monitor such issues, as we believe such findings would make inclusion of these cases in any quantitative analysis difficult, as necessary data is missing. We will be following up with MCSO regarding each of these issues.

MCSO published an initial NTCF study in February 2023. While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward. We have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded.

During our October 2023 site visit, we discussed MCSO's progress in modifying the Non-Traffic Contact Form (NTCF) and policy. Following a historical summary of the issues, MCSO gave a PowerPoint presentation outlining its plans going forward. MCSO proposes to utilize NTCFs only for deputy-initiated, on-sight events. All calls for service that may have appeared in NTCFs in the past will be handled through Incident Reports or other means in the future. In addition, the NTCF itself will be modified to resemble the Vehicle Stop Contact Form (VSCF) to ensure that analyses can be conducted. MCSO also believes the best way to analyze the limited number of NTCFs will be to use simple ratio analyses of non-traffic contacts per deputy for minority groups as opposed to whites. MCSO most recently amended EA-3 (Non-Traffic Contact) in April 2025. We continue to await the quantitative analysis agreed upon with MCSO. This should also be useful for supervisors to evaluate the activity of deputies under their command.

One issue of particular importance is how MCSO will count and monitor search requests by deputies for those persons they come into contact with during a non-traffic contact. MCSO has proposed using an acceptance for the search captured on BWC. We and the Parties are concerned that, without adequate documentation on forms, it would be difficult to accurately capture all events in the database that should be used to analyze non-traffic contacts. Additionally, it may limit the usefulness of Non-Traffic Contact Forms for supervisory oversight of deputy activity. Absent the ability to analyze non-traffic contacts completely may limit MCSO's ability to achieve compliance for several Paragraphs. We will discuss this with MCSO further during our upcoming site visits.

MCSO also conducts evaluations of supervisory investigations into non-traffic stop alert investigations each month. We select a random sample of 15 cases, when the number of completed investigations exceeds that amount; and evaluate the sufficiency of the investigations undertaken. In 2022, MCSO requested to change the monthly inspection to quarterly due to the fact that reviewing so few cases each month increased the likelihood of being found noncompliant. We agreed to convert the alert inspection to a quarterly process that includes an evaluation of the effectiveness of the interventions undertaken. MCSO produced this evaluation for the first time during the third and fourth quarters of 2022 and has continued to provide these to us since that time. To include an evaluation of whether any alerts are recurring, MCSO evaluates the closed alerts from nine months prior to the reporting period and examines all alerts for the next six months.

MCSO has established an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The ARG ensures that the reports of the supervisors address all aspects of the assigned investigations and returns those that are deficient to the District for continued revision. Over the past several months, we have noted that the proportion of completed alert investigations being sent back to the Districts by the ARG is minimal. MCSO has emphasized supervisory investigations in the past several years' training, as well as the creation of liaisons between BIO and the Districts to ensure that supervisors receive the necessary support and information to complete these investigations.

As noted above, the EIS Alert Investigations inspection comprises an evaluation of the timely completion of alert investigations for the prior quarter and an evaluation of whether alerts have reoccurred from nine months prior to the most recent quarter. As a result, we always report for the quarter prior to the current time period due to the need for sufficient time to pass to evaluate the success of interventions. For the second and third quarter EIS Alert Investigations inspections for 2025 MCSO found that 100% of alert investigations were completed within the 30 days required by policy.

In the second section of the inspection, MCSO evaluates whether alert investigations closed nine months prior reoccurred during the next two quarters. In each of the second and third quarter alert reports, MCSO notes that there was one recurring alert. When a recurring alert arises, AIU staff investigate how supervisors responded to the new alert. For both of these recurring alerts, the supervisor escalated the intervention to include additional training. MCSO provided sufficient detail from its inspection investigations to justify the responses of the supervisors.

The Audit and Inspections Unit (AIU) also conducts monthly audits of supervisory oversight via the Supervisor Notes made for each deputy. Minimally, each month, supervisors should be making a performance appraisal note, two Supervisor Note entries, reviewing two body-worn camera recordings, reviewing the EIS profile of their subordinates, and noting such in BlueTeam. During the third quarter of 2025, MCSO reported 100% compliance for September, which we concur with. MCSO also reported a compliance rate of 87.66% in July and 94.7% in August. Our review found that in each month, there were three supervisors who failed to make multiple notations outlined above for several of their subordinates. As a result, our compliance ratings were more than 10 percentage points lower than those MCSO reported. MCSO sent out BIO Action Forms for the deficiencies reported. We will continue to monitor these reports.

AIU also conducts three inspections of traffic stop information: two pertain to the timely review and discussion of traffic stops by supervisors for each subordinate; and one inspects the correct completion of traffic forms and the coordination of these forms with databases such as CAD and the review of body-worn camera footage. For this quarter, the traffic discussion and review inspections, MCSO reported compliance rates of 100%. We concurred with these findings.

For the traffic data inspection, MCSO reported compliance rates exceeding 99% for the quarter. Our compliance calculations for the quarter were slightly lower each month, 97.1%, due to an error on a conclusion of contact in July, the BWC not being on during a traffic stop in August, and a license mismatch between the VSCF and CAD in September. Additionally, there was no indication that the immediate supervisor caught these deficiencies. All three inspections were based upon a stratified random sample of all traffic stops that our Team provided to MCSO. AIU sent BIO Action Forms to those Districts where it found deficiencies. As noted above, we will continue to monitor these reports.

MCSO has developed an Incident Report Inspection that has been approved following several revisions. The inspection should include instances where prosecuting authorities turned cases down due to a lack of probable cause, among other matrix items developed by MCSO. MCSO reported compliance rates exceeding 99% for this quarter, with no instance of a case being turned down due to a lack of probable cause. Our review of the inspections for the quarter found that in each month, there was one instance of a missing property receipt. Additionally, in August, there was no indication of a search incident to a tow; and in September, there was one case where the reviewer indicated the report lacked reasonable suspicion for the initial contact. Therefore, our compliance rates were 97.5%, 95%, and 95% respectively. In each instance, the inspection also noted that supervisors did not catch these deficiencies while reviewing the deputies' documents. For those deficiencies discovered during the inspection process, AIU sent BIO Action Forms to the appropriate Districts for additional review and action.

In past quarterly status reports, we issued a warning regarding compliance with this Paragraph as several inspections showed compliance rates under 94%. In the current quarter, we found some improvement with compliance rates and others with deficiency issues. We will continue to monitor these trends.

MCSO has made great strides in utilizing existing data sources to ensure that supervisors are routinely and consistently evaluating the performance of their subordinates, including the creation of the EIS Alert Review Group and BIO Action Form tracking processes. However, during recent

evaluations and discussions among us, MCSO, and the Parties of policy GJ-3 (Search and Seizure) and the Consent to Search Form, it has become apparent that not all searches receive the same scrutiny from supervisory staff as we have prescribed for traffic stops in general. Given that these searches and seizures can occur both within traffic stops and during non-traffic contacts, we have proposed modifications to GJ-3 that would enhance the ability of supervisors to access and review these events. We have made these same observations in past quarterly reports and note the import of clear and definite responsibilities and duties of supervisory oversight. We have also noted repeatedly, under Paragraph 69, that when AIU inspectors find minor deficiencies in Incident Reports for deputies, the supervisors have failed to address these issues with their subordinate deputies without notification of the inspection deficiencies.

On April 11, 2025, and again on July 25, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we deferred our determination for this assertion. We noted our concern that searches and seizures can occur both within traffic stops and during non-traffic contacts. We and the Parties need to be confident that all searches will be captured in the database where they can be part of an analysis, if necessary, reviewable by supervisors and retained for future reference. In that vein, we have proposed modifications to GJ-3 that would enhance the ability of supervisors to access and review these events. We have made these same observations in past quarterly reports and note the import of clear and definite responsibilities and duties of supervisory oversight. We have also noted repeatedly, under Paragraph 69, that when AIU inspectors find minor deficiencies in Incident Reports for deputies, the supervisors have failed to address these issues with their subordinate deputies without notification of the inspection deficiencies. Finally, while NTCFs are in the database, MCSO has not yet produced an analysis that would afford the examination of potential bias within and between non-traffic contact events. Given that we do not want to compound problems of oversight, until such time as the processes related to GJ-3 and non-traffic contact events are incorporated into policy and practice, we are deferring our determination of Full and Effective Compliance for Paragraph 69.

**Paragraph 70.** *If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.*

**Phase 1:** In compliance

- Early Intervention Unit (EIU) Operations Manual, most recently amended on December 3, 2024.

- EB-1 (Traffic Enforcement, Violator Contacts, and Citation Issuance), most recently amended on April 10, 2025.

- EB-2 (Traffic Stop Data Collection), most recently amended on April 8, 2025.

- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:** Not in compliance

MCSO has finalized protocol and training-related plans for the Traffic Stop Monthly Reports (TSMRs) and memorialized these in the TSAU Operations Manual. MCSO has also modified GH-5 and incorporated the necessary documents from TSMR into that policy. The TSMR is intended to provide a more timely response to potential indications of bias at the deputy level through the examination of a rolling 12 months of traffic stop data for each deputy. MCSO has refined the vetting process for those cases where a deputy flags in the analysis and has recommended outcomes ranging from the discounting of a flag to the onset of full interventions, which would entail remedies based upon the findings of TSAU. MCSO has continued producing the monthly vetting analyses for our ongoing review, as well as documentation of any cases that are closed as a result of the completion of TSMR processes. There was one recommendation for a full intervention this quarter, and the memos that resulted from findings of minor policy violations by TSAU reviewers appeared to be responded to by District personnel in appropriate ways. We discussed these issues with MCSO personnel throughout our 2025 site visits.

While MCSO has finalized the development of the EIU Operations Manual, the agency does regularly submit analyses and proposed changes to Appendix A as needed. We will continue to work with MCSO on the refinement of this appendix. MCSO has received approval to move forward on several TSQR projects and published 19 of these reports through the third quarter of 2025.

Each year, MCSO publishes a Traffic Stop Annual Report. In the last three years, the agency has followed these publications up with an anticipated response of the agency following an evaluation from MCSO's Internal Review Group (IRG). In TSAR8, published in June 2023, and TSAR10, published in June 2025, MCSO reported finding some significant outcome disparities that may indicate bias within the patrol function. TSAR9, published in June 2024, was the first annual report that showed no significant disparities between Hispanic and white drivers in terms of outcomes; however, TSAR9 did find significant disparities between all minority drivers and white drivers for citation rates and stop length.

In response to each of these reports, MCSO held Town Halls both for District personnel and community groups, instituted some additional training, and investigated some of the findings from the annual reports in more fine-grained quarterly analyses. We have discussed several ways that MCSO might use the Town Halls as a more measurable outcome of the IRG review process. MCSO has also created an Accreditation Management Unit and is compiling information and data to work toward full compliance with the Arizona Law Enforcement Accreditation Process. Additionally, MCSO developed a dashboard of deputy traffic stop and patrol activity that could serve to improve deputy oversight by immediate supervisors and command staff. MCSO has also provided additional training regarding the use of Extended Traffic Stop Indicators as a result of TSQRs conducted over the last several years (TSQR3, TSQR13, and most recently, TSQR17 in March 2025). MCSO also reviews all traffic stops lasting over 20 minutes to determine if the deputy should have employed an ETSI.

For the past two years, MCSO has also published a quarterly report in conjunction with the annual report that examines more closely the traffic stop activity within and between Districts. According to MCSO, these District analyses have provided the agency with the opportunity to tailor the Town Hall meetings in the Districts to address the types of findings that show how one District differs from the others. It could also allow for a more focused training program based upon findings unique to each District. We and the Parties have discussed several of these issues with MCSO during quarterly site visit meetings. We look forward to reviewing any modifications MCSO might make to the Town Hall process that would contribute to MCSO's compliance.

During our February 2024 site visit meeting on Paragraph 70, MCSO noted that over 99% of sworn personnel had completed the advanced training on TSAR8 described above via the HUB. Additionally, MCSO has also created a dashboard of traffic stop activity to allow supervisors to view the accumulated data of their deputies' traffic stops. This dashboard was completed in September 2024. We have noted elsewhere that command staff have expressed the usefulness of the dashboard during several visits to Districts in 2025, but many command staff believe that front-line supervisors have not incorporated the dashboard into their reviews of deputies as they have already created such processes that are duplicated by the dashboard. As noted above, MCSO also created an Internal Review Group (IRG) to evaluate all statistical reports (TSQRs and TSARs) and recommend appropriate responses to the findings.

The Constitutional Policing Plan (CPP) was created to assist with the resolution of issues identified in the Traffic Stop Annual Reports (TSARs). The CPP received Court approval on October 12, 2017. The CPP included nine Goals and a timeline for the completion of the Goals. Our comments in this report pertain to compliance with the Plan during the third quarter of 2025. MCSO began using an online progress tracking tool (Smartsheet) and provided a link to the application in April 2020. The online spreadsheet was based on the plan originally agreed to by the Parties and approved by the Court. The spreadsheet provided added details of MCSO's reported progress on each of the nine CPP Goals: the start date; the projected completion date; and the status of sub-Goals and projects.

In February 2024, MCSO advised us that the agency would no longer be updating the online Smartsheet. As MCSO is no longer updating the Smartsheet, the agency must provide other documentation of its activities related to the CPP Goals so that we can verify MCSO's progress. Our compliance assessment remains based on the existing Constitutional Policing Plan, the results of traffic stop data analysis reports, as well as MCSO's response to those reports.

During our October site visit, we met with MCSO and the Parties to discuss Paragraph 70 and the Constitutional Policing Plan (CPP). We determine compliance with the CPP through several means. First, we issue monthly and quarterly document requests on specific Goals of the CPP, which we review. We have monthly document requests on proposals in support of Goals 1, 3, 4, and 5. We review meeting agendas, supervisors' notes, and discussion items to verify compliance with the activities created under those Goals. To meet the training requirements for Goals 3, 4, and 5, we will consider training enhanced if it is demonstrably different from training currently offered as part of meeting the basic requirements of the First and Second Orders. We closely review this content for overlapping topics and material that is required to be presented in other Order-related training such as the ACT or SRELE. As we have advised MCSO, the enhanced training can reinforce material currently provided in these training programs; but enhanced training cannot simply be a repackaging of existing curriculum without notable modifications or additions. We will determine if the proposed training is enhanced during our initial review consistent with the training development Paragraphs of the First Order. We verify the completion of training requirements through attendance sheets, test results and analysis, evaluation reports, and HUB reports. Reviews of BIO inspections, Supervisor Notes, and attendance sheets aid with documenting Captains' meetings and roll call briefings. Our standing requests for other Paragraphs of the First and Second Orders also provide information related to some of the CPP Goals. For Goal 1, we review MCSO monthly submissions related to supervisory corrective actions. For Goal 2, we review a selected sample of deputy and supervisor Employee Performance Appraisals (EPAs). For Goal 6, we conduct periodic meetings with MCSO, the Plaintiffs, and Plaintiff-Intervenor related to the evaluation of traffic stop data and associated monthly, quarterly, and annual reports. More specifically, Goal 6 seeks data collection that focuses on the discretionary aspects of law enforcement for further analysis, such as the ongoing discussions related to the Consent to Search Form and data collection. For Goal 9, we request recruiting, hiring, and retention statistical information; and compare these statistics to the previous quarter, and we report our findings. Our comments below reflect what we learned because of our reviews of documentation during the third quarter of 2025, our site visit requests, and through our discussions during our October 2025 site visit.

Goal 1: Implementing an effective Early Intervention System (EIS) with supervisor discussions. During this reporting period, between September 18-25, 2025, MCSO reported that the sworn component of the Traffic Stop Analysis Unit (TSAU) utilized its existing liaison function with Patrol Bureaus East and West to physically meet with MCSO personnel assigned to Districts 1, 2, 3, 4, and 7, and Lake Patrol. According to MCSO, these meetings were initiated by the TSAU and organized to simultaneously meet third quarter 2025 Court-ordered Town Hall requirements and provide hands-on, one-on-one, mentoring to line-level deputies, first-line supervisor, and command-level personnel. The Town Halls depicted coverage topics of TSQR17, TSQR18, TSAR10, and the additional search information now compiled on the VSCF.

During our October site visit, we discussed at length a better way to document these meetings while adhering to existing policy so MCSO.  For Town Halls, there is no documentation of who is in attendance; what content was delivered; and what, if any, measurable performance objectives exist.  We believe that the use of existing standardized means of documentation will better serve MCSO as it seeks compliance with this Paragraph.

Goal 2: Evaluating supervisors' performances through an effective Employee Performance Appraisal process.  During this reporting period, the Employee Retention and Performance Division (ERPD) audited 14 EPAs of sworn personnel, requiring feedback to approvers on nine of them.  This continues to be significant, considering that 64% of audited EPAs during this reporting period required supervisory feedback.  During our October site visit, we discussed the spreadsheet that HR provides documenting EPA audits to determine if MCSO could add a column naming the chain of command for reviewers of record.  Unfortunately, HR advised us that the ERPD does not have the records to provide that information.  MCSO advised us that in September 2025, the ERPD received feedback from the Bureau of Internal Oversight (BIO) about testing the Supervisor Note enhancement.  At present, the Technology Bureau is continuing to research and test potential solutions.  It remains uncertain whether the formatting issue can be resolved within the current system architecture.

Goal 3: Delivering enhanced implicit bias training.  The Training Division is currently developing a 2025 CPP Enhanced Training program.  MCSO did not produce any new materials to support roll call briefing or Captains' meetings materials during this reporting period.

Goal 4: Enhanced Fair and Impartial Decision-Making training (FIDM).  During the third quarter of 2025, MCSO did not produce or deliver any training specific to Goal 4.

Goal 5: Delivering enhanced training on cultural competency and community perspectives on policing.  During the third quarter of 2025, MCSO did not produce or deliver any training specific to Goal 5.

Ten traffic surveys were completed in the third quarter of 2025.  This brings the total number of surveys from the beginning to 186 of 88,769 traffic stops.  The response rate stays unchanged at 0.2%.  We continue to believe that the distribution method can be improved and will not intimidate any persons from participating in the survey, as MCSO has asserted.  From the documents provided, nine respondents agreed that deputies treated them without bias.  Of the 10 respondents, three were Hispanic, three were white, and four were unable to be determined due to involvement in vehicle crashes and parking events.  Despite the dismal returns of the traffic survey, MCSO has not changed its distribution method.

Goal 6:  Improving traffic stop data collection and analysis.  MCSO continues to refine methodologies, when necessary, through collaboration with the Monitoring Team and the Parties.  The latest annual reports show that disparities between Hispanic and white drivers, involving traffic stop outcome measures, remain.  The report highlights significant differences between all minority drivers and white drivers for stop length and citation rate.

During this reporting period, MCSO published updates to actions, planned or taken, by the agency in response the TSAR10 and TSQR16 (Contracted Jurisdictions); TSQR17 (Extended Traffic Indicator Use 2024) and TSQR18 (District Analysis 2024).  The production of a webpage to

deploy traffic trends has been updated through September 2025. In March, sworn employees received an email with traffic trends for the fourth quarter of 2024. During our District visits, we requested a demonstration of the real time traffic stop dashboard for patrol supervisors. Patrol supervisors have often noted that they use existing data sources to track their employees' activity, while District administrative staff relayed that they employ the dashboard to observe trends across their districts and use the data during community engagement. MCSO has indicated prior training of personnel on the dashboard but does not require its use. Previously discussed and approved alterations to the VSCF and the NTCF occurred during August 2025. In addition, MCSO advised us that the agency held two community meetings during this reporting period. The first occurred on March 25, 2025, in Gila Bend; and the second was held in Aguila on April 3, 2025. During the meetings, the Traffic Stop Analysis Unit provided overviews of traffic stop analysis and internal audits and inspections. We will continue to review, evaluate, and offer suggestions to actions and responses to the analytic reports as they are produced.

Goal 7: Encouraging and commending employees' performance and service to the community. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 8: Studying the Peer Intervention Program. This goal has been completed. This goal was not part of the requirements set by the First Order.

Goal 9: Building a workforce that provides Constitutional and community-oriented policing and reflects the community we serve. For our October site visit, MCSO reported continuation of pre-employment hiring events during this reporting period. In addition, there were 14 recruitment outreach events conducted throughout the County in July and August.

In response to our October site visit request, MCSO reported a total of 969 overall vacancies as of September 30, 2025. This is a decrease of 95 vacancies over the last quarter. The vacancies reported for the third quarter of 2025 were 100 sworn (14.37%), 647 Detention (29.68%), and 222 civilian (18.83%). One hundred sworn vacancies represent 10.3% of the total vacancies. Six hundred-and-forty-seven Detention vacancies represent 66.76% of the total vacancies. Two-hundred-and-twenty-two civilian vacancies represent 22.91% of the total vacancies. MCSO reported 54 voluntary separations during the third quarter. Of the 54 voluntary separations, 14 were sworn personnel. The demographics for sworn separations were 50% white, 35.71% Latino, 7.14% Two or More, and 7.14% unknown. MCSO reported 17 voluntary separations of Detention personnel, of which the demographics were reported as 17.65% white, 41.18% Latino, 17.65% Black, and 5.88% Native Hawaiian/Other Pacific Islander. MCSO reported 23 voluntary separations of civilian personnel, with the demographics reported as 46.30% white, 31.48% Latino, 7.41% Black, 5.56% Unknown, 3.70% Two or More Races, 3.70% Native Hawaiian/Other Pacific Islander, and 1.85% Asian.

MCSO reported 194 new employees hired during the third quarter of 2025. Of those 194 new employees, 29 were sworn, 129 were Detention, and 36 were civilian. The demographics for new sworn personnel were reported as 51.72% white, 31.03% Latino, 10.34% Black, 3.45% Asian, and 3.45% Native Hawaiian/Other Pacific Islander. The demographics for new Detention personnel were reported as 24.81% white, 50.39% Latino, 16.28% Black, 3.10% Asian, 3.10% two or more races, 1.55% Native Hawaiian/Other Pacific Islander, and .78% unknown. The demographics for new civilian personnel were reported as 38.89% white, 30.56% Latino, 8.33% Black, 8.33% Asian, 11.11% two or more races, and 2.78% American Indian/Alaskan Native.

MCSO reports that sworn Academy Class 167 will graduate in November 2025. There are 13 recruits remaining in this class. Class demographics are reported as 15% white, 54% Latino, 23% Black, and 8% Two or More Races. Sworn class 168 is scheduled to graduate in March 2026. There are 11 recruits scheduled. This class is currently reporting at 74% white, 16% Hispanic or Latino, and 11% Black/African American.

Detention Academy Class 993 is scheduled to graduate Detention Officers in October 2025. The demographics for 49 recruits in Class 993 at its start were reported as 59% Hispanic or Latino, 18% white, 16% Black or African American, 4% two or more races, and 2% Asian. Class 994 is scheduled to graduate Detention Officers in December 2025. The demographics for 57 recruits in Class 994 at its start were reported as 47% Hispanic or Latino, 26% white, 18% Black or African American, 4% were not specified, 2% Asian, 2% Native Hawaiian/Other Pacific Islander, and 2% two or more races.

Regarding Deputy Services Aide academy classes, the previously reported Academy class graduated Deputy Services Aides on August 21, 2025. The demographics for six trainees were reported as 50% white, 17% Hispanic or Latino, 17% Black or African American, and 17% Asian.

Regarding detention services officer academy classes, the previously reported academy class graduated Deputy Services Officers August 21, 2025. The demographics for six trainees were reported as 50% white, 17% Hispanic or Latino, 17% Black or African American, and 17% Asian.

Supervisory employees, as of September 30, 2025, were 174 sworn, 257 Detention, and 162 civilians. Supervisor demographics for sworn were reported as 71.84% white, 20.69% Hispanic or Latino, 2.87% Black or African American, 2.87% two or more races, 1.15% Asian, and 0.57% not specified. Supervisor demographics for Detention were reported as 63.04% white, 27.24% Hispanic or Latino, 3.11% Black or African American, 2.72% two or more races, 2.33% Asian, 1.17% Native Hawaiian/Other Pacific Islander, and 0.39% American Indian/Alaskan Native. Supervisor demographics for civilian employees were reported as 62.35% white, 19.75% Hispanic or Latino, 9.26% Black or African American, 3.09% Asian, 3.09% two or more races, 1.85% American Indian/Alaskan Native, and 0.62% not specified.

Our compliance assessment remains based on the existing Constitutional Policing Plan and the results of traffic stop data analysis reports, as well as MCSO's response to those reports – both operationally and with training. We believe that the work and suggestions of the IRG to these ongoing analytic reports is crucial in supplying the direction of changes needed to training, policy, and practice.

***Paragraph 71.***  *In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.*

**In Full and Effective Compliance**

MCSO has provided us with access to existing data from monthly and annual reports.

While we continue to work with both MCSO and the Parties on specific issues of methodology for Non-Traffic Contact Forms, as well as the Annual and Quarterly Reports for traffic stop data, we have nonetheless been afforded complete access to all requests involving data.  For example, MCSO published TSQR9, 2021: Special Assignments, and the agency put into place mechanisms to ensure that the undercounting of stops conducted during special assignments does not reoccur.  MCSO has also suggested actions which could improve the consistency of traffic stop actions taken by deputies regardless of assignment.  MCSO reported some differences in the magnitude of significant findings between TSAR7 and TSQR9, but otherwise the findings of potential bias were unchanged as it relates to those special assignment stops that were previously undercounted.  In TSQR10 (Searches), MCSO found that nearly two dozen searches had been coded incorrectly as either discretionary or non-discretionary searches.  This was largely due to a deputy having indicated multiple search types during an incident which the coding syntax could not adequately address.  The agency has used this discovery to modify the data prior to any analysis for the eighth annual report.  MCSO's quarterly report, TSQR11, Low Stop Volume Deputies, published on June 30, 2023, examined whether the traffic stop outcomes of low-volume deputies differ from their high-volume counterparts.  The report found that 41% of deputies make under 20 stops per year and those stops (970) represent approximately 5% of all traffic stops for the agency during the year.  MCSO found that low-volume deputies had a lower citation rate than their high-volume counterparts (35.88% vs. 52.41%) but in the process low-volume deputies contacted a higher proportion of Hispanic drivers (33.4% vs. 23.50%).  However, these differences did not result in findings of significantly greater disparities in the outcomes of white and Hispanic drivers for low-stop deputies, or disparities in comparison to their high-volume counterparts.  In essence, the report concluded that any disparities that do arise are not dependent upon the volume of traffic stops made by deputies.

MCSO continues to find through its quarterly reports of Extended Traffic Stop Indicators (TSQR3, TSQR13, and TSQR17) that Hispanic and minority drivers experience longer traffic stops.  In the latest version of this ongoing analysis, MCSO claims that the agency "do[es] not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order."  We do not agree with the placement of this statement at the outset of the investigation and have raised the issue with MCSO.  We believe that this is an empirical question that should be answered through analysis – and not something that should be stated as an *a priori* decision.  This difference of opinion has not impacted the results of this ongoing effort.  MCSO reports that the agency intends to continue exploring ways to reduce disparities across ethnicities through its inspections and TSMR reviews.

Most recently, we found that several deputies were not completing all of the personal information of persons stopped during non-traffic contacts.  Our concern was that, if there were no protocols for completely filling out these forms, it would make any analytic comparisons less efficient, as

it would increase the amount of missing data. Following discussions on this issue during our April, July, and October site visits, MCSO stated that the agency would produce an Appendix to EA-3 (Non-Traffic Contacts) that prescribes how deputies should complete the forms and what supervisors should be reviewing as they approve these forms.

MCSO has been forthcoming when the agency recognizes any data deficiencies and has modified data quality procedures when issues arise. We will review additional data quality procedures as they are made available to us.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## Section 8: Early Identification System (EIS)

**COURT ORDER IX.  EARLY IDENTIFICATION SYSTEM ("EIS")**

### *a. Development and Implementation of the EIS*

***Paragraph 72.***  *MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.*

**Phase 1:**  In compliance

- Early Intervention Unit (EIU) Operations Manual, most recently amended on December 3, 2024.

- EA-3 (Non-Traffic Contact), most recently amended on April 8, 2025.

- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:**  Not in compliance

As a result of interfaces for remote databases introduced in 2017, the Early Intervention System (EIS) now includes Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of the Courts (AOC), and training completion and policy acknowledgement records from the Cornerstone software (the HUB).  MCSO continues to update the EIU Operations Manual to memorialize the collection, analysis, and dissemination of relevant data, as well as the responsibilities and roles of agency and EIU personnel.  During the first quarter of 2023, MCSO updated Appendix A, "EIS Allegations and Incident Thresholds" following extensive review of the thresholds, as well as EIS Alert Process (302).  In addition, MCSO has conducted threshold analyses on vehicle pursuits, deputy accidents, as well as internal and external complaints; and applied the results accordingly in the appendix.  Going forward, MCSO has produced a plan to modify and review the thresholds on a regular basis as more thresholds are evaluated.  During the third and fourth quarters of 2022, MCSO also modified the EIS Alert inspection from a monthly to a quarterly report and included in the latter quarter an evaluation of the effectiveness of interventions undertaken.  MCSO has updated several sections of the EIU Operations Manual throughout 2024, as well as proposed new threshold levels for BIO Action Forms.  Each of these additions or modifications has improved the process of oversight and evaluation of potential bias and provides needed tools for early intervention should such issues arise.

To capture the activities of deputies in non-traffic stops of individuals, MCSO developed Non-Traffic Contact Forms (NTCFs), which were interfaced with EIS in mid-2017. MCSO has provided us with access to investigative stops that make up a portion of NTCFs since their inception. Over the past several years, we have suggested that MCSO create a methodology to statistically examine these civilian contacts to ensure that there is no evidence of bias in the way they are conducted. MCSO proposed an initial study of how the NTCFs and the related policy are being used across the agency. The NTCF study was published in February 2023. While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward. We and the Parties have provided MCSO with our comments and concerns regarding the initial study and MCSO has responded. MCSO utilized the initial study to review the NTCF and policy (EA-3 [Non-Traffic Contact]), which was amended in April 2025. A new NTCF was produced in August 2025. Our review of several NTCFs during the first and second quarters of 2025 uncovered instances where deputies had not completed all of the personal information relevant to the person contacted. This would make the form, in that case, useless for future analysis. After reviewing these with MCSO during our April and July site visits, MCSO stated that the agency would propose an Appendix to EA-3 that would set out the requirements of filling out the forms that would be unambiguous for line-level personnel. During our review of NTCFs for the current quarter, we found a dozen instances where Hispanic drivers were indicated as white on the NTCF, but on IRs or VSCFs that were included in the same stops they were indicated as white and Hispanic. We believe this occurred as the new NTCF has only one Race/Ethnicity box, whereas the other forms have two boxes: one for Race and one for Ethnicity. MCSO stated that the agency would investigate and make modifications as needed. We will report on these in future quarterly reports.

During our October 2023 site visit, MCSO presented a preview of an upcoming proposal to limit NTCFs to only deputy-initiated, on-scene events. Examples might include if a deputy observes a person riding a bike without a light or someone lurking behind a business at night. The NTCF will not be used for service calls, as these will be captured on various other forms, like the Incident Report (IR), when required by a call for service. The NTCFs were modified so that they are similar to the Vehicle Stop Contact Forms (VSCFs) to allow analyses that are less than, but approximate, the type of comparative analyses of traffic stops. The analytic approach being investigated, according to MCSO, is outlined on the U.S. Department of Justice website and involves a ratio comparison of deputies' non-traffic contacts (NTCs) for Hispanics, or other minority groups, compared to whites. However, until such time as this analytic approach is placed into production on a regularly approved basis, MCSO will not achieve Phase 2 compliance with this Paragraph.

As mentioned above, one issue of particular importance is how MCSO will count and monitor search requests by deputies for those persons they come into contact with during non-traffic contacts. MCSO has proposed using an acceptance for the search captured on BWCs. We and the Parties are concerned that without adequate documentation on forms, it would be difficult to accurately capture all events in the database that should be used to analyze non-traffic contacts. Additionally, it may limit the usefulness of NTCFs for supervisory oversight of deputy activity.

We will continue to work with MCSO to finalize each of these data analytic methods. MCSO continues to regularly publish a number of reports on deputy activity and supervisory oversight that are not tied to the methodologies of the TSMR, TSQR, or TSAR.

The Audits and Inspections Unit (AIU) produces a monthly report evaluating Supervisor Notes based upon a random sample we draw that indicates whether the selected supervisors are reviewing the EIS data of deputies under their command. The inspection looks for indications that supervisors made entries for each person they supervise with regard to two randomly selected BWC videos, provide one EPA note, make two supervisor entries, and indicate that the supervisor has reviewed their deputies' EIS status. The compliance rates reported by MCSO are based on a matrix developed for this inspection. For this quarter, the compliance rates reported by MCSO are 87.6% in July, 94.7% in August, and 100% in September. Our computed compliance rates were over 10 percentage points lower for July and August, as we compute rates based on cases rather than matrices, and there were three supervisors who failed to make multiple notations for their subordinates. BIO Action Forms were sent to the supervisors with deficiencies.

In the Traffic Stop Data Inspection for this quarter, MCSO reported compliance rates in excess of 99%. Our calculations are slightly lower, 97.1%, each month, as we calculated rates based on deficient cases involving contact conclusion in July, BWC engagement in August, and license plate mismatches between VSCF and CAD in September. The compliance rates for the Traffic Stop Discussion and Review Inspections for this quarter were all 100%, which we concurred with. All the inspections for traffic stops are based upon stratified random samples that we draw on a monthly basis. The deficiencies noted by the inspectors resulted in BIO Action Forms being sent to the appropriate Districts for this quarter. While we can look for trends in deficiencies over each quarter, we have suggested to MCSO that AIU conduct an evaluation of all BIO Action Forms sent to Districts to ensure that there are not long-term trends by Districts or supervisors that cannot be distinguished while looking at shorter timeframes. MCSO conducted the preliminary analysis of BIO Action Forms from January to May 2019 and reported these findings during our July 2019 site visit. Following several refinements, MCSO has been producing BIO Action Form inspections since 2022. MCSO suggested that conducting the BAF inspection semi-annually with overlapping six-month periods in the annual data caused some issues of repetition and proposed that the BAF inspection be conducted annually. We agreed with this proposal in June 2024; therefore, the next BAF inspection will run from January 1-December 31 of each calendar year, and the inspection will be published in the following second quarter of the ensuing year.

The annual BAF report produced in June 2025 replicates many of the findings of the earlier reports. The Incident Report, Search, and Traffic Stop Data Inspections accounted for the majority of BAFs. The highest issue cited was a lack of proper documentation along with time management issues. MCSO also identified five supervisors that had the highest number of BAFs within their units. The deficiencies were similar to the patterns identified across the organization, and only one of the five supervisors had appeared as a high incidence supervisor in a previous BAF study. While this supervisor arose again for some of the same issues, the volume of BAFs was lower during 2024. MCSO also noted that supervisors selecting escalating interventions, when a subordinate has a repeated deficiency, has been effective. The level of deficiencies has

been reduced since the introduction of the BAF inspection several years prior, as Districts have been implementing the recommendations from prior BAF studies. EIU also produces a monthly report on non-traffic alerts triggered within EIS. EIU personnel review the alerts and disseminate them to supervisors and District command if alerts indicate the potential for biased activity or thresholds are exceeded for particular actions such as external complaints, data validations, and others. Once the supervisors receive the alert investigation, they employ a template (Attachment B of GH-5 [Early Identification System]) to conduct the investigation and report their findings and results to the chain of command through BlueTeam. MCSO has also established an EIS Alert Review Group (ARG) to evaluate the closure of alert investigations. During this quarter, we found no issues with the production of these reports and documents, and, according to the EIS Alert Inspection produced in June, there was only one recurring alert in which an escalating intervention was employed. We will continue to monitor these issues in subsequent reporting periods.

***Paragraph 73.*** *Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").*

**In Full and Effective Compliance**

In September 2023, MCSO supplied documentation of its reorganization of the Bureau of Internal Oversight (BIO) and the Court Implementation Division (CID). The major change moves the Traffic Stop Analysis Unit (TSAU) from BIO to CID without changing the important functions of this unit.

BIO is overseen by a captain and is comprised of two Units designed to achieve different compliance functions. Each is a fully operational Unit headed by a lieutenant with both sworn and civilian staff responsible for diverse but interrelated oversight functions.

The Early Intervention Unit (EIU) coordinates the daily operation of the EIS. This Unit evaluates alerts generated by the EIS, reviews them, and sends out investigations to District personnel as prescribed by policy.

The Audits and Inspections Unit (AIU) has developed and carries out ongoing inspections to ensure that deputies and supervisors are fully using the EIS properly. When AIU discovers deficiencies, it sends out BIO Action Forms to the affected Districts and individuals; and ensures the return of the appropriate forms.

The Traffic Stop Analysis Unit (TSAU) was established due to the complexities of generating all the statistical reports related to traffic and patrol functions of MCSO. TSAU, comprised of both civilian and sworn personnel, responds to specific requests made by us and the Parties; and to answer any questions related to the operation or analysis of data during and between our site visit meetings.

Over the last few years, MCSO has expanded the EIS database to include Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), records from the Administrative Office of Courts (AOC), and training and policy receipt records from the Cornerstone software program (the HUB). Supervisors now have much more information available to them about the deputies under their command than they ever had in the past.

During our April 2024 site visit, MCSO informed us that the agency had created an Internal Review Group (IRG) to evaluate and respond to MCSO's analytic reports. We discussed the IRG with MCSO during our April and July 2024 site visits. As was noted in Paragraphs 65 and 70, the IRG meets after a statistical report (TSAR or TSQR) is produced to evaluate how the agency will respond to the findings. MCSO produces the minutes from these meetings as responses to the particular TSAR or TSQR, as well as progress reports to a particular TSAR or TSQR. We have elaborated on these in Paragraphs 65 and 70; elsewhere as needed.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 74.*** *MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.*

**In Full and Effective Compliance**

MCSO has met the requirements of this Paragraph for the most part by identifying the data to be collected and the responsibility of persons across the organization to review, verify, and inspect the data making up the early intervention system. These roles and responsibilities are originally developed in GH-5 (Early Identification System) and more comprehensively elaborated in Section 200 (Duties and Responsibilities), approved in August 2019 and updated in the third quarter of 2024, of the EIU Operations Manual.

MCSO has continually refined the data-handling protocol since the publication of earlier TSARs, which were fraught with problems. These processes have been memorialized in the EIU Operations Manual (Section 306), which was approved in July 2020. Aside from Section 200, noted above, Section 305 (Software Change Control Processes), approved in October 2018, is intended to ensure that all modifications to software or data collection are coordinated in a prospective fashion before any implementation occurs. These software changes are provided to us on a monthly basis through regular document requests and are discussed during the quarterly site visit meetings. For example, during the fourth quarter of 2022, MCSO introduced a Special Assignment update that allows deputies to identify traffic stops that occur during DUI, Aggressive driving, Click It and Ticket, or other special assignment patrols. Deputies are also provided the ability to add clarifying comments to their selections.

In the third quarter of 2022, MCSO introduced two new drop-down items for extended stops as a result of findings in prior TSQR analyses. The first is the ability of deputies to note license issues arising during the stop, and the second is a broader "other issue" that may lead to extended stops. The deputies are required to elaborate in comment fields what those issues may involve. During 2024, MCSO has been evaluating modifications to the VSCF and NTCF. Each of these sections of the EIU Operations Manual expands upon policy that has already been approved.

MCSO has also established a committee of personnel from each unit that handles, or adds to, traffic data before it is analyzed. The reports from the regular monthly meetings of this group are made available to us and show the attention to detail and memorialization of changes put in place to improve data processes. During the second quarter of 2025, MCSO reported that changes in the approval process for VSCFs were implemented in April 2025 and that VSCFs would include a mandatory passenger contact field as well as the ability to note a warrant arrest. During our October 2023 site visit, we met with this group and discussed the ongoing nature of the monthly meetings. In March 2024, MCSO noted in the "Communication of Change" document provided each month, that the agency was planning to implement changes to both the VSCFs and NTCFs that had been discussed during prior site visit meetings. Our concern, as raised above, is that without adequate training and protocols regarding how to fill out the NTCF, several cases from this and the last quarter have arisen where personal information of those contacted was incomplete. This could impact the ability to have a full analytic examination of potential bias in NTCF stops. MCSO suggested in July 2025 that the agency will draft an Appendix to EA-3 to address how deputies should complete the form. We found the EIU lieutenant and staff to be well-versed in every aspect about which we inquired. We will elaborate on additional changes as they occur.

Additionally, in TSQR10, "Searches," published in March 2023, MCSO found that nearly two dozen searches had been coded incorrectly as either discretionary or non-discretionary searches. This was largely due to a deputy having indicated multiple search types during an incident, which the coding syntax could not adequately address. As a result, MCSO recoded the data prior to any analysis for TSAR8. The agency is also reviewing the training, policy, and analytic syntax related to searches to ensure that such miscoding does not recur. We and the Parties have been involved in ongoing discussions with MCSO regarding possible revisions to GJ-3 (Search and Seizure). MCSO's position is that a BWC waiver by a subject should be sufficient – while we and the Plaintiffs maintain that, without a Consent to Search Form, the review and oversight of these events may not be reviewed and evaluated by supervisory personnel since they are only required to review two BWCs for their subordinates each month. We are also concerned about how MCSO will choose to capture these events in the data system to ensure that they are searchable and retrievable for any follow-up, review, and analysis.

Finally, EIU produces a monthly report for benchmarks not related to the traffic stop methodologies. We routinely use these monthly tables to evaluate compliance with various Paragraphs of the First Order. For traffic-related Benchmarks 3 and 8 (Paragraph 67), MCSO documents both traffic stops involving immigration inquiries and data validation errors committed by deputies. During this reporting period, there were no immigration inquiries; however, there were five data validation alerts.

On September 25, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 75.** *The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:*

a.    *all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);*

b.    *all internal investigations of alleged or suspected misconduct;*

c.    *data compiled under the traffic stop data collection and the patrol data collection mechanisms;*

d.    *all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;*

e.    *all arrests;*

f.    *all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;*

g.    *all arrests in which the individual was released from custody without formal charges being sought;*

h.    *all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;*

i.    *all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;*

j.    *all disciplinary action taken against employees;*

k.    *all non-disciplinary corrective action required of employees;*

l.    *all awards and commendations received by employees;*

m.    *Training history for each employee; and*

n.    *bi-monthly Supervisory observations of each employee.*

**In Full and Effective Compliance**

Since 2017, MCSO has placed into production data interfaces for Incident Reports (IRs), Non-Traffic Contact Forms (NTCFs), Justice Court turndowns (AOC) and the Cornerstone software program (the HUB) that provides reports for training and policy acknowledgment. MCSO continues to develop some inspections or analytic reports that ensure that personnel are accurately using the EIS data available; however, the data do exist in the EIS and are accessible by personnel we have interviewed during site visits. We will continue to evaluate and monitor the use of EIS in furtherance of the Orders. We had noted in previous quarterly status reports that prior to the onset of the pandemic we were able to observe data pertaining to each Subparagraph below during site visits.

During our October 2023 site visit, EIU personnel demonstrated how the data for the following Subparagraphs appear on-screen and are accessible to first-line supervisors. We were able to request and witness how easily the data can be searched for particular deputies, incidents, or groupings (personnel or incident types). We found no issues of concern during this review. We anticipate conducting similar reviews and inquiries during future site visits. During our April and October 2024 site visits, the EIU team was able to clarify how some updates to software systems were being referenced in updates to the EIS Operations Manual. This information exchange further ensures the integrity of the data handling process managed by MCSO. During a District visit in February 2025, we asked that command personnel pull up the dashboard of deputy/District activity that had been released in September 2024. While the initial attempt was successful, it took intervention by a TSAU representative to pull up the information. Our ensuing visits to other Districts found personnel prepared for this request. During our July 2025 site visit, every District was able to show the dashboard; but most indicated that the dashboard was used more by District command staff than line supervisors as the latter had already developed patterns of oversight that the dashboard mimics.

Paragraph 75.a. requires that the database include "all misconduct Complaints or allegations (and their dispositions)," with some exclusions.

EIPro, a web-based software application that allows employees and supervisors to view information in the IAPro case management system, includes the number of misconduct complaints and allegations against deputies. Since February 2017, both open and closed cases have been viewable by supervisors. PSB controls the ability to view open cases based upon the parties who may be involved. PSB personnel developed a protocol to write the summaries for both open and closed cases that appear in the EIS. This protocol has been approved and incorporated into the PSB Operations Manual that was published on December 13, 2018. Each month, we receive a spreadsheet of open and closed external complaints as they appear in EI Pro for supervisors to review. Our examination of these descriptions for July through September found that these summaries met our expectations.

Additionally, during our 2024 and 2025 site visits, we observed that field supervisors could easily access these summaries and understand the types of issues involved in the complaints. Supervisors conducting alert investigations have also routinely referred to a review of complaint summaries as a portion of their investigative process. Supervisors also advised us that they can always contact EIU and PSB for clarification if it is necessary.

MCSO is in compliance with this Subparagraph.

Paragraph 75.b. requires that the database include "all internal investigations of alleged or suspected misconduct."

Corresponding to the discussion above involving external complaints, internal investigation summaries also appear in the IAPro system. All complaint summaries, open and closed, have been viewable since February 2017. PSB uses a standard protocol to develop the case summaries and access limits. We approved this protocol, and it is included in the PSB Operations Manual. Each month, we receive a spreadsheet of internal allegations as they appear to supervisors in EIS. Our review of the summaries for July through September found these summaries to be transparent and easily understandable.

During our site visits in 2024 and 2025, we found that line supervisors are also able to easily access the summaries of open and closed internal investigations pertaining to their subordinates. Supervisors also have referred to these summary fields while conducting alert investigations. Field supervisors always have the option of requesting additional information from EIU and PSB should they deem the summaries insufficient.

MCSO is in compliance with this Subparagraph.

Paragraph 75.c. requires that the database include "data compiled under the traffic stop data collection and the patrol data collection mechanisms."

MCSO has developed electronic forms to collect data from traffic stops, incidental contacts, and warnings.

MCSO has also developed interfaces with EIS for remote databases including Incident Reports (IRs) and Non-Traffic Contact Forms (NTCFs). These reports are readily available to supervisors to review within EIS. During our October 2023 through July 2025 visits to several Districts, field supervisors demonstrated that they have the ability to view IRs and NTCFs. AIU already conducts an inspection of IRs and has revised the methodology to improve and streamline the inspection process. We have suggested that MCSO create a similar inspection for NTCFs, as well as propose an analytical strategy to examine whether any racial or ethnic inconsistencies may exist in the incidents documented on the NTCF. MCSO produced a study of NTCF use in February 2023. While this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors, it did provide some insight into the modifications needed in both the form and policy going forward.

Our review of NTCFs for the first quarter of 2025 found one instance in March where a search was conducted and the form was marked incident to arrest; however, while the individual could have been arrested, the person was actually released with a warning. In a second March incident, the individual was stopped for a bicycle violation, but the deputy did not fill out the person's personal information. Through a documentation request MCSO was able to produce corrected documents for each instance. A review of the April NTCFs found a similar incident where the personal information of a person stopped was not completed on the NTCF. During discussions of these cases in April and July, MCSO noted that the agency would be proposing an Appendix to EA-3 to set out a protocol for how deputies would fill out these forms. Additionally, in the NTCFs for June, provided in September, there were two stops in which deputies marked "white" on the NTCF for the person contacted and "Hispanic" on the IR. For the third quarter review of

NTCFs, we found another 12 such instances. We raised this issue with MCSO during our October site visit. Our belief is that a statistical methodology to examine NTCFs would allow a more comprehensive evaluation; however, such a methodology requires accurate data at the start. As noted in previous Paragraphs, MCSO is working on language regarding searches that may occur within non-traffic contacts. The issue for this Paragraph is how those searches will be captured in the database. We will continue to work with MCSO as this process moves forward.

This Paragraph requires that the data for such activities exists within EIS; however, Paragraphs 72, 81a., and 81b.vi. require an analysis of these stops. Therefore, while MCSO complies with this Subparagraph at present, MCSO will not achieve compliance for the other Paragraphs until a method of analysis is approved and produced. We will also continue to evaluate compliance with this Paragraph, depending on the process adopted regarding searches that could occur during NTCs.

MCSO is in compliance with this Subparagraph.

Paragraph 75.d. requires that the database include "all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel."

MCSO's Public Records and Request Management Section (PRRM) receives and forwards this information to EIU for entry into the EIS database. Supervisors have demonstrated the ability to access this information during our October 2023 site visit. During the first quarter of 2023, MCSO also updated Appendix G (Unique Incident Procedures) of the EIU Operations Manual to include instructions on how to handle Notice of Claims. During 2024, MCSO updated the Appendix to reflect changes occurring as a result of software improvements.

MCSO is in compliance with this Subparagraph.

Paragraph 75.e. requires that the database include "all arrests."

Arrests may not always occur as a result of a traffic stop. MCSO, therefore, has placed into production an interface between EIS and the Jail Management System (JMS). This interface allows supervisors to easily access information regarding arrests that cannot be viewed through traffic data. During our October 2023 site visit, supervisors demonstrated the ability to access the IRs and related arrest information. The timeliness and sufficiency of that review is evaluated under Paragraph 93. Our review of these documents shows that MCSO is in compliance with this Subparagraph, as the data exist in the database.

Paragraph 75.f. requires that the database include "all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law."

Incident Reports (IRs) are housed in the TraCS (Traffic and Criminal Software) system. Supervisors must review and sign off on IRs for each deputy involving an arrest or detention of a suspect within 72 hours of the incident. Supervisors are also required to ensure that probable cause exists for each charge or arrest outlined within an IR. AIU additionally conducts an

inspection of IRs to ensure that all policy requirements are met. During the 3rd quarter of 2025, MCSO reported IR compliance rates in excess of 99%, using a matrix to assess compliance. Our compliance findings were slightly lower each month but still well above 94%. During this reporting period, in September, there was one finding of a lack of articulation of legal requirements. More importantly, the inspection found that the supervisors in these instances did not flag these as problematic or needing to be edited/rewritten.

If a court or prosecutor decides not to prosecute a case, both the deputy and their immediate supervisor are notified. In 2019, MCSO created a new inspection that combined IR and County Attorney Turndown inspections. MCSO's intent was to catch instances of reasonable suspicion and probable cause issues earlier in the process. Other deficiencies result in BIO sending Action Forms to the appropriate District personnel.

MCSO is in compliance with this Subparagraph.

Paragraph 75.g. requires that the database include "all arrests in which the individual was released from custody without formal charges being sought."

The ability to capture this information depends upon what actually occurred within the context of the interaction. If the suspect was taken into physical custody but released prior to booking, there would be a JMS record, as indicated in Subparagraph 75.e. above. Therefore, MCSO could use the interface described above to pull the relevant data elements into EIS. However, if the incident does not rise to the point of physical custody and detention, then it would likely yield an Incident Report, covered under Subparagraph 75.f. above or an Investigatory Stop under Subparagraph 75.h. to follow. The interfaces for IR and NTCF data became operational prior to July 1, 2017. The inspection process referred to above will capture elements useful for the evaluation of this Subparagraph. Aside from the issues noted above, we found no additional events relevant to this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 75.h. requires that the database include "all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of/or probable cause to believe a crime had been committed, as required by law."

MCSO has developed interfaces for both IRs and NTCFs. As noted in 75.f., our compliance calculation for inspection of IRs were slightly lower in this quarter than those reported by MCSO, although the compliance rates remained above the 94% level. AIU sent BIO Action Forms (BAFs) to Districts with deficiencies. In addition, AIU publishes BIO Action Form Tracking Studies that includes an evaluation of IR practices by supervisors. We have discussed these in detail in other Paragraphs, but this inspection does provide additional information for evaluating the compliance of MCSO with this Paragraph.

In July 2017, the interface between EIS and the database for NTCFs was placed into production. MCSO also reissued EA-3 (Non-Traffic Contact) and amended the policy on June 14, 2018 (and most recently amended it on April 8, 2025). This policy specifies the responsibility of MCSO personnel regarding different types of search occurrences. If the search is related to a traffic stop, it should be captured on the VSCF. Searches occurring within activities resulting in an Incident Report will be captured under Subparagraph 75.e., and NTCF searches fall under this Subparagraph.

The development of a statistical examination of NTCF stops should be a priority for MCSO now that the Traffic Stop Methodologies for the Monthly Analyses are complete. Such an examination is required by Paragraphs 72 and 81.b.vi. During our October 2023 and February 2024 site visits, MCSO outlined the changes the agency was considering for the NTCF and policy, as well as the creation of a means to analyze NTCFs. Our concern at present involves the ability to ascertain that all search requests during these non-traffic encounters are captured in the data that will be used for analytic purposes. Anything short of that may affect compliance in this and related Paragraphs and Subparagraphs. The new NTCF was placed into production in August 2025. As noted in previous Paragraphs, we found instances during the third quarter review of NTCFs where deputies identified drivers as white on the NTCF and white/Hispanic on the IR or VSCF that accompanied the NTCF. We raised this issue with MCSO during our October site visit, and we will evaluate the agency's method of addressing such issues once MCSO makes a proposal.

The Search Inspection provided by MCSO shows that, during the first quarter, there was one instance each in January and March where the activity of the deputy, *Terry* frisk, and vehicle inventory did not align between the forms and BWC review. In February, there were three instances where the search documentation did not align across the forms with the explanation provided by the deputy or did not appear to comply with federal law or the First Order. Our compliance rates, therefore, were 97.1%, 91.6%, and 97.2% respectively. During the second quarter, there was one instance in April and another in May where cross-checking the documents showed that they were not uniform. Our compliance rates for these two months were 97.22% and 97.06%, respectively. In the third quarter, our compliance rate for July was 94.1%, due to two instances where there was an inconsistency between the VSCF and NTCF. We concur with the 100% compliance rates for August and September. At present, this inspection pertains to searches conducted during traffic stops.

MCSO is in compliance with this Subparagraph.

Paragraph 75.i. requires that the database include "all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision."

The EIS database has included both County Attorney Actions and an interface with the Justice Courts (AOC) since July 2017. MCSO began using a method that merged the County Attorney Turndown Inspection with the IR inspection. The first inspection was produced in August 2019 using July data. For this quarter, our computed compliance rates for the IRs were slightly lower than those of MCSO (Subparagraph 75f). The IR inspection did not include any County Attorney Turndowns, as none were received indicating a problem with probable cause. AIU sent several BIO Action Forms relating to missing documents to the Districts for review due to the deficiencies

found by the inspectors. For this Subparagraph, we also receive a random selection of IRs turned down for prosecution from MCAO and the Justice Courts. Our review of these indicate that most had been turned down using the generic phrases "no reasonable likelihood of conviction," "dismissed to aide in prosecution,", "old/stale," or "sentenced for another crime." We found no significant problems with the reports reviewed for this quarter. We will continue to evaluate the inspection and IRs in future quarterly status reports.

MCSO is in compliance with this Subparagraph.

Paragraph 75.j. requires that the database include "all disciplinary action taken against employees."

MCSO currently tracks disciplinary actions in the IAPro system (for this and Paragraphs 26, 28, 69, and 89), which allows supervisors to search the history of their employees in EIS.

Additionally, the Administrative Services Division replies to a monthly request that incorporates this Subparagraph; and the Division's report indicates that no discipline was imposed for bias-related incidents between January and September 2025. In addition, during our October 2023 site visit, EIU personnel were able to modify the search for this Subparagraph to include all discipline or any subset thereof. MCSO also provides Incident Reports, when necessary, that involve fraud that may include a suspect of Hispanic origin.

MCSO is in compliance with this Subparagraph.

Paragraph 75.k. requires that the database include "all non-disciplinary corrective action required of employees."

The information required by this Subparagraph is captured in the EIS. MCSO produces a Supervisor Note inspection (in particular, bimonthly reviews of a deputy's performance) and the monthly alert report described in the previous Subparagraph to fulfill the requirements for this Subparagraph. In addition, we also review up to 15 closed alert inspections conducted by supervisors each month. (If there are more than 15, the cases are randomly selected from the total.) As noted previously, the majority of cases are closed through a meeting with a supervisor, but we also saw in May a reassignment to another shift and counseling on workplace professionalism, as well as training recommendations.

Supervisors also are required to make two comments regarding their subordinates each month in their BlueTeam Notes. In the Supervisor Notes inspections for this quarter, there were several supervisors in July and August who failed to make the expected notations for their subordinates; otherwise, there were no issues of concern.

MCSO is in compliance with this Subparagraph.

Paragraph 75.l. requires that the database include "all awards and commendations received by employees."

MCSO first published GC-13 (Awards) on November 30, 2017, and most recently revised this policy on April 23, 2024.  With this publication, MCSO established categories for awards or commendations that could be tracked within the EIS database.  With the introduction of the newest version of EIPro, these fields are also searchable by supervisors.  During our past site visits, supervisors demonstrated how they could search these fields and locate awards of their subordinates in the EIS data.

MCSO is in compliance with this Subparagraph.

Paragraph 75.m. requires that the database include the "[t]raining history for each employee."

MCSO has transitioned from the Skills Manager System to the Cornerstone (the HUB) software program.  The HUB has replaced the E-Policy and E-Learning programs.  The HUB routinely updates recent training and policy reviews for deputies and is visible by immediate supervisors.  MCSO also developed an interface between the HUB and EIS.

During our October 2023 through February 2025 site visits, all field supervisors who we contacted stated that they were familiar with the HUB and were able to access the information contained therein.  MCSO personnel informed us that supervisors have ready access to the training and policy reviews of their subordinates.  We will continue to evaluate supervisors' ability to easily search and use EIS during future site visits.  As noted above, this will include not only a review with EIU technical staff but field supervisors at the Districts.

MCSO is in compliance with this Subparagraph.

Paragraph 75.n. requires that the database include "bi-monthly Supervisory observations of each employee."

The Audits and Inspections Unit (AIU) conducts a monthly inspection of Supervisor Notes.  One of the indicators AIU evaluates is whether supervisors are making two notes per deputy each month.  For this quarter, AIU identified three supervisors in July and August who failed to note the review of EIS information for one of their subordinates.

MCSO is in compliance with this Subparagraph.

With the operationalization of interfaces for Incident Reports, Non-Traffic Contact Forms, the Administrative Office of the Courts, and the HUB, EIS contains the information required by the Order.  MCSO has worked diligently to use some of the data above to investigate compliance rates with the Orders.  MCSO continues to develop other inspections or data analytic methods in response to our recommendations.  We will continue to monitor the issues raised above regarding documentation of deputy activity during non-traffic contacts and the ability to analyze these stops to investigate potential bias in the interactions.

On April 8, 2024, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 76.*** *The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).*

**In Full and Effective Compliance**

MCSO has instituted a quality check process for Vehicle Stop Contact Forms (VSCFs) that requires supervisors to review all traffic stop documents within three days of the stop. AIU also conducts an inspection of the timeliness of these reviews as well as a second inspection on Traffic Stop Data. Each of these inspections are based upon a stratified random sample of traffic stops that we conducted. The Traffic Stop Data inspection employs a matrix that ensures that the name, serial number, and unit of the deputy is included on the VSCF in addition to the identity and race/ethnicity of the driver. The overall rate of compliance for the Traffic Stop Data inspections reported by MCSO exceeded 99% for this reporting period, and none of the deficiencies involved identification of deputies or drivers. As previously noted, our compliance calculations for this period were lower, due to the fact that we do not employ a matrix to assess compliance – but rather deem individual cases as deficient if any significant information is determined not to be consistent across traffic stop forms or CAD.

MCSO has incorporated patrol data into the EIS through the creation of interfaces for Incident Report (IR) and Non-Traffic Contact Form (NTCF) documents. Each of these documents lists the required name of the deputy and civilian, as well as the ethnicity of the civilian, in accordance with this Paragraph. AIU conducts an inspection of IRs, including a check for racial/ethnic bias in the reporting documents and the identification of all parties contacted as a result of the incident. Over the past two quarters, we found two instances of an NTCF (March and April) that did not include the identity of a person contacted. As noted above, MCSO is taking steps to create an Appendix to EA-3 to ensure uniformity of information on the NTCF. Non-Traffic Contact Forms contain the same basic information about the identity of the deputy making the contact and the persons being contacted. Our only concern at this point is that the NTCF has only one box to identify Race/Ethnicity, while the VSCF and IR have two – which may have led to the inconsistencies in the identification of Hispanics on the NTCF.

While MCSO does not yet conduct an inspection of NTCFs, the agency does provide us with copies of all the documents for investigative stops and field information. Aside from the two recent instances noted above and the boxes identifying race/ethnicity discovered in the third quarter, we have not found a repetitive problem with NTCF documentation that includes the criteria required by this Paragraph. MCSO is responding to these issues. We will be re-evaluating the agency's compliance with this Paragraph once those issues are addressed.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 77.  MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.*

**In Full and Effective Compliance**

Since our earliest site visits in 2014, we have addressed the issue of "necessary equipment, in sufficient amount and in good working order" with MCSO.  As part of our monthly document requests, we receive an accounting, by District, of how many vehicles have functioning TraCS systems.

Since the end of 2015, we have found that all marked patrol vehicles were properly equipped with TraCS equipment.  MCSO developed EB-2 (Traffic Stop Data Collection), which states that in the event that a TraCS vehicle is not operational, or available, each District possesses the necessary equipment at the substation for deputies to input his/her traffic stop information before the end of the shift.  Due to the mountainous regions throughout Maricopa County, there have always been connectivity issues.  However, these areas are well-known to Patrol deputies; and they have demonstrated how they adapt to connectivity problems.  The VSCF also allows deputies to note issues with technology on a traffic stop.  As referenced in TSQR17, Technical Issues rank third in terms of ETSIs used (approximately 10% of all ETSI stops) behind Documentation Issues and other delays.

During our past visits to the Districts, we regularly spot-checked the facilities and patrol cars; and found that they had functioning TraCS equipment, and that each District office had available computers for any occurrence of system failures with vehicle equipment.  During recent site visits, we found that each patrol unit in service had functioning equipment; and the Districts possessed replacement vehicles and body-worn cameras in sufficient quantity.

At present, the technology and equipment available at MCSO meet the requirements of the Order.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.


*Paragraph 78.  MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.  No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.*

**In Full and Effective Compliance**

GH-5 (Early Identification System) clearly states that employees only have access to EIS in furtherance of the performance of their duties, and that any other unauthorized access will be addressed under MCSO's discipline policy. The policy also notes that access to individual deputy information will be limited to appropriate supervisory/administrative personnel associated with that deputy. In addition, the policy states that personal information will be maintained in the database for at least five years following an employee's separation from the agency; however, all other information will be retained in EIS indefinitely.

As a result of an audit conducted in 2017, MCSO discovered that a substantiated misuse of computer systems occurred in both 2011 and 2015 but had not been effectively communicated between organizational Bureaus. As a result, in November 2017, MCSO published a System Log Audit operating procedure that required PSB to notify the Technology Bureau of any investigations involving a system breach. We fully vetted this operating procedure (BAS SOP 17-4) during our January 2018 site visit. MCSO reported no system breaches in past reviews for this Paragraph.

In July 2023, MCSO provided its second quarter submission for Paragraphs 58 and 78. During the second quarter of 2023, PSB closed three cases relevant to these Paragraphs and notified the Technology Bureau of those cases: IA2016-0383 involved a Posse member who utilized CAD to run two record checks on himself; IA2022-0494 involved a Detention Officer who used MCSO data access to locate a former inmate for personal reasons; and IA2022-0504 involved a deputy using MCSO data access regarding a personal relationship. During the fourth quarter of 2023 there were two relevant cases to this Paragraph: IA2018-0523 involving a SIMS clerk who accessed ACJIS data for personal reasons; and IA2023-0388 involving Detention personnel who used MCSO databases to access inmate information that was not approved. In each case, PSB noted that the offending party resigned before discipline could be imposed. In the third quarter of 2024, MCSO reported one instance, IA2024-0448, in which a Senior Specialist accessed a law enforcement database that was not related to work activity. The employee was reportedly terminated. In the fourth quarter of 2024, MCSO reported one instance, IA2024-0080, in which three Detention officers accessed the SHIELD database to review the booking records of another employee. All three individuals left the employment of MCSO. During the first two quarters of 2025, there were no instances reported by MCSO. In the third quarter, MCSO identified one instance, IA2024-0416, that included multiple issues – including the misuse of the SHIELD database for which the deputy received a suspension and written reprimand.

MCSO's concern for the integrity of information in EIS is further exemplified by the protocols that PSB has established to meet the requirements of Subparagraphs 75.a. and 75.b. regarding purview of open complaints and internal investigations. PSB not only controls who can view summaries of open investigations – but has established a protocol for creating the summaries of open investigations to protect the integrity of the cases while they are being processed.

MCSO has also established a work group to ensure the integrity of traffic stop data used for analysis. The protocols used by this work group are incorporated into Section 306 of the TSAU Operations Manual. We have approved this section, and it has been incorporated into the manual as finalized.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 79.***  *The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.*

**Phase 1:**  In compliance

- EA-3 (Non-Traffic Contact), most recently amended on April 8, 2025.
- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:**  Not in compliance

During the fourth quarter of 2022, MCSO completed the pilot project for the Traffic Stop Monthly Report (TSMR); however, the finalization of guiding policies did not take place until late March 2023.  We have also recommended to MCSO that the agency needs to create an analytical plan for the Non-Traffic Contact Forms that have accumulated over the past several years.  During our October 2023, February 2024, and April 2024 site visits, MCSO presented the outline of its proposal to modify the NTCF, related policy, and the creation of a new analytic method for NTCFs.  We and the Parties asked clarifying questions and have commented on early drafts of the policy changes to EA-3 (Non-Traffic Contact) proposed.  This February 2023 study focused on how deputies employ the NTCF and understand the associated policy; however, this analysis did not investigate potential indications of bias in how these stops are conducted by deputies or evaluated by supervisors.  It did, however, provide some insight into the modifications needed in both the form and the policy going forward.  MCSO most recently amended EA-3 in April 2025. Our inspection of NTCFs over the past two quarters found two instances where deputies did not completely provide the identifying information for the person contacted, making the statistical inclusion of these events problematic.  During the third quarter review of NTCFs, we found 12 instances where deputies identified Hispanic persons as white due to the fact that the NTCF has only one box for Race/Ethnicity – whereas the IRs and VSCFs associated with these stops showed the subjects were white in the race box, but Hispanic in the Ethnicity box.  We raised this prior issue with MCSO, and the agency suggested creating an Appendix to EA-3 to standardize how deputies fill out the form.  We await this proposal.  During our October site visit, we raised the latter issue with MCSO and the agency suggested that MCSO will be addressing these soon. MCSO will remain not in compliance with this Paragraph until such time as the agency proposes and places into production a means of analyzing NTC events, and an inspection is in place to make certain that all forms resulting from an NTC event are consistent.

MCSO has published its eighth, ninth, and tenth Traffic Stop Annual Reports (TSAR), which we discuss in other Paragraphs.  Although the ninth report concluded that systemic bias in patrol functions through traffic stop outcomes did not appear to exist, they have not yet shown a steady statistically significant change in the level of potential bias.  For instance, for stop length, MCSO

reported a decline from 2018 to 2019 for Latinos and minorities combined, but an increase from 2019 to 2020 and a decrease from 2020 to 2021. A similar trend was found for searches of Latinos and minorities combined. Additionally, MCSO reported an increasing citation rate for Latinos from 2018 to 2019 and 2020; however, a decline occurred for 2021 for all minorities grouped together and Latinos compared separately. In a recent Traffic Stop Quarterly Report (TSQR8) "Disparities Over Time," MCSO investigated the disparities between stop length, citations, arrests, and searches over time. The agency analyzed data from the time period 2017 to 2021 in a variety of ways and found some positive and some negative changes. MCSO summarized these findings in the conclusions: "The results of the analyses performed do not demonstrate a clear pattern of disparities consistently increasing or decreasing over time." MCSO also noted that the agency believes that the lack of longer-term trends may be due to the fact that many changes to practice and policy occurred prior to 2017. We will continue to work with MCSO on the issue of trend analyses.

MCSO's plan for the analysis of monthly traffic data also stems from the foundation created by the fourth through the seventh TSARs. MCSO completed a pilot program for TSMR in October 2022. The methodologies and processes have been modified each time a problem with the analysis or interventions occurred. The information from these analyses has been used to inform and refine the vetting processes developed in conjunction with us and the Parties. Based on the vetting processes, TSAU recommends actions ranging from discounting of flags to full intervention processes involving remedies for the particular issues that arose during the vetting process. We and the Parties have been involved in each step of these processes. Additionally, we have begun reviewing the vetting and closure of TSMR cases during our quarterly site visits, most recently in October 2024 through October 2025.

EIU and AIU pull together data to produce reports and inspections of both deputy and supervisor activity. The EIS automatically triggers alerts for repetitive actions, such as receiving multiple BIO Action Forms or external complaints. For the past two years BIO has been reevaluating the threshold levels that trigger several of these alerts and, in some instances, suspended them during this period. During the third quarter of 2023, MCSO published Appendix A (EIS Allegation and Incident Thresholds) to the EIU Operations Manual as well as producing two threshold analyses for vehicle pursuits and accidents. During the fourth quarter, MCSO produced a threshold analysis of external complaints; and in the first quarter of 2024, MCSO produced a threshold analysis of internal complaints. Most recently, MCSO has proposed a modification for BIO Action Forms.

The EIU uses the information gathered to create monthly reports and to determine whether an investigation by a supervisor is required. AIU publishes a quarterly inspection on EIS Alert Processes to ensure that alert investigations are conducted within policy timeframes and to summarize the manner in which investigations were closed. Additionally, the report looks for recurring flags to ensure that supervisors are addressing potential problems that recur with enhanced interventions. During our February and April 2024 site visits we raised concerns that many supervisors appeared to be using the same intervention repeatedly; and we requested a more thorough examination and explanation of what supervisors were doing in response to repetitive flags. In both the second and third quarters, MCSO's report included the discussion of several

recurring flags.  In each report, MCSO provided exhaustive discussion of the recurring alerts as some of the interventions suggested by supervisors were of the same or lessor magnitude; however, given the information provided by MCSO, following the discussions during our February and April site visits, we are not concerned that the recurring alerts did not result in an upgraded intervention.  In fact, the three most recent quarterly EIS Alert inspections (December 2024; March 2025; June 2025) show that recurring alerts were on a downward trend; and for those with recurring alerts, the supervisors were indeed applying enhanced interventions

AIU also uses the EIS database to generate numerous inspections of traffic stop data, Supervisor Notes, and Incident Report inspections, among many others.  When deficiencies are found, AIU sends out BIO Action Forms to the District command to rectify the situation and memorialize what actions are taken.  These inspections are critical to evaluate compliance with several Paragraphs in the Order.

### b. Training on the EIS

***Paragraph 80.***  *MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system.  MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command.  Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns.  Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries.  MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.*

**In Full and Effective Compliance**

MCSO's curriculum for Supervisor Responsibilities: Effective Law Enforcement (SRELE) regularly includes a refresher and updates for supervisors regarding how most effectively to use EIS tools and complete Alert Investigations for their subordinates within policy guidelines. MCSO has modified the Traffic Stop Monthly Report (TSMR) analysis and participated in regular conference calls with us and the Parties during the TSMR pilot, which was completed in October 2022.  Additionally, MCSO has published the first 18 Traffic Stop Quarterly Reports (TSQRs). As we have noted in earlier Paragraphs, the conclusions and recommendations of each of these reports could prove useful for the continued refinement of supervisory training conducted by MCSO.  In response to TSAR8 and TSQR12, "District Analysis," for the same time period of traffic stops, MCSO created online training for deputies in response to the annual report; and held District meetings in response to the quarterly report.  MCSO has also published TSAR9 and TSQR14, District Analysis, using 2023 traffic stop data and proposed accreditation processes for the organization – along with a means of checking long traffic stops without ETSIs and trends in traffic stop violations, among other responses.  Recently, MCSO published TSAR10 and TSQR18, for 2024 data, which found more disparities in traffic stops than were reported in

2023.The Internal Review Group's response to these include the production of monthly traffic stop dashboards, which have been in place since September 2024, a more thorough review of arrests in the upcoming TSQR20 Arrests analysis, the publication of a follow-up report examining the District report (TSQR18) and modifications to the VSCF, which took place in August 2025.

We will continue to assist MCSO as it formulates training curriculum to enhance the supervisory functions of the Office.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### c. Protocol for Agency and Supervisory Use of the EIS

**Paragraph 81.** *MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:*

a.  *comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;*

b.  *identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:*

      i.  *failure to follow any of the documentation requirements mandated pursuant to this Order;*

      ii.  *racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;*

      iii.  *evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;*

      iv.  *a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;*

      v.  *complaints by members of the public or other officers; and*

      vi.  *other indications of racial or ethnic bias in the exercise of official duties;*

c.  *MCSO commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;*

d.    *a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;*

e.    *identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;*

f.    *a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;*

g.    *a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;*

h.    *an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and*

i.    *mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.*

**Phase 1:** In compliance

- EA-3 (Non-Traffic Contact), most recently amended on April 8, 2025.
- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:** Not in compliance

MCSO completed the Traffic Stop Monthly Report (TSMR) pilot program and published all related documents and protocols during the fourth quarter of 2022 in the TSAU Operations Manual. Late in the first quarter of 2023, MCSO modified GH-5 (Early Identification System) with the TSMR materials and appendices. The TSMRs will assist MCSO and its supervisors in evaluating the activity of individual deputies with regard to traffic stops and examine any behaviors that might suggest biased activity. MCSO will continue to share the results of its monthly vetting analyses with us and the Parties, in addition to providing all documents related to the closing of any cases that have gone beyond the initial vetting process. During this quarter, MCSO recommended actions ranging from discounting of flags to memos to the Districts as outlined in other Paragraphs.

MCSO has also published 19 TSQRs through the third quarter of 2025. The topics of these analyses and their findings have been discussed in detail in other sections of this report, and in our previous quarterly reports. Each of these analyses has yielded information that could inform the development of training, modification of policy, future analyses, and the dissemination of resources to improve supervisory capabilities and deputy performance.

Paragraph 81.a. requires that MCSO's EIS protocols include "comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies."

The EIU has conducted monthly and annual analyses looking for outliers that may indicate that an individual is behaving in a biased or unprofessional manner, in accordance with Paragraphs 65, 66, and 67. The Traffic Stop Monthly Reports (TSMRs) had been suspended for several years, beginning in 2016. However, in conjunction with us and the Parties, MCSO completed an 18-month pilot of the TSMR in October 2022; and finalized all relevant documents and protocols in the TSAU Operations Manual. As noted above, MCSO has also modified GH-5 (Early Identification System) to include those protocols that are pertinent from the completion of the TSMR pilot. Both the TSAR and TSMR employ comparative peer group analyses to identify any indications that deputies may be conducting traffic stops in potentially discriminatory ways.

MCSO has also developed an interface for Non-Traffic Contact Forms (NTCFs) to be available in the EIS database. In February 2023, MCSO had published an initial inquiry into how deputies use NTCFs. There was no evaluation in this initial study examining potential bias in the contacts between deputies and citizens. We and the Parties have commented on what has been produced thus far. MCSO most recently amended EA-3 in April 2025 and modified the NTCF in August 2025. We have noted with MCSO that there have been several instances where deputies did not collect the personal information of persons on the NTCF in March and April, as well as inaccurately identified Hispanic persons solely as white in the third quarter. During our July site visit, MCSO advised that the agency would propose an Appendix to EA-3 that includes directions on how to fill out the forms for each NTCF. During our October site visit, MCSO noted that the agency would be investigating the disparities found for ethnicity and propose a plan for correction. This is crucial for NTCFs to be analyzed comprehensively. We will continue to evaluate all materials associated with EA-3 as they are produced.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.b. requires that MCSO's EIS protocols include "identification of warning signs or other indicia of possible misconduct."

GH-5 (Early Identification System) provides significant direction for employees and supervisors alike to understand what type of behaviors will be viewed as problematic. As noted above, the intent of the TSMR is to identify deputies who might be engaged in biased activity regarding who they arrest, cite, warn, or search. MCSO completed the TSMR pilot program in October 2022 and have been providing all expected analyses and documentation since that time.

MCSO has also revised the EIU Operations Manual, which includes sections on data protocols and the several analyses based upon the traffic stop and patrol data. In particular, MCSO has recently modified and published Appendix A (EIS Allegations and Incident Thresholds) along

with new threshold analyses for vehicle pursuits, accidents, as well as internal and external complaints. MCSO has also updated the EIS Alert Process (Section 302) along with several other appendices. We will continue to work with MCSO to refine and implement any new processes, as well as evaluate any additional modifications to the Operations Manual or its related appendices.

Finally, as noted in Subparagraph 81.a. and 81.b.vi, MCSO should utilize all patrol data to evaluate the behavior of deputies in comparison to their peers. While the volume of Non-Traffic Contact Forms (NTCFs) pales in comparison to traffic stops, there are enough accumulated forms for analysis to commence. As noted above, we will review all materials related to EA-3 (Non-Traffic Contact) when they are made available.

MCSO is not in compliance with this Subparagraph.

Paragraph 81.c. requires that MCSO's EIS protocols include "MCSO Commander and Supervisor review, on a regular basis, but not less than bimonthly, of EIS reports regarding each officer under the Commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports."

Supervisor Note inspections include four measures to assess how well supervisors are using EIS information to oversee the activity and behavior of their subordinates: making supervisory comments on deputies; reviewing their body-worn camera footage; making Employee Performance Appraisal (EPA) notations; and reviewing subordinates' EIS profiles. The overall compliance rate reported by MCSO for the first quarter was 100% in January and March and 91.03% in February. Our compliance calculation for February was slightly lower, 88.1%, since two supervisors failed to make notations for five of their subordinates. For the second quarter, we concurred with the 100% compliance reported for April and May. However, we did not concur with MCSO's finding of 98.71% compliance for June; we found a compliance rating of 97.73% due to a supervisor not supplying two notes for a deputy and failing to notate an inspection of a deputy's EIS profile. In July and August, we also found that three supervisors, in each month, who failed to make all of the necessary notations which led to our lower compliance rates than reported by MCSO. We did concur with the 100% rate for September.

When deficiencies are found, AIU sends out BIO Action Forms to those Districts, no matter the level of compliance. We have also repeatedly requested additional information from MCSO when we encounter an issue of concern and MCSO has always willingly provided the needed information or additional data. Rarely have we noted deficiencies involving the same supervisors in consecutive months. MCSO has already included repetitive BIO Action Form (BAF) deficiencies as an alert allegation. AIU has developed and placed into production a means to better track BAFs by type, individual, and District to ensure that any corrective actions are targeted at the most appropriate level and to be able to determine if there are particular supervisors that appear repeatedly within specified timeframes. We have noted in our review of 15 randomly selected alert investigations each month, that there appears to have been an increase in investigations due to repetitive BAFs. We believe the BAF tracking inspections, discussed in prior Paragraphs, will be instrumental for MCSO in evaluating and adjusting the actions of deputy and supervisory personnel.

MCSO is in compliance with this Subparagraph.

Paragraph 81.d. requires that MCSO's EIS protocols include "a requirement that MCSO Commanders and Supervisors initiate, implement and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS."

The EIS database generates alerts for issues ranging from data entry errors to internal and external complaints. From these alerts, EIU personnel send out for investigation those alerts that are not redundant or mischaracterized in some fashion. Supervisors have a set amount of time – 30 days – to return these investigations with a description of their investigation and the outcome.

MCSO has established an EIS Alert Review Group (ARG) that evaluates the investigations of supervisors prior to closing an alert. The group ensures that the reports of the supervisors address all aspects of the assigned investigation and returns those that are deficient to the District for continued revision. Following the creation of the ARG, we have found the supervisors' investigations and summaries to be more complete and thorough. Over time, the review group's request for additional information has dropped well below one third of the investigations evaluated. MCSO has always provided us with the original alert investigation documents (Attachment B of GH-5 [Early Identification System]), as well as modified ones arising from the ARG's requests. Additionally, during our October 2023 site visit, we met with the ARG to discuss the processes the ARG employs in evaluating the closure of investigations. The ARG provided invaluable insight into the processes it employs, and we are confident that the ARG is raising the importance of these investigations across the organization.

AIU also conducts an inspection for EIS Alert Review Processes. This inspection initially determines whether the investigation was completed within policy timeframes of 30 days. The compliance rate for the third quarter of 2025 is 100%. Beginning in the fourth quarter of 2022, MCSO also produced an EIS Alerts Inspection which included a method of evaluating whether the interventions triggered by alert investigations may, or may not, be mitigating the problematic activity giving rise to the original alert. In that vein, MCSO has repeatedly found that in over 95% of cases, flags do not recur within six months following the original flag. When they do recur, MCSO ensures that supervisors are responding to the repetitive issue. As discussed previously, following our discussions during our February and April 2024 site visits, MCSO has provided us with extensive documentation pertaining to how supervisors were handling recurring alerts for deputies under their purview, as well as ensuring that they use enhanced interventions when recurring alerts arise. In the Alert Inspection published in March 2025, two deputies had recurring alerts, but they were not for the same thresholds as the original alerts. In the June and September 2025 publications, the supervisors imposed escalating interventions for the deputy who did have repetitive alerts for the same threshold. We believe this shows the responsiveness of MCSO to our earlier concerns.

This addition to the quarterly EIS Alert Inspection fulfills the need to ensure that repetitive problematic behavior is being flagged and addressed appropriately. We will continue to evaluate whether recurring alert cases are addressed through elevated interventions, or if there are appropriate explanations justifying the supervisor's intervention actions.

MCSO is in compliance with this Subparagraph.

Paragraph 81.e. requires MCSO's EIS protocols to include "identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any case where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system."

GC-17 (Employee Disciplinary Procedures) and GH-5 (Early Identification System) provide a wide range of options for supervisor interventions, as well as practical guidelines about how to employ those options.  As noted above, GH-5 includes Attachment B, "Early Identification Alert Response Form."  This form specifies the responsibility of supervisors and serves as a checklist of processes the supervisor should use.  EIU also attaches any documents, citations, or BWC recordings the supervisor might need to conduct an inquiry.  We began observing the use of these forms in April 2017.  Over the past year, we have found that alert investigations conducted by supervisors have improved.  During the third and fourth quarters of 2024 and the first three quarters of 2025, supervisors recommended over one dozen meetings with a supervisors and additional training where necessary, in addition to meeting with a commander.

MCSO has also established an EIS Alert Review Group (ARG) to ensure that the closure of alerts is supported by documentation from supervisors and responsive to the needs of the organization. MCSO has established an extension protocol for alert investigation timeframes when documentation issues delay the process.  During our face-to-face meeting with the ARG during the October 2023 site visit, we found that the ARG group effectively reviewed and responded to the information included by the supervisors regarding the investigations conducted.  We will continue to evaluate the documents as they are produced and anticipate routine meetings with the ARG during upcoming site visits.

MCSO is in compliance with this Subparagraph.

Paragraph 81.f. requires that MCSO's EIS protocols include "a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS."

In the development of GH-5 (Early Identification System), MCSO has taken into consideration the nature of the employee's assignment.  MCSO has created an appendix for thresholds based on the number of BAFs generated within a particular branch (Administration, Enforcement, etc.). The BAF threshold is different for particular branches of the organization because of the nature of their duties.  MCSO has also created, in this appendix, a "use of force" threshold that is different for Detention and Patrol branches.  These examples show that MCSO has incorporated threshold levels based upon the nature of duties in particular areas of the organization.  During the first

quarter of 2022, MCSO produced a Threshold Analysis Review Proposal which was approved. MCSO used the approved proposal to modify Appendix A (EIS Allegations and Incident Thresholds) to the EIU Operations manual as well as conducting threshold reviews of traffic accident and pursuit policies during the first quarter of 2023. MCSO has subsequently conducted threshold analyses for internal and external complaints in 2023 and 2024. MCSO has repeatedly kept us informed of any new analyses being undertaken and proposed threshold modifications when they are supported by the analysis.

MCSO and its data analysis vendor proposed and employed an expansion of "peer" comparisons beyond just the location of the traffic stop in the fourth TSAR and has made modifications where necessary in the fifth through the eighth TSARs. MCSO has also concluded the pilot-testing for the TSMR using these new peer comparison strategies. MCSO also added refinements to the time and location of traffic stops that more precisely allows for comparisons of similarly situated deputies through a statistical splining procedure. As a result of the completion of the pilot and operationalization of the TSMR, MCSO is now in compliance with the Subparagraph. We are, of course, awaiting how the analysis of NTCFs will be conducted in conjunction with this Subparagraph.

MCSO is in compliance with this Subparagraph.

Paragraph 81.g. requires that MCSO's EIS protocols include "a process for prompt review by MCSO Commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command."

MCSO has noted the need for a prompt review in both the "Supervisor Responsibilities" and "Command Staff Responsibilities" sections of GH-5 (Early Identification System). EIU specifically addressed this issue during the EIS and SRELE training completed in November 2017 and updated each year thereafter. EIU advised supervisors to document when they conducted their review in Supervisor Notes, as well as how long the deputy had been working in their chain of command when the review was conducted. As noted, this was also reiterated in the SRELE training that was approved on September 30, 2019. During our visits to several Districts – most recently in October 2025 – MCSO personnel informed us that most command staff attempt to review these materials within the first few days that a deputy, or supervisor, moves to their District. In no cases have we found information where the 14-day limit outlined in policy has been problematic.

MCSO is in compliance with this Subparagraph.

Paragraph 81.h. requires that MCSO's EIS protocols include "an evaluation of whether MCSO Commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk."

EIU has improved the processing and tracking of alert investigations. The development of Attachment B to GH-5 (Early Identification System) and training completed in EIS and SRELE has dramatically improved the information provided by supervisors when closing alerts. AIU also conducted an EIS Alert Review Process inspection that specifically looks for indications that supervisors have conducted a thorough examination within policy timeframes and selected appropriate responses to the allegations included in the alert investigation. Initially, this

inspection was limited to reviewing whether supervisors were completing alert investigations within the 30-day policy requirements. MCSO's compliance rate for EIS inspections in the third and fourth quarters of 2024 and the first three quarters of 2025, was 100%. These rates match up with our own review. AIU sends out BIO Action Forms for those investigations that do not meet the time requirements.

As noted above, MCSO has also implemented a process following the closure of an investigation to ensure that no similar alerts are triggered within the next two quarters. The EIS alert inspection for the third quarter of 2024 showed two recurring alerts and provided ample explanation regarding the enhancement to meeting with a commander, in one instance; and no further action in another due to the fact that the investigation had been turned over to PSB. For the first quarter of 2025, there were no instances of recurring alerts for the same threshold. For the second and third quarters of 2025 there was one recurring alert each period where the supervisor recommended multiple enhanced interventions including training. This inspection will become a valuable component to ensure that supervisors and command staff are using EIS to promote efficiency and ethical policing during the alert investigation process. We will continue to evaluate these inspections as they become available. MCSO has agreed that recurring alerts must show an enhanced intervention or explain why this was not possible in any particular case.

MCSO has also conducted a Post-Stop Perceived Ethnicity Inspection, which looks specifically at traffic stops where the driver has a traditionally Latino surname, but the VSCF indicates a white driver. The inspectors review BWC recordings and evaluate whether the deputy correctly marked the form for the driver and any potential passengers within the vehicle stopped. MCSO reported compliance rates of 93.1%, 95.83%, and 100% for January through March 2025. For the second quarter MCSO reported rates of 95.65%, 100% and 100% respectively. For the third quarter, MCSO reported compliance rates of 100% for July and September and 92.5% for August due to two instances where the review of BWC was not consistent with the VSCF. Both forms were subsequently corrected. MCSO is in compliance with this Subparagraph.

Paragraph 81.i. requires that MCSO's EIS protocols include "mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data."

MCSO has addressed the security and integrity of data in GH-5 (Early Identification System), as well as instituting facility inspections throughout the Districts – including the security of terminals, access to information, and mobile displays. We spot-check technology and security of old forms during our site visits and have found no problems to date. Additionally, on November 6, 2017, MCSO published the operating procedure for System Log Audit Requests; this became effective on November 30, 2017. The procedure outlines how PSB personnel will notify the Technology Bureau of any allegations of misuse of MCSO information systems and request an audit of the suspected breach. We discussed this operating procedure, BAS SOP 17-4, during our January 2018 site visit meetings; it meets all the concerns voiced since the February 2017 discovery of two cases where data was compromised, but no one notified the Technology Bureau. We believe this procedure has proven effective to this point, as referenced in Paragraph 78. In addition, we are provided all internal investigation summaries initiated each month. As noted in our Paragraph 78 discussion, several cases required PSB to notify the Technology Bureau during

the third and fourth quarters of 2023, as well as the second through fourth quarters of 2024, and finally, the third quarter of 2025. We will continue to evaluate the effectiveness of MCSO's attention to data integrity.

MCSO is in compliance with this Subparagraph.

MCSO meets some of the requirements of Paragraph 81, but there remain a variety of activities that are currently ongoing that need to be completed before MCSO will be fully compliant. AIU has improved the tracking of alert investigations with the creation of the EIS Alert Review Process Inspection; and initiated an analysis of BIO Action Form tracking. Since the fourth quarter of 2022, MCSO has also produced an analysis of whether there are recurring alerts for deputies who have previously experienced an intervention. We will continue to evaluate the new inspections. We have also requested that MCSO devise an audit for the NTCFs that have accumulated over the past several years. MCSO has completed an initial evaluation of how deputies use the NTCF and is currently evaluating EA-3 (Non-Traffic Contact) policy and the necessary forms associated with these stops, along with a methodology to evaluate potential biases resulting from these stops. We await the analysis of accumulated NTCFs to enhance supervisory knowledge and add to the data available to determine compliance with several EIS-related Paragraphs.

During our October 2023, and February and April 2024 site visits, MCSO discussed the upcoming proposal to modify the policy, forms, and analysis related to non-traffic contacts. The new NTCF was placed into production in April 2025. We noted two instances, during our review of monthly NTCFs, where deputies had not provided the identifying information of the persons contacted. During the July 2025 site visit MCSO acknowledge this issue and stated they would be proposing an Appendix to EA-3 defining the responsibilities of deputies to fill out the form completely. We will evaluate these as the proposal is formalized. Our main concern for this Paragraph, is to ensure that all data elements for non-traffic contacts are accurately and adequately captured in the database and available for use by supervisors and command staff, as well as available for quantitative analysis. Command staff have taken a more active role in evaluating the work of supervisors as evidenced by the number of alert investigations returned to supervisors for revision or additional inquiry. To comply with this and other Paragraphs, however, the methods would also have to be able to indicate statistically whether potential bias might be occurring with regard to how different ethnicities and races are being selected and treated during the encounters captured on the NTCFs. We have also suggested to MCSO that the agency create an inspection of NTCFs so that the agency can quickly correct any inaccuracies in the reporting of race/ethnicity of persons contacted. This may also require the modification of the NTCF to more closely mirror the drop-down boxes for race and ethnicity found in the VSCF and IR. We will continue to evaluate MCSO's progress toward the goals outlined in this Paragraph.

## Section 9: Supervision and Evaluation of Officer Performance

**COURT ORDER X. SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

*Paragraph 82.  MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order.  First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct.  To achieve these outcomes, MCSO shall undertake the following duties and measures:*

### a. General Duties of Supervisors

*Paragraph 83.  MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies.  Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.*

**In Full and Effective Compliance**

We reviewed a sample of 61 Incident Reports for July, for the randomly selected date of July 4, 2025.  All of the 61 Incident Reports were submitted before the end of the shift.  We verified the timely supervisory review in 56 of the 61 incident reports.  No Arrest Reports were received or reviewed and approved by supervisors during this reporting period.  There were five Vehicle Crash Reports submitted in the July sample, and we verified timely supervisory reviews on all of the reports.  We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness.  None of the reports reviewed had any major errors.  In total, 61 of the 61 Incident Reports we reviewed were in compliance, for a compliance rate of 100%.

For July, MCSO reported a total of 294:58 staff hours dedicated to community policing.  MCSO reported 270 occasions of community policing throughout its components, with 245 of those attributed to deputies in the Patrol function.  The July report from the Community Outreach Division (COrD) documented 24 events in which MCSO staff met with and interacted with members of different community organizations.  MCSO reported that COrD attended a number of community engagement special events to include meetings with several recruiting events.  COrD also attended career day school events and several meetings with community advisory groups.

From our reviews of 18 community policing worksheets selected for the month, Patrol deputies reported 27:50 hours of community policing, with 971 community members involved with those activities.  MCSO Patrol Deputies reported community policing activities in Aguila, Phoenix, Peoria, Litchfield Park, Sun City, Sun City West, Youngtown, and Palo Verde.  Of the 18 community policing worksheets, 11 (61%) did not receive supervisory review.  One was a duplicate event, and five were activities associated with the Sun City Posse with the pick-up of donations for the Posse to distribute.

We reviewed a representative sample of 90 Incident Reports for August for the randomly selected date of August 31, 2025.  We verified that 81 of the 90 Incident Reports were submitted before the end of the shift.  We verified that 81 of the 90 Incident Reports had proper documentation of timely supervisory review.  Nine of the 90 Incident Reports were not approved by a supervisor.  Of the 90 Incident Reports, three were vehicle collisions, of which three had documentation of supervisory review and approval.  There were no Arrest Reports submitted for the month.  We conducted a review of a 10% sample of the Incident Reports submitted and found no significant deficiencies.  The overall compliance rate for timely submission and review of Incident Reports in August was 90%.

For Aug, MCSO reported a total of 364:23 staff hours dedicated to community policing.  MCSO reported 302 occasions of community policing throughout its components, with 274 of those attributed to deputies in the Patrol function.  The August report from COrD documented 23 community engagement activities.  COrD members reported that they participated in several the community engagement events.  In our reviews of a sample of 17 community policing worksheets, deputies reported a total of 25.87 hours of community policing, with 1,399 community members involved with those activities.  MCSO reported community policing activities in Youngtown, Peoria, Litchfield Park, Palo Verde, and Scottsdale.  We noted that in two of the 17 sample reviews (11.76%), deputies incorrectly cited patrol activities as community policing events.  Supervisors improperly signed off on these events as well.

We reviewed a representative sample of 60 Incident Reports for September, for the randomly selected date of September 1, 2025.  Sixty of the 60 reports were in compliance with timely submission and timely supervisory review.  There were four incidents involving vehicle crashes.  We verified timely supervisory review in four of the four crash reports.  No Arrest Reports were reviewed.  During our quality reviews of a 10% sample of reports, we found no significant errors.  The compliance rate for September was 100%.  For the third quarter of 2025, 201 of 211 Incident Reports reviewed were in compliance, for a 95% compliance rate.

For September, MCSO reported a total of 398:26 staff hours dedicated to community policing.  MCSO reported 340 occasions of community policing throughout its components, with 308 of those attributed to deputies in the Patrol function.  The September report from COrD documented 32 instances in which MCSO staff participated in community events.  COrD representatives attended meetings with representatives of AZ Youthforce and Valor Veterans.  COrD members also met with community associations and attended a number of special events and career fairs.

For September, we reviewed a sample of 20 community policing worksheets.  On the community policing worksheets, deputies reported 30:55 hours of community policing, with 2,306 community members involved with those activities.  MCSO Patrol deputies reported community

policing activities in Phoenix, Sun City West, Cave Creek, Mesa, and Morristown.  We also noted that in 11 of the 20 (55%) worksheets we reviewed, supervisors had not reviewed and approved the documents.

For each month of the quarter, we selected a supervisor and a squad of deputies from each District for review.  We requested several documents, including Patrol Activity Logs (PALs), for each deputy.  We reviewed PALs for each month of the quarter to assess if deputies turned them in by the end of each shift, and if supervisors reviewed each PAL.

For July, we reviewed PALs for 17 deputies, four DSA and six supervisors.  All 17 deputies' Patrol Activity Logs contained documentation of supervisory review.  All six supervisors' Patrol Activity Logs contained documentation of supervisory review.  All six supervisors' Patrol Activity Logs contained documentation of command-level review.  In four of the 17deputies' PALs, we noted that there was no patrol miles listed.  This is a recurring trend, and supervisors continue to approve PALs absent this information.

Based on the review of PAL samples selected for deputies in July, on a daily basis, deputies completed an average of 1.35 Incident Reports, handled an average of 8.23 calls for service, completed an average of 2.58 self-initiated calls, made one arrest, and traveled an average of 109.35 miles.  There was one community policing event documented in the PALs reviewed for July.

For August, we reviewed Patrol Activity Logs for 23 deputies, two DSA, and six supervisors.  All 23 deputies' PALs, and both DSA PALs contained documentation of supervisory review.  All six supervisors' PALs contained documentation of command-level review.  For August, six of the 23 PALs reviewed contained extremely low or no mileage noted.

Based on the review of PAL samples selected for 23 deputies in August, on a daily basis, deputies completed an average of .6 Incident Reports, handled an average of 4.30 calls for service, completed an average of 2.95 self-initiated calls, made an average of .17 arrests, and traveled an average of 98.78 miles.  There were eight community policing events documented in the PALs reviewed for August.

For September, we reviewed Patrol Activity Logs for 21 deputies, five DSAs, and six supervisors.  All 21 deputies' PALs, and all DSA PALs contained documentation of supervisory review.  All six supervisors' PALs contained documentation of command-level review.  For September, 10 of the 21 PALs reviewed contained extremely low or no mileage noted.

Based on the review of PAL samples selected for 21 deputies in September, on a daily basis, deputies completed an average of 0.76 Incident Reports, handled an average of 4.66 calls for service, completed an average of 3.09 self-initiated calls, made an average of 0.14 arrests, and traveled an average of 76.76 miles.

We also reviewed deputies' and supervisors' PALs to determine if supervisors provided on-scene supervision, and if those supervisor-deputy contacts were documented. For the sample dates selected in July, there were 28 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in August, there were 13 supervisor-deputy field contacts reported by deputies and supervisors. For the sample dates selected in September, there were 17 supervisor-deputy field contacts reported by deputies and supervisors.

For July, August, and September, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). For July, we selected a sample of 15 NTCFs for review. All 15 NTCFs were submitted prior to the end of the shift. Fourteen of 15 NTCFs were reviewed and approved by supervisors within the required timeframe. However, three of the NTCFs were problematic. For one NTCF, it improperly documents a consent search where no request for a consent search is requested nor is one granted. A second should have been documented on an IR as it was not a consensual encounter. The third was a courtesy transport where the deputy handcuffs the subject for a clear DUI, searches the person absent any request or DUI arrest, and tells the subject he will drive him home. The compliance rate for timely submission and review of NTCFs was 100%. For August, we selected 15 NTCFs to review. Fifteen NTCFs were submitted prior to the end of the shift, and 15 NTCFs were reviewed and approved by supervisors within the required timeframe. The compliance rate for August was 100%. For September, we selected 15 NTCFs for review. Fifteen of 15 NTCFs were submitted prior to the end of the shift, and 15 of 15 NTCFs were reviewed and approved by supervisors within the required timeframe. Two of the 15 NTCFs were identified as consent searches. For both incidents the subjects were riding bikes. In one incident, consent to search is neither asked for nor granted, nor is the subject advised of their right to refuse or revoke any consent. In the second instance, the deputy asks the subject if he minds if he is searched "real quick," and the subject responds affirmatively. Again in this instance, the deputy did not advise the subject of the right to refuse or revoke consent. The compliance rate for timely submission and review of NTCFs in September was 100%. For the third quarter of 2025, the overall compliance rate for timely submission and timely supervisory review of NTCFs was 97.77%. We assess compliance with the timely submission and review of NTCFs in conjunction with timely reviews of VSCFs, under Paragraph 90. For the period in review, MCSO was in compliance with this Paragraph.

Our reviews for this reporting period revealed that in July, of the 15 NTCFs we reviewed, seven stops involved white individuals, with a total of seven white individuals contacted during these incidents. Five stops involved Latino individuals, with a total of five Latino individuals involved in those incidents. For August, we reviewed 15 NTCFs. Of the 15 stops we reviewed, seven stops involved white individuals, with a total of seven white individuals contacted in those incidents. Four stops involved Latino individuals, with a total of four Latino individuals contacted in those incidents. Two stops involved American Indian/Alaskan Natives. Two stops involved Black individuals. For September, we reviewed 15 NTFCs, of which five stops involved five white individuals contacted in those incidents. Four stops involved Latino individuals contacted in separate incidents. Three stops involved Black individuals.

Our reviews of NTCFs for this quarter revealed that white individuals were involved in approximately 37% of the stops. Latino individuals were involved in approximately 28% of the stops. Black individuals were involved in approximately 15% of the stops. American Indian/Alaskan Native individuals were involved in 11% of the stops.

During our October site visit, we visited all Patrol Districts and spoke to representatives of the command staff from each District. With regard to span of control, District 1 reported eight scheduling issues in the past quarter. During these shifts, a sergeant had responsibility for between 10 and 12 deputies. District 1 staff attempted to find additional sergeants, but the District was unsuccessful. District command personnel have previously raised the issue of being short deputies and sergeants at this District. District 1 staff expect deputies to patrol by being involved and visible, investigating issues accordingly, and responding to calls expeditiously. Command staff believe priorities can vary, but traffic patrol falls below interacting with the community and treating the public with respect.

District 2 reported no span of control violations for the last quarter. We verified, through our document requests, that there were span of control memos submitted. District 2 representatives continue to report that Deputies in District 2 focus on traffic enforcement when not responding to calls for service; however, deputies are going from call to call with little time for proactivity. Deputies are expected to provide visibility to the community, increase their level of traffic enforcement, respond to increases in calls for service and are questioned when their Patrol Activity Logs show periods of 30 minutes or longer without an entry. District 2 personnel report that Posse members' cars are typically free-wheeling and they want them seen in the community; however, they are generally scheduled ahead of time and attend briefings with deputies.

District 3 reported no shifts where the span of control was exceeded. We verified this through our document requests. District 3 representatives continue to report they have 17 deputy vacancies, and they believe they need additional staff. Homelessness is becoming a larger problem. The District 3 station is still under construction, and the staff continue to work out of trailers. District 3 staff continue to remind us that the trailers are in areas that are not easily accessible to the public, and that there is a lack of signage to direct residents to the trailers. In addition, due to technical difficulties, the Youngtown substation remains non-operational. Two Posse members work at night regularly and attend briefings; generally, they operate a solo King car but occasionally ride with a deputy. The Sun City West Posse operates independently and is not included in our span of control.

District 4 reported no span of control violations for the last quarter. We verified that this is accurate through reviews of document requests for the third quarter. District 4 staff emphasize proactive visibility while patrolling and encourage deputies to become more active in terms of investigations. Traffic patrol is always a priority addressed by traffic cars for Cave Creek and Carefree. There has been an increase in traffic requests for Anthem, as well. Crime is trending down, with mental health and social service calls trending upward. Calls for service are manageable but become problematic if they occur during one bad traffic event. Generally if Posse volunteer for service at District 4, they are assigned administrative assistance rather than traffic.

District 5, Lake Patrol, has not reported any span of control concerns in the past, and did not report any in the third quarter. They indicate sworn vacancies to be nine deputies and one sergeant. Lake Patrol is mostly a recreational area with varying patterns of activity, depending on the two distinct seasonal activities of summer and winter. The staff in Lake Patrol reported staffing as their biggest concern limiting their ability to complete training. The vehicle situation is described as precarious due to no MCSO fleet support. Command staff promote the use of FTOs to answer calls in adjacent Districts. Three Posse members routinely show up mid-shift and are added to the daily roster. Two Posse members generally ride together, and one rides solo, on Saturdays and Sundays in the summer and are assigned river-area assignments.

District 7 reported no span of control concerns, as its deputy-supervisor ratio is generally 4:1, and staffing is mandated as a result of being a contract city. District 7 staff stated that the District leadership provides a lot of hands-on mentorships and attend regular meetings with the Town Council. District 7 reports a continued rise in domestic violence issues, personal crimes, and fraud. Posse volunteers show up mid-shift and contact the shift sergeant to receive a briefing and are then added to the daily roster.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion. For this reporting period, MCSO remains in Full and Effective Compliance with the requirements of this Paragraph.

**Paragraph 84.** *Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2025. For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3. For August, we reviewed a sample of shift rosters from Districts 4, 5, and 7. For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors. During the third quarter of 2025, there were no shifts where supervisors had responsibility for more deputies than permitted by this Paragraph.

For July, there were no span of control memos submitted. All 18 shifts reviewed for July were in compliance.

For August, District 1 submitted five span of control memos for the month. The first memo documented a shift where a supervisor had oversight of nine deputies and one Posse member, for a total of 10 subordinates. The second memo documented a shift where a supervisor had oversight of 10 deputies – two of whom were FTOs (Field Training Officers) with OITs (Officers in Training) riding with them. We count an FTO and an OIT riding in the same vehicle as one subordinate, since the junior deputy is still in training. Therefore, there were 10 total subordinates for the supervisor, during this shift. The third memo documented a shift where a supervisor had

oversight of nine deputies – two of whom were FTOs and had OITs riding with them – and one Posse member. There were 10 total subordinates for this supervisor during this shift. The fourth and fifth memos documented shifts where supervisors had oversight of 10 deputies each. Districts 2, 3, 4, 5, and 7 did not submit any span of control memos for August. All 18 shifts reviewed for August were in compliance.

For September, District 1 submitted three span of control memos. The first memo documented a shift where a supervisor had oversight of 10 deputies and two Posse members. This brings the total number of subordinates to 12 for this shift. The second memo documented a shift where a supervisor had oversight of 10 deputies and two OITs. As previously noted, OITs riding together with FTOs are counted as one unit. Therefore, the total number of subordinates for this shift was 10. The third memo documented a shift where a supervisor had oversight of 11 deputies and two OITs. The total number of subordinates for this shift was 11. Districts 2, 3, 4, and 7 and Lake Patrol did not submit any span of control memos for September. All 18 shifts reviewed for September were in compliance.

Of the sample of 54 Patrol shifts reviewed for this quarter, we found all 54 to be in compliance with the requirements of this Paragraph. On September 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 85.** *First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested that MCSO provide copies of reports documenting that supervisors are meeting with and discussing individually the stops made by each deputy, at least once per month. We then requested documentation for one randomly selected supervisor from each District, for each month of the reporting period, and the squad of deputies who reports to that supervisor. Supervisors record the discussion of traffic stops by applying the "Discussed with Deputy" option. MCSO documents supervisor-deputy discussions in a spreadsheet, which it submits for inspection. The spreadsheet also documents timely supervisory review of VSCFs. In addition to the spreadsheet, MCSO submits all VSCFs for the month in review. We select a 10% random sample of VSCFs from each District to review for content. We also inspect the sample of VSCFs submitted for review of traffic stops under Paragraphs 25 and 54, as part of compliance with Paragraph 91, to verify if supervisors are addressing deficiencies in the documentation related to the stops.

Paragraph 85 requires that supervisors discuss traffic stops at least once per month with their deputies. To efficiently manage this requirement along with other administrative and operational duties, supervisors conduct several traffic stop-related discussions with each deputy during the month. Traffic stop reviews by supervisors may be delayed until the next month if they occur

late in the current month.  Our selections for these discussions change every month, so to obtain complete records for each deputy, MCSO holds the submission until all information requested for the month is complete.  So, the documentation of supervisory-deputy discussions of traffic stops is submitted 30 days retroactively.

For July, MCSO submitted the June 2025 and July 2025 traffic stops for each deputy, by District.  The total number of traffic stops for each District was:  District 1, 41; District 2, 10; District 3, three; District 4, 21; District 5, 108; and District 7, 10.  There was a total of 193 traffic-related events for all Districts, and sergeants discussed 180 of these events with the deputies who conducted them, for a compliance rate of 93.26%.

For August, MCSO submitted the July and August traffic stops for each deputy, by District.  The total number of traffic stops for each District was: District 1, 41; District 2, 9; District 3, three; District 4, 20; District 5, 107; and District 7, 10.  There was a total of 190 traffic-related events for all Districts, and sergeants discussed 179 of these with the deputies that conducted them, for a compliance rate of 98.35%.

For September, MCSO submitted the August and September traffic stops for each deputy, by District.  The total number of traffic stops for each District was:  District 1, 49; District 2, 26; District 3, 16; District 4, 73; District 5, 56; and District 7, five.  There was a total of 225 traffic-related events for all Districts, and sergeants discussed all 225 of these events with the deputies who conducted them, for a compliance rate of 100%.

For this reporting period, there was a total of 608 traffic stops reported.  We received documentation that supervisors discussed all 584 of these stops with the deputies that conducted them.  This is a compliance rate of 96%.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 86.**  *On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units.  Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2025.  For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  For August, we reviewed a sample of shift rosters from Districts 4, 5, and 7.  For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3.

MCSO deputies' and sergeants' activities are captured in Patrol Activity Logs (PALs).  We selected a random sample of one day per month, and one squad per District, for review.  For July we reviewed PALs for six sergeants and 17 deputies.  We noted a total of 36 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates.  For

Deputy Services Aides (DSAs), we reviewed a Computer Aided Dispatch (CAD) report that documented the incidents in which supervisors were on the scene of calls with DSAs, to provide supervisory assistance. For July, there were 11 incidents, in all Districts, where supervisors responded to calls for service with DSAs. For July, we reviewed a sample of 20 PALs for Posse members who were on duty during the selected dates. There were nine incidents, for the selected dates, where supervisors were on the scene of calls with Posse members, to provide supervisory assistance.

For August, we requested PALs for six sergeants and 23 deputies. We noted a total of 18 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed a CAD report that documented the incidents in which supervisors were on the scene of calls with DSAs, to provide supervisory assistance. For August, there were seven incidents, in all Districts, where supervisors responded to calls for service with DSAs. For August, we reviewed a sample of 20 PALs for Posse members who were on duty during the selected dates. There were 22 incidents, for the selected dates, where supervisors were on the scene of calls with Posse members, to provide supervisory assistance.

For September, we requested PALs for five sergeants and 21 deputies. We noted a total of 30 field supervisor-deputy contacts between the combined deputies' and sergeants' PALs for the selected dates. We reviewed a CAD report that documented the incidents in which supervisors were on the scene of calls with DSAs, to provide supervisory assistance. For September, there were 13 incidents, in all districts, where supervisors responded to calls for service with DSAs. For September, we reviewed a sample of 20 PALs for Posse members who were on duty during the selected dates. There were 13 incidents, for the selected dates, where supervisors were on the scene of calls with Posse members, to provide supervisory assistance.

We reviewed the monthly shift rosters for each month of the reporting period. Our reviews indicate that supervisors are assigned to work the same hours as the deputies under their supervision. Our reviews of Patrol Activity Logs indicate that supervisors have been available to provide on-scene supervision to personnel working in Patrol. (See Paragraph 266 for additional comments, as it relates to supervision of Posse members.)

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 87.** *MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.*

**Phase 1:** In compliance

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on March 5, 2024.

- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on March 5, 2024.
- GC-17 (Employee Disciplinary Procedures), most recently amended on November 22, 2024.

**Phase 2:**  In compliance

To assess compliance with this Paragraph, we request the names of deputies and supervisors with completed performance appraisals from the previous month on a monthly basis.  From the list of employees provided, we request a representative sample.  The choice of deputies and supervisors for EPA requests is determined by the criteria in the First and Second Orders.  Supervisors have more requirements, so we generally review more of their performance appraisals for compliance.

We requested and reviewed Employee Performance Appraisals for five deputies and 10 supervisors completed in July.  All five deputy EPAs appropriately addressed each employee's performance for the period under review.  All 10 supervisor EPAs were in compliance.  All 10 supervisor EPAs rated the supervisors on the quality and effectiveness of their supervision.  All 10 of the supervisor EPAs rated the supervisors on their ability to identify and respond to misconduct.  All 10 supervisor EPAs properly addressed the quality of supervisory reviews.  For July, including both deputy and supervisor EPAs, all 15 EPAs, or 100%, followed Paragraph 87.

We requested and reviewed Employee Performance Appraisals for five deputies and seven supervisors whose performance evaluations were completed in August.  All five deputy EPAs were in compliance, and all four supervisor EPAs met Paragraph 87 requirements.  For August, including both deputy and supervisor EPAs, All 12 EPAs, or 100%, were in compliance with the requirements of this Paragraph.  All seven supervisor EPAs appropriately rated the employees on the quality and effectiveness of their supervision.  All seven EPAs included comments related to the supervisor's ability to identify and respond to misconduct.  All seven supervisor EPAs properly addressed the quality of supervisory reviews.  For August, including both deputy and supervisor EPAs, all 12 EPAs, or 100%, followed Paragraph 87.

We requested and reviewed Employee Performance Appraisals for four deputies and five supervisors whose performance evaluations were completed in September.  All four deputy EPAs sufficiently addressed all required areas of assessment.  All five supervisor EPAs met the requirements of Paragraph 87.  All five supervisor EPAs appropriately rated the employees on the quality and effectiveness of their supervision.  All 10 EPAs included comments related to the supervisor's ability to identify and respond to misconduct.  All five supervisor EPAs properly addressed the quality of supervisory reviews.  For September, including both deputy and supervisor EPAs, nine of nine EPAs were in compliance, or 100%.

For the third quarter of 2025, we reviewed EPAs for 14 deputies and 22 supervisors.  As it pertains to the requirements of this Paragraph, 14 of 14 deputy EPAs were in compliance, and all 22 supervisor EPAs were in compliance, for a compliance rate of 100%.  For this review period, all 36 EPAs reviewed were in compliance with the requirements of this Paragraph, for a compliance rate of 100%.  MCSO remains in compliance with this Paragraph.

*b. Additional Supervisory Measures*

***Paragraph 88.*** *To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue.

For this reporting period we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 211 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we have found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 89.*** *A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.*

**In Full and Effective Compliance**

To assess MCSO's compliance with this Paragraph, we requested all reports related to immigration status investigations, any immigration-related crimes, or any incidents or arrests involving lack of identity documents. The Incident Reports requested were for the period in review. Any incident wherein a deputy requests a supervisor's permission to contact Immigration and Customs Enforcement (ICE) or Customs and Border Patrol (CBP) – to ascertain the legal status of an individual involved in a stop, detention, or any incident under investigation by MCSO – falls under the reporting requirements of this request.

For the third quarter of 2025, MCSO did not submit any arrests that fell within the reporting requirements of this Paragraph.

On December 9, 2019, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 90.*** *MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred. Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.*

**In Full and Effective Compliance**

We reviewed 37 incidents involving traffic stops for July 2025. There were 15 stops related to speeding, of which 10 resulted in citations and five resulted in warnings. Five stops were for moving violations other than speeding. Thirteen stops were related to registration or license plate violations. No stops were due to equipment violations. Eighteen of the 37 stops resulted in citations, and 19 resulted in written warnings. All 37 Vehicle Stop Contact Forms we reviewed noted the serial number of the reviewing supervisor, date, and time of supervisory review. For July MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 193 VSCFs. Supervisors reviewed 180 of 193VSCFs within 72 hours, for a compliance rate of 93.26%.

We reviewed 35 incidents involving traffic stops for August 2025. Fourteen of the 35 traffic stops were related to speeding. Of the 14 stops related to speeding, eight drivers received citations, and six received warnings. Eleven of the stops involved moving traffic infractions other than speeding. No stops were due to equipment violations. Eight stops were related to registration or license plate violations. Of the 35 stops, 15 resulted in citations, and 20 resulted in written warnings. For August, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 190 VSCFs. Supervisors reviewed 179 VSCFs within 72 hours, for a compliance rate of 94.21%.

We reviewed 35 incidents involving traffic stops for September 2025. Twelve of the 35 traffic stops involved speeding violations. Of the 12 stops related to speeding, eight drivers received citations, and four drivers received warnings. Six stops involved equipment violations. Ten stops involved traffic violations other than speeding. Seven stops involved registration or license plate violations. Of the 35 stops, 18 resulted in citations, and 17 resulted in warnings. For September, MCSO submitted a spreadsheet documenting each VSCF by District, for a total of 225 VSCFs. We reviewed the data and supervisors reviewed all 225 VSCFs within 72 hours, for a 100% compliance rate.

For every month of the review period, we reviewed selected samples of non-traffic incidents involving stops and detentions, which were recorded on Non-Traffic Contact Forms (NTCFs). Our assessment of compliance also included reviews of BWC recordings on selected cases, some of which included searches of the individuals contacted.

For July, we selected a sample of 15 NTCFs to review.  All 15 NTCFs had been submitted prior to the end of the shift.  Fourteen NTCFs were reviewed and approved by supervisors within 72 hours, as required.  We reviewed BWC recordings submitted with three of the incidents and noted issues of concern related to consent searches, consensual encounters, and voluntary transportation to include incorrect documentation that should not have been an NTCF, and lack of probable cause for the search.  The compliance rate for timely submission and timely supervisory review of NTCFs in July was 93.33%.

For August, we selected a sample of 15 NTCFs to review.  All 15 of 15 NTCFs were turned in before the end of the shift.  Fifteen of the 15 NTCFs had supervisory reviews documented within 72 hours.  The compliance rate for timely submission and timely supervisory review of NTCFs in August was 100%.

For September, we reviewed a sample of 15 NTCFs generated during the month.  Fifteen of 15 NTCFs were submitted prior to the end of the shift, and 15 of the 15 NTCFs were reviewed and approved by supervisors within the required timeframe.  Fifteen of the 15 NTCFs were in compliance.  Two NTCFs were very similar in that both involved individuals riding bikes.  One subject was neither asked nor granted, nor apprised of their right of refusal or revocation for a consent search.  The second the deputy simply asked, "You mind if I search you real quick?"  Again in the second case, proper consent was neither asked nor granted, and the deputy did not advise the person of their right of refusal or revocation for a consent search.  We found two NTCFs to be noncompliant.  The supervisors approved both NTCFs without any comments or correction.  The compliance rate for timely submission and timely supervisory review of NTCFs in September was 100%.

For the third quarter of 2025, 44 of the 45 NTCFs reviewed were in compliance with timely supervisory review.  The overall compliance rate for timely review was 97.77%.

We take into account all stops and detentions, both traffic and non-traffic, when we determine the compliance rate for this Paragraph.  For the third quarter of 2025, all 584 of 608 VSCFs reviewed were in compliance, and 44 of 45 NTCFs reviewed were in compliance.  The compliance rate for timely reviews of all combined stops and detentions, from the samples chosen for this reporting period, was 96.5%.  For this reporting period, our inspection of the documentation provided did not reveal any evidence of boilerplate or conclusory language, inconsistent or inaccurate information, or lack of articulation, as to the legal basis for stops and detentions.

On December 19, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 91.**    *As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**In Full and Effective Compliance**

We reviewed traffic stop data reported by MCSO for its July inspection (BI2025-0102).  To determine compliance with this Paragraph, we randomly selected 35 traffic-related events, which BIO then audited for compliance.  Of the 35 traffic-related events, MCSO reported a 100% compliance rate.  Our review of the inspection report found that no stops were found as having deficiencies, resulting in BIO Action Forms.

For July, all 35 stops we reviewed were in compliance with this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District for July, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed data for 193 traffic stops and determined that supervisors had completed timely reviews in 180 of 193 VSCFs, or 93.26% of the cases.  For July, we requested a sample of 15 NTCFs generated for the month, from the list that MCSO submitted.  We reviewed the 15 NTCFs to determine if supervisors were reviewing them within the required 72 hours and determined that 14 of 15 NTCFs, or 93.33%, were in compliance.

For July, we requested a sample of eight corrective actions generated during the month.  Corrective actions are documented on BlueTeam Supervisor Notes.  Five corrective actions were related to Body-Worn Camera (BWC) reviews.  Two corrective actions were due to erroneous or missing information on the VSCFs, citations, or written warnings.  One corrective action was the result of policy violations during a traffic stops.  For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection.  There were no BlueTeam corrective actions submitted pertaining to the 35 stops selected for July.

We reviewed traffic stop data reported by MCSO for its August inspection (BI2025-0115).  We randomly selected 35 traffic-related events, which BIO then audited for compliance.  The inspection resulted in a 100% compliance rating.  Our review of the inspection report found that no stops were listed as having deficiencies.  For August, all 35 stops we reviewed were in compliance with this Paragraph.

We reviewed a spreadsheet documenting each VSCF by District for August, to determine if supervisors were reviewing VSCFs within the required 72 hours.  We reviewed 190 VSCFs and determined that supervisors had completed timely reviews of documentation in 179 stops, for a 94.21% compliance rating.  From the list submitted by MCSO, we requested 15 NTCFs that were generated in August.  We inspected the NTCFs to determine if supervisors were reviewing them within the required 72 hours.  We determined that supervisors had completed timely reviews of 15 of 15 NTCFs for a 100% compliance rating for August.

For August, we requested a list of corrective actions. From the list submitted, we selected a sample of 10 corrective actions generated for the month. Two corrective actions were associated with VSCF missing information deficiencies. Six corrective actions were the result of BWC reviews associated with traffic stops, with two associated with late activations. Two corrective actions were the result of erroneous or missing information required on traffic stop documentation. For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection. There were no BlueTeam corrective action notes submitted pertaining to the 35 stops selected for August.

We reviewed traffic stop data reported by MCSO for its September inspection (BI2025-0124). We randomly selected 35 traffic-related events, which BIO then audited for compliance. The inspection resulted in a 99.60% compliance rating. Our review of the inspection report found that four stops listed as having deficiencies. As a result of the inspection, six BIO Action Forms were generated. The first deficiency found that the violator's license plate did not match all applicable forms. The second deficiency found that the violation classification on the VSCF did not reflect the outcome of the traffic stop. The third and fourth deficiencies found that a license/warrant check had not been conducted on the violators. For September, the 31 stops we reviewed were in compliance with this Paragraph.

For September, we requested a list of corrective actions. From the list submitted, we selected a sample of 10 corrective actions that were generated for the month. Two corrective actions were the result of late activation of the BWC. Four corrective actions were the result of erroneous or missing information required on traffic stop documentation. Two corrective actions were the result of policy violations related to traffic stops. For the month in review, we requested all corrective actions relative to the sample of 35 traffic stops that were selected for the monthly Traffic Stop Data Collection Inspection. There were no BlueTeam corrective action notes submitted pertaining to the 35 stops selected for September. During this reporting period, MCSO closed two administrative investigations initiated as a result of investigative detentions or stops that did not appear to be supported by probable cause.

We reviewed a spreadsheet documenting each VSCF by District. For September, we reviewed 225 VSCFs and determined that supervisors had completed timely reviews in all 225 VSCFs, for a 100% compliance rate. For September, we requested 15 NTCFs generated by Patrol deputies. We reviewed all 15 NTCFs to determine if supervisors were reviewing NTCFs within the required 72 hours. We determined that supervisors had completed timely reviews in all 15 NTCFs. We determined that 13 of 15 NTCFs were in compliance. Two were for consent searches that were improperly conducted. Supervisors reviewing both of these NTCFs did not correct the deficiencies we identified. This is a compliance rate of 86.66%. Compliance on timely submission and supervisor review of VSCFs and NTCFs is assessed in Paragraph 90.

Paragraph 90 requires timely supervisory reviews of documentation pertaining to stops and detentions. Paragraph 91 requires supervisors to identify policy violations, deficiencies, and training issues noted in stops and detentions. Of the sample of 608 stops inspected for this reporting period, we found that 584 were in compliance with this Paragraph. The compliance rate for Paragraph 91 for this reporting period was 96.05%.

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 92.** *Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.*

**Phase 1:** In compliance

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on March 5, 2024.

- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on March 5, 2024.

**Phase 2:** In compliance

To determine compliance, we review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87. We then review the information to determine if all violations, deficiencies, PSB investigations, and corrective actions taken pertaining to stops and detentions, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA. Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes reflects on the quality of the supervisor's reviews. By reviewing EIS and IAPro resumes, we also can identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA. For applicable supervisors' EPAs, in addition to the above metric, we review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements. Both of these requirements must be met for compliance. Deficiencies in quality of EIS reviews by supervisors will also impact our assessment of compliance for Paragraph 100. To ensure fairness to the agency, when we assess compliance with this Paragraph, we also look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For July, we reviewed five deputy EPAs and 10 supervisor EPAs. All five deputy EPAs reviewed were in compliance, and 10 of 10 supervisor EPAs reviewed were in compliance. For August, we reviewed five deputy EPAs and seven supervisor EPAs. All five deputy EPAs reviewed were in compliance, and seven of seven supervisor EPAs reviewed were in compliance. For September we reviewed four deputy EPAs and four supervisor EPAs. All four deputy EPAs reviewed were in compliance, and four of four supervisor EPAs reviewed were in compliance.

For the third quarter, 14 of 14 deputy EPAs reviewed were in compliance with this Paragraph. Twenty-one of 21 supervisor EPAs reviewed were in compliance with this Paragraph. Including deputy and supervisor EPAs, there was a total of 35 EPAs, of which all met the requirements of Paragraph 92. The compliance rate for this reporting period was 100%. For the third quarter of 2025, MCSO remains in compliance with the requirements of this Paragraph.

**Paragraph 93.** *Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.*

**In Full and Effective Compliance**

We reviewed a sample of 61 Incident Reports for July, for the randomly selected date of July 4, 2025. Sixty-one of the 61 Incident Reports were submitted before the end of the shift. We verified the timely supervisory review in 56 of the 61 incident reports. No Arrest Reports required review by supervisors within the required 72 hours. There were six Vehicle Crash Reports submitted in the July sample, and we verified timely supervisory reviews on all of the reports. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness. We did not find any incident reports with any significant deficiencies. In total, 56 of 61 Incident Reports we reviewed were in compliance, for a compliance rate of 91.80%.

We reviewed a representative sample of 90 Incident Reports for August, for the randomly selected date of August 31, 2025. We verified that all 90 Incident Reports were submitted before the end of the shift. We verified that 81 of the 90 Incident Reports had proper documentation of timely supervisory review. Three of the 90 Incident Reports were vehicle crashes. We verified supervisory review on three of the three vehicle crash reports. We conducted a review of a 10% sample of the Incident Reports submitted for the date requested, to determine quality and completeness; we noted no significant deficiencies. The overall compliance rate for timely submission and review of Incident Reports for August was 90%.

We reviewed a representative sample of 60 Incident Reports for September, for the randomly selected date of September 1, 2025. We verified the timely submission of reports and timely supervisory reviews on 52 of 60 Incident Reports. Four Vehicle Crash Reports were in compliance. There were no Arrest Reports submitted. The compliance rate for September was 86.66%. We conducted a quality review of a 10% sample of the Incident Reports submitted. We found no significant issues with quality. For the third quarter of 2025, we found that 189 of 211 Incident Reports were in compliance, or 89.57%.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 94.*** *As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we request a list of bookings and criminal citations for the period in review. We randomly select a sample of 20 bookings and 20 criminal citations, which BIO then inspects for compliance. In addition, MCSO reviews all cases involving immigration arrests, and arrests related to lack of identity documents. MCSO also reviews all Maricopa County Attorney's Office (MCAO) turndowns for lack of probable cause and submits those for our review. The total of cases selected per month does not exceed 60. We review Incident Report Inspection reports as part of the documentation to determine compliance with Paragraphs 94 and 96. The BIO inspection covers the selected cases, which are retroactive two months.

We review the Incident Report Inspection Report and its corresponding Inspection Matrix for each month of the reporting period. Some inspection points in the matrix are given stronger consideration in our reviews than others, as these are fundamental requirements of Paragraph 94; if deficiencies are noted, they may also impact the successful conclusion of the case. In all the cases described below, we relied on the BIO inspector's notations and observations to determine our findings.

In addition to documentation described above, we review all Incident Report Memorialization (IRM) forms submitted for the quarter. The Incident Report Memorialization form is used by supervisors to document deficient arrests and corrective actions taken. In accordance with this Paragraph and MCSO policy, supervisors are required to document arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The supervisor generating the IRM, and the commander reviewing the IRM, should ensure that the documentation includes the corrective action taken to resolve issues caused by the deficiency, as well as the remedial action taken to prevent future reoccurrence.

For July, we reviewed the July Incident Report Inspection (BI2025-0097). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. MCSO did not submit any immigration-related arrests, cases involving identity theft investigations, or County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.88% compliance rating. The BIO Inspection Report noted one deficiency, which resulted in one BIO Action Forms. As a result of our review of all the documentation submitted, including the matrix, we determined that one case had a deficiency that was not addressed by the first-line supervisor and therefore was not in compliance with this Paragraph. The case involved a property seizure in District 3. The individual was not issued a property receipt for items seized that can legally be possessed. We do not consider this to be serious deficiency. In total, we reviewed 40 cases, of which 39 were in compliance.

For August, we reviewed the August Incident Report Inspection (BI2025-0111). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. MCSO did not submit any immigration-related arrests, cases involving identity theft investigations, or County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.51% compliance rating. The BIO Inspection Report noted one case deficiency. As a result of our review of all the documentation submitted, including the matrix, we determined that one case had serious deficiencies that should have been addressed by the first-line supervisor and therefore was not in compliance with this Paragraph. In total, we reviewed 40 cases, and 39 were in compliance.

For September, we reviewed the September Incident Report Inspection (BI2025-0125). We selected 20 bookings and 20 criminal citations, which BIO then inspected for compliance. There were no immigration-related arrests, and no cases involving identity theft investigations reported by MCSO. There were no County Attorney turndowns for lack of probable cause. The inspection resulted in a 99.74% compliance rating. We reviewed the inspection report, which noted two deficient cases, and reviewed the matrix used by BIO for the inspection. Two BIO Action Forms were generated for the deficiencies. In the first case, the report lacked articulation for reasonable suspicion for contacting the subject. The second case arose because the deputy did not list all seized property on the property receipt. In total, we reviewed 40 cases, of which 38 were in compliance.

Pursuant to our reviews of the BIO Incident Report Inspections for the third quarter, as well as the corresponding Inspection Matrices, we determined that no arrest cases were noncompliant. There were no Incident Report Memorialization (IRM) forms submitted for the third quarter. Of the 120 cases reviewed in the BIO inspections for the quarter, we determined that 116 cases were in compliance. The compliance rating for the third quarter of 2025 was 96.66%.

On April 11, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 95.***  *Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.*

**Phase 1:**  In compliance

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on March 5, 2024.

- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on March 5, 2024.

**Phase 2:**  In compliance

There are two primary areas of assessment for this Paragraph.  The first is to determine if supervisors are tracking subordinates' deficiencies and violations in arrests and accurately documenting these issues along with corrective actions in employees' EPAs.  In addition, repeated corrective actions should be addressed in EPAs.  The second is to determine if the quality of supervisory EIS reviews are being addressed in supervisors' EPAs.  The quality and effectiveness of interventions, as a result of deficiencies pertaining to stops and detentions, is a requirement which we assess under Paragraph 97.

To determine compliance, we will review the EIS and IAPro histories for each of the employees whose EPAs were selected for review under Paragraph 87.  We will then review the information to determine if all violations, deficiencies, IA investigations, and corrective actions taken pertaining to arrests, which were listed in the employee's EIS and IAPro resumes, were accurately documented in the employee's EPA.  Failure to identify and memorialize any issues and actions taken as noted in the employee's EIS and IAPro resumes, reflects on the quality of the supervisor's reviews.  By reviewing EIS and IAPro resumes, we are also able to identify if a deputy has repeated entries of any specific violations, and if subsequent actions taken to correct the issue have been documented in the employee's EPA.  For applicable supervisors' EPAs, in addition to the above metric, we will review comments made in reference to the quality of supervisory reviews to ensure that the rater has specific comments addressing this Paragraph's requirements.  Both of these requirements must be met for compliance.

Deficiencies in quality of EIS reviews by supervisors will also reflect in our assessment of compliance for Paragraph 100.  To ensure fairness to the agency, when we assess compliance with this Paragraph, we also try look at the performance appraisal as a whole to determine if the intent and spirit of the Paragraph under review was captured.

For July, we reviewed five deputy EPAs and 10 supervisor EPAs.  All five deputy EPAs reviewed were in compliance, and 10 of 10 supervisor EPAs reviewed were in compliance.  For August, we reviewed five deputy EPAs and seven supervisor EPAs.  All five deputy EPAs reviewed were in compliance, and seven of seven supervisor EPAs reviewed were in compliance.  For September we reviewed four deputy EPAs and four supervisor EPAs.  All four deputy EPAs reviewed were in compliance, and four of four supervisor EPAs reviewed were in compliance.

For the third quarter, 14 of 14 deputy EPAs reviewed were in compliance with this Paragraph.  Twenty-one of 21 supervisor EPAs reviewed were in compliance with this Paragraph.  Including deputy and supervisor EPAs, there was a total of 35 EPAs, of which all met the requirements of Paragraph 95.  The compliance rate for this reporting period was 100%.  For the third quarter of 2025, MCSO remains in compliance with the requirements of this Paragraph.

***Paragraph 96.***  *A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.*

**Phase 1:**  In compliance

- EA-11 (Arrest Procedures), most recently amended on November 4, 2024.

**Phase 2:**  In compliance

This Paragraph requires that a command-level official review a supervisor's investigation of the circumstances pertaining to any arrest that lacks probable cause, is in violation of policy, or where there is a need for corrective action or review of the agency's policy, strategy, tactics, or training.  This Paragraph also requires that the commander evaluate the corrective action and recommendations to ensure that these are appropriate.

Our reviews to determine compliance with this Paragraph are associated with the documentation provided for Paragraph 94.  If BIO identifies deficient cases in the Incident Report inspection, and the deficiencies fall within any of the four areas noted in Paragraphs 94 and 96, we will review the documentation to determine compliance.  Since this Paragraph pertains to command reviews of supervisory investigations of deficient arrests, we will also review Incident Report Memorialization (IRM) forms to determine compliance.  Our reviews for compliance with this Paragraph are determined by the command staff's timely reviews of IRMs once submitted by supervisors, and commanders' evaluation of the corrective actions taken.

During this reporting period, we did not receive any Incident Report Memorialization forms.

For the third quarter of 2025, MCSO is in compliance with this Paragraph.

***Paragraph 97.*** *MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).*

**Phase 1:** In compliance

- GH-5 (Early Identification System), most recently amended on December 12, 2024.

**Phase 2:** In compliance

As per GH-5 (Early Identification System) and GB-2 (Command Responsibility), supervisors are required to conduct EIS reviews twice per month for sworn members. Command review of EIS profiles of supervisory and command personnel began in February 2017. To assess MCSO's compliance with this Paragraph, for every month of the reporting period, we select a supervisor and a squad of deputies from each District. We then review the documentation provided as verification of compliance with this Paragraph. We also request that EIS reviews of the commanders responsible for the selected personnel be included. The purpose of conducting EIS reviews is for supervisors to oversee the performance of subordinates and take appropriate action on issues that need to be corrected.

This Paragraph also requires that the effectiveness of interventions be evaluated. MCSO conducts a quarterly inspection of EIS Alert Investigations conducted by supervisors that are not related to traffic. During the first quarter of 2025 there were seven alert investigations closed, and all occurred within policy timeframes for 100% compliance. The second part of the EIS Alert Inspection is to examine whether there were recurring alerts and how they were dealt with. In this quarterly report, MCSO noted that two deputies had recurring alerts – but they were for completely different thresholds. Therefore, the compliance rate for the first quarter is 100%, which is an improvement over the fourth quarter finding of 93.7%.

Second, MCSO provides a monthly Sworn Supervisor Notes inspection that ensures supervisors make two supervisory notes for their deputies, one EPA note and conduct two EIS reviews. EIS reviews should be thorough and completed within a timeframe that allows supervisors to monitor performance and address any concerns noted in a timely manner. We believe that periodic EIS reviews should be conducted on a schedule that maximizes their usefulness. We understand that an exact 14-day timeframe may not be possible for all EIS reviews; and we will therefore conduct our reviews using a standard of reasonableness. Two EIS reviews conducted within a short time period, on the same employee, lead to questions regarding the purpose and quality of the reviews. EIS reviews conducted too close to each other do not address the intent of this Paragraph. We review documentation to determine if EIS reviews are being conducted in accordance with the requirements of this Paragraph, or if they are being conducted perfunctorily without regard for usefulness or quality. For the first quarter, MCSO provided documentation that the compliance rates for the Sworn Supervisor Note Inspection was 100% for January and March; however, the agency reports a 91.03% compliance for February. We concur with the rates for January and March; however, we computed a slightly lower compliance rate for February since we do not employ a matrix – but rather deem an entire case as deficient if any required portion is missing. (Our compliance rate is 88.1%.)

During the third quarter of 2025, we reviewed eight closed TSMR investigations: four in July; two in August; and two in September.  Seven of the eight flags were discounted at the second stage review because earlier discrepancies leading to the flags were explained during the second review process.  Typically, this involves examining the details of stops for the same offense across race/ethnic categories.  Six of the seven closed investigations were addressed by memos to the respective districts as the review by TSAU uncovered minor policy or procedural issues.  Most often, the issues involve completing all paperwork properly, the collection of phone numbers during traffic stops, the proper use of ETSIs, de/activation of body-worn cameras, issues related to internal guidelines used by deputies, among others.  All six supervisors held individual meetings with their deputies to address the issues raised during the TSAU review process.  One case was continued to a full intervention, as the second review did not uncover a viable reason for the discrepancies that led to the original flag.  We will report on the outcome of this intervention when it is made available.

For April, we reviewed Supervisor Notes requested as verification of compliance for 51 employees.  Of the 51 selected employees, 37 had appropriate documentation of timely EIS reviews, for a compliance rate of 72.54%.

For May, we requested Supervisor Notes as verification of compliance of EIS reviews for 45 employees.  We received Supervisor Notes for all 45 employees, which we then reviewed for compliance.  We determined that 36 of the 45 EIS reviews were in compliance.  One employee had two EIS reviews completed on the same day.  Eight employees had two EIS reviews conducted within close proximity.  The compliance rate for August was 80%.

For June, we requested and received Supervisor Notes as verification of compliance of EIS reviews for 44 employees.  Five employees had two EIS reviews conducted within close proximity.  Of the 44 employees, 39 had appropriate documentation of compliance with this Paragraph, for a compliance rate of 88.63%.

For the second quarter of 2025, we reviewed the documentation provided for 140 employees – which included the ranks of deputy, sergeant, lieutenant, and captain.  Of the 140 employees, 112 had documentation that met compliance requirements.  The compliance rate for this review period was 80.00%.  For the second quarter of 2025, MCSO remains in compliance with the requirements of this Paragraph.

### d. Regular Employee Performance Review and Evaluations

*Paragraph 98.  MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.*

**Phase 1:**  In compliance

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on March 5, 2024.

- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on March 5, 2024.

**Phase 2:** In compliance

There are several Paragraphs in the First and Second Orders that have requirements pertaining to the assessment, documentation, and tracking of employee performance. The methodologies for the assessment of compliance are explained under each of those Paragraphs. This Paragraph requires that MCSO create and implement a system for regular employee performance evaluations that tracks past performance, in part, to determine if there are patterns of prohibited behavior. MCSO completely revised the employee performance evaluation system and trained all supervisors on the new policies. We believe the new system implemented provides supervisors with the means to effectively evaluate and track employee performance. MCSO has met the requirements of this Paragraph, for the creation of a viable employee performance evaluation system. The assessment of compliance for each Paragraph related to the evaluation of employee performance will be assessed based on each Paragraph's specific requirements.

*Paragraph 99. The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.*

**Phase 1:** In compliance

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on March 5, 2024.

- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on March 5, 2024.

**Phase 2:** In compliance

The current EPA form has an acknowledgement at the conclusion that supervisors are required to include in their performance appraisal, affirming that they have done due diligence in researching and documenting the requirements of Paragraph 99. The form currently states that the supervisor must "List all complaints against the employee that 1) were received during the appraisal period, 2) remain open from the current and prior appraisal periods, or 3) were closed during the appraisal period including investigation findings and imposed disciplinary action, if applicable." Supervisors completing EPAs are required to document their findings relevant to these areas, if their reviews reveal any applicable events or actions. The areas of review include complaint investigations and dispositions; discipline; citizen complaints; commendations; awards; civil or administrative claims; and past supervisory actions taken following EIS Alerts. We do not rely solely on the supervisor's affirmation that a thorough review was completed. We verify supporting documentation to ensure the supervisor has conducted a thorough review and that the information provided under Paragraph 99 is correct. We review IAPro resumes for each employee whose EPA we received during the quarter, under Paragraphs 87, 92, and 95. We

review these resumes and compare them to the notations listed by the supervisor authoring the EPA. We ensure that all investigations into misconduct and any disciplinary actions taken during the rating period, as mentioned in the resumes, are recorded in the EPA. We have emphasized to MCSO the importance of correct documentation and thorough reviews of IAPro resumes. MCSO claims that, at times, supervisors could not access certain misconduct investigations because those cases were not recorded in EPAs. Our proof of compliance reviews is based on documentation provided by MCSO. In our reviews, we can only assess compliance based on what the documentation shows.

For this reporting period, we reviewed Employee Performance Appraisals for 14 deputies and 18 supervisors. For July, we found three of five deputy EPAs in compliance and seven of the 10 supervisor EPAs in compliance. For August, we found five of five deputy EPAs in compliance with this Paragraph and four of four supervisor EPAs reviewed were in compliance with the requirements of Paragraph 99. For September, we reviewed four deputy EPAs and four supervisor EPAs. Four of four deputy EPAs were in compliance, and four of four supervisor EPAs were in compliance with Paragraph 99.

For the third quarter of 2025 of the total 32 EPAs reviewed, 27 were in compliance. The compliance rate for the third quarter was 84.37%. For the third quarter of 2025, MCSO remains in compliance with the requirements of Paragraph 99.

**Paragraph 100.** *The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.*

**Phase 1:** In compliance

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on March 5, 2024.

- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on March 5, 2024.

**Phase 2:** In compliance

The current EPA form has a rating dimension where supervisors are required to document the quality of supervisory reviews and supervisor accountability. This Paragraph only pertains to supervisor EPAs, and we review comments to ensure that the rater has addressed all areas associated with the quality of supervisory reviews. We also consider the requirements of Paragraphs 92 and 95 for EIS supervisory review quality. Reviews of supervisors' misconduct investigations, as mentioned in Paragraph 176, also contribute to evaluating compliance with this Paragraph.

We reviewed Employee Performance Appraisals for 18 supervisors and commanders who received EPAs during this reporting period. Paragraphs 92 and 95 require supervisors to review and track violations and corrective actions in EIS. For July, our reviews indicated that all 10 supervisor EPAs were in compliance with the requirements of this Paragraph. For August, our reviews indicated that all four supervisor EPAs were in compliance with the requirements of this Paragraph. For September, our reviews indicated that all four supervisor EPAs were in compliance with the requirements of this Paragraph.

Of the 18 supervisor EPAs reviewed for this quarter, all were in compliance with the requirements of this Paragraph, or 100%. For the period in review, MCSO was in compliance with this Paragraph.

**Paragraph 101.** *Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.*

**In Full and Effective Compliance**

MCSO does not have any specialized units that enforce immigration-related laws. Therefore, by default, MCSO is in Phase 2 compliance with this Paragraph. We continue to monitor arrests and detentions as part of our review process to ensure that MCSO is in compliance with its own directives on this issue. For July, August, and September, we received lists containing all incidents involving MCSO arrests and criminal citations. For each month, we requested a random sample of arrests and criminal citations. In total, we reviewed 60 incidents involving arrests and 60 incidents involving criminal citations. We also reviewed a random sample of 211 Incident Reports for this reporting period. During our reviews of the documentation provided for this reporting period, we found no evidence to indicate any violations of this Paragraph.

On December 28, 2018, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## Section 10: Misconduct and Complaints

**COURT ORDER XI.  MISCONDUCT AND COMPLAINTS**

### a. Internally-Discovered Violations

***Paragraph 102.*** *MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information.  Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.*

**Phase 1:**  In compliance

**Phase 2:**  Not in compliance

During our assessments of compliance with this Paragraph, we have reviewed hundreds of misconduct investigations involving MCSO personnel.  Many of them have been internally generated.

During this reporting period, we reviewed 186 administrative misconduct investigations.  Sixty were generated internally.  MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel.  While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance.  For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

MCSO violated this Paragraph because MCSO command staff, by virtue of its filing administrative and criminal charges against Captain Lugo, as well as other actions, engaged in retaliatory acts against Captain Lugo for his stated intent to abide by MCSO policy and Court Orders.

In addition, MCSO violated this Paragraph by ignoring the established policies that were approved by the Monitor and issued by the Court.  These established policies include:

1. GC-17 Attachment A (Discipline Matrix) and B (Categories of Offenses), which delineate the discipline for all misconduct offenses, including Driving Under the Influence (DUI).

2. GH-2 (Internal Investigations), which defines Appointing Authority as "the designated member of Office command staff, appointed by the Sheriff, whose duties include being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard." Nothing in the policy states that the Appointing Authority falls outside of the command staff.

3. GH-2 (Internal Investigations) (2)(B)(12) provides for the presence of an observer in the interview of a law enforcement officer when there is reasonable belief that the interview could result in dismissal, demotion or suspension: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." Accordingly, attorney presence as an observer in a PSB interview, as approved by the Sheriff and Executive Chief Palopoli, was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted.

4. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline. MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo. Additionally, GH-2 provides that there be no retaliation.

### b. Audit Checks

***Paragraph 103.*** *Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including: Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.*

**In Full and Effective Compliance**

Paragraph 103 requires that MCSO conduct "regular, targeted, and random integrity audit checks." MCSO's Audits and Inspections Unit (AIU), a Unit of the Bureau of Internal Oversight (BIO), is responsible for these requirements. This Paragraph does not set frequency standards for integrity tests. During this reporting period, AIU published several completed inspection reports to fulfill the "regular" and "random" elements of this Paragraph. AIU's inspections examined complaint intake tests, Early Identification System (EIS) alerts, Supervisor Notes, Patrol Activity Logs, traffic stop data, post-stop ethnicity, passenger contacts, County Attorney turndown dispositions, Patrol Shift Rosters, and others. BIO publishes these reports on its website, www.mcsobio.org, which the public can access.

On October 1, 2024, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### c. Complaint Tracking and Investigations

***Paragraph 104.*** *Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence. Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.*

**In Full and Effective Compliance**

In the fall of 2015, MCSO developed a draft checklist and investigative format for administrative investigations. All the requirements in this Paragraph were included in these protocols and approved for use in 2016. Effective June 1, 2016, all administrative investigations have been required to include these forms. Since that time, the forms have been revised to provide additional clarification on procedural requirements. MCSO has consistently met the requirement to use these forms and includes the checklists in administrative investigation files forwarded for our review.

During this reporting period, we reviewed 186 administrative misconduct investigations. Of the total 186, 101 involved sworn personnel. All 101 included the use of the approved investigative format and checklist. We continue to note that deputies consistently appear for scheduled interviews, provide all required information to investigators, and cooperate with investigations. There were no instances identified where a supervisor failed to facilitate a deputy's attendance at an interview or where an investigator failed to notify the employee's supervisor of an intended administrative interview.

On March 17, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 105.*** *Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.*

**In Full and Effective Compliance**

Our reviews of investigations conducted by MCSO have verified that the information required for compliance with this Paragraph is consistently provided in the checklist and investigative reports.

As a result of the Second Order and effective July 20, 2016, the PSB Commander makes all preliminary disciplinary decisions. The PSB and Administrative Services Division Commanders developed a worksheet that provides information regarding how MCSO makes disciplinary decisions, and how MCSO considers employees' work history. PSB includes this form in the sustained investigation documentation that we receive and review for compliance.

During this reporting period, we reviewed 53 sustained administrative misconduct investigations. Twenty of these involved misconduct by sworn personnel. Twenty-one involved misconduct by Detention personnel, 10 involved misconduct by civilian personnel, and two involved posse members. In 16 of the cases, none of the involved employees were still employed by MCSO at the time of the completion of the investigation or the discipline process, or the employee was unknown. Thirty-seven of the sustained investigations identified one or more principal still employed by MCSO at the time final findings or discipline decisions were made.

In all of the 37 sustained investigations involving known MCSO personnel, the PSB Commander determined the findings and presumptive range of discipline for the sustained violations. We found that generally, where appropriate, discipline history, past complaints, performance evaluations, traffic stop and patrol data, and training records were included in the documents considered for discipline findings. All 37 were referred for discipline or other corrective action.

On October 5, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 106.*** *Records of Complaints and investigations shall be maintained and made available, un-redacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.*

**In Full and Effective Compliance**

MCSO has two obligations under this Paragraph: to maintain and make records available. The Paragraph also covers the requirement that MCSO make unredacted records of such investigations available to the Plaintiffs' attorneys and Plaintiff-Intervenor as well.

## Section 11: Community Engagement

**COURT ORDER XII.  COMMUNITY ENGAGEMENT**

*a. Community Outreach Program*

*Paragraph 107.  To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the time that this order is in place.  To this end, the MCSO shall conduct the following district community outreach program.*

*Paragraph 109.  The Monitor shall hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs class.  The meetings shall be for the purpose of reporting the MCSO' progress in implementing this Order.  These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order.  Summaries of audits and reports completed by the MCSO pursuant to this Order shall be made available.  The meetings shall be under the direction of the Monitor and/or his designee.  The Sheriff and/or the MCSO will participate in the meetings to provide substantive comments related to the Melendres case and the implementation of the orders resulting from it, as well as answer questions related to its implementation, if requested to do so by the Monitor or the community.  If the Sheriff is unable to attend a meeting due to other obligations, he shall notify the Monitor at least 30 days prior to that meeting.  The Monitor shall consult with Plaintiffs' representatives and the Community Advisory Board on the location and content of the meetings.  The Monitor shall clarify for the public at these meetings that MCSO does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

This Paragraph, per the June 3, 2019 Order (Document 2431), returned the community meetings to the Monitor's supervision and directed the Monitor to hold at least one public meeting per quarter to coincide with the quarterly site visits by the Monitor in a location convenient to the Plaintiffs' class.

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  Following our July community meeting, at which several attendees were unruly and directed insults at Hispanic attendees, members of the Monitoring Team, and Plaintiffs' counsel, the Court directed that the October 22, 2025 community meeting be held in the Special Proceedings Courtroom of the Sandra Day O'Connor U.S. Courthouse, 401 West Washington Street, in Phoenix.  The Court selected the location for the October community meeting in order to provide adequate security for all attendees.

The October meeting was comprised of two parts.  First, Judge G. Murray Snow presented a comprehensive review of the requirements of the four Orders relating to the *Melendres* case.  Second, one Deputy Monitor welcomed the estimated 200 attendees; explained the role of the Monitoring Team; and introduced Sheriff Sheridan, who addressed the attendees.  Following the Sheriff, the Monitor provided updates on two lingering compliance areas: traffic stops and the backlog of internal affairs investigations in the Professional Standards Bureau.  The Monitor informed the audience that a measure of a police agency is its ability to police itself, and that this has been an issue with MCSO historically.  The Monitor also noted that there has been some reduction in the investigative backlog, and that the Sheriff advised him that MCSO will work more expeditiously to reduce the backlog.  As required by this Paragraph, the Monitor clarified that MCSO does not enforce immigration laws, except to the extent that it is enforcing Arizona and federal criminal laws.

The Monitor concluded by saying that the most important element of these community meetings, and the primary purpose of the meetings, is to hear from the community members.  As directed by the Court, the Community Advisory Board (CAB) gathered comments and questions from community members in advance of the meeting.  At the meeting, two CAB members read these comments and questions, to which the Sheriff and the Monitor responded.

***Paragraph 110.**  The meetings present an opportunity for the Monitor and MCSO representatives to listen to community members' experiences and concerns about MCSO practices.  The Monitor may investigate and respond to those concerns.  The Monitor shall inform the public that the purpose of the meeting is to discuss the Melendres case and the orders implementing the relief of that case.  To the extent that the Monitor receives concerns at such meetings that are neither within the scope of this order nor useful in determining the Defendant's compliance with this order, it may inform the complainant how to file an appropriate complaint with the MCSO or appropriate law enforcement agency.  The Sheriff may respond to non-Melendres questions raised at meetings to the extent, in his sole discretion, if the Sheriff wishes to do so.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings.  As noted above, we held a community meeting on Wednesday, October 22, 2025 in the Special Proceedings Courtroom of the Sandra Day O'Connor U.S. Courthouse, 401 West Washington Street, in Phoenix.

At the meeting, we informed the attendees that the purpose of the meeting was to discuss the Court Orders implementing the relief of the *Melendres* case. Two members of the Community Advisory Board (CAB) presented complaints and concerns the CAB solicited from Plaintiffs' class members. One CAB member explained that most of the feedback and questions the CAB received related to the recently released Court-directed report related to the costs of the *Melendres* case. The Sheriff responded to some of those questions. Questions were posed as to whether the MCSO was working with U.S. Immigration and Customs Enforcement (ICE) to raid workplaces, to which the Sheriff responded that MCSO enforces state law, and does not work with ICE. Another CAB member also addressed those in attendance, with comments that were generally supportive of MCSO.

***Paragraph 111.*** *English and Spanish-speaking Monitor Personnel shall attend these meetings and be available to answer questions from the public about its publicly available reports concerning MCSO's implementation of this Order and other publicly available information. The Plaintiffs' and Plaintiff-Intervenor's representatives shall be invited to attend and the Monitor shall announce their presence and state their availability to answer questions.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings. As noted above, we held a community meeting in October 2025 in the Special Proceedings Courtroom of the Sandra Day O'Connor U.S. Courthouse. English and Spanish-speaking Monitoring Team personnel attended the meeting, and a professional interpreter provided Spanish interpretation. We introduced the Sheriff and CAB members who offered remarks; and we advised the attendees that they, as well as members of the Monitoring Team, were available to answer community members' questions.

***Paragraph 112.*** *At least ten days before such meetings, the Monitor shall widely publicize the meetings in English and Spanish after consulting with Plaintiffs' representatives and the Community Advisory Board regarding advertising methods. Options for advertising include, but are not limited to, television, radio, print media, internet and social media, and any other means available. Defendants shall either provide a place for such meetings that is acceptable to the Monitor or pay the Monitor the necessary expenses incurred in arranging for such meeting places. The Defendants shall also pay the reasonable expenses of publicizing the meetings as required above, and the additional reasonable personnel and expenses that the Monitor will incur as a result of performing his obligations with respect to the Community Outreach Program. If any party determines there is little interest or participation in such meetings among community members, or that they have otherwise fulfilled their purpose, it can file a request with the Court that this requirement be revised or eliminated.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The requirements of this Paragraph are not applicable as they apply to actions that the Monitor, not MCSO, is required to take regarding community meetings. We held a community meeting on Wednesday, October 22, 2025 in the Special Proceedings Courtroom of the Sandra Day O'Connor U.S. Courthouse in Phoenix. Approximately 200 community members attended. We distributed English-Spanish flyers at community organizations, businesses, and other locations throughout Maricopa County; emailed announcements to community members; and posted information about the meeting on community calendars and websites.

### b. MCSO Community Liaison

*Paragraph 113. MCSO shall select or hire a Community Liaison who is fluent in English and Spanish. The hours and contact information of the MCSO Community Outreach Division ("COD") shall be made available to the public including on the MCSO website. The COD shall be directly available to the public for communications and questions regarding the MCSO.*

**In Full and Effective Compliance**

This Paragraph requires that MCSO select or hire a Community Liaison who is fluent in English and Spanish. MCSO's Community Outreach Division (COrD) has two Community Liaison Officers who are fluent in English and Spanish. The COrD uses the term "Community Liaison" for these two individuals and its other staff members, though not all of them are bilingual.

The MCSO website lists the hours and contact information of the COrD and its staff – as well as the COrD's mission and overarching goals, and frequently asked questions regarding MCSO. The MCSO website includes information about the language abilities of COrD's Community Liaison Officers.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 114. The COD shall have the following duties in relation to community engagement:*

a.     ~~to coordinate the district community meetings described above in Paragraphs 109 to 112;~~

b.     ~~to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118; and~~

c.     *to compile any complaints, concerns and suggestions submitted to the COD by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns; and*

d.     *to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership.*

**In Full and Effective Compliance**

Pursuant to the June 3, 2019 Order (Document 2431), Subparagraphs a. and b. of this Paragraph are no longer applicable.

During this reporting period, as in the past, some CAB members participated in a few of our compliance meetings during our October site visit – including meetings on MCSO's interaction with the CAB and community engagement, and MCSO's Constitutional Policing Plan.

MCSO has provided documentation that all current COrD personnel completed an online Complaint Intake and Processing course, to assist them in receiving and appropriately directing any complaints or concerns they receive from community members, including complaints of potential employee misconduct. When new personnel are assigned to the COrD, we request and review documentation that the new staff members have completed this training. For this reporting period, upon our request, MCSO provided documentation that its two newest staff members completed the training.

The COrD has developed a form for capturing information on complaints, concerns, and suggestions submitted by members of the public to the COrD. In the past, COrD personnel have reported that when they receive concerns from community members, they forward those that are complaints to PSB; and that they sometimes receive inquiries for which COrD staff believe it is appropriate to direct community members to written materials or MCSO's website. During this reporting period, COrD personnel reported that they again did not receive any *Melendres*-related complaints, concerns, or suggestions from the public during this reporting period. The COrD has not reported any such *Melendres*-related complaints, concerns, and suggestions since the entry of the First Order. The Community Advisory Board (CAB) has previously expressed surprise at this fact, and suggested that it is perhaps attributable to the types of outreach activities the COrD generally participates in.

During our upcoming site visit, as we do during all of our site visits, we will inquire with COrD personnel regarding any complaints, concerns, and suggestions it has received from the public. We will also discuss the requirement that COrD communicate any concerns received from the community at regular meetings with the Monitor and MCSO leadership. The Monitoring Team, the CAB, and the Plaintiffs consider this a priority.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### c. Community Advisory Board

**Paragraph 115.**    *MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the MCSO and the community, and to provide specific recommendations to MCSO and the Monitor about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.  The MCSO shall cooperate with the Monitor to assure that members of the CAB are given appropriate access to relevant material, documents, and training so the CAB can make informed recommendations and commentaries to the Monitor.*

**Phase 1:**  In compliance

- Court Implementation Division (CID) Operations Manual, most recently revised on January 3, 2023.

**Phase 2:**  Deferred

MCSO, through its appointed liaison to the CAB, continues to respond to the CAB's inquiries and requests for information.  CAB members continue to provide recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of the Orders entered by the Court in this matter are met.

MCSO was not in compliance with this Paragraph for two reporting periods due to the agency's failure to participate in the CAB's November 2024 community meeting to listen to concerns from members of the Plaintiffs' class.  For this reporting period, we are deferring our compliance assessment for this Paragraph as we monitor closely how MCSO personnel and leadership respond to the CAB.

On April 11, 2025 and again on July 25, 2025, MCSO asserted Full and Effective Compliance with this Paragraph.  As MCSO was not in Phase 2 compliance with this Paragraph, we do not concur with MCSO's assertion for Full and Effective Compliance with this Paragraph.


**Paragraph 116.**  *The CAB shall have five members, two to be selected by MCSO and two to be selected by Plaintiffs' representatives.  One member shall be jointly selected by MCSO and Plaintiffs' representatives.  Members of the CAB shall not be MCSO Employees or any of the named class representatives nor any of the attorneys involved in this case.  The CAB shall continue for at least the length of this Order.*

**In Full and Effective Compliance**

The CAB is designed as a five-member body:  There are two members selected by MCSO, two members selected by Plaintiffs' attorneys, and one member jointly selected by MCSO and Plaintiffs' attorneys.  None of the current CAB members are MCSO employees, named class representatives, or attorneys involved in this case.

On December 19, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 117.*** *The CAB shall hold meetings at regular intervals. The meetings may be either public or private as the purpose of the meeting dictates, at the election of the CAB. The Defendants shall provide a suitable place for such meetings. The Monitor shall coordinate the meetings and communicate with CAB members, and provide administrative support for the CAB.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable. During this reporting period, CAB members met regularly as a group, often with members of the Monitoring Team. A member of the Monitoring Team coordinated the meetings and provided administrative support for the CAB.

In addition, during our October site visit, some CAB members participated in some of our compliance meetings – including meetings on the Constitutional Policing Plan, community engagement/CAB, and other topics. In our regular interactions with CAB members via conference calls and virtual meetings, we have continued to provide information about MCSO's progress achieving compliance with the Orders and discuss ways to improve the relationship between the Plaintiffs' class and MCSO. CAB members have also assisted the Monitoring Team with plans and outreach related to our quarterly community meetings.

The CAB last held its own community meeting in November 2024, at the Mount of Olives Church in Phoenix. The meeting was open to the public, and approximately 40 community members attended. The meeting was held in Spanish, and a professional interpreter provided simultaneous English interpretation to the attendees who participated in the meeting remotely.

***Paragraph 118.*** *During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and transmit them to the Monitor and the MCSO for investigation and/or action. The Parties will also be given the CAB's reports and recommendations to the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The requirements of this Paragraph do not require any action on the part of MCSO; thus, they are not applicable. As noted above, during this reporting period, as in the past, some CAB members participated in a few of our compliance meetings during our July site visit.

As noted above, in November 2024, the CAB held a community meeting at the Mount of Olives Church in Phoenix. The meeting, attended by approximately 40 community members, was conducted in Spanish with a professional interpreter providing simultaneous English interpretation for those who participated in the meeting remotely. The CAB members provided the community members with information about the *Melendres* case and the reform process and how to file complaints against MCSO. Attendees who spoke at the meeting asked for updates on MCSO's progress with the reforms and also expressed their fears about potential immigration enforcement by MCSO and other law enforcement agencies in the communities where members of the Plaintiffs' class live and work.

We requested from MCSO documentation of concerns received from CAB members during their meetings about MCSO practices that may be in violation of the Court's Orders that were transmitted to the MCSO for investigation and/or action during this reporting period. MCSO did not report any such concerns during this reporting period.

## Second Supplemental Permanent Injunction/Judgment Order

### Section 12: Misconduct Investigations, Discipline, and Grievances

In the second quarter of 2025, during the intake and routing process of administrative misconduct investigations, the Monitoring Team learned about the filing of complaints by Sergeant Aaron Engelbeck against the then-Commander, Captain Gregory Lugo, of the Professional Standards Bureau (PSB). The Monitor raised procedural concerns regarding the handling of these complaints by MCSO. Ultimately, the Sheriff placed Captain Lugo on administrative leave based on claims of insubordination following orders given by Captain Lugo's superior, Executive Chief Melissa Palopoli, related to the complaints. MCSO command staff then referred the investigation of both administrative and criminal complaints against Captain Lugo to an outside agency. Following this, in April 2025, we initiated an inquiry pursuant to our authority under the Court's Orders.[6]

Our inquiry revealed the failure by MCSO's executive leaders to adhere to Arizona law and comply with professional, ethical standards and established agency policies governing internal investigations; and demonstrated their disregard for compliance obligations, threatening the integrity of Court-ordered reforms.[7]

The following are our key findings:

1. Defendants inquired about reopening final disciplinary decisions made by MCSO to accomplish various purposes; these cases were already closed. Defendants had no authority to reopen or attempt to reopen any closed cases.

2. Kenneth Holmes has been serving as the Pre-Determination Hearing Officer at MCSO, in violation of MCSO policy and applicable law.

3. Had Kenneth Holmes been qualified to serve as the Pre-Determination Hearing Officer at MCSO, he nevertheless failed to comply with MCSO policy and applicable law when he vacated the discipline and findings against Sergeant Engelbeck.

4. Executive Chief Palopoli, under instruction from the Sheriff, allowed an attorney to be present during a PSB investigative interview, in violation of MCSO policy and applicable law.

5. MCSO failed to engage in appropriate, uniform, and fair discipline as required by the Court Orders.

*Finding #1: Defendants inquired about reopening final disciplinary decisions made by MCSO to accomplish various purposes; these cases were already closed. Defendants had no authority to reopen or attempt to reopen any closed cases.*

Executive command repeatedly inquired of Captain Lugo about revisiting internal administrative investigation findings or discipline and requested to look at specific cases.

### a. *Request by designated Executive Chief of Detention Rollie Seebert and designated Chief of Enforcement George Hawthorne*

In December 2024, incoming MCSO executive command expressed to Captain Lugo their frustration regarding both disciplinary actions in several closed PSB investigations. The Sheriff called Captain Lugo to advise him that the Sheriff's designated Executive Chief of Detention, Rollie Seebert, would be reaching out to Captain Lugo for a meeting.[8] On December 11, 2024, before the Sheriff assumed office, Executive Chief Seebert and the designated Chief of Enforcement, George Hawthorne, met with Captain Lugo at PSB. Executive Chief Seebert and Chief Hawthorne asked Captain Lugo if PSB could reinvestigate closed complaints. Captain Lugo confirmed that this was not the case, citing restrictions under state law that would prevent the reinvestigation of closed cases.[9]

### b. *Request to reopen discipline imposed on two former deputies placed on the Brady List*

Captain Lugo and executive command held their first monthly PSB meeting in March 2025. Before the meeting, Undersheriff Gentry emailed Captain Lugo, requesting that he bring the case file of Deputy Wade Voeltz to the meeting, stating that the Sheriff wanted him (Undersheriff Gentry) to "take action or review action."[10] The Undersheriff later requested that Captain Lugo also bring the case file for an investigation involving Deputy Ryan Lowry, which was then in the appeals process.[11] Given that these were direct orders from the Undersheriff, Captain Lugo could not ignore them. Both investigations pertained to former sworn members who were found to have been untruthful as a result of disciplinary violations, and who were placed on the Brady List.[12] During the meeting, Executive Chief Palopoli inquired about PSB's role in placing members on the Brady List, and Captain Lugo clarified that the Conduct Resolution Section (CRS) managed the Brady List directly with the Maricopa County Attorney's Office; it did not fall under PSB's purview.[13]

Undersheriff Gentry also questioned the outcome of the Deputy Lowry case, stating that he (Undersheriff Gentry) did not understand why MCSO terminated somebody "for clocking in from the District to drive to an off-duty job."[14] Captain Lugo explained that Deputy Lowry was terminated for substantial timesheet violations, where he was clocking in at a District station but working off-duty jobs during the hours he was required to have been on duty.[15] Given that these violations related to untruthfulness, according to Captain Lugo, it was certain that Deputy Lowry would be placed on the Brady List after he exhausted his appeals.

Arizona law provides the framework governing the discipline of public employees, including law enforcement officers. Law enforcement officers may be dismissed, demoted, suspended, or otherwise disciplined for just cause pursuant to the procedures therein established.[16] A law enforcement officer who has been demoted, dismissed, or suspended has a right to appeal discipline to the Maricopa County Law Enforcement Officers Merit Commission within 10 calendar days of receipt of the Sheriff's disciplinary order.[17] Within these same 10 days, and before an appeal is filed, the Sheriff as the appointing authority or his designee, can rescind, reconsider, or modify the discipline because the decision is not yet final.

In the event that the law enforcement officer appeals, jurisdiction vests in the Merit System Commission, who shall conduct a hearing, and any order issued by this body becomes final and binding on the parties, subject only to judicial review.[18] After the expiration of the 10 days, or if an appeal is filed, the Sheriff can no longer make any unilateral changes on the discipline. The administrative decision becomes final for purposes of issue preclusion when the proceedings conclude, even absent the appeal.[19] Even where a disciplinary decision does not involve demotion, dismissal, or suspension, the decision is nevertheless final once issued because no statutory or rule-based appeal is authorized.[20] Arizona law provides an exception to this where no statute, rule, or ordinance makes an evidentiary hearing the final administrative determination, allowing an employer a limited review strictly conditioned to cases where the decision is arbitrary or without reasonable justification. There are specific requirements such as complying with a hearing affording both the law enforcement officer and the employer equal due process rights and stating with specificity the reason for any amendment or modification.[21]

c. **Defendants requested to change the Discipline Matrix to consider a Driving Under the Influence (DUI) citation less serious to impact discipline in an ongoing investigation**

During the first few months of the new administration, Undersheriff Gentry told Captain Lugo that he did not like that an off-duty Driving Under the Influence (DUI) citation would result in the subsequent termination of a sworn employee. Captain Lugo believed that Undersheriff Gentry was referring to a case regarding a Detention sergeant who was arrested for a DUI and placed on administrative leave. Undersheriff Gentry told Captain Lugo that he and the Sheriff were considering changing the DUI policy, and he inquired whether changing the policy would prevent this individual from being terminated. According to Captain Lugo, he responded to Undersheriff Gentry, "I need to apply the policy in the [Discipline] Matrix in a uniform manner to the facts," and added that he did not believe that the Monitoring Team or the Parties would be supportive of that change.

The commission of a DUI under GC-17 (Employee Disciplinary Procedure), Attachment A, Discipline Matrix, is a Category 7 offense; and it provides that the only penalty for a Category 7 offense is dismissal. Despite this, Undersheriff Gentry and the Sheriff wanted to change the Matrix to effect change in the outcome of an existing case involving an employee who committed a DUI. Undersheriff Gentry argued that the Detention sergeant should not be penalized because the employee self-reported the DUI; Captain Lugo stated that the agency would have found out anyway, since the Records Division conducted random criminal history checks on employees.

### Finding #2:  Kenneth Holmes has been serving as the Pre-Determination Hearing Officer at MCSO, in violation of MCSO policy and applicable law.

Hearing Officer Holmes had been serving as MCSO's Hearing Officer, and shortly after his retirement from MCSO, under the incumbency of former Sheriff Paul Penzone, he reached an agreement to continue as such.[22]  At the time of these events, Hearing Officer Holmes held the position for nearly eight years.[23]  Given that Holmes is not a designated member of the Sheriff's command staff, his appointment as Appointing Authority violates the Court's Orders and MCSO policy – a matter which we could have noted earlier.  As a result, rather than referring to Holmes as "Appointing Authority," in this report, as it relates to our special inquiry, we refer to him as the "Pre-Determination Hearing Officer."

### Finding #3:  Had Kenneth Holmes been qualified to serve as the Pre-Determination Hearing Officer at MCSO, he nevertheless failed to comply with MCSO policy and applicable law when he vacated the discipline and findings against Sergeant Engelbeck.

Sergeant Aaron Engelbeck previously served as a probationary lieutenant under Captain Lugo, when both were assigned to the Patrol Division in 2020.[24]  Based on deficient performance issues, Captain Lugo recommended that Sergeant Engelbeck not complete his probationary period and return to the rank of sergeant.  The documentation was advanced through the chain of command, and PSB personnel at the time filed internal insubordination allegations against Sergeant Engelbeck.  The PSB investigation was completed, and former Executive Chief Michael Caputo recommended three sustained findings for insubordination against Sergeant Engelbeck.  The investigation and findings were advanced to Hearing Officer Holmes for the Pre-Determination Hearing.[25]  On October 24, 2024, Hearing Officer Holmes sustained two counts of insubordination.  As discipline, Sergeant Engelbeck received a one-week (40-hour) suspension without pay.  Sergeant Engelbeck served the one-week suspension in late October 2024 and appealed to the Maricopa County Law Enforcement Officers Merit Commission to reconsider the outcome of his case.

Following a series of communications between Maricopa County Attorney's Office (MCAO) counsel and Hearing Officer Holmes, on January 28, 2025, approximately one month after the Sheriff took office, Hearing Officer Holmes issued a letter to Sergeant Engelbeck overruling his previous decision on the 40-hour discipline imposed.  Sergeant Engelbeck was informed that both

insubordination findings were changed to not sustained. On the same day, the Conduct Resolution Section (CRS) notified Maricopa County that Sergeant Engelbeck's 40-hour suspension had been rescinded.[26]  On January 30, 2025, Hearing Officer Holmes revised the Pre-Determination Hearing (PDH) worksheet for the Sergeant Engelbeck decision, to rescind the discipline and change the findings of the case.[27]

On February 6, 2025, Hearing Officer Holmes issued an Employee Disciplinary Considerations and Decision for his final decision of "No Discipline," justifying his decision to overrule himself.[28]  This document contains incongruent statements, changing the previous findings of October 2024 from sustained to not sustained. In his justification memo, Hearing Officer Holmes stated that the evidence supported allegations that Sergeant Engelbeck was insubordinate – but that mitigating circumstances should be considered.  Hearing Officer Holmes stated that the evidence supported that Captain Lugo used the insubordination violations as part of his rationale to recommend that Sergeant Engelbeck's probationary status as a lieutenant be revoked.  Hearing Officer Holmes also stated that the demotion "was perceived by the employee as serious discipline for misconduct," and that MCAO counsel (later identified as Neil Landeen) had advised him that no discipline was necessary and that a Merit Commission appeal hearing would not be in the best interest of MCSO or Sergeant Engelbeck.[29]  The appeal was subsequently closed.  Given that Holmes alleged that he acted upon an MCAO attorney's advice in his justification memo to change the discipline, we inquired about the content of the communication.  During our interview with Hearing Officer Holmes, his counsel claimed attorney-client privilege, despite the waiver of privilege by Holmes in his memorandum.

During his interview, Hearing Officer Holmes characterized discipline reversals as "very unusual."[30]  Hearing Officer Holmes acknowledged that no facts had changed between the time he determined the case should be sustained and the time he changed it to not sustained.[31]  In his justification memo, Hearing Officer Holmes stated that he was relying on the advice of counsel – but later in his interview, he contradicted himself, stating that he had reached the decision to overturn on his own, and that counsel concurred with him.[32]  Hearing Officer Holmes added that he did not have any discussions with Sheriff Sheridan about this.[33]  It was Hearing Officer Holmes's view that the insubordination allegations should not have been investigated given the demotion.

Hearing Officer Holmes had issued findings and imposed discipline in accordance with GC-17 (Employee Disciplinary Procedure), Attachment A, Discipline Matrix, Category 6 (29A), First Offense.[34]  Sergeant Engelbeck appealed the discipline imposed to the Merit Commission.  The system gives any MCSO law enforcement officer who has been demoted, dismissed, or suspended the right to appeal the Sheriff's decision so long as he or she does so "not later than ten (10) days following the date of receipt by the employee of a written order from the appointing authority."[35]  Following a hearing, the Commission determines, by majority vote, whether to sustain the appeal upon a finding that the appealed action was arbitrary or taken without reasonable cause.  In the absence of such a finding, the appeal is dismissed.

In the case of Sergeant Engelbeck, the case never reached a hearing before the Merit Commission because of a decision by Hearing Officer Holmes in concert with MCAO counsel, to change the discipline and findings.  However, Hearing Officer Holmes had no authority to change the

discipline or findings, given the appeal before the Merit Commission. Only the Sheriff could have reopened the discipline for Sergeant Engelbeck pursuant to the narrow exception under A.R.S. § 38-1106(I), permitting a sheriff to reopen a disciplinary matter; and in this circumstance, the statutory requirements for that exception were not met. Hearing Officer Holmes's initial decision to sustain discipline against Sergeant Engelbeck was neither arbitrary nor without reasonable justification. The record established that Sergeant Engelbeck engaged in insubordination despite him failing his probationary period. Moreover, no separate hearing prior to the revocation was held. Hearing Officer Holmes had no authority to alter the findings or modify the discipline in the Sergeant Engelbeck case.

***Finding #4: Executive Chief Palopoli, under instruction from the Sheriff, allowed an attorney to be present during a PSB investigative interview, in violation of MCSO policy and applicable law.***

In late February 2025, the Sheriff and MCSO executive command permitted an attorney to attend a PSB interview of a principal who was a former employee at MCSO. Captain Lugo attempted to disallow the attorney's participation, as GH-2 (Internal Investigations) provides that the PSB Commander has final authority on the exclusion from participation of an observer; and initially, Executive Chief Palopoli agreed with him.[36] However, the representing attorney, the same one who had represented Deputy Lowry and Deputy Voeltz (involved in the Brady List cases discussed above), stated that the Sheriff had approved her presence in the PSB interview.[37]

Executive Chief Palopoli then overruled herself, stating that the Sheriff had approved it and that she was not pushing back on it, ultimately directing Captain Lugo to allow the attorney to be present during the interview.[38] Captain Lugo informed her that the Monitor would be reviewing the case, given that it involved a CP-8 (Preventing Racial and Other Bias-Based Policing) allegation for gender discrimination, and that allowing the presence of counsel violated policy.[39] Captain Lugo explained that, although Arizona law allowed for law enforcement agencies to determine the adequacy of an attorney's presence in interviews, MCSO policy prohibited it; and allowing it could set a precedent within the agency.[40]

Consistent with Arizona law, whenever an employer interviews a law enforcement officer in the course of an administrative investigation, and there is reasonable belief that the interview could result in dismissal, demotion or suspension, a law enforcement officer may select a representative observer to be present during his interview.[41] Pursuant to the law, however, the observer "shall not be an attorney," unless agreed to by the employer. GH-2 (Internal Investigations) (2)(B)(12) further provides as follows: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." Accordingly, attorney presence as an observer was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted. Consequently, by allowing attorney presence during the PSB interview, Executive Chief Palopoli violated both Arizona law and MCSO policy.

***Finding #5: MCSO failed to engage in appropriate, uniform, and fair discipline as required by the Court Orders.***

### a. *State of play during the time MCSO filed the Captain Lugo complaints*

During the first few months of the Sheridan administration, Captain Lugo received inquiries about reopening final disciplinary decisions in closed cases adjudicated during previous administrations in violation of Arizona law, as stated in the previous sections. Lugo similarly declined multiple inappropriate requests made by executive command. Examples of these include:

1) Captain Lugo received a call from Chief Hawthorne, joined on speakerphone by Chief George Pepe, stating that he was "told to look into" a meeting with a sworn employee who had expressed multiple concerns about the way interviews were being conducted.[42] Captain Lugo told Chief Hawthorne those matters had been addressed in earlier closed Service Complaints by PSB.[43] Two days later, Chief Hawthorne contacted Captain Lugo again, offering an apology and expressing appreciation for his work.[44]

2) A sworn employee filed a grievance on a written reprimand, although appealing a written reprimand was not allowed by policy.[45] Captain Lugo informed the employee that her written reprimand did not qualify for a grievance. The employee appealed this decision directly to Undersheriff Gentry, who then brought the issue up with Captain Lugo, stating that he was thinking of sending the grievance back to Captain Lugo because he (Captain Lugo) had not properly addressed it.[46] Captain Lugo explained that returning the grievance back to PSB violated policy.

3) The Sheriff inquired if he could overturn the decisions of Hearing Officer Holmes, a PDH officer, and whether there was a time for him to do that.[47] Captain Lugo replied that the policy (GH-2 [Internal Investigations]) identified parameters, but that had not occurred in PSB while he had been there.[48]

4) Captain Lugo learned from Chief Paul Chagolla that the Sheriff had verbally authorized a change of uniform for Posse members without first changing the applicable policy, and that deputies were unhappy with the change once the Posse started showing up with the new uniform.[49] Captain Lugo inquired whether the Monitor had been informed, given that complaints were being raised.[50]

5) On April 2, 2025, in a meeting with the Sheriff, Undersheriff Gentry, and Executive Chief Palopoli, Captain Lugo reiterated that an attorney's presence during a PSB interview was contrary to GH-2 (Internal Investigations), a policy issued by the Court.[51] According to Captain Lugo, the Sheriff then asked him, "So I violated the Court Order?" Captain Lugo replied that the policy had been violated and stated that the report of the investigation would note the attendance of counsel in the interview. According to Captain Lugo, "[H]is [the Sheriff's] face turned red."[52]

### b. *Sergeant Engelbeck's administrative complaint against Lugo was a refile of a prior resolved complaint*

On March 10, 2025, after his discipline was inappropriately dismissed by Hearing Officer Holmes, Sergeant Engelbeck filed a complaint against Captain Lugo directly with Undersheriff Gentry, reraising a matter that had been investigated as a Service Complaint by the previous administration.[53]  On July 8, 2024, the investigation of the Service Complaint by then-Executive Chief Caputo culminated in an administrative closure, with the approval of then-Executive Chief Ann Scheel.[54]  This resolution was further reviewed and approved by the Monitoring Team.  Nevertheless, one year later, Sergeant Engelbeck filed the same complaint against Captain Lugo for the underlying alleged conduct and the failure to investigate his complaint.  No investigation of this complaint should have occurred, as it had been finalized.

Sergeant Engelbeck further alleged that he had received an electronic copy of his case file from MCSO on December 20, 2024, for his appeal to the Merit Commission, and that the link did not include his first interview with Sergeant Robert Leatham in October 2020.  Sergeant Engelbeck alleged that this meant that evidence had been tampered with or destroyed and that "someone would have to deliberately omit them for discovery."[55]  There was no explicit accusation that Lugo had destroyed or tampered with any evidence.

### c. *The handling of Sergeant Engelbeck's complaints by command staff*

Undersheriff Gentry was aware that the facts of the administrative complaint were investigated as a Service Complaint conducted by Executive Chief Caputo in 2024.[56]  He thought that Sergeant Engelbeck's complaint was a "redundancy" and that "the whole thing smack[ed] of retaliation and may not have merit" – but he still insisted that it be handled by a different agency just so "we [MCSO] don't look bad one way or the other."[57]  As to the criminal allegations raised, Undersheriff Gentry sent the file to Executive Chief Palopoli on March 10, 2025 for referral to an outside agency.  After reviewing the file, Executive Chief Palopoli spoke to Undersheriff Gentry, and he advised her that the case needed to be investigated by an outside agency.[58]

On March 18, 2025, Executive Chief Palopoli informed Captain Lugo that he was the principal of a complaint; and that a liaison would be needed to conduct an external investigation.  Executive Chief Palopoli alleged that on this date she told Captain Lugo to "stay out of it."[59]  She also requested that Captain Lugo identify a point of contact within PSB, a lieutenant who Executive Chief Palopoli could contact.[60]  She also told Captain Lugo that an investigation on the Sergeant Engelbeck complaints would be conducted – but that he (Captain Lugo) would not be placed on administrative leave, and that he would remain in his position as PSB Commander.[61]  She also informed Captain Lugo that he would be training a captain to be able to take over in the event that "something happened" to him, like if he was out on leave, out of the country, sick, or taking time off.[62]  Executive Chief Palopoli mentioned that Undersheriff Gentry had selected Captain W. Cory Morrison as the person to train.[63]  The stated goal was to have one captain in charge of investigations involving sworn personnel, while the other would be responsible for investigations involving Detention and non-sworn personnel.  Soon after, Captain Lugo made his concerns about this issue known to his superiors.

Six days later, Deputy Chief Matthew Summers, although not in Lugo's chain of command, called Captain Lugo and advised him that a different captain, Captain Dominick Reaulo, would be transferred to PSB as a co-commander and that Captain Morrison would be replacing Captain Reaulo in the Bureau of Internal Oversight (BIO).[64]  During the conversation, Deputy Chief Summers asked Captain Lugo if Captain Morrison would have issues with his eligibility for transferring into BIO, and Captain Lugo stated that the transfers had to go through the Court-ordered pre-approval process.[65]  Both notifications to Captain Lugo were prior to any written requests to the Monitor for approval of any transfers into PSB or BIO, which are required by the Second Order.[66]

On March 21, 2025, Chief Donald Anders of the Monitoring Team and Captain Lugo held their regularly scheduled weekly meeting to discuss the intake and routing of complaints, per Third Order Paragraphs 346 and 347.  As is customary, Captain Lugo identified the complaints that had been received in PSB.  Sergeant Engelbeck's complaints had been received on March 10, 2025, although at the time, a PSB number had not yet been assigned.

On March 20, 2025, Executive Chief Palopoli initiated contact with the contract investigative firm, Jensen Hughes.[67] By March 24, 2025, Jensen Hughes had agreed to investigate Captain Lugo as the subject of the complaint, and Executive Chief Palopoli informed Captain Lugo.[68] PSB had used Jensen Hughes to outsource MCSO disciplinary cases when there was a real or perceived conflict that would prevent MCSO staff from completing an objective investigation. A Jensen Hughes investigator was assigned, and communication was established in preparation for their handling of this complaint investigation. Yet despite clear directives from the Court on the proper procedure for intake and routing of investigations, and prior notice by Captain Lugo to Executive Chief Palopoli of the requirement for the Monitoring Team's involvement through intake and routing, Executive Chief Palopoli took these actions without any consultation with the Monitoring Team.[69]

On March 25, 2025, Executive Chief Palopoli contacted the Monitoring Team via email to advise that a complaint against Lugo had been lodged, and that it was MCSO's decision to send the case to Jensen Hughes. Later that same day, Deputy Chief Summers, joined by Executive Chief Palopoli, called the Monitor and characterized Captain Lugo as an invaluable asset to the MCSO organization. Prior to this call, Executive Chief Palopoli had already formed an opinion about potential criminal violations regarding the allegations brought forth by Sergeant Engelbeck, which she had shared with Undersheriff Gentry. However, during the March 25 call to the Monitor, neither Deputy Chief Summers nor Executive Chief Palopoli raised any criminal violations by Lugo, nor did they mention anything regarding his possible transfer out of PSB.

### d. Executive Chief Palopoli's personal views about the complaints filed by Sergeant Engelbeck

On April 1, 2025, Executive Chief Palopoli met with Chief Anders, and stated the following:

- She noted that Sergeant Engelbeck might not have a right to the interview requested, given the reversal of discipline by the CRS.

- She believed CRS did not provide Sergeant Engelbeck with an interview recording alleged to had been destroyed by Sergeant Engelbeck and which CRS had under its control, because CRS overturned his case as per Hearing Officer Holmes's decision.

- She did not believe the allegations were criminal in nature.

- She did not believe Sergeant Engelbeck's complaint was different from the Service Complaint resolved by Caputo.

- She thought Sergeant Engelbeck's case might be motivated by retaliation.

- She thought that the CRS should have provided the interview recording to Sergeant Engelbeck, and she did not believe that Captain Lugo and Sergeant Leatham would be principals in the investigation.

Via IAPro, Executive Chief Palopoli accessed IA2020-0555 – the very case for which Sergeant Engelbeck was seeking the missing evidence – and found that the file contained relevant information and multiple documents.[70]   When asked why she accessed the investigative file, Executive Chief Palopoli replied, "I was trying to see if that video existed that was being referenced."[71]   Executive Chief Palopoli, however, stopped short of determining if the interview videos existed in the investigative file.  Had she done so, she would have seen the alleged destroyed evidence was filed and maintained right where it was supposed to be.

### e. *The proposed co-captaincy*

On March 25, 2025, Executive Chief Palopoli and Deputy Chief Summers reached out to the Monitor to advise him that MCSO planned to propose a dual co-captaincy into PSB with Captain Flowers and Captain Reaulo; and sought to transfer Captain Morrison into BIO, despite his failure to qualify for the position.  These notifications were made verbally and not in writing.  The Monitor stressed the importance of MCSO's adherence to the Court-ordered procedure for transferring personnel in and out of PSB and BIO, which required written pre-approval by the Monitor.

On April 7, 2025, the Monitor received a memorandum authored by Deputy Chief Summers, "Assignment Approval Request Bureau of Internal Oversight Re: Capt. W.C. Morrison #1509."  As a matter of course, the Monitor receives transfer requests for approval into PSB, CID, and BIO.  However, this was not a request for transfer under Paragraph 268 – but as Deputy Chief Summers put it, his "review of the previously identified historical information specific to Captain Cory Morrison S1509."[72]   The Monitor had never received a similar document in support of a transfer request in the past.

The memo documented three PSB investigations involving Captain Morrison as a principal: two already closed and one open.  One of the open cases involved an allegation that Captain Morrison (who held the rank of Chief at the time) inappropriately touched a female server in a sports bar/restaurant.  The investigation resulted in a sustained finding, and a two-week (80-hour) suspension was administered and served.[73]

In his memo, Deputy Chief Summers emphasized the following when referring to the closed administrative case: "[I]t is clear that the preponderance of evidence suggests that Captain Morrison inappropriately touched a female server as indicated by the report" – but yet he wanted to give some context in support of Captain Morrison by outlining mitigating factors.[74] Deputy Chief Summers asked the Monitor to consider as mitigating factors in the evaluation of the transfer of Captain Morrison into BIO the following: a) No victim was willing to aid in the investigation and there was no criminal prosecution; b) there was no conviction, and thus, no crime; c) the investigative report contained unnecessarily inflammatory descriptors; d) the victim had no idea of the rank of Captain Morrison or the agency that he worked for; and e) Captain Morrison was off duty at the time of the incident and therefore did not represent the Office in any manner. MCSO policy, however, does not consider any of these factors to be relevant in either the decision on whether to sustain an administrative allegation of misconduct or in determining the level of discipline.[75]

Deputy Chief Summers further alleged that MCSO had overreached when it sustained Captain Morrison and imposed the 80-hour discipline. He claimed that "[i]t is important to note that the sustained allegations do not disqualify his [Captain Morrison's] assignment to the Bureau of Internal Oversight (BIO). Also, none of the alleged conduct would impact the effectiveness or ability to perform his duties in BIO." He also argued, "Should we be unable to transfer Captain Morrison it will complicate the other captain transfers we intend to make effective April 14th."[76]

Deputy Chief Summers then went on to discuss another serious misconduct case with Captain Morrison as the principal, which resulted in sustained findings and his demotion from the rank of Chief to Captain; as well as an open case for Failure to Meet Standards, a CP-2 (Code of Conduct) violation. Yet despite this, Deputy Chief Summers stated he "felt comfortable that [Captain Morrison] would still qualify" under Second Order Paragraph 268 to be transferred into BIO.[77] He also admitted that prior to writing the memorandum, he did a general review of Morrison's cases, but "[had not] reviewed everything in the case file[s]."[78]

MCSO eventually submitted the documentation for the proposed co-captaincy at PSB to the Monitor and it was denied. MCSO sought court review of the Monitor's denial. On November 3, 2025, the Court denied MCSO's request to overturn the Monitor's decision.[79]

### f. *The tense meeting between command staff and Captain Lugo*

On April 2, 2025, in a meeting of the Sheriff, Undersheriff Gentry, Executive Chief Palopoli, and Captain Lugo, the group discussed the topic of the dual co-captaincy. Captain Lugo expressed that there had not been enough collaboration regarding the impact of the decision, nor had his expertise or experience been considered.[80] Captain Lugo highlighted the fact that MCSO had tried on two different occasions in the past to implement a two-captain structure, without success. Captain Lugo also attributed the two-captain structure as a factor that contributed to the current investigative backlog. Captain Lugo explained to the Sheriff that he did not want to be responsible for the

decisions and work product of a colleague equal in rank in PSB, and that he did not want to violate the Court Orders regarding the reduction of the backlog.[81] Captain Lugo noted that only two positions – the Sheriff and the PSB Commander – were named in the Orders; and that the restructuring decisions could impact the agency with fines, and he did not want to be held responsible.[82] Captain Lugo expressed that, under his leadership, PSB was able to reduce the backlog and that others in his role had failed to make such progress; yet Captain Lugo was not involved in the command staff's decision-making on the matter of assigning a second captain to PSB.

When the command staff identified Captain Morrison as a potential second captain in PSB, Captain Lugo again expressed concern about Captain Morrison's fitness for the role, given Captain Morrison's previously sustained investigative findings and commensurate discipline.[83] Captain Lugo stated that Undersheriff Gentry claimed in the meeting that he did not know the details of Captain Morrison's sustained discipline history.[84] When the command staff identified Captain Reaulo as an alternative option for the second captain in PSB, Captain Lugo informed them that at least two members of PSB threatened to quit (or requested to transfer out of PSB) if Captain Reaulo was assigned to PSB.[85] Captain Lugo stated that he had a contingency plan to fill the vacant Special Projects Manager position, and that he had full faith in his lieutenants to step in; but that also the Court and the Monitor would be willing to work with MCSO in the event that he was unavailable.[86] Undersheriff Gentry apparently chuckled at the ideas provided by Captain Lugo.[87] Before the meeting concluded, Captain Lugo was given 30 days to develop an alternative plan of action to address the command staff's proposed two-captain approach.[88]

During the meeting, Captain Lugo also conveyed his concerns about what he perceived as acts of retaliation from Sergeant Engelbeck, given his March 10, 2025 complaints. Captain Lugo explained that he felt he was being targeted by Sergeant Engelbeck on the basis that Captain Lugo held Sergeant Engelbeck accountable for acts of insubordination, which led to Sergeant Engelbeck's demotion in October 2020 and subsequent discipline in October 2024.[89] Undersheriff Gentry inquired as to what Captain Lugo's plan would be if anything should happen to him (Captain Lugo ), such as being placed on administrative leave.[90] Captain Lugo later conveyed to the Monitoring Team that he perceived this as a veiled threat – and that similar threats of being placed on administrative leave were conveyed by executive staff during other conversations with Captain Lugo regarding decisions that may contravene Court-ordered policies.

During the April 2, 2025, meeting, Captain Lugo also provided updates on current investigations. One update involved recently promoted Chief Brandon Smith, who was under PSB investigation for allegedly interfering with an administrative investigation and a criminal investigation.[91] Per policy, Captain Lugo documented the PSB investigation information on the appropriate form prior to Smith's promotional application to Chief. After receiving the update, the Sheriff appeared to be unaware that the newly promoted Chief had potential disciplinary issues.[92] The promotion stood,

nonetheless.  The Sheriff stated that assigning two captains to PSB was his own idea, to share the workload with Captain Lugo.[93]  During his interview with the Monitoring Team, the Sheriff stated that Captain Lugo appeared to be very upset about the possibility of working alongside a second captain.  The Sheriff also stated, "I think he [Captain Lugo] felt that we were coming after him."[94]

### g.  *The placement of Captain Lugo on administrative leave*

On April 4, 2025, two days after the meeting in the Sheriff's office, Captain Lugo was placed on administrative leave.

That day, Undersheriff Gentry reached out to Captain Lugo to say that he needed to place him on administrative leave.[95]  When Captain Lugo inquired regarding the reason for being placed on leave, Undersheriff Gentry replied, "It's nothing."  He added that legal counsel advised the Sheriff to handle it like any other case, and that they did not need to get in trouble with "the guy across the street," referring to the U.S. District Judge assigned to this case.[96]  The administrative leave document was served on Lugo on April 7, 2025, three days after being placed on leave.  The allegations listed in the administrative leave document provided to Captain Lugo reference IA2025-0139, the internal administrative allegations initiated by Executive Chief Palopoli that same day.  Therefore, at the time Captain Lugo was placed on leave, Executive Chief Palopoli had not yet filed her complaint.  The administrative paperwork on the leave referenced IA2025-0139, but did *not* reference IA2025-0111, the complaints lodged by Sergeant Engelbeck.

For his part, the Sheriff, in his interview, stated that he placed Captain Lugo on leave to "err on the side of caution" since Captain Lugo was "like the beacon to the entire organization, to the Monitor Team...and to the Court" and that he "had no choice but to put him on admin leave."[97]  The Sheriff furthered that on April 4, Undersheriff Gentry told him that Sergeant Engelbeck had identified Captain Lugo as a criminal suspect, and Executive Chief Palopoli had informed him that Captain Lugo had been insubordinate.[98]  After placing Captain Lugo on leave, Undersheriff Gentry then requested information and assistance from Captain Lugo on how to update Captain Lugo's status in the Human Resources system of record, effectively asking Captain Lugo how to place himself on administrative leave.[99]

After being placed on administrative leave, Captain Lugo was restricted from MCSO network systems, blocked from cell phone access, and ordered to surrender his office keys and MCSO-issued equipment.  MCSO personnel were instructed not to talk with him.  Captain Lugo believed that Sergeant Engelbeck's allegations were retaliation against him, and "that doesn't typically qualify at the onset of a complaint for administrative leave.[100]

### h.  *The filing of the insubordination complaint against Lugo*

On April 7, 2025, Executive Chief Palopoli filed an administrative insubordination complaint against Lugo stating that she had discovered on April 2 that Captain Lugo had accessed case number IA2025-0111 (the Sergeant Engelbeck complaint) in IAPro

on March 10 and March 21.[101]  Executive Chief Palopoli alleged that Captain Lugo's misconduct and insubordination was due to his failure to notify her that he was the principal of the complaint made by Sergeant Engelbeck (IA2025-0111), which was entered into Blue Team on March 10, 2025, and from his accessing the file on March 21 after her verbal direction to Captain Lugo to "stay out of it" which she alleged occurred on March 18, 2025, although the Independent Investigator found this to have occurred after the fact, on March 24, 2025.[102]

Executive Chief Palopoli also claimed that Captain Lugo failed to respond to her directive (given on March 24, 2025) to provide the name of a PSB lieutenant for liaison purposes when she was trying to assign the case to Jensen Hughes, an outside vendor.[103] She alleged that Captain Lugo might have been responsible for directing PSB Lieutenant Frederick Porter to liaise with Jensen Hughes, a conclusion she reached after she reviewed a draft IA Investigative Plan authored by Lieutenant Porter and emailed to Executive Chief Palopoli on March 30, 2025.  Executive Chief Palopoli believed the *draft* IA investigative plan was a *final* IA investigative plan that Lieutenant Porter had also sent to Jensen Hughes.  Moreover, she believed that there was a possibility that because Captain Lugo was Lieutenant Porter's direct supervisor, that he (Captain Lugo) was insubordinate by directing Lieutenant Porter to develop and send the investigative plan.

### i.  *The referral of the complaints to AZDPS*

On April 9, 2025, MCSO hosted a meeting at the Sheriff's office with representatives of the Arizona Department of Public Safety (AZDPS).  In attendance from MCSO were Undersheriff Gentry, Executive Chief Palopoli, and Deputy Chief Summers; and in attendance from AZDPS were Captain Hancock and Sergeant Baum from the AZDPS Office of Internal Affairs.[104]  Undersheriff Gentry stated that he made the decision to contact AZDPS since the investigation "came in as a criminal allegation," and that AZDPS should determine if it was a criminal matter.[105]  Executive Chief Palopoli confirmed that sending the matter over to AZDPS was Undersheriff Gentry's unilateral decision.[106]  The purpose of the meeting was for AZDPS to accept responsibility to investigate the two alleged misconduct cases filed against Captain Lugo: IA2025-0111 (Sergeant Engelbeck's administrative and criminal complaint) and IA2025-0139 (Executive Chief Palopoli's administrative complaint).

At the meeting, MCSO command staff presented the allegations to AZDPS and stated that complaint IA2025-0111 had both administrative and potential criminal aspects. According to Undersheriff Gentry, it was Executive Chief Palopoli who led the discussion when presenting the details of the allegations of both cases, including the one for which she initiated (IA2025-0139).[107]  Remarkably, Executive Chief Palopoli did not believe that it was inappropriate that she, as the complainant, was in the meeting relaying the orders she allegedly gave Captain Lugo and how she believed he had violated them.[108]  Further, Undersheriff Gentry's allowing her participation was even more remarkable and wholly inappropriate.

AZDPS investigated the criminal case under IA2025-0111 against Captain Lugo and found that no criminal violations occurred.  AZDPS investigated the administrative case under IA2025-0111 and the insubordination case under IA2025-0139.  AZDPS advised that, while AZDPS conducts internal investigations at the request of other agencies, it does not reach conclusions or dispositions.  As a result, on October 30, 2025, the Monitor requested that the Independent Investigator, who had been appointed by the Court on May 30, 2025, review all investigations conducted by the AZDPS and issue findings of fact and recommendations.[109]

On January 26, 2026, the Independent Investigator issued her findings and recommendations as follows:

> [T]he Independent Investigator concurs with the criminal investigation's conclusion that no criminal violations occurred.  Therefore, Captain Lugo and Sergeant Leatham are Exonerated of the A.R.S. § 38-1106(A)(1) allegation, and the ARS 13-2809(A)(1) allegation is Unfounded.  The allegation of a violation of CP-2, Code of Conduct, Section 6: Conformance to Established Laws related to MCSO IA 2025-0111 is Unfounded as to Captain Lugo and Sergeant Leatham.  Finally, with regard to IA 2025-0139, the allegation that Captain Lugo failed to notify Chief Palopoli of his conflict of interest is Not Sustained, and Captain Lugo is Exonerated of the insubordination allegation.[110]

No credible complaints were lodged against Captain Lugo that would have justified placing him on administrative leave.  In addition, the Monitoring Team did not authorize his removal as PSB Commander, as required by the Court Orders.[111]

As previously noted, MCSO has no authority to reopen or re-investigate matters once they have been investigated by MCSO and closed.  Therefore, Undersheriff Gentry's determination that the Sergeant Engelbeck administrative complaint – which had been administratively closed as a Service Complaint in 2024 – had to be investigated by an outside agency was in violation of Arizona law.  Undersheriff Gentry failed to review, or reviewed and ignored, a prior determination by the agency that resolved the complaint; and moved forward with his misguided opinion that the complaints against Captain Lugo had to be investigated.

No criminal allegation should have been filed against Captain Lugo given Sergeant Engelbeck's generalized and unsupported assertion that he had not been provided with an interview of his demotion case.  Our Team was able to determine, quickly and with minimal effort, that the interviews that Sergeant Engelbeck alleged were not provided to him did, in fact, exist.  The CRS is charged with fulfilling any document requests for an employee's investigative file, because of an appeal before the Merit Commission.  A telephone call to CRS would have quickly revealed that the video interviews were not missing or omitted from the investigative file which is kept in IAPro; and whether there had been any administrative, technical, or human error in the transmission of the information from the CRS to Sergeant Engelbeck.  But such a call was never made.

Executive Chief Palopoli's insubordination allegations against Captain Lugo lacked evidentiary support.  First, she claimed to have found out on April 2, 2025, that Lugo failed to tell her he was the subject of a complaint back on March 10, 2025.  A review by Captain Lugo of the March 10 complaint could have only made him aware of a prior case that Sergeant Engelbeck had filed against him which Captain Lugo thought was retaliatory in nature, but there was no indication that any criminal allegations were made against him.  The facts support that Captain Lugo met with Executive Chief Palopoli on March 11, 2025, and they discussed the allegations including Captain Lugo's thoughts about it.  On March 11, Executive Chief Palopoli found out that Captain Lugo failed to tell her the day before of the allegations, yet she waited 27 days before filing a complaint.  Second, she alleged that Captain Lugo failed to identify the name of a PSB lieutenant for purposes of investigative liaison.  A review of her interview reveals that she did not consider this matter a priority and that it would only become relevant when the case was assigned over for investigation to the outside agency.[112]  Third, she alleged that Captain Lugo violated an order by directing Lieutenant Porter to liaise with Jensen Hughes.

The facts show that Lieutenant Porter ended up sending Executive Chief Palopoli a draft investigative plan --because she failed to notify both PSB and Jensen Hughes that the firm would not be working on the matter due to the Monitor's direction on the conflict of interest.  Executive Chief Palopoli met with Chief Anders of the Monitoring Team on March 26, 2025, and Chief Anders rejected the use of Jensen Hughes.  Executive Chief Palopoli notified PSB of this five days later, March 31, 2025, and Jensen Hughes seven days later, April 2, 2025.  On March 30, 2025, Lieutenant Porter, who was at the time the liaison at PSB with Jensen Hughes, and believing the firm was still assigned the case, sent a *draft* investigative plan to Executive Chief Palopoli for comment.  Executive Chief Palopoli believed that Lieutenant Porter had sent the investigative plan to Jensen Hughes, but when challenged during her interview she confirmed that Lieutenant Porter never sent the final investigative plan to Jensen Hughes.[113]  Finally, the allegation that Lugo violated an order by accessing IAPro on March 21, 2025, after Executive Chief Palopoli had instructed him to "stay out of it" is contrary to the evidence.  Chief Anders informed Executive Chief Palopoli that IAPro log represented that Captain Lugo had logged into IAPro during the regularly scheduled Friday meeting between Chief Anders and Captain Lugo to discuss intake and routing as per the Court's Orders, which occurred on March 21, 2025.[114]  The Independent Investigator found that Executive Chief Palopoli told Captain Lugo to "stay out of it" on March 24, 2025, after Lugo had logged into IAPro.

The Sheriff, Undersheriff Gentry, and Executive Chief Palopoli violated the Court Orders in their handling of the complaints against Captain Lugo.  Captain Lugo, for his part, rejected the new administration's inquiries to reopen discipline in violation of Arizona law and the Court's Orders; to change disciplinary policies to apply more favorable outcomes to individual cases in violation of the Court's Orders; and to request the appointment of two captains to head PSB in violation of the Court's Orders.[115]  In addition, Captain Lugo identified to both the Sheriff and executive command multiple violations of policy pertaining to disciplinary and Court-ordered procedures.

There was no good faith basis for MCSO command staff to refer the Sergeant Engelbeck complaint against Captain Lugo for outside investigation. The administrative portion of the complaint had been resolved through the Service Complaint completed in 2024. The criminal allegation could have easily been resolved with a call to CRS or through a review of Sergeant Engelbeck's investigative file by an administrator for the agency. Captain Lugo had nothing to do with CRS's failure to provide the information to Sergeant Engelbeck. Designating the complaint as being against Captain Lugo and determining that Captain Lugo should be placed on administrative leave while the complaint was investigated by an outside agency were not supported by any reasonable basis. These actions support the contention that Captain Lugo was removed from the PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy; and support Lugo's perception, as Sheriff Sheridan put it, that the administration was "coming after him."[116] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures.

### j. MCSO's request to transfer Lugo from PSB into the Court Security Division

On February 6, 2026, after the issuance of the Independent Investigator's report, Commander Clinton Doyle of the Court Implementation Division (CID) submitted a request for Captain Lugo to transfer out of PSB and into the Court Security Division. The Monitoring Team requested the reason for the transfer. In response, Commander Doyle provided that Captain Lugo had been the PSB Commander for five years and that the current administration had told Captain Lugo that he would "most likely" be transferred after one year. Upon further information requests by the Monitoring Team, Commander Doyle stated that there was no policy regarding the length of tenure in any assignment within MCSO and that Sheriff Sheridan and Undersheriff Gentry had told Captain Lugo about his alleged future transfer in December 2024. On February 25, 2026, the Monitoring Team did not approve the request to transfer based on the findings our inquiry. The Monitoring Team concluded that the stated reason for Captain Lugo's transfer was a pretext; and that the real reason was retaliatory given his resistance to the administration's attempts to manipulate the PSB process and standing policies and defy the Court Orders.

On March 5, 2026, MCSO advised the Monitoring Team that Captain Flowers, who was serving as PSB Commander on a temporary basis as approved by the Monitor on April 30, 2025, had taken leave. On the same day, the Monitor rescinded the approval of then-Captain Flowers as PSB Commander and informed MCSO that the only recognized PSB Commander was Captain Lugo who had been approved as the PSB Commander on February 5, 2021. MCSO responded that the Monitor had no authority to designate the PSB Commander; and that Captain Reaulo was serving as PSB Commander and Captain Lugo was serving as Deputy Commander. At the time of the communication, MCSO had not yet requested the approval of Captain Reaulo as PSB Commander. (On November 8, 2025, the Monitor approved the transfer of Captain Reaulo into PSB as Deputy Commander.)

Following a hearing, the Court entered an Order on March 13, 2026, stating that the appointment of a qualified commander to lead PSB required the Monitor's advanced approval under Paragraph 268.[117] The Court further affirmed that Captain Lugo, as the only candidate approved by the Monitor, was the current PSB Commander.

As a result of the findings from our inquiry, on May 30, 2025, the Court appointed an Independent Investigator for IA2025-0185.[118]

## COURT ORDER XV.    MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES

***Paragraph 163.*** *The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process. To achieve these outcomes, the Sheriff shall implement the requirements set out below.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

As previously articulated in the details of our inquiry, there was no good faith basis for MCSO command staff to refer the Sergeant Engelbeck complaint against Captain Lugo for outside investigation. The administrative portion of the complaint had been resolved through the Service Complaint completed in 2024. The criminal allegation would've been resolved with a call to the CRS or through a review of Sergeant Engelbeck's investigative file by an IAPro administrator for the agency. Captain Lugo had nothing to do with CRS's failure to provide the information to Sergeant Engelbeck. Designating the complaint as being against Captain Lugo and determining that Captain Lugo should be placed on administrative leave while the complaint was investigated by an outside agency were not supported by any reasonable basis. These actions support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Captain Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[119] Particularly, Captain Lugo

rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures. Therefore, the Sheriff, Undersheriff Gentry, and Executive Chief Palopoli violated this Paragraph.

### A. Policies Regarding Misconduct Investigations, Discipline, and Grievances

***Paragraph 165.*** *Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures. The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order. If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements. To the extent that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order. Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

As noted previously, MCSO provided us with the following:

- Administrative Services Division (ASD) Operations Manual, most recently amended on November 26, 2024.
- Audits and Inspections Unit (AIU) Operations Manual, currently under revision.
- Body-Worn Camera Operations Manual, published on December 22, 2016.
- CP-2 (Code of Conduct), most recently amended on September 3, 2025.
- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.
- CP-5 (Truthfulness), most recently amended on November 17, 2022.
- CP-8 (Preventing Racial and Other Bias-Based Profiling), most recently amended on January 23, 2025.
- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.
- EA-2 (Patrol Vehicles), most recently revised on December 25, 2024.
- GA-1 (Development of Written Orders), most recently amended on November 9, 2023.
- GB-2 (Command Responsibility), most recently amended on September 16, 2025.

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on October 16, 2025.

- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on October 16, 2025.

- GC-7 (Transfer of Personnel), most recently amended on January 16, 2025.

- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on January 16, 2025.

- GC-12 (Hiring and Promotional Procedures), most recently amended on April 4, 2025.

- GC-16 (Employee Grievance Procedures), most recently amended on January 16, 2025.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 22, 2024.

- GD-9 (Litigation Initiation, Document Preservation, and Document Production Notices), most recently amended on October 7, 2025.

- GE-4 (Use, Assignment, and Operation of Vehicles), most recently amended on November 22, 2024.

- GG-1 (Peace Officer Training Administration), most recently amended on November 26, 2024.

- GG-2 (Detention/Civilian Training Administration), most recently amended on November 26, 2024.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- GH-4 (Bureau of Internal Oversight Audits and Inspections), most recently amended on December 12, 2024.

- GH-5 (Early Identification System), most recently amended on December 12, 2024.

- GI-5 (Voiance Language Services), most recently amended on October 31, 2023.

- GJ-24 (Community Relations and Youth Programs), most recently revised on November 27, 2024.

- GJ-26 (Sheriff's Reserve Deputy Program), most recently amended on October 31, 2023.

- GJ-27 (Sheriff's Posse Program), most recently amended on January 19, 2024.

- GJ-35 (Body-Worn Cameras), most recently amended on April 10, 2025.

- Professional Standards Bureau (PSB) Operations Manual, most recently amended on November 13, 2023.

- Training Division Operations Manual, most recently amended on January 11, 2024.

This Paragraph implies that the review process and final adoption of the updated policies would take two months to complete, assuming that the new or revised policies were provided within one month of the issuance of the Second Order. This is due, in some measure, to researched and well-considered recommendations by the Parties; and robust discussion about policy language, application, and outcomes during our site visit meetings.

We received a majority of the documents listed above within one month of the entry of the Order. We and the Parties conducted initial reviews and returned the revised documents, with additional recommendations, to MCSO for additional work. MCSO continues provide us and the Parties with any new and revised policies for review and recommendations.

On December 12, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 165. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

MCSO ignored established policies that were approved by the Monitor and issued by the Court. These policies include:

1. GC-17 Attachment A (Discipline Matrix) and B (Categories of Offenses), which delineate the discipline for all misconduct offenses, including Driving Under the Influence (DUI).

2. GH-2 (Internal Investigations), which defines Appointing Authority as "the designated member of Office command staff, appointed by the Sheriff, whose duties include being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard." Nothing in the policy states that the Appointing Authority falls outside of the command staff.

3. GH-2 (Internal Investigations) (2)(B)(12) provides for the presence of an observer in the interview of a law enforcement officer when there is reasonable belief that the interview could result in dismissal, demotion or suspension: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." Accordingly, attorney presence as an observer in a PSB interview, as approved by the Sheriff and Executive Chief Palopoli, was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted.

4. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline. MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo.

MCSO is not in compliance with this Paragraph.

***Paragraph 166.*** *Such policies shall apply to all misconduct investigations of MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

As previously articulated in the details of our inquiry, MCSO ignored established policies that were approved by the Monitor and issued by the Court. These policies include:

1. GC-17 Attachment A (Discipline Matrix) and B (Categories of Offenses), which delineate the discipline for all misconduct offenses, including Driving Under the Influence (DUI).

2. GH-2 (Internal Investigations), which defines Appointing Authority as "the designated member of Office command staff, appointed by the Sheriff, whose duties include being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard." Nothing in the policy states that the Appointing Authority falls outside of the command staff.

3. GH-2 (Internal Investigations) (2)(B)(12) provides for the presence of an observer in the interview of a law enforcement officer when there is reasonable belief that the interview could result in dismissal, demotion or suspension: "The observer selected must be an employee of the Office, not an attorney" and that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." Accordingly, attorney presence as an observer in a PSB interview, as approved by the Sheriff and Executive Chief Palopoli, was not permitted by the policy; and Captain Lugo was vested with the sole authority to determine whether the attorney's presence was permitted.

4. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline. MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo.

MCSO is not in compliance with the requirements of this Paragraph.


***Paragraph 167.*** *The policies shall include the following provisions:*

*a.    Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:*

*i.    No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.*

*ii.   No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions*

> *with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.*

> iii.   *No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command.  Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

b.   *If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority.  Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.*

c.   *Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy.  All decisions not to investigate alleged untruthfulness must be documented in writing.*

d.   *Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau.  During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.*

e.   *Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.*

f.   *Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination.  The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.*

g.   *No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.*

**Phase 1:**  In compliance

**Phase 2:**  Not in compliance

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations.

During this reporting period, we reviewed 186 closed administrative misconduct investigations, 10 of which were critical incidents. Sworn, Detention, or civilian personnel assigned to PSB conducted 143 of the investigations we reviewed, compared to 134 during the last reporting period. PSB outsourced nine of the investigations to an outside vendor. Sworn supervisors in Districts or Divisions outside of PSB conducted 34 of the investigations, compared to 41 during the last reporting period.

Paragraph 167 a.i-iii. prohibits any employee with any conflicts of interest from participating in, holding hearings on, or making any disciplinary decisions in a misconduct investigation.

While our standard review of closed cases for this reporting period did not identify concerns with this Subparagraph, as a result of our inquiry presented in detail earlier in this report, we identified serious concerns regarding MCSO's compliance with the requirements of this Subparagraph. GH-2 (Internal Investigations) and GC-17 (Disciplinary Matrix) provide the framework that MCSO must follow when conducting internal investigations and imposing discipline. MCSO command failed to engage in appropriate uniform and fair discipline regarding the investigations against Captain Lugo.

Executive Chief Palopoli violated the requirements of this Subparagraph when she initially made the decision to assign this case to Jensen Hughes, failing to identify the conflict of interest that would exist by doing so since Captain Lugo oversaw the work of Jensen Hughes. She further violated this Subparagraph when she knowingly participated in the initial briefing with AZDPS when, as the complainant in this case, she clearly had a conflict of interest. Undersheriff Gentry also violated this Subparagraph by allowing this to occur.

Paragraph 167.b. requires that if the internal affairs investigator or a commander responsible for making disciplinary decisions identifies a conflict of interest, appropriate notifications must be made immediately. There were no instances during this reporting period where a supervisor failed to identify a conflict of interest and inappropriately conducted an investigation.

Paragraph 167.c. requires that investigations into truthfulness be initiated by the Chief Deputy (now retitled as the Undersheriff) or the PSB Commander. MCSO identified five instances during this reporting period where PSB believed that a truthfulness allegation was appropriate and conducted the proper investigation. In one case, we believe a truthfulness allegation should have been initiated and PSB failed to do so. We will discuss this case with MCSO during our next site visit.

Paragraph 167.d. requires that any MCSO employee who observes or becomes aware of misconduct by another employee shall immediately report such conduct to a supervisor or directly to PSB. Per the requirement, during the period in which the Monitor has authority to oversee any operations of MCSO, any employee may also report alleged misconduct to the Monitor. Of the 186 administrative cases we reviewed for this reporting period, there were 46 investigations where an employee reported potential misconduct by another employee, or a supervisor identified potential employee misconduct. We did not identify any instance where a supervisor failed to identify and report potential misconduct as required.

Paragraph 167.e. requires that when supervisors learn of an act of misconduct, the supervisor shall immediately document and report the information to PSB. We did not identify any instance where a supervisor failed to document and report potential misconduct as required.

Paragraph 167.f. provides for the potential for a disciplinary sanction or other corrective action if an employee fails to bring forth an act of misconduct. We did not identify any instance where a supervisor failed to bring forward misconduct as required during this reporting period.

Paragraph 167.g. requires that a sergeant or higher-ranking employee conduct all misconduct investigations conducted at the District level. All District-level cases that we reviewed for this reporting period complied with this requirement.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Subparagraph 167.a.i.iii and therefore not in compliance with Paragraph 167. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

**Paragraph 168.** *All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations that were completed during this reporting period.

There were seven investigations where allegations applicable to compliance with this Paragraph were made. Five were externally generated complaints, and two were internally generated. None of the cases resulted in a sustained finding related to the requirements of this Paragraph.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 168. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

As previously articulated in the details of our inquiry, there was no good faith basis for the investigations initiated against Captain Lugo. Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint

process. Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence. Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave. These actions, only two days after a meeting between Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Captain Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[120] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures. Therefore, the Sheriff, Undersheriff Gentry, and Executive Chief Palopoli violated this Paragraph.

**Paragraph 169.** *Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations that were completed during this reporting period.

There were seven investigations where allegations applicable to compliance with this Paragraph were made. None of the seven resulted in a sustained finding of retaliation against any employee.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 169. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

As previously articulated in the details of our inquiry, there was no good faith basis for the investigations initiated against Captain Lugo. Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint process. Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence. Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave. These actions, only two days after a meeting between

Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo, support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy. They also support Captain Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[121]  Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB.  Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures.  Therefore, the Sheriff, Undersheriff Gentry, and Executive Chief Palopoli violated this Paragraph.

**Paragraph 170.**  *The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations.  Employees as well as civilians shall be permitted to make misconduct allegations anonymously.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.  Sixty were initiated as a result of internal complaints, and 126 were externally generated.  We also reviewed seven criminal investigations conducted by MCSO.  All seven of these were internally generated.

Of the 186 administrative misconduct investigations we reviewed for this reporting period, 14 involved anonymous complaints.  Nineteen others were complaints from identified third-party complainants.  We have not become aware of any evidence indicating that MCSO refused to accept and complete any investigations initiated by third-party or anonymous complainants.  None of the 186 administrative misconduct investigations we reviewed during this reporting period included any allegations indicating that any third-party or anonymous complaint was not appropriately accepted and investigated.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 171.**  *The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

We determined that 31 of the 186 completed administrative investigations we reviewed involved complainants who sought to withdraw their complaints; or were unavailable, unwilling, or unable to cooperate.  MCSO completed all 31 investigations and reached a finding as required.  We also

found that in 44 of the 186 investigations, all of the identified principals left MCSO employment prior to the finalization of the investigation or discipline process.  MCSO completed all of these investigations and reached a finding as required.  Thirteen of these 44 investigations resulted in a sustained finding for one or more of these former employees.  The remaining 31 did not result in sustained findings for any of these former employees.  None of the 186 investigations we evaluated for compliance were prematurely terminated.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 172.***  *Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators.  Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 186 completed administrative misconduct investigations.  There was one investigation where PSB identified that an employee had failed to accurately provide all information or evidence required during the investigation.  PSB initiated a truthfulness investigation and the allegation was sustained.  The employee was dismissed by MCSO as a result.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 173.***  *Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation.  The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct.  This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

**Phase 1:**  In compliance

- GC-4 (Detention/Civilian Employee Performance Appraisals), most recently amended on March 5, 2024.
- GC-4 (S) (Sworn Employee Performance Appraisals and Management), most recently amended on March 5, 2024.
- GC-11 (Employee Probationary Periods and Unclassified Employees), most recently amended on January 16, 2025.
- GC-12 (Hiring and Promotional Procedures), most recently amended on April 4, 2025.

**Phase 2:**  Not in compliance

MCSO has established a protocol to address the requirements of this Paragraph. When a promotion list is established for sworn or Detention personnel, a copy of the list is forwarded to the Professional Standards Bureau (PSB). Before any promotion is finalized, PSB conducts a check of each employee's disciplinary profile in the automated system (IAPro). As part of the promotional process, members of MCSO's command staff meet to discuss each employee's qualifications. During this meeting, the results of the IAPro checks are provided to the staff for review and consideration. The PSB Commander generally attends the promotion meetings for both Detention and sworn personnel and clarifies any questions regarding the disciplinary history that the staff may have. When an employee is moved from a civilian employment position to a sworn employment position, MCSO conducts a thorough background investigation. The process involves a review and update of the candidate's PSB files, which is completed by Pre-Employment Services. For Detention employees who are moving to sworn positions, the information in the employee's file is updated to include any revised or new information. Due to the scheduling of our site visits, we inspect personnel files for employees who were promoted during the last month of the preceding quarter, and the first two months of the current reporting period. In our reviews, we ensure that the documentation, as it pertains to compliance with this Paragraph, is included in personnel files.

For the months of July, August, and September, MCSO reported a total of 29 promotions. Of the 29 employees promoted, one was sworn, 18 were Detention, and 10 were civilian. MCSO reported 15 employees hired, with 13 of the 15 being rehires. The rehired employees consisted of eight sworn, two Detention, and five civilians. We reviewed the documentation provided for these employees and documented our concerns; our concerns were discussed with MCSO during our October site visit.

For our October site visit, personnel file inspection, we requested 46 personnel files for review. These were for employees who were promoted or rehired during June, July, and August. Our file inspections are generally for the last month of the previous quarter, and the first two months of the most recently completed quarter. Two of the 46 employees had been terminated prior to our October review, so our inspection consisted of 44 personnel files. The files inspected consisted of 29 promoted employees and 15 rehired employees. Our inspection of the personnel files of the 29 promoted employees found that six of the promoted employees had open investigations of potentially serious misconduct that required justification memos to be provided. The memos had not been provided in the monthly submissions for this Paragraph, and they were not found in their respective files during our inspection. In addition, we found that two of the 15 rehired employees had open misconduct investigations at the time they separated from employment; these investigations had not been completed prior to the rehiring of the employees. In addition, there were no justification memos in their files to explain the circumstances of their rehiring. Of the employee files that we found to be deficient, one was for a sworn employee, one was for a civilian employee, and six files were for Detention employees. Of the 44 personnel files inspected, eight were not in compliance. This equates to an 81.82% compliance rate. In response to our site visit request, after we pointed out the deficiencies related to these files, MCSO provided justification memos and corrected errors on promotional documentation for the eight employees whose files we found out of compliance.

In addition, during our inquiry related to the administrative investigation of the PSB Commander, documented in more detail under Paragraphs 219, 220, and 221, we became aware of a Detention Captain's promotion to Deputy Chief that we believe occurred sometime during the first quarter or in the early part of the second quarter of 2025. This promotion was never submitted for our review in response to our document requests for Paragraph 173. We verified that documentation pertaining to this promotion was never provided. This is extremely concerning, considering the fact that the employee had an open misconduct investigation at the time of his promotion. For the third quarter of 2025, MCSO is not in compliance with the requirements of this Paragraph.

***Paragraph 174.** Employees' and applicants' disciplinary history shall be considered in all hiring, promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.*

### In Full and Effective Compliance

For employees who are promoted, the documentation submitted by MCSO generally includes the disciplinary history for the previous 10 years and any applicable disciplinary actions. MCSO also provides the disciplinary history of Detention and civilian employees who have been upgraded in classification to sworn status.

For the third quarter of 2025, MCSO reported the promotion of one sworn employee, 18 Detention employees, and 10 civilians. In addition, MCSO reported the hiring of 15 employees, with 13 of those being rehired former employees. We reviewed the documentation provided and noted concerns with two employees who had open misconduct investigations when they separated from employment, and the misconduct allegations had not been resolved prior to their return. There was no written justification provided for the hiring of these employees with unresolved allegations of misconduct. Additional details of these concerns are documented in our reviews of Paragraph 173. During our October site visit, we also reviewed the files for four employees who were transferred to PSB and CID. We found no deficiencies in these files.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 175.*** *As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.*

**In Full and Effective Compliance**

Per policy, MCSO is to conduct an EIS review within 14 days of an affected employee's transfer. We requested a list of employees that were transferred during this reporting period. From the list, we selected a sample of employees to review and verify that there was documentation of the required EIS reviews. To verify compliance with this Paragraph, we review the transfer request documents that MCSO completes for each employee. The documents memorialize the commander's acknowledgment of review of the transferred employee's disciplinary history, as well as the review of the employee's performance appraisals for the previous five years. This review is generally conducted before the gaining commander accepts the transfer, a few days prior to the transfer becoming effective.

For July, we requested a list of all employees who were transferred during the previous month. MCSO submitted a list, and we selected 25 of the employees who were transferred in June, for review. The list we requested was comprised of 12 Detention employees and 13 sworn employees. All of the 12 Detention employees selected had proper documentation of command review of their EIS profiles. All 13 sworn employees selected had proper documentation of command review of their EIS profiles. For July, all 25 employee transfers were in compliance with timely command review of the employees' EIS profiles.

For August, we requested a list of all employees who were transferred during the previous month. MCSO submitted a list, and we selected 25 of the employees who were transferred in July, for review. Our selection was comprised of 12 Detention employees and 13 sworn employees. We reviewed the documentation submitted for all the transfers. Of the 12 Detention employees requested, all had proper documentation of command review of their EIS profiles. Of the 13 sworn employees requested, all had proper documentation of command review of their EIS profiles. For August, all 25 transfers reviewed were in compliance with the requirements of this Paragraph.

For September, we requested a list of all employees who were transferred during the previous month. From the list, we requested the documentation for 25 employees. Our selection was comprised of 12 Detention employees and 13 sworn employees. We reviewed the documentation submitted for all the transfers. Of the 12 Detention employees requested, all had proper documentation of command review of their EIS profiles. Of the 13 sworn employees requested, all had proper documentation of command review of their EIS profiles. For September, all 25 transfers reviewed were in compliance with the requirements of this Paragraph.

For the third quarter of 2025, all 75 employees transferred had proper documentation of timely command review of their EIS profiles. The compliance rate for the second quarter was 100%.

On October 1, 2024, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 176.*** *The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.*

**In Full and Effective Compliance**

This Paragraph requires that employees who conduct misconduct investigations have an assessment on the quality of their investigations documented in their Employee Performance Appraisals. This Paragraph also requires that commanders who evaluate their subordinates' misconduct investigations must have the quality of these evaluations reflected in their own EPAs. To assess compliance with this Paragraph, we look for specific comments by raters completing EPAs. In supervisor EPAs, we look for comments addressing the quality of investigations. In commanders' EPAs, we look for comments assessing the quality of reviews of investigations. Frequently, the employee under evaluation does not oversee any staff members or has not been involved in conducting or reviewing investigations into misconduct. In these cases, we look for comments by the rater that show why the employee was not rated on this requirement.

In addition, we review a list of all PSB memos showing investigative deficiencies in misconduct investigations. If we find any deficiencies that correspond to the employee's evaluation period, we expect those to be named in the employee's EPA. If we discover documented shortcomings in the employee under evaluation, and the evaluator does not record these issues in the EPA, it will impact compliance with this Paragraph.

We reviewed Employee Performance Appraisals for 18 supervisors and commanders who received EPAs during this reporting period. Of the 18 supervisor EPAs that we reviewed for this quarter, all had proper assessments of the supervisors' quality of internal affairs investigations or the quality of their reviews of internal affairs investigations. Supervisors who neither conducted nor reviewed internal affairs investigations during the appraisal period had this fact accurately recorded on their EPAs. For this reporting period, all 18 supervisor EPAs we reviewed were in compliance with the requirements of this Paragraph, for a 100% compliance rating.

On January 9, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 177.*** *There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

In misconduct investigations that resulted in serious discipline and in which the employee was afforded the opportunity for an administrative hearing, the only reference to the hearing was "pre-determination hearing."

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**B.      *Misconduct-Related Training***

***Paragraph 178.*** *Within three months of the finalization of these policies consistent with ¶ 65of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:*

a.      *investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;*

b.      *the particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;*

c.      *properly weighing the credibility of civilian witnesses against employees;*

d.      *using objective evidence to resolve inconsistent statements;*

e.      *the proper application of the appropriate standard of proof;*

f.      *report-writing skills;*

g.      *requirements related to the confidentiality of witnesses and/or complainants;*

h.      *considerations in handling anonymous complaints;*

i.      *relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and*

j.      *relevant state and federal law, including Garrity v. New Jersey, and the requirements of this Court's orders.*

**In Full and Effective Compliance**

MCSO supplied the PSB40 curriculum to all personnel assigned to PSB and District supervisors when it was first developed. Subsequently, all promotional candidates receive this curriculum in the Supervisors' Program prior to or shortly after their promotion.

This course is reserved for delivery on an as-needed basis to new sergeants and newly hired civilian investigators.

MCSO delivered the PSB40 Train-the-Trainer training class once during this reporting period to 40 personnel (17 sworn, 18 Detention, five civilian). No personnel needed test remediation.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 179.*** *All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.*

**In Full and Effective Compliance**

MCSO did not deliver the 2025 PSB8 External during this reporting period. The curriculum remains under development.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 180.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.*

**In Full and Effective Compliance**

MCSO distributes new or annually revised policies via the HUB, an electronic training management system. This training includes updates to all policies related to misconduct investigations, discipline, and grievances. Each distribution requires all employees to complete personal attestations to indicate that they have read and understand the policy requirements.

To assess compliance with this Paragraph, we review the HUB generated reports of attestations that identify each individual and their dates of review. Compliance assessments for this Paragraph are based on the review of attestations for the following policies: CP-2 (Code of Conduct); CP-3 (Workplace Professionalism: Discrimination and Harassment); CP-11 (Anti-Retaliation); GB-2 (Command Responsibility); GH-2 (Internal Investigations); GC-16 (Employee Grievance Procedures); and GC-17 (Employee Disciplinary Procedures).

During this reporting period, we reviewed the status of individual reviews for Briefing Board (BB) 25-09 (CP-2), BB 21-70 (CP-3), BB 22-01 (CP-11), BB 23-50 (GB-2), BB 22-56 (GH-2), BB 23-42 (GC-16), and BB 25-09 (GC-17). All employee categories remain in compliance.

On June 17, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 181.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.*

### In Full and Effective Compliance

MCSO currently delivers the 2021 Complaint Intake and Reception Training via the HUB to all new hires in all personnel categories. This first training provides important guidance when interacting with members of the public who wish to file a complaint against MCSO personnel. The 2021 Complaint Intake and Reception curriculum previously received annual review. All employee classes are still in compliance.

On April 8, 2024, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 182.*** *Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.*

### In Full and Effective Compliance

This Paragraph requires that all supervisors receive training on their obligations when responding to a scene by a subordinate to accept a civilian complaint, or when they receive a complaint by telephone or email. All existing and new supervisors receive this first training content within the Misconduct Investigative Training (PSB40) and the Complaint Reception and Processing training; and it is covered in subsequent annual Supervisors' Responsibilities: Effective Law Enforcement (SRELE) and Annual Combined Training (ACT) programs. All active supervisors receive this training at least once; and in most cases, more than once.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### C.    *Administrative Investigation Review*

***Paragraph 183.***  *The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.  The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.*

***Paragraph 184.***  *All findings will be based on the appropriate standard of proof.  These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

Of the 186 cases we reviewed, all but nine (5%) complied with the requirements of this Paragraph.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 185.***  *Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations and seven criminal investigations during this reporting period.  There was one instance where PSB was not appropriately notified at the time of complaint as required.  PSB properly addressed this incident by initiating an administrative misconduct investigation.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 186.*** *Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.*

**In Full and Effective Compliance**

During numerous site visits, we have met with PSB personnel to discuss and observe the capabilities of IAPro, which serves as the technology instrument that meets the compliance criteria of this Paragraph. IAPro logs critical dates and times, alerts regarding timeframes and deadlines, chronological misconduct investigation status, notifications, and dispositions. The tracking system provides estimates of key timeframes for all investigators to ensure that they learn of previous and upcoming investigative milestones. PSB has confirmed that civil notice claims are entered in the tracking system. The IAPro system integrates exceptionally well with the EIS and BlueTeam technology systems and can be remotely accessed.

PSB has a civilian supervisor assigned to manage the administration of the centralized tracking system. The documentation that PSB has provided to us for review, and the direct user access that a member of our Team has to the centralized numbering and tracking system, indicates that the system possesses the functionality as required by this Paragraph and is being used according to the requirements of this Paragraph.

During this reporting period, we found that all 186 administrative misconduct investigations we reviewed were properly assigned a unique identifier. Of the 186, 126 involved an external complaint and PSB provided the complainant with this unique identifier as required in all those cases where contact information was available and the complainant desired contact. In all but one, PSB also sent an initial letter to the complainant within seven days, providing the case number or provided an acceptable reason for not doing so, and sent final findings and discipline determinations where appropriate. In some cases, anonymous complainants do not provide contact information; and in others, known complainants decline to provide MCSO with adequate contact information.

Sixty complaints were internally generated. Based on the Fourth Order, all notifications and letters regarding the initiation of an investigation and the completion and discipline findings for each investigation are now required to be sent to both internal and external complainants. September 15, 2024 is the date we began holding MCSO accountable for all notifications and letters sent to internal complainants. Seventeen internally generated complaints were initiated after September 15, 2024; and all 17 contained all of the required notifications to the complainants.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 187.* *The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have verified that PSB maintains both hardcopy and electronic files intended to contain all the documents required for compliance with this Paragraph.

During our site visits, a member of our Team inspects the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We have verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team member has also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

In May 2018, PSB relocated to a new offsite facility. We verified at that time that PSB maintained both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph at the new facility.

During our January 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms and randomly selecting internal affairs case files to verify that all information was also being electronically maintained in IAPro.

During our October 2019 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms. We also randomly reviewed both electronic and hardcopy documents to ensure that all information was being maintained as required for compliance with this Paragraph.

During our October 2023 site visit, members of our Team inspected the file rooms where hardcopies of investigations are stored and randomly reviewed case files to verify compliance. We verified that criminal and administrative investigation files are stored in separate rooms, and access to these rooms is restricted. Our Team members also used the access granted to IAPro to randomly select internal affairs case files to verify that all information is being maintained electronically.

During our February 2024 site visit, we again met with PSB and reviewed the data being maintained in IAPro.

In June 2024, PSB relocated to a new offsite facility. We verified during our July 2024 site visit that PSB continued to maintain both hardcopy and electronic files at its new facility.

During our October 2024 site visit, a member of our Team reviewed the electronic IAPro functions and the "Non-complaints" list that is maintained by PSB.

During our February 2025 site visit, a member of our Team verified continued compliance at the PSB facility by inspecting both the criminal and administrative investigation file rooms.

During our July 2025 site visit, our Team inspected the IAPro functionality by reviewing District, Division, and PSB cases stored within the system.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 188.** *Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations, Service Complaints, and PSB Diversions.

We have previously concurred with MCSO that Phase 2 compliance with this Paragraph would be based on PSB's determination of the initial allegations, and not which category of offense was determined once the investigation was completed.

During this reporting period, we reviewed 186 administrative misconduct investigations. All 186 complied with the requirements of this Paragraph. Sixty were internally generated, and 126 were externally generated.

We reviewed 162 Service Complaints during this reporting period. Three were internally generated and 159 were externally generated. Seven of the 162 were appropriately reclassified as misconduct investigations. Of the remaining 155 investigations, we agree that PSB made the appropriate decision regarding categorizing the complaint and followed up appropriately in all but five of the cases. We found 157 (97%) of the total 162 complaints in compliance with the

requirements established in the Service Complaint process. In four, we believe the investigator failed to conduct necessary follow-up prior to finalizing the complaint as a service complaint. In one, the service complaint was handled by a subordinate employee of the involved employee. We will discuss these cases with PSB during our next site visit.

As we have consistently noted in our review of Service Complaints, the majority of these complaints involve laws, policies, or procedures where there is no employee misconduct; or are complaints where it is determined that MCSO employees are not involved. During this reporting period, 79 (51%) of the 155 closed Service Complaints did not involve misconduct. Fifty-two (34%) did not involve MCSO employees, and 24 (15%) were closed due to lack of specificity.

In July 2019, we and the Parties approved MCSO's proposal to use an expedited process to handle Service Complaints where it could be immediately determined that the complaint did not involve MCSO personnel, and the Service Complaint form was revised. PSB also added a signature line to this revised form requiring District and Division command personnel to review and approve Service Complaints completed by their personnel prior to them being forwarded to PSB for a final review.

Consistent with the provisions of policies on internal investigations and discipline, the PSB Commander has had the discretion to determine if internal complaints alleging minor policy violations could be addressed through the use of a coaching without a formal investigation if certain criteria existed. If the PSB Commander made this determination, it had to be documented.

In May 2021, revisions to GH-2 (Internal Investigations) modified the authority of the PSB Commander as it related to internal complaints that met certain criteria. The revised policy allowed the PSB Commander to address qualifying internal complaints through the use of an approved supervisor-initiated intervention and was no longer limited to only coaching. This became referred to as the PSB Diversion process.

In November 2023, revisions to GH-2 (Internal Investigations) again modified and expanded the authority of the PSB Commander as a result of the Third Order. The new policies provide greater latitude to the PSB Commander in determining what types of complaints may be eligible to be resolved through the use of the PSB Diversion process.

During this reporting period, we reviewed one instance where the PSB Commander determined that a complaint could be handled with an approved PSB Diversion. We agreed with his decision.

Our Team conducted numerous reviews related to this Paragraph. Compliance was based on our findings for administrative misconduct investigations (186), Service Complaints (162), and one PSB Diversion, a total of 349 reviews. Of the total 349 reviewed, 344 (99%) were in compliance with the requirements of this Paragraph.

On June 18, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 189.*** *The Professional Standards Bureau shall administratively investigate:*

a.      *misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and*

b.      *misconduct indicating apparent criminal conduct by an employee.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph during this reporting period, we reviewed 186 completed administrative misconduct investigations conducted by MCSO personnel.

Division or District personnel outside of PSB investigated 34 of the 186 administrative misconduct investigations we reviewed during this reporting period. PSB investigators conducted 143 of the investigations and outsourced nine to an outside investigator. PSB also submitted seven criminal investigations for review. We did not identify any investigation conducted outside of PSB that should have been forwarded to PSB for investigation and was not.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 190.*** *Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed a total of 193 employee misconduct investigations during this reporting period. Of these, 186 were administrative investigations, and seven were criminal investigations. All seven of the criminal investigations were conducted by PSB.

Of the 186 administrative misconduct cases we reviewed for this Paragraph, PSB investigators conducted 143. PSB outsourced nine, and 34 were investigated at the District or Division level. We did not identify any investigation conducted by District or Division supervisors where we believe it should have been forwarded to PSB for investigation and was not.

MCSO has complied with the requirements to train all supervisors who conduct minor misconduct investigations.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 191.*** *If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately notify the Professional Standards Bureau, which shall take over the investigation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period. In the 34 administrative misconduct cases investigated at the District or Division level, we did not identify any case where we believe that potential serious misconduct existed, and the supervisor failed to forward the case to PSB.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 192.*** *The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.*

**In Full and Effective Compliance**

PSB command personnel advised us that they continue to review investigations in "real time" as they come into the Bureau. During this reporting period, MCSO continued to provide copies of PSB's reviews of completed Division-level misconduct investigations that were assigned outside of the Bureau. The review template used by PSB includes sections that address whether or not the investigation is properly categorized, whether the investigation is properly conducted, and whether appropriate findings have been reached. Additionally, copies of emails detailing the quality of the investigation, identified deficiencies, and required edits sent electronically to affected Division Commanders were provided for each case reviewed.

PSB included the information required by this Paragraph in its semi-annual public Misconduct Investigations Report, which is required under Paragraph 251. The reports have routinely contained an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.

In 2022 and through August 2023, MCSO had been publishing the semi-annual report in an untimely manner. We informed MCSO that it must ensure that the reports are published in a consistent and timely manner going forward; otherwise, it will affect MCSO's compliance status with this requirement. During our October 2023 site visit, MCSO informed us that future reports will be published in a more efficient manner. MCSO informed us that the agency is processing information for the report on an ongoing basis, as opposed to waiting until the end of the semi-annual period. MCSO stated that it anticipated that future reports would be published within four to six months after the conclusion of the semi-annual period using this process.

During this reporting period, on September 17, 2025, MCSO published the semi-annual report covering the dates of January 1-June 30, 2025.  We consider the publication of the report as timely, and within six months after the conclusion of the semi-annual period.  The previous semi-annual report was also published in a timely manner.  The report contains an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached.  MCSO remains in compliance with this requirement.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 193.**  *When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense.  Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.  Fifty-three had sustained allegations against one or more employees.  In 37 of these investigations, at least one principal was still an MCSO employee at the time the investigation was completed, or discipline decisions were made.  In all 37, the most serious policy violation was used to determine the final category of the offense for discipline purposes, if more than one policy violation was sustained.

In cases where multiple violations of policy occurred, this information was listed on the preliminary discipline document.  There were no cases where the exoneration of any offense precluded discipline for any sustained allegations.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 194.**  *The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.*

**Phase 1:**  In compliance

- CP-2 (Code of Conduct), most recently amended on September 3, 2025.

- CP-3 (Workplace Professionalism: Discrimination and Harassment), most recently amended on December 16, 2021.

- CP-5 (Truthfulness), most recently amended on November 17, 2022.

- CP-11 (Anti-Retaliation), most recently amended on January 6, 2022.

- GC-16 (Employee Grievance Procedures), most recently amended on January 16, 2025.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 22, 2024.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- Administrative Services Division (ASD) Operations Manual, most recently amended on November 26, 2024.

- Professional Standards Bureau (PSB) Operations Manual, most recently amended on November 13, 2023.

**Phase 2:**  Not in compliance

We determine Phase 2 compliance with this Paragraph by a review of completed misconduct investigations conducted by MCSO, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance.

We reviewed 186 administrative misconduct investigations, 10 of which were critical incidents, and seven criminal investigations during this reporting period.  All seven of the criminal investigations complied with MCSO policy and the requirements of the Second Order.

Effective with the entry of the Fourth Order, administrative misconduct investigations are now required to be finalized, and closed, and the complainant must be notified of the outcome within 180 days to be compliant.  The previous 60-85-day requirement for completion of the investigative portion of the case no longer applies for compliance to any case completed on or after September 1, 2025.  All 186 cases reviewed during this reporting period were finalized and closed after September 1, 2024.  Of these, 52 (28%) were finalized, closed and all required notifications were made within the required 180 days, the same compliance finding as the last report period.

Of the 186 administrative misconduct cases we reviewed, PSB personnel completed 143.  Forty-seven were conducted by sworn investigators, 48 by Detention personnel and 48 by civilian personnel.  We found deficiencies other than extensions in 14 (10%) of the total 143 investigations, an increase of 6% noncompliance compared to the last reporting period.  This is the first time in numerous reporting periods where noncompliance of PSB cases has exceeded 5%.  We will discuss what factors made have led to this with PSB during our next site visit.  With the inclusion of those investigations that were found noncompliant based on timeliness, 28 (20%) of the 143 investigations conducted by PSB were in overall compliance – a decrease from 27% during the last reporting period.

We reviewed nine investigations that PSB outsourced to an outside investigator.  Five (56%) of the investigations were in full compliance.  Seven (78%) were found in investigative compliance.  Seven of the nine were completed within the required 180-day timeline.

For this reporting period, Districts or Divisions outside of PSB conducted 34 investigations. We found deficiencies other than timeliness in six (18%) of the cases we reviewed. This is a decrease in investigative noncompliance from 29% during the last reporting period. Fourteen (41%) were in full compliance, an increase from 37% during the last reporting period.

As a result of both investigative deficiencies and administrative deficiencies, overall compliance for all administrative investigations conducted by MCSO was 26%, an increase in compliance from 21% during the last reporting period.

There are many factors that impact the PSB Commander's ability to determine compliance in all cases. One factor is that the PSB Commander must rely on other PSB staff members to conduct case reviews and ensure proper documentation is completed. For many reporting periods, we have reported that PSB personnel who review District and Division cases have consistently identified and addressed the majority – and in some quarters, all – of the deficiencies we also identified in these cases. We did not find that to be true during this and the last reporting period. We continue to believe there may be a number of reasons this occurred. First, it appears that four different lieutenants in PSB are now reviewing these cases. It is our recollection that in the past, these reviews were conducted in most cases by a single PSB lieutenant, which resulted in more consistent review and documentation. We will discuss the use of multiple reviewers with PSB again during our next site visit.

Second, as with the last reporting period, we saw both regular District and Division cases, and PSB8 training cases completed by District and Division personnel. Of the 34 District and Division cases we reviewed, nine were completed as part of the regular assignment of cases to Districts and Divisions. Eight of the nine (89%) were found in investigative compliance.

Twenty-five cases were reviewed as part of the PSB8 training. Of the 25, we identified that five (20%) had investigative deficiencies. Of these five, none of the deficiencies we identified were identified in the District or Division where they were completed. PSB identified deficiencies in three of the five. As we noted during the last quarter, in those cases where PSB did identify concerns, PSB only authored "feedback" memorandums – but stopped short of finding any of the cases deficient. It is our understanding from speaking to PSB personnel that students were advised in the training that none of the cases they completed for the class would be handled as cases would normally be, and PSB lieutenants were instructed that only feedback should be provided.

Regardless of the decision to use feedback documents instead of deficiency memorandums for these cases, our concerns lie primarily with the failure to properly complete and review these cases. Five of the six cases we found noncompliant were filed by external complainants with real complaints about MCSO personnel and deserved the same level of review, accuracy, and corrections as any other case.

We note that, as originally intended, we will review all of the finalized PSB8 training cases over the coming months. Our findings will continue to be based on the requirements of the Orders; and we will continue to find these cases out of compliance if they have deficiencies, regardless of whether MCSO continues to write only feedback memorandums. Given our reviews during the this and the last quarter we are concerned that we may continue to find the same concerns in the remainder of our review of these cases.

Another factor affecting the PSB Commander's ability to ensure that all investigations are properly completed is that the Appointing Authority – not the PSB Commander – determines the final findings and discipline. During this reporting period, there were six instances where the Appointing Authority mitigated the findings within the range of discipline for the offense. We agree with these decisions. In two cases, the Appointing Authority overturned the findings of PSB. We disagree with this decision in one of the two cases. We will discuss these cases with MCSO during our next site visit.

The overall investigative quality of District and Division cases has also had an adverse impact on the ability of the PSB Commander to ensure investigations are properly completed. While compliance with these cases has seen improvement, to date, they have been unable to maintain this improvement over multiple reporting periods. During this and the last reporting period, the lack of compliance of these cases had an adverse impact in many areas of compliance for the investigation of administrative misconduct investigations.

MCSO has shared the agency's concerns during prior site visits regarding errors that it considers to be minor or administrative being used to find cases out of compliance by our Team. In MCSO's 45th compliance report, in Paragraph 194, MCSO wrote, "MCSO should not be found out of compliance for harmless errors during the investigative process." The Monitoring Team closely evaluates investigations prior to making compliance findings. In the majority of cases we find noncompliant, the deficiencies include, but are not limited to: inappropriate allegations; improper findings; failure to conduct thorough investigations; failure to interview all parties and witnesses who may have information; failure to collect all evidence; and leading questions. None of these are "harmless errors."

In many cases, there are also deficiencies such as administrative failures, or incomplete paperwork, to include but not be limited to: failure to offer an in-person interview; failure to complete all required notifications; failure to record all interviews; failure to separate allegations; failure to document all witness information; and failure to include all information required for review. While we note these deficiencies in the appropriate Paragraphs, we do not generally find these cases noncompliant unless there are numerous deficiencies. MCSO's overall compliance findings would be far lower than they currently are if we found MCSO out of compliance for every deficiency we identify.

While we are not sure what MCSO considers to be a "harmless error," during our next site visit, we will discuss the agency's concerns in an effort to dispel what we believe is an inaccurate belief about how our compliance findings are made.

Since 2016, PSB has taken a number of actions to address both investigative deficiencies and other concerns with the completion of administrative investigations. We have continued to meet with PSB and District and Division personnel since that time to update them on our identification of training and performance issues that adversely affect compliance with the Second Order. Members of the Monitoring Team also meet with PSB every two weeks to discuss Class Remedial Matters, and we use this opportunity to discuss other ongoing concerns that affect compliance. In our meetings with PSB and the Parties during site visits, we have also discussed additional opportunities and potential remedies to address the challenges of completing quality investigations within the required timelines. The Parties have also addressed this issue in both the meet-and-confer process and litigation. The Court appointed an outside expert to examine issues relevant to the deficiencies associated with PSB investigations. The Parties reviewed the expert's recommendations, and the Court issued its Third Order in November 2022. Since that time, MCSO proposed revised draft policies and procedures; and we and the Parties made many recommendations. The revised policies were finalized and approved in November 2023.

Since the approval of the revised policies, we have worked closely with PSB to review cases in the backlog to determine which could be resolved without conducting a full investigation and which cases might be eligible for an expedited resolution of some kind. We discuss these reviews further in the Third Order Paragraphs in this report.

In 2014, PSB initiated 717 internal investigations. In 2015, PSB initiated 916 cases: and in 2016, 847 cases. There were 1,028 cases initiated in 2017. In 2018, there were 1,114 investigations initiated. In 2019, PSB initiated a total of 1,072 investigations and in 2020, PSB opened a total of 1,204 investigations. In 2021, PSB opened a total of 1,172 investigations, a small decrease from 2020. In 2022, PSB opened a total of 1,062 cases and in 2023, 1,078 investigations were initiated. In 2024, MCSO initiated 1,040 investigations.

In 2016, prior to the entry of the Second Order, PSB investigators were carrying an average active caseload of 12-16 cases each month. By the end of 2021, the average monthly caseload in PSB was 74 cases per investigator. The average days to complete an administrative investigation in PSB at the end of 2021 was 704 days. For investigations completed outside of PSB, the average number of days to complete an investigation was 439 days.

At the end of 2020, there were 2,010 pending investigations. At the end of 2021, the number of pending investigations had increased to 2,149. While the total numbers included administrative misconduct investigations, Service Complaints, criminal investigations, and critical incident investigations, the majority continued to be administrative misconduct investigations and Service Complaints. By the end of 2022, the total number of pending investigations was 2,375. The vast majority of these cases continued to be assigned to PSB for completion.

Our concerns with the growing number of cases and MCSO's inability to conduct timely investigations has been articulated in our reports for numerous years. Despite training, efforts to streamline processes, and the creation of alternative methods to handle some complaints, the problem had continued to grow. MCSO simply has not had enough personnel assigned to PSB to address these investigations. While some budget requests have been made to increase staffing in PSB, approved requests were often not filled in a timely manner; and even when filled, the number of authorized positions remained insufficient to address the growing need. In late 2022, the Court interceded and placed requirements on MCSO regarding the minimum number of investigative personnel to be assigned to PSB.

During our February 2025 site visit, PSB advised that the total number of all pending cases at the end of 2024 was 1,562, a reduction from 2,197 at the end of 2023. Of the total 1,562, 1,302 were administrative misconduct investigations – a decrease from 1,984 at the end of 2023. The average time from initiation to full closure of an administrative misconduct investigation decreased from 827 days at the end of 2023 to 774 days at the end of 2024. The average caseload for a PSB investigator at the end 2024 was 31 active cases per month, a decrease from 42 cases at the end of 2023.

During our April 2025 site visit, PSB advised that the total number of all pending investigations was 1,368, a reduction from 1,562 at the end of 2024. Of the 1,368 total pending cases, 1,119 were administrative misconduct investigations, a decrease from 1,302. The average time from initiation to full closure of an administrative misconduct investigation decreased from 774 days at the end of 2024, to 708 days at the end of this reporting period. The average caseload for a PSB investigator decreased from 31 at the end of 2024 to 25 at the end of this reporting period.

During our July 2025 site visit, PSB advised us that the total number of all pending investigations for this reporting period was 1,288, a reduction from 1,368 during the last reporting period. Of the 1,288 total pending cases, 1,011 were administrative misconduct investigations, a decrease from 1,119 during the last reporting period. The average time from initiation to full closure of an administrative misconduct investigation increased from 708 days during the last reporting period to 1,070 during this reporting period. The average caseload for a PSB investigator decreased from 25 the last reporting period to 24 at the end of this reporting period.

During our October 2025 site visit, PSB advised us that the total number of all pending investigations for this reporting period was 1,151, a reduction from 1,288 during the last reporting period. This number included administrative misconduct investigations, critical incident investigations, criminal investigations, service complaints, and PSB diversions. Of the 1,151, 832 were misconduct investigations, a decrease from 1,011 the last reporting period. The average time from initiation to full closure of an investigation decreased from 1,070 days the last quarter to 1,027 days this reporting period. This number continues to fluctuate from quarter to quarter, largely based on the number of backlog cases completed during the quarter. The average monthly caseload for a PSB investigator decreased from 24 cases the last reporting period to 22 cases at the end of this reporting period.

As a result of the Third Order, we agreed with MCSO that those cases that would be considered to be administrative misconduct backlog cases would be those administrative investigations and critical incidents where required investigative actions were still pending and the investigation had

not been completed in accordance with the timelines established in Paragraph 204, and an extension had not been granted as per Paragraph 365. An investigation would be considered complete when all investigative actions have been completed and the PSB Commander has signed off in concurrence. The date the PSB Commander signed off on the investigation would be the date the investigation was no longer counted as part of the backlog, irrespective of the findings. At the end of October 2023, of the total pending administrative misconduct cases, 1,765 met the agreed upon definition for a backlog case. At the end of December 2023, 1,732 met the agreed-upon definition of a backlog case. At the end of March 2024, 1,629 cases met the agreed-upon definition of a backlog case. At the end of June 2024, 1,373 cases met the agreed-upon definition of a backlog case. At the end of September 2024, 1,307 met the agreed-upon definition of a backlog case. This number was later changed to 1,331 after the second review of the backlog, following the entry of the Fourth Order.

During past site visits, PSB staff had communicated that PSB had contracted with a qualified private vendor to conduct cases where conflicts of interest exist. During our January 2021 site visit, PSB personnel advised us that they were considering retaining additional outside contract investigators but had not identified any who met the hiring criteria. PSB was also considering outsourcing additional investigations to the current contract investigator if he had the staff to accept additional investigations. During our April 2021 site visit, PSB personnel advised us that they had identified another vendor and outsourced 25 cases to this entity as a pilot program. Since April 2021, PSB has continued to outsource investigations to this second vendor, Jensen Hughes.

During this reporting period, PSB advised us that there were no new administrative misconduct investigations that had been outsourced to Jensen Hughes and 11 were pending completion. We received and reviewed nine misconduct investigations conducted by Jensen Hughes during this reporting period. In July 2025, MCSO advised that the agency had contracted with a new vendor, AZ Truth Finder, to conduct conflict investigations. Six cases were assigned to this new vendor during this reporting period.

After the entry of the Second Order, PSB reviewed the disciplinary backgrounds of all those who might conduct internal investigations and notified us of those supervisors who would be prohibited from conducting such investigations due to their backgrounds. At that time, MCSO identified two supervisors who were ineligible to conduct internal investigations. Neither of these two employees are still employed at MCSO. MCSO has since identified additional supervisors who are ineligible to conduct administrative investigations.

At the end of last reporting period, there were nine supervisors, seven sergeants, and two lieutenants who had been determined to be ineligible to conduct administrative misconduct investigations. All but one were ineligible due to their sustained cases. During our July 2025 site visit, PSB personnel advised us that they review this list of supervisors on a monthly basis to determine if any can again become eligible to conduct misconduct investigations. At that time, they advised us that two should again become eligible in August 2025.

During this reporting period, two sergeants were removed from the ineligibility list. Five sergeants and two lieutenants remain on the ineligible list.

***Paragraph 195.*** *Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.*

**Phase 1:** In compliance

- Professional Standards Bureau (PSB) Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** Not in compliance

In conjunction with this Paragraph, Paragraph 178 mandates that within three months of the finalization of policies consistent with Paragraph 165, all PSB personnel would receive 40 hours of comprehensive training. Paragraph 178 requires training of all supervisors within three months of the finalization of policies, and sufficient trained personnel in PSB within six months of the entry of the Order. The first week of the required Misconduct Investigative Training commenced on September 18, 2017, and the training was completed prior to the end of 2017.

Between 2016 and 2021, the number of investigators assigned to PSB remained between 24 and 26 – despite an increase in initiated cases that grew from 847 in 2016 to 1,072 in 2021; a backlog of cases that had grown to 2,149 cases; and an average investigator monthly caseload that had grown from 12 cases to 74 cases.

Between January 2022 and December 2022, the number of pending cases continued to increase. By the end of 2022, the pending case list had grown to 2,375 cases, and the average caseload for an investigator in PSB was 65 cases. There were 40 investigators assigned to PSB at the end of 2022.

At the end of 2023, PSB investigative staffing had increased to 43; this included 11 sworn investigators, 17 Detention investigators, and 15 civilian investigators. The average caseload per investigator had decreased from 65 active cases per month at the end of December 2022 to 42 at the end of 2023. The number of pending investigations was 2,197, a decrease from 2,375 at the end of 2022. The average number of days for a PSB investigator to complete the investigative portion

At the end of 2024, PSB investigative staffing had increased to 47; this included 11 sworn investigators, 17 Detention investigators, and 18 civilian investigators. The average caseload per investigator had decreased from 42 active cases per month at the end of December 2023 to 31 at the end of 2024. The number of pending investigations was 1,562, a decrease from 2,197 at the end of 2023. The average number of days for a PSB investigator to complete the investigative portion of a case was 755 days.

During our July 2025 site visit, PSB advised that the total number of investigators was 49; this number included 11 sworn investigators, 17 Detention investigators, and 21 civilian investigators. PSB noted one sworn lieutenant vacancy and one Detention sergeant vacancy. The total number of pending investigations was 1,288, a decrease from 1,368 at the end of the last reporting period, and the number of pending administrative misconduct investigations was 1,011, a decrease from 1,119 at the end of the last reporting period. The average monthly caseload for a PSB investigator was 24 active cases, a slight decrease from 25 at the end of the end of the last reporting period; and the average number of days for a PSB investigator to complete the investigative portion of a case was 1,023 days, a significant increase from the 720 days reported during the last reporting period.

During our October 2025 site visit, PSB advised that the total number of investigators was 48; this number included 10 sworn investigators, 17 Detention investigators, and 21 civilian investigators. PSB noted one sworn lieutenant vacancy, one sworn Sergeant vacancy and one Detention sergeant vacancy. The total number of pending investigations was 1,151, a decrease from 1,288 at the end of the last reporting period, and the number of pending administrative misconduct investigations was 832, a decrease from 1,011 at the end of the last reporting period. The average monthly caseload for a PSB investigator was 22 active cases, a decrease from 24 at the end of the last reporting period; and the average number of days for a PSB investigator to complete the investigative portion of a case was 1,087 days, an increase from the 1,023 days reported during the last reporting period.

The Second Order requires that PSB have "sufficient trained personnel to fulfill the requirements of this Order." MCSO has delivered the required Misconduct Investigative Training, and our focus remains on the ability of PSB staff to carry out its mission. As we have documented in numerous previous reports, MCSO has remained understaffed for years. While we continue to acknowledge that staffing levels in PSB have increased, pending cases show a continuing decline in numbers and the average caseloads for an investigator has also declined, there was still a pending caseload of 832 administrative misconduct cases at the end of this reporting period. Until MCSO is able to demonstrate that the level of staffing in PSB is sufficient to address the investigative caseload assigned to their personnel and results in timely investigations, we will not find MCSO in compliance with this Paragraph.

***Paragraph 196.*** *Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.*

**In Full and Effective Compliance**

As a result of the Second Order, MCSO retained an outside contractor to conduct some investigations identified in the Court's Findings of Facts and had continued to outsource additional cases to this vendor, primarily those for which a potential conflict of interest exists. In 2017, the PSB Commander indicated that MCSO did not envision any need to retain additional contract investigators beyond the one investigator that had been already retained.

In 2021, due to the increasing case backlog, MCSO contracted with a second vendor to assist with reducing the backlog. PSB began outsourcing cases due to both potential conflicts of interest and to assist MCSO in reducing the number of pending cases. This second vendor, Jensen Hughes, employs multiple investigators who are assigned cases by PSB. These investigators were initially assigned older cases that had minimal additional follow up needed, but PSB later began assigning them current investigations as well.

At the end of 2024, PSB advised there were 20 outsourced cases pending, all assigned to Jensen Hughes. The 15 pending cases assigned to the original contract investigator retained to conduct conflict cases had been returned to MCSO for reassignment. Four had been reassigned, and 11 were still under review. No cases had been assigned to Baseline Investigations.

During our July 2025 site visit, PSB advised that there were 20 outsourced cases pending. Seventeen were assigned to Jensen Hughes, two to the Arizona Department of Public Safety (DPS), and one to an outside conflict investigator appointed by the Court.

During our October 2025 site visit, PSB advised there were 20 outsourced cases pending. Eleven were assigned to Jensen Hughes, six were assigned to AZ Truth Finder, two were assigned to the Arizona Department of Public Safety, and one was assigned to an outside conflict investigator appointed by the Court.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 197.*  *The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed.  If the Sheriff declines to designate a qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.*

**In Full and Effective Compliance**

In January 2018, MCSO advised us that due to reorganizations within the Office, the responsibility to serve as the PSB Commander for purposes of compliance with this Order would be transferred to a captain within PSB.  An Executive Chief would maintain overall oversight of PSB.

Since 2021, we had been interacting with the same captain assigned as the PSB Commander.  As we have documented for numerous reporting periods, we found this captain to be professional, focused, responsive, accepting of feedback from our Team, and committed to doing the right thing.  Under his leadership, PSB made numerous improvements to its processes, revised major policies and protocols, occupied a new off-site facility, and reviewed backlog cases.

In April 2025, due to this Commander's absence from the office, a PSB lieutenant was named as the Acting Commander; and on May 5, 2025, another captain was temporarily transferred to PSB to serve as the PSB Commander during the absence of the assigned captain.

While this captain had served as a PSB lieutenant prior to his promotion to captain, he still had a learning curve in this new assignment.  We have continued to provide him with insights into our case review processes and our expectations; provided guidance on the handling of Class Remedial Matters (CRMs); and provided other perspectives and information when asked.  During this reporting period, he continued to be responsive to our concerns, questions, and requests.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 198.*    *To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space.  This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.*

**In Full and Effective Compliance**

During our previous site visits, we toured the new PSB office, which is located at 4000 North Central Avenue in Phoenix.  The office, which comprises two floors of a high-rise office building, was recently remodeled for PSB's use.  The new facility gives PSB personnel expanded working areas, interview and conference rooms, and space for secure file storage.  The building has sufficient space for receiving members of the public, and its location is on a major thoroughfare

that is convenient to the Valley Metro Rail light rail system.  The high-rise office building houses a Hilton Garden Inn hotel and other businesses, and PSB shares the building's lobby and elevators with those tenants.  However, PSB's offices are separate from the hotel; other businesses; and, as required by this Paragraph, any MCSO facilities.

When we visited in October, we noted that MCSO had not rectified the concerns we identified during our previous visits about the accessibility of the space to the community – especially members of the Plaintiffs' class.  As we noted following our four previous visits to the facility, the signage guiding visitors to the only available nearby parking, in a secure lot, could still be easily misconstrued.  The parking lot is marked for use by guests at the building's adjacent hotel and requires a credit card for entry; and although PSB personnel informed us that they validate parking for visitors, the lot currently has no signage related to PSB or MCSO or parking validation.  This could be intimidating to complainants or other community members visiting the facility.

When we inquired with PSB about the lack of parking signage, we learned that PSB was not planning to place additional signage; and that adding any additional exterior signage is challenging because the PSB facility is located in a private building and the space is being leased.

PSB has taken some steps to assist visitors in locating parking and locating the PSB office.  When a complainant calls the PSB complaint line, the call goes to the PSB administrative officer, who explains where PSB is located and the available parking, to include validation of the parking.  In addition, the administrative officer directs the caller to the PSB website, which provides the building address and suite numbers of the PSB facility and three parking options.  While the PSB website may be helpful to individuals who call the PSB complaint line, there is no signage in the vicinity of the building directing PSB visitors to available parking and parking validation.  Accordingly, if a complainant has not called the PSB complaint line or gone to the website, that person would not be aware of the available parking, nor of the parking validation available.

We again urge MCSO to reassess its position regarding additional signage for parking availability and validation.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 199.  The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct.  Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations.  Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.*

**In Full and Effective Compliance**

This Paragraph requires that any individual who is assigned to investigate employee misconduct meet the qualifications of an internal affairs investigator, as noted in this Paragraph. We verify compliance by reviewing documentation submitted for employees transferred into PSB, as well as employees hired for assignment to PSB as internal affairs investigators. In addition, we ensure that none of the misconduct investigations we review for compliance are completed by any employee on the PSB ineligibility list. Any employee who has a history of conducting deficient investigations, or has multiple sustained misconduct allegations, or has one sustained allegation of a Category 6 or Category 7 offense, is presumptively ineligible to conduct misconduct investigations. GH-2 reflects the directive of this Paragraph, to ensure that only supervisors who meet the criteria established by this Paragraph are assigned misconduct investigations. The PSB Operations Manual, which formalizes the review process, states that if any supervisor is deemed ineligible, the PSB Commander will notify the supervisor's commander in writing and ensure that a BlueTeam entry is made to memorialize the supervisor's ineligibility to conduct misconduct investigations. A record of supervisors deemed ineligible to conduct misconduct investigations is maintained in PSB. These procedures were finalized and documented in the PSB Operations Manual, published on December 13, 2018.

During the third quarter of 2025, MCSO removed two employees from the list of supervisors who are ineligible to conduct internal affairs investigations. For July and August, the list remained unchanged. In September, two supervisors became eligible, once again, to conduct misconduct investigations. During the third quarter there were three transfers into PSB: two Detention sergeants and one sworn sergeant. We reviewed the documentation provided for the transfers and found no issues. The transfers were approved.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 200.** *In each misconduct investigation, investigators shall:*

a.      *conduct investigations in a rigorous and impartial manner designed to determine the facts;*

b.      *approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;*

c.      *identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;*

d.      *make reasonable attempts to locate and interview all witnesses, including civilian witnesses;*

e.      *make reasonable attempts to interview any civilian complainant in person;*

f.      *audio and video record all interviews;*

g.      *when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;*

h.      *make credibility determinations, as appropriate; and*

> i.     *attempt to resolve material inconsistencies between employee, complainant, and witness statements.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period. All but one were initiated and completed after the new IA and discipline policies became effective in May 2017. PSB investigated 143 of the cases, nine were outsourced, and District or Division supervisory personnel investigated 34 of the cases. Of the cases we reviewed, 126 involved external complaints, and 60 were internally generated.

Paragraph 200.a. requires that misconduct investigations be conducted in a rigorous and impartial manner. During the last reporting period, two completed investigations we reviewed failed to comply with the requirements of this Subparagraph. During this reporting period, all of the investigations we revied complied with the requirements of this Subparagraph.

Paragraph 200.b. requires that investigations be approached without prejudging the facts or permitting preconceived impressions. We carefully review completed investigations, examining statements made by complainants, witnesses, investigative leads, and principal employees – and reviews available documentation and independent evidence to ensure that allegations of misconduct are properly resolved. We focus on the process followed by the investigators and the completeness of the investigation and verify that all conclusions are based on the evidence presented. During this reporting period, all of the investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 200.c. requires that investigators identify, collect, and consider all relevant evidence. During the last reporting period, all completed investigations complied with the requirements of this Subparagraph. During this reporting period, six investigations (3%) we reviewed failed to comply with the requirements of this Subparagraph.

Paragraph 200.d. requires that investigators make reasonable attempts to locate and interview all witnesses. During the last reporting period, all completed investigation complied with the requirements of this Subparagraph. During this reporting period, four investigations (2%) we reviewed failed to comply with the requirement of this Subparagraph.

Paragraph 200.e. requires that investigators make reasonable attempts to interview civilian complainants in person. During this reporting period, 126 investigations were initiated based on external complaints. In 74, an in-person interview was offered to the complainant. Thirty-six complainants participated in an in-person interview. In 38, the complainant declined an in-person interview. In 52 of the 126 investigations, an in-person interview was not offered to the complainant. In all but one (1%), the investigative report contained an acceptable reason for not offering the in-person interview, including: complainants who were out of state; anonymous complainants; no contact information provided; and COVID restrictions in place at the time of the investigation. PSB discontinued the authorization to conduct telephone interviews based on COVID restrictions, effective May 1, 2022.

Paragraph 200.f. requires audio- and video-recording of all interviews. Of the 186 administrative investigations reviewed for this reporting period, there were 66 cases where all interviews were not both audio- and video-recorded. In all but two of the 66, an acceptable explanation was provided by the investigator.

Paragraph 200.g. requires that when conducting interviews, investigators avoid asking leading questions or questions that may suggest justification for the alleged misconduct. During the last reporting period, two cases (1%) fell short of compliance with this Subparagraph. During this reporting period, one case (1%) fell short of compliance with this Subparagraph.

Paragraph 200.h. requires that proper credibility determinations be made. During this and the last reporting period, all investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 200.i. requires that investigators attempt to resolve all material inconsistencies. During the last reporting period, all investigations we reviewed complied with the requirements of this Subparagraph. During this reporting period, four cases (2%) failed to comply with the requirements of this Subparagraph.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


***Paragraph 201.*** *There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

Of the 186 investigations, 126 involved complainants that were not identified as MCSO employees. Fifty-four investigations included interviews with witnesses or investigative leads who were not MCSO employees. During this and the last reporting period, all investigations we reviewed complied with the requirements of this Paragraph.

We did not identify any completed investigations where a witness's statement was disregarded solely because of any connection identified in this Paragraph, nor where a witness's criminal history or findings of truthfulness were considered.

On December 23, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 202.*** *Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period. In 12 of the 186 investigations, MCSO identified additional potential misconduct during the investigations and properly added additional allegations, initiated new investigations, or addressed the violations with an appropriate supervisor intervention. During the last reporting period, we identified three investigations (2%) where we believe additional misconduct may have occurred and was not addressed by MCSO. During this reporting period, we identified seven investigations (4%) where we believe additional misconduct may have occurred and was not addressed by MCSO.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 203.*** *If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the mission of an internal affairs investigator is to determine whether any misconduct occurred.*

**In Full and Effective Compliance**

To determine Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

There were no indications in any of the completed investigations we reviewed that any MCSO investigators considered alone any pleading or finding of guilty by any person as a reason to make any determination regarding the potential misconduct of any MCSO personnel, nor were any investigations discontinued for this reason.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 205.***  *The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.*

**In Full and Effective Compliance**

We determine compliance with this Paragraph by assigning a member of our Team to observe demonstrations of the IAPro database during our site visits or other meetings with PSB throughout the reporting period.  The IAPro technology serves as the centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based on an external complaint.  This database contains the capacity to manage and store information required for compliance with this Paragraph.

During our site visits, on numerous occasions, we have met with PSB personnel and observed IAPro to ensure that the system generates appropriate alerts to responsible investigators and PSB commanders if deadlines are not met.  We have reviewed emails PSB disseminates each month to Districts and Divisions to identify investigative deadlines.  We have also reviewed the BlueTeam Dashboard, which uses a color-coded system to identify investigations that are nearing deadlines or are past deadlines.  The information appears in each supervisor's BlueTeam account when they are monitoring open cases.

A civilian supervisor is primarily responsible for administering the centralized tracking system.  In addition, all PSB and Division investigators can access the electronic BlueTeam database – a system that integrates with IAPro – at any time to view the assignment and status of administrative investigations.

In May 2018, PSB relocated to an offsite location.  In July 2018, a member of our Team verified that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During our January, July, and October 2019 site visits, a member of our Team verified that the tracking mechanisms remain in place.  We also continued to receive monthly notifications from PSB regarding closed administrative investigations, and we evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion.

During our October 2023 site visit, members of our Team verified that tracking mechanisms in IAPro for investigations remain in place.  During our meeting with PSB staff, we observed that there is a tracking sheet maintained for each investigation.  Alerts regarding timelines and deadlines are being entered and overdue cases are also tracked.  It is also possible to generate specific reports from the system when needed.

During our February 2024 site visit, we again reviewed the tracking of cases in IAPro and found that PSB continues to use this system; updates are entered regularly.

In June 2024, PSB relocated to a new offsite location.  We have since reviewed the IAPro database to verify that the existing tracking mechanisms continue to be used for the tracking of investigations at the new facility.

During this reporting period, we continued to receive monthly notifications from PSB regarding closed administrative misconduct investigations; and we continue to evaluate these closed investigations for the entirety of a reporting period against a multitude of criteria, including whether the cases were completed in a timely fashion. (See Paragraph 204.)

During our July 2025 site visit, our Team inspected IAPro functionality by reviewing both District/Division and PSB cases stored in the system.

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 206.**  *At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:*

a.      *a narrative description of the incident;*

b.      *documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;*

c.      *documentation of whether employees were interviewed, and a transcript or recording of those interviews;*

d.      *the names of all other MCSO employees who witnessed the incident;*

e.      *the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees;*

f.      *in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;*

g.      *in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;*

h.      *an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;*

i.      *if a weapon was used, documentation that the employee's certification and training for the weapon were current; and*

j.      *documentation of recommendations for initiation of the disciplinary process; and*

> k.      in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.

**In Full and Effective Compliance**

Paragraph 206.a. requires a written description on the incident be included in the investigative report. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.b. requires documentation of evidence gathered, including all known information about witnesses. All but one of the completed investigation we reviewed during this reporting period complied with the requirements of this Subparagraph.

Paragraph 206.c. requires documentation of whether employees were interviewed, and a transcript or recording of these interviews. All of the completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.d. requires that the names of all MCSO employees who witnessed the incident be included in the report. All but three (2%) of the completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.e. requires that the internal affairs investigator's evaluation of the incident includes a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations, orders, or other standards of conduct required of MCSO employees. All completed investigations that we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.f. requires that when MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from person's credibility must be provided. During this reporting period, all but four (2%) of the investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.g. requires that when material inconsistencies must be resolved, a precise description of the evidence be included in the report. During this reporting period, all but four (2%) of the investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.h. requires that assessment of the incident for policy, training, tactical, or equipment concerns be included in the investigative report, to include any recommendations. During this reporting period, all of the completed investigations we reviewed complied with the requirements of this Subparagraph when applicable.

Paragraph 206.i. requires that if a weapon was used, documentation that the employee's certification and training for the weapon must be included in the investigative written report. All of the completed investigations we reviewed complied with the requirements of this Subparagraph.

Paragraph 206.j. requires that documentation of the initiation of the disciplinary process be included in the investigation. Compliance is achieved when the misconduct investigator completes the investigation with a finding of sustained, when applicable, and the PSB Commander subsequently approves the finding. This is considered the initiation of the disciplinary process. Thirty-seven of the 186 administrative misconduct investigations we reviewed had sustained findings against one or more active MCSO employee. All complied with the requirements of this Subparagraph.

Paragraph 206.k. requires that any contacts and updates with the complainant be documented in the investigative report. MCSO documented eight instances during this reporting period where this occurred.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 207.*** *In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:*

a.      *the law enforcement action was in compliance with training and legal standards;*

b.      *the use of different tactics should or could have been employed;*

c.      *the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and*

d.      *the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.*

**In Full and Effective Compliance**

During this reporting period, we reviewed 186 administrative misconduct investigations. MCSO properly assessed and documented whether any of the requirements of this Paragraph were relevant in all of the completed cases we reviewed. MCSO did not identify any cases where action related to this Paragraph was appropriate.

PSB continues to use an internal tracking form to ensure that those concerns that are forwarded to other Divisions within MCSO for action or review are addressed. We receive and review this tracking document each month. During our January 2023 site visit meeting, we discussed our ongoing concerns with the number of issues that had not been addressed, and the way the tracking system was being used. We requested that PSB provide a presentation during our next site visit meeting to clarify the processes involved with addressing these concerns and explain why there is such a large number of concerns that have not yet been resolved.

During our April 2023 site visit, we met with MCSO command personnel to discuss our ongoing concerns with the resolution of those issues PSB had documented and forwarded to Divisions outside of PSB. In some cases, MCSO advised us that the concern had been addressed but had just not been documented. In others, there was no explanation for the failure to resolve the noted concern.

Since that time, we have continued to discuss this concern during each of our site visits and have closely monitored these reports. During our April 2025 site visit, we again verified that PSB continues to address the identified concerns tracking. We verified during our meeting and by reviewing those concerns now pending that PSB continues to track and forward these concerns for resolution when appropriate to do so.

This Paragraph addresses only the requirement for an assessment and documentation by the investigator of policy, training, tactical, or equipment concerns; and we continue to find this Paragraph in compliance. Our concern with resolution of these concerns, once identified, is addressed in Paragraph 216.

On December 19, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 208.** *For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a.      *"Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;*

b.      *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;*

c.      *"Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or*

d.      *"Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO personnel and completed during this reporting period. We evaluate compliance with this Paragraph against the standard of whether a finding was made, and whether the finding was correct.

During the last reporting period, we concurred with the findings of the PSB Commander in 171 (97%) of the 177 cases that we reviewed.

During this reporting period, we concurred with the findings of the PSB Commander in 177 (95%) of the 186 investigations we reviewed for compliance with this Paragraph.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 209.*** *For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 34 administrative misconduct investigations conducted by Districts or Divisions outside of PSB. All 34 were forwarded to PSB as required, and all contained the approval of the responsible District or Division Commander. As noted in previous reporting periods, and again during *this* reporting period, some of the District or Division level investigations were not in compliance with various requirements of the Second Order – as indicated throughout this report. However, we assessed MCSO's compliance with this Paragraph based on these cases being forwarded through the chain of command for approval of the investigation and findings.

On September 25, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 210.*** *For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 143 administrative misconduct investigations that were conducted by PSB personnel. All 143 complied with the requirements of this Paragraph. The nine investigations outsourced to an outside vendor by PSB also complied with the requirements of this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 211.*** *If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations conducted by MCSO and completed during this reporting period.

PSB investigated 143 of the 186 administrative misconduct investigations we reviewed during this reporting period and outsourced an additional two. In 129 (90%) of the 143 investigations conducted by PSB, we found the investigations to be thorough, the reports well-written and we agreed with the findings. PSB investigations have consistently been at or above 95% investigative compliance for numerous reporting periods and this decrease to 90% in investigative compliance is concerning. We identified specific concerns with 14 investigations conducted by PSB. These concerns include failure to conduct a thorough investigation, failure to interview all parties/witnesses, failure to collect all evidence, failure to address potential additional misconduct, and failure to properly determine an appropriate category of offense. In one, while we agree with the findings of PSB, we disagree with the Appointing Authority's decision to overturn PSB's findings of sustained, and find the allegation not sustained. We will discuss our concerns with the compliance for these investigations during our next site visit. Based on our review of these cases, which includes all compliance requirements, 29 investigations (20%) are in full compliance, an increase from 17% the last reporting period.

PSB outsourced nine of the completed investigations we reviewed for this reporting period. All nine were outsourced to Jensen Hughes, a vendor contracted by MCSO to assist in reducing the backlog of cases. One of the nine (11%) was noncompliant due to investigative deficiencies, and two others (22%) were not compliant due only to timeliness. Of the nine cases, six (67%) were in full compliance.

Of the 41 investigations conducted by Districts and Divisions outside of PSB during the last reporting period, 12 were found deficient. The lieutenants and captains did not identify any deficiencies in any of their reviews of these cases. In some cases, the deficiencies were significant, including improper findings, failure to conduct complete investigations, and leading questions.

During this reporting period, Districts and Divisions outside of PSB conducted 34 of the completed investigations we reviewed for this reporting period compared to 41 during the last reporting period. Fourteen (42%) were in full compliance, including timelines, an increase from 37% during the last reporting period. Twelve (36%) were forwarded to PSB within the internally mandated timeline of 60-days. Sixteen (48%) were finalized and closed within the 180-day requirement. Six (18%) had one or more investigative deficiencies. This is a decrease from 29% noncompliance during the last reporting period. These deficiencies included: unsupported findings; leading questions, failure to identify all principals, failure to collect all evidence and failure to conduct a thorough investigation. Twenty-eight (82%) of the 34 investigations met all investigative compliance requirements, an increase from 71% during the last reporting period.

Of the 34 investigations we reviewed that were conducted by Districts and Divisions outside of PSB, nine were completed as part of the standard process for the completion of minor misconduct investigations. Eight of these nine (89%) were found to be in investigative compliance. Twenty-five of the 34 investigations conducted by Divisions outside of PSB were completed as part of the PSB8 training. Five (20%) had investigative deficiencies. Again, this quarter, none of these deficiencies were identified by command personnel in the Districts/Divisions where they were

completed. These deficiencies included leading questions, failure to address potential additional misconduct, and failure to complete a thorough investigation. These deficiencies should have been identified and where possible, corrected, prior to forwarding the cases to PSB. As we noted during the last reporting period, the expectations for completing these investigations should be the same as for any other investigation. There are still numerous PSB8 investigations that our Team has yet to review. We continue to have concerns regarding the failure to ensure these investigations were properly completed and received the proper level of oversight.

This Paragraph requires that if the Commander of the Division in which the internal affairs investigation was conducted determines findings to be unsupported, the investigation is to be returned to the investigator for correction. It requires that the Commander of the Division document inadequacies and include this documentation as an addendum to the original investigation. It requires the investigator's supervisor to take appropriate action to address any inadequately supported determination and any investigative deficiencies. Finally, this Paragraph holds the Commander responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.

In January 2018, we requested that MCSO begin providing us with documentation that reflects the actions being taken to address deficient misconduct investigations. We requested that PSB and command personnel provide a response to this request on a monthly basis. We have received the requested documentation since March 2018. District and Division command personnel had on a number of occasions documented their identification of deficiencies prior to forwarding the investigations conducted by their personnel to PSB. Though MCSO has discontinued the practice, for a period of time, Division Chiefs were also required to review the completed investigations by their personnel. During the time we were also receiving their documentation, we found and noted in our reports that this added attention and oversight resulted in improved investigations and the identification and correction of deficiencies. However, for this and the last reporting period, despite a number of deficiencies in District and Division cases, we did not receive any documentation that command personnel in the Districts/Divisions identified or addressed any deficiencies in investigations conducted by their personnel.

We have noted in numerous prior reporting periods that both the supervisors who complete deficient investigations and the command personnel who approve them must be held accountable if MCSO is to achieve Phase 2 compliance with this Paragraph. During this reporting period, the investigative compliance of investigations conducted by PSB decreased to 90% compared to 96% the last reporting period. Compliance for those investigations conducted outside of PSB increased from 71% the last reporting period to 82% this reporting period. Investigative compliance for the nine investigations conducted by the outside vendor was 78% compared to 100% during the last reporting period. Overall investigative compliance was 88%. With the inclusion of timeliness, compliance for all investigations was 26%.

***Paragraph 212.*** *Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

The 40-hour Misconduct Investigative Training was completed in late 2017. In January 2018, we requested that MCSO begin providing us with a document that reflects what actions are being taken to address deficient misconduct investigations on a monthly basis. As discussed in Paragraph 211, we have consistently received documentation since March 2018. During this reporting period, PSB identified and documented some deficiencies with investigations. District command personnel did not identify or address any deficient investigation we reviewed during this reporting period.

PSB investigators have consistently completed thorough investigations as has been demonstrated by their high compliance rate over numerous reporting periods. While there have been occasional errors made, or disagreements with outcomes, and their compliance faltered this reporting period, we have not identified any investigator in PSB who we believe does not conduct a quality investigation on any ongoing basis.

In the case of investigations conducted outside of PSB, some Districts continue to use a single supervisor to conduct all investigations for the District when possible to do so. We previously identified that two of these assigned supervisors had completed multiple deficient investigations over several reporting periods. We brought those to the attention of MCSO. One has since left employment with MCSO, and the other is no longer assigned to conduct District investigations.

For this reporting period, we reviewed 34 investigations conducted by supervisors in Districts and Divisions outside of PSB. Six of these had investigative deficiencies. The deficient cases were investigated by different supervisors assigned to a District or Division outside of PSB. As we have previously noted during our reviews over multiple reporting periods, even experienced supervisors sometimes have little experience in conducting administrative misconduct investigations and in other cases, investigations are conducted by newly promoted supervisors, who have no experience in conducting administrative misconduct investigations. We have not observed any instances of repetitive deficiencies by District or Division supervisors who conduct administrative misconduct investigations that we believe would be cause for discipline or other administrative actions.

On June 23, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 213.*** *Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period. Of the 186 investigations, 143 were investigated by PSB personnel, nine were outsourced, and 34 were investigated by MCSO personnel outside of PSB.

None of the documentation we received regarding investigations conducted outside of PSB indicated that any person below the rank of sergeant was responsible for conducting the investigation.

During the last reporting period, all 41 District or Division-level approved cases were forwarded to, and reviewed by PSB, as required. Twelve (29%) had an identified deficiency.

During this reporting period, all 34 District or Division-level investigations we reviewed were forwarded to and reviewed by PSB as required. Six (18%) of the 34 had identified deficiencies, a decrease from 29% during the last reporting period. These deficiencies included: leading questions, failure to identify potential additional misconduct, and failure to conduct a thorough investigation. All of these investigations were completed and reviewed, after the increased oversight by command personnel began; and all six were reviewed by one or more members of District or Division command staff prior to forwarding them to PSB.

During this reporting period, 14 (41%) of the investigations conducted by District and Divisions were in full compliance, an increase from 37% during the last reporting period.

On January 9, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 214. At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

Our analysis for this reporting period revealed that of the 34 investigations conducted outside of PSB, none were returned by PSB to the original investigating supervisor for further investigation or analysis or reassigned to a different investigator.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 215. If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we reviewed 34 administrative misconduct investigations conducted by MCSO personnel outside of PSB and completed during this reporting period.

Five of the 34 completed misconduct investigations conducted outside of PSB resulted in sustained findings against personnel still employed by MCSO. In all five, the reports included documentation of the discipline or corrective action that was taken. There were no instances where other actions by command personnel were necessary.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 216.*** *If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.*

**Phase 1:** In compliance

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 22, 2024.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- Professional Standards Bureau (PSB) Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** In compliance

To assess Phase 2 compliance with this Paragraph, we reviewed 186 administrative misconduct investigations during this reporting period.

PSB conducted 143 of the completed investigations we reviewed during this reporting period. The nine outsourced cases are also included here as PSB maintains responsibility for these cases. Thirty-two of these cases resulted in sustained findings against current MCSO employees. In all 32, the PSB Commander ensured that appropriate discipline and/or corrective action was recommended for the sustained allegations in all but one of the investigations.

We continue to note that the PSB Commander cannot ensure that appropriate discipline or corrective action are the final outcome of sustained misconduct investigations, as the Appointing Authority makes the final decisions for discipline in both minor misconduct cases and in serious misconduct cases that result in PDHs. This hearing officer has the authority to change the findings or reduce the discipline. In two cases, the Appointing Authority overturned the sustained findings of PSB. We disagree with his decision to do so in one of these cases. In six cases, he mitigated the discipline within the range as allowed by MCSO policy. We agree with his decision to do so. In the remaining sustained cases, the final sanction was the presumptive discipline identified by the PSB Commander.

The PSB Commander has consistently ensured that, when appropriate, policy, training, tactical, and equipment concerns are identified. PSB then forwards these concerns to the appropriate Division for follow-up or resolution. PSB personnel maintain a list of these concerns and track the progress of each concern that was forwarded. While investigators have been properly identifying these concerns and authoring appropriate memos of concern, many of the concerns had remained unaddressed by those responsible for doing so. We have acknowledged that while the nature of some of these concerns, particularly those that may require policy revision, may take a lengthy amount of time to resolve, many of had remained pending for several years according to the tracking document provided by PSB. Concerns regarding training, tactical, and equipment also remained pending for lengthy periods of time. We discussed this issue with MCSO during multiple site visit meetings, and we also discuss this under Paragraph 207.

During our April 2023 site visit, we met with MCSO command personnel to discuss our ongoing concerns with the resolution of those issues PSB had documented and forwarded to Divisions outside of PSB. In some cases, MCSO advised us that the concern had been addressed but had just not been documented. In others, there was no explanation for the failure to resolve the noted concern. The PSB Commander reported that he was reviewing the entire list; he understood that there were more than 99 unresolved concerns; he was working to improve the tracking system; and that he intended to incorporate the use of BlueTeam to track these in the future. Since that time, we have continued to meet with MCSO command personnel during each site visit to receive information and updates on our concerns about addressing these issues in a timely manner. MCSO has continued to update us that all pending concerns are being addressed, though some required extensive research to resolve and the PSB Commander wanted to ensure all appropriate actions had been taken prior to approving a closure. We have been satisfied that appropriate progress has been made.

During our April 2024 site visit, we discussed with PSB personnel the status of the identified concerns tracking process. We noted more timely resolution of new concerns brought forward, but there still remained a backlog. We did note that many of the older concerns contained the documentation of actions taken and were only pending the final review and approval prior to being closed.

During our July 2024 site visit, we again discussed the concerns tracking documentation. For most of the remaining concerns, there has been updated information added, though final closure has not yet occurred. The PSB Commander advised us that he was reviewing all final documentation for the pending concerns prior to approving their closures. He believed final closure would occur on the majority of them during the next reporting period. We will continue to closely monitor MCSO's ongoing efforts in addressing these concerns. MCSO remains in compliance with this Paragraph.

During our October 2024 site visit, we again discussed the concerns tracking documentation. The PSB Commander advised us that 28 concerns remained pending, 11 of which were initiated in 2024. Of the remaining 17, the majority are still pending only the final clearance by the PSB Commander.

During our February 2025 site visit, PSB advised us that there were 30 pending identified concerns. Eleven of these were new concerns, while the remaining 19 were older concerns, many involving equipment and training. Most had an updated memorandum regarding the concerns but had not been finalized and closed. We continued to find MCSO in compliance with this Paragraph as PSB had made significant strides to address the pending concerns; the resolution of some of these concerns were outside the scope and responsibility of PSB requiring action from personnel outside of PSB; and though not fully closed, PSB had added updated information to the tracking sheet on the pending concerns.

For this reporting period, the total number of pending concerns was reduced from 10 to three. All three have recent updates on the status of the concerns. MCSO remains in compliance with this Paragraph.

***Paragraph 217.*** *The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for min or misconduct to ensure compliance with MCSO policy and legal standards.*

**In Full and Effective Compliance**

Based on the requirements of the Second Order, District and Division Commanders will not impose discipline for minor misconduct. In all cases, the PSB Commander will determine the final findings for internal investigations and the presumptive range of discipline for those cases with sustained findings. The Appointing Authority will then make the final determination of discipline.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 218.*** *The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files intended to contain all documents required for compliance with this Paragraph.

A member of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance on multiple occasions when PSB was housed at MCSO Headquarters. Our Team member also used the access granted to IAPro to randomly select internal affairs case files to verify that all information was being maintained electronically.

PSB completed the move to its new offsite facility in May 2018. Subsequent to the move, a member of our Team conducted an inspection of the file rooms in the new facility; and reviewed a random sample of internal investigations in IAPro to verify ongoing compliance. We continued to verify compliance during our site visits in January and October 2019, and October 2023 and February 2024 site visits.

PSB completed the move to a new offsite facility in June 2024. We inspected both the criminal and administrative file rooms at the new facility during our July 2024 site visit to ensure files were being properly maintained as required.

During our October 2024 site visit, we reviewed the IAPro database functions at the new PSB facility and found them to contain the information necessary to properly provide case management information.

During our February 2025 site visit, members of our Team inspected the file rooms where hardcopies of administrative investigations were stored and randomly reviewed case files to verify compliance.

During our July 2025 site visit, our Team inspected the IAPro functionality and retention by reviewing cases stored in the system.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.


*Paragraph 219. The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

As previously documented in the details of our inquiry in this report, the Sheriff and/or command staff's inquiries or intentions regarding the reopening of investigations involving sworn employees such as the two cases regarding Voeltz and Lowry (Brady List), are contrary to the finality of administrative decisions under Arizona law and MCSO's own policies. Both of these cases had been investigated and resulted in sustained findings. The resulting discipline was appropriate and consistent with law and the policies in place. No further action would be appropriate and violates the requirements of this Paragraph.

There was no good faith basis for the investigations initiated against Captain Lugo. Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint process. Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence. Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave. These actions, only days after a meeting between Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[122] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures. Therefore, the Sheriff, Undersheriff Gentry, and Executive Chief Palopoli violated this Paragraph.

Hearing Officer Holmes violated the requirements of this Paragraph when he reversed his previous findings of the Sergeant Engelbeck investigation and further changed the disciplinary findings. Hearing Officer Holmes acknowledged that this was very unusual, and that there were no changes in circumstances between his initial findings and discipline and the reversal. The

allegations clearly called for the imposition of discipline, and Hearing Officer Holmes reversed his findings and the discipline. Hearing Officer Holmes had no authority to change the findings of the investigation or to reverse the finding of discipline.

MCSO is not in compliance with the requirements of this Paragraph.

**Paragraph 220.** *To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:*

a.      *establish a presumptive range of discipline for each type of violation;*

b.      *increase the presumptive discipline based on an employee's prior violations;*

c.      *set out defined mitigating and aggravating factors;*

d.      *prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;*

e.      *prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;*

f.      *prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;*

g.      *clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;*

h.      *provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;*

i.      *provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;*

j.      *provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;*

k.      *require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and*

l.      *provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

During this reporting period, the PSB Commander sustained misconduct against one or more identified employees in 53 of the 186 administrative misconduct investigations we reviewed. In 37 of the sustained investigations, one or more of the known principal employees were still employed at MCSO at the time findings or discipline decisions were made. As a result of these sustained investigations, one employee was dismissed from MCSO, seven employees received a

suspension of eight hours or more, 11 employees received a written reprimand, and 19 received a coaching. Three were given probationary releases rather than discipline. Compliance for this Paragraph is based on the discipline findings for both minor and serious discipline. In those cases where only serious discipline is recommended, compliance findings specific to those cases are addressed in Paragraph 226.

Paragraph 220.a. requires a presumptive range of discipline for each type of violation. Of the 53 total sustained cases that we reviewed for this reporting period, 37 investigations involved known employees still employed by MCSO at the time discipline decisions were made. The PSB Commander determined and documented the presumptive discipline range in compliance with this Subparagraph in all of these cases.

As our inquiry documents earlier in this report, the current administration engaged in concerning discussion about changing the required disciplinary finding on a case involving the commission of a DUI by an MCSO employee. Despite the fact that the commission of a DUI is a Category 7 offense and the disciplinary matrix provides that the only penalty for a Category 7 offense is dismissal, Undersheriff Gentry and the Sheriff wanted to change the Matrix to effect change in the outcome of an existing case involving an employee who committed a DUI in violation of 220.a.

Paragraph 220.b. requires that presumptive discipline be increased if an employee has prior violations. In 15 of the 37 investigations with sustained findings, an employee had prior sustained violations. The PSB Commander considered and increased the presumptive discipline based on the Matrices in place at the time of the misconduct.

Paragraph 220.c. requires that mitigating and aggravating factors be defined. Aggravating and mitigating factors are not specifically defined in the internal affairs investigation or discipline policy in effect prior to May 18, 2017. The revised discipline policy, effective May 18, 2017, defined these factors. These aggravating or mitigating factors are not identified by the PSB Commander – but by the Appointing Authority when making the final disciplinary decisions.

During this reporting period, all of the sustained cases were initiated after May 18, 2017. In all 37, the Appointing Authority provided justification and documentation for all factors considered when making the final decisions in all the cases based on the Matrices in place at the time of the misconduct. We also found that he continues to specifically identify those instances where there are aggravating or mitigating factors in the justification documents when appropriate.

Paragraph 220.d. prohibits the consideration of any prohibited biases when determining discipline. None of the sustained cases that resulted in discipline that we reviewed during this reporting period included any indication that any biases were considered when determining discipline.

Paragraph 220.e. prohibits any conflicts, nepotism, or bias of any kind in the administration of discipline. None of the sustained cases we reviewed during this reporting period had any indication of conflicts, nepotism, or bias of any kind when determining the disciplinary sanction.

Paragraph 220.f. prohibits the consideration of the high (or low) profile nature of an incident when determining discipline. None of the sustained cases we reviewed during this reporting period indicated any consideration of the high- or low-profile nature of the incident when considering discipline.

Paragraph 220.g. requires that clearly defined forms of discipline and classes of discipline be defined. Phase 2 compliance is not applicable to this Subparagraph.

As previously articulated in the details of our inquiry, GC-17 Attachment B (Categories of Offenses) provides that the commission of a DUI to any degree is considered a Category 7 offense. GC-17 Attachment A (Disciplinary Matrix) provides that the only penalty for a Category 7 offense is dismissal. The current Disciplinary Matrix is unequivocal as to the discipline to be applied in the case of a DUI. The attempt by Undersheriff Gentry and the Sheriff to change the Matrix to effect change in the case of the employee who committed a DUI was in violation of 220.g.

Paragraph 220.h. requires that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline. There were no instances during this reporting period where we believe a coaching was used when discipline was a more appropriate outcome.

Paragraph 220.i. requires that MCSO will not take only non-disciplinary action in cases where the Discipline Matrices call for the imposition of discipline. There were no instances during this reporting period where MCSO took non-disciplinary action for an act of misconduct that was ineligible to be handled in this manner.

Further, as previously articulated in the details of our inquiry, Paragraph 220.i. provides that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline. The repeated inquiries by command staff into closed investigations was an attempt to take some "corrective action" on disciplinary decisions that had become final under Arizona law and was in violation of 220.i. Similarly, Hearing Officer Holmes violated the requirements of this Paragraph when he reversed his previous findings of the Sergeant Engelbeck investigation and further changed the disciplinary findings. Hearing Officer Holmes acknowledged that this was very unusual and that there were no changes in circumstances between his initial findings and discipline and the reversal. Hearing Officer Holmes had no authority to change the findings of the investigation or to reverse the finding of discipline.

Paragraph 220.j. requires that MCSO consider whether non-disciplinary corrective action is also appropriate. There were no instances during this reporting period where non-disciplinary actions were also found to be appropriate.

Paragraph 220.k. requires that any departure from the discipline recommended under the Discipline Matrices be justified in writing and included in the employee's file. All but one of the investigations with sustained findings resulted in employee discipline or other approved corrective action. In one, the Appointing Authority overturned the findings of the PSB Commander. We disagree with his decision to do so.

The Appointing Authority mitigated the discipline for six of the sustained allegations. The Appointing Authority provided justification and documentation as required and we agree with his decisions. In the remaining cases, the final discipline was the presumptive identified for the sustained policy violations.

As we have previously noted, compliance for this Paragraph is based on the final outcome for all sustained investigations. Those instances that involve only serious discipline are specifically covered in Paragraph 226.

Paragraph 220.l. requires that a Discipline Matrix for unclassified management employees be at least as demanding as the Discipline Matrix for management-level employees. We reviewed the approved policies that affect discipline for unclassified management employees, and they comply with this requirement. During this reporting period, MCSO did not complete or submit any administrative investigations involving unclassified management employees.

During this reporting period, all of the sustained investigations were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date and have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where he made the final decision.

There was no good faith basis for the investigations initiated against Captain Lugo. Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint process. Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence. Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave. These actions, only days after a meeting between Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[123] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures. Therefore, the Sheriff, Undersheriff Gentry, and Executive Chief Palopoli violated this Paragraph.

Further, MCSO had requested that the Monitor consider Captain Morrison as BIO Commander. Deputy Chief Summers violated Paragraph 220 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate.

On April 8, 2024, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 220. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

**Paragraph 221.** *The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 37 misconduct investigations with sustained allegations that resulted in the recommendation for corrective action or discipline for MCSO employees. We found that MCSO met the requirements for compliance with this Paragraph.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 221. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

There was no good faith basis for MCSO command staff to refer the Sergeant Engelbeck complaint against Lugo for outside investigation. The administrative portion of the complaint had been resolved through the Service Complaint completed in 2024. The criminal allegation would have been resolved with a call to the CRS or through a review of Sergeant Engelbeck's investigative file by an IAPro administrator for the agency. Captain Lugo had nothing to do with CRS's failure to provide the information to Sergeant Engelbeck. Designating the complaint as being against Captain Lugo and determining that Captain Lugo should be placed on administrative leave while the complaint was investigated by an outside agency were not supported by any reasonable basis. These actions support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him[124]." Particularly, Captain Lugo rebuffed attempts by the new administration

regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures. Therefore, the Sheriff, Undersheriff Gentry and Executive Chief Palopoli violated this Paragraph.

Further, MCSO had requested that the Monitor consider Captain Morrison as BIO Commander. Deputy Chief Summers violated Paragraph 221 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate.

**Paragraph 222.** *The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, there were 37 investigations with sustained findings that resulted in recommendations for discipline or other corrective action. In all 37, the PSB Commander determined and documented in writing the presumptive range of discipline based on the policies and Discipline Matrices in effect at the time of the investigation. The documentation submitted for this Paragraph included the category, offense number, and employee's discipline history.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## E.    Pre-Determination Hearings

**Paragraph 223.** *If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel where MCSO holds a Pre-Determination Hearing (PDH).

During this reporting period, 37 administrative misconduct investigations resulted in sustained findings against current MCSO employees. Sixteen of the sustained investigations were for serious misconduct. In all 16, a PDH was held.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 223. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

Hearing Officer Holmes was conducting pre-determination hearings after he retired, without being a designated member of MCSO's command staff. At the time he was holding the PDHs, he was not an MCSO employee, and therefore his designation was in violation of Paragraph 223.

*Paragraph 224. Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, in the 16 cases where a Pre-Determination Hearing was held, the hearing was audio- and video-recorded as required, included in the administrative file, and reviewed by a member of our Team.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 225. If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During this reporting period, 16 sustained investigations we reviewed resulted in a Pre-Determination Hearing and we reviewed all the recordings of these hearings. There were no instances where a principal employee provided new or additional information requiring additional consideration or investigation relevant to the sustained allegations.

On September 24, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 226.*** *If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

To assess compliance with this Paragraph, we review completed misconduct investigations conducted by MCSO personnel.

During our site visits, we have met with Kenneth Holmes. Hearing Officer Holmes is not a designated member of the Sheriff's command staff as required by Paragraph 223. Therefore, his appointment as Pre-Determination Hearing Officer violates the Court's Orders and MCSO policy.

We have met with Hearing Officer Holmes and the Administrative Services Division as necessary to discuss any concerns we have with final outcomes or decisions that result from Pre-Determination Hearings. During these meetings, we have discussed that the Appointing Authority does not have the authority to reduce discipline based only on timeframe concerns when an employee appeals discipline in these cases. It is the Maricopa County Attorney's Office (MCAO) that reviews these cases and determines whether the cases should go forward. Both the Appointing Authority and the representative from MCAO advised us that they have taken some of these cases forward; but in others, they did not believe it was appropriate to do so, based on the totality of circumstances.

We have also discussed those cases where a decision may be made after a Pre-Determination Hearing that a reduction in discipline will occur, and those cases where a decision to reduce the discipline may occur if an appeal is filed. MCSO has advised us that it consults with MCAO attorneys in these cases, and the attorneys' input is related to the final outcomes. We continue to note that all the documentation we receive and review is authored and signed by the Appointing Authority, so our assessment can only consider any final decisions as his.

During this reporting period, 16 cases with sustained serious misconduct resulted in a PDH. Fifteen resulted in serious discipline. The Appointing Authority provided a justification for all final decisions; and this information was provided to our Team in the submissions regarding closed administrative misconduct investigations.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 226. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

In the case involving Sergeant Engelbeck, Hearing Officer Holmes had properly imposed discipline in accordance with GC-17 (Employee Disciplinary Procedure), Attachment A, Discipline Matrix, Category 6 (29A), First Offense.[125]    Sergeant Engelbeck appealed the discipline imposed to the Merit Commission.  The case never reached a hearing before the Merit Commission because of a decision by Hearing Officer Holmes in concert with MCAO counsel, to change the discipline and findings.  However, Hearing Officer Holmes had no authority to change the discipline or findings given the appeal before the Merit Commission.  Only the Sheriff could have reopened the discipline for Sergeant Engelbeck pursuant to the narrow exception under A.R. S. § 38-1106(I), permitting a sheriff to reopen a disciplinary matter; and in this circumstance, the statutory requirements for that exception were not met.  Hearing Officer Holmes's initial decision to sustain discipline against Sergeant Engelbeck was neither arbitrary nor without reasonable justification.  The record established that Sergeant Engelbeck engaged in insubordination despite him failing his probationary period.  Moreover, no separate hearing prior to the revocation was held.  Holmes had no authority to alter the findings or modify the discipline in the Sergeant Engelbeck case.

MCSO is not in compliance with this Paragraph.


**Paragraph 227.**    *The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted.  The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:*

a.    *his or her personal opinion about the employee's reputation;*

b.    *the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;*

c.    *whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.*

**Phase 1:**  In compliance

**Phase 2:**  Not in compliance

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 37 administrative misconduct investigations where discipline or corrective action was recommended.  The serious sustained allegations in 16 of these investigations resulted in their referrals for Pre-Determination Hearings.

Paragraph 227.a. prohibits the designated member of command staff conducting a Pre-Determination Hearing from considering a personal opinion of an employee's reputation when determining discipline. There were no indications in our reviews of these investigations that any personal opinion was considered in making a disciplinary decision.

Paragraph 227.b. prohibits the consideration of the employee's past disciplinary history (or lack thereof), except as provided in the Discipline Matrix. There were no instances where we determined that the member of command staff responsible for conducting the Pre-Determination Hearing considered disciplinary history outside of the requirements of this Paragraph.

Paragraph 227.c. prohibits the consideration of others jointly responsible for misconduct, except that the decision-maker may consider such discipline to the extent that discipline on others had been previously imposed and the conduct was similarly culpable. There were no indications in our reviews that the misconduct of others was improperly considered in the disciplinary decisions that were made.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 227. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

During our site visits, we have met with Kenneth Holmes. Hearing Officer Holmes is not a designated member of the Sheriff's command staff as required by Paragraph 223. Therefore, his appointment as Pre-Determination Hearing Officer violates the Court's Orders and MCSO policy. Had Hearing Officer Holmes been qualified to serve as a PDH officer, he failed to comply with the law, Court Orders, and policies that would justify vacating the discipline and findings against Sergeant Engelbeck.

In the case involving Sergeant Engelbeck, Hearing Officer Holmes had properly imposed discipline in accordance with GC-17 (Employee Disciplinary Procedure), Attachment A, Discipline Matrix, Category 6 (29A), First Offense.[126] Sergeant Engelbeck appealed the discipline imposed to the Merit Commission. The case never reached a hearing before the Merit Commission because of a decision by Hearing Officer Holmes in concert with MCAO counsel, to change the discipline and findings. However, Hearing Officer Holmes had no authority to change the discipline or findings given the appeal before the Merit Commission. Only the Sheriff could have reopened the discipline for Sergeant Engelbeck pursuant to the narrow exception under A.R. S. § 38-1106(I), permitting a sheriff to reopen a disciplinary matter; and in this circumstance, the statutory requirements for that exception were not met. Hearing Officer Holmes's initial decision to sustain discipline against Sergeant Engelbeck was neither arbitrary nor without reasonable justification. The record established that Sergeant Engelbeck engaged in insubordination despite him failing his probationary period. Moreover, no separate hearing prior to the revocation was held. Hearing Officer Holmes had no authority to alter the findings or modify the discipline in the Sergeant Engelbeck case.

***Paragraph 228.*** *The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:*

a.       *that decision does not relate to the Sheriff or his designee;*

b.       *the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;*

c.       *the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and*

d.       *the written explanation is available to the public upon request.*

**Phase 1:**  In compliance

**Phase 2:**  Not in compliance

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we did not review any cases where the Sheriff or his designee rescinded, revoked, or altered any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 228.  For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

During our site visits, we have met with Kenneth Holmes.  Holmes is not a designated member of the Sheriff's command staff as required by Paragraph 223.  Therefore, his appointment as Pre-Determination Hearing Officer violates the Court's Orders and MCSO policy.  Had Hearing Officer Holmes been qualified to serve as a PDH officer, he failed to comply with the law, Court Orders, and policies that would justify vacating the discipline and findings against Sergeant Engelbeck.  Only the Sheriff was qualified to rescind, revoke, or alter the discipline against Sergeant Engelbeck; and he failed to do so within the statutory framework prior to the appeal.

The Sheriff and/or command staff's inquiries into reopening discipline in closed administrative investigations, changing disciplinary policies, or misapplying disciplinary policies were done in violation of this Paragraph.

On March 13, 2026, the Court issued an Order (Doc. 3442) asking the Parties to brief the issue of whether the Sheriff had the authority to alter final PSB disciplinary decisions.  On March 30, 2026, Defendants filed a response.  Subsequently, on April 1, 2026, the Court issued an Order (Doc. 3448) regarding the finality of discipline under Arizona law.

MCSO is not in compliance with this Paragraph.

*Paragraph 229.    Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau.    If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.*

## In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review completed criminal misconduct investigations.

During this reporting period, we reviewed seven criminal investigations.    All seven were internally generated and appropriately assigned to criminal investigators in PSB.    The investigations were brought to the attention of the PSB Commander as required and an administrative misconduct investigation was also initiated.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.    After review, we concurred with this assertion.

*Paragraph 230.    If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority.    No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.*

## In Full and Effective Compliance

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations conducted by both criminal and administrative investigators to ensure that they contain appropriate documentation that complies with the requirements of this Paragraph.

We previously determined that in many cases, the administrative investigation is not submitted and reviewed during the same reporting period as the criminal investigation, as generally, administrative investigations are finalized after the completion of the criminal investigation. We discussed this issue with PSB during our January 2017 site visit.    To resolve the concern, PSB

agreed to provide us with a copy of any criminal investigation when PSB submits the administrative misconduct investigation for our review, even if the criminal investigation has been previously submitted. MCSO has been consistently providing copies of these criminal investigations with the administrative investigation since that time.

During this reporting period, we reviewed 10 administrative misconduct investigations where criminal conduct may also have occurred. Seven were investigated criminally by MCSO criminal investigators, and two were investigated by a separate unit at MCSO. One was investigated by the law enforcement agency that had jurisdiction where the alleged conduct occurred.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 231.** *The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to Garrity.*

### In Full and Effective Compliance

PSB is divided into criminal and administrative sections. Criminal investigators and administrative investigators are housed on separate floors of the building. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate file rooms for criminal and administrative investigative documents and reports. We have previously verified during our site visits that the required separation of criminal and administrative investigations and restricted access to IAPro is in place.

In May 2018, PSB relocated to a new offsite location. After PSB's move to its new facility, we verified that criminal and administrative investigation files were housed on separate floors in the new facility. Criminal investigators do not have access to the IAPro database for administrative investigations, and there are separate and secured file rooms for criminal and administrative documents and reports.

During our October 2019 site visit, a member of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro remains in place.

During our October 2023 site visit, members of our Team again verified that criminal and administrative investigative files are housed on separate floors, there is restricted access to both file rooms, and restricted access to IAPro also remains in place.

In June 2024, PSB relocated to a new offsite location. During our July 2024 site visit, our Team verified that criminal and administrative files are housed separately and there is restricted access to both file rooms.

During our February 2025 site visit, members of our Team again verified that criminal and administrative files are housed separately and there is restricted access to both file rooms.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 232.* *The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review administrative misconduct and criminal investigations.

During this reporting period, we reviewed seven criminal misconduct investigations conducted by MCSO personnel. All seven had a companion administrative misconduct investigation, as required; and are in compliance with the requirements of this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 233.* *If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, the investigator documented their conclusion and decision to close four of the seven criminal investigations we reviewed without submittal to a prosecuting agency and the PSB Commander approved this decision.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 234.*  *If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness.  The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation.  Such directions shall be documented in writing and included in the investigatory file.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, we reviewed seven criminal misconduct investigations conducted by PSB personnel.  Three were submitted to a prosecutorial agency.  Two of these resulted in criminal charges being filed.  In one, the prosecutorial agency declined prosecution, citing a lack of video evidence and conflicting statements.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 235.*  *If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.*

**In Full and Effective Compliance**

To determine MCSO's compliance with this Paragraph, we review criminal misconduct investigations.

During this reporting period, three criminal investigations we reviewed resulted in submittal to a prosecutorial agency.  In two, criminal charges were filed.  In one, prosecution was declined by MCAO, citing a lack of video evidence and conflicting statements.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 236.*  *The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.*

**In Full and Effective Compliance**

To determine compliance with this Paragraph, we have observed that PSB maintains both hardcopy and electronic files that are intended to contain all the documents required per this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

### G.    Civilian Complaint Intake, Communication, and Tracking

**Paragraph 237.**  *Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.*

**Phase 1**:  Not applicable

**Phase 2:**  Not applicable

We developed and implemented a Complaint Process Community Awareness Program to promote awareness throughout the Maricopa County community about the process for filing complaints about the conduct of MCSO employees.  The program provides for distributing brochures describing the complaint process at quarterly community meetings and using public service announcements – made via local media outlets and social media – to provide basic information (in both English and Spanish) about MCSO's complaint process.

We contacted faith organizations and civic groups throughout Maricopa County requesting that they make complaint process information forms available to members of their congregations and groups.  The Complaint Process Community Awareness Program incorporates input from the CAB, MCSO, and the ACLU of Arizona.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 238.**  *The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant.  MCSO will document all complaints in writing.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review all new misconduct complaints received each month and completed misconduct investigations conducted by MCSO personnel.  In addition, we review many initial complaint documents or initial telephone calls, BWC videos, traffic stop videos, Supervisor Notes, compliance and BIO reviews, and consider findings in the complaint testing process.

During this reporting period, we reviewed 186 completed administrative misconduct investigations.  Of those, 126 were externally generated complaints.  We did not identify any instance where an employee did not initiate a complaint from a community member as required.

Our review of traffic stops for this reporting period did not identify any instances where a subject who was arrested made allegations of misconduct by MCSO personnel during his arrest that went unaddressed.  Our review of Supervisor Notes during this reporting period did not identify any incidents where there were indications that a complaint had been made but not properly reported.  We reviewed numerous complainant contacts and found no indication that a supervisor initially refused to take a complaint or attempted to dissuade the complainant from making a complaint.  Neither CID nor BIO identified any instances in their reviews during this reporting period that indicated that a complainant had attempted to file a complaint and been refused.

We continue to find that MCSO consistently accepts and records complaints as required for compliance with this Paragraph.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

**Paragraph 239.**  *In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours.  The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites.  The placards shall be in both English and Spanish.*

**In Full and Effective Compliance**

During our July site visit, we noted that permanent placards containing the required information were clearly visible at MCSO headquarters and all District stations.  The following locations also visibly displayed the current comment and complaint forms in English and Spanish: Fountain Hills Town Hall, Fountain Hills Community Center, three separate locations of Señor Taco Restaurant, Mesquite Library, and Paradise Valley Community Center.

At all of the sites visited that also displayed the permanent placards, we were able to verify that permanent placards meeting all the requirements of this Paragraph were prominently displayed, the placards state that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint in English or Spanish or their preferred language, to include American Sign Language; in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online.  The placard includes relevant contact information, including telephone numbers, email addresses, mailing addresses, and websites.

During our October site visit, MCSO reported that, during this reporting period, it did not receive any feedback from the community regarding the permanent complaint placards.

On March 16, 2021, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 240.*  *The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles.  Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer.  The Sheriff must provide all supervising officers with telephones.  Supervising officers must timely respond to such complaints registered by civilians.*

**In Full and Effective Compliance**

During our October site visit, we visited District offices and the Training Center and verified that MCSO maintained adequate supplies of complaint forms for deputies to carry in their vehicles. We also verified that supervisors were in possession of MCSO-issued cellular telephones. MCSO's complaint intake testing program – in which an external vendor conducts 24 complaint intake tests via telephone, email, U.S. Mail, MCSO's website, and in-person tests annually – has mostly found that MCSO personnel respond in accordance with agency policy and in a timely fashion to a diverse group of complainants.  Where the complaint intake tests have identified deficiencies, MCSO has taken appropriate corrective steps, such as issuing BIO Action Forms or conducting another follow-up.  (See Paragraphs 254-260.)

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 241.*  *The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public.  There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.*

**In Full and Effective Compliance**

During our October site visit, we visited the new PSB office, which is located at 4000 North Central Avenue in Phoenix.  When we visited, we noted that MCSO had not rectified our concerns about the accessibility of the space to the community – especially members of the Plaintiffs' class. The signage/information guiding visitors to the only available nearby parking in a secure lot could be easily misconstrued.  The parking lot is marked for use by guests at the building's adjacent hotel and requires a credit card for entry; and although PSB personnel informed us that they validate parking for visitors, the lot currently has no signage related to PSB or MCSO or parking validation.  This could be intimidating to complainants or other community members visiting the facility.

When we inquired with PSB about the lack of parking signage, we learned that PSB did not plan to place any additional signage, and that adding any additional exterior signage is challenging because the PSB facility is located in a private building and the space is being leased.

PSB has taken some steps to assist visitors in locating parking and locating the PSB office.  When a complainant calls the PSB complaint line, the call goes to the PSB administrative officer, who explains where PSB is located and the available parking, to include validation of the parking.  In addition, the administrative officer directs the caller to the PSB website, which provides the

building address and suite numbers of the PSB facility and three parking options. While the PSB website may be helpful to individuals who call the PSB complaint line, there is no signage in the vicinity of the building directing PSB visitors to available parking and parking validation. Accordingly, if a complainant has not called the PSB complaint line or gone to the website, that person would not be aware of the available parking, nor of the parking validation available. We again urge MCSO to reassess its position regarding additional signage for parking availability and validation.

On February 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 242. The Sheriff will also make complaint forms widely available at locations around the County including:  the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches and the offices and gathering places of community groups, to make these materials available.*

**In Full and Effective Compliance**

MCSO has complaint forms available in English and Spanish on the MCSO and Maricopa County websites. MCSO maintains a list – of MCSO facilities, County offices, and public locations where community groups meet – where Community Outreach Division personnel attempt to make the forms available.

According to the Community Outreach Division (COrD), there are 117 locations throughout Maricopa County that make these forms accessible to community members. During our October site visit, we visited MCSO Headquarters; Districts 1, 2, 3, 4, and 7 and Lake Patrol facilities; and six additional public facilities to verify that MCSO comment and complaint Forms are available to the public. All locations we visited displayed the forms. We continue to encourage the COrD to continue to communicate with community organizations, especially those who support and serve members of the Plaintiffs' class, and the Community Advisory Board (CAB) in identifying additional locations – including grocery stores, pharmacies, and other businesses that are located in communities where members of the Plaintiffs' class live and work.

On March 31, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 243. The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.*

**In Full and Effective Compliance**

In July 2016, MCSO established the free 24-hour hotline for members of the public to make complaints; the hotline continued to be operational during this reporting period. We periodically called the hotline during this reporting period; and verified that the hotline is operational in both English and Spanish and provides instructions in both languages on how to register a complaint.

The recording advises callers that if the call is an emergency, they are to call 911. Callers are requested to provide their name, telephone number, and a brief summary of their complaint. If callers leave a recorded message, they are advised that MCSO will contact them as soon as possible. If callers do not wish to leave a recorded message, they are provided with a telephone number to call to speak to a supervisor. That number connects the callers to the MCSO switchboard operator, who will connect the caller to an appropriate supervisor. Callers are further advised of MCSO's operating hours if they wish to contact PSB directly. MCSO reported that there have been no calls to the hotline during this reporting period.

On October 31, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 244.** *The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.*

### In Full and Effective Compliance

Our review of the English and Spanish complaint forms' content did not reveal any language that could reasonably be construed as discouraging the filing of a complaint.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 245.** *Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.*

### In Full and Effective Compliance

Complaint forms in English and Spanish are accessible on MCSO's website. The complaint form states that anyone who has a concern regarding the performance of any MCSO employee has the right to file a complaint – in English or Spanish or their preferred language, to include American Sign Language – in person at any District facility or at the Professional Standards Bureau, by mail, by telephone, by fax, or online. The forms provide street addresses, contact numbers, and website information.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 246.*** *In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:*

a.  *within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;*

b.  *when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and*

c.  *in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations. During this reporting period, we reviewed 186 administrative misconduct investigations. Of these, 126 were externally generated.

Paragraph 246.a. requires that a civilian complainant receive a written notice of receipt of his/her complaint within seven days. This letter must include the tracking number, the name of the investigator assigned, and information regarding how the complainant can inquire about the status of his/her complaint. In 108 of the 126 externally generated complaints, a letter was sent to the complainant within seven days as required. In 16, PSB did not send a letter, but provided an acceptable explanation for not doing so. In two (1%) of the cases where there appeared to be contact information for the complainant, the letter was not sent within seven days as required; and PSB did not provide an acceptable explanation for not doing so. All the letters sent and reviewed included the name of the investigator and information regarding how the complainant could inquire about the status of the complaint.

Paragraph 246.b. requires that PSB notify a civilian complainant of the outcome of the investigation. In all the externally generated complaints, the complainant was provided a notice of the outcome when contact information was known, and the complainant wanted contact.

Paragraph 246.c. requires that PSB notify a civilian complainant of any discipline imposed as soon as permitted by law. In all the externally generated complaints with sustained findings, PSB properly notified the complainant of the sustained findings and the discipline information as required when contact information was known.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

The Fourth Order, dated August 30, 2024, has been interpreted to include that all required notifications sent to civilian complainant's must now also be sent to employee complainants. We notified MCSO of our intent to apply the same standard to internal complainants as external complainants, effective September 15, 2024, for any investigation initiated on or after that date.

During this reporting period, 17 internally generated complaints were both initiated and completed after September 15, 2024. Fourteen contained the required notifications to internal complainants. In three, the complaints were filed anonymously; and no contact information was provided.

***Paragraph 247.*** *Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.*

**In Full and Effective Compliance**

To assess compliance with this Paragraph, we review completed misconduct investigations.

During this reporting period, we reviewed 186 administrative misconduct investigations. Of these, 126 were externally generated and 60 were internally generated. We did not identify any instances where a complainant was discouraged from, or denied, contact with MCSO investigators to determine the status of his/her complaint, or to request and receive an update. MCSO appropriately had contact with complainants as required in Paragraph 246 in all cases where the complainant was known and wished to participate in the investigation. In eight cases, MCSO personnel documented that they had additional contact with the complainant during the course of the investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 248.*** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.*

**In Full and Effective Compliance**

To assess Phase 2 compliance with this Paragraph, we review completed misconduct investigations.

Each month, PSB provides a list of new complaints alleging biased policing. PSB also provides all closed investigations where biased policing was alleged. For this Paragraph, only allegations of biased policing that do not affect the Plaintiffs' class are reported. Those complaints alleging bias against members of the Plaintiffs' class are captured in a separate category and reported under Paragraphs 275-288.

During this reporting period, we reviewed 25 investigations where potential bias was alleged that did not affect members of the Plaintiffs' class. PSB tracked these investigations in a separate category as required by this Paragraph and reported them in Paragraph 33.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 249.** *The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.*

**In Full and Effective Compliance**

To determine Phase 2 compliance for this Paragraph, we review a monthly report from PSB that provides the information required for compliance.

To ensure that we are consistently informed of complaints relative to this Paragraph, PSB provides information concerning these investigations in its monthly document submission relative to this Paragraph. During this reporting period, there were two investigations submitted for review for this Paragraph.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 250.** *The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.*

**In Full and Effective Compliance**

PSB continues to prepare a comprehensive quarterly assessment of the types of complaints received to identify and assess potential problematic patterns or trends. PSB's assessment identifies the Divisions that received the highest number of complaints during the quarter, notable patterns and trends identified within MCSO Divisions, a summary of all of the misconduct allegations made during the quarter, and employees with potentially problematic patterns or trends of misconduct during the quarter.

MCSO previously informed us that the contents of the quarterly assessment were discussed at executive staff meetings. During our April 2025 site visit, we inquired as to how this information is being disseminated to command staff in the Office, and MCSO has advised us that the information is disseminated to command staff via email.

PSB also includes the information required by this Paragraph in its public Semi-Annual Misconduct Investigations Report, which is required under Paragraph 251. The most recent Semi-Annual Report for the period of January 1-June 30, 2025, contains the issues identified as potentially problematic patterns or trends.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## H.    Transparency Measures

**Paragraph 251.**  *The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:*

a.    *summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;*

b.    *aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;*

c.    *analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;*

d.    *aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;*

e.    *aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;*

f.    *aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and*

g.    *aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.*

**In Full and Effective Compliance**

The PSB Operations Manual identifies the PSB Commander as responsible for preparing the semi-annual public report on misconduct investigations.  The manual also contains provisions for the production of summary information regarding sustained conflict of interest violations; an analysis of the complaint intake process; and aggregate data on complaints (internal and external), processing of misconduct cases, outcomes of misconduct cases, and employees with persistent misconduct problems.

Since July 2019, PSB has issued and posted on MCSO's website its semi-annual public report.  PSB also incorporates information relevant to Paragraph 192 in its semi-annual report, which requires that PSB review, at least semi-annually, all misconduct investigations that were assigned outside the Bureau to determine whether the investigation was properly categorized, whether the investigation was properly conducted, and whether appropriate findings were reached.  PSB also incorporates information relevant to Paragraph 250 in this report, which includes an assessment of potential problematic patterns or trends, based on a review of complaints received.

During our October 2019 site visit, PSB informed us that it developed a voluntary survey for complainants to complete after the conclusion of the investigation; the survey would capture complainants' demographic information.  MCSO utilizes prepaid postage return envelopes when mailing to the surveys to the complainants.  The use of the prepaid postage return envelopes allows the complainants to mail the survey to MCSO without having to incur any fees.  PSB commenced distribution of the surveys to complainants for cases that were closed during January 2020.  In addition, PSB is also informing complainants of a web-based version of the survey that may be completed online.  PSB is now collecting the voluntary surveys that are returned.  PSB continues to include the relevant demographic information in the most recently published semi-annual report.

In 2022 and through August 2023, MCSO had been publishing the semi-annual report in an untimely manner.  During our October 2023 site visit, MCSO informed us that future reports will be published in a more efficient and timely manner.  MCSO informed us that the agency is processing information for the report on an ongoing basis, as opposed to waiting until the end of the semi-annual period.  MCSO stated that it anticipated that future reports would be published within four to six months after the conclusion of the semi-annual period by using this process.

During this reporting period, on September 17, 2025, MCSO published the semi-annual report covering the dates of January 1-June 30, 2025. We consider the publication of the report as timely, and within six months after the conclusion of the semi-annual period. The previous semi-annual report was also published in a timely manner. The report contains an analysis as to whether cases assigned outside of PSB were properly categorized, whether the investigations were properly conducted, and whether appropriate findings have been reached. MCSO remains in compliance with this requirement.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 252.** *The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.*

**In Full and Effective Compliance**

PSB publishes detailed summaries each month of completed misconduct investigations in an electronic format that is accessible via MCSO's website. The following data fields have been identified for public disclosure: Internal Affairs Number; Date Opened; Incident Type; Original Complaint; Policy Violation(s) Alleged and the Outcome; Discipline; Investigative Summary; and Date Completed. During our April 2017 site visit, we approved the PSB template containing detailed summaries of completed misconduct investigations for placement on the MCSO website. Each reporting period, we conduct a review of the detailed summaries of completed misconduct investigations to ensure that the content is consistent with the requirements of this Paragraph. In addition, we verify that the monthly detailed summaries of completed misconduct investigations are posted on MCSO's website for public review.

During this reporting period, PSB made the monthly detailed summaries of completed internal investigations for July-September 2025 available to the public in a designated section on the homepage of MCSO's website. The reports provide significant details regarding alleged misconduct, the findings of the investigation, and, if there is a finding of misconduct, what type of discipline was imposed.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 253.** *The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:*

a.      *complaint notification procedures were not followed;*

b.      *a misconduct complaint was not assigned a unique identifier;*

c.      *investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;*

d.      *deadlines were not met;*

e.      *an investigation was conducted by an employee who had not received required misconduct investigation training;*

f.      *an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;*

g.      *an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;*

h.      *an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;*

i.      *any interviews were not recorded;*

j.      *the investigation report was not reviewed by the appropriate personnel;*

k.      *employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;*

l.      *a final finding was not reached on a misconduct allegation;*

m.      *an employee's disciplinary history was not documented in a disciplinary recommendation; or*

n.      *no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.*

**In Full and Effective Compliance**

On June 26, 2018, we approved the methodology developed by AIU for the inspection that would address the requirements of this Paragraph, which would start with an inspection of investigations that commenced after November 1, 2017. AIU has opted to conduct monthly inspections of misconduct investigations in lieu of conducting a semi-annual audit. During this reporting period, AIU prepared inspection reports for misconduct investigations that closed during May-July 2025.

When perceived deficiencies are identified, AIU requests a BIO Action Form from the specific District/Division Commander to address the issue(s).

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

### I.    *Testing Program for Civilian Complaint Intake*

**Paragraph 254.** *The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau upon the receipt of a civilian complaint.*

**In Full and Effective Compliance**

To meet the requirements of this Paragraph, AIU has contracted with an external vendor, which is responsible for conducting complaint intake testing via telephone, email, U.S. Mail, MCSO's website, and in-person tests. MCSO has been working with the current vendor since early 2024. The testers, under the direction of the vendor, file fictitious complaints to conduct the testing. We receive and review documentation of these tests – including any available video and audio-recorded documentation – as they are completed, as part of our monthly document requests. Unless the test is an in-person test, the vendor did not advise AIU of the tests in advance but instead emailed AIU once a test has been completed with documentation of the test. We evaluate MCSO's compliance with this Paragraph based on how the agency responds to the outcomes of the tests, regardless of whether the tests "succeed" or "fail."

Following the outcome of several past complaint intake tests in which front-line staff responded inappropriately, AIU developed a useful complaint intake checklist for administrative staff, which we and the Parties reviewed and approved. MCSO distributed the checklist to the Patrol Divisions for dissemination to their personnel who interact with the public, and the checklist is available to all employees via the agency's shared internal hard drive. AIU also publishes its monthly inspection reports for public viewing at mcsobio.org.

During this reporting period, the vendor conducted six complaint intake tests. We conducted a review of the documentation of the tests conducted and agree with the findings contained in the reports.

In July 2025, the complaint intake tests consisted of one in-person test and one via PSB's hotline phone number. The in-person test, which was conducted at District 7, determined that the sergeant that took the complaint followed the documentation procedures for the taking of the complaint, and provided the tester with information on the procedures. The complaint intake test conducted via PSB's telephone hotline, which is available 24 hours, yet only available for receiving voicemail after work hours. In this test, the tester left a voicemail message. PSB retrieved the voicemail message and determined that the complaint information was properly entered into Blue Team; the tester was provided an email advising of PSB's receipt of the voicemail message.

In August 2025, the intake tests consisted of one via U.S. mail and one in-person test. The test conducted via mail was determined to have been processed properly by PSB personnel. The in-person test, which was conducted at PSB's office, determined that the sergeant that took the complaint followed the documentation procedures for the taking of the complaint, and provided the tester with information on the procedures.

In September 2025, the intake tests consisted of one via MCSO's website and one in-person test. USPS mail to PSB. The test conducted via MCSO's website was determined to have been processed properly by PSB personnel. The in-person test was conducted at the Northwest Regional District Court. In that case, the deputy did not follow the procedure requiring that a supervisor be notified to take the complaint. Instead, the deputy provided a complaint form/brochure to the tester and explained it to the tester. The in-person test case was deemed a failure. During our October 2025 site visit, AIU stated that the case was in the review process by the deputy's captain; and MCSO is considering re-training. Although that decision was not yet confirmed, BIO will generate an Action Form to document the corrective action(s).

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 255.** *The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.*

**In Full and Effective Compliance**

AIU has informed its complaint intake testing vendor of this requirement. In addition, AIU developed several procedures to ensure that the Complaint Intake Testing Program does not waste resources investigating fictitious complaints made by testers – including setting parameters for the types of inquiries that testers make and creating official identification cards for testers designating them as such. For in-person tests, AIU required that its vendor inform AIU in advance of all tests; and AIU personnel made themselves available via telephone if testers encountered any issue as they lodged their test complaints.

During our April 2024 site visit, AIU personnel informed us that PSB personnel had expended considerable time and effort gathering data on several fictitious complaints before PSB was notified that they were tests. During our July 2024 site visit, AIU informed us that AIU's Operations Manual has been updated to resolve this issue. During our October 2024 site visit, AIU advised us that it has not made any additional updates since that time. During our site visits in 2025, MCSO did not notify us of any further issues related to this topic.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 256.***  *The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website.  Testers shall not interfere with deputies taking law enforcement action.  Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.*

**In Full and Effective Compliance**

AIU advised its complaint intake testing vendor that testers shall not interfere with deputies taking law enforcement action, nor shall they attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

AIU had asked its vendor to inform AIU in advance of all in-person tests, and AIU personnel made themselves available via telephone if testers encountered any issue as they lodged their test complaints.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 257.***  *The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.*

**In Full and Effective Compliance**

AIU informed its complaint intake testing vendor of the requirements of this Paragraph.  We receive copies of the recordings following the completion of the tests.  Per the agreed-upon methodology, all tests conducted via telephone are audio-recorded; and all in-person testers' interactions with MCSO personnel are video-recorded to assess the appropriateness of responses and information provided.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 258.***  *The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.*

**In Full and Effective Compliance**

AIU informed its complaint intake testing vendor of the requirements of this Paragraph so that the tests it conducts shall also assess whether employees promptly notify PSB of civilian complaints and provide accurate and complete information to the Bureau.

As it receives documentation about completed tests, AIU reviews the information; and issues BIO Action Forms, authors memorandums of concern, or takes other appropriate action if a test fails or raises any concerns about the conduct of MCSO employees.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 259.** *MCSO shall not permit current or former employees to serve as testers.*

**In Full and Effective Compliance**

AIU informed its complaint intake testing vendor of this requirement. AIU personnel have informed us that no current or former employees have served, or will serve in the future, as testers.

On April 1, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 260.** *The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:*

a.     *a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, mail, and electronic);*

b.     *the number and proportion of tests in which employees responded inappropriately to a tester;*

c.     *the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;*

d.     *the number and proportion of tests in which employees failed to promptly notify the Professional Standards Bureau of the civilian complaint;*

e.     *the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;*

f.     *an evaluation of the civilian complaint intake based upon the results of the testing program; and*

g.     *a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.*

**In Full and Effective Compliance**

MCSO informed us during our February 2024 site visit, that it had identified a new vendor that began working with AIU in early 2024. We have reviewed the complaint intake testing documentation by the new vendor and found it to be thorough and meeting the requirements set by MCSO and this Paragraph.

While not required by this Paragraph, AIU also continues to issue monthly reports on complaint intake testing. We review these reports and find that they accurately summarize the results of the complaint intake tests and any follow-up actions taken by AIU. We reviewed AIU's monthly reports for July-September 2025. Each of the reports contains summaries of the tests that were conducted during this reporting period.

During this reporting period, MCSO published its fifth annual report on the complaint intake testing program, which covers the time period of July 1, 2024-June 30, 2025.  The report summarizes the tests, which we have discussed in our quarterly status reports.  In all tests in which AIU identified deficiencies, it followed up appropriately using BIO Action Forms or other corrective actions.

MCSO remains in compliance with this requirement.

On April 8, 2024, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

## Section 13: Community Outreach and Community Advisory Board

**COURT ORDER XVI.    COMMUNITY    OUTREACH    AND    COMMUNITY ADVISORY BOARD**

**Paragraph 261.** *The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The CAB continues to explore the possibility of retaining a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel. The CAB is particularly interested in learning more about any barriers to filing complaints that may exist for members of the Plaintiffs' class.

**Paragraph 262.** *In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The CAB's approved budget includes categories for expenses including community meetings; video production (to produce a short video in English and Spanish that provides information about the CAB and the MCSO complaint process); marketing materials; stipends for an assistant to help coordinate CAB meeting logistics; and reimbursement for CAB members' meeting expenses.

Following the Monitor's approval of the CAB's budget, the CAB established a bank account, and the County provided the $15,000. CAB members developed procedures for tracking funds and receiving reimbursement. We meet regularly with CAB members to discuss these procedures and review the CAB's expenditures to date; these records appear to be in order.

## Section 14: Supervision and Staffing

**COURT ORDER XVII.       SUPERVISION AND STAFFING**

***Paragraph 263.*** *The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent Injunction.*

***Paragraph 264.*** *The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.*

**In Full and Effective Compliance**

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2025. For July, we reviewed a sample of shift rosters from Districts 1, 3, and 7. For August, we reviewed a sample of shift rosters from Districts 2, 4 and 5. For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3. Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 265.*** *First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.*

**In Full and Effective Compliance**

Paragraph 265 is a general directive that covers several aspects of supervision. MCSO must meet the requirements in Paragraphs 83, 85, 89, 90, 91, 93, and 94 to meet the requirements of this Paragraph. For the third quarter of 2025, MCSO was in compliance with all the required Paragraphs.

On April 11, 2025, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 266.*** *First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

To assess Phase 2 compliance with this Paragraph, we review a sample of daily shift rosters for the three months of the reporting period. We examine rosters to ensure that Patrol supervisors are not assigned more personnel than they can effectively supervise. We base our findings on the sample of rosters requested for the quarter. We review rosters to ensure supervisors oversee no more than 10 persons; this could include a combination of deputies, Deputy Service Aides (DSAs), and Posse members. We consider any shift where a supervisor had more than 10 persons to be noncompliant, as per this Paragraph's requirement. In addition, we monitor submissions by Patrol supervisors indicating the shifts where the span of control was exceeded.

As per MCSO policy, supervisors are required to document shifts where the span of control was exceeded in a memorandum to the District Commander. We review each memo to determine if the reasons for exceeding the span of control were reasonable and unforeseen. If the circumstances leading to the span of control being exceeded are acceptable and correctly documented, we consider that shift to be in compliance.

On September 27, 2023, the Court entered an Order granting MCSO's request to increase the span of control as part of a 12-month pilot program overseen by the Monitor. The pilot program increased the span of control with respect to civilian personnel, and authorized Patrol supervisors to oversee eight deputies and four non-sworn personnel (which may include up to two Posse members, and two Deputy Service Aides). Since the inception of this Order, and pursuant to the Court's directive, we have been requesting additional documentation pertaining to DSA and Posse activities. We have reviewed documents pertaining to supervisor responses to DSA calls for service, as well as incidents where Posse members were present.

During the third quarter, we requested Computer Aided Dispatch (CAD) logs documenting incidents where supervisors have responded to DSA calls, and we requested a sample of PALs for Posse members for each month of the quarter.  It is also our standard practice to review all investigations involving allegations of misconduct involving DSA and Posse members.  During our compliance site visit in October 2025, we reviewed BWC video for incidents in which DSAs and Posse members were involved, to ensure compliance with Order requirements.  In addition, during our site visits, we have been interviewing field supervisors to ascertain any impacts related to the change in the span of control.  We submitted our findings and recommendations to the Court for review.

On October 29, 2025, the Court extended the pilot program, with additional requirements, from November 1, 2025, to October 31, 2026.  In its Order, the Court directed the Monitoring Team to assess compliance with the following:  a) whether Posse members reporting for duty at patrol districts were subject to identified and consistent supervision; b) whether Posse members that commence their duties at the beginning of a regularly assigned patrol shift are identified on the patrol shift roster; c) in those instances where Posse members report for duty after the shift has begun, whether the patrol supervisor ensures that the Posse member is briefed on issues that were addressed at the beginning of the shift, and whether the Posse member is added to the patrol shift roster; d) Whether all Posse members working in patrol districts are assigned and appropriately wear and use body-worn camera at all times during their shift; and e) whether Posse members submit Patrol Activity Logs (PALs) at the end of their shift.  The Court directed the Monitoring Team to submit an addendum to our original recommendation at the conclusion of the one-year period.  Pursuant to the Court's directive, we will revise the documentation requested from MCSO, review the information provided, and submit an assessment of compliance to the Court and the Parties.

To verify Phase 2 compliance with this Paragraph, we reviewed monthly rosters and shift rosters for the third quarter of 2025.  For July, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  For August, we reviewed a sample of shift rosters from Districts 4, 5, and 7.  For September, we reviewed a sample of shift rosters from Districts 1, 2, and 3.  Our reviews of monthly and daily rosters indicated that deputies were assigned to a single consistent supervisor, and deputies worked the same shifts as their supervisors.  During the third quarter of 2025, there were no shifts where supervisors had responsibility for more deputies than permitted by this Paragraph.

For July, there were no span of control memos submitted.  All 18 shifts reviewed for July were in compliance.

For August, District 1 submitted five span of control memos for the month.  The first memo documented a shift where a supervisor had oversight of nine deputies and one Posse member, for a total of 10 subordinates.  The second memo documented a shift where a supervisor had oversight of 10 deputies and two OITs (Officers in Training) riding with FTOs (Field Training Officers).  As noted in Paragraph 84, we count an FTO and an OIT riding in the same vehicle as one subordinate.  Therefore, the total amount of subordinates for the supervisor, in this shift, was 10.  The third memo documented a shift where a supervisor had oversight of nine deputies, one Posse member, and two OITs riding with FTOs.  The total amount of subordinates for this supervisor,

in this shift, was 10.  The fourth and fifth memos documented shifts where supervisors had oversight of ten deputies each.  Districts 2, 3, 4, 5, and 7 did not submit any span of control memos for August.  All 18 shifts reviewed for August were in compliance.

For September, District 1 submitted three span of control memos.  The first memo documented a shift where a supervisor had oversight of 10 deputies and two Posse members.  This brings the total number of subordinates to 12 for this shift.  The second memo documented a shift where a supervisor had oversight of 10 deputies and two OITs.  The total number of subordinates for this shift was 10.  The third memo documented a shift where a supervisor had oversight of 11 deputies and two OITs.  The total number of subordinates for this shift was 11.  Districts 2, 3, 4, and 7 and Lake Patrol did not submit any span of control memos for September.  All 18 shifts reviewed for September were in compliance.

For third quarter of 2025, we reviewed selected dates when Posse members were on duty to determine compliance with this Paragraph.  We selected 20 incidents for each month of the quarter, for a total of 60 incidents.  We select samples from a CAD (Computer Aided Dispatch) report for incidents where Posse members were present.  For July, of the 20 incidents requested, 18 PALs were submitted for our review.  Two of the incidents had no associated PALs submitted for the date.  Of the 18 PALs submitted, only 14 had documentation of supervisory review.  Of the 20 incidents selected, only 14 of the Posse members involved in those incidents were documented in shift rosters.  For August, 20 PALs were submitted for the 20 incidents requested.  Of those 20 PALs, 17 had documentation of supervisory review.  Of the 20 incidents selected, only 14 of the Posse members involved in those incidents were documented in shift rosters.  For September, of the 20 incidents requested, 19 PALs were submitted for our review.  One incident had no associated PAL submitted for the date.  Of the 19 PALs submitted, only 12 had documentation of supervisory review.  Of the 20 incidents selected for review, only 14 of the Posse members involved in those incidents were documented in shift rosters.

From our sample selection of 60 incidents involving Posse, we reviewed 57 PALs for Posse members who were on scene during the selected incidents.  Of the 57 PALs reviewed during the third quarter, 43 had documentation of supervisory review, as required by GB-2 (Command Responsibility), or 75.44%.  Of the sample selection of 60 incidents where Posse members were involved, only 42 (70%) of the Posse members volunteering for the dates in question were documented on the daily rosters.

During our October site visit, we met with MCSO to review to BWC footage of incidents where DSAs and Posse members responded to incidents in the field.  From a list of incidents where DSAs and Posse members had been present, we selected 15 incidents for DSAs and 25 incidents for Posse.  We reviewed each of the incidents with MCSO staff.  In nine of the 15 incidents involving DSAs, there was associated BWC video, and all nine incidents with BWC recordings were reviewed.  For the incidents with no associated video, we were advised that in four of the incidents, the DSA was preempted or cancelled before arrival.  In two incidents there was no public contact.  Of the nine incidents involving DSAs where there was associated video recordings, four had announcement by the DSA that contact had ended.

Of the total 19 incidents involving Posse members selected for inspection, nine had associated BWC recordings. Ten incidents had no video, for different reasons. The reasons cited for no video included no contact with the public (eight incidents) and cancellation of the call prior to arrival (two incidents). We reviewed nine BWC recordings and observed similar results as in our last site visit reviews where Posse members failed to announce the end of contact. During our reviews of BWCs, we observed little or no direction provided to Posse members, by deputies or supervisors on the scene.

This Paragraph states "First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise." In our last two quarterly status reports, we noted our concerns with regard to the proper use of body-worn cameras by Posse members, as it relates to GJ-27. In our last two reports, we have also expressed our concerns in Paragraph 46, for the same reasons. For this reporting period, supervisors reviewed 43 Posse PALs of the provided sample of 57, or 75.44%; this is well below accepted compliance standards. In addition, of the sample selection of 60 incidents involving Posse members, only 42 of the 60 Posse members involved in those incidents were documented on shift rosters, or 70%. GJ-27 states, "Posse members working in this capacity shall be under the supervision and span of control of a sworn supervisor. Posse members utilized to provide Patrol Assistance shall be documented on Shift Rosters and the Patrol Activity Logs." GB-2 (Command Responsibility) requires that supervisors ensure all subordinates are listed on the shift roster, "First line patrol supervisors shall ensure that a Daily Shift Roster is completed for each shift in order to reflect the subordinates that are working under that supervisor for each day worked." In addition, GB-2 states, "Supervisors shall review the Patrol Activity Log (PAL) through Praxis for all patrol shifts worked by their assigned subordinates."

Our reviews, again for this quarter, found that several Posse members were actively working in Patrol but were not documented on the shift rosters. Our concern is that unless all working Posse members are properly documented on shift rosters, we will be unable to accurately determine compliance with span of control requirements. As noted in our assessment of this Paragraph's requirements, the compliance rate for supervisory review of Posse PALs for this quarter was 75.44%, and the compliance rate for Posse members being listed on shift rosters was 70%. During our October site visit to the Patrol districts, we inquired about procedures involving Posse members. We were advised that supervisors routinely add Posse members to shift rosters whenever they report for duty after the shift has begun, and that supervisors generally review all Posse PALs. In our meeting with District 1 supervisors, we were told that there was a temporary "software problem" where PALs showed no supervisor review, but the problem was subsequently fixed. However, our reviews of daily shift rosters and PALs for deputies, DSAs, and Posse for the last two quarters have only revealed inconsistent documentation and supervisory reviews, as it relates to Posse members, on both shift rosters and PALs. Our document reviews have continued to indicate that there have been Posse members present on incidents but not depicted on the daily shift rosters. If supervisors cannot effectively supervise Posse members under their purview, to include compliance with all policy directives, it affects compliance with the requirements of this Paragraph. In our last reporting period, we issued a noncompliance warning. During this quarter, MCSO failed to meet the requirements of this Paragraph. Additional comments on our compliance findings and concerns are listed under Paragraph 46.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion. However, MCSO is not in compliance with this Paragraph for this reporting period.

**Paragraph 267.** *Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.*

**Phase 1:** In compliance

- GB-2 (Command Responsibility), most recently amended on September 16, 2025.

**Phase 2:** In compliance

Close and effective supervision requires that supervisors consistently apply the concepts established in several Paragraphs of the First Order. There are requirements covered in other Paragraphs that directly concern Paragraph 267, and must therefore be in compliance for MCSO to establish compliance with this Paragraph. We have determined that for MCSO to meet the requirements of this Paragraph, it must achieve compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96.

During the third quarter, MCSO was in compliance with Paragraphs 83, 85, 89, 90, 91, 93, and 96. For the period in review, MCSO was in compliance with the requirements of Paragraph 267.

**Paragraph 268.** *During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

During the third quarter of 2025, MCSO submitted requests for the transfer of six employees, as it relates requirements of this Paragraph. MCSO requested the transfer of one employee to the Court Implementation Division (CID) and one employee out of CID. We reviewed the documentation provided and approved both transfers. MCSO requested the transfer of one sworn sergeant and two Detention sergeants into the Professional Standards Bureau (PSB), and one Detention sergeant out of PSB. These transfers were reviewed and approved. MCSO requested the transfer of one employee out of the Bureau of Internal Oversight (BIO). We reviewed the documentation provided for this transfer, and the transfer was approved.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However, while we previously found MCSO in compliance with this Paragraph, the findings of our inquiry reflect that the agency is no longer in compliance with the requirements of Paragraph 268. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

MCSO violated this Paragraph when Deputy Chief Summers authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate. Further, MCSO continued to violate this Paragraph when it failed to timely and formally get preapproval of the transfer and designation of any commander it intended to place or placed as head of PSB, CID, or BIO. MCSO further violated this Paragraph when it requested, for pretextual reasons, that Captain Lugo be removed as PSB Commander and transferred into the Court Security Division. The Monitor considered the transfer request to be retaliatory in nature, due to Captain's Lugo rebuffing of the administration's inquiries to act in violation of established policies and the Court Orders.

## Section 15: Document Preservation and Production

**COURT ORDER XVIII.    DOCUMENT PRESERVATION AND PRODUCTION**

*Paragraph 269.  The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.*

**Phase 1:**  In compliance

- GD-9 (Litigation Initiation, Legal Hold and Document Production Notices), most recently amended on October 7, 2025.

- GD-9 Exterro User Guide, most recently amended on October 7, 2025.

**Phase 2:**  In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of document preservation notices or legal holds to MCSO employees.  The data reviewed for this reporting period included June through August 2025, as per an agreement that we reached with MCSO to stagger our document requests for this Paragraph due to the large volume of data that MCSO had to provide prior to our site visits.

Document preservation is set in motion when a party sends a legal hold notice to MCSO requesting the preservation of relevant documents or records and electronically stored information (ESI), in anticipation of future litigation against the agency.

Upon the receipt of a litigation hold, which is usually sent by the Maricopa County Attorney's Office (MCAO), the PRRM inputs the data into the system, which conducts a search for responsive documents within MCSO computer drives.  The system also identifies potential document custodians, which are later filtered by an PRRM employee.  The PRRM then serves the custodians with a legal hold in electronic format, known as a Legal Hold Questionnaire, within five business days.  Upon receipt of the notice, MCSO custodians must acknowledge receipt of the request and then complete a questionnaire that identifies responsive documents, both electronic and hardcopies; and preserve them in the way they are kept in the regular course of business.

For this Paragraph, we reviewed all files provided by MCSO through ShareFile.  We reviewed a sample of the third-party source documents that generate the litigation holds that the PRRM receives from MCAO and third parties.  The Legal Hold Questionnaires that were sent out were distributed in a timely manner 100% of the time, to the custodians who may have responsive documents.

The Legal Hold Questionnaire requires employees to: 1) acknowledge receipt of the legal hold; 2) acknowledge their responsibility to preserve records; 3) provide details regarding what they have done to research responsive records, documents, or ESI; and 4) identify what records, documents, or ESI they are preserving.  GD-9 requires that the Questionnaire be completed within 10 business days and provides a warning regarding the consequences of not preserving records.

During this reporting period, MCSO employees returned the Legal Hold Questionnaire within the required 10 business days 94% of the time.

MCSO's Public Records and Requests Management Section (PRRM) had been managing litigation holds through Open Axes, a software program. In January 2021, MCSO migrated data from the legacy systems to OneDrive, and into an on-premises storage array (Qumulo). There was no connectivity between these systems and Open Axes, which later required MCSO to perform reruns of data. The process became protracted in part due to the vendor. During the first quarter of 2023. the agency informed us that it was seeking to procure a new vendor for legal hold and discovery. As a result, we deferred compliance with this Paragraph.

During the past year, MCSO has been working to procure Exterro and transition to its platform. We learned during our October 2025 site visit that the Exterro platform was operational and that MCSO had fully transitioned from Open Axes. Accordingly, MCSO updated GD-9 (Litigation Initiation, Legal Hold and Document Production Notices) on October 7, 2025. The agency also disseminated Administrative Broadcast 25-51, notifying employees that OpenAxes had been replaced by Exterro; Administrative Broadcast 25-52, announcing that the PRRM had effectively implemented Exterro; and Briefing Board 25-35 associated with the Exterro User Guide. All employees were then trained on the Exterro tool.

MCSO is now in compliance with this Paragraph.

**Paragraph 270.** *The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:*

a.   *promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;*

b.   *ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and*

c.   *ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.*

**Phase 1:** In compliance

- Administrative Services Division (ASD) Operations Manual, most recently amended on November 26, 2024.

- GD-9 (Litigation Initiation, Legal Hold, and Document Production Notices), most recently amended on October 7, 2025.

- GD-9 Exterro User Guide, most recently amended on October 7, 2025.

- GM-1 (Electronic Communications, Data and Voicemail), most recently amended on March 7, 2024.

**Phase 2:** In compliance

To verify MCSO's Phase 2 compliance with this Paragraph, we reviewed monthly submissions of requests for documents to MCSO employees for the reporting period, and documents drafted by the PRRM in search of documents from other MCSO Divisions. For this reporting period, we identified a sample of document requests and received a copy of the responsive documents sequestered and/or produced. The data reviewed for this reporting period included June through August 2025, as per an agreement we reached with MCSO to stagger our document requests for this Paragraph. This was due to the large volume of data that MCSO had to provide prior to our site visits.

MCSO's Public Records and Requests Management Section (PRRM) had been managing litigation holds through Open Axes, a software program. In January 2021, MCSO migrated data from the legacy systems to OneDrive, and into an on-premises storage array (Qumulo). There was no connectivity between these systems and Open Axes, which later required MCSO to perform reruns of data. The process became protracted, in part due to the vendor. During the first quarter of 2023. the agency informed us that it was in the process of procuring a new vendor for legal hold and discovery. As a result, we deferred our compliance finding for this Paragraph.

During the past year, MCSO has been in an ongoing process of procuring Exterro and transitioning into its platform. We learned during our October 2025 site visit that the Exterro platform was operational, and MCSO had fully transitioned from Open Axes. MCSO updated GD-9 (Litigation Initiation, Legal Hold and Document Production Notices) on October 7, 2025. The agency also disseminated Administrative Broadcast 25-51 on October 2, 2025, notifying employees that OpenAxes has been replaced by Exterro; Administrative Broadcast 25-52, announcing that the PRRM had effectively implemented Exterro; and Briefing Board 2535, associated with the Exterro User Guide. All employees were then trained on the Exterro tool. As a result, MCSO is now in compliance with this Paragraph.

Paragraph 270.a. requires prompt communication of document requests to all personnel who could possibly be in possession of responsive documents. GD-9 requires the PRRM to enter the data into a tracking system within five business days of receipt and to draft a Legal Hold Questionnaire within five additional business days. The PRRM is required, within five business days, to respond to the request for production if sourced within PRRM, or to forward to the required MCSO Division for production. The Divisions have 10 days to produce the data requested. During this reporting period, we found that in 100% of the cases, the PRRM promptly communicated document requests to personnel who might be in possession of responsive documents.

Our review revealed that MCSO is manually forwarding the Document Production Notices in a timely manner to all its Divisions. In addition, MCSO is sending the Document Production Acknowledgement Questionnaire (Attachment B), to all employees. In 100% of the cases, the personnel who provided responsive documents properly completed Attachment B.

Paragraph 270.b. requires that all responsive electronically stored information (ESI) be stored, sequestered, and preserved by MCSO through a centralized process. MCSO performs the searches through a centralized process established by the PRRM. For this reporting period, the preservation of the data was completed at the Division that had the actual document, while the notation was made in the software program, to aid the PRRM in the case management. For this

Paragraph, we review the data and visit MCSO areas to ensure that personnel are informed of the duty to preserve the data in both electronic and hardcopies, and that the employees are preserving the data.   During this reporting period, we visited the following MCSO Divisions: Telecommunications, Human Resources, Computer Assisted Dispatch, Property and Evidence, Training, Towers Jail, Lower Buckeye Jail, Inmate Medical Services and the Watkins Intake, Transfer and Release facility.  All data with a legal hold was being preserved.

Paragraph 270.c. requires that MCSO conduct an adequate search for documents, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.  We reviewed a sample of responsive documents for this reporting period, and MCSO identified responsive documents to the document production notices in all cases we reviewed.

***Paragraph 271.***  *Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation.  Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.*

**In Full and Effective Compliance**

On October 7, 2025, MCSO revised the Administrative Services Division Operations Manual, which details the protocols for the legal holds requested in litigation.

On April 11, 2025, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

***Paragraph 272.***  *The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.*

**In Full and Effective Compliance**

During this reporting period, the data revealed that no internal investigations were completed against any MCSO employee for failure to preserve or produce documents.

On September 30, 2022, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## Section 16: Additional Training

**COURT ORDER XIX.        ADDITIONAL TRAINING**

***Paragraph 273.*** *Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.*

**In Full and Effective Compliance**

MCSO previously delivered this training on the E-Policy platform. All personnel (100%) determined to be applicable by CID have received this training.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

## Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiffs' Class

**COURT ORDER XX.        COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFFS' CLASS**

*Paragraph 274.  In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiffs' class, the Court further orders as follows:*

### A.        Investigations to be Overseen and/or Conducted by the Monitor

*Paragraph 275.  The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters.  The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.*

*Paragraph 276.  The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.*

**In Full and Effective Compliance**

The Second Order requires oversight by the Monitor for all internal investigations determined to be Class Remedial Matters (CRMs).  The Professional Standards Bureau (PSB) schedules meetings every two weeks to discuss existing and incoming complaints to determine which, if any, could be CRMs.  During these meetings, PSB personnel discuss cases pending a CRM decision, cases determined to be CRMs, and any cases where the decision may be made that the case would not be classified as a CRM.  The PSB Commander determines the classification of the cases.  A member of our Team attends all of these meetings to provide the oversight required for this Paragraph.

At the end of the July-September 2016 reporting period, PSB had reviewed 442 administrative investigations that were open as of July 20, 2016; and determined that 42 of them met the basic criteria for CRMs.  These cases were reviewed during the scheduled CRM meetings.  In addition, we randomly selected an additional 52 cases from the 400 remaining pending cases; and concurred with PSB's assessment that the cases did not meet the basic criteria for CRMs.  In

addition to the 42 cases determined to be potential CRMs from the pending case list as of July 20, 2016, PSB identified an additional 10 cases that were potential CRM cases. At the end of the first reporting period after the entry of the Second Order, nine cases had been determined to be CRMs; and one other was pending a CRM decision. The remaining cases reviewed were determined not to be CRMs.

At the end of this reporting period, there were a total of 840 cases that have been reviewed as possible CRMs; and 159 cases that have been determined to be CRMs since the entry of the Second Order (July 20, 2016). At the end of this reporting period, MCSO had completed and submitted a total of 156 CRM cases for our review. Three were pending completion and finalization at the end of this reporting period.

Of the CRM cases that have been closed to date with findings of sustained misconduct and reviewed by our Team, 16 have involved employees who are deceased or left MCSO employment prior to the completion of the investigation or the disciplinary process. Sixty-one have involved current employees of MCSO. Eight of the cases closed to date involved a sustained finding of misconduct involving bias related to the Plaintiffs' class: six sustained allegations of an inappropriate and biased comment; and two sustained allegations of bias-based policing.

During the scheduled meetings, case investigators continue to provide investigative updates on all cases that could be, or are, CRMs. Their briefings are thorough, and they continue to be responsive to any questions, suggestions, or input from members of our Team. In all cases where we have provided oversight since July 20, 2016, we concurred with the decisions made by the PSB Commander regarding the case classifications and findings based on the briefings provided during the CRM meetings. Where appropriate, we also approved the discipline in these cases.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

**Paragraph 277.** *This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288 below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.*

*Paragraph 278.* *The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.*

**In Full and Effective Compliance**

Since the first CRM meeting held on August 17, 2016, PSB has consistently completed the required notification to us regarding the cases that could be considered CRMs. A Monitoring Team member has attended every CRM meeting with PSB where these matters are discussed and personally reviewed a number of the cases that were pending on July 20, 2016; and our Team member reviews the new cases that are presented at each meeting. There has been no need for us to independently identify CRMs, as PSB consistently properly identifies and reports these cases as required.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 279.* *The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.*

**In Full and Effective Compliance**

During the scheduled CRM meetings attended by Monitoring Team members, PSB has consistently properly identified cases that could be, or are, CRMs. PSB personnel brief each case at these meetings, and their briefings have included all appropriate information. They have been responsive to questions from our Team members during the meetings, and they have responded appropriately to the recommendations we have offered. There has been no need for us to independently conduct any review, research, or investigation.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 280.* *The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

During this reporting period, cases involving both sworn and non-sworn members of MCSO have continued to be reviewed as CRMs when appropriate, and written notice has been provided to the Court. There were no appeals by any Parties regarding any of the CRM classifications.

***Paragraph 281.*** *Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.*

**Phase 1:** In compliance

- GC-16 (Employee Grievance Procedures), most recently amended on January 16, 2025.

- GC-17 (Employee Disciplinary Procedures), most recently amended on November 22, 2024.

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

- Administrative Services Division (ASD) Operations Manual, most recently amended on November 26, 2024.

- Professional Standards Bureau (PSB) Operations Manual, most recently amended on November 13, 2023.

**Phase 2:** Not in compliance

To evaluate Phase 2 compliance with this Paragraph, a Monitoring Team member has attended each meeting conducted by PSB to discuss Class Remedial Matters.

The Plaintiffs and the Plaintiff-Intervenor have previously forwarded to us concerns about certain CRM investigations submitted by MCSO for our review. Upon further review of some of the cases they provided, we concluded that, in some, additional scrutiny of these investigations by PSB was warranted. We continue to meet with PSB to discuss concerns and provide information regarding areas where we believe improvements can be made. Our discussions continue to include: ensuring that credibility assessments, where appropriate, are conducted and well-documented in reports; that the appropriate standard of proof is considered and properly documented in reports; that in the event disparate treatment is at issue in a case, the employee's history is reviewed to determine if there is any pattern, and where necessary, additional interview questions are asked; and that if a single employee has repeated allegations of similar misconduct, a review is conducted to determine if there is any pattern that needs to be addressed. We have also discussed potential training opportunities for PSB investigators on both disparate treatment and credibility assessments. We were hopeful that some appropriate training could be identified and delivered as part of the required eight-hour training for PSB investigators in 2023.

In a meeting with PSB in August 2023, the PSB Commander informed us again that the Bureau had not yet located any potential training that he believed would be appropriate regarding either disparate treatment or conducting credibility assessments. He again advised us that the annual training for the year would be dedicated to the new requirements of the Third Order and those policies and protocols that would be revised as a result. We previously had recommended that PSB continue to look for training to address the specific focus areas we had identified. PSB advised that in June 2023, the Training Division reached out to the Parties and our Team to request input on proposed topics and potential vendors for the 2024 PSB8 internal training. We provided potential training recommendations. Previously, the PSB Commander had also located one possible training course on credibility assessments that he was researching.

During our October 2024 site visit, PSB advised us that the vendor selected and approved to deliver customized training to PSB investigators, which included training on disparate treatment and credibility assessments, had completed the training.

During the last reporting period, there was one CRM case finalized by MCSO and submitted for our review. We concurred with the findings of the PSB Commander in this case. This investigation was completed and finalized within the 180-day timeframe.

During this reporting period, there were three CRM cases completed by PSB and submitted for our review. We meet with PSB every two weeks to identify cases that should be considered CRMs. We also track the progress of those cases as they are investigated, reviewed, and finalized. Each step of the process requires review and approval by our Team.

One of the three CRM cases we reviewed this reporting period was completed and finalized within the 180-day timeframe. The other two investigations were completed within 475 and 496 days, respectively. The average number of days for full closure of the three investigations was 354 days. All three of the CRM cases we reviewed for this reporting period involved sworn personnel.

Two CRM investigations were internally generated. Both involved an MCSO supervisor contacting Immigration Customs and Enforcement (ICE) to determine the legal status of two persons found to be in possession of and firing firearms in their neighborhoods, after deputies were unable to obtain proper identification documents from the suspects. The inquiries were made to determine if the charge of possession of a deadly weapon by a prohibited possessor was appropriate in addition to other charges being filed. Neither subject was ultimately charged with this violation. The investigation determined that while the inquiry was not inappropriate, MCSO had not provided proper direction to its employees regarding the use of the prohibited possessor statute. MCSO has since provided clarification to all MCSO personnel. One employee was sustained for failure to provide all information required on booking paperwork.

One CRM investigation was initiated when a complainant alleged that a sworn employee had made an unprofessional statement about only writing citations to Hispanic persons. This was alleged to have occurred in a meeting with other County employees present. MCSO completed a thorough investigation. None of the attendees at the meeting heard the MCSO employee make this or any other inappropriate comment, and the employee adamantly denied doing so. A review of citations issued by this employee did not reveal any indication that citations were inappropriately issued or only issued to Hispanic persons.

We concurred with the findings in the three CRM cases we reviewed this reporting period.

In MCSO's 45th quarterly compliance report, the agency asserted, to support its argument for a finding of in compliance for this Paragraph, that "no CRMS are on the backlog."

Over the years that we have met with PSB to discuss possible CRMs, there have been numerous occasions where PSB would bring a case forward months – or in some cases, *years* – after the initial complaint was made. In 2024 and 2025 alone, PSB brought forward no fewer than seven cases as possible CRMs that would have been part of the backlog; the oldest of these cases was initiated in 2019. Generally, this might occur for one of the following reasons: a complainant's Hispanic surname is not identified during the initial complaint intake; the complainant does not have a Hispanic surname, but it is discovered during the investigation or during the quality review of the case that the complainant was Hispanic; and though the complainant is not Hispanic, the allegations include bias affecting members of the Plaintiffs' class.

Given our experience with PSB and its review of potential CRMs, we believe, that had these complaints been investigated at the time that they were received, PSB would have most likely identified that these complaints were potential CRM cases early in the investigation; and the cases would have been brought forward in a timely manner. Though these cases were *not* brought forward when they were initiated, PSB brought them forward as soon as PSB personnel realized, often in the quality control review process prior to finalizing a case, that they should have been reviewed.

We have not found MCSO noncompliant for these failures, as the agency has consistently ensured that, once identified, the cases are brought forward for review. However, while our review of these seven cases did not identify any that should have been CRMs, we cannot support MCSO's assertion that there are no CRMs in the backlog. It is simply inappropriate to make that determination until all of the backlog cases have been completed.

***Paragraph 282.*** *The Sheriff and/or his appointee may exercise the authority given pursuant to this Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.*

**In Full and Effective Compliance**

There were no CRM cases completed during this, or previous reporting periods, in which the Sheriff and/or his appointee exercised their authority to resolve CRMs, which we needed to vacate or override.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 283.*  *The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

At the end of this reporting period, MCSO had completed a total of 157 CRM cases since July 20, 2016.  Three were completed and submitted for our review during this reporting period.

*Paragraph 284.*  *The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions.  The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.*

**In Full and Effective Compliance**

During this and previous reporting periods, a Monitoring Team member has attended all scheduled CRM meetings conducted in an appropriate location determined by MCSO.  PSB continues to provide a password and access to the IAPro system to a member of our Team so that we can complete independent case reviews if necessary.

PSB personnel continue to be professional and responsive to all input, questions, or concerns we have raised.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph.  After review, we concurred with this assertion.

*Paragraph 285.*  *Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

Since we began monitoring CRM cases in July 2016, there have been numerous cases with sustained findings.  In all cases, we have concurred with the disciplinary findings of MCSO; and there has been no action necessary on our part relative to this Paragraph.

*Paragraph 286.* *Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.*

**In Full and Effective Compliance**

During this reporting period, three CRM case was completed and submitted for our review. They did not involve potential criminal violations. No action on our part relative to this Paragraph was necessary.

On January 6, 2023, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

*Paragraph 287.* *Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law or MCSO policy to appeal or grieve that decision with the following alterations:*

a.     *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b.     *disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.*

**In Full and Effective Compliance**

Seventy-seven completed CRM cases have had sustained findings of misconduct since the issuance of the Second Order. We have concurred with all of MCSO's sustained findings.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

***Paragraph 288.***  *The Monitor's authority over Class Remedial Matters will cease when both:*

a,  *The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.*

b.  *The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.*

**Phase 1:**  Not applicable

**Phase 2:**  Not in compliance

PSB is responsible for the investigation of all CRM cases and has continued to appropriately identify cases that could be, or are, CRMs.  PSB personnel have been responsive to any concerns or questions we have raised, and have taken our input, comments, and recommendations into account prior to proceeding in their determination of CRM classification, case investigation needs, and case findings.  They have continued to provide detailed information and updates in the scheduled briefings.

Throughout our discussions and reviews of CRMs, we have considered this process to be a collaborative one and have often provided comments or suggestions during our ongoing discussions.  This has, in some cases, allowed MCSO to revise its decisions prior to the cases being finalized, preventing the necessity for our Team to overrule the agency's decisions, and allowing for in compliance findings.  We will continue to provide our comments, guidance, and assistance as long as it is necessary to ensure compliance.

During this reporting period, we reviewed three completed CRM case.  We found that all three complied with all investigative requirements, and we concurred with the outcomes.

In addition to the requirements of this Paragraph specific to the handling of CRM matters, it also requires that MCSO conduct appropriate internal affairs procedures and adequately investigate and adjudicate all matters to come to its attention.

As a result of our inquiry presented in detail earlier in this report, we identified serious concerns.  There was no good faith basis for the investigations initiated against Captain Lugo.  Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint process.  Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence.  Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave.  These actions, only days after a meeting between Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo support the contention that Captain Lugo was removed from PSB because of his

reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[127] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures.

MCSO had requested that the Monitor consider Captain Morrison to be BIO Commander. Deputy Chief Summers violated Paragraph 288 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate.

MCSO is not in compliance with the requirements of this Paragraph.


**Paragraph 289.** *To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

During this reporting period, we reviewed 186 administrative misconduct investigations, 162 Service Complaints, five PSB Diversions, and seven criminal misconduct investigations. We found all seven of the criminal investigations, 157 of 162 service complaints, and all five PSB Diversions in compliance with all requirements.

Of the total 186 administrative misconduct investigations we reviewed during this reporting period, 52 (28%) were finalized and closed within the required 180-day timeframe, the same percentage as the last reporting period. This is a decrease from 35% during the last reporting period.

There were two completed administrative misconduct investigations submitted for compliance with Paragraph 249 (investigatory stops). There were 25 investigations we reviewed for compliance with Paragraph 33 (bias policing). There were three investigations completed and reviewed for compliance with Paragraph 275 (CRMs) during this reporting period.

We found that PSB was in full compliance in 29 (20%) of the 143 investigations we reviewed, an increase from 17% during the last reporting. Of the nine investigations we reviewed that were conducted by outside vendors, six were in full compliance. Of the 34 investigations we reviewed that were conducted by Divisions and Districts outside of PSB, 14 (41%) were in full compliance, an increase from 37% during the last quarter. Overall compliance for all administrative misconduct investigations reviewed during this reporting period was 26%, an increase from 22% during the last reporting period

During each of our site visits, we meet with PSB personnel to discuss the deficiencies in those investigations conducted by both their personnel, outside vendors, and Divisions outside PSB. In July 2020, we also began meeting with the Deputy Chiefs who have oversight for investigations

conducted outside of PSB. Our intent for these meetings is to have meaningful discussion about deficiencies we continue to find, the actions being taken to address the ongoing concerns, and other ideas MCSO might have for addressing future deficiencies.

As a result of our inquiry presented in detail earlier in this report, we identified serious concerns. There was no good faith basis for the investigations initiated against Captain Lugo. Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint process. Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence. Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave. These actions, only days after a meeting between Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[128] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures.

MCSO had requested that the Monitor consider Captain Morrison as BIO Commander. Deputy Chief Summers violated Paragraph 290 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate.

MCSO is not in compliance with the requirements of this Paragraph.


***Paragraph 291.*** *The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

This report, including all commentary regarding MCSO's compliance with investigative and disciplinary requirements, serves as our report to the Court on these matters. An overall summary of our compliance observations and findings is provided below.

During this reporting period, we reviewed 186 administrative misconduct investigations and seven criminal misconduct investigations. All seven of the criminal investigations were in compliance with the Second Order. Of the 193 total administrative and criminal misconduct investigations we reviewed, 55 (28%) were in full compliance with the Second Order, an increase in full compliance from 22% during the last quarter. Of the 186 administrative investigations, 48 (26%) were in full compliance with the Second Order, an increase from 21% during the last reporting period.

In 2016, PSB provided us with a memorandum describing PSB's efforts in meeting the requirements of this Paragraph related to the Court's Findings of Fact. MCSO had outsourced three cases to another law enforcement agency, and an additional four investigations were pending outsourcing to an outside investigator. These cases were outsourced due to the involvement of the former Chief Deputy, or other conflicts of interest identified by MCSO, and included the investigations identified in Paragraph 300. MCSO processed a Request for Proposal and retained an outside investigator who met the requirements of Paragraphs 167.iii and 196 to conduct the investigations identified. One potential misconduct case identified in the Court's Findings of Fact was retained and investigated by PSB, as no identifiable conflict of interest appeared to exist.

Since 2016, MCSO has continued to outsource cases to this contract investigator and in 2021 began outsourcing cases to a second outside vendor to assist with the backlog of cases. During each site visit, we meet with PSB personnel to discuss the status of those cases that have been outsourced to any contract vendor, other law enforcement agency, or other person or entity, so that we can continue to monitor these investigations and ensure that all misconduct cases, including those identified in the Findings of Fact, are thoroughly investigated. PSB has continued to keep us apprised of the status of all such investigations.

During our July 2024 site visit, PSB advised that no new investigations were outsourced to the initial contract vendor the agency retained to conduct conflict cases. MCSO terminated its contract with this vendor the end of June 2024, and the 15 pending cases were returned to PSB for reassignment. Four new cases were outsourced to the second vendor, Jensen Hughes, retained to assist in reducing the backlog of administrative misconduct investigations. At the end of June 2024, this vendor had 22 pending cases; and 12 were submitted for our review during this reporting period. MCSO also advised us during our site visit that the agency had retained a new vendor, Baseline Investigations, to conduct conflict cases, but no investigations have yet been assigned to this vendor.

During the last reporting period, MCSO outsourced two new investigations to Jensen Hughes. This vendor had 17 pending cases, and two were submitted for our review. MCSO had not outsourced any investigations to the new vendor, Az Truth Finder, contracted to conduct conflict cases.

During this reporting period, MCSO did not outsource any new cases to Jensen Hughes. Eleven cases were pending completion, and nine were submitted for our review. MCSO assigned six cases to AZ Truth Finder, the new vendor contracted to conduct conflict case investigations.

The Independent Investigator has previously completed all the investigations identified by the Court, as well as those where he initiated new investigations due to potential misconduct he identified during his reviews. All have been reviewed by our Team to ensure they complied with the Order of Court. The Independent Discipline Authority has also previously submitted his final report on those cases that had sustained findings, and we reviewed these findings. We did not make compliance findings on these cases, but we determined that the 12 investigations specifically directed by the Court for reinvestigation, as well as the additional cases where the Independent Investigator determined an investigation should be conducted, were properly completed, and addressed the concerns identified by the Court.

As a result of our inquiry presented in detail earlier in this report, we identified serious concerns regarding MCSO's compliance with the requirements of this Paragraph. There was no good faith basis for the investigations initiated against Captain Lugo. Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint process. Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence. Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave. These actions, only days after a meeting between Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[129] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures.

MCSO had requested that the Monitor consider Captain Morrison as BIO Commander. Deputy Chief Summers violated Paragraph 291 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate.

***Paragraph 292.*** *To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.*

**Phase 1:**  In compliance

**Phase 2:**  Not in compliance

PSB personnel continue to inform us of ongoing criminal and administrative misconduct investigations. A member of our Team attends each CRM meeting, reviews the lists of new internal investigations, and has access to PSB's IAPro database. The only cases for which any oversight occurs during the investigative process are those that are determined to be CRMs. We review all other misconduct investigations once they are completed, reviewed, approved, and finalized by MCSO personnel.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

However. as a result of our inquiry presented in detail earlier in this report, we identified serious concerns regarding MCSO's compliance with the requirements of this Paragraph. There was no good faith basis for the investigations initiated against Captain Lugo. Sergeant Engelbeck's complaint had already been addressed and closed by the previous administration by use of an authorized service complaint process. Captain Lugo had no involvement whatsoever in what Sergeant Engelbeck did or did not receive from CRS, a fact executive staff could have easily determined, yet instead they initiated a criminal allegation against him for potentially tampering with evidence. Captain Lugo was informed that he was placed on administrative leave for Executive Chief Palopoli's administrative insubordination complaint alone, even though she had not filed the complaint at the time that he was placed on leave. These actions, only days after a meeting between Captain Lugo and executive staff regarding concerns brought forward by Captain Lugo support the contention that Captain Lugo was removed from PSB because of his reluctance to violate Arizona law, Court Orders, and MCSO policy, and support Lugo's perceptions, as Sheriff Sheridan put it, that the administration was "coming after him."[130] Particularly, Captain Lugo rebuffed attempts by the new administration regarding inquiries into reopening discipline in closed administrative investigations; changing disciplinary policies or misapplying disciplinary policies; and appointing two captains to head PSB. Captain Lugo had pointed out violations of disciplinary policies on disciplinary procedures.

Further, MCSO had requested that the Monitor consider Captain Morrison as BIO Commander. Deputy Chief Summers violated Paragraph 292 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate.

MCSO is not in compliance with this Paragraph.

***Paragraph 293.*** *The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous Order. (Doc. 606 ¶¶ 128, 132.)*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

Since we began reviewing internal investigations conducted by MCSO, we have reviewed hundreds of investigations into alleged misconduct by MCSO personnel. During this reporting period, we reviewed 186 administrative misconduct investigations, 162 Service Complaints, five PSB Diversions, and seven criminal misconduct investigations. All seven criminal investigations, 157 of the service complaints, and all five PSB Diversions were in full compliance.

The investigative quality of PSB administrative investigations has remained high for numerous reporting periods with investigative compliance at or above 95%. Investigative compliance fell to 90% during this reporting period, and we will discuss this with MCSO during our next site visit to determine what factors may have led to this reduction in compliance. The investigative compliance of investigations conducted by Districts and Divisions outside of PSB continues to fluctuate from quarter to quarter, as they have been unable to maintain improved compliance. During the last reporting period, we noted a significant decline in the quality of their investigations. During this reporting period, there was some improvement.

During our October 2025 site visit, PSB advised us that the average time from initiation of a complaint until full closure, which includes all review and associated discipline or other administrative actions, was 1,027 days, a decrease from 1,070 days during the last quarter. The average investigative time was 1,004, a decrease from 1,039 days during the last reporting period. For investigations conducted by PSB, the average investigative time was 1,087 days, an increase from 1,023 days during the last reporting period; and the average number of days to full closure was 1,105 days, a decrease from 1,236 days during the last reporting period. For investigations conducted by District and Divisions outside of PSB, the average investigative time was 739 days, an increase from 1,085 days during the last reporting period, and the average number of days to full closure was 788 days, a decrease from 1,130 days during the last reporting period. We note here that timelines for completion of IA investigations fluctuates from quarter to quarter, primarily due to the number of cases from the backlog that were closed during the quarter. A large number of backlog cases were completed and submitted for our review during this and the last reporting period.

Regardless of whether we consider investigative time or the full closure time of an administrative misconduct investigation, it continues to be clear that misconduct investigations are not being addressed in a timely manner. We continue to note that in some of these delayed investigations, potential evidence has been lost; investigators have been unable to locate and contact complainants, witnesses, and investigative leads; employees' memories have been adversely impacted by the delay in their interviews; and in some cases, serious misconduct has been left unaddressed for lengthy periods of time.

PSB was responsible for conducting 143 of the 186 total administrative misconduct investigations we reviewed for this reporting period.  Of the 143 investigations conducted by PSB, 14 (10%) had deficiencies not including timeliness, an increase from 4% during the last reporting period.  With the inclusion of timeliness, 29 (20%) were found to be in full compliance, an increase from 17% during the last reporting period.  Of the nine cases outsourced by PSB, one had investigative deficiencies.  With the inclusion of timeliness, six (67%) were in full compliance.

Thirty-four investigations were conducted outside of PSB.  Of the total 34, 14 (41%) were in full compliance, an increase from 37% during the last reporting period.  six (18%) had investigative deficiencies.  This is a decrease in investigative noncompliance from 29% during the last reporting period.  Investigative compliance for these cases was 81%, an increase from 71% during the last reporting period.  We note that again for this reporting period, District and Division lieutenants and captains did not identify or document any of the deficiencies in the cases we found deficient.  PSB reviewers, who have a strong history of properly identifying deficient investigations, identified three of these cases as having investigative concerns.

MCSO completed delivery of the 40-hour Misconduct Investigative Training at the end of 2017, and all sworn supervisors who investigate administrative misconduct attended the training.  Refresher training on misconduct investigations has also been delivered since the initial 40-hour training.  During this reporting period, the PSB8 training for personnel outside of PSB who investigate misconduct included classroom training in the proper completion and review of administrative misconduct investigations and an assignment of backlog cases for completion after the training.  Some, or all of this training, was also attended by District and Division lieutenants and captains.  We supported this type of training, believing it would serve two benefits; improvement in the completion and review of misconduct investigations; and the ability for MCSO to fully investigate and close up to 100 backlog cases.  We continue to be both surprised and disappointed in the quality of the investigations and reviews of these cases.

As we have noted in our previous reports, we must consider all requirements for investigations at the time they are submitted for our review, including their timely completion.  MCSO's inability to address timely completion of investigations remains an ongoing issue that continues to adversely impact the agency's compliance findings.

PSB personnel continue to be receptive to our input, and we have had many meetings and discussions regarding the investigations being conducted and the compliance for both PSB and District and Division Cases.  We also discuss compliance concerns with District and Division command personnel during our site visits.  During our next site visit, we will discuss those cases that are noncompliant with MCSO; and address our concerns about the compliance findings for this reporting period.  We continue to stress that compliance is not the sole responsibility of any one individual or Division – but dependent on all those who complete, review, or approve internal investigations.

Between 2016 and 2021, the number of investigator positions assigned to PSB averaged between 24 and 26.  With the addition of new civilian investigator positions, restructuring, filling of vacant positions, and intervention by the Court, at the end of this reporting period, PSB had 48 investigators.

During this reporting period, and as a result of our inquiry presented in detail earlier in this report, we have serious concerns with MCSO's handling of the internal affairs process and the investigation of alleged misconduct – as documented throughout this report. This is particularly as it relates to the manipulation of the internal investigation procedures weaponized against the PSB Commander for rebuffing violations of policy and procedures. This is precisely the reason that the Court entered the Second Order against MCSO.

### B.    Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority

*Paragraph 294.  In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (see, e.g., Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (Id. at ¶ 904.)*

*Paragraph 295.  In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.*

### 1.    The Independent Investigator

*Paragraph 298.  In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class.  While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.*

*Paragraph 300.  The following potential misconduct is not sufficiently related to the rights of the members of the Plaintiff class to justify any independent investigation:*

a.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).*

b.    *Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (Id. at ¶ 816).*

c.     *Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (Id. at ¶ 823).*

d.     *Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (Id. at ¶¶ 766–825).*

**Phase 1:**  Not applicable

**Phase 2:**  Deferred

During our January 2017 site visit, the PSB Commander informed us that all acts of misconduct that we identified and discussed during our October 2016 site visit would be provided to a contracted investigator for investigative purposes.

Since that time, MCSO has contracted with a licensed private investigator.  The contract investigator possesses the requisite qualifications and experience to conduct the investigations of misconduct outlined in Paragraph 300 (a.-c.), and the additional misconduct in the Findings of Fact that directly associates with Paragraph 300 (d).

During our April 2017 site visit, we met with PSB command staff and representatives from the Maricopa County Attorney's Office (MCAO) to verify that all the acts of misconduct that were identified in the Findings of Fact (FOF) are under investigation, either by the Court-appointed Independent Investigator or the private licensed contract investigator.  Before this meeting, PSB command provided us with a roster of related acts of misconduct that PSB intended to be assigned to the contract investigator.  The roster of intended assignments did not include all the acts of misconduct that we had discussed.  MCAO and PSB command personnel explained that the Court also identified, in Paragraph 301, many of the acts of potential misconduct identified in the FOF as sufficiently related to the rights of members of the Plaintiffs' class.  In Paragraph 301, the Court documented that because of this determination, investigations of the potential misconduct were justified if the Independent Investigator deemed that an investigation was warranted.

The Independent Investigator has completed all 12 of the administrative misconduct investigations specifically identified by the Court in the Second Order, and all other investigations for which he determined an administrative misconduct investigation should be conducted.  The Independent Disciplinary Authority has also completed all the discipline findings for these cases.  While we did not make compliance findings for these cases, we reviewed them and found that they complied with the direction of the Court.

MCSO terminated its contract with the investigator previously retained by MCSO to complete several cases that were identified by the Court in this Paragraph.  A new vendor has now been assigned six of these cases.

Our ability to verify that all potential misconduct outlined in the FOF has been investigated by PSB, the PSB contract investigator, or the Independent Investigator remains pending until all the investigations are completed. Once this occurs, we can determine if there is any additional misconduct identified in the FOF that still requires investigation. Finally, the PSB Commander and MCAO advised us that the acts of misconduct involving former Sheriff Arpaio as identified in the FOF would not be investigated by any entity, as there does not exist any statute that addresses how a Sheriff would be disciplined in the event of a sustained finding resulting from an administrative misconduct investigation.

*Paragraph 310. The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.*

## 2. The Independent Disciplinary Authority

*Paragraph 337. Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:*

a. *When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.*

b. *A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the*

*constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.*

**In Full and Effective Compliance**

During this reporting period, no grievances were filed that met the criteria for transmitting to the Monitor.

On December 16, 2020, MCSO asserted Full and Effective Compliance with this Paragraph. After review, we concurred with this assertion.

# Third Supplemental Permanent Injunction/Judgment Order

***Paragraph 338.*** *Within 14 days from the date of this order, MCSO will calculate and provide the Court and the parties with the dollar amount required to recruit, hire, train and compensate for one year a single PSB budgeted sergeant position.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

On November 22, 2022, as required, MCSO filed with the Court the cost to the agency for a budgeted Professional Standards Bureau (PSB) sworn sergeant position for one year. MCSO identified the amount as $191,415.12. This amount was calculated using the mid-range salary for a sworn sergeant position, associated mandatory retirement contributions, employer taxes, and costs related to benefits.

MCSO is in compliance with this Paragraph.


***Paragraph 339.*** *MCSO must not reduce the staffing levels at PSB below the minimum investigator staffing number identified in ¶ 340 while a backlog in investigations remains.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

PSB personnel include sworn, Detention, and civilian investigators. In July, PSB had 48 investigators (10 sworn, 17 Detention, and 21 civilian). In August, PSB had 47 investigators (10 sworn, 16 Detention, and 21 civilian). In September, PSB had 48 investigators (10 sworn, 17 Detention, and 21 civilian).

PSB is required to have a minimum staffing level of 39 investigators. We monitor MCSO's compliance with this requirement on a monthly basis, and we will continue to summarize PSB staffing levels in our quarterly status reports.


***Paragraph 340.*** *Within 60 days from the date of this order, MCSO will fill the seven currently budgeted, yet vacant, positions at PSB referred to in Mr. Gennaco's report, through hiring or internal transfers. (Doc. 2790 at 15.) The staffing referred to by Mr. Gennaco, together with the full staffing of the vacant positions, is 39 investigators. This is the minimum investigator staffing number. If MCSO fails to fill any one of the seven vacant budgeted staffing positions with an AZPOST sworn investigator who is approved by the Monitor within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators. It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum investigator staffing number.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO currently meets the required PSB minimum staffing level of 39 investigators. At the end of this reporting period, MCSO met the minimum investigator staffing number for PSB staffing (with a total of 48 investigators). Per this Paragraph, if MCSO fails to maintain this minimum PSB investigator staffing level, MCSO and/or Maricopa County shall contribute the costs associated with a sworn sergeant's position into a PSB Staffing Fund three times the amount identified in Paragraph 338, or $191,415.12.

MCSO was not obligated to contribute to the PSB Staffing Fund during this reporting period. MCSO is in compliance with this Paragraph.

*Paragraph 341.* *If MCSO desires to fill the positions with new civilian investigators in lieu of sworn officers, it may do so to the extent that it is authorized to do so, consistent with state law. Should it fail to fill any one of the seven vacant positions within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators. It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum staffing number.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this reporting period, PSB investigator staffing met the minimum investigator staffing number of 39 investigators and ended this reporting period with a total of 48 investigators.

*Paragraph 342.* *If the MCSO attempts to fill these open positions with a mix of qualified sworn personnel and civilian investigators, it may do so to the extent that it can, consistent with state law. Nevertheless, if it fails to fill any one of the seven vacant positions within 60 days, the MCSO and/or Maricopa County will pay into the PSB Staffing Fund three times the amount identified in ¶ 338 above for each vacancy remaining. It shall, thereafter on a monthly basis pay three times the amount identified in ¶ 338 above for every month that the number of PSB investigators falls below the minimum staffing number.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

During this reporting period, PSB investigator staffing has met the minimum required number of 39 investigators, and PSB ended this reporting period with 48 investigators.

Detention investigators assigned to PSB shoulder a large share of the case workload, but these positions are not specifically listed in the Third Order. Additionally, during a Court hearing on January 27, 2023, the Court requested additional information as to the qualifications of civilian investigators hired to work in PSB. In January 2024, the Court entered an Order (Doc. 2966) extending the Monitor's process of pre-approval to potential civilian investigators.

**Paragraph 343.** *MCSO is authorized to conduct PSB investigations through approved private contractors if it can do so consistent with state law.*

**Phase 1:** In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

**Phase 2:** In compliance

The previous version of GH-2 allowed for the outsourcing of investigations, and MCSO has used outside vendors for some investigations for years. On November 14, 2023, following the entry of the Third Order, the revised GH-2 policy was finalized and approved. It continues to authorize MCSO to outsource investigations to outside vendors.

In July 2024, MCSO advised us that the agency had retained a new vendor, Baseline Investigations, to conduct conflict investigations. We requested that MCSO provide us with documentation that provides contract information and articulates that the employee of the new contract vendor has the requisite skills to complete such investigations; as well as any other documentation used for the vendor selection or vetting of the selected vendor. We received and reviewed the documentation provided by MCSO and agreed that this vendor met the requirements to conduct administrative misconduct investigations on behalf of MCSO. There were no investigations ever assigned to this vendor, and MCSO advised us in July 2025 that the agency would not renew this contract.

During our July 2025 site visit, MCSO advised us that they had retained a new vendor, AZ Truth Finder, to conduct conflict investigations. We again requested that MCSO provide us with documentation that provided contract information and articulated that the employees of the new contract vendor had the requisite skills to complete such investigations, as well as any other information documentation used for vendor selection or vetting of the selected vendor. We have received and reviewed the documentation, and we agree that this vendor meets the requirements to conduct administrative misconduct investigations on behalf of MCSO.

During this reporting period, MCSO has continued to use one of the previously approved contract vendors, Jensen Hughes, to conduct administrative misconduct investigations. There were no new cases were assigned to this vendor during this reporting period. Eleven were pending completion, and nine were closed and forwarded for our review during this reporting period. Six cases were outsourced to the new vendor, AZ Truth Finder, contracted to conduct conflict cases.

***Paragraph 344.*** *MCSO must demonstrate that it is using overtime and other administrative tools to increase the personnel hours committed to investigate all types of complaints.  MCSO shall report its use of these tools to the Monitor on a monthly basis.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO provided reports for July-September 2025 verifying the use of PSB overtime committed to investigating complaints.  The documentation includes the overtime costs for PSB investigators, case reviewers (supervisory/command personnel), and administrative personnel dedicated to investigative activities.  During this reporting period, the total PSB combined staffing overtime hours used for July-September 2025 decreased from the second quarter of 2025, from 4,323.25 hours to 4,290.75 hours.

MCSO reported that it employed administrative tools to increase personnel hours committed to investigating all types of PSB complaints.  According to MCSO, PSB currently has seven administrative support staff.  According to MCSO, the agency implemented changes such as using PSB administrative support staff to prepare cases; research just cause; provide information and assistance at the onset of the investigations; and provide other investigative assistance, as needed, to investigators assigned to PSB and the Districts/Divisions.  PSB administrative support staff also use overtime hours to prepare interview forms, upload documents, and other administrative tasks that investigators had previously completed.  These initial processes were included in the eight-hour PSB training course.

In addition, PSB implemented an electronic report submission and review process for administrative cases.  MCSO reports that this process has been completed by all four PSB squads.  Per PSB, this electronic submission, review, approval, and tracking process eliminates further delays in processing cases and reduces the time it takes for an administrative investigation to be completed.

The PSB administrative changes outlined in this Paragraph are being incorporated into the PSB Operations Manual that is currently under revision.

For this reporting period, MCSO reported that the agency has filled all management assistant positions; and that newly appointed staff members are undergoing training.  MCSO has conducted interviews for the Detention sergeant PSB administrative investigator position, and the selection process continues.

MCSO is in compliance with this Paragraph.

*Paragraph 345.* *MCSO and/or Maricopa County shall hereby establish a PSB Staffing Fund, which shall be a separate account of the MCSO. The amounts set forth in ¶¶ 340-42 shall be paid directly into this account. The MCSO, however, is only authorized to withdraw funds from this account for the hiring and payment of PSB investigators or private investigators contracted with PSB who are in compliance with the requirements of state law. The fund may also be used to hire necessary additional PSB administrative staff and necessary additional PSB supervisory staff only, and for no other purpose. MCSO is not permitted to offset the amount of any fine from PSB's existing budget or use it to subsidize the number of PSB staff and investigators existing at the time of this Order. MCSO shall provide an accounting of the PSB Staffing Fund on a monthly basis to the Monitor and the Court. But, if necessary, MCSO is permitted to augment and/or exceed the salary and incentives normally paid PSB investigators to hire and/or maintain sufficient investigators, whether sworn or civilian, to reduce the backlog.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

On December 7, 2022, the Maricopa County Board of Supervisors held its formal meeting and established the PSB Staffing Fund as required by the Third Order. The Board set aside $1,148,491 from the General Fund as a contingency, should it be necessary for PSB Staffing Fund. No funds have been transferred to the PSB Staffing Fund, as MCSO has continued to meet the staffing requirements of the Third Order.

MCSO is in compliance with this Paragraph.

*Paragraph 346.* *The Court hereby vests the Monitor, Robert Warshaw, with the supplemental authorities set forth in this Order. The Monitor therefore has immediate authority to oversee all of MCSO's complaint intake and routing. The Court hereby vacates any previous order that conflicts with this Order, including but not limited to ¶ 292 of the Second Order (Doc. 1765). In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases. The Monitor must consult with the PSB Commander about these policy decisions but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

We and the PSB Commander met 11 times during the third quarter of 2025, bringing our meetings with the PSB Commander for this purpose to date to a total of 147. Our regularly scheduled consultation meetings with the PSB Commander occur, on average, once each week. We hold *ad hoc* meetings when additional time is needed, and when it is necessary to follow up on specific complaints prior to a final intake and routing decision.

The consultation meeting process typically includes presentation by the PSB Commander of complaints received since the previous meeting, assigned case numbers, the date the complaint was received, the manner it was reported to MCSO, and the date the complaint was initially assigned. The process also involves preliminary consideration regarding Class Remedial Matter status, and possible PSB Diversions. Due to the focus on timeliness, complaints are often initially assigned for investigation prior to our discussion. However, the intake category and the investigative routing of the case is subject to change following the presentation. The PSB Commander also provides us with a summary of the complaint and, if known, employment categories of personnel allegedly involved. The presentation also includes the initial classification of alleged policy violations, type, and location of investigation assignment – e.g., Service Complaint in PSB; minor misconduct administrative investigation to a District or Division; outsourced investigation; and, as applicable, Class Remedial Matter status, and PSB Diversion eligibility.

Our discussion and consultation about each complaint typically results in either agreement with the initial intake and routing decisions made by the Commander, or a revision of the intake category and routing of the complaint for investigation. Periodically, the PSB Commander will opt to discuss a variety of circumstances associated with the complaint prior to either a final collaborative decision on intake and routing, or our independent decision and direction.

Our final consultation meeting with the PSB Commander during this reporting period occurred on September 26, 2025. Up to this date and for this reporting period, we discussed 340 complaints. Of those complaints, and after our consultation meetings where final determinations were able to be made, 173 were classified as Service Complaints, and 167 were classified as administrative investigations. Three of the Administrative Investigations were classified as critical incidents. Of the administrative investigations, a total of 91 complaints were internally generated complaints – that is, initiated by MCSO employees – while 76 were generated by external complainants. During this reporting period, thirty cases were diverted at intake, 26 of which were health-related in-custody deaths applicable under Paragraph 353(c).

None of the complaints were outsourced for investigation, while 25 administrative investigations were routed to MCSO Districts or Divisions. One complaint was a complaint intake test, and four complaints were routed as PSB Diversions. During the third quarter of 2025, no complaints were originally routed to either a District for investigation, and later returned to PSB for investigation after additional information was discovered.

During the intake and routing process throughout this reporting period, PSB brought forward to our Team 26 Paragraph 353(c) cases associated with health-related in-custody deaths. These cases were preliminarily categorized as PSB Diversions, pending PSB's receipt and review of all documentation and evidence associated with each in-custody death.

The Monitor has authority to oversee all of MCSO's complaint intake and routing. Executive Chief Palopoli violated the requirements of this Paragraph when she initially made the decision to assign this case to Jensen Hughes without consulting with the Monitor. The Monitor, when eventually advised of the Sergeant Engelbeck allegations and that an investigation had been referred to Jensen Hughes, informed Executive Chief Palopoli that the referral was inappropriate.

MCSO is not in compliance with this Paragraph.

***Paragraph 347.*** *The Monitor shall revise and/or formalize MCSO's intake and routing processes. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

Generally, based upon standardized guidelines, MCSO policy allows for the assignment of minor misconduct allegation investigations to Districts and/or Divisions outside of the PSB structure where sworn employees are assigned. The investigations are performed by supervisors who have received requisite training. If an allegation of misconduct is made against a ranking member, i.e., principal, at a District or Division, the investigation must be conducted by a member holding at least one rank higher than the principal, but no rank lower than sergeant. Between March 1, 2022 and the issuance of the Third Order, PSB did not assign administrative investigations to Districts or Divisions for investigation.

When the Third Order was issued on November 8, 2022, we re-implemented the practice of routing qualified minor misconduct investigations to Districts and Divisions. Given the backlog and timeliness issues associated with administrative investigations, we believe this is a preferred practice. Our direction to assign cases to Districts and Divisions helps to reduce the investigative caseload in PSB, allows utilization of trained supervisors at these locations, and increases supervisory awareness and accountability for their subordinates' job performance. Moreover, we encourage assignment of investigations to Districts and Divisions to facilitate timely access to witnesses and principals. When minor misconduct investigations are completed by sworn supervisors in Districts and Divisions, the investigation is forwarded through the chain of command, up to and including their Chief, before the case is finally submitted to PSB. The routing of cases up the chain of command through managers and executives is done for review and approval purposes. We believe it also facilitates visibility and identification of individual job performance, enhances awareness of possible trends by individuals or District/Division-wide, and promotes opportunities for active leadership, proactive remediation, and training.

During this reporting period, 25 minor misconduct investigations were assigned to either Districts or Divisions.

There were 30 PSB Diversions during this reporting period, to include 26 in-custody deaths. The PSB Commander consulted with our Team regarding the circumstances of the complaints, resulting in mutual decisions regarding the implementation of a PSB Diversion for the principal employees, and/or a *preliminary* PSB categorization for Paragraph 353(c), health-related in-custody deaths.

As previously noted, during the intake and routing process throughout this reporting period, PSB brought forward to our Team 26 Paragraph 353(c) circumstances associated with health-related in-custody deaths. During the first reporting period of 2024, PSB agreed with our Team to administratively advance health-related in-custody deaths through the Intake and Routing process outlined in Paragraphs 346 and 347.

The Monitor has authority to oversee all of MCSO's complaint intake and routing. Executive Chief Palopoli violated the requirements of this Subparagraph when she initially made the decision to assign this case to Jensen Hughes without consulting with the Monitor.

MCSO is not in compliance with this Paragraph.

***Paragraph 348.*** *The Monitor will evaluate PSB's current investigative practices. The PSB, under the authority of the Monitor, shall create, and submit for the Monitor's approval, policies and procedures that:*

*(a)    Identify and eliminate unnecessary investigative requirements that may be removed from particular classes of cases;*

*(b)    Provide for the establishment of an investigative plan for each investigation to eliminate unnecessary steps for the investigation of the complaint at issue;*

*(c)    Establish formal internal scheduling expectations and requirements for supervisory interventions;*

*(d)    Establish expectations on the timeline for each step of the review process. The formulated expectations will be consistent with the timeline requirements of this Court's previous orders;*

*(e)    Assess current use of IA Pro as a case management/tracking tool.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

This Paragraph requires MCSO to create and submit for the Monitor's approval various policies and procedures that address the planning, thoroughness, and timeliness of administrative misconduct investigations conducted by MCSO and eliminate unnecessary investigations in some classes of cases. Pursuant to Paragraph 349, the Monitor submitted the finalized versions of these policies and procedures to the Court within four months of the entry of the Third Order. On October 12, 2023, the Court approved MCSO's final policies; these policies were finalized and approved on November 14, 2023. During our July 2024 site visit, PSB personnel advised that the required training had been delivered and was pending approval of completion by our Team. Our Team has since approved the completion of this training.

Any administrative misconduct investigation initiated on or after July 1, 2024, is required to meet the compliance standards of the policies that were finalized in November of 2023. Of the 186 administrative misconduct investigations we reviewed for this reporting period, 58 were initiated on or after July 1, 2024.

To determine Phase 2 compliance with this Paragraph, we review completed investigations, administrative closures, expedited resolutions, and Service Complaints, and assess the use of IAPro.

Paragraph 348(a) requires that PSB have in place policies and procedures that "identify and eliminate unnecessary investigative requirements that may be removed from particular classes of cases." The following circumstances were approved for inclusion in this Subparagraph:

1.    Situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident. Cases are determined to be eligible based on criteria established in MCSO policy.

There were no cases submitted for our review that met this criteria during this reporting period.

2. Situations of an internal or external complaint where under the clear and convincing evidence standard, external documentary or video evidence establishes that the alleged violation of Office policy did not occur and there is no indication of any other employee misconduct resulting in an Expedited Resolution with a finding of unfounded.

There were no cases submitted for our review that met this criteria during this reporting period.

3. Situations where an investigator may consider reducing or eliminating unnecessary investigative steps. Examples of potential unnecessary steps include, but are not limited to: the necessity for a second chair during investigative interviews; the necessity to interview all potential investigation leads or witnesses in a specific case; and the timing of principal and witness interviews.

During this reporting period, 58 of the administrative misconduct investigations we reviewed were initiated after the finalization of the revised policies in November of 2023 and the completion of training in June 2024. For purposes of compliance, we agreed to use July 1, 2024, as the effective date for determining compliance. In the majority of the investigations we reviewed that were initiated and completed after July 1, 2024, we noted that investigators appropriately eliminated the need for interviews of some investigative leads or witnesses; and in some cases, appropriately relied on BWC video rather than conduct unnecessary interviews and summarized these video reviews focusing only on those portions that were relevant to the investigation. Witnesses and investigative leads were interviewed at appropriate times during the investigations, and we noted a number of instances where a second chair was not utilized for employee interviews.

Paragraph 348(b) requires that PSB have in place policies and procedures that "provide for the establishment of an investigative plan for each investigation to eliminate unnecessary steps for the investigation of the complaint at issue."

During this reporting period, 58 of the investigations we reviewed were initiated after the finalization of the revised policies and the completion of the training. All of the 58 contained an investigative plan as required that was provided to our Team. We identified two cases (3%) where we believe the investigative plan did not cover all necessary steps.

Paragraph 348(c) requires that PSB have in place policies and procedures that "establish formal internal scheduling expectations and requirements for supervisory interventions."

During this reporting period, there was one approved supervisor intervention approved and submitted for our review. The intervention complied with the requirements for compliance.

Paragraph 348(d) requires that PSB have in place policies and procedures that "establish expectations on the timeline for each step of the review process. The formulated expectations will be consistent with the timeline requirements of this Court's previous orders." For those cases investigated outside of PSB, the chain of command has up to 10 days within the 60 calendar days to complete their review. For those cases investigated by PSB, the PSB Commander has 10 calendar days to complete a review of the investigation.

During this reporting period, 58 of the investigations we reviewed were initiated after the revised policies were approved and training completed.  In two cases, the investigative plan was not approved by the Division Commander within seven calendar days as required.  In seven investigations (12%), all investigated by PSB, the PSB Commander did not review and sign off on the investigation within 10 days of receipt of the report.  MCSO is not in compliance with the requirements of this Subparagraph.

Paragraph 348(e) requires that PSB have in place policies and procedures that "assess current use of IA Pro as a case management/tracking tool."  The interaction of our Team with the PSB investigative process reveals a variety of the tracking mechanisms within the IA Pro case management/tracking tool are in place and functional.  Our Team has noted tracking sheets are associated with, and maintained, for each investigation.  Critical features of the case management/tracking tool include investigative timeline and deadline alerts, and our Team has found these to be functional.  Moreover, the case management tool reasonably facilitates tracking overdue investigations, whether they be outsourced, assigned to Districts or Divisions, or to PSB investigators.  When necessary, the case management/tracking tool can uniquely generate specific reports.

MCSO is not in compliance with this Paragraph.


**Paragraph 349.**  *The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog.  If a backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.  Given that the parties have provided the Monitor with feedback on these issues, the Monitor is directed to consider the input already articulated by the parties on these issues and determine, at his discretion, to adopt them or not.  The Monitor may choose, but will not be required, to seek additional input from the parties in the development of the above stated policies.  The Monitor shall finalize and submit such policies to the Court within four months of the date of this order.  The parties shall have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies.  The Court will, if necessary thereafter, make determinations as to the final policies.*

**Phase 1:**  Not applicable

**Phase 2:**  Not applicable

The MCSO complaint investigation backlog at the end of this reporting period totaled 640 cases. The authority granted to the Monitor remains applicable to this Paragraph due to the existing MCSO backlog.  The Parties and the Monitor met their obligations to finalize and submit policies to the Court.  On October 12, 2023, the Court approved MCSO's final policies; these policies were finalized and approved on November 14, 2023.

***Paragraph 350.*** *The Monitor will assess MCSO's compliance with the investigative requirements of this order and shall determine whether training on investigative planning and supervision is needed and implement such training.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

On October 12, 2023, the Court approved MCSO's final policies (updated iterations of GH-2 [Internal Investigations]; the PSB Operations Manual; and an attachment to GC-17 [Employee Disciplinary Procedures]) in accordance with the Third Order. MCSO completed the required training for the new policies in June 2024. We assess MCSO's compliance with the investigative requirements of this Order for any investigation initiated by MCSO on or after July 1, 2024, to determine whether training is necessary in investigative planning and supervision. During this reporting period, MCSO complied with the investigative requirements of the Third Order; and no training needs have been identified on investigative planning and supervision.

***Paragraph 351.*** *The Monitor has the authority to make recommendations to the Court concerning the revision of the Court's orders as it pertains to the investigation of complaints where, in its opinion, such revisions would increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

The Third Order, entered on November 8, 2022, includes several remedies to assist in the reduction of MCSO's investigative backlog. Per the Order, "to protect the interests of the Plaintiff class (let alone the general public), in ensuring that investigations are completed in sufficient time to administer discipline, the Court will require that the MCSO come into compliance with its reasonable investigative protocols." This Paragraph grants authority to the Monitor to recommend to the Court revisions to "increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency." The Monitor did not make any such recommendations during this reporting period.

***Paragraph 352.*** *The Monitor may intervene in the course of any investigation for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog, if he deems it appropriate, and will document his actions in a quarterly report to be submitted to the Court. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

This Paragraph requires the Monitor to document in a quarterly report to be submitted to the Court any interventions it has taken "for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog."

During our April 2025 site visit, the Monitor initiated an inquiry. For a detailed description of the facts identified in our inquiry, see Second Order section on page 179.

*Paragraph 353.* *The Monitor shall recommend to the Court adjustments in the investigations of the following categories of cases according to the following procedure:*

*MCSO shall, upon the approval of the Monitor:*

*(a)    Create, formalize, and implement a policy regarding whether investigations are necessary when the complaint was submitted to the MCSO more than a year after the last instance of the underlying alleged misconduct reported, or when the MCSO employee involved left MCSO's employ prior to the filing of the complaint.*

*(b)    Create, formalize, and implement a policy regarding when investigations are necessary if the initial complainant is unwilling or unable to cooperate, or if the initial complainant is anonymous.*

*(c)    Create, formalize, and implement a policy regarding when MCSO may investigate health related in-custody jail deaths by County medical staff.*

*(d)    Create, formalize, and implement a policy regarding when an entity other than PSB may investigate internal allegations emanating from workplace relationships.*

*(e)    Create, formalize, and implement a policy regarding when, in cases in which external evidence establishes a violation, the PSB Commander has the discretion to offer principals a mitigated penalty if they accept responsibility. The mitigated penalty shall be no lower than the minimum discipline within the applicable discipline matrix range for the charged offenses.*

*(f)    Create, formalize, and implement a policy regarding when the PSB commander is authorized to handle the alleged minor misconduct through supervisory intervention in lieu of investigation. MCSO shall submit to the Monitor within 15 days, a list of the minor misconduct within the GC-17 (Disciplinary Matrix) which it deems should be considered by the Monitor to be handled as a supervisory intervention. MCSO's list shall exclude allegations concerning the Plaintiff class and allegations of bias.*

*In proposing such policies to the Monitor, the MCSO shall fully and openly consult with the other parties to this litigation. All parties shall move expeditiously to formulate, consult with, and approve these policies. MCSO and the parties shall complete and submit to the Monitor for approval all such proposed policies within three months of this order. As to those issues on which the parties cannot obtain consensus, they shall each submit their proposals to the Monitor. The Monitor shall then, promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, thereafter, make determinations as to the final policies.*

**Phase 1:** In compliance

**Phase 2:** Not in compliance

This Paragraph requires MCSO to create and submit for the Monitor's approval various policies that include "adjustments in the investigations" of several categories of cases, to assist in the reduction of the investigative backlog. These adjustments include circumstances in which, for example, misconduct was alleged against personnel who "left MCSO's employ prior to the filing of the complaint" and in which anonymous complainants have alleged misconduct. According to this Paragraph, MCSO was required to submit these policies within three months of the entry of the Third Order. On October 12, 2023, the Court reissued GH-2 (Internal Investigations), the PSB Operations Manual, and an attachment to GC-17 (Employee Disciplinary Procedures). On November 14, 2023, the revised policies were finalized and approved. During our July 2024 site visit, PSB personnel advised that the training had been delivered and was approved by our Team during the reporting period.

On November 16, 2023, PSB and our Team began reviewing backlog cases to determine which cases might be eligible for a PSB Diversion as allowed in the Third Order and the revised MCSO policies. During April 2024, we completed our reviews of all pending backlog cases. During our reviews we reviewed a total of 2,181 backlog cases, finding 254 eligible for a diversion. We found 1,435 cases ineligible for diversion. This determination was made based on the briefing and data provided to our Team at the time we met with PSB. For purposes of our reporting, we only determine and report compliance once we have received and reviewed the completed case, including all documentation and justification.

To determined Phase 2 compliance with this Paragraph during this reporting period, we reviewed a total of five PSB Diversions. None of the five were backlog cases.

Subparagraph 353(a) requires that MCSO "create, formalize, and implement a policy regarding whether investigations are necessary when the complaint was submitted to the MCSO more than a year after the last instance of the underlying alleged misconduct reported, or when the MCSO employee involved left MCSO's employ prior to the filing of the complaint." The following circumstances were approved for inclusion in this Subparagraph:

1.     Situations where a complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported.

       During this reporting period, there were no PSB Diversions submitted to and reviewed by our Team that met this criteria.

2.     Situations where an internal or external complaint was received by the Office after the employee(s) involved in the alleged misconduct left employment with the Office.

       During this reporting period, there were no PSB Diversions submitted to and reviewed by our Team that met this criteria.

Subparagraph 353(b) requires that MCSO "create, formalize, and implement a policy regarding when investigations are necessary if the initial complainant is unwilling or unable to cooperate, or if the initial complainant is anonymous." The following circumstances were approved for inclusion in this Subparagraph:

1.      Situations when the initial complainant is unwilling or unable to cooperate.

There were no cases meeting this criteria that were submitted to and reviewed by our Team for closure during this reporting period.

2.      Situations where the initial complainant is anonymous.

There were no cases meeting this criteria that were submitted to and reviewed by our Team for closure during this reporting period.

Paragraph 353(c) requires that MCSO "create, formalize, and implement a policy regarding when MCSO may investigate health related in-custody jail deaths by County medical staff." These health-related in-custody jail deaths do not involve the use of force and are considered non-critical incidents under Office policy. During the first reporting period of 2024, PSB agreed with our Team to administratively advance health-related in-custody deaths through the intake and routing process outlined in Paragraphs 346 and 347.

During this reporting period, MCSO brought forward at intake 26 health-related in-custody jail deaths consistent with the Third Order requirements. After reviewing a presentation by PSB, we initially agreed that these cases would be *preliminarily* categorized as PSB Diversions, pending PSB's receipt and review of all documentation and evidence associated with each in-custody death.

Historically at intake, we have experienced significant delays regarding PSB notification and presentation of in-custody jail deaths during the intake and routing process. Delays in PSB notifications to our Team can result from a combination of delinquencies, including Sheriff's investigative and jail staff neglecting to timely notify PSB of in-custody jail deaths, Detention staff failing to complete and forward Preliminary Inquiry Reports (PIRs) to PSB, PSB's efforts to conduct forensic accounting of historical incidents, and delays with Jail Crimes investigative staff completing reports and forwarding same to PSB in a timely manner. During this reporting period, there were significant delays when making notification to our Team regarding the two in-custody jail deaths.

After the initial determination for diversion at Intake, during this reporting period, MCSO provided four completed in-custody jail death investigations for our final review. All four inmate jail death cases were not reported to PSB in a timely manner; none met the 30-day reporting requirement to PSB.

All four deaths were considered non-critical incidents and did not involve the use of force or alleged misconduct by MCSO personnel. While the four in-custody jail death investigations are in compliance with the requirements of this Paragraph, the reporting of in-custody jail deaths to PSB remains untimely. We have conveyed our concerns related to the delayed reporting by the jail to PSB.

Additionally, three of the four completed death investigations involved attempted suicides in the inmates' assigned cells. Two inmates constructed rope ligatures and anchored their bedsheets or blankets to the top bunk. Another inmate attempted to commit suicide by constructing a ligature from above the cell's rear table. All three inmates were transported to the hospital, where they each died several days later.

Since November 2024, we have reviewed 20 completed in-custody jail deaths not related to a critical incident. The Jail Crimes Investigation Unit investigations determined that the inmate deaths were attributed to the following factors: natural deaths; accidental deaths; undetermined deaths; and suicides. We note that in the suicide deaths, inmates used jail-issued sheets and/or blankets to create rope-like ligatures to facilitate hanging themselves from the top bunks of their assigned cells. The top bunks in these cells are part of the jail's construction; they are anchored to the cell wall, and the mattress foundation contains drain holes. In these incidents, inmates used the wall anchors and/or drain holes in the mattress foundation to assist in their suicides.

Subparagraph 353(d) requires MCSO to "create, formalize, and implement a policy regarding when an entity other than PSB may investigate internal allegations emanating from workplace relationships."

During this reporting period, MCSO brought to intake three cases fitting this PSB Diversion criteria.

Subparagraph 353(e) requires that MCSO "create, formalize, and implement a policy regarding when, in cases in which external evidence establishes a violation, the PSB Commander has the discretion to offer principals a mitigated penalty if they accept responsibility. The mitigated penalty shall be no lower than the minimum discipline within the applicable discipline matrix range for the charged offenses."

Subparagraph 353(f) requires that MCSO "create, formalize, and implement a policy regarding when the PSB commander is authorized to handle the alleged minor misconduct through supervisory intervention in lieu of investigation. MCSO shall submit to the Monitor within 15 days, a list of the minor misconduct within the GC-17 (Disciplinary Matrix) which it deems should be considered by the Monitor to be handled as a supervisory intervention. MCSO's list shall exclude allegations concerning the Plaintiff class and allegations of bias."

During this reporting period, we reviewed one case where the PSB Commander determined that alleged minor misconduct was eligible for a supervisory intervention in lieu of an investigation. All requirements to do so were met.

This Paragraph required PSB, under the authority of the Monitor, to create and submit new policies and procedures related to internal investigations. GC-17,[131] (Employee Disciplinary Procedures) was among those policies. GC-17 Attachment B (Categories of Offenses) provides that the commission of a DUI to any degree is considered a Category 7 offense. GC-17 Attachment A (Disciplinary Matrix) provides that the only penalty for a Category 7 offense is dismissal. The current disciplinary matrix is unequivocal as to the discipline to be applied in the case of a DUI. The attempts by Undersheriff Gentry, at the behest of the Sheriff, to change the Matrix to effect change in the case of the employee who committed a DUI was in violation of this Paragraph.

MCSO is not in compliance with this Paragraph.

**Paragraph 355.** *The Monitor and the PSB shall review the cases in the current backlog that are eligible to be diverted from PSB investigations by ¶ 353 of this order. It is the expectation of the Court that the diverted cases shall reduce the current backlog.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

Members of the Monitoring Team have met with PSB staff to discuss the current backlog on multiple occasions. After discussion, we agreed that backlog cases would be defined as those administrative investigations and critical incidents where required investigative actions were still pending and the investigation had not been completed in accordance with the timelines established in Paragraph 204, and an extension had not been granted as per Paragraph 365. An investigation was considered complete when all investigative actions have been completed and the PSB Commander had signed off in concurrence. The date the PSB Commander signed off on the investigation was the date the investigation was no longer counted as part of the backlog, irrespective of the findings.

The revised policies affecting investigations of complaints were finalized and approved on November 14. 2023. Our Team began meeting biweekly with PSB to discuss backlog cases on November 16, 2023. These meetings included a briefing by the PSB Commander on the backlog cases. During this briefing, the Commander provided our Team with specific information on each case, including: the category and offense number of the complaint; the prior work history of the employee; and a detailed summary of the complaint. Some discussion occurred, and the Commander then made a recommendation on whether he believed the case was eligible for a PSB Diversion.

During our February 2024 site visit, we discussed the review process for backlog cases and expectations for completion of these reviews with MCSO personnel. In November and December 2023, the number of cases reviewed was small as PSB continued to develop the process for the reviews. During our site visit, we noted that the number of cases reviewed beginning in January 2024 had increased significantly. Prior to our site visit, the Court issued an Order on January 3, 2024, requiring the backlog case review to be completed by June 1, 2024. In our discussion during our site visit, MCSO personnel were confident that the reviews would be completed prior to this deadline. Based on our reviews at that time, we agreed with this assessment by MCSO.

During our April 2024 site visit, we again discussed the review process for backlog cases and expectations for the completion of these reviews with MCSO personnel. At that time, PSB personnel expressed confidence that the reviews would be completed by the June 1, 2024 deadline established by the Court.

During April 2024, we reviewed 598 backlog cases for possible PSB Diversion eligibility. After review, we agreed with PSB that 13 appeared to be eligible for a PSB Diversion based on the requirements of the Third Order and the revised MCSO policies. As previously noted, we do not assess these cases for compliance until we receive the completed PSB Diversion report and all other documentation from MCSO. During the review process, we identify and report on both the justification for a PSB Diversion and the compliance of the case. We completed our initial review of all backlog cases on April 25, 2024. Of the total 2,181 cases we reviewed, we found 1,435 cases ineligible for a diversion due to; the type of offense, the category or offense number, the discipline history of the employee, or other factors that made the case ineligible. We verbally approved 254 cases for diversion completing the Court's requirement for the initial backlog case review. We note here, that after this approval, six cases were later removed from the approved list due to either an inaccurate initial count or because the cases were found not to qualify after further reviewed by PSB. The final count of approved backlog cases resultant from our initial review was 248. We have received and reviewed all of these cases.

On August 30, 2024, the Court issued the Fourth Order. This Order modified and set new requirements for the completion of administrative misconduct investigations, specifically addressing the timeline requirement for completion.

Paragraph 204 of the Second Order states, in part, "Internal Affairs will complete their administrative investigations within 85 calendar days of the initiation of the investigations (60 calendar days if within a Division)." As per the Fourth Order, entered August 30, 2024, Paragraph 204 set new requirements for the completion of administrative investigations.

Amended Paragraph 204 requires the completion of administrative investigations within 180 days of the initiation of the complaint. If the administrative investigation determines that no "disciplinary action" is appropriate, the investigation is complete when both: (1) the employee is served with the notice of findings and (2) the complainant is notified consistent with Paragraph 246 at the complainant's last known point(s) of contact. If the MCSO pre-determination hearing concludes that "disciplinary action" is appropriate, the administrative investigation is complete when both: (1) the employee is served with notice of discipline and (2) when the nature of the determined discipline (termination, demotion, or suspension) is sent to the complainant at the complainant's last known point(s) of contact. This notice to the complainant shall inform the

complainant that the discipline may not be final, as the employee may pursue administrative and court appeals of the discipline. When discipline is appealed, and thus the investigation is extended, MCSO shall inform the complainant when the discipline becomes final.

We began the revised assessment of compliance with amended Paragraph 204 requirements for all administrative investigations completed on or after September 1, 2024.

For this reporting period, all 186 administrative misconduct investigations we reviewed were completed on or after September 1, 2024, and were assessed based on the finalization and closure of the investigation for purposes of timeline compliance. It was also the interpretation of the Fourth Order that required notifications to complainants included all complainants, not just external ones. As this requirement had not been applied to internal complainants prior to the implementation of the Fourth Order, we notified MCSO that effective September 15, 2024, required notifications to complainants would apply to both internal and external complainants for any investigation initiated on or after that date. There were 17 internally generated complainants initiated and closed after September 15, 2024, during this reporting period, and all 17 complied with the revised requirements of Paragraph 204.

As a result of the modification of Paragraph 204, our Team worked with PSB to review and update the number of cases that would qualify as backlog cases under the new criteria.

MCSO provided a spreadsheet of administrative investigations in the backlog for the time period ending on August 31, 2024. The list contained two separate calculations. The first list calculated the number of cases in the backlog using the amended Paragraph 204 requirements, which resulted in 1,331 open cases remaining in the backlog, as of August 31, 2024. The second list calculated the number of open cases in the backlog using the previous 60-/85-day timeline, and this resulted in 1,286 cases remaining in the backlog, for the same time period. We used amended Paragraph 204 requirements to certify the backlog.

***Paragraph 360.*** *The Monitor shall submit a quarterly progress report to the Court and parties describing the rationale for each type of investigative diversion approved, the result of each diversion type, the backlog tally, the number of completed cases, unresolved issues, and further actions required to address the backlog and staffing levels at PSB.*

**Phase 1:** Not applicable

**Phase 2:** Not applicable

We submitted our twelfth quarterly progress report to the Court and the Parties on November 19, 2025. The report covered the period of July 1-September 30, 2025.

***Paragraph 361.*** *Under the direction of the Court, MCSO shall commission an independent study to determine: (1) the most efficient way for MCSO to allocate its personnel in light of existing authorized staffing levels, the requirements and expectations of its served communities, the requirements of this Court's Orders, the timely elimination of the existing backlog of PSB investigations, and state law; (2) the necessary staffing level for MCSO to fulfill these obligations regardless of the existing staffing level; and (3) the PSB staffing level required to maintain the timely completion of PSB investigations in compliance with the Orders of this Court and state law. MCSO shall (1) provide a draft Request for Proposals to the Court, the Monitor, and the parties; (2) disclose credible bids to the Court, the Monitor, and the parties; and (3) obtain Court approval of the methodology for the study. MCSO must ensure that the study is completed within one year of the entry of this Order.*

**Phase 1:** Not applicable

**Phase 2:** Not in compliance

On July 7, 2022, before the entry of the Third Order, MCSO selected the Center for Public Safety Management (CPSM) to conduct a staffing analysis of its sworn functions. On November 14, 2022, following the entry of the Third Order, CPSM accepted an additional scope of work through the Maricopa County Office of Procurement Services to address the Third Order requirements, including the timely elimination of the existing backlog of PSB investigations.

On November 16, 2022, MCSO filed with the Court a request for approval of CPSM to continue with the independent study and evaluation ordered by the Court under this Paragraph.

At a January 27, 2023 hearing, the Court determined that it would assess CPSM's staffing study after its completion to determine if it meets the requirements of this Paragraph. On March 1, 2024, MCSO published the CPSM staffing study.

On August 30, 2024, the Court entered the Fourth Order after finding that the CPSM staffing study did not meet the requirements of Paragraphs 361 and 362. The Court also found that MCSO's noncompliant staffing study did not effectively assist in reducing the current backlog of complaints in a sustainable way. In the Fourth Order, the Court noted, "The failure to submit a compliant study thus frustrated the Court's purposes in reducing the backlog of complaints against the MCSO in a sustainable way, curing the contempt originally imposed, and providing efficient and economic alternatives for the deployment of law enforcement officers to meet the requirements of the state law and the Court's orders." The Fourth Order sets minimum monthly and quarterly case reduction requirements.

***Paragraph 362.***   *The Court is aware that the MCSO has already engaged a consultant to undertake a similar evaluation.   Nevertheless, while the Court will consider both the qualifications of the consultant already hired by MCSO and the outcome of that study, the work of that consultant must comply with the Court's requirements, supra and will not be deemed to satisfy the terms of this Order absent the approval of this Court.   If MCSO wishes to obtain Court approval of the consultant it has already hired, it must, as a prerequisite, provide the contracting documents to the Court, the Monitor, and the parties within five business days of the entry of this Order; and it must submit the consultant's draft methodology to the Court, the Monitor, and the parties within 30 days of the entry of this Order.*

**Phase 1:**  Not applicable

**Phase 2:**  Not in compliance

On December 8, 2022, MCSO submitted the contracting and methodology documentation for its consultant, the Center for Public Safety Management (CPSM), as required by this Paragraph.

MCSO published the CPSM staffing study on March 1, 2024.

On August 30, 2024, the Court entered the Fourth Order after finding that the CPSM staffing study did not meet the requirements of Paragraphs 361 and 362.  The Court found that MCSO's noncompliant staffing study did not effectively assist in reducing the current backlog of complaints in a sustainable way.  The Fourth Order also addressed future PSB staffing requirements.


***Paragraph 364.***   *To keep the parties and the Court informed, the MCSO shall report monthly on the size of the backlog to the Monitor, the parties, and the Court.   The Monitor's quarterly progress report will further assess the status of the backlog.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

MCSO reports the number of backlog cases each month as required.  At the end of December 2022, they reported 2,074 cases in the backlog.

At the end of the first quarter of 2023, MCSO reported that 1,958 cases remained in the backlog. At the end of the second quarter of 2023, MCSO reported that 1,842 cases remained in the backlog.  At the end of the third quarter of 2023, MCSO reported that 1,765 cases remained in the backlog.  At the end of the fourth quarter of 2023, MCSO reported that 1,732 cases remained in the backlog.

At the end of the first quarter of 2024, MCSO reported 1,629 cases remained in the backlog.  At the end of the second quarter of 2024, MCSO reported that 1,373 cases remained in the backlog.  At the end of the third quarter of 2024, MCSO reported 1,307 cases remaining in the backlog.  This number was then adjusted to 1,331 as a result of the new requirements for timeliness as noted in multiple Paragraphs in this report.  At the end of December 2024, MCSO reported 1,157 cases remaining in the backlog.

At the end of the first quarter of 2025, MCSO reported 996 cases in the backlog. At the end of the second quarter of 2025, MCSO reported 821 cases in the backlog. At the end of this reporting period, MCSO reported 640 cases in the backlog.

*Paragraph 365.* *The authority for MCSO to grant itself extensions in investigation deadlines granted in ¶ 204 of Doc. 1765 is revoked. The Monitor shall be authorized to grant reasonable extensions upon reviewing requests submitted to him by the Sheriff.*

**Phase 1:** In compliance

**Phase 2:** In compliance

Following the entry of the Third Order, we communicated, and exchanged draft documents, with the PSB Commander regarding immediate and interim protocols – including our expectations and the documents and information necessary for the Sheriff to notify our Team of requests for extensions of investigation deadlines during the period leading to formalized and approved policy. We addressed the mechanics for communicating the decisions made by our Team back to the Sheriff. During this reporting period, MCSO submitted three requests for extensions, which we approved.

*Paragraph 368.* *MCSO will continue to pay into the PSB Staffing Fund pursuant to ¶ 357 until MCSO reports for twelve continuous months that it has no open investigations that have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed. At that time, MCSO may petition the Court to dissolve the PSB Staffing Fund.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

MCSO was not required to contribute to the PSB Staffing Fund during this reporting period due to meeting the staffing minimum requirements. As of September 30, 2025, MCSO's complaint investigation backlog stood at 640 cases.

# Fourth Supplemental Permanent Injunction/Judgment Order

*Paragraph 204.  Internal affairs investigations (whether in PSB or a Division) will complete their administrative investigations within 180 calendar days of the initiation of the complaint.  If the administrative investigation determines that no "Disciplinary Action" is appropriate, the investigation is complete when both: (1) the employee is served with the notice of findings1 and (2) the Complainant is notified consistent with Paragraph 246 at the Complainant's last known point(s) of contact.*

*If the MCSO Pre-Determination hearing concludes that "Disciplinary Action"2 is appropriate, the administrative investigation is complete when both: (1) the employee is served with the notice of discipline and (2) when the nature of the determined discipline (termination, demotion or suspension) is sent to the Complainant at the Complainant's last known point(s) of contact.  This notice to the Complainant shall inform the Complainant that the discipline may not be final, as the employee may pursue administrative and court appeals of the discipline.  When discipline is appealed, and thus the investigation is extended, the MCSO shall inform the Complainant when the discipline becomes final.  The MCSO shall file a monthly report with the Monitor in which it will identify all investigations which the PSB Commander has approved and closed but for which the pre-determination hearing has not been completed.  Further, the MCSO shall report to the Monitor and the Parties within ten days of the dismissal of any discipline pursuant to A.R.S. § 38-1110(E).*

**Phase 1:**  In compliance

- GH-2 (Internal Investigations), most recently amended on November 14, 2023.

**Phase 2:**  Not in compliance

On August 30, 2024, the Court issued the Fourth Amended Supplemental Permanent Injunction/Judgment Order (Fourth Order), amending Paragraph 204 of the Second Amended Supplemental Permanent Injunction/Judgment Order (Second Order), and directing MCSO to complete internal affairs investigations within 180 calendar days of the initiation of the complaint. Prior to the Fourth Order, Paragraph 204 was assessed based on the completion of the investigative portion of the case within 85 calendar days of the initiation of the investigations (60 calendar days if within a Division).  We began the revised assessment of compliance with amended Paragraph 204 requirements for all administrative investigations initiated and completed on or after September 15, 2024.

To determine Phase 2 compliance with this Paragraph, we review administrative misconduct investigations conducted by MCSO.

For this reporting period, all 186 administrative misconduct investigations were completed on or after September 1, 2024. Therefore, we assessed them using the new Fourth Order requirements for compliance with this Paragraph. The Fourth Order requires that *all* complainants, not just *external* complainants, receive notifications from the beginning of the investigation to the end of the investigation. As this requirement did not exist under the Second Order, we notified MCSO that notification requirements for internal complainants would become effective for any investigation initiated on or after September 15, 2024. There were 17 such investigation during this reporting period, and all 17 met all requirements for notifications to internal complainants.

PSB conducted 143 of the 186 administrative misconduct investigations we reviewed for this reporting period. Thirty (21%) of the 143 were finalized and closed within the required 180-day timeframe and met all the requirements of the amended Paragraph 204. Of the nine cases outsourced to an outside vendor, six (67%) were finalized and closed within the 180-day timeframe.

For those investigations conducted by Districts or Divisions outside of PSB, MCSO has chosen to maintain the requirement of completion and submittal of the investigative report to PSB within 60 days. Thirty-four cases were investigated by Districts or Divisions outside of PSB. Twelve (36%) were completed within the 60-day internal requirement, a reduction from 46% during the last reporting period. We note that this ongoing reduction in 60-day completion continues to be largely a result of the backlog cases that were investigated by these supervisors as part of the PSB8 training. We have traditionally determined District/Division case compliance with timeliness based on the initial submittal of the case to PSB within 60 days. We will continue to report this information for these investigations, as the Divisions and Districts should not be held responsible for the review and completion time once the case arrives at PSB. Under the amended compliance requirement, 16 (48%) of these cases were closed and finalized within the amended 180-day requirements.

As the Conduct Resolution Section (CRS) of the Administrative Services Division now plays a large role in the 180-day compliance requirement since it reviews and processes all sustained investigations, we have been meeting with CRS during the past several reporting periods. We have discussed CRS's processes and staffing to determine if there were or are any modifications necessary as a result of the new requirements and if CRS has adequate staffing to fulfill its responsibilities. The CRS Commander has been helpful in explaining CRS's functions and has continued to advise us that CRS does currently have adequate staffing. We will continue to meet with CRS during future site to confirm practices, determine if protocols remain the same, identify any challenges CRS may be experiencing, and discuss staffing.

As we noted in Paragraph 194, the timely completion of administrative investigations has continued to be of concern for many reporting periods. Of the total 186 administrative misconduct investigations we reviewed during this reporting period, 52 (28%) were finalized and closed within the 180-day timeframe, a slight increase in compliance from 27% during the last reporting period

At the end of 2023, the average time from the initiation of an administrative misconduct investigation until full closure was 827 days. At the end of 2024, the average number of days was 774 days. At the end of the first quarter of 2025, the average number of days was 708 days. At the end of second quarter of 2025, MCSO reported the average number of days for full completion and closure of an administrative misconduct investigation was 1,070. At the end of the third quarter, MCSO reported the average number of days for full completion and closure of an administrative misconduct investigation was 1,027 days. We note that, at least in part, the increased closure time for this and the last reporting period, is a result of the backlog cases completed by District and Division personnel as part of the external PSB8 training.

As we have noted in our last 21 quarterly status reports, we no longer accept workload as the justification for the failure to complete investigations in a timely manner. It continues to be clear from our reviews during this and prior reporting period that the time it takes to conduct administrative misconduct investigations remains unacceptable.

In addition to the modification of the timeline requirements for the completion of investigations, the Fourth Order includes two additional provisions. The first provision requires that "MCSO shall file a monthly report with the Monitor in which it will identify all investigations which the PSB Commander has approved and closed but for which the pre-determination hearing has not been completed." At the end of this reporting period, MCSO reported that no investigations had been closed as defined by the Fourth Order.

The second provision requires that "MCSO shall report to the Monitor and the Parties within ten days of the dismissal of any discipline pursuant to A.R.S. § 38-1110(E)." We added a quarterly document request to capture this information moving forward. MCSO has reported that no such dismissals occurred during this reporting period.

MCSO is not in Phase 2 compliance with this Paragraph.


**Paragraph 356.** *Within ten business days of the entry of this order, the MCSO shall provide to the Monitor the number of administrative investigations remaining in the backlog that are open and have not been completed within the time limits required by the Court (or, in other words, the extent to which the backlog is changed by the extended timeline authorized above for Doc. 1765 ¶ 204 as amended). The Monitor shall have ten business days thereafter to certify the backlog to the parties and the Court. At the beginning of each month, the number of open cases whose investigations have exceeded the time by which Doc. 1765 ¶ 204 as amended required that they be completed shall be the remaining backlog. The remaining backlog shall include not only the number of cases that were not closed, but also the number of cases that were added to the backlog during that month. This backlog shall not include any cases for which the Monitor has granted an extension of the investigation deadline pursuant to ¶ 365 of this order.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

On August 30, 2024, the Court issued the Fourth Amended Supplemental Permanent Injunction/Judgment Order (Fourth Order), amending Paragraph 204 of the Second Amended Supplemental Permanent Injunction/Judgment Order (Second Order), and directing MCSO to complete internal affairs investigations within 180 calendar days of the initiation of the complaint. Prior to the Fourth Order, Paragraph 204 was assessed based on the completion of the investigative portion of the case within 85 calendar days of the initiation of the investigations (60 calendar days if within a Division). We began the revised assessment of compliance with amended Paragraph 204 requirements for all administrative investigations initiated and completed on or after September 15, 2024.

Members of the Monitoring Team met with PSB staff on numerous occasions to discuss the administrative case backlog. The revised policies became effective November 14, 2023; and we began working with PSB to review existing backlog cases on November 16, 2023.

On April 25, 2024, we held our last meeting with PSB to discuss cases in the initial backlog that could be eligible for a diversion. Of the total 2,181 cases we reviewed, 1,435 cases were determined to be ineligible for diversion and remained in the backlog. After confirming and agreeing on this final number with PSB, we provided certification to the Court on May 20, 2024, that the remaining number of open backlog cases was 1,435.

As a result of the Fourth Order, a second review of backlog cases was conducted to address the modifications made by the Court regarding timelines. As noted in Paragraphs 204 and 355 of this Report, our Team worked with PSB to determine an updated number of backlog cases. On September 30, 2024, and pursuant to the amendments to this Paragraph, our Team provided certification to the Court that the backlog number was 1,331.

**Paragraph 357.** *The cases in this remaining backlog should be identified by year, giving priority to the oldest cases, i.e., the cases that were filed first. The expectation should be to address the oldest cases first, without ignoring the continuing caseload. MCSO shall close at least 25 cases per quarter that were filed between 2015-2020. In their monthly report, the MCSO shall specify in which year each case eliminated from the backlog was filed.*

**Phase 1:** Not applicable

**Phase 2:** In compliance

On August 30, 2024, the Court issued the Fourth Amended Supplemental Permanent Injunction/Judgment Order (Fourth Order), amending Paragraph 204 of the Second Amended Supplemental Permanent Injunction/Judgment Order (Second Order), and directing MCSO to complete internal affairs investigations within 180 calendar days of the initiation of the complaint. Prior to the Fourth Order, Paragraph 204 was assessed based on the completion of the investigative portion of the case within 85 calendar days of the initiation of the investigations (60 calendar days if within a Division). We began the revised assessment of compliance with amended Paragraph 204 requirements for all administrative investigations initiated and completed on or after September 15, 2024.

Members of the Monitoring Team have met with PSB staff to discuss the backlog and identified how many cases were pending for each year. The revised policies relevant to misconduct investigations were finalized and approved on November 14, 2023; and we began working with MCSO to review backlog cases on November 16, 2023.

On April 25, 2024, we held our last meeting with PSB to discuss cases in the initial backlog that could be eligible for a diversion. Of the total 2,181 cases we reviewed, 1,435 cases remained in the backlog after our review. After confirming and agreeing on this final number with PSB, we provided certification to the Court on May 20, 2024, that the remaining number of open backlog cases was 1,435. PSB assured us that the Bureau would continue to monitor the existing case backlog and bring forward any cases where a change in a previously ineligible case made the case potentially eligible for a diversion moving forward.

During our July 2024 site visit, we discussed the completion of the initial backlog case review and next steps for addressing the remaining backlog. The PSB Commander assured us that the goal was to continue to address cases in the backlog without negatively affecting the ongoing caseload. Our Team has since modified our document requests to PSB to ensure we receive lists each month of cases remaining in the backlog, backlog cases that have been closed, a list of those cases in the continuing backlog that have been completed, a list of the ongoing cases that have been closed and other information we may need to make our compliance findings. We will closely monitor this information on an ongoing basis.

During this reporting period, we verified that PSB identified the cases remaining in the backlog by the year in which the complaints were filed. This Paragraph requires MCSO to close at least 25 cases filed between 2015-2020 during this quarter. The number of cases filed between 2015-2020 that PSB closed during the second quarter were: April, 35; May, 34; and June 26. Pursuant to Paragraph 357, MCSO met the requirements of this Paragraph, of closing 25 cases per quarter, by closing 95 cases filed between 2015-2020. In addition, PSB closed 71 non-backlog cases during period in review.

***Paragraph 358.***  *Beginning on October 1, 2024, the MCSO will be required to reduce the backlog number remaining on the last day of the previous calendar-quarter (September 30, 2024) by 45 cases per month for a minimum total reduction of 135 cases during the last calendar quarter of 2024.  Beginning on January 1, 2025, the amount of required case reduction will increase to a 50 case reduction per month from the number of the backlog existing on the last day of the previous quarter (Dec. 31, 2024) for a minimum total reduction of 150 cases for the first calendar quarter of 2025.  Beginning on April 1, 2025, the amount of required case reduction will increase to a 55 case reduction per month from the number of the backlog existing on the last day of the previous quarter (March 31, 2025) for a minimum total reduction of 165 caseload reduction for the second calendar quarter of 2025.  Beginning on July 1, 2025, the minimum amount of required case reduction from the backlog number on the last day of the previous quarter (June 30, 2025) will increase to a 60 case reduction per month and a 180 minimum caseload reduction for the third calendar-quarter of 2025.  This backlog reduction number of 60 per month and 180 per quarter will remain the required minimum backlog caseload reduction per quarter from the backlog number on the last day of the previous quarter until the backlog is eliminated.  For each calendar-quarter in which PSB cannot reduce the remaining backlog by the requisite number of cases from the number of the backlog existing on the last day of the previous quarter, the MCSO and/or Maricopa County shall pay into the PSB Staffing Fund two times the amount identified in ¶ 338 ($191,415.12) for each month in that quarter in which the PSB did not reduce the backlog by the requisite number of cases specified for that month.  For each calendar-quarter that MCSO reduces the remaining backlog by more than the minimum backlog reduction required to avoid the assessment to the PSB Staffing Fund, Defendants may credit the excess cases toward any month or months in the following quarter's minimum backlog case reduction.  The Defendants may apply excess credits only to months in the quarter immediately following the quarter in which the Defendants accrued the credits.  For the month of September 2024, the MCSO and/or Maricopa County shall pay into the PBS Staffing Fund two times the amount identified in ¶ 338 above if they cannot reduce the backlog by twenty cases from the previous month.  If, however, the new certification of the backlog in ¶ 356 as amended results in an increase of more than twenty cases in the backlog from the backlog existing on August 31, 2024, the MCSO and defendant are released from paying into the PSB Staffing Fund for the month of September 2024 only.  The Court may for good cause shown consider modifications to the payment schedule in this paragraph after October 1, 2025.*

**Phase 1:**  Not applicable

**Phase 2:**  In compliance

Pursuant to Paragraph 358, MCSO met the minimum requirements of 165 closed cases for this quarter, with a net reduction of 182 cases.  MCSO exceeded the quarterly goal of 180 cases by two cases.

## Section 18:  Concluding Remarks

MCSO is in Phase 1 compliance with 80 of the applicable First Order Paragraphs, or 100%; 103 of the applicable Second Order Paragraphs, or 100%; four of the applicable Third Order Paragraphs, or 100%; and one of the applicable Fourth Order Paragraphs, or 100%.

We assess Phase 2 compliance with 98 Paragraphs of the First Order; 118 Paragraphs of the Second Order; 19 of the Third Order; and four of the Fourth Order, for a total of 240 Paragraphs.

Including the Paragraphs in which MCSO is in Full and Effective Compliance, MCSO is in Phase 2, or operational compliance, with 82 of the 98 applicable First Order Paragraphs, or 84%. Including the Paragraphs in which MCSO is in Full and Effective Compliance (FEC), MCSO is in Phase 2 compliance with 93 of the 118 applicable Second Order Paragraphs, or 79%.  MCSO is in Phase 2 compliance with 13 of the 19 applicable Third Order Paragraphs, or 68%; and in Phase 2 compliance with three of the four applicable Fourth Order Paragraphs, or 75%.

MCSO retains the obligation to document that the Office remains in Full and Effective Compliance with the Paragraphs so designated.

The overall investigative compliance of those cases investigated by PSB had been at or above 95% compliance for numerous reporting periods, but it fell to 90% during this reporting period. We are concerned with this unexpected reduction in compliance and will discuss it with PSB at our next site visit.

As reported during the last reporting period, we again identified concerns with District and Division investigations during this reporting period, specifically with those completed as part of the PSB8 training.  Of the total 34 cases investigated, nine were investigated as part of the ongoing practice of assigning minor misconduct investigations to Divisions and Districts outside of PSB. All but one (11%) of these nine cases were in investigative compliance, an improvement from the last reporting period

Twenty-five of the 34 cases were completed by District and Division personnel as part of the PSB8 training.  Of these, five (20%) had investigative deficiencies.  Again, this reporting period, none of these deficiencies were identified or addressed by District or Division command personnel.  There are still numerous investigations that were completed during the PSB8 training that we have not yet reviewed.   We are concerned that we will continue to see ongoing unaddressed deficiencies with the remainder of these cases.  District investigations are an important part of a culture of accountability, and an improvement to the quality of these cases is an imperative, whether they are current cases, backlog cases, or cases that were assigned during the PSB8 training.

In March 2025, circumstances brought about a change in PSB leadership.  During this reporting period, we have been working with the new captain temporarily assigned to fulfill the responsibility as PSB Commander.  We have continued to discuss CRM cases, our protocols for case reviews, necessary documentation, and other PSB matters with this Commander since his assignment.  We have continued to find him to be responsive to our inquiries and concerns.

During the second half of 2025, the Court issued additional directives that provide further guidance in several aspects of the Orders. One of those directives relates to supervision and span of control. The most recent order on span of control (Doc. 3298), filed on October 29, 2025, establishes an extension to the original span of control pilot (Doc. 2937) which ran from October 1, 2023 through September 30, 2024. The Court extended the review period of the pilot based on our recommendation, following some concerning trends we observed in our reviews of documentation, BWC videos, and from our interviews of supervisors during our site visits. Several years ago, when MCSO first established the DSA program, there was a concern raised by MCSO that due to span of control limitations, Posse volunteers had to routinely refrain from providing volunteer services. If a supervisor had a full complement of eight deputies and two DSAs, it was not possible to include any Posse members in their shift without violating policy or the Order. Consequently, MCSO argued that on many occasions Posse members had to be sent home without providing any services.

While we acknowledge the value of community members volunteering their services and being actively involved in securing their neighborhoods, we are concerned with MCSO's ability to adequately train, supervise, and track volunteers. We are most concerned with MCSO's use of Qualified Armed Posse (QAP), who may be carrying out roles that exceed the scope of their authority and may become involved in complex law enforcement situations that exceed their training and experience. In our reviews of body-worn camera recordings, we have not observed supervisors or deputies providing much direction to Posse members. In addition, the training provided to Posse members at this point appears to be inadequate for the roles they are assuming. We will continue to monitor this and report our findings in our future quarterly status reports.

As we noted in our previous report, MCSO's continued efforts have resulted in MCSO maintaining compliance with the requirement to properly document the seizure of contraband and evidence during traffic stops. We commend MCSO for its efforts to attain and maintain compliance with this requirement.

During the previous reporting period, MCSO attained compliance with the requirement to provide passengers that were contacted by deputies with either an Incidental Contact Form, a citation, or a warning. During this reporting period, MCSO maintained compliance with this requirement. We commend MCSO for its efforts to attain and maintain compliance with this requirement.

We continue to request that MCSO increase its efforts to ensure deputies properly conduct and document searches of vehicle occupants during traffic stops. During this reporting period, there was one traffic stop that involved a consent search and it was found to not be in compliance, due to the deputy failing to inform the person of the right to refuse the search and the right to revoke the consent at any time. We noted that MCSO updated the Vehicle Stop Contact Form (VSCF) to include additional fields for capturing pertinent data related to consent searches; however, we also noted that the revisions to the VSCF were not provided to the Monitoring Team for review and comment prior to the implementation of the form.

We also noted that since the revised VSCF was implemented there are a number of traffic stops involving passengers in which the form indicates that the passengers were searched; however, based on our review of the body-worn recordings, there was no searches of the passengers.

During the third quarter review of NTCFs, we found 12 instances where deputies identified Hispanic persons as white due to the fact that the NTCF has only one box for Race/Ethnicity, whereas the IRs and VSCFs associated with these stops showed the subjects were white in the Race box, but Hispanic in the Ethnicity box. We raised this issue with MCSO and await the agency's response.

Integrated into this report are compliance findings that were derived from the results of the Monitor's inquiry that commenced in the second quarter of 2025. Behind the numbers is a disturbing pattern of behaviors, policy violations, Court violations, statutory violations, and a host of ethical breaches that call into question the integrity of the agency, as well as its senior leaders. Thirty Paragraphs were implicated by our inquiry's findings and are now not in compliance.

While our report cites matters relevant to the Commander of the Professional Standards Bureau, our concerns go far beyond the tribulations suffered by one individual. A breach of integrity, however small, mitigates community trust and internal trust. But the breaches we cite are not small. They speak to something greater and more troubling. Specifically, even in the face of contempt findings relevant to the manipulation of the PSB process, the transgressions continue to flourish and have clearly impeded the reform process. Scores of deputies, supervisors, and commanders at MCSO have worked diligently to achieve compliance and adopt the principles of constitutional policing. Administrative and professional staff have made major contributions in support of the technologies and processes that have moved the agency forward.

Simply put, the *Melendres* case is about disparities: treating one group differently from others. What the Monitoring Team has found here is an attempt to create an internal culture where favor and reprisal are tools of control: to impact outcomes; to instill fear in changemakers; and to grant favors and position to those who bend to misguided directions.

Law enforcement must subscribe to the highest principles of integrity. Law enforcement leaders must ensure this through their own examples of good judgment, principled thinking, adherence to fairness, and a commitment to justice. Law enforcement agencies are expected to protect rights and liberties, be accountable and transparent, forge community partnerships, and be just in their treatment of those in their employ. The weaponization of the PSB function; the abuse of the disciplinary system and its attendant safeguards; and the inappropriate, if not unlawful, exercise of authority disguised as legitimate is unacceptable.

This has not merely been a *systemic* failure – though systems, in fact, failed. These were *concerted efforts* to break the rules, ignore policy and statute, and violate Court Orders. Manipulating the PSB process also sends a chilling message to the community, which has every right to expect honest redress when filing a complaint.

Overall, MCSO's Phase 2 compliance has dropped from 92% to 80%, a 12% reduction from the last reporting period. Thirty-one Paragraphs that had been in compliance are now not in compliance; and of those, 14 were previously in Full and Effective Compliance. When integrity is compromised, it calls into question the authenticity of data, reports, and other indicia used to determine compliance findings. Further, we are concerned that behaviors cited in this report are flourishing.

We have carefully reviewed the objections raised by MCSO to the draft of this report. Some modifications were made as a result. We wholly reject MCSO's assertion that this report was in any way in response to any motions filed with the Court relevant to the status of the *Melendres* case. Our inquiry preceded the filing of any such motions.

The Sheriff, the Undersheriff, the Executive Chief, the Deputy Chief, and others cited in this report bear full responsibility for these violations and setbacks in compliance.

## Appendix 1:  Acronyms

The following is a listing of acronyms frequently used in our quarterly status reports:

| | |
|---|---|
| AB | Administrative Broadcast |
| ACJIS | Arizona Criminal Justice Information System |
| ACLU | American Civil Liberties Union |
| ACT | Annual Combined Training |
| AIU | Audits and Inspections Unit |
| AOC | Administrative Office of Courts |
| ARG | Alert Review Group |
| ARS | Arizona Revised Statutes |
| ASU | Arizona State University |
| ATU | Anti-Trafficking Unit |
| BAF | BIO Action Form |
| BB | Briefing Board |
| BIO | Bureau of Internal Oversight |
| BWC | Body-worn camera |
| CAB | Community Advisory Board |
| CAD | Computer Aided Dispatch |
| CBP | Customs and Border Protection |
| CDA | Command Daily Assessment |
| CEU | Criminal Employment Unit |
| CHU | Custody Hospital Unit |
| CID | Court Implementation Division |
| COrD | Community Outreach Division |
| CORT | Court Order Required Training |
| CPSM | Center for Public Safety Management |
| CRM | Class Remedial Matter |
| DOJ | Department of Justice |

| DSA | Deputy Service Aide |
|-----|---------------------|
| DUI | Driving Under the Influence |
| EEPM | Effective Employee Performance Management |
| EIS | Early Identification System |
| EIU | Early Intervention Unit |
| EPA | Employee Performance Appraisal |
| ESI | Electronically stored information |
| ETSI | Extended traffic stop indicator |
| FBI | Federal Bureau of Investigation |
| FEC | Full and Effective Compliance |
| FIDM | Fair and Impartial Decision Making |
| FOF | Findings of Fact |
| FTO | Field Training Officer |
| GI | General Instructor |
| ICE | Immigration and Customs Enforcement |
| IIU | Internal Investigations Unit |
| IR | Incident Report |
| IRM | Incident Report Memorialization |
| JED | Judicial Enforcement Division |
| LNET | Long non-extended traffic stop |
| LOS | Length of stop |
| LLS | Legal Liaison Section |
| MCAO | Maricopa County Attorney's Office |
| MCSO | Maricopa County Sheriff's Office |
| NETS | Non-extended traffic stops |
| NOI | Notice of Investigation |
| NTC | Non-Traffic Contact |
| NTCF | Non-Traffic Contact Form |
| OA | Open Axes |
| OIT | Officer in Training |

| PAL | Patrol Activity Log |
|------|------|
| PDH | Pre-Determination Hearing |
| POST | Peace Officers Standards and Training |
| PPMU | Posse Personnel Management Unit |
| PRRM | Public Records and Requests Management Section |
| PSB | Professional Standards Bureau |
| SID | Special Investigations Division |
| SIMS | Sheriff's Information Management Services |
| SMS | Skills Manager System |
| SPSS | Statistical Package for the Social Science |
| SRT | Special Response Team |
| TraCS | Traffic and Criminal Software |
| TSAR | Traffic Stop Annual Report |
| TSAU | Traffic Stop Analysis Unit |
| TSMR | Traffic Stop Monthly Report |
| TSQR | Traffic Stop Quarterly Report |
| VSCF | Vehicle Stop Contact Form |

# Endnotes

[1] Doc. 2830, ¶¶ 346 and 347, Appendix 2.

[2] MCSO's organizational chart (as of March 2025), Appendix 2.

[3] The percent in compliance for Phase 1 is calculated by dividing the number of Order Paragraphs determined to be in compliance by the total number of Paragraphs requiring a corresponding policy or procedure. Paragraphs with the status of Deferred are included in the denominator, while Paragraphs with the status of Not Applicable are not included. Therefore, the number of Paragraphs included in the denominator totals 188 for Phase 1; the number of Paragraphs included in the denominator totals 240 for Phase 2.

[4] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

[5] This number includes those Paragraphs that are deemed in Full and Effective Compliance.

[6] Doc. 2830, ¶¶ 346 and 347, Appendix 2.

[7] Docs. 606, 1765, 2830 and 3076, Appendix 2.

[8] Captain Gregory Lugo, Interview, 15:2-8, (April 18, 2025), Appendix 3.

[9] Id. at 17:11-25

[10] *Id.* at 51:16-52:8.

[11] *Id.* at 53:9-12.

[12] "Brady List" refers to a list of law enforcement officers with misconduct histories that could affect their credibility. Named after the Supreme Court case *Brady v. Maryland* 373 U.S. 83 (1963), these lists are maintained by prosecutors to ensure the disclosure of appropriate information to defense attorneys and defendants. This is also referred to as the "Rule 15" list, in reference to Rule 15 of the Arizona Rules of Criminal Procedure which outlines the disclosure requirements for witnessed used in criminal cases.

[13] Interview with Lugo*, supra* note 10 at 55:16-56:5.

[14] *Id.* at 60:8-17.

[15] *Id.* at 61:4-10.

[16] A.R.S. § 38-1101, *et seq.*

[17] A.R.S. § 11-356 (B)

[18] A.R.S. § 38-1004.

[19] *Legacy Found. Action Fund v. Citizens Clean Elections Comm'n,* 254 Ariz. 485, 493, (2023).

[20] See, *Woerth v. City of Flagstaff,* 167 Ariz. 412, 416-17 (Ct. App. 1990) (citing *Arizona Dep't of Economic Sec. v. Holland,* 120 Ariz. 371, 372, (Ct. App. 1978)).

[21] A.R. S. § 38-1106(I).

[22] Kenneth Holmes, Interview at 6:7-7:10 (April 23, 2025), see Appendix 3.

[23] *Id.* at 6:4-6.

[24] Per GC-11 (Employee Probationary Periods, Unclassified Employees, and Releases), the promotional probationary period for a sworn employee is for six months unless extended by the Sheriff for up to an additional six months. A promotional probationary employee who fails to satisfactorily complete the promotional probationary period may be, without right of appeal, reverted to a position of the class previously occupied or to another suitable position. A promotional probationary employee, who is suspended or dismissed, has the right of appeal. See, Appendix 2.

[25] Holmes was serving as the PDH officer in violation of the Court's Orders and MCSO policy.

[26] Letter from Holmes to Sergeant Engelbeck and Memorandum to Employee Records, County Human Resources from CRS MCSO, both dated January 28, 2025, Appendix 2.

[27] Findings of IA2020-0555, as revised by Holmes on January 30, 2025 (The document wrongly listed the year as 2024), Appendix 2.

[28] Employee Disciplinary Considerations and Decision for IA2020-0555 of February 6, 2025, Appendix 2.

[29] *Id.*

[30] Interview with Holmes, *supra* note 24, at 14:13-15:4.

[31] *Id.* at 41:1-44:9.

[32] *Id.* at 53:1-11.

[33] *Id.* at 51: 4-12.

[34] Presumptive Range of Discipline for IA20-0555 of September 26, 2024, and GC-17 (Employee Disciplinary Procedures), Appendix 2.

[35] *Law Enforcement Officers' Merit System Resolution,* Maricopa County, at 8 (last updated April 2018), https://www.maricopa.gov/DocumentCenter/View/16949/Law-Enforcement-Officers-Merit-System-Resolution-?bidId=

[36] Interview with Captain Lugo, *supra* note 10*,* at 44:13-48:7.

[37] *Id.* at 48:8-15.

[38] *Id.* at 48:23-49:10.

[39] *Id*. at 58:5-17.

[40] *Id*. at 59:8-22.

[41] A.R.S. § 38-1104(A)(1).

[42] Interview with Captain Lugo, *supra* note 10, at 140:15-141:11.

[43] *Id.*

[44] *Id.* at 141:12-19.

[45] *Id.* at 61:25-63:24.

[46] *Id.* at 64:2-16

[47] *Id.* at 65:1-17, 66:20-67:5.

[48] *Id.* at 67:7-12.

[49] *Id.* at 96:14-97:18

[50] *Id.* at 99:13-16

[51] *Id*. at138:23-139:5 and Doc. 2939, See Appendix 2.

[52] *Id.* at 139:6-23.

[53] After the demotion of Sergeant Engelbeck, he allegedly filed a complaint against Captain Lugo with Sergeant Leatham, who was a PSB investigator at the time. Sergeant Leatham disputes this.

[54] See, SC2024-0168, Appendix 2.

[55] Sergeant Engelbeck complaints of March 10, 2025, Appendix 2.

[56] Undersheriff Jeffrey Gentry*,* Interview at 10:1-13 (April 21, 2025), Appendix 3.

[57] *Id*. at 27:6-28:7.

[58] Executive Chief Melissa Palopoli, Interview at 6:1-6 (April 17, 2025), Appendix 3

[59] Palopoli testified in her interview that this had occurred on March 11, 2025, *Id.* at 4:11-20., but then provided a written supplement stating it occurred on March 21, 2025. See Appendix 2. The Independent Investigator concluded that she did not give this directive to Captain Lugo until March 24, 2025. See Appendix 2.

[60] Interview with Palopoli, *supra* note 60, at 4:21-24.

[61] Interview with Captain Lugo, *supra* note 10, at 84:25-85:5.

[62] *Id*. at 86:5-8.

[63] *Id.* at 86:17-24.

[64] *Id.* at 102:8-11.

[65] *Id.* at 102:14-103:13.

[66] Doc. 1765, ¶ 268, Appendix 2.

[67] Interview with Palopoli, *supra* note 60*,* at 7:16-21.

[68] *Id.* at 9:10-25.

[69] Doc. 1765 at ¶ 167 and Doc. 3076 at ¶¶ 345, 347, Appendix 2.

[70] Executive Chief Melissa Palopoli, Interview, at 38:25-39-5 (April 21, 2025), Appendix 3.

[71] *Id.* at 37:8-12.

[72] Memorandum of April 7, 2025, from Deputy Chief Summers, Deputy Chief of the Compliance Bureau to the Monitor re: Assignment Approval Request Bureau of Internal Oversight Re: Captain W.C. Morrison #1509, Appendix 2.

[73] Captain Morrison had also been demoted from the rank of Chief to Captain because of a separate serious misconduct investigation.

[74] See, *supra* note 74.

[75] GH-2 (Internal Investigations), Appendix 2.

[76] See, *supra* note 74.

[77] Chief Matthew Summers, Interview, at 35:23-36:10 (April 17, 2025), Appendix 3.

[78] *Id.* at 34:21-23.

[79] Doc. 3305, Appendix 2.

[80] Interview with Captain Lugo, *supra* note 10, at 109:24-111:24.

[81] *Id.* at 111: 6-24.

[82] *Id.* at 138:1-19.

[83] *Id.* at 113:13-18.

[84] *Id.* at 113:19-21.

[85] *Id.* at 113:22-24.

[86] *Id.* at 113:25-114:18.

[87] *Id.* at 114:19-24.

[88] *Id.* at 115:9-12.

[89] *Id.* at 112:5-19.

[90] *Id.* at 112:1-4.

[91] *Id.* at 132:2-133:10.

[92] *Id.* at 133:13-16.

[93] Sheriff Gerard Sheridan, Interview, at 14:3-8 (May 13, 2025); see Appendix 3.

[94] *Id.* at 14:9-13.

[95] Interview with Lugo, *supra* note 10 at 122:4-11.

[96] *Id.* at 122:23-123:13.

[97] Interview with Sheridan, *supra* note 95, at 17:12-22.

[98] *Id.* at 20:8-22:5.

[99] Interview with Captain Lugo, *supra* note 10, at 122:8-18.

[100] *Id.* at 123:14-21.

[101] Interview with Palopoli, *supra* note 60, at 57:9-12.

[102] *Id.* at 57:15-20 and Independent Investigator Report at Appendix 2.

[103] *Id.* at 57:21-25.

[104] The purpose of Deputy Chief Summers's attendance is unclear, although in her interview, Executive Chief Palopoli indicated that she had accessed his organizational expertise on prior occasions.

[105] Interview with Undersheriff Gentry, *supra* note 58, at 12:13-13:4.

[106] Interview with Palopoli, *supra* note 60, at 28:21-29:24.

[107] Interview with Gentry, *supra* note 58, at 39:5-14.

[108] Interview with Palopoli, *supra* note 60 at 39:20-42:22.

[109] Doc. 3191.

[110] Independent Investigator Report, Appendix 2.

[111] Doc. 1765 at ¶ 268, Appendix 2.

[112] Interview with Palopoli, *supra* note 72 at 33:9-35:14.

[113] *Id.* at 12:5-14.

[114] Doc. 2830, ¶¶ 346, 347, Appendix 2.

[115] See, Doc. 3305, at 11, Appendix 2.

[116] Interview with Sheridan *supra* note 95, at 14:9-13.

[117] Doc. 3422 at 7, Appendix 2.

[118] Doc. 3191, Appendix 2.

[119] Interview with Sheridan *supra* note 95, at 14:9-13.

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] Presumptive Range of Discipline for IA20-0555 of September 26, 2024, and GC-17 (Employee Disciplinary Procedures), Appendix 2.

[126] *Id.*

[127] Interview with Sheridan *supra* note 99, at 14:9-13.

[128] *Id.*

[129] *Id.*

[130] I*d.*

[131] Doc. 2830 at ¶ 353, Appendix 2.