# Exhibit 1

## Appendix 2: Reference Documents

| Document | Bates stamp numbers |
|---|---|
| SC2024-0168 Service Complaint Summary involving Captain Lugo, completed July 8, 2024 | 46REPORT000003 |
| Presumptive Range of Discipline for IA 2020-0555 of September 26, 2024 | 46REPORT000006 |
| Letter from Holmes to Sergeant Engelbeck Notifying Rescinding of Previous Disciplinary Decision, January 28, 2025 | 46REPORT000009 |
| Memorandum to Employee Records, County Human Resources from CRS MCSO, January 28, 2025 | 46REPORT000010 |
| IA 2020-0555 Decision Memo and Findings as revised by Holmes, January 30, 2025 (Sergeant Engelbeck) | 46REPORT000068 |
| Employee Disciplinary Considerations and Decision for IA 2020-0555 of February 6, 2025 | 46REPORT000073 |
| MCSO's organizational chart (as of March 2025) | 46REPORT000075 |
| Sergeant Engelbeck complaints of March 10, 2025 | 46REPORT000091 |
| Notice of Administrative Leave to Captain Lugo, April 4, 2025 | 46REPORT000095 |
| Email from Executive Chief Palopoli to PSB Lieutenant Porter on April 7, 2025 | 46REPORT000096 |
| Memo of April 7, 2025, from Deputy Chief Summers, Deputy Chief of the Compliance Bureau to the Monitor re: Assignment Approval Request Bureau of Internal Oversight Re: Captain W.C. Morrison #1509 | 46REPORT000099 |
| Supplemental Permanent Injunction/Judgment Order, as amended (Doc. 606) | 46REPORT000102 |
| Second Amended Second Supplemental Permanent Injunction/Judgment Order (Doc. 1765) | 46REPORT000161 |
| Amended Third Supplemental Permanent Injunction/Judgment Order (Doc. 2830) | 46REPORT000228 |
| Order of October 12, 2023 (Doc. 2938) | 46REPORT000243 |

| Document | Bates stamp numbers |
|---|---|
| Amended Fourth Amended Supplemental Permanent Injunction/Judgment Order (Doc. 3076) | 46REPORT000342 |
| Order of May 30, 2025 (Doc. 3191) | 46REPORT000353 |
| Order of November 3, 2025 (Doc. 3305) | 46REPORT000358 |
| Order of March 13, 2026 (Doc. 3422) | 46REPORT000373 |
| GH-2 (Internal Investigations) | 46REPORT000380 |
| GC-11 (Employee Probationary Periods, Unclassified Employees, and Releases) | 46REPORT000424 |
| GC-17 (Employee Disciplinary Procedures), Attachments A and B | 46REPORT000430 |
| Report of Independent Investigator | 46REPORT000474 |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Revised 08/14/2019

## Maricopa County Sheriff's Office
### Service Complaint

*** This CAN NOT be used for an allegation of employee misconduct ***

| | | |
|---|---|---|
| **1. SC NUMBER** | **2. IA NUMBER** | **3. DATE OF REPORT** |
| SC2024-0168 | | 07/8/2024 |

**4. INVESTIGATOR**
Executive Chief Michael V. Caputo #S2351

**5. DIVISION**
Compliance Bureau / Professional Standards Bureau

### 6. INVOLVED EMPLOYEE(S) Use a continuation page if more than two employees.

| | |
|---|---|
| **Name:** Captain Greg Lugo #S1868 | **Name:** Sergeant Robert Leatham #S1462 |
| **Division:** Professional Standards Bureau | **Division:** Professional Standards Bureau |

### 7. COMPLAINANT(S)/WITNESS(ES) Use a continuation page if more than two complainants/witnesses.

| | |
|---|---|
| **Name:** Sergeant Aaron Engelbeck #S1673 <br> **Address:** 550 W Jackson Street <br> Phoenix, AZ 85003 <br> **Telephone:** <br> **Email:** | **Name:** <br> **Address:** <br> <br> **Telephone:** <br> **Email:** |

| **8. DATE/TIME OF INCIDENT** | **9. INCIDENT/EVENT NUMBER** | **10. LOCATION OF INCIDENT** |
|---|---|---|
| 11/10/2020 | | Gilbert, AZ |

### 11. ORIGINAL COMPLAINT OR CONCERN (short synopsis)

On 06/13/2024, Sgt Engelbeck e-mailed Chief Caputo inquiring on the status of IA2020-0555, wherein he is the principal. He further inquired if new IA(s) were opened on Captain Lugo related to Sgt Engelbeck's 2020 demotion and/or an IA opened on Sgt Leatham for failure to initiate an IA on Captain Lugo in the first place.

### 12. ASSOCIATED POLICY CONCERNS

Allegations included GB-2, CP-5, CP-2, and GC-11.

### 13. OTHER AGENCY REFERRAL (Identified upon initial review)

☐ **Complainant Notified**
    ☐ Email ☐ Phone ☐ Mail ☐ In Person ☐ Other

**Referred to:**
☐ Phoenix PD ☐ Mesa PD ☐ CHS ☐ Other_____

**Date of Notification:**

### 14. INQUIRY ACTIONS TAKEN

☒ **Research Conducted** – *(Attached)*
    ☐ CAD ☐ IR ☐ BWC ☒ EIPro ☐ TraCs ☒ Other
☐ **Interviewed Complainant** – *(Recorded and Attached)*

☐ **Interviewed ALL Witnesses** – *(Recorded and Attached)*
☐ **Interviewed ALL Employees** – *(Recorded and Attached)*
☐ **BWC Reviewed**

### 15. REASON FOR ADMINISTRATIVE CLOSURE

☒ **No Policy Violation**
☐ **No MCSO Employees Involved**
☐ **Explanation Policy/Procedure**
☐ **Complaint Lacks Specificity**

### 16. DIVISION APPROVAL OF SERVICE COMPLAINT

| Investigator Signature/Date | Division Commander Signature/Date |
|---|---|
| *Michael V. Caputo* S2351    07/08/2024 | *Ann Scheel*    07/08/2024 |

### 17. PSB APPROVAL OF SERVICE COMPLAINT – PSB USE ONLY

☑ Approved as Written    ☐ Approved with Justification Attached    ☐ DENIED – IA OPENED –

**PSB COMMENTS:**

| **DATE** | **BY WHOM** |
|---|---|
| 07/08/2024 | (SAA) |

### 18. SERVICE COMPLAINT FORWARDED TO: – PSB USE ONLY

☐ Policy Division    ☐ Training Division    ☐ Other –

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 19. REPORT OF ACTIONS TAKEN | SC NUMBER | SC-2024-0168 |
| --- | --- | --- |

On 06/13/2024, an email was sent from Sgt Aaron Engelbeck #S1673 to Executive Chief Michael Caputo #S2351. In summary, Sgt Engelbeck attached a 12-page document related to his 2020 probationary release (demotion) wherein he claimed Captain Lugo violated numerous MCSO policies. He further claimed he brought the information to the attention of Sgt Leatham during administrative investigation (IA2020-0555). It was later determined Sgt Engelbeck is listed as a principal for numerous policy violations, some of which were related to the poor performance justifying his 2020 demotion. Sgt Engelbeck claimed an administrative investigation should have been opened against Captain Lugo and he further claimed an administrative investigation should be opened against Sgt Leatham for failure to open an investigation on Captain Lugo. Sgt Engelbeck further stated he believed his demotion was unjustified and he wished to know the status of IA2020-0555 as it was still open and pending.

On 06/14/2024 an email response was sent to Sgt Engelbeck confirming Executive Chief Caputo would be looking into his concerns. He was further advised IA2020-0555 was in fact completed and currently in the review and approval stages by Executive Chief Caputo in lieu of PSB Captain Lugo.

Upon further review it was determined, as fully documented in administrative investigation (IA2020-0555), on 11/10/2020, Sgt Engelbeck provided the same exact 12 pages of documents to PSB Sgt Leatham as part of a follow up principal interview. Sgt Leatham noted he met with Sgt Engelbeck in the parking lot of a shopping center around Power Road and Queen Creek Road in Gilbert. The interaction with Sgt Engelbeck was less than five minutes, and no audio or video was recorded of it. They parted ways once he provided a brief explanation of what the documents contained. When Sgt Leatham ultimately had a chance to review the information, he noted the first twelve pages consisted of a typed rebuttal defending himself from the allegations of misconduct in the referenced administrative investigation as well rebuttals for the poor performance issues for which he was demoted from Lieutenant back to Sergeant. Sgt Engelbeck also expressed his frustrations in working for Captain Lugo and the way his demotion was handled by Chief Morrison and Chief Bailey. Other information Sgt Engelbeck included in the packet was the six-month evaluation authored by Captain Lugo, supervisor notes by Captain Lugo and Captain Braaten, and a list of MCSO employees who needed to complete evaluations on subordinates before 09/01/2020. Sgt Leatham noted when he looked through the list related to evaluations, Sgt Engelbeck had highlighted names of other Lieutenants, Captains, and Bureau Chiefs who had not completed evaluations. The packet also contained Supervisor Notes Engelbeck printed from the Blue Team database.

In summary, Sgt Engelbeck referenced numerous issues to include: Captain Lugo allegedly violated GB-2 by not providing him with training or guidance as a new Lieutenant; Captain Lugo allegedly violated CP-5 by entering information Sgt Engelbeck did not agree with regarding poor performance; Captain Lugo allegedly violated CP-2 by documenting Sgt Engelbeck's numerous policy violations which ultimately led to the referenced administrative investigation; Captain Lugo allegedly violated GC-11 related to Sgt Engelbeck's probationary release (demotion) because he did not first implement corrective actions and interventions; and Sgt Engelbeck further claimed the administrative investigation was initiated by PSB as retaliation against him because he complained to Captain Lugo's supervisor.

When the 12-page document was evaluated by PSB for the administrative investigation, it was determined it would not be appropriate to include it as a part of the investigation. The reason it was not included was because the twelve-page rebuttal was written well after the initial PSB principal interview took place. During the initial PSB interview, Sgt Engelbeck did not wish to provide a 5-minute rebuttal, rather, he was now attempting to submit the 12-pages of documents in the same way a five-minute statement would have been used during his interview. Sgt Engelbeck expressed his displeasure with the investigation and the fact he was being held accountable, but none of his peer supervisors were. As the PSB investigation clearly notes, Sgt Engelbeck declined to make a five-minute statement at the conclusion of his Principal interview, but several weeks later, he used information discussed during his interview to defend himself and vilify Captain Lugo and Chief Morrison. Furthermore, Sgt Engelbeck's main argument centered around why he was demoted. It was made clear during his interview that the performance issues associated with his demotion were separate from the allegations of misconduct in the administrative investigation. At the conclusion of Sgt Engelbeck's letter, he alleges Captain Lugo created a hostile work environment and that he and Chief Morrison violated various MCSO policies. The topic of hostile work environment can be found within MCSO Policy, CP-3, Workplace Professionalism (Effective Date 01/24/2019). That policy contains the following statement related to hostile work environments and harassment:

*Harassment: Unwelcome sexual advances, request for sexual favors, and other conduct of a sexual nature, or treatment of an individual based on a protected characteristic that is not welcome, that is offensive, that interferes with work effectiveness or that creates an intimidating, hostile, or offensive work environment. Not all conduct that is unpleasant or upsetting constitutes harassment.*

The information provided by Sgt. Engelbeck could have been verbally expressed during his five-minute statement, or it could be offered as a part of a hearing to contest any findings he does not agree with at the conclusion of the administrative investigation. Still, he chose not to make a five-minute statement and it was rightly determined to be inappropriate to allow him to use information garnered from the interview, then turn around and use that information to write a twelve-page rebuttal where he defends his actions and vilifies his Commander's decisions. Therefore, as detailed in the referenced administrative investigation, the narrative provided by Sgt Engelbeck was placed in the physical file for the administrative investigation and turned in when the investigation was recently completed. As for the supervisor notes from Blue Team and his six-month evaluation, that information had already been reviewed and would have been whether Sgt Engelbeck provided it or not. That information therefore was included in the case file in IAPro.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 18. REPORT OF ACTIONS TAKEN (continued) | SC NUMBER SC2024-0168 |
|---|---|

The rationale for why an administrative investigation was not opened against Captain Lugo was explained in detail to include the fact when Sgt Leatham met Sgt Engelbeck on 11/10/2020, he did not say anything about filing a complaint against Captain Lugo or Chief Morrison. Sgt Leatham took the documents because he did not know if they had any evidentiary value to this investigation. When Sgt Leatham reviewed the documents, he found nothing Sgt Engelbeck provided which had any additional evidentiary value. As for the specific comments Sgt Engelbeck made in reference to Captain Lugo's alleged retaliation, MCSO Policy CP-11, Anti-Retaliation (Effective Date 12/13/2018), states in part:

*3. An employee shall, without retaliation, report an act of alleged misconduct by another employee to a supervisor or directly to the Professional Standards Bureau (PSB) or to any outside entity authorized to take corrective action.*

*4. All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, member of the public, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action. Retaliating against any person who reports or investigates alleged misconduct shall be considered serious misconduct and shall result in disciplinary action, up to and including dismissal from employment.*

Based on the above relevant sections from the Anti-Retaliation policy, PSB determined if Sgt Engelbeck were to make an allegation of misconduct against Captain Lugo for reporting Sgt Engelbeck's conduct to PSB, Sgt Engelbeck would himself be violating this policy. Sgt Leatham clearly explained to Sgt Engelbeck that MCSO Policy CP-11, Anti-Retaliation, prohibits filing a complaint against another person who has filed a complaint against the principal. During the PSB review, the comments about Captain Lugo retaliating against him were considered, but Sgt Engelbeck did not describe any type of protected activity he was involved in that resulted in adverse treatment or action. Based on the interviews conducted with Sgt Engelbeck and Captain Lugo, it was further determined that nothing asked of Sgt Engelbeck was outside of MCSO policy. It was noted that Sgt Engelbeck may not have liked being held to a high standard or having to work weekends, but nothing Captain Lugo asked him to do was a violation of MCSO policy.

According to MCSO CP-3, Workplace Professionalism: Discrimination and Harassment (Effective Date 01/24/2019), defines a Protected Activity as:

*Protected Activity: An employee's good faith expressed opposition to an employer's practice that he reasonably believes to be discrimination, such as complaining of alleged discrimination or harassment against oneself or another or filing a charge of discrimination. Protected activity may also include exercising legal rights, such as requesting a reasonable accommodation based on religion or disability, requesting leave under the Family Medical Leave Act, or filing a worker's compensation claim.*

CP-11 and CP-3 both define retaliation as:

*Retaliation: Subjecting an employee to adverse treatment or adverse action because the employee engaged in a protected activity. All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, member of the public, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and is strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action.*

None of the orders Captain Lugo gave to Sgt Engelbeck constituted any sort of adverse treatment/action that was associated with a protected activity. Furthermore, Sgt Engelbeck claimed Captain Lugo created a hostile work environment, which is defined in CP-11, under the definition of "Harassment," which states the following:

*Harassment: Unwelcome sexual advances, request for sexual favors, and other conduct of a sexual nature, or treatment of an individual based on a protected characteristic that is not welcome, that is offensive, that interferes with work effectiveness or that creates an intimidating, hostile, or offensive work environment. Not all conduct that is unpleasant or upsetting constitutes harassment.*

As detailed in the administrative investigation, the last sentence in the above definition addresses Sgt Engelbeck's feeling like he was working in a hostile environment. Just because he was being asked to perform to a higher standard than other MCSO Lieutenants does not mean the work environment was hostile. At no time did Sgt Engelbeck describe anything that would constitute a hostile work environment.

MCSO policy allows employees to file administrative claims under state or federal discrimination laws with the Equal Employment Opportunity Commission (EEOC) or the Arizona Attorney General's Office, Civil Rights Division. Sgt Engelbeck could also have filed a grievance to address his demotion at the time. During his second principal interview, Sgt Engelbeck was specifically asked if he filed a grievance to address his demotion to which Sgt Engelbeck replied he had not. MCSO Policy, GC-16, Employee Grievance Procedures identifies Office Policy and Procedures as being grievance eligible matters.

Based on the above circumstances, this service complaint is appropriate for an administrative closure as it is without merit and involves dissatisfaction with the formal administrative process for probationary release (demotion), documentation of poor performance, and procedures for administrative investigations of policy violations involving member of MCSO. The additional allegation that an employee failed to open an administrative investigation is also without merit as all information was carefully considered and fully documented in the related PSB administrative investigation in which the principal is in fact the same as the complainant in this service complaint.

46REPORT000005

# Presumptive Range of Discipline
## IA No. 20-0555
## Principal: Sergeant Aaron Engelbeck S1673
## Matrix Date: 06/25/2020

The PSB Commander shall make the preliminary determination of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation(s) and the employee's discipline history. (¶222)

When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used to determine the category of the offense. Exoneration on the most serious offense does not preclude discipline as to the less serious offenses stemming from the same misconduct. (¶193)

Each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline. (¶221)

The monitor shall review and approve all disciplinary decisions on Class Remedial Matters. (¶283)

Upon review of the administrative investigation, the Personnel File, and Policy GC-17, *Employee Disciplinary Procedure*, the following is the presumptive disciplinary range to be imposed:

☐        Class Remedial Matter                    ☐        Exempt Employee

☐ IA ☐ Monitor ☐ Range ☐ Monitor ☐ Appoint Authority ☐ Monitor ☐ PDH ☐ Monitor ☐ Employee

### Allegation #1

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| 1 | 6 or 7 | 29.A | 6=24-40-80 7=Dismissal |
| | | | |
| | | | |

### Allegation #4

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| 1 | 6 or 7 | 29.A | 6=24-40-80 7=Dismissal |
| | | | |
| | | | |

### Allegation #5

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| 1 | 6 or 7 | 29.A | 6=24-40-80 7=Dismissal |
| | | | |
| | | | |

### Allegation #N/A

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Current Offense Number | 1 offense No Coach | Discipline Range For This Act/Omission (Most Serious Policy Violation) | Category 6= 24-40-80 |
|---|---|---|---|

Additional Notes:_____ See attached

Revised 05242022

# Review of Prior Discipline
## IA No.: 20-0555
## Principal: Sergeant Aaron Engelbeck S1673
## Matrix Date: 06/25/2020

The PSB Commander shall make the preliminary determination of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation(s) and the employee's discipline history. (¶222)

The number of times an employee has received prior discipline, which is still eligible for consideration, shall be used when determining where an employee shall be placed within the matrix. The matrix to be used shall be determined based on the IA Case number that is currently being considered for discipline (Subject IA) and the effective date of the matrix.

The prior discipline to be considered shall be determined based on: (1) identify all sustained IA case numbers prior to the Subject IA; (2) determine the Category (1-3) or (4-7) for each of the identified IA cases; (3) identify when employee signed for discipline; (4) determine which IA cases drop off from consideration based on the 3/5-year lookback. Coaching will be considered for 1-year lookback.
- Matrix eff 5/18/17 to Current
  - Category 1 – 3 considered for **3** years prior to current offense
  - Category 4 -7 considered for **5** years prior to current offense

Any discipline issued after the Subject IA Initiated/Start date shall not be considered.

| Subject IA Case | Case Number | IA Initiated/Start Date | Lookback Dates (1, 3, and 5 Years) |
|---|---|---|---|
| | 20-0555 | 10/03/2020 | **1 Year –** 10/03/2019<br>**3 Year –** 10/03/2017<br>**5 year –** 10/03/2015 |

| Prior Sustained IA Cases or Coaching | Case Number | Category of Offense | Discipline Signed by Employee | Consider for this Disciplinary Action - Y/N |
|---|---|---|---|---|
| | 21-0152 | 2 | 03/27/2023 | N |
| | | | | |
| | | | | |
| | | | | |

Additional Notes: _____

PSB Commander Signature and Date: _____ S235I    09/26/2024

Revised 11/14/2023

46REPORT000007

**IA 20-0555**
**Sergeant Aaron Engelbeck S1673**
**Attachment - Presumptive Range of Discipline**

Upon review of IA 20-0555 and the Findings, I select the following for the Range of Discipline:

Regarding Allegations 1, 4 and 5, the Range of Discipline is Category 6 or Category 7. Category 6 was selected. This was selected for all Allegations based on the circumstances of the conduct that constitutes unethical behavior and had a serious and adverse impact on the Office and other Office employees.

The appointing authority is authorized to make the final determination regarding the discipline to be imposed within the range identified above.

PSB Commander Signature and Date: _____ 52351    09/26/2024

46REPORT000008

 Maricopa County Sheriff's Office

January 28, 2025

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Sergeant Engelbeck:

On October 24, 2024, the Maricopa County Sheriff's Office suspended you for 40 hours without pay as a result of the sustained allegations outlined in Internal Investigation #2020-0555. On October 30, 2024, you appealed the 40-hour suspension to the Maricopa County Law Enforcement Officer's Merit System Commission.  This letter is to notify you that after further consideration, the Office has decided to modify the disciplinary action imposed to no discipline.  The Office will thus rescind the 40-hour suspension and file a motion to vacate the pending Merit Commission appeal hearing.

Your employment records are being corrected to reflect the rescission of the suspension, and this letter shall be placed in your personnel file.   You will be reimbursed for 40 hours of pay at the rate you were being compensated at the time you served the suspension.  Your reimbursement will be processed by County Payroll.  Please allow processing time.

Sincerely,

Ken Holmes

Appointing Authority

KH:adc

cc:     County Payroll Records
        Personnel File
        Merit Commission – Keri March


I acknowledge receipt of this letter: _____
                                          Signature                              Date

 **Maricopa County Sheriff's Office**

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

# MEMORANDUM

TO:       Michele Patrick
          Employee Records
          County Human Resources

FROM:     Denise Callahan
          Conduct Resolution Commander
          Maricopa County Sheriff's Office

DATE:     January 28, 2025

SUBJECT:  Rescission 40-hour Suspension -Sergeant Aaron Engelbeck


On October 24, 2024, the Maricopa County Sheriff's Office suspended Sergeant Aaron Engelbeck for 40 hours as a result of the sustained allegations outlined in Internal Investigation #2020-0555. On January 28, 2025, the Maricopa County Sheriff's Office rescinded the 40-hour suspension. Please update Sergeant Engelbecks employment records to reflect the suspension rescission effective January 28, 2025. These documents will be updated in his MCSO personnel file.

Sincerely,

*Denise Callahan*

Commander Denise Callahan
Administrative Services Division



cc:    Personnel File
       MCAO Civil Services Division

46REPORT000010

# Maricopa County Sheriff's Office

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

January 28, 2025

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Sergeant Engelbeck:

On October 24, 2024, the Maricopa County Sheriff's Office suspended you for 40 hours without pay as a result of the sustained allegations outlined in Internal Investigation #2020-0555. On October 30, 2024, you appealed the 40-hour suspension to the Maricopa County Law Enforcement Officer's Merit System Commission. This letter is to notify you that after further consideration, the Office has decided to modify the disciplinary action imposed to no discipline. The Office will thus rescind the 40-hour suspension and file a motion to vacate the pending Merit Commission appeal hearing.

Your employment records are being corrected to reflect the rescission of the suspension, and this letter shall be placed in your personnel file. You will be reimbursed for 40 hours of pay at the rate you were being compensated at the time you served the suspension. Your reimbursement will be processed by County Payroll. Please allow processing time.

Sincerely,

Ken Holmes

Appointing Authority

KH:adc

cc:    County Payroll Records
       Personnel File
       Merit Commission – Keri March

I acknowledge receipt of this letter: _SGT. ___ #1673_   1/28/2025
                                      Signature                    Date

46REPORT000011

**Employee Disciplinary Considerations and Decision**

**Employee Name:** _____AARON ENGELBECK_____ **IA#** _2020-0555_
**Appointing Authority:** _Ken Holmes_

**The following information was considered when making the decision to impose discipline:**

- ☐ Employee's work record.
- ☐ Discipline imposed on other employees is the same as in similar circumstances.
- ☐ Evidence supports the employee is a deputy sheriff and currently holding the rank of sergeant.
- ☐ Evidence supports the employee was holding the rank of lieutenant at the time the misconduct of Insubordination occurred.
- ☐ Employee was sustained on 3 counts of Policy CP-2.39, Insubordination.(Shown in Allegation #1; #4, and #5)
- ☐ Regarding Allegation #1, the evidence supports the employee was insubordinate when he failed to follow a direct order, by his captain, to remain within the boundaries of District VI, while on duty.
- ☐ Evidence supports the direct orders came in the form of directives, memorialized in Supervisory Notes, and meetings with the captain.
- ☐ Regarding Allegation #4, evidence supports that PSB alleged the employee was insubordinate when he deactivated the GPS on his MDC. I find the employee did deactivate the GPS on his MDC however there were no requisite orders by the captain to prevent the employee from doing so. Therefore, I find this allegation, to be **NOT SUSTAINED.**
- ☐ Regarding Allegation #5, evidence support the employee was insubordinate when he intentionally avoided going in the District VI substation, which was in contrary to what was ordered by his captain.
- ☐ The policy violations equate to misconduct stated in Category 6(29A), of GC-17.
- ☐ The employee has no other acts of misconduct.
- ☐ The Discipline Matrix was considered whereby the minimum discipline is a 24 Hour Suspension, the  presumptive discipline is a 40 Hour Suspension, and the maximum range of potential discipline is an 80 Hour Suspension.
- ☐ I find the following mitigating circumstances. 1. Evidence supports the additional two Insubordination violations cited by the employee's captain in a memorandum to his Deputy Chief, dated 09/22/2020, were used by the captain to support the recommendation for the employee to be released/demoted from promotional probation. 2. The employee was demoted from lieutenant to sergeant, in part, by these allegations of insubordination, on 10/12/2020. This demotion was perceived by the employee as serious discipline for the misconduct, although it was a failure to meet his promotional probation.
- ☐ As such, Counsel provided a legal opinion, regarding this matter, that no discipline is necessary and proceeding with a merit commission appeal hearing would not be in the best interest of the MCSO or the employee at issue.
- ☐ Due to the above stated mitigating factors, the fact this is a Category 6 violation, and the employee has no other acts of misconduct, I find, **NO DISCIPLINE**, to be appropriate.

1

46REPORT000012

PDH Factors:

See the audio/video recording of the PDH, attached.

**Final Decision (based on the above factors): This is a Deviation from the Disciplinary Matrix.**

_____**No Discipline**_____

Appointing Authority Signature: _____

Date: _____2-6-25_____

Engelbeck, Aaron (IA#2020-0555)

2

46REPORT000013

## Jack Greer (MCSO)

| | |
|---|---|
| **From:** | Denise Callahan (MCSO) |
| **Sent:** | Thursday, February 6, 2025 9:05 AM |
| **To:** | Ryan Giguere (MCSO); Jack Greer (MCSO) |
| **Subject:** | FW: Engelbeck v MCSO MCFY25-L01 - Zoom Link for Hearing |

Ada "Denise" Callahan
Conduct Resolution Commander
Administrative Services Division/HR Bureau
Maricopa County Sheriff's Office
Office: 602-876-5456 | Reception: 602-876-3456
Schedule: Mon - Thurs 0600-1600
Denise_Callahan@mcso.maricopa.gov

The information contained in this email and any files transmitted with it are confidential and/or privileged, and are intended solely for the use of the recipients listed above. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of the transmitted information is strictly prohibited. If you have received this transmission in error, please immediately notify the sender and delete and destroy all copies and attachments.

**From:** Neil Landeen (MCAO) <landeenn@mcao.maricopa.gov>
**Sent:** Thursday, February 6, 2025 8:54 AM
**To:** Denise Callahan (MCSO) <Denise_Callahan@MCSO.Maricopa.gov>
**Subject:** FW: Engelbeck v MCSO MCFY25-L01 - Zoom Link for Hearing

Hi Denise. For your records, please see below email confirmation that this matter has been closed:



**Neil Landeen**
Deputy County Attorney
Civil Services Division
Email: landeenn@mcao.maricopa.gov
Direct : 602-506-0017
Cell : 480-392-2716
225 W. Madison
Phoenix, AZ 85003
http://www.maricopacountyattorney.org

**From:** Merit Commission <MCmerit@maricopa.gov>
**Sent:** Wednesday, January 29, 2025 5:10 PM
**To:** Neil Landeen (MCAO) <landeenn@mcao.maricopa.gov>; aengelbeck@gmail.com
**Subject:** RE: Engelbeck v MCSO MCFY25-L01 - Zoom Link for Hearing

Good afternoon,

Received; the appeal MCFY25-L01 has been closed. Please let me know if you need anything from me other than this email.

Thank you,

1

Keri



**Keri March**
**HUMAN RESOURCES**
301 W. Jefferson, 8th Floor Phoenix, AZ 85003
Management Assistant
**O:**  602-506-4007   **C:**  602-647-6670
**MARICOPA.GOV**
**Facebook** | **Instagram** | **Twitter** | **YouTube**

2

46REPORT000015



# Maricopa County Sheriff's Office

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

## MEMORANDUM

TO:        Neil Landeen
           Maricopa County Attorney's Office

FROM:      Denise Callahan
           Administrative Services Division

DATE:      November 6, 2024

SUBJECT:   Merit Appeal – Aaron Engelbeck S1673 (IA2020-0555)

Enclosed are copies of the following documents regarding the appeal of Aaron Engelbeck:

- Personnel File
- IA20-0555 Investigative file
- MCSO Policies CP-2, Code of Conduct and GC-17, Employee Disciplinary Procedures
- Similar Discipline for the past 2 years (No similar discipline)
- Discipline Paperwork – Notice of Pre-Determination Hearing, Suspension letter and Pre-Determination Hearing video/audio

If I can be of further assistance, please contact me at 602-876-5456 or Denise_Callahan@mcso.maricopa.gov.

Sincerely,

*Denise Callahan*

Denise Callahan
Administrative Services Division

Enclosures

46REPORT000016

**MERIT SYSTEMS COMMISSION**
MIKE BRANHAM, Chairman, District 4
KATHRYN PETSAS Vice-Chairman, District 3
CASEY BLAIS, District 1
GAIL PERRY, District 2
REBEKAH FRIEND, District 5



<div align="center">

**MARICOPA COUNTY LAW ENFORCEMENT OFFICER'S**

**MERIT SYSTEM COMMISSION**

</div>

| | | |
|---|---|---|
| AARON ENGELBECK, | | **MCFY25-L01** |
| APPELLANT, | ) | |
| | ) | |
| v. | ) | **NOTICE OF CONTINUED** |
| | ) | **HEARING** |
| MARICOPA COUNTY SHERIFF'S OFFICE, | ) | |
| RESPONDENT. | ) | |
| | ) | |

The Maricopa County Law Enforcement Officer's Commission hereby notices the hearing in the above-captioned matter originally scheduled for: **FRIDAY, JANUARY 10, 2025,** *at 9:00 AM,* will now be continued to: **FRIDAY, FEBRUARY 7, 2025 AT 9:30 AM.** The hearing will be conducted via Zoom. A link will be sent out to all parties.

All parties are hereby notified that they may appear personally, produce evidence, and provide testimony. Parties may represent themselves or be represented by legal counsel. The hearing will be conducted on an informal basis. In the event that a party is over thirty (30) minutes late for the hearing, testimony may be taken on the record verifying or denying the allegations in the letter of discipline. The Hearing Officer shall prepare recommendations based on the evidence presented and submit the recommendations to the Commission.

Requests to issue subpoenas for the attendance of witnesses or the production of documents at the hearing shall be made by providing all subpoena forms that include complete contact information for each individual to the Merit Systems Commission, 301 West Jefferson Street, 8th Floor, Phoenix, AZ 85003, *__no later than 5:00 PM on Tuesday, January 28, 2025.__*

**46REPORT000017**

Any party who needs to request a change in the date, time, or place of the hearing, should first contact the other party and then either submit a stipulation (written agreement) or a motion to the Hearing Officer. The Merit System Coordinator and the opposing party should be copied on all communications to the Hearing Officer. As a general rule, requests for continuances should be made within five (5) days of the date of this notice.

If the date of the hearing changes for any reason, it is the responsibility of the parties requesting subpoenas to notify their witness(es) of the date and time of the rescheduled hearing. Fourteen (14) days prior to the initial hearing date, the parties shall exchange their lists of witnesses and exhibits to be used in the hearing.

Please direct questions to the Merit Systems Coordinator at (602) 506-3792.

Dated Monday, January 6, 2025

*Keri March*

Keri March, Merit Systems Coordinator,
On behalf of the Maricopa County
Law Enforcement Officer's Merit System Commission

46REPORT000018

**ORIGINAL** of the foregoing mailed **CERTIFIED DELIVERY** Article No. 7020 1810 0000 5821 7428 via **REGULAR MAIL** and via **E-MAIL** on Monday, January 6, 2025, to:

AARON ENGELBECK
2779 S. HARMONY AVE.
GILBERT, AZ 85295
AENGELBECK@GMAIL.COM
*Appellant*

**COPIES** sent via e-mail on Monday, January 6, 2025, to:

NEIL LANDEEN
COUNTY ATTORNEY'S OFFICE
255 W. MADISON ST.
PHOENIX AZ 85003
LANDEENN@MCAO.MARICOPA.GOV
*Attorney for the Respondent*

KEN HOLMES
SHERIFF'S OFFICE
550 W JACKSON ST
PHOENIX AZ 85003
K_HOLMES@MCSO.MARICOPA.GOV
*Respondent/Appointing Authority*

PRUDENCE LEE
JURISPRUDENCE@Q.COM
*Hearing Officer*

SQUAW PEAK REPORTING, INC
P.O.BOX 26158
PHOENIX AZ 85068
TAMMYJEANGILLETT@AOL.COM
*Court Reporter*

**By:** *Keri March*
_____
Keri March, Merit Systems Coordinator
Maricopa County Human Resources



**MERIT SYSTEMS COMMISSION**
MIKE BRANHAM, Chairman, District 4
KATHRYN PETSAS Vice-Chairman, District 3
CASEY BLAIS, District 1
GAIL PERRY, District 2
REBEKAH FRIEND, District 5

## MARICOPA COUNTY LAW ENFORCEMENT OFFICER'S

## MERIT SYSTEM COMMISSION

| | | |
|---|---|---|
| AARON ENGELBECK, | | MCFY25-L01 |
| APPELLANT, | ) | |
| | ) | |
| v. | ) | **NOTICE OF HEARING** |
| | ) | **BEFORE HEARING OFFICER** |
| MARICOPA COUNTY SHERIFF'S OFFICE, | ) | |
| RESPONDENT. | ) | |
| | ) | |

The Maricopa County Law Enforcement Officer's Merit System Commission (the "Commission"), hereby notices the hearing in the above-captioned matter for:

### _Friday, January 10, 2025, at 9:00 am_

The hearing will be conducted virtually via Zoom. All parties will receive a link via email to access the hearing and to share with their witnesses.

The Commission has assigned this appeal to the following Hearing Officer:

> Prudence Lee
>
> jurisprudence@q.com
>
> PHONE: (602) 758-9914

All parties are hereby notified that they may appear personally, produce evidence and provide testimony. Parties may represent themselves or be represented by legal counsel. The hearing will be conducted on an informal basis. In the event that a party is over thirty (30)

minutes late for the hearing, testimony may be taken on the record verifying or denying the allegations in the letter of discipline.  The Hearing Officer shall prepare recommendations based on the evidence presented, and submit the recommendations to the Commission.

A party who needs to request a change in the date, time or place of the hearing should first contact the other party, and then either submit a stipulation (written agreement) or a motion to the Hearing Officer.  **The Merit Systems Coordinator and the opposing party should be copied on all communications to the Hearing Officer.**  As a general rule, motions to continue should be made as soon as practicable after receipt of this notice. Requests for continuances made within five (5) business days of the scheduled hearing will not be granted, barring emergent circumstances.

Requests to issue subpoenas for the attendance of witnesses or the production of documents at the hearing shall be made by providing all subpoena forms that include complete contact information for each individual to the **Merit Systems Coordinator, 301 W. Jefferson Street, 8th Floor Phoenix, AZ 85003 or by email to MCMerit@Maricopa.gov**, no later than ***5:00 p.m. on Tuesday, December 31, 2024.*** If the date of the hearing changes for any reason, it is the responsibility of the parties requesting subpoenas to notify their witness(es) of the date and time of the rescheduled hearing.  Fourteen (14) days prior to the initial hearing date, the parties shall exchange with each other their lists of witnesses and exhibits to be used in the hearing.

Please direct questions to the Merit Systems Coordinator at (602) 506-4007.

Dated: Tuesday, November 12, 2024

*Keri March*

Keri March, Merit Systems Coordinator,
On behalf of the Maricopa County
Law Enforcement Officers' Merit System Commission

46REPORT000021

**ORIGINAL** of the foregoing mailed **CERTIFIED DELIVERY** Article No. 7020 1810 0000 5821 7404 via **REGULAR MAIL** and via **E-MAIL** on Tuesday, November 12, 2024, to:

AARON ENGELBECK
2779 S. HARMONY AVE.
 GILBERT, AZ 85295
AENGELBECK@GMAIL.COM
*Appellant*

**COPIES** sent via e-mail on Tuesday, November 12, 2024, to:

NEIL LANDEEN
COUNTY ATTORNEY'S OFFICE
255 W. MADISON ST.
PHOENIX AZ 85003
LANDEENN@MCAO.MARICOPA.GOV
*Attorney for the Respondent*

KEN HOLMES
SHERIFF'S OFFICE
550 W JACKSON ST
PHOENIX AZ 85003
K_HOLMES@MCSO.MARICOPA.GOV
*Respondent/Appointing Authority*

PRUDENCE LEE
JURISPRUDENCE@Q.COM
*Hearing Officer*

SQUAW PEAK REPORTING, INC
P.O.BOX 26158
PHOENIX AZ 85068
TAMMYJEANGILLETT@AOL.COM
*Court Reporter*

**By:** *Keri March*
　　　　Keri March, Merit Systems Coordinator
　　　　Maricopa County Human Resources

46REPORT000022

PAGES 1 of 26

Appeal to Merit Board

Involving MCSO IA2020-0555

Appeal authored by Aaron Engelbeck

2024 OCT 30 PM 1:22

46REPORT000023

In this appeal, I will be addressing problems regarding the findings, timing, and level of discipline resulting from this investigation. The findings are described in the attached notice of Pre-Determination Hearing. Through the following pages I will demonstrate how MCSO and its Professional Standards Bureau fail to follow their own policies and procedures to benefit and protect certain members of command staff while punishing line level people.

Allegation No. 1:

In February 2020 Captain Lugo provided a written statement of expectations regarding his directives over Lieutenants in District 6. It should first be noted that this document said these were "expectations" not orders or directives. Among these expectations were the suggestion to be within the district during working hours. I had been advised by a Chief prior to this that logging on from my residence was acceptable. In addition, I would put myself on "SuperAdmin" and work in an administrative capacity from my residence. This finding does not address the fact that this all occurred during COVID 19 provisions and extra precautions were being taken office-wide. Many restaurants were closed during this time and it made sense to eat my breakfast at my residence for safety reasons. Command staff in every division was being ordered to stay home, including those in HQ. Many command staff were given permission to work from home during this period, not coming into any office facility at all. I understand that in a patrol capacity I was not going to be afforded this safety measure but it doesn't seem unreasonable I could mitigate this at this time by reducing the amount of my exposure. Captain Lugo states that he would not have altered my work situation if I had asked. This demonstrates that he is unconcerned for the safety of his subordinates. I contend that the safety of line level workers should be considered equally across the Office. Furthermore, this directive would force me to operate county equipment while not being logged on. This is contrary to normal operations throughout the entire county. There is also liability involved with this. It should be noted that I was being asked to do things that no lieutenant was being asked to do anywhere else within this agency.

I ask again, as I asked within my previous (uninvestigated) complaint, why I was treated differently than previous lieutenants working in District 6. When I was working as a detective sergeant prior to my promotion, I would meet for breakfast with Lieutenant Banks outside of Queen Creek, where she was assigned and working for Captain Lugo. I would meet her during her working hours in her county vehicle and in uniform. She is a long standing and well respected member of this Office and I sought her guidance in many matters. I was treated to a different level of discretion than Lieutenant Banks. Lieutenant Banks was never interviewed regarding this matter in spite of the fact that I specifically named her. This is relevant information that was completely disregarded by the investigator. I addressed this matter in my complaint against Captain Lugo in that I was targeted for some reason by him. This shows that these expectations are exclusive to me as both Captain Lugo and Lieutenant Jakovidic lived within the town limits therefore could and did log on from their residence. Lieutenant Jokovidic was the other Lieutenant working in Queen Creek at the time. The combination of the COVID 19 restrictions and the absolute unfairness of Captain Lugo's request make these findings unreasonable.

Allegation No. 4:

This allegation was ultimately found by Mr. Holmes to be incorrect and unreasonable. I only include it to show the bias of the investigator as well as anyone that oversaw and signed off this

46REPORT000024

investigation. It should have been corrected long before getting to Mr. Holmes. This allegation fails to address the concept that no order was given forbidding me from turning off my GPS. Therefore, I cannot be insubordinate in turning it off. Furthermore, this allegation also fails to address that I turned the GPS back on not knowing it was no longer working. Sergeant Leatham himself attempted to turn the GPS back on but was incapable. He then took my computer to the IT department to investigate and still returned it with a non-working GPS. I can only assume that not even IT could fix this problem. I turned the GPS back on but it did not work and continues not to work in spite of professional attention. I did not turn the GPS off to be insubordinate and couldn't be insubordinate since neither policy, nor Captain Lugo had forbid me from turning it off. I attempted to turn it back on and assumed it was working at that point. If this is such an important issue, why would the Office return equipment to me that is incapable of transmitting my location 4 years later?

Allegation No. 5:

Captain Lugo's expectations were "to be present in the office, out on patrol, and accessible to patrol supervisors". The PDH then goes on to describe that I would often be within the district, parked. Anyone that has worked patrol knows there are periods of time when you will park and be immobile. This goes further for a lieutenant when it comes to emails, phone calls, paperwork etc. I was always accessible to patrol supervisors, especially being in the field, even when I am stationary. No sergeant ever complained to me about being unable to contact me and on the contrary, I had excellent communication with the sergeants working under me. Therefore, I was complying with this command.

This allegation also fails to address that Captain Lugo was creating a hostile work environment which was reported to the Deputy Chief Cory Morrison by both myself and Lieutenant Jakovidic. The Deputy Chief attempted to resolve this situation by creating a meeting between Captain Lugo, Lieutenant Jakovidic, and myself to talk about concerns. This meeting, I've come to believe, has led to the continuing retaliation I am receiving from Captain Lugo and his division. The Deputy Chief made no other attempts to resolve this situation beyond that meeting. This allowed Captain Lugo to continue his plan and execution of demoting me and seeking his retaliation. As this hostile work environment was being created, and was subsequently reported by more than just myself, it seems reasonable to complete my duties outside of the office and away from the person creating the environment. I sought help from my superiors and found my concerns dismissed. This leaves me little avenue to alleviate the tensions of the environment. I sought help from my chain of command and none was given. Mr. Holmes implied it was incumbent on me to pressure the deputy chief about fixing the situation rather than trusting that my superiors are going to do their sworn duties. This would not be the last time my requests for help would be ignored.

In October 2020, I brought to the attention of Sergeant Leatham the numerous policy violations committed by Captain Lugo noted in my attached complaint. I had the expectation that, according to policy, these allegations would be investigated. I was incorrect in assuming that policy would be followed. I found out nearly three and a half years later that Sergeant Leatham never opened a separate investigation in spite of MCSO policy. I then brought this to the attention of Deputy Chief Caputo. It seems he launched Service Complaint number SC2024-0168. This is again a violation of policy as it states "we found that Captain Lugo and Sergeant Leatham followed proper Office policy

and procedure." Policy states that serious allegations of policy violation cannot be investigated in a service complaint but rather require a full investigation. As one of the allegations I brought to the attention of Sergeant Leatham involve Captain Lugo's truthfulness, this would be outside of the scope of Service Complaints.

It is becoming clear that there is an intention to protect Captain Lugo from proper investigation by an independent investigator. Many of my concerns and defenses to these allegations would be revealed and corroborated with a proper investigation as is required by policy. I asked Mr. Holmes to imagine if this had occurred at a district level. If a supervisor at a district level failed to enter a complaint properly as an investigation, then his/her superior further failed, 3 ½ years later, to follow up in opening an investigation, there would be major discipline to follow up to possible termination as stated in policy. Mr. Holmes could not disagree with this and offered no solution or explanation.

The discipline listed is not reasonable. I was already demoted in reference to Captain Lugo's allegations. Mr. Holmes claims this is a separate matter due to the policy violations being separate from the alleged procedural issues for which I was demoted. I reminded Mr. Holmes that Captain Lugo deliberately omitted information from the supervisor notes used to demote me. This would have been discovered had a proper investigation been conducted. The fact that this was never investigated demonstrates the neglect to conduct a proper investigation on myself as these are inseparable. However, a demotion has shown in the past to be adequate discipline for sustained allegations. This has been cited as adequate discipline in past investigations even in the case of unsuccessful completion of probation. As a result of this, I was denied a subsequent county wide raise, and the COVID 19 pay incentive. I could not promote for the 4 years due to having an open investigation with serious allegations. Now, you wish to subject me to this again. As a result of major discipline I will be denied yet another raise. This shows a continued punishment over the course of four years for a single incident. Mr. Holmes is claiming that we can simply split the allegations by Captain Lugo and use half to demote me and then another half to punish me 4 years later. This is unreasonable by any standard and is not listed in policy.

Captain Lugo failed to offer guidance in this matter and did not allow any time for corrective action to take place. He waited until approximately 20 days before recommending I do not complete probation to tell me about any of these supposed short comings. This is in violation of policy GB-2 Command Responsibility which states "Supervisors shall initiate approved interventions, as specified in GH-5, Early Identification System, to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation." Captain Lugo had no intention of developing me as a lieutenant and to the contrary created a negative work environment where I was uncomfortable even being around him. This was addressed to the Deputy Chief and very little effort was taken to improve this situation. This was also addressed in my complaint to both Sergeant Leatham and Deputy Chief Caputo but has yet to be investigated properly. Mr. Holmes, in my PDH, would say it was incumbent on me to follow up and make sure my superiors were actually taking action after my complaints rather than expecting them to do their respective duties. Mr. Holmes pointed out that there were obvious breakdowns in the process from those around me. I agree but want to point out that I am the only one being punished in ANY way.

46REPORT000026

Lastly, the amount of time this has taken, only to conclude with major discipline, is outrageous. State law has recently been changed to correct this situation regarding Law Enforcement Officers barring this behavior from an agency. PSB seems to have no concerns disregarding the same state statutes that MCSO expects me and my colleagues to adhere to on a daily basis. Mr. Holmes pointed out that any cases opened before the passing of this law are exempt from these restrictions. While this is true, I ask this question. If a state entity decides it should be illegal to treat an individual sworn officer in this manner, do we have an ethical right to do so? The state decided this behavior is unacceptable but we are going to continue to behave this way and treat our employees in a manner that is now against the law. I find this to be deplorable, especially from a division that is intended to be the moral compass of the Office. However, even dismissing the state statutes, the federal standards and guidelines for internal affairs state "Completion of Internal Affairs investigations should occur as rapidly as is reasonably necessary to fulfill the investigative mission. In all instances, however, an internal investigation should be completed within a reasonable time before any applicable statute of limitations or other bar to officer discipline has run out. It is preferable to conclude investigations within 180 days." It goes on to say "Agencies with more limited staffing may, in good faith, require a longer duration of time for completing an investigation." Sergeant Leatham was told to make this case a priority and yet he did nothing for 3 ½ years knowing this could result in major discipline. It is beyond reason to consider this "good faith". The MCSO PSB division is not short staffed but rather employs the most sergeants of any division within the Office.

I doubt anyone would agree that waiting four years to conclude major discipline is required would be considered "in good faith". In addition, being continuously punished through demotion, salary restriction, suspension, withheld from promotion and then further salary restriction would also fall well outside the realms of "good faith" and reason. Mr. Holmes told me that the burden lies on me to prove this was outside of good faith. I believe any reasonable person would see it is not good faith as I have outlined above. Even the time restrictions of this appeal process show the hypocrisy of this situation. I am only allowed 10 calendar days to respond to an investigation which took them 4 years.

Further, this being the first sustained CP-2 allegation, make this discipline excessive as well.


I write these words with the deserved respect of the Agency. However, as I've stated above, this entire situation has left me disheartened and incredibly frustrated. I don't think my current mental state is unreasonable as the actions of the Office have been unreasonable. Ultimately, I do not ask for leniency but rather for Justice and fairness, the same justice and fairness that I'm expected to administer in my duties which I have continued to do for the last 20 years.

This agency continues to violate its own policies and hold line level staff to a different standard than the command levels. This goes against the very oath we take as well as decency in the profession.


Respectfully,

Sgt. A. Engelbeck #S1673

Uninvestigated complaint presented to PSB in October 2020

46REPORT000028

In the time I was assigned to District 6, I was under the command of Captain Greg Lugo. The intention of this document is to outline the possible policy violations, shortcomings as a leader and commander, and the failure to comply to procedural justice on every level of Captain Lugo. I believe that through the course of this writing, I will demonstrate how he failed to supervise, demonstrated a bias, and was misleading or untruthful in official documents.

In December 2019, I was promoted to the rank of lieutenant. As is the practice in this office, I was placed on probation for the subsequent year. I was immediately assigned to District 2 as the West side Watch Commander. During that brief time, I received positive feedback from my commander Captain Braaten. He stated he looked favorably on the work I was doing and wanted to keep me under his command. (SN2019-00054074, SN2019-00055179, SN2020-00002457, SN2020-00002786, SN2020-00007242) I was, however, transferred to District 6 as a patrol lieutenant in February of 2020. Shortly after arriving, Captain Greg Lugo outlined his expectations of the lieutenants. We met and these were agreed upon.

On April 29, 2020, a blue team entry was authored by Captain Greg Lugo which outlined a number of deficiencies he was identifying with me (SN2020-00019114). I was not afforded the opportunity to review and discuss these things before Captain Lugo made this entry. There were some omissions in this entry which were deliberately attempting to show me in a negative light. I felt this strongly enough that I contacted my Deputy Chief, Cory Morrison, to advise him of this and my dissatisfaction with Captain Lugo failing to communicate with me. Chief Morrison asked if I wanted to have a meeting with himself and the captain to resolve these issues. I told him that was not my desire but rather to make him aware of the perceived discrepancies written by Captain Lugo. He spoke of transferring me out of District 6. I told him I did not wish to run from conflict and wanted to attempt to resolve this with Captain Lugo in a one on one meeting. In the meantime, I drafted the following email in response to the blue team entry:

Captain,

Thank you for taking the time to meet with me. I wanted highlight some of the points discussed about the Blue Team entry you submitted on April 29, 2020. I have pasted the entry below for reference.

On 04/29/2020 I conducted a review of the EIS Profile belonging to Lieutenant Engelbeck via the EI Pro Application. Upon review of the information contained in the system there were no new entries or entries that I had not authored or already been aware of contained in the system since my prior review. In addition, no additional action was warranted at this time regarding the review.

Performance of Essential Job Duties: Is all required paperwork submitted in the time frame specified? No. During this review period Lieutenant Engelbeck was provided with two separate lists of overdue items containing tasks that were overdue or coming due were provided. One was provided at the initial time period when Lieutenant Engelbeck was assigned to District 6 and contained various Blue Team Entries, EPA's, or other tasks that were long overdue, while

46REPORT000029

the other was more recent and involved a list of overdue overtime request forms (some forms dating back to January 2020). Specific deadlines were provided for the overdue overtime sheets and they were requested to be submitted by the respective hourly employee by the end of the next working shift. After approximately a two week period all of the forms for Lieutenant Engelbeck's staff still had not yet been completed/submitted. Due to these deadlines not being met, on 04/13/2020 I requested via email for a written explanation from Lieutenant Engelbeck as to the reason for that deadline not being met and with a request for an explanation on the steps he would take in the future to ensure these deadlines are met. The deadline for that written response was 04/17/2020. At this time (04/29/2020) a response has not been provided/received nor has any explanation been provided for the delay. The week of April 6, 2020 was an ADP payroll processing week and on of the responsibilities of a supervisor/command staff is to ensure the proper completion of necessary forms/documents/items with ADP being one of them for their respective chain of command. The lieutenant is responsible for ensuring the proper completion of duties/responsibilities of their respective sergeants. MCSO Payroll also sends out reminder emails leading up to the final possible day for those that still did not have their ADP approved in accordance with requirements. On the week of April 6, 2020 I received a notification after the payroll deadline that a deputy's ADP in Lieutenant Engelbeck's chain of command had not had their ADP approved by a supervisor. I had to conduct and complete the review of this deputy's ADP in order for the processing of this employee's pay check. These notifications are not sent to the division commander level until the last moment as routine reminders are sent to sergeants and lieutenants only. This is not say Due to this deadline not being met, on 04/09/2020 I submitted a request to Lieutenant Engelbeck via email for a written explanation from Lieutenant Engelbeck why this ADP was unable to be approved and what steps he would take in the future to ensure that this did not reoccur. The deadline for that written response was 04/13/2020. At this time (04/29/2020) a response has not been provided/received nor has any explanation been provided for the delay. It should be further noted that during a District 6 Command meeting on 04/15/2020 Lieutenant Engelbeck made verbal statements acknowledging he was aware of the written explanation requests.

In response to this entry here are a few of my concerns:

You have returned EPAs to sergeants, through me, which you felt were unbalanced. The comments in the EPAs were all positive and contained no negatives or areas of improvement. I agree that a balance needs to be created in evaluating someone's job performance. However, this is my second blue team performance note from you and at no time have you written what I'm doing right. This is essential for my development as a lieutenant. I believe a balance should be created in these entries as well as EPAs.

The list you submitted to me was of items that were due previous to my arrival at District 6. In other words, this is work left to me by previous lieutenants. I think it is unrealistic to say that I could catch up on previous lieutenants work as well as learn and keep up with my own. You are correct in stating that I acknowledged these overdue items in our meeting, but I also voiced my frustrations that I cannot see what is overdue in Blue Team itself as other lieutenants at other districts can. I have to rely on you to make me a list of items overdue, I have to print out this list, and then I have to cross them off a written list as they come through my blue team. If I should be working in my car, or simply forget to cross it off the list there is no way for me to check on it other than coming to you. This, to me, lacks efficiency and is very cumbersome. I also expressed frustration with the fact that I and Lt. Jakowinicz are out of the loop when it comes to administrative items. Such as the list of OT sheets you mentioned. The admins here do not send these to the lieutenants but rather straight to you and then you pass it to us. This has

since been corrected but you write this entry instead of waiting for things to correct themselves with the changes. Again, many of these forms were before my arrival, it will take time for them to be completed. Once again, I had to awkwardly print out this list and cross off the OT forms as they come across my desk.

You asked me to write an explanation as to why a sergeant did not have a timesheet signed off by the deadline. You asked me to write what would be done in the future to keep this from happening again. Your email did not state that this was a continuing problem and I don't consider it to be. This was a one time occurrence from Sgt. Thomas. He explained to me that in 5 years he has not missed one before now. Whether that is true or not, nothing was documented stating this was an issue before and he had not done this in my time as his supervisor. As I stated in my email, I don't believe it is reasonable to put something in writing for a one time human error. This sends a wrong message in my opinion and it is not how I want to lead. Human error must be considered and taken into account. Mistakes will happen.

I have recently attended some courses on leadership within law enforcement. They have all emphasized that there must be a balance in feedback from supervisors. I believe, for my own development, I should be afforded this luxury as well. Also, in these courses, they spoke of empowering subordinates. As I have been trying to re-establish the chain of command it has become apparent that this has not been the case prior to now. I voiced in our meeting that I did not feel like a part of command staff. In the last few weeks, I met with some deputies and explained my intentions of respecting the chain of command. One of these deputies actually laughed and said "it doesn't work that way here". I can see I have an uphill battle.

I would like to thank you for taking the time to meet with me and look forward to our working relationship in the future. Thank you for hearing my concerns.

However, I did not send this email. As illustrated, I felt the entry was deliberately inaccurate to portray me as not having completed a single task assigned by Captain Lugo. I chose not to send this email because I did not want to create unnecessary conflict between the Captain and myself. Unknown to me, Lieutenant Jakowinicz also contacted Chief Morrison on another date to offer his own complaints about Captain Lugo. Chief Morrison decided to have a meeting with the four of us to attempt to resolve this. During the meeting, Captain Lugo expressed that he was upset because two new lieutenants had come into the district and began complaining right away to the chief when we could have come to him and talked to him. I responded saying that Captain Lugo had entered the negative blue team entry without talking to me so there was no reason for me to feel that line of communication was open. This clearly showed that Captain Lugo felt communication was important but as was the case this time as well as in September, he did not use that communication to speak to me before writing negative things about me. In addition, Chief Morrison stated that I did not ask him for a meeting but rather called him to tell him that I "wasn't the turd" he was reading about. By saying this, Chief Morrison clearly stated he understood that I felt I was being misrepresented.

46REPORT000031

I did not feel we were communicating well with the Captain and I chose to have a one on one meeting with him afterward. During this meeting I felt we heard each other. I told the captain I felt I needed positive as well as negative feedback to improve my performance. The captain said he understood some of my concerns. I also voiced how I felt what he had written was inaccurate and could have been said in a way that did not seem as negative. I did express my concerns about not having access to blue team. During the meeting with Chief Morrison, I asked the chief if he allowed his lieutenants to have access to blue team when he was a captain. He said he always did but knew Captain Lugo had a different opinion. I expressed my issues with being held to the responsibility of something without being allowed the tools to do this job. There was no further resolution to this subject.

I met again later with the Captain and expressed my desire to be mentored by him and "pick his brain" about philosophies and pitfalls of command. During this time he shared some of his thoughts. This would be the last time, however, that the captain made any attempts to mentor. I followed up that meeting by sending the following email in contrast to the one I did not send previously:


Captain,

I just wanted to take a moment to reiterate what we talked about earlier. I appreciate the efforts you have made to develop me as a lieutenant and as a member of command staff. It has not gone unnoticed by me and I wanted to acknowledge it. Thanks for being open to my suggestions and I hope to model this as well. In addition, I wanted to thank you for allowing me to ask you some questions about moving into a Captain position and helping me understand your role. I hope to model my future work habits after some of yours such as organization and attention to detail. I believe this office has fallen short sometimes in mentoring. This is a two way street and I hope we can continue this in the future.

I appreciate your efforts.

Thanks,
Lt. Aaron Engelbeck



As illustrated, I was trying to reach out and maintain a strong working partnership with the captain in spite of the feelings I had before about what I saw as him misrepresenting me in previous blue team entries.


A short time later on 06/19/2020, I received my 6 month probationary review from Captain Lugo which is attached. This review was largely positive and showed improvement from the previous blue team note. I discussed it with the captain and felt we were working together at that time. It should be noted there was no follow up with Chief Morrison over the status of our working relationship. It wasn't until I approached the chief and informed him that things had improved that anything about the subject was spoken between the two of us.

Since I started as a lieutenant, I was told by more than one lieutenant that they would start their day logged on at their place of residence and monitoring the radio. I was not advised this was unacceptable at any time. These other lieutenants would not leave their residence for as many as a few hours after logging on. Inversely, during this time of Covid-19, I was attempting to minimize my time within the office and would have breakfast at my residence as well as check emails and blue team entries. I was never told this was an issue with Captain Lugo nor was I told a specific time which he wanted me within the town limits. Captain Lugo advised he wanted lieutenants within the town limits during working hours. So once I entered the town, I would not leave. But since lieutenants prior to me advised they would sometimes not get into town until a few hours after starting, I saw no reason I would be held to some sort of standard different than others. Due to the Sheriff's Office having a high intolerance for inequitable and biased treatment, I believed I would be judged in the same light as anyone else. This was proven not to be the case however. I never changed this behavior or altered my routine. I never attempted to conceal my location at my residence and knew the GPS would show me there. Again, I felt I had no reason to since this was presented to me as normal lieutenant working practice. My residence is 5 miles from the town limits of Queen Creek. This distance could be covered by myself in under 10 minutes. I received no negative feedback from Captain Lugo about this or anything else over the course of the next 6 months. To the contrary, I received only positive blue team entries after my review until September 18, 2020. I would be interested to learn why he never enforced this same rule with ANY previous lieutenant.

On September 18, 2020, I was within the town limits on patrol in my vehicle. I was parked nearby the district working on my MDC computer when I received a text message from Captain Lugo asking that I come to the office for a meeting. I was walking in the district doors within 5 minutes. I met with the Captain and he began to outline several deficiencies he perceived in my performance. This was the first I had heard of any negative perception of my performance. However, the captain had typed two pages of notes for these perceptions. The responsibility of a leader would be to bring these things to my attention as they arose instead of waiting to compile a list and present it all at once. Having asked the captain to mentor me on a previous occasion, I was surprised he did not take the opportunity to speak to me about these matters as they were discovered. However, it became obvious quickly that the captain was compiling every small piece of information to show me in a negative light and had absolutely no intention of helping me succeed.

The Captain asked me about an IA that was assigned to me and coming due. It was not overdue but coming due. He asked where I was at with the investigation. I advised him that I had requested GPS information I felt the investigation was at a stand still until this information was received as it would shape the rest of the investigation. The captain authored the blue team following this meeting and omitted my thoughts that the investigation couldn't move forward without the GPS information but rather simply stated "has not conducted any additional investigation on this case as of this date". It is subtle omissions such as this that were deliberate attempts to paint me in a negative light.

The Captain brought up a BIO action form which had been assigned to me. I did turn this in 3 days late. However, once again, the Captain does not tell the whole story but rather conveniently leaves out important details. This is shocking for someone so committed to attention to detail. In the third week of August from the 20th to the 24th, I left the country for a

previously planned vacation. This trip, if cancelled, would be a loss of money on my part. Upon returning, as ordered by MCSO command, I attempted to contact LMS. I left two separate voicemails and an email asking for their permission to return to work. During that time I went on my own initiative to have my antibodies tested for Covid 19. I was displaying no symptoms but wanted to return to work sooner. In the meantime, as per the order, I did not come to any office facility. I did not receive a return call from LMS, in spite of my repeated efforts, until a full week after my return. By the time I was able to return, it was the 2nd of September. The BIO action form the captain referred to needed a wet signature therefore could not be turned in until I physically had the form. The captain states that I did not communicate this with him yet I was constantly in communication with him about my status with LMS. One would think he could infer that due to this status the BIO action form could not be completed on time. Once again this was left out of the entry to deliberately make me look worse. He did this again when it came to blue team entries that are required by policy within the month. I was unable to complete performance notes for my direct reports by the end of the month. The captain stated that I was out of the office due to not getting clearance from LMS for a period of time. He was vague about this period of time going through the end of the month up to and including the due date of the above items. In addition, he stated that I should anticipate such delays. I'm not sure how, in these unprecedented times, that anyone could anticipate these things. It should be noted that he mentions I had previously missed ONE blue team entry in May 2020 as well. He does not mention in this entry that the reason for this was we were conducting emergency actions with protests downtown which stretched through the end of the month. Again, these are unprecedented times and these are the only reason these entries were missed.

The captain went on to bring up things which I cannot see or check dates on. He brought up four EPAs assigned to sergeants in my purview. 2 assigned to Sergeant Calderon, 1 assigned to Sergeant Frei, and 1 assigned to Sergeant Yager. It should be noted, there is no way for me to see when these EPAs are due because, in Praxis, it is impossible to see anyone other than your direct reports. I am unable to view when their subordinates are due. In his haste to gather as much negative information that he could against me, the captain did not double check his efforts. I later pointed out that one of the EPAs was completed and he himself had already signed it off. One of the EPAs was over 30 days late, this is true, but the other two were as little as 8 days overdue. This illustrates his efforts to show me in as negative a light as possible. Later, I would even say to the Chief Morrison that "no one is jumping up and down demanding EPAs be on time" to which he said he would agree. Yet the captain wants to point this out as an example of my negative performance. As of September 25, 2020, when a list of overdue EPAs was sent out office wide, there were 7 EPAs which were 6 to 8 months overdue at the rank of Lieutenant or above. Chief Morrison's EPA was overdue by 8 months. This just illustrates that Captain Lugo intended to hold me to a standard to which not even the highest levels of command hold themselves.

The captain then spoke of an assignment HE had given to one of my sergeants. He did not go through me in any way. He did not present the information to me and tell me to make sure it was completed. He simply emailed directly to the sergeant. In the body of the email (attached) he did not mention me once. He did not suggest I follow up or ensure the deadline was met. The best the captain could do to communicate with me on this was to CC the email to me. When a captain bypasses a lieutenant completely and ignores the chain of command, without saying otherwise, I read nothing which gave me the impression that he wanted me to follow up with this.

46REPORT000034

Lastly, the captain spoke of a time which I did not notify him of a road closure. This was a miscommunication between myself and the sergeant. There are a number of things the captain wishes to be informed of involving the town and I was unaware he needed to know of the road opening. One would think this could be chalked up to a learning experience. However, the captain was anxious to add this to the list of deficiencies.

While this meeting occurred on September 18, 2020, I was only given a full 24 days to attempt to correct them. In spite of the fact that the captain had nothing negative to say to me in the six months prior to that. It also seems interesting timing that on September 26, 2020 I turned in a memo of interest to transfer to another district.

On September 25, 2020, I asked Deputy Chief Cory Morrison if he was available to talk. He allowed me to contact him by telephone. In this conversation I expressed how I was concerned again how I was being misrepresented by Captain Lugo. In spite of the fact that Chief Morrison had recognized this was my perception in our previous meeting. I told him this was getting so bad I was losing sleep. He gave the advice to speak with Captain Lugo about the entry. It would later be proven that I had less than 24 days to do so because he was already beginning his paperwork to recommend the termination of my probation. Chief Morrison stated that he did not want to intervene and "cut Greg off at the knees" however, it seems okay that Captain Lugo was trying to do just that to me.

On October 11, 2020, as I was covering a Sunday for another lieutenant (not my normally scheduled day) the captain requested a meeting at the end of the day. I stayed late and was called into a meeting with Executive Chief Bailey, Deputy Chief Morrison, and Captain Lugo. I was told I would not be completing probation and it was effective immediately. I advised the Chief that I received no mentorship or development from the captain. Chief Bailey asked for examples. I stated that I was probably one of the only lieutenants in the entire Sheriff's Office that did not have access to blue team in order to monitor his subordinates. The chief seemed surprised by this information and asked why I didn't. I stated it was because the captain didn't think it was appropriate. I was denied access yet was expected to be up on these overdue items. I then also stated that I could not see when the reviews were due which he was expecting me to enforce. Chief Bailey seemed confused by this and asked if I had Praxis. I reminded him that we could only see our direct reports in Praxis and not their subordinates. Chief Bailey then asked if I had made Chief Morrison aware of these problems. I told him that I had called Chief Morrison on two occasions and received no support. Chief Bailey mentioned that this was a failure on their part as well. While I did not reply at the time, I wondered if it is their failure, what consequence do they face? Am I the only one receiving the consequences for their failure? Chief Bailey then stated that Captain Lugo holds people to a very high standard and things that might be okay in other districts wouldn't be okay under him. Again, I did not reply to this but my concern would be that there is an inequitable standard here. Am I to be held to the Greg Lugo standard to get through my probation, or an Office standard? Why is there a difference? An agency as large as MCSO should have a uniform standard. This creates a system which can be polluted with Bias. Lastly, Chief Bailey stated that the decision has been made and it's final. My question now is, when is it okay in any aspect of this profession, to make a decision before receiving all of the information? People have received disciplinary action for making decisions without all of the involved facts. Yet, in spite of

46REPORT000035

information which was obviously new to the chiefs, he failed to re-examine the decision. To illustrate this was a hostile act, it was known to all parties at that meeting that I was going on vacation the next day. They felt that this could not wait but instead had to be done at a time which they knew would ruin my time off.

The final act of indignation to this came the following week while I was still on vacation. I received a call from Sergeant Leatham in PSB stating that he needed to talk with me on my first day back. He stated a new complaint against me had been filed internally. This is an obvious act of retaliation. After I verbally state my grievances in the meeting, an internal complaint is filed with information that had been known to captain Lugo for over a month. Why did the information suddenly warrant an internal complaint but did not the prior month. I believe it was because I had voiced my grievances and made it obvious I intended to file a complaint. He then felt the need to beat me to the proverbial punch by filing an internal complaint. This complaint has now been called a priority. It seems easy to see that is because there is an urgency to have it completed before my complaint could be.

I have a history with Captain Lugo which I believe demonstrates his willingness to make detrimental decisions for no other reason than to be proven right. In 2014 I was working in the Major Crimes Division. During that time I was under Lieutenant Greg Lugo. I was a detective in the Special Victims Unit. I received a case in which a 9 year old girl and her younger brother disclosed to a doctor that they had been inappropriately touched by their step-grandfather. The young boy disclosed that the grandfather had also taken photographs of his sister. He could not describe what the photographs were taken with but remembered seeing the photographic images on the back of the device as the photos were taken. The grandfather was arrested following further investigation and I authored a search warrant for his residence to attempt to find the digital images. I requested all computers, jump drives, data cards, disks, and phones among other things. I was unaware the practice at that time was to run a warrant by the lieutenant before sending it to the judge. Instead I had the warrant looked over by a fellow, senior detective. Todd Mcgehee suggested some changes and I then sent the warrant to a judge. I advised Lieutenant Lugo that we would be serving a search warrant on an unoccupied residence. A few moments later I got a phone call from Sergeant Alex Frank who told me that the practice was to have lieutenants look over warrants before sending them to a judge. I told the sergeant that I would adopt that practice in the future and that the warrant had been returned after the judge signed it. I told Sergeant Frank that he could take the signed warrant to the lieutenant to review if he liked. Sergeant Frank did this and returned a short time later. He told me the lieutenant did not think I had enough probable cause to ask for phones. I was shocked by this because it clearly made no sense. Cellular phones are probably the most common way people store photos. Both Detective Mcgehee and myself were completely dumbfounded by this statement. After some discussion, I was told to rewrite the warrant without the phone request in spite of the fact that the warrant had already been signed by the judge allowing me to take the phones in the residence. I did as I was ordered and rewrote the warrant. I only tell this story to demonstrate that Greg Lugo was willing to jeopardize a case involving a 9 year old victim. I can only speculate but I think it is apparent that he wanted to find something wrong with the warrant in order to establish his authority. He did this even though the request of removing the phones was completely illogical and ridiculous.

To return to my opening comments, procedural justice is paramount to best practices and incredibly important to the philosophies of this Office. Procedural justice is broken down into four parts: Fairness and Consistency, Voice and Representation, Transparency and Openness,

and Impartiality and Unbiased. These are consistent whether we are dealing with internal or external matters. This was reinforced by a powerpoint presentation delivered to all sworn employees on October 18, 2020.

Captain Lugo violated fairness and consistency by not holding me to the same standard as lieutenants in other areas of the office, other lieutenants that have worked for him in the past, as well as other lieutenants currently working for him. He has not mentioned EPAs to the other lieutenants nor late blue team items. He has not talked to anyone else about logging on at home or not coming into the town limits right away. Yet he used these things to push for my demotion. This demonstrates a bias and inequitable behavior.

Captain Lugo violated Voice and Representation by not allowing me to defend any of the things he found deficient before using them against me. He authored a document both in blue team and in memo form before allowing me to have a say in this information and how it was presented. I also had no voice with the Chief in my efforts to seek help from outside the building.

Captain Lugo violated Transparency and Openness by not sharing any of this information with me prior to 24 days before my demotion. This shows he had not intention of developing me or attempting to fix these so called problems. In addition, he was deliberately vague and evasive with his blue team entries painting a picture skewed from the truth. He, for unknown reasons, decided he would change the course of my career unfairly and maliciously.

Lastly, Captain Lugo violated Impartiality and Unbiased by holding me to an unfair and very different standard than other lieutenants in the office. He repeatedly shifted perceptions and enforced his own rules without impartiality against me and not others.

GB-2 Command Responsibility (6/28/19)
    1. Command Authority of the Office: The order of command authority for the Office shall be:
        A. Sheriff: The elected position of Sheriff is derived from the Arizona Constitution, Article 12, Section 3, which permits the legislature to establish the range and scope of the Sheriff's authority, mandated duties, and responsibilities as set forth in Arizona Revised Statutes (ARS) § 11-441 through 459. The Maricopa County Sheriff's Office is the agency established to assist the Sheriff in executing their statutory duties and in providing public safety services to the members of the public of Maricopa County. The mandated responsibilities of the Office include, but are not limited to:
        5. Providing the training, logistical, and administrative support necessary to comply with mandated functions.

Captain Lugo violated GB-2 by refusing to provide any training or guidance. He also did not allow me to have the tools necessary to monitor things for which he was holding me accountable (Blue Team purview). This did not allow me to comply with mandated functions. In addition, Chief Morrison refused to step in and correct any of this behavior with Captain Lugo in spite of being made aware of these issues.

46REPORT000037

CP-5 Truthfullness (9/11/20)

1.    Truthfulness: It is the expectation of the Office that all employees shall be absolutely truthful when being questioned, whether on-duty or off-duty by a supervisor, an internal affairs investigator, a criminal investigator and polygraph examiner. This Office Policy applies with respect to questioning about any subject at any time relating to job responsibilities, job performance, and/or matters covered by Office Policy, Maricopa County Merit Rules, or Office adopted Maricopa County Policy. The requirement for absolute truthfulness applies with equal force to on-duty and off-duty conduct and communications. The following non-exhaustive list of examples provides contexts for this Office Policy:

C. Employees shall not make false official records or enter or cause to be entered into any books, logs, records, reports, or electronic documents any inaccurate, false, or improper information or material for the purpose of deception.

Captain Lugo violated CP-5 by deliberately entering improper information for the purpose of deceiving those above him about my performance. He misled his superiors by omitting information in an attempt to defame my character.

CP-2 Code of Conduct (7/30/20)
7. Individual Responsibility: To ensure the credibility and integrity of the Office, it is the duty of all personnel associated with the Office to take appropriate action whenever they learn of a violation being committed, or having been committed, by any other person associated with the Office in any capacity, which by its very nature would tend to discredit an employee or the Office. Individual responsibility includes conduct on or off-duty.
D. Retaliation:
1. Personnel shall not retaliate against an employee who reports misconduct or a violation in fulfillment of this individual responsibility, policy responsibility, or duty.

Captain Lugo violated CP-2 by retaliating against me because of the number of grievances and policy violations I voiced in front of Captain Lugo, Chief Morrison, and Chief Bailey. I clearly stated that Captain Lugo acted inappropriately and was singling me out among other employees and lieutenants. The internal complaint was entered with information the Captain had for over a month. He did not enter an internal complaint until after I voiced my grievances to his supervisors. One must believe that either Captain Lugo violated the retaliation policy or he violated the policy for entering a complaint as soon as practicable following the discovery of the violation. I believe Captain Lugo knew I was not violating policy and that is why he did not enter the complaint until after my grievances.

GC-11 Employee Probationary Period

PAGE 26 of 26

2. Requirements for Classified Probationary Employees: An employee's performance must meet minimum standards for the employee to successfully complete a probationary period.

C. During the initial probationary period, any employee may be released from employment without cause. Should it be determined that a probationary employee is not successfully completing probation, the supervisor shall be responsible for initiating an entry in Blue Team by selecting the incident type Probationary Release. The Blue Team entry must include the probationary employee's performance deficiencies, all corrective action taken, interventions, and any policy violations and supporting documentation.

This policy clearly states that a blue team entry seeking to terminate probation should include corrective action taken and interventions. He did not seek to take any corrective action outside of the meeting on September 18th. Since I was demoted 24 days later, obviously this was not meant to be corrective. In the six months prior to September 18th he did not offer a single piece of training, coaching, or discussion to correct behaviors he identified. This supports the fact that he had no intention of helping an employee under his command to succeed. To the contrary, he set me up to fail.

CP-2 Code of Conduct (7/30/20)

7. Individual Responsibility: To ensure the credibility and integrity of the Office, it is the duty of all personnel associated with the Office to take appropriate action whenever they learn of a violation being committed, or having been committed, by any other person associated with the Office in any capacity, which by its very nature would tend to discredit an employee or the Office. Individual responsibility includes conduct on or off-duty.

A. Any employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a supervisor or directly to the PSB, or to any outside entity authorized to take corrective action, without fear of retaliation. Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary action, up to and including dismissal from employment. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.

I believe this policy demonstrates there was retaliation because if Captain Lugo truly felt I had violated any policies, he would have entered the internal complaint "as soon as practicable".

46REPORT000039



# Maricopa County Sheriff's Office

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

October 24, 2024

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Sergeant Engelbeck:

After giving due consideration to the information you presented at your pre-determination hearing, your service record, and upon further review of the investigation, I have decided to proceed with discipline. Note that this disciplinary action is based on sustained findings of Allegation #1 and Allegation #5. It has been determined that Allegations #2, #3, and #4 are Not Sustained.

In accordance with Policy GC-17, *Employee Disciplinary Procedure*, Attachment A, Discipline Matrix, this imposed discipline is a Category 6(29.A), First Offense. This letter is to notify you that you shall be suspended for 40-hours without pay from your position as a Deputy Sergeant. The dates of your suspension are as follows:

Monday, October 28, 2024, through Friday, November 1, 2024, (40-hours)

This action is taken subsequent to Administrative Investigation #20-0555 and under the authority of Maricopa County Law Enforcement Merit System Resolution Section 15 and Rule 10.07(A). The cause(s) for this action are:

Maricopa County Law Enforcement Officers Merit System Resolution Section 15 (C):

(5)     Neglect of Duty

CP-2, Code of Conduct, Section 39, *Insubordination*: Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

On July 30, 2020, you completed TheHub training confirming that you received Critical Policy, CP-2, Code of Conduct, and acknowledged that you are responsible for knowing, understanding, and abiding by the policy. You also acknowledged that it is your responsibility to remain familiar with all policy as it affects your duties as an Office employee.

In accordance with Merit Rule 10.07(A), an employee may be suspended for cause as provided in the Law Enforcement Merit Resolution. Each violation constitutes separate and independent cause for suspension.

Sergeant Aaron Engelbeck S1673
October 24, 2024
Page 2 of 4

For more detailed findings and conclusions for each sustained allegation of wrongdoing, please refer to Administrative Investigation #20-0555, which is incorporated by reference as if fully set forth herein.

Introduction

On October 3, 2020, Captain G. Lugo entered an internal complaint alleging you were insubordinate when you failed to follow direct orders provided to you while assigned as a [1]District 6 Patrol Lieutenant. The matter was assigned to Professional Standards Bureau (PSB) Sergeant R. Leatham for investigation.

Your Unit History, and CAD data were reviewed by Sergeant Leatham as part of the investigation. The review showed that you would often put yourself in service at the beginning of your shift using the service code [2]"Superadmin." You would then remain at your residence, which was in the town of Gilbert, for an extended period of time before you arrived in the boundaries of the town of Queen Creek. Additionally, it was noted that you seldom went to the substation or went on calls for service, rather you sat stationary in various parking lots in Queen Creek and your primary service code was "Superadmin." Sergeant Leatham determined you established a pattern of behavior where you would log on while at your residence and remain at your residence for several hours before driving to your area of responsibility. It was noted the drive time from your residence to District 6 was about five minutes.

As part of Sergeant Leatham's investigation, he also reviewed Blue Team notes that were made regarding your assignment in District 6. Specifically, he reviewed Supervisor Note SN2020-00019122 dated April 29, 2020. Attached to the Supervisor Note was an agenda titled, "District 6 – Lieutenant Expectations – Briefing 04/15/2020 1000 hours." Under the bullet point of Work schedules, the following was noted, "The expectation is that during the normal work hours you will physically be located within the boundaries of District 6, barring having to go take care of an issue, but then return. The expectation is to be present in the office, out on patrol, and accessible to patrol supervisors. If not, I need to be advised."

Another Supervisor Note reviewed was SN2020-00041517. Attached to this Supervisor Note was an email dated September 19, 2020, from Captain Lugo to you and was regarding a meeting you had with Captain Lugo on September 18, 2020. The email included a bullet point titled Work location/requirements. Within that bullet point the following was noted, "It was reiterated that during your on-duty work hours you are required to be within the Town Limits of the Town of Queen Creek. Furthermore, when not on a call for service and/or assisting patrol units with a matter, you are required to physically be in the District 6 Substation. This allows you to be present and available for the deputies, supervisors, administrative staff, and myself to troubleshoot issues, answer question, address matters. As previously reiterated, if you need to leave the Town Limits or attend to other matters in which you will not be able to be physically at the District 6 Substation, a notification to me is required."

Allegation No.1

---

[1] On October 12, 2020, you were demoted from lieutenant to sergeant for unsuccessful completion of promotional probation.
[2] Superadmin is used by supervisors to indicate that the supervisor is completing administrative tasks.

Sergeant Aaron Engelbeck S1673
October 24, 2024
Page 3 of 4

It is alleged you were insubordinate when you failed to follow an order given by your captain to be physically located within the boundaries of District 6 during your work hours.

### Supporting Facts:

Captain Lugo was interviewed by PSB investigators on October 15, 2020. Captain Lugo was the District 6 captain during the timeframe under investigation. Captain Lugo stated he had a meeting with you on April 15, 2020, where he gave you a list of expectations, including being physically located within the boundaries of District 6 during your working hours, unless you had to take care of an issue, but then return upon resolving the issue. A Supervisor Note was entered by Captain Lugo at the conclusion of the meeting listing the expectations.

Regarding working from home, Captain Lugo stated you never asked for permission to work from home on a regular basis, and if you had, he would not have permitted it because your job required you to be present within the patrol district. Captain Lugo stated he began to notice you were frequently late arriving in the boundaries of District 6 and you were frequently absent from the substation. He stated your absences frequently resulted in him having to help your subordinates with tasks you should have been doing.

Captain Lugo stated on September 18, 2020, after it became apparent you were spending several hours a day at your residence and not within the district as you had been instructed, he had a meeting with you and gave you a direct order to be within the boundaries of the district, and if you were not on a call for service, you needed to be physically located within the substation to handle administrative matters. He stated this meeting was documented in an email and a Supervisor Note which were both sent to you. While reviewing your records, Sergeant Leatham discovered that on September 19, 2020, the day after meeting with Captain Lugo, you started your shift in the same manner as September 18, 2020. You logged on at your residence and put yourself out of service with the "Superadmin" service code and remained at your residence until 0941 hours.

During your PSB interview you acknowledged receiving the expectations list from Captain Lugo and being told to be within your area of responsibility during your shift. You admitted to logging in, then eating breakfast and reading emails or Blue Team Notes before driving to District 6. You told PSB investigators you would frequently park in various areas around the district because you did not want to be around Captain Lugo at the substation.

When asked about the email Captain Lugo sent to you on September 18, 2020, you admitted to intentionally not reading it because you were angry with Captain Lugo and did not want to read the email. When asked about being within the boundaries of District 6 by a certain time, you stated you were following the directions given to you by your previous commander when you were assigned to District 2, as well as other lieutenants who had been assigned to District 6. You stated you modeled your behavior by what your peers were doing and not what Captain Lugo was asking you to do.

### Allegation No.5

It is alleged that you were insubordinate when you intentionally avoided going to the District 6 substation as ordered by your captain.

### Supporting Facts:

46REPORT000042

Sergeant Aaron Engelbeck S1673
October 24, 2024
Page 4 of 4

Captain Lugo told PSB he noticed you were parking in various locations around the district, but you were regularly absent from the substation. During your PSB interview you admitted one of your reasons for not going to the substation was to avoid being around Captain Lugo.

I have reviewed your Personnel file to consider your service record.

Your actions constitute a serious violation of departmental policies and regulations and such misconduct calls for appropriate disciplinary action. Continued violations on your part will result in more serious disciplinary action, up to and including, dismissal from the Maricopa County Sheriff's Office.

You have the right to appeal this suspension to the Maricopa County Merit System Commission. Any such appeal must be submitted in writing and received within ten (10) calendar days after your receipt of this notice. Your appeal must state the facts upon which it is based and the action requested of the Commission. Address any appeal to Maricopa County Human Resources Director, 301 W. Jefferson, 8th Floor, Phoenix, Arizona 85003-2113.

As outlined in Arizona Revised Statutes §38-1101, you are entitled to receive a copy of the investigative file. Should you wish to receive the file, you must forward your written request, along with a copy of the filed notice of appeal, attn: Director Tiffani Shaw, Maricopa County Sheriff's Office, Administrative Services Division, Sheriff's Office Administration Building, 550 West Jackson Street, Phoenix, Arizona 85003. Upon receipt by the Division, you will be contacted regarding your request. Please note that it is unlawful to disseminate information that is disclosed pursuant to §38-1101 to any person other than the parties to the appeal and their lawful representatives for purposes of the appeal of the disciplinary action.

Sincerely,

Ken Holmes
Appointing Authority

KH:jrg

cc:    County Human Resources Department
       County Human Resources Director
       Personnel File

I acknowledge receipt of this letter:

_____      #S673 _____      10/24/2024 _____
           Signature                                    Date

46REPORT000043

MARICOPA COUNTY SHERIFF'S OFFICE
CONDUCT RESOLUTION SECTION

# PRE-DETERMINATION HEARING WORKSHEET

**Employee Name:**      Sergeant Aaron Engelbeck S1673

**Investigation #:**      IA#2020-0555

**Hearing Date:**      Thursday, October 10, 2024

**Hearing Time:**      11:00 a.m.

**Hearing Held By:**      Ken Holmes
                                        Appointing Authority

**Persons Present:**      Ken Holmes
                                        Denise Callahan
                                        Aaron Engelbeck

**Proposed Action:**      ~~Suspension / 40 hours [Category 6(29.A) - First Offense]~~

**Cause for Action:**      Not Sustained / No Discipline    KH HH 1-30-25

Maricopa County Employee Officers Merit System Resolution Section 14:

> (5)      Neglect of Duty
>
>> CP-2, Code of Conduct, Section 39, *Insubordination*: Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

On July 30, 2020, you completed TheHub training confirming that you received Critical Policy, CP-2, Code of Conduct, and acknowledged that you are responsible for knowing, understanding, and abiding by the policy. You also acknowledged that it is your responsibility to remain familiar with all policy as it affects your duties as an Office employee.

In accordance with Merit Rule 10.07(A), an employee may be suspended for cause as provided in the Law Enforcement Merit Resolution. Each violation constitutes separate and independent cause for suspension. For more detailed findings and conclusions for each sustained allegation of wrongdoing, please refer to Administrative Investigation #20-0555, which is incorporated by reference as if fully set forth herein.

> **Allegation #2, CP-5, Truthfulness was Not-Sustained**
> **Allegation #3, CP-5, Truthfulness was Not-Sustained**

<u>Introduction</u>

On October 3, 2020, Captain G. Lugo entered an internal complaint alleging you were insubordinate when you failed to follow direct orders provided to you while assigned as a

46REPORT000044

[1]District 6 Patrol Lieutenant. The matter was assigned to Professional Standards Bureau (PSB) Sergeant R. Leatham for investigation.

Your Unit History, CAD, and GPS data were reviewed by Sergeant Leatham as part of the investigation. The review showed that you would often put yourself in service at the beginning of your shift using the service code [2]"Superadmin." You would then remain at your residence, which was in the town of Gilbert, for an extended period of time before you arrived in the boundaries of the town of Queen Creek. Additionally, it was noted that you seldom went to the substation or went on calls for service, rather you sat stationary in various parking lots in Queen Creek and your primary service code was "Superadmin." Sergeant Leatham determined you established a pattern of behavior where you would log on while at your residence and remain at your residence for several hours before driving to your area of responsibility. It was noted the drive time from your residence to District 6 was about five minutes. Finally, it was noted that your GPS was turned off on September 19, 2020.

As part of Sergeant Leatham's investigation, he also reviewed Blue Team notes that were made regarding your assignment in District 6. Specifically, he reviewed Supervisor Note SN2020-00019122 dated April 29, 2020. Attached to the Supervisor Note was an agenda titled, "District 6 – Lieutenant Expectations – Briefing 04/15/2020 1000 hours." Under the bullet point of Work schedules, the following was noted, "The expectation is that during the normal work hours you will physically be located within the boundaries of District 6, barring having to go take care of an issue, but then return. The expectation is to be present in the office, out on patrol, and accessible to patrol supervisors. If not, I need to be advised."

Another Supervisor Note reviewed was SN2020-00041517. Attached to this Supervisor Note was an email dated September 19, 2020, from Captain Lugo to you and was regarding a meeting you had with Captain Lugo on September 18, 2020. The email included a bullet point titled Work location/requirements. Within that bullet point the following was noted, "It was reiterated that during your on-duty work hours you are required to be within the Town Limits of the Town of Queen Creek. Furthermore, when not on a call for service and/or assisting patrol units with a matter, you are required to physically be in the District 6 Substation. This allows you to be present and available for the deputies, supervisors, administrative staff, and myself to troubleshoot issues, answer question, address matters. As previously reiterated, if you need to leave the Town Limits or attend to other matters in which you will not be able to be physically at the District 6 Substation, a notification to me is required."

Allegation No.1

It is alleged you were insubordinate when you failed to follow an order given by your captain to be physically located within the boundaries of District 6 during your work hours.

Supporting Facts:

Captain Lugo was interviewed by PSB investigators on October 15, 2020. Captain Lugo was the District 6 captain during the timeframe under investigation. Captain Lugo stated he had a meeting with you on April 15, 2020, where he gave you a list of expectations, including being physically located within the boundaries of District 6 during your working hours, unless you had

---

[1] On October 12, 2020, you were demoted from lieutenant to sergeant for unsuccessful completion of promotional probation.
[2] Superadmin is used by supervisors to indicate that the supervisor is completing administrative tasks.

Page 3 of 4

to take care of an issue, but then return upon resolving the issue.  A Supervisor Note was entered by Captain Lugo at the conclusion of the meeting listing the expectations.

Regarding working from home, Captain Lugo stated you never asked for permission to work from home on a regular basis, and if you had, he would not have permitted it because your job required you to be present within the patrol district.  Captain Lugo stated he began to notice you were frequently late arriving in the boundaries of District 6 and you were frequently absent from the substation.  He stated your absences frequently resulted in him having to help your subordinates with tasks you should have been doing.

Captain Lugo stated on September 18, 2020, after it became apparent you were spending several hours a day at your residence and not within the district as you had been instructed, he had a meeting with you and gave you a direct order to be within the boundaries of the district, and if you were not on a call for service, you needed to be physically located within the substation to handle administrative matters.  He stated this meeting was documented in an email and a Supervisor Note which were both sent to you. While reviewing your records, Sergeant Leatham discovered that on September 19, 2020, the day after meeting with Captain Lugo, you started your shift in the same manner as September 18, 2020.  You logged on at your residence and put yourself out of service with the "Superadmin" service code and remained at your residence until 0941 hours.

During your PSB interview you acknowledged receiving the expectations list from Captain Lugo and being told to be within your area of responsibility during your shift.  You admitted to logging in, then eating breakfast and reading emails or Blue Team Notes before driving to District 6. You told PSB investigators you would frequently park in various areas around the district because you did not want to be around Captain Lugo at the substation.

When asked about the email Captain Lugo sent to you on September 18, 2020, you admitted to intentionally not reading it because you were angry with Captain Lugo and did not want to read the email.  When asked about being within the boundaries of District 6 by a certain time, you stated you were following the directions given to you by your previous commander when you were assigned to District 2, as well as other lieutenants who had been assigned to District 6.  You stated you modeled your behavior by what your peers were doing and not what Captain Lugo was asking you to do.

Allegation No.4

It is alleged that you were insubordinate when you deactivated the GPS on your MDC.

Supporting Facts:

In reviewing your Unit History, GPS, and CAD data, it was discovered after logging on at 0650 hours on September 19, 2020, you remained at your residence until 0941 hours. The GPS data for that day showed you drove to the substation where you stayed for about one hour, then drove around the district before stopping in a parking lot around Ellsworth Road and Victoria Road. After stopping in that area, your GPS signal was turned off at 1128 hours.

Sergeant Leatham found no notes were recorded in your unit history to show your GPS tried to pick up a signal from a satellite.  Sergeant Leatham noted if the GPS cannot receive a signal, the unit history will record a comment that says, "GPS Signal None."  No comments like this were found in your unit history after September 18, 2020.  Sergeant Leatham noted with your GPS locator turned off MCSO dispatch, Captain Lugo, and other deputies could not see your location

46REPORT000046

Page 4 of 4

during your shift. It was discovered during the investigation that your GPS locator had not received a signal since September 19, 2020, the day it was turned off.

During your PSB interview you admitted to turning off the GPS locator in your MDC. You stated it was easy to turn off, but you were not sure if you turned it back on. You stated you never checked to see if your GPS was working properly following you turning it off. When asked what your reasoning was for turning your GPS locator off, you said you were angry with Captain Lugo.

<u>Allegation No.5</u>

It is alleged that you were insubordinate when you intentionally avoided going to the District 6 substation as ordered by your captain.

<u>Supporting Facts:</u>

Captain Lugo told PSB he noticed you were parking in various locations around the district, but you were regularly absent from the substation. During your PSB interview you admitted one of your reasons for not going to the substation was to avoid being around Captain Lugo.

I have reviewed your Personnel file to consider your service record.

**Discipline:**   No Discipline

Ken Holmes
Appointing Authority

1-30-25
Date

cc: Personnel
    Professional Standards Bureau

46REPORT000047

RECEIVED

OCT 1 0 2024

3 pages apc

There are several points I would like to address regarding the findings, timing, and level of discipline described in the notice of PDH.

Allegaition No. 1:

Captain Lugo did provide a written statement of expectations regarding his directives over Lieutenants in District 6. I had been advised by a Chief prior to this that logging on from my residence was acceptable. In addition, I would put myself on "SuperAdmin" and work in an administrative capacity from my residence. This finding does not address the fact that this all occurred during COVID 19 provisions and extra precautions were being taken office-wide. Many restaurants were closed during this time and it made sense to eat my breakfast at my residence for safety reasons. Command staff in every division was being ordered to stay home, including those in HQ. Many command staff were given permission to work from home during this period, not coming into any office facility at all. I understand that in a patrol capacity I was not going to be afforded this safety measure but I thought I could mitigate this at this time by reducing the amount of my exposure. Captain Lugo states that he would not have altered my work situation if I had asked. This demonstrates that he is unconcerned for the safety of his subordinates. Why was this so important for staff at higher levels but not those within the Queen Creek district?

I ask again why I was treated differently than previous lieutenants working in District 6. This is unreasonable and targeted for some reason by Captain Lugo. It seems this is an easy directive for him to give when he lives within the boundaries of Queen Creek and therefore may log on from his residence. The same can be said for Lieutenant Jakovidic.

Allegation No. 4:

This allegation fails to address the concept that no order was given to turn off my GPS. Therefore, how can I be insubordinate in turning it off? Furthermore, this allegation also fails to address that I turned the GPS back on but it did not work. Sergeant Leatham himself attempted to turn the GPS back on but was incapable. He then took my computer to the IT department to investigate and still returned it with a non-working GPS. I can only assume that not even IT could fix this problem. I turned the GPS back on but it did not work and continues not to work in spite of professional attention. I did not turn the GPS off to be insubordinate and couldn't be insubordinate since neither policy, nor Captain Lugo had forbid me from turning it off. I attempted to turn it back on and assumed it was working at that point.

Allegation No. 5:

Captain Lugo's directives were to be in the office, on patrol, and accessible to patrol supervisors. I was always accessible to patrol supervisors, especially being in the field, even when I am stationary. No sergeant ever complained to me about being unable to contact me and on the contrary, I had excellent communication with the sergeants working under me. Therefore, I was complying with this command.

This allegation also fails to address that Captain Lugo was creating a hostile work environment which was reported to the Deputy Chief by both myself and Lieutenant Jakovidic. The Deputy Chief attempted to resolve this situation by creating a meeting between Captain Lugo, Lieutenant Jakovidic, and myself to talk about concerns. This meeting, I've come to believe, has led to the

continuing retaliation I am receiving from Captain Lugo and his division. The Deputy Chief made no other attempts to resolve this situation beyond that meeting. This allowed Captain Lugo to continue his plan and execution of demoting me and seeking his retaliation. As this hostile work environment was being created, and was subsequently reported by more than just myself, it seems reasonable to complete my duties outside of the office and away from the person creating the environment. I sought help from my superiors and found my concerns dismissed.

I later brought to the attention of Sergeant Leatham the numerous policy violations committed by Captain Lugo. I had the expectation that, according to policy, these allegations would be investigated. I was incorrect in assuming that policy would be followed. I found out nearly three and a half years later that Sergeant Leatham never opened a separate investigation in spite of MCSO policy. I then brought this to the attention of Deputy Chief Caputo. It seems he launched Service Complaint number SC2024-0168. This is again a violation of policy as it states "we found that Captain Lugo and Sergeant Leatham followed proper Office policy and procedure." Policy states that serious allegations of policy violation cannot be investigated in a service complaint but rather require a full investigation. As one of the allegations I brought to the attention of Sergeant Leatham involve Captain Lugo's truthfulness, this would be outside of the scope of Service Complaints.

It is becoming clear that there is an intention to protect Captain Lugo from proper investigation by an independent investigator.

The discipline listed is not reasonable. I was already demoted in reference to Captain Lugo's allegations. This has been cited as adequate discipline in past investigations even in the case of unsuccessful completion of probation. As a result of this, I was denied a subsequent county wide raise, and the COVID 19 pay incentive. Now, you wish to subject me to this again. As a result of major discipline I will be denied yet another raise. This shows a continued punishment for a single incident.

Captain Lugo failed to offer guidance in this matter and did not allow any time for corrective action to take place. He waited until approximately 20 days before recommending I do not complete probation. This is in violation of policy GB-2 Command Responsibility which states "Supervisors shall initiate approved interventions, as specified in GH-5, Early Identification System, to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation." Captain Lugo had no intention of developing me as a lieutenant and to the contrary created a negative work environment where I was uncomfortable even being around him. This was addressed to the Deputy Chief and very little effort was taken to improve this situation. This was also addressed in my complaint to both Sergeant Leatham and Deputy Chief Caputo but has yet to be investigated properly.

Lastly, the amount of time this has taken, only to conclude with major discipline, is outrageous. State law has recently been changed to correct this situation regarding Law Enforcement Officers barring this behavior from an agency. PSB seems to have no concerns disregarding the same state statutes that MCSO expects me and my colleagues to adhere to on a daily basis. However, even dismissing the state statutes, the federal standards and guidelines for internal affairs state "Completion of Internal Affairs investigations should occur as rapidly as is reasonably necessary to fulfill the investigative mission. In all instances, however, an internal investigation should be completed within a reasonable time before any applicable statute of limitations or other bar to officer discipline has run out. It is preferable to conclude investigations within 180 days." It goes on to say "Agencies with more limited staffing may, in good faith, require a longer duration of time for completing an investigation."

I doubt anyone would agree that waiting four years to conclude major discipline is required would be considered "in good faith". In addition, being continuously punished through demotion, salary restriction, suspension, and then further salary restriction would also fall well outside the realms of "good faith" and reason.

Further, this being the first sustained CP-2 allegation, make this discipline excessive as well.


I write these words with the deserved respect of the Agency. However, as I've stated above, this entire situation has left me disheartened and incredibly frustrated. I don't think my current mental state is unreasonable as the actions of the Office have been unreasonable. Ultimately, I do not ask for leniency but rather for Justice and fairness, the same justice and fairness that I'm expected to administer in my duties which I have continued to do for the last 20 years.


Sincerely,

Sgt. A. Engelbeck #S1673

46REPORT000050

# Introduction and Conclusion Pre-Determination Hearing

**Introduction:**

Today is <u>Thursday, October 10, 2024</u>, and it is <u>10:14</u> hours. We are here today for

the Pre-Determination Hearing on <u>Sergeant Aaron Engelbeck S1673</u>. This Pre-

Determination Hearing is in reference to IA#20-0555. Present in the room are:

Ken Holmes Appointing Authority
Denise Callahan Conduct Resolution Commander
Sergeant Aaron Engelbeck S1673


**Conclusion:**

The time is <u>10:27</u> hours and this concludes the Pre-Determination Hearing

for <u>Sergeant Aaron Engelbeck S1673</u>.



Chief please schedule during PDH:

| <u>Discipline Meeting</u> |
| :--- |
| Date:  10-17-24 |
| Time:  12:15 |

46REPORT000051



# Maricopa County Sheriff's Office

550 West Jackson Street
Phoenix, AZ 85003
Phone: 602.876.1000
www.mcso.org

## PRE-DETERMINATION HEARING

In accordance with the U.S. Supreme Court decision of Cleveland Board of Education v. Loudermill (March 1985), public employers who have implemented a Merit or Civil Service system must provide a minimal due process procedure before demotion and/or suspension of a regular status employee.  The requirements include providing the employee with notice of the proposed actions giving specific grounds and particular facts upon which the action will be based and affording the employee an opportunity to respond either orally, in writing, or both, to the charges.

Today's hearing is being offered to give you an opportunity to respond orally and/or in writing to the charges.  It is your time to explain why the Office should not proceed with the discipline.  No final decision regarding your discipline has been made, ***nor will one be made at this hearing***.

The role of the appointing authority, or his designee, at this stage of the process is to gather information from you.  This time has been set aside for you. What you may expect today is the opportunity to be heard.  Do not expect immediate feedback regarding what you present: rather, subsequent to today's hearing, the appointing authority, or his designee, will consider all of the input you have provided in the full context of the grounds and facts upon which the proposed action was originally based.  Only after this review will a decision be made to implement or abandon the proposed discipline.

Today's hearing will be recorded.  If you desire a copy of the recording, please indicate your request below.

I acknowledge the purpose of today's hearing.  I understand the hearing is being recorded and that I may request a copy of the recording:

_____     _S1673_____     __10/10/2024_____
Signature                                    Serial #                                  Date

**I would like to request a copy of the recording from today's hearing.**
Yes ☒                    No ☐
**The Administrative Services Division shall provide a copy of the recording within 30 days.**

Revised May 11, 2017

46REPORT000052

MARICOPA COUNTY SHERIFF'S OFFICE
CONDUCT RESOLUTION SECTION

## PRE-DETERMINATION HEARING
## EMPLOYEE INFORMATION FORM

Employee Name: Sgt. Aaron Engelbeck S1693

### Employee Assignment

| | |
|---|---|
| Current Assignment: DISTRICT 1 PATROL | |
| Bureau: | Division Commander: CAPT. McBRIDE |
| Supervisor: LT. J. THOMAS | Supervisor Phone: |

### Employee Schedule and Contact Information

| How should we contact you regarding these matters? (Please list in order of preference) | Work | Work cell | Home | Personal Cell | Other |
|---|---|---|---|---|---|
| (480) 206-7055 | | | | ✓ | |
| ( ) - | | | | | |
| ( ) - | | | | | |
| ( ) - | | | | | |

| | Start Time | End Time |
|---|---|---|
| Monday | 0600 | 1800 |
| Tuesday | 0600 | 1800 |
| Wednesday | 0600 | 1800 |
| Thursday | 0600 | 1800 |
| Friday | | |
| Saturday | | |
| Sunday | | |

### Employee Availability

Please list any approved absences or training that you have in the next 30 days. If you are uncertain of a date, please provide as much information as you can.

| Date(s) | Event |
|---|---|
| | |
| | |
| | |
| | |

46REPORT000053

**Instructions for Delivery of Letter**

Date:    September 26, 2024

Re:    Employee:    Sergeant Aaron Engelbeck S1673
       Assignment:    District I

Attached is a letter notifying the employee of their scheduled Pre-Determination Hearing (PDH) with the Appointing Authority.  **Service of the PDH Letter must be completed same day or no later than the next shift the employee is scheduled to work.**

- This form must be completed by the person serving the PDH letter.
- Print the PDH letter and meet privately with the employee to serve the letter and obtain their signature.
- Scan and email the signed copies of the PDH letter and this form back to my attention as soon as possible.
- Provide the employee with the original signed PDH letter.
- If you are not able to scan and email the signed letters back to me, you must return them via hand delivery to my attention as soon as possible.

If you have any questions, I can be reached at (602) 876-5507.

Thank you for your assistance.

Jack Greer
Conduct Resolution Section
Maricopa County Sheriff's Office

Date and Time Delivered: ___9/26/24    1500 Hrs___

Delivered By: ___LT. Chris Houck ,1852___

46REPORT000054

# Maricopa County Sheriff's Office

550 West Jackson Street
Phoenix, AZ 85003
Phone: 602.876.1000
www.mcso.org

September 26, 2024

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Sergeant Engelbeck:

This letter is to notify you in advance that the Maricopa County Sheriff's Office is considering taking disciplinary action against you in the form of a 40-hour suspension from duty as a result of your conduct. In accordance with Policy GC-17, *Employee Disciplinary Procedure*, Attachment A, Discipline Matrix, this proposed discipline is a Category 6(29.A), First Offense.

You have been scheduled for a Pre-Determination Hearing with me at 11:00 a.m. on Thursday, October 10, 2024. The cause for the considered action, the specific reason for action, information regarding your review of the investigation, your opportunity to respond in writing to the investigation and its findings, and information regarding the Pre-Determination Hearing are provided.

This action is taken subsequent to Administrative Investigation #20-0555 and under the authority of Maricopa County Law Enforcement Merit System Resolution Section 15 and Rule 10.07(A). The cause(s) for this action are:

Maricopa County Law Enforcement Officers Merit System Resolution Section 15:

    (5)    Neglect of Duty

        CP-2, Code of Conduct, Section 39, *Insubordination*: Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

        On July 30, 2020, you completed TheHub training confirming that you received Critical Policy, CP-2, Code of Conduct, and acknowledged that you are responsible for knowing, understanding, and abiding by the policy. You also acknowledged that it is your responsibility to remain familiar with all policy as it affects your duties as an Office employee.

In accordance with Merit Rule 10.07(A), an employee may be suspended for cause as provided in the Law Enforcement Merit Resolution. Each violation constitutes separate and independent cause for suspension. For more detailed findings and conclusions for each sustained allegation of wrongdoing,

46REPORT000055

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 2 of 5

please refer to Administrative Investigation #20-0555, which is incorporated by reference as if fully set forth herein.

**Allegation #2, CP-5, Truthfulness was Not-Sustained**
**Allegation #3, CP-5, Truthfulness was Not-Sustained**

Introduction

On October 3, 2020, Captain G. Lugo entered an internal complaint alleging you were insubordinate when you failed to follow direct orders provided to you while assigned as a [1]District 6 Patrol Lieutenant. The matter was assigned to Professional Standards Bureau (PSB) Sergeant R. Leatham for investigation.

Your Unit History, CAD, and GPS data were reviewed by Sergeant Leatham as part of the investigation. The review showed that you would often put yourself in service at the beginning of your shift using the service code [2]"Superadmin." You would then remain at your residence, which was in the town of Gilbert, for an extended period of time before you arrived in the boundaries of the town of Queen Creek. Additionally, it was noted that you seldom went to the substation or went on calls for service, rather you sat stationary in various parking lots in Queen Creek and your primary service code was "Superadmin." Sergeant Leatham determined you established a pattern of behavior where you would log on while at your residence and remain at your residence for several hours before driving to your area of responsibility. It was noted the drive time from your residence to District 6 was about five minutes. Finally, it was noted that your GPS was turned off on September 19, 2020.

As part of Sergeant Leatham's investigation, he also reviewed Blue Team notes that were made regarding your assignment in District 6. Specifically, he reviewed Supervisor Note SN2020-00019122 dated April 29, 2020. Attached to the Supervisor Note was an agenda titled, "District 6 – Lieutenant Expectations – Briefing 04/15/2020 1000 hours." Under the bullet point of Work schedules, the following was noted, "The expectation is that during the normal work hours you will physically be located within the boundaries of District 6, barring having to go take care of an issue, but then return. The expectation is to be present in the office, out on patrol, and accessible to patrol supervisors. If not, I need to be advised."

Another Supervisor Note reviewed was SN2020-00041517. Attached to this Supervisor Note was an email dated September 19, 2020, from Captain Lugo to you and was regarding a meeting you had with Captain Lugo on September 18, 2020. The email included a bullet point titled Work location/requirements. Within that bullet point the following was noted, "It was reiterated that during your on-duty work hours you are required to be within the Town Limits of the Town of Queen Creek. Furthermore, when not on a call for service and/or assisting patrol units with a matter, you are required to physically be in the District 6 Substation. This allows you to be present and available for the deputies, supervisors, administrative staff, and myself to troubleshoot issues, answer question, address matters. As previously reiterated, if you need to

---

[1] On October 12, 2020, you were demoted from lieutenant to sergeant for unsuccessful completion of promotional probation.
[2] Superadmin is used by supervisors to indicate that the supervisor is completing administrative tasks.

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 3 of 5

leave the Town Limits or attend to other matters in which you will not be able to be physically at the District 6 Substation, a notification to me is required."

## Allegation No.1

It is alleged you were insubordinate when you failed to follow an order given by your captain to be physically located within the boundaries of District 6 during your work hours.

### Supporting Facts:

Captain Lugo was interviewed by PSB investigators on October 15, 2020. Captain Lugo was the District 6 captain during the timeframe under investigation. Captain Lugo stated he had a meeting with you on April 15, 2020, where he gave you a list of expectations, including being physically located within the boundaries of District 6 during your working hours, unless you had to take care of an issue, but then return upon resolving the issue. A Supervisor Note was entered by Captain Lugo at the conclusion of the meeting listing the expectations.

Regarding working from home, Captain Lugo stated you never asked for permission to work from home on a regular basis, and if you had, he would not have permitted it because your job required you to be present within the patrol district. Captain Lugo stated he began to notice you were frequently late arriving in the boundaries of District 6 and you were frequently absent from the substation. He stated your absences frequently resulted in him having to help your subordinates with tasks you should have been doing.

Captain Lugo stated on September 18, 2020, after it became apparent you were spending several hours a day at your residence and not within the district as you had been instructed, he had a meeting with you and gave you a direct order to be within the boundaries of the district, and if you were not on a call for service, you needed to be physically located within the substation to handle administrative matters. He stated this meeting was documented in an email and a Supervisor Note which were both sent to you. While reviewing your records, Sergeant Leatham discovered that on September 19, 2020, the day after meeting with Captain Lugo, you started your shift in the same manner as September 18, 2020. You logged on at your residence and put yourself out of service with the "Superadmin" service code and remained at your residence until 0941 hours.

During your PSB interview you acknowledged receiving the expectations list from Captain Lugo and being told to be within your area of responsibility during your shift. You admitted to logging in, then eating breakfast and reading emails or Blue Team Notes before driving to District 6. You told PSB investigators you would frequently park in various areas around the district because you did not want to be around Captain Lugo at the substation.

When asked about the email Captain Lugo sent to you on September 18, 2020, you admitted to intentionally not reading it because you were angry with Captain Lugo and did not want to read the email. When asked about being within the boundaries of District 6 by a certain time, you stated you were following the directions given to you by your previous commander when you were assigned to District 2, as well as other lieutenants who had been assigned to District 6. You

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 4 of 5

stated you modeled your behavior by what your peers were doing and not what Captain Lugo was asking you to do.

## Allegation No.4

It is alleged that you were insubordinate when you deactivated the GPS on your MDC.

### Supporting Facts:

In reviewing your Unit History, GPS, and CAD data, it was discovered after logging on at 0650 hours on September 19, 2020, you remained at your residence until 0941 hours. The GPS data for that day showed you drove to the substation where you stayed for about one hour, then drove around the district before stopping in a parking lot around Ellsworth Road and Victoria Road. After stopping in that area, your GPS signal was turned off at 1128 hours.

Sergeant Leatham found no notes were recorded in your unit history to show your GPS tried to pick up a signal from a satellite. Sergeant Leatham noted if the GPS cannot receive a signal, the unit history will record a comment that says, "GPS Signal None." No comments like this were found in your unit history after September 18, 2020. Sergeant Leatham noted with your GPS locator turned off MCSO dispatch, Captain Lugo, and other deputies could not see your location during your shift. It was discovered during the investigation that your GPS locator had not received a signal since September 19, 2020, the day it was turned off.

During your PSB interview you admitted to turning off the GPS locator in your MDC. You stated it was easy to turn off, but you were not sure if you turned it back on. You stated you never checked to see if your GPS was working properly following you turning it off. When asked what your reasoning was for turning your GPS locator off, you said you were angry with Captain Lugo.

## Allegation No.5

It is alleged that you were insubordinate when you intentionally avoided going to the District 6 substation as ordered by your captain.

### Supporting Facts:

Captain Lugo told PSB he noticed you were parking in various locations around the district, but you were regularly absent from the substation. During your PSB interview you admitted one of your reasons for not going to the substation was to avoid being around Captain Lugo.

I have reviewed your Personnel file to consider your service record.

The Hearing will be held in the Administrative Services Division Conference Room located in the Sheriff's Office Administration Building, 550 West Jackson Street, Phoenix, AZ, 85003. *Please report to the security desk in the front lobby when you arrive. You and your employee assistant will be required to secure all weapons in a locker, to include firearms and knives, prior to entering the Division.* The purpose of this hearing is to allow you an opportunity to present mitigating information and/or explain why the Office should not proceed with the proposed discipline. A final decision regarding your

46REPORT000058

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 5 of 5

discipline has not been made, nor will one be made at the hearing.  Only after a review of all the information presented will a final decision be made.

Prior to the Pre-Determination Hearing, you may review the Administrative Investigation report.  If you wish to review the report, please contact Jack Greer at (602) 876-5507 to make an appointment.  You may bring an assistant to aid in the review of the investigative file and/or attend the Predetermination Hearing. The assistant may not be an attorney or an Office supervisor and shall not be in any way involved in the investigation or related investigation. You shall provide the assistant's name to Jack Greer prior to the review. You are not permitted to copy the report or any portion of the report.  You may also prepare and submit a written response to the investigation and its findings.  Your review must be completed, and a response received prior to the hearing.  Please submit this response to Jack Greer at the Administrative Services Division on the 4th floor of the Sheriff's Office Administration Building.

Parking is available from 8:00 a.m. to 6:00 p.m. in the Maricopa County Customer/Visitor parking lot located at 5th Avenue and Madison Street, just north of the Sheriff's Administration Building.

If you intend to appear for your Pre-Determination Hearing, please confirm the date with Jack Greer.  If you do not appear or submit a written response, I will assume you have no further information that you wish to provide, and you will be deemed to have waived your right to the Pre-Determination Hearing.

Sincerely,

Ken Holmes
Appointing Authority

KH:jrg

I acknowledge receipt of this letter:

_____                    9/26/2024
Signature                                                Date

46REPORT000059

Schedule PDH for:

Date: 10/10/24

Time: 11:00

Preliminary decision: 4/6 Hour Suspen

Appointing Authority _____

September 26, 2024

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Sergeant Engelbeck:

This letter is to notify you in advance that the Maricopa County Sheriff's Office is considering taking disciplinary action against you in the form of a XX-hour suspension from duty as a result of your conduct. In accordance with Policy GC-17, *Employee Disciplinary Procedure*, Attachment A, Discipline Matrix, this proposed discipline is a Category X(x), XXXXX Offense.

You have been scheduled for a Pre-Determination Hearing with me at <u>XXX a.m. on XXXX, XXXX, 2024.</u> The cause for the considered action, the specific reason for action, information regarding your review of the investigation, your opportunity to respond in writing to the investigation and its findings, and information regarding the Pre-Determination Hearing are provided.

This action is taken subsequent to Administrative Investigation #20-0555 and under the authority of Maricopa County Law Enforcement Merit System Resolution Section 15 and Rule 10.07(A). The cause(s) for this action are:

Maricopa County Law Enforcement Officers Merit System Resolution Section 15:

    (5)    Neglect of Duty

        CP-2, Code of Conduct, Section 39, *Insubordination*: Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

        On July 30, 2020, you completed TheHub training confirming that you received Critical Policy, CP-2, Code of Conduct, and acknowledged that you are responsible for knowing, understanding, and abiding by the policy. You also acknowledged that it is your responsibility to remain familiar with all policy as it affects your duties as an Office employee.

In accordance with Merit Rule 10.07(A), an employee may be suspended for cause as provided in the Law Enforcement Merit Resolution. Each violation constitutes separate and independent cause for suspension. For more detailed findings and conclusions for each sustained allegation of wrongdoing,

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 2 of 5

please refer to Administrative Investigation #20-0555, which is incorporated by reference as if fully set forth herein.

**Allegation #2, CP-5, Truthfulness was Not-Sustained**
**Allegation #3, CP-5, Truthfulness was Not-Sustained**

Introduction

On October 3, 2020, Captain G. Lugo entered an internal complaint alleging you were insubordinate when you failed to follow direct orders provided to you while assigned as a [1]District 6 Patrol Lieutenant. The matter was assigned to Professional Standards Bureau (PSB) Sergeant R. Leatham for investigation.

Your Unit History, CAD, and GPS data were reviewed by Sergeant Leatham as part of the investigation. The review showed that you would often put yourself in service at the beginning of your shift using the service code [2]"Superadmin." You would then remain at your residence, which was in the town of Gilbert, for an extended period of time before you arrived in the boundaries of the town of Queen Creek. Additionally, it was noted that you seldom went to the substation or went on calls for service, rather you sat stationary in various parking lots in Queen Creek and your primary service code was "Superadmin." Sergeant Leatham determined you established a pattern of behavior where you would log on while at your residence and remain at your residence for several hours before driving to your area of responsibility. It was noted the drive time from your residence to District 6 was about five minutes. Finally, it was noted that your GPS was turned off on September 19, 2020.

As part of Sergeant Leatham's investigation, he also reviewed Blue Team notes that were made regarding your assignment in District 6. Specifically, he reviewed Supervisor Note SN2020-00019122 dated April 29, 2020. Attached to the Supervisor Note was an agenda titled, "District 6 – Lieutenant Expectations – Briefing 04/15/2020 1000 hours." Under the bullet point of Work schedules, the following was noted, "The expectation is that during the normal work hours you will physically be located within the boundaries of District 6, barring having to go take care of an issue, but then return. The expectation is to be present in the office, out on patrol, and accessible to patrol supervisors. If not, I need to be advised."

Another Supervisor Note reviewed was SN2020-00041517. Attached to this Supervisor Note was an email dated September 19, 2020, from Captain Lugo to you and was regarding a meeting you had with Captain Lugo on September 18, 2020. The email included a bullet point titled Work location/requirements. Within that bullet point the following was noted, "It was reiterated that during your on-duty work hours you are required to be within the Town Limits of the Town of Queen Creek. Furthermore, when not on a call for service and/or assisting patrol units with a matter, you are required to physically be in the District 6 Substation. This allows you to be present and available for the deputies, supervisors, administrative staff, and myself to troubleshoot issues, answer question, address matters. As previously reiterated, if you need to

---

[1] On October 12, 2020, you were demoted from lieutenant to sergeant for unsuccessful completion of promotional probation.
[2] Superadmin is used by supervisors to indicate that the supervisor is completing administrative tasks.

46REPORT000061

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 3 of 5

leave the Town Limits or attend to other matters in which you will not be able to be physically at the District 6 Substation, a notification to me is required."

<u>Allegation No.1</u>

It is alleged you were insubordinate when you failed to follow an order given by your captain to be physically located within the boundaries of District 6 during your work hours.

<u>Supporting Facts:</u>

Captain Lugo was interviewed by PSB investigators on October 15, 2020. Captain Lugo was the District 6 captain during the timeframe under investigation. Captain Lugo stated he had a meeting with you on April 15, 2020, where he gave you a list of expectations, including being physically located within the boundaries of District 6 during your working hours, unless you had to take care of an issue, but then return upon resolving the issue. A Supervisor Note was entered by Captain Lugo at the conclusion of the meeting listing the expectations.

Regarding working from home, Captain Lugo stated you never asked for permission to work from home on a regular basis, and if you had, he would not have permitted it because your job required you to be present within the patrol district. Captain Lugo stated he began to notice you were frequently late arriving in the boundaries of District 6 and you were frequently absent from the substation. He stated your absences frequently resulted in him having to help your subordinates with tasks you should have been doing.

Captain Lugo stated on September 18, 2020, after it became apparent you were spending several hours a day at your residence and not within the district as you had been instructed, he had a meeting with you and gave you a direct order to be within the boundaries of the district, and if you were not on a call for service, you needed to be physically located within the substation to handle administrative matters. He stated this meeting was documented in an email and a Supervisor Note which were both sent to you. While reviewing your records, Sergeant Leatham discovered that on September 19, 2020, the day after meeting with Captain Lugo, you started your shift in the same manner as September 18, 2020. You logged on at your residence and put yourself out of service with the "Superadmin" service code and remained at your residence until 0941 hours.

During your PSB interview you acknowledged receiving the expectations list from Captain Lugo and being told to be within your area of responsibility during your shift. You admitted to logging in, then eating breakfast and reading emails or Blue Team Notes before driving to District 6. You told PSB investigators you would frequently park in various areas around the district because you did not want to be around Captain Lugo at the substation.

When asked about the email Captain Lugo sent to you on September 18, 2020, you admitted to intentionally not reading it because you were angry with Captain Lugo and did not want to read the email. When asked about being within the boundaries of District 6 by a certain time, you stated you were following the directions given to you by your previous commander when you were assigned to District 2, as well as other lieutenants who had been assigned to District 6. You

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 4 of 5

stated you modeled your behavior by what your peers were doing and not what Captain Lugo was asking you to do.

## Allegation No.4

It is alleged that you were insubordinate when you deactivated the GPS on your MDC.

### Supporting Facts:

In reviewing your Unit History, GPS, and CAD data, it was discovered after logging on at 0650 hours on September 19, 2020, you remained at your residence until 0941 hours. The GPS data for that day showed you drove to the substation where you stayed for about one hour, then drove around the district before stopping in a parking lot around Ellsworth Road and Victoria Road. After stopping in that area, your GPS signal was turned off at 1128 hours.

Sergeant Leatham found no notes were recorded in your unit history to show your GPS tried to pick up a signal from a satellite. Sergeant Leatham noted if the GPS cannot receive a signal, the unit history will record a comment that says, "GPS Signal None." No comments like this were found in your unit history after September 18, 2020. Sergeant Leatham noted with your GPS locator turned off MCSO dispatch, Captain Lugo, and other deputies could not see your location during your shift. It was discovered during the investigation that your GPS locator had not received a signal since September 19, 2020, the day it was turned off.

During your PSB interview you admitted to turning off the GPS locator in your MDC. You stated it was easy to turn off, but you were not sure if you turned it back on. You stated you never checked to see if your GPS was working properly following you turning it off. When asked what your reasoning was for turning your GPS locator off, you said you were angry with Captain Lugo.

## Allegation No.5

It is alleged that you were insubordinate when you intentionally avoided going to the District 6 substation as ordered by your captain.

### Supporting Facts:

Captain Lugo told PSB he noticed you were parking in various locations around the district, but you were regularly absent from the substation. During your PSB interview you admitted one of your reasons for not going to the substation was to avoid being around Captain Lugo.

I have reviewed your Personnel file to consider your service record.

The Hearing will be held in the Administrative Services Division Conference Room located in the Sheriff's Office Administration Building, 550 West Jackson Street, Phoenix, AZ, 85003. ***Please report to the security desk in the front lobby when you arrive. You and your employee assistant will be required to secure all weapons in a locker, to include firearms and knives, prior to entering the Division.*** The purpose of this hearing is to allow you an opportunity to present mitigating information and/or explain why the Office should not proceed with the proposed discipline. A final decision regarding your

46REPORT000063

Sergeant Aaron Engelbeck S1673
September 26, 2024
Page 5 of 5

discipline has not been made, nor will one be made at the hearing. Only after a review of all the information presented will a final decision be made.

Prior to the Pre-Determination Hearing, you may review the Administrative Investigation report. If you wish to review the report, please contact Jack Greer at (602) 876-5507 to make an appointment. You may bring an assistant to aid in the review of the investigative file and/or attend the Predetermination Hearing. The assistant may not be an attorney or an Office supervisor and shall not be in any way involved in the investigation or related investigation. You shall provide the assistant's name to Jack Greer prior to the review. You are not permitted to copy the report or any portion of the report. You may also prepare and submit a written response to the investigation and its findings. Your review must be completed, and a response received prior to the hearing. Please submit this response to Jack Greer at the Administrative Services Division on the 4th floor of the Sheriff's Office Administration Building.

Parking is available from 8:00 a.m. to 6:00 p.m. in the Maricopa County Customer/Visitor parking lot located at 5th Avenue and Madison Street, just north of the Sheriff's Administration Building.

If you intend to appear for your Pre-Determination Hearing, please confirm the date with Jack Greer. If you do not appear or submit a written response, I will assume you have no further information that you wish to provide, and you will be deemed to have waived your right to the Pre-Determination Hearing.

Sincerely,


Ken Holmes
Appointing Authority

KH:jrg



I acknowledge receipt of this letter:

_____          _____
Signature                                                              Date

# Presumptive Range of Discipline
## IA No. 20-0555
## Principal: Sergeant Aaron Engelbeck S1673
## Matrix Date: 06/25/2020

The PSB Commander shall make the preliminary determination of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation(s) and the employee's discipline history. (¶222)

When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used to determine the category of the offense. Exoneration on the most serious offense does not preclude discipline as to the less serious offenses stemming from the same misconduct. (¶193)

Each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline. (¶221)

The monitor shall review and approve all disciplinary decisions on Class Remedial Matters. (¶283)

Upon review of the administrative investigation, the Personnel File, and Policy GC-17, *Employee Disciplinary Procedure*, the following is the presumptive disciplinary range to be imposed:

☐        Class Remedial Matter                                    ☐        Exempt Employee
☐ IA ☐ Monitor ☐ Range ☐ Monitor ☐ Appoint Authority ☐ Monitor ☐ PDH ☐ Monitor ☐ Employee

**Allegation #1**

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| 1 | 6 or 7 | 29.A | 6=24-40-80 7=Dismissal |
| | | | |
| | | | |

**Allegation #4**

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| 1 | 6 or 7 | 29.A | 6=24-40-80 7=Dismissal |
| | | | |
| | | | |

**Allegation #5**

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| 1 | 6 or 7 | 29.A | 6=24-40-80 7=Dismissal |
| | | | |
| | | | |

**Allegation #N/A**

| Policy No. | Category No. | Subsection or Paragraph | Discipline Range |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| Current Offense Number | 1 offense No Coach | Discipline Range For This Act/Omission (Most Serious Policy Violation) | Category 6= 24-40-80 |
|---|---|---|---|

Additional Notes:_____        See attached

Revised 05242022

46REPORT000065

IA 20-0555
Sergeant Aaron Engelbeck S1673
Attachment - Presumptive Range of Discipline


Upon review of IA 20-0555 and the Findings, I select the following for the Range of Discipline:

Regarding Allegations 1, 4 and 5, the Range of Discipline is Category 6 or Category 7. Category 6 was selected. This was selected for all Allegations based on the circumstances of the conduct that constitutes unethical behavior and had a serious and adverse impact on the Office and other Office employees.



The appointing authority is authorized to make the final determination regarding the discipline to be imposed within the range identified above.

PSB Commander Signature and Date: _____ 5235I    09/26/2024

46REPORT000066

# Review of Prior Discipline
## IA No.: 20-0555
## Principal: Sergeant Aaron Engelbeck S1673
## Matrix Date: 06/25/2020

The PSB Commander shall make the preliminary determination of the discipline to be imposed in all cases and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation(s) and the employee's discipline history. (¶222)

The number of times an employee has received prior discipline, which is still eligible for consideration, shall be used when determining where an employee shall be placed within the matrix. The matrix to be used shall be determined based on the IA Case number that is currently being considered for discipline (Subject IA) and the effective date of the matrix.

The prior discipline to be considered shall be determined based on: (1) identify all sustained IA case numbers prior to the Subject IA; (2) determine the Category (1-3) or (4-7) for each of the identified IA cases; (3) identify when employee signed for discipline; (4) determine which IA cases drop off from consideration based on the 3/5-year lookback. Coaching will be considered for 1-year lookback.
- Matrix eff 5/18/17 to Current
  - Category 1 – 3 considered for **3** years prior to current offense
  - Category 4 -7 considered for **5** years prior to current offense

Any discipline issued after the Subject IA Initiated/Start date shall not be considered.

| Subject IA Case | Case Number | IA Initiated/Start Date | Lookback Dates (1, 3, and 5 Years) |
|---|---|---|---|
|  | 20-0555 | 10/03/2020 | 1 Year – 10/03/2019<br>3 Year – 10/03/2017<br>5 year – 10/03/2015 |

| Prior Sustained IA Cases or Coaching | Case Number | Category of Offense | Discipline Signed by Employee | Consider for this Disciplinary Action - Y/N |
|---|---|---|---|---|
|  | 21-0152 | 2 | 03/27/2023 | N |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Additional Notes: _____

PSB Commander Signature and Date: _____ S235I    09/26/2024

Revised 11/14/2023

46REPORT000067

☐CRM

### MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

## FINDINGS

**Principal:**  **Aaron Engelbeck S1673**

**Allegation #1:**  **It is internally alleged Lt. Engelbeck was insubordinate when he failed to follow a direct order when he was not within the boundaries of District VI as ordered by his Captain..**

**Policy #1:**  **CP-2.3, Code of Conduct** (Effective 07/30/2020)

39. **Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility.* The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

Sustained _____          _____ S 2351          06/12/2024
Findings                                      Division Commander                              Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained
~~Sustained~~ ℗          _____          1-30-25 ℮
                                                                                  ~~10-24-24~~
Final Findings                              Appointing Authority                          Date

Discipline Imposed: _____ ~~40-Hour Suspension~~ No Discipline ℗

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

Investigator:  Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

Page 88 of 92

46REPORT000068

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

## FINDINGS

**Principal:**         **Aaron Engelbeck S1673**

**Allegation #2:**     **It is internally alleged Lt. Engelbeck was untruthful by entering "QCK" as his location when he was not physically located in Queen Creek.**

**Policy #1:**         **CP-5.1.C, Truthfulness** (Effective Date 09/11/2020)

  **B.** Employees shall not make false official records or enter or cause to be entered into any books, logs, records, reports, or electronic documents any inaccurate, false, or improper information or material for the purpose of deception.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

Not Sustained                    _MM_  S231          66/12/2024
Findings              Division Commander                    Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained                    Kon lole          10-24-24
Final Findings            Appointing Authority            Date

~~Discipline Imposed:~~ _____

  ☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

Investigator:  Sgt. R. Leatham S1462            Reviewer:  Capt. G. Lugo S1480

46REPORT000069

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

## FINDINGS

**Principal:**  Aaron Engelbeck S1673

**Allegation #3:**  It is internally alleged; Sgt. Engelbeck lied to PSB investigators about activating the GPS tracker in his MDC after he admitted to turning it off.

**Policy #1:**  CP-5.1.A, Truthfulness (Effective Date 09/11/2020)

    A.  Employees shall not lie or make a false statement relative to a material fact for the purpose of deception, during the course of an official investigation.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

Not Sustained _____  _____ MMVC ____ S2351 _____  06/12/2024
Findings                       Division Commander                   Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained _____  _____  10·24-26
Final Findings                  Appointing Authority                Date

Discipline Imposed: _____

☐  Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

_____

Investigator:  Sgt. R. Leatham S1462          Reviewer: Capt. G. Lugo S1480

46REPORT000070

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
IA #2020-0555
**FINDINGS**

**Principal:**        **Aaron Engelbeck S1673**

**Allegation #4:**    **It is internally alleged Lt. Engelbeck was insubordinate when he deactivated the GPS on his MDC.**

**Policy #1:**       **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_Sustained_                    _Mull_        S2351            _06/12/2024_
Findings                    Division Commander                 Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

_Not Sustained_                 _Ken Khl_        _10.24.24_
Final Findings              Appointing Authority             Date

~~Discipline Imposed:~~

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

Notes: _____
_____
_____
_____

Investigator:  Sgt. R. Leatham S1462        Reviewer: Capt. G. Lugo S1480

Page 91 of 92

**46REPORT000071**

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**
**FINDINGS**

**Principal:**        **Aaron Engelbeck S1673**

**Allegation #5:**    **It is internally alleged Lt. Engelbeck was insubordinate when he intentionally avoided going to the District VI substation, as ordered by Captain Lugo.**

**Policy #1:**        **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

| | | | |
|---|---|---|---|
| _Sustained_ | _MMVD_    S2351 | | _06/12/2024_ |
| Findings | Division Commander | | Date |

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

NOT SUSTAINED                                          1-30-24  ℗
~~SUSTAINED~~  ℗                                        ~~10-24-24~~

Final Findings        Appointing Authority              Date

Discipline Imposed: ~~40 Hour Suspension~~ No Discipline  ℗

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

_____

Investigator:  Sgt. R. Leatham S1462        Reviewer:  Capt. G. Lugo S1480

Page 92 of 92

46REPORT000072

## Employee Disciplinary Considerations and Decision

**Employee Name:** _____AARON ENGELBECK_____ IA# _2020-0555_
**Appointing Authority:** _Ken Holmes_

**The following information was considered when making the decision to impose discipline:**

Employee's work record.

Discipline imposed on other employees is the same as in similar circumstances.

Evidence supports the employee is a deputy sheriff and currently holding the rank of sergeant.

Evidence supports the employee was holding the rank of lieutenant at the time the misconduct of Insubordination occurred.

Employee was sustained on 3 counts of Policy CP-2.39, Insubordination.(Shown in Allegation #1; #4, and #5)

Regarding Allegation #1, the evidence supports the employee was insubordinate when he failed to follow a direct order, by his captain, to remain within the boundaries of District VI, while on duty.

Evidence supports the direct orders came in the form of directives, memorialized in Supervisory Notes, and meetings with the captain.

Regarding Allegation #4, evidence supports that PSB alleged the employee was insubordinate when he deactivated the GPS on his MDC. I find the employee did deactivate the GPS on his MDC however there were no requisite orders by the captain to prevent the employee from doing so. Therefore, I find this allegation, to be **NOT SUSTAINED.**

Regarding Allegation #5, evidence support the employee was insubordinate when he intentionally avoided going in the District VI substation, which was in contrary to what was ordered by his captain.

The policy violations equate to misconduct stated in Category 6(29A), of GC-17.

The employee has no other acts of misconduct.

The Discipline Matrix was considered whereby the minimum discipline is a 24 Hour Suspension, the presumptive discipline is a 40 Hour Suspension, and the maximum range of potential discipline is an 80 Hour Suspension.

I find the following mitigating circumstances. 1. Evidence supports the additional two Insubordination violations cited by the employee's captain in a memorandum to his Deputy Chief, dated 09/22/2020, were used by the captain to support the recommendation for the employee to be released/demoted from promotional probation. 2. The employee was demoted from lieutenant to sergeant, in part, by these allegations of insubordination, on 10/12/2020. This demotion was perceived by the employee as serious discipline for the misconduct, although it was a failure to meet his promotional probation.

As such, Counsel provided a legal opinion, regarding this matter, that no discipline is necessary and proceeding with a merit commission appeal hearing would not be in the best interest of the MCSO or the employee at issue.

Due to the above stated mitigating factors, the fact this is a Category 6 violation, and the employee has no other acts of misconduct, I find, **NO DISCIPLINE**, to be appropriate.

1

46REPORT000073

PDH Factors:

See the audio/video recording of the PDH, attached.

**Final Decision (based on the above factors): This is a Deviation from the Disciplinary Matrix.**

_____**No Discipline**_____

Appointing Authority Signature: _____

Date: _____2-6-25_____

Engelbeck, Aaron (IA#2020-0555)

2

CONFIDENTIAL - ATTORNEY'S EYES ONLY

1



**MCSO—SHERIFF'S COMMAND**

**SHERIFF**
Jerry Sheridan
(2158)
100-D500-5001-MPOS

**Executive Assistant**
(08931)
Terri Coombs
100-D500-5001-ODIR

**EXECUTIVE CHIEF OF ADMINISTRATION**
(78612)
Chad Willems
100-D500-5039-ODIR

**CHIEF DEPUTY OPERATIONS COMMAND**
(77816)
Jeff Gentry
100-D500-5001-ODIR

**DIRECTOR OFFICE OF COMMUNITY DEVELOPMENT**
(77130)
Rudy Bustamante
100-D500-5001-COFB

Updated  3/31/2025  Source: OOS/ WorkDay roster

**46REPORT000075**

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**MCSO—
Operations Command**

**CHIEF
DEPUTY**
(77816)
Jeff Gentry
100-D500-5001-ODIR

**Executive Assistant**
(08931)
Michele Vendredi
100-D500-5001-ODIR

**ENFORCEMENT COMMAND
EXECUTIVE
CHIEF**
(78234)
VACANT
100-D500-5003-PATR

**CUSTODY
EXECUTIVE
CHIEF**
(77602)
Rollie Seebert
255-D500-5005-PRDM

**DEPUTY CHIEF PATROL RESOURCES**
(5085)
Paul Chagolla

**DEPUTY CHIEF PATROL EAST**
(2280)
100-D500-5040-PATR-1000
James McFarland

**DEPUTY CHIEF PATROL WEST**
(5058)
Phil Dougherty

**DEPUTY CHIEF INVESTIGATIONS**
(5050)
George Pepe

**DEPUTY CHIEF CUSTODY REGION 1**
(10784)
Mike Dawson
255-D500-5110-PRDM-1000

**DEPUTY CHIEF CUSTODY REGION 2**
(69078)
Brent Williams
255-D500-5120-PRDM-1000

**DEPUTY CHIEF CUSTODY REGION 3**
(9872 )
Jesse Spurgin
255-D500-5130-PRDM-1000

**DEPUTY CHIEF  CUSTODY REGION 4**
(18500)
Brandon Smith
255-D500-5150-PRDM-1000

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000076

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**MCSO—**
**Chief of Administration**

**CHIEF OF ADMINISTRATION**
(78612)
Chad Willems
100-D500-5039-ODIR

**Executive Assistant**
(08931)
Michele Vendredi
100-D500-5001-ODIR

**EXECUTIVE CHIEF FINANCIAL OFFICER**
(77336)
Jim Prindiville
100-D500-5002--BDFS

**EXECUTIVE CHIEF COMPLIANCE**
(70259)
Melissa Palopoli
100-D500-5007-RCOM-MEL0

**DEPUTY CHIEF Human Resources/Policy/ Compliance**
(77145)
Cmdr. K. Grennan
100-D500-5022-HRAC

**DEPUTY CHIEF INFORMATION OFFICER**
(69717)
Jon Fendenheim

**DEPUTY CHIEF BIO; Court Compliance; Training**
(76967)
Matt Summers
100-D500-5006-RCOM-MEL0

**Commander Professional Standards Bureau**
(17171)
Captain Greg Lugo (2/22/2021)
100-D500-5021-PROF

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000077

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**MCSO—Special Programs**
**COMMUNITY DEVEL-**
**OPMENT AND PIO**

**DIRECTOR**
**OFFICE OF COMMUNITY**
**DEVELOPMENT**
(77130)
Rudy Bustamante
100-D500-5001-COFB

**Public Affairs and**
**Media Director**
(09634)
Chris Hegstrom
100-D500-5001-ODIR

**Sheriff's Programs and**
**Services**
**Manager**
(77132)
**Vacant**
100-D500-5001-COFB

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000078

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**PATROL EAST**



**EXECUTIVE CHIEF OF ENFORCEMENT**
(77129)
VACANT
100-D500-5003-PATR

**PATROL BUREAU EAST DEPUTY CHIEF**
(02280)
James McFarland
100-D500-5040-PATR
*Contracts:  Fountain Hills; Guadalupe; Queen Creek*

**Patrol District 1 Captain**
(2953)
Jesus Jerez
100-D500-5041-PATR;100-D500-5041-INVT
Contract:  4GUD

**Patrol District 7 Captain**
(2956)
Kevin Thomas
100-D500-5045 PATR;
100-D500-5045-INVT
Contract:  4FTN

**Lake Division Lt.**
(2275)
Aaron Flowers
100-D500-5046-PATR;
100-D500-5046 SRCH;
251-D500-5046-Varies-Varies
Contract:  4FCD

Updated  3/31/2025  Source: OOS/ WorkDay roster

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**PATROL WEST**

**EXECUTIVE CHIEF OF ENFORCEMENT**
(77129)
VACANT
100-D500-5003-PATR

**PATROL  BUREAU WEST DEPUTY CHIEF**
(02949)
Phil Dougherty
100-D500-5058-PATR
*Contracts:  Gila Bend; Goodyear (Mobile); Litch-field Park; Youngtown; Aviation*

**Patrol District 2 Captain**
(18490)
Aaron Flowers
100-D500-5042-PATR;
100-D500-5042-INVT
Contracts:  4LIT; 4GBN; 4GDY; 4FCD

**Patrol District 3 Captain**
(33544)
Brian Stutsman
100-D500-5043-PATR;
100-D500-5043-INVT;
Contract:   4YNG

**Patrol District 4 Captain**
(2958)
Dave Letourneau
100-D500-5044 PATR;
100-D500-5044-INVT
Contracts:  4CAR; 4CAV

Updated  3/31/2025  Source: OOS/ WorkDay roster

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**PATROL RESOURCES**



**EXECUTIVE CHIEF OF ENFORCEMENT**
VACANT
(77129)
100-D500-5003-PATR

**PATROL RESOURCES BUREAU**
**Deputy Chief**
Paul Chagolla
(33277)

**Aviation/Extraditions Captain**
(2277)
Tim Palmer
100-D500-5055 SWAT 255-D500-5055 SWAT (JAIL K-9's) *(TOU; K-9; EOD) Special Weapons and Tactics/ High Risk Response;*

**Extraditions Captain**
Tim Palmer
(2859)
255-D500-5105-EXTR

**Aviation Services Commander**
(2924)
Tim Palmer
100-D500-5054-AVIA

**SWAT Captain**
(2277)
Ryan McBride
100-D500-5055 SWAT 255-D500-5055 SWAT (JAIL K-9's) *(TOU; K-9; EOD) Special Weapons and Tactics/ High Risk Response;*

**Judicial Enforcement Division Captain**
(2947)
Larry Kratzer
100-D500-5083-CVPR
*Court Documents; Licensing/ Delinquent*

**Court Security Captain**
(2957)
Barry Roska
100-D500-5052-CTSC
100-D500-5052-CTSC-MEL0

**Enforcement Support Division Captain**
(02936)
Jonathan Halverson
100-D500-5048-ENFO

**Communications Division**
Jim Stilwell

**Criminal Intelligence Captain**
(77426)
Joe Dietrich
100-D500-5081-DSTR
251-D500-5081-DSTR
*Critical Infrastructure; Ball*

**Chase Field Contract Events Coordinator**
(69847)
Lt. Martin Overton
100-D500-5081-DSTR*(MEL0)*
100-D500-5040-BOBP

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000081

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**INVESTIGATIONS**

**EXECUTIVE CHIEF OF ENFORCEMENT**
VACANT
(77129)
100-D500-5003-PATR

**DEPUTY CHIEF INVESTIGATIONS**
**Deputy Chief**
George Pepe

**Special Investigations Captain**
(33278)
Cory Morrison
100-D500-5062-INVT
251-D500-5062-INVT - Vari
212-D500-5062-INVT; *HIDTA; IINET; Violent Crimes; RICO, Anti Trafficking;*

**Major Crimes Division Captain**
(2952)
David Lee
100-D500-5063-INVT; 251-D500-5063-INVT
100-D500-5063-ENFO-*MASH*
*Homicide/Vehicle Crimes; Special Victims/Auto Theft*
*Computer Crimes/FBI Task Force/Jail Crimes/ Arson/Forensics, Animal Cruelty*

**Records and AFIS Division Commander**
(15602)
Julie Ahlquist
255-D500-5072-IIAR
100-D500-5072 WRNT

**Scientific Analysis Division**
(77995)
Melissa Fernandez
100-D500-5064-INVT

**General Crimes Captain**
Phil Hilliker
100-D500-5066-INVT
Property crimes, Fraud, Person's crimes

**Property Management**
(68990)
Burton Roberts
100-D500-5071- PPEV
258-D500-5071-PPEV-3511
*Mandated Towing—3511*

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000082

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**CUSTODY REGION 1**
And Other

**CUSTODY**
**Executive Chief**
(18500)
Rollie Seebert
255-D500-5005-PRDM

**CUSTODY REGION 1**
**Deputy Chief**
(10784)
Mike Dawson
255-D500-5110-PRDM

**Food Services**
**Commander**
(2311)
Warren Coppock
255-D500-5135-PRDM

**512 (Bed) Facility**
**Captain**
(79410)
Scott Vail
255-D500-5118-PRDM

**Watkins Jail**
**Captain**
*(1600 Facility)*
Jennifer Crosby
(9873)
255-D500-5119 PRDM
Work Furlough/Work Release
255-D500-5127-INLA

**ITR**
**Captain**
(12328)
Jannis Mossman
255-D500-5111
255-D500-5143 IIAR
251-D500-5143 IIAR
ITR
255-D500-5101-IIAR

**Custody Business Ops**
**Lieutenant**
(62072)
Brian Sajonia
255-D500-5128 PRDM
(Custody Admin; Use of Force)
255-D500-5005 PRDM;
**Occupational Safety Div**.
OSHA—255-D500-5093-RMGT

**Sheriff's *Inmate***
**Information Management**
**(SIMS)**
**Commander**
(77605)
Debbie Vazquez
Manager
Theresa Harris
255-D500-5143 IIAR
251-D500-5143 IIAR
Work Box
Sgt. Len Stock
Victims Notification (VANU)
Melissa Tautimes

Updated  3/31/2025  Source: OOS/ WorkDay roster

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**CUSTODY REGION II**



**CUSTODY**
**Executive Chief**
(18500)
Rollie Seebert
255-D500-5005-PRDM

**CUSTODY REGION II**
(69078)
**Deputy Chief**
Brent Williams
255-D500-5120 PRDM

Transportation
(63490)
Lt. Michael Greg
255-D500-5113-INTR
(09260)
Jail Wagon
**Vacant**
255-D500-5115-INTR

**Court Operations**
**Captain**
(61277)
Michael Wilkins
255-D500-5116-INTR
*Court Inmate Security*

**Jail Intel**
Lt. John Noble
255-D500-5084-JIAS
*Jail Intel; Records/Video; ITMU*

**Estrella Jail**
**Captain**
(2281)
Dustin Nolte

**Institutional Svcs. Division/**
**Ancillary Svcs.**
(62064)
Lt. Lourdes Bandilla
255-D500-5140-MANS
255-D500-5132-MANS
*Mail; Library; Inmate Legal;SVP; PREA; LEP Compliance*

**Bureau Hearing Unit**
**Commander**
Lt Chad John
(2590)
255-D500-5130 (PREA); 5126 MANS

**Custodial Services**
Manager
(9216)
Maria Salazar
255-D500-5141 FACI

**Laundry**
Manager
(9340)
Christopher Ardito
255-D500-5133 PRDM

**Inmate Canteen**
Supervisor
(11848)
Gail Travino
252-D500-5136 INSS
252-D500-5136 PRDM

**Distribution**
Supervisor
(9640)
Paul Schlenker
255-D500-5134 PRDM

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000084



**CUSTODY REGION III**

**CUSTODY**
**Executive Chief**
Rollie Seebert
(18500)
255-D500-5005-PRDM

**CUSTODY REGION III**
**Deputy Chief**
Jesse Spurgin
(9872)
255-D500-5130-PRDM

**SRT**
**(Special Response Team)**
**Lieutenant**
(61275)
Dino Graffious
255-D500-5117-PRDM

**Towers Jail**
**Captain**
( 69134)
Richard Hallett
255-D500-5124 PRDM

**4th Avenue Jail**
**Captain**
(2593)
Ashley Osolin
255-D500-5114-PRDM

**Inmate Classification**
**Commander**
(8344)
Leo Chacon
255-D500-5144 IIAR

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**CUSTODY  REGION IV**

**CUSTODY**
**Executive Chief**
(18500)
Rollie Seebert
255-D500-5005-PRDM

**CUSTODY REGION IV**
**Deputy Chief**
Brandon Smith
(18500; SN: A2324)
255-D500-5-PRDM

**Lower Buckeye Jail**
**Captain**
(63425)
Calvin King
255-D500-5131-PRDM

**Inmate Medical Services**
**Captain**
(66638)
VACANT
255-D500-5125-MANS
**MTS/MERIT/MIHS**
**Lt. Brandon Jones**
**CHU**
Lt. Gary Byrne

**Custody Support/Inmate**
**Services/ Programs**
**Commander**
(70081)
Bridget Mack
255-D500-5053
*Religious Services MANS; Adult*
*Programs ISTP;  Adult Education*
*IEPA; MASH 1 and II ISTP;*
*(Lt  J. Collins)*

**MASH**
Maricopa County
Sheriff Animal Safe
Haven
Lt. Dane Valdivia
252-D500-5059-1000-
ISTP

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000086

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**COMPLIANCE/
BIO/Training/PSB**

**CHIEF OF
ADMINISTRATION**
(78612)
Chad Willems
100-D500-5039-ODIR

**Executive Assistant**
(08931)
Michele Vendredi
100-D500-5001-ODIR

**EXECUTIVE CHIEF
COMPLIANCE**
(70259)
Melissa Palopoli
100-D500-5007-RCOM-MEL0

**Compliance
DEPUTY CHIEF**
(70260)
Matt Summers
100-D500-5006-RCOM-MEL0

**Community Outreach
Community Liaison**
(69276)
Joon Ra
100-D500-5001-COFB

**Court Compliance
Captain**
(18823)
Clint Doyle
100-D500 -5006-RCOM-MEL0

**Bureau of Internal
Oversight
Captain**
(70260)
Dominick Reaulo
100-D500-5007-RCOM-MEL0

**MCSO Training
Captain**
(63493)
Jennifer Perks
100-D500-5073-TRAG
100-D500-5073-TRAG-MEL0
255-D500-5073-TRAG

Updated  3/31/2025  Source: OOS/ WorkDay roster

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**COMPLIANCE/HR**



**CHIEF OF ADMINISTRATION**
(78612)
Chad Willems
100-D500-5039-ODIR

**CHIEF**
**Human Resources Officer**
(77145)
Kelly Grennan
100-D500-5022-HRAC
100-D500-5022-HRAC

**Pre-Employment Services Commander**
(62059)
Jennifer Ferrie
100-D500-5028-HRAC*

**Benefits; Compensation; Leave Management Commander**
(78244)
Michele Lardani
100-D500-5026-HRAC

**Employment Services and Payroll Commander**
(18674)
Kelly Grennan
100-D500-5026 HRAC

**Director of Administrative Services Division**
(9620)
Tiffani Shaw
100-D500-5027 HRAC

**Behavioral Services (Psychological Evals and Polygraph) Commander**
Allyssa Rojo

**Health and Wellness**
Administrator
Nicki Bartram

**Legal Liaison**
Commander
Kimberly Thompson

**Policy**
Commander
Rich Kabel

**Conduct Resolution**
Commander
Ada "Denise" Callahan

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000088

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**SHERIFF'S EXECUTIVE CHIEF ADMINISTOR**
(78612)
Chad Willems
100-D500-5039-ODIR

**MCSO—CFO**
**BUS OPS; Finance; Bus Svcs; Fleet; Technology; C&M; Communications;**

**Communications Division Commander**
(76565)
James Stilwell
100-D500-5082-DISP;
255-D500-5082-MANS

**Management Assistant**
(78613)
Jackie Johnson
100-D500-5001-ODIR

**EXECUTIVE CHIEF FINANCIAL OFFICER**
(77336)
Jim Prindiville
100-D500-5002-BDFS

**FINANCIAL ADMINISTRATOR**
(68372)
Dan Campion
100-D500-5010-BDFS

**BUSINESS SRVCS Commander**
(11670)
Amie Bristol
100-D500-5011-BDFS
BOS Items; Non-Procurement Contracts; IGAs; MOUs

**Procurement Supervisor**
(18496)
**Vacant**
100-D500-5019-PROC

**Financial Reporting Commander**
(76570)
Cal Davidson
100-D500-5013-BDFS
Finance Manager/Grants Administrator
Cindy Kenney

**Construction and Maint. Manager**
(64506)
Robert (Bobby) Palma
100-D500-**5015-BLDR**
CARES Coord.

**FINANCIAL SRVS Commander**
(63369)
Marcella Ranus
100-D500-5014- BDFS
Accounts Payable; Travel; Inmate Trust Account

**Budget Development and Mgmnt Commander**
**(76730)**
**Vacant**
100-D500-5012 BDFS

**Warehouse**
100-D500-5018-PROC
Ed Waldner

**FLEET MGMT Commander**
(18498)
Julie Cole
100-D500-5016 FMGT

Updated  3/31/2025  Source: OOS/ WorkDay roster

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**MCSO TECHNOLOGY BUREAU**

**EXECUTIVE CHIEF OF ADMINISTRATION**
(78612)
Chad Willems
100-D500-5039-ODIR

**DEPUTY CHIEF INFORMATION OFFICER**
(69717)
Jon Fendenheim
100-D500-5030--ODIR

**IT PMO Manager**
(76554)
Kathryn Eaton
100-D500-5030-ODIR

**Enterprise Applications & Data Services**
(3195)
Bansi Sharma
100-D500-5032-BUAS
CAD/ GIS; Database Administration; Application Services
255-D500-5032-BUAS
255-D500-5032-BUAS(SHIELD)

**IT Operations and Customer Engagement Commander**
(77414)
Jeanne Vaughn
Operations Service Desk; Advanced OPS; PC Tech Support
100-D500-5034-TSPT

**Enterprise Infrastructure**
(69142)
Reggie Graham
Radio Support; Voice/ Mobile Services
100-D500-5035-MCSI
252-D500-5035-MCSI

**IT Governance**
Stephen Welsh
ITS Support; IT Gov; Audit
100-D500-5030-ODIR

Updated  3/31/2025  Source: OOS/ WorkDay roster

46REPORT000090

CONFIDENTIAL - ATTORNEY'S EYES ONLY

In January 2025, I was made aware that the Maricopa County Sheriff's Office (MCSO) Professional Standards Bureau (PSB) had violated Arizona State Statute (ARS) 38-1106 (A)(1) which states that the respondent (MCSO) must provide a copy of the respondent's investigative file related to the appeal within fourteen (14) calendar days of the request from the appellant. They have also violated ARS 13-2809(A)(1) Tampering with physical evidence which states: A person commits tampering with physical evidence if , with intent that it be used, introduced, rejected or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person: 1. Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability. I believe the facts will show this was willful and with full knowledge by a person unknown at this time in PSB. The following will illustrate how this occurred:

In October 2020, Captain Greg Lugo filed an administrative complaint against myself with allegations of truthfulness and insubordination. At the time, I was Captain Lugo's direct report as a lieutenant in District 6 (Queen Creek). I was interviewed by Sergeant Robert Leatham at this time involving the matter. During that interview, I advised the investigator of several policy violations of which Captain Lugo was responsible. These violations included such policies as command responsibility, truthfulness, and retaliation among others. I later provided the same information in written form to clarify the allegations. In spite of receiving this information, Sergeant Robert Leatham failed to open an independent investigation into these allegations, I was unaware of this at the time. I am also unaware if this decision was made by Sergeant Leatham or the decision came from within his chain of command. This is contrary to MCSO policy. It is unknown by me at this time if Sergeant Leatham made this decision on his own or was ordered to do this by someone in his chain of command.

In March of 2021, Captain Lugo was installed as commander of PSB. I believe this move was already intended at the time of my interview and allegations of misconduct by Captain Lugo.

Following this investigation, I was punished both formally and informally over the course of the next four years. I was demoted (probation terminated), denied a merit-based salary increase the next year, denied a one-time monetary incentive for working through the pandemic, and with an open investigation, I was unable to promote for the next 4 years. In May of 2021, I emailed Chief Deputy Russ Skinner (who would be installed as Sheriff in 2024). I outlined my protests in not receiving a merit increase or the Covid one time incentive. I also advised him of the allegations I entered against Captain Lugo and that, since Captain Lugo was now commander of PSB, this would not be properly investigated. He replied that I was not eligible for the increase or incentive. He also assured me that my allegations were being investigated.

In January 2024, I was called to interview again with Sergeant Leatham. This interview involved clarification of GPS information within my computer. At the conclusion of the interview, I asked for the case number for my allegations against Captain Lugo. He stated an investigation was not opened involving this. I told him I was in shock of this because MCSO policy states if a supervisor is made aware of misconduct, the allegations must be investigated.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

He stated to me that since Captain Lugo opened his investigation first that I would be retaliating against Captain Lugo if I continued to pursue these allegations. I reminded Sergeant Leatham that I was first to state Captain Lugo was retaliating against me. Sergeant Leatham stated Captain Lugo entered his investigation first. I took this to be a threat from PSB that should I continue with my pursuit of an investigation, I would be facing new allegations of retaliation. When I left that interview, Sergeant Leatham told me he would speak to his supervisors about the investigation. I responded with doubt.

In June of 2024, I sent an email to the chief of compliance, Michael Caputo. I advised him that I made the investigator aware of policy violations and he refused to open an investigation. I provided my original written complaint about Captain Lugo. I also reminded him that in addition to Captain Lugo's policy violations, Sergeant Leatham was violating policy by refusing to open a separate investigation. This is an allegation of employee misconduct. Chief Caputo assured me he would look into the matter. Approximately one month later I was notified that a service complaint regarding my inquiry had been completed. MCSO policy GH-2 *Internal Investigations* states "A service complaint is not an allegation of employee misconduct." So this is now another level in the chain of command violating MCSO policy to prevent Captain Lugo from being properly investigated.

In September 2024, I was notified that the investigation from 4 years prior had been completed. The truthfulness allegation was not sustained but they sustained 3 allegations of insubordination. I was advised, the appointing authority, Ken Holmes, was considering 40 hours of suspension as discipline. As this is major discipline, I was entitled to a pre-determination hearing (PDH). I went before the appointing authority and brought forth my arguments against the sustained findings. I also made clear that 4 years to conclude this investigation and dole out major discipline was unethical and contrary to current state law. I also made aware the efforts to avoid investigating Captain Lugo. (This is the fourth person I have made aware of this violation of MCSO policy.) After consideration, the appointing authority overturned one of the sustained findings but upheld the remaining 2. He informed me he was going to proceed with the 40 hour suspension. I advised him that I was looking forward to an appeal as I would finally have an authority outside of the Sheriff's Office view the unethical practices within the PSB division. Mr. Holmes then provided me with the suspension information which would begin the following week (October 2024).

I was provided 10 calendar days to file the appeal. As I was serving the suspension at that time, this was done on my own time and at my own expense. I filed the appeal within the allotted 10 days. I was later notified that a hearing had been scheduled for January 10, 2025 (MCFY25-L01).

I was provided documentation for the appeal process which included an advisement that "Pursuant to A.R.S. 38-1106(A)(1), the appellant may submit a written request, accompanied by a copy of the filed notice of appeal, for a copy of the respondent's investigative file related to the appeal. The respondent must provide the requested copy within fourteen (14) calendar days of their receipt of the request." I immediately emailed the legal liaison for the Sheriff's Office to

46REPORT000092

request the report.  In the email, I also provided the above statute and reminded they have 14 days to provide the case file.

On November 14, 2024, I received an email from Neil Landeen with the Maricopa County Attorney's Office stating he was the assigned representation for the Sheriff's Office.  I provided subpoenas to the hearing officer, Prudence Lee, and Mr. Landeen in requesting my witnesses for the hearing.  Among these subpoena's was one for Chief Caputo.

On December 20, 2024, I received an email from Simon Haines which shared the case file.  This was provided through a web link which had me set up a login and password for access. I was not provided an actual physical copy of these documents.  I took a cursory glance and saw the file included the report, attachments, and several audio and video files.  There was no notice that any parts of the case file would be provided at another time nor was there any indication the case file was incomplete.

On December 22, 2024, Michael Caputo responded to his subpoena stating he was unavailable on that date.  Neil Landeen advised he was willing to reschedule so I could have access to this witness.  The hearing was rescheduled for February 7, 2025.  I then began to prepare my appeal arguments.

As I reviewed the report authored by Sergeant Leatham, I noticed that there were several omissions regarding my statements in the interview.  In addition, it appeared the report was being tailored to support a sustained allegation.  I remembered approximately half of the principal interview I participated in was spent in which I was explaining policy violations from Captain Lugo.  It is contrary to MCSO policy and practice to require someone to state "I want to file a complaint."  It only requires an allegation, either verbal or written, of employee misconduct to require an investigation.  Yet Sergeant Leatham's report said "Explanation of why an additional IA investigation was not opened: When I met Engelbeck on 11/10/2020 and he gave me these documents, he did not say anything about filing a complaint against Captain Lugo or Chief Morrison."  The report later described when I asked for the case number in the follow up interview.  The report stated: "At the conclusion of the interview, Engelbeck was offered time to make a five-minute statement.  Rather than make a five-minute statement, he requested an IA number for a complaint that was never made."  The report also reinforced the previous threats levied by Sergeant Leatham.  The report stated: "Based on the above sections from the Anti-Retaliation policy, if Engelbeck were to make an allegation of misconduct against Captain Lugo for reporting Engelbeck's conduct to PSB, Engelbeck would violate this policy."

After taking note of numerous discrepancies in the report, I decided the best way to proceed would be to observe the primary video between myself and Sergeant Leatham.  I planned to bring specific moments in the video to the attention of Sergeant Leatham and ask him under oath why these statements were excluded from his report and investigation.  I then began searching for the video in the provided case file.  While there were several video and audio files for other witness interviews, there were no video or audio files provided for that interview nor Captain Lugo's complaint interview.

On January 27, 2025, I emailed Mr. Landeen.  The email stated the following:

CONFIDENTIAL - ATTORNEY'S EYES ONLY

*Hello sir, in reviewing the uploaded files you shared with me, I discovered there is no video or audio for the first interview of myself.  Please add this at your earliest convenience.  Thank you, Aaron.*

I did not receive a response that day. The next day I received a phone call from the Conflict Resolution department.  They stated there had been a change to my suspension.  They further stated the suspension had been rescinded.  I received a letter in my MCSO email which confirmed this and I was told it required my signature by the end of the day.  The letter gave no explanation for the reason of the rescinding.  I replied back and inquired as to whether the findings of the investigation would also be changed.  I received a response stating that the Appointing Authority would indeed change the findings.  With the Sheriff's Office paying me back the lost wages over the suspension, MCSO requested the vacating of the appeal hearing the same day which was granted.

It is my belief that the efforts to vacate the appeal were meant to cover the withholding of evidence.  This is also an effort to avoid questioning as to the PSB practices under oath.  It is my belief that Captain Lugo had more involvement in this case than was appropriate as he should have recused himself.  I believe the video was not provided because it would clearly illustrate that I had indeed attempted to file a complaint of retaliation four years prior.  The video would also show discrepancies in the report, possibly to the point of violating Office truthfulness policy.  PSB practices are being revealed in this case and other cases to show a serious lack of fairness and impartiality.  This is made possible by the challenges provided in the appeal process.  They are aware most employees do not want to tackle the difficult task of appeal.

The videos provided and the missing videos should have been stored in the same place according to Office policy.  Therefore, someone would have to deliberately omit them for discovery.  The legal liaison is known to consult with the case agents and PSB command for what can and can't be released.  As this was a concluded investigation, the excuse of "continued investigation" is not valid for omission.  Furthermore, I believe the wish to vacate the appeal the day after I made it known I was aware of the incomplete case file, is implicating as well.  It appears to me that PSB was aware of the omission but was waiting to see if I actually discovered this.

I am seeking an investigation into these criminal violations.

46REPORT000094

CONFIDENTIAL - ATTORNEY'S EYES ONLY



## Maricopa County Sheriff's Office

Chief Deputy Jeff Gentry
550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

April 7, 2025

Captain Greg Lugo S1480
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Greg Lugo,

Effective immediately, you are being placed on Administrative Leave with Pay. You will report by calling the Professional Standards Bureau at (602) 876-5429 between 0900 hours and 0930 hours each day Monday through Friday, except holidays. While on Administrative Leave with Pay you will remain at your place of residence, and you will make yourself available to Sheriff's Office administrative investigators between 0900- and 1700-hours Monday through Friday. While on Administrative Leave with Pay, any off-duty permits that have been authorized for you are immediately suspended, you are not to work off-duty. While on Administrative Leave with Pay, you are not to carry or use any weapons that may have been issued to you by the Maricopa County Sheriff's Office.

Sincerely,

Jeff Gentry
Chief Deputy
Command Administration
Maricopa County Sheriff's Office

Professional Standards Investigation number IA#2025-0139.

I acknowledge receipt of this letter:

_____          _____
Signature                                    Date

46REPORT000095

| | |
|---|---|
| **From:** | Melissa Palopoli (MCSO) |
| **To:** | Don Anders |
| **Subject:** | RE: |
| **Date:** | Thursday, April 10, 2025 10:00:00 AM |
| **Attachments:** | image001.png |
| | image002.png |

Chief Anders,

Please see responses to your questions below:

Date of receipt by PSB – 4/7/25

Approximate date occurred, if known  - 3/10/25 for the failure to notify &  4/3/25 is when the insubordination was discovered

Complainant, e.g., Anonymous (If generated Internally, complainant's position, e.g., a District 3 lieutenant)

Generated Internally or Externally – internally by Chief Palopoli

Where investigation assigned (if confirmed) – DPS Sergeant Baum is leading the investigation

Date assigned – assigned officially to DPS on 4/9/25

Thank you,
Melissa



**Melissa L. Palopoli**
Executive Chief of Compliance
Compliance Bureau
Maricopa County Sheriff's Office
550 W. Jackson Street, Phoenix, AZ 85003

Office: 602-876-5271
Cell : 602-856-2832
E-mail : melissa.palopoli@MCSO.maricopa.gov

MARICOPA COUNTY
SHERIFF'S OFFICE

---

**From:** Don Anders <dkanders57@gmail.com>
**Sent:** Wednesday, April 9, 2025 12:26 PM
**To:** Melissa Palopoli (MCSO) <Melissa.Palopoli@MCSO.Maricopa.gov>
**Subject:** Re: FW: hows this?

| |
|---|
| **This Message Is From an External Sender** |
| This message came from outside your organization. Please use caution when corresponding outside the county. |

46REPORT000096

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Thank you.  For consistency, accuracy, and for the Monitor's records, in addition to the only narrative in the Blue Team entry which was provided in the email to Lt. Porter, can you confirm/provide:

Date of receipt by PSB
Approximate date occurred, if known
Complainant, e.g., Anonymous (If generated Internally, complainant's position, e.g., a District 3 lieutenant)
Generated Internally or Externally
Where investigation assigned (if confirmed)
Date assigned

Regards,

Donald Anders
Monitoring Team

On Wed, Apr 9, 2025 at 13:04 Melissa Palopoli (MCSO) <Melissa.Palopoli@mcso.maricopa.gov> wrote:

> This would be the email attached to the files I sent over to you. This is all that is currently on file for the 139 investigation.
>
> ---
>
> **From:** Melissa Palopoli (MCSO)
> **Sent:** Monday, April 7, 2025 2:47 PM
> **To:** Frederick Porter (MCSO) <F_Porter@MCSO.maricopa.gov>
> **Subject:** hows this?
>
> It is alleged that Captain Lugo was insubordinate by failing to follow a direct order regarding an internal investigation. It is also alleged that he failed to notify his supervisor about a criminal allegation involving himself.

46REPORT000097

CONFIDENTIAL - ATTORNEY'S EYES ONLY



MARICOPA COUNTY
SHERIFF'S OFFICE

**Melissa L. Palopoli**
Executive Chief of Compliance
Compliance Bureau
Maricopa County Sheriff's Office
550 W. Jackson Street, Phoenix, AZ 85003

**Office:** 602-876-5271
**Cell:** 602-856-2832
**E-mail:** melissa.palopoli@MCSO.maricopa.gov

46REPORT000098

# MARICOPA COUNTY SHERIFF'S OFFICE          *Memorandum*



| **To:** | Chief R. Warshaw<br>Court Appointed Monitor | **From:** | M. Summers #1641<br>Deputy Chief<br>Compliance Bureau |
|---|---|---|---|

| **Subject:** | Assignment Approval Request<br>Bureau of Internal Oversight<br>Re: Captain W.C. Morrison #1509 | **Date:** | April 7, 2025 |
|---|---|---|---|

Paragraph 174 of the Second Permanent Injunction Order requires that employee's disciplinary history shall be considered in all hiring, promotion, and transfer decisions; and this consideration shall be documented.

Additionally, paragraph 268 requires that during the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history.

This document is intended to memorialize my review of the previously identified historical information specific to Captain Cory Morrison S1509.

As part of that process internal investigations were reviewed. I identified two External Complaints with Sustained findings and will discuss each:

IA2020-0616 CP-2 Code of Conduct, Procedures, 6. Conformance to Established Laws. The incident summary indicates that: The complainant alleged a Sworn Deputy Chief assaulted a female while in a sports bar restaurant approximately five years ago.

This resulted in one sustained finding for the above listed policy. The subsequent discipline for a Category 4 offense was an 80-hour suspension.

My review of the investigation revealed several factors that should be included during your consideration of this request. Importantly I should emphasize that I am not trying to excuse or minimize the behavior. Though Capt. Morrison does not recall, and the only witness was the server, it is clear that the preponderance of evidence suggests that Captain Morrison inappropriately touched a female server as indicated by the report.

That said, there are additional factors that provide significant context and should be considered. I will list those here:

The investigators were able to narrow the timeframe of the incident to approximately 2016-2018. With the investigation being completed in January of 2021. We are discussing this matter appropriately 7-9 years after its occurrence and more than 4 years after the conclusion of the investigation.

Revised: 12.21.17

46REPORT000099

The server and Captain Morrison had been familiar with each other for years and mutually initiated public social physical interactions were not uncommon in their relationship.

Several statements made by the server were conspicuously absent from the Critical Facts and should have been included and considered. They were statements such as:

**It was nothing serious. It was a silly thing I didn't think that much of it.**

Such mitigating information being excluded when reading the manner in which the investigation is described in the above summary is concerning.

The summary describes a Deputy Chief assaulted a female.

The investigators were able to narrow this allegation to a window of approximately 2-3 years. As a result, the probability is that Cory was a lieutenant or captain. His promotion to chief did not occur during the time period they identified. Thus, it is misleading to identify him as a Deputy Chief in the allegation.

There was no victim willing to aid in prosecution.

There was no criminal investigation.

There was no conviction and thus no crime.

The descriptors that were used are unnecessarily inflammatory.

The server did not know what rank Cory was nor what agency he worked for.

He was off duty and did not represent the Office in any manner.

After reviewing the investigation, I believe it was overreach for the Office to take the action it did.

It should be noted that the complainant had previously made threats to Cory and his family which resulted in a protective detail from the Office watching Cory's residence for a period of time.

IA2020-0285 CP-3.4.A, Workplace Professionalism and GB-2, Command Responsibility. This incident summary indicates that: An anonymous complainant alleged a Lieutenant made disparaging remarks toward a Captain about having a stutter and a medical condition. It was also alleged a Chief was present at the time and did nothing to correct or stop the behavior. Additionally, it was alleged the Lieutenant made disparaging comments about the Captain to subordinate employees.

This resulted in two sustained findings for the above listed policies. The subsequent discipline was a demotion for a Category 3 offense.

The allegations involving Cory mostly center around him overhearing a lieutenant refer to the captain using the name of a fictional television character which is played by an actor. The investigation assumes that Cory understood the intent of the comment as being negative (as the investigation discusses both positive and negative attributes of the character). Further, that he had knowledge that the involved Captain's family may have similar conditions. During the interview he indicated that he was not aware of this. Most importantly and concerning is that Captain Morrison (at the time Chief) went into the

46REPORT000100

Captain's office after the meeting in question to speak to him in private. He asked the Captain if he had any concerns, other than requesting that the Chief have the lieutenants discuss their issues in the future with him first, the Captain indicated that he did not. This is conspicuously absent from the Critical Facts.

No PDH was held due to the demotion being from an appointed position. Thus, Chief Morrison had no ability to appeal.

There is currently one Open IA2023-0043 CP-2 Code of Conduct, Failure to Meet Standards. The incident summary indicates that: It was alleged a Sworn Sergeant reported for duty under the influence of alcohol. It was also alleged a Captain and Lieutenant failed to take appropriate action when it was alleged that a sworn sergeant reported for duty with an odor of alcohol emanating from his person. During the investigation, it was alleged a second Sworn Sergeant failed to report misconduct when he knew the Sergeant reported for work with the odor of alcohol.

It is important to note that the sustained allegations do not disqualify his assignment to the Bureau of Internal Oversight. Also, that none of the alleged conduct would impact his effectiveness or ability to perform his duties within BIO. Years have lapsed since his last discipline. His performance in the intervening years has been positive. During his more than two decades of service to our Office he has held positions to include: PSB supervisor, BIO captain, and Training commander. Captain Morrison possess a rare set of knowledge, experience, and intelligence. There are few sworn commanders within our organization that possess the requisite capability to excel in the Compliance Bureau. There are even fewer that possess these qualities and have the interest in coming to the Compliance Bureau. Captain Morrison is one of those few.

Captain Morrison is currently assigned to a specialty assignment in the Special Investigations Division. In his career he has received a Unit Citation, numerous letters of recognition, and 17 Commendations. Since receiving his last discipline, all of Captain Morrison's EPA's have been Meets Standards or Exceeds Standards.

Should we be unable to transfer Captain Morrison it will complicate the other captain transfers we intend to make effective April 14th.

We appreciate your time, attention, and consideration of our request. Please do not hesitate to contact me for any further information.

46REPORT000101

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., | No. CV-07-02513-PHX-GMS |
| Plaintiffs, | **SUPPLEMENTAL PERMANENT INJUNCTION/JUDGMENT ORDER** |
| v. | |
| Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al., | |
| Defendants. | |

## BACKGROUND

On May 24, 2013, the Court issued Findings of Fact and Conclusions of Law after conducting a bench trial in this matter. (Doc. 579.) The Court held that Defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

The Court permanently enjoined Defendants from the following:

(1) Detaining, holding or arresting Latino occupants of vehicles based on a reasonable belief, without more, that such persons are in the country without authorization;

(2) Following or enforcing its "LEAR" policy, as currently written, against any Latino occupant of a vehicle in Maricopa County;

(3) Using race or Latino ancestry as a factor in determining whether to stop any vehicle;

(4) Using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle may be in the country without authorization;

(5) Detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of the vehicle's occupants have committed or are committing a violation of federal or state criminal law;

(6) Detaining, holding, or arresting Latino occupants of a vehicle for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that the necessary elements of the crime are present; and

(7) Detaining, arresting, or holding persons who are occupants of motor vehicles based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

After issuing the injunctions, the Court held a status conference with the Parties on June 14, 2013. (Doc. 582.) The Parties desired to negotiate the terms of a consent decree to ensure Defendants' compliance with the injunctions. On August 16, the Parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement, and terms on which they could not agree. (Doc. 592.) The Court held a hearing on August 30 at which it discussed both the terms agreed upon and the disputed terms with the Parties. (Doc. 599.) As a result of the trial and the subsequent proceedings, the Court orders the following supplemental injunctive relief.

## REMEDIES

### I.    DEFINITIONS

1.    The following terms and definitions shall apply to this Order:

a.    "Boilerplate" means language that is stock, formulaic, appears repeatedly in different reports, and fails to attest to the unique facts of an incident;

b.    "CAB" means the Community Advisory Board;

c.    "CAD" means "Computer Aided Dispatch," the electronic system that tracks communications between MCSO deputies and dispatch while on patrol;

d.    "CBP" means U.S. Customers and Border Protection;

- 2 -

46REPORT000103

e.  "Complainant" means any person, including a member of the public, MCSO deputy, detention officer, civilian employee, or posse member, who makes a complaint against MCSO;

f.  "Complaint" means any allegation of improper conduct made by a member of the public or MCSO personnel regarding MCSO services, policy or procedure, that alleges dissatisfaction with or misconduct by MCSO personnel;

g.  "Order" means this Order;

h.  "County" means Maricopa County, including its agents and employees;

i.  "Court" means the United States District Judge for the District of Arizona presiding over this case;

j.  "Defendants" means defendants in the above-captioned action, i.e., Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, and the MCSO;

k.  "Deputy" or "deputy" means any sworn law enforcement officer employed by or working for MCSO, including Supervisors, patrol and reserve officers;

l.  "Discipline" means a personnel action for violation of any law, regulation, rule, or MCSO policy, including, but not limited to, an admonishment, written reprimand, suspension, demotion or termination;

m. "Discriminatory Policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, based on a person's actual or perceived race or ethnicity.  Discriminatory Policing does not include using a person's race or ethnicity in any reliable suspect-specific description or for purposes of data collection;

n.  "District" refers to one of the seven police service areas of MCSO;

o.  "Effective Date" means the day this Order is entered by the Court;

p.  "Exigent Circumstances" means emergencies in which a reasonable person would believe that imminent death or bodily harm to a person or persons or the destruction of evidence is likely or as otherwise defined by law;

q.  "EIS" means Early Identification System;

- 3 -

46REPORT000104

r.  "Full and Effective Compliance" means compliance with all relevant provisions of this Order. The Defendants shall begin to be in Full and Effective Compliance with this Order when all of the following have been both completed and consistently maintained:

    i.  A Monitor has been appointed pursuant to Paragraphs 119–121 of this Order.

    ii.  The MCSO has formed an Implementation Unit pursuant to Paragraph 9 of this Order.

    iii.  The MCSO has developed, and, pursuant to Paragraph 30, either the Monitor or the Court has approved, and the MCSO has fully implemented the Policies and Procedures and amendments to Policies and Procedures set out in Section V of this Order.

    iv.  The MCSO has developed curriculum and training materials that have, pursuant to Paragraph 46 of this Order, been approved by the Monitor or the Court.

    v.  The MCSO has developed and implemented a training schedule pursuant to Paragraph 44 of this Order.

    vi.  The MCSO has trained all existing MCSO Supervisors, Deputies, and posse members pursuant to Paragraphs 41–53 of this Order.

    vii.  The MCSO has developed proposed protocols, including draft templates and instructions for Significant Operations and Patrols as set out in Section VI of this Order that have, pursuant to Paragraph 37, been approved by the Monitor or the Court, and have been implemented.

    viii.  The MCSO has provided an adequate number of Supervisors as well as proper Deputy assignments pursuant to Paragraphs 82 and 84 of this Order.

    ix.  The MCSO has developed and implemented a system for performance evaluations pursuant to Paragraph 98 of this Order.

    x.  The MCSO has developed and implemented eligibility criteria for assignment to specialized units pursuant to Paragraph 101 of this Order.

- 4 -

xi. The MCSO has developed and implemented an audit check plan to detect Deputy misconduct pursuant to Paragraph 103 of this Order.

xii. The MCSO has developed and implemented a system to collect traffic stop data and a protocol for audit checks of that system pursuant to Paragraphs 54–59 of this Order.

xiii. The MCSO has developed and implemented a protocol for the periodic analysis of the traffic stop data pursuant to Paragraph 64 of this Order.

xiv. The MCSO has developed and implemented a system for electronic data entry by Deputies pursuant to Paragraph 60 of this Order.

xv. The MCSO has developed and implemented a system for the audio and video recording of traffic stops and a protocol for reviewing the recordings pursuant to Paragraphs 61–63 of this Order with the understanding that Full and Effective Compliance may be achieved once all traffic patrol vehicles that make traffic stops used by Specialized Units have been mounted with the audio and video equipment, so long as the remaining vehicles are timely equipped with the audio and video equipment according to the requirements of those Paragraphs.

xvi. The MCSO has formed a Unit to aid in the development and implementation of the EIS, developed and implemented the EIS, and trained all MCSO personnel on the use of the EIS pursuant to Paragraphs 72–81 of this Order.

xvii. The MCSO has developed and implemented a community outreach program pursuant to Paragraphs 107–112 of this Order.

xviii. The MCSO has selected or hired a Community Liaison Officer pursuant to Paragraphs 113–114 of this Order.

xix. The MCSO has worked with Plaintiffs' representatives and community representatives and created a Community Advisory Board pursuant to Paragraphs 115–116 of this Order.

46REPORT000106

xx. The MCSO has conducted at least one comprehensive internal assessment pursuant to Paragraphs 12–13 of this Order.

xxi. The Monitor has conducted a comprehensive assessment pursuant to Paragraphs 13 or 138 and has certified that the MCSO is in compliance with all of the scheduled obligations described above in Paragraph 1 and in compliance with all other periodic and/or continuing obligations in this Order since the Effective Date.

s. "IA" means Internal Affairs, the MCSO unit charged with conducting internal and administrative investigations of MCSO deputies, agents, and employees;

t. "ICE" means U.S. Immigration and Customs Enforcement;

u. "Immigration-Related Law" means any civil or criminal offense related to immigration status;

v. "Immigration-Related Crime" means any statute imposing criminal punishment in which immigration status is an element of the offense;

w. "include" or "including" means "include or including, but not limited to";

x. "Investigatory Stop," "Investigatory Contact," or "Investigatory Detention" means a detention short of an arrest in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968);

y. "LEAR Policy," means the MCSO policy described on page 2 and 113 of the Court's May 24, 2013 Findings of Fact and Conclusions of Law of detaining persons believed to be in the country without authorization but whom they cannot arrest on state charges, in order to summon a supervisor and communicate with federal authorities;

z. "MCSO" means the Sheriff of the Maricopa County Sheriff's Office acting in his or her official capacity, including the MCSO's agents, deputies, detention officers, Supervisors, employees (both sworn and unsworn), and posse volunteers;

aa. "MCSO Implementation Unit" means the unit created by the MCSO and consisting of MCSO Employees to facilitate implementation of this Order;

- 6 -

46REPORT000107

bb. "MCSO Personnel" or "MCSO Employee" means all MCSO Employees, contractors and volunteers, including command staff, deputies, detention officers, civilian employees and posse volunteers;

cc. "MDT" means Mobile Data Terminal, the computerized system used in MCSO vehicles to conduct inquiries on individuals encountered on patrol;

dd. "Monitor" means a person or team of people who shall be selected to assess and report on the Defendants' implementation of this Order;

ee. "On-site Observation" means first-hand observation by the Monitor of MCSO activities, e.g., ride-alongs with Deputies on patrol or attendance at MCSO meetings or trainings;

ff. "Parties" means Plaintiffs and Defendants collectively in the above-captioned action;

gg. "Patrol Operations" means all MCSO law enforcement operations conducted by Deputies in a law enforcement support or patrol capacity which involves motor vehicle traffic stops, including Significant Operations as defined below. Jail or detention facility operations are not a part of Patrol Operations;

hh. "Plaintiffs" means plaintiffs in the above-captioned action;

ii. "Policies and Procedures" means written regulations or directives, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of MCSO personnel, and providing specific direction in how to fulfill those duties, functions, or obligations. All Policies and Procedures should be available in hardcopy and electronically;

jj. "Sheriff" means the current and future sheriffs of MCSO;

kk. "Significant Operation" or "Significant Patrol" means any pre-planned Patrol Operation that will involve traffic stops of vehicles within Maricopa County involving 10 or more MCSO Personnel excluding posse members;

ll. "Specialized Unit" means a temporary or permanent organization of deputies within MCSO whose operational objectives are focused on a specific law enforcement purpose beyond general patrol or criminal investigations;

- 7 -

46REPORT000108

mm. "Supervisor" or "supervisor" means a sworn MCSO employee at the rank of sergeant or above (or anyone acting in those capacities) with oversight responsibility for MCSO personnel;

nn. "Training" or "training" means MCSO instruction that aspires towards industry best practices and includes adult-learning methods that incorporate realistic role-playing scenarios, interactive exercises, traditional lecture formats, and testing and/or writings that indicate that MCSO personnel taking the Training comprehend the material taught;

oo. "Vehicle stop" means any instance where a MCSO Deputy directs a civilian operating a motor vehicle of any type to stop and in which the driver and any passengers are detained for any length of time.

## II. EFFECTIVE DATE, JURISDICTION AND PARTY REPRESENTATIVES

2. This Order shall become effective upon entry by the Court.

3. To ensure that the requirements of this Order are properly and timely implemented, the Court will retain jurisdiction over this action for all purposes until such time as the Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three years.

4. The Parties may agree to jointly ask the Court to terminate this Order if the Parties agree that Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three continuous years. If the Parties disagree on whether Defendants have achieved Full and Effective Compliance for no less than three continuous years, either Party may seek to terminate this Order. If Defendants move to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so at least 60 days prior to filing a motion to terminate. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court. If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or

- 8 -

interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order. If the Defendants move for termination of this Order, Plaintiffs will have 60 days after the receipt of the Defendants' motion to object to the motion. If Plaintiffs do not object, the Court may grant the Defendants' motion. If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

5. After Defendants have reached Full and Effective Compliance, Defendants shall also have the right to move to terminate any part, portion, or term of this Order if they believe that they have maintained compliance with such portion, part, or term of this Order for no less than three continuous years. At least 60 days prior to filing a motion to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court. If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order. Plaintiffs shall have the right to oppose such motion within 60 days after receipt of the Defendants' motion. If Plaintiffs do not object, the Court may grant the Defendants' motion. If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

6. At all times, the Defendants shall bear the burden of demonstrating Full and Effective Compliance with this Order.

7. This Order shall run against the Sheriff in his official capacity, as well as the MCSO. For purposes of implementation and enforcement of the Order, the representatives for the Parties shall be:

   a. Plaintiffs: The American Civil Liberties Union of Arizona ("ACLU-AZ") and any other representative(s) designated by the ACLU-AZ;

- 9 -

b. Defendants: Chief David Trombi and Captain Larry Farnsworth (or other designee selected by the Sheriff).

8. The Court, upon 60 days' notice to the Parties, retains the right to modify or terminate this Order in whole or in part if it is satisfied that the Defendants have substantially complied with any or all of the terms of the Order for a period of three years, or if it is otherwise satisfied that a modification is justified.

## III.   MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT

9. Defendants shall hire and retain, or reassign current MCSO employees to form an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation of this Order. This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order. At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee. The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.

10. MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order. At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.

- 10 -

46REPORT000111

11. Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.

12. The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.

13. The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the

- 11 -

46REPORT000112

determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).

### IV.     MONITOR REVIEW PROCESS

14.    In any place where this Order provides for Defendants to submit policies, procedures, protocols or other materials to the Monitor for his or her review, Defendants shall submit such materials to the Monitor and provide a copy to Plaintiffs' representatives within the specified time.

15.    Plaintiffs shall have an opportunity to provide any comments or recommendations on the materials within 14 days of receipt. The Monitor shall thereafter communicate to the Parties the results of its review. If the Monitor has any concerns or recommendations regarding the materials, it will include those concerns or recommendations. The MCSO may then amend the materials and resubmit them to the Monitor within 14 days for further review. Either Party may apply to the Monitor for an extension of the deadlines in this Paragraph. In conducting its review, the Monitor may take into account industry best practices and the record in this litigation.

16.    If the Monitor approves the matter submitted, the Monitor will make a record of his or her approval and inform both parties. In cases where neither party objects to the Monitor's action, the Monitor's determination will be final. When the Monitor approves such matter, no further action is needed before the MCSO implements the relevant policies, procedures, protocols or materials. The MCSO shall do so promptly and without delay.

17.    If either Party does not agree with the Monitor's determination, then the Party may make a motion directly to the Court for resolution of the dispute. The non-moving Party may

- 12 -

respond to such motion within 14 days of filing. The moving Party may file a reply within 7 days after that. Any policies, procedures, protocols or other materials subject to the dispute need not be implemented until the Court makes a determination.

## V.     POLICIES AND PROCEDURES

18.     MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.

19.     To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.

20.     The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.

### a.     Policies and Procedures to Ensure Bias-Free Policing

21.     The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:

a.   define racial profiling as the reliance on race or ethnicity to *any* degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;

b.   prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;

c.   prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;

- 13 -

46REPORT000114

Case 2:07-cv-02513-GMS   Document 906   Filed 10/02/13   Page 14 of 59

    d.  specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and

    e.  include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.

22.  MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.

23.  Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.

24.  The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.

    **b.**    **Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

25.  The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:

    a.  prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;

- 14 -

46REPORT000115

b.  provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;

c.  prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;

d.  prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;

e.  prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;

f.  require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;

g.  prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;

h.  require the duration of each traffic stop to be recorded;

i.  provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and

j.  instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.

**c.    Policies and Procedures to Ensure Bias-Free Detentions and Arrests**

26.  The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:

- 15 -

46REPORT000116

a. require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;

b. require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;

c. provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;

d. require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;

e. prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and

f. prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).

**d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws**

27. The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.

28. The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:

a. specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;

- 16 -

46REPORT000117

b. prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;

c. prohibit officers from initiating a pretextual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;

d. prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);

e. prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

f. unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP. In such cases, the officer must still comply with Paragraph 25(g) of this Order. Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

- 17 -

46REPORT000118

g. prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;

h. require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time Supervisor approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

**e.    Policies and Procedures Generally**

29. MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.

30. Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.

31. Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.

32. The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to

- 18 -

46REPORT000119

policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations.  The MCSO shall apply policies uniformly.

33.  MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.

34.  MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards.  The MCSO shall document such annual review in writing.  MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.

## VI.    PRE-PLANNED OPERATIONS

35.  The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.

36.  The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.

37.  The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in

- 19 -

46REPORT000120

Case 2:07-cv-02513-GMS Document 906 Filed 10/02/13 Page 20 of 59

Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.

38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:

a. documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);

b. information that triggered the operation and/or selection of the particular site for the operation;

c. documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;

d. documentation of command staff review and approval of the operation and operations plans;

e. a listing of specific operational objectives for the patrol;

f. documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;

g. any operations plans, other instructions, guidance or post-operation feedback or de-briefing provided to participating MCSO Personnel;

h. a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;

i. arrest lists, officer participation logs and records for the patrol; and

j. data about each contact made during the operation, including whether it resulted in a citation or arrest.

- 20 -

46REPORT000121

39. The MCSO shall hold a community outreach meeting no more than 30 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.

40. The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.

## VII.    TRAINING

### a.    General Provisions

41. To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.

42. The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.

43. The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training

- 21 -

46REPORT000122

shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.

44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.

45. The Training may incorporate adult-learning methods that incorporate role-playing scenarios, interactive exercises, as well as traditional lecture formats.

46. The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.

47. MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.

b. **Bias-Free Policing Training**

48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.

49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a. definitions of racial profiling and Discriminatory Policing;

- 22 -

46REPORT000123

b. examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;

c. the protection of civil rights as a central part of the police mission and as essential to effective policing;

d. an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;

e. constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;

f. MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

g. MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

h. police and community perspectives related to Discriminatory Policing;

i. the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j. methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k. methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l. methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m. cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n. problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

- 23 -

46REPORT000124

o.  the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p.  the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q.  background information on the *Melendres v. Arpaio* litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio*, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r.  instruction on the data collection protocols and reporting requirements of this Order.

**c.  Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws**

50.  In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.

51.  The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a.  an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;

b.  guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;

c.  guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;

- 24 -

46REPORT000125

d. constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;

e. MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

f. the circumstances under which a passenger may be questioned or asked for identification;

g. the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h. the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i. the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j. a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k. a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or

46REPORT000126

apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l. an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m. the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n. provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio* and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o. instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**d.     Supervisor and Command Level Training**

52. MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.

53. The Supervisor-specific Training shall address or include, at a minimum:

a. techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;

46REPORT000127

b. how to conduct regular reviews of subordinates;

c. operation of Supervisory tools such as EIS;

d. evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;

e. how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;

f. how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;

g. incorporating integrity-related data into COMSTAT reporting;

h. how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;

i. how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;

j. how to respond to and investigate allegations of Deputy misconduct generally;

k. evaluating Deputy performance as part of the regular employee performance evaluation; and

l. building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.

## VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW

### a. Collection of Traffic Stop Data

54. Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:

a. the name, badge/serial number, and unit of each Deputy and posse member involved;

b. the date, time and location of the stop, recorded in a format that can be subject to geocoding;

c. the license plate state and number of the subject vehicle;

- 27 -

46REPORT000128

   d.   the total number of occupants in the vehicle;

   e.   the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);

   f.   the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);

   g.   an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;

   h.   the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;

   i.   time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;

   j.   whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and  if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;

   k.   whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;

   l.   whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and

   m.   the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.

- 28 -

46REPORT000129

55.     MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.

56.     The traffic stop data collection system shall be subject to regular audits and quality control checks.  MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.

57.     MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on in-car recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.

58.     The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties.  If the Parties cannot agree, the Court shall make the determination.

59.     Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.

46REPORT000130

**b. Electronic Data Entry**

60. Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically. Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.

**c. Audio-Video Recording of Traffic Stops**

61. The MCSO will install functional video and audio recording equipment in all traffic patrol vehicles that make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment. MCSO shall prioritize the installation of such equipment in all traffic patrol vehicles that makes traffic stops used by Specialized Units that enforce Immigration-Related Laws, and such installation must be complete within 180 days of the Effective Date. MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date. Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.

62. Deputies shall turn on any in-vehicle video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is non-functioning within a reasonable time shall be subject to Discipline.

- 30 -

46REPORT000131

Case 2:07-cv-02513-GMS   Document 906   Filed 10/02/13   Page 31 of 59

63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a protocol, to be reviewed by the Monitor pursuant to the process described in Section IV, for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order.

**d.     Review of Traffic Stop Data**

64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.

65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.

66. MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.

46REPORT000132

67. In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:

   a. racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;

   b. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;

   c. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

   d. indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and

   e. other indications of racial or ethnic bias in the exercise of official duties.

68. When reviewing collected patrol data, MCSO shall examine at least the following:

   a. the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;

   b. the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;

   c. the tactics employed during the Significant Operation and whether they yielded the desired results;

   d. the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity

- 32 -

46REPORT000133

and the surname information captured or provided by the persons stopped, detained or arrested;

    e.   the resource needs and allocation during the Significant Operation; and

    f.   any Complaints lodged against MCSO Personnel following a Significant Operation.

69.   In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit

70.   If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.

71.   In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.

46REPORT000134

## IX. EARLY IDENTIFICATION SYSTEM ("EIS")

### a. Development and Implementation of the EIS

72. MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date. MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.

73. Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").

74. MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.

75. The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:

    a. all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e., any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);

    b. all internal investigations of alleged or suspected misconduct;

46REPORT000135

Case 2:07-cv-02513-GMS Document 806 Filed 10/02/13 Page 35 of 59

c. data compiled under the traffic stop data collection and the patrol data collection mechanisms;

d. all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;

e. all arrests;

f. all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;

g. all arrests in which the individual was released from custody without formal charges being sought;

h. all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;

i. all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;

j. all disciplinary action taken against employees;

k. all non-disciplinary corrective action required of employees;

l. all awards and commendations received by employees;

m. Training history for each employee; and

n. bi-monthly Supervisory observations of each employee.

76. The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).

46REPORT000136

77. MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.

78. MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.

79. The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.

**b.      Training on the EIS**

80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following

- 36 -

46REPORT000137

the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.

**c.** **Protocol for Agency and Supervisory Use of the EIS**

81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:

a. comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;

b. identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:

    i. failure to follow any of the documentation requirements mandated pursuant to this Order;

    ii. racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;

    iii. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;

    iv. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

- 37 -

46REPORT000138

     v.  Complaints by members of the public or other officers; and

     vi.  other indications of racial or ethnic bias in the exercise of official duties;

c.  MCSO commander and Supervisor review, on a regular basis, but not less than bi-monthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;

d.  a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;

e.  identification of a range of intervention options to facilitate an effective response to suspected or identified problems. In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity. All interventions will be documented in writing and entered into the automated system;

f.  a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and not solely on the number or percentages of incidents in any category of information recorded in the EIS;

g.  a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;

h.  an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and

- 38 -

46REPORT000139

i.   mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.

**X.      SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE**

82.   MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order. First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct. To achieve these outcomes, MCSO shall undertake the following duties and measures:

   **a.      General Duties of Supervisors**

83.   MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies. Effective supervision requires that Supervisors: respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.

84.   Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor. First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.

85.   First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order. This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.

- 39 -

46REPORT000140

86. On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.

87. MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.

**b. Additional Supervisory Measures**

88. To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.

89. A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.

90. MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred.

- 40 -

46REPORT000141

Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.

91. As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

92. Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.

93. Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.

94. As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that

- 41 -

46REPORT000142

indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

95. Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action. The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations. The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.

96. A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The commander's review shall be completed within 14 days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.

97. MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).

**d.     Regular Employee Performance Review and Evaluations**

98. MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance

- 42 -

46REPORT000143

Case 2:07-cv-02513-GMS   Document 806   Filed 10/02/13   Page 43 of 59

to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.

99.    The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.

100.    The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.

101.    Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws.  Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner.  Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.

46REPORT000144

## XI.   MISCONDUCT AND COMPLAINTS

### a.   Internally-Discovered Violations

102.   MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.

### b.   Audit Checks

103.   Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including:  Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.

### c.   Complaint Tracking and Investigations

104.   Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.

105.   Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.

- 44 -

46REPORT000145

106. Records of Complaints and investigations shall be maintained and made available, unredacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.

## XII.   COMMUNITY ENGAGEMENT

### a.   Community Outreach Program

107. To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the period that this Order is in place. To this end, the MCSO shall create the following district community outreach program.

108. Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.

109. As part of its Community Outreach and Public Information program, the MCSO shall hold a public meeting in each of MCSO's patrol Districts within 90 days of the Effective Date, and at least one meeting in each District annually thereafter. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

110. The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.  MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.

111. English- and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public.  At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the

- 45 -

46REPORT000146

Community Liaison Officer (described below) shall participate in the meetings. Plaintiffs' representatives shall be invited to attend.

112. The meetings shall be held in locations convenient and accessible to the public. At least one week before such meetings, the MCSO shall widely publicize the meetings using English and Spanish-language television, print media and the internet.

**b.      Community Liaison Officer**

113. Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.

114. The CLO shall have the following duties:

   a. to coordinate the district community meetings described above in Paragraphs 109 to 112;

   b. to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118;

   c. to compile any Complaints, concerns and suggestions submitted to CLO by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;

   d. to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and

   e. to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.

**c.      Community Advisory Board**

115. MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the

- 46 -

46REPORT000147

MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

116. The CAB shall have six members, three to be selected by the MCSO and three to be selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case. However, a member of the MCSO Implementation Unit and at least one representative for Plaintiffs shall attend every meeting of the CAB. The CAB shall continue for at least the length of this Order.

117. The CAB shall hold public meetings at regular intervals of no more than four months. The meeting space shall be provided by the MCSO. The CLO shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.

118. During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and make reasonable efforts to address such concerns. Members will also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.

## XIII. INDEPENDENT MONITOR AND OTHER PROCEDURES REGARDING ENFORCEMENT

### a. Selection of the Monitor

119. The Court shall appoint an Independent Monitor to assist with implementation of, and assess compliance with, this Order. Within 60 days of the Effective Date, the Parties shall agree on the selection of a Monitor to be appointed by the Court.

120. The Parties shall have an opportunity to separately interview prospective candidates if they choose, as well as request additional information about prospective candidates' background and experience, proposed annual fees and costs, proposed annual budget,

- 47 -

46REPORT000148

including references and a list of recent consulting or monitoring work and the fees and costs from that prior consulting or monitoring work as well as information as to whether the candidate meet or exceeded any budgets for that prior consulting or monitoring work.

121. If the Parties are unable to agree on a Monitor or an alternative method of selection within 60 days of the Effective Date, each Party shall, no later than 70 days from the Effective Date, submit the names and resumes of three candidates with experience as law enforcement practices experts or monitors to the Court, and the Court shall select a Monitor from among the qualified candidates.

122. The Monitor shall be appointed for the term of this Order. In the event a Monitor is to be replaced, the Parties shall select a new Monitor by the same process as above. The Court may order the removal of the Monitor for any reason sua sponte, or upon Motion by any party.

123. Defendants shall provide the Monitor with permanent office space and reasonable office support such as office furniture, secure internet access, telephones, secure document storage, and photocopying, faxing and scanning equipment. Defendants shall bear all reasonable fees and costs of the Monitor. However, the Parties recognize the importance of ensuring that the fees and costs borne by Defendants are reasonable. In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, Defendants, Plaintiffs, and the Monitor shall attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court. All Parties shall be included in any communications related to such a dispute.

124. The Monitor, at any time after his or her initial selection, may request authorization from the Court to be allowed to hire or employ or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by this Order or by the Court. The Monitor shall submit to the Court the task to be performed by the proposed additional person or entity, the scope of the work to be performed, the project fees and expenses associated with such work, the expected length of time for such work, and the reasons the Monitor is unable to perform such work and requires the

- 48 -

46REPORT000149

assistance of the additional person or entity and why existing MCSO personnel cannot perform the task requested by the Monitor. Any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Order shall be subject to the provisions of this Order. The Monitor shall notify the Defendants and Plaintiffs' representatives in writing if the Monitor wishes to hire such additional persons or entities. The notice shall identify and describe the qualifications of the person or entity to be hired, the monitoring tasks to be performed, the estimated cost and length of time of the task, and explain why existing MCSO personnel cannot perform the task requested or desired by the Monitor. If the County and Plaintiffs agree to the Monitor's proposal, the Monitor shall be authorized to hire or employ such additional persons or entities. The County or Plaintiffs have 15 business days to state any disagreement with the proposal. If the County and Plaintiffs are unable to reach agreement within 15 business days of receiving notice of the disagreement by the other Party, the Court shall resolve the dispute.

125. Should any Party determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority or failed to satisfactorily perform the duties required by this Order, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors. The Party or Parties, as the case may be, shall attempt to resolve such disputes cooperatively prior to seeking the assistance of the Court. All Parties shall be included in any communications related to such a dispute.

**b.     Role of the Monitor**

126. The Monitor shall be subject to the supervision and orders of the Court, consistent with this Order. The Monitor shall have the duties, responsibilities and authority conferred by the Court and this Order, including, but not limited to: (1) reviewing the MCSO Patrol Operations Policies and Procedures provided for by this Order and making recommendations to the Court regarding the same; (2) reviewing a protocol with the

- 49 -

46REPORT000150

Parties to ensure that any Significant Operations conducted by the MCSO are conducted in a race-neutral fashion; (3) reviewing the curriculum, materials and proposed instructors for Training required by this Order; (4) reviewing the collected traffic stop data and the collected Saturation Patrol data to determine whether the data required to be gathered by this Order is, in fact, being collected by the MCSO; (5) reviewing protocols regarding the collection, analysis, and use of such data and determining whether the MCSO is in compliance with those protocols; (6) reviewing the collected data to determine whether, in the opinion of the Monitor, MCSO is appropriately reviewing the collected data to determine possible isolated or systemic racial profiling occurring, and if so, reporting the factual basis supporting that judgment to the Parties and the Court; (7) evaluating the effectiveness of the MCSO's changes in the areas of supervision and oversight and reporting the same to the parties and the Court; (8) reviewing the corrective action taken by the MCSO concerning any possible violations of this Order or MCSO policy and procedures and reporting the same to the parties and the Court; (9) evaluating the MCSO's engagement with the communities affected by its activities as set forth by this Order; and (10) assessing the MCSO's overall compliance with the Order.

127. To assess and report on the Defendants' implementation of this Order and whether implementation is resulting in the constitutional and professional treatment of individuals by MCSO, the Monitor shall conduct the audits, compliance reviews and outcome assessments specified below, and such additional audits and assessments as the Monitor or the Parties deem appropriate.

128. The ultimate arbiter of compliance is the Court and Parties may make their own submissions regarding compliance separate from the Monitor's reports. In any areas where the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution.

129. In carrying out these duties, the Monitor shall be permitted to have ex parte communications with the Parties.

- 50 -

46REPORT000151

**c.      Monitoring Plan and Review Methodology**

130.   The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

a.   a description of the work conducted by the Monitor during the reporting period;

b.   a listing of each Order requirement which indicates whether each requirement has been addressed by the MCSO, is the subject of sufficient Training, and whether the MCSO is in compliance with that requirement of the Order in the judgment, opinion, and experience of the Monitor;

c.   the methodology and specific findings for each audit or review conducted;

d.   for any requirements that were audited and reviewed and found not to have been fully implemented in practice in the judgment, opinion, and experience of the Monitor, the Monitor's recommendations to the Court regarding necessary steps to achieve compliance;

e.   in the judgment, opinion, and experience of the Monitor an assessment of MCSO's progress in achieving the desired outcomes for each area covered by the Order, noting issues of concern or particular achievement;

f.   the methodology and specific findings for each outcome assessment conducted; and

g.   a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Order.

131.   The Monitor's reports shall be public except for information covered by privacy laws or that is otherwise confidential. If any information is redacted from the Monitor's report, an unredacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit, review or assessment need not be made publicly available but shall be retained by the Monitor and provided to either or both Parties upon request.

132.   The Monitor shall provide a copy of quarterly reports to the Parties in draft form at least 21 business days prior to filing them with the Court to allow the Parties to provide written comment on the reports.  The Monitor shall consider the Parties' responses and make any

46REPORT000152

changes the Monitor deems appropriate before issuing the report. The Monitor shall attach to his or her report copies of any comments submitted by the Parties.

133. Within 60 days of his or her appointment, the Monitor shall develop a plan for conducting the above audits, reviews and outcome assessments, and shall submit this plan to the Parties for review and approval. In the event that the Parties cannot agree, the plan will be submitted to the Court for final approval. This plan shall:

   a. clearly delineate the requirements of the Order to be assessed for compliance, indicating which requirements will be assessed together;

   b. set out a schedule for conducting an initial audit or review of each requirement of the Order, and periodic audits and reviews thereafter;

   c. set out a schedule for conducting initial outcome assessments for each area of the Order, and periodic assessments thereafter.

134. Where the Monitor recommends and the Parties agree, the Monitor may refrain from conducting an audit or review of a requirement previously found to have been fully implemented in practice by the Monitor, or refrain from conducting an outcome assessment if previous assessments indicate that the outcome intended by a requirement has been achieved.

135. At least 30 days prior to the initiation of any audit, review or assessment, the Monitor shall submit a proposed methodology to the Parties. The Parties shall submit any comments or concerns regarding the proposed methodology to the Monitor within 15 days of the proposed date of the assessment, review or audit. The Monitor shall modify the methodology as necessary to address any concerns or shall inform the Parties in writing of the reasons it is not modifying its methodology as proposed. If Parties do not agree with the proposed methodology, the Monitor shall then file with the Court the proposed methodology for approval.

136. In conducting the outcome assessments, the Monitor should measure not only the MCSO's progress in implementing the provisions of this Order, but the effectiveness of

46REPORT000153

the reforms. To do so, the Monitor shall take into account the following performance-based metrics and trends:

a. Deputies' awareness and comprehension of issues addressed by departmental policies and Training;

b. data relating to the race and ethnicity of individuals stopped, detained and arrested by the MCSO, including the rate at which investigations result in a citation or arrest;

c. data related to the documented reasonable suspicion or probable cause to stop, detain or arrest individuals encountered on traffic stops, broken down by the actual or perceived race or ethnicity of the person(s) stopped/arrested;

d. the use and deployment of Specialized Units;

e. the execution of any significant operations, including planning and site selection, tactics employed, staffing and units involved, and the intended and actual results of such operations;

f. the amount and quality of supervision provided by the MCSO's chain of command;

g. the prevalence of civilian Complaints regarding biased policing or unlawful detentions and arrests by MCSO Patrol Operation deputies;

h. the number and rate of Complaints that are accepted, sustained and not sustained, overall and broken down by type, unit, geographic area and the actual or perceived race or ethnicity of Complainants;

i. disciplinary outcomes for any violations of departmental policy;

j. whether any Deputies are the subject of repeated misconduct Complaints, civil suits, or criminal charges, including for off-duty conduct; and

k. the level of MCSO engagement and participation with the community advisory board;

137. To facilitate the Monitor's outcome assessments, the Monitor may also conduct his or her own periodic analysis of the traffic stop and Significant Operations data collected by the MCSO pursuant to this Order, subject to the terms of this Order as to the Monitor's proposed hiring of assistance. The Monitor shall retain an individual or entity with

- 53 -

46REPORT000154

expertise in social science research and statistics to conduct the survey if the Monitor does not have this expertise him/herself.

138. The Monitor shall conduct a comprehensive re-assessment each year after the Effective Date to determine whether and to what extent the outcomes intended by this Order have been achieved, and any modifications to the Order that he/she believes are necessary for continued achievement in light of changed circumstances or unanticipated impact (or lack of impact) of a requirement. This re-assessment shall also address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating Full and Effective Compliance. Based upon this comprehensive re-assessment, the Monitor may recommend to the parties and the Court modifications to the Order that he/she believes are necessary to achieve and sustain intended outcomes.

d. **Monitor Recommendations and Technical Assistance**

139. The Monitor may make additional recommendations to the Parties regarding measures necessary to ensure timely, Full and Effective Compliance with this Order and its underlying objectives. Such recommendations may include a recommendation to change, modify, or amend a provision of the Order, a recommendation for additional Training in any area related to this Order, or a recommendation to seek technical assistance. In addition to making recommendations, the Monitor may also, at the request of the Parties, provide technical assistance directly to the MCSO consistent with the Monitor's responsibilities under this Order. In the event that full and effective implementation of this Order requires technical assistance beyond the scope of what the Monitor can provide, Defendants shall reasonably arrange for prompt initiation of such technical assistance consistent with the terms of this Order.

e. **Communication between Monitor and Parties**

140. The Monitor shall maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of Defendants' implementation of and compliance with this Order.

- 54 -

46REPORT000155

**f.      Public Statements, Testimony, Records, and Conflicts of Interest**

141.    Except as required or authorized by the terms of this Order or the Parties acting together: neither the Monitor, nor any agent, employee, or independent contractor thereof, shall make any public statements, outside of statements to the Court as contemplated in this Order, with regard to any act or omission of the Defendants, or their agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to the Order.  Any press statement made by the Monitor regarding its employment or monitoring activities under this Order shall first be approved by the Parties.

142.    Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Maricopa County or its departments, Deputies, agents or employees.

143.    The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.

144.    The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Order.

**g.      Access and Confidentiality**

145.    Defendants shall ensure that the Monitor has timely, full and direct access to all personnel, documents, facilities and Order-related Trainings and meetings that the Monitor reasonably deems necessary to carry out its duties. The Monitor shall cooperate with the Defendants to access people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations. To facilitate his or her monitoring responsibilities, the Monitor may conduct On-Site

46REPORT000156

Observations, visits and assessments without prior notice to the Defendants absent Exigent Circumstances.

146. Defendants may withhold from the Monitor any documents or data protected by the attorney-client privilege. Should the Defendants decline to provide the Monitor access to documents or data based on attorney-client privilege, the Defendants shall inform the Monitor and Plaintiffs that it is withholding documents or data on this basis and shall provide the Monitor and Plaintiffs with a log describing the documents or data.

147. Defendants shall ensure that Plaintiffs' representatives and their consultative experts and agents shall have full and direct access to all Defendants' staff, employees, facilities, documents and data relevant to this Order upon reasonable notice.   Plaintiffs' representatives and their consultative experts and agents shall cooperate with the Defendants to access involved personnel, facilities, and documents in a reasonable manner that, consistent with Plaintiffs' responsibilities to enforce this Order, minimizes interference with regular duties.

148. The Monitor and Plaintiffs shall provide the Defendants with reasonable notice of a request for copies of documents.  Upon such request, the Defendants shall provide in a timely manner copies (electronic, where readily available) of the requested documents.

149. The Monitor shall have access to all records and information relating to criminal investigations relevant to this Order as permissible by law. The Monitor shall treat such records as confidential and shall not disclose the same to any third party. The Monitor and Plaintiffs shall have access to all documents in concluded or closed MCSO criminal investigation files. The Monitor shall also have reasonable access to all arrest reports, warrants, and warrant applications whether or not contained in open criminal investigation files absent Exigent Circumstances.

150. The Parties may make use of protective orders or agreements to ensure the confidentiality of any non-public information as appropriate and necessary. Other than as expressly provided herein, this Order shall not be deemed a waiver of any privilege or right the Defendants may assert, including those recognized at common law or created by statute,

46REPORT000157

rule or regulation, against any other person or entity with respect to the disclosure of any document.

### h. Modification and Enforcement of the Order

151. Where the Parties agree with the Monitor's recommendations to change a provision of the Order, the Parties may apply to the Court via stipulated Motion or other appropriate filing to make the desired change.

152. Plaintiffs' representatives may seek enforcement of this Order if they determine that the Defendants have failed to fully comply with any provision contained herein. Plaintiffs' representatives are not required to prove that the MCSO is engaged in racial profiling in order for the Court to find that Defendants have failed to fully comply. Plaintiffs may demonstrate that the MCSO has failed to fulfill a particular obligation under this Order or failed to make sustained and continuing progress on applicable performance-based metrics.

153. The Parties shall first attempt to resolve any dispute informally by notification and conferral. If a dispute cannot be resolved informally, Plaintiffs' representatives may apply to the Court for appropriate relief, up to and including the imposition of contempt sanctions. Interventions short of an imposition of contempt sanctions may include, but are not limited to, additional oversight, further restrictions on agency activities, and additional Training or reporting requirements.

154. Defendants may move the Court for a protective order and/or other appropriate relief if they reasonably believe Plaintiffs' representative is abusing its rights under this Order or acting solely to annoy or harass Defendants. Prior to moving for any such protective order or other relief, Defendants shall be required to provide Plaintiffs with notice of their intent to do so and shall confer with Plaintiffs in good faith to resolve any such dispute.

155. The Parties shall notify each other of any court or administrative challenge to this Order. In the event any provision of this Order is challenged in any local or state court, removal to a federal court shall be sought by the Parties and transfer of venue to this District will be sought.

46REPORT000158

156. The Defendants agree to promptly notify Plaintiffs if any term of this Order becomes subject to collective bargaining consultation and to consult with Plaintiffs in a timely manner regarding the implications of any collective bargaining consultation in relation to this Order.

157. Defendants shall pay reasonable fees and costs incurred as a result of having to initiate litigation to secure enforcement, should Plaintiffs prevail in such litigation. Nothing in this provision affects the right of Plaintiffs to seek fees and costs for work performed in the case prior to the Effective Date or in connection with any appeal taken by Defendants of the Court's May 24, 2013 Findings of Fact, Conclusions of Law and Order.

158. Defendants reserve the right to move the Court to alter, amend, modify, or terminate this Order at any time based on an adverse decision of an appellate court of competent jurisdiction ruling on the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

159. Nothing in this Section, nor in this Order is intended to, nor shall, constitute a waiver, termination, abrogation, or ending of the appeal rights of the Defendants to challenge the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

**IT IS THEREFORE ORDERED** that the Court's injunction of December 23, 2011 is made permanent. The Court's injunction of May 24, 2013 shall remain permanent. For removal of doubt, both the December 23, 2011 injunction and the May 24, 2013 injunction shall survive the termination of this Order until and unless specifically dissolved or modified by the Court or an appellate court of competent jurisdiction.

**IT IS FURTHER ORDERED** that this Order is an appealable final judgment. The Clerk of Court is directed to enter judgment accordingly.

/ / /

/ / /

/ / /

46REPORT000159

IT IS FURTHER ORDERED that this Court retains jurisdiction over this case for the purposes of implementing this Order.

Dated this 2nd day of October, 2013.

G. Murray Snow
United States District Judge

46REPORT000160

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **SECOND AMENDED[1] SECOND SUPPLEMENTAL PERMANENT INJUNCTION/JUDGEMENT ORDER** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

This Court held 21 days of evidentiary hearings in April, September, October, and November of 2015. At issue were three charges of civil contempt raised against Sheriff Joseph Arpaio and various other alleged non-party contemnors. Also at issue was the relief necessary to compensate the Plaintiff class for the Defendants' acts of misconduct in, among other things, failing to provide requested discovery materials prior to the underlying trial in this matter.

On May 13, 2016, the Court issued detailed Findings of Fact. (Findings of Fact, Doc. 1677.) The Court found that Sheriff Arpaio and his command staff knowingly failed to implement the Court's preliminary injunction, resulting in harm to many

---

[1] This second amended order corrects internal paragraph cross-reference errors. Otherwise, the content remains the same.

46REPORT000161

Plaintiff class members who were detained in violation of their constitutional rights. (Doc. 1677 at ¶¶ 1–164.) The Court also found that Defendants failed to disclose thousands of relevant items of requested discovery they were legally obligated to disclose, and, after the post-trial disclosure of additional evidence, deliberately violated court orders, thereby impeding the litigation, harming the Plaintiff class, and resulting in a trial that did not completely address—and remedies that did not fully repair—the MCSO's violations of Plaintiffs' constitutional rights. (*Id.* at ¶¶ 165–217, 239–94.) The contempt hearing further established that after Defendants disclosed to the Court extensive MCSO misconduct, including its failure to provide additional evidence pursuant to Defendants' discovery obligations, the Court allowed Defendants at their insistence to seek to investigate and discipline that misconduct and to disclose newfound evidence. (*Id.* at ¶¶ 220–22.) Nevertheless, instead of forthrightly meeting their responsibilities, Defendants continued to intentionally withhold relevant evidence during the course of their ensuing investigation and the eventual contempt hearing. (*Id.* at ¶¶ 218–386.) Further, in investigating the misconduct with respect to members of the Plaintiff class, Sheriff Arpaio and the MCSO manipulated all aspects of the internal affairs process to minimize or entirely avoid imposing discipline on MCSO deputies and command staff whose actions violated the rights of the Plaintiff class. (*Id.* at ¶¶ 387–875.)

The facts of this case are particularly egregious and extraordinary. The MCSO's constitutional violations are broad in scope, involve its highest ranking command staff, and flow into its management of internal affairs investigations. Thus the necessary remedies—tailored to the violations at issue—must reach that far.

The parties have briefed and argued before the Court the sources and scope of the Court's authority to issue remedies in light of the Findings of Fact, including Defendants' concerns regarding federalism and due process. *See, e.g.*, Plaintiff's Memorandum on Remedies for Civil Contempt (Doc. 1684); United States' Memorandum in Response to Findings of Fact (Doc. 1685); Defendants' Responsive Memorandum to Court's Findings

46REPORT000162

of Fact (Doc. 1687); Parties' Joint Memorandum Re: Internal Investigations (Doc. 1715); Plaintiffs' Response to Defendant Arpaio's Briefing Re: Internal Affairs (Doc. 1720); United States' Response to Defendant Arpaio's Positions Re: Internal Investigations (Doc. 1721); Defendant Arpaio's Reply in Support of Briefing Re: Internal Affairs Investigations and Discipline (Doc. 1729). The Court therefore prefaces its remedial order with an analysis of these issues.

## I.     SOURCES OF THE COURT'S AUTHORITY TO FASHION REMEDIES

Had the Court had access to the evidence withheld by the MCSO and the evidence to which it led, the Court would have entered injunctive relief much broader in scope. (Doc. 1677 at ¶ 890). Although this bad faith failure to produce evidence gave rise to various remedies, the Parties agreed to pursue any relief for the Defendants' withholding of discovery in the same evidentiary hearings that would be necessitated by the Court's Order to Show Cause for contempt. (*See id.* at ¶¶ 891–93).

A principal purpose of the hearing was, therefore, to provide the Plaintiff class the relief it would have had, to the extent possible, had Defendants complied with their discovery obligations prior to trial.

The Court derives authority to fashion remedies in this instance from multiple sources, including the Court's broad and flexible equitable powers to remedy past wrongs, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 12-16 (1971), the Court's equitable authority to modify its injunctions in light of changed circumstances, *United States v. Swift & Co.*, 286 U.S. 106, 114-15 (1932), and the Court's authority to impose remedial sanctions for civil contempt, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827-29 (1994).

### A.     Broad Remedial Powers

In "cases involving the framing of equitable remedies to repair the denial of a constitutional right[,] [t]he task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." *Swann*, 402 U.S. at 15-16. Federal courts focus on three factors when applying equitable principles. *Milliken v.*

- 3 -

46REPORT000163

*Bradley,* 433 U.S. 267, 281 (1977). First, "with any equity case, the nature of the violation determines the scope of the remedy." S*wann*, 402 U.S. at 16. "The remedy must therefore be related to the condition alleged to offend the Constitution." *Milliken,* 433 U.S. at 281 (internal quotation marks omitted). "Second, the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.* "Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.* However, if the authorities "fail in their affirmative obligations . . . judicial authority may be invoked." *Id.* (quoting S*wann*, 402 U.S. at 15). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." S*wann*, 402 U.S. at 15.

"[I]njunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quotation omitted), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799, 193 L. Ed. 2d 711 (2016). "Nevertheless, the district court has broad discretion in fashioning a remedy [and] is permitted to order 'relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation.'" *Id.* (quoting *Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir. 1986)). "Therefore, an injunction exceeds the scope of a district court's power only if it is 'aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.'" *Id.* (quoting *Milliken,* 433 U.S. at 282).

Moreover, "the enjoined party's 'history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted.'" *Id.* (quoting *Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000)). When faced with "repetitive failures to comply with orders[,]" a district court is "'justified in entering a comprehensive order to insure against the risk of inadequate compliance.'" *Sharp*, 233 F.3d at 1173 (quoting

- 4 -

46REPORT000164

*Hutto v. Finney,* 437 U.S. 678, 687 (1978)).

Here, as in *Sharp*, the Court orders remedies which are necessary to cure the MCSO's constitutional violations, in light of the MCSO's history of noncompliance. *See id.* at 1173. To the extent that the Court orders reforms of the MCSO's policies and practices, these reforms are necessary "to insure against the risk of inadequate compliance," *id.* (quoting *Hutto,* 437 U.S. at 687), because absent such reforms, there is no way to determine whether policies or practices that insulated those who violated the constitutional rights of the Plaintiff class from investigation and discipline would continue to do so. Further, the reforms are aimed at eliminating a condition that flows from the MCSO's violation of the constitutional rights at issue—namely, the tacit authorization and condonation that the MCSO conveys to its deputies when police misconduct related to members of the Plaintiff class is exempted from the normal internal affairs system and is treated with special leniency or is entirely swept under the rug.[2]

"Members of the Plaintiff class constituted the overwhelming majority of the victims of the multiple acts of misconduct that were the subject of virtually all of the flawed investigations" summarized in the Court's Findings of Fact. (Findings of Fact, Doc. 1677 at ¶ 888.) So long as individuals within the MCSO can disobey the Court's orders with impunity, the rights of the Plaintiff class are not secure. "[T]he ability to effectively investigate and discipline officers . . . is essential to correcting the underlying constitutional violations found in this case, and thus to the final resolution of this long-standing litigation." *Madrid v. Woodford*, No. C90-3094 TEH, 2004 WL 2623924, at *8–9 (N.D. Cal. Nov. 17, 2004). The Court's orders in this case have required

---

[2] *See* Doc. 1677 at 2 ("To escape accountability for their own misconduct, and the misconduct of those who had implemented their decisions, Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor. The Defendants' unfair, partial, and inequitable application of discipline disproportionally damaged members of the Plaintiff class.").

- 5 -

46REPORT000165

implementation of new policies. A system that effectively ensures compliance with the Court's orders requires five "interrelated components," each of which "builds upon and reinforces the others": written policies, training, supervision, investigation, and officer discipline. *Madrid v. Gomez*, 889 F. Supp. 1146, 1181 (N.D. Cal. 1995). "[A] meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, [an organization's] . . . policies and procedures become a dead letter." *Id.*

Defendants continue to "manipulate[e] the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class." (Findings of Fact, Doc. 1677 at ¶ 889.) In light of Defendants' repeated violations of the Court's orders and their continued attempts "to conceal additional past mistreatment of the Plaintiff class as it comes to light in order to avoid responsibility for it," (*id.*,) the Court has the authority to mandate reforms of the MCSO's internal affairs system in order to ensure the MCSO's continued compliance with the Court's permanent injunction (Doc. 606) and to coerce the MCSO's compliance with the Court's previous orders, as well as with orders the Court may enter in the future as the need arises.

### B. Equitable Authority to Modify Injunctions

"A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Swift*, 286 U.S. at 114. "The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). A modification is appropriate when a court, faced with new facts, must make a change "to effectuate . . . the basic purpose of the original" injunction. *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942) (holding a modification making a consent decree more onerous for the enjoined entity to be reasonable where it effectuates the purpose of the original consent decree).

- 6 -

46REPORT000166

Before the Court entered its injunction, Plaintiffs requested provisions "revising the internal affairs division of the MCSO and the investigation and resolution of complaints." (*See, e.g.*, Doc. 603 at Tr. 7.) The Court denied much of the relief sought. (Findings of Fact, Doc. 1677 at ¶ 883.) Neither Plaintiffs nor the Court knew that "the MCSO had deprived the Plaintiffs of considerable evidence of misconduct towards members of the Plaintiff class." (*Id.* at ¶ 884.) Had Defendants disclosed such evidence, Plaintiffs could have demonstrated "the MCSO's inadequate, bad faith, and discriminatory internal investigation policies and practices as well as additional harms." (*Id.* at ¶ 885.) Because Defendants failed to disclose that evidence, the Court was unable "to timely evaluate that evidence in fashioning the appropriate injunctive relief for the Plaintiffs." (*Id.*)

"Had the evidence that Defendants withheld from the Court and the information to which it led been presented at trial, the Court would have entered injunctive relief much broader in scope." (*Id.* at ¶ 890.) It is incumbent upon the Court now, equipped as it is with additional facts, to amend the injunction and grant the relief that would have been appropriate at the time of the original injunction had the MCSO disclosed such evidence in a timely manner, as was their duty.

## C. Civil Contempt Authority

"[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Bagwell*, 512 U.S. at 827. A contempt sanction is "civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'"[3] *Id.* at 829 (quoting *United States v. Mine Workers,* 330 U.S. 258, 303–304 (1947)).

Ensuring that the MCSO has a functional system of investigating officer misconduct and imposing discipline is a remedial measure designed to coerce the MCSO

---

[3] This remedial order only sets forth remedies addressing the MCSO's policies and procedures. To the extent that the parties may stipulate to the principal provisions of an order designed to monetarily compensate the victims of Defendants' contemptuous acts, the Court may issue a subsequent order providing for such compensation.

- 7 -

46REPORT000167

into compliance with the Court's orders. (Findings of Fact, Doc. 1677 at ¶¶ 888–89.) The MCSO must have in place an effective means of imposing discipline upon its own officers in order to ensure that officers do not feel at liberty to disregard MCSO's policies. To the extent that such policies are in place to protect the rights of the Plaintiff class, an effective disciplinary system is an essential component of Plaintiffs' protection. The MCSO's flawed investigations "demonstrate the Defendants' ongoing, unfair, and inequitable treatment of members of the Plaintiff class." (Findings of Fact, Doc. 1677 at ¶ 887.)

## II. FEDERALISM

"[A]ppropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode,* 423 U.S. 362, 379 (1976). Federalism concerns "are highly contextual and must be evaluated on a case-by-case basis." *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 860 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992).

"Where federal constitutional rights have been traduced, . . . principles of restraint, including comity, separation of powers and pragmatic caution dissolve." *Id.* (citation omitted). "Nonetheless, federal courts should always seek to minimize interference with legitimate state activities in tailoring remedies." *Id.* at 861. "In employing their broad equitable powers, federal courts should 'exercise the least possible power adequate to the end proposed.'" *Id.* (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)). However, "when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable." *Id.*

"Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Id.* "[O]therwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Id.* at 862.

Defendants cite *Rizzo*, a case in which the Supreme Court held that a district court departed from the principles that govern injunctive relief, including principles of

- 8 -

46REPORT000168

Case 2:07-cv-02513-GMS Document 3509-1 Filed 06/12/26 Page 169 of 998

federalism, when it "injected itself by injunctive decree into the internal disciplinary affairs of [a] state agency." (Doc. 1715 at 12 (quoting *Rizzo*, 423 U.S. at 380).) The facts of *Rizzo*, however, are diametrically opposed to the facts of the case at hand. In *Rizzo*, the district court had found an unrelated assortment of constitutional violations committed by a few individual rank and file police officers, a problem which the court indicated was "fairly typical of those afflicting police departments in major urban areas." *Id.* at 375. The district court also found that "the responsible authorities [*i.e.*, command staff] had played no affirmative part in depriving any members of the two respondent classes of any constitutional rights." *Id.* at 377. Thus, the Supreme Court held that when the district court attempted to fashion "prophylactic procedures . . . designed to minimize [isolated constitutional violations] on the part of a handful of its employees" without evidence of any unconstitutional plan or policy promulgated by the responsible authorities, the remedy ordered by the district court was "quite at odds with the settled rule that in federal equity cases the nature of the violation determines the scope of the remedy," and moreover, "important considerations of federalism" weighed against the unnecessary intrusion into state affairs. *Id.* at 378 (internal quotation omitted).

The *Rizzo* Court distinguished cases in which the district court found "the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption and enforcement of deliberate policies by the defendants," or a "persistent pattern" that "flowed from an intentional, concerted, and indeed conspiratorial effort" to deprive a class of its constitutional rights. *Id.* at 373–75 (citing *Hague v. CIO*, 307 U.S. 496 (1939) and *Allee v. Medrano*, 416 U.S. 802 (1974)).

Here, the Court found the presence of those exact distinguishing characteristics. In the underlying case, the Court determined that the Defendants were systematically violating the Fourth and Fourteenth Amendment rights of the Plaintiff class in several different respects including the adoption of unconstitutional policies. *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 826–27 (D. Ariz. 2013), *adhered to,* No. CV-07-02513-PHX-GMS, 2013 WL 5498218 (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part,* 784

- 9 -

46REPORT000169

F.3d 1254 (9th Cir. 2015), and *aff'd,* 784 F.3d 1254 (9th Cir. 2015) ("*Melendres* 2013 FOF"). The MCSO continued to adhere to these policies after the Court ruled in 2011 that they violated Plaintiffs' constitutional rights. *See, e.g., id.* at 825 ("The LEAR policy, however, remains in force."); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 994 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

Moreover, and more recently, the Court found in its May 2016 Findings of Fact that "Defendants intentionally failed to implement the Court's preliminary injunction . . . , failed to disclose thousands of relevant items of requested discovery they were legally obligated to disclose, and, after the post-trial disclosure of additional evidence, deliberately violated court orders and thereby prevented a full recovery of relevant evidence." (Findings of Fact, Doc. 1677 at 1-2.) "To escape accountability . . . , Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor." *Id.* at 2. The Court found that Defendants were "manipulating the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class. *Id.* at ¶ 889.

Under the facts of this case, the Court has fashioned remedies which account for and balance the need to respect the prerogatives of state officials with the need to prevent them from exercising their discretion in a way that violates Plaintiffs' constitutional rights and the need to provide a remedy for the past deprivation of those rights. The Court previously fashioned less intrusive remedies, but those remedies were not effective due to Defendants' deliberate failures and manipulations. (*See, e.g.*, *id.* at ¶¶ 365–69.)

46REPORT000170

The Court must do what is necessary to achieve the end goal of "restoring the victims of discriminatory conduct to the position they would have occupied in the absence of that conduct" and eventually restoring authority to MCSO command staff, once there is a "system that is operating in compliance with the Constitution." *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995). Here, the scope of Defendants' constitutional violation is broad; the violation permeates the internal affairs investigatory processes, which have been manipulated to provide impunity to those who violate the rights of the Plaintiff class.[4] (*See* Findings of Fact, Doc. 1677 ¶¶ 387–765.) The remedy, as is determined by the scope and nature of the violation, must reach as far as the violation flows. *Jenkins*, 515 U.S. at 98; *Milliken,* 433 U.S. at 282. "[W]here, as here, a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the condition that offends the Constitution." *Milliken,* 433 U.S. at 282 (internal quotation marks omitted).

As such, "there is no merit to [Defendants'] claims that the relief ordered here violates the Tenth Amendment and general principles of federalism." *Id.* at 291. "The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment." *Id.*

There is also no merit to Defendants' prospective argument that the *Rooker-Feldman* doctrine prevents the Court from reviewing a decision of a merit commission or

---

[4] As the Court has previously observed, the egregious and extraordinary nature of the constitutional violations in this case enhances the scope of the necessary intervention to remedy such intentional conduct. Regardless of whether the MCSO's manipulation of its internal investigations to provide impunity for those who violate Plaintiffs' rights, thereby tacitly authorizing such violations, might itself be a (new) constitutional violation, the Court has found this conduct to be indicative of a scheme to avoid accountability for violating the Court's injunction. (Doc. 1677 ¶¶ 726, 733, 868–75, 889.) The MCSO has chosen to deliberately thwart the effectiveness of the remedies the Court already set forth in this case. As such, Defendants' argument that the MCSO "has not yet had an opportunity to implement remedies in response to the Court's Findings of Fact" misses the point. This case has a long history before May 13, 2016. The remedies the Court sets forth now are responsive to that history of Defendants' evasion, manipulation, and violation of their obligations under the Court's orders, not to any recently discovered constitutional violation.

- 11 -

state court regarding the discipline of an MCSO employee whose conduct has been investigated pursuant to this Court's remedial scheme.

"*Rooker–Feldman* . . . is a narrow doctrine, confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (internal quotation omitted). "The doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002). Moreover, "the rule has long stood that a state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction is subject to collateral attack in the federal courts." *In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir. 2000).

The Court has had exclusive jurisdiction over this case for nine years. To the extent that the Court has ordered remedies that will result in internal affairs investigations of individuals at the MCSO, those investigations stem from this case. The Court has the jurisdiction to see that its orders are followed and that the Plaintiffs' rights are vindicated. *Rooker-Feldman* is inapplicable.

## III. DUE PROCESS

### A. The Arizona Police Officer's Bill of Rights

Arizona has codified a police officer's "bill of rights." A.R.S. §§ 38-1101–1115. Pursuant to this Arizona law, "[a]n employer shall make a good faith effort to complete any investigation of employee misconduct within one hundred eighty calendar days after the employer receives notice of the allegation by a person authorized by the employer to initiate an investigation of the misconduct." *Id.* § 38-1110(A). "If the employer exceeds the one hundred eighty calendar day limit, the employer shall provide the employee with a written explanation containing the reasons the investigation continued beyond one hundred eighty calendar days." *Id.* "On an appeal of discipline by the employee, a hearing officer, administrative law judge or appeals board may dismiss the discipline if it

- 12 -

46REPORT000172

is determined that the employer did not make a good faith effort to complete the investigation within one hundred eighty calendar days." *Id.* § 38-1110(C).

Defendants argue that this state law "creates federally protected constitutional rights because that statutory scheme contains 'particularized standards or criteria' to create a property interest." (Doc. 1729 at 7 (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 369-70 (9th Cir. 1990).) Defendants quoted *Allen* for the proposition that "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 911 F.2d at 369-70.

However, Defendants failed to note that the next paragraph in the *Allen* opinion clarifies that "[w]hether an expectation of entitlement is sufficient to create a property interest will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker]." *Id.* at 370 (internal quotation omitted). The Arizona statute at issue here does not contain mandatory language, as it merely provides that the administrative law judge or appeals board "may" dismiss the discipline, as an exercise of its discretion. A.R.S. § 38-1110.

Moreover, in *Allen*, the plaintiff of a § 1983 action claimed that "his layoff constituted a deprivation of a constitutionally protected property interest without due process of law." *Allen*, 911 F.2d at 369. Even if the plaintiff in that case had successfully made a case that he had a constitutionally protected property right in continued employment (he did not), his constitutional rights could be violated only if he were deprived of such an interest *without due process of law*. Thus, *Allen* does not stand for the proposition that state law can affect what due process itself entails.

Here, the Parties do not dispute that MCSO employees have a property interest in their jobs. Rather, Defendants suggest that the Arizona statute changes what constitutes the due process to which the property interest holder is entitled. That proposition was squarely rejected in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). In

- 13 -

46REPORT000173

*Loudermill*, the Supreme Court stated in no uncertain terms that the answer to the question of "what process is due . . . is not to be found in [an] Ohio statute." *Id.* Nor is it to be found in an Arizona statute. Rather, due process is a matter of settled constitutional law. Due process requires "a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* at 542. MCSO employees will not be denied that.

Thus, the requirement under Arizona law that employers must make a good faith effort to complete investigations within 180 days is not incorporated into the constitutional guarantee of due process. Moreover, where the MCSO deliberately ensured that 180 days passed in order to protect certain employees from *Melendres*-related discipline, dismissing that discipline would impede the vindication of Plaintiffs' constitutional rights. That cannot stand. *Swann,* 402 U.S. at 45 ("[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees.").

### B. Reliance on the Court's Findings of Fact

Any employee subject to an investigation will have a hearing, at which he or she can present evidence and raise a defense. On the other hand, a great deal of evidence was set forth during the 21 days of evidentiary hearings, some of which may be relevant to a given investigation, and this evidence need not be disregarded.

## IV.  GC-17, MCSO'S PRINCIPAL DISCIPLINARY POLICY, APPLIES TO ALL EMPLOYEES

Sheriff Arpaio is the appointing authority over certified employees in the MCSO, and he has unique disciplinary authority over all deputies within the MCSO, according to state law. *See Hounshell v. White*, 220 Ariz. 1, 202 P.3d 466 (App. 2008). The MCSO's principal disciplinary policy, GC-17, applies to all employees and sets out disciplinary matrices that apply to virtually all employees. There is, generally speaking, a disciplinary matrix for regular employees (non-exempt regular status employees) and a slightly more demanding disciplinary matrix for management employees (exempt regular status employees). The disciplinary matrix is slightly more demanding for management

- 14 -

46REPORT000174

employees because, as MCSO policy makes clear, management employees should typically be held to a higher standard of conduct. (Ex. 2001 at MELC416243.) Nevertheless, even for those employees subject to a disciplinary matrix, Sheriff Arpaio, and his designee, Chief Deputy Sheridan, have the authority to ignore the matrix and impose whatever discipline they deem appropriate.

Chief Deputy Sheridan is the highest level management employee within the MCSO. As an employee, he is clearly subject to departmental policy and discipline, and he has previously been a principal or a person of interest in the disciplinary process. Chief Deputy Sheridan is, however, an unclassified employee. Thus, although he is subject to GC-17, there is no specific disciplinary matrix that applies to him. Defendants argue that because there is no specific disciplinary matrix that applies to him, the Court should take greater care, due to federalism concerns, in subjecting his misconduct to evaluation (or re-evaluation) and to potential discipline than it takes with respect to other MCSO employees.

Nevertheless, as the Findings of Fact make clear, Sheriff Arpaio and Chief Deputy Sheridan are the authors of the manipulation and misconduct that has prevented the fair, uniform, and appropriate application of discipline on MCSO employees as that misconduct pertains to the members of the Plaintiff class. Sheriff Arpaio, as an elected official of Maricopa County, however, is not subject to any MCSO disciplinary policy. He is also, of course, an official who is elected by the people of Arizona. Neither of these factors is true with respect to Chief Deputy Sheridan. To the extent that Sheriff Arpaio and Chief Deputy Sheridan have manipulated the Internal Affairs process at the MCSO to ensure that many employees—including Chief Deputy Sheridan—were disciplined in a relatively lenient manner or not at all for violating the rights of the Plaintiff class, a remedy is necessary and within the scope of the Court's authority, as the condition flows from the constitutional violation at issue in this case. *See Milliken,* 433 U.S. at 282.

/ / /

- 15 -

Pursuant to state law, Chief Deputy Sheridan can be disciplined.  His discipline is at the discretion of Sheriff Arpaio.  In light of Sheriff Arpaio's manipulations in this case, the discretion granted to the sheriff by state law does not prevent the Court from ordering that appropriate discipline be imposed, as failure to do so would be an undue impediment of the remedies to which the Plaintiff class is entitled as a result of the deprivation of their constitutional rights.

Due to Sheriff Arpaio and Chief Deputy Sheridan's manipulation of the disciplinary process, the Court has fashioned a remedy in which an independent internal affairs investigator, and an independent disciplinary authority, both nominated by the parties, shall make and review disciplinary decisions for all employees pertaining to the misconduct discussed in the findings of fact.  Those independent authorities are experienced in police discipline and shall have the authority, independent from the Court, to decide discipline.  The Independent Authorities shall apply the disciplinary matrices, but have the authority to disregard the disciplinary matrices in cases in which they provide appropriate justification for doing so.  They shall have the authority to determine the appropriate discipline for Chief Deputy Sheridan.  In doing so they shall approximate MCSO policy as closely as possible.  Because Chief Deputy Sheridan is the highest level management employee within the MCSO, they shall thus apply categories of misconduct and presumptive levels of discipline to him that are no less exacting than those set forth in the disciplinary matrix for exempt regular status employees of the MCSO, in order that Sheridan be "held to a higher standard."  (*Id.*; Ex. 2001 at MELC416243.)

In light of the above, the following procedures and authorities are hereby ordered.  These procedures are numbered consecutively to those set forth in the Court's previous Supplemental Permanent Injunctive orders, (Doc. 606, 670), which are incorporated herewith.

**IT IS HEREBY ORDERED** entering this Second Supplemental Permanent Injunction/Judgement Order as follows**:**

/ / /

- 16 -

46REPORT000176

## XIV. ADDITIONAL DEFINITIONS

160. This Second Supplemental Permanent Injunction incorporates all definitions in the Court's first Supplemental Permanent Injunction (Doc. 606 ¶ 1).

161. The following terms and definitions shall also apply to this Order:

162. "Misconduct" means a violation of MCSO policies or procedures; violation of federal, state, or local criminal or applicable civil laws; constitutional violations, whether criminal or civil; violation of administrative rules; and violation of regulations.

    a. "Minor misconduct" means misconduct that, if sustained, would result in discipline and/or corrective action less severe than a suspension;

    b. "Serious misconduct" means misconduct that, if sustained, would result in discipline of suspension, demotion, or termination;

    c. "Misconduct indicating apparent criminal conduct by an employee" means misconduct that a reasonable and trained Supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

    d. "Internal affairs investigator" means any employee who conducts an administrative investigation of misconduct, including investigators assigned to the Professional Standards Bureau or Supervisors in the employee's Division or Bureau who are assigned to investigate misconduct.

    e. "Preponderance of the Evidence" means that the facts alleged are more likely true than not true.

    f. "Clear and Convincing Evidence" means that the party must present evidence that leaves one with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This standard of proof is higher than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

    g. "Principal" means an employee against whom a complaint of misconduct or

46REPORT000177

wrongdoing has been made and who is a subject of a misconduct investigation.

h. "Tester" means a person who poses as a civilian making a fictitious complaint for assessment purposes.

i. "Class Remedial Matters" means possible misconduct involving members of the Plaintiff class and the MCSO or the remedies to which such class members are entitled as set forth in the Findings of Fact and various supplemental orders of this Court.

**XV.   MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

163.   The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.

164.   All policies, procedures, protocols, training materials, and other material required by this Order are subject to the same process of review and comment by the parties and approval by the Monitor described in Section IV and ¶ 46 of the first Supplemental Permanent Injunction (Doc. 606).

**A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances**

165.   Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures.  The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent

- 18 -

46REPORT000178

that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order. Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.

166. Such policies shall apply to all misconduct investigations of MCSO personnel.

167. The policies shall include the following provisions:

a. Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:

i. No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.

ii. No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.

iii. No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

b. If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or,

- 19 -

46REPORT000179

if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

c. Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.

d. Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.

e. Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.

f. Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.

g. No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.

168. All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates

- 20 -

46REPORT000180

with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.

169. Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.

170. The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.

171. The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.

172. Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.

173. Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.

174. Employees' and applicants' disciplinary history shall be considered in all hiring,

- 21 -

46REPORT000181

promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.

175. As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.

176. The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.

177. There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.

**B.     Misconduct-Related Training**

178. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:

a. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;

b. the particular challenges of administrative law enforcement misconduct

- 22 -

46REPORT000182

investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;

c. properly weighing the credibility of civilian witnesses against employees;

d. using objective evidence to resolve inconsistent statements;

e. the proper application of the appropriate standard of proof;

f. report-writing skills;

g. requirements related to the confidentiality of witnesses and/or complainants;

h. considerations in handling anonymous complaints;

i. relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and

j. relevant state and federal law, including *Garrity v. New Jersey*, and the requirements of this Court's orders.

179. All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.

180. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.

181. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including

46REPORT000183

dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.

182. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.

**C.      Administrative Investigation Review**

183. The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct.   The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.

184. All findings will be based on the appropriate standard of proof.  These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.

185. Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.

186. Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident.  If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made.  The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and

46REPORT000184

reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.

187. The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.

188. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.

189. The Professional Standards Bureau shall administratively investigate:

a. misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and

b. misconduct indicating apparent criminal conduct by an employee.

190. Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.

191. If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately

- 25 -

46REPORT000185

Case 2:07-cv-02513-GMS Document 1765 Filed 07/26/16 Page 26 of 67

notify the Professional Standards Bureau, which shall take over the investigation.

192. The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.

193. When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.

194. The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.

195. Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.

196. Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.

197. The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a

46REPORT000186

qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.

198. To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.

199. The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.

200. In each misconduct investigation, investigators shall:

a. conduct investigations in a rigorous and impartial manner designed to determine the facts;

b. approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;

c. identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;

d. make reasonable attempts to locate and interview all witnesses, including

- 27 -

46REPORT000187

civilian witnesses;

e. make reasonable attempts to interview any civilian complainant in person;

f. audio and video record all interviews;

g. when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

h. make credibility determinations, as appropriate; and

i. attempt to resolve material inconsistencies between employee, complainant, and witness statements.

201. There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

202. Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.

203. If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the

- 28 -

46REPORT000188

mission of an internal affairs investigator is to determine whether any misconduct occurred.

204. Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division). Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau. Reasonable requests for extensions of time may be granted.

205. The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.

206. At the conclusion of each investigation, internal affairs investigators will prepare an investigation report. The report will include:

a. a narrative description of the incident;

b. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report will also include all available identifying information for anyone who refuses to provide a statement;

c. documentation of whether employees were interviewed, and a transcript or recording of those interviews;

d. the names of all other MCSO employees who witnessed the incident;

e. the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations,

- 29 -

46REPORT000189

Case 2:07-cv-02513-GMS   Document 1765   Filed 07/26/16   Page 30 of 67

orders, or other standards of conduct required of MCSO employees;

f.  in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

g.  in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

h.  an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;

i.  if a weapon was used, documentation that the employee's certification and training for the weapon were current; and

j.  documentation of recommendations for initiation of the disciplinary process; and

k.  in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.

207. In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:

a.  the law enforcement action was in compliance with training and legal standards;

b.  the use of different tactics should or could have been employed;

c.  the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and

d.  the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.

208. For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of

46REPORT000190

misconduct in an administrative investigation:

a. "Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;

b. "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;

c. "Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or

d. "Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.

209. For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.

210. For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.

211. If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.

46REPORT000191

212. Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.

213. Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.

214. At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.

215. If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's

46REPORT000192

Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

216. If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

217. The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.

218. The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.

**D. Discipline**

219. The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.

220. To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:

a. establish a presumptive range of discipline for each type of violation;

b. increase the presumptive discipline based on an employee's prior violations;

- 33 -

46REPORT000193

c. set out defined mitigating and aggravating factors;

d. prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;

e. prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;

f. prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;

g. clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;

h. provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;

i. provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;

j. provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;

k. require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and

l. provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.

221. The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.

222. The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the

- 34 -

46REPORT000194

presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.

### E. Pre-Determination Hearings

223. If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.

224. Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.

225. If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.

226. If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.

227. The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination

- 35 -

46REPORT000195

hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:

a. his or her personal opinion about the employee's reputation;

b. the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;

c. whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

228. The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:

a. that decision does not relate to the Sheriff or his designee;

b. the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;

c. the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and

d. the written explanation is available to the public upon request.

**F.    Criminal Misconduct Investigations**

229. Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau. If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the

- 36 -

46REPORT000196

evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.

230. If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority. No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.

231. The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to *Garrity*.

232. The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to

46REPORT000197

different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.

233. If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.

234. If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.

235. If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

236. The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.

**G.     Civilian Complaint Intake, Communication, and Tracking**

237. Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for

- 38 -

46REPORT000198

Case 2:07-cv-02513-GMS   Document 1765   Filed 07/26/16   Page 39 of 67

filing complaints about the conduct of MCSO employees.

238. The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.

239. In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours. The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish.

240. The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.

241. The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.

242. The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches

- 39 -

46REPORT000199

and the offices and gathering places of community groups, to make these materials available.

243. The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.

244. The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.

245. Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.

246. In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:

   a. within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;

   b. when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and

   c. in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.

- 40 -

46REPORT000200

247. Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.

248. The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.

249. The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.

250. The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.

**H.     Transparency Measures**

251. The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:

   a. summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;

   b. aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.);

- 41 -

46REPORT000201

complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;

c. analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;

d. aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;

e. aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;

f. aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa

- 42 -

46REPORT000202

County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and

g. aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.

252. The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.

253. The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:

a. complaint notification procedures were not followed;

b. a misconduct complaint was not assigned a unique identifier;

- 43 -

46REPORT000203

c. investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;

d. deadlines were not met;

e. an investigation was conducted by an employee who had not received required misconduct investigation training;

f. an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;

g. an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;

h. an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;

i. any interviews were not recorded;

j. the investigation report was not reviewed by the appropriate personnel;

k. employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;

l. a final finding was not reached on a misconduct allegation;

m. an employee's disciplinary history was not documented in a disciplinary recommendation; or

n. no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.

**I.      Testing Program for Civilian Complaint Intake**

254.   The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau

- 44 -

46REPORT000204

upon the receipt of a civilian complaint.

255. The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.

256. The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

257. The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.

258. The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.

259. MCSO shall not permit current or former employees to serve as testers.

260. The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:

    a. a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (*i.e.*, in-person, telephonic, mail, and electronic);

    b. the number and proportion of tests in which employees responded inappropriately to a tester;

    c. the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;

    d. the number and proportion of tests in which employees failed to promptly

- 45 -

46REPORT000205

notify the Professional Standards Bureau of the civilian complaint;

e. the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;

f. an evaluation of the civilian complaint intake based upon the results of the testing program; and

g. a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.

## XVI. COMMUNITY OUTREACH AND COMMUNITY ADVISORY BOARD

261. The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.

262. In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities. The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose. The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.

## XVII. SUPERVISION AND STAFFING

263. The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent

46REPORT000206

Injunction.

264. The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.

265. First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.

266. First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise. The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons. If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations. The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.

267. Supervisors shall be responsible for close and effective supervision of deputies under their command. Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.

268. During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to

- 47 -

46REPORT000207

achieve compliance in a timely manner.

## XVIII. DOCUMENT PRESERVATION AND PRODUCTION

269. The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.

270. The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:

   a. promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;

   b. ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and

   c. ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.

271. Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation. Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.

272. The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.

/ / /

/ / /

46REPORT000208

## XIX. ADDITIONAL TRAINING

273. Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.

## XX. COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS

274. In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:

### A. Investigations to be Overseen and/or Conducted by the Monitor

275. The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters. The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.

276. The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.

277. This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288

- 49 -

below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.

278. The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.

279. The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.

280. The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.

281. Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.

282. The Sheriff and/or his appointee may exercise the authority given pursuant to this

- 50 -

46REPORT000210

Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.

283. The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.

284. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions. The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.

285. Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).

286. Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.

287. Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law

- 51 -

46REPORT000211

or MCSO policy to appeal or grieve that decision with the following alterations:

a. When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance. If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.

b. disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.

288. The Monitor's authority over Class Remedial Matters will cease when both:

a. The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.

b. The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.

289. To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.

290. This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a

46REPORT000212

direct relation to the Plaintiff class. The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.

291. The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.

292. To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.

293. The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous order. (Doc. 606 ¶¶ 128, 132.)

/ / /

46REPORT000213

**B.      Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority**

294.   In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (*see, e.g.*, Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated.  (*Id.* at ¶ 904.)

295.   In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.

**1.      The Independent Investigator**

296.   The Independent Investigator shall be Daniel Giaquinto, Esq.  He shall have the authority to:

a. investigate and assess the adequacy of the investigations and the discipline imposed and/or the grievance decisions rendered in those investigations that have been completed by the MCSO and that the Court has deemed to be inadequate.  These investigations include, but are not limited to, the following:

    1. IA #2014-542

    2. IA #2014-543

    3. IA #2014-295

    4. IA #2105-541

    5. IA #2015-018

    6. IA #2014-021

    7. IA#2014-022

    8. IA #2014-544

    9. IA #2014-545

    10. IA #2014-546

- 54 -

46REPORT000214

11. IA #2014-547

12. IA #2014-548

To the extent that he deems reinvestigation to be appropriate, he shall have the authority to reinvestigate such matters, to make preliminary findings, to prepare a report, and to recommend new discipline to the Independent Disciplinary Authority for final findings and, if appropriate, for the imposition of new or different discipline.

b. investigate and assess whether the Findings of Fact demonstrate in his judgment other acts of misconduct which should be investigated and/or brought to the Independent Disciplinary Authority for a disciplinary decision.

297. In performing these functions he shall be entitled to the protections set forth in Doc. 606 ¶ 144.

298. In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class. While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.

299. The Court does not wish to constrain the judgment of the Independent Investigator in identifying any acts of potential misconduct revealed by the Findings of Fact. Nevertheless, without attempting to be exhaustive, the Court provides the following rulings to the Independent Investigator to the extent that the parties have identified uncharged misconduct arising from the Findings of Fact in their previous briefing.

300. The following potential misconduct is not sufficiently related to the rights of the

- 55 -

46REPORT000215

members of the Plaintiff class to justify any independent investigation:

a. Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation.  (Doc. 1677 at ¶ 385).

b. Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation.  (*Id.* at ¶ 816).

c. Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed.  (*Id.* at ¶ 823).

d. Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation.  (*Id.* at ¶¶ 766–825).

301. The following potential misconduct is sufficiently related to the rights of the members of the Plaintiff class to justify an independent investigation should the Independent Investigator deem that such an investigation is merited:

a. The mishandling of internal investigations by Chief Deputy Sheridan, and/or Chief Olsen, Captain Bailey, Sergeant Tennyson, and any other employee who the Independent Investigator determines to have played a role in the deficient internal affairs investigations  that related to misconduct pertaining to members of the Plaintiff class.  Such potential violations include, but are not limited to, the manipulation of timing on investigations to influence discipline, biased decision-making, improper conduct of investigations, and the deliberate or negligent mishandling of investigations, whether criminal or administrative.

b. The knowing misstatements made under oath to the Court by Chief Deputy Sheridan regarding his knowledge of the Court's preliminary injunction.  (*Id.* at ¶ 87).

- 56 -

46REPORT000216

c. The knowing misstatements made under oath to the Court by Chief Deputy Sheridan about his instruction to send out a directive to MCSO commanders regarding the collection of video evidence. (*Id.* at ¶¶ 228–32).

d. The knowing misstatement to the press regarding the 1459 IDs made by Chief Deputy Sheridan on the night the Court ordered those IDs to be transferred to the Court's custody, and Chief Deputy Sheridan's subsequent reaffirmation of those misstatements under oath. (*Id.* at ¶¶ 325–36).

e. The knowing misstatement made under oath by Chief Deputy Sheridan to Chief Anders of the Monitor staff that he did not completely suspend the investigation into the 1459 IDs. (*Id.* at ¶¶ 337–41).

f. Chief Deputy Sheridan's "suspension" of the investigation into the existence of the 1459 IDs in an unsuccessful attempt to avoid the Court's multiple orders requiring their disclosure. (*Id.* at 294–348).

g. Captain Bailey's intentional misstatements of fact to the Monitor regarding the 1459 IDs in an attempt to conceal their existence. (*Id.*)

h. Chief Trombi's misstatement to Special Investigator Vogel under oath that Chief Sands had directed that Deputy Armendariz not be transferred out of the Human Smuggling Unit. (*Id.* at ¶¶ 517, 521).

i. Property that may have been improperly seized or inventoried and that has not been investigated to date. (*See, e.g.*, *id.* at ¶ 720.)

j. The violation of the Court's May 14, 2014 order by Chief Deputy Sheridan.

k. The untruthful statements made by MCSO personnel that they were collecting IDs for use in formalized training courses. (*Id.* at ¶¶ 630, 638.)

l. Detective Frei's mishandling of property and his attempt to destroy such property. (*Id.* at ¶¶ 699–700.)

302. To the extent that the Independent Investigator identifies other matters that should be investigated or reinvestigated, he shall indicate to the parties and the Monitor, in writing, the subject of such investigation and the likely principals. These

- 57 -

46REPORT000217

designations shall be filed under seal and shall be kept confidential by the parties. To the extent the Court has not already made the determination, the Independent Investigator shall also designate whether or not he believes that such matters are sufficiently related to the rights and remedies to which the members of the Plaintiff class are entitled so as to be within his jurisdiction. Alternatively, he may request the Court to make that designation by written notice filed under seal with the Court and provided to the parties. In the event that the Independent Investigator makes the designation, any party may appeal to the Court the Independent Investigator's designation within seven days of receiving notice of it.

303. To the extent possible, the Independent Investigator shall conduct his investigations in compliance with the best investigative practices and in compliance with the processes and standards set forth in this Order governing the operations of MCSO's Professional Standards Bureau.

304. In preliminarily determining charges and discipline, the Independent Investigator shall apply the two disciplinary matrices attached to GC-17 to the appropriate MCSO employees. To the extent that an MCSO employee is a non-classified employee, and is thus subject to the MCSO disciplinary policy GC-17 but not subject to an applicable disciplinary matrix, the Independent Investigator shall apply a level of discipline that is no less than that specified for those classified employees within the MCSO that share similar job functions as the non-classified employee. For example, Chief Deputy Sheridan, who has the highest command position of any employee within the MCSO, but who is an unclassified employee, shall be subject to a level of discipline no less than that indicated by the disciplinary matrix for exempt regular status employees. (*See, e.g.*, Ex. 2001 at MELC416243 (MCSO disciplinary policy establishing that MCSO management employees are subjected to a higher standard of discipline than non-management employees: "Regular status exempt employees typically hold a management position, and therefore, are held to a higher [disciplinary] standard.").)

46REPORT000218

305. When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of offense.

306. In applying the disciplinary matrix to determine the possible range of discipline in new investigations or reinvestigations, the Independent Investigator is obliged to determine the number of prior offenses that have been sustained against the principle. In making this determination, he may rely on the past disciplinary decisions made by the MCSO even if the investigation was deemed inadequate or invalid by this Court. Alternatively, if he deems it appropriate, the Independent Investigator may re-investigate or recalculate whether past separate discipline should or should not have been imposed in determining the possible range of discipline for a new or reopened offense. To the extent that the Independent Investigator determines that the appropriate categorization of an offense within the disciplinary matrix would require the reassessment of past misconduct which the employee either did not receive but should have, or did receive but should not have, he shall calculate whether the employee would or would not have received past discipline had the MCSO applied the appropriate standard of care for internal affairs operations prevailing in police agencies of MCSO's size. Should that require a determination of liability for alleged misconduct that is not related to the rights of the members of the Plaintiff class, the Independent Investigator may seek guidance from the Court if necessary.

307. The Sheriff and the MCSO's cooperation with such assessments and reinvestigations are required. The Sheriff shall insure that the Independent Investigator and each of the investigators or members of his staff are given timely and complete access to MCSO documents, employees, information, and resources in conducting his assessment and investigations, in making his reports, and in pursuing his other activities under this Order. The Sheriff shall also provide any necessary facilities or resources to hold necessary interviews, provide appropriate

46REPORT000219

notices, and/or conduct hearings.

308. The Independent Investigator should operate as efficiently and expeditiously as possible. He may therefore employ the four persons whose resumes he has submitted to the Court as investigators on his team. He may, if he deems it necessary, engage additional qualified investigators to assist him in timely completing whichever investigations he deems fit. The County will pay his reasonable expenses and the reasonable expenses of his staff, as well as reasonable lodging, meal, travel, administrative, and other necessary expenses. The Independent Investigator may enter into a contract with the County governing his services if he wishes to do so. Otherwise, he should provide monthly bills for his services to the County, and shall be promptly paid for his services. The Court will resolve any disputes between the Independent Investigator and the County about what is reasonable. Should the Independent Investigator or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

309. The Independent Investigator is authorized to prioritize the investigations in light of what he believes to be their relative gravity and their relative merit. In determining the extent to which additional investigation is necessary or advisable, the Independent Investigator is authorized to refer to any of the work that has preceded his appointment in this matter including but not limited to: (1) the Court's Findings of Fact, (2) the evidence, testimony and statements offered at the evidentiary hearing or in other Court proceedings, (3) the investigative interviews conducted by the MCSO, as well as all materials generated in their underlying reports and hearings, including the reports, interviews and evidence identified by Special Investigator Don Vogel who was the MCSO's investigator in IA #2014-542 and IA #2014-543, the interviews undertaken by the Monitors, as well as the parties' responses to the Monitor's inquiries for documents and the underlying discovery provided in this matter.

- 60 -

46REPORT000220

310.   The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information.   The Monitor and the Independent Investigator may communicate to coordinate their investigations.   Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.

311.   To the extent that legal questions arise on which the Independent Investigator needs a determination, he can apply to the Court for such a determination after serving the Court and the parties with the request.

312.   If any other matters arise on which the Independent Investigator needs to request that the Court enter an order, he may apply to the Court for such an order in writing served to all the parties.   In the writing, he should specify the reason for the request and the remedy sought.

313.   Except as otherwise indicated in this order, the Independent Investigator has the sole authority to determine whether reinvestigations or new charges arising from the Findings of Fact should or should not be pursued.   The Independent Investigator has the right to consider the severity of the misconduct, its apparent merit, the practicality of bringing charges, and the expense of pursuing such charges in making this determination in accord with how such determinations would be made by a responsible internal affairs unit within a police agency of the similar size to the MCSO.   Similarly, with the exceptions specified, the Independent Investigator has the authority to reopen investigations, pursue new investigations, make preliminary findings of fact, bring charges against an employee, and recommend to the Independent Disciplinary Authority that a particular level of discipline be imposed.

314.   Any decision not to pursue charges shall be explained in writing to the parties.

315.   For those charges he brings to the Independent Disciplinary Authority, the Independent Investigator shall prepare thorough reports setting forth the basis for

46REPORT000221

his findings of fact and his recommended discipline.

316. To the extent the Independent Investigator's recommended findings or discipline depart from procedures set forth in this Order, or from the disciplinary matrices, the Independent Investigator shall explain the basis for his recommended departure(s) in writing.

317. Such decisions are not appealable by the parties, and they cannot be countermanded by the Sheriff or the MCSO, with the caveat that the Independent Disciplinary Authority shall make the final decision with respect to liability and discipline for all charges of misconduct brought by the Independent Investigator regardless of whether such preliminary charges are for minor or serious discipline. Nevertheless, the Independent Disciplinary Authority must provide an opportunity to be heard only to those employees who may be subject to a level of discipline that requires such a hearing.

318. To the extent the Independent Disciplinary Authority desires the Independent Investigator's presence at a pre-determination hearing, the Independent Investigator shall be present to participate to the extent directed.

319. To the extent the Independent Investigator encounters evidence of conduct that he believes should be the subject of a criminal investigation, he shall inform the Commander of the Professional Standards Bureau in compliance with ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then report the matter directly and confidentially to the appropriate prosecuting agency. The Independent Investigator shall then coordinate the administrative investigation with the criminal investigation consistent with the manner set forth in ¶¶ 229–36 above. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Independent Investigator shall report the matter directly and confidentially to the appropriate prosecuting agency without discussing it with the Commander of Professional Standards Bureau.

/ / /

- 62 -

46REPORT000222

## 2. The Independent Disciplinary Authority

320. The Independent Disciplinary Authority shall be Daniel Alonso. The Independent Disciplinary Authority shall hold hearings required by law and policy, and make liability and disciplinary determinations with respect to all charges that are brought to him by the Independent Investigator. In performing these functions he shall be entitled to the protections set forth in Doc. 606 ¶ 144.

321. The Independent Disciplinary Authority should operate as efficiently and expeditiously as possible. He may employ associates to the extent that they are necessary in documenting his decisions or holding pre-determination hearings. The County will pay his reasonable expenses and the reasonable expenses of his staff, as well as reasonable lodging, meal, travel, administrative, and other necessary expenses. The Independent Disciplinary Authority may enter into a contract with the County governing his services if he wishes to do so. Otherwise, he should provide monthly bills for his services to the County, and shall be promptly paid for his services. The Court will resolve any disputes between the Independent Disciplinary Authority and the County about what is reasonable. Should the Independent Disciplinary Authority or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

322. The Independent Disciplinary Authority will be the final arbiter of the facts and will decide which acts of misconduct, if any, the sustained facts establish. If the facts establish misconduct, it is the duty of the Independent Disciplinary Authority to determine the level of discipline to be imposed on the employee.

323. Should the Independent Disciplinary Authority or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

324. Any legal questions that go beyond the above determinations should be forwarded in writing by the Independent Disciplinary Authority to the Court for

- 63 -

46REPORT000223

determination with copies to other parties.

325. Should he deem minor discipline appropriate, he shall write the written reprimand and direct that it be placed in the employee's file.

326. If the Independent Investigator makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, the Independent Disciplinary Authority will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.

327. Consistent with the applicable law, the Independent Disciplinary Authority shall provide notice through the Sheriff's office or otherwise to any employee who has a right to be heard. The Sheriff shall promptly provide the Independent Disciplinary Authority with the resources, information, and access necessary to provide such notice to MCSO employees and to schedule such hearings in conjunction with the Independent Investigator.

328. The Sheriff shall ensure that the Independent Disciplinary Authority and the members of his staff are given timely and complete access to MCSO resources, personnel, and facilities. The Sheriff shall provide complete and full access to any other resources to hold necessary interviews, provide appropriate notices, and/or conduct hearings.

329. Pre-determination hearings will be audio and video recorded in their entirety, and the recordings shall be maintained with the administrative investigation file.

330. If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the Independent Investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Independent Investigator shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the

46REPORT000224

Independent Investigator's initial misconduct investigation.

331.  If the Independent Disciplinary Authority does not uphold the charges recommended by Independent Investigator in any respect, or does not impose the Independent Investigator's recommended discipline and/or non-disciplinary corrective action, the Independent Disciplinary Authority shall set forth in writing his justification for doing so.   This justification will be appended to the investigation file.

332.  The Independent Disciplinary Authority should apply the disciplinary matrix, and any decision not to do so shall be justified in writing.

333.  The Independent Disciplinary Authority may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:

   a.  his or her personal opinion about the employee's reputation;

   b.  the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;

   c.  whether others were jointly responsible for the misconduct, except that the Independent Disciplinary Authority  may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

334.  The Decisions reached by the Independent Disciplinary Authority shall be final.

335.  Except as otherwise specified in this order, no party has the right to appeal the decisions of either the Independent Investigator or the Independent Disciplinary Authority.  The Sheriff shall implement those decisions.

336.  Neither the Sheriff nor his designee has any authority to rescind, revoke, or alter any disciplinary decision made by either Independent Investigator or the Independent Disciplinary Authority by grievance decision, appeal, directive, or otherwise.

337.  Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the

46REPORT000225

imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:

a. When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure. Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance. If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.

b. A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right. The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat. Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct. In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class. As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants. As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court. In this rare

- 66 -

46REPORT000226

instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO.   If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.

Dated this 25th day of July, 2016.

_____
Honorable G. Murray Snow
United States District Judge

- 67 -

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>and<br><br>United States of America,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Paul Penzone, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**AMENDED\***<br>**THIRD SUPPLEMENTAL PERMANENT INJUNCTION/ JUDGMENT ORDER**<br><br>(\*Page 1, Line 9, Title Change Only) |

This Order resolves the pending Order to Show Cause. (Doc. 2681.) It also resolves Sheriff Paul Penzone's Motion to Modify Second Order. (Doc. 2647.) For the following reasons, the Court finds Sheriff Paul Penzone in civil contempt and sets forth appropriate curative orders. Those curative measures include granting his motion to Modify Second Order (Doc. 2647) in part and denying it in part.

**Contempt Findings**

In 2016, this Court found that the MCSO manipulated the timing of investigations brought to it to impose either no discipline or less serious discipline on its deputies in those cases in which discipline was warranted. (Doc. 1677 at ¶¶ 574-583); (Doc. 1765 at 2.)[1]

---

[1] It further found that other investigations were delayed to avoid the Court's efficient review of those investigations. (Doc. 1677 at ¶¶ 729-33.)

46REPORT000228

This delaying tactic was possible because, pursuant to its internal procedures and then-existing state law, the MCSO could not impose discipline on a deputy if the investigation of the alleged misconduct took longer than four months.[2] It was thus easy to exonerate a deputy accused of misconduct by merely failing to timely investigate his or her misconduct.

At that time, the Court found that in many other respects the MCSO had engaged in biased and faulty investigations. To remedy that conduct, the Court required that the Sheriff provide that "all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated." (Doc. 1765 at ¶ 163.) It further required that the Sheriff and MCSO "conduct objective, comprehensive and timely administrative investigations of all allegations of employee misconduct." (*Id.* at ¶ 183.) Specifically, Defendants were required to complete administrative investigations within 85 calendar days of the initiation of the investigation by PSB and 60 calendar days for investigations conducted in the Divisions. (*Id.* at ¶ 204.)

Nevertheless, since the Court entered that order the Defendants have continually failed to complete their investigations in a timely manner. The MCSO has been aware that adequate staffing has been an issue with PSB since at least 2017. (Doc. 2167 at ¶ 175). In 2018, two years after the Court entered its order, the average closure of a case took 204 days—about two and a half times the maximum permitted by this Court's order. This, in itself, violated the Court's order and state law. That number, however, continued to increase. In 2019 the average closure ballooned to 499 days and 552 days in 2020. (Doc. 2569 at ¶ 194.) In 2020, the Monitor found that MCSO had filled only one of the eleven positions approved for PSB in the 2018 budget. (Doc. 2594 at ¶ 193.) The Monitor thus found MCSO in non-compliance with paragraph 195's personnel requirement and paragraph 204's timely investigation requirements in its November 2020 and February 2021 reports. (Docs. 2569, 2594.) In these reports the Monitor noted the continuing failure to staff up the PSB even with budgeted positions. As the report stated, "PSB continued to

---

[2] Close to the time that the Court entered its order, the Arizona Legislature extended the statutory deadline for law enforcement agencies to complete internal investigations from 120 to 180 days. A.R.S. § 38-1110(A).

46REPORT000229

note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if [positions authorized in the 2018 budget that had not been filled] were added, the Bureau would still be insufficiently staffed to meet its responsibilities." (Doc. 2594 at ¶ 195.) The Monitor explained, "we have previously noted, hiring of civilian personnel is a positive step, but their hiring will not address what is an unacceptable failure to properly staff PSB with an adequate number of investigators to comply with the order." (*Id*. at ¶ 195.) The Monitor thus held the MCSO as being out of compliance with ¶¶ 195 and 204 of this Court's order. (*Id.* at ¶¶ 195, 204.) This pattern continued and worsened. The Court entered its Order to Show Cause ("OSC") why Defendants should not be held in contempt in August of 2021. (Doc. 2681.) Prior to entering the Order, the Court noted that "[r]ather than taking the necessary substantive steps to resolve the backlog and process the complaints within the time period specified by the Order, however, the MCSO has repeatedly granted itself . . . extensions . . . while the backlogs continued to increase." (Doc. 2576 at 2.)

After reviewing the briefing and while setting the OSC hearing the Court noted that, even if it accepted all of the Defendants' responses to the OSC as true, it would hold Sheriff Penzone in contempt. (Doc. 2657 at 14.) Thereafter, the parties commendably agreed to use the show cause hearing to focus on remedies for the contempt, and a Management Expert was retained to recommend how to proceed. (Doc. 2663 at 2.)

The Court thereafter withheld any formal finding of contempt to determine whether the Defendants would take remedial steps with respect to the backlog while it awaited the Management Expert's Report. To be sure, the Monitor and the Management Expert both report that the internal investigations in which MCSO does engage are well done and well-intentioned. (Doc. 2790 at 10-11.) The Management Expert indicated that the MCSO was cooperative with him in his investigations and evaluations. (*Id.* at 4.) Yet, during the time that the Management Expert has been preparing his recommendations, the existing investigator vacancies in the PSB have remained unfilled, and the timeline to complete an investigation has grown to approximately 600 days per investigation. (Doc. 2802-1 at 5.)

- 3 -

46REPORT000230

For full administrative cases involving sworn personnel, the timeline to complete an investigation is now apparently in excess of 800 days. (Doc. 2810 at 43.) MCSO now has 2,137 pending investigations. (Doc. 2801-1 at 3.) Each of its investigators, on average, complete 17 investigations a year. (Doc. 2810 at 5.) The failure to complete investigations in a timely manner has become so extreme as to render investigations completely ineffectual and render no service to either the complainant or MCSO personnel. The Management Expert confirmed the Court's calculation that at the present rate that the investigative staff is clearing complaints, coupled with the rate at which uninvestigated complaints are accruing, it would require 117 case investigators to clear up the caseload over the next two years. (Doc. 2810 at 5-6.)

Further, newly-amended state law now provides protection for MCSO personnel who have been involved in delayed investigations by mandating the dismissal of the complaint after one year from its filing. A.R.S. § 38-1110(A). While the new state law protects deputy sheriffs who are innocent but accused of misconduct from protracted investigations, it does nothing to protect the interests of those members of the public, including members of the Plaintiff class, who have a basis for filing such complaints. It simply dismisses them. While the new statute apparently assumes that all internal investigations should be completed within 180 days, and only rarely should take longer than that, it does nothing to protect the complaining parties from a deputy's misconduct, or to cure that misconduct, if the agency merely delays the investigation more than one year, whether through bad faith or otherwise. It was precisely the manipulation of such otherwise reasonable time constraints that resulted in the MCSO's abuses and led to the Court's imposition of the time limits on investigations more than six years ago. In the Court's view, the new statute does not prevent the Sheriff from complying with the terms of this Court's previous orders for all outstanding investigations. If the parties feel otherwise, they must raise the issue with the Court.

Sheriff Penzone's non-compliance with ¶¶ 195 and 204 of the Second Order have been knowing and continuous. To be sure, Sheriff Penzone has had at least some difficulty

- 4 -

46REPORT000231

in implementing the Court's orders in the present environment. Nevertheless, he does not demonstrate that he has taken all reasonable steps to comply with the order, especially as the backlog has increased. The backlog, despite Sheriff Penzone's knowledge of it, only gets worse. It may be that Sheriff Penzone welcomes this Court's intervention by way of contempt remedies to cure that backlog. In any event, he leaves the Court with few options for obtaining compliance with its orders. Thus, the Court holds the Sheriff in civil contempt.

The Court has the authority to enter civil contempts in such cases and to compel appropriate remedial measures. *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (affirming a court's authority to enter a contempt order with sanctions designed to bring San Francisco's jail population levels in line with its previous order). "[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Int'l Union Mine Workers of Am. V. Bagwell*, 512 U.S. 821, 827 (1994). A contempt sanction is "civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'" *Id.* at 829 (quoting *United States v. Mine Workers*, 330 U.S. 258, 303-304 (1947)).

The Court's mechanism imposing fines as a result of the contempt will coerce Defendants to appropriately support their compliance efforts. The fines are reasonable in light of Defendants' continued contumacy, and the unique structure of the fines (a "PSB Staffing Fund") ensures that any fines imposed will help Defendants comply with the Court's orders.

To determine the appropriate size and duration of a civil contempt fine designed to coerce compliance, the Court considers "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983) (quoting *United Mine Workers of Am.*, 330 U.S. at 304); *see also Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 514 (9th Cir. 1992) (affirming a $10,000

- 5 -

46REPORT000232

daily fine as properly tailored to coerce compliance "[b]ecause the district court considered the harm threatened and the effectiveness of prior injunctive relief in setting the amount"). Here, the character and magnitude of the harm to Plaintiffs, the general public, and MCSO personnel posed by Defendants' violations establishes the need for a substantial fine. Although MCSO command staff have known about the violations for years, the backlog continues to grow, and MCSO has not taken meaningful steps to address it.

The Court's fine structure is also highly likely to bring MCSO into compliance. Defendants can avoid paying fines by filling vacant positions at PSB, engaging contractors to staff PSB, and steadily decreasing the backlog. The Court expects MCSO to decrease the backlog at a reasonable rate – at least 20 cases each month. This rate roughly approximates the rate at which the backlog has grown under MCSO's current leadership. (*See* Doc. 2790 at 5.) And, even if Defendants clear the backlog at that rate, it will still take years to clear it. If Defendants are unable to avoid paying the fines, they may use the fines to help cure their violations by hiring additional staff, increasing investigators' salaries, and paying investigators incentives.

Therefore, to protect the interests of the Plaintiff class (let alone the general public), in ensuring that investigations are completed in sufficient time to administer discipline, the Court will require that the MCSO come into compliance with its reasonable investigative protocols. It thus enters the following remedies:

**Remedies**

The paragraphs in the remainder of this Order are numbered as to continue from the numbered paragraphs in the Second Amended Second Supplemental Permanent Injunction Order (Doc. 1765).

338. Within 14 days from the date of this order, MCSO will calculate and provide the Court and the parties with the dollar amount required to recruit, hire, train and compensate for one year a single PSB budgeted sergeant position.

339. MCSO must not reduce the staffing levels at PSB below the minimum investigator staffing number identified in ¶ 340 while a backlog in investigations remains.

46REPORT000233

340. Within 60 days from the date of this order, MCSO will fill the seven currently budgeted, yet vacant, positions at PSB referred to in Mr. Gennaco's report, through hiring or internal transfers. (Doc. 2790 at 15.) The staffing referred to by Mr. Gennaco, together with the full staffing of the vacant positions, is 39 investigators. This is the minimum investigator staffing number. If MCSO fails to fill any one of the seven vacant budgeted staffing positions with an AZPOST sworn investigator who is approved by the Monitor within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators. It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum investigator staffing number.

341. If MCSO desires to fill the positions with new civilian investigators in lieu of sworn officers, it may do so to the extent that it is authorized to do so, consistent with state law. Should it fail to fill any one of the seven vacant positions within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators. It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum staffing number.

342. If the MCSO attempts to fill these open positions with a mix of qualified sworn personnel and civilian investigators, it may do so to the extent that it can, consistent with state law. Nevertheless, if it fails to fill any one of the seven vacant positions within 60 days, the MCSO and/or Maricopa County will pay into the PSB Staffing Fund three times the amount identified in ¶ 338 above for each vacancy remaining. It shall, thereafter on a monthly basis pay three times the amount identified in ¶ 338 above for every month that the number of PSB investigators falls below the

- 7 -

46REPORT000234

minimum staffing number.

343. MCSO is authorized to conduct PSB investigations through approved private contractors if it can do so consistent with state law.

344. MCSO must demonstrate that it is using overtime and other administrative tools to increase the personnel hours committed to investigate all types of complaints. MCSO shall report its use of these tools to the Monitor on a monthly basis.

345. MCSO and/or Maricopa County shall hereby establish a PSB Staffing Fund, which shall be a separate account of the MCSO. The amounts set forth in ¶¶ 340-42 shall be paid directly into this account. The MCSO, however, is only authorized to withdraw funds from this account for the hiring and payment of PSB investigators or private investigators contracted with PSB who are in compliance with the requirements of state law. The fund may also be used to hire necessary additional PSB administrative staff and necessary additional PSB supervisory staff only, and for no other purpose. MCSO is not permitted to offset the amount of any fine from PSB's existing budget or use it to subsidize the number of PSB staff and investigators existing at the time of this Order. MCSO shall provide an accounting of the PSB Staffing Fund on a monthly basis to the Monitor and the Court. But, if necessary, MCSO is permitted to augment and/or exceed the salary and incentives normally paid PSB investigators to hire and/or maintain sufficient investigators, whether sworn or civilian, to reduce the backlog.

346. The Court hereby vests the Monitor, Robert Warshaw, with the supplemental authorities set forth in this Order.[3] The Monitor therefore has immediate authority

_____

[3] The Court is aware of the concern of the Plaintiffs and Plaintiff-Intervenor that expanding the Monitor's duties to include those of the Constitutional Policing Authority as recommended by Mr. Gennaco might, in some way, compromise the Monitor's responsibilities under ¶ 126 of the Supplemental Permanent Injunction. The Court also shares MCSO's concern about the length of time necessary to develop a new role, hire a "CPA," and bring that individual up to speed in time to efficiently implement the curative reforms set forth below. The Court is aware of the massive existing backlog, and the need to timely correct that backlog. The Court also notes that the requirements of this Order, in many respects, track over the same territory that the Monitor and the parties have already

46REPORT000235

to oversee all of MCSO's complaint intake and routing. The Court hereby vacates any previous order that conflicts with this Order, including but not limited to ¶ 292 of the Second Order (Doc. 1765). In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases. The Monitor must consult with the PSB Commander about these policy decisions but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

347. The Monitor shall revise and/or formalize MCSO's intake and routing processes. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

348. The Monitor will evaluate PSB's current investigative practices. The PSB, under

_____

been over ad nauseum. (*See, e.g.*, Doc. 1765 at ¶¶ 163-167.) It therefore determines to assign the responsibilities set forth in Mr. Gennaco's report to the Monitor.

- 9 -

46REPORT000236

the authority of the Monitor, shall create, and submit for the Monitor's approval, policies and procedures that:

(a) Identify and eliminate unnecessary investigative requirements that may be removed from particular classes of cases;

(b) Provide for the establishment of an investigative plan for each investigation to eliminate unnecessary steps for the investigation of the complaint at issue;

(c) Establish formal internal scheduling expectations and requirements for supervisory interventions;

(d) Establish expectations on the timeline for each step of the review process. The formulated expectations will be consistent with the timeline requirements of this Court's previous orders;

(e) Assess current use of IA Pro as a case management/tracking tool.

349. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If a backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor. Given that the parties have provided the Monitor with feedback on these issues, the Monitor is directed to consider the input already articulated by the parties on these issues and determine, at his discretion, to adopt them or not. The Monitor may choose, but will not be required, to seek additional input from the parties in the development of the above stated policies. The Monitor shall finalize and submit such policies to the Court within four months of the date of this order. The parties shall have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, if necessary thereafter, make determinations as to the final policies.

350. The Monitor will assess MCSO's compliance with the investigative requirements of this order and shall determine whether training on investigative planning and supervision is needed and implement such training.

351. The Monitor has the authority to make recommendations to the Court concerning

- 10 -

46REPORT000237

the revision of the Court's orders as it pertains to the investigation of complaints where, in its opinion, such revisions would increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency.

352.  The Monitor may intervene in the course of any investigation for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog, if he deems it appropriate, and will document his actions in a quarterly report to be submitted to the Court.  The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog.  If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

353.  The Monitor shall recommend to the Court adjustments in the investigations of the following categories of cases according to the following procedure:

MCSO shall, upon the approval of the Monitor:

(a) Create, formalize, and implement a policy regarding whether investigations are necessary when the complaint was submitted to the MCSO more than a year after the last instance of the underlying alleged misconduct reported, or when the MCSO employee involved left MCSO's employ prior to the filing of the complaint.

(b) Create, formalize, and implement a policy regarding when investigations are necessary if the initial complainant is unwilling or unable to cooperate, or if the initial complainant is anonymous.

(c) Create, formalize, and implement a policy regarding when MCSO may investigate health related in-custody jail deaths by County medical staff.

(d) Create, formalize, and implement a policy regarding when an entity other than PSB may investigate internal allegations emanating from workplace relationships.

(e) Create, formalize, and implement a policy regarding when, in cases in which

- 11 -

46REPORT000238

external evidence establishes a violation, the PSB Commander has the discretion to offer principals a mitigated penalty if they accept responsibility. The mitigated penalty shall be no lower than the minimum discipline within the applicable discipline matrix range for the charged offenses.

(f) Create, formalize, and implement a policy regarding when the PSB commander is authorized to handle the alleged minor misconduct through supervisory intervention in lieu of investigation. MCSO shall submit to the Monitor within 15 days, a list of the minor misconduct within the GC-17 (Disciplinary Matrix) which it deems should be considered by the Monitor to be handled as a supervisory intervention. MCSO's list shall exclude allegations concerning the Plaintiff class and allegations of bias.

In proposing such policies to the Monitor, the MCSO shall fully and openly consult with the other parties to this litigation. All parties shall move expeditiously to formulate, consult with, and approve these policies. MCSO and the parties shall complete and submit to the Monitor for approval all such proposed policies within three months of this order. As to those issues on which the parties cannot obtain consensus, they shall each submit their proposals to the Monitor. The Monitor shall then, promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, thereafter, make determinations as to the final policies.

354. To the extent that the policies require implementation plans or address deadlines, the Court shall approve these after they are submitted by the Monitor.

355. The Monitor and the PSB shall review the cases in the current backlog that are eligible to be diverted from PSB investigations by ¶ 353 of this order. It is the expectation of the Court that the diverted cases shall reduce the current backlog.

356. Within five business days of the elimination of these cases from the backlog, the Monitor shall certify to the parties and the Court the number of administrative investigations remaining in the backlog that are open and have not been completed

46REPORT000239

within the time limits required by the Court. At the beginning of each month, the number of open cases whose investigations have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed shall be the remaining backlog. This backlog shall not include any cases for which the Monitor has granted an extension of the investigative deadline pursuant to ¶ 365 of this Order.

357. The cases in this remaining backlog should be identified by year, giving priority to the oldest cases, i.e., the cases that were filed first. The expectation should be to address the oldest cases first, without ignoring the continuing caseload. For each month in which the PSB cannot reduce the remaining backlog by 20 cases from the previous month's number, the MCSO and/or Maricopa County shall pay into the PSB Staffing Fund two times the amount identified in ¶ 338 above.

358. Maricopa County has requested that the Court relax its investigative timeline to be consistent with state law. The Court shall only consider doing so, when significant progress is made towards the reduction of the backlog.

359. The MCSO and/or Maricopa County shall pay all reasonable costs of the Monitor, consistent with ¶ 123 of the Supplemental Permanent Injunction. The Monitor is free from any liability for such matters as set forth in ¶ 144 of the Supplemental Permanent Injunction.

360. The Monitor shall submit a quarterly progress report to the Court and parties describing the rationale for each type of investigative diversion approved, the result of each diversion type, the backlog tally, the number of completed cases, unresolved issues, and further actions required to address the backlog and staffing levels at PSB.

361. Under the direction of the Court, MCSO shall commission an independent study to determine: (1) the most efficient way for MCSO to allocate its personnel in light of existing authorized staffing levels, the requirements and expectations of its served communities, the requirements of this Court's Orders, the timely elimination of the existing backlog of PSB investigations, and state law; (2) the necessary staffing level for MCSO to fulfill these obligations regardless of the existing staffing level;

- 13 -

46REPORT000240

and (3) the PSB staffing level required to maintain the timely completion of PSB investigations in compliance with the Orders of this Court and state law. MCSO shall (1) provide a draft Request for Proposals to the Court, the Monitor, and the parties; (2) disclose credible bids to the Court, the Monitor, and the parties; and (3) obtain Court approval of the methodology for the study. MCSO must ensure that the study is completed within one year of the entry of this Order.

362. The Court is aware that the MCSO has already engaged a consultant to undertake a similar evaluation. Nevertheless, while the Court will consider both the qualifications of the consultant already hired by MCSO and the outcome of that study, the work of that consultant must comply with the Court's requirements, *supra* and will not be deemed to satisfy the terms of this Order absent the approval of this Court. If MCSO wishes to obtain Court approval of the consultant it has already hired, it must, as a prerequisite, provide the contracting documents to the Court, the Monitor, and the parties within five business days of the entry of this Order; and it must submit the consultant's draft methodology to the Court, the Monitor, and the parties within 30 days of the entry of this Order.

363. MCSO is required to provide access to personnel, documents, and facilities as mandated by ¶ 145 of Doc. 606 so that the Monitor can perform his newly expanded duties.

364. To keep the parties and the Court informed, the MCSO shall report monthly on the size of the backlog to the Monitor, the parties, and the Court. The Monitor's quarterly progress report will further assess the status of the backlog.

365. The authority for MCSO to grant itself extensions in investigation deadlines granted in ¶ 204 of Doc. 1765 is revoked. The Monitor shall be authorized to grant reasonable extensions upon reviewing requests submitted to him by the Sheriff.

366. At any time after the Monitor's submittal of its second quarterly progress report, the Court may revisit the contents of this order and make any changes it deems appropriate.

- 14 -

46REPORT000241

367. Should the Sheriff perceive any conflict between this order and the requirements of state law, the Sheriff shall immediately raise the potential conflict with the Court by motion.

368. MCSO will continue to pay into the PSB Staffing Fund pursuant to ¶ 357 until MCSO reports for twelve continuous months that it has no open investigations that have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed. At that time, MCSO may petition the Court to dissolve the PSB Staffing Fund.

**IT IS THEREFORE ORDERED** granting Defendants' Motion to Modify Second Order (Doc. 2647) in part and denying it in part.

Dated this 30th day of November, 2022.

_____
G. Murray Snow
Chief United States District Judge

- 15 -

46REPORT000242

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **ORDER** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Paul Penzone, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

Paragraph 348 of this Court's November 30, 2022 Amended Third Supplemental Permanent Injunction Judgment Order (Doc. 2830) required the Monitor to evaluate PSB's current investigative practices. It then required the PSB, under the authority of the Monitor, to create and submit new policies and procedures related to MCSO's internal investigations. These policies and procedures were to include among other things: the required creation of investigative plans, scheduling expectations, requirements for supervisory interventions, investigative timeline expectations and the use of IA Pro as a case management tracking tool.

In ¶ 353 of that same order the Court required the MCSO to create, formalize and implement adjustments in its investigative policies pertaining to several categories of cases

46REPORT000243

as provided in ¶ 353 (a)-(f). Further, MCSO was ordered to "fully and openly consult with the other parties to this litigation." (Doc. 2830, ¶ 353).

The Court has been advised that the parties met telephonically on several occasions to discuss MCSO's proposed policies. On February 8, 2023, pursuant to ¶ 353, MCSO submitted to the Monitor its proposed version of GH-2 (Internal Investigations) and the PSB's Operations Manual. On that same day, and pursuant to the Amended Third Supplemental Preliminary Injunction Judgment Order, the parties also submitted to the Monitor their proposals.

Paragraph 353 required the Monitor to "promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies." (Doc. 2830, ¶ 353).

The Monitor submitted its proposed policies to the Court and the parties on March 8, 2023 in accordance with ¶ 349. Pursuant to ¶ 353, the parties were given two weeks to provide the Court with any comments on the Monitor's final proposed policies. The parties subsequently submitted to the Court and the Monitor their comments to the proposed policies on March 23, 2023.

**IT IS HEREBY ORDERED** that MCSO shall within one week of this Order adopt policies attached to this Order as Exhibit A, GH-2 (Internal Investigations), Exhibit B, Professional Standards Bureau Operations Manual and Exhibit C, Attachment B of GC-17 (Employee Disciplinary Procedures).

**IT IS FURTHER ORDERED** that MCSO shall, in consultation with the Monitor, make those changes to other existing policies or supporting documents that are essential to and consistent with Exhibits A, B and C to this Order.

/ / /

/ / /

/ / /

/ / /

46REPORT000244

**IT IS FURTHER ORDERED** that to the extent any of the policies attached to this Order may be deemed in conflict with the provisions of Paragraphs 170 or 171 of the Court's Second Amended Second Supplemental Permanent Injunction Judgment Order (Doc. 1765), the policies attached to this Order are authorized to supersede the mandates of those paragraphs.

Dated this 12th day of October, 2023.

_____
G. Murray Snow
Chief United States District Judge

46REPORT000245



# MARICOPA COUNTY SHERIFF'S OFFICE
# POLICY AND PROCEDURES

| Subject<br>**INTERNAL INVESTIGATIONS** | Policy Number<br>**GH-2** |
|---|---|
| | Effective Date<br>**XX-XX-XX** |

| Related Information | Supersedes |
|---|---|
| ARS Title 38, Chapter 8, Article 1<br>ARS 38-1104<br>ARS 38-1116<br>ARS 39-128<br>Maricopa County Employee Merit System Rules<br>Maricopa County Law Enforcement Officers' Merit System Rules<br>CP-2, *Code of Conduct*<br>DJ-3, *Inmate Grievance Procedures*<br>GC-16, *Employee Grievance Procedures*<br>GC-17, *Employee Disciplinary Procedures*<br>GC-21, *Drug, Medication, and Alcohol Testing*<br>GE-3, *Property Management and Evidence Control*<br>GE-4, *Use, Assignment, and Operation of Vehicles*<br>GH-3, *Polygraph Procedures and Documents*<br>GH-5, *Early Identification System*<br>GI-1, *Radio and Enforcement Communications Procedures*<br>GJ-2, *Critical Incident Response*<br>GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate*<br>GJ-24, *Community Relations and Youth Programs*<br>GJ-28, *Prison Rape Elimination Act (PREA)* | GH-2 (10-25-22) |

**PURPOSE**

The purpose of this Office Policy is to establish guidelines and procedures for accepting, processing, and investigating complaints of employee misconduct. Complaints include, but are not limited to, those brought forward by members of the public, inmates, Maricopa County employees, and Sheriff's Office employees.

Although this Office Policy refers to employees throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and Posse members.

**POLICY**

It is the policy of the Office to ensure that all complaints of employee misconduct – whether internally discovered and/or alleged by another employee or based on a complaint filed by a member of the public – are fully, fairly, impartially, and efficiently investigated. All investigative findings shall be supported by the appropriate standard of proof and documented in writing; and all employees who commit misconduct shall be held accountable pursuant to a disciplinary system that is fair, consistent, and unbiased; and provides due process.

**DEFINITIONS**

***Administrative Closure:*** A result of a PSB Diversion process in which the PSB Commander reviews individual complaints, on a case-by-case basis, and determines that they cannot be satisfactorily investigated or an investigation is not necessary. Administrative Closures may be used in the following circumstances: a) Situations where an internal or external complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported; b) Situations where an internal or external complaint was received by the Office after the

46REPORT000246

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: xx-xx-xx**

employee(s) involved in the alleged misconduct left employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident; c) Situations where in an internal or external complaint the initial complainant is unwilling or unable to cooperate; d) Situations where in an internal or external complaint the initial complainant is anonymous; e) Situations resulting in the death or serious physical injury of a prisoner or an inmate that do not involve a use of force by an employee and are considered non-critical incidents; and f) Situations where an internal complaint originated from a workplace relationship and is most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division.

An Administrative Closure shall also be used when the following circumstances exist in a Service Complaint: a) The complaint does not allege employee misconduct and can be resolved with an explanation to the complainant regarding the policy, procedure, service level due to manpower or resources, or statutory authority required of the Office.  This includes matters in which the complainant questions Office policy, procedures, or service level due to manpower or resources, or statutory authority required of the Office; b) The complainant does not allege employee misconduct and expresses dissatisfaction with the outcome of formal legal, civil, or administrative processes involving members of the Office.  The preliminary inquiry associated with this type of Service Complaint closure shall be thoroughly reviewed and verify that potential employee misconduct was not involved with the incident prior to closure; c) The complainant does not allege employee misconduct and requests additional information or follow-up actions pertaining to a prior call for service, report, or investigation; or d) The complaint lacks specificity and the complainant refuses or is unable to provide further clarification necessary for the Office to fully understand the complaint, or the complainant does not articulate facts amounting to an allegation of employee misconduct.

*Appointing Authority:* For the purposes of this policy, the designated member of Office command staff, appointed by the Sheriff, whose duties include: being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard.

*Blue Team:* The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct.  The information from Blue Team is transferred to the IAPro Early Identification case management system.

*Classified:* All positions in Maricopa County service that are covered by the Maricopa County Merit System Rules.  Excluded are those employees identified as temporary, initial probation, or contract employees, and those positions identified as unclassified.

*Clear and Convincing Evidence:*  Evidence that leaves one with a firm belief or conviction that is highly probable that the factual contention of the claim or defense is true.  This standard of proof is higher than proof by a preponderance of the evidence but does not require proof beyond a reasonable doubt.  The standard of proof, Clear and Convincing Evidence, is only utilized when determining an investigatory finding of Unfounded; it is evidence that the allegation was false or not supported by fact.

*Closed Case Notification:* A memorandum sent to the principal, investigative lead, and witness of an administrative investigation to inform the employee that the investigation is complete.  The notification for the principal is only sent if the finding of the investigation was Unfounded, Exonerated, or Not Sustained.

*Coaching:* Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

2

46REPORT000247

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

For the purpose of determining the number of offenses committed within identified categories of Office Policy GC-17, *Employee Disciplinary Procedures*, Attachment A, the first use of Coaching shall not constitute an offense. However, the use of Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation.  Coaching shall be documented in Blue Team and shall be considered for the purpose of discipline for one year prior to the current offense.

*Compelled Statement:* Information received during an administrative investigation, which the Office has required an employee to provide under penalty of disciplinary action, up to, and including, dismissal from employment.

*Complainant:* Any individual who files a complaint regarding the conduct of any employee alleging a violation of Office policies, procedures, or actions.

*Complaint:* An allegation of employee misconduct or wrongdoing.  The complaint may be made verbally or in writing, in person, by phone, by mail, or online; and may be by the individual complainant, someone acting on the complainant's behalf or anonymously; and with or without a signature.

*Criminal Investigator:* An Office criminal detective, whether assigned to the Criminal PSB Section or another detective unit of the Office, who conducts an investigation into allegations of employee criminal misconduct.

*Critical Incident:* Any incident that involves the use of force by an employee resulting in death or serious physical injury of a member of the public, prisoner, or an inmate; any assault upon MCSO employees, by any means, that results in serious physical injury or death; or the intentional and unintentional discharge of a firearm by an employee in the performance of their lawful duties.  The term "critical incident," as used in this Office Policy, is narrowed for investigative purposes as specified in Office Policy GJ-2, *Critical Incident Response*, and should not be confused with the definition provided in Office Policy GC-22, *Critical Incident Stress Management Program*, which is all-encompassing and directly associated with issues of critical incident stress management.  A critical incident **does not** include the following and therefore **does not** require protocol activation:

    A.    The necessary dispatch of an animal for humane/medical purposes; including discharge of a firearm toward an animal for self-defense of themselves or in defense of others; or

    B.    The use of a specialized firearm by the Tactical Operations Unit in order to enhance officer safety, dispense chemical agents, or as an entry device, when no serious physical injury or death to any person occurs.

*Disciplinary Offer:* A situation where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, that establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrices, resulting in a sustained finding.  A Disciplinary Offer should be considered an Expedited Resolution.

*Domestic Partner:* An interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else.

*Early Identification System* **(EIS)***:* A system of electronic databases that captures and stores threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response.  The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities.  The database allows the Office to document appropriate identifying information for

3

46REPORT000248

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

involved employees, (and members of the public, when applicable), and the actions taken to address the tendencies identified.  Blue Team, IAPro, and EI Pro are applications of the EIS.

*Early Intervention Unit* **(EIU)***:* The EIU is part of the Bureau of Internal Oversight.  The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users.  The unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct or operating procedures and recognizes positive attributes by reviewing employee awards.  The Office shall ensure that there is sufficient staff to facilitate EIS input and training.

*Employee:* A person currently employed by the Office in a classified, unclassified, contract, or temporary status.

*Employee Misconduct:* Conduct that includes but is not limited to: a violation of Office Policy; an act of retaliation for complying with Office Policy; an intentional provision of false information in an administrative investigation or any official report, log, or electronic transmittal of information; an intentional failure to complete data collection of other paperwork requirements required by the Office; or federal, state, or local criminal or civil violations.

*Employee Retention and Performance Division (ERPD):* The ERPD is a resource available to all employees, supervisors, and commanders to assist with addressing employee performance concerns and sources of conflict originating from workplace relationships on a case-by-case basis.  This includes resolving disputes pertaining to annual performance appraisals, supervisor application of workplace rules/regulations, and disputes pertaining to employee leave matters.  The Employee Retention and Performance Division is comprised of the Leave Management, Compensation, and Retention and Performance Sections.  The Leave Management Section (LMS) coordinates leaves of absence and modified duty requests for employees in accordance with the Family and Medical Leave Act (FMLA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), the Americans with Disabilities Act (ADA), workers' compensation policy, and other related regulations and policies.

*Expedited Resolution:* A truncated investigative process that may be used in the event of a Disciplinary Offer resulting in a sustained finding, or in the event that documentary or video evidence presents clear and convincing evidence establishing that the alleged violation of Office Policy did not occur and there is no evidence or indication of any other potential employee misconduct involved in the incident (resulting in an Unfounded finding).

*External Complaint:* An expression of dissatisfaction by the public, directed at an employee's conduct.

*Family Relationship:* Relatedness or connection by blood or marriage or adoption.

*Garrity Warning:* A notice of an employee's obligations and rights regarding compelled statements during an administrative investigation.

*Good Faith:* Honesty of purpose and absence of intent to defraud.

*IA Number:* A unique investigative action number assigned to an allegation of misconduct for tracking and recording purposes.

*IAPro:* A case management system used by the EIU, the Professional Standards Bureau (PSB), and the Administrative Services Division that tracks and analyzes information, including but not limited to, complaints, commendations, use of force incidents, pursuits, discipline, supervisor notes, and internal investigations.  IAPro is used by PSB for the periodic assessment of timelines of investigations and for monitoring the caseloads of internal affairs investigators.  IAPro is also used to track, as a separate complaint category, allegations of biased policing and unlawful investigatory stops, searches, seizures, or arrests.

4

46REPORT000249

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: xx-xx-xx**

*Internal Affairs Investigator:* Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct.

*Internal Complaint:* A complaint that originates from within the Office. Such complaints may be initiated by other employees or from supervisors who observed, or were informed by other employees, of possible policy violations or other misconduct. For the purpose of this Office Policy, complaints made by a former Office employee regarding conduct that occurred while the former employee was still employed by the Office shall also be identified as an internal complaint.

*Intervention:* An approved specified action taken by a supervisor to improve a situation or prevent a potential negative work performance situation from developing into misconduct.

*Investigative File:* The Office's complete investigative report and any attachments detailing the incidents being investigated. The file shall contain, but is not limited to, the Administrative Investigations Process Checklist, Cover Sheet, Findings Page(s), Prior Work History Report, Investigative Plan, Investigative Report, the Presumptive Range of Discipline form, the Employee Disciplinary Considerations and Decision form, transcripts, audio/video of interviews, body-worn camera footage, the Inmate Grievance Form, if applicable, etc. Depending on the outcome of the investigation, the file shall also contain, but not be limited to, a Final Disposition Letter; Closed Case Notification; and documents that record discipline, to include the Pre-Determination Hearing (PDH) recording. The Professional Standards Bureau shall maintain the investigative file of all documents within the Office's custody and control relating to any investigation and related disciplinary proceedings, grievance proceedings, and appeals to the Maricopa County Merit Systems Commission or state court.

*Investigative Lead:* An individual believed to have information or facts relevant to the matter under investigation.

*Law Enforcement Officer:* An employee of the Office, other than an initial probation employee, who is a deputy sheriff or a detention officer.

*Merit Rules:* The Maricopa County Employee Merit System Rules and the Maricopa County Law Enforcement Officers' Merit System Rules.

*Minor Discipline:* Discipline less severe than a suspension, such as a written reprimand.

*Misconduct:* Includes any violation of Office Policy or Procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

> *Criminal Misconduct:* Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> *Minor Misconduct:* Misconduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

> Minor misconduct, while a violation of Office Policy, can often be addressed with field supervisor-initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not, per the

5

46REPORT000250

Office Disciplinary Matrix, exceed a Category 1, First or Second Offense; a Category 2, First Offense and which has not been received by the Office as an external complaint, or has not already been assigned to the Professional Standards Bureau (PSB).

**Serious Misconduct:** Misconduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

**Notice of Investigation:** A written notice given to an employee during an administrative investigation which identifies the employee's status in the investigation, the employee's responsibility not to discuss the investigation with anyone other than those specified, the name and rank of the assigned investigators, and the right to have an observer present at the interview.

**Official Investigation:** An official examination by a supervisor, an internal affairs investigator, or a criminal investigator, into alleged employee misconduct that relates to or may affect an employee's position with the Office. The Office has two types of investigations that are used to examine these allegations:

1. Administrative Investigation: An investigation conducted into apparent violations of Office Policy. Sustained allegations for an administrative investigation provide the basis for the imposition of discipline according to the Discipline Matrices and the Categories of Offenses, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

2. Criminal Investigation: An investigation by a criminal investigator into an allegation of employee criminal misconduct. These include the process of collecting information (or evidence) about a crime in order to: 1) determine if a crime has been committed; 2) identify the perpetrator; 3) apprehend the perpetrator, and 4) provide evidence to support a conviction in court.

The following does not constitute an official investigation or investigative interview: (a) questioning in the normal course of duty, counseling or instruction, or an informal verbal admonishment by, or other routine or unplanned contact with a supervisor or other law enforcement officer; or (b) preliminary questioning to determine the scope of the allegations or if an investigation is necessary. However, such counseling, instructions, verbal admonishments, other contacts, and preliminary questioning are covered by and subject to the truthfulness standards found in Office Policy CP-5, *Truthfulness*.

**Pre-Determination Hearing (PDH):** A forum that allows an employee, regardless of employment status, who is being considered for serious discipline, to address the appointing authority regarding the intended discipline.

**Pre-Determination Hearing Notice:** A written notice given to an employee who is being considered for serious discipline. The notice includes information regarding: 1) the proposed disciplinary action, 2) the Merit Rules, as applicable; 3) policies alleged to have been violated; 4) sufficient details describing the specific reasons that are being considered for disciplinary action; 5) the employee's relevant work history; 6) the opportunity for the employee to review the investigative file; 7) the employee's opportunity to present mitigating information; and 8) the date and time of the hearing.

**Preliminary Inquiry:** The gathering of information available to determine the scope of the allegation and to preserve perishable evidence. This can include a review of EI Pro, Blue Team, traffic stop data, Computer Aided Dispatch (CAD), Shift Log entries in SHIELD, audio and video recordings, and preliminary audio- and video-recorded questioning of parties involved.

**Preponderance of the Evidence:** Facts alleged are more likely true than not true. Preponderance of the evidence is only utilized when determining an investigatory finding of Sustained.

6

46REPORT000251

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: xx-xx-xx**

*Principal:* An employee identified as the primary focus of an administrative investigation and against whom a complaint of misconduct has been made.  An administrative investigation may have multiple principals.

*PSB Administrative Investigators – Critical Incidents* **(PSB-CI)***:* Select members of the administrative section of the Professional Standards Bureau (PSB) who are responsible for investigating critical incidents strictly for administrative purposes.  The PSB-CI shall be comprised of no less than one PSB Command Staff and two investigators.

*PSB Diversion:*  A complaint intake process to address, on a case-by-case basis, eligible complaints without the initiation of a formal administrative investigation or service complaint.  Complaints received by the PSB shall be reviewed to make an initial determination of the most appropriate course of action to take based on the nature of the allegation.  The Diversion process can culminate in one of the following:  PSB-Directed Supervisory Intervention; Administrative Closure; or Expedited Resolution with a finding of Unfounded.

*PSB-Directed Supervisory Intervention:* A PSB Diversion intended to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation.  PSB may, on a case-by-case basis, initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching.  The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in Attachment B of Office Policy GC-17 for any External Complaints.

*Serious Discipline:* Discipline which results in an employee receiving a suspension, demotion, or dismissal from employment.  All sustained violations of a Category 7 offense as specified in Office Policy GC-17, *Employee Disciplinary Procedures,* shall result in dismissal from employment.

*Serious Physical Injury:* Injury which causes death or creates a reasonable risk of death, severe and permanent disfigurement, severe impairment of health, or loss or protracted impairment of the functions of any bodily organ or limb.

*Service Complaint:*  A complaint regarding an inadequate policy, procedure, practice, service level due to staffing or resources, or statutory authority required of the Office.  A service complaint is not an allegation of employee misconduct.

*Supervisor:* An employee to whom subordinates report.

      1.      Commander: An employee with the rank of lieutenant or above, or its civilian equivalent.

      2.      First-Line Supervisor: An employee with the rank of sergeant, or its civilian equivalent.

*Unclassified Employee, Civilian Only:* An at-will employee not covered by the Maricopa County Employee Merit System Rules.

*Volunteer:* A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered.  An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

*Witness:*  An individual who has observed an incident.

7

46REPORT000252

**Policy GH-2,** *Internal Investigations*                                        **Effective Date: xx-xx-xx**

**PROCEDURES**

1.  **Supervisor-Initiated Intervention:** An approved action, as specified in Office Policy GH-5, *Early Identification System*, taken by a supervisor to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation. Supervisors may also initiate this action when an employee's conduct, has minimal negative impact on the overall operations. Examples of employee work performance situations in which a supervisor may consider approved interventions include those categorized as a Category 1 or Category 2 of the Attachment B, of Office Policy GC-17, *Employee Disciplinary Procedures*. Employee conduct outside of the limitations of this section shall be addressed, as specified in this Office Policy. Supervisors are encouraged to contact the PSB if unsure whether the employee work performance situation may be addressed through a supervisor-initiated intervention or reported to the PSB for action.

    A.  Prior to determining intervention regarding the work performance situation, the supervisor shall:

        1.  Confirm the employee's conduct does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, and which has not been received by the Office as an External Complaint, or has not already been assigned to the PSB;

        2.  Review discipline history by accessing the employee's EIPro Dashboard to assist the supervisor in their intervention or corrective action decision; and

        3.  Ensure that when considering a coaching for the intervention, that the employee will not exceed the number of coachings allowed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, for one year prior to the current offense.

    B.  All supervisor-initiated intervention action taken shall be documented in Blue Team, as specified in Office Policy GH-5, *Early Identification System*. The entry shall include justification for the intervention and the specific policy or policies involved in the performance issue linked to the employee.

2.  **Complaint Intake Procedures:** The Office shall ensure that all allegations of employee misconduct, whether internally discovered or based on a complaint from a member of the public, or from an inmate, are fully, fairly, and efficiently investigated. All complaints shall be reviewed by the PSB Commander to determine if they are to be addressed as a PSB Diversion or a Service Complaint, or administratively investigated. All investigative findings must be supported by the appropriate standard of proof, as defined for each findings disposition, and shall be documented in writing. All employees who commit misconduct shall be held accountable.

    Complaints and allegations of misconduct, including third-party and anonymous complaints, shall be accepted and addressed as a PSB Diversion or a Service Complaint, or administratively investigated. All employees and members of the public shall be permitted to report allegations of misconduct anonymously. When a third-party registers a complaint on behalf of another individual, every reasonable effort shall be made to contact the alleged offended individual to verify the complaint. All complaints shall be documented, investigated, and dispositions determined as appropriate and per policy, and a written record made of the findings and resolution.

    A.  The Office shall provide a *Comment and Complaint Form* in both English and Spanish.

8

46REPORT000253

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: xx-xx-xx**

1. A *Comment and Complaint Form* shall be available in the following locations:

   a. All deputies shall carry complaint forms in their Office vehicles. Upon request, deputies shall provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and e-mail address, of their immediate supervisor;

   b. At the reception desk at Office Headquarters and Districts;

   c. At the reception desk at PSB;

   d. On the Office website;

   e. The Office shall allow for complaints to be received through a free 24-hour hotline; and

   f. Permanent placards shall be posted and maintained in locations clearly visible to members of the public at the reception desk at Office Headquarters and Districts. The placards shall describe the complaint process and include all relevant contact information, including telephone numbers, e-mail addresses, mailing addresses, and internet sites. The placards shall be both in English and Spanish.

2. The Community Outreach Division (COrD) shall be responsible for ensuring that *Comment and Complaint Forms* are available at all times at the Office Headquarters, Districts, and other public locations. Deputies shall ensure that *Comment and Complaint Forms* are available in their patrol vehicles. PSB shall be responsible for the reception desk of the PSB and for those complaints received through the hotline.

B. Every complaint shall be documented in detail by the person receiving the complaint. Complaints shall normally be referred to a supervisor, but if this is not practicable, the receiving employee shall obtain pertinent information about the complaint and then immediately forward the information to a supervisor. This procedure shall be followed regardless of whether the complaint is submitted verbally, in writing, in person, by phone, by mail, or online, or whether the complaint is submitted by the complainant, someone acting on the complainant's behalf, anonymously, or with or without the complainant's signature. Complaints received by the Communications Division shall be processed as specified in Office Policy, GI-1, *Radio and Enforcement Communications Procedures*. When notified by an employee, the supervisor shall immediately document the notification and ensure that PSB has been advised through Blue Team. Employees receiving complaints shall ensure the maintenance of confidentiality. Employees shall not divulge the name of any persons filing a complaint or provide complainant information to any employee other than the supervisor and/or PSB personnel authorized by Office command to properly process and investigate allegations of misconduct. Upon receipt of the complaint, supervisors are not to discuss the facts of the allegation with those involved as to not compromise the integrity of the investigation. When taking complaint information, Office employees shall respond to the complainant in a courteous and professional manner. If asked by the complainant to identify themselves, employees shall provide at a minimum, their name and serial number.

9

46REPORT000254

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

1. External Complaints

    a. External Complaints shall be accepted. No employee shall attempt to discourage, interfere with, or delay an individual from registering a complaint. Every effort shall be made to facilitate the convenient, courteous, and prompt receipt and processing of an external complaint. The fact that a complainant does not speak, read, or write in English; or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.

        (1) Complaints received at the Division by phone or in person shall be referred to the on-duty supervisor. Complaints received at the Sheriff's Office Headquarters by phone or in person shall be referred to the Court Implementation Division. If this is not practical, the receiving employee shall obtain pertinent information about the complaint and have a supervisor make contact with the complainant as soon as possible. The PSB shall accept any external complaint directly from a complainant.

        (2) Complaints received by mail, e-mail, or the Office website shall be forwarded as follows:

            (a) Complaints addressed to the Sheriff shall be routed to the PSB along with all supporting documents in a manner that promotes confidentiality.

            (b) Complaints received through the mail, e-mail, the Office website, or received from other sources, shall be forwarded to the PSB.

        (3) Complaints requiring the Office to investigate allegations of criminal misconduct require the receiving supervisor to immediately notify their own chain of command, unless this notification would negatively impact the integrity of the complaint and the subsequent investigation. The respective commander shall notify the PSB Commander for investigative assignment.

        (4) Complaints involving allegations of excessive force or physical abuse require the supervisor to make every reasonable attempt to make immediate personal contact with the complainant. This interaction shall be both audio and video recorded unless deemed impractical to do so. Color photographs shall promptly be taken of any alleged physical injury. In extreme circumstances, personnel from the Scientific Analysis Division shall be contacted to take the photos. Complainants may also be encouraged to seek medical evaluation at their own expense and shall be asked to sign an *Authorization to Release Information* (See Attachment B) if treatment is sought.

    b. External complaints shall be documented in detail and forwarded immediately to the PSB through Blue Team.

        (1) If received by a supervisor, the supervisor shall:

10

46REPORT000255

**Policy GH-2,** *Internal Investigations*                                   **Effective Date: xx-xx-xx**

(a)     Offer to meet in person, and if in-person contact is desired, audio and video record the interaction.  If the complainant does not desire in person contact, the contact shall be made by telephone, documented in the investigative report, and the supervisor shall audio record the interaction.

(b)     Obtain the following minimum information:

    i)      Date of occurrence;

    ii)     Time of occurrence;

    iii)    Incident summary;

    iv)     Incident location;

    v)      Complainant's name and contact information;

    vi)     Witness's name and contact information;

    vii)    Supporting documents and/or evidence;

    viii)   Involved employees; and

    ix)     Any other available information.

(c)     Immediately complete an entry utilizing Blue Team by selecting Incident Type – External Complaint.  This information shall be automatically routed to PSB.  If Blue Team is unavailable, the supervisor shall complete the *Complaint Acceptance Report* (see Attachment A) and e-mail the document to the PS.  Once Blue Team is available, the information from the *Complaint Acceptance Report* shall be promptly added by the supervisor to Blue Team.

(d)     Attach audio and video recording(s) and any related documents to the Blue Team entry.  If Blue Team is not available, send copies of the audio and video recording(s) and related documents to the PSB.

(2)     If received by the PSB, the PSB shall:

(a)     Offer to meet with the complainant and if in-person contact is desired, audio and video record the interaction.  If the complainant does not desire in-person contact, the contact shall be made by telephone, documented in the investigative report, and the PSB shall audio record the interaction.

11

46REPORT000256

Policy GH-2, *Internal Investigations*                                        **Effective Date: xx-xx-xx**

> (b)    Enter the information directly into IAPro and attach audio and video recordings and related documents. If IAPro is unavailable, complete the *Complaint Acceptance Report*. Once IAPro is available, the information from the *Complaint Acceptance Report* and the audio and video recording(s) shall be promptly added to IAPro by the PSB.

c.    When possible, the supervisor or the PSB shall give verbal acknowledgment to the complainant that the complaint has been received and documented, that it shall be forwarded to the PSB for action, and an Office representative shall contact the complainant as part of the complaint process. If verbal acknowledgement is not possible, the supervisor or the PSB shall give written acknowledgement through mail or e-mail. If acknowledgement in any form is not possible due to the lack of complainant contact information, this shall be documented in the IAPro Investigative Case File.

d.    The PSB shall notify the principal's Division Commander and Bureau Chief of the complaint provided that the integrity of subsequent action will not be compromised. If the complaint is addressed through an administrative investigation, the principal's affected Division Commander and Bureau Chief are not to discuss the facts of the allegation with those involved as to not compromise the integrity of the investigation.

e.    Upon determination by the PSB Commander that an allegation of misconduct requires an investigation, the PSB shall promptly assign an IA Number to the incident and provide it to the complainant. Within seven days, the PSB shall provide a written update to the complainant which shall include the IA Number and the name of the assigned investigator. This written update shall also inform the complainant how they may contact the PSB to inquire about the status of the complaint.

f.    If during the course of a PSB or Division administrative investigation the assigned investigator identifies a new principal, the investigator shall notify the Division Commander and Bureau Chief of the new principal, provided that the integrity of the investigation will not be compromised.

g.    When allegations are filed on multiple employees involved in a single act of misconduct, one IA Number shall be assigned. The assigned IA Number shall be noted on all documents resulting from the complaint.

2.    Inmate Complaints

a.    Inmate complaints shall be received through *Inmate Grievance* forms, *Inmate Request* forms, or through verbal communication. Inmates shall be directed to submit their complaint on an *Inmate Grievance* form, as specified in Office Policy DJ-3, *Inmate Grievance Procedures*. If the inmate refuses to complete an *Inmate Grievance* form, any information collected regarding the complaint shall be attached to an *Inmate Grievance* form and forwarded through the grievance process.

12

46REPORT000257

Detention personnel shall collect an inmate's grievance or complaint as soon as possible during the course of their shift duties and make an attempt to resolve the grievance or complaint within 72 hours.  Detention personnel unable to resolve the grievance within 72 hours, shall forward the *Inmate Grievance* form to a shift supervisor.

If at any time during this process employee misconduct is identified, it shall immediately be entered into Blue Team as an External Complaint by the supervisor identifying the misconduct.  The entry shall include all investigative documentation obtained prior to the misconduct being identified.  Forms regarding the processing of inmate complaints alleging employee misconduct are located in the Bureau Hearing Unit Forms/Misconduct Grievance Forms folder on the Office's shared drive.

b.      Inmate complaints shall be processed based on the topic of the complaint.  The established procedures are as follows:

(1)     Inmate complaints involving policy, procedure, or services of the jail shall be addressed through the inmate grievance process, as specified in Office Policy DJ-3, *Inmate Grievance Procedures*.

(2)     Inmate complaint allegations of employee misconduct related to violations of the Prison Rape Elimination Act (PREA) shall be addressed, as specified in Office Policies DJ-3, *Inmate Grievance Procedure* and GJ-28, *Prison Rape Elimination Act* (PREA).  The PREA Coordinator shall forward the completed PREA incident documents to the PSB Commander or designee, for review.

(3)     Inmate complaints regarding allegations of employee misconduct, to include use of force, shall be addressed, as specified in this Policy.

(4)     Inmate complaints regarding allegations of employee misconduct of a criminal nature shall be reported immediately to the Division Commander, and the PSB.

(5)     All other inmate complaints regarding allegations of employee misconduct received by non-supervisory personnel shall be immediately forwarded to a supervisor for action.

c.      Supervisor responsibilities when an inmate complaint alleges employee misconduct:

(1)     Upon determining an Inmate Grievance *Preliminary Inquiry Report* (PIR) is needed, the supervisor shall contact the facility Custody Bureau Hearing Unit (CBHU) Sergeant to receive a grievance tracking number and an Inmate Grievance Tracking Coversheet.

13

46REPORT000258

(2)     As soon as possible, and not to exceed seven calendar days of receiving the *Inmate Grievance* form, to include those that are noted as resolved by the inmate after the officer responds in Section II of the *Inmate Grievance* form, the supervisor receiving the inmate complaint shall be responsible for completing a preliminary inquiry regarding the allegation. The preliminary inquiry shall include, but is not limited to the following:

(a)     An audio recorded statement from the inmate complainant;

(b)     Documented review of audio and video recordings, Shift Log entries in SHIELD, and rosters; and

(c)     Documented limited questioning of the employee to determine the validity of the complaint.

(3)     Upon completion of the preliminary inquiry, the supervisor shall document their findings on a PIR.

(4)     The supervisor shall write a synopsis of the PIR findings on the inmate's original *Inmate Grievance* form.

(5)     The supervisor shall provide all documentation, to include the PIR, Grievance Tracking Coversheet, the original *Inmate Grievance* form, and any associated information, to the shift commander for their review.

(6)     In the event a supervisor is an involved employee in an inmate's complaint alleging employee misconduct, that supervisor shall not conduct the preliminary inquiry. The shift commander shall then determine which supervisor will conduct the preliminary inquiry.

d.     Shift Commander, Jail Commander, CBHU Commander or designee's, responsibilities when an inmate alleges employee misconduct:

(1)     As soon as possible, and not to exceed seven calendar days of receipt of the documentation from the supervisor, the shift and jail commander shall conduct their reviews and document their conclusion on the PIR.

(a)     In the event that during the review by the shift or jail commander, either determines that misconduct did occur, they shall consult with the PSB Commander or designee, and provide them with a copy of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information. The PSB Commander or designee, shall determine if misconduct by the employee has occurred and shall notify the CBHU of their determination.

(b)     If the PSB determines an investigation is warranted, the copy of the *Inmate Grievance* form, the PIR, and Grievance Tracking Coversheet, and any associated information shall be forwarded to the PSB. Entry into IAPro and the assignment of an IA Number will stop the grievance process. The PSB shall provide

14

documentation to the CBHU staff notifying them of the IA Number for processing and closure in the CBHU database. The CBHU staff shall make a notation on the original *Inmate Grievance* form indicating the PSB is investigating the allegation and attach the PSB documentation. The CBHU shall then provide the IA Number to the inmate in the grievance response.

(c) When the shift and jail commander complete their review, and conclude no employee misconduct occurred, they shall ensure the original *Inmate Grievance* form is returned to the inmate within three calendar days. The inmate shall be instructed to select their choice of action in Section IV of the *Inmate Grievance* form, and then sign their name, booking number, and the date, and be provided their copy of the grievance form. N**o PIR or Grievance Tracking Coversheet shall be provided to the inmate as part of the response. T**he *Inmate Grievance* form shall then be forwarded to the CBHU Commander, along with the PIR, the Grievance Tracking Coversheet, and any other associated information.

(2) The CBHU Commander or designee, shall conduct a review and document their findings on the PIR as soon as possible, and not to exceed seven calendar days of the shift or jail commander's documentation.

(a) If the CBHU Commander or designee, determines that employee misconduct may have occurred, they shall consult with the PSB, and provide the PSB with a copy of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information. The PSB Commander or designee, shall determine if an investigation is warranted. If the allegation is going to be investigated by the PSB, the *Inmate Grievance* form will be closed out in the CBHU database upon issuance of the IA Number in IAPro. The CBHU staff shall make a notation on the original *Inmate Grievance* form indicating the PSB is investigating the allegation and attach the PSB documentation. The CBHU shall then provide the IA Number to the inmate in the grievance response.

(b) A copy of the grievance form indicating the assigned IA Number and noting that PSB will be conducting an investigation shall be provided to the inmate by the CBHU Commander or designee. N**o PIR or Grievance Tracking Coversheet shall be provided to the inmate as part of the response.**

(c) If upon review of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, the CBHU Commander or designee, determines the PSB is not going to investigate the allegation, the *Inmate Grievance* form shall continue through the inmate grievance process. All collected information obtained during the preliminary inquiry, to include the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, shall be stored in the CBHU database.

15

46REPORT000260

**Policy GH-2,** *Internal Investigations* <span style="float:right">**Effective Date: xx-xx-xx**</span>

  e. Once potential misconduct is identified, the PSB Commander shall make the final determination whether an administrative investigation is conducted following consultation with the shift or jail commander, or the CBHU Commander or designee, regarding an inmate allegation of employee misconduct.

   (1) For allegations of misconduct, the CBHU Commander shall provide the Inmate Grievance form, the PIR, the Grievance Tracking Coversheet, and any other associated information from the shift or jail commander to the PSB Commander or designee, who shall make an initial determination of the category of the alleged offense and promptly assign an internal affairs investigator.

   (2) If the PSB Commander or designee, determines an administrative investigation is warranted, the PSB shall enter the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, into IAPro, as an External Complaint, listing the inmate as the complainant.

   (3) Once determined the complaint will be investigated as an External Complaint through the PSB, the *Inmate Grievance* shall not be processed any further by the CBHU and closed out in the CBHU database as investigated further by the PSB and referencing the IA Number. The CBHU Commander or designee, shall notify the inmate regarding the status of their grievance.

   (4) If the PSB Commander or designee, determined employee misconduct did not occur, the allegation shall remain as an inmate grievance. The PSB's determination shall be documented in the CBHU database, and the *Inmate Grievance* form shall continue through the grievance process, as specified on Office Policy DJ-3, *Inmate Grievance Procedures*.

 3. Internal Complaints

  a. Internal complaints shall be accepted by supervisors. While employees may enter an internal complaint into Blue Team or may contact the PSB directly, employees are encouraged, but not required, to first attempt to resolve their internal complaint through their respective chain of command.

   (1) Employees who observe or become aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a supervisor, directly to the PSB, or any outside entity authorized to take corrective action, without fear of retaliation. When the misconduct involves a supervisor, the employee shall either contact the next level in the chain of command, or the PSB, at any time, regarding misconduct involving an Office employee or make a Blue Team entry.

   (2) Internal complaints shall not be confused with an employee grievance. A grievance is directed at such matters as employee status, work conditions, or operational procedures, as specified in Office Policy GC-16, *Employee Grievance Procedures*. An internal complaint is directed at alleged misconduct on the part of an employee which shall warrant a preliminary inquiry or investigation, and possible disciplinary action.

16

46REPORT000261

(3)     Internal complaints shall not be confused with matters associated with Failure to Perform at Level Required of the Position (not involving misconduct). These matters do not involve misconduct and no internal complaint shall be submitted. Supervisors shall contact the Human Resources Bureau for guidance on how to manage an employee for Failure to Perform at Level Required of the Position (not involving misconduct).

(a)     Supervisor action to assist the employee shall include intervention options as specified in Office Policy GH-5, *Early Identification System*, and this Office policy.

(b)     The use of Failure to Perform at Level Required of Position will be limited at this time to civilian personnel and will require the review of the PSB Commander to ensure the employee action is not misconduct.

b.     Internal complaints shall be documented in detail and immediately forwarded to the PSB through Blue Team.

(1)     If an internal complaint is received by the supervisor, the complaint shall be documented consistent with external complaints, as specified in this Office Policy. When entering the information into Blue Team, the supervisor shall select Incident Type – Internal Complaint. The information shall be automatically routed to the PSB.

(2)     If the employee elects to enter a complaint directly into Blue Team, they shall select Incident Type – Internal Complaint and enter the required information. This information shall be automatically routed to the PSB.

(3)     If an internal complaint is received by the PSB, complaints shall be documented consistent with external complaints, as specified in this Office Policy. When entering the information into IAPro, PSB shall select Incident Type – Internal Complaint.

4.     Service Complaints

a.     The Office shall receive, evaluate, and respond to service complaints regarding inadequate policy, procedure, practice, service level due to manpower or resources, or statutory authority required of the Office. A service complaint shall not include allegations of employee misconduct. A service complaint provides a mechanism to foster communication between members of the Office and the public.

b.     Preliminary Inquiry: If a supervisor receives a complaint believed to be a service complaint, the supervisor shall conduct a preliminary inquiry. The supervisor shall document information gathered during the preliminary inquiry. The information to be documented shall include:

(1)     An audio recording of the personal contact with the complainant. If the complainant does not want personal contact, the interaction shall be audio recorded;

17

46REPORT000262

    (2)      If needed, any interviews of involved employees; and

    (3)      Information gathered through a review of EI Pro, Blue Team, traffic stop data, CAD, Shift Log entries in SHIELDs, audio and video recordings, and limited preliminary questioning of the parties involved.

c.      *Service Complaint Form*: The supervisor shall complete the *Service Complaint Form* and include all information gathered during the preliminary inquiry. The *Service Complaint Form* shall be forwarded to the PSB through Blue Team by selecting Incident Type – Service Complaint. The *Service Complaint Form* is found in the Internal Affairs\Forms folder on the Office's shared drive. The audio and video recordings and other information gathered during the preliminary inquiry shall be attached to the Blue Team entry when forwarded to the PSB.

d.      Review of Service Complaint: The PSB shall review the preliminary inquiry and determine whether the complaint shall be issued a Service Complaint number (SC Number) and closed administratively, the complaint will be investigated administratively and issued an IA Number, or PSB will utilize the PSB Diversion process. When a complaint consists of both misconduct and service issues, only an IA Number shall be issued. However, the matters determined to be a service complaint can be treated as separate allegations and closed as service complaints.

    (1)      Administrative Closure: An Administrative Closure shall be used to indicate a service complaint was resolved without an administrative investigation.

        (a)      Administrative Closures shall be used when any of the following circumstances exist:

           i.      The complaint does not allege employee misconduct and can be resolved with an explanation to the complainant regarding the policy, procedure, service level due to manpower or resources, or statutory authority required of the Office. This includes matters in which the complainant questions Office policy, procedures, or service level due to manpower or resources, or statutory authority required of the Office.

           ii.      The complainant does not allege employee misconduct and expresses dissatisfaction with the outcome of formal legal, civil, or administrative processes involving members of the Office. The preliminary inquiry associated with this type of Service Complaint closure shall be thoroughly reviewed and confirm potential employee misconduct was not involved with the incident prior to closure.

           iii.      The complainant does not allege employee misconduct and requests additional information or follow-up actions pertaining to a prior call for service, report, or investigation.

46REPORT000263

iv. The complaint lacks specificity and the complainant refuses or is unable to provide further clarification necessary for the Office to fully understand the complaint, or the complainant does not articulate facts amounting to an allegation of employee misconduct.

(b) If the service complaint is closed with the appropriate administrative finding, the PSB shall complete an entry into IAPro by selecting Incident Type – Service Complaint. The entry shall include the SC Number and outcome.

i. PSB shall prepare and distribute the *Final Disposition Letter.* The complainant should be informed that their complaint is being looked into for possible changes to policy and training, if applicable.

ii. The PSB shall forward copies of the service complaint to the Policy Development Section, Training Division, or any other area that may be impacted by the information contained in the complaint for review and action, if necessary. The Policy Development Section and/or Training Division shall be required to look into the issue and respond to the PSB about any changes that it will make or why changes are not being made.

(2) Administrative Investigation: If the service complaint is elevated to an administrative investigation, the PSB shall assign an IA Number and assign the investigation to the appropriate Division or maintain and initiate the investigation.

5. Office Vehicle Accidents

a. Office vehicle accident investigations shall be addressed, as specified in Office Policy GE-4, Use, *Assignment, and Operation of Vehicles.*

6. PSB Diversions

a. The PSB Diversion process is a mechanism initiated by the PSB Commander to address, on a case-by-case basis, eligible complaints that are most appropriately handled without the initiation of a formal administrative investigation or Service Complaint.

b. The PSB Diversion process shall utilize the EIS to process, document, route, and track the way eligible complaints are addressed in lieu of a formal administrative investigation or Service Complaint.

c. The PSB Diversion process shall require notification to the complainant, principal employees, and the respective employee's chain of command consistent with notifications sent when an administrative investigation or Service Complaint is received or closed.

19

46REPORT000264

Court Order Annual Review 2022-23

**Policy GH-2,** *Internal Investigations*                    **Effective Date: xx-xx-xx**

   d.   If the PSB Diversion process is utilized, the incident type of PSB Diversion will be utilized in the IAPro Database, a unique tracking number will be assigned, and all documentation associated with the PSB Diversion and involved employees will be attached.

   e.   Only the specific categories of complaints identified in this Office Policy are eligible for a PSB Diversion.

   f.   The PSB Commander shall document in writing the decision to utilize a PSB Diversion instead of initiating a formal administrative investigation or Service Complaint. Decisions as to how complaints are classified or which are eligible for PSB Diversions will be made on a case-by-case basis; and based on the circumstances, cases may be reclassified.

   g.   If the PSB Commander determines that a qualifying complaint should be addressed with an approved PSB Diversion, the following procedures shall apply:

      (1)   The *PSB Diversion Service Form* shall include the PSB Diversion tracking number, involved employee, synopsis, associated policy violation(s), category of offense(s), and offense number.

      (2)   The *PSB Diversion Service Form* shall include instructions for issuance to the employee and be routed via the involved employee's chain of command for service.

      (3)   The *PSB Diversion Service Form* shall be issued to the involved employee, documented in the EIS in accordance with the instructions provided, and returned to the PSB within 30 calendar days.

      (4)   The *PSB Diversion Service Form* will be attached to the PSB Diversion Incident in the IAPro Database and linked to any associated EIS entries.

   h.   The following types of complaints are not eligible for consideration for a Diversion:

      (1)   Complaints involving members of the Plaintiffs' class;

      (2)   Complaints involving allegations of bias;

      (3)   Complaints involving allegations of criminal conduct;

      (4)   Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

      (5)   Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

      (6)   Allegations of conduct that, if sustained, could constitute a Category 3 or higher Offense from the Office's Disciplinary Matrices – unless otherwise specified below.

   i.   The following situations, on a case-by-case basis, are eligible as part of the Diversion process, to be Administrative Closures:

20

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: xx-xx-xx**

(1)     Situations where a complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported.

(2)     Situations where an internal or external complaint was received by the Office after the employee(s) involved in the alleged misconduct left employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident.

   (a)     Should the principal employee return to work at the Office, the case shall be reactivated and resumed for full completion in accordance with Office Policy standards. The time in which the employee was not employed with the Office shall be excluded from the investigative timeline.

(3)     Situations when the initial complainant is unwilling or unable to cooperate.

(4)     Situations where the initial complainant is anonymous. Anonymous complainants include those that are known but desire to remain anonymous and requested to not be included in the investigative report and those whose identity is unable to be confirmed.

(5)     Situations resulting in a health-related in-custody jail death that do not involve the use of force by an employee and are considered non-critical incidents under Office Policy.

   (a)     There are no exclusions for Diversions in these situations.

   (b)     **Prisoner or Inmate Death** *Preliminary Inquiry Report* **(PIR):** Following the death of a prisoner or inmate in Office custody, as specified in Office Policy GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate*, where there is **no** employee use of force, and when no PSB investigation has otherwise been initiated, shall require the completion of a PIR, as specified in this Office Policy. The PIR shall be conducted to identify potential employee misconduct associated with the incident. If at any time during the PIR process employee misconduct is identified, it shall immediately be entered into Blue Team as an Internal Complaint by the supervisor identifying the misconduct.

      i.     The gathering of information for the PIR shall include, but is not limited to, interviews of involved employees, information gathered through various data sources, and the review of associated audio and video recordings. The PIR will ensure that any perishable evidence relevant to an administrative misconduct investigation is preserved.

21

46REPORT000266

      ii.     PIRs completed pursuant to a prisoner or inmate death shall be forwarded through the chain of command to the PSB Commander or designee to determine if an administrative investigation is warranted to determine whether any violation of Office policy contributed in any way to the prisoner or inmate death.

           a.     If the PSB Commander or designee determines employee misconduct was identified, the PIR shall be entered as an Internal Complaint pursuant to this Office Policy.

           b.     If the PSB Commander or designee determines employee misconduct did not occur, no further administrative investigative action is required.

      iii.     A prisoner or inmate death PIR is not required when the following occurs:

           a.     The death of a prisoner or inmate is determined be a critical incident, as specified in Office Policy GJ-2, *Critical Incident Response*; or

           b.     The PSB has already initiated an administrative investigation into the incident.

(6)     Situations where an internal complaint originated from a workplace relationship(s) and are most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division (ERPD) in accordance with the process outlined in the PSB Operations Manual.

     (a)     The following types of complaints are not eligible for consideration for a PSB Diversion Process in place of a formal administrative investigation or Service Complaint:

          i.     Allegations of conduct that, if sustained, could constitute a Category 4 or higher Offense from the Office's Disciplinary Matrices.

j.     PSB-Directed Supervisory Interventions:

(1)     Situations wherein the PSB may initiate an PSB-Directed Supervisory Intervention to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, PSB may initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any

22

46REPORT000267

Internal Complaint and as specified in Attachment B of Office Policy GC-17 for any External Complaints. Employee conduct outside of the limitations of the named sections for both internal and external allegations shall be addressed by considering the definition for each Category of Offenses and determining placement, as specified in the Office Policy.

These situations are eligible, on a case-by-case basis, for consideration by the PSB Commander for an approved PSB-Directed Supervisory Intervention, in lieu of an administrative investigation or Service Complaint.

    (a)    Following a review of the circumstances of the incident, available evidence, EIS profile, and the disciplinary history of the potential principal, the PSB Commander shall make an initial determination if the allegations can appropriately be addressed through an approved PSB-Directed Supervisory Intervention. Principals shall not exceed the number of coachings allowed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, for one year prior to the current offense.

  k.    Expedited Resolution with a finding of Unfounded:

    (1)    Situations of an internal or external complaint where under the clear and convincing evidence standard, external documentary or video evidence establishes that the alleged violation of Office Policy did not occur and there is no indication of any other employee misconduct resulting in an Expedited Resolution with a finding of Unfounded.

        (a)    If the investigator determines during the administrative investigative process that above conditions are met, and the case investigation has not already been completed, the investigator shall document in the investigative report the following:

            i.    The manner and circumstances in which the above condition is met to support an expedited finding;

            ii.    The investigative steps taken to verify there are no other indications or evidence of other employee misconduct involved in the incident;

            iii.    If applicable, the readily available clear and convincing evidence demonstrating that the alleged violation of Office Policy could not occur as alleged, supporting an unfounded finding;

            iv.    The investigative report shall be completed with the recommended expedited finding of unfounded and submitted for review in accordance with the processing of all other completed administrative investigations.

            v.    If the Expedited Resolution and finding is approved by the PSB Commander, the administrative case will proceed

23

**46REPORT000268**

through all other formal closure processes for an administrative investigation as outlined in Office Policy.

vi.  If the Expedited Resolution and finding is applied to an administrative investigation, a special indicator linked to the expedited finding shall be included in IAPro Investigative Case File and associated with the employee's EIS information for future reference.

3.  Disciplinary Offer:  Situations where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrix, as further described:

A.  A Disciplinary Offer is to be considered an Expedited Resolution.

B.  The ability of the PSB Commander to offer principals the presumptive discipline or a mitigated penalty if they accept responsibility, shall include allegations that, if sustained, could constitute a Category 1, Category 2, and Category 3, First Offense, where minor discipline is within the approved range pursuant to Office Policy GC-17, *Employee Disciplinary Procedures*.

C.  If determined to be eligible, the PSB Commander shall coordinate with the MCSO Administrative Services Division (ASD) Conduct Resolution Section (CRS) to prepare and extend the written disciplinary offer to the principal employee(s).

D.  The principal employee(s) shall have seven (7) calendar days during a time period the employee is regularly scheduled to work to respond to the disciplinary offer.

E.  If the employee accepts responsibility for the policy violation(s) and returns the signed disciplinary offer, the ASD CRS shall prepare/process the disciplinary action in accordance with standard operating procedures for minor discipline administration following a formal administrative investigation.  Some steps may not be required to complete this investigation.

F.  If the employee declines to accept the disciplinary offer or fails to return the disciplinary offer to the ASD CRS by the deadline provided, the ASD CRS shall forward the response or lack of response to the PSB Commander for the initiation of a formal administrative investigation.

G.  In the event information/evidence related to this complaint is later discovered which could require the matter to be investigated further by the PSB, the discipline offer or issuance shall be rescinded by the PSB Commander.

H.  The following types of complaints are not eligible for consideration for a presumptive discipline or a mitigated penalty in place of a full formal administrative investigation or Service Complaint:

1.  Complaints involving members of the Plaintiffs' class;

1.  Complaints involving allegations of bias;

2.  Complaints involving allegations of criminal conduct;

24

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

      3.     Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

      4.     Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

      6.     Allegations of conduct that, if sustained, could constitute a Category 3 Offense where minor discipline is not within the approved range from the Office's Disciplinary Matrices.

4.    **Investigative Assignment:** The PSB Commander will make an initial determination of the category of offense and then promptly assign an internal affairs investigator, or a criminal investigator as required. If the misconduct investigation will be investigated at the Division level, the Division Commander shall assign the internal affairs investigator.

    A.    Investigations of complaints shall only be conducted by individuals who meet the clearly defined qualifications documented in the PSB Operations Manual, or as justified in writing by the PSB Commander. The Office must ensure that an internal affairs investigator:

      1.     Possesses excellent investigative skills, has a reputation for integrity, possesses the ability to write clear reports, has the ability to be fair and objective in determining whether an employee committed misconduct; and

      2.     Does not have a disciplinary history of three or more sustained violations of misconduct or does not have one sustained violation of a Category 6 from the Office's Disciplinary Matrices, as specified in Office Policy GC-17, *Employee Disciplinary Procedures,* and does not have a history of conducting deficient investigations.

      3.     Is not listed in the Law Enforcement Rule 15 Disclosure Database.

    B.    Allegations of employee minor misconduct shall be administratively investigated by a sergeant who has received misconduct investigative training.

      1.     Division level internal affairs investigators may seek assistance from the PSB at any time during the investigation.

      2.     If at any point during an administrative investigation the investigator has information indicating the principal may have committed misconduct of a serious or criminal nature, the investigator shall immediately notify the PSB, which shall assume the investigation.

    C.    The PSB shall investigate the following allegations of employee misconduct:

      1.     Serious misconduct;

      2.     Misconduct indicating apparent criminal conduct;

      3.     Allegations of a violation of Office Policy, CP-5, *Truthfulness*;

      4.     Complaints alleging any act of discriminatory policing or conduct;

      5.     Discriminatory motor vehicle stop complaints;

25

46REPORT000270

6.      Supervisory referrals resulting from a supervisory review of reports or recordings depicting discriminatory actions;

7.      Use of force complaints in which serious injury results or is alleged;

8.      Complaints alleging an employee has committed an act of domestic violence;

9.      The filing of any civil suit by a member of the public alleging misconduct of an employee which occurred on or off duty;

10.      Critical incidents, as specified in Office Policy GJ-2, *Critical Incident Response*; and

11.      Any investigation, which due to its complexity or the involvement of personnel from multiple squads or Divisions or is beyond the capabilities of Division level personnel.

D.      Conflict of Interest: Conflict of interest in administrative investigations is prohibited. An assigned investigator shall disclose any involvement or relationship which could be perceived to compromise the investigative process to the PSB Commander prior to the start of the investigation. The PSB Commander shall make a determination as to whether the perception is justified and reassign the investigation, if necessary.

1.      No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.

2.      No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation shall investigate the misconduct. Relationships that shall be reported, include but are not limited to:

     a.      Family relationship(s);

     b.      Outside business relationship(s);

     c.      Romantic relationship(s);

     d.      Personal friendship(s) that extends outside of the Office; and

     e.      Close professional relationship(s).

3.      No employee shall be involved in an investigation, whether criminal or administrative, with respect to any persons who are superior in rank and in their chain of command. Investigations of the Chief Deputy's conduct, whether criminal or civil, must be referred to an outside authority.

4.      If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority.

5.      Where appropriate to ensure the fact and appearance of impartiality, the PSB Commander or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.

26

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

6. Any outside authority retained by the Office must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest. The PSB shall determine if an outside investigator possesses the requisite background and level of experience of internal affairs and the absence of any actual or perceived conflicts of interest.

5. **Investigation of Complaints:** The investigation of allegations is a critical part of the complaint and discipline process. A decision to exonerate, unfound, not sustain, or sustain a charge must be based upon actual and reliable information. The investigation shall consist of gathering and reporting facts related to the allegation. Credibility determinations shall be based upon all known facts. Employees shall provide all relevant evidence and information in their custody and control to internal affairs investigators. They shall also advise investigators of persons who shall be contacted for statements. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.

A. Investigations must be viewed by the public and Office employees as diligent, thorough, and impartial. The investigation shall be conducted in a manner that shall reveal the facts. In each misconduct investigation, investigators shall:

1. Conduct investigations in a rigorous and impartial manner designed to determine the facts;

2. Approach the investigation without prejudging the facts and without permitting any preconceived impression of the principal, investigative lead, witness, or complainant to cloud the investigations;

3. Identify, collect, and consider all relevant, circumstantial, direct, and physical evidence, including any audio or video recordings while ensuring evidence is collected in a timely fashion and in accordance with Office Policy GE-3, *Property Management and Evidence Control*;

4. Make reasonable attempts to locate and interview all witnesses, including members of the public. Leaving voice mail messages and sending certified letters is not sufficient. Reasonable attempts may include, but are not limited to, neighborhood canvasses, checking with the Post Office, accessing open Internet resources, and completing Department of Motor Vehicle checks. All attempts shall be documented in the investigative report with the date, time, where, when, and who was contacted, to include all reasons why an interview was not conducted;

5. Offer in person interviews to any external complainants;

6. Audio and video record all interviews. Exceptions to a recorded interview may include, but are not limited to, the fact that the member of the community does not wish to be audio and/or video recorded, or that the member of the community resides outside of Maricopa County. If an interview is not audio and video recorded, all reasons shall be documented in the investigative report;

7. Avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

8. Attempt to resolve material inconsistencies between employee, complainant, investigative lead, and witness statements, and make credibility determinations as appropriate;

27

46REPORT000272

9. Not give automatic preference for an employee's statement over a statement received from a member of the public;

10. Not disregard a witness or investigative lead's statement solely because the witness or investigative lead has a connection to either the complainant or an employee or has a criminal history; and

11. Not alone consider the fact that a complainant committed a crime, pled guilty, or is found guilty of an offense, to determine whether the employee engaged in misconduct; nor will such factors by themselves justify discontinuing an investigation.

B. Internal affairs investigators shall consider the witness or investigative lead's criminal history or any adjudicated findings of untruthfulness in evaluating their statement. Additionally, the internal affairs investigator shall take into account the record of any witness, investigative lead, complainant, or employee who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

C. Investigators shall investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.

D. The Office shall not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline unless it meets the specific situations approved for Administrative Closures. The Office will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.

E. Administrative Investigation: The PSB Commander shall determine if an administrative investigation will be conducted at the Division level or by the PSB, as specified in this Office Policy.

F. Criminal Investigation: When appropriate, a separate criminal investigation shall be conducted by the PSB Criminal Investigations Section, an Office criminal investigations unit, such as the Major Crimes or Special Investigations Division, or by a law enforcement agency having jurisdiction, for the purpose of prosecution. A criminal investigation conducted by an Office criminal investigative unit must first be authorized by, and under the authority of, the PSB Commander; and must be conducted separately from any administrative investigation. All criminal investigations conducted by the Office shall be assigned a Criminal Internal Affairs (CIA) number. The initiation of a criminal investigation does not preclude the initiation and/or continuing of an administrative investigation.

1. When a complaint, whether internal or external, has the implication of possibly being criminal in nature, the PSB Commander shall be immediately notified. This includes critical incidents as defined in Office Policy GJ-2, *Critical Incident Response*, regardless of the jurisdiction where the critical incident occurred or where another entity retains jurisdiction.

2. If the criminal misconduct is discovered during an administrative investigation conducted outside of the PSB, the PSB shall immediately assume the administrative investigation.

3. If the evidence of criminal misconduct pertains to someone who is superior in rank to the PSB Commander and is within the commander's chain of command, the PSB Commander shall provide the evidence directly to the appropriate prosecuting authority, such as the Maricopa County Attorney's Office, the Arizona Attorney General's Office, or the United

28

46REPORT000273

**Policy GH-2,** *Internal Investigations*                                                  **Effective Date: xx-xx-xx**

States Attorney's Office, without notifying those in the chain of command who may be the subject of the investigation.

4.  An administrative investigation shall be required for any matter investigated criminally. Such administrative investigations shall be completed regardless of the outcome of the criminal investigations, including cases in which the prosecuting agency declines to prosecute or dismisses the charges.

5.  If a misconduct allegation will be investigated criminally, the PSB will not compel an interview of the principal pursuant to *Garrity*, until it has first consulted with the criminal investigator and the relevant prosecuting authority.

    a.  No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the PSB Commander in consultation with the entity conducting the criminal investigation.

    b.  The PSB shall document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.

    c.  When an administrative investigation begins prior to the criminal investigation being completed, it is imperative the administrative investigator does not communicate with the criminal investigator about any statements by the principal that were compelled pursuant to *Garrity*. The administrative investigator can obtain any and all information about the criminal investigation from the criminal investigator for the administrative investigation.

6.  Administrative investigators shall not take part in any criminal investigation interviews of Office personnel. They shall, however, monitor the interview from a location which is out of view of the person being interviewed. The person being interviewed shall not be advised of the presence of administrative investigators. The administrative investigators shall not discuss or suggest any line of questioning or inquiry with criminal investigative personnel.

7.  Administrative investigators shall coordinate any anticipated actions with the on-scene, criminal investigation commander before entering the scene.

8.  If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the PSB Commander. The PSB Commander shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing and include it in the investigatory file.

9.  If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the PSB Commander shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The PSB Commander shall direct that the investigator conducts additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.

29

46REPORT000274

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

10. If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the PSB shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

11. The Sheriff shall require the PSB to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.

G. In cases where the alleged misconduct involves a violation of Office Policy CP-5, *Truthfulness*, the PSB Commander or Chief Deputy may initiate an administrative investigation. If the decision is made not to investigate, the decision and the supporting information shall be documented in a memorandum and retained by the PSB in both hard copy and electronic form for record retention purposes.

H. Volunteer: A volunteer's continued service with the Office shall be at the discretion of the Sheriff. Volunteers are subject to, and shall comply with all Office Policies, rules, and regulations. Violations of Office Policies, rules, and regulation shall be addressed, as specified in Office Policies GC-17, *Employee Disciplinary Procedures,* and this Office Policy. Serious violations of Office Policy by a volunteer shall result in a review by the PSB Commander to determine whether a Pre-Determination Hearing is held; or the services of the volunteer are to be immediately terminated.

6. **Administrative Investigation Report:** At the conclusion of each investigation the internal affairs investigator shall document all information gathered during the investigation in the investigative report.

A. Report Format: The investigator shall utilize the following investigative report format. The format and forms for the investigative report shall be found in the Internal Affairs\Forms folder on the Office's shared drive. All facts gathered during the investigation shall be documented. The investigative report shall include:

1. Investigative Plan: An Investigative Plan shall be created for each Administrative Investigation. The primary objectives of an administrative Investigative Plan are to provide a roadmap for a thorough and complete investigation; to identify all reasonable opportunities to reduce and eliminate unnecessary investigative steps; and to promote timely completion of the investigation. The Investigative Plan serves as the foundation and starting point for the efficient investigation of the alleged employee misconduct.

a. An *Investigative Plan* shall be formulated collaboratively with between the investigator and the investigator's supervisor. The Investigative Plan shall be completed and approved by the investigator's Division Commander within seven (7) calendar days of the case assignment to the investigator.

b. The *Investigative Plan* shall include the following items*:*

(1) Complaint synopsis: The complaint synopsis shall consist of a few sentences providing an overall synopsis of the known allegations/facts after review of the complaint intake and all available associated evidence available to the investigator and their supervisor at the time the Investigative Plan is drafted.

(2) Evidence: The evidence section shall consist of a list of all available items of evidence the investigator has currently in their possession or plans to seek out/collect/request/review during the investigation.

30

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

    (3)    Case outline: The case outline is a free-form outline of the projected order of investigative steps anticipated to be taken by the investigator. This section may be in bullet point or narrative form but must provide enough information to ascertain the projected sequence of events and any investigative steps anticipated necessary to complete the investigation.

        (a)    Examples that investigators and supervisors may consider when examining the possibility of reducing and/or eliminating unnecessary investigative steps include, but are not limited to:

            i.    Second Chair: Investigators should consider the physical presence of a second investigator at Complainant, Witness and Principal interviews as an exception rather than the rule.

            ii.    Witness Interviews: Investigators and their supervisors shall consider the necessity when interviewing a multitude of witnesses who they reasonably believe observed, or know of, the same activity, and who will provide reasonably similar information.

            iii.    Principal Interviews: Principals should be interviewed as soon as practicable and reasonable, based upon the cumulative evidence and information obtained by the investigator.

    (4)    Additional information: This section allows for the investigator to provide any other relevant information pertaining to the overall investigative strategy.

    (5)    Estimated investigative completion date: This section shall include the investigator's estimated date of completion and submission to their supervisor by following the steps outlined in the proposed Investigative Plan.

    (6)    Supervisory Review: This section shall list the reviewing supervisor and the date in which the Investigative Plan was approved.

    c.    The *Investigative Plan* submission, review, and approval workflow process shall consist of the following:

    (1)    Division/District Investigations:

        a.    The PSB will include a blank Investigative Plan template with the initial email notification sent to the respective Division Commander upon the initiation or assignment of a new administrative investigation.

        b.    The Investigative Plan email template shall be completed by the investigator and shall list all relevant data, forms, reports and materials. (e.g., BWC, IRs, CAD) provided with the initial complaint.

        c.    The investigator's supervisor shall work with the assigned investigator to revise/edit the Investigative Plan as needed to eliminate any unnecessary investigative steps.

31

46REPORT000276

    d.    Once approved, the investigator's supervisor shall forward the Investigative Plan via the chain of command to the Division Commander. The investigator can begin the investigation following the immediate supervisor's approval of the plan. If anyone in the chain of command, including the Division Commander, suggests modifications to the plan during the subsequent review process, those will be communicated to the investigator as soon as possible. Once approved, the Division Commander will forward the completed email template to the PSB.

    e.    The PSB will upload the approved Investigative Plan utilizing the IAPro Database "*Running Sheet*" feature making the approved Investigative Plan accessible and viewable by all Blue Team users having access to the incident for reference throughout the course of the investigation.

    (2)    *Investigative Plans* for cases assigned to the PSB will be completed in accordance with specifications within the PSB Operations Manual.

    (3)    The *Investigative Plan* shall be stored within the IAPro database and will be available for review/reference throughout the course of the investigation and shall be retained in the case file for future reference.

2.    *Administrative Investigations Process Checklist*

3.    *Coversheet*

4.    *Investigative Report*: The body of the report shall document all actions taken during the investigation.

5.    *Findings*: A *Findings* page shall be prepared for each policy violation. If there are multiple policy violations, allegations, or principals, there shall be a separate *Findings* page for each principal, each allegation, and each policy violation.

6.    *Prior Work History Report*: *A Prior Work History Report* shall be prepared in order to consider the principal's work history.

    a.    The PSB shall review the employee's EI Pro/Blue Team entries and Personnel File, as well as any other pertinent information on the employee in order to compile a complete history. The review shall include the employee's prior five years of MCSO work history, to include a review of the employee's Employee Performance Appraisals. This report shall be completed and uploaded into Blue Team within five business days of the complaint being filed.

    b.    If the case is assigned to the Division level, the assigned Division investigator shall review the employee's EIPro/Blue Team entries, and any other information regarding the employee's prior five years of work history and document the information on the report.

    c.    The following shall be included in the *Prior Work History Report*:

32

46REPORT000277

**Policy GH-2,** *Internal Investigations*                                     **Effective Date: xx-xx-xx**

        (1)      Commendations and awards;

        (2)      Findings of misconduct, which includes misconduct for which discipline was ultimately not issued for procedural reasons, such as but not limited to, the Merit Commission finding a good faith effort was not made to complete an investigation within the statutory requirements. The findings of misconduct shall be considered in future disciplinary decisions;

        (3)      The IAPro complaint history; and

        (4)      Discipline, to include information regarding the allegation, the date of allegation, and the findings.

B.      Report Documentation: The investigator shall ensure the following are documented in the administrative investigation:

1.      A narrative description of the incident;

2.      Documentation of all evidence that was gathered, including names, phone numbers, and addresses of complainants, witnesses, and investigative leads. In situations where there are no known witnesses or investigative leads, the report shall specifically state this fact. In circumstances in which witnesses, or investigative leads were present, but circumstances prevented the investigator from determining the identification, phone number, or address of those witnesses or investigative leads, the report shall state the reason. The report shall also include all available identifying information for anyone who refuses to provide a statement;

3.      Names of all Office employees who witnessed the incident;

4.      Documentation of whether employees were interviewed and a transcript or recording of the interviews;

5.      The investigator's evaluation of the incident, based on their review of the evidence gathered, including a determination of whether the employee's actions appear to be within Office Policy, procedure, regulations, orders, or other standards of conduct required of Office employees;

7.      In cases where the investigator asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

8.      In cases where material inconsistencies must be resolved between complainant, witness, investigative lead, and employee statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

9.      An assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns shall be addressed. In accessing the incident for policy, training, tactical or equipment concerns, the investigator shall include an assessment of whether:

        a.      The law enforcement action was in compliance with training and legal standards;

        b.      The use of different tactics should or could have been employed;

33

46REPORT000278

      c.     The incident indicates a need for additional training;

      d.     The incident suggests that the Office should revise its policies, strategies, tactics or training;

   10.     If a weapon was used, documentation that the employee's certification and training for the weapon were current;

   11.     In the instance of an externally generated complaint, documentation of all contacts and updates with the complainant; and

   12.     At the conclusion of an administrative investigation, the investigator shall identify a finding for each policy violation. An investigation with a sustained policy violation shall be forwarded to the PSB Commander which will result in the initiation of the disciplinary process.

7. **Investigative Findings:** At the conclusion of an administrative investigation, the investigator shall identify one of the following findings for each allegation of a policy violation:

    A.     Exonerated: This shall indicate the investigation determined that alleged conduct occurred, but the actions of the employee were within Office Policy, procedures, or training.

    B.     Unfounded: This shall indicate the investigation determined by clear and convincing evidence, that the allegation was false or not supported by fact.

    C.     Not Sustained: This shall indicate the investigation determined that there was insufficient evidence to prove or disprove the allegation;

    D.     Sustained: This shall indicate the investigation determined that the allegations are supported by the preponderance of the evidence and justify a reasonable conclusion of a policy violation.

8. **Review of Administrative Investigations**

    A.     Enforcement Division Administrative Investigation Review:

      1.     Once the investigative report is completed, the investigator shall forward the report through the chain of command to the Division Commander for review and signature. The chain of command shall have up to 10 days within the 60 calendar days to complete their review. The investigative file shall not be forwarded to the PSB until the Division Commander has approved the investigation and concurred with the findings. The IAPro Task Feature shall be utilized to track and provide alerts regarding due dates for review and approval to the Division chain of command.

        a.     If anyone in the chain of command determines that the findings of the investigation are not supported by the appropriate standard of proof, as defined for each findings disposition, that supervisor shall return the investigation to the investigator for correction or additional investigative effort.

          (1)     The Division Commander shall document the inadequacies in a memorandum and shall forward the documentation to the PSB no later than 60 days after receipt of the complaint for investigation.

34

46REPORT000279

           (2)     The Division Commander shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.

     b.     The Division Commander shall be responsible for the accuracy and completeness of the investigation reports prepared by investigators under their command.

   2.     Once the Division Commander has approved the investigation and concurred with the findings, the Division Commander shall forward the investigative file to the PSB Commander or designee, for review. The PSB shall review the investigative file for completeness, thoroughness, and appropriate investigative actions. The PSB shall ensure that the investigative findings are supported by evidence.

     a.     If the PSB review determines the investigation is properly completed, the next course of action based on the findings of the investigation shall occur.

     b.     If the investigation is incomplete or unsatisfactory, the PSB shall return the investigative file for revision and/or further investigation, as necessary. The PSB shall order additional investigation when it appears there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.

     c.     When the findings of the investigation report are not supported by the appropriate standard of proof, as defined for each findings disposition, the PSB shall document the reasons for this determination.

     d.     The PSB shall ensure revisions and/or further investigation complies with the PSB recommendations and established timelines.

     e.     At the discretion of the PSB Commander, an administrative investigation may be assigned or re-assigned to another supervisor with the approval of the supervisor's commander, whether within or outside of the district or bureau in which the incident occurred or may be returned to the original supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.

B.     PSB Administrative Investigation Review: Once the investigative report is completed, the PSB investigator shall forward the report to the PSB Commander. The PSB Commander shall have up to 10 calendar days, within the 85 calendar days, to complete a review of the investigative report. The PSB Commander shall also be responsible for the accuracy and completeness of the investigation reports prepared by investigators under their command and shall determine the findings for each alleged policy violation.

   1.     If the PSB Commander determines that the findings of the investigation are not supported by the appropriate standard of proof, the PSB Commander shall return the investigation to the investigator for correction or additional investigative effort.

   2.     The PSB Commander shall document the inadequacies and take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.

C.     PSB Commander Determinations:

35

46REPORT000280

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: xx-xx-xx**

1.      Once an investigation is completely, thoroughly, and appropriately investigated, the PSB Commander shall determine the next course of action based on the findings of the investigation.

   a.   If the findings for the policy violation(s) in a completed Enforcement Division administrative investigation are Not Sustained, Unfounded, or Exonerated, following the review by the PSB Commander or designee, action to close and file the case, accordingly, shall occur.

   b.   If the findings for the policy violation(s) in a completed PSB administrative investigation are Not Sustained, Unfounded, or Exonerated, the PSB Commander shall make final findings, sign the investigative report, ensure that all notifications are made to the complainant and involved employee(s), and direct that the case be closed and filed accordingly.

   c.   If the findings for the policy violations in either a completed Enforcement Division or PSB administrative investigation are sustained, the PSB Commander shall make a preliminary determination if discipline is to be imposed and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's discipline history.

      (1)   If the PSB Commander makes a preliminary determination that the sustained allegations for a Category 1, First or Second Offense, or a Category 2 First Offense, can appropriately be handled by a Coaching, the investigation shall be forwarded to the Administrative Services Division. The Administrative Services Division will notify the appropriate chain of command to ensure that the Coaching is conducted and documented both in the EIS and as the resolution to the investigation in question before the case is closed. If the PSB Commander determines that minor discipline is to be imposed, the Administrative Services Division shall be responsible for coordinating the process. This includes preparing detailed correspondence, and ensuring all necessary notifications and actions are completed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

      (2)   When the PSB Commander makes a preliminary determination that serious discipline should be imposed, the appointing authority shall conduct a PDH and will provide the employee with an opportunity to be heard. The preliminary determination of discipline will be forwarded to the Administrative Services Division to process in accordance with Office Policy, GC-17, *Employee Disciplinary Procedures*; and to coordinate the process. This includes preparing detailed correspondence, scheduling the PDH, if applicable, and ensuring all necessary notifications and actions are completed.

2.      Policy, training, tactical or equipment concerns shall be addressed as specified in this Office Policy.

3.      The PSB Commander shall review all serious Office Policy violations by a volunteer, to determine whether a PDH is held, or the services of the volunteer are immediately terminated.

36

46REPORT000281

**Policy GH-2,** *Internal Investigations*        **Effective Date: xx-xx-xx**

9.    **Timeline for Completing Administrative Investigations:** The investigative timeline for cases assigned to the PSB or outsourced by PSB is 85 calendar days, and for cases assigned outside of the PSB 60 calendar days. Should a case be transferred during the investigative process between the PSB and a Division outside of the PSB, the timeline will default to 85 calendar days. Investigative start, extension, and completion timeline procedures are as follows:

     A.    Investigative Timeline: The investigative timeline starts on the date the Office receives notice of alleged employee misconduct by a person authorized by the Office to initiate an investigation which includes investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct and ends when the completed investigation is approved by the PSB Commander.

         1.    Administrative investigations shall be investigated and submitted to the PSB Commander by the due date identified by the PSB.

         2.    If it appears that the investigation will exceed the investigative timeline identified by the PSB, and a reasonable justification exists to request an extension, the investigator shall complete a *Request for Investigative Extension*.

            a.    Reasonable justifications to extend the investigative timeline are situations beyond the investigator's control that have caused delays in the investigation. Examples of reasonable justification include, but are not limited to: documented attempts to obtain crucial evidence; situations where involved employees are out on approved leave for prolonged periods of time during the investigative timeframe (i.e., FMLA or military leave), the prolonged unavailability of the non-employee complainant, witness, or evidence, or a criminal investigation restricting necessary investigative steps from being completed.

            b.    The investigative timeline shall not be extended without an approved reasonable justification.

         3.    Division Process to Requests for Investigative Extension: The *Request for Investigative Extension* for a Division Level Investigation is attached as Appendix xxx and shall be processed in the following manner:

            a.    The *Request for Investigative Extension* shall be completed by the investigator and submitted through the chain of command to their Executive Chief for review. The Executive Chief will forward the *Request for Investigative Extension* to the PSB Commander for processing no later than 10 calendar days prior to the current investigative due date.

            b.    If approved, the PSB will facilitate the submission to the Sheriff for review and consideration.

            c.    If approved by the Sheriff, the PSB will submit the request to the Monitor Team (during such time as the Monitor is assigned) for final review, approval, and establishment of a new investigation due date.

            d.    If a new due date is approved, the *Request for Investigative Extension* will be added to the investigative case file and provided to the investigator and respective Division Commander by the PSB.

37

46REPORT000282

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: xx-xx-xx**

  e.     If at any stage, the *Request for Investigative Extension* is not approved, the *Request for Investigative Extension* will be provided to the PSB to be added to the investigative case file and a copy of the unapproved request will be provided to the investigator and respective Division Commander by the PSB.

  f.     The PSB will update the IAPro database with any approved extension due date.

  g.     If the investigation is not completed by the newly established due date a new *Request for Investigative Extension* will be completed utilizing the procedures previously outlined.

B.     Investigative Timeline Extension: Completion of the *Request for Investigative Extension* shall include a brief synopsis of the case, the justification for requesting the extension, and the new investigative timeline due date being requested.

  1.     The *Request for Investigative Extension* shall be submitted to the PSB Commander no later than 10 calendar days prior to the current investigative due date.

  2.     The *Request for Investigative Extension* will be attached to the administrative investigation case file and if applicable, any newly approved deadline will be provided to the investigator and respective Division Commander by the PSB.

C.     Overall Investigation Completion Timeline: The **overall** administrative investigation completion timeline starts on the date the Office receives notice of alleged employee misconduct by a person authorized by the Office to initiate an investigation which includes investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct and ends when the employee is served with a *Closed Case Notification, Coaching, Written Reprimand, or Pre-Determination Hearing Notice*.

  1.     In cases involving a law enforcement officer's conduct that may result in suspension, demotion, or dismissal, the Office is statutorily obligated to make a good faith effort to complete an administrative investigation within 180 calendar days after the Office receives notice of the allegation by a person authorized by the Office to initiate an investigation. The 180-calendar day timeline is met when the employee is served with a *Closed Case Notification, Coaching, Written Reprimand*, or *Pre-Determination Hearing Notice*.

  2.     If it appears that the completion timeline will exceed the statutorily identified 180th calendar day despite good faith efforts, and additional time is necessary to obtain or review evidence, the Office shall provide the principal(s) with a written notice explanation of the reasons for the investigation to continue beyond 180 calendar days.

    a.     The PSB shall prepare a *180-Day Notice* and provide a copy of the *180-Day Notice* signed by the PSB Commander to the principal(s) **prior** to 180 calendar days.

    b.     The *180-Day Notice* shall be attached to the investigative report and documented in IAPro.

  3.     In accordance with Arizona Revised Statute, following the *180-Day Notice,* the completion timeline for an administrative investigation involving a law enforcement officer's conduct that may result in suspension, demotion, or dismissal, shall not exceed an additional 360 calendar days, with the exceptions of events indicated below.

38

46REPORT000283

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

    a.    The completion timeline is suspended during the time that any criminal investigation or prosecution is pending in connection with the act, omission, or other allegation of misconduct.

    b.    The completion timeline is suspended during the period of time in which a law enforcement officer who is involved in the investigation is incapacitated or otherwise unavailable.

    c.    The completion timeline may be suspended for a period prescribed in a written waiver of the limitation by the law enforcement officer.

    d.    The completion timeline may be suspended for emergencies or natural disasters during the time period in which the governor has declared a state of emergency within the jurisdictional boundaries of the concerned employer.

    e.    A multijurisdictional investigation may be extended for a period of time reasonably necessary to facilitate the coordination of the employers involved.

10.    **Administrative Investigation Interview Guidelines:** Interviews shall be conducted according to the following guidelines:

    A.    Audio and video recordings of the entire interview shall be made by the assigned investigator for administrative purposes. To ensure the integrity of the investigation, these recordings shall become part of the investigative file as the official recordings. Employees are permitted to record their own interviews with investigators using personally owned electronic devices. Recordings made by the employee, or the employee's observer, do not constitute an official record of the interview.

    B.    The employee's observer may take notes during the interview. The employee may use notes taken during the interview only to assist them in the investigation or a disciplinary matter. The notes do not constitute an official record of the interview.

    C.    Any notes that are taken or recordings made during the interview shall be kept confidential and may only be discussed and/or shared with those specified in the Notice of Investigation, the employee's observer, and the employee's attorney.

    D.    Principals of an administrative investigation should, in most cases, be interviewed after the complainant, witness, and investigative leads have been interviewed, evidence has been examined, associated reports and testimony have been reviewed; and the principal's training, work assignments, supervisor notes, and previous similar administrative investigations and/or criminal investigations involving the principal, have been reviewed.

    E.    The interview shall be conducted at a reasonable hour, preferably during the interviewee's work schedule, unless circumstances dictate otherwise. Maricopa County and Office employees interviewed outside their work schedule must be paid for all hours they are required to participate in the interview.

    F.    The interview shall be conducted with an Office employee at PSB or at the district/Division. Interviews of employee complainants and witnesses may be conducted via Microsoft Teams video-conferencing at the discretion of the investigator if the confidentiality and other interview requirements of Office Policy are met. The Microsoft Team video conference shall be recorded, and the employee notified of the recording process. Interviews with members of the public shall be conducted at a mutually agreeable location or through a mutually agreeable communication method.

39

46REPORT000284

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: xx-xx-xx**

G.      Any employee participating in an interview at the PSB office shall be required to secure all weapons, to include firearms and knives, prior to entering the PSB office.  This includes complainants, witnesses, investigative leads, principals, and employee observers.

H.      All employees shall cooperate with an administrative investigation, including appearing for an interview when requested by an investigator, and providing all required documents, evidence, or names of witnesses that may be relevant to the investigation.  Intentionally withholding evidence or information during an administrative investigation shall result in disciplinary action.

I.      Supervisors shall be notified when an employee under their supervision is summoned as part of an administrative investigation and shall facilitate the employee's appearance, absent extraordinary and documented circumstances.

J.      A principal shall be permitted reasonable breaks of limited duration during any interview for the purpose of telephonic or in-person consultation with others, including attorneys, who are immediately available.

K.      In an administrative investigation where the principal is involved in a use of force incident that resulted in death or serious physical injury of a person and the principal video recorded the event, the investigator shall offer the principal the opportunity to view the video recording.  Once the initial administrative interview has been conducted, the administrative investigator shall show the principal the recording.  This shall occur prior to the conclusion of the interview process.  The principal shall be given the opportunity to provide additional information to supplement his statement, and he may be asked additional questions by the investigator, as specified in Office Policy GJ-35, *Body-Worn Cameras*.

1.      Prior to viewing the video recording, the investigator shall read the principal the following statement, as specified in ARS 38-1116:

*Video evidence has limitations and may depict events differently than you recall.  The video evidence may assist your memory and may assist in explaining your state of mind at the time of the incident.  Viewing video evidence may or may not provide additional clarity to what you remember.  You should not feel in any way compelled or obligated to explain any difference in what you remember and acted on from what viewing the additional evidence provides you.*

2.      Following the review of the video recording, the principal shall be given the opportunity to provide the investigator information they believe is relevant to the administrative investigation.

11.   **Administrative Interview Forms:** Prior to an administrative investigation interview, and at the investigator's discretion to preserve the integrity of the investigation, employee complainants, witnesses, investigative leads, and principals shall be provided a *Notice of Investigation,* and principals shall be provided a *Garrity Warning*.  A copy of each shall be provided to the employee.

A.      The *Notice of Investigation* templates are located in the Internal Affairs\Forms folder on the Office's shared drive.

1.      The *Notice of Investigation* clarifies the employee's status in the investigation and the employee's responsibility not to discuss the investigation with anyone other than those specified in the *Notice of Investigation*.

40

46REPORT000285

a.   If the *Notice of Investigation* allows the employee to speak with their spouse or domestic partner about the investigation and the spouse or domestic partner is an employee of the Office, the following shall apply:

(1)   The spouse or domestic partner shall adhere to all the requirement of the *Notice of Investigation* and shall not be required to sign or receive a copy of their spouse or domestic partner's *Notice of Investigation.*

(2)   The spouse or domestic partner shall not discuss the investigation with anyone other than those specified in the *Notice of Investigation.*

b.   An employee's spouse or domestic partner, who violates the *Notice of Investigation*, shall be subject to disciplinary action, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

2.   The *Notice of Investigation* issued to a principal shall include the alleged facts that are the basis of the investigation, the specific nature of the investigation, the principal's status in the investigation, all known allegations of misconduct that are the reason for the interview, and the principal's right to have an observer present at the interview.  The principal shall be provided a copy of the notice of investigation that they shall retain.

a.   When issuing the notice to the principal, the Office shall provide any relevant and readily available materials, including complaints that contain the alleged facts, except for complaints that are filed with the Office and that include allegations of unlawful discrimination, harassment, or retaliation, or complaints that involve matters under the jurisdiction of the EEOC.  The format of the materials may be written, audio, or video.

b.   The Office is not required to disclose any facts to the employee that would impede the investigation.

3.   During an interview if, through questioning of the employee, additional employee misconduct is discovered beyond the scope of the current administrative investigation, the in-progress interview shall continue and questions concerning the new misconduct may be asked without the issuance of a separate *Notice of Investigation*.

a.   All new allegations of employee misconduct shall be investigated, as specified in this Office Policy.  Following the interview, a determination shall be made by the PSB Commander, as specified in this Office Policy, whether a separate investigation into the newly alleged misconduct shall be conducted or whether the new allegations shall be included in the current investigation.

b.   During an interview, should misconduct of a criminal nature be disclosed, the interview must cease, and further direction be provided by the PSB Commander.

4.   If an employee is involved in a critical incident investigation, statements made during a tactical debrief will not be considered a violation of a NOI.

B.   The *Garrity Warning* template is located in the Internal Affairs\Forms folder on the Office's shared drive.  The *Garrity Warning* advises employees that statements given during an administrative

41

46REPORT000286

investigation are compelled statements and cannot be used to incriminate the affected employee in any criminal proceedings. *Garrity* shall only be provided to principals of an investigation.

C. Employee Release from NOI: An employee is released from the NOI when notified by the PSB that the investigation is closed.

12. **Employee Right to an Observer:**

A. If an employee is party to an administrative investigation as a witness, investigative lead, or principal, they shall be notified that they may request to have an observer present during the interview, at no cost to the Office. The investigator shall have the employee complete the *Employee Observer Admonition* or the *Observer Waiver Form* prior to the interview. These forms are located in the Internal Affairs\Forms folder on the Office's shared drive.

B. If an employee witness, investigative lead, or principal desires an observer, they shall provide the name of the prospective observer to the investigator to ensure the observer selected is not involved in the investigation as a complainant, principal, witness, or investigative lead, or is an observer for another employee involved in the same or related investigation. Personnel within the employee's chain of command shall be excluded from acting as an employee's observer. The PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer.

C. The observer selected must be an employee of the Office, not an attorney, and must be available on reasonable notice so that the interview is not unreasonably delayed. If the selected observer is not reasonably available, the employee witness, investigative lead, or principal may request permission from their assigned investigator to use a representative from their professional membership organization.

D. If an employee witness, investigative lead, or principal elects to have an observer, they may only have one observer at any given time.

E. An employee who agrees to be an observer shall do so at no cost to the Office by using their own off-duty time. Accrued vacation time may be used during scheduled duty hours, provided that the absence shall not have a cost impact on the operation of the area where the observer is assigned.

F. An observer must, in fact, act only as an observer. At no time shall the observer interrupt the investigative interview in any manner including, but not limited to, engaging in any form of verbal or non-verbal communication, making distracting noises, or hindering the flow or direction of the interview.

G. The observer is prohibited from making any electronic recordings or transmitting any portion of the interview in real time. Any open or covert attempt to do so shall result in disciplinary action.

H. Employee observers are permitted to take notes during the interview.

1. The notes may only be used to assist in the investigation or a disciplinary matter. The notes do not constitute an official record of the interview.

2. Any notes that are taken during the interview shall be kept confidential and shall only be discussed and/or shared with those specified in the *Notice of Investigation,* the employee the observer is representing, and the employee's attorney.

Court Order Annual Review 2022-23

**Policy GH-2,** *Internal Investigations* **Effective Date: xx-xx-xx**

    3. If the employee, employee's observer, attorney, or anyone specified in the *Notice of Investigation* releases information without authorization, the employee, the employee's observer, and any other Office employee specified in the *Notice of Investigation* may be subject to disciplinary action up to and including, dismissal from employment.

  I. If the employee witness, investigative lead, or principal or their observer fails to comply with these guidelines, the offender may be subject to disciplinary action. If the observer's non-compliance occurs during the interview, the observer shall be immediately removed from the interview.

  J. Once the interview has concluded, the employee witness, investigative lead, or principal is prohibited from discussing the interview or investigation with anyone other than the assigned investigator, observer, or legal counsel. If the employee witness, investigative lead, or principal releases information without authorization, the Office may subject the employee to disciplinary action.

  K. Once the interview has been concluded, the observer is prohibited from discussing the interview or investigation with anyone other than the assigned investigator or the employee they represented. If the observer releases information without authorization, the Office may subject the employee to disciplinary action.

  L. Employees shall not be subject to discipline, threat of retaliation, or retaliation for requesting the use of, or serving as, an observer.

  M. The right to an observer does not apply to an interview that is:

    1. In the normal course of duty, counseling, instruction, an informal verbal admonishment, or other routine or unplanned contact with a supervisor or any other employee;

    2. During a preliminary inquiry to determine the scope of the allegations; or

    3. In the course of a criminal investigation.

13. **Employee Five-Minute Statement**: At the conclusion of the interview, a principal shall be entitled to make a statement to the investigator, not to exceed five minutes, addressing specific facts or policies that are related to the interview.

14. **Examinations and Tests:** The *Garrity Warning* shall be given to a principal, and the *Notice of Investigation* shall be given to any employee, prior to any examination or test. Photographs, lineups, and psychological or physical examinations may be required in an administrative investigation and shall be authorized by the PSB Commander.

  A. If it appears likely that an employee shall be required to submit to examinations or tests during the course of an administrative investigation, the employee shall be advised that submission is compulsory. The required examinations or tests shall be incident-specific and narrowly and directly related to the employee's performance or non-performance of duty, their fitness for duty, or the alleged misconduct.

  B. With proper justification, a request for a physical or psychological examination of an employee may be approved. The employee shall cooperate with the examiner and submit to all laboratory or psychological tests. Drug testing procedures are specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*.

43

46REPORT000288

15. **Administrative Leave with Pay:** The purpose of administrative leave is to manage risk and to protect employees, victims, and the integrity of an investigation. Employees may also be placed on administrative leave with pay due to a critical incident. The following procedures specify when and how an employee may be placed on administrative leave:

    A.     Command personnel of the rank of lieutenant or above, or their civilian counterparts may place an employee on administrative leave with pay for the remainder of a shift for alleged infractions of the law, Maricopa County Merit System Rules, or Office Policy. The incident shall immediately be reported to the bureau commander, who shall review the facts of the incident and, if necessary, extend the administrative leave up to a maximum of three working days. The Chief Deputy or the PSB Commander or designee must authorize leave to exceed three working days. Once authorized, the employee shall be advised of the administrative leave in writing.

    B.     If the allegation in the complaint would likely result in dismissal if sustained, the bureau commander may place an employee on administrative leave with pay for the remainder of a shift and shall refer the matter directly to the Chief Deputy or the PSB Commander or designee, who may place the employee on administrative leave with pay. The employee shall be advised of the administrative leave in writing.

    C.     Employees involved in a critical incident may be placed on administrative leave with pay. The Chief Deputy or PSB Commander or designee, shall authorize critical incident administrative leave. Once authorized, the employee shall be advised of the administrative leave in writing. This leave typically includes the remainder of the work week during which the critical incident occurred plus an additional 40 hours during which time the PSB Administrative Investigators-Critical Incident members shall conduct their initial investigation and allow the involved employee to complete other administrative processes required following a critical incident.

16. **Retaliation:** All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, member of the public, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action. Retaliating against any person who reports or investigates alleged misconduct shall be considered serious misconduct and shall result in disciplinary action, up to and including dismissal from employment.

17. **Closed Case Notification:**

    A.     Upon completion of the investigation, if the findings are determined to be Not Sustained, Unfounded, or Exonerated, the PSB shall send the principal a *Closed Case Notification* memorandum notifying the principal of the outcome. If the finding is Sustained, and discipline is required, the procedures shall be followed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*. A template for a *Closed Case Notification* is found in the Internal Affairs\Forms folder on the Office's shared drive.

    B.     Upon completion of the investigation, the PSB shall notify the employee witnesses and investigative leads that the case is closed.

18. **Final Disposition Letter:** A *Final Disposition Letter* shall be sent to all known complainants by the PSB upon completion of the investigation. A copy of the letter must be maintained with the investigative file. Templates for this letter may be found in the Internal Affairs\Forms folder on the Office's shared drive. The letter shall state whether the actions of the employee were appropriate under the circumstances or fell within the guidelines of policy. When the actions of an employee have been found to be in violation of policy, the complainant shall also be advised that the matter shall be addressed internally. In cases involving a complaint

44

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: xx-xx-xx**

from a member of the public, the complainant shall be notified of the findings, and as applicable, the imposed discipline as permitted by law.

19. **Employee Resignation/Retirements While Under Investigation:** An investigation of an employee who resigns or retires while under investigation shall be completed and findings regarding policy violations shall be made, unless it meets the criteria for a PSB Diversion as per this Policy. Depending on the status of the investigation at the time of the resignation or retirement, the employee shall be given the opportunity to participate in an interview and/or provide written information regarding the findings of the investigation before the case is finalized.

20. **Policy, Training, Tactical or Equipment Failure or Deficiency:** A failure or deficiency occurs when the allegation is true and the action of the employee was within policy or training guidelines, but the result was inappropriate or undesirable.

    A.    If, during the course of an administrative investigation, an investigator identifies a policy deficiency, training or tactical failure, or equipment failure, the investigator shall document the deficiency or failure in their investigative report. The PSB shall notify the Division Commander of the Policy Development Section and/or Training Division of the deficiency or failure, and ensure that the policy, tactical, or equipment concerns are resolved. The Policy Development Section and/or Training Division shall notify the PSB of the actions taken. This information will be added to the investigative file.

    B.    If, during the course of an administrative investigation, an investigator identifies an employee's training deficiency, the investigator shall document the deficiency in their investigative report. The PSB Commander shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. A memorandum of concern detailing the policy, training, tactical or equipment concerns, and any proposed recommendations, shall be authored and forwarded to the appropriate Bureau Chief and Division Commander for review and action.

21. **Confidentiality and Security of Records:** Information regarding an employee misconduct investigation shall be kept as confidential as possible while still allowing for a thorough investigation.

    A.    The PSB shall maintain a complete file of all documents within the Office's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Merit Systems Commission or a state court. All files, reports, tapes, electronic media, memoranda, and other forms of documentation relating to a completed administrative investigation shall be filed in the PSB. All investigations shall be securely maintained. All copies of documents related to a completed administrative investigation shall be destroyed upon notification that the original investigation documents have been received by the PSB.

    B.    Polygraph Services may retain original documents and polygraph recordings which are prepared or originated by that unit, but shall not retain any other investigative material, as specified in Office Policy GH-3, *Polygraph Procedures and Documents*.

22. **Records Disclosure:** The Administrative Services Division may distribute copies of all or any portion of an administrative investigation for administrative or public record purposes, or as necessary to comply with a judgment of a federal or state court.

    A.    In accordance with ARS Title 38, Chapter 8, Article 1, information about a law enforcement officer's investigative file shall not be released for public inspection until the investigation is complete, or the Office has discontinued the investigation. The investigation is not considered complete until the principal receives a *Closed Case Notification*, a Coaching, a *Written Reprimand*, or a Notice of

45

46REPORT000290

**Policy GH-2,** *Internal Investigations* <span style="float:right">**Effective Date: xx-xx-xx**</span>

Disciplinary Action. If the investigative file is the subject of an appeal regarding a disciplinary action that resulted in a suspension, demotion, or dismissal by a classified law enforcement officer, the investigative file is not complete until the conclusion of the appeal process before the Maricopa County Merit Systems Commission, or such time to appeal has lapsed.

B.  Investigative files for all other Office employees shall be released, in accordance with state law.

C.  Polygraph data and reports regarding a classified law enforcement officer shall be disclosed, pursuant to ARS Title 38, Chapter 8, Article 1.

23. **Records Retention:** In accordance with ARS 39-128, the Office shall retain all records that are reasonably necessary or appropriate to maintain an accurate knowledge of disciplinary action involving employees of the Office, including the employee's responses to all disciplinary actions. All administrative investigations shall be maintained for five years after an employee's separation or retirement from Office employment.

Attachment A
Complaint Acceptance Report Protected.docx

Attachment B
Authorization to Release Information Protected.docx

46

46REPORT000291

# MARICOPA COUNTY SHERIFF'S OFFICE
## Paul Penzone, Sheriff

## Professional Standards Bureau
## Operations Manual
## Effective Xxxxxx xx, 2023



*The content of this Office manual provides specific guidance regarding the administrative practices and procedures associated with the (Area of Operation). The contents are not intended to supersede or conflict with Office Policy, but to clarify and define the division's daily operations. Personnel assigned to the Professional Standards Bureau shall be responsible for reading, understanding, and complying with the provisions contained in this Operations Manual, in addition to Maricopa County Sheriff's Office Policy.*

*Employees wishing to submit recommendations for procedural changes to this manual shall do so in writing through the chain-of-command. Recommendations are to be submitted with an explanation as to why a revision would be beneficial and should include a sample draft of the proposed revision.*

**Approved by:**

_____ Date: _____

**PSB Commander**

**Approved by:**

_____ Date: _____

**Executive Chief Bureau of Compliance**

46REPORT000292

**101. Definitions:**

**Administrative Closure:** A result of a PSB Diversion process in which the PSB Commander reviews individual complaints, on a case-by-case basis, and determines that they cannot be satisfactorily investigated or an investigation is not necessary. Administrative Closures may be used in the following circumstances: a) Situations where an internal or external complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported; b) Situations where an internal or external complaint was received by the Office after the employee(s) involved in the alleged misconduct left employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident; c) Situations where in an internal or external complaint the initial complainant is unwilling or unable to cooperate; d) Situations where in an internal or external complaint the initial complainant is anonymous; e) Situations resulting in the death or serious physical injury of a prisoner or an inmate that do not involve a use of force by an employee and are considered non-critical incidents; and f) Situations where an internal complaint originated from a workplace relationship and is most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division.

An Administrative Closure shall also be used when the following circumstances exist in a Service Complaint: a) The complaint does not allege employee misconduct and can be resolved with an explanation to the complainant regarding the policy, procedure, service level due to manpower or resources, or statutory authority required of the Office. This includes matters in which the complainant questions Office policy, procedures, or service level due to manpower or resources, or statutory authority required of the Office; b) The complaint does not allege employee misconduct and expresses dissatisfaction with the outcome of formal legal, civil, or administrative processes involving members of the Office. The preliminary inquiry associated with this type of Service Complaint closure shall be thoroughly reviewed and verify that potential employee misconduct was not involved with the incident prior to closure; c) The complaint does not allege employee misconduct and requests additional information or follow-up actions pertaining to a prior call for service, report, or investigation; or d) The complaint lacks specificity and the complainant refuses or is unable to provide further clarification necessary for the Office to fully understand the complaint, or the complainant does not articulate facts amounting to an allegation of employee misconduct.

**Appointing Authority:** For the purposes of this policy, the designated member of Office command staff, appointed by the Sheriff, whose duties include conducting the Pre-Determination Hearing; and providing the employee with an opportunity to be heard.

**Blue Team:** The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IAPro Early Identification case management system.

**Class Remedial Matter:** Misconduct by employees of the Office involving those matters covered by the *Melendres* case or the remedies to which those impacted by the *Melendres* case are entitled.

**Classified:** All positions in Maricopa County service that are covered by the Maricopa County Merit System Rules. Excluded are those employees identified as temporary, initial probation, or contract employees, and those positions identified as unclassified.

**Clear and Convincing Evidence:** Evidence that leaves one with a firm belief or conviction that is highly probable that the factual contention of the claim or defense is true. This standard of proof is higher than proof by a preponderance of the evidence but does not require proof beyond a reasonable doubt. The standard of proof, Clear and Convincing Evidence, is only utilized when determining an investigatory finding of Unfounded; it is evidence that the allegation was false or not supported by fact.

2

46REPORT000293

**Coaching:** Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

For the purpose of determining the number of offenses committed within identified categories of Office Policy GC-17, *Employee Disciplinary Procedures*, Attachment A, the first use of Coaching shall not constitute an offense. However, the use of Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation. Coaching shall be documented in Blue Team and shall be considered for the purpose of discipline for one year prior to the current offense.

**Compelled Statement:** Information received during an administrative investigation, which the Office has required an employee to provide under penalty of disciplinary action, up to, and including, employment dismissal.

**Complainant:** Any individual who files a complaint regarding the conduct of any employee alleging a violation of Office policies, procedures, or actions.

**Complaint:** An allegation of employee misconduct or wrongdoing. The complaint may be made verbally or in writing, in person, by phone, by mail, or online; and may be by the individual complainant, someone acting on the complainant's behalf or anonymously; and with or without a signature.

**Complaint Intake Sergeant:** A Professional Standards Bureau (PSB) employee assigned to receive Internal and External Complaints, enter into IAPro, and forward them to the appropriate commander.

**Court Appointed Monitor (The Monitor and/or the Monitor Team):** A person or team of people selected to assess and report on the MCSO's implementation of the October 2, 2013 Supplemental Permanent Injunction/Judgment Order and all subsequent amended and/or modified orders related to this document (*Melendres* Court Order and/or the Order).

**Critical Incident:** Any incident that involves the use of force by an employee resulting in death or serious physical injury of a member of the public, prisoner, or an inmate; any assault upon MCSO employees, by any means, that results in serious physical injury or death; or the intentional and unintentional discharge of a firearm by an employee in the performance of their lawful duties. The term "critical incident," as used in this Office Policy, is narrowed for investigative purposes and should not be confused with the definition provided in Office Policy GC-22, Critical Incident Stress Management Program, which is all encompassing and directly associated with issues of critical incident stress management. A critical incident does not include the following and therefore does not require protocol activation:

A. The necessary dispatch of an animal for humane/medical purposes; including discharge of a firearm toward an animal for self-defense of themselves or in defense of others; or

B. The use of a specialized firearm by the Tactical Operations Unit in order to enhance officer safety, dispense chemical agents, or as an entry device, when no serious physical injury or death to any person occurs.

3

46REPORT000294

**Disciplinary Offer:** A situation where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, that establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrices, resulting in a sustained finding. A Disciplinary Offer should be considered an Expedited Resolution.

**Early Identification System (EIS):** A system of electronic databases that captures and stores threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified. Blue Team, IAPro, and EI Pro are applications of the EIS.

**Early Intervention Unit (EIU):** The EIU is part of the Bureau of Internal Oversight. The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users. The unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct or operating procedures and recognizes positive attributes by reviewing employee awards. The Office shall ensure there is sufficient staff to facilitate EIS input and training.

**Employee:** A person currently employed by the Office in a classified, unclassified, contract or temporary status.

**Employee Misconduct:** Conduct that includes, but is not limited to: a violation of Office policy; an act of retaliation for complying with Office policy; an intentional provision of false information in an administrative investigation or any official report, log, or electronic transmittal of information; an intentional failure to complete data collection of other paperwork requirements required by the Office; or federal, state, or local criminal or civil violations.

**Employee Retention and Performance Division (ERPD):** The ERPD is a resource available to all employees, supervisors, and commanders to assist with addressing employee performance concerns and sources of conflict originating from workplace relationships on a case-by-case basis. This includes resolving disputes pertaining to annual performance appraisals, supervisor application of workplace rules/regulations, and disputes pertaining to employee leave matters. The Employee Retention and Performance Division is comprised of the Leave Management, Compensation, and Retention and Performance Sections. The Leave Management Section (LMS) coordinates leaves of absence and modified duty requests for employees in accordance with the Family and Medical Leave Act (FMLA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), the Americans with Disabilities Act (ADA), workers' compensation policy, and other related regulations and policies.

**Expedited Resolution:** A truncated investigative process that may be used in the event of a Disciplinary Offer resulting in a sustained finding, or in the event that documentary or video evidence presents clear and convincing evidence establishing that the alleged violation of Office Policy did not occur and there is no evidence or indication of any other potential employee misconduct involved in the incident (resulting in an Unfounded finding).

**External Complaint:** An expression of dissatisfaction by the public, directed at an employee's conduct, Office policy and procedure, or service.

4

46REPORT000295

**Federal Court Order (the *Melendres* Court Order and/or the Order):** The October 2, 2013 Supplemental Permanent Injunction/Judgment Order, the Amended Second Supplemental Permanent Injunction/Judgement Order, and all subsequent amended and/or modified orders related to this document.

**Garrity Warning:** A notice of an employee's obligations and rights regarding compelled statements during an administrative investigation.

**IA Number:** A unique investigative action number assigned to an allegation of misconduct for tracking and recording purposes.

**IAPro:** A case management system used by the EIU, the Professional Standards Bureau (PSB), and the Administrative Services Division that tracks and analyzes information, including but not limited to, complaints, commendations, use of force incidents, pursuits, discipline, supervisor notes, and internal investigations. IAPro is used by PSB for the periodic assessment of timelines of investigations and for monitoring the caseloads of internal affairs investigators. IAPro is also used to track, as a separate complaint category, allegations of biased policing and unlawful investigatory stops, searches, seizures, or arrests.

**Internal Complaint:** A complaint that originates from within the Office. Such complaints may be initiated by other employees or from supervisors who observed, or were informed by other employees, of possible policy violations or other misconduct. For the purpose of this Office Policy, complaints made by a former Office employee regarding conduct that occurred while still employed by the Office shall also be identified as an internal complaint.

**Internal Affairs Investigator:** Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the PSB or supervisors in an Office division or bureau who are assigned to investigate misconduct.

**Investigative File:** The Office's complete investigative report and any attachments detailing the incidents being investigated. The file shall contain, but is not limited to, the Administrative Investigations Process Checklist, Cover Sheet, Findings Page(s), Prior Work History Report, Investigative Plan, Investigative Report, the Presumptive Range of Discipline form, the Employee Disciplinary Considerations and Decision form, transcripts, audio/video of interviews, body-worn camera footage, etc. Depending on the outcome of the investigation, the file shall also contain, but not be limited to, a Final Disposition Letter, Closed Case Notification, and documents that record discipline, to include the Pre-Determination Hearing (PDH) recording. The Professional Standards Bureau shall maintain the investigative file of all documents within the Office's custody and control relating to any investigation and related disciplinary proceedings, grievance proceedings, and appeals to the Maricopa County Merit System Council or state court.

**Investigative Lead:** An individual believed to have information or facts relevant to the matter under investigation.

**MCSO Quarterly Report:** Report submitted to the Monitor Team on a quarterly basis assessing MCSO's level of compliance with the Order.

**Misconduct:** Any violation of Office policy or procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

**Criminal Misconduct:** Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

5

46REPORT000296

**Minor Misconduct:** Misconduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

Minor misconduct, while a violation of Office Policy, can often be addressed with field supervisor-initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense and which has not been received by the Office as an External Complaint, or has not already been assigned to the Professional Standards Bureau (PSB).

**Serious Misconduct:** Misconduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

**The Office:** The Maricopa County Sheriff's Office or the MCSO.

**Notice of Investigation:** A written notice given to an employee during an administrative investigation which identifies the employee's status in the investigation, the employee's responsibility not to discuss the investigation with anyone other than those specified, the name and rank of the assigned investigators, and the right to have an observer present at the interview.

**Official Investigation:** An official inquiry by a supervisor, a Professional Standards Bureau administrative investigator, a criminal investigator, or a polygraph examiner into alleged employee misconduct or wrongdoing that relates to or may affect an employee's position with the Office. The Office has two types of investigations that are used to examine these allegations:

1.    Administrative Investigation: An investigation conducted into apparent violations of Office policy. Sustained allegations for an administrative investigation provide the basis for the imposition of discipline according to the Discipline Matrices and the Categories of Offenses, as specified in Office Policy GC-17, *Employee Disciplinary Procedure*.

2.    Criminal Investigation: An investigation by a criminal investigator into an allegation of employee criminal misconduct. These include the process of collecting information (or evidence) about a crime in order to: 1) determine if a crime has been committed; 2) identify the perpetrator; 3) apprehend the perpetrator, and 4) provide evidence to support a conviction in court.

**Pre-Determination Hearing (PDH):** A forum that allows an employee, regardless of employment status, who is being considered for serious discipline, to address the Appointing Authority regarding the intended discipline.

**Preponderance of the Evidence:** Facts alleged are more likely true than not true. The standard of proof, Preponderance of the Evidence, is only utilized when determining an investigatory finding of Sustained.

**PSB Diversion:** A complaint intake process to address, on a case-by-case basis, eligible complaints without the initiation of a formal administrative investigation or service complaint. Complaints received by the PSB shall be reviewed to make an initial determination of the most appropriate course of action to take based on the nature of the allegation. The Diversion process can culminate in one of the following: PSB-Directed Supervisory Intervention; Administrative Closure; or Expedited Resolution with a finding of Unfounded.

6

46REPORT000297

**PSB-Directed Supervisory Intervention:** A PSB Diversion intended to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation.  PSB may, on a case-by-case basis, initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching.  The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in Attachment B of Office Policy GC-17 for any External Complaints.

**Service Complaint:**  A complaint regarding an inadequate policy, procedure, practice, service level due to manpower or resources, or statutory authority required of the Office.   A service complaint is not an allegation of employee misconduct.

46REPORT000298

**SECTION 300 – PROCEDURES**

**301.    Complaint Intake and Assignment**

    A.    PSB Review:

        1.    Once a complaint is received by the PSB, a review will be conducted.  Prior to assigning an investigation number, the PSB Commander shall make an initial determination of the most appropriate course of action to take regarding the complaint based on whether employee misconduct is alleged, and if so, the category of alleged offense(s).

        2.    The PSB Commander shall determine, on a case-by-case basis, if the complaint shall be processed as a PSB Diversion, Service Complaint, or administratively investigated.

            a.    The PSB Diversion is a mechanism initiated by the PSB Commander to address complaints that are eligible and most appropriately handled without the initiation of a formal administrative investigation or Service Complaint.

            b.    Only the specific categories of complaints in this Office Policy are eligible for a PSB Diversion.

            c.    The PSB Commander shall document in writing the decision to utilize a PSB Diversion instead of initiating a formal administrative investigation or Service Complaint.  Decisions as to how complaints are classified or which are eligible for PSB Diversions will be made on a case-by-case basis; cases may be reclassified.

            d.    If the PSB Commander determines that a qualifying complaint should be addressed with an approved PSB Diversion, the following procedures shall apply:

                (1)    The *PSB Diversion Service Form* shall include the PSB Diversion tracking number, involved employee, synopsis, associated policy violation(s), category of offense(s), and offense number.

                (2)    The *PSB Diversion Service Form* shall include instructions for issuance to the employee and be routed via the involved employee's chain of command for service.

                (3)    The *PSB Diversion Service Form* shall be issued to the involved employee, documented in the EIS in accordance with the instructions provided, and returned to the PSB within 30 calendar days.

                (4)    The *PSB Diversion Service Form* will be attached to the PSB Diversion Incident in the IAPro Database and linked to any associated EIS entries.

            e.    The following types of complaints are not eligible for consideration for a Diversion:

                (1)    Complaints involving members of the Plaintiffs' class;

                (2)    Complaints involving allegations of bias;

                (3)    Complaints involving allegations of criminal conduct;

8

46REPORT000299

(4)    Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

(5)    Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

(6)    Allegations of conduct that, if sustained, could constitute a Category 3 or higher Offense from the Office's Disciplinary Matrices – unless otherwise specified below.

f.    The following situations, on a case-by-case basis, are eligible as part of the Diversion process, to be Administrative Closures:

(1)    Situations where a complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported.

(2)    Situations where an internal or external complaint was received by the Office after the employee(s) involved in the alleged misconduct left employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident.

    (a)    Should the principal employee return to work at the Office, the case shall be reactivated and resumed for full completion in accordance with Office Policy standards. The time in which the employee was not employed with the Office shall be excluded from the investigative timeline.

(3)    Situations when the initial complainant is unwilling or unable to cooperate.

(4)    Situations where the initial complainant is anonymous. Anonymous complainants include those that are known but desire to remain anonymous and requested to not be included in the investigative report and those whose identity is unable to be confirmed.

(5)    Situations resulting in a health-related in-custody jail death that do not involve the use of force by an employee and are considered non-critical incidents under Office Policy.

    (a)    There are no exclusions for Diversions in these situations.

    (b)    **Prisoner or Inmate Death *Preliminary Inquiry Report* (PIR):** Following the death of a prisoner or inmate in Office custody, as specified in Office Policy GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate*, where there is **no** employee use of force, and when no PSB investigation has otherwise been initiated, shall require the completion of a PIR, as specified in this Office Policy. The PIR shall be conducted to identify potential employee misconduct associated with the incident. If at any time during the PIR process employee misconduct is identified, it shall

9

immediately be entered into Blue Team as an Internal Complaint by the supervisor identifying the misconduct.

    i.    The gathering of information for the PIR shall include, but is not limited to, interviews of involved employees, information gathered through various data sources, and the review of associated audio and video recordings. The PIR will ensure that any perishable evidence relevant to an administrative misconduct investigation is preserved.

    ii.    PIRs completed pursuant to a prisoner or inmate death shall be forwarded through the chain of command to the PSB Commander or designee to determine if an administrative investigation is warranted to determine whether any violation of Office policy contributed in any way to the prisoner or inmate death.

        a.    If the PSB Commander or designee determines employee misconduct was identified, the PIR shall be entered as an Internal Complaint pursuant to this Office Policy.

        b.    If the PSB Commander or designee determines employee misconduct did not occur, no further administrative investigative action is required.

    iii.    A prisoner or inmate death PIR is not required when the following occurs:

        a.    The death of a prisoner or inmate is determined be a critical incident, as specified in Office Policy GJ-2, *Critical Incident Response*; or

        b.    The PSB has already initiated an administrative investigation into the incident.

(6)    Situations where an internal complaint originated from a workplace relationship(s) and are most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division (ERPD) in accordance with the process outlined in the PSB Operations Manual.

    (a)    The following types of complaints are not eligible for consideration for a PSB Diversion Process in place of a formal administrative investigation or Service Complaint:

        i.    Allegations of conduct that, if sustained, could constitute a Category 4 or higher Offense from the Office's Disciplinary Matrices.

10

46REPORT000301

g.   PSB-Directed Supervisory Interventions:

(1)   Situations wherein the PSB may initiate an PSB-Directed Supervisory Intervention to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, PSB may initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in Attachment B of Office Policy GC-17 for any External Complaints. Employee conduct outside of the limitations of the named sections for both internal and external allegations shall be addressed by considering the definition for each Category of Offenses and determining placement, as specified in the Office Policy.

These situations are eligible, on a case-by-case basis, for consideration by the PSB Commander for an approved PSB-Directed Supervisory Intervention, in lieu of an administrative investigation or Service Complaint.

(a)   Following a review of the circumstances of the incident, available evidence, EIS profile, and the disciplinary history of the potential principal, the PSB Commander shall make an initial determination if the allegations can appropriately be addressed through an approved PSB-Directed Supervisory Intervention. Principals shall not exceed the number of coachings allowed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, for one year prior to the current offense.

h.   Expedited Resolution with a finding of Unfounded:

(1)   Situations of an internal or external complaint where under the clear and convincing evidence standard, external documentary or video evidence establishes that the alleged violation of Office Policy did not occur and there is no indication of any other employee misconduct resulting in an Expedited Resolution with a finding of Unfounded.

(a)   If the investigator determines during the administrative investigative process that above conditions are met, and the case investigation has not already been completed, the investigator shall document in the investigative report the following:

i.   The manner and circumstances in which the above condition is met to support an expedited finding;

ii.   The investigative steps taken to verify there are no other indications or evidence of other employee misconduct involved in the incident;

11

46REPORT000302

    iii. If applicable, the readily available clear and convincing evidence demonstrating that the alleged violation of Office Policy could not occur as alleged, supporting an unfounded finding;

    iv. The investigative report shall be completed with the recommended expedited finding of unfounded and submitted for review in accordance with the processing of all other completed administrative investigations.

    v. If the Expedited Resolution and finding is approved by the PSB Commander, the administrative case will proceed through all other formal closure processes for an administrative investigation as outlined in Office Policy.

    vi. If the Expedited Resolution and finding is applied to an administrative investigation, a special indicator linked to the expedited finding shall be included in IAPro Investigative Case File and associated with the employee's EIS information for future reference.

3. The PSB Commander shall take into consideration the following when deciding if a PSB Diversion process is the most appropriate manner to address a complaint without the initiation of a formal administrative investigation or Service Complaint:

  a. The information obtained during the complaint intake process including giving weight to the complainant's explanation of the impact of the alleged employee misconduct.

  b. If the complaint filing was delayed, the reason(s) why a complaint filing was delayed. The mere fact of a delay in filing a complaint shall not be sufficient grounds in and of itself to not pursue an administrative investigation.

  c. The availability of evidence, to include BWC if readily available, and witnesses relevant to the alleged employee misconduct.

  d. If the complainant is anonymous or becomes unwilling or unable to cooperate. The mere fact that the complainant is anonymous or becomes unwilling or unable to cooperate with the investigation in and of itself shall not be sufficient grounds to not pursue an administrative investigation. A final decision shall be based on the totality of the information, the existing evidence, and/or the availability of viable leads to pursue.

  e. The EIS history of the involved employee(s), to include other pending administrative investigations.

  f. The disciplinary history of the involved employees. To include an overall three-year lookback review conducted for patterns of behaviors and misconduct.

  g. Potential policy, training, or tactical concerns involved in the incident.

12

46REPORT000303

h. Formal processes or mechanisms in MCSO Policy available to address the matter (i.e., the *Employee Grievance* process, the Early Identification Unit, *Maricopa County Merit Systems* and the *Employee Performance Appraisal* process).

i. Whether or not the alleged employee misconduct involved a supervisor's actions, or a supervisory failure.

4. The PSB Commander shall document in writing the decision to utilize a PSB Diversion instead of initiating a formal administrative investigation or Service Complaint.

a. The PSB Commander shall utilize the PSB Review Worksheet (Appendix xxxx) to document the review process and assessment.

b. The PSB Diversion Worksheet documentation shall demonstrate the PSB made a good faith effort to search and review readily available evidence relevant to the allegations that was not part of the initial complaint entry (physical evidence, identifying witnesses, BWC footage, other surveillance footage, etc.) to have a sufficient understanding of the totality of the circumstances regarding the incident. If necessary, the PSB shall also conduct or request a supervisor to conduct some preliminary inquiry actions that shall be documented in the PSB Diversion Worksheet, such as confirmation of information from complainants, witnesses, other involved participants, or record searches/requests, GPS data review, to understand the scope of the incident. All information shall be considered when determining the appropriate PSB Diversion course of action, or if a formal administrative investigation is appropriate.

c. If the PSB Commander determines that a PSB Diversion process should be utilized, the complaint shall be categorized with the incident type of PSB Diversion in the IAPro Database. The entry shall link the involved employees, allegations, and the determination.

(1) The PSB Diversion Service Form, disciplinary history, and all information received/reviewed shall be attached to the PSB Diversion Case File in the IAPro Database.

(2) If the PSB Commander determines that a qualifying complaint should be addressed with an approved supervisory intervention or combination of supervisory intervention methods, the following procedures shall apply:

(a) The PSB Diversion Service Form shall include the PSB Diversion tracking number, involved employee, synopsis, associated policy violation(s), category of offense(s), and offense numbers.

13

46REPORT000304

(b) The PSB Diversion Service Form shall include instructions for issuance to the employee and be routed via the involved employee's chain of command for service.

(c) The PSB Diversion Service Form shall be issued to the involved employee, documented in the EIS in accordance with the instructions provided, and returned to the PSB within 30 calendar days.

(d) The PSB Diversion Service Form will be attached to the PSB Diversion Incident in the IAPro Database and linked to any associated EIS entries.

(3) If the PSB Commander determines that an internal complaint originating from a workplace relationship should be handled with the assistance of the MCSO Employee Retention and Performance Division (ERPD), the following procedures shall apply:

(a) The ERPD is a resource available to all employees, supervisors, and commanders to assist with addressing employee performance concerns and sources of conflict originating from workplace relationships. This includes resolving disputes pertaining to annual performance appraisals, supervisor application of workplace rules/regulations, and disputes pertaining to employee leave matters.

(b) The PSB Commander shall, based upon the information available determine the level of involvement by the ERPD to address the complaint. The PSB Diversion Worksheet shall be utilized by the PSB Commander as outlined above to document the review, assessment, and eligibility of the matter to be resolved utilizing the ERPD.

i. If the PSB Commander determines that a qualifying complaint is most appropriately handled as a supervisory intervention with the assistance of the ERPD, in addition to processing the matter as a supervisor intervention, the PSB shall facilitate the following:

a. The PSB shall provide the contact information of the ERPD to the supervisor assigned the PSB Diversion to assist them as needed to complete the appropriate supervisory intervention.

b. The PSB shall provide the available information regarding the matter and the contact information for the supervisor assigned the PSB Diversion to the ERPD to foster communication and promote the most appropriate resolution to the supervisory intervention.

ii. If the PSB Commander determined that a qualifying complaint is most appropriately assessed for a proper course

14

46REPORT000305

of action by the ERPD, the PSB Commander shall refer the matter and all available information to the ERPD for further assessment.

a.      The ERPD will review, evaluate, inquire as needed, and formulate a memorandum outlining a recommended course of action to resolve the complaint. The memorandum including the proposed action(s) shall be provided in writing to the PSB Commander with a projected completion date. The memorandum shall also include any portion(s) of the complaint in which the ERPD determines to be feels are outside the scope of the proposed resolution or if additional alleged employee misconduct is identified.

b.      The PSB Commander shall review the proposal from the ERPD to resolve the complaint to verify no additional employee misconduct concerns have been identified. The PSB Commander will work with the ERPD to resolve any other identified concerns before moving forward with the proposal.

1.      If approved by the PSB Commander, the matter will be returned to the ERPD for completion of the proposed action.

2.      The ERPD shall document the completion of the proposed action which will be forwarded to the PSB Commander, or designee for review and inclusion in the PSB Diversion file in IAPro.

3.      If, after review, additional alleged employee misconduct has been identified, or the matter warrants further formal investigation, the formal administrative investigative process shall be initiated.

(4)      In the event that the PSB Commander determines that a Diversion should be utilized, the following procedures shall apply:

(a)      PSB Commander will complete the PSB Diversion Worksheet documenting a summary of the incident, the review conducted, assessment, policy violations.

(b)      The complaint should be categorized with the incident type of PSB Diversion in the IAPro Database. The entry shall link the involved employees, allegations, and the determination.

15

46REPORT000306

(c)     The case should be administratively closed with an explanation as to why that is the appropriate course of action. The PSB Diversion process shall utilize the EIS to process, document, route, and track the how eligible complaints are addressed in lieu of a formal administrative investigation or Service Complaint.

(5)     The PSB Diversion process shall require notification to the complainant, principal employees, and the respective employee's chain of command consistent with notifications sent when an administrative investigation or Service Complaint is received or closed.

(6)     Should additional allegations of employee misconduct or information become available during the PSB Diversion process, it shall be reviewed by the PSB Commander to assess whether the matter warrants the initiation of a formal administrative investigation or Service Complaint.

(7)     The procedures set forth in Office Policy shall retroactively apply to any open complaints/investigations.

(8)     If the complaint meets the requirements to be processed as a Service Complaint, it shall continue through the Service Complaint process as specified in Office Policy.

(9)     If the complaint will be administratively investigated, the PSB Commander will make an initial determination of the category of the alleged offense, assign an IA Number to track the allegation of misconduct, and promptly assign an internal affairs investigator(s).

(10)     If an administrative investigation is initiated, the PSB shall provide a written update to the complainant within seven days which shall include the IA Number and the name of the assigned investigator. This written update shall also inform the complainant how they may contact the PSB to inquire about the status of the complaint.

(11)     When allegations are filed on multiple employees involved in a single act of misconduct, one IA Number shall be assigned. The assigned IA Number shall be noted on all documents resulting from the complaint.

(12)     The incident type of PSB Diversion shall also be utilized by the PSB to document communications received by the PSB that are not complaints, rather other inquires, questions, comments, commendations, or other matters. While these matters do not meet the definition of a complaint of employee misconduct, the PSB Diversion incident type with an appropriate label shall be the mechanism to store/document the action taken by the PSB in response to these communications. Communications in this category are not to be confused with complaints of employee misconduct and shall be categorized separately for tracking purposes with the IAPro Database.

16

46REPORT000307

5.    Disciplinary Offer: Situations where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrices, as further described:

    a.    A Disciplinary Offer is to be considered an Expedited Resolution.

    b.    The ability of the PSB Commander to offer principals the presumptive discipline or a mitigated penalty if they accept responsibility, shall include allegations that, if sustained, could constitute a Category 1, Category 2 and Category 3, First Offense, where minor discipline is within the approved range pursuant to Office Policy GC-17, *Employee Disciplinary Procedures.*

    c.    If determined to be eligible, the PSB Commander shall coordinate with the MCSO Administrative Services Division (ASD) Conduct Resolution Section (CRS) to prepare and extend the written disciplinary offer to the principal employee(s).

    d.    The principal employee(s) shall have seven (7) calendar days during a time period the employee is regularly scheduled to work to respond to the disciplinary offer.

    e.    If the employee accepts responsibility for the policy violation(s) and returns the signed disciplinary offer, the ASD CRS shall prepare/process the disciplinary action in accordance with standard operating procedures for minor discipline administration following a formal administrative investigation. Some steps may not be required to complete this investigation.

    f.    If the employee declines to accept the disciplinary offer or fails to return the disciplinary offer to the ASD CRS by the deadline provided, the ASD CRS shall forward the response or lack of response to the PSB Commander for the initiation of a formal administrative investigation.

    g.    In the event information/evidence related to this complaint is later discovered which could require the matter to be investigated further by the PSB, the discipline offer or issuance shall be rescinded by the PSB Commander.

    h.    The following types of complaints are not eligible for consideration for a presumptive discipline or a mitigated penalty in place of a full formal administrative investigation or Service Complaint:

        (1)    Complaints involving members of the Plaintiffs' class;

        (2)    Complaints involving allegations of bias;

        (3)    Complaints involving allegations of criminal conduct;

        (4)    Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

17

46REPORT000308

<div style="margin-left:2em">

(5) Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

(6) Allegations of conduct that, if sustained, could constitute a Category 3 Offense where minor discipline is not within the approved range from the Office's Disciplinary Matrices.

</div>

B. Case assignment: Administrative Investigations shall be assigned in accordance with Policy GH-2, *Internal Investigations*, and all applicable Court Orders.

1. The PSB Commander shall make an initial determination of the category of offense and then promptly assign the case to an internal affairs investigator.

2. The PSB Commander shall determine whether the administrative investigation will be conducted at the division level or by the PSB. Caseload, conflict(s) of interest, and investigative experience shall be taken into consideration when assigning cases.

C. Complaint Intake - Associated Blue Team, IAPro Duties/Responsibilities:

1. IAPro and Blue Team shall be utilized, as appropriate to each, during the complaint intake process for purposes to include, but not be limited to: case number; logging dates and times of complaint receipt; nature of the complaint; how the complaint was received; alleged policy violation(s); name of complainant (if known); complainant contact information; name of principal(s) if known; date reviewed by PSB commander; date complaint assigned; assigned investigator(s) or District/Division Commander; investigator's supervisor; completion due date; due date for the PSB Investigative Plan; PSB Diversion Worksheet (if applicable); and date notice of complaint receipt provided to the complainant (if applicable).

18

46REPORT000309

**302.    Administrative Investigations**

A.    Administrative Investigations shall be received and conducted in accordance with Policy GH-2, *Internal Investigations,* Arizona Revised Statutes, Title 38, and the Amended Second Supplemental Permanent Injunction/Judgement Order, Document 176, 2:07-cv-02513-GMS.

1.    The investigation shall consist of gathering and reporting facts related to the allegation. Credibility determinations shall be based upon all known facts.   Employees shall present documentary evidence on their behalf at any time prior to the conclusion of an investigation. They shall also advise investigators of persons who shall be contacted for statements.

2.    In each misconduct investigation, investigators shall:

a.    Conduct investigations in a rigorous and impartial manner designed to determine the facts;

b.    Approach the investigation without prejudging the facts and without permitting any preconceived impression of the principal, investigative lead, witness or complainant to cloud the investigations;

c.    Identify, collect, and consider all relevant, circumstantial, direct, and physical evidence, including any audio or video recordings;

d.    Make reasonable attempts to locate and interview all witnesses, including members of the public;

e.    Make reasonable attempts to interview any external complainants in person;

f.    Audio and video record all interviews;

g.    Avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

h.    Attempt to resolve material inconsistencies between employee, complainant, investigative lead, and witness statements, and make credibility determinations as appropriate;

i.    Not give automatic preference for an employee's statement over a statement received from a member of the public;

j.    Not disregard a witness or investigative lead's statement solely because the witness or investigative lead has a connection to either the complainant or an employee or has a criminal history; and

k.    Not alone consider the fact that a complainant committed a crime, pled guilty or is found guilty of an offense, to determine whether the employee engaged in misconduct; nor will any such fact, by itself, justify discontinuing an investigation.

19

46REPORT000310

3.       Internal affairs investigators shall consider the witness or investigative lead's criminal history or any adjudicated findings of untruthfulness in evaluating their statement. Additionally, the internal affairs investigator shall consider the record of any witness, investigative lead, complainant, or employee who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

4.       Investigators shall investigate any additional evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.

5.       The MCSO shall not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline, unless it meets the specific situations approved for Administrative Closures. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.

B.    Investigative Timelines: Investigative start, extension, and completion timeline procedures are as follows:

1.       Administrative investigations shall be investigated and submitted to the PSB Commander by the deadline identified by the PSB.

2.       If the investigation is conducted by the PSB or outsourced to an outside vendor, the investigative timeline shall be completed within 85 calendar days.

3.       If the investigation is completed by an enforcement division other than the PSB, the investigative timeline shall be 60 calendar days. Within these 60 calendar days, the chain of command shall have up to 10 calendar days to complete its review.

4.       If it appears the investigation will exceed the investigative timeline identified by the PSB, and a reasonable justification exists to request an extension, the investigator shall complete a *Request for Investigative Extension.*

a.       Requests for extensions must provide sufficient detail to justify the amount of time requested and demonstrate why the extension shall be deemed reasonable. Reasonable justifications to the investigative timeline may include situations where involved employees are out on approved leave for prolonged periods of time during the investigative timeframe (i.e., FMLA or military leave), the prolonged unavailability of the non-employee complainant, witness, or evidence, or a criminal investigation restricting necessary investigative steps from being completed.

b.       The investigative timeline shall not be extended without an approved justification.

c.       No part of the administrative investigation shall be held in abeyance unless authorized by the PSB Commander in consultation with the entity conducting the criminal investigation.

5.       Division Process to Requests for Investigative Extension: The *Request for Investigative Extension* for a Division Level Investigation is attached as Appendix xxx and shall be processed in the following manner:

20

a. The *Request for Investigative Extension* shall be completed by the investigator and submitted through the chain of command to their Executive Chief for review. The Executive Chief will forward the *Request for Investigative Extension* to the PSB Commander for processing no later than 10 calendar days prior to the current investigative due date.

b. If approved, the PSB will facilitate the submission to the Sheriff for review and consideration.

c. If approved by the Sheriff, the PSB will submit the request to the Monitor Team for final review, approval, and establishment of a new investigation due date.

d. If a new due date is approved, the *Request for Investigative Extension* will be added to the investigative case file and provided to the investigator and respective Division Commander by the PSB.

e. If at any stage, the *Request for Investigative Extension* is not approved, the *Request for Investigative Extension* will be provided to the PSB to be added to the investigative case file and a copy of the unapproved request will be provided to the investigator and respective Division Commander by the PSB.

f. The PSB will update the IAPro database with any approved extension due date or disapproved extension request.

g. If the investigation is not completed by the newly established due date a new *Request for Investigative Extension* shall be completed utilizing the procedures previously outlined.

6. PSB Process to Requests for Investigative Extension: The *Request for Investigative Extension* for a PSB Investigation is attached as Appendix xxx and shall be processed in the following manner:

a. The *Request for Investigative Extension* shall be completed by the investigator and submitted through the chain of command to the PSB Commander for review. The *Request for Investigative Extension* shall be submitted to the PSB Commander for processing no later than 10 calendar days prior to the current investigative due date.

b. If approved, the PSB will facilitate the submission to the Sheriff for review and consideration.

c. If approved by the Sheriff, the PSB will submit the request to the Monitor Team (during such time as the Monitor is assigned) for final review, approval, and establishment of a new investigation due date.

d. If a new date is approved, the *Request for Investigative Extension* will be added to the investigative case file and disseminated to the investigator.

e. If at any stage, the *Request for Investigative Extension* is not approved, the *Request for Investigative Extension* will be provided to the PSB to be added to investigative case file and a copy of the unapproved request will be provided to the investigator.

21

46REPORT000312

  f. The PSB will update the IAPro database with any approved extension due date or disapproved extension request.

  g. If the investigation is not completed by the newly established due date a new *Request for Investigative Extension* shall be completed.

7. Overall Investigation Completion Timeline: The **overall** administrative investigation completion timeline starts on the date the Office receives notice of alleged employee misconduct by a person authorized by the Office to initiate an investigation which includes investigators assigned to the PSB or supervisors in an Office division or bureau who are assigned to investigate misconduct and ends when the employee is served with a *Closed Case Notification, Coaching, Written Reprimand, or Pre-Determination Hearing Notice.*

  a. In cases involving a law enforcement officer's conduct that may result in suspension, demotion, or dismissal, the Office is statutorily obligated to make a good faith effort to complete an administrative investigation within 180 calendar days after the Office receives notice of the allegation by a person authorized by the Office which includes investigators assigned to the PSB or supervisors in an Office division or bureau who are assigned to investigate misconduct to initiate an investigation. The 180-calendar day timeline is met when the employee is served with a *Closed Case Notification, Coaching, Written Reprimand, or Pre-Determination Hearing Notice.*

  b. If it appears that the completion timeline will **exceed** the statutorily identified 180th calendar day despite good faith efforts and additional time is necessary to obtain or review evidence, the Office shall provide the principal(s) with a written notice explanation of the reasons for the investigation to continue beyond 180 calendar days.

   (1) The PSB shall prepare a *180-Day Notice* and provide a copy of the *180-Day Notice* signed by the PSB Commander to the principal(s) **prior** to 180 calendar days.

   (2) The *180-Day Notice* shall be attached to the investigative report in IAPro including documentation of the *180-Day Notice being provided to the principal(s).*

  c. In accordance with Arizona Revised Statute, following the *180-Day Notice,* the completion timeline for an administrative investigation involving a law enforcement officer's conduct that may result in suspension, demotion, or dismissal, shall not exceed an additional 360 calendar days, with the exceptions of events indicated below. When one of these exceptions occur, the investigator shall include the information in the IAPro case file:

   (1) The completion timeline is suspended during the time that any criminal investigation or prosecution is pending in connection with the act, omission, or other allegation of misconduct.

   (2) The completion timeline is suspended during the period of time in which a law enforcement officer who is involved in the investigation is incapacitated or otherwise unavailable.

   (3) The completion timeline may be suspended for a period prescribed in a written waiver of the limitation by the law enforcement officer.

<div align="center">22</div>

46REPORT000313

(4) The completion timeline may be suspended for emergencies or natural disasters during the time period in which the governor has declared a state of emergency within the jurisdictional boundaries of the concerned employer.

(5) A multijurisdictional investigation may be extended for a period of time reasonably necessary to facilitate the coordination of the employers involved.

**303. Administrative Investigation Reports**

A. Throughout the course of each investigation the internal affairs investigator shall document all information gathered during the investigation in the investigative report.

1. Report Format: The investigator shall utilize the appropriate investigative report format. The format and forms for the investigative report are found at M: PSB\Investigation Forms (See Attachments B through E.) All facts gathered during the investigation shall be documented. The investigative report shall include:

a. Investigative Plan: An Investigative Plan shall be created for each Administrative Investigation. The primary objectives of an administrative Investigative Plan are: to provide a roadmap for a thorough and complete investigation; to identify all reasonable opportunities to reduce and eliminate unnecessary investigative steps; and to promote timely completion of the investigation. The Investigative Plan serves as the foundation and starting point for the efficient investigation of the alleged employee misconduct.

(1) An *Investigative Plan* shall be formulated collaboratively between the investigator and the investigator's supervisor. The Investigative Plan shall be completed and approved by the investigator's Division Commander within seven (7) calendar days of the case assignment to the investigator.

(2) The *Investigative Plan* shall include the following items:

(a) Complaint synopsis: The complaint synopsis shall consist of a few sentences providing an overall synopsis of the known allegations/facts after review of the complaint intake and all available associated evidence available to the investigator and their supervisor at the time the Investigative Plan is drafted.

(b) Evidence: The evidence section shall consist of a list of all available items of evidence the investigator has currently in their possession or plans to seek out/collect/request/review during the investigation.

(c) Case outline: The case outline is a free-form outline of the projected order of investigative steps anticipated to be taken by the investigator. This section may be in bullet point or narrative form but must provide enough information to ascertain the projected sequence of events and any investigative steps anticipated necessary to complete the investigation.

(d) Additional information: This section allows for the investigator to provide any other relevant information pertaining to the overall investigative strategy.

23

46REPORT000314

(e)     Estimated investigative completion date: This section shall include the investigator's estimated date of completion and submission to their supervisor by following the steps outlined in the proposed Investigative Plan.

(f)     Supervisory Review: This section shall list the reviewing supervisor and the date in which the Investigative Plan was approved.

(3)     The *Investigative Plan* submission, review, and approval workflow process shall consist of the following:

(a)     The Investigative Plan template shall be entered into the IAPro Database utilizing the Running Sheet feature for supervisory review and approval.

(b)     The reviewing supervisor shall work with the assigned investigator to revise/edit the Investigative Plan as needed to eliminate any unnecessary investigative steps.

(c)     Once approved, the investigator's supervisor, a Lieutenant, shall document their approval of the Investigative Plan on the applicable IAPro Running Sheet with their date of approval. The investigator can begin the investigation following the immediate supervisor's approval of the plan.

Within 5 days after the approval of the Investigative Plan, another Lieutenant will review the approved plan. If this reviewer suggests modifications to the plan during this review process, those will be communicated to the investigator's supervisor as soon as possible.

(d)     The Investigative Plan shall be stored within the IAPro Database and be available for review/reference throughout the course of the investigation, and a copy shall be retained in the case file for future reference.

(e)     The IAPro Task Feature shall be utilized to track the initial assignment and due date for completion and approval of all investigative plans. Alerts associated with the investigative plan due date shall be provided to the investigator, their supervisor, and their commander in Blue Team.

b.     Prior Work History Report: *A Prior Work History Report* shall be prepared in order to consider the principal's work history.

(1)     The PSB shall review the employee's EI Pro/Blue Team entries and Personnel File, as well as any other pertinent information on the employee in order to compile a complete history. The review shall include the employee's prior five years of MCSO work history, to include a review of the employee's Employee Performance Appraisals. This report shall be completed and uploaded into Blue Team within five days of the complaint being filed.

24

46REPORT000315

> (2) If the case is assigned to the division level, the assigned division investigator shall review the employee's Division File, Supervisor Notes, and any other information regarding the employee's prior ten years of work history and document the information on the report. If the PSB is conducting the investigation, the PSB investigator shall contact the division level supervisor who shall assist with gathering the information so that it can be documented in the report.
>
> (3) The following shall be included in the *Prior Work History Report*:
>
> > (a) Commendations and awards;
> >
> > (b) Findings of misconduct, which includes misconduct for which discipline was ultimately not issued for procedural reasons, such as but not limited to, the Merit Commission finding a good faith effort was not made to complete an investigation within the statutory requirements. The findings of misconduct shall be considered in future disciplinary decisions;
> >
> > (c) The IAPRO complaint history; and
> >
> > (d) Discipline, to include information regarding the allegation, the date of allegation; and the findings.

c. Coversheet

d. Administrative Investigations Process Checklist

e. Findings: A *Findings* page shall be prepared for each policy violation. If there are multiple policy violations, allegations, or principals, there shall be a separate *Findings* page for each principal, each allegation, and each policy violation.

f. Investigative Report: The body of the report shall document all actions taken during the investigation.

2. Report Documentation: The investigator shall ensure the following are documented in the administrative investigation:

a. A narrative description of the incident;

b. Documentation of all evidence that was gathered, including names, phone numbers, and addresses of civilian complainants, witnesses, and investigative leads. In situations where there are no known witnesses or investigative leads, the report shall specifically state this fact. In circumstances in which witnesses or investigative leads were present but circumstances prevented the investigator from determining the identification, phone number, or address of those witnesses or investigative leads, the report shall state the reason. The report shall also include all available identifying information for anyone who refuses to provide a statement;

c. Names of all Office employees who witnessed the incident;

d. Documentation of whether employees were interviewed and a transcript or recording

25

46REPORT000316

of the interviews;

e. The investigator's evaluation of the incident, based on their review of the evidence gathered, including a determination of whether the employee's actions appear to be within Office policy, procedure, regulations, orders, or other standards of conduct required of Office employees;

f. In cases where the investigator asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility.

g. In cases where material inconsistencies must be resolved between complainant, witness, investigative lead, and employee statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies.

h. An assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns shall be addressed. In accessing the incident for policy, training, tactical, or equipment concerns, the investigator shall include an assessment of whether:

    (1) The law enforcement action complied with training and legal standards;

    (2) The use of different tactics should or could have been employed;

    (3) The incident indicates a need for additional training;

    (4) The incident suggests that the Office should revise its policies, strategies, tactics or training;

i. If a weapon was used, documentation that the employee's certification and training for the weapon were current.

j. In the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.

k. For each allegation of misconduct, investigators shall identify and recommend one of the following dispositions for each allegation of misconduct:

    (1) Unfounded – the investigation determines by clear and convincing evidence, that the allegation was false or not supported by fact.

    (2) Exonerated – the investigation determines that the alleged misconduct did occur but did not violate policy, procedure, or training.

    (3) Not Sustained – the investigation determines that there is insufficient evidence to prove or disprove the allegation.

    (4) Sustained – the investigation determines by the preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation.

26

46REPORT000317

3.  PSB Administrative Investigation Review Timeline: The supervisory review process for administrative investigations completed by PSB Investigators plays a significant role in the overall quality and timeliness of completion for administrative investigations. The review process of administrative investigations completed by the PSB shall be completed as specified in MCSO Policy GH-2 *Internal Investigations*, with the following timeline expectations:

    a.  PSB supervisory staff shall monitor the timely completion of administrative investigations assigned to subordinate personnel to ensure compliance with investigative requirements and to identify if additional training, investigative planning, or additional supervision is necessary.

    b.  PSB staff shall utilize the IAPro Database Timescale feature to monitor case progress, status, and the review process.

    c.  PSB Supervisory staff shall utilize the IAPro Database Task feature to track the receipt, review, approval, forwarding to the PSB Commander, or return of an administrative investigation for further investigation. The IAPro Database Task feature generates alerts for investigators and supervisors to identify those cases coming due or overdue.

    d.  The quality of the level of review of an administrative investigation must be balanced with the timeliness of such review to ensure efficient operations and compliance with investigative timelines.

    e.  It is the expectation that barring unusual circumstances, an approved investigative extension, or specific arrangements made with the investigator's supervisor, that the PSB investigator submit their completed case for review by the 75-day investigative timeline date. The remaining 10 days allows for the supervisory review and to resolve any additional investigatory actions deemed necessary and still satisfy the 85-day investigative timeline.

    f.  It is the expectation that barring unusual circumstances, a supervisor shall complete their review within seven (7) calendar days of receipt of the completed investigation. If there are circumstances warranting additional time to review the case beyond seven calendar days (7), the supervisor shall add an explanation in the IAPro Database Running Sheets feature associated with the IAPro Investigative File.

27

46REPORT000318

**307.** **Critical Incident and Non-Critical Incident Occurrences**

A. Critical Incident: Administrative Critical Incident Investigations shall be received and conducted in accordance with Policy GJ-2, *Critical Incident Response,* and the *Critical Incident Investigations Protocol,* Arizona Revised Statutes, and the Court's Order in the *Ortega Melendres v Arpaio* litigation.

   1. PSB investigators shall investigate the incident strictly for administrative purposes and shall not be involved in the criminal investigation surrounding the incident. The scope of the critical investigation is to identify acts of misconduct; and/or tactics, training, equipment, or policy concerns.

   2. A Critical Incident Investigation number (CI) shall be assigned.

   3. The critical incident investigation will proceed under the same guidelines as listed in the internal investigation section of this operational manual, Policy GJ-2, *Critical Incident Investigations,* and the MCSO Critical Incident Protocol.

   4. The critical incident investigator shall submit a written report to the PSB Commander and Bureau of Compliance Executive Chief via the chain of command for approval.

   5. The PSB Commander shall ensure that the written report is forwarded and presented to the Use of Force Review Board and/or the respective custody Bureau Chief in the case of an in-custody death.

B. Non-Critical Incident: An incident resulting in the death or serious physical injury of a prisoner or an inmate that **does not** involve the use of force by an employee shall be considered a **non-critical incident** and **does not** require protocol activation. Procedures for these prisoner or inmate occurrences shall be followed, as specified in Office Policy GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate.*

   1. **Prisoner/Inmate Death *Preliminary Inquiry Report* (PIR):** A PIR is required following the natural death of an inmate, inmate death by suicide, and prisoner/inmate deaths occurring in a custody bureau facility, detention transportation vehicle, or a jail wagon transport vehicle, and when no PSB investigation has otherwise been initiated. The PIR shall be completed, as specified in Office Policy GH-2, *Internal Investigations*.

      a. The PIR shall be conducted to identify potential employee misconduct associated with the incident. If at any time during the PIR process employee misconduct is identified, it shall immediately be entered into Blue Team as an Internal Complaint by the supervisor identifying the misconduct.

      b. PIRs completed pursuant to a prisoner or inmate death shall be forwarded through the chain of command within 30 calendar days to the PSB Commander or designee to determine if an administrative investigation is warranted to determine whether any violation of Office policy contributed in any way to the prisoner or inmate death.

46REPORT000319

(1) If at any time during the PIR review the PSB Commander determines further inquiry action is needed in order to properly complete the review, the PIR shall be returned to the jail facility commander to ensure the action is completed and provided back to the PSB Commander within 14 calendar days.

(2) If additional time is needed to complete the PIR, the custody bureau facility commander shall provide a documented request for an extension and provide an estimated time of submission to the PSB Commander.

(3) If the PSB Commander or designee identifies potential employee misconduct associated with the incident, the information and associated documentation shall be entered into Blue Team for the consideration of the initiation of an administrative investigation in accordance with Office Policy.

(4) If the PSB Commander or designee determines employee misconduct did not occur, no further administrative investigative action is required. The PSB Commander or designee shall complete a PSB Division Review form summarizing the review conducted and incident assessment along with the mechanism(s) any training, tactical, or equipment concerns identified were addressed.

    (a) The PSB Diversion Worksheet will be forwarded to the PSB Commander for final review and approval.

    (b) Once approved, the PSB Diversion Worksheet and all associated documentation provided/reviewed with the PIR will be uploaded to IAPro with the incident type of PSB Diversion and a unique PSB Diversion identifier.

c. A prisoner or inmate death PIR is not required when the following occurs:

(1) The death of a prisoner or inmate is determined be a critical incident, as specified in Office Policy GJ-2, *Critical Incident Response*; or

(2) The PSB has already initiated an administrative investigation into the incident.

29

46REPORT000320




**GC-17,** *Employee Disciplinary Procedures*
**CATEGORIES OF OFFENSES**
**Attachment B**
Effective Date: 06-25-20

---

*Discipline for violation of the law, regardless of the ultimate adjudication of any criminal or civil charges, shall be based on the facts and evidence discovered during the Office investigation.*

*Conduct that is not specifically identified in the following chart shall be reviewed using the definition for each Category of Offense.*

---

## CATEGORY 1
Conduct, while against policy, has a minimal negative impact on the overall operations or professional image of the Office and usually of a first offense nature. This conduct however, is not acceptable and must be corrected. Failure to correct the behavior shall result in more severe discipline.

Violations in Category 1 involve neglect. If acts are found to be intentional, or repeated, after coaching or other intervention by a supervisor, these violations shall move to Category 3, or higher.

## CATEGORY 2
Conduct that has more than minimal negative impact on the operations or professional image of the Office; or conduct that negatively impacts relationships with other employees, agencies or members of the public; or conduct under Category 1 with repetitive offenses.

## CATEGORY 3
Conduct that has a pronounced negative impact on the operations or professional image of the Office, relationships with other employees, agencies, or the public; or conduct within a lower Category of Offenses with repetitive offenses.

## CATEGORY 4
Conduct that is substantially contrary to the values of the Office; or that substantially interferes with its mission, operations, or professional image; or that involves a demonstrable serious risk to employees or public safety.

## CATEGORY 5
Conduct that involved the serious abuse or misuse of authority, unethical behavior, or an act that results in an actual serious and/or adverse impact on employee or public safety, or to the professionalism of the Office.

## CATEGORY 6
Conduct that involves the serious abuse or misuse of authority, unethical behavior; or an act that results in an actual serious and adverse impact on the Office employee, public or public safety; or to the professionalism of the Office.

## CATEGORY 7
Any violation of law, policy, rule or regulation which: foreseeably results in death or serious bodily injury; or constitutes a willful and wanton disregard of Office guiding principles; or involves any act or omission which demonstrates a serious lack of the integrity, ethics or character related to an Office employee's fitness to hold their position; or involves egregious misconduct substantially contrary to the standards of conduct reasonably expected, to include those whose sworn duty is to uphold the law; or involves conduct which constitutes the failure to adhere to any condition of employment required or mandated by law.

46REPORT000321

**Policy GC-17,** *Employee Disciplinary Procedures* **Effective Date: 06-25-20**

Attachment B

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| **1  UNETHICAL CONDUCT** | | | | | | | |
| A. Participating in activities which would compromise an employee's ability to perform Office duties objectively and impartially. | | | ● | | | | |
| B. Withholding relevant information or misleading investigators during a criminal or administrative investigation. | | | | | | ● | |
| C. Failure to inform command staff regarding a conflict of interest related to an administrative investigation and the administration of discipline. | | | | ● | ● | ● | ● |
| D. Violation of Office Policy CP-5, *Truthfulness*. | | | | | | | ● |
| E. Violation of Office Policy CP-3, *Workplace Professionalism: Discrimination and Harassment*, by actions that include unlawful discrimination or harassment of another person because of an individual's protected characteristics. | | | | | | | ● |
| F. Violation of Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling*, by taking law enforcement actions based on race, ethnic background, gender, sexual orientation, religion, economic status, age, cultural group, or national origin, including the selection of people for consensual contacts. | | | | | | | ● |
| G. Violation of Office Policy CP-8, *Preventing Racial and other Bias-Based Profiling*, by basing detention operations on race, ethnic background, gender, sexual orientation, religion, economic status, age, cultural group, or national origin. | | | ● | ● | ● | ● | ● |
| H. Violation of Office Policy CP-11, *Anti-Retaliation*, by actions that include retaliation against any person, member of the public, or employee for their lawful expression of opinions in exercise of their First Amendment right to freedom of speech. | | | | | | ● | ● |
| **2  CONFORMANCE TO OFFICE DIRECTIVES** | | | | | | | |
| A. Unintentional failure to conform to the provisions of all written policies, except those found to be unlawful, incorrect, or inapplicable. | ● | | | | | | |
| B. Intentional failure to conform to the provisions of all written policies, except those found to be unlawful, incorrect, or inapplicable. | | | ● | | | | |
| C. Unintentional failure to comply with any court related matters such as court orders or judgment, orders, written instructions, and rules. | | ● | | | | | |
| D. Intentional failure to comply with any court related matters such as court orders or judgment, orders, written instructions, and rules. | | | | | | ● | ● |
| E. Failure to accept responsibility for own acts and shift burden or responsibility to another person. | | ● | | | | | |
| F. Disregard of safety rules which place other employees or members of the public at risk. | | | ● | | | | |

2

46REPORT000322

**Policy GC-17,** *Employee Disciplinary Procedures*       **Effective Date: 06-25-20**

Attachment B

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| **3  CONFORMANCE TO ESTABLISHED LAWS** | | | | | | | |
| A.  Commission of Class 2 or Class 3 misdemeanor violation, with the exception of a criminal speed violation. | | | | ● | | | |
| B  Commission of a criminal speed violation. | | ● | | | | | |
| C.  Commission of a Class 1 misdemeanor violation, not to include DUI. | | | | | | ● | |
| D.  Commission of DUI to any degree. | | | | | | | ● |
| E.  Conduct that constitutes a felony under state law, or any other state's law, or federal law. While travelling abroad, employees shall abide by the laws of foreign countries, insofar as the laws do not conflict with the laws of the U.S. | | | | | | | ● |
| F.  Failure to report the knowledge of the commission of a felony by an employee. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | | | | | | | ● |
| G.  Commission of theft, stealing, misappropriation of funds, or fraudulent activity. | | | | | | | ● |
| **4  INDIVIDUAL RESPONSIBILITY** | | | | | | | |
| A.  Failure of an employee who observes or becomes aware of any act of misconduct by another employee to report the incident as soon as practicable to a supervisor or directly to the PSB. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | ● | ● | ● | ● | ● | ● | ● |
| B.  Failure of an employee to take appropriate action whenever learning of a policy violation being committed, or having been committed, by any other person associated with the Office in any capacity, which by its very nature would tend to discredit an employee or the Office. To include conduct on or off-duty. **The presumptive discipline for a failure to take appropriate action may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | ● | ● | ● | ● | ● | ● | ● |
| C.  Failure to adequately assist members of the public with the Comment and Complaint Form process. | | ● | | | | | |
| D.  Failure by an on-duty supervisor or commander to document in Blue Team an internal or external complaint of misconduct. | | | ● | | | | |
| E.  Failure to report, without delay, to the on-duty supervisor, an appropriate commander, or the PSB, when any false information is alleged or reasonably believed to have been provided in an administrative investigation or on any official report, log, or electronic transmittal of information, testimony, communication with other officials, public | | | | ● | ● | ● | ● |

3

46REPORT000323

**Policy GC-17,** *Employee Disciplinary Procedures*        **Effective Date: 06-25-20**

<u>Attachment B</u>

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| | presentations such as community meetings, and press briefings. | | | | | | | |
| F. | Participation in the retaliating against an employee who reports misconduct or a violation of policy, responsibility, or duty. | | | | | | ● | |
| G. | Failure to report secondary employment when required. | ● | | | | | | |
| H. | Failure to report a missing firearm. | | | ● | ● | ● | ● | ● |
| **5** | **UNBECOMING CONDUCT** | | | | | | | |
| A. | Failure by an employee to conduct themselves, at all times, both on and off duty, in such a manner as to reflect favorably on the Office, as specified in Office Policy CP-2, *Code of Conduct*. | | ● | | | | | |
| B. | Failure to show respect for the uniforms of the Office. | ● | | | | | | |
| C. | Failure of an employee who is on duty or identified by dress, location, or association as an employee, to maintain a professional demeanor and perform their duties in a calm and firm manner. | | ● | | | | | |
| D. | Participating in the demeaning of persons, or bias language against any individual regardless of age, nationality, religious beliefs, race, gender, culture, sexual orientation, gender identity, veteran status, ancestry, or disability. | | | | | ● | ● | ● |
| E. | Failure by an employee to conduct themselves in a manner that will foster respect and cooperation among themselves and other members of the Office. | | ● | | | | | |
| F. | Failure to take reasonable action commensurate and appropriate to the situation to ensure a person is not subject to cruel treatment or neglectful inhumane action. | | | | | ● | ● | ● |
| G. | Failure to take reasonable action commensurate and appropriate to the situation to ensure an animal is not subject to cruel treatment or neglectful inhumane action. | | | | ● | | | |
| H. | Failure by an employee who has contact with the public to deal with people fairly, and courteously. | | ● | | | | | |
| I. | Use of profanity, rude or insulting language, or conduct offensive to employees or members of the public that is not of a discriminatory nature or a racial slur. | | ● | | | | | |
| J. | Use of profanity, rude or insulting language, or conduct offensive to employees or members of the public that is of a discriminatory nature or a racial slur. | | | | | ● | ● | ● |
| K. | Failure to represent the Office in a professional manner while in uniform or in a County vehicle, to members of the public. | | ● | | | | | |
| L. | Unwarranted or unnecessary threat of physical violence by an employee, to another employee or the public. | | | | | ● | ● | ● |
| M. | Sexual harassment of another person. | | | | | | | ● |
| N. | Cheating on promotion examinations. | | | | | | | ● |
| O. | Possession of weapons on Maricopa County property in violation of Office Policy GJ-23, *Firearms*. | | | | | | ● | |
| P. | Buying or selling contraband on County property. | | | | | | | ● |

4

46REPORT000324

**Policy GC-17,** *Employee Disciplinary Procedures*     **Effective Date: 06-25-20**
<u>Attachment B</u>

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Q. | Fraud in securing employment. | | | | | | | ● |
| R. | Sexual conduct on duty and/or while on or using County property or equipment. | | | | | | | ● |
| S. | Sexual conduct off duty while on or using County property or equipment. | | | | | ● | | |
| **6** | **ALCOHOL** | | | | | | | |
| A. | Consuming alcoholic beverages while on duty except with prior supervisory consent. | | | | | | | ● |
| B. | Purchasing, or in immediate possession of, any kind of alcoholic beverage(s) while on duty, except in the performance of official duties or authorized training with prior supervisory consent. | | | | | ● | | |
| C. | Reporting for duty, or on duty, with any odor of alcoholic beverage on the employee's breath or while under the influence of any alcoholic beverage to any degree. | | | | | | ● | |
| D. | Failure by a supervisor to take action, as specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*, when they reasonably believes that an employee who is on duty or reporting for duty smells of, or is under the impairment of, alcoholic beverages to any degree. | | | | | ● | | |
| E. | Violation of Office Policy ED-2, *Covert Operations*, in all cases where personnel who consume alcoholic beverages on duty: fail to avoid any physical condition or impairment which could adversely affect the employee's performance of duty; operate a Maricopa County vehicle; or bring discredit upon the Office. | | | | | | ● | |
| F. | Failure by employees and supervisors to be attentive to, and restrict, physical enforcement action and the display or use of weapons when the employee(s) is known to have consumed and/or be under the influence of an alcoholic beverage(s) during a covert operation, except in extreme and exigent circumstances. | | | | | | ● | |
| G. | Failure by an employee in a specialized assignment, if called out, to advise a supervisor that within the last eight hours they have been drinking, the type and amount of alcoholic beverage consumed, and how long it has been since the last drink. | | | | ● | | | |
| H. | When making the decision to activate an employee, the supervisor shall ensure based on the information provided by the employee that no alcoholic beverage have been consumed within the last eight hours prior to a call out. | | | | ● | | | |
| I. | Purchasing or consuming alcohol off-duty and in uniform. | | ● | | | | | |
| J. | Consuming alcohol at a training event while on-duty. | | | | | | ● | ● |
| K. | Operating any Maricopa County vehicle within eight hours after consuming any alcoholic beverages. | | | | ● | | | |

5

46REPORT000325

**Policy GC-17,** *Employee Disciplinary Procedures*  **Effective Date: 06-25-20**
Attachment B

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| | L. | Displaying or wearing any recognizable item of Office apparel, while on or off duty, in a public place or an establishment where the primary purpose is to sell or serve alcoholic beverages or consuming any alcoholic beverages while displaying or wearing any recognizable items of Office apparel, unless in the performance of official duties. | | | | ● | | | |
| | M. | Consuming alcoholic beverages in any Maricopa County facility or Maricopa County vehicle by an employee, except in the performance of official duties or authorized training. | | | | | | | ● |
| | N. | Allowing the consumption of alcoholic beverages at any time, or for any reason, by a guests, volunteers, public observers or other members of the public while in Maricopa County facilities, Maricopa County vehicles, or vehicles owned by a Posse Branch or individual posse member that are used for Office related operations. | | | | ● | | | |
| | O. | Driving while under the influence of alcohol or drugs while on duty, to exclude legally prescribed drugs that do not impair or inhibit an employee's capacity to perform their responsibilities. | | | | | | | ● |
| | P. | Carrying a firearm while off duty when consuming alcohol and taking law enforcement action. | | | | | ● | ● | ● |
| **7** | | **USE OF MEDICATION OR DRUGS** | | | | | | | |
| | A. | Failure by the employee who takes prescribed or over-the-counter medications to be aware of any side effects the medications may have on the performance of their duties. | | ● | | | | | |
| | B. | Failure by an employee to advise their supervisor, prior to reporting for duty, when taking medication that might impair their ability to perform the essential job functions of their position. | | ● | | | | | |
| | C. | Refusing to participate in a drug, medication, or alcohol test, as specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*. | | | | | | | ● |
| | D. | Unlawful possession or use of drugs or medication, to include the prescribed medication of another. | | | | | | | ● |
| **8** | | **GRATUITIES, REWARDS, OR LOANS** | | | | | | | |
| | A. | Use of position for personal gain, on or off duty, to solicit, seek, or receive any personal loan, gift, gratuity, or other favor, from the general public, any private business firms which deal with the Office, or any other agency or department of Maricopa County which is, or may appear to be, intended to influence official conduct. | | | | | | ● | |
| | B. | Accepting, directly or indirectly, a gratuity, fee, loan, reward, or gift of any kind for services rendered in the course of official duties or for services rendered in the course of an Office-approved off-duty assignment. This includes directly or indirectly accepting or obtaining a gratuity, fee, loan, reward, or gift of any kind and passing it on to family members, other Office employees, or acquaintances. | | | | | ● | | |

6

46REPORT000326

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| C. Use of position to solicit free admission to places of amusement, entertainment, or sporting events or to solicit free meals, or any favors or gratuities not ordinarily afforded to a member of the public. | | | ● | | | | |
| D. Accepting or soliciting a bribe. | | | | | | | ● |
| **9 ABUSE OF POSITION OR AUTHORITY** | | | | | | | |
| A. Use of official position, identification cards, or badges to avoid the consequences of illegal acts such as driving under the influence or helping family members avoid the consequences of illegal acts. | | | | | | ● | |
| B. Use of official position, identification cards, or badges for personal or financial gain related to official duties. | | | | | | ● | |
| C. Use of official position, identification cards, or badge to obtain privileges not otherwise available to them or others, except in the performance of official duty. | | | | | ● | | |
| D. Use of official position, identification card, or badge to misrepresenting their position or authority in the Office. | | | | | | ● | |
| E. Lending identification cards, badges, or uniforms to another person not authorized to display or possess. | | | ● | | | | |
| F. Permitting Office identification cards or badges to be photographed or reproduced unless necessary for official business. | ● | | | | | | |
| G. Identifying themselves as members of the Office, visually or verbally, in connection with testimonials or advertisements, unless specifically authorized by the Sheriff, or designee. | | | ● | | | | |
| H. Interfering by virtue of their position, with an Office criminal or administrative investigation; act in manner which might aid any person in escaping arrest or delay the apprehension of a criminal; facilitate the removal or concealment of contraband. | | | | | | | ● |
| I. Convert for personal use any found, impounded, abandoned, or recovered property, or any property held or released as evidence. | | | | | | ● | ● |
| J. Failure to return seized, found, or recovered property directly to a property custodian, court, or owner. | | | ● | | | | |
| K. Misuse of NCIC or any Office or law enforcement database. | | | | | ● | ● | ● |
| L. Misuse of position or authority to affect a promotion, transfer, or restoration to duty by obtaining an unfair advantage as a result of any act prohibited by Office Policy and/or Maricopa County Merit Rules, such as but not limited to nepotism; retaliation; conflict of interest; discrimination; or harassment. | | | | | ● | | |
| M. Intentionally denying any person of civil liberties (such as no probable cause for arrest, search and seizure, or failing to give Miranda Warning when required, or any that may be guaranteed by the Constitution of the United States). | | | | | ● | ● | ● |

7

Case 2:07-cv-02513-GMS Document 3509-38 Filed 06/12/26 Page 328 of 998

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| N. Unintentionally denying any person of civil liberties (such as no probable cause for arrest, search and seizure, or failing to give Miranda Warning when required, or any that may be guaranteed by the Constitution of the United States). | | ● | ● | ● | | | |

**10  CARE AND USE OF OFFICE OR MARICOPA COUNTY EQUIPMENT**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Misuse of Office and Maricopa County equipment. | ● | | | | | | |
| B. Use of Office and Maricopa County cell phones, fax machines, printers, and copiers which inhibits either governmental or administrative use, or impact employee's ability to perform their assigned duties. | | ● | | | | | |
| C. Use of Office and Maricopa County equipment used in a manner that discriminates, or denigrates, anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. | | | | | | ● | ● |
| D. Use of e-mail and voice mail in a manner that discriminates, or denigrates, anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. | | | | | | ● | ● |
| E. Willfully damaging, losing, misplacing, or abusing Office and Maricopa County equipment. | | | ● | | | | |
| F. Negligently damaging, losing, misplacing, or abusing Office and Maricopa County equipment. | | ● | | | | | |
| G. Failure to maintain Maricopa County issued equipment in proper order. | ● | | | | | | |
| H. Intentionally accessing internet pornography sites while using a County computer unless directed to do so by a supervisor for investigative purposes. | | | | | | ● | |
| I Personnel shall refrain from using profane or offensive language or images in any aspect of their electronic communications, including system passwords, as specified in Office Policy GM-1, *Electronic Communications and Voicemail*. | | ● | ● | ● | | | |
| J. Speeding or committing traffic violations while driving a County owned vehicle (Civil sanctions only. Criminal cases should be considered aggravating circumstances). | | ● | | | | | |
| K. Involvement in a preventable accident with an Office vehicle while engaged in emergency driving. | | | | ● | | | |
| L. Unauthorized use of County equipment and personnel for personal profit. | | | | | | | ● |

**11  CONFIDENTIAL INFORMATION, PROTECTED HEALTH INFORMATION, AND DIVULGING CRIMINAL RECORDS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Discussing or disclosing sensitive law enforcement or confidential information without supervisor direction or approval, and with persons unauthorized to receive the information, or permitted or required by law. | | | | | | ● | |
| B. Unauthorized release of Criminal History Record Information (CHRI). | | | | | | ● | |

8

46REPORT000328

**Policy GC-17,** *Employee Disciplinary Procedures*          **Effective Date: 06-25-20**
Attachment B

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| C. | | Using, copying, making notes regarding, removing, releasing, or disclosing information or facts that are of a personal or confidential nature regarding an employee, inmate, or other person's health or medical information, unless doing so legally in the course and within the scope of official duties. | | | | | ● | | |
| D. | | Failure to immediately notify a supervisor upon becoming aware of anyone improperly accessing or releasing information or facts that are of a personal or confidential nature regarding an employee, inmate, or other person's health or medical information. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | | | ● | | | | |
| E. | | Intentional and unauthorized alteration, disclosure, copying, and retention of confidential material or sensitive information. | | | | | | ● | |
| F. | | Unintentional destruction or removal of County records. | | | ● | | | | |
| **12 PERFORMANCE OR DERELICTION OF DUTY** | | | | | | | | | |
| A. | | Failure to devote working time and attention to the service of the Office to complete all assignments in a timely manner. | | ● | | | | | |
| B. | | Engaging in any activities or personal business, such as personal phone calls or text messages, or other electronic activities which would cause neglect to duty. | ● | | | | | | |
| C. | | Displaying cowardice or failing to support fellow employees in the lawful performance of duty. | | | | ● | | | |
| D. | | Willful failure to appear for judicial subpoenas, whether on behalf of the state or in actions against the employee. | | | ● | | | | |
| E. | | Unintentional failure to comply with document preservation and production requirements, as specified in Office Policy GD-9, *Litigation Initiation, Document Preservation, and Document Production Notices.* | | ● | | | | | |
| F. | | Intentional failure to comply with document preservation and production requirements, as specified in Office Policy GD-9, *Litigation Initiation, Document Preservation, and Document Production Notices.* | | | | | | ● | |
| G. | | Engaging in any strike, or restricting output causing a work slowdown in support of a strike. | | | | | | | ● |
| **13 PUNCTUALITY & ABSENCES** | | | | | | | | | |
| A. | | Failure to be punctual in reporting to a designated duty post and physically ready to assume assigned duties. | ● | | | | | | |
| B. | | Failure by a supervisor to enter tardiness and early departures data into Blue Team, as specified in Office Policies GC-1, *Leaves and Absences*, and CP-2, *Code of Conduct*. | ● | | | | | | |

9

46REPORT000329

**Policy GC-17,** *Employee Disciplinary Procedures*      **Effective Date: 06-25-20**

<u>Attachment B</u>

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| C. | Absent Without Authorized Leave (AWOL) except when extenuating circumstances are found to have existed. AWOL occurs when an employee fails to call in to a supervisor, and who does not show for their scheduled shift. | ● | ● | ● | ● | ● | ● | ● |
| D. | Abuse of sick or vacation leave for non-FMLA-qualifying events. | ● | | | | | | |

**14 POLITICAL ACTIVITY**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| A. | Use of authority of position, Maricopa County business, personnel, equipment, materials, buildings, or other resources, to influence the vote or political activities, or for the purpose of influencing the outcomes of elections. | | | | | | | ● |
| B. | Use of political endorsement in connection with any appointment to a position in the Maricopa County classified service. | | | | | | ● | |
| C. | Use or promise to use, any official authority or position for the purpose of influencing the vote, or political action of any person or for any other considerations. | | | | | | | ● |
| D. | Soliciting an employee to engage in, or deny him the opportunity to engage in, activities permitted regarding political activity. | | | | | | ● | |
| E. | Participating in any direct or indirect threat, such as intimidation, coercion, discrimination, reprisal, force, or any adverse consequence, such as the loss of any benefit, reward, promotion, assignment, or compensation based on the employee's involvement in a political activity. | | | | | | | ● |
| F. | Engaging in political activity while on duty, while in uniform, or at public expense, except as authorized in CP-2, Code of Conduct. | | | | | | | ● |
| G. | Denying any employee of any civil liberties, as guaranteed by the Constitution of the United States or the Constitution and Laws of the State of Arizona based on the employee's involvement in political activity. | | | | | | | ● |
| H. | Shall not participation as a member of any national, state, or local committee of a political party, an officer or chairperson of a committee of a partisan political club, a candidate for nomination or election to any public office, which is either paid or partisan, or take part in the management of any political party, partisan or nonpartisan campaign, or recall effort. | | | | ● | | | |
| I. | Discriminate against another employee for engaging in, or choosing not to engage in, any permitted political activity. | | | | | | | ● |
| J. | Retaliate against another employee for engaging in, or choosing not to engage in, any permitted political activity. | | | | | | | ● |
| K. | Conducting support of family members running for political office outside the provisions of Office Policy CP-2, *Code of Conduct*. | | | ● | | | | |

10

46REPORT000330

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| L. Employees using the authority of their position to influence the vote or political activities of any subordinate employee. | | | | | | | ● |
| **15 PUBLIC APPEARANCE AND STATEMENTS** | | | | | | | |
| A. Publicly ridiculing the Office, its policies, or its employees, orally, in writing, or through social media, where such expression is defamatory, obscene, unlawful, tends to undermine the effectiveness of the Office, interferes with the maintenance of discipline, or is made with reckless disregard for the truth. | | | | | ● | | |
| B. Addressing public gatherings, appearing on radio or television, or releasing for publication, an article, manuscript, or other material which pertains to the operations or activities of the Office, without prior approval from the Sheriff, or designee. | | | ● | | | | |
| **16 ENDORSEMENTS, REFERRALS, AND VENDORS** | | | | | | | |
| A. Recommending, suggesting, or advocating for the employment of any person, or procurement of any particular product, professional, or commercial service outside the official procurement process. | | | | ● | | | |
| B. Failure by an employee to disclose their interest for any contract, sale, purchase, or service, in which they have an interest. | | | | ● | | | |
| C. Failure by an employee to disclose their interest and abstaining from voting for any contract, sale, purchase, or service, in which they have an interest. | | | | ● | | | |
| **17 LABOR/ FRATERNAL ORGANIZATIONS AND ASSOCIATIONS** | | | | | | | |
| A. Joining, and, or holding office in any employee organization, labor union, or professional association, organized for any illegal purposes or primarily engaged in activities contrary to law. | | | | | | | ● |
| B. Attempting to prohibit or intimidate any covered employee from belonging to, or holding office in, any lawful organization. | | | | | ● | | |
| **18 ASSOCIATIONS AND FRATERNIZATION WITH INMATES OR PRISONERS** | | | | | | | |
| A. Indulging in undue familiarity with inmates or prisoners. | | | | | | | ● |
| B. Fraternization with inmates and prisoners, unless it is unavoidable due to family member relationships. | | | ● | | | | |
| C. Engage the services of, accept services from, or do favors for, any person known to them to have been in the custody of the Office, or any other detention or correctional facility within the last two years. | | | | ● | | | |
| D. Conveying written or oral messages between inmates. | | | ● | | | | |
| E. Corresponding with, or assisting in conducting correspondence with inmates, former inmates, or other persons not in custody, on behalf of an inmate. | | | | ● | | | |
| F. Assisting inmates in the submission or preparation of judicial documents. | | | | ● | | | |

11

46REPORT000331

**Policy GC-17,** *Employee Disciplinary Procedures*      **Effective Date: 06-25-20**

Attachment B

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| G. Writing letters of recommendation, on behalf of inmates on matters concerning official business of the Office, without authorization from their bureau commander. | | | | ● | | | |
| H. Exchanging money or property with inmates or prisoners. | | | | | | ● | ● |
| I. Providing inmates with newspapers, magazines, or books from outside the jail. | | ● | | | | | |
| J. Engaging in informal, non-work-related discussions with inmates or prisoners concerning other officers, inmates, or prisoners. | | | ● | | | | |
| K. Making remarks of a personal nature in reference to any officers, inmates or prisoners, witnesses, or informants where the remarks may be within earshot of any inmate or prisoner. | | | ● | | | | |
| L. Encouraging or sympathize with inmates in their complaints about rules, regulations, or jail conditions, to include, failing to properly address the complaint or notify a supervisor of the situation. | | ● | | | | | |
| M. Offering religious or other advice to inmates regarding personal, family, or case-related problems. | | | ● | | | | |

**19 EMPLOYEE RELATIONSHIPS WITH PERSONS VISITING INMATES**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Granting special privileges, such as an extended visit time, or allowing an unscheduled visit, to visitors without the approval of the shift commander. | | | | ● | | | |
| B. Accepting favors or gratuities from visitors at any time. | | | | | ● | | |
| C. Indulging in undue familiarity with visitors. | | | | | | | ● |
| D. Fraternization with visitors. | | | | ● | | | |

**20 EMPLOYEE RELATIONSHIPS WITH OTHER EMPLOYEES**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Failure to be respectful and maintain a professional, courteous, and cooperative demeanor with other employees of the Office and other law enforcement or criminal justice personnel. | | ● | | | | | |
| B. Failure to be respectful and maintain a professional, courteous, and cooperative demeanor with supervisory personnel. | | ● | | | | | |
| C. Defying the authority of any supervisor by being disrespectful, arrogant, or displaying disrespectful conduct, whether in or out of the supervisor's presence. | | | | ● | | | |
| D. Covertly recording conversations involving other Office employees. | | | | | ● | ● | |
| E. Failure to promote the establishment and maintenance of a professional workplace, free from discourteous treatment of others. | | ● | | | | | |

12

46REPORT000332

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| F. Dating, entering into a romantic relationship, or having any form of sexual interaction between a supervisor and their supervised employee. | | | | ● | | | |
| G. Failure to notify supervisor when employees working in the same division or building are in a dating, romantic relationship, or are having any form of sexual interaction. | | ● | | | | | |

**21  EMPLOYEE RELATIONSHIPS WITH KNOWN OR SUSPECTED CRIMINALS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Associating or dealings with persons whom they know, or have reason to believe are, or have been, recently charged with criminal acts, or any person who the employee should reasonably know to have been involved in criminal acts or are under indictment. This is to include criminal investigation, arrests or incarceration.  Employees shall also avoid associations with known racketeers, illegal gamblers, and persons in the community with a reputation for criminal behavior. | | | | ● | | | |

**22  EMPLOYEE RELATIONSHIPS WITH VICTIMS, WITNESSES, INFORMANTS, OR OTHER SUCH INDIVIDUALS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Converting an enforcement contact with persons, including, but not limited to, victims, witnesses, informants, suspects, or traffic violators, into a dating relationship, sexual relationship, social relationship, or business relationship during the course of any official contact or investigation. | | | | | | ● | ● |
| B. Failure to notify their supervisor of any relationship that evolves following contact due to job responsibilities. | | | | ● | | | |

**23  FREQUENTING PROHIBITED ESTABLISHMENTS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Knowingly entering or frequent any establishment, such as a house of prostitution or illegal gambling house, wherein the laws of the United States, the state, or the local jurisdiction are regularly violated, except in the performance of duty or while acting under proper and specific orders from a supervisor. | | | | ● | | | |

**24  GAMBLING**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Participating in any form of illegal gambling at any time, except in the performance of duty, and while acting under proper and specific orders from a supervisor. | | | | | | ● | ● |

**25  SLEEPING ON DUTY**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Sleeping on duty without authorization. | | | ● | | | | |

**26  INTERFERENCE WITH OFFICIAL INVESTIGATIONS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Use of official position or knowledge gained by employment with this Office to hinder, obstruct, or interfere with any case, official operation, or investigation being handled by this Office or any other agency. | | | | | | | ● |
| B. Improper discussing and sharing of confidential internal investigation information. | | | | | ● | ● | ● |

13

46REPORT000333

**Policy GC-17,** *Employee Disciplinary Procedures*          **Effective Date: 06-25-20**
Attachment B

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| C. Failure to submit to an administrative interview or refusal to cooperate in a polygraph examination during an administrative investigation. | | | | | | | ● |
| **27 REQUEST FOR ASSISTANCE** | | | | | | | |
| A. Failure to adequately assist members of the public, when requesting assistance from the Office either by telephone or in person. | | ● | ● | ● | ● | ● | ● |
| **28 FAILURE TO MEET STANDARDS** | | | | | | | |
| A. Failure to perform assigned duties in an acceptable manner. | | ● | | | | | |
| B. Failure to possess the knowledge required to perform assigned duties based on the employee's job classification and training. | | ● | ● | | | | |
| C. Failure to complete assignments properly. | | ● | | | | | |
| D. Failure to make reasonable decisions or take appropriate actions. | | ● | | | | | |
| E. Failure to accomplish a reasonable share of the workload. | ● | | | | | | |
| F. Failure to conduct proper security walks. | | ● | | | | | |
| G. Failure to complete proper Operations Journal entries. | | ● | | | | | |
| H. Failure to conduct a proper headcount. | | ● | | | | | |
| I. Failure to perform security functions which would not have the potential to place members of the public at risk. | | ● | | | | | |
| J. Failure to perform security functions that result in an escape or which places other employees or members of the public at risk. | | | | | | ● | |
| K. Failure to follow release procedures as specified in Office Policy DO-2, *Release Process*, resulting in an erroneous release from custody. | | ● | ● | | | | |
| L. Reckless use, handling, or display of firearms. | | | | | | ● | |
| M. Unintentional, voluntary discharge of firearm, where the trigger was manipulated voluntarily, but the discharge was unintentional. | | ● | | | | | |
| N. Unintentional, involuntary discharge of firearm, where the trigger was manipulated involuntarily, and discharge was unintentional. | | ● | | | | | |
| O. Accidental discharge of firearm, where outside influences such as clothing or equipment contacting the trigger occurred, due to failure to safety or holster firearm properly. Does not include actual mechanical failures. | | ● | | | | | |
| P. Unintentional non-activation and use of body-worn cameras. | | ● | | | | | |
| Q. Intentional failure to notify a supervisor and the Body-Camera Program Administrator of lost, stolen, damaged, or non-functioning equipment. | | | | ● | | | |
| R. Deliberate and/or repeat failures to activate and use body-worn cameras, failure to activate and use body-worn cameras when conducting traffic stops, responding to calls for service, or interacting with the public for investigative or enforcement activities, unless exigent circumstances exist. | | | | | | ● | |

14

46REPORT000334

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 06-25-20**
Attachment B

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| S. | Failure to intervene or respond when necessary, to include: calls for service, dispatch, and requests for assistance. | | | ● | | | | |
| T. | Failure to respond to a radio call. | | ● | | | | | |
| U. | Unintentional failure to complete reports as directed by Office policies, to include but not limited to, Incident Reports, PREA Reports, and Use of Force Reports. | | | ● | | | | |
| V. | Intentional failure to complete reports as directed by Office policies, to include but not limited to, Incident Reports, PREA Reports, and Use of Force Reports. | | | ● | | | | |
| W. | Failure by a supervisor to conduct any required reviews with adequate and consistent quality. | | | ● | | | | |
| X. | Neglect to maintain prescribed records. | | | ● | | | | |
| Y. | Failure by a supervisor to ensure employees perform required duties, or hold them accountable, of which does not place other employees or members of the public at risk. | | | ● | | | | |
| Z. | Failure to conform to work standards established for the employee's rank or position. | | ● | ● | | | | |
| aa. | Failure to meet mandatory training as it relates to Arizona Peace Officer Standards and Training Board (AZ POST) requirements and Court order mandates. | | | ● | | | | |
| bb. | Misuse and/or abuse of supervisory authority or privilege. | | | ● | | | | |
| cc. | Failure to exercise proper supervision over assigned employee or prisoner. | | | ● | | | | |
| dd. | Inattentiveness to duty or horseplay. | ● | | | | | | |
| ee. | Failure to report to assigned area of responsibility during a shift. | | ● | | | | | |
| ff. | Failure to advise employee of the grievance and appeal process and/or inform the chain of command of possible forthcoming complaints or grievances. | | ● | | | | | |
| gg. | Refusing to participate in an Intervention Action Plan. | | | | | | ● | |
| hh. | Allowing unauthorized personnel to enter work areas. | | ● | | | | | |
| ii. | Failure to report an industrial injury requiring medical attention with 24 hours. | ● | | | | | | |
| jj. | Failure of a supervisor to complete the Industrial Injury Report within 24 hours. | | ● | | | | | |
| kk. | Failure to make required EIS Blue Team entries as a line staff employee. | ● | | | | | | |
| ll. | Failure by a supervisor to make required EIS Blue Team entries. | | ● | | | | | |
| mm. | Intentional misplacement of important documents or property with serious consequences for law enforcement. | | | | | | ● | ● |
| nn. | Unintentional misplacement of important documents or property without serious consequences for law enforcement. | ● | | | | | | |
| oo. | Failure to thoroughly search for and properly collect any available evidence in any arrest or criminal investigation. | | | ● | | | | |

15

46REPORT000335

Case 2:07-cv-02513-GMS Document 3029-38 Filed 06/12/26 Page 436 of 998

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| pp. | Failure to notify the Office of a change of address or telephone number. | ● | | | | | | |
| qq. | Failure to maintain telephone or other method of delivering messages. | ● | | | | | | |
| rr. | Failure to maintain required uniform. | ● | | | | | | |
| ss. | Failure to maintain personal appearance appropriate to the job. | ● | | | | | | |
| tt. | Failure to keep work or vehicle area clean and uncluttered, causing a work hazard. | ● | | | | | | |
| uu. | Office employees and volunteers entering or working in a jail facility are prohibited from bringing personal cell phones, and other personal electronic items (MP3 players, iPods, personal laptops, tablets, smart watches, or any other personal electronic devices that are used for texting, e-mails, social media or viewing movies/clips, into secured areas of jail facilities, unless approved by a supervisor, or otherwise authorized, as specified in Office Policy CP-2, *Code of Conduct*. | ● | ● | | | | | |

**29 INSUBORDINATION**

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| A. | Failure by an employee to follow a reasonable and lawful order given by a supervisor regardless of the method of conveyance. | | | | | | ● | ● |

**30 LOITERING**

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| A. | Remaining in eating establishments, gas stations, or other public places for longer than is reasonably required to complete the legitimate activity for which they stopped while on duty or in uniform, unless required by duty. | | ● | | | | | |
| B. | Remaining at a duty post or any Office location beyond the end of their shift, unless conducting official business or for a minimal period while awaiting transportation from work. | ● | | | | | | |

**31 ABUSE OF PROCESS, WITHHOLDING EVIDENCE, AND MISAPPROPRIATION OF PROPERTY**

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| A. | Manufacturing, concealing, falsifying, destroying, removing, tampering with, or withholding evidence or information, or make false accusations in a criminal, traffic matter, or administrative matter. | | | | | | | ● |
| B. | Failure to ensure a valid chain of evidence with adherence to the guidelines for the strict control and management of evidentiary property, as specified in Office Policy GE-3, *Property Management and Evidence Control.* | | | ● | | | | |
| C. | Failure to properly report and document, any property that is being held as evidence, found property, or for safekeeping, which comes into possession of the employee during the course of regular duties. | | | | | ● | ● | |
| D. | Unintentional failure to properly secure an individual's personal property which results in the loss of those items. | | ● | | | | | |

16

46REPORT000336

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 06-25-20**
<u>Attachment B</u>

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| E. Intentional or negligent failure to properly secure an individual's personal property which results in the loss of those items. | | | | | | ● | ● |
| **32  TREATMENT OF MEMBERS OF THE PUBLIC OR  PERSONS IN CUSTODY** | | | | | | | |
| A. Unnecessary use of force or force option with a member of the public or persons who are in the custody of the Office, or failure to report such actions. | | | | | | ● | |
| B. Abusive treatment of members of the public, or inmates, or prisoners, which does not rise to the level of assault. | | | | | ● | | |
| **33  GUM AND TOBACCO USAGE** | | | | | | | |
| A. Use of tobacco products or gum while making personal contacts with members of the public in the performance of their duties. Tobacco products use includes, but is not limited to: cigars; cigarettes; pipes; chewing tobacco; and, E-cigarettes. | ● | | | | | | |
| B. Use of tobacco products in a non-designated area. | ● | | | | | | |
| **34  PROPERTY DAMAGE** | | | | | | | |
| A. Failure to notify a supervisor, or if unavailable, the nearest on-duty supervisor, and promptly submit a written report concerning any damage to real or personal property, including vehicles, belonging to the Office, Maricopa County, a member of the public, or any other entity or individual, which is a result of, or occurred during, the execution of their official duties or responsibilities. | | | ● | | | | |
| B. Failure to notify a supervisor and promptly submit a written report concerning any damage to real or personal property of others, including vehicles, belonging to the Office, Maricopa County, while off duty. | | | ● | | | | |
| C. Attempting to work out or negotiate a settlement with any entity or individual regarding personal or Maricopa County liability when property damage has occurred during the execution of official duties. | | | | | | ● | |
| **35  RUMORS OR GOSSIP** | | | | | | | |
| A. Spreading rumors or gossip is prohibited. | | ● | | | | | |
| B. Failure by supervisors to take action when made aware of the spreading of rumors or gossip. | | | ● | | | | |
| **36  SOCIAL NETWORKING SITES** | | | | | | | |
| A. Accessing social networking sites on Office equipment while on duty unless in the performance of official duties. | | ● | | | | | |
| B. Publicly expressing, sharing, or posting information regarding the Office which would jeopardize the safety and security of Office employees, inmates or the public, or which could negatively impact the efficient or effective operation of the Office. | | | ● | ● | ● | ● | ● |

17

46REPORT000337

Case 2:07-cv-02513-GMS Document 2529-38 Filed 06/12/23 Page 638 of 998

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| **37  KEEPING SUPERVISORS INFORMED** | | | | | | | |
| A.  Failure to notify a supervisor of all situations, events, incidents, inspections, and communications that affect, or may affect, the Office, or with which the Office may be concerned. | | ● | | | | | |
| B.  Failure to notify involvement in any situation being investigated by another law enforcement agency, whether as a witness, victim, or suspect, or in anticipation of becoming an accused suspect. | | ● | | | | | |
| C.  Failure to notify a supervisor of the suspension or revocation of driving privileges. (This failure applies only to the reporting, not actual vehicle operation which falls under Section 3, Subsection B, Commission of a Class 1 misdemeanor). | | | ● | | | | |
| D.  Failure to notify a supervisor upon knowledge of a family member being booked into an Office jail. | | ● | | | | | |
| E.  Failure to notify a supervisor of the issuance of a court order, such as an order of protection or an injunction against harassment, in which the Office employee has been named. | | | ● | | | | |
| F.  Failure to notify a supervisor of the receipt of a moving vehicle traffic citation. | ● | | | | | | |
| **38  USE OF DISCRETION** | | | | | | | |
| A.  Failure to use discretion in the enforcement of laws and in determining appropriate actions. | | ● | | | | | |
| B.  Failure to use discretion to evaluate the circumstances and consider available resources and alternate solutions. | | ● | | | | | |

46REPORT000338

**Policy GC-17,** *Employee Disciplinary Procedures*          **Effective Date:** _____
**Attachment B**

## INELIGIBLE EXTERNAL
## PSB-DIRECTED SUPERVISORY INTERVENTIONS

*Once MCSO receives an internal or external complaint, the PSB Commander shall make an initial determination that a qualifying complaint may be addressed as an approved PSB-Directed Supervisory Intervention. There are some Categories of Offenses that might be either internal or external and may be subject to different criteria.*

*All external allegations of a Category 1, First or Second Offense or Category 2, First Offense as set forth in Attachment B of Office Policy GC-17 shall be eligible for a PSB-Directed Supervisory Intervention with the EXCEPTION of those listed below under this Attachment C of Office Policy GC-17:*

## 4. INDIVIDUAL RESPONSIBILITY

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | Failure of an employee who observes or becomes aware of any act of misconduct by another employee to report the incident as soon as practicable to a supervisor or directly to the PSB. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | | ● | ● | ● | ● | ● | ● | ● |
| B. | Failure of an employee to take appropriate action whenever learning of an Office Policy violation being committed, or having been committed, by any other person associated with the Office in any capacity, which by its very nature would tend to discredit an employee or the Office. To include conduct on or off-duty. **The presumptive discipline for a failure to take appropriate action may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | | ● | ● | ● | ● | ● | ● | ● |
| C. | Failure to adequately assist members of the public with the Comment and Complaint Form process. | | | ● | | | | | |

20

46REPORT000339

**Policy GC-17,** *Employee Disciplinary Procedures*           **Effective Date:** _____
**Attachment B**

### 5.  UNBECOMING CONDUCT

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | Failure by an employee to conduct themselves, at all times, both on and off duty, in such a manner as to reflect favorably on the Office, as specified in Office Policy CP-2, *Code of Conduct*. | | | ● | | | | | |
| C. | Failure of an employee who is on duty or identified by dress, location, or association as an employee, to maintain a professional demeanor and perform their duties in a calm and firm manner. | | | ● | | | | | |
| H. | Failure by an employee who has contact with the public to deal with people fairly, and courteously. | | | ● | | | | | |
| I. | Use of profanity, rude or insulting language, or conduct offensive to employees or members of the public that is not of a discriminatory nature or a racial slur. | | | ● | | | | | |
| K. | Failure to represent the Office in a professional manner while in uniform or in a County vehicle, to members of the public. | | | ● | | | | | |

### 9. ABUSE OF POSITION OR AUTHORITY

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| N. | Unintentionally denying any person of civil liberties (such as no probable cause for arrest, search and seizure, or failing to give Miranda Warning when required, or any that may be guaranteed by the Constitution of the United States). | | | ● | ● | ● | | | |

### 10.  CARE AND USE OF OFFICE OR MARICOPA COUNTY EQUIPMENT

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| L. | Committing criminal traffic violations while driving a County owned vehicle. Criminal violations to include but not limited to, criminal speed, driving without a valid license, driving with a suspended license, reckless driving, hit and run, vehicular manslaughter, and driving under the influence of alcohol or drugs. | | | ● | ● | ● | ● | ● | ● |

### 18.  ASSOCIATIONS AND FRATERNIZATION WITH INMATES OR PRISIONERS

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| L. | Encouraging or sympathize with inmates in their complaints about rules, regulations, or jail conditions, to include, failing to properly address the complaint or notify a supervisor of the situation. | | | ● | | | | | |

21

46REPORT000340

**Policy GC-17,** *Employee Disciplinary Procedures*          **Effective Date:** _____
**Attachment B**

### 27. REQUEST FOR ASSISTANCE

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | Failure to adequately assist members of the public, when requesting assistance from the Office either by telephone or in person. | | | ● | ● | ● | ● | ● | ● |

### 28. FAILURE TO MEET STANDARDS

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| Y. | Failure by a supervisor to ensure employees perform required duties, or hold them accountable, of which does not place other employees or members of the public at risk. | | | ● | | | | | |

22

46REPORT000341

WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.,

Plaintiffs,

and

United States of America,

Plaintiff-Intervenor,

v.

Russ Skinner, in his official capacity as Sheriff of Maricopa County, Arizona, et al.,

Defendants.

No. CV-07-02513-PHX-GMS

**AMENDED\***
**FOURTH AMENDED**
**SUPPLEMENTAL PERMANENT**
**INJUNCTION/JUDGMENT ORDER**

(*Amending Doc. 3075 on Page 9, Line 12, to read "not closed")

Pending before the Court is Defendants' Motion for Approval of Staffing Study Pursuant to Paragraphs 361 and 362. (Doc. 2984). At the oral argument on that motion, the Court informed the parties that while it considered the staffing study useful in some respects, the staffing did not comply with the Court's requirements in Paragraphs 361 and 362. The failure to submit a compliant study thus frustrated the Court's purposes in reducing the backlog of complaints against the MCSO in a sustainable way, curing the contempt originally imposed, and providing efficient and economic alternatives for the deployment of law enforcement officers to meet the requirements of the state law and the Court's orders.

46REPORT000342

The parties requested additional time to see if they could craft a resolution that would accomplish the purposes of the staffing study as it pertained to the backlog without requiring that the staffing study be redone. The Court granted this request. (Doc. 3012). Thereafter, the parties filed a Report of Joint Submission of Parties regarding Completion of Purposes of Staffing Study. (Doc. 3036). The Report advances two separate proposals which call for the elimination of the backlog by March 31, 2026. The MCSO/DOJ proposal further acknowledges that, to accomplish this result, Defendants must reduce the backlog by 63 PSB cases every month. (*Id.* at 10).

To practically accomplish this backlog reduction, the MCSO/DOJ joint proposal proposed that:

1. The Court extend the time to 180 days in which the MCSO must complete all investigations. This, according to the joint proposers, would eliminate approximately 23.6 cases per month from the backlog and would be more in-line with state law pertaining to other complaints. (*Id.* at 4-5).

2. The MCSO appoint ten new PSB investigators by the end of the year. (*Id.* at 4).

3. The MCSO double the efficiency of current investigations. (*Id.* at 4-5).

4. The Court meet with the parties regularly to assess their progress towards compliance. (*Id.* at 8-9).

In evaluating this proposal, the Court had the following observations:

1. In establishing the PSB Staffing Fund and the requirement that funding occur for every month in which the backlog could not be reduced by 20 cases per month, the Court had in mind its initially imposed timeline for the completion of preliminary investigations. The Court also reserved the authority to adjust the minimum backlog reduction after the completion of the staffing study. (Doc. 2830 at ¶ 366). The Court further noted that it would consider relaxing the investigative timeline only "when significant progress is made towards the reduction of the backlog." (*Id.* at ¶ 358). A significant number of the backlog reduction in the past year has come from the court-authorized diversions from the backlog, which was not the source of the reduction the Court

46REPORT000343

had in mind. The Court is, nevertheless, willing to expand the investigative timelines to be more in compliance with state law. In doing so, however, it will increase the number of monthly backlog reductions that must occur to avoid the payment of funds into the PSB Staffing Fund. Such an increase will reflect the court's grant of an increased time limit for investigation completion and be more in line with the amount of monthly minimum backlog reductions which the parties recognize are necessary to eliminate the backlog in a reasonable time.

2.      While the MCSO/DOJ proposal suggested hiring ten new PSB investigators by the end of the year, it specified that this would not guarantee the increase of the current investigators by ten because "[t]he number at that time may vary depending on retirements or resignations, or if MCSO exceeds its goal of 10 new investigators." (Doc. 3036 at 5). As the parties will recall, the staffing study recommended the addition of at least 13 additional investigators to the PSB to reduce the backlog and thereafter function in compliance with state law. But the Court found the staffing study unacceptable because it in no way offered any analysis on which to conclude that 13 additional investigators would be sufficient to accomplish the required task or maintain adequate PSB operations thereafter. The analysis provided by the joint proposal itself notes that through the addition of ten investigators "MCSO anticipates that it will be able to reduce the backlog by an additional 9 cases per month." (*Id.*). Nine additional closures per month is far fewer than the 63 necessary to timely reduce the backlog.

3.      The MCSO offers no analysis suggesting that it can approximately double the case resolutions per month per investigator through investigative efficiencies. To date, and while working with years of backlog, the only effective method appears to have been to increase the number of investigators.

4.      While the Court recognizes the importance of accountability, with the lack of sufficient analysis and the absence of any enforcement mechanism, the Court is dubious that increased meetings with the Court to ascertain adequate compliance with the backlog reduction will prove fruitful. Rather, increased meetings will likely result only in

- 3 -

46REPORT000344

piecemeal micromanagement by the Court. Nevertheless, the Court has already implemented a mechanism by which, in the absence of adequate backlog reduction, additional funding must be provided to increase PSB personnel. The funding depends upon the extent to which the backlog is not reasonably reduced on a month-by-month basis. Prior to the completion of the staffing report, the Court reserved the right to adjust these numbers. (Doc. 2830 ¶ 366). In short, if the Court uses the mechanism in place and enhances the minimum quarterly number to be eliminated from the backlog in light of the additional timeline relief Defendants are requesting, it can, commensurate with the deadlines suggested by the Defendants themselves, reduce the backlog without being overly involved in matters of MCSO administration.

As a result, the Court drafted the outlines of a proposed order and submitted it to the parties for comment. In light of the comments of the parties, the Court addresses some aspects of the Peace Officer's Bill of Rights, Ariz. Rev. Stat., Title 38, Chapter 8, Article 1.

Among other things, that Peace Officer's Bill of Rights provides time limits within which initial administrative investigations must be completed and also accords certain procedural rights and protections when an investigation may result in a disciplinary action. "Disciplinary action" is defined as "the dismissal, the demotion or any suspension of a law enforcement officer that is a result of misconduct or unsatisfactory performance." A.R.S. §38-1101(3). The article also affirms a law enforcement's right to appeal a disciplinary action.

The statute provides that, in a usual case, the employer of a law enforcement officer has no more than 180 days after the employer has received qualifying notice of the complaint to complete the initial administrative investigation. A.R.S. § 38-1110(A). Per the statute, the initial administrative investigation is not complete until the employee is served with either a notice of discipline or a notice of findings. *Id*. As it pertains to the Defendants in this action, a notice of discipline is served after a pre-determination hearing determines that a law enforcement officer should be terminated, demoted or suspended and the law enforcement officer is so notified. (Doc. 1765 ¶¶ 183-228).

- 4 -

46REPORT000345

A "notice of findings" is served when an investigation determines that anything other than "the dismissal, demotion or any suspension of a law enforcement officer" is the appropriate resolution to the investigation. A.R.S. § 38-1110(A). Thus a "notice of findings" includes, but is not limited to, a Closed Case Notification, Coaching, Written Reprimand or any other internal affairs investigation that imposes lesser discipline than "dismissal, demotion or suspension of a law enforcement officer." *Id*. To the extent that the MCSO has adopted a different definition of what completes an investigation for purposes of removing it from the backlog, it is not in compliance with the enforceable timeline contained in the Peace Officer's Bill of Rights.

Upon additional reflection on its proposal, MCSO suggests that it may be unable to comply with the 180 day timeline effectively mandated by the Peace Officer's Bill of Rights. A.R.S. § 38-1110(A). It offers, however, no reason why. There is no suggestion that timely compliance should be difficult in cases of "notice of finding" when no pre-determination hearing is required. Presumably then, the concern arises from cases where a pre-determination hearing is necessary. (Doc. 1765 ¶ 223); *see* A.R.S. §38-1101(3).

This at least suggests the possibility that the MCSO has been removing cases from the backlog without complying with the notification requirements contained in the Peace Officer's Bill of Rights and which notification standard police practice would also require be delivered to the Complainant. For the first time MCSO asserts that the Conduct Resolution Section is involved in the process—presumably providing pre-determination hearings in cases of notice of discipline. Yet, the MCSO has provided no evidence as to how many of the cases removed from the backlog still have not had their pre-determination hearings. Nor does it indicate generally how many investigations result in recommended disciplinary action requiring a pre-determination hearing; that the failure to conduct such determinations on a timely basis by command staff is justified, or the amount of time such pre-determination hearings take. The Defendants request that the use of the Staffing Fund in Paragraph 354 be expanded to permit expenditures on behalf of the Conduct Resolution Section. While the Court does not reject such an expanded use of the fund out of hand, it

- 5 -

46REPORT000346

would require that a systemic and justifying need be demonstrated that ranks with the need for more PSB resources in resolving the backlog. No such need has yet been established. The Court further notes that in the interim, the Monitor may justify extensions in appropriate circumstances in individual cases, as set forth in Doc. 2830 ¶ 365.

The article further affirms that a law enforcement officer may appeal from a decision in which discipline is imposed. *See* A.R.S. § 38-1106(A). If an officer does so, the law provides confidentiality for a limited additional time for the officer's personnel files. A.R.S. § 38-1109(A). Any information about the investigation is excluded from that part of the personnel file of a law enforcement officer that is available for public inspection "until the investigation is complete or the employer has discontinued the investigation." A.R.S. §38-1109(A). Further, information to be used in the officer's appeal by either party is subject to limited disclosure requirements and may not be disseminated except to the appellant or "their lawful representatives." A.R.S. § 38-1106(B). If an officer appeals a disciplinary action, then for purposes of the confidentiality of his investigative file, "the investigation is not complete until the conclusion of the appeal process." A.R.S. §38-1109(B).

Defendants' assertion, however, that this confidentiality extends beyond the personnel files and other disclosure requirements is incorrect. The statute is quite clear that all hearings on the officer's appeal are open to the public. A.R.S. §38-1106 (J) ("all hearings pursuant to this section shall be open to the public. Executive sessions allowed . . . shall be limited to legal advice to a personnel appeals board or for deliberations.") Since all hearings regarding the officer's appeal of the pre-hearing determination are open to the public, then the result of the pre-hearing determination and the fact that the officer appealed that determination are not confidential by the statute's design. In providing that hearings on appeals are open to the public, the statute authorizes public access to the information presented at the hearing. Thus, neither the result of the pre-hearing determination, nor the appeal made from it, are subject to the limited additional confidentiality extended to the investigative and personnel files.

46REPORT000347

Moreover, pursuant to the statute, the employer bears the burden of proof on appeal. A.R.S. §38-1106 (G). It is difficult to ascertain in most cases how the employer could be reasonably expected to meet that burden in the absence of calling the complainant as a witness at the appeal. With that in mind, the suggestion that the statute – which applies only to the officer's personnel and investigative files – prevents the complainant from knowing the pre-hearing determination makes little sense.

Federal courts recognize an interest in public disclosure and accountability with law enforcement operations, especially in circumstances of misconduct. *C.f. Uniformed Fire Officers Ass'n v. Blasio*, 846 Fed. Appx. 25, 31 ("[T]he public has a stronger legitimate interest in the records of law enforcement officers than in those of other public employees."); *Ocasio v. U.S. Dep. of Justice*, 70 F. Supp. 3d 469, 482 (finding that "the [c]ourt cannot conclude there is no public interest in the disclosure of the records" relating to "serious misconduct" of law enforcement); *Kallstrom v. City of Columbus*, 165 F. Supp. 2d 686, 696 (holding that the "disclosure of public records, including police officer personnel files" achieves a "compelling state interest" of ensuring accountability in government).

Restricting access to the details of the investigation found in the investigative and personnel files until the appeal is complete may be sensible, and may protect the appellate process. But that does not mean that the officer's appeal, and per force the result of the pre-determination hearing that generated it, are kept from the public in general. The statute mandates otherwise.

After having considered the comments of the Parties, the Court, now orders that Paragraph 204 of its Second Amended Second Supplemental Permanent Injunction/Judgment Order (Doc. 1765) and Paragraphs 356-358 of the Amended Third Supplemental Permanent Injunction/Judgment Order (Doc. 2830 ) be amended.

**IT IS THEREFORE ORDERED** amending Paragraph 204 of the July 26, 2016 Second Amended Second Supplemental Permanent Injunction/Judgment Order (Doc. 1765) and Paragraphs 356-58 of the November 30, 2022 Amended Third

- 7 -

46REPORT000348

Supplemental Permanent Injunction/Judgment Order (Doc. 2830) as follows:

**a. Doc. 1765 - Second Amended Second Supplemental Permanent Injunction/ Judgment Order**

204. Internal affairs investigations (whether in PSB or a Division) will complete their administrative investigations within 180 calendar days of the initiation of the complaint. If the administrative investigation determines that no "Disciplinary Action" is appropriate, the investigation is complete when both: (1) the employee is served with the notice of findings[1] and (2) the Complainant is notified consistent with Paragraph 246 at the Complainant's last known point(s) of contact.

If the MCSO Pre-Determination hearing concludes that "Disciplinary Action"[2] is appropriate, the administrative investigation is complete when both: (1) the employee is served with the notice of discipline and (2) when the nature of the determined discipline (termination, demotion or suspension) is sent to the Complainant at the Complainant's last known point(s) of contact. This notice to the Complainant shall inform the Complainant that the discipline may not be final, as the employee may pursue administrative and court appeals of the discipline. When discipline is appealed, and thus the investigation is extended, the MCSO shall inform the Complainant when the discipline becomes final. The MCSO shall file a monthly report with the Monitor in which it will identify all investigations which the PSB Commander has approved and closed but for which the pre-determination hearing has not been completed. Further, the MCSO shall report to the Monitor and the Parties within ten days of the dismissal of any discipline pursuant to A.R.S. § 38-1110(E).

---

[1] "Notice of findings" includes, but is not limited to, a Closed Case Notification, Coaching Service Form, Written Reprimand or any other internal affairs investigation that imposes lesser discipline on a law enforcement officer than "dismissal, demotion or suspension of a law enforcement officer." *See* A.R.S. § 38-1110(B).

[2] "Disciplinary Action" means the dismissal, the demotion or any suspension of a law enforcement officer that is the result of misconduct or unsatisfactory performance." A.R.S. § 38-1101(3).

46REPORT000349

**b. Doc. 2830 Amended Third Supplemental Permanent Injunction/ Judgment Order**

356. Within ten business days of the entry of this order, the MCSO shall provide to the Monitor the number of administrative investigations remaining in the backlog that are open and have not been completed within the time limits required by the Court (or, in other words, the extent to which the backlog is changed by the extended timeline authorized above for Doc. 1765 ¶ 204 as amended). The Monitor shall have ten business days thereafter to certify the backlog to the parties and the Court. At the beginning of each month, the number of open cases whose investigations have exceeded the time by which Doc. 1765 ¶204 as amended required that they be completed shall be the remaining backlog. The remaining backlog shall include not only the number of cases that were not closed, but also the number of cases that were added to the backlog during that month. This backlog shall not include any cases for which the Monitor has granted an extension of the investigation deadline pursuant to ¶ 365 of this order.

357. The cases in this remaining backlog should be identified by year, giving priority to the oldest cases, i.e., the cases that were filed first. The expectation should be to address the oldest cases first, without ignoring the continuing caseload. MCSO shall close at least 25 cases per quarter that were filed between 2015-2020. In their monthly report, the MCSO shall specify in which year each case eliminated from the backlog was filed.

358. Beginning on October 1, 2024, the MCSO will be required to reduce the backlog number remaining on the last day of the previous calendar-quarter (September 30, 2024) by 45 cases per month for a minimum total reduction of 135 cases during the last calendar quarter of 2024. Beginning on January 1, 2025, the amount of required case reduction will increase to a 50 case reduction per month from the number of the backlog existing on the last day of the previous quarter (Dec. 31, 2024) for a minimum total reduction of 150 cases for the first calendar quarter of 2025.

- 9 -

46REPORT000350

Beginning on April 1, 2025, the amount of required case reduction will increase to a 55 case reduction per month from the number of the backlog existing on the last day of the previous quarter (March 31, 2025) for a minimum total reduction of 165 caseload reduction for the second calendar quarter of 2025. Beginning on July 1, 2025, the minimum amount of required case reduction from the backlog number on the last day of the previous quarter (June 30, 2025) will increase to a 60 case reduction per month and a 180 minimum caseload reduction for the third calendar-quarter of 2025. This backlog reduction number of 60 per month and 180 per quarter will remain the required minimum backlog caseload reduction per quarter from the backlog number on the last day of the previous quarter until the backlog is eliminated. For each calendar-quarter in which PSB cannot reduce the remaining backlog by the requisite number of cases from the number of the backlog existing on the last day of the previous quarter, the MCSO and/or Maricopa County shall pay into the PSB Staffing Fund two times the amount identified in ¶ 338 ($191,415.12) for each month in that quarter in which the PSB did not reduce the backlog by the requisite number of cases specified for that month. For each calendar-quarter that MCSO reduces the remaining backlog by more than the minimum backlog reduction required to avoid the assessment to the PSB Staffing Fund, Defendants may credit the excess cases toward any month or months in the following quarter's minimum backlog case reduction. The Defendants may apply excess credits only to months in the quarter immediately following the quarter in which the Defendants accrued the credits. For the month of September 2024, the MCSO and/or Maricopa County shall pay into the PBS Staffing Fund two times the amount identified in ¶ 338 above if they cannot reduce the backlog by twenty cases from the previous month. If, however, the new certification of the backlog in ¶ 356 as amended results in an increase of more than twenty cases in the backlog from the backlog existing on August 31, 2024, the MCSO and defendant are released from paying into the PSB Staffing Fund for the month of September 2024 only. The

- 10 -

46REPORT000351

Court may for good cause shown consider modifications to the payment schedule in this paragraph after October 1, 2025.

Dated this 4th day of September, 2024.

_____
G. Murray Snow
Chief United States District Judge

- 11 -

46REPORT000352

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
|---|---|
| Plaintiffs, | **ORDER** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

Pending before the Court is the appointment of an outside investigator for IA 2025-0185. After consideration of the positions of the parties, the Court appoints Shaneeda Jaffer of the Cleveland-based law firm of Benesch, Friedlander, Coplan and Aronoff to conduct that investigation.

The Defendants' objection that it is not aware of the nature of IA 2025-0185 is without merit. The complaint was made to the MCSO's Professional Standards Bureau and it was assigned a number by that Bureau. After consultation with the monitor by PSB, IA 2025-0185 was recommended for independent investigation. In light of the rulings of this Court regarding such procedures, and the reasons such rulings were entered, the Monitor need not further justify his recommendation to the MCSO. Further, it is within

46REPORT000353

the realm of cases in which the Court's previous orders have authorized the appointment of an Independent Investigator.

As for Defendants' expressed concerns about Ms. Jaffer, the Court has consulted with its counterpart in the Northern District of California in which Ms. Jaffer has been involved in internal affairs investigations. This Court has been assured by the Court in the Northern District of California of the competence, professionalism, and objectivity of those investigations. The Court thus rejects MCSO's concerns to the contrary.

As the Court understands it, the Monitor became aware of Ms. Jaffer from her service in the Northern District of California, but the Monitor neither appointed her, nor directed her work there. Nevertheless, should other matters be recommended for assignment to an outside investigator, and after the required consultation between the Monitor and the MCSO, the Monitor believes the Court should assign a different outside investigator for reasons that seem appropriate to him, the Monitor may so recommend to the Court as well as the reasons for that recommendation. If after the consultation and recommendation process is completed, the MCSO believes that Ms. Jaffer should not be appointed to that investigation for reasons specific to that investigation, the MCSO may so recommend to the Court as well as the reasons for the recommendation.

In the meantime, Ms. Jaffer, the Monitor and the Parties shall proceed as follows with respect to the appointment of Ms. Jaffer:

1. The Monitor shall prepare a confidential memorandum in which the Monitor shall include all the facts pertinent to the charge to be investigated and the reasons for the investigation. The Monitor shall provide the confidential memorandum to the independent investigator and would thereafter provide no direction to the independent investigator.

2. The independent investigator shall, thereafter, pursue the matter independently and shall have the same access to cooperation and information from all parties, specifically including the MCSO as have been provided the Monitor in this lawsuit by this Court's orders.

- 2 -

46REPORT000354

3.      In performing her functions the Independent Investigator and her staff shall receive the same immunities which deputy sheriffs assigned to PSB receive in the discharge of their duties under state and federal law. The independent investigator shall also be granted the immunity set forth in Doc. 606 ¶ 144.

4.      To the extent possible, the Independent Investigator shall conduct the investigation in compliance with the best investigative practices and in compliance with the processes and standards set forth in the Court's previous orders and which govern the operations of MCSO's Professional Standards Bureau.

5.      In preliminarily making a determination as to whether charges or discipline are appropriate, the Independent Investigator shall apply the two disciplinary matrices attached to GC-17 to the appropriate MCSO employees. To the extent that an MCSO employee is a non-classified employee, and is thus subject to the MCSO disciplinary policy GC-17 but not subject to an applicable disciplinary matrix, the Independent Investigator shall apply a level of discipline that is no less than that specified for those classified employees within the MCSO that share similar job functions as the non-classified employee.

6.      When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of offenses.

7.      The Sheriff, the County and the MCSO's cooperation with the investigation is required. The Sheriff shall insure that the Independent Investigator and each of the investigators or members of the investigators staff are given timely and complete access to MCSO documents, office holders, employees, information, and resources in conducting the investigation(s), making reports, and in pursuing other activities under this Order. The Sheriff shall also provide any necessary facilities or resources to hold necessary interviews, provide appropriate notices, and/or conduct hearings.

8.      The Independent Investigator should operate as efficiently and expeditiously as possible. To this end the Independent Investigator may, if deemed necessary,

- 3 -

46REPORT000355

engage additional qualified investigators to assist in timely completing the investigation(s). The County will pay the Independent Investigator's reasonable expenses and the reasonable expenses of the Independent Investigator's staff, as well as reasonable lodging, meal, travel, administrative, and other necessary expenses. The Independent Investigator may enter into a contract with the County governing these services if the Independent Investigator wishes to do so. Otherwise, the Independent Investigator shall provide monthly bills for the services to the County and shall be promptly paid for such services. The Court will resolve any disputes between the Independent Investigator and the County about what is reasonable. Should the Independent Investigator or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to the parties.

9.     The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within their own delegated responsibility. The Monitor retains the same supervisory authority over the results of the investigation, as he does over all other PSB investigations, but the Monitor may not use information arising from the PSB investigation, unless the Monitor independently uncovered the information in his own inquiries and/or disclosed that information to the Independent Investigator.

10.     To the extent that the Independent Investigator identifies other matters that should be investigated or reinvestigated, the Independent Investigator shall indicate to the parties, the Monitor, and the Court in writing, the subject of such investigation and the likely principals.

11.     If any other matters arise on which the Independent Investigator needs to request that the Court enter an order, she may apply to the Court for such an order

- 4 -

46REPORT000356

in writing served to all the parties. In the writing, the Independent Investigator should specify the reasons for the request and the remedy sought.

12.     Except as otherwise indicated in this order, the Independent Investigator has the sole authority to determine whether charges arising from the Findings of Fact should or should not be pursued. The Independent Investigator has the right to consider the severity of the misconduct, its apparent merit, the practicality of bringing charges, and the expense of pursuing such charges in making this determination in accord with how such determinations would be made by a responsible internal affairs unit within a police agency of a similar size to the MCSO.

13.     The Independent Investigator shall prepare thorough reports setting forth the basis for the findings of fact and any determinations made by the Independent Investigator.

14.     To the extent the Independent Investigator's recommended findings or discipline depart from procedures set forth in this Order, or from MCSO's disciplinary matrices, the Independent Investigator shall explain the basis for the recommended departures in writing.

15.     These rules may be amended upon a meritorious request by the Independent Investigator, a Party, or the Monitor.

**IT IS THEREFORE ORDERED:**

Appointing Shaneeda Jaffer as an outside investigator in this case for IA 2025-0185.

**IT IS FURTHER ORDERED:** that her investigation(s) shall promptly proceed as outlined in this order.

Dated this 30th day of May, 2025.

G. Murray Snow
Senior United States District Judge

- 5 -

46REPORT000357

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **ORDER** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

Pending before the Court is Defendant Gerard A. Sheridan's Motion to Overturn the Monitor's Denial of MCSO's Professional Standards Bureau ("PSB") transfers. (Doc. 3217). For the reasons stated below, the motion is denied. Nevertheless, the Court's analysis suggests, and the Court sets forth some proposals that may in whole or in part, achieve the Sheriff's objective of furthering the shared goal of achieving full and effective compliance with the Court's orders.

## BACKGROUND

Sometime after the Court entered its first remedial injunction in this action, it became apparent that the MCSO had "failed to disclose thousands of relevant items of discovery" that had been requested by the Plaintiff class in the original discrimination trial.

46REPORT000358

(Doc. 1677 at 1-2). When the matter and the unprovided discovery was disclosed, the Court held extensive hearings on contempt orders, and it uncovered a number of instances of misconduct committed against the Plaintiff class of which the Court had previously been unaware. Further, under the observation of the Monitor, the MCSO conducted PSB investigations for the misconduct against the Plaintiff class that had been recently disclosed up to and including the imposition of discipline for that misconduct. During this process, and after it was completed, the Court held extensive hearings reviewing, among other things, (1) MCSO's contempt of the Court's previous orders and (2) the past and ongoing disciplinary process on the misconduct.

In 2016, the Court issued 162 pages of Findings of Fact detailing, among other things, the bad faith of MCSO's misconduct investigations and disciplinary process as it pertained to the Plaintiff Class. (*See* Doc. 1677). Of MCSO's investigatory and discipline process, as it pertained to the Plaintiff class, the Court noted "constitutional violations [that] are broad in scope, [and that] involve [MCSO's] highest ranking command staff, and flow into its management of internal affairs investigations." (Doc. 1765 at 2; *see also* Doc. 1677 ¶¶ 574-83). As this Court noted at the time, "Sheriff Arpaio and [then] Chief Deputy [and now Sheriff] Sheridan are the authors of the manipulation and misconduct that has prevented the fair, uniform, and appropriate application of discipline on MCSO employees as that misconduct pertains to the members of the Plaintiff class." (Doc. 1765 at 15).

As is relevant here, the Court determined that:

- MCSO deputies wrongfully took personal property of members of the Plaintiff class including forms of identification, credit cards, license plates, money, bank cards, cell phones, purses, wallets, weapons, memory cards, passports, religious statuettes, CDs, and homemade footwear that were not turned into property and evidence. (Doc. 1677 ¶¶ 616-640, 659, 681).

- PSB did not conduct adequate investigations of those charged with misconduct in so doing. (*Id.* ¶¶ 648-54, 718-51).

- MCSO promulgated a special discriminatory policy pertaining only to misconduct investigations arising from this case. According to this *Melendres* policy, multiple independent violations of MCSO policies

- 2 -

46REPORT000359

committed by MCSO personnel in *Melendres* detentions counted as only one policy violation for purposes of applying MCSO's disciplinary matrix. (*Id.* ¶¶ 509, 571-72). This policy discriminated against the Plaintiff class.

- MCSO, and Chief Deputy Sheridan specifically (*id.* ¶ 576; Doc. 1043 at 160-61), manipulated the timing of investigations in this case so as to prevent officers guilty of misconduct from being disciplined due to state law limits on the time in which investigations are to be completed if discipline is to be imposed. (Doc. 1677 ¶¶ 574-83, 714, 717).

- MCSO intentionally created conflicts by designating subordinates to decide on the discipline of their commanding officers (for example, Sheriff Arpaio designated Chief Deputy Sheridan's subordinate and friend to ultimately decide on the preliminary misconduct determinations that had been entered against Chief Deputy Sheridan). (*Id.* at ¶ 484). Chief Deputy Sheridan maintained supervision of misconduct investigations made against personal friends and from whom his wife had received real estate commissions. (*Id.* ¶¶ 769-73). Chief Deputy Sheridan assigned misconduct investigations to the friends of the personnel against whom the complaint was made. (*Id.* ¶ 775). Chief Deputy Sheridan had now-Chief, then-Captain Bailey, and then-commander of the PSB, supervise investigations into misconduct in which he was involved and in which he was a principal. (*Id.* ¶¶ 707-11).

- PSB investigations were completed in compliance with the pre-dispositions of Chief Deputy Sheridan, Captain Bailey and Captain Tennyson that no discipline should be imposed. (*Id.* ¶¶ 684-89).

- Chief Deputy Sheridan inappropriately intervened in PSB investigations and their parameters. (*Id.* ¶¶ 610-12, 614, 616, 628-29). For example, Chief Deputy Sheridan ordered that disciplinary records reflecting the imposition of previous discipline be expunged so as not to reflect that he overturned discipline that has been previously sustained. (*Id.* ¶¶ 756-58).

- Sheriff Arpaio and Chief Deputy Sheridan promoted and gave pay raises to persons who were under investigation for misconduct involving failure to comply with the Court's orders in this case. (*Id.* ¶¶ 499-500).

- MCSO did not provide adequate training on how to conduct an internal investigation. (*Id.* ¶¶ 862-67).

- MCSO PSB investigators offered false reasons for the detention of the property in their investigations. (*Id.* ¶¶ 616-90).

- 3 -

46REPORT000360

- MCSO did not track complaints registered against MCSO officers. (*Id.* ¶¶ 550-51, 853-64).

- PSB investigators were not adequately trained to conduct competent investigations of misconduct involving the Plaintiff class. (*Id.* ¶¶ 584-91).

- Division investigators were not adequately trained nor consistent in their application of different Division policies regarding discipline. Yet, there was no method for PSB to review or approve Division discipline. (*Id.* ¶¶ 592-601, 859-864).

- MCSO attempted to blame the Monitor for MCSO's own investigative inadequacies. (*Id.* ¶ 675).

- MCSO policy, at the time, failed to require any written justification for the Sheriff or his designee to explain a grievance decision, nor did they actually explain such decisions. (*Id.* ¶ 760).

- MCSO did not adequately train its leaders on how to supervise subordinates. (*Id.* ¶¶ 838-49).

- MCSO had inadequate internal affairs ("IA") policies. (*Id.* ¶¶ 868-75).

As a result of these findings, the Court entered a Second Order for Injunctive Relief. It imposed 92 additional requirements concerning misconduct investigations, discipline and grievances, five additional requirements concerning supervision and staffing, one additional requirement for additional training, and eighteen requirements concerning complaint and misconduct investigations regarding members of the Plaintiffs class. (*See* Doc. 1765). The Ninth Circuit affirmed this order in full. *Melendres v. Maricopa County*, 897 F.3d 1217, 1222 (9th Cir. 2018) (*Melendres IV*) (holding that "we are satisfied that the challenged provisions flow from MCSO's violations of court orders, constitutional violations, or both. . . . Each challenged provision addresses the internal affairs and employee discipline process, which the district court found based on ample evidence MCSO had 'manipulated' to 'minimize or entirely avoid imposing discipline on MCSO deputies and command staff.'" (citations omitted)).

Shortly thereafter, Sheriff Penzone assumed office. In at least one respect, Sheriff Penzone continued to violate both the Court's orders and the specifications of state law, in

- 4 -

46REPORT000361

continually failing to complete timely investigations of his employees' misconduct—and in fact drastically increasing the delay in completing such investigations. As the Court noted in also holding Sheriff Penzone in contempt and implementing appropriate remedies:

> Since the Court entered that order the Defendants have continually failed to complete their investigations in a timely manner. . . . In 2018, two years after the Court entered its order, the average closure of a case took 204 days—about two and a half times the maximum permitted by this Court's order. This, in itself, violated the Court's order and state law. That number, however, continued to increase. In 2019 the average closure ballooned to 499 days and 552 days in 2020. . . . [T]he timeline to complete an investigation has grown to approximately 600 days per investigation. . . . For full administrative cases involving sworn personnel, the timeline to complete an investigation is now apparently in excess of 800 days. . . . MCSO now has 2,137 pending investigations.

(Doc. 2830 at 2-4 (citations omitted)).

As a result of the continued failure of Sheriff Penzone to comply with the Court's order, despite having received ample warning of a pending contempt finding, the Court put in place additional curative measures which also assigned the Monitor the role of the Constitutional Policing Authority ("CPA"). This enhanced the Monitor's authority over intake and assignment that was previously given to him in the Court's Second Order for Injunctive Relief. These additional measures were part of the Third Order for Injunctive Relief entered in this action. (Doc. 2830). This Order too was fully affirmed by the Ninth Circuit on appeal. *Melendres v. Skinner,* 113 F.4th 1126, 1140 (9th Cir. 2024) (*Melendres V*) (holding that "[i]n sum, we conclude . . . that the district court has inherent equitable authority to assign the CPA's responsibilities to the Monitor").

Due to the need to take additional steps to ameliorate the mammoth backlog, the Court granted some relief requested by Defendants and added a schedule for backlog reduction. Failure to comply with the schedule mandated additional funding for the employ of additional PSB investigators. (Doc. 3076).

In November 2024, Chief Deputy Sheridan was elected Sheriff in his own right.

46REPORT000362

After assuming office, he has made significant progress in reducing the still-existing backlog of uninvestigated complaints against the MCSO. Further, he made a number of changes in his command staff and requested changes in the PSB. The Monitor denied both requests. First at issue here is his request that the Monitor's decision declining to authorize the transfer of five district-level misconduct investigators to PSB be overturned.[1] (Doc. 3217 at 9). Second, the Sheriff requests this Court to "overturn the Monitor's denial of MSCO's [*sic*] proposal to transfer Captain Reaulo, currently the BIO Captain who has been approved under Paragraph 268, to the PSB and order that MCSO is entitled to staff two commanders in PSB as it proposed." (*Id.*).

## ANALYSIS

### A. While the Backlog Persists, the Monitor Has the Authority to Decide Where Complaints Will Be Routed.

While the backlog persists, the authority to route complaints, minor or otherwise, rests with the Monitor. The Court vested such authority in the Monitor only after the MCSO's continuing failure to take action despite an ever-worsening backlog. As part of the Third Order for Injunctive Relief entered in this action, the Court ordered:

> *The Monitor therefore has immediate authority to oversee all of MCSO's complaint intake and routing.* The Court hereby vacates any previous order that conflicts with this Order, including but not limited to ¶ 292 of the Second Order. (Doc. 1765). In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods to include diversion and/or

---

[1] It was only in the subsequent communications regarding this request that the Sheriff purportedly clarified that his request for the transfer of the five investigators was a temporary one. Despite this "temporary" request (*see* Doc. 3217 at 9), the authority re-assigned to the Monitor to oversee all intake and routing only exists while a backlog is in place. Because the Sheriff's request is only for the "temporary" period until the backlog is eliminated and because, as the reply indicates that the Sheriff has a preference for the centralized investigation of both minor and serious misconduct in the PSB (*see* Doc. 3255 at 7), the request does not appear to truly be a temporary one.

- 6 -

46REPORT000363

outsourcing of cases.

(Doc. 2830 ¶ 346 (emphasis added)). Further, as it has to do with the routing of complaints, should the Sheriff and the Monitor disagree about where a complaint should be routed during the time that the backlog remains, the Order further specifies that the authority rests with the Monitor to make the final decision:

> The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

(*Id.* ¶ 347). The Ninth Circuit has already upheld the Court's grant of authority to the Monitor to make decisions concerning "all of MCSO's complaint intake and routing." *Melendres V*, 113 F.4th at 1136 (holding that "in certain circumstances, the district court, relying on its inherent powers, may vest a non-judicial officer with control over narrow areas of a governmental defendant's operations"). Thus, the Sheriff's request in this respect is denied.

Nor has the Sheriff demonstrated that the Monitor has made a mistake in judgment in the exercise of that authority, even if he highlights competing alternatives. In denying MCSO's request to temporarily transfer the five district investigators to the PSB, the Monitor specified both: (1) that his concern was that the transfer left the five districts without a viable plan to ensure continuity of misconduct investigations at the district level (Doc. 3217 at 28) and (2) that "[t]he involvement of District and Division supervisors in the investigative process is essential for fostering accountability, consistency in supervisory practices, and responsiveness to concerns of the Plaintiffs' class." (*Id.* at 29). The Monitor is right on both counts.

- 7 -

46REPORT000364

### 1. Continuity in District Misconduct Investigations.

As it pertains to ensuring continuity in misconduct investigations, the MCSO has a long history of having investigators in the districts handle less serious complaints. Not surprisingly, the MCSO was using district investigations to investigate less serious misconduct during the misconduct investigations and discipline that arose in this matter. In its 2016 Findings of Fact in this case, this Court noted the harm that was done to the Plaintiff class due to the absence of training for division investigators and a lack of consistency in their application of different division policies regarding discipline. (Doc. 1677 ¶¶ 592-601). The Court further noted the absence of any method for PSB to review or approve division discipline or ensure that appropriate matters were assigned to the divisions to investigate. (*Id.* ¶¶ 859-64).

Because MCSO was then, and continues now, to use the districts to conduct less serious misconduct investigations, with the PSB conducting the more serious investigations, the curative action required by this Court's orders contemplates such a system. Paragraph 189 of the Court's Second Injunctive Order mandates that PSB deputies investigate serious administrative investigations that could result in the suspension, demotion or termination of an employee or misconduct indicating apparent criminal conduct by an employee. (Doc. 1765 ¶ 189). It says nothing about conducting investigations of minor misconduct. Without necessarily deciding the question so as to avoid imposing a requirement on MCSO before it is necessary, the Court notes that the rule of interpretation of *expressio unius est exclusio alterius* presumes that the designation of certain manners of operation, e.g., PSB investigates all serious misconduct, presumes that the omission from the paragraph of the investigation of minor misconduct should be understood as an exclusion to PSB's operative authority under the Order. *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005). The next paragraph of the Court's order, paragraph 190, allows supervisors in districts to conduct minor misconduct investigations. (Doc. 1765 ¶ 190). Removing paragraph 190 from its context, the Sheriff argues that paragraph 190's assertion that minor investigations ***may*** be investigated by the

- 8 -

46REPORT000365

districts, does not mean that they have to be investigated by district investigators. (*See* Doc. 3217 at 9). Even so, the Sheriff does not suggest who else could investigate minor complaints, under the Order. The Sheriff's proposal assumes that PSB can, but the Court's orders do not explicitly so provide.[2]

This tends to undercut the Sheriff's assumption that transferring the district investigators to PSB would reduce the backlog. The backlog of misconduct complaints is made up of both complaints of serious misconduct and minor complaints. Making district investigators PSB investigators arguably leaves no one to investigate and resolve minor complaints. In such a case, the Sheriff would lose the benefit of resolving the minor cases of misconduct should they constitute part of the backlog. In his motion, the Sheriff does not provide the number of cases resolved during the past months that are cases involving minor discipline compared to the more serious cases. Such cases can be resolved more quickly, because they are minor, because the adequacy of the investigation is reviewed by the Division Commander and a member of PSB, but not necessarily the PSB Commander. (Doc. 1765 ¶¶ 209, 211). Further discipline in minor cases is imposed also by the Division Commander, but not the PSB Commander (*id.* ¶ 215), and there is no pre-determination hearing involved with cases of minor discipline.

Moreover, the injunctive orders in this matter are not designed to merely accomplish short-term change. They have been through four sheriffs already. Even if Sheriff Sheridan now prefers a more centralized approach to misconduct investigations and discipline, it is certainly an advantage to have MCSO officers, operating in their districts, both witness and be involved in, the implementation of MCSO's self-policing processes for the term that the backlog will remain. The elimination of investigative processes within the districts

---

[2] Moreover, MCSO policy specifies that "[a]llegations of employee *minor* misconduct shall be administratively investigated by a *sergeant* who has received misconduct investigative training," and that "*Division level internal affairs investigators* may seek *assistance* from the PSB at any time during the investigation." MCSO Internal Investigation Policy GH-2, Section 4(B) (emphasis added). The PSB "shall assume the investigation" only when the "investigator has information indicating the principal may have committed *misconduct of a serious or criminal nature.*" *Id.* at Section (4)(B)(2).

- 9 -

46REPORT000366

"reduce[s] the accountability of field supervisors and negate[s] multiple years of field supervisors gaining experience on how to properly conduct investigations." (Doc. 3217 at 47 (quoting Doc. 2802 at 187)). It is beneficial to have a broad knowledge of police discipline operations in the force as a whole. An elimination of the backlog is not the only function to be assured by timely misconduct investigations.

### 2. Fostering Accountability, Consistency in Supervisory Practices, and Responsiveness to Concerns of the Plaintiff's Class.

As stated, in denying the Sheriff's request to transfer the five district misconduct investigators into PSB, the Monitor also noted "[t]he involvement of District and Division supervisors in the investigative process is essential for fostering accountability, consistency in supervisory practices, and responsiveness to concerns of the Plaintiffs' class." (Doc. 3217 at 29).

Sheriff Sheridan does not successfully dispute this point. Sheriff Sheridan only recently returned as Sheriff to the MCSO. When he left as Chief Deputy Sheriff in 2016, he did so after violating the remedies to which the Plaintiff class was entitled by failing to implement court orders, manipulating many different aspects of PSB processes and personnel, and attempting to change disciplinary records which would suggest his responsibility for such interventions. He was found responsible for civil contempt and responsible for misconduct. It seems correct to this Court that, if Sheriff Sheridan were inclined to again obfuscate the administration of fair and impartial discipline as Sheriff, (and the Court is not necessarily assuming that he is), he could do so. Yet, it would not be as easy for him, or anyone else within his administration, to manipulate a diversified disciplinary system involving district investigations with trained investigators, without such manipulation being more likely to come to light, and the administration facing accountability for it (at least to the extent that the continued Monitorship over the MCSO investigative function would be extended in such cases). The Monitor, then, is correct in considering this as a factor in maintaining the viability of the diversified discipline system to which to refer investigations of minor misconduct.

In the interest, however, of resolving the backlog consistently with the concerns of

- 10 -

46REPORT000367

the Sheriff and the Monitor, the Court would consider, with the approval of the parties, revising paragraphs 190, 209-17 and any other necessary paragraphs to allow the Sheriff to assign PSB investigations to district investigators whose competency and efficacy has been approved by the Monitor. In that manner, district investigators can do what the Sheriff proposes: they can continue to investigate minor discipline arising from their districts, can be removed from patrol duties, and can be assigned serious cases by the PSB. Discipline in minor cases would still be imposed by district commanders, and in major cases by the PSB commander. In that way, the Court believes at least initially, that the purposes of the Sheriff and the concerns of the Monitor can both be accommodated.

### B. Maintaining Unity of Command.

As to the Monitor's denial of the transfer of Captain Reaulo into PSB, the Court's Orders do not contemplate the bifurcation for the responsibility for the choices the orders place on the PSB Commander. Paragraph 197 stipulates that PSB shall "be headed by a qualified Commander" with "ultimate authority . . . for reaching the findings of investigations and preliminarily determining any discipline to be imposed." (Doc. 1765 ¶ 197). Nothing about this language suggests that this authority can be split between two commanders, or a commander and a deputy commander. The Court's orders also assign other decisions uniquely to the PSB Commander. (*Id.* ¶¶ 211, 214, 216, 229, 233, 234). The Ninth Circuit has already affirmed the Sheriff's challenge to these provisions. *Melendres IV,* 897 F.3d at 1222 (holding that "we are satisfied that the challenged provisions flow from MCSO's violations of court orders, constitutional violations, or both . . . which the district court found based on ample evidence MCSO had 'manipulated' to 'minimize or entirely avoid imposing discipline on MCSO deputies and command staff'" (citations omitted)).

The Sheriff does not explain under what authority the Monitor might have approved his request to appoint two captains to the PSB when Court orders do not provide for it. (Doc. 606 ¶ 126 ("The Monitor shall be subject to the supervision and orders of the Court . . . .")). Even the framing of the Sheriff's motion demonstrates his knowledge that his

- 11 -

46REPORT000368

request would require an order of the Court. (*See* Doc. 3217 at 8-9 ("This Court should overturn the Monitor's denial of MCSO's proposal to transfer Captain Reaulo, currently the BIO Captain who has been approved under Paragraph 268, to the PSB and order that MCSO is entitled to staff two commanders in PSB as it proposed.").

The Second Injunctive Order was filed in significant part to prevent the present Sheriff's previous manipulation and misconduct as it relates to his direction of the PSB when he was Chief Deputy. As a protection against such manipulation, the Court specified a unified control and responsibility for the decisions which lies with a single Commander of the PSB. It also specified another Burean and a Division within the MCSO whose transfer of personnel in and out were required to be approved by the Monitor:

> During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.

(Doc. 1765 ¶ 268).

The Sheriff states that first Captain Lugo and now, Captain Flowers, are overwhelmed with the responsibilities of being the PSB Commander. The Court wishes to be mindful of the demands placed on the Commander of the PSB and would take appropriate action if supported by sufficient information, to cure excessive demands on the Commander. Certainly, excessive overtime hours are concerning. Yet, as the Sheriff himself noted, Captain Lugo's proposed resolution to the problem is filling the five vacant PSB positions including vacancies for two lieutenant positions and an administrative assistant and adding ten investigators. (Doc. 3217 at 4-5). Certainly, filling the two vacant lieutenant positions (not to mention filling the administrative assistant vacancy) would

- 12 -

46REPORT000369

relieve administrative burden and excessive overtime hours, let alone adding ten investigators.

The responsibilities unique to the Commander of the PSB under the Court's orders in administrative investigations are: (1) the evaluation of whether findings in the investigative reports of serious misconduct are supported by the appropriate standard of proof (Doc. 1765 ¶ 211); (2) the reassignment, in her or his discretion, of any investigations that have been inadequately conducted (*id.* ¶ 214); and (3) the imposition of appropriate discipline and/or corrective action when a PSB investigation indicates a serious violation of misconduct. (*Id.* ¶ 216). In criminal investigations, the Commander of the PSB must: (1) provide evidence of criminal misconduct of anyone that has supervision over the PSB Commander directly to the appropriate prosecutorial authority (*id.* ¶ 229); (2) separately consider an investigator's decision to close a criminal investigation without referring it to a prosecuting agency (*id.* ¶ 233); and (3) direct the investigator to conduct additional investigation when it appears that there may be additional relevant evidence. (*Id.* ¶ 234).

The Sheriff, in his motion, does not provide the Court with how many of the misconduct cases resolved in a month are minor misconduct, how many are serious misconduct and how many are criminal investigations. Nor does he say why the preliminary work on such matters cannot be assigned to subordinates in command. Thus, the Court has insufficient information to permit it to evaluate whether there truly is a need for two separate commanders in PSB, or whether a different division of administrative responsibilities is possible in conjunction with the Court's orders (especially if the vacant lieutenant positions are filled). Certainly, while the Commander bears the sole and ultimate responsibility for these specific tasks designated, there is nothing that says that he cannot delegate such matters for initial assessments and recommendations to subordinate lieutenants under his or her command.

To the extent that the Sheriff disagrees with Captain Lugo's assessment, the Sheriff fails to support his request by indicating the nature of the work that is overwhelming the present Captain, and why the appropriate solution is the appointment of a separate captain,

- 13 -

46REPORT000370

rather than the filling of the two vacant lieutenant positions (or more if necessary), or even the appointment of a true Deputy Commander, to assist the Commander. This would have many of the advantages which the Sheriff extols and would not violate the Court's orders. While the Court appreciates the Department of Justice's good faith effort to broker a solution to the problem, the Department of Justice's proposed resolution, accepted and adopted by the Sheriff in his Reply, still bifurcates command, and does so in a way that makes the Deputy Commander ultimately responsible for some PSB decisions which the current orders unequivocally and intentionally place in the PSB Commander. (*See*, *e.g.*, Doc. 1765 ¶¶ 197, 211, 214, 216, 229, 233, 234). The Court here declines to effectively amend its orders on piecemeal appeals from the Monitor's decisions without full consideration of the parties, a consideration of the paragraphs of the Courts orders that are affected, and a demonstrated necessity. Yet, subject to ¶ 268, there is nothing in the Court's Orders that prevents the MCSO from appointing a true Deputy Commander to PSB in lieu of or in addition to filling the lieutenant positions. The Deputy Commander may do work and make recommendations on individual investigations, as well as the Commander's other responsibilities, but the Deputy Commander may not assume the ultimate responsibility for PSB operations and decisions that lie with the PSB Commander.

### 1. The Inadequacy of Captain Reaulo's Replacement.

In addition to declining the request to transfer Captain Reaulo to the PSB because it would violate the orders of the Court, the Monitor also noted that the replacement tendered by the MCSO to replace Captain Reaulo as the Commander of the Bureau of Internal Oversight was unacceptable due to his past disciplinary record. (Doc. 3217 at 20-21 ("Capt. Morrison's multiple sustained misconduct investigations and disciplinary history make him ineligible for transfer to this key position."). This was a sufficient and independent reason to deny the transfer of Captain Reaulo from the Bureau of Internal Oversight until an acceptable replacement is identified.

### CONCLUSION

For the above reasons,

- 14 -

46REPORT000371

**IT IS ORDERED** that Defendant Gerard A Sheridan's Motion to Overturn the Monitor's Denial of PSB transfers (Doc. 3217) is denied.

Dated this 3rd day of November, 2025.

_____
G. Murray Snow
Senior United States District Judge

46REPORT000372

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>and<br><br>United States of America,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

## I. The Appointment of a Qualified Candidate to Lead the Professional Standards Bureau Requires the Monitor's Advanced Approval

On March 7, 2026, the Court was informed by the Monitor, who received notice via email from MCSO's counsel, that the MCSO had elevated Captain Dominick Reaulo as Commander of the Professional Standards Bureau ("PSB") and placed Captain Gregory Lugo as PSB Deputy Commander. The Court held a hearing on March 12, 2026, to discuss whether Captain Reaulo's elevation to PSB Commander first required approval by the Monitor.

Captain Lugo was approved by the Monitor as the PSB Commander in February 2021. Captain Lugo was placed on administrative leave by MCSO from April 2025 to February 2026. During this interim period, the Monitor approved the transfer of Captain

46REPORT000373

Aaron Flowers from the Patrol and Enforcement Support Bureau to temporarily assume the duties of PSB Commander. The Monitor rescinded Captain Flowers's temporary appointment on March 5, 2026.

Captain Reaulo, on the other hand, was not approved by the Monitor as the PSB Commander. Previously, MCSO had sought to transfer Captain Reaulo from the Bureau of Internal Oversight ("BIO") to the PSB as its second Commander. The Monitor denied this request. MCSO subsequently moved this Court to overturn the denial of Captain Reaulo's proposed PSB transfer. (Doc. 3217). The Court denied MCSO's motion, stating that no language in the Court's orders suggested that the authority of the PSB Commander can be split between two captains. (Doc. 3305). MCSO then proposed transferring Captain Reaulo to PSB as Deputy Commander, which the Monitor approved in November 2025.

At the March 12, 2026 hearing, counsel for MCSO averred that the Monitor lacks authority under the Court's orders to approve or disapprove MCSO's designated PSB Commander. Pointing to paragraph 197, which states that the Court has the authority to designate a qualified PSB Commander only if the Sheriff declines to do so (Doc. 1765 ¶ 197), counsel argued that the Court's orders provide the Sheriff with the explicit authority to designate a qualified PSB Commander. Thus, MCSO argues, the Sheriff can elevate Captain Reaulo as PSB Commander without the Monitor's approval. This argument is incorrect. Paragraph 197 must be read in tandem with other provisions of the Court's orders, such as paragraph 268. While the Sheriff has the authority to designate his qualified candidate to be PSB Commander, that candidate must subsequently be approved by the Monitor. MCSO's argument to the contrary ignores what has already been settled by this Court.

Paragraph 268 of the Court's Second Supplemental Injunctive Order states, in full:

> During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor. Prior to any transfer into any of these components, the MCSO

46REPORT000374

shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history. The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.

(*Id.* ¶ 268). Previously, in April 2025, a dispute emerged as to whether that provision required the Monitor to approve the appointment of the Commander of the Court Implementation Division ("CID"). (Doc. 3146). There, MCSO argued that, under ¶ 268, it did not need the Monitor's approval for a "new hire"—rather than a "transfer"—to lead the CID. (Doc. 3151 at 6:4-7:17). The Court rejected this argument, stating that a "transfer into the division includes a new hire." (*Id.* at 7:20). Additionally, the Court clarified that part of the purpose of ¶ 268 was to require the Monitor's approval for the commanders of BIO, PSB, and CID:

> [The] purpose was to the require . . . anybody who was working in . . . Bureau of Internal Oversight, Professional Standards Bureau, or the Court Implementation Division to have to be approved by the Monitor and *that the chief of those divisions had to be approved by the Monitor* and the removal of one of those had positions had to be approved by the Monitor.

(*Id.* at 21:10-17 (emphasis added)). Though the Court offered to amend the language in ¶ 268 "to say those things explicitly" (*id.* at 21:22-23), counsel for MCSO stated on the record that he understood that the commanders for BIO, PSB, and CID required approval from the Monitor:

> Once again, Your Honor, I have heard, and I believe my partners, my clients have heard, what you mean by that paragraph loudly and clearly . . . . We do understand that it requires now pre-approval of anybody going in and out, of course, as it states, transfers, but a hire also and *anybody who's going to be in command or a commander of, you know, BIO, PSB or CID*. Totally understand that. So I would not personally require the Court to do anything.

(*Id.* at 21:24-22:9 (emphasis added)). The Court thus did not amend the language in ¶ 268.

Against this backdrop, the elevation of Captain Reaulo to PSB Commander is

- 3 -

46REPORT000375

inappropriate. Captain Reaulo has not been approved by the Monitor to serve as PSB Commander. Instead, Captain Lugo is the only candidate that has been approved by the Monitor for position of PSB Commander. Thus, Captain Lugo—not Captain Reaulo—is the current PSB Commander.

The Court will amend ¶ 268 to reflect the parties' understanding of the provision, based on MCSO counsel's admission on the record in April 2025.

## II. Whether the Sheriff has the Authority to Alter Final PSB Disciplinary Decisions

Separately, at the March 12, 2026 hearing, the Court addressed paragraph 228 of the Court's Second Supplemental Injunctive Order, as it had several concerns with it.

First, as the paragraph's placement under the subheading of "Pre-Determination Hearing" indicates, this provision was intended to grant the Sheriff (or his designee) the authority to rescind, revoke, or alter any disciplinary decision made by either the PSB Commander or the appointed MCSO pre-determination hearing officer up to the expiration of the period that the disciplined employee had to appeal to the Maricopa County Merit Systems Commission. (Doc. 1765 ¶ 228). That paragraph, however, was not designed or intended to alter the state law governing the finality of disciplinary decisions made by the MCSO under state law. The Court does not believe that any Sheriff has attempted to so use that authority. Nevertheless, shorn of its context, the paragraph might erroneously be read to conflict with state law concerning the finality of the MCSO's disciplinary decisions. The Court has thus determined that it must be reviewed with the parties and potentially revised to clarify the authority granted.

Before making any such revision, however, the Court will set forth its understanding of what Arizona law provides regarding the finality of MCSO disciplinary decisions. The Court will allow the parties to address that understanding so that, should any revision of ¶ 228 occur, it can be done in compliance with a correct understanding of state law.

When the PSB receives a complaint in which it either (a) exonerates the officer, (b) finds the complaint unfounded, or (c) does not sustain the complaint, there is no right of appeal to Maricopa County's Law Enforcement Officers' Merit System Commission (the

- 4 -

46REPORT000376

"Merit System Commission"). That determination, thus, becomes final. Only disciplinary findings of "Sustained" are appealable to the Merit System Commission. MCSO Internal Investigation Policy GH-2 § 8(C)(1)(b) ("If the findings for the policy violation(s) in a completed PSB administrative investigation are Not Sustained, Unfounded, or Exonerated, the PSB Commander shall make *final findings* . . and direct that the case be closed and filed accordingly." (emphasis added)); *Jared P. v. Glade T.*, 221 Ariz. 21, 27, 209 P.3d 157, 163 (Ct. App. 2009) ("A final order is one which ends the proceedings . . . ."); *see also* A.R.S. § 38-1003(6) (authorizing the Merit System Commission to only hear appeals for discipline resulting in "suspension, demotion or dismissal of a classified law enforcement officer"); *Law Enforcement Officers' Merit System Resolution*, Maricopa County § 16(A) (stating the same).[1]

Nor is there a right of appeal to the Merit System Commission if only minor discipline[2] is imposed on an employee. The County ordinance, and the statute authorizing it, only allow an MCSO employee to appeal matters involving suspension, demotion, or dismissal. A.R.S. § 38-1003(6); *Law Enforcement Officers' Merit System Resolution,* Maricopa County § 16(A). Because the statute and the ordinance authorize no appeal of minor discipline or unsustained complaints, such determinations are final. *See, e.g.*, *Woerth v. City of Flagstaff,* 167 Ariz. 412, 416-17, 808 P.2d 297, 301-02 (Ct. App. 1990) (holding that "[t]he decision of an administrative body is final unless a statute authorizes an appeal" (citing *Arizona Dep't of Economic Sec. v. Holland,* 120 Ariz. 371, 372, 586 P.2d 216, 217 (Ct. App. 1978))).

When, however, the Sheriff or the authorized pre-determination hearing officer imposes a decision of serious discipline—defined as suspension, demotion, or dismissal— the disciplined officer has ten days in which to appeal to the Merit System Commission. *Law Enforcement Officers' Merit System Resolution,* Maricopa County § 16(A). An

---

[1]Available at https://www.maricopa.gov/DocumentCenter/View/16949/Law-Enforcement-Officers-Merit-System-Resolution- (last updated April 2018).

[2]Defined as "[d]iscipline less severe than a suspension, such as a written reprimand." MCSO Internal Investigation Policy GH-2 at 5.

- 5 -

46REPORT000377

officer's failure to appeal to the Merit System Commission makes the pre-hearing determination officer's decision final. *Legacy Found. Action Fund v. Citizens Clean Elections Comm'n*, 254 Ariz. 485, 493, 524 P.3d 1141, 1149 (2023); *Guertin v. Pinal County*, 178 Ariz. 610, 612, 875 P.2d 843, 845 (Ct. App. 1994) ("A party's failure to appeal a final administrative decision makes that decision final and res judicata.").

If the officer timely appeals the decision of the pre-determination hearing officer to the Merit System Commission, the decision of that commission is final, unless the disciplined employee further appeals the Merit System Commission's determination to the state judiciary on an administrative review. *Law Enforcement Officers' Merit System Resolution,* Maricopa County § 16(G) ("The findings and decisions of the [Merit System] Commission *shall be final* and shall be subject only to administrative review as provided in Arizona Revised Statutes 38-1004." (emphasis added)).

Nothing about ¶ 228 was meant to grant the Sheriff any authority to change those finality deadlines. The Court first invites the parties to comment on the Court's understanding of the finality provisions of Arizona state law prior to any potential revision of ¶ 228 if that party has a different view.

Second, because by state law the Sheriff is the "sole appointing authority for [his] respective employees," *Hounshell v. White,* 220 Ariz. 1, 6, 202 P.3d 466, 471 (Ct. App. 2008), the Court is not sure it granted any additional authority not already provided under Arizona state law by adding ¶ 228 to the Second Supplemental Injunctive Order. The parties are invited to comment on that if they wish to do so.

Third, in any event, should the Sheriff alter any discipline imposed by a pre-determination hearing officer, it seems to the Court that the Monitor, in considering the Sheriff's compliance with his obligation to provide "consistently applied" and "fair" discipline (s*ee* Doc 1765 ¶ 219), may take into account any such alteration. Again, the parties may comment on this if they wish to do so.

Should the parties desire to be heard on any of the above three questions, particularly the finality of MCSO disciplinary decisions, the parties shall submit their briefs to the

46REPORT000378

Court, which are not to exceed 15 pages, by March 27, 2026.

Accordingly,

**IT IS THEREFORE ORDERED** amending Paragraph 268 of the Second Supplemental Injunctive Order (Doc. 1765) as follows:

268.    During the term that a Monitor oversees the Sheriff and the MCSO in this action, any new hire or transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor.  The appointment of any candidate by the Sheriff to head the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall also require advanced approval from the Monitor.  Prior to any new hire, transfer, or elevation into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the new hire, transfer, or elevation and shall produce copies of the individual's résumé and disciplinary history.  The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to achieve compliance in a timely manner.

**IT IS FURTHER ORDERED** that Captain Gregory Lugo, as the only candidate approved by the Monitor, is the current Professional Standards Bureau Commander.

**IT IS FURTHER ORDERED** that Plaintiffs, Defendants, and the United States shall file their briefs on the potential revision of Doc. 1765 ¶ 228 by March 27, 2026.

Dated this 12th day of March, 2026.

_G. Murray Snow_
G. Murray Snow
Senior United States District Judge

- 7 -

46REPORT000379

CONFIDENTIAL - ATTORNEY'S EYES ONLY



# MARICOPA COUNTY SHERIFF'S OFFICE
# POLICY AND PROCEDURES

| Subject | Policy Number |
|---|---|
| | **GH-2** |
| **INTERNAL INVESTIGATIONS** | **Effective Date** |
| | **11-14-23** |

| Related Information | Supersedes |
|---|---|
| ARS Title 38, Chapter 8, Article 1<br>ARS 38-1104<br>ARS 38-1116<br>ARS 39-128<br>Maricopa County Employee Merit System Rules<br>Maricopa County Law Enforcement Officers' Merit System Rules<br>CP-2, *Code of Conduct*<br>DJ-3, *Inmate Grievance Procedures*<br>GC-16, *Employee Grievance Procedures*<br>GC-17, *Employee Disciplinary Procedures*<br>GC-21, *Drug, Medication, and Alcohol Testing*<br>GE-3, *Property Management and Evidence Control*<br>GE-4, *Use, Assignment, and Operation of Vehicles*<br>GH-3, *Polygraph Procedures and Documents*<br>GH-5, *Early Identification System*<br>GI-1, *Radio and Enforcement Communications Procedures*<br>GJ-2, *Critical Incident Response*<br>GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate*<br>GJ-24, *Community Relations and Youth Programs*<br>GJ-28, *Prison Rape Elimination Act (PREA)* | GH-2 (10-25-22) |

**PURPOSE**

The purpose of this Office Policy is to establish guidelines and procedures for accepting, processing, and investigating complaints of employee misconduct. Complaints include, but are not limited to, those brought forward by members of the public, inmates, Maricopa County employees, and Sheriff's Office employees.

Although this Office Policy refers to employees throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and Posse members.

**POLICY**

It is the policy of the Office to ensure that all complaints of employee misconduct – whether internally discovered and/or alleged by another employee or based on a complaint filed by a member of the public – are fully, fairly, impartially, and efficiently investigated. All investigative findings shall be supported by the appropriate standard of proof and documented in writing; and all employees who commit misconduct shall be held accountable pursuant to a disciplinary system that is fair, consistent, and unbiased; and provides due process.

**DEFINITIONS**

***Administrative Closure:*** A result of a PSB Diversion process in which the PSB Commander reviews individual complaints, on a case-by-case basis, and determines that they cannot be satisfactorily investigated or an investigation is not necessary. Administrative Closures may be used in the following circumstances: a) Situations where an internal or external complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported; b) Situations where an internal or external complaint was received by the Office after the

46REPORT000380

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                              **Effective Date: 11-14-23**

employee(s) involved in the alleged misconduct left employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident; c) Situations where in an internal or external complaint the initial complainant is unwilling or unable to cooperate; d) Situations where in an internal or external complaint the initial complainant is anonymous; e) Situations resulting in the death or serious physical injury of a prisoner or an inmate that do not involve a use of force by an employee and are considered non-critical incidents; and f) Situations where an internal complaint originated from a workplace relationship and is most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division.

An Administrative Closure shall also be used when the following circumstances exist in a Service Complaint: a) The complaint does not allege employee misconduct and can be resolved with an explanation to the complainant regarding the policy, procedure, service level due to manpower or resources, or statutory authority required of the Office.  This includes matters in which the complainant questions Office policy, procedures, or service level due to manpower or resources, or statutory authority required of the Office; b) The complainant does not allege employee misconduct and expresses dissatisfaction with the outcome of formal legal, civil, or administrative processes involving members of the Office.  The preliminary inquiry associated with this type of Service Complaint closure shall be thoroughly reviewed and verify that potential employee misconduct was not involved with the incident prior to closure; c) The complainant does not allege employee misconduct and requests additional information or follow-up actions pertaining to a prior call for service, report, or investigation; or d) The complaint lacks specificity and the complainant refuses or is unable to provide further clarification necessary for the Office to fully understand the complaint, or the complainant does not articulate facts amounting to an allegation of employee misconduct.

*Appointing Authority:* For the purposes of this policy, the designated member of Office command staff, appointed by the Sheriff, whose duties include: being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard.

*Blue Team:* The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct.  The information from Blue Team is transferred to the IAPro Early Identification case management system.

*Classified:* All positions in Maricopa County service that are covered by the Maricopa County Merit System Rules.  Excluded are those employees identified as temporary, initial probation, or contract employees, and those positions identified as unclassified.

*Clear and Convincing Evidence:*  Evidence that leaves one with a firm belief or conviction that is highly probable that the factual contention of the claim or defense is true.  This standard of proof is higher than proof by a preponderance of the evidence but does not require proof beyond a reasonable doubt.  The standard of proof, Clear and Convincing Evidence, is only utilized when determining an investigatory finding of Unfounded; it is evidence that the allegation was false or not supported by fact.

*Closed Case Notification:* A memorandum sent to the principal, investigative lead, and witness of an administrative investigation to inform the employee that the investigation is complete.  The notification for the principal is only sent if the finding of the investigation was Unfounded, Exonerated, or Not Sustained.

*Coaching:* Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

For the purpose of determining the number of offenses committed within identified categories of Office Policy GC-17, *Employee Disciplinary Procedures*, Attachment A, the first use of Coaching shall not constitute an offense.  However, the use of Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation.  Coaching shall

2

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                         **Effective Date: 11-14-23**

be documented in Blue Team and shall be considered for the purpose of discipline for one year prior to the current offense.

***Compelled Statement:*** Information received during an administrative investigation, which the Office has required an employee to provide under penalty of disciplinary action, up to, and including, dismissal from employment.

***Complainant:*** Any individual who files a complaint regarding the conduct of any employee alleging a violation of Office policies, procedures, or actions.

***Complaint:*** An allegation of employee misconduct or wrongdoing. The complaint may be made verbally or in writing, in person, by phone, by mail, or online; and may be by the individual complainant, someone acting on the complainant's behalf or anonymously; and with or without a signature.

***Criminal Investigator:*** An Office criminal detective, whether assigned to the Criminal PSB Section or another detective unit of the Office, who conducts an investigation into allegations of employee criminal misconduct.

***Critical Incident:*** Any incident that involves the use of force by an employee resulting in death or serious physical injury of a member of the public, prisoner, or an inmate; any assault upon MCSO employees, by any means, that results in serious physical injury or death; or the intentional and unintentional discharge of a firearm by an employee in the performance of their lawful duties. The term "critical incident," as used in this Office Policy, is narrowed for investigative purposes as specified in Office Policy GJ-2, *Critical Incident Response*, and should not be confused with the definition provided in Office Policy GC-22, *Critical Incident Stress Management Program*, which is all-encompassing and directly associated with issues of critical incident stress management. A critical incident **does not** include the following and therefore **does not** require protocol activation:

   A.    The necessary dispatch of an animal for humane/medical purposes; including discharge of a firearm toward an animal for self-defense of themselves or in defense of others; or

   B.    The use of a specialized firearm by the Tactical Operations Unit in order to enhance officer safety, dispense chemical agents, or as an entry device, when no serious physical injury or death to any person occurs.

***Disciplinary Offer:*** A situation where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, that establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrices, resulting in a sustained finding. A Disciplinary Offer should be considered an Expedited Resolution.

***Domestic Partner:*** An interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else.

***Early Identification System*** **(EIS)***:* A system of electronic databases that captures and stores threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public, when applicable), and the actions taken to address the tendencies identified. Blue Team, IAPro, and EI Pro are applications of the EIS.

***Early Intervention Unit*** **(EIU)***:* The EIU is part of the Bureau of Internal Oversight. The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users. The

3

46REPORT000382

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: 11-14-23**

unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct or operating procedures and recognizes positive attributes by reviewing employee awards.  The Office shall ensure that there is sufficient staff to facilitate EIS input and training.

*Employee:* A person currently employed by the Office in a classified, unclassified, contract, or temporary status.

*Employee Misconduct:* Conduct that includes but is not limited to: a violation of Office Policy; an act of retaliation for complying with Office Policy; an intentional provision of false information in an administrative investigation or any official report, log, or electronic transmittal of information; an intentional failure to complete data collection of other paperwork requirements required by the Office; or federal, state, or local criminal or civil violations.

*Employee Retention and Performance Division (ERPD):* The ERPD is a resource available to all employees, supervisors, and commanders to assist with addressing employee performance concerns and sources of conflict originating from workplace relationships on a case-by-case basis.  This includes resolving disputes pertaining to annual performance appraisals, supervisor application of workplace rules/regulations, and disputes pertaining to employee leave matters.  The Employee Retention and Performance Division is comprised of the Leave Management, Compensation, and Retention and Performance Sections.  The Leave Management Section (LMS) coordinates leaves of absence and modified duty requests for employees in accordance with the Family and Medical Leave Act (FMLA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), the Americans with Disabilities Act (ADA), workers' compensation policy, and other related regulations and policies.

*Expedited Resolution:* A truncated investigative process that may be used in the event of a Disciplinary Offer resulting in a sustained finding, or in the event that documentary or video evidence presents clear and convincing evidence establishing that the alleged violation of Office Policy did not occur and there is no evidence or indication of any other potential employee misconduct involved in the incident (resulting in an Unfounded finding).

*External Complaint:* An expression of dissatisfaction by the public, directed at an employee's conduct.

*Family Relationship:* Relatedness or connection by blood or marriage or adoption.

*Garrity Warning:* A notice of an employee's obligations and rights regarding compelled statements during an administrative investigation.

*Good Faith:* Honesty of purpose and absence of intent to defraud.

*IA Number:* A unique investigative action number assigned to an allegation of misconduct for tracking and recording purposes.

*IAPro:* A case management system used by the EIU, the Professional Standards Bureau (PSB), and the Administrative Services Division that tracks and analyzes information, including but not limited to, complaints, commendations, use of force incidents, pursuits, discipline, supervisor notes, and internal investigations.  IAPro is used by PSB for the periodic assessment of timelines of investigations and for monitoring the caseloads of internal affairs investigators.  IAPro is also used to track, as a separate complaint category, allegations of biased policing and unlawful investigatory stops, searches, seizures, or arrests.

*Internal Affairs Investigator:* Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct.

*Internal Complaint:* A complaint that originates from within the Office.  Such complaints may be initiated by other employees or from supervisors who observed, or were informed by other employees, of possible policy violations or other misconduct.  For the purpose of this Office Policy, complaints made by a former Office employee regarding conduct that occurred while the former employee was still employed by the Office shall also be identified as an

4

46REPORT000383

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                        **Effective Date: 11-14-23**

internal complaint.

*Intervention:* An approved specified action taken by a supervisor to improve a situation or prevent a potential negative work performance situation from developing into misconduct.

*Investigative File:* The Office's complete investigative report and any attachments detailing the incidents being investigated. The file shall contain, but is not limited to, the *Administrative Investigations Process Checklist, Cover Sheet, Findings Page(s), Prior Work History Report, Investigative Plan, Investigative Report,* the *Presumptive Range of Discipline* form, the *Employee Disciplinary Considerations and Decision* form, transcripts, audio/video of interviews, body-worn camera footage, *the Inmate Grievance Form,* if applicable, etc. Depending on the outcome of the investigation, the file shall also contain, but not be limited to, a *Final Disposition Letter; Closed Case Notification;* and documents that record discipline, to include the Pre-Determination Hearing (PDH) recording. The Professional Standards Bureau shall maintain the investigative file of all documents within the Office's custody and control relating to any investigation and related disciplinary proceedings, grievance proceedings, and appeals to the Maricopa County Merit Systems Commission or state court.

*Investigative Lead:* An individual believed to have information or facts relevant to the matter under investigation.

*Law Enforcement Officer:* An employee of the Office, other than an initial probation employee, who is a deputy sheriff or a detention officer.

*Merit Rules:* The Maricopa County Employee Merit System Rules and the Maricopa County Law Enforcement Officers' Merit System Rules.

*Minor Discipline:* Discipline less severe than a suspension, such as a written reprimand.

*Misconduct:* Includes any violation of Office Policy or Procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

> *Criminal Misconduct:* Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> *Minor Misconduct:* Misconduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

> Minor misconduct, while a violation of Office Policy, can often be addressed with field supervisor-initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not, per the Office Disciplinary Matrix, exceed a Category 1, First or Second Offense; a Category 2, First Offense and which has not been received by the Office as an external complaint, or has not already been assigned to the Professional Standards Bureau (PSB).

> *Serious Misconduct:* Misconduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

*Notice of Investigation:* A written notice given to an employee during an administrative investigation which identifies

5

46REPORT000384

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                **Effective Date: 11-14-23**

the employee's status in the investigation, the employee's responsibility not to discuss the investigation with anyone other than those specified, the name and rank of the assigned investigators, and the right to have an observer present at the interview.

***Official Investigation:*** An official examination by a supervisor, an internal affairs investigator, or a criminal investigator, into alleged employee misconduct that relates to or may affect an employee's position with the Office. The Office has two types of investigations that are used to examine these allegations:

1.   Administrative Investigation: An investigation conducted into apparent violations of Office Policy. Sustained allegations for an administrative investigation provide the basis for the imposition of discipline according to the Discipline Matrices and the Categories of Offenses, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

2.   Criminal Investigation: An investigation by a criminal investigator into an allegation of employee criminal misconduct. These include the process of collecting information (or evidence) about a crime in order to: 1) determine if a crime has been committed; 2) identify the perpetrator; 3) apprehend the perpetrator, and 4) provide evidence to support a conviction in court.

The following does not constitute an official investigation or investigative interview: (a) questioning in the normal course of duty, counseling or instruction, or an informal verbal admonishment by, or other routine or unplanned contact with a supervisor or other law enforcement officer; or (b) preliminary questioning to determine the scope of the allegations or if an investigation is necessary.  However, such counseling, instructions, verbal admonishments, other contacts, and preliminary questioning are covered by and subject to the truthfulness standards found in Office Policy CP-5, *Truthfulness*.

***Pre-Determination Hearing*** **(PDH)***:* A forum that allows an employee, regardless of employment status, who is being considered for serious discipline, to address the appointing authority regarding the intended discipline.

***Pre-Determination Hearing Notice:*** A written notice given to an employee who is being considered for serious discipline.  The notice includes information regarding: 1) the proposed disciplinary action, 2) the Merit Rules, as applicable; 3) policies alleged to have been violated; 4) sufficient details describing the specific reasons that are being considered for disciplinary action; 5) the employee's relevant work history; 6) the opportunity for the employee to review the investigative file; 7) the employee's opportunity to present mitigating information; and 8) the date and time of the hearing.

***Preliminary Inquiry:***  The gathering of information available to determine the scope of the allegation and to preserve perishable evidence.  This can include a review of EI Pro, Blue Team, traffic stop data, Computer Aided Dispatch (CAD), Shift Log entries in SHIELD, audio and video recordings, and preliminary audio- and video-recorded questioning of parties involved.

***Preponderance of the Evidence:*** Facts alleged are more likely true than not true.  Preponderance of the evidence is only utilized when determining an investigatory finding of Sustained.

***Principal:*** An employee identified as the primary focus of an administrative investigation and against whom a complaint of misconduct has been made.  An administrative investigation may have multiple principals.

***PSB Administrative Investigators – Critical Incidents*** **(PSB-CI)***:* Select members of the administrative section of the Professional Standards Bureau (PSB) who are responsible for investigating critical incidents strictly for administrative purposes.  The PSB-CI shall be comprised of no less than one PSB Command Staff and two investigators.

***PSB Diversion:***  A complaint intake process to address, on a case-by-case basis, eligible complaints without the initiation of a formal administrative investigation or service complaint.  Complaints received by the PSB shall be

6

46REPORT000385

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                               **Effective Date: 11-14-23**

reviewed to make an initial determination of the most appropriate course of action to take based on the nature of the allegation. The Diversion process can culminate in one of the following: PSB-Directed Supervisory Intervention; Administrative Closure; or Expedited Resolution with a finding of Unfounded.

***PSB-Directed Supervisory Intervention:*** A PSB Diversion intended to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation. PSB may, on a case-by-case basis, initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in Attachment B of Office Policy GC-17, *Employee Disciplinary Procedures* for any External Complaints.

***Serious Discipline:*** Discipline which results in an employee receiving a suspension, demotion, or dismissal from employment. All sustained violations of a Category 7 offense as specified in Office Policy GC-17, *Employee Disciplinary Procedures,* shall result in dismissal from employment.

***Serious Physical Injury:*** Injury which causes death or creates a reasonable risk of death, severe and permanent disfigurement, severe impairment of health, or loss or protracted impairment of the functions of any bodily organ or limb.

***Service Complaint:*** A complaint regarding an inadequate policy, procedure, practice, service level due to staffing or resources, or statutory authority required of the Office. A service complaint is not an allegation of employee misconduct.

***Supervisor:*** An employee to whom subordinates report.

1.      Commander: An employee with the rank of lieutenant or above, or its civilian equivalent.

2.      First-Line Supervisor: An employee with the rank of sergeant, or its civilian equivalent.

***Unclassified Employee, Civilian Only:*** An at-will employee not covered by the Maricopa County Employee Merit System Rules.

***Volunteer:*** A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

***Witness:*** An individual who has observed an incident.

**PROCEDURES**

1.    **Supervisor-Initiated Intervention:** An approved action, as specified in Office Policy GH-5, *Early Identification System*, taken by a supervisor to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation. Supervisors may also initiate this action when an employee's conduct, has minimal negative impact on the overall operations. Examples of employee work performance situations in which a supervisor may consider approved interventions include those categorized as a Category 1 or Category 2 of the Attachment B, of Office Policy GC-17, *Employee Disciplinary Procedures.* Employee conduct outside of the limitations of this section shall be addressed, as specified in this Office Policy. Supervisors are encouraged to contact the PSB if unsure whether the employee work performance situation may be addressed through a supervisor-initiated intervention or reported to the PSB for action.

7

46REPORT000386

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                              **Effective Date: 11-14-23**

    A.      Prior to determining intervention regarding the work performance situation, the supervisor shall:

          1.      Confirm the employee's conduct does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, and which has not been received by the Office as an External Complaint, or has not already been assigned to the PSB;

          2.      Review discipline history by accessing the employee's EIPro Dashboard to assist the supervisor in their intervention or corrective action decision; and

          3.      Ensure that when considering a coaching for the intervention, that the employee will not exceed the number of coachings allowed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, for one year prior to the current offense.

    B.      All supervisor-initiated intervention action taken shall be documented in Blue Team, as specified in Office Policy GH-5, *Early Identification System*. The entry shall include justification for the intervention and the specific policy or policies involved in the performance issue linked to the employee.

2.      **Complaint Intake Procedures:** The Office shall ensure that all allegations of employee misconduct, whether internally discovered or based on a complaint from a member of the public, or from an inmate, are fully, fairly, and efficiently investigated. All complaints shall be reviewed by the PSB Commander to determine if they are to be addressed as a PSB Diversion or a Service Complaint, or administratively investigated. All investigative findings must be supported by the appropriate standard of proof, as defined for each findings disposition, and shall be documented in writing. All employees who commit misconduct shall be held accountable.

        Complaints and allegations of misconduct, including third-party and anonymous complaints, shall be accepted and addressed as a PSB Diversion or a Service Complaint, or administratively investigated. All employees and members of the public shall be permitted to report allegations of misconduct anonymously. When a third party registers a complaint on behalf of another individual, every reasonable effort shall be made to contact the alleged offended individual to verify the complaint. All complaints shall be documented, investigated, and dispositions determined as appropriate and per policy, and a written record made of the findings and resolution.

    A.      The Office shall provide a *Comment and Complaint Form* in both English and Spanish.

          1.      A *Comment and Complaint Form* shall be available in the following locations:

              a.      All deputies shall carry complaint forms in their Office vehicles. Upon request, deputies shall provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and e-mail address, of their immediate supervisor;

              b.      At the reception desk at Office Headquarters and Districts;

              c.      At the reception desk at PSB;

              d.      On the Office website;

              e.      The Office shall allow for complaints to be received through a free 24-hour hotline; and

8

46REPORT000387

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

        f.        Permanent placards shall be posted and maintained in locations clearly visible to members of the public at the reception desk at Office Headquarters and Districts. The placards shall describe the complaint process and include all relevant contact information, including telephone numbers, e-mail addresses, mailing addresses, and internet sites. The placards shall be both in English and Spanish.

    2.    The Community Outreach Division (COrD) shall be responsible for ensuring that *Comment and Complaint Forms* are available at all times at the Office Headquarters, Districts, and other public locations. Deputies shall ensure that *Comment and Complaint Forms* are available in their patrol vehicles. PSB shall be responsible for the reception desk of the PSB and for those complaints received through the hotline.

B.    Every complaint shall be documented in detail by the person receiving the complaint. Complaints shall normally be referred to a supervisor, but if this is not practicable, the receiving employee shall obtain pertinent information about the complaint and then immediately forward the information to a supervisor. This procedure shall be followed regardless of whether the complaint is submitted verbally, in writing, in person, by phone, by mail, or online, or whether the complaint is submitted by the complainant, someone acting on the complainant's behalf, anonymously, or with or without the complainant's signature. Complaints received by the Communications Division shall be processed as specified in Office Policy, GI-1, *Radio and Enforcement Communications Procedures*. When notified by an employee, the supervisor shall immediately document the notification and ensure that PSB has been advised through Blue Team. Employees receiving complaints shall ensure the maintenance of confidentiality. Employees shall not divulge the name of any persons filing a complaint or provide complainant information to any employee other than the supervisor and/or PSB personnel authorized by Office command to properly process and investigate allegations of misconduct. Upon receipt of the complaint, supervisors are not to discuss the facts of the allegation with those involved as to not compromise the integrity of the investigation. When taking complaint information, Office employees shall respond to the complainant in a courteous and professional manner. If asked by the complainant to identify themselves, employees shall provide at a minimum, their name and serial number.

    1.    External Complaints:

        a.        External Complaints shall be accepted. No employee shall attempt to discourage, interfere with, or delay an individual from registering a complaint. Every effort shall be made to facilitate the convenient, courteous, and prompt receipt and processing of an external complaint. The fact that a complainant does not speak, read, or write in English; or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.

            (1)    Complaints received at the Division by phone or in person shall be referred to the on-duty supervisor. Complaints received at the Sheriff's Office Headquarters by phone or in person shall be referred to the Court Implementation Division. If this is not practical, the receiving employee shall obtain pertinent information about the complaint and have a supervisor make contact with the complainant as soon as possible. The PSB shall accept any external complaint directly from a complainant.

            (2)    Complaints received by mail, e-mail, or the Office website shall be forwarded as follows:

                (a)    Complaints addressed to the Sheriff shall be routed to the PSB along

9

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                    **Effective Date: 11-14-23**

with all supporting documents in a manner that promotes confidentiality.

(b)    Complaints received through the mail, e-mail, the Office website, or received from other sources, shall be forwarded to the PSB.

(3)    Complaints requiring the Office to investigate allegations of criminal misconduct require the receiving supervisor to immediately notify their own chain of command unless this notification would negatively impact the integrity of the complaint and the subsequent investigation. The respective commander shall notify the PSB Commander for investigative assignment.

(4)    Complaints involving allegations of excessive force or physical abuse require the supervisor to make every reasonable attempt to make immediate personal contact with the complainant. This interaction shall be both audio and video recorded unless deemed impractical to do so. Color photographs shall promptly be taken of any alleged physical injury. In extreme circumstances, personnel from the Scientific Analysis Division shall be contacted to take the photos. Complainants may also be encouraged to seek medical evaluation at their own expense and shall be asked to sign an *Authorization to Release Information* (See Attachment B) if treatment is sought.

b.    External complaints shall be documented in detail and forwarded immediately to the PSB through Blue Team.

(1)    If received by a supervisor, the supervisor shall:

(a)    Offer to meet in person, and if in-person contact is desired, audio and video record the interaction. If the complainant does not desire in-person contact, the contact shall be made by telephone, documented in the investigative report, and the supervisor shall audio record the interaction.

(b)    Obtain the following minimum information:

i)      Date of occurrence;

ii)     Time of occurrence;

iii)    Incident summary;

iv)     Incident location;

v)      Complainant's name and contact information;

vi)     Witness's name and contact information;

vii)    Supporting documents and/or evidence;

viii)   Involved employees; and

ix)     Any other available information.

10

46REPORT000389

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                                        **Effective Date: 11-14-23**

> (c)  Immediately complete an entry utilizing Blue Team by selecting Incident Type – External Complaint. This information shall be automatically routed to PSB. If Blue Team is unavailable, the supervisor shall complete the *Complaint Acceptance Report* (see Attachment A) and e-mail the document to the PS. Once Blue Team is available, the information from the *Complaint Acceptance Report* shall be promptly added by the supervisor to Blue Team.

> (d)  Attach audio and video recording(s) and any related documents to the Blue Team entry. If Blue Team is not available, send copies of the audio and video recording(s) and related documents to the PSB.

> (2)  If received by the PSB, the PSB shall:

> (a)  Offer to meet with the complainant and if in-person contact is desired, audio and video record the interaction. If the complainant does not desire in-person contact, the contact shall be made by telephone, documented in the investigative report, and the PSB shall audio record the interaction.

> (b)  Enter the information directly into IAPro and attach audio and video recordings and related documents. If IAPro is unavailable, complete the *Complaint Acceptance Report*. Once IAPro is available, the information from the *Complaint Acceptance Report* and the audio and video recording(s) shall be promptly added to IAPro by the PSB.

c.  When possible, the supervisor or the PSB shall give verbal acknowledgment to the complainant that the complaint has been received and documented, that it shall be forwarded to the PSB for action, and an Office representative shall contact the complainant as part of the complaint process. If verbal acknowledgement is not possible, the supervisor or the PSB shall give written acknowledgement through mail or e-mail. If acknowledgement in any form is not possible due to the lack of complainant contact information, this shall be documented in the IAPro Investigative Case File.

d.  The PSB shall notify the principal's Division Commander and Bureau Chief of the complaint provided that the integrity of subsequent action will not be compromised. If the complaint is addressed through an administrative investigation, the principal's affected Division Commander and Bureau Chief are not to discuss the facts of the allegation with those involved as to not compromise the integrity of the investigation.

e.  Upon determination by the PSB Commander that an allegation of misconduct requires an investigation, the PSB shall promptly assign an IA Number to the incident and provide it to the complainant. Within seven days, the PSB shall provide a written update to the complainant which shall include the IA Number and the name of the assigned investigator. This written update shall also inform the complainant how they may contact the PSB to inquire about the status of the complaint.

f.  If during the course of a PSB or Division administrative investigation the assigned investigator identifies a new principal, the investigator shall notify the Division Commander and Bureau Chief of the new principal, provided that the integrity of

11

46REPORT000390

**Policy GH-2,** *Internal Investigations*                                   **Effective Date: 11-14-23**

the investigation will not be compromised.

g.      When allegations are filed on multiple employees involved in a single act of misconduct, one IA Number shall be assigned. The assigned IA Number shall be noted on all documents resulting from the complaint.

2.   Inmate Complaints:

a.      Inmate complaints shall be received through *Inmate Grievance* forms, *Inmate Request* forms, or through verbal communication. Inmates shall be directed to submit their complaint on an *Inmate Grievance* form, as specified in Office Policy DJ-3, *Inmate Grievance Procedures*. If the inmate refuses to complete an *Inmate Grievance* form, any information collected regarding the complaint shall be attached to an *Inmate Grievance* form and forwarded through the grievance process.

Detention personnel shall collect an inmate's grievance or complaint as soon as possible during the course of their shift duties and make an attempt to resolve the grievance or complaint within 72 hours. Detention personnel unable to resolve the grievance within 72 hours, shall forward the *Inmate Grievance* form to a shift supervisor.

If at any time during this process employee misconduct is identified, it shall immediately be entered into Blue Team as an External Complaint by the supervisor identifying the misconduct. The entry shall include all investigative documentation obtained prior to the misconduct being identified. Forms regarding the processing of inmate complaints alleging employee misconduct are located in the Bureau Hearing Unit Forms/Misconduct Grievance Forms folder on the Office's shared drive.

b.      Inmate complaints shall be processed based on the topic of the complaint. The established procedures are as follows:

(1)      Inmate complaints involving policy, procedure, or services of the jail shall be addressed through the inmate grievance process, as specified in Office Policy DJ-3, *Inmate Grievance Procedures*.

(2)      Inmate complaint allegations of employee misconduct related to violations of the Prison Rape Elimination Act (PREA) shall be addressed, as specified in Office Policies DJ-3, *Inmate Grievance Procedure* and GJ-28, *Prison Rape Elimination Act* (PREA). The PREA Coordinator shall forward the completed PREA incident documents to the PSB Commander or designee, for review.

(3)      Inmate complaints regarding allegations of employee misconduct, to include use of force, shall be addressed, as specified in this Policy.

(4)      Inmate complaints regarding allegations of employee misconduct of a criminal nature shall be reported immediately to the Division Commander, and the PSB.

(5)      All other inmate complaints regarding allegations of employee misconduct received by non-supervisory personnel shall be immediately forwarded to a supervisor for action.

12

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

  c. Supervisor responsibilities when an inmate complaint alleges employee misconduct:

    (1) Upon determining an Inmate Grievance *Preliminary Inquiry Report* (PIR) is needed, the supervisor shall contact the facility Custody Bureau Hearing Unit (CBHU) Sergeant to receive a grievance tracking number and an Inmate Grievance Tracking Coversheet.

    (2) As soon as possible, and not to exceed seven calendar days of receiving the *Inmate Grievance* form, to include those that are noted as resolved by the inmate after the officer responds in Section II of the *Inmate Grievance* form, the supervisor receiving the inmate complaint shall be responsible for completing a preliminary inquiry regarding the allegation.  The preliminary inquiry shall include, but is not limited to the following:

      (a) An audio recorded statement from the inmate complainant;

      (b) Documented review of audio and video recordings, Shift Log entries in SHIELD, and rosters; and

      (c) Documented limited questioning of the employee to determine the validity of the complaint.

    (3) Upon completion of the preliminary inquiry, the supervisor shall document their findings on a PIR.

    (4) The supervisor shall write a synopsis of the PIR findings on the inmate's original *Inmate Grievance* form.

    (5) The supervisor shall provide all documentation, to include the PIR, Grievance Tracking Coversheet, the original *Inmate Grievance* form, and any associated information, to the shift commander for their review.

    (6) In the event a supervisor is an involved employee in an inmate's complaint alleging employee misconduct, that supervisor shall not conduct the preliminary inquiry.  The shift commander shall then determine which supervisor will conduct the preliminary inquiry.

  d. Shift Commander, Jail Commander, CBHU Commander or designee's, responsibilities when an inmate alleges employee misconduct:

    (1) As soon as possible, and not to exceed seven calendar days of receipt of the documentation from the supervisor, the shift and jail commander shall conduct their reviews and document their conclusion on the PIR.

      (a) In the event that during the review by the shift or jail commander, either determines that misconduct did occur, they shall consult with the PSB Commander or designee, and provide them with a copy of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information. The PSB Commander or designee, shall determine if misconduct by the employee has occurred and shall notify the CBHU of their determination.

13

46REPORT000392

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

(b)     If the PSB determines an investigation is warranted, the copy of the *Inmate Grievance* form, the PIR, and Grievance Tracking Coversheet, and any associated information shall be forwarded to the PSB.  Entry into IAPro and the assignment of an IA Number will stop the grievance process.  The PSB shall provide documentation to the CBHU staff notifying them of the IA Number for processing and closure in the CBHU database.  The CBHU staff shall make a notation on the original *Inmate Grievance* form indicating the PSB is investigating the allegation and attach the PSB documentation.  The CBHU shall then provide the IA Number to the inmate in the grievance response.

(c)     When the shift and jail commander complete their review, and conclude no employee misconduct occurred, they shall ensure the original *Inmate Grievance* form is returned to the inmate within three calendar days.  The inmate shall be instructed to select their choice of action in Section IV of the *Inmate Grievance* form, and then sign their name, booking number, and the date, and be provided their copy of the grievance form.  N**o PIR or Grievance Tracking Coversheet shall be provided to the inmate as part of the response.  T**he *Inmate Grievance* form shall then be forwarded to the CBHU Commander, along with the PIR, the Grievance Tracking Coversheet, and any other associated information.

(2)     The CBHU Commander or designee, shall conduct a review and document their findings on the PIR as soon as possible, and not to exceed seven calendar days of the shift or jail commander's documentation.

(a)     If the CBHU Commander or designee, determines that employee misconduct may have occurred, they shall consult with the PSB, and provide the PSB with a copy of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information.  The PSB Commander or designee, shall determine if an investigation is warranted.  If the allegation is going to be investigated by the PSB, the *Inmate Grievance* form will be closed out in the CBHU database upon issuance of the IA Number in IAPro.  The CBHU staff shall make a notation on the original *Inmate Grievance* form indicating the PSB is investigating the allegation and attach the PSB documentation. The CBHU shall then provide the IA Number to the inmate in the grievance response.

(b)     A copy of the grievance form indicating the assigned IA Number and noting that PSB will be conducting an investigation shall be provided to the inmate by the CBHU Commander or designee.  N**o PIR or Grievance Tracking Coversheet shall be provided to the inmate as part of the response.**

(c)     If upon review of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, the CBHU Commander or designee, determines the PSB is not going to investigate the allegation, the *Inmate Grievance* form shall continue through the inmate grievance process.  All collected information obtained during the preliminary inquiry, to

14

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                      **Effective Date: 11-14-23**

include the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, shall be stored in the CBHU database.

e.      Once potential misconduct is identified, the PSB Commander shall make the final determination whether an administrative investigation is conducted following consultation with the shift or jail commander, or the CBHU Commander or designee, regarding an inmate allegation of employee misconduct.

(1)     For allegations of misconduct, the CBHU Commander shall provide the Inmate Grievance form, the PIR, the Grievance Tracking Coversheet, and any other associated information from the shift or jail commander to the PSB Commander or designee, who shall make an initial determination of the category of the alleged offense and promptly assign an internal affairs investigator.

(2)     If the PSB Commander or designee, determines an administrative investigation is warranted, the PSB shall enter the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, into IAPro, as an External Complaint, listing the inmate as the complainant.

(3)     Once determined the complaint will be investigated as an External Complaint through the PSB, the *Inmate Grievance* shall not be processed any further by the CBHU and closed out in the CBHU database as investigated further by the PSB and referencing the IA Number. The CBHU Commander or designee, shall notify the inmate regarding the status of their grievance.

(4)     If the PSB Commander or designee, determined employee misconduct did not occur, the allegation shall remain as an inmate grievance. The PSB's determination shall be documented in the CBHU database, and the *Inmate Grievance* form shall continue through the grievance process, as specified on Office Policy DJ-3, *Inmate Grievance Procedures*.

3.   Internal Complaints

a.      Internal complaints shall be accepted by supervisors. While employees may enter an internal complaint into Blue Team or may contact the PSB directly, employees are encouraged, but not required, to first attempt to resolve their internal complaint through their respective chain of command.

(1)     Employees who observe or become aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a supervisor, directly to the PSB, or any outside entity authorized to take corrective action, without fear of retaliation. When the misconduct involves a supervisor, the employee shall either contact the next level in the chain of command, or the PSB, at any time, regarding misconduct involving an Office employee or make a Blue Team entry.

(2)     Internal complaints shall not be confused with an employee grievance. A grievance is directed at such matters as employee status, work conditions, or operational procedures, as specified in Office Policy GC-16, *Employee Grievance Procedures*. An internal complaint is directed at alleged

15

46REPORT000394

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

misconduct on the part of an employee which shall warrant a preliminary inquiry or investigation, and possible disciplinary action.

(3)    Internal complaints shall not be confused with matters associated with Failure to Perform at Level Required of the Position (not involving misconduct). These matters do not involve misconduct and no internal complaint shall be submitted. Supervisors shall contact the Human Resources Bureau for guidance on how to manage an employee for Failure to Perform at Level Required of the Position (not involving misconduct).

(a)    Supervisor action to assist the employee shall include intervention options as specified in Office Policy GH-5, *Early Identification System*, and this Office policy.

(b)    The use of Failure to Perform at Level Required of Position will be limited at this time to civilian personnel and will require the review of the PSB Commander to ensure the employee action is not misconduct.

b.    Internal complaints shall be documented in detail and immediately forwarded to the PSB through Blue Team.

(1)    If an internal complaint is received by the supervisor, the complaint shall be documented consistent with external complaints, as specified in this Office Policy. When entering the information into Blue Team, the supervisor shall select Incident Type – Internal Complaint. The information shall be automatically routed to the PSB.

(2)    If the employee elects to enter a complaint directly into Blue Team, they shall select Incident Type – Internal Complaint and enter the required information. This information shall be automatically routed to the PSB.

(3)    If an internal complaint is received by the PSB, complaints shall be documented consistent with external complaints, as specified in this Office Policy. When entering the information into IAPro, PSB shall select Incident Type – Internal Complaint.

4.    Service Complaints:

a.    The Office shall receive, evaluate, and respond to service complaints regarding inadequate policy, procedure, practice, service level due to manpower or resources, or statutory authority required of the Office. A service complaint shall not include allegations of employee misconduct. A service complaint provides a mechanism to foster communication between members of the Office and the public.

b.    Preliminary Inquiry: If a supervisor receives a complaint believed to be a service complaint, the supervisor shall conduct a preliminary inquiry. The supervisor shall document information gathered during the preliminary inquiry. The information to be documented shall include:

(1)    An audio recording of the personal contact with the complainant. If the complainant does not want personal contact, the interaction shall be audio recorded;

16

46REPORT000395

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

(2)    If needed, any interviews of involved employees; and

(3)    Information gathered through a review of EI Pro, Blue Team, traffic stop data, CAD, Shift Log entries in SHIELDs, audio and video recordings, and limited preliminary questioning of the parties involved.

c.    *Service Complaint Form*: The supervisor shall complete the *Service Complaint Form* and include all information gathered during the preliminary inquiry. The *Service Complaint Form* shall be forwarded to the PSB through Blue Team by selecting Incident Type – Service Complaint. The *Service Complaint Form* is found in the Internal Affairs\Forms folder on the Office's shared drive. The audio and video recordings and other information gathered during the preliminary inquiry shall be attached to the Blue Team entry when forwarded to the PSB.

d.    Review of Service Complaint: The PSB shall review the preliminary inquiry and determine whether the complaint shall be issued a Service Complaint number (SC Number) and closed administratively, the complaint will be investigated administratively and issued an IA Number, or PSB will utilize the PSB Diversion process. When a complaint consists of both misconduct and service issues, only an IA Number shall be issued. However, the matters determined to be a service complaint can be treated as separate allegations and closed as service complaints.

(1)    Administrative Closure: An Administrative Closure shall be used to indicate a service complaint was resolved without an administrative investigation.

(a)    Administrative Closures shall be used when any of the following circumstances exist:

i.    The complaint does not allege employee misconduct and can be resolved with an explanation to the complainant regarding the policy, procedure, service level due to manpower or resources, or statutory authority required of the Office. This includes matters in which the complainant questions Office policy, procedures, or service level due to manpower or resources, or statutory authority required of the Office.

ii.    The complainant does not allege employee misconduct and expresses dissatisfaction with the outcome of formal legal, civil, or administrative processes involving members of the Office. The preliminary inquiry associated with this type of Service Complaint closure shall be thoroughly reviewed and confirm potential employee misconduct was not involved with the incident prior to closure.

iii.    The complainant does not allege employee misconduct and requests additional information or follow-up actions pertaining to a prior call for service, report, or investigation.

iv.    The complaint lacks specificity and the complainant refuses or is unable to provide further clarification necessary for the Office to fully understand the complaint, or the complainant does not articulate facts amounting to an

17

46REPORT000396

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

allegation of employee misconduct.

> (b) If the service complaint is closed with the appropriate administrative finding, the PSB shall complete an entry into IAPro by selecting Incident Type – Service Complaint. The entry shall include the SC Number and outcome.
>
>> i. PSB shall prepare and distribute the *Final Disposition Letter.* The complainant should be informed that their complaint is being looked into for possible changes to policy and training, if applicable.
>>
>> ii. The PSB shall forward copies of the service complaint to the Policy Development Section, Training Division, or any other area that may be impacted by the information contained in the complaint for review and action, if necessary. The Policy Development Section and/or Training Division shall be required to look into the issue and respond to the PSB about any changes that it will make or why changes are not being made.
>
> (2) Administrative Investigation: If the service complaint is elevated to an administrative investigation, the PSB shall assign an IA Number and assign the investigation to the appropriate Division or maintain and initiate the investigation.

5. Office Vehicle Accidents: Office vehicle accident investigations shall be addressed, as specified in Office Policy GE-4, Use, *Assignment, and Operation of Vehicles.*

6. PSB Diversions:

   a. The PSB Diversion process is a mechanism initiated by the PSB Commander to address, on a case-by-case basis, eligible complaints that are most appropriately handled without the initiation of a formal administrative investigation or Service Complaint.

   b. The PSB Diversion process shall utilize the EIS to process, document, route, and track the way eligible complaints are addressed in lieu of a formal administrative investigation or Service Complaint.

   c. The PSB Diversion process shall require notification to the complainant, principal employees, and the respective employee's chain of command consistent with notifications sent when an administrative investigation or Service Complaint is received or closed.

   d. If the PSB Diversion process is utilized, the incident type of PSB Diversion will be utilized in the IAPro Database, a unique tracking number will be assigned, and all documentation associated with the PSB Diversion and involved employees will be attached.

   e. Only the specific categories of complaints identified in this Office Policy are eligible for a PSB Diversion.

18

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

f.   The PSB Commander shall document in writing the decision to utilize a PSB Diversion instead of initiating a formal administrative investigation or Service Complaint. Decisions as to how complaints are classified or which are eligible for PSB Diversions will be made on a case-by-case basis; and based on the circumstances, cases may be reclassified.

g.   If the PSB Commander determines that a qualifying complaint should be addressed with an approved PSB Diversion, the following procedures shall apply:

   (1)   The *PSB Diversion Service Form* shall include the PSB Diversion tracking number, involved employee, synopsis, associated policy violation(s), category of offense(s), and offense number.

   (2)   The *PSB Diversion Service Form* shall include instructions for issuance to the employee and be routed via the involved employee's chain of command for service.

   (3)   The *PSB Diversion Service Form* shall be issued to the involved employee, documented in the EIS in accordance with the instructions provided, and returned to the PSB within 30 calendar days.

   (4)   The *PSB Diversion Service Form* will be attached to the PSB Diversion Incident in the IAPro Database and linked to any associated EIS entries.

h.   The following types of complaints are not eligible for consideration for a Diversion:

   (1)   Complaints involving members of the Plaintiffs' class;

   (2)   Complaints involving allegations of bias;

   (3)   Complaints involving allegations of criminal conduct;

   (4)   Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

   (5)   Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

   (6)   Allegations of conduct that, if sustained, could constitute a Category 3 or higher Offense from the Office's Disciplinary Matrices – unless otherwise specified below.

i.   The following situations, on a case-by-case basis, are eligible as part of the Diversion process, to be Administrative Closures:

   (1)   Situations where a complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported.

   (2)   Situations where an internal or external complaint was received by the Office after the employee(s) involved in the alleged misconduct left employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no

19

46REPORT000398

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: 11-14-23**

evidence or indication of any other potential employee misconduct in the incident.

(a)     Should the principal employee return to work at the Office, the case shall be reactivated and resumed for full completion in accordance with Office Policy standards.

(b)     The time in which the employee was not employed with the Office shall be excluded from the investigative timeline.

(3)     Situations when the initial complainant is unwilling or unable to cooperate.

(4)     Situations where the initial complainant is anonymous. Anonymous complainants include those that are known but desire to remain anonymous and requested to not be included in the investigative report and those whose identity is unable to be confirmed.

(5)     Situations resulting in a health-related in-custody jail death that do not involve the use of force by an employee and are considered non-critical incidents under Office Policy.

(a)     There are no exclusions for Diversions in these situations.

(b)     **Prisoner or Inmate Death** *Preliminary Inquiry Report* **(PIR):** Following the death of a prisoner or inmate in Office custody, as specified in Office Policy GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate*, where there is **no** employee use of force, and when no PSB investigation has otherwise been initiated, shall require the completion of a PIR, as specified in this Office Policy. The PIR shall be conducted to identify potential employee misconduct associated with the incident. If at any time during the PIR process employee misconduct is identified, it shall immediately be entered into Blue Team as an Internal Complaint by the supervisor identifying the misconduct.

i.      The gathering of information for the PIR shall include, but is not limited to, interviews of involved employees, information gathered through various data sources, and the review of associated audio and video recordings. The PIR will ensure that any perishable evidence relevant to an administrative misconduct investigation is preserved.

ii.     PIRs completed pursuant to a prisoner or inmate death shall be forwarded through the chain of command to the PSB Commander or designee to determine if an administrative investigation is warranted to determine whether any violation of Office policy contributed in any way to the prisoner or inmate death.

a.      If the PSB Commander or designee determines employee misconduct was identified, the PIR shall be entered as an Internal Complaint pursuant to this

20

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

Office Policy.

b.      If the PSB Commander or designee determines employee misconduct did not occur, no further administrative investigative action is required.

iii.    A prisoner or inmate death PIR is not required when the following occurs:

a.      The death of a prisoner or inmate is determined be a critical incident, as specified in Office Policy GJ-2, *Critical Incident Response*; or

b.      The PSB has already initiated an administrative investigation into the incident.

(6)     Situations where an internal complaint originated from a workplace relationship(s) and are most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division (ERPD) in accordance with the process outlined in the PSB Operations Manual.

(a)     The following types of complaints are not eligible for consideration for a PSB Diversion Process in place of a formal administrative investigation or Service Complaint:

i.      Allegations of conduct that, if sustained, could constitute a Category 4 or higher Offense from the Office's Disciplinary Matrices.

j.      PSB-Directed Supervisory Interventions:

(1)     Situations wherein the PSB may initiate a PSB-Directed Supervisory Intervention to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, PSB may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in Attachment B of Office Policy GC-17, *Employee Disciplinary Procedures* for any External Complaints. Employee conduct outside of the limitations of the named sections for both internal and external allegations shall be addressed by considering the definition for each Category of Offenses and determining placement, as specified in the Office Policy.

These situations are eligible, on a case-by-case basis, for consideration by the PSB Commander for an approved PSB-Directed Supervisory Intervention, in lieu of an administrative investigation or Service Complaint.

21

46REPORT000400

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

(a)    Following a review of the circumstances of the incident, available evidence, EIS profile, and the disciplinary history of the potential principal, the PSB Commander shall make an initial determination if the allegations can appropriately be addressed through an approved PSB-Directed Supervisory Intervention.

(b)    Principals shall not exceed the number of coachings allowed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, for one year prior to the current offense.

k.    Expedited Resolution with a finding of Unfounded:

(1)    Situations of an internal or external complaint where under the clear and convincing evidence standard, external documentary or video evidence establishes that the alleged violation of Office Policy did not occur and there is no indication of any other employee misconduct resulting in an Expedited Resolution with a finding of Unfounded.

(a)    If the investigator determines during the administrative investigative process that above conditions are met, and the case investigation has not already been completed, the investigator shall document in the investigative report the following:

i.    The manner and circumstances in which the above condition is met to support an expedited finding;

ii.    The investigative steps taken to verify there are no other indications or evidence of other employee misconduct involved in the incident;

iii.    If applicable, the readily available clear and convincing evidence demonstrating that the alleged violation of Office Policy could not occur as alleged, supporting an unfounded finding;

iv.    The investigative report shall be completed with the recommended expedited finding of unfounded and submitted for review in accordance with the processing of all other completed administrative investigations.

v.    If the Expedited Resolution and finding is approved by the PSB Commander, the administrative case will proceed through all other formal closure processes for an administrative investigation as outlined in Office Policy.

vi.    If the Expedited Resolution and finding is applied to an administrative investigation, a special indicator linked to the expedited finding shall be included in IAPro Investigative Case File and associated with the employee's EIS information for future reference.

3.    **Disciplinary Offer:** Situations where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, establishes a violation of Office Policy, and the

22

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                               **Effective Date: 11-14-23**

PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrix, as further described:

A.      A Disciplinary Offer is to be considered an Expedited Resolution.

B.      The ability of the PSB Commander to offer principals the presumptive discipline or a mitigated penalty if they accept responsibility, shall include allegations that, if sustained, could constitute a Category 1, Category 2, and Category 3, First Offense, where minor discipline is within the approved range pursuant to Office Policy GC-17, *Employee Disciplinary Procedures.*

C.      If determined to be eligible, the PSB Commander shall coordinate with the MCSO Administrative Services Division (ASD) Conduct Resolution Section (CRS) to prepare and extend the written disciplinary offer to the principal employee(s).

D.      The principal employee(s) shall have seven (7) calendar days during a time period the employee is regularly scheduled to work to respond to the disciplinary offer.

E.      If the employee accepts responsibility for the policy violation(s) and returns the signed disciplinary offer, the CRS shall prepare/process the disciplinary action in accordance with standard operating procedures for minor discipline administration following a formal administrative investigation.  Some steps may not be required to complete this investigation.

F.      If the employee declines to accept the disciplinary offer or fails to return the disciplinary offer to the CRS by the deadline provided, the CRS shall forward the response or lack of response to the PSB Commander for the initiation of a formal administrative investigation.

G.      In the event information/evidence related to a complaint is later discovered which could require the matter to be investigated further by the PSB, the discipline offer or issuance shall be rescinded by the PSB Commander.

H.      The following types of complaints are not eligible for consideration for a presumptive discipline or a mitigated penalty in place of a full formal administrative investigation or Service Complaint:

   1.      Complaints involving members of the Plaintiffs' class;

   2.      Complaints involving allegations of bias;

   3.      Complaints involving allegations of criminal conduct;

   4.      Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

   5.      Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

   6.      Allegations of conduct that, if sustained, could constitute a Category 3 Offense where minor discipline is not within the approved range from the Office's Disciplinary Matrices.

23

46REPORT000402

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

4.    **Investigative Assignment:** The PSB Commander will make an initial determination of the category of offense and then promptly assign an internal affairs investigator, or a criminal investigator as required. If the misconduct investigation will be investigated at the Division level, the Division Commander shall assign the internal affairs investigator.

  A.    Investigations of complaints shall only be conducted by individuals who meet the clearly defined qualifications documented in the PSB Operations Manual, or as justified in writing by the PSB Commander. The Office must ensure that an internal affairs investigator:

   1.    Possesses excellent investigative skills, has a reputation for integrity, possesses the ability to write clear reports, has the ability to be fair and objective in determining whether an employee committed misconduct; and

   2.    Does not have a disciplinary history of three or more sustained violations of misconduct or does not have one sustained violation of a Category 6 from the Office's Disciplinary Matrices, as specified in Office Policy GC-17, *Employee Disciplinary Procedures,* and does not have a history of conducting deficient investigations.

   3.    Is not listed in the Law Enforcement Rule 15 Disclosure Database.

  B.    Allegations of employee minor misconduct shall be administratively investigated by a sergeant who has received misconduct investigative training.

   1.    Division level internal affairs investigators may seek assistance from the PSB at any time during the investigation.

   2.    If at any point during an administrative investigation the investigator has information indicating the principal may have committed misconduct of a serious or criminal nature, the investigator shall immediately notify the PSB, which shall assume the investigation.

  C.    The PSB shall investigate the following allegations of employee misconduct:

   1.    Serious misconduct;

   2.    Misconduct indicating apparent criminal conduct;

   3.    Allegations of a violation of Office Policy, CP-5, *Truthfulness*;

   4.    Complaints alleging any act of discriminatory policing or conduct;

   5.    Discriminatory motor vehicle stop complaints;

   6.    Supervisory referrals resulting from a supervisory review of reports or recordings depicting discriminatory actions;

   7.    Use of force complaints in which serious injury results or is alleged;

   8.    Complaints alleging an employee has committed an act of domestic violence;

   9.    The filing of any civil suit by a member of the public alleging misconduct of an employee which occurred on or off duty;

   10.    Critical incidents, as specified in Office Policy GJ-2, *Critical Incident Response*; and

   11.    Any investigation, which due to its complexity or the involvement of personnel from multiple squads or Divisions or is beyond the capabilities of Division level personnel.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: 11-14-23**

D.     Conflict of Interest: Conflict of interest in administrative investigations is prohibited. An assigned investigator shall disclose any involvement or relationship which could be perceived to compromise the investigative process to the PSB Commander prior to the start of the investigation. The PSB Commander shall make a determination as to whether the perception is justified and reassign the investigation, if necessary.

1.     No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.

2.     No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation shall investigate the misconduct. Relationships that shall be reported, include but are not limited to:

a.     Family relationship(s);

b.     Outside business relationship(s);

c.     Romantic relationship(s);

d.     Personal friendship(s) that extends outside of the Office; and

e.     Close professional relationship(s).

3.     No employee shall be involved in an investigation, whether criminal or administrative, with respect to any persons who are superior in rank and in their chain of command. Investigations of the Chief Deputy's conduct, whether criminal or civil, must be referred to an outside authority.

4.     If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority.

5.     Where appropriate to ensure the fact and appearance of impartiality, the PSB Commander or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.

6.     Any outside authority retained by the Office must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest. The PSB shall determine if an outside investigator possesses the requisite background and level of experience of internal affairs and the absence of any actual or perceived conflicts of interest.

5.     **Investigation of Complaints:** The investigation of allegations is a critical part of the complaint and discipline process. A decision to exonerate, unfound, not sustain, or sustain a charge must be based upon actual and reliable information. The investigation shall consist of gathering and reporting facts related to the allegation. Credibility determinations shall be based upon all known facts. Employees shall provide all relevant evidence and information in their custody and control to internal affairs investigators. They shall also advise investigators of persons who shall be contacted for statements. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.

A.     Investigations must be viewed by the public and Office employees as diligent, thorough, and

25

46REPORT000404

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

impartial.  The investigation shall be conducted in a manner that shall reveal the facts.  In each misconduct investigation, investigators shall:

1.      Conduct investigations in a rigorous and impartial manner designed to determine the facts;

2.      Approach the investigation without prejudging the facts and without permitting any preconceived impression of the principal, investigative lead, witness, or complainant to cloud the investigations;

3.      Identify, collect, and consider all relevant, circumstantial, direct, and physical evidence, including any audio or video recordings while ensuring evidence is collected in a timely fashion and in accordance with Office Policy GE-3, *Property Management and Evidence Control*;

4.      Make reasonable attempts to locate and interview all witnesses, including members of the public.  Leaving voice mail messages and sending certified letters is not sufficient. Reasonable attempts may include, but are not limited to, neighborhood canvasses, checking with the Post Office, accessing open Internet resources, and completing Department of Motor Vehicle checks.  All attempts shall be documented in the investigative report with the date, time, where, when, and who was contacted, to include all reasons why an interview was not conducted;

5.      Offer in person interviews to any external complainants;

6.      Audio and video record all interviews.  Exceptions to a recorded interview may include, but are not limited to, the fact that the member of the community does not wish to be audio and/or video recorded, or that the member of the community resides outside of Maricopa County.  If an interview is not audio and video recorded, all reasons shall be documented in the investigative report;

7.      Avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

8.      Attempt to resolve material inconsistencies between employee, complainant, investigative lead, and witness statements, and make credibility determinations as appropriate;

9.      Not give automatic preference for an employee's statement over a statement received from a member of the public;

10.     Not disregard a witness or investigative lead's statement solely because the witness or investigative lead has a connection to either the complainant or an employee or has a criminal history; and

11.     Not alone consider the fact that a complainant committed a crime, pled guilty, or is found guilty of an offense, to determine whether the employee engaged in misconduct; nor will such factors by themselves justify discontinuing an investigation.

B.      Internal affairs investigators shall consider the witness or investigative lead's criminal history or any adjudicated findings of untruthfulness in evaluating their statement.  Additionally, the internal affairs investigator shall take into account the record of any witness, investigative lead, complainant, or employee who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

C.      Investigators shall investigate any evidence of potential misconduct uncovered during the course of

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                        **Effective Date: 11-14-23**

the investigation, regardless of whether the potential misconduct was part of the original allegation.

D.      The Office shall not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline unless it meets the specific situations approved for Administrative Closures. The Office will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.

E.      Administrative Investigation: The PSB Commander shall determine if an administrative investigation will be conducted at the Division level or by the PSB, as specified in this Office Policy.

F.      Criminal Investigation: When appropriate, a separate criminal investigation shall be conducted by the PSB Criminal Investigations Section, an Office criminal investigations unit, such as the Major Crimes or Special Investigations Division, or by a law enforcement agency having jurisdiction, for the purpose of prosecution. A criminal investigation conducted by an Office criminal investigative unit must first be authorized by, and under the authority of, the PSB Commander; and must be conducted separately from any administrative investigation. All criminal investigations conducted by the Office shall be assigned a Criminal Internal Affairs (CIA) number. The initiation of a criminal investigation does not preclude the initiation and/or continuing of an administrative investigation.

1.      When a complaint, whether internal or external, has the implication of possibly being criminal in nature, the PSB Commander shall be immediately notified. This includes critical incidents as defined in Office Policy GJ-2, *Critical Incident Response*, regardless of the jurisdiction where the critical incident occurred or where another entity retains jurisdiction.

2.      If the criminal misconduct is discovered during an administrative investigation conducted outside of the PSB, the PSB shall immediately assume the administrative investigation.

3.      If the evidence of criminal misconduct pertains to someone who is superior in rank to the PSB Commander and is within the commander's chain of command, the PSB Commander shall provide the evidence directly to the appropriate prosecuting authority, such as the Maricopa County Attorney's Office, the Arizona Attorney General's Office, or the United States Attorney's Office, without notifying those in the chain of command who may be the subject of the investigation.

4.      An administrative investigation shall be required for any matter investigated criminally. Such administrative investigations shall be completed regardless of the outcome of the criminal investigations, including cases in which the prosecuting agency declines to prosecute or dismisses the charges.

5.      If a misconduct allegation will be investigated criminally, the PSB will not compel an interview of the principal pursuant to *Garrity*, until it has first consulted with the criminal investigator and the relevant prosecuting authority.

   a.      No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the PSB Commander in consultation with the entity conducting the criminal investigation.

   b.      The PSB shall document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.

27

46REPORT000406

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                **Effective Date: 11-14-23**

c.    When an administrative investigation begins prior to the criminal investigation being completed, it is imperative the administrative investigator does not communicate with the criminal investigator about any statements by the principal that were compelled pursuant to *Garrity*. The administrative investigator can obtain any and all information about the criminal investigation from the criminal investigator for the administrative investigation.

6.    Administrative investigators shall not take part in any criminal investigation interviews of Office personnel. They shall, however, monitor the interview from a location which is out of view of the person being interviewed. The person being interviewed shall not be advised of the presence of administrative investigators. The administrative investigators shall not discuss or suggest any line of questioning or inquiry with criminal investigative personnel.

7.    Administrative investigators shall coordinate any anticipated actions with the on-scene, criminal investigation commander before entering the scene.

8.    If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the PSB Commander. The PSB Commander shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing and include it in the investigatory file.

9.    If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the PSB Commander shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The PSB Commander shall direct that the investigator conducts additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.

10.   If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the PSB shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

11.   The Sheriff shall require the PSB to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.

G.    In cases where the alleged misconduct involves a violation of Office Policy CP-5, *Truthfulness*, the PSB Commander or Chief Deputy may initiate an administrative investigation. If the decision is made not to investigate, the decision and the supporting information shall be documented in a memorandum and retained by the PSB in both hard copy and electronic form for record retention purposes.

H.    Volunteer: A volunteer's continued service with the Office shall be at the discretion of the Sheriff. Volunteers are subject to, and shall comply with all Office Policies, rules, and regulations. Violations of Office Policies, rules, and regulation shall be addressed, as specified in Office Policies GC-17, *Employee Disciplinary Procedures,* and this Office Policy. Serious violations of Office Policy by a volunteer shall result in a review by the PSB Commander to determine whether a Pre-Determination Hearing is held; or the services of the volunteer are to be immediately terminated.

6.    **Administrative Investigation Report:** At the conclusion of each investigation the internal affairs investigator shall document all information gathered during the investigation in the investigative report.

28

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                    **Effective Date: 11-14-23**

A.      Report Format: The investigator shall utilize the following investigative report format.  The format and forms for the investigative report shall be found in the Internal Affairs\Forms folder on the Office's shared drive.  All facts gathered during the investigation shall be documented.  The investigative report shall include:

1.      Investigative Plan: An Investigative Plan shall be created for each Administrative Investigation. The primary objectives of an administrative Investigative Plan are to provide a roadmap for a thorough and complete investigation; to identify all reasonable opportunities to reduce and eliminate unnecessary investigative steps; and to promote timely completion of the investigation.  The Investigative Plan serves as the foundation and starting point for the efficient investigation of the alleged employee misconduct.

a.      An *Investigative Plan* shall be formulated collaboratively between the investigator and the investigator's supervisor.  The Investigative Plan shall be completed and approved by the investigator's Division Commander within seven (7) calendar days of the case assignment to the investigator.

b.      The *Investigative Plan* shall include the following items*:*

(1)      Complaint synopsis: The complaint synopsis shall consist of a few sentences providing an overall synopsis of the known allegations/facts after review of the complaint intake and all available associated evidence available to the investigator and their supervisor at the time the *Investigative Plan* is drafted.

(2)      Evidence: The evidence section shall consist of a list of all available items of evidence the investigator has currently in their possession or plans to seek out/collect/request/review during the investigation.

(3)      Case outline: The case outline is a free-form outline of the projected order of investigative steps anticipated to be taken by the investigator.  This section may be in bullet point or narrative form but must provide enough information to ascertain the projected sequence of events and any investigative steps anticipated necessary to complete the investigation.

(a)      Examples that investigators and supervisors may consider when examining the possibility of reducing and/or eliminating unnecessary investigative steps include, but are not limited to:

i.      Second Chair: Investigators should consider the physical presence of a second investigator at Complainant, Witness and Principal interviews as an exception rather than the rule.

ii.      Witness Interviews: Investigators and their supervisors shall consider the necessity when interviewing a multitude of witnesses who they reasonably believe observed, or know of, the same activity, and who will provide reasonably similar information.

iii.      Principal Interviews: Principals should be interviewed as soon as practicable and reasonable, based upon the cumulative evidence and information obtained by the investigator.

29

46REPORT000408

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

(4)    Additional information: This section allows for the investigator to provide any other relevant information pertaining to the overall investigative strategy.

(5)    Estimated investigative completion date: This section shall include the investigator's estimated date of completion and submission to their supervisor by following the steps outlined in the proposed Investigative Plan.

(6)    Supervisory Review: This section shall list the reviewing supervisor and the date in which the Investigative Plan was approved.

c.    The *Investigative Plan* submission, review, and approval workflow process shall consist of the following:

(1)    Division/District Investigations:

(a)    The PSB will include a blank Investigative Plan template with the initial email notification sent to the respective Division Commander upon the initiation or assignment of a new administrative investigation.

(b)    The *Investigative Plan* email template shall be completed by the investigator and shall list all relevant data, forms, reports and materials. (e.g., BWC, IRs, CAD) provided with the initial complaint.

(c)    The investigator's supervisor shall work with the assigned investigator to revise/edit the Investigative Plan as needed to eliminate any unnecessary investigative steps.

(d)    Once approved, the investigator's supervisor shall forward the *Investigative Plan* through the chain of command to the Division Commander. The investigator can begin the investigation following the immediate supervisor's approval of the plan.  If anyone in the chain of command, including the Division Commander, suggests modifications to the plan during the subsequent review process, those will be communicated to the investigator as soon as possible.  Once approved, the Division Commander will forward the completed email template to the PSB.

(e)    The PSB will upload the approved Investigative Plan utilizing the IAPro Database "*Running Sheet*" feature making the approved Investigative Plan accessible and viewable by all Blue Team users having access to the incident for reference throughout the course of the investigation.

(2)    *Investigative Plans* for cases assigned to the PSB will be completed in accordance with specifications within the PSB Operations Manual.

(3)    The *Investigative Plan* shall be stored within the IAPro database and will be available for review/reference throughout the course of the investigation and shall be retained in the case file for future reference.

2.    *Administrative Investigations Process Checklist*

30

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

3.    *Coversheet*

4.    *Investigative Report*: The body of the report shall document all actions taken during the investigation.

5.    *Findings*: A *Findings* page shall be prepared for each policy violation. If there are multiple policy violations, allegations, or principals, there shall be a separate *Findings* page for each principal, each allegation, and each policy violation.

6.    *Prior Work History Report*: *A Prior Work History Report* shall be prepared in order to consider the principal's work history.

   a.    The PSB shall review the employee's EI Pro/Blue Team entries and Personnel File, as well as any other pertinent information on the employee in order to compile a complete history. The review shall include the employee's prior five years of MCSO work history, to include a review of the employee's Employee Performance Appraisals. This report shall be completed and uploaded into Blue Team within five business days of the complaint being filed.

   b.    If the case is assigned to the Division level, the assigned Division investigator shall review the employee's EIPro/Blue Team entries, and any other information regarding the employee's prior five years of work history and document the information on the report.

   c.    The following shall be included in the *Prior Work History Report*:

      (1)    Commendations and awards;

      (2)    Findings of misconduct, which includes misconduct for which discipline was ultimately not issued for procedural reasons, such as but not limited to, the Merit Commission finding a good faith effort was not made to complete an investigation within the statutory requirements. The findings of misconduct shall be considered in future disciplinary decisions;

      (3)    The IAPro complaint history; and

      (4)    Discipline, to include information regarding the allegation, the date of allegation, and the findings.

B.    Report Documentation: The investigator shall ensure the following are documented in the administrative investigation:

1.    A narrative description of the incident;

2.    Documentation of all evidence that was gathered, including names, phone numbers, and addresses of complainants, witnesses, and investigative leads. In situations where there are no known witnesses or investigative leads, the report shall specifically state this fact. In circumstances in which witnesses, or investigative leads were present, but circumstances prevented the investigator from determining the identification, phone number, or address of those witnesses or investigative leads, the report shall state the reason. The report shall also include all available identifying information for anyone who refuses to provide a statement;

3.    Names of all Office employees who witnessed the incident;

31

46REPORT000410

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                                    **Effective Date: 11-14-23**

4.      Documentation of whether employees were interviewed and a transcript or recording of the interviews;

5.      The investigator's evaluation of the incident, based on their review of the evidence gathered, including a determination of whether the employee's actions appear to be within Office Policy, procedure, regulations, orders, or other standards of conduct required of Office employees;

6.      In cases where the investigator asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

7.      In cases where material inconsistencies must be resolved between complainant, witness, investigative lead, and employee statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

8.      An assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns shall be addressed.  In accessing the incident for policy, training, tactical or equipment concerns, the investigator shall include an assessment of whether:

   a.      The law enforcement action was in compliance with training and legal standards;

   b.      The use of different tactics should or could have been employed;

   c.      The incident indicates a need for additional training;

   d.      The incident suggests that the Office should revise its policies, strategies, tactics or training;

9.      If a weapon was used, documentation that the employee's certification and training for the weapon were current;

10.     In the instance of an externally generated complaint, documentation of all contacts and updates with the complainant; and

11.     At the conclusion of an administrative investigation, the investigator shall identify a finding for each policy violation.  An investigation with a sustained policy violation shall be forwarded to the PSB Commander which will result in the initiation of the disciplinary process.

7.    **Investigative Findings:** At the conclusion of an administrative investigation, the investigator shall identify one of the following findings for each allegation of a policy violation:

   A.     Exonerated: This shall indicate the investigation determined that alleged conduct occurred, but the actions of the employee were within Office Policy, procedures, or training.

   B.     Unfounded: This shall indicate the investigation determined by clear and convincing evidence, that the allegation was false or not supported by fact.

   C.     Not Sustained: This shall indicate the investigation determined that there was insufficient evidence to prove or disprove the allegation;

   D.     Sustained: This shall indicate the investigation determined that the allegations are supported by the

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                    **Effective Date: 11-14-23**

preponderance of the evidence and justify a reasonable conclusion of a policy violation.

8.      **Review of Administrative Investigations:**

A.      Enforcement Division Administrative Investigation Review:

1.      Once the investigative report is completed, the investigator shall forward the report through the chain of command to the Division Commander for review and signature. The chain of command shall have up to 10 calendar days within the 60 calendar days to complete their review. The investigative file shall not be forwarded to the PSB until the Division Commander has approved the investigation and concurred with the findings. The IAPro Task Feature shall be utilized to track and provide alerts regarding due dates for review and approval to the Division chain of command.

   a.      If anyone in the chain of command determines that the findings of the investigation are not supported by the appropriate standard of proof, as defined for each findings disposition, that supervisor shall return the investigation to the investigator for correction or additional investigative effort.

      (1)      The Division Commander shall document the inadequacies in a memorandum and shall forward the documentation to the PSB no later than 60 calendar days after receipt of the complaint for investigation.

      (2)      The Division Commander shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.

   b.      The Division Commander shall be responsible for the accuracy and completeness of the investigation reports prepared by investigators under their command.

2.      Once the Division Commander has approved the investigation and concurred with the findings, the Division Commander shall forward the investigative file to the PSB Commander or designee, for review. The PSB shall review the investigative file for completeness, thoroughness, and appropriate investigative actions. The PSB shall ensure that the investigative findings are supported by evidence.

   a.      If the PSB review determines the investigation is properly completed, the next course of action based on the findings of the investigation shall occur.

   b.      If the investigation is incomplete or unsatisfactory, the PSB shall return the investigative file for revision and/or further investigation, as necessary. The PSB shall order additional investigation when it appears there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.

   c.      When the findings of the investigation report are not supported by the appropriate standard of proof, as defined for each findings disposition, the PSB shall document the reasons for this determination.

   d.      The PSB shall ensure revisions and/or further investigation complies with the PSB recommendations and established timelines.

   e.      At the discretion of the PSB Commander, an administrative investigation may be

33

46REPORT000412

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

assigned or re-assigned to another supervisor with the approval of the supervisor's commander, whether within or outside of the district or bureau in which the incident occurred or may be returned to the original supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.

B.    PSB Administrative Investigation Review: Once the investigative report is completed, the PSB investigator shall forward the report to the PSB Commander. The PSB Commander shall have up to 10 calendar days, within the 85 calendar days, to complete a review of the investigative report. The PSB Commander shall also be responsible for the accuracy and completeness of the investigation reports prepared by investigators under their command and shall determine the findings for each alleged policy violation.

1.    If the PSB Commander determines that the findings of the investigation are not supported by the appropriate standard of proof, the PSB Commander shall return the investigation to the investigator for correction or additional investigative effort.

2.    The PSB Commander shall document the inadequacies and take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.

C.    PSB Commander Determinations:

1.    Once an investigation is completely, thoroughly, and appropriately investigated, the PSB Commander shall determine the next course of action based on the findings of the investigation.

a.    If the findings for the policy violation(s) in a completed Enforcement Division administrative investigation are Not Sustained, Unfounded, or Exonerated, following the review by the PSB Commander or designee, action to close and file the case, accordingly, shall occur.

b.    If the findings for the policy violation(s) in a completed PSB administrative investigation are Not Sustained, Unfounded, or Exonerated, the PSB Commander shall make final findings, sign the investigative report, ensure that all notifications are made to the complainant and involved employee(s), and direct that the case be closed and filed accordingly.

c.    If the findings for the policy violations in either a completed Enforcement Division or PSB administrative investigation are sustained, the PSB Commander shall make a preliminary determination if discipline is to be imposed and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's discipline history.

(1)    If the PSB Commander makes a preliminary determination that the sustained allegations for a Category 1, First or Second Offense, or a Category 2 First Offense, can appropriately be handled by a Coaching, the investigation shall be forwarded to the Administrative Services Division. The Administrative Services Division will notify the appropriate chain of command to ensure that the Coaching is conducted and documented both in the EIS and as the resolution to the investigation in question before the case is closed. If the PSB Commander determines that minor discipline is to be imposed, the Administrative Services Division shall be responsible for coordinating the process. This includes preparing detailed correspondence, and ensuring all necessary notifications and actions are completed, as

34

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                              **Effective Date: 11-14-23**

specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

(2)     When the PSB Commander makes a preliminary determination that serious discipline should be imposed, the appointing authority shall conduct a PDH and will provide the employee with an opportunity to be heard. The preliminary determination of discipline will be forwarded to the Administrative Services Division to process in accordance with Office Policy, GC-17, *Employee Disciplinary Procedures*; and to coordinate the process. This includes preparing detailed correspondence, scheduling the PDH, if applicable, and ensuring all necessary notifications and actions are completed.

2.     Policy, training, tactical or equipment concerns shall be addressed as specified in this Office Policy.

3.     The PSB Commander shall review all serious Office Policy violations by a volunteer, to determine whether a PDH is held, or the services of the volunteer are immediately terminated.

9.     **Timeline for Completing Administrative Investigations:** The investigative timeline for cases assigned to the PSB or outsourced by PSB is 85 calendar days, and for cases assigned outside of the PSB 60 calendar days. Should a case be transferred during the investigative process between the PSB and a Division outside of the PSB, the timeline will default to 85 calendar days. Investigative start, extension, and completion timeline procedures are as follows:

A.     Investigative Timeline: The investigative timeline starts on the date the Office receives notice of alleged employee misconduct by a person authorized by the Office to initiate an investigation which includes investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct and ends when the completed investigation is approved by the PSB Commander.

1.     Administrative investigations shall be investigated and submitted to the PSB Commander by the due date identified by the PSB.

2.     If it appears that the investigation will exceed the investigative timeline identified by the PSB, and a reasonable justification exists to request an extension, the investigator shall complete a *Request for Investigative Extension*.

a.     Reasonable justifications to extend the investigative timeline are situations beyond the investigator's control that have caused delays in the investigation. Examples of reasonable justification include, but are not limited to: documented attempts to obtain crucial evidence; situations where involved employees are out on approved leave for prolonged periods of time during the investigative timeframe (i.e., FMLA or military leave), the prolonged unavailability of the non-employee complainant, witness, or evidence, or a criminal investigation restricting necessary investigative steps from being completed.

b.     The investigative timeline shall not be extended without an approved reasonable justification.

3.     Division Process to Requests for Investigative Extension: The *Request for Investigative Extension* for a Division Level Investigation is located in the Office's shared drive PSB

35

46REPORT000414

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

folder and shall be processed in the following manner:

a. The *Request for Investigative Extension* shall be completed by the investigator and submitted through the chain of command to their Executive Chief for review. The Executive Chief will forward the *Request for Investigative Extension* to the PSB Commander for processing no later than 10 calendar days prior to the current investigative due date.

b. If approved, the PSB will facilitate the submission to the Sheriff for review and consideration.

c. If approved by the Sheriff, the PSB will submit the request to the Monitor Team (during such time as the Monitor is assigned) for final review, approval, and establishment of a new investigation due date.

d. If a new due date is approved, the *Request for Investigative Extension* will be added to the investigative case file and provided to the investigator and respective Division Commander by the PSB.

e. If at any stage, the *Request for Investigative Extension* is not approved, the *Request for Investigative Extension* will be provided to the PSB to be added to the investigative case file and a copy of the unapproved request will be provided to the investigator and respective Division Commander by the PSB.

f. The PSB will update the IAPro database with any approved extension due date.

g. If the investigation is not completed by the newly established due date a new *Request for Investigative Extension* will be completed utilizing the procedures previously outlined.

B. Investigative Timeline Extension: Completion of the *Request for Investigative Extension* shall include a brief synopsis of the case, the justification for requesting the extension, and the new investigative timeline due date being requested.

1. The *Request for Investigative Extension* shall be submitted to the PSB Commander no later than 10 calendar days prior to the current investigative due date.

2. The *Request for Investigative Extension* will be attached to the administrative investigation case file and if applicable, any newly approved deadline will be provided to the investigator and respective Division Commander by the PSB.

C. Overall Investigation Completion Timeline: The **overall** administrative investigation completion timeline starts on the date the Office receives notice of alleged employee misconduct by a person authorized by the Office to initiate an investigation which includes investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct and ends when the employee is served with a *Closed Case Notification, Coaching, Written Reprimand, or Pre-Determination Hearing Notice*.

1. In cases involving a law enforcement officer's conduct that may result in suspension, demotion, or dismissal, the Office is statutorily obligated to make a good faith effort to complete an administrative investigation within 180 calendar days after the Office receives notice of the allegation by a person authorized by the Office to initiate an investigation. The 180-calendar day timeline is met when the employee is served with a *Closed Case*

36

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                    **Effective Date: 11-14-23**

*Notification*, *Coaching, Written Reprimand*, or *Pre-Determination Hearing Notice*.

2.  If it appears that the completion timeline will exceed the statutorily identified 180th calendar day despite good faith efforts, and additional time is necessary to obtain or review evidence, the Office shall provide the principal(s) with a written notice explanation of the reasons for the investigation to continue beyond 180 calendar days.

    a.  The PSB shall prepare a *180-Day Notice* and provide a copy of the *180-Day Notice* signed by the PSB Commander to the principal(s) **prior** to 180 calendar days.

    b.  The *180-Day Notice* shall be attached to the investigative report and documented in IAPro.

3.  In accordance with Arizona Revised Statute, following the *180-Day Notice,* the completion timeline for an administrative investigation involving a law enforcement officer's conduct that may result in suspension, demotion, or dismissal, shall not exceed an additional 360 calendar days, with the exceptions of events indicated below.

    a.  The completion timeline is suspended during the time that any criminal investigation or prosecution is pending in connection with the act, omission, or other allegation of misconduct.

    b.  The completion timeline is suspended during the period of time in which a law enforcement officer who is involved in the investigation is incapacitated or otherwise unavailable.

    c.  The completion timeline may be suspended for a period prescribed in a written waiver of the limitation by the law enforcement officer.

    d.  The completion timeline may be suspended for emergencies or natural disasters during the time period in which the governor has declared a state of emergency within the jurisdictional boundaries of the concerned employer.

    e.  A multijurisdictional investigation may be extended for a period of time reasonably necessary to facilitate the coordination of the employers involved.

10. **Administrative Investigation Interview Guidelines:** Interviews shall be conducted according to the following guidelines:

    A.  Audio and video recordings of the entire interview shall be made by the assigned investigator for administrative purposes. To ensure the integrity of the investigation, these recordings shall become part of the investigative file as the official recordings. Employees are permitted to record their own interviews with investigators using personally owned electronic devices. Recordings made by the employee, or the employee's observer, do not constitute an official record of the interview.

    B.  The employee's observer may take notes during the interview. The employee may use notes taken during the interview only to assist them in the investigation or a disciplinary matter. The notes do not constitute an official record of the interview.

    C.  Any notes that are taken or recordings made during the interview shall be kept confidential and may only be discussed and/or shared with those specified in the Notice of Investigation, the employee's observer, and the employee's attorney.

37

46REPORT000416

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

D.    Principals of an administrative investigation should, in most cases, be interviewed after the complainant, witness, and investigative leads have been interviewed, evidence has been examined, associated reports and testimony have been reviewed; and the principal's training, work assignments, supervisor notes, and previous similar administrative investigations and/or criminal investigations involving the principal, have been reviewed.

E.    The interview shall be conducted at a reasonable hour, preferably during the interviewee's work schedule, unless circumstances dictate otherwise.  Maricopa County and Office employees interviewed outside their work schedule must be paid for all hours they are required to participate in the interview.

F.    The interview shall be conducted with an Office employee at PSB or at the district/Division. Interviews of employee complainants and witnesses may be conducted through Microsoft Teams video- conferencing at the discretion of the investigator if the confidentiality and other interview requirements of Office Policy are met.  The Microsoft Team video conference shall be recorded, and the employee notified of the recording process.  Interviews with members of the public shall be conducted at a mutually agreeable location or through a mutually agreeable communication method.

G.    Any employee participating in an interview at the PSB office shall be required to secure all weapons, to include firearms and knives, prior to entering the PSB office.  This includes complainants, witnesses, investigative leads, principals, and employee observers.

H.    All employees shall cooperate with an administrative investigation, including appearing for an interview when requested by an investigator, and providing all required documents, evidence, or names of witnesses that may be relevant to the investigation.  Intentionally withholding evidence or information during an administrative investigation shall result in disciplinary action.

I.    Supervisors shall be notified when an employee under their supervision is summoned as part of an administrative investigation and shall facilitate the employee's appearance, absent extraordinary and documented circumstances.

J.    A principal shall be permitted reasonable breaks of limited duration during any interview for the purpose of telephonic or in-person consultation with others, including attorneys, who are immediately available.

K.    In an administrative investigation where the principal is involved in a use of force incident that resulted in death or serious physical injury of a person and the principal video recorded the event, the investigator shall offer the principal the opportunity to view the video recording.  Once the initial administrative interview has been conducted, the administrative investigator shall show the principal the recording.  This shall occur prior to the conclusion of the interview process.  The principal shall be given the opportunity to provide additional information to supplement his statement, and he may be asked additional questions by the investigator, as specified in Office Policy GJ-35, *Body-Worn Cameras*.

1.    Prior to viewing the video recording, the investigator shall read the principal the following statement, as specified in ARS 38-1116:

*Video evidence has limitations and may depict events differently than you recall.  The video evidence may assist your memory and may assist in explaining your state of mind at the time of the incident.  Viewing video evidence may or may not provide additional clarity to what you remember.  You should not feel in any way compelled or obligated to explain any difference in what you remember and acted on from what viewing the additional evidence provides you.*

2.    Following the review of the video recording, the principal shall be given the opportunity to

38

46REPORT000417

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                                 **Effective Date: 11-14-23**

provide the investigator information they believe is relevant to the administrative investigation.

11.   **Administrative Interview Forms:** Prior to an administrative investigation interview, and at the investigator's discretion to preserve the integrity of the investigation, employee complainants, witnesses, investigative leads, and principals shall be provided a *Notice of Investigation,* and principals shall be provided a *Garrity Warning.* A copy of each shall be provided to the employee.

    A.   The *Notice of Investigation* templates are located in the Internal Affairs\Forms folder on the Office's shared drive.

        1.   The *Notice of Investigation* clarifies the employee's status in the investigation and the employee's responsibility not to discuss the investigation with anyone other than those specified in the *Notice of Investigation.*

            a.   If the *Notice of Investigation* allows the employee to speak with their spouse or domestic partner about the investigation and the spouse or domestic partner is an employee of the Office, the following shall apply:

                (1)   The spouse or domestic partner shall adhere to all the requirement of the *Notice of Investigation* and shall not be required to sign or receive a copy of their spouse or domestic partner's *Notice of Investigation.*

                (2)   The spouse or domestic partner shall not discuss the investigation with anyone other than those specified in the *Notice of Investigation.*

            b.   An employee's spouse or domestic partner, who violates the *Notice of Investigation,* shall be subject to disciplinary action, as specified in Office Policy GC-17, *Employee Disciplinary Procedures.*

        2.   The *Notice of Investigation* issued to a principal shall include the alleged facts that are the basis of the investigation, the specific nature of the investigation, the principal's status in the investigation, all known allegations of misconduct that are the reason for the interview, and the principal's right to have an observer present at the interview. The principal shall be provided a copy of the notice of investigation that they shall retain.

            a.   When issuing the notice to the principal, the Office shall provide any relevant and readily available materials, including complaints that contain the alleged facts, except for complaints that are filed with the Office and that include allegations of unlawful discrimination, harassment, or retaliation, or complaints that involve matters under the jurisdiction of the EEOC. The format of the materials may be written, audio, or video.

            b.   The Office is not required to disclose any facts to the employee that would impede the investigation.

        3.   During an interview if, through questioning of the employee, additional employee misconduct is discovered beyond the scope of the current administrative investigation, the in-progress interview shall continue and questions concerning the new misconduct may be asked without the issuance of a separate *Notice of Investigation.*

            a.   All new allegations of employee misconduct shall be investigated, as specified in this Office Policy. Following the interview, a determination shall be made by the

39

46REPORT000418

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                               **Effective Date: 11-14-23**

PSB Commander, as specified in this Office Policy, whether a separate investigation into the newly alleged misconduct shall be conducted or whether the new allegations shall be included in the current investigation.

  b.    During an interview, should misconduct of a criminal nature be disclosed, the interview must cease, and further direction be provided by the PSB Commander.

  4.    If an employee is involved in a critical incident investigation, statements made during a tactical debrief will not be considered a violation of a NOI.

B.    The *Garrity Warning* template is located in the Internal Affairs\Forms folder on the Office's shared drive. The *Garrity Warning* advises employees that statements given during an administrative investigation are compelled statements and cannot be used to incriminate the affected employee in any criminal proceedings. *Garrity* shall only be provided to principals of an investigation.

C.    Employee Release from NOI: An employee is released from the NOI when notified by the PSB that the investigation is closed.

12.    **Employee Right to an Observer:**

A.    If an employee is party to an administrative investigation as a witness, investigative lead, or principal, they shall be notified that they may request to have an observer present during the interview, at no cost to the Office. The investigator shall have the employee complete the *Employee Observer Admonition* or the *Observer Waiver Form* prior to the interview. These forms are located in the Internal Affairs\Forms folder on the Office's shared drive.

B.    If an employee witness, investigative lead, or principal desires an observer, they shall provide the name of the prospective observer to the investigator to ensure the observer selected is not involved in the investigation as a complainant, principal, witness, or investigative lead, or is an observer for another employee involved in the same or related investigation. Personnel within the employee's chain of command shall be excluded from acting as an employee's observer. The PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer.

C.    The observer selected must be an employee of the Office, not an attorney, and must be available on reasonable notice so that the interview is not unreasonably delayed. If the selected observer is not reasonably available, the employee witness, investigative lead, or principal may request permission from their assigned investigator to use a representative from their professional membership organization.

D.    If an employee witness, investigative lead, or principal elects to have an observer, they may only have one observer at any given time.

E.    An employee who agrees to be an observer shall do so at no cost to the Office by using their own off-duty time. Accrued vacation time may be used during scheduled duty hours, provided that the absence shall not have a cost impact on the operation of the area where the observer is assigned.

F.    An observer must, in fact, act only as an observer. At no time shall the observer interrupt the investigative interview in any manner including, but not limited to, engaging in any form of verbal or non-verbal communication, making distracting noises, or hindering the flow or direction of the interview.

G.    The observer is prohibited from making any electronic recordings or transmitting any portion of the

40

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

interview in real time.  Any open or covert attempt to do so shall result in disciplinary action.

H.     Employee observers are permitted to take notes during the interview.

   1.     The notes may only be used to assist in the investigation or a disciplinary matter.  The notes do not constitute an official record of the interview.

   2.     Any notes that are taken during the interview shall be kept confidential and shall only be discussed and/or shared with those specified in the *Notice of Investigation,* the employee the observer is representing, and the employee's attorney.

   3.     If the employee, employee's observer, attorney, or anyone specified in the *Notice of Investigation* releases information without authorization, the employee, the employee's observer, and any other Office employee specified in the *Notice of Investigation* may be subject to disciplinary action up to and including, dismissal from employment.

I.     If the employee witness, investigative lead, or principal or their observer fails to comply with these guidelines, the offender may be subject to disciplinary action.  If the observer's non-compliance occurs during the interview, the observer shall be immediately removed from the interview.

J.     Once the interview has concluded, the employee witness, investigative lead, or principal is prohibited from discussing the interview or investigation with anyone other than the assigned investigator, observer, or legal counsel.  If the employee witness, investigative lead, or principal releases information without authorization, the Office may subject the employee to disciplinary action.

K.     Once the interview has been concluded, the observer is prohibited from discussing the interview or investigation with anyone other than the assigned investigator or the employee they represented.  If the observer releases information without authorization, the Office may subject the employee to disciplinary action.

L.     Employees shall not be subject to discipline, threat of retaliation, or retaliation for requesting the use of, or serving as, an observer.

M.     The right to an observer does not apply to an interview that is:

   1.     In the normal course of duty, counseling, instruction, an informal verbal admonishment, or other routine or unplanned contact with a supervisor or any other employee;

   2.     During a preliminary inquiry to determine the scope of the allegations; or

   3.     In the course of a criminal investigation.

13.     **Employee Five-Minute Statement**: At the conclusion of the interview, a principal shall be entitled to make a statement to the investigator, not to exceed five minutes, addressing specific facts or policies that are related to the interview.

14.     **Examinations and Tests:** The *Garrity Warning* shall be given to a principal, and the *Notice of Investigation* shall be given to any employee, prior to any examination or test.  Photographs, lineups, and psychological or physical examinations may be required in an administrative investigation and shall be authorized by the PSB Commander.

A.     If it appears likely that an employee shall be required to submit to examinations or tests during the course of an administrative investigation, the employee shall be advised that submission is compulsory.  The required examinations or tests shall be incident-specific and narrowly and directly related to the employee's performance or non-performance of duty, their fitness for duty, or the

41

46REPORT000420

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

alleged misconduct.

B.      With proper justification, a request for a physical or psychological examination of an employee may be approved. The employee shall cooperate with the examiner and submit to all laboratory or psychological tests. Drug testing procedures are specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*.

15.     **Administrative Leave with Pay:** The purpose of administrative leave is to manage risk and to protect employees, victims, and the integrity of an investigation. Employees may also be placed on administrative leave with pay due to a critical incident. The following procedures specify when and how an employee may be placed on administrative leave:

A.      Command personnel of the rank of lieutenant or above, or their civilian counterparts may place an employee on administrative leave with pay for the remainder of a shift for alleged infractions of the law, Maricopa County Merit System Rules, or Office Policy. The incident shall immediately be reported to the bureau commander, who shall review the facts of the incident and, if necessary, extend the administrative leave up to a maximum of three working days. The Chief Deputy or the PSB Commander or designee must authorize leave to exceed three working days. Once authorized, the employee shall be advised of the administrative leave in writing.

B.      If the allegation in the complaint would likely result in dismissal if sustained, the bureau commander may place an employee on administrative leave with pay for the remainder of a shift and shall refer the matter directly to the Chief Deputy or the PSB Commander or designee, who may place the employee on administrative leave with pay. The employee shall be advised of the administrative leave in writing.

C.      Employees involved in a critical incident may be placed on administrative leave with pay. The Chief Deputy or PSB Commander or designee, shall authorize critical incident administrative leave. Once authorized, the employee shall be advised of the administrative leave in writing. This leave typically includes the remainder of the work week during which the critical incident occurred plus an additional 40 hours during which time the PSB Administrative Investigators-Critical Incident members shall conduct their initial investigation and allow the involved employee to complete other administrative processes required following a critical incident.

16.     **Retaliation:** All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, member of the public, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action. Retaliating against any person who reports or investigates alleged misconduct shall be considered serious misconduct and shall result in disciplinary action, up to and including dismissal from employment.

17.     **Closed Case Notification:**

A.      Upon completion of the investigation, if the findings are determined to be Not Sustained, Unfounded, or Exonerated, the PSB shall send the principal a *Closed Case Notification* memorandum notifying the principal of the outcome. If the finding is Sustained, and discipline is required, the procedures shall be followed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*. A template for a *Closed Case Notification* is found in the Internal Affairs\Forms folder on the Office's shared drive.

B.      Upon completion of the investigation, the PSB shall notify the employee witnesses and investigative leads that the case is closed.

42

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

18.  **Final Disposition Letter:** A *Final Disposition Letter* shall be sent to all known complainants by the PSB upon completion of the investigation. A copy of the letter must be maintained with the investigative file. Templates for this letter may be found in the Internal Affairs\Forms folder on the Office's shared drive. The letter shall state whether the actions of the employee were appropriate under the circumstances or fell within the guidelines of policy. When the actions of an employee have been found to be in violation of policy, the complainant shall also be advised that the matter shall be addressed internally. In cases involving a complaint from a member of the public, the complainant shall be notified of the findings, and as applicable, the imposed discipline as permitted by law.

19.  **Employee Resignation/Retirements While Under Investigation:** An investigation of an employee who resigns or retires while under investigation shall be completed and findings regarding policy violations shall be made, unless it meets the criteria for a PSB Diversion as per this Policy. Depending on the status of the investigation at the time of the resignation or retirement, the employee shall be given the opportunity to participate in an interview and/or provide written information regarding the findings of the investigation before the case is finalized.

20.  **Policy, Training, Tactical or Equipment Failure or Deficiency:** A failure or deficiency occurs when the allegation is true and the action of the employee was within policy or training guidelines, but the result was inappropriate or undesirable.

     A.   If, during the course of an administrative investigation, an investigator identifies a policy deficiency, training or tactical failure, or equipment failure, the investigator shall document the deficiency or failure in their investigative report. The PSB shall notify the Division Commander of the Policy Development Section and/or Training Division of the deficiency or failure, and ensure that the policy, tactical, or equipment concerns are resolved. The Policy Development Section and/or Training Division shall notify the PSB of the actions taken. This information will be added to the investigative file.

     B.   If, during the course of an administrative investigation, an investigator identifies an employee's training deficiency, the investigator shall document the deficiency in their investigative report. The PSB Commander shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. A memorandum of concern detailing the policy, training, tactical or equipment concerns, and any proposed recommendations, shall be authored and forwarded to the appropriate Bureau Chief and Division Commander for review and action.

21.  **Confidentiality and Security of Records:** Information regarding an employee misconduct investigation shall be kept as confidential as possible while still allowing for a thorough investigation.

     A.   The PSB shall maintain a complete file of all documents within the Office's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Merit Systems Commission or a state court. All files, reports, tapes, electronic media, memoranda, and other forms of documentation relating to a completed administrative investigation shall be filed in the PSB. All investigations shall be securely maintained. All copies of documents related to a completed administrative investigation shall be destroyed upon notification that the original investigation documents have been received by the PSB.

     B.   Polygraph Services may retain original documents and polygraph recordings which are prepared or originated by that unit, but shall not retain any other investigative material, as specified in Office Policy GH-3, *Polygraph Procedures and Documents*.

22.  **Records Disclosure:** The Administrative Services Division may distribute copies of all or any portion of an administrative investigation for administrative or public record purposes, or as necessary to comply with a

43

46REPORT000422

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GH-2,** *Internal Investigations*                                                      **Effective Date: 11-14-23**

judgment of a federal or state court.

A.     In accordance with ARS Title 38, Chapter 8, Article 1, information about a law enforcement officer's investigative file shall not be released for public inspection until the investigation is complete, or the Office has discontinued the investigation.  The investigation is not considered complete until the principal receives a *Closed Case Notification*, a Coaching, a *Written Reprimand*, or a Notice of Disciplinary Action. If the investigative file is the subject of an appeal regarding a disciplinary action that resulted in a suspension, demotion, or dismissal by a classified law enforcement officer, the investigative file is not complete until the conclusion of the appeal process before the Maricopa County Merit Systems Commission, or such time to appeal has lapsed.

B.     Investigative files for all other Office employees shall be released, in accordance with state law.

C.     Polygraph data and reports regarding a classified law enforcement officer shall be disclosed, pursuant to ARS Title 38, Chapter 8, Article 1.

23.    **Records Retention:** In accordance with ARS 39-128, the Office shall retain all records that are reasonably necessary or appropriate to maintain an accurate knowledge of disciplinary action involving employees of the Office, including the employee's responses to all disciplinary actions. All administrative investigations shall be maintained for five years after an employee's separation or retirement from Office employment.

Attachment A
Complaint Acceptance Report Protected.docx

Attachment B
Authorization to Release Information Protected.docx

44

46REPORT000423

CONFIDENTIAL - ATTORNEY'S EYES ONLY



| MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | |
|---|---|
| **Subject** <br><br> **EMPLOYEE PROBATIONARY PERIODS, UNCLASSIFIED EMPLOYEES, AND RELEASES** | **Policy Number** <br> **GC-11** <br><br> **Effective Date** <br> **01-16-25** |
| **Related Information** <br> GC-17, *Employee Disciplinary Procedures* <br> GH-2, *Internal Investigations* <br> Maricopa County Employee Merit System Resolution and Rules <br> Maricopa County Law Enforcement Officers' Merit System Rules | **Supersedes** <br><br> GC-11 (11-30-23) |

**PURPOSE**

The purpose of this Office Policy is to specify the probationary periods for classified employees covered by the Maricopa County Law Enforcement Officers' Merit System Rules or the Maricopa County Employee Merit System Resolution and Rules. This policy also provides guidelines to address unclassified employees who are not covered by Maricopa County Merit System Rules and do not serve probationary periods.

**POLICY**

It is the policy of the Office to establish a standard evaluation period for classified employees during their initial probationary appointment and promotional probationary appointments, as specified in the applicable Maricopa County Law Enforcement Officers' Merit System Rules or the Maricopa County Employee Merit System Resolution and Rules, and to establish procedures for evaluating unclassified employees determined not to have met minimum performance standards.

**DEFINITIONS**

*At-Will Employee:* An employment relationship where either party to the relationship may sever the relationship for any reason other than an unlawful reason. This includes unclassified, initial probation, contract, and temporary employees.

*Blue Team:* The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IAPro Early Identification case management system.

*Classified:* Positions in Maricopa County service that are covered by the Maricopa County Employee Merit System Resolution and Rules or the Maricopa County Law Enforcement Officers' Merit System Rules. Excluded are those employees identified as temporary, initial probation, or contract employees, and those positions identified as unclassified.

*Early Intervention Unit* **(EIU)***:* The EIU is part of the Bureau of Internal Oversight. The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users. The unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct or operating procedures, and recognizes positive attributes by reviewing employee awards. The Office shall ensure there is sufficient personnel to facilitate EIS input and training.

*Employee:* A person currently employed by the Office in a classified, unclassified, contract, or temporary status.

46REPORT000424

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-11,** *Employee Probationary Periods, Unclassified Employees, and Releases*   **Effective Date: 01-16-25**

*IAPro:* A case management system used by the EIU, the Professional Standards Bureau (PSB), and the Administrative Services Division that tracks and analyzes information, including but not limited to, complaints, commendations, use of force incidents, pursuits, discipline, supervisor notes, and internal investigations. IAPro is used by PSB for the periodic assessment of timelines of investigations and for monitoring the caseloads of internal affairs investigators. IAPro is also used to track, as a separate complaint category, allegations of biased policing and unlawful investigatory stops, searches, seizures, or arrests.

*Initial Probation:* A specified period of time following the employment of a classified employee in a budgeted position during which the work performance of the employee is evaluated. A classified employee may be released from initial probation for or without cause.

*Initial Probation, Detention Only:* With the exception of Job Profile adjustments and reassignments, detention personnel must serve an initial probation period upon their most recent employment, to include hire, promotion, demotion, or transfer into any classified position. The initial probation period shall be a minimum of one year and may be extended by the Sheriff or designee for up to six additional months.

*Maricopa County Merit System Rules:* The Maricopa County Employee Merit System Resolution and Rules and the Maricopa County Law Enforcement Officers' Merit System Rules.

*Minimum Performance Standards:* The most basic level of activity and behavior necessary for an employee to fulfill their job requirements.

*Pre-Determination Hearing* (PDH)*:* A forum that allows an employee, regardless of employment status, who is being considered for suspension, demotion, dismissal, or probationary release, to address the appointing authority, or the Sheriff or designee regarding the intended action.

*Probationary Appointment, Sworn Only:* The appointment to a regular position through certification in accordance with the Law Enforcement Officers' Merit System Rules. The probationary period for the probationary appointment of an entry level deputy shall be one year and may be extended by the Sheriff, or designee, for up to six additional months. An employee may be separated at any time during the initial probationary period without the right of appeal. In any case of suspension, dismissal, or demotion during an employee's initial probationary period the Sheriff or designee may investigate the circumstances and causes for the action taken. The employee must be given written notice of the action taken by the Sheriff or designee prior to the expiration of the established probationary period or the employee will be considered to have successfully completed the probationary period

*Promotion:* The movement of an employee to a different position control number at a higher rate of pay through an announced recruitment process.

*Promotional Probation, Detention Only:* The promotional probationary period for a detention officer shall be 12 months unless extended by the Sheriff for not more than six months. A promotional probationary employee, who fails to satisfactorily complete the promotional probationary period may, without right of appeal, be reverted to a position of the class previously occupied or to another suitable position.

*Promotional Probation, Sworn Only:* The promotional probationary period for a sworn employee shall be six months unless extended by the Sheriff for up to an additional six months. A promotional probationary employee who fails to satisfactorily complete the promotional probationary period may be, without right of appeal, reverted to a position of the class previously occupied or to another suitable position. A promotional probationary employee, who is suspended or dismissed, has the right of appeal.

*Regular Status:* The status an employee achieves under the applicable Maricopa County Employee Merit System Resolution and Rules or the Maricopa County Law Enforcement Officers' Merit System Rules when retained in a position of the classified service following the successful completion of the initial probation period.

*Unclassified:* Positions in Maricopa County service that are not covered by the Maricopa County Merit System Rules. Those employees identified as unclassified are considered at-will employees.

2

46REPORT000425

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-11,** *Employee Probationary Periods, Unclassified Employees, and Releases*  **Effective Date: 01-16-25**

**PROCEDURES**

1.  **Unclassified Employees:** Employees who are unclassified do not serve probationary periods, as they are at-will employees and are not covered by the Maricopa County Merit System Rules. Unclassified employees who are suspended or dismissed from employment by the Office are entitled to a Pre-Determination Hearing (PDH) if deemed warranted following a review by the Administrative Services Division (ASD) in consultation with the Professional Standards Bureau (PSB). However, these employment actions are not appealable to the Merit Commission.

    A.    Unclassified Employee Less than One Year:

    1.    Should it be determined that an unclassified employee with less than one year of Office employment and/or less than one year in their current job profile is not meeting minimum performance standards, the supervisor shall be responsible for initiating an entry in Blue Team by selecting the Incident Type Probationary Release and selecting the Allegation PR - Unclassified Release Less Than One Year. The Blue Team entry must include the employee's performance deficiencies, all corrective action taken, interventions, and any policy violations and supporting documentation. The Blue Team entry must be initiated prior to the employee's twelfth month of unclassified service.

        a.    The Blue Team entry shall be forwarded through the chain of command to the respective bureau chief.

        b.    The employee shall not be copied on this entry.

    2.    The bureau chief shall determine if the information provided by the supervisor supports a release from employment.

        a.    If the bureau chief determines that the release from employment is not warranted, the bureau chief shall document in Blue Team why the information provided by the supervisor does not support a release and provide the next course of action. The bureau chief may request additional information from the reporting supervisor in order to make a determination if the initial information provided does not provide enough detail to support an informed decision. The Blue Team entry shall be forwarded to the Early Intervention Unit (EIU).

        b.    If the bureau chief determines that a release from employment is warranted, the bureau chief shall document their approval in Blue Team and forward the information to the EIU. The bureau chief shall advise the ASD of the approval through a carbon copy of the Blue Team entry. The EIU shall officially notify the ASD of the Blue Team entry upon receipt. The ASD shall review the information to confirm the release is justified from a human resources perspective. Once confirmed, the ASD shall consult with the PSB Commander to determine if a PDH is warranted, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, and to determine if the employee should be placed on Administrative Leave with Pay.

            (1)    If no PDH is warranted due to insufficient justification to support the release or the action of the employee does not warrant a PDH for release from employment, the ASD shall notify the employee's bureau chief that the employee will not be released from employment.

            (2)    If a PDH is warranted, the ASD shall be responsible for coordinating the process. This includes preparing detailed correspondence, scheduling the

3

46REPORT000426

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-11,** *Employee Probationary Periods, Unclassified Employees, and Releases*   **Effective Date: 01-16-25**

> PDH, and ensuring necessary notifications and actions are completed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*. This also includes providing written notification to the employee.

> c.    Once the employee is released from employment, the ASD shall upload documentation generated during the release process into IA Pro under the Probationary Release Case Number generated by IA Pro.

B.    Unclassified Employee Over One Year: An unclassified employee with over one year of employment and/or over one year in their current job profile and not meeting minimum performance standards shall be managed, as specified in Office Policies GH-2, *Internal Investigations* and GC-17, *Employee Disciplinary Procedures*.

2.    **Requirements for Classified Probationary Employees:** An employee must achieve minimum performance standards in appraised categories for the employee to successfully complete a probationary period.

A.    Probation does not end upon completion of the probationary appraisal. The probationary period ends upon completion of the last day of the probationary period, including any extension thereto.

B.    If a probationary period is to be extended, it should be initiated no later than 21 calendar days prior to the employee's probationary end date.

1.    A request for an extension shall be completed by the employee's supervisor and submitted through the chain of command to the bureau chief for approval.

2.    The employee's supervisor may notify the employee of the extension request.

3.    Once approved by the bureau chief, the bureau chief should provide the request for extension of probation to the Human Resource Services Division no later than 14 calendar days prior to the employee's current probationary period end date.

4.    The Human Resource Services Division shall provide the employee written notice of the probation extension, prior to the probation completion date or the employee shall be considered to have successfully completed the probationary period.

C.    During the initial probationary period, any employee may be released from employment with or without cause. Should it be determined that a probationary employee is not successfully completing probation, the supervisor shall be responsible for initiating an entry in Blue Team by selecting the Incident Type Probationary Release and selecting the Allegation PR - Probation Release.

1.    The Blue Team entry must include the probationary employee's performance deficiencies, corrective action taken, interventions, and any policy violations and supporting documentation.

2.    The Blue Team entry must be initiated no later than 30 calendar days prior to the employee's probationary end date.

3.    The Blue Team entry shall be forwarded through the chain of command to the respective bureau chief.

4.    The employee shall not be carbon copied on this entry.

4

46REPORT000427

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-11,** *Employee Probationary Periods, Unclassified Employees, and Releases*  **Effective Date: 01-16-25**

    D.    The bureau chief shall determine if the information provided by the supervisor supports a release from employment.

        1.    If the bureau chief determines that the release from employment is not warranted, the bureau chief shall document in Blue Team, why the information provided by the supervisor does not support a release from probation and provide the next course of action. The bureau chief may request additional information from the reporting supervisor in order to make a determination if the initial information provided does not provide enough detail to support an informed decision. The Blue Team entry shall be forwarded to the EIU.

        2.    If the bureau chief determines that a release from employment is warranted, the bureau chief shall document their approval in Blue Team and forward the information to the EIU. The EIU shall notify the ASD of the Blue Team entry. The ASD shall review the information to confirm the release is justified from a human resources perspective. Once confirmed, the ASD shall consult with the PSB Commander, to determine if a PDH is warranted, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, and to determine if the employee should be placed on Administrative Leave with Pay.

            a.    If after consulting with the PSB Commander, it is determined a release is not warranted due to insufficient justification to support the release or the action of the employee does not warrant a PDH for release from employment, the ASD shall notify the employee's bureau chief that the employee will not be released from probation.

            b.    If a PDH is warranted, the ASD shall be responsible for coordinating the process. This includes preparing detailed correspondence, scheduling the PDH, and ensuring necessary notifications and actions are completed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*. This also includes providing written notification to the employee, prior to the end of the probationary period.

            c.    Once the employee is released from employment for unsuccessful completion of probation, the ASD shall upload documentation generated during the probationary release process into IA Pro under the Probationary Release Case Number generated by IA Pro.

3.    **Job Change to Deputy Sheriff:** A regular-status employee occupying a detention officer position at the rank of sergeant or above, who accepts a job change to a deputy sheriff trainee or deputy sheriff position, shall serve a one year initial probationary period. This probationary period may be extended for up to an additional six months to ensure that the employee meets the required standards of employment.

        1.    An employee, who accepts a job change to a deputy sheriff trainee position and fails to satisfactorily complete the prescribed Arizona Peace Officer Standards and Training (AZPOST) Board academy; or the initial probationary period of deputy sheriff may, at the Office's discretion, revert only to an available position within a Job Profile for which the employee qualifies. Exception being employees who occupied a ranked detention officer position shall revert only to an available position in the Detention Officer Job Profile.

        2.    Subject to available positions, the Office may attempt to place the employee in a position which may initiate a new initial probationary period of one year, depending on classification.

4.    **Deputy Trainee Probation:** Upon successful completion of the prescribed AZPOST academy training, a deputy trainee shall be promoted to deputy sheriff and commence the initial probationary period prescribed for that classification under the Maricopa County Law Enforcement Officers' Merit System Rules. No other

46REPORT000428

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-11,** *Employee Probationary Periods, Unclassified Employees, and Releases*   **Effective Date: 01-16-25**

exceptions to probationary periods may be made without written approval from the Maricopa County Human Resources Director.

5.      **Initial-Probationary Employee:** An initial-probationary classified employee may be suspended, demoted, or dismissed at any time without the right of appeal.

6.      **Voluntary Demotion:** If a classified employee covered by the Maricopa County Law Enforcement Officers' Merit System Rules or the Maricopa County Employee Merit System Resolution and Rules requests in writing they be assigned to a position of a lower class, the Office may make such a demotion. In such cases, the demotion will be deemed to have been made on a voluntary basis and there shall be no right of appeal. A copy of the employee's written request shall be filed in the employee's Personnel File.

6

46REPORT000429



| | MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | |
|---|---|---|
| **Subject** **EMPLOYEE DISCIPLINARY PROCEDURES** | **Policy Number** **GC-17** | |
| | **Effective Date** **11-22-24** | |

| **Related Information** | **Supersedes** |
|---|---|
| Arizona Administrative Code R13-4-109 ARS Title 38 Chapter 8 Article 1 ARS 39-128 ARS Title 39 Maricopa County Employee Merit System Resolutions and Rules Maricopa County Law Enforcement Officers' Merit System Rules CP-1, *Use of Force* CP-2, *Code of Conduct* CP-5, *Truthfulness* EA-18, *Law Enforcement Extra Duty and Off-Duty Employment* GC-1, *Leaves and Absences* GC-11, *Employee Probationary Periods and Unclassified Employees* GC-16, *Employee Grievance Procedures* GD-10, *Off-Duty Incidents* GE-4, *Use, Assignment, and Operation of Vehicles* GH-2, *Internal Investigations* GH-5, *Early Identification System* | GC-17 (02-22-24) |

**PURPOSE**

The purpose of this Office Policy is to establish guidelines and procedures for administrating discipline, maintaining disciplinary records, and processing disciplinary appeals for employees.

Although this Office Policy refers to employees throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and posse members.

**POLICY**

It is the policy of the Office to ensure that employees are conducting themselves according to the law, Office Policy, the Maricopa County Employee Merit System Resolution and Rules, the Maricopa County Law Enforcement Officers' Merit System Rules, and applicable County Policy. In the event that an employee is not in compliance, the Office shall address the issue and impose fair and equitable discipline as necessary.

Office employees are required to report violations of policy; supervisors are accountable for identifying and responding to policy or procedure violations by personnel under their command; and employees are accountable for policy and procedure violations. The Office shall apply policies uniformly.

**DEFINITIONS**

*Aggravating Factor:* Any fact or circumstance that increases the severity or culpability of an act (i.e., recidivism, harm to the victim, or lack of remorse).

*Appointing Authority:* For the purpose of this Office Policy, the designated member of Office command staff, appointed by the Sheriff, whose duties include: being responsible for the conducting of the Pre-Determination Hearing; and providing the employee with an opportunity to be heard.

46REPORT000430

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

***Blue Team:*** The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IAPro Early Identification case management system.

***Classified:*** All positions in Maricopa County service that are covered by the Maricopa County Employee Merit System Resolution and Rules or the Maricopa County Law Enforcement Officers' Merit System Rules. Excluded are those employees identified as temporary, initial probation, or contract employees, and those positions identified as unclassified.

***Class Remedial Matter:*** Misconduct by employees of the Office involving those matters covered by the Melendres case or the remedies to which those impacted by the Melendres case are entitled.

***Coaching:*** Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

For the purpose of determining the number of offenses committed within identified categories of the Attachment A, the first use of Coaching shall not constitute an offense. However, the use of Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation. Coaching shall be documented in Blue Team and shall be considered for the purpose of discipline for one year prior to the current offense.

***Disciplinary Offer:*** A situation where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, that establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrices, resulting in a sustained finding. A Disciplinary Offer should be considered an Expedited Resolution.

***Early Identification System*** **(EIS)***:* A system of electronic databases that captures and stores threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified. Blue Team, IAPro, and EIPro are applications of the EIS.

***Employee:*** A person currently employed by the Office in a classified, unclassified, contract, or temporary status.

***Exempt Employees:*** Employees who meets the definition of an executive, administrative, or professional employee as defined in the Fair Labor Standards Act (FLSA). Employees who are designated as exempt are not eligible for overtime pay.

***Expedited Resolution:*** A truncated investigative process that may be used in the event of a Disciplinary Offer resulting in a sustained finding, or in the event that documentary or video evidence presents clear and convincing evidence establishing that the alleged violation of Office Policy did not occur and there is no evidence or indication of any other potential employee misconduct involved in the incident (resulting in an Unfounded finding).

***Initial Probation:*** A specified period of time following the employment of a classified employee in a budgeted position during which the work performance of the employee is evaluated. A classified employee may be released from initial probation for or without cause.

2

46REPORT000431

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

1. ***Initial Probation, Detention Only:*** With the exception of Job Profile adjustments and reassignments, detention personnel must serve an initial probation period upon their most recent employment, to include hire, promotion, demotion, or transfer into any classified position. The initial probation period shall be a minimum of one year and may be extended by the Sheriff or designee for up to six additional months.

2. ***Probationary Appointment, Sworn Only:*** The appointment to a regular position through certification in accordance with the Law Enforcement Officers' Merit System Rules. The probationary period for the probationary appointment of an entry level employee shall be one year and may be extended by the Sheriff or designee for up to six additional months.

3. An employee may be separated at any time during the initial probationary period without the right of appeal. In any case of suspension, dismissal, or demotion during an employee's initial probationary period the Sheriff or designee may investigate the circumstances and causes for the action taken. The employee must be given written notice of the action taken by the Sheriff or designee prior to the expiration of the established probationary period or the employee will be considered to have successfully completed the probationary period.

***Internal Affairs Investigator:*** Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the Professional Standards Bureau (PSB) or supervisors in an Office division or bureau who are assigned to investigate misconduct.

***Intervention:*** An approved specified action taken by a supervisor to improve a situation or prevent a potential negative work performance situation from developing into misconduct.

***Investigative File:*** The Office's complete investigative report and any attachments detailing the incidents being investigated. The file shall contain, but is not limited to, the *Administrative Investigations Process Checklist, Cover Sheet, Findings Page(s), Prior Work History Report*, Investigative Plan, Investigative Report, the *Presumptive Range of Discipline* form, the *Employee Disciplinary Considerations and Decision* form, transcripts, audio/video of interviews, body camera footage, the *Inmate Grievance Form* if applicable, etc. Depending on the outcome of the investigation, the file may also contain, but is not limited to, a *Final Disposition Letter*, *Closed Case Notification*, and documents that record discipline, to include the Pre-Determination Hearing (PDH) recording. The Professional Standards Bureau shall maintain the investigative file of all documents within the Office's custody and control relating to any investigation and related disciplinary proceedings, grievance proceedings, and appeals to the Maricopa County Merit System Commission or state court.

***Law Enforcement Officer:*** An employee of the Office, other than an initial probation employee, who is a deputy sheriff or a detention officer.

***Minor Discipline:*** Discipline less severe than a suspension, such as a written reprimand.

***Misconduct:*** Includes any violation of Office Policy or Procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

***Criminal Misconduct:*** Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

***Minor Misconduct:*** Misconduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

3

46REPORT000432

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

Minor misconduct, while a violation of Office Policy, can often be addressed with supervisor-initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include; Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention, shall only be used to address employee minor misconduct or behavior that does not, per the Office Disciplinary Matrix, exceed a Category 1, First or Second Offense or a Category 2, First Offense, and which has not been received by the Office as an External Complaint, or has not already been assigned to the Professional Standards Bureau (PSB).

**Serious Misconduct:** Misconduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

**Mitigating Factor:** Any information or evidence presented regarding the employee or the circumstances of the incident that might result in reduced discipline.

**Non-Exempt Employee:** An employee who is covered by the provisions of the Fair Labor Standards Act and must be compensated for overtime hours worked.

**Official Investigation:** An official examination by a supervisor, an internal affairs investigator or a criminal investigator into alleged employee misconduct that relates to or may affect an employee's position with the Office. The Office has two types of investigations that are used to examine these allegations:

1.    Administrative Investigation: An investigation conducted into apparent violations of Office Policy. Sustained allegations for an administrative investigation provide the basis for the imposition of discipline according to the Discipline Matrices provided in Attachment A and the Categories of Offenses provided in Attachment B.

2.    Criminal Investigation: An investigation by a criminal investigator into an allegation of employee criminal misconduct. These include the process of collecting information (or evidence) about a crime in order to: 1) determine if a crime has been committed; 2) identify the perpetrator; 3) apprehend the perpetrator; and 4) provide evidence to support a conviction in court.

The following does not constitute an official investigation or investigative interview: (a) in the normal course of duty, counseling or instruction, or an informal verbal admonishment by, or other routine or unplanned contact with a supervisor or other law enforcement officer; or (b) preliminary questioning to determine the scope of the allegations or if an investigation is necessary. However, such counseling, instructions, verbal admonishments, other contacts, and preliminary questioning are covered by and subject to the truthfulness standards found in Office Policy CP-5, *Truthfulness*.

**Off-Duty:** A time considered when an employee is **not** being compensated by the County.

**On-Duty:** A time considered when an employee is being compensated by the County.

**Pre-Determination Hearing (PDH):** A forum that allows an employee, regardless of employment status, who is being considered for suspension, demotion, dismissal, or probationary release, to address the appointing authority, or the Sheriff or designee regarding the intended action.

**Preponderance of the Evidence:** Facts alleged are more likely true than not true. Preponderance of the evidence is only utilized when determining an investigatory finding of Sustained.

**PSB Diversion:** A complaint intake process to address, on a case-by-case basis, eligible complaints without the

4

46REPORT000433

**Policy GC-17,** *Employee Disciplinary Procedures*                      **Effective Date: 11-22-24**

initiation of a formal administrative investigation or service complaint. Complaints received by the PSB shall be reviewed to make an initial determination of the most appropriate course of action to take based on the nature of the allegation. The Diversion process can culminate in one of the following: PSB-Directed Supervisory Intervention; Administrative Closure; or Expedited Resolution with a finding of Unfounded.

*PSB-Directed Supervisory Intervention:* A PSB Diversion intended to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation. PSB may, on a case-by-case basis, initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in the Attachment B of this Office Policy for any External Complaints.

*Promotional Probation* **(Sworn Only)***:* The promotional probationary period for a sworn employee shall be twelve months unless extended by the Sheriff for up to an additional six months. A promotional probationary employee, who fails to satisfactorily complete the promotional probationary period may be, without right of appeal, reverted to a position of the class previously occupied or to another suitable position. A promotional probationary employee, who is suspended or dismissed, has the right of appeal.

*Regular Status:* The status an employee achieves under the applicable Maricopa County Employee Merit System Resolution or Rules or the Maricopa County Law Enforcement Officers' Merit System Rules when retained in a position of the classified service following the successful completion of the initial probation period.

*Serious Discipline:* Discipline which results in an employee receiving a suspension, demotion, or dismissal from employment. All sustained violations of a Category 7 Offense, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, shall result in dismissal from employment.

*Unclassified Employee, Civilian Only:* An at-will employee not covered by the Maricopa County Employee Merit System Resolution and Rules or the Maricopa County Law Enforcement Officers' Merit System Rules.

*Volunteer:* A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

**PROCEDURES**

1. **Individual Responsibility:** Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary action, up to and including dismissal from employment. The presumptive discipline for a failure to report such allegations shall be commensurate with the presumptive discipline for the underlying misconduct or may be one offense less than received by the employee who committed the act. All employees who commit misconduct shall be held accountable, as specified in this Office Policy.

2. **Conflicts of Interest:** Conflict of interest, nepotism, or bias of any kind in the administration of discipline is prohibited.

   A. No employee who has an external business relationship or close personal relationship with a principal may make any disciplinary decisions or recommendations with respect to the misconduct, including the determination of any appeal arising from any discipline.

   B. No employee shall be involved in making any disciplinary decisions or recommendations with respect to any persons who are superior in rank and in their chain of command.

5

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Policy GC-17, *Employee Disciplinary Procedures*                    Effective Date: 11-22-24

C.    If the appointing authority who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting their involvement should immediately inform the Professional Standards Bureau (PSB) Commander, or if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority. The outside authority for disciplinary matters will be the Maricopa County Attorney's Office – Civil Division.

3.    **Supervisor Initiated Intervention:** An approved action, as specified in Office Policy GH-5, *Early Identification System*, taken by a supervisor to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation. Supervisors may also initiate this action when an employee's conduct has minimal negative impact on the overall operations of the Office. Examples of employee work performance situations in which a supervisor may consider approved interventions include those categorized as a Category 1 or Category 2 of the Attachment B, of this Office Policy. Employee conduct outside of the limitations of this section shall be addressed, as specified in Office Policy GH-2, *Internal Investigations*. Supervisors are encouraged to contact the PSB if unsure whether the employee work performance situation may be addressed through a supervisor initiated intervention or reported to the PSB for action.

A.    Prior to determining intervention regarding work performance situations, the supervisor shall:

1.    Confirm the employee's conduct does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, as specified in this Office Policy, and which has not been received by the Office as an External Complaint, or has not already been assigned to the PSB;

2.    Review the employee's EIPro Dashboard to assist the supervisor in their intervention or corrective action decision; and

3.    Ensure that when considering a Coaching for the intervention, that the employee will not exceed the number of Coachings allowed, as specified in this Office Policy for one year prior to the current Offense.

B.    All supervisor initiated intervention action taken shall be documented in Blue Team, as specified in Office Policy GH-5, *Early Identification System*. The entry shall include justification for the intervention and the specific policy or policies involved in the performance issue linked to the employee.

4.    **Progressive Discipline:** In order to protect the integrity and reputation of the Office, discipline shall be imposed pursuant to the appropriate disciplinary matrices in the Attachment A, as a corrective or punitive measure in response to an employee's misconduct in violation of Office Policy. The minimum level of discipline imposed shall be a Written Reprimand. Acts of misconduct or repeated deficient job performance may warrant the use of progressive discipline. However, grave acts of misconduct may warrant serious discipline of an employee without minor discipline being used. Accordingly, minor discipline should generally be imposed first, unless the misconduct is of a more grievous nature. Conversely repeat violations, or multiple violations arising from one incident, should generally result in progressively more serious discipline. The PSB Commander and the appointing authority shall determine if minor or serious discipline are warranted upon review of the investigative report, the discipline matrices, and the Categories of Offenses. Progressive discipline does not apply to initial probationary or temporary employees.

A.    The Office will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline.

B.    The Office will consider whether non-disciplinary corrective action is also appropriate in a case

6

46REPORT000435

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

where discipline has been imposed.

5.    **Preliminary Determinations of Discipline:**

    A.    Internal affairs investigators shall not recommend discipline. The administrative investigation sustaining a policy violation shall be forwarded to the PSB Commander to initiate the disciplinary process.

    B.    The PSB Commander shall make preliminary determinations of the range the discipline to be imposed in all cases and shall document those determinations in writing on the *Presumptive Range of Discipline* form specific to the investigation under review, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.

    C.    Once the PSB Commander determines the range of discipline to be imposed, the Administrative Services Division shall be responsible for coordinating the discipline process with the appointing authority. This includes preparing detailed correspondence, scheduling the PDH (if applicable), and ensuring all necessary notifications and actions are completed.

        1.    If the PSB Commander makes a preliminary determination that minor discipline should be imposed, and the appointing authority has concurred, a Written Reprimand shall be prepared by the Administrative Services Division, as specified in this Office Policy.

        2.    If the PSB Commander makes a preliminary determination that serious discipline should be imposed, the appointing authority will provide an opportunity for a PDH and will provide the employee with an opportunity to be heard, as specified in this Office Policy.

        3.    When the determination indicates policy, training, tactical or equipment concerns, the PSB Commander shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. A memorandum of concern detailing the policy, training, tactical, or equipment concerns, and any proposed recommendations, shall be authored and forwarded to the appropriate bureau chief and division commander for review and action.

6.    **Discipline Matrices:** One of the primary goals of this Office Policy is to make discipline uniform and equitable throughout the Office. It is essential to consider the offense, as well as mitigating and aggravating circumstances, when determining the level of discipline to be imposed. The Discipline Matrices (see Attachment A) represent penalties to be imposed for various Categories of Offenses. The Matrices establish a presumptive range of discipline dependent on the number of offenses and the duration of time between offenses. The Discipline Matrices also take into consideration the requirement that discipline for unclassified supervisory level or exempt, regular status employees must be issued pursuant to the Fair Labor Standards Act (FLSA) and that unclassified supervisory level or exempt, regular status employees typically hold a management position and, therefore, are held to a higher standard. The employee's age, nationality/national origin, immigration status, religious beliefs/religion, race, color, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical or mental disability, ethnic background, or socioeconomic status is a prohibited consideration when determining discipline.

    A.    The Office shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.

    B.    The PSB Commander and the appointing authority reserve the right to deviate from the Discipline Matrices when the prescribed penalty fails to address the totality of the circumstances of the event.

7

46REPORT000436

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

This deviation could result from a combination of mitigating or aggravating factors associated with a misconduct event, or possibly following the review of an outside agency's investigative report. Any departure from the presumptive range of discipline set out in the Discipline Matrices shall be justified in writing by PSB Commander or the appointing authority and placed in the employee's Personnel File and investigative file.

C.    The appointing authority shall administer discipline in matters involving serious discipline. The following shall be considered by the PSB Commander and the appointing authority when determining the appropriate penalty within the minimum and maximum recommended range of the Discipline Matrices:

1.    The Office shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.

2.    When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the Category of the Offense. Exoneration on the most serious offense does not preclude discipline or consideration of aggravating circumstances as to less serious offenses stemming from the same misconduct.

3.    Mitigating and aggravating factors shall be considered when determining the appropriate discipline but shall not be utilized to absolve an employee of liability for the conduct.

   a.    Examples of mitigating factors that may be considered include, but are not limited to:

      (1)    Employee's work or service record;

      (2)    Employee's attitude towards the offense (accepts responsibility and does not shift to another);

      (3)    Employee notified the Office of the wrongdoing;

      (4)    Employee expressed remorse;

      (5)    Conduct occurred due to provocation by another employee;

      (6)    Conduct occurred due to an order by a supervisor; and/or

      (7)    Conduct was a mistake or misunderstanding of facts.

   b.    Examples of aggravating factors that may be considered include, but are not limited to:

      (1)    Employee's work or service record;

      (2)    Employee's attitude and actions during the investigation;

      (3)    Employee's prior disciplinary record (as allowed for in this Office Policy);

         Employee was previously warned or disciplined for engaging in similar misconduct;

8

46REPORT000437

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                  **Effective Date: 11-22-24**

(4)     Employee was dishonest (violation of Office Policy CP-5, *Truthfulness,* which shall be considered a separate Office Policy violation) during the investigation process;

(5)     Employee did not express remorse;

(6)     Employee failed to fully acknowledge the wrongful conduct, shifted blame;

(7)     Employee did not fully cooperate (violation of Office Policies CP-2, *Code of Conduct* and GH-2*, Internal Investigations*, which shall be considered separate Office Policy violations) in the investigative process;

(8)     Employee holds a rank or position of authority within the Office;

(9)     Employee was intoxicated;

(10)    Employee's contacts with the public, and prominence of the position;

(11)    Conduct was intentional, planned and premeditated;

(12)    Conduct occurred or was repeated over a significant length of time;

(13)    Conduct was deliberate, willful or reckless;

(14)    Conduct had a possibility to harm self, other employees, the Office, or the community;

(15)    Conduct harmed the profession of law enforcement;

(16)    Conduct caused a high level of torment or anguish to the victim;

(17)    Conduct involved the use of official authority to facilitate the misconduct;

(18)    Conduct resulted in financial benefit or self-gain to the employee;

(19)    Conduct involving inappropriate use of force (violation of Office Policy CP-1, *Use of Force*, which shall be considered a separate Office Policy violation) in the investigative process;

(20)    Conduct was based on a personal motive;

(21)    Conduct was criminal; and/or

(22)    Conduct was repetitive violations of the same nature.

4.    The number of times an employee has received prior discipline shall be considered when determining where an employee shall be placed within the Categories and Offenses of the Matrices.

a.    Discipline involving a sustained Office Policy violation of a Category 1-3 offense shall be considered for three years prior to the current offense.

9

46REPORT000438

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*          **Effective Date: 11-22-24**

b. Discipline involving a sustained Office Policy violation of a Category 4-7 offense shall be considered for five years prior to the current offense.

c. As an example: If a non-exempt employee has a sustained Category 2 and a separate sustained Category 5 (within three years prior to the current offense) and the current case involves a Category 2 offense, the conduct would be placed within the "Third Offense, Category 2" having a range of an 8-hour to 24-hour suspension.

d. All sustained violations of a Category 7 offense shall result in dismissal from employment.

5. The Office is prohibited from considering the high (or low) profile nature of the incident, including media coverage or other public attention when determining appropriate discipline. The Office shall consider the nature of the allegations and any impact that tends to disrupt, diminish, or otherwise jeopardize public trust in the law enforcement profession.

7. **Office Vehicle Accidents:** Office vehicle accidents shall be addressed, as specified in Office Policy GE-4, *Use, Assignment, and Operation of Vehicles.*

8. **Minor Discipline:** Minor discipline may be imposed to correct an employee's performance or conduct. Minor discipline shall be based on the misconduct and issued following an administrative investigation determination, or when the employee is eligible for a disciplinary offer, as specified in Office Policy GH-2, *Internal Investigations*. A disciplinary offer should be considered an expedited resolution and is one of the PSB's diversion processes. A *Written Reprimand* is the only form of a minor discipline penalty for employee minor misconduct.

A. *Written Reprimand*: A *Written Reprimand* is a written directive to an employee advising the employee of performance deficiencies. The reprimand shall include corrective action to be taken by the employee.

1. Written Reprimand Issued as a Result of Administrative Investigation: Upon the PSB Commander's preliminary determination of discipline for an administrative investigation and the appointing authority's concurrence, a *Written Reprimand* shall be prepared by the Administrative Services Division (ASD) Conduct Resolution Section (CRS). The *Written Reprimand* shall include the following:

a. An accurate and concise description of the conduct involved;

b. A complete list of each sustained Office Policy, applicable County Policy, and/or Maricopa County Merit System Resolutions and Rules or Maricopa County Law Enforcement Officers' Merit System Rules, stating the policies or rules that were violated, and quoting the relevant section/s verbatim;

c. The Investigative Action (IA) case number;

d. Corrective action to be taken by the employee;

e. A directive forbidding recurrence of the unacceptable conduct and a notice that future similar conduct will result in further disciplinary action; and

f. The appointing authority's signature.

2. Written Reprimand Issued as a Result of a Disciplinary Offer: The *Written Reprimand* may

10

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

be issued as a result of a disciplinary offer when there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal involved accepted responsibility for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrices.

    a.    The ability of the PSB Commander to offer a principal a penalty in form of minor discipline shall be limited to incidents where the penalty is minor discipline.

    b.    If determined to be eligible, the PSB Commander shall coordinate with the ASD CRS to prepare and extend the written disciplinary offer to the principal.

    c.    The principal has seven calendar days from the notification date to make their decision and respond back through e-mail communication to the CRS. If the principal declines the mitigated discipline offer, the complaint shall then be investigated through the formal administrative investigation process.

    d.    If the principal accepts responsibility for the policy violation(s), the CRS shall prepare/process the minor disciplinary penalty *Written Reprimand* in accordance with the same administrative procedures for minor discipline following a formal administrative investigation to include the PSB Diversion tracking number.

    e.    If the principal declines to accept the disciplinary offer or fails to return the disciplinary offer to the CRS by the deadline provided, the CRS shall forward the response or lack of response to the PSB Commander for the initiation of a formal administrative investigation.

    f.    Further procedures regarding PSB Diversion processes are specified in Office Policy GH-2, *Internal Investigations*.

3.    Once completed with all requisite signatures, the *Written Reprimand* will be forwarded to a supervisor who shall review and discuss the *Written Reprimand* with the employee and instruct the employee to acknowledge receipt by signing and dating the reprimand. If the employee refuses to sign the form, the supervisor shall document that on the form by writing refused to sign in the employee's signature block, with the supervisor's name and the date.

    a.    A copy of the *Written Reprimand* shall be given to the employee and a second copy shall be placed in the employees' Division File. The original reprimand shall be sent to the ASD who will be responsible for: placing a copy in the administrative investigation or PSB diversion, scanning a copy into the EIS, and forwarding the original to the Human Resource Services Division for placement into the employee's Personnel File.

    b.    Information regarding the *Written Reprimand* shall be included in the employee's next Employee Performance Appraisal (EPA).

B.    In the event information/evidence related to this complaint is later discovered which could require the matter to be investigated further by the PSB, the minor discipline offer or issuance may be rescinded by the PSB Commander. A rescission of discipline shall meet the requirements as specified in this Office Policy.

11

46REPORT000440

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                                    **Effective Date: 11-22-24**

C.      As specified in Office Policy GC-16, *Employee Grievance Procedures*, a *Written Reprimand* is not a grievable matter. If the employee disagrees with the content of the *Written Reprimand*, he may submit a written response to the Administrative Services Division within five business days. The Administrative Services Division shall ensure that the employee's written response is attached to the *Written Reprimand* and processed, as specified in this Office Policy. The employee's *Written Reprimand* and associated attached written response shall become part of the file and be available for supervisory review in any future event. No further action will occur with the *Written Reprimand* or written response.

9.    **Serious Discipline of a Regular Status Employee:**

A.      Serious discipline, as defined as a suspension, demotion, or dismissal, may be imposed upon a sustained misconduct allegation, following a determination by the PSB Commander that serious discipline should be imposed, and the concurrence by the appointing authority.

B.      A regular status law enforcement officer shall not be subject to serious discipline except for just cause. Each of the following prongs shall be met prior to issuing such discipline to a regular status law enforcement officer:

1.    The employee was informed that disciplinary action could potentially result for such conduct, through the law, the Maricopa County Law Enforcement Merit Rules, applicable County Policy, Office Policy, command directives, The *Briefing Board*, other communications to the employee, or the employee should reasonably have known that disciplinary action could occur for such conduct;

2.    The disciplinary action is reasonably related to the standards of conduct for a professional law enforcement officer, the mission of the Office, the orderly, efficient or safe operation of the Office, or the law enforcement officer's fitness for duty;

3.    The discipline is supported by a preponderance of evidence that the conduct occurred; and

4.    The discipline is not excessive and is reasonably related to the seriousness of the offense and the law enforcement officer's service record.

C.      Employees who are being considered for serious discipline and will be conducting business with the Administrative Services Division will be required to secure all weapons in a locker, to include firearms and knives, prior to entering the Division. This includes the employee and the employee's assistant.

D.      Pre-Determination Hearing (PDH): A regular status employee shall be offered a full opportunity to a PDH prior to imposing serious discipline.

1.    PDH Notice: Employees who are being considered for serious discipline shall be notified in writing by the appointing authority. Once the notice is signed by the appointing authority a copy shall be placed in the investigative file. The notification shall include the following information:

a.    The proposed disciplinary action and, if suspension is being considered, the length of suspension being considered shall be included;

b.    The applicable Maricopa County Employee Merit System Resolution and Rules or Maricopa County Law Enforcement Officers' Merit System Rules, and other policies that the employee is alleged to have violated;

12

46REPORT000441

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*        **Effective Date: 11-22-24**

c.     Sufficient details describing the specific reasons that are being considered for the disciplinary action and the application of the Discipline Matrices;

d.     The employee's relevant disciplinary history as specified in this Office Policy;

e.     The employee's opportunity to review the investigation file;

f.     The employee's opportunity to present mitigating information; and

g.     The date and time of the PDH. The date and time for the PDH shall allow a minimum of three business days for the employee to prepare for the hearing.

2.     Summary of Discipline Issued: Upon request, employees shall be provided a basic summary, prior to the PDH, of discipline issued for similar-type misconduct, pursuant to the guidelines provided in ARS Title 38 Chapter 8 Article 1.

3.     Employee Review of the Investigative File: The employee may review the investigative file prior to the PDH. The employee shall be granted, upon request, a reasonable amount of on-duty time to review the investigative file. The review shall not exceed eight hours and cannot require the use of overtime compensation. Supervisors are encouraged to make any necessary adjustment to the employee's schedule to avoid overtime compensation. The employee review of the investigative file process shall further include the following requirements as applicable:

a.     The employee may bring an assistant to aid with the review of the investigative file provided the following provisions are met:

(1)     The employee shall provide the assistant's name to the Administrative Services Division at least 24 hours prior to the review.

(2)     The assistant may not be an attorney or an Office supervisor, which includes anyone holding the rank of sergeant or above, or the civilian equivalent.

(3)     The assistant shall not be in any way involved in the investigation or a related investigation.

(4)     The assistant shall not be a former employee who was terminated for cause or resigned from the Office in lieu of termination.

b.     The assistant shall be required to sign the Admonishment Regarding Review of Pending Investigation. Employees found to be in violation of the admonishment may be subject to disciplinary action, up to and including dismissal from employment.

c.     The use of an assistant does not grant the employee or the assistant permission to discuss the investigation with other members of the Office.

d.     If the assistant is an Office employee, the assistant shall obtain permission from their immediate supervisor to be absent from their duties and shall do so at no cost to the Office by using their own off-duty time. Accrued vacation time may be used during scheduled duty hours, provided that the absence shall not have a cost impact on the operations of the area where the assistant is assigned.

13

46REPORT000442

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

e.   Neither the employee nor their assistant may copy any portion of the investigative file during this review; however, both may take notes when reviewing the file.

4.   PDH: The hearing shall be conducted with the appointing authority. The employee shall be compensated for the PDH, and the supervisor shall adjust the employee's schedule to avoid overtime compensation. The PDH process shall further include the following requirements as applicable:

a.   The employee may bring an assistant to aid with the PDH provided the following provisions are met:

(1)   The employee shall provide the assistant's name to the Administrative Services Division at least 24 hours prior to the PDH.

(2)   The assistant may not be an attorney or an Office supervisor, which includes anyone holding the rank of sergeant or above or the civilian equivalent.

(3)   The assistant shall not be in any way involved in the investigation or a related investigation.

(4)   The assistant shall not be a former employee who was terminated for cause or resigned from the Office in lieu of termination.

b.   The use of an assistant does not grant the employee or the assistant permission to discuss the PDH with other members of the Office.

c.   If the assistant is an Office employee, the assistant shall obtain permission from their immediate supervisor to be absent from their duties and shall do so at no cost to the Office by using their own off-duty time.

d.   Accrued vacation time may be used during scheduled duty hours, provided that the absence shall not have a cost impact on the operations of the area where the assistant is assigned.

e.   PDH's will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file. Upon request, the employee shall be provided a copy of the recording within 30 calendar days of the request.

f.   The employee's right to a PDH may be satisfied by the employee submitting a written response to the PDH Notice. If the employee does not appear at the PDH or submit a written response to the PDH Notice by the date of the PDH, the employee shall be deemed to have waived their right to a hearing.

g.   If an employee provides new or additional evidence at a PDH, the hearing will be suspended, and the matter will be returned to the PSB Commander for consideration or further investigation, as necessary.

(1)   If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the PDH.

(2)   The PSB shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during

14

46REPORT000443

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                           **Effective Date: 11-22-24**

the initial misconduct investigation.

    h.    Upon consideration of all facts, the appointing authority may:

        (1)    Impose a suspension, demotion, or dismissal and issue a Notice of Disciplinary Action to the employee;

        (2)    Further the investigation based on information provided during the PDH. If the employee disputes the fact found in the investigation, the internal affairs investigator shall be permitted to respond to the disputed facts or conduct additional investigation; and/or

        (3)    Take other appropriate action.

    i.    The appointing authority shall document how the conclusion was reached for the issued discipline. This documentation shall be appended to the investigation file and placed in the employee's Personnel File.

        (1)    If the appointing authority conducting the PDH does not uphold the preliminary findings recommended by the PSB Commander in any respect or does not impose the PSB Commander's recommended discipline and/or non-disciplinary corrective action, the appointing authority shall also document in a written narrative their justification for doing so. This justification will be specific to the circumstances of the case and of sufficient detail to provide adequate understanding of the action taken or not taken, for an independent reviewer, and be appended to the investigation file.

        (2)    The appointing authority shall document in a written narrative all deviation from the disciplinary matrices and shall only do so for reasons described in this Office Policy. This justification will be specific to the circumstances of the case and be appended to the investigation file. The appointing authority may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrices:

            (a)    Their personal opinion about the employee's reputation; and

            (b)    Whether others were jointly responsible for the misconduct, except that the appointing authority may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

E.    Notice of Disciplinary Action: When serious discipline is imposed, a regular status employee shall be notified in writing by the appointing authority.

    1.    A copy of the PDH Notice and Notice of Disciplinary Action, as well as documentation of the PDH hearing and subsequent actions taken by the appointing authority, shall be made part of the investigative file.

    2.    Copies of the PDH Notice and Notice of Disciplinary Action shall be placed in the employee's Personnel File. However, no information about the investigation of a law enforcement officer shall be placed in the Personnel File until the investigation and any subsequent disciplinary appeals to the Maricopa County Merit Systems Commission are complete, as specified in

15

46REPORT000444

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

ARS Title 38 Chapter 8 Article 1.

3.    The Notice of Disciplinary Action shall include the following information:

    a.    The specific discipline imposed;

    b.    The applicable Maricopa County Employee Merit System Resolution and Rules or Maricopa County Law Enforcement Officers' Merit System Rules, and other policies that the employee violated;

    c.    Sufficient details describing the specific reasons that were considered for the disciplinary action;

    d.    The employee's relevant disciplinary history as specified in this Office Policy;

    e.    The regular status employee's right to appeal such action to the Maricopa County Merit Systems Commission; and

    f.    The Office Policies that were Not Sustained, Exonerated, or Unfounded.

4.    Employees who are suspended remain governed by all the provisions of Office Policy CP-2, *Code of Conduct*.

    a.    While suspended, employees are prohibited from wearing any law enforcement uniform and performing any Office job duties.

    b.    An employee is prohibited from working any hours in a paid capacity on the date(s) of their suspension or working their regular days off or any extra hours to make up for the hours they are suspended. This includes any extra/off-duty law enforcement employment, as specified in Office Policy EA-18, *Law Enforcement Extra Duty and Off-Duty Employment* on the date(s) of their suspension. An employee's work week total hours in the County payroll system shall not exceed 40.0 hours when a suspension has occurred. The hours of suspension are designated in the payroll system as Leave Without Pay and shall be appropriately indicated.

    c.    An employee shall not be scheduled to serve a suspension during the same week where a legal holiday occurs. Office Policy GC-1, *Leaves and Absences* specifies legal holidays to be observed with pay are: New Year's Day, Martin Luther King, Jr./Civil Rights Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Veterans Day, Thanksgiving Day, the Friday after Thanksgiving Day, and Christmas Day.

    d.    An employee shall not be scheduled for a suspension on their last scheduled day before or after a legal holiday; regardless whether the suspension day occurs in a different pay period.

        (1)    An employee must at least be in a partial paid status for the scheduled day before and the scheduled day after a legal holiday in order to receive Holiday Pay.

        (2)    Employees who are in a full UNPAID status on their scheduled day before or after a holiday are not eligible to receive Holiday Pay, as specified in Office Policy GC-1, *Leaves and Absences*.

16

46REPORT000445

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

      e.      If while suspended, an employee observes an off-duty incident, as specified in Office Policy GD-10, *Off-Duty Incidents*, the employee may take action; and shall then follow procedures, as specified in Office Policy GD-10, *Off-Duty Incidents*.

    F.      Administrative Leave with Pay: If it is determined that an employee must be removed from the workplace pending a PDH or a final discipline determination, the employee may be placed on Administrative Leave with Pay, as specified in Office Policy GH-2, *Internal Investigations*. Employees on Administrative Leave with Pay remain governed by all the provisions of Office Policy CP-2, *Code of Conduct*. While on Administrative Leave with Pay, employees shall not wear any law enforcement uniform or take any law enforcement-type action, including working any extra duty/off-duty law enforcement employment as specified in Office Policy EA-18, *Law Enforcement Extra Duty and Off-Duty Employment*.

10.    **Serious Discipline of an Unclassified Employee**: An unclassified employee is not covered by the Maricopa County Employee Merit System Resolution and Rules, however, shall be given the option of attending a PDH.

    A.      An unclassified employee is not obligated to attend the PDH as attendance is voluntary.

    B.      Any verbal or written statements made during the PDH may be used to incriminate the employee.

    C.      The PDH's will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file. Upon request, the employee shall be provided a copy of the recording within 30 calendar days of the request.

    D.      The employee may submit information in writing in addition to, or instead of attending the hearing.

    E.      The employee may be placed on Administrative Leave with Pay, as specified in this Office Policy.

    F.      Discipline imposed is not subject to appeal to the Maricopa County Merit System Commission.

11.    **Unclassified Employee Less than One Year:** An unclassified employee with less than one year of employment and/or less than one year in their current job profile who is not meeting minimum performance standards shall be managed, as specified in Office Policy GC-11, *Employee Probationary Periods and Unclassified Employees*.

12.    **EIS:** Once the discipline has been issued and the employee's right to appeal timeframe has expired, or following the completion of the appeal process, the Administrative Services Division is responsible for uploading the Findings of the investigation into IAPro. This information will then be accessible to supervisors in EIPro.

13.    **Rescission of Discipline:** The Sheriff and the appointing authority have the authority to rescind, revoke, or alter any disciplinary decision made by either the PSB Commander or the appointing authority so long as:

    A.      That decision does not relate to the Sheriff or the appointing authority;

    B.      That decision is not related to an independent authority or to a Class Remedial Matter;

    C.      The Sheriff or the appointing authority, provides a written narrative that documents the justification for the grounds of the decision as to each employee involved;

    D.      The written explanation is placed in the Personnel Files of all employees who were affected by the

17

46REPORT000446

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

decision of the Sheriff or the appointing authority; an

E.    The written explanation is available to the public upon request.

14.    **Appeal of Disciplinary Action:** A classified employee who receives discipline may request a review.

A.    Any classified employee who receives minor discipline and disputes the content of the discipline may submit a written response, as specified in this Office Policy.

B.    Serious discipline of classified regular status employees may be appealed to the Maricopa County Merit Systems Commission. Procedures are specified in the Law Enforcement Officers' Merit System Rules for sworn personnel, the Employee Merit System Resolution and Rules for detention and classified civilian personnel, and ARS Title 38 Chapter 8 Article 1 for a regular status law enforcement officer. The Maricopa County Merit System Rules are located on the Maricopa County Intranet.

C.    On an appeal of discipline by a regular status law enforcement officer, the Maricopa County Merit Systems Commission may dismiss the discipline if it determines that the Office did not make a good faith effort to complete the investigation within 180 calendar days, as specified in ARS Title 38 Chapter 8 Article 1.

1.    The allegation regarding any employee act, omission, or misconduct may be sustained and the employee's personnel file shall reflect that the allegation was sustained, but no discipline was administered due to the Merit Commission's determination that the Office did not make a good faith effort to complete the investigation within 180 calendar days. Documentation of the Merit Commission outcome shall be placed in the investigative file.

2.    The sustained discipline may be considered when determining discipline in any future sustained misconduct violation.

D.    Any unclassified employee may not seek an appeal to discipline imposed.

15.    **Rehire Discipline History:** When a former employee, not subject to the provisions of Arizona Administrative Code R13-4-109 (Denial, Revocation, Suspension, or Cancellation of Peace Officer Certification Status), or has not previously received a sustained allegation of a Category 6 or Category 7 offense, is rehired, whether for any full-time MCSO position or for reserve deputy status, their past discipline history shall be considered during the hiring process, and during the course of their current employment as follows:

A.    If a former employee is rehired, the employee's past discipline history shall continue to be considered for any future promotions throughout the course of employment.

B.    If a former employee is rehired, the employee's past discipline history shall continue to be considered for any future discipline during the time frame of the most current sustained offense.

C.    If a former employee is rehired, the employee's past discipline history shall continue to be considered for any future transfers during the time frame of the most current sustained offense.

D.    If a former employee is rehired, the employee's past discipline history shall be considered in future assignments as a Training Division Instructor or Field Training Officer during the time frames of the most current sustained offense.

16.    **Volunteer**: A volunteer's continued service with the Office shall be at the discretion of the Sheriff.

18

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**

Volunteers are subject to, and shall comply with all Office Policies, rules, and regulations. Violations of Office Policies, rules, and regulation shall be addressed, as specified in Office Policies GH-2, *Internal Investigations,* and this Office Policy. Serious violations of Office Policy by a volunteer, shall result in a review by the PSB Commander to determine whether a Pre-Determination Hearing is held, or the services of the volunteer are to be immediately terminated.

17. **Class Remedial Matters and Independent Disciplinary Authority:** Matters involving class remedial matters and the independent disciplinary authority shall be processed as required by law and Office Policy. Additional information regarding these processes may be obtained from the Administrative Services Division Operations Manual.

18. **EPA's Involving Employee Misconduct:** When the budget allows for a performance-based salary increase, the Office will utilize the criteria adopted by the Maricopa County Board of Supervisors to determine employee eligibility. Those employees who were involuntarily demoted during the applicable rating period, or who have not successfully met their specific performance expectations or performance standards during the applicable EPA rating period, will not be considered for a performance-based salary increase. Employees who served a suspension but successfully met their specific performance expectations or performance standards during the applicable EPA rating period are eligible to receive a salary increase.

19. **Records Disclosure:** The Administrative Services Division may distribute copies of all or any portion of an investigative file for administrative or public record purposes or as necessary to comply with a judgment of a federal or state court.

    A. In accordance with ARS Title 38 Chapter 8 Article 1, information about a regular status law enforcement officer's investigative file shall not be released for public inspection until the investigation is complete or the Office has discontinued the investigation. If the investigative file is the subject of an appeal to a disciplinary action by a classified law enforcement officer, the investigative file is not complete until the conclusion of the appeal process before the Maricopa County Merit Systems Commission.

    B. Investigative files for all other Office employees shall be released in accordance with state law pursuant to ARS, Title 39.

    C. Polygraph data and reports regarding a classified law enforcement officer shall be disclosed pursuant to ARS Title 38 Chapter 8 Article 1.

20. **Records Retention:** In accordance with ARS 39-128, the Office shall retain all records that are reasonably necessary or appropriate to maintain an accurate knowledge of disciplinary action involving employees of the Office, including the employee's responses to all disciplinary actions. Administrative investigative files shall be maintained for five years after an employee's separation or retirement from Office employment, or as long as any document preservation requirement applies as a result of litigation.

46REPORT000448

CONFIDENTIAL - ATTORNEY'S EYES ONLY




# GC-17, *Employee Disciplinary Procedures*
## DISCIPLINE MATRICES
### Attachment A
Effective Date: 11-22-24

## DISCIPLINE MATRIX - Non-Exempt, Regular Status Employee

The below Matrix shall be used to determine the range of discipline that may be imposed for a non-exempt status employee. Every offense level has a minimum penalty, a presumptive penalty, and a maximum penalty. The PSB Commander must make preliminary determinations of the range of discipline. The presumptive discipline shall be imposed unless aggravating or mitigating circumstances exist and are articulated in the investigative file.

Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

For the purpose of determining the number of offenses committed within identified categories of this matrix, the first use of non-disciplinary Coaching shall not constitute an offense. However, the use of non-disciplinary Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation. Coaching shall be documented in Blue Team and shall be considered for one year prior to the current offense.

Based on the matrix below, after review and determination by the PSB Commander, or as determined by the supervisor, as specified in this Office Policy regarding Section 1, Supervisor Initiated Intervention, the use of a non-disciplinary Coaching by a supervisor may be acceptable only for a Category 1, First or Second Offense or a Category 2, First Offense.

**Min.** = Minimum Discipline    **W.R.** = Written Reprimand    **Dis.** = Dismissal
**Pres.** = Presumptive Discipline    **Hrs.** = Hours of Suspension    **Max.** = Maximum Discipline

| Category | First Offense Min. | First Offense Pres. | First Offense Max. | Second Offense Min. | Second Offense Pres. | Second Offense Max. | Third Offense Min. | Third Offense Pres. | Third Offense Max. | Fourth Offense Min. | Fourth Offense Pres. | Fourth Offense Max. | Fifth Offense Min. | Fifth Offense Pres. | Fifth Offense Max. | Sixth Offense Min. | Sixth Offense Pres. | Sixth Offense Max. | Seventh Offense Min. | Seventh Offense Pres. | Seventh Offense Max. | Eighth Offense |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 |  | W.R. | W.R. |  | W.R. | 8Hrs | W.R. | 8Hrs | 16Hrs | 8Hrs | 16Hrs | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal |
| 2 |  | W.R. | 8Hrs | W.R. | 8Hrs | 16Hrs | 8Hrs | 16Hrs | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal |  |  |  |
| 3 | W.R. | 8Hrs | 16Hrs | 8Hrs | 16Hrs | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal |  |  |  |  |  |  |
| 4 | 8Hrs | 16Hr | 24Hrs | 16Hrs | 24Hrs | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal |  |  |  |  |  |  |  |  |  |
| 5 | 16Hrs | 24Hr | 40Hrs | 24Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal |  |  |  |  |  |  |  |  |  |  |  |  |
| 6 | 24Hrs | 40Hr | 80Hrs | 40Hrs | 80Hrs | Dis. | Dismissal |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 7 | Dismissal |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

- An employee's workweek will be changed to a five/eight schedule when a suspension is to be served.
- A non-exempt, regular status employee shall not be suspended for more than 40 working hours per pay period.
- When conduct of personnel falls in a discipline range from a suspension to dismissal, 120 hours will be the maximum number of hours an employee shall be suspended during each disciplinary procedure.
- Demotions may be considered for personnel whose conduct falls in a discipline level which is equivalent to an 80 hours or more suspension.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**
**Attachment A**

---

## DISCIPLINE MATRIX - Exempt, Regular Status Employee

The below Matrix shall be used to determine the range of discipline that may be imposed for an unclassified supervisory level, or exempt status employee. Every offense level has a minimum penalty, a presumptive penalty, and a maximum penalty. The PSB Commander must make preliminary determinations of the range of discipline. The presumptive discipline shall be imposed unless aggravating or mitigating circumstances exist and are articulated in the investigation file.

Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

For the purpose of determining the number of offenses committed within identified categories of this matrix, the first use of non-disciplinary Coaching shall not constitute an offense. However, the use of non-disciplinary Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation. Coaching shall be documented in Blue Team and shall be considered for one  year prior to the current offense.

Based on the matrix below, after review and determination by the PSB Commander, or as determined by the supervisor as specified in this Office Policy regarding Section 1 Supervisor Initiated Intervention, the use of a non-disciplinary Coaching by a supervisor may be acceptable only for a Category 1, First or Second Offense or a Category 2, First Offense.

**Min.** = Minimum Discipline          **W.R.** = Written Reprimand          **Dis.** = Dismissal
**Pres**. = Presumptive Discipline     **Hrs.** = Hours of Suspension        **Max.** = Maximum Discipline

| Category | First Offense | | | Second Offense | | | Third Offense | | | Fourth Offense | | | Fifth Offense | | | Sixth Offense |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Min. | Pres. | Max. | Min. | Pres. | Max. | Min. | Pres. | Max. | Min. | Pres. | Max. | Min. | Pres. | Max. | |
| 1 |  | W.R. | W.R. |  | W.R. | 40Hrs | W.R. | 40Hrs | 80Hrs | 40Hrs | 80Hrs | 120Hr | 80Hrs | 120Hr | Dis. | Dismissal |
| 2 |  | W.R. | 40Hrs | W.R. | 40Hrs | 80Hrs | 40Hrs | 80Hrs | 120Hr | 80Hrs | 120Hr | Dis. | Dismissal | | | |
| 3 | W.R. | 40Hrs | 80Hrs | 40Hrs | 80Hrs | 120Hr | 80Hrs | 120Hr | Dis. | Dismissal | | | | | | |
| 4 | 40Hrs | 40Hrs | 80Hrs | 40Hrs | 80Hrs | 120Hr | 80Hrs | 120Hr | Dis. | Dismissal | | | | | | |
| 5 | 40Hrs | 80Hrs | 120Hr | 80Hrs | 120Hr | Dis. | Dismissal | | | | | | | | | |
| 6 | 80Hrs | 80Hrs | 120Hr | 80Hrs | 120Hr | Dis | Dismissal | | | | | | | | | |
| 7 | Dismissal | | | | | | | | | | | | | | | |

- Pursuant to the FLSA, suspensions for exempt employees must be limited as follows: Misconduct that rises to the level of suspension shall result in a suspension of a full 40-hour workweek or incremental full workweeks (80 hours, 120 hours).
- An employee's workweek(s) will be changed to a five/eight schedule when a suspension is to be served.
- When conduct of personnel falls in a discipline range from a suspension to dismissal, 120 hours will be the maximum number of hours an employee shall be suspended during each disciplinary procedure.
- Demotions may be considered for personnel whose conduct falls in a discipline level which is equivalent to more than an 80 hours suspension.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*            **Effective Date: 11-22-24**
**Attachment A**

## DISCIPLINE MATRIX - Volunteer

The below Matrix shall be used to determine the range of discipline that may be imposed for a Volunteer. After review and determination by the PSB Commander, or as determined by the supervisor as specified in this Office Policy regarding Section 1, Supervisor Initiated Intervention, the use of a non-disciplinary Coaching by a supervisor may be acceptable only for a Category 1, First or Second Offense or a Category 2, First Offense.

| Category | First Offense | | Second Offense | | Third Offense | |
|---|---|---|---|---|---|---|
| | Minimun | Maximum | Minimum | Maximum | Minimum | Maximum |
| 1 | | Written Reprimand | | 30 Day Suspension | 30 Day Suspension | Dismissal |
| 2 | | 30 Day Suspension | 30 Day Suspension | 60 Day Suspension | 60 Day Suspension | Dismissal |
| 3 | Written Reprimand | 60 Day Suspension | 60 Day Suspension | 90 Day Suspension | 90 Day Suspension | Dismissal |
| 4 | 90 Day Suspension | 120 Day Suspension | 120 Day Suspension | Dismissal | Dismissal | |
| 5 | 120 Day Suspension | Dismissal | 150 Day Suspension | Dismissal | Dismissal | |
| 6 | 150 Day Suspension | Dismissal | 180 Day Suspension | Dismissal | Dismissal | |
| 7 | Dismissal | | | | | |

3

46REPORT000451

**GC-17, Employee Disciplinary Procedures**
CONFIDENTIAL – ATTORNEYS EYES ONLY

# CATEGORIES OF OFFENSES
## Attachment B
Effective Date: 11-22-24



---

*Discipline for violation of the law, regardless of the ultimate adjudication of any criminal or civil charges, shall be based on the facts and evidence discovered during the Office investigation.*

*Conduct that is not specifically identified in the following chart shall be reviewed using the definition for each Category of Offense.*

---

## CATEGORY 1
Conduct, while against policy, has a minimal negative impact on the overall operations or professional image of the Office and usually of a first offense nature. This conduct however, is not acceptable and must be corrected. Failure to correct the behavior shall result in more severe discipline.

Violations in Category 1 involve neglect. If acts are found to be intentional, or repeated, after coaching or other intervention by a supervisor, these violations shall move to Category 3, or higher.

## CATEGORY 2
Conduct that has more than minimal negative impact on the operations or professional image of the Office; or conduct that negatively impacts relationships with other employees, agencies or members of the public; or conduct under Category 1 with repetitive offenses.

## CATEGORY 3
Conduct that has a pronounced negative impact on the operations or professional image of the Office, relationships with other employees, agencies, or the public; or conduct within a lower Category of Offenses with repetitive offenses.

## CATEGORY 4
Conduct that is substantially contrary to the values of the Office; or that substantially interferes with its mission, operations, or professional image; or that involves a demonstrable serious risk to employees or public safety.

## CATEGORY 5
Conduct that involved the serious abuse or misuse of authority, unethical behavior, or an act that results in an actual serious and/or adverse impact on employee or public safety, or to the professionalism of the Office.

## CATEGORY 6
Conduct that involves the serious abuse or misuse of authority, unethical behavior; or an act that results in an actual serious and adverse impact on the Office employee, public or public safety; or to the professionalism of the Office.

## CATEGORY 7
Any violation of law, policy, rule or regulation which: foreseeably results in death or serious bodily injury; or constitutes a willful and wanton disregard of Office guiding principles; or involves any act or omission which demonstrates a serious lack of the integrity, ethics or character related to an Office employee's fitness to hold their position; or involves egregious misconduct substantially contrary to the standards of conduct reasonably expected, to include those whose sworn duty is to uphold the law; or involves conduct which constitutes the failure to adhere to any condition of employment required or mandated by law.

46REPORT000452

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures* **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| **1 UNETHICAL CONDUCT** | | | | | | | |
| A. Participating in activities which would compromise an employee's ability to perform Office duties objectively and impartially. | | | ● | | | | |
| B. Withholding relevant information or misleading investigators during a criminal or administrative investigation. | | | | | | | ● |
| C. Failure to inform command staff regarding a conflict of interest related to an administrative investigation and the administration of discipline. | | | | | ● | ● | ● | ● |
| D. Violation of Office Policy CP-5, *Truthfulness*. | | | | | | | ● |
| E. Violation of Office Policy CP-3, *Workplace Professionalism*, by actions that include unlawful discrimination or harassment of another person because of an individual's protected characteristics. | | | | | | | ● |
| F. Violation of Office Policy CP-3, *Workplace Professionalism*, by carrying out wrongful conduct; otherwise defined in the Office Policy as, "*conduct that, if allowed to continue, could potentially lead to unlawful discrimination, harassment, or retaliation.*" | | ● | ● | ● | ● | ● | |
| F. Violation of Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling*, by taking law enforcement actions based on age, nationality/ national origin, immigration status, religious beliefs/religion, race, color, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical or mental disability, ethnic background, or socioeconomic status, to include, but not limited to, calls for service, traffic stops, arrests, detentions, consensual and non-consensual contacts, unless those characteristics are part of a description received of a specific suspect, perpetrator, or witness for whom a deputy is then searching. | | | | | | | ● |
| G. Violation of Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling*, by basing detention operations on age, nationality/national origin, immigration status, religious beliefs/religion, race, color, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical or mental disability, ethnic background, or socioeconomic status, or any other identifiable group characteristic, except as part of a reliable and specific inmate description, is prohibited. | | | ● | ● | ● | ● | ● |
| H. Violation of Office Policy CP-11, *Anti-Retaliation*, by actions that include retaliation against any person, member of the public, or employee for their lawful expression of opinions in exercise of their First Amendment right to freedom of speech. | | | | | | ● | ● |
| I. Violation by an employee of the Prisoner Rape Elimination Act (PREA), specific to sexual abuse or sexual harassment of an inmate, which may or may not include criminal charges. | | | | | | | ● |

2

46REPORT000453

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                          **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| **2 CONFORMANCE TO OFFICE DIRECTIVES** | | | | | | | |
| A. Unintentional failure to conform to the provisions of all written policies, except those found to be unlawful, incorrect, or inapplicable. | ● | | | | | | |
| B. Intentional failure to conform to the provisions of all written policies, except those found to be unlawful, incorrect, or inapplicable. | | | ● | | | | |
| C. Unintentional failure to comply with any court related matters such as court orders or judgment, orders, written instructions, and rules. | | ● | | | | | |
| D. Intentional failure to comply with any court related matters such as court orders or judgment, orders, written instructions, and rules. | | | | | | ● | ● |
| E. Failure to accept responsibility for own acts and shift burden or responsibility to another person. | | ● | | | | | |
| F. Disregard of safety rules which place other employees or members of the public at risk. | | | | ● | | | |
| **3 CONFORMANCE TO ESTABLISHED LAWS** | | | | | | | |
| A. Commission of Class 2 or Class 3 misdemeanor violation, with the exception of a criminal speed violation. | | | | ● | | | |
| B Commission of a criminal speed violation. | | ● | | | | | |
| C. Commission of a Class 1 misdemeanor violation, not to include DUI. | | | | | | ● | |
| D. Commission of DUI to any degree. | | | | | | | ● |
| E. Conduct that constitutes a felony under state law, or any other state's law, or federal law. While travelling abroad, employees shall abide by the laws of foreign countries, insofar as the laws do not conflict with the laws of the U.S. | | | | | | | ● |
| F. Failure to report the knowledge of the commission of a felony by an employee. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | | | | | | | ● |
| G. Commission of theft, stealing, misappropriation of funds, or fraudulent activity. | | | | | | | ● |
| **4 INDIVIDUAL RESPONSIBILITY** | | | | | | | |
| A. Failure of an employee who observes or becomes aware of any act of misconduct by another employee to report the incident as soon as practicable to a supervisor or directly to the PSB. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | ● | ● | ● | ● | ● | ● | ● |

3

46REPORT000454

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**
**Attachment B**

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| B. | | Failure of an employee to take appropriate action whenever learning of an Office Policy violation being committed, or having been committed, by any other person associated with the Office in any capacity, which by its very nature would tend to discredit an employee or the Office. To include conduct on or off-duty. **The presumptive discipline for a failure to take appropriate action may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | ● | ● | ● | ● | ● | ● | ● |
| C. | | Failure to adequately assist members of the public with the Comment and Complaint Form process. | | ● | | | | | |
| D. | | Failure by an on-duty supervisor or commander to document in Blue Team an internal or external complaint of misconduct. | | | ● | | | | |
| E. | | Failure to report, without delay, to the on-duty supervisor, an appropriate commander, or the PSB, when any false information is alleged or reasonably believed to have been provided in an administrative investigation or on any official report, log, or electronic transmittal of information, testimony, communication with other officials, public presentations such as community meetings, and press briefings. | | | | ● | ● | ● | ● |
| F. | | Participation in the retaliating against an employee who reports misconduct or a violation of policy, responsibility, or duty. | | | | | | ● | |
| G. | | Failure to report secondary employment, as specified in Office Policy GC-18, *Secondary Employment,* or law enforcement off-duty employment as specified in Office Policy EA-18, *Law Enforcement Extra-Duty and Off-Duty Employment.* | ● | ● | | | | | |
| H. | | Failure to report a missing firearm. | | | ● | ● | ● | ● | ● |
| I. | | Failure to follow reporting requirements, as specified in Office Policy GJ-28, *Prison Rape elimination Act* (PREA). To include but not limited to, reporting PREA sexual abuse, sexual harassment, or voyeurism, and/or taking action upon learning of a report of sexual abuse, sexual harassment, or voyeurism. | | | ● | ● | ● | ● | ● |
| **5** | | **UNBECOMING CONDUCT** | | | | | | | |
| A. | | Failure by an employee to conduct themselves, at all times, both on and off duty, in such a manner as to reflect favorably on the Office, as specified in Office Policy CP-2, *Code of Conduct.* | | ● | | | | | |
| B. | | Failure to show respect for the uniforms of the Office. | ● | | | | | | |
| C. | | Failure of an employee who is on duty or identified by dress, location, or association as an employee, to maintain a professional demeanor and perform their duties in a calm and firm manner. | | ● | | | | | |

4

46REPORT000455

**Policy GC-17,** *Employee Disciplinary Procedures*                                    **Effective Date: 11-22-24**
**Attachment B**

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| D. | | Participating in the demeaning of persons, or bias language against any individual regardless of age, nationality/national origin, immigration status, religious beliefs/religion, race, color, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical or mental disability, ethnic background, or socioeconomic status. | | | | | ● | ● | ● |
| E. | | Failure by an employee to conduct themselves in a manner that will foster respect and cooperation among themselves and other members of the Office. | | ● | | | | | |
| F. | | Failure to take reasonable action commensurate and appropriate to the situation to ensure a person is not subject to cruel treatment or neglectful inhumane action. | | | | | ● | ● | ● |
| G. | | Failure to take reasonable action commensurate and appropriate to the situation to ensure an animal is not subject to cruel treatment or neglectful inhumane action. | | | ● | | | | |
| H. | | Failure by an employee who has contact with the public to deal with people fairly, and courteously. | | ● | | | | | |
| I. | | Use of profanity, rude or insulting language, or conduct offensive to employees or members of the public that is not of a discriminatory nature or a racial slur. | | ● | | | | | |
| J. | | Use of profanity, rude or insulting language, or conduct offensive to employees or members of the public that is of a discriminatory nature or a racial slur. | | | | | ● | ● | ● |
| K. | | Failure to represent the Office in a professional manner while in uniform or in a County vehicle, to members of the public. | | ● | | | | | |
| L. | | Unwarranted or unnecessary threat of physical violence by an employee, to another employee or the public. | | | | | ● | ● | ● |
| M. | | Sexual harassment of another person. | | | | | | | ● |
| N. | | Cheating on promotion examinations. | | | | | | | ● |
| O. | | Possession of weapons on Maricopa County property in violation of Office Policy GJ-23, *Firearms*. | | | | | | ● | |
| P. | | Buying or selling contraband on County property. | | | | | | | ● |
| Q. | | Fraud in securing employment. | | | | | | | ● |
| R. | | Sexual conduct on duty and/or while on or using County property or equipment. | | | | | | | ● |
| S. | | Sexual conduct off duty while on or using County property or equipment. | | | | ● | | | |
| **6** | **ALCOHOL** | | | | | | | | |
| A. | | Consuming alcoholic beverages while on duty except with prior supervisory consent. | | | | | | | ● |
| B. | | Purchasing, or in immediate possession of, any kind of alcoholic beverage(s) while on duty, except in the performance of official duties or authorized training with prior supervisory consent. | | | | | ● | | |
| C. | | Reporting for duty, or on duty, with any odor of alcoholic beverage on the employee's breath or while under the influence of any alcoholic beverage to any degree. | | | | | | ● | |

5

46REPORT000456

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**
**Attachment B**

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| D. | Failure by a supervisor to take action, as specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*, when they reasonably believes that an employee who is on duty or reporting for duty smells of, or is under the impairment of, alcoholic beverages to any degree. | | | | | ● | | |
| E. | Violation of Office Policy ED-2, *Covert Operations*, in all cases where personnel who consume alcoholic beverages on duty: fail to avoid any physical condition or impairment which could adversely affect the employee's performance of duty; operate a Maricopa County vehicle; or bring discredit upon the Office. | | | | | | ● | |
| F. | Failure by employees and supervisors to be attentive to, and restrict, physical enforcement action and the display or use of weapons when the employee(s) is known to have consumed and/or be under the influence of an alcoholic beverage(s) during a covert operation, except in extreme and exigent circumstances. | | | | | | ● | |
| G. | Failure by an employee in a specialized assignment, if called out, to advise a supervisor that within the last eight hours they have been drinking, the type and amount of alcoholic beverage consumed, and how long it has been since the last drink. | | | | ● | | | |
| H. | When making the decision to activate an employee, the supervisor shall ensure based on the information provided by the employee that no alcoholic beverage have been consumed within the last eight hours prior to a call out. | | | | ● | | | |
| I. | Purchasing or consuming alcohol off-duty and in uniform. | | ● | | | | | |
| J | Consuming alcohol at a training event while on-duty. | | | | | | ● | ● |
| K. | Operating any Maricopa County vehicle within eight hours after consuming any alcoholic beverages. | | | | ● | | | |
| L. | Displaying or wearing any recognizable item of Office apparel, while on or off duty, in a public place or an establishment where the primary purpose is to sell or serve alcoholic beverages or consuming any alcoholic beverages while displaying or wearing any recognizable items of Office apparel, unless in the performance of official duties. | | | | ● | | | |
| M. | Consuming alcoholic beverages in any Maricopa County facility or Maricopa County vehicle by an employee, except in the performance of official duties or authorized training. | | | | | | | ● |
| N. | Allowing the consumption of alcoholic beverages at any time, or for any reason, by a guests, volunteers, public observers or other members of the public while in Maricopa County facilities, Maricopa County vehicles, or vehicles owned by a Posse Branch or individual posse member that are used for Office related operations. | | | | ● | | | |
| O. | Driving while under the influence of alcohol or drugs while on duty, to exclude legally prescribed drugs that do not impair or inhibit an employee's capacity to perform their responsibilities. | | | | | | | ● |

46REPORT000457

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                                    **Effective Date: 11-22-24**
**Attachment B**

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| | P. | Carrying a firearm while off duty when consuming alcohol and taking law enforcement action. | | | | | ● | ● | ● |
| **7** | | **USE OF MEDICATION OR DRUGS** | | | | | | | |
| | A. | Failure by the employee who takes prescribed or over-the-counter medications to be aware of any side effects the medications may have on the performance of their duties. | | ● | | | | | |
| | B. | Failure by an employee to advise their supervisor, prior to reporting for duty, when taking medication that might impair their ability to perform the essential job functions of their position. | | ● | | | | | |
| | C. | Refusing to participate in a drug, medication, or alcohol test, as specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*. | | | | | | | ● |
| | D. | Unlawful possession or use of drugs or medication, to include the prescribed medication of another. | | | | | | | ● |
| **8** | | **GRATUITIES, REWARDS, OR LOANS** | | | | | | | |
| | A. | Use of position for personal gain, on or off duty, to solicit, seek, or receive any personal loan, gift, gratuity, or other favor, from the general public, any private business firms which deal with the Office, or any other agency or department of Maricopa County which is, or may appear to be, intended to influence official conduct. | | | | | ● | | |
| | B. | Accepting, directly or indirectly, a gratuity, fee, loan, reward, or gift of any kind for services rendered in the course of official duties or for services rendered in the course of an Office-approved off-duty assignment. This includes directly or indirectly accepting or obtaining a gratuity, fee, loan, reward, or gift of any kind and passing it on to family members, other Office employees, or acquaintances. | | | ● | | | | |
| | C. | Use of position to solicit free admission to places of amusement, entertainment, or sporting events or to solicit free meals, or any favors or gratuities not ordinarily afforded to a member of the public. | | | ● | | | | |
| | D. | Accepting or soliciting a bribe. | | | | | | | ● |
| **9** | | **ABUSE OF POSITION OR AUTHORITY** | | | | | | | |
| | A. | Use of official position, identification cards, or badges to avoid the consequences of illegal acts such as driving under the influence or helping family members avoid the consequences of illegal acts. | | | | | | ● | |
| | B. | Use of official position, identification cards, or badges for personal or financial gain related to official duties. | | | | | | ● | |
| | C. | Use of official position, identification cards, or badge to obtain privileges not otherwise available to them or others, except in the performance of official duty. | | | | | ● | | |
| | D. | Use of official position, identification card, or badge to misrepresenting their position or authority in the Office. | | | | | | ● | |

7

46REPORT000458

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| E. | Lending identification cards, badges, or uniforms to another person not authorized to display or possess. | | | | ● | | | | |
| F. | Permitting Office identification cards or badges to be photographed or reproduced unless necessary for official business. | | ● | | | | | | |
| G. | Identifying themselves as members of the Office, visually or verbally, in connection with testimonials or advertisements, unless specifically authorized by the Sheriff, or designee. | | | | ● | | | | |
| H. | Interfering by virtue of their position, with an Office criminal or administrative investigation; act in manner which might aid any person in escaping arrest or delay the apprehension of a criminal; facilitate the removal or concealment of contraband. | | | | | | | | ● |
| I. | Convert for personal use any found, impounded, abandoned, or recovered property, or any property held or released as evidence. | | | | | | | ● | ● |
| J. | Failure to return seized, found, or recovered property directly to a property custodian, court, or owner. | | | | ● | | | | |
| K. | Misuse of NCIC or any Office or law enforcement database. | | | | | | ● | ● | ● |
| L. | Misuse of position or authority to affect a promotion, transfer, or restoration to duty by obtaining an unfair advantage as a result of any act prohibited by Office Policy and/or Maricopa County Merit System Rules, such as but not limited to nepotism; retaliation; conflict of interest; discrimination; or harassment. | | | | | | ● | | |
| M. | Intentionally denying any person of civil liberties (such as no probable cause for arrest, search and seizure, or failing to give Miranda Warning when required, or any that may be guaranteed by the Constitution of the United States). | | | | | | ● | ● | ● |
| N. | Unintentionally denying any person of civil liberties (such as no probable cause for arrest, search and seizure, or failing to give Miranda Warning when required, or any that may be guaranteed by the Constitution of the United States). | | ● | ● | ● | | | | |
| **10** | **CARE AND USE OF OFFICE OR MARICOPA COUNTY EQUIPMENT** | | | | | | | | |
| A. | Misuse of Office and Maricopa County equipment. | ● | | | | | | | |
| B. | Use of Office and Maricopa County cell phones, fax machines, printers, and copiers which inhibits either governmental or administrative use, or impact employee's ability to perform their assigned duties. | | ● | | | | | | |
| C. | Use of Office and Maricopa County equipment used in a manner that discriminates, or denigrates, anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. | | | | | | | ● | ● |
| D. | Use of e-mail and voice mail in a manner that discriminates, or denigrates, anyone on the basis of race, color, national origin, age, religious beliefs, gender, culture, sexual orientation, veteran status, or disability. | | | | | | | ● | ● |

46REPORT000459

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                          **Effective Date: 11-22-24**
**Attachment B**

| Category | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| E. | Willfully damaging, losing, misplacing, or abusing Office and Maricopa County equipment. | | | ● | | | | |
| F. | Negligently damaging, losing, misplacing, or abusing Office and Maricopa County equipment. | | ● | | | | | |
| G. | Failure to maintain Maricopa County issued equipment in proper order. | ● | | | | | | |
| H. | Intentionally accessing internet pornography sites while using a County computer unless directed to do so by a supervisor for investigative purposes. | | | | | | ● | |
| I | Personnel shall refrain from using profane or offensive language or images in any aspect of their electronic communications, including system passwords, as specified in Office Policy GM-1, *Electronic Communications, Data and Voice Mail*. | | ● | ● | ● | | | |
| J | Speeding while driving a County owned vehicle civil violation only. | ● | | | | | | |
| K. | Committing civil traffic violations other than speeding, while driving a County owned vehicle. Civil violations to include but not limited to, making an illegal turn, running a red light, and driving without a seatbelt. | | ● | | | | | |
| L. | Committing criminal traffic violations while driving a County owned vehicle. Criminal violations to include but not limited to, criminal speed, driving without a valid license, driving with a suspended license, reckless driving, hit and run, vehicular manslaughter, and driving under the influence of alcohol or drugs. | | ● | ● | ● | ● | ● | ● |
| M. | Involvement in a preventable accident with an Office vehicle while engaged in emergency driving. | | | ● | | | | |
| N. | Unauthorized use of County equipment and personnel for personal profit. | | | | | | | ● |
| **11** | **CONFIDENTIAL INFORMATION, PROTECTED HEALTH INFORMATION, AND DIVULGING CRIMINAL RECORDS** | | | | | | | |
| A. | Discussing or disclosing sensitive law enforcement or confidential information without supervisor direction or approval, and with persons unauthorized to receive the information, or permitted or required by law. | | | | | ● | | |
| B. | Unauthorized release of Criminal History Record Information (CHRI). | | | | | | ● | |
| C. | Using, copying, making notes regarding, removing, releasing, or disclosing information or facts that are of a personal or confidential nature regarding an employee, inmate, or other person's health or medical information, unless doing so legally in the course and within the scope of official duties. | | | | | ● | | |

9

46REPORT000460

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                              **Effective Date: 11-22-24**
**Attachment B**

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| | D. | Failure to immediately notify a supervisor upon becoming aware of anyone improperly accessing or releasing information or facts that are of a personal or confidential nature regarding an employee, inmate, or other person's health or medical information. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | | | | ● | | | |
| | E. | Intentional and unauthorized alteration, disclosure, copying, and retention of confidential material or sensitive information. | | | | | | ● | |
| | F. | Unintentional destruction or removal of County records. | | | ● | | | | |
| **12** | | **PERFORMANCE OR DERELICTION OF DUTY** | | | | | | | |
| | A. | Failure to devote working time and attention to the service of the Office to complete all assignments in a timely manner. | | ● | | | | | |
| | B. | Engaging in any activities or personal business, such as personal phone calls or text messages, or other electronic activities which would cause neglect to duty. | ● | | | | | | |
| | C. | Displaying cowardice or failing to support fellow employees in the lawful performance of duty. | | | | ● | | | |
| | D. | Willful failure to appear for judicial subpoenas, whether on behalf of the state or in actions against the employee. | | | ● | | | | |
| | E. | Unintentional failure to comply with document preservation and production requirements, as specified in Office Policy GD-9, *Litigation Initiation, Document Preservation, and Document Production Notices.* | | ● | | | | | |
| | F. | Intentional failure to comply with document preservation and production requirements, as specified in Office Policy GD-9, *Litigation Initiation, Document Preservation, and Document Production Notices.* | | | | | | ● | |
| | G. | Engaging in any strike or restricting output causing a work slowdown in support of a strike. | | | | | | | ● |
| | H. | Failure to follow documentation and administrative requirements, as specified in Office Policy GJ-28, *Prison Rape Elimination Act* (PREA). To include but not limited to, data collection, hiring and promotional procedures, completion of PREA training, providing PREA information to employees and inmates, providing appropriate inmate housing, and medical and mental health services, completing PREA Safety Inspections, completing PREA opposite gender announcements, making PSB notifications, and initiating inmate disciplinary actions. | ● | ● | ● | | | | |
| **13** | | **PUNCTUALITY & ABSENCES** | | | | | | | |
| | A. | Failure to be punctual in reporting to a designated duty post and physically ready to assume assigned duties. | ● | ● | ● | | | | |

10

46REPORT000461

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                                   **Effective Date: 11-22-24**
**Attachment B**

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| B. | Failure by a supervisor to enter tardiness and early departures data into Blue Team, as specified in Office Policies GC-1, *Leaves and Absences*, and CP-2, *Code of Conduct*. | | ● | | | | | | |
| C. | Absent Without Authorized Leave (AWOL) except when extenuating circumstances are found to have existed. AWOL occurs when an employee fails to call in to a supervisor, and who does not show for their scheduled shift. | | ● | ● | ● | ● | ● | ● | ● |
| D. | Abuse of sick or vacation leave for non-FMLA-qualifying events. | | ● | | | | | | |

### 14  POLITICAL ACTIVITY

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | Use of authority of position, Maricopa County business, personnel, equipment, materials, buildings, or other resources, to influence the vote or political activities, or for the purpose of influencing the outcomes of elections. | | | | | | | | ● |
| B. | Use of political endorsement in connection with any appointment to a position in the Maricopa County classified service. | | | | | | | ● | |
| C. | Use or promise to use, any official authority or position for the purpose of influencing the vote, or political action of any person or for any other considerations. | | | | | | | | ● |
| D. | Soliciting an employee to engage in, or deny him the opportunity to engage in, activities permitted regarding political activity. | | | | | | | ● | |
| E. | Participating in any direct or indirect threat, such as intimidation, coercion, discrimination, reprisal, force, or any adverse consequence, such as the loss of any benefit, reward, promotion, assignment, or compensation based on the employee's involvement in a political activity. | | | | | | | | ● |
| F. | Engaging in political activity while on duty, while in uniform, or at public expense, except as authorized in CP-2, *Code of Conduct*. | | | | | | | | ● |
| G. | Denying any employee of any civil liberties, as guaranteed by the Constitution of the United States or the Constitution and Laws of the State of Arizona based on the employee's involvement in political activity. | | | | | | | | ● |
| H. | Shall not participation as a member of any national, state, or local committee of a political party, an officer or chairperson of a committee of a partisan political club, a candidate for nomination or election to any public office, which is either paid or partisan, or take part in the management of any political party, partisan or nonpartisan campaign, or recall effort. | | | | | ● | | | |
| I. | Discriminate against another employee for engaging in, or choosing not to engage in, any permitted political activity. | | | | | | | | ● |
| J. | Retaliate against another employee for engaging in, or choosing not to engage in, any permitted political activity. | | | | | | | | ● |

11

46REPORT000462

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                                **Effective Date: 11-22-24**
**Attachment B**

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| K. | Conducting support of family members running for political office outside the provisions of Office Policy CP-2, *Code of Conduct*. | | | ● | | | | |
| L. | Employees using the authority of their position to influence the vote or political activities of any subordinate employee. | | | | | | | ● |
| **15** | **PUBLIC APPEARANCE AND STATEMENTS** | | | | | | | |
| A. | Publicly ridiculing the Office, its policies, or its employees, orally, in writing, or through social media, where such expression is defamatory, obscene, unlawful, tends to undermine the effectiveness of the Office, interferes with the maintenance of discipline, or is made with reckless disregard for the truth. | | | | | ● | | |
| B. | Addressing public gatherings, appearing on radio or television, or releasing for publication, an article, manuscript, or other material which pertains to the operations or activities of the Office, without prior approval from the Sheriff, or designee. | | | ● | | | | |
| **16** | **ENDORSEMENTS, REFERRALS, AND VENDORS** | | | | | | | |
| A. | Recommending, suggesting, or advocating for the employment of any person, or procurement of any particular product, professional, or commercial service outside the official procurement process. | | | | ● | | | |
| B. | Failure by an employee to disclose their interest for any contract, sale, purchase, or service, in which they have an interest. | | | | ● | | | |
| C. | Failure by an employee to disclose their interest and abstaining from voting for any contract, sale, purchase, or service, in which they have an interest. | | | | ● | | | |
| **17** | **LABOR/ FRATERNAL ORGANIZATIONS AND ASSOCIATIONS** | | | | | | | |
| A. | Joining, and, or holding office in any employee organization, labor union, or professional association, organized for any illegal purposes or primarily engaged in activities contrary to law. | | | | | | | ● |
| B. | Attempting to prohibit or intimidate any covered employee from belonging to, or holding office in, any lawful organization. | | | | | ● | | |
| **18** | **ASSOCIATIONS AND FRATERNIZATION WITH INMATES OR PRISONERS** | | | | | | | |
| A. | Indulging in undue familiarity with inmates or prisoners. | | | | | | | ● |
| B. | Fraternization with inmates and prisoners unless it is unavoidable due to family member relationships. | | | ● | | | | |
| C. | Engage the services of, accept services from, or do favors for, any person known to them to have been in the custody of the Office, or any other detention or correctional facility within the last two years. | | | | ● | | | |
| D. | Conveying written or oral messages between inmates. | | | ● | | | | |

46REPORT000463

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| E. Corresponding with, or assisting in conducting correspondence with inmates, former inmates, or other persons not in custody, on behalf of an inmate. | | | | ● | | | |
| F. Assisting inmates in the submission or preparation of judicial documents. | | | | ● | | | |
| G. Writing letters of recommendation, on behalf of inmates on matters concerning official business of the Office, without authorization from their bureau commander. | | | | ● | | | |
| H. Exchanging money or property with inmates or prisoners. | | | | | | ● | ● |
| I. Providing inmates with newspapers, magazines, or books from outside the jail. | | ● | | | | | |
| J. Engaging in informal, non-work-related discussions with inmates or prisoners concerning other officers, inmates, or prisoners. | | | ● | | | | |
| K. Making remarks of a personal nature in reference to any officers, inmates or prisoners, witnesses, or informants where the remarks may be within earshot of any inmate or prisoner. | | | ● | | | | |
| L. Encouraging or sympathize with inmates in their complaints about rules, regulations, or jail conditions, to include, failing to properly address the complaint or notify a supervisor of the situation. | | ● | | | | | |
| M. Offering religious or other advice to inmates regarding personal, family, or case-related problems. | | | ● | | | | |

**19  EMPLOYEE RELATIONSHIPS WITH PERSONS VISITING INMATES**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Granting special privileges, such as an extended visit time, or allowing an unscheduled visit, to visitors without the approval of the shift commander. | | | | ● | | | |
| B. Accepting favors or gratuities from visitors at any time. | | | | | ● | | |
| C. Indulging in undue familiarity with visitors. | | | | | | | ● |
| D. Fraternization with visitors. | | | ● | | | | |

**20  EMPLOYEE RELATIONSHIPS WITH OTHER EMPLOYEES**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Failure to be respectful and maintain a professional, courteous, and cooperative demeanor with other employees of the Office and other law enforcement or criminal justice personnel. | | ● | | | | | |
| B. Failure to be respectful and maintain a professional, courteous, and cooperative demeanor with supervisory personnel. | | ● | | | | | |
| C. Defying the authority of any supervisor by being disrespectful, arrogant, or displaying disrespectful conduct, whether in or out of the supervisor's presence. | | | ● | | | | |
| D. Covertly recording conversations involving other Office employees. | | | | ● | ● | | |

13

46REPORT000464

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                           **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| E. Failure to promote the establishment and maintenance of a professional workplace, free from discourteous treatment of others. | | ● | | | | | |
| F. Dating, entering into a romantic relationship, or having any form of sexual interaction between a supervisor and their supervised employee. | | | | ● | | | |
| G. Failure to notify supervisor when employees working in the same division or building are in a dating, romantic relationship, or are having any form of sexual interaction. | | | ● | | | | |

**21  EMPLOYEE RELATIONSHIPS WITH KNOWN OR SUSPECTED CRIMINALS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Associating or dealings with persons whom they know, or have reason to believe are, or have been, recently charged with criminal acts, or any person who the employee should reasonably know to have been involved in criminal acts or are under indictment. This is to include criminal investigation, arrests or incarceration. Employees shall also avoid associations with known racketeers, illegal gamblers, and persons in the community with a reputation for criminal behavior. | | | | ● | | | |

**22  EMPLOYEE RELATIONSHIPS WITH VICTIMS, WITNESSES, INFORMANTS, OR OTHER SUCH INDIVIDUALS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Converting an enforcement contact with persons, including, but not limited to, victims, witnesses, informants, suspects, or traffic violators, into a dating relationship, sexual relationship, social relationship, or business relationship during the course of any official contact or investigation. | | | | | | ● | ● |
| B. Failure to notify their supervisor of any relationship that evolves following contact due to job responsibilities. | | | | ● | | | |

**23  FREQUENTING PROHIBITED ESTABLISHMENTS**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Knowingly entering or frequent any establishment, such as a house of prostitution or illegal gambling house, wherein the laws of the United States, the state, or the local jurisdiction are regularly violated, except in the performance of duty or while acting under proper and specific orders from a supervisor. | | | | ● | | | |

**24  GAMBLING**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Participating in any form of illegal gambling at any time, except in the performance of duty, and while acting under proper and specific orders from a supervisor. | | | | | | ● | ● |

**25  SLEEPING ON DUTY**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| A. Sleeping on duty without authorization. | | | ● | | | | |

14

46REPORT000465

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| **26  INTERFERENCE WITH OFFICIAL INVESTIGATIONS** | | | | | | | |
| A. Use of official position or knowledge gained by employment with this Office to hinder, obstruct, or interfere with any case, official operation, or investigation being handled by this Office or any other agency. | | | | | | | ● |
| B. Improper discussing and sharing of confidential internal investigation information. | | | | ● | ● | ● | |
| C. Failure to submit to an administrative interview during an administrative investigation. | | | | | | | ● |
| **27  REQUEST FOR ASSISTANCE** | | | | | | | |
| A. Failure to adequately assist members of the public, when requesting assistance from the Office either by telephone or in person. | | ● | ● | ● | ● | ● | ● |
| **28  FAILURE TO MEET STANDARDS** | | | | | | | |
| A. Failure to perform assigned duties in an acceptable manner. | | ● | | | | | |
| B. Failure to possess the knowledge required to perform assigned duties based on the employee's job classification and training. | | ● | ● | | | | |
| C. Failure to complete assignments properly. | | ● | | | | | |
| D. Failure to make reasonable decisions or take appropriate actions. | | ● | | | | | |
| E. Failure to accomplish a reasonable share of the workload. | ● | | | | | | |
| F. Failure to conduct proper security walks. | | ● | | | | | |
| G. Failure to complete proper SHIELD entries. | | ● | | | | | |
| H. Failure to conduct a proper headcount. | | ● | | | | | |
| I. Failure to perform security functions which would not have the potential to place members of the public at risk. | | ● | | | | | |
| J. Failure to perform security functions that result in an escape or which places other employees or members of the public at risk. | | | | | | ● | |
| K. Failure to follow release procedures as specified in Office Policy DO-2, *Release Process*, resulting in an erroneous release from custody. | | ● | ● | | | | |
| L. Reckless use, handling, or display of firearms. | | | | | | ● | |
| M. Unintentional, voluntary discharge of firearm, where the trigger was manipulated voluntarily, but the discharge was unintentional. | | ● | | | | | |
| N. Unintentional, involuntary discharge of firearm, where the trigger was manipulated involuntarily, and discharge was unintentional. | | ● | | | | | |
| O. Accidental discharge of firearm, where outside influences such as clothing or equipment contacting the trigger occurred, due to failure to safety or holster firearm properly. Does not include actual mechanical failures. | | ● | | | | | |

15

46REPORT000466

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                                    **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| P. Unintentional non-activation and use of body-worn cameras when recording is otherwise required, as specified in Office Policy GJ-35, *Body-Worn Camera* (i.e., overlooked, preoccupied, fail to reactivate after being turned off for an authorized reason, or was distracted without intent to not record contact). | | ● | | | | | |
| Q. Unintentional deactivation of a body-worn camera when recording is otherwise required, as specified in Office Policy GJ-35, *Body-Worn Camera* (i.e., turned off before ending contact at a call for service without intent to not record contact, misunderstanding of Office Policy requirements). | | ● | | | | | |
| R. Repeat failures to activate/reactivate and use body-worn cameras, repeat failure to activate/reactivate and use body-worn cameras when conducting traffic stops, responding to calls for service, or interacting with the public for investigative or enforcement activities, unless exigent circumstances exist. | | | ● | ● | ● | ● | ● |
| S. Intentional deactivation or non-activation of a body-worn camera when activation is otherwise required and when the action was done beyond a misunderstanding of Office Policy requirements; to include tampering with the camera and/or recording, hardware or software component of the camera, as specified in Office Policy GJ-35, *Body-Worn Camera*. When this intentional act occurs, there is a permissive inference that the missing footage would have reflected misconduct and was done with the intent to conceal unlawful or inappropriate actions or to obstruct justice. | | | | | | | ● |
| T. Intentional failure to notify a supervisor and the Body-Camera Unit Supervisor of lost, stolen, damaged, or non-functioning equipment. | | | | ● | | | |
| U. Failure to intervene or respond when necessary, to include: calls for service, dispatch, and requests for assistance. | | | ● | | | | |
| V. Failure to respond to a radio call. | | ● | | | | | |
| W. Unintentional failure to complete reports as directed by Office policies, to include but not limited to, Incident Reports, PREA Reports, and Use of Force Reports. | | ● | | | | | |
| X. Intentional failure to complete reports as directed by Office policies, to include but not limited to, Incident Reports, PREA Reports, and Use of Force Reports. | | | ● | | | | |
| Y. Failure by a supervisor to conduct any required reviews with adequate and consistent quality. | | ● | | | | | |
| Z. Neglect to maintain prescribed records. | | ● | | | | | |
| aa. Failure by a supervisor to ensure employees perform required duties, or hold them accountable, of which does not place other employees or members of the public at risk. | | ● | | | | | |
| bb. Failure to conform to work standards established for the employee's rank or position. | | ● | ● | | | | |

16

46REPORT000467

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures* **Effective Date: 11-22-24**
**Attachment B**

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| cc. | | Failure to meet mandatory training as it relates to Arizona Peace Officer Standards and Training Board (AZ POST) requirements and Court order mandates. | | | ● | | | | |
| dd. | | Misuse and/or abuse of supervisory authority or privilege. | | | ● | | | | |
| ee. | | Failure to exercise proper supervision over assigned employee or prisoner. | | | ● | | | | |
| ff. | | Inattentiveness to duty or horseplay. | ● | | | | | | |
| gg. | | Failure to report to assigned area of responsibility during a shift. | | ● | | | | | |
| hh. | | Failure to advise employee of the grievance and appeal process and/or inform the chain of command of possible forthcoming complaints or grievances. | | ● | | | | | |
| ii. | | Refusing to participate in an Intervention Action Plan. | | | | | | ● | |
| jj. | | Allowing unauthorized personnel to enter work areas. | | ● | | | | | |
| kk. | | Failure to report an industrial injury requiring medical attention with 24 hours. | ● | | | | | | |
| ll. | | Failure of a supervisor to complete the Industrial Injury Report within 24 hours. | | ● | | | | | |
| mm. | | Failure to make required EIS Blue Team entries as a line staff employee. | ● | | | | | | |
| nn. | | Failure by a supervisor to make required EIS Blue Team entries. | | ● | | | | | |
| oo. | | Intentional misplacement of important documents or property with serious consequences for law enforcement. | | | | | | ● | ● |
| pp. | | Unintentional misplacement of important documents or property without serious consequences for law enforcement. | ● | | | | | | |
| qq. | | Failure to thoroughly search for and properly collect any available evidence in any arrest or criminal investigation. | | | ● | | | | |
| rr. | | Failure to notify the Office of a change of address or telephone number. | ● | | | | | | |
| ss. | | Failure to maintain telephone or other method of delivering messages. | ● | | | | | | |
| tt. | | Failure to maintain required uniform. | ● | | | | | | |
| uu. | | Failure to maintain personal appearance appropriate to the job. | ● | | | | | | |
| vv. | | Failure to keep work or vehicle area clean and uncluttered, causing a work hazard. | ● | | | | | | |

17

46REPORT000468

Case 2:07-cv-02513-GMS   Document 3509-1   Filed 06/12/26   Page 469 of 998
CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| ww. | Office employees and volunteers entering or working in a jail facility are prohibited from bringing personal cell phones, and other personal electronic items (MP3 players, iPods, personal laptops, tablets, smart watches, or any other personal electronic devices that are used for texting, e-mails, social media or viewing movies/clips, into secured areas of jail facilities, unless approved by a supervisor, or otherwise authorized, as specified in Office Policy CP-2, *Code of Conduct*. | ● | ● | | | | | |
| xx. | Failure to follow proper attire and grooming requirements, as specified in Office Policy GC-19, *Dress and Appearance*. | ● | ● | | | | | |

**29  INSUBORDINATION**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| A. | Failure by an employee to follow a reasonable and lawful order given by a supervisor regardless of the method of conveyance. | | | | | | ● | ● |

**30  LOITERING**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| A. | Remaining in eating establishments, gas stations, or other public places for longer than is reasonably required to complete the legitimate activity for which they stopped while on duty or in uniform, unless required by duty. | | ● | | | | | |
| B. | Remaining at a duty post or any Office location beyond the end of their shift, unless conducting official business or for a minimal period while awaiting transportation from work. | ● | | | | | | |

**31  ABUSE OF PROCESS, WITHHOLDING EVIDENCE, AND  MISAPPROPRIATION OF PROPERTY**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| A. | Manufacturing, concealing, falsifying, destroying, removing, tampering with, or withholding evidence or information, or make false accusations in a criminal, traffic matter, or administrative matter. | | | | | | | ● |
| B. | Failure to ensure a valid chain of evidence with adherence to the guidelines for the strict control and management of evidentiary property, as specified in Office Policy GE-3, *Property Management and Evidence Control.* | | | ● | | | | |
| C. | Failure to properly report and document, any property that is being held as evidence, found property, or for safekeeping, which comes into possession of the employee during the course of regular duties. | | | | | ● | ● | |
| D. | Unintentional failure to properly secure an individual's personal property which results in the loss of those items. | | ● | | | | | |
| E. | Intentional or negligent failure to properly secure an individual's personal property which results in the loss of those items. | | | | | | ● | ● |

**32  TREATMENT OF MEMBERS OF THE PUBLIC OR  PERSONS IN CUSTODY**

18

46REPORT000469

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                    **Effective Date: 11-22-24**
**Attachment B**

| | | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | | Unnecessary use of force or force option with a member of the public or persons who are in the custody of the Office, or failure to report such actions. | | | | | | ● | |
| B. | | Abusive treatment of members of the public, or inmates, or prisoners, which does not rise to the level of assault. | | | | | ● | | |

**33  GUM AND TOBACCO USAGE**

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | | Use of tobacco products or gum while making personal contacts with members of the public in the performance of their duties. Tobacco products use includes but is not limited to: cigars; cigarettes; pipes; chewing tobacco; and E-cigarettes. | ● | | | | | | |
| B. | | Use of tobacco products in a non-designated area. | ● | | | | | | |

**34  PROPERTY DAMAGE**

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | | Failure to notify a supervisor, or if unavailable, the nearest on-duty supervisor, and promptly submit a written report concerning any damage to real or personal property, including vehicles, belonging to the Office, Maricopa County, a member of the public, or any other entity or individual, which is a result of, or occurred during, the execution of their official duties or responsibilities. | | | ● | | | | |
| B. | | Failure to notify a supervisor and promptly submit a written report concerning any damage to real or personal property of others, including vehicles, belonging to the Office, Maricopa County, while off duty. | | | ● | | | | |
| C. | | Attempting to work out or negotiate a settlement with any entity or individual regarding personal or Maricopa County liability when property damage has occurred during the execution of official duties. | | | | | | ● | |

**35  RUMORS OR GOSSIP**

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | | Spreading rumors or gossip is prohibited. | | ● | | | | | |
| B. | | Failure by supervisors to take action when made aware of the spreading of rumors or gossip. | | | ● | | | | |

**36  SOCIAL NETWORKING SITES**

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| A. | | Accessing social networking sites on Office equipment while on duty unless in the performance of official duties or accessing official Office controlled social media sites, such as Twitter, Facebook, or Instagram for viewing purposes of Office announcements only. | | ● | | | | | |
| B. | | Publicly expressing, sharing, or posting information regarding the Office which would jeopardize the safety and security of Office employees, inmates or the public, or which could negatively impact the efficient or effective operation of the Office. | | | ● | ● | ● | ● | ● |

**37  KEEPING SUPERVISORS INFORMED**

19

46REPORT000470

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*  **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|:-:|:-:|:-:|:-:|:-:|:-:|:-:|
| A. Failure to notify a supervisor of all situations, events, incidents, inspections, and communications that affect, or may affect, the Office, or with which the Office may be concerned. | | ● | | | | | |
| B. Failure to notify involvement in any situation being investigated by another law enforcement agency, whether as a witness, victim, or suspect, or in anticipation of becoming an accused suspect. | | ● | | | | | |
| C. Failure to notify a supervisor of the suspension or revocation of driving privileges. (This failure applies only to the reporting, not actual vehicle operation which falls under Section 3, Subsection B, Commission of a Class 1 misdemeanor). | | | ● | | | | |
| D. Failure to notify a supervisor upon knowledge of a family member being booked into an Office jail. | | ● | | | | | |
| E. Failure to notify a supervisor of the issuance of a court order, such as an order of protection or an injunction against harassment, in which the Office employee has been named. | | | ● | | | | |
| F. Failure to notify a supervisor of the receipt of a moving vehicle traffic citation. | ● | | | | | | |
| **38  USE OF DISCRETION** | | | | | | | |
| A. Failure to use discretion in the enforcement of laws and in determining appropriate actions. | | ● | | | | | |
| B. Failure to use discretion to evaluate the circumstances and consider available resources and alternate solutions. | | ● | | | | | |

46REPORT000471

# INELIGIBLE EXTERNAL
# PSB-DIRECTED SUPERVISORY INTERVENTIONS

> *Once MCSO receives an internal or external complaint, the PSB Commander shall make an initial determination that a qualifying complaint may be addressed as an approved PSB-Directed Supervisory Intervention. There are some Categories of Offenses that might be either internal or external and may be subject to different criteria.*
>
> *All external allegations of a Category 1, First or Second Offense or Category 2, First Offense as set forth in Attachment B of Office Policy GC-17 shall be eligible for a PSB-Directed Supervisory Intervention with the EXCEPTION of those listed below:*

| | Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| **4** | **INDIVIDUAL RESPONSIBILITY** | | | | | | | |
| A. | Failure of an employee who observes or becomes aware of any act of misconduct by another employee to report the incident as soon as practicable to a supervisor or directly to the PSB. **The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | ● | ● | ● | ● | ● | ● | ● |
| B. | Failure of an employee to take appropriate action whenever learning of an Office Policy violation being committed, or having been committed, by any other person associated with the Office in any capacity, which by its very nature would tend to discredit an employee or the Office. To include conduct on or off-duty. **The presumptive discipline for a failure to take appropriate action may be commensurate with the presumptive discipline for the underlying misconduct or maybe one offense less than received by the employee who committed the act.** | ● | ● | ● | ● | ● | ● | ● |
| C. | Failure to adequately assist members of the public with the Comment and Complaint Form process. | | ● | | | | | |
| **5** | **UNBECOMING CONDUCT** | | | | | | | |
| A. | Failure by an employee to conduct themselves, at all times, both on and off duty, in such a manner as to reflect favorably on the Office, as specified in Office Policy CP-2, *Code of Conduct*. | | ● | | | | | |
| C. | Failure of an employee who is on duty or identified by dress, location, or association as an employee, to maintain a professional demeanor and perform their duties in a calm and firm manner. | | ● | | | | | |
| H. | Failure by an employee who has contact with the public to deal with people fairly, and courteously. | | ● | | | | | |
| I. | Use of profanity, rude or insulting language, or conduct offensive to employees or members of the public that is not of a discriminatory nature or a racial slur. | | ● | | | | | |

21

46REPORT000472

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy GC-17,** *Employee Disciplinary Procedures*                                    **Effective Date: 11-22-24**
**Attachment B**

| Category | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| K. Failure to represent the Office in a professional manner while in uniform or in a County vehicle, to members of the public. | | ● | | | | | |
| **9   ABUSE OF POSITION OR AUTHORITY** | | | | | | | |
| N. Unintentionally denying any person of civil liberties (such as no probable cause for arrest, search and seizure, or failing to give Miranda Warning when required, or any that may be guaranteed by the Constitution of the United States). | | ● | ● | ● | | | |
| **10   CARE AND USE OF OFFICE OR MARICOPA COUNTY EQUIPMENT** | | | | | | | |
| L. Committing criminal traffic violations while driving a County owned vehicle. Criminal violations to include but not limited to, criminal speed, driving without a valid license, driving with a suspended license, reckless driving, hit and run, vehicular manslaughter, and driving under the influence of alcohol or drugs. | | ● | ● | ● | ● | ● | ● |
| **18   ASSOCIATIONS AND FRATERNIZATION WITH INMATES OR PRISONERS** | | | | | | | |
| L. Encouraging or sympathize with inmates in their complaints about rules, regulations, or jail conditions, to include, failing to properly address the complaint or notify a supervisor of the situation. | | ● | | | | | |
| **27   REQUEST FOR ASSISTANCE** | | | | | | | |
| A. Failure to adequately assist members of the public, when requesting assistance from the Office either by telephone or in person. | | ● | ● | ● | ● | ● | ● |
| **28   FAILURE TO MEET STANDARDS** | | | | | | | |
| Y. Failure by a supervisor to ensure employees perform required duties, or hold them accountable, of which does not place other employees or members of the public at risk. | | ● | | | | | |

22

46REPORT000473



100 Pine Street, Suite 3100
San Francisco, California 94111
Direct Dial:  628.201.0793
Fax:  628.221.5828

## MEMORANDUM

| | |
|---|---|
| **To:** | Captain Aaron Flowers<br>Maricopa County Sheriff's Office |
| **From:** | Shaneeda Jaffer<br>Independent Investigator |
| **Date:** | January 26, 2026 |
| **Subject:** | Investigative Report and Recommendation for IA 2025-0111 and IA 2025-0165 |

This Investigative Report and Recommendations ("Report") concerning Internal Affairs Investigations IA 2025-0111 and IA 2025-0139 is provided by the Court Appointed Independent Investigator ("Independent Investigator") pursuant to the Chief Robert Warshaw's (the "Monitor") request on October 30, 2025.

## I.    Introduction

On May 30, 2025, Judge Snow, District of Arizona, appointed Shaneeda Jaffer as Independent Investigator for Maricopa County Sheriff's Office ("MCSO") IA 2025-0185.[1]  On October 30, 2025, the Monitor, pursuant to his authority to oversee MSCO's Professional Standards Bureau ("PSB") and Internal Affairs ("IA") investigation, discipline, grievances, policies, procedures, and protocols[2], requested that the Independent Investigator review the record for IA 2025-0111 and IA 2025-0139 and provide recommended findings and conclusions.

Ultimately, two MCSO Complaints are at issue – IA 2025-0111 and IA 2025-0139.  These two MCSO IA Complaints led to three distinct investigations completed by the Arizona Department of Public Safety ("APDS"):

- <u>MCSO IA 2025-0111.</u>  On March 10, 2025, Sergeant Aaron Engelbeck ("Sergeant Engelbeck") submitted a complaint alleging the destruction and/or withholding of evidence related to his appeal of a prior investigation.[3]  This complaint listed Captain Gregory Lugo ("Captain Lugo") and Sergeant Robert Leatham ("Sergeant Leatham") as "Involved Employees."[4]

---

[1] Doc. 3191.

[2] Doc. 1785 at ¶ 276; Doc. 2827 ¶¶ 346-347; 352.

[3] Complaint, IA 2025-0111 at 6 (MELC0005346086). IA2025-0111 is related to the alleged destruction of evidence from IA2020-0555.

[4] *Id.*

46REPORT000474

     o  ADPS Agent Patrick Quane conducted a criminal investigation, during which he concluded that no criminal violation occurred.[5]

     o  Additionally, ADPS Sergeant Robert Olshaskie conducted an internal affairs investigation into these allegations.[6]

-  <u>MCSO IA 2025-0139.</u>  On or about April 7, 2025, MCSO Executive Chief Melissa Palopoli ("Palopoli") accused Captain Lugo of failing to notify her of the conflict of interest resulting from Engelbeck's March 10, 2025, complaint and of insubordination when Captain Lugo reviewed IA 2025-0111 after instructions to "stay out of it."  ADPS Sergeant Craig Baum conducted an internal affairs investigation into the alleged insubordination and failure to notify.

MCSO placed Captain Lugo on administrative leave with pay during the pendency of the criminal and internal affairs investigations.  While the criminal investigation related to MCSO IA 2025-0111 conclusively determined that no criminal violations occurred, neither ADPS internal affairs investigation presented findings and recommendations about either administrative matter.  Thus, on October 30, 2025, the Monitor requested that the Independent Investigator review all three investigations conducted by ADPS to make findings and recommendations.  This report presents the Independent Investigator's findings of facts.  Thereafter, this report addresses each of ADPS's investigations, including limited additional factual findings, relevant MCSO policies and Court Orders, and ultimately issues findings and recommendations for each allegation.

As detailed below, the Independent Investigator concurs with the criminal investigation's conclusion that no criminal violations occurred.  Therefore, Captain Lugo and Sergeant Leatham are ***Exonerated*** of the A.R.S. § 38-1106(A)(1) allegation, and the ARS 13-2809(A)(1) allegation is ***Unfounded***.  The allegation of a violation of CP-2, Code of Conduct, Section 6: Conformance to Established Laws related to MCSO IA 2025-0111 is ***Unfounded*** as to Captain Lugo and Sergeant Leatham.  Finally, with regard to IA 2025-0139, the allegation that Captain Lugo failed to notify Chief Palopoli of his conflict of interest is ***Not Sustained***, and Captain Lugo is ***Exonerated*** of the insubordination allegation.

## II.    Factual Findings

On October 3, 2020, MCSO Professional Standards Bureau ("PSB") initiated an investigation into allegations of insubordination and untruthfulness against Sergeant Aaron Engelbeck.[7]  PSB Sergeant Robert Leatham conducted this investigation, which was assigned MCSO case number IA 2020-0555.[8]  At the time, Captain Lugo was a Captain in the District 6 Patrol Division and a supervisor to Sergeant Engelbeck.[9]  Initially, Captain Lugo submitted a memorandum to the chain of command entitled, "Recommendation for release/demotion from promotional probation" as to Sergeant Engelbeck.[10]  Thereafter, PSB initiated the internal affairs investigation into aspects of Sergeant Engelbeck's performance as detailed in Captain Lugo's

---

[5] ADPS Criminal Report I25023143 ("Quane Report").
[6] ADPS IA 2025-165 ("Olshaskie's Report").
[7] IA 2020-0555, Sgt. Leatham's Investigative Report, at 7 (MELC0005345489).
[8] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[9] *Id.*
[10] Memorandum recommending Engelbeck's demotion, at 1 (MELC0005345855-56).

2

memorandum.[11]    Sergeant Leatham interviewed Sergeant Engelbeck on October 21, 2020, and January 31, 2024, and interviewed Captain Lugo on October 15, 2020.[12]    The October 24, 2024 final findings indicated two sustained allegations of insubordination, and Sergeant Engelbeck received a 40-hour suspension.[13]    The other allegations were not sustained.[14]

Sergeant Engelbeck appealed his discipline related to IA 2020-0555 in October 2024, claiming that Captain Lugo engaged in misconduct and retaliated against him contrary to policy.[15] On December 9, 2024, Sergeant Engelbeck requested the full case file from the IA 2020-0555 investigation, and on December 20, 2024, Sergeant Engelbeck received documents and records in response.[16]    On January 27, 2025, Sergeant Engelbeck realized that the recordings of his and Captain Lugo's interviews with Sergeant Leatham were not included in the documents and records he received for his appeal.[17]    Also on January 27, 2025, Sergeant Engelbeck contacted Neil Landeen of the Maricopa County Attorney's Office ("MCAO") to inform him that the interview recordings had not been provided.[18]    The following day, January 28, 2025, MCSO Conduct Resolution personnel informed Sergeant Engelbeck that the sustained insubordination charges were being changed to not sustained, and the Appeal of Discipline Hearing was being vacated.[19] Further, Sergeant Engelbeck learned that he would be paid for the 40-hour suspension he had served.[20]

Concerned that misconduct had occurred, on March 10, 2025, Sergeant Engelbeck filed a complaint against the Professional Standards Bureau (PSB) and Captain Lugo.[21]    Sergeant Engelbeck alleged that, in his first interview with Sergeant Leatham, he lodged several complaints against Captain Lugo regarding command responsibility, truthfulness, and retaliation.[22]    The complaints were not investigated, and shortly afterwards, Captain Lugo was promoted to PSB Commander.[23]    Sergeant Engelbeck claimed that Captain Lugo and the PSB had destroyed evidence of the interview and intentionally refused to provide it when Sergeant Engelbeck requested it for his appeal.[24]    Notably, Conduct Resolution, not the PSB, provides documentation in the event of discipline, and Captain Lugo was listed as an "interested party" rather than a principal."[25]    This case was no different: the materials Sergeant Engelbeck received, that he believed to be incomplete, were sent to him by Conduct Resolution, not the PSB.[26]

---

[11] *Id.*
[12] IA 2020-0555 Investigative Report, at 4-5 (MELC0005345486-87).
[13] Letter imposing discipline, at 1 (Oct. 24, 2024) (MELC0005345720-23).
[14] IA 2020-0555 Findings (MELC0005345708-12).
[15] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[16] *Id.*, at 3-4 (MELC0005346082-83).
[17] *Id.* (MELC00005346083).
[18] *Id.*
[19] *Id.* (MELC00005346083-84).
[20] *Id.; see also* Ken Holmes, *Letter rescinding discipline* (Jan. 28, 2025).
[21] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Olshaskie's Report, No. 2025-165, at 7 (Oct. 18, 2025); *see also* Policy GH-2, *Internal Investigation*, Section 22 ("The Administrative Services Division may distribute copies of all or any portion of an administrative investigation for administrative or public record purposes[.]").
[26] *Id.*, at 10-12; Quane's Report, at 8-9.

46REPORT000476

On March 10, 2025, at 4:02 PM, Sergeant Engelbeck emailed the substance of his complaint, along with documents, to Undersheriff Jeff Gentry ("Gentry").[27] At 4:03 PM, Sergeant Engelbeck uploaded his complaint onto IAPro BlueTeam, listing Captain Lugo and Sergeant Leatham as involved parties.[28] At 6:03 PM, Undersheriff Gentry sent Sergeant Engelbeck's email to Chief Palopoli, recommending that an outside agency investigate the incident. Chief Palopoli responded to the email just before 7:00 PM.[29] At 7:03 PM, during a typical review of incoming IA complaints, Captain Lugo viewed the first three paragraphs of the complaint, which, among other things, identified Captain Lugo as an involved party in the complaint and stated that Sergeant Engelbeck had informed Undersheriff Gentry via email of his complaint.[30] Captain Lugo did not notify Chief Palopoli about the complaint that evening.[31]

The next day, March 11, 2025, Chief Palopoli initiated a discussion about the complaint with Captain Lugo via phone call at 11:11 AM.[32] Captain Lugo noted that this indicated to him that Chief Palopoli was aware of the complaint and of his conflict of interest with Sergeant Engelbeck.[33] During the conversation with Chief Palopoli, Captain Lugo also expressed concern that this would essentially reopen a closed case.[34] Captain Lugo requested that it be treated as an investigation against the Conduct Resolution Section or a service complaint to avoid reopening closed cases.[35]

On March 18, at 9:00 AM, Captain Lugo arrived at Headquarters to discuss the investigation with Chief Palopoli.[36] She notified Captain Lugo that an outside agency would investigate the matter.[37] Captain Lugo explained to Chief Palopoli that the investigation had exceeded the seven-day compliance period.[38] During her July 23, 2025, interview with ADPS, Chief Palopoli stated that she decided to formally designate the matter as an Internal Affairs investigation, and that she instructed Captain Lugo to "stay out of it."[39] When asked whether she could remember what she specifically said to Captain Lugo, Chief Palopoli stated,

> Um, what exactly I said no, um, but I do recall that we designated it as an internal investigation involving [Captain Lugo] as a principal, and that he was to stay out of, out of the investigation and to provide me with a lieutenant, um, as my point of contact. So, to me, staying out of the investigation is completely wiping your hands of it, stepping back

---

[27] Email chain re: Request for outside agency criminal investigation sent 4:02 PM (Mar. 10, 2025).
[28] IAPro BlueTeam is web-based software application that is a companion product to the IAPro case management system used by law enforcement agencies.
[29] Email chain re: Request for outside agency criminal investigation, sent 5:03 PM (Mar. 10, 2025).
[30] Capt. Lugo Aug. 12, 2025, Interview Tr. at 5.
[31] *Id.*, at 6.
[32] *Id.*, at 8.
[33] *Id.*, at 8-9.
[34] *Id.*, at 9.
[35] *Id.*, at 9-10.
[36] *Id.*, at 12-13.
[37] *Id.*, at 13.
[38] *Id., see also* Policy GH-2, *Internal Investigation*, Section 2(B)(1)(e).
[39] Chief Palopoli timeline, pg. 1; Chief Palopoli Interview Summary, at 4.

4

and not having any involvement whatsoever, and recusing yourself at any moment in time that it comes up.[40]

While Chief Palopoli claims that it was during the March 18, 2025, meeting that she ordered Captain Lugo to "stay out of it," Captain Lugo denies that these instructions occurred at this meeting.[41]

On March 21, 2025, Captain Lugo met with Chief Don Anders, a member of the Monitor team, ("Monitor Anders") for their regularly scheduled intake meeting to "go through all the cases from the prior week."[42]  Captain Lugo explained that during these meetings, he and Monitor Anders review all new cases since the last meeting, as required by the Court Orders.[43]  Captain Lugo informed Monitor Anders of Sergeant Engelbeck's complaint against him, later called IA2025-0111.[44]  At Monitor Anders' request, Captain Lugo accessed the BlueTeam log to provide more information about the case, including what the complaint said about the chief deputy, and they discussed the complaint's similarity to the previously investigated case.[45]  The User Log indicates that Captain Lugo only accessed the incident at this time; he did not open any files or attachments associated with the complaint.[46]  This is corroborated by the case note referenced in Sergeant Baum's report:

> Case Note:   *On August 27, 2025, [ADPS] Legal Counsel spoke with Chief Anders. Chief Anders confirmed that a conversation occurred with Captain Lugo on March 21, 2025.  The purpose of that conversation was to discuss newly received cases and the assignment of those cases within the PSB.[47]*

On March 24, 2025, Chief Palopoli informed Captain Lugo that she intended to assign IA 2025-0111 to Jensen Hughes, PSB's conflict investigation firm.[48]  Captain Lugo promptly informed Chief Palopoli of a conflict of interest with Jensen Hughes, given Captain Lugo's oversight of their work.[49]  Captain Lugo indicated that it was during this March 24, 2025, meeting that Chief Palopoli instructed Captain Lugo to "stay out of it."[50]  Captain Lugo also shared Monitor Anders' contact information with Chief Palopoli.[51]  Regarding Palopoli's order to "stay out of it," the following exchange took place during Captain Lugo's August 12, 2025, interview:

> **Baum:**   Sir, were you given a direct order to stay out of the investigation by Chief Palopoli?

---

[40] Investigative Narrative: Internal Affairs Complaint #2025-064 ("Baum Report"), at 5; Chief Palopoli Interview Summary, at 6.

[41] Capt. Lugo Aug. 12, 2025, Interview Tr., at 63.

[42] Capt. Lugo Aug. 12, 2025, Interview Transcript, at 18.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *See* IA 2025-0111 Access Log (MELC0005344969).

[47] Baum Report, at 6.

[48] Capt. Lugo's Timeline, at 6-7 (MELC0005344957-58).; Capt. Lugo Aug. 12, 2025, Interview Transcript, at 20.

[49] Capt. Lugo Aug. 12, 2025, Interview Transcript, at 20.

[50] Capt. Lugo's Timeline, at 7 (MELC0005344958); Capt. Lugo Aug. 12, 2025, Interview Transcript, at 20.

[51] Capt. Lugo's Timeline, at 7.

5

46REPORT000478

| | |
|---|---|
| **Lugo:** | To stay out of the actual investigative steps?  Yes. |
| **Glueck[52]:** | Including accessing the case in IAPro? |
| **Lugo:** | No. |
| **Glueck:** | Okay.  What did her order mean to you then? |
| **Lugo:** | So, her order which reiterated my statements of stay out of it meant the actual doing anything involving the investigation.  Does not mean anything reference to providing or fulfilling any of my requirements of the court's order such as the dates, the times, the information that the monitor requires of the intake process advising the court appointed monitor of it.  Um, but I would not go in to look at the attachments, of course.  I would not, um, sign off on any memos.  I would not direct any investigation.  Um, I would not, you know, monitor any interviews approve or, uh, review any investigative plans.  I would not direct investigative plans.  Um, that is what I mean in of staying out the actual investigating aspect, the actions, uh, of collecting that information.[53] |

When asked if Chief Palopoli elaborated on her order, Captain Lugo explained that she did not:

There's no written communication as such, um, of typically when we talk about in our agency of giving orders and making it clear, you know, there's, uh, various mechanisms that it's memorialized, okay, including email, text message, um, supervisor notes, all of that.  And at no time was there any clarification.[54]

On March 25, 2025, Captain Lugo spoke with Monitor Anders to continue the March 21, 2025, call.[55]  The Monitor agreed to handle the conflict-of-interest issue.[56]

On March 27, 2025, Chief Palopoli contacted Captain Lugo regarding the Sergeant Engelbeck matter.[57]  Chief Palopoli asked Captain Lugo who he would recommend to investigate this case.[58]  Captain Lugo said that he declined to recommend anyone.[59]

On March 28, 2025, Captain Lugo attended his regularly scheduled intake meeting with Monitor Anders.[60]  During that call, Monitor Anders asked Captain Lugo for the "assigned date," so Captain Lugo accessed the IAPro log for IA2025-0111 a second time, once again at Monitor

---

[52] ADPS Sergeant Tristan Glueck.
[53] Capt. Lugo Aug. 12, 2025, Interview Transcript, at 46-47.
[54] *Id.* at 47.
[55] *Id.* at 22.
[56] *Id.*
[57] *Id.* at 23; Capt. Lugo's Timeline, at 11 (MELC0005344962).
[58] Capt. Lugo Aug. 12, 2025, Interview Tr., at 24; Capt. Lugo's Timeline, at 11 (MELC0005344962).
[59] *Id.*
[60] Capt. Lugo Aug. 12, 2025, Interview Tr., at 26-27.

46REPORT000479

Anders' direction.[61]  Captain Lugo later indicated concern about the authenticity of the IAPro access log, as it did not reflect his access that day.[62]

On April 2, 2025, Captain Lugo attended a meeting with Undersheriff Gentry, Chief Palopoli, and others, during which Captain Lugo indicated that his team was notified of IA 2025-0111, and that the case should be locked down.[63]  Also on April 2, 2025, Chief Palopoli accessed the user log in IAPro to see who had viewed IA 2025-0111.[64]  She observed that Captain Lugo accessed the log on March 21, 2025, after Chief Palopoli claims to have ordered him "stay out of it."[65]

Concurrently, Chief Palopoli and Undersheriff Gentry decided to refer the investigation to ADPS, as their normal outside investigator, Jensen Hughes, had a conflict-of-interest.[66]  On April 3, 2025, Undersheriff Gentry sent a letter to Colonel Jeffrey Glover of ADPS requesting external assistance in conducting an internal affairs investigation.

On April 4, 2025, Undersheriff Gentry informed Captain Lugo that he was being placed on administrative leave pending this investigation.[67]  Captain Lugo protested, saying that his case should follow the same procedure as all PSB cases.[68]  On April 7, 2025, MCSO officially placed Captain Lugo on administrative leave. [69]

On April 7, 2025, Chief Palopoli lodged a second internal affairs complaint against Captain Lugo for insubordination when he accessed the online portal associated with IA2025-0111 against orders.[70]  Chief Palopoli also alleged that Captain Lugo failed to notify her of the conflict of interest in Sergeant Engelbeck's complaint.[71]  Chief Palopoli's complaint was ultimately assigned case number IA 2025-0139.

On April 9, 2025, MCSO personnel hosted a meeting with ADPS regarding the referral of Sergeant Engelbeck's and Chief Palopoli's complaints.[72]  Undersheriff Gentry, Chief Palopoli, and Deputy Chief Matt Summers attended for MCSO, while Captain Gunnar Hancock and Sergeant Baum attended for ADPS.[73]  During the meeting, Chief Palopoli "provided [] pertinent documentation" to Sergeant Baum.[74]

---

[61] *Id.* at 27.

[62] *Id.* at 28.

[63] Chief Palopoli July 23, 2025, Interview Summary, at 4-5.

[64] Chief Palopoli's Timeline, at 3.

[65] *Id.*

[66] Baum Report, at 6-7.

[67] Capt. Lugo's Timeline, at 13-17; Chief Palopoli's Timeline, at 3.

[68] Capt. Lugo's Aug. 12, 2025, Interview Transcript, at 33-34.

[69] Capt. Lugo's Suspension Letter (Apr. 7, 2025).

[70] Chief Palopoli's timeline, at 3.

[71] Email from Chief Palopoli to Lieutenant Frederick Porter, sent 2:47 PM (April 7, 2025).

[72] Baum Report, at 1.

[73] *Id.*

[74] *Id.*

7

46REPORT000480

**III.    IA 2025-0111 – Criminal Investigation**

MCSO referred IA2025-0111 to ADPS for criminal investigation.  ADPS Agent Patrick Quane conducted the investigation and concluded that no criminal violation occurred.

8

**A.** **Allegations and Charges**

    1.    <u>MSCO</u>—violation of A.R.S. § 38-1106(A)(1) for failure to provide the respondent's investigative file within 14 calendar days of the request.

    2.    <u>MSCO</u>—violation of A.R.S. § 13-2809(A)(1) tampering with physical evidence.

**B.** **Relevant Laws and MCSO Policies**

    1.    A.R.S. § 38-1106(A)(1)

In any appeal of a disciplinary action by a law enforcement officer, the parties shall cooperate with each other, act in good faith and exchange copies of all relevant documents and a list of all witnesses pursuant to the following time periods and requirements:

Within fourteen calendar days after the employer's receipt of a written request from the law enforcement officer for a copy of the investigative file that is accompanied by a copy of the filed notice of appeal, the employer shall provide a complete copy of the investigative file as well as the names and contact information for all persons interviewed during the course of the investigation.

The proper remedy for a violation is the exclusion of evidence, unless the failure to comply is because of excusable neglect.  A.R.S. § 38-1106(D).

    2.    A.R.S § 13-2809(A)(1)

A person commits tampering with physical evidence if, with intent that it be used, introduced, rejected or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person:

Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability.

    3.    Policy GH-2, *Internal Investigations, Sections 22 & 23: Records Disclosure and Retention*

The Administrative Services Division may distribute copies of all or any portion of an administrative investigation for administrative or public record purposes, or as necessary to comply with a judgment of a federal or state court.

In accordance with A.R.S. § 39-128, the Office shall retain all records that are reasonably necessary or appropriate to maintain an accurate knowledge of disciplinary action involving employees of the Office, including the employee's responses to all disciplinary actions.  All administrative investigations shall be maintained for five years after an employee's separation or retirement from Office employment.

<center>9</center>

46REPORT000482

### C.    Investigation Materials

During his investigation, Agent Quane reviewed the documents and records outlined in his report.[75]  Additionally, Agent Quane interviewed:

- Lieutenant Frederick Porter (April 17, 2025; May 5, 2025);
- Sergeant Robert Leatham (April 21, 2025);
- Sergeant Aaron Engelbeck (April 29, 2025);
- Management Analyst Maria Garcia (April 22, 2025); and
- MSCO Director of Conduct Resolution Tiffani Shaw (May 7, 2025).

### D.    Agent Quane's Findings

Agent Quane concluded that no criminal misconduct occurred in IA 2025-0111.[76]  Not only was it impossible for a criminal violation of A.R.S. § 13-2809(A)(1) to have occurred because no testimony was taken under oath, but no individual suspect was identified.[77]  Accordingly, it was not only impossible to violate the statute and tamper with evidence, but also no tampering occurred.[78]

Even had a violation occurred, Agent Quane concluded that it was unintentional.[79]  Agent Quane contacted Conduct Resolution, the MCSO entity responsible for maintaining and providing IA-related files, and observed the interview that Sergeant Engelbeck claimed was deleted.[80]  Agent Quane found that it was both unmodified and saved within MCSO's systems, contrary to Sergeant Engelbeck's claims.[81]  He also discussed the incident with Tiffani Shaw, the Director of Conduct Resolution.[82]  She explained that if Sergeant Engelbeck did not receive the video, it was merely an oversight on the part of Conduct Resolution.[83]

Accordingly, Agent Quane concluded that no violation of A.R.S. § 13-2809(A)(1) occurred, because (1) no evidence was given under oath, and (2) no intentional modification of evidence occurred.[84]

On the other hand, Agent Quane found that a violation of A.R.S. § 38-1106(A)(1) did occur, because Sergeant Engelbeck did not receive the documentation he requested from Conduct Resolution within the 14-day statutorily required period.[85]  However, Agent Quane concluded that this is an administrative policy, rather than a criminal statute, so no criminal penalties could stem from it.[86]

---

[75] Quane's Report, at 4-7.

[76] *Id.* at 8-9.

[77] *Id.*

[78] *Id.*

[79] *Id.* at 7-8.

[80] *Id.* at 8.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.* at 8-9.

[85] *Id.*

[86] *Id.*

10

Further, based on his conversation with Ms. Shaw, Agent Quane concluded that any omissions from Sergeant Engelbeck's file were inadvertent.[87]  As a result, no further criminal investigation was warranted.

### E.    Independent Investigator's Findings

1.    A.R.S. § 38-1106(A)(1)

The Independent Investigator finds that this alleged "criminal" violation is administrative in nature.  Accordingly, no criminal violation occurred.

A.R.S. § 38-1106(a) requires the employer to provide a law enforcement officer who requests his or her administrative file the entire file within fourteen (14) calendar days.[88]  It also states that the proper remedy for a violation is the exclusion of evidence, "unless the failure to comply is because of excusable neglect."[89]

Here, Sergeant Engelbeck submitted his request on December 9, 2025.[90]  He did not receive the entirety of his administrative file within 14 days of the request.  On January 27, 2025, Sergeant Engelbeck notified Neil Landeen from MCAO that he did not receive his first interview with Sergeant Leatham, nor Captain Lugo's interview.  This exceeded the 14-day window, thus violating the statutory mandate.

As Agent Quane found, neither Captain Lugo nor Sergeant Leatham were involved in preparing or sharing Sergeant Engelbeck's file.  Instead, Conduct Resolution stores and provides that information.  Because neither Captain Lugo nor Sergeant Leatham were tasked with providing this information, they cannot be responsible for any violation.

Additionally, the violation (by Conduct Resolution) is likely due to excusable neglect. Agent Quane obtained, and the Independent Investigator reviewed, files from Conduct Resolution. There is no evidence that the interview videos were destroyed, mutilated, altered, or concealed in any way.  After a conversation with Ms. Shaw from Conduct Resolution, Agent Quane concluded that the omission of the interview was an oversight.  This constitutes the excusable neglect contemplated by the statute.

Accordingly, because the failure to provide Sergeant Engelbeck's interview within 14 days was due to excusable neglect by Conduct Resolution and not the willful actions of Captain Lugo or Sergeant Leatham, the Independent Investigator finds that Captain Lugo and Sergeant Leatham are ***Exonerated*** of this allegation.[91]

---

[87] *Id.* at 8.
[88] A.R.S. § 38-1106(A)(1).
[89] A.R.S. § 38-1106(D).
[90] Complaint IA 2025-0111, at 1-2 (MELC0005346080).
[91] Doc. 1765, at ¶ 208(d); Policy GH-2, *Internal Investigation*, Section 7(A).

11

2.      A.R.S § 13-2809(A)(1)

It was also alleged that Sergeant Leatham and Captain Lugo violated A.R.S § 13-2809(A)(1) and tampered with evidence by destroying and withholding evidence from Sergeant Engelbeck's appeal.  As Agent Quane concluded, an "official proceeding" is one "heard before any legislative, judicial, administrative or other governmental agency or official authorized to hear evidence under oath."[92]  "While a police investigation is arguably an administrative governmental function, no governmental body hears evidence under oath in that context[.]"[93]  Agent Quane repeatedly asked, and was repeatedly informed, that the interviews were not given under oath.[94]  Accordingly, neither Captain Lugo nor Sergeant Leatham could tamper with evidence in violation of the statute, because it did not involve any proceeding that occurred under oath.

Moreover, there is no evidence to suggest that either Captain Lugo or Sergeant Leatham were involved in providing the files to Sergeant Engelbeck.  Both explained that neither of them is involved in providing files on appeal—instead, Conduct Resolution supplies that information.  Further, Agent Quane's investigation revealed that the files Sergeant Engelbeck claimed had been deleted were actually intact and stored along with his file.  Finally, Tiffani Shaw indicated that if Sergeant Engelbeck did not receive all the files he requested, it was likely an error on the part of Conduct Resolution and was unintentional.

Because neither Captain Lugo nor Sergeant Leatham had any role in providing the case file to Sergeant Engelbeck for the purposes of his appeal, the allegation of a violation of A.R.S. § 13-2809(A)(1) for tampering with physical evidence is ***Unfounded***.[95]

## IV.      IA 2025-0111 – Internal Affairs Investigation

ADPS Sergeant Olshaskie conducted the internal affairs investigation into the allegations of IA 2025-0111, that Sergeant Leatham and Captain Lugo tampered with Sergeant Engelbeck's record on appeal.

### A.      Policy

1.      MSCO Policy CP-2*, Code of Conduct, Section 6: Conformance to Established Laws.*

Employees shall obey all local ordinances, county and state laws, laws of all states of the United States and subdivisions thereof, and all laws of the United States.  While traveling outside of the continental United States, employees shall abide by all laws of foreign countries not in conflict with the laws of the United States.  Violation of any established ordinance or law may result in disciplinary action, up to dismissal and possible criminal prosecution.  Disciplinary action may be imposed regardless of the outcome of any criminal investigation.

---

[92] A.R.S. § 13-2801(2).
[93] *State v. Larriba-Tucker,* 259 Ariz. 320, 565 P.3d 1072, ¶ 17 (App. 2025).
[94] *Id.* at 5-6.
[95] Doc. 1765, at ¶ 208(a); Policy GH-2, *Internal Investigation*, Section 7(B).

12

### B.    Investigation Materials

Sergeant Olshaskie reviewed various documents and interviews associated with 2020-0555,[96] related to the investigation into Sergeant Engelbeck's insubordination, and conducted various interviews, including:

- Sergeant Aaron Engelbeck (September 23, 2025);
- Sergeant Robert Leatham (October 6, 2025);
- Captain Greg Lugo (October 9, 2025).

### C.    Sergeant Olshaskie's Investigation

While interviewing Sergeant Engelbeck, Sergeant Olshaskie noted that Captain Lugo and Sergeant Leatham were not principals, but merely "involved employees."[97]  Sergeant Engelbeck stated that he did not have proof that either Captain Lugo or Sergeant Leatham were involved but thought they "had the most to gain."[98]  Sergeant Engelbeck also admitted he was aware, by October 2025, that the files he requested did, in fact, exist and had not been tampered with.[99]  He also admitted that he had no evidence that any of his files were modified.[100]

Sergeant Olshaskie also interviewed Sergeant Leatham.[101]  Sergeant Leatham stated that he has no involvement in the appeals process or the way evidence is gathered, and believed that Captain Lugo did not, either.[102]  Captain Lugo provided the same information in his interview, stating that the PSB has "zero involvement" in providing a case file for appeals.[103]  Captain Lugo stated that he was not involved in providing the case file for Sergeant Engelbeck's appeal.[104]  Ultimately, Sergeant Olshaskie did not issue any findings or recommendations.

### D.    Independent Investigator's Findings

As above in the criminal investigation, there is no evidence to suggest that either Captain Lugo or Sergeant Leatham were involved in providing the files to Sergeant Engelbeck.  Instead, that is a function of the Conduct Resolution Section.  Further, because both Agent Quane and the Independent Investigator concluded that no criminal violation occurred, it follows that neither Captain Lugo nor Sergeant Leatham violated CP-2, Code of Conduct, Section 6: Conformance to Established Laws.  As such, the allegation of a violation of CP-2, Code of Conduct, Section 6: Conformance to Established Laws is ***Unfounded***.[105]

---

[96] Olshaskie's Report, at 2.
[97] *Id.*
[98] *Id.* at 8.
[99] *Id.* at 10.
[100] *Id.*
[101] *Id.* at 11.
[102] *Id.* at 11-12.
[103] *Id.* at 14.
[104] *Id.*
[105] Doc. 1765, at ¶ 208(a); Policy GH-2, *Internal Investigation*, Section 7(B).

13

46REPORT000486

## V.    IA 2025-0139 – Internal Affairs Investigation

ADPS Sergeant Baum investigated IA 2025-0139, specifically Chief Palopoli's allegations of insubordination and failure to notify against Captain Lugo.  Lieutenant Baum began his investigation on April 9, 2025.

### A.    Allegations and Policies

Chief Palopoli accused Captain Lugo of failing to notify her of his conflict of interest related to Engelbeck's March 10, 2025, complaint in conformance with MCSO GH-2, Section 4(D)(4).  She also alleged insubordination as defined in CP-2, Section 40, for Captain Lugo accessing the IAPro file for Engelbeck's complaint on March 21, 2025.

### B.    Relevant Policies and Court Orders

#### 1.    MCSO Policy GH-2, *Internal Investigations*

Section 2(B)(1)(e): Upon determination by the PSB Commander that an allegation of misconduct requires an investigation, the PSB shall promptly assign an IA Number to the incident and provide it to the complainant.  Within seven days, the PSB shall provide a written update to the complainant which shall include the IA Number and the name of the assigned investigator.  This written update shall also inform the complainant how they may contact the PSB to inquire about the status of the complaint.

Section 4(D): Conflict of interest in administrative investigations is prohibited.  An assigned investigator shall disclose any involvement or relationship which could be perceived to compromise the investigative process to the PSB Commander prior to the start of the investigation.  The PSB Commander shall make a determination as to whether the perception is justified and reassign the investigation, if necessary.

Section 4(D)(4): If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority.

#### 2.    MCSO Policy CP-2, *Code of Conduct*

Section 40: Insubordination is the willful refusal to obey a reasonable and lawful order.  A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*.  The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

#### 3.    MCSO Policy GB-2, *Command Responsibility*

Section 6: Orders are commands or directives issued by a person with authority.  When orders are given in the form of oral commands, they should be simple and direct and may be followed by a written order.

14

Section 6(A): Written orders should be used when: a situation is complex enough that misunderstanding is reasonably possible; when several persons or units are involved and all must have the same understanding; and when coordination, control, and follow-up are necessary.

1. Such orders permit the recipient to refer to them for details and serve as evidence of precise instructions.

4.   *Ortega Melendres v. Arpaio,* Permanent Injunction Order, Doc. 606 (D. Ariz. Oct. 2, 2013) Supplemental Permanent Injunction/Judgment Order

On October 2, 2013, the Court entered its Supplemental Permanent Injunction/Judgment Order.[106]   Section IV of that order mandates Monitor review and approval of policies and procedures and the process by which policies and procedures are to be submitted for such review and approval.[107]

5.   *Ortega Melendres v. Arpaio,* Second Amended Second Supplemental Permanent Injunction/Judgment Order, Doc. 1765 (D. Ariz. July 26, 2016)

On July 26, 2016, the Court entered its Second Amended Second Supplemental Permanent Injunction/Judgment Order.[108]   Section XV of that order pertains to misconduct investigations, discipline, and grievances.[109]   That order mandates "[a]ll policies, procedures, protocols, training materials, and other material required by this Order are subject to the same process of review and comment by the parties and approval by the Monitor described in Section IV and ¶46 of the first Supplemental Permanent Injunction (Doc. 606)."[110]   It also mandates that conflicts of interest in investigations are strictly prohibited.[111]   It states that retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense.[112]

6.   *Ortega Melendres v. Penzone,* Order Resolving Order to Show Cause and Civil Contempt Findings, Doc. 2827 (D. Ariz. Nov. 8, 2022)

On November 8, 2022, the Court entered the above-referenced order.  It explained that the MCSO engaged in biased investigations that were delayed to such an extent that the behavior circumvented the Court's orders.[113]   To remedy the violation, the Court granted the Monitor Team "authority to oversee all of MSCO's [PSB] complaint intake and routing."[114]   It also commands the Monitor and the PSB Commander to work together and determine which complaints should be

---

[106] Doc. 606.
[107] *Id.* at ¶¶14-17.
[108] Doc. 1765.
[109] *Id.* at 18.
[110] *Id.* at ¶163-64.
[111] *Id.* at ¶¶ 167(a)(i)-(iii).
[112] *Id.* at ¶ 169.
[113] *Id.* at 1-2.
[114] *Id.* at 8.

15

46REPORT000488

investigated by the PSB or referred to other agencies.[115]  The Order repeatedly states that the "Monitor must consult with the PSB Commander" about the intake and routing process.[116]

### C.  Investigation Materials

Sergeant Baum reviewed documents provided by MCSO and conducted interviews of:

- Lieutenant Porter (July 20, 2025);
- Chief Palopoli (July 23, 2025 & September 3, 2025); and
- Captain Lugo (August 12, 2025). [117]

### D.  Sergeant Baum's Investigation

Sergeant Baum did not issue conclusions about the allegations, but he created a detailed narrative describing the events related to IA2025-0139.  He specifically noted the following discrepancies between Captain Lugo's and Chief Palopoli's interview testimony:

| Discrepancies between Captain Lugo and Chief Palopoli | | |
|---|---|---|
| Event | Chief Palopoli's Version | Captain Lugo's Version |
| Chief Palopoli orders Captain Lugo to "stay out of it." | March 18, 2025 | March 24, 2025 |
| Chief Palopoli orders Captain Lugo to open an IA number and assign a sergeant | March 18, 2025 | March 24, 2025 |
| Chief Palopoli calls Captain Lugo and asks him who he "recommends" to investigate his case | This did not happen | March 27, 2025 |

In his second interview of Chief Palopoli, Sergeant Baum asked if she was sure that her order to "stay out of it" occurred on March 18, 2025.[118]  She said that she was sure based on her notes.[119]  Sergeant Baum also reviewed and compared Chief Palopoli's and Captain Lugo's timelines.[120]

---

[115] *Id.* at 9.
[116] *Id.*
[117] *See generally*, Baum's Report.
[118] Chief Palopoli Interview Summary, at 7.
[119] *Id.*
[120] Baum Report, at n. 14 & 15.

46REPORT000489

### E.    Independent Investigator's Findings

#### 1.    Failure to Notify

The language in GH-2 mirrors the Court Order's requirement that "a commander who is responsible for making disciplinary findings or determining discipline" must "immediately inform … the highest-ranking non-conflicted chief-level officer at MSCO."[121]  Similarly, it requires a Supervisor to "immediately document and report information" to the PSB.[122]  In contrast, other language in the Order requires employees to report incidents "as soon as practicable."[123]

Captain Lugo explained that, at approximately 7:03 PM, he accessed the IAPro incoming folder and reviewed the first three paragraphs of Sergeant Engelbeck's complaint.[124]  Significantly, Captain Lugo was not named as a principal in that complaint.[125]  The first three paragraphs detail the events from IA2020-0555, a case that had already closed.[126]  Aware that Sergeant Engelbeck had previously filed complaints about Captain Lugo, and that those complaints were handled, and closed, as service complaints, Captain Lugo believed that the new complaint was an effort by Engelbeck to re-litigate matters already adjudicated.[127]  Further, Captain Lugo observed that the complaint indicated that Sergeant Engelbeck had also emailed the substance of his complaint to Undersheriff Gentry.[128]  These facts, taken together, indicate that Captain Lugo did not believe that Sergeant Engelbeck's complaint necessitated a formal internal affairs investigation, and that his chain of command was already aware of the allegations.  This justifies Captain Lugo's failure to contact Chief Palopoli as soon as he saw the complaint—he believed his chain of command already knew, and he was not named as a principal.

In any event, Captain Lugo did not fail to timely notify Chief Palopoli.  Captain Lugo reviewed Sergeant Engleback's complaint at approximately 7:03 PM on March 10, 2025.[129]  Captain Lugo indicated that he worked later into the evening, from home.[130]  Captain Lugo explained that, during this period, he worked later at night and cared for his children during the morning hours, as his children were on spring break.[131]  As 7:00 PM is after typical working hours, Captain Lugo's failure to call Chief Palopoli that evening is understandable.  The following morning, when Chief Palopoli contacted him at approximately 11:11 AM, Captain Lugo was taking care of his children, which explains his failure to notify her prior to her request for a call—he was not working. [132]

Based on the limited information that Captain Lugo read from Sergeant Engelbeck's complaint, it is reasonable that he believed the complaint was Sergeant Engelbeck's attempt to

---

[121] Doc. 1975 at 19-20.
[122] *Id.* at 20.
[123] *Id.*
[124] Capt. Lugo Aug. 12, 2025, Interview Tr., at 5.
[125] IA 2025-0111 Complaint, at 6 (MELC0005346085).
[126] *Id.* at 1-2 (MELC0005346080-81).
[127] Capt. Lugo Aug. 12, 2025, Interview Tr., at 9-10.
[128] *See* IA2025-0111 Access Log.
[129] *Id.*
[130] Capt. Lugo Aug. 12, 2025, Interview Tr., at 4-5; 8.
[131] *Id.* at 8.
[132] *Id.*

17

retaliate against him, and that his chain of command was already aware of the substance of the complaint. Further, the approximately 16-hour gap between when he read three paragraphs of the complaint and when he spoke to Chief Palopoli is reasonable, given the late hour that Captain Lugo read the complaint, and his family obligations the following morning. Accordingly, the allegation that Captain Lugo failed to notify Chief Palopoli of his conflict of interest is ***Not Sustained.***[133]

### 2.    Insubordination

Insubordination is the willful refusal to obey a reasonable and lawful order.[134] A willful violation is intentional; not accidental; voluntary; designed.[135] Captain Lugo was not insubordinate for three reasons: (1) the Independent Investigator finds that Chief Palopoli's oral order to "stay out of it" was issued on March 24, 2025, after Captain Lugo accessed the IAPro portal; (2) Chief Palopoli's oral order to "stay out of it" was vague, unreasonable, and unlawful; and (3) Captain Lugo accessed the IAPro portal at the Monitor's direction.

First, the Independent Investigator finds that Chief Palopoli's order was issued on March 24, 2025, after Captain Lugo's access to the IAPro portal, not on March 18, 2025, as Chief Palopoli alleges.[136] The Independent Investigator finds Captain Lugo's interview testimony to be more credible than Chief Palopoli's on this point for several reasons. First, Captain Lugo took contemporaneous notes of all his interactions and conversations with Chief Palopoli and Undersheriff Gentry during this time. Second, Captain Lugo's testimony is supported by corroborating evidence including call logs, text message screen shots, and date-stamped notes. Chief Palopoli's notes were not made contemporaneously and lack detail and support.

Additionally, independent evidence supports that Chief Palopoli gave the "stay out of it" directive to Captain Lugo on March 24, 2025. This evidence shows that Chief Palopoli made the decision to open Sergeant Engelbeck's complaint as an internal affairs investigation on March 24, 2024. During her interview, Chief Palopoli said that it was during the same conversation she instructed Lugo to "stay out of it" that she made the decision to open the complaint as an internal investigation involving Captain Lugo as a principal:

> Um, what exactly I said no, um, but I do recall that we designated it as an internal investigation involving [Captain Lugo] as a principal, and that he was to stay out of, out of the investigation and to provide me with a lieutenant, um, as my point of contact. So, to me, staying out of the investigation is completely wiping your hands of it, stepping back and not having any involvement whatsoever, and recusing yourself at any moment in time that it comes up.[137]

---

[133] Doc. 1765, at ¶ 208(c); Policy GH-2, *Internal Investigation*, Section 7(C).

[134] MCSO Policy CP-2, Code of Conduct, Section 40.

[135] MSCO Policy CP-2, at 2.

[136] Captain Lugo indicated that he also accessed the log on March 28, 2025, although this is absent from the Access Log. (Lugo Interview Tr. at 27-28). As further stated below, this does not change the Independent Investigator's findings, as Chief Palopoli's order was vague and unreasonable.

[137] Baum Report, at 5.

46REPORT000491

Captain Lugo agreed that this decision was made at the same time as the order to "stay out of it," but stated that the conversation took place on March 24, 2025. Review of the IA 2025-0111 User Log shows only user one access—by Chief Palopoli—on March 18, 2025, at 9:05 AM. This was during her meeting with Captain Lugo in her office. No additional activity followed on March 18, 2025. In contrast, the log shows a flurry of intake and routing activity by PSB administrative staff during the afternoon of March 24, 2025. This activity includes the assignment of case number IA 2025-0111 and several additional early intake tasks. That this activity took place on the afternoon of March 24, 2025, is consistent with Chief Palopoli's statement that she decided to open the case during the same conversation she instructed Captain Lugo to "stay out of it." It follows, then, that the "stay out of it" order came on March 24, 2025. Because Chief Palopoli's order came after Captain Lugo's March 21, 2025 access to the IAPro portal, Captain Lugo did not willfully refuse to obey an order.[138]

Second, Chief Palopoli's oral order to "stay out of it" was vague, unreasonable, and unlawful. The order should have been "followed by a written order" with "precise instructions," and Chief Palopoli's failure to clearly articulate the details and parameters of the oral order renders compliance nearly impossible.[139] To be sure, in his interview, Captain Lugo indicated that he was the first to use the term "stay out of it" on March 24, 2025, when he was explaining to Chief Palopoli that Jensen Hughes could not conduct the investigation because of their own conflict of interest. Specifically, Captain Lugo provided Monitor Anders' contact information to Chief Palopoli so that they could discuss the issue and find an un-conflicted external agency to conduct the investigation. With that information shared, Captain Lugo then told Chief Palopoli that he would "stay out of it."[140]

As the conversation ended, Chief Palopoli parroted Captain Lugo's term back to him when she instructed him to "stay out of it." Chief Palopoli did not elaborate to Captain Lugo what she intended with the instruction. During her July 23, 2025, interview, Chief Palopoli explained that she intended the order to convey that Captain Lugo was to have no involvement whatsoever:

> So, to me, staying out of the investigation is completely wiping your hands of it, stepping back and not having any involvement whatsoever, and recusing yourself at any moment in time that it comes up.[141]

But, importantly, Chief Palopoli then invited Captain Lugo to violate that very order on March 27, 2025, when she asked Captain Lugo who he would recommend to investigate this case.[142] Had

---

[138] During his August 12, 2025, interview, Captain Lugo explained that he accessed the IAPro system again on March 28, 2025, during another regularly scheduled intake meeting with Monitor Anders. During this call, Monitor Anders instructed Captain Lugo to access IAPro to obtain the 'assigned date.' The access log provided to the Independent Investigator does not reflect Captain Lugo's March 28, 2025, access. However, because the Independent Investigator determines that Chief Palopoli's order to "stay out of it" was unreasonable and unlawful, and because Monitor Anders' instruction to access IAPro supersedes Chief Palopoli's order, the March 28, 2025, IAPro access is inconsequential.

[139] *See* Policy GB-2, *Command Responsibility*, Section 6(a).

[140] Later, on March 27, 2025, when Chief Palopoli asked Captain Lugo who he would recommend to investigate the case, Captain Lugo declined to recommend anyone, consistent with his understanding of "stay[ing] out of it."

[141] Investigative Narrative: Internal Affairs Complaint #2025-064 ("Baum Report"), at 5; Chief Palopoli Interview Summary, at 6.

[142] Capt. Lugo Aug. 12, 2025, Interview Tr., at 24; Capt. Lugo's Timeline, at 11 (MELC0005344962).

19

46REPORT000492

she truly intended for Captain Lugo to "wip[e] [his] hands of it," then it makes no sense that she sought his counsel about it just days later.

Further, Chief Palopoli provided no instruction to Captain Lugo at the time of the order that he was not permitted to access the IAPro portal, as required to fulfill his duties under MCSO policies and the Federal Court Orders. Indeed, such an order from Chief Palopoli prohibiting Captain Lugo from complying with the Federal Court Order would be an unlawful order. As a result, the Independent Investigator finds that Chief Palopoli's oral order to "stay out of it" was vague, unreasonable, and unlawful. Therefore, Captain Lugo's access to the IAPro portal was not a willful refusal to obey a reasonable and lawful order.

Finally, Captain Lugo accessed the IAPro portal on March 21, 2025 at the Monitor's instruction. This is corroborated by Lieutenant Baum's investigation:

> Case Note:  *On August 27, 2025, DPS Legal Counsel spoke with Chief Anders. Chief Anders confirmed that a conversation occurred with Captain Lugo on March 21, 2025. The purpose of that conversation was to discuss newly received cases and the assignment of those cases within the PSB.*

Captain Lugo was required by court order to cooperate with Monitor Anders so he could determine the investigative process for every complaint.[143] Accordingly, Captain Lugo was obligated to comply with Monitor Anders' request for information about an incoming complaint. This applies equally to Captain Lugo's March 28, 2025, access, if that indeed occurred. As a result, Captain Lugo received an order from the Monitor that superseded any order given by Chief Palopoli.

Chief Palopoli's order to "stay out of it" occurred on March 24, 2025, was unreasonably vague, and unlawful. Further, Captain Lugo accessed the IAPro portal on March 21, 2025, at the specific request of the Monitor, in order to comply with the Federal Court Orders. As a result, Captain Lugo did not violate a lawful order and is ***Exonerated*** of the allegation of insubordination.[144]

---

[143] Doc. 2827, at 8.
[144] Doc. 1765, at ¶ 208(d); Policy GH-2, *Internal Investigation*, Section 7(A).

20

46REPORT000493

## VI.   Summary of Findings

| Summary of Findings | | | |
|---|---|---|---|
| **Investigation No.** | **Allegation(s)** | **Principal(s)** | **Independent Investigator's Findings** |
| IA2025-0111 | ARS § 38-1106(a): failure to provide a law enforcement officer who requests his or her administrative file the entire file within fourteen (14) calendar days. | Captain Greg Lugo; Sergeant Robert Leatham | *Exonerated* |
| IA2025-0111 | A.R.S § 13-2809(A)(1): tampering with evidence by destroying and withholding evidence from Sergeant Engelbeck's appeal. | Captain Greg Lugo; Sergeant Robert Leatham | *Unfounded* |
| IA2025-0111 | Failure to follow established laws in violation of Policy CP-2. | Captain Greg Lugo; Sergeant Robert Leatham | *Unfounded* |
| IA2025-0139 | Failure to warn of a conflict of interest in violation of Policy GH-2, Internal Investigations. | Captain Greg Lugo | *Not Sustained* |
| IA2025-0139 | Insubordination for failing to follow a reasonable lawful order in violation of Policy CP-2. | Captain Greg Lugo | *Exonerated* |

21

| Appendix | |
|---|---|
| **Statutes and Codes** | |
| ARS 13-2809 | 3 |
| ARS 38-1106 | 4 |
| CP-2 Code of Conduct | 8 |
| GH-2 Internal Investigations | 30 |
| First Court Order- Doc No. 606 | 74 |
| Second Court Order- Doc No. 1765 | 133 |
| Third Court Order- Doc No. 2827 | 200 |
| **Interviews & Timelines** | |
| Capt. Lugo's Timeline | 216 |
| Capt. Lugo's August 12, 2025, Interview Transcript | 233 |
| Chief Palopoli's Timeline | 297 |
| Chief Palopoli's July 23, 2025, Interview Summary | 301 |
| **Investigative Reports** | |
| Agent Quane's Report | 310 |
| Sgt. Baum's Report | 319 |
| Sgt. Olshaskie's Report | 328 |
| Sgt. Leatham's Report for 2020-0555 | 342 |
| **Miscellaneous Documentation** | |
| 1.28.2025 letter rescinding Sgt. Engelbeck's discipline | 456 |
| IA2025-0111 Complaint | 457 |
| IA2025-0111 Access Log | 464 |
| Suspension Letter sent to Capt. Lugo April 7, 2025 | 474 |
| Sgt. Engelbeck Recommendation for Demotion Memo | 475 |
| Sgt. Engelbeck's Suspension Letter (Oct. 24, 2024) | 486 |
| IA2020-0555 Findings | 490 |
| Signed Letter Rescinding Discipline (Jan. 28, 2025) | 495 |
| 3.10.2025 emails between Undersheriff Gentry, Chief Palopoli, and Sgt. Engelbeck re: Request for outside agency criminal investigation | 496 |
| Email from Chief Palopoli to Lieutenant Frederick Porter, sent 2:47 PM (April 7, 2025). | 503 |

22

# APPENDIX

46REPORT000496

# Statutes & Codes

46REPORT000497

---

Arizona Revised Statutes Annotated
  Title 13. Criminal Code (Refs & Annos)
    Chapter 28. Interference with Judicial and Other Proceedings (Refs & Annos)

A.R.S. § 13-2809

## § 13-2809. Tampering with physical evidence; classification

Currentness

**A.** A person commits tampering with physical evidence if, with intent that it be used, introduced, rejected or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person:

1. Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability; or

2. Knowingly makes, produces or offers any false physical evidence; or

3. Prevents the production of physical evidence by an act of force, intimidation or deception against any person.

**B.** Inadmissibility of the evidence in question is not a defense.

**C.** Tampering with physical evidence is a class 6 felony.

**Credits**
Added by Laws 1977, Ch. 142, § 90, eff. Oct. 1, 1978.

Notes of Decisions (2)

A. R. S. § 13-2809, AZ ST § 13-2809
Current through legislation of the First Regular Session of the Fifty-Seventh Legislature (2025).

---

End of Document                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

46REPORT000498

Arizona Revised Statutes Annotated
   Title 38. Public Officers and Employees (Refs & Annos)
     Chapter 8. Public Safety Officers (Refs & Annos)
       Article 1. Law Enforcement Officers (Refs & Annos)

A.R.S. § 38-1106

## § 38-1106. Appeal of disciplinary actions; transcripts; change of hearing officer or administrative law judge; burden of proof; final disposition report; exception

Effective: September 24, 2022

Currentness

**A.** In any appeal of a disciplinary action by a law enforcement officer, the parties shall cooperate with each other, act in good faith and exchange copies of all relevant documents and a list of all witnesses pursuant to the following time periods and requirements:

1. Within fourteen calendar days after the employer's receipt of a written request from the law enforcement officer for a copy of the investigative file that is accompanied by a copy of the filed notice of appeal, the employer shall provide a complete copy of the investigative file as well as the names and contact information for all persons interviewed during the course of the investigation.

2. Not later than fourteen calendar days before the appeal hearing, the parties shall produce and serve on every party the following information:

(a) The name of each witness whom the disclosing party expects to call at the appeal hearing, with a designation of the subject matter on which each witness might be called to testify. A witness may decline an interview. The parties shall not interfere with any decision of a witness regarding whether to be interviewed. An employer shall not discipline, retaliate against or threaten to retaliate against any witness for agreeing to be interviewed or for testifying or providing evidence in the appeal.

(b) The name and contact information of each person who has given statements, whether written or recorded or signed or unsigned, regarding matters relevant to the notice of discipline and the custodian of the copies of those statements.

(c) Copies of any documents that may be introduced at the hearing and that have not previously been disclosed.

3. The duty to disclose information continues to exist throughout the process and up to the end of the appeal process.

**B.** It is unlawful for a person to disseminate information that is disclosed pursuant to subsection A of this section to any person other than the parties to the appeal and their lawful representatives for purposes of the appeal of the disciplinary action. This subsection does not prohibit the use of the information in the hearing or disclosure pursuant to title 39, chapter 1, article 2.[1]

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  1

**C.** If a transcript is required in an administrative hearing, the employer shall obtain the transcript and provide a copy to the law enforcement officer within ten calendar days after the employer's receipt of the transcript.

**D.** Failure to comply with the requirements of subsection A or B of this section shall result in the exclusion of the witness, evidence or testimony, unless the failure to comply is because of excusable neglect.

**E.** The employer or the law enforcement officer may seek a determination by the hearing officer, administrative law judge or appeals board hearing the appeal regarding any evidence that the employer or the law enforcement officer believes should not be disclosed pursuant to subsection A of this section because the risk of harm involved in disclosure outweighs any usefulness of the disclosure in the hearing. In determining whether evidence will be disclosed, the hearing officer, administrative law judge or appeals board may perform an in camera review of the evidence and may disclose the material subject to any restriction on the disclosure, including the closing of the hearing or the sealing of the records, that the hearing officer, administrative law judge or appeals board finds necessary under the circumstances.

**F.** In any appeal of a disciplinary action by a law enforcement officer in which a single hearing officer or administrative law judge has been appointed to conduct the appeal hearing, the law enforcement officer or the employer, within ten calendar days after the appointment of the hearing officer or administrative law judge, may request a change of hearing officer or administrative law judge. In cases before the office of administrative hearings or if the employer is a county, city or town, on the first request of a party, the request shall be granted. A city or town with a population of less than sixty-five thousand persons or a county with a population of less than two hundred fifty thousand persons must provide, if necessary to comply with this subsection, for an alternate hearing officer by means of an interagency agreement with another city, town or county. If the law enforcement officer is the party who requested the alternate hearing officer, the law enforcement officer shall reimburse the city, town or county for one-half of any additional expenses incurred by the city, town or county in procuring the alternate hearing officer under the interagency agreement. If an alternate hearing officer is requested by means of an interagency agreement, the hearing officer shall provide to the law enforcement officer or employer the option of continuing the hearing for an additional ten calendar days. Any subsequent requests may be granted only on a showing that a fair and impartial hearing cannot be obtained due to the prejudice of the assigned hearing officer or administrative law judge. The supervisor or supervising body of the hearing officer or administrative law judge shall decide whether a showing of prejudice has been made.

**G.** The employer has the burden of proof in an appeal of a disciplinary action by a law enforcement officer.

**H.** The hearing officer, administrative law judge or appeals board may take into consideration violations of this article as mitigation in determining discipline.

**I.** Except where a statute, rule or ordinance makes the administrative evidentiary hearing the final administrative determination and after a hearing where the law enforcement officer and the employer have been equally allowed to call and examine witnesses, cross-examine witnesses, provide documentary evidence and otherwise fully participate in the hearing, an employer or a person acting on behalf of an employer may amend, modify, reject or reverse the portion of a decision made by a hearing officer, administrative law judge or appeals board that was arbitrary or without reasonable justification. The employer or person acting on behalf of the employer shall state the reason for the amendment, modification, rejection or reversal.

**J.** Notwithstanding chapter 3, article 3.1 of this title,[2] all hearings pursuant to this section shall be open to the public. Executive sessions allowed pursuant to § 38-431.03 shall be limited to legal advice to a personnel appeals board or for deliberations.

46REPORT000500

**K.** A law enforcement officer who prevails in an appeal where a termination has been reversed shall be awarded retroactive compensation from the date of the officer's separation to the date of reinstatement. The hearing officer, administrative law judge or appeals board hearing the appeal shall determine the amount of retroactive compensation awarded and any reduction to that amount. Retroactive compensation may be reduced:

1. If there is undue delay in setting a hearing date caused by the law enforcement officer or the law enforcement officer's representative.

2. If the law enforcement officer requests a continuance.

3. If there exists a period between separation and reinstatement that the law enforcement officer would have been unable to perform the duties of a law enforcement officer.

4. By any amount earned by the law enforcement officer in alternative employment.

5. If the hearing officer, administrative law judge or appeals board finds that the law enforcement officer's action or misconduct warrants suspension or demotion.

**L.** The hearing officer, administrative law judge or appeals board shall state in every finding of disciplinary action whether or not just cause existed for the disciplinary action.

**M.** The hearing officer, administrative law judge or appeals board shall document in the record those circumstances where the hearing officer, administrative law judge or appeals board determines that a party has clearly violated a party's obligation under this section.

**N.** Immediately after a law enforcement officer receives the final disposition of an appeal of a disciplinary action, the administrative law judge, hearing officer or presiding authority shall provide a final disposition report that includes the final decision and any amended findings of fact to the law enforcement agency that initiated or imposed the discipline.

**O.** A law enforcement agency that receives a final disposition report shall include the final disposition report in the agency's original investigation record. If the law enforcement agency provided a prosecuting agency with information that was obtained during the investigation of the law enforcement officer for the prosecuting agency's rule 15.1 database, the law enforcement agency shall forward the final disposition report to the prosecuting agency.

**P.** This section does not apply to a law enforcement officer who is employed by an agency of this state as an at will employee.

**Credits**

Added by Laws 2014, Ch. 240, § 9, eff. Jan. 1, 2015. Amended by Laws 2016, Ch. 318, § 2; Laws 2019, Ch. 110, § 3; Laws 2022, Ch. 139, § 1; Laws 2022, Ch. 175, § 4.

46REPORT000501

Notes of Decisions (3)

Footnotes

1        Section 39-121 et seq.

2        Section 38-431 et seq.

A. R. S. § 38-1106, AZ ST § 38-1106
Current through legislation of the First Regular Session of the Fifty-Seventh Legislature (2025).

**End of Document**                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

46REPORT000502

CONFIDENTIAL - ATTORNEY'S EYES ONLY



| | MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | |
|---|---|---|
| **Subject** **CODE OF CONDUCT** | | **Policy Number** **CP-2** |
| | | **Effective Date** **01-11-24** |
| **Related Information** Arizona Revised Statutes Maricopa County Merit System Rules Code of Ethics Multiple Office Policies | **Supersedes** CP-2 (02-14-23) | |

## PURPOSE

The purpose of this Office Policy is to establish guidelines and procedures by which all employees of the Office shall conduct themselves, both on and off-duty.

Although this Office Policy refers to employees throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and posse members.

## POLICY

It is the policy of the Office to ensure efficiency, instill discipline, and foster positive public trust by setting forth guidelines governing the conduct and demeanor of every member of the Office. This Office Policy is also intended to hold employees accountable for federal, state, and local laws by ensuring that any criminal misconduct is investigated.

## DEFINITIONS

*Conflict of Interest:* A conflict that involves, but is not limited to, nepotism, bias of any kind, an external business relationship, a close personal relationship, or superiority in rank in an individual's chain of command.

*Employee:* A person currently employed by the Office in a classified, unclassified, contract, or temporary status.

*Family Member:* An employee's spouse to whom they are legally married under the laws of any state, parents (biological, adopted, foster, step, in-law, or individual who stood in loco parentis to the employee when they were a child), sibling (biological, adopted, foster, step, in-law, or half), child (biological, adopted, foster, step, in-law, or child to whom the employee stands in loco parentis), grandparents (biological, adopted, step, or in-law), grandchildren, custodial persons, a reportable occurrence under Arizona law of fetal death of a listed relation, and the employee's aunts, uncles, nieces, nephews, or first cousins.

*Internal Affairs Investigator:* Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the Professional Standards Bureau (PSB) or supervisors in an Office division or bureau who are assigned to investigate misconduct.

*Misconduct:* Includes any violation of Office Policy or procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

*Criminal Misconduct:* Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                     **Effective Date: 01-11-24**

> *Minor Misconduct:* Misconduct that, if sustained, would result in discipline or corrective action less severe than a suspension.
>
> Minor misconduct, while a violation of Office Policy, can often be addressed with supervisor-initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include; Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not, per the Office Disciplinary Matrix, exceed a Category 1, First or Second Offense or a Category 2, First Offense, and which has not been received by the Office as an External Complaint, or has not already been assigned to the Professional Standards Bureau (PSB).
>
> *Serious Misconduct:* Misconduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

*Negligence:* Failure to exercise the care a reasonable or prudent person would exercise in similar circumstances.

*Office Property:* Any property owned, leased, or purchased by Maricopa County for Office use.

*Socioeconomic Status:* Relating to or concerned with the social standing or class of an individual or group based on social and economic factors such as, education, income, and occupation.

*Undue Familiarity:* Conduct that includes any act of a sexual nature with an offender who is in the custody of the state department of corrections, the department of juvenile corrections, a private prison facility, a juvenile detention facility, a city or county jail, or with an offender who is under the supervision of either department, a city, or county.

*Volunteer:* A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

*Willful:* Intentional; not accidental; voluntary; designed.

**PROCEDURES**

1.    **Unethical Conduct:**

    A.    Employees shall maintain a high level of ethical conduct at all times and shall be honest, fair, and impartial, while working or identified as employees of the Office.

    B.    Employees shall not participate in any activity which would compromise their ability to perform their Office duties objectively and impartially.

    C.    Personnel shall not withhold relevant information or mislead investigators during a criminal or administrative investigation.

    D.    All employees shall abide by the *Sheriff's Office Code of Ethics*, as specified in this Office Policy (see Attachment A). Classified employees shall also abide by the Maricopa County Merit System Rules Code of Ethics.

2.    **Truthfulness:** The Office requires absolute truthfulness from every applicant in securing employment and from every employee during employment, as specified in Office Policy CP-5, *Truthfulness*.

2

46REPORT000504

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct* **Effective Date: 01-11-24**

3.  **Discrimination and Harassment:** The Office believes that any type of harassment, including sexual harassment, unlawful discrimination, or retaliation, in the workplace or wherever business is conducted on behalf of the Office, undermines the integrity of the employment relationship and shall be addressed, as specified in Office Policy CP-3, *Workplace Professionalism*.

4.  **Conflict of Interest:** Employees shall not involve themselves in any matter that may involve a conflict of interest or the appearance of a conflict of interest. Should a conflict of interest arise, employees shall notify their supervisor.

    A.  In matters involving misconduct or discipline, employees shall notify the Professional Standards Bureau (PSB) Commander. If the PSB Commander also suffers from a conflict, the highest-ranking, non-conflicted Office chief or, if there is no non-conflicted Office chief, an outside authority shall make the determination. The outside authority for matters involving discipline will be the Maricopa County Attorney's Office – Civil Division.

    B.  Employees are authorized to work secondary employment when the employment does not interfere with their Office responsibilities, create a conflict of interest, or create an appearance of impropriety, as specified in Office Policy GC-18, *Secondary Employment*.

5.  **Conformance to Office Directives and Orders:**

    A.  Employees shall conform to the provisions of all written policies, and required court orders, except those found to be unlawful, incorrect, or inapplicable. Violations of written policies and/or court orders, with or without articulable justification, may result in disciplinary action.

    B.  Employees shall conscientiously obey all lawful orders given to them by persons having authority, as specified in Office Policy, GB-2, *Command Responsibility*.

    C.  Employees shall be held fully accountable for their own acts. They shall not shift the burden or responsibility to another for their failure to execute an order or duty, for inappropriate behavior, or for any other dereliction of duty.

6.  **Conformance to Established Laws:** Employees shall obey all local ordinances, county and state laws, laws of all states of the United States and subdivisions thereof, and all laws of the United States. While traveling outside of the continental United States, employees shall abide by all laws of foreign countries not in conflict with the laws of the United States. Violation of any established ordinance or law may result in disciplinary action, up to dismissal and possible criminal prosecution. Disciplinary action may be imposed regardless of the outcome of any criminal investigation.

7.  **Individual Responsibility:** To ensure the credibility and integrity of the Office, it is the duty of all personnel associated with the Office to take appropriate action whenever they learn of a violation being committed, or having been committed, by any other person associated with the Office in any capacity, which by its very nature would tend to discredit an employee or the Office. Individual responsibility includes conduct on or off-duty.

    A.  Any employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a supervisor or directly to the PSB, or to any outside entity authorized to take corrective action, without fear of retaliation. Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary action, up to and including dismissal from employment. The presumptive discipline for a failure to report such allegations shall be commensurate with the presumptive discipline for the underlying misconduct or may be one offense less than received by the employee who committed the act.

    B.  The on-duty supervisor or commander shall immediately document the reported act of misconduct

3

46REPORT000505

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct* **Effective Date: 01-11-24**

by entering the appropriate complaint entry type in Blue Team. This information shall be automatically routed to the PSB, as specified in Office Policy GH-2, *Internal Investigations*.

C.     Personnel shall, without delay, report to the on-duty supervisor, an appropriate commander, or the PSB, when any false information is alleged or reasonably believed to have been provided in an administrative investigation or on any official report, log, or electronic transmittal of information, testimony, communication with other officials, public presentations such as community meetings, and press briefings.

D.     Retaliation:

1.     Personnel shall not retaliate against an employee who reports misconduct or a violation in fulfillment of this individual responsibility, policy responsibility, or duty.

2.     All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any individual, member of the public, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action. Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious misconduct and shall result in disciplinary action, up to and including dismissal from employment, as specified in Office Policy CP-11, *Anti-Retaliation.*

8.     **Command and Supervisory Responsibility:** Supervisors, at all levels, shall provide proper direction, coordination, and control of subordinates, as specified in Office Policy GB-2, *Command Responsibility*.

9.     **Unbecoming Conduct:**

A.     Employees shall conduct themselves at all times, both on and off-duty, in such a manner as to reflect favorably on the Office. Unbecoming conduct shall include disorderly conduct; activities that conflict with, or have the potential to conflict with Office duties; tend to bring the Office into disrepute; reflect discredit upon employees as members of the Office; or tend to impair the operation and efficiency of the Office or any of its employees.

B.     Employees shall show respect for the uniforms of the Office at all times.

1.     When worn, all uniforms shall be neat, clean, and worn in compliance with Office Policy GC-19, *Dress and Appearance*.

2.     No distinguishable portion of the uniform shall be worn with civilian attire while on-duty, as specified in Office Policy GC-20, *Uniform Specifications*.

3.     Employees shall not wear their uniform off-duty while engaging in personal business, as specified in Office Policy GC-20, *Uniform Specifications*.

4.     At no time shall any Office uniform be worn to represent the wearer as having the authority of any other class of employee.

C.     Employees who are on-duty or identified by dress, location, or association as employees, shall maintain a professional demeanor and perform their duties in a calm and firm manner, acting together to assist and protect each other.

4

46REPORT000506

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                          **Effective Date: 01-11-24**

D.   Employees shall not demean persons or act disparagingly against any individual regardless of age, nationality/national origin, immigration status, religious beliefs/religion, race, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical/ intellectual/mental health disability, ethnic background, or socioeconomic status.

E.   Employees shall conduct themselves in a manner that will foster respect and cooperation among themselves and other members of the Office.

F.   Employees shall not, at any time or for any reason, subject any person to cruel treatment or inhumane action. Employees shall take reasonable action commensurate and appropriate to the situation to ensure a person is not subject to cruel treatment or inhumane action. Office Policy CP-1, *Use of Force*, and ARS 31-101 through § 31-146 governs the treatment of persons in custody.

G.   Employees shall not, at any time or for any reason, subject any animal to cruel treatment or inhumane action. Employees shall take reasonable action commensurate and appropriate to the situation to ensure an animal is not subject to cruel treatment or inhumane action. Hunting, when it is conducted according to law, shall not be considered a violation of this section.

H.   Employees who have contact with the public should strive to gain public support and cooperation by dealing with people courteously.

10.   **Use of Force:** Employees shall only use the amount of force that is objectively reasonable and necessary to address the situation, as specified in Office Policy CP-1, *Use of Force*.

11.   **Duty to Intervene / Duty to Render Aid:**

A.   Employees shall intervene when observing a fellow employee violating an inmate's or member of the public's constitutional rights by taking immediate intervention action, unless exigent circumstances make it unsafe or impossible to do so. Employees should consider the circumstances surrounding the incident to determine the appropriate form of intervention action. Intervention may be verbal and/or physical depending on the urgency of the situation. If intervention action is necessary, employees may take the following action:

1.   Take a preventative approach, whenever possible, if observing behavior that suggests that another employee is about to engage in unbecoming conduct or misconduct, when such conduct is being committed by an involved employee;

2.   Take an active approach to intervene to stop any unbecoming conduct or misconduct, when such conduct is being committed by an involved employee; and/or

3.   Come between the involved employee and the subject involved when safe and feasible to do so while preserving officer safety, if verbal interventions are not sufficient to stop the conduct.

B.   The employee who intervened should take command of the scene, unless exigent circumstances make it unsafe or impractical to do so.

C.   If the involved employee is receptive to the intervention and unbecoming conduct or misconduct is **avoided**, there is no reporting requirement.

1.   If the involved employee is not receptive to the intervention and unbecoming conduct or misconduct **occurs**, the reporting employee shall immediately contact a supervisor to respond to the scene.

5

46REPORT000507

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2, *Code of Conduct***                                    **Effective Date: 01-11-24**

2.      Employees shall report all allegations of misconduct, as specified in Office Policy GH-2, *Internal Investigations*.

D.      Retaliating against any person who reports or investigates alleged misconduct shall be considered serious misconduct and shall result in disciplinary action, up to and including dismissal from employment, as specified in Office Policy CP-11, *Anti-Retaliation*. Examples where intervention would be required include, but are not limited to, the following:

1.      Observed use of force techniques beyond what is permissible by Office Policy, state or federal law; as specified in Office Policy CP-1, *Use of Force*. Procedures for intervention and reporting excessive use of force shall be followed, as specified in Office Policy CP-1, *Use of Force*;

2.      Observed unconstitutional arrests or detentions occurring in the employee's presence and with sufficient time to take reasonable action:

a.      Supervisors shall document corrective actions for violations or deficiencies in investigative stops, detentions, or arrests, as specified in Office Policy GB-2, *Command Responsibility*.

b.      Unconstitutional arrests or detentions involving racial profiling shall be handled as specified in Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling*.

3.      Unlawful search and seizure.

E.      Employees shall render medical aid consistent with their training and certification when actions of an employee result in the need to provide and/or obtain medical attention, as specified in Office Policy CP-1, *Use of Force*. Except as otherwise provided by statute, employees shall not be held liable for injuries caused by the act or omission of another person. However, employees are not exonerated from liability for injury proximately caused by their own negligent or wrongful act or omission.

12.    **Alcohol:**

A.      Employees shall not purchase, or have in their immediate possession, or consume any kind of alcoholic beverages while on-duty, except in the performance of official duties or authorized training and with prior supervisory approval. Additionally, employees shall not report for duty, or be on duty, with any odor of alcoholic beverage on their breath or while under the influence of any alcoholic beverage to any degree. Any employee observing another employee in violation of this section shall advise any on-duty supervisor as soon as possible. Impairment is not requisite for violations of this section.

B.      A supervisor who reasonably believes that an employee who is on duty or reporting for duty smells of, or is under the impairment of, alcoholic beverage to any degree, shall refer to the procedures specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*.

C.      Employees authorized to consume alcoholic beverages in the performance of their duty, such as undercover detectives, shall comply with the provisions of Office Policy ED-2, *Covert Operations*. In all cases, personnel who consume alcoholic beverages on duty shall avoid any physical condition or impairment which could adversely affect their performance of duty or bring discredit upon the Office. Supervisors of such employees are cautioned that they are responsible for monitoring the conduct and demeanor of personnel engaged in the consumption of alcoholic beverages and taking appropriate action. Except in extreme and exigent circumstances, employees and supervisors shall be particularly attentive to, and reasonably discourage, physical enforcement action and the display

46REPORT000508

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                    **Effective Date: 01-11-24**

or use of weapons by employees when employees are known to have consumed and/or be under the influence of an alcoholic beverage.

D.    Office personnel in specialized assignments, who are subject to call out, are requested to refrain from alcoholic beverage consumption.

1.    If called out, an employee who has been drinking within the last eight hours shall advise the immediate supervisor, if available, or the on-duty supervisor that the employee has been drinking, the type and amount of alcoholic beverage consumed, and how long it has been since the last drink.

2.    Based on the information provided by the employee, the supervisor shall consider all factors, including the time elapsed, when making a decision to activate an employee who has been drinking. Based on the totality of the information, the supervisor's decision must be made to ensure that the employee has not consumed any alcoholic beverage within the last eight hours.

E.    Employees shall not operate any Maricopa County vehicle within eight hours after consuming any alcoholic beverages. Employees working covert operations shall adhere to the procedures specified in Office Policy ED-2, *Covert Operations* regarding the consumption of alcoholic beverages and operating a Maricopa County vehicle.

F.    On and off-duty employees shall not display or wear any recognizable item of Office apparel in a public place or an establishment where the primary purpose is to sell or serve alcoholic beverages, nor shall they consume any alcoholic beverages, or purchase alcoholic beverages while displaying or wearing any recognizable items of Office apparel, unless in the performance of official duties, as specified in Office Policy ED-2, *Covert Operations*.

G.    Employees shall not consume alcoholic beverages in any Maricopa County facility or Maricopa County vehicle, except in the performance of official duties or authorized training, and with prior supervisor consent. Guests, volunteers, public observers or other members of the public are prohibited from consuming alcoholic beverages at any time, or for any reason, while in Maricopa County facilities, Maricopa County vehicles, or vehicles owned by a Posse Branch or individual posse member that are used for Office related operations. Posse vehicles used for Office-related operations are specified in Office Policy GJ-27, *Sheriff's Posse Program*. Employees observing violations shall promptly report the violation to a supervisor who will take action to stop the violation.

H.    While in a training status to include travel/out of agency training, employees shall not purchase or consume alcoholic beverages during any period where they are considered on duty. On duty includes, but is not limited to, breaks; transportation; or wait time in between training sessions where the employee is being compensated. This does not preclude employees from consuming alcoholic beverages when off duty on non-compensated time, excluding extradition trips. If alcohol is consumed in an off-duty status the employee shall ensure they do not return to an on-duty status having the odor of alcohol on their breath or be under the influence to any degree. Off-duty status does not include non-compensated breaks during shifts or training sessions, including but not limited to, meal breaks or intermission.

13.    **Use of Medication or Drugs:**

A.    Marijuana remains a violation of Federal Law.

B.    Employees are prohibited from personal possession, growing, using, being under the influence, impaired by or subject to the effects of recreational marijuana.

7

46REPORT000509

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                **Effective Date: 01-11-24**

C.      Employees are prohibited from using any drug which has not been legally prescribed for their use, or abusing prescription or over-the-counter medications. Any use of drugs not legally prescribed for the employee's use, or any abuse of prescriptions or over-the-counter medication, shall be grounds for discipline, up to and including dismissal from employment.

D.      Employees who take prescribed or over-the-counter medications are responsible for being aware of any effects the medications may have on the performance of their duties. Employees shall advise their supervisor, prior to reporting for duty, when taking medication that might impair their ability to perform the essential job functions of their position. The employee shall provide their supervisor with a written memorandum identifying the essential job functions that may be affected as a result of any side effects from the medication. The employee shall also include the anticipated amount of time the medication is to be taken or the date it is believed that it will no longer be needed.

E.      A supervisor who reasonably believes that an employee who is on duty, or reporting for duty, smells of or is under the impairment of drugs or medication to any degree, shall follow the procedures, as specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing.* If the employee refuses to participate in the drug, medication, or alcohol test, the employee must be made aware that the penalty for refusal to take a test ordered by a supervisor shall be dismissal from employment.

14.      **Gratuities, Rewards, or Loans:**

A.      Employees shall not use their position for personal gain, on or off duty, or solicit, seek, or accept on their own behalf any personal loan, gift, gratuity, or other favor, from the general public, any private business firms which deal with the Office, or any other agency or department of Maricopa County which is, or may appear to be, intended to influence official conduct. Discounts and offers which comply with and are authorized under a Maricopa County or Office solicitation policy are exempted from this provision.

1.      This section does not prohibit the acceptance of food or refreshments of insignificant value in the ordinary course of a meeting, conference, or other occasion where the employee is properly in attendance.

2.      This section does not prohibit the acceptance of unsolicited advertising or promotional material such as pens, pencils, calendars, and other items of nominal value.

3.      This section does not preclude an employee from accepting law enforcement off-duty or secondary employment work.

a.      All law enforcement off-duty and/or secondary employment work obtained must meet the requirements of Office Policy EA-18, *Law Enforcement Extra-Duty and Off-Duty Employment* and GC-18, *Secondary Employment.*

b.      The off-duty employment must not place the employee as an expert witness against the Office or opposing any other criminal justice agency, including occupations such as a traffic reconstruction consultant.

4.      This section does not preclude an employee from requesting and accepting the assignment of flight miles in any airline's frequent flyer program, and participating in any reduced fare coupons, free tickets, or other tangible awards, or incentives while traveling on Office business, as specified in Office Policy GD-21, *Business Travel and Travel Expenses.*

B.      Employees shall not accept, directly or indirectly, a gratuity, fee, loan, reward, or gift of any kind for services rendered in the course of official duties or for services rendered in the course of an Office-approved off-duty assignment. This includes directly or indirectly accepting or obtaining a gratuity,

8

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                    **Effective Date: 01-11-24**

fee, loan, reward, or gift of any kind and passing it on to family members, other Office employees, or acquaintances.

C.    Employees shall not use their position to solicit free admission to places of amusement, entertainment, or sporting events, or to solicit free meals, or any favors or gratuities not ordinarily afforded to a member of the public.

15.    **Compensation:** Pursuant to ARS 38-505, no public officer or employee may receive or agree to receive, directly or indirectly, compensation other than, as provided by law, for any service rendered or to be rendered by the employee personally in any case, proceeding, application, or other matter pending before the Office of which the person is a public officer or employee. Compensation is statutorily defined as money, a tangible thing of value, or a financial benefit.

16.    **Abuse of Position or Authority:**

A.    Employees are prohibited from using their official position, Office-issued identification (ID) cards, or Office badges for any of the following:

1.    Personal or financial gain directly related to Office duties;

2.    Obtaining privileges not otherwise available to them or to others, except in the performance of duty;

3.    Avoiding the consequences of illegal acts such as traffic violations or driving under the influence, or helping family members avoid the consequences of illegal acts; and

4.    Misrepresenting their position or authority in the Office.

B.    Employees shall not lend their Office-issued ID cards, Office badges, or uniforms to another person. Employees shall not permit their Office-issued ID cards or Office badges to be photographed or reproduced unless necessary for official business such as extradition trips, obtaining records from other government agencies, or otherwise authorized by the Chief Deputy or designee.

C.    Employees shall not identify themselves as members of the Office, visually or verbally, in connection with testimonials or advertisements, unless specifically authorized by the Chief Deputy or designee.

D.    Employees shall not, by virtue of their position, engage in any of the following:

1.    Interfere with an Office criminal or administrative investigation;

2.    Act in manner which might aid any person in escaping arrest, or delay the apprehension of a criminal;

3.    Facilitate the removal or concealment of contraband;

4.    Convert to their personal use any found, impounded, abandoned, or recovered property, or any property held or released as evidence;

5.    Misuse any Office or law enforcement database or; or

6.    Use their position or authority to affect a promotion, transfer, restoration to duty or by obtaining an unfair advantage as a result of any act prohibited by Office Policy and/or Maricopa County Merit System Rules, such as but not limited to:

9

46REPORT000511

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                                                    **Effective Date: 01-11-24**

a.      Nepotism;

b.      Retaliation;

c.      Conflict of Interest;

d.      Discrimination; or

e.      Harassment.

17.    **Care and Use of Office or Maricopa County Equipment:**

A.    Employees shall use Office and Maricopa County equipment for its intended purpose. Limited incidental personal use of Office and Maricopa County cell phones, fax machines, printers, and copiers are permitted. Such use shall not inhibit either governmental or administrative use, or impact the employee's ability to perform their assigned duties. Office and Maricopa County equipment shall not be used in a manner that discriminates or denigrates anyone on the basis of race, color, nationality/national origin, immigration status, age, religious beliefs/religion, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical/ intellectual/ mental health disability, ethnic background, or socioeconomic status.

B.    E-mail and voice mail are authorized for limited personal use, as specified in Office Policy GM-1, *Electronic Communications, Data and Voice Mail.* Employees are cautioned to use discretion and good judgment when sending e-mail or voice mail messages. All e-mail and voice mail shall be professional in content and shall not be used in a manner that discriminates or denigrates anyone on the basis of race, color, nationality/national origin, immigration status, age, religious beliefs/religion, gender, culture/cultural group, sexual orientation, gender identity/expression, veteran status, ancestry, physical/intellectual/ mental health disability, ethnic background, or socioeconomic status.

C.    Office and Maricopa County equipment shall not be willfully or negligently damaged, lost, misplaced, or abused. All equipment issued to employees shall be maintained in proper order. Employees shall report any damaged, lost, or misplaced equipment to their on-duty supervisor by submitting the appropriate notification and/or documentation requirement, as applicable.

18.    **Office Vehicles and Driving:** Office and Maricopa County vehicles shall be used and operated in a manner which maintains the integrity of its parts, components, and intended use, as specified in Office Policies GE-4, *Use, Assignment, and Operation of Vehicles* and EA-2, *Patrol Vehicles*.

19.    **Confidential Information, Protected Health Information, and Divulging Criminal Records:** Employees shall comply with all federal and state laws regarding the collection, storing, release and disposal of confidential information.

A.    Employees shall only discuss or disclose sensitive law enforcement or confidential information, as follows:

1.      As directed by a supervisor, and if permitted or required by law; and

2.      With persons authorized to receive the information.

B.    In the course of official business, employees may learn certain facts that are of a personal or confidential nature regarding an employee, inmate, or other person's protected health or medical information. All confidential information and records shall be kept strictly confidential, to the extent permitted by law.

10

46REPORT000512

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct* **Effective Date: 01-11-24**

        1.    Employees shall not use, copy, make notes regarding, remove, release, or disclose this information, unless doing so legally in the course and within the scope of their official duties.

        2.    Employees who become aware of anyone improperly accessing or releasing this information shall immediately notify a supervisor.

    C.    Employees shall not release Criminal History Record Information (CHRI) on any individual, except as specified in Office Policy GF-3, *Criminal History Record Information and Public Records*.

20.    **Performance or Dereliction of Duty:** Employees are derelict in the performance of their duties when they willfully or negligently fail to perform them, or when they perform them in a grossly inefficient manner.

    A.    Employees shall devote their working time and attention to the service of the Office and shall complete all assignments in a timely manner, as set forth by their supervisor or chain of command.

    B.    While on-duty, employees shall not engage in any activities or personal business, such as personal phone calls or text messages, or other electronic activities which would cause them to neglect or be inattentive to duty.

    C.    Employees shall serve the Office with loyalty and discretion and shall not display cowardice or fail to support their fellow employees in the lawful performance of duty.

    D.    Judicial subpoenas shall constitute an order to appear and shall be honored, whether on behalf of the state or in actions against the employee, as specified in Office Policy GD-9, *Litigation Initiation, Document Preservation, and Document Production Notices.*

    E.    All employees shall comply with document preservation and production requirements, as specified in Office Policy GD-9, *Litigation Initiation, Document Preservation, and Document Production Notices*. Employees found to be in violation shall be subject to disciplinary action, up to and including dismissal from employment, and potentially other sanctions.

    F.    Employees shall not engage in any strike. The term "strike" includes a concerted failure to report for duty, willful absence from one's position, or the stoppage of work. It also includes unauthorized holidays, sickness unsubstantiated by a licensed healthcare provider's statement during a strike situation, or withholding the full, faithful, and proper performance of the duties of employment for the purposes of inducing, influencing, or coercing a change in rights, conditions, compensation, privileges, or obligations of employment. Employees who engage in any strike shall be disciplined, up to and including dismissal from employment.

21.    **Punctuality:**

    A.    All employees shall be punctual in reporting to their designated duty post and shall be physically ready to assume their duties at the time specified by their supervisor.

    B.    Foreseeable tardiness must be approved in advance to ensure proper staffing of the Office. Unless circumstances are of an emergency nature, any unforeseeable tardiness must be reported to the employee's supervisor no later than 15 minutes before the start of the shift. Unless the supervisor has issued a memo detailing another notification option for subordinates, an employee who is late for work must either call and speak to the supervisor, or leave a voicemail message for the supervisor, with current contact information where the employee can be promptly reached.

    C.    An employee who fails to call in to a supervisor and who does not show for their scheduled shift, shall be considered Absent Without Authorized Leave, except when extenuating circumstances are

11

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                    **Effective Date: 01-11-24**

found to have existed. Employees and supervisors should refer to Office Policy GC-1, *Leaves and Absences*, for information regarding foreseeable and unforeseeable absences.

D.     All supervisors are responsible for the timely, accurate, and complete entry of tardiness and early departures data in Blue Team, as specified in Office Policy GC-1, *Leaves and Absences*.

22.     **Political Activity:** It is the intent of the Office to conform to public policy that government programs be administered in an unbiased manner and without favoritism for, or against, any political party or group, or any member in order to promote public confidence in government, government integrity, and the efficient delivery of governmental services, and to ensure that employees are free from any express or implied requirement, or any political or other pressure of any kind, to engage or not engage in political activity.

A.     Employees shall not use the authority of their positions to influence the vote or political activities of any subordinate employee, as specified in ARS 11-410. Furthermore, under the guise of Maricopa County business, personnel, equipment, materials, buildings, or other resources shall not be used for the purpose of influencing the outcomes of elections.

B.     Employees shall not use political endorsement in connection with any appointment to a position in the Maricopa County classified service.

C.     Employees shall neither use, nor promise to use, any official authority or position for the purpose of influencing the vote, or political action of any person or for any other considerations.

D.     No person may solicit any employee to engage in, or deny the opportunity to engage in, activities permitted by this section. Any direct or indirect threat, such as intimidation, coercion, discrimination, reprisal, force, or any adverse consequence, such as the loss of any benefit, reward, promotion, assignment, or compensation, is prohibited.

E.     Employees shall not engage in any activity permitted by this section while on-duty, while in uniform, or at public expense. Nothing in this Office Policy shall be construed as denying any employee any civil liberties, as guaranteed by the Constitution of the United States or the Constitution and Laws of the State of Arizona.

F.     Employees shall not be members of any national, state, or local committee of a political party, nor an officer or chairperson of a committee of a partisan political club, nor a candidate for nomination or election to any public office, which is either paid or partisan. They shall not take part in the management of any political party, partisan or nonpartisan campaign, or recall effort.

G.     The provisions of this section shall not apply to, homeowner association, school board or community college district governing board elections. An employee may serve as a member of the governing board of a homeowner association, common or high school district, or as a member of the community college governing board.

H.     While off duty, employees may:

1.     Express opinions, attend meetings for the purpose of becoming informed concerning the candidates for public office and the political issues, cast a vote, and sign nominating or recall petitions;

2.     Make contributions to candidates, political parties, or campaign committees contributing to candidates, or advocate the election or defeat of candidates;

3.     Circulate candidate nomination or recall petitions, or engage in activities to advocate the election or defeat of candidates;

12

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                      **Effective Date: 01-11-24**

4.      Solicit or encourage contributions to be made directly to candidates or campaign committees contributing to candidates, or advocate the election or defeat of candidates; and

5.      Campaign for themselves and hold unpaid, nonpartisan public office, or campaign for or against ballot issues, referendum questions, constitutional amendments, or municipal ordinances, except where a conflict of interest is created.

I.      No employee shall be discriminated or retaliated against for engaging in, or choosing not to engage in, any activity permitted in this section.

J.      Any employee of the Office who violates any of the provisions of this section shall be subject to disciplinary action, up to and including dismissal from employment.

K.      Employees who have family members running for political office shall ensure that their conduct in support of their family members is consistent with the provisions of this section.

23.    **Public Appearances and Statements:** Any public expression, by which it could be reasonably assumed that the employee is acting as a spokesperson on behalf of the Office, will be governed by this Office Policy.

A.      Employees shall not publicly ridicule the Office, its policies, or its employees, orally, in writing, or electronically in social networking sites, where such expression is defamatory, obscene, unlawful, tends to undermine the effectiveness of the Office, undermine the safety and security of Office jail facilities, undermine the authority or direction of a supervisor, interferes with the maintenance of discipline, or is made with reckless disregard for the truth.

B.      Employees shall not address public gatherings, appear on radio or television, or release for publication, an article, manuscript, or other material which pertains to the operations or activities of the Office, without prior approval from their bureau chief. To be authorized, such articles, manuscripts, and interview materials must support the Mission Statement of the Sheriff's Office and reflect Office goals and objectives.

C.      Employees shall not act in a private capacity or do any work in a private capacity, which may be construed by the public to be an official act of the Sheriff's Office, without prior written approval of the Chief Deputy or designee.

24.    **Endorsements, Referrals, and Vendors:**

A.      Employees acting in their official capacity must comply with Maricopa County and Office procurement procedures. As a result, employees shall not recommend, suggest, or advocate for the employment of any person, or procurement of any particular product, professional, or commercial service outside the official procurement process. When any such service is necessary, employees shall proceed, as specified in Office Policy GE-1, *Supply Requisition, Procurement, and Inventory*.

B.      Employees must disclose their interest and shall not participate in or vote for any contract, sale, purchase, or service, in which they have an interest. Conflict of interest laws must be observed.

25.    **Labor and Fraternal Organizations and Associations:** Employees may join and hold office in any employee organization, labor union, or professional association in which they are eligible for membership, provided it is not organized for any illegal purpose or primarily engaged in activities contrary to law. No employee shall attempt to prohibit or intimidate any covered employee from belonging to, or holding office in, any lawful organization. Membership in such organizations shall not be considered in any personnel action, including promotion, demotion, suspension, or dismissal from employment.

26.    **Prohibited Associations and Fraternization with Inmates or Prisoners:**

13

46REPORT000515

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                              **Effective Date: 01-11-24**

A.    Employees shall not indulge in undue familiarity with inmates or prisoners. Undue familiarity includes any act of a sexual nature with an offender who is in the custody of the state department of corrections, the department of juvenile corrections, a private prison facility, a juvenile detention facility, a city or county jail or with an offender who is under the supervision of either department, a city, or county. Office employees found in violation of this Office Policy are punishable administratively and criminally, up to and including dismissal from employment.

B.    Employees shall not fraternize with, engage the services of, accept services from, or do favors for, any person known to them to be in custody or have been in the custody of the Office, or any other detention or correctional facility within the last two years, unless it is unavoidable due to family member relationships.

C.    Employees shall not convey written or oral messages between inmates, except those which are necessary in the operation of the Office jail facility.

D.    Employees shall not correspond with, or assist in conducting correspondence with inmates, former inmates, or other persons not in custody, on behalf of an inmate, unless required to do so in the performance of their duties.

E.    Employees shall not assist inmates in the submission or preparation of judicial documents, to include the photocopying of judicial documents, other than providing the necessary forms, papers, or writing implements, unless required to do so in the performance of their duties, or by court order.

F.    Employees shall not write letters of recommendation, on behalf of inmates on matters concerning official business of the Office, without authorization from their bureau commander.

G.    Employees shall not exchange money or property with inmates or prisoners, unless required to do so in the performance of their duties.

H.    Employees shall not provide inmates with newspapers, magazines, or books from outside the Office jail facility, except those mailed to the inmate from the publisher or the publisher's authorized distributor, or an online retailer, as specified in Office Policy DK-1, *Inmate Mail*.

I.    Employees shall not engage in informal, non-work-related discussions with inmates or prisoners concerning other officers, inmates, or prisoners. Employees shall not make remarks of a personal nature in reference to any officers, inmates or prisoners, witnesses, or informants where the remarks may be within earshot of any inmate or prisoner.

J.    Employees shall not encourage or sympathize with inmates in their complaints about rules, regulations, or jail conditions. However, complaints shall be reported to the appropriate personnel.

K.    Employees shall not offer religious or other advice to inmates regarding personal, family, or case-related problems. Inmates seeking advice will be referred to appropriately trained Office personnel or other outside agencies.

27.    **Prohibited Employee Relationships with Persons Visiting Inmates:**

A.    Employees shall not grant special privileges to visitors without the approval of the shift commander.

B.    Employees shall not accept favors or gratuities from visitors at any time.

C.    Employees shall not indulge in undue familiarity or fraternize with visitors.

14

46REPORT000516

CONFIDENTIAL - ATTORNEY'S EYES ONLY
**Policy CP-2,** *Code of Conduct* **Effective Date: 01-11-24**

28. **Prohibited Items Entering Secured Office Jail Facilities:** All persons entering an Office jail facility are subject to search of their person and belongings for prohibited items, as specified in Office Policy DH-1, *Jail Access*.

    A.    All Office employees, visitors, and volunteers entering or working in a jail facility are prohibited from bringing personal electronic devices into secured areas of jail facilities, unless approved by a supervisor, or otherwise authorized. Personal electronic devices include, but are not limited to:

        1.    Cellular phones;

        2.    MP3 players;

        3.    iPods;

        4.    Personal laptops;

        5.    Tablets;

        6.    Texting devices;

        7.    E-mail devices;

        8.    Social media devices;

        9.    Movie/video clip devices; or

        10.    Smart Watches: These devices are prohibited for video viewing, video/audio recording, social media, entertainment listening, and communication purposes. They are authorized in a secured jail facility when used for fitness tracking and time/date purposes.

    B.    Employees should refer to Office Policy DH-1, *Jail Access,* for further restrictions on prohibited items in an Office jail facility.

29. **Employee Relationships with Other Employees:**

    A.    Employees shall be respectful and maintain a professional, courteous, and cooperative demeanor with other employees of the Office and other law enforcement or criminal justice personnel.

    B.    Employees shall be respectful and maintain a professional, courteous, and cooperative demeanor with supervisory personnel. Employees shall not defy or undermine the authority and/or direction of any supervisor by being disrespectful, arrogant, or displaying disrespectful conduct, whether in or out of the supervisor's presence.

    C.    When family members are employed by the Office, no employee shall be in a reporting line of supervision to a family member. In the event it is determined a family member would be, or has been placed in a reporting line of supervision, an appropriate course of action will be determined by the Chief Deputy or designee.

    D.    Intimate and sexual relationships between employees are addressed in Office Policy CP-3, *Workplace Professionalism.*

    E.    Employees shall not covertly record conversations involving other Office employees, unless the recording is in furtherance of an official Office investigation, or prior approval for the covert recording has been obtained from a bureau chief or designee.

15

46REPORT000517

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                    **Effective Date: 01-11-24**

30.    **Prohibited Employee Relationships with Known or Suspected Criminals:** Employees shall avoid associations or dealings with persons whom they know, or have reason to believe are, or have been, recently charged with criminal acts, or any person who the employee should reasonably know to have been involved in criminal acts, or are under indictment. Exceptions may be made when necessary, in the performance of an employee's duties, or when such contacts are with family members.

31.    **Prohibited Employee Relationships with Victims, Witnesses, Informants, or Other Such Individuals:** Employees shall not attempt to convert an enforcement action contact with persons including, but not limited to, victims, witnesses, informants, suspects, or traffic violators, into a dating relationship, sexual relationship, social relationship, or business relationship during the course of, or as a direct result of, any official contact. Employees shall notify their supervisor of any relationship that evolves following contact due to job responsibilities.

32.    **Workplace Activities:**

   A.    Employees on Maricopa County property or while using Maricopa County resources are prohibited from engaging in the following activities:

   1.    Sale of food to non-Maricopa County employees;

   2.    Organizing gambling pools; and

   3.    Conducting raffles.

   B.    Employees may sell food to other Maricopa County employees while on Maricopa County property with prior approval of their bureau chief by submitting a memorandum through their chain of command.

33.    **Solicitation:** Solicitation, posting of notices, and the distribution of non-official Office literature shall be done in such a manner to prevent conflicts of interest and interference with work.

   A.    Dissemination of literature and information regarding the following organizations, programs, or activities is permissible and subject to the oversight of a bureau chief:

   1.    Required Literature: All programs and postings required by local, state, or federal law.

   2.    Maricopa County and Office Sponsored Programs: Programs that are developed and approved by the Maricopa County Board of Supervisors or their designee, or the Sheriff, or the Chief Deputy.

   3.    Employee Discounts: Offered from organizations with a contract or written agreement with Maricopa County or the State of Arizona to provide goods, services, or discounts.

   4.    Training Programs: Approved by a bureau chief relating to an employee's job duties or to maintain an employee's work required professional certifications.

   5.    Non-Work Time: Employees who are not on work time, may solicit and distribute literature in public places such as sidewalks, open or public parking lots, or other facilities that are traditionally available for public use.

   6.    Constitutionally Protected Speech: Permitted within reasonable parameters to time, place, and manner restrictions.

16

46REPORT000518

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                                    **Effective Date: 01-11-24**

7. Non-Work Areas: Employees placing literature in Office break rooms that are located in non-work areas are subject to the following restrictions:

   a. Employees shall submit a memorandum for approval, through the chain of command, to their bureau chief and must be granted permission prior to placing literature in break rooms. Literature containing content that is contrary to law, Office Policy, Maricopa County Merit System Rules, or Maricopa County policy shall be denied. The bureau chief shall promptly notify the Administrative Services Division of any concerns prior to denying the request.

   b. If approved, employees may display literature for a maximum of two weeks unless their bureau chief grants an extension. This is to avoid break room clutter, to ensure the literature is current, and to allow for a variety of literature.

   c. Employees shall place on the literature their name, the start date, and length of time the information will be placed in the break room.

   d. Employees are responsible for removing literature on or before the deadline. Failure to timely remove literature may result in the employee losing future privileges to post information.

   e. The literature cannot obstruct official Office literature, or any literature already posted.

   f. By permitting employees to place literature in break rooms, the Office has not confirmed the accuracy of the information and does not endorse or accept responsibility or liability for the views, opinions, or information stated in the literature. Employees assume full and sole responsibility for any action taken based on information read or found in the literature.

B. Employees are prohibited from posting, soliciting, distributing, or circulating literature, selling merchandise, or promoting support for any cause or organization during their work time, or during the work time of the employees to whom such activity is directed, unless prior approval is granted by their bureau chief and permissible, as specified in this Office Policy. Except when doing so for the Office/Maricopa County, or with prior approval as specified in this Office Policy, employees will not post, solicit, distribute, or circulate any literature in work areas, hallways, elevators, lobbies, secured employee parking lots, or through any Maricopa County owned or controlled technology resources, to include but are not limited to the email system.

C. Non-Maricopa County employees are prohibited from soliciting to Office employees in areas not open to the public, such as Office buildings and facilities, or areas open to the public for a limited or designated purpose including, but not limited to, lobbies and hallways without prior approval from a bureau chief.

D. Examples of acceptable and unacceptable solicitation are as follows:

   1. Acceptable Solicitation: Maricopa County blood drive, Combined Charitable Campaign, E.A.S.E. Program, Maricopa County benefits/open enrollment and wellness programs, Special Olympics, employee assistance breakfast/lunch sales, can food/school supply/toy drives sponsored by the Office/Maricopa County, and any other event that supports the mission of the Office and approved by a bureau chief.

17

46REPORT000519

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                      **Effective Date: 01-11-24**

2.    Unacceptable Solicitation: Organization membership applications or promotion of a specific event or vendor other than those sanctioned by the Office/Maricopa County.

34.    **Frequenting Prohibited Establishments:** Employees shall not knowingly enter or frequent any establishment, such as a house of prostitution or illegal gambling house, wherein the laws of the United States, the state, or the local jurisdiction are regularly violated, except in the performance of their official duty or while acting under proper and specific orders from a supervisor.

35.    **Gambling:** Employees shall not participate in any form of illegal gambling at any time, except in the performance of duty, and while acting under proper and specific orders from a supervisor.

36.    **Sleeping On-Duty:**

A.    Employees shall not sleep on duty unless, specifically authorized to do so, by a supervisor, under exigent circumstances. Circumstances include, but are not limited to, extended hours due to an investigative assignment or a search and rescue mission.

B.    Employees who feel they are unable to stay awake on duty have the responsibility to notify their immediate supervisor, who shall determine the proper course of action.

37.    **Interference with Official Investigations:** Employees shall not use their official position or knowledge gained by employment with this Office to hinder, obstruct, or interfere with any case, official operation, or investigation being handled by this Office or any other agency. This includes a violation of the Notice of Investigation when an employee has been directed to limit discussion regarding an administrative investigation, as specified in Office Policy GH-2, *Internal Investigations*.

38.    **Request for Assistance:** When any person requests assistance from the Office or makes a complaint, or report, either by telephone or in person, all pertinent information shall be obtained in an official and courteous manner, and shall be properly and judiciously acted upon, in accordance with Office Policy, GH-2, *Internal Investigations*. Employees shall not attempt to dissuade a member of the public from filing a complaint or to narrow the grounds of the person's complaint. Members of the public attempting to make a complaint shall not be referred to other Office divisions or commands and shall be provided information about the Office's complaint process. All reports, complaint and allegations of misconduct, including third-party and anonymous complaints and allegations shall be investigated. Members of the public may call in their complaints by calling 1-844-887-4483, or as specified in Office Policy GJ-24, *Community Relations and Youth Programs*.

39.    **Failure to Meet Standards:** Failure to meet standards is the inability, unwillingness, or failure to perform assigned duties in an acceptable manner, or the failure to accomplish a reasonable share of the workload. Employees shall:

A.    Possess the knowledge required to perform assigned duties;

1.    An employee's chain of command shall remain aware of the employee's capacity to perform their assigned duties and take reasonable action to resolve any identified deficiency.

2.    Employees shall notify their supervisor if the employee believes they (the employee) do not possess the knowledge required to perform their assigned duties.

B.    Complete assignments properly;

C.    Conform to work standards established for the employee's rank or position;

D.    Make reasonable decisions or take appropriate actions;

18

46REPORT000520

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct* **Effective Date: 01-11-24**

    E.    Not display cowardice if they are deputies, reserve deputies, deputy services aide, detention officers, or security officers;

    F.    Not be absent from the assigned area of responsibility during a tour-of-duty without authorization; and

    G.    Not be absent without authorized leave, as specified in Office Policy GC-1, *Leaves and Absences.*

40.    **Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

41.    **Loitering:** While on duty or in uniform, employees shall not remain in eating establishments, service stations, or other public places for longer than is reasonably required to complete the legitimate activity for which they stopped, unless required by duty. Employees shall not remain at a duty post or any Office location beyond the end of their shift, unless conducting official business or for a minimal period while awaiting transportation from work.

42.    **Abuse of Process, Withholding Evidence, and Misappropriation of Property:**

    A.    Employees shall not manufacture, conceal, falsify, destroy, remove, tamper with, or withhold evidence or information, or make false accusations in a criminal, traffic matter, or administrative matter.

    B.    Employees shall ensure a valid chain of evidence with adherence to the guidelines for the strict control and management of evidentiary property, as specified in Office Policy GE-3, *Property Management and Evidence Control*. Employees are responsible for properly reporting, documenting, securing, and impounding any property that is being held as evidence, found property, or for safekeeping, which comes into their possession during the course of their regular duties, prior to the end of the shift in which it was seized or recovered unless a request for an extension is approved by the respective division commander responsible for the investigation as specified in Office Policy GE-3, *Property Management and Evidence Control*.

    C.    Employees shall not appropriate any Maricopa County property, evidence, or found or recovered property for their own use.

    D.    Any property abandoned, forfeited, or unclaimed that has a useful value to the Office shall be appropriated as diverted property in accordance with ARS 12-941 and the requirements of Office Policy GE-3, *Property Management and Evidence Control*.

43.    **Treatment of Persons in Custody:** Employees shall not mistreat persons who are in the custody of the Office. Employees shall handle such persons in accordance with established laws and Office procedures. Office Policies and established laws governing the treatment of persons in custody include but are not limited to, Office Policy CP-1, *Use of Force*, Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling*, Office Policy GJ-37, *Transgender and Intersex Interactions*, and ARS 31-101 through 31-146.

44.    **Gum and Tobacco Product Usage:** Employees, in the performance of their duties, shall not chew tobacco or gum while making personal contacts with the public. Further restrictions on tobacco use are specified in Office Policy GD-4, *Use of Tobacco Products*.

45.    **Return of Office and Maricopa County Property Upon Separation:**

19

46REPORT000521

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                      **Effective Date: 01-11-24**

A.    When employees separate employment with the Office, to include resignation, retirement, or dismissal, they shall return all their Office and other Maricopa County issued property to the designated division, as specified in Office Policies GC-15, *Employee Resignation and Retirements*, GJ-26, *Sheriff's Reserve Deputy Program*, and GJ-27, *Sheriff's Posse Program*.

B.    When employees return property damaged, through their negligence or deliberate action, or fail to return all issued Office or Maricopa County property, they may be held criminally or civilly liable.

46.    **Property Damage:**

A.    Employees shall immediately notify their supervisor, or if unavailable, the nearest on-duty supervisor, and promptly submit a written report concerning any damage to real or personal property, including vehicles, belonging to the Office, Maricopa County, a member of the public, or any other entity or individual, which is a result of, or occurred during, the execution of their official duties or responsibilities.

B.    Employees shall immediately notify their supervisor and promptly submit a written report concerning any damage to real or personal property of others, including vehicles, belonging to the Office or Maricopa County that occurred while the employee was off duty.

C.    Employees shall never attempt to work out or negotiate a settlement with any entity or individual regarding personal or Maricopa County liability when property damage has occurred during the execution of official duties.

47.    **Off-Duty Law Enforcement Action:**

A.    While off duty, an Officer-In-Training (OIT) shall not take any law enforcement action until successful completion of the Field Training Program, as specified in Office Policy GD-10, *Off-Duty Incidents*.

B.    Compensated and reserve sworn personnel may take law enforcement action, as specified in Office Policy GD-10, *Off-Duty Incidents*.

C.    Detention officers, deputy trainees, deputy services aides, posse members, and civilian personnel are not AZPOST certified peace officers and shall not take any off-duty law enforcement action, but may act in a civilian capacity, and should notify the appropriate law enforcement agency concerning criminal activity, as specified in Office Policy GD-10, *Off-Duty Incidents*.

48.    **Rumors or Gossip:** Employees shall not spread rumors, gossip, or false information which discredits another employee or harms the employee's reputation. Supervisors made aware of violations shall take immediate action to correct the situation and initiate disciplinary action, if warranted.

49.    **Social Networking Sites:** The use of social networking sites such as Facebook and X (formerly Twitter) have become common outlets for employees to socialize. Employees must be mindful of the negative impact of inappropriate or unauthorized postings involving the Sheriff's Office and their direct impact on the relationship between the Office and the community.

A.    Social networking sites shall not be accessed on Office equipment while on duty unless in the performance of official duties or accessing official Office controlled social media sites, such as X (formerly Twitter), Facebook, or Instagram for viewing purposes of Office announcements only.

B.    Employees are prohibited from accessing the TikTok social media application on all Office controlled devices. Employees are also prohibited from accessing the TikTok social media

20

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                                                      **Effective Date: 01-11-24**

application on a personal controlled electronic device that is connected to the Office or the Maricopa County courts Wi-Fi or direct network.

C.      Whether on or off duty, employees shall not publicly express, share, or post information regarding the Office which would jeopardize the safety and security of Office employees, inmates, or the public, or which could negatively impact the efficient or effective operation of the Office, undermine the safety and security of Office jail facilities, or undermine the authority or direction of a supervisor.

D.      Due to the increased scrutiny of law enforcement personnel postings on social networking sites, the Office strongly discourages employees from posting information regarding their own off-duty activities or the off-duty activities of another Office employee which may tend to bring the person's reputation into question. This is not intended to infringe upon any employee's First Amendment or other constitutional rights, but those who may be called to testify on behalf of the Office as part of their official duties must guard their reputation and should be aware that attorneys may attempt to use postings on social networking sites for impeachment purposes. Further information on the use of social media shall be followed, as specified in Office Policy GD-7, *Media Relations and Social Media*.

50.     **Keeping Supervisors Informed:**

A.      Employees must promptly notify their supervisors of all situations, events, incidents, inspections, and communications that affect, or may affect, the Office, or with which the Office may be concerned. The employee shall also promptly generate an entry in Blue Team to report such activities to their supervisor under the Incident Type Employee Reported Activity; and tag the appropriate Allegation category under the Involved Employee section. If the reported information involves misconduct, the on-duty supervisor or commander shall immediately document the information in Blue Team. This information shall be automatically routed to the PSB. On-duty supervisors and their command personnel shall remain attentive to allegations or observations of alleged misconduct where immediate notification to PSB would be reasonable and appropriate.

B.      Examples of situations that require employees to keep their supervisors informed include, but are not limited to, the following:

1.      Involvement in any situation being investigated by another law enforcement agency, whether as a witness, victim, or suspect, or in anticipation of becoming a suspect;

2.      The suspension or revocation of driving privileges;

3.      Receipt of a moving vehicle traffic citation;

4.      Knowledge of the booking of a family member into an Office jail facility; and

5.      The issuance of a court order, such as an order of protection or an injunction against harassment, in which an Office employee has been named.

C.      Supervisors should notify their chain of command, as appropriate.

51.     **Use of Discretion:**

A.      Office Policy cannot be written to cover every situation in which an employee may become involved. The employee must use discretion in the enforcement of laws and in determining appropriate actions. Supervisors have the authority to make decisions on behalf of the Office and to provide employees with direction and guidance on how to perform their duties.

21

46REPORT000523

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Policy CP-2,** *Code of Conduct*                    **Effective Date: 01-11-24**

    B.    When employees and supervisors are faced with a situation in which discretion can be exercised, Office employees and supervisors are cautioned against unnecessarily escalating situations or addressing a situation in an urgent or expeditious manner when circumstances do not dictate the necessity to do so. Employees and supervisors shall evaluate the circumstances and consider available resources and alternative solutions. They should rely on their training, Office Policy, established procedures, statutes, and the direction of supervisors in making a decision.

    C.    The appropriate decision should be the least restrictive one that still accomplishes the intent of the law, is in accordance with Office Policy, and does not compromise employee safety.

    D.    Discretion is limited by federal, state, and local law, as well as case law, Office Policy, and the employee's rank and level of responsibility.

52.    **Oath of Office:** The Sheriff or designee, shall administer the Oath of Office to all new sworn and detention personnel prior to assuming their new duties. The Oath of Office requires the employee to support the Constitution of the United States and the Constitution and Laws of the State of Arizona (See Attachment A).

22

46REPORT000524



| MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | | |
|---|---|---|
| **Subject**<br><br>**INTERNAL INVESTIGATIONS** | **Policy Number**<br>**GH-2** | |
| | **Effective Date**<br>**11-14-23** | |

| Related Information | Supersedes |
|---|---|
| ARS Title 38, Chapter 8, Article 1<br>ARS 38-1104<br>ARS 38-1116<br>ARS 39-128<br>Maricopa County Employee Merit System Rules<br>Maricopa County Law Enforcement Officers' Merit System Rules<br>CP-2, *Code of Conduct*<br>DJ-3*, Inmate Grievance Procedures*<br>GC-16, *Employee Grievance Procedures*<br>GC-17, *Employee Disciplinary Procedures*<br>GC-21*, Drug, Medication, and Alcohol Testing*<br>GE-3*, Property Management and Evidence Control*<br>GE-4*, Use, Assignment, and Operation of Vehicles*<br>GH-3, *Polygraph Procedures and Documents*<br>GH-5, *Early Identification System*<br>GI-1, *Radio and Enforcement Communications Procedures*<br>GJ-2, *Critical Incident Response*<br>GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate*<br>GJ-24, *Community Relations and Youth Programs*<br>GJ-28, *Prison Rape Elimination Act (PREA)* | GH-2 (10-25-22) |

| Version Date | Review Period | Description of Review |
|---|---|---|
| 11-14-23 | July 2023 – June 2024 | Statement of Annual Review – No Changes |

**PURPOSE**

The purpose of this Office Policy is to establish guidelines and procedures for accepting, processing, and investigating complaints of employee misconduct. Complaints include, but are not limited to, those brought forward by members of the public, inmates, Maricopa County employees, and Sheriff's Office employees.

Although this Office Policy refers to employees throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and Posse members.

**POLICY**

It is the policy of the Office to ensure that all complaints of employee misconduct – whether internally discovered and/or alleged by another employee or based on a complaint filed by a member of the public – are fully, fairly, impartially, and efficiently investigated. All investigative findings shall be supported by the appropriate standard of proof and documented in writing; and all employees who commit misconduct shall be held accountable pursuant to a disciplinary system that is fair, consistent, and unbiased; and provides due process.

**DEFINITIONS**

*Administrative Closure:* A result of a PSB Diversion process in which the PSB Commander reviews individual complaints, on a case-by-case basis, and determines that they cannot be satisfactorily investigated or an investigation is not necessary. Administrative Closures may be used in the following circumstances: a) Situations where an internal

46REPORT000525

**Policy GH-2,** *Internal Investigations*                                        **Effective Date: 11-14-23**

or external complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported; b) Situations where an internal or external complaint was received by the Office after the employee(s) involved in the alleged misconduct left employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident; c) Situations where in an internal or external complaint the initial complainant is unwilling or unable to cooperate; d) Situations where in an internal or external complaint the initial complainant is anonymous; e) Situations resulting in the death or serious physical injury of a prisoner or an inmate that do not involve a use of force by an employee and are considered non-critical incidents; and f) Situations where an internal complaint originated from a workplace relationship and is most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division.

An Administrative Closure shall also be used when the following circumstances exist in a Service Complaint: a) The complaint does not allege employee misconduct and can be resolved with an explanation to the complainant regarding the policy, procedure, service level due to manpower or resources, or statutory authority required of the Office.  This includes matters in which the complainant questions Office policy, procedures, or service level due to manpower or resources, or statutory authority required of the Office; b) The complainant does not allege employee misconduct and expresses dissatisfaction with the outcome of formal legal, civil, or administrative processes involving members of the Office.  The preliminary inquiry associated with this type of Service Complaint closure shall be thoroughly reviewed and verify that potential employee misconduct was not involved with the incident prior to closure; c) The complainant does not allege employee misconduct and requests additional information or follow-up actions pertaining to a prior call for service, report, or investigation; or d) The complaint lacks specificity and the complainant refuses or is unable to provide further clarification necessary for the Office to fully understand the complaint, or the complainant does not articulate facts amounting to an allegation of employee misconduct.

*Appointing Authority:* For the purposes of this policy, the designated member of Office command staff, appointed by the Sheriff, whose duties include: being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard.

*Blue Team:* The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct.  The information from Blue Team is transferred to the IAPro Early Identification case management system.

*Classified:* All positions in Maricopa County service that are covered by the Maricopa County Merit System Rules. Excluded are those employees identified as temporary, initial probation, or contract employees, and those positions identified as unclassified.

*Clear and Convincing Evidence:* Evidence that leaves one with a firm belief or conviction that is highly probable that the factual contention of the claim or defense is true.  This standard of proof is higher than proof by a preponderance of the evidence but does not require proof beyond a reasonable doubt.  The standard of proof, Clear and Convincing Evidence, is only utilized when determining an investigatory finding of Unfounded; it is evidence that the allegation was false or not supported by fact.

*Closed Case Notification:* A memorandum sent to the principal, investigative lead, and witness of an administrative investigation to inform the employee that the investigation is complete.  The notification for the principal is only sent if the finding of the investigation was Unfounded, Exonerated, or Not Sustained.

*Coaching:* Coaching is a non-disciplinary interaction between a supervisor and an employee that supports an individual in achieving specific personal or professional goals by providing training, advice, and guidance in response to a specific situation.

For the purpose of determining the number of offenses committed within identified categories of Office Policy GC-17, *Employee Disciplinary Procedures*, Attachment A, the first use of Coaching shall not constitute an offense.

2

**Policy GH-2,** *Internal Investigations*                                          **Effective Date: 11-14-23**

However, the use of Coaching shall require that subsequent conduct by the employee that falls in the same category be addressed as a First Offense for both internal and external allegations, pre and post investigation. Coaching shall be documented in Blue Team and shall be considered for the purpose of discipline for one year prior to the current offense.

*Compelled Statement:* Information received during an administrative investigation, which the Office has required an employee to provide under penalty of disciplinary action, up to, and including, dismissal from employment.

*Complainant:* Any individual who files a complaint regarding the conduct of any employee alleging a violation of Office policies, procedures, or actions.

*Complaint:* An allegation of employee misconduct or wrongdoing. The complaint may be made verbally or in writing, in person, by phone, by mail, or online; and may be by the individual complainant, someone acting on the complainant's behalf or anonymously; and with or without a signature.

*Criminal Investigator:* An Office criminal detective, whether assigned to the Criminal PSB Section or another detective unit of the Office, who conducts an investigation into allegations of employee criminal misconduct.

*Critical Incident:* Any incident that involves the use of force by an employee resulting in death or serious physical injury of a member of the public, prisoner, or an inmate; any assault upon MCSO employees, by any means, that results in serious physical injury or death; or the intentional and unintentional discharge of a firearm by an employee in the performance of their lawful duties. The term "critical incident," as used in this Office Policy, is narrowed for investigative purposes as specified in Office Policy GJ-2, *Critical Incident Response*, and should not be confused with the definition provided in Office Policy GC-22, *Critical Incident Stress Management Program*, which is all-encompassing and directly associated with issues of critical incident stress management. A critical incident **does not** include the following and therefore **does not** require protocol activation:

   A.    The necessary dispatch of an animal for humane/medical purposes; including discharge of a firearm toward an animal for self-defense of themselves or in defense of others; or

   B.    The use of a specialized firearm by the Tactical Operations Unit in order to enhance officer safety, dispense chemical agents, or as an entry device, when no serious physical injury or death to any person occurs.

*Disciplinary Offer:* A situation where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, that establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrices, resulting in a sustained finding. A Disciplinary Offer should be considered an Expedited Resolution.

*Domestic Partner:* An interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else.

*Early Identification System* **(EIS)***:* A system of electronic databases that captures and stores threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public, when applicable), and the actions taken to address the tendencies identified. Blue Team, IAPro, and EI Pro are applications of the EIS.

3

46REPORT000527

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

***Early Intervention Unit*** **(EIU)***:* The EIU is part of the Bureau of Internal Oversight.  The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users.  The unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct or operating procedures and recognizes positive attributes by reviewing employee awards.  The Office shall ensure that there is sufficient staff to facilitate EIS input and training.

***Employee:*** A person currently employed by the Office in a classified, unclassified, contract, or temporary status.

***Employee Misconduct:*** Conduct that includes but is not limited to: a violation of Office Policy; an act of retaliation for complying with Office Policy; an intentional provision of false information in an administrative investigation or any official report, log, or electronic transmittal of information; an intentional failure to complete data collection of other paperwork requirements required by the Office; or federal, state, or local criminal or civil violations.

***Employee Retention and Performance Division (ERPD):*** The ERPD is a resource available to all employees, supervisors, and commanders to assist with addressing employee performance concerns and sources of conflict originating from workplace relationships on a case-by-case basis.  This includes resolving disputes pertaining to annual performance appraisals, supervisor application of workplace rules/regulations, and disputes pertaining to employee leave matters.  The Employee Retention and Performance Division is comprised of the Leave Management, Compensation, and Retention and Performance Sections.  The Leave Management Section (LMS) coordinates leaves of absence and modified duty requests for employees in accordance with the Family and Medical Leave Act (FMLA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), the Americans with Disabilities Act (ADA), workers' compensation policy, and other related regulations and policies.

***Expedited Resolution:*** A truncated investigative process that may be used in the event of a Disciplinary Offer resulting in a sustained finding, or in the event that documentary or video evidence presents clear and convincing evidence establishing that the alleged violation of Office Policy did not occur and there is no evidence or indication of any other potential employee misconduct involved in the incident (resulting in an Unfounded finding).

***External Complaint:*** An expression of dissatisfaction by the public, directed at an employee's conduct.

***Family Relationship:*** Relatedness or connection by blood or marriage or adoption.

***Garrity Warning:*** A notice of an employee's obligations and rights regarding compelled statements during an administrative investigation.

***Good Faith:*** Honesty of purpose and absence of intent to defraud.

***IA Number:*** A unique investigative action number assigned to an allegation of misconduct for tracking and recording purposes.

***IAPro:*** A case management system used by the EIU, the Professional Standards Bureau (PSB), and the Administrative Services Division that tracks and analyzes information, including but not limited to, complaints, commendations, use of force incidents, pursuits, discipline, supervisor notes, and internal investigations.  IAPro is used by PSB for the periodic assessment of timelines of investigations and for monitoring the caseloads of internal affairs investigators.  IAPro is also used to track, as a separate complaint category, allegations of biased policing and unlawful investigatory stops, searches, seizures, or arrests.

***Internal Affairs Investigator:*** Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct.

***Internal Complaint:*** A complaint that originates from within the Office.  Such complaints may be initiated by other employees or from supervisors who observed, or were informed by other employees, of possible policy violations or

4

46REPORT000528

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

other misconduct. For the purpose of this Office Policy, complaints made by a former Office employee regarding conduct that occurred while the former employee was still employed by the Office shall also be identified as an internal complaint.

*Intervention:* An approved specified action taken by a supervisor to improve a situation or prevent a potential negative work performance situation from developing into misconduct.

*Investigative File:* The Office's complete investigative report and any attachments detailing the incidents being investigated. The file shall contain, but is not limited to, the *Administrative Investigations Process Checklist*, *Cover Sheet, Findings Page(s), Prior Work History Report*, *Investigative Plan*, *Investigative Report*, the *Presumptive Range of Discipline* form, the *Employee Disciplinary Considerations and Decision* form, transcripts, audio/video of interviews, body-worn camera footage, *the Inmate Grievance Form*, if applicable, etc. Depending on the outcome of the investigation, the file shall also contain, but not be limited to, a *Final Disposition Letter*; *Closed Case Notification*; and documents that record discipline, to include the Pre-Determination Hearing (PDH) recording. The Professional Standards Bureau shall maintain the investigative file of all documents within the Office's custody and control relating to any investigation and related disciplinary proceedings, grievance proceedings, and appeals to the Maricopa County Merit Systems Commission or state court.

*Investigative Lead:* An individual believed to have information or facts relevant to the matter under investigation.

*Law Enforcement Officer:* An employee of the Office, other than an initial probation employee, who is a deputy sheriff or a detention officer.

*Merit Rules:* The Maricopa County Employee Merit System Rules and the Maricopa County Law Enforcement Officers' Merit System Rules.

*Minor Discipline:* Discipline less severe than a suspension, such as a written reprimand.

*Misconduct:* Includes any violation of Office Policy or Procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

> *Criminal Misconduct:* Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> *Minor Misconduct:* Misconduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

> Minor misconduct, while a violation of Office Policy, can often be addressed with field supervisor-initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not, per the Office Disciplinary Matrix, exceed a Category 1, First or Second Offense; a Category 2, First Offense and which has not been received by the Office as an external complaint, or has not already been assigned to the Professional Standards Bureau (PSB).

> *Serious Misconduct:* Misconduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

5

46REPORT000529

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

*Notice of Investigation:* A written notice given to an employee during an administrative investigation which identifies the employee's status in the investigation, the employee's responsibility not to discuss the investigation with anyone other than those specified, the name and rank of the assigned investigators, and the right to have an observer present at the interview.

*Official Investigation:* An official examination by a supervisor, an internal affairs investigator, or a criminal investigator, into alleged employee misconduct that relates to or may affect an employee's position with the Office. The Office has two types of investigations that are used to examine these allegations:

   1.     Administrative Investigation: An investigation conducted into apparent violations of Office Policy. Sustained allegations for an administrative investigation provide the basis for the imposition of discipline according to the Discipline Matrices and the Categories of Offenses, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

   2.     Criminal Investigation: An investigation by a criminal investigator into an allegation of employee criminal misconduct. These include the process of collecting information (or evidence) about a crime in order to: 1) determine if a crime has been committed; 2) identify the perpetrator; 3) apprehend the perpetrator, and 4) provide evidence to support a conviction in court.

The following does not constitute an official investigation or investigative interview: (a) questioning in the normal course of duty, counseling or instruction, or an informal verbal admonishment by, or other routine or unplanned contact with a supervisor or other law enforcement officer; or (b) preliminary questioning to determine the scope of the allegations or if an investigation is necessary.  However, such counseling, instructions, verbal admonishments, other contacts, and preliminary questioning are covered by and subject to the truthfulness standards found in Office Policy CP-5, *Truthfulness*.

*Pre-Determination Hearing* **(PDH)***:* A forum that allows an employee, regardless of employment status, who is being considered for serious discipline, to address the appointing authority regarding the intended discipline.

*Pre-Determination Hearing Notice:* A written notice given to an employee who is being considered for serious discipline.  The notice includes information regarding: 1) the proposed disciplinary action, 2) the Merit Rules, as applicable; 3) policies alleged to have been violated; 4) sufficient details describing the specific reasons that are being considered for disciplinary action; 5) the employee's relevant work history; 6) the opportunity for the employee to review the investigative file; 7) the employee's opportunity to present mitigating information; and 8) the date and time of the hearing.

*Preliminary Inquiry:*  The gathering of information available to determine the scope of the allegation and to preserve perishable evidence.  This can include a review of EI Pro, Blue Team, traffic stop data, Computer Aided Dispatch (CAD), Shift Log entries in SHIELD, audio and video recordings, and preliminary audio- and video-recorded questioning of parties involved.

*Preponderance of the Evidence:* Facts alleged are more likely true than not true.  Preponderance of the evidence is only utilized when determining an investigatory finding of Sustained.

*Principal:* An employee identified as the primary focus of an administrative investigation and against whom a complaint of misconduct has been made.  An administrative investigation may have multiple principals.

*PSB Administrative Investigators – Critical Incidents* **(PSB-CI)***:* Select members of the administrative section of the Professional Standards Bureau (PSB) who are responsible for investigating critical incidents strictly for administrative purposes.  The PSB-CI shall be comprised of no less than one PSB Command Staff and two investigators.

*PSB Diversion:*  A complaint intake process to address, on a case-by-case basis, eligible complaints without the

6

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: 11-14-23**

initiation of a formal administrative investigation or service complaint.  Complaints received by the PSB shall be reviewed to make an initial determination of the most appropriate course of action to take based on the nature of the allegation.  The Diversion process can culminate in one of the following:  PSB-Directed Supervisory Intervention; Administrative Closure; or Expedited Resolution with a finding of Unfounded.

***PSB-Directed Supervisory Intervention:*** A PSB Diversion intended to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation.  PSB may, on a case-by-case basis, initiate an intervention method, as specified in Office Policy GH-5, Early Identification System, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching.  The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in Attachment B of Office Policy GC-17, *Employee Disciplinary Procedures* for any External Complaints.

***Serious Discipline:*** Discipline which results in an employee receiving a suspension, demotion, or dismissal from employment.  All sustained violations of a Category 7 offense as specified in Office Policy GC-17, *Employee Disciplinary Procedures,* shall result in dismissal from employment.

***Serious Physical Injury:*** Injury which causes death or creates a reasonable risk of death, severe and permanent disfigurement, severe impairment of health, or loss or protracted impairment of the functions of any bodily organ or limb.

***Service Complaint:***  A complaint regarding an inadequate policy, procedure, practice, service level due to staffing or resources, or statutory authority required of the Office.  A service complaint is not an allegation of employee misconduct.

***Supervisor:*** An employee to whom subordinates report.

     1.     Commander: An employee with the rank of lieutenant or above, or its civilian equivalent.

     2.     First-Line Supervisor: An employee with the rank of sergeant, or its civilian equivalent.

***Unclassified Employee, Civilian Only:*** An at-will employee not covered by the Maricopa County Employee Merit System Rules.

***Volunteer:*** A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered.  An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

***Witness:***  An individual who has observed an incident.

**PROCEDURES**

1.     **Supervisor-Initiated Intervention:** An approved action, as specified in Office Policy GH-5, *Early Identification System*, taken by a supervisor to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation.  Supervisors may also initiate this action when an employee's conduct, has minimal negative impact on the overall operations.  Examples of employee work performance situations in which a supervisor may consider approved interventions include those categorized as a Category 1 or Category 2 of the Attachment B, of Office Policy GC-17, *Employee Disciplinary Procedures.*  Employee conduct outside of the limitations of this section shall be addressed, as specified in this Office Policy.  Supervisors are encouraged to contact the PSB if unsure whether the employee work performance situation may be addressed through a supervisor-initiated intervention or reported to the

7

46REPORT000531

**Policy GH-2,** *Internal Investigations*                                                      **Effective Date: 11-14-23**

PSB for action.

A.    Prior to determining intervention regarding the work performance situation, the supervisor shall:

1.    Confirm the employee's conduct does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, and which has not been received by the Office as an External Complaint, or has not already been assigned to the PSB;

2.    Review discipline history by accessing the employee's EIPro Dashboard to assist the supervisor in their intervention or corrective action decision; and

3.    Ensure that when considering a coaching for the intervention, that the employee will not exceed the number of coachings allowed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, for one year prior to the current offense.

B.    All supervisor-initiated intervention action taken shall be documented in Blue Team, as specified in Office Policy GH-5, *Early Identification System*. The entry shall include justification for the intervention and the specific policy or policies involved in the performance issue linked to the employee.

2.    **Complaint Intake Procedures:** The Office shall ensure that all allegations of employee misconduct, whether internally discovered or based on a complaint from a member of the public, or from an inmate, are fully, fairly, and efficiently investigated. All complaints shall be reviewed by the PSB Commander to determine if they are to be addressed as a PSB Diversion or a Service Complaint, or administratively investigated. All investigative findings must be supported by the appropriate standard of proof, as defined for each findings disposition, and shall be documented in writing. All employees who commit misconduct shall be held accountable.

Complaints and allegations of misconduct, including third-party and anonymous complaints, shall be accepted and addressed as a PSB Diversion or a Service Complaint, or administratively investigated. All employees and members of the public shall be permitted to report allegations of misconduct anonymously. When a third party registers a complaint on behalf of another individual, every reasonable effort shall be made to contact the alleged offended individual to verify the complaint. All complaints shall be documented, investigated, and dispositions determined as appropriate and per policy, and a written record made of the findings and resolution.

A.    The Office shall provide a *Comment and Complaint Form* in both English and Spanish.

1.    A *Comment and Complaint Form* shall be available in the following locations:

a.    All deputies shall carry complaint forms in their Office vehicles. Upon request, deputies shall provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and e-mail address, of their immediate supervisor;

b.    At the reception desk at Office Headquarters and Districts;

c.    At the reception desk at PSB;

d.    On the Office website;

e.    The Office shall allow for complaints to be received through a free 24-hour hotline;

8

**Policy GH-2,** *Internal Investigations*                                                    **Effective Date: 11-14-23**

and

    f.    Permanent placards shall be posted and maintained in locations clearly visible to members of the public at the reception desk at Office Headquarters and Districts. The placards shall describe the complaint process and include all relevant contact information, including telephone numbers, e-mail addresses, mailing addresses, and internet sites. The placards shall be both in English and Spanish.

    2.    The Community Outreach Division (COrD) shall be responsible for ensuring that *Comment and Complaint Forms* are available at all times at the Office Headquarters, Districts, and other public locations. Deputies shall ensure that *Comment and Complaint Forms* are available in their patrol vehicles. PSB shall be responsible for the reception desk of the PSB and for those complaints received through the hotline.

B.    Every complaint shall be documented in detail by the person receiving the complaint. Complaints shall normally be referred to a supervisor, but if this is not practicable, the receiving employee shall obtain pertinent information about the complaint and then immediately forward the information to a supervisor. This procedure shall be followed regardless of whether the complaint is submitted verbally, in writing, in person, by phone, by mail, or online, or whether the complaint is submitted by the complainant, someone acting on the complainant's behalf, anonymously, or with or without the complainant's signature. Complaints received by the Communications Division shall be processed as specified in Office Policy, GI-1, *Radio and Enforcement Communications Procedures*. When notified by an employee, the supervisor shall immediately document the notification and ensure that PSB has been advised through Blue Team. Employees receiving complaints shall ensure the maintenance of confidentiality. Employees shall not divulge the name of any persons filing a complaint or provide complainant information to any employee other than the supervisor and/or PSB personnel authorized by Office command to properly process and investigate allegations of misconduct. Upon receipt of the complaint, supervisors are not to discuss the facts of the allegation with those involved as to not compromise the integrity of the investigation. When taking complaint information, Office employees shall respond to the complainant in a courteous and professional manner. If asked by the complainant to identify themselves, employees shall provide at a minimum, their name and serial number.

    1.    External Complaints:

    a.    External Complaints shall be accepted. No employee shall attempt to discourage, interfere with, or delay an individual from registering a complaint. Every effort shall be made to facilitate the convenient, courteous, and prompt receipt and processing of an external complaint. The fact that a complainant does not speak, read, or write in English; or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.

    (1)    Complaints received at the Division by phone or in person shall be referred to the on-duty supervisor. Complaints received at the Sheriff's Office Headquarters by phone or in person shall be referred to the Court Implementation Division. If this is not practical, the receiving employee shall obtain pertinent information about the complaint and have a supervisor make contact with the complainant as soon as possible. The PSB shall accept any external complaint directly from a complainant.

    (2)    Complaints received by mail, e-mail, or the Office website shall be forwarded as follows:

9

46REPORT000533

> (a) Complaints addressed to the Sheriff shall be routed to the PSB along with all supporting documents in a manner that promotes confidentiality.
>
> (b) Complaints received through the mail, e-mail, the Office website, or received from other sources, shall be forwarded to the PSB.

(3) Complaints requiring the Office to investigate allegations of criminal misconduct require the receiving supervisor to immediately notify their own chain of command unless this notification would negatively impact the integrity of the complaint and the subsequent investigation. The respective commander shall notify the PSB Commander for investigative assignment.

(4) Complaints involving allegations of excessive force or physical abuse require the supervisor to make every reasonable attempt to make immediate personal contact with the complainant. This interaction shall be both audio and video recorded unless deemed impractical to do so. Color photographs shall promptly be taken of any alleged physical injury. In extreme circumstances, personnel from the Scientific Analysis Division shall be contacted to take the photos. Complainants may also be encouraged to seek medical evaluation at their own expense and shall be asked to sign an *Authorization to Release Information* (See Attachment B) if treatment is sought.

b. External complaints shall be documented in detail and forwarded immediately to the PSB through Blue Team.

(1) If received by a supervisor, the supervisor shall:

> (a) Offer to meet in person, and if in-person contact is desired, audio and video record the interaction. If the complainant does not desire in-person contact, the contact shall be made by telephone, documented in the investigative report, and the supervisor shall audio record the interaction.
>
> (b) Obtain the following minimum information:
>
> > i) Date of occurrence;
> >
> > ii) Time of occurrence;
> >
> > iii) Incident summary;
> >
> > iv) Incident location;
> >
> > v) Complainant's name and contact information;
> >
> > vi) Witness's name and contact information;
> >
> > vii) Supporting documents and/or evidence;
> >
> > viii) Involved employees; and

10

ix)     Any other available information.

(c)     Immediately complete an entry utilizing Blue Team by selecting Incident Type – External Complaint.  This information shall be automatically routed to PSB.  If Blue Team is unavailable, the supervisor shall complete the *Complaint Acceptance Report* (see Attachment A) and e-mail the document to the PS. Once Blue Team is available, the information from the *Complaint Acceptance Report* shall be promptly added by the supervisor to Blue Team.

(d)     Attach audio and video recording(s) and any related documents to the Blue Team entry.  If Blue Team is not available, send copies of the audio and video recording(s) and related documents to the PSB.

(2)     If received by the PSB, the PSB shall:

(a)     Offer to meet with the complainant and if in-person contact is desired, audio and video record the interaction.  If the complainant does not desire in-person contact, the contact shall be made by telephone, documented in the investigative report, and the PSB shall audio record the interaction.

(b)     Enter the information directly into IAPro and attach audio and video recordings and related documents.  If IAPro is unavailable, complete the *Complaint Acceptance Report*.  Once IAPro is available, the information from the *Complaint Acceptance Report* and the audio and video recording(s) shall be promptly added to IAPro by the PSB.

c.     When possible, the supervisor or the PSB shall give verbal acknowledgment to the complainant that the complaint has been received and documented, that it shall be forwarded to the PSB for action, and an Office representative shall contact the complainant as part of the complaint process.  If verbal acknowledgement is not possible, the supervisor or the PSB shall give written acknowledgement through mail or e-mail.  If acknowledgement in any form is not possible due to the lack of complainant contact information, this shall be documented in the IAPro Investigative Case File.

d.     The PSB shall notify the principal's Division Commander and Bureau Chief of the complaint provided that the integrity of subsequent action will not be compromised. If the complaint is addressed through an administrative investigation, the principal's affected Division Commander and Bureau Chief are not to discuss the facts of the allegation with those involved as to not compromise the integrity of the investigation.

e.     Upon determination by the PSB Commander that an allegation of misconduct requires an investigation, the PSB shall promptly assign an IA Number to the incident and provide it to the complainant.  Within seven days, the PSB shall provide a written update to the complainant which shall include the IA Number and the name of the assigned investigator.  This written update shall also inform the complainant how they may contact the PSB to inquire about the status of the complaint.

f.     If during the course of a PSB or Division administrative investigation the assigned

11

46REPORT000535

investigator identifies a new principal, the investigator shall notify the Division Commander and Bureau Chief of the new principal, provided that the integrity of the investigation will not be compromised.

g.    When allegations are filed on multiple employees involved in a single act of misconduct, one IA Number shall be assigned. The assigned IA Number shall be noted on all documents resulting from the complaint.

2.    Inmate Complaints:

a.    Inmate complaints shall be received through *Inmate Grievance* forms, *Inmate Request* forms, or through verbal communication. Inmates shall be directed to submit their complaint on an *Inmate Grievance* form, as specified in Office Policy DJ-3, *Inmate Grievance Procedures*. If the inmate refuses to complete an *Inmate Grievance* form, any information collected regarding the complaint shall be attached to an *Inmate Grievance* form and forwarded through the grievance process.

Detention personnel shall collect an inmate's grievance or complaint as soon as possible during the course of their shift duties and make an attempt to resolve the grievance or complaint within 72 hours. Detention personnel unable to resolve the grievance within 72 hours, shall forward the *Inmate Grievance* form to a shift supervisor.

If at any time during this process employee misconduct is identified, it shall immediately be entered into Blue Team as an External Complaint by the supervisor identifying the misconduct. The entry shall include all investigative documentation obtained prior to the misconduct being identified. Forms regarding the processing of inmate complaints alleging employee misconduct are located in the Bureau Hearing Unit Forms/Misconduct Grievance Forms folder on the Office's shared drive.

b.    Inmate complaints shall be processed based on the topic of the complaint. The established procedures are as follows:

(1)    Inmate complaints involving policy, procedure, or services of the jail shall be addressed through the inmate grievance process, as specified in Office Policy DJ-3, *Inmate Grievance Procedures*.

(2)    Inmate complaint allegations of employee misconduct related to violations of the Prison Rape Elimination Act (PREA) shall be addressed, as specified in Office Policies DJ-3, *Inmate Grievance Procedure* and GJ-28, *Prison Rape Elimination Act* (PREA). The PREA Coordinator shall forward the completed PREA incident documents to the PSB Commander or designee, for review.

(3)    Inmate complaints regarding allegations of employee misconduct, to include use of force, shall be addressed, as specified in this Policy.

(4)    Inmate complaints regarding allegations of employee misconduct of a criminal nature shall be reported immediately to the Division Commander, and the PSB.

(5)    All other inmate complaints regarding allegations of employee misconduct

12

**46REPORT000536**

**Policy GH-2,** *Internal Investigations*                    **Effective Date: 11-14-23**

received by non-supervisory personnel shall be immediately forwarded to a supervisor for action.

c.      Supervisor responsibilities when an inmate complaint alleges employee misconduct:

(1)      Upon determining an Inmate Grievance *Preliminary Inquiry Report* (PIR) is needed, the supervisor shall contact the facility Custody Bureau Hearing Unit (CBHU) Sergeant to receive a grievance tracking number and an Inmate Grievance Tracking Coversheet.

(2)      As soon as possible, and not to exceed seven calendar days of receiving the *Inmate Grievance* form, to include those that are noted as resolved by the inmate after the officer responds in Section II of the *Inmate Grievance* form, the supervisor receiving the inmate complaint shall be responsible for completing a preliminary inquiry regarding the allegation. The preliminary inquiry shall include, but is not limited to the following:

(a)      An audio recorded statement from the inmate complainant;

(b)      Documented review of audio and video recordings, Shift Log entries in SHIELD, and rosters; and

(c)      Documented limited questioning of the employee to determine the validity of the complaint.

(3)      Upon completion of the preliminary inquiry, the supervisor shall document their findings on a PIR.

(4)      The supervisor shall write a synopsis of the PIR findings on the inmate's original *Inmate Grievance* form.

(5)      The supervisor shall provide all documentation, to include the PIR, Grievance Tracking Coversheet, the original *Inmate Grievance* form, and any associated information, to the shift commander for their review.

(6)      In the event a supervisor is an involved employee in an inmate's complaint alleging employee misconduct, that supervisor shall not conduct the preliminary inquiry. The shift commander shall then determine which supervisor will conduct the preliminary inquiry.

d.      Shift Commander, Jail Commander, CBHU Commander or designee's, responsibilities when an inmate alleges employee misconduct:

(1)      As soon as possible, and not to exceed seven calendar days of receipt of the documentation from the supervisor, the shift and jail commander shall conduct their reviews and document their conclusion on the PIR.

(a)      In the event that during the review by the shift or jail commander, either determines that misconduct did occur, they shall consult with the PSB Commander or designee, and provide them with a copy of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information. The PSB Commander or designee, shall determine if misconduct by the

13

employee has occurred and shall notify the CBHU of their determination.

(b)     If the PSB determines an investigation is warranted, the copy of the *Inmate Grievance* form, the PIR, and Grievance Tracking Coversheet, and any associated information shall be forwarded to the PSB.  Entry into IAPro and the assignment of an IA Number will stop the grievance process.  The PSB shall provide documentation to the CBHU staff notifying them of the IA Number for processing and closure in the CBHU database.  The CBHU staff shall make a notation on the original *Inmate Grievance* form indicating the PSB is investigating the allegation and attach the PSB documentation.  The CBHU shall then provide the IA Number to the inmate in the grievance response.

(c)     When the shift and jail commander complete their review, and conclude no employee misconduct occurred, they shall ensure the original *Inmate Grievance* form is returned to the inmate within three calendar days.  The inmate shall be instructed to select their choice of action in Section IV of the *Inmate Grievance* form, and then sign their name, booking number, and the date, and be provided their copy of the grievance form.  N**o PIR or Grievance Tracking Coversheet shall be provided to the inmate as part of the response.  T**he *Inmate Grievance* form shall then be forwarded to the CBHU Commander, along with the PIR, the Grievance Tracking Coversheet, and any other associated information.

(2)     The CBHU Commander or designee, shall conduct a review and document their findings on the PIR as soon as possible, and not to exceed seven calendar days of the shift or jail commander's documentation.

(a)     If the CBHU Commander or designee, determines that employee misconduct may have occurred, they shall consult with the PSB, and provide the PSB with a copy of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information.  The PSB Commander or designee, shall determine if an investigation is warranted.  If the allegation is going to be investigated by the PSB, the *Inmate Grievance* form will be closed out in the CBHU database upon issuance of the IA Number in IAPro.  The CBHU staff shall make a notation on the original *Inmate Grievance* form indicating the PSB is investigating the allegation and attach the PSB documentation. The CBHU shall then provide the IA Number to the inmate in the grievance response.

(b)     A copy of the grievance form indicating the assigned IA Number and noting that PSB will be conducting an investigation shall be provided to the inmate by the CBHU Commander or designee.  N**o PIR or Grievance Tracking Coversheet shall be provided to the inmate as part of the response.**

(c)     If upon review of the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, the CBHU Commander or designee, determines the

14

**46REPORT000538**

PSB is not going to investigate the allegation, the *Inmate Grievance* form shall continue through the inmate grievance process. All collected information obtained during the preliminary inquiry, to include the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, shall be stored in the CBHU database.

e.  Once potential misconduct is identified, the PSB Commander shall make the final determination whether an administrative investigation is conducted following consultation with the shift or jail commander, or the CBHU Commander or designee, regarding an inmate allegation of employee misconduct.

(1)  For allegations of misconduct, the CBHU Commander shall provide the Inmate Grievance form, the PIR, the Grievance Tracking Coversheet, and any other associated information from the shift or jail commander to the PSB Commander or designee, who shall make an initial determination of the category of the alleged offense and promptly assign an internal affairs investigator.

(2)  If the PSB Commander or designee, determines an administrative investigation is warranted, the PSB shall enter the *Inmate Grievance* form, the PIR, the Grievance Tracking Coversheet, and any other associated information, into IAPro, as an External Complaint, listing the inmate as the complainant.

(3)  Once determined the complaint will be investigated as an External Complaint through the PSB, the *Inmate Grievance* shall not be processed any further by the CBHU and closed out in the CBHU database as investigated further by the PSB and referencing the IA Number. The CBHU Commander or designee, shall notify the inmate regarding the status of their grievance.

(4)  If the PSB Commander or designee, determined employee misconduct did not occur, the allegation shall remain as an inmate grievance. The PSB's determination shall be documented in the CBHU database, and the *Inmate Grievance* form shall continue through the grievance process, as specified on Office Policy DJ-3, *Inmate Grievance Procedures*.

3.  Internal Complaints

a.  Internal complaints shall be accepted by supervisors. While employees may enter an internal complaint into Blue Team or may contact the PSB directly, employees are encouraged, but not required, to first attempt to resolve their internal complaint through their respective chain of command.

(1)  Employees who observe or become aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a supervisor, directly to the PSB, or any outside entity authorized to take corrective action, without fear of retaliation. When the misconduct involves a supervisor, the employee shall either contact the next level in the chain of command, or the PSB, at any time, regarding misconduct involving an Office employee or make a Blue Team entry.

15

46REPORT000539

(2)    Internal complaints shall not be confused with an employee grievance. A grievance is directed at such matters as employee status, work conditions, or operational procedures, as specified in Office Policy GC-16, *Employee Grievance Procedures*. An internal complaint is directed at alleged misconduct on the part of an employee which shall warrant a preliminary inquiry or investigation, and possible disciplinary action.

(3)    Internal complaints shall not be confused with matters associated with Failure to Perform at Level Required of the Position (not involving misconduct). These matters do not involve misconduct and no internal complaint shall be submitted. Supervisors shall contact the Human Resources Bureau for guidance on how to manage an employee for Failure to Perform at Level Required of the Position (not involving misconduct).

(a)    Supervisor action to assist the employee shall include intervention options as specified in Office Policy GH-5, *Early Identification System*, and this Office policy.

(b)    The use of Failure to Perform at Level Required of Position will be limited at this time to civilian personnel and will require the review of the PSB Commander to ensure the employee action is not misconduct.

b.    Internal complaints shall be documented in detail and immediately forwarded to the PSB through Blue Team.

(1)    If an internal complaint is received by the supervisor, the complaint shall be documented consistent with external complaints, as specified in this Office Policy. When entering the information into Blue Team, the supervisor shall select Incident Type – Internal Complaint. The information shall be automatically routed to the PSB.

(2)    If the employee elects to enter a complaint directly into Blue Team, they shall select Incident Type – Internal Complaint and enter the required information. This information shall be automatically routed to the PSB.

(3)    If an internal complaint is received by the PSB, complaints shall be documented consistent with external complaints, as specified in this Office Policy. When entering the information into IAPro, PSB shall select Incident Type – Internal Complaint.

4.    Service Complaints:

a.    The Office shall receive, evaluate, and respond to service complaints regarding inadequate policy, procedure, practice, service level due to manpower or resources, or statutory authority required of the Office. A service complaint shall not include allegations of employee misconduct. A service complaint provides a mechanism to foster communication between members of the Office and the public.

b.    Preliminary Inquiry: If a supervisor receives a complaint believed to be a service complaint, the supervisor shall conduct a preliminary inquiry. The supervisor shall document information gathered during the preliminary inquiry. The information to be documented shall include:

16

**Policy GH-2,** *Internal Investigations*                    **Effective Date: 11-14-23**

(1)     An audio recording of the personal contact with the complainant. If the complainant does not want personal contact, the interaction shall be audio recorded;

(2)     If needed, any interviews of involved employees; and

(3)     Information gathered through a review of EI Pro, Blue Team, traffic stop data, CAD, Shift Log entries in SHIELDs, audio and video recordings, and limited preliminary questioning of the parties involved.

c.     *Service Complaint Form*: The supervisor shall complete the *Service Complaint Form* and include all information gathered during the preliminary inquiry. The *Service Complaint Form* shall be forwarded to the PSB through Blue Team by selecting Incident Type – Service Complaint. The *Service Complaint Form* is found in the Internal Affairs\Forms folder on the Office's shared drive. The audio and video recordings and other information gathered during the preliminary inquiry shall be attached to the Blue Team entry when forwarded to the PSB.

d.     Review of Service Complaint: The PSB shall review the preliminary inquiry and determine whether the complaint shall be issued a Service Complaint number (SC Number) and closed administratively, the complaint will be investigated administratively and issued an IA Number, or PSB will utilize the PSB Diversion process. When a complaint consists of both misconduct and service issues, only an IA Number shall be issued. However, the matters determined to be a service complaint can be treated as separate allegations and closed as service complaints.

(1)     Administrative Closure: An Administrative Closure shall be used to indicate a service complaint was resolved without an administrative investigation.

(a)     Administrative Closures shall be used when any of the following circumstances exist:

i.     The complaint does not allege employee misconduct and can be resolved with an explanation to the complainant regarding the policy, procedure, service level due to manpower or resources, or statutory authority required of the Office. This includes matters in which the complainant questions Office policy, procedures, or service level due to manpower or resources, or statutory authority required of the Office.

ii.     The complainant does not allege employee misconduct and expresses dissatisfaction with the outcome of formal legal, civil, or administrative processes involving members of the Office. The preliminary inquiry associated with this type of Service Complaint closure shall be thoroughly reviewed and confirm potential employee misconduct was not involved with the incident prior to closure.

iii.     The complainant does not allege employee misconduct and requests additional information or follow-up actions pertaining to a prior call for service, report, or investigation.

17

46REPORT000541

             iv.    The complaint lacks specificity and the complainant refuses or is unable to provide further clarification necessary for the Office to fully understand the complaint, or the complainant does not articulate facts amounting to an allegation of employee misconduct.

       (b)    If the service complaint is closed with the appropriate administrative finding, the PSB shall complete an entry into IAPro by selecting Incident Type – Service Complaint. The entry shall include the SC Number and outcome.

             i.    PSB shall prepare and distribute the *Final Disposition Letter.* The complainant should be informed that their complaint is being looked into for possible changes to policy and training, if applicable.

             ii.    The PSB shall forward copies of the service complaint to the Policy Development Section, Training Division, or any other area that may be impacted by the information contained in the complaint for review and action, if necessary. The Policy Development Section and/or Training Division shall be required to look into the issue and respond to the PSB about any changes that it will make or why changes are not being made.

    (2)    Administrative Investigation: If the service complaint is elevated to an administrative investigation, the PSB shall assign an IA Number and assign the investigation to the appropriate Division or maintain and initiate the investigation.

5.    Office Vehicle Accidents: Office vehicle accident investigations shall be addressed, as specified in Office Policy GE-4, Use, *Assignment, and Operation of Vehicles.*

6.    PSB Diversions:

    a.    The PSB Diversion process is a mechanism initiated by the PSB Commander to address, on a case-by-case basis, eligible complaints that are most appropriately handled without the initiation of a formal administrative investigation or Service Complaint.

    b.    The PSB Diversion process shall utilize the EIS to process, document, route, and track the way eligible complaints are addressed in lieu of a formal administrative investigation or Service Complaint.

    c.    The PSB Diversion process shall require notification to the complainant, principal employees, and the respective employee's chain of command consistent with notifications sent when an administrative investigation or Service Complaint is received or closed.

    d.    If the PSB Diversion process is utilized, the incident type of PSB Diversion will be utilized in the IAPro Database, a unique tracking number will be assigned, and all documentation associated with the PSB Diversion and involved employees will be attached.

18

46REPORT000542

**Policy GH-2, *Internal Investigations***                                    **Effective Date: 11-14-23**

    e.    Only the specific categories of complaints identified in this Office Policy are eligible for a PSB Diversion.

    f.    The PSB Commander shall document in writing the decision to utilize a PSB Diversion instead of initiating a formal administrative investigation or Service Complaint. Decisions as to how complaints are classified or which are eligible for PSB Diversions will be made on a case-by-case basis; and based on the circumstances, cases may be reclassified.

    g.    If the PSB Commander determines that a qualifying complaint should be addressed with an approved PSB Diversion, the following procedures shall apply:

        (1)    The *PSB Diversion Service Form* shall include the PSB Diversion tracking number, involved employee, synopsis, associated policy violation(s), category of offense(s), and offense number.

        (2)    The *PSB Diversion Service Form* shall include instructions for issuance to the employee and be routed via the involved employee's chain of command for service.

        (3)    The *PSB Diversion Service Form* shall be issued to the involved employee, documented in the EIS in accordance with the instructions provided, and returned to the PSB within 30 calendar days.

        (4)    The *PSB Diversion Service Form* will be attached to the PSB Diversion Incident in the IAPro Database and linked to any associated EIS entries.

    h.    The following types of complaints are not eligible for consideration for a Diversion:

        (1)    Complaints involving members of the Plaintiffs' class;

        (2)    Complaints involving allegations of bias;

        (3)    Complaints involving allegations of criminal conduct;

        (4)    Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

        (5)    Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

        (6)    Allegations of conduct that, if sustained, could constitute a Category 3 or higher Offense from the Office's Disciplinary Matrices – unless otherwise specified below.

    i.    The following situations, on a case-by-case basis, are eligible as part of the Diversion process, to be Administrative Closures:

        (1)    Situations where a complaint was received by the Office more than one year after the last instance of the underlying alleged misconduct being reported.

        (2)    Situations where an internal or external complaint was received by the Office after the employee(s) involved in the alleged misconduct left

    19

46REPORT000543

employment with the Office; or situations where, in an internal or external complaint, the principal employee involved in the alleged misconduct is deceased or becomes no longer employed by the Office and there is no evidence or indication of any other potential employee misconduct in the incident.

(a)    Should the principal employee return to work at the Office, the case shall be reactivated and resumed for full completion in accordance with Office Policy standards.

(b)    The time in which the employee was not employed with the Office shall be excluded from the investigative timeline.

(3)    Situations when the initial complainant is unwilling or unable to cooperate.

(4)    Situations where the initial complainant is anonymous. Anonymous complainants include those that are known but desire to remain anonymous and requested to not be included in the investigative report and those whose identity is unable to be confirmed.

(5)    Situations resulting in a health-related in-custody jail death that do not involve the use of force by an employee and are considered non-critical incidents under Office Policy.

(a)    There are no exclusions for Diversions in these situations.

(b)    **Prisoner or Inmate Death** *Preliminary Inquiry Report* **(PIR):** Following the death of a prisoner or inmate in Office custody, as specified in Office Policy GJ-11, *Serious Diagnosed Illness, Serious Physical Injury or Death of a Prisoner or Inmate*, where there is **no** employee use of force, and when no PSB investigation has otherwise been initiated, shall require the completion of a PIR, as specified in this Office Policy. The PIR shall be conducted to identify potential employee misconduct associated with the incident. If at any time during the PIR process employee misconduct is identified, it shall immediately be entered into Blue Team as an Internal Complaint by the supervisor identifying the misconduct.

i.    The gathering of information for the PIR shall include, but is not limited to, interviews of involved employees, information gathered through various data sources, and the review of associated audio and video recordings. The PIR will ensure that any perishable evidence relevant to an administrative misconduct investigation is preserved.

ii.    PIRs completed pursuant to a prisoner or inmate death shall be forwarded through the chain of command to the PSB Commander or designee to determine if an administrative investigation is warranted to determine whether any violation of Office policy contributed in any way to the prisoner or inmate death.

20

**46REPORT000544**

**Policy GH-2,** *Internal Investigations*                                        **Effective Date: 11-14-23**

        a.     If the PSB Commander or designee determines employee misconduct was identified, the PIR shall be entered as an Internal Complaint pursuant to this Office Policy.

        b.     If the PSB Commander or designee determines employee misconduct did not occur, no further administrative investigative action is required.

     iii.     A prisoner or inmate death PIR is not required when the following occurs:

        a.     The death of a prisoner or inmate is determined be a critical incident, as specified in Office Policy GJ-2, *Critical Incident Response*; or

        b.     The PSB has already initiated an administrative investigation into the incident.

(6)     Situations where an internal complaint originated from a workplace relationship(s) and are most appropriately addressed with the assistance of the MCSO Employee Retention and Performance Division (ERPD) in accordance with the process outlined in the PSB Operations Manual.

    (a)     The following types of complaints are not eligible for consideration for a PSB Diversion Process in place of a formal administrative investigation or Service Complaint:

        i.     Allegations of conduct that, if sustained, could constitute a Category 4 or higher Offense from the Office's Disciplinary Matrices.

j.     PSB-Directed Supervisory Interventions:

(1)     Situations wherein the PSB may initiate a PSB-Directed Supervisory Intervention to improve and/or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, PSB may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System*, to include: Squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training; supervisor evaluation period; action plan; meeting with the commander; re-assignment; and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that per the Office Disciplinary Matrices does not exceed a Category 1, First or Second Offense; a Category 2, First Offense for any Internal Complaint and as specified in Attachment B of Office Policy GC-17, *Employee Disciplinary Procedures* for any External Complaints. Employee conduct outside of the limitations of the named sections for both internal and external allegations shall be addressed by considering the definition for each Category of Offenses and determining placement, as specified in the Office Policy.

These situations are eligible, on a case-by-case basis, for consideration by

21

46REPORT000545

the PSB Commander for an approved PSB-Directed Supervisory Intervention, in lieu of an administrative investigation or Service Complaint.

    (a)    Following a review of the circumstances of the incident, available evidence, EIS profile, and the disciplinary history of the potential principal, the PSB Commander shall make an initial determination if the allegations can appropriately be addressed through an approved PSB-Directed Supervisory Intervention.

    (b)    Principals shall not exceed the number of coachings allowed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*, for one year prior to the current offense.

    k.    Expedited Resolution with a finding of Unfounded:

    (1)    Situations of an internal or external complaint where under the clear and convincing evidence standard, external documentary or video evidence establishes that the alleged violation of Office Policy did not occur and there is no indication of any other employee misconduct resulting in an Expedited Resolution with a finding of Unfounded.

    (a)    If the investigator determines during the administrative investigative process that above conditions are met, and the case investigation has not already been completed, the investigator shall document in the investigative report the following:

    i.    The manner and circumstances in which the above condition is met to support an expedited finding;

    ii.    The investigative steps taken to verify there are no other indications or evidence of other employee misconduct involved in the incident;

    iii.    If applicable, the readily available clear and convincing evidence demonstrating that the alleged violation of Office Policy could not occur as alleged, supporting an unfounded finding;

    iv.    The investigative report shall be completed with the recommended expedited finding of unfounded and submitted for review in accordance with the processing of all other completed administrative investigations.

    v.    If the Expedited Resolution and finding is approved by the PSB Commander, the administrative case will proceed through all other formal closure processes for an administrative investigation as outlined in Office Policy.

    vi.    If the Expedited Resolution and finding is applied to an administrative investigation, a special indicator linked to the expedited finding shall be included in IAPro Investigative Case File and associated with the employee's EIS information for future reference.

22

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

3.    **Disciplinary Offer:**  Situations where there is sufficient external evidence, documentary or video evidence that is dispositive of whether a violation of policy occurred, establishes a violation of Office Policy, and the PSB Commander determines based on the circumstances of the situation, that the principal(s) involved accepted responsibility and received an offer for either the presumptive discipline or a mitigated discipline no lower than the minimum discipline within the Office Disciplinary Matrix, as further described:

A.    A Disciplinary Offer is to be considered an Expedited Resolution.

B.    The ability of the PSB Commander to offer principals the presumptive discipline or a mitigated penalty if they accept responsibility, shall include allegations that, if sustained, could constitute a Category 1, Category 2, and Category 3, First Offense, where minor discipline is within the approved range pursuant to Office Policy GC-17, *Employee Disciplinary Procedures.*

C.    If determined to be eligible, the PSB Commander shall coordinate with the MCSO Administrative Services Division (ASD) Conduct Resolution Section (CRS) to prepare and extend the written disciplinary offer to the principal employee(s).

D.    The principal employee(s) shall have seven (7) calendar days during a time period the employee is regularly scheduled to work to respond to the disciplinary offer.

E.    If the employee accepts responsibility for the policy violation(s) and returns the signed disciplinary offer, the CRS shall prepare/process the disciplinary action in accordance with standard operating procedures for minor discipline administration following a formal administrative investigation.  Some steps may not be required to complete this investigation.

F.    If the employee declines to accept the disciplinary offer or fails to return the disciplinary offer to the CRS by the deadline provided, the CRS shall forward the response or lack of response to the PSB Commander for the initiation of a formal administrative investigation.

G.    In the event information/evidence related to a complaint is later discovered which could require the matter to be investigated further by the PSB, the discipline offer or issuance shall be rescinded by the PSB Commander.

H.    The following types of complaints are not eligible for consideration for a presumptive discipline or a mitigated penalty in place of a full formal administrative investigation or Service Complaint:

1.    Complaints involving members of the Plaintiffs' class;

2.    Complaints involving allegations of bias;

3.    Complaints involving allegations of criminal conduct;

4.    Allegations of conduct that, if sustained, would require notification to the MCAO for Rule 15 Disclosure pursuant to *Brady v. Maryland*;

5.    Allegations of conduct that, if sustained, could result in the revocation of a principal's AZ POST certification; and

6.    Allegations of conduct that, if sustained, could constitute a Category 3 Offense where minor discipline is not within the approved range from the Office's Disciplinary

23

**Policy GH-2,** *Internal Investigations*                                                  **Effective Date: 11-14-23**

Matrices.

4.   **Investigative Assignment:** The PSB Commander will make an initial determination of the category of offense and then promptly assign an internal affairs investigator, or a criminal investigator as required. If the misconduct investigation will be investigated at the Division level, the Division Commander shall assign the internal affairs investigator.

   A.   Investigations of complaints shall only be conducted by individuals who meet the clearly defined qualifications documented in the PSB Operations Manual, or as justified in writing by the PSB Commander. The Office must ensure that an internal affairs investigator:

      1.   Possesses excellent investigative skills, has a reputation for integrity, possesses the ability to write clear reports, has the ability to be fair and objective in determining whether an employee committed misconduct; and

      2.   Does not have a disciplinary history of three or more sustained violations of misconduct or does not have one sustained violation of a Category 6 from the Office's Disciplinary Matrices, as specified in Office Policy GC-17, *Employee Disciplinary Procedures,* and does not have a history of conducting deficient investigations.

      3.   Is not listed in the Law Enforcement Rule 15 Disclosure Database.

   B.   Allegations of employee minor misconduct shall be administratively investigated by a sergeant who has received misconduct investigative training.

      1.   Division level internal affairs investigators may seek assistance from the PSB at any time during the investigation.

      2.   If at any point during an administrative investigation the investigator has information indicating the principal may have committed misconduct of a serious or criminal nature, the investigator shall immediately notify the PSB, which shall assume the investigation.

   C.   The PSB shall investigate the following allegations of employee misconduct:

      1.   Serious misconduct;

      2.   Misconduct indicating apparent criminal conduct;

      3.   Allegations of a violation of Office Policy, CP-5, *Truthfulness*;

      4.   Complaints alleging any act of discriminatory policing or conduct;

      5.   Discriminatory motor vehicle stop complaints;

      6.   Supervisory referrals resulting from a supervisory review of reports or recordings depicting discriminatory actions;

      7.   Use of force complaints in which serious injury results or is alleged;

      8.   Complaints alleging an employee has committed an act of domestic violence;

      9.   The filing of any civil suit by a member of the public alleging misconduct of an employee which occurred on or off duty;

      10.   Critical incidents, as specified in Office Policy GJ-2, *Critical Incident Response*; and

24

11.    Any investigation, which due to its complexity or the involvement of personnel from multiple squads or Divisions or is beyond the capabilities of Division level personnel.

D.    Conflict of Interest: Conflict of interest in administrative investigations is prohibited. An assigned investigator shall disclose any involvement or relationship which could be perceived to compromise the investigative process to the PSB Commander prior to the start of the investigation. The PSB Commander shall make a determination as to whether the perception is justified and reassign the investigation, if necessary.

1.    No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.

2.    No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation shall investigate the misconduct. Relationships that shall be reported, include but are not limited to:

a.    Family relationship(s);

b.    Outside business relationship(s);

c.    Romantic relationship(s);

d.    Personal friendship(s) that extends outside of the Office; and

e.    Close professional relationship(s).

3.    No employee shall be involved in an investigation, whether criminal or administrative, with respect to any persons who are superior in rank and in their chain of command. Investigations of the Chief Deputy's conduct, whether criminal or civil, must be referred to an outside authority.

4.    If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority.

5.    Where appropriate to ensure the fact and appearance of impartiality, the PSB Commander or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.

6.    Any outside authority retained by the Office must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest. The PSB shall determine if an outside investigator possesses the requisite background and level of experience of internal affairs and the absence of any actual or perceived conflicts of interest.

5.    **Investigation of Complaints:** The investigation of allegations is a critical part of the complaint and discipline process. A decision to exonerate, unfound, not sustain, or sustain a charge must be based upon actual and reliable information. The investigation shall consist of gathering and reporting facts related to the allegation. Credibility determinations shall be based upon all known facts. Employees shall provide all relevant evidence and information in their custody dond control to internal affairs investigators. They shall also advise investigators of persons who shall be contacted for statements. Intentionally withholding evidence or

25

information from an internal affairs investigator shall result in discipline.

A.     Investigations must be viewed by the public and Office employees as diligent, thorough, and impartial.  The investigation shall be conducted in a manner that shall reveal the facts.  In each misconduct investigation, investigators shall:

   1.     Conduct investigations in a rigorous and impartial manner designed to determine the facts;

   2.     Approach the investigation without prejudging the facts and without permitting any preconceived impression of the principal, investigative lead, witness, or complainant to cloud the investigations;

   3.     Identify, collect, and consider all relevant, circumstantial, direct, and physical evidence, including any audio or video recordings while ensuring evidence is collected in a timely fashion and in accordance with Office Policy GE-3, *Property Management and Evidence Control*;

   4.     Make reasonable attempts to locate and interview all witnesses, including members of the public.  Leaving voice mail messages and sending certified letters is not sufficient.  Reasonable attempts may include, but are not limited to, neighborhood canvasses, checking with the Post Office, accessing open Internet resources, and completing Department of Motor Vehicle checks.  All attempts shall be documented in the investigative report with the date, time, where, when, and who was contacted, to include all reasons why an interview was not conducted;

   5.     Offer in person interviews to any external complainants;

   6.     Audio and video record all interviews.  Exceptions to a recorded interview may include, but are not limited to, the fact that the member of the community does not wish to be audio and/or video recorded, or that the member of the community resides outside of Maricopa County.  If an interview is not audio and video recorded, all reasons shall be documented in the investigative report;

   7.     Avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

   8.     Attempt to resolve material inconsistencies between employee, complainant, investigative lead, and witness statements, and make credibility determinations as appropriate;

   9.     Not give automatic preference for an employee's statement over a statement received from a member of the public;

   10.    Not disregard a witness or investigative lead's statement solely because the witness or investigative lead has a connection to either the complainant or an employee or has a criminal history; and

   11.    Not alone consider the fact that a complainant committed a crime, pled guilty, or is found guilty of an offense, to determine whether the employee engaged in misconduct; nor will such factors by themselves justify discontinuing an investigation.

B.     Internal affairs investigators shall consider the witness or investigative lead's criminal history or any adjudicated findings of untruthfulness in evaluating their statement.  Additionally, the internal affairs investigator shall take into account the record of any witness, investigative lead, complainant, or

employee who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

C.     Investigators shall investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.

D.     The Office shall not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline unless it meets the specific situations approved for Administrative Closures.  The Office will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.

E.     Administrative Investigation: The PSB Commander shall determine if an administrative investigation will be conducted at the Division level or by the PSB, as specified in this Office Policy.

F.     Criminal Investigation: When appropriate, a separate criminal investigation shall be conducted by the PSB Criminal Investigations Section, an Office criminal investigations unit, such as the Major Crimes or Special Investigations Division, or by a law enforcement agency having jurisdiction, for the purpose of prosecution.  A criminal investigation conducted by an Office criminal investigative unit must first be authorized by, and under the authority of, the PSB Commander; and must be conducted separately from any administrative investigation.  All criminal investigations conducted by the Office shall be assigned a Criminal Internal Affairs (CIA) number.  The initiation of a criminal investigation does not preclude the initiation and/or continuing of an administrative investigation.

   1.     When a complaint, whether internal or external, has the implication of possibly being criminal in nature, the PSB Commander shall be immediately notified.  This includes critical incidents as defined in Office Policy GJ-2, *Critical Incident Response*, regardless of the jurisdiction where the critical incident occurred or where another entity retains jurisdiction.

   2.     If the criminal misconduct is discovered during an administrative investigation conducted outside of the PSB, the PSB shall immediately assume the administrative investigation.

   3.     If the evidence of criminal misconduct pertains to someone who is superior in rank to the PSB Commander and is within the commander's chain of command, the PSB Commander shall provide the evidence directly to the appropriate prosecuting authority, such as the Maricopa County Attorney's Office, the Arizona Attorney General's Office, or the United States Attorney's Office, without notifying those in the chain of command who may be the subject of the investigation.

   4.     An administrative investigation shall be required for any matter investigated criminally.  Such administrative investigations shall be completed regardless of the outcome of the criminal investigations, including cases in which the prosecuting agency declines to prosecute or dismisses the charges.

   5.     If a misconduct allegation will be investigated criminally, the PSB will not compel an interview of the principal pursuant to *Garrity*, until it has first consulted with the criminal investigator and the relevant prosecuting authority.

      a.     No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the PSB Commander in consultation with the entity conducting the criminal investigation.

27

**Policy GH-2,** *Internal Investigations*                                           **Effective Date: 11-14-23**

     b.     The PSB shall document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.

     c.     When an administrative investigation begins prior to the criminal investigation being completed, it is imperative the administrative investigator does not communicate with the criminal investigator about any statements by the principal that were compelled pursuant to *Garrity*. The administrative investigator can obtain any and all information about the criminal investigation from the criminal investigator for the administrative investigation.

6.     Administrative investigators shall not take part in any criminal investigation interviews of Office personnel. They shall, however, monitor the interview from a location which is out of view of the person being interviewed. The person being interviewed shall not be advised of the presence of administrative investigators. The administrative investigators shall not discuss or suggest any line of questioning or inquiry with criminal investigative personnel.

7.     Administrative investigators shall coordinate any anticipated actions with the on-scene, criminal investigation commander before entering the scene.

8.     If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the PSB Commander. The PSB Commander shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing and include it in the investigatory file.

9.     If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the PSB Commander shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The PSB Commander shall direct that the investigator conducts additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.

10.     If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the PSB shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

11.     The Sheriff shall require the PSB to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.

G.     In cases where the alleged misconduct involves a violation of Office Policy CP-5, *Truthfulness*, the PSB Commander or Chief Deputy may initiate an administrative investigation. If the decision is made not to investigate, the decision and the supporting information shall be documented in a memorandum and retained by the PSB in both hard copy and electronic form for record retention purposes.

H.     Volunteer: A volunteer's continued service with the Office shall be at the discretion of the Sheriff. Volunteers are subject to, and shall comply with all Office Policies, rules, and regulations. Violations of Office Policies, rules, and regulation shall be addressed, as specified in Office Policies GC-17, *Employee Disciplinary Procedures,* and this Office Policy. Serious violations of Office Policy by a volunteer shall result in a review by the PSB Commander to determine whether a Pre-Determination Hearing is held; or the services of the volunteer are to be immediately terminated.

28

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

6.    **Administrative Investigation Report:** At the conclusion of each investigation the internal affairs investigator shall document all information gathered during the investigation in the investigative report.

A.    Report Format: The investigator shall utilize the following investigative report format. The format and forms for the investigative report shall be found in the Internal Affairs\Forms folder on the Office's shared drive. All facts gathered during the investigation shall be documented. The investigative report shall include:

1.    Investigative Plan: An Investigative Plan shall be created for each Administrative Investigation. The primary objectives of an administrative Investigative Plan are to provide a roadmap for a thorough and complete investigation; to identify all reasonable opportunities to reduce and eliminate unnecessary investigative steps; and to promote timely completion of the investigation. The Investigative Plan serves as the foundation and starting point for the efficient investigation of the alleged employee misconduct.

a.    An *Investigative Plan* shall be formulated collaboratively between the investigator and the investigator's supervisor. The Investigative Plan shall be completed and approved by the investigator's Division Commander within seven (7) calendar days of the case assignment to the investigator.

b.    The *Investigative Plan* shall include the following items*:*

(1)    Complaint synopsis: The complaint synopsis shall consist of a few sentences providing an overall synopsis of the known allegations/facts after review of the complaint intake and all available associated evidence available to the investigator and their supervisor at the time the *Investigative Plan* is drafted.

(2)    Evidence: The evidence section shall consist of a list of all available items of evidence the investigator has currently in their possession or plans to seek out/collect/request/review during the investigation.

(3)    Case outline: The case outline is a free-form outline of the projected order of investigative steps anticipated to be taken by the investigator. This section may be in bullet point or narrative form but must provide enough information to ascertain the projected sequence of events and any investigative steps anticipated necessary to complete the investigation.

(a)    Examples that investigators and supervisors may consider when examining the possibility of reducing and/or eliminating unnecessary investigative steps include, but are not limited to:

i.    Second Chair: Investigators should consider the physical presence of a second investigator at Complainant, Witness and Principal interviews as an exception rather than the rule.

ii.    Witness Interviews: Investigators and their supervisors shall consider the necessity when interviewing a multitude of witnesses who they reasonably believe observed, or know of, the same activity, and who will provide reasonably similar information.

iii.    Principal Interviews: Principals should be interviewed as

29

46REPORT000553

soon as practicable and reasonable, based upon the cumulative evidence and information obtained by the investigator.

    (4)    Additional information: This section allows for the investigator to provide any other relevant information pertaining to the overall investigative strategy.

    (5)    Estimated investigative completion date: This section shall include the investigator's estimated date of completion and submission to their supervisor by following the steps outlined in the proposed Investigative Plan.

    (6)    Supervisory Review: This section shall list the reviewing supervisor and the date in which the Investigative Plan was approved.

    c.    The *Investigative Plan* submission, review, and approval workflow process shall consist of the following:

    (1)    Division/District Investigations:

    (a)    The PSB will include a blank Investigative Plan template with the initial email notification sent to the respective Division Commander upon the initiation or assignment of a new administrative investigation.

    (b)    The *Investigative Plan* email template shall be completed by the investigator and shall list all relevant data, forms, reports and materials. (e.g., BWC, IRs, CAD) provided with the initial complaint.

    (c)    The investigator's supervisor shall work with the assigned investigator to revise/edit the Investigative Plan as needed to eliminate any unnecessary investigative steps.

    (d)    Once approved, the investigator's supervisor shall forward the *Investigative Plan* through the chain of command to the Division Commander. The investigator can begin the investigation following the immediate supervisor's approval of the plan.  If anyone in the chain of command, including the Division Commander, suggests modifications to the plan during the subsequent review process, those will be communicated to the investigator as soon as possible.  Once approved, the Division Commander will forward the completed email template to the PSB.

    (e)    The PSB will upload the approved Investigative Plan utilizing the IAPro Database "*Running Sheet*" feature making the approved Investigative Plan accessible and viewable by all Blue Team users having access to the incident for reference throughout the course of the investigation.

    (2)    *Investigative Plans* for cases assigned to the PSB will be completed in accordance with specifications within the PSB Operations Manual.

    (3)    The *Investigative Plan* shall be stored within the IAPro database and will be available for review/reference throughout the course of the investigation and

30

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: 11-14-23**

shall be retained in the case file for future reference.

2.     *Administrative Investigations Process Checklist*

3.     *Coversheet*

4.     *Investigative Report*: The body of the report shall document all actions taken during the investigation.

5.     *Findings*: A *Findings* page shall be prepared for each policy violation. If there are multiple policy violations, allegations, or principals, there shall be a separate *Findings* page for each principal, each allegation, and each policy violation.

6.     *Prior Work History Report*: *A Prior Work History Report* shall be prepared in order to consider the principal's work history.

    a.     The PSB shall review the employee's EI Pro/Blue Team entries and Personnel File, as well as any other pertinent information on the employee in order to compile a complete history. The review shall include the employee's prior five years of MCSO work history, to include a review of the employee's Employee Performance Appraisals. This report shall be completed and uploaded into Blue Team within five business days of the complaint being filed.

    b.     If the case is assigned to the Division level, the assigned Division investigator shall review the employee's EIPro/Blue Team entries, and any other information regarding the employee's prior five years of work history and document the information on the report.

    c.     The following shall be included in the *Prior Work History Report*:

        (1)     Commendations and awards;

        (2)     Findings of misconduct, which includes misconduct for which discipline was ultimately not issued for procedural reasons, such as but not limited to, the Merit Commission finding a good faith effort was not made to complete an investigation within the statutory requirements. The findings of misconduct shall be considered in future disciplinary decisions;

        (3)     The IAPro complaint history; and

        (4)     Discipline, to include information regarding the allegation, the date of allegation, and the findings.

B.     Report Documentation: The investigator shall ensure the following are documented in the administrative investigation:

1.     A narrative description of the incident;

2.     Documentation of all evidence that was gathered, including names, phone numbers, and addresses of complainants, witnesses, and investigative leads. In situations where there are no known witnesses or investigative leads, the report shall specifically state this fact. In circumstances in which witnesses, or investigative leads were present, but circumstances prevented the investigator from determining the identification, phone number, or address of

31

those witnesses or investigative leads, the report shall state the reason. The report shall also include all available identifying information for anyone who refuses to provide a statement;

3. Names of all Office employees who witnessed the incident;

4. Documentation of whether employees were interviewed and a transcript or recording of the interviews;

5. The investigator's evaluation of the incident, based on their review of the evidence gathered, including a determination of whether the employee's actions appear to be within Office Policy, procedure, regulations, orders, or other standards of conduct required of Office employees;

6. In cases where the investigator asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

7. In cases where material inconsistencies must be resolved between complainant, witness, investigative lead, and employee statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

8. An assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns shall be addressed. In accessing the incident for policy, training, tactical or equipment concerns, the investigator shall include an assessment of whether:

   a. The law enforcement action was in compliance with training and legal standards;

   b. The use of different tactics should or could have been employed;

   c. The incident indicates a need for additional training;

   d. The incident suggests that the Office should revise its policies, strategies, tactics or training;

9. If a weapon was used, documentation that the employee's certification and training for the weapon were current;

10. In the instance of an externally generated complaint, documentation of all contacts and updates with the complainant; and

11. At the conclusion of an administrative investigation, the investigator shall identify a finding for each policy violation. An investigation with a sustained policy violation shall be forwarded to the PSB Commander which will result in the initiation of the disciplinary process.

7. **Investigative Findings:** At the conclusion of an administrative investigation, the investigator shall identify one of the following findings for each allegation of a policy violation:

   A. Exonerated: This shall indicate the investigation determined that alleged conduct occurred, but the actions of the employee were within Office Policy, procedures, or training.

   B. Unfounded: This shall indicate the investigation determined by clear and convincing evidence, that the allegation was false or not supported by fact.

32

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

C.    Not Sustained: This shall indicate the investigation determined that there was insufficient evidence to prove or disprove the allegation;

D.    Sustained: This shall indicate the investigation determined that the allegations are supported by the preponderance of the evidence and justify a reasonable conclusion of a policy violation.

8.    **Review of Administrative Investigations:**

A.    Enforcement Division Administrative Investigation Review:

1.    Once the investigative report is completed, the investigator shall forward the report through the chain of command to the Division Commander for review and signature. The chain of command shall have up to 10 calendar days within the 60 calendar days to complete their review. The investigative file shall not be forwarded to the PSB until the Division Commander has approved the investigation and concurred with the findings. The IAPro Task Feature shall be utilized to track and provide alerts regarding due dates for review and approval to the Division chain of command.

a.    If anyone in the chain of command determines that the findings of the investigation are not supported by the appropriate standard of proof, as defined for each findings disposition, that supervisor shall return the investigation to the investigator for correction or additional investigative effort.

(1)    The Division Commander shall document the inadequacies in a memorandum and shall forward the documentation to the PSB no later than 60 calendar days after receipt of the complaint for investigation.

(2)    The Division Commander shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.

b.    The Division Commander shall be responsible for the accuracy and completeness of the investigation reports prepared by investigators under their command.

2.    Once the Division Commander has approved the investigation and concurred with the findings, the Division Commander shall forward the investigative file to the PSB Commander or designee, for review. The PSB shall review the investigative file for completeness, thoroughness, and appropriate investigative actions. The PSB shall ensure that the investigative findings are supported by evidence.

a.    If the PSB review determines the investigation is properly completed, the next course of action based on the findings of the investigation shall occur.

b.    If the investigation is incomplete or unsatisfactory, the PSB shall return the investigative file for revision and/or further investigation, as necessary. The PSB shall order additional investigation when it appears there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.

c.    When the findings of the investigation report are not supported by the appropriate standard of proof, as defined for each findings disposition, the PSB shall document the reasons for this determination.

33

46REPORT000557

      d.     The PSB shall ensure revisions and/or further investigation complies with the PSB recommendations and established timelines.

      e.     At the discretion of the PSB Commander, an administrative investigation may be assigned or re-assigned to another supervisor with the approval of the supervisor's commander, whether within or outside of the district or bureau in which the incident occurred or may be returned to the original supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.

B.     PSB Administrative Investigation Review: Once the investigative report is completed, the PSB investigator shall forward the report to the PSB Commander. The PSB Commander shall have up to 10 calendar days, within the 85 calendar days, to complete a review of the investigative report. The PSB Commander shall also be responsible for the accuracy and completeness of the investigation reports prepared by investigators under their command and shall determine the findings for each alleged policy violation.

     1.     If the PSB Commander determines that the findings of the investigation are not supported by the appropriate standard of proof, the PSB Commander shall return the investigation to the investigator for correction or additional investigative effort.

     2.     The PSB Commander shall document the inadequacies and take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it.

C.     PSB Commander Determinations:

     1.     Once an investigation is completely, thoroughly, and appropriately investigated, the PSB Commander shall determine the next course of action based on the findings of the investigation.

         a.     If the findings for the policy violation(s) in a completed Enforcement Division administrative investigation are Not Sustained, Unfounded, or Exonerated, following the review by the PSB Commander or designee, action to close and file the case, accordingly, shall occur.

         b.     If the findings for the policy violation(s) in a completed PSB administrative investigation are Not Sustained, Unfounded, or Exonerated, the PSB Commander shall make final findings, sign the investigative report, ensure that all notifications are made to the complainant and involved employee(s), and direct that the case be closed and filed accordingly.

         c.     If the findings for the policy violations in either a completed Enforcement Division or PSB administrative investigation are sustained, the PSB Commander shall make a preliminary determination if discipline is to be imposed and shall document those determinations in writing, including the presumptive range of discipline for the sustained misconduct allegation, and the employee's discipline history.

            (1)     If the PSB Commander makes a preliminary determination that the sustained allegations for a Category 1, First or Second Offense, or a Category 2 First Offense, can appropriately be handled by a Coaching, the investigation shall be forwarded to the Administrative Services Division. The Administrative Services Division will notify the appropriate chain of command to ensure that the Coaching is conducted and documented both in the EIS and as the resolution to the investigation in question before the case

34

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: 11-14-23**

is closed.  If the PSB Commander determines that minor discipline is to be imposed, the Administrative Services Division shall be responsible for coordinating the process.  This includes preparing detailed correspondence, and ensuring all necessary notifications and actions are completed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

(2)     When the PSB Commander makes a preliminary determination that serious discipline should be imposed, the appointing authority shall conduct a PDH and will provide the employee with an opportunity to be heard.  The preliminary determination of discipline will be forwarded to the Administrative Services Division to process in accordance with Office Policy, GC-17, *Employee Disciplinary Procedures*; and to coordinate the process.  This includes preparing detailed correspondence, scheduling the PDH, if applicable, and ensuring all necessary notifications and actions are completed.

2.     Policy, training, tactical or equipment concerns shall be addressed as specified in this Office Policy.

3.     The PSB Commander shall review all serious Office Policy violations by a volunteer, to determine whether a PDH is held, or the services of the volunteer are immediately terminated.

9.     **Timeline for Completing Administrative Investigations:**  The investigative timeline for cases assigned to the PSB or outsourced by PSB is 85 calendar days, and for cases assigned outside of the PSB 60 calendar days.  Should a case be transferred during the investigative process between the PSB and a Division outside of the PSB, the timeline will default to 85 calendar days.  Investigative start, extension, and completion timeline procedures are as follows:

A.     Investigative Timeline: The investigative timeline starts on the date the Office receives notice of alleged employee misconduct by a person authorized by the Office to initiate an investigation which includes investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct and ends when the completed investigation is approved by the PSB Commander.

1.     Administrative investigations shall be investigated and submitted to the PSB Commander by the due date identified by the PSB.

2.     If it appears that the investigation will exceed the investigative timeline identified by the PSB, and a reasonable justification exists to request an extension, the investigator shall complete a *Request for Investigative Extension*.

a.     Reasonable justifications to extend the investigative timeline are situations beyond the investigator's control that have caused delays in the investigation. Examples of reasonable justification include, but are not limited to: documented attempts to obtain crucial evidence; situations where involved employees are out on approved leave for prolonged periods of time during the investigative timeframe (i.e., FMLA or military leave), the prolonged unavailability of the non-employee complainant, witness, or evidence, or a criminal investigation restricting necessary investigative steps from being completed.

b.     The investigative timeline shall not be extended without an approved reasonable

35

46REPORT000559

justification.

3.    Division Process to Requests for Investigative Extension: The *Request for Investigative Extension* for a Division Level Investigation is located in the Office's shared drive PSB folder and shall be processed in the following manner:

a.    The *Request for Investigative Extension* shall be completed by the investigator and submitted through the chain of command to their Executive Chief for review. The Executive Chief will forward the *Request for Investigative Extension* to the PSB Commander for processing no later than 10 calendar days prior to the current investigative due date.

b.    If approved, the PSB will facilitate the submission to the Sheriff for review and consideration.

c.    If approved by the Sheriff, the PSB will submit the request to the Monitor Team (during such time as the Monitor is assigned) for final review, approval, and establishment of a new investigation due date.

d.    If a new due date is approved, the *Request for Investigative Extension* will be added to the investigative case file and provided to the investigator and respective Division Commander by the PSB.

e.    If at any stage, the *Request for Investigative Extension* is not approved, the *Request for Investigative Extension* will be provided to the PSB to be added to the investigative case file and a copy of the unapproved request will be provided to the investigator and respective Division Commander by the PSB.

f.    The PSB will update the IAPro database with any approved extension due date.

g.    If the investigation is not completed by the newly established due date a new *Request for Investigative Extension* will be completed utilizing the procedures previously outlined.

B.    Investigative Timeline Extension: Completion of the *Request for Investigative Extension* shall include a brief synopsis of the case, the justification for requesting the extension, and the new investigative timeline due date being requested.

1.    The *Request for Investigative Extension* shall be submitted to the PSB Commander no later than 10 calendar days prior to the current investigative due date.

2.    The *Request for Investigative Extension* will be attached to the administrative investigation case file and if applicable, any newly approved deadline will be provided to the investigator and respective Division Commander by the PSB.

C.    Overall Investigation Completion Timeline: The **overall** administrative investigation completion timeline starts on the date the Office receives notice of alleged employee misconduct by a person authorized by the Office to initiate an investigation which includes investigators assigned to the PSB or supervisors in an Office Division or bureau who are assigned to investigate misconduct and ends when the employee is served with a *Closed Case Notification, Coaching, Written Reprimand, or Pre-Determination Hearing Notice*.

1.    In cases involving a law enforcement officer's conduct that may result in suspension,

36

demotion, or dismissal, the Office is statutorily obligated to make a good faith effort to complete an administrative investigation within 180 calendar days after the Office receives notice of the allegation by a person authorized by the Office to initiate an investigation. The 180-calendar day timeline is met when the employee is served with a *Closed Case Notification*, *Coaching, Written Reprimand*, or *Pre-Determination Hearing Notice*.

2.  If it appears that the completion timeline will exceed the statutorily identified 180th calendar day despite good faith efforts, and additional time is necessary to obtain or review evidence, the Office shall provide the principal(s) with a written notice explanation of the reasons for the investigation to continue beyond 180 calendar days.

    a.  The PSB shall prepare a *180-Day Notice* and provide a copy of the *180-Day Notice* signed by the PSB Commander to the principal(s) **prior** to 180 calendar days.

    b.  The *180-Day Notice* shall be attached to the investigative report and documented in IAPro.

3.  In accordance with Arizona Revised Statute, following the *180-Day Notice,* the completion timeline for an administrative investigation involving a law enforcement officer's conduct that may result in suspension, demotion, or dismissal, shall not exceed an additional 360 calendar days, with the exceptions of events indicated below.

    a.  The completion timeline is suspended during the time that any criminal investigation or prosecution is pending in connection with the act, omission, or other allegation of misconduct.

    b.  The completion timeline is suspended during the period of time in which a law enforcement officer who is involved in the investigation is incapacitated or otherwise unavailable.

    c.  The completion timeline may be suspended for a period prescribed in a written waiver of the limitation by the law enforcement officer.

    d.  The completion timeline may be suspended for emergencies or natural disasters during the time period in which the governor has declared a state of emergency within the jurisdictional boundaries of the concerned employer.

    e.  A multijurisdictional investigation may be extended for a period of time reasonably necessary to facilitate the coordination of the employers involved.

10.  **Administrative Investigation Interview Guidelines:** Interviews shall be conducted according to the following guidelines:

    A.  Audio and video recordings of the entire interview shall be made by the assigned investigator for administrative purposes. To ensure the integrity of the investigation, these recordings shall become part of the investigative file as the official recordings. Employees are permitted to record their own interviews with investigators using personally owned electronic devices. Recordings made by the employee, or the employee's observer, do not constitute an official record of the interview.

    B.  The employee's observer may take notes during the interview. The employee may use notes taken during the interview only to assist them in the investigation or a disciplinary matter. The notes do not constitute an official record of the interview.

37

46REPORT000561

**Policy GH-2,** *Internal Investigations* **Effective Date: 11-14-23**

C.    Any notes that are taken or recordings made during the interview shall be kept confidential and may only be discussed and/or shared with those specified in the Notice of Investigation, the employee's observer, and the employee's attorney.

D.    Principals of an administrative investigation should, in most cases, be interviewed after the complainant, witness, and investigative leads have been interviewed, evidence has been examined, associated reports and testimony have been reviewed; and the principal's training, work assignments, supervisor notes, and previous similar administrative investigations and/or criminal investigations involving the principal, have been reviewed.

E.    The interview shall be conducted at a reasonable hour, preferably during the interviewee's work schedule, unless circumstances dictate otherwise.  Maricopa County and Office employees interviewed outside their work schedule must be paid for all hours they are required to participate in the interview.

F.    The interview shall be conducted with an Office employee at PSB or at the district/Division. Interviews of employee complainants and witnesses may be conducted through Microsoft Teams video- conferencing at the discretion of the investigator if the confidentiality and other interview requirements of Office Policy are met.  The Microsoft Team video conference shall be recorded, and the employee notified of the recording process.  Interviews with members of the public shall be conducted at a mutually agreeable location or through a mutually agreeable communication method.

G.    Any employee participating in an interview at the PSB office shall be required to secure all weapons, to include firearms and knives, prior to entering the PSB office.  This includes complainants, witnesses, investigative leads, principals, and employee observers.

H.    All employees shall cooperate with an administrative investigation, including appearing for an interview when requested by an investigator, and providing all required documents, evidence, or names of witnesses that may be relevant to the investigation.  Intentionally withholding evidence or information during an administrative investigation shall result in disciplinary action.

I.    Supervisors shall be notified when an employee under their supervision is summoned as part of an administrative investigation and shall facilitate the employee's appearance, absent extraordinary and documented circumstances.

J.    A principal shall be permitted reasonable breaks of limited duration during any interview for the purpose of telephonic or in-person consultation with others, including attorneys, who are immediately available.

K.    In an administrative investigation where the principal is involved in a use of force incident that resulted in death or serious physical injury of a person and the principal video recorded the event, the investigator shall offer the principal the opportunity to view the video recording.  Once the initial administrative interview has been conducted, the administrative investigator shall show the principal the recording.  This shall occur prior to the conclusion of the interview process.  The principal shall be given the opportunity to provide additional information to supplement his statement, and he may be asked additional questions by the investigator, as specified in Office Policy GJ-35, *Body-Worn Cameras*.

1.    Prior to viewing the video recording, the investigator shall read the principal the following statement, as specified in ARS 38-1116:

*Video evidence has limitations and may depict events differently than you recall.  The video evidence may assist your memory and may assist in explaining your state of mind at the time of the incident.  Viewing video evidence may or may not provide additional clarity to what*

38

*you remember. You should not feel in any way compelled or obligated to explain any difference in what you remember and acted on from what viewing the additional evidence provides you.*

2.   Following the review of the video recording, the principal shall be given the opportunity to provide the investigator information they believe is relevant to the administrative investigation.

11.   **Administrative Interview Forms:** Prior to an administrative investigation interview, and at the investigator's discretion to preserve the integrity of the investigation, employee complainants, witnesses, investigative leads, and principals shall be provided a *Notice of Investigation,* and principals shall be provided a *Garrity Warning*. A copy of each shall be provided to the employee.

A.   The *Notice of Investigation* templates are located in the Internal Affairs\Forms folder on the Office's shared drive.

1.   The *Notice of Investigation* clarifies the employee's status in the investigation and the employee's responsibility not to discuss the investigation with anyone other than those specified in the *Notice of Investigation*.

a.   If the *Notice of Investigation* allows the employee to speak with their spouse or domestic partner about the investigation and the spouse or domestic partner is an employee of the Office, the following shall apply:

(1)   The spouse or domestic partner shall adhere to all the requirement of the *Notice of Investigation* and shall not be required to sign or receive a copy of their spouse or domestic partner's *Notice of Investigation*.

(2)   The spouse or domestic partner shall not discuss the investigation with anyone other than those specified in the *Notice of Investigation*.

b.   An employee's spouse or domestic partner, who violates the *Notice of Investigation*, shall be subject to disciplinary action, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

2.   The *Notice of Investigation* issued to a principal shall include the alleged facts that are the basis of the investigation, the specific nature of the investigation, the principal's status in the investigation, all known allegations of misconduct that are the reason for the interview, and the principal's right to have an observer present at the interview. The principal shall be provided a copy of the notice of investigation that they shall retain.

a.   When issuing the notice to the principal, the Office shall provide any relevant and readily available materials, including complaints that contain the alleged facts, except for complaints that are filed with the Office and that include allegations of unlawful discrimination, harassment, or retaliation, or complaints that involve matters under the jurisdiction of the EEOC. The format of the materials may be written, audio, or video.

b.   The Office is not required to disclose any facts to the employee that would impede the investigation.

3.   During an interview if, through questioning of the employee, additional employee misconduct is discovered beyond the scope of the current administrative investigation, the

39

in-progress interview shall continue and questions concerning the new misconduct may be asked without the issuance of a separate *Notice of Investigation*.

    a.    All new allegations of employee misconduct shall be investigated, as specified in this Office Policy.  Following the interview, a determination shall be made by the PSB Commander, as specified in this Office Policy, whether a separate investigation into the newly alleged misconduct shall be conducted or whether the new allegations shall be included in the current investigation.

    b.    During an interview, should misconduct of a criminal nature be disclosed, the interview must cease, and further direction be provided by the PSB Commander.

4.    If an employee is involved in a critical incident investigation, statements made during a tactical debrief will not be considered a violation of a NOI.

B.    The *Garrity Warning* template is located in the Internal Affairs\Forms folder on the Office's shared drive.  The *Garrity Warning* advises employees that statements given during an administrative investigation are compelled statements and cannot be used to incriminate the affected employee in any criminal proceedings.  *Garrity* shall only be provided to principals of an investigation.

C.    Employee Release from NOI: An employee is released from the NOI when notified by the PSB that the investigation is closed.

12.    **Employee Right to an Observer:**

A.    If an employee is party to an administrative investigation as a witness, investigative lead, or principal, they shall be notified that they may request to have an observer present during the interview, at no cost to the Office.  The investigator shall have the employee complete the *Employee Observer Admonition* or the *Observer Waiver Form* prior to the interview.  These forms are located in the Internal Affairs\Forms folder on the Office's shared drive.

B.    If an employee witness, investigative lead, or principal desires an observer, they shall provide the name of the prospective observer to the investigator to ensure the observer selected is not involved in the investigation as a complainant, principal, witness, or investigative lead, or is an observer for another employee involved in the same or related investigation.  Personnel within the employee's chain of command shall be excluded from acting as an employee's observer.  The PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer.

C.    The observer selected must be an employee of the Office, not an attorney, and must be available on reasonable notice so that the interview is not unreasonably delayed.  If the selected observer is not reasonably available, the employee witness, investigative lead, or principal may request permission from their assigned investigator to use a representative from their professional membership organization.

D.    If an employee witness, investigative lead, or principal elects to have an observer, they may only have one observer at any given time.

E.    An employee who agrees to be an observer shall do so at no cost to the Office by using their own off-duty time.  Accrued vacation time may be used during scheduled duty hours, provided that the absence shall not have a cost impact on the operation of the area where the observer is assigned.

F.    An observer must, in fact, act only as an observer.  At no time shall the observer interrupt the

40

46REPORT000564

investigative interview in any manner including, but not limited to, engaging in any form of verbal or non-verbal communication, making distracting noises, or hindering the flow or direction of the interview.

G.    The observer is prohibited from making any electronic recordings or transmitting any portion of the interview in real time. Any open or covert attempt to do so shall result in disciplinary action.

H.    Employee observers are permitted to take notes during the interview.

1.    The notes may only be used to assist in the investigation or a disciplinary matter. The notes do not constitute an official record of the interview.

2.    Any notes that are taken during the interview shall be kept confidential and shall only be discussed and/or shared with those specified in the *Notice of Investigation,* the employee the observer is representing, and the employee's attorney.

3.    If the employee, employee's observer, attorney, or anyone specified in the *Notice of Investigation* releases information without authorization, the employee, the employee's observer, and any other Office employee specified in the *Notice of Investigation* may be subject to disciplinary action up to and including, dismissal from employment.

I.    If the employee witness, investigative lead, or principal or their observer fails to comply with these guidelines, the offender may be subject to disciplinary action. If the observer's non-compliance occurs during the interview, the observer shall be immediately removed from the interview.

J.    Once the interview has concluded, the employee witness, investigative lead, or principal is prohibited from discussing the interview or investigation with anyone other than the assigned investigator, observer, or legal counsel. If the employee witness, investigative lead, or principal releases information without authorization, the Office may subject the employee to disciplinary action.

K.    Once the interview has been concluded, the observer is prohibited from discussing the interview or investigation with anyone other than the assigned investigator or the employee they represented. If the observer releases information without authorization, the Office may subject the employee to disciplinary action.

L.    Employees shall not be subject to discipline, threat of retaliation, or retaliation for requesting the use of, or serving as, an observer.

M.    The right to an observer does not apply to an interview that is:

1.    In the normal course of duty, counseling, instruction, an informal verbal admonishment, or other routine or unplanned contact with a supervisor or any other employee;

2.    During a preliminary inquiry to determine the scope of the allegations; or

3.    In the course of a criminal investigation.

13.    **Employee Five-Minute Statement**: At the conclusion of the interview, a principal shall be entitled to make a statement to the investigator, not to exceed five minutes, addressing specific facts or policies that are related to the interview.

14.    **Examinations and Tests:** The *Garrity Warning* shall be given to a principal, and the *Notice of Investigation* shall be given to any employee, prior to any examination or test. Photographs, lineups, and psychological or physical examinations may be required in an administrative investigation and shall be authorized by the PSB

41

46REPORT000565

Commander.

    A.    If it appears likely that an employee shall be required to submit to examinations or tests during the course of an administrative investigation, the employee shall be advised that submission is compulsory. The required examinations or tests shall be incident-specific and narrowly and directly related to the employee's performance or non-performance of duty, their fitness for duty, or the alleged misconduct.

    B.    With proper justification, a request for a physical or psychological examination of an employee may be approved. The employee shall cooperate with the examiner and submit to all laboratory or psychological tests. Drug testing procedures are specified in Office Policy GC-21, *Drug, Medication, and Alcohol Testing*.

15.    **Administrative Leave with Pay:** The purpose of administrative leave is to manage risk and to protect employees, victims, and the integrity of an investigation. Employees may also be placed on administrative leave with pay due to a critical incident. The following procedures specify when and how an employee may be placed on administrative leave:

    A.    Command personnel of the rank of lieutenant or above, or their civilian counterparts may place an employee on administrative leave with pay for the remainder of a shift for alleged infractions of the law, Maricopa County Merit System Rules, or Office Policy. The incident shall immediately be reported to the bureau commander, who shall review the facts of the incident and, if necessary, extend the administrative leave up to a maximum of three working days. The Chief Deputy or the PSB Commander or designee must authorize leave to exceed three working days. Once authorized, the employee shall be advised of the administrative leave in writing.

    B.    If the allegation in the complaint would likely result in dismissal if sustained, the bureau commander may place an employee on administrative leave with pay for the remainder of a shift and shall refer the matter directly to the Chief Deputy or the PSB Commander or designee, who may place the employee on administrative leave with pay. The employee shall be advised of the administrative leave in writing.

    C.    Employees involved in a critical incident may be placed on administrative leave with pay. The Chief Deputy or PSB Commander or designee, shall authorize critical incident administrative leave. Once authorized, the employee shall be advised of the administrative leave in writing. This leave typically includes the remainder of the work week during which the critical incident occurred plus an additional 40 hours during which time the PSB Administrative Investigators-Critical Incident members shall conduct their initial investigation and allow the involved employee to complete other administrative processes required following a critical incident.

16.    **Retaliation:** All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, member of the public, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action. Retaliating against any person who reports or investigates alleged misconduct shall be considered serious misconduct and shall result in disciplinary action, up to and including dismissal from employment.

17.    **Closed Case Notification:**

    A.    Upon completion of the investigation, if the findings are determined to be Not Sustained, Unfounded, or Exonerated, the PSB shall send the principal a *Closed Case Notification* memorandum notifying the principal of the outcome. If the finding is Sustained, and discipline is required, the procedures shall be

42

**Policy GH-2,** *Internal Investigations*                                    **Effective Date: 11-14-23**

followed, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*. A template for a *Closed Case Notification* is found in the Internal Affairs\Forms folder on the Office's shared drive.

B.    Upon completion of the investigation, the PSB shall notify the employee witnesses and investigative leads that the case is closed.

18.    **Final Disposition Letter:** A *Final Disposition Letter* shall be sent to all known complainants by the PSB upon completion of the investigation. A copy of the letter must be maintained with the investigative file. Templates for this letter may be found in the Internal Affairs\Forms folder on the Office's shared drive. The letter shall state whether the actions of the employee were appropriate under the circumstances or fell within the guidelines of policy. When the actions of an employee have been found to be in violation of policy, the complainant shall also be advised that the matter shall be addressed internally. In cases involving a complaint from a member of the public, the complainant shall be notified of the findings, and as applicable, the imposed discipline as permitted by law.

19.    **Employee Resignation/Retirements While Under Investigation:** An investigation of an employee who resigns or retires while under investigation shall be completed and findings regarding policy violations shall be made, unless it meets the criteria for a PSB Diversion as per this Policy. Depending on the status of the investigation at the time of the resignation or retirement, the employee shall be given the opportunity to participate in an interview and/or provide written information regarding the findings of the investigation before the case is finalized.

20.    **Policy, Training, Tactical or Equipment Failure or Deficiency:** A failure or deficiency occurs when the allegation is true and the action of the employee was within policy or training guidelines, but the result was inappropriate or undesirable.

A.    If, during the course of an administrative investigation, an investigator identifies a policy deficiency, training or tactical failure, or equipment failure, the investigator shall document the deficiency or failure in their investigative report. The PSB shall notify the Division Commander of the Policy Development Section and/or Training Division of the deficiency or failure, and ensure that the policy, tactical, or equipment concerns are resolved. The Policy Development Section and/or Training Division shall notify the PSB of the actions taken. This information will be added to the investigative file.

B.    If, during the course of an administrative investigation, an investigator identifies an employee's training deficiency, the investigator shall document the deficiency in their investigative report. The PSB Commander shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. A memorandum of concern detailing the policy, training, tactical or equipment concerns, and any proposed recommendations, shall be authored and forwarded to the appropriate Bureau Chief and Division Commander for review and action.

21.    **Confidentiality and Security of Records:** Information regarding an employee misconduct investigation shall be kept as confidential as possible while still allowing for a thorough investigation.

A.    The PSB shall maintain a complete file of all documents within the Office's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Merit Systems Commission or a state court. All files, reports, tapes, electronic media, memoranda, and other forms of documentation relating to a completed administrative investigation shall be filed in the PSB. All investigations shall be securely maintained. All copies of documents related to a completed administrative investigation shall be destroyed upon notification that the original investigation documents have been received by the PSB.

43

46REPORT000567

**Policy GH-2,** *Internal Investigations*                                      **Effective Date: 11-14-23**

B.      Polygraph Services may retain original documents and polygraph recordings which are prepared or originated by that unit, but shall not retain any other investigative material, as specified in Office Policy GH-3, *Polygraph Procedures and Documents*.

22.    **Records Disclosure:** The Administrative Services Division may distribute copies of all or any portion of an administrative investigation for administrative or public record purposes, or as necessary to comply with a judgment of a federal or state court.

A.      In accordance with ARS Title 38, Chapter 8, Article 1, information about a law enforcement officer's investigative file shall not be released for public inspection until the investigation is complete, or the Office has discontinued the investigation. The investigation is not considered complete until the principal receives a *Closed Case Notification*, a Coaching, a *Written Reprimand*, or a Notice of Disciplinary Action. If the investigative file is the subject of an appeal regarding a disciplinary action that resulted in a suspension, demotion, or dismissal by a classified law enforcement officer, the investigative file is not complete until the conclusion of the appeal process before the Maricopa County Merit Systems Commission, or such time to appeal has lapsed.

B.      Investigative files for all other Office employees shall be released, in accordance with state law.

C.      Polygraph data and reports regarding a classified law enforcement officer shall be disclosed, pursuant to ARS Title 38, Chapter 8, Article 1.

23.    **Records Retention:** In accordance with ARS 39-128, the Office shall retain all records that are reasonably necessary or appropriate to maintain an accurate knowledge of disciplinary action involving employees of the Office, including the employee's responses to all disciplinary actions. All administrative investigations shall be maintained for five years after an employee's separation or retirement from Office employment.

Attachment A
Complaint Acceptance Report Protected.docx

Attachment B
Authorization to Release Information Protected.docx

44

46REPORT000568

**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al., | No. CV-07-02513-PHX-GMS |
| Plaintiffs, | **SUPPLEMENTAL PERMANENT INJUNCTION/JUDGMENT ORDER** |
| v. | |
| Joseph M. Arpaio, in his individual and official capacity as Sheriff of Maricopa County, AZ; et al., | |
| Defendants. | |

## BACKGROUND

On May 24, 2013, the Court issued Findings of Fact and Conclusions of Law after conducting a bench trial in this matter. (Doc. 579.) The Court held that Defendants' operations at issue violated the Plaintiff class's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

The Court permanently enjoined Defendants from the following:

(1) Detaining, holding or arresting Latino occupants of vehicles based on a reasonable belief, without more, that such persons are in the country without authorization;

(2) Following or enforcing its "LEAR" policy, as currently written, against any Latino occupant of a vehicle in Maricopa County;

(3) Using race or Latino ancestry as a factor in determining whether to stop any vehicle;

(4) Using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle may be in the country without authorization;

46REPORT000569

(5) Detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of the vehicle's occupants have committed or are committing a violation of federal or state criminal law;

(6) Detaining, holding, or arresting Latino occupants of a vehicle for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that the necessary elements of the crime are present; and

(7) Detaining, arresting, or holding persons who are occupants of motor vehicles based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

After issuing the injunctions, the Court held a status conference with the Parties on June 14, 2013. (Doc. 582.) The Parties desired to negotiate the terms of a consent decree to ensure Defendants' compliance with the injunctions. On August 16, the Parties filed a Proposed Consent Decree that contained both terms to which the parties were able to reach agreement, and terms on which they could not agree. (Doc. 592.) The Court held a hearing on August 30 at which it discussed both the terms agreed upon and the disputed terms with the Parties. (Doc. 599.) As a result of the trial and the subsequent proceedings, the Court orders the following supplemental injunctive relief.

## REMEDIES

### I. DEFINITIONS

1. The following terms and definitions shall apply to this Order:

   a. "Boilerplate" means language that is stock, formulaic, appears repeatedly in different reports, and fails to attest to the unique facts of an incident;

   b. "CAB" means the Community Advisory Board;

   c. "CAD" means "Computer Aided Dispatch," the electronic system that tracks communications between MCSO deputies and dispatch while on patrol;

   d. "CBP" means U.S. Customers and Border Protection;

- 2 -

46REPORT000570

e.  "Complainant" means any person, including a member of the public, MCSO deputy, detention officer, civilian employee, or posse member, who makes a complaint against MCSO;

f.  "Complaint" means any allegation of improper conduct made by a member of the public or MCSO personnel regarding MCSO services, policy or procedure, that alleges dissatisfaction with or misconduct by MCSO personnel;

g.  "Order" means this Order;

h.  "County" means Maricopa County, including its agents and employees;

i.  "Court" means the United States District Judge for the District of Arizona presiding over this case;

j.  "Defendants" means defendants in the above-captioned action, i.e., Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, and the MCSO;

k.  "Deputy" or "deputy" means any sworn law enforcement officer employed by or working for MCSO, including Supervisors, patrol and reserve officers;

l.  "Discipline" means a personnel action for violation of any law, regulation, rule, or MCSO policy, including, but not limited to, an admonishment, written reprimand, suspension, demotion or termination;

m.  "Discriminatory Policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, based on a person's actual or perceived race or ethnicity.  Discriminatory Policing does not include using a person's race or ethnicity in any reliable suspect-specific description or for purposes of data collection;

n.  "District" refers to one of the seven police service areas of MCSO;

o.  "Effective Date" means the day this Order is entered by the Court;

p.  "Exigent Circumstances" means emergencies in which a reasonable person would believe that imminent death or bodily harm to a person or persons or the destruction of evidence is likely or as otherwise defined by law;

q.  "EIS" means Early Identification System;

- 3 -

46REPORT000571

r. "Full and Effective Compliance" means compliance with all relevant provisions of this Order. The Defendants shall begin to be in Full and Effective Compliance with this Order when all of the following have been both completed and consistently maintained:

    i. A Monitor has been appointed pursuant to Paragraphs 119–121 of this Order.

    ii. The MCSO has formed an Implementation Unit pursuant to Paragraph 9 of this Order.

    iii. The MCSO has developed, and, pursuant to Paragraph 30, either the Monitor or the Court has approved, and the MCSO has fully implemented the Policies and Procedures and amendments to Policies and Procedures set out in Section V of this Order.

    iv. The MCSO has developed curriculum and training materials that have, pursuant to Paragraph 46 of this Order, been approved by the Monitor or the Court.

    v. The MCSO has developed and implemented a training schedule pursuant to Paragraph 44 of this Order.

    vi. The MCSO has trained all existing MCSO Supervisors, Deputies, and posse members pursuant to Paragraphs 41–53 of this Order.

    vii. The MCSO has developed proposed protocols, including draft templates and instructions for Significant Operations and Patrols as set out in Section VI of this Order that have, pursuant to Paragraph 37, been approved by the Monitor or the Court, and have been implemented.

    viii. The MCSO has provided an adequate number of Supervisors as well as proper Deputy assignments pursuant to Paragraphs 82 and 84 of this Order.

    ix. The MCSO has developed and implemented a system for performance evaluations pursuant to Paragraph 98 of this Order.

    x. The MCSO has developed and implemented eligibility criteria for assignment to specialized units pursuant to Paragraph 101 of this Order.

- 4 -

46REPORT000572

xi. The MCSO has developed and implemented an audit check plan to detect Deputy misconduct pursuant to Paragraph 103 of this Order.

xii. The MCSO has developed and implemented a system to collect traffic stop data and a protocol for audit checks of that system pursuant to Paragraphs 54–59 of this Order.

xiii. The MCSO has developed and implemented a protocol for the periodic analysis of the traffic stop data pursuant to Paragraph 64 of this Order.

xiv. The MCSO has developed and implemented a system for electronic data entry by Deputies pursuant to Paragraph 60 of this Order.

xv. The MCSO has developed and implemented a system for the audio and video recording of traffic stops and a protocol for reviewing the recordings pursuant to Paragraphs 61–63 of this Order with the understanding that Full and Effective Compliance may be achieved once all traffic patrol vehicles that make traffic stops used by Specialized Units have been mounted with the audio and video equipment, so long as the remaining vehicles are timely equipped with the audio and video equipment according to the requirements of those Paragraphs.

xvi. The MCSO has formed a Unit to aid in the development and implementation of the EIS, developed and implemented the EIS, and trained all MCSO personnel on the use of the EIS pursuant to Paragraphs 72–81 of this Order.

xvii. The MCSO has developed and implemented a community outreach program pursuant to Paragraphs 107–112 of this Order.

xviii. The MCSO has selected or hired a Community Liaison Officer pursuant to Paragraphs 113–114 of this Order.

xix. The MCSO has worked with Plaintiffs' representatives and community representatives and created a Community Advisory Board pursuant to Paragraphs 115–116 of this Order.

46REPORT000573

xx. The MCSO has conducted at least one comprehensive internal assessment pursuant to Paragraphs 12–13 of this Order.

xxi.     The Monitor has conducted a comprehensive assessment pursuant to Paragraphs 13 or 138 and has certified that the MCSO is in compliance with all of the scheduled obligations described above in Paragraph 1 and in compliance with all other periodic and/or continuing obligations in this Order since the Effective Date.

s.   "IA" means Internal Affairs, the MCSO unit charged with conducting internal and administrative investigations of MCSO deputies, agents, and employees;

t.   "ICE" means U.S. Immigration and Customs Enforcement;

u.   "Immigration-Related Law" means any civil or criminal offense related to immigration status;

v.   "Immigration-Related Crime" means any statute imposing criminal punishment in which immigration status is an element of the offense;

w.   "include" or "including" means "include or including, but not limited to";

x.   "Investigatory Stop," "Investigatory Contact," or "Investigatory Detention"  means a detention short of an arrest in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968);

y.   "LEAR Policy," means the MCSO policy described on page 2 and 113 of the Court's May 24, 2013 Findings of Fact and Conclusions of Law of detaining persons believed to be in the country without authorization but whom they cannot arrest on state charges, in order to summon a supervisor and communicate with federal authorities;

z.   "MCSO" means the Sheriff of the Maricopa County Sheriff's Office acting in his or her official capacity, including the MCSO's agents, deputies, detention officers, Supervisors, employees (both sworn and unsworn), and posse volunteers;

aa. "MCSO Implementation Unit" means the unit created by the MCSO and consisting of MCSO Employees to facilitate implementation of this Order;

- 6 -

46REPORT000574

bb. "MCSO Personnel" or "MCSO Employee" means all MCSO Employees, contractors and volunteers, including command staff, deputies, detention officers, civilian employees and posse volunteers;

cc. "MDT" means Mobile Data Terminal, the computerized system used in MCSO vehicles to conduct inquiries on individuals encountered on patrol;

dd. "Monitor" means a person or team of people who shall be selected to assess and report on the Defendants' implementation of this Order;

ee. "On-site Observation" means first-hand observation by the Monitor of MCSO activities, e.g., ride-alongs with Deputies on patrol or attendance at MCSO meetings or trainings;

ff. "Parties" means Plaintiffs and Defendants collectively in the above-captioned action;

gg. "Patrol Operations" means all MCSO law enforcement operations conducted by Deputies in a law enforcement support or patrol capacity which involves motor vehicle traffic stops, including Significant Operations as defined below. Jail or detention facility operations are not a part of Patrol Operations;

hh. "Plaintiffs" means plaintiffs in the above-captioned action;

ii. "Policies and Procedures" means written regulations or directives, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of MCSO personnel, and providing specific direction in how to fulfill those duties, functions, or obligations. All Policies and Procedures should be available in hardcopy and electronically;

jj. "Sheriff" means the current and future sheriffs of MCSO;

kk. "Significant Operation" or "Significant Patrol" means any pre-planned Patrol Operation that will involve traffic stops of vehicles within Maricopa County involving 10 or more MCSO Personnel excluding posse members;

ll. "Specialized Unit" means a temporary or permanent organization of deputies within MCSO whose operational objectives are focused on a specific law enforcement purpose beyond general patrol or criminal investigations;

- 7 -

46REPORT000575

mm. "Supervisor" or "supervisor" means a sworn MCSO employee at the rank of sergeant or above (or anyone acting in those capacities) with oversight responsibility for MCSO personnel;

nn. "Training" or "training" means MCSO instruction that aspires towards industry best practices and includes adult-learning methods that incorporate realistic role-playing scenarios, interactive exercises, traditional lecture formats, and testing and/or writings that indicate that MCSO personnel taking the Training comprehend the material taught;

oo. "Vehicle stop" means any instance where a MCSO Deputy directs a civilian operating a motor vehicle of any type to stop and in which the driver and any passengers are detained for any length of time.

## II.    EFFECTIVE DATE, JURISDICTION AND PARTY REPRESENTATIVES

2.    This Order shall become effective upon entry by the Court.

3.    To ensure that the requirements of this Order are properly and timely implemented, the Court will retain jurisdiction over this action for all purposes until such time as the Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three years.

4.    The Parties may agree to jointly ask the Court to terminate this Order if the Parties agree that Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three continuous years.  If the Parties disagree on whether Defendants have achieved Full and Effective Compliance for no less than three continuous years, either Party may seek to terminate this Order. If Defendants move to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so at least 60 days prior to filing a motion to terminate. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court.  If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or

- 8 -

46REPORT000576

interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order. If the Defendants move for termination of this Order, Plaintiffs will have 60 days after the receipt of the Defendants' motion to object to the motion. If Plaintiffs do not object, the Court may grant the Defendants' motion. If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

5. After Defendants have reached Full and Effective Compliance, Defendants shall also have the right to move to terminate any part, portion, or term of this Order if they believe that they have maintained compliance with such portion, part, or term of this Order for no less than three continuous years. At least 60 days prior to filing a motion to terminate, Defendants must provide the Monitor and Plaintiffs with notice that they intend to do so. The Parties shall confer with each other and the Monitor to see if any disagreements can be resolved before Defendants file their motion with the Court. If, after a reasonable period of consultation and the completion of any audit or evaluation that Plaintiffs and/or the Monitor may wish to undertake, including On-Site Observations, document review, or interviews with the Defendants' personnel, the Parties cannot resolve any compliance issues, the Defendants may file a motion to terminate this Order. Plaintiffs shall have the right to oppose such motion within 60 days after receipt of the Defendants' motion. If Plaintiffs do not object, the Court may grant the Defendants' motion. If Plaintiffs do make an objection, the Court may hold a hearing on the motion, but at any rate shall resolve the dispute.

6. At all times, the Defendants shall bear the burden of demonstrating Full and Effective Compliance with this Order.

7. This Order shall run against the Sheriff in his official capacity, as well as the MCSO. For purposes of implementation and enforcement of the Order, the representatives for the Parties shall be:

    a. Plaintiffs: The American Civil Liberties Union of Arizona ("ACLU-AZ") and any other representative(s) designated by the ACLU-AZ;

<div align="center">- 9 -</div>

46REPORT000577

b.  Defendants: Chief David Trombi and Captain Larry Farnsworth (or other designee selected by the Sheriff).

8.  The Court, upon 60 days' notice to the Parties, retains the right to modify or terminate this Order in whole or in part if it is satisfied that the Defendants have substantially complied with any or all of the terms of the Order for a period of three years, or if it is otherwise satisfied that a modification is justified.

## III.   MCSO IMPLEMENTATION UNIT AND INTERNAL AGENCY-WIDE ASSESSMENT

9.  Defendants shall hire and retain, or reassign current MCSO employees to form an inter-disciplinary unit with the skills and abilities necessary to facilitate implementation of this Order.  This unit shall be called the MCSO Implementation Unit and serve as a liaison between the Parties and the Monitor and shall assist with the Defendants' implementation of and compliance with this Order.  At a minimum, this unit shall: coordinate the Defendants' compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the Defendants' personnel to the Monitor and Plaintiffs representatives; ensure that all data, documents and records are maintained as provided in this Order; and assist in assigning implementation and compliance-related tasks to MCSO Personnel, as directed by the Sheriff or his designee.  The unit will include a single person to serve as a point of contact in communications with Plaintiffs, the Monitor and the Court.

10. MCSO shall collect and maintain all data and records necessary to: (1) implement this order, and document implementation of and compliance with this Order, including data and records necessary for the Monitor to conduct reliable outcome assessments, compliance reviews, and audits; and (2) perform ongoing quality assurance in each of the areas addressed by this Order.  At a minimum, the foregoing data collection practices shall comport with current professional standards, with input on those standards from the Monitor.

- 10 -

46REPORT000578

11. Beginning with the Monitor's first quarterly report, the Defendants, working with the unit assigned for implementation of the Order, shall file with the Court, with a copy to the Monitor and Plaintiffs, a status report no later than 30 days before the Monitor's quarterly report is due. The Defendants' report shall (i) delineate the steps taken by the Defendants during the reporting period to implement this Order; (ii) delineate the Defendants' plans to correct any problems; and (iii) include responses to any concerns raised in the Monitor's previous quarterly report.

12. The Defendants, working with the unit assigned for implementation of the Order, shall conduct a comprehensive internal assessment of their Policies and Procedures affecting Patrol Operations regarding Discriminatory Policing and unlawful detentions in the field as well as overall compliance with the Court's orders and this Order on an annual basis. The comprehensive Patrol Operations assessment shall include, but not be limited to, an analysis of collected traffic-stop and high-profile or immigration-related operations data; written Policies and Procedures; Training, as set forth in the Order; compliance with Policies and Procedures; Supervisor review; intake and investigation of civilian Complaints; conduct of internal investigations; Discipline of officers; and community relations. The first assessment shall be conducted within 180 days of the Effective Date. Results of each assessment shall be provided to the Court, the Monitor, and Plaintiffs' representatives.

13. The internal assessments prepared by the Defendants will state for the Monitor and Plaintiffs' representatives the date upon which the Defendants believe they are first in compliance with any subpart of this Order and the date on which the Defendants first assert they are in Full and Effective Compliance with the Order and the reasons for that assertion. When the Defendants first assert compliance with any subpart or Full and Effective Compliance with the Order, the Monitor shall within 30 days determine whether the Defendants are in compliance with the designated subpart(s) or in Full and Effective Compliance with the Order. If either party contests the Monitor's determination it may file an objection with the Court, from which the Court will make the

- 11 -

46REPORT000579

determination. Thereafter, in each assessment, the Defendants will indicate with which subpart(s) of this Order it remains or has come into full compliance and the reasons therefore. The Monitor shall within 30 days thereafter make a determination as to whether the Defendants remain in Full and Effective Compliance with the Order and the reasons therefore. The Court may, at its option, order hearings on any such assessments to establish whether the Defendants are in Full and Effective Compliance with the Order or in compliance with any subpart(s).

### IV. MONITOR REVIEW PROCESS

14. In any place where this Order provides for Defendants to submit policies, procedures, protocols or other materials to the Monitor for his or her review, Defendants shall submit such materials to the Monitor and provide a copy to Plaintiffs' representatives within the specified time.

15. Plaintiffs shall have an opportunity to provide any comments or recommendations on the materials within 14 days of receipt. The Monitor shall thereafter communicate to the Parties the results of its review. If the Monitor has any concerns or recommendations regarding the materials, it will include those concerns or recommendations. The MCSO may then amend the materials and resubmit them to the Monitor within 14 days for further review. Either Party may apply to the Monitor for an extension of the deadlines in this Paragraph. In conducting its review, the Monitor may take into account industry best practices and the record in this litigation.

16. If the Monitor approves the matter submitted, the Monitor will make a record of his or her approval and inform both parties. In cases where neither party objects to the Monitor's action, the Monitor's determination will be final. When the Monitor approves such matter, no further action is needed before the MCSO implements the relevant policies, procedures, protocols or materials. The MCSO shall do so promptly and without delay.

17. If either Party does not agree with the Monitor's determination, then the Party may make a motion directly to the Court for resolution of the dispute. The non-moving Party may

- 12 -

46REPORT000580

respond to such motion within 14 days of filing. The moving Party may file a reply within 7 days after that. Any policies, procedures, protocols or other materials subject to the dispute need not be implemented until the Court makes a determination.

## V.     POLICIES AND PROCEDURES

18. MCSO shall deliver police services consistent with the Constitution and laws of the United States and State of Arizona, MCSO policy, and this Order, and with current professional standards.  In conducting its activities, MCSO shall ensure that members of the public receive equal protection of the law, without discriminating based on actual or perceived race or ethnicity, and in a manner that promotes public confidence.

19. To further the goals in this Order, the MCSO shall conduct a comprehensive review of all Patrol Operations Policies and Procedures and make appropriate amendments to ensure that they reflect the Court's permanent injunction and this Order.

20. The MCSO shall comply with and operate in accordance with the Policies and Procedures discussed in this Order and shall take all reasonable measures to ensure that all Patrol Operations personnel comply with all such Policies and Procedures.

   **a.     Policies and Procedures to Ensure Bias-Free Policing**

21. The MCSO shall promulgate a new, department-wide policy or policies clearly prohibiting Discriminatory Policing and racial profiling. The policy or policies shall, at a minimum:

   a. define racial profiling as the reliance on race or ethnicity to *any* degree in making law enforcement decisions, except in connection with a reliable and specific suspect description;

   b. prohibit the selective enforcement or non-enforcement of the law based on race or ethnicity;

   c. prohibit the selection or rejection of particular policing tactics or strategies or locations based to any degree on race or ethnicity;

- 13 -

46REPORT000581

d. specify that the presence of reasonable suspicion or probable cause to believe an individual has violated a law does not necessarily mean that an officer's action is race-neutral; and

e. include a description of the agency's Training requirements on the topic of racial profiling in Paragraphs 48–51, data collection requirements (including video and audio recording of stops as set forth elsewhere in this Order) in Paragraphs 54–63 and oversight mechanisms to detect and prevent racial profiling, including disciplinary consequences for officers who engage in racial profiling.

22. MCSO leadership and supervising Deputies and detention officers shall unequivocally and consistently reinforce to subordinates that Discriminatory Policing is unacceptable.

23. Within 30 days of the Effective Date, MCSO shall modify its Code of Conduct to prohibit MCSO Employees from utilizing County property, such as County e-mail, in a manner that discriminates against, or denigrates, anyone on the basis of race, color, or national origin.

24. The MCSO shall ensure that its operations are not motivated by or initiated in response to requests for law enforcement action based on race or ethnicity. In deciding to take any law enforcement action, the MCSO shall not rely on any information received from the public, including through any hotline, by mail, email, phone or in person, unless the information contains evidence of a crime that is independently corroborated by the MCSO, such independent corroboration is documented in writing, and reliance on the information is consistent with all MCSO policies.

**b.    Policies and Procedures to Ensure Bias-Free Traffic Enforcement**

25. The MCSO will revise its policy or policies relating to traffic enforcement to ensure that those policies, at a minimum:

a. prohibit racial profiling in the enforcement of traffic laws, including the selection of which vehicles to stop based to any degree on race or ethnicity, even where an officer has reasonable suspicion or probable cause to believe a violation is being or has been committed;

- 14 -

46REPORT000582

Case 2:07-cv-02513-GMS Document 906 Filed 10/02/13 Page 15 of 59

b. provide Deputies with guidance on effective traffic enforcement, including the prioritization of traffic enforcement resources to promote public safety;

c. prohibit the selection of particular communities, locations or geographic areas for targeted traffic enforcement based to any degree on the racial or ethnic composition of the community;

d. prohibit the selection of which motor vehicle occupants to question or investigate based to any degree on race or ethnicity;

e. prohibit the use of particular tactics or procedures on a traffic stop based on race or ethnicity;

f. require deputies at the beginning of each stop, before making contact with the vehicle, to contact dispatch and state the reason for the stop, unless Exigent Circumstances make it unsafe or impracticable for the deputy to contact dispatch;

g. prohibit Deputies from extending the duration of any traffic stop longer than the time that is necessary to address the original purpose for the stop and/or to resolve any apparent criminal violation for which the Deputy has or acquires reasonable suspicion or probable cause to believe has been committed or is being committed;

h. require the duration of each traffic stop to be recorded;

i. provide Deputies with a list and/or description of forms of identification deemed acceptable for drivers and passengers (in circumstances where identification is required of them) who are unable to present a driver's license or other state-issued identification; and

j. instruct Deputies that they are not to ask for the Social Security number or card of any motorist who has provided a valid form of identification, unless it is needed to complete a citation or report.

c. **Policies and Procedures to Ensure Bias-Free Detentions and Arrests**

26. The MCSO shall revise its policy or policies relating to Investigatory Detentions and arrests to ensure that those policies, at a minimum:

- 15 -

a. require that Deputies have reasonable suspicion that a person is engaged in, has committed, or is about to commit, a crime before initiating an investigatory seizure;

b. require that Deputies have probable cause to believe that a person is engaged in, has committed, or is about to commit, a crime before initiating an arrest;

c. provide Deputies with guidance on factors to be considered in deciding whether to cite and release an individual for a criminal violation or whether to make an arrest;

d. require Deputies to notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime by a vehicle passenger related to lack of an identity document;

e. prohibit the use of a person's race or ethnicity as a factor in establishing reasonable suspicion or probable cause to believe a person has, is, or will commit a crime, except as part of a reliable and specific suspect description; and

f. prohibit the use of quotas, whether formal or informal, for stops, citations, detentions, or arrests (though this requirement shall not be construed to prohibit the MCSO from reviewing Deputy activity for the purpose of assessing a Deputy's overall effectiveness or whether the Deputy may be engaging in unconstitutional policing).

**d. Policies and Procedures Governing the Enforcement of Immigration-Related Laws**

27. The MCSO shall remove discussion of its LEAR Policy from all agency written Policies and Procedures, except that the agency may mention the LEAR Policy in order to clarify that it is discontinued.

28. The MCSO shall promulgate a new policy or policies, or will revise its existing policy or policies, relating to the enforcement of Immigration-Related Laws to ensure that they, at a minimum:

a. specify that unauthorized presence in the United States is not a crime and does not itself constitute reasonable suspicion or probable cause to believe that a person has committed or is committing any crime;

- 16 -

46REPORT000584

b. prohibit officers from detaining any individual based on actual or suspected "unlawful presence," without something more;

c. prohibit officers from initiating a pretextual vehicle stop where an officer has reasonable suspicion or probable cause to believe a traffic or equipment violation has been or is being committed in order to determine whether the driver or passengers are unlawfully present;

d. prohibit the Deputies from relying on race or apparent Latino ancestry to any degree to select whom to stop or to investigate for an Immigration-Related Crime (except in connection with a specific suspect description);

e. prohibit Deputies from relying on a suspect's speaking Spanish, or speaking English with an accent, or appearance as a day laborer as a factor in developing reasonable suspicion or probable cause to believe a person has committed or is committing any crime, or reasonable suspicion to believe that an individual is in the country without authorization;

f. unless the officer has reasonable suspicion that the person is in the country unlawfully and probable cause to believe the individual has committed or is committing a crime, the MCSO shall prohibit officers from (a) questioning any individual as to his/her alienage or immigration status; (b) investigating an individual's identity or searching the individual in order to develop evidence of unlawful status; or (c) detaining an individual while contacting ICE/CBP with an inquiry about immigration status or awaiting a response from ICE/CBP.  In such cases, the officer must still comply with Paragraph 25(g) of this Order.  Notwithstanding the foregoing, an officer may (a) briefly question an individual as to his/her alienage or immigration status; (b) contact ICE/CBP and await a response from federal authorities if the officer has reasonable suspicion to believe the person is in the country unlawfully and reasonable suspicion to believe the person is engaged in an Immigration-Related Crime for which unlawful immigration status is an element, so long as doing so does not unreasonably extend the stop in violation of Paragraph 25(g) of this Order;

- 17 -

46REPORT000585

g. prohibit Deputies from transporting or delivering an individual to ICE/CBP custody from a traffic stop unless a request to do so has been voluntarily made by the individual;

h. require that, before any questioning as to alienage or immigration status or any contact with ICE/CBP is initiated, an officer check with a Supervisor to ensure that the circumstances justify such an action under MCSO policy and receive approval to proceed. Officers must also document, in every such case, (a) the reason(s) for making the immigration-status inquiry or contacting ICE/CBP, (b) the time Supervisor approval was received, (c) when ICE/CBP was contacted, (d) the time it took to receive a response from ICE/CBP, if applicable, and (e) whether the individual was then transferred to ICE/CBP custody.

**e. Policies and Procedures Generally**

29. MCSO Policies and Procedures shall define terms clearly, comply with applicable law and the requirements of this Order, and comport with current professional standards.

30. Unless otherwise noted, the MCSO shall submit all Policies and Procedures and amendments to Policies and Procedures provided for by this Order to the Monitor for review within 90 days of the Effective Date pursuant to the process described in Section IV. These Policies and Procedures shall be approved by the Monitor or the Court prior to their implementation.

31. Within 60 days after such approval, MCSO shall ensure that all relevant MCSO Patrol Operation Personnel have received, read, and understand their responsibilities pursuant to the Policy or Procedure. The MCSO shall ensure that personnel continue to be regularly notified of any new Policies and Procedures or changes to Policies and Procedures. The Monitor shall assess and report to the Court and the Parties on whether he/she believes relevant personnel are provided sufficient notification of and access to, and understand each policy or procedure as necessary to fulfill their responsibilities.

32. The MCSO shall require that all Patrol Operation personnel report violations of policy; that Supervisors of all ranks shall be held accountable for identifying and responding to

- 18 -

46REPORT000586

policy or procedure violations by personnel under their command; and that personnel be held accountable for policy and procedure violations. The MCSO shall apply policies uniformly.

33. MCSO Personnel who engage in Discriminatory Policing in any context will be subjected to administrative Discipline and, where appropriate, referred for criminal prosecution. MCSO shall provide clear guidelines, in writing, regarding the disciplinary consequences for personnel who engage in Discriminatory Policing.

34. MCSO shall review each policy and procedure on an annual basis to ensure that the policy or procedure provides effective direction to MCSO Personnel and remains consistent with this Order, current law and professional standards. The MCSO shall document such annual review in writing. MCSO also shall review Policies and Procedures as necessary upon notice of a policy deficiency during audits or reviews. MCSO shall revise any deficient policy as soon as practicable.

## VI.    PRE-PLANNED OPERATIONS

35. The Monitor shall regularly review the mission statement, policies and operations documents of any Specialized Unit within the MCSO that enforces Immigration-Related Laws to ensure that such unit(s) is/are operating in accordance with the Constitution, the laws of the United States and State of Arizona, and this Order.

36. The MCSO shall ensure that any Significant Operations or Patrols are initiated and carried out in a race-neutral fashion. For any Significant Operation or Patrol involving 10 or more MCSO personnel, excluding posse members, the MSCO shall develop a written protocol including a statement of the operational motivations and objectives, parameters for supporting documentation that shall be collected, operations plans, and provide instructions to supervisors, deputies and posse members. That written protocol shall be provided to the Monitor in advance of any Significant Operation or Patrol.

37. The MCSO shall submit a standard template for operations plans and standard instructions for supervisors, deputies and posse members applicable to all Significant Operations or Patrols to the Monitor for review pursuant to the process described in

- 19 -

46REPORT000587

Case 2:07-cv-02513-GMS Document 906 Filed 10/02/13 Page 20 of 59

Section IV within 90 days of the Effective Date. In Exigent Circumstances, the MCSO may conduct Significant Operations or Patrols during the interim period but such patrols shall be conducted in a manner that is in compliance with the requirement of this Order. Any Significant Operations or Patrols thereafter must be in accordance with the approved template and instructions.

38. If the MCSO conducts any Significant Operations or Patrols involving 10 or more MCSO Personnel excluding posse members, it shall create the following documentation and provide it to the Monitor and Plaintiffs within 30 days after the operation:

   a. documentation of the specific justification/reason for the operation, certified as drafted prior to the operation (this documentation must include analysis of relevant, reliable, and comparative crime data);

   b. information that triggered the operation and/or selection of the particular site for the operation;

   c. documentation of the steps taken to corroborate any information or intelligence received from non-law enforcement personnel;

   d. documentation of command staff review and approval of the operation and operations plans;

   e. a listing of specific operational objectives for the patrol;

   f. documentation of specific operational objectives and instructions as communicated to participating MCSO Personnel;

   g. any operations plans, other instructions, guidance or post-operation feedback or de-briefing provided to participating MCSO Personnel;

   h. a post-operation analysis of the patrol, including a detailed report of any significant events that occurred during the patrol;

   i. arrest lists, officer participation logs and records for the patrol; and

   j. data about each contact made during the operation, including whether it resulted in a citation or arrest.

- 20 -

46REPORT000588

39. The MCSO shall hold a community outreach meeting no more than 30 days after any Significant Operations or Patrols in the affected District(s). MCSO shall work with the Community Advisory Board to ensure that the community outreach meeting adequately communicates information regarding the objectives and results of the operation or patrol. The community outreach meeting shall be advertised and conducted in English and Spanish.

40. The MCSO shall notify the Monitor and Plaintiffs within 24 hours of any immigration-related traffic enforcement activity or Significant Operation involving the arrest of 5 or more people unless such disclosure would interfere with an on-going criminal investigation in which case the notification shall be provided under seal to the Court, which may determine that disclosure to the Monitor and Plaintiffs would not interfere with an on-going criminal investigation. In any event, as soon as disclosure would no longer interfere with an on-going criminal investigation, MCSO shall provide the notification to the Monitor and Plaintiffs. To the extent that it is not already covered above by Paragraph 38, the Monitor and Plaintiffs may request any documentation related to such activity as they deem reasonably necessary to ensure compliance with the Court's orders.

## VII.  TRAINING

### a.  General Provisions

41. To ensure that the Policies and Procedures provided for by this Order are effectuated, the MCSO shall implement the following requirements regarding Training.

42. The persons presenting this Training in each area shall be competent instructors with significant experience and expertise in the area. Those presenting Training on legal matters shall also hold a law degree from an accredited law school and be admitted to a Bar of any state and/or the District of Columbia.

43. The Training shall include at least 60% live training (i.e., with a live instructor) which includes an interactive component and no more than 40% on-line training. The Training

- 21 -

46REPORT000589

shall also include testing and/or writings that indicate that MCSO Personnel taking the Training comprehend the material taught whether via live training or via on-line training.

44. Within 90 days of the Effective Date, MCSO shall set out a schedule for delivering all Training required by this Order. Plaintiffs' Representative and the Monitor shall be provided with the schedule of all Trainings and will be permitted to observe all live trainings and all on-line training. Attendees shall sign in at each live session. MCSO shall keep an up-to-date list of the live and on-line Training sessions and hours attended or viewed by each officer and Supervisor and make that available to the Monitor and Plaintiffs.

45. The Training may incorporate adult-learning methods that incorporate role-playing scenarios, interactive exercises, as well as traditional lecture formats.

46. The curriculum and any materials and information on the proposed instructors for the Training provided for by this Order shall be provided to the Monitor within 90 days of the Effective Date for review pursuant to the process described in Section IV. The Monitor and Plaintiffs may provide resources that the MCSO can consult to develop the content of the Training, including names of suggested instructors.

47. MCSO shall regularly update the Training to keep up with developments in the law and to take into account feedback from the Monitor, the Court, Plaintiffs and MCSO Personnel.

**b.      Bias-Free Policing Training**

48. The MCSO shall provide all sworn Deputies, including Supervisors and chiefs, as well as all posse members, with 12 hours of comprehensive and interdisciplinary Training on bias-free policing within 240 days of the Effective Date, or for new Deputies or posse members, within 90 days of the start of their service, and at least 6 hours annually thereafter.

49. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a.   definitions of racial profiling and Discriminatory Policing;

46REPORT000590

b. examples of the type of conduct that would constitute Discriminatory Policing as well as examples of the types of indicators Deputies may properly rely upon;

c. the protection of civil rights as a central part of the police mission and as essential to effective policing;

d. an emphasis on ethics, professionalism and the protection of civil rights as a central part of the police mission and as essential to effective policing;

e. constitutional and other legal requirements related to equal protection, unlawful discrimination, and restrictions on the enforcement of Immigration-Related Laws, including the requirements of this Order;

f. MCSO policies related to Discriminatory Policing, the enforcement of Immigration-Related Laws and traffic enforcement, and to the extent past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

g. MCSO's protocol and requirements for ensuring that any significant pre-planned operations or patrols are initiated and carried out in a race-neutral fashion;

h. police and community perspectives related to Discriminatory Policing;

i. the existence of arbitrary classifications, stereotypes, and implicit bias, and the impact that these may have on the decision-making and behavior of a Deputy;

j. methods and strategies for identifying stereotypes and implicit bias in Deputy decision-making;

k. methods and strategies for ensuring effective policing, including reliance solely on non-discriminatory factors at key decision points;

l. methods and strategies to reduce misunderstanding, resolve and/or de-escalate conflict, and avoid Complaints due to perceived police bias or discrimination;

m. cultural awareness and how to communicate with individuals in commonly encountered scenarios;

n. problem-oriented policing tactics and other methods for improving public safety and crime prevention through community engagement;

- 23 -

46REPORT000591

o. the benefits of actively engaging community organizations, including those serving youth and immigrant communities;

p. the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

q. background information on the *Melendres v. Arpaio* litigation, as well as a summary and explanation of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio*, the parameters of the Court's permanent injunction, and the requirements of this Order; and

r. instruction on the data collection protocols and reporting requirements of this Order.

**c. Training on Detentions, Arrests, and the Enforcement of Immigration-Related Laws**

50. In addition to the Training on bias-free policing, the MCSO shall provide all sworn personnel, including Supervisors and chiefs, as well as all posse members, with 6 hours of Training on the Fourth Amendment, including on detentions, arrests and the enforcement of Immigration-Related Laws within 180 days of the effective date of this Order, or for new Deputies or posse members, within 90 days of the start of their service. MCSO shall provide all Deputies with 4 hours of Training each year thereafter.

51. The Training shall incorporate the most current developments in federal and Arizona law and MCSO policy, and shall address or include, at a minimum:

a. an explanation of the difference between various police contacts according to the level of police intrusion and the requisite level of suspicion; the difference between reasonable suspicion and mere speculation; and the difference between voluntary consent and mere acquiescence to police authority;

b. guidance on the facts and circumstances that should be considered in initiating, expanding or terminating an Investigatory Stop or detention;

c. guidance on the circumstances under which an Investigatory Detention can become an arrest requiring probable cause;

- 24 -

46REPORT000592

d.  constitutional and other legal requirements related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, including the requirements of this Order;

e.  MCSO policies related to stops, detentions and arrests, and the enforcement of Immigration-Related Laws, and the extent to which past instructions to personnel on these topics were incorrect, a correction of any misconceptions about the law or MCSO policies;

f.  the circumstances under which a passenger may be questioned or asked for identification;

g.  the forms of identification that will be deemed acceptable if a driver or passenger (in circumstances where identification is required of them) is unable to present an Arizona driver's license;

h.  the circumstances under which an officer may initiate a vehicle stop in order to investigate a load vehicle;

i.  the circumstances under which a Deputy may question any individual as to his/her alienage or immigration status, investigate an individual's identity or search the individual in order to develop evidence of unlawful status, contact ICE/CBP, await a response from ICE/CBP and/or deliver an individual to ICE/CBP custody;

j.  a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause to believe that a vehicle or an individual is involved in an immigration-related state crime, such as a violation of the Arizona Human Smuggling Statute, as drawn from legal precedent and updated as necessary; the factors shall not include actual or apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a Hispanic day laborer;

k.  a discussion of the factors that may properly be considered in establishing reasonable suspicion or probable cause that an individual is in the country unlawfully, as drawn from legal precedent and updated as necessary; the factors shall not include actual or

- 25 -

46REPORT000593

apparent race or ethnicity, speaking Spanish, speaking English with an accent, or appearance as a day laborer;

l. an emphasis on the rule that use of race or ethnicity to any degree, except in the case of a reliable, specific suspect description, is prohibited;

m. the MCSO process for investigating Complaints of possible misconduct and the disciplinary consequences for personnel found to have violated MCSO policy;

n. provide all trainees a copy of the Court's May 24, 2013 Findings of Fact and Conclusions of Law in *Melendres v. Arpaio* and this Order, as well as a summary and explanation of the same that is drafted by counsel for Plaintiffs or Defendants and reviewed by the Monitor or the Court; and

o. instruction on the data collection protocols and reporting requirements of this Order, particularly reporting requirements for any contact with ICE/CBP.

**d.     Supervisor and Command Level Training**

52. MCSO shall provide Supervisors with comprehensive and interdisciplinary Training on supervision strategies and supervisory responsibilities under the Order. MCSO shall provide an initial mandatory supervisor training of no less than 6 hours, which shall be completed prior to assuming supervisory responsibilities or, for current MCSO Supervisors, within 180 days of the Effective Date of this Order. In addition to this initial Supervisor Training, MCSO shall require each Supervisor to complete at least 4 hours of Supervisor-specific Training annually thereafter. As needed, Supervisors shall also receive Training and updates as required by changes in pertinent developments in the law of equal protection, Fourth Amendment, the enforcement of Immigration-Related Laws, and other areas, as well as Training in new skills.

53. The Supervisor-specific Training shall address or include, at a minimum:

a. techniques for effectively guiding and directing Deputies, and promoting effective and constitutional police practices in conformity with the Policies and Procedures in Paragraphs 18–34 and the Fourth and Fourteenth Amendment Training in Paragraphs 48–51;

- 26 -

46REPORT000594

b. how to conduct regular reviews of subordinates;

c. operation of Supervisory tools such as EIS;

d. evaluation of written reports, including how to identify conclusory, "canned," or perfunctory language that is not supported by specific facts;

e. how to analyze collected traffic stop data, audio and visual recordings, and patrol data to look for warning signs or indicia of possible racial profiling or unlawful conduct;

f. how to plan significant operations and patrols to ensure that they are race-neutral and how to supervise Deputies engaged in such operations;

g. incorporating integrity-related data into COMSTAT reporting;

h. how to respond to calls from Deputies requesting permission to proceed with an investigation of an individual's immigration status, including contacting ICE/CBP;

i. how to respond to the scene of a traffic stop when a civilian would like to make a Complaint against a Deputy;

j. how to respond to and investigate allegations of Deputy misconduct generally;

k. evaluating Deputy performance as part of the regular employee performance evaluation; and

l. building community partnerships and guiding Deputies to do the Training for Personnel Conducting Misconduct Investigations.

## VIII. TRAFFIC STOP DOCUMENTATION AND DATA COLLECTION AND REVIEW

### a. Collection of Traffic Stop Data

54. Within 180 days of the Effective Date, MCSO shall develop a system to ensure that Deputies collect data on all vehicle stops, whether or not they result in the issuance of a citation or arrest. This system shall require Deputies to document, at a minimum:

a. the name, badge/serial number, and unit of each Deputy and posse member involved;

b. the date, time and location of the stop, recorded in a format that can be subject to geocoding;

c. the license plate state and number of the subject vehicle;

- 27 -

46REPORT000595

d.  the total number of occupants in the vehicle;

e.  the Deputy's subjective perceived race, ethnicity and gender of the driver and any passengers, based on the officer's subjective impression (no inquiry into an occupant's ethnicity or gender is required or permitted);

f.  the name of any individual upon whom the Deputy runs a license or warrant check (including subject's surname);

g.  an indication of whether the Deputy otherwise contacted any passengers, the nature of the contact, and the reasons for such contact;

h.  the reason for the stop, recorded prior to contact with the occupants of the stopped vehicle, including a description of the traffic or equipment violation observed, if any, and any indicators of criminal activity developed before or during the stop;

i.  time the stop began; any available data from the E-Ticketing system regarding the time any citation was issued; time a release was made without citation; the time any arrest was made; and the time the stop/detention was concluded either by citation, release, or transport of a person to jail or elsewhere or Deputy's departure from the scene;

j.  whether any inquiry as to immigration status was conducted and whether ICE/CBP was contacted, and  if so, the facts supporting the inquiry or contact with ICE/CBP, the time Supervisor approval was sought, the time ICE/CBP was contacted, the time it took to complete the immigration status investigation or receive a response from ICE/CBP, and whether ICE/CBP ultimately took custody of the individual;

k.  whether any individual was asked to consent to a search (and the response), whether a probable cause search was performed on any individual, or whether a pat-and-frisk search was performed on any individual;

l.  whether any contraband or evidence was seized from any individual, and nature of the contraband or evidence; and

m.  the final disposition of the stop, including whether a citation was issued or an arrest was made or a release was made without citation.

- 28 -

46REPORT000596

55. MCSO shall assign a unique ID for each incident/stop so that any other documentation (e.g., citations, incident reports, tow forms) can be linked back to the stop.

56. The traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV.

57. MCSO shall explore the possibility of relying on the CAD and/or MDT systems to check if all stops are being recorded and relying on in-car recording equipment to check whether Deputies are accurately reporting stop length. In addition, MCSO shall implement a system for Deputies to provide motorists with a copy of non-sensitive data recorded for each stop (such as a receipt) with instructions for how to report any inaccuracies the motorist believes are in the data, which can then be analyzed as part of any audit. The receipt will be provided to motorists even if the stop does not result in a citation or arrest.

58. The MCSO shall ensure that all databases containing individual-specific data comply with federal and state privacy standards governing personally-identifiable information. MCSO shall develop a process to restrict database access to authorized, identified users who are accessing the information for a legitimate and identified purpose as defined by the Parties. If the Parties cannot agree, the Court shall make the determination.

59. Notwithstanding the foregoing, the MCSO shall provide full access to the collected data to the Monitor and Plaintiffs' representatives, who shall keep any personal identifying information confidential. Every 180 days, MCSO shall provide the traffic stop data collected up to that date to the Monitor and Plaintiffs' representatives in electronic form. If proprietary software is necessary to view and analyze the data, MCSO shall provide a copy of the same. If the Monitor or the Parties wish to submit data with personal identifying information to the Court, they shall provide the personally identifying information under seal.

46REPORT000597

**b.      Electronic Data Entry**

60.    Within one year of the Effective Date, the MCSO shall develop a system by which Deputies can input traffic stop data electronically.  Such electronic data system shall have the capability to generate summary reports and analyses, and to conduct searches and queries. MCSO will explore whether such data collection capability is possible through the agency's existing CAD and MDT systems, or a combination of the CAD and MDT systems with a new data collection system. Data need not all be collected in a single database; however, it should be collected in a format that can be efficiently analyzed together. Before developing an electronic system, the MCSO may collect data manually but must ensure that such data can be entered into the electronic system in a timely and accurate fashion as soon as practicable.

**c.      Audio-Video Recording of Traffic Stops**

61.    The MCSO will install functional video and audio recording equipment in all traffic patrol vehicles that make traffic stops, and shall commence regular operation and maintenance of such video and audio recording equipment.  MCSO shall prioritize the installation of such equipment in all traffic patrol vehicles that makes traffic stops used by Specialized Units that enforce Immigration-Related Laws, and such installation must be complete within 180 days of the Effective Date.  MCSO shall equip all traffic patrol vehicles that make traffic stops with video and audio recording equipment within 2 years of the Effective Date.  Subject to Maricopa County code and the State of Arizona's procurement law, the Court shall choose the vendor for the video and audio recording equipment if the Parties and the Monitor cannot agree on one.

62.    Deputies shall turn on any in-vehicle video and audio recording equipment as soon the decision to initiate the stop is made and continue recording through the end of the stop. MCSO shall repair or replace all non-functioning video or audio recording equipment, as necessary for reliable functioning. Deputies who fail to activate and to use their recording equipment according to MCSO policy or notify MCSO that their equipment is non-functioning within a reasonable time shall be subject to Discipline.

- 30 -

46REPORT000598

63. MCSO shall retain traffic stop written data for a minimum of 5 years after it is created, and shall retain in-car camera recordings for a minimum of 3 years unless a case involving the traffic stop remains under investigation by the MCSO or the Monitor, or is the subject of a Notice of Claim, civil litigation or criminal investigation, for a longer period, in which case the MCSO shall maintain such data or recordings for at least one year after the final disposition of the matter, including appeals. MCSO shall develop a protocol, to be reviewed by the Monitor pursuant to the process described in Section IV, for reviewing the in-car camera recordings and for responding to public records requests in accordance with the Order.

**d.     Review of Traffic Stop Data**

64. Within 180 days of the Effective Date, MCSO shall develop a protocol for periodic analysis of the traffic stop data described above in Paragraphs 54 to 59 ("collected traffic stop data") and data gathered for any Significant Operation as described in this Order ("collected patrol data") to look for warning signs or indicia or possible racial profiling or other improper conduct under this Order.

65. MCSO shall designate a group with the MCSO Implementation Unit, or other MCSO Personnel working under the supervision of a Lieutenant or higher-ranked officer, to analyze the collected data on a monthly, quarterly and annual basis, and report their findings to the Monitor and the Parties. This review group shall analyze the data to look for possible individual-level, unit-level or systemic problems. Review group members shall not review or analyze collected traffic stop data or collected patrol data relating to their own activities.

66. MCSO shall conduct one agency-wide comprehensive analysis of the data per year, which shall incorporate analytical benchmarks previously reviewed by the Monitor pursuant to the process described in Section IV. The benchmarks may be derived from the EIS or IA-PRO system, subject to Monitor approval. The MCSO may hire or contract with an outside entity to conduct this analysis. The yearly comprehensive analysis shall be made available to the public and at no cost to the Monitor and Plaintiffs.

- 31 -

46REPORT000599

67. In this context, warning signs or indicia of possible racial profiling or other misconduct include, but are not limited to:

   a. racial and ethnic disparities in deputies', units' or the agency's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of deputies' duties, or racial or ethnic disparities in traffic stop patterns when compared with data of deputies' peers;

   b. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;

   c. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

   d. indications that deputies, units or the agency is not complying with the data collection requirements of this Order; and

   e. other indications of racial or ethnic bias in the exercise of official duties.

68. When reviewing collected patrol data, MCSO shall examine at least the following:

   a. the justification for the Significant Operation, the process for site selection, and the procedures followed during the planning and implementation of the Significant Operation;

   b. the effectiveness of the Significant Operation as measured against the specific operational objectives for the Significant Operation, including a review of crime data before and after the operation;

   c. the tactics employed during the Significant Operation and whether they yielded the desired results;

   d. the number and rate of stops, Investigatory Detentions and arrests, and the documented reasons supporting those stops, detentions and arrests, overall and broken down by Deputy, geographic area, and the actual or perceived race and/or ethnicity

- 32 -

46REPORT000600

and the surname information captured or provided by the persons stopped, detained or arrested;

    e.  the resource needs and allocation during the Significant Operation; and

    f.  any Complaints lodged against MCSO Personnel following a Significant Operation.

69.   In addition to the agency-wide analysis of collected traffic stop and patrol data, MCSO Supervisors shall also conduct a review of the collected data for the Deputies under his or her command on a monthly basis to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws by a Deputy. Each Supervisor will also report his or her conclusions based on such review on a monthly basis to a designated commander in the MCSO Implementation Unit

70.   If any one of the foregoing reviews and analyses of the traffic stop data indicates that a particular Deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, MCSO shall take reasonable steps to investigate and closely monitor the situation. Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or of other supervised, monitored, and documented action plans and strategies designed to modify activity. If the MCSO or the Monitor concludes that systemic problems of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement exist, the MCSO shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the appropriate Supervisor(s) or Command Staff. All interventions shall be documented in writing.

71.   In addition to the underlying collected data, the Monitor and Plaintiffs' representatives shall have access to the results of all Supervisor and agency level reviews of the traffic stop and patrol data.

- 33 -

46REPORT000601

## IX.    EARLY IDENTIFICATION SYSTEM ("EIS")

### a.    Development and Implementation of the EIS

72.    MCSO shall work with the Monitor, with input from the Parties, to develop, implement and maintain a computerized EIS to support the effective supervision and management of MCSO Deputies and employees, including the identification of and response to potentially problematic behaviors, including racial profiling, unlawful detentions and arrests, and improper enforcement of Immigration-Related Laws within one year of the Effective Date.  MCSO will regularly use EIS data to promote lawful, ethical and professional police practices; and to evaluate the performance of MCSO Patrol Operations Employees across all ranks, units and shifts.

73.    Within 180 days of the Effective Date, MCSO shall either create a unit, which shall include at least one full-time-equivalent qualified information technology specialist, or otherwise expand the already existing role of the MCSO information technology specialist to facilitate the development, implementation, and maintenance of the EIS. MCSO shall ensure that there is sufficient additional staff to facilitate EIS data input and provide Training and assistance to EIS users. This unit may be housed within Internal Affairs ("IA").

74.    MCSO shall develop and implement a protocol setting out the fields for historical data, deadlines for inputting data related to current and new information, and the individuals responsible for capturing and inputting data.

75.    The EIS shall include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve:

   a.    all misconduct Complaints or allegations (and their dispositions), excluding those made by inmates relating to conditions of confinement or conduct of detention officers (i.e,, any complaint or allegation relating to a traffic stop shall be collected and subject to this Paragraph even if made by an inmate);

   b.    all internal investigations of alleged or suspected misconduct;

- 34 -

46REPORT000602

   c.  data compiled under the traffic stop data collection and the patrol data collection mechanisms;

   d.  all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the County and/or its Deputies or agents, resulting from MCSO Patrol Operations or the actions of MCSO Patrol Operation Personnel;

   e.  all arrests;

   f.  all arrests in which the arresting Deputy fails to articulate probable cause in the arrest report, or where an MCSO Supervisor, court or prosecutor later determines the arrest was not supported by probable cause to believe a crime had been committed, as required by law;

   g.  all arrests in which the individual was released from custody without formal charges being sought;

   h.  all Investigatory Stops, detentions, and/or searches, including those found by the Monitor, an MCSO supervisor, court or prosecutor to be unsupported by reasonable suspicion of or probable cause to believe a crime had been committed, as required by law;

   i.  all instances in which MCSO is informed by a prosecuting authority or a court that a decision to decline prosecution or to dismiss charges, and if available, the reason for such decision;

   j.  all disciplinary action taken against employees;

   k.  all non-disciplinary corrective action required of employees;

   l.  all awards and commendations received by employees;

   m.  Training history for each employee; and

   n.  bi-monthly Supervisory observations of each employee.

76.  The EIS shall include appropriate identifying information for each involved Deputy (i.e., name, badge number, shift and Supervisor) and civilian (e.g., race and/or ethnicity).

46REPORT000603

77. MCSO shall maintain computer hardware, including servers, terminals and other necessary equipment, in sufficient amount and in good working order to permit personnel, including Supervisors and commanders, ready and secure access to the EIS system to permit timely input and review of EIS data as necessary to comply with the requirements of this Order.

78. MCSO shall maintain all personally identifiable information about a Deputy included in the EIS for at least five years following the Deputy's separation from the agency. Information necessary for aggregate statistical analysis will be maintained indefinitely in the EIS. On an ongoing basis, MCSO shall enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. No individual within MCSO shall have access to individually identifiable information that is maintained only within EIS and is about a deputy not within that individual's direct command, except as necessary for investigative, technological, or auditing purposes.

79. The EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date. Prior to full implementation of the new EIS, MCSO will continue to use existing databases and resources to the fullest extent possible, to identify patterns of conduct by employees or groups of Deputies.

**b.  Training on the EIS**

80. MCSO will provide education and training to all employees, including Deputies, Supervisors and commanders regarding EIS prior to its implementation as appropriate to facilitate proper understanding and use of the system. MCSO Supervisors shall be trained in and required to use EIS to ensure that each Supervisor has a complete and current understanding of the employees under the Supervisor's command. Commanders and Supervisors shall be educated and trained in evaluating and making appropriate comparisons in order to identify any significant individual or group patterns. Following

- 36 -

46REPORT000604

the initial implementation of the EIS, and as experience and the availability of new technology may warrant, MCSO may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. MCSO shall submit all such proposals for review by the Monitor pursuant to the process described in Section IV.

**c. Protocol for Agency and Supervisory Use of the EIS**

81. MCSO shall develop and implement a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, identifying Deputies for intervention, Supervisory use, Supervisory/agency intervention, documentation and audit. Additional required protocol elements include:

a. comparative data analysis, including peer group analysis, to identify patterns of activity by individual Deputies and groups of Deputies;

b. identification of warning signs or other indicia of possible misconduct, including, but not necessarily limited, to:

    i. failure to follow any of the documentation requirements mandated pursuant to this Order;

    ii. racial and ethnic disparities in the Deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries, that cannot be explained by statistical modeling of race neutral factors or characteristics of Deputies' specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a Deputy's peers;

    iii. evidence of extended traffic stops or increased inquiries/investigations where investigations involve a Latino driver or passengers;

    iv. a citation rate for traffic stops that is an outlier when compared to data of a Deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

- 37 -

46REPORT000605

Case 2:07-cv-02513-GMS   Document 806   Filed 10/02/13   Page 38 of 59

v.   Complaints by members of the public or other officers; and

vi.   other indications of racial or ethnic bias in the exercise of official duties;

c.   MCSO commander and Supervisor review, on a regular basis, but not less than bi-monthly, of EIS reports regarding each officer under the commander or Supervisor's direct command and, at least quarterly, broader, pattern-based reports;

d.   a requirement that MCSO commanders and Supervisors initiate, implement, and assess the effectiveness of interventions for individual Deputies, Supervisors, and units, based on assessment of the information contained in the EIS;

e.   identification of a range of intervention options to facilitate an effective response to suspected or identified problems.  In any cases where a Supervisor believes a Deputy may be engaging in racial profiling, unlawful detentions or arrests, or improper enforcement of Immigration-Related Laws or the early warning protocol is triggered, the MCSO shall notify the Monitor and Plaintiffs and take reasonable steps to investigate and closely monitor the situation, and take corrective action to remedy the issue.  Interventions may include but are not limited to counseling, Training, Supervisor ride-alongs, ordering changes in practice or procedure, changing duty assignments, Discipline, or other supervised, monitored, and documented action plans and strategies designed to modify activity.  All interventions will be documented in writing and entered into the automated system;

f.   a statement that the decision to order an intervention for an employee or group using EIS data shall include peer group analysis, including consideration of the nature of the employee's assignment, and  not solely on the number or percentages of incidents in any category of information recorded in the EIS;

g.   a process for prompt review by MCSO commanders and Supervisors of the EIS records of all Deputies upon transfer to their supervision or command;

h.   an evaluation of whether MCSO commanders and Supervisors are appropriately using the EIS to enhance effective and ethical policing and reduce risk; and

46REPORT000606

i.   mechanisms to ensure monitored and secure access to the EIS to ensure the integrity, proper use, and appropriate confidentiality of the data.

## X.      SUPERVISION AND EVALUATIONS OF OFFICER PERFORMANCE

82.   MCSO and the County shall ensure that an adequate number of qualified first-line Supervisors are available to provide the effective supervision necessary to ensure that Deputies are following the Constitution and  laws of the United States and State of Arizona, MCSO policy, and this Order.  First-line Supervisors shall ensure that Deputies are policing actively and effectively, are provided with the instruction necessary to correct mistakes, and are held accountable for misconduct.  To achieve these outcomes, MCSO shall undertake the following duties and measures:

### a.      General Duties of Supervisors

83.   MCSO Supervisors shall provide the effective supervision necessary to direct and guide Deputies.  Effective supervision requires that Supervisors:  respond to the scene of certain arrests; review each field interview card and incident report; confirm the accuracy and completeness of Deputies' daily activity reports; respond to each Complaint of misconduct; ensure Deputies are working actively to engage the community and increase public trust and safety; provide counseling, redirection, support to Deputies as needed, and are held accountable for performing each of these duties.

84.   Within 120 days of the Effective Date, all patrol Deputies shall be assigned to a single, consistent, clearly identified Supervisor.  First-line field Supervisors shall be assigned to supervise no more than twelve Deputies.

85.   First-line field Supervisors shall be required to discuss individually the stops made by each Deputy they supervise with the respective Deputies no less than one time per month in order to ensure compliance with this Order.  This discussion should include, at a minimum, whether the Deputy detained any individuals stopped during the preceding month, the reason for any such detention, and a discussion of any stops that at any point involved any immigration issues.

- 39 -

46REPORT000607

86. On-duty field Supervisors shall be available throughout their shift to provide adequate on-scene field supervision to Deputies under their direct command and, as needed, to provide Supervisory assistance to other units. Supervisors shall be assigned to and shall actually work the same days and hours as the Deputies they are assigned to supervise, absent exceptional circumstances.

87. MCSO shall hold Commanders and Supervisors directly accountable for the quality and effectiveness of their supervision, including whether commanders and Supervisors identify and effectively respond to misconduct, as part of their performance evaluations and through non-disciplinary corrective action, or through the initiation of formal investigation and the disciplinary process, as appropriate.

**b. Additional Supervisory Measures**

88. To ensure compliance with the terms of this Order, first-line Supervisors in any Specialized Units enforcing Immigration-Related Laws shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying them in the field, and directly supervise the in-the-field-activities of all members of the unit for at least two weeks every year.

89. A Deputy shall notify a Supervisor before initiating any immigration status investigation, as discussed in Paragraph 28. Deputies shall also notify Supervisors before effectuating an arrest following any immigration-related investigation or for an Immigration-Related Crime, or for any crime related to identity fraud or lack of an identity document. The responding Supervisor shall approve or disapprove the Deputy's investigation or arrest recommendation based on the available information and conformance with MCSO policy. The Supervisor shall take appropriate action to address any deficiencies in Deputies' investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative investigation.

90. MCSO Deputies shall submit documentation of all stops and Investigatory Detentions conducted to their Supervisors by the end of the shift in which the action occurred.

- 40 -

46REPORT000608

Absent exceptional circumstances, within 72 hours of receiving such documentation, a Supervisor shall independently review the information. Supervisors shall review reports and forms for Boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Appropriate disciplinary action should be taken where Deputies routinely employ Boilerplate or conclusory language.

91. As part of the Supervisory review, the Supervisor shall document any Investigatory Stops and detentions that appear unsupported by reasonable suspicion or are otherwise in violation of MCSO policy, or stops or detentions that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training. The Supervisor shall take appropriate action to address all violations or deficiencies in Investigatory Stops or detentions, including recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

92. Supervisors shall use EIS to track each subordinate's violations or deficiencies in Investigatory Stops or detentions and the corrective actions taken, in order to identify Deputies needing repeated corrective action. Supervisors shall notify IA. The Supervisor shall ensure that each violation or deficiency is documented in the Deputy's performance evaluations. The quality and completeness of these Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations. MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct complete, thorough, and accurate reviews of Deputies' stops and Investigatory Detentions.

93. Absent extraordinary circumstances, MCSO Deputies shall complete all incident reports before the end of shift. MCSO field Supervisors shall review incident reports and shall memorialize their review of incident reports within 72 hours of an arrest, absent exceptional circumstances.

94. As part of the Supervisory review, the Supervisor shall document any arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that

- 41 -

46REPORT000609

indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The Supervisor shall take appropriate action to address violations or deficiencies in making arrests, including notification of prosecuting authorities, recommending non-disciplinary corrective action for the involved Deputy, and/or referring the incident for administrative or criminal investigation.

95.   Supervisors shall use EIS to track each subordinate's violations or deficiencies in the arrests and the corrective actions taken, in order to identify Deputies needing repeated corrective action.  The Supervisor shall ensure that each violation or deficiency is noted in the Deputy's performance evaluations.  The quality of these supervisory reviews shall be taken into account in the Supervisor's own performance evaluations, promotions, or internal transfers.  MCSO shall take appropriate corrective or disciplinary action against Supervisors who fail to conduct reviews of adequate and consistent quality.

96.   A command-level official shall review, in writing, all Supervisory reviews related to arrests that are unsupported by probable cause or are otherwise in violation of MCSO policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or Training.  The commander's review shall be completed within 14 days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the Supervisor's written report and ensure that all appropriate corrective action is taken.

97.   MCSO Commanders and Supervisors shall periodically review the EIS reports and information, and initiate, implement, or assess the effectiveness of interventions for individual Deputies, Supervisors, and units based on that review. The obligations of MCSO Commanders and Supervisors in that regard are described above in Paragraphs 81(c)–(h).

**d.      Regular Employee Performance Review and Evaluations**

98.   MCSO, in consultation with the Monitor, shall create a system for regular employee performance evaluations that, among other things, track each officer's past performance

- 42 -

46REPORT000610

to determine whether the officer has demonstrated a pattern of behavior prohibited by MCSO policy or this Order.

99. The review shall take into consideration all past Complaint investigations; the results of all investigations; Discipline, if any, resulting from the investigation; citizen Complaints and commendation; awards; civil or administrative claims and lawsuits related to MCSO operations; Training history; assignment and rank history; and past Supervisory actions taken pursuant to the early warning protocol.

100. The quality of Supervisory reviews shall be taken into account in the Supervisor's own performance evaluations.

101. Within 180 days of the Effective Date, MCSO shall develop and implement eligibility criteria for assignment to Specialized Units enforcing Immigration-Related Laws. Such criteria and procedures shall emphasize the individual's integrity, good judgment, and demonstrated capacity to carry out the mission of each Specialized Unit in a constitutional, lawful, and bias-free manner. Deputies assigned to a Specialized Unit who are unable to maintain eligibility shall be immediately re-assigned.

46REPORT000611

## XI.    MISCONDUCT AND COMPLAINTS

### a.    Internally-Discovered Violations

102.    MCSO shall require all personnel to report without delay alleged or apparent misconduct by other MCSO Personnel to a Supervisor or directly to IA that reasonably appears to constitute: (i) a violation of MCSO policy or this Order; (ii) an intentional failure to complete data collection or other paperwork requirements required by MCSO policy or this Order; (iii) an act of retaliation for complying with any MCSO policy; (iv) or an intentional provision of false information in an administrative investigation or any official report, log or electronic transmittal of information. Failure to voluntarily report or document apparent misconduct described in this Paragraph shall be an offense subject to Discipline.

### b.    Audit Checks

103.    Within one year of the Effective Date, MCSO shall develop a plan for conducting regular, targeted, and random integrity audit checks to identify and investigate Deputies possibly engaging in improper behavior, including:  Discriminatory Policing; unlawful detentions and arrests; improper enforcement of Immigration-Related Laws; and failure to report misconduct.

### c.    Complaint Tracking and Investigations

104.    Subject to applicable laws, MCSO shall require Deputies to cooperate with administrative investigations, including appearing for an interview when requested by an investigator and providing all requested documents and evidence.  Supervisors shall be notified when a Deputy under their supervision is summoned as part of an administrative investigation and shall facilitate the Deputy's appearance, absent extraordinary and documented circumstances.

105.    Investigators shall have access to, and take into account as appropriate, the collected traffic stop and patrol data, Training records, Discipline history, and any past Complaints and performance evaluations of involved officers.

46REPORT000612

106. Records of Complaints and investigations shall be maintained and made available, unredacted, to the Monitor and Plaintiffs' representatives upon request. The Monitor and Plaintiffs' representatives shall maintain the confidentiality of any information therein that is not public record. Disclosure of records of pending investigations shall be consistent with state law.

## XII.   COMMUNITY ENGAGEMENT

### a.   Community Outreach Program

107. To rebuild public confidence and trust in the MCSO and in the reform process, the MCSO shall work to improve community relationships and engage constructively with the community during the period that this Order is in place. To this end, the MCSO shall create the following district community outreach program.

108. Within 180 days of the Effective Date, MCSO shall develop and implement a Community Outreach and Public Information program in each MCSO District.

109. As part of its Community Outreach and Public Information program, the MCSO shall hold a public meeting in each of MCSO's patrol Districts within 90 days of the Effective Date, and at least one meeting in each District annually thereafter. These meetings shall be used to inform community members of the policy changes or other significant actions that the MCSO has taken to implement the provisions of this Order. Summaries of audits and reports completed by the MCSO pursuant to this Order shall be provided. The MCSO shall clarify for the public at these meetings that it does not enforce immigration laws except to the extent that it is enforcing Arizona and federal criminal laws.

110. The meetings present an opportunity for MCSO representatives to listen to community members' experiences and concerns about MCSO practices implementing this Order, including the impact on public trust.  MCSO representatives shall make reasonable efforts to address such concerns during the meetings and afterward.

111. English- and Spanish-speaking MCSO Personnel shall attend these meetings and be available to answer questions from the public.  At least one MCSO Supervisor with extensive knowledge of the agency's implementation of the Order, as well as the

- 45 -

46REPORT000613

Community Liaison Officer (described below) shall participate in the meetings. Plaintiffs' representatives shall be invited to attend.

112. The meetings shall be held in locations convenient and accessible to the public. At least one week before such meetings, the MCSO shall widely publicize the meetings using English and Spanish-language television, print media and the internet.

**b.      Community Liaison Officer**

113. Within 90 days of the Effective Date, MCSO shall select or hire a Community Liaison Officer ("CLO") who is a sworn Deputy fluent in English and Spanish. The hours and contact information of the CLO shall be made available to the public including on the MCSO website. The CLO shall be directly available to the public for communications and questions regarding the MCSO.

114. The CLO shall have the following duties:

    a.   to coordinate the district community meetings described above in Paragraphs 109 to 112;

    b.   to provide administrative support for, coordinate and attend meetings of the Community Advisory Board described in Paragraphs 117 to 118;

    c.   to compile any Complaints, concerns and suggestions submitted to CLO by members of the public about the implementation of this Order and the Court's order of December 23, 2011, and its findings of fact and conclusions of law dated May 24, 2013, even if they don't rise to the level of requiring formal action by IA or other component of the MCSO, and to respond to Complainants' concerns;

    d.   to communicate concerns received from the community at regular meetings with the Monitor and MCSO leadership; and

    e.   to compile concerns received from the community in a written report every 180 days and share the report with the Monitor and the Parties.

**c.      Community Advisory Board**

115. MCSO and Plaintiffs' representatives shall work with community representatives to create a Community Advisory Board ("CAB") to facilitate regular dialogue between the

- 46 -

46REPORT000614

MCSO and community leaders, and to provide specific recommendations to MCSO about policies and practices that will increase community trust and ensure that the provisions of this Order and other orders entered by the Court in this matter are met.

116. The CAB shall have six members, three to be selected by the MCSO and three to be selected by Plaintiffs' representatives. Members of the CAB shall not be MCSO Employees or any of the named class representatives, nor any of the attorneys involved in this case. However, a member of the MCSO Implementation Unit and at least one representative for Plaintiffs shall attend every meeting of the CAB. The CAB shall continue for at least the length of this Order.

117. The CAB shall hold public meetings at regular intervals of no more than four months. The meeting space shall be provided by the MCSO. The CLO shall coordinate the meetings and communicate with Board members, and provide administrative support for the CAB.

118. During the meetings of the CAB, members will relay or gather concerns from the community about MCSO practices that may violate the provisions of this Order and the Court's previous injunctive orders entered in this matter and make reasonable efforts to address such concerns. Members will also hear from MCSO Personnel on matters of concern pertaining to the MCSO's compliance with the orders of this Court.

## XIII. INDEPENDENT MONITOR AND OTHER PROCEDURES REGARDING ENFORCEMENT

### a. Selection of the Monitor

119. The Court shall appoint an Independent Monitor to assist with implementation of, and assess compliance with, this Order. Within 60 days of the Effective Date, the Parties shall agree on the selection of a Monitor to be appointed by the Court.

120. The Parties shall have an opportunity to separately interview prospective candidates if they choose, as well as request additional information about prospective candidates' background and experience, proposed annual fees and costs, proposed annual budget,

- 47 -

46REPORT000615

including references and a list of recent consulting or monitoring work and the fees and costs from that prior consulting or monitoring work as well as information as to whether the candidate meet or exceeded any budgets for that prior consulting or monitoring work.

121. If the Parties are unable to agree on a Monitor or an alternative method of selection within 60 days of the Effective Date, each Party shall, no later than 70 days from the Effective Date, submit the names and resumes of three candidates with experience as law enforcement practices experts or monitors to the Court, and the Court shall select a Monitor from among the qualified candidates.

122. The Monitor shall be appointed for the term of this Order.  In the event a Monitor is to be replaced, the Parties shall select a new Monitor by the same process as above.   The Court may order the removal of the Monitor for any reason sua sponte, or upon Motion by any party.

123. Defendants shall provide the Monitor with permanent office space and reasonable office support such as office furniture, secure internet access, telephones, secure document storage, and photocopying, faxing and scanning equipment. Defendants shall bear all reasonable fees and costs of the Monitor. However, the Parties recognize the importance of ensuring that the fees and costs borne by Defendants are reasonable.  In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, Defendants, Plaintiffs, and the Monitor shall attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court.  All Parties shall be included in any communications related to such a dispute.

124. The Monitor, at any time after his or her initial selection, may request authorization from the Court to be allowed to hire or employ or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by this Order or by the Court. The Monitor shall submit to the Court the task to be performed by the proposed additional person or entity, the scope of the work to be performed, the project fees and expenses associated with such work, the expected length of time for such work, and the reasons the Monitor is unable to perform such work and requires the

- 48 -

assistance of the additional person or entity and why existing MCSO personnel cannot perform the task requested by the Monitor. Any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Order shall be subject to the provisions of this Order. The Monitor shall notify the Defendants and Plaintiffs' representatives in writing if the Monitor wishes to hire such additional persons or entities. The notice shall identify and describe the qualifications of the person or entity to be hired, the monitoring tasks to be performed, the estimated cost and length of time of the task, and explain why existing MCSO personnel cannot perform the task requested or desired by the Monitor. If the County and Plaintiffs agree to the Monitor's proposal, the Monitor shall be authorized to hire or employ such additional persons or entities. The County or Plaintiffs have 15 business days to state any disagreement with the proposal. If the County and Plaintiffs are unable to reach agreement within 15 business days of receiving notice of the disagreement by the other Party, the Court shall resolve the dispute.

125. Should any Party determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority or failed to satisfactorily perform the duties required by this Order, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors. The Party or Parties, as the case may be, shall attempt to resolve such disputes cooperatively prior to seeking the assistance of the Court. All Parties shall be included in any communications related to such a dispute.

**b.     Role of the Monitor**

126. The Monitor shall be subject to the supervision and orders of the Court, consistent with this Order. The Monitor shall have the duties, responsibilities and authority conferred by the Court and this Order, including, but not limited to: (1) reviewing the MCSO Patrol Operations Policies and Procedures provided for by this Order and making recommendations to the Court regarding the same; (2) reviewing a protocol with the

- 49 -

46REPORT000617

Parties to ensure that any Significant Operations conducted by the MCSO are conducted in a race-neutral fashion; (3) reviewing the curriculum, materials and proposed instructors for Training required by this Order; (4) reviewing the collected traffic stop data and the collected Saturation Patrol data to determine whether the data required to be gathered by this Order is, in fact, being collected by the MCSO; (5) reviewing protocols regarding the collection, analysis, and use of such data and determining whether the MCSO is in compliance with those protocols; (6) reviewing the collected data to determine whether, in the opinion of the Monitor, MCSO is appropriately reviewing the collected data to determine possible isolated or systemic racial profiling occurring, and if so, reporting the factual basis supporting that judgment to the Parties and the Court; (7) evaluating the effectiveness of the MCSO's changes in the areas of supervision and oversight and reporting the same to the parties and the Court; (8) reviewing the corrective action taken by the MCSO concerning any possible violations of this Order or MCSO policy and procedures and reporting the same to the parties and the Court; (9) evaluating the MCSO's engagement with the communities affected by its activities as set forth by this Order; and (10) assessing the MCSO's overall compliance with the Order.

127. To assess and report on the Defendants' implementation of this Order and whether implementation is resulting in the constitutional and professional treatment of individuals by MCSO, the Monitor shall conduct the audits, compliance reviews and outcome assessments specified below, and such additional audits and assessments as the Monitor or the Parties deem appropriate.

128. The ultimate arbiter of compliance is the Court and Parties may make their own submissions regarding compliance separate from the Monitor's reports. In any areas where the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution.

129. In carrying out these duties, the Monitor shall be permitted to have ex parte communications with the Parties.

46REPORT000618

### c. Monitoring Plan and Review Methodology

130. The Monitor shall file with the Court quarterly written, public reports covering the reporting period that shall include:

   a. a description of the work conducted by the Monitor during the reporting period;

   b. a listing of each Order requirement which indicates whether each requirement has been addressed by the MCSO, is the subject of sufficient Training, and whether the MCSO is in compliance with that requirement of the Order in the judgment, opinion, and experience of the Monitor;

   c. the methodology and specific findings for each audit or review conducted;

   d. for any requirements that were audited and reviewed and found not to have been fully implemented in practice in the judgment, opinion, and experience of the Monitor, the Monitor's recommendations to the Court regarding necessary steps to achieve compliance;

   e. in the judgment, opinion, and experience of the Monitor an assessment of MCSO's progress in achieving the desired outcomes for each area covered by the Order, noting issues of concern or particular achievement;

   f. the methodology and specific findings for each outcome assessment conducted; and

   g. a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Order.

131. The Monitor's reports shall be public except for information covered by privacy laws or that is otherwise confidential. If any information is redacted from the Monitor's report, an unredacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit, review or assessment need not be made publicly available but shall be retained by the Monitor and provided to either or both Parties upon request.

132. The Monitor shall provide a copy of quarterly reports to the Parties in draft form at least 21 business days prior to filing them with the Court to allow the Parties to provide written comment on the reports. The Monitor shall consider the Parties' responses and make any

- 51 -

46REPORT000619

changes the Monitor deems appropriate before issuing the report. The Monitor shall attach to his or her report copies of any comments submitted by the Parties.

133. Within 60 days of his or her appointment, the Monitor shall develop a plan for conducting the above audits, reviews and outcome assessments, and shall submit this plan to the Parties for review and approval. In the event that the Parties cannot agree, the plan will be submitted to the Court for final approval. This plan shall:

   a. clearly delineate the requirements of the Order to be assessed for compliance, indicating which requirements will be assessed together;

   b. set out a schedule for conducting an initial audit or review of each requirement of the Order, and periodic audits and reviews thereafter;

   c. set out a schedule for conducting initial outcome assessments for each area of the Order, and periodic assessments thereafter.

134. Where the Monitor recommends and the Parties agree, the Monitor may refrain from conducting an audit or review of a requirement previously found to have been fully implemented in practice by the Monitor, or refrain from conducting an outcome assessment if previous assessments indicate that the outcome intended by a requirement has been achieved.

135. At least 30 days prior to the initiation of any audit, review or assessment, the Monitor shall submit a proposed methodology to the Parties. The Parties shall submit any comments or concerns regarding the proposed methodology to the Monitor within 15 days of the proposed date of the assessment, review or audit. The Monitor shall modify the methodology as necessary to address any concerns or shall inform the Parties in writing of the reasons it is not modifying its methodology as proposed. If Parties do not agree with the proposed methodology, the Monitor shall then file with the Court the proposed methodology for approval.

136. In conducting the outcome assessments, the Monitor should measure not only the MCSO's progress in implementing the provisions of this Order, but the effectiveness of

- 52 -

46REPORT000620

the reforms. To do so, the Monitor shall take into account the following performance-based metrics and trends:

    a.  Deputies' awareness and comprehension of issues addressed by departmental policies and Training;

    b.  data relating to the race and ethnicity of individuals stopped, detained and arrested by the MCSO, including the rate at which investigations result in a citation or arrest;

    c.  data related to the documented reasonable suspicion or probable cause to stop, detain or arrest individuals encountered on traffic stops, broken down by the actual or perceived race or ethnicity of the person(s) stopped/arrested;

    d.  the use and deployment of Specialized Units;

    e.  the execution of any significant operations, including planning and site selection, tactics employed, staffing and units involved, and the intended and actual results of such operations;

    f.  the amount and quality of supervision provided by the MCSO's chain of command;

    g.  the prevalence of civilian Complaints regarding biased policing or unlawful detentions and arrests by MCSO Patrol Operation deputies;

    h.  the number and rate of Complaints that are accepted, sustained and not sustained, overall and broken down by type, unit, geographic area and the actual or perceived race or ethnicity of Complainants;

    i.  disciplinary outcomes for any violations of departmental policy;

    j.  whether any Deputies are the subject of repeated misconduct Complaints, civil suits, or criminal charges, including for off-duty conduct; and

    k.  the level of MCSO engagement and participation with the community advisory board;

137. To facilitate the Monitor's outcome assessments, the Monitor may also conduct his or her own periodic analysis of the traffic stop and Significant Operations data collected by the MCSO pursuant to this Order, subject to the terms of this Order as to the Monitor's proposed hiring of assistance. The Monitor shall retain an individual or entity with

- 53 -

46REPORT000621

expertise in social science research and statistics to conduct the survey if the Monitor does not have this expertise him/herself.

138. The Monitor shall conduct a comprehensive re-assessment each year after the Effective Date to determine whether and to what extent the outcomes intended by this Order have been achieved, and any modifications to the Order that he/she believes are necessary for continued achievement in light of changed circumstances or unanticipated impact (or lack of impact) of a requirement. This re-assessment shall also address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating Full and Effective Compliance. Based upon this comprehensive re-assessment, the Monitor may recommend to the parties and the Court modifications to the Order that he/she believes are necessary to achieve and sustain intended outcomes.

### d. Monitor Recommendations and Technical Assistance

139. The Monitor may make additional recommendations to the Parties regarding measures necessary to ensure timely, Full and Effective Compliance with this Order and its underlying objectives. Such recommendations may include a recommendation to change, modify, or amend a provision of the Order, a recommendation for additional Training in any area related to this Order, or a recommendation to seek technical assistance. In addition to making recommendations, the Monitor may also, at the request of the Parties, provide technical assistance directly to the MCSO consistent with the Monitor's responsibilities under this Order. In the event that full and effective implementation of this Order requires technical assistance beyond the scope of what the Monitor can provide, Defendants shall reasonably arrange for prompt initiation of such technical assistance consistent with the terms of this Order.

### e. Communication between Monitor and Parties

140. The Monitor shall maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of Defendants' implementation of and compliance with this Order.

- 54 -

46REPORT000622

**f.      Public Statements, Testimony, Records, and Conflicts of Interest**

141.   Except as required or authorized by the terms of this Order or the Parties acting together: neither the Monitor, nor any agent, employee, or independent contractor thereof, shall make any public statements, outside of statements to the Court as contemplated in this Order, with regard to any act or omission of the Defendants, or their agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to the Order.  Any press statement made by the Monitor regarding its employment or monitoring activities under this Order shall first be approved by the Parties.

142.   Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Maricopa County or its departments, Deputies, agents or employees.

143.   The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection.

144.   The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Order.

**g.      Access and Confidentiality**

145.   Defendants shall ensure that the Monitor has timely, full and direct access to all personnel, documents, facilities and Order-related Trainings and meetings that the Monitor reasonably deems necessary to carry out its duties. The Monitor shall cooperate with the Defendants to access people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations. To facilitate his or her monitoring responsibilities, the Monitor may conduct On-Site

46REPORT000623

Observations, visits and assessments without prior notice to the Defendants absent Exigent Circumstances.

146. Defendants may withhold from the Monitor any documents or data protected by the attorney-client privilege. Should the Defendants decline to provide the Monitor access to documents or data based on attorney-client privilege, the Defendants shall inform the Monitor and Plaintiffs that it is withholding documents or data on this basis and shall provide the Monitor and Plaintiffs with a log describing the documents or data.

147. Defendants shall ensure that Plaintiffs' representatives and their consultative experts and agents shall have full and direct access to all Defendants' staff, employees, facilities, documents and data relevant to this Order upon reasonable notice. Plaintiffs' representatives and their consultative experts and agents shall cooperate with the Defendants to access involved personnel, facilities, and documents in a reasonable manner that, consistent with Plaintiffs' responsibilities to enforce this Order, minimizes interference with regular duties.

148. The Monitor and Plaintiffs shall provide the Defendants with reasonable notice of a request for copies of documents. Upon such request, the Defendants shall provide in a timely manner copies (electronic, where readily available) of the requested documents.

149. The Monitor shall have access to all records and information relating to criminal investigations relevant to this Order as permissible by law. The Monitor shall treat such records as confidential and shall not disclose the same to any third party. The Monitor and Plaintiffs shall have access to all documents in concluded or closed MCSO criminal investigation files. The Monitor shall also have reasonable access to all arrest reports, warrants, and warrant applications whether or not contained in open criminal investigation files absent Exigent Circumstances.

150. The Parties may make use of protective orders or agreements to ensure the confidentiality of any non-public information as appropriate and necessary. Other than as expressly provided herein, this Order shall not be deemed a waiver of any privilege or right the Defendants may assert, including those recognized at common law or created by statute,

46REPORT000624

Case 2:07-cv-02513-GMS Document 806 Filed 10/02/13 Page 57 of 59

rule or regulation, against any other person or entity with respect to the disclosure of any document.

### h. Modification and Enforcement of the Order

151. Where the Parties agree with the Monitor's recommendations to change a provision of the Order, the Parties may apply to the Court via stipulated Motion or other appropriate filing to make the desired change.

152. Plaintiffs' representatives may seek enforcement of this Order if they determine that the Defendants have failed to fully comply with any provision contained herein. Plaintiffs' representatives are not required to prove that the MCSO is engaged in racial profiling in order for the Court to find that Defendants have failed to fully comply. Plaintiffs may demonstrate that the MCSO has failed to fulfill a particular obligation under this Order or failed to make sustained and continuing progress on applicable performance-based metrics.

153. The Parties shall first attempt to resolve any dispute informally by notification and conferral. If a dispute cannot be resolved informally, Plaintiffs' representatives may apply to the Court for appropriate relief, up to and including the imposition of contempt sanctions. Interventions short of an imposition of contempt sanctions may include, but are not limited to, additional oversight, further restrictions on agency activities, and additional Training or reporting requirements.

154. Defendants may move the Court for a protective order and/or other appropriate relief if they reasonably believe Plaintiffs' representative is abusing its rights under this Order or acting solely to annoy or harass Defendants. Prior to moving for any such protective order or other relief, Defendants shall be required to provide Plaintiffs with notice of their intent to do so and shall confer with Plaintiffs in good faith to resolve any such dispute.

155. The Parties shall notify each other of any court or administrative challenge to this Order. In the event any provision of this Order is challenged in any local or state court, removal to a federal court shall be sought by the Parties and transfer of venue to this District will be sought.

46REPORT000625

156.     The Defendants agree to promptly notify Plaintiffs if any term of this Order becomes subject to collective bargaining consultation and to consult with Plaintiffs in a timely manner regarding the implications of any collective bargaining consultation in relation to this Order.

157.     Defendants shall pay reasonable fees and costs incurred as a result of having to initiate litigation to secure enforcement, should Plaintiffs prevail in such litigation. Nothing in this provision affects the right of Plaintiffs to seek fees and costs for work performed in the case prior to the Effective Date or in connection with any appeal taken by Defendants of the Court's May 24, 2013 Findings of Fact, Conclusions of Law and Order.

158.     Defendants reserve the right to move the Court to alter, amend, modify, or terminate this Order at any time based on an adverse decision of an appellate court of competent jurisdiction ruling on the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

159.     Nothing in this Section, nor in this Order is intended to, nor shall, constitute a waiver, termination, abrogation, or ending of the appeal rights of the Defendants to challenge the Court's Order dated December 23, 2011 and its Findings of Fact, Conclusions of Law, and Order dated May 24, 2013.

**IT IS THEREFORE ORDERED** that the Court's injunction of December 23, 2011 is made permanent. The Court's injunction of May 24, 2013 shall remain permanent.  For removal of doubt, both the December 23, 2011 injunction and the May 24, 2013 injunction shall survive the termination of this Order until and unless specifically dissolved or modified by the Court or an appellate court of competent jurisdiction.

**IT IS FURTHER ORDERED** that this Order is an appealable final judgment. The Clerk of Court is directed to enter judgment accordingly.

/ / /

/ / /

/ / /

46REPORT000626

IT IS FURTHER ORDERED that this Court retains jurisdiction over this case for the purposes of implementing this Order.

Dated this 2nd day of October, 2013.


_____

G. Murray Snow

United States District Judge

46REPORT000627

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>    Plaintiffs,<br><br>and<br><br>United States of America,<br><br>    Plaintiff-Intervenor,<br><br>v.<br><br>Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>    Defendants. | No. CV-07-2513-PHX-GMS<br><br>**SECOND AMENDED[1] SECOND SUPPLEMENTAL PERMANENT INJUNCTION/JUDGEMENT ORDER** |

   This Court held 21 days of evidentiary hearings in April, September, October, and November of 2015. At issue were three charges of civil contempt raised against Sheriff Joseph Arpaio and various other alleged non-party contemnors. Also at issue was the relief necessary to compensate the Plaintiff class for the Defendants' acts of misconduct in, among other things, failing to provide requested discovery materials prior to the underlying trial in this matter.

   On May 13, 2016, the Court issued detailed Findings of Fact. (Findings of Fact, Doc. 1677.) The Court found that Sheriff Arpaio and his command staff knowingly failed to implement the Court's preliminary injunction, resulting in harm to many

---

  [1] This second amended order corrects internal paragraph cross-reference errors. Otherwise, the content remains the same.

46REPORT000628

Plaintiff class members who were detained in violation of their constitutional rights. (Doc. 1677 at ¶¶ 1–164.) The Court also found that Defendants failed to disclose thousands of relevant items of requested discovery they were legally obligated to disclose, and, after the post-trial disclosure of additional evidence, deliberately violated court orders, thereby impeding the litigation, harming the Plaintiff class, and resulting in a trial that did not completely address—and remedies that did not fully repair—the MCSO's violations of Plaintiffs' constitutional rights. (*Id.* at ¶¶ 165–217, 239–94.) The contempt hearing further established that after Defendants disclosed to the Court extensive MCSO misconduct, including its failure to provide additional evidence pursuant to Defendants' discovery obligations, the Court allowed Defendants at their insistence to seek to investigate and discipline that misconduct and to disclose newfound evidence. (*Id.* at ¶¶ 220–22.) Nevertheless, instead of forthrightly meeting their responsibilities, Defendants continued to intentionally withhold relevant evidence during the course of their ensuing investigation and the eventual contempt hearing. (*Id.* at ¶¶ 218–386.) Further, in investigating the misconduct with respect to members of the Plaintiff class, Sheriff Arpaio and the MCSO manipulated all aspects of the internal affairs process to minimize or entirely avoid imposing discipline on MCSO deputies and command staff whose actions violated the rights of the Plaintiff class. (*Id.* at ¶¶ 387–875.)

The facts of this case are particularly egregious and extraordinary. The MCSO's constitutional violations are broad in scope, involve its highest ranking command staff, and flow into its management of internal affairs investigations. Thus the necessary remedies—tailored to the violations at issue—must reach that far.

The parties have briefed and argued before the Court the sources and scope of the Court's authority to issue remedies in light of the Findings of Fact, including Defendants' concerns regarding federalism and due process. *See, e.g.*, Plaintiff's Memorandum on Remedies for Civil Contempt (Doc. 1684); United States' Memorandum in Response to Findings of Fact (Doc. 1685); Defendants' Responsive Memorandum to Court's Findings

- 2 -

46REPORT000629

of Fact (Doc. 1687); Parties' Joint Memorandum Re: Internal Investigations (Doc. 1715); Plaintiffs' Response to Defendant Arpaio's Briefing Re: Internal Affairs (Doc. 1720); United States' Response to Defendant Arpaio's Positions Re: Internal Investigations (Doc. 1721); Defendant Arpaio's Reply in Support of Briefing Re: Internal Affairs Investigations and Discipline (Doc. 1729). The Court therefore prefaces its remedial order with an analysis of these issues.

## I.  SOURCES OF THE COURT'S AUTHORITY TO FASHION REMEDIES

Had the Court had access to the evidence withheld by the MCSO and the evidence to which it led, the Court would have entered injunctive relief much broader in scope. (Doc. 1677 at ¶ 890). Although this bad faith failure to produce evidence gave rise to various remedies, the Parties agreed to pursue any relief for the Defendants' withholding of discovery in the same evidentiary hearings that would be necessitated by the Court's Order to Show Cause for contempt. (*See id.* at ¶¶ 891–93).

A principal purpose of the hearing was, therefore, to provide the Plaintiff class the relief it would have had, to the extent possible, had Defendants complied with their discovery obligations prior to trial.

The Court derives authority to fashion remedies in this instance from multiple sources, including the Court's broad and flexible equitable powers to remedy past wrongs, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 12-16 (1971), the Court's equitable authority to modify its injunctions in light of changed circumstances, *United States v. Swift & Co.*, 286 U.S. 106, 114-15 (1932), and the Court's authority to impose remedial sanctions for civil contempt, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827-29 (1994).

### A.  Broad Remedial Powers

In "cases involving the framing of equitable remedies to repair the denial of a constitutional right[,] [t]he task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." *Swann*, 402 U.S. at 15-16. Federal courts focus on three factors when applying equitable principles. *Milliken v.*

- 3 -

46REPORT000630

*Bradley,* 433 U.S. 267, 281 (1977). First, "with any equity case, the nature of the violation determines the scope of the remedy." S*wann*, 402 U.S. at 16. "The remedy must therefore be related to the condition alleged to offend the Constitution." *Milliken,* 433 U.S. at 281 (internal quotation marks omitted). "Second, the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Id.* "Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Id.* However, if the authorities "fail in their affirmative obligations . . . judicial authority may be invoked." *Id.* (quoting S*wann*, 402 U.S. at 15). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." S*wann*, 402 U.S. at 15.

"[I]njunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (quotation omitted), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799, 193 L. Ed. 2d 711 (2016). "Nevertheless, the district court has broad discretion in fashioning a remedy [and] is permitted to order 'relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation.'" *Id.* (quoting *Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir. 1986)). "Therefore, an injunction exceeds the scope of a district court's power only if it is 'aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.'" *Id.* (quoting *Milliken,* 433 U.S. at 282).

Moreover, "the enjoined party's 'history of noncompliance with prior orders can justify greater court involvement than is ordinarily permitted.'" *Id.* (quoting *Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000)). When faced with "repetitive failures to comply with orders[,]" a district court is "'justified in entering a comprehensive order to insure against the risk of inadequate compliance.'" *Sharp*, 233 F.3d at 1173 (quoting

- 4 -

*Hutto v. Finney,* 437 U.S. 678, 687 (1978)).

Here, as in *Sharp*, the Court orders remedies which are necessary to cure the MCSO's constitutional violations, in light of the MCSO's history of noncompliance. *See id.* at 1173. To the extent that the Court orders reforms of the MCSO's policies and practices, these reforms are necessary "to insure against the risk of inadequate compliance," *id.* (quoting *Hutto,* 437 U.S. at 687), because absent such reforms, there is no way to determine whether policies or practices that insulated those who violated the constitutional rights of the Plaintiff class from investigation and discipline would continue to do so. Further, the reforms are aimed at eliminating a condition that flows from the MCSO's violation of the constitutional rights at issue—namely, the tacit authorization and condonation that the MCSO conveys to its deputies when police misconduct related to members of the Plaintiff class is exempted from the normal internal affairs system and is treated with special leniency or is entirely swept under the rug.[2]

"Members of the Plaintiff class constituted the overwhelming majority of the victims of the multiple acts of misconduct that were the subject of virtually all of the flawed investigations" summarized in the Court's Findings of Fact. (Findings of Fact, Doc. 1677 at ¶ 888.) So long as individuals within the MCSO can disobey the Court's orders with impunity, the rights of the Plaintiff class are not secure. "[T]he ability to effectively investigate and discipline officers . . . is essential to correcting the underlying constitutional violations found in this case, and thus to the final resolution of this long-standing litigation." *Madrid v. Woodford*, No. C90-3094 TEH, 2004 WL 2623924, at *8–9 (N.D. Cal. Nov. 17, 2004). The Court's orders in this case have required

---

[2] *See* Doc. 1677 at 2 ("To escape accountability for their own misconduct, and the misconduct of those who had implemented their decisions, Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor. The Defendants' unfair, partial, and inequitable application of discipline disproportionally damaged members of the Plaintiff class.").

46REPORT000632

implementation of new policies. A system that effectively ensures compliance with the Court's orders requires five "interrelated components," each of which "builds upon and reinforces the others": written policies, training, supervision, investigation, and officer discipline. *Madrid v. Gomez*, 889 F. Supp. 1146, 1181 (N.D. Cal. 1995). "[A] meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, [an organization's] . . . policies and procedures become a dead letter." *Id.*

Defendants continue to "manipulate[e] the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class." (Findings of Fact, Doc. 1677 at ¶ 889.) In light of Defendants' repeated violations of the Court's orders and their continued attempts "to conceal additional past mistreatment of the Plaintiff class as it comes to light in order to avoid responsibility for it," (*id.*,) the Court has the authority to mandate reforms of the MCSO's internal affairs system in order to ensure the MCSO's continued compliance with the Court's permanent injunction (Doc. 606) and to coerce the MCSO's compliance with the Court's previous orders, as well as with orders the Court may enter in the future as the need arises.

### B.     Equitable Authority to Modify Injunctions

"A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Swift*, 286 U.S. at 114. "The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). A modification is appropriate when a court, faced with new facts, must make a change "to effectuate . . . the basic purpose of the original" injunction. *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942) (holding a modification making a consent decree more onerous for the enjoined entity to be reasonable where it effectuates the purpose of the original consent decree).

- 6 -

Case 2:07-cv-02513-GMS Document 3509-1 Filed 06/12/26 Page 634 of 998

Before the Court entered its injunction, Plaintiffs requested provisions "revising the internal affairs division of the MCSO and the investigation and resolution of complaints." (*See, e.g.*, Doc. 603 at Tr. 7.)  The Court denied much of the relief sought. (Findings of Fact, Doc. 1677 at ¶ 883.)  Neither Plaintiffs nor the Court knew that "the MCSO had deprived the Plaintiffs of considerable evidence of misconduct towards members of the Plaintiff class." (*Id.* at ¶ 884.)  Had Defendants disclosed such evidence, Plaintiffs could have demonstrated "the MCSO's inadequate, bad faith, and discriminatory internal investigation policies and practices as well as additional harms." (*Id.* at ¶ 885.)  Because Defendants failed to disclose that evidence, the Court was unable "to timely evaluate that evidence in fashioning the appropriate injunctive relief for the Plaintiffs." (*Id.*)

"Had the evidence that Defendants withheld from the Court and the information to which it led been presented at trial, the Court would have entered injunctive relief much broader in scope." (*Id.* at ¶ 890.)  It is incumbent upon the Court now, equipped as it is with additional facts, to amend the injunction and grant the relief that would have been appropriate at the time of the original injunction had the MCSO disclosed such evidence in a timely manner, as was their duty.

## C.    Civil Contempt Authority

"[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Bagwell*, 512 U.S. at 827.  A contempt sanction is "civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'"[3] *Id.* at 829 (quoting *United States v. Mine Workers,* 330 U.S. 258, 303–304 (1947)).

Ensuring that the MCSO has a functional system of investigating officer misconduct and imposing discipline is a remedial measure designed to coerce the MCSO

---

[3] This remedial order only sets forth remedies addressing the MCSO's policies and procedures.  To the extent that the parties may stipulate to the principal provisions of an order designed to monetarily compensate the victims of Defendants' contemptuous acts, the Court may issue a subsequent order providing for such compensation.

- 7 -

46REPORT000634

Case 2:07-cv-02513-GMS   Document 3509-1   Filed 06/12/26   Page 635 of 998

into compliance with the Court's orders.  (Findings of Fact, Doc. 1677 at ¶¶ 888–89.) The MCSO must have in place an effective means of imposing discipline upon its own officers in order to ensure that officers do not feel at liberty to disregard MCSO's policies.  To the extent that such policies are in place to protect the rights of the Plaintiff class, an effective disciplinary system is an essential component of Plaintiffs' protection. The MCSO's flawed investigations "demonstrate the Defendants' ongoing, unfair, and inequitable treatment of members of the Plaintiff class."  (Findings of Fact, Doc. 1677 at ¶ 887.)

## II.     FEDERALISM

"[A]ppropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief."  *Rizzo v. Goode,* 423 U.S. 362, 379 (1976).  Federalism concerns "are highly contextual and must be evaluated on a case-by-case basis."  *Stone v. City & Cty. of S.F.*, 968 F.2d 850, 860 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992).

"Where federal constitutional rights have been traduced, . . . principles of restraint, including comity, separation of powers and pragmatic caution dissolve."  *Id.* (citation omitted).  "Nonetheless, federal courts should always seek to minimize interference with legitimate state activities in tailoring remedies."  *Id.* at 861.  "In employing their broad equitable powers, federal courts should 'exercise the least possible power adequate to the end proposed.'"  *Id.* (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)). However, "when the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable."  *Id.*

"Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights."  *Id.*  "[O]therwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme."  *Id.* at 862.

Defendants cite *Rizzo*, a case in which the Supreme Court held that a district court departed from the principles that govern injunctive relief, including principles of

46REPORT000635

federalism, when it "injected itself by injunctive decree into the internal disciplinary affairs of [a] state agency." (Doc. 1715 at 12 (quoting *Rizzo*, 423 U.S. at 380).) The facts of *Rizzo*, however, are diametrically opposed to the facts of the case at hand. In *Rizzo*, the district court had found an unrelated assortment of constitutional violations committed by a few individual rank and file police officers, a problem which the court indicated was "fairly typical of those afflicting police departments in major urban areas." *Id.* at 375. The district court also found that "the responsible authorities [*i.e.*, command staff] had played no affirmative part in depriving any members of the two respondent classes of any constitutional rights." *Id.* at 377. Thus, the Supreme Court held that when the district court attempted to fashion "prophylactic procedures . . . designed to minimize [isolated constitutional violations] on the part of a handful of its employees" without evidence of any unconstitutional plan or policy promulgated by the responsible authorities, the remedy ordered by the district court was "quite at odds with the settled rule that in federal equity cases the nature of the violation determines the scope of the remedy," and moreover, "important considerations of federalism" weighed against the unnecessary intrusion into state affairs. *Id.* at 378 (internal quotation omitted).

The *Rizzo* Court distinguished cases in which the district court found "the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption and enforcement of deliberate policies by the defendants," or a "persistent pattern" that "flowed from an intentional, concerted, and indeed conspiratorial effort" to deprive a class of its constitutional rights. *Id.* at 373–75 (citing *Hague v. CIO*, 307 U.S. 496 (1939) and *Allee v. Medrano*, 416 U.S. 802 (1974)).

Here, the Court found the presence of those exact distinguishing characteristics. In the underlying case, the Court determined that the Defendants were systematically violating the Fourth and Fourteenth Amendment rights of the Plaintiff class in several different respects including the adoption of unconstitutional policies. *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 826–27 (D. Ariz. 2013), *adhered to,* No. CV-07-02513-PHX-GMS, 2013 WL 5498218 (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part,* 784

46REPORT000636

F.3d 1254 (9th Cir. 2015), and *aff'd,* 784 F.3d 1254 (9th Cir. 2015) ("*Melendres* 2013 FOF"). The MCSO continued to adhere to these policies after the Court ruled in 2011 that they violated Plaintiffs' constitutional rights. *See, e.g., id.* at 825 ("The LEAR policy, however, remains in force."); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 994 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

Moreover, and more recently, the Court found in its May 2016 Findings of Fact that "Defendants intentionally failed to implement the Court's preliminary injunction . . . , failed to disclose thousands of relevant items of requested discovery they were legally obligated to disclose, and, after the post-trial disclosure of additional evidence, deliberately violated court orders and thereby prevented a full recovery of relevant evidence." (Findings of Fact, Doc. 1677 at 1-2.) "To escape accountability . . . , Defendants, or their proxies, named disciplinary officers who were biased in their favor and had conflicts, Defendants remained in control of investigations in which they themselves had conflicts, Defendants promulgated special inequitable disciplinary policies pertaining only to *Melendres*-related internal investigations, Defendants delayed investigations so as to justify the imposition of lesser or no discipline, Defendants misapplied their own disciplinary policies, and Defendants asserted intentional misstatements of fact to their own investigators and to the court-appointed Monitor." *Id.* at 2. The Court found that Defendants were "manipulating the operation of their disciplinary processes to minimize or altogether avoid imposing fair and equitable internal discipline for misconduct committed against members of the Plaintiff class. *Id.* at ¶ 889.

Under the facts of this case, the Court has fashioned remedies which account for and balance the need to respect the prerogatives of state officials with the need to prevent them from exercising their discretion in a way that violates Plaintiffs' constitutional rights and the need to provide a remedy for the past deprivation of those rights. The Court previously fashioned less intrusive remedies, but those remedies were not effective due to Defendants' deliberate failures and manipulations. (*See, e.g.*, *id.* at ¶¶ 365–69.)

- 10 -

46REPORT000637

The Court must do what is necessary to achieve the end goal of "restoring the victims of discriminatory conduct to the position they would have occupied in the absence of that conduct" and eventually restoring authority to MCSO command staff, once there is a "system that is operating in compliance with the Constitution." *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995). Here, the scope of Defendants' constitutional violation is broad; the violation permeates the internal affairs investigatory processes, which have been manipulated to provide impunity to those who violate the rights of the Plaintiff class.[4] (*See* Findings of Fact, Doc. 1677 ¶¶ 387–765.) The remedy, as is determined by the scope and nature of the violation, must reach as far as the violation flows. *Jenkins*, 515 U.S. at 98; *Milliken,* 433 U.S. at 282. "[W]here, as here, a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the condition that offends the Constitution." *Milliken,* 433 U.S. at 282 (internal quotation marks omitted).

As such, "there is no merit to [Defendants'] claims that the relief ordered here violates the Tenth Amendment and general principles of federalism." *Id.* at 291. "The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment." *Id.*

There is also no merit to Defendants' prospective argument that the *Rooker-Feldman* doctrine prevents the Court from reviewing a decision of a merit commission or

---

[4] As the Court has previously observed, the egregious and extraordinary nature of the constitutional violations in this case enhances the scope of the necessary intervention to remedy such intentional conduct. Regardless of whether the MCSO's manipulation of its internal investigations to provide impunity for those who violate Plaintiffs' rights, thereby tacitly authorizing such violations, might itself be a (new) constitutional violation, the Court has found this conduct to be indicative of a scheme to avoid accountability for violating the Court's injunction. (Doc. 1677 ¶¶ 726, 733, 868–75, 889.) The MCSO has chosen to deliberately thwart the effectiveness of the remedies the Court already set forth in this case. As such, Defendants' argument that the MCSO "has not yet had an opportunity to implement remedies in response to the Court's Findings of Fact" misses the point. This case has a long history before May 13, 2016. The remedies the Court sets forth now are responsive to that history of Defendants' evasion, manipulation, and violation of their obligations under the Court's orders, not to any recently discovered constitutional violation.

- 11 -

46REPORT000638

state court regarding the discipline of an MCSO employee whose conduct has been investigated pursuant to this Court's remedial scheme.

"*Rooker–Feldman* . . . is a narrow doctrine, confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (internal quotation omitted). "The doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 n.3 (2002). Moreover, "the rule has long stood that a state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction is subject to collateral attack in the federal courts." *In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir. 2000).

The Court has had exclusive jurisdiction over this case for nine years. To the extent that the Court has ordered remedies that will result in internal affairs investigations of individuals at the MCSO, those investigations stem from this case. The Court has the jurisdiction to see that its orders are followed and that the Plaintiffs' rights are vindicated. *Rooker-Feldman* is inapplicable.

## III.   DUE PROCESS

### A.   The Arizona Police Officer's Bill of Rights

Arizona has codified a police officer's "bill of rights." A.R.S. §§ 38-1101–1115. Pursuant to this Arizona law, "[a]n employer shall make a good faith effort to complete any investigation of employee misconduct within one hundred eighty calendar days after the employer receives notice of the allegation by a person authorized by the employer to initiate an investigation of the misconduct." *Id.* § 38-1110(A). "If the employer exceeds the one hundred eighty calendar day limit, the employer shall provide the employee with a written explanation containing the reasons the investigation continued beyond one hundred eighty calendar days." *Id.* "On an appeal of discipline by the employee, a hearing officer, administrative law judge or appeals board may dismiss the discipline if it

- 12 -

46REPORT000639

is determined that the employer did not make a good faith effort to complete the investigation within one hundred eighty calendar days." *Id.* § 38-1110(C).

Defendants argue that this state law "creates federally protected constitutional rights because that statutory scheme contains 'particularized standards or criteria' to create a property interest." (Doc. 1729 at 7 (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 369-70 (9th Cir. 1990).) Defendants quoted *Allen* for the proposition that "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 911 F.2d at 369-70.

However, Defendants failed to note that the next paragraph in the *Allen* opinion clarifies that "[w]hether an expectation of entitlement is sufficient to create a property interest will depend largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker]." *Id.* at 370 (internal quotation omitted). The Arizona statute at issue here does not contain mandatory language, as it merely provides that the administrative law judge or appeals board "may" dismiss the discipline, as an exercise of its discretion. A.R.S. § 38-1110.

Moreover, in *Allen*, the plaintiff of a § 1983 action claimed that "his layoff constituted a deprivation of a constitutionally protected property interest without due process of law." *Allen*, 911 F.2d at 369. Even if the plaintiff in that case had successfully made a case that he had a constitutionally protected property right in continued employment (he did not), his constitutional rights could be violated only if he were deprived of such an interest *without due process of law*. Thus, *Allen* does not stand for the proposition that state law can affect what due process itself entails.

Here, the Parties do not dispute that MCSO employees have a property interest in their jobs. Rather, Defendants suggest that the Arizona statute changes what constitutes the due process to which the property interest holder is entitled. That proposition was squarely rejected in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). In

- 13 -

46REPORT000640

*Loudermill*, the Supreme Court stated in no uncertain terms that the answer to the question of "what process is due . . . is not to be found in [an] Ohio statute." *Id.* Nor is it to be found in an Arizona statute. Rather, due process is a matter of settled constitutional law. Due process requires "a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* at 542. MCSO employees will not be denied that.

Thus, the requirement under Arizona law that employers must make a good faith effort to complete investigations within 180 days is not incorporated into the constitutional guarantee of due process. Moreover, where the MCSO deliberately ensured that 180 days passed in order to protect certain employees from *Melendres*-related discipline, dismissing that discipline would impede the vindication of Plaintiffs' constitutional rights. That cannot stand. *Swann,* 402 U.S. at 45 ("[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees.").

## B. Reliance on the Court's Findings of Fact

Any employee subject to an investigation will have a hearing, at which he or she can present evidence and raise a defense. On the other hand, a great deal of evidence was set forth during the 21 days of evidentiary hearings, some of which may be relevant to a given investigation, and this evidence need not be disregarded.

## IV. GC-17, MCSO'S PRINCIPAL DISCIPLINARY POLICY, APPLIES TO ALL EMPLOYEES

Sheriff Arpaio is the appointing authority over certified employees in the MCSO, and he has unique disciplinary authority over all deputies within the MCSO, according to state law. *See Hounshell v. White*, 220 Ariz. 1, 202 P.3d 466 (App. 2008). The MCSO's principal disciplinary policy, GC-17, applies to all employees and sets out disciplinary matrices that apply to virtually all employees. There is, generally speaking, a disciplinary matrix for regular employees (non-exempt regular status employees) and a slightly more demanding disciplinary matrix for management employees (exempt regular status employees). The disciplinary matrix is slightly more demanding for management

- 14 -

46REPORT000641

employees because, as MCSO policy makes clear, management employees should typically be held to a higher standard of conduct. (Ex. 2001 at MELC416243.) Nevertheless, even for those employees subject to a disciplinary matrix, Sheriff Arpaio, and his designee, Chief Deputy Sheridan, have the authority to ignore the matrix and impose whatever discipline they deem appropriate.

Chief Deputy Sheridan is the highest level management employee within the MCSO. As an employee, he is clearly subject to departmental policy and discipline, and he has previously been a principal or a person of interest in the disciplinary process. Chief Deputy Sheridan is, however, an unclassified employee. Thus, although he is subject to GC-17, there is no specific disciplinary matrix that applies to him. Defendants argue that because there is no specific disciplinary matrix that applies to him, the Court should take greater care, due to federalism concerns, in subjecting his misconduct to evaluation (or re-evaluation) and to potential discipline than it takes with respect to other MCSO employees.

Nevertheless, as the Findings of Fact make clear, Sheriff Arpaio and Chief Deputy Sheridan are the authors of the manipulation and misconduct that has prevented the fair, uniform, and appropriate application of discipline on MCSO employees as that misconduct pertains to the members of the Plaintiff class. Sheriff Arpaio, as an elected official of Maricopa County, however, is not subject to any MCSO disciplinary policy. He is also, of course, an official who is elected by the people of Arizona. Neither of these factors is true with respect to Chief Deputy Sheridan. To the extent that Sheriff Arpaio and Chief Deputy Sheridan have manipulated the Internal Affairs process at the MCSO to ensure that many employees—including Chief Deputy Sheridan—were disciplined in a relatively lenient manner or not at all for violating the rights of the Plaintiff class, a remedy is necessary and within the scope of the Court's authority, as the condition flows from the constitutional violation at issue in this case. *See Milliken,* 433 U.S. at 282.

/ / /

- 15 -

Pursuant to state law, Chief Deputy Sheridan can be disciplined. His discipline is at the discretion of Sheriff Arpaio. In light of Sheriff Arpaio's manipulations in this case, the discretion granted to the sheriff by state law does not prevent the Court from ordering that appropriate discipline be imposed, as failure to do so would be an undue impediment of the remedies to which the Plaintiff class is entitled as a result of the deprivation of their constitutional rights.

Due to Sheriff Arpaio and Chief Deputy Sheridan's manipulation of the disciplinary process, the Court has fashioned a remedy in which an independent internal affairs investigator, and an independent disciplinary authority, both nominated by the parties, shall make and review disciplinary decisions for all employees pertaining to the misconduct discussed in the findings of fact. Those independent authorities are experienced in police discipline and shall have the authority, independent from the Court, to decide discipline. The Independent Authorities shall apply the disciplinary matrices, but have the authority to disregard the disciplinary matrices in cases in which they provide appropriate justification for doing so. They shall have the authority to determine the appropriate discipline for Chief Deputy Sheridan. In doing so they shall approximate MCSO policy as closely as possible. Because Chief Deputy Sheridan is the highest level management employee within the MCSO, they shall thus apply categories of misconduct and presumptive levels of discipline to him that are no less exacting than those set forth in the disciplinary matrix for exempt regular status employees of the MCSO, in order that Sheridan be "held to a higher standard." (*Id.*; Ex. 2001 at MELC416243.)

In light of the above, the following procedures and authorities are hereby ordered. These procedures are numbered consecutively to those set forth in the Court's previous Supplemental Permanent Injunctive orders, (Doc. 606, 670), which are incorporated herewith.

**IT IS HEREBY ORDERED** entering this Second Supplemental Permanent Injunction/Judgement Order as follows:

/ / /

- 16 -

46REPORT000643

## XIV. ADDITIONAL DEFINITIONS

160. This Second Supplemental Permanent Injunction incorporates all definitions in the Court's first Supplemental Permanent Injunction (Doc. 606 ¶ 1).

161. The following terms and definitions shall also apply to this Order:

162. "Misconduct" means a violation of MCSO policies or procedures; violation of federal, state, or local criminal or applicable civil laws; constitutional violations, whether criminal or civil; violation of administrative rules; and violation of regulations.

    a. "Minor misconduct" means misconduct that, if sustained, would result in discipline and/or corrective action less severe than a suspension;

    b. "Serious misconduct" means misconduct that, if sustained, would result in discipline of suspension, demotion, or termination;

    c. "Misconduct indicating apparent criminal conduct by an employee" means misconduct that a reasonable and trained Supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

    d. "Internal affairs investigator" means any employee who conducts an administrative investigation of misconduct, including investigators assigned to the Professional Standards Bureau or Supervisors in the employee's Division or Bureau who are assigned to investigate misconduct.

    e. "Preponderance of the Evidence" means that the facts alleged are more likely true than not true.

    f. "Clear and Convincing Evidence" means that the party must present evidence that leaves one with a firm belief or conviction that it is highly probable that the factual contentions of the claim or defense are true. This standard of proof is higher than proof by a preponderance of the evidence, but it does not require proof beyond a reasonable doubt.

    g. "Principal" means an employee against whom a complaint of misconduct or

- 17 -

46REPORT000644

wrongdoing has been made and who is a subject of a misconduct investigation.

h. "Tester" means a person who poses as a civilian making a fictitious complaint for assessment purposes.

i. "Class Remedial Matters" means possible misconduct involving members of the Plaintiff class and the MCSO or the remedies to which such class members are entitled as set forth in the Findings of Fact and various supplemental orders of this Court.

**XV.    MISCONDUCT INVESTIGATIONS, DISCIPLINE, AND GRIEVANCES**

163.    The Sheriff will ensure that all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair, consistent, unbiased and provides due process.  To achieve these outcomes, the Sheriff shall implement the requirements set out below.

164.    All policies, procedures, protocols, training materials, and other material required by this Order are subject to the same process of review and comment by the parties and approval by the Monitor described in Section IV and ¶ 46 of the first Supplemental Permanent Injunction (Doc. 606).

**A.  Policies Regarding Misconduct Investigations, Discipline, and Grievances**

165.    Within one month of the entry of this Order, the Sheriff shall conduct a comprehensive review of all policies, procedures, manuals, and other written directives related to misconduct investigations, employee discipline, and grievances, and shall provide to the Monitor and Plaintiffs new policies and procedures or revise existing policies and procedures.  The new or revised policies and procedures that shall be provided shall incorporate all of the requirements of this Order.  If there are any provisions as to which the parties do not agree, they will expeditiously confer and attempt to resolve their disagreements.  To the extent

46REPORT000645

that the parties cannot agree on any proposed revisions, those matters shall be submitted to the Court for resolution within three months of the date of the entry of this Order. Any party who delays the approval by insisting on provisions that are contrary to this Order is subject to sanction.

166. Such policies shall apply to all misconduct investigations of MCSO personnel.

167. The policies shall include the following provisions:

a. Conflicts of interest in internal affairs investigations or in those assigned by the MCSO to hold hearings and make disciplinary decisions shall be prohibited. This provision requires the following:

    i. No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.

    ii. No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation may investigate the misconduct. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any grievance or appeal arising from any discipline.

    iii. No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

b. If an internal affairs investigator or a commander who is responsible for making disciplinary findings or determining discipline has knowledge of a conflict of interest affecting his or her involvement, he or she should immediately inform the Commander of the Professional Standards Bureau or,

- 19 -

46REPORT000646

if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level officer at MCSO or, if there is no non-conflicted chief-level officer at MCSO, an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

c. Investigations into an employee's alleged untruthfulness can be initiated by the Commander of the Professional Standards Bureau or the Chief Deputy. All decisions not to investigate alleged untruthfulness must be documented in writing.

d. Any MCSO employee who observes or becomes aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a Supervisor or directly to the Professional Standards Bureau. During any period in which a Monitor is appointed to oversee any operations of the MCSO, any employee may, without retaliation, report acts of alleged misconduct directly to the Monitor.

e. Where an act of misconduct is reported to a Supervisor, the Supervisor shall immediately document and report the information to the Professional Standards Bureau.

f. Failure to report an act of misconduct shall be considered misconduct and may result in disciplinary or corrective action, up to and including termination. The presumptive discipline for a failure to report such allegations may be commensurate with the presumptive discipline for the underlying misconduct.

g. No MCSO employee with a rank lower than Sergeant will conduct an investigation at the District level.

168. All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, civilian, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, or cooperates

- 20 -

46REPORT000647

with an investigation of misconduct constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to the Monitor, during any period in which a Monitor is appointed to oversee any operations of the MCSO.

169. Retaliating against any person who reports or investigates alleged misconduct shall be considered a serious offense and shall result in discipline, up to and including termination.

170. The Sheriff shall investigate all complaints and allegations of misconduct, including third-party and anonymous complaints and allegations. Employees as well as civilians shall be permitted to make misconduct allegations anonymously.

171. The MCSO will not terminate an administrative investigation solely on the basis that the complainant seeks to withdraw the complaint, or is unavailable, unwilling, or unable to cooperate with an investigation, or because the principal resigns or retires to avoid discipline. The MCSO will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available.

172. Employees are required to provide all relevant evidence and information in their custody and control to internal affairs investigators. Intentionally withholding evidence or information from an internal affairs investigator shall result in discipline.

173. Any employee who is named as a principal in an ongoing investigation of serious misconduct shall be presumptively ineligible for hire or promotion during the pendency of the investigation. The Sheriff and/or the MCSO shall provide a written justification for hiring or promoting an employee or applicant who is a principal in an ongoing investigation of serious misconduct. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.

174. Employees' and applicants' disciplinary history shall be considered in all hiring,

- 21 -

46REPORT000648

promotion, and transfer decisions, and this consideration shall be documented. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be presumptively ineligible for hire or promotion. MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor.

175. As soon as practicable, commanders shall review the disciplinary history of all employees who are transferred to their command.

176. The quality of investigators' internal affairs investigations and Supervisors' reviews of investigations shall be taken into account in their performance evaluations.

177. There shall be no procedure referred to as a "name-clearing hearing." All pre-disciplinary hearings shall be referred to as "pre-determination hearings," regardless of the employment status of the principal.

**B.     Misconduct-Related Training**

178. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will have provided all Supervisors and all personnel assigned to the Professional Standards Bureau with 40 hours of comprehensive training on conducting employee misconduct investigations. This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor. This training will include instruction in:

   a. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;

   b. the particular challenges of administrative law enforcement misconduct

46REPORT000649

investigations, including identifying alleged misconduct that is not clearly stated in the complaint, or that becomes apparent during the investigation;

c.  properly weighing the credibility of civilian witnesses against employees;

d.  using objective evidence to resolve inconsistent statements;

e.  the proper application of the appropriate standard of proof;

f.  report-writing skills;

g.  requirements related to the confidentiality of witnesses and/or complainants;

h.  considerations in handling anonymous complaints;

i.  relevant MCSO rules and policies, including protocols related to administrative investigations of alleged officer misconduct; and

j.  relevant state and federal law, including *Garrity v. New Jersey*, and the requirements of this Court's orders.

179.  All Supervisors and all personnel assigned to the Professional Standards Bureau also will receive eight hours of in-service training annually related to conducting misconduct investigations.  This training shall be delivered by a person with subject matter expertise in misconduct investigation who shall be approved by the Monitor.

180.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees on MCSO's new or revised policies related to misconduct investigations, discipline, and grievances. This training shall include instruction on identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation.

181.  Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all employees, including

46REPORT000650

dispatchers, to properly handle civilian complaint intake, including how to provide complaint materials and information, and the consequences for failing to take complaints.

182. Within three months of the finalization of these policies consistent with ¶ 165 of this Order, the Sheriff will provide training that is adequate in quality, quantity, scope, and type, as determined by the Monitor, to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct and on their obligations when they are phoned or emailed directly by a civilian filing a complaint against one of their subordinates.

### C.    Administrative Investigation Review

183. The Sheriff and the MCSO will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct. The Sheriff shall put in place and follow the policies set forth below with respect to administrative investigations.

184. All findings will be based on the appropriate standard of proof. These standards will be clearly delineated in policies, training, and procedures, and accompanied by detailed examples to ensure proper application by internal affairs investigators.

185. Upon receipt of any allegation of misconduct, whether internally discovered or based upon a civilian complaint, employees shall immediately notify the Professional Standards Bureau.

186. Effective immediately, the Professional Standards Bureau shall maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will promptly assign a unique identifier to the incident. If the allegation was made through a civilian complaint, the unique identifier will be provided to the complainant at the time the complaint is made. The Professional Standards Bureau's centralized numbering and tracking system will maintain accurate and

46REPORT000651

reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status, if requested, and final disposition of the complaint. The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Order, including requirements of timeliness of investigations. The system also will be used to monitor and maintain appropriate caseloads for internal affairs investigators.

187. The Professional Standards Bureau shall maintain a complete file of all documents within the MCSO's custody and control relating to any investigations and related disciplinary proceedings, including pre-determination hearings, grievance proceedings, and appeals to the Maricopa County Law Enforcement Merit System Council or a state court.

188. Upon being notified of any allegation of misconduct, the Professional Standards Bureau will make an initial determination of the category of the alleged offense, to be used for the purposes of assigning the administrative investigation to an investigator. After initially categorizing the allegation, the Professional Standards Bureau will promptly assign an internal affairs investigator.

189. The Professional Standards Bureau shall administratively investigate:

a. misconduct allegations of a serious nature, including any allegation that may result in suspension, demotion, or termination; and

b. misconduct indicating apparent criminal conduct by an employee.

190. Allegations of employee misconduct that are of a minor nature may be administratively investigated by a trained and qualified Supervisor in the employee's District.

191. If at any point during a misconduct investigation an investigating Supervisor outside of the Professional Standards Bureau believes that the principal may have committed misconduct of a serious or criminal nature, he or she shall immediately

46REPORT000652

notify the Professional Standards Bureau, which shall take over the investigation.

192. The Professional Standards Bureau shall review, at least semi-annually, all investigations assigned outside the Bureau to determine, among the other matters set forth in ¶ 251 below, whether the investigation is properly categorized, whether the investigation is being properly conducted, and whether appropriate findings have been reached.

193. When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of the offense. Exoneration on the most serious offense does not preclude discipline as to less serious offenses stemming from the same misconduct.

194. The Commander of the Professional Standards Bureau shall ensure that investigations comply with MCSO policy and all requirements of this Order, including those related to training, investigators' disciplinary backgrounds, and conflicts of interest.

195. Within six months of the entry of this Order, the Professional Standards Bureau shall include sufficient trained personnel to fulfill the requirements of this Order.

196. Where appropriate to ensure the fact and appearance of impartiality, the Commander of the Professional Standards Bureau or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation. Any outside investigator retained by the MCSO must possess the requisite background and level of experience of Internal Affairs investigators and must be free of any actual or perceived conflicts of interest.

197. The Professional Standards Bureau will be headed by a qualified Commander. The Commander of the Professional Standards Bureau will have ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed. If the Sheriff declines to designate a

- 26 -

46REPORT000653

qualified Commander of the Professional Standards Bureau, the Court will designate a qualified candidate, which may be a Civilian Director in lieu of a sworn officer.

198. To promote independence and the confidentiality of investigations, the Professional Standards Bureau shall be physically located in a facility that is separate from other MCSO facilities, such as a professional office building or commercial retail space. This facility shall be easily accessible to the public, present a non-intimidating atmosphere, and have sufficient space and personnel for receiving members of the public and for permitting them to file complaints.

199. The MCSO will ensure that the qualifications for service as an internal affairs investigator shall be clearly defined and that anyone tasked with investigating employee misconduct possesses excellent investigative skills, a reputation for integrity, the ability to write clear reports, and the ability to be fair and objective in determining whether an employee committed misconduct. Employees with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, will be presumptively ineligible to conduct misconduct investigations. Employees with a history of conducting deficient investigations will also be presumptively ineligible for these duties.

200. In each misconduct investigation, investigators shall:

    a. conduct investigations in a rigorous and impartial manner designed to determine the facts;

    b. approach investigations without prejudging the facts and without permitting any preconceived impression of the principal or any witness to cloud the investigation;

    c. identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including any audio or video recordings;

    d. make reasonable attempts to locate and interview all witnesses, including

- 27 -

46REPORT000654

civilian witnesses;

    e.   make reasonable attempts to interview any civilian complainant in person;

    f.   audio and video record all interviews;

    g.  when conducting interviews, avoid asking leading questions and questions that may suggest justifications for the alleged misconduct;

    h.  make credibility determinations, as appropriate; and

    i.   attempt to resolve material inconsistencies between employee, complainant, and witness statements.

201.   There will be no automatic preference for an employee's statement over a non-employee's statement. Internal affairs investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the employee or because the witness or complainant has a criminal history, but may consider the witness's criminal history or any adjudicated findings of untruthfulness in evaluating that witness's statement. In conducting the investigation, internal affairs investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

202.   Internal affairs investigators will investigate any evidence of potential misconduct uncovered during the course of the investigation, regardless of whether the potential misconduct was part of the original allegation.

203.   If the person involved in the encounter with the MCSO pleads guilty or is found guilty of an offense, internal affairs investigators will not consider that information alone to be determinative of whether an MCSO employee engaged in misconduct, nor will it by itself justify discontinuing the investigation. MCSO training materials and policies on internal investigations will acknowledge explicitly that the fact of a criminal conviction related to the administrative investigation is not determinative of whether an MCSO employee engaged in misconduct and that the

- 28 -

46REPORT000655

mission of an internal affairs investigator is to determine whether any misconduct occurred.

204. Internal affairs investigators will complete their administrative investigations within 85 calendar days of the initiation of the investigation (60 calendar days if within a Division).  Any request for an extension of time must be approved in writing by the Commander of the Professional Standards Bureau.  Reasonable requests for extensions of time may be granted.

205. The Professional Standards Bureau shall maintain a database to track all ongoing misconduct cases, and shall generate alerts to the responsible investigator and his or her Supervisor and the Commander of the Professional Standards Bureau when deadlines are not met.

206. At the conclusion of each investigation, internal affairs investigators will prepare an investigation report.  The report will include:

a.  a narrative description of the incident;

b.  documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident.  In situations in which there are no known witnesses, the report will specifically state this fact.  In situations in which witnesses were present but circumstances prevented the internal affairs investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why.  The report will also include all available identifying information for anyone who refuses to provide a statement;

c.  documentation of whether employees were interviewed, and a transcript or recording of those interviews;

d.  the names of all other MCSO employees who witnessed the incident;

e.  the internal affairs investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the employee's actions appear to be within MCSO policy, procedure, regulations,

46REPORT000656

orders, or other standards of conduct required of MCSO employees;

f. in cases where the MCSO asserts that material inconsistencies were resolved, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

g. in cases where material inconsistencies must be resolved between complainant, employee, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

h. an assessment of the incident for policy, training, tactical, or equipment concerns, including any recommendations for how those concerns will be addressed;

i. if a weapon was used, documentation that the employee's certification and training for the weapon were current; and

j. documentation of recommendations for initiation of the disciplinary process; and

k. in the instance of an externally generated complaint, documentation of all contacts and updates with the complainant.

207. In assessing the incident for policy, training, tactical, or equipment concerns, investigation reports will include an assessment of whether:

a. the law enforcement action was in compliance with training and legal standards;

b. the use of different tactics should or could have been employed;

c. the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and

d. the incident suggests that the MCSO should revise its policies, strategies, tactics, or training.

208. For each allegation of misconduct, internal affairs investigators shall explicitly identify and recommend one of the following dispositions for each allegation of

- 30 -

46REPORT000657

misconduct in an administrative investigation:

a. "Unfounded," where the investigation determines, by clear and convincing evidence, that the allegation was false or not supported by fact;

b. "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur and justifies a reasonable conclusion of a policy violation;

c. "Not Sustained," where the investigation determines that there is insufficient evidence to prove or disprove the allegation; or

d. "Exonerated," where the investigation determines that the alleged conduct did occur but did not violate MCSO policies, procedures, or training.

209. For investigations carried out by Supervisors outside of the Professional Standards Bureau, the investigator shall forward the completed investigation report through his or her chain of command to his or her Division Commander. The Division Commander must approve the investigation and indicate his or her concurrence with the findings.

210. For investigations carried out by the Professional Standards Bureau, the investigator shall forward the completed investigation report to the Commander.

211. If the Commander—meaning the Commander of the PSB or the Commander of the Division in which the internal affairs investigation was conducted—determines that the findings of the investigation report are not supported by the appropriate standard of proof, the Commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's Supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The Commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under his or her command.

- 31 -

46REPORT000658

212. Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of his or her investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the Professional Standards Bureau.

213. Investigations of minor misconduct conducted outside of the Professional Standards Bureau must be conducted by a Supervisor and not by line-level deputies. After such investigations, the investigating Supervisor's Commander shall forward the investigation file to the Professional Standards Bureau after he or she finds that the misconduct investigation is complete and the findings are supported by the evidence. The Professional Standards Bureau shall review the misconduct investigation to ensure that it is complete and that the findings are supported by the evidence. The Professional Standards Bureau shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings. Where the findings of the investigation report are not supported by the appropriate standard of proof, the Professional Standards Bureau shall document the reasons for this determination and shall include this documentation as an addendum to the original investigation.

214. At the discretion of the Commander of the Professional Standards Bureau, a misconduct investigation may be assigned or re-assigned to another Supervisor with the approval of his or her Commander, whether within or outside of the District or Bureau in which the incident occurred, or may be returned to the original Supervisor for further investigation or analysis. This assignment or re-assignment shall be explained in writing.

215. If, after an investigation conducted outside of the Professional Standards Bureau, an employee's actions are found to violate policy, the investigating Supervisor's

- 32 -

46REPORT000659

Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

216. If, after an investigation conducted by the Professional Standards Bureau, an employee's actions are found to violate policy, the Commander of the Professional Standards Bureau shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the Commander of the Professional Standards Bureau shall also ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved.

217. The Professional Standards Bureau shall conduct targeted and random reviews of discipline imposed by Commanders for minor misconduct to ensure compliance with MCSO policy and legal standards.

218. The Professional Standards Bureau shall maintain all administrative investigation reports and files after they are completed for record-keeping in accordance with applicable law.

**D. Discipline**

219. The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.

220. To ensure consistency in the imposition of discipline, the Sheriff shall review the MCSO's current disciplinary matrices and, upon approval of the parties and the Monitor, will amend them as necessary to ensure that they:

   a. establish a presumptive range of discipline for each type of violation;

   b. increase the presumptive discipline based on an employee's prior violations;

- 33 -

46REPORT000660

c. set out defined mitigating and aggravating factors;

d. prohibit consideration of the employee's race, gender, gender identity, sexual orientation, national origin, age, or ethnicity;

e. prohibit conflicts, nepotism, or bias of any kind in the administration of discipline;

f. prohibit consideration of the high (or low) profile nature of the incident, including media coverage or other public attention;

g. clearly define forms of discipline and define classes of discipline as used in policies and operations manuals;

h. provide that corrective action such as coaching or training is not considered to be discipline and should not be used as a substitute for discipline where the matrix calls for discipline;

i. provide that the MCSO will not take only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;

j. provide that the MCSO will consider whether non-disciplinary corrective action is also appropriate in a case where discipline has been imposed;

k. require that any departures from the discipline recommended under the disciplinary matrices be justified in writing and included in the employee's file; and

l. provide a disciplinary matrix for unclassified management level employees that is at least as demanding as the disciplinary matrix for management level employees.

221. The Sheriff shall mandate that each act or omission that results in a sustained misconduct allegation shall be treated as a separate offense for the purposes of imposing discipline.

222. The Sheriff shall also provide that the Commander of the Professional Standards Bureau shall make preliminary determinations of the discipline to be imposed in all cases and shall document those determinations in writing, including the

46REPORT000661

presumptive range of discipline for the sustained misconduct allegation, and the employee's disciplinary history.

### E.    Pre-Determination Hearings

223.   If the Commander of the Professional Standards Bureau makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, a designated member of MCSO's command staff will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.

224.   Pre-determination hearings will be audio and video recorded in their entirety, and the recording shall be maintained with the administrative investigation file.

225.   If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the internal affairs investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing.  The Professional Standards Bureau shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the initial misconduct investigation.

226.   If the designated member of MCSO's command staff conducting the pre-determination hearing does not uphold the charges recommended by the Professional Standards Bureau in any respect, or does not impose the Commander of the Professional Standards Bureau's recommended discipline and/or non-disciplinary corrective action, the Sheriff shall require the designated member of MCSO's command staff to set forth in writing his or her justification for doing so. This justification will be appended to the investigation file.

227.   The Sheriff shall promulgate MCSO policy which shall provide that the designated member of MCSO's command staff conducting a pre-determination

- 35 -

46REPORT000662

hearing should apply the disciplinary matrix and set forth clear guidelines for the grounds on which a deviation is permitted. The Sheriff shall mandate that the designated member of MCSO's command staff may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:

a. his or her personal opinion about the employee's reputation;

b. the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;

c. whether others were jointly responsible for the misconduct, except that the MCSO disciplinary decision maker may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

228. The Sheriff or his designee has the authority to rescind, revoke or alter any disciplinary decision made by either the Commander of the Professional Standards Bureau or the appointed MCSO disciplinary authority so long as:

a. that decision does not relate to the Sheriff or his designee;

b. the Sheriff or his designee provides a thorough written and reasonable explanation for the grounds of the decision as to each employee involved;

c. the written explanation is placed in the employment files of all employees who were affected by the decision of the Sheriff or his designee; and

d. the written explanation is available to the public upon request.

**F.    Criminal Misconduct Investigations**

229. Whenever an internal affairs investigator or Commander finds evidence of misconduct indicating apparent criminal conduct by an employee, the Sheriff shall require that the internal affairs investigator or Commander immediately notify the Commander of the Professional Standards Bureau. If the administrative misconduct investigation is being conducted by a Supervisor outside of the Professional Standards Bureau, the Sheriff shall require that the Professional Standards Bureau immediately take over the administrative investigation. If the

- 36 -

46REPORT000663

evidence of misconduct pertains to someone who is superior in rank to the Commander of the Professional Standards Bureau and is within the Commander's chain of command, the Sheriff shall require the Commander to provide the evidence directly to what he or she believes is the appropriate prosecuting authority—the Maricopa County Attorney, the Arizona Attorney General, or the United States Attorney for the District of Arizona—without notifying those in his or her chain of command who may be the subject of a criminal investigation.

230. If a misconduct allegation will be investigated criminally, the Sheriff shall require that the Professional Standards Bureau not compel an interview of the principal pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967), until it has first consulted with the criminal investigator and the relevant prosecuting authority. No other part of the administrative investigation shall be held in abeyance unless specifically authorized by the Commander of the Professional Standards Bureau in consultation with the entity conducting the criminal investigation. The Sheriff shall require the Professional Standards Bureau to document in writing all decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority.

231. The Sheriff shall require the Professional Standards Bureau to ensure that investigators conducting a criminal investigation do not have access to any statements by the principal that were compelled pursuant to *Garrity*.

232. The Sheriff shall require the Professional Standards Bureau to complete all such administrative investigations regardless of the outcome of any criminal investigation, including cases in which the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges. The Sheriff shall require that all relevant provisions of MCSO policies and procedures and the operations manual for the Professional Standards Bureau shall remind members of the Bureau that administrative and criminal cases are held to

- 37 -

46REPORT000664

different standards of proof, that the elements of a policy violation differ from those of a criminal offense, and that the purposes of the administrative investigation process differ from those of the criminal investigation process.

233. If the investigator conducting the criminal investigation decides to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the Professional Standards Bureau. The Commander of the Professional Standards Bureau shall separately consider whether to refer the matter to a prosecuting agency and shall document the decision in writing.

234. If the investigator conducting the criminal investigation decides to refer the matter to a prosecuting agency, the Professional Standards Bureau shall review the information provided to the prosecuting agency to ensure that it is of sufficient quality and completeness. The Commander of the Professional Standards Bureau shall direct that the investigator conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation. Such directions shall be documented in writing and included in the investigatory file.

235. If the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the Professional Standards Bureau shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

236. The Sheriff shall require the Professional Standards Bureau to maintain all criminal investigation reports and files after they are completed for record-keeping in accordance with applicable law.

**G.     Civilian Complaint Intake, Communication, and Tracking**

237. Within six months of the entry of this Order, the Monitor, in consultation with the Community Advisory Board, will develop and implement a program to promote awareness throughout the Maricopa County community about the process for

- 38 -

46REPORT000665

filing complaints about the conduct of MCSO employees.

238. The Sheriff shall require the MCSO to accept all civilian complaints, whether submitted verbally or in writing; in person, by phone, by mail, or online; by a complainant, someone acting on the complainant's behalf, or anonymously; and with or without a signature from the complainant. MCSO will document all complaints in writing.

239. In locations clearly visible to members of the public at the reception desk at MCSO headquarters and at all District stations, the Sheriff and the MCSO will post and maintain permanent placards clearly and simply describing the civilian complaint process that is visible to the public at all hours. The placards shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish.

240. The Sheriff shall require all deputies to carry complaint forms in their MCSO vehicles. Upon request, deputies will provide individuals with complaint forms and information about how to file a complaint, their name and badge number, and the contact information, including telephone number and email address, of their immediate supervising officer. The Sheriff must provide all supervising officers with telephones. Supervising officers must timely respond to such complaints registered by civilians.

241. The Sheriff will ensure that the Professional Standards Bureau facility is easily accessible to members of the public. There shall be a space available for receiving walk-in visitors and personnel who can assist the public with filing complaints and/or answer an individual's questions about the complaint investigation process.

242. The Sheriff will also make complaint forms widely available at locations around the County including: the websites of MCSO and Maricopa County government; the lobby of MCSO's headquarters; each patrol District; and the Maricopa County government offices. The Sheriff will ask locations, such as public library branches

- 39 -

46REPORT000666

and the offices and gathering places of community groups, to make these materials available.

243. The Sheriff shall establish a free, 24-hour hotline for members of the public to make complaints.

244. The Sheriff shall ensure that the MCSO's complaint form does not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.

245. Within two months of the entry of this Order, complaint forms will be made available, at a minimum, in English and Spanish. The MCSO will make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or write in English, or is deaf or hard of hearing, will not be grounds to decline to accept or investigate a complaint.

246. In the course of investigating a civilian complaint, the Professional Standards Bureau will send periodic written updates to the complainant including:

   a. within seven days of receipt of a complaint, the Professional Standards Bureau will send non-anonymous complainants a written notice of receipt, including the tracking number assigned to the complaint and the name of the investigator assigned. The notice will inform the complainant how he or she may contact the Professional Standards Bureau to inquire about the status of a complaint;

   b. when the Professional Standards Bureau concludes its investigation, the Bureau will notify the complainant that the investigation has been concluded and inform the complainant of the Bureau's findings as soon as is permitted by law; and

   c. in cases where discipline is imposed, the Professional Standards Bureau will notify the complainant of the discipline as soon as is permitted by law.

46REPORT000667

247. Notwithstanding the above written communications, a complainant and/or his or her representative may contact the Professional Standards Bureau at any time to determine the status of his or her complaint. The Sheriff shall require the MCSO to update the complainant with the status of the investigation.

248. The Professional Standards Bureau will track, as a separate category of complaints, allegations of biased policing, including allegations that a deputy conducted an investigatory stop or arrest based on an individual's demographic category or used a slur based on an individual's actual or perceived race, ethnicity, nationality, or immigration status, sex, sexual orientation, or gender identity. The Professional Standards Bureau will require that complaints of biased policing are captured and tracked appropriately, even if the complainant does not so label the allegation.

249. The Professional Standards Bureau will track, as a separate category of complaints, allegations of unlawful investigatory stops, searches, seizures, or arrests.

250. The Professional Standards Bureau will conduct regular assessments of the types of complaints being received to identify and assess potential problematic patterns and trends.

### H. Transparency Measures

251. The Sheriff shall require the Professional Standards Bureau to produce a semi-annual public report on misconduct investigations, including, at a minimum, the following:

a. summary information, which does not name the specific employees involved, about any sustained allegations that an employee violated conflict-of-interest rules in conducting or reviewing misconduct investigations;

b. aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.);

- 41 -

46REPORT000668

complainants' demographic information; complaints received from anonymous complainants or third parties; and principals' demographic information;

c. analysis of whether any increase or decrease in the number of civilian complaints received from reporting period to reporting period is attributable to issues in the complaint intake process or other factors;

d. aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;

e. aggregate data on the processing of misconduct cases, including the number of cases assigned to Supervisors outside of the Professional Standards Bureau versus investigators in the Professional Standards Bureau; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding discipline, or other final disposition if no discipline is imposed; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;

f. aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of misconduct allegations supported by the appropriate standard of proof; the number of sustained allegations resulting in a non-disciplinary outcome, coaching, written reprimand, suspension, demotion, and termination; the number of cases in which findings were changed after a pre-determination hearing, broken down by initial finding and final finding; the number of cases in which discipline was changed after a pre-determination hearing, broken down by initial discipline and final discipline; the number of cases in which findings were overruled, sustained, or changed by the Maricopa

- 42 -

46REPORT000669

County Law Enforcement Merit System Council, broken down by the finding reached by the MCSO and the finding reached by the Council; and the number of cases in which discipline was altered by the Council, broken down by the discipline imposed by the MCSO and the disciplinary ruling of the Council; and similar information on appeals beyond the Council; and

g. aggregate data on employees with persistent or serious misconduct problems, including the number of employees who have been the subject of more than two misconduct investigations in the previous 12 months, broken down by serious and minor misconduct; the number of employees who have had more than one sustained allegation of minor misconduct in the previous 12 months, broken down by the number of sustained allegations; the number of employees who have had more than one sustained allegation of serious misconduct in the previous 12 months, broken down by the number of sustained allegations; and the number of criminal prosecutions of employees, broken down by criminal charge.

252. The Sheriff shall require the MCSO to make detailed summaries of completed internal affairs investigations readily available to the public to the full extent permitted under state law, in electronic form on a designated section of its website that is linked to directly from the MCSO's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct alleged against MCSO employees.

253. The MCSO Bureau of Internal Oversight shall produce a semi-annual public audit report regarding misconduct investigations. This report shall analyze a stratified random sample of misconduct investigations that were completed during the previous six months to identify any procedural irregularities, including any instances in which:

a. complaint notification procedures were not followed;

b. a misconduct complaint was not assigned a unique identifier;

- 43 -

46REPORT000670

c. investigation assignment protocols were not followed, such as serious or criminal misconduct being investigated outside of the Professional Standards Bureau;

d. deadlines were not met;

e. an investigation was conducted by an employee who had not received required misconduct investigation training;

f. an investigation was conducted by an employee with a history of multiple sustained misconduct allegations, or one sustained allegation of a Category 6 or Category 7 offense from the MCSO's disciplinary matrices;

g. an investigation was conducted by an employee who was named as a principal or witness in any investigation of the underlying incident;

h. an investigation was conducted of a superior officer within the internal affairs investigator's chain of command;

i. any interviews were not recorded;

j. the investigation report was not reviewed by the appropriate personnel;

k. employees were promoted or received a salary increase while named as a principal in an ongoing misconduct investigation absent the required written justification;

l. a final finding was not reached on a misconduct allegation;

m. an employee's disciplinary history was not documented in a disciplinary recommendation; or

n. no written explanation was provided for the imposition of discipline inconsistent with the disciplinary matrix.

**I.** **Testing Program for Civilian Complaint Intake**

254. The Sheriff shall initiate a testing program designed to assess civilian complaint intake. Specifically, the testing program shall assess whether employees are providing civilians appropriate and accurate information about the complaint process and whether employees are notifying the Professional Standards Bureau

- 44 -

46REPORT000671

upon the receipt of a civilian complaint.

255. The testing program is not intended to assess investigations of civilian complaints, and the MCSO shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers.

256. The testing program shall assess complaint intake for complaints made in person at MCSO facilities, complaints made telephonically, by mail, and complaints made electronically by email or through MCSO's website. Testers shall not interfere with deputies taking law enforcement action. Testers shall not attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of MCSO facilities.

257. The testing program shall include sufficient random and targeted testing to assess the complaint intake process, utilizing surreptitious video and/or audio recording, as permitted by state law, of testers' interactions with MCSO personnel to assess the appropriateness of responses and information provided.

258. The testing program shall also assess whether employees promptly notify the Professional Standards Bureau of civilian complaints and provide accurate and complete information to the Bureau.

259. MCSO shall not permit current or former employees to serve as testers.

260. The MCSO shall produce an annual report on the testing program. This report shall include, at a minimum:

    a. a description of the testing program, including the testing methodology and the number of tests conducted broken down by type (*i.e.*, in-person, telephonic, mail, and electronic);

    b. the number and proportion of tests in which employees responded inappropriately to a tester;

    c. the number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;

    d. the number and proportion of tests in which employees failed to promptly

- 45 -

46REPORT000672

notify the Professional Standards Bureau of the civilian complaint;

e. the number and proportion of tests in which employees failed to convey accurate information about the complaint to the Professional Standards Bureau;

f. an evaluation of the civilian complaint intake based upon the results of the testing program; and

g. a description of any steps to be taken to improve civilian complaint intake as a result of the testing program.

## XVI. COMMUNITY OUTREACH AND COMMUNITY ADVISORY BOARD

261. The Community Advisory Board may conduct or retain a consultant to conduct a study to identify barriers to the filing of civilian complaints against MCSO personnel.

262. In addition to the administrative support provided for in the Supplemental Permanent Injunction, (Doc. 670 ¶ 117), the Community Advisory Board shall be provided with annual funding to support its activities, including but not limited to funds for appropriate research, outreach advertising and website maintenance, stipends for intern support, professional interpretation and translation, and out-of-pocket costs of the Community Advisory Board members for transportation related to their official responsibilities.  The Community Advisory Board shall submit a proposed annual budget to the Monitor, not to exceed $15,000, and upon approval of the annual budget, the County shall deposit that amount into an account established by the Community Advisory Board for that purpose.  The Community Advisory Board shall be required to keep detailed records of expenditures which are subject to review.

## XVII. SUPERVISION AND STAFFING

263. The following Section of this Order represents additions and amendments to Section X of the first Supplemental Permanent Injunction, Supervision and Evaluations of Officer Performance, and the provisions of this Section override any conflicting provisions in Section X of the first Supplemental Permanent

46REPORT000673

Injunction.

264.  The Sheriff shall ensure that all patrol deputies shall be assigned to a primary, clearly identified, first-line supervisor.

265.  First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command.

266.  First-line patrol supervisors shall be assigned as primary supervisor to no more persons than it is possible to effectively supervise.  The Sheriff should seek to establish staffing that permits a supervisor to oversee no more than eight deputies, but in no event should a supervisor be responsible for more than ten persons.  If the Sheriff determines that assignment complexity, the geographic size of a district, the volume of calls for service, or other circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, it shall explain such reasons in writing, and, during the period that the MCSO is subject to the Monitor, shall provide the Monitor with such explanations.  The Monitor shall provide an assessment to the Court as to whether the reduced or increased ratio is appropriate in the circumstances indicated.

267.  Supervisors shall be responsible for close and effective supervision of deputies under their command.  Supervisors shall ensure that all deputies under their direct command comply with MCSO policy, federal, state and local law, and this Court's orders.

268.  During the term that a Monitor oversees the Sheriff and the MCSO in this action, any transfer of sworn personnel or supervisors in or out of the Professional Standards Bureau, the Bureau of Internal Oversight, and the Court Implementation Division shall require advanced approval from the Monitor.  Prior to any transfer into any of these components, the MCSO shall provide the Court, the Monitor, and the parties with advance notice of the transfer and shall produce copies of the individual's résumé and disciplinary history.  The Court may order the removal of the heads of these components if doing so is, in the Court's view, necessary to

46REPORT000674

achieve compliance in a timely manner.

## XVIII.        DOCUMENT PRESERVATION AND PRODUCTION

269. The Sheriff shall ensure that when the MCSO receives a document preservation notice from a litigant, the MCSO shall promptly communicate that document preservation notice to all personnel who might possibly have responsive documents.

270. The Sheriff shall ensure that when the MCSO receives a request for documents in the course of litigation, it shall:

   a. promptly communicate the document request to all personnel who might possibly be in possession of responsive documents;

   b. ensure that all existing electronic files, including email files and data stored on networked drives, are sequestered and preserved through a centralized process; and

   c. ensure that a thorough and adequate search for documents is conducted, and that each employee who might possibly be in possession of responsive documents conducts a thorough and adequate search of all relevant physical and electronic files.

271. Within three months of the effective date of this Order, the Sheriff shall ensure that the MCSO Compliance Division promulgates detailed protocols for the preservation and production of documents requested in litigation.  Such protocols shall be subject to the approval of the Monitor after a period of comment by the Parties.

272. The Sheriff shall ensure that MCSO policy provides that all employees must comply with document preservation and production requirements and that violators of this policy shall be subject to discipline and potentially other sanctions.

/ / /

/ / /

46REPORT000675

## XIX. ADDITIONAL TRAINING

273. Within two months of the entry of this Order, the Sheriff shall ensure that all employees are briefed and presented with the terms of the Order, along with relevant background information about the Court's May 13, 2016 Findings of Fact, (Doc. 1677), upon which this Order is based.

## XX. COMPLAINTS AND MISCONDUCT INVESTIGATIONS RELATING TO MEMBERS OF THE PLAINTIFF CLASS

274. In light of the Court's finding that the MCSO, and in particular Sheriff Arpaio and Chief Deputy Sheridan, willfully and systematically manipulated, misapplied, and subverted MCSO's employee disciplinary policies and internal affairs processes to avoid imposing appropriate discipline on MCSO deputies and command staff for their violations of MCSO policies with respect to members of the Plaintiff class, the Court further orders as follows:

### A. Investigations to be Overseen and/or Conducted by the Monitor

275. The Monitor is vested with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to Class Remedial Matters. The Monitor is free from any liability for such matters as is set forth in ¶ 144 of the Supplemental Permanent Injunction.

276. The Monitor shall have the authority to direct and/or approve all aspects of the intake and investigation of Class Remedial Matters, the assignment of responsibility for such investigations including, if necessary, assignment to his own Monitor team or to other independent sources for investigation, the preliminary and final investigation of complaints and/or the determination of whether they should be criminally or administratively investigated, the determination of responsibility and the imposition of discipline on all matters, and any grievances filed in those matters.

277. This authority is effective immediately and shall remain vested in the Monitor until the MCSO's internal affairs investigations reach the benchmarks set forth in ¶ 288

- 49 -

46REPORT000676

below. With respect to Class Remedial Matters, the Monitor has plenary authority, except where authority is vested in the Independent Investigative and Disciplinary Authorities separately appointed by the Court, as is further set forth in ¶¶ 296–337 below.

278. The Sheriff shall alert the Monitor in writing to all matters that could be considered Class Remedial Matters, and the Monitor has the authority to independently identify such matters. The Monitor shall provide an effective level of oversight to provide reasonable assurance that all Class Remedial Matters come to his attention.

279. The Monitor shall have complete authority to conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner.

280. The Monitor shall provide written notice to the Court and to the parties when he determines that he has jurisdiction over a Class Remedial Matter. Any party may appeal the Monitor's determination as to whether he has jurisdiction over a Class Remedial Matter to this Court within seven days of the Monitor's notice. During the pendency of any such appeal the Monitor has authority to make orders and initiate and conduct investigations concerning Class Remedial Matters and the Sheriff and the MCSO will fully comply with such action by the Monitor.

281. Subject to the authority of the Monitor, the Sheriff shall ensure that the MCSO receives and processes Class Remedial Matters consistent with: (1) the requirements of this Order and the previous orders of this Court, (2) MCSO policies promulgated pursuant to this Order, and (3) the manner in which, pursuant to policy, the MCSO handles all other complaints and disciplinary matters. The Sheriff will direct that the Professional Standards Bureau and the members of his appointed command staff arrive at a disciplinary decision in each Class Remedial Matter.

282. The Sheriff and/or his appointee may exercise the authority given pursuant to this

46REPORT000677

Order to direct and/or resolve such Class Remedial Matters, however, the decisions and directives of the Sheriff and/or his designee with respect to Class Remedial Matters may be vacated or overridden in whole or in part by the Monitor. Neither the Sheriff nor the MCSO has any authority, absent further order of this Court, to countermand any directions or decision of the Monitor with respect to Class Remedial Matters by grievance, appeal, briefing board, directive, or otherwise.

283. The Monitor shall review and approve all disciplinary decisions on Class Remedial Matters.

284. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions, investigations, hearings, and disciplinary decisions. The Sheriff and the MCSO shall also provide any necessary facilities or resources without cost to the Monitor to facilitate the Monitor's directions and/or investigations.

285. Should the Monitor decide to deviate from the Policies set forth in this Order or from the standard application of the disciplinary matrix, the Monitor shall justify the decision in writing and place the written explanation in the affected employee's (or employees') file(s).

286. Should the Monitor believe that a matter should be criminally investigated, he shall follow the procedures set forth in ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then either confidentially initiate a Professional Standards Bureau criminal investigation overseen by the Monitor or report the matter directly and confidentially to the appropriate prosecuting agency. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Monitor shall report the matter directly and confidentially to the appropriate prosecuting agency. The Monitor shall then coordinate the administrative investigation with the criminal investigation in the manner set forth in ¶¶ 229–36 above.

287. Any persons receiving discipline for any Class Remedial Matters that have been approved by the Monitor shall maintain any right they may have under Arizona law

46REPORT000678

or MCSO policy to appeal or grieve that decision with the following alterations:

a. When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.  Nevertheless, the Sheriff or his designee shall immediately transmit the grievance to the Monitor who shall have authority to and shall decide the grievance.  If, in resolving the grievance, the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.

b. disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Monitor.

288.  The Monitor's authority over Class Remedial Matters will cease when both:

a. The final decision of the Professional Standards Bureau, the Division, or the Sheriff, or his designee, on Class Remedial Matters has concurred with the Monitor's independent decision on the same record at least 95% of the time for a period of three years.

b. The Court determines that for a period of three continuous years the MCSO has complied with the complaint intake procedures set forth in this Order, conducted appropriate internal affairs procedures, and adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level.

289.  To make the determination required by subpart (b), the Court extends the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely that are related to Class Remedial Matters.

290.  This requirement is necessitated by the Court's Findings of Fact that show that the MCSO manipulates internal affairs investigations other than those that have a

- 52 -

46REPORT000679

direct relation to the Plaintiff class. The Court will not return the final authority to the Sheriff to investigate matters pertaining to members of the Plaintiff class until it has assurance that the MCSO uniformly investigates misconduct and applies appropriate, uniform, and fair discipline at all levels of command, whether or not the alleged misconduct directly relates to members of the Plaintiff Class.

291. The Monitor shall report to the Court, on a quarterly basis, whether the MCSO has fairly, adequately, thoroughly, and expeditiously assessed, investigated, disciplined, and made grievance decisions in a manner consistent with this Order during that quarter. This report is to cover all internal affairs matters within the MCSO whether or not the matters are Class Remedial Matters. The report shall also apprise the Court whether the MCSO has yet appropriately investigated and acted upon the misconduct identified in the Court's Findings of Fact, whether or not such matters constitute Class Remedial Matters.

292. To make this assessment, the Monitor is to be given full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO. In making and reporting his assessment, the Monitor shall take steps to comply with the rights of the principals under investigation in compliance with state law. While the Monitor can assess all internal affairs investigations conducted by the MCSO to evaluate their good faith compliance with this Order, the Monitor does not have authority to direct or participate in the investigations of or make any orders as to matters that do not qualify as Class Remedial Matters.

293. The Monitor shall append to the quarterly reports it currently produces to the Court its findings on the MCSO's overall internal affairs investigations. The parties, should they choose to do so, shall have the right to challenge the Monitor's assessment in the manner provided in the Court's previous order. (Doc. 606 ¶¶ 128, 132.)

/ / /

- 53 -

46REPORT000680

**B.** **Investigations to be Conducted by the Independent Investigator and the Independent Disciplinary Authority**

294. In its Findings of Fact, (Doc. 1677), the Court identified both: (1) internal affairs investigations already completed by the MCSO that were inadequate or insufficient; (*see, e.g.*, Doc. 1677 at ¶ 903), and (2) misconduct or alleged misconduct that had never been investigated by MCSO that should be or should have been investigated. (*Id.* at ¶ 904.)

295. In light of MCSO's failure to appropriately investigate these matters, the Court appoints an Independent Investigator and an Independent Disciplinary Authority from the candidates set forth by the parties, and vests them with the authority to investigate and decide discipline in these matters.

### 1. The Independent Investigator

296. The Independent Investigator shall be Daniel Giaquinto, Esq. He shall have the authority to:

a. investigate and assess the adequacy of the investigations and the discipline imposed and/or the grievance decisions rendered in those investigations that have been completed by the MCSO and that the Court has deemed to be inadequate. These investigations include, but are not limited to, the following:

    1. IA #2014-542

    2. IA #2014-543

    3. IA #2014-295

    4. IA #2105-541

    5. IA #2015-018

    6. IA #2014-021

    7. IA#2014-022

    8. IA #2014-544

    9. IA #2014-545

    10. IA #2014-546

46REPORT000681

11. IA #2014-547

12. IA #2014-548

To the extent that he deems reinvestigation to be appropriate, he shall have the authority to reinvestigate such matters, to make preliminary findings, to prepare a report, and to recommend new discipline to the Independent Disciplinary Authority for final findings and, if appropriate, for the imposition of new or different discipline.

b. investigate and assess whether the Findings of Fact demonstrate in his judgment other acts of misconduct which should be investigated and/or brought to the Independent Disciplinary Authority for a disciplinary decision.

297. In performing these functions he shall be entitled to the protections set forth in Doc. 606 ¶ 144.

298. In assessing the existence of previously uncharged acts of misconduct that may be revealed by the Findings of Fact, the Independent Investigator does not have authority to investigate acts of misconduct that are not sufficiently related to the rights of the members of the Plaintiff class. While the Independent Investigator should identify such acts of misconduct and report those acts to the Commander of the Professional Standards Bureau, and to the Monitor for purposes of making the Monitor's assessment identified in ¶¶ 291–93 above, the Independent Investigator may not independently investigate those matters absent the authorization and the request of the Sheriff.

299. The Court does not wish to constrain the judgment of the Independent Investigator in identifying any acts of potential misconduct revealed by the Findings of Fact. Nevertheless, without attempting to be exhaustive, the Court provides the following rulings to the Independent Investigator to the extent that the parties have identified uncharged misconduct arising from the Findings of Fact in their previous briefing.

300. The following potential misconduct is not sufficiently related to the rights of the

46REPORT000682

members of the Plaintiff class to justify any independent investigation:

    a. Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the Montgomery investigation. (Doc. 1677 at ¶ 385).

    b. Uninvestigated untruthful statements made to the Court under oath by Chief Deputy Sheridan concerning the existence of the McKessy investigation. (*Id.* at ¶ 816).

    c. Chief Deputy Sheridan's untruthful statements to Lieutenant Seagraves made during the course of an internal investigation of Detective Mackiewicz to the effect that an investigation into the overtime allegations against Detective Mackiewicz had already been completed. (*Id.* at ¶ 823).

    d. Other uninvestigated acts of misconduct of Chief Deputy Sheridan, Captain Bailey, Sergeant Tennyson, Detective Zebro, Detective Mackiewicz, or others that occurred during the McKessy investigation. (*Id.* at ¶¶ 766–825).

301. The following potential misconduct is sufficiently related to the rights of the members of the Plaintiff class to justify an independent investigation should the Independent Investigator deem that such an investigation is merited:

    a. The mishandling of internal investigations by Chief Deputy Sheridan, and/or Chief Olsen, Captain Bailey, Sergeant Tennyson, and any other employee who the Independent Investigator determines to have played a role in the deficient internal affairs investigations that related to misconduct pertaining to members of the Plaintiff class. Such potential violations include, but are not limited to, the manipulation of timing on investigations to influence discipline, biased decision-making, improper conduct of investigations, and the deliberate or negligent mishandling of investigations, whether criminal or administrative.

    b. The knowing misstatements made under oath to the Court by Chief Deputy Sheridan regarding his knowledge of the Court's preliminary injunction. (*Id.* at ¶ 87).

- 56 -

46REPORT000683

c. The knowing misstatements made under oath to the Court by Chief Deputy Sheridan about his instruction to send out a directive to MCSO commanders regarding the collection of video evidence. (*Id.* at ¶¶ 228–32).

d. The knowing misstatement to the press regarding the 1459 IDs made by Chief Deputy Sheridan on the night the Court ordered those IDs to be transferred to the Court's custody, and Chief Deputy Sheridan's subsequent reaffirmation of those misstatements under oath. (*Id.* at ¶¶ 325–36).

e. The knowing misstatement made under oath by Chief Deputy Sheridan to Chief Anders of the Monitor staff that he did not completely suspend the investigation into the 1459 IDs. (*Id.* at ¶¶ 337–41).

f. Chief Deputy Sheridan's "suspension" of the investigation into the existence of the 1459 IDs in an unsuccessful attempt to avoid the Court's multiple orders requiring their disclosure. (*Id.* at 294–348).

g. Captain Bailey's intentional misstatements of fact to the Monitor regarding the 1459 IDs in an attempt to conceal their existence. (*Id.*)

h. Chief Trombi's misstatement to Special Investigator Vogel under oath that Chief Sands had directed that Deputy Armendariz not be transferred out of the Human Smuggling Unit. (*Id.* at ¶¶ 517, 521).

i. Property that may have been improperly seized or inventoried and that has not been investigated to date. (*See, e.g.*, *id.* at ¶ 720.)

j. The violation of the Court's May 14, 2014 order by Chief Deputy Sheridan.

k. The untruthful statements made by MCSO personnel that they were collecting IDs for use in formalized training courses. (*Id.* at ¶¶ 630, 638.)

l. Detective Frei's mishandling of property and his attempt to destroy such property. (*Id.* at ¶¶ 699–700.)

302. To the extent that the Independent Investigator identifies other matters that should be investigated or reinvestigated, he shall indicate to the parties and the Monitor, in writing, the subject of such investigation and the likely principals. These

- 57 -

46REPORT000684

designations shall be filed under seal and shall be kept confidential by the parties. To the extent the Court has not already made the determination, the Independent Investigator shall also designate whether or not he believes that such matters are sufficiently related to the rights and remedies to which the members of the Plaintiff class are entitled so as to be within his jurisdiction. Alternatively, he may request the Court to make that designation by written notice filed under seal with the Court and provided to the parties. In the event that the Independent Investigator makes the designation, any party may appeal to the Court the Independent Investigator's designation within seven days of receiving notice of it.

303. To the extent possible, the Independent Investigator shall conduct his investigations in compliance with the best investigative practices and in compliance with the processes and standards set forth in this Order governing the operations of MCSO's Professional Standards Bureau.

304. In preliminarily determining charges and discipline, the Independent Investigator shall apply the two disciplinary matrices attached to GC-17 to the appropriate MCSO employees. To the extent that an MCSO employee is a non-classified employee, and is thus subject to the MCSO disciplinary policy GC-17 but not subject to an applicable disciplinary matrix, the Independent Investigator shall apply a level of discipline that is no less than that specified for those classified employees within the MCSO that share similar job functions as the non-classified employee. For example, Chief Deputy Sheridan, who has the highest command position of any employee within the MCSO, but who is an unclassified employee, shall be subject to a level of discipline no less than that indicated by the disciplinary matrix for exempt regular status employees. (*See, e.g.*, Ex. 2001 at MELC416243 (MCSO disciplinary policy establishing that MCSO management employees are subjected to a higher standard of discipline than non-management employees: "Regular status exempt employees typically hold a management position, and therefore, are held to a higher [disciplinary] standard.").)

- 58 -

46REPORT000685

305. When a single act of alleged misconduct would constitute multiple separate policy violations, all applicable policy violations shall be charged, but the most serious policy violation shall be used for determining the category of offense.

306. In applying the disciplinary matrix to determine the possible range of discipline in new investigations or reinvestigations, the Independent Investigator is obliged to determine the number of prior offenses that have been sustained against the principle. In making this determination, he may rely on the past disciplinary decisions made by the MCSO even if the investigation was deemed inadequate or invalid by this Court. Alternatively, if he deems it appropriate, the Independent Investigator may re-investigate or recalculate whether past separate discipline should or should not have been imposed in determining the possible range of discipline for a new or reopened offense. To the extent that the Independent Investigator determines that the appropriate categorization of an offense within the disciplinary matrix would require the reassessment of past misconduct which the employee either did not receive but should have, or did receive but should not have, he shall calculate whether the employee would or would not have received past discipline had the MCSO applied the appropriate standard of care for internal affairs operations prevailing in police agencies of MCSO's size. Should that require a determination of liability for alleged misconduct that is not related to the rights of the members of the Plaintiff class, the Independent Investigator may seek guidance from the Court if necessary.

307. The Sheriff and the MCSO's cooperation with such assessments and reinvestigations are required. The Sheriff shall insure that the Independent Investigator and each of the investigators or members of his staff are given timely and complete access to MCSO documents, employees, information, and resources in conducting his assessment and investigations, in making his reports, and in pursuing his other activities under this Order. The Sheriff shall also provide any necessary facilities or resources to hold necessary interviews, provide appropriate

46REPORT000686

notices, and/or conduct hearings.

308. The Independent Investigator should operate as efficiently and expeditiously as possible. He may therefore employ the four persons whose resumes he has submitted to the Court as investigators on his team. He may, if he deems it necessary, engage additional qualified investigators to assist him in timely completing whichever investigations he deems fit. The County will pay his reasonable expenses and the reasonable expenses of his staff, as well as reasonable lodging, meal, travel, administrative, and other necessary expenses. The Independent Investigator may enter into a contract with the County governing his services if he wishes to do so. Otherwise, he should provide monthly bills for his services to the County, and shall be promptly paid for his services. The Court will resolve any disputes between the Independent Investigator and the County about what is reasonable. Should the Independent Investigator or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

309. The Independent Investigator is authorized to prioritize the investigations in light of what he believes to be their relative gravity and their relative merit. In determining the extent to which additional investigation is necessary or advisable, the Independent Investigator is authorized to refer to any of the work that has preceded his appointment in this matter including but not limited to: (1) the Court's Findings of Fact, (2) the evidence, testimony and statements offered at the evidentiary hearing or in other Court proceedings, (3) the investigative interviews conducted by the MCSO, as well as all materials generated in their underlying reports and hearings, including the reports, interviews and evidence identified by Special Investigator Don Vogel who was the MCSO's investigator in IA #2014-542 and IA #2014-543, the interviews undertaken by the Monitors, as well as the parties' responses to the Monitor's inquiries for documents and the underlying discovery provided in this matter.

- 60 -

46REPORT000687

310. The Monitor and the parties are directed to promptly comply with the Independent Investigator's requests for information. The Monitor and the Independent Investigator may communicate to coordinate their investigations. Nevertheless, each is independently responsible for their respective jurisdiction set forth in this Order, and each should make independent decisions within his own delegated responsibility.

311. To the extent that legal questions arise on which the Independent Investigator needs a determination, he can apply to the Court for such a determination after serving the Court and the parties with the request.

312. If any other matters arise on which the Independent Investigator needs to request that the Court enter an order, he may apply to the Court for such an order in writing served to all the parties. In the writing, he should specify the reason for the request and the remedy sought.

313. Except as otherwise indicated in this order, the Independent Investigator has the sole authority to determine whether reinvestigations or new charges arising from the Findings of Fact should or should not be pursued. The Independent Investigator has the right to consider the severity of the misconduct, its apparent merit, the practicality of bringing charges, and the expense of pursuing such charges in making this determination in accord with how such determinations would be made by a responsible internal affairs unit within a police agency of the similar size to the MCSO. Similarly, with the exceptions specified, the Independent Investigator has the authority to reopen investigations, pursue new investigations, make preliminary findings of fact, bring charges against an employee, and recommend to the Independent Disciplinary Authority that a particular level of discipline be imposed.

314. Any decision not to pursue charges shall be explained in writing to the parties.

315. For those charges he brings to the Independent Disciplinary Authority, the Independent Investigator shall prepare thorough reports setting forth the basis for

- 61 -

46REPORT000688

his findings of fact and his recommended discipline.

316. To the extent the Independent Investigator's recommended findings or discipline depart from procedures set forth in this Order, or from the disciplinary matrices, the Independent Investigator shall explain the basis for his recommended departure(s) in writing.

317. Such decisions are not appealable by the parties, and they cannot be countermanded by the Sheriff or the MCSO, with the caveat that the Independent Disciplinary Authority shall make the final decision with respect to liability and discipline for all charges of misconduct brought by the Independent Investigator regardless of whether such preliminary charges are for minor or serious discipline. Nevertheless, the Independent Disciplinary Authority must provide an opportunity to be heard only to those employees who may be subject to a level of discipline that requires such a hearing.

318. To the extent the Independent Disciplinary Authority desires the Independent Investigator's presence at a pre-determination hearing, the Independent Investigator shall be present to participate to the extent directed.

319. To the extent the Independent Investigator encounters evidence of conduct that he believes should be the subject of a criminal investigation, he shall inform the Commander of the Professional Standards Bureau in compliance with ¶¶ 229–36 above. The Commander of the Professional Standards Bureau shall then report the matter directly and confidentially to the appropriate prosecuting agency. The Independent Investigator shall then coordinate the administrative investigation with the criminal investigation consistent with the manner set forth in ¶¶ 229–36 above. To the extent that the matter may involve the Commander of the Professional Standards Bureau as a principal, the Independent Investigator shall report the matter directly and confidentially to the appropriate prosecuting agency without discussing it with the Commander of Professional Standards Bureau.

/ / /

- 62 -

46REPORT000689

## 2. The Independent Disciplinary Authority

320. The Independent Disciplinary Authority shall be Daniel Alonso. The Independent Disciplinary Authority shall hold hearings required by law and policy, and make liability and disciplinary determinations with respect to all charges that are brought to him by the Independent Investigator. In performing these functions he shall be entitled to the protections set forth in Doc. 606 ¶ 144.

321. The Independent Disciplinary Authority should operate as efficiently and expeditiously as possible. He may employ associates to the extent that they are necessary in documenting his decisions or holding pre-determination hearings. The County will pay his reasonable expenses and the reasonable expenses of his staff, as well as reasonable lodging, meal, travel, administrative, and other necessary expenses. The Independent Disciplinary Authority may enter into a contract with the County governing his services if he wishes to do so. Otherwise, he should provide monthly bills for his services to the County, and shall be promptly paid for his services. The Court will resolve any disputes between the Independent Disciplinary Authority and the County about what is reasonable. Should the Independent Disciplinary Authority or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

322. The Independent Disciplinary Authority will be the final arbiter of the facts and will decide which acts of misconduct, if any, the sustained facts establish. If the facts establish misconduct, it is the duty of the Independent Disciplinary Authority to determine the level of discipline to be imposed on the employee.

323. Should the Independent Disciplinary Authority or the County require further orders of the Court in this respect, they may apply to the Court in writing for such an order with a copy to other parties.

324. Any legal questions that go beyond the above determinations should be forwarded in writing by the Independent Disciplinary Authority to the Court for

- 63 -

46REPORT000690

determination with copies to other parties.

325. Should he deem minor discipline appropriate, he shall write the written reprimand and direct that it be placed in the employee's file.

326. If the Independent Investigator makes a preliminary determination that serious discipline (defined as suspension, demotion, or termination) should be imposed, the Independent Disciplinary Authority will conduct a pre-determination hearing and will provide the employee with an opportunity to be heard.

327. Consistent with the applicable law, the Independent Disciplinary Authority shall provide notice through the Sheriff's office or otherwise to any employee who has a right to be heard. The Sheriff shall promptly provide the Independent Disciplinary Authority with the resources, information, and access necessary to provide such notice to MCSO employees and to schedule such hearings in conjunction with the Independent Investigator.

328. The Sheriff shall ensure that the Independent Disciplinary Authority and the members of his staff are given timely and complete access to MCSO resources, personnel, and facilities. The Sheriff shall provide complete and full access to any other resources to hold necessary interviews, provide appropriate notices, and/or conduct hearings.

329. Pre-determination hearings will be audio and video recorded in their entirety, and the recordings shall be maintained with the administrative investigation file.

330. If an employee provides new or additional evidence at a pre-determination hearing, the hearing will be suspended and the matter will be returned to the Independent Investigator for consideration or further investigation, as necessary. If after any further investigation or consideration of the new or additional evidence, there is no change in the determination of preliminary discipline, the matter will go back to the pre-determination hearing. The Independent Investigator shall initiate a separate misconduct investigation if it appears that the employee intentionally withheld the new or additional evidence during the

- 64 -

46REPORT000691

Independent Investigator's initial misconduct investigation.

331. If the Independent Disciplinary Authority does not uphold the charges recommended by Independent Investigator in any respect, or does not impose the Independent Investigator's recommended discipline and/or non-disciplinary corrective action, the Independent Disciplinary Authority shall set forth in writing his justification for doing so.   This justification will be appended to the investigation file.

332. The Independent Disciplinary Authority should apply the disciplinary matrix, and any decision not to do so shall be justified in writing.

333. The Independent Disciplinary Authority may not consider the following as grounds for mitigation or reducing the level of discipline prescribed by the matrix:

    a.  his or her personal opinion about the employee's reputation;

    b.  the employee's past disciplinary history (or lack thereof), except as provided in the disciplinary matrix;

    c.  whether others were jointly responsible for the misconduct, except that the Independent Disciplinary Authority  may consider the measure of discipline imposed on other employees involved to the extent that discipline on others had been previously imposed and the conduct was similarly culpable.

334. The Decisions reached by the Independent Disciplinary Authority shall be final.

335. Except as otherwise specified in this order, no party has the right to appeal the decisions of either the Independent Investigator or the Independent Disciplinary Authority.  The Sheriff shall implement those decisions.

336. Neither the Sheriff nor his designee has any authority to rescind, revoke, or alter any disciplinary decision made by either Independent Investigator or the Independent Disciplinary Authority by grievance decision, appeal, directive, or otherwise.

337. Nevertheless, when discipline is imposed by the Independent Disciplinary Authority, the employee shall maintain his or her appeal rights following the

46REPORT000692

Case 2:07-cv-02513-GMS   Document 1765   Filed 07/26/16   Page 66 of 67

imposition of administrative discipline as specified by Arizona law and MCSO policy with the following exceptions:

a.  When minor discipline is imposed, a grievance may be filed with the Sheriff or his designee consistent with existing MCSO procedure.   Nevertheless, the Sheriff or his designee shall transmit the grievance to the Monitor who shall have authority to decide the grievance.   If in resolving the grievance the Monitor changes the disciplinary decision in any respect, he shall explain his decision in writing.

b.  A disciplined MCSO employee maintains his or her right to appeal serious discipline to the Maricopa County Law Enforcement Merit System Council to the extent the employee has such a right.   The Council may exercise its normal supervisory authority over discipline imposed by the Independent Disciplinary Authority with one caveat.   Arizona law allows the Council the discretion to vacate discipline if it finds that the MCSO did not make a good faith effort to investigate and impose the discipline within 180 days of learning of the misconduct.   In the case of any of the disciplinary matters considered by the Independent Disciplinary Authority, the MCSO will not have made that effort. The delay, in fact, will have resulted from MCSO's bad faith effort to avoid the appropriate imposition of discipline on MCSO employees to the detriment of the members of the Plaintiff class.   As such, the Council's determination to vacate discipline because it was not timely imposed would only serve to compound the harms imposed by the Defendants and to deprive the members of the Plaintiff class of the remedies to which they are entitled due to the constitutional violations they have suffered at the hands of the Defendants.   As is more fully explained above, such a determination by the Council would constitute an undue impediment to the remedy that the Plaintiff class would have received for the constitutional violations inflicted by the MCSO if the MCSO had complied with its original obligations to this Court.   In this rare

- 66 -

46REPORT000693

46REPORT000694

Case 2:07-cv-02513-GMS Document 3509-1 Filed 06/12/26 Page 694 of 998

instance, therefore, the Council may not explicitly or implicitly exercise its discretion to reduce discipline on the basis that the matter was not timely investigated or asserted by the MCSO. If the Plaintiff class believes the Council has done so, it may seek the reversal of such reduction with this Court pursuant to this Order.

Dated this 25th day of July, 2016.

Honorable G. Murray Snow
United States District Judge

**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al. | No. CV-07-2513-PHX-GMS |
| Plaintiffs, | **ORDER** |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Paul Penzone, in his official capacity as Sheriff of Maricopa County, Arizona; et al. | |
| Defendants. | |

This Order resolves the pending Order to Show Cause. (Doc. 2681.) It also resolves Sheriff Paul Penzone's Motion to Modify Second Order. (Doc. 2647.) For the following reasons, the Court finds Sheriff Paul Penzone in civil contempt and sets forth appropriate curative orders. Those curative measures include granting his motion to Modify Second Order (Doc. 2647) in part and denying it in part.

**Contempt Findings**

In 2016, this Court found that the MCSO manipulated the timing of investigations brought to it to impose either no discipline or less serious discipline on its deputies in those cases in which discipline was warranted. (Doc. 1677 at ¶¶ 574-583); (Doc. 1765 at 2.)[1]

---

[1] It further found that other investigations were delayed to avoid the Court's efficient review of those investigations. (Doc. 1677 at ¶¶ 729-33.)

46REPORT000695

This delaying tactic was possible because, pursuant to its internal procedures and then-existing state law, the MCSO could not impose discipline on a deputy if the investigation of the alleged misconduct took longer than four months.[2] It was thus easy to exonerate a deputy accused of misconduct by merely failing to timely investigate his or her misconduct.

At that time, the Court found that in many other respects the MCSO had engaged in biased and faulty investigations. To remedy that conduct, the Court required that the Sheriff provide that "all allegations of employee misconduct, whether internally discovered or based on a civilian complaint, are fully, fairly, and efficiently investigated." (Doc. 1765 at ¶ 163.) It further required that the Sheriff and MCSO "conduct objective, comprehensive and timely administrative investigations of all allegations of employee misconduct." (*Id.* at ¶ 183.) Specifically, Defendants were required to complete administrative investigations within 85 calendar days of the initiation of the investigation by PSB and 60 calendar days for investigations conducted in the Divisions. (*Id.* at ¶ 204.)

Nevertheless, since the Court entered that order the Defendants have continually failed to complete their investigations in a timely manner. The MCSO has been aware that adequate staffing has been an issue with PSB since at least 2017. (Doc. 2167 at ¶ 175). In 2018, two years after the Court entered its order, the average closure of a case took 204 days—about two and a half times the maximum permitted by this Court's order. This, in itself, violated the Court's order and state law. That number, however, continued to increase. In 2019 the average closure ballooned to 499 days and 552 days in 2020. (Doc. 2569 at ¶ 194.) In 2020, the Monitor found that MCSO had filled only one of the eleven positions approved for PSB in the 2018 budget. (Doc. 2594 at ¶ 193.) The Monitor thus found MCSO in non-compliance with paragraph 195's personnel requirement and paragraph 204's timely investigation requirements in its November 2020 and February 2021 reports. (Docs. 2569, 2594.) In these reports the Monitor noted the continuing failure to staff up the PSB even with budgeted positions. As the report stated, "PSB continued to

---

[2] Close to the time that the Court entered its order, the Arizona Legislature extended the statutory deadline for law enforcement agencies to complete internal investigations from 120 to 180 days. A.R.S. § 38-1110(A).

46REPORT000696

note that with the continuing influx of new cases, and the ongoing backlog of investigations, even if [positions authorized in the 2018 budget that had not been filled] were added, the Bureau would still be insufficiently staffed to meet its responsibilities." (Doc. 2594 at ¶ 195.)  The Monitor explained, "we have previously noted, hiring of civilian personnel is a positive step, but their hiring will not address what is an unacceptable failure to properly staff PSB with an adequate number of investigators to comply with the order." (*Id*. at ¶ 195.)  The Monitor thus held the MCSO as being out of compliance with ¶¶ 195 and 204 of this Court's order.  (*Id.* at ¶¶ 195, 204.)  This pattern continued and worsened. The Court entered its Order to Show Cause ("OSC") why Defendants should not be held in contempt in August of 2021.  (Doc. 2681.)  Prior to entering the Order, the Court noted that "[r]ather than taking the necessary substantive steps to resolve the backlog and process the complaints within the time period specified by the Order, however, the MCSO has repeatedly granted itself . . . extensions . . .  while the backlogs continued to increase." (Doc. 2576 at 2.)

After reviewing the briefing and while setting the OSC hearing the Court noted that, even if it accepted all of the Defendants' responses to the OSC as true, it would hold Sheriff Penzone in contempt.  (Doc. 2657 at 14.)  Thereafter, the parties commendably agreed to use the show cause hearing to focus on remedies for the contempt, and a Management Expert was retained to recommend how to proceed. (Doc. 2663 at 2.)

The Court thereafter withheld any formal finding of contempt to determine whether the Defendants would take remedial steps with respect to the backlog while it awaited the Management Expert's Report.  To be sure, the Monitor and the Management Expert both report that the internal investigations in which MCSO does engage are well done and well-intentioned. (Doc. 2790 at 10-11.)  The Management Expert indicated that the MCSO was cooperative with him in his investigations and evaluations.  (*Id.* at 4.)  Yet, during the time that the Management Expert has been preparing his recommendations, the existing investigator vacancies in the PSB have remained unfilled, and the timeline to complete an investigation has grown to approximately 600 days per investigation. (Doc. 2802-1 at 5.)

- 3 -

46REPORT000697

For full administrative cases involving sworn personnel, the timeline to complete an investigation is now apparently in excess of 800 days. (Doc. 2810 at 43.) MCSO now has 2,137 pending investigations. (Doc. 2801-1 at 3.) Each of its investigators, on average, complete 17 investigations a year. (Doc. 2810 at 5.) The failure to complete investigations in a timely manner has become so extreme as to render investigations completely ineffectual and render no service to either the complainant or MCSO personnel. The Management Expert confirmed the Court's calculation that at the present rate that the investigative staff is clearing complaints, coupled with the rate at which uninvestigated complaints are accruing, it would require 117 case investigators to clear up the caseload over the next two years. (Doc. 2810 at 5-6.)

Further, newly-amended state law now provides protection for MCSO personnel who have been involved in delayed investigations by mandating the dismissal of the complaint after one year from its filing. A.R.S. § 38-1110(A). While the new state law protects deputy sheriffs who are innocent but accused of misconduct from protracted investigations, it does nothing to protect the interests of those members of the public, including members of the Plaintiff class, who have a basis for filing such complaints. It simply dismisses them. While the new statute apparently assumes that all internal investigations should be completed within 180 days, and only rarely should take longer than that, it does nothing to protect the complaining parties from a deputy's misconduct, or to cure that misconduct, if the agency merely delays the investigation more than one year, whether through bad faith or otherwise. It was precisely the manipulation of such otherwise reasonable time constraints that resulted in the MCSO's abuses and led to the Court's imposition of the time limits on investigations more than six years ago. In the Court's view, the new statute does not prevent the Sheriff from complying with the terms of this Court's previous orders for all outstanding investigations. If the parties feel otherwise, they must raise the issue with the Court.

Sheriff Penzone's non-compliance with ¶¶ 195 and 204 of the Second Order have been knowing and continuous. To be sure, Sheriff Penzone has had at least some difficulty

- 4 -

46REPORT000698

in implementing the Court's orders in the present environment.  Nevertheless, he does not demonstrate that he has taken all reasonable steps to comply with the order, especially as the backlog has increased.  The backlog, despite Sheriff Penzone's knowledge of it, only gets worse.  It may be that Sheriff Penzone welcomes this Court's intervention by way of contempt remedies to cure that backlog.  In any event, he leaves the Court with few options for obtaining compliance with its orders.  Thus, the Court holds the Sheriff in civil contempt.

The Court has the authority to enter civil contempts in such cases and to compel appropriate remedial measures.  *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (affirming a court's authority to enter a contempt order with sanctions designed to bring San Francisco's jail population levels in line with its previous order).  "[A] contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Int'l Union Mine Workers of Am. V. Bagwell*, 512 U.S. 821, 827 (1994).  A contempt sanction is "civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'"  *Id.* at 829 (quoting *United States v. Mine Workers*, 330 U.S. 258, 303-304 (1947)).

The Court's mechanism imposing fines as a result of the contempt will coerce Defendants to appropriately support their compliance efforts.  The fines are reasonable in light of Defendants' continued contumacy, and the unique structure of the fines (a "PSB Staffing Fund") ensures that any fines imposed will help Defendants comply with the Court's orders.

To determine the appropriate size and duration of a civil contempt fine designed to coerce compliance, the Court considers "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."  *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983) (quoting *United Mine Workers of Am.*, 330 U.S. at 304); *see also Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 514 (9th Cir. 1992) (affirming a $10,000

- 5 -

46REPORT000699

daily fine as properly tailored to coerce compliance "[b]ecause the district court considered the harm threatened and the effectiveness of prior injunctive relief in setting the amount"). Here, the character and magnitude of the harm to Plaintiffs, the general public, and MCSO personnel posed by Defendants' violations establishes the need for a substantial fine. Although MCSO command staff have known about the violations for years, the backlog continues to grow, and MCSO has not taken meaningful steps to address it.

The Court's fine structure is also highly likely to bring MCSO into compliance. Defendants can avoid paying fines by filling vacant positions at PSB, engaging contractors to staff PSB, and steadily decreasing the backlog. The Court expects MCSO to decrease the backlog at a reasonable rate – at least 20 cases each month. This rate roughly approximates the rate at which the backlog has grown under MCSO's current leadership. (*See* Doc. 2790 at 5.) And, even if Defendants clear the backlog at that rate, it will still take years to clear it. If Defendants are unable to avoid paying the fines, they may use the fines to help cure their violations by hiring additional staff, increasing investigators' salaries, and paying investigators incentives.

Therefore, to protect the interests of the Plaintiff class (let alone the general public), in ensuring that investigations are completed in sufficient time to administer discipline, the Court will require that the MCSO come into compliance with its reasonable investigative protocols. It thus enters the following remedies:

**Remedies**

The paragraphs in the remainder of this Order are numbered as to continue from the numbered paragraphs in the Second Amended Second Supplemental Permanent Injunction Order (Doc. 1765).

338. Within 14 days from the date of this order, MCSO will calculate and provide the Court and the parties with the dollar amount required to recruit, hire, train and compensate for one year a single PSB budgeted sergeant position.

339. MCSO must not reduce the staffing levels at PSB below the minimum investigator staffing number identified in ¶ 340 while a backlog in investigations remains.

- 6 -

46REPORT000700

340. Within 60 days from the date of this order, MCSO will fill the seven currently budgeted, yet vacant, positions at PSB referred to in Mr. Gennaco's report, through hiring or internal transfers. (Doc. 2790 at 15.) The staffing referred to by Mr. Gennaco, together with the full staffing of the vacant positions, is 39 investigators. This is the minimum investigator staffing number. If MCSO fails to fill any one of the seven vacant budgeted staffing positions with an AZPOST sworn investigator who is approved by the Monitor within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators. It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum investigator staffing number.

341. If MCSO desires to fill the positions with new civilian investigators in lieu of sworn officers, it may do so to the extent that it is authorized to do so, consistent with state law. Should it fail to fill any one of the seven vacant positions within 60 days of the date of this order, MCSO and/or Maricopa County will pay into a PSB Staffing Fund three times the amount identified by PSB in ¶ 338 above for each vacancy remaining at the MCSO for budgeted investigators. It shall, thereafter on a monthly basis pay into the Staffing Fund three times the amount identified in ¶ 338 above for every month the number of PSB investigators falls below the minimum staffing number.

342. If the MCSO attempts to fill these open positions with a mix of qualified sworn personnel and civilian investigators, it may do so to the extent that it can, consistent with state law. Nevertheless, if it fails to fill any one of the seven vacant positions within 60 days, the MCSO and/or Maricopa County will pay into the PSB Staffing Fund three times the amount identified in ¶ 338 above for each vacancy remaining. It shall, thereafter on a monthly basis pay three times the amount identified in ¶ 338 above for every month that the number of PSB investigators falls below the

46REPORT000701

minimum staffing number.

343. MCSO is authorized to conduct PSB investigations through approved private contractors if it can do so consistent with state law.

344. MCSO must demonstrate that it is using overtime and other administrative tools to increase the personnel hours committed to investigate all types of complaints. MCSO shall report its use of these tools to the Monitor on a monthly basis.

345. MCSO and/or Maricopa County shall hereby establish a PSB Staffing Fund, which shall be a separate account of the MCSO. The amounts set forth in ¶¶ 340-42 shall be paid directly into this account. The MCSO, however, is only authorized to withdraw funds from this account for the hiring and payment of PSB investigators or private investigators contracted with PSB who are in compliance with the requirements of state law. The fund may also be used to hire necessary additional PSB administrative staff and necessary additional PSB supervisory staff only, and for no other purpose. MCSO is not permitted to offset the amount of any fine from PSB's existing budget or use it to subsidize the number of PSB staff and investigators existing at the time of this Order. MCSO shall provide an accounting of the PSB Staffing Fund on a monthly basis to the Monitor and the Court. But, if necessary, MCSO is permitted to augment and/or exceed the salary and incentives normally paid PSB investigators to hire and/or maintain sufficient investigators, whether sworn or civilian, to reduce the backlog.

346. The Court hereby vests the Monitor, Robert Warshaw, with the supplemental authorities set forth in this Order.[3] The Monitor therefore has immediate authority

---

[3] The Court is aware of the concern of the Plaintiffs and Plaintiff-Intervenor that expanding the Monitor's duties to include those of the Constitutional Policing Authority as recommended by Mr. Gennaco might, in some way, compromise the Monitor's responsibilities under ¶ 126 of the Supplemental Permanent Injunction. The Court also shares MCSO's concern about the length of time necessary to develop a new role, hire a "CPA," and bring that individual up to speed in time to efficiently implement the curative reforms set forth below. The Court is aware of the massive existing backlog, and the need to timely correct that backlog. The Court also notes that the requirements of this Order, in many respects, track over the same territory that the Monitor and the parties have already

- 8 -

46REPORT000702

to oversee all of MCSO's complaint intake and routing. The Court hereby vacates any previous order that conflicts with this Order, including but not limited to ¶ 292 of the Second Order (Doc. 1765). In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases. The Monitor must consult with the PSB Commander about these policy decisions but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

347. The Monitor shall revise and/or formalize MCSO's intake and routing processes. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but maintains independent authority to make the ultimate decision. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

348. The Monitor will evaluate PSB's current investigative practices. The PSB, under

---

been over ad nauseum. (*See, e.g.*, Doc. 1765 at ¶¶ 163-167.) It therefore determines to assign the responsibilities set forth in Mr. Gennaco's report to the Monitor.

46REPORT000703

the authority of the Monitor, shall create, and submit for the Monitor's approval, policies and procedures that:

(a) Identify and eliminate unnecessary investigative requirements that may be removed from particular classes of cases;

(b) Provide for the establishment of an investigative plan for each investigation to eliminate unnecessary steps for the investigation of the complaint at issue;

(c) Establish formal internal scheduling expectations and requirements for supervisory interventions;

(d) Establish expectations on the timeline for each step of the review process. The formulated expectations will be consistent with the timeline requirements of this Court's previous orders;

(e) Assess current use of IA Pro as a case management/tracking tool.

349. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If a backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor. Given that the parties have provided the Monitor with feedback on these issues, the Monitor is directed to consider the input already articulated by the parties on these issues and determine, at his discretion, to adopt them or not. The Monitor may choose, but will not be required, to seek additional input from the parties in the development of the above stated policies. The Monitor shall finalize and submit such policies to the Court within four months of the date of this order. The parties shall have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, if necessary thereafter, make determinations as to the final policies.

350. The Monitor will assess MCSO's compliance with the investigative requirements of this order and shall determine whether training on investigative planning and supervision is needed and implement such training.

351. The Monitor has the authority to make recommendations to the Court concerning

46REPORT000704

the revision of the Court's orders as it pertains to the investigation of complaints where, in its opinion, such revisions would increase efficiency without impinging on investigations necessary to the operation of a fair and unbiased law enforcement agency.

352. The Monitor may intervene in the course of any investigation for the purpose of facilitating the appropriate operation of the PSB and/or the reduction of the backlog, if he deems it appropriate, and will document his actions in a quarterly report to be submitted to the Court. The authority granted to the Monitor in this paragraph shall not be applicable when there is no backlog. If the backlog is eliminated and then arises again while the Defendants are still subject to monitoring, this authority will be renewed in the Monitor.

353. The Monitor shall recommend to the Court adjustments in the investigations of the following categories of cases according to the following procedure:

MCSO shall, upon the approval of the Monitor:

(a) Create, formalize, and implement a policy regarding whether investigations are necessary when the complaint was submitted to the MCSO more than a year after the last instance of the underlying alleged misconduct reported, or when the MCSO employee involved left MCSO's employ prior to the filing of the complaint.

(b) Create, formalize, and implement a policy regarding when investigations are necessary if the initial complainant is unwilling or unable to cooperate, or if the initial complainant is anonymous.

(c) Create, formalize, and implement a policy regarding when MCSO may investigate health related in-custody jail deaths by County medical staff.

(d) Create, formalize, and implement a policy regarding when an entity other than PSB may investigate internal allegations emanating from workplace relationships.

(e) Create, formalize, and implement a policy regarding when, in cases in which

- 11 -

46REPORT000705

external evidence establishes a violation, the PSB Commander has the discretion to offer principals a mitigated penalty if they accept responsibility. The mitigated penalty shall be no lower than the minimum discipline within the applicable discipline matrix range for the charged offenses.

(f) Create, formalize, and implement a policy regarding when the PSB commander is authorized to handle the alleged minor misconduct through supervisory intervention in lieu of investigation. MCSO shall submit to the Monitor within 15 days, a list of the minor misconduct within the GC-17 (Disciplinary Matrix) which it deems should be considered by the Monitor to be handled as a supervisory intervention. MCSO's list shall exclude allegations concerning the Plaintiff class and allegations of bias.

In proposing such policies to the Monitor, the MCSO shall fully and openly consult with the other parties to this litigation. All parties shall move expeditiously to formulate, consult with, and approve these policies. MCSO and the parties shall complete and submit to the Monitor for approval all such proposed policies within three months of this order. As to those issues on which the parties cannot obtain consensus, they shall each submit their proposals to the Monitor. The Monitor shall then, promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, thereafter, make determinations as to the final policies.

354. To the extent that the policies require implementation plans or address deadlines, the Court shall approve these after they are submitted by the Monitor.

355. The Monitor and the PSB shall review the cases in the current backlog that are eligible to be diverted from PSB investigations by ¶ 353 of this order. It is the expectation of the Court that the diverted cases shall reduce the current backlog.

356. Within five business days of the elimination of these cases from the backlog, the Monitor shall certify to the parties and the Court the number of administrative investigations remaining in the backlog that are open and have not been completed

46REPORT000706

within the time limits required by the Court. At the beginning of each month, the number of open cases whose investigations have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed shall be the remaining backlog.  This backlog shall not include any cases for which the Monitor has granted an extension of the investigative deadline pursuant to ¶ 365 of this Order.

357. The cases in this remaining backlog should be identified by year, giving priority to the oldest cases, i.e., the cases that were filed first.  The expectation should be to address the oldest cases first, without ignoring the continuing caseload.  For each month in which the PSB cannot reduce the remaining backlog by 20 cases from the previous month's number, the MCSO and/or Maricopa County shall pay into the PSB Staffing Fund two times the amount identified in ¶ 338 above.

358. Maricopa County has requested that the Court relax its investigative timeline to be consistent with state law.  The Court shall only consider doing so, when significant progress is made towards the reduction of the backlog.

359. The MCSO and/or Maricopa County shall pay all reasonable costs of the Monitor, consistent with ¶ 123 of the Supplemental Permanent Injunction.  The Monitor is free from any liability for such matters as set forth in ¶ 144 of the Supplemental Permanent Injunction.

360. The Monitor shall submit a quarterly progress report to the Court and parties describing the rationale for each type of investigative diversion approved, the result of each diversion type, the backlog tally, the number of completed cases, unresolved issues, and further actions required to address the backlog and staffing levels at PSB.

361. Under the direction of the Court, MCSO shall commission an independent study to determine: (1) the most efficient way for MCSO to allocate its personnel in light of existing authorized staffing levels, the requirements and expectations of its served communities, the requirements of this Court's Orders, the timely elimination of the existing backlog of PSB investigations, and state law; (2) the necessary staffing level for MCSO to fulfill these obligations regardless of the existing staffing level;

- 13 -

46REPORT000707

and (3) the PSB staffing level required to maintain the timely completion of PSB investigations in compliance with the Orders of this Court and state law. MCSO shall (1) provide a draft Request for Proposals to the Court, the Monitor, and the parties; (2) disclose credible bids to the Court, the Monitor, and the parties; and (3) obtain Court approval of the methodology for the study. MCSO must ensure that the study is completed within one year of the entry of this Order.

362. The Court is aware that the MCSO has already engaged a consultant to undertake a similar evaluation. Nevertheless, while the Court will consider both the qualifications of the consultant already hired by MCSO and the outcome of that study, the work of that consultant must comply with the Court's requirements, *supra* and will not be deemed to satisfy the terms of this Order absent the approval of this Court. If MCSO wishes to obtain Court approval of the consultant it has already hired, it must, as a prerequisite, provide the contracting documents to the Court, the Monitor, and the parties within five business days of the entry of this Order; and it must submit the consultant's draft methodology to the Court, the Monitor, and the parties within 30 days of the entry of this Order.

363. MCSO is required to provide access to personnel, documents, and facilities as mandated by ¶ 145 of Doc. 606 so that the Monitor can perform his newly expanded duties.

364. To keep the parties and the Court informed, the MCSO shall report monthly on the size of the backlog to the Monitor, the parties, and the Court. The Monitor's quarterly progress report will further assess the status of the backlog.

365. The authority for MCSO to grant itself extensions in investigation deadlines granted in ¶ 204 of Doc. 1765 is revoked. The Monitor shall be authorized to grant reasonable extensions upon reviewing requests submitted to him by the Sheriff.

366. At any time after the Monitor's submittal of its second quarterly progress report, the Court may revisit the contents of this order and make any changes it deems appropriate.

- 14 -

46REPORT000708

367. Should the Sheriff perceive any conflict between this order and the requirements of state law, the Sheriff shall immediately raise the potential conflict with the Court by motion.

368. MCSO will continue to pay into the PSB Staffing Fund pursuant to ¶ 357 until MCSO reports for twelve continuous months that it has no open investigations that have exceeded the time by which Doc. 1765 ¶ 204 required that they be completed. At that time, MCSO may petition the Court to dissolve the PSB Staffing Fund.

**IT IS THEREFORE ORDERED** granting Defendants' Motion to Modify Second Order (Doc. 2647) in part and denying it in part.

Dated this 8th day of November, 2022.

_____
G. Murray Snow
Chief United States District Judge

- 15 -

46REPORT000709

# Interviews & Timelines

46REPORT000710

**Basic timeline, evidence items, text messages, file names:**

The information provided below is a basic timeline with the available text messages, file names, and other associated known information referenced throughout the interview on 08/12/2025. There is a firm belief that there is additional evidence to support the timeline below as well as statements made during the 08/12/2025 interview that the principal has not been afforded an opportunity to research, collect, or identify given being placed on administrative leave and all accesses suspended on 04/04/2025. The specific allegations of this investigation were also not known to the principal until 08/11/2025. A preservation hold was previously submitted to MCSO for a variety of materials on 04/07/2025 and a copy of the preservation hold request was provided to the AZ DPS investigator on 08/12/2025.

The below timeline captures relevant communications between Chief Palopoli and Captain Lugo as described in depth during the 08/12/2025 principal interview:

February 2025 – Approximately the middle of the month possibly the week after the Monitor Teams site visit. Date can be confirmed via email records. In person, in Chief's Office at HQ.
- Topic(s):
  - Initial meeting, meet and greet
  - PowerPoint presentation provided, reviewed with Chief Palopoli
  - PowerPoint shows the various Court Orders, etc.
  - Stated: "you have this all under control, just keep doing what you're doing"
- Additional supporting information or evidence:
  - Outlook email conversation between Captain Lugo and Chief Palopoli.
  - Lugo Outlook Calendar might have information
  - PowerPoint Presentation – Saved in Lugo's OneDrive possibly in PSB Folder titled Presentations, file name may be something to the effect of PSB Situational Briefing. Exact file name not known from memory.


March 5, 2025 – First reoccurring meeting with Sheriff, Chief Deputy, and Chief Palopoli. In person, in Executive Conference Room at HQ.
- Topic(s):
  - Numerous topics discussed not involving this case.
  - Following meeting, text message sent on 03/06/2025 to see if there were any follow up questions and subsequent telephone conversation.
- Additional supporting information or evidence:
  - Text messages (provided below)
  - Cell phone log (provided below)

1

46REPORT000711



2

46REPORT000712

March 10, 2025 – Initial Blue Team (BT) Entry complaint receipt/review (which was later assigned as IA# 2025-0111 on 03/24/2025).

- Topic(s):
    - First review of the incident summary approximately 3 paragraphs of the initial BT complaint entry.
    - Reviewed as this is the standard procedure for reviewing all incoming complaints for proper determination, assignment, and routing.
    - Last line of entry advising Chief Deputy provided information.
    - Bocardo discussion also known.
- Additional supporting information or evidence:
    - Initial BT entry as reviewed on 03/10/2025 was not provided during the review of materials prior to principal interview.  Concern is that this item was not provided to AZ DPS investigator suggesting it may have not been properly documented.
    - Initial BT entry should be available and archived in IA Pro and/or with Monique (MCSO intake staff).

March 11, 2025 – Communication initiated by Chief Palopoli regarding the Engelbeck complaint entry (which was later assigned to be IA2025-0111 on 03/24/2025).

- Topic(s):
    - 03/11/2025 – 1111 hours – Text message initiated by Chief to give her a call when I had a few moments.
    - 03/11/2025 – Telephone discussion occurred regarding matter.  I informed her of the history and my knowledge of the case that Engelbeck was referencing, to include the fact that the complaint being made by Engelbeck was retaliation toward me, the investigator, and others for being involved in his misconduct investigation.  It was also reiterated that this matter was already previously handled, addressed with a Service Complaint and Chief Caputo.
    - Chief Palopoli mentioned she was trying to "make this go away."
    - Expressed other concerns as referenced in interview to the chief.
- Additional supporting information or evidence:
    - Text message (provided below)
    - Telephone call log (provided below)
    - MCSO LAN access and IA Pro Activity to demonstrate work activity and timeframe for Captain Lugo on 03/10 and 03/11.

3



46REPORT000714

March 17, 2025 – Email communication initiated by Chief Palopoli requesting a meeting for tomorrow (03/18/2025).

- Topic(s):
    - Meeting request from Chief Palopoli to "go over some stuff."
    - Meeting scheduled for in person at Chief's Office at HQ.  0900 – 1000 hours on 03/18/2025.
- Additional supporting information or evidence:
    - Email string between Chief Palopoli and Captain Lugo.
        - Possible email message name:  "RE_meet up.msg"
        - Possible entry on Captain Lugo's Outlook Calendar


March 18, 2025 – Meeting with Chief Palopoli in her office at HQ at 0900 hours.

- Topic(s):
    - Three main areas discussed and details of discussion as outlined in interview on 08/12/2025.
    - Advised seven (7) day requirement has been exceeded.
    - Advised of need to present to Chief Anders.
    - Explained the Chief Anders process from prior instances and watched her write down Chief Anders name in her notebook.
    - Advised Chief Palopoli to advise me on the type of complaint she wanted (Service Complaint, PSB Diversion, Internal Administrative Investigation, etc.) once it was decided and I would have the admin staff initiate the process and send her whatever additional information she may need.
    - I also explained on how this process was done in the past, I would inform Anders, and then provide her his email and then they would consult.
    - Chief Palopoli made the statement of not thinking she would be able to find another law enforcement agency that would be willing to do an investigation and that could do an investigation.
    - Other matters were discussed not directly related to the allegations in the NOI.
- Additional supporting information or evidence:
    - None

March 21, 2025 – Initial intake meeting and conversation with Chief Anders.  Need to verify the phone logs, Teams meeting, and outlook calendar, and possible notes to confirm.

- Topic(s):
    - While there was no IA# assigned as of this time, as in prior instances or when there were prior concerns, during our regular intake meeting, I presented to Chief Anders the fact that there was a

5

complaint filed by Engelbeck and that Chief Palopoli was aware of the matter and I advised her to reach out to Anders to consult.

- o Chief Anders had many questions about the case as he recalled the prior Engelbeck Service Compliant and the dealings with Chief Caputo.  I was able to answer from memory my questions until we ran out of time and we agreed to re-group later in the day, which ended being via email several days later where we scheduled a follow up meeting on 03/25/2025 via phone.
- o Follow up telephonic meeting was scheduled via email on or about March 23-24, 2025.

- Additional supporting information or evidence:
  - o Email communication and string on Captain Lugo and Chief Anders' email accounts.  Title of email messages unknown from memory.
  - o Possible calendar item in Outlook for Captain Lugo
  - o Teams meeting records in OneDrive and record of meeting length and participants.  Meeting title most likely would, based on memory, be something similar to "Intake Meeting w/ Chief Anders."
  - o Outlook emails of meeting invite for the above described meeting would also be in the sent or possibly archived folder regarding this meeting anywhere from earlier the same day to approximately a week prior to the meeting which would be the day of the prior meeting.
  - o Possible Post-It-Note on Captain Lugo's desk with possible additional information.
  - o Excel spreadsheet in Captain Lugo's OneDrive titled something similar to, based on memory, to be "cases reviewed" and this would be in the PSB Folder under the Complaint Intake Folder.  Would have to review or search to locate.  The relevance here is this running spreadsheet would show the cases that had IA#'s issued that were discussed at this meeting and also at the 03/28 meeting.
  - o OneNote entry for notes taken during regular intake meeting may contain additional information.  The exact location, title, file name, page, cannot be recalled from memory without searching/viewing the notebooks.
  - o IA Pro Administrative User Activity Logs would capture date/time and volume of activity in searchable format as to the actions of the principal throughout this meeting with Chief Anders and the "incident access" on the user log document provided in the principal interview on 08/12/2025.

March 24, 2025 – Telephone initiation and conversation about the Engelbeck case. See text messages, and notes initiated via text starting at 0921 hours.
- Topic(s):

6

- o 0921 hours – Received text message from Chief Palopoli requesting I call her when I had five minutes.
- o 0945 hours – Approximate time of telephone call where I called Chief Palopoli as discussed in interview on 08/12/2025.
- o This conversation covered in detail during the interview on 08/12/2025.
- o This is the conversation where the phrase "stay out of it" was used as discussed during the interview in depth on 08/12/2025.
- o No specific mention of the Blue Team entry, IA Pro, Chief Anders or not providing any information to Chief Anders.
- Additional supporting information or evidence:
  - o Email sent to initiate the case assignment as requested in Outlook which has content relative to advising others and Lt. Porter's information and for the assigned investigators to work through the Chief. Email titled: "IC – BT – 03_10 – D1. Msg". This message is believed to also have been cc'd or b'cc'd to Chief Palopoli and contains others email contact information.
  - o Email to Chief Palopoli with Chief Anders contact information sent on 03/24/2025 – Email believed to be titled and saved as: "Chief Anders – Email Contact.msg"
  - o Commander notification email which should be in case file also most likely contains Lt. Porter's contact information. Unknown file name.
  - o Possibly a separate email was sent to Chief Palopoli with Lt. Porter's contact information – would be in Outlook account of Captain Lugo, Chief Palopoli, and may have been cc'd or b'cc'd to others such as Amy or Lt. Porter so their accounts would need to be checked. Unknown message name from memory or exact location it was archived if generated in Outlook account. May also be in case file.
  - o Text message string (provided below)
  - o Phone log (provided below)

7



8



March 25, 2025 – 0930 hours – Telephone call with Chief Anders regarding this matter, which was scheduled as a follow up to the 03/21/2025 conversation.

- Topic(s):
    - Telephone call initiated by me to Chief Anders where I advised of the communications the prior day 03/24/2025 with Chief Palopoli regarding this case, as well as the decision to initiate a formal administrative investigation, be issued an IA number, and to assign the case to Jensen Hughes.
    - Expressed concern with having my lieutenant, admin support staff, and Jensen Hughes involved in the investigation as it is a conflict of interest.
    - Additional topics discussed which were explained during the 08/12/2025 interview.
    - Chief Anders asked if Chief Palopoli was aware of the Third Court Order.  I advised Chief Anders I provided her his contact email and

9

advised him of the email I sent to Monique on 03/24/2025 referenced above (IC – BT – 03_10 – D1. Msg).

- Additional supporting information or evidence:
  - Telephone log (provided below) – this is the telephone number for Chief Anders.
  - Post-it-Note was most likely still on Captain Lugo's desk as of 04/04/2025 with phone number and may contain additional handwritten notes, indications, or references.
  - OneNote entry made regarding call on 03/25/2025 which was generated on 03/25/2025 at approximately 1221 hours.  This is in the OneDrive for Captain Lugo but based on memory, the exact page, title, location, or which notebook or notebook section is unknown if this note and would need to be searched.



46REPORT000720

March 27, 2025 – Thursday – 1234 hours  - Text Message and phone conversation with Chief Palopoli (initiated by her) regarding the Engelbeck matter.

- Topic(s):
  - 03/27/2025 – Approximately 1234 hours – Text message received – (see message) – "Hi Greg! You have a second for a quick call?"
  - Messages exchanged and call made at approximately 1240 hours.
  - This is the conversation explained during the 08/12/2025 interview where Chief Palopoli indicated Chief Anders advised the IA2025-0111 case could not be assigned to Jensen Hughes.  Asked several follow up questions regarding Eggelston and explanations were provided.
  - As indicated in 08/12/2025 interview, Chief Palopoli asked for suggestions and recommendations on who to now assign the case (IA2025-0111).  I declined to provide input, suggestions, or recommendations as this was now a formal administrative investigation and would be a conflict of interest and inappropriate for me to provide suggestions or recommendations.
  - "Yes I am learning that.." quote made as explained in interview on 08/12/2025.
  - Chief Palopoli made a statement that another option would be to have an outside law enforcement agency conduct the investigation but she did not feel their capabilities were good enough to conduct an investigation because she did not know of one that was "competent" to conduct an investigation.
  - Back to zero or back to square one comment made as explained in interview on 08/12/2025.
- Additional supporting information or evidence:
  - Telephone log (provided below)
  - Text message string (provided below)
  - OneNote pages and documents where this was documented which may include two different pages or one page consisting of the same location where I put the notes relative to Chief Anders advisement on 03/28/2025 of the above conversation.  From memory, unable to identify the proper file name, location, folder, where this would be located in Captain Lugo's OneDrive.

11





12

March 28, 2025 – 1000 hours – Approximate – Normal reoccurring intake meeting with Chief Anders
- Topic(s):
  - As discussed in 08/12/2025 interview, this is the conversation where Chief Anders asked for the assigned date of IA2025-0111 when it came up in numeric order on the list of new cases to review.
  - Status and Assign tab access as described in interview and vocalized to Chief Anders as also described in 08/12/2025 interview.
- Additional supporting information or evidence:
  - Outlook calendar meeting invite/content possibly titled something similar to "Intake meeting w/ Chief Anders"
  - Outlook meeting invites would be archived as a sent message to Chief Anders on this date or possibly sometime between the prior meeting and this meeting.
  - Microsoft Teams calendar and meeting in Captain Lugo's OneDrive of the meeting in question, length of time, participants.
  - Running excel spreadsheet in Captain Lugo's One Drive that was utilized for this meeting.  Excel file may be on Captain Lugo's OneDrive under the PSB Complaint Intake folder possibly titled something similar to "cases reviewed.xls".  This will show all cases reviewed at the respective intake meeting.
  - IA Pro user logs for the cases preceding IA2025-0111 on the excel list and after IA2025-0111 demonstrating the process, time spent, and the difference of the manner in which the assigned date was the item accessed.  This from memory would be at least IA2025-0110 and IA2025-0112 but additional ones on the excel spreadsheet that show reviewed on this date, with a comparison of the IA Pro Administrator's logs of activity with those cases and activity around the time of this meeting, will further confirm the statements made in the interview on 08/12/2025.
  - Captain Lugo's OneNote entry for this intake meeting.  From memory unsure exactly which folder, notebook, or page it would be located.  Possibly in the section titled "Court Order" or "Third Order" and then the corresponding date.  Unsure of exact location from memory.  This entry may also contain notes of the 03/27/2025 conversation with Chief Palopoli and the advisement to Chief Anders of the conversation content with Chief Palopoli along with my concerns.

April 2, 2025 – 1000 hours – Meeting with Chief Deputy, Sheriff, and Chief Palopoli at MCSO HQ conference room.
- Topic(s):
  - This in person meeting was described in detail during the interview on 08/12/2025.

13

- o Other topics unrelated to the allegation(s) in this case discussed.
- o Restructure of PSB discussed as described in interview on 08/12/2025 and the clarification of the statement by Chief Gentry that Chief Palopoli had discussed the matter with me being not correct was pointed out.
- o Chief Gentry brought up the Engelbeck case, including the statement implying that he was sure I was aware of the case, and the hypothetical statement of being placed on administrative leave as described in interview on 08/12/2025.
- o Advised the group I did express that what I saw (a few paragraphs) and knew at that point, I was not sure it is actually warrants a misconduct investigation (previously investigated, alternative approach, etc.) but that there may be items that I am not yet aware of as the entry stated additional items were provided to the Chief Deputy.
- o Captain Lugo advised all three participants in the room that he will not be in contempt and will not violate the Federal Court's Orders. Furthermore, concerns relative to implications that changes to PSB have already caused and may have to current production levels, projections, and the ability to meet the Court Ordered requirements in the future, resulting in sanctions.
- Additional supporting documentation evidence:
  - o Outlook calendar meeting invite on OneDrive account belonging to all three participants of the meeting.

April 3, 2025 – Evening hours – Approximately 1800 hours – Aguila Elementary.
- Topic(s):
  - o Community meeting in Aguila and had a private conversation regarding a recent jail contraband case providing the update with both Chief Palopoli and Chief Gentry, and no mention of this matter or anything associated with it.
- Additional supporting information or evidence:
  - o Possibly in the Outlook calendar of Captain Lugo and others in attendance.
  - o Emails in Outlook belonging to Captain Lugo and other members of the Community Outreach Division and Court Implementation Division relative to the meeting being held, content of meeting, etc.  Unknown on email titles, where documentation or files may have been saved in OneDrive from memory.

April 4, 2025 – Approximately - 1000 hours – Regular intake meeting with Chief Anders
- Topic(s):
  - o Regular intake meeting with Chief Anders

14

- o No mention of the Engelbeck case, rather all other cases and items were processed as normal.
- Additional supporting information or evidence:
  - o Outlook calendar meeting invite and content possibly titled something similar to "Intake meeting w/ Chief Anders"
  - o Outlook meeting invites would be archived as a sent message to Chief Anders on this date or possibly sometime between the prior meeting and this meeting.
  - o Microsoft Teams calendar and meeting in Captain Lugo's OneDrive of the meeting in question, length of time, participants.
  - o Running excel spreadsheet in Captain Lugo's One Drive that was utilized for this meeting.  Excel file may be on Captain Lugo's OneDrive under the PSB Complaint Intake folder possibly titled something similar to "cases reviewed.xls".  This will show all cases reviewed at the respective meeting per date column.
  - o Captain Lugo's OneNote entry for this intake meeting.  From memory unsure exactly which folder, notebook, or page it would be located.  Possibly in the section titled "Court Order" or "Third Order" and then the corresponding date.  Unsure of exact location from memory.

April 4, 2025 – Approximately 1518 hours – Being placed on Administrative Leave
- Topic(s):
  - o Communication from Chief Gentry to being placed on administrative leave as described in interview on 08/12/2024.
- Additional supporting information or evidence:
  - o Text Message (provided below)
  - o Phone logs (provided below)

15





16

46REPORT000726



Additional supporting information or evidence:

- Topic(s):
  - Weekly report of newly generated internal affairs cases is generated and emailed electronically to me as well as various members of the PSB as described during the 08/12/2025 interview. This file was emailed to Chief Palopoli by Captain Lugo estimated to be during the week of 03/31/2025. Email is relevant as it demonstrates the information in the system at that time (the time the report was generated) as well as the allegations that the intake staff concluded were the basis of the complaint with the information available or provided.
    - Document title and initial email title from memory should be similar to: "Weekly open case report 3_24_35-3_30_25.msg"
    - The forwarded email message sent by Captain Lugo to Chief Palopoli most likely would have a message titled something similar to "Weekly Opened Case Report." This message would be in Captain Lugo's Outlook archive (unknown from memory if in sent folder or in archive folder with a category flag, or saved elsewhere). There was also a message sent to the Monitor Team (Chief Kiyler) with the same information as that was the procedure at the time. The actual report is further archived in Captain Lugo's OneDrive under the PSB Folder in a subfolder possibly titled Opened Case Reports but would need verification.

17

46REPORT000727

**INTERVIEW WITH CAPTAIN LUGO**
**Q=Sgt. Craig Baum**
**Q1=Sgt. Tristan Glueck**
**A=Capt. Lugo**

Q:     Let's start. Today's date is August 12, 2025, and the time is now 1017 hours. This interview concerns Internal Affairs Case Number 2025-064. This interview is being conducted in (DPS IA Suite) located in Phoenix, Arizona. Present for the interview are Internal Affairs Sergeant Craig Baum, Badge #6968, and Sergeant Tristan Glueck, Badge #7108. The person being interviewed is the subject of this investigation, MCSO Captain Greg Lugo, #S1480. Captain Lugo has support observer, MCSO Sergeant Alex Frank, #S1455, present as support observer. You were given the opportunity to review documents pertaining to this case on 8-11. Is that's correct, sir?

A:     That's correct. Yes.

Q:     Okay.

A:     Today's the 12th, so yes.

Q:     You had the opportunity to review and sign those investigation files and review GH2, internal investigation. Do you have any questions about those documents at this time?

A:     No.

Q:     You are aware that this administrative and confidential investigation does not com- discussed with anyone outside of this interview?

A:     Or on the Notice of Investigation.

Q:     Correct.

A:     Right? So.

Q:     So, like clergy.

A:     Yes. All of the - other than what's designated on there.

Q:     Um, correct.

A:     I understand, yes.

Q:     You're aware that those investigations compels you to give a complete and truthful answers?

A:     Yes.

Q:     Can you state your full name, badge number and current assignment?

A:     Um, Captain Greg Lugo, L-U-G-O, Badge Number 1480, Maricopa County Sheriff's Office, currently assigned to the Professional Standards Bureau.

Q:     How long have you been with the department?

A:     Um, so we're looking at about 24 years, so, uh, 2001, uh, is when I, uh, like, I finished the police academy and became sworn.  Somewhere at 25, so actually it's coming up August, I think, 9th, actually, is the day we graduated the academy, so about 24 years.

Q:     Which academy did you attend, sir?

A:     UM, the, uh - it was at the MCSO Academy, Class 106, the AZ POST.

Q:     Who's your current supervisor?

A:     Well, I'm - because I'm on administrative leave, I report to the PSB, so.  So, I think at the time that this occurred, my supervisor was, uh, Executive Chief Palopoli.  So according to the admin leave paperwork, I am my point of contact is a detention officer and has been since April 4.

Q:     And...

A:     So.

Q:     ...who - who is that?

A:     That's, uh, Officer (Linda Walters).

Q:     Okay, sir.  Can you tell what occurred with this complaint?

A:    Okay.  So, um, when you say this complaint, are you referring to the insubordination or are you referring to...

Q:    Uh, this complaint, sir, that we're here for today, insubordination and failure to notify.

A:    Okay.  So, I did not know what this...

Q:    Yeah.

A:    ...complaint was about until yesterday.  Um, absent the phone call when you told me to, you know, you needed to schedule the interview, and you mentioned the word, uh, insubordination.  Um, but to give you the rundown of then, after I reviewed the material, um, what my perspective is, I believe that the, um - the easiest way is to go through a timeline of events of the interactions that are the basis, at least in the documents I reviewed of accessing, um, and, uh, insubordination aspect, uh, between me and the chief. So, would you like me to go through that timeline?

Q:    Yes, sir.

A:    Okay. So to understand and put, uh, the, uh, items in context, uh, first off, I wanna make it clear that, uh, this is based on my notes that I have available to me and had available to me, but as of April 4, I was completely locked out of, uh, the system, and so I cannot access.  Um, I know that there's notes and information, and I'll be able to point to some of those files and advise where they could be potentially located, but those files, uh, further support the timeline of events, and the facts here.  Um, that are, uh, that we go through it, so.  Um, and I can go into more detail on any of these, uh, if - if you'd like, but, uh, just to try to keep it on track with this particular complaint.  Um, so I think to put the interactions with Chief Palopoli and me, um, to be able to lead up to that conversation about IA, which later was determined to be, uh, 111 and the access, allegedly, of that.  Um, I need to give you just a little bit of background.  Um, so, uh, in February, and I'd have to verify the date over an e-mail 'cause there was e-mail correspondence, I got an e-mail from Chief Palopoli who wanted to meet me.  Um, I did not even know she was hired, uh, but, uh, wanted to meet me.  Um, and just do an initial introduction. So, in that meeting, there was an initial meeting, and I provided her a PowerPoint of where PSB was 'cause I'm the PSB commander at the time, and I can get into those duties, um, at a - at a later point.  So, um, I provided her that presentation, and I think some of the key takeaways of that meeting are, she says, I can work whatever schedule I want.  And she points to her screen or the screen I had of the PowerPoint presentation, which I don't have access to show you, uh, but, uh, talks about some of the requirements of the court's order, especially with regard to, uh, processing incoming complaints.  And,

46REPORT000730

uh, she says, you have this all under control as it is.  So just keep doing whatever it is that you're doing.  Okay, this is very complex.  She also refers to, um - she liked the PowerPoint presentation because Matt Summers, who was a captain at the time, uh, provided her all these other documents, and she flipped through these documents on her desk, which to me appeared to be copies of the monitored quarterly reports and the court orders.  That will become relevant later.  Um, and said she rather just like the 10 - it was like 10 or 12, uh, slide PowerPoint presentation.  So, at that meeting, uh, there's other things - other things that don't have to do with this case that were discussed, just housekeeping, uh, kinds of issues.  Um, we exchanged some phone numbers.  And, um, then, uh, through follow-up communication, we were going to resume we had typically a monthly meeting with the sheriff and the chief deputy and PSB.  Um, that was already typically that was done during the prior administrations, both of them.  And so, I inquired if we were going to resume those.  So, there was some communication back and forth. And those were resumed with the first one being, uh, on March 5.  So, March 5, there is one of those first reoccurring meetings.  Now that really is just updating on regular - uh, regular matters in PSB.  We're still not even to this complaint as of yet.  So, you know, the 111 being entered.  So, then March 10.  Okay? So, this is the day that the initial blue team entry, or you can say complaint entry comes in, um - in IAPro. So, my role and responsibility as the PSB commander.  So, I don't know if DPS uses IAPro or not, but, um, there's an incoming bin, is what they call it.  And the default setting on every time I log into IAPro, that's what comes up first and so those are pretty much like any complaint, uh, that is in the queue, meaning it needs, like, somebody entered it somewhere, and it needs to be still processed.  So, one of my many duties as the PSB commander is to review every complaint, um, every item really sent to PSB for a possible, uh, complaint issue, and then identify a proper course of action in accordance to the MCSO policy.  So oftentimes there's - that includes ones that come in through email, which there's a PSB email box, which is separate from IAPro, but then there's also the IAPro, uh, bin, so, um, this would have been March 10.  Um, it was that week, and if you look at the - the version of the user log that was provided, um, which I'm going off of that, and we can talk about that later.  But um, so March 10 of that particular week, I would have been working, um, some very odd hours because my kids were on spring break, and so, um, it also would not be uncommon in my last 4 years working at PSB to work well in excess of 100, 120, sometimes even up to 130 hour pay periods, um, due to the demand and the requirements of the position to keep us on track.  So, um, I recall, uh, reading, which would align with, uh, the access log.  Um, let me look.  I wrote notes of this.  So, this was my first review.  So, I am looking at - so they come in, and everything in the incoming bin is there.  So, uh, what happens is, um, it's the category, and this becomes relevant if you look at the NOI, because what happens is, there's the field is blank for assigned.  The column, um, is blank.  Um, until the first time one the first person clicks and opens that. When they first open it, then if

INTERVIEW WITH CAPTAIN LUGO
Interviewer: Sgt. Craig Baum
08-12-25/10:17 am
Case # 2025-064
Page  5

you do not assign it to somebody, it auto-populates the word unassigned...

Q:     Mm-hm.

A:     ...which is where you're gonna get this.  So that's - and that only happens the very first time, so, um, that anyone opens it.  Now my intake staff also have access to that incoming bin, and they help me manage it in that sense.  So sometimes if because we have deadlines of - they have to be processed within 7 days, and there's other requirements that they'll help me, be like, "Hey, that one came in on this day.  What are we doing with it?" Or, you know, there's some communication back and forth.  So sometimes they look at it before I see it.  On this particular, uh, one, I don't believe that was the case based on what you have there.  Um, so I click on it, and what I see is approximately three paragraphs only.  Okay? What I'm looking at is the bubble, the incident summary bubble that comes up.  So, you double-click on the incident, and I don't know how familiar you are with IAPro.  I could walk you through it.  Um, there's, uh, like six or seven tabs across the - the screen, and there's like a file - there's like a tree.  Last night I tried to pull up the user manual that's public record that's on the - I don't have the file tree here, uh, an example of it.  But needless to say, so it lists.  Uh, so but the incident summary, um, is then a box of pretty much a - a - a narrative of whatever was entered.  Um, I start reading the summary, which consists of about three paragraphs.  I think it was three paragraphs and a additional line. Um, and as I'm reading it, I'd like to refer back to my notes because I - (unintelligible) page 10.  So I was at home, uh, working, um, as I said, and I work well into the evening on many days, especially when they're on spring break.  And if you were to look at my - I - I have evidence to support I was doing other activities, uh, you know, official business at this time.  At that moment, 7- it's 1903 or something, uh, is what it says on that - that document.

Q:     Mm-hm.

A:     So, I reviewed the handful of paragraphs, and, um, I read the summary, that summary box, one time.  One time.  Um, I read the summary.  Uh, from what I can recall from reading it one time, it makes some type of statements ranging from Sheriff Skinner not paying COVID pay, uh, to Engelbeck. I see Engelbeck is the person who entered it, um, 'cause that's on the first line on the side.  Okay? To, uh, an interview, um, him not being provided regarding his case that was under appeal, which was the triple 5 case.  Um, to being unhappy, he couldn't cross-examine me in his merit appeal.  Um, his findings were changed prior to - because his findings were changed.  Uh, he also referenced something about evidence being destroyed and cited some ARS Statute.  Um, at the end of the entry, I noted that it was written that other information was provided to the chief deputy.

INTERVIEW WITH CAPTAIN LUGO
Interviewer: Sgt. Craig Baum
08-12-25/10:17 am
Case # 2025-064
Page 6

Q:        Okay.

A:        Um, I also recall it saying something to the effect that I might have had involvement in his case and should have, uh, recluse myself or recused myself, using the right term, and that Holmes changed one of the findings, um, initially but then changed other findings with no explanation. Um, I closed the entry, uh, because I recognize that that's referencing me. And so, I closed the entry at that moment. And my plan is at an appropriate time. Well, first off, I see that it's already given to the chief deputy is what he says in there. And then I'm going to follow up with Chief Palopoli and let her decide what she wants to do with it. So, we are at the very infant stages in MCSO policy of initial intake and routing. So, this is, uh, based on the documents I reviewed yesterday. I see that it was entered a few hours earlier. So, I continue doing, uh, some other work, uh, but we are well into the evening. Um, and then, um - um, so that pretty much, uh, would - well, that would be in line with - so we have now 7 plus days. Um, the other items that are crossing my mind and that are coming into my mind is, I'm aware there was a service complaint previously done, um, involving Engelbeck 'cause I knew that from before. I don't recall ever reading that or ever seeing that completed one until yesterday. Okay? Um, I know that he brought up other issues in his appeal, uh, you know, matter and he, you know - he also tried to file the same similar complaints and was upset regarding, um, uh, his case. The - the 555 case and how that was, uh, purs- you know, being, uh, handled kind of thing. So, um, without getting off-topic and talking about 555, 'cause I don't think that has really any relevance, uh, to these allegations, uh, where we stand today. Um, uh, one other thing that I had in my mind but it's - it is dropping off right now, I got it, so. I continued, uh, about my business. In reading what I read, which I was not provided anywhere. The - the incident summary that I actually read on that date. Okay? Um, to me their, uh - that is something that can be processed, might have already been addressed. But I don't even know that if you look at our policy, um, jumping around of a service complaint, it almost fits that, okay, the COVID pay has nothing to do with - you know, that's a procedural issue that can be, uh - uh, grieved for a separate process. Um, not being provided to be able to cross-examine an appeal. Well, the appeal, everything was dropped. So that's an explanation of - that's a merit appeal. Like, that's a merit, right? And if you didn't have an appeal, yeah, you don't get to cross-examine, the findings be changed. There's a procedure for that and why that occurred. And that's not, uh, PSB not being provided. Whatever, during his appeal is a matter that PSB isn't even involved in. So, um, and that's where he cited some other - that other statute. So, reading that to me, there's no, um -there's no ag- agency or urgency at 7:00, uh, plus at night to need to take any other action. Uh, as the PSB commander, um, on the intake and routing, because he also says the chief deputy was already - this with - this - and an additional material was provided to the chief deputy, which I don't know what that was. So now I put that also

together with, approximately 1 to 2 weeks prior to this, um, Sergeant Bacardo, uh, Gino Bacardo, who works in our professional standards, um, was, uh, he was, uh - they were working. He's in the criminal section, and they were working, um, another complaint from Engelbeck regarding thumb drives, uh, being potentially stolen from his office at his district substation. And so, Gino was looking at that or Sergeant Bacardo was looking at that from a, you know, criminal perspective. Um, and, um, Sergeant Bacardo came in to me and said that he spoke to Engelbeck and Engelbeck - about the thumb drives. But Engelbeck, uh, brings up to him, starts asking questions about, uh, who can delete files and where are files deleted and all of this, uh, nonsense because he wasn't provided something during his appeal. Um, Sergeant Bocardo comes to me going, "I don't know. What should I tell him? I don't know what, like I don't know how that all works. He's on the criminal side, not on the administrative side." And I instructed Sergeant Bacardo, I said, "You need to tell him he needs to go back through who he dealt with in his appeal. If he's saying he wasn't provided something in his appeal," which would be our conduct resolution section or the county attorney who he's interacting with for his appeal, which I believe was Neil Landeen, um, and his staff at this time. So, Sergeant Bacardo then offers and - and says, well, Engelbeck indicated that he has an upcoming meeting with the sheriff and chief deputy to discuss basically his complaints about PSB. Okay. So, um, I have that knowledge in my head, you know, of occurring at 1 to 2 weeks later when I see this, okay well, obviously he had his meeting, or he's providing his stuff to the chief deputy, whatever his concerns, uh, very well might be.

A:    Okay.

A:    So, I go about and I - you'd have to look at all my accesses of how - I don't remember how long I worked that day. Had I known this was gonna be an issue? I do also use a, um - I - to keep track of all my hours, um, so I can input my hours correctly. I do - I basically punch in and out on my phone and I keep a record for the pay period. And then - 'cause I can't even keep track of how many hours I'm working and then at the end of the pay period, when I go in to complete my time because I'm a salaried employee, I refer to that and put that in and then clear it out for the next week. Um, so - but you could easily see my access to Outlook and everything else to see what around, you know, the other items that I was doing there. Um, I also would have reviewed any other, uh, complaints, new ones that came in and would have sent emails, uh, to our intake staff to process those. So, the normal process of an intake is it's reviewed there and everything, whether it's an email or what and then I send an email to (Monique) at the time, who was our, uh, complaint intake, my contact, um, and say, hey, make this one. And I refer to it in a certain code, which I'll show you in - in the - the email message. And that one make that an internal complaint, assign it and where to assign it, uh, to, whether it's going

to an investigator.  And if I want to go to a specific investigator, if it's going out to a division to investigate or for assigning it, uh, somewhere else.  So, I'm just trying to give you sort of perspective there.  So, my plan was, okay well, the next, uh, appropriate time I'll have a discussion here with the chief.  Obviously, the chief deputy knows about it.  So, um, the next morning then.  And I have text messages, uh, to back this up, uh, that I can provide to you.  Uh, but, uh, about 11:11, I receive, uh - this is now on the 11th.  I receive a text message from, uh, Chief Palopoli, advising her to give her a call when I had a few minutes.  So, to give you an idea where my schedule is and what I'm looking at on this day, I'm also working from home.  Kids are on spring break.  Um, you'd have to look at the access log.  So, one, I even started that particular morning because, uh, when they're on spring break with - I take them to an activity the first thing in the morning, 7:00, 8 o'clock.  Sometimes we're not back till 9:00, 10:00.  And then I, uh, start - start about my work.  So 11:11, I get the, uh, text message to call her when I have a few minutes.  Um, I called her at 11:13 and the call was 21 minutes.  I have the call log history, uh, snapshotted.  Uh, that I can provide you if - if you, uh, would like that.  Um, she started the conversation, uh, that she was sure that I already saw it, but Engelbeck had filed a complaint.  Um, I in- uh, indicated, uh - I inquired as to what it entailed and advised her that I had seen the blue team entry.  Um, and read it one time and was going to follow up with her because it makes the mention that, um, he - I knew about that I mentioned about the meeting.  That I had information about.  And the comment at the end of the entry that said that, uh, he provided the information to the chief deputy.  And I forget if it said, provided, sent to, I - I don't recall exactly the verbiage, but it indicated clearly that the chief deputy was made aware.  Um, I did indicate that, hey, it was - I read about three paragraphs 'cause that's all that was there in that summary, is all that I, uh, looked at.  Um, and, um, she then starts asking me for a quick overview of all the information she talks about.  She - we talk about the thumb drive case that I just talked to.  You just mentioned pretty much running through the same, uh - uh, information, uh, with regard to that, um, as well as the fact 'cause in the thumb drive case, I don't know who's investigating that at this point, uh, but, um, there's comments in there that, uh, Englebeck is alleging that, um, Captain Lugo, uh, Sergeant Leatham, Ken Holmes or Lieutenant Houck would be the only ones that have interest in his thumb drives, uh, pretty much making the roundabout allegation that we went into his office, wherever that is, at the district substation and took thumb drives off his desk, um, that had some type of appeal material that only he knew about.  Um, so, uh, I - I'm getting off-topic there.  But I brought up the fact that all he's doing is this is a clear retaliation, uh, with regard to Engelbeck.  He's unhappy with, uh, the way his misconduct inves- investigation ended out.  He's retaliated against other individuals.  Uh, and I could point to other cases, other supervisors over the years that if ever held him accountable.  Um, and, of course, I think, as you saw in the documents, if you read all those, this all stems back to, um - I

46REPORT000735

made a recommendation that he did not successfully combete - complete his promotional probation as a lieutenant, um, years earlier, so. Um, I bring up some of that. A bit of it. Bring that up 'cause, uh, Chief Palopoli is asking me all these questions. Um, I also express now further concerns with Chief, uh, Palopoli about, uh, the chief deputy and others, uh, interjecting themselves into old cases, reinvestigating matters because my understanding with what I read, number one, uh, it doesn't even apply to PSB individuals or - and the- these matters were already addressed. Uh, and or in, you know, by Chief Caputo or also in that original 555 case. But needless to say - and I say interjecting themselves into others without going way off down a rabbit hole. Um, there was - uh, at that March - that first monthly meeting, um, uh, the chief deputy, uh, they started asking questions about, and they wanted copies of some older cases, some cases that were already completed and were giving the impression to me that - that they were looking at taking action on those cases and possibly, um, reversing them, uh - uh, and, uh, removing somebody from the Rule 15 list, etc. So I know that's a whole separate, but that's where I expressed, you know, now - now I have concern here if we're going to entertain with a meeting, uh, because there's other examples leading up to this, um, that I either - I'm becoming aware of as the PSB commander, that other chiefs, um, and executive command that were recently brought in or, um, openly entertaining complaints about cases that have already been closed...

Q:          Mm-hm.

A:          ...and concerns with those and how, uh, you know, and they were seeing it, what they were - they could do to change them or take whatever action. So, they're entertaining all of this. I expressed just concerns with re- basically, um, litigating cases that have already been litigated. Um, I told her, uh, I also spelled out how - 'cause it mentions in there how I'm not involved whatsoever in providing any files or anything to him and an appeal and that she needs to probably go talk to - she needs to look at the Chief Caputo complaint. She might need to go talk to conduct resolution, but maybe she should go, you know, talk to Ken Holmes, who's our appointing authority and find out what actually happened, uh, with that case. Uh, I wanna say, she also asked some questions with regard to, like, why the findings got changed in that 555 case and how that all played out. Um, I - to the best of my memory with what I knew at that moment, I filled her in on that. Now, um, she makes a - a statement there that I didn't see in her interview. Uh, but, um, she said she was not concerned and was just trying to make this go away. And I said, "I'm not asking you to go make it go away." Um, meaning the complaint. I said, "I - you just need to know all the information and then let me know what - what needs to happen, uh, with regard to it." So, there it sits in the incoming bin of IAPro. So anytime me or a few other individuals that have it set, to be able to view that incoming again that have the permissions to do so, it's sitting there,

uh, waiting for the chief to determine what course of action, um, needs to be taken, um, with regard to it, so. And that would be - the next step would be the intake and routing, okay? Of it. At first, you gotta identify not to go through all our policies and procedures, but the PSB commanders to review it, uh, has the ability to do, uh, an actual - not even as a supervisor, but to be able to do additional review to determine if, uh, you know, it can be handled, how it needs to be appropriately handled in accordance with the court's order. And that's, you know, there's a variety of options in GH2, uh, diversions and everything else or an actual administrative investigation. So that's the stage that it's left at. So, I said, well, let me know what you need to do.

Q1: Captain, let me stop you for one second. If it has not been assigned an IAPro by you.

Q1: ...or by - by - by somebody and the - the - then you open IAPro. Does it show you accessing that?

A: Just opening IAPro?

Q1: Yes, sir.

A: No.

Q1: Okay. So...

A: You'll have to...

Q1: So you would have to actually click on the - the - on the case or on the complaint in order to show your access to it?

A: Um, with what I know, yes, to show incident accessed. So, where you see on that, and I'll get to later. This is not an authentic copy of the user log, which I...

Q1: Okay.

A: Yeah....have a screen image I could show you. But yeah, where it says incident access by user. My understanding is that you have to actually - so even if I did a search for that. Like - do you guys have I- use - use IAPro or no?

Q1: We use it as a filing system.

A: Okay.

INTERVIEW WITH CAPTAIN LUGO
Interviewer: Sgt. Craig Baum
08-12-25/10:17 am
Case # 2025-064
Page 11

Q1:     We - we - we get our complaints through a - through - through a different form.

A:      Okay. Okay.

Q1:     So, we - we don't use it as complaint intake.

A:      Yeah. Okay. So, well, it's just an entry that's on there.  So, it's a - a line across the top on the incoming bin.  So, if I just say, do a search and say, I want all complaints between January 1 and December 31 for the year, it's gonna give me all those, say, it- say, it's a 100.  None of those are gonna show that I accessed anything because I didn't - until I have to actually have to double-click on that one, then it's going to...

Q1:     That's what I need to know, sir.

A:      ...open up in IAPro.

Q1:     Okay.

A:      Yes.

Q1:     Thank you, sir.

A:      So...

Q1:     Go ahead and carry on.

A:      A- and just to give you a little bit of history there, like, I was one of the very first, uh, IAPro, um, administrators for our organization.  I actually helped establish and set up the entire EIS, uh, throughout the court orders.  Um, uh, CI technologies actually asked me to go be an instructor for them.  So, like we actually tailored the system.  So, um, you know, that's just to give a basis of my knowledge of - of how it works.  And of course, I know software changes over time.  So, there's been some changes, uh, but...

Q1:     Okay.

A:      ...just to give you a perspective there.

Q1:     Carry on, sir.

A:      Yeah. So, uh, that ends the, um - go back to my timeline, like get this timeline.  So, stay on track.  Okay.  So, March 11.  Okay.  I talked about that, the text message, which I can show you, uh, that text message string and

call history, if you need for that. I made the mention of trying to make it go away, covered that.  And yeah, I expressed the concerns.  And I can list - give you those other cases if you want to know about them, but I mean, I don't know those other cases of it but.  So, uh, then there's no discussion at all or communication regarding this matter with her until, uh, March 17.  So - well, I don't know that the March 17 communication yet, but March 17, and there's an email, uh, you can go - you got to look through my emails and hers, but she sends an email requesting a meeting for tomorrow, March 18.  Um, I inquire as to, she says, uh, it's to quote, "go over some stuff", end quote, is I think the - I don't know if that's the title of the email or what, uh, but that's in the email and there's an email exchange back and forth, I think to figure out the time of when we're going to meet.  Um, uh, and, uh, I asked, is there anything you need me to prepare for that to bring for you?  Like, I don't know what this is about.  Um, and, uh, we are, uh - she says, no, there's nothing, um, but she wanted it in person at her office, um, at headquarters, so it was set for 9 o'clock on the 18th, so I arrived at 9 o'clock-ish, give or take, I think it was there, maybe a few minutes early.  Um, but, um, so I walk into her office here, um, on March 18, and, uh, the only other person in there is her, and this is in person.  Um, she closed - gets up and closes the door and says she does not want Sergeant Fisk to hear this conversation.

Q1:     Okay.

A:      So, Sergeant Fisk.  That's a whole another story, but his cubicle is, I believe, right down the hall around - around the corner, so.

Q:      Mm-hm.

A:      Um, she starts out the conversation, saying that, uh, it's about the Engelbeck matter, and I was not being placed on leave at this moment, and I'm gonna still be the PSB commander and do everything that I'm responsible to do, and I don't understand where any administrative leave would come into effect here, this is not making any sense to me.  Um, continue doing my current role, but the chief deputy decided he was going to - going to be requesting an outside agency, conduct an investigation.  So let me go to my - more detailed notes of this meeting.  So, we then - there was three main items discussed during this in person meeting, so the first item was the Engelbeck matter.  Um, she advised that she spoke with the chief deputy, the chief deputy is going to look at requesting an outside agency to conduct an investigation into the matter.  Um, she advised, she did not think they were going to be able to find an outside en- entity to conduct an investigation, but that was the chief deputy's decision.  Uh, Chief Palopoli made a strange comment at the beginning like I said, saying, "I was not being placed on leave and remaining in my position, but an investigation was going to be conducted."  Um, I inquired as to what the allegations were, and Chief Palopoli stated, uh, 'cause I

said - brought up the retaliation concerns just like I did on the phone call, and I said, well what are really the allegations here.  And she says well the outcome might be retaliation, uh, towards Engelbeck on this case, meaning he's retaliating against me.  Um, I attempted to explain I wasn't aware of the overall complaint.  Uh, but, uh, you know, I also heard third party - I reaffirmed that the conversation, you know the Engelbeck stating he was gonna have a meeting with the sheriff or chief deputy, um, about, uh, him being unhappy with PSB.  I reiterated there was a prior service complaint, and on what I perceive to be the issues relative to PSB, based on the paragraphs that I read, um, that, uh, these matters, uh, were already addressed, and - or the matters have nothing to do with PSB, or even me about my work.  Okay? Um, Chief Palopoli then indicated that Engelbeck is alleging a criminal violation of tampering with evidence, and that was the first time I heard of a criminal allegation.  Um, also informed that the chief that, uh, if - I said if the allegations of a case was initiated, um, of me, a - a criminal investigation against me, that I would be ineligible, uh, to teach the training courses that were in the middle of teaching, uh, at that point, and we're gonna cause - there's gonna be a whole bunch of other slew of problematic issues which, you know, I'm not gonna be able to do, pursuant to our policies.  Um, she was surprised and, uh, indicated that she was not aware of those implications.  Um, I asked her - I also then asked her, well, what do you want to do about the entry? It's still sitting in IAPro, so you just need to tell me what you wanna do with that.  Um, I indica- I told her the process requires a case number, a case classification, an intake determination, additional steps, all that need to be done within 7 days.  And she asks, well, how long do we have? And I said 7 days, and we are now already on day 8, so we're already now out of compliance with the policy and the court's order, uh, with regard to that.  Um, this included a review with the monitor team that I reiterated to her, which becomes relevant because I brought those up in prior discussions in my PowerPoint of how the monitor actually, pursuant to the court's order, has full authority over the entire complaint intake, uh, routing, decision, determination process, which I can cite to you in the paragraphs.  But, I mean, reiterating this to her.  So, um, uh, I said this requires a review with the monitor team, and I walked her through what information needs to be provided to the monitor team, typically how it does, how I do it.  He wants to know the allegations.  Um, I talked about the routing, and I said, also then you need to tell me what to do with it 'cause your are the - you're options are of course, a service complaint, a diversion, an IA, all of those different options once you decide what you wanna do with it, and then it needs to be, uh, confir- co- uh, spoken to with, uh, Chief (Anders).  So, um, I said, just let me know what you need to do with it, and I will have the administrative staff process it and send her the information.  Okay.  That's how we have handled these, anything similar to this, uh, up until this point.  Um, so there's been several others that I could point you back to, but, uh, the monitor has been on board as well.  So, um, you know, the most recent one before that, Chief Caputo's service

complaint that was found in compliance, same thing.  He said I want a service complaint number.  Okay.  I told my staff, make a service complaint number, give it to the chief, and go through the process, you know, like it would, so.  Needless to say, I told her just tell me the information.  That's how we've handled all these in the past.  Just whatever you want done with it, tell me, and we'll - I'll let my staff know, and they'll do it.  So - because there's a - a slew of things that it triggers.  As soon as you pull that number, all these other processes start occurring simultaneously.  We've built this very robust system at the PSB that I don't think the chief is knowledgeable at all about what, but as soon as that number's pulled, I have staff on the floor below start pulling work histories, start, like, it's just this whole ripple effect of doing all this stuff, preparing forms for the investigators to help do all of that administrative paperwork that's required, um, which - there's a lot, but to be able to let the investigators do their investigation and not spend time on administrative tasks.  But I - I - sorry, digressed a little bit there.  So, I further said she needed to discuss with the monitor as they handled the complaint intake.  She asked how that process worked, and I said, in the past I would let the monitor team know.  She would be reaching out to them and then give her the monitor's email, and they could arrange for her to meet and review how they wanted.  So that's exactly how we've done it in the past because I am the point of contact with the monitor for intake and routing.  And so, I typically say, "Hey, just so you're not caught off guard, this is, you know - there's one - they need to talk to you about one."  That kind of thing.  So, uh, in the interim, uh, the reporting is needed on this case, and a case number is required.  Um, uh, concerns were also expressed by me that maybe she should maybe read the case, uh, meaning the original 555 case, speak with Conduct Resolution, uh, Ken Holmes, who's our point authority, and the MCAO on the decisions to change the findings and what materials were provided to Engelbeck because PSB doesn't - isn't involved with that at all.

A:    Okay.

A:    So, I said, "Hey, maybe you should do all that and, you know, review it." Uh, the - and I know in the back of my mind because the monitor, Chief (Anders), is gonna be asking these questions, and he's already familiar with the service complaint, uh, with Engelbeck from before because that was just done in 2024, so.

A:    Um...

A:    I suggested she look at the case files because I even said, well, what file is he saying, is tampered with or what?  I said, we don't provide any materials.  Regardless, PSB doesn't provide.  Um, uh, and the statute he's referring to is referencing under - until a case is closed.  So, I'm sorry, we don't provide any materials to anyone, um, until a case is closed.  Um, and requests come

46REPORT000741

through a public records request, meaning PSB doesn't.  So, we have no involvement with providing materials during an appeal.  Uh, the case was closed in February of, uh, this year.  Um, so and I know that because I got a closed case notification, but all of his requests, uh, and information during the appeal were provided by an entity not involved with PSB.  Um, I also did go over her, the - briefly the sort of the three subpoenas process that occurred in the 555 case about them, his merit appeal.  So - 'cause I was reiterating that he's saying that I had some involvement in his case.  And I just said, "Go look at the case.  You're going to see that."  I said, I didn't even read that case, 555.  Uh, I am still waiting for a copy of it, actually, um, I reviewed most of the Word document the day before, uh, I was told that the appeal hearing, which was like for that Friday, was going to occur.  So, I read a - a word version of it.  Um, so I spelled this all out to her saying that - so, like, I don't know how I could have any involvement in his case.  I didn't sign it.  I didn't do anything, uh, with regard to it being worked over all these years.  And I said, you'll be able to see that.  And that was what my understanding was Chief Caputo already looked at.  But, uh, so I just spelled out when I looked at that 05 case, meaning, during the appeal and how I was advised that they were actually dismissing the appeal and the fact that the county attorney asked me to testify initially and then, uh, for that case, and then Engelbeck tried to subpoena me for that case, which further goes to support his retaliation harassment.  And there's e-mails, that's something separate but I sort of give a brief recap of that information.  Um, and I also reiterated, uh, the service complaint.  Uh, and that service complaint done by Caputo on this matter was already reviewed and approved by the monitor.  And the monitor actually found it in compliance 'cause I remember her speaking about it at a monitor site visit meeting, saying that she even reviewed a service complaint completed by Chief Caputo, and it was compliant with all the requirements of the order.  So, um, uh, I told the IA would be provided in March.  Uh, I said it was going to be provided to the monitor.  And this is the 555 case because it was closed in February.  And I told her I expec- I expected the monitor to find the 555 case not compliant 'cause they did not agree with the appointing authority changing the findings.  So, I don't know what they ever, uh, determined, but I expressed concern of that.  Um, then I also, uh, expressed concern of setting precedents.  Uh, we've dealt with this over the years where every employee wants an outside investigation.  And with all of our requirements, that's one of the many reasons.  But, you know, we're setting precedents of, okay, we're going to re-investigate something and start bringing in all these outside - like everybody's gonna request an outside investigation every time.  And - so we're not even gonna have - uh, how are we going to meet all of the requirements of a backlog, a timeline, a laundry list of issues.  I just expressed concerns with that and how we're - we've been very careful over the years on any of these major decisions to not set precedents but, um, you know, it's gonna - if you're gonna start entertaining that and interjecting yourself into every case, which is your choice, but, um, we're

gonna have issues with PSB operations, the ability to address the backlog, numbers, reduction, that all lead us to potential fines and contempt of court, so. By the PSB commander as well as the sheriff. So, I expressed concerns of that. Um, and, uh, so the impression I'm getting is clearly, uh, Chief Palopoli and the chief deputy at this point, uh, are unfamiliar with the implications, the court order requirements, the tracking, the mechanisms, all that have been created to me. Um, I verbally provided the name of Chief (Anders), and I watched her as she wrote it down on her notebook. I think I even spelled it for her. Um, and she reiterated that, well, we're already past the 7-day window here, 'cause we're already, I think, on day 8 or 9, um, so. Now, there were two other items discussed. Okay? So, this is where, um, her timeline is not accurate. Okay? Or I don't know that timeline but, you know, is missing some additional, uh, dates and instances. So, um, there is no request for an IA number at this March 18 meeting. Um, I said, tell me - uh, we left this meeting, as - tell me what you would like to be done. Just let me know, and I'll have my staff pull it and do it. Okay? - and she said she was going to check. That chief deputy was still looking for an outside agency. Okay? So, we then talked about two other issues that are unrelated to this. So, you know, a second item was discussed. I'll just give you the topic...

Q:     Mm-hm.

A:     ...so you know if it ever comes up. But it was about, uh, an attorney being allowed to be an observer in an interview of an IA. So that was sort of a topic that we discussed. And then the third item that was discussed, which will come up a little bit relevant later but, well she also indicated that, um, the chief deputy decided that, um, they were going to assign a second captain to the PSB. But I would still be the PSB commander, uh, and do everything that I do and be responsible for everything that I do. But they were assigning a second person, and she gave a variety of reasons. So, the chief deputy already decided this and that I would have to work to train that captain in the event that I was to go on leave or get stuck out of the country was the explanation, was the quote. Okay? So now we're here a second time of being, uh - uh, I don't see how any of this comes in, but being placed on leave, which if we're to - so - so, uh, she then abruptly - so there's discussion of that. You know, that was the topic that was discussed. And the only other relevant thing there was I asked who - I said, "Okay, who's the - who's the captain?" And she says, "It's Cory Morrison," is the captain and it's been decided.

Q:     Mm-hm.

A:     But don't say anything. Okay? All right. And she said, I have to go to another meeting. If you want, the chief deputy's door is already open, is always open. And we can - after we have this other meeting, we can - you can stick around, and we can have another meeting. I didn't see - and I - so she

gets up, and she's basically walking out of her office at this moment 'cause they had another meeting starting at 11:00. So that all in-person meeting lasted literally an hour, uh, give or take, a few minutes. Okay? So, uh, the email is titled, uh, you know, I have the title of the email message, um, that - to set this meeting up and what it's about. So, I have that title. I can provide you. You know, that's the email that you need to - you need to find. So, uh, just - I hear nothing still regarding this particular case. So, I have a - a phone call, uh, or this matter. I have a phone call that, uh, communication with Chief Palapoli. And I look at my, uh, county user log - a phone log. I believe on the - it would be the - believe the - the 19th. Uh, can I look at that real quick and be sure? So, it's just to show you there's text message on there, I took a screenshot. Yeah. Okay. So nowhere. Yeah. No, that was the, uh - yeah. Let me see. Yeah. No, that was earlier. That was something different. So that's not on the, like - so the next, uh, contact I have - now before we get much further here. Just to give you an idea where these notes are coming from. So, without getting way down in the weeds, um, with this new administration coming into. I worked with this - some of this administration previously when they were involved before. Um, I've been heavily involved for years in the compliance metric, and I know what my requirements are pursuant to the court's second order as the PSB commander. And I could spell that all out. I have that all listed, um, 'cause when I first got a sign there, I went through and said, this is everything I'm required to do. And it identifies specifically the PSB commander. That's me. Who's approved by the court. And it holds me responsible in federal court for these matters. So, the only two people that actually requires to do anything is the sheriff and the PSB commander. So, um, I have that, you know, hanging over my head that I can be held in contempt as I am entrusted and re- given the responsibility from the court and approved by the court and the monitor to ensure I go through there and show you all policies are followed regarding the PSB. And says a PSB commander shall do this - shall do that - shall do this.

A: You know, so if you go back in the history of the - the order, you know, and why it came without giving you - you know, going through all of that. I don't know if you're familiar with it, but, um, we can point back if you need to. So, um, with this new administration coming in and some of the, uh, interactions that were occurring, including at that first March meeting, um, and some of the things that the chief deputy was initiating to do, um, and injecting himself into prior cases. Um, I started taking extremely copious notes immediately after these interactions or...

A: ...shortly thereafter, um, to document all of these interactions, because I am certain that I will be testifying in federal court to some of the actions and the things that executive command, the sheriff, and the chief deputy or now under-sheriff did. So, um, I was also concerned of when I - it - it was clear to me that, um, they were not, uh, aware of requirements of the - the policies and

procedures that I needed to protect myself. And knowing that, the attorneys that she references are the attorneys for the sheriff. They're not - they don't represent Greg Lugo's best interests in the federal court, so. So, I just started keeping extremely, timely notes of these interactions, knowing that all this is not making sense. The hair on the back of my neck standing up, and I need to document this 'cause I'm not allowed to record them, feel covertly. And I didn't. Um, so I need to start making sure I start keeping track of these details, knowing that, uh, very potentially something like this or - and I anticipate something much larger, uh - uh, you know, occurring. But - so, and I could show you the timestamps of when some of these notes were made that I have. And like I said, there's other notes, um, uh, that I don't have access to. You know, that might also help fill in the gaps. But - so then March 24 occurs. Okay? So, to - to back up a little before we get there. So, we are on the Ma- Friday, March. I think that's 21st on this list. Um, and I'd have to veri- you could verify looking at my, um, team's meeting, my outlook calendar. And I also take notes. But I have a reoccurring meeting with Chief (Anders), who's the monitor that handles the intake and routing. And so, on March 21. So, this Friday, uh, that particular Friday, um, there, um, I go through the - all the cases from the prior week. We've built a relationship where he lets me assign a number and at least initially assign it somewhere. And then knowing that we still need to brief it, but not to hold it up a few days. And then he if he wants to change the designation, then he changes it. But we had in the very beginning, we've been doing this for years. There's well over hundreds of meetings that we weren't in agreement on in the begi- very beginning. But we know, I know exactly where he's going to go, uh, pretty much 99% of the time. He knows where I'm gonna go. So, if there's a question, I can always - I can always hold one if he wants for his, you know, final determination. If I'm unsure or unclear. But - so I have a regular meeting already scheduled for March 21 with him. And we go over the complaints that were pretty much since the meeting prior, which we usually do once a week. Um, I have an Excel spreadsheet that I run a report out of IAPro, grab it and put it on there. Um, and so it's a running list that shows the date that we discussed it. S- some of the cases I actually go into and put a - a task depending on if it's approved diversion. Um, so, uh, and then also I go through the case when I'm talking with him and IAPro on one screen 'cause he asked questions, and I brief him on each case. So, um, this one does not have an IA number yet. Okay. The 111 number is not even created yet. Okay? Which she's saying was created in March 18, which - that's not the case, 'cause if you look at this log, it shows you when the number was issued. Uh, I - I think it's - we're looking - gonna be on March, like, 24 or something. There you go. Okay? So, um, which this is not unusual, but I go over all the other cases with him and I say, "Hey, uh, I have one other thing," which is we always have discussions about issues and concerns, "That I want to make you aware of for transparency." And I walk him through exactly what's happened so far with this, that I saw it. He entered it,

INTERVIEW WITH CAPTAIN LUGO
Interviewer: Sgt. Craig Baum
08-12-25/10:17 am
Case # 2025-064
Page 19

supposedly gave other stuff to the chief deputy. Um, and he goes, well, what is that? How - he asked me, I wanna say he asked me, like, "What does it say about the chief deputy?" And I regurgitated, um, that, "Hey," you know, it said given to or provided to, I forget exactly what my term was, but said, "You know, it was provided to the chief deputy." And so, there's no IA number assigned to it. It's still sitting in the incoming bin, um, at this time. Um, and just as in prior instances when there were, uh, other po- possible concerns during our meeting, I present them to him, and I just wanted to let him know. He starts asking me all these questions and saying, "Wait a minute, this was already investigated. This is the same thing that I dealt with Caputo with." And I said, "Yes." And he starts then asking me about how the appeal occurred and all of that. And I, uh - we spoke for some time, I wanna say. I had another meeting at starting at 11:00 that morning. So, which, I think you'd have to look at my Outlook calendar 'cause I do a team's meeting invite for him for these. Well, for just about everyone, occasionally when he's out of the country or something, we just do it over the phone. But it's archived there. And then I also do a one note notes page of every meeting I have with him that I put anything unique that we discussed, which I don't have access to that. But that's gonna show you - that's gonna support my timeline here, um, as well, as well as he takes very good notes. And he would support exactly this conversation in the timeline as well. So, um, he implied that he had not yet heard from Chief Palopoli on it, um, and asked a whole bunch of questions. And I advised him I would give her, you know, basically this. The purpose was, hey, I told her she reached out to you. I'm going to give her your email. So, you guys can discuss it. So, you're not caught off guard. This is just what I know of what it is. I don't know the other stuff. So, he asked a whole bunch of additional questions, like I said. Um, and, uh, we actually ran out of time because I had another meeting starting. So, I said, "Hey, we need to cut it short," 'cause then he still had more questions. And I said, so, uh, the agreement was, "Well, call me back." He asked me to call him back after my other meeting. Well, to make the longer story short there, that other meeting went way too long. Chief (Anders) is like in Idaho or something - something like that. So, by the time that the other meeting was done we're already well past into the evening. And so, um, I've - my plan was just to follow up with him the following week. Um, so there's an email of that which you'd have to go find. So that ends that conversation. Um, that's where I would, uh, guess, it's me clicking on it. You know, once again, just what was our - what's only in IAPro there, right in that time frame. Looks like that all aligns, um, with him asking a few questions. Um, so March 23 or 24, you have to look at my email to see. But, uh, sometimes I would - we would communicate on Sunday, uh, over email sometimes so I don't remember. I'd have to find the email. But I reached out to him, said, hey, what's your schedule look like this coming week to pick up our conversation from where we left off? Um, so we schedule, what we schedule for is March 25, okay? We schedule for a phone call and...

46REPORT000746

A:    ...I have a call log to support that, okay? So, we schedule that. Now, March 24 so you back up a day. What's March 24 is, um, was it Monday or Tuesday?

A:    (Unintelligible).

A:    March 24 is a Monday. Okay? So now we're on Monday 'cause that was Friday. The 21st was Friday that I, you know, dealt with (Anders) the evening. So, we then communicate to schedule for the - later in the week. So now March 24, um, I - at 9:21, and I have the text message that I can show you. I get a text message from Chief Palopoli, uh, asking that I call her when I have 5 minutes.

A:    Okay.

A:    So, this is on March 24, um, about 9:45. Um, I have the call log history that supports this. Um, I give her a call, um, and, uh, she indicated that she de- she needed to discuss. It was about the Engelbeck complaint. So, um, Chief Palopoli requested on March 24 an I.A. number and for Lieutenant (Porter)'s contact, stating she was assigning the case to Jensen Hughes. Okay. I advised Chief Palopoli that I supervise Jensen Hughes. Um, Jensen Hughes is a group, a private company that we contracted with to help us with cases. So, it's basically they're a contract investigator. They're not a conflict investigator. They're a contract. So, they work very closely with our staff. I actually supervise them. I sign off on all of their work, um, just as in they were working as one of our sergeants, um, or investigators, civil investigators. And I actually sign off on their invoices and, um, have the ability to terminate them and have. Um, so, you know, uh, for, uh, unsatisfactory performance, meaning that we're not, you know, the individual investigators. So, I have to approve them. The monitor has to approve them. And then, yes, and I have historically gotten rid of, uh, some of them. So, I advise Chief Palopoli that I supervise them. I also supervise Lieutenant (Porter) as he's a direct report to me at this time. And also, Amy, um, who is, uh, one of the administrative supervisors, I think in that binder, had her name, um, 'cause she helps Lieutenant (Porter), uh, liaison with Jensen Hughes. So, she's a direct report at the time to me as well. Okay? So, I advised her that they are a contract investigator, not a conflict investigator. Um, and having them, uh, involves, uh, by sheer definition a conflict of interest. Um, I am supervisory in rank, uh, to those individuals. I supervise them directly. If you're now creating that you're identifying this as an administrative investigation now, and you're - you - they can't do it. That would be a violation of our policy and the federal court order. And it would be a violation of me violating the order, allowing it to happen because I'm responsible, and I can point to the

46REPORT000747

paragraph to ensure it's done right including conflict of interest okay matters. So, um, I advised her of this. I expressed that, um, I have not been involved in the case, and I'm not afraid of an investigation. Uh, I'm just afraid of the investigation being contracted - conducted contrary to policy, uh, procedures and the court's orders. Chief Palopoli still requested an I.A. number and for the case to be assigned to Jensen Hughes. Um, I informed Chief Palopoli that I would provide her Chief (Anders) email to discuss the matter with him. And I would quote, I - I am certain that I said I will also and then I'll stay out of it, okay? And when I say stay out of it, that is the investigative process. Like, anything that you need, you know, there's memos to be done. There's approvals to be done. Routing and all of that. So, I'll initiate the process just like we did before, and I'll stay out of it, okay? Um, from this point forward, um, I believe I used the form - the - the term, I'm certain that I used that term. I know she says later 'cause at the end she makes a comment of stay out of it. Um, and I'm referencing all of - there's letters. There's prior work histories. There's notifications to be done. There's an investigative plan that needs to be done within so many days and approved by the PSB commander. There's tracking associated with the court's order on a variety of these metrics. Um, you know, all of our staff, like I told you before starts then getting into it and starts being involved. And we have already experienced this once before where Chief Caputo tried to have a lieutenant involved in a service complaint involving me.

A:    And that, um, was found not compliant in a violation of the court's orders. So - and that was just a service complaint on a different matter after I told them you can't have a lieutenant who I supervise do it but, um, uh, so, uh, she makes no mention of the blue team entry, um, or not discussing or not providing any information to Chief Anders during this - during this conversation. Um, and in the conversation I re- uh, as requested, I said I'll have my team go through pull the number provide it to Lieutenant Porter to go through the process. And then I have the email, and I have the email message titled. So, then I go on, and I actually send the email to Monique. And the email's titled, just like I do the others, Internal Complaint IC-BT-0310D1. 'Cause that's where - so, you know, there's my message to Monique that says, here's that, you know, internal complaint. Make it an I.A. Assign it to Jensen Hughes. And I have to look at the email, but I know I put something in there to the effect of anything you'd normally deal with me with, deal with Chief Palopoli. Now this is the email that, uh, I am 99.9% certain I also sent to Chief Palopoli to Lieutenant Porter. I might have BCC'd Lieutenant Porter just so he was aware of that needing to, so, you know, kind of thing. Um, and I might have also BCC'd, uh, Monique's supervisor. I'm not sure if I did or not but, um, I - I don't know if I CC'd Chief Palopoli or sent it to her or BCC'd her, but it's on there. Um, and Lieutenant Porter's information's on there, so. Um, so that's on March 24 that that

discussion occurs. I know in her interview and in the timeline there she's saying that that occurs on March 18, which that's not what happens, so. So, um, on a side note of that, um, well, I'll get back to - get back to that. So, March 25 so the next day, comes around. And this is where I already had the telephone meeting with Chief Anders to follow up on this. So, um, I have the phone call history. We talk on the phone. I don't remember. I'd have to look at the call history. I have the screenshot. Um, we're talking, uh, about 9:30 am. I don't know if, uh, I put in my notes here. Well, let me back up. So, I wrote these notes about that last conversation before I sent the email to Monique. So, there's probably gonna be like a 30 to maybe 60-minute window 'cause I was typing out my conversation going, hey, this is a conflict of interest. Like, she - this is a complete violation. Like, I want no part of this. This is a problem. And the ripple effects are just, you know, they- they're just - they're just a laundry list of them, but. So, March 25, I have my - we already previously scheduled this follow-up. Uh, I end up calling, uh, initiated by me to Anders 'cause of the time that we had scheduled, um, where I advised him of the communications I had with Chief Palopoli the day before. And said, I expressed a concern with the lieutenants and admins, uh, my administrative staff and my subordinates being involved and assigned the case. All of the con- same thing I just explained to you about the conflict of interest. I explained everything I told her and that she still wanted to - to be assigned to them, and she wanted the I.A. number. And I - to back up, when I asked her for the number, I said, "Well, tell me what type of complaint you want it to be?" And she says, "Well, what do you mean?" And I said, "Well, it can be a service complaint. It can be an I.A. It can be a criminal IA. It can be a PSB diversion. Like, just tell me which one you want and we'll - we'll do it." And she said, just make it an administrative I.A., an internal complaint. So, I go through Anders, uh, and talk to him all about this. He expresses the same concern that, "Jensen Hughes can't do that. That's a conflict of interest. Lieutenant Porter can't be involved in that. That's a conflict of interest." He then asked me if Chief Palopoli is even aware of the third court order. Uh, once again, this is implying to me that there's still been no communication, uh, with Chief Anders, uh, her at this point.

A:    So, um, I have an email as well where I emailed Chief Anders contact information to Chief Palopoli. So, there's an email of that. And I wanna say that was also on the 24th. I have that later in my notes. I don't know if I have the title of that email.

Q1:    Did you ask Chief Anders if he had had conversations with - with Chief Palopoli at that point?

A:    I did not.

Q1:    Okay. Carry on, sir.

A:  Um, I indicated I'm certain she's aware of the third order because I am certain she's aware of your name be Anders because I watched her write it down as I told her. So - and I know I sent another email. I have to find the exact date. It would have been the 24th. I'm almost certain it was before this conversation. But I said I- I've also had verbal discussions with her, um, this intake process, like I already walked you through. And quite frankly it's in the - the court's orders. It's discussed various times, um, that an executive chief certainly should be well aware of, um, including the third court order but, uh, I informed Chief Anders of the email I sent her about the case and also the email I sent her with Chief Anders contact information. So, I'm verbalizing this to Chief Anders. He then said, okay, he - we didn't discuss any further on this case. And he says, okay, he'll - he'll handle it. So that's on the 25th, okay? So now we go to the 27th, okay? Which is also I believe to be missing from, uh, her interview and timeline. On Thursday the 27th, and I have text messages to support this and other evidence. Um, 12:34, um, I get a text message initiated by her, Chief Palopoli and, uh, she says, uh, hi, Greg, can you - you have a second for a quick call? I can give you these messages. I responded with good afternoon. This is about 12:34 on March 27. I responded with good afternoon. Um, I was in a meeting. And she responded, okay, just call when you're free. I have the - the text messages. You can look at the - the, uh, logs and everything, uh, of that and the notes. So about 12:40, I give her a call. And she indicated it was regarding the Engelbeck complaint.

A:  Okay? She stated that she indicated that Chief Anders informed her - he did not want Jensen Hughes working on the case. And she began then asking all sorts of questions about, uh, Jim Egelston who is another contract investigator with Baseline Investigations, okay? So, um, we also contracted with him. Um, and so she's asking all sorts of questions of who he is and all of this which I explained to her once again. Um, while he is an independent, um, he's supposed to liaison directly with me. I sign off on his invoices. I actually was part of the process to get him while Chief Caputo took the role of it - the lead of it but to get him as another person on board to help us with some, you know, unique investigations. So, it would be a conflict of interest probably, um, as well with regard to Egelston, uh, doing it. Not to mention, um, Egelston, I was not impressed whatsoever with his investigative quality, um, and his responsiveness. And so, I expressed concerns of trying to send anything to him because I hadn't yet even assigned him a case. There's a whole other aspect, uh, that, uh, while we had a purchase order that Sheriff Penzone and that administration used Egelston for, and that was the Phoenix Police Department protest case with that whole challenge coin and the gang charges that whole mess that I'm sure you're aware of, you know, just generally from the media. So, um, and investigate - so he was originally contracted to do that investigation. And so, he was doing that and then, um, he also previously had relationships with Chief

Caputo and Chief Ann Scheel who the reason I didn't use him is because they are they would have been at the time my supervisors. So, I would only use him for cases that would involve my supervisors that I would outsource. And if they're friends, they can't investigate the friends that they previously worked with. Needless to say, um, as I discussed with the sheriff and the chief deputy back in December, that we probably, after the change of administration in the first of the year, need to look at replacing Egelston with somebody else and doing an open recruitment again or going, uh, bid, going out to bid kind of process. So, he was sort of kept on - on ice, for lack of a better term. So, she's asking all these questions. I explained exactly what I explained to you and why I don't think he's even capable. And then she offered that - well, she already spoke to him and his contract ends coming up, which the purchase order lasts. We can renew the contract very easily. That's not a problem. But, um, uh, she also said, he said he doesn't have the bandwidth, the - the resources, the time to do it right now. And so, I said, okay well, I still would have the same concerns. Um, he also worked with Amy, you know, to get him trained enough to speed. Needless to say. So then Chief Palopoli asked me, says, "Well, who would you recommend?" I assigned the Engelbeck case to, this is the 111 case, that we just had the conversation about that. She already now indicated that she's initiating an investigation on me. And I stated it would be inappropriate for me to provide any further suggestions or recommendations on the matter as she had now, at this point, is initiated in a formal investigation on the matter. Um, she then changes, meaning, Chief Palopoli then changes - I think that's yours beeping.

Q:   Oh.

A:   Battery. You're good?

Q1:  Carry on, sir.

A:   Okay. And then I don't know if we can, uh, could maybe take a break after this. We talk about this meeting, these things, so.

Q1:  I think that would be good idea, sir.

A:   Okay. So Chief Palopoli then asked, well, hypothetically, I don't think she used the term hypothetically. But she then asked, "What would I do." Meaning the PSB commander, um, "If there was a complaint that came in on the chief deputy?" And I explained, "Well first, I would review it, determine if it even needed to be an investigation. Um, and then if it did, I would then go down my list of resources." So, um, she then had asked, well, who are that you, you know, basically saying, "Well, who would you suggest that? And who are those resources?" Um, given my - they're my contacts, my relationships, former, you know, they might have - I worked with them before.

46REPORT000751

INTERVIEW WITH CAPTAIN LUGO
Interviewer: Sgt. Craig Baum
08-12-25/10:17 am
Case # 2025-064
Page 25

And I have a list of them, um, and use them before, uh, for investigations. I said it would be further inappropriate, again, for me to provide suggestions on an investigation of who to give it to and or use my resources to investigate my case 'cause they were back in the same conflict. What I'm thinking of here in the back of my mind is, okay, well, if they're re-entertaining an Engelbeck complaint, um, it can't have like and they're doing a case. He's not gonna be happy with the outcome. I already know what the outcome is going to be because I didn't do anything with regard to any of what he's alleging. But I know that's not what we're here for. But I'm thinking that if I have any involvement whatsoever, like he uses anybody that used to work with me or I worked for, those are some of the resources or that I have used for other matters or that even the court has used in other matters. I've even had those as resources. These are relationships, working and professional, that I have built up over time, uh, because we help them out as well, uh, as, uh, joint agencies. Um, and so it'd be inappropriate for me to give those, like, I - I can't be, you know, we're - we're gonna have a problem here 'cause he's not gonna be happy no matter what. Um, so, uh, Chief Palopoli then said, "Yell, yes," and this is the quote. "Yes, I am learning that." Was her - was the quote. Uh, Chief Palopoli then said the other option was to have an outside law enforcement agency. And she reite- reiterated here at this meeting now, this is - well, this is a telephone, uh, conversation. Um, she doesn't feel their capabilities are good to conduct a proper investigation. She made the statement to the effect that she did not know of another, uh, agency being able to conduct, quote, "A competent investigation." Okay? So, uh, this seemed to me to be continued attempts to try to get me to react or provide additional feedback, suggestions, what to do with it. Which at this point, she made it an I.A. It's a formal case. I can't have I - uh, I'm not going to even provide you any further direction. It'd be completely inappropriate. Um, and contrary to policy, the court order which is actually becomes it's the federal judge in law, okay? She then says multiple times that, well, she's back to square one and, uh, starting at zero. And, uh, that, uh, the contract investigator, that's the Egelston, expires in April. There's money on the purchase order. But, you know, uh, she's back to square one. The call ended about 17 minutes later. Um, and that conversation occurred for about 17 minutes.

A:     Okay.

A:     So, um, I just wanna see if there's anything else referenced to that particular. I'll come back to that. But, um, I don't know if this is a good time...

A:     Umm.

A:     ...if we can - it's a good time to take a break or if you had questions, referenced anything so far or that particular date 'cause I think we're getting close to the - the other couple dates and follow-ups and.

46REPORT000752

Q:     Okay. The time is 1139.  We'll take a 10-minute break (unintelligible).

A:     Okay.

Q:     All right.  The time is 1158 hours, (unintelligible).

Q1:    Mm-hm.

A:     Okay.  So, we just finish talking about, um, the 27, March 27.  So that's, uh, that conversation with Chief Palopoli that, um, based on what I reviewed there was, uh, never presented or brought up, uh, during the course of her interview or, uh, in - in the timeline there, so.  Um, now, uh, we proceed to the next day, March 28, which is my normal intake meeting with Chief Anders, okay?  So now we're on March 28.  So, this is the day after, um, she just asked me what to do with the case and all this after she made those other prior statements.  Um, and, uh, on March 28, um, you'd have to look to verify on my Outlook calendar, the OneNote, the exact, uh, starting time, whether it was 10:00.  There was some where we'd be starting at 9:30 but right around that morning.  Um, so here I have a regular intake meeting, uh, with Anders to go over basically now.  So, since the 21st meeting, right?  Now we're talking about every I.A. that was pulled since the prior meeting, which was the 21st.  So, this is my normal, uh, meeting with him.  So, as I explained before, I run a report, uh, creates it, put it into an Excel...

A:     Mm-hm.

A:     ...and then I copy that Excel and just add it to the bottom of my running Excel list. It's called, I wanna say, Cases Reviewed.  I could give you - I could point to where that file is in my - my personal OneDrive, but I think it's Cases Reviewed, an Excel spreadsheet.  But I'd have to - I'd have to look at it to see the exact, uh, ver- the exact title of the - of that.  So, um, at this meeting, um, and you could verify this, uh, as well, uh, through my usage of IAPro on that time.  So how those meetings normally go is, so I pull that number over, that - that list over.  And so, I have an Excel spreadsheet that's sorted in numeric order.  I.A. number order.  So of course, one, two, three, four.  So, where we go is I put it at the bottom, sort it, and we pick up, 'cause Chief Anders is, uh, you know, on - we're on Microsoft Teams or on the phone.  Um, I - we confirm, okay, we left off on, whatever, 165.  So, this is number 166.  And then we just go down the list just in numeric order.  So, I'd have to look at my Excel spreadsheet to see how many were before.  But I think, my memory is there was two or three before we got to 111.  So we were probably at, like, 109, maybe - maybe a few before that.  Uh, but why don't we go through the normal intake process.  I - this - this is what it is.  I open it in IAPro as I'm talking to him on the phone.  He asks whatever questions.

Okay.  We go to the next one.  All right.  110.  It's an external complaint received on this day.  Uh, it involves civilian or involves detention.  Here's the allegations.  Here's any unique circumstances.  He asked for - sometimes he asks questions.  And this is what we're doing with the assignment routing.  So, I see on that list we get to 111.  And now I know 111 is this - this case here.  And the way I know that is because there was a weekly report generated, which is done weekly, that after they pulled 111, and it gets distributed out to various people in PSB, including me.  And I send that to the chief and I also send it to the monitor.  And on that, I peruse it before I send it out because I inevitably get questions from the monitor.  It's every new case that was opened in the prior week of, "Hey, wait a minute, what's - we got questions on this one or we got questions on this one."  So, I peruse it just to see what- what's on there.  And as I scroll down looking, I see 111.  All right; that's the number.  Um, and I see a one-line summary.  Um, I have that document and that on an email.  Uh, but I can see it's like one or two sentences, a summary of the complaint and I believe it lists me and Leatham as the involved.  I- I'd show you the file if I - you know, but I - we have it there.  Needless to say, I also see on my Excel spreadsheet because it does give you the I.A. number, and it gives you, like, the first - I don't know how many characters, 20 characters of the summary, um, on that Excel spreadsheet when you run that report.  And so, I tell Chief Anders, I - this is before I open it up, I say, hey, 111, this is the Engelbeck one that we've already had some discussions with, um, that he knows about as we've talked the last several days and a couple weeks.  And he goes, okay.  And he seems surprised, 'cause, like, that was the first time he's getting the number.  And so, I said, yeah.  And, um, I said, I wanna unintelligible you of the conversation I had with Chief Palopoli yesterday.  So, I take the time to, uh, go through with what I just told you, where she then reached out to me after she made it an I.A., asking me what to do with it on the assignment.  And she advised that, uh, Chief, you said, it couldn't go to Jensen Hughes, um, you know, and she was trying to figure out what the heck to do with it.  So, I updated him, just like I summarized to you that whole conversation and my concerns, uh, with - with such.  And so then he asked me specifically, he goes, "Okay, well, I need the assigned date."  And I said, "Well, I have to click on it to get the assigned date."  And I don't remember if he goes, Uh-huh.  Okay.  What.  Nothing.  Affirmative.  I forget exactly what, but it was clear.  And then I vocalized as I went through.  Literally, we're talking seconds.  I said, I'm double-clicking, and I vocalized to him on the phone.  Double-clicking, status and of assign tab, I know exactly where to go which is the second tab.  I have a screenshot of what that looks like, which all you see is to get the assigned date.  Um, and I said, "Okay, the assigned date is this."  And I said, "I'm closing - closing, not looking at anything else."  Closed, done.  He said, "Okay. Onto the next one." So, if you were to look at my user log or you were to look at the user log for 110, the case before and then 112.  You're going to see, and you look at the access for 111, um, you're going to see s- probably less than 10 seconds, okay, from the

time that that's accessed to the time that the next one's accessed.  And then you're gonna also be able to see, uh, in the user logs of those other cases how all we - we open attachments in that during that, um, as well.  So why that's significant is it was certainly under the direction of him but where that becomes significant here is, why I don't think this is an authentic copy of the user log is because that's not on here.  That access isn't even listed here so, um...

Q1:    Uh, let me ask you something, sir, because we - we - we don't - we don't have the same structure that you do.

A:    Um-huh.

Q1:    Does Chief Anders supersede Chief Palopoli in rank?

A:    Well, Chief Anders is the monitor.

Q1:    Right. So, if he tells you to do something and Chief Palopoli has told you not to do something, who takes weight?

A:    Well, I would argue that Chief Anders as in the court order and I can point to the paragraph is, um, acting as an officer of the federal court and therefore, uh, not following an officer of the court, um, is actually, uh, which in the court's orders, um, is actually a violation of law. So, um, any order not to discuss it with Chief Anders, um, I would say, is, uh, invalid and unlawful order, okay? Which she never said anything about not discussing it with Chief Anders.

Q1:    All right.

A:    So.

Q1:    Carry on.

A:    So, um - and I already reiterated, we can go back if you need of just stay out of it to begin with because there's all these metrics looking at the assigned date, uh, and accessing the assigned date it clearly shows that nothing, you know, there's no attachments accessed, there's no other information that, uh, is - is accessed, and I'm required to provide that information.  And that's actually in the monitor's quarterly reports of what the - by the PSB commander as everything talks about the PSB commander is responsible to do this.  The PSB commander has - doesn't even mention an executive chief, so.

Q1:    Okay.

A:    But what's interesting is that's not even on this log.

A:   Okay.

A:   So, uh, you know, when, you know, an interview with Chief Anders is done, um, 'cause he keeps very good notes, uh, he's going - my statements are going to be completely supported.  Um, I am fully confident that - of that, so.  Needless to say, I update him on that, and we go through, and you can see the - the - the timeline there but, um, uh, on the 28th.  So, then we move to April 2, which I think is, uh, on your timeline there.  So, there's various topics discussed which - some of which are not relevant to this, you know, investigation.  They were about some other investigations and case. But, um, what comes up, uh, which is significant there on April 2 is...

A:   Okay. So, April 2 is, uh, you know, that reoccurring meeting that we have with, um - with - with the sheriff and, uh, the - the people that are present in this room are the sheriff, the chief deputy and, uh, Chief Palopoli and me.  So, this is on April 2, about 10:30 at headquarters in conference room 530.

A:   The first item was a separate, uh, different I.A. case that we talked about, not relevant to this.  The next item was another I.A. case that was not referenced to this.  Um, I gave an update on the USB backlog so we don't need to go into that.  Um, when I asked if there's any further on any of the noteworthy cases or issues, um, Chief Palopoli asked for an update on another case, a different case.  So, I - I provided that update and, um, we talked about a different case there.  And so then, um, following that discussion, um, I asked if there was any other questions and, uh, not to get way in the weeds or off-topic but, um, all three of them said they had no other questions or matters. And I said, well, um, as the sheriff has previously stated, um, he always - he wanted - if there were any problems or, uh, concerns, uh, on the forefront, to bring them to his attention.  And he wasn't afraid of bad news, and he needed to know about it.  So, I took that opportunity that - uh, and I reiterated his statements and told him that there's a sort of, I called it, trouble afoot.  And what we're now talking about is, um, I explained that, uh, you know, there was concerns.  Um, so we have all these metrics that we have to meet or get fined, and the PSB commander in reducing this backlog.  So, um, I'm being advised third- and fourth-hand information that the sheriff or the chief deputy has decided they're restructuring the PSB.  They're adding a second captain...

A:   ...to PSB. And, um, I had concerns because I'm getting that, and I don't wanna get way off-topic, but I'm hearing that from other captains that chiefs have already told them that. I actually heard from a captain who said he was being transferred, already officially told to PSB which has to get monitor approval, and it's supposed to have the PSB commander's approval.  Um, so, um, I expressed concerns of all of that, um, is one of many factors that, hey, uh, you know, our work product were working very well, but I anticipate

it's running into problems.  You know, you're restructuring, changing everything to meet those targets, um, as I've laid out.  Um, and the sheriff has publicly said that the PSB commander, it's on - he - he has a plan to get this backlog.  We've averted all fines and violations of the court's order with regard to a backlog.  I won't get into, you know, we don't need to talk more about that unless you have questions.  So, I expressed that, uh, being problematic.  I also expressed, um, you know, with, uh, so they then start meeting, Chief Gentry brings up, well, you're aware of the Engelbeck complaint.  So, he brings it up again, initiates it.  And I reiterated, "Yeah, I read like three paragraphs of that information."  And he said that, um, he says, "What happens if the agency that we give it to, um, says you need to be on administrative leave?"  So, I'm - uh, I expressed concern saying, hey, um, you know, the - the - the - the concern is that the PSB commander is not even being afforded the same process that everybody else is being afforded, that the PSB commander affords everyone else.  You know, and I said well, he says, "What do you mean?" And I expressed, you know, to review it, uh, knowing that at least I said, what I know of the three paragraphs, um, like I don't know what other information he provided you or whatever, but that was all handled.  And I just regurgitated what I've previously told Chief Palopoli about it and what I've relayed to you as well about the concerns with that.  Um, he also says, "Well, you're also the hardest working.  I see, you know, in person in the organization on the hours, all our eggs are in one basket."  That was the sheriff's statement.  Um, and, um, he brings up some other, uh, concerns to justify the second captain.  Now, where this becomes relevant, he says, "Well, your boss has already spoken to you about this." And Chief Palopoli is in the room, and I looked at her and I said, "No, Chief Palopoli said that you already decided that this was happening."  And said it was Cory Morrison who - and I was like, "You don't even realize Cory Morrison is, uh, involved in prior Engelbeck matters."  Um, you know, on prior cases where I was the victim of those investigations of the misconduct.  And, um, he advised he wasn't aware, um, of that.  And so, um, Chief Palopoli tries to interject, saying, well, we you know, sort of like, "Well, we sort of talked about it."  "No," I said, you said that it was already decided.  So, where this becomes relevant is, you know, I gave all sorts of other specifics on the problems with having a second captain or, you know, that doesn't report to me.  All of the metrics were built, like, it doesn't help the backlog.  And I explained my rationale for that and the concerns - and the concerns that while they ultimately get that decision, if they wanna restructure that, um, you know, and I respect that but I was - found it interesting that I wasn't even consulted or asked or provided any, uh, input, uh, you know, to provide any input on that.  So, I gave one example of where that's, uh, problematic.  Um, and then he indicated that, well, the Engelbeck complaint, meaning Chief Gentry, um, anytime we get a complaint, it must be, uh, it must be investigated.  So, um, the conversation of the Engelbe- Engelbeck complaint, uh, pretty much, uh, you know, ended at

that point.  Uh, but I brought up all - all those, uh, like I said, those concerns and how that, uh, he brought up an example, meaning Chief Gentry of saying that some other time I was on vacation, and somebody needed something from me and Chief Caputo said to wait until Greg gets back.  And I asked for any additional information that he wouldn't give me with regard to whatever that was.  There's another rationale of needing a second captain who would not, uh, report to me, uh, but I would still be responsible for the court order and have the final say in PSB matters.  So I just - so, um, I expressed my concern with that, um, that, you know, based on all of our metrics and I anticipate us having, uh, problems and concerns with meeting the metrics if you start to do this because there's already swirling rumors about the second captain and who that is and people expressing concern with - with regard to that.  I also took the opportunity to say, well, yes, and you're also revisiting complaints, such as the Engelbeck complaint, because I said you didn't even hide that complaint in IAPro, and it was on the weekly report, and you sent it out to everybody.  So all my staff who are not only working on it now also know that my subordinates that, you know, I- I'm under investigation for something, which I guess they can - they can know, but now we create - we're creating the environment of several of the staff are aware of the historical case with Engelbeck because he was appealing it and are now concerned and expressing concern if this administration is going to entertain everybody that was unhappy with their case.  And I expressed that, um, uh, to him, and he indicated, and I expressed again that it was retaliation by Engelbeck and, uh, he indicated that that's gonna be investigated in this case, so meaning the case that they're sending to an outside law enforcement agency.  So, um, why that - why some of that becomes - there was some other discussion about some other things, uh, you know, and projections.  Let me just consult my notes, so I'm trying to stay on track and not get too far, um, off. Okay.  So - and how that meeting pretty much ended, then I told the sheriff, I reiterated to all three of them that the only people in the court's order and I can show you where it - that the only two people that are named in there as I told you before, is the PSB commander and the sheriff, um, who's responsible so, uh, for certain aspects.  And so, I said - I - I said, "Sheriff, you know, I said, I will not be in contempt.  I will not violate the court's orders." And, um, I made that extremely clear, um, you know, and, uh - uh, to him and, um, to - to the group.  And, uh, I also wanna reiterate that, you know, I said, "Hey, if you want to change any processes, there's a process to change that if you want something different but, um, there's processes need to be followed pursuant to the court's order."  One of those being adding - transferring somebody to prof- professional standards bureau or out anybody.  So, um, my interpretation was that was not well received, um, when I drew the line in the sand and said that I will not - just so you know, I'm following - I'm not going to be - I'm not gonna be - my neck's not gonna be on the line.  You know, I'm not gonna be on the chopping block, um, in front of the - the federal court judge, you know, with the responsibilities that I have.  So why I - why I would say that that's

relevant for a variety of issues but, uh, then, uh, I think in her interview she says that following that meeting based on what I said, she then started looking at the log and saw that, um, all these other people were in the case.  And she - at least I wanna say looking at her interview summary, said she was surprised by that, which you got to realize that weekly report was sent to her as well prior to and I have the title of the email message.  So, this would have been before the April 2 meeting, um, uh, but I don't know exactly what date.  You'd have to look at the - the message.  And that information actually contains that report contains more information than the assigned date of - of the actual case, so.  So, April 2, that meeting pretty much wraps up at that point.  Um, and then, um, uh, and - and I just wanna reiterate, even at that point when, uh, you know, up until that point, you know, and even at that meeting, Chief Gentry and all three of them, uh, there was no, uh, after he, meaning Chief Gentry, brought up the Engelbeck complaint, there was no reaffirmation of any directive or guidance or anything with regard to what do or not do, um, with that Engelbeck complaint.  So, um, April 3, so the following day, um, there was a community meeting in Agila.  Um, so I did have some interactions with Chief Palopoli and Chief Gentry to update them on a separate - a new, uh, administrative case that came in that was sort of a big deal.  So, before the meeting we pulled aside and there was no discussion whatsoever or reaffirmation, that's in the evening, um, of any, uh, given any direction or guidance or any - any comments regarding the - the Engelbeck case.  Um, and then April 4, I have the next meeting with Chief Anders, again, the regular intake meeting, and we go through that in the morning on the, uh, normal, uh - normal cases, the Engelbeck case, 'cause we talked about the prior week.  We don't even - there's not even discussion whatsoever, uh, with - with regard to that, so.  And then later in that day in the afternoon is when the administrative leave events unfolded which, um, I can expand on that if you need, but I don't know that that's relevant to the allegations that you're looking at, uh, you know, um, uh, here today, so.

Q:     That took place in the Chief Deputy's office?

A:     What did?


A:     No, so, um, I got a ph- a text message. First, I got a phone call. Um, I'll actually show you the - the phone log. Let me find my notes, all right? But, um, and I was in a meeting talking with, um, Lieutenant Crosby. So just - he was in my office. I'm at a different building. Um, and, um, I think I have whole (unintelligible). Sorry.  Give me a second, please.  So, April 4, I'm in my office speaking to Lieutenant Crosby about, um, we had a - a new administrative case, uh, it might be criminal in nature, uh, at the 4th Avenue Jail involving detention staff. So, this is the one that at the community meeting I was giving an update 'cause it was just rapidly evolving.  So,

INTERVIEW WITH CAPTAIN LUGO
Interviewer: Sgt. Craig Baum
08-12-25/10:17 am
Case # 2025-064
Page 33

Lieutenant Crosby, they did some more work on it.  He was briefing me on that.

A:    And so, I get a - a call from an unknown number, 'cause I don't have it stored in my phone, 'cause I don't - at this point even still - well, at that point I didn't know what Chief Gentry's cell phone number was.  The Chief Deputy.  So, I have the phone number here and I don't recognize the number. It's on my work phone.  Um, so I let it go to voicemail  'cause I was in the middle of talking with Lieutenant Crosby. And, uh, then at 1518, um, he sends me a text message stating, uh, hey, Greg, from the same number, this is Jeff Gentry, call me as soon as you can.  Um, I assumed that he's asking for an update on the jail case, so I was letting the lieutenant finish his briefing with me so that I could appropriately, um, provide the update.  That's what my assumption was.  Um, so we're now - that was at, uh, 1518, is when I got the text message. 1535 and I can show you the text message.  I have it.  Um, I returned the call and after ringing, he answered, meaning Chief Gentry, and he said, uh, something to the effect of - uh, he asked, uh, if it was a good time and he - I asked him if it was a good time.  And he said, "Hold on, I'm walking."  And it sounded like he was walking in the background.  Um, and he said something, like going back to his office.  Um, after a short pause, uh, it sounded that he's walking, he began speaking, um, Chief Gentry said he was in a difficult position, but he needed to - he needed to place me on administrative leave.  He said in the conversation that it's an awkward situation as I'm normally the one to place someone on leave, so he was asking me how to go about putting myself on administrative leave, okay?  He asked me to put him in contact with one of my lieutenants.  I informed him that normally (Linda) is the one who prepares the paperwork, and she already left for the day 'cause we're at 3, you know, Friday afternoon here, and so I indicated that the other individuals that know how to conduct - complete, generate the admin leave paperwork and letters is the conduct resolution section.  Um, and he stated he did not even think to go to conduct resolution.  They're this floor, one floor, two floors down where - they're on the fourth floor, I think.  They're in the same building as the chief deputy.  Um, we're over on Central and Indian, uh, Central and Indian School.  But, um, he stated that he would then contact them.  I told him that there is another lieutenant here.  It's Lieutenant Crosby 'cause I just met with him.  He just walked out.  Uh, and as I just finished meeting with him, and so I think he's still in the building but a lot of people the lieutenants leave early if they work.  I asked Chief Gentry if I would provide - be provided with any information or the topic the idea about the reason for the administrative leave, and he said it was the Engelbeck complaint.  Chief Gentry stated something to the effect of I know - and don't know if you use the term, "I know it's bullshit, um, or it's nothing," uh, use some type of word like that, uh, but stated he was told by the sheriff to do this after legal counsel told the sheriff they needed to

handle this case like any other, and they did not get to get - they did not wanna get into trouble with the guy, he's referring to the judge, across the street.  I informed Chief Gentry that I was concerned as I was aware of the current practices and qualifications of when a person is put on leave. What I'm saying is like the threshold of when we put somebody on leave and have been for the 4 years that I've been in charge of PSB but, um, and, um, I'm aware of that and this is concerning to me as I'm thinking that the Engelbeck retaliated like there's nothing even to that.  So, um, it's not making any sense to me.  So, my thought was, uh, this does not typically qualify, uh, at the onset of complaint for administrative leave.  Chief Gentry then stated something of the effect that he's been the chief deputy for 3 months and this is not something desirable or something to the effect that he ever thought he would do something to that effect. Um, I believe he did reiterate, he was told, uh, that this is what needed to be done by the sheriff and that's what he's doing.  I indicated that I understood, and Chief Gentry began asking if I needed a ride home, if I was in the office or exactly whatever the process was.  I told Chief Gentry I was in the office.  I'm aware of the procedures and typically when this occurs, um, at a time such as this late in the day, on a weekend.  Things like that.  Uh, when the paperwork's not readily available, the person goes home and then would return on Monday or during the week at a different time once the paperwork's drafted and ready to sign.  Um, I told Chief Gentry that I'd pack up my stuff and leave the building right now.  I'll go home and, uh, check in next week 'cause we're out of Friday.  I informed him I will not do anything such as law enforcement activities, etc.  I know the rules.  Uh, we'll then - we can go from there.  Chief Gentry, um, if I recall correctly, did apologize saying, I'm sorry and that he would be in touch.  The call then ended.  Uh, the telephone call was approximately 6 minutes in length and the summary, uh, that I just - uh, my notes were written approximately of this, uh, interaction about 29 hours after the event occurred, um, is when I, uh, jotted all these notes and specifics down. Um, so I - uh, so, uh, at that point I packed up my stuff.  All of my, uh - uh, information is open on the computer, and I emailed myself two strings of notes that I already had some of that in, uh, Outlook, um, that's where I was keeping some of my notes of these other things. So, I just emailed those things. Uh, you can look on Outlook and see what I emailed to my personal email, uh, knowing that I was gonna be locked out of the system.  Um, and those were notes that I was compiling up until this point because this is completely bizarre. Um, and I went to the restroom real quick.  Came back to my office.  Grabbed my bags, uh, like I normally did, and I actually unlocked my office door because I know only a limited number of people have a key to that, and I figured they might need to get in there at some point.  Um, and so, uh, 'cause nobody asked me to leave my keys or anything, so I left it unlocked, um, which we, um, normally do, so it would be accessible to others.  Closed the door and, uh, went walking out the building, I passed Lieutenant (Hitticus)' office.  Didn't say anything to him.  I just told him have a great weekend, and he said, "We'll see you on

Monday." And I said, "You too, have a good weekend." I walked out, um, got in my car. Uh, I waved to the security guy as I was, uh, on the floor as I was getting on the elevator, um, and, uh, drove home. And about, uh, 45, 60 minutes as I was driving home, um, my MDC starts, uh, chirping and gives me the error message that basically, like, re-login. So, you can see the access was all turned off, is what that indicates to me. So, um, you know, so 'cause my MDC was, uh, is - is always on. So, I received the alert in Teams that said, you know, you need to re-sign into Teams. I did try to re-sign in to see if I could get anything to make sure that's what it was, wasn't a connection and certainly, oh my - I can't access anything, so. Um, so he left it with - he would be in touch. Um, Monday, comes around, so now we're at the 7th. And, um, I call in to (Linda) 'cause I know that's the normal procedure - sorry. Back up one day. Sunday, I unload my tiny vehicle 'cause it's a take-home vehicle, at my house and I drive it down to the office, um, and I have my wife follow us with the kids. And I leave it in the parking lot. I leave whatever cases I had with me in my bag, um, that I was working on. Uh, I take piles of cases home. We now did - we were doing half of them digitally. So, I leave them on the front seat of the car. I lock the car up. I know that, um, Sandra, um, has ano- has another key to my car. She has an extra key to everybody's car who - I don't even go in the building on - on Sunday. I put my car in my parking spot. I already unloaded all my personal stuff at home. Leave, uh, that - uh, those cases that I had on that - on Sunday. And saying to myself, well, when they - on Monday I can, you know, tell them where all that stuff is and how they can get it. Um, so, uh, Monday, I call in to (Linda). I just call her desk number, I think is what it was, because I know that's the normal procedure, uh, for admin leave which - (Linda) is one of my direct reports, mind you, as well. So - so I'm calling in to a subordinate but - uh, and, um, she obviously got wind of, you know, what's going on, and she just said, "This is gonna be awkward." I said, "It's, uh, we gotta do - we gotta do." And she goes, "Okay." You know, I call in, give whatever the typical information we need first thing in the morning and, "All right, have a great day." Uh, that was right around 9:00-ish. Don't hear anything, um, all day until approximately - I'd like to get you the day - the time, um, 1642. Uh, my home phone number starts calling from - uh, and on the caller ID to me, it looks like it might be a county phone number - county cell phone number because it has a 602-908 and there's - I don't think there's a name on the caller ID. And mind you, nobody really had - I don't know where anybody gets my home phone number 'cause we just use it for, like, our house alarm. Like, we don't ever really use it and that's the number I think that they gave when you called me. Um, so, uh, that's not - but needless to say, it looks like 908, my wife actually answers it and says it's asked for me, and it's Lieutenant Crosby and, uh, I can hear he's driving, and he goes hey I pulled the short straw, I need to survey with the paperwork. Okay. And I admittedly sarcastically said, well you have, like, 18 minutes because I'm now only paid till 5 o'clock and, you know, so, uh, and I was already dressed ready actually to go to the

gym as soon as I could leave at 5 o'clock.  And so he goes, "I'm out on my way I'll be there."  I said, "Okay I'll meet you out front."  Um, so I waited out on my front porch - pa- porch or patio.  He arrived a few minutes later, um, I have, uh, I took pictures of the key 'cause he goes, "Oh, here's the paperwork."  I can show you what they gave me.  They gave me a letter that just says there's an investigation.  This is the standard admin leave memo.  I filled in some information for them, some contact information.  He gave me this letter.  And I signed it, this is my copy. He took that back.  He read this out loud, I think he was on Axon, uh, he was recording it or whatever.  I don't know.  Okay, we did on the hood of his car, in the street in front of my house.  Um, I told him, "Okay.  Well, just so you know my car is there, Sandra has a key.  There's cases all on the - on the desk." And he started to go over this, and I said, "Do you need to read the whole thing?" And, uh, 'cause I think - I think normally (Linda) does.  I said, "I can read it you, or you can acknowledge them.  I know what, um, what it says, so."  Um, and then I did ask him I said, "Well, wait a minute.  What's the - is this the right I.A. number?" And his response was, "I think so." That I.A. number is not 111.  That's not the Engelbeck complaint.  It's 139 so, um, he goes, "Yeah, I think that's it."  Okay.  I said, I think - I said - I think - I think he's recording of it.  Uh, I think I was like 'Hey, that's interesting." And then he goes, "The only thing I was asked to get from you is the key to your office."  I said, "Let me go get it."  I went inside and got it.  I started to come out, and then I was like, "Hold on, I wanna take a picture."  So, when I got my phone 'cause I just wanna take a picture of what I was giving him.  And so, we took a picture on the hood of his car, it was the key to my office and then there's a - the key to the building, there's two keys.  There's a general key and a key to the offices. He took those and drove away and then the next contact I have other than calling in every day is when you reached out to me, um, saying that which is why I asked for an I.A. number, um, uh, you know, on the phone, try to figure out if that's this case or if that's a different case or, um, who - who knows what else, you know, I don't know what else kind of cases it could've been.

Q:       Okay. And so, let me ask you, what is your relationship with, uh, Sergeant Engelbeck?

A:       Um, so Sergeant Engelbeck, um, I supervised him - going back, this is all just memory-wise.  So, I supervised him for a short time when he was on the FBI robbery and fugitive robbery task force, um, as a detective, and I was a sergeant or lieutenant in our major crimes division.  So, he didn't really report to me but he sort of did under MCSO.  But he was on a task force.  Um, then he worked for me for a short time in Special Victims Unit as a detective. Um, I believe he's continued working there when I was also the lieutenant of the Special Victims Unit.  I don't know. And then, um, you know, we got transferred to different places.  Uh, he then was assigned to me when he got promoted to a lieutenant.  He got assigned to me when I was, uh, the,

uh, commander of District 6, the top of Queen Creek. And then that initiated that's he was still on probation.  He was - I think he was only promoted a month or so earlier.  And then that's when not to wade go off the, you know, that's where the, uh, employee performance deficiencies, uh, started with regard to him, that I started documenting, and I have all those documents, uh, saved on my OneDrive.  They were all put in - in supervisor notes which stormed - served as the foundation for his - my memo to re- recommend his, uh, have not successfully complete probation for a variety of reasons, uh, promotional probation.  Um, so that then, subsequently, there was also the case that Cory Morrison was referencing where, um, uh, he was party to a - a meeting where, uh, Lieutenant Jakovinich, um, uh, berated me and, uh, made, you know, various inappropriate comments and that - that was all, uh, investigated which I've never actually seen that completed case.  Uh, but, uh, so Engelbeck was part of that.  And, uh, then I know his case was eventually completed here, um, when I went to the Professional Standards Bureau for talking about 555 case.  Um, I do recall, um - I knew the case was still open because I never got a - I never got a notification that was closed.  Um, but, um - and then when I was doing like a full case audit when I took over, uh, the commander to figure out where - how many cases we had, I could see 555 on there that it was there.  And I knew the investigator, Sergeant Leatham and, um, I had no involvement, uh, with the investigation.  I didn't direct it or even re- ask any questions, uh, regarding it, just knowing that it was there and still open.  Uh, you could go through the - I think there's a spells out, uh, the - the process there. At one point, um, I was told that Engelbeck either met with or had communication with, uh, Russ Skinner, who was the chief deputy at the time and, um, expressed concern that I was in PSB, and his case was being investigated in PSB. And I got a directive from Executive Chief Molina, at the time I don't recall if it was an email. I'd have to go back and look or a verbal that said Skinner said for you to have nothing to do with that 555 case. I said no problem, absolutely. Um, it was continued to be worked. There were then, uh, there was a memo, uh, that was generated requesting a - a truthfulness allegation be added, um, from the investigator. And you can see, uh, they gave me that memo. I said, "Just give it to me and I will put - I'm recusing myself o - of - of this and forward it." 'Cause at the time the policy read there was only, like, three people, two or three, that could approve a truthfulness allegation.  So, I put on there and gave it and they made the decision, um, that was just requesting to add the allegation. Uh, that's in the case file. Um, and I was advised when they were interviewing him at a certain time that, uh, a certain date that - and I tried to completely avoid the building and actually leave the building. So, I was not even there when that was occurring, um, on - on those times.  And then - then, uh, when you go back at that case, so then that case was handed to me in hard-copy form when it was completed by the investigator.  Um, the lieutenant, Lieutenant Romney, um, asked if the investigator should change the name on the - for the footer of the form to somebody else's name besides me on the

report. I said, "Just leave it." I was like, "I'm not going to the name is fine because they'll just cross it out." You know, my - my boss would cross it out, just write their name. Like, we don't need to change the whole format of every single page, uh, for the purpose of - of that. He said, "Okay." They physically handed me that case when it was done. Um, this is all going off my memory. Um, and I saw what it is. We were using these green cover sheets to track them at the time. I saw what it was. Did not look at all. It's - it was like a volume of this. And contacted my chief and I physically brought it over to him when we had a subsequent meeting and said, "Here it is. If you want me to review it, I'll review it. Um, but here you go. I haven't looked at it. I don't even know what the finding is. I don't know - I don't know what -" I - I didn't do anything. I gave it to him. I wanna say a couple weeks went by. And I don't remember if he gave it back to our admin staff 'cause then the process is to process. Or if he gave it to me and I carried it back and said here you go, um, uh, I did not look to see what the findings were. Did not even know. Um, then I see so - uh, so then it gets processed. Obviously, there were sustained findings on it. Gets processed. The - what ends up happening is, um, I see it we get a weekly report of the cases and discipline. And so, I, of course, see it on there. I remember the number from my, uh, NOI on that case back, uh, when - when it, uh, you know, when it was 555 pretty memorable, um, back when I was given an NOI, you know, before that - you know, on that. And so, um, I see it on that list, and then I see it goes to, like, you know, the discipline and all I see is they did - I think they give him 40 or 80 hours 'cause it shows on that report. Still didn't - didn't do anything. And then I see it that shows up on the - their weekly report of appeals so that he's appealing it, okay? Um, so then I get - uh, the next thing I see is an email from the county attorney, I wanna say asking, uh, will you - will I testify as I made the complaint? I was the complainant in that case. And would I be willing to testify in the merit, he appealed. I said, "I - oh yeah. I could -" he asked if I was available. I wanna say it was originally scheduled, you have to go back and live all emails. I think was originally scheduled for, like, the first or second week in January was the appeal scheduled. And I said, "Yeah. I - I - I - I'll testify that." But I said, "Well, how -" I didn't tell him. But then I reached out to Ken Holmes who's the appointing authority going, "Hey, what's the - what's his argument here on the appeal?" Neil, who Ken Holmes works with on the appeal. And Ken Holmes gives me his opinion of what, uh, the - uh, the Engelbeck's, uh, come, you know, uh, basis for his appeal is. At some point there's an email that Neil Landeen - so he's the county attorney on behalf of - you know, he's an attorney. I don't know if that's client attorney or not. But he emails me, um, whatever - it looks very similar to one of those documents that you provided me. It was like, "Hey, this is Engelbeck's sort of appeal notification. So, you know what he might ask." And so, I asked Ken Holmes. I - I - I said, "Well, like, I don't - like, I've never even read this case." And I said, "What's the argument?" And Ken Holmes, uh, said. "Well, he's arguing something about - he was already disciplined and since you made the

complaint." And I told Ken Holmes, "If my memory serves me correct, I never actually even made a complaint on Engelbeck." And he was like, "What do you mean?" And I said, "You need to look at the - like, I don't think I ever even made a complaint. I wrote a memo of requesting him not complete probation for all of these reasons, some other entity." I'm in Patrol District 6 at the time when this occurs. And I assume it's the PSB commander and, or executive command decided to initiate an administrative investigation. And then I was summoned to be interviewed for it and interviewed to the facts. And so, my understanding based on my conversations with Ken Holmes 'cause he says, "Well, the attorney probably needs to talk to you about that." 'Cause I said I, you know, I - you know, personally, I almost think I - I - I agree with Engelbeck that you were already disciplined for this. You know, like, I don't know the issue.

A:    But, uh, I wasn't - I did not do the discipline range and all that, which that's where I would have presented that information too, you know, 'cause that's my - one of my roles to do the presumptive range of discipline and all that. I didn't do any of that. I was - I wasn't even aware that that occurred. I - I was later told that Chief Caputo did that. Um, and you would see that in the case file. But I'm jumping around anyway. And so then, Ken Holmes says, "Well, maybe you should read the case first of the 555 case." So, in standard process for appeal, um, the conduct resolution prepares for the people that are - the MCSO PSB, the people that are testifying like a binder of the materials. I think it has transcripts in there. So, they said, "Hey, we have your binder for that ready to go." And I'd have to go back and look at the - the messages. But I didn't go down there and get it for weeks because the appeal was, like, set for January, and then it got like rescheduled. And so, I was like, "Well, I'll review that when we get - get there later." Um, so prior to January -- I - I don't know how deep you are. You know, I get an email from, uh, I think it was the county attorney saying here's three subpoenas for Engelbeck for his appeal. He wants, uh, me. He says that I - he wants me to provide him with - I think there's two other IA cases. Uh, he wants me to provide him with all the information about the investigator, um - um, regarding deficiencies. And then he also then subpoenaed me to testify on his behalf. So, there was like three subpoenas. Three. It might have been four. So, I coordinated with the county attorney and said, "Well, we - like, conduct resolution gives this." Like, do you need me, and they took care of it. I did prepare a response for the, uh, subpoena on, uh, Sergeant Leatham. There was a subpoena for I wrote up what I reviewed and everything and provided that to Neil Landeen to provide. And then the other subpoena was to appear at the hearing on January. So, um - for Engelbeck. So, then I wanna say when that got rescheduled, um, Engelbeck sent me an email that said it's been rescheduled to another date. So, which, quite frankly, I think is inappropriate. But, you know, um, you know, that's I was

already notified from Neil Landeen that it was being re- rescheduled. And so, then I - I think he got rescheduled for somewhere in February, um, and it was the - the week before or maybe that week. Uh, it might have been the week before February. I went - I was down at conduct resolution dealing with something else, and I picked up that binder finally. And I wanna say, I think was (Jack Greer) was the one I went and got it from. But he had to go into somebody else's office. And he's like, "In the binder? I had that for Captain Lugo." Picked that sucker up, put it in my car and took it home. Um, and, uh, never actually opened it, looked at it. So did go on our network drive to get a word version from Leatham of the narrative that he wrote. And the reason I did that is because at the time, uh, 'cause I was having to read so many - I have to read every one of those IAs that we do. We're talking a hundred plus a - a month. And, um, I play them on my MDC, and it reads it aloud as I drive to and from work. So, my - that was my okay. Well, I'll read this for the first time. I'll read it to me. So, I need a word version or a digital version, not the, uh, binder. And, of course, I don't know what else was even in the binder. So, I got through that, um, the narrative of that, I think, one time, um, the day before. Uh, then that - that was the week that the hearing was rescheduled for. And I made a mental note because that word version has, like, uh, it doesn't have my original memo. Like, it doesn't play it 'cause it was like a screenshot. And so, I was like, "I need to go look in that binder." But then on the - that, like, the next day, um, I don't know.

Leatham or Romney, uh, somebody told me that, "Hey, did you hear it got all they dismissed the appeal?" "Oh, man, I didn't - I didn't know anything." The following day, Ken Holmes called me and said, "Hey, did Neil Landeen call you?" "I - I haven't talked to that guy." And he says, "Well, just so you know, we overturned it and did this and changed it." And I, uh, expressed. I said, "Wait a minute. What?" Like, I'm concerned. I was like, "I agree that he got the discipline. But I don't see how the finding changes." And I said, "It sounds like if you were consistent with prior practices the finding should have remained sustained, and the discipline should have just been no discipline." Because it should have been the disciplines already handled in the demotion which, to my knowledge, would be consistent with other cases. And Ken Holmes reiterated that. "Well, it's in subordination all day long, meaning what Engelbeck did, um, in that instance. But this is based on the legal advice you'd have to interview Holmes." He told me. I said, "Okay. Whatever." I don't agree with it. But, you know, I'm not - that's not my - I said that's the process. Okay. And, uh, that was - I said ironic. I just read the - just finished reading the narrative, like, literally a day or two before. And he was upset meeting Ken Holmes. I say upset. He expressed dissatisfaction that the attorney never reached out to me to discuss it with me, which - okay. I don't - I don't really - like, that's the process. The process - the process. That's fine. Um, so I was preparing to testify and, uh, fully convinced based on that note, that letter that, uh, Neil Landeen said of this foundation of his complaint that, uh, he was gonna bring up, uh, you

know, he was just gonna try to smear campaign and talk about how terrible I am and every aspect of the word. Um, and I asked Ken Holmes. I said, "Is that - do they cut that off?" Like, "Is Neil Landeen gonna object to that 'cause it's all irrelevant bringing up stuff from, you know, that there's not anywhere remotely, uh, you know, just as a smear campaign." And Ken Holmes said, "Well, he should, but he probably won't." Meaning the attorney. And I said, "Okay, man." I said, "I'll do what - if that's what it takes. Uh, I'm not - all right." You know? Like, I said, "I'll - I'll take it." So.

Q:     What is your relationship with the Executive Chief Palopoli?

A:     Um, I went through pretty much every interaction I had with her with the exception of, I would estimate less than - less than a dozen others, just interactions since - since she's been hired, um, with the MCSO. I told you that - that - that's how I learned that she was even hired was her first email. Um, there was a handful of other interactions, um, about that attorney issue, um, and possibly some other, uh - uh, passing by at like a community meeting, uh, where, uh, she just walked by, and I walked by and said hello, kinda - kinda thing. Um, but, um...

Q1:    Did you know her - did you know her prior to - to her coming to MCSO?

A:     Not at all.

Q1:    Okay.

A:     That was the first - literally, her email to me was the first time. I didn't even - I didn't even know technically who I was supposed to report to starting on January 1. And there was some confusion there because I met with the sheriff in December. And he says, "Well, just call him if I need something." And then he does make a statement. I'm getting out of that. So, then it's - I do - I do meet a few times with Chief Gentry from January through, uh, you know, before February that Chief Palopoli is. And at one of those interactions, the sheriff says, "Well, you know, talk to your boss." And he points to Chief Gentry. So, I was under the impression up until that time that if I needed anything call the sheriff. I didn't even have Chief Gentry's number, but I could figure out how to get a hold of him if I needed to. And I was asked multiple times from the monitors of who was over - who was over you, who was overseeing you. And I expressed that, uh, I was told to call the sheriff. "Well, have you?" I said, "I haven't needed to." Like, you know, like, I'll - I'll call Gentry. Well, I haven't needed to. I - you know, we - we're - we were told business as usual, so we kept on going. So, I don't - yeah. I don't know.

Q:     How long have you worked for...

A:      For whom?

Q:      ...for Chief Palopoli?

A:      Uh, that would have been since the February, that meeting, February - I think it was the 17th or 18th. I'd have to look at the email of, uh, when that, uh, started. Might have some time logs. But was in the middle of February. I think it was - yeah. I don't know if she was there for the monitor site visit in February or not. I don't know. I don't think she was. I think it was a week after that. I think the first day was a holiday that week. I think.

Q:      Did you have a good working relationship with her?

A:      Um, I don't know that there is a relationship with her. Like, I don't know - I would say it was good. But there's no, I could point to, you know, other instances where there seemed to be, um, a complete lack of, uh, knowledge, awareness and communication issues. Not to go off on a topic. But we had this, uh, concern with the allowing attorneys into - in - as an observer, um, which is a violation of our policy, which our policy is issued by the court, the only policy that is. So, it's a violation of the court's order. And I brought those concerns up to her, uh, because she said the sheriff approved this and this was the source of that other March meeting, uh, that is. But why I bring that up is, um, I informed her of this is what my plan was, this is what the investigator was doing. I was surprising her what we were doing. Meaning, we were not going to allow it 'cause we can't. And she says, "That sounds good." I was not understanding what the request was. And so, there was some back-and-forth until the attorney showed up the interview and created a big scene calling the sheriff and everybody else. And she calls me. And I said, "Well, hey, here's the we talked about this, literally, a few days ago, and you were, uh, we're doing exactly what you agreed to." And it cleared - came - became clear to me. She became flustered and was like, "Well, I'm just not gonna push back. So, we're just gonna do it." Is - is the answer. So, any time that - uh, I was trying to get a specific answer or anything like that, it was I'm not going to push back. Um, I think the other quote, "I'm just following orders." When I was expressing concern of, uh, initial - you know, that the very first time I met with her in person on the 18th, um, you know, uh, kind of thing. So, um - so that's - I - I don't know. I mean, I - obviously, it appears that there's - I - it appears very interesting the timing of - of this. And I think - I don't know when you wanna get back to the specific allegations, um, of this. But a lot of that seems, you know, looking at it now after today and what has occurred over the last 4 months, um, it seems very, uh, I think is suspect. Um, and - and - and, uh, odd a- and not consistent with how we've done business. So.

46REPORT000769

Q:     I wanna go back to the complaint, sir.  So 2025-1-11, um, what was your intent when you access that complaint in April?

A:     Okay. On which day?

Q:     First time.

A:     Okay.  So, the first time is to do my normal, uh, intake process.  So, to review it, to determine what the nature of it was and determine, uh, proper intake routing, uh, what next steps needed to be taken.

Q:     What did you do after initially seeing that complaint?

A:     Um, I made a note - a mental note of it.  And my plan was to, at the next appropriate time, discuss it with the chief and decide what, uh, to allow her to decide what needed to be ha- needed to happen with it.  Knowing full well that it says that the chief deputy was already made aware of it.

Q:     And you said that a couple times the chief deputy's been made aware of it.  That's not your boss, though, right?

A:     Uh, that's, uh - he's not my, uh, direct report at that point. Yes, sir.

Q:     So how do you know that - how do you know that, uh, Executive Chief Palopoli knows about it...

A:     Mm-hm.

Q:     ...other than what you read here through the email?

A:     Um, I don't - at that point, it's at the 1903.  I don't know that.  Which is why I would follow up with her normally at an appropriate time.

Q:     What do you consider an appropriate time?

A:     Um, with my next interaction with her prior to the 7-day requirement of, uh, intake and routing.

Q:     Could you call her?

A:     I could have.  At 7 o'clock at night.

Q1:    I'm curious, sir, what dictates when you decide to - to - to make those notifications.  Is it ju- just based on your time and experience say, okay. The - this does not warrant an immediate response?  Or did - are there

parameters set?  You know, if thi- this involves a person of this rank, it needs to be done with this time.  If the - this involves an excessive force complaint, doesn't need to be done at this time.  You have set parameters or is it your judgment?

A:  Uh, typically, I'm going based on prior.  Uh, so to me, we're talking about, you know, by prior experience is there any urgency as in - is there any evidence or anybody that anything that's gonna get change...

Q:  Okay.

A:  ...uh, between this point and the next?  Is there any evidence that could be destroyed?  If we're talking a use of force, then yes.  If we're talking a criminal thing, then yes.  But all of those are required to be phone notifications made to the PSB commander.

Q:  Okay.

A:  Or the on-call.

Q:  Mm-hm.

A:  So, any of those urgent things, officer involved shootings -- all of that, all of those constitute yes, an immediate, uh, notification.  A regular blue team entry, um, that really, to me, with what I read and see, and we're already talking, um, after hours, um, for her, um, is, uh, clearly, and I could cite, uh, I think the policy that was highlighted that you gave me.  But I think the proper policy that applies to that is in CP2 where it mentions, you know, uh - uh, with regard as soon as practicable, okay?  And it also says that anything with the PSB commander, the chief deputy should make the decision.

Q:  Okay.

A:  So, um, you know, that to me would be, you know, it's okay.  Well, next time I talked to her, you know, we'll bring it up there.  This has been the consistent practice for others of a similar nature.  Um, there, uh - there was even one that I discussed with Chief Gentry in the earlier of the year before Chief Palopoli was even hired.  That at the next opportunity I had, where I had Chief Gentry, I brought it up and presented to him.  So, which was - which was within the required time frame, uh, of the - the court compliance, uh, mechanism, uh, and - and requirements, so.

Q:  Just clarify that time on those 7 days.

A:  Um, I'd have to - I wanna verify in the GH2.  But it's - it should be

a processed, you know, within 7 days, I believe. Yeah. So, any complaint? Um, and then it also gives - the policy also gives, uh, under the section, the - under the third court, the - the court third order, it gives the PSB commander the flexibility to even do more of an inquiry and review additional information before it's determined what the proper course of action is done. I know that's getting, like, ahead of, uh, what you're talking about a notification. Uh, but the - a notification talks about, you know, there's prior work history that has to be done within so many days. I think it's 5. Um, there's all these metrics. I think the complaint, uh - complaint letter - the - is - and we've been going and the - yeah. It's 7. I go off my memory. I verify in the policy but - so that's where all the intake - all the complaints. That's why my admin staff, if you were to verify them, you - they also keep track of that 7 days saying, hey, we need to do something with these. We have 7-day window. 7 calendar days. Not business days.

Q: And sir, sir do you feel your notification was timely to the chief?

A: Uh, for the information that I had at the time. Absolutely.

Q: When you met with the chief, Chief Palopoli, I'm talking about, on, March 11, 2025, who initiated that conversation?

A: March 11, that was a phone conversation.

Q: Like, you - you text 1111 hours?

A: Yeah. That's a phone conversation. Um, so 1111 -- let me look at my timeline. Yeah. 1111, uh, she, uh, Chief Palopoli initiated a text message.

Q: Do you remember what was said in that conversation? With the Chief. You said you had copies of those text messages?

A: Yeah. The text messages. Yeah. It was, uh - uh, she indicated to give her a call when I had a few moments.

Q1: And you went telephonic from there?

A: Yeah. And then I gave her a call and I have the - the call log.

Q: Can you tell me again what was discussed in that conversation?

A: Okay. I - all right. Let me go back to my, uh, detailed notes. Mmm, asked me to give her a call when I had a few moments. I called her at approximately 11:13. The call lasted for 21 minutes. Um, she started the conversation indicating she was sure I had already saw it, but that Engelbeck had filed a

46REPORT000772

complaint. So. Um, I inquired as to, uh, what it entailed and advised her that I had seen the Blue Team entry because I'm asking this, well, what did it entail? Because I saw that it said - said to the chief deputy, no forward to chief deputy. I said, I saw the Blue Team entry and read it one time, um, but was going to follow up with her, um, as she - as it indicated that, uh, indicated that I knew of the conversation that was relayed from (Bacardo) that he was meeting with the chief deputy as well. Um, I gave her a quick overview of the information that I had and, uh, also advised her of the other case involving the thumb drives and the concerns with that. So, she indicated that she was not concerned reference this - the complaint that come in and was just trying to make it go away.

Q:      You're saying you're referring to 2025-111?

A:      Correct.

Q:      Okay.

A:      I further expressed concerns. Um, then I went on to the chief deputy and others interjecting themselves in the older cases. I think I spelled all that out a little bit earlier, uh, when we went through the timeline which not to completely jump. But, um, the reason we have the second court order is because the chief deputy and the sheriff and the executive command were found by the court to be interjecting and manipulating all aspects of the internal affairs process. And I can cite to where that is. So, I know that, that that's the foundation which is actually the foundation on why the court instituted a PSB commander, uh, you know, as the person responsible, you know, that has to be approved and everything by the court. So, to take their involvement out of the internal affairs process.

Q:      Sir, were you given a direct order to stay out of the investigation by Chief Palopoli?

A:      To stay out of the actual investigative steps? Yes.

Q1:     Including accessing the case in IApro?

A:      No.

Q1:     Okay. What did her order mean to you then?

A:      So, her order which reiterated my statements of stay out of it meant the actual doing anything involving the investigation. Does not mean anything reference to providing or fulfilling any of my requirements of the court's order such as the dates, the times, the information that the monitor requires of the intake

process advising the court appointed monitor of it.  Um, but I would not go in to look at the attachments, of course.  I would not, um, sign off on any memos.  I would not direct any investigation.  Um, I would not, you know, monitor any interviews approve or, uh, review any investigative plans.  I would not direct investigative plans.  Um, that is what I mean in of staying out the actual investigating aspect, the actions, uh, of collecting that information.  So.

Q: Do you remember what she said to you when she gave you that order?

A: Um, well, originally, this is - and this - all this conversation is on the 24th is when this occurred.  Let me verify.  Not the 18th as she alleges.  The 24th.

Q: Mm-hm.

A: Yes.  After I said the normal process would be that I would have our administrative staff, uh, tell them to open whatever number you want, and then I would stay out of it, meaning the investigative process.  And I wanna say at the end after I said, "Okay. I'm gonna send that stuff to you." And she says, "Okay.  Stay out of it." And repeated that.

Q: That's all she said, was stay out of it?

A: Absolutely.  Can I reiterate that?  At no time following that was there ever any elaboration on what stay out of it meant to her?  Okay.  Or what she interpreted.  There's no written communication as such, um, of typically when we talk about in our agency of giving orders and making it clear, you know, there's, uh, various mechanisms that it's memorialized, okay, including email, text message, um, supervisor notes, all of that.  And at no time was there any clarification.  And at no time was there any clarification that I needed even ask 'cause it's a given to me pursuant to the policy in the court order.  It references being involved in the actual investigation.  It doesn't reference, uh, looking and, uh, or providing, um, dates and raw data information.

Q1: At any point when you access the IAPro case file the second time for at the request of the - the - the court monitor, chief - is that Chief Anders.

A: That is Chief Anders. Yeah.

Q1: Okay.  At any point, did you manipulate the case file in any way shape or form in IAPro, sir?

A: Absolutely not.

Q1:     Thank you.

A:      And the - the user log would show everything.  The user log would show if I looked at any attachments, it would show if anything was changed.  I wanna reiterate.  That's not an authentic copy, um, and it's missing information of the user log.  Um, so of the actual user log that's gonna show anytime anything has changed.  Um, there's also, I wanna reiterate, an administrator, um, portal for IAPro, that I am one of the administrators, that there's a separate query you can do to see their activity which I am not sure 'cause I've only had to use it one time in a case.  I'm not sure if it gives you even more detail then what the authentic user log would look like.  So, this tells you much more detail.  And this is the authentic that there appears to me can I look at it?  Appears to me, if you look at the end, this was a report run list created.  Okay.  So, this appears that this is potentially like a report run, uh, possibly in the reports tab of or or field, not necessarily from the user log.

Q:      Where - where did you get this, sir?

A:      That's a sample, uh, right out of the IAPro user manual, that's on the internet.  So, this is just like an example.  So, I printed this up last night after I saw what that was provided.  Which the way this looks, if you printed this report, I believe, uh, you can actually manipulate that.  Which is why it's not that authentic.

Q:      Do - do you believe this report was manipulated somehow?

A:      Um, I believe that they're missing information on that report and it's not authentic copy, accurate copy of the user log of, uh, the - the case that is involved here.

Q:      And what do you believe the missing was?

A:      Um, the access on the 28th or 29th.

Q:      Is that the only thing?

A:      Um, well, I believe there - if that's the case, there could possibly be some of this other detail missing.  Yeah.  Which would further show, um, the fact that, um, the - when the incident summary was changed.  So, there's seems to just seems to be very, um, uh you know, it just seems to be - it's not authentic.  Like, it seems to that there's no - how is there any, uh, verification that that's actually the - the proper.

Q:      I'm following what you're saying.  Is that what you're talking about?  You're saying, uh, it's been summary changed?

A:    Yes.  So, what - what is interesting - well, again, the reason I say this is interesting.  I don't want to get way off in the weeds.  But the Blue Team report that I was provided, that whole it was like six or seven pages.

Q:    Mm-hm.

A:    The thing that was, like, printed sideways, okay?  So that's not the summary that I saw when I accessed, okay?  So, this log here which I think you - you're missing some of the detail that helped.  But so it talks - so the process of that is they take that information from the original summary, and then they put that - they create a file and put that as an attachment on the tree of what that was.  They change that summary, meaning the intake staff does, typically one sentence or so.  Um, you have two sentences because then that goes on all the reports.  And so, um, what I'm getting at is it appears that, you know, how do we know how is it also that Blue Team report looks like it's missing the header and footer to show when that was taken 'cause otherwise that can be just taken at that instant snapshot in time that that's actually the files here and there wasn't potentially another change to - to the summary.  So, this screenshot image of - comes directly from the actual IA pro system, you know, the - the - when you open up the incident rather than that which, uh, appears clearly to be like a report written or drafted.  And it looks like it's actually Xerox copy at least the one.  Yeah.  So, which my other concern is it's missing, um, unless I'm completely, in my notes, don't align at all which I have text messages and outlook and everything that all would coincide that - that why then is the access, um, when I accessed it on 3/28.  Um, not listed up there.  Oh.

Q:    So, when you accessed on the 24th, right?

A:    I think it's 21st.

Q:    Or 21st.  Are you sure this - was that on a meeting with the monitor?

A:    That would have been the first discussion with the monitor.  Yes.

Q:    And (unintelligible).

A:    But not the discussion. That's...

Q:    ...on - on the 28th.

A:    Correct.  Because the 21st, the IA number wasn't even added yet.  IA number wasn't added till the 24th.

Q:      Right.

A:      So actually 21st - I'm sorry.  Yeah.

Q:      Okay.

A:      Mm-hm. Yeah. Um, so that would have been - and if you look at the time, that's right in the time frame which you could confirm with my Teams meeting and with an interview with Chief Anders that - that's where - where - and also this is not showing anything was accessed.  You know, no files, no attachments, uh, nada, you know?  So that just means that it was clicked on.  And I explained this already.

Q:      Okay.

A:      So.

Q:      Were you asked by Executive Chief Palopoli to assign a lieutenant to her point of contact?

A:      No.  She asked who the point of contact was.  And I said it would be Lieutenant (Porter) and (Amy).  And that's in the same conversation on the 24th where I said - where I said they supervised there the point of contact for Jensen Hughes.  So, I verbally told her there that.  So, I'll - I'll step back...

Q:      Mm-hm.

A:      ...a second.  Did she ask me who it is at that point?  I don't know if she asked a little my notes of who is the point of contact.  But I explained it in that same conversation that it's Lieutenant Porter and Amy.  Like, it's in that conversation already.  So, there was no left to do ask of sending somebody's information.  Um, and that's occurring, once again, on the 24th because she requested an IA number and for Lieutenant Porter's contact.

Q1:     She requested Lieutenant Porter's contact, not...

A:      Yeah.

Q1:     ...I need a - I need a contact number for lieutenant?

A:      No. Because I said, well, Lieutenant Porter is the contact, like, it's all in that same conversation.

Q1:     So that wasn't prompted by her that was something that you volunteered Lieutenant Porter will be your contact?

A:     Yes.  She requested an IA number, and I explained when she says it gonna be assigned to Jensen Hughes.  So, I said, "Okay. Well, that's a conflict of interest because Lieutenant Porter is the contact and Amy."  And then I went in and explained all that. And she still wanted. "Okay. Well, send me." You know, uh, then, uh, send given IA and send, uh, you know, Lieutenant Porter's, you know, uh, contact information which if you look at the email was done.  He's on the email...

Q1:    Okay.

A:     ...when I asked the IA to be opened.  So.

Q:     Okay.  Did you ever send her any contact information for Lieutenant Porter?

A:     In that email.  His email is there. Like, that's...

A:     Phone number...

A:     ...the contact.

Q:     Yeah.

A:     You hover - you hover on the email and that's the phone number. So...

Q1:    That's how system works. Okay.

A:     Yeah.

Q1:    (Unintelligible).

A:     Yeah.  And it shows who the supervisor is.  It gives a phone, like...

Q1:    We have no way of knowing that unless you (unintelligible).

A:     Yeah.  Well, I'm just - like, he - he was also copied on it and told to, you know, that everything needed to go through her.  So, I'm saying, "Hey, here you go, you two."  First, I have all sorts of concerns that it's even they're being involved in it.  But that was ultimately your decision.  So, you go right ahead then.  And then here everybody is.  Um, there's - you can - there's a variety of way.  But...

Q1:    Is it possible with her being new to the system that - that - that she did not know that hovering over that name, the way I didn't know that - that - that would provide his contact information?

46REPORT000778

A:    Um, I - I can't say that it's not possible. But I know she is at least more well-versed than being completely naive to the Outlook system because she's made prior comments when we were scheduling one of the meetings that she could go in and access my calendar and saw where I was.  Um, and saw that I was not available because I was a training.  So, she knows enough to navigate the system to get in to view a subordinate's calendar and see exactly where there's - the location of the calendar.  So, I would be hard-pressed, number one, to - to - for that to be the case.  Number two, I would have to verify. But she probably was already provided a phone list.  Um, there's a office of the sheriff phone list that has Lieutenant Porter and the PSB phone number, you know, that is published and available.  Um, and there's also an alpha paging system that has every County employees cell phone number, um, on there.  Um, so I expressed this, you know?  So, to me, the contact which based on my interactions here and what I saw and Lieutenant Porter's in- uh, Lieutenant Porter's, um, interview and the materials is their communication all took place over email and not over the phone or anything of that nature.  So.

Q:    Do you agree that having contact with, uh, 2025-111 would be a conflict of interest?

A:    By definition of a policy, um, having contact with is what you said?

Q:    Doing anything with it.

A:    Doing any investigative steps or participating in the investigation, um, when you look at the definition of conflict of interest would be.  Yes.

Q:    Do you believe you're in subordinate to Executive Chief Palopoli might not following her orders to stay away from the case?

A:    Um, no.

Q:    Why not?

A:    Um, she never gave an order against doing anything that I did, number one.  Uh, number two, as the evidence would support in my timeline e- even if that order was given based on this log, that was done after these accesses.  So, there's no evidence in this logs that even shows that I accessed it if you're to even accept that the stay out of it was an order.  Which, uh, to me, I don't even - that's not an order not to fulfill my requirements, uh, of the court order and keep the court ordered - the court order - the court appointed monitor apprised and even more so by giving him that date at that moment in time on the 28th, that Friday.  That date would further signify she is actually violating the conflict of interest by state statute policy because she's actually assigning

the case and having my supportive staff do investigative steps on the case against what she already told me, and they continued that the monitor said that it can't be assigned there. And they continued to allow it to be done. So, providing that date to him clearly is not in any way impacting, uh, any type of investigation, is not accessing changing, archiving, deleting, obtaining any information that was not already, uh, known, uh - uh, to me and was merely, otherwise, I can't fulfill the requirements. And there was never any directive given of any sort to say not - do not talk to Chief Anders. I'll take care of it. Don't give him any information, which that would have been unlawful anyway. But don't give him any information. If he has anything, you send them to me. Nothing of that nature.

Q:   Did you ever give Lieutenant Porter any directives?

A:   Um, I did. Yeah. Or guidance.

Q:   What did you tell him?

A:   So, I don't recall the exact date but after, uh, we created - the case was created. So, the IA email went out. So that would have been after the 24th. Um, that went to him - well, went to - I- I'm almost certain it went to him as well. But, you know, that, "Hey, this is being assigned to Jensen Hughes, you know, uh, contact the chief for anything further." I don't remember the exact date. But he did come into my office at one point and asked, "Hey, who do we - who do I need to talk to about this." Because I - you know, about that case. I said, "You need - the chief didn't call you yet?" Like, "You need to talk to the chief." Um, and he says, "Okay. Yeah. I know 'cause I can't talk to you about it." I said, "Yeah. Go talk to the chief." So that occurred in my office in person. And, uh, then there was, uh, then I wanna say it was probably about a week later, um, that, uh, he came by, and he said, "Hey, just so you know, it's going somewhere else, and we're - we're not involved with it anymore. We were told to" - I think he used in his interview. I don't think - I don't remember him saying to me stand down. But I think that was what. But he was - he said, "Okay. Just so you know, it's not, which I think is relevant information as how do I supervise staff that is involved in invest- is actually involved 'cause they're reviewing, generating investigative plans, determining investigative steps. How do I supervise a supportive staff that's doing that on me. Because anything I do to that person, if I - anything is, you know, to hold them accountable as well, it's because he's investigating 'cause I'm investigating you." So. So there was two brief, uh, in-person contacts, um, with - with Lieutenant Porter on that. But never discussed on anything regarding what steps to take in the investigation, investigative planning - no. It was who do I need to talk to? Which to me, also, was who does he forward the investigative plan to because normally that would come for a Jensen Hughes case that comes to me. And I said, "You got to send that all to

the - it's all gotta go to the chief."

Q:    Any other conversations with him about this case at all?

A:    No.  It was those two, um, interactions.

Q:    What were you trying to accomplish with this case when it first got assigned?  What I'm saying - what I mean by that is you're - were you trying to make a service complaint, were you trying to do something else with it?

A:    I wasn't trying to do anything with it.  Okay?  So, um, it needs to be done in accordance to policy.  There's various options.  And I made this overwhelmingly clear multiple times in several of the conversations, especially when she's calling me, asking me what to do with it even after the IA, uh, was.  But before that was - and when she said - let me back up.  When she's talking on the - the 11th of she's trying to make it go away.  Um, I don't think I even, like, really entertained that, um, you know, and just even said anything.  I don't know that I even responded directly to that statement.  But later, I said, "You just need to let me know what needs to be done with it."  And I'm not afraid of an investigation.  I am afraid that it's not done in accordance to policy and the court's orders and to be compliant.  Because ultimately, the person whose neck is on the line for being compliant, it sounds silly even a case on me is me according to the court order.  So.

Q:    Did you believe that the complaint filed by - by Sergeant Engelbeck was retaliatory out of variety case 555?

A:    I do. Yes.

Q:    Why?

A:    Um, because - and I could go - there's a variety of reasons.  But, um, uh - uh, my understanding is, um, he - he brought up several of these issues in the 555 case.  So, it was addressed in there.  And if I'm not mistaken, I only reviewed that narrative once, but he was instructed by the investigator that what he's trying to do would be retaliation, um, towards me.  Um, he continued to press the issue, um, filing the complaint with Chief Caputo.  Uh, my understanding is that he also, um, went based on the conversations I had with what I was told to not be involved in it.  But he also tried to go to Chief Deputy Skinner, um, and told that service complaint - I believe he was told it would be retaliation.  Uh, I would review his PDH, um, interview with Ken Holmes because I believe it was brought up there as well.  And he was told again that taking any adverse action against anybody who participates in a misconduct investigation or cooperates with, you have to realize that, like I said before, I don't - I didn't even file the 555 complaint.  I

was required to be interviewed 'cause I'm required to, uh, participate when I'm compelled to be interviewed on the facts of a situation. And if you follow the documents, you're going to see that. Okay? So, then he, uh - the complaint about the thumb drives, okay? And he's throwing my name as much - as well as the investigator if s- sneaking into his office and taking thumb drives. You know, how - how, like, absurd, to say the least. Um, my understanding is he also emailed other various chiefs, uh, pursuing the same types of issues and concerns, um, in - in the 555, uh, matter. Um, and then he moves forward to bring this. And with what I saw those three paragraphs is, um, that, uh, um, as well as there's some other instances of what I would say is his, uh, pattern of harassment. Um, uh, but, uh, he's saying that he did something to the effect of he didn't get to cross-examine me, okay? So how is that the basis of any being able to submitting any complaint. Um, and even more so he's, uh, alleging a criminal conduct, um, you know, that resulted in a criminal investigation, apparently, um, that has no foundation whatsoever. Um, uh, so based on seeing that I believe in that document, there is reference that I might have been involved in criminal conduct, okay, which I, of course, didn't see in those three, uh, three - three paragraphs and I think a sentence. Okay? Um, so all of that is continuing to pursue, um, with an - an appeal, uh, based on basically the foundation is that I cooperated with an investigation that I'm required to cooperate with and did an interview. And so, you're going to con- continue to repeatedly do that. Now I talked about the subpoena email as well. I think that's just a continued pattern of see, look, I'm gonna get you, you know? I - I'm not trying to, you know, uh - you know, downplay it. But what is if there's a subpoena, why does he have to email me, uh, directly, that he's appealing that I'm testifying. And, um, uh, lastly, you know, I - you know, there's another instance and I get, you know, that, you know, of this, uh, continued pattern harassment which includes I've reviewed other cases involving, uh, Engelbeck. I've signed off on other cases. And he's never had objection to those things. Uh, ones in which he was sustained and ones in which he wasn't as the PSB commander. Never an objection to regard to those. But he also in other - some of those cases is as soon as a - a supervisor commander tries to hold him accountable for something, um, there was another you could look at. It was involving, uh, Captain John Bailey and Chris Houck is the IA. I don't have the IA number. But it was him and, uh, about him, uh, leaving the building, uh, and take - you know, leaving early and fa- uh, falsifying his time sheet. There was an IA done on that. There was an IA on him not doing his job as a - as a sergeant. But, um, he turned around and tried to file a complaint against, uh, John Bailey, his captain who, uh, initiated the complaint there. So. Um, there seems to be a continued pattern, um, of this conduct. Those other cases are an example. And this matter, you know, it was handled through an appeal whether you agree with what happened or not there's a process, uh, that doesn't make it misconduct for the individual who merely, um, was asked to be interviewed - well, required to be interviewed and provide answered the

questions of the interview and didn't even initiate, uh, the complaint which he would have all of that material and know that if he went through the actual case. So it would be, I would see it where I sit today as adverse action taken against an employee for participating in, um, a misconduct investigation. I'm paraphrasing the policy. I have it here if you need, so.

Q:     Sir, did you ever make any attempt to try to make this case disappear. I'm talking about 25-111?

A:     Not at all.

Q:     Sir, you've been truthful throughout this interview?

A:     Yes, sir.

Q:     Any policies you'd like to review, and you'd like to (unintelligible)? So, this is CP2 and this is GH2. Are you familiar with both of those.

A:     I am. Yeah.

Q:     Um, you - you reviewed - reviewed both yesterday?

A:     Um, yes. I did. I'm familiar them. I can find if there's something you need to find.

Q:     All right. Sir, uh, for MCSO policy GH2 internal investigations reviewing that policy, do you believe you're in compliance with it?

A:     Yes.

Q:     Why?

A:     Because there's no violation of any of the policy - the section of this policy. I think it carve out, I think, the section that you had highlighted. To give you more specifics here, it's page 25, if I remember correctly. Yeah. This - this one doesn't - the one you gave me yesterday had section highlighted but this whole section of conflict of interest on page 25 applies. So, to - after it's been initiated - investigation has been initiated, all of this, if you look at the timeline the way this policy is written, I was actually - the person who worked with the court to revise this policy. And I've actually - have been recognized by the court and the monitor as the subject matter expert, um, I've been - I've given declarations - formal declarations in the court about PSB matters and this, you know, specifically the policy. But this section that was cited of this conflict of interest, this all talks about after an administrative investigation. So, this is after an investigation has already been determined

46REPORT000783

to - needed to be open. We're way back here of initial intake and process, complaint intake procedures before it's even determined that an IA needs to be opened.

Q: So, you believe you're in compliance with the entire policy?

A: Yes. The proper policy that would apply would be CP2.

Q: All right. Sir, how much review, you reviewed CP2, uh, MCSO policy CP2 code of conduct. After reviewing that policy, do you - do you believe you're in compliance with it?

A: Yes.

Q: Why?

A: Okay. So, to start with if you're looking at, um, under - no way you wanna start. You have sections highlighted but. Okay. To start with the conflict-of-interest section that was updated here on this brief report. Employees shall not involve themselves in any manner that may involve a conflict of interest, appear to be a conflict of interest, should a conflict of interest arise, employees shall notify their supervisor as soon as practicable or practical. Employees who are not sure if a conflict should make those declarations. Okay. Now, you go to the section right below that. So, where we're at here at the initial intake review of this policy - of this complaint. Okay. It's we're talking about 9 o'clock - or 7 o'clock at night 19 whatever, uh, 1903. Okay. Become aware. So, when would be the next soon as practicable. Okay. I'm working from home, I actually worked from home the next morning, so you'd have to look. I don't know how many hours of it all before 11 o'clock, um, and what - you'd have to look at what else I was dealing with at that moment but first off, what's practical and where are we at with regard to that complaint. So if you look at the GH2 where we're at in the procedures and the PSB operations manual where we're out of the procedures is it first needs to be reviewed all of the material and the PSB commander then - so where we're at the crossroads is to decide the proper course of action whether there needs to be an investigation, whether there isn't, whether they need to do further inquiry first or what. So that's the moment in time of where we are, okay? So, the next then there has to be a decision, we're at a decision point of reviewing that what needs to be done. Let me take you to, its Page 4 where that - that section kicks up. In matters involving misconduct or discipline, so I guess this could loosely be, okay, is he alleging misconduct or not we don't even know that a misconduct. It hasn't been determined then a misconduct investigation should be convicted. Employees shall notify the PSB commander if the PSB commander suffers from a conflict the highest ranking non-conflicted office

chief, okay? Um, if there is not a non-conflicted office chief and outside authority shall make the determination, okay? So who else is the highest ranking non-conflicted chief that would 2be the chief deputy, Chief Gentry who on the entry, um, indicates that he was already made aware of this and also given additional information that I'm not privy to, and I don't know that I've even seen so -'cause I don't know what that was, okay? So that's where we get and then the count- then she initiates, uh - uh, communication, and absolutely I bring it up. At no point according to emails that she has, she was aware of this, um, to - about over 2 hours prior to me seeing it in Blue Team. She was actually aware of more information, uh - uh, than I had. And I wanna say -- I'd go back and look at that, didn't the email - I think the email said something to the effect of, she said she would look at it the next day, okay? So where is the obligation to, this is so bad, so egregious. Um, it said in there that a complaint was entered in Blue Team that I need to notify, uh, the PSB commander not to even go near it, I'm aware of it or anything of that nature. No. Obviously, it wasn't, uh, urgent, uh, enough to her. And so, what are we talking, a matter of 1903 to 1111 or 1113, what is that? Not even - that's less than 24 hours on what I know at the time is, we have a 7-day window, possibly even more if there's an inquiry to be done. The chief deputy was provided additional information and determination needs to be made at some point. I know you can't delete it. You can't make it go away. There's no access to - there's - you know, nobody accessed - I didn't access anything else regarding it, okay. So, where there's zero urgency whatsoever. And then you go to site, uh, code of conduct policy. Policy can't be driven to cover every - you know, we're talking about use of discretion, um, the employee must use the discretion and the enforcement of laws and determining appropriate actions shall have the authority. And when employees and supervisors are faced with situations that discretion can be exercised shall be cautioned against unnecessarily escalating situations and addressing a situation in an urgent or expeditious manner when circumstances do not necessarily dictate. So, we shall evaluate the circumstances and consider all resources and alternative situations. So, as I indicated before, uh, the appropriate decision should be the least restrictive and the one that still accommodates the intent. As I indicated before there's - you know, the proper course of action is to, uh, advise the Chief at - at an appropriate time, uh, and leave it as is until they can - she can determine what course of action she wants to go, which would be completely consistent with prior processes and practices, um, of any other case. The quick turnaround of even viewing it within a few hours is not - is a little bit unique in this situation to begin with. It just happened to work that way because I was trying to catch up on the other ones in the incoming bin. And so, do I check it every single day? I can't say that I do every single day. Um, sometimes it goes 3, 4 days. Sometimes it's even gone 7 before we check the - the incoming bin or my admin staff says, hey, those coming up, excuse me, of 7 days so we need to make a decision. And so, uh, you know, there's - there's all these processes in

place and if it was required of an immediate, uh, you know, nature when we're talking use of force critical incident, all of those require immediate phone - require phone communication directly with me not even with the on call, uh, PSB Lieutenant. So that covers that - that aspect, um, you know, the insubordination. I don't know if you have more questions first but willful refusal to obey a lawful order. And when you look at what's the definition of willful in the policy. Intentional not accidental voluntary or designed. So first off, there was no order given to do anything that I did or to not do anything that I - that I did. The order she's inferring she gave, if the correct timelines used with the evidence of supports would even be after this access was done which this log would show that it was never even accessed, um, after her - when you use the correct timeline perceived, you know, what she perceives as an order which was never followed up and you could go back and look at command responsibility policy of the - we try, like, the site. When we specifically start talking about orders - um, so no responsibility should be assigned to employee unless they have the authority to necessary to fill the responsibility. So, I'm required by the court order to provide the information that I did, the time that I did access it, um, even though she didn't give me an order not to give that information. Um, but I'm saying if she's giving - if she's interpreting her words as that means you can't get into it, you can't even give the receipt or the assigned date, um, which she should know I'm required to do. It's in all the quarterly reports he actually cites what information he ne- he needs and is provided and how those discussions go, okay? So that would then eliminate me from being able to fulfill what I'm required to by - by the court's order and actually violate the court's order. Written order shall be used when the situation is complex, and their misunderstanding is reasonably possible. She never asked any clarifications. Uh, in her interview she doesn't even say that. She asked do you understand, do you know, you know, confirm this, never followed up with a written, uh, communication of any nature which would be consistent which if you were to look at our agency in subordination cases, uh, we don't even look at a case of insubordination until we have at le- not based on a verbal kind of thing of this nature - allegation of this nature. So, I would encourage you to look at some historical insubordination, uh, cases where ironically the 555 case Engelbeck was told verbally, given in writing multiple times, acknowledged he received the order and acknowledged he willingly willfully didn't obey it and the agency is coming around for whatever reason saying well, that's not even in subordination. So, I know it was changed for a separate reason, but those are the thresholds when you look at the threshold of, uh, insubordination that we've used historically in the PSB, uh, for, uh, anything rising to that level and there was never any follow-up, never any follow-through. And, uh, I just wanna add that - then there's still even, uh, you know, that, um, she brings up the case after she says stay out of it, which she doesn't even go into and explain that - provide that information to you. So, she's picking and choosing, um, what information and her timeline is off she's excluding meetings and combining discussions. So, if

her order was to stay out of it how do you stay out of it but yet then now, I'm calling you asking what to do with it and give me direction for it, you know, to assign it to.  So, um, I think when you look in context, and you know in context of all of that information, and you take that conversation in context with she never clarified she'd never, you know, anything.  And quite frankly I had no reason to need clarification.  Because to me stay out of it.  Well, yeah.  That's a given.  It's still gonna show up on our backlog report of open cases.  Like, it's still gotta be listed there but that means - okay.  I see the number, but that means that, yes.  Like I said I'm not involving myself directing or influencing any investigative actions or no actions or decisions or determinations, merely fulfilling requirement of reporting what I'm required to by the court, and was never, uh, given any directive or order not to - to not do that.

Q: Is there anything I have not asked you that you'd like to bring up this time?  And that maybe the period of time to make a statement.

A: Okay

A: I just like to reiterate, um, that, uh, like I pointed out throughout the interview that there's various files of additional evidence to demonstrate, improve and establish the timeline that I provided.  Um, so I don't have access to that information.  I think we talked about it.  I haven't had access to any of that information so, uh, there certainly could be additional notes, additional evidence that I can't think of that are, uh, available there to further prove, um, any of - any of this as well.  So, I don't have that - I mean I don't have access to that so.

Q: Anything else, sir?

A: Um, I don't - I don't think so.

Q1: Sir, before we conclude...

Q1: ...will we be able to have copies of those?

A: Of what exactly?

Q1: The - the - well, you've tabbed out a bunch of stuff.

A: Absolutely. Yeah. You can make copies.

Q1: Okay.

A: Mm-hm.  I think there's...

Q:      Is there anything been discussed off tape we need to re- readdressed on tape, prior to us concluding this interview?

A:      Uh, I think that the - the question that I had, uh, this morning when we first got here after we reviewed the material was, uh, the - the origination of the - where this complaint, meaning 139, uh, started.  So, uh, I was not provide- I don't have any material that was provided to me to show where that originated.  So, to create a number in our system somebody's gotta create an entry.  So, I was not provided that entry of 139.  And/or whatever associated information or where that came from, uh, in any format.  So, my question is where did that - you know, where did 139, uh, really originate, uh, from?  So, uh, I think that's worthy of noting just on the record but, you know.  So.

Q:      Anything else, sir?

Q1:     No.  I don't think so at this time.

Q:      All right.  Per ARS 38-1104 law enforcement officer at the conclusion of interview is entitled to a period of time to consult with the officer's representative and may make a statement not to exceed 5-minutes addressing the specific facts or policies that are related to the interview.  Would you like to, uh, break prior to conducting this?

A:      Yes.

Q:      Okay.  10 minutes.  Time is 1400 hours.

Q1:     In the interim, sir, if you - if I could have the - the - the policy to directly related to court monitors, uh, what you are required to comply with the court for the court monitor.

A:      Okay.

Q1:     Then you - you referenced it several times and I wanna make sure that we have a copy of it.

Q:      Mm-hm.  It's on the record as well so, like, probably one second.

A:      You might need to have the locations.  So, the ops manual, here are saying reports with that.  And then, of course, these are the couple of - uh, couple of things on, first, second and third order.  So can we, just, like, my copies back, so.

Q:      Okay.

Q1:     Thank you, sir.

A:      Here's the - those are the that's the quarterly report.  I can explain that more to you if you need but.  So, this is the monitors report I just printed up these pages 'cause it's, uh, 306 pages on the website as well.  But these are certain paragraphs talking about the complaint intake process the Chief Anders.  So that's the 43rd report which, if you look at the 41st and 42nd 'cause this is done in July.  You know, if you're trying to go before this event occurred, they all have the same language, but that might be.

Q:      (Unintelligible). This one here (unintelligible) right there.  All right.  Back on record.  The time is 1417 hours. Sir did you wanna make an employee statement to your chain of command.

A:      Yes. I did. So just wanna briefly touch through, uh, the allegations here, so we have on the Notice of Investigation.  Um, it's, uh, alleged that I access that attempted to assign and then to some other entity.  So as demonstrated on the log I think I - we already explained that that that's a default mechanism, you can confirm through IAPro and that's just the first time somebody looks at it, it automatically creates that.  At no time, uh, does that mean anything about trying to change assignment or move it or not to do anything with it that's an automatic default.  And if you were to look in any other case you would - you're gonna see the exact same thing in a user log.  The first person that looks at it, it's gonna default there as long as they didn't assign a number or assign it to an entity the first time, they looked at it.  So, think we covered that.  Uh, number two, concerning the complaint that I did not make, uh, notification to Chief Palopoli.  Um, so alleged on March 10 at 1903 I accessed it.  I was in a, uh, working capacity doing my re- required duties of the policy and the court order.  And, um, which I already cited the sections of - the sections of GH2 that were cited, talk about after an investigation is determined there's never an attempt to do anything, uh, nefarious change, manipulate, impede, any type of investigation with regard to that.  It was based on the information I had at the time, the knowledge of the prior service complaint, uh, with Chief Caputo, um, the knowledge of the prior conversation with Sergeant (Picardo).  Um, the fact that it's 7:00 at night and I didn't start working until, at least 9:00 maybe 10:00 am the next morning, um, uh, splitting hairs over a matter of that's not an appropriate notification clearly fits CP2 that - uh, that as soon as practicable.  Not to mention the fact is that - um, that is a decision point, that's not a misconduct. It's not an investigation yet.  So, if you look at CP2, you look at the definition of code of - uh, conflict of interest, that references to an investigation and that's also mirrored in the court's order, uh, meaning investigative steps.  But you get back to that, um, and the fact that um, it says that any decision needs to go to the highest ranking chief.  So, the Chief Deputy was already aware.  We have ample time

that would be consistent, um, on how handled up until this point those types of instances before when they've come in, and they've involved me, it was - there was no urgency.  There was no - you know, they were, okay.  Well, we'll get it to the - we'll talk about with the monitor.  We'll get it to the chief. Let them decide.  So, there's multiple cases, uh, since the third order was in effect, uh, that that occurred that includes a case involving Chief Molina, uh, in case coming directly from the court and the judge, uh, involving Chief (Sheil).  Um, one - at least one involving me and also another one involving me, uh, recently.  So last -- on that allegation if - if that was such a concern, so that was aware - that was made known to Chief Palopoli, if that was such a concern then she would have known on 3/11 the fact that I didn't make appropriate notification.  But it doesn't become an issue until after the 4/2 meeting where I expressed concern.  So, she was already aware of this for however many days that is between 3.  So that's not even an issue to her. You - you acknowledge, we acknowledge in her emails, so she already knew of the case.  So, um, that seems, uh, highly, uh, concerning and problematic.  Um, then moving on to not accessing the complaint.  I think at the end of the day if you're to look at the timeline, uh, clearly, uh, Chief Palopoli, um, is picking and choosing what information and con- uh, conflate, combining meetings.  She doesn't even, uh, bring up other conversations that occurred or at least there's no evidence of that of her bringing those up, uh, including the fact of, uh, you know, where the correct date that - even the comment about stay out of it was made is incorrect in her timeline.  And I have additional evidence that would support that including an interview with, uh, Chief (Anders) would further support that.  So, um, and then your - yeah. We're talking about alleged to access the file again against a direct order so on March 21.  So, if you were to look at the proper timeline the access on March 21 which was official responsible - uh, the responsible duties of, if I opened anything that was attached - if anything was attached that would have been visible here, um, and/or in the authentic user log.  But that was not done and that could be confirmed as that was a discussion as well with Chief Anders to keep it transparent as required, uh, by, uh, the court's order so.  Um, lastly, um, you take this all in the account of the time clearly.  Um, the actions of Chief Palopoli.  Um, my understanding even at this time when this, uh, complaint is going through the process of all the requirements I'm required to do that she's not even approved by the court to oversee any PSB matters.  So, all of those, anybody involved in overseeing PSB matters, uh, must be approved by the court.  And my understanding is at this time that was still not - at the time that this occurred that that was not even, uh, approved officially by the court.  Um, so that further jeopardizes, um, even her involvement that should have been in - in the - in the case to begin with or any type of, uh, misconduct case.  So, um, I would reiterate that, uh, I did not see an interview with Chief Anders that, um, clearly it wasn't even - it wasn't brought up either by, uh, Chief Palopoli, um, the fact that he's a potential witness. If you're to look I have a court order document that, uh, was issued

recently, uh, back in April that indicates that Chief Anders is a possible witness.  He is a witness in might be related investigation which this is all court matters that were going on, so the chief of compliance should certainly be aware.  Um, and, uh, she also knows of the conversations, but Chief Anders is not even brought up, uh, or interviewed.  Um, Monique who is the one who actually processed it, um, is not interviewed as well, and she would also have those emails which I don't know if she keeps them somewhere else or if they're stored in IAPro.  I don't know if she uploads those when I email her to say what needs to be done.  So, um, I reiterated before I also have additional files and all that does support everything that I said and support the timeline that is the accurate timeline of the events, um, which, uh, you know, clearly contradicts Chief, uh, Palopoli's, uh, position there.  So, her timeline and chain of events.  So, with that - yeah. It's - uh, I think that addresses at least these, uh, yeah, the policies that were here. Just - I wanna give it one more read to make sure.  Yeah.  So, then I would just - yeah.  I would just like to make sure, and I know we've went round around about it.  But authentic copy of the log as well as an authentic copy of whatever it was that - was known to me, meaning those three paragraphs that I was reviewed, uh, you know, that I actually saw to be able to really hone in on the, uh, to get the - uh, to establish that this is no different than any other complaint.  Uh, meaning the - the timeline, there's no urgency whatsoever to have to take.  And if you'll look at the proper policy, not only is the Chief Deputy already aware.  And it's - that's confirmed with their emails that he's already aware.  Uh, but, um, we're also talking about the fact that, you know, there - there's plenty of time and nothing's going away.  Nobody's making any decisions on anything so.  With that, I think, yeah, that would conclude my statement.

Q:          Okay.  This will conclude the interview.  The time is 1427 hours.


This transcript has been reviewed with the audio recording submitted and it is an accurate transcription.
Signed _____

# Timeline of Relevant Events

The following timeline is constructed primarily from the significant points and Chief Palopoli's notes. It outlines key events related to IA2025-0111 and IA2025-0139, providing context for Chief Palopoli's actions. The times are approximate.

- **March 10, 2026:**
  - **4:02 PM:** Sgt. Engelbeck enters a complaint into Blue Team, alleging "intentional destruction or withholding of evidence" between October 2024 and January 2025, naming Captain Lugo and Sgt. Leatham as potential principals. The complaint, with attached documents, is emailed to Undersheriff Gentry.
  - **6:03 PM:** Undersheriff Gentry forwards the email to Chief Palopoli, recommending an outside agency investigate due to PSB involvement.
  - **6:62 PM:** Chief Palopoli responds, stating she will review the documents and provide thoughts the next day.
  - **7:03 PM:** Captain Lugo reviews the Blue Team entry, noting he "briefly looked through it," but does not notify Chief Palopoli, despite MCSO policy requiring immediate notification if a conflict exists.
- **March 11, 2026:**
  - **Morning:** Chief Palopoli and Undersheriff Gentry discuss the complaint in person. Gentry reaffirms his direction for an outside agency investigation.
  - 11:11 AM: Chief Palopoli texts Captain Lugo to discuss the investigation. They speak for 21 minutes around 11:13 AM. Lugo acknowledges seeing the Blue Team entry, suggests it may be retaliatory due to prior history with Engelbeck, and argues it should be a Service Complaint or an investigation against Conduct Resolution (instead of an IA against Lugo).
  - Chief Palopoli accessed IA2020-055 (a related case involving Engelbeck) in IA Pro, noting numerous files but unable to confirm if the specific video interview of Engelbeck and Leatham referenced in the BlueTeam was present, as she did not open individual files. This access was for review, not investigation, aligning with her non-investigative role.
- **March 18, 2026:**
  - Chief Palopoli meets Captain Lugo in her office to discuss PSB matters. After considering the attachments to the complaint contained in the email, she determines that she agrees with Undersheriff Gentry's assessment that the allegations, even if unlikely, if true would be significant enough to warrant a formal investigation. Therefore, Chief Palopoli formally designates IA2025-0111 as an Internal Investigation and directs Captain Lugo to stay out of it, including not accessing IA Pro, due to his potential involvement. She requests Captain Lugo assign a lieutenant from PSB as a point of contact (POC) for coordination with Chief Palopoli, which Captain Lugo does not do.

- **3:07 PM:** Egelston informs Chief Palopoli he is too busy to take the case and that his contract expires April 19, 2025, with no renewal discussions.
- Chief Palopoli emails Chief Anders, reporting the issue with Baseline and suggesting other agencies.
- **March 27, 2026:**
    - **9:49 AM:** Chief Anders calls Chief Palopoli to discuss renewing Baseline's contract. Chief Palopoli notes Egelston's unavailability and proposes alternatives.
    - Chief Palopoli emails Chief Anders, confirming the contract could be renewed but highlighting concerns, offering further discussion.
- **March 28, 2026:**
    - **11:18 AM:** Chief Palopoli misses a call from Chief Anders, returning it for a 5-minute discussion. She reiterates concerns about Baseline and notes Undersheriff Gentry's intent to contact Arizona Department of Public Safety (AZDPS).
    - Chief Palopoli receives an email from Mark Giuffre (Jensen Hughes), noting confusion because Lieutenant Porter assigned the case to investigator Joy Fitzgerald. Chief Palopoli clarifies that Jensen Hughes should stand down, as she did not authorize Lt. Porter's actions.
- **March 30, 2026:**
    - Lieutenant Porter emails Jensen Hughes' Joy Fitzgerald with an investigative plan, copying Chief Palopoli (received March 31). Chief Palopoli is concerned, as she did not direct Lt. Porter, and Captain Lugo had not assigned him as POC.
- **March 31, 2026:**
    - Chief Palopoli reviews Lt. Porter's email and plan, noting the unauthorized action.
- **April 1, 2026:**
    - Chief Palopoli emails Lt. Porter, thanking him for the plan but clarifying that Jensen Hughes is not being used per the Chief Anders' guidance and to stand down.
    - **1:31 PM:** Chief Palopoli speaks with Chief Anders for 18 minutes, discussing the unsuitability of Jensen Hughes and Baseline. She notes Undersheriff Gentry's intent to request AZDPS conduct the investigation.
    - **4:09 PM:** Chief Anders confirms the Monitor Team's approval for AZDPS to take the conflict investigation, provided Captain Lugo is not involved.
- **April 2, 2026:**
    - **Morning:** Monthly PSB meeting with Undersheriff Gentry, Sheriff, Captain Lugo, and Chief Palopoli. During this meeting, Captain Lugo expresses concerns about IA2025-0111 not being locked down in IA Pro, noting multiple accesses. Chief Palopoli reminds Captain Lugo she requested a lieutenant assignment, which he failed to provide.

- **3:30 PM:** Chief Palopoli accesses the IA Pro audit trail for IA2025-0111, an idea triggered by Captain Lugo raising access issues in the earlier meeting. Chief Palopoli discovered Captain Lugo accessed the investigation on March 21, 2025, after her March 18 directive. She prints the log, noting other accesses by PSB admin and Lieutenant Porter.
  - Chief Palopoli briefs Undersheriff Gentry on Captain Lugo's access that appeared to constitute insubordination.
- **April 3, 2026:**
  - After consulting the legal team, Undersheriff Gentry, and Chief Summers, the legal team is tasked with contacting Chief Warshaw (Monitor Team) to discuss Captain Lugo's actions, including likely insubordination (failure to assign a lieutenant, unauthorized IA Pro access), an allegation of failure to timely notify a supervisor (Captain Lugo not immediately contacting Chief Palopoli on March 1O and Chief Palopoli needing to have the initial contact with Captain Lugo on March 11) and potential insubordination (directing Lt. Porter's plan). The legal team attempts to reach Warshaw without response by day's end.
- **April 4, 2026:**
  - After multiple unsuccessful attempts to contact Chief Warshaw, Chief Deputy Gentry places Captain Lugo on Administrative Leave with Pay (ALWP), consistent with MCSO policy for serious allegations. Chief Deputy Gentry contacts Captain Lugo, who agrees to go home.
  - Chief Palopoli accompanies Chief Deputy Gentry to Conduct Resolution to discuss ALWP paperwork, handled by Ryan Giguere.
  - **4:13 PM:** Chief Palopoli texts Lieutenant Porter requesting a call. During the subsequent phone call, Chief Palopoli appoints Lt. Porter acting PSB Commander due to Captain Lugo's ALWP.
- **April 7, 2026:**
  - **9:00 AM:** Meeting with Monitor Team, MCSO legal team, Undersheriff Gentry, Chief Palopoli, and Chief Summers. The Monitor Team is updated on AZDPS's potential involvement, Captain Lugo's ALWP, and Lt. Porter's role as acting PSB Commander.
  - **10:46 AM:** Undersheriff Gentry, Chief Palopoli, and Chief Summers meet with PSB staff to address concerns and confirm Lt. Porter's role. They discover Captain Lugo's office is locked, with Captain Lugo holding the only key, raising concerns about case file access.
  - Chief Palopoli forwards the ALWP packet to Lt. Porter, who handles the Notice of Investigation (NOi) and retrieves Captain Lugo's key and property.
- **April 8, 2026:**
  - Chief Palopoli emails Chief Anders, confirming AZDPS's willingness to investigate and scheduling a meeting for April 9 at 2:00 PM.
- **April 9, 2026:**

- **2:00 PM:** In-person meeting at the Sheriff's office with Chief Palopoli, Chief Summers, Undersheriff Gentry (partially), and AZDPS Sergeants Baum and another from Internal Affairs. AZDPS agrees to investigate IA2025-0111 (criminal first, then administrative) and IA2025-0139 (administrative). Chief Palopoli provides Sgt. Engelbeck's complaint documents and Lugo's NOi.
- **2:28-2:47 PM:** Chief Palopoli sends electronic copies of the NOi and Engelbeck's files to AZDPS and instructs PSB's Amy Gutierrez to assist Sgt. Baum.

- **April 10, 2026:**
  - Chief Palopoli responds to Chief Anders' document request for tA2025-0111 and IA2025-0139, providing details after consulting with MCSO's legal team.
- **April 17, 2025:**
  - Chief Palopoli is interviewed by Chief Anders and Major Al Peters at the Monitor Team's office, addressing her handling of IA2025-0111 and IA2025-0139.

46REPORT000795

On July 23, 2025, at approximately 1001 hours, Maricopa County Sheriff's Office (MCSO) Executive Chief Melissa Palopoli, #B6639, was interviewed by Arizona Department of Public Safety (DPS) Internal Affairs (IA) Sergeant Tristan Glueck, #7108, and IA Sergeant Craig Baum, #6968.  The interview was conducted at the DPS IA office in Phoenix, Arizona.

Prior to the interview commencing, Executive Chief Palopoli reviewed the MCSO Internal Investigation forms provided to the AZDPS, and a Notice of Investigation (NOI) for case #2025-064.  She was advised of her right to the presence of a support observer and declined to have one present.  Executive Chief Palopoli signed the Garrity Warning, Recording Admonition and the NOI before the interview commenced.

The relevant specifics of the interview are annotated in the Investigative Narrative of this report. The complete audio/video recording generated from the interview is on file and available for review.

The following is a summary of the interview with Executive Chief Palopoli:

Executive Chief Palopoli had been employed by the MCSO since February 2025 and was assigned as the Executive Chief over compliance.  At the time of the interview, Executive Chief Palopoli's immediate supervisor was Undersheriff Jeff Gentry, #S1560.

Executive Chief Palopoli said in her assignment as the Executive Chief over compliance, she was over four different divisions, and one of them was the Professional Standards Bureau (PSB). She said PSB was where Captain Gregory Lugo, #S1480, was assigned as the commander.

Executive Chief Palopoli said she started with MCSO on February 18, 2025.  She said on March 10, 2025, Sergeant Engelbeck, #S1673, entered a complaint into Blue Team.  She said that complaint was alleging internal destruction and withholding of evidence between the months of October 2024 and January 2025, where Sergeant Engelbeck named Captain Lugo and Sergeant Leatham, #S1462, as potential principals (Subjects).  Executive Chief Palopoli said that complaint, along with a "bunch" of attachments, were sent to Undersheriff Gentry's email. Executive Chief Palopoli said the email was sent on March 10, 2025, at around 4 p.m.  She said Undersheriff Gentry forwarded it to her "Around 5 p.m. or so that afternoon."  She said Undersheriff Gentry asked her to "take a look at it and give him my thoughts."  Executive Chief Palopoli told IA that she did not see the email until 45-50 minutes later.  She said she responded to the email and advised Undersheriff Gentry that she would look at it and let him know her thoughts in the morning.

Executive Chief Palopoli said on March 11, 2025, she had a discussion with Undersheriff Gentry regarding where the investigation would go since Captain Lugo was being named as a "principal" in the complaint.  She said Undersheriff Gentry's first thought was to have DPS investigate the complaint.  Executive Chief Palopoli told IA "Unbeknownst to me at that time,

CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.

Captain Lugo had seen that incident in Blue Team the night before as evidenced by the log that was accessed, that you could see on IAPRO." She said Captain Lugo had looked at the complaint at approximately 7 p.m. Executive Chief Palopoli said she saw Captain Lugo accessed it on the IAPRO access log.

She said Captain Lugo "at no time" between 7 p.m. when Captain Lugo saw the incident on Blue Team until the next day when she contacted him herself at "11 o'clock or so" in the morning on March 11th, 2025, did Captain Lugo ever reach out to her as his immediate supervisor to inform her of an investigation naming himself as the principal. Executive Chief Palopoli said it was a violation of the Internal Investigations (GH2) policy.

She said when she spoke to Captain Lugo to discuss the investigation Captain Lugo did tell her that he had seen the entry into Blue Team the evening before and that "he knew the players, he knew what it was, you know, he kind of had an idea of what it was about. He suggested that it might be some type of retaliation against him based on that investigation and that it didn't go the way that Sergeant Engelbeck wanted it to go."

Executive Chief Palopoli said Captain Lugo was trying to advise her that they should look at the complaint as a "Service Complaint" or have conflict resolution or someone outside the agency investigate it. She said the MCSO had a conflict investigator, the Jenson Hughes Group (JHG).

Executive Chief Palopoli said that one of the things Sergeant Engelbeck was alleging was that there was withholding of evidence occurring and that there was a video recording missing when Sergeant Engelbeck had asked for all the documentation. Executive Chief Palopoli said she had accessed IAPRO and the system had changed a lot since the last time she had used it approximately ten years ago. She said, "And I was like, wow, there's a lot of files in here. I wouldn't be able to tell which one was that video" and she just backed out of IAPRO. She said she just did a cursory search to see if the video existed, but it was something someone else should look into because it was beyond her purview.

Executive Chief Palopoli said she met with Captain Lugo in her office on March 18, 2025. She said Undersheriff Gentry was still adamant that the investigation be handled by an outside agency, and she agreed. She said at that point she designated the internal investigation to be a formal investigation and directed Captain Lugo to remain "out of it" since he was one of the principals (Subjects). Executive Chief Palopoli said she asked Captain Lugo to assign a lieutenant within PSB as her direct point of contact and "he did not, he actually did not do that." She said at no point did Captain Lugo "ever notify me who the lieutenant was going to be, my point of contact." She said at the time she was still very new at MCSO and was still learning a lot. She said she was working with four divisions and was trying to learn what was "going on" so there was some time that went by between some things. Executive Chief Palopoli said, "that's why I didn't even follow up with the captain to say, hey, who's the lieutenant you're supposed to give me, provide me with a lieutenant until a little bit later."

CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.

Executive Chief Palopoli said she made contact with Tiffany Shaw, #A4428, who was one of the division directors, but she was out sick, so she had to wait for her to come back to work. She said Ms. Shaw came back to work on March 20, 2025, and provided her with the contact information for Jenson Hughes, a company "that we conflict out some investigations to." She said she emailed Jenson Hughes and scheduled a virtual meeting for March 24, 2025. She said, "Unbeknownst to me at this time, even though I gave him (Captain Lugo) the directive to stay out of the investigation on March 21st, according to the IAPRO log, Captain Lugo did access that investigation at that time."

On March 24, 2025, Executive Chief Palopoli met with Jenson Hughes, and they agreed to "take that conflict investigation, and they assigned an investigator to that investigation." She said she "reached out to the monitor," who was Chief Donald Anders. She said on March 25, 2025, she emailed Chief Anders, and she advised him in the email that she had a meeting with Jensen Hughes, and that they were available to take that conflict investigation. Executive Chief Palopoli said Chief Anders responded and asked her to put the investigation "on pause" and scheduled a call for the next day.

Executive Chief Palopoli said on March 26, 2025, she spoke with Chief Anders and explained the allegations and then "offered up" that Jensen Hughes was available to do the conflict investigation. She said Chief Anders told her that they would not be an appropriate group to use because they actually report to Captain Lugo within PSB when they're doing their conflict investigations. She said Chief Anders then advised her that there was "another group" that they had used in the past to do contracted conflict investigations under the name of Baseline Investigations, and he asked her to reach out to them.

Executive Chief Palopoli said in that same conversation with Chief Anders, he did advise her that Captain Lugo had discussed the investigation with him, which confirmed that Captain Lugo had prior knowledge of the investigation and his involvement.

Executive Chief Palopoli said she reached out to Baseline Investigations and spoke to the owner. She said the owner informed her that his contract was expiring within three weeks, and that he was too busy to take the investigation. Executive Chief Palopoli said she notified Chief Anders, and he asked her about having their contract renewed. She said she "highlighted some concerns" MCSO had with Baseline Investigations. She said on March 28, 2025, she missed a phone call from Chief Anders and returned it "immediately", and she reiterated her concerns about Baseline Investigations. She said she also noted that the undersheriff was intending on contacting DPS to request they conduct the investigation.

Executive Chief Palopoli said she received an email from Jensen Hughes that stated that they were confused because Lieutenant Frederick Porter, #1873, from PSB had assigned the case to their investigator Joy Fitzgerald. She said she clarified with the owner of Jensen Hughes that they were told to "stand down" and that they needed to remain "standing down." Executive

CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.

Chief Palopoli said she did not know where the order came from or how Lieutenant Porter got an order to contact anybody within Jensen Hughes.

Executive Chief Palopoli said she was "very confused" as to what was going on there. She said on March 30, 2025, Lieutenant Porter sent another email to Jensen Hughes. She said Lieutenant Porter emailed Ms. Fitzgerald, the investigator, with an investigative plan attached. Executive Chief Palopoli said she had been copied on the email and received it on March 31, 2025.

Executive Chief Palopoli said, "At this point, I'm again concerned, because I did not direct the lieutenant to complete an investigative plan, and I still had not even heard from Captain Lugo that he had assigned Porter as the POC between me and PSB."

Executive Chief Palopoli said on April 1, 2025, she emailed Lieutenant Porter and thanked him for the investigative plan. She said she clarified "again" with Lieutenant Porter that Jensen Hughes was "told to stand down," and that "we" would not be using them.

Executive Chief Palopoli said she spoke to Chief Anders again to discuss the "unsuitability" of Jensen Hughes and Baseline investigations. She said she "noted" one more time to Chief Anders that Undersheriff Gentry would like to use the DPS to conduct the investigation. She said a few hours later, she received a phone call back from the monitor saying the monitor team was approving DPS to take that conflict investigation, provided that Captain Lugo was not involved in anything that was coming to the DPS.

Executive Chief Palopoli said on April 2, 2025, she had a monthly PSB meeting with Undersheriff Gentry, Sheriff Jerry Sheridan, #S0496, and Captain Lugo. She said they had set these meetings up the month before because the sheriff and the undersheriff wanted to know what cases were at the top of the list in terms of having the most influence on the MCSO.

Executive Chief Palopoli said after concluding that portion of the meeting, Captain Lugo wanted to discuss his concerns about his IA investigation, and that within IAPRO, the case had not been locked down. She said there were "all sorts of people" that were accessing it without permission, which she did not know until Captain Lugo "brought that to light." She said after that meeting concluded, later on that afternoon, she accessed the IAPRO for that case to look at the audit trail and to see "like, hey, who else is accessing this? Like maybe we need to look into some of these people." She said what she saw were "most of the people" were administrators for PSB. Executive Chief Palopoli said that was when she saw that Captain Lugo had accessed it on March 21, 2025, after "I gave him a direct order not to." She said, "wait a minute, I told him not to access this case anymore and to stay out of it, and here he was accessing it on March 21st." She said at that point; she briefed Undersheriff Gentry that Captain Lugo had accessed the case. Executive Chief Palopoli said that brought her to the conclusion that it was an insubordinate act.

Executive Chief Palopoli said MCSO met with their own team of attorneys to consult with them

CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.

as to what steps to take next, since it was involving the PSB captain who was named. She said the legal team attempted several times to contact the head monitor to discuss the actions, to discuss the insubordination, and then also to discuss the fact that Captain Lugo had not notified her in a timely manner of the investigation against him.

She said in MCSO policy, "it actually says that if it's the PSB commander, that they should have immediately notified their supervisor." She said they never got a response from the monitoring team after "several calls, reach-outs to them, which is odd." She said, "normally, we get a response back, but we did not." She said on April 4, 2025, Undersheriff Gentry decided that he was going to place Captain Lugo on administrative leave with pay.

Executive Chief Palopoli said at that point, she appointed Lieutenant Porter to be the acting commander of PSB. She said herself; Undersheriff Gentry and Deputy Chief Matt Summers, #S1641, went to the PSB to meet with the staff regarding Captain Lugo being placed on administrative leave to answer any of their questions since placing their commander on leave was a "big deal." She said PSB is located in a separate building from the MCSO headquarters. She said when they were there, they realized that Captain Lugo's office was locked and later learned that he was the only one with a key to the office. She said that raised concerns about backlogged cases that were unable to be accessed. She said she asked Lieutenant Porter to reach out to Captain Lugo and retrieve the key to his office and any other property that belonged to the MCSO.

Executive Chief Palopoli said they were "finally" able to get in contact with the monitor team "to update them that we were going to be involving the DPS, that Captain Lugo was out on leave, and that Lieutenant Porter would be the acting PSB commander." She said she notified Chief Anders of the DPS conducting the investigation.

Executive Chief Palopoli said she thought on April 15, 2025, the monitor team conducted their quarterly site visit with MCSO. She said when that occurred, she was "brought in" for two lengthy interviews asking about her involvement in the investigation.

Executive Chief Palopoli was asked by IA if she had given Captain Lugo a direct order not to access the complaint and she said, yes. When asked when she said March 18, 2025. When asked how the order was conveyed to Captain Lugo she said, "It was in person. So, verbal."

Executive Chief Palopoli was asked what Blue Team was and she said, "Blue Team is the software, I guess, program that you can put complaints in, commendations in. Anybody in the office can file a complaint against another person in the office by just entering it themselves." When asked if the programs purpose was for complaints and compliments, she said, "Right. It's also for supervisor notes. So, we have to put in monthly supervisor notes according to the court order. We enter them through Blue Team." Executive Chief Palopoli was asked by IA if there was a protocol for the use of Blue Team to file a complaint and she said, "No." She said through

**CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.**

Blue Team people can also file complaints "anonymously as well."

When asked by IA what she thought Captain Lugo was trying to do with the complaint she said, "I think – I can't really say what I think he was trying to do. I think that in the past, especially with this Sergeant Engelbeck, that there's been other – there's been a lot of things that have gone on with him." She said, "I think what Captain Lugo was trying to do was to make it so that it would be a service complaint." She said it did not meet those parameters because there was a criminal allegation.

When asked if she remembered the instructions she gave Captain Lugo she said, "What exactly I said? No." She said, "But I do recall that we designated it as an internal investigation involving him as a principal, and that he was to stay out of the investigation and to provide me with a lieutenant as my point of contact." Executive Chief Palopoli said, "to me, staying out of the investigation is completely wiping your hands of it, stepping back, and not having any involvement whatsoever and recusing yourself at any moment in time that it comes up."

When asked if Captain Lugo ever gave her the name of a lieutenant she said, "No." When asked if she believed her instructions to Captain Lugo were clear she said, "Yes." When asked by IA what Captain Lugo's response was, she said, "From what I remember, he confirmed it with an affirmative okay." She said, "it was a verbal acknowledgement that he understood what I was saying."

Executive Chief Palopoli said she told Captain Lugo to stay out of the complaint after he accessed it on March 18, 2025, and on March 21, 2025, after she learned that he had accessed it again. Executive Chief Palopoli was asked what it meant to her after learning Captain Lugo accessed the file again after being given a direct order, and she said, "To me, that meant that he was insubordinate, that I gave him an order, and that he did not follow that order." She said it was not until Captain Lugo had met with her and advised that IAPRO was not locked down that she realized that Captain Lugo had accessed it again, and that was on April 2, 2025. She said it was at that point when she spoke with Undersheriff Gentry to advise him of that information and that's what "got the ball rolling with putting him on leave." When asked if Captain Lugo ever notified her of his access to the file in IAPRO she said, "No." She said he never notified her, and instead, she had to reach out to Captain Lugo regarding his access.

Executive Chief Palopoli told IA that Lieutenant Porter was notified of the circumstances regarding Captain Lugo's suspension. She said Lieutenant Porter "already kind of knew about the investigation because of the investigative plan that was sent to Jensen Hughes." She said she never mentioned Captain Lugo's access to Blue Team, so she did not give him too much information.

The interview concluded at 1038 hours.

CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.

On September 3, 2025, at 1317 hours, Internal Affairs Sergeants Craig Baum and Anthony Falcone, #6504, conducted a follow-up interview with Executive Chief Melissa Palopoli at DPS headquarters in Phoenix, Arizona.

When asked about the March 18, 2025, meeting with Captain Lugo, Executive Chief Palopoli stated, "According to my notes and the information and the memory that I had, that meeting took place on the 18th." She acknowledged there was another meeting on March 24th but emphasized that her instructions to Captain Lugo on March 18th were for him to "remain out of the investigation." She explained, "We had quite a few meetings within that time frame. So, his notes might be different than mine."

Regarding Captain Lugo's statement that she told him to "stay out of it" on March 24th via telephone, Executive Chief Palopoli responded, "I remember the conversation of telling him to stay out of it. I don't remember if it was in person…or over the phone. But I do recall advising him to do so."

When asked about the IAPRO logs, Executive Chief Palopoli denied any manipulation, stating, "No, I wouldn't even know if you could do that." She affirmed that she believed the log to be accurate. She further explained that she was unfamiliar with case 2025-139, saying, "I don't think I've ever accessed 139 I just said, whatever you think is appropriate at the time, again, I was very new."

Executive Chief Palopoli reiterated her position regarding the March 18, 2025, date, stating, "I'm pretty adamant about my date. It's my word against his." She explained she based her position on her "memory-wise, and also going through my log of phone calls and meetings with him."

She was asked about whether Captain Lugo should have contacted her immediately after seeing a complaint against himself in IAPRO. She answered, "Yes, and it wasn't that late, it was 7 PM." Executive Chief Palopoli said, "I'm available 24-7, so I have a county phone." She confirmed that immediate notification was written in policy GH2.

When presented with Captain Lugo's statement that executive staff had already been made aware of the complaint via email from Sergeant Engelbeck, Executive Chief Palopoli disagreed and said, "I do not believe that was acceptable without proof of that, then that is not notification." She stressed that Captain Lugo should have confirmed the information directly with her or the undersheriff.

Regarding retaliation allegations, Executive Chief Palopoli confirmed Captain Lugo told her there was retaliation from Sergeant Engelbeck. She said Captain Lugo also mentioned that her predecessor, Chief Caputo, had investigated something similar as a service complaint. Executive Chief Palopoli explained, "I was unaware of that I probably said, taking his information if I believed that it was already handled, then we would try to figure out a way to kind of make

CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.

Engelbeck understand that it's already been handled." However, she added, "as time went on, we realized there were newer allegations that came out past the date of the service complaint."

On April 2, 2025, Executive Chief Palopoli documented a meeting where Captain Lugo "expresses concerns about IA 2025-0111 not being locked down in IA Pro, noting multiple accesses." She stated that she checked the log that afternoon and discovered that Captain Lugo had accessed it on March 21, 2025. She noted other access by PSB administrative personnel and Lieutenant Porter. She explained that Captain Lugo was placed on administrative leave on April 4, 2025, and at that point, case 2025-139 was opened. Executive Chief Palopoli clarified that Captain Lugo never had access to case 2025-0139 and that responsibility for locking down access was given to Lieutenant Porter. She stated if the IA PRO summary originally said something different, and then was changed she would contact Lieutenant Porter."

She confirmed that Captain Lugo, as a PSB commander, should not have reviewed a complaint involving himself, explaining, "As soon as knowing that he was the person they were alleging committed an act, then he should have immediately notified me." She cited GH2 as the policy requiring immediate notification.

At the conclusion of the interview, Executive Chief Palopoli emphasized that the main discrepancy was the date of her instructions to Captain Lugo: "Other than that, the one date, that's probably the biggest bone of contention here is I said the 18th, and he's saying the 24th." She reiterated, "Somebody else saying an email was sent to the undersheriff is not notification, and it's clearly stated in here (GH-2 Internal Investigations) how that should happen."

The interview concluded at 1337 hours.

**CONFIDENTIAL INFORMATION - DO NOT REPRODUCE ANY PORTION OF THIS REPORT.**

# Investigative Reports

46REPORT000804



# ARIZONA DEPT OF PUBLIC SAFETY
Detective/Agent Report for Incident I25023143

| | |
|---|---|
| **Nature:** MISCELLANEOUS | **Address:** 3800 N CENTRAL AVE |
| **Location:** M05 | PHOENIX AZ 85012 |

**Offense Codes:**

| | | |
|---|---|---|
| **Received By:** QUANE,P | **How Received:** O | **Agency:** ADPS |
| **Responding Troopers:** QUANE,P | | |
| **Responsible Detective/Agent:** QUANE,P | **Disposition:** UNF 08/05/25 | |
| **When Reported:** 08:30:15 04/16/25 | **Occurred Between:** 08:30:15 04/16/25 and 08:30:15 04/16/25 | |

| | | |
|---|---|---|
| **Assigned To:** | **Detail:** | **Date Assigned:** **/**/** |
| **Status:** | **Status Date:** **/**/** | **Due Date:** **/**/** |

## Summary

**Complainant:**

| | | |
|---|---|---|
| **Last:** | **First:** | **Mid:** |
| **DOB:** **/**/** | **Dr Lic:** | **Address:** |
| **Race:**   **Sex:** | **Phone:** | **City:** , |

## Offense Codes

**Reported:** NC NOT CLASSIFIED          **Observed:**

## Circumstances

| | |
|---|---|
| **Responding Troopers:** | **Unit :** |
| QUANE,P | MI222 |

| | |
|---|---|
| **Responsible Detective/Agent:** QUANE,P | **Agency:** ADPS |
| **Received By:** QUANE,P | **Last Radio Log:** 08:36:37 04/16/25 CMPLT |
| **How Received:** O TROOPER REPORT | **Clearance:** 6 REPORT TAKEN |
| **When Reported:** 08:30:15 04/16/25 | **Disposition:** UNF **Date:** 08/05/25 |
| **Judicial Status:** | **Occurred between:** 08:30:15 04/16/25 |
| **Locator Code:** 71020200 | **and:** 08:30:15 04/16/25 |

**Modus Operandi:**          **Description :**          **Method :**

10/30/25

46REPORT000805

**Involvements**

| Date | Type | Description | Relationship |
|------|------|-------------|--------------|

10/30/25

46REPORT000806

## Narrative

Investigation Summary- (Agent P. Quane #11570)

April 14, 2025, 1315 Hours

I was contacted by Arizona Department of Public Safety (AZDPS) Captain Matthew
Kunda and requested to assist in investigating a criminal complaint. Maricopa
County Sheriff's Office (MCSO), Sergeant (Sgt.) Aaron Engelbeck, #S1673 has
alleged two criminal complaints (listed below) against MCSO personnel.

* ARS 38-1106 (A) (1) Appeal of disciplinary actions;
* ARS 13-2809 (A) (1) Tampering with Physical Evidence

Captain Kunda provided a copy of Aaron's four-page letter outlining his
grievances against the MCSO Professional Standards Bureau (PSB). In his letter,
Aaron claimed that MCSO personnel violated ARS 38-1106 (A)(1) and ARS 13-1209
(A)(1) by failing to provide him with the PSB video-recorded interview from
October 2020. He suspected that certain MCSO personnel may have intentionally
made this video unavailable to him.

Additionally, Aaron mentioned that after he requested the video, the Conflict
Resolution department contacted him to inform him that his suspension had been
rescinded and that he would receive compensation for lost wages. He believed
this was an attempt by MCSO to withhold evidence, which could be a violation of
criminal statute.

I was provided a phone number for MCSO Lieutenant Fred Porter and informed that
he would be my point of contact. Furthermore, I was advised that the DPS
Internal Affairs (IA) would conduct a separate administrative investigation,
while my investigation would focus solely on the two alleged criminal
complaints.

1ST Alleged Criminal Complaint:

ARS 38-1106 outlines the process for appealing disciplinary actions taken
against law enforcement officers, such as suspension, demotion, or dismissal. It
ensures that officers can challenge actions they believe are unjust or
unwarranted.

ARS 38-1106 is not a criminal statute. ARS 38-1106 reads in pertinent part:

"38-1106. Appeal of disciplinary actions; transcripts; change of hearing officer
or administrative law judge; burden of proof; final disposition report;

A. In any appeal of a disciplinary action by a law enforcement officer, the
parties shall cooperate with each other, act in good faith, and exchange copies
of all relevant documents and a list of all witnesses pursuant to the following
time periods and requirements:

1. Within fourteen calendar days after the employer's receipt of a written
request from the law enforcement officer for a copy of the investigative file
that is accompanied by a copy of the filed notice of appeal, the employer shall
provide a complete copy of the investigative file as well as the names and
contact information for all persons interviewed during the course of the
investigation."

A review of ARS 38-1106(D) indicated any violation of section A of
this statute results in the exclusion of the witness, evidence, or testimony.

46REPORT000807

38-1106 (D) provides in pertinent part:

"D. Failure to comply with the requirements of subsection A or B of this section shall result in the exclusion of the witness, evidence, or testimony unless the failure to comply is because of excusable neglect."

2nd Alleged Criminal Complaint:

Aaron's second criminal complaint against MCSO is that an unknown MCSO personnel tampered/destroyed physical evidence. Unlike ARS 38-1106, ARS 13-2809 is a criminal charge (Class 6 Felony).

13-2809. Tampering with physical evidence; classification provides in pertinent part:

"A. A person commits tampering with physical evidence if, with intent that it be used, introduced, rejected, or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person:

1. Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability;"

13-2809 is a class 6 felony that can be charged if tampering with physical evidence can be established in an official proceeding.

An official proceeding is defined in ARS 13-2801 as:

"a proceeding heard before any legislative, judicial, administrative, or other governmental agency or official authorized tohear evidence under oath."

A check of definitions indicated that an official proceeding must be authorized to hear evidence under oath.

1409 Hours

I contacted MCSO Lieutenant (Lt.) Porter (MCSO Point of Contact), for the phone numbers for the following subjects:

* MCSO Sgt. Aaron Englebeck
* MCSO Sgt. Robert Leatham, #S1462

I requested all copies of the paperwork provided and signed by Aaron at the beginning of his internal investigation.

Lt. Porter stated that all MCSO internal investigations regarding Aaron were administrative and that no evidence was sworn under oath.

April 17, 2025, 1017 Hours

I received an email from Lt. Porter providing me with Sgt. Aaron Englbeck's phone number: 602-291-7485. Lt. Porter documented that he would have Sgt. Leatham contact me on Monday, April 21, 2025.

1445 Hours

I met with Lt. Porter (4800 N. Central Ave. Suite 1700, Phoenix, AZ. 85012), who provided me with four forms that are provided to all subjects under investigation;

10/30/25

46REPORT000808

* Notice of Investigation (NOI)
* Garrity Warning
* Employee Observer Admonition
* Observer Waiver Form

A review of all forms confirmed that the proceedings were administrative in nature, not criminal. None of the forms indicated that any testimony or evidence provided would be given under oath. Additionally, the four forms were blank and unsigned by Aaron. Lt. Porter respectfully declined to provide copies of Aaron's signed paperwork, so I agreed to ask Aaron for his signed documents.

I contacted Aaron and requested that he participate in an interview with DPS MID personnel. We agreed to speak at a later date, as Aaron advised he would be out of town April 25-28, 2025.

04/21/25  1007 Hours

I reached out to MCSO Sgt. Robert Leatham, who was reluctant to discuss the investigation until he had spoken with MCSO in-house legal counsel. I acknowledged his position and informed him that my only question was whether he had ever required Aaron to testify or provide evidence under sworn oath during the investigation.

Sgt. Leatham stated that investigations by the Professional Standards Bureau (PSB) do not require testimony or evidence given under sworn oath, as is necessary in criminal trials and depositions. Sgt. Leatham confirmed that Aaron had not provided any testimony or evidence under sworn oath.

Sgt. Leatham confirmed Lt. Porter's statement that the following forms are provided to all subjects under investigation;

* Notice of Investigation
* Garrity Warning
* Employee Observer Admonition
* Observer Waiver Form

Sgt. Leatham noted that there is another form called the Notice of Employee's Intent to Record Administrative Interview. He confirmed that this form, like all other forms used in an internal investigation, does not require testimony or evidence to be given under oath. To the best of Sgt. Leatham's recollection, this form was neither completed nor needed for Aaron's investigation.

1247 Hours

I contacted Sergeant Leatham and read my report regarding his previous statement word for word. After listening, Sergeant Leatham confirmed that it was a true and accurate statement. I then asked if there was anything he disagreed with or if he would like to add anything to the previously documented statement.

Sgt. Leatham requested that I specify that the Garrity Warning form is only provided to the subject being investigated in an internal investigation. Sgt. Leatham referred to the investigated subject as "the principal" of the investigation.

04/22/24  1020 Hours

I met with MCSO Management Analyst Mara Garcia, who provided me with blank copies of:

46REPORT000809

MCSO Notice of Employee's Intent to Record Administrative Interview.

A review of the form confirmed the proceedings were administrative and not criminal. The form does not require evidence/testimony to be sworn under oath.

1627 Hours

I contacted Aaron, who agreed to participate in an interview on April 29, 2025, at 1300 hours. Aaron agreed to bring any paperwork provided to him by MCSO PSB.

04/29/25 1330 Hours

Aaron participated in an interview conducted by Agent Keith Moffitt, #11410, and me (Agent Quane, #11570) at the AZ DPS MID fourteenth-floor conference room.

The digitally recorded interview commenced at 1343 hours and concluded at 1445 hours. The interview was recorded on my department-issued Axon body-worn camera (BWC) and uploaded to Evidence.com.

The following summary highlights the pertinent information obtained from the interview. For a more detailed account of the interview, refer to Evidence.com, folder labeled; Video Interview(s).

* Aaron confirmed there are no other criminal complaints against MCSO personnel other than the two previous alleged complaints. Those complaints are specifically;

- ARS 38-1106 (A) (1)  Appeal of disciplinary actions;
- ARS 13-2809 (A) (1)  Tampering with Physical Evidence

* Aaron reviewed his four-page letter complaint with investigators to establish a clearer timeline of events.
* Aaron confirmed Captain Lugo filed a complaint against him for insubordination and truthfulness in October 2020.
* Aaron confirmed he was interviewed by PSB Sgt. Leatham in late October or early November 2020.
* Aaron was demoted from Lieutenant to Sergeant in October 2020.
* In May 2021, Aaron emailed Chief Deputy Russ Skinner, disagreeing with the demotion process and the fairness of the investigation; specifically, he disagreed with Captain Lugo's placement as PSB Commander while also being the complainant against him.
* Aaron advised from May 2021 until January 2024; he has had no contact with his pending case with the MCSO PSB.
* In January 2024, Aaron was interviewed by Sgt. Leatham a second time regarding the same case.
* In June 2024, Aaron emailed Michael Caputo (Chief Compliance) to inform him of policy violations.
* In September 2024, Aaron was made aware that the investigation was formally closed.
* In October 2024, Aaron filed an appeal to ensure that an outside party would review his case.
* Aaron has confirmed multiple times that he has never formally provided testimony or evidence under oath.
* In December 2020, Simon Haines shared a file for Aaron's appeal process. However, his first audio and video interview with Sgt. Leatham was not included in the file.
* On January 27, 2025, Aaron emailed Michael Landeen from MCAO to inform him that the file was missing Aaron's first interview with Sgt. Leatham. In

10/30/25

46REPORT000810

addition, Captain Lugo's interview from October 2020 was also missing.
* Conflict Resolution Ken Holmes advised Aaron that his findings would be changed, and his suspension would be rescinded.
* MCSO requested to withdraw the appeal on the same day.
* Aaron confirmed that MCSO provided a partial electronic file within the required 14 days.
* Aaron confirmed that MCSO PSB provided him with his Notice of Investigation and additional PSB forms. MCSO Detective Cody Morin was present on his behalf during the interview.
* Aaron reiterated that no testimony/evidence was ever sworn under oath.
* Aaron provided copies of his paperwork to investigators. All copies were uploaded into Evidence.com and Spillman attachments.

Aaron provided me with the following copies:

* Sgt. Robert Leatham's Investigation Report (92 pages)
* Aaron's e-mail to MCSO Compliance
* 2020 Notice of Investigation- Sgt. Englebeck
* 2020 Garrity Warning
* 2020 Employee Observer Admonition
* 2020 Observer Waiver Form
* 2020 Notice Investigation- Captain Lugo
* 2024 Notice of Investigation- Sgt. Englebeck
* 2024 Garrity Warning
* 2024 Observer Waiver Form
* Miscellaneous MCSO paperwork
* Maricopa County Merit Systems Commission Appellant's Guide
* MCSO Notice of Hearing

All items provided were uploaded into Evidence.com and Spillman attachments.

04/30/2025 1053 Hours

I received several e-mails from Aaron regarding paperwork related to his complaints. All items were uploaded into Evidence.com and Spillman attachments.

* Respondent's List of Witnesses
* Timeline
* Several e-mails
* Changed Findings
* Narrative of Changed Discipline
* Aaron's 4-Page Complaint

1151 Hours

I contacted Maricopa County Attorney's Office (MCAO) Management Analyst Simon Haines and requested confirmation that the video interview from October 2020 had been retained. Simon advised that he would contact me after consulting with an MCAO attorney.

05/05/25 1044 Hours

I contacted Lt. Porter, who agreed to show me Aaron's interview. Lt. Porter was confident that the interview had been properly retained.

05/06/2025 1440 Hours

10/30/25

46REPORT000811

I met with Lieutenant Porter in his office. At my request, he accessed IA Pro and opened the case file MCSO IA# 2020-0555. I confirmed that this file pertained to the internal investigation regarding Aaron. I also verified that MCSO retained the interview conducted by Sgt. Leatham in November 2020. At my request, Lieutenant Porter played segments of the video interview, which lasted for two hours, eleven minutes, and forty-five seconds. The video appeared to be unaltered, untampered, and undamaged in any way.

I confirmed that MCSO retained the interview conducted by Sgt. Leatham with Captain Lugo in October 2020. At my request, Lt. Porter opened and played segments of the video interview, which lasted two hours, twenty-three minutes, and thirty-two seconds. The video appeared to be unaltered, untampered with, and undamaged in any way.

Photos were taken of IA Pro that displayed the case had been retained and uploaded into Evidence.com, in a folder labeled PSB Retained videos.

05/07/2025 1345 Hours

Lt. Porter provided me with the phone number for MCSO Director of Conduct Resolution, Tiffani Shaw, 602-876-4415. Director Shaw noted that if Aaron didn't receive the two video interviews, it was an oversight. She added that a phone call to their office would have prompted them to provide the files.

1520 Hours

I contacted Aaron and reviewed my report, including his interview summary, key points, and all the paperwork he provided to investigators.

After listening, Aaron verified that this statement was true and accurate. I asked if there was anything he disagreed with or if he wanted to add to his previously documented statement.

Aaron requested that I indicate that the missing files were both video and audio. He reiterated that it was a true and accurate statement.

05/08/25 1235 Hours

After review, a violation of ARS 38-1106 did occur, specifically, MCSO did not provide all related documentation required for appeal of discipline to Sgt. Aaron Englebeck within the required 14 days. The proper remedy as prescribed in ARS 38-1106 (D) was properly applied, and the discipline Aaron had received was rescinded. The failure to provide this documentation as required appeared to be inadvertent. Any violation of this code is not criminal. The missing video files were provided to this investigation and were stored within the appropriate MCSO data files (IA Pro). No evidence was found of prior deletion or manipulation of these files. No violation of ARS 13-2809 A. 1. (Tampering with Evidence) was discovered.

05/29/25 1510 Hours

In summary, no criminal statute was found to have been violated. While a violation of ARS 38-1106.A.1 Appeal of Disciplinary Actions did occur, the proper remedy was applied. In any case, this is not a criminal statute.

Regarding the allegation of violation of ARS 13-2809.A.1, no evidence was found to prove a violation of this statute had occurred. Further, no responsible party has been identified as a potential suspect of violating this statute. As such,

46REPORT000812

this case falls below the threshold required to submit for charges with the
Maricopa County Attorney's Office, as confirmed with Deputy County Attorney Neha
Bhatia.

No probable cause exists to pursue with criminal complaints.

06/03/25 1715 Hours

I contacted Aaron and reviewed the findings of the investigaiton.

Investigation concluded.

10/30/25

46REPORT000813

# ARIZONA DEPARTMENT OF PUBLIC SAFETY
### INTEROFFICE MEMORANDUM



**JEFFREY GLOVER**
**DIRECTOR**

**DATE:**      October 2, 2025

**TO:**      Sheriff Jerry Sheridan, #S0496

**FROM:**      Sergeant Craig Baum, #6968, Internal Affairs

**SUBJECT:**   **INVESTIGATIVE NARRATIVE – INTERNAL AFFAIRS COMPLAINT #2025-064**


On April 3, 2025, the Arizona Department of Public Safety (DPS) received a letter from Maricopa County Sheriff (MCSO) Undersheriff Jeff Gentry, #S1560.  The letter detailed alleged misconduct by MCSO Captain Greg Lugo, #S1480.  The alleged misconduct occurred between March 10, 2025, and March 21, 2025.[1]

On April 9, 2025, DPS Internal Affairs (IA) Captain Gunnar Hancock, #6775, and Sergeant Craig Baum, #6968, met with Undersheriff Gentry, MCSO Executive Chief Melissa Palopoli, #B6639, and MCSO Deputy Chief Matt Summers, #S1641, at the MCSO Headquarters located at 550 W. Jackson Street, in Phoenix, Arizona.  Executive Chief Palopoli initiated an internal investigation referencing MCSO IA #2025-0139 and provided the pertinent documentation.

Undersheriff Gentry requested that the DPS investigate the possible policy and regulation violations.

An IA case number was drawn, and on April 9, 2025, the investigation was assigned to Sergeant Baum for completion.

The following United States District Court Orders were pertinent to this investigation:

> *Ortega Melendres v. Arpaio*, Permanent Injunction Order, Doc. 606 (D. Ariz. Oct. 2, 2013)[2]

> *Ortega Melendres v. Arpaio*, Second Amended Second Supplemental Permanent Injunction/Judgment Order, Doc. 1765 (D. Ariz. July 26, 2016)[3]

> *Ortega Melendres v. Penzone*, Order Resolving Order to Show Cause and Civil Contempt

---

[1] Addendum 1 – Agency assist letter requesting investigation by DPS
[2] Addendum 2 – First Court Order Doc 606
[3] Addendum 3 – Second Court Order Doc 1765

**CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT**

Findings, Doc. 2827 (D. Ariz. Nov. 8, 2022)[4]

The following MCSO policies and procedures were pertinent to this investigation:

*MCSO Policy CP-2 – Code of Conduct*[5]

*MCSO Policy GB-2 – Command Responsibility*[6]

*MCSO Policy GH-2 – Internal Investigations*[7]

*MCSO Policy GH-5 – Early Identification System*[8]

*MCSO Policy CP-11 – Anti-Retaliation*[9]

*MCSO PSB Operations Manual Sections 101 and 301*[10]

*Monitors 43rd Quarterly Report*[11]

## Summary

On March 10, 2025, at 1602 hours, Undersheriff Gentry received an email from MCSO Sergeant Aaron Engelbeck, #S1673. In the email, Sergeant Engelbeck attached documents outlining a criminal complaint against the MSCO PSB, in which he alleged they intentionally withheld evidence or disposed of evidence. Sergeant Engelbeck also alleged the PSB had shown "conspiratorial behavior at every level" and had resisted an investigation into the PSB Commander, Captain Lugo.

On March 10, 2025, at 1703 hours, Undersheriff Gentry sent Sergeant Engelbeck's email to Executive Chief Palopoli. Executive Chief Palopoli learned that Captain Lugo had accessed MCSO IA 2025-0111 on March 10, 2025, at 1903 hours. Captain Lugo did not notify her in a timely manner, and only reported access the following day, March 11, 2025, after being contacted by Executive Chief Palopoli.

Executive Chief Palopoli gave specific instructions to Captain Lugo not to access the complaint in the Internal Affairs Professional Standards (IAPRO) system. On March 21, 2025, Captain Lugo disregarded Executive Chief Palopoli's directive and demonstrated insubordination when

---

[4] Addendum 4 – Third Court Order Doc 2827
[5] Addendum 5 – *MCSO Policy CP-2 – Code of Conduct*
[6] Addendum 6 – *MCSO Policy GB-2 – Command Responsibility*
[7] Addendum 7 – *MCSO Policy GH-2 – Internal Investigations*
[8] Addendum 8 – *MCSO Policy GH-5 – Early Identification System*
[9] Addendum 9 – *MCSO Policy CP-11 – Anti-Retaliation*
[10] Addendum 10 – *MCSO PSB Ops Manual, Sections 101 and 103*
[11] Addendum 11 – *Monitor's 43rd Quarterly Report, Doc 3198*

CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT

he accessed IAPRO a second time.

On April 4, 2025, Undersheriff Gentry placed Captain Lugo on administrative leave pending the outcome of the investigation.

**Involved Deputy Sheriff**

Captain Lugo had been employed with the MCSO for over twenty-four years.  He was assigned as the PSB Commander.  Executive Chief Palopoli was his supervisor at the time of the incident.

**Investigation**

Based on the supporting documents and interviews, the investigation revealed the following facts about the incident:

On March 10, 2025, Sergeant Engelbeck submitted a complaint through BlueTeam, a companion module to the IAPRO system, alleging destruction and withholding of evidence between October 2024 and January 2025.  He named Captain Lugo and Sergeant Robert Leatham, #S1462, as principals.[12]  The complaint, along with attachments, was sent to Undersheriff Gentry at 1602 hours, and Undersheriff Gentry forwarded the email to Executive Chief Palopoli at 1703 hours.[13]  Executive Chief Palopoli acknowledged receiving the materials but did not review them in detail until the following morning.

**Failure to Notify**

On the same evening, March 10, 2025, Captain Lugo stated he accessed the IAPRO incoming bin at approximately 1903 hours.  He said the entry contained "about three paragraphs and an additional line" referencing COVID pay, the "555 case," evidence destruction, and information that said it had been provided by email to Undersheriff Gentry.  Captain Lugo said, "I read the summary one time, I closed the entry because I recognized that's referencing me."  Executive Chief Palopoli said, "Unbeknownst to me, Captain Lugo had seen that incident.  He had looked at it about approximately 7 p.m."  Captain Lugo said his intent was to bring the matter to Chief Palopoli at an appropriate time.  Executive Chief Palopoli told IA that Captain Lugo at "no time" had reached out to her as his immediate supervisor to inform her.  Executive Chief Palopoli said she had to initiate contact with Captain Lugo.

On March 11, 2025, at 1111 hours, Chief Palopoli texted Captain Lugo requesting that he call her.  Captain Lugo called Executive Chief Palopoli at 1113 hours, and they talked for twenty-one minutes.  Captain Lugo said that during their call, she told him she was aware Sergeant Engelbeck had filed a complaint.  She said Captain Lugo confirmed to her he had read "about three paragraphs" and described the matter as retaliation, telling her, "All he's doing is this is a

---

[12] Addendum - 12 IA 2025-0111 Internal Complaint Submitted by Engelbeck
[13] Addendum - 13 Engelbeck email to Undersheriff Gentry

CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT

clear retaliation he's unhappy with the way his misconduct investigation ended out." Captain Lugo told IA, "I informed her of the history and my knowledge of the case, to include the fact that the complaint being made by Engelbeck was retaliation toward me."

Executive Chief Palopoli said Captain Lugo never reached out to her after he first saw the complaint on March 10, 2025, at 1903 hours, which Executive Chief Palopoli considered a violation of policy requiring immediate supervisor notification when the PSB commander is named as a principal. Captain Lugo was asked by IA what action he took after seeing the complaint, and Captain Lugo said, "I made a note, a mental note of it." Captain Lugo said, "My plan was to, at the next appropriate time, discuss it with the Chief." Captain Lugo told IA "Knowing full well that it says that the Chief Deputy was already made aware of it." When asked by IA if Undersheriff Gentry was his boss, Captain Lugo said he was not his "direct report." When asked by IA how he knew that Executive Chief Palopoli was aware of the complaint, he said, "I don't know that." Captain Lugo said it was 1903 hours, "Which is why I would follow up with her normally at an appropriate time."

When asked by IA what he considered an appropriate time, Captain Lugo said, "Um, with my next interaction with her prior to the 7-day requirement of, uh, intake and routing." When asked if he could have called Executive Chief Palopoli, he said, "I could have. At 7 o'clock at night." Executive Chief Palopoli was asked by IA whether Captain Lugo should have contacted her immediately after seeing a complaint against himself in IAPRO. She answered, "Yes, and it wasn't that late, it was 7 PM." Executive Chief Palopoli said, "I'm available 24-7, so I have a county phone." Captain Lugo was asked by IA if he felt his notification was timely, and he said, "Uh, for the information that I had at the time. Absolutely." Captain Lugo told IA the entry was at the "very infant stages in MCSO policy of initial intake and routing."

Both Captain Lugo and Executive Chief Palopoli completed timelines.[14] [15] Between their respective timelines and interviews, a date discrepancy was found. Captain Lugo told IA that the conversation with Executive Chief Palopoli occurred on March 24, 2025, and "Not the 18th as she alleges." Executive Chief Palopoli was asked about the March 18, 2025, meeting with Captain Lugo. Executive Chief Palopoli stated, "According to my notes and the information and the memory that I had, that meeting took place on the 18th." She acknowledged there was another meeting on March 24th, but emphasized that her instructions to Captain Lugo on March 18, 2025, were for him to "remain out of the investigation." She explained, "We had quite a few meetings within that time frame. So, his notes might be different than mine."

Executive Chief Palopoli was asked by IA regarding Captain Lugo's statement that she told him to "stay out of it" on March 24, 2025, via telephone, Executive Chief Palopoli responded, "I remember the conversation of telling him to stay out of it. I don't remember if it was in person or over the phone. But I do recall advising him to do so."

---

[14] Addendum - 14 Consolidated timeline w images from Captain Lugo
[15] Addendum - 15 Timeline from Executive Chief Palopoli

CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT

On March 18, 2025, Captain Lugo met with Executive Chief Palopoli in her office. Captain Lugo recalled Executive Chief Palopoli telling him, "It's about the Engelbeck matter, and you're not being placed on leave at this moment, but the Chief Deputy (Undersheriff) decided he was going to request an outside agency to conduct an investigation." He said she also stated that the allegation involved "a criminal violation of tampering with evidence." Captain Lugo raised concerns that the complaint was already out of compliance for case classification and assignment. Executive Chief Palopoli was asked by IA what she said to Captain Lugo, and Executive Chief Palopoli said, "Um, what exactly I said no, um, but I do recall that we designated it as an internal investigation involving him as a principal, and that he was to stay out of, out of the investigation and to provide me with a lieutenant, um, as my point of contact. So, to me, staying out of the investigation is completely wiping your hands of it, stepping back and not having any involvement whatsoever, and recusing yourself at any moment in time that it comes up*.*" She said Captain Lugo acknowledged with "an affirmative okay" but failed to provide her with a lieutenant.

Executive Chief Palopoli was asked by IA to confirm the date she told Captain Lugo not to access the case, and she said, "March 18th." When asked how she gave the order to Captain Lugo, she said, "It was in person, all verbal." Captain Lugo told IA during that meeting he and Executive Chief Palopoli discussed two other items. He said the second one was "an attorney being allowed to be an observer in an interview of an IA."

Captain Lugo told IA that the third item was that they were going to assign a second captain to the PSB. "But I would still be the PSB Commander, uh, and do everything that I do and be responsible for everything that I do." Captain Lugo recalled Executive Chief Palopoli further stating that when he asked who the captain was, she said, "It's Cory Morrison," and it had been decided, "But don't say anything" regarding the addition of another captain to the PSB. Captain Lugo told IA that Executive Chief Palopoli had another meeting and told him the Undersheriffs' door is open, and he could "stick around" and they could have another meeting. Captain Lugo said he did not see a point and left.

Captain Lugo told IA, "So, um, with this new administration coming in and some of the, uh, interactions that were occurring, including at that first March meeting, um, and some of the things that the Chief Deputy was initiating to do, um, and injecting himself into prior cases. Um, I started taking extremely copious notes immediately after these interactions or shortly thereafter, um, to document all of these interactions, because I am certain that I will be testifying in federal court to some of the actions and the things that executive command, the Sheriff, and the Chief Deputy or now Undersheriff did. So, um, I was also concerned of when I it it was clear to me that, um, they were not, uh, aware of requirements of the the policies and procedures that I needed to protect myself. And knowing that, the attorneys that she references are the attorneys for the Sheriff. They're not. They don't represent Greg Lugo's best interests in the federal court, so. So, I just started keeping extremely, timely notes of these interactions, knowing that all this is not making sense. The hair on the back of my neck standing up, and I need to document this cause I'm not allowed to record them, feel covertly. And I didn't."

CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT

**Insubordination**

On March 21, 2025, Captain Lugo said he discussed the matter with Monitor Chief Don Anders for the first time during their intake meeting, noting that the complaint was still sitting in the incoming bin in IAPRO. Executive Chief Palopoli later reviewed IAPRO audit logs and stated Captain Lugo accessed the case on March 21, 2025, despite her March 18, 2025, directive not to.[16] She considered this to be insubordination. Captain Lugo maintained his access was at the request of Chief Anders and lasted only seconds to verify an assigned date. (Third Court Order #2827)

Captain Lugo said during that conversation Chief Anders asked him "specifically" for the "assigned date." Captain Lugo said he told Chief Anders, "Well, I have to click on it to get the assigned date." Captain Lugo told IA, "I don't remember if he (Chief Anders) goes, 'Uh-huh. Okay. What. Nothing. Affirmative.' I forget exactly what, but it was clear. And then I vocalized as I went through. Literally, we're talking seconds. I said, 'I'm double-clicking,' and I vocalized to him on the phone. Double-clicking, status and assign tab, I know exactly where to go, which is the second tab." Captain Lugo said he told Chief Anders "Okay, the assigned date is this" and said, "I'm closing - closing, not looking at anything else. Closed, done."
Captain Lugo told IA any order not to discuss the case with Chief Anders "I would say, is, uh, invalid and unlawful order." Captain Lugo said Executive Chief Palopoli "never said anything about not discussing it with Chief Anders." Sergeant Baum attempted to contact Chief Anders for an interview to confirm the conversation, but the interview was denied.

> *Case Note:* *On August 27, 2025, DPS Legal Counsel spoke with Chief Anders. Chief Anders confirmed that a conversation occurred with Captain Lugo on March 21, 2025. The purpose of that conversation was to discuss newly received cases and the assignment of those cases within the PSB.*

Captain Lugo told IA there was "no request for an IA number at this March 18 meeting. Um, I said, 'Tell me', uh, we left this meeting, as 'tell me what you would like to be done.'" Captain Lugo said it was on March 24, 2025, that Executive Chief Palopoli requested that he assign the complaint to the global consulting firm, Jensen Hughes. Captain Lugo said he objected, stating, "I supervise Jensen Hughes; having them involved is a conflict of interest." Despite his objections, he instructed his staff to create an IA case and assign it, noting that further communication should go through Executive Chief Palopoli. A review of the IAPRO log for case #2025-0111 showed that the IA number was pulled on March 24, 2025, at 1359 hours by Management Assistant, Ms. Monique Habblett, #B6244. Executive Chief Palopoli said she had already met with Jensen Hughes that day and they agreed they would take the case. On March 25, 2025, she informed Chief Anders, who instructed her to pause the assignment, citing the conflict of interest.

MCSO Lieutenant Frederick Porter, #S1873, stated that he later assigned the case to Jensen

---

[16] Addendum - 16 IA2025-0111-User Log

CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT

Hughes investigator, Joy Fitzgerald, and completed an investigative plan,[17] which he sent to Executive Chief Palopoli. Lieutenant Porter said at the time he was unaware she (Executive Chief Palopoli) had already contacted another investigator at Jensen Hughes. He acknowledged, "There was some confusion there." He said he was not told to stand down until after he had sent the investigative plan, at which point Executive Chief Palopoli emailed him, clarifying the firm (Jensen Hughes) would not be used. In a follow-up message to Sergeant Baum, Lieutenant Portor said he informed Captain Lugo that PSB had been told to "stand down."[18]

Executive Chief Palopoli said she had not directed Lieutenant Porter to contact Jensen Hughes or to complete an investigative plan and noted she had never been informed by Captain Lugo that Lieutenant Porter was her designated point of contact for PSB. When asked by IA if Executive Chief Palopoli had asked him to assign a Lieutenant as her point of contact, Captain Lugo said, "No. She asked who the point of contact was, and I said it would be Lieutenant Porter and Amy." Captain Lugo told IA that was in the same conversation he had with Executive Chief Palopoli on March 24, 2025.

On April 2, 2025, Captain Lugo said he attended a PSB meeting with Sheriff Jerry Sheridan, #S0496, Undersheriff Gentry, and Executive Chief Palopoli in conference room 530. He told IA the purpose of that meeting was to discuss other IA cases and the MCSO case backlog. Captain Lugo told IA that Sheriff Sheridan had previously stated he always wanted to know if there were any problems or concerns on the "forefront" and bring them to his attention. "And he wasn't afraid of bad news, and he needed to know about it. So, I took that opportunity that uh, and I reiterated his statements and told him that there's a sort of, I called it, 'trouble afoot.'" Captain Lugo said, "I explained that, uh, you know, there was concerns. Um, so we have all these metrics that we have to meet or get fined, and the PSB Commander in reducing this backlog. So, um, I'm being advised third and fourth-hand information that the Sheriff or the Chief Deputy has decided they're restructuring the PSB. They're adding a second captain to PSB and, um, I had concerns." Captain Lugo told IA that he had been "hearing that from other captains that chiefs have already told them that." Captain Lugo said he "actually heard from a captain who said he was being transferred, already officially told to PSB which has to get monitor approval, and it's supposed to have the PSB Commander's approval." Captain Lugo said he expressed those concerns and it "being problematic."

Captain Lugo said Undersheriff Gentry brought up the "Engelbeck" complaint (IA 2025-0111), and Captain Lugo said he told him, "Yeah, I read like three paragraphs of that information." Captain Lugo said Undersheriff Gentry asked him, "What happens if the agency that we give it to says you need to be on administrative leave?" Captain Lugo told IA, "I expressed concern." Captain Lugo said, "The concern is that the PSB Commander is not even being afforded the same process that everybody else is being afforded, that the PSB Commander affords everyone else." Captain Lugo told IA that Undersheriff Gentry asked what he meant and Captain Lugo said, "I expressed, you know, to review it, uh, knowing that at least I said, what I know of the

---

[17] Addendum - 17 Investigation Plan IA2025-0111
[18] Addendum - 18 New IA notification IA2025-0111 from Lt. Porter

**CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT**

three paragraphs, um, like I don't know what other information he (Engelbeck) provided you or whatever, but that was all handled." Captain Lugo said he "reiterated to all three of them that the only people in the court's order and I can show you where it is that the only two people that are named in there as I told you before, is the PSB Commander and the Sheriff, um, who's responsible so, uh, for certain aspects. And so, I said, I, I said, "'Sheriff, you know,' I said, 'I will not be in contempt. I will not violate the court's orders.' And, um, I made that extremely clear, um, you know, and, uh, uh, to him and, um, to, to the group." Captain Lugo told IA "I also wanna reiterate that, you know, I said, 'Hey, if you want to change any processes, there's a process to change that if you want something different but, um, there's processes need to be followed pursuant to the court's order.'" One of those, he said, "being adding or transferring somebody to professional standards bureau or out anybody." Captain Lugo told IA, "My interpretation was that was not well received, um, when I drew the line in the sand and said that I will not, just so you know, I'm following, I'm not going to be, I'm not gonna be, my neck's not gonna be on the line. You know, I'm not gonna be on the chopping block, um, in front of the the federal court judge, you know, with the responsibilities that I have."

Executive Chief Palopoli confirmed this meeting occurred and said Captain Lugo raised concerns about IAPRO not being locked down and unauthorized access. Executive Chief Palopoli said that after reviewing the audit trail, she confirmed Captain Lugo had accessed the case on March 21, 2025, in violation of her order. She said she briefed Undersheriff Gentry and concluded it was insubordination. Captain Lugo was asked by IA if he believed he was insubordinate, and he said, "Um, no." When asked why, Captain Lugo said, "Um, she never gave an order against doing anything that I did, number one. Uh, number two, as the evidence would support in my timeline, even if that order was given based on this log, that was done after these accesses."

On April 4, 2025, at 1518 hours, Captain Lugo received a text from Undersheriff Gentry requesting that he return the call. Captain Lugo said Undersheriff Gentry told him, "I'm in a difficult position, but I need to place you on administrative leave… I know it's bullshit… but the Sheriff told me to do this after legal counsel said they needed to handle this case like any other, and they didn't want to get into trouble with the guy across the street." Captain Lugo objected, stating, "This does not typically qualify, at the onset of complaint, for administrative leave." Executive Chief Palopoli confirmed that Undersheriff Gentry placed Captain Lugo on paid administrative leave on April 4, 2025. After Captain Lugo was placed on leave, Executive Chief Palopoli, Undersheriff Gentry, and Deputy Chief Matt Summers, #1641, met with PSB staff to address concerns, and Executive Chief Palopoli appointed Lieutenant Portor as acting commander of the PSB.

Lieutenant Portor confirmed he assumed acting command on April 7, 2025. He stated, "I received a phone call from my Chief saying I was put in charge as acting captain, and I opened up an investigation from an email that she sent me after he was put on leave." He said he was told the case involved "insubordination" but was not given specifics. He said he had one discussion with Captain Lugo in which he confirmed with him that he would not be contacting him about the matter because Captain Lugo was involved. He said Captain Lugo told him he had

CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT

passed along his number to Executive Chief Palopoli.  Lieutenant Portor told IA he was unaware of any directive ordering Captain Lugo not to access IAPRO.

**CONFIDENTIAL INFORMATION – DO NOT REPRODUCE ANY PORTION OF THIS REPORT**



**JEFFREY GLOVER**
DIRECTOR

**DATE:**       October 18, 2025

**TO:**          Colonel Jeffrey Glover, #11422, Director

**FROM:**      Sergeant Robert Olshaskie, #7027, Internal Affairs

**SUBJECT:    INVESTIGATIVE NARRATIVE – INTERNAL AFFAIRS COMPLAINT #2025-165**

On March 10, 2025, the Maricopa County Sheriff's Office (MCSO) became aware of possible misconduct by Captain Gregory Lugo, #S1480, and Sergeant Robert Leatham, #S1462. Internal Affairs (IA) case number IA #2025-0111 was drawn alleging a violation of the MCSO Policy CP-2, Code of Conduct, Section 6: Conformance to Established Laws, regarding MCSO IA #2020-0555.

On September 4, 2025, MCSO Undersheriff Jeff Gentry requested that the Arizona Department of Public Safety (DPS) complete an Internal Affairs Investigation, citing a conflict of interest associated with this case.

The following United States District Court Orders were pertinent to this investigation:

*Ortega Melendres v. Arpaio*, Permanent Injunction Order, Doc. 606 (D. Ariz. Oct. 2, 2013)[1]

*Ortega Melendres v. Arpaio*, Second Amended Second Supplemental Permanent Injunction/Judgment Order, Doc. 1765 (D. Ariz. July 26, 2016)[2]

*Ortega Melendres v. Penzone*, Order Resolving Order to Show Cause and Civil Contempt Findings, Doc. 2827 (D. Ariz. Nov. 8, 2022)[3]

The following MCSO policies and procedures were pertinent to this investigation:

*MCSO Policy CP-2 – Code of Conduct*[4]

*MCSO Policy GH-2 – Internal Investigations*[5]

---

[1] Addendum 1 – First Court Order Doc 606
[2] Addendum 2 – Second Court Order Doc 1765
[3] Addendum 3 – Third Court Order Doc 2827
[4] Addendum 4 – *MCSO Policy CP-2 – Code of Conduct*
[5] Addendum 5 – *MCSO Policy GH-2 – Internal Investigations*

46REPORT000823

## Summary

On October 3, 2020, the MCSO Professional Standards Bureau (PSB) initiated an investigation, documented under IA#2020-0555. The allegations of insubordination and untruthfulness were made against MCSO Sergeant Aaron Engelbeck, #S1673. The case was closed in October 2024 with sustained allegations of insubordination.

Sergeant Engelbeck exercised his right to file an appeal of his discipline and filed the necessary documentation. The request for appeal was accepted, and a hearing was scheduled. On December 9, 2024, Sergeant Engelbeck requested the full case file for IA #2020-0555. On December 20, 2024, Sergeant Engelbeck received the case file.

On January 27, 2025, Sergeant Engelbeck discovered the case file was missing audio and video recordings for his IA interview and Captain Lugo's IA interview. Sergeant Engelbeck notified Maricopa County Attorney Neil Landeen, who was assigned as representation for MCSO, that the recordings were not included in his case file.

On January 28, 2025, the Conflict Resolution Department for MCSO contacted Sergeant Engelbeck and notified him that the sustained allegations were being changed to unsustained and the Appeal of Discipline Hearing was being vacated.

On March 10, 2025, Sergeant Engelbeck filed an internal complaint through BlueTeam, alleging the MCSO PSB violated Arizona Revised Statutes (ARS) §38-1106A1 - Appeal of Disciplinary Actions and §13-2809 - Tampering with Physical Evidence. Sergeant Engelbeck stated in his complaint that he believed an investigation would show that an unknown person in PSB willfully and with full knowledge committed the violations by withholding the audio and video recorded interviews. Sergeant Engelbeck listed Captain Lugo and Sergeant Leatham as involved employees on the complaint.

On September 8, 2025, DPS IA #2025-165 was drawn and was assigned to DPS IA Sergeant Robert Olshaskie, #7027.

## Investigation

Based on supporting documentation and IA interviews, the investigation revealed the following facts about the incident:

On October 3, 2020, the MCSO PSB began investigation, IA#2020-0555. The case identified Sergeant Engelbeck as the principal and included three allegations of insubordination and two allegations of untruthfulness. Captain Lugo was listed as the complainant. The final findings indicated two sustained allegations of insubordination on October 24, 2024. The discipline imposed was a 40-hour suspension. The other allegations were unsustained.

After Sergeant Engelbeck was notified of the findings and the discipline, he filed for an Appeal of Discipline Hearing. The hearing was granted and scheduled to occur on January 10, 2025. On December 9, 2024, Sergeant Engelbeck requested the full case file for IA #2020-0555. On December 20, 2024, Sergeant Engelbeck received an email from Simon Haines with a link that provided him access to the case file that was created for him.

On January 27, 2025, while preparing his case and reviewing the provided materials, Sergeant Engelbeck discovered the materials provided for his review did not include audio or video copies of his IA interview or Captain Lugo's IA interview. Sergeant Engelbeck emailed Maricopa County Attorney Neil Landeen, who had been assigned as counsel for MCSO, and advised him of the unprovided materials.

On January 28, 2025, MCSO Conflict Resolution personnel contacted Sergeant Engelbeck and informed him that the sustained insubordination charges were being changed to not sustained, and the Appeal of Discipline Hearing was being vacated. Sergeant Engelbeck was also provided payment for the 40-hour suspension he had served.

On March 10, 2025, Sergeant Engelbeck filed an internal complaint through IAPro BlueTeam, a web-based software application that is a companion product to IAPro case management system used by law enforcement agencies.  The complaint alleged that the MCSO PSB violated Arizona Revised Statutes (ARS) §38-1106A1 - Appeal of Disciplinary Actions and §13-2809 - Tampering with Physical Evidence. Sergeant Engelbeck stated in his complaint that he believed an investigation would show that an unknown person in PSB willfully, and with full knowledge, committed the violations by withholding the audio and video recorded interviews. Sergeant Engelbeck listed Captain Lugo and Sergeant Leatham as involved employees on the complaint. The following presents Sergeant Engelbeck's complaint in its entirety:

*In January 2025, I was made aware that the Maricopa County Sheriff's Office (MCSO) Professional Standards Bureau (PSB) had violated Arizona State Statute (ARS) 38-1106 (A)(1) which states that the respondent (MCSO) must provide a copy of the respondent's investigative file related to the appeal within fourteen (14) calendar days of the request from the appellant. They have also violated ARS 13-2809(A)(1) Tampering with physical evidence which states: A person commits tampering with physical evidence if, with intent that it be used, introduced, rejected or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person: 1. Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability.  I believe the facts will show this was willful and with full knowledge by a person unknown at this time in PSB. The following will illustrate how this occurred:*

*In October 2020, Captain Greg Lugo filed an administrative complaint against myself with allegations of truthfulness and insubordination. At the time, I was Captain Lugo's direct report as a lieutenant in District 6 (Queen Creek). I was interviewed by Sergeant Robert Leatham at this time involving the matter. During that interview, I advised the investigator of*

*several policy violations of which Captain Lugo was responsible. These violations included such policies as command responsibility, truthfulness, and retaliation among others. I later provided the same information in written form to clarify the allegations. In spite of receiving this information, Sergeant Robert Leatham failed to open an independent investigation into these allegations, I was unaware of this at the time. I am also unaware if this decision was made by Sergeant Leatham or the decision came from within his chain of command. This is contrary to MCSO policy. It is unknown by me at this time if Sergeant Leatham made this decision on his own or was ordered to do this by someone in his chain of command.*

*In March of 2021, Captain Lugo was installed as commander of PSB. I believe this move was already intended at the time of my interview and allegations of misconduct by Captain Lugo.*

*Following this investigation, I was punished both formally and informally over the course of the next four years. I was demoted (probation terminated), denied a merit-based salary increase the next year, denied a one-time monetary incentive for working through the pandemic, and with an open investigation, I was unable to promote for the next 4 years. In May of 2021, I emailed Chief Deputy Russ Skinner (who would be installed as Sheriff in 2024). I outlined my protests in not receiving a merit increase or the Covid one time incentive. I also advised him of the allegations I entered against Captain Lugo and that, since Captain Lugo was now commander of PSB, this would not be properly investigated. He replied that I was not eligible for the increase or incentive. He also assured me that my allegations were being investigated.*

*In January 2024, I was called to interview again with Sergeant Leatham. This interview involved clarification of GPS information within my computer. At the conclusion of the interview, I asked for the case number for my allegations against Captain Lugo. He stated an investigation was not opened involving this. I told him I was in shock of this because MCSO policy states if a supervisor is made aware of misconduct, the allegations must be investigated. He stated to me that since Captain Lugo opened his investigation first that I would be retaliating against Captain Lugo if I continued to pursue these allegations. I reminded Sergeant Leatham that I was first to state Captain Lugo was retaliating against me. Sergeant Leatham stated Captain Lugo entered his investigation first. I took this to be a threat from PSB that should I continue with my pursuit of an investigation, I would be facing new allegations of retaliation. When I left that interview, Sergeant Leatham told me he would speak to his supervisors about the investigation. I responded with doubt.*

*In June of 2024, I sent an email to the chief of compliance, Michael Caputo. I advised him that I made the investigator aware of policy violations and he refused to open an investigation. I provided my original written complaint about Captain Lugo. I also reminded him that in addition to Captain Lugo's policy violations, Sergeant Leatham was violating policy by refusing to open a separate investigation. This is an allegation of employee misconduct. Chief Caputo assured me he would look into the matter. Approximately one month later I was notified that a service complaint regarding my inquiry had been completed. MCSO*

policy GH-2 Internal Investigations states "A service complaint is not an allegation of employee misconduct." So this is now another level in the chain of command violating MCSO policy to prevent Captain Lugo from being properly investigated.

In September 2024, I was notified that the investigation from 4 years prior had been completed. The truthfulness allegation was not sustained but they sustained 3 allegations of insubordination. I was advised, the appointing authority, Ken Holmes, was considering 40 hours of suspension as discipline. As this is major discipline, I was entitled to a pre-determination hearing (PDH). I went before the appointing authority and brought forth my arguments against the sustained findings. I also made clear that 4 years to conclude this investigation and dole out major discipline was unethical and contrary to current state law. I also made aware the efforts to avoid investigating Captain Lugo. (This is the fourth person I have made aware of this violation of MCSO policy.) After consideration, the appointing authority overturned one of the sustained findings but upheld the remaining 2. He informed me he was going to proceed with the 40 hour suspension. I advised him that I was looking forward to an appeal as I would finally have an authority outside of the Sheriff's Office view the unethical practices within the PSB division. Mr. Holmes then provided me with the suspension information which would begin the following week (October 2024).

I was provided 10 calendar days to file the appeal. As I was serving the suspension at that time, this was done on my own time and at my own expense. I filed the appeal within the allotted 10 days. I was later notified that a hearing had been scheduled for January 10, 2025 (MCFY25-L01).

I was provided documentation for the appeal process which included an advisement that "Pursuant to A.RS. 38-1106(A)(1), the appellant may submit a written request, accompanied by a copy of the filed notice of appeal, for a copy of the respondent's investigative file related to the appeal. The respondent must provide the requested copy within fourteen (14) calendar days of their receipt of the request." I immediately emailed the legal liaison for the Sheriff's Office to request the report. In the email, I also provided the above statute and reminded they have 14 days to provide the case file.

On November 14, 2024, I received an email from Neil Landeen with the Maricopa County Attorney'sOffice stating he was the assigned representation for the Sheriff's Office. I provided subpoenas to the hearing officer, Prudence Lee, and Mr. Landeen in requesting my witnesses for the hearing. Among these subpoena's was one for Chief Caputo.

On December 20, 2024, I received an email from Simon Haines which shared the case file. This was provided through a web link which had me set up a login and password for access. I was not provided an actual physical copy of these documents. I took a cursory glance and saw the file included the report, attachments, and several audio and video files. There was no notice that any parts of the case file would be provided at another time nor was there any indication the case file was incomplete. On December 22, 2024, Michael Caputo responded to his subpoena stating he was unavailable on that date. Neil Landeen advised he was willing to

reschedule so I could have access to this witness. The hearing was rescheduled for February 7, 2025. I then began to prepare my appeal arguments.

As I reviewed the report authored by Sergeant Leatham, I noticed that there were several omissions regarding my statements in the interview. In addition, it appeared the report was being tailored to support a sustained allegation. I remembered approximately half of the principal interview I participated in was spent in which I was explaining policy violations from Captain Lugo. It is contrary to MCSO policy and practice to require someone to state "I want to file a complaint." It only requires an allegation, either verbal or written, of employee misconduct to require an investigation. Yet Sergeant Leatham's report said "Explanation of why an additional IA investigation was not opened: When I met Engelbeck on 11/10/2020 and he gave me these documents, he did not say anything about filing a complaint against Captain Lugo or Chief Morrison." The report later described when I asked for the case number in the follow up interview. The report stated: "At the conclusion of the interview, Engelbeck was offered time to make a five-minute statement. Rather than make a five-minute statement, he requested an IA number for a complaint that was never made." The report also reinforced the previous threats levied by Sergeant Leatham. The report stated: "Based on the above sections from the Anti-Retaliation policy, if Engelbeck were to make an allegation of misconduct against Captain Lugo for reporting Engelbeck's conduct to PSB, Engelbeck would violate this policy."

After taking note of numerous discrepancies in the report, I decided the best way to proceed would be to observe the primary video between myself and Sergeant Leatham. I planned to bring specific moments in the video to the attention of Sergeant Leatham and ask him under oath why these statements were excluded from his report and investigation. I then began searching for the video in the provided case file. While there were several video and audio files for other witness interviews, there were no video or audio files provided for that interview nor Captain Lugo's complaint interview.

On January 27, 2025, I emailed Mr. Landeen. The email stated the following:

Hello sir, in reviewing the uploaded files you shared with me, I discovered there is no video or audio for the first interview of myself. Please add this at your earliest convenience. Thank you, Aaron.

I did not receive a response that day. The next day I received a phone call from the Conflict Resolution department. They stated there had been a change to my suspension. They further stated the suspension had been rescinded. I received a letter in my MCSO email which confirmed this and I was told it required my signature by the end of the day. The letter gave no explanation for the reason of the rescinding. I replied back and inquired as to whether the findings of the investigation would also be changed. I received a response stating that the Appointing Authority would indeed change the findings. With the Sheriff's Office paying me back the lost wages over the suspension, MCSO requested the vacating of the appeal hearing the same day which was granted.

*It is my belief that the efforts to vacate the appeal were meant to cover the withholding of evidence. This is also an effort to avoid questioning as to the PSB practices under oath. It is my belief that Captain Lugo had more involvement in this case than was appropriate as he should have recused himself. I believe the video was not provided because it would clearly illustrate that I had indeed attempted to file a complaint of retaliation four years prior. The video would also show discrepancies in the report, possibly to the point of violating Office truthfulness policy. PSB practices are being revealed in this case and other cases to show a serious lack of fairness and impartiality. This is made possible by the challenges provided in the appeal process. They are aware most employees do not want to tackle the difficult task of appeal.*

*The videos provided and the missing videos should have been stored in the same place according to Office policy. Therefore, someone would have to deliberately omit them for discovery. The legal liaison is known to consult with the case agents and PSB command for what can and can't be released. As this was a concluded investigation, the excuse of "continued investigation" is not valid for omission. Furthermore, I believe the wish to vacate the appeal the day after I made it known I was aware of the incomplete case file, is implicating as well. It appears to me that PSB was aware of the omission but was waiting to see if I actually discovered this.*

*I am seeking an investigation into these criminal violations.*[6]

## **Allegations**

*MCSO Policy CP-2 - Code of Conduct, Section 6: Conformance to Established Laws*

During his IA interview, Sergeant Olshaskie asked Sergeant Engelbeck to explain why he accused Captain Lugo and Sergeant Leatham of violating ARS §38-1106 and §13-2809. Sergeant Engelbeck clarified, "In my complaint, I never specifically named Lugo or Leatham as being the ones who violated. I basically said someone did this. Um, I was not specific. I do have my reasons for believing Captain Lugo had something to do with it." Sergeant Engelbeck stated he left it to the criminal investigator, DPS MID Agent Patrick Quane, #11570, to determine who was responsible. Agent Quane subsequently completed a criminal investigation (DPS DR#I25023143).[7]

Sergeant Engelbeck explained, "I didn't specifically tag Captain Lugo as being the, uh, principal or anything like that, which I could, okay. When I'm opening the, uh, the file. But I, I believe I left that blank. I described how, um, Leatham failed to open the IA against Lugo. These files were not given to me. Lugo's the lead or the head of that division. It, it stands to reason that he would be in control of that. I don't know. I, and so I was, I was trying to be, um, as objective as possible to say, I don't know who, but it happened."

---

[6] Addendum 6 – IA2025-0111 Original Summary as provided in BT
[7] Addendum 7 – DPS Criminal Report I25023143

Sergeant Olshaskie asked, "So are you saying that you believe they have reason to have wanted to do that (deliberately withhold the recordings), but you don't have any proof that they did it?" Sergeant Engelbeck answered, "Correct."

When asked if he believed someone intentionally withheld the information, Sergeant Engelbeck said, "I believe they had the most to gain."

Sergeant Olshaskie referred to the written complaint form, noting that Sergeant Engelbeck had listed Captain Lugo and Sergeant Leatham as "Involved employees." Sergeant Engelbeck explained, "That's why I specifically didn't say, uh, principal. In our language, principal means this is the person that's being accused of doing it, but involved employees just means they're somehow involved."

Sergeant Olshaskie asked Sergeant Engelbeck to provide more information as to who may have been involved in withholding the interviews or any other information to follow up on. Sergeant Engelbeck stated, "Well, I know, uh, (Agent) Quane went over and actually saw the file (interview recordings), so it does still exist. Um, they told him, from what he told me, they didn't know why it wasn't provided to me, that if I would of asked, it would've been provided to me." Sergeant Engelbeck continued, "However, that's obviously not what the statute states. It says you'll give it over. I shouldn't have to ask for any individual pieces."

Sergeant Engelbeck explained that he discovered the two videos and two audio recordings were missing while reviewing the provided material and preparing his case. He stated, "There was discrepancies and it, and it felt to me to the point of almost dishonesty, because Leatham basically said I never asked to file a complaint on Lugo, which I think I made very clear and that was why I wanted to review the video for one thing, just to say like, was I unclear at any time that I definitely wanted to file a complaint. And so that was one reason I went to look. And then another was there was a lot missing as far as the things I had said about Lugo's policy violations. Um, and then I followed up where I met with him two weeks later. I don't know this, if this is provided there, I met with Latham two weeks later and gave him 12 typed pages of the complaint that I was filing. And at the end of which, I specifically cited six policy violations. So I don't think it was ambiguous at all that I intended to file a complaint on Lugo. Yet he states in there very clearly that I never asked to file a complaint. So that was why I went looking for the video, and that was how I discovered the video was missing." Sergeant Engelbeck said this was discovered by him on January 27, 2025. Sergeant Engelbeck sent an email to Mr. Landeen requesting the missing audio and video files.

Sergeant Engelbeck stated that the next day, January 28, 2025, "The Conflict Resolution Department sent me the like sign this, saying we're agreeing to let it go. And it was then that I said, wait a minute, before I do this, are you changing the findings, and just, I don't want just my money back. I want you to change the findings, and then they said, replied back, 'Yes, we will change the findings as well.'"

Sergeant Olshaskie asked, "Do you have any specific information or evidence that the videos or audios were intentionally not provided to you?" Sergeant Engelbeck replied, "Nothing specific. Um, just the very obvious feeling that it seems a little too specific to very four specific files. Um, I have nothing because I don't know enough about their process. I don't know who actually has to see when we, um, get notice that we have an investigation, criminal investigation. 'Cause I don't work with IA that much, but when we have a criminal investigation and it's being released for court or something, they'll, they'll reach out to the investigator and his supervisor, and they'll ask, 'What can we release?' Usually, if it's going through court, it's everything, but they do give you the chance to, like, okay, maybe hold onto this or whatever. That's, that's almost always the case is you are allowed to have a chance to say like, 'I don't wanna release this.' You have to give good reason, of course. But there is a chance, so I assume they do it the same way, where they reach out to the investigator and his supervisors to say like, 'Hey, we're supposed to release this stuff. What do you want to release?' So that is my assumption. I can't, I don't know specifically what their procedure is in that sense."

Sergeant Olshaskie asked if he knew who processed his request for the complete case file. Sergeant Engelbeck did not know who processed the request or compiled the materials that were provided.

Sergeant Olshaskie asked Sergeant Engelbeck, "Towards the end of your complaint, you wrote, 'It's my belief that the efforts to vacate the appeal were meant to cover withholding of evidence.' Do you have any proof of this?" Sergeant Engelbeck responded, "No proof of that."

Sergeant Engelbeck clarified, "That's based on my assumption. I, I can say what I believe leads to motive as far as that goes. Um, I think Leatham was dishonest in his writing about the report, and that would be very apparent if I were able to view the video. I think also the complaint process, as far as my complaint would go, is, uh, was obviously policy violations there, and that would've been very obvious in watching the video. So, it would've been a time for me with them under oath to be able to point out all of these policy violations and, in this case law violation."

Sergeant Olshaskie asked if he had ever received copies of the missing audio or videos. Sergeant Engelbeck answered, "I still have not seen it." When asked if he had made another request for them, Sergeant Engelbeck admitted, "I haven't specifically made another request, no."

Sergeant Olshaskie then stated, "You said, I believe the video was not provided because it would clearly illustrate that I had indeed attempted to file a complaint of retaliation four years prior. The video would also show discrepancies in the report, possibly to the point of violating office truthfulness policy." Sergeant Olshaskie asked, "Who would have been able to withhold the video? Do you know?" Sergeant Engelbeck answered, "I think, uh, Leatham could have personally said it. I think Lugo definitely could have said that, where, you know, we're gonna hold onto these files or whatever." Sergeant Engelbeck was unable to provide investigators with proof this had occurred.

Sergeant Olshaskie asked Sergeant Engelbeck, "Another statement in your complaint says 'The missing videos should have been stored in the same place according to office policy, therefore someone would've had to deliberately omit them from discovery.' And you're saying that because they were four different items, two audio and two video, and they are the same two videos?" Sergeant Engelbeck confirmed, "Yes. Same interviews." He added, "And all of it goes into the same case file. So, it's, it's not like you have to click here and get this and click here and get this. It's all in the same place. So, it would have to have been, you've got a list of things and for some reason you click so many but leave out those."

Sergeant Olshaskie said, "Another statement you made in your complaint was, 'I believe the wish to vacate the appeal the day after I made it known I was aware of the incomplete case file, is implicating as well. It appears to me that PSB was aware of the omission but was waiting to see if I actually discovered this.'"

Sergeant Olshaskie asked Sergeant Engelbeck if he knew for certain that PSB was aware of the omission. He answered, "I have no proof of that, no."

Sergeant Olshaskie asked, "Is it possible that the videos were unintentionally left out of the case file that was originally sent to you? Is that a possibility?" Sergeant Engelbeck responded, "I can't deny it's a possibility. Sure, I find it highly unlikely, but yes."

Sergeant Olshaskie then said, "It sounds like… You believe that was their game plan. 'Hey, let's give him everything except this. If he doesn't catch it, we'll go forward.' Correct? 'If he does catch it, then we'll just rescind it.'" Sergeant Engelbeck answered, "I think it's a possibility. I think ultimately, they decided they didn't want to be under oath and have me ask questions. I had a long series of questions I was going to be asking as far as, uh, truthfulness and policy violation. And, and I found that to be, I, I to be candid, I, they know they violated policy. They know I would be able to prove it. Therefore, don't give him the video. If he doesn't ask, we can move forward."

Sergeant Olshaskie asked Sergeant Engelbeck, "What do you think Captain Lugo would have to gain from preventing you from getting those files?" Sergeant Engelbeck responded, "I think Captain Lugo very specifically knows that I was accusing him of untruthfulness, which is a fireable offense… he was omitting in the supervisory notes that he was writing about me… to make me look as bad as possible to get demoted. In our office, lying, omission, is still lying."

He elaborated, "I believe if it was investigated, it would be easily proven that he definitely omitted things that he knew for certain… I have email documentation saying, 'I told you that', you know, 'Here's why it's not getting done at this time.' And yet he writes that I never told him."

During Sergeant Leatham's IA interview, Sergeant Olshaskie asked if he had recorded the interviews of Sergeant Engelbeck and Captain Lugo. Sergeant Leatham confirmed, "I did." When asked whether both audio and video recordings were made, Sergeant Leatham explained, "Yes. Yeah, because we always had a backup audio recorder and video recorder, I guess."

Sergeant Olshaskie inquired about the storage of those recordings. Sergeant Leatham explained that the interview videos would upload automatically to AXON's cloud-based digital evidence management system, evidence.com. He added that, when the first interviews were conducted, they used recorders that required manual upload into IA Pro. When asked whether the videos would be in IAPro, Sergeant Leatham confirmed they would have been uploaded.

Sergeant Olshaskie asked Sergeant Leatham about his familiarity with the appeal process and whether he had any involvement in it. Sergeant Leatham responded, "I have zero involvement in that." He elaborated that although he had a couple of cases where appeals were filed, he was unaware of them until he received notice that he would have to testify. When asked if it was his responsibility to compile and send the case file for appeals, Sergeant Leatham answered, "It is not."

Sergeant Olshaskie asked when Sergeant Leatham was notified that Sergeant Engelbeck had requested his file and was appealing. Sergeant Leatham stated that he could check his email but recalled receiving an email from Neil Landeen in November of 2024. That was how he learned about the appeal. When asked if that was the first he had heard of it, Sergeant Leatham confirmed it was.

Sergeant Olshaskie asked if Sergeant Leatham had checked whether the videos and audios were still available in IAPro. Sergeant Leatham replied, "I haven't looked at that case file in a long time." When asked if he was aware that the two interviews were omitted from the case file Sergeant Engelbeck received, Sergeant Leatham said, "I had no knowledge of it until I heard a complaint was being filed against me."

Sergeant Olshaskie asked whether Captain Lugo would have been involved in compiling the files that would be sent to Sergeant Engelbeck. Sergeant Leatham said he did not know what Captain Lugo's involvement would have been. He added that since Captain Lugo was listed in the complaint, he probably had nothing to do with it, but Sergeant Leatham could not confirm this.

When asked how the recordings could have been overlooked or not included, Sergeant Leatham said, "No idea."

When asked who builds the case file in IAPro, Sergeant Leatham explained that administrative staff handle that process. He stated that, even back in 2020, administrative staff scanned and uploaded all documents and recordings. He emphasized that he had no involvement in preparing materials for hearings.

When asked if he had heard Captain Lugo or anyone else discuss how the recordings were overlooked, Sergeant Leatham said, "No."

Sergeant Olshaskie brought up allegations made by Sergeant Engelbeck during his interview with Sergeant Leatham, which were not part of the current investigation. He asked if those allegations, if not brought to light, would have benefited Captain Lugo. Sergeant Leatham explained that Sergeant Engelbeck initially declined to make a statement but later submitted a rebuttal of 19 to 20 pages. Sergeant Leatham stated that he submitted the document to his supervisors, who determined that the issues were grievable but not misconduct. He was told not to include it in a complaint because it was outside of policy.

Sergeant Olshaskie asked whether Sergeant Leatham benefited in any way from the recordings not being provided. Sergeant Leatham stated, "No," noting that the only person who benefited was Sergeant Engelbeck. When asked if there was a conspiracy against Sergeant Engelbeck, Sergeant Leatham said, "Not to my knowledge."

During Captain Lugo's IA interview, he was asked, "Were you assigned as Captain over PSB when case number 2020-0555 was being investigated?" Captain Lugo replied, "For a portion of the time, it was being investigated. My understanding is yes, I was assigned as the PSB Commander." Sergeant Olshaskie clarified that when the investigation began, Captain Lugo was assigned to  District 6 in Queen Creek. Captain Lugo confirmed, "Correct. When it started."

Sergeant Olshaskie asked, "My understanding is that you filed a complaint against Engelbeck. Is that correct?" Captain Lugo replied, "I don't think that's correct." When asked who filed the complaint, Captain Lugo stated, "I believe that I filed a… memorandum… reporting his deficiencies amongst other issues… for him to not successfully complete his promotional probation as a Lieutenant… somebody in the chain of command… I don't know who… decided to initiate an IA over a portion of what I submitted for him to not successfully complete his promotional probation for his performance deficiencies that included the insubordination issues and the, and the truthfulness issues." Captain Lugo continued, "I was then summoned… for that initial interview with Sergeant Leatham at the PSB, where I was then… asked questions about portions of my memorandum. And all about the insubordination. So I don't think I ever actually filed a formal complaint. I answered questions and, uh, responded to the actual interview request. Um, the decision to do that was not mine."

Sergeant Olshaskie asked if Captain Lugo was later assigned as PSB Commander. Captain Lugo responded, "Yes. February of 2021, I believe." When asked if he oversaw the investigation, Captain Lugo replied, "If your definition of oversee is to have any involvement with, no… Was I aware that it was there, uh, being investigated? Um, yes, I was. Um, we have various reporting mechanisms to report on, you know, assigned cases, who has what case… Any investigatory action or decisions… With one exception… There was a memorandum that should be in that case file that… the investigator, I believe, uh, Sergeant Leatham… requested to add a CP5 or a truthfulness allegation to the case, which normally… required at the time the PSB commander's

46REPORT000834

approval or the chief deputy's approval, or the chief of administration's approval. That's the only people that could, per policy at that time… authorize a truthfulness violation allegation to be investigated. So that memorandum came across my desk, and I don't have any reason to believe it wouldn't be in the case file… I, uh, wrote on there, and I don't know if I'm using the right term, but recused myself and sent that to the Chief of Administration… She ultimately made that decision and forwarded that back to the investigator… So I made no ruling, determination, or any, uh, action on that. So other than that… the investigation I knew was… going on. I was apprised of a day they were interviewing… Engelbeck in the building… And I made sure I wasn't at the building."

Captain Lugo explained that upon case completion, he received the file and delivered it to Chief Caputo: "I didn't even open it, didn't look at it… I physically hand-delivered it to Chief Caputo at the time and said, 'Here's the case. When you're done with it… Let me know and I'll have somebody pick it up'… To take it through its next process, whichever way it goes." He stated, "I did not even know… didn't even look at it. Don't, didn't even know the findings."

Sergeant Olshaskie asked, "Is that entire case file uploaded into IAPro, to include the audio and video recorded interviews?" Captain Lugo explained, everything is uploaded to IAPro as the case is worked. He stated that the audio and video also get uploaded to evidence.com.
When asked if the case file would still be in IAPro and evidence.com, Captain Lugo stated, "I have no reason to say why it wouldn't." He confirmed his interview was conducted at the PSB building and would be in evidence.com and IAPro.

Sergeant Olshaskie asked, "Were you notified when Engelbeck filed his Appeal of Disciplinary Hearing?" Captain Lugo replied, "I was notified… by Neil Landeen, who works for the Maricopa County Attorney's Office."

Sergeant Olshaskie asked about the process for compiling and providing the case file upon appeal. Captain Lugo explained that the PSB Commander "Signs the findings pages as the PSB Commander. Whatever he signs says, uh, you know, 'Sustained, not sustained' whatever on each allegation. Then… we make sure everything matches up for our legal, or our court compliance, that we have everything. We didn't miss anything. It goes to the Conduct Resolution section, which is a completely separate entity from PSB… Conduct Resolution reviews it for legal compliance of HR matters. They are the ones that then prep the material for the appointing authority… They actually apply the finding. They give… a range of discipline that comes to the PSB Commander to then have to make a determination on." Captain Lugo continued to explain, "So Conduct Resolution becomes involved in the case. They say, 'Hey, here's other similar cases. This is that policy violation. This is what it was. PSB Commander, what do you want to say as the range of discipline?' There's communication back and forth on that. In this case, that happened with Caputo. And that should be in the case file. Then Conduct Resolution says, 'Okay, thank you.' They don't make any decisions there. They just prep the paperwork. They then prepare it for the appointing authority. They go through that process all completely outside of PSB. And then, of course, in this case, he files his appeal. Um, I believe I haven't looked at it

in some time. The person he's required to file the appeal with is a county entity, the Merit Commission… I believe that's where he's required to notify. I think he can notify Conduct Resolution. But in this process of setting up the meetings with even the appointing authority, that's all done by the Administrative Services Division, which covers Conduct Resolution… They handle the scheduling of the hearing and all of that… They're the ones who get notified from Neil Ladeen's group. This employee filed an appeal, we're accepting the appeal, meaning it met the… the criteria, and then they start working together to provide whatever it is they're required to provide."

When asked if PSB is notified or involved in providing the case file, Captain Lugo stated, "PSB has zero involvement whatsoever, including the investigator and the PSB Commander." He added, "I don't think I was ever advised of what they provided or that there was a request to provide in any merit hearing."

Sergeant Olshaskie stated, "It sounds like you were completely uninvolved in any process of supplying any records for the appeal." Captain Lugo said, "Correct."

Sergeant Olshaskie asked if he had given directions to anybody not to provide the videos or the audio recordings. Captain Lugo replied, "No."

Sergeant Olshaskie asked Captain Lugo if he had benefited in any way since the case was dismissed or overturned. Captain Lugo replied, "No."

46REPORT000836

CONFIDENTIAL - ATTORNEY'S EYES ONLY

## Maricopa County Sheriff's Office
### Administrative Investigations Process Checklist

| IA # | IA2020-0555 | Date Complaint Received: 10/03/2020 |
|---|---|---|
| Assigned Investigator: | Sgt. Robert Leatham S1462 | Date Submitted by Investigator: 02/22/2024 |

| | | YES | NO | N/A | Initial | Date |
|---|---|---|---|---|---|---|
| 1. | Was the complaint/allegation documented in detail on a Complaint Acceptance Report *(Attachment A or B)*, or BlueTeam/IAPro Report *(Sheriff's Internal Complaint Form)*? | ☒ | ☐ | ☐ | RKL | 02/22/2024 |
| 2. | If an **External** complaint, was the initial complaint intake audio recorded and uploaded to BlueTeam/IAPro? | ☐ | ☐ | ☒ | | |
| 3. | Was the Principal's Prior Work History Report reviewed? *(will be uploaded to BlueTeam/IAPro by PSB within 5 days of complaint)* | ☒ | ☐ | ☐ | | |
| 4. | Were all items gathered during the Preliminary Inquiry reviewed and uploaded (or submitted with hard copy file) to BlueTeam/IAPro? *(includes review of EIPro, IAPro, BlueTeam, Traffic Stop Data, CAD, Video, BWC, Social Media Postings, Other)* | ☒ | ☐ | ☐ | | |
| 5. | Were all interviews with Complainant(s) recorded and uploaded (or submitted with hard copy file) to BlueTeam/IAPro? *(if an employee, include Garrity Warning, Notice of Investigation and Observer forms provided, signed and uploaded to BlueTeam/IAPro)* | ☒ | ☐ | ☐ | | |
| 6. | Were all interviews with Witness(es)/Investigative Lead(s) recorded and uploaded (or submitted with hard copy file) to BlueTeam/IAPro? *(if an employee, include Garrity Warning, Notice of Investigation and Observer forms provided, signed and uploaded to BlueTeam/IAPro)* | ☒ | ☐ | ☐ | | |
| 7. | Were all interviews with the Principal(s) recorded and uploaded (or submitted with hard copy file) to BlueTeam/IAPro? *(including Garrity Warning, Notice of Investigation and Observer forms provided, signed and uploaded to BlueTeam/IAPro)* | ☒ | ☐ | ☐ | | |
| 8. | Prior to the conclusion of the Principal interview, was the Principal offered an opportunity to make a statement not to exceed five minutes? | ☒ | ☐ | ☐ | | |
| 9. | Was the Supervisor(s) notified that the employee(s) under their supervision was summoned as part of the administrative investigation and facilitate their appearance? | ☐ | ☒ | ☐ | | |
| 10. | Did ALL employees cooperate with the investigative process? | ☒ | ☐ | ☐ | | |
| 11. | Does this investigative file contain the following: | | | | | |
| | A. Administrative Investigations Process Checklist | ☒ | ☐ | ☐ | RKL | 2/22/2024 |
| | B. Findings Page | ☒ | ☐ | ☐ | | |
| | C. Prior Work History Report *(EIPro, IAPro, BlueTeam & Personnel files, Other)* | ☒ | ☐ | ☐ | | |
| | D. Cover Sheet/Investigative Report | ☒ | ☐ | ☐ | | |
| | E. Attachments *(Complaint Form/Attachment A or B, NOIs, Garrity, Observer forms, Other Documents, CDs/DVDs)* | ☒ | ☐ | ☐ | | |
| 12. | Was this routed through the chain of command to the Division Commander for review and signature? | ☒ | ☐ | ☐ | | |

13. If "**NO**" or "**N/A**" was checked above, provide brief explanation for each. *(provide detailed explanation in Investigative Report)*
Complaint was not external; Engelbeck's supervisor was not made aware that the first interivew was taking place.

_____

14. Were any policy, training, tactical or equipment concerns identified? **Yes/No** If Yes, explain how it was addressed.
A policy update in 2022 made it a requirement for GPS to be left on for Patrol.   A request was submitted to BIO to conduct audits/inspecations for GPS units and for vehicle mileage being entered at the start/end of patrol shifts.

15. After the Division Commander has reviewed and signed, the printed investigative file must be delivered to PSB.

### PSB use only

| | | |
|---|---|---|
| Date Initial letter sent: | 60/85 Day Extension Memo:  Y / N / NA | Date approved: |
| Date Final Disposition letter to complainant: | 180 Day Extension Memo:    Y / N / NA | Date approved: |
| Date Closed Notification to IL's/Witnesses: | Date all attached videos uploaded: | |
| Date Closed Notification to Principal: *(Exonerated/Unfounded/Not Sustained)* | Date all other attachments uploaded: | |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555
## COVERSHEET/INVESTIGATIVE REPORT

**Date of Incident:**          10/03/2020

**Location of Incident:**      **Various Locations in Queen Creek and Gilbert, AZ**

**Date of Complaint:**         10/03/2020

**Date Investigation Initiated:**  10/03/2020

**Unavailable Dates:**         **N/A**

**Date Investigation Completed**:   02/22/2024

**Assigned Investigator:**     Sgt. Robert Leatham S1462
                               Professional Standards Bureau

**Investigator Signature:** _Sgt. R. L_____ S1462_          Date: _02/22/2024____

**I have reviewed this investigative report:**

**Supervisor Signature:** _LT. _____, 1529_     Date: _3-11-24_
                          Lt. Edward Romney S1529

**Commander Signature:** _MMM (S235)_ Date: _06/12/2024_
                         ~~Captain Gregory Lugo S1480~~
                         Executive Chief Michael V. Caputo S2351

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT5006898

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

## INVESTIGATIVE REPORT

**Complainant(s):**   **Captain Gregory Lugo S1480**
Commander
Professional Standards Bureau
G_Lugo@mcso.maricopa.gov

**Witness(es):**   **N/A**

**Investigative Lead(s):**

**Lisa Leitch (Data Only)**
Business Systems Manager

**Ashley "AJ" Hinton B2343**
MCSO Technology Bureau
MDC Lead Tech

**Margaret "Maggie" Montoya-De La O**
MCSO Technology Bureau
Business systems analyst/ CAD administrator

**Gerson Wright B5579**
MCSO Technology Bureau
Software Architect

**Principal #1:**   **Aaron Engelbeck S1673**
District I
Patrol Supervisor

**Allegation #1:**   **It is internally alleged Lt. Engelbeck was insubordinate when he failed to follow a direct order when he was not within the boundaries of District VI as ordered by his Captain.**

**Policy #1:**   **CP-2.3, Code of Conduct** (Effective 07/30/2020)

39. **Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility.* The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

**Allegation #2:**   **It is internally alleged Lt. Engelbeck was untruthful by entering "QCK" as his location when he was not physically located in Queen Creek.**

**Policy #1:**   **CP-5.1.C, Truthfulness** (Effective Date 09/11/2020)

---

Investigator:   Sgt. R. Leatham S1462

Reviewer:  Capt. G. Lugo S1480

46REPORT000839

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

C. Employees shall not make false official records or enter or cause to be entered into any books, logs, records, reports, or electronic documents any inaccurate, false, or improper information or material for the purpose of deception.

**Allegation #3:** **It is internally alleged that Sgt. Engelbeck lied to PSB investigators about activating the GPS tracker in his MDC after he admitted to turning it off.**

**Policy #1:** **CP-5.1.A, Truthfulness (Effective Date 09/11/2020)**

A. Employees shall not lie or make a false statement relative to a material fact for the purpose of deception, during the course of an official investigation.

**Allegation #4:** **It is internally alleged Lt. Engelbeck was insubordinate when he deactivated the GPS on his MDC.**

**Policy #1:** **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

**Allegation #5:** **It is internally alleged Lt. Engelbeck was insubordinate when he intentionally avoided going to the District VI substation, as ordered by Captain Lugo.**

**Policy #1:** **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

**Just Cause:** According to MCSO Training records Aaron Engelbeck S1673 completed a mandatory review and acknowledgment of MCSO Policy **CP-2, Code of Conduct** (***Effective date 07/30/2020*** ) on 07/30/2020. This record can be found in EI Pro under record #**TRN2020-00381878**.

**In addition to the listed policies, this investigation will attempt to identify concerns with equipment, policy, tactics and training. If deficiencies are found they will be addressed in the body of the investigation. Unless noted, there were no weapons used in this incident. This case will also be assessed for criminal conduct. If elements are found or uncovered, the file will be sent to Criminal Internal Affairs for review.**

Investigator:   Sgt. R. Leatham S1462          Reviewer:   Capt. G. Lugo S1480

46REPORT5000840

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

**IAPro Attachments:**

**Complaint Intake:**
IA2020-0555 New IA Notification Commander  (pdf)
Lugo Axon_Interview_-_Interview_Room_2020  (mp4)
Lugo admin forms  (pdf)
Demotion Recommendation Memo Supplement 10132020  (pdf)
Engelbeck Recommendation for Demotion Memo
Engelbeck Action History  (pdf)

**Documents:**
041520 Expectations meeting list  (docx)
Email Lugo to Engelbeck  (pdf)
Lugo Meeting Notes 09182020  (pdf)
SN2020-00019122 Lugo to Engelbeck  (rtf)
Engelbeck  Nov 2020 CAD__UnitHistory  (xlsx)
Engelbeck Dec 2020 CAD__UnitHistory  (xlsx)
Engelbeck Oct_ 2020 CAD__UnitHistory  (xlsx)
Engelbeck Sept 2020 CAD__UnitHistory  (xlsx)

**Engelbeck Interviews:**
IA2020-0555 Audio Interview 01-31-2024 - Engelbeck  (m4a)
IA2020-0555 Engelbeck MDC Retrieval  (mov)
IA2020-0555 NOI - Obs Waiver - Garrity - Engelbeck  (pdf)
IA2020-0555 Video Interview 01-31-2024 - Engelbeck  (mp4)
Engelbeck - Morin admin forms  (pdf)
Engelbeck Axon_Interview_Room_2020  (mp4)
IA2020-0555 2nd PSB Interview Confirmation - Supervisor Notification - Principal - Engelbeck

**Technology Bureau Interviews:**
IA2020-0555 Audio Interview 01-17-2024 - Wright  (m4a)
IA2020-0555 NOI - Obs Waiver - Wright  (pdf)
IA2020-0555 PSB Interview Confirmation - Supervisor Notification - IL - Wright  (pdf)
IA2020-0555 Video Interview 01-17-2024 - Wright  (mp4)
IA2020-0555 Audio Interview 01-16-2024 - Montoya-De La O  (m4a)
IA2020-0555 NOI - Obs Waiver - Montoya-De La O  (pdf)
IA2020-0555 Video Interview 01-16-2024 - Montoya-De La O  (mp4)
IA2020-0555 PSB Interview Confirmation - Supervisor Notification - IL - Montoya-De La O  (pdf)
IA2020-0555 - GPS Info Form Hinton  (pdf)
IA2020-0555 - NOI - Obs Waiver - Hinton  (pdf)
IA2020-0555 Audio Interview 01-09-2024 - Hinton  (m4a)
IA2020-0555 Video Interview 01-09-2024 - Hinton  (mp4)
AJ Hinton PSB Interview conformation for IA2020-0555  (pdf)
2 Axon videos: MDC Exam with AJ Hinton

---

Investigator:   Sgt. R. Leatham S1462            Reviewer:  Capt. G. Lugo S1480

46REPORT900841

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
IA #2020-0555

**GPS Data:**
Email request to Margaret Montoya-De La O   (pdf)
01-2021 S1673 UH   (pdf)
11-2020 S1673 UH   (pdf)
12-2020 S1673 UH   (pdf)
A607 09042020 GPS Map   (mp4)
A607 09182020  GPS Map (mp4)
A607 09192020   GPS Map (mp4)
A120_2020-11-17 0000_2020-11-19 2359_GPS   (txt)
A120_2020-11-23 0000_2020-11-26 2359_GPS   (txt)
A120_2020-11-30 0000_2020-11-30 2359_GPS   (txt)
A120_2020-12-01 0000_2020-12-03 2359_GPS   (txt)
A120_2020-12-07 0000_2020-12-10 2359_GPS   (txt)
A120_2020-12-14 0000_2020-12-17 2359_GPS   (txt)
A120_2020-12-21 0000_2020-12-24 2359_GPS   (txt)
A120_2020-12-21 0000_2020-12-24 2359_GPS (002)   (pdf)
A120_2020-12-28 0000_2020-12-31 2359_GPS   (txt)
A120_2021-01-04 0000_2021-01-07 2359_GPS   (txt)
A120_2021-01-11 0000_2021-01-14 2359_GPS   (txt)
A120_2021-01-20 0000_2021-01-20 2359_GPS OFF  (txt)
B120_2021-01-18 0000_2021-01-19 2359_GPS With S2089 ON   (txt)
B120_2021-01-21 0000_2021-01-21 2359_GPS with S2089 ON   (txt)
B120_2021-01-25 0000_2021-01-27 2359_GPS with S2089 ON   (txt)
C120_2021-01-28 0000_2021-01-28 2359_GPS OFF   (txt)

**Engelbeck Unit Histories:**  09/04/2020 – 10-03/2020 (PDF)
**Engelbeck Door card swipe histories** 09/04/2020

**Queen Creek Contract:**
IA2020-0555 Queen Creek Town Contact Request   (pdf)
Queen Creek IGA Eff 1_1_2019_Signed   (pdf)

**Extension Memos:**
IA2020-0555 180 Day Notice 03222023 GL   (pdf)
IA2020-0555 180 Day Notification 03222023   (pdf)
IA2020-0555 180 092322  RKL ER GL   (pdf)
IA2020-0555 180 Day Notification 09232022   (pdf)
IA2020-0555 180 Day Notification 03272022   (pdf)
IA2020-0555. 180. Engelbeck 032722. RKL  ER GLr   (pdf)
IA2020-0555 180 Day Notification 09282021   (pdf)
IA2020-0555. 180. Engelbeck 092821. RKL.GLr   (pdf)
IA2020-0555 180 Day Notification 04012021   (pdf)
IA2020-0555 180 Engelbeck 040121 RKLr   (pdf)
IA2020-0555 85 122720 RL VHr   (pdf)

---

Investigator:   Sgt. R. Leatham S1462                Reviewer:  Capt. G. Lugo S1480

46REPORT000842

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

**PSB Prior Work History Report Engelbeck**  (doc)
**IA2020-0555 CP-5 Memo GPS Deactivation RL MC AS**  (pdf)
**Just Cause - TRN2020-00381878 CP-2 Engelbeck**  (pdf)

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORTS000843

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

**Synopsis:**

On 10/03/2020, it was internally alleged that Lt. Engelbeck was not following orders from his Division Commander, Captain Lugo, which involved being within the boundaries of District IV (Queen Creek) during his shift and being at the District VI substation when not on calls for service. It was also internally alleged Lt. Engelbeck failed to accurately enter his work locations into CAD. Rather than enter an accurate location, Lt. Engelbeck would enter his location in CAD as "QCK", which is an abbreviation for Queen Creek. Additional allegations of misconduct that are internally alleged involve the inaccurate work locations were entered by Lt. Engelbeck into the CAD system to be intentionally deceptive about his location while on duty. It was also internally alleged that Lt. Engelbeck intentionally turned off his MDCs ability to track his location with GPS so his Captain would not know where he was. It was internally discovered and alleged that Lt. Engelbeck's GPS was deactivated on 09/19/2020, one month prior to his first interview with PSB and during that interview he admitted to turning off his GPS to see if it would work, but he was not sure if he turned it back on. This resulted in an additional allegation of misconduct where it was alleged Engelbeck lied to PSB investigators during his first interview. Engelbeck was interviewed for a second time on 01/31/2024 and during that interview it was confirmed the GPS tracker on his MDC was still deactivated. Additional allegations of misconduct were added to this investigation which stemmed from factual data obtained from the MCSO Technology Bureau. Those allegations involve the intentional deactivation of his GPS system so his location could not be detected, and intentionally avoiding the District VI substation in order to avoid being around Captain Lugo, even though he had been given a direct order to be at the District VI substation when not on calls for service with Patrol Deputies.

**Investigation:**

On 10/03/2020, the Professional Standards Bureau received an internal complaint from District VI Patrol Captain G. Lugo S1480 reference Lieutenant Aaron Engelbeck's failure to follow direct orders and entering inaccurate locations for himself into the MCSO CAD system. Captain Lugo alleged the inaccurate location entries in the CAD system were intentionally done in order for Engelbeck to make it look like he was in his area of responsibility, when in fact, he was outside of the District VI boundaries.

As a part of a performance related issue, which resulted in Engelbeck's demotion from Lieutenant (probationary) back to Sergeant, Captain Lugo authored a memo which addressed Engelbeck's performance issues. The memo also contained internally discovered allegations of misconduct that initiated this administrative investigation.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT0000844

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Rather than summarize Captain Lugo's memo, I will insert it the parts of the memorandum that pertain to the allegations of misconduct. I will leave out the performance issues which were related to Engelbeck's demotion. The entire memo has been uploaded to this case file in IAPro, where it can be read in its entirety.

The portion of Captain Lugo's memo that contained the allegations of misconduct have been inserted below.

Work Locations/Assignment/Requirements
  o For the past couple of weeks, the increasing pattern of Lieutenant Engelbeck not being present in the District 6 Substation for significant periods of time had been observed. During these increasingly observed longer periods of time it was further noted that it did not appear that Lieutenant Engelbeck was on any significant call for service and per the CAD, Lieutenant Engelbeck was listed as out of service for supervisor administrative duties with a location of "QCK." It should be noted that informally, at least two of Lieutenant Engelbeck's direct reports also relayed to me indications that Lieutenant Engelbeck was not frequently in the office. These statements were provided when the supervisors were directed to route information and/or consult with their lieutenant regarding a work-related issue/matter.
  o On 09/04/2020 I was on-duty at the District 6 Patrol Substation conducting official business and had multiple issues to discuss with Lieutenant Engelbeck, the on-duty District 6 Patrol Lieutenant. However, Lieutenant Engelbeck was not seen in/around the substation. It should be noted that on 09/04/2020 there were extensive computer outages making various applications including CAD inoperable limiting the ability to complete work from an MDC. At approximately 1330 hours, I reached out to Lieutenant Engelbeck inquiring as to if he was coming to the office on this date via text message. Lieutenant Engelbeck responded via text stating the following "I can. Need to go over some stuff? I'm five minutes away." I indicated in the affirmative and he subsequently responded to the District 6 Patrol Substation where we met and discussed various issues some of which were previously referenced.
  o On 09/18/2020, the on-duty patrol sergeant (Sergeant Yager) for District 6 was scheduled to attend mandatory block training for the first portion of the shift. Lieutenant Engelbeck was filling in as the on-duty patrol sergeant while the sergeant attended the mandatory training. The mandatory training course began at the MCSO Training Center at 0700 hours and the patrol sergeant checked off on CAD that he was en-route to the training center at 0526 hours. The CAD data for the patrol supervisor (A650) shows radio being advised that Lieutenant Engelbeck (A607) was covering starting at approximately 0536 hours. Upon logging on to start the day at approximately 0747 hours, I noticed there was a vehicle crash incident that was currently being worked by District 6 Deputies. The location and circumstances of the incident which included a major traffic throughfare in the Town of Queen Creek, the closure of lane(s) of traffic, and the involvement of a school bus in the vehicle collision incident classify this incident as requiring supervisory notification to me. The incident (MC20183031) began at approximately 0633 hours, was still being worked, and no notification had been provided. I noticed on the CAD system that Lieutenant Engelbeck (A607) was logged on and checked off with the code of "SUPERADMIN" and a location of "QCK." However, when looking at the map representing the GPS location of his whereabouts, it showed him at a location near Harmony Ave / Frye Rd, Gilbert. This location is consistent with Lieutenant Engelbeck's home address of 2779 S. Harmony Ave, Gilbert. I continued to periodically monitor the GPS location per the map which continued to display that

Investigator:   Sgt. R. Leatham S1462                     Reviewer:  Capt. G. Lugo S1480

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Lieutenant Engelbeck continued to be at the same location near Harmony Ave / Frye Road for approximately an additional hour.
- It should be noted that Lieutenant Engelbeck's home address of 2779 S Harmony Ave, Gilbert is approximately 5 miles from the northwest boundary of Lieutenant Engelbeck's area of responsibility within the Town of Queen Creek (District 6).
- It should be further noted that from approximately 0530 hours until approximately 0800 hours when I was within the Town of Queen Creek boundaries, there was no only no command level employee within the Town of Queen Creek, but no on duty supervisor within the Town of Queen Creek.

o Throughout the duration of 09/18/2020 while working at the District 6 Patrol Substation, I noticed that Lieutenant Engelbeck was not present. Other than being in a separate area of the building for approximately one hour, I did not see Lieutenant Engelbeck. Upon checking/reviewing CAD I noticed that Lieutenant Engelbeck did not check off on any calls for service/incidents the entire day. However, he was checked off per CAD as being in "QCK."

o On 09/18/2020 at approximately 1402 hours I sent Lieutenant Engelbeck a text message asking if he was coming to the office today. After approximately 36 minutes of not receiving a response, I attempted to contact Lieutenant Engelbeck via his county issued cellular telephone. Upon calling the telephone number I could hear the telephone ringing simultaneously in Lieutenant Engelbeck's office. Following this discovery, I called Lieutenant Engelbeck on his personal cellular telephone number. Lieutenant Engelbeck answered the telephone and I advised him I needed him to come to the office as I needed to go over some items with him. I mentioned that I attempted to text and call him on his other phone and as I began stating that I heard the phone in the other room, Lieutenant Engelbeck verbally responded that he put his phone in vibrate mode in class (referring to the prior training day) and he forgot to turn vibrate mode back off. This statement and response appeared deflective but were not explored further at that time.

o During a performance meeting on 09/18/2020 at approximately 1445 hours, that was previously referenced in this memorandum, I inquired with Lieutenant Engelbeck as the vehicle accident incident. Lieutenant Engelbeck indicated that he thought that the incident began before the sergeant (Sergeant Yager) had left for training. He assumed that Sergeant Yager had provided the necessary notification. Lieutenant Engelbeck also verbalized that he did not know the incident involved a school bus and recalled being advised via the radio that the roadway had been cleared. Lieutenant Engelbeck did not have an explanation as to why the notification process had not been completed other than to say that he did not recall all of the items on the notification list. The list he is referencing is a previously provided mandatory notification list for supervisors/command assigned to District 6. Lieutenant Engelbeck was further reminded of the importance of the notification process and later provided another copy of the notification list via email on 09/19/2020.

o Additionally, during the performance meeting on 09/18/2020 I reminded Lieutenant Engelbeck of the requirement to be within the Town Limits of Queen Creek during while on duty. I also further provided the verbal directive that Lieutenant Engelbeck was now required to be in the District 6 Patrol Substation when he was not on a call for service or otherwise assisting patrol deputies/staff with matters. His physical presence was now required to be available for deputies, sergeants, administrative staff, the public, and myself to be able to troubleshoot matters and answer questions. Lieutenant Engelbeck indicated he understood and verbalized that his supervisors have his phone number. I reiterated the directive and informed Lieutenant Engelbeck that he needs to be here (at the District 6 Patrol Division) as we cannot constantly be calling him. Lieutenant Engelbeck did not have any additional questions, problems, or concerns regarding this directive when asked.

o It should be noted that at Lieutenant Engelbeck has never requested or been given authorization to work his shift as a patrol lieutenant from his residence or outside his area of responsibility. The importance/requirement of having patrol lieutenant/command coverage within the respective area of responsibility has been relayed countless times with Lieutenant Engelbeck. Lieutenant Engelbeck has demonstrated his awareness of this requirement and the importance of having command coverage every time that he has requested time off from work and/or to attend training and command coverage was discussed.

---

Investigator:   Sgt. R. Leatham S1462

Reviewer:  Capt. G. Lugo S1480

46REPORT000846

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

# MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

○ The notification requirement process, the directive to be within the Town Limits of the Queen Creek while on duty, the requirement for the lieutenant to properly document their activities in CAD with accurate location information, and the requirement of notification of departing the Town Limits during the work shift were all relayed formally (in addition to occasional verbal reminders/discussion), at an expectation meeting on 04/15/2020 as well as at a follow up confirmation to the expectations of the 04/15/2020 meeting on 05/13/2020. The expectation meeting minutes were also provided in writing to Lieutenant Engelbeck and entered in the EIS for future reference following the 04/15/2020 meeting.

○ On 09/19/2020 at approximately 0830 hours I accessed the MCSO CAD via the I-Net Viewer Application to follow up on the directive given to Lieutenant Engelbeck the prior day (09/18/2020) regarding him being present in the Town of Queen Creek. Upon reviewing the GPS location information, it was observed that Lieutenant Engelbeck remained in the area of Harmony Ave / Frye Road, Gilbert since the time he logged on for duty that day (approximately 0650 hours). He also checked off in the CAD by manually entering a location of "QCK" at approximately 0650 hours. The location of "QCK" is not consistent with the GPS location information captured. Furthermore, per the CAD history, Lieutenant Engelbeck did not respond or check off on any calls for service/incidents throughout the entire shift of 09/19/2020.

○ In order to confirm the accuracy of the information observed via the MCSO I-Net View Application, the CAD administrator Lisa Leitch was contacted and the GPS information was requested for Lieutenant Engelbeck (A607) on 09/18/2020 and 09/19/2020. The observations noted above were confirmed and provided in written form and in a video file. The written form documents the following GPS location of Lieutenant Engelbeck's MDC for 09/18/2020 and 09/19/2020.

- 09/18/2020:
  - From log on time (0631 hours) until approximately 0841 hours he was located at 2779 S Harmony Ave, Gilbert
  - 0905 hours to 1008 hours – 20727 E Civic Parkway (District 6 Substation)
  - 1014 hours to 1123 hours – 21051 S Ellsworth Loop Road
  - 1126 hours to 1441 hours – Southside of Rittenhouse Road, West of Ellsworth Loop Road
  - 1447 hours to 1703 hours – 20727 E Civic Parkway (District 6 Substation)
  - 1725 hours to 1738 hours – 2779 S Harmony Ave, Gilbert
- 09/19/2020
  - From log on time (0650 hours) until approximately 0944 hours he was located at 2779 S Harmony Ave, Gilbert
  - 1004 hours to 1105 hours – 20727 E Civic Parkway (District 6 Substation)
  - 1119 hours to 1128 hours – 20770 E Victoria Lane
  - After 1128 hours there are no GPS records

○ The ID Card access log for the District 6 Patrol Substation was obtained from the Town of Queen Creek. The log is available for review and confirms the times in which Lieutenant Engelbeck had accessed the parking area and/or the building at the District 6 Patrol Substation as represented in the GPS CAD data/logs above. It should be noted that Lieutenant Engelbeck was provided with the access card formally issued to Lieutenant Banks which is why the log show Lieutenant Banks' name and not Lieutenant Engelbeck's name. The name was not updated in the Town of Queen Creek's database.

The supporting documentation/records for the above listed circumstances/situations/incidents that are not already included in the MCSO EIS or probationary period employee performance appraisal are available for further review/submission.

The above outlined circumstances/observations regarding the performance of MCSO Lieutenant Aaron Engelbeck #1673 over the past six-month period have demonstrated his inability to fulfill some of the most fundamental responsibilities of the job description of a lieutenant. Despite repeated formal training, policy mandates, directives,

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPeGTo00847

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

and reminders, Lieutenant Engelbeck has demonstrated a pattern of blatant disregard for deadlines, and directives, rising to the level of insubordination. Furthermore, his unwillingness to accept responsibility for these performance issues and his attempts to deflect responsibility as a probationary lieutenant are further troubling. Therefore, it is recommended for Lieutenant Aaron Engelbeck to be released/demoted from his probational probationary period returning to his former rank of Sergeant.

Nothing further.

The IAPro case file for this investigation included Captain Lugo's written complaint as well as a second memo which was written as an addendum to the first memo and used to document Engelbeck's performance issues that resulted in his demotion from Lieutenant to Sergeant. According to MCSO records, which have been uploaded to this case file in IAPro, that demotion occurred on 10/12/2020.

Due to the fact that Engelbeck had been demoted for failing to complete tasks required of a Lieutenant, there had to be a separation of the items that were considered performance issues and the allegations of misconduct. Ultimately the topics Captain Lugo identified as issues that resulted in Engelbeck's demotion, were not investigated as allegations of misconduct.

In order to better understand what the allegations of misconduct are, an interview with Captain Lugo took place on 10/15/2020, at the MCSO PSB office. When it came to scheduling Captain Lugo's interview, I contacted him directly, by phone, and scheduled the interview. When I scheduled the interview with Captain Lugo, I failed to notify his direct supervisor, Chief Cory Morrison, that the interview was going to take place.

### Request of GPS data for Engelbeck's vehicle:

Because Captain Lugo's written complaint documented Engelbeck not being located within his area of responsibility as directed by Lugo, I submitted a request to Lisa Leitch for that data. Lisa Leitch, who is now retired, was the administrator of the MCSO CAD program and was used as a source of data to obtain vehicle GPS data for this investigation. Lisa was not interviewed and was only used to obtain data. The emails sent to her that requested this information have been uploaded to this case file in IAPro.

Lisa Leitch responded to my request and provided me with the GPS data for Engelbeck's patrol vehicle on 10/14/2020. The requested GPS data were from 09/04/2020, 09/18/2020 and 09/19/2020. These dates were requested because they are the dates Captain Lugo identified as being the day he first noticed Engelbeck was at his house and not within the District VI boundaries (09/04/2020). 09/18 and 09/19 were the other dates specific to the allegations made by Captain Lugo where Engelbeck was at his house and not in District VI after he was given a direct order by Lugo to be in town during his shift.

---

Investigator:  Sgt. R. Leatham S1462                          Reviewer:  Capt. G. Lugo S1480

46REPOST000848

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

When the GPS data was obtain from Lisa it showed Engelbeck remained at his residence in Gilbert for extended periods of time after he logged in for work. The GPS data showed this occurred on 09/04, 09/18 and 09/19/2020.

While in the process of completing this investigation, in late 2023, additional GPS data was requested in December 2023, from Margaret Montoya – De La O, who took over Lisa Leitch's assignment when Lisa retired. The additional information was requested because during the review of Engelbeck's GPS data that was obtained from Lisa, it was discovered the GPS for Engelbeck's vehicle stopped transmitting on 09/19/2020 at 11:28 hours. This was in the middle of his shift while he was in Queen Creek. His GPS remained off for the remainder of his shift. The additional GPS information I requested from Margaret was requested to determine when Engelbeck's GPS began transmitting again. It was discovered by Margaret that Engelbeck's GPS was never turned back on.

A more detailed summary of the GPS data will be completed farther along in this report.

### Complainant Interview: Captain G. Lugo S1480 10/15/20

*The following is a summary of the interview with Captain Lugo on 10/15/2020 at approximately 10:30 hours at the MCSO PSB offices. The interview was audio/video recorded and uploaded to this case file in IAPro. Sgt. Alex Frank S1455, who is assigned to PSB, sat second chair for this interview. This interview took place during the COVID-19 pandemic, which resulted in face masks being worn by all participants.*

On 10/15/20, at about 10:30 hours, Captain Lugo arrived for his scheduled interview as the complainant for this investigation. Upon arrival, he was escorted to interview room 2020, where he was provided his notice of investigation (NOI) and the observer waiver memo. He was also provided with a copy of a lengthy memo, approximately ten pages, he wrote explaining the reasons for the demotion of Lieutenant (Lt.) Aaron Engelbeck S1673, back to Sergeant.

In that memo, Captain Lugo documented performance issues which resulted in Engelbeck's demotion from Lieutenant to Sergeant. In the memo, he also documented allegations of misconduct involving insubordination and potential truthfulness. The allegation of insubordination was associated with Engelbeck failing to follow a direct order after Captain Lugo told him to be physically located within the patrol district. Captain Lugo said Engelbeck failed to follow that order and was logged in for work at 06:30 in the area near his home. The allegation of truthfulness was associated with Engelbeck placing himself out of service on his MDC and entering his location as "QCK" (Queen Creek) when he was not actually in Queen Creek.

Before the camera was turned on, I told Captain Lugo this interview would not focus on the performance issues that resulted in Engelbeck's demotion.

---

Investigator:   Sgt. R. Leatham S1462                                 Reviewer:  Capt. G. Lugo S1480

46REPPGR1008845

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Instead, it would focus on the insubordination and truthfulness issues he documented in the memo he submitted as the written complaint that started this investigation. At 10:47 hours, the audio/video recorder was activated, and after Captain Lugo signed the administrative forms, the interview began.

After explaining the purpose of the interview, I asked Captain Lugo to explain how Engelbeck was insubordinate and why the inaccurate locations were documented in his memo. Captain Lugo understood the need to avoid the performance issues but explained he would need to use some of the information related to some of those performance issues to explain what led up to the insubordination and discovery of potential truthfulness.

Captain Lugo described how District VI differs from working in other Patrol Districts for the MCSO because it is a contract city. He described it as being similar to a small town police department where the Mayor, Town Council, and Town Manager are all very involved with the MCSO's role as the law enforcement agency for Queen Creek.

Captain Lugo said Engelbeck was promoted to Lieutenant in December of 2019. After a short stint in a different patrol district (District II), he was transferred to District VI in February 2020.

Captain Lugo explained meeting with Engelbeck and the other Lieutenant assigned to District VI simultaneously as Engelbeck. The meeting took place on April 15, 2020, and it was later documented as a supervisor note (SN2020-0019122), which was sent to Engelbeck through the Blue Team database.

During that meeting, he provided both Lieutenants with a list of expectations he had of them, which was also included in the supervisor note Captain Lugo authored as a follow-up to the meeting. He explained that the meeting was because they needed to be aware of the city government's active role within District VI and because he wanted to relay information to them that had been discussed during the MCSO Executive Command and the Captains within the office. Captain Lugo also said the meetings with the Executive Command started before Engelbeck being transferred to District VI.

One of the topics discussed during those meetings was an Office-wide need for Lieutenants assigned to patrol districts to be present and available to assist Sergeants and at their respective patrol offices to assist with administrative tasks. The MCSO Executive Command desired to have Lieutenants available seven days a week. Another aspect associated with Lieutenants was having them work on weekends, which he knew would not be a popular request.

I asked Captain Lugo if the topic was only discussed verbally or if it was documented in an email or some other format. Captain Lugo said the discussion was primarily verbal. Still, some unofficial emails were exchanged about the topic between members of the MCSO command structure.

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPCSET000800

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Along with talking about Lieutenants being available seven days a week, Captain Lugo also stressed that the District VI Lieutenants needed to be physically located within the district boundaries during their shift. By "district boundaries," Captain Lugo meant they needed to be physically located within the Town of Queen Creek. After verbally explaining the requirement for his Lieutenants, Captain Lugo said neither Engelbeck nor the other Lieutenant asked for clarification on being physically located in District VI during their shift.

Once it was verbally explained, Captain Lugo authored the above-mentioned supervisor note.

The following information was found in Captain Lugo's supervisor note when I reviewed it.

The topics highlighted under the "Work Schedules" on the PDF are as follows:

1. *"physically located within the boundaries of District 6, barring having to go take care of an issue, but then return.*

2. *The expectations are to be present in the office, out on patrol, and accessible to patrol supervisors. If not, I need to be advised.*

3. *CAD needs to be accurate pertaining to activity being conducted with location information entered.*

a. *This demonstrates what activities are being conducted*

4. *Should regularly attend briefings*

5. *Should regularly respond to calls for service out in a patrol environment.*

Other items on the list provided to Engelbeck by Captain Lugo pertained to performance objectives and do not pertain to this investigation. A copy of the list of expectations has been uploaded to this case file in IAPro.

Captain Lugo drafted the list of expectations so it would be clear what was expected of the District VI Lieutenants, not just Engelbeck. Concessions were given if either one of them needed to leave District VI.

They simply needed to notify Captain Lugo so he could listen up for any calls that may need the presence of a Commander. Captain Lugo explained how the rule of staying in town during their shift was not a hard and fast rule, and he understood his Lieutenants would have to leave town to complete various tasks. He only asked that he be made aware of the need to leave. To further help me understand the need to have the Lieutenants within the town limits, Captain Lugo described how busy District VI can be, and he, along with the district detectives, will often go out to assist with traffic control during collision investigations or to help with other serious incidents. He expected that if he could take up a position to assist with a vehicle collision, his Lieutenants should also be capable of it.

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT00089

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

After explaining why his Lieutenants were working weekends and how unpopular that decision was, Captain Lugo discussed the issue of Engelbeck not being present within the boundaries of District VI by referring to a commanders meeting that was held in late 2019 or early 2020, where they discussed lieutenants being present within their respective districts during patrol shifts. The discussion involved having lieutenants available seven days a week so they could respond to critical incidents, assist patrol, and handle other issues that might come up.

Captain Lugo was asked to describe any clarification Engelbeck sought after that meeting. He said no clarifying questions were asked.

After explaining the purpose of the April 15th meeting with his Lieutenants, Captain Lugo said Deputy Chief C. Morrison set it up. Chief Morrison, Lt. Engelbeck, Lt. Jakowinicz, and Captain Lugo were all in attendance. That meeting was ultimately deemed to be unproductive, and it resulted in the opening of IA2020-0285. The details of that meeting were not brought up during this interview because they were associated with a separate investigation. However, Captain Lugo said he asked both Lieutenants at the end of that meeting if they needed any clarification on the expectations he had given them the previous month. Both Lieutenants said they did not need additional clarification about Captain Lugo's expectations.

During that meeting, Captain Lugo said he further discussed the expectation/requirement he had of Engelbeck to be present within his area of responsibility. He identified Engelbeck's area of responsibility as being within the town limits of Queen Creek. The expectation of both Lieutenants being within their area of responsibility was given to both Lieutenants assigned to Queen Creek and not just Engelbeck. As Captain Lugo previously stated, it was also an agency-wide change to have Lieutenants working on weekends.

About four months after the May 13th meeting, Captain Lugo said he began to notice Engelbeck was not within his area of responsibility as he had directed.

Captain Lugo utilized the I/Netviewer, which is a web-based version of the MCSO computer-aided dispatch (CAD) program that he could use to view a map of Maricopa County and see the calls for service and the location of patrol vehicles within each patrol district.

While reviewing I/Netviewer, Captain Lugo noticed a pattern developing during Engelbeck's shifts where he was not within the District VI boundary when he should have been. Captain Lugo also noticed Engelbeck was going into the office during his scheduled work week, which was Wednesday - Saturday, 07:00 – 17:00. Captain Lugo understood there were times when the Lieutenants might be late getting to District VI, which was something he did not have an issue with.

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPCST000852

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

As long as he was notified they were running late. Also, knowing their duties might take them away from District VI, Captain Lugo asked to be notified if either of his Lieutenants was leaving. That way he could listen to the radio and respond to any calls that might need a member of District VI command.

Captain Lugo said he would regularly receive notices from Engelbeck that he needed to leave the patrol district. Captain Lugo interpreted those notifications to mean Engelbeck was aware of how important it was for his Lieutenants to be in town and to notify him when they were leaving.

When he realized Engelbeck was regularly not within the patrol district boundaries at the time specified, Captain Lugo began to notice he rarely heard Engelbeck on the MCSO radio. He pointed out that he would frequently hear Lt. Jakowinicz being checked on by the dispatcher but not Engelbeck. Not only did Captain Lugo see Engelbeck was not located within the patrol district when he should have been, but he frequently had to call Engelbeck to get him to the substation to take care of administrative tasks.

Captain Lugo described walking to Engelbeck's office to speak with him and saw he was hardly ever there. He described Engelbeck's office as being located a short distance down the hall from his office. He began to notice the lights were always off, and paperwork placed in the box on the wall next to Engelbeck's office door was undisturbed. These observations resulted in Captain Lugo wondering if Engelbeck was on a call for service, so he would check I/Netviewer to check Engelbeck's location.

When Captain Lugo checked Engelbeck's location, he noticed the GPS on Engelbeck's MDC showed him in the area of East Fry Road and South Harmony Lane in Gilbert. This location was near Val Vista Drive and Pecos Road in Gilbert, and based on MCSO employment records, it was the approximate location of Engelbeck's residence. The location showed Engelbeck was approximately five miles outside of the western boundary of Queen Creek. Captain Lugo began to see Engelbeck's location was frequently seen in a neighborhood near the southwest corner of Hawes Road and Queen Creek Road in Queen Creek.

He would also see Engelbeck stationary for extended periods in the parking lots of two shopping centers located within Queen Creek that were identified as the Queen Creek Marketplace and QC District.

Captain Lugo described Engelbeck's activity at these locations as being "stagnant" for long periods. Captain Lugo said that during his meeting with Engelbeck, he told him he wanted him in the office to address his administrative duties and on patrol to be available for his subordinates. He also explained that Engelbeck's assignment was a Patrol Lieutenant and not an Administrative Lieutenant, so Captain Lugo had an expectation that Engelbeck would respond to calls for service if he was available to do so. However, when he checked Engelbeck's patrol activity logs, he noticed Engelbeck was responding to a few calls for service. Still, the majority of the time, he was stationary for long periods.

Investigator:  Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

During his review of Engelbeck's patrol activities, Captain Lugo noticed Engelbeck was putting himself out on "Admin" or "SuperAdmin" duties on his MDC. He was not utilizing the radio and having the MCSO dispatcher do it for him. Captain Lugo described speaking with Lisa Leitch, one of the MCSO CAD administrators. She told him that when someone enters information into the CAD system from their MDC, such as Engelbeck putting himself out on "SuperAdmin," a dollar sign, "$" is placed next to that person's call sign. This identifies the terminal or computer that was used to enter the information. So, when Engelbeck put himself out on "SuperAdmin" in the "Terminal" column of the CAD print-out, it would show "$A607," and the operator who entered the information would be identified using that person's name. The term "SuperAdmin" was clarified as "Supervisor Admin," a code entered into the CAD system when a supervisor is working on administrative duties.

During the interview, Captain Lugo was given a printed copy of Engelbeck's unit history for the days he described in the memo he authored for the complaint, which initiated this investigation. The CAD histories he provided were for 09/04/2020, 09/18/2020 and 09/19/2020.

Captain Lugo pointed out the "$A607," under the "Terminal" column where Engelbeck made his own entries into his MDC and pointed out the difference between the information when an MCSO dispatcher made the entry versus when Engelbeck made the entry. Those entries are documented with the first and last name of the dispatcher, their serial number, the terminal they were using, and information contained within the "comment" column.

Another piece of information required of MCSO personnel is the entry of an accurate location for everyone using the CAD system. When it came to the accuracy of the GPS in MCSO vehicles, Captain Lugo was aware they were not 100% accurate, so he did not rely purely on the GPS data. That was why he began looking into the calls for service Engelbeck responded to and how infrequently Engelbeck was using his radio.

When Engelbeck was working in his vehicle away from the office, Captain Lugo said he did not have any problems with that as long as he was being productive.

He also explained there were a lot of tasks that Engelbeck had to complete in person, so he had to be present in the substation and not just available by phone.

Another reason why Captain Lugo did not have any issues with Engelbeck working in his vehicle was it would allow him to respond to calls for service faster.

However, as Captain Lugo already explained, Engelbeck was rarely heard on the radio, and he would remain stationary and did not respond to very many calls for service. Captain Lugo's knowledge of how

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000854

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

# MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

many calls Engelbeck responded to was obtained by conducting reviews of his Patrol Activity Logs and checking Engelbeck's locations in the CAD system.

As a pattern of behavior related to Engelbeck's whereabouts and productivity began to develop, it became frustrating for Captain Lugo, the administrative staff, and the sergeants assigned to him. Captain Lugo said the Sergeants and the administrative staff would go to Captain Lugo because they did not know where Engelbeck was.

This resulted in Captain Lugo emailing and calling Engelbeck and asking him to go into the office to take care of tasks that fell under his purview. Captain Lugo explained how he should not have called or emailed Engelbeck to find out where he was so he could do his job. Captain Lugo's observations of Engelbeck's activities showed he needed to pay more attention to Engelbeck's activities and whereabouts.

As Captain Lugo began scrutinizing Engelbeck's locations, he tried not to jump to conclusions. He knew the GPS data was not always 100% accurate, and he did not want to make any assumptions about Engelbeck's location on the map. Captain Lugo began to notice Engelbeck's location was how he would put himself out of service in the CAD system for administrative duties while using the location of "QCK," which is an abbreviation of Queen Creek.

Captain Lugo said the QCK was an entry that had to be manually entered and could not be selected from a drop-down menu. The issue Captain Lugo had with Engelbeck using QCK as his location was the map showed he was in the area of his home near Harmony and Pecos in Gilbert. Per MCSO policy, an accurate location needs to be used, and he was not physically located within his area of responsibility.

Captain Lugo said this pattern went on for about four months before he addressed the fact that Engelbeck was not present within the patrol district or at the District VI substation, as he was instructed during the April 15th meeting. Captain Lugo addressed it in a meeting with Engelbeck on September 18, 2020. He planned to meet with Engelbeck when he arrived at the District VI substation, which Captain Lugo expected to occur at some point during the morning. He explained how he waited for Engelbeck while completing administrative tasks of his own. When Engelbeck did not arrive, Captain Lugo checked the CAD map and saw he was parked stationary near one of the shopping centers in Queen Creek.

Before describing why he was meeting with Engelbeck, Captain Lugo said the meeting could not happen sooner because Engelbeck had been out of the office for over a month. He explained how Engelbeck took personal time off, and he could not return to work because of travel restrictions due to the COVID-19 pandemic. As he described Engelbeck being out of the office, Captain Lugo said Engelbeck still had administrative tasks that needed to be done. But at no time did he reach out to him and seek permission to work from home. The month away from work resulted in Engelbeck getting farther behind on administrative tasks he was required to complete. He also explained how, after Engelbeck returned to

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000855

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

work, he had been approved to attend two separate training events, further delaying the one-on-one meeting.

On the morning of 09/18/2020, Captain Lugo logged into his MDC at about 07:30 and immediately saw a traffic collision with injuries in Queen Creek, where Deputies were actively working. He explained how this caught him by surprise because he is supposed to be notified of any collisions that might cause a back-up or delay for traffic in Queen Creek.

The notifications must be made because the Town Council wants to be aware of those types of delays.

Captain Lugo further explained that the Sergeant for that shift would be in a training class until about noon, and Engelbeck was supposed to be supervising that Sergeant's patrol squad.

When Captain Lugo checked Engelbeck's location, he saw the CAD map showing he was in the area of Fry Road and Pecos Road in Gilbert. That intersection is the closest main intersection to Engelbeck's residence, and the CAD map showed his vehicle was near his residence. He also noticed Engelbeck had entered "QCK" for his location, but based on the CAD map he was not in QCK. Captain Lugo noted this information, made his notification to the Town Council, then drove to the District VI substation.

While waiting for Engelbeck to arrive at the substation, Captain Lugo described having to be on an extended phone call, which he took in the Town Council chambers so he would not be disturbed. He said that the phone call lasted more than one hour. When that call concluded, and he was walking back to his office, he saw the light in Engelbeck's office was off when it had been on earlier. He also noticed the items in Engelbeck's mailbox were gone. Captain Lugo did not know where he went, but because it was around lunchtime, he assumed Engelbeck may have gone to lunch.

Eventually, Captain Lugo reached out to Engelbeck over the phone to tell him he needed to meet with him. When he called Engelbeck's county-issued cell phone, he could hear it ringing inside Engelbeck's office. Captain Lugo explained in detail how the phone in Engelbeck's office started to ring as soon as he called the number, then it stopped ringing as soon as he hung up the phone. He did not physically look inside the office for the phone, but based on his deductive reasoning, he concluded Engelbeck's work phone was in his office.

He then called Engelbeck's personal cell phone, which he answered and told Captain Lugo he would be en route to the substation.

When Engelbeck arrived for the meeting, they discussed his performance issues. To make sure Engelbeck understood where he needed to be during his shift, Captain Lugo told him he needed to be within the Town limits during his shift. He also told Engelbeck he needed him to be physically located within the substation when he wasn't helping patrol with calls for service or on the scene with them.

---

Investigator:  Sgt. R. Leatham S1462

Reviewer:  Capt. G. Lugo S1480

46REPORT000806

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Captain Lugo emphasized how he physically pointed at the table they were sitting at and told Engelbeck, "I need you here." This was said because he wanted Engelbeck to understand the importance of being in the substation to take care of his administrative duties. Captain Lugo further explained how he was constantly being interrupted by Sergeants and administrative staff because Engelbeck was not at the substation to address their needs. When asked to describe how Engelbeck responded to his request, Captain Lugo said Engelbeck nodded his head up and down, which he interpreted as Engelbeck understood what Captain Lugo was asking of him.

I asked Captain Lugo to tell me how he viewed the information he relayed to Engelbeck.

He described it as being a direct order to Engelbeck. Captain Lugo explained that he did not want the meeting to be accusatory, so he did not ask Engelbeck why he wasn't in town during his shift.

Captain Lugo explained that the information he provided was also included in a memo he authored that was used as the complaint in this investigation. He also said he did not know if Engelbeck had a family issue that may have prevented him from leaving his home early. Captain Lugo said he recalled receiving one text message from Engelbeck, and he did not specify the date when he requested to work on administrative duties from home. Other than that, he said Engelbeck never inquired about telecommuting. He explained that the denial would be because Engelbeck is a Patrol Lieutenant, not an administrative Lieutenant.

Therefore, his presence was needed within District VI during his assigned shifts.

When it came to the presence of the District VI Lieutenants within the district boundaries, Captain Lugo described how the Town of Queen Creek is paying for the services of two Lieutenants, so he expected that they would be present and in town during their shifts. He pointed out that the MCSO contract with Queen Creek does not say the Lieutenants are required to be in town, but when the second Lieutenant position was added, the Queen Creek Town Manager wanted both of the Lieutenants to be present and in town. For clarification, the question was asked if the Lieutenants needed to be close to or within the district. He said they were to be "Within their area of responsibility.

Captain Lugo was asked to explain his expectations of his Patrol Lieutenants.

The short and sweet version was that they were to complete their administrative duties and support sergeants by ensuring they completed their work. He also wanted his Lieutenants to lead by example by responding to traffic collisions, helping with traffic control, or other tasks they could help with that did not require them to take over the scene. Captain Lugo also said there was an expectation for Patrol Lieutenants to cover Sergeant shifts that might need to be covered. He pointed out that Engelbeck had

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000837

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
IA #2020-0555

four Sergeants who reported to him, and his workload wasn't so overwhelming that it prevented him from more than just administrative work.

To get further clarification on Engelbeck being outside the District VI boundaries during his shift, I asked Captain Lugo to help me identify when that pattern began.

He said he looked into Engelbeck's previous patrol shifts, and he saw that practice started near the end of August, but he did not know about it until September 18. He said he was unaware of it because he had his own tasks to complete, and he did not feel he needed to keep an eye on Engelbeck.

Captain Lugo did notice Engelbeck's presence at the District VI substation began to decline after their April 15 meeting. Before that he would regularly see him at the substation. He also began to notice Engelbeck was using the QCK entry in CAD when he was 5-6 miles outside of his area of responsibility.

When he reviewed Engelbeck's Supervisor Notes from his time in District II, Captain Lugo did not see any similar behavior documented by his previous commander.

After Captain Lugo had the meeting with Engelbeck on 09/18, he documented the discussion in an email and a supervisor note. The email was sent to Engelbeck, and a copy of it has been uploaded to this case file in IAPro.

The following morning, 09/19/2020, a Saturday, Engelbeck again logged onto his computer at home and was not physically present within the District VI boundary as he was ordered to be. When Captain Lugo logged into his computer at about 07:00, he saw Engelbeck went 10-8 at 06:30, and the CAD map showed him the area of his residence.

Captain Lugo said he kept track of Engelbeck's location that morning and saw he was at his house for several hours.

He also said "QCK" was used for his location but was not physically located in Queen Creek. As he spoke of the inaccurate location Engelbeck entered into CAD, he pointed out that MCSO Policy dictates and requires all information entered into CAD to be accurate.

Because of truthfulness, as it relates to the location Engelbeck was entering into CAD, I asked Captain Lugo to explain how this was a truthfulness issue.

He described how Engelbeck was not only outside of the area where his CAD entry said he was located, but there were multiple steps he had to take to complete that entry. He further explained how Engelbeck had to knowingly type the information into the computer. The information he used had to be manually entered and could not be selected from a drop-down menu.

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPCSI000898

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

Captain Lugo described how a series of choices are available for employees to put themselves out on specific details in a drop-down menu.

Some of the selections include various administrative duties, such as Supervisor Admin duties, report writing, complaint intake, lunch, dinner, coffee, bathroom breaks, and being out at their home residence. Captain Lugo said he never heard Engelbeck use his radio to inform his dispatcher that he was going to be out at his residence. He also pointed out that if that occurred, the entry in CAD would have indicated that the dispatcher entered the information. Per Captain Lugo, the CAD entries he reviewed showed Engelbeck manually entered the locations that showed his location in CAD.

Captain Lugo said he continued to watch Engelbeck's location and saw the same behavior of putting himself in "QCK" when he was not physically located in Queen Creek. Around September 26, Captain Lugo noticed Engelbeck's location was showing him to be in the Tucson area. Again, he knew the GPS for MCSO computers, which is where the location is tracked, is not always accurate. To find out why this may happen, Captain Lugo spoke with Lisa Leitch, the former CAD administrator for the MCSO, and told him that it could be due to a connectivity issue. But it could also happen if the GPS is not working properly. Captain Lugo did add that other MCSO call signs, other than Engelbeck's, were populated in that area. So, he did not know if it was a network issue or if the GPS data for multiple MCSO employees were malfunctioning.

Captain Lugo said he eventually stopped looking into Engelbeck's location after the complaint was filed and after he was demoted. He stated Engelbeck was demoted the Sunday before this interview taking place.

After discussing the CAD history and locations, Captain Lugo was asked to explain what he meant when he told Engelbeck he needed him "here." He said he meant Engelbeck needed to be physically located within the District VI substation if he was not out helping patrol.

Captain Lugo then described Engelbeck's response as an up-and-down shake of the head, indicating he understood what was being said. According to Captain Lugo, Engelbeck did not ask for any clarification or guidance on what was being asked of him. Captain Lugo also described Engelbeck seeking clarification and guidance on other matters involving his subordinates, but he did not seek any clarification on this topic.

Captain Lugo was asked to describe how he viewed Engelbeck's failure to do what he had asked him to do. Captain Lugo described it as being insubordinate. He felt he gave Engelbeck a very clear order, which went unfollowed.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000859

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Captain Lugo also said he did not receive any phone calls, texts, or emails from Engelbeck that might have explained why he was not within his area of responsibility on time.

After explaining how he viewed Engelbeck's behavior, Captain Lugo said he would not have had an issue with Engelbeck being out of the office as long as his administrative duties were done. But because they were not getting done and because of poor communication between Engelbeck and his subordinates, Captain Lugo had no choice but to give Engelbeck direct orders to try and change his behavior. He pointed out that the other Lieutenant who was transferred to District VI at the same time as Engelbeck did not require the same amount of attention from him because he was completing his administrative duties.

As we approached the end of the interview, Captain Lugo talked about ID card swipes that he obtained from the Town of Queen Creek to see when Engelbeck was entering the substation. He said Engelbeck had been given a key card that Lt. Banks previously used. Hence, the swipes that identify the user at "Banks" were actually Engelbeck's swipes.

The user name for the card had not been changed. Those card swipes will be reviewed and summarized further in this report.

The interview with Captain Lugo concluded at 13:01. Before that time, a break was taken that lasted from 12:50 to 12:55. During that time, the audio/video recorders remained active, and Captain Lugo stayed in the interview room when Sgt. Frank and I exited. There was no discussion about this investigation with Captain Lugo during that break.

## "District 6 – Lieutenant Expectations – Briefing 04/15/2020 1000 hours"

The following information is the list of expectations Captain Lugo gave to both of the District VI Lieutenants during their meeting on 04/15/2020. This list was provided to me by Captain Lugo and it has been uploaded to this case file in IAPro. The list was also sent to both Lieutenants in a supervisor note authored by Captain Lugo on 04/29/2020. The supervisor note was located in the Blue Team data base (SN2020-00019122) and it has been uploaded tot his case file in IAPro.

### District 6 - Lieutenant Expectations – Briefing 04/15/2020 1000 hours:
- Standing weekly meeting – Wednesday's at 1000 hours – District 6
  - Please come prepared on notable issues/concerns/ideas and/or anything that has been worked on in the past week.
- Work schedules:
  - The expectation is that during the normal work hours you will physically be located within the boundaries of District 6, barring having to go take care of an issue, but then return.
  - The expectation is to be present in the office, out on patrol, and accessible to patrol supervisors. If not, I need to be advised.

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT600866

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

- CAD needs to be accurate pertaining to activity being conducted with location information entered
  - This demonstrates what activities are being conducted
- Should regularly attend briefings
- Should regularly respond to calls for service out in a patrol environment

- Tracking of documents/deadlines
  - Deadlines are not optional, and the responsibility of the lieutenant is to ensure these items are completed/submitted:
    - Examples: Overdue EPA's – these now require a memorandum to be included with them as they are several months overdue
    - Blue Team Entries Overdue
    - CPP – Presentation – how many were completed, and which ones were not completed?
    - List of items (already overdue and previously provided):
      - Delp – EPA (Segura)
      - MFN2019-000134 (Nate)
      - MFN2017-000654 (Calderon)
      - MFN2017-000616 (Lawson)
      - MTN2019-000360 (Nate)
      - MFN2019-000154 (Limb)
      - Ruehle – EPA (Frei)
      - Bradbury – ERA – Blue Team Entry (ODPC)
      - Hernandez – Use of Force Report (Glenn/Yager)
      - MFN2020-0034 (Luna)
      - Vehicle Accident – Klingensmith
      -

- Line level inspections
  - Expectation is that the lieutenant will conduct at least one line level inspection per month and enter such inspection into Blue Team. Please cc me on the submissions.
  - Examples – Facility inspections, safety inspections, equipment inspections, TraCS inspections, BWC inspections, HUB inspections,

- Proper procedures/paperwork/workflow/requirements
  - Expectation is that submissions of documents such as memorandums, vehicle accidents, use of force, etc. are submitted in accordance with MCSO Policy requirements. If unknown, research prior to submission.
  - Use of Force, vehicle accidents, pursuits, require a BWC footage review
    - The review must be notated and included in the comments/review portion of the chain of command.

- Cases being follow up on by patrol
  - Expectation is to monitor these cases as well to ensure requirements are completed

- Blue Team Entries – Supervisor Notes

---

Investigator:   Sgt. R. Leatham S1462              Reviewer:  Capt. G. Lugo S1480

46REPORT000801

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

- o Content needs to be thorough and able to appropriately document the performance evaluations.
- o Reiterates ability for us to support the sergeants/deputies, employees, etc.
- Emergency Response Incident – Critical Incident
  - o Each lieutenant is requested to draft a critical incident table top type incident to present to patrol squads and run them through the process/incident.
  - o Responses are due by May 15, 2020
- IA Investigations – PSB Extension Memorandums/due dates

The following information consists of the summary Captain Lugo completed reference the meeting held on 04/15/2020:

*On 04/15/2020 beginning at approximately 1000 hours, a District 6 Command Meeting was held and those in attendance included myself, Lieutenant Jakowinicz, and Lieutenant Engelbeck. The purpose of this meeting was to review some of the unique expectations of command staff assigned to the District 6. While this meeting did not review all of the standard expectations of a command staff member as dictated throughout MCSO Policy, it did focus on some of the additional specific expectations for District 6. These expectations overlap a variety of MCSO Policies and some of the tasks also outlined in MCSO Policy GB-2 Command Responsibility were reviewed/discussed. A printed agenda was provided to both lieutenants and is attached to this entry for reference. In short, some of the key areas of focus were on the accountability for deadlines that are provided to be adhered too and monitored by the respective lieutenant for their subordinate personnel. Specifically, there were many items (Blue Team Entries, EPA's, etc.) that were previously sent to respective lieutenants at the beginning of their assignment to District 6 which was over 30 days prior that still have not been follow up through and completed by respective personnel. Another list of these items were provided to the respective lieutenants at this meeting. Engagement with the staff, being present in the respective district area of responsibilities, schedules, CAD logs/entries, the completion of line level inspections on a monthly basis by command, the responsibility for lieutenants to ensure their review of any documents/items/IA's/memos for compliance with MCSO policy were reiterated as a requirement for lieutenants.*

*In addition, each lieutenant was assigned to create a mock emergency response scenario in order to run through each patrol squad at the division as a table top exercise for educational purposes. These incidents should include some form of emergency situation or critical incident and is due to be drafted and submitted to me in writing by May 15, 2020. Following the receipt and review of these scenarios, the plan will be for them to be presented to each patrol squad.*

*This meeting further provided a discussion opportunity for the District 6 Command and the results of the discussion fostered some positive changes for division including the implementation of a standing weekly*

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000862

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

*District 6 Command Meeting. This meeting is scheduled to occur on Wednesday at 1000 hours at the District 6 Patrol Division.*

### Principal Interview Sgt. Aaron Engelbeck S1673

*The following summarizes the Principal interview with Sgt. A. Engelbeck which took place at the MCSO PSB office on October 21, 2020. During the interview Sgt. Engelbeck utilized Detective Cody Morin S1407 as his employee observer. Sgt. Alex Frank S1455, who is assigned to PSB sat second chair for this interview. I failed to notify Engelbeck's supervisor that this interview needed to take place. The interview was audio/video recorded and was uploaded to this case file in IAPro.*

On October 21, 2020, at approximately 10:30 hours, Sgt. A. Engelbeck arrived for his principal interview reference this investigation. Upon his arrival he was escorted to interview room 2020 where he was provided copies of the complaint, CAD histories and the administrative documents required for this interview. After he was given time to review the documents, the audio/video equipment was activated and the interview began.

Once the administrative documents were reviewed and signed, I explained the purpose for the interview was to have Engelbeck to explain why he was outside of his area of responsibility while he was assigned to District VI as a Patrol Lieutenant, after his supervisor instructed him to be within his area of responsibility at a specific time. About a week prior to this interview taking place, Engelbeck had been demoted from Lieutenant to Sergeant due to performance issues which were documented by Captain Lugo. I explained the performance issues associated with that demotion would not be discussed in detail, but there was an understanding that the performance issues may bleed over into the interview because they did overlap the allegations of misconduct. I told Engelbeck I wanted to focus on the allegations of misconduct, which included an allegation of potential truthfulness related to the location he was entering in CAD during his shifts and the allegation of misconduct related to insubordination.

One of the forms provided to Engelbeck before the interview started was a list of expectations which was given to him by Lugo after he was transferred to District VI in February of 2020. I asked Engelbeck to tell me about the expectations Lugo had of him. The expectations listed topics such as being on patrol and available to patrol sergeants during their shift and also being in the office to assist with other tasks. He described having to be within the town limits of Queen Creek during his shift and if he had to leave Queen Creek for any reason he was to provide notification to Lugo. Engelbeck said he received the list of expectations in a supervisor note in Blue Team which had been authored by Lugo (SN20019122).

I asked Engelbeck to explain why Lugo wanted to be notified if he had to leave District VI. Engelbeck described it as a rule Lugo made up to keep both Lieutenants from leaving the District VI boundaries during their shifts. For example, when they asked Lugo why he needed to be notified if they were leaving

Investigator:   Sgt. R. Leatham S1462                 Reviewer:  Capt. G. Lugo S1480

46REPOST000803

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

the town limits, he responded by telling them it was either in policy or part of the MCSO contract with the Town of Queen Creek. He described it as being "Greg's Rules," and not something found anywhere in MCSO policy or within the contract the MCSO had with Queen Creek.

Engelbeck said he asked Captain Lugo to provide a copy of the Queen Creek contract, but Lugo would not give it to him. Engelbeck said a copy was eventually given Lt. Jakowinicz by a Deputy Chief, and Engelbeck, who did not see or read the contract, was told there was nothing in it that required an MCSO Lieutenant to remain within the town boundaries at all times. Engelbeck said Lugo also used MCSO Policy along with the Queen Creek contract to force his Lieutenants to work weekends. He described him as using them as "leverage," to work weekends, and to complete other tasks not required by MCSO policy.

He provided an example of a task Lugo asked him to complete and claimed it was not required by MCSO policy. Engelbeck said Lugo wanted line level inspections completed on a monthly basis and he did not agree with completing them on a monthly basis because policy only required them to be completed once every three months. He pointed this out to Lugo, but completed the line-level inspections anyway, because he was being asked to do it by his commander. Another task Engelbeck disagreed with Lugo on was his requirement of attaching the transaction list with his P-card log. Engelbeck said he reviewed the policy (GE-2, County Purchase Cards) and told Lugo the policy did not require him to do that. He then stated Lugo did not like to be contradicted by his subordinates.

**Investigators Note:**

*MCSO Policy GE-2 and the P-Card User's Manual both require employees to submit transaction logs on a monthly basis regardless if the card was used for fuel purchases or not. The policy and the user's manual were found in the finance folder on the M drive.*

Engelbeck found it frustrating when Lugo told him the tasks he was being asked to complete were within Policy or the Queen Creek contract, when he did not feel the what Lugo was asking was true or accurate. He knew Lugo often went above and beyond what the typical Captain does and he simply wanted Lugo to tell him what he was asking of him were his expectations and not a requirement of MCSO Policy or the Queen Creek contract. Engelbeck was asked if a Captain was required to give him a reason for the tasks he was asking a subordinate to complete. He responded with, "No."

Engelbeck was asked to describe what was expected of him reference being within the boundaries of Queen Creek during his shift. He said there was never a specific time given for when he had to be in the town boundaries. Engelbeck was asked to provide the start/end time for his shifts. He said his shift started at 06:30 and ended at 16:30 and he was scheduled to work Wednesday – Saturday. Engelbeck explained, when he was promoted from Sergeant to Lieutenant, he was assigned to District II as a Watch Commander. According to Engelbeck, the instructions he was given by the District II commander, was for him to log

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000804

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

on from his residence then drive to District II. Engelbeck was asked to describe his commute from his residence to District II and how far he had to drive. He said the commute was about 55 miles from his home in Gilbert and there was no rush to get to his area of responsibility because traffic was typically frequently heavy.

When it came to logging on for work after his transfer to District VI, Engelbeck said he was never given a specific time in which he had to be within the town boundaries of Queen Creek. Engelbeck said he spoke with one of the previous District VI Lieutenants about going 10-8. He identified that person as Lt. Kristin Banks. He said Lt. Banks told him she would go 10-8 from home, often stop somewhere and get breakfast prior to completing her drive to District VI. Once she was done with breakfast, Lt. Banks would then drive to District VI. Engelbeck said he met with Lt. Banks several times for breakfast and those meals were frequently outside of the District VI boundaries. Engelbeck said he was aware that Lt. Banks would not get to the District VI office until around 09:00 hours.

Engelbeck was asked to describe any instructions Lugo gave him reference being in Queen Creek during their first meeting in April of 2020. Engelbeck said he was only told to be in town during his shift and to stay in town until the end of his shift. Engelbeck said his daily routine was based on the assumption that other Lieutenants within the MCSO were going 10-8 from home and not immediately driving to their area of responsibility but staying there until the end of their shifts.

I asked Engelbeck to describe his daily routine for me. He said he would typically be dressed and logged into CAD by about 06:30 every day. Once he was logged in he would eat breakfast at home while monitoring the radio and CAD for calls for service. Engelbeck said he would also go through his emails and review any Blue Team entries that had been sent to him.

Engelbeck was asked to describe how he let dispatch know he was 10-8 and available for calls. He said he typically would not let radio know he was 10-8. His practice was to log into CAD on his MDC and enter a location of "QCK," to indicate he was available for any traffic within District VI. Engelbeck was asked if he used QCK as his location to make it look like he was in Queen Creek. He explained it was not intended as a way to be deceptive of his location but if he wanted to be deceptive he would have turned the GPS off on his computer. I asked Engelbeck if he ever tried to turn off his GPS locater. He said he did, but added he was told, by Lt. Jakowinicz, that policy did not require command level employees to have their location turned on when they were working. Engelbeck said he turned off his GPS a few weeks prior to this interview to see if it would work, but at no time prior to that did he do it.

Engelbeck was asked if turning the GPS off had been easy. He responded by saying, "I think so." But he could not remember how to do it, even though he admitted it was pretty easy to figure out. Sgt. Frank asked him to explain the purpose of turning off his GPS location. Engelbeck responded by saying, "I

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000865

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

don't know," and he did it because Jakowinicz talked about it.   For clarification, Sgt. Frank asked Engelbeck if he turned his GPS off.  Engelbeck said he did, but it was only to see if he could.  He followed that up by saying if he wanted to be deceptive, he would have turned off the GPS a long time ago.   He then said he turned it on, or "thought" he turned it back on.

**Investigators Note:**

*The topic of Engelbeck deactivating the GPS device in his MDC was not discussed in further detail, at this time, because I was not aware that when he turned off his GPS, on 09/18/2020, it was never turned back on.  Engelbeck would not be called in for a second interview until 01/31/2024, because his lack of a GPS signal was discovered until December of 2023.  A summary of that second interview occurs farther along in this narrative.*

*Additionally, Engelbeck was correct about a lack of verbiage in policy directing MCSO employees not to turn off the GPS for MCSO patrol vehicles.  In April 2020, MCSO Policy, GE-4, Use, assignment and operation of vehicles was updated to provide verbiage that GPS for patrol vehicles is to be left on, unless permission is granted by a Bureau Chief to turn it off.*

As for using the "QCK," as his location in CAD, Engelbeck compared his use of it to a detective who is doing follow up on an investigation, but rather than being at the scene of the incident he was in his office working on that case.  As a Lieutenant assigned to District VI, Engelbeck said he was available for calls in Queen Creek even though he was not in town at that time.  He looked it as being available for his area of responsibility, even though he was not physically located in his area of responsibility.

Once his morning routine was complete Engelbeck drove the four miles from his home to Queen Creek where he remained for the remainder of his shift.  The tasks at his residence typically occurred around about two hours after he logged into CAD, which he estimated to be around 08:30 or 09:00 hours.  Another reason Engelbeck wasn't in a rush to get into the District VI office was because he wanted to limit his potential exposure to the COVID-19 virus, which was an international concern at this point in time.  He felt his routine was responsible because it limited his contact with people, which also reduced the risk of him catching or spreading the virus.

As we discussed the expectations of a Lieutenant in District VI, Engelbeck pointed out that a Patrol Lieutenant in District VI is expected to perform at a higher level than any other Lieutenant working for the MCSO.  When asked to further explain what he meant by that, Engelbeck said he had been told to be out on patrol, available for patrol sergeants in the field and not to be in the office for extended periods of time.  Engelbeck understood that was his job, but he chose not to go to every call for service because he did not want the patrol sergeants to feel like he was looking over their shoulders.  He based the decision not to continuously look over the shoulders of subordinates, on training he attended related to leadership.

Investigator:   Sgt. R. Leatham S1462                          Reviewer:  Capt. G. Lugo S1480

46REPORT000806

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

He also said he did not like having people look over his shoulder while he was at work and he did not want to do that to his subordinates. Engelbeck said the way he chose to be available to subordinates was to make sure the patrol sergeants had his phone number so they could call him when they needed him. Engelbeck was asked what "available," meant to him. He said Captain Lugo never provided him with a definition of what he meant by "being available," but to him being available meant he could be reached by telephone.

Engelbeck further addressed not being in the office, other than the COVID-19 pandemic, was because he had a hard time being around Lugo. So, to avoid having contact with Lugo, he chose not to go into the office. He described Lugo as being unemotional, and difficult to communicate with, so he felt the best course of action was to keep his distance from him. Engelbeck said he was told he needed to be in the office in case someone needed him, but stated he was never given specific times of when he should be in the office. If someone needed him, Engelbeck said he would have complied to the request and would have gone to the office to address the need.

He also explained how he did not want his new rank of Lieutenant to change the way he behaved while on duty. Because Engelbeck brought up his probationary status earlier in the interview, I asked him to tell me what occurred if he did not complete necessary administrative tasks while he is on-duty. He stated he would not have made it off probation. The failure to complete administrative tasks on time was one of the reasons he was demoted back to Sergeant. During this time he admitted to wondering if he was going to meet his probationary status after the meeting he had with Captain Lugo in April. The feelings related to potentially not meeting probation and his lack of mentoring from Captain Lugo was another reason he eventually reached out and called Chief Morrison, who arranged a meeting at District VI with Lugo and both of his Lieutenants.

**Investigator's Note:**

*The meeting with Chief Morrison was associated with IA2020-0285 and it occurred because Engelbeck and former MCSO Lt. Jakowinicz reached out to Chief Morrison because they were finding it difficult to work for Captain Lugo. Statements and comments made towards/about Captain Lugo by Lt. Jakowinicz during that meeting resulted in Jakowinicz and Chief Morrison being made Principals. Engelbeck was interviewed as a Witness in that investigation. Details of that meeting will not be provided in this written report because, even though it is connected to the issues between Lugo and Engelbeck, it was separate from this incident.*

Engelbeck was asked to explain how Lugo was hard to work for. He explained it was because Lugo was a poor communicator. He described having patrol sergeants and deputies going into his office to complain about having to work for Captain Lugo. He further described him as being very "black/white," and a

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

"check the box," kind of a guy. He added, Lugo was very strong administratively, but he was not a good mentor, which is what he was looking for. Rather than being a mentor, Engelbeck described feeling like Lugo was "out to get me." He said he tried to communicate with Captain Lugo but did not feel that communication was successful.

After bringing up the meeting with Chief Morrison, Engelbeck began to describe reasons why his work was not being completed. Everything he described was related to the performance issues which were the reasons for his demotion from Lieutenant to Sergeant. During this explanation he talked about not being given full access to Blue Team and how it could have made his job easier. Because he was not given full access to the Blue Team database, Engelbeck had to use a whiteboard in his office to track tasks that were coming due. He also described receiving a positive six month evaluation and positive supervisor notes before being blindsided by his demotion.

He explained how he had not received any guidance from Captain Lugo, nor was he approached by Lugo to discuss his performance issues before being demoted. Prior to being demoted, Engelbeck said he did not receive any kind of feedback from Lugo about his performance issues.

One thing that Engelbeck said that stood out was that he felt like he was being singled out because Lugo was asking him to do more than the normal MCSO Lieutenant. He said he asked Lt. Jakowinicz if Lugo was bringing any deficiencies to his attention. According to Engelbeck, Jakowinicz said no.

Another performance issue he talked about involved not being able to complete administrative tasks on time because the MCSO Leave Management Section (LMS) did not call Engelbeck back for a week after he left the County for vacation. Because of Covid-19, Engelbeck could not return to work without being cleared by LMS, which prevented him from completing assigned tasks.

After talking about these performance issues, the topic of the interview went back to Engelbeck not being present at the District VI substation.

When asked to explain why he was not at the District VI office as directed, Engelbeck said he often chose to find a place in Queen Creek to park where he would complete his Blue Team notes and respond to emails on his MDC. He said this tactic allowed him to quickly if he needed to go to a call for service.

Engelbeck was asked to clarify his interpretation of instructions given to him by Captain Lugo during their meeting on September 18th where he was told he needed to be in Queen Creek during his shift. He was asked if he viewed being told to be at the substation as a direct order from Captain Lugo. Engelbeck said he did not know if he saw it as a direct order because Captain Lugo did not tell him, "You will be here." He stated Captain Lugo told him "I need you here more." When asked to describe what else was discussed

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000868

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

he said he could not recall because he was angry and not paying attention. Engelbeck said he was angry because he felt like he was the only Lieutenant in the MCSO who was getting "hammered for this stuff."

Prior to this interview taking place, I was made aware of an email sent to Engelbeck by Captain Lugo on Saturday Sept 19th at 16:20 hours, which was used to document a meeting they had on 09/18/2020. In that email Captain Lugo reiterated Engelbeck's duties and responsibilities as well as when he is expected to be within the boundaries of District VI. When Engelbeck was asked to describe when he read that email, he said it was not until a few days after it had been sent. He said it went unread because he was upset with Captain Lugo and he did not want to read it.

I referred to the email and specifically to the section titled, "Work locations/requirements," which stated:

Work locations/requirements:
   ○ It was reiterated that during your on-duty work hours you are required to be within the Town Limits of the Town of Queen Creek. Furthermore, when not on a call for service and/or assisting patrol units with a matter, you are required to physically be in the District 6 Substation. This allows you to be present and available for the deputies, supervisors, administrative staff, and myself to troubleshoot issues, answer questions, address matters.
   ○ As previously reiterated, if you need to leave the Town Limits or attend to other matters in which you will not be able to be physically at the District 6 Substation, a notification to me is required.

After being asked to explain his interpretation of that topic, Engelbeck said he did not look at himself as being any different than any other Lieutenant who had been assigned to work in District VI and he could check on and go into town when he chose to. He was asked to clarify what, "during your work hours you are required to be within the Town limits," meant. Engelbeck referred back to what Captain Braaten, his District II Commander, told him, which was to check on then drive to District II after he finished his morning routine. He said Captain Braaten did not have an issue with that practice and he knew some of the previous Lieutenants in District VI would not arrive at the office until around 09:00 hours.

Engelbeck was asked to explain how it was not a direct order when his Captain told him he needed to be within the Town limits during his on-duty work hours. Engelbeck said he was not given a specific time to be in Town and he was only told, "I need you here." He further stated he did not go into Queen Creek at a specific time, but when he got there he stayed until the end of his shift. For further clarification, Engelbeck was asked why he did not take his breakfast and drive to Queen Creek. He stated it was because he was never told to get into Town right away. If Lugo had told Engelbeck to not stay at home and drive into Queen Creek, he said he would have done that. He followed that up by saying he would not have been happy about it, but he would have done it.

Because he was being asked to behave differently than previous District VI Lieutenants, Engelbeck felt he was being singled out by Captain Lugo. He further justified the continuation of his routine by saying

Investigator:   Sgt. R. Leatham S1462                        Reviewer:  Capt. G. Lugo S1480

46REPORT000869

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Lt. Banks told him to check on at home, eat breakfast and not go to the office until 09:00 hours. He pointed out that the two of them would meet for breakfast in Mesa prior to his promotion and while she was still assigned to District VI. He pointed out that another District VI Lieutenant would do the same thing but admitted that Lieutenant lived within the boundaries of District VI.

He admitted to not changing his routine after receiving the email from Captain Lugo because he felt he was being responsible by staying out of the office. Engelbeck also pointed out that District II was 55 miles away from where he lives and he was able to address issues in that patrol area telephonically. Even though he only lived about five miles from Queen Creek, Engelbeck felt he could address issues over the phone as he had done while assigned to District II. Knowing Queen Creek was a contract town, I asked Engelbeck to explain the difference between being assigned to work in that environment versus working in District II. He pointed out that Litchfield Park, which is part of District II was also a contract town, and to him there were no glaring differences.

In order to clarify what Captain Lugo asked of him reference his work, he was asked if he looked at Lugo's request as being a direct order. Engelbeck said he did not believe it was. Knowing his work day was scheduled to start at 06:30, Engelbeck was asked to reconcile not being in town by that time. He stated Lugo never told him to be in town by 06:30 and he was never given a specific time to be in town.

Engelbeck also pointed out he knew Lugo was paying attention to his location and if he had issues with it, why didn't he approach him and tell him to change that behavior. Engelbeck expressed his frustrations with Lugo failing to have clear lines of communication with him. He was asked to describe how clear lines of communication were established. Engelbeck said it was never established.

It was further pointed out that the list of expectations Lugo had given Engelbeck told him to be in town "during normal working hours," which was a very specific statement. It had been established that his working hours were 06:30 to 16:30 and how his morning routine clashed with Lugo's expectations. Engelbeck admitted it did clash because he was trying to stay within policy, but Lugo was demanding him to go above and beyond what policy requires.

After talking about his interpretation of when he should be within the boundaries of District VI, we transitioned to what he described as Captain Lugo singling him out. Engelbeck stated Captain Lugo did not like having anyone stand up against him and he wanted all of his supervisors to be subservient to him. He then brought up an incident which occurred several years prior to this when Engelbeck was a Detective in Major Crimes and Captain Lugo had just been promoted to Lieutenant. He pointed out that Sgt. Frank was his direct supervisor at the time.

The issue Engelbeck brought up occurred about six years prior to this incident, when he was a Detective assigned to the Major Crimes Division and Captain Lugo was a newly promoted Lieutenant in the same

---

Investigator:   Sgt. R. Leatham S1462                       Reviewer:  Capt. G. Lugo S1480

46REPORT000876

CONFIDENTIAL - ATTORNEY'S EYES ONLY
☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

Division. He described a search warrant he wrote for a case involving a 9 year old female victim. After completing the warrant, Engelbeck had a peer review it then submitted it to the court for a judge to sign it. Engelbeck pointed out that Sgt. Frank was his supervisor at the time and when Lugo learned of the search warrant he wanted to review it. When Lugo reviewed the warrant he disagreed with an aspect of it and had Engelbeck re-write it then re-submit it to the court. This was upsetting to Engelbeck because he felt the peer review process was sufficient and the delay in obtaining the warrant was going to potentially endanger his victim.

Engelbeck relayed this incident because he felt Lugo was holding onto issues associated with that incident and it was now impacting their ability to work together in District VI. Engelbeck said he felt like Lugo had a mental image of him as a person who does not want to follow the rules. Engelbeck was asked if those feelings were ever expressed to Lugo. He stated those feelings had not been expressed because he had not been around Lugo until he was transferred to District VI.

Prior to Engelbeck being demoted back to Sergeant from Lieutenant, he described a meeting at the MCSO Headquarters building with Executive Chief J. Baily, Chief Morrison, Captain Lugo and himself. During that meeting he described expressing his concerns and frustrations to Chief Baily. He described how he told Chief Bailey how he struggled to work between "Greg's Rules" and policy, while trying to achieve Lugos nearly impossible expectations. Engelbeck also shared his frustrations with the fact that Lugo did not give him total access to Blue Team. He said both Chief Baily and Chief Morrison were surprised by this, but asked Engelbeck if his subordinates copied him on their submissions in Blue Team. Engelbeck told him they did, but he was required to track those submissions using a whiteboard rather than being able to see them in Blue Team.

Engelbeck was asked if it wasn't also his responsibility to have strict standards. He admitted that it was but followed it up by saying he wasn't doing anything other Lieutenant's within the MCSO weren't doing and it was also Lugo's responsibility to train and develop/mentor him. Engelbeck described feeling like Lugo did not mentor him as he should have. He said Chief Baily's response was to tell him Lugo had very high standards and his demotion was also a failure by the MCSO.

What further frustrated Engelbeck was the fact that shortly after being demoted, he was contacted by me and asked to come in for this interview. He felt like Lugo was "beating him to the punch," which made this investigation feel like it was retaliatory. He felt it was retaliatory because he told Chief Baily and Chief Morrison about the issues he was having with Lugo, while Lugo was present in the meeting. He said the administrative investigation into this incident was opened before his grievances with Lugo could be addressed.

---

Investigator:  Sgt. R. Leatham S1462                     Reviewer:  Capt. G. Lugo S1480

46REPORT000871

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

**Interview Breaks**:

During this interview two breaks were taken. The first from 11:53 hours until 12:10 hours. The second break was from 12:40 to 12:54 hours. During both of those breaks all four of us left the interview rooms. During that time the audio/video recorders remained activated and at no time was there any discussion between Engelbeck and the PSB investigators.

When we returned from the last break there were no other questions that needed to be asked of Engelbeck. At the conclusion of the interview Engelbeck was given the opportunity to make a five-minute statement.

**Principal's five-minute statement**:

Engelbeck declined to make a statement and at approximately 13:06 hours the interview concluded.

**Documents provided by Engelbeck 11/10/2020:**

About two weeks after Engelbeck's PSB interview, he asked me if he could turn over some documents he wanted included in this investigation. I agreed to meet him on 11/10/2020 in the parking lot of a shopping center in the area of Power Road and Queen Creek Road in Gilbert.

The interaction with Engelbeck was less than five minutes, and no audio or video was recorded of it. We parted ways once he provided me with a brief explanation of what he was giving me.

When I had a chance to review the information, I saw the first twelve pages consisted of a typed rebuttal defending himself from the allegations of misconduct and for the reasons he was demoted from Lieutenant back to Sergeant. Engelbeck also expressed his frustrations in working for Lugo and the way his demotion was handled by Chief Morrison and Chief Bailey.

The other information Engelbeck included in the packet was the six-month evaluation Lugo authored, supervisor notes by Captain Lugo and Captain Braaten, and a list of MCSO employees who needed to complete evaluations on subordinates before 09/01/2020. When I looked through the list related to evaluations, I noted Engelbeck highlighted names of other Lieutenants, Captains, and Bureau Chiefs who had not completed evaluations. The packet also contained Supervisor Notes Engelbeck printed from the Blue Team database.

When this information was evaluated for this investigation, it was determined that it would not be appropriate to include it as a part of this investigation. The reason it was not included is because the twelve-page rebuttal was written after the PSB interview took place he wrote is being used in the same way a five-minute statement would have been used during his interview. Engelbeck expressed his displeasure with the investigation and the fact he was being held accountable, but none of his supervisors were. As the reader saw, Engelbeck declined to make a five-minute statement at the conclusion of his

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000872

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Principal interview, but several weeks later, he used information discussed during his interview to defend himself and vilify Captain Lugo and Chief Morrison.

It should also be noted that much of Engelbeck's argument centers around why he was demoted. It was made clear during his interview that the performance issues associated with his demotion were separated from the allegations of misconduct during this investigation.

At the conclusion of Engelbeck's letter, he alleges Captain Lugo created a hostile work environment and that he and Chief Morrison violated various MCSO policies. The topic of a hostile work environment can be found within MCSO Policy, **CP-3, Workplace Professionalism** (Effective Date 01/24/2019).

That policy contains the following statement related to hostile work environments and harassment:

*Harassment: Unwelcome sexual advances, request for sexual favors, and other conduct of a sexual nature, or treatment of an individual based on a protected characteristic that is not welcome, that is offensive, that interferes with work effectiveness or that creates an intimidating, hostile, or offensive work environment. Not all conduct that is unpleasant or upsetting constitutes harassment.*

The information provided to me by Sgt. Engelbeck could have been verbally expressed during his five-minute statement, or it could have been read as a part of a hearing to contest findings he did not agree with at the conclusion of this administrative investigation. Still, he chose not to make a five-minute statement. Because he chose not to make a five-minute statement, it would not be appropriate to allow him to use information garnered from the interview then used to write a twelve-page rebuttal where he defends his actions and vilifies his commander's decisions.

Therefore, the narrative provided by Engelbeck will not be uploaded to his case file in IAPro. It will be placed in the physical file for this investigation and turned in when the investigation is completed.

As for the supervisor notes from Blue Team and his six-month evaluation, that information had already been reviewed or would have been reviewed whether Engelbeck provided it or not. The information he provided will be included in this case file in IAPro.

**Explanation of why an additional IA investigation was not opened:**

When I met Engelbeck on 11/10/2020 and he gave me these documents, he did not say anything about filing a complaint against Captain Lugo or Chief Morrison. I took the documents he gave me because I did not know if they had any evidentiary value to this investigation. When I reviewed it, I found I had reviewed everything already, except for his twelve-page statement. Nothing Engelbeck gave me had evidentiary value.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000873

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

The comments Engelbeck made in his written statement, reference to feeling like Lugo was retaliating against him, did not result in the creation of a new investigation. **MCSO Policy CP-11, Anti-Retaliation (Effective Date 12/13/2018)**, states:

*3. An employee shall, without retaliation, report an act of alleged misconduct by another employee to a supervisor or directly to the Professional Standards Bureau (PSB) or to any outside entity authorized to take corrective action.*

*4. All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, member of the public, or employee because that person reports misconduct, attempts to make or makes a misconduct complaint in good faith, cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and are strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action. Retaliating against any person who reports or investigates alleged misconduct shall be considered serious misconduct and shall result in disciplinary action, up to and including dismissal from employment.*

Based on the above sections from the Anti-Retaliation policy, if Engelbeck were to make an allegation of misconduct against Captain Lugo for reporting Engelbeck's conduct to PSB, Engelbeck would violate this policy. His comments about Lugo retaliating against him were considered, but he did not describe any type of protected activity he was involved in that resulted in adverse treatment or action. Based on the interviews conducted with Engelbeck and Lugo, nothing that was asked of Engelbeck was outside of MCSO policy. He may not have liked being held to a higher standard or having to work weekends, but nothing Captain Lugo was asking him to do was a violation of MCSO policy.

According to MCSO **CP-3, Workplace Professionalism: Discrimination and Harassment** (Effective Date 01/24/2019), defines a Protected Activity as:

**Protected Activity**: *An employee's good faith expressed opposition to an employer's practice that he reasonably believes to be discrimination, such as complaining of alleged discrimination or harassment against oneself or another or filing a charge of discrimination. Protected activity may also include exercising legal rights, such as requesting a reasonable accommodation based on religion or disability, requesting leave under the Family Medical Leave Act, or filing a worker's compensation claim.*

CP-11 and CP-3 both define retaliation as:

**Retaliation**: *Subjecting an employee to adverse treatment or adverse action because the employee engaged in a protected activity. All forms of reprisal, discouragement, intimidation, coercion, or adverse action against any person, member of the public, or employee because that person reports misconduct,*

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000874

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

*attempts to make or makes a misconduct complaint in good faith, cooperates with an investigation of misconduct, conducts an investigation or enforces the findings of a misconduct investigation, constitute retaliation and is strictly prohibited. This also includes reports of misconduct made directly to any outside entity authorized to take corrective action.*

None of the orders Lugo gave to Engelbeck constituted any sort of adverse treatment/action that was associated with a protected activity. Because Engelbeck was claiming Lugo created a hostile work environment, which is defined in CP-11, under the definition of "Harassment," which states the following:

*Harassment: Unwelcome sexual advances, request for sexual favors, and other conduct of a sexual nature, or treatment of an individual based on a protected characteristic that is not welcome, that is offensive, that interferes with work effectiveness or that creates an intimidating, hostile, or offensive work environment. Not all conduct that is unpleasant or upsetting constitutes harassment.*

The last sentence in that definition addresses Engelbeck feeling like he was working in a hostile environment. Just because he was being asked to perform to a higher standard than a typical MCSO Lieutenant does not mean the work environment was hostile. At no time did Engelbeck describe anything that would constitute a hostile work environment.

MCSO policy allows employees to file administrative claims under state or federal discrimination laws with the Equal Employment Opportunity Commission (EEOC) or the Arizona Attorney General's Office, Civil Rights Division.

It should also be noted, Engelbeck could have filed a grievance to addressed his demotion. During his second interview he was asked if he filed a grievance to address his demotion and Engelbeck said he had not. MCSO Policy, GC-16, Employee Grievance Procedures identifies Office Policy and Procedures as being grievable matters.

**Summary of GPS data and CAD Histories:**

Because Engelbeck's locations played a significant role in this investigation, GPS data was requested two separate times from the MCSO Technology Bureau. The first request was made to Lisa Leitch in October 2020, to determine how much time Engelbeck was spending at his home after going 10-8 for work. As previously stated, a second request was made in December 2023, after it was discovered Engelbeck turned his GPS off on 09/19/2020. His GPS was found to be off when his MDC was looked at by PSB investigators on 01/31/2024. The GPS data was obtained from Lisa Leitch, who was listed as an investigative lead (IL – Data Only) and she was not interviewed. The second request was made to Margaret Montoya – De La O, who was also listed as an IL, but based on her findings interviews were conducted with her and two other Technology Bureau employees.

---

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPORT000875

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

The GPS data obtained for this investigation shows the location of the mobile data computer (MDC) that was assigned to Engelbeck. The information provided by Lisa Leitch consisted of a map that showed Engelbeck's location, along with a time stamp for every ping of the GPS transmission and an approximate speed/heading while driving.

Lisa entered the GPS pings into the map and then converted them to a video, making it possible to follow Engelbeck's location throughout his shift if needed. In order to reduce the amount of data Lisa needed to review and download, I narrowed the scope of some of the GPS data to be limited to when the GPS started transmitting when Engelbeck left his residence. The GPS data and Unit Histories have been uploaded to this case file in IAPro.

**GPS Data for 09/04/2020:**

The GPS data for this date begins at 06:35, and the location of the pings is in the area of South Harmony Avenue and East Frye Road in Gilbert, AZ. The major intersections for these cross streets are Val Vista Drive and Pecos Road. Harmony and Frye is Engelbeck's home location.

The GPS data shows Engelbeck remained at this location until 08:48. At this time, he drives East towards Queen Creek. I did not request any additional information for this date because I only wanted to determine how long Engelbeck was at his home after he logged in for work.

The GPS data showed Engelbeck remained at home for two hours and thirteen minutes.

**CAD History for 09/04/2020:**

Below is Engelbeck's CAD history for the same date as his GPS data. The CAD history shows Engelbeck logging in at 06:35, then putting himself out on "SuperAdmin" (administrative duties) with a location of "QCK" (Queen Creek).

---

**MCSO Patrol Activity Log**                                    9/4/2020

| Serial No: | S1673 | ENGELBECK |
|---|---|---|
| Supervisor: | S1480 | LUGO |

| Car ID | Miles Driven |
|---|---|
| 322005 | 0 |

Reviewed By S1480 on 9/7/2020 9:06:06 AM

| Spvsr On Scene | IR Generated | Calls For Service | Onview | Total Accidents | Traffic Stop Detail | Total Arrests |
|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 0 |

*NOTE: Information below is from the Unit History*

| Time Recvd | Unit Id | Unit Status Descr | Event Number | Init. Type Code | End Type Code | Dispo | Location |
|---|---|---|---|---|---|---|---|
| 2020-09-04 06:35:39 | A607 | Unit initial log for service | | | | | |
| 2020-09-04 06:35:40 | A607 | Unit is available (voiced : by dispatch) | | | | | |
| 2020-09-04 06:36:13 | A607 | Unit is out of service | | | SUPERADMN | | QCK |
| 2020-09-04 16:51:01 | A607 | Unit is available (voiced : by dispatch) | | | | | |
| 2020-09-04 16:51:09 | A607 | Unit log off of service | | | | | |

---

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPORT000876

CONFIDENTIAL - ATTORNEY'S EYES ONLY
☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Based on Engelbeck's unit history, he worked on administrative tasks for the entire shift but did not respond to any calls for service or engage in any law enforcement contact.

**Unit History and GPS Data for 09/18/2020:**

This GPS data was requested because this was another date Captain Lugo identified in his complaint memo, which documented Engelbeck being outside his area of responsibility during his shift when he was supposed to be within the District VI boundaries supervising deputies. This was also the day Captain Lugo wanted to speak to Engelbeck about performance issues and not being physically located in District VI during his shift. Captain Lugo saw Engelbeck's vehicle at the substation and noticed Engelbeck had been in his office because the paperwork in a wall box near his door was no longer there. Captain Lugo used the I/Netviewer to see where Engelbeck was located, and he found him stationary for long periods at random locations in Queen Creek.

He ultimately had to call Engelbeck and ask him to drive to the substation for their meeting.

The pings for this GPS information began at 06:31, and he put himself out of service with "Superadmin," with his location being QCK. At this time, Engelbeck is not in Queen Creek but in Gilbert in the area of East Frye Road and South Harmony Avenue. The GPS data shows Engelbeck remained at this location until 08:42 hours. Two hours and eleven minutes after logging into his computer.

The GPS tracks Engelbeck to Queen Creek, where he stops at the District VI substation at 09:06 and leaves at 10:05.

When he arrived at the Queen Creek substation, Engelbeck left himself out of service for "Superadmin" but changed his location to "ST600." "ST600" is the radio code for the District VI substation in Queen Creek.

After leaving the substation, Engelbeck drove to the area of Ellsworth Loop Road and parked in a parking lot on the east side of Ellsworth Loop Road between Rittenhouse and East Maya Road. There are numerous restaurants and stores in the area where Engelbeck parked. According to Engelbeck's unit history, he does not put himself out on any kind of call for service in that area, nor does he change his location for "Superadmin." He remains at this location from 10:15 to 11:24. At this point, he drives to another parking lot on the west side of Ellsworth Loop Road, where he parks at 11:27. Engelbeck remains at this location for about ten minutes, where at 11:37, he drives a short distance to the south and east, but remained in the same parking lot, and stopped. Engelbeck is at this location for approximately three hours, from 11:37 to 14:41.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000877

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

14:41 Engelbeck leaves the parking lot and drives back to the Queen Creek substation. Based on the interview completed with Captain Lugo, which was about the time he called Engelbeck and had him return to the substation for a meeting.

Engelbeck remains at the District VI substation until 17:03 hours. After leaving the substation, Engelbeck returns home and the GPS is single, and his unit history ends at 17:38 hours.

Engelbeck's Unit History for 09/18/2020 has been inserted for the reader to review:

**MCSO Patrol Activity Log**                                                          **9/18/2020**

| Serial No: | S1673 | ENGELBECK | | Car ID | Miles Driven |
|---|---|---|---|---|---|
| Supervisor: | S1480 | LUGO | | 322005 | 0 |

Reviewed By S1480 on 9/21/2020 9:47:12 AM

| Spvsr On Scene | IR Generated | Calls For Service | Onview | Total Accidents | Traffic Stop Detail | Total Arrests |
|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 0 |

NOTE: Information below is from the Unit History

| Time Recvd | Unit Id | Unit Status Descr | Event Number | Init. Type Code | End Type Code | Dispo | Location |
|---|---|---|---|---|---|---|---|
| 2020-09-18 06:31:26 | A607 | Unit is available (voiced : by dispatch) | | | | | |
| 2020-09-18 06:31:26 | A607 | Unit initial log for service | | | | | |
| 2020-09-18 06:31:45 | A607 | Unit is out of service | | | SUPERADMN | | QCK |
| 2020-09-18 09:06:32 | A607 | Unit is available (voiced : by dispatch) | | | | | |
| 2020-09-18 09:06:46 | A607 | Unit is out of service | | | SUPERADMN | | ST600 |
| 2020-09-18 17:38:11 | A607 | Unit is available (voiced : by dispatch) | | | | | |
| 2020-09-18 17:38:28 | A607 | Unit log off of service | | | | | |

## Unit History and GPS data for 09/19/2020:

This GPS data was requested because it was another significant date identified by Captain Lugo associated with Engelbeck's failure to follow a direct order reference within the boundaries of District VI during his shift. During his interview and documented within a supervisor note, Captain Lugo said he gave Engelbeck a direct order telling him he needed him to be physically located within District VI during his shift. He said he needed Engelbeck at the substation if he was not out on calls for service. When Captain Lugo checked I/Netviewer the day after giving that order (09/19/20), he saw Engelbeck was logged in at his home and not within the town boundaries as he had ordered.

Engelbeck's GPS data and his Unit History for 09/19/2020 showed he logged in at 06:50 and then put himself on "Superadmin" with a location of QCK. Engelbeck, again, was not in Queen Creek. The GPS

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000878

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

ping showed he was in the area of South Harmony Avenue and East Frye Road, which is where his residence is located.

The GPS data showed Engelbeck was at this location for almost three hours, from 06:50 to 09:41. When Engelbeck left his home, he drove east to Queen Creek, where he entered the town boundary at about 09:57. GPS data showed he arrived at the substation at about 10:05 and stayed until 11:05.

When he left at 11:05, Engelbeck drove around the downtown area of Queen Creek for about fifteen minutes until he stopped in the area of Ellsworth Road and East Victoria Lane. There are several restaurants and shops where his GPS tagged his location. At 11:28, the GPS single from Engelbeck's computer stops transmitting and does not produce a signal for the remainder of his shift.

According to Engelbeck's Unit History for this day, he ended his shift at 16:38. For over five hours, Engelbeck's location was unknown and could not be tracked. Engelbeck's Unit History has been included for the readers convenience.

**MCSO Patrol Activity Log**                                                    9/19/2020

Serial No:   S1673    ENGELBECK

Supervisor:  S1480    LUGO

| Car ID | Miles Driven |
|--------|--------------|
| 322005 | 331 |

Reviewed By S1480 on 9/21/2020 9:47:41 AM

| Spvsr On Scene | IR Generated | Calls For Service | Onview | Total Accidents | Traffic Stop Detail | Total Arrests |
|----------------|--------------|-------------------|--------|-----------------|---------------------|---------------|
| 0 | 0 | 0 | 0 | 0 | 0 | 0 |

NOTE: Information below is from the Unit History

| Time Recvd | Unit Id | Unit Status Descr | Event Number | Init. Type Code | End Type Code | Dispo | Location |
|------------|---------|-------------------|--------------|-----------------|---------------|-------|----------|
| 2020-09-19 06:50:03 | A807 | Unit is available (voiced : by dispatch) | | | | | |
| 2020-09-19 06:50:03 | A807 | Unit initial log for service | | | | | |
| 2020-09-19 06:50:30 | A807 | Unit is out of service | | | SUPERADMIN | | QCK |
| 2020-09-19 16:38:18 | A807 | Unit is available (voiced : by dispatch) | | | | | |
| 2020-09-19 16:38:31 | A807 | Unit log off of service | | | | | |

After it was discovered that Engelbeck's GPS stopped transmitting during his shift an additional request for GPS data was made to Margaret Montoya-De La O. Margaret was asked to use the stopping point of 09/19/2020 at 11:28, which is when Engelbeck's GPS stopped transmitting, and find out when it began transmitting again. During his Principal interview Engelbeck admitted to turning off the location for his GPS but said he "though" he turned it back on. He did not say when he turned it back on and he was not asked to provide a date when it was turned back on. Knowing the GPS data history was maintained by the MCSO Technology Bureau I knew I could get an accurate date/time of the GPS reactivation from them.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000879

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

On 01/03/2024, I sent Margaret Montoya-De La O an email asking her to identify when Engelbeck's GPS was turned back on. After exchanging a series of emails with Margaret she discovered Engelbeck's GPS was not turned back on for four months. Margaret said it was not turned back on until 01/28/2021, which was when he logged on as a District I patrol supervisor with the call sign of "B120." B120 meant that a second sergeant was riding with Engelbeck. Margaret said the GPS data she found showed Engelbeck's GPS was turned off when he was functioning as a lone supervisor, but if a second supervisor was with him he would turn it back on. A review of the Unit History for 01/03/2024, showed Engelbeck was riding with Sgt. A. Bratt and his MDC, not Engelbeck's was used to log them in for that shift.

When this information was discovered an interview was set up with Margaret to have her explain what she discovered and how she discovered it. Margaret's role in this investigation changed from a "Data Only" investigative lead, to being interviewed as an investigative lead.

### Investigative Lead: Ashley "AJ" Hinton, MCSO Tech Bureau:

*The following summarizes the interview with AJ Hinton. AJ was interviewed as an investigative lead to explain how the GPS could be disabled by the MDC users who were operating MCSO patrol vehicles. AJ's supervisor was informed of the interview via email, which was uploaded to this case file in IAPro. The interview was audio/video recorded and uploaded to this case file in IAPro. After the interview, AJ provided notes related to GPS and how it works. Those notes have also been uploaded to this case file in IAPro. Susan Benge B5796, a civilian investigator with the MCSO PSB, sat second chair for this interview.*

On 01/09/2024, at about 13:00, AJ Hinton arrived at the MCSO PSB office for his scheduled interview. Before the interview, AJ was provided with the required administrative forms so he could review them before activating the recording devices. Once the recording devices were activated, the interview began with introductions and reviewing and signing the administrative forms. Copies of those forms were given to AJ after the interview.

To start the interview, I told AJ he was being interviewed to help me understand how the GPS systems used in MCSO patrol vehicles worked and how they could be deactivated. Before explaining how the GPS systems are deactivated, AJ provided a brief history of his employment with the MCSO. He stated his employment with the MCSO began in 2012 when he was hired as a supervisor in the MCSO Technology Bureau. He later demoted himself to the level of a technician in the Tech Bureau, where he was one of the architects for the current MDC system that the MCSO is using.

AJ began by explaining how some of the hardware connections used to connect the GPS antenna on the vehicle's roof to the docking station could be intentionally and/or accidentally damaged. AJ brought physical examples of the GPS connections to show me what he was referring to and showed me how easy

---

Investigator:  Sgt. R. Leatham S1462                Reviewer: Capt. G. Lugo S1480

46REPORT000880

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

it would be to damage the connection. If that was the way the GPS was disabled, it would result in irreparable damage to the hardware.

The other way he said the GPS could be disabled was by right-clicking on the GPS gate icon on the bottom right of the MDC monitor and clicking "Exit" on the menu that pops up. AJ explained how that would disable the vehicle GPS from being seen on the CAD computer, which prevents the vehicle's location from being seen by other MDC users.

AJ said a few other ways to disable the GPS would be to unscrew the round antenna on the roof of the patrol vehicle. He called the GPS antenna "the puck" because it looked like a hockey puck. He also said one of the wires connected to the GPS antenna and running into the docking station could be unscrewed, too. The caveat was that if the wrong wire was disconnected, the MCD would lose its cellular signal rather than the GPS signal.

When asked to explain the GPS, AJ said the GPS data is used by other systems in the MDC and not just the mobile dispatch system. He identified some of those databases as TraCs, JWI, other topographical maps, and several of the proprietary programs created by the MCSO. I asked AJ to describe instances where an MCSO employee would have to disable their GPS. He said there wasn't a reason he could think of for it.

I asked AJ to help me understand why the ability to deactivate the GPS has not been removed from MCSO employees. He said the ability to turn off the GPS has become less of an issue than it used to be because some of the applications that use the GPS data have to run under administrator rights. The need for some applications to run under administrator rights requires MCSO employees to all have administrator rights to a certain extent. The "administrator rights" given to MCSO employees do not allow them to make significant changes to MDC programs. Removing the ability to turn off the GPS data would require significant changes to how the MDCs are used. According to AJ it would not be beneficial.

I explained to him that the incident we discussed occurred in 2020, and I wanted to know what changes were made to the GPS from 2020 to 2024. AJ stated it was essentially the same system, other than a few minor changes.

He said the current configuration allows GPS to be turned off if someone chooses to. I asked AJ to describe how they are notified when a GPS is turned off and back on. He said notifications are not sent to the Tech Bureau when the GPS gate is turned off or on, nor is it logged in any sort of database. If the GPS is turned off, only the person turning it off/on would know it was taking place.

My next question for AJ was to help me understand why the MCSO CAD system would show a person was located somewhere in southern AZ. In this case, I saw Engelbeck's location, which showed he was

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000881

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

in the area of Ajo, AZ. AJ said that is a default location used for people who log in through MCSO communications but don't have an MDC.

He also said that location is used if the GPS signal is not working on an MDC.

One of the final questions I had for AJ was related to information I found in Engelbeck's unit histories between 09/04/2020 and 09/19/2020. The information was found in the "History Command" box, which is available when the unit histories are downloaded to an Excel spreadsheet.

Some boxes have notations related to the GPS single being "strong" or "none." I asked AJ if he could tell me the meaning behind those notations. He said he did not have anything to do with the information documented in the CAD system, and the best person for me to speak with about that would be Margaret De La O or her supervisor.

Even though Engelbeck had admitted to turning off his GPS data, I wanted to know if there was anything else that would impact the GPS data. AJ said a prolonged stop under an underpass or parking near large buildings would impact it. Other than that, as long you have open sky, the MDC's GPS receiver should receive a satellite signal.

After this interview, it was learned that the GPS gate on MCSO patrol MDC was easily deactivated by clicking on the GPS icon and then selecting "Exit" on the drop-down menu. It could also be done by disconnecting or damaging hardware that connects the GPS antenna to the MDC docking station. Other information that was obtained was that there was no way for the Technology Bureau to lock or track manual deactivations of the GPS gate.

While reviewing the GPS pings provided to me by Lisa Leitch, I noticed the pings bounced around and did not record just one spot. Because this created a question about the accuracy of the GPS, I asked AJ how accurate the GPS location is. He said the GPS signal was accurate to about ten meters or thirty feet from the GPS-equipped device.

At approximately 13:30, the interview with AJ concluded. Before exiting the interview room and turning off the recording device, AJ explained how he had communicated with Magaret De La O about this specific case because they were trying to answer my questions for Margaret when I requested GPS data from her. I explained that I understood the communication because they were trying to get the information I had requested. After that brief discussion, I exited the interview room and deactivated the video recorder. The audio recorder I had been using as a backup was deactivated before having that brief discussion with AJ. It did not capture what was said while the camera was still recording.

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000882

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

**Investigative Lead:  Margaret Montoya-De La O:**

*The following summarizes the interview with Margaret Montoya-De La O, which took place on 01/16/2024 at the MCSO PSB office.*

*Margaret's supervisor was made aware of the interview before it taking place. Margaret did not utilize an employee observer, and Sgt. A. Frank, S1455, who is assigned to PSB, sat second chair. The interview was audio/video recorded, and it has been uploaded to this case file in IAPro. Copies of the required administrative forms were given to Margaret before the conclusion of the interview.*

Margaret arrived for her interview at approximately 08:45 hours and was escorted to interview room 2024, where she was provided the required administrative forms for this interview. She was provided copies of those forms after the interview.

To start the interview, introductions were conducted. Margaret explained she had worked as an MCSO dispatcher for thirteen years before transitioning to her current position as a Business Systems Analyst and CAD administrator for the MCSO. Margaret stated her current role involves regularly accessing GPS data of MCSO patrol vehicles for PSB investigations, along with any other requests that may need GPS data. The GPS data she accesses is obtained through a program called Intergraph Tracker, which is linked to the dispatch program used by Deputies and Supervisors during their patrol shifts. Margaret explained how the Tracker application works, and it works by receiving a GPS signal through a GPS receiver that is built into the MDC. That GPS signal is used to capture and display the location of deputies during the shifts. The GPS information is only accessible by a CAD administrator, such as Margaret, through the use of the Tracker software that she has access to.

When the GPS is in use, it captures the location of the Deputy every 800 feet or every 20 seconds, whichever comes first.

Margaret said taking the MDC into a building will interfere with the signal and the CAD report or Patrol Activity Log (PAL) will document the GPS signal as being poor or "None." If the MDC is in a vehicle and not in a building, it will document a good or strong signal in the unit history, which is available through the Unit History of each patrol deputy.

When she was asked to describe any identified limitations of the GPS, Margaret said the Technology Bureau has discovered that moving the MPS icon from the computer screen to the toolbar at the bottom of the computer screen prevents the GPS dialogue from activating. This configuration results in MPS not capturing the GPS signal for that patrol deputy, which results in their location not being seen on the display map in the MPS application.

---

Investigator:   Sgt. R. Leatham S1462                          Reviewer:  Capt. G. Lugo S1480

46REPORT000883

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

# MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

After talking about how the location of the MPS application on the MDC screen impacts the usage of the GPS signal, I asked Margaret to describe any areas within Maricopa County where the GPS signal may be poor. Before her answering that question, I reminded her that I had spent ten years in the Lake Patrol Division, and I knew, from my own experiences, that GPS signals are frequently lost on MDCs in the rural areas within the Lake Patrol area of responsibility.

Other than areas within the Lake Patrol Division, Margaret said there were a few areas of poor GPS reception in the southern area of District VI (Queen Creek), Apache Junction, and various areas in District II.

After discussing how the GPS data is used and retrieved and what areas it may not function very well, I explained to Margaret how Engelbeck admitted to turning off his GPS signal but said he turned it back on. While reviewing a map showing Engelbeck's location for 09/19/2020, I saw his GPS signal went off at 11:28 and reached out to Margaret so she could identify when his GPS signal came back on. The information Margaret obtained through the Intergraph Tracker showed that Engelbeck's computer did not record a GPS signal until 01/18/2021. Before this interview, Margaret sent me some data showing Engelbeck's GPS signal was not active after September 19, 2020, and it was not detected throughout the remaining months of 2020. I needed Margaret to explain what she saw in the data she sent me. The information Margaret sent me was in PDF and electronic notebook files, which have been uploaded to this case file in IAPro.

Margaret explained how the Patrol Activity Log/Unit History documents the MDC user entering information associated with a call for service or if the dispatcher is the person who enters the information.

During this explanation, I logged into the computer in the interview room and turned on the TV so the camera could capture the computer screen in the room. Utilizing Engelbeck's unit history for 01/18/2021, Margaret explained how her search for a GPS track from Engelbeck's computer led her to this date because that was the first GPS track documented for Engelbeck since his GPS was turned off on 09/19/2020. Margaret also included this information because she wanted to show that a GPS track was only captured because Engelbeck was riding with another Sergeant during that shift. Margaret said the only time she saw a GPS track for Engelbeck was when he was riding in a patrol vehicle with another Sergeant. If he was by himself, there would be no GPS track for that shift.

To show me how the Intergraph Tracker works, Margaret connected her work computer to the large screen in the interview room and opened the application. She used Engelbeck's serial number, S1673, and conducted various searches for GPS data between September 2020 and January 2021. No data was found.

The significance of this is related to Engelbeck's 10/21/2020 interview, where he admitted to turning off his GPS, but then he turned it back on again because he did not want to make it appear as if he was being

---

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPORT000884

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

deceptive. The last GPS track Engelbeck had was 09/19/2020 at 11:28 hours. Between 09/19/2020 and 10/21/2020, Engelbeck did not have a recorded GPS tracker. After 10/21/2020, Engelbeck did not have a recorded GPS track until 01/18/2021.

Before ending the interview with Margaret, I wanted to discuss some comments that were recorded in the Unit History under the "History Comment" column. I wanted to know what was meant by *"Device 1010563/HT Radio/Default System removed from employee 771673,"/ "Device 00037264/MDT/Default System removed from employee 771673,"/"Tracking device 00037264/MDT/Default System cleared,"/ "Tracking device 00037264/MDT/Default System cleared for employee 771673."*

Margaret told me she did not know what that information meant and that I would have to speak with Gerson Wright to find out what those comments meant.

Once Margaret explained the lack of GPS data and showed how the GPS data was obtained and what it meant, her interview concluded.

**Investigative Lead Interview: Gerson Wright:**

*The following summarizes the interview with Gerson Wright, which took place on 01/17/2024 at the MCSO PSB office. Gerson's supervisor was aware of the interview before it took place. Gerson did not utilize an employee observer, and Sgt. A. Frank, S1455, who is assigned to PSB, sat second chair. The interview was audio/video recorded and uploaded to this case file in IAPro. Copies of the required administrative forms were given to Gerson before the interview's conclusion.*

On 01/17/2024, at about 13:00, Gerson Wright arrived at the PSB office for his interview and was escorted to interview room 2024. Before the interview began, Gerson was given his copies of the requisite administrative forms. After conducting a brief review of the forms, Gerson stated he was ready to begin.

Before getting into the interview specifics, I asked Gerson to provide me with his employment background before and with the MCSO. Prior to working for the MCSO, Gerson spent twelve years working for Mesa PD as a CAD administrator. During that time, he became involved in working on their MDC/CAD program, which resulted in him being hired by Intergraph. Intergraph is the company that designed the CAD program used by MCSO patrol deputies. While working for Intergraph, Gerson was the Intergraph consultant who worked with Boston PD and Houston PD to get their CAD programs up and running. Gerson said he took his current position with the MCSO in 2022, and he is currently updating and improving our current system.

Gerson's role with the MCSO is that of a Software Architect, and he is the supervisor over the CAD, TraCs, and GSI (GPS mapping) programs that the MCSO uses.

---

Investigator:   Sgt. R. Leatham S1462                 Reviewer:  Capt. G. Lugo S1480

46REPORT000885

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

After providing his background and employment history, I explained how my investigation took me to the point where an interview with Gerson was necessary.

That explanation involved the discovery that Engelbeck's GPS was deactivated on 09/19/2020 and Margaret's discovery that there was no GPS history for Engelbeck until he worked with another MCSO sergeant in January 2021. I also explained to Gerson that Engelbeck was interviewed in October 2020, and during that interview, he admitted to turning off his GPS and then said he thought he turned it back on.

Based on what I had discovered during interviews with Margaret and AJ Hinton, Engelbeck did not turn his GPS back on after 09/19/2020. I told Gerson I needed to know if he was seeing anything different in the Unit Histories, I was going to show him.

Before we talked about the Unit Histories, I wanted to know what occurs if the GPS gate is off when the MDC is powered off. The GPS gate is a red/green icon on the lower right corner of the MDC screen.

Gerson said the GPS gate would reset when it was powered back on, and it would have to be turned off by the user every time they rebooted their MDC. Gerson said the Technology Bureau is aware that the various GPS systems can be turned off by MCSO personnel, but nothing has been done on their end to prevent that from happening. I asked Gerson if the deactivation of GPS through the GPS gate icon is tracked. He said it can be tracked, but he was told not to remove that capability because it puts too much data into the Praxis reports. Gerson said he would like to remove employee access to the GPS gate, but he has left it alone at the request of others within the Technology Bureau.

I told Gerson there were some comments in the "History Comment" column of the Unit History that I needed his help to understand.

It should be noted that before the interview, I downloaded Engelbeck's Unit Histories for September, October, November, and December 2020. The Unit History month of September was chosen because Captain Lugo began to notice Engelbeck spending extended periods away from the office and outside District VI. I also discovered his GPS signal was no longer tracked after 09/19/2020.

The Unit Histories for October through December were chosen because those months did not show any logged data related to a GPS signal coming from Engelbeck's MDC. I wanted Gerson to help me understand why.

Using the computer in the interview room, I put the Unit History for December on the screen and pointed out the "History Comment" box. I pointed out how I could see Engelbeck's history documented a GPS signal from 09/03/2020 until 09/19/2020. The image below is a screenshot from Engelbeck's Unit History for September 2020. The circled comments are what I wanted Gerson to help me understand. Comments

---

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPORT000886

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

were captured on this day, documenting his GPS signal strength was "None" at 09:58 and "High" at 10:03. Those comments tell me Engelbeck's GPS was working; I needed Gerson to tell me what the comments circled in red meant.

| Date | Time | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/03/2020 | 09:58:10 | 322005 | S1673 | S1673 | D6 | QCK | 2035 | | SUPE RADM N | A607 | GPS SIGNAL STRENGTH NONE | Comments added by unit or the running of ACJIS |
| 09/03/2020 | 10:03:10 | 322005 | S1673 | S1673 | D6 | QCK | 2035 | | SUPE RADM N | A607 | GPS SIGNAL STRENGTH HIGH | Comments added by unit or the running of ACJIS |

| Date | Time | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 09/03/2020 | 22:47:48 | 322005 | S1673 | A4924 | D6 | | A607 | Tracking device 00037264/MDT/Default System cleared for employee 771673 |
| 09/03/2020 | 22:47:48 | 322005 | S1673 | A4924 | D6 | | A607 | Tracking device 00037264/MDT/Default System cleared |
| 09/03/2020 | 22:47:48 | 322005 | S1673 | A4924 | D6 | | A607 | Device 00037264/MDT/Default System removed from employee 771673 |
| 09/03/2020 | 22:47:48 | 322005 | S1673 | A4924 | D6 | | A607 | Device 1010563/HT Radio/Default System removed from employee 771673 |

Using the large television monitor in the room, I showed Gerson an Excel spreadsheet that contained Engelbeck's Unit Histories for September 2020.

When he saw the comments in the Unit History, Gerson said they indicate three things. One is it happens when a person logs in for off-duty employment, and they are not driving a vehicle equipped with an MDC or do not have an MDC with them.

He also said the off-duty Deputy would populate the CAD map in the area of Ajo, AZ, which is done to prevent unnecessary icons of off-duty deputies from cluttering the patrol maps on the computer.

Another way those comments are captured is when the user closes the MPS application.

Gerson also said those comments are captured when the GPS tracking ability is deactivated through the MPS program in an MDC. Gerson said this action is different from a person right-clicking on the GPS icon in the lower right corner of their MDC screen and deactivating the GPS in that manner. He said a series of steps need to be taken through the MPS program to get to the page where the GPS can be deactivated.

---

Investigator:   Sgt. R. Leatham S1462                     Reviewer:  Capt. G. Lugo S1480

46REPORT000887

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Until now, I was unaware that MCSO personnel could deactivate the GPS tracking ability in their MDC. Before showing us how that process was completed, we took a break at 13:21 hours, and Sgt. Frank retrieved his MDC, and I retrieved an HDMI cable so we could connect the MDC to the television in the interview room.

We returned at 13:26, and Gerson logged into the MPS application using his administrator credentials.

As he logged into the system, he talked about how disturbing this behavior was and the safety risks it creates when people turn off their GPS. He says the GPS tracker allows MCSO dispatchers to track deputies for safety reasons.

To show us how the GPS can be turned off through the MPS application, Gerson connected Sgt. Frank's MDC to the wall-mounted television and logged into the MPS application. From Page 1, Gerson selected the tab labeled Page 2, then selected the box that said, "Update Unit Properties." Once that tab was selected, it took him to another page with three tabs labeled Unit, Users, and Devices at the top of the screen. The Unit tab showed a vehicle number and the mileage entered by the driver. Gerson selected the "Devices" tab that changed the screen to show the Unit and User ID along with two checked boxes on the right side of the screen. If the two checked boxes are clicked on, it will disable the GPS tracking for the MPS program. The comments I was asking Gerson to explain to me that was related to the "Default System removed/cleared" were generated when these two boxes were selected and the checks were removed.

Gerson explained that the comments in the Unit History are created when the GPS is deactivated, and the system tries to update the GPS location.

When the location cannot be updated because the GPS has been disabled, it creates a history comment. Gerson added there is a legitimate purpose for MCSO personnel to access the Unit Properties tab: add a second person, a second radio, to the MPS login. But by allowing employees the ability to make those changes, they can also disable the GPS for the MPS.

Once Gerson was logged into the MPS system, he showed the multi-step process one has to take to get to the page that disables the GPS for the MPS application. The multi-step process showed the act of disabling the GPS had to be done with intent.

As we talked about the GPS, I asked Gerson what it meant when patrol units were being populated on the map in the area of Ajo, AZ. He said that meant their GPS had been disabled.

He specifically identified the verbiage of "Default System Cleared" and said it meant the MDC user had turned off Engelbeck's GPS through the MPS system. When asked why a person unchecked those two boxes, Gerson said the only reason is to prevent their location from being tracked.

---

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPORT000888

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

As we discussed the issue of Engelbeck disabling his GPS, Gerson stated he was disturbed by Engelbeck's usage of his GPS and how the intent of the GPS tracking was for the safety of patrol deputies. He talked about removing the ability for MCSO employees to turn the GPS signal off. Gerson said there is an update available he could send out that would remove anyone's ability to remove access to those check boxes that disable the ability of their GPS to track their location. Seeing there may be a potential issue with the GPS tracking of MCSO vehicles, I told Gerson he was free to speak with his supervisors and address this issue in a manner they feel is most appropriate.

I asked Gerson if the comments captured in Engelbeck's Unit History were enough to prove he was turning his GPS tracking off through the MPS program. Gerson said yes. Gerson was asked if there was any other way for the comments related to the deactivation of the MDC GPS to be captured in any way other than what we had discussed. He said no. Gerson also said the comments are intentionally meant to be cryptic, and he worked for the company that designed the system.

In regards to the comments captured when the GPS history is turned off, Gerson said the number 1010563 is the number that identifies Engelbeck's portable radio. The number 0037364 identifies Engelbeck's MDC.

To ensure there was no doubt that Engelbeck's GPS was being turned off and there was no other source of information, I scrolled through the Excel spreadsheet and asked Gerson to point out anything that might say something else may have been going on. As I scrolled, he repeatedly pointed out where Engelbeck had turned off the GPS tracking for his MDC. Gerson also said the default setting is for those two boxes to be checked, so when the MDC is shut off and the GPS deactivated, it will be activated when rebooted. Gerson said for the GPS to be turned off for every shift, Engelbeck would have to take the multi-step process, click on the checked boxes, and deactivate the GPS.

Gerson was also asked if there was any other way for the user to get to the page where they could turn off the GPS tracking. He said no.

**Interview Break:**

At 13:54 hours, Sgt. Frank and I took a break and exited the room.

Gerson also exited the room to make a phone call. While we were out of the room, there was no contact between Gerson and Sgt. Frank and I, other than telling him we were ready to proceed with the interview, at 13:58, the interview resumed, but we did not have any other direct questions for Gerson. I asked Gerson if there was anything he felt we needed to know for this investigation. He stated no.

At 14:00 hours, the interview with Gerson Wright concluded.

---

Investigator:   Sgt. R. Leatham S1462                Reviewer:  Capt. G. Lugo S1480

46REPORT000889

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

**Review of Engelbeck's Unit Histories (CAD):**

*The patrol histories for Engelbeck were reviewed to look for any patterns of behavior associated with the allegations of misconduct that were made against him. Those unit histories were located within the Praxis database as well as the "Reports" section found in the MCSO Portal Links home page. Engelbeck's Patrol Activity Logs (PAL) from April 16, 2020, to October 11, 2020, were reviewed and uploaded into this case file in IAPro. Every PAL will not be summarized in this narrative. This will be an overview of any patterns of behavior that were observed during that review.*

The review of Engelbeck's PAL, or what are also referred to as CAD (Computer Aided Dispatch) histories, Engelbeck would consistently become available for work by logging into the MCSO dispatch program between 06:30 and 06:45. There are a few times where he started closer to 06:15. There were a few instances where Engelbeck did not log in until around 09:00 or 10:00 but special events were taking place in Queen Creek.

One patter that was observed is associated with Engelbeck putting himself out on "Superadmin" and entering his location as "QCK." QCK is an abbreviated version of Queen Creek. A result of Engelbeck putting himself out on "Superadmin," is that he is in the CAD system as being "out of service," or not available for traffic. It should be noted that GPS data was not obtained for every one of the CAD/PAL histories, but when these histories are compared to the CAD histories that do have GPS, it shows Engelbeck's pattern of behavior was consistent while he was assigned as a Patrol Lieutenant in Queen Creek.

Along with starting his shifts between 06:30 and 06:45, he would frequently stay at the location where he logged in for several hours. The amount of time he stayed at his home varied from one hour to three or four hours. There were several dates where he logged in and did not put himself out on "Superadmin," but it as infrequently done.

**Investigators Note:**

*During his interview Engelbeck admitted his pattern of behavior consisted of logging onto his computer while at home then working on administrative duties before driving into Queen Creek. Even though GPS data was not obtained for Engelbeck's location for ever day he logged on, he admitted to logging in while at home and staying there for extended periods of time.*

Another pattern that was observed involved Engelbeck remaining on "Superadmin" during his entire shift. There were only a few instances where Engelbeck put himself out of service by using the complaint service code or by responding to calls for service. As for going to calls for service as a Patrol Lieutenant, there are only a handful of CAD histories showing him responding to calls for service. If he wasn't on a call

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000890

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

for service his histories showed he was on "Superadmin." "Superadmin," was the service code most frequently used during Engelbeck's shifts.

Engelbeck's Unit Histories for 09/18/2020 and 09/19/2020 were reviewed because those two dates were identified by Captain Lugo as significant dates related to Engelbeck's conduct as it pertains to this investigation. 09/18/2020 was the day when one of Engelbeck's patrol sergeants was in training and Engelbeck was tasked with being the patrol supervisor for the district. The CAD history showed he logged in at 06:31 then put himself out on "Superadmin" at the same time. At 09:06, he changes his location to "ST600" which is the Queen Creek substation, but he is still on "Superadmin."

On that same date (09/18/2020), the patrol sergeant, Sgt. Yager, sent his dispatcher a message from his computer informer them he would be in training and "A607", Engelbeck, would be covering until he was done with training. That message was sent to dispatch at 05:36 hours. That CAD message was uploaded to this case file in IAPro with the CAD histories.

09/18/2020 was also the date Captain Lugo had to call Engelbeck to the substation to have a meeting with him reference being within the District VI boundaries and at the substation during his shift. The CAD history for the next morning, 09/19/2020, showed Engelbeck logged in at 06:50, put himself out on "Superadmin" and remained out of service with that code until 16:38 hours, which is when his shift ended.

GPS data was obtained for the date of 09/19/2020 and what was discovered during that review has already been summarized.

After 09/19/2020, Engelbeck continued the practice of logging on at his home and remained there for more than three hours. None of his Unit Histories after 09/19/2020 documented him responding to calls for service or taking supervisory action other than the administrative duties that necessitated the frequent use of the "Superadmin" service code.

While reviewing Engelbeck's Unit Histories, I noticed on the histories generated 09/19/2020, and earlier, the Unit Histories contained the verbiage, " *Tracking device 00037264/MDT/Default System cleared for employee 771673, Tracking device 00037264/MDT/Default System cleared, Device 00037264/MDT/Default System removed from employee 771673, Device 1010563/HT Radio/Default System removed from employee 771673.* "

The first Unit History where these captured comments were observed were on 09/04/2020. When compared to the 09/05/2020 Unit History, there are different comments logged related to the strength of Engelbeck's GPS signal. Those comments stated, "GPS Signal High, Good or None." Also captured in the comments on 09/05/2020 were the same comments related to the deactivation of the tracking device.

---

Investigator: Sgt. R. Leatham S1462          Reviewer: Capt. G. Lugo S1480

46REPORT000891

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

During September 2020, Engelbeck's Unit History documented the presences of a GPS signal through his MDC. After 09/19/2020, Engelbeck's Unit Histories do not document any kind of GPS signal strength. The only information documented in the comments are associated with the deactivation of the default tracking device. Based on the interview conducted with Gerson Wright, no GPS signal was detected because Engelbeck deactivated the GPS signal through the MPS/CAD application.

During Engelbeck's Principal interview on 10/21/2020 he admitted to turning off the GPS tracking on his MDC, but then stated he turned it back on to avoid the appearance of being deceptive about his location. Knowing Engelbeck turned his GPS off on 09/19/2020 at 11:28 hours, and it remained off for the rest of his shift, I sent Margaret Montoya-De La O an email asking her to provide me a date of when his GPS signal was picked up again.

The information Margaret Montoya-De La O discovered using the Intergraph Tracker application showed Engelbeck's MDC did not produce a GPS track after 09/19/2020 until 01/18/2021. On that date Engelbeck was partnered with a second sergeant and when they logged in for their patrol shift it was with the other sergeants MDC and not Engelbeck's.

The information discovered by Margaret documented no trackable GPS signals from Engelbeck while he was on patrol beginning on 09/19/2020 through January 2021. This is significant because Engelbeck was interviewed on 10/20/2020 where he said he turned off his GPS but turned it back on because he did not want to appeared as if he was trying to be deceptive. Margaret's research not only showed Engelbeck had deactivated his GPS prior to being interviewed on 10/20/2020, but he also kept it deactivated after his PSB interview.

This internally discovered lie required the addition of a new allegation of misconduct against Engelbeck where it is alleged he lied to PSB investigators during his interview about the deactivation of the GPS system while working as a Patrol Lieutenant in District VI.

Engelbeck's Unit Histories and the corroborating evidence provided by Margaret Montoya-De La O have been uploaded tot his case file in IAPro.

**CP-5, Truthfulness memo:**

Per MCSO Policy, the discovery that Engelbeck lied to PSB investigators during his interview in October 2020, required approval from a Bureau Chief to proceed with the investigation into a truthfulness allegation. A memorandum requesting approval to proceed with that aspect of the investigation was authored and submitted to my supervisor. The memorandum was approved and has been uploaded to this case file in the IAPro database.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000892

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

The next step in the investigation is to conduct a second interview with Sgt. Aaron Engelbeck. That interview has been scheduled for 01/31/20204.

**Principal Interview #2: Sgt. Aaron Engelbeck S1673:**

*The following summarizes the second Principal Interview conducted with Engelbeck, which took place at the MCSO PSB office on 01/31/2024. Before the interview's occurrence, Engelbeck's supervisor was made aware of the interview via an email from PSB admin staff. Sgt. E. Thompson S1747, who is assigned to PSB, sat second chair for the interview. The interview was audio/video recorded and uploaded to this case file in IAPro. Engelbeck chose not to utilize an employee observer during this interview.*

The interview with Engelbeck began at approximately 13:14 hours. Before starting the interview, I provided him with a new Principal NOI, Garrity warnings, and observer waiver memo. The need for the new forms was because of a new allegation related to MCSO Policy CP-5, which was related to comments he made during his first interview about his activation/deactivation of the GPS in his MDC.

Once the audio/video recorder was activated and after the administrative forms were signed, I explained the new CP-5 allegation, and he would have to clarify his actions related to not having a GPS track since 09/19/2020. The portion of Engelbeck's 10/21/2020 interview that this new allegation was based on was played for him. The statement was made at the 53-minute 30-second mark in his interview.

Approximately one minute of video was played from that starting point. That selection of video was played twice to ensure he heard what was said. I also took the time to stress to Engelbeck the importance of him being completely honest during this interview.

In the previous interview, we discussed Engelbeck's use of "QCK" as his location in his Unit Histories, which was alleged as misconduct by Captain Lugo because he was not entering an accurate location. During the video excerpt, Engelbeck introduces the topic of deactivating his GPS if he wanted to be deceptive. He is asked if he ever did that, and he admits to tampering with his GPS, but he could not recall what was done to turn it off. He also stated he could not recall if he ever re-activated the GPS.

His justification for this action was to see if it would work because former MCSO Lieutenant Brian Jakowinicz told him command-level employees did not need to have GPS activated, so he should turn it off [Or something similar].

I explained to Engelbeck that I tried to close this loop, which he opened, without having to conduct a second interview, but when I reached out to the MCSO Technology Bureau, they discovered significant information related to his GPS that he needed to answer.

Because I had stressed the importance of truthfulness, I told Engelbeck I conducted several other interviews before bringing him in, so I needed him to be completely honest.

---

Investigator:   Sgt. R. Leatham S1462                          Reviewer:  Capt. G. Lugo S1480

46REPORT000893

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Engelbeck was asked to explain how he turned his GPS tracker off and how long it was off. He initially said he could not say when he turned it off. I told him the previous interview occurred on 10/21/2020.

He said it was probably a few weeks before that, but he could not be sure.

As for how he turned it off, he said he did not know if he went through the CAD system on the MDC or if it was on the computer itself. Engelbeck followed up by saying he looked in several places on the MDC and felt he was successful in turning it off, but he was not sure. I followed up by asking Engelbeck if he turned off the GPS in his MDC, and he stated, "I think so." Because there is more than one way to turn off the GPS tracking, I asked Engelbeck if he turned it off through the CAD system. He said he could not remember. I asked him how many steps he took to complete the task of turning off the GPS. Engelbeck said he did not remember. He again said he did not know if he was successful or not.

Engelbeck was asked to explain how he could not be sure if he turned the GPS back on after he turned it off. Engelbeck said he was not sure the GPS came back on because when he logged into CAD, "random GPS coordinates" would come up, but he did not know if they were accurate or not. When asked how often he turned off the GPS, Engelbeck said he thought he turned it off just once, but he could not be sure.

Engelbeck was asked to explain why he looked into turning it off. He stated that one reason for doing it was because he was angry at Captain Lugo and because he was told that Command-level employees did not need to have it on.

Engelbeck was asked to clarify what he meant by the GPS was showing a weird location for him. He said any time he tried to put himself out at a specific location, GPS coordinates would be present in the location line. He said the line never provided a location such as a crossroads; it would only give those GPS coordinates. Engelbeck was asked if he had ever contacted the Tech Bureau (MCSO Technology Bureau) to have them look at the issue. He stated no. When asked why, Engelbeck said it was because he was still angry and did not want to bother with it.

Engelbeck was asked why MCSO vehicles are equipped with GPS. He answered by saying, "So the office knows our location." That question was followed up by asking for another purpose of the GPS. This question evoked an annoyed response from Engelbeck, where he stated, *"Safety? I don't know why? What Cha getting at?"*

It was pointed out that officer safety is an obvious reason to have a working GPS on a patrol vehicle, and then I asked him why he even looked into turning it off. Engelbeck's response was, *"Again? I told you, Rob, I was angry, and the point was he [Captain Lugo] knew where I was, so obviously, I didn't turn it*

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000894

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

*off. I wasn't trying to be deceptive. I looked at it out of curiosity because Jakowinicz brought it up. That's it."*

Sticking with his comment about the "weird" GPS location, Engelbeck asked how long it took him to notice it. He could not say when he noticed but said it was still doing it. I again asked if he contacted the Technology Bureau and asked them to look at it.

Engelbeck said, "No."

At this point, I brought up that GPS data is tracked and retrievable, then explained how I reached out to the Technology Bureau to get his GPS tracks for three specific days in September 2020.

Those dates were the 4th, 18th and 19th. I explained the specific reasons for those dates, and the primary purpose was to see how long he was staying at his house. I then played the GPS tracker video Lisa Leitch created for September 19th and cued it to the time of 11:28, which was when Engelbeck's GPS was last tracked. Engelbeck was shown how his GPS signal disappeared while he was parked in the area of Ellsworth Road and Victoria Lane in Queen Creek.

Engelbeck was asked what was in that area. He said it was a shopping center where he would frequently park to monitor traffic. He followed that up by saying it was also an excuse not to be in the office with Lugo.

After being shown that his GPS went off at 11:28, and he was on shift until about 14:30. To gauge whether or not Engelbeck was intentionally turning off his GPS daily, I asked if he had any idea what the Technology Bureau found when they looked for a trackable GPS history for him. Engelbeck only guessed that the GPS was not working. He then volunteered to go get his MDC so we could examine it to determine if anything had been turned off.

Part of the interview was going to involve looking at Engelbeck's computer because after I learned Engelbeck's GPS was off for an extended period, I used the web-based I/Netviewer and saw for myself that his GPS was putting him in Ajo, AZ and not in District I. I explained this to Engelbeck.

He then stated, *"Well, I don't know what the system is like. I don't know if you turn it off like it stays off, and you can't turn it back on. I don't know. But I never reached out, and I never looked into it any deeper. No one's ever said like, Hey, I can't track you. Okay. So I didn't look deeper into it."*

*Leatham: Nobody's brought anything to your attention? Nobody's said anything?"*

*Engelbeck: "Nope. Nobody in command. No one above me. No one, none of my supervisors, has ever said, I can't track you. So figure it out."*

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000895

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Before Engelbeck's computer was retrieved, he was asked to walk us through how he logged onto his computer at the start of his shift. Engelbeck said he never turns his MDC off unless a reboot is required.

Other than rebooting the computer when needed, he leaves it on all the time. When he logs in for work, Engelbeck said he logs into the MPS system, enters information for the vehicle he is driving, and then puts himself out at Station 100 (District I). Engelbeck said he had to delete the GPS coordinates to enter the location to put himself out at District I. He then puts himself out on "Superadmin." He said there are no other steps he takes before or after logging into the CAD system.

Because I wanted to be sure Engelbeck was not turning off his vehicle GPS at the start of every shift, I asked him if there was a time, other than that day on 09/19/2020, when he turned off the GPS through his MDC. He said, "No. Not at all."

At 13:39 hours, we took a break. We exited the interview room, so Engelbeck's computer could be retrieved from his patrol vehicle.

**Retrieval of Engelbeck's MDC:**

Sgt. B. Flanigan S1994, who is assigned to PSB, utilized the Axon Capture application on his MCSO-issued cell phone and video recorded himself leaving the PSB office, walking to the parking lot where Engelbeck's vehicle was parked, retrieving the MDC from the vehicle, and placing it inside the interview room.

He stopped the recording once the computer and Engelbeck's keys were placed on the interview room table. The video was taken to document the retrieval and to show the computer was not tampered with prior to it being placed inside the interview room.

The video captured by Sgt. Flanigan has been uploaded to this case file in IAPro.

Review of Engelbeck's MDC:

After the MDC was retrieved from Engelbeck's patrol vehicle, the interview began again at 13:58.

After Engelbeck logged into his MDC, he turned the screen towards me, and sat back in his chair. The first thing I noticed on the screen was the missing icon for the GpsGate.

The green square icon has a G in the middle if the GPS is on and working. The square is red if the GPS is not working. On Engelbeck's GPS, the square was not even visible on the screen.

Sgt. Thompson used his office-issued cell phone and took five total pictures of the review of Engelbeck's MDC. Those photos have been uploaded to Evidence.com and to this case file in IAPro.

The first picture Sgt. Thompson photographed the MDC screen with the missing GPS gate icon.

---

Investigator:    Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000896

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**





The above icon is what should be present. If the GPS is active and working, the box will be green.

Once it was discovered the GPS gate was not working I checked the properties section of the MPS to see if the GPS had been disabled in the manner shown to me by Gerson Wright. I found both of the boxes in the properties were checked. If they had been unchecked the GPS would not have worked.



Once the two boxes within the properties setting of the MPS were checked, I used the search bar at the bottom of the screen on Engelbeck's MDC and searched for "GPS." This search resulted in the Franson

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPORT000897

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

GPS gate populating at the bottom right of the screen. It populated in the red box like what is seen above.

When I checked the setting for the GpsGate, it was discovered a box that needed to be checked in order for the GPS to work was not checked. See the image on the next page.



It should be noted that while Engelbeck's MDC was being examined, an HDMI cable was plugged into it so our actions could be seen on the large TV and captured on the camera in the interview room.

Before we began looking at Engelbeck's computer, he was logged into the MPS CAD program. I opened the map on his MDC and saw his GPS icon did not show him in the area of the MCSO PSB office. I tried to zoom in on the area of Ajo to see his "A120" icon was visible. The MDC map could not zoom in close enough to see Engelbeck's icon. Before his arrival, I checked the map on the I/Netviewer and saw his GPS was placing him in Ajo. It did not show his vehicle driving towards the PSB office location.

Before the review of Engelbeck's computer began, a separate MDC that was logged into the MPS/CAD program was being monitored by PSB staff in a separate room. This was done to see what occurred on the MDC when the GPS was turned back on.

When I clicked on the "*Start GpsGate after boot*" box, I saw the GPS icon at the bottom right of the screen turned green. This told me the failure of the GPS to work properly was because that one box was not checked. I was told Engelbeck's MDC location showed he was at the PSB office.

---

Investigator:    Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000898

CONFIDENTIAL - ATTORNEY'S EYES ONLY
☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

I submitted an additional request for GPS data to the MCSO Technology Bureau to confirm when and where a GPS signal appeared for Engelbeck's MDC.

Once it was confirmed the GPS on Engelbeck's computer worked, the start GPS gate button was unchecked, the computer was rebooted, and Engelbeck logged back in. This was done to see what happened to the GPS when the MDC is rebooted. As Engelbeck was rebooting the computer, I asked him how long it had been assigned to him. He stated he has had it since the MDC was assigned to him. He was also asked if anyone else could log into his MDC. Engelbeck said no.

As the reboot process was taking place, I asked Engelbeck to explain how, as a supervisor, he was not paying attention to the map on his MDC or getting his GPS fixed. He stated the following:

Leatham: *I gotta reconcile why, as a supervisor, you're not getting that fixed. Why you're not thinking that it's important to see where you're at in the map?*

Engelbeck: *I haven't been on patrol before now in about two and a half, three years. So it really hadn't occurred to me. Now I'm logging back on, and now I'm really pissed off, and I don't care anymore. So yeah, it didn't really occur to me. That was the last thing on my mind.*

Leatham: *So you're pissed off and you just don't care?*

Engelbeck: *It's not that I don't care. It's the last thing on my mind. I gotta get back into patrol. I gotta figure out I'm being unjustly treated by this division, being unjustly treated by my captain, who I have a complaint against. Inadvertently or not inadvertently, indirectly. And then you guys demote him twice and put him in charge of me again. So I gotta deal with him. It's like.*

Leatham: *It has nothing to do with this.*

Engelbeck: *I know. You're right. You're right. It does actually, it has a lot to do with it. It has a lot to do with what you're asking me right now.*

Engelbeck was told that this interview resulted from facts and data I found while trying to complete this investigation. It was pointed out that he admitted to turning off his GPS in September 2020, but he could not recall if he turned it back on or not. It was also pointed out to him that there was a policy update in 2022 that required all GPS to be activated and that, as a supervisor, he did not know his GPS was off.

Engelbeck's response was to say the GPS looked "weird," and he didn't say he knew it was off. I repeated his statement made earlier in the interview, where he noticed the "weird" GPS, but he did nothing to fix it. I then pointed out that he was the one who turned off the GPS, but he was saying he did not know it was off. Engelbeck's response was to say he never looked at the location that was showing him on the map, and he only assumed the GPS coordinates that were populating in his GPS were accurate.

---

Investigator:    Sgt. R. Leatham S1462          Reviewer:    Capt. G. Lugo S1480

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Engelbeck was asked to show us the GPS coordinates he was referring to. He clicked the location button on the MDC screen, and the line that appeared had GPS coordinates that began with -112. Based on my experience working in the MCSO Lake Patrol Division, where GPS coordinates were the only way to find a scene location that might be in the desert, GPS coordinates beginning with -112 are located west of Phoenix, while coordinates that begin with -111 are east of Phoenix.

**Investigators Note:**

*GPS coordinates for Ajo, AZ, were obtained post-interview as -112.860710 W 32.371723 N. The GPS coordinates for Mesa, which is where the District I substation is located, were confirmed as -111.8315 W 33.4152 N. We did not discuss Engelbeck's knowledge of GPS coordinates, and this was just to show the GPS coordinates where Engelbeck was being shown on the MDC map, compared to his work location.*

Engelbeck also demonstrated how he deletes the GPS coordinates then enters his location. He did this by putting PSB as his location. Engelbeck said he does not pay attention to the GPS coordinates; he just deletes it and enters his location.

As we talked, Engelbeck was asked to navigate to the GpsGate settings on his MDC. When he reached the window where the GPS could be deactivated, he was asked to describe how familiar he was with the settings box that was open on the screen. Engelbeck said it did not look familiar at all. He then said, "I have no idea…" but stopped and said, "I don't believe I have ever seen this one." He was referring to the window that was open and visible on the monitors in front of him.

With the GPS settings open, after the MDC had rebooted, the "start GpsGate after reboot" box remained unchecked. When I clicked on the GPS gate icon earlier in the interview, the GPS indicator turned green. This time, it remained red, which indicated it was not receiving a signal.

**Investigator's Note:**

*During previous interviews with Technology Bureau staff, they said being indoors would impact the MDC's ability to get a GPS signal.*

*During this interview, we were in a windowless room on the second floor of the East Court Tower, and there were numerous floors above us, which is most likely the reason for the lack of a GPS signal.*

At that point, Engelbeck asked if that was the only thing that was making the GPS not work. Because neither Sgt. Thompson nor myself are MDC technicians, he was told we weren't sure. I later told him the MDC would have to be looked at by an MDC technician with the Technology Bureau to make sure it was working properly.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000900

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

I took this opportunity to bring up the Unit Histories I have looked at while looking for facts and data for this investigation. I told Engelbeck I noticed the mileage he entered never changed. He was asked to explain how accurate his mileage logs are. Engelbeck said they are probably not accurate at all. When asked why, Engelbeck said he estimates his mileage because he is not in the car when he logs into the MPS system. He said the reason for that is because he is in briefing.

Engelbeck was asked how long he had been doing that. He stated ever since he has been back on patrol. When asked to give the number he typically enters, Engelbeck said he uses 15,000 as the milage.

When Engelbeck was asked what policy says about vehicle mileage logs, he said, "*I have no idea. I'm sure it says accurate mileage.*" Engelbeck explained that he is not in his vehicle when he logs onto the MPS on his MDC and estimates the mileage on his patrol vehicle.

Engelbeck was asked how long he had been doing that, and he said since he had been back on patrol. When he was asked to identify the number he typically used, Engelbeck said it was 15,000

**Investigator Note**:

*A review of Engelbeck's Unit Histories from 2020 as a Lieutenant showed he frequently entered inaccurate vehicle mileage or no mileage at all during his patrol shifts. When his 2023 Unit Histories were checked, 15,000 was frequently entered as the starting mileage Engelbeck entered for his vehicle mileage while working patrol shifts in District I. This internally discovered policy violation will result in an added allegation of misconduct.*

At this point in the interview, Sgt. Thompson nor I had any other questions for Engelbeck. He was told his MDC would be taken to the MCSO Technology Bureau, where one of their technicians would review the discoveries related to the GPS.

**Principal's five-minute statement**:

At the conclusion of the interview, Engelbeck was offered time to make a five-minute statement. Rather than make a five-minute statement, he requested an IA number for a complaint that was never made. He referred to a twelve-page document he authored and gave me when I met him in the area of Power Road and Queen Creek Road in Gilbert on 11/10/2020.

The documents he provided were taken as part of this investigation, but they were not used to create a new administrative investigation.

This meeting with Engelbeck lasted only a few minutes, and no audio or video was recorded. However, I do recall he did not tell me wanted to file a complaint when he gave me the documents. These were the

---

Investigator:  Sgt. R. Leatham S1462                     Reviewer:  Capt. G. Lugo S1480
46REPORT000901

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

same documents I referred to earlier in this report where Engelbeck chose not to make a five-minute statement during his first interview but then provided a written rebuttal to Captain Lugo's complaint.

Engelbeck said he documented serious misconduct on the parts of Captain Lugo and then Chief C. Morrison, and he was upset that Captain Lugo filed a complaint before he could file his own. Engelbeck voiced his frustrations, but he did not say anything about the allegations being made against him in this investigation.

It was explained to Engelbeck that MCSO Policy CP-11, Anti-Retaliation, prohibits filing a complaint against another person who has filed a complaint against the Principal.

I told Engelbeck I would speak to my current supervisor about it, but it was not the practice of the MCSO for Principals to make complaints on Complainants. After voicing his frustrations, Engelbeck was offered a chance to make another five-minute statement. He declined to do so. At 14:40 hours, the interview concluded.

Once Engelbeck left the building, the twelve-page document he gave me was given to Lt. E. Romney S1529 so he could determine what course of action would be taken with it.

**Truthfulness allegation**:

After the interview, the decision was made not to put Engelbeck on administrative leave related to the truthfulness allegation. Further investigation was needed to determine to what degree Engelbeck's deactivation of his GPS and failure to ensure it was working were a truthfulness issue.

**MCSO Technology Bureau review of Engelbeck's MDC:**

*The following summarizes the review of Engelbeck's MDC by AJ Hinton at the MCSO Headquarters building on 02/02/2024 at 08:00. This review was audio/video recorded with the Axon Capture App on my MCSO-issued cell phone. That video was later uploaded to this case file in IAPro. Before AJ examined the computer, the GPS settings were put in the same condition as when it was looked at during Engelbeck's interview on 01/31/2024. The MDC remained in my possession until it was examined on 02/02/2024. At no time was it tampered with or turned on in any way.*

On 02/02/2024, at 08:00, I met with AJ Hinton in a third-floor conference room at the MCSO Headquarters (550 W. Jackson Street Phoenix, AZ) so he could confirm the reason Engelbeck's GPS was not showing his location was because he had turned off the ability for the GpsGate to start when he logged into MDC.

Before starting the review, I activated the video capture feature on the Axon Capture application on my MCSO-issued cell phone. It should be noted that two videos were created for this incident because I inadvertently stopped the recording while trying to reposition the camera.

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

CONFIDENTIAL - ATTORNEY'S EYES ONLY
☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

The record button was immediately pressed again. I estimate there is a one or two-second break between both videos.

Once the video recorder was initialized, I asked AJ to identify the issue with Engelbeck's MDC and why it showed his location in Ajo, AZ.

Once AJ logged into the computer and into the MPS application as an administrator, he saw the GpsGate in the lower right corner of the screen was red. I asked him to describe what that meant. He said the computer was not receiving any GPS data. To determine why it was not receiving data, AJ looked in several files deep within the hard drive of the MDC. We discussed the programs that use the GPS gate as their data source as he looked. He identified some programs: the Topographical Map program, Streets and Trips, and TraCs.

As he reviewed the program files, AJ referred to some updates the Technology Bureau put out that may have impacted the ability of the GPS gate to start up. He looked at those specific settings and described potential conflicts with other MDCs in the past.

The issue he brought up was related to the Comports, and if the appropriate number was not next to a specific port, the GPS gate would not start up. AJ identified the programs that use GPS data and the ports they were linked to. AJ identified Comport 10 as the port used by MPS to get its GPS signal. As he analyzed the system, AJ said there may be settings deeper within the MDC that may not have been working correctly, so he went through the process to check them. To check for any conflicts within the system, AJ looked at a setting within the control panel section of the MDC operating system.

AJ navigated to where the GPS ports were visible in the control panel and located a possible conflict with one of the ports within the GPS. This conflict may have interfered with how the GPS operated. Still, then it was pointed out that since a GPS signal was not being received by the MPS CAD program, which meant the MPS CAD program did not know the location of the MDC.

**Investigator Note:**

*During this portion of AJ's review, he was unaware that the GPS was activated during the interview with Engelbeck when I checked the "Start GpsGate" box on the MDC.*

*Even though he was looking for possible errors that may have prevented the GPS from working correctly, it confirmed that it worked once that specific box was checked.*

As AJ navigated through the computer, he described the various ways an update from Microsoft may impact the ability of the MDC to receive a GPS signal. We discussed how those updates might impact the MDC. Still, ultimately, the topic was irrelevant because the GPS had already been proven to work.

---

Investigator:    Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480
46REPORT000903

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

AJ spoke of the GpsGate, which he accessed with a right-click on the red GPS icon on the lower right of the MDC screen. He looked at the first window under the settings and said it showed information about how the GPS signal enters the MDC. AJ said the settings he saw on the first page were configured correctly.

I asked AJ to look under the Advanced setting and describe what he saw.

AJ said the advanced settings are set to start the GPS when the computer boots up.

He pointed out various features under the advanced menu of the settings tab, but he did not address the unchecked box next to the "Start GpsGate after boot." I asked AJ to explain how that box would impact the GPS if it was unchecked.

He said the GpsGate is still set to run and should function whether or not that box is checked. AJ navigated through several folders until he arrived at one associated with the startup function of the GpsGate. When he arrived at that folder, he saw the GpsGate shortcut was missing from it, and with a confused tone, AJ said that the shortcut should have been in that folder. As he began looking for reasons why the shortcut was missing, I asked AJ if he could tell me the shortcut he was looking for.

After clicking on the Windows icon at the bottom left of the screen, AJ scrolled down until he found the Franson GpsGate icon and said that was the shortcut that should have been in that folder. AJ navigated back to the folder where the Franson shortcut was missing and said it should be in that folder, but it was not. AJ further stated that the lack of having the "Start GpsGate at boot" box checked was not a reliable way to prevent the GPS from tracking the user's location. The GPS should start whether or not that box is checked when reboots.

While AJ navigated the various screens, I held my cell phone near the MDC screen to capture what he was doing. After AJ described how the startup folder is more challenging to find and that was the folder he was looking under, I put my phone down so I could show him pictures that were taken of Engelbeck's MDC during his interview at PSB. After I logged into my MDC and opened the pictures, I accidentally touched the record button on the screen, which caused the video to stop recording. This occurred at about 08:18. I immediately pushed the record button again to start another recording.

The timestamp in the upper right corner of the Axon video shows the first video stopped at 15:18:55, Zulu time. It is unknown why Axon records in Zulu time, but it is also known as Greenwich Mean Time (GMT). When the Zulu time of 15:18 is converted, it was consistent with Arizona time, which was 08:18. The second stamp on the second video starts at 15:18:58 GMT. This time is included to show the camera was stopped for only three seconds.

---

Investigator:   Sgt. R. Leatham S1462                Reviewer:  Capt. G. Lugo S1480

46REPORT000904

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

The interview with AJ resumed, and I showed him the images of Engelbeck's MDC and explained what condition the GPS was in when it was looked at during the interview.

The first picture I showed AJ was of Engelbeck's MDC after it was logged into the MPS CAD system. I asked AJ to tell me what was missing from the screen. He identified the icon for the Fanson GpsGate was missing from the bottom of the screen. AJ was asked to explain what the missing icon meant. I said the GpsGate distributes GPS data to the various applications that require GPS data. If that icon was missing, AJ described it as a missing link in the chain needed for the GPS data. I pointed out that my MDC has never been placed in a patrol vehicle, and the GPS icon is always red. AJ would later fix this issue, which was caused by an update from Microsoft. I then pointed out how Engelbeck's computer did not have a visible GPS icon.

The next picture I showed AJ was an image of the properties page found in the MPS application, which Gerson Wright showed me how to access. I told AJ the two boxes in this area of Engelbeck's MDC were checked as they should have been. He clarified that his role with the MCSO is that of an MDC technician, and he is not very familiar with the MPS CAD application, so he did not know the significance of those two checked boxes or two red boxes found on the same properties page.

The next image I showed AJ was the advanced settings page where the "Start GpsGate.." box was not checked. I asked AJ to tell me what information he could provide based on what he saw on that screen. He said the missing checkmark from the box keeps the GpsGate from starting up and has resulted in MDC not being able to receive and distribute a signal to the applications that need it. I asked AJ to describe its impact on other applications if the GPS was not working appropriately. He said the impact would be minimal because some applications do not regularly use the GPS signal.

I asked AJ to tell me where my patrol vehicle would populate on that map if I worked in the East Mesa area, but the "Start GpsGate" box was not checked. AJ said logging into the MPS CAD program without active GPS data would send the patrol vehicle icon to the default location on the map near Ajo, AZ. AJ could not explain why that location was chosen. Still, it was chosen by a previous CAD administrator no longer employed with the MCSO. AJ said one reason units without GPS or non-working GPS were shown in Ajo was so the dispatcher could look at their maps and see which units were not receiving a GPS signal.

I asked AJ to describe who or what was put in place to monitor the units that were populating at the default location near Ajo. To his knowledge, he did not know if anyone was actively monitoring the MPS CAD map to see who had a working GPS and who did not.

AJ was asked to describe what would happen if that box was left unchecked, but the MDC was never shut down but allowed to run all night. He said the lack of a reboot would not give the GPS a chance to start

---

Investigator:    Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000905

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

up again because the MDC is not being allowed to reboot. For clarification, I asked AJ to tell me what condition the "Start GpsGate.." box would be in if I powered down my MDC and left that box unchecked. He presumed that the application would not start appropriately. I further clarified so I understood what he was saying, and he said it had been a long time since he tested that feature.

Before he answered the question, there was another feature he wanted to look at that was associated with the GPS. After he navigated to the settings page he was looking for, we continued to discuss the various ways MCSO personnel could populate on the map near Ajo. Those ways were to not have a GPS signal, to log in with radio without an MDC, or to log into the I/Netviewer. The settings page he navigated to was discussed and will be explained further in this narrative.

Once we finished discussing that, I told AJ how Engelbeck's GPS signal showed he was at the PSB office after I checked the "Start GpsGate" box during his interview.

I told AJ that his GPS signal came on when I checked that box and answered one of my main questions. What I wanted to know was why MCSO employees can deactivate their GPS. AJ explained it was because all MDC users have a certain level of administrator access, so they can effectively use their MDCs to do their jobs without calling the Technology Bureau. The example he provided was a deputy obtaining video evidence that required a proprietary application to view the video. He said they want deputies to be able to load that application and view the video without asking the Technology Bureau to load it every time they have to do it.

For MCSO personnel to use their MDCs as efficiently as possible, they must keep those administrative rights. The caveat is that if the Technology Bureau had to make it so MCSO personnel could not access the settings window where the GPS access is located, they would have to remove every level of admin rights that allow them greater access to the MDCs capabilities. AJ said there have been conversations had about making that change, and the "ball is rolling" in that direction, but it will take research by the Technology Bureau before it is done.

AJ transitioned back to the settings he navigated to on Engelbeck's MDC and said he wanted to see if the GPS service was running for the GpsGate. He described the technical aspect of the Franson GpsGate if it were to run as a service rather than an application. AJ said the only impact that would have is the GPS signal would still be received without having the red G at the bottom of the screen. He also said it would block non-administrators from changing how the MDC functioned.

I asked AJ what issues would be created if the MPS application ran as a service and not an app. His information was a repeat of what he said during his first interview with me. He said if MPS was run as a service, it would prevent the GpsGate from turning on. AJ went on to identify various ways for the GPS not to function correctly, but none of those ways applied to this investigation.

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000906

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

I continued to speak with AJ about the setting Engelbeck's MDC was left with after the interview concluded and the impact it may have had on the ability of the GpsGate to activate. As I explained how it was left, AJ wanted to check another folder on the MDC and navigated to an advanced folder somewhere in the system with a Franson GpsGate icon in the folder. AJ then unchecked the "Start GpsGate at Startup" box. When he did that, the Franson GpsGate icon disappeared; when the icon disappeared, AJ said that was the reason the GPS was failing to work. When the "Start GpsGate" was unchecked, it prevented the GPS from starting at all.

After AJ identified the unchecking of that box as the issue, we further discussed what it would take to prevent employees from unchecking it.

The remainder of the interview involved some minor clarifications that have already been addressed and asking AJ if the deactivation of this GPS could have been accidental. He said there were too many steps that needed to be taken to turn it off, and he did not believe it could be done accidentally.

At 08:41, the interview with AJ Hinton concluded.

**Engelbeck's door car swipes at District VI Substation and Unit History comparison:**

When Captain Lugo was interviewed, he provided a history report containing door card swipes to show when Engelbeck was arriving at the District VI substation. The name for the card is "K. Banks," who is Kristen Banks. Banks was assigned to District VI before Engelbeck and he was given her old door card. The history provided by Captain Lugo documented door swipes starting on 09/04/2020 and ending on 10/03/2020.

**Investigators Note:**

*Lt. Banks' work history records show she was transferred out of District VI, to the Training Division on 02/24/2019.*

The original document provided by Captain Lugo was placed in the physical case file and retained by PSB. It was also scanned and uploaded to the case file in IAPro. The quality of the scan is not as good as the paper copy, but the dates/times of Engelbeck's card swipes can still be seen. Rather than type out the dates and

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000907

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

# MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

| # | TIME | Loc | EVENT | Dev # | DEVICE | NAME | Code |
|---|------|-----|-------|-------|--------|------|------|
| **Friday** | **9/4/2020** | | | | | | |
| 1 | 2:04:01PM | 11 | Access Granted | 59.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 2 | 2:06:09PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 3 | 2:06:28PM | 11 | Access Granted | 42.8 | 191 Body Cam Room | BANKS, K. MCSO | 7032839 |
| **Sunday** | **9/6/2020** | | | | | | |
| 4 | 9:57:54AM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 5 | 10:40:12AM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 6 | 1:15:38PM | 11 | Access Granted | 59.8 | West Gate | BANKS, K. MCSO | 7032839 |
| 7 | 1:25:25PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| **Thursday** | **9/10/2020** | | | | | | |
| 8 | 12:59:15PM | 11 | Access Granted | 35.3 | East Gate | BANKS, K. MCSO | 7032839 |
| 9 | 2:02:47PM | 11 | Access Granted | 14.9 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| **Friday** | **9/11/2020** | | | | | | |
| 10 | 11:58:03AM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 11 | 12:28:14PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 12 | 4:26:16PM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| **Saturday** | **9/12/2020** | | | | | | |
| 13 | 11:15:03AM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 14 | 11:15:11AM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 15 | 1:13:43PM | 11 | Access Granted | 35.3 | East Gate | BANKS, K. MCSO | 7032839 |
| 16 | 1:15:34PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 17 | 2:21:36PM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 18 | 2:23:25PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 19 | 2:23:39PM | 11 | Access Granted | 42.8 | 191 Body Cam Room | BANKS, K. MCSO | 7032839 |
| **Wednesday** | **9/16/2020** | | | | | | |
| 20 | 8:39:36AM | 11 | Access Granted | 39.8 | West Gate | BANKS, K. MCSO | 7032839 |
| 21 | 8:45:30AM | 11 | Access Granted | 14.8 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 22 | 11:09:26AM | 11 | Access Granted | 42.3 | 191 Body Cam Room | BANKS, K. MCSO | 7032839 |
| **Friday** | **9/18/2020** | | | | | | |
| 23 | 9:05:01AM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 24 | 9:05:23AM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 25 | 2:47:50PM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 26 | 2:49:35PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| **Saturday** | **9/19/2020** | | | | | | |
| 27 | 10:34:51AM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 28 | 10:55:05AM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 29 | 11:39:07AM | 11 | Access Granted | 39.3 | West Gate | BANKS, K. MCSO | 7032839 |
| 30 | 1:16:13PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |
| 31 | 1:59:17PM | 11 | Access Granted | 35.3 | East Gate | BANKS, K. MCSO | 7032839 |
| 32 | 2:07:19PM | 11 | Access Granted | 14.3 | 165B Ent from Corr 165 | BANKS, K. MCSO | 7032839 |

Investigator: Sgt. R. Leatham S1462          Reviewer: Capt. G. Lugo S1480

46REPORT000908

☐CRM

# MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
## IA #2020-0555

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Saturday | 9-26-2020 | | | | | | |
| 33 | 9:10:25AM | 11 | Access Granted | 39 . 8 | West Gate | BANKS, K : MCSO | 7032x39 |
| 34 | 10:09:13AM | 11 | Access Granted | 14 8 | 165B Ext from Corr 165 | BANKS, K : MCSO | 7032x39 |
| 35 | 1:11:48PM | 11 | Access Granted | 38 8 | East Gate | BANKS, K : MCSO | 7032x39 |
| 36 | 1:55:55PM | 11 | Access Granted | 14 8 | 165B Ext from Corr 165 | BANKS, K : MCSO | 7032x39 |
| 37 | 3:41:13PM | 11 | Access Granted | 38 8 | East Gate | BANKS, K : MCSO | 7032x39 |
| 38 | 3:43:26PM | 11 | Access Granted | 14 8 | 165B Ext from Corr 165 | BANKS, K : MCSO | 7032x39 |
| Saturday | 10-3-2020 | | | | | | |
| 39 | 8:34:15AM | 11 | Access Granted | 39 . 8 | West Gate | BANKS, K : MCSO | 7032x39 |
| 40 | 8:26:45AM | 11 | Access Granted | 14 8 | 165B Ext from Corr 165 | BANKS, K : MCSO | 7032x39 |
| 41 | 11:05:17AM | 11 | Access Granted | 14 8 | 165B Ext from Corr 165 | BANKS, K : MCSO | 7032x39 |

Based on the above card swipes, the earliest time Engelbeck arrived at the District VI substation was 08:34, which is two hours after his shift began. Other time stamps show him arriving at 12:56, 11:58, 11:15 and 10:04. Engelbeck was never questioned or asked to explain his arrival times at the District VI substation.

When the dates on the door swipes are compared to Engelbeck's Unit Histories, it shows inconsistencies between his location and the information entered into CAD. 09/04/2020, Engelbeck logged on at 06:35, then put himself out on "Superadmin." The only location he provided was to enter "QCK." At no time does he put himself out at the District VI substation.

Engelbeck's Unity History for 09/05/2020 is the same as the 4th, but there are no card swipes recorded at the substation. He put himself on "Superadmin" at 06:48, entered "QCK" as his location and that was it. No other activities or locations are documented.

His Unit History for 09/06 is the same as the 4th and 5th, with the exception that he puts himself out at "ST600" at 13:22. The card swipe shows he was at the substation at 08:35

Engelbeck's Unit History for 9/10 contains the same information at the 4th and 5th. A card swipe showing he arrived at District VI at 12:56, after logging on at 06:33.

The Unit History for 9/11/2020 begins with Engelbeck going on "Superadmin" at 06:32 with his location being QCK. This history differs from the others because he went to a community policing event at the American Leadership Academy in Queen Creek from 08:14 until 10:00. Card swipes show he arrived at the District VI substation at 11:58. At 10:00 he puts himself out on "Superadmin" with his location being "QCK." His location does not change until 16:39, when he puts himself out at "ST600."

The Unit History for 09/12/2020 starts the same as previous days. Logged on at 06:31, and out on "Superadmin" with a location of "QCK." At 11:15 there was a card swipe when he entered the District VI property. At 11:16 he changes his location to "ST600." The Unit History shows Engelbeck responded to a citizen/motor assist at 14:02. When he clears that call at 14:11, he puts himself back on "Superadmin"

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

and makes "ST600" his location. This occurs at 14:55. A card swipe showed Engelbeck arrived at the District VI property at 14:21.

Engelbeck's Unit History for 09/16/2020 starts in the same manner as previous days. He logs on for work at 06:31, and puts himself out on "Superadmin" with a location of "QCK." The card swipe record shows he was at the District VI substation at 08:35. At 12:05 he responded to a call related to a suspicious person. At 13:10, he cleared himself off the call. At 13:50 he put himself back on "Superadmin" with a location of QCK. He remained on "Superadmin" until he logged off at 17:00. There were no door card swipes for him after 11:09.

Engelbeck did not have any door card swipes for 09/17/2020 because he was at the MCSO training building. He accurately entered the location for the MCSO training facility in his Unit History.

Engelbeck's Unit history for 09/18/2020 begins at 06:31 with "Superadmin" and "QCK." His location changes at 09:06 when he puts himself out at "ST600." The door card history shows he arrived at District VI at 09:05. Another entry swipe showed he arrived again at 14:47. This is the same date where Captain Lugo had to call Engelbeck to get him come to District VI so he could meet with him about being at the substation when he is not out on calls for service.

The door swipe history showed Engelbeck did not arrive at the District VI substation until 10:04. His Unit History showed he was logged on at 06:51 and out on "Superadmin" with a location of "QCK." The door swipe history showed a swipe for 11:39, which is eleven minutes after his GPS stopped recording his location. Another door swipe, showing he entered the property was recorded at 13:59.

Engelbeck does not have another door swipe until 09/26/2020, which is recorded at 09:50. His Unit History showed he was logged on at 06:31, out on "Superadmin," and his location was "QCK." On this date Engelbeck has entry swipes for District VI at 13:11 and 15:41. The location is his Unit History never changes to document where he went or to show he was out at ST600.

The last door swipe provided to me occurred on 10/03/2020 at 08:34. Engelbeck's Unit History for that date shows he was logged on at 06:31, out on "Superadmin," with a location of "QCK." At 08:35 his location is changed to ST600 and he is taking care of a complaint.

The door swipe history and the Unit Histories that coincide with those swipes have been uploaded to this case file in IAPro.

**Policy Failure/Correction:**

During the investigation into these allegations of misconduct, I attempted to locate any MCSO policies which governed that deactivation of GPS units contained with the issued MDCs and I was not able to identify a policy that covered that specific topic. This issue was addressed and corrected in a separate

Investigator:   Sgt. R. Leatham S1462                 Reviewer:  Capt. G. Lugo S1480

46REPORT000910

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

### MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

administrative investigation which resulted in MCSO Policy **GE-4, Use, Assignment and Operation of Vehicles,** being updated to state the following:

*C. All assigned Office Mobile Data Computers (MDCs) have Global Positioning System (GPS) tracking capabilities. GPS tracking capabilities provide real time and historical information to Communication Division personnel to ensure employees safety, decrease Office liability, and provide for the efficient deployment of Office resources.*

*1. The GPS tracking feature on the MDC shall **not** be disabled by an employee unless prior approval has been obtained from their bureau chief for reasons to include, but not limited to, a specific task or investigative action.*

*2. Upon completion of the approved specific task or investigative action for the deactivation, the employee shall immediately reactivate the GPS feature.*

Because the issue of the deactivation of the GPS feature was addressed prior to the completion of this investigation, there is no longer a need for me to take corrective action to address this issue.

**Review of Body Worn Camera Video:**

There is no body camera footage associated with this investigation.

**In addition to the listed policies, this investigation attempted to identify concerns with equipment, policy, tactics and training. Deficiencies related to the incorrect vehicle miles being entered at the start/end of shift was found, along with potential deactivation of GPS locators in patrol vehicles. Those deficiencies were submitted to the MCSO Bureau of Internal Oversight to analyze and correct. There were no concerns related to policy and training that were identified. There were no weapons used in this incident and there was no criminal conduct discovered during the administrative investigation**

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

46REPORT000911

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

**Critical Facts and Conclusions:**

**Allegation #1:**   **It is internally alleged Lt. Engelbeck failed to follow a direct order when he was not within the boundaries of District VI as ordered by his Captain.**

**Policy #1:**   **CP-2.3, Code of Conduct** (Effective 07/30/2020)

39. **Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

**Critical Facts:**

- On December 2, 2019, Engelbeck was promoted to the rank of Lieutenant and assigned to District II Patrol.
- The District II substation is located in Avondale, AZ, which is approximately 45 miles from Engelbeck's residence.
- Directions given to him by the District II Commander was to log on at his residence then drive to his area of responsibility.
- On February 24, 2020, Engelbeck was transferred to District VI, which was the patrol district that encompassed the contract town of Queen Creek, AZ.
- Prior to the opening of this administrative investigation, Engelbeck failed to complete his probationary Lieutenant status and was demoted to Sergeant and assigned to District I.
- Engelbeck's home is five miles away from the Queen Creek town limits.
- On 04/15/2020, Captain Lugo held a meeting with Engelbeck where he given a list of expectations that said, "during the normal working hours you will physically be located within the boundaries of District 6, barring to take care of an issue, but then return."
- The Town of Queen Creek was paying to have two Lieutenants assigned to their town, and they expected to have them present and available in town.
- A supervisor note was written by Captain Lugo to document the meeting. The list of expectations was included in that meeting.
- During his interview, Engelbeck acknowledged receiving the expectations list and being told to be within his area of responsibility during his shift.
- Patrol Activity Logs and CAD histories established a pattern of behavior where Engelbeck would remain at his residence for several hours after going 10-8, prior to driving to his area of responsibility.
- Engelbeck admitted to logging in, eating breakfast and reading emails or Blue Team notes before driving to District VI.
- During the majority of 2020, the Covid-19 pandemic impacted the way the MCSO functioned and numerous divisions required employees to work from home.
- During this time Engelbeck was assigned as a Patrol Lieutenant which did not allow him to telecommute.
- The duties of a Patrol Lieutenant required them to be within their area of responsibility so they

---

Investigator:   Sgt. R. Leatham S1462              Reviewer:   Capt. G. Lugo S1480

46REPORT000912

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

could respond to calls for service, supervise patrol sergeants, address administrative issues with their subordinates, issue orders, address major events within their patrol area, and receive/investigate complaints. Another aspect of Engelbeck's job as a Lieutenant was to provide instruction on policies, procedures and techniques.

- The description of Engelbeck's job as a patrol Lieutenant was taken from the "Job Description" section of his six month employee appraisal.

- Captain Lugo said Engelbeck never sought permission to work from home on a regular basis, and if he had he would not permitted it because his job required him to be present within the patrol district.

- Captain Lugo began to notice Engelbeck was frequently late arriving in the limits of District VI and he was frequently absent from the District VI substation. Engelbeck's absence resulted in Captain Lugo having to help Engelbeck's subordinates with tasks Engelbeck should have been addressing.

- During his Principal interview, Engelbeck admitted to not going to the District VI substation because he wanted to limit potential exposure to Covid-19, but he also said he was avoiding being around Captain Lugo.

- On 09/18/2020, after it became apparent to Captain Lugo that Engelbeck was spending several hours a day at his residence and not within District VI as he had been instructed, he had a meeting with Engelbeck. During that meeting he gave Engelbeck a direct order to be within the boundaries of District VI during his work shift, and if he was not out on a call for service he needed to be physically located within the District VI substation so he could address administrative issues.

- That meeting was documented in an email and a supervisor note which were both sent to Engelbeck.

- During his interview, Engelbeck said he was never given a specific time to be within the District boundaries. Engelbeck identified his work hours as being approximately 06:30-16:30 with his work days being Wednesday – Saturday. He said Captain Lugo never told him to be in town at a specific time.

- The Merriam-Webster definition of "During," is "Throughout the duration of."

- On 09/19/2020, Engelbeck started his shift in the same manner as he started on 09/18/2020 and numerous other shifts. He logged on, at his residence, at 06:50 put himself out of service with the "Superadmin" service code and remained there until 09:41.

- GPS data of Engelbeck's location on 09/18/2020 and 09/19/2020 were obtained from the MCSO Technology Bureau. GPS data was also obtained for 09/04/2020, which was the day Captain Lugo first noticed Engelbeck was logging in at home and staying for extended periods of time.

- When Engelbeck was questioned about the email sent by Captain Lugo about the meeting, he admitted to intentionally not reading it because he was angry or upset with Lugo and he did not want to read the email.

- The GPS Data, Patrol Activity Logs and Engelbeck's statements during his interview, established a pattern of behavior where he would log into his MDC while at home, put himself out of service and remain at home for an extended period of time.

- When it came to being within the Queen Creek boundaries by a certain time, Engelbeck admitted to following the directions given to him by his previous commander, as well as other Lieutenants who had been assigned to District VI. He modeled his behavior by what other peers were doing and not what Captain Lugo was asking him to do.

---

Investigator:    Sgt. R. Leatham S1462                Reviewer:  Capt. G. Lugo S1480

46REPORT000913

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

- Engelbeck felt he could adequately supervise at a distance via telephone, CAD or the radio. He admitted that he did not like having people look over his shoulder, so he was not going to supervise in that way.
- Engelbeck did not view Captain Lugo's request to be within the boundaries of District VI as a direct order. Therefore he did not deviate from the routine he established for himself.

**Conclusion:**

When Engelbeck was promoted from Sergeant to Lieutenant, he was assigned to District II as a watch commander. According to Engelbeck, he was told by his Captain to log into CAD or go 10-8 from home and then make his way to District II. The drive from Gilbert to Avondale takes approximately one hour or more, depending on traffic. The directions given to Engelbeck by his Commander while he was assigned to District II were reasonable, considering the distance he had to travel. Watch commanders are assigned to a specific patrol district; however, they typically manage more than one district during the evenings. Engelbeck was not a Watch Commander while he was assigned to District VI, so his only area of responsibility was District VI.

When he was transferred to District VI in February 2020, his drive decreased by 40 miles, and the drive time from his residence to Queen Creek took about ten minutes. When Engelbeck's new Captain asked him to be within the boundaries of his new patrol district during his shift, he could have logged into CAD and been in town within ten minutes. According to Captain Lugo, he had no issues with Engelbeck not getting into District VI for ten or fifteen minutes after he logged on. Engelbeck chose not to follow Captain Lugo's request and frequently remained at his residence for two to three hours after he logged in for work. CAD histories/Patrol Activity Logs showed Engelbeck would log into CAD and immediately put himself out of service using the out-of-service code for supervisor administrative duties, "Superadmin."

Engelbeck also admitted during his interview that one of the previous District VI Lieutenants, whom he was friends with, would regularly meet him for breakfast before she drove to Queen Creek for work. Engelbeck felt he should be allowed to behave in the same manner as previous District VI Lieutenants did. Still, Captain Lugo was making him perform at a standard not expected of other MCSO Lieutenants. Captain Lugo's request to have Engelbeck be within the boundaries of District VI during his shift was not unreasonable, nor was it a policy violation. Captain Lugo admitted he did not tell Engelbeck he wanted him to be within the boundaries of District VI by 7:00. Still, he felt he made it clear during the two meetings with Engelbeck that he needed to be in District VI during his shift. By "During," Captain Lugo meant for the entirety of his shift unless he had to leave to take care of work-related issues. If that occurred, Engelbeck was required to notify Captain Lugo. When it came to Engelbeck working from home, Captain Lugo said Engelbeck never sought approval to work from home or to spend his morning hours working from home. After Captain Lugo spoke with Engelbeck on 09/18/2020 and gave him a direct order to be within the District VI boundaries during his shift, Engelbeck did not believe he was given a direct order and began his next shift at his home, where he remained for over three hours. Captain Lugo documented that meeting in a supervisor note and an email, both of which were sent to Engelbeck. When Engelbeck was asked if he had read the email, he stated he had not because he was angry with Captain Lugo.

At the conclusion of this administrative investigation, reference **Allegation #1 Policy #1**, where it is alleged Engelbeck was insubordinate by failing to follow a direct order from his supervisor. This investigation determined the allegations are supported by the preponderance of the evidence and justify a reasonable conclusion of a policy violation. Therefore, I recommend a finding of **SUSTAINED.**

---

Investigator:    Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000914

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

**Allegation #2:**   **It is internally alleged Lt. Engelbeck was untruthful by entering "QCK" as his location when he was not physically located in Queen Creek.**

**Policy #1:**   **CP-5.1.C, Truthfulness** (Effective Date 09/11/2020)

C. Employees shall not make false official records or enter or cause to be entered into any books, logs, records, reports, or electronic documents any inaccurate, false, or improper information or material for the purpose of deception.

**Critical Facts:**

- While assigned as one of two District VI Patrol Lieutenants, Engelbeck would enter QCK as his unit location after he logged in to work through his office issued MDC.
- GPS records obtained from the MCSO Technology Bureau show Engelbeck was at his home in Gilbert when he logged in for work.
- QCK is an abbreviation for Queen Creek.
- In April 2020, Captain Lugo held a meeting with Engelbeck and the other District VI Lieutenant and told them they needed to be within the boundaries of District VI during their shifts.
- Engelbeck interpreted "during," to mean at some point during his shift.
- Captain Lugo meant he wanted Engelbeck within the town limits ten to fifteen minutes after Engelbeck's shift started.
- During Captain Lugo's interview he identified Engelbeck's use of an inaccurate location to make it look like he was in Queen Creek when he actually wasn't.
- Captain Lugo saw the inaccurate location as a truthfulness issue because he said it was creating a false official record.
- During his Principal interview, Engelbeck said he entered QCK as his location to show that was his area of responsibility and not because he wanted to make it look like he was in Queen Creek when he actually wasn't in Queen Creek.
- There is no corroborating evidence or witnesses/investigative leads who could prove Engelbeck intentionally entered an inaccurate location into his Unit History in order to be deceptive about where he was.

**Conclusion:**

While assigned to District VI as a Patrol Lieutenant from February 2020 to October 2020, Engelbeck would log in to his MDC at his home in Gilbert and enter his location as "QCK," an abbreviated version of Queen Creek. According to Engelbeck, this was his way of letting dispatch know he was available for the area of Queen Creek and not an attempt at being deceptive by being in Gilbert but putting his location as Queen Creek. When Captain Lugo saw Engelbeck's location was entered as Queen Creek, but he could see on the MDC map that he was in Gilbert, he interpreted it as a violation of MCSO Policy CP-5 because Engelbeck created a false or official record. During this investigation, no other evidence was discovered, nor were any other witnesses/investigative leads identified who could corroborate Captain Lugo's allegation that Engelbeck was creating a false office record by entering an inaccurate location into his Unit History.

At the conclusion of this administrative investigation, reference **Allegation #2 Policy #1**, where it is

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000915

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

internally alleged Engelbeck was untruthful because he entered his location as "QCK" or Queen Creek when he was not physically located in Queen Creek. This investigation determined there was insufficient evidence to prove or disprove the allegation. Therefore, I recommend a finding of **NOT SUSTAINED**.

**Allegation #3:**     **It is internally alleged that Sgt. Engelbeck lied to PSB investigators about activating the GPS tracker in his MDC after he admitted to turning it off.**

**Policy #1:**     **CP-5.1.A, Truthfulness (Effective Date 09/11/2020)**

A. Employees shall not lie or make a false statement relative to a material fact for the purpose of deception, during the course of an official investigation.

**Critical Facts:**

- During his first Principal interview, on 10/21/2020, Engelbeck admitted to turning off the GPS receiver on his MDC, but then stated he thought he turned it back on.
- When that statement was made that status of Engelbeck's GPS being either on or off was not being looked at.
- The only way his GPS information was being used to determine how much time he was spending at his residence after logging on for work.
- While this investigation was being completed in December 2023, his GPS data was reviewed again and it was discovered that his GPS was turned off on 09/19/2020, and it was never turned back on.
- A request was sent to the MCSO Technology Bureau and they were asked to identify when the GPS was turned back on. It was discovered that Engelbeck's GPS never came back on.
- Between 09/19/2020 and 01/18/2021, there was no GPS data for Engelbeck.
- The Unit History logs that are retained in Praxis document whether or not a patrol vehicle has a working GPS. It will log whether a GPS signal is strong, good or none.
- After 09/19/2020, Engelbeck did not have any comments in his unit histories until 1/18/2021 and the only reason he had any GPS data was because he was riding with another District I Sergeant whose MDC was used to log them in for their shift.
- Interviews were done with staff members of the MCSO Technology Bureau who described two different ways in which the GPS, which is located in the MDC could have been disabled.
- Based on specific verbiage contained within Engelbeck's Unit Histories, Gerson Wright, who is the MCSO lead for the Intergraph MPS CAD program that is loaded on MDCs, Gerson said Engelbeck was turning off his GPS on daily basis by going to a specific page within the MPS system and turning it off.
- Prior to working for the MCSO, Gerson worked for Intergraph as a CAD administrator and he is the architect of the current program being used by the MCSO.
- The truthfulness allegation was made based on Gerson's interpretation of the GPS data that was documented in Engelbeck's CAD histories.
- A second interview was conducted with Engelbeck on 01/31/2024, and his MDC was inspected by PSB investigators. It was discovered that he turned his GPS off by right-clicking the GPS icon on his MDC screen and removing a check from a box that prompts the GPS to load when the MPS program is started.
- The GPS was not turned off in the manner described by Gerson Wright. Engelbeck would have had to go into the MPS program every day and turn off the GPS. The manner in which it was

---

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000916

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

turned off did not require a daily act from Engelbeck to turn it off. Once the check was removed from the box the GPS remained off until it was turned back on during his PSB interview.

- At the conclusion of the interview and after the examination of his MDC, there was no evidence to prove Engelbeck intentionally lied to PSB investigators during his first interview.
- More than three years had elapsed between Engelbeck's first interview and his second interview.

**Conclusion:**

When this administrative investigation started, GPS data was used to determine how much time Engelbeck spent at his residence after logging into his MDC for work. During his first interview with PSB investigators on 10/21/2020, while talking about his location during patrol shifts, Engelbeck stated how he would turn his GPS off if he wanted to be deceptive.

He admitted to turning off his GPS to see if it worked, then stated he thought he turned it on, but he was unsure if he did. When that statement was made, there were no indications that Engelbeck had turned his GPS off and was never turned back on. While summarizing that interview and reviewing Engelbeck's GPS data from 09/19/2020, it was discovered his GPS was turned off at 11:28.

The MCSO Technology Bureau looked into his GPS history and discovered that Engelbeck's GPS never came back on.

Interviews were conducted with personnel from the MCSO Technology Bureau so I could understand how the GPS for MCSO patrol vehicles worked and how it could be turned off. It was learned that the GPS could be turned off by unchecking a box within the GpsGate menu or by taking multiple steps through the MPS CAD system and turning it off daily. Gerson Wright, who is the architect of the current MPS program being used by the MCSO, said Engelbeck was turning his GPS off by using the multi-step process through the MPS program, which was made based on Gerson's interpretation of the dialogue captured in the Unit Histories from Engelbeck's patrol shifts.

When Engelbeck was interviewed for a second time on 1/31/2024, he was shown the statement he made during his first interview about turning off his GPS to see if it worked, then "thinking" he turned it back. Engelbeck was asked to explain how he turned off the GPS and tried to turn it back on. He stated he did not recall any of the steps to turn it off or how he tried to turn it back on. His MDC was examined during the interview, and how Gerson Wright said the GPS was deactivated was not how Engelbeck had turned it off. He turned off his GPS by going through the GpsGate icon, which is located in the lower right-hand corner of most MDC screens. He then removed a check from a box that prevented the GpsGate from loading when the MPS CAD system was turned on. Even though it was confirmed Engelbeck's GPS was deactivated, it was not done so in the alleged manner. The way Gerson alleged it happened would have required Engelbeck to intentionally turn it off daily. How the GPS was turned off was in a manner that once the box was unchecked, the GPS stayed off, and Engelbeck did not have to do it daily.

Even though Engelbeck admitted to turning off his GPS, which is addressed with a different allegation, I could not prove Engelbeck intentionally lied to PSB investigators during his first interview.

At the conclusion of this administrative investigation, reference Allegation #4, Policy #1, where it is internally alleged that Engelbeck lied to PSB investigators during his interview, it was determined there was insufficient evidence to prove or disprove the allegation. Therefore I recommend a finding of **NOT SUSTAINED.**

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT00091

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

**Allegation #4:** **It is internally alleged Lt. Engelbeck was insubordinate when he deactivated the GPS on his MDC.**

**Policy #1:** **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

**Critical Facts:**

- On 12/2/2019, Engelbeck was promoted to Lieutenant and assigned to work as a Watch Commander in District II.
- On 02/24/2020, Engelbeck was transferred to District VI, where he was one of two Lieutenants assigned to that patrol district.
- Two months after Engelbeck was transferred to District VI, Captain Lugo met with him and the other newly transferred Lieutenant. This meeting was held on 04/15/2020.
- During the meeting Captain Lugo provided both Lieutenants with a list of his expectations for them.
- One expectation was that they would be physically located within the boundaries of District VI during their shifts unless they had to leave for a specific reason.
- A review of Engelbeck's Unit Histories and GPS data, while he was assigned to District VI, revealed a pattern of behavior where he would log on for work at his home in Gilbert, remain there for several hours prior to driving to Queen Creek.
- Data associated with GPS locations for MCSO patrol vehicles is stored and accessible to the MCSO Technology Bureau.
- Captain Lugo could see Engelbeck's location on the I/Netviewer program which is a web based version of the MCSO dispatch program on MDCs used during patrol.
- GPS track histories are stored by the MCSO Technology Bureau and they show the locations and routes taken by MCSO patrol vehicles during their shifts.
- Captain Lugo first noticed Engelbeck was staying at his home on 09/04/2020. Prior to that date he was aware that Engelbeck was regularly absent from the District VI substation.
- On 09/18/2020, Lugo again saw Engelbeck was at his home and not within District VI while the patrol supervisor was in Phoenix for training. This left District VI without a patrol supervisor who was physically located within the district boundaries.
- 09/18/2020 was the day Captain Lugo had chosen to address Engelbeck's frequent absence from the District VI station and his habit of logging in at home and staying there for several hours.
- Towards the end of the day on 09/18/2020, Captain Lugo met with Engelbeck and gave him a direct order to physically be located within the District VI boundaries during his shift, and when not on patrol he wanted him to be physically located in the District VI substation to handle administrative tasks.
- Captain Lugo documented that meeting with an email to Engelbeck, as well as a supervisor note in the Blue Team database.

Investigator:    Sgt. R. Leatham S1462                 Reviewer:   Capt. G. Lugo S1480

46REPORT000918

CONFIDENTIAL - ATTORNEY'S EYES ONLY
☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

- GPS data for 09/04/2020, 09/18/2020 and 09/19/2020, that was requested from the MCSO Technology Bureau.
- On the morning of 09/19/2020, they day after his meeting with Captain Lugo, Engelbeck's Unit History showed he started his shift at his home by logging in to his MDC at 06:50 and putting himself out on "Superadmin," with a location of QCK, and remained at his home until 09:41.
- 09/19/2020, at 11:28 hours, Engelbeck's GPS signal was off, and it never came back on. His Unit History showed he was working until about 16:30.
- Prior to turning off his GPS, the GPS data showed Engelbeck was at him residence for about three hours. After that he drove to the District VI substation where he stayed for about one hour. He then drove around Queen Creek before stopping in the area of Ellsworth Road and Victoria Road which is where he was parked when his GPS stopped tracking.
- Engelbeck said he would frequently park in various areas around Queen Creek because he did not want to be around Lugo at the substation.
- There were no notes recorded in Engelbeck's Unit History to show this GPS tried to pick up a signal form a satellite.
- If the GPS cannot receive a signal the Unit History will record a comment that says, "GPS Signal None." No comments likes this were found any of Engelbeck's Unit Histories after 09/18/2020
- During both of Engelbeck's interviews he admitted to turning off the GPS locator in his MDC.
- Engelbeck said it was easy to turn off, but he was not sure if he turned it back on or not.
- When asked how he turned it off, Engelbeck could not remember how he did it.
- The box he unchecked to turn off his GPS is the same box that is checked in order to turn it back on.
- With his GPS locator turned off, MCSO dispatch and other Patrol Deputies could not see Engelbeck's location during his patrol shifts.
- Deputies who are logged in without a GPS or this with a non-working/disabled GPS populate on the patrol map to a default location near Ajo, AZ, which is in Pima County, near Maricopa County's southwestern border.
- When Engelbeck turned off his GPS tracker, it was not a requirement for the GPS to be left on in MCSO Patrol Vehicles.
- When Engelbeck was asked what his reasoning was for turning it off, he could not provide a valid or reasonable explanation for why he did it. His response was, he did not know.
- During Engelbeck's second interview, on 1/31/2024, he described the purpose for the GPS system was so people could see your location. He later conceded that safety was another reason to have GPS trackers in vehicles.
- Engelbeck admitted to turning off the GPS in his MDC because he was angry with Captain Lugo.
- During that same interview, Engelbeck admitted to not wanting to go to the District VI substation because he did not want to be around Lugo.
- With his GPS deactivated, Captain Lugo could not see Engelbeck's exact location while he was on duty.
- While completing this investigation, it was discovered Engelbeck's MDC had not recorded a GPS signal since the day it was turned off, on 09/19/2020. During his 1/31/2024, interview with PSB he admitted to not checking to see if his GPS was working properly.
- He also stated no one pointed out to him that his GPS was not working and because he was still angry he did nothing to ensure it was working properly.

---

Investigator:   Sgt. R. Leatham S1462                     Reviewer:  Capt. G. Lugo S1480

46REPORT000919

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

**Conclusion:**

When Engelbeck deactivated the GPS in his MDC ON 09/19/2020, he was a Patrol Lieutenant assigned to District IV. When it was discovered that his GPS had been deactivated for over three years, he was assigned to District I as a Patrol Sergeant. The day before Engelbeck turned off his GPS and left it off, Captain Lugo met with him at the District VI substation and gave him direct orders to be physically located within District VI during his shift. If he is not on a call for service, he was to be physically located at the District VI substation. That meeting happened towards the end of Engelbeck's shift on 09/18/2020. When Engelbeck started his shift the following morning, he did not deviate from logging in at home and staying for several hours before driving the four or five miles to Queen Creek.

Queen Creek was the contract city with the MCSO that comprised District VI. Captain Lugo had observed Engelbeck's pattern of behavior for several weeks and held a meeting on 09/18/2020 to stop his behavior. Rather than do as his Captain was asking, Engelbeck said he did not see what Lugo told him as being a direct order. He also followed the guidance of his previous Captain, who told him to log on at home and then make his way to District II.

District II is approximately 45 miles from Engelbeck's home. The western boundary for District VI is about four or five miles away from his home. As a Lieutenant with the MCSO, Engelbeck's job was to assist with administrative duties, supervise subordinates, and hold them accountable to policy. In October 2020, MCSO policy did not tell MCSO personnel that vehicle GPS had to be activated. That has since changed. But regardless of how Engelbeck interpreted what Captain Lugo said to him during their meeting on 09/19/2020, he was given a direct order to physically be located within District VI during his "on-duty work hours." He was not told to get there at some point but to be there "during" his shift. The Merriam-Webster definition of "during" is "Throughout the duration of." According to Engelbeck, the duration of his shift was 6:30 to 16:30. Rather than following the order given to him by Captain Lugo, Engelbeck chose to be deceptive and turned off his GPS. When he was asked to explain his reasoning for turning off his GPS, Engelbeck said it was done because he was angry with Captain Lugo. Engelbeck also admitted to not having people looking over his shoulder while working. So, to avoid having his location tracked by Captain Lugo, Engelbeck turned off his GPS, and he left it off until PSB investigators turned it back on in January 2024. During his October 2020 interview, Engelbeck said he thought he turned the GPS back on.

It turns on by checking the box he unchecked when he turned the GPS off. He did not attempt to have the Technology Bureau check it and ensure it was running properly. He also stated no one else told him his GPS was not working, and because he was still angry, he did nothing to ensure his location was visible on the CAD map. The fact that Lt. Engelbeck intentionally went into the GpsGate program on his MDC and turned off his GPS was an intentional act. The only purpose for the deactivation of his GPS was to hide his location from Captain Lugo.

At the conclusion of this investigation, reference **Allegation #4, Policy #1**, where it is internally alleged Lt. Engelbeck was insubordinate when he deactivated the GPS on his MDC to prevent Captain Lugo from seeing his location, it has been determined that the allegations are supported by the preponderance of the evidence and justify a reasonable conclusion of a policy violation. Therefore, I make a recommended finding of **SUSTAINED**.

---

Investigator:  Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000920

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

**Allegation #5:** **It is internally alleged Lt. Engelbeck was insubordinate when he intentionally avoided going to the District VI substation, as ordered by Captain Lugo.**

**Policy #1:** **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

**Critical Facts:**

- On 04/15/2020, Captain Lugo held a briefing with Lt. Engelbeck at the District VI substation where he was provided with a list of expectations related to work locations. These expectations were documented in a Supervisor Note that was sent to Engelbeck on 04/29/2020.
- Captain Lugo provided a copy of his notes that were used during that meeting.
- During the meeting he addressed work locations where he told his Lieutenants they were required to be in Queen Creek while on shift and to be located within the District VI substation if they were not on a call for service.
- GPS data showed Engelbeck was not following Captain Lugo's order of being within the boundaries of District VI for his shift.
- The data showed he would log on for work and remain at his residence for several hours before driving to his area of responsibility.
- During his Principal interview, Engelbeck admitted to making that his daily practice. He justified his practice by saying his previous Commander in District II, told him to log on at home then make his way to District II.
- The drive from Engelbeck's home in Gilbert to District II is approximately 55 miles. The drive from his home to Queen Creek is about 5 miles.
- During his interview, Engelbeck further justified arriving to District VI when he wanted to because previous District VI Lieutenants told him they did not arrive in town until around 09:00.
- Rather than follow Captain Lugos's orders, Engelbeck chose to follow directions given to him by his previous Captain and a peer of the same rank.
- In September 2020, after noticing Engelbeck was frequently absent from the District VI substation, Captain Lugo began checking Engelbeck's location with the aid of a web based CAD program. This is when he noticed Engelbeck was at home for extended periods of time.
- Captain Lugo also saw Engelbeck was parking in various locations around Queen Creek, but he was regularly absent from the substation.
- Captain Lugo also noticed Engelbeck was not responding to calls for service when he was stationary in Queen Creek.
- Unit Histories were reviewed for Engelbeck and it was found he responded to some calls for service, but his primary service code was "SuperAdmin." Which is a code for a supervisor who is completing administrative tasks.
- To address Engelbeck's lack of presence at the substation and being at his home for extended periods, Captain Lugo met with him on 09/18/2020.

---

Investigator:    Sgt. R. Leatham S1462                              Reviewer:    Capt. G. Lugo S1480

46REPORT000921

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

- In that meeting the topics of work locations were discussed. An email was sent from Captain Lugo to Engelbeck which provided Engelbeck with written orders of what is expected of his work locations.

- Captain Lugo specifically told Engelbeck he was required to be within the Town limits of Queen Creek. Engelbeck's work hours were 06:30-16:30. When not on a call for service he was ordered to be within the District VI substation so he could assist with administrative tasks.

- On the morning of 09/19/2020, GPS data and Engelbeck's Unit History showed he logged on for work at about 06:30 and remained at his residence until 09:41.

- After leaving his residence, Engelbeck drove to the District VI substation where he remained for about one hour. When he left the substation, he drove around Queen Creek before stopping in the area of Ellsworth Road and Victoria Road, where at 11:28 hours, his GPS device was turned off.

- During his first principal interview, Engelbeck said he turned off his GPS to see if he could do. He "thought" he turned it back on but he wasn't sure. GPS records show Engelbeck never turned his GPS back on.

- It was turned off for more than three years.

- When asked what the purpose was for turning off his GPS, Engelbeck said he did not know. But it was not to be deceptive. If he wanted to be deceptive he would have turned it off sooner than he did.

- During that same interview Engelbeck said he was never given a specific time to be in Queen Creek and he did not view Captain Lugo's directions as being a direct order.

- When he was asked about reading the email sent by Captain Lugo on 09/19/2020, the day after their meeting, Engelbeck said he did not read for a few days because he was angry.

- During the review of the GPS data, in December 2023, it was discovered Engelbeck's GPS never came back on, so he was called in for a second interview to explain why.

- During the second interview Engelbeck said he still could not recall if his GPS was turned back on or not. He also said he did not make any attempts to make sure it was working because he was was angry.

- During his second interview, Engelbeck was asked to describe what was in the area of Ellsworth Road and Victoria Road. He said it was a place where he would regularly park because it kept him away from the office and he did not have to be around Captain Lugo.

- A review of card swipes for District VI and the coinciding Unit Histories for 09/04/2020 and 10/03/2020, showed Engelbeck was putting himself out on supervisor admin duties, but he was not going to District VI.

- Unit Histories showed he would regularly log on at 06:31, but he would not go to the substation until hours later. Engelbeck has a Unit History for 0905/2020, but there are no card swipes at the District VI substation.

**Conclusion:**

About two months after Lt. Engelbeck was transferred to District VI, Captain Lugo met with him and the other Lieutenant, who was also transferred into District VI when Engelbeck was transferred there. During that meeting in April 2020, Captain Lugo gave both Lieutenants orders about where they needed to be while on duty.

Those orders involved responding to calls for service with Patrol Deputies and being at the District VI substation when they were not on calls for service. In the documents obtained from Captain Lugo and the

---

Investigator:   Sgt. R. Leatham S1462                Reviewer:  Capt. G. Lugo S1480

46REPORT000922

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

Blue Team database, none of the notes contained verbiage from Captain Lugo telling Lt. Engelbeck that he needed to be within the District boundaries by a certain time. His expectation was for him to be in Queen Creek within ten or fifteen minutes after logging in for work. The specific phrasing used by Captain Lugo was, "During normal working hours, you will physically be located within the boundaries of District 6." He also stressed he wanted his Lieutenants to be out on patrol but in the office when not on a call for service. Several months after this meeting, Captain Lugo saw Engelbeck was regularly absent from the substation for extended periods. Using a CAD map, he saw Engelbeck was parking for several hours

in various areas of Queen Creek. He found himself having to call Engelbeck to the substation to have him address administrative issues. Captain Lugo also noticed Engelbeck was staying at his residence for several hours after he logged in to work. He noted this behavior was contrary to what he expected of a Lieutenant, so a second meeting was held with Engelbeck on 09/18/2020. During that meeting, Captain Lugo gave Engelbeck direct orders on where he needed to be during his patrol shifts. The day after Captain Lugo met with Engelbeck and gave him direct orders regarding where he needed to be during his shift, Engelbeck logged in at home and stayed there for more than three hours before driving to District VI.

GPS data showed Engelbeck logged on for work at his residence at about 06:30 and remained there until 09:41. Understandably, Engelbeck's Commander at District II told him to log on from home and then make the 55-mile drive from his home. However, the western boundary for Queen Creek is about five miles from Engelbeck's home, and it would take him ten or fifteen minutes to be within the Town limits.

One of the reasons Engelbeck said he stayed home was to eat breakfast before going to work. I have been inside the District VI substation and know it is equipped with appliances where meals could be prepared or stored in a refrigerator after they were prepared at home. Not only does GPS data show Engelbeck logging in at home and remaining there for several hours, but he also admitted this was his daily practice. GPS not only showed he was staying at home, but it also showed he was staying away from the District VI substation, which is contrary to what Captain Lugo asked him to do. During his first interview, Engelbeck said he avoided the District VI substation to avoid getting/spreading COVID-19. During his second interview, where the deactivation of his GPS device was discussed, Engelbeck said he parked away from the substation. He did not want to be around Captain Lugo because he was angry with him. Rather than rise up and meet the expectations Captain Lugo and the Town of Queen Creek had for a Lieutenant, Engelbeck defied direct orders and avoided the substation because he was angry and did not want to be around Captain Lugo. The expectations Captain Lugo had for Engelbeck had been explained to him verbally and provided to him in writing. Even though Engelbeck disagreed with some of the tasks Captain Lugo asked him, nothing he was asked to do was outside MCSO policy. Rather than do what was being asked and ordered, Engelbeck chose to disobey a direct order and avoided the substation because he did not want to be around Captain Lugo.

At the conclusion of this administrative investigation, reference Allegation #5, Policy #1, where it is alleged Lt. Engelbeck was insubordinate when he intentionally avoided going to the District VI substation because he did not want to be around Captain Lugo. This investigation determined the allegations are supported by the preponderance of the evidence and justify a reasonable conclusion of a policy violation. Therefore I recommend a finding of **SUSTAINED.**

Investigator:   Sgt. R. Leatham S1462                     Reviewer:  Capt. G. Lugo S1480

46REPORT000923

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

## PRIOR WORK HISTORY REPORT

☒    EIPro/IAPro/BlueTeam/Division File

☐    Personnel file *(includes Discipline, Employee Performance Appraisals, Commendations and Awards)*

☐    Other_____

During the review of the principal's prior five years of service record, the following prior work history was discovered:

**Principal:**        **Aaron Engelbeck S1673**

Blue Team Supervisor Notes
- Completed online training
- 1/13/17 Coaching on attitude
- Commendation- 2020
- Commendation- 2018

Personnel File
- IA2008-0051 8 hour suspension
- 10/5/11 Chief Award Chief Munnell
- Letter of Appreciation 10/5/11 Phoenix PD
- Letter of Commendation- 9/18/07 Chief Munnell

IAPro
- IA2008-0151- Performance or Dereliction of Duty- Sustained
- Conformance to Office Directives and Established Laws- Sustained
- Code of Conduct- Sustained-  8 Hours suspended
- IA2017-0232- CP-1 Use of Force, GJ30-Taser-Active

Investigator:   Sgt. R. Leatham S1462                    Reviewer:  Capt. G. Lugo S1480

46REPORT000924

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
IA #2020-0555

# FINDINGS

**Principal:**        **Aaron Engelbeck S1673**

**Allegation #1:**    **It is internally alleged Lt. Engelbeck was insubordinate when he failed to follow a direct order when he was not within the boundaries of District VI as ordered by his Captain..**

**Policy #1:**        **CP-2.3, Code of Conduct** (Effective 07/30/2020)

39. **Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

Sustained _____          _____ S 2351 _____          06/12/2024
Findings                   Division Commander                      Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained          1-30-25
Sustained ⓟ          _____          10-24-24
Final Findings        Appointing Authority                  Date

Discipline Imposed: ___ 40 Hour Suspension No Discipline ⓟ ___

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

Investigator:   Sgt. R. Leatham S1462          Reviewer: Capt. G. Lugo S1480

Page 88 of 92

46REPORT000925

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

## FINDINGS

**Principal:**        **Aaron Engelbeck S1673**

**Allegation #2:**    **It is internally alleged Lt. Engelbeck was untruthful by entering "QCK" as his location when he was not physically located in Queen Creek.**

**Policy #1:**        **CP-5.1.C, Truthfulness** (Effective Date 09/11/2020)

**B.** Employees shall not make false official records or enter or cause to be entered into any books, logs, records, reports, or electronic documents any inaccurate, false, or improper information or material for the purpose of deception.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_Not Sustained_        _____ S381        _06/12/2024_
Findings                Division Commander              Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

_Not Sustained_        _____        _10-24-24_
Final Findings          Appointing Authority           Date

~~Discipline Imposed:~~ _____

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

Page 89 of 92

46REPORT000926

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

### MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

## FINDINGS

**Principal:**      Aaron Engelbeck S1673

**Allegation #3:**      It is internally alleged; Sgt. Engelbeck lied to PSB investigators about activating the GPS tracker in his MDC after he admitted to turning it off.

**Policy #1:**      CP-5.1.A, Truthfulness (Effective Date 09/11/2020)

A.  Employees shall not lie or make a false statement relative to a material fact for the purpose of deception, during the course of an official investigation.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

Not Sustained

Findings                         Division Commander    S2351              06/12/2024
                                                                          Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained

Final Findings                    Appointing Authority                  10·24-22
                                                                         Date

~~Discipline Imposed:~~ _____

☐  Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

_____

Investigator:   Sgt. R. Leatham S1462                Reviewer: Capt. G. Lugo S1480

46REPORT000927

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555
### FINDINGS

**Principal:**          **Aaron Engelbeck S1673**

**Allegation #4:**      **It is internally alleged Lt. Engelbeck was insubordinate when he deactivated the GPS on his MDC.**

**Policy #1:**          **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_Sustained_                    _____ 52351_              _06/12/2024_
Findings                      Division Commander           Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

_Not Sustained_               _____                  _10·24·24_
Final Findings                Appointing Authority         Date

~~Discipline Imposed:~~ _____

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:** _____

_____

_____

_____

Investigator:   Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

Page 91 of 92

46REPORT000928

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555
### FINDINGS

**Principal:**      **Aaron Engelbeck S1673**

**Allegation #5:**     **It is internally alleged Lt. Engelbeck was insubordinate when he intentionally avoided going to the District VI substation, as ordered by Captain Lugo.**

**Policy #1:**      **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_Sustained_      _//////_   _S2351_     _06/12/2024_
Findings            Division Commander                Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

NOT SUSTAINED
~~SUSTAINED~~ (R)     _/Kim K/_         1-30-24   (R)
Final Findings            Appointing Authority        ~~10-24-24~~   Date

Discipline Imposed:   ~~40 Hour suspension~~ No Discipline (P)

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

_____

Investigator:  Sgt. R. Leatham S1462        Reviewer:  Capt. G. Lugo S1480

Page 92 of 92

46REPORT000929

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE       *Memorandum*



Paul Penzone, Sheriff

| **To:** Aaron Engelbeck S1673 | **From:** Michael Caputo S2351 |
|---|---|
| Sergeant | Bureau Chief |
| District I – Patrol | Compliance Bureau |

| **Subject:** Notice of Investigation (Principal) IA # 2020-0555 | **Date:** 01/31/2024 |
|---|---|

This memorandum is to inform you that an official Administrative Investigation has been initiated in which you have been named as a **Principal**. This investigation stems from allegations of violation of Sheriff's Office Policy CP-2 Code of Conduct; Insubordination, CP-2 Code of Conduct; Conformance to Office Directives and CP-5 Truthfulness. This is an official Administrative Investigation as defined in Office Policy, **GH-2, Internal Investigations.**

The alleged facts/allegations of misconduct that are the basis of the investigation are:

**It is internally alleged; while assigned to District VI, Engelbeck entered inaccurate location information in his Unit Histories, which created false or inaccurate records. It is internally alleged; Lieutenant Engelbeck disobeyed direct orders from his Captain, related to his location during his shift. It is internally alleged that Engelbeck lied to PSB Investigators about the activation/deactivation of the GPS tracking system while on duty.**

Copies of the complaint(s) that contain the alleged facts (except in matters pursuant to Federal EEOC laws) are available for your review.

This investigation is not to be discussed by you with **any person** other than the assigned investigator(s), your observer, your attorney, your clergy, your spouse, or domestic partner, (so long as he or she is not a witness, investigative lead, or principal in this investigation) (a domestic partner is defined as an interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else), or a licensed mental health professional or physician during professional consultation, treatment, or evaluation. **Failure to comply with this order *will* result in disciplinary action.**

You have the right to have an employee observer present. **At the conclusion of the interview, you are entitled to a period of time to consult with your employee observer, or take time to yourself and may make a statement not to exceed five minutes addressing specific facts or policies that are related to the interview.**

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

Signature and Serial Number    #673          Date 1/31/24

Revised: 02.05.2020

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



| To: | Michael Caputo S2351 | From: | Aaron Engelbeck S1673 |
|---|---|---|---|
| | Bureau Chief | | Sergeant |
| | Compliance Bureau | | District I – Patrol |

| Subject: | **Observer Waiver Form**<br>**IA# 2020-0555** | Date: | 01/31/2024 |
|---|---|---|---|

I have voluntarily chosen to proceed with this Administrative interview on (date), without the presence of an employee observer.

I acknowledge that I have read and understand this memorandum.

_____     _____
Signature and Serial Number               Date

1/31/24

46REPORT000931

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



| To: | Aaron Engelbeck S1673<br>Sergeant<br>District I – Patrol | From: | Michael Caputo S2351<br>Bureau Chief<br>Compliance Bureau |
|---|---|---|---|
| **Subject:** | **Garrity Warning**<br>**IA#2020-0555** | **Date:** | 01/31/2024 |

This is an Administrative Investigation being conducted on 01/31/2024 at 13:17 hours, by Sgt. R. Leatham S1462 at 101 W. Jefferson Street Phoenix, AZ. This investigation stems from allegations of violations of Sheriff's Office Policy: CP-2, Code of Conduct; Insubordination, CP-2, Code of Conduct; Conformance to Office Directives and CP-5, Truthfulness.

By Office Policy you are to make full, complete and truthful statements during this interview. The Sheriff's Office is committed to a strict standard of truthfulness as established in Office Policy. **Failure to be absolutely truthful during this investigation *will* result in your termination.**

**Compelled statements cannot be used to incriminate you in any criminal proceedings regarding this subject matter.**

This interview is being recorded for administrative purposes. You are to speak clearly and enunciate so the recording is as clear as possible.

Do you understand the content of this memorandum? ___Y AS___

Do you have any questions regarding the content of this memorandum? ___N AC___

Employee: ___Sgt. S #1673___
Signature and Serial Number

Investigator: ___S/ R L S1462___
Signature and Serial Number

Investigator: ___S S 1347___
Signature and Serial Number

5000-135 R10-93 (MW97 v1.0 5/27/98)

46REPORT000932

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



Paul Penzone, Sheriff

| To: | Sergeant A. Engelbeck S1673 | From: | Capt. D. Lee S1695 |
|---|---|---|---|
| | Patrol Supervisor | | Division Commander |
| | District I | | Professional Standards Bureau |
| **Subject:** | **Notice of Investigation (Principal)** IA # 2020-0555 | **Date:** | 10/21/2020 |

This memorandum is to inform you that an official Administrative Investigation has been initiated in which you have been named as a **Principal**. This investigation stems from allegations of violation of Sheriff's Office Policy CP-2 Code of Conduct and CP-5 Truthfulness. This is an official Administrative Investigation as defined in Office Policy, **GH-2, Internal Investigations.**

The alleged facts/allegations of misconduct that are the basis of the investigation are:
**While assigned as a patrol Lieutenant in District VI, Lieutenant Engelbeck entered inaccurate information into his MDC pertaining to his location while on-duty after he had been given orders to enter accurate location information. On 09/19/20 Lieutenant Engelbeck disobeyed a direct order to be physically located within the boundaries at of District VI when he was on-duty and to be at the District VI substation when not on calls for service.**

Copies of the complaint(s) that contain the alleged facts (except in matters pursuant to Federal EEOC laws) are available for your review.

This investigation is not to be discussed by you with **any person** other than the assigned investigator(s), your observer, your attorney, your clergy, your spouse, or domestic partner, (so long as he or she is not a witness, investigative lead, or principal in this investigation) (a domestic partner is defined as an interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else), or a licensed mental health professional or physician during professional consultation, treatment, or evaluation.
**Failure to comply with this order *will* result in disciplinary action.**

You have the right to have an employee observer present. **At the conclusion of the interview, you are entitled to a period of time to consult with your employee observer, or take time to yourself and may make a statement not to exceed five minutes addressing specific facts or policies that are related to the interview.**
The assigned investigator is: Sgt. Robert Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____    S1673    _10/21/20_
Signature and Serial Number    Date

Revised: 02.05.2020

46REPORT000933

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



| To: | Sgt. Aaron Engelbeck S1673<br>Patrol Supervisor<br>District I | From: | Captain D. Lee S1695<br>Commander<br>Professional Standards Bureau |
|---|---|---|---|
| Subject: | **Garrity Warning**<br>IA#20-0555 | Date: | 10/21/2020 |

This is an Administrative Investigation being conducted on 10/21/20 at 11:03 hours, by Sgt. Robert Leatham S1462 at 101 W. Jefferson Street Phoenix, AZ. This investigation stems from allegations of violations of Sheriff's Office Policy: **CP-2 Code of Conduct and CP-5 Truthfulness**

By Office Policy you are to make full, complete and truthful statements during this interview. The Sheriff's Office is committed to a strict standard of truthfulness as established in Office Policy. **Failure to be absolutely truthful during this investigation *will* result in your termination.**

**Compelled statements cannot be used to incriminate you in any criminal proceedings regarding this subject matter**.

This interview is being recorded for administrative purposes. You are to speak clearly and enunciate so the recording is as clear as possible.

Do you understand the content of this memorandum? YES

Do you have any questions regarding the content of this memorandum? No

Employee: _____ 5673
Signature and Serial Number

Investigator: _____ S1462
Signature and Serial Number

Investigator: _Sgt. Alex Frank_ S1455
Signature and Serial Number

5000-135 R10-93 (MW97 v1.0 5/27/98)

46REPORT000934

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



| To: Dep. Cody Mann S1407 Detective Major Crimes | From: | Captain D. Lee S1695 Commander Professional Standards Bureau |
|---|---|---|
| **Subject:** Employee Observer Admonition IA # 2020-0555 | | **Date:** 10/21/2020 |

Sgt. Englebeck S1673

You have been selected by, and have voluntarily agreed to act as employee observer during the course of this official Internal Investigation as defined in Office Policy, **GH-2**.

As the employee observer, you are to participate in this interview as an observer only. At no time shall you interrupt the interview in any manner, including but not limited to: engaging in any form of verbal or non-verbal communication, making distracting noises, or hindering the flow or direction of the interview.

At the conclusion of this interview, you are further ordered not to discuss this investigation with anyone other than the Principal or the assigned investigators.

Failure to comply with the orders contained in this admonition shall result in disciplinary action as well as your immediate removal from the interview room. You may then be permitted to observe the remainder of the interview from a separate monitoring room.

The assigned investigators are: Sgt. Robert Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____ #S1407
Signature and Serial Number

10/21/2020
Date

46REPORT000935

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE     *Memorandum*



| To: | Captain D. Lee S1695<br>Division Commander<br>Professional Standards Bureau | From: | Captain G. Lugo S1480<br>Commander<br>District VI |
|---|---|---|---|
| **Subject:** | **Observer Waiver Form**<br>**IA#2020-0555** | **Date:** | 10/15/2020 |

I have voluntarily chosen to proceed with this Administrative interview on 10/15/2020, without the presence of an employee observer.

I acknowledge that I have read and understand this memorandum.

_____ 1480          _____ 10/15/2020
Signature and Serial Number          Date

46REPORT000936

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



Paul Penzone, Sheriff

| To: | Captain G. Lugo S1480 | From: | Capt. D. Lee S1695 |
|---|---|---|---|
| | Commander | | Division Commander |
| | District VI | | Professional Standards Bureau |

| Subject: | Notice of Investigation IA # 2020-0555 | Date: | 10/15/2020 |
|---|---|---|---|

This memorandum is to inform you that an official Administrative Investigation has been initiated in which you have been named as a **Complainant**.

This investigation stems from allegations of violation of Sheriff's Office Policy CP-2, Code of Conduct and CP-5 Truthfulness -and has been authorized by the Sheriff/Chief Deputy.  This is an official administrative Investigation as defined in Office Policy, **GH-2, Internal Investigations.**

This investigation is not to be discussed by you with **any person** other than the assigned investigator(s), your observer, your attorney, your clergy, your spouse, or domestic partner, (so long as he or she is not a witness, investigative lead, or principal in this investigation) (a domestic partner is defined as an interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else), or a licensed mental health professional or physician during professional consultation, treatment, or evaluation.
**Failure to comply with this order *will* result in disciplinary action.**

The assigned investigator is:  Sgt. Robert Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____ 1480          10/15/2020
Signature and Serial Number                   Date

Revised: 02.05.2020

46REPORT000937

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



Paul Penzone, Sheriff

| To: | Margaret Montoya-De La O B0349<br>IT Business Systems Analyst Senior<br>Telecommunications Tech | From: | Capt. G. Lugo S1480<br>Division Commander<br>Professional Standards<br>Bureau |
|---|---|---|---|
| Subject: | Notice of Investigation<br>IA # 2020-0555 | Date: | 01/16/2024 |

This memorandum is to inform you that an official Administrative Investigation has been initiated in which you have been named as an Investigative Lead.

This investigation stems from allegations of violation of Sheriff's Office Policy **GI1- Radio Communications, CP2- Code of Conduct- Insubordination, CP5- Truthfulness, and CP2- Code of Conduct- Conformance to Office Directives** and has been authorized by the Sheriff/Chief Deputy. This is an official administrative Investigation as defined in Office Policy, **GH-2, Internal Investigations.**

This investigation is not to be discussed by you with **any person** other than the assigned investigator(s), your observer, your attorney, your clergy, your spouse, or domestic partner, (so long as he or she is not a witness, investigative lead, or principal in this investigation) (a domestic partner is defined as an interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else), or a licensed mental health professional or physician during professional consultation, treatment, or evaluation.

**Failure to comply with this order *will* result in disciplinary action.**

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____ B0349
Signature and Serial Number

1/14/24
Date

Revised: 02.05.2020

46REPORT000938

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



| To: | Captain G. Lugo S1480 Commander Professional Standards Bureau | From: | Margaret Montoya-De La O B0349 IT Business Systems Analyst Senior Telecommunications Tech |
|---|---|---|---|
| Subject: | Observer Waiver Form IA# 2020-0555 | Date: | 01/16/2024 |

I have voluntarily chosen to proceed with this Administrative interview on January 16th, 2024, without the presence of an employee observer.

I acknowledge that I have read and understand this memorandum.

_Mont Myk De La O B0349_    _1/16/24_

Signature and Serial Number          Date

Revised: 12.21.17

46REPORT000939

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*

| To: | From: | Captain G. Lugo S1480 |
| --- | --- | --- |
| | | Commander |
| | | Professional Standards Bureau |
| **Subject:** Employee Observer Admonition IA # 2020-0555 | **Date:** 01/16/2024 | |

Paul Penzone, Sheriff

You have been selected by Margaret Montoya-De La O B0349 and have voluntarily agreed to act as employee observer during the course of this official Internal Investigation as defined in Office Policy, **GH-2 Internal Investigations**.

As the employee observer, you are to participate in this interview as an observer only. At no time shall you interrupt the interview in any manner, including but not limited to: engaging in any form of verbal or non-verbal communication, making distracting noises, or hindering the flow or direction of the interview.

You are not to make any electronic recordings of this interview. At the conclusion of this interview, you are further ordered not to discuss this investigation with anyone other than Margaret Montoya-De La O B0349 or the assigned investigators.

Failure to comply with the orders contained in this admonition shall result in disciplinary action as well as your immediate removal from the interview room. You may then be permitted to observe the remainder of the interview from a separate monitoring room.

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____          _____

Signature and Serial Number                    Date

46REPORT000940

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*

| To: | Margaret Montoya-De La O B0349 | From: | Captain G. Lugo S1480 |
|---|---|---|---|
| | IT Business Systems Analyst Senior | | Commander |
| | Telecommunications Tech | | Professional Standards Bureau |

| Subject: | Notice of employee's intent to record administrative interview in IA # 2020-0555 | Date: | 01/16/2024 |
|---|---|---|---|

This memorandum is to advise you of the obligations you have as a result of your decision to record your Administrative Investigation interview in the IA# listed above.

Employees shall be responsible for providing their own electronic device to be used during their Administrative Investigation interview. The Professional Standards Bureau will not provide, or unreasonably delay the interview to allow an employee to obtain a recording device. If the recording device is not the property of the employee, the recording shall be deleted from the device before it is returned to the original owner.

Employees shall only record the interview once the investigator has acknowledged that the interview is proceeding. Employees are reminded that as per Office Policy CP-2, *Code of Conduct*, employees shall not covertly record conversations.

Employees are not authorized to video record or livestream the interview. Cellular/Smart Phones may be used to record audio only, however, shall be placed in "airplane mode" and all audible sounds shall be turned off as to not cause a distraction during the interview. If the device disrupts the interview, the PSB will direct that the device be turned off.

Employees are reminded that although permitted to use personally owned electronic devices to record an interview during an Administrative Investigation, employees shall adhere to their *Notice of Investigation* (NOI) and Office Policy GH-2, *Internal Investigations* regarding the recording.

The interview may not be shared with anyone beyond the scope of the NOI. Violation of the NOI, including allowing the recording to be shared, overheard by others, or left in a manner that allows access by others either through intentional acts or negligence, will result in discipline, up to and including termination.

As specified in Office Policy GH-2, *Internal Investigations*, if the employee, employee's observer, attorney, or anyone specified in the *Notice of Investigation* releases information without authorization, including any recorded interviews, the employee, the employee's observer, and any other Office employee specified in the *Notice of Investigation* may be subject to disciplinary action up to and including, dismissal from employment.

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____          _____
Interviewee Signature and Serial Number                    Date

Revised: 12.21.17

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



Paul Penzone, Sheriff

| To: | Gerson Wright B5579<br>Software Architect<br>Business System Development | From: | Capt. G. Lugo S1480<br>Division Commander<br>Professional Standards<br>Bureau |
|---|---|---|---|
| Subject: | Notice of Investigation<br>IA # 2020-0555 | Date: | 01/17/2024 |

This memorandum is to inform you that an official Administrative Investigation has been initiated in which you have been named as an **Investigative Lead.**

This investigation stems from allegations of violation of Sheriff's Office Policy **GI1 - Radio Communications, CP2 - Code of Conduct – Insubordination, CP5 - Truthfulness,** and **CP2 - Code of Conduct - Conformance to Office Directives** and has been authorized by the Sheriff/Chief Deputy. This is an official administrative Investigation as defined in Office Policy, **GH-2, Internal Investigations.**

This investigation is not to be discussed by you with **any person** other than the assigned investigator(s), your observer, your attorney, your clergy, your spouse, or domestic partner, (so long as he or she is not a witness, investigative lead, or principal in this investigation) (a domestic partner is defined as an interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else), or a licensed mental health professional or physician during professional consultation, treatment, or evaluation.

**Failure to comply with this order *will* result in disciplinary action.**

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

Signature and Serial Number B5579          Date 1/17/24

Revised: 02.05.2020

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE



*Memorandum*

| To: | Captain G. Lugo S1480<br>Commander<br>Professional Standards Bureau | From: | Gerson Wright B5579<br>Software Architect<br>Business System Development |
|---|---|---|---|
| Subject: | Observer Waiver Form<br>IA# 2020-0555 | Date: | 01/17/2024 |

I have voluntarily chosen to proceed with this Administrative interview on 01/17/2024, without the presence of an employee observer.

I acknowledge that I have read and understand this memorandum.

_____ B5579        1/17/24
Signature and Serial Number      Date

Revised: 12.21.17

46REPORT000943

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE      *Memorandum*

| | | |
|---|---|---|
| **To:** | | **From:** Captain G. Lugo S1480 Commander Professional Standards Bureau |
| **Subject:** Employee Observer Admonition IA # 2020-0555 | | **Date:** 01/17/2024 |

Paul Penzone, Sheriff

You have been selected by Gerson Wright B5579 and have voluntarily agreed to act as employee observer during the course of this official Internal Investigation as defined in Office Policy, **GH-2 Internal Investigations**.

As the employee observer, you are to participate in this interview as an observer only. At no time shall you interrupt the interview in any manner, including but not limited to: engaging in any form of verbal or non-verbal communication, making distracting noises, or hindering the flow or direction of the interview.

You are not to make any electronic recordings of this interview. At the conclusion of this interview, you are further ordered not to discuss this investigation with anyone other than Gerson Wright B5579 or the assigned investigators.

Failure to comply with the orders contained in this admonition shall result in disciplinary action as well as your immediate removal from the interview room. You may then be permitted to observe the remainder of the interview from a separate monitoring room.

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____          _____

Signature and Serial Number                   Date

46REPORT000944

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



| To: | Gerson Wright B5579<br>Software Architect<br>Business System Development | From: | Captain G. Lugo S1480<br>Commander<br>Professional Standards<br>Bureau |
|---|---|---|---|
| Subject: | Notice of employee's intent to record administrative interview in<br>IA # 2020-0555 | Date: | 01/17/2024 |

This memorandum is to advise you of the obligations you have as a result of your decision to record your Administrative Investigation interview in the IA# listed above.

Employees shall be responsible for providing their own electronic device to be used during their Administrative Investigation interview. The Professional Standards Bureau will not provide, or unreasonably delay the interview to allow an employee to obtain a recording device. If the recording device is not the property of the employee, the recording shall be deleted from the device before it is returned to the original owner.

Employees shall only record the interview once the investigator has acknowledged that the interview is proceeding. Employees are reminded that as per Office Policy CP-2, *Code of Conduct*, employees shall not covertly record conversations.

Employees are not authorized to video record or livestream the interview. Cellular/Smart Phones may be used to record audio only, however, shall be placed in "airplane mode" and all audible sounds shall be turned off as to not cause a distraction during the interview. If the device disrupts the interview, the PSB will direct that the device be turned off.

Employees are reminded that although permitted to use personally owned electronic devices to record an interview during an Administrative Investigation, employees shall adhere to their *Notice of Investigation* (NOI) and Office Policy GH-2, *Internal Investigations* regarding the recording.

The interview may not be shared with anyone beyond the scope of the NOI. Violation of the NOI, including allowing the recording to be shared, overheard by others, or left in a manner that allows access by others either through intentional acts or negligence, will result in discipline, up to and including termination.

As specified in Office Policy GH-2, *Internal Investigations*, if the employee, employee's observer, attorney, or anyone specified in the *Notice of Investigation* releases information without authorization, including any recorded interviews, the employee, the employee's observer, and any other Office employee specified in the *Notice of Investigation* may be subject to disciplinary action up to and including, dismissal from employment.

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____          _____
Interviewee Signature and Serial Number                  Date

Revised: 12.21.17

46REPORT000945

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



Paul Penzone, Sheriff

| To: | Ashley Hinton B2343 | From: | Capt. G. Lugo S1480 |
|---|---|---|---|
| | PC Tech Senior | | Division Commander |
| | Mainframe Ops and Tech Support | | Professional Standards Bureau |
| Subject: | Notice of Investigation IA # 2020-0555 | Date: | 01/09/2024 |

This memorandum is to inform you that an official Administrative Investigation has been initiated in which you have been named as an Investigative Lead.

This investigation stems from allegations of violation of Sheriff's Office Policy **GI1- Radio Communications, CP2- Code of Conduct- Insubordination, CP5- Truthfulness, and CP2- Code of Conduct- Conformance to Office Directives** and has been authorized by the Sheriff/Chief Deputy. This is an official administrative Investigation as defined in Office Policy, **GH-2, Internal Investigations.**

This investigation is not to be discussed by you with **any person** other than the assigned investigator(s), your observer, your attorney, your clergy, your spouse, or domestic partner, (so long as he or she is not a witness, investigative lead, or principal in this investigation) (a domestic partner is defined as an interpersonal relationship between two individuals who live together and share a common domestic life but are not married to each other or anyone else), or a licensed mental health professional or physician during professional consultation, treatment, or evaluation.

**Failure to comply with this order *will* result in disciplinary action.**

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____ B2343      1/8/2024
Signature and Serial Number          Date

Revised: 02.05.2020

46REPORT000946

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*

| To: | Ashley Hinton B2343<br>PC Tech Senior<br>Mainframe Ops and Tech Support | From: | Captain G. Lugo S1480<br>Commander<br>Professional Standards Bureau |
|---|---|---|---|
| Subject: | Notice of employee's intent to record administrative interview in<br>IA # 2020-0555 | Date: | 01/09/2024 |

This memorandum is to advise you of the obligations you have as a result of your decision to record your Administrative Investigation interview in the IA# listed above.

Employees shall be responsible for providing their own electronic device to be used during their Administrative Investigation interview. The Professional Standards Bureau will not provide, or unreasonably delay the interview to allow an employee to obtain a recording device. If the recording device is not the property of the employee, the recording shall be deleted from the device before it is returned to the original owner.

Employees shall only record the interview once the investigator has acknowledged that the interview is proceeding. Employees are reminded that as per Office Policy CP-2, *Code of Conduct*, employees shall not covertly record conversations.

Employees are not authorized to video record or livestream the interview. Cellular/Smart Phones may be used to record audio only, however, shall be placed in "airplane mode" and all audible sounds shall be turned off as to not cause a distraction during the interview. If the device disrupts the interview, the PSB will direct that the device be turned off.

Employees are reminded that although permitted to use personally owned electronic devices to record an interview during an Administrative Investigation, employees shall adhere to their *Notice of Investigation* (NOI) and Office Policy GH-2, *Internal Investigations* regarding the recording.

The interview may not be shared with anyone beyond the scope of the NOI. Violation of the NOI, including allowing the recording to be shared, overheard by others, or left in a manner that allows access by others either through intentional acts or negligence, will result in discipline, up to and including termination.

As specified in Office Policy GH-2, *Internal Investigations*, if the employee, employee's observer, attorney, or anyone specified in the *Notice of Investigation* releases information without authorization, including any recorded interviews, the employee, the employee's observer, and any other Office employee specified in the *Notice of Investigation* may be subject to disciplinary action up to and including, dismissal from employment.

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____     _____

Interviewee Signature and Serial Number                    Date

Revised: 12.21.17

46REPORT000947

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*

| To: | From: | Captain G. Lugo S1480 |
| --- | --- | --- |
| | | Commander |
| | | **Professional Standards Bureau** |
| **Subject:** Employee Observer Admonition IA # 2020-0555 | **Date:** | 01/09/2024 |

Paul Penzone, Sheriff

You have been selected by Ashley Hinton B2343 and have voluntarily agreed to act as employee observer during the course of this official Internal Investigation as defined in Office Policy, **GH-2 Internal Investigations**.

As the employee observer, you are to participate in this interview as an observer only. At no time shall you interrupt the interview in any manner, including but not limited to: engaging in any form of verbal or non-verbal communication, making distracting noises, or hindering the flow or direction of the interview.

You are not to make any electronic recordings of this interview. At the conclusion of this interview, you are further ordered not to discuss this investigation with anyone other than Ashley Hinton B2343 or the assigned investigators.

Failure to comply with the orders contained in this admonition shall result in disciplinary action as well as your immediate removal from the interview room. You may then be permitted to observe the remainder of the interview from a separate monitoring room.

The assigned investigator is: Sgt. R. Leatham S1462

I acknowledge that I have read and understand this memorandum.

_____        _____
Signature and Serial Number                        Date

46REPORT000948

CONFIDENTIAL - ATTORNEY'S EYES ONLY

# MARICOPA COUNTY SHERIFF'S OFFICE

*Memorandum*



| To: | Captain G. Lugo S1480<br>Commander<br>Professional Standards Bureau | From: | Ashley Hinton B2343<br>PC Tech Senior<br>Mainframe Ops and Tech Support |
|---|---|---|---|
| Subject: | Observer Waiver Form<br>IA# 2022-0555 | Date: | 01/09/2024 |

I have voluntarily chosen to proceed with this Administrative interview on 01/09/2024, without the presence of an employee observer.

I acknowledge that I have read and understand this memorandum.

_____ B2343
Signature and Serial Number

___1/9/2024___
Date

Revised: 12.21.17

46REPORT000949

# Miscellaneous Documentation

46REPORT000950



# Maricopa County Sheriff's Office

January 28, 2025

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Sergeant Engelbeck:

On October 24, 2024, the Maricopa County Sheriff's Office suspended you for 40 hours without pay as a result of the sustained allegations outlined in Internal Investigation #2020-0555. On October 30, 2024, you appealed the 40-hour suspension to the Maricopa County Law Enforcement Officer's Merit System Commission. This letter is to notify you that after further consideration, the Office has decided to modify the disciplinary action imposed to no discipline. The Office will thus rescind the 40-hour suspension and file a motion to vacate the pending Merit Commission appeal hearing.

Your employment records are being corrected to reflect the rescission of the suspension, and this letter shall be placed in your personnel file. You will be reimbursed for 40 hours of pay at the rate you were being compensated at the time you served the suspension. Your reimbursement will be processed by County Payroll. Please allow processing time.

Sincerely,

Ken Holmes

Appointing Authority

KH:adc

cc:    County Payroll Records
       Personnel File
       Merit Commission – Keri March

I acknowledge receipt of this letter: _____

Signature                                    Date

# Maricopa County Sheriff
# Internal Complaint Report

## Incident Details

## Incident Location

| | | |
|---|---|---|
| Date Received | 03/10/2025 | Location of Occurrence — |
| Entered By | Sergeant Aaron Engelbeck - S1673 | [None Entered] |
| Date/Time of Occurrence | — | |
| Date/Time Entered | 03/10/2025 16:03 | |
| Record ID Number | 5611451 | |
| Event No | — | |
| IA No | IA2025-0111 | |

## Incident Summary

In January 2025, I was made aware that the Maricopa County Sheriff's Office (MCSO) Professional Standards Bureau (PSB) had violated Arizona State Statute (ARS) 38-1106 (A)(1) which states that the respondent (MCSO) must provide a copy of the respondent's investigative file related to the appeal within fourteen (14) calendar days of the request from the appellant. They have also violated ARS 13-2809(A)(1) Tampering with physical evidence which states: A person commits tampering with physical evidence if , with intent that it be used, introduced, rejected or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person: 1. Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability. I believe the facts will show this was willful and with full knowledge by a person unknown at this time in PSB. The following will illustrate how this occurred:

In October 2020, Captain Greg Lugo filed an administrative complaint against myself with allegations of truthfulness and insubordination. At the time, I was Captain Lugo's direct report as a lieutenant in District 6

46REPORT000952

Case 2:07-cv-02513-GMS    Document 3509-1    Filed 06/12/26    Page 953 of 998

(Queen Creek).  I was interviewed by Sergeant Robert Leatham at this time involving the matter.  During that interview, I advised the investigator of several policy violations of which Captain Lugo was responsible.  These violations included such policies as command responsibility, truthfulness, and retaliation among others.  I later provided the same information in written form to clarify the allegations.  In spite of receiving this information, Sergeant Robert Leatham failed to open an independent investigation into these allegations, I was unaware of this at the time.  I am also unaware if this decision was made by Sergeant Leatham or the decision came from within his chain of command.  This is contrary to MCSO policy.  It is unknown by me at this time if Sergeant Leatham made this decision on his own or was ordered to do this by someone in his chain of command.

In March of 2021, Captain Lugo was installed as commander of PSB.  I believe this move was already intended at the time of my interview and allegations of misconduct by Captain Lugo.

Following this investigation, I was punished both formally and informally over the course of the next four years.  I was demoted (probation terminated), denied a merit-based salary increase the next year, denied a one-time monetary incentive for working through the pandemic, and with an open investigation, I was unable to promote for the next 4 years.  In May of 2021, I emailed Chief Deputy Russ Skinner (who would be installed as Sheriff in 2024).  I outlined my protests in not receiving a merit increase or the Covid one time incentive.  I also advised him of the allegations I entered against Captain Lugo and that, since Captain Lugo was now commander of PSB, this would not be properly investigated.  He replied that I was not eligible for the increase or incentive.  He also assured me that my allegations were being investigated.

In January 2024, I was called to interview again with Sergeant Leatham.  This interview involved clarification of GPS information within my computer.  At the conclusion of the interview, I asked for the case number for my allegations against Captain Lugo.  He stated an investigation was not opened involving this.  I told him I was in shock of this because MCSO policy states if a supervisor is made aware of misconduct, the allegations must be investigated.  He stated to me that since Captain Lugo opened his investigation first that I would be retaliating against Captain Lugo if I continued to pursue these allegations.  I reminded Sergeant Leatham that I was first to state Captain Lugo was retaliating against me.  Sergeant Leatham stated Captain Lugo entered his investigation first.  I took this to be a threat from PSB that should I continue with my pursuit of an investigation, I would be facing new allegations of retaliation.  When I left that interview, Sergeant Leatham told me he would speak to his supervisors about the investigation.  I responded with doubt.

In June of 2024, I sent an email to the chief of compliance, Michael Caputo.  I advised him that I made the investigator aware of policy violations and he refused to open an investigation.  I provided my original

46REPORT000953

written complaint about Captain Lugo. I also reminded him that in addition to Captain Lugo's policy violations, Sergeant Leatham was violating policy by refusing to open a separate investigation. This is an allegation of employee misconduct. Chief Caputo assured me he would look into the matter. Approximately one month later I was notified that a service complaint regarding my inquiry had been completed. MCSO policy GH-2 Internal Investigations states "A service complaint is not an allegation of employee misconduct." So this is now another level in the chain of command violating MCSO policy to prevent Captain Lugo from being properly investigated.

In September 2024, I was notified that the investigation from 4 years prior had been completed. The truthfulness allegation was not sustained but they sustained 3 allegations of insubordination. I was advised, the appointing authority, Ken Holmes, was considering 40 hours of suspension as discipline. As this is major discipline, I was entitled to a pre-determination hearing (PDH). I went before the appointing authority and brought forth my arguments against the sustained findings. I also made clear that 4 years to conclude this investigation and dole out major discipline was unethical and contrary to current state law. I also made aware the efforts to avoid investigating Captain Lugo. (This is the fourth person I have made aware of this violation of MCSO policy.) After consideration, the appointing authority overturned one of the sustained findings but upheld the remaining 2. He informed me he was going to proceed with the 40 hour suspension. I advised him that I was looking forward to an appeal as I would finally have an authority outside of the Sheriff's Office view the unethical practices within the PSB division. Mr. Holmes then provided me with the suspension information which would begin the following week (October 2024).

I was provided 10 calendar days to file the appeal. As I was serving the suspension at that time, this was done on my own time and at my own expense. I filed the appeal within the allotted 10 days. I was later notified that a hearing had been scheduled for January 10, 2025 (MCFY25-L01).

I was provided documentation for the appeal process which included an advisement that "Pursuant to A.R.S. 38-1106(A)(1), the appellant may submit a written request, accompanied by a copy of the filed notice of appeal, for a copy of the respondent's investigative file related to the appeal. The respondent must provide the requested copy within fourteen (14) calendar days of their receipt of the request." I immediately emailed the legal liaison for the Sheriff's Office to request the report. In the email, I also provided the above statute and reminded they have 14 days to provide the case file.

On November 14, 2024, I received an email from Neil Landeen with the Maricopa County Attorney's Office stating he was the assigned representation for the Sheriff's Office. I provided subpoenas to the hearing officer, Prudence Lee, and Mr. Landeen in requesting my witnesses for the hearing. Among these subpoena's was one for Chief Caputo.

On December 20, 2024, I received an email from Simon Haines which shared the case file. This was provided through a web link which had me set up a login and password for access. I was not provided an actual physical copy of these documents. I took a cursory glance and saw the file included the report, attachments, and several audio and video files. There was no notice that any parts of the case file would be provided at another time nor was there any indication the case file was incomplete.

On December 22, 2024, Michael Caputo responded to his subpoena stating he was unavailable on that date. Neil Landeen advised he was willing to reschedule so I could have access to this witness. The hearing was rescheduled for February 7, 2025. I then began to prepare my appeal arguments.

As I reviewed the report authored by Sergeant Leatham, I noticed that there were several omissions regarding my statements in the interview. In addition, it appeared the report was being tailored to support a sustained allegation. I remembered approximately half of the principal interview I participated in was spent in which I was explaining policy violations from Captain Lugo. It is contrary to MCSO policy and practice to require someone to state "I want to file a complaint." It only requires an allegation, either verbal or written, of employee misconduct to require an investigation. Yet Sergeant Leatham's report said "Explanation of why an additional IA investigation was not opened: When I met Engelbeck on 11/10/2020 and he gave me these documents, he did not say anything about filing a complaint against Captain Lugo or Chief Morrison." The report later described when I asked for the case number in the follow up interview. The report stated: "At the conclusion of the interview, Engelbeck was offered time to make a five-minute statement. Rather than make a five-minute statement, he requested an IA number for a complaint that was never made." The report also reinforced the previous threats levied by Sergeant Leatham. The report stated: "Based on the above sections from the Anti-Retaliation policy, if Engelbeck were to make an allegation of misconduct against Captain Lugo for reporting Engelbeck's conduct to PSB, Engelbeck would violate this policy."

After taking note of numerous discrepancies in the report, I decided the best way to proceed would be to observe the primary video between myself and Sergeant Leatham. I planned to bring specific moments in the video to the attention of Sergeant Leatham and ask him under oath why these statements were excluded from his report and investigation. I then began searching for the video in the provided case file. While there were several video and audio files for other witness interviews, there were no video or audio files provided for that interview nor Captain Lugo's complaint interview.

On January 27, 2025, I emailed Mr. Landeen. The email stated the following:

Hello sir, in reviewing the uploaded files you shared with me, I discovered there is no video or audio for the first interview of myself. Please add this at your earliest convenience. Thank you, Aaron.

I did not receive a response that day. The next day I received a phone call from the Conflict Resolution

department. They stated there had been a change to my suspension. They further stated the suspension had been rescinded. I received a letter in my MCSO email which confirmed this and I was told it required my signature by the end of the day. The letter gave no explanation for the reason of the rescinding. I replied back and inquired as to whether the findings of the investigation would also be changed. I received a response stating that the Appointing Authority would indeed change the findings. With the Sheriff's Office paying me back the lost wages over the suspension, MCSO requested the vacating of the appeal hearing the same day which was granted.

It is my belief that the efforts to vacate the appeal were meant to cover the withholding of evidence. This is also an effort to avoid questioning as to the PSB practices under oath. It is my belief that Captain Lugo had more involvement in this case than was appropriate as he should have recused himself. I believe the video was not provided because it would clearly illustrate that I had indeed attempted to file a complaint of retaliation four years prior. The video would also show discrepancies in the report, possibly to the point of violating Office truthfulness policy. PSB practices are being revealed in this case and other cases to show a serious lack of fairness and impartiality. This is made possible by the challenges provided in the appeal process. They are aware most employees do not want to tackle the difficult task of appeal.

The videos provided and the missing videos should have been stored in the same place according to Office policy. Therefore, someone would have to deliberately omit them for discovery. The legal liaison is known to consult with the case agents and PSB command for what can and can't be released. As this was a concluded investigation, the excuse of "continued investigation" is not valid for omission. Furthermore, I believe the wish to vacate the appeal the day after I made it known I was aware of the incomplete case file, is implicating as well. It appears to me that PSB was aware of the omission but was waiting to see if I actually discovered this.

I am seeking an investigation into these criminal violations.

This information was also sent to Chief Deputy Gentry as a request for outside agency investigation.

## Reporting Employees

Sergeant Aaron Engelbeck - S1673

(Data at the time of incident)

Assignment        Sergeant Enforcement Command/Patrol and Enforcement Support/5041-District I

Role              —

Height         —

Weight         —

## Involved Employees

Sergeant Robert Leatham - S1462

(Data at the time of incident)

Assignment      Sergeant Operation Command/Operation Command/5021-Professional Standards

Role           —

Height         —

Weight         —

Captain Gregory Lugo - S1480

(Data at the time of incident)

Assignment      Captain Operation Command/Operation Command/5021-Professional Standards

Role           —

Height         —

Weight         —

## Attachments

No Attachments

## Assignment History

No assignment history

Chain of Command History

**Author Signature Line**

_____

Sergeant Aaron Engelbeck - S1673

46REPORT000958

**Accces to Internal Complaint IA2025-0111 Received on: 03/10/2025**

| | | |
|---|---|---|
| 2025-03-10 16:03 | Sergeant Aaron Engelbeck created new Internal Complaint Incident | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 16:03 | Sergeant Aaron Engelbeck viewed Incident | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 16:03 | Sergeant Aaron Engelbeck updated Incident | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 16:04 | Sergeant Aaron Engelbeck updated Incident | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 16:04 | Sergeant Aaron Engelbeck linked Complainant Employee Sergeant Aaron Engelbeck to incident | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 16:04 | Sergeant Aaron Engelbeck linked Involved Employee Captain Gregory Lugo to incident | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 16:05 | Sergeant Aaron Engelbeck linked Involved Employee Sergeant Robert Leatham to incident | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 16:05 | Sergeant Aaron Engelbeck marked incident entry complete | Engelbeck, Aaron Michael Sergeant [S1673] |
| 2025-03-10 19:03 | Investigator assigned: Un-assigned | Captain Gregory Lugo |
| 2025-03-10 19:03 | Incident access by a user. | Captain Gregory Lugo |
| 2025-03-11 11:01 | Incident access by a user. | Exec Chief Melissa Palopoli |
| 2025-03-18 09:05 | Incident access by a user. | Exec Chief Melissa Palopoli |
| 2025-03-19 14:04 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-19 14:09 | Viewing linked employee folder Sergeant Aaron Michael Engelbeck [S1673] | Mgt an Monique Habblett |

| Date/Time | Action | User |
|---|---|---|
| 2025-03-21 10:26 | Incident access by a user. | Captain Gregory Lugo |
| 2025-03-24 08:55 | Incident access by a user. | Exec Chief Melissa Palopoli |
| 2025-03-24 11:24 | Incident access by a user. | Exec Chief Melissa Palopoli |
| 2025-03-24 13:58 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-24 13:59 | IA No changed from BLANK (NULL) to IA2025-0111 | Mgt an Monique Habblett |
| 2025-03-24 14:00 | Mgt an M Habblett viewed printable report | Mgt an Monique Habblett |
| 2025-03-24 14:00 | File linked to incident: IA2025-0111 Original Summary as Provided in BT.pdf | Mgt an Monique Habblett |
| 2025-03-24 14:00 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt an Monique Habblett |
| 2025-03-24 14:02 | Due date set to: 05/09/2025 | Mgt an Monique Habblett |
| 2025-03-24 14:02 | BlueTeam incoming entry released from holding status | Mgt an Monique Habblett |
| 2025-03-24 14:02 | Access level set to: 2 | Mgt an Monique Habblett |
| 2025-03-24 14:02 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-24 14:18 | Internal Complaint IA2025-0111: new allegation: CP2 - Code of Conduct - Performance or Dereliction of Duty linked to R Leatham | Mgt an Monique Habblett |
| 2025-03-24 14:19 | Added unknown employee | Mgt an Monique Habblett |
| 2025-03-24 14:19 | Internal Complaint IA2025-0111: new allegation: CP2 - Code of Conduct - Performance or Dereliction of Duty linked to Unknown employee | Mgt an Monique Habblett |
| 2025-03-24 14:27 | Incident access by a user. | Mgt Asst Daniel Valeev |
| 2025-03-24 14:48 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-24 14:48 | IA 2A - 60 Day Extension Request (District) task created on 03/24/2025 was deleted from the incident | Mgt an Monique Habblett |
| 2025-03-24 14:49 | IA R6 - District Case Review task created on 03/24/2025 was deleted from the incident | Mgt an Monique Habblett |

| | | |
|---|---|---|
| 2025-03-24 14:55 | Internal Complaint IA2025-0111: allegation linked to R Leatham changed from: CP2 - Code of Conduct - Performance or Dereliction of Duty to CP2 - Code of Conduct - Individual Responsibility | Mgt an Monique Habblett |
| 2025-03-24 15:00 | Internal Complaint IA2025-0111: new allegation: GB2 - Command Responsibility linked to G Lugo | Mgt an Monique Habblett |
| 2025-03-24 15:03 | Internal Complaint IA2025-0111: new allegation: CP11 - Anti-Retaliation linked to G Lugo | Mgt an Monique Habblett |
| 2025-03-24 15:03 | Internal Complaint IA2025-0111: Allegation: GB2 - Command Responsibility deleted from G Lugo | Mgt an Monique Habblett |
| 2025-03-24 15:07 | Internal Complaint IA2025-0111: allegation linked to Unknown employee changed from: CP2 - Code of Conduct - Performance or Dereliction of Duty to CP2 - Code of Conduct - Abuse of Process, Withholding Evidence, and Misappropriation of Proper | Mgt an Monique Habblett |
| 2025-03-24 15:09 | Incident summary changed | Mgt an Monique Habblett |
| 2025-03-24 15:09 | Change of Inv unit from District 1 to PSB Sworn | Mgt an Monique Habblett |
| 2025-03-24 15:09 | Status set to : Suspended | Mgt an Monique Habblett |
| 2025-03-24 15:09 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-24 15:10 | Category Failure to Report Misconduct added | Mgt an Monique Habblett |
| 2025-03-24 15:11 | Category Retaliation added | Mgt an Monique Habblett |
| 2025-03-24 15:13 | Category Property Management added | Mgt an Monique Habblett |
| 2025-03-24 15:13 | Category Property Management removed | Mgt an Monique Habblett |
| 2025-03-24 15:13 | Category Principal(s) - Sworn added | Mgt an Monique Habblett |
| 2025-03-24 15:17 | Investigator assigned: ADM Supv Alice Kosmata | Mgt an Monique Habblett |
| 2025-03-24 15:17 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-24 15:19 | File linked to incident: IA2025-0111 New IA Commander Notification.pdf | Mgt an Monique Habblett |
| 2025-03-24 15:19 | File viewed: IA2025-0111 New IA Commander Notification : \IADATA\WordDocs\PSB Sworn\Mar2025\IA2025-0111 New IA Commander Notification-1.pdf | Mgt an Monique Habblett |
| 2025-03-24 15:20 | File linked to incident: IA2025-0111 Outsourced.pdf | Mgt an Monique Habblett |

46REPORT000961

| | | |
|---|---|---|
| 2025-03-24 15:20 | File viewed: IA2025-0111 Outsourced : \IADATA\WordDocs\PSB Sworn\Mar2025\IA2025-0111 Outsourced-1.pdf | Mgt an Monique Habblett |
| 2025-03-24 15:21 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-24 15:26 | Incident access by a user. | ADM Supv Alice Kosmata |
| 2025-03-24 17:18 | Incident access by a user. | Lieutenant Frederick Porter |
| 2025-03-24 17:18 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT -1.pdf | Lieutenant Frederick Porter |
| 2025-03-25 07:59 | Incident access by a user. | Detn Off Linda Walters |
| 2025-03-25 10:40 | Incident access by a user. | Detn Off Linda Walters |
| 2025-03-25 10:41 | Incident access by a user. | Detn Off Linda Walters |
| 2025-03-25 10:42 | File linked to incident: PSB Prior Work History Lugo.doc | Detn Off Linda Walters |
| 2025-03-25 10:42 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT -1.pdf | Detn Off Linda Walters |
| 2025-03-25 10:44 | Incident access by a user. | Detn Off Linda Walters |
| 2025-03-25 10:45 | File linked to incident: PSB Prior Work History Leatham.doc | Detn Off Linda Walters |
| 2025-03-25 10:45 | File viewed: PSB Prior Work History Lugo : \IADATA\WordDocs\PSB Sworn\Mar2025\PSB Prior Work History Lugo-1.doc | Detn Off Linda Walters |
| 2025-03-25 12:38 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-25 12:38 | Category Outsourced added | Mgt an Monique Habblett |
| 2025-03-25 14:41 | Incident access by a user. | Admin Asst Anna Chacon Hernandez |
| 2025-03-25 14:41 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT -1.pdf | Admin Asst Anna Chacon Hernandez |
| 2025-03-25 14:56 | Incident access by a user. | Admin Asst Anna Chacon Hernandez |

46REPORT000962

| | | |
|---|---|---|
| 2025-03-25 14:58 | File linked to incident: CP-2, Code of Conduct.pdf | Admin Asst Anna Chacon Hernandez |
| 2025-03-25 14:58 | File linked to incident: CP-11, Anti-Retaliation.pdf | Admin Asst Anna Chacon Hernandez |
| 2025-03-25 15:00 | File linked to incident: Just Cause TRN2024-00069122 CP-2 Leatham.pdf | Admin Asst Anna Chacon Hernandez |
| 2025-03-25 15:00 | File viewed: CP-11, Anti-Retaliation : \IADATA\WordDocs\PSB Sworn\Mar2025\CP-11 Anti-Retaliation-1.pdf | Admin Asst Anna Chacon Hernandez |
| 2025-03-25 15:01 | File viewed: CP-11, Anti-Retaliation : \IADATA\WordDocs\PSB Sworn\Mar2025\CP-11 Anti-Retaliation-1.pdf | Admin Asst Anna Chacon Hernandez |
| 2025-03-25 15:02 | File linked to incident: Just Cause TRN2022-00039074 CP-11 Lugo.pdf | Admin Asst Anna Chacon Hernandez |
| 2025-03-26 07:24 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-03-26 07:27 | File linked to incident: IA2025-0111 Employee Initial Letter.pdf | Mgt an Monique Habblett |
| 2025-03-26 07:27 | File viewed: IA2025-0111 Employee Initial Letter : \IADATA\WordDocs\PSB Sworn\Mar2025\IA2025-0111 Employee Initial Letter-1.pdf | Mgt an Monique Habblett |
| 2025-03-26 07:27 | IA 1 - Initial Letter to Complainant: Done date changed from : to 03/26/2025 | Mgt an Monique Habblett |
| 2025-03-26 09:15 | Incident access by a user. | Exec Chief Melissa Palopoli |
| 2025-03-26 09:17 | Exec Chi M Palopoli viewed printable report | Exec Chief Melissa Palopoli |
| 2025-03-27 08:51 | Incident access by a user. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'IA2025-0111 Employee Initial Letter.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'IA2025-0111 New IA Commander Notification.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'IA2025-0111 Original Summary as Provided in BT.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |

| | | |
|---|---|---|
| 2025-03-27 09:00 | File from NETWORKSHARE 'IA2025-0111 Outsourced.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'CP-11 Anti-Retaliation.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'CP-2 Code of Conduct.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'Just Cause TRN2024-00069122 CP-2 Leatham.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'PSB Prior Work History Leatham.doc' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'Just Cause TRN2022-00039074 CP-11 Lugo.pdf' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 09:00 | File from NETWORKSHARE 'PSB Prior Work History Lugo.doc' - compressed to zip. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 12:07 | Incident access by a user. | Admin Asst Anna Chacon Hernandez |
| 2025-03-27 14:36 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:36 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:36 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:37 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:38 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:46 | File viewed: Just Cause TRN2022-00039074 CP-11 Lugo : \IADATA\WordDocs\PSB Sworn\Mar2025\Just Cause TRN2022-00039074 CP-11 Lugo-1.pdf | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:47 | File viewed: Just Cause TRN2024-00069122 CP-2 Leatham : \IADATA\WordDocs\PSB Sworn\Mar2025\Just Cause TRN2024-00069122 CP-2 Leatham-1.pdf | Mgt Asst Amy Gutierrez |

| | | |
|---|---|---|
| 2025-03-27 14:51 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:51 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt Asst Amy Gutierrez |
| 2025-03-27 14:54 | Incident access by a user. | Admin Asst Anna Chacon Hernandez |
| 2025-03-30 17:58 | Incident access by a user. | Lieutenant Frederick Porter |
| 2025-03-30 17:58 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Lieutenant Frederick Porter |
| 2025-03-30 18:19 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Lieutenant Frederick Porter |
| 2025-03-30 19:27 | Incident access by a user. | Lieutenant Frederick Porter |
| 2025-03-30 19:57 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Lieutenant Frederick Porter |
| 2025-03-30 20:02 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Lieutenant Frederick Porter |
| 2025-03-30 20:04 | File viewed: IA2025-0111 Outsourced : \IADATA\WordDocs\PSB Sworn\Mar2025\IA2025-0111 Outsourced-1.pdf | Lieutenant Frederick Porter |
| 2025-03-30 20:04 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Lieutenant Frederick Porter |
| 2025-03-31 08:54 | Incident access by a user. | Mgt an Mara Garcia |
| 2025-03-31 08:54 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt an Mara Garcia |
| 2025-03-31 12:50 | Incident access by a user. | ADM Supv Alice Kosmata |

46REPORT000965

| Date | Event | User |
|---|---|---|
| 2025-04-02 08:22 | Incident access by a user. | Admin Asst Kimberly Herrera |
| 2025-04-02 13:51 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-04-02 13:51 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-04-02 13:52 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-04-02 13:52 | File viewed: IA2025-0111 Employee Initial Letter : \IADATA\WordDocs\PSB Sworn\Mar2025\IA2025-0111 Employee Initial Letter-1.pdf | Mgt Asst Amy Gutierrez |
| 2025-04-02 15:29 | Incident access by a user. | Exec Chief Melissa Palopoli |
| 2025-04-07 11:17 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-04-07 13:33 | Incident access by a user. | Mgt an Mara Garcia |
| 2025-04-07 13:36 | Incident access by a user. | Mgt an Mara Garcia |
| 2025-04-07 13:36 | Secured lock turned ON - Incident is locked. | Mgt an Mara Garcia |
| 2025-04-07 13:39 | Investigator un-assigned: ADM Supv Alice Kosmata | Mgt an Mara Garcia |
| 2025-04-07 13:39 | Investigator assigned: Un-assigned | Mgt an Mara Garcia |
| 2025-04-07 13:54 | Incident access by a user. | Mgt an Mara Garcia |
| 2025-04-07 14:27 | Incident access by a user. | Lieutenant Frederick Porter |
| 2025-04-09 07:12 | Incident access by a user. | Mgt Asst Kaitlin Corless |
| 2025-04-09 07:13 | Incident purge hold status set OFF - incident can be incident-level purged | Mgt Asst Kaitlin Corless |
| 2025-04-09 09:18 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-04-17 06:38 | Incident access by a user. | Mgt Asst Kaitlin Corless |
| 2025-04-17 06:38 | Incident access by a user. | Mgt Asst Kaitlin Corless |
| 2025-04-17 11:32 | Incident access by a user. | Exec Chief Melissa Palopoli |

| | | |
|---|---|---|
| 2025-04-24 07:20 | Incident access by a user. | Mgt an Monique Habblett |
| 2025-04-24 07:21 | File viewed: IA2025-0111 Original Summary as Provided in BT : \IADATA\WordDocs\District 1\Mar2025\IA2025-0111 Original Summary as Provided in BT-1.pdf | Mgt an Monique Habblett |
| 2025-05-01 10:48 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-05-06 07:03 | Incident access by a user. | Admin Asst Jordan Thornton |
| 2025-05-23 09:56 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-06-04 06:29 | Incident access by a user. | Mgt Asst Amy Gutierrez |
| 2025-06-04 06:29 | IA 3A - 85 Day Extension Request (PSB): Done date changed from : to 06/04/2025 | Mgt Asst Amy Gutierrez |
| 2025-06-04 06:29 | IA S - Sheriff Extension Request task created on 03/24/2025 was deleted from the incident | Mgt Asst Amy Gutierrez |
| 2025-06-04 06:29 | IA M - Monitor Extension Request task created on 03/24/2025 was deleted from the incident | Mgt Asst Amy Gutierrez |
| 2025-06-04 06:29 | IA 6A - 180 Day Unknown Follow up task created on 03/24/2025 was deleted from the incident | Mgt Asst Amy Gutierrez |
| 2025-06-09 09:03 | Incident access by a user. | Mgt an Mara Garcia |
| 2025-06-09 09:04 | Incident summary changed | Mgt an Mara Garcia |
| 2025-06-20 10:26 | Incident access by a user. | Lieutenant Kelly Bocardo |
| 2025-06-20 10:32 | Incident access by a user. | Lieutenant Kelly Bocardo |
| 2025-06-20 10:37 | Incident access by a user. | Lieutenant Kelly Bocardo |
| 2025-06-20 11:49 | Incident access by a user. | Captain Aaron Flowers |
| 2025-07-08 09:17 | Incident access by a user. | Mgt an Mara Garcia |
| 2025-07-08 10:04 | Incident access by a user. | Mgt an Mara Garcia |
| 2025-07-10 13:15 | Incident access by a user. | Mgt an Mariusz Kurowski |
| 2025-07-30 09:39 | Incident access by a user. | Mgt Asst Kontressa Macklin |
| 2025-08-06 10:03 | Incident access by a user. | Mgt an Mariusz Kurowski |

| 2025-08-06 10:07 | Incident access by a user. | Mgt an Mariusz Kurowski |
| 2025-08-08 11:52 | Incident access by a user. | Captain Aaron Flowers |
| 2025-08-13 07:06 | Incident access by a user. | Mgt an Monique Habblett |

**Listing created on Aug 13, 2025 at 07:07 by Mgt an Monique Habblett**



**Maricopa County Sheriff's Office**

Chief Deputy Jeff Gentry
550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

April 7, 2025

Captain Greg Lugo S1480
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Greg Lugo,

Effective immediately, you are being placed on Administrative Leave with Pay. You will report by calling the Professional Standards Bureau at (602) 876-5429 between 0900 hours and 0930 hours each day Monday through Friday, except holidays. While on Administrative Leave with Pay you will remain at your place of residence, and you will make yourself available to Sheriff's Office administrative investigators between 0900- and 1700-hours Monday through Friday. While on Administrative Leave with Pay, any off-duty permits that have been authorized for you are immediately suspended, you are not to work off-duty. While on Administrative Leave with Pay, you are not to carry or use any weapons that may have been issued to you by the Maricopa County Sheriff's Office.

Sincerely,

Jeff Gentry
Chief Deputy
Command Administration
Maricopa County Sheriff's Office

Professional Standards Investigation number IA#2025-0139.

I acknowledge receipt of this letter:

_____        _____
Signature                               Date

# MARICOPA COUNTY SHERIFF'S OFFICE    *Memorandum*



| **To:** C. Morrison #1509 <br> Deputy Chief <br> Patrol East | **From:** G. Lugo #1480  *GL* <br> Captain <br> District 6 Patrol Division |
|---|---|
| **Subject:** Recommendation for release/demotion from promotional probation <br> Lieutenant Aaron Engelbeck #1673 | **Date:** September 22, 2020 |

The purpose of this memorandum is to request the recommendation for Lieutenant Aaron Engelbeck #1673 to be considered for a demotion from the rank of lieutenant during his probational period due to unsatisfactory performance.

Effective December 2, 2019 Aaron Engelbeck #1673 was promoted from the rank of sergeant to the rank of lieutenant. Following the promotion, Lieutenant Engelbeck was assigned to the District 2 Patrol Division. Effective February 24, 2020, Lieutenant Engelbeck was transferred to the District 6 Patrol Division where I have since served as his supervisor. Upon Lieutenant Engelbeck's assignment to the District 6 Patrol Division, performance issues began to surface mainly in the areas of Performance of Essential Job Duties and the Quality of Supervisory Reviews/Supervisor Accountability. These issues were presented to Lieutenant Engelbeck, documented within the MCSO EIS in March 2020 and April 2020. The issues were further referenced in his six-month probationary performance appraisal. The six-month appraisal was completed and signed by Lieutenant Engelbeck on June 19, 2020. After June 19, 2020, those performance issues were observed to have improved, remaining within the meeting minimum standards category for a period of time. However, within the past couple of months, similar performance issues have surfaced again primarily in the areas of Performance of Essential Job Duties and Quality of Supervisory Review/Supervisor Accountability. These performance issues/concerns have evolved, expanded, resulting in negative performance patterns. Upon initial review of these resurfacing patterns, further work performance concerns/issues were identified. The specific circumstances supporting the recommendation of this memorandum along with the work performance concerns/issues are outlined below.

## Performance of Essential Job Duties:

- Administrative Investigation IA2020-0326:
  - In June 2020, Lieutenant Engelbeck was assigned an administrative investigation (IA2020-0326) pertaining to a complaint/allegation of driving behaviors associated with two MCSO vehicles, one of which was driven by a sergeant. Lieutenant Engelbeck submitted this administrative investigation for review and it was returned by me for corrections on 08/19/2020. It should be noted that the investigation was noticeably deficient. For example, Lieutenant Engelbeck requested the GPS records for the vehicles in question for the incorrect date. When the CAD administrator indicated that they were unable to find the principal employees logged on for the date requested, Lieutenant Engelbeck never explored the reason for the discrepancy. It should be further noted that the principal employees were identified as they were logged on in/around the time frame and driving vehicles in/around the area described in the CAD system. Regardless, Lieutenant Engelbeck moved on with the investigative interviews and completed the investigation, rather than exploring the reason for the discrepancy. Other issues included but are not limited to the following: the incorrect occurrence location, no appropriate follow up with the initial complainant as he reported having video footage of the incident, no reference as to how the employees were identified as involved, and no scene investigation. The complete review notes associated with this division commander review are available upon request.
  - An extension memorandum for IA2020-0326 was submitted and approved by PSB. Upon providing Lieutenant Engelbeck with the approved extension memorandum via email, he was

Revised: 12.21.17

46REPORT000970

advised that the new due date for this investigation was 09/10/2020. As of 09/18/2020 at approximately 1430 hours, the investigative report was not submitted, nor was an extension memorandum submitted or any communication as to why it could not be completed by the deadline. During a performance meeting on 09/18/2020 at approximately 1445 hours, I inquired into the status of this administrative investigation. Lieutenant Engelbeck did not provide a justification/explanation as to why the 09/10/2020 deadline was not met other than to indicate that he thought the due date was coming up. Upon inquiring as to the status of this administrative investigation, Lieutenant Engelbeck indicated that since the case was returned to him on 08/19/2020 he had not done any investigative work. Lieutenant Engelbeck stated that he had been trying to obtain the correct GPS records from the CAD administrator and corrected some of the typos I had indicated. Otherwise, he had not completed any investigative action since 08/19/2020. It was requested for an extension memo to be completed/submitted immediately on this case and an extension memo was submitted later in the day on 09/18/2020.

- o It should be noted that the issue of the significance of the quality of administrative investigations and the deadlines associated with them were reinforced countless times with Lieutenant Engelbeck. Those specific instances in which these issues were formally documented as being conveyed to Lieutenant Engelbeck include an expectations meeting on 04/15/2020, a supervisors staff meeting on 05/06/2020, a follow up confirmation to the expectations of the 04/15/2020 meeting on 05/13/2020, a District 6 Commander's meeting on 07/22/2020, at a meeting/discussion with Lieutenant Engelbeck on 09/04/2020, and also at a District 6 Commander's meeting on 09/16/2020. These discussions are also in addition to the already mandated and completed PSB 40 hour training course and annual mandatory 8 hour training courses associated with PSB investigations.

- EIS Blue Team Entries
  - o On 09/14/2020 I received the Draft BIO inspection report (BI2020-0101) pertaining to the sworn supervisor note entries for the month of August 2020. Contained within the inspection was an identified deficiency pertaining to Lieutenant Engelbeck. The deficiency was pertaining to Lieutenant Engelbeck not having completed a supervisor note documenting employee performance for Sergeant Calderon for the month of August 2020. This is the second time since May 2020 that Lieutenant Engelbeck failed to complete his standard required supervisor notes within the required timeframes. Upon examination of the month of August 2020, it was determined that Lieutenant Engelbeck failed to complete a supervisor note documenting employee performance on all four (4) of his assigned direct reports. Those entries that were contained within the system consisted of a couple of sentences, appeared boilerplate, and failed to address employee performance. The monthly requirements pertaining to supervisor notes are nothing new and have been referenced in formal training courses and MCSO Policies for several years. Furthermore, when addressing the BIO Action Form with Lieutenant Engelbeck for the missed notes in the month of May 2020, Lieutenant Engelbeck acknowledged he understood these requirements.
  - o An additional examination via the EI Pro Application determined that Lieutenant Engelbeck also failed to complete a line level inspection pertaining to all four (4) of his assigned direct reports for the month of August 2020. Lieutenant Engelbeck had been directed to complete one line level inspection pertaining to each of his direct reports every month. This directive was provided verbally and in writing to Lieutenant Engelbeck at a District 6 Commander Expectations meeting on 04/15/2020 and further acknowledged he understood this expectation at a follow up meeting on 05/13/2020. Furthermore, Lieutenant Engelbeck has entered/completed these line level inspections in the past demonstrating his awareness of this requirement.
  - o During a performance meeting on 09/18/2020 at approximately 1445 hours, I advised Lieutenant Engelbeck of the EIS entries issues notated above and Lieutenant Engelbeck acknowledged that he had not completed these entries. Lieutenant Engelbeck advised the reason for not completing the supervisor notes was due to the fact that he was on vacation for a week in August 2020 and was planning to complete them upon his return. Given the fact that Lieutenant Engelbeck went on vacation out of the country, the MCSO Leave Management Section took an additional week to clear Lieutenant Engelbeck to return to work. This is the reason why he stated he had not completed the required notes. Lieutenant Engelbeck did not have an explanation as to why he had

2 | P a g e

46REPORT000971

not since complete the notes nor why it was not communicated. On the other hand, when I inquired as to the reason why the line level inspections had not been entered, Lieutenant Engelbeck reasserted the same response, but also indicated that MCSO Policy only requires line level inspection entries quarterly for a lieutenant. Lieutenant Engelbeck insisted that MCSO Training Division while he was at training the previous day (09/17/2020) informed him that line level inspection entries were only required per policy quarterly. I reminded Lieutenant Engelbeck of my prior directive pertaining to monthly line level inspections and he did not have a response. Lieutenant Engelbeck was instructed to make up the required supervisor note entries and the line level inspection entries.

- It should be noted that Lieutenant Engelbeck did take approved vacation for period of time consisting of non-essential travel outside of the country. Per MCSO Briefing Board 20-42, employees choosing to leave the country on non-essential travel, are required to notify their supervisor prior to travel and they are also required to obtain clearance from MCSO LMS prior to returning to work. Lieutenant Engelbeck did not notify me prior to his travel. After returning from his vacation on 08/24/2020 I received a text message from Lieutenant Engelbeck asking what he needed to do to get clearance to return to work after being out of the country. Lieutenant Engelbeck was provided with a contact telephone number for LMS and instructed to email LMS in addition to calling. On Lieutenant Engelbeck's next scheduled work shift (08/26/2020) I received a text message from him approximately 1 ½ hours into his shift advising me he needed to go to Mesa to get an antibody test. When I inquired as to if LMS cleared him to return to work, he indicated he had not heard from them and was unsure if that meant he could or could not return without their clearance. Lieutenant Engelbeck was instructed to the directives set forth under Briefing Board 20-42. These directives were also part of a mandatory HUB training course that was issued on 06/30/2020. Lieutenant Engelbeck advised via text message that he left another message and email and was "going to try to get some admin stuff done at home." Lieutenant Engelbeck later received clearance from MCSO LMS to return to work on 09/01/2020 and MCSO LMS indicated they spoke to Lieutenant Engelbeck and he was doing some "telework in the meantime." These communications and information associated surrounding the excuse provided by Lieutenant Engelbeck on 09/18/2020 do not appear to justify his inability to complete his required EIS entries.

- BIO Action Form(s)
    o On 06/10/2020 Lieutenant Engelbeck was assigned a BIO Action Form (BAF2020-0168) regarding one of his direct reports not having completed their required patrol activity log reviews for April 2020. When this BIO Action Form was assigned, Lieutenant Engelbeck was advised within the assigned EIS Blue Team Entry that the due date for this BIO Action Form to have to the Division Commander was 07/01/2020. This BIO Action Form was not submitted to the Division Commander until 07/04/2020 and prior to this date, there was no explanation, justification, or request for additional time to complete/submit the BIO Action Form. Furthermore, upon review of the BIO Action Form that was completed/submitted by Lieutenant Engelbeck on 07/04/2020, it was found that the form was missing a selection and there were no signatures on the form as required by MCSO Policy. The BIO Action Form was returned to Lieutenant Engelbeck on 07/04/2020 and it was not until 07/08/2020 that the BIO Action Form was corrected and resubmitted.
    o On 08/14/2020 Lieutenant Engelbeck was assigned a BIO Action Form (BAF2020-0247) regarding one of his direct reports having an error on the daily shift roster for June 2020. When this BIO Action Form was assigned, Lieutenant Engelbeck was advised within the assigned EIS Blue Team Entry that the due date for this BIO Action Form to have to the Division Commander was 09/01/2020. This BIO Action Form was not submitted by 09/01/2020 and prior to this date, there was no explanation, justification, or request for additional time to complete/submit the BIO Action Form. On 09/04/2020 during a meeting with Lieutenant Engelbeck I inquired as to the status of this BIO Action Form. Lieutenant Engelbeck did not provide a justification or explanation as to why the BIO Action Form had not been completed by the deadline provided. Lieutenant

46REPORT000972

Engelbeck was instructed to complete/submit the BIO Action Form immediately. However, it was not until 09/06/2020 that the BIO Action Form was completed/submitted.

- o As previously outlined in this memorandum, the deadlines associated with BIO Action Forms and deadlines established by the Division Commander are in place to allow for appropriate review and/or submission to take place while meeting the deadlines set forth in MCSO Policy. These deadlines, the requirements to meet these deadlines associated with BIO Action Forms are not only clearly outlined in MCSO Policy, but have also been communicated with Lieutenant Engelbeck as various times to include formal meetings on 04/15/2020, 05/06/2020, and 05/13/2020.

**Quality of Supervisory Reviews/Supervisory Accountability:**

- Service Complaint Review/Submission SC2020-0288
   - o MCSO Service Complaint SC2020-0288 was a service complaint assigned to one of Lieutenant Engelbeck's direct reports (Sergeant Calderon). This service complaint was submitted to me by Lieutenant Engelbeck for review on 09/06/2020. The submission was in the form of an electronic Blue Team submission. Upon review of the limited information contained within the electronic submission, it was discovered that the entry contained two attached documents representing the service complaint form(s). When those documents were opened, they were the same Service Complaint Continuation Pages attached two times with two different file names. The first couple of pages of the Service Complaint which includes the signature pages were not attached/included. In addition, the Service Complaint entry also was missing the supporting documents/attachments which are required. The Service Complaint entry was returned to Lieutenant Engelbeck with a notes correction page via the Blue Team System.
   - o On 09/18/2020 during a performance meeting with Lieutenant Engelbeck I advised Lieutenant Engelbeck of the concerns with the level of review that could have been completed by him regarding this Service Complaint. He verbally stated that he reviewed the document in hard copy form but did not have an explanation as to why the hard copy form had not been submitted to me for review with all of the necessary supporting documents. Lieutenant Engelbeck stated that the sergeant (implying Sergeant Calderon) had told him that the Service Complaint does not need a "wet signature" and that is why he submitted to me electronically in Blue Team. This statement is further concerning as following my review of the Service Complaint and return of the Service Complaint on 09/09/2020 to the investigator (Sergeant Calderon), the investigator stated that the Lieutenant (Engelbeck) told him to submit it electronically. When informed of this contradiction, Lieutenant Engelbeck did not have an explanation, nor was an explanation or this issue further questioned at that time.
   - o As previously noted the issue of the significance of the quality of administrative investigations and the deadlines associated with them were reinforced countless times with Lieutenant Engelbeck. Those specific instances in which these issues were formally documented as being conveyed to Lieutenant Engelbeck prior to the submission of this Service Complaint include an expectations meeting on 04/15/2020, a supervisors staff meeting on 05/06/2020, a follow up confirmation to the expectations of the 04/15/2020 meeting on 05/13/2020, a District 6 Commander's meeting on 07/22/2020, and at a meeting/discussion with Lt. Engelbeck on 09/04/2020 (two days prior to his submission of Service Complaint SC2020-0288). These discussions are in addition to the mandated and completed PSB 40 hour training course and annual mandatory 8 hour training course for supervisors.
- Administrative Investigation IA2019-0606
   - o MCSO Administrative Investigation IA2019-0606 is an administrative investigation assigned to one of Lieutenant Engelbeck's direct reports (Sgt. Thomas). Following a division commander review, this administrative investigation was returned to Lieutenant Engelbeck and Sergeant Thomas for corrections on 08/17/2020. This case has previously had multiple extensions and the due date at that time for the case to be completed/submitted to the Division Commander for review and/or an extension memo was 08/19/2020. The official PSB due date at this time was 09/01/2020.

46REPORT000973

The case was not completed/submitted nor was an extension memo or any communication to the division commander regarding needing additional time for completion by Lieutenant Engelbeck or Sergeant Thomas. On 08/31/2020 I sent an electronic mail message to both Sergeant Thomas and Lieutenant Engelbeck requesting an extension memo be completed/submitted immediately regarding this case. On 09/01/2020 Sergeant Thomas submitted the extension memorandum and forwarded me a copy of his prior submission of an extension memo for this case to Lieutenant Engelbeck back on 08/25/2020. No response, explanation, or follow up was ever received by Lieutenant Engelbeck regarding the overdue status of this request.

- o On 09/18/2020 during a performance meeting with Lieutenant Engelbeck I inquired with Lieutenant Engelbeck as to the status of this administrative investigation and/or an investigative update since the case was returned for corrections on 08/17/2020. Lieutenant Engelbeck only explained that he thought he recalled that Sergeant Thomas wanted to discuss the additional interviews needed prior to doing the interviews. It should be noted that in addition to additional interviews, there were additional investigative steps still needed to be corrected on this investigation. Lieutenant Engelbeck was also reminded during this meeting that the corrections needed were also provide to him regarding this matter.
- o As previously established, the significance of administrative investigations, the deadlines associated with them, and the quality of reviews were repeatedly communicated to Lieutenant Engelbeck.

- EPA completion deadlines/concerns
    - o During the month of August 2020 and September 2020, multiple employees under the command of Lieutenant Engelbeck have had their annual performance appraisal due dates come up. All of the EPA due dates have not only been provided on a regular basis for the past several months by MCSO Human Resources, but the District 6 Administrative Staff routinely send out email reminders to the supervisors and respective command staff pertaining to EPA due dates that are forthcoming along with their due dates. As the writing of this memorandum, the following EPA's under the command of Lieutenant Engelbeck have not been submitted:
        - EPA – Deputy Gomez – Due on 08/05/2020
        - EPA – Deputy Ashworth – Due on 09/10/2020
        - EPA – Deputy Gilchrist – Due on 09/10/2020
        - EPA – Administrative Assistant Reagle – Due on 09/11/2020
    - o It should be noted the due dates and expectation associated with the timely completion of these EPA's was previously outlined with Lieutenant Engelbeck at an expectations meeting on 04/15/2020, a supervisors staff meeting on 05/06/2020, and a follow up confirmation to the expectations of the 04/15/2020 meeting on 05/13/2020. Furthermore, there have been electronic mail reminders sent to Lieutenant Engelbeck by the District 6 Administrative Staff regarding all of the above overdue EPA's with at least three reminders sent regarding the EPA that was due on 08/05/2020. The due dates provided are the due dates for the EPA's to be received by Human Resources. Also, no communications as to why these have not yet been submitted and/or a request for additional time or assistance to facilitate the completion of these items has been received.
    - o On 09/18/2020 during a performance meeting with Lieutenant Engelbeck I inquired as to the status of these overdue EPA's. Lieutenant Engelbeck was unable to provide an explanation of the overdue EPA's.
- Injury Report – DSA Russell
    - o On 09/09/2020 MCSO Deputy Service Aide Russell sustained a minor on duty injury at the scene of a traffic collision. While the injury was minor in nature, DSA Russell did seek out medical attention for this injury and reported all the necessary information to the respective supervisor. One of Lieutenant Engelbeck's direct reports (Sergeant Yager) was assigned to complete the necessary paperwork/submission for this incident. As of 09/18/2020, it was determined that the necessary entries/documentation had not been submitted through the chain of command for this incident.
    - o On 09/18/2020 during a performance meeting with Lieutenant Engelbeck I inquired as to the status of the overdue injury report pertaining to DSA Russell. The importance of this requirement was

46REPORT000974

stressed as the employee sought medical attention for this incident. There had also been no communication as to why this report had not yet been completed/submitted. Lieutenant Engelbeck indicated that he had the paperwork (apparently in his purview) to review indicating that the supervisor completed/submitted the documentation, but that Lieutenant Engelbeck had not completed his review. It was requested for Lieutenant Engelbeck to have this paperwork completed as soon as possible.

- EIS Entry – Minor Award Issue
  - o An EIS Blue Team Entry was authored on 08/10/2020 and submitted through the chain of command regarding the nomination of the Medical Aide Award. This entry was submitted through Lieutenant Engelbeck to me on 08/14/2020. On 08/14/2020, the entry was returned to Lieutenant Engelbeck for necessary corrections as the entry was incorrectly categorized as a Minor Award Nomination when it needed to be a Higher Award Nomination and it needed to have the proper allegation attached. The entry was resubmitted by Lieutenant Engelbeck on 08/18/2020 to me however the initial requested corrections were still not completed. On 08/21/2020 the entry was returned to Lieutenant Engelbeck for the correction of the proper type of entry and instructions on how to rectify the entry. On 09/06/2020 Lieutenant Engelbeck returned to entry back to me merely with a comment that it was in the system incorrectly. The entry was returned a second time with the initial instructions for how to correct the issue and no communication was received regarding additional questions regarding this matter or how to rectify this matter. As of the writing of this memorandum, the entry has not been resubmitted.
  - o It should be noted that the category of this entry dictates the routing and process of this entry and makes the employees eligible for a formal higher award with the Office. This entry/incident and the fact that the entry was not addressed and merely returned demonstrates the level of review, lack of attention to detail, and/or response to a request for corrections from Lieutenant Engelbeck's supervisor.
- Multiple Statute of Limitations Cases
  - o On 08/12/2020 the District 6 Detective Sergeant forwarded and electronic mail message to Lieutenant Engelbeck and me regarding a deputy (Deputy Lawson) under Lieutenant Engelbeck's command. The issue presented involved a total of seven cases assigned to Deputy Lawson for follow up that were recently all being cleared exceptionally by Deputy Lawson citing the statute of limitations expiring. The detective supervisor observed that there had been no documented follow up on these cases since 2019, there appeared to be workable leads on these cases, the victims were never notified of the case status change, and the narrative on these supplements/clearance sheets appeared to be "cut and paste", contained the same spelling errors, and could be considered boilerplate.
  - o On 08/12/2020 after reviewing this electronic mail message I assigned Lieutenant Engelbeck the task of reviewing these matters and addressing them. I further indicated that I did recall this particular deputy already having similar issues previously addressed under a prior supervisor.
  - o On 09/06/2020 I received an electronic mail message that Lieutenant Engelbeck discussed the statute of limitations matter with the deputy's current and former supervisor and they had a discussion with the deputy regarding the lack of follow up. This was also notated per Lieutenant Engelbeck as being referenced in a supervisor note. Upon review of the supervisor note that was entered on 09/06/2020 by Sergeant Frei, this was the second time in which this deputy had similar issues pertaining to not following up on cases and clearing them due to the expiration of the statute of limitations. There was however no mention of the boilerplate issues/concerns and/or the lack of follow up or notification of the victims in the respective cases. A request was sent to Lieutenant Engelbeck for additional information/action regarding the victim contact and the boilerplate concerns on 09/07/2020. At the time of this memorandum, no response has been received.
  - o It should be noted that the task of monitoring the timely completion of cases assigned to respective patrol squads was clearly assigned to the respective lieutenant at an expectations meeting on 04/15/2020, a supervisors staff meeting on 05/06/2020, and a follow up confirmation to the expectations of the 04/15/2020 meeting on 05/13/2020. Further concerning is the fact that this was the second time that this deputy had this situation occur, the fact that the second occurrence

46REPORT000975

involved seven cases, and the fact that they were missed for entire year period of time before being identified.

- Community Policing Issue/Assignment
  - On 09/01/2020 Sergeant Frei was assigned by the Division Commander to work with his respective squad to formulate a plan to address a mounting community concern relative to a particular residence in the area and potential criminal activity. Sergeant Frei is one of Lieutenant Engelbeck's direct reports. Lieutenant Engelbeck was copied on the request and all the background of the task was included in the assignment electronic mail message. Furthermore, attached to the request was already compiled background information from the crime analyst for review. The due date for the plan to be provided to the division commander was 09/11/2020. As of 09/18/2020, no plan or response had been provided nor was any communication provided regarding the reason that it had not been able to be completed as requested.
  - On 09/18/2020 during a performance meeting with Lieutenant Engelbeck I inquired as to the status of this overdue item. Lieutenant Engelbeck did not provide an explanation as to why this had not been completed.
- Work Locations/Assignment/Requirements
  - For the past couple of weeks, the increasing pattern of Lieutenant Engelbeck not being present in the District 6 Substation for significant periods of time had been observed. During these increasingly observed longer periods of time it was further noted that it did not appear that Lieutenant Engelbeck was on any significant call for service and per the CAD, Lieutenant Engelbeck was listed as out of service for supervisor administrative duties with a location of "QCK." It should be noted that informally, at least two of Lieutenant Engelbeck's direct reports also relayed to me indications that Lieutenant Engelbeck was not frequently in the office. These statements were provided when the supervisors were directed to route information and/or consult with their lieutenant regarding a work-related issue/matter.
  - On 09/04/2020 I was on-duty at the District 6 Patrol Substation conducting official business and had multiple issues to discuss with Lieutenant Engelbeck, the on-duty District 6 Patrol Lieutenant. However, Lieutenant Engelbeck was not seen in/around the substation. It should be noted that on 09/04/2020 there were extensive computer outages making various applications including CAD inoperable limiting the ability to complete work from an MDC. At approximately 1330 hours, I reached out to Lieutenant Engelbeck inquiring as to if he was coming to the office on this date via text message. Lieutenant Engelbeck responded via text stating the following "I can. Need to go over some stuff? I'm five minutes away." I indicated in the affirmative and he subsequently responded to the District 6 Patrol Substation where we met and discussed various issues some of which were previously referenced.
  - On 09/18/2020, the on-duty patrol sergeant (Sergeant Yager) for District 6 was scheduled to attend mandatory block training for the first portion of the shift. Lieutenant Engelbeck was filling in as the on-duty patrol sergeant while the sergeant attended the mandatory training. The mandatory training course began at the MCSO Training Center at 0700 hours and the patrol sergeant checked off on CAD that he was en-route to the training center at 0526 hours. The CAD data for the patrol supervisor (A650) shows radio being advised that Lieutenant Engelbeck (A607) was covering starting at approximately 0536 hours. Upon logging on to start the day at approximately 0747 hours, I noticed there was a vehicle crash incident that was currently being worked by District 6 Deputies. The location and circumstances of the incident which included a major traffic throughfare in the Town of Queen Creek, the closure of lane(s) of traffic, and the involvement of a school bus in the vehicle collision incident classify this incident as requiring supervisory notification to me. The incident (MC20183031) began at approximately 0633 hours, was still being worked, and no notification had been provided. I noticed on the CAD system that Lieutenant Engelbeck (A607) was logged on and checked off with the code of "SUPERADMIN" and a location of "QCK." However, when looking at the map representing the GPS location of his whereabouts, it showed him at a location near Harmony Ave / Frye Rd, Gilbert. This location is consistent with Lieutenant Engelbeck's home address of 2779 S. Harmony Ave, Gilbert. I continued to periodically monitor the GPS location per the map which continued to display that

46REPORT000976

Lieutenant Engelbeck continued to be at the same location near Harmony Ave / Frye Road for approximately an additional hour.

- It should be noted that Lieutenant Engelbeck's home address of 2779 S Harmony Ave, Gilbert is approximately 5 miles from the northwest boundary of Lieutenant Engelbeck's area of responsibility within the Town of Queen Creek (District 6).
- It should be further noted that from approximately 0530 hours until approximately 0800 hours when I was within the Town of Queen Creek boundaries, there was no only no command level employee within the Town of Queen Creek, but no on duty supervisor within the Town of Queen Creek.

o Throughout the duration of 09/18/2020 while working at the District 6 Patrol Substation, I noticed that Lieutenant Engelbeck was not present. Other than being in a separate area of the building for approximately one hour, I did not see Lieutenant Engelbeck. Upon checking/reviewing CAD I noticed that Lieutenant Engelbeck did not check off on any calls for service/incidents the entire day. However, he was checked off per CAD as being in "QCK."

o On 09/18/2020 at approximately 1402 hours I sent Lieutenant Engelbeck a text message asking if he was coming to the office today. After approximately 36 minutes of not receiving a response, I attempted to contact Lieutenant Engelbeck via his county issued cellular telephone. Upon calling the telephone number I could hear the telephone ringing simultaneously in Lieutenant Engelbeck's office. Following this discovery, I called Lieutenant Engelbeck on his personal cellular telephone number. Lieutenant Engelbeck answered the telephone and I advised him I needed him to come to the office as I needed to go over some items with him. I mentioned that I attempted to text and call him on his other phone and as I began stating that I heard the phone in the other room, Lieutenant Engelbeck verbally responded that he put his phone in vibrate mode in class (referring to the prior training day) and he forgot to turn vibrate mode back off. This statement and response appeared deflective but were not explored further at that time.

o During a performance meeting on 09/18/2020 at approximately 1445 hours, that was previously referenced in this memorandum, I inquired with Lieutenant Engelbeck as the vehicle accident incident. Lieutenant Engelbeck indicated that he thought that the incident began before the sergeant (Sergeant Yager) had left for training. He assumed that Sergeant Yager had provided the necessary notification. Lieutenant Engelbeck also verbalized that he did not know the incident involved a school bus and recalled being advised via the radio that the roadway had been cleared. Lieutenant Engelbeck did not have an explanation as to why the notification process had not been completed other than to say that he did not recall all of the items on the notification list. The list he is referencing is a previously provided mandatory notification list for supervisors/command assigned to District 6. Lieutenant Engelbeck was further reminded of the importance of the notification process and later provided another copy of the notification list via email on 09/19/2020.

o Additionally, during the performance meeting on 09/18/2020 I reminded Lieutenant Engelbeck of the requirement to be within the Town Limits of Queen Creek during while on duty. I also further provided the verbal directive that Lieutenant Engelbeck was now required to be in the District 6 Patrol Substation when he was not on a call for service or otherwise assisting patrol deputies/staff with matters. His physical presence was now required to be available for deputies, sergeants, administrative staff, the public, and myself to be able to troubleshoot matters and answer questions. Lieutenant Engelbeck indicated he understood and verbalized that his supervisors have his phone number. I reiterated the directive and informed Lieutenant Engelbeck that he needs to be here (at the District 6 Patrol Division) as we cannot constantly be calling him. Lieutenant Engelbeck did not have any additional questions, problems, or concerns regarding this directive when asked.

o It should be noted that at Lieutenant Engelbeck has never requested or been given authorization to work his shift as a patrol lieutenant from his residence or outside his area of responsibility. The importance/requirement of having patrol lieutenant/command coverage within the respective area of responsibility has been relayed countless times with Lieutenant Engelbeck. Lieutenant Engelbeck has demonstrated his awareness of this requirement and the importance of having command coverage every time that he has requested time off from work and/or to attend training and command coverage was discussed.

8 | P a g e

46REPORT000977

- o The notification requirement process, the directive to be within the Town Limits of the Queen Creek while on duty, the requirement for the lieutenant to properly document their activities in CAD with accurate location information, and the requirement of notification of departing the Town Limits during the work shift were all relayed formally (in addition to occasional verbal reminders/discussion), at an expectation meeting on 04/15/2020 as well as at a follow up confirmation to the expectations of the 04/15/2020 meeting on 05/13/2020. The expectation meeting minutes were also provided in writing to Lieutenant Engelbeck and entered in the EIS for future reference following the 04/15/2020 meeting.
- o On 09/19/2020 at approximately 0830 hours I accessed the MCSO CAD via the I-Net Viewer Application to follow up on the directive given to Lieutenant Engelbeck the prior day (09/18/2020) regarding him being present in the Town of Queen Creek. Upon reviewing the GPS location information, it was observed that Lieutenant Engelbeck remained in the area of Harmony Ave / Frye Road, Gilbert since the time he logged on for duty that day (approximately 0650 hours). He also checked off in the CAD by manually entering a location of "QCK" at approximately 0650 hours. The location of "QCK" is not consistent with the GPS location information captured. Furthermore, per the CAD history, Lieutenant Engelbeck did not respond or check off on any calls for service/incidents throughout the entire shift of 09/19/2020.
- o In order to confirm the accuracy of the information observed via the MCSO I-Net View Application, the CAD administrator Lisa Leitch was contacted and the GPS information was requested for Lieutenant Engelbeck (A607) on 09/18/2020 and 09/19/2020. The observations noted above were confirmed and provided in written form and in a video file. The written form documents the following GPS location of Lieutenant Engelbeck's MDC for 09/18/2020 and 09/19/2020.
  - 09/18/2020:
    - From log on time (0631 hours) until approximately 0841 hours he was located at 2779 S Harmony Ave, Gilbert
    - 0905 hours to 1008 hours – 20727 E Civic Parkway (District 6 Substation)
    - 1014 hours to 1123 hours – 21051 S Ellsworth Loop Road
    - 1126 hours to 1441 hours – Southside of Rittenhouse Road, West of Ellsworth Loop Road
    - 1447 hours to 1703 hours – 20727 E Civic Parkway (District 6 Substation)
    - 1725 hours to 1738 hours – 2779 S Harmony Ave, Gilbert
  - 09/19/2020
    - From log on time (0650 hours) until approximately 0944 hours he was located at 2779 S Harmony Ave, Gilbert
    - 1004 hours to 1105 hours – 20727 E Civic Parkway (District 6 Substation)
    - 1119 hours to 1128 hours – 20770 E Victoria Lane
    - After 1128 hours there are no GPS records
- o The ID Card access log for the District 6 Patrol Substation was obtained from the Town of Queen Creek. The log is available for review and confirms the times in which Lieutenant Engelbeck had accessed the parking area and/or the building at the District 6 Patrol Substation as represented in the GPS CAD data/logs above. It should be noted that Lieutenant Engelbeck was provided with the access card formally issued to Lieutenant Banks which is why the log show Lieutenant Banks' name and not Lieutenant Engelbeck's name. The name was not updated in the Town of Queen Creek's database.

The supporting documentation/records for the above listed circumstances/situations/incidents that are not already included in the MCSO EIS or probationary period employee performance appraisal are available for further review/submission.

The above outlined circumstances/observations regarding the performance of MCSO Lieutenant Aaron Engelbeck #1673 over the past six-month period have demonstrated his inability to fulfill some of the most fundamental responsibilities of the job description of a lieutenant. Despite repeated formal training, policy mandates, directives,

46REPORT000978

CONFIDENTIAL - ATTORNEY'S EYES ONLY

and reminders, Lieutenant Engelbeck has demonstrated a pattern of blatant disregard for deadlines, and directives, rising to the level of insubordination. Furthermore, his unwillingness to accept responsibility for these performance issues and his attempts to deflect responsibility as a probationary lieutenant are further troubling. Therefore, it is recommended for Lieutenant Aaron Engelbeck to be released/demoted from his probational probationary period returning to his former rank of Sergeant.

Nothing further.

46REPORT000979

CONFIDENTIAL - ATTORNEY'S EYES ONLY

**Subject: __Recommendation for release/demotion from promotional probation__    Date: __09/22/2020____**

**Chain of Command Signatures:**

_____        _____        _____
**Direct Supervisor's Signature**        **Serial #**        **Date**
Comments: _____
_____
_____


_____        _____        _____
**Lieutenant/Section Commander's Signature    Serial #**        **Date**
Comments: _____
_____
_____


___*Captain G. Lugo #1480*_____        S1480        09/22/2020
**Division/District Commander's Signature**    **Serial #**        **Date**
Comments: _Submitted for consideration/review._____
_____
_____


_____        _____        _____
**Deputy Chief's Signature**        **Serial #**        **Date**
Comments:_____
_____
_____
_____
_____


_____*S l~ #1051*_____        _____        *09-23-20*
**Executive Chief's Signature**        **Serial #**        **Date**
Comments: _____
FORWARD TO PSB FOR REVIEW OF EVENTS 9-18 + 9-19 FOR TRUTHFULNESS + INSUBORDINATION
FORWARD TO ADMIN SERVICES FOR PROMOTIONAL PROBATIONARY DEMOTION
_____


_____        _____        _____
**Chief Deputy/Chief of Staff/CFO's Signature**        **Serial #**        **Date**
Comments: _____
_____
_____
_____

46REPORT000980

CONFIDENTIAL - ATTORNEY'S EYES ONLY



**Maricopa County Sheriff's Office**

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

October 24, 2024

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

Dear Sergeant Engelbeck:

After giving due consideration to the information you presented at your pre-determination hearing, your service record, and upon further review of the investigation, I have decided to proceed with discipline. Note that this disciplinary action is based on sustained findings of Allegation #1 and Allegation #5. It has been determined that Allegations #2, #3, and #4 are Not Sustained.

In accordance with Policy GC-17, *Employee Disciplinary Procedure*, Attachment A, Discipline Matrix, this imposed discipline is a Category 6(29.A), First Offense. This letter is to notify you that you shall be suspended for 40-hours without pay from your position as a Deputy Sergeant. The dates of your suspension are as follows:

Monday, October 28, 2024, through Friday, November 1, 2024, (40-hours)

This action is taken subsequent to Administrative Investigation #20-0555 and under the authority of Maricopa County Law Enforcement Merit System Resolution Section 15 and Rule 10.07(A). The cause(s) for this action are:

Maricopa County Law Enforcement Officers Merit System Resolution Section 15 (C):

(5)    Neglect of Duty

CP-2, Code of Conduct, Section 39, *Insubordination*: Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

On July 30, 2020, you completed TheHub training confirming that you received Critical Policy, CP-2, Code of Conduct, and acknowledged that you are responsible for knowing, understanding, and abiding by the policy. You also acknowledged that it is your responsibility to remain familiar with all policy as it affects your duties as an Office employee.

In accordance with Merit Rule 10.07(A), an employee may be suspended for cause as provided in the Law Enforcement Merit Resolution. Each violation constitutes separate and independent cause for suspension.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Sergeant Aaron Engelbeck S1673
October 24, 2024
Page 2 of 4

For more detailed findings and conclusions for each sustained allegation of wrongdoing, please refer to Administrative Investigation #20-0555, which is incorporated by reference as if fully set forth herein.

## Introduction

On October 3, 2020, Captain G. Lugo entered an internal complaint alleging you were insubordinate when you failed to follow direct orders provided to you while assigned as a [1]District 6 Patrol Lieutenant. The matter was assigned to Professional Standards Bureau (PSB) Sergeant R. Leatham for investigation.

Your Unit History, and CAD data were reviewed by Sergeant Leatham as part of the investigation. The review showed that you would often put yourself in service at the beginning of your shift using the service code [2]"Superadmin." You would then remain at your residence, which was in the town of Gilbert, for an extended period of time before you arrived in the boundaries of the town of Queen Creek. Additionally, it was noted that you seldom went to the substation or went on calls for service, rather you sat stationary in various parking lots in Queen Creek and your primary service code was "Superadmin." Sergeant Leatham determined you established a pattern of behavior where you would log on while at your residence and remain at your residence for several hours before driving to your area of responsibility.  It was noted the drive time from your residence to District 6 was about five minutes.

As part of Sergeant Leatham's investigation, he also reviewed Blue Team notes that were made regarding your assignment in District 6. Specifically, he reviewed Supervisor Note SN2020-00019122 dated April 29, 2020. Attached to the Supervisor Note was an agenda titled, "District 6 – Lieutenant Expectations – Briefing 04/15/2020 1000 hours." Under the bullet point of Work schedules, the following was noted, "The expectation is that during the normal work hours you will physically be located within the boundaries of District 6, barring having to go take care of an issue, but then return. The expectation is to be present in the office, out on patrol, and accessible to patrol supervisors. If not, I need to be advised."

Another Supervisor Note reviewed was SN2020-00041517. Attached to this Supervisor Note was an email dated September 19, 2020, from Captain Lugo to you and was regarding a meeting you had with Captain Lugo on September 18, 2020. The email included a bullet point titled Work location/requirements. Within that bullet point the following was noted, "It was reiterated that during your on-duty work hours you are required to be within the Town Limits of the Town of Queen Creek. Furthermore, when not on a call for service and/or assisting patrol units with a matter, you are required to physically be in the District 6 Substation. This allows you to be present and available for the deputies, supervisors, administrative staff, and myself to troubleshoot issues, answer question, address matters. As previously reiterated, if you need to leave the Town Limits or attend to other matters in which you will not be able to be physically at the District 6 Substation, a notification to me is required."

## Allegation No.1

---

[1] On October 12, 2020, you were demoted from lieutenant to sergeant for unsuccessful completion of promotional probation.
[2] Superadmin is used by supervisors to indicate that the supervisor is completing administrative tasks.

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Sergeant Aaron Engelbeck S1673
October 24, 2024
Page 3 of 4

It is alleged you were insubordinate when you failed to follow an order given by your captain to be physically located within the boundaries of District 6 during your work hours.

### Supporting Facts:

Captain Lugo was interviewed by PSB investigators on October 15, 2020. Captain Lugo was the District 6 captain during the timeframe under investigation. Captain Lugo stated he had a meeting with you on April 15, 2020, where he gave you a list of expectations, including being physically located within the boundaries of District 6 during your working hours, unless you had to take care of an issue, but then return upon resolving the issue. A Supervisor Note was entered by Captain Lugo at the conclusion of the meeting listing the expectations.

Regarding working from home, Captain Lugo stated you never asked for permission to work from home on a regular basis, and if you had, he would not have permitted it because your job required you to be present within the patrol district. Captain Lugo stated he began to notice you were frequently late arriving in the boundaries of District 6 and you were frequently absent from the substation. He stated your absences frequently resulted in him having to help your subordinates with tasks you should have been doing.

Captain Lugo stated on September 18, 2020, after it became apparent you were spending several hours a day at your residence and not within the district as you had been instructed, he had a meeting with you and gave you a direct order to be within the boundaries of the district, and if you were not on a call for service, you needed to be physically located within the substation to handle administrative matters. He stated this meeting was documented in an email and a Supervisor Note which were both sent to you. While reviewing your records, Sergeant Leatham discovered that on September 19, 2020, the day after meeting with Captain Lugo, you started your shift in the same manner as September 18, 2020. You logged on at your residence and put yourself out of service with the "Superadmin" service code and remained at your residence until 0941 hours.

During your PSB interview you acknowledged receiving the expectations list from Captain Lugo and being told to be within your area of responsibility during your shift. You admitted to logging in, then eating breakfast and reading emails or Blue Team Notes before driving to District 6. You told PSB investigators you would frequently park in various areas around the district because you did not want to be around Captain Lugo at the substation.

When asked about the email Captain Lugo sent to you on September 18, 2020, you admitted to intentionally not reading it because you were angry with Captain Lugo and did not want to read the email. When asked about being within the boundaries of District 6 by a certain time, you stated you were following the directions given to you by your previous commander when you were assigned to District 2, as well as other lieutenants who had been assigned to District 6. You stated you modeled your behavior by what your peers were doing and not what Captain Lugo was asking you to do.

### Allegation No.5

It is alleged that you were insubordinate when you intentionally avoided going to the District 6 substation as ordered by your captain.

### Supporting Facts:

Sergeant Aaron Engelbeck S1673
October 24, 2024
Page 4 of 4

Captain Lugo told PSB he noticed you were parking in various locations around the district, but you were regularly absent from the substation. During your PSB interview you admitted one of your reasons for not going to the substation was to avoid being around Captain Lugo.

I have reviewed your Personnel file to consider your service record.

Your actions constitute a serious violation of departmental policies and regulations and such misconduct calls for appropriate disciplinary action. Continued violations on your part will result in more serious disciplinary action, up to and including, dismissal from the Maricopa County Sheriff's Office.

You have the right to appeal this suspension to the Maricopa County Merit System Commission. Any such appeal must be submitted in writing and received within ten (10) calendar days after your receipt of this notice. Your appeal must state the facts upon which it is based and the action requested of the Commission. Address any appeal to Maricopa County Human Resources Director, 301 W. Jefferson, 8th Floor, Phoenix, Arizona 85003-2113.

As outlined in Arizona Revised Statutes §38-1101, you are entitled to receive a copy of the investigative file. Should you wish to receive the file, you must forward your written request, along with a copy of the filed notice of appeal, attn: Director Tiffani Shaw, Maricopa County Sheriff's Office, Administrative Services Division, Sheriff's Office Administration Building, 550 West Jackson Street, Phoenix, Arizona 85003. Upon receipt by the Division, you will be contacted regarding your request. Please note that it is unlawful to disseminate information that is disclosed pursuant to §38-1101 to any person other than the parties to the appeal and their lawful representatives for purposes of the appeal of the disciplinary action.

Sincerely,

Ken Holmes
Appointing Authority

KH:jrg

cc:    County Human Resources Department
       County Human Resources Director
       Personnel File

I acknowledge receipt of this letter:

_____    #S1673    10/24/2024
            Signature                              Date

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
#### IA #2020-0555

## FINDINGS

**Principal:**      **Aaron Engelbeck S1673**

**Allegation #1:**   **It is internally alleged Lt. Engelbeck was insubordinate when he failed to follow a direct order when he was not within the boundaries of District VI as ordered by his Captain..**

**Policy #1:**      **CP-2.3, Code of Conduct** (Effective 07/30/2020)

39. **Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_Sustained_ _____      _____ S2331_      __06/12/2024__
Findings                       Division Commander                        Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained
_Sustained_ ℗    ____Kym Kutz____    1-30-25  ℮
Final Findings        ℗              Appointing Authority          10-24-24    Date

Discipline Imposed: ___40-Hour Suspension   No Discipline___ ℗

☐  Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

Investigator:  Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

Page 88 of 92

46REPORT000985

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

## FINDINGS

| | |
|---|---|
| **Principal:** | **Aaron Engelbeck S1673** |
| **Allegation #2:** | **It is internally alleged Lt. Engelbeck was untruthful by entering "QCK" as his location when he was not physically located in Queen Creek.** |
| **Policy #1:** | **CP-5.1.C, Truthfulness** (Effective Date 09/11/2020) |

**B.** Employees shall not make false official records or enter or cause to be entered into any books, logs, records, reports, or electronic documents any inaccurate, false, or improper information or material for the purpose of deception.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_Not Sustained_     _(signature)_ S2351     06/12/2024
Findings             Division Commander            Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

_Not Sustained_     _(signature)_     10-24-24
Final Findings          Appointing Authority          Date

~~Discipline Imposed:~~ _____

☐ Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

| | |
|---|---|
| Investigator:  Sgt. R. Leatham S1462 | Reviewer: Capt. G. Lugo S1480 |

46REPORT000986

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

**MARICOPA COUNTY SHERIFF'S OFFICE**
**ADMINISTRATIVE INVESTIGATION**
**IA #2020-0555**

# FINDINGS

**Principal:**          Aaron Engelbeck S1673

**Allegation #3:**      **It is internally alleged; Sgt. Engelbeck lied to PSB investigators about activating the GPS tracker in his MDC after he admitted to turning it off.**

**Policy #1:**          **CP-5.1.A, Truthfulness (Effective Date 09/11/2020)**

        **A.** Employees shall not lie or make a false statement relative to a material fact for the purpose of deception, during the course of an official investigation.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_Not Sustained_                     _ΛΛΛ ΛΛ      5235/_                    _06/12/2024_
Findings                                 Division Commander                                Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

_Not Sustained_                     _Kym N/L_                              _10·24-26_
Final Findings                          Appointing Authority                            Date

~~Discipline Imposed~~: _____

    ☐  Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

_____

Investigator:   Sgt. R. Leatham S1462                 Reviewer:  Capt. G. Lugo S1480

46REPORT000987

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
### ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

## FINDINGS

**Principal:**          **Aaron Engelbeck S1673**

**Allegation #4:**      **It is internally alleged Lt. Engelbeck was insubordinate when he deactivated the GPS on his MDC.**

**Policy #1:**          **CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

Sustained                    _MMV_  S2351                    06/12/2024
Findings                     Division Commander                     Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained                                                  10·24·24
Final Findings               Appointing Authority                    Date

~~Discipline Imposed:~~ _____

☐  Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:** _____

_____

_____

_____

Investigator:  Sgt. R. Leatham S1462          Reviewer:  Capt. G. Lugo S1480

Page 91 of 92

46REPORT000988

CONFIDENTIAL - ATTORNEY'S EYES ONLY

☐CRM

## MARICOPA COUNTY SHERIFF'S OFFICE
## ADMINISTRATIVE INVESTIGATION
### IA #2020-0555

## FINDINGS

**Principal:**　　　　**Aaron Engelbeck S1673**

**Allegation #5:**　　**It is internally alleged Lt. Engelbeck was insubordinate when he intentionally avoided going to the District VI substation, as ordered by Captain Lugo.**

**Policy #1:**　　　　**CP-2.39, Code of Conduct (Effective Date 07/30/2020)**

**39. Insubordination:** Insubordination is the willful refusal to obey a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, *Command Responsibility*. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

I have reviewed this investigative file and find sufficient facts to support the Preliminary Findings.

_____Sustained_____　　　_____/////_____ 52351　　　06/12/2024
Findings　　　　　　　　　　Division Commander　　　　　　Date

After giving due consideration to the information received from this investigative report and, if applicable, the information provided during the Pre-Determination Hearing process, I have made the following Final Findings regarding the stated policy violation:

Not Sustained
~~Sustained~~ ℗　　　　_____/Jm /dL_____　　　　1-30.24　℗
Final Findings　　　　　　　　　　Appointing Authority　　　　~~10-24-24~~
　　　　　　　　　　　　　　　　　　　　　　　　　　　　Date

　　　　　　　　　　　　　　　　　　　　　　　　　　　℗
Discipline Imposed: ___~~40 Hour Suspension~~ No Discipline___

☐　Justification Memorandum for Discipline Imposed or the decision not to impose discipline for any sustained findings is attached

**Notes:**

_____

_____

_____

_____

Investigator:　Sgt. R. Leatham S1462　　　　　Reviewer:　Capt. G. Lugo S1480

Page 92 of 92



# Maricopa County Sheriff's Office

January 28, 2025

Sergeant Aaron Engelbeck S1673
550 W. Jackson Street
Phoenix, Arizona 85003

550 West Jackson Street
Phoenix, AZ 85003
Phone (602)876-1000
www.mcso.org

Dear Sergeant Engelbeck:

On October 24, 2024, the Maricopa County Sheriff's Office suspended you for 40 hours without pay as a result of the sustained allegations outlined in Internal Investigation #2020-0555. On October 30, 2024, you appealed the 40-hour suspension to the Maricopa County Law Enforcement Officer's Merit System Commission. This letter is to notify you that after further consideration, the Office has decided to modify the disciplinary action imposed to no discipline. The Office will thus rescind the 40-hour suspension and file a motion to vacate the pending Merit Commission appeal hearing.

Your employment records are being corrected to reflect the rescission of the suspension, and this letter shall be placed in your personnel file. You will be reimbursed for 40 hours of pay at the rate you were being compensated at the time you served the suspension. Your reimbursement will be processed by County Payroll. Please allow processing time.

Sincerely,

Ken Holmes

Appointing Authority

KH:adc

cc:    County Payroll Records
       Personnel File
       Merit Commission – Keri March

I acknowledge receipt of this letter: _____  _____
                                        Signature                    Date

**From:**      Melissa Palopoli (MCSO)
**To:**        Craig Baum
**Subject:**   Fw: Request for outside agency criminal investigation
**Date:**      Wednesday, April 9, 2025 5:35:06 PM
**Attachments:** image001.png
               image002.png
               PDH findings.pdf
               complaint letter.docx
               Concerning the one time lump sum increase.txt
               SC2024-0168 SC Form.pdf
               Unresolved PSB complaint.txt
               Timeline.xlsx
               Criminal Complaint.pdf

Get Outlook for iOS

**From:** Melissa Palopoli (MCSO) <Melissa.Palopoli@MCSO.Maricopa.gov>
**Sent:** Monday, March 24, 2025 8:55:33 AM
**To:** Melissa Palopoli (MCSO) <Melissa.Palopoli@MCSO.Maricopa.gov>
**Subject:** FW: Request for outside agency criminal investigation

In January 2025, I was made aware that the Maricopa County Sheriff's Office (MCSO) Professional Standards Bureau (PSB) had violated Arizona State Statute (ARS) 38-1106 (A)(1) which states that the respondent (MCSO) must provide a copy of the respondent's investigative file related to the appeal within fourteen (14) calendar days of the request from the appellant.  They have also violated ARS 13-2809(A)(1) Tampering with physical evidence which states: A person commits tampering with physical evidence if , with intent that it be used, introduced, rejected or unavailable in an official proceeding which is then pending or which such person knows is about to be instituted, such person: 1. Destroys, mutilates, alters, conceals or removes physical evidence with the intent to impair its verity or availability.  I believe the facts will show this was willful and with full knowledge by a person unknown at this time in PSB.  The following will illustrate how this occurred:

In October 2020, Captain Greg Lugo filed an administrative complaint against myself with allegations of truthfulness and insubordination.  At the time, I was Captain Lugo's direct report as a lieutenant in District 6 (Queen Creek).  I was interviewed by Sergeant Robert Leatham at this time involving the matter.  During that interview, I advised the investigator of several policy violations of which Captain Lugo was responsible. These violations included such policies as command responsibility, truthfulness, and retaliation among others.  I later provided the same information in written form to clarify the allegations.  In spite of receiving this information, Sergeant Robert Leatham failed to open an independent investigation into these allegations, I was unaware of this at the time.  I am also unaware if this decision was made by Sergeant Leatham or the decision came from within his chain of command.  This is contrary to MCSO policy.  It is unknown by me at this time if Sergeant Leatham made this decision on his own or was ordered to do this by someone in his chain of command.

In March of 2021, Captain Lugo was installed as commander of PSB.  I believe this move was already intended at the time of my interview and allegations of misconduct by Captain Lugo.

Following this investigation, I was punished both formally and informally over the course of the next four years.  I was demoted (probation terminated), denied a merit-based salary increase the next year, denied a one-time monetary incentive for working through the pandemic, and with an open investigation, I was unable to promote for the next 4 years.  In May of 2021, I emailed Chief Deputy Russ Skinner (who would be installed as Sheriff in 2024).  I outlined my protests in not receiving a merit increase or the Covid one time incentive.  I also advised him of the allegations I entered against Captain Lugo and that, since Captain Lugo was now commander of PSB, this would not be properly investigated.  He replied that I was not eligible for the increase or incentive.  He also assured me that my allegations were being investigated.

In January 2024, I was called to interview again with Sergeant Leatham.  This interview involved clarification of GPS information within my computer.  At the conclusion of the interview, I asked for the case number for my allegations against Captain Lugo.  He stated an investigation was not opened involving this.  I told him I was in shock of this because MCSO policy states if a supervisor is made aware of misconduct, the allegations must be investigated.  He stated to me that since Captain Lugo opened his investigation first that I would be retaliating against Captain Lugo if I continued to pursue these allegations.  I reminded Sergeant Leatham that I was first to state Captain Lugo was retaliating against me.  Sergeant Leatham stated Captain Lugo entered his investigation first.  I took this to be a threat from PSB that should I continue with my pursuit of an investigation, I would be facing new allegations of retaliation.  When I left that interview, Sergeant Leatham told me he would speak to his supervisors about the investigation.  I responded with doubt.

In June of 2024, I sent an email to the chief of compliance, Michael Caputo.  I advised him that I made the investigator aware of policy violations and he refused to open an investigation.  I provided my original written complaint about Captain Lugo.  I also reminded him that in addition to Captain Lugo's policy violations, Sergeant Leatham was violating policy by refusing to open a separate investigation.  This is an allegation of employee misconduct. Chief Caputo assured me he would look into the matter.  Approximately one month later I was notified that a service complaint regarding my inquiry had been completed.  MCSO policy GH-2 Internal Investigations states "A service complaint is not an allegation of employee misconduct."  So this is now another level in the chain of command violating MCSO policy to prevent Captain Lugo from being properly investigated.

In September 2024, I was notified that the investigation from 4 years prior had been completed.  The truthfulness allegation was not sustained but they sustained 3 allegations of insubordination.  I was advised, the appointing authority, Ken Holmes, was considering 40 hours of suspension as discipline.  As this is major discipline, I was entitled to a pre-

determination hearing (PDH). I went before the appointing authority and brought forth my arguments against the sustained findings. I also made clear that 4 years to conclude this investigation and dole out major discipline was unethical and contrary to current state law. I also made aware the efforts to avoid investigating Captain Lugo. (This is the fourth person I have made aware of this violation of MCSO policy.) After consideration, the appointing authority overturned one of the sustained findings but upheld the remaining 2. He informed me he was going to proceed with the 40 hour suspension. I advised him that I was looking forward to an appeal as I would finally have an authority outside of the Sheriff's Office view the unethical practices within the PSB division. Mr. Holmes then provided me with the suspension information which would begin the following week (October 2024).

I was provided 10 calendar days to file the appeal. As I was serving the suspension at that time, this was done on my own time and at my own expense. I filed the appeal within the allotted 10 days. I was later notified that a hearing had been scheduled for January 10, 2025 (MCFY25-L01).

I was provided documentation for the appeal process which included an advisement that "Pursuant to A.R.S. 38-1106(A)(1), the appellant may submit a written request, accompanied by a copy of the filed notice of appeal, for a copy of the respondent's investigative file related to the appeal. The respondent must provide the requested copy within fourteen (14) calendar days of their receipt of the request." I immediately emailed the legal liaison for the Sheriff's Office to request the report. In the email, I also provided the above statute and reminded they have 14 days to provide the case file.

On November 14, 2024, I received an email from Neil Landeen with the Maricopa County Attorney's Office stating he was the assigned representation for the Sheriff's Office. I provided subpoenas to the hearing officer, Prudence Lee, and Mr. Landeen in requesting my witnesses for the hearing. Among these subpoena's was one for Chief Caputo.

On December 20, 2024, I received an email from Simon Haines which shared the case file. This was provided through a web link which had me set up a login and password for access. I was not provided an actual physical copy of these documents. I took a cursory glance and saw the file included the report, attachments, and several audio and video files. There was no notice that any parts of the case file would be provided at another time nor was there any indication the case file was incomplete.

On December 22, 2024, Michael Caputo responded to his subpoena stating he was unavailable on that date. Neil Landeen advised he was willing to reschedule so I could have access to this witness. The hearing was rescheduled for February 7, 2025. I then began to prepare my appeal arguments.

As I reviewed the report authored by Sergeant Leatham, I noticed that there were several omissions regarding my statements in the interview. In addition, it appeared the report was being tailored to support a sustained allegation. I remembered approximately half of the principal interview I participated in was spent in which I was explaining policy violations from

Captain Lugo.  It is contrary to MCSO policy and practice to require someone to state "I want to file a complaint."  It only requires an allegation, either verbal or written, of employee misconduct to require an investigation.  Yet Sergeant Leatham's report said "Explanation of why an additional IA investigation was not opened: When I met Engelbeck on 11/10/2020 and he gave me these documents, he did not say anything about filing a complaint against Captain Lugo or Chief Morrison."  The report later described when I asked for the case number in the follow up interview.  The report stated: "At the conclusion of the interview, Engelbeck was offered time to make a five-minute statement.  Rather than make a five-minute statement, he requested an IA number for a complaint that was never made."  The report also reinforced the previous threats levied by Sergeant Leatham.  The report stated: "Based on the above sections from the Anti-Retaliation policy, if Engelbeck were to make an allegation of misconduct against Captain Lugo for reporting Engelbeck's conduct to PSB, Engelbeck would violate this policy."

After taking note of numerous discrepancies in the report, I decided the best way to proceed would be to observe the primary video between myself and Sergeant Leatham.  I planned to bring specific moments in the video to the attention of Sergeant Leatham and ask him under oath why these statements were excluded from his report and investigation.  I then began searching for the video in the provided case file.  While there were several video and audio files for other witness interviews, there were no video or audio files provided for that interview nor Captain Lugo's complaint interview.

On January 27, 2025, I emailed Mr. Landeen.  The email stated the following: Hello sir, in reviewing the uploaded files you shared with me, I discovered there is no video or audio for the first interview of myself.  Please add this at your earliest convenience.  Thank you, Aaron.

I did not receive a response that day. The next day I received a phone call from the Conflict Resolution department.  They stated there had been a change to my suspension.  They further stated the suspension had been rescinded.  I received a letter in my MCSO email which confirmed this and I was told it required my signature by the end of the day.  The letter gave no explanation for the reason of the rescinding.  I replied back and inquired as to whether the findings of the investigation would also be changed.  I received a response stating that the Appointing Authority would indeed change the findings.  With the Sheriff's Office paying me back the lost wages over the suspension, MCSO requested the vacating of the appeal hearing the same day which was granted.

It is my belief that the efforts to vacate the appeal were meant to cover the withholding of evidence.  This is also an effort to avoid questioning as to the PSB practices under oath.  It is my belief that Captain Lugo had more involvement in this case than was appropriate as he should have recused himself.  I believe the video was not provided because it would clearly illustrate that I had indeed attempted to file a complaint of retaliation four years prior.  The video would also show discrepancies in the report, possibly to the point of violating Office truthfulness policy.  PSB practices are being revealed in this case and other cases to show a

serious lack of fairness and impartiality. This is made possible by the challenges provided in the appeal process. They are aware most employees do not want to tackle the difficult task of appeal.

The videos provided and the missing videos should have been stored in the same place according to Office policy. Therefore, someone would have to deliberately omit them for discovery. The legal liaison is known to consult with the case agents and PSB command for what can and can't be released. As this was a concluded investigation, the excuse of "continued investigation" is not valid for omission. Furthermore, I believe the wish to vacate the appeal the day after I made it known I was aware of the incomplete case file, is implicating as well. It appears to me that PSB was aware of the omission but was waiting to see if I actually discovered this.

I am seeking an investigation into these criminal violations.
This information was also sent to Chief Deputy Gentry as a request for outside agency investigation.

---

**From:** Jeff Gentry (MCSO) <Jeff.Gentry@MCSO.maricopa.gov>
**Sent:** Monday, March 10, 2025 5:03 PM
**To:** Melissa Palopoli (MCSO) <Melissa.Palopoli@MCSO.Maricopa.gov>
**Subject:** FW: Request for outside agency criminal investigation

Melissa,

I received this today. This is the first I'm hearing of any of this. I think the responsible thing to do would be to ask an outside agency to investigate. Thoughts?

Thanks,



**Jeff Gentry**
**Chief Deputy**

---

**From:** Aaron Engelbeck (MCSO) <A_Engelbeck@MCSO.maricopa.gov>
**Sent:** Monday, March 10, 2025 4:02 PM
**To:** Jeff Gentry (MCSO) <Jeff.Gentry@MCSO.maricopa.gov>
**Subject:** Request for outside agency criminal investigation

Chief Deputy Gentry:

Please observe the attached documents outlining my criminal complaint against the Professional Standards Bureau (PSB) for the intentional destruction or withholding of evidence between October 2024 and January 2025.

Attached documentation:
- Formal statement of criminal complaint
- PDH findings
- PDH response
- Timeline of events
- Email correspondence with (then) Chief Deputy Russ Skinner
- Email correspondence with (then) Chief Michael Caputo
- Service Complaint authored by (then) Chief Michael Caputo
- Original Complaint authored by myself provided to PSB

The Professional Standards Bureau has continually shown conspiratorial behavior at every level in resisting an investigation of its commander Captain Greg Lugo. I have attached correspondence with the former chief deputy (and later Sheriff) Russ Skinner in which he states an investigation will be conducted involving Greg Lugo. This investigation never occurred. I have also attached an email to former Chief Michael Caputo advising him of malfeasance within PSB, as a sergeant refused to open an investigation on Captain Greg Lugo after being advised both verbally and in writing of misconduct. The sergeant failed to investigate these allegations and further threatened me with new allegations of retaliation if I proceeded. In addition, I have attached a service complaint authored by former Chief Caputo dismissing the behavior. A service complaint to resolve this matter is also counter to MCSO policy. MCSO policy states any supervisor advised of misconduct shall open an administrative investigation. Policy also states that a service complaint cannot be utilized to clear matters of misconduct.

As you can see, for the above reasons, I cannot in any way trust our PSB division to handle a proper and impartial investigation. This is the reason I am requesting an outside agency investigate. I am, of course, available to discuss this matter further with you.

I have also added the criminal complaint in Blue Team.

Thank you for your consideration,
Sgt. Aaron Engelbeck #S1673
Maricopa County Sheriff's Office
District 1
Desk: 602-876-3774
Cell: 602-291-7485

1MCSO



**The information contained and transmitted is intended only for the person or entity to whom it is addressed and may contain confidential and/or privileged material.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited.   If you have received this e-mail in error, please notify the sender, delete and destroy this message and it's attachments.**

**From:** Melissa Palopoli (MCSO)
**Sent:** Monday, April 7, 2025 2:47 PM
**To:** Frederick Porter (MCSO) <F_Porter@MCSO.maricopa.gov>
**Subject:** hows this?

It is alleged that Captain Lugo was insubordinate by failing to follow a direct order regarding an internal investigation. It is also alleged that he failed to notify his supervisor about a criminal allegation involving himself.



**MARICOPA COUNTY SHERIFF'S OFFICE**

**Melissa L. Palopoli**
Executive Chief of Compliance
Compliance Bureau
Maricopa County Sheriff's Office
550 W. Jackson Street, Phoenix, AZ 85003

**Office:** 602-876-5271
**Cell:** 602-856-2832
**E-mail:** melissa.palopoli@MCSO.maricopa.gov

1

46REPORT000998