# Exhibit 2

## Appendix 3: Transcripts of Interviews

| Transcript | Bates stamp numbers |
|---|---|
| Executive Chief Palopoli Interview, April 17, 2025 | 46REPORT0001000 |
| Deputy Chief Summers Interview, April 17, 2025 | 46REPORT0001079 |
| Captain Lugo Interview, April 18, 2025 | 46REPORT0001120 |
| Undersheriff Gentry Interview, April 21, 2025 | 46REPORT0001266 |
| Executive Chief Palopoli Interview, April 21, 2025 | 46REPORT0001326 |
| Written Supplement from Executive Chief Palopoli, April 21, 2025 | 46REPORT0001385 |
| Ms. Hablett (PSB) Interview, April 22, 2025 | 46REPORT0001395 |
| Commander Doyle (CID) Interview, April 22, 2025 | 46REPORT0001421 |
| Lieutenant Porter (PSB) Interview, April 22, 2025 | 46REPORT0001448 |
| Commander Callahan (CRS) Interview, April 22, 2025 | 46REPORT0001475 |
| Director Shaw Interview, April 22, 2025 | 46REPORT0001519 |
| Mr. Holmes Interview, April 23, 2025 | 46REPORT0001540 |
| Written Supplement from Executive Chief Palopoli, April 24, 2025 | 46REPORT0001595 |
| Director Shaw Interview, May 13, 2025 | 46REPORT0001604 |
| Mr. Holmes Interview, May 13, 2025 | 46REPORT0001616 |
| Sheriff Sheridan Interview, May 13, 2025 (Part A) | 46REPORT0001671 |
| Sheriff Sheridan Interview, May 13, 2025 (Part B) | 46REPORT0001716 |

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with MELISSA PALOPOLI

April 17, 2025


_____


Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

**TRANSCRIPT OF INTERVIEW WITH MELISSA PALOPOLI**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001001

                    P R O C E E D I N G S

        (PLEASE NOTE:  There were no introductory remarks made on the tape regarding who was present in the room.  The Court Reporter recognized the voices from prior transcriptions. Attorney Steve Serbalik was at the April 21, 2025, interview with Chief Palopoli; it is assumed it is him speaking in this interview as well.)

A.    I got the Chief Deputy, Chief Jeff Gentry, on that same date, the 10th I believe you said, with an email forwarded to me from the Chief Deputy or the origin of the email was from Sergeant Engelbeck.  Sergeant Engelbeck wrote Chief Gentry an email stating that he wished to have an outside agency take a look at the allegations involving him and also involving -- I believe he named Captain Lugo.  I don't have anything in front of me to believe they named Captain Lugo and Sergeant Latham from PSB.

        That was -- I wanted to say approximately 5 p.m. because I think I had worked like 8 to 4:30 that day and I had just arrived at home about a half-hour drive and I saw the email.  There was a bunch of attachments on it from Sergeant Engelbeck and realizing it was a lot to look through, I wrote the Chief Deputy back and said, "Hey, I'll look through this and I'll talk with you tomorrow."

        So the next morning I went in to the office, read through all of the documents and documentation provided by

Sergeant Engelbeck at which point I then spoke to the Chief Deputy and I said -- I had only been there for 20 days at this point with MCSO so I said, "What would you like to do regarding this?"

And he said, "Well, I think we should have an outside agency take a look to keep us" -- keep MCSO away from it essentially, especially since it was involving a PSB commander.

And at that point, I had reached out to Captain Lugo, around 11, 11 a.m. that morning, I'm not really sure what time it was --

Q.    That was the 11th?

A.    Yes, the next day, yeah, it would be the 11th.  And asked him -- I don't remember if I asked him to call me or to come down to headquarters, guys.  I honestly can't recall if it was an in-person meeting or over the phone at which point we briefly spoke about the investigation and I had advised him at that point that he should remain out of it since it was involving him unless I had procedural questions.  And that's because I didn't know the PSB world with MCSO well enough in terms of how they conducted their investigations.

And at that point, Captain Lugo agreed and I asked him to provide me with a point of contact within PSB, a lieutenant that I could be in conversation with, and he said he would let me know who that person would be.

Q.    What was the direction to Captain Lugo?  I missed that.

A.    The direction was to provide me with -- to stay out of the investigation, to remove himself from it.  I knew that much well enough about Internal Affairs investigations, and to provide me a point of contact within PSB.  I forget what else I said.  I think that was just to stay out of the investigation.  Oh, if I had questions regarding procedural things within PSB for an internal investigation, that I would contact him on those.  But it wouldn't be anything related -- directly related to the 111 investigation.

Oh, sorry.  Going back.  I did ask Captain Lugo if he was aware of the investigation during that meeting and he said that he was.  He stated that he had seen it the night before and that he had read through it briefly.

BY MR. ANDERS:

Q.    When you spoke with Chief Gentry after you reviewed the email and all of the attachments, was that in person, by phone, text message, email?  What was the mode of that communication?

A.    It wasn't by text and, sir, I'm sorry, I have many conversations with the Chief Deputy.  At this point what happened a month and a half ago I don't recall.  More than likely it was in person.  That's typically how I have my meetings with him.  He comes in.  I wait for him to have an opportunity to speak and I go in his office and talk to him.  I just don't have a recollection of exactly what happened on this one.

46REPORT001004

Q.   So you were left with the understanding that the Chief Deputy felt this should be an investigation and should be investigated by an outside agency?

A.   Yes, sir.

Q.   Is that how you couched it?

A.   Yes, sir.

Q.   When you communicated with Captain Lugo and had this conversation about provide me a point of contact.  I might have procedural issues.  I'll come back to you with -- you know, remove yourself from the investigation or stay away from the investigation, what was the venue for that conversation?

A.   What was the venue for that?

Q.   Yes.  What was the venue?  Was it in your office, his office?

A.   I said that prior, I'm sorry.  I wasn't sure if it was on the phone or in person.  I believe it was in person.  At the time it seemed innocuous but now it seems important so I'm sorry.

Q.   And did Lugo have any response to that?

A.   He agreed.

Q.   Okay.  Did Lugo say when he became aware of that case?

A.   He had told me that it was -- the evening before he saw it --

Q.   The evening before?

A.   -- it in IAPro.

Q.   So what occurred then after that conversation with Chief Deputy and then with Captain Lugo?

A.   What then occurred?

Q.   What event occurred?

A.   I'm sorry, between the construction (referring to noise outside) and --

Q.   Yes.

A.   You know, and I mean no disrespect, Chief.  If you have a specific question, that's kind of a broad question and I want to be as truthful as possible without . . .

Q.   So did you review, like, a Blue Team entry or give consideration to an outside agency that the Chief Deputy had talked about?  In other words, from your perspective, you removed him from the investigation?

A.   Yeah.

Q.   So what would be your next steps?

A.   So in talking to Greg, he mentioned something about Jensen Hughes and I didn't know -- again, at this point I hadn't been there very long so I didn't know who -- if we had a conflict investigator, who he was.  And I had reached out to Jensen Hughes.  They didn't advise that they were not the right people to talk to.  It wasn't until I spoke to you, Chief Anders, that you advised that Jensen Hughes was not the avenue to go, that Baseline Investigations would be the appropriate party.

          So anytime I had a conversation with you, I briefed

8

the Chief Deputy on those but that would be kind of what the next steps were, what the conversations were with Jensen Hughes and then I believe it was with you as well.

Q.   Okay.

MR. PETERS:   Can I stop for a second?

With the Jensen Hughes, you say you spoke with Jensen Hughes?

THE WITNESS:   I did.

MR. PETERS:   Okay.  And how did you -- how did you address that with them and how was their response?  How did you become aware from them that there was a conflict?

THE WITNESS:   I didn't say that they told me there was a conflict.  It wasn't until I spoke to Chief Anders that he told me that they were not the avenue to go down.

MR. PETERS:   So in your conversations with Jensen Hughes, then, were they briefed at all on the case?

THE WITNESS:   They were briefed on a brief summary as to what the allegation was.

MR. PETERS:   And what did they tell you after that?  Anything?

THE WITNESS:   No.  They were going to assign an investigator and proceed from there.

MR. PETERS:   So they were ready to go to work?

THE WITNESS:   Yeah, they were.  They actually had an investigator reach out to me and they were assigning the case.

46REPORT001007

MR. PETERS:  Who was that investigator that reached out to you?

THE WITNESS:  I would have to go back and look.  I'm sorry.  I don't have the person's name, nor do I recall it.

MR. PETERS:  Okay.

THE WITNESS:  I can get back to you, though.

BY MR. ANDERS:

Q.   So did Lugo ever reach out to Jensen Hughes?

A.   I'm unaware.

Q.   So you reached out to Jensen Hughes.  Do you know who you spoke with at Jensen Hughes?

A.   Mark was one of the supervisors I believe.

Q.   Okay.  Just a telephone conversation?

A.   It was actually a Teams meeting.

Q.   Okay.  Okay.  Just the two of you on the call?

A.   I believe so.  I would have to go back and check.

Q.   Sounds like you briefed him on we have these allegations against a PSB commander.  I would like you folks to assume the investigation.  Don't let me put words in your mouth but --

A.   I didn't give him very much facts other than it was internal complaint against -- with possibly the principals being -- sorry, Captain Lugo and potentially Sergeant Latham.

Q.   Okay.  And then it sounds like they assigned an investigator and that investigator reached back out to you?

A.   It was an email back and forth.

Q.    Okay.

And do we have that email?

A.    I believe I provided it.  I will double-check, though, sir.  It was kind of -- we were in a frenzy to get some of this stuff to you and I have not had the opportunity to go through and see if I had forgotten anything to provide to you guys.

Q.    Sure.

A.    So I'm going to actual -- actually, I'm going to write that down because I don't know if I gave you that Jensen Hughes stuff.

Q.    The reason I ask about, you know, did Captain Lugo reach out to Jensen Hughes or were you the individual representing the office that reached out to Jensen Hughes?  As you recall, we had a meeting, the Monitor, myself, other members of the Monitoring Team, Mr. Popolizio, Chief Deputy Gentry, yourself, Chief Summers, I think that meeting was on April 7, a Monday.  And during that meeting in part, Chief Summers represented that additional charges were going to be filed against Captain Lugo and it included to the effect that it had been found out that he had communicated with or assigned the case or tried to assign the case to Jensen Hughes.

A.    I don't recall Chief Summers saying that, sir.

Q.    Okay.  Have you had any contacts with Sergeant Engelbeck?

A.    No.

Q.    No communication, email, text messages, phone calls,

anything of that nature?

A.   No, sir.  And I have never met him in my life.

Q.   You and I first talked about the case on -- you emailed me on March 25 and we spoke on March 26 and you briefed me about the case at that time.  I think you provided me with the case number at that time as well.  We kind of went through a format that I explained that I typically do for an intake and routing.

What can you recall between when you first learned of the case the evening of the 10th to 15 days later when you and I spoke, what all can you recall that occurred during that period of time with regards to any conversations with the Chief Deputy, Captain Summers, any other member of supervisory command or executive staff regarding the allegation, potential courses of action, options with regards to investigations and so forth?

A.   The majority of any conversations that I had were trying to determine who the conflict investigator was going to be to take the evaluation.  That was -- and that was new person confusion on my part as to how do we find a conflict investigator and who are they?

And then it wasn't until I spoke to you that you provided me with Baseline Innovations.

Q.   So regarding the allegations that the sergeant has made against the PSB Sergeant, Latham, and forgive me, I'm mispronouncing his name, Captain Lugo, did you do any sort of

preliminary inquiry into what might have previously been investigated, whether there was any potential of veracity here?

And so before you answer that, let me just ask, what do you recall are the absolute allegations being made against Sergeant Latham and Captain Lugo?

A.   It was tampering with evidence and possibly withholding evidence.  I don't remember the exact allegation, sir.

Q.   So I think the way that you had -- and I'll get to this with more specificity a little bit later but I think when we had talked, it was essentially that Latham had neglected to initiate or report an allegation that Sergeant Engelbeck had made during a separate PSB interview, basically during his five minutes at the end of the interview.  Also allege that Captain Lugo had retaliated against and that, for want of a better term, evidence, essentially an audio or video of an interview that Sergeant Engelbeck will be involved in that that had not been provided to him upon request in preparation for his merit hearing but that he had not named any principals regarding that allegation, that you had indicated that there were no identified principals associated with that.

Does that sound accurate?

A.   That sounds accurate.

Q.   So the -- at the time that we spoke on the 26th, the allegations involving Captain Lugo would be retaliation and the allegation involving Sergeant -- and again I don't want to put

words in your mouth so don't let me do that.  Please take the liberty to correct me.  And the allegation against Latham would be essentially failing to initiate the start of an investigation when he made -- when Engelbeck made the allegation against Lugo, but there was a third allegation out there but no identified principals in the allegation, unknown individuals, withheld or destroyed evidence.

MR. SERBALIK:  Do we have a copy of this?  Sorry.  I'm very new to this, but do you have a copy of it that I would be able to see or I might be able to refresh her recollection?

MR. ANDERS:  Not that I can get in a timely manner, no.

MR. SERBALIK:  Okay.

THE WITNESS:  With all due respect, sir, because I don't want to speak in any inaccuracies --

BY MR. ANDERS:

Q.    Sure.

A.    -- I would like to be able to refer to that document myself to -- because I don't -- it has been over a month since I've --

Q.    Sure.  That's fair.  And I'll come back and visit this a little bit later.

A.    Okay.

Q.    So with regards to in the email you sent me on the 25th and the conversation we had on the 26th, you represented that

you had had communication with Jensen Hughes on the 24th which would have been a Monday.  The email you sent me on the 25th said that you had connected, met with Jensen Hughes the day before and they had agreed to accept the case.

Up to that point, on the 24th when you had reached out to Jensen Hughes, had you taken any steps to explore these allegations?  In other words, not an investigation but does that interview, in fact, still exist?  Would that be retained in IAPro?  Has this been investigated previously, any preliminary steps before referring it out to investigation?

A.    No.  The only thing that I did was read the documentation provided by Sergeant Engelbeck which included a Service Complaint that was completed by my predecessor, Mike Caputo, so I was reading through all of that documentation which was a lot.  It was a lot.

Q.    Did you get a sense of whether or not Chief Caputo had previously investigated these allegations and reached a conclusion this was a duplication?

A.    From what I could read was that he investigated it -- again, I don't have it in front of me, some of the previous allegations, not the new allegations of the criminal allegations of tampering with evidence and withholding evidence.

Q.    Do you know if those -- I'm just going to call it a recording of Sergeant Engelbeck's interview that he is claiming

46REPORT001013

was destroyed, tampered with or --

A.    I don't know.

Q.    Do you know if that exists?

A.    I don't know.

Q.    He had requested this, my understanding is, as a result of his filed appeal to the Merit Commission and he is alleging that you didn't get it.

Who would be responsible for providing that to him?

A.    Sir, I do not know.  I believe that Conduct Resolutions can obtain that information for somebody; but ultimately the ownership of IAPro and everything in there, to my knowledge, is PSB.

Q.    Did you reach out to anybody in Conduct Resolution, hey, do you guys do this?

A.    Do what?

Q.    Are you folks -- is your charge to provide all of the indicia and evidence being requested by somebody who has filed an appeal?

A.    Sir, I did not.  Because of the direction of the Chief Deputy, we were looking to conflict this investigation out.  So I was not going to do any investigative steps when we were talking about conflicting it out to an outside investigator.

So those are investigative steps that you are speaking of and I did not do any of those.

Q.    So your thought is just at face value, Engelbeck documents

46REPORT001014

all of this, we're going to send it out for investigation.  If Engelbeck said day is night and night is day, no preliminary investigation, send it out for investigation?

A.    I was going to the direction of the Chief Deputy.

Q.    And that was the Chief Deputy -- did he tell you directly do not do any preliminary inquiry or exploration or --

A.    No, sir.  His direction was that he wanted it to be conflicted out.

MR. PETERS:  Can I just interrupt for one second?  I just want to go back for a moment, because you mentioned about the housing of IAPro and PSB and everything.  Do you have IAPro access?

THE WITNESS:  Yes, sir.

MR. PETERS:  Okay.  Did you access IAPro during this period of time?

THE WITNESS:  Yes, sir.

MR. PETERS:  To research this information?

THE WITNESS:  I -- I observed the case that was entered by Sergeant Engelbeck to make sure --

MR. PETERS:  Only that case?

THE WITNESS:  Only that case?  I don't understand.

MR. PETERS:  Is that the only case that you accessed in IAPro related to this?

THE WITNESS:  I believe so.  But I -- sir, I don't want to sit here and be like, yeah, that's the only case I

looked at.  I believe that was the only one that I accessed but I don't recall.

MR. PETERS:  So it is possible -- in answer to Chief's question, it is possible that you did some sort of preliminary inquiry on these other cases?

THE WITNESS:  I don't believe that I did.

MR. PETERS:  Okay.

BY MR. ANDERS:

Q.   Other than reading Chief Caputo's investigation.

A.   That was actually in the email --

Q.   Right, not in IAPro.  It was given to you by Chief Deputy.

A.   Correct.

Q.   Okay.

You were a former lieutenant, Scottsdale PD?

A.   Yes, sir.

Q.   And that so that role would require not only that you conducted administrative and likely criminal investigations against sworn personnel?

A.   I never conducted a criminal investigation against a sworn personnel.

Q.   Okay.  If the Chief Deputy, and I'm going to use the word directed or ordered -- the Chief Deputy had not directed or ordered you to conflict this case out to an outside -- and I'll say entity, would you have done anything different?

A.   I can't answer, sir.  And I'm not trying to be difficult

46REPORT001016

but I can't answer that because I don't know what I would have done differently had he not provided me that direction.

Q.    And who have you communicated with in PSB regarding this case, this investigation since -- Captain Lugo was removedly essentially?

A.    M'hum.

Q.    Do you have a direct liaison then with PSB other than Captain Lugo or have you re-communicated with Captain Lugo? You said something about procedural issues that you might want to reconnect with him about.

A.    No, because I was unsure -- I did communicate with Captain Lugo again trying to understand the relationship with Jensen Hughes and the relationship with Baseline Investigations so we spoke about that.  We did not speak about this investigation; and since Captain Lugo has been on leave, the acting PSB commander is Lieutenant Porter.  And him and I have had a conversation in terms of anything that Arizona Department of Public Safety is requesting needs to be sent from PSB over to them, electronic files and such not.

Q.    With Arizona DPS, would you be the contact and you would contact Lieutenant Porter or are they directed to go directly to Lieutenant Porter?

A.    They are actually -- I believe directly going to one of the administrative supervisors in PSB.

Q.    Okay.

19

A.    And there's like three of them with names that start with A and I can't remember her name.  So I can get that for you if you need it.

Q.    Was Captain Lugo ever formally told, "You are under investigation for these allegations made by Sergeant Engelbeck"?

A.    I believe the Chief Deputy advised him of that beginning of April.

Q.    Beginning of April.

So when we talked about 0111, he would not have known he was under investigation or be told he was under investigation for at least 20 days, three weeks --

A.    Something like that.

Q.    Regarding 0111?

A.    If I can go back, sir.  He was advised that we were looking to conflict it out.  He did understand that.  Did I ever say to him, "Are you under investigation," I don't believe I said it like that but he understood that we were looking to conflict the case out to an outside investigator.

So if I was Captain Lugo, I would assume that I was under investigation.

Q.    When you first learned of these documents sent to you by the Chief Deputy and the attachments, what was your consideration or your discernment or -- regarding a criminal allegation?  Did you believe that what's being alleged here is

46REPORT001018

certainly criminal in nature, it's only administrative in nature?  What were your thoughts at the time?

A.    At face value, looking at the allegation, if there was -- if there was anything that was not provided to them on purpose, then that could be considered criminal but, again, I didn't know if there was any truth lined it or not.

Can I go back to the previous question?

Q.    Please, yeah.

A.    So in thinking of what my conversation with Captain Lugo on March 11 when I advised him to remain out of the investigation, to keep himself out of it, so going back to whether or not I asked, advised him he was under investigation and I said to you I didn't necessarily say those words, I did tell him that, he was to completely remove himself from anything related to that including access egg the file. Somebody else needed to be the person that could do all of those things within that file.

So those are things that, in my view, somebody should assume that they were under investigation, especially a PSB commander who knows the PSB world very well.

Q.    Was there point in time that you were resolute that this was going to be your -- you believe this was a criminal allegation being made and that it should be sourced out as a criminal investigation?  Was there contemplation?  Was there discussion?  Did you meet with colleagues, former colleagues,

with the Chief Deputy, Chief Summers, anybody and say, "Hey, just not quite sure where to go with this.  Is this criminal?  Is this administrative?  Where do I go?  What do I do with this?"

A.   Regarding 111?

Q.   Yes.

A.   The conversations that I had would have been with the Chief Deputy.  Chief Summers may have been involved in some of those conversations and it was not about whether or not to investigate the criminal allegations.  It was about who was going to take the conflict investigation from us.  We were going to let that conflict investigator determine if it was criminal or not.

MR. PETERS:  Just to clarify.  You said you may have had Chief Summers in there.  Do you think -- do you think that was appropriate for Chief Summers to have been in those conversations since he has been placed in his current position?

THE WITNESS:  Well, Chief Summers is direct report of mine and Chief Summers is somebody that -- what's the word I'm liking for? -- in-depth knowledge of MCSO and the functions of MCSO.  So I was relying on him to kind of guide me with some of the things I did not know, having only been there for a view weeks.  So I didn't think it was inappropriate, sir, and neither did the Chief Deputy.

\\\

46REPORT001020

22

BY MR. ANDERS:

Q.   Prior to -- when you reached out to Jensen Hughes, your belief was that there were criminal allegations?

A.   Yes, sir.

Q.   And can Jensen Hughes do criminal investigations --

A.   I do not --

Q.   -- of civilians?

A.   I do not know.  I don't believe so.

Q.   So what would have been the mechanics of that?  How would Jensen Hughes do a criminal investigation?

A.   It was the guidance that I received so I was unsure of whether or not this was going -- if it was going to go the criminal route, then I understand that it would need to be provided to a law enforcement agency.  But I was provided guidance to contact Jensen Hughes.

        And I don't think Baseline Investigations would be able to do a criminal investigation, sir, and you advised me that that is who I should contact.  So if they can't either, then that was not good advice either.

Q.   Yeah.  We can talk about that because I think there was some ambiguity at that time whether or not this was going to go forward as a criminal investigation.

        So who offered you that guidance to contact Jensen Hughes?

A.   I believe I said it earlier.  I believe Greg advised me

46REPORT001021

that Jensen Hughes was the key, the people to contact and then also Conduct Resolution, somebody there from there, Tiffany Shaw, advised me as well.

Q.   So you would have sought out counsel if Tiffany Shaw, "What do I do with this?"

A.   No.   I'm not sure how show came to me.   I believe at the same time, around the same time the Chief Deputy might have asked her to talk to me.   Or maybe Greg advised me to talk to her, too.   I don't remember how I got in touch with Tiffany Shaw, to be honest with you.

Q.   Is Captain Lugo?

A.   Yes.

Q.   Captain Lugo guided you to Jensen Hughes?

A.   Yeah, I believe so.

Q.   Do you know when he would have --

A.   It was the next day.

Q.   On the 11th March 11?

A.   Yes, sir.

Q.   When you first contacted him?

A.   M'hum.

Q.   At that time that Captain Lugo -- I'm going to use the term recommended, guided, explained this is the thing to do, contact Jensen Hughes, did he understands that you believed that there were criminal allegations to be investigated?

A.   I don't know.   He read the complaint.

46REPORT001022

Q.   Did he explain what his role historically has been with Jensen Hughes?

A.   Captain Lugo?

Q.   Yes.  I'm sorry, Captain Lugo, yes.

A.   He did not.

Q.   So when you and I talked on the 26th -- in fact, when I sent an email back to you on the 25th, I asked that you not advance that investigation with Jensen Hughes and then when we spoke on the phone on the 26th I explained why and the manager -- administrative and operational history that Captain Lugo had with Jensen Hughes and that that would be entirely inappropriate for that investigation to go to Jensen Hughes for those reasons, clearly a conflict.

And in light of that managerial, administrative, and operational and training history that PSB has with Jensen Hughes, the responsibilities Captain Lugo has with regards to managing investigators and the completed investigations from Jensen Hughes, what are your thoughts about Captain Lugo then guiding you to utilize Jensen Hughes as the investigative entity for 0111?

A.   It didn't make any sense to me why he would guide me to them knowing that they wouldn't be able to do it or shouldn't be doing it.

Q.   Didn't make any sense then or any sense later?

A.   Later when I spoke to you, sir, and why he didn't provide

Baseline Investigations as the conflict investigator to me tether.

Q.   Okay.  So you've reached out to Jensen Hughes at essentially the direction, guidance, referral of Captain Lugo and Tiffany Shaw -- is that her name? -- and they have essentially -- well, they have accepted responsibility for the investigation, your thoughts are the investigation is, it's administrative and criminal at the time you're talking with Jensen Hughes.  But I think what I've heard is you're unsure authorities, capacities, and otherwise, that Jensen Hughes could actually do a criminal investigation.

Do you know in your conversation with them was the term "criminal" used?  In other words, were they -- were they clearly understanding they were accepting responsibility for a criminal investigation?

A.   I don't remember the details of my conversation.  I can look back to see if I have any notes on it but I can't answer your question without authority.

Q.   Okay.  I'm not really going to have much discussion about Baseline.  You and I had exchanged emails and also phone conversations and for a reason or a number of reasons, MCSO made a determination not to advance the case with Baseline Investigations in significant measure because Baseline's contract was terminating.  Baseline simply didn't have time within the terms of the contract and the possibility of some

46REPORT001024

other concerns as well.

And I think it's been referenced in the last couple of weeks that the office has no intent of renewing Baseline Investigations' contract.  I think we spoke about that on Tuesday of this week.

A.    Yes, sir.

Q.    So let's go ahead and fast forward then to Arizona Department of Public Safety.

You said initially when you heard from the Chief Deputy the evening of the 10th, the morning of the 11th of March, the Chief Deputy was interested in conflicting the case out to another agency or an outside agency.

At what point was a determination made that that agency should be Arizona DPS?

A.    It was beginning -- the beginning of April because we were going back and forth with is it Jensen Hughes?  Then I spoke to you, then it was Baseline.  Then we had the calls with Baseline or email.  They got a call and an email with Baseline.  And then it was a good week or so later is when he decided that that was who he was going to contact.  I don't know why.

Q.    Okay.

And so how did you learn of that?  Did he tell you, email you, saying, "We're going to ask Arizona DPS?"  How does that come about?

A.    In conversation the Chief Deputy mentioned that he was

thinking about contacting Arizona DPS since they are the state -- our state police agency --

Q.    M'hum?

A.    -- to conduct that investigation.

Q.    That would be -- that would have been in early April?

A.    Yes, sir.

Q.    Okay.

At the time that the Chief Deputy told you this, did he ask your thoughts about it?

A.    No.

Q.    This was an autonomous decision as far as you know?

A.    Yes.  He did not ask my opinion on that, sir.

Q.    Okay.  Was he aware of your efforts to assign the investigation to Jensen Hughes?

A.    Yes.

Q.    And that those efforts had been essentially terminated?

A.    Yes, sir.

Q.    And was he aware of the effort to assign the case to Baseline Investigations?

A.    Yes, sir.

Q.    And so, again, I don't want to speak for you.  As a result of Jensen Hughes not conducting an investigation, Baseline not conducting an investigation, the Chief Deputy made a unilateral decision he was going to reach out to the Arizona Department of Public Safety --

46REPORT001026

A.    Yes, sir.

Q.    -- to assume the investigation?

Do you know if the Chief Deputy was under the impression that this was solely an administrative investigation, solely a criminal investigation -- we're talking about 0111 -- or both?

A.    He believed that there was -- the criminal allegation related to 111 and then the administrative allegation related to -- I don't remember -- is it 138 or 139?  I don't remember the exact number.  138.

I'm sorry.  May we take a quick break?  I need to use the restroom.

MR. ANDERS:  Yes, sure.  We'll go off the record now at 12:49 p.m.

(Recess at 12:49 p.m.; resumed at 12:54 p.m.)

MR. PETERS:  Okay.  We're resuming the Chief Melissa Palopoli interview.  It now 12:54 p.m.

MR. ANDERS:  Thank you, Major.

EXAMINATION

BY MR. ANDERS:

Q.    So going back to the topic of Arizona Department of Public Safety, my impression just prior to the break, what I left with was that the Chief Deputy made a unilateral decision following the fact that Jensen Hughes and Baseline were not going to be able to do this case; that it was going to go to an outside law

29

enforcement agency, and that would be Arizona Department of Public Safety.

A.    He was going to request.

Q.    Request it.  Yes.

A.    Because they could turn him down and then we need to find somebody else.

Q.    I agree with you.  Do you know why Arizona Department of Public Safety?

A.    As I said before, they are the state police agency.  And since we are a County agency, the next level up above would be state, so that is what -- how he came to that determination. And he told me that himself.

Q.    Okay.  So he wanted a state law enforcement agency to do it, not another Sheriff's Office, not the prosecutor's or states call it a District Attorney's Office.

A.    I don't assume to know why he came to that decision other than this thought process of . . .

MR. PETERS:  Do you recall whether or not he requested from you any additional thoughts on that and whether or not you provided any additional thoughts on that to him?

THE WITNESS:  He did not ask me for guidance at all, sir.

MR. PETERS:  At all?

THE WITNESS:  No.

MR. PETERS:  So there would have been no email and

traffic back and forth to that regard?

THE WITNESS:  No, sir.

MR. PETERS:  Thank you.

BY MR. ANDERS:

Q.   Do you know of any relationships, professional relationships, that the Chief Deputy has with members of the Arizona Department of Public Safety?

A.   I do not.

Q.   Yourself, do you have professional relationships with any members of Arizona Department of Public Safety?

A.   No, sir.

MR. SERBALIK:  Besides just friends.  I'm sure you know people.

THE WITNESS:  I don't really know DPS officers.  My niece was dispatcher, like, four years ago for two years but that's it.  I do not know of anybody personally.

BY MR. ANDERS:

Q.   During our conversations you had represented that the Chief Deputy was going to be communicating with Arizona Department of Public Safety, sending a letter to the Arizona Department of Public Safety.  Do you know if -- was a letter or an email sent?

A.   I did not know what he meant by a letter, sir, and I don't know if he sent a letter, if he emailed, if he called.  I don't recall how he made that communication to them.

Q.   Okay.

A.   I believe we spoke about it in the April 7 meeting, I believe that question came up.

Q.   Yes.  I'm going to get to that.

A.   Okay.

Q.   So you don't know, from personal knowledge, whether or not an email was sent, a text message was sent, what I'll call snail mail, U.S. Mail, hard copy was sent or just whether it was just a phone call --

A.   I don't know.

Q.   -- making a request?

A.   I don't know.

Q.   He never confirmed that with you?

A.   No, sir.

Q.   Okay.  Do you know who he communicated with at Arizona Department of Public Safety regarding the initial request?

A.   I do not.

Q.   And do you have any knowledge of what it was he was requesting?  In other words, the level of detail surrounding allegations and who it might involve and so forth?

A.   I do not know the detail, what the detail of his request was.

Q.   When he represented to you that he was going to reach out to Arizona Department of Public Safety with a letter, do you know when he communicated that to you?

A.   Prior to our April 7 meeting that we were all on that Monday.

Q.   Okay.  And did he represent basically this whole situation is on pause, do X, Y, and Z, don't do anything, stand by until I hear back?  What were next steps?

A.   Next steps in?

Q.   He says, you know, it's my intent to send a letter to Arizona Department of Public Safety.  What was your posture at that point or your direction?  Was it just a matter of we're waiting?

A.   I mean, there was a pause in terms of -- there was no pause.  We weren't doing anything other than Captain Lugo was put on administrative leave.  At that point it was -- there was a direction provided to Conduct Resolutions to complete the packet that they put together for anytime somebody goes out on administrative leave with pay, so that was the only thing that happened in the interim of waiting for DPS to contact the Chief Deputy back after he had reached out.

        So on pause meaning we weren't doing any further investigation.  However, there were some administrative tasks that were taking place.

Q.   That makes sense, yeah.  In that April 7 meeting, Chief Warshaw asked Chief Deputy about Arizona Department of Public Safety and outreach to them, my word outreach, but communicating with them and making that request.

46REPORT001031

The Chief Deputy represented that he had communicated with the colonel at the Arizona Department of Public Safety in email, had sent an email, and also had sent a letter in U.S. Mail and that he was awaiting any sort of a response.  I think Chief Warshaw pursued this a little bit further and my recollection is that Chief Deputy represented that if he didn't hear something soon or later that day, that he was going to go ahead and make a phone cull to the Arizona Department of Public Safety.

Ultimately, somehow it appears Arizona Department of Public Safety responded to the Chief Deputy.  Do you know when that happened and how that happened?

A.    I did not.  I believe that the Chief Deputy, sometime after that meeting to the next day, the next morning, either -- I believe he received a phone call but I do not know who it was from related to their ability to assist us.

Q.    You had sent me an email on the early afternoon of April 8 which was a Tuesday representing that essentially at the time you were composing the email, Chief Deputy had heard back from the Arizona Department of Public Safety and that they would sent the investigation.

A.    Yes.  That's correct.

Q.    And that your words were we are meeting with them at 2 o'clock Arizona time the following day of April 9 which was a Wednesday?

46REPORT001032

A.   Yes, that's correct, sir.

Q.   And but you don't know how Chief Gentry heard back from Arizona Department of Public Safety?

A.   My recollection is that it was a phone call.

Q.   Okay.  Sure.  Do you know from who?

A.   No.  And I wasn't privy to the call.  I wasn't in the room at the time.

Q.   Okay.  In our document request yesterday we asked for any and all -- I'll paraphrase -- conveyances of communication, modes of communication regarding 0111 and 0139 and the Arizona Department of Public Safety.

Chief Deputy had represented on April 7 to Chief Warshaw that an email was sent and U.S. Mail letter was sent. We have been unable to locate those in the production of documents certainly under the batch titled DPS which is where we would expect to find it.

Do you have any idea if those documents might be located somewhere else in the bundle that was provided to us last night?

A.   No, sir.  I would not know why that wasn't provided to you other than Chief Gentry may not have gotten around to it at that point yesterday.  I don't know.  I know he had to attend the community meeting with you all as well yesterday.

Q.   Okay.

A.   So I can -- I know you plan to speak with him.  But if

46REPORT001033

that's something you would like me to do when I get back, I can ask him --

Q.   I don't think so.  I think we will follow up with him.

A.   Okay.  Okay.  So don't do.

Q.   So early afternoon, Tuesday, April 8, you represent in an email we are meeting with DPS tomorrow 2 o'clock Arizona time. Did that meeting, in fact, happen?

A.   Yes, sir.

Q.   Was it a phone meeting, Zoom, Teams, or in person?

A.   In person.

Q.   Where?

A.   In the Sheriff's Office.

Q.   Okay.  Did representatives of DPS came to the Sheriff's Office?

A.   Yes, sir.

Q.   Who all then was present at the meeting?

A.   It was myself, Chief Summers, Chief Gentry, although he did leave for a short period of time and then came back, and then two sergeants from Arizona DPS, one of only that I have the name of Baum, B-A-U-M.  I don't know the other gentleman's name.  He did not provide a business card, but he works with him in their Internal Affairs.  Both were the rank of sergeant.

Q.   The two sergeants?

A.   Yes, sir.

Q.   And do you know what their roles or assignments at DPS?

A.   Internal Affairs.

Q.   They work Internal Affairs.

A.   Yes, sir.

MR. PETERS:  Can you tell us where in MCSO that meeting took place?

THE WITNESS:  It was in the Sheriff's Office -- at the Sheriff's table in his actual office.

MR. PETERS:  In the Sheriff's Office?

THE WITNESS:  Yes, sir.

BY MR. ANDERS:

Q.   Were there any notes or recordings made of the discussion during that meeting?

A.   No, sir.

Q.   About how long did the meeting last?

A.   I don't remember.  Less than an hour.

Q.   And at the time the meeting commenced, Arizona DPS obviously agreed to assume the investigation?

A.   Yes, sir.

Q.   Do you know if they had initially, on the eighth, agreed to assume both a criminal and administrative investigation or just a criminal or just an administrative?

A.   So they advised that they have another division that was going to investigate the criminal part first.

Q.   M'hum.

A.   And then the administrative investigation would take

37

part -- take place secondary to that once that criminal investigation was completed.

Q.    And was the arm of Arizona DPS criminal investigators, were they represented at the meeting or was it only administrative investigators?

A.    They were just administrative investigators and they advised us that they would take it back and speak with their criminal investigators.  And I have not spoken to anybody from there since then.

Q.    Were there any protections afforded in the State of Arizona with regards to whatever is discovered or determined in a criminal investigation being -- informing the administrative investigation?

A.    So the -- to my knowledge, and I can let Steve answer it. My knowledge is that criminal investigation can share the information with the administrative investigation but not the other way around.

Q.    M'hum.  So they have assumed the investigation.  My understanding is that both 0111 and 0139.

A.    Yes, sir.

Q.    And we'll talk about the particular 0139 in just a second. Sergeant Engelbeck is the complainant in 0111.

A.    Yes, sir.

Q.    Who is the complainant in 0139?

A.    I am listed as complainant, sir.

46REPORT001036

Q.    Okay.  Would you at some point be interviewed by criminal investigators?

A.    I do not know.  I would not know the reason why I would be investigated by the criminal investigators since I was not here during the course of the 111 originating complaint.

Q.    Would they want to interview you with regards to your interactions with Captain Lugo or any other parties and their knowledge of the allegations being made, what you might know about any previous investigation that's been done?

A.    I can't speak to how they would do their criminal investigation, sir, so I don't know the answer to that question.  Sorry.

Q.    Would Arizona DPS investigators want to interview the complainant for the administrative investigation?

A.    For -- meaning?

Q.    For 0139.

A.    Meaning me?

Q.    Right.

A.    I don't know.  If they want to, they can.

Q.    Okay.  Well, let me rephrase that.  If you were conducting an administrative investigation regarding withholding or destruction of evidence, retaliation, failure to initiate or advance information about an administrative investigation and if Major Peters came to you with that complaint and that complaint was filed, would you, as the investigator, want to

46REPORT001037

interview Major Peters?

MR. SERBALIK:  I'm sorry.  I'm unclear.  Are you asking about the 111 or are you asking about the second?

MR. ANDERS:  0139.

MR. SERBALIK:  The second investigation?

MR. ANDERS:  Correct.

THE WITNESS:  I'm not following.

BY MR. ANDERS:

Q.   Okay.  You're the complainant in 0139?

A.   Yes, sir.

Q.   Are they -- is Arizona DPS conducting an administrative investigation in 0139?

A.   Yes, sir.

Q.   If you were an investigator conducting an administrative investigation, would you want to interview the complainant?

A.   Of course.

Q.   Okay.

A.   Sorry, I thought you were talking about the criminal investigation still.  I apologize.

Q.   So what are your thoughts about the appropriateness of you interacting with Arizona Department of Public Safety administrative investigators knowing they are going to be the individuals who are going to conduct the investigation?

A.   I provided them with the information to both investigations and that was all I did was I provided them with

the information that Engelbeck had sent to the Chief Deputy back on March 10 and I provided them with the case number and I believe the letter informing Captain Lugo that he was on administrative leave. That was all that they got from me.

Q. What's the nature of discussion that sounds like it was maybe a little bit less than an hour? Were you present for that entire period of time?

A. Yes, sir.

Q. What's the nature of that conversation?

A. We talked about the origin of the investigation itself and 111 and how it came to the Chief Deputy and got forwarded and all of the things that we've spoken about, Jensen Hughes and the investigator and how we derived to getting down to Arizona DPS and provided them with -- I didn't give them the testimony or things that would be -- come out in an administrative investigation other than the stuff that was written in fact. The original complaint that you had asked for as well, sir.

Q. 0111 or 139?

A. No. The 139.

Q. So 0139, there were two, perhaps three sentences in the complaint?

A. That's right.

Q. That's all they are aware of?

A. If I verbally explained anything to them. I don't know if it was me who did or Chief Gentry gave them some information,

46REPORT001039

sir. I don't see the inappropriateness as on complainant they need information regarding the actual complaint as how we derived to getting to that point, so I'm sure I'll be interviewed on record. But I did provide them with a baseline of what the allegations were.

Q. Can you help me out with specificity what you recall telling them or what was discussed with regards to 0139, and what I'm talking about with specificity was were they informed that, hey, Captain Lugo was given -- and I'm not saying this in fact occurred. This is hypothesizing. Captain Lugo was given an order and he violated the order?

A. Yes, sir.

Q. Captain Lugo accessed IAPro when he was told he wasn't supposed to access IAPro. We're alleging Captain Lugo did X, Y, and Z?

A. Yes, sir.

Q. That level of detail?

A. Yes. They were provided with -- I just don't remember if it was me who provided all of that detail, sir. So that's the part where -- so they were provided with detail as to what my instructions were to Captain Lugo, the fact that he accessed IAPro on multiple occasions, which I have for you as well because it was not in the packet from yesterday. It's being uploaded now but I have this copy for you guys now, that Captain Lugo had accessed IAPro after I advised him not to and

46REPORT001040

that that was against my direct order.  And I provided them with the information that he was aware of the information on March 10 and at no point did he ever reach out to me to tell me that there was an allegation against him until I reached out to him the following day.

Q.   So let me ask you your thoughts about essentially you have concluded that he was insubordinate.  You had told the investigators he was given this direction and he did this, basically presupposing the conclusion of the investigation.  You have told them this happened as compared to you being removed from that meeting and another individual, executive within the organization, representing to the investigators we have made an allegation against Captain Lugo.  That allegation involves X and Y.  The complainant is Chief Palopoli and you're going to want to interview her and the other individuals we can identify for you to help you jump start the investigation might be this individual and this individual.

But my impression of what you're telling me is, the conclusion is already predisposed by telling them, "I ordered Lugo to do this and he did contrary.  He violated that order."  Where is the investigation?

A.   So who is supposed to give him that information?

Q.   Chief Gentry, the Sheriff, Chief Summers.  They are aware of it; right?  Chief Gentry didn't go into that meeting not knowing this information.

46REPORT001041

A.    I don't believe that it's inappropriate that I was in that meeting.

Q.    Following the meeting then, I think within an hour of that meeting, sent an email to Sergeant Baum.  Does that sound about right?

A.    I have no idea.  Baum, Baum.

Q.    But he was in the meeting?

A.    Yes, sir.

Q.    And at least what I've seen in this very large drop last night was it was in significant measure what Chief Gentry had sent you?

A.    Yes.

Q.    Okay.  Was there anything else you can recall that was provided to them in writing?

A.    He was provided with that copy as well.

Q.    This?

A.    Yes.

Q.    What do you think the perspective of the Arizona DPS investigators was at the end of the meeting?  I mean, in other words, was the attitude we're happy to do it, we're reluctant to do it unless we're ordered to do it?

A.    I don't know what their perspective was.  Part of the meeting was also explaining the orders that were under the Monitoring Team, that we are under federal monitoring, so I'm not sure if they were unaware of that or not or they were aware

of it.  But they didn't have -- honestly, they were two of the most non-demeanor people that I've ever met in my life, just flat affect.  So I have no idea what they were feeling when they left there.

Q.    As of today, what's the status of 0111?

A.    0111 is the case that DPS has given to their Criminal Division to look at.

Q.    Okay.  And your understanding is their procedure will be criminal investigation first and then administrative investigation will follow?

A.    Yes, sir.

Q.    And the two investigators that were present were administrative investigators.  They would take your information back to the criminal investigators?

A.    Yes.

Q.    Okay.  I just want to talk a little bit about the conversations and emails that you and I have had.

On March 25, which was a Tuesday, you introduced yourself via email, that you had recently received a complaint regarding Captain Lugo and Sergeant Latham.  In fact, that complaint had been received 15 days prior.

Did anybody ever provide you guidance, direction, or information regarding the role of the Federal Monitor as it relates to intake and routing of PSB investigations?

A.    Greg Lugo, Captain Lugo, did provide me with a little bit

46REPORT001043

of that information but, again, my understanding of the Federal Monitor's involvement didn't come until this process.  I was new to MCSO at the time.

Q.    Did he or Lieutenant Porter or Chief Deputy Gentry or Chief Summers or -- I'm sorry, Tiffany Shaw, Ken Holmes, anybody ever explain to you that, hey, there are these paragraphs, 346 and 347.  Under the judge's third order that before we do anything, we have to talk to Chief Anders and essentially vet the nature of the complaint and then discuss the assignment and routing of the complaint.  Was that ever explained to you?

A.    No, sir.

Q.    How, ultimately, did you find out?  What precipitated you emailing me?

A.    I don't remember who guided me to email you.  It may have even have been Captain Lugo.  Go ahead.

Q.    And in that March 25 email you represented that you had met with Jensen Hughes to discuss that they were available to conduct the investigation, they are willing to do the investigation.  You were checking with me.

And I replied, essentially, pause or don't advance. We agreed to talk at 9 o'clock Arizona time the next day on the 26th.

We talked and, again, I think I talked about you just give me the particulars of the allegations.  You told me that

the complainant, Sergeant Engelbeck, had not named Captain Lugo but is alleging it is him associated with the criminal allegation.

You explained to me that you believed the evidence that we're talking about here, the interview that Engelbeck is alleging was withheld or destroyed, that you believed that should have come from Conduct Resolution. It was their responsibility to provide video of the Sergeant Engelbeck interview even though the complainant alleges PSB did not provide it to Conduct Resolution.

And Blue Team, the allegations were abuse of process, misappropriation of property, and withholding of evidence that you connected to Jensen Hughes. You were not sure who had made the entry into Blue Team.

I explained to you Baseline.

Your quote to me was: An unknown employee tampered and destroyed physical evidence.

No principal was named. And you did not know exactly who the principal was. You said the sergeant made a complaint during an interview on a separate case.

You did not -- and that the complaint he had made at the end of the interview on a separate case, he alleges that complaint did not get investigated.

You told me you did not believe this was true, that you believe Caputo did the investigation.

Did you ever confirm that at all, whether Caputo did an investigation?

A.   I read the Service Complaint and it appeared that he looked into that and found it -- I don't know what the terminology for Service Complaints findings are, but that he determined that -- and I -- without reviewing it again, sir, because it has been over a month, I don't know exactly what his conclusions are so I don't want to continue speaking on it until I -- if you give me the opportunity to take a look at it, if you guys have it, I'm happy to read through it again.

Q.   But you did believe Chief Caputo had done an investigation on this?

A.   I mean -- yes.  It was not an investigation, sir; it was a Service Complaint.

Q.   Okay.

MR. PETERS:  Well, just for clarity, that is one of the investigations.  Okay.  Well, it's not an IA like internal investigation.  It's.

MR. SERBALIK:  Just a learning.

THE WITNESS:  Yeah.  Yeah.  Missed a lot, that's for sure.

BY MR. ANDERS:

Q.   You explained that the complainant is saying that he did not get documents for the merit hearing appeal process.  The 40-hour suspension that the complainant had served had been

rescinded and the finding of the IA investigation, which had been sustained resulting in the suspension, had been changed to not sustained.  You said you had not looked into it but you could not imagine that the evidence did not exist, that everything is kept in IAPro.  This is on March 26, 16 days after the sergeant made the entry into Blue Team.

Just given those thoughts, Caputo has done previous investigation, can't imagine it wasn't investigated, can't imagine that this -- can't imagine that this evidence was destroyed because -- and that it didn't exist because everything is kept in IAPro.

So I'm just curious, how do we go from an Executive Chief who believes there's been an investigation by their predecessor at least involving some of the allegations made by this complainant that they just can't even believe this is true, everything is kept in IAPro.

How does no preliminary inquiry occur regarding is it in IAPro?  Is Conduct Resolution responsible for this?  Why wouldn't they have given it?  How do we go from this to let's assign it to a state agency for a criminal investigation?

A.    Well, if one of the allegations is withholding of evidence, I can't prove that without doing interviews and finding out if he actually did indeed receive that evidence that he requested.

If he even really requested it.  So as soon as you're

46REPORT001047

aware -- and procedurally as soon as you're aware that there may be a criminal allegation, the administrative investigation should stop and then a criminal investigation should then go on.

So at that point, I don't know if it's criminal or not but there's an allegation that it's criminal and there's a potential that it could be.  So at that point, it needs to be investigated criminally prior to administratively.

And I am not --

Q.    So your thoughts are you should not make any inquiry, any preliminary inquiry, any follow-up even though at the time you represented to me that you weren't sure this was criminal?

A.    Can you -- is that a question?  I'm not following, sir.

Q.    No.    That's fact.

On Tuesday -- well, let's advance.  On Friday, the 28th, in a phone call we further discussed that it wasn't Jensen Hughes and that you had researched Baseline.  Couldn't be Baseline.  The Chief Deputy was interested in DPS and I think we agreed why don't you go ahead and give consideration about it over the weekend and come up with the final recommendation on who exactly you wanted to investigate this case.  I think there was some discussion about a possibility of MCAO.

On Tuesday, the 21st, you expressed you didn't believe Baseline was an option.  Chief Gentry was going to talk

46REPORT001048

to Department of Public Safety that the complainant alleges Lugo committed a crime by not providing evidence. You stated it may be that Conduct Resolution did not provide the interview because they decided to overturn the case. Gentry was looking at sending a letter to DPS to do the investigation. You felt it best for an outside agency to do it.

I inquired about the term "criminal" that you had used. You said that the allegations here are similar to those made previously to Chief Caputo.

You said that the investigation could reveal a retaliation charge against the complainant but you thought that was a stretch. You think it's Conduct Resolution that would have provided the evidence but you weren't sure. And you're not sure that Lugo and Latham would end up even being the principals, that the complainant was angry at Lugo and the complainant and Captain Lugo had a history.

So I think what I'm hearing from you is regarding 0111, that because the complainant is alleging something criminal but you're not sure who the principal is, you said the principal is unknown regarding the criminal allegation that Captain Lugo has identified retaliation and that Latham is identified for not advancing an investigation.

Now, there may be additional information that came forward that I'm not aware of and that your thoughts are that they may not even turn out to be the principals. Much of this

46REPORT001049

may have already been investigated by Chief Caputo, that Conduct Resolution may not have provided it because they reversed essentially the suspension and the findings, they or somebody else did, and may not even be PSB's responsibility. It may be Conduct Resolution's responsibility.

But given all of that information that you're aware of, that it's still appropriate to assign this out for a criminal investigation.  Is that correct?

A.   Based on -- if you're asking me if everything that you just said is correct, again, without having the ability to look back at notes or look at the investigation by Chief Caputo, I don't want to be beholden that, yes, you are correct or no, you're not correct.

I'm not trying to be difficult, sir.  I'm just -- there was a lot that you said and I don't want to be provided with a paragraph and to be able to have to say whether or not it's correct.

Q.   When you told me that the evidence you believed would have come from Conduct Resolution to provide it to Sergeant Engelbeck --

A.   That was information that somebody provided me that that's how conduct -- what Conduct Resolution does.  But I have not still to this day been able to deep dive that to see if that is accurate.

Q.   But given that information, would you still believe that,

46REPORT001050

wow, we have -- we have even a preponderance of a crime here?

A.    The fact that -- the principals sometimes in criminal investigations can change.  So the fact that this person is alleging that they did not receive evidence related to their internal investigation has to be investigated appropriately and by -- making assumptions is not the way to do that.

Q.    Who made the determination that this was going to be referred out as a criminal investigation?

A.    The Chief Deputy.

Q.    The Chief Deputy?

A.    Yes, sir.

Q.    Did you support that?  Did you argue against it?  Was there conversation about this may or may not be a criminal investigation?  Hey, let's give consideration to everything we know at this point.  This person is saying an unknown person withheld, tampered, or destroyed evidence.  Chief Deputy, why are we sending this out as a criminal investigation against the PSB commander?  He's not even naming the PSB commander as the person who did that?  In fact, what I'm being told is that might not even be PSB's responsibility, it might be Conduct Resolution's responsibility and there are some very strong possibilities of explanation that exist here.  Did you guys ever have that conversation?

A.    I didn't because that would all come out in the criminal investigation and if no crime occurred, then no crime occurred

but it needs to be investigated appropriately.

Q.    So, again, I think what I'm hearing is most anybody can make any criminal allegation and that is going to go out for a criminal investigation.  If somebody walked in to PSB and said, "Major Peters did X, Y, and Z," and it's very clear, wait a minute, there's some strong indications that that very probably -- that's going out for a criminal investigation.

A.    So since Captain Lugo is named in the original allegation, who would you suggest to do that preliminary digging from PSB?  One of his employees?  One of his directs?

Q.    Well, I'm not here to answer questions, number one; and number two, it would be his upper chain of command.  I mean, it appears to me that you believed there are very probable explanations for this; that, in fact, there may not be any merit to this whatsoever and, in fact, somebody in the organization is thinking there could be retaliation charges filed charged against this complainant, although you thought that was a stretch.

So I'm just trying to bridge that synapse between you appear to have very serious doubt that anything criminally happened here, but yet -- and that Captain Lugo has even been named as the principal in the criminal allegation, but yet you're supporting this being referred out as a criminal allegation.

A.    In light of the additional issues regarding Captain Lugo,

I thought it would be best for it to be provided to an outside agency, sir.

MR. PETERS:  And did you ever share those thoughts with anyone else?

THE WITNESS:  In conversation with the Chief Deputy.

MR. PETERS:  With the Chief Deputy.  Was there -- do you recall if there was ever any request from him specifically that you provide all of your thoughts on the matter?

THE WITNESS:  No, sir.

BY MR. ANDERS:

Q.   I apologize if I asked this before.  I honestly don't remember what your response was.  My sense in our conversations, emails, the aggregate of our communications leading up until April -- about April 7, there was a sense of ambiguity, skepticism, vacillation regarding whether this was even a criminal matter at all, that this is easily explained away.  A couple of phone calls.  Conduct Resolution, did you guys provide this?  No, we didn't.  Why didn't you provide it?  Hey, we always do but the charges were -- the finding was reversed and the suspension was reversed and he was made whole so we didn't have any reason, done.

So I'm just trying to understand when and how the decision was made that this was going to be advanced as a criminal investigation.

A.   Like I said before, that was done by the Chief Deputy,

sir.

Q. And you support that?

A. Yes.

Q. Given all you're aware of?

A. Yes.

Q. Did you ever explain to the Chief Deputy -- and I don't mean this in any disrespectful manner but, hey, boss, I have an obligation to tell you a few things here, like, one, Captain Lugo hasn't been named as a principal. This guy is not saying that Captain Lugo did it. I don't think it's PSB that's even responsible for this. I have been told it's Conduct Resolution that does it. And there could be some very legitimate reasons that Conduct Resolution didn't do it and we could clear this up with a phone call or two.

Oh, and these other allegations you've read, assuming he read the Chief Caputo investigation, you read the Chief Caputo investigation. Those appear to have been previously investigated and essentially put to bed, closed.

Did you ever have that conversation with him?

A. We didn't have that conversation, sir, but I believe that the Chief Deputy was provided the same -- he was provided the information that he provided me regarding Chief Caputo's investigation, regarding the allegation itself and Chief Deputy Gentry has history with MCSO and would know the policies and procedures related to Conduct Resolution and -- I forgot what

46REPORT001054

PDH stands for, he would have knowledge of what all of those entities do.

So an assumption on my part would be that he would have that -- would understand that way better than I would.

Q.    Okay.  Regarding 139, you're the complainant in 0139. That complaint was filed in the afternoon or evening of April 7, Monday, 2025.  We, the Monitoring Team and Chief Warshaw, the Monitor, first learned of these new allegations during the phone call we had between MCSO representatives, their legal counsel, and members of the Monitoring Team.  I don't recall -- I think that was a Zoom call but I could be wrong.  It could have been Teams.

And Chief Summers vehemently represented, provided us a reminder of how critical the role of the PSB commander was and the access to sensitive and confidential information that the PSB commander would have, how it was a critical role, I paraphrase, but let us know just how important the role of PSB commander was and that information -- additional charges were going to be entered in Blue Team right after the meeting regarding insubordination.  If I recall right, accessing computer systems in violation of an order, and again I paraphrase, and that he had either initiated or facilitated or reached out or communicated with Jensen Hughes to conduct the investigation regarding 0111.  That was the first we heard of this.

46REPORT001055

When were you aware of the insubordination?

A.   When was I aware of the insubordination regarding not to access IAPro?

Q.   Well, regarding 0139.  So you had filed an allegation of insubordination against Captain Lugo -- so let me rephrase that.  What is the nature of the insubordination and when did the insubordination occur?  And, third, when did you learn of the insubordination?

A.   So the insubordination I learned of the Thursday before that meeting on the seventh, so would that be the third.

Q.   The third, m'hum?

A.   Yes, sir.

Q.   Okay.  What is the nature of the insubordination and how did you learn of it?

A.   The nature of it was, I gave him an order to not involve himself in the investigation and to not access anything related to the investigation, meaning IAPro.  And when I pulled the lab of IAPro is when I learned that he had been in the system on March I believe 21 or 25 and that was against the direct order to remain out of the investigation.

And then also not providing me with that Lieutenant's name only to have that lieutenant send me an investigative plan after we had had zero contact.

Q.   And I'm sorry I missed that part.  What lieutenant?

A.   Porter.

46REPORT001056

Q.   And he was supposed to give you Porter's name?  I'm sorry.

A.   Porter and I should have been communicating and I don't know who -- and this is -- I don't know who directed Porter to complete an investigative plan.  I don't know who that was. And that's part of the investigation.  That could be something that -- it maybe somebody else but it may have been Greg Lugo. I don't know, sir.

Q.   Okay.

Hasn't somebody else or Greg Lugo didn't do what?

A.   That tasked Lieutenant Porter were creating an investigative plan, because I certainly did not.

Q.   Would Lieutenant Porter have done that on his own?

A.   I don't know.  I had had no conversations with him related to the investigation.

Q.   So there was an investigative plan put together for 0111?

A.   If you recall, it was when -- during the time that Jensen Hughes had not pulled the brake yet.  I had advised them that we were on pause.

Q.   Okay.

A.   So somehow Lieutenant Porter had had -- because I had an email from him and I still have to provide you those emails.  I had an email from Jensen Hughes stating that Lieutenant Porter had a conversation with a different investigator from Jensen Hughes and that person, Mark, from Jensen Hughes was confused as to why Lieutenant Porter was conversing with an investigator

46REPORT001057

that he had not appointed as the investigator for this incident.

And I said I have no idea.  I did not direct Lieutenant Porter to reach out to Jensen Hughes whatsoever. And I had made it very clear to Greg and to everyone that I would be handling that communication.

So I do not know -- and that maybe that's something that Lieutenant Porter does.  I don't know.

Q.   So you got an email from Mark from Jensen Hughes saying, hey, Lieutenant Porter is reaching out to one of my investigators about this case, 0111?

A.   Yes, sir.

Q.   And he did indicate what the content of the communication was?

A.   No, sir.

Q.   Was there an inquiry, hey, can you tell me who's going to be investigating the case so I can -- I'll be your point of contact here for any archived files you might need or --

A.    The premise of the email from Mark was, hey, so, you know, Lieutenant Porter is communicating with this other investigator.  Did you want -- basically he was confused.  Did you want this other investigator to do this?  Because I already assigned a person to you.  I forgot the guy's name.

And I said I've I have no idea what you're talking about.

46REPORT001058

Q.   Did -- so what did Porter say when you called him and asked him, "What are you doing contacting Jensen Hughes?"

A.   I didn't.

Q.   Why wouldn't you do that?

A.   I believe I was still conversing back and forth with -- I believe I may have sent Lieutenant Porter an email, I apologize, saying, hey, we're holding off on using Jensen Hughes as per the Monitor.  That is not the route that we want to take.  And he replied back, "Copy.  I'll stand down."

Q.   Would it be inappropriate for Porter to reach out to Jensen Hughes knowing you were going to reach out to Jensen Hughes and say, FYI, I'm your point of contact or --

A.   It would be but I don't know who gave him --

Q.   Or is there any reason to do that as a lieutenant?  Would he have the capacity to do that on his own volition?

A.   I don't know.

Q.   Knowing he's liaison to Jensen Hughes and he is the direct liaison to Jensen Hughes from PSB?

A.   I don't know, sir.  At that time I didn't know and I haven't done any further inquiries because we are where we are today.

Q.   So is that -- that is part of the insubordination allegation against Captain Lugo.

A.   I don't know if it's insubordination or not, sir.  I don't know if he had contact with Fred Porter, Lieutenant Porter

regarding hey, do the investigative.

Q.   Then why are you alleging insubordination against Captain Lugo if you don't know if that would be part of insubordination?

A.   That would be discovered -- that would be discovered through the administrative investigation, but the insubordination is for him to stay out of this investigation and clearly I have documentation as to him being in the case file some ten days later.

Q.   But just with regards to Lieutenant Porter and Jensen Hughes, correct me if I'm wrong, but I understand you're citing that as a segment or a component of the insubordination allegation against Captain Lugo.  Otherwise, I don't understand why we're talking about it.

A.   I directed Captain Lugo to provide me with a lieutenant that I could be in contact with related to this investigation and that never happened.  And then Lieutenant Porter completed an investigative plan at no direction from me.  So who gave him the direction to do that?  And if he does that on his own, then I need to know that.  But that needs to come out in the administrative investigation.  Because if he was directed to do that by Captain Lugo, that would be insubordination as well, wouldn't it?

          I mean, I know you're not here to answer the questions but that's where I get that.

46REPORT001060

Q.   So let me just ask you this:  I mean, is every conflict, every suspicion, every potential allegation investigated, an Internal Affairs number is pulled as compared to -- I wonder how Porter put together that investigative plan and why he reached out to Jensen Hughes.  I think I'll pick up the phone and call Porter and say, "Hey, Porter help me out here.  You heard a conversation with me and Captain Lugo.  You heard my direction.  I'm reaching out to Jensen Hughes.  I'm being told that you're communicating with Jensen Hughes.  Let's make sure we're not in a conflict here.  What's going on?"

Or does it require sending out to a state agency to investigate?  And what would lead you to believe that it's any more probable that Captain Lugo directed him to do that as compared to he knows you're dealing with Jensen Hughes.  He is the liaison to Jensen Hughes and that he did it on his own volition?  I just am really wrestling with why we're going from zero to 10 and doing a state investigation on a PSB commander for something that's easily explained away in a phone call?

A.   At the point of receiving Lieutenant Porter's investigative plan, sir, it was my understanding that the Chief Deputy was intending on contacting Arizona DPS to do a conflict investigation.  At that point I felt that was not my -- within my purview to reach out to Lieutenant Porter if this was all pending an administrative investigation.

Q.   When did you get that --

MR. SERBALIK:  Can I take a restroom break?

THE WITNESS:  Yes.

MR. ANDERS:  Oh, yes.

MR. PETERS:  We're going on break at 1:51.

(Recess at 1:51 p.m.; resumed at 2:01 p.m.)

MR. PETERS:  Okay.  We're going back on the record at 2:01 p.m.

THE WITNESS:  Chief Anders, I may, if I can take a moment.

BY MR. ANDERS:

Q.    Please.

A.    So with all of the questions, and I understand why you keep going back to at what point did you believe this was going -- needed to be an outside investigation.  Why didn't you do these inquiries?

In my position at this point, when there are these allegations involving my captain of PSB, who happens to be my single point of failure when comes to PSB, which is a third and fourth order, all has to do with PSB.  The concern is this needs to be investigated appropriately, this needs to be done the right way.

And all of these -- all of these things, if you look at -- if you take each little point one by one, they don't look so bad.  But the totality of all of the allegations is what I have to look at as the Executive Chief.  And also, sir, I am no

longer a sworn investigator for the State of Arizona, so I'm not going to do an investigation on my PSB commander or anybody related in the department at this point

So in my purview, this needs to be investigated appropriately. And if the Chief Deputy believed that AZ DPS was the appropriate agency to do so, then I am going to back the Chief Deputy on that in terms of providing them with whatever information they need, being interviewed by them either in the criminal or the civil or administrative investigation. And just as I'm being cooperative with you both, I want to be cooperative with that investigation as well

But some of the questions that you're asking me is why didn't you do this, why didn't you call this? I was not going to conduct an investigation and those are all investigative steps, and that is why I did what I did and why I am supportive of Arizona DPS or any other agency if the conflict investigator wasn't available other than the criminal aspect, I understand that, but somebody outside of my myself doing it and who else could do it if it does involve the PSB captain.

Whether or not the allegations are true, that's where we have to be. We have to decide that -- we don't have to decide that. The outside agency has to come to that conclusion. And a lot of times when I did my time in Internal Affairs, a lot of times allegations came to me that were not

46REPORT001063

true but I still had to investigate them.  I still had to dig deep to decide whether or not they were true allegations.

And if they weren't, then they were found to be unfounded or not sustained came out of that.  And believe me, I was happy when that would occur.

I don't want somebody to be in the position where they are facing any type of discipline.

Q.   Thank you.  When did you first learn that Lieutenant Porter had composed an investigative plan and had reached out to Jensen Hughes?

A.   I would have to look back at the emails from Jensen Hughes.  I believe the email came before I received the investigative plan.  It was like a Thursday/Friday and then Sunday night he sent me the investigative plan.  I didn't see it until Monday morning so it was kind of an over-the-weekend thing.

Q.   Was this like shorting after the 10th?

A.   Oh, no.  No.  This was actually, like, April -- March 31, April 1.  I believe the 31st was a Sunday and I believe that's when he sent me the investigative plan.

Q.   31st was a Monday.  First was a Tuesday.

A.   Okay.  Then back it up a day.  Sorry.  It was a Sunday night that he sent me the investigative plan.  I have to go back to double-check that that was the date, and I may or may not have provided that again.  So I'm going to go back and

46REPORT001064

check that.

Q.    Thank you.  You just anticipated my question, whether or not we had that investigative plan.

A.    It's all related to Jensen Hughes so -- yes.  And I apologize.

(Cross talking).

Q.    Do you remember what was in the investigative plan?

A.    Sir, I didn't even look through it because I at that point had already had the conversation with Jensen Hughes that we weren't going to be using them.  So to me it was like wait a minute, apparently that didn't get communicated well to . . .

Q.    I just want to make sure I'm accurate.  You are citing Lieutenant Porter's communication and investigative plan, essentially his liaison with Jensen Hughes, as one element of insubordination that needs to be investigated.

A.    I am citing that I do not know who directed Lieutenant Porter to complete an investigative plan.  And if you're saying he's the liaison for Jensen Hughes, and maybe that's just what he normally does, I don't know.

I was surprised to see it because I already told Jensen Hughes, "Hey, we're standing down and now," and, no, I did not pick that other investigator a few days prior.

Q.    But Porter is not being investigated?

A.    No, sir.

Q.    So to find out why Porter did that, you have made an

46REPORT001065

allegation against Captain Lugo for insubordination to find out was it Lugo.

Did you consider making an allegation against somebody else so the investigation would reveal how Porter came to communicate with Jensen Hughes?

In other words, to talk in cop terms, what's the reasonable suspicion that it was Captain Lugo who was insubordinate by instructing Lieutenant Porter to communicate with Jensen Hughes?  What would lead you to believe with some propensity or some preponderance to file an insubordination allegation against Captain Lugo other than Porter works for Lugo?  This is what I'm wrestling with.

A.    Okay.  So how I came to that conclusion is I had asked Captain Lugo to provide me with a lieutenant who I would be able to liaison with regarding the investigation.

Q.    And that was when?

A.    On March 11 I believe or some time directly after that.

Q.    Okay.

A.    And I did not receive any communication from him who that lieutenant would be.  And surprisingly to me, I received the email from Jensen Hughes saying that Lieutenant Porter reached out and then more surprisingly was receiving the investigation plan.

Q.    About three weeks later?

A.    Yes, sir.

Q.   So you went about three weeks, did not circle back with Captain Lugo, "Hey, reminder, FYI, I had asked for a Lieutenant Liaison in PSB"?

A.   Right.  I did not because we were -- at that point, you and I were discussing Jensen Hughes, the conflict investigator, Baseline Investigations, plus that's not my only function.

Q.   Sure.  I understand that.

A.   Yeah.

Q.   But help me to understand the nexus between Porter reaching out to Jensen Hughes and the fact that Lugo told him to reach out to Jensen Hughes.  What leads you to believe that Captain Lugo, in any way, shape, or form, directed, influenced, guided Lieutenant Porter to reach out to Jensen Hughes particularly given the fact that apparently he was given an order to remove himself from the case?  In other words, what's the bridge there?  What got you to that?

A.   That is a question, one, for Lieutenant Porter; two, Lieutenant Porter is a direct report of Captain Lugo.

Q.   So it must have been Captain Lugo who told him to do it.

A.   I don't know of anybody else that would have because I didn't.

Q.   Would anybody tell him to do it?

A.   I don't know.

Q.   Is that a prerequisite?

A.   I don't know.

46REPORT001067

Q.   So because you don't know, let's make an allegation against the Captain of PSB, have that investigated by a state agency and then you'll get your answer.  You make the allegation but I'm trying to figure out what's the foundation for the allegation other than the guy who did this is supervised by the Captain, so it must have been the Captain?

A.   And, Chief Anders, there are two other allegations, one of insubordination and the other of failing to report the -- that he was being investigated as well.

So in all of it together, that was added in because we don't know and I was not at that point going to do any fact-finding to determine whether or not it was true.

Q.   Did you explain what we just discussed to the Arizona investigators?  Here's the deal going on with Lieutenant Porter.  What came to my attention was Jensen Hughes, got this email, investigative plan.  I believe Captain Lugo gave direction to Lieutenant Porter.  This is why Porter did what he did.

A.   I told them of the first allegation of insubordination related to staying out of the case itself.  I told them of the failure to report, and I told them that I had received an investigative plan from Lieutenant Porter and I do not know who directed him to do that check and he is -- that he is a direct report of Captain Lugo.

Q.   Was Lieutenant Porter aware?  In other words, why would it

have been inappropriate for Lieutenant Porter to communicate with Jensen Hughes?

A.    Because the direction that I gave to Captain Lugo was to provide me with a lieutenant so that I could speak with them regarding the next steps of the investigation.

Q.    Did you give direction to Lieutenant Porter not to communicate with Jensen Hughes?

A.    I had not had any communication with Lieutenant Porter.

Q.    You hadn't directed him to remove himself from the investigation, not become involved in the investigation?

A.    The only direction I gave him was that the email saying we are standing down from investigation with Jensen Hughes.

Q.    So is it entirely possible or reasonable that Porter, being a liaison to Jensen Hughes, reach out to Jensen Hughes?

A.    As I'm learning now, that is possible.  But, sir, prior to you and I speaking today, I did not know that.

Q.    That could have been resolved with just a phone call to Lieutenant Porter; right?

A.    That information probably could have been provided to me by several people.

Q.    Regarding -- I think I understand regarding a timeline, March 11 is when you had the first conversation with Captain Lugo regarding 0111.  Can you tell me about the order? In other words, what is the manner in which an order was given to the PSB commander about what he was to do or not to do?  Was

it verbal?  Was it in writing?

A.    It was all verbal.

Q.    And was it couched as you are forthwith hereby ordered to not do the following or to do the following?  Captain Lugo, do you clearly understand what it is I have said?

A.    I think we discussed this earlier and I think what I said to him is, "You are to remove yourself from any involvement in this investigation."

Q.    What was his reply to that?

A.    He replied in the affirmative and then I reiterated, "You understand?"  And he said yes.

Q.    Okay.  And hence that direction to Captain Lugo, aside from the suspicion that he influenced Lieutenant Porter in the communication with Jensen Hughes, what are the, for want of a better term, the grounds for the insubordination?

A.    The grounds for the insubordination are that I told him not to access -- to do anything related to the investigation and then he re-accessed that investigation and that he was supposed to advise me as to what lieutenant was going to be on that investigation and he indeed did not.

Q.    Is that insubordination if you're telling him he must remove himself from the case and then doesn't tell you who the lieutenant is, is that a violation of the order you just gave him?

A.    It's an order to provide me with a lieutenant's name as to

46REPORT001070

72

who would be my liaison.  So to do the -- to do the thing that you're not -- that I tell you not to do is insubordination but then to not do the thing that I'm asking you to do would also be insubordination, sir.

If I ask you not to gas your vehicle up at the end of your shift and you -- go ahead.

Q.    How many times in your career have you directed, ordered, a -- forgive the term -- subordinate sworn peace officer to do something and they didn't do it?

A.    I wouldn't be able to answer that question, sir.

Q.    Hundreds of times, right, over a career?

A.    I don't have an answer.  I don't know.

Q.    Every time do you charge them with insubordination and launch an outside agency investigation?

A.    As -- if it's related -- this is related to a PSB investigation, sir.  This isn't -- again, this isn't me telling somebody to drop their uniform off at the dry cleaner and they don't do it.  This is related to an internal investigation.

Q.    Not providing you the name of a lieutenant.

A.    It's all a totality of the things --

Q.    The aggregate.  It's the whole composition.

And then the -- so we have -- I'm just trying to nail down the foundation for the insubordination and what I'm understanding -- and please correct me if I'm wrong.  Order was given on the 11th.  Subsequent to that, Lieutenant Porter

46REPORT001071

73

communicates with Jensen Hughes.  You believe Lugo was responsible for that; that Lugo did not give you the name of a PSB lieutenant, that's insubordination.  And then the third element is the accessing of the IAPro.

When did you learn of the access to IAPro?

A.   I believe I answered that, too.  I don't recall exactly when I looked in there to see that he had accessed it.  There will be a log of when I was in there.  That's not the complete log, obviously.  It's just the first page.

Q.   There's a March 24 your name.  March 21 is Captain Lugo.  March 18 is your name.  March 11 is your name.  March 10 is Captain Lugo.  March 10 is Captain Lugo.

So the third element of the insubordination allegation is that subsequent to March 11, he accessed IAPro?

A.   Yes, sir.

Q.   Okay.  So it wouldn't be the March 10.  March 10 he does what he does.  He accesses IAPro to see what complaints have come in or Blue Team to see what complaints have come in.  Nothing on the 11th.  So he accessed it one time on March 21.

Do you know what happened on March 21?

A.   No, sir.

Q.   Do you know that he and I meet every Friday to discuss intake and routing of cases?

A.   Yes.

Q.   March 21 was a Friday.  At 10:26 in the morning when he

74

accessed it is when he would be meeting with the Federal Monitor to discuss intake and routing of cases.

A.    So you're telling me facts related to an investigation that I'm going to be interviewed on.  You understand that; right?

And I'm not trying to be difficult here.  But now you've just provided me with information that I'm going to be asked on an administrative investigation.

Q.    And the harm in that is?

MR. SERBALIK:  The question was did you know that.

THE WITNESS:  I knew that you guys met.  I did not know that it had any relation to that log until you just told me just now.

BY MR. ANDERS:

Q.    If you believe there's some conflict or harm in informing you that of that, please let me know what that is.

I would like to go to another topic.  I honestly don't want to keep you much longer, actually two.  One is the reversal of the suspension of Sergeant Engelbeck and the reversal of the sustained finding.  This is post PDH conducted by Chief Holmes, retired Chief Holmes.

Do you have any knowledge of how that came about.  Who made that decision, why that decision was made?

A.    Thank you prior to my employment with the Maricopa County Sheriff's Office, sir, so I do not.

46REPORT001073

Q.   Okay.  So it was part of this issue surrounding Engelbeck's allegations and the allegation that an interview was destroyed or tampered with or withheld and that it may have been the responsibility of Conduct Resolution to provide this to Engelbeck through all of that process.  It hasn't come to your attention why the case was reversed essentially or who did it?

A.   No, sir.  And I believe Captain Lugo in our initial conversation was -- expressed surprise at that as well.

Q.   Okay.  In one of our -- I ask because in one of our phone conversations you had mentioned something to the effect of you need to learn more about that or something.  I was just curious if you had.

A.   Yeah.  I had never dealt with an agency that had Conduct Resolutions and PDH and Mr. Holmes.  That was all very new to me.  We had two Internal Affairs investigators back in my department and we answered to the assistant -- one of the assistant chiefs.

Q.   Yeah.  Regarding Captain Morrison, we were provided information from Captain Summers Tuesday.  Captain Summers told representatives of the Monitoring Team that it was being considered, there was thought being given to changing the sustained findings on previous cases and changing the sustained finding on a case that the office considers to be technically still open.

46REPORT001074

76

Do you know anything about the consideration or thinking about reversing the sustained findings on those three cases associated with Captain Morrison?

A.   I had heard I believe the Chief Deputy talking about reviewing those cases and I have never read -- I have never read them, sir, so I --

Q.   You wouldn't have cause to.

A.   No.  So I don't know if there was any -- what the reasoning behind possibly overturning those would be.  I didn't get involved in deep conversation in that.

Q.   How did you come to hear about the Chief Deputy thinking about doing this?

A.   It was -- it came up in a meeting with I believe Chief Summers, myself, and the Chief Deputy discussing the transfer of Morrison and then they talked about the new allegations that is open or recently closed, I'm not really sure where that's at, and there that was -- and I don't know if it's not sustained.  I can't remember.  And that the Chief Deputy wanted to review the prior cases to determine if they should still remain as sustained because he seemed to have some prior knowledge to prior to being the Chief Deputy of those incidents.

But I can't speak for the -- why he would say anything related to that.

Q.   You wouldn't have any knowledge of why he would say

46REPORT001075

anything like that.

A.    No, sir.

MR. ANDERS:  Do you have a question about that, Al?

MR. PETERS:  No.  No.  My question was answered.

BY MR. ANDERS:

Q.    Are you aware of any conversation, consideration, meetings, communication, thoughts about changing the findings of any other current or former employees?

A.    No, sir.

MR. ANDERS:  Al, do you have anything else?

MR. PETERS:  I'm just looking real quick.

This is still sticking, in my mind, but I think you may have answered it already.  I just want to confirm it.

When you gave Captain Lugo the order on March 11, the order was verbalized.  Was there any memorialization of that order included in the case file?

THE WITNESS:  No, sir.

MR. PETERS:  Or anywhere else?

THE WITNESS:  No.  I did not follow up with an email at that point which I regret not having done.

MR. PETERS:  And it was -- just to be clear, it was just you and Captain Lugo?

THE WITNESS:  Yes, sir.

BY MR. ANDERS:

Q.    Chief, is there anything else that you want to leave us

46REPORT001076

78

with, anything that you think, "Doggone it, I wish they would have asked me that"?

A.    No, sir, but I would love the opportunity that if there's something that I left out, that I would be able to communicate with you and perhaps schedule a secondary meeting.

MR. ANDERS:  Absolutely.  Welcome to and I would encourage that, yes.  I would also just want to direct you to not have any conversation with anybody --

THE WITNESS:  Yes, sir.

MR. ANDERS:  -- about what it was we discussed here today except with your counsel.

THE WITNESS:  I understand, absolutely, sir.

MR. ANDERS:  Okay.  Great.

THE WITNESS:  And for your awareness, that log has been provided to CID and they are uploading it, a PDF copy of it, to the ShareFile so that you will have that as well.  And I will send over the emails from Jensen Hughes as soon as I get back.

MR. ANDERS:  Thank you very much for your time and cooperation.

THE WITNESS:  Thank you, both.

MR. PETERS:  And with that, we're going off the record at 2:26 p.m.

(Proceedings concluded at 2:26 p.m.)

46REPORT001077

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 11th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with MATT SUMMERS

April 17, 2025

_____




Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001079

## TRANSCRIPT OF INTERVIEW WITH MATT SUMMERS

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001080

P R O C E E D I N G S

MR. PETERS:  The date is April 17.  2:42 p.m.  We're here at the Monitoring Team office in the Luhrs Building, myself, Major Alfred Peters; Chief Don Anders.

Deputy Chief, would you please enter yourself?

THE WITNESS:  Sure.  My name is Matt Summers.  I am a Deputy Chief with the Maricopa County Sheriff's Office currently assigned as the commander of the Compliance Bureau.

MR. PETERS:  And, sir?

MR. HOLOHAN:  I'm Brian Holohan.  I'm his lawyer.

MR. PETERS:  Okay.

And with that . . .

MR. ANDERS:  Great.  Thank you, Major.

Thank you very much for being here, Chief.  I really appreciate it, on particularly short notice.

THE WITNESS:  Sure.

EXAMINATION

BY MR. ANDERS:

Q.   How long have you been a Chief?

A.   A Chief, since -- it hasn't been long.  I'm trying to remember.  A few months.

Q.   Okay.  And prior to that, you were a captain in charge of?

A.   The Court Implementation Division.

Q.   For how long did that . . .

A.   Not exactly but a number of years.  About four-ish years

approximately.

Q.    About when, what year did you begin to have an integrated role with the Court and the Court orders and the whole Melendres case?

A.    In any capacity?

Q.    Well, I mean, yeah.  For instance, hey, as a lieutenant, I was in charge of training associated with Melendres.

A.    And I was.

Q.    Oh, you were?  Okay.  Yeah.  Yeah.  So are we going back to 2017, 2016?

A.    Again, without looking, I don't want to give you specific --

Q.    No.  No.

A.    But, yes.  Kind of towards the initial inception of this process I was I believe the first lieutenant in training under order.

Q.    Okay.  All right.  Great.  Good.  Good.

I wanted to talk about what's been identified as PSB case number 2025-0111.  This is a complaint that was initially filed by Sergeant Englebeck.  He made an entry in Blue Team on March 10, 2025.  This case has very much come to the attention of Captain Lugo, I believe Lieutenant Porter may have some information about it perhaps, certainly, Chief Palopoli and the Chief Deputy Gentry.

Are you familiar with I'll just call it 0111?

46REPORT001082

A.   Not by number but by your description, I believe I am with it, though I don't have a lot of firsthand direct involvement but, yes, I am familiar with it.

Q.   Can you tell me what you know about it and how you came to learn about it?

A.   So primarily just from conversations with my boss, Chief Palopoli.

Q.   And what would be the venue and the nature of those conversations?

A.   Her being new to the office.  She would occasionally say, hey, this and that occurred.  I'm thinking about doing this or that.  What would you -- what would you suggest?  Or does that sound appropriate or whatnot.

Q.   Do you know when your first communication with her occurred regarding 0111?

A.   I do not specifically, no.

Q.   What can you tell me that you know about the case, about the allegations and the investigation?

A.   Very generically, that a criminal complaint or allegation was made against or involving Captain Lugo and -- I mean, that's how it began.

Q.   Okay.  What sort of counsel, advice, direction would Chief Palopoli solicit from you?

A.   So when she informed me about that, she said, you know, what should I do.  And I said, well, first thing you should do

is have a discussion with you, Chief Anders, in reference to notifying you and you're going to have to get involved in terms of directing the initiation of the investigation. I said it's up to you, not up to me, but my recommendation would be that it conflicted out, for obvious reasons.

Q. Did you give her any recommendation about where to potentially assign or at least request that the case be adopted?

A. Yes. I said that should be a conversation with you, but I believe we had -- I don't have a lot of direct -- because I still don't have and have never directly supervised PSB.

Q. I understand.

A. So I believe that we had at least one conflict investigator but I didn't know all of the specifics of the details and everything surrounding it, but I said she needed to have a conversation with you to determine what would be the appropriate entity to engage to investigate it.

Q. So you would have had that conversation with her before March 25? That's the first day that she reached out to me was March 25.

A. Again, I would have to look at --

Q. I'm not going to hold you to that. Did you ever have an opportunity to read the allegations against Captain Lugo?

A. No.

Q. Okay. What was explained to you by Chief Palopoli? Did

you believe it was simply administrative, that it involved criminal matters, or was this a determination that Chief Palopoli had already made that this is a criminal matter?

A.   I didn't -- I don't have enough -- still do date I don't have enough information on the specifics to be able to make that assessment.

Q.   Okay.  All right.

A.   I do believe, though, that it's most appropriate if -- and this is what I told her, if there is a question, that someone outside the agency determine what direction the investigation needed to go.  Was it criminal or not?  Was it administrative or not, but that we shouldn't be involved in making those determinations.

Q.   So as you're undoubtedly aware, one of the allegations is that Captain Lugo withheld, destroyed, or tampered with an administrative interview from years prior and this is, I'm sure Chief Palopoli explained to you, this is the nature of the criminal allegation.

A.   I didn't know that much detail, no.

Q.   And so given that foundation, my question is, did you ever provide her information or did she ever inquire about, hey, who's responsible for giving a sergeant all of their documentation associated with a case when they appeal?  Like what's the role of Conduct Resolution?  What's role of PSB?

A.   I know she had -- well I don't know.  She told me she had

conversations with Conduct Resolution and PSB about that.

Q.   And she told you that during your first conversation?

A.   Oh, I don't recall which conversation.

Q.   Have you been present or had a conversation with anybody besides Chief Palopoli about 0111?

A.   Again, not by the IA number but I was present during a -- I don't remember if it was just one conversation with Chief Gentry and Chief Palopoli when she was advising him.  But at least one conversation.

Q.   Okay.  Where would that have occurred and what was the precipice for the conversation?

A.   I don't recall.  Probably on the fifth floor, probably one of our offices.

Q.   And you said something about advising the Chief Deputy. Was she informing him of 0111 or --

A.   I don't remember what the primary intent of the conversation was or what triggered the conversation, just that she was discussing the matter with Chief Deputy.

Q.   Okay.

MR. PETERS:  If I could just interrupt.

So at that point where she was -- where Chief Palopoli was discussing the matter with Chief Gentry, do you feel, do you agree that it was appropriate for you to have been within that conversation?

THE WITNESS:  I mean, I guess from my perspective, I

46REPORT001086

didn't have direct oversight or involvement with PSB but Chief Gentry and Chief Palopoli were both fairly new to the office. I mean, Chief Gentry had worked for the office previously but it had been many years and not in that role. And Chief Palopoli has never worked for the Sheriff's Office and had been there for a limited amount of time.

So I was just there I think as a resource.

MR. PETERS: Did you have any concerns or do you have any concerns now about the confidentiality of the information that was discussed?

THE WITNESS: That I was present for it?

MR. ANDERS: Yes.

THE WITNESS: No.

MR. ANDERS: Okay.

BY MR. ANDERS:

Q. There was a meeting with the Arizona Department of Public Safety that occurred on the fifth floor on Wednesday, March 9, 2 o'clock in the afternoon. Present at the meeting were two administrative sergeants -- two administrative investigators with the rank of sergeant from DPS, Chief Gentry, Chief Palopoli. Chief Palopoli represents that you were also present at that meeting, that that meeting lasted perhaps a little bit less than an hour. So there was -- if in fact that is the case, that's a lot of information to be discussed about allegations against Captain Lugo.

46REPORT001087

First, does that sound accurate?  Do you recall being at that meeting?

A.   So a couple things.  One, I believe it was, if I'm correct, a sergeant and a Captain from DPS.  That's my understanding.

Q.   Okay.

A.   And then I don't remember the exact amount of time we were in there.  I do know it was fairly hectic because when we first came in, I believe the Captain was on the phone so weren't -- didn't begin the meeting initially and Jeff Gentry wasn't available.  I believe he was doing -- I don't know, something, swearing people in or something.  And then he came and left and the Captain was on the phone for a period of time.  So we weren't sitting in there engaged in detailed conversation for the duration of that meeting.

Q.   Understood.  Understood.

A.   We typically made small talk before the Chief came in from my recollection.

Q.   Okay.  You said the Captain was physically present but on the phone.

A.   Yes.

Q.   Okay.

A.   So he wasn't --

Q.   He wasn't calling in on the phone?

A.   No.

46REPORT001088

Q. So the duration of the meeting, can you just tell us what your recollection is regarding what was presented to Arizona DPS?

A. Just I think what was provided -- I didn't review it but I believe what was provided to you is what was communicated. The email that people Chief Gentry had who he forwarded that to Chief Palopoli at some point in reference to the criminal allegation and that that was printed out and given to them. The information has been provided to you as well. And then the policy I believe and her contact information. I'm not -- I'm not aware if there's any -- maybe the letter that Gentry wrote to DPS but I'm not aware -- I didn't sit there and go through -- I just saw that it was there. I didn't go through it.

Q. So this would be documents or indicia provided to them?

A. Documents.

Q. Clearly during this span of time there was quite bit of conversation; right? So what I'm trying to understand, and after speaking with Chief Palopoli, she represents that, yeah, I mean, it was not a *di minimis* period time and that there was an appreciable amount of information, verbal information, provided by members of MCSO to the investigators from Arizona DPS.

So I'm just trying to understand your recollection of what was provided verbally to Arizona DPS.

46REPORT001089

A.    Okay.  My recollection wasn't that it was an hour long that we were -- you know, I think it was less than that.  I don't remember specifically how much but I would also say that while some of the nexus of the -- what generated the investigation was discussed certainly, that all of the details of the investigation weren't the primary substance of the conversation.  Lot of it was also procedural and can we get this form and who would we contact at PSB to get this and things like that, to give them the resources that were needed to conduct the investigation.

Q.    Sure.  At the conclusion of the meeting, was it your understanding they were going to assume a criminal and administrative investigation?

A.    It was.

Q.    Do you recall what the name of the administrative investigation would be?

A.    I believe she was, again, in general terms, failure to notify Chief Palopoli and then -- and I don't know what the specific -- I don't recall the specific allegation but essentially in one of the things I told Chief Palopoli initially is when she should contact you and obviously Captain Lugo should be well aware, but he should conflict himself out of this investigation.  He shouldn't have any involvement in the matter, assigning it or accessing it or anything like that.

46REPORT001090

So he apparently -- one of the allegations is that after she instructed him not to be involved in assignment or accessing the investigation, that he did appear to have involvement in both assigning potentially and accessing again the allegation.

Q.   So there are two cases involved, 0111 which we just talked about the complaint filed by Sergeant Englebeck, and then 0139, which was a Blue Team entry made by Chief Palopoli, or at least she forwarded information to PSB on April 7 alleging insubordination.   And I'll come back to that in just a second.

When we talk about the meeting on April 9 with AZ DPS, you heard on the call that we had on April 7 that was Chief Gentry, yourself, Chief Palopoli, I think legal counsel, there may have been other MCSO representatives, forgive my absence of memory, and then Chief Warshaw and members of the Monitoring Team.   And Chief Warshaw asked Chief Gentry directly about his means of communication with Arizona DPS on requesting that they consider adopting the investigations involving Captain Lugo.

Chief Gentry represented that he had communicated, he had sent an email and a letter via email to the colonel of the Arizona Department of Public Safety but had not heard anything back yet.

In all fairness, there was a very large drop late last night and we have not gone through everything that was

dropped but we were unable to locate that email and that letter and any documented return that may have been received from Arizona Department of Public Safety.

Do you have any idea if it was dropped, where we might find that?

A.    I can certainly look into it.  But I don't know.  I can't direct you specifically to it, no.

Q.    Okay.

A.    I don't have anything to take notes on but if you can shoot me an email or something, we can --

Q.    Major Peters will definitely follow up on that, yeah.

The meeting on April 7 with the individuals that I just named, you were very clear in your refreshing our memories about the criticality of the role of the PSB commander, how important that individual is to the organization, the access they have to sensitive information, the access they have to confidential information, and that we just need to understand the importance and influence of the role of the PSB commander.

And then advised the Monitoring Team that additional allegations were going to be made after the meeting against Captain Lugo.  And those involved, if I recall correctly, insubordination, but also you mentioned that he had communicated with or had coordinated with or had initiated the investigation involving him with Jensen Hughes.  So I don't remember the exact terms but that he had facilitated in some

46REPORT001092

manner communication and investigation with Jensen Hughes.

So my question to you, Chief, is when did you learn about the things that you talked about on -- during that meeting on April 7?

A.    Oh, I don't recall specifically.

Q.    A day or two that morning or a week earlier?

A.    I don't recall specifically.

Q.    Why would you inform the Monitoring Team of that as compared to the Chief Deputy or the complainant, Chief Palopoli?

A.    From recollection and I believe Sheriff's Office legal counsel was part of the conversation.  They asked me to give the overview.  I don't know how much detail I should go into their conversation.

MR. PETERS:  Can you just clarify who from the legal counsel?  Mr. Popolizio I believe.

MR. ANDERS:  He was on the call, yeah.

BY MR. ANDERS:

Q.    No.  I don't want to know any of your conversation with counsel.

And I think you alluded that Captain Lugo was also going to be placed on administrative leave during our call.  Do you remember that?

A.    So I'm trying to remember the series of events here.

So the call you're referencing was on -- was that on

the Monday?

Q.   Monday, the seventh.

A.   Yeah, I believe that he was -- and I wasn't directly involved in this.  I think I was actually either out of town or headed out of town.  But I believe he was placed on administrative leave on Friday but I wasn't directly involved with it.  And I believe, and I wasn't directly involved with this either, that legal counsel was attempting to contact by multiple means Chief Warshaw to notify him.  But I wasn't directly involved in that.

Q.   Thank you for that.

A.   I'm trying to -- so what I'm trying to do is be as candid and transparent as possible; but I want to emphasize when I'm not directly involved in something, I don't want to, you know, get down the road and say that you said specifically.

Q.   I appreciate that very much, yes.  Absolutely.

        Was it your understanding that it was going to be Chief Palopoli who was going to make the Blue Team entry or initiate the internal complaint regarding insubordination?

A.   I believe so, yes.

Q.   And, in fact, she was the complainant.  Chief Palopoli was then at the meeting with Arizona Department of Public Safety on -- two days later, at 2 o'clock on April 9.

        Do you have any thoughts about the complainant, the individual initiating the complaint of insubordination against

46REPORT001094

the PSB captain being present at that meeting and telling the investigators what it was that happened as compared to that information being presented by a relatively neutral party and investigators, you need to understand complainant in this case is Chief Melissa Palopoli and she's somebody that you're going to want to interview?

In other words, do you have any thoughts about either a conflict or undue influence upon those investigators when the complainant is in the room expressing what it was that occurred?

A.    Sure.  I mean, I have a few thoughts on that.  One, I do believe that was made clear to them, that she was clearly --

Q.    The complainant?

A.    Yes, and likely to be interviewed.  And as we're all aware, this is kind of a very unique, unusual situation.  I mean, as I've pointed out, I mean, you yourself have the potential to be interviewed as a witness.  So, I mean, there's -- there are some unique aspects to this investigation that aren't typically present when you have, you know, the PSB commander would typically be one handling a lot of this stuff, you know.

Q.    Do you have any concerns that Chief Palopoli was at that meeting and offering information to the investigators?

A.    No, because she made it very apparent from the get-go that, listen, you guys will likely interview me but I don't

46REPORT001095

know how else to get this information to you for you to get this started, being that I'm the one that has the knowledge because she's -- normally it would be the PSB commander.  But she was -- the PSB commander obviously was the subject.

Q.   Chief Gentry was clearly aware of the allegations; correct?

A.   Yes.

Q.   And as a proxy or vicariously, he could have represented the information to the investigators in the absence of Chief Palopoli; is that correct?

A.   I'm not saying that's not possible.  Sure.

Q.   You were at this meeting.  What is your understanding regarding the insubordination allegation?  What was explained as the grounds for the insubordination allegation?

A.   So, again, I wasn't directly involved.  But as I understand it, and from my perspective, the PSB commander should certainly know that he -- if he is a principal or an allegation involves him, he should immediately notify his supervisor and conflict himself out of the investigation.

But it's my understanding -- again, I wasn't present for this -- that Chief Palopoli gave a direct order to Captain Lugo not to be involved in any way, shape, or form with that complaint and that he appoint a liaison lieutenant to directly report to her so they could administratively if they needed access to IAPro or log something down or transmit

46REPORT001096

information, then she could decide with you who the conflict investigator was going to be and then they could facilitate getting the information to the chosen conflict investigator.

And from my understanding -- and I don't know and I don't want to speculate what transpired but from my understanding --

Q.   Can I just stop there?  Your understanding would be you were at the meeting with the investigators when this information is being communicated; correct?

A.   Right.  And I say my understanding because I wasn't present when this took place.

Q.   Correct.

A.   The conversations between Chief Palopoli and you, Chief Palopoli and Captain Lugo, so it's being relayed to me.  So I want to emphasize the fact that this, again, is not firsthand knowledge.  But from my understanding, after she issued that order, he appears to have likely been involved and both accessing and determining where, who and how the investigation was going to be sent to.

MR. PETERS:  And how would you come across that information?

THE WITNESS:  Because it was relayed to me that the investigation was ultimately assigned and she -- it was relayed to me again -- I wasn't firsthand involved in this -- that she specifically told the Captain not to assign it, not to have any

involvement with it, not to access it, and that she would determine when, how, and when with Chief Anders it would be assigned and that her and the lieutenant that he was supposed to assign to her as a liaison would ensure that administratively through IAPro or whatever they had the investigative entity, whoever that was determined to be, would have access to the complaint so that it removed Captain Lugo from any potential conflict or even the appearance of any potential impropriety.

BY MR. ANDERS:

Q.   Was -- is part of the insubordination allegation that Captain Lugo neglected to assign a lieutenant?

A.   I'm not certain of that.

Q.   Was it that he somehow influenced or directly communicated with Jensen Hughes?

A.   I'm not certain.

Q.   Was it that he accessed Blue Team or IAPro or hard copies of evidence?

A.   I do believe that there is a log that indicates -- or I was told, and I believe I saw that at some point that he appears to have accessed it after she informed me she told him not to have any access or involvement with the matter.

Q.   Okay.

A.   But I don't know and I don't want to speculate and the investigation at some point should answer those questions you

46REPORT001098

just posed to me, but I can -- I can't answer those questions with the information I have or the knowledge I have.

Q.    Listening to what was communicated at the meeting, was Arizona DPS and the meeting that you were present at with Chief Gentry and Chief Palopoli and then one-on-one conversations you had with Chief Palopoli.

Do you have thoughts about the appropriateness of an investigation going forward that alleges Captain Lugo or perhaps Sergeant Latham committed a criminal act?  Do you have any concerns about the propriety of Captain Lugo being placed on administrative leave?  Do you have any concerns about perhaps some preliminary steps could have been taken before we went from one to 10 that may very rapidly answer who may have been responsible and why things did or didn't happen, or is your thought different?

A.    That's a lot of questions to unpack there.  I'll do my best to answer them.

So one thought is, and something I mentioned earlier is that it was my belief that the valuation of the allegation and complaint should be conflicted out to determine and that you should be involved from the inception of that process to determine what direction it should go.  Does it necessitate a criminal investigation?  Does it necessitate a criminal and administrative or just administrative or neither?  And I don't have the details still today to make the --

46REPORT001099

22

Q.    Just tell me what you knew.  That's all I'm asking, knowing what you were made aware of.

A.    I think knowing that the little that I know, I think it's most appropriate to have someone outside the organization make the determination, involves an allegation against the PSB commander.

MR. PETERS:  If I could just interject.

So, Chief, just so I'm clear then.  So then your thoughts are that it would be more appropriate for someone outside of the organization to do a preliminary review to determine whether or not a criminal investigation should be initiated, an admin investigation should be initiated, both, or none at all?

THE WITNESS:  Yes, and particularly because she had been there for a matter of I don't know how long, weeks.  And I had mentioned to her if you had been in place for a significantly longer period of time and were more well-versed in the hundreds of paragraphs and virtually the entirety of three of the most detailed court orders that exist in reference to governing PSB matters, maybe you would feel comfortable doing this yourself.

However, being that the PSB commander would normally be the person to try to initially make that determination with you but he clearly shouldn't be the one making that final determination, I did recommend that we have someone outside our

organization take a look in concert and in coordination with you to determine what the appropriate course of action would be so that there was no conflict with the organization.

MR. PETERS: Okay. So then following that discussion there, is it a fair characterization to say that you gave advice to your fellow chiefs to have someone just look at the preliminary piece of that to determine whether or not this should become any of those investigations?

THE WITNESS: I said we should definitely conflict it out, yes. And they should make the determinations on the course that it goes, yes.

MR. PETERS: Thank you.

BY MR. ANDERS:

Q. My understanding is that at the conclusion of the meeting with Arizona Department of Public Safety on April 9, Arizona DPS is going to conduct an administrative investigation and a criminal investigation and that the people present were not criminal investigators. They were administrative investigators, and that the administrative investigators were going to take the information back to the criminal investigators.

And so I'm trying to grasp whether or not Arizona DPS took the information provided to them and they were going to do an assessment whether or not a criminal should be done or whether or not they were asked, please do a criminal

24

investigation for us?

A.    So I wasn't part of the initial conversations about what was requested from them, but my understanding from the meeting was they were going to take the information and determine are we going to have a criminal investigation conducted first?  And then do the administrative investigation?  Or does the criminal investigation need to be conducted?  That we were handing that to them and that they were going to make the determinations on the trajectory of the investigations.

        MR. PETERS:  Again, so would it have been represented to them that it was MCSO's desire to have a criminal investigation conducted or would it be represented to them that we're requesting you to review this and advise us on whether you believe there should be an investigation initiated?

        THE WITNESS:  My understanding was basically -- and again, I wasn't privy to all the other conversations or communications -- was that we were giving this to them and they were going to determine the appropriate course or courses of action that should be taken.

        MR. PETERS:  In your presence was there any direction for them to bring that information back to you to advise MCSO that this was the course of action we decided on?

        THE WITNESS:  Not that I recall.

        MR. PETERS:  Okay.

\\\

46REPORT001102

BY MR. ANDERS:

Q.    Typically at a meeting such as that, if notes are not being scribed during the meeting, somebody memorializes what it was that occurred at the meeting and if nothing else, memo the file or at least some chronicling that memorializes this meeting occurred, these are the fundamental points that were discussed, these are the agreements that were reached.  Do you know who took those notes or memorialize the content of that meeting?

A.    No.  I do think that -- I don't remember how I did it but there were three -- there were a handful of forms that they wanted that I was going to give them a contact person at PSB to get that information for them and we gave them the information for the contact person.  But in terms of any sort of detailed notes, I don't recall if anyone was taking detailed notes or not.

        MR. PETERS:  I'm surprised because you usually take good notes.

        THE WITNESS:  Oh, well, thank you.

BY MR. ANDERS:

Q.    Do you know how the decision was made?  Who made the decision to communicate with Arizona DPS?  Was it Arizona DPS doing this as compared to Baseline, as compared to MCAO, as compared to another Sheriff's Office?  How did this end up with Arizona DPS?

A.   So I'm not certain but I believe, again, from what was communicated to me, that there was some -- and I wasn't present for it -- there was some conversations with you and with the Chief Deputy and with -- I mean, involving -- I'm not saying you two spoke but Chief Palopoli spoke to you, Chief Palopoli spoke to the Chief Deputy, and at some point that -- I wasn't present.

Q.   Somebody made a decision.

A.   Yes.   That wasn't me and I wasn't present for it.

Q.   Do you know of any correspondence that has circled back to the office as a result of the initial outreach?

A.   I'm not aware of any.

Q.   Okay.

        MR. ANDERS:   Do you have anything else regarding that, Major?

        MR. PETERS:   No.   Thank you.

BY MR. ANDERS:

Q.   I want to shift gears a little bit and talk about Sergeant Englebeck.   Forgive me if I'm not pronouncing that right.   I think it's Englebeck.

A.   Yeah.

Q.   Sergeant Englebeck was investigated by PSB at the direction of a chief officer about four years ago.   That may not be exact.   Ultimately that investigation concluded in 2024. Parts of that investigation were sustained.   The -- a PDH was

held by retired Chief Ken Holmes.  Chief Holmes sustained at least one allegation that had been made and agreed with the recommended 40-hour suspension.  The 40-hour suspension was then served by Sergeant Englebeck.  Sergeant Englebeck determined to appeal to the Merit Commission, in fact, filed the appropriate notification he was going to appeal to the Merit Commission.

He requested documents to support his appeal, his preparation for his appeal.  That appeal was scheduled for either January or early February of 2025.

In December of 2024 Sergeant Englebeck was advised that the 40-hour suspension was going to be reversed and he was going to be made whole.  He was also notified or notification was sent out that not only was the 40-hour suspension going to be reversed but the sustained finding was going to be reversed and it was no longer going to be considered sustained.

Do you have any knowledge at all with regards to how, why, or who was involved in the decision to reverse the suspension and the finding of the case?

A.    No.

Q.    Do you know who in the conversation has authority to reverse a -- the discipline or the finding of a case post-PDH hearing?

A.    Well, so -- I mean, I'm not looking at policy right now.

Q.    I understand.

46REPORT001105

28

A.   So please don't hold me to this but from my understanding, without reviewing policy to confirm, I believe it's the Appointing Authority or Sheriff or his designee.  But that's from memory and not -- I mean obviously we can cite policy if we want to get --

Q.   The Appointing Authority would be Chief Holmes?

A.   Typically, yes.

Q.   Okay.  So if Chief Holmes holds a PDH and determines Major Peters, the allegation remains sustained and you're going to serve a 40-hour suspension and ten months later, after the suspension is served, Chief Holmes makes the determination I'm going to reverse that sustained finding and we're going to make you whole regarding the 40-hour suspension.

     Is it your understanding that Chief Holmes would have the authority to do that?

A.   I'm not familiar with a situation like that being encountered before so I would be speculating.  I'm not certain. I would have to review policy and consult folks on that.

Q.   Have you ever heard of that being done previously historically in your time in the Sheriff's Office, a case post-PDH being reversed by any executive or command member of the organization, not Merit Commission?

A.   Right.  I understand that -- I'm not positive.  I believe it may have occurred before but I'm not directly involved with a lot of those types of instances so I can't state with

certainty.

Q.    Sure.

Do you have any idea why that would have been done?

A.    No.

Q.    You haven't been present at any meetings or a party to any conversations where this was considered or discussed?

A.    The summary that you just gave me of that case was far more knowledge than I had before you provided that summary.

Q.    Understood.

I would like to talk about Captain Morrison. Captain Morrison has had previous sustained PSB investigations. Captain Morrison was previously demoted is my understanding. Captain Morrison has had a case, my words, not anybody else's, that has been lingering a bit and is still in the most technical sense considered by the office to be open.  My understanding -- please if you know different, I absolutely insist that you correct me.  My understanding is that the most recent case was scheduled for PDH.  Either a PDH occurred about August of 2024 or the PDH was forestalled but that the case was sent back to PSB.  I believe a PDH occurred and the conclusion of the PDH, it went back to PSB for further review based upon some information.  I could very well be wrong with that.

I did know that that case did go back to PSB.  PSB did follow-up and then that case, as we were informed on Tuesday by Conduct Resolution staff, PSB then has sent the case

back to Conduct Resolution and the sustained finding was not changed by PSB.

Subsequent to the meeting that the Monitoring Team held with office representatives and counsel around 2:30 Chief Rojas had a conversation with you and it is my understanding you represented to Chief Rojas that there has been some thinking or some thought or some consideration to changing the finding involving the case that the office currently considers to be open and there may be some consideration, some thinking, some thought or some discussion regarding changing the previous sustained findings involving Captain Morrison as a principal.

If I mischaracterized that, please tell me.

A.   Okay.  So the first part of your summary of this again had greater detail than I am aware of.  But fast forward to the end of it, I believe -- and again, I'll double-check, I believe that case you're referencing has been provided to you.

Okay.  Just so you're aware.  All right.

And then -- so in reference to -- so, yes, one of the things -- again, I'm doing this all from recollection and I don't have anything to refer to here.  I believe one of the things in my correspondence with Chief Rojas was if there is any development on this case you're referencing, the current case, we would like to know because as you're aware, we're pending the transfer of two captains to PSB to be approved to ensure that hopefully there's little disruption as possible to

31

the backlog and the reduction of the backlog.  That's obviously a primary concern of the office to --

Q.    I apologize to interrupt --

A.    Yeah.

Q.    -- but before I lose my thought, if there's any development in this case meaning from the Monitoring Team?

A.    No.  From the current case.

Q.    The current case?

A.    The current case, yeah.

Q.    You said if there's any development, you would want to know about it?

A.    He would want to know about it, Chief Rojas.

Q.    Chief Rojas would want to --

      (Cross-talking.)

A.    The case that's still coming to the end of its cycle but it's still technically open.

Q.    So he approached you and said if there's any development in this case, he would like to know about it?

A.    Yes.  And I believe he did so by email and in person.

Q.    Okay.

A.    And so Chief Gentry had told me that that case was coming towards the end.  And, again, I don't have all the specifics but it looks like there's a possibility or probability that the change -- that the sustained finding may be changed.

      So I updated Chief Rojas to that.  I'm trying to get

46REPORT001109

the Monitoring Team as realtime information as possible and being as transparent as possible.

Q.   That's understood and very much appreciated, absolutely.

How -- what was the means by which you became aware that Chief Gentry has represented that the finding in the current open case may be changed?

A.   So again, I'm doing this from recollection.  I don't have anything to refer to.  I believe Chief Rojas, in my correspondence with him, said he wanted an update whenever one became available on that case.  And I relayed that information to Chief Gentry at some point; he became aware of it.  And so he then -- I believe it was the first day of the site visit. Again, this is just from recollection, he told me if Chief Rojas asks or if you want to update him, this is the status. It looks like it may be overturned.

And so I relayed that to Chief Rojas

Q.   Did Chief Gentry represent why it would be overturned in light of PSB's not amending the original sustained finding?

A.   I don't have granular knowledge of that but just generally that -- again, a general response from me in reference to that because I don't have the specific knowledge but he said something to the effect of it appears that there's insufficient evidence to conclude that something did occur and that someone was aware.  But, again, I don't have all of the specifics on that.

Q.   So is your interpretation of that that essentially the Chief Deputy is in disagreement with the PSB investigation?  If they have done their investigation, they have now twice recommended sustained.  He is saying, hey, it appears that there is not facts to support the sustained finding.  So if I take the liberty to interpret that, the Chief Deputy does not agree with the conclusions arrived at by PSB.

A.   I don't want to speak for him.  I'm not saying that doesn't sound reasonable.

Q.   I'm just asking for your interpretation.

A.   I mean, I understand that would be a logical assertion but again, I don't want to speak for him.

Q.   Chief Rojas represented to Major Peters and I that you also represented to him on the 15th that it was not only the current open case involving Captain Morrison but that previous sustained cases where Captain Morrison was a principal, those findings may also be reversed.

A.   So you guys are in receipt of a three-page memo that I authored requesting approval for Captain Morrison to be transferred to Bio, and I outline in there my thought process on that.  And Chief Gentry reviewed that memorandum and he indicated to me that he had considered reviewing the cases to determine if, based upon information in the letters and his understanding of it, if the finding should be reconsidered.

Q.   The information in the letters being the letter you wrote,

34

the three-page.

A.    That and I again don't want to speculate or speak for him. I don't know if he had other knowledge of them other than he did review the letter that I wrote.

Q.    Did he review it --

A.    Or the memorandum.

Q.    -- before submission to the Monitoring Team or after the submission?

A.    I believe before, I believe.

Q.    Before?

A.    I believe.

Q.    Did he articulate in any way grounds or reason for having those considerations other than the matter of the memo?

A.    I mean, I can speak for myself, not for him. I have serious concerns about the manner in which those investigations were conducted, the fundamental fairness or lack thereof, the presence or conspicuous absence of critical facts and omission of certainly critical facts and the overreach and the extremity of the discipline. Yeah, so I personally have concerns about it.

Q.    You've read the cases?

A.    I've reviewed the case. I haven't reviewed everything in the case file. I've just done a general review of the case.

Q.    So my impression what I'm left with is Chief Gentry is giving consideration to changing the sustained finding on at

46REPORT001112

35

least three cases involving Captain Morrison to a different finding?

A.   So it's never been encapsulated like that in a conversation.

Q.   But that's sum total.

A.   Right.  Of multiple -- yes.

Q.   Okay.

A.   Consideration.  I don't know that he's made any determination.

Q.   Correct.

MR. PETERS:  I'm sorry.  Am I interrupting your chain?

MR. ANDERS:  Go ahead.

MR. PETERS:  Chief, what would prompt you, especially in your current position, to have gone through the case file with such detail that would provide you with the impression that there was an overreach on the case and all of the issues you just mentioned and prompt you to create a memo to formulate the basis of possibly overturning that?

THE WITNESS:  Well, and I didn't -- I didn't make a recommendation in memorandum that it should be overturned but I said I had -- and I do have concerns.

MR. PETERS:  Again, but why -- I mean, what would prompt you to delve into that investigation to that degree to raise those concerns?

46REPORT001113

THE WITNESS:  Because he had two sustained findings and one open case and he received major discipline on those and you're going to be reviewing those for consideration of him coming down to Bio.  That has to be preapproved per Paragraph 268 by the Monitoring Team.  And I wanted to ensure if I was going to do that, whether or not I felt he qualified based upon those previous investigations and the sustained finding from years prior and then if I felt comfortable that he still would qualify, that I would be able to represent and articulate that to you.

So when -- it is my understanding that's one of the first ones I recall writing.  But if I'm going to make that request, I, number one, have to be confident in it and then, secondly, I have to be able to present the justification to the Monitoring Team for consideration so I reviewed just the written report.

MR. PETERS:  So would it be fair to represent you disagree -- maybe not Jeff Gentry but you disagreed with the PSB investigation and the review process and the completion of the case?

THE WITNESS:  On those two sustained cases?

MR. PETERS:  Yes.

THE WITNESS:  That I reviewed?  I have serious concerns.  Yes.  I mean, if you want to -- if you want to give me access to my memo, I can cite more specifics.

46REPORT001114

37

BY MR. ANDERS:

Q.   Let me ask you this.  Have you conveyed those thoughts to Chief Gentry that you have concerns about the sustained findings?

A.   He read my memorandum.

Q.   Okay.  Have you engaged in conversations with him and discussed this or is it just only communication regarding your feelings is what's in this memo?

A.   I think we probably have discussed it in person but not in like granular detail.

Q.   Okay.  Regarding the consideration being given to essentially reverse the sustained finding involving Captain Morrison, are you aware of any conversations, any documentation, any consideration, any thinking by any commander, executive personnel in the office to do the same with any other current or former employee?  When I say doing the same, reversing sustained findings or walking back and reversing discipline?

A.   Not to my knowledge.  And the reason, obviously, I am aware of these is because of the transfer request and those three investigations come up when we're doing the background necessary to provide you guys the documentation.

Q.   So you're not aware of any other thoughts about, you know, there was this case with John Doe, hey, kind of similar to Captain Morrison, that we should really take a look at that

because like our thoughts about the Morrison case, we don't think it has the legs to actually support a sustained finding?

A.   I am not aware of anything at present, no.

Q.   Okay.

MR. PETERS:  Aside from those cases, is it fair to say that Morrison was your selection for the transfer?

THE WITNESS:  I recommended him, yes.  There's very few people that have the background, the intellect, intelligence, willingness to come to a position like that.  And I believe it would be most advantageous for the continued progress with the orders.  And also -- you know, obviously we can read my into the record if you would like, but those things had transpired and I'm not trying to minimize or mitigate any conduct, but years prior.  And so part of the thing here is are we going to continue to punish and, in essence, someone who wants to go somewhere years after if it doesn't have any impact on their ability to do the job?  And I think that we need to consider a multitude of factors that I outlined in my memo when we're making these decisions.

BY MR. ANDERS:

Q.   As part of the consideration to reverse Captain Morrison's findings and impose discipline, is part of that consideration based upon the fact that it may put at risk his transfer and that if those findings and/or discipline are reversed, that then that may eliminate obstacles to approval to him being

transferred?

A.   No.  Not from my understanding.  And I wouldn't be the decision-maker and I haven't suggested they be overturned.  And I wouldn't be the one to overturn them.  But I again, I believe -- I haven't reviewed all of these other cases that may or may -- I may or may not have my personal opinions on how the appropriateness of the findings and the critical facts and whatnot.  But these are the cases that I reviewed and I do feel they were inappropriately handled.

Q.   Besides Chief Gentry, have you had any conversation with any other Chief officer or Sheriff regarding reverse -- considering the reversal of the sustained findings and/or discipline?

A.   Not that I recall.  Possibly Chief Palopoli but, again, I don't -- I don't recall specifically.  I mean, I think she may be aware of it.  I mean I engage her in regular conversation, so I can't recall if I've discussed it with her or not.

Q.   Okay.

MR. ANDERS:  Major, do you have anything?

MR. PETERS:  Not at the moment.

MR. ANDERS:  Okay.

Chief, anything that we should have asked you that we did not ask you?

THE WITNESS:  Nothing I'm aware of.

\\\

46REPORT001117

40

MR. ANDERS:  Okay.  I do want to take the liberty just to direct you to not talk about anything we have discussed here today, the nature of the questions, the focus of the questions, the answers to the questions, with any other individual other than your counsel.

THE WITNESS:  Okay.

MR. ANDERS:  Great.  Thank you.

Thank you both very much for being here.

MR. PETERS:  Thank you very much and with that we'll go off the record at 3:41.

(Proceedings concluded at 3:41 p.m.)

46REPORT001118

41

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 13th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

46REPORT001119

Reporter's Transcript of Recorded Interview

In the Matter of:

Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with GREG LUGO

April 18, 2025

_____

Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001120

### TRANSCRIPT OF INTERVIEW WITH GREG LUGO

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001121

P R O C E E D I N G S

MS. KIYLER:  All right.  Mine shows recording.  All right.  We are here today in the law office of Yen, Pilch, Robaina and Kresin; correct?  And with attorney Phil Fleming who is your attorney, Captain Lugo; is that correct?

THE WITNESS:  That is correct.

MS. KIYLER:  Could each of you just identify yourselves, your rank or --

You first.

THE WITNESS:  Certainly.  Greg Lugo, Captain at the Maricopa County Sheriff's Office.

MR. FLEMING:  Phil Fleming, and I'm an attorney with Yen, Pilch, Robaina & Kresin.

MS. KIYLER:  And I'm Sherry Kiyler.  I'm a member of the Maricopa Monitoring Team appointed by Federal Judge Ed Snow back in 2014 I believe.  And beginning in 2015 I basically became the face of our team and the primary contact person for the Professional Standards Bureau.

I was counting earlier and I know you were my fourth commander in PSB or maybe fifth but I have been the primary contact with PSB for a number of years.

As a result of that, Captain, you and I have had many, many discussions over the past number of years that you've been in PSB about PSB practices, about PSB policies, about Internal Affairs cases.  We've had some spirited

4

discussions in some cases in terms of what I believe it looks like and what you believe it looks like and I consider them all to have been professional in nature and we have not always agreed.  But I think that would be normal.

EXAMINATION

BY MS. KIYLER:

Q.  So before we get into the specifics of what I wanted to talk to you about, could you just kind of lay out your history in MCSO in terms of where you hired on and where you've been assigned, those kinds of things.

A.  Okay.  I'll try to hit everything but I believe it was 2001 is when I was hired, attended the academy, started in April I believe of 2001, graduated in August of 2001.

Q.  Summertime.

A.  So from that point, I started as a Deputy Sheriff.  I worked in various areas, court -- worked in, like, court security initially out of the academy and then actually went out to my field training in my District 1 patrol area, worked there for -- I would have to go back and look at my résumé.  I didn't bring a copy of how long exactly.  But worked there in a patrol capacity in District 1, became a field training officer, and then was selected and transferred to our General Investigations Division as a detective.  So there I worked primarily jail crimes, investigations.  I also assisted -- we assisted the Homicide Unit and the other units there in the

46REPORT001123

organization.  I promoted to sergeant in there in detectives and they remained -- kept me in the General Crimes area.

I also did fire investigations, supervised them and our Special Victims Unit as a sergeant.

I was moved into the Special Victims Unit on the heels of a major political firestorm, sex crimes cases that were not appropriately handled.  And, in essence, we did an audit of the entire Sex Crimes Division and reworked -- I believe it was 513 cases that we had to review and we ended up reopening somewhere just over 400.

But I spearheaded that process, was then subsequently transferred a couple different places as a sergeant to an Organizational Development Bureau that was created by Chief Hendershott at the time, which a newly created division, spent I think a little bit less than a year there and then went to our Enforcement Support Division for about a month where I was then transferred out to patrol again as a patrol sergeant in District 1.

So I worked in Patrol Division in District 1 and got a phone call one day that I was being transferred back to -- at the time it was called General Investigations Division, back to assist with some more flare-ups with the sex crimes and some other matters there in the General Crimes Division.

I was promoted at that point to a lieutenant position and assumed command of various entities there in the General

46REPORT001124

Crimes.  It was called General Investigations.  But it's now called Major Crimes and General Crimes.

So all of the higher profile types cases, homicides, Jail Crimes Unit, sex crimes, that's what I was handling, vehicular crimes.

At that point out of the blue, and I know it was the day before Thanksgiving on one year I got a phone call that I was being immediately transferred on a Wednesday to our Early Intervention Unit there out of the Bio Division so I was transferred there and assumed that initial role starting up the whole early intervention squad working with the requirements of the Court's order and that, worked there -- I would have to look at how many years it was but was promoted to Captain while I was in that role, took over the Bio Division as the Captain I believe it was somewhere around three months or so.

And I was then advised I was being transferred to our District 6 as the Patrol Division Commander of District 6 which was a contract law enforcement with the Town of Queen Creek.

And then I served there for -- I would have to check how many years but it was a few years when I was approached by -- and advised by -- I was asked to have a meeting with the chief -- I think he was chief deputy at the time but Skinner and Chief Molina at the time and they came and visited me.  I believe Skinner ended up having to cancel.  I don't recall if he canceled or not, if he was there, but I was advised that

46REPORT001125

Sheriff Penzone's request that he wanted me to go to the Professional Standards Bureau.

Q.    Do you remember what year that was?

A.    I believe that was the beginning of 2021.  I believe it was the end of January, beginning of February.  We were actually -- I was actually helping the Town of Queen Creek.  They were converting to their own police department.

Q.    Yep.

A.    And I was actually helping them hire and start to set that process up, which had about a year left when I left there before they did a full conversion.  So I believe they took over -- it was late 2021, might have been early 2022 when the Sheriff's Office left the Town of Queen Creek.

Q.    Is it fair to say since that time, you've been -- I have been your primary contact on the Monitoring Team?

A.    Absolutely, yes.

Q.    And I'll say once again here for the record, my intent here today is to gain a better understanding and to memorialize some of the events that have impacted you, your division, and the MCSO over the past number of months.  I am not here in any way to investigate or to question you about whatever allegations have been opened against you, okay?

      So I would like to go back if we could, Captain, to when you had your first interaction with Sheriff Sheridan before he took office back I think in December when you were

8

asked to meet with him.  Can you kind of just summarize what the content of that meeting was and what your thoughts were when you left that meeting?

A.    Yes.  And I just wanted to -- I tried to compile some notes that I had copies of and things that I had.  I know there are other additional notes and references that I don't have access to at the time, so I'm going off of the notes that I do have, my memory at this point, so I just wanted to clarify that, because I am limited on some of --

Q.    And I'm going to try not to go around what date or time or whatever.

A.    I was able to nail down some of the dates pretty soon so -- so I guess to start, it was -- of course we saw the results of the election and there were rumors swirling of what -- you know with Sheriff Sheridan coming in, what was going to happen to various entities within the organization, specifically with the Professional Standards Bureau.

And so it was -- I don't know exactly what date but I was contacted by an email I believe from Sheriff Skinner who was in place at the time that said that the incoming Sheriff would like to set up a meeting with PSB, with CID and I believe there was a third -- I don't recall which one it was on the email string.  And so they had some dates and he asked basically try to schedule something.

And I forget if it was to respond to Sheriff Skinner

46REPORT001127

or one of the admins or what. But I ended up scheduling the PSB portion, which I am pretty certain occurred then on December 6 of 2024. I don't recall what time. I would have to look at my calendar. But I went ahead and prepared about a -- I would say maybe a dozen to 20 slide PowerPoint slide presentation which is also saved on my computer that I don't have.

But, basically, I looked at it and the only instructions I was given was it was pretty much like a situational briefing. And so I had Googled what a situational briefing would be and tried to think okay, what would I want to know coming in, put together some information, just general where we are, how we got to where we are since I have been in PSB, the issuance of the Court's orders, the third, fourth order, the backlog issues and all of that.

I go to the headquarters building. That's where the meeting was held and it was scheduled in one of the third floor conference rooms. And I remember, well, because I set up my computer and then Chief Molina I believe texted me and said they are in her office on the fifth floor. So I went up to the fifth floor and I didn't know if anybody else was going to be there aside from the Sheriff, meaning Sheriff Sheridan, because I did hear prior from my boss, Chief Caputo, that he was told to stay away and not be in the meeting.

So I walk in and there's Chief Molina is there.

46REPORT001128

She's the Chief Deputy at the time, myself, Jerry Sheridan and Jeff Gentry.

Q.   Do you know why Caputo was asked not to attend?

A.   No, I don't.  I believe he said something to the effect of he's going to be leaving and he didn't want to -- he wasn't -- he was told to sort of not be involved in these meetings and discussions.

Q.   Okay.

A.   So I go into the meeting originally in the very beginning -- I know who Jerry Sheridan is.  I was working here when he worked here before, so we are not complete strangers and I know who Jeff Gentry is.  I did have some very limited interactions with him when he worked for the organization years and years before.

Q.   What were those interactions?  I mean, same rank, different ranks, same bureau?

A.   Well, Jerry Sheridan, I remember my last meeting with Jerry Sheridan, that the last time I actually had a discussion with him, I remember two things that come to mind.  One is I was called there on the heels of the sex crimes matter and it was him and I believe it was Chief Trombi and I was called in to Jerry Sheridan's office and they were telling me I needed to go do an interview with the Arizona Republic.  I -- actually I think I did two interviews about the sex crimes audit, what we found, results of all of that because it was going around.

46REPORT001129

There was occasionally prior to that time some briefings on some higher profile sex crimes cases but my most memorable sort of last real interaction was there.  And I don't remember if it was before or after but I think afterwards at one of my promotion ceremonies when I was promoted to Lieutenant Jerry Sheridan was still with the organization and he came over, because he worked with my father-in-law, and he made a statement about my father-in-law, who is a former MCSO sergeant and made a statement during the public -- this saying how good of a person my father-in-law was and Sheridan came over and shook hands or something of that nature at that ceremony.

Q.   Had you had any interaction with Chief Deputy Gentry back in those days?

A.   No.   The interactions were more along the lines of -- the last sort of notable interaction I remember having with him was I was attacked by an individual on my street when I was jogging when I lived in Mesa and it caused some -- I have some scarring in my arm and this and I believed it was associated -- he was a gang member that recognized me is what we put together, probably from investigating things in the jail, and he attacked me with a belt and he had a knife and he almost stabbed me. But he was actually -- he was living down the street with his father and he just got out of prison.

Why I bring this up is because Gentry was tasked --

12

my boss had Gentry and his team come out to my house and they set up cameras at my house because we were afraid of threats from this gentleman down the street, that he was going to go after me.

Q.   Where was Gentry assigned then?

A.   I believe they called it like the Threat Squad or Special Investigations.  So that's sort of like my last memorable interaction with him when we worked previously other than maybe seeing him at, you know, commander's meeting or something of that nature after that because he did eventually promote to lieutenant and I might have been in a patrol meeting or something.

Q.   All right.  Let's go back to the meeting with Sheridan. Are there any high points of that meeting?  Anything you walked away believing or thinking?

A.   Well, I didn't know what to expect.  I firmly felt going into that that based on rumor, that I was going to be reassigned out of the Professional Standards Bureau and they were going to make some changes which, you know, I was okay with if that was their decision.

But out of the gate, the thing that I recall is Jerry Sheridan started out and just said okay, I wanted you to know, we need you to get us through this."  So I don't -- I have some notes on some of the exact quotes but it was, you know, we need you.  Basically what I got from that was -- he said we're

basically putting confidence in you to get us through, meaning the organization, through this and hope -- basically address this backlog and get rid of the federal oversight.

Q.   And I think you told me at one point that you left there believing that you were going to get support?

A.   Yes.  So he indicated at the end of that -- I mean we talked about various things.  Obviously I went through just some overview.  He did have a copy of either the third or fourth order.  He flipped through because he asked at one point how the fines worked and things of that nature.  I tried to explain to him as quickly and efficiently as I could.  He flipped through it.  We talked about just some -- you know, the common sort of challenges that I foresee, the challenges that PSB specifically support outside of PSB and that was everywhere of not only conduct of people being interviewed and just misinformation about what's going on in the PSB.  And I cautioned him to please make sure before he jumps to conclusions and anything that he's heard that I would be more than happy to provide him the information, the facts, before that.

So I mean there was all sorts of discussion but I sort of walked out of there feeling like he basically said nope, keep doing what you're doing.  We're going to get this through.  And at the end what was memorable to me was he asked if I had any questions and I said, "Well, what is success for

the PSB look like to him?"

And his statement was, "The backlog be gone by the end of the year."

Q.   And you said?

A.   And I -- well, I said, "I don't know that that's going to happen."  And he meant 2025 because he didn't like the August 2026 projected dated that I had.  If we met the minimum requirements of the order, that's where it would get from where we were.

So I left -- Chief Molina was there as well.  I mean, we talked about a variety of different things, some common complaints, what are complaints, what aren't complaints, things of that nature; and I left the room and Chief Gentry and Chief Molina and Sheridan stayed there.

Q.   At some point you had a meeting with Chief Seebert and I believe that was before he came to MCSO.  He came over to PSB with someone else.  Can you tell me a little about that meeting and how that happened?

A.   Yes.  So this meeting was on the sixth of December, the next day, which was Saturday.  I got a text message.  I forget if it came from Chief Molina or Sheriff Skinner or somebody else that said Sheridan asked for my phone number and so expect a call from him and they provided it.  And so the next day, which is a Saturday, Jerry Sheridan calls me.  And I remember exactly where I was.  I was driving to the gym and I have the

46REPORT001133

time down here.  It's in my call history.

And he basically just says he wants to thank me for the information that I provided him the day before and that he said, "Don't be afraid to call the Sheriff if there's a problem.  People would be afraid.  I wanted you to know you can at all.  This is my number," and he said he wanted me to meet with Rollie Seebert, who he advised me at that point was taking over as the Executive Chief of Detention.

I also brought up in that conversation, I said, "Well, if he," meaning Jerry Sheridan or Gentry, "had any other ideas or wanted me to make any adjustments or anything of that nature, to let me know.  If he wants to go a different direction with regard to PSB, that's certainly I understand that that is the case that what he wants."

And I remember him saying, "No, no."  He basically interrupted me and said, "No.  No.  No.  You just keep doing what you're doing and we're just going to leave it basically up to you."

Q.   Okay.

A.   So he said he was going to give my number to Seebert.

We go back and forth then I do get a missed call from -- I don't recognize the number on the seventh of December which is that same day, Saturday.  I don't answer.  No voicemail.  The same number calls me on Monday morning at 7:32 and I don't answer, the voicemail is left and it's Rollie

46REPORT001134

Seebert. And I return his call about 30 minutes later and we basically set up a time to meet at PSB on December 11.

I did caution him, I didn't know if he wanted to really meet at PSB given he wasn't officially announced and I was concerned of rumors and everything else of who he could run into. And Chief Seebert's statement was, "I don't give a fuck." I remember the quote well.

And I said okay and I told him I would text him the information, the location and that, because I offered to go wherever he wanted to meet. We set up a time for Wednesday, December 11, at 9:30.

I text him later that day with the address and don't get a response and the parking information the next day I text him again and just to confirm the message was received and he does respond back, says, "Got it. See you there." And I have those text messages saved on my phone.

So December 11 comes around and it's about 9:30 is the time that we scheduled at PSB offices and I was going to the restroom before the meeting and out of the elevator comes George Hawthorne and I know George Hawthorne. I know who he is. And there was rumor he was potentially coming back to the organization. And he says he was there for a meeting with me and Seebert.

So I take him to the conference room and then Seebert shows up a few minutes later and I meet with both of them,

46REPORT001135

myself and the two of them.  I went through the same PowerPoint presentation -- I updated the date.  I don't know if I -- I don't think I updated anything else but I printed a copy both for each of them.  We went through that.

That interaction became what I perceive more of an interrogation towards me about PSB operations from both Seebert and Hawthorne, more so from Hawthorne in my opinion but asking, "Did we try this?  Did somebody go tell the Judge?  These cases, all of these in the jail have nothing to do with the Court's order," things of that nature.

Seebert did ask me if we reinvestigate cases that were already closed and I asked him -- I told him no.  And he said he heard from some either association or union that he's hearing that we reinvestigate the same complaints on police that were already closed.

Q.   Let me get a little clarity on that.  So -- an already closed investigation would be one that's gone through the whole process and discipline has been given or whatever.  Do you have the authority to reinvestigate those?

A.   We don't.  So I don't know that we have -- I would argue that just without verifying but I believe that's going to fall into the Bill of Rights is going to say that, you know, you can't really reinvestigate those matters.

Q.   Whether or not they are sustained?

A.   Correct.  Yeah.

46REPORT001136

18

And so I told him that's not our practice and we got into a discussion and he -- he indicated something to the effect of if the complaint is closed but then somebody complains about the same thing, you reinvestigate it and I said, "No.  We don't do that."

I did give him one example of an instance that I recall we had, and I don't know if that's what he was referring to, but that instance was in the jail where it was an anonymous complaint and it basically became not sustained because the video footage was gone.  It was an internal matter, and basically yet he said -- he said/she said had occurred.  So we had -- basically we were at a not sustained.

Well, that got closed and published on the website and then the anonymous person submitted a copy -- they actually filmed a copy of the video footage of it occurring and had it and submitted that, and so we opened a case into the fact that those employees -- the employee lied about it occurring, you know, to the PSB investigators because they were adamant that it didn't occur and we had video footage of it occurring.

So that wasn't the same allegation and I gave him that example and he didn't really tell me if that's what he was referring to or not but I said, "So we've had like a situation of that nature but we don't reinvestigate the same complaints."

Q.   Okay.  Was there some discussion about the demeanor of employees brought into PSB and the demeanor of your employees

46REPORT001137

and if there was, can you elaborate on that?

A.    Yes.  So I brought up with what are the challenges and the support outside of PSB?  That's on one of my slides, just the challenges, and I brought up some of the issues that I know we've discussed at Monitor site visit meetings about conduct of individuals.

Q.    And we did during the site visit as well.

A.    I know historically, at least the last couple of site visits, that has become an issue and it is becoming an increasing challenge.  And there was a discussion with Hawthorne about that.  He really indicated that he felt that our investigators -- because I think -- if I remember right I said something to the effect of, "Well, sometimes like we have to give a little bit of flexibility in an official interview for both the interviewee and the interviewer," is certainly my position and perspective.  Because it's an official interview, people are going to get a little -- maybe a little bit more emotional and things of that nature and I gave some examples.  And he was adamant that our PSB investigators, there's no reason for them to curse or use curse words in the interview because I brought up, well, there might be a time where the investigator has to sort of raise their voice and become a little bit confrontational with an employee who is, you know, becoming that.

And Hawthorne basically had a very hard time

46REPORT001138

understanding that and said that he didn't see a reason and PSB, basically, should just be professional at all times and the interviewee or the people in the interview, you know, are expected to be upset and act professional per se and that should be fine.

So we talked a little bit about that and I expressed the concerns of that that we've seen and I believe I gave one or two examples of people interrupting interviews. I don't know if I gave any names at that point to Hawthorne.

Q. At one point -- well, after Sheridan takes office in January, I think in our conversations in earlier January there wasn't a lot of contact from his office in terms of direction or it was kind of you're doing your thing and they are doing their thing.

But at one point you were asked by Chief Pape to come downtown about an anonymous complaint that had been left on the Sheriff's desk and there was some discussion about who was going to investigate it. Can you tell me about that?

A. Yes. So that was Chief Gentry and so I have -- well, I had -- basically, the month of January I felt certain that I was on an island completely with no communication. I assumed that the person I was reporting to was Jeff Gentry if I needed anything. I didn't have his direct phone number or I had the Sheriff's phone number and so I didn't really need anything at that point. But I did -- the next interaction I had with

46REPORT001139

Gentry was in January after a Captains' meeting at the end of January and there was a brief discussion. That's not yet to where you're at.

Q.    Okay.

A.    But I can then skip over that interaction.

Q.    Is there something of note in that interaction?

A.    Well, of note in that interaction, it was after the Captains' meeting and I think it was either the third or fourth Monday of January.

Q.    In January.

A.    And what's notable in that is the Sheriff made mention -- it's all the captains and made mention of if there's something -- if there's bad news or there's something -- there's a problem, he needs somebody to tell him. And I think he gave his crystal ball analogy that gives -- I believe he gave it there that, you know, he's not afraid of any bad news and somebody needs to tell him what's going on. So that was notable to me because that came into play later.

But at the end of that meeting there was regular business. I did actually give a short update about PSB status -- it was sort of when they went around the room -- of backlog and things of that nature. Gentry said he needed to speak with me and Dave Letourneau after the meeting, so before he dismisses everybody. And he goes, "And it's not about the same. They are two separate matters, not related."

46REPORT001140

22

So I waited.  He first met with Letourneau and then I sit down with him at one of the tables there in the conference room and Gentry brings up -- he asks about the DUI policy and we had a case that started I believe either the end of December, beginning of January with a detention sergeant who got arrested for DUI and we placed him on administrative leave.  And the investigation was pretty much almost completed.  And that is the case that I know Gentry was referring to saying that, well, he doesn't like the fact that an off-duty DUI results in termination.  He went on to speak about several other things about that and how the Sheriff doesn't like that policy, why did it change?  When did it change?  If they are going to -- he's to work to change the policy and if they change the policy, does that prevent this individual from being terminated.

And I told him it wouldn't because it occurred already and that was the policy in place at the time.  I gave him a little bit of what I knew of when that time frame changed, which I know was under Sheriff Penzone, meaning the discipline, making it.  And Gentry spoke about the Rob Shetler incident, who was a detective I believe that worked with Gentry, and said that, you know, Rob Shetler got a DUI and, you know, he's a great guy.  This was years and years ago.  I don't know if that resulted in the termination of him or not, but he made one mistake and they shouldn't lose their job for making

46REPORT001141

one mistake. And so he was going to work with Policy to change it and he said the Sheriff didn't like it either.

So that became noteworthy to me because I did express to him, he said, well -- he asked what my opinion was of that policy and I said I don't really care to have an opinion at the end of the day, but we just -- I need to apply the policy in the matrix in a uniform manner to the facts. I said, "So you want to do that, you've got to change it." And I didn't think that the Monitor Team and the parties would be supportive of that; but if that's what he wanted to go ahead and do, that certainly is -- certainly is his choice.

Q.    And as I remember that, that was a policy change that was initiated by Sheriff Penzone?

A.    I believe so.

Q.    And one the Monitoring Team approved when we approved a bunch of other things.

A.    Yes. And I think I did also bring up with Gentry. I did years and years ago under the old policy, I actually investigated one of my detectives who got a DUI and I was not in PSB and I did the investigation and he got a suspension but he still works for us to this day. He was not terminated for it.

So I think I might have brought that up but I said this is the policy at the time.

And he asked for my opinion. I explained the matrix

and that and I believe he said something to the effect of, well, this officer is a really good guy or something to that and then he says he shouldn't get in trouble for self-reporting because -- he would have never told us, we would have never known.  And this is where I had a disagreement with Chief Gentry.  I said, "We would have found out."  And he questioned on how we would have found out.  And I said, "We would have eventually found out.  Either the law enforcement agency would have called us."  There's -- you know, I know of all of these other things that are in place.  Somebody would have said something.  We do random -- the Records Division does random, you know, criminal history checks on employees, you know, every so many months, you know.  The Court would have been -- we would have found out at some point.  And I said, "I'm very confident we would have found out at some point if he didn't report it."

So he didn't think the person being honest should lose their job.  So he then made mention of he was trying to get to PSB and he's just been too busy because he said, "That was the first time I got a chance to talk to you.  Can I go to PSB?"

Q.    And this is Gentry?

A.    This is Gentry.  This is in that same.  And I said, "You absolutely can come to PSB," and he asked where we were.  And I gave him the rough layout and said I would gladly -- if he

wanted to let me know, I can schedule a time for him to come over and give him a little tour and that if that's what he wanted.

But he didn't -- I didn't ask but he didn't give me his phone number or anything or give me any direction of what, if anything, I needed to call him about at that point.

So then we get -- the next communication I had with him is in February.  There's an email.

Q.   Can we go back to the January, the civilian -- we had had a discussion that there had been an anonymous complaint left on the Sheriff's desk.

A.   I believe it was February.

Q.   Oh, February.

A.   I would have to check the email.

Q.   That's okay.

A.   And I believe it was the beginning of February when that occurred.  That's the anonymous complaint and this was my next communication with Gentry and there's an email about it.  He emails me and it was -- it was early in the week but it was somewhere closer around 4 o'clock in the afternoon and says he wanted the contact information for the independent investigator and I questioned -- I said -- I responded in an email like okay.  I was like independent or contract?  Like what?  And he said, "Well, he has a complaint that he thinks he needs to refer to them," and there was two or three emails going back

46REPORT001144

and forth.

And I said, "Well, can you send a copy of it to me and so I can see if it's something we already have, if it's already been investigated?"  I'm trying to -- like hold on, wait a minute, like before we go.

And he said he didn't want to make a digital copy. He had a hard copy there at his office and he was at his office.

So I don't recall if he told me to come over there or I said, "Well, I can come over there right now and take a look." It sounded very urgent.  So I don't remember who but I went.  I drove over there.  I said, "I'm leaving right now. I'll be there in," whatever, 15, 30 minutes and I went over to his office on the fifth floor.

Q.   And this is Gentry?

A.   This is Gentry.  Not Pape.  Gentry is there only one there in his office and I walk in and he goes, "Okay.  Well, here it is."  He hands me this hard copy and I'm reading it and so then there's nobody else in his office.  I read through it and it has to do with our CISM division which we had some prior cases, things ranging from our CISM, who is the Critical Incident Stress Management team, that they also run like their private counseling business and they are, like, referring people to it. They might be double-dipping, working that while they are on the clock with us, and it had several names in there.

46REPORT001145

27

It clearly appeared to be probably on the heels of we just finished a couple cases involving some serious allegations of some members of CISM and the possible sexual harassment kind of situation. And so I -- to me it seemed like that's probably the disgruntled person who had the complaint against them sending this and there was one line in there that said Gentry -- I said, "What makes you think this needed to be outsourced?"

And he goes, "Well, there's the reference to PSB."

And I asked him, "What do you mean?" And I read it. There was one sentence and it's in the case where that case is. I recall one sentence that said generally PSB has access to confidential CISM information, which I know is not true.

But I said, "Well, I don't know that that means that it needs to be -- it doesn't name anybody." I said, "I don't know that that means that it needs to be outsourced like conflicted out." I said, "We're dealing with a whole bunch of cases at CISM involving the sexual harassment" -- involving there's a potential lawsuit going on regarding that matter and that was all going on for months prior to them taking it to the office.

He also says that one of the names in there, he goes, "I don't know if you know but that is the daughter of Kelly Grennan who is the now the HR" --

Q. Yeah. I know who Kelly is. Her daughter is what, the

46REPORT001146

28

victim?

A.   No, one of the people that's alleged to be in the misconduct --

Q.   Oh.  Okay?

A.   -- of that CISM.  She works -- doesn't have the same last name and I didn't even know that.  I said okay and I made a mental note so I could tell the investigator.  And he said, "So she doesn't know about this," because I asked, "Who's in charge of CISM?  Did you talk to them about this?"

And he said, "Well, Kelly Grennan and her daughter."

And I said, "Wait a minute.  Her daughter works under her command?"

And he says, "Yes.  We're trying to fix that."

And I said, "Well, I think that's a problem," but --

Q.   Is it only a problem if it's a direct report or anywhere in the chain?

A.   I would have to look at the policy but, I mean, I think that it's -- I just see that as a potential problem.

Q.   Okay.

A.   And so I said, "Well, that's on him and he's aware of it to handle."

And I said, "I think we can handle this," and I took the -- I said, "Well, when did you get this?"  Because I looked at the date and I want to say -- and I would to look at the form, but I think it said January 6.

46REPORT001147

And he said, "Somebody left it on the Sheriff's desk."  And he goes, "I can probably figure out who it was."

And I said, "Don't worry."  I said, "I think I have a pretty good idea who it is."

Q.    So did you end up with that case?

A.    So we have the case and I did -- I don't know who I assigned it to.  It either was Investigator Borko (phonetic), who was handling the other CISM cases, or I might have assigned it to Jensen Hughes.  I don't recall.  I think it's still open as far as I know.

So that was my next interaction with him about that. There's one other noteworthy thing in that discussion -- well, there's two I think noteworthy things that come to mind.  Is at one point Jerry Sheridan walked into the room and he shook my hand and he tried to like give me a hug.  And I remember it because he was eating something and it got on my shoulder because he had something in his mouth he was chewing on and he's, "Oh," like trying to get it off.  So he basically said, and I know this is -- I believe this is February because I think this is the week after the site visit that we had I think is when this occurred.

Q.    Which was early February?

A.    Yeah, which I think was -- so and he says, "I was meaning to call you and wanted to" -- basically he's saying, "You did a great job at the site visit," and, "We," meaning MCSO, "had

46REPORT001148

fucked up."  And he was referring to the staffing and that was the new investigators, civilian investigators and the admin positions that -- I know we talked about at the site visit in February that we asked to add.

Q.    Right.

A.    And that they didn't create them yet.  They were approved but they weren't created and so he Says, "We are doing that right now.  We are working on that and you need to have your staff for you but," he says, "we," meaning MCSO, "like we dropped the ball."  And I think he used the term, "We fucked up."

Q.    It's interesting because we had that conversation at the site visit and it was -- we left it it's a pending as to what was going on with him.

A.    Yeah.  So I have emails because I know that they did after that site visit and I don't know if it was before or after I discussed this with Sheridan, this meeting.  I think it was Prendiville or one of the other sent me an email and said they created -- it might have been Gertrude Jackson -- I have an email -- that they actually created the positions now and they are here and who are we going to put them under, like in our structure, and I gave him a name of a lieutenant to just put the vacant positions under.  So I know that has since been done.

And then we're, of course, working to hire -- we're

46REPORT001149

in the midst of hiring people for that and have filled a few of them already.

But he brings that up and then he says, "You just tell me what you need and, you know, you did a great job," Referencing I believe the site visit. And so that was sort of noteworthy to me there. And he said, "You have a great boss," and he sort of like motions towards Gentry who is sitting at his desk, which makes me further reaffirms to me that, okay, that's who I'm reporting to because I was never really officially told. So I'm like okay. That to me reinforces that's who -- all right. And he said let him or my boss know if I need anything, and he basically said a few other things and then, "I'll just let you guys to it," and then he left the room.

So Gentry then asked if there was anything else that I needed, I had for him, and I had one other thing that I wanted to bring up with him. And I brought this issue up with him and so what this is is a complaint.

So former Deputy Wisda was contacted as a witness for a case that Investigator Hardina was working on and this was an old -- I believe it was 2017 or '18 case and Wisda was a potential witness.

So what happens here is Wisda sends an email to Hardina because Hardina ends up -- they create these form letters, insider letters, and I of course sign them as the --

46REPORT001150

at the time the PSB commander.  And Hardina, unbeknownst to me, sent it certified.  And so Wisda got this certified letter and shotgunned an email to Hardina saying he doesn't appreciate how he had to go to the post office and wait in line for an hour, blah, blah, blah.  Why didn't you just call his phone number?

Which Wisda doesn't know that Hardina tried all of the phone numbers and didn't get anywhere.  And then he says, "I wanted to make this a formal complaint against Captain Lugo for sending me a certified letter," and it's something to the effect of brings discredit on the office to send a certified letter for a 2017 or '18 case or something like that, that he was a witness.

And so I talked to Hardina, sent that to his lieutenant, which was Hiticus and I -- Hiticus looked into it. Simultaneously I pretty much get this case that Hardina does do an interview with Wisda as a witness and that actually makes a difference in the case.  It actually made it unfounded as opposed to not sustained, because Wisda was the only remaining witness that wasn't interviewed.  And Hiticus actually sent the case back to the investigator to try to reach out to Wisda and said that, yeah, that was Hardina's decision to send certified.

And so my position was that that needs to be -- at least a service complaint to document that because he threw that allegation in there.  And my plan was to give that to Hiticus to write up and then I wanted -- and I told Gentry

this, that I wanted -- I said I would wanted -- he's my boss. I need him to review and sign it, because I didn't wanted to sign it if it referenced me even though I know it's not me but it references me.  So in the past, that is how we've done it. And I wanted somebody else to review it and so I would probably be bringing it to him when it's done just so that he would be good.

And I also expressed this concern because Wisda, I knew from third-hand information, was a very active participant in Jerry Sheridan's campaign for Sheriff.  I believe he was actually the one that was helping him file -- I saw him on finance reports.

So I brought that up to Gentry because we did also have this discussion in this meeting about all of these sort of nonsense complaints coming in and I said, "Well, here's an example.  Wisda, who is" -- I was like, "Here is what he did."

And Gentry does say, "I have Wisda's phone number. Do you wanted me just to call him?"

And I said, "No.  You can do what you want.  I'm just letting you know."

And he's, "Oh, Wisda is just pissed off at PSB."

And I said, "Well, yeah."  And this is the end result, because I knew that we had prior cases, meaning PSB, with Wisda involving.

So I advised Gentry of this at that and I said,

46REPORT001152

34

"Okay.  So that's my plan," and I was also going to discuss it but I still had to discuss it with Chief Anders at the intake stage, but that was my plan and then I would have it assigned. It would be referenced in that other case, you know, of how he had handled it.  And I reviewed that case already and that case does -- Hardina puts in he tried to call the phone numbers, all of this stuff.  He ends up sending a certified letter.

And then I had a service complaint created and reviewed it --

Q.   And you did discuss that with Anders?

A.   M'hum.  And it's assigned.  I have not seen it come back. It was assigned to Hiticus.

Q.   Okay.

A.   There was an email that I sent to Monique to say open this and make this -- you know, that a service complaint.

So that then pretty much left it.  I want to say that was probably the end of that contact then with Gentry in his office and I had -- he physically gave me that complaint and I left.

The next day -- because I went home there from there. It was either the next day or the day after I had IA open it and gave it to our intake staff for the CISM complaint.

Q.   Oh, for the CISM complaint?

A.   Yes.  And that was initiated.

Q.   All right.  Moving a little further along, sometime before

46REPORT001153

Chief Palopoli arrived, you had occasion to be concerned about your timecards?

A.    Yes.

Q.    Could you explain or elaborate on -- I believe the concern was who was signing them and changing them and was that appropriate?

A.    Yes.  So -- and I would have to verify the exact date but it was one of the days that was a holiday and I was working on that holiday and that would have been I believe -- we're talking somewhere in February.  I would have to go back and look to verify.  But what ends up happening, and there's an email about that, is I went on -- I got an email notification and this was a Monday I believe, it was a holiday, that my schedule was changed in the workday.  It's like an automatic email.  I knew that the workday or the timecards were due that week.  So typically Monday or Tuesday I go in and enter mine for the prior two weeks, make any edits and then I review and approve all of my staff.

So I saw this and I thought it was odd.  So I went in to the workday and I was working at the time from home on other matters and I went to go review timecards and I noticed that where all of week one showed for mine already showed green as approved.

And I clicked on -- you have to click on each day and those hours are just the standard eight hours, eight hours,

46REPORT001154

eight hours which I keep my hours and I go and actually enter them what they actually accurately are.  And I noticed, well, why is it approved?  So it was all of one week of the pay period and then I wanted to say it was one or two days and I did like a write-up of it but one or two days of the second week of that pay period.

And I click in and look and it's showing approved and it's showing manually entered, I forget what the term is, approved and then advanced.

So, in essence, the time card does require two -- it's supposed to be the employee reviewing, entering, approving and then the supervisor approving and so there's supposed to be two.  You could actually do it if you're a time keeper.  I can enter it for the employee and approve for them and then I can manually advance it and approve it as the supervisor.

And so that's what I'm seeing occurs and I notice that the person who did that is Benjamin Fisk.  That's the name listed.

Q.   And who is he?

A.   So he is a detention sergeant who is the head of the Detention Association who was recently moved to a position that has become known as the tension liaison I believe was the official title.  I don't recall what it currently is on the fifth floor with the Sheriff.  He is a very strong supporter of Jerry Sheridan and he is a -- has been a very vocal person

46REPORT001155

against PSB for the last several years in so much of at one point of there was an interaction where he was refusing to leave the PSB and was asking if I was going to get arrested for trespassing at one point and him also making statements walking down the hall that, "Wait until the new Sheriff comes in because you guys will all be shotgunned out of here," as he was walking down the hall.

So this is all in 2024 there in or around the time -- I don't know if this was before the election was over or after but in or around that time.

So I know that history with Ben Fisk.  We have some cases involving him.  Ironically enough, I don't think I've ever really -- I've ever really interacted directly with him anytime recent.  I believe I put him actually in for a life-saving award when I was a detective or sergeant in Jail Crimes for a suicide inmate that he helped saved in one of the jails but . . .

Q.   So I notice he's now reviewing that.

A.   So I notice that and I start to look at the week before because I was curious and I see that he did the pay period before as well.  He approved them.  I entered them but he approved the time but these he's entering standard hours, whatever is the -- it's a prepopulated schedule and then which are not accurate for what I worked.  So I went in and basically then made the adjustment and put in the correct hours and then

46REPORT001156

hit the submit on my end.

And when I hit the submit on my end, I believe it still showed at that point -- it tells you who it goes to and it's Jerry Sheridan.

So that's wherever since I started it, was showing from January every time I submit a time card, it says okay.  It has been submitted Jerry Sheridan, he's next up.

Q.   So from a protocol or policy standpoint, why is that a problem?

A.   Why is --

Q.   -- Fisk signing your time sheet a problem?

A.   Well, I see a couple issues.  It's contrary to our policy, ADP policy.  He's entering it.  He did not enter a comment in there, which is required by policy if he enters and approves time without the employee approving it.

He is not in my chain of command.  He is, in essence, a subordinate employee and I was also concerned with the perception that, you know, we try to keep individuals, if they are approving anything that is done by PSB, then we probably have a potential conflict if we get a case.

And so we try to be independent and so if they are approving or we're relying on them to approve it, how can we be neutral if we have to investigate a case involving them.

Q.   Okay.  That takes care of it.  Thank you.

So what did you do about it?

46REPORT001157

A.   So I that day sent an email to Jeff Gentry and I have that email and I said that sort of what I found and that I had some serious concerns with that.  I did not go so far to say I wanted to make a complaint or anything.  I just said, "Here's the situation.  I have some serious concerns regarding this," and I went in and entered the time.  And I figured, well, I would expect then the Chief Deputy to assess.  I didn't want to jump to conclusions.  Maybe Fisk was authorized to do it or told to do it.  I don't know.  That is their wheelhouse, not mine.

And so -- but I expressed that I had some serious concerns about it and I sent an email.

Q.   And what was the outcome?

A.   I want to say he responded to an email that evening and said he had concerns as well and he'll look into it tomorrow or he'll deal with it tomorrow.  You would have to go back to look at the email what he said.

Q.   Is he still approving your time sheet?

A.   No.  So I had went back in and checked after this went down and Jeff Gentry then went in and approved that pay period after I resubmitted it because I told him I resubmitted it with the correct hours.  And so then it showed Gentry approved it. But he never responded, followed up with me.  I don't know what I -- I never saw a complaint come in to PSB regarding the matter and my plan was to give him a few weeks, probably up to

like 30 days and then at that point probably follow up with the Chief Deputy and just see what, if anything, occurred to ensure that that wasn't happening. And I was also then keeping closer track on who was approving that moving forward and I would check.

We move right basically in to the next week or two. My new boss reaches out me and then I believe the next pay period after that I had went back and pulled the records. One of the next pay periods then it's showing my timecards going to her instead.

Q. So let's talk about when she reached out to you. I think there was a meeting scheduled --

A. So --

Q. -- for you and her?

A. Yeah. So we're in February. I would have to look at the email for the exact date I have but I get this email from her that basically says -- and I don't have -- without looking at that email but basically was, hey, we wanted to set up a time for like a meet and greet and I didn't even know who this person was. But I see on the email string, it says, you know, Executive Chief of Compliance and so I assume that that is who my boss is. So I didn't respond and said hey -- we exchange emails on a time, figure out a date and time and I asked if there was anything she wanted prepared and she said no, just to get to know you or something like that.

41

And so we set for her office and I actually contacted Captain Lugo to ask if he knew where the office physically was so I wasn't wandering around the fifth floor. And he sort of gave me the general area of the building because I didn't want to wander around the fifth floor with Ben Fisk and some others up there, so he sort of gave me an idea where it is.

Q.   All right. So you go to this meeting.

A.   I do. I updated the PowerPoint presentation I had and brought that with me and -- meaning updated it. Now we're a couple months in so the stats change slightly and I go to this meeting and I have to look at the email.

Q.   And let me know here if at any point you need a break.

A.   Thank you.

And so she basically -- she's in her office. I go in there and she basically says, hey, yeah, nice to meet you. I've heard some things about you, that kind of thing. And basically makes some statements that seemed very odd to me but I'm aware she's saying, "Well, I'm not concerned about what your work hours are or where you work as long as you get your job done." She didn't really -- I don't know that she asked very much more besides that and said, "Well, what do you have?"

And I said, "Well, I put together" -- I had a printout of it, the same PowerPoint and I said, "Well, I tried to put myself in your shoes. What would you want to know?" And then I went through the whole PowerPoint. I brought my

computer, put it on her desk and went through the PowerPoint with her.  I think we were there for an hour and a half maybe, maybe two hours.

She didn't really have very many questions.  She had a few questions there.  She said this is a whole lot of information.  It's only like her -- I think she said only her second day or eighth day or something like that and she said that I will be reporting directly to her.  I will not be reporting to Matt Summers.  Matt Summers will be over Bio, CID, and Training.  And I remember saying, "Oh, so like Chief Booker's former position, how that worked?"  And she says yes.

And then I brought up how she would like to be communicated and notified of things because she goes, "Well, do you have any questions?"

And she brought up this, "Well, do you want my work phone or my personal number?"

And I said, "No, your work phone."  And so she gave me her phone number.  I gave her -- I think I asked her, too, how to pronounce her last name because I was unsure and so we put that information in.  I did not give her my personal number.  I gave her my work cell number.  She gave me both of her numbers and then she asked, "Well, what happens" --

Because I said, "Well, how do you wanted to be notified, email, text, phone when we have like an officer-involved shooting?"  And she was asking how that works.

46REPORT001161

And I explained how sort of the notification process typically has worked for that.  And then I also asked if she wanted to resume the regular PSB meetings which we were doing for the last two sheriffs, which was once a month typically, just on like high-profile and she says she didn't know.  She asked what they were.  And I told her pretty much what we did there and who was usually involved.

And she said she would have to check with the Chief Deputy and she would get back to me and.  So I said okay.  And then I also -- I don't know if I brought up the weekly report that I send her or not, if it was there or if I just started sending it to her in an email.  Those are the weekly incoming cases that I know the report gets sent to you as well.

So she thanked me and said, "If you need anything else," but I remember her when I said, "Anything else?"  And she -- like my laptop is there and she does this on her desk and she goes, "Looks like you have this all under control.  And so just keep doing what you're doing."

And I said, "Okay."

And, "This is a lot easier for me to digest rather than it's your first," and like a stack of papers she said Matt Summers gave her to read and she likes this a little better, this succinct presentation.

So I wanted to say later that day it might have been or a day or two later I get an email from her that they wanted

46REPORT001162

to resume those meetings. And then I have to ask her, "Okay, did you want me to set up the invite?" And she comes back and says that she would have somebody else do it. So I then see that invite come out which oddly now added George Hawthorne to it.

So the invite was then to Sheriff Gentry, Hawthorne, her, and me and I thought that was a little bit odd.

Q.   Because he was at that point the Executive Chief for?

A.   Enforcement.

Q.   Enforcement.

A.   And we never typically had that person in those meetings but I thought that was odd.

Q.   Also during February, Captain, you and I had a discussion about some concerns, some complaints, concerns, about having an attorney in an interview which is specifically prohibited by MCSO policy?

A.   Yes.

Q.   I know from a compliance standpoint, you had some concerns with that. So we discussed them. What brought that to the table for you and I to discuss?

A.   Okay. So this occurred the end of February. I would have to verify the date. It was the week of our first monthly scheduled meeting which is typically the first Wednesday of the month. So I believe that would be March 2 or 3. I would have to look at the calendar. But it was the Monday before there

45

which I don't know if that's the last day of February or not but it started the week before that so it would be the last week of February where I got an email from my boss, Chief Palopoli, and she said that the Chief Deputy -- there's somebody being interviewed and they wanted to bring an attorney.  I have the email.  I forget exactly what it says.

Q.    Just a general sense of what --

A.    Yeah.  They wanted to have an attorney for an interview. I think she said like a Mesa officer and I was sort of not sure, but I was previously apprized by the investigator of this case and the investigator said this is a case that has -- involves a principal -- former employee is the principal.  So he was deputy when this occurred and he now works for I believe Gilbert, not Mesa, but he's now a Gilbert police officer.

But the investigator cc'd me on an email where they were scheduling the meeting, and then an attorney -- and I forget who it is, sent the email or maybe it was the individual being interviewed.  It was Corey Roberts is the person and it was the officer, former deputy, and that they wanted to bring their counsel to the interview.

And I know that the investigator who was Nate Tomaszewski is the PSB investigator.  I know we briefly talked about it and we're like, "Well, that's contrary.  We can't allow that."  If they want to take breaks, this is not compelled, doesn't have to be here, like that is contrary to

46REPORT001164

what we have.  So I would take the position that we're not going to allow that.  They could wait in the lobby.  They could do this.

And I think he brings up it's Kathleen Bailey is who he brings up, knowing that it's that law firm.  And I'm aware of who Kathleen Bailey is and the fact that she has been at PSB for interviews before and has waited in the lobby and things of that nature.

So certainly aware of that.  So I get copied on an email that Nate Tomaszewski, our investigator, he copied me on, sent to I think Corey Roberts or the counsel or whoever just saying they are not going to be allowed in the interview and that.  And I had then a subsequent discussion with our investigator because I didn't like the way the email was worded.  I thought it could come across a little like he didn't give the other options like, you know, hey, you're not compelled -- like it didn't really explain it very well.  And I said, "Hey, just be prepared.  Maybe you need to explain this a little bit better," so we had just a brief discussion.

So that occurs and I would have to go back and find the email.  But then either the next day or shortly thereafter I get the email from my boss that says they understand that this person is being interviewed and they wanted to allow an attorney there.

And so the Chief Deputy or something said to have an

attorney.  I replied to the email that I had concerns and the way I'm understanding the request, it would be contrary to our policy and practice.  And I think I put in the email, you know, is there time to discuss this kind of thing?

Her response, and I have that email string, was, "Oh, I think we have misunderstood what the request was," which to me was sounding like I think they thought that this was -- this was -- it wasn't the principal and it was some other -- like some other request or something, I don't know.  It was a witness or something.  I don't know.  And so at one point, and now I'm trying to think -- I don't think I have this written down here.  I would have to verify.

I had a discussion in person with my boss about this and said -- I believe it was in her office.  I've got to find the date.  This is before the interview occurs and I said, "Hey, following up," you know, I was concerned.  And it might have been on the phone.  I would have to verify.  And I said, "We don't allow that.  Here's the problems, here's all my concerns with it," and we don't -- you know.  So that's contrary to that.  I don't know.  Are we sure that we wanted to allow that?

And she says, "Well, no.  Make sure he knows it's not compelled.  He doesn't have to participate."  And I even mentioned he could do it over the phone and like technically he could have his attorney there and we would never know and it

wouldn't really make a difference, but he could do it on the phone.  He doesn't have to interview and if the attorney comes, we're going to explain we can't do the interview if the attorney is in the room.  They can wait.  They can take breaks kind of thing.

And she says, "Nope.  That sounds good.  That's a good plan.  I support that."

So the day of the interview comes, which is actually that Monday before the first meeting, and I am about pulling into the office.  This is right around 9 o'clock in the morning and my phone call rings from the investigator.  And I think actually I was still driving up Central, Third Street.  And he says, "Whup, she is here and she's making a big stink and it's Kathleen Bailey and saying that the Sheriff approved this.  And so what do you do want us to do?"

And I said, "Well, where are they?"

And he said, "They are in the room right now reviewing the material," meaning the attorney and Corey Roberts.

And I had said, "Okay."  I was like, "I'm getting in the parking lot.  Let me come up there and find out."  And I'm trying to think of how we're going to best approach this.

Before I get out of my car, a few minutes later, my boss calls me on the phone, on the cell phone, and she says, "I hear that there's a -- I hear she's down there and the

49

investigators are not letting her in the interview."

And I explained, "Yep, this is what we previously talked about."

And she says, "Well, we're just going to let her be in the interview."

And I said, "Okay," and I started to list off the concerns and she says, "I am not going to push back on this." And I believe she also said, "The Sheriff approved this," or she said she didn't know that the Sheriff approved it, something to that effect when we were previously talking.

So I said, "Okay.  Well, I don't know if they are still here."  I said, "Let me go inside and find out, you know, what we're going to do."

And she said, "So we're going to do it."

And I just said, "Okay."  And I said, "Let me go find out what" -- you know, thinking they might have already left if they were told they couldn't do it.

And I go upstairs literally from the parking lot on up there and they are still there and they are still reviewing the material.  And the investigator comes into my office, Tomaszewski, and I forget who the other investigator that was working with him on it.  And I said, "We're just going to allow it."

So I said, "But just make sure you notate it on the record in the interview when you do introductions and why she's

50

there," meaning she's there at the authorization of the Sheriff, because that's what she was saying, and I said, "Make sure you notate it in the report that it was authorized," and by that I said, "Do not make any huge deal of it. Just make sure it's on the record so it doesn't come back on you as the investigator and we'll deal with it."

He leaves to go do that. Linda Walters comes walking over to my office and asked sort of like, "What's going on?" Because she's because she says she got a call from Chris Clark. Now, Chris Clark is the sworn representative and she makes some reference to Joe Lecure I think is how you say his name

Q. It's Clure, Joe Clure, C-L-U-R-E. Joe Clure, Arizona Police Association.

A. Calls Linda's main number and asks what's going on and claims that he was -- this is all third-hand information I'm getting now from, like, Linda and saying something to the effect of he got a call from Joe Clure and the attorney's there and somebody is not allowing the attorney. And he's on his way to PSB, meaning Chris Clark.

And I said, "What does he mean he's on the way to PSB?"

And Linda says, "I don't know. I think he has another interview on another case, like he's being interviewed on something else."

So I brush that off but I made a mental note of it

46REPORT001169

because it seemed very odd to me that -- obviously, because I think this is laying the segue for later meetings, like why -- I think there's something going on here with regard to Kathleen Bailey.

So I make mental note.  They do the interview and off it goes.  I never see or hear from Chris Clark on that day.  I don't know if he ever showed up or -- I don't know if he was interviewed in some other case, nothing.  But they finish the interview and go and that's pretty much the end of that matter.  I just tell the investigator what to do, reiterate those things in the case.  I think he gave me a debrief after that.  She didn't interject anything in the interview.  She didn't do that but she did record it.  She said she was going to record it.  And the interview didn't really make or break anything in the case.

Q.    Let's move on to what was I guess the first monthly meeting that you had with the Sheriff, the Chief Deputy, and the Executive Chief.  And I believe you were asked to bring some items to that meeting.

A.    Yes.

Q.    Can you tell me what those were?

A.    So this is the Wednesday meeting pretty much the Wednesday of that Monday that that event that just occurred at PSB.

Q.    M'hum.

A.    I believe it was that Monday.  So now Wednesday is coming

46REPORT001170

52

along and now we're on Tuesday first and I get an email from Jeff Gentry I believe and it is something to the effect of he has been asked by the Sheriff to possibly or take action on a case or review action on a case. I would have to look at the email to get the verbiage or the Sheriff has been asked to take action on a case. And they mention it's the Wave Voltz (phonetic) case. I don't know if he identified it by case number or not.

But I know what case -- I can put two and two together of what case he's talking about.

Q. As can I.

A. And so I said okay. And he said, "Can you bring a copy of it or send me an electronic copy of it, at our meeting on Wednesday?"

So I -- I believe that was Tuesday. It might have been Monday, Tuesday. I would have to look at the email.

Q. That's fine.

A. And so I ask -- the next day I don't know if I sent an email or what I asked Linda, who does our records, to download or make a complete copy and put it in a binder and I'm going to take it over there with me on Wednesday and give it to him, a copy of it.

And this starts to raise red flags because I know that there has been quite a push over the years. He's on the Rule 15 list for that case and I know they have tried time and

46REPORT001171

time again to get him removed from the list on that case.  And I believe Kathleen Bailey is the attorney for -- that has been trying to promote that.  So I put that together with the fact that she made the comment that she spoke with the Sheriff directly about being in the interview on Monday and I know that she previously was involved in the Wave Voltz case so I -- that's -- that starts to -- that starts to connect the dots for me.

So I don't know if it was in the same email string or another email, either later that day, that same day that he asked me about the Wave Voltz case and said, "Also can you bring a copy of the Lowry case?"

And I asked which Lowry case because I know that there is more than one and there's a couple -- the one that is -- I don't know where it says today but at the time was -- he was terminated for and it is in merit appeal.  I don't know if there's even a hearing date set yet, but I know that at this time that's where it's at.  It was already through the Appointing Authority, terminated, and he's in the merit appeal process.

And so he says, "The one that he got fired on."  This is in the email string.  I know there was other Lowry cases that recently were closed, too, and so he says, "The one that he got terminated on," I believe is the verbiage in the email. I would have to defer to get the exact.

46REPORT001172

And I said okay.  I believe that was Tuesday evening that he sent that because Wednesday morning I think first thing I asked Linda to get a copy of that one for me together before and I needed it like within, like, an hour or two because I needed to be over there at 10:30.  I think I emailed her and so when she got in, she could work on it, you know, starting when she gets in early.

And I said, "Okay.  You know, I'll bring that along as well."

So it's my understanding that also Kathleen Bailey is the one representing Lowry on that appeal.  And so now you have those three sort of things all coming to a head here at the same time.  So I brought the huge binders and Linda made also a USB copy of everything.  And I did ask Gentry in the emails does he want audio, video interviews, too, or does he just want the documents and he said just all the documents.

So we didn't do any, like, video, audio interviews, but there are like these binders, I know you've seen them. They are -- you know, those cases.

Q.   And in both cases, it was Gentry that asked you to bring them?

A.   Yes.

Q.   Did he say he wanted to see them, the Sheriff wanted to see them?  Did he say?

A.   No.  The Volts case makes that comment about the Sheriff

55

and wanting -- he was asked to take action.  The other one just said the Lowry case, also bring the Lowry case, and it doesn't say necessarily what for.

Q.    Okay.  So you did that?

A.    So I arrive there at 10:30 and this is in the executive conference room, fifth floor, 530 or whatever the number is, and I'm carrying these two binders and I walk into the room and I don't think anybody is there yet.  I put the binders down next to me and then Chief Palopoli is the first one to show up and she says that the Sheriff and Gentry, something about they are getting fingerprints down and so they are running behind. And so she then brings up in the meantime -- I think there was a little bit of small talk at first, kind of how are you doing kind of thing and we talk about a few things while we're waiting for them to arrive, one of which she says that -- she said, "The Sheriff and Chief Deputy are concerned about the Rule 15 list," and she wanted to know why we're reporting people to the Rule 15 list that are not sworn employees.

        And I explained the process of the Rule 15 list, that PSB doesn't do it.  That is Conduct Resolution and there's actually, like, I get copies of them, what the rulings are and we put them in the case file.  But also I have documents from the County Attorney on what it is that they want and I explained my knowledge of how that works and how Maricopa County Attorney's Office, it's a broader scope than what the

federal --

Q.   Right.

A.   And I said, "I have all of those letters.  They send them out regularly, what they want to see, but ultimately that's Conduct Resolution.  That's who you need to talk to."

Q.   So you don't make that decision?

A.   Correct.  And this is with my knowledge of -- sometime in January, February, there was a news article that they went after Sheriff Sheridan about this Rule 15 list when he removed the scanners for the employees and said, "I trust the employees."  They made a big splash that you have the most people on the Rule 15 list than anybody.

     And the PIO reached out to me asking me a million questions at that point asking me to respond to that news article.  And I ended up sending him a copy of the quarterly document request that we provided.

Q.   To me?

A.   For the site visit in February.  I don't know if it's quarterly or monthly but that shows the employees that are on there.

     And so I gave that to the PIO because he's like, "I don't want to weed through all of these," you know, the whole list of which ones are former employees.  I said, "Well, here you go."

Q.   Because that list is just current employees; correct?

46REPORT001175

57

A.    Correct, m'hum.

      And so I put that together that I know he's getting pressure from the media and I go -- at least negative and then she's bringing this up and she's saying she doesn't think -- we shouldn't be sending people that are not sworn employees to the Rule 15 list.

Q.    Did she say what he based that opinion on?

A.    No.  I believe she said that the Sheriff -- or the Chief Deputy.  I don't recall if she thought that or if she's just relaying it.

      And I explained why some of those would be relevant such as somebody -- I know we had a criminal records clerk that testifies to criminal histories as an expert, I mean, things of that nature, property and evidence technicians, all of that would be, you know, concerning.  But she would have to actually talk to Conduct Resolution.  While we're waiting, she's bringing this up and now I'm putting this together with the two cases that I just gave -- you know.  You start to wait a minute here.

Q.    Because in both cases, Volts and then Lowry would have been put on Rule 15?

A.    Lowry would have been, yes.  I don't know if he is yet or not.  I don't know.

Q.    If it's under appeal, perhaps not?

A.    Yeah.  I don't know but -- yeah.

46REPORT001176

58

Q.   Okay.  So --

A.   So then she brings up -- she also goes, "Well, then whatever happened with the attorney issue," meaning the interview on Monday.

And I indicated that, "Well," I said, "we went forward with the interview.  They were still there," and I said -- I explained how this puts me in a difficult position. All of the same things I later explained to the Sheriff and the Chief Deputy but I'm required by the order to ensure that the cases are done in accordance to policy and the order and this is contrary to that and, you know, it puts me in a very bad position.  I don't think that it's going to be received favorably when it gets reviewed by the Monitor Team and it's a sworn case and it involved a CP-8 allegation.  So I think that it's going to be scrutinized a little bit more.  The CP-8 was not for race, it was for I think gender but it was a CP-8 allegation in that case.

But I explained the whole host of issues and then also what I understood was that I heard second- and third-hand information from 2024 where there was discussion in the legislature about trying to change A.R.S. regarding allowing an attorney in there, making it not be agency specific and be basically allowing it.

Q.   Because the current rule is -- correct me if I'm wrong -- it is allowed by the state at the discretion of the individual

46REPORT001177

agency.  So it's an agency, a sole agency decision?

A.    Yes.

Q.    And your policy currently says no?

A.    Correct.

Q.    Okay.

A.    It says an employee observer shall not be --

Q.    In attendance.  All right.

A.    And so I explained that and my understanding was the other law enforcement agencies, at least what I was told by -- there were some meetings I was going to go sit in on in 2024, these meetings and discussions with the legislator and the associations and that about this.  And but I didn't go sit in, other people did, and it was relayed to me that the most of the law enforcement agencies were against the attorney but of course other people were for it.

         And so I brought up the concerns of he's setting the precedence like -- I just want him to realize, meaning the Sheriff, like if he's setting the precedence, that might cause conflict with -- law enforcement agencies might not be happy with him either thinking more -- you know, globally I'm thinking and just explaining, hey, that's my understanding. You do what you want.

Q.    So when you were having that discussion with him in this meeting --

A.    With just her right now.

46REPORT001178

60

Q.    Oh, with just her?

A.    M'hum.  And all of this I repeated with them and I can get into with some slight different specifics.  But I explained this to her and she goes, "Well, we'll have to bring it up," and so that conversation ends with them pretty much walking in the door about 15, 20 minutes later.

Q.    Okay.

A.    Meaning Gentry and the Sheriff and I brief them.  I showed Chief Deputy Gentry the two binders and said here are the two cases and I expressed the concern with the Lowry case saying I wanted him to know that that was still open and under appeal and so I just wanted to make that clear to him.  And he made the statement at some point that says he doesn't understand why we terminated somebody for clocking in from the district to drive to an off-duty job.  And I said, "Those are not the facts of that case.  You might want to review the facts before you, you know, get to that."

Q.    Did he say anything that he thought that the employee should not have been terminated?

A.    No.  He just says, "I don't understand why we terminated an employee."

Q.    For that reason.

A.    Yeah, for clocking in and drive time to an off-duty job.  And -- because that case revolves around a whole bunch of off-duty jobs that some he left hours before and that it was

46REPORT001179

driving but others he never even went to and it's thousands and thousands of dollars.

Q.    Okay.

A.    So I didn't -- yeah.  He made a statement he didn't understand why we terminated an employee for clocking in from the district while going to and from an off-duty job.  I told him those are not the facts of the case and they are more serious matters totaling thousands of dollars of off-duty work. He didn't work.  I expressed that I was concerned because as an open -- it's under appeal still and I wanted him to know that.

Q.    Did you also discuss the Voltz case?

A.    We did not.  I don't recall us going into any other detail, just that the Volts case is there.  I believe there was discussion again related a little bit with him.  I don't know if it was that meeting with Gentry or at another meeting but it was just some general things about the Rule 15 list as well, meaning that he didn't understand why people -- we were sending stuff to the Rule 15 list.  I don't recall if it was in that meeting with him or not.

Q.    Did you discuss with Gentry and Sheridan the issue of the attorney being in the interview?

A.    Yes.  So before we get there and I'm going to go in sequential order in that meeting.

Q.    If I missed something, sure.

A.    Well, it's a slightly different topic but the next topic

we sort of discuss is an employee grievance that was filed by Sandoval regarding a case in which she was sustained on.

Q.    Who is she?

A.    She's a sergeant with our organization.

Q.    Sworn?

A.    Yep.  And so I brought -- I think Gentry actually brought that up and made a comment that he saw -- let me back up just a little bit.

When it was just my boss, Chief Palopoli in the room, she also mentioned she saw the grievance response that I did on Sandoval's grievance.  She filed a grievance --

Q.    You can't -- I thought you couldn't file a grievance.

A.    Well, she did.  See she filed a grievance on her written reprimand and her outcome of her IA.  So my boss, I copied her when I did the response that basically said you can't appeal this written reprimand.  You already exhausted.  That was pretty much my response to Sandoval's grievance on it.  I copied my boss and I copy typically the Chief Deputy because the next avenue the employee has, if they don't like my response for an IA, they go to the Chief Deputy.  So I copied him on a courtesy just so they see what it is and they are not blind-sided if they get it.

So my boss, before Gentry and Sheridan walked in, said she saw my response and she agrees with it which my response was pretty short, sweet, and just said, you know, you

can't appeal a written reprimand through a grievance process, in essence.

So I believe Gentry brings it up when they are in the room and he says he saw the grievance that I completed and he initially said he wanted to talk to me about it because he sees her point and agrees with her.  And he stated within a few minutes of get getting my email that I cc'd him on my grievance response, she basically appealed it to him, the grievance response.  And I told him -- he says he's thinking about sending it back to me because he didn't think I addressed it.

Q.    Let me clarify.  She filed a grievance which is not allowable.

A.    Well, it's not a grievable matter.

Q.    Okay.  So you file a grievance on a non-grievable matter?

A.    M'hum.

Q.    So is your response this is a non-grievable matter.  Thank you very much.

A.    Pretty much, yes.  My response is, you know, for a written reprimand and I cited the policy.

Q.    Right.

A.    You can write a rebuttal and she did that and it was attached to the case file.  But this basically then is no -- you know, the other issues are not grievable is pretty much what my response is.  I'm paraphrasing.

Q.    Okay.  So why would it come back to you?  For what

46REPORT001182

64

purpose?

A.    Well, Gentry is saying that he's thinking about sending it back to me because I didn't answer her grievance.

Q.    Okay.

A.    And I told him that, well, he could do what he wanted but the policy is for him to address it at this point now.  If she doesn't like my grievance response, then he can decide what he wants -- he can respond.

Q.    And this is, once again, a complete the case, discipline has been done?

A.    M'hum.

Q.    And she is now trying to grieve something she can't grieve?

A.    M'hum.

Q.    And she's going up the chain for that purpose?

A.    Yep.

Q.    Do you know what happened to that?

A.    No.  I never saw an actual response.  I didn't go in and check the case at some point to see if he changed -- if the findings got changed.  She was sustained I believe on three policy violations in that case and her grievance centered around one of the allegations.

Q.    And you said you looked at it to see if any of the findings had been changed?

A.    Yeah, to see if his grievance response is in there because

46REPORT001183

65

in prior discussions there was a question from Sheridan.  He asked if he could overturn Holmes, the Appointing Authority's decision, and I forget where the context of that conversation was.

Q.   It was in that meeting?

A.   Yeah.  And he I think asked me as well and -- but I know there was a time where he said, meaning Sheridan, is there a time limit for him to do that.  And that raised red flags for me of I'm thinking okay.  Well, now are they going to -- in this case that's why I went and checked, did they go after the fact, after we've provided the closed case to the Monitor, reported it all as is, you know, are they potentially going in, you know, and could he?  And I don't know -- in policy there's not a time limit per se I don't think in there but he has to provide, meaning the Sheriff --

Q.   A written notification?

A.   Yes, that's available for inspection I think is the --

Q.   Yeah.  Would that have to go back to PSB for the record?

A.   We've never had that happen so.

Q.   I mean, the Sheriff has overturned, previous I think to you being there, and he prepared a justification document that was filed with the entire case so I believe that's the process.

A.   Yeah.

Q.   Like if he did this --

A.   I think it would have to be and -- yeah, it would go in

46REPORT001184

the case file and the finding would have to be changed in IAPro. That's how it would have to happen.

Q. So in theory, Captain, if this is closed, it's all filed and done away with and somebody, be it the Chief Deputy or the Sheriff, decides to overturn the case, technically they would have to file something to say they had done so?

A. I would -- I would think so.

Q. And if they didn't, how would you know that they didn't?

A. I don't -- unless we came across the case, if they didn't -- nobody notified us, we wouldn't know.

Q. Okay.

A. I would think you would need an updated notification letter to the complainant, you would need an updated -- I mean, if you're going to be transparent about it --

Q. Right, for the whole process.

A. And all of those things but, you know, thinking about it, could they have just done that and Conduct Resolution change it? The Conduct Resolution would tell me but, you know, I don't know. That's I think all speculation.

Q. When the Sheriff was asking you during that meeting about the rules of overturning cases or of him overruling a finding by Holmes, did he mention a specific case he was looking at?

A. He did not but, you know, there was discussion with him and Gentry about they wanted to know what -- why Ken Holmes is the Appointing Authority and his role, so there was some

discussion of that.  And, yeah, this is where at one point the Sheriff asked if he had the authority to overrule Ken Holmes and I indicated there's a clause in the policy that allows for it in situations as long as it's documented and it fits the other parameters.

Q.    So did you tell him there was a process to do that?

A.    M'hum.  I said it's in policy.  I think at one point I did look at the policy in the last couple months and I don't think it really spells it out.  It tells you what he can do but it doesn't say you must do this, this, this, and I'm not aware of us -- I haven't been in PSB where that's occurred on the Sheriff so I don't know.

Q.    All right.  Do you have anything else right in that area or have we covered everything?

A.    Well, just the grievance issue.  So he brings up that and how he thinks he agrees with her and he also brings up that maybe there's a problem with NOI and one of the allegations wasn't on the NOI or something to that effect.

And I said, "Well, I would have to go back and look at the specifics of the case," but spelling out the whole process like the NOI is not a fluid document.  We might not know at the beginning of the interview what all of the policies are and I sort of spelled that out.  And then at the end of it he sort of was -- I left it as, "Well, you can do whatever it is you want to do with the grievance."  Like, you know, in

46REPORT001186

essence, it's not my problem at this point.

Q.    All right.  I'm going to ask some questions about the complaint that came in that involves you.  But they are general questions.  There will be no questions regarding any misconduct or potential misconduct on your part.

A.    Okay.

Q.    I'm aware that a complaint did come in from Sargeant Engelbeck and that at some point Chief Palopoli called you and basically said she's sure you know about it and then asked you what it was all about?

A.    M'hum.

Q.    Why would they have even known about that complaint at that point?

A.    So how that went down, how that is spelled out is I have March 10 and I would have to go -- you would have to look on the computer to get the exact time but this was -- I was working from home at this point and I review all incoming complaints in Blue Team as part of one of my duties and I saw this complaint entered in from Engelbeck.

So I reviewed the handful of paragraphs in the summary that are there and I read that one time.  And off my memory, he talks about various issues ranging from Sheriff Skinner not paying him COVID pay to something about evidence being destroyed to something to the effect of I was involved in his case and should have conflicted out, and I believe there

46REPORT001187

was something in there about he didn't get a chance to cross-examine me at some merit appeal.

So I see that entry and at the end of it there's something that says additional information or something has been provided to the Chief Deputy.

So I note that and I go, "My plan then" -- okay, and I can see who he's alleging, me plus a whole bunch of other people generally, and I said, "Okay, my plan then is I need to talk to -- this is how I would handle any other one, talk with my boss at the next opportune time and give it to them and have them decide how they want to handle it."

Q.    But she calls you?

A.    Yes.  So then the next day I get a text message from her about 1111 hours and she asks if I can give her a call when I have a few minutes.  I call her at 1113 hours.  The call was 21 minutes in length and she started the conversation indicating she was sure that I already saw it but Engelbeck had filed a complaint.

I told her -- I inquired as to what it entailed and I said, yes, that I had seen the Blue Team entry.

Q.    So you acknowledged you had seen it?

A.    Yes.  I saw the Blue Team entry and read it one time and was going to follow up with her as he indicated he was meeting with the Chief Deputy in the entry, that last sentence.

Q.    Meaning provided information.

46REPORT001188

A.    Provided information.  Now I see meeting because about one or two weeks earlier -- this gets very complicated and I would have to figure out the exact date.  I don't know, our Criminals Section is working another Engelbeck complaint from October, November where he claimed there's missing thumb drives from his desk or his office in District 1.

Q.    So that's where the missing thumb drives come from?

A.    M'hum.

Q.    That's a different case?

A.    A completely different case.

      So --

Q.    Do you know how that came in?  Were you aware of that?

A.    I was, m'hum.  So he alleges that someone stole three thumb -- I don't remember how many thumb drives, six thumb drives from his office that went missing sometime -- I want to say like he gave a 30-day window while he was serving his suspension for the original -- the 2020 case that he appealed.

Q.    Is there also an open IA on that?

A.    There is.

Q.    Was it discussed with Anders?

A.    It was.  And so that was assigned to Robert Scotford of PSB who I asked to do an interview with Engelbeck to verify what and I gave them, "If he alleges that I'm involved, then I just need to know and we will handle accordingly."

      Scotford does an interview and there's an email that

71

he sends that he was requesting it be considered for criminal review because somebody stole, allegedly stole these thumb drives.

Q.   Scotford wrote that?

A.   Yeah.  He sent it to I think Romney at one point I spoke to Romney about it and I said, "Write it up and send it to me."

And Scotford clearly in the email says Engelbeck, when he was interviewed, he said he's not making an allegation that PSB took it but he -- when Scotford asked him who would have an interest in the thumb drives, Engelbeck listed myself, Ken Holmes, Houck, and Bob Latham.

Q.   And what is purportedly on these thumb drives?

A.   I believe, according to Scotford, Engelbeck relayed there was materials for his appeal.  But I think in the same notion, Scotford asked him who would know what's on those thumb drives?  And Engelbeck says nobody.

Q.   So that's a totally separate.

A.   It is.  It is a separate case.  So Scotford asked for a criminal review because somebody went into his office.  Some of those thumb drives are personal, some are county.  I forget what the number is.  So I gave it to Gino, our criminal, and I said, "Hey, we're going to have you do a criminal review on this," and I told Gino I said, "If you believe there's an allegation that involves me or Ken Holmes here, you find any evidence of that, just stop, let me know, and we'll send it --

46REPORT001190

we'll take it different direction."

So Gino's group starts working there and where this comes into play, because about a week or two before this complaint comes in, Gino approaches me in my office at PSB and he says he got off the phone with Engelbeck. They were trying to set up a criminal interview with Engelbeck about the thumb drives and Engelbeck started telling -- asking Gino who at PSB, like, provides interviews and accesses interviews because I think somebody deleted interviews for my appeal and starts asking all of these questions about who gives him stuff for his appeal.

And Gino said I didn't know -- like, "I don't know any of that," and so he's like, "What do you want me to tell them?" And he also, meaning Gino, said Engelbeck kept saying, "This is just between Aaron and Gino."

And so I told Gino, I said, "Anything with his appeal PSB does not -- is not involved with. He needs to go back through who he was dealing with at his Conduct Resolution or the attorney at the County Attorney's Office and talk to them if he wasn't -- he's claiming he wasn't given an interview or something of that nature." I said, "But we have nothing to do with that and the logs would know, you know, that we have nothing to do with that."

So Gino makes mention -- this is why I bring this up, is because Gino says, "Well, Engelbeck said he has either" --

46REPORT001191

and I forget which person he said but he has a meeting with either the Sheriff or Chief Deputy about PSB.

Q.    He tells Gino that?

A.    Yeah.  Gino relays that to me.  So I forget if Gino said the Sheriff, Chief Deputy, or both, I don't know.  So that's about one to two weeks prior.

And then this complaint comes in which is why I bring up -- that's why I think in my notes I put he was meeting with the Chief Deputy.  I'm putting it together in my head that -- but the entry I think says that the last that he gave the Chief Deputy.  It was forwarded to the Chief Deputy.

Q.    So in all likelihood, he did but that's information you put together from a variety of places.  You don't know factually that he did it?

A.    Correct.

Now, I know I brought it up two weeks ago with the Chief Deputy and he was adamant I didn't meet with him, but we can get to when we get to that meeting.  He goes, "I just got email," because I expressed frustration with them going in, meeting with all of these individuals that have gripes about their cases and they are just opening up a can of worms because there was another issue with Hawthorne and Hall doing the same thing.  That's a separate.

So I explain to my bosses here on the phone, I give her a little bit of a history of -- I tell her about the thumb

drive case, just that it's there.  I also tell her that I know there was a service complaint done by Caputo and, quite frankly, what Engelbeck is doing, he's retaliating towards me.

Q.   So you told your boss that?

A.   I did.  M'hum, against me, the investigator, Conduct Resolution, the Appointing Authority.  That is clearly -- I also expressed concerns with her about the Chief Deputy and others interjecting themselves into older cases, past cases, matters that have already been investigated and that there was already a service complaint done by Chief Caputo on this.  And I believe that spelled out all of that information with what he was referring to.  I also informed her that I didn't even read that case, meaning the original case, until about a week or so prior to the scheduled merit appeal hearing.

And I walked briefly through -- she asked what was the outcome, why did the hearing not happen, and I spelled out with what I knew there on how it was appealed and then before the hearing, Ken Holmes changed the findings.  And I thought that occurred and --

Q.   Let me go back a minute here.  So you told you hadn't read the case until a week or so before the appeal hearing?

A.   555 case.  The case where --

Q.   That's the original one?

A.   M'hum.

Q.   Where you wrote a memo recommending demotion?

46REPORT001193

A.    Yes.

Q.    That all stemmed from that?

A.    Yes.  That's the case I'm talking about.

Q.    You were not the PSB commander at that time when you did that?

A.    That's correct.

Q.    What involvement did you have in that case?

A.    I think I was listed as the complainant and I was --

Q.    Were you interviewed?

A.    And I was interviewed as the complainant.

Q.    Were you interviewed as the complainant?

A.    I don't think so.  I don't think I ever filed a memo.

Q.    You wrote a memo.

A.    I wrote a memo, yes, I wrote a memo and then I was -- and I would have to go back and look.  I believe because I only read the case once preparing for the merit appeal, but this is what I brought up to Ken Holmes, because I said, "Hey, the County Attorney is asking me to testify because I filed the complaint and I don't know that I ever filed a complaint."

Q.    Did you have a right to look at that report?

A.    The 555 one?

Q.    Yes.

A.    I believe so to testify.  I was given it to testify in the merit hearing.  Conduct Resolution gave me a copy of it.

Q.    So Conduct Resolution gave you a copy to review?

46REPORT001194

A.   Yes.  I picked up a binder from them.

Now, I look at a Word document so it could read to it me aloud.  I did not crack open the hard copy binder.  That's the 555 case.

Q.   Right.  Is that a standard practice, if you're going to be a witness for MCSO, that you are provided those kinds of materials?

A.   I don't see why it wouldn't be.  Yes.  I know other investigators that are provided the same appeal binders at any of those hearings and that's the first time that I actually read that 555 IA and that would have been the week before -- it's in February and I could track down the date that I went and picked it up from Conduct Resolution.

Q.   And then you ended up obviously not testifying because it went away?

A.   M'hum.

Q.   Okay.

A.   So I sort of relay that to my boss on how the 555 case, my understanding and what I was told by Ken Holmes on why it was changed and the findings were changed and why the hearing didn't go.

Q.   And which was, again, because?

A.   Holmes pretty much relayed to me so he calls me and I have to go back and look at the call logs.  I believe he might have texted me first.  But this is I guess the day after they

46REPORT001195

dismissed it and I believe it's the Wednesday before the hearing was set to be. I think the hearing was set for a Friday. It was originally set in January and then it got rescheduled to February something. And he says, "Hey, did Neil Landeen," that's the County Attorney, "call you?"

Q. Would he have been the attorney --

A. Yes, the County.

Q. -- attached to this case?

A. M'hum. "Did he call you?" Because Neil Landeen, there's emails. He previously emailed me asking if I would be willing to testify as the complainant and if I was available. I don't know if he said as complainant but to testify in it.

Q. Okay.

A. And I informed him I was and I blocked that time on the calender. That was I believe back in November-December when he emailed me. And then Neil Landeen was copied on the emails that I got with the subpoenas that Engelbeck filed also claiming that he was going to call me to testify for him.

Q. Okay.

A. He asked -- he subpoenaed like three other things of me as well. There's emails on that.

Q. Okay.

A. And so I communicated back and forth.

Q. So let's go back to what Holmes told you.

A. So I reached out to Holmes. I want to say it was the week

or so before the merit hearing and it might have been a week earlier and just said, "What do you think of this case?  Like what do you think Engelbeck's, like, approach is going to be here, like with regard to" -- because I said I was a little bit -- I was like he's going to -- so I saw -- Neil Landeen sent me what Engelbeck wrote up of, like, his conditions of his appeal.  And so I got sent that as well from the County Attorney.  I would have to go back and look at the emails.

And it's I hate Greg Lugo, a diatribe over stuff from years ago.  And so I read that and I see the subpoena list that involves myself, Latham, Jackavinich (phonetic) and I think Latham that Engelbeck is subpoenaing to testify.

Q.    Okay.  And so I was -- I asked Ken Holmes I said, "What do you think his challenge is here?  And like this is going to be an attempt at character assassination of Greg Lugo.?"  And I was like, "Are we really going to go through with it?"  I said, "I'll go he through with it if that's what you want to do."

And he's, Well, you made the complaint."

And I said, "Wait a minute.  I don't think I ever made a complaint."

And he goes, "What do you mean?"

I said, "I haven't even read the case," when I had this discussion with Holmes.

And he goes, "Well, let me talk to Neil and maybe you should read the case first and I'll talk to Neil and find out,"

46REPORT001197

because Holmes gave me -- he said, "I think his issue is going to be that he was previously disciplined on this already."

And I expressed in either this conversation or a later one like I sort of agree with that, like I hate to tell you but like -- because I don't think I made a complaint.  I encompassed it into my recommendation for him not to --

Q.   And I've read that so --

A.   So I don't think -- yeah.  And I was like -- I recall being told to come to PSB to be interviewed about it and I interviewed and I want to say by reading 555, that case, that is sort of how it starts, is I was interviewed as a complainant.

So I didn't even -- I stopped going back to go look for all of that stuff because -- so I tell Holmes, "Well, I'll read it.  I know Conduct Resolution previously said, "Hey, we have a copy of the binder for you.  When do you want to pick it up?"  Because I didn't have time and I wasn't worried until the hearing, getting closer to the hearing.

So I talked to Holmes and I want to say -- then he goes he'll talk to Neil and this and he said, "Read the case," and then I think he said, "Let me know what you think, like why don't you read the case first?"

And so my plan was to read the case and so I got a copy from Conduct Resolution and I also got a digital copy from our network drive because the way I read so many reports is I

46REPORT001198

have it play to me and it reads as I'm driving.

Q.    Interesting.  Okay.

A.    So that's one of my, you know, to and from work so it's reading -- it aloud to me so that way I could take advantage of that time or if I'm in my office or what, I can sort of do a couple of things at the same time.

And so I grab that, I went down to Conduct Resolution and I think it was Jack Greer, the binder that had my name, that picked it up and put it in my car, and I was going to read it the next week and then started listening to it.

Before I call back and talk to Holmes, this is the following week, Holmes calls me.  I hear -- I think it was on Tuesday from Lieutenant Romley I believe that, "Hey, did you hear they dismissed Engelbeck thing."

And I said, "Nah, I didn't know.  Nope, that's not -- it's news to me."

And so Holmes reaches out to me I believe the next day and says, "Hey, did Neil call you"?

"Nope."  And I said, "No, I haven't spoken to Neil." I said, "Actually, I just finished reading the case and I'm, quite frankly, all fired up again about the situation because I read the case."

And he goes, "Well, we're changing it.  We're dropping the appeal and we did that yesterday," so it was already done.  And he goes, "Neil was supposed to call you and

81

talk to you first."

I said, "Well, he didn't."

And so he's like, "Well, I hate to be the bearer of the bad news," in essence, you know, the bearer of the news.

And I said, "Well," I said, "what is sort of, like, can you explain?"

He says, "Well, it's the double discipline and with what you were going to say, that" -- I think the way he worded it, "Your testimony that you didn't file a complaint I, think they confirmed that" -- this is Greg speculating.  I think they confirmed that I never actually filed a complaint, that that was going to be a hurdle that they didn't want to -- they didn't think was going to be hopeful with the current hearing officers.

And I expressed my concern of the character assassination.  I said, "Is Neil going to let them just go talk about everything irrelevant?"

And Ken Holmes says, "Well, that's what Neil does. He won't object to that."

And I was like, "Well, I'll do that if that's what we need to do but, like -- I don't know" --

Q.   So you were fine with them --

A.   Well, and so I told Ken Holmes, I said, "Here's my problem, though, how are you dismissing it?  This is my position."

46REPORT001200

He goes, "Well, we're just changing the findings to not sustained."

And I said, "Well, that's where I have the problem." I said, "I think the findings should still be sustained and the discipline should just be no discipline given that he was previously disciplined," because he clearly -- I still think that he had a CP-5 violation. I didn't make that determination. They did not sustain on that but -- and I'm okay with that. That was the investigator.

But the insubordination and Holmes said, "This is insubordination all day long, absolutely, without a doubt." He goes, "But we're afraid we're going to get sued similar to," and he brought up I think the Atencia case is what he brought up.

Q.    I remember the Atencia.

A.    And I said, "Well, I just think it should show on his record of sustained, discipline handled" -- no discipline as we have handled as -- there was another case that was handled that way with a Lieutenant. I believe it was -- what is his name now?

Q.    That's okay.

A.    He was sleeping or something on an off-duty job and stuff like that and I know Jeremy Blaine.

Q.    Yes.

A.    And the reason I know of that case and why that was --

46REPORT001201

because that's the case that Engelbeck subpoenaed for this and he subpoenaed it from me, that case, for the merit appeal.

Q.   Because he got demoted with no discipline.

A.   Yes.  And I think he subpoenaed another case and he's asking me to produce it and I reached out to the County Attorney and Conduct Resolution situation, "Hey, like, why am I providing an IA that I had nothing to do within?  Shouldn't this probably go through like the legal liaison and that?"  And they said they are taking care of it.

So that's how I knew of that case.  And I looked at that case because I was curious why is he subpoenaing me to provide it and it does say sustained and it says no discipline.

Q.   And I've reviewed a number of those over the years.

A.   So I expressed that to Holmes and he's just, "We're afraid that's going to cause problems and we'll get sued eventually," and he started citing some other things.

And I said, "Okay, do you whatever it is you want to do," like that's fine.

So that's how I -- and then I want to say the subsequent day or in the subsequent days, I think it was actually a site visit day that I went and returned that binder --

Q.   Okay.

A.   -- to Conduct Resolution.

Q.   Okay.  So moving on to when you were told they were going

to bring another captain into PSB, can you talk about what occurred, what the content of the conversation was?

A.    Okay.  So we will fast forward to -- I believe it was it looks like March 17 and 18th -- the 18th is when the meeting occurred.  But on the 17th I got an email from Chief Palopoli requesting to meet sometime tomorrow, that was 3-18, to, quote, go over some stuff, end quote.  I have the email communication I have.  We communicated for the meeting, to set it up for 9 a.m. on the 18th at her office at headquarters.

I did question if she needed anything prepared and she said there was nothing to prepare.

So I arrive at her office on 3-18 at headquarters. She gets up and closes the door and states the only people in the room now are me and her and states that she does not trust Sergeant Fisk around headquarters as he sits right near her office and she didn't want anyone else to hear this.  She starts the conversation asking if I had anything and I said I did not.

And then she went into basically three main areas of discussion.  The first had to do with the Engelbeck case.  I don't know if we want to go into those details about that since you asked about the other, the two captains.

Q.    Just in general.  But at that point you were told you were not being put off on admin leave?

A.    Yes.  So that's how she starts that, which made me very

concerned, and she says that first thing had to do with the Engelbeck complaint and she made the very -- the very first comment was, "You're not being placed on administrative leave and you're remaining in your position as the PSB commander," but that an investigation was going to be conducted.

Q.   Okay.  Sufficient.

A.   So there was other, of course, conversation about that but I'll leave that.

So then the second item was brought up again about the -- that she covered was allowing attorneys in the interview.  So I don't know if you wanted to go into details more about that or not.  But that's just rehashing that same issue and the fact that they -- the Chief said that either the sheriff or Chief Deputy or somebody attended an East Valley Chief of Police meeting and found out there's a couple of agencies that do allow an attorney but most do not in the room.

I expressed all of the same concerns that I previously expressed and even more so some others of allowing attorneys in the interview room and she said that she was going to go talk to the Chief Deputy about that.

And then the third item she wanted to talk about, she said that the Chief Deputy decided they will be adding a second captain to PSB.

Q.   And that you can elaborate on, please.

A.   So Palopoli reiterated I would remain as the PSB commander

and still do everything I would currently do, in essence be responsible for everything, but that I would work to train a captain to be able to take over in the event I was out on leave or stuck out of the country or taking time off.

Chief Palopoli stated that they were worried if something happened to me, I got sick, et cetera, and this has nothing to do with the Engelbeck issues but they were worried if something would happen to me, what they would do.

Q.    Okay.

A.    She also noticed -- she said she noticed I was sending emails at six and seven at night and I need some time off.  She doesn't think I would be happy with this and she is just -- she said that she is just the messenger.

Q.    Did she tell you who that person was going to be?

A.    I did ask.  I said, "Well, who might this person be?  Who is this person or second captain?"

And she said it was Corey Morrison.  She said, "I believe Morrison," and then she goes, "Corey Morrison." Actually, I don't know if she said Corey but she said Morrison, which I know there's only one Captain Morrison so I think she might have said Corey as well.

She said Morrison first because I remember her looking at her notepad.  And she said, "Do not go saying anything yet but that is who the Chief Deputy has selected."

Chief Palopoli further stated that I currently had

46REPORT001205

lieutenants that could step in but that the Chief Deputy wanted a second captain.  She reiterated that I would still be the PSB commander.

When I asked that who would be considered the commander and responsible to the Court's obligations, order, you know, all of those responsibilities and she said it would still be me, just that I would teach someone else everything I did.

Chief Palopoli stated the Chief Deputy's door is open if I would like to speak with him about it and she was only the messenger.  I believe she repeated that a second time.

Q.   What was your response?

A.   I said I just -- in all of this I just -- other than asking the question who it was going to be and who was responsible, I just nodded, and said, "Okay."

And she said, Chief Palopoli said, "Think it through," but if I wanted to meet with the Chief Deputy at 11 o'clock today, we could do that as they had a meeting and they needed to go.

Q.   And did you opt to do that or not?

A.   I did not.  This was now approaching I believe 10 o'clock. I think that was their meeting, from 10 to 11 and so I said okay.  I nodded and grabbed my computer and walked out of her office and left and went back up to my office.

Q.   What was your opinion of this?

46REPORT001206

88

A.    Well --

Q.    Or is or was.

A.    As I expressed to them further, I have grave concerns with the responsibility of having two captains, I don't see how that helps the person that is ultimately responsible, because -- this is Greg's opinion.  Because when I first got assigned to that position, I went through -- and I have a list.  I went through the entire court order, all of the policies, and listed out all of the things that I'm responsible for and what things I can delegate and those things are delegated.

Now, there's a few that are not delegated, again, because I lost Erin Flowers, but all of the other stuff I feel that the policies and the order require the -- whoever that is -- to do.

And not having somebody that you can't -- you don't supervise I think causes a problem and, quite frankly, us eliminating the second and third middle person in this process over the years is what has helped us streamline the process.

So lastly, I was gravely concerned when they mentioned in the same discussion earlier -- this is the same discussion, she brings up the Engelbeck case, that Corey Morrison of all people, who I don't know at this point that she knows the history, but that was involved in the case where he allowed a lieutenant and he himself -- and one of those lieutenants was Engelbeck to -- met IA where they made some

derogatory comments and demeaning situation towards me which I believe Corey Morrison was sustained on or somehow disciplined for. I never actually read that case either. But I know there were --

Q. I have, because I review cases.

A. So I found that very interesting, that of all people, that that's the person that they are selecting. And then I also know that we just were finishing a case that he's facing major discipline on.

Q. Do you know the current status of that case?

A. As of -- it was either the end of March or beginning of April while I was still there, it was sent back. We did the follow-up that Ken Holmes had --

Q. Okay.

A. It went to PDH. The only principal left is Corey Morrison.

Q. Okay.

A. He had his PDH. I want to say it was September, October of '24 and he threw out additional information and requested to go back to PSB. Ken Holmes sent it back to PSB and they did further interviews, including an interview with Morrison, an interview I believe with John Bailey and I think there might have been -- I think there might have been another interview, maybe not. But they did the supplemental, an addendum and I want to say it was the end of February, somewhere in March.

46REPORT001208

90

That supplemental got attached with the new findings page. It's remaining sustained is what the recommendation was on the policy violation and was sent back to Conduct Resolution.

And I think -- before I was removed from there, I did not see a new discipline range which it would be the same range, so I don't know if they would send it again, because it's the same -- the finding is still recommended sustained.

Q.    And you also don't know if Ken Holmes accepted that?

A.    Yes.  I don't know.

Q.    So you don't know what happened to it?

A.    I just knew it was on the list that it went back to Conduct Resolution.

Now the other people involved, the other principals, they already were -- the findings were done, sustained.  The ones there were sustained, got their discipline.  That's all over and done with.  The only person left on that case is -- was Corey Morrison and he actually asked about it at the PSB training when he ran into me in February.  He goes, "What's going on with this case?"  And he was questioning the timeline.

So knowing that that is going through and I believe it's looking -- due to the range that he's looking at, like in the range of demotion as a possibility for that because --

Q.    What's the category?

A.    It's like a category two or three but it's --

Q.    He's got priors.

A.    Yeah.  He's got so many priors so he's up there.  It's like -- and I guess they could --

Q.    Mitigate?

A.    Yeah, absolutely.

Q.    But it's serious discipline eligible, basically?

A.    Yes.

Q.    Okay.  All right.

A.    So that pretty much was -- yeah, that's what my feelings were.

Q.    In a number of our different conversations, Captain, we've talked about -- and you've mentioned some of them here today, like allowing attorneys in PSB interviews, making changes to DUIs, I think you talked about cell phones in the jail.  There were also some changes to posse members that were coming in to you and being a challenge in terms of opening a complaint or not.  Can you talk about that?

A.    Yes.  So the cell phone, can I talk about the cell phone first because it's pretty much the same?

Q.    Sure.

        MR. FLEMING:  Can we take a quick break?

        THE WITNESS:  Absolutely.  I'm sorry.

        MR. FLEMING:  Can we take a break?

        MS. KIYLER:  Yeah, sure.

        We'll be going off the record at --

        THE WITNESS:  12:20.

MS. KIYLER:  -- 12:20.

(Recess taken at 12:20; resumed at 12:24.)

MS. KIYLER:  All right.  We are going back on the record at 12:24 p.m.

And Captain Lugo's attorney has left the room and we'll be finishing the interview with just Captain Lugo and myself.

BY MS. KIYLER:

Q.   So, Captain Lugo, I think where we were at was the concerns you had about some of the changes being made.  And I think you were talking about cell phones when we took our break.

A.   Yes.  So there was -- and I would have to research the time, what the date was, but there was an immediate policy change regarding cell phone usage in the jail facilities and this came out via an email.  There was a YouTube video and a briefing board on some immediate policy changes.

And I found this somewhat interesting because I believe it was the next day we got a complaint in Blue Team from a facility regarding an employee using a cell phone.  I believe it was in one of the warehouses and they were saying that, you know, they thought that was a policy violation.

And I was trying to go back and look at the policy change and sort of compare it and understand the way the written policy reads about cell phone use and how it's

concerning from my perspective trying to look at cases and apply them uniformly with sort of some of the what I would say is vagueness of the policy.

And I was trying to think about how we were going to handle these. So that came in and I want to say that weekend, I think it was a Saturday. I would have to go back and look at my phone, but Ken Holmes called me. We talked on the phone. He either texted me or called me and it was about the cell phone stuff because he was apprized of the policy change or update and he wanted to know how I was going to handle those and he just wanted to make sure we had -- we talked it through because he just apparently disciplined somebody for a cell phone matter like two -- the day before that briefing board came out at PDH our coaching or whatever.

And I think that case was slightly different because I think that case involved, off mirror memory, the employee bringing the phone in, either videoing surveillance footage and then recording it with their cell phone and then using that to write their use of force report or that was their excuse.

Q.    Okay.

A.    So I think that was the circumstances of that case and the person was sustained for doing, recording that, the jail video with their personal cell phone and having their phone in the jail. I would have to look at the case.

But Holmes brings up and he says he read it and, of

94

course, he's an attorney and he goes, "this is -- this could create a problem here the way it's -- like how we apply this," in essence.

So I said, "Well, I'm looking at it and trying to" -- and I advised him that we already got the first one in and so I was just trying to think about it and he was expressing -- I think the reason he called me, he said he was going on vacation or something and was going to be out for a few weeks. So that's why he said it was on his mind and he just wanted to make sure he got the information to me to think about it.

And he brought up I think a few other concerns from a discipline standpoint of, well, hold on. Let's be careful about setting precedence and things of that nature, which I always appreciate his input on those because at the end of the day, we just want to get it right.

So one of the following subsequent intake meetings with Chief Anders and after that complaint came in, I think it might have been the next one, the Friday after that, might have been two, I don't know; but I brought this issue up to him and was like, hey, here's sort of -- we got this challenge I'm trying to work through and so I don't know exactly yet how we're going to do it but there's these changes coming, the policy change. It's vague. And that complaint in general didn't -- the way it read, I think it was still sitting in there because I had one of my lieutenants do a review of it, is

we need to ask some more questions to determine if what they are even saying -- the way it's written doesn't even look like it alleges misconduct at all under the policy.

But the supervisor is adamant, the lieutenant I think at the division is adamant that it's a policy violation.

And so I wanted my lieutenant to go, like, "Can you go talk to that lieutenant and find out some details exactly of what the circumstances are and if it applied?"

And so my lieutenant did that. That was I believe Lieutenant Pelling. I asked him to do that and he came back with a report and he was going to write me up something on it. But he learned that apparently various jail facilities have issued their own directive as well now on cell phones clarifying, saying you can't do this even though the policy says you can. Like you can't have it in certain areas. It just is like -- it just -- he's learning that this captain at this jail did it, this directive. This captain at this jail did this directive. A couple of them shared a similar directive.

So the feedback I'm getting is that they seem to be giving their own directives now that very much might not be uniform. And then also he got details of the -- this actual complaint.

Q.    Okay.

A.    And the details I think confirm the policy the way it's

96

written now is not even a policy violation.

So my plan was I was going to have Lieutenant Pelling send me that write-up and then I was going to go back to Anders with it and look at doing a diversion to document to say that basically they think it's this.  It's not because this is why it doesn't even arise.

So that was my game plan and that is sort of what I talked to Holmes a little bit, saying that's sort of what my plan is.  If I find it's not a violation, since they entered it, we're going to have to do something with it.  That would probably be in the Diversion category or all the Supporting or maybe it would be a Service Complaint but we're running into this.

So that occurs and within a week or so -- and I remember where he was.  I was on the treadmill at the gym and Chief Chagolla calls me and I could find in my records probably when but he calls and says he has a situation and he starts talking about the posse.

And so he wanted to know how I wanted to handle it.  And basically, in the long -- or shot of it is he brings up the fact that he is hearing individuals at districts wanting to file complaints on posse members because they showed up wearing uniforms that say Deputy Sheriff on them that's contrary to the uniform policy that is currently in place.

Years ago, before the policy -- the uniform was

46REPORT001215

changed, posse members wore the exact same uniform as a Deputy Sheriff other than the badge, the metal badge said Posse, if they wore the metal badge.  But the uniform shirt had the Deputy Sheriff badges so that was the old.

So Chagolla brings this up because he says he's getting individuals wanting to make complaints and causing push-back at the districts, patrol level individuals telling posse members, "You can't wear that.  You're like in violation of the policy."

The posse members are saying, "The Sheriff authorized us to do this."  And so I asked Chagolla if that is true.  And Chagolla says, "Yes, that is true," and he said, "The Sheriff told them they were allowed to do that at some posse meetings." And so Chagolla was concerned, in essence -- well, I think I'm speaking for him saying that but the impression I got is he's concerned that he wanted to make me aware because he wanted to know how I was going to handle the complaints and he didn't want to be stuck in the middle.

And so I asked Chagolla, I said, "Can you send me documentation of wherever this meeting was, you know, what was told, what was not told so I can use it?"  And I brought up to him, I said, "We're already dealing with this with the cell phones so that then I can figure out" -- I said, "We'll take it slow.  It's not the end of the world here."

And he said, "Absolutely," and he said, "There's

46REPORT001216

other things" -- I want to say he said there were a few other things he told the posse can do, too, which I don't know he got into the details on the phone.  I said, "Well, just email me the documentation and if you give me the date, time, or whatever, and then I'll take it from there."

I said, "We haven't gotten any formal complaints in yet on the posse," and that was at that moment that I was talking to him on the phone, I haven't seen one officially come in before I was removed but -- so I want to say it was a few days later he sent me documentation in the form of PowerPoint at least -- I think there might have been two PowerPoint presentations.  I have those emails.

Q.   Is there a briefing board, admin broadcast, any authorization, official authorization?

A.   I have not seen anything, nope.

And so this is like a PowerPoint presentation with a date of -- it looks like it's a posse commanders' meeting and it talks about what their things are doing, going to be changing with the posse, one of which tells them effective immediately -- if I'm not mistaken, I would have to look at it but I think it says effective immediately you could wear the uniforms.

Q.   So you do have a copy of that communication somewhere?

A.   It's in my email.

Q.   Okay.  I understand.

46REPORT001217

99

A.    Which I am locked out of.  So the way Chagolla expressed it to me was -- because that meeting occurred I want to say it was 30, 45 days prior to him calling me.  But the way he sort of -- I was able to understand it is they went to the uniform store right after that.  It just took a couple weeks until they actually got the uniforms that are showing up.

Q.    Yes.

A.    And now it's going over the last thing I talked with Chagolla, I said, "Well, is there going to be a policy change, like" -- he said he's working on getting the policy because -- I think he said he knows but he said, "It's got to go to the Monitor."

        And I said, "Oh, okay."  Because I think I asked that.  I think the way I asked that was, "Did this go to the Monitor?  Like is there a policy change?  Is there going to be a briefing board or what?"  And he says he's working on getting that to the Monitor and putting that together.

Q.    So we have cell phones in the mails, attorneys in PSB interviews, posse members, DUI no longer a Category 7 offense.  And then the only other thing I remember us talking about at some point is requirements for off-duty work.  Do you remember that?

A.    I remember a discussion coming up.  I don't remember who it was with, whether it was with the Policy Division or if it was with Gentry about off-duty.  It was with Chief Gentry.  I

don't know which meeting it was.  It was one of the ones I think we talked about.

There was a discussion about off duty where he was asking -- he wanted me take -- it might have been after the commanders' meeting.  He wanted to set up a meeting to discuss the off-duty.  He needed to talk to me about the off-duty. That was something he wanted to talk to me about.

Q.    Okay.

A.    And this might have been that first meeting in March. Yeah, I think it was because we were running into a hard stop and I had to leave.  I think that's where it was at the end and he said he wanted to talk about off-duty and ODM because I said we had a whole bunch of issues with ODM and off-duty cases.

Q.    No kidding.

A.    He said he wanted to talk to me about that.  And I believe there was also some discussion I had informal with the policy section where they were saying that they had been asked to look at updating the off-duty policies and those are things they had been asked to look at.

Q.    Okay.  So let's go to the discussion you had with Dominick Reaulo about him being transferred to PSB?

A.    Okay.  So I have that meeting with -- we just went over it looks like on March where I was advised that Corey Morrison was -- that was March 18.  So there's that discussion and that's the first time I hear of the second captain being moved

there.

And so there's of course some other communication about some other matters that we won't get into -- that aren't relevant to the second captain.

And so then on March 24 I had several sort of informal communications with Captain Reaulo, just, "Oh, I hear I might be transferred," this and that, that kind of thing. I'm hearing all of this scuttle. And what ends up happening is I start getting -- I had people in my office. And I would have to go back and look at the dates, but I had a lieutenant come to me saying that he heard from a captain in District 7 that a second captain was being assigned to PSB and that that's what the chiefs told them.

And then I had one of my sergeants come to me and express their displeasure with the fact that they heard a second captain is coming and who that was. They heard it was Dominick. And then I had one of my investigators also come to me and ask, "We heard this". And then I had a civilian come to me and advise that she got forwarded a screenshot of an email that Captain Reaulo sent to his staff that said he was officially being transferred to PSB. And the civilian staff who knows our civilian staff actually sent it --

Q.   Of course they did.

A.   -- to her and goes, "Like what's this all about?"

So she comes over to me and is like, "When were you

going to tell us?  Are you being transferred out?  What?" Because it just said that, you know, Dominick was being transferred.

And I was like, "I haven't officially heard that. I've heard this from all the other people.  I've heard nothing from anybody in my chain."

So that's all happening in or around March 20, 24th. So what ends up happening is March 24 at about 11:28 I get a call from Chief Summers.  He calls me and tells me, "Hey, if nobody told you yet, Dominick is being transferred to PSB and Corey Morrison is being transferred to Bio."

And I told him, "I have not -- nobody officially in my chain has told me that."

Now, I believe -- yeah.  So that was after.  So this would be -- and I said, "Oh, okay."  And then he said -- he inquired if I knew if there were any issues with Corey and his transfer eligibility to go to Bio.  So Summers is asking me if I thought there was going to be any issues with Corey Morrison's transfer to Bio because he said Dominick is coming to PSB and Corey is going to Bio.

And I advised him that the transfer needs to be processed just as any other transfer in or out of Bio and whoever does those processes for Bio and CID, like, they need to go through that process.  PSB doesn't do their transfer requests.

46REPORT001221

Q.   Right.

A.   So I got the impression he was asking me to do something for him to do that and he did ask if there was anything I knew that would preclude him from being transferred.  And I told him I didn't want to misspeak.  I know of course the case that is in Conduct Resolution.  I don't know what the final findings are yet but I would have to run a full report and do an analysis to make sure.  I didn't want to tell him yes or no for a variety of reasons and also didn't want to be accused of trying to influence something either.

     And so I said, "You know, off the top of my head, I'm not sure.  I would have to do a full analysis without running a report."

Q.   Did he ask you to do that?

A.   He did not.

     Now, I got the impression he was implying like he was trying to get me to volunteer to do it and I didn't volunteer to do it.

Q.   Okay.

A.   So that's not my shop at the time, Bio.

Q.   Right.

A.   And all of which I thought was odd because he should know these things.  He worked in CID.

     So approximately then at 1140 hours, so this is 12 minutes later, Captain Reaulo called me and he advised me that

104

he was told he's coming to PSB and that I was already aware.  I asked what his responsibilities in that were.  And Reaulo said that he was told by Summers that PSB was to be split up by detention and civilian matters versus sworn or something to that effect.  And he was in communication with Chief Summers regarding the matter.

I didn't ask any more questions.  I just.  Oh, okay.  Interesting.  I have not heard anything from my identified chain of command at that point.

Q.    When did you get told by your chain of command?

A.    So -- let me look at my timeline here -- okay.  3-25.  That was a discussion with Chief Anders about something sells.  3-27.

So on March 27 I get a call from Captain Reaulo advising to call, he had some additional information.  He texted me.  I was busy.  He tried to call.  He texted me.  I text him back and he then called me -- okay.  That's 3-27.  I think I'm missing something here.

Oh.  No.  So Dominick says he has more information.  This conversation is on 3-27 at about 1152.  He had a conversation with Chief Palopoli, meaning Dominick had a conversation, and was advised the transfer might be, quote, put off.  He stated he was told he's going to oversee all of detention and civilian cases for PSB but I would remain as the PSB commander.  He stated he was told he would be responsible

46REPORT001223

for everything associated with detention civilian, which is unclear what exact that might be, but he believes that to be everything from intake through discipline.

Dominick believes Captain Summers was behind these ideas and told him that he had already told him everything, meaning Dominick asked Summers for more details and Summers said, "I already told you," and Dominick said, "You didn't tell me."

Dominick stated it appears to him they are having difficulty with finding a replacement for Bio and Summers was trying write a memo for justification relative to Corey and his eligibility for being approved to be transferred to Bio.

And allegedly Dominick believed the paperwork had not been submitted to the Monitor Team yet.

All of this of course is -- I think a lot of this is speculation, you know, from what he's telling me.  So the conversation a few other items relative to the compliance meeting that occurred earlier in the day.

So they had a compliance meeting with the compliance bureau and this is like a standing compliance meeting that typically they don't invite me to.  So I had been invited once or two times.

But we were talking about I think, if my memory is right, the entire structure and the Outlook system and got all screwed up so who was reporting to who.

46REPORT001224

Q.    Oh.

A.    And like everything -- and that's where I got a fury of contacts from my staff, because they go in there and it's showing they are now like under John Halverson.  They are like, "Are you being transferred?"  And it's just -- they call it the chain of command sort of thing.  There was a tech issue.

Q.    Okay.

A.    So we were just talking about that because it screws up everything.  It screwed up everything.  When we were trying to assign these cases in the training and notify the right command, the command structure we're using is the wrong command because it's not -- so we had a discussion about that.

Q.    I'm still looking for the date you were informed.

A.    Yeah.  So then we're still moving forward.  3-27, that's a discussion about other things with Chief Palopoli.

So then 3-31, that's where -- 3-31 I get an email from Chief Palopoli stating she would like to set up a meeting before or after our PSB meeting.  This is the PSB meeting she means, is the first monthly meeting with the Sheriff for April.

Q.    Okay.

A.    So she says that meeting is at 10:30.  The meeting was titled the meeting -- the email, meeting to discuss PSB X-F-E-R, so transfer.  So invited Captain Reaulo, myself and Matt Summers.  She recommended either 9:30 or 11:30.  I responded I had a conflict at 9:30 and then had a hard stop at

noon so I would be available.  She then -- there's communication back and forth.  I was unavailable for Thursday of that week and it was set for Thursday.  I have those emails. Thursday afternoon.

Q.   And then prior to that you had your regular meeting with Sheridan, Gentry, and Palopoli.  That would have been on Wednesday; correct?

A.   Correct, that was Wednesday the second.

So that's -- I figured that email, it says meeting to discuss PSB transfer.  I mean, I guess maybe that's an official notice.  I don't know.

Q.   Was there a discussion in the meeting with Sheridan and Gentry?

A.   Yes.  So then 4-2 we have the meeting because one of the topics I wanted to bring up at that meeting was all of this rumor and gossip about a second captain and the fact that I am -- I truly felt, still feel to this day, that -- and I expressed this to them -- that I compared it to a train and we are -- we were almost approaching -- we've got to maintain 45 miles per hour to meet the bare minimum of the requirements of the order, the backlog reduction.  We're almost to top out. We're still climbing to top-out speed and with the training and things occurring and they basically pulled the emergency brake already with all of this discussion and I have staff worried. They are, "All am I going to get transferred?  Who is doing

46REPORT001226

what?" It's consumed a whole bunch of their time.

Q. And you shared this?

A. I did. So my plan was to still bring it up here because I still haven't heard officially that this is even happening --

Q. Right.

A. -- other than from Summers who I get he's a chief but he is not -- I'm not -- I don't report to him.

Q. Right.

A. So the 4-2 meeting goes on and I don't know if you want to go through the details of all of that or just focus on the details relative to the transfer issue.

Q. Well, I know that you brought up your concerns during that meeting and the fact that they hadn't told you and at some point didn't they agree that they should have told you and hadn't?

A. Yes. So regarding the transfer and amongst other things, I brought up the fact that I compared to what the Sheriff said. He wanted the bad news and wanted to know if there's problems. And I told him there's problems afoot and explained what these issues were, and I found it concerning that this restructure and all of this that is being relayed by multiple chiefs and has, you know, already caused a concern with the staff and none of it -- I wasn't even involved in any of the discussions.

I said ultimately that's their decision what they want to do. And during the discussion -- and I have a whole

46REPORT001227

bunch of notes of all of the specifics but Chief Gentry brings up again, well -- he brings up the Engelbeck case and he says, "You're very much aware of the Engelbeck case.  What happens if the outside agency requests you to be put on administrative leave?"

Q.   Did you respond to that?

A.   I did not directly to that statement.  So this is now I think we're the third or fourth time that this has been brought up, this notion which I call a veiled threat of administrative leave.  But I did --

Q.   Why do you think they kept bringing that up?

A.   I have no idea.

So I expressed the concern.  I told him that I found it very concerning that, in essence, the PSB commander does not get afforded the same courtesy and treatment, in essence.  I don't think I used the word "treatment" but the same courtesy that the PSB commander affords every other employee of this organization.  And that was on the heels of the administrative leave comment but, you know, it wasn't directly just to that one thing.  I let him finish what he was saying.  And in that discussion -- and he asked sort of what that meant.

Yeah.  He said he wasn't afraid to bring up the bad news, so that's what I was sharing with him.  At first I said it was interesting and concerning.  There's an apparent decision or restructuring of the PSB without any discussion or

110

input or involvement by me.  At first the Sheriff looked at Chief Gentry and like gave a look of something to the effect of I think he asked the rhetorical question, restructure, and seemed confused and Gentry then stated this was the two captains concept.

I reiterated that all of the talk regarding the changes is already negatively impacted efficiency, operations, and will result in decreased efficiency, production, being subject to fines, decreased compliance, possible contempt.  At one point I explained to the group that I have been the only one that has been able to reduce all the numbers, make the progress to date, and was not even involved in the discussion on the matter.  Instead, the message is conveyed to all of those outside my chain and I'm hearing it from other captains and chiefs and other line staff.  Yet no one in my chain has chosen to communicate or discuss it with me.

Chief Gentry began speaking about there being a problem if something were to happen to me and they were concerned for me due to the number of hours I was working.  He stated those hours put me as the hardest working person in the organization, Sheridan at one point brings up that -- right now all the eggs are in one basket and this was the rationale for adding a second captain.  They reiterated I would still have the final say on everything and still be the PSB commander.

I went on to explain that I was not -- this was not

46REPORT001229

part of the plan.  It has been tried two times prior, has contributed partially to the current backlog, and I was not going to be responsible for another captain's decisions that I did not supervise.

Q.    Why not?  Why didn't you want to be responsible?

A.    Because I don't want -- I can't change them.  I don't want to violate the Court's order.  I don't want to violate our policies; and at the end of the day, I want to us get it right and I want it to be a uniform, fair, equitable process that is legitimate.

So if they want somebody else to do it, that's fine, but I'm putting my name on it and being the one to have to explain it and stand up to it, to the Court issues, to the parties, to the Monitor, to the agency, and the public.  My name goes on the letter.  They call me when they don't like the outcome of the case.

The captain in the district who the finding was this and, you know, the person is unhappy, they are calling PSB wanting to talk to -- you know.  They are not the ones that also have to face the public and explain it to them.

So I told him I would -- yeah, not -- yeah, I would not be in contempt.  I said that multiple times.

So I expressed a whole bunch of scenarios on how the second captain didn't work.

Okay.  So this gets to, I'm sorry, where you were.

46REPORT001230

112

The Chief Deputy then indicated what happens if the outside law enforcement agency working the complaint that I know you know about -- he's referring to Engelbeck -- comes back and says that I need to be on administrative leave.

I expressed very interesting that the PSB commander is not afforded the same courtesy that the PSB commander provides every other employee in this organization.  He cocked his head looked at me and I stated that the -- that individual, meaning Engelbeck, has been retaliating towards me, harassing me and on a smear campaign of me, the investigator of the Conduct Resolution section and the Appointing Authority and every other supervisor, commander that has held him accountable for something.

I'm referring to John Bailey, to Chris Houck in District 1 of those cases that were there.  This has been going on for years and it should have been reviewed with clearly seeing there's no need for an investigation.

I did clarify that that is just on what I know on what the allegations are.

Q.   Right.

A.   I said there might be something else I'm not aware of but based on my one-time review of the -- whatever, three, four paragraphs and I clarified that and said so.  Gentry then starts telling -- saying that, well, it's a complaint and there's no way around conducting an investigation.  That's what

46REPORT001231

113

policy says.

I remained silent and at this point just said okay. And I actually closed my notebook. I thought that the meeting was pretty much over at this point. And then the Sheriff started to speak up and they were -- he said he was concerned for me. And Gentry did state they should have spoken to me about this and discussed it but thought my supervisor had.

Chief Palopoli, who was in the meeting, says she brought it up and I interjected stating that, no, when Chief Palopoli brought this up several weeks ago, it was in the same conversation with the Engelbeck complaint.

Q.   Right.

A.   And there was -- that was the way it was brought up to me and that the Chief Deputy had already decided when it was brought up and the fact that that second captain was Morrison. I once again explained my concern with the history about the Engelbeck complaint and the idea of bringing Morrison, who was previously sustained for what he did.

So he -- Gentry claimed he didn't know what the history was and they were looking for someone that would work well with me.

So I informed Gentry I already had two people advise that they would quit or resign if Dominick came to PSB, and I was unsure that they would actually go through with it or not. But then the Sheriff asked what I was suggesting; and I said I

had a plan to fill, you know, the special projects manager position where I had the job description in the review stage right now.  We have another plan in place and, you know, he brings up the eggs in one basket and I said, "Well, what would be your [inaudible] Sheriff would be my plan if something were to happen."

And I said, "Well, I would like to, you know, generate something to show that but I have full confidence that my lieutenants would be able to at least, if something unexpected happened to me, to at least be able to figure it out and carry the torch for a short period of time," knowing that -- barring a life-threatening situation, I could still help guide them through the phone and give them a couple of things here and there and give them -- at least tell them where things are if they couldn't figure it out.  But I also expressed that I think that the Court and the Monitor would be -- if something unexpected like that occurred, would be also willing to work with us.

At one point, Gentry chuckled at the idea because I said, "Well, I think the lieutenants can figure it out if something unexpected happened," and I wrote here in my notes it appeared to me he chuckled with the ideas and I said, "Well, it's still my job to mentor my lieutenants," but that wasn't going to work.  He brought up a situation that says that he was told by some chief that when I was on my last vacation, someone

46REPORT001233

went to Chief Caputo and asked something about PSB and Chief Caputo told them they had to wait until I got back.

I asked if the situation warranted immediate response because I had a lieutenant filling in and I know they took care of some stuff while I was gone because they briefed me when I got back.

And he didn't have any -- he said he didn't have any other details of what that was.

So at the end of the conversation.  It was agreed upon specifically by Chief Palopoli that I had until the end of the month to come up with a contingency plan and then it will be reconsidered, the two-lieutenant idea.

Q.    During this meeting, did Chief Gentry or anyone else give you their opinion of the Engelbeck complaint in terms of its veracity?

A.    At this meeting I don't -- I don't know.  So at this meeting if I go back through looking at my notes . . .

Q.    Okay.  So at the end of that meeting, at any rate, they were holding off on the transfers?

A.    Well, that's -- he said I had 30 days to come up with a contingency plan.  I didn't ever officially was told that the transfer was occurring or not occurring.  Going back to I know Dominick said he did send out an email that he was officially told.  I don't know if he said a date.  That goes back to that email that he sent to his staff that caused a -- but then later

46REPORT001234

that same day, so this meeting ends that we talked about some other stuff in the meeting.

I would have to double-check my notes to see if they made any comments specifically about the Engelbeck complaint, you know, more.  But I don't think off the top of my head.

So later that afternoon -- and I would have to check my email for the date.  So we have the meeting scheduled on 4-3, the next day, to talk about the transfer.  I get the meeting cancelation notice on my email that -- from Chief Palopoli that just says -- I have to look at the verbiage there.  It just says this meeting is canceled and the transfer is on hold or something to that effect.  You would have to look at the email to see.

And then 4-2, later on, a few moments later, I think it was an hour or two, Dominick calls me and asked if I knew anything and I stated I only got the individual meeting cancelation.  He informed me he did receive an individual email as well and just said the transfer is on hold indefinitely or something to that effect.  He said he was going to trying to track down Chief Palopoli the next day to see if he can get some more answers and some specifics.  He said he went looking for Chief Palopoli and ran into Chief McFarland and Summers and one of them told Dominick that they -- which it sounded to me like he's talking about Gentry, Sheridan, and Chief Palopoli -- went to lunch and then after lunch indicated the transfer was

on hold.  Dominick claims he asked Summers and Summers said he didn't know what was going on because they, meaning Palopoli and Gentry and the Sheriff, handle PSB matters.

So 4-3 then I have a discussion with Dominick as well on phone and he says he was able to locate Chief Palopoli and she indicated there was a meeting and that I had -- I had a meeting with them and I had 30 days to come up with a plan and the transfer is on hold.

So I didn't really offer much information to Dominick at all and informed him that I did have a meeting and I did -- I told him -- I told the information that I don't think they wanted to hear and I'm working on drafting a contingency plan.

Q.   So given what you just said about you told them things they didn't want to hear, when you walked away from that meeting, what was your perspective or thoughts about what had just happened?

A.   My -- that's the Wednesday meeting with Sheriff Gentry.  I walked out of that meeting and I felt that -- because I felt that it was my obligation at some point where I was seeing these other things occurring, that I needed to make it known to them that I was not going -- I was not going to be found in contempt, that I wasn't going to not follow the policies, procedures, and the orders.

And at that point I felt that I knew, if you want to call it due diligence, but I did everything I needed to do to

46REPORT001236

try to save them from themselves as well of what I predict of, you know, going down the road of not following, you know, and/or just not meeting the deadline of backlog reduction, all of those things.

And I waived the flag as best I could and at that point, what happens to them -- or what they choose to do or decide is on them.

So when I walked out of that meeting, I felt that I needed to -- that's why I actually brought some notes to that meeting, because we talked about some other things, too, meaning some cases; but I felt like I needed to have that forum because as the Sheriff said, he wanted to know the bad news and when things or there's problems and I felt satisfied that I told him of what my position was and what their problems were.

Q.    How did you perceive their reception of what you told them?

A.    I don't think they were -- I did not perceive it as if they -- I thought they were sort of surprised that I stood up and I wasn't going to back down to those things, quite frankly. And I thought of it as two things afterwards.  I thought either they are going to respect me more or they are going to completely despise me and I couldn't tell which one it was.

Q.    What do you think today?

A.    I don't think they -- I don't think they care for me at all so -- they spoke many a times in that meeting of I'm

46REPORT001237

working too much and what if something were to happen to me or my wife and they are concerned.  But the Sheriff did say at the end, he goes, I have in my notes, because I was -- I could -- I was visibly nervous at the end and I think he could sense that.

And he said that I did not have to wait until one of these meetings.  Obviously this was weighing on me for some time and he could tell that and I did not have to wait for one of these meetings to bring these issues up.  And this was all, that they were just concerned about me is what he says.

How I think that is completely not the case is if that was truly the case, there's no communication.  The next meeting is canceled.  Nobody -- not any three of them reached out to me.  I attended the community meeting, had a discussion briefly with Gentry at that community meeting about new case that we were dealing with and Palopoli, I gave them a briefing update.  Not once did they ask about me or anything.

Q.    You went to the community meeting?

A.    In Agila.  There's one the day after this meeting.

Q.    Oh.  Okay.

A.    So the MCSO one.

Q.    Okay.

A.    And so I had to approach them to -- I needed to give them a briefing.  We had case involving the detention officers working -- doing inappropriate things with the Mexican Mafia individuals and so that was all just rapidly evolving.  So this

meeting is Wednesday. That was rapidly evolving Thursday and into Friday and that community meeting at Agila was Thursday night so I drove up there. I got -- we did a massive search at the jail and found some drugs and so I was briefing. So I wanted to give the Chief Deputy that update.

And I said, hey, when you have a chance for an update. So we went into one of the side rooms before the meeting started and I gave him the update.

But this goes back to -- they just asked questions about that case pretty much. Other than that, ignored me. The Chief Deputy did come over at one point and stand by me at the end. He was talking to somebody I was talking to.

But the Sheriff actually just walked by. I was waiting to see what -- I was interested to see what the reaction was to try to understand whether they were happy or not from what I told them. And the Sheriff walked by at one point with, ironically enough, Palopoli showed up there at Aguila, which seemed a little bit odd to me, and they go walking out together. And the Sheriff looked over at me and just -- he said, "Thanks for coming to" -- I had two of my investigators there. And he looks at me and just said, "I'm glad we didn't need you," or something like that and just kept walking.

Q.    What happened the next day?

A.    So then there's no communication until that afternoon the

next day, which is Friday.  So Friday, the fourth, approximately 1518 hours, I'm in my office speaking with Lieutenant Crosby about that Fourth Avenue Jail, that case because they're continuing to do more follow-up now on Friday morning about the search, the one that started Thursday.  We were actually putting three officers on leave because of it because we got a chance to watch the video and it's pretty clear on video that this is some bad stuff going on.

And so I was in the office.  Crosby was giving me an update because they just went and placed those three people on leave and he's giving me an update on the case.  And I get a phone call on my cell phone from a number I don't recognize.  I have it written down here, I didn't have programmed in my phone, so I let it go to voicemail.

And a few moments later a text message comes from that number that says, "Hey, Greg.  This is Jeff Gentry. Please call me as soon as you can."  I assumed he was inquiring about the update of the case that I was briefing Crosby on because they were just at the jail and I'm sure it's created a whole bunch of additional questions.  So I elected to complete that briefing so when I called to Gentry, I would at least have the complete information.

So that goes on about 1535 hours so we're talking what is that, 10, 15 minutes later, give or take.  I return the call to Gentry and it rang for a short time.  He answered the

phone and said something to the effect of, "Hey, Greg."  And I asked him if this was a good time and he said, "Hold on for a second," as he was walking back to his office is what he says.

It sounds like he's walking on phone while he's carrying the phone and so there's a pause.  And then he began speaking.  It sounded as if he was walking.  He said he was in a very difficult position but he needed to place me on administrative leave.  He said that the conversation -- that it is an awkward situation as I am normally the one to place someone on administrative leave, so he was asking me how to go about putting myself on administrative leave.

He asked me to put him in contact with one of my lieutenants and I informed him that normally Linda does the paperwork but she has already left for the day.  And I indicated that the Conduct Resolution section also knows how to do the paperwork and he stated he did not think to go to the Conduct Resolution section.  And I affirmed that that is in his building, just downstairs.

He said he would contact item.  I told him the other lieutenant that is here is Lieutenant Crosby as I just finished the briefing with him so I assumed he was still in the building.

I asked Gentry if I would be provided with any information, topic, idea about the reason for the administrative leave and he stated that it was the Engelbeck

complaint.

He then stated something to the effect of, "I know it's bullshit," or, "It's nothing," or he used some other similar word.  I don't know.  Originally I thought he said bullshit but I don't know for certain if that's the actual term he used.  But he's indicated that it's nothing, but he said that he was told the Sheriff to do this after legal counsel --

Q.   He was told by the Sheriff?

A.   Yep, to do this after legal counsel told the Sheriff they needed to handle this case like any other and they did not need to get into trouble with the guy across the street, referring to the judge.  I think he said -- he clarified that but it was pretty obvious to me that he meant Judge Snow.

I informed Chief Gentry I was very concerned as I was aware of the current practices and qualifications of when we put a person on administrative leave and this is concerning as I'm thinking in my head the allegation I'm aware of is the Engelbeck complaint and that's retaliation actually against me.  My thought is, that doesn't typically qualify at the onset of a complaint for administrative leave, knowing that I know what we have been doing for years.

Chief Gentry then stated something to the effect of he has been the Chief Deputy for three months and this is not something desirable or something to the effect of he never thought he would do or something like that.

I do believe I reiterated that -- he reiterated that he was -- this is what needed to be done by the Sheriff and so that is what he's doing.

I indicated that I understand and Gentry began asking if I needed a ride home, if I was at the office or what exactly the process was.

I told Chief Gentry that I was at the office. I'm aware of the procedures and typically when this occurs at such a time as today late in the day or there's no paperwork readily available, the person goes home and will return on Monday or during the week at a different time once the paperwork is drafted to sign.

I told Gentry I would pack my stuff up right now and leave the building. I will go home and check in next week.

I informed him I will not do anything such as law enforcement activities. I know the rules and we'll go from there.

Chief Gentry, if I recall correctly, did apologize at least once saying, "I'm sorry," and said that he would be in touch. The call then ended. It was approximately six minutes in length and that summary that I gave you is my notes I wrote about 29 hours after it occurred.

Q.   Have you since been served with an NOI?

A.   No.

Q.   Have you since been called in for any interview?

46REPORT001243

A.    No.

Q.    Do you know today what the allegations are against you?

A.    No, not -- let me correct that.  Not for the case that I am own administrative leave for.

Q.    Okay.

A.    So -- and I have the paperwork here.  So Monday -- I'm jumping ahead.

So I went to the restroom.  I actually -- and I'll admit it.  I copied some notes that I had on my computer and emailed them to myself.  I went to the restroom.  This is right after I hung up the phone, grabbed my bag.

Q.    And these were personal notes, sir?

A.    These are my running notes of my interactions with my chief and those kinds of things and I didn't get all of them.  But I basically spent I think it was probably less than two or three minutes.  I just did a copy.  I didn't delete anything.  Copy and pasted it into an email.  I sent it to my work email and my personal email.

Q.    Okay.

A.    So that I would have them.

And then went to the restroom, came back, got my -- like my glasses and my bag and my drink, shut down my computer, went to my door.  My door normally is locked so when you close the door, it's locked.  I changed it so it was unlocked so that figuring somebody would probably have to get in there and I

46REPORT001244

didn't want -- I know there's only a few people that have a key to that office.

And so I left it unlocked, in the unlocked position and I went to walk out and I saw -- I walked by Hiticus's office and he was there and he was standing at his computer and I said, "Oh, have a good one."  And he says, "Have a good weekend."  And he says, "See you Monday."

I said, "Have a great weekend."  And I went out the door, down the elevator into my car.

I drove home and while I was driving home, because my mobile computer was on, I get the error message that it pings and shows that I'm locked out.

So I see that.  So I go home and I hear nothing Monday.  I call Monday morning.  I know what the procedure is so I call Linda Walters, who is a subordinate of mine by the way, and call in and tell her, you know -- she was apparently already advised so she knew.  And I said, "I'm calling in," and I think her statement was, "This is going to suck."  And I said, "It's nothing personal.  I'm just calling in.  This is what we need to do."

And I then waited at home.  Approximately 4:42, 1642, my home phone starts ringing.  Now, I do have a home phone number, still.

Q.    I do, too, actually.

A.    We usually don't use it for anything except for -- yeah.

46REPORT001245

And I noticed the prefix on the caller ID is -- well, it's 602 but it's 908, and I know that that is one of some cell phones, County cell phones.

And it doesn't have a name.  And I'm like that's just so bizarre because who would have my home phone number?  So my wife answers it and it is Lieutenant Crosby.  She says it's Lieutenant Crosby.

I get on the phone and Lieutenant Crosby says -- you could tell he's driving and he says, "I pulled the short straw and I have to serve you with your paperwork."  I made a sarcastic comment that he has 18 minutes, knowing that I only have to be there until 5 o'clock.  And he said, "I'm right nearby," and I said, "I'll be waiting outside."

And so I went out on my front patio and waited and he showed up a few minutes later and on the hood of his car in the street, he gave me -- he put on a recorder and read the letter and then --

Q.   It's the admin letter; right?

A.   Yeah.  Just the standard letter that has Gentry's name on it.

Q.   That's all right.  I know what it is.

A.   And then -- so he reads that aloud and he goes on the record and then they give me the standard packet and I said, "Are you going to read this whole thing to me?"

And he goes, "No.  I'm not going to put you through

46REPORT001246

that."

And I said, "Okay."  And he did read a few spots I think on the second page.

But it caught my attention because this IA number is different than what I know is 159 or 139, I'm sorry, that is what I know is the Engelbeck complaint, which I know is 111. And the way I know that is because it was on the weekly report when I sent the weekly report out and also when I reviewed it with Anders on our weekly reports, because we go in sequential order.

So I interrupted Crosby and I said, "Is this the correct IA number?"

And his response was, "I believe so."

And my response was, "Oh, that's interesting, because that's not the same case as the Engelbeck complaint."

And so then he finished the paperwork and he said, "There's one request is," what he said, "and that is for your key to your office."

And I said, "Well, let me go get it."  So I went in and got the two keys that I have.  One is my specific office door key and then the other one is the general key to the general doors.  We have the two-tiered system there and I brought them out to him and I asked him if he could take a picture of them before I gave them to him and he did and then I said, "Well, let me -- I would like to take a picture."  I left

46REPORT001247

my phone inside so I went back inside, came back out, snapped the photo of the two keys, gave him the keys and at that point I asked him if he was still on the recorder and he said he wasn't.

And I said, "I just want to let you know all of the cases I had in my possession in my car, my car is at the office there in my parking space and all of those cases I physically had in my possession, the physical case files that I would have done over the weekend," and I think almost all of them I already went through just during the week. I just didn't sign. I said, "They are on the passenger seat of the car and Sandra, our admin, as a key to my vehicle. So I just wanted to let you know that they are there."

And he says, "Got it," and he just shook his head and I said, "It's all good. I said it's all good, have a good one." And he got in his car and drove away so . . .

Q.    Do you now know what the allegations are for that 0139 investigation?

A.    I do not. I have not had any communication other than calling Linda every day.

Q.    So no one has reached out to you?

A.    No. I called Linda every morning of working. I took a day off here and there, took some -- you know, I sent her an email. You know, I had to take my kids to a doctor's appointment and things like that which is all the standard

process here.  It's in the letter that I'm following to a T.

And still to this day, as of today, I have -- I don't know what -- I haven't had any communication with anybody.

Q.   But it's your understanding that your admin leave is a result of this second IA?

A.   Well, the paperwork has this other --

Q.   Only that IA number?

A.   M'hum.  But he verbally told me it was the Engelbeck complaint.  So I don't know.  I know looking at that number, this number here, 139, just thinking of where we were, that's a very recent number, like literally probably that week or the Monday that they pulled the number, like if I'm just guesstimating where we are with what I know.

Q.   So all in all, Captain, having discussed what we've discussed for the last three plus hours now, and they are going to throw us out of here pretty soon here I'm pretty sure, give me your overall thoughts of what's happened here and why, if you know or if you have an opinion?

A.   Well, I didn't get into the other details of the meeting on the Wednesday meeting and we talked about three other cases, all of which -- and I have the chance to sort of look back now and I have of course been on leave now for whatever it is, two weeks to think about this, is those cases, those other cases we've talked about also have the potential to reflect negatively on the Sheriff and/or the Sheriff's Office.

Q.   Can you tell me what those cases are?

A.   One of those cases involves -- we went into quite --

Q.   And discussed this with them at the Wednesday meeting?

A.   I did.

Q.   The last Wednesday meeting on the second.

A.   The second because I started the meeting with first wanting to go through these and typically we go through the priority cases or things that are -- so the first was the Callahan, case so this is a case that involves a detention officer who was alleged to be having sex with an inmate in a closet at the jail and during that he also gave her a gummy bear that was not proven but it seemed like it might be, you know, a drug gummy bear, what do they call it, an edible potentially.

The sex investigation has basically resulted -- is resulting in like a not sustained because we don't have enough but he is sustained on going in the closet.  We have him going in there and some other lower level things.  So, I mean, I think of this -- I'm trying to think of this in the bigger picture but that certainly -- there was lots of questions of was it a drug thing.

Q.   And how did it get into the jail?

A.   Well, the officer gave it to her.  So that is a current hot button topic, so we talked about that and how he's on admin leave but he's going to be removed off of admin leave.  People

were just waiting for the discipline to be done.

Then the next case that was brought up is the Dominique Campbell case which involves a detention sergeant falsifying his time records and that is one -- a principal in this case is now Chief Brandon Smith.

Q.    He's a principal?

A.    He is a principal in that case.  It's on hold or was because Dominique Campbell is being prosecuted for felony charges on this and it's pending a trial date.

Q.    So it was filed criminally?

A.    Yes.  So the administrative is not done but the administrative has since identified Brandon Smith.  It was an open case when I was recently promoted to chief.  He was a detention captain.  He just got promoted under this new administration.

Q.    And that was an open case when he was promoted to chief?

A.    Yep.

Q.    Do you know what the allegations were?

A.    The allegation is he's interfering with an administrative investigation and criminal investigation.

Where we are at from an investigative standpoint, I don't know if we're going to be at sustained on that.  It's clearly sustained on a lower level.  It's alleged that -- so a co-worker reported this sergeant, who is friends with Brandon Smith, basically falsifying his time for weeks, not being there

and putting in hours.  That person made a complaint to PSB. Brandon Smith caught wind of it, went and researched all of his timecards, printed out a list, gave it to the suspect and told him to come up with an excuse for every one of those days.

Q.    And the principal is Dominique --

A.    Campbell.

Q.    -- Campbell?

A.    240008.

Q.    Is it a him or a her?

A.    It's a he.

So there's -- there's a timeline issue potentially that might be his out, meaning Brandon Smith's, for the CAT-7 but that clearly -- because the Sheriff asked, "You mean the Brandon Smith we just promoted?"

And I said, "Yes, sir.  That's who we're talking about."

And it also involves a detention lieutenant who we might or the investigation believes that he lied in his interview potentially but it's sort of like they got it to the point they can't do anything more because Criminal has Brandon Smith and that lieutenant were actually going to testify on behalf of the defense --

Q.    Oh.

A.    -- for that employee.

Q.    Okay.

134

A.    Was the plan.  He might take a plea.  But he's being prosecuted for a felony.  So we went into the details of concern of that and meaning Sheridan and Gentry rolled their eyes when they said, "The Brandon Smith we just promoted to chief?"  And I said yes.  And I know on the promotion form I put that information on there and I never saw an exception memo, so I know that information was on when the PSB did the review of it.

And then I went on and explained the status of the backlog and at one point --

Q.    You said there were three cases?

A.    Yep.

Q.    I'm sorry.

A.    So I talked about the backlog and just the progress we've made, you know, the levels, you know, being under a thousand. And the Sheriff, "Would it be a policy violation if I came across the table and gave you a kiss on the forehead?"

And then he said, "Well, thank you for that."  And I explained how the training and what our plan is moving forward to maintain the target.

So we talked about that and then Chief Palopoli brought up the questions of asking about the Brian Stutsman case.  So this involves Markham, former Deputy Markham, and I went into details on this which I previously briefed them on this back in the March meeting but the Sheriff seemed to not

46REPORT001253

really remember.

So this is -- and this has been discussed with Chief Anders at length.  In short, Deputy Markham, who was a deputy at the time, her significant other allegedly committed suicide in her presence and it's being criminally investigated by Surprise Police Department.  And the scene is not matching I believe, that there might be more to the story and this might not have been a suicide, rather potentially a homicide.

Q.    And what does that do with Stutsman?

A.    Well, Stutsman, this occurs on a Saturday.  Stutsman storms into PSB Monday morning of that week and I went through this whole story, we have an IA on it, and demands to speak to me unannounced and he starts volunteering information that he was texting with her right when this happened and he's been trying to help her, made lots of statements that seemed very potentially suspicious, that he might have been involved with her, and that he was trying to get her to California and that she originally thought she had an alcohol problem but maybe it's more -- she had a history of some complaints from the end of last year of the no show-no call and we were still working on those.  But just the nature of him showing up and he starts volunteering these text communications.

We know with our information from Surprise that they grabbed her phones and did search warrants.  So there might be some sort of connection there with Stutsman.  And then

ironically enough, later that week, after Stutsman just shows up and demands to speak to me and I documented this all because I asked him, "Do we need to go into an interview room?"

And he goes, "No.  No.  No.  I just need to" -- it was just so bizarre that one of his sergeants was being interviewed on a different case at the time in PSB and I think he thought that sergeant was going to out him.  The sergeant did, at the end of his interview, say he thought there was -- they basically at the district were not on the same page with how the issues with Markham should be.

Q.    Yes.

A.    And they all suspect something more because going on so we were getting all of these things.

Well, oddly enough, that Friday then of that week, Thursday or Friday, when Surprise Police call me -- well, they call PSB -- well, actually I think they called Conduct Resolution.  We got in contact with them to find out what they needed and they wanted to know -- they were told she was on administrative leave, which she wasn't.  She was on, like, unapproved leave and it looks like the Leave Management Section dropped the ball on that.

But when I inquired of what her current status was, I get forwarded a copy of her immediate resignation that was received, it was handwritten and received by Stutsman which could be a sheer coincidence.  He is the District 3 captain.

46REPORT001255

That's where she worked.  But -- so I expressed, you know, some of the details of why Surprise thinks it's suspect and I know that Stutsman is -- I believe Stutsman is on good terms with Chief Gentry.

So that's certainly -- and at one point the Sheriff says, "So you're thinking she killed him?"

And I said, "Well, that's what they are looking at." And then when talking about Stutsman, and I wrote down one of these quotes that at one point the Sheriff says, "Wait a minute.  Do you know Stutsman?  Do you know?"

And I said, "Yeah, I know who he is."

And he made a statement -- it was somewhat to the effect of, "I bet he was fucking her."

And I just was like, "Okay."

And so I just was bringing up to them because this certainly could cause -- and Surprise is -- they are going to let us know if they get to the point of arresting somebody, even though she doesn't work for us any more, but certainly a concern there.

So those are pretty much the three cases that I brought up.  So I know that's a long about way but the more I try to consider, I don't think any of those three would be favorable.  And I think drawing -- this is just Greg's opinion, drawing I think the line in the sand where I reiterated that I will not be in contempt.  I will not violate the Court's order.

46REPORT001256

And I told all three of them there that I believe there's only two people's names that are -- I referred many times that, you know, my neck is on the line, you know, with the Court as the PSB commander, not as Greg Lugo but as the PSB commander; and the only people that are facing that is Sheriff -- and I pointed at him -- and me, in that order, none of these other people in the room.

And I told the Sheriff that he put the responsibility of the PSB on me publicly because I've seen news articles where he said it's -- I'm the PSB commander for now and also made the statement of he has a plan and it's a good plan, referring to me, and so he's distancing himself there. And I told him he put it on me publicly. It's under the court order. And then he told me as well multiple times individually that you do your thing and they are restructuring or making decisions that I think are going to be detrimental to the progress. And I see us forthcoming with fines and other issues and, like, I am not going to be responsible for that or I don't want to be responsible for that.

Q.   You mentioned in there when you were telling us -- and thank you for that -- that only you and Sheridan really are named in the order in terms of responsibility.

When you had the discussion with him about the issue of the attorney that was allowed to be in the IA, and you explained to him what happened, was he concerned?

46REPORT001257

A.    He was.  So that goes back to the March meeting when we talk about the attorney and at one point, because I reiterated that that's contrary to our policy, the GH-2.  And the GH-2 policy is I believe the only policy that is actually issued by the Court.

And under the third order, I don't know -- I don't think there's another one.  And at one point he does say, and I'll have to look at my notes exactly, but he sort of says out loud, "So I violated the court order."  I don't know if he said we or I violated the court order, meaning him.

And I nodded and said, "Well, you violated the policy."  And he repeated it out loud.  He then looked to me like his face turned red.  He slouched down in his chair and I want to say he folded his arms at that point and looked over at me.

And I did advise him enough to verify in my notes that I wrote after that because it was something that I don't think I'll ever forget, the reaction, but that -- I said, "It's put me in a very difficult position but it is going to be in the report."

Q.    You don't really have a choice; right?

A.    Yeah.  So that's where -- so that was his reaction to that.

Q.    Is there anything, Captain, that we haven't discussed, that you would like to discuss that we missed in our trip

through this last several months?

A.   Let me just take a second to look here.

I would like to mention the conversation that I had. This goes back to sort of that support outside of PSB.  So there was a discussion that I had, a telephone conversation with George Hawthorne at one point.  And I would have to go back and try to find the date exactly, but this is well after he's working with our organization.  I want to say it was after the January or was it the February site visit, the January 1?

Q.   Yes.

A.   And the discussion was brought up about Sergeant Hall and this conduct and interviews.  So there was a day and I want to say it was the week before the promotion announcement that they were promoting Matt Summers is how I remember it because -- and I want to say it was a Wednesday and I got a phone call on my cell phone from a number, my work cell phone, that just said 602.  And I answered it and it was -- I was clearly on speaker phone and it was George Hawthorne and he said that he had Chief Pape there with him and I could -- it sounded to me like there was somebody else, there was other people in the background but I don't know for certain.  And, in essence, Chief Hawthorne says that he went and met -- and I don't recall if he meant him and Pape, if he said him and Gentry met with Brandon Hall and Hall, has a whole bunch of gripes about PSB.

And so Hawthorne starts asking me about, you know,

46REPORT001259

this A.R.S. and the timelines and NOIs and all of the same issues that Brandon Hall has previously brought up in service complaints.

And it was, quite frankly, offensive the way that he was coming across cold calling me on speaker and I advised him that all of those matters that he's talking about were previously addressed and documented.

And he stated something to the effect of, "Well, I just was told to look into it. We're trying to figure something out," or something to that effect. And then he pretty much was in a hurry to get me off the phone.

So the phone call ends and I want to say it was two days later and I believe it was on a Friday. I then get another call from the same sort of blocked number and it is Chief Hawthorne again. And I can tell I'm on speaker phone but he says -- he basically wants to apologize for that and said that he was just told to look into some stuff and that's what he was doing. "And you're doing a great job. Thanks." And then said bye.

Q.    Did he tell you who told him to look into stuff?

A.    No.

Q.    Okay.

A.    So I heard rumors and it was just rumor I heard that Chief Gentry might have been with Hawthorne when they went and met with Hall. It sounds like I heard rumors of that and I don't

know if that's accurate or not but -- so I don't know if that was May as well or not but what I heard and I didn't, you know, completely clarify that and where that comes into play is significant further is because this goes back to --

And I'm sorry, I'm opening up more -- one of the discussions with my boss because we subsequently got a complaint in about Brandon Hall's conduct at the PSB-8 training and it was an anonymous complaint and how he was speaking to PSB command and PSB instructors in that class.  It was the very first class, like two days after we get this anonymous complaint.  And this is about a week or two after I had this discussion with Hawthorne.

And so I went to my boss, Chief Palopoli, and said, hey, because then I learned Chief Hawthorne, I was going to go talk to him and find out what the discussion entailed hoping that what did they tell him, did they tell him to behave?  Is this something they want to just handle?  Is it internal sort of thing of his conduct at this training?

I was only there for a portion of the training.  I did not see anything that I think would rise to a policy violation even with his -- he had some questions for me.  He had some difficult questions but supposedly it was much worse in the morning and I wasn't there for it.

So there's an IA that's open on that.  And the reason I opened an IA on it was because I went to my boss saying I was

going to go to Hawthorne.  Who do you want me to talk to this about this now?  And he said -- because I heard that maybe Gentry was there so can we find out what the meeting entailed, who did it so we can figure out did they tell him to act appropriate or not, like what did they tell him?  And because I think we had a more significant issue of a week prior, they told him to mind his business with PSB and that he's acting this way as opposed to or did they just fuel the fire.  And then decide if they want to handle it.

And she said she was going to check.  She was going to check and never got back with me.  And so I, for purposes of -- and I've discussed this with Chief Anders, we made it an IA and it's being investigated.

Q.    Okay.

A.    And then just the last thing I would like to mention and bring up is it's become overwhelmingly evident that Chief Palopoli and Chief Gentry and others in our chain of command and even the Sheriff are clearly not informed and understand the processes that are in place with PSB to include the meetings, requirements, and interactions that the PSB commander has with the Monitor Team.

And I think that that is a further -- a symptom of their uneasiness and some of their treatment towards me.

So I don't think they have the slightest idea of the documentation, the work flow, the process, the communication

144

and things.  And I firmly suspect that that is why there are some of these cases a contributing factor that they have since initiated.  But I don't know exactly but, you know, I can -- I feel confident that I did what I needed to do and bring what I needed to bring to their attention.

Q.    Fair enough.

Captain, is there anything else?

A.    No.  Just -- well, yeah.  Just lastly, I just -- you know, I'm overwhelmingly concerned of repercussions from the information that I shared here today and this is, once again, based on the notes I have available to me at this moment and what I could confirm the specific dates and times, knowing that I know there's more and there's some more specific evidence. But certainly I have concerns about that but --

Q.    What do you think is going to happen to you?

A.    They could initiate additional investigations, move towards a termination offense, manipulate findings of investigations involving myself and, in essence, also try to throw other accusations or other problems my direction, blaming me for it when that's not the case.  And then not being afforded -- me not being afforded the due process of it, all by even I think to this date, you know, just in the last few weeks completely jeopardizing my reputation, my, you know, the perception of others affecting future job employment opportunities, you know, career growth in others areas or other

46REPORT001263

career aspirations.

And, in essence, I certainly expect repercussions for doing this interview while I'm on administrative leave.

Q.    Then why did you do it?

A.    It's the right thing to do.  The truth needs to be said and the facts need to be provided so that the appropriate authorities can do what they want to do.

Q.    Shall we conclude at this point, sir?

All right.  We are concluding this interview at 2 p.m. on Friday, April 18.

(Proceedings concluded at 2:00 p.m.)

46REPORT001264

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 7th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with JEFF GENTRY

April 21, 2025

_____


Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001266

## TRANSCRIPT OF INTERVIEW WITH JEFF GENTRY

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001267

P R O C E E D I N G S

MR. ANDERS:  -- building in the Federal Monitor's conference room.

With me today is Chief Kiyler, Major Peters is on the telephone.

And I'll ask each one of you to identify yourselves, please.

MS. BARNES:  Sarah Barnes, outside counsel from Broening, Oberg, Woods & Wilson, for Undersheriiff Gentry.

MR. MASTERSON:  John Masterson with Jones, Skelton & Hochuli, for Maricopa County Sheriff and Maricopa County Sheriff's Office.

THE WITNESS:  And I'm Jeff Gentry, Undersheriff, Maricopa County.

MR. ANDERS:  Great.  Thank you.

EXAMINATION

BY MR. ANDERS:

Q.   So last week, Chief Deputy, has the title changed?

A.   Yes.

Q.   Good.  I like Undersheriff.

A.   It more reflects the job description.

Q.   There you go.  Good.  Thanks so much for being here today. I really appreciate it.

A.   Sure.

Q.   We'll just go through a series of questions.  If there's

something I ask and you don't understand, please just let me know. There's nothing here that's about gotcha or anything like that. I'll be as transparent and straightforward as I reasonably can be, but there will just be a series of topics that I would like to ask you about.

A. Sure.

Q. And of course I know you'll be as forthcoming as you possibly can.

I think I would just like to start with your assessment of Chief -- Executive Chief Palopoli with regards to her expertise as it relates to administrative investigations and criminal investigations of sworn personnel.

A. I haven't had much of an opportunity to assess that at all. We have been together working in this job for about two months now. So there hasn't been much of an assessment of that. I know that prior to coming here with the Sheriff's Office that she had worked at Scottsdale PD and was part of their Professional Standards Bureau at some point.

Q. As part of the consideration to hire her with the Sheriff's Office, would her training and expertise associated with administrative and criminal investigations be a consideration?

A. Certainly.

Q. Your thoughts about Chief Summers and the same question, his training, expertise as it relates to criminal and

administrative investigations of sworn personnel?

A.   Again, I worked here once before, right.  I didn't have a lot of contact with Chief Summers even back then and so the only assessment I have of him is over the last couple of months.  He seemed to be very helpful in CID and very knowledgeable about the court orders and what was happening in PSB, but I don't know that I have an assessment about his abilities to investigate.

Q.   Okay.

How about just not necessarily investigate but just knowledge of the process.  And these instructions are going to go away very soon.  I apologize.

A.   No worries.  He seems to be very knowledgeable about the process.

Q.   Okay.  Great.

And then how about yourself, Undersheriff, your training, expertise and experience in administrative and criminal investigations of sworn personnel?

A.   I have very little experience in investigating sworn personnel.  In my previous assignment with the Sheriff's Office I had to do just couple of internal investigations.  It would be administrative and I was part of a couple of criminal ones, mostly as a reporter and once as a witness.

Q.   Okay.

Have you worked in Internal Affairs or PSB?

A.    I did not.

Q.    Okay.

Are you aware of any -- I'll call them Internal Affairs investigations, synonymous with PSB investigations but are you aware of any Internal Affairs investigations or criminal investigations involving Captain Lugo as a principal or as a suspect at any time during his career?

A.    Yes.

Q.    Aside from the most recipient developments?

A.    No.

Q.    Okay.  Do you have knowledge of -- have you reviewed any of his previous annual evaluations?

A.    I have not.

Q.    Do you have a general opinion of -- the current investigations aside so maybe let's rewind about six weeks, any impressions with regards to Captain Lugo's professional ethics?

A.    None.

Q.    Any concerns about an individual instance or a pattern of instances regarding policy breaches by Captain Lugo?

A.    No.

Q.    Okay.  Why has Captain Lugo been assigned to PSB in recipient years?  Do you know?

A.    I don't know.  He was appointed to that position or transferred in or however you want to say it by a previous administration and saw no reason to change that.

46REPORT001271

Q.    Neither you nor the Sheriff has had a reason to consider a change in command at PSB prior to these most recent allegations?

A.    No.    Not at all with a change in command at all.    But I did notice that Captain Lugo was extremely overworked.    He was putting in a lot excessive hours and I began to worry that we might have a single point of failure there.    Everybody that I talked to said they go to Greg Lugo for absolutely everything PSB related and I noticed that I was getting emails and things from him in the evening hours fairly regularly and so I began to question whether or not we needed to give him some relief but not change.

Q.    So more of a just what may be considered an exceptional workload, exceptional number of hours worked but not necessarily any deficiencies with regards to his performance?

A.    Not at all.

Q.    Would that be fair?

A.    Oh, yeah.

Q.    Great.    I wanted to talk about PSB IA number 2025-0111. I'll probably refer to it going forward as just 0111.

And you're familiar with 0111 and I'll just pry a provide of a summary.    My understanding is that during the afternoon or early evening hours of March 10, 2025, you received an email with attachments from a Sergeant Engelbeck. Forgive me if I'm mispronouncing his name.    You received those

and I've seen emails then and have been told by Chief Palopoli that you then forwarded those to her that same evening. The email that you sent her represented or inquired her thoughts about referring an investigation to an outside agency.

And, please, if I misspeak or this sounds inaccurate at any time, please let me know.

At the time that you read the documents emailed to you by Sergeant Engelbeck and at the time you forwarded them to Chief Palopoli and inquired about her thoughts as it relates to assigning to an outside agency, what did you believe the allegations were at that time?

A.    So the allegations from Sergeant Engelbeck, as I did a cursory read over the documents that were sent to me appeared to be -- they claim to be criminal in nature as well as administrative. And the criminal nature of that had to do with tampering of evidence or tampering with witnesses of some kind.

Q.    Were there administrative allegations made as well?

A.    I believe there are, yeah.

Q.    Okay. And do you recall that Sergeant Engelbeck identified Captain Lugo and/or Sergeant Latham as, for want of a better term, suspects in the destruction or tampering of documents or evidence or witnesses?

A.    I believe that's accurate.

Q.    Okay. And, Undersheriff, why would you at that stage give consideration to referring the investigation to an outside

agency?

A.   This was a brand new complaint to me.  I didn't see it coming, didn't know it was coming.  It came in to me by email without any kind of phone call or anything like that.

I know that somebody is making a complaint.  We're going to take the complaint.  It's going to have to be an investigation.

And with the Captain of our Professional Standards Bureau being the subject of that investigation, my immediate thought was we can't do this, that we need to find a different agency to deal with this.

Q.   And is it fair to say that you believe very early on this would involve an administrative and a criminal investigation involving Captain Lugo as the principal and suspect respectively?

A.   Yes.

Q.   Okay.  And the intent would be to assign to an outside agency to investigate both administrative and criminal allegations?

A.   Yes.

Q.   Okay.  Prior to drawing those -- I'll call them preliminary conclusions, did you conduct any sort of preliminary inquiry or research?  By way of example, I think in the documents that Sergeant Engelbeck sent you, he referenced perhaps a previous investigation conducted by Chief Caputo.

Did you take a look at that to see if, in fact, this was a redundant matter?

A.    I looked over it and what was completed by then Chief Caputo was a Service Complaint I believe and that didn't address any kind of criminal allegations.  And with there being criminal allegations, I still firmly believed that somebody else needed to take a look at this.

Q.    Okay.  Do you know if Chief Caputo's investigation, the Service Complaint, appropriately addressed the administrative allegations being made by Sergeant Engelbeck that the current allegations he was making could have been just a repeat of what previously had been alleged and investigated by Chief Caputo?

A.    I didn't make that assessment.

Q.    Okay.  My understanding is that the morning of March 11, Chief Palopoli read the email that you sent her with all or some of the attachments and then she connected with you sometime during the morning of March 11.

         Do you remember that?

A.    I'm sure I did connect with her.

Q.    Do you remember if that would be by phone or in person?

A.    Likely in person.

Q.    Do you recall what occurred during that communication after she had reviewed the email?

A.    I don't want to misspeak at all so I don't know if it was at that time or not, but the only conversation I had with Chief

Palopoli was, you know -- I had suggested that DPS right off the bat because there was a history of the Sheriff's Office asking DPS to investigate other internal investigations if there was a conflict.  At some point she informed me that we have -- we should have a conflict investigator and that at some point she was going to consult you.

Q.   Okay.  At that what I'll call an early stage, that morning of March 11, did you provide her with any guidance or direction on what her next step should be or direction that the office was going to take in this matter?

A.   Actually she and I discussed her having a little bit of time to look it over and see, you know, exactly what you asked me a little bit ago, if I had made an assessment on whether Mr. Caputo's investigation satisfied anything or if this was -- so she asked for some time to review that to see what it was. And I told her I don't think that's a problem.

Q.   Okay.  Aside from her review or her intent to review Chief Caputo's activity, do you know if she identify or did you provide her guidance on anything else she pay want to take a look at preliminarily?

A.   No.

Q.   Okay.  Did you give her direction to contact Jensen Hughes?

A.   No.

Q.   Do you know who gave her direction to contact Jensen

Hughes or why she contacted Jensen Hughes?

A.   I'm trying to think.  I want to say that she told me you mentioned that.

Q.   Okay.  How about Baseline?

A.   That's the one that you mentioned, I'm sorry.  Yeah, so she did come to me and said, you know, hold on.  We might be able to get this conflict investigator at Baseline Investigations.  And it wasn't until later on that we learned that that person that runs that organization was too busy and the contract was going to expire in mid-April.

Q.   Yeah.

A.   So I don't recall where Jensen Hughes came from.

Q.   Regarding 0111, who decided -- and there had to be a decision.  Who decided that this would be investigated criminally?

A.   Well, it came in as a criminal allegation, right, and then I'm the one that decided to -- ultimately to contact DPS and ask them to come over or asked them to investigate.

When they contacted me, I invited them over to the office and we had a sit-down where I presented what -- we presented the information from Sergeant Englebeck and the DPS identified that this was also a criminal allegation and so they indicated that they would turn that over to their counterparts at DPS to conduct a criminal investigation.

Q.   But you also considered it to be a criminal allegation; is

46REPORT001277

that correct?

A.    Just from what came in, yeah.  I didn't do any kind of investigating to determine whether it was actual or any validity to it or not.

Q.    Okay.

I asked Chief Palopoli if she did any preliminary inquiry after she read the email and the allegations made by Sergeant Engelbeck and she said that she did not because of your direction.

Do you know why she would say that?

A.    The only thing that I can think of again is the information I had was that this was a criminal complaint and that I don't want to -- I don't want to mess it up.

Q.    She said she did not do any investigative steps; at the Chief Deputy's direction, Undersheriff's direction, is that he wanted it conflicted out.

Do you recall any conversations involving you, Chief Summers, and Chief Palopoli regarding 0111?

A.    I don't -- specifically I don't know.  I've had so many conversations with both of those individuals that -- if you could be more specific, I might be able to recall.

Q.    Chief Palopoli just represented that she had had conversations with yourself and with Chief Summers.  My impression was, and she may have stated implicitly that it was amongst the three of you and I was just curious, with regards

46REPORT001278

14

to 0111 and I'm just curious if you remembered that.  And if so, what you recall the content of that meeting to be or meetings.

A.    I don't.  I don't know that Chief Summers was involved. When it was ultimately decided that Captain Lugo needed to be placed on leave, I consulted him for processes.  But he wasn't very helpful with that.

Q.    Regarding Chief Palopoli reaching out to Jensen Hughes, forgive me if I said this in a slightly different way earlier, but she explained that she had received guidance regarding reaching out to Jensen Hughes.  Do you have any idea who gave her that guidance?

A.    Well, as I recall now, I did not know that we had Jensen Hughes.  So she did -- she did at some point come to me and say, hey, we have this Jensen Hughes place that we could go to conflict out or we could go to the County Attorney's office. And to myself, why don't we just go into DPS?

And so if it -- if it was in house and it was something that would be okay for us to utilize, then I believe I did say go ahead and contact Jensen Hughes.

Q.    Okay.  Do you recall ever having any conversation with Tiffany Shaw regarding 0111?

A.    Only at the point where we had to place -- I don't think she was there.  And I've had lots of conversations with Tiffany Shaw so I don't recall specifically talking to Ms. Shaw about

46REPORT001279

anything regarding Captain Lugo investigation.

Q. Regarding the -- I'll just call them documents, I think it's the interview that Sergeant Englebeck is primarily focused on that may be destroyed, withheld, tampered with and so forth, if a sworn employee at PDH is sustained, serves that suspension, wants to file the complaint with the Merit Commission and they request documents like the actual indicia representing the investigation, evidence audio and video of interviews, who provides that? Who serves as the conveyance and the liaison to that employee and/or their counsel?

A. That should be Tiffany Shaw's group.

Q. That's Conduct Resolution.

A. Or -- well she's over much more than Conduct Resolution so that Records and Requests or what we used to call the legal liaison and they have recently claimed their name as well to -- I believe it's Legal Requests or something of that nature.

Q. Okay. So if retired Chief Holmes suspended Don Anders for 80 hours, I serve be my 80 hours but I still want to appeal to the Merit Commission, would I have any reason to go to PSB to get all of my documents? Would PSB be responsible for providing me or is essentially the primary point of contact Conflict Resolution?

A. Yeah. Conflict Resolution folks would be the -- the policy folks down there would be the place to go.

Q. Okay. Where would an interview that Sergeant Englebeck is

referring to in his criminal allegation, within the office, where would that interview be retained?  Where would it be archived?

A.   If it was an internal investigation, it would be archived with Internal Investigations.

Q.   So I'm sorry, let me rephrase that.  Would it be kept like in Civil Division, in Detentions, Major Crimes, PSB, Conflict Resolution?  Where would it be archived or in none of those? Is it housed like on a master server somewhere, on a software program?

A.   I have no idea.

Q.   Okay.  Are you familiar with IAPro?

A.   Not really.  I know it exists.

Q.   Would you know that if I was an investigator and I interviewed Sergeant Kiyler as a principal and that was audio and video recorded, that that interview would ultimately be archived within IAPro?

A.   I wouldn't know that.

Q.   Okay.  Would you know that, in fact, at any time going forward, once that interview was archived in IAPro, if Lieutenant John Smith and Captain Jane Doe accessed IAPro and accessed that case and accessed that interview, there would be a footprint, a bread crumb trail identifying date, time, and who accessed it?

A.   I am aware because of this investigation now that there is

that very thing.

Q.   Do you know if anybody did that during these preliminary stages, the sergeant is alleging that it was destroyed or tampered with or withheld or omitted, do you know did anybody jump into IAPro and say does that thing still exist?

A.   I don't know.

Q.   So my impression is Sergeant Englebeck is appealing or, going now into late 2024, is appealing to the Merit Commission. He wants his entire case, including all evidence, and is alleging he did not get this interview or interviews and that it would be Conduct Resolution responsible for as the point of contact to provide that.  Would there be other explanations, other reasonable explanations for why Sergeant Englebeck did not get that interview if, in fact, he did not get the interview?

A.   I don't know that I could speak to that.  I wasn't -- I wasn't even here then.  I would hate to speculate.  I have idea.

Q.   So thinking about even an outsider looking in, is it possible that you Resolution forgot?

A.   Well, I suppose anytime you're dealing with somebody with a heart, there's a possibility of a mistake.

Q.   I'm sure.  Possible that it disappeared in cyberspace during the transmission?

A.   I don't know.  I have no idea.

46REPORT001282

18

Q.    Technology glitch?

A.    I'm sure there's a number of reasons, yeah.

Q.    Did Sergeant Englebeck's case, his suspension get reversed?

A.    I don't know.

Q.    Do you know if the finding of his case got reversed?

A.    I don't know.

Q.    So if the case was -- the finding was reversed and the suspension was reversed, he did serve a 40-hour suspension but then he was made whole.  He was noticed I believe in late January that in fact he was being made whole on the 40-hour suspension.

If Conduct Resolution is involved in that mix, in that process, is it possible that Conflict Resolution was advised or was part of the decision-making body that -- there's no reason for this case to go forward to the Merit Commission because it's going to get reversed.  So because it's going to get reversed, we're not going to provide the interview.  I'm not saying that's what happened.  I'm just asking would that be a possibility?

A.    I have no idea.  I really don't.

In my experience with the folks so far down in Conduct Resolution or policy or research and records, whatever they are called now, that they reply to every request.  So I don't think that they make judgments as to whether or not they

46REPORT001283

are going to comply with a request or not.  They just -- if it's legal, they do it.

Q.   Okay.  Good.  So when you got the complaint, you considered Captain Lugo we're talking about a crime now as the suspect in this criminal allegation.  I've read what it was that Sergeant Englebeck submitted to you and ultimately that Chief Palopoli received from you.  And I could be mistaken but I don't think so, I read it a couple of times, I can not find anywhere where Sergeant Englebeck identifies Captain Lugo as being responsible for the destruction, tampering, withholding or omission of the item he says he did not receive.  And I'm curious if you can recall where in that complaint Sergeant Englebeck identifies Captain Lugo as a suspect or even provides a degree of reasonable suspicion let alone probable cause that he would be the suspect?

A.   I believe he identifies Captain Lugo in his initial email right on the -- one of the first couple of lines.  Other than that, I don't know and I didn't evaluate it for any kind of merit to the allegation.

Q.   And the first couple of lines, do you recall what -- is he referring to criminal allegation involving Captain Lugo or complaint involving Captain Lugo or --

A.   I don't remember exactly what he said but he basically said -- sent an email to me, hey, I'm submitting this as a criminal complaint.  And I'm paraphrasing here because I don't

46REPORT001284

recall exactly what he wrote. But I believe it's at that point that he identified Captain Lugo's the subject of his complaint.

Q. I just want to read to you some -- in the body of the complaint, some of the quotes that Sergeant Englebeck wrote in the complaint that these were as close as I can get to him, Sergeant Englebeck, referring the criminal matter and who might be responsible.

He talks about how PSB violated A.R.S. he said, quote, I believe the facts will show this was willful and willful knowledge by a person unknown at this time in PSB.

He said: Someone would have to deliberately omit them, files. He said: It appears to me that PSB was aware of the omission but was waiting to see if I actually discovered this. He thinks there was -- the appeal was vacated in an effort to cover up withholding of the evidence.

So a few times he refers to it was omitted, there's an omission, again omitted from discovery, it was not provided, withholding, and I just can't find Captain Lugo's name attached to any of that.

A. Interesting. Is that the email that I received?

Q. No. No. This is a separate email here.

A. Do you have that, a copy of that email that I received?

Q. Don't know that I do. I would have to dig into the documents.

A. I believe that he said that I've already put this into

46REPORT001285

Blue Team, into the system, and somewhere he identified Greg Lugo as the person of interest.

Q.   In the administrative part for retaliation or for criminal part?  Because he does identify Captain Lugo for retaliation which I think is what was investigated by Chief Caputo.

A.   Okay.

Q.   Prior to or during the time leading up to contact with Arizona Department of Public Safety, I think you said you very probably had some conversation with Chief Palopoli and with -- possibly with Chief Summers.  Was there ever any communication with the Sheriff where 0111 and these criminal allegations as has been identified were communicated to the Sheriff?

A.   Yes.

Q.   Can you tell me when and the venue in which that occurred?

A.   I spoke with him directly in his office.  When would have been -- it wasn't the same day that I received the email but the next day or very shortly thereafter.

Q.   Do you recall what the nature of the conversation was?

A.   It was actually very casual.  I told him we received this. We're going to send it to an outside agency to investigate. And that was pretty much it.

Q.   Did the Sheriff provide any opinion, commentary, or provide you with any guidance or direction?

A.   Not at that time, no.

Q.   At a later time did he provide opinion, guidance,

22

direction, commentary?

A.    The only other time the Sheriff gave me any direction on this at all was after it came to light that Chief Palopoli had identified that Captain Lugo accessed the case in IAPro after he had been told not to.  When I told the Sheriff that, the Sheriff then said, "We have to put him on admin leave."  He said, "If we don't do something, if we don't show action right now the Monitors, the Court is going to tear us apart."  That's the only other direction I've gotten from the Sheriff.

Q.    And so the -- to encapsulate I think what the Sheriff was referring to and what you just referred to, we'll just call it insubordination, would that be a fair term?  That's a term that Chief Palopoli has used.

A.    I believe that's what they are saying, yeah.

Q.    So that's case number 2025-0139.  So why don't we go ahead and advance to that.  How did you become aware of 0139?

A.    Chief Palopoli came to me and said this is what happened.

Q.    Do you recall what she said happened?

A.    I could paraphrase it.

Q.    Oh, sure.

A.    Sure.  She said that she had to contact Captain Lugo to find out -- to talk about the fact that there had been a complaint entered against him and he was already aware of it.  And so she relayed to me that he didn't report to her immediately when he found out about it.  She discovered that he

had already accessed and read what was uploaded or entered into Blue Team, IAPro, whatever it is, and then she told him not to have anything else to do with it. And then later on she told me in a subsequent conversation that not only had Captain Lugo accessed that case again in IAPro but also assigned it to Jensen Hughes.

Q.    Did she explain how she came to identify Captain Lugo had accessed the case in IAPro?

A.    Some kind of log that exists.

Q.    Okay. And did she explain how she became aware, how she knew of Captain Lugo -- I'm sorry, what did you say, assigned the case to Jensen Hughes?

A.    Yeah.

Q.    Did she say how that came about, how she knew that?

A.    She said she was contacted by I think it was an investigator from Jensen Hughes who said they had an investigations plan and she had to tell them, "No. No. No. We're not using Jensen Hughes for this." And then she backtracked and found out that it had been assigned through I believe electronically through IAPro.

Q.    And that Captain Lugo did that assignment?

A.    That's my understanding.

Q.    Okay. Do you recall, Undersheriff, when Chief Palopoli approached you with this information?

A.    No.

Q.   Maybe it helps, the first that the Monitor -- well, I should explain the first that I became aware of it, I think the first that the Monitor became aware of 0139 with any articulation and specificity was the meeting that members of the Monitoring Team and Chief Warshaw had with yourself, Chief Summers, Chief Palopoli, there may be other office representatives, and legal counsel if I recall.  Mr. Popolizio was on the call.  That was on Tuesday -- I'm sorry.  That was Monday, April 7.

Captain Lugo, my understanding, was placed on administrative leave the previous Friday, April 4.

A.   Right.

Q.   Does that help at all with when Chief pole Palopoli approached you with the information?

A.   So that's when I would have found out about it and that's when I went to the Sheriff.

Q.   On the fourth?

A.   Yes.

Q.   And the Sheriff's direction then when you explained to him what Chief Palopoli explained, that Captain Lugo had accessed the file after being told not to and that he had assigned the case electronically to Jensen Hughes.  Was there anything else involved in 0139, any other allegation that you can recall?

A.   Just the failure to report that the complaint existed, that he knew about it.

46REPORT001289

Q.   And so the expectation, I think what I'm hearing, and I do not want to put words in your mouth so please correct me, is that if Captain Lugo acknowledged that he accessed in Blue Team 0111 and because 0111 involved a criminal allegation involving Captain Lugo, that Captain Lugo should have notified his chain command without reasonable delay.  Is that correct?

A.   I believe that's accurate.  That's how policy reads at the moment, yeah.

Q.   Can you help me to understand what policy is at the present time with regards -- what is policy at the present time with regards to notification of chain of command in a matter such as that?

A.   I don't know if I could quote it for you but it does say without delay or immediately or something like that notify your chain of command when there's a complaint filed against you.

Q.   Regarding the administrative leave, you have said that this came at the Sheriff's direction and that would have been on Friday, April 4.

A.   Correct.

Q.   The formal notification and Blue Team entry regarding 0139 was not done until Monday, April 7 after the meeting that we had.  Do you know why the delay in making the entry?

A.   With regard to the administrative leave?

Q.   With regards to the complaint itself, 0139, the insubordination against Captain Lugo.  So he was put on

administrative leave on Friday.  The letter you sent him which I have here -- I have here in my folder somewhere but you reference at the bottom of the administrative leave letter 2025-0139.  That's the insubordination case.  He was put on admin leave for that case on Friday, the fourth of April; but a Blue Team entry was not made either directly or by proxy from Chief Palopoli until the afternoon or evening hours of Monday, April 7.

A.   Okay.

Q.   And so I'm just curious, do you know why that delay occurred?

A.   I don't.

Q.   If Chief Palopoli knew of this on Thursday or Friday, the third or the fourth, notified you on the fourth, why the Chief is delaying and notifying internal -- PSB about the allegation?

A.   I don't know.

Q.   Okay.  With regards to 0111, was there any influence on the decision to place Chief Lugo -- I'm sorry, Captain Lugo on administrative leave for 0139?  Did 0111 influence that decision at all or was he placed on administrative leave solely for the insubordination allegation surrounding 0139?

A.   It was really the combination of the two.  I was not going to place him on admin leave for the complaint made by Sergeant Englebeck; however, when I became aware of -- when I became aware of the PSB commander doing something that is

inappropriate, especially with regard to an Internal Affairs investigation, the Sheriff and I had a discussion and that's when the decision was made to place him on admin leave.

So when you say influenced, it's a combination of the two cases.

Q.    M'hum.   So standing alone, the administrative allegation made against Captain Lugo by Sergeant Englebeck and what you and Chief Palopoli believed to be a criminal allegation made by Sergeant Englebeck against Captain Lugo, that would not justify administrative -- placing Captain Lugo on administrative leave. But if there was an allegation of insubordination, then that was the reason for the administrative leave.   Is that correct?

A.    Technically I think what you're saying is correct. However, there is -- we did read through the information from Sergeant Engelbeck and Chief Palopoli did contact Caputo at some point and it appeared that this had been investigated in the past and that this was going to be a redundancy.   But I still wanted outside investigators to deal with that.   And so based on -- based on the idea that we didn't believe that that case had any particular merit, we weren't going to place him on admin leave for that.   I don't believe it compromises his ability to be the PSB commander.

Q.    Do you know when Chief Palopoli communicated with former Chief Caputo?

A.    I don't.   She told me she called him.

46REPORT001292

Q.   But it sounds like a consequence of that call was the administrative investigations probably were investigated.

A.   I honestly -- I don't know.  The only thing I got out of that was that this whole thing smacks of retaliation and may not have merit.  But, again, I -- basically I insisted that it be handled by a different agency just so that we don't look bad one way or the other.

Q.   Can you help me understand just a little bit -- with a little bit more clarity, Undersheriff, when you say this whole thing smacks of retaliation and may not have merit.  I think I repeated that back accurately.  If not, please correct me.  What are your thoughts about that?  What do you mean by that, this whole thing smacks of retaliation?

A.   The complaint by Sergeant Englebeck is the only thing I'm referring to there, is that it appears that it was potentially investigated, looked at, and determined that there was nothing to it, and that he's bringing this back up.

     I don't know one way or the other.  It was brand new to me and it comes in and PSB is the subject of the complaint.  I thought it needed to go to an outside agency for clarity.

Q.   And do you have a thought about the -- what you and Chief Palopoli -- well, I may be misspeaking if I include Chief Summers in that -- believe was a criminal allegation made by Sergeant Englebeck against Captain Lugo, is your thought that that also smacks of retaliation and may not have merit?

46REPORT001293

29

A.    Yeah.  I don't know whether it has merit or not.  That's the reason for sending it to an investigator to determine.

Q.    My impression when I spoke with Chief Palopoli, and I believe Major Peters feels the same, is that when I inquired with Chief Palopoli about preliminary steps, right, like if there's no understanding for what the process is, who might be responsible for providing the documents.  Does the document even still exist?  Was it removed from a hard drive somewhere. Nope, it's -- we checked.  It exists.

But in summary, her posture appears to be a very pristine and antiseptic approach, which is a criminal allegation was made against the PSB commander.  That criminal allegation needs to be investigated.  And because it involves the PSB commander, the determination was made to have it criminally investigated by an outside agency.

Does that sound about right?

A.    Yeah.

Q.    Do you have any thoughts about any sort of preliminary inquiry to see whether or not it warrants a criminal investigation?

A.    From my perspective, it doesn't matter whether I think it Warrants anything or not.  It's a complaint that was made and in the best -- I believe in the best interest of the MCSO, that it was best to farm that out to provide all the information that we were given and add it to another agency to investigate

to see if there is any merit to that or not or if it is retaliation.

Q.   If an allegation was made, a similar allegation, say, was made against a patrol sergeant, would there also not be any type of preliminary inquiry?  It just probably would not be assigned out but retained within the organization?

A.   That would go to our Professional Standards Bureau.

Q.   Yeah.  Would there be consideration for putting that sergeant on admin leave?

A.   Potentially.

MR. PETERS:  Chief Anders, could I jump in here for one second?

MR. ANDERS:  Yes, please.

MR. PETERS:  I just have a question about this preliminary inquiry.  And, Undersheriff, is it safe to say that you are unaware of the requirements of GH-2, the investigation policy?

THE WITNESS:  No, it's not safe to say that.

MR. PETERS:  Well, then would you be aware then that a preliminary inquiry is contained within there and what a preliminary inquiry entails?

THE WITNESS:  I am familiar with a preliminary inquiry.

MR. PETERS:  If you are familiar with it, then would you say that the steps for a preliminary inquiry were

undertaken in this case?

THE WITNESS:  I'm not sure what you're asking.

MR. PETERS:  By policy, by policy, by MCSO existing policy, would you say that a preliminary inquiry and the steps that are required were taken in this instance?

Chief, I can't see what's going on.

THE WITNESS:  I don't know how to answer that.  I apologize.  I'm trying to think.

MR. PETERS:  Well, again, I'm just trying to confirm if you are familiar with the policy guiding internal investigations.

THE WITNESS:  I have read the policy and I'm trying to rack my brain to determine what would be required here that wasn't done.

MR. PETERS:  Okay.  So then it's safe to say you cannot recall what should have been done; correct?

THE WITNESS:  I cannot recall whatever is in policy that you think we didn't do.

MR. PETERS:  Okay.  Thank you.

BY MR. ANDERS:

Q.    Undersheriff, how long were you with the Sheriff's Office before you retired?

A.    I was with the MCSO for 18 and a half years.

Q.    Okay.  Were you with any other agencies prior to that?

A.    Yes.

46REPORT001296

Q.    How many years was that?

A.    Ten.

Q.    Okay.

A.    9.75.

Q.    Can you recall approximately how many times an employee was placed on administrative leave for an allegation of insubordination during your career?

A.    I have no idea.

Q.    Do you recall one time?

A.    I don't know that I know anybody that was placed on admin leave.  I'm sure it happens.

Q.    If John Doe were to call PSB, hypothetical, and say, "I need to take the next two hours and talk with an intake deputy staff member because I have a list here of 25 deputies, sergeants, and lieutenants out at two different districts that I want to accuse of a criminal act," and that individual identifies all 25 of those individuals and identifies a separate criminal act on a separate day and time for each one of those individuals, how would that be managed within office?

A.    That sounds massive.  Hypothetically, I don't know that I could give you an answer on that.  That would be something we would have to staff and figure out and work through.

Q.    Typically, an industry standard may represent something like this.  An allegation is made against Captain John Doe for destruction of evidence.  A criminal allegation.  Somebody of

equal rank or higher with authority then may go to the property room and find out, does that evidence still exist in the property room?

And let's say the destruction of evidence is one pound of cocaine and they go and they weigh it and that one pound is diminished down to two ounces or that cocaine is missing altogether, in fact, checked out by the individual that the allegation is made against.

Then that allegation has been preliminarily reviewed and then very probably referred out for criminal investigation.

But if an inquiry is made and that full 16 ounces of cocaine is sitting right there in the property room, nobody has touched it, log reflects no access whatsoever, do you think that allegations would still be referred out for a criminal investigation, or has the matter essentially been rerouted?

A.    At the end of the day, we're going to accept all complaints, right.

Q.    Absolutely.

A.    And it will be investigated in some way.  Preliminarily that sounds like something that isn't a valid complaint.  However, probably going to ask somebody to do more than just preliminarily look at it.

MS. KIYLER:  May I?

MR. ANDERS:  Please.

MS. KIYLER:  As I review, as you know, both the

34

criminal and the administrative investigations, are you aware that many times Criminal is asked to do a preliminary review to determine if a criminal allegation should be filed?

THE WITNESS:  Yes.

MS. KIYLER:  And that they often initiate no investigation whatsoever and, instead, respond that it's unfounded because it established in their preliminary inquiry that it did not happen?

THE WITNESS:  That would be fine.

MS. KIYLER:  So you don't have a problem with that -- I think that's the point of the preliminary inquiry.

THE WITNESS:  Okay.

MS. KIYLER:  And you are aware that your criminal investigators do that?

THE WITNESS:  Sure.

MS. KIYLER:  Okay.  Thank you.

BY MR. ANDERS:

Q.   So the point of my question, Undersheriff, again, not to be berate it, is I'm just trying to understand the synapse between this narrative complaint that Sergeant Englebeck emailed you where neither Captain Lugo nor Sergeant Latham are referenced in any way in that narrative to being suspected by Sergeant Englebeck of destroying, withholding, tampering with what it is he's missing that's been omitted or any witnesses and how we went from that to we're going to refer this out for

a criminal investigation, right, without any preliminary inquiry as simple as perhaps somebody get into IAPro and find out if that interview still exists.  Somebody get ahold of Conduct Resolution and say, "Quick question.  This go says he didn't get it.  Any thoughts?"

"Yeah, we didn't give it to him because of this," or, "Oops, let me check the file.  Yep, our bad."

Do you see what I'm getting at?

A.   I do.

Q.   Do you have any thoughts about that?

A.   I do.

Q.   Please.

A.   So from my position, had I received that about somebody else, I would have forwarded that to Greg Lugo and said, "Hey, have somebody look into this."  But this was not a complaint about somebody else.  It was a complaint about Greg Lugo and so I didn't have that.  And so any kind of preliminary investigation or looking into that, I didn't -- I had no idea who I was going to get to do that.

And so the only thing that I could think of was do what the office had done previously when there was a conflict of that nature and that is ask another agency for help.

Q.   Still believing that the allegation had been made against Captain Lugo for a criminal act?

A.   That's what I believe, yeah.

Q. And so -- and we may be into semantics here, inquiry, investigation, exploration. What would prohibit Chief Palopoli on her own volition, her own initiative as Captain Lugo's boss, from pursuing some of that early exploration and fact-finding to see if this in fact had any legs to it whatsoever or what would prevent you from directing Chief Palopoli from doing that?

A. Nothing other than a little bit of newness in the position here and varying probably exactly this. Wanting to remain neutral in the whole matter and ask another agency to assist.

Q. Chief Palopoli, she could have asked her subordinate, Chief Summers, to do the same, couldn't she?

A. She could have.

Q. I want to talk about the assignment, the ultimate assignment of this case to Arizona Department of Public Safety the case being 0111 and 0139. There was a letter signed by you sent to Colonel Jeffrey Glover, the Director of Arizona DPS, dated April 3. I think this was sent in both U.S. Mail and by email by your executive assistant -- forgive my pronunciation of her name -- Bendretti (phonetic)?

A. Yeah.

Q. Had you or any designate or delegate or proxy of yours had any contact with Arizona Department of Public Safety prior to this letter going out associated with these cases?

A. No.

Q.    None at all?  This was -- when they received this, this would be the very first they knew anything about this?

A.    Yes.

Q.    Okay.  Do you know how they replied or who replied to this letter?

A.    They called me at the phone number that is listed there and left a message for me.

Q.    Do you know who called?

A.    It was a Captain of their Internal Affairs.

Q.    And the content of the message?

A.    It was, "Hey, this is Captain" -- I forget his last name now from the Arizona Department of Public Safety and asking me call him.

Q.    Okay.  And that occurred?

A.    That occurred.

Q.    And what was the nature of conversation?

A.    That they were in receipt of the letter and of course they had gotten authorization to proceed and he wanted to come over or meet, whether that be at our place or theirs, and discuss the case.

Q.    Okay.  And that meeting occurred?

A.    It did.

Q.    And I think it happened on Wednesday, April 9 at 2 p.m.

A.    Could be.

Q.    I think that's right.  Chief Palopoli emailed me the

afternoon of -- I believe it was the afternoon but it was on April 8 saying you had just heard from a captain at DPS and I think her quote to me was very similar to:  We are meeting DPS tomorrow, which would have been April 9, at 2 p.m.

So that meeting occurred.  Where did the meet -- where was the meeting held?

A.    In the Sheriff's Office.

Q.    In the Sheriff's Office.  The Sheriff's Office?

A.    M'hum.

Q.    Up on the fifth floor?

A.    Correct.

Q.    Does the Sheriff have a conference room or --

A.    There's a conference table in the office.

Q.    A conference table in the office.  Who all was present at that meeting?

A.    Myself, Chief Palopoli, Chief Summers, and then the captain from Arizona Department of Public Safety as well as a sergeant.

Q.    Okay.  Was it Sergeant Baum?  That's the name that I've heard.  Does that ring a bell at all?

A.    That sounds correct.  I don't recall his name.

Q.    Sure.  The captain and the sergeant, were they -- they were from DPS Internal Affairs?

A.    Yes.

Q.    Were there any criminal investigators present from DPS?

A.    No.

Q.    I think you may have mentioned earlier they were going to take the information back to their criminal investigators?

A.    Yes.

Q.    Can you tell me what occurred at the meeting?  It has been represented to me that it was less than an hour.

A.    It was about an hour.  So we made our introductions. Chief Palopoli had a folder with a printout of all of the attachments from Sergeant Englebeck, all the original -- not original but printouts of the email and things of that nature and passed it over and we gave a brief synopsis of the cases.

Q.    Okay.  When you say we gave a brief synopsis --

A.    It was a group effort but for the most part, mostly Chief Palopoli.

Q.    Okay.  And as best as you can recollect, and I am interested in detail as best as you can recollect, what it was she provided to Arizona DPS, what information she provided.

A.    Just pretty simply that I had received this email from Sergeant Englebeck and that a printout of all of those attachments were provided as well as his initial email and then sort of brief, very, very brief overview of it and when any kind of criminal allegations were brought up.  The captain said that they don't do criminal investigations, that that would be a counterpart of theirs and that they would take the information that we were providing and they would put any kind

of administrative investigation on hold pending any kind of criminal investigation that might occur.

Q.    That's an industry practice generally?

A.    Yeah.

Q.    Not universally.  And there are reasons at times not to put the administrative investigation on hold.

        This meeting lasted about an hour.  So that was about -- it wasn't an hour's worth of conversation I don't think.  I mean, very basically, did Chief Palopoli discuss 0139 and the insubordination?

A.    Yes.

Q.    And did she outline with any articulation or specificity here's how we got to 0139?  Here's what this --

A.    She provided it as part of the package.  She provided the log from IAPro that showed where Captain Lugo had accessed the case.

Q.    Okay.  Did she explain, "I gave him and an order on this day"?

A.    I believe she did.

Q.    "I ordered him to provide me the name of a lieutenant.  He didn't give the name of a lieutenant"?

A.    I don't recall that.

Q.    Okay.  Was Sheriff at this meeting?  It was in his office.

A.    No.  He wasn't.  His conference table is nicer than mine there.

46REPORT001305

Q.    Okay.  As is often the case with sheriffs.

MR. MASTERSON:  That's because he stole it from you.

THE WITNESS:  He did actually steal it from me, yeah.

BY MR. ANDERS:

Q.    Arizona DPS, they have a sergeant and a captain in room and they are in the room with the Undersheriff of the largest Sheriff's Office in the State of Arizona and two chief officers from that same Sheriff's Office.  Any sense that they could be feeling this investigation is predisposed?  These folks are saying this happened.  Chief Palopoli is saying this is what happened.  There is insubordination that occurred because I'm telling you this is what happened?

A.    So Chief Palopoli didn't use those particular terms that you just used.  I could see how -- what you're saying could be the case.  But that was not the tone or air of the meeting.

Q.    I overemphasize, yes.

A.    The facts were laid out, you know, this is what we know or what we've received from this sergeant.  This is what we've received.  We don't know anything really about it.

And then the other allegation had to be explained but it was explained in very matter of fact terms.

Q.    Chief Palopoli is the complainant, right, regarding 0139?

A.    She is.

Q.    Was she directed to file this complaint with PSB or did she come to you, and only one of many possibilities so I don't

46REPORT001306

want to say this is the only -- it's not either/or.  Did she come to you and say, "Hey, I just ran a PSB IAPro log.  I see that Captain Lugo accessed the file on March 21, 2025, at 10:26 in the morning.  And I gave him an order to stay away from this case, so I'm going make a complaint with PSB"?

Or did she approach you and say, "Boss, I want to provide you with something that has come to my attention.  I'm seeking some guidance, direction.  I would like to have a conversation.  What do we do with this?"

A.    I don't recall the exact -- I don't know that either one of those scenarios is actually --

Q.    Fair enough.

A.    -- the way it went.  She came to me with what she discovered and we discussed it a little bit and we both agreed that that was a problem and what do we do.

It's uncharted territory for me here.  The last thing in the world I expected was to have a complaint and then another allegation against our PSB commander.  That brings to light one of my worst fears ever because he had been such a -- making such progress, right, and the last thing in the world I wanted to do was have to investigate the PSB commander.

So she came to me, laid out the facts.  We both agreed that, was a problem and that we were going to have to report that and so I guess in a sense I did direct her to go ahead and file the complaint.

46REPORT001307

Q.    Has Chief Palopoli explained to you what was occurring on March 21 at 10:26 in the morning when Captain Lugo accessed IAPro?

A.    No.    And I don't know what you mean by what was occurring.

Q.    Whether or not any potential -- and I emphasize potential explanation for why that may have occurred?

A.    No.

Q.    Okay.    I want to take a little bit of time and talk about Captain Morrison.

A.    Okay.

        MS. KIYLER:    Before you do that, Chief, can I just go back on one?

        MR. ANDERS:    Yes.

        MS. KIYLER:    Undersheriff, you had mentioned that DPS had done investigations for you before.

        THE WITNESS:    They had done investigations for the Sheriff's Office.    I had never request one before.

        MS. KIYLER:    Do you know how long ago that has been? I mean, is it something recent where you know MCSO has typically used Arizona DPS?

        THE WITNESS:    So the archived letter that I pulled it to see that -- I think it was dated in 2022, 2023 maybe, it was from Sheriff Penzone to DPS and that was the only outside agency request that I found in the archives.

        MS. KIYLER:    Do you recall what that was a request

for?

THE WITNESS:  It was a request for an internal investigation.  I don't recall what it was for.

MS. KIYLER:  Okay.

MR. ANDERS:  I apologize.

BY MR. ANDERS:

Q.   Undersheriff, when was that, that request by Sheriff Penzone?

A.   It was in 2022 or 2023.  There's a date on it and I can --

Q.   I think it's a use of force situation in the jail.  It was a critical incident in the jail?

A.   Was it?

Q.   Yeah.

MS. KIYLER:  That would make sense because I haven't seen an Arizona DPS internal investigation for MCSO in years so that's why I was just curious.  Thank you.

THE WITNESS:  Sure.

BY MR. ANDERS:

Q.   Regarding Captain Morrison, you're aware of course that there's a request for Captain Morrison to be transferred?

A.   Yes.

Q.   During the Monitoring Team site visit on April 15 there was a meeting held with Conduct Resolution.  During that meeting the case involving Captain Morrison was raised.  I don't believe his name was raised, just the case number, and

this is a case that the office considers to technically still be open.

And what Conduct Resolution represented to Chief Kiyler during the meeting was essentially this case -- current open case involving Captain Morrison had gone to PDH. I don't recall if PDH had actually occurred. It probably did and then subsequent to that, the case was sent back to PSB for further review and PSB had then conducted that further review and/or supplementary investigation and that it was then sent back to Conduct Resolution and the finding remained sustained.

And at the time of our meting on April 15, that case rested in Conduct Resolution with a finding that remained as sustained.

After that meeting, on the afternoon of April 15, Chief Rojas contacted Chief Summers and he asked Chief Summers essentially, and I paraphrase, but for an update on the case. Chief Summers told Chief Rojas that the finding, the sustained finding, could be changed and that findings in previous cases could be changed, cases involving Captain Summers.

So I asked Captain Summers about this when I spoke with him late last week and I asked him about this conversation he had with Chief Rojas. He said that Chief Deputy Gentry told him, Chief Summers, there was a possibility or a probability the sustained finding may be changed; that Chief Gentry said regarding the status, "It looks like it may be overturned."

46REPORT001310

Are the statements that Chief Summers was making, are those accurate?

A.    Yes.

Q.    Why would a finding in the current case that the office considers to be open after an investigation, a finding, a PDH, a supplementary investigation review, the finding remains the same, why then would it be overturned?

A.    Well, in a conversation that I had with -- so I knew about the request to transfer Captain Morrison to Bio.  I knew that there was an open case on him that was pending, a final decision -- and that final decision was going to be rendered by Ken Holmes, not me.  So I spoke to Ken Holmes about it.  I said, "What's your impression?"  I asked him for his impression of the case and he said he thought that they didn't -- they didn't establish -- I forget the term he used but they didn't establish what he believed should be a sustained violation here and he was going to overturn it.

And I asked for a copy of it so that I could read it as well from the Conduct Resolution, and I discovered that Captain Morrison had a couple of others as well so I just asked for a copy of all of them.

I have personally not completed reading any of those cases so I haven't made any kind of a determination myself as to what I think about them.

Q.    After becoming aware of the open case, you reached out to

retired Chief Holmes, the Appointing Authority hearing officer for PDHs.

A.    I wouldn't say I reached out to him.  We were both in the same room at the same time so I just asked him.

Q.    Okay.  And he conducted a PDH?

A.    I believe he has.

Q.    Okay.  And is it anticipated it's going to return for a supplementary PDH?  What would be the process going forward --

A.    I don't believe there's such a thing as a supplementary. I haven't heard of a supplementary PDH yet.  I believe the -- the next step is a decision by Mr. Holmes and then a final meeting where the decision will be given to Captain Morrison.

Q.    So do I understand that then Chief Holmes expressed that he was going to overturn the finding?  He did not believe the case or the investigation supported the finding?

A.    Correct.

Q.    Did he explain why?

A.    No.

Q.    Chief Summers said you were considering reviewing previous sustained cases involving Captain Morrison to see if those findings should be changed.

      Is what Chief Summers said correct?

A.    Yes.  Like I just told you a minute ago, I asked for copies of the previous cases on Captain Morrison as well so that I could review them and take a look and see what we're

48

asking to be transferred over to Bio.

Q.   That would be the purpose in asking for the cases, is just to determine its suitability for being transferred to Bio?

A.   To review them, yeah.

Q.   What Chief Summers said is that you wanted to review previous sustained cases to see if the findings should be changed.

A.   So Chief Summers has written a memo, I believe it's required by Paragraph 268 I believe, in which he brought to light specificity things that he believes are acts of unfairness or omissions from the case that would have affected the findings of those cases.

And so I decided that I would like to review them.

Q.   I think you wrote a three-page memo and that he told me before he provided that memo to the Monitor, he provided the memo to you and that you read it before he provided it to the Monitor.   This is what Chief Summers said.

What do you know of the relationship between Chief Summers and Captain Morrison?

A.   I don't know anything about it.

Q.   Who advocated for or is recommending Captain Morrison to be transferred to Bio?

A.   Actually, the first recommendation to me came from Chief Chagolla.   He's the one that mentioned Captain Morrison to me first because Captain Morrison had been down there or worked in

Court Implementation prior and would have a good understanding of what needed to be done in Bio without too much learning curve.

And so I -- when we started talking about sending some extra help over to PSB, I had to worry -- I forget who identified Captain Reaulo from Bio.  And so in -- trying to figure out who to backfill Reaulo with, should we end up being able to transfer him over there, Chagolla suggested Morrison.

So subsequently I then suggested Morrison to the rest of the chiefs.  So that's how that came about.

Q.   Okay.  So Chief Summers told me that he recommended Morrison to be transferred to Bio and then he wrote the memo, the three-page memo, representing the request to the Monitor to transfer Morrison to Bio and that he presented you with that memo as I had referenced earlier, he had presented the memo to you as I had referenced earlier.

A.   M'hum.  He's the -- officially requesting that.

Q.   That's a exactly right, yeah.  Yeah, I'm not saying that that's not his responsibility.  Yeah, that is his responsibility.

So I don't mean this in a negative way, just the best term that I can come up with.  Have you had any sense that you're being lobbied by Chief Summers to transfer Captain Morrison into Bio?

A.   No.  I don't feel like that.  I believe that I'm the one

46REPORT001314

that brought that name up.  When Chagolla and I had a conversation about it, it was only Chagolla and I in the office together.  Nobody else was there.  And so when I brought that up in a meeting with just the chiefs, I'm the one that threw out Corey Morrison's name.  So I don't feel like I'm being lobbied or pressured to do that.

Q.   Okay.

A.   I will say that I do get the impression that Chief Summers thinks that Corey Morrison is a good choice.

Q.   He made that very clear.

A.   Yeah.

Q.   So your thoughts are, going forward, you've actually asked for the cases, the previous sustained cases involving Captain Morrison.  Have you received those?

A.   I did, from Conduct Resolution.

Q.   But you haven't finished going through and reading the cases?

A.   I have been a little busy.

Q.   Yeah.  Understandable.  Any inclination on what your decision might be?

A.   No idea.

Q.   Can you tell me what is the -- what are the office and/or County authorities that allow the reversal of a sustained finding to a different finding after that finding has been made, and I'll say aged.  In other words, going back years.

46REPORT001315

What would be the authorities that permit that to occur?  Who has the authority to do it and what are the mechanics in doing that?

A.   That's a great question.  I don't know.  I have been told that the Appointing Authority or myself or the Sheriff could do that.  I haven't researched that in policy.  I don't know if that's even a thing.

Q.   So if the undersheriff, Don Anders, decides I want to take a look at 50 sustained cases involving these 30 individuals over the past 15 years and I'm going to make a decision that should not have been sustained, that should not have been sustained, would I have the authority to write a two-page memorandum and say, "Reverse that.  Oh, by the way they got a 120-hour suspension, make them whole with interest"?  I'm just trying to understand what are the mechanics?  How does that happen?

A.   I don't know.

Q.   That's an awful lot of authority.

A.   It sure is.

Q.   Yeah.

A.   I don't know that.

Q.   Okay.

        MR. ANDERS:  Sherry, before I go on to the next topic, any questions?

        MS. KIYLER:  I'm good.  Thank you.

BY MR. ANDERS:

Q.   Undersheriff, I'm mindful of your time.  You had said that you had until 1530 today so we're going to keep you within that envelope and I want to respect your time.

A.   Thank you.

Q.   We wanted to take a little bit of time and talk about the reversal of the finding and the discipline involving Sergeant Englebeck in late 2024 or early 2025, and I think that Major Peters has a series of questions he would like to ask you.  I'm going to turn up the volume.

MR. ANDERS:  Major Peters, are you with us?

MR. PETERS:  I am.  Thank you, Chief.

MR. ANDERS:  The floor is yours.

MR. PETERS:  Okay.  Can everyone hear me fine?

MR. ANDERS:  Yes.  We can hear you fine.

MR. PETERS:  Okay.

Undersheriff, I would like to explore a little bit the transfer of some of this information between the office, the Appointing Authority, and then Sergeant Englebeck occurred.  So that's predominantly where these questions will be going.

On Tuesday, January 28, MCSO rescinded the 40-hour suspension of Sergeant Englebeck for case 2020-0555.  And what I'm wondering is if you can recall, did you attend any meetings -- and if you did with whom -- between January 28 and January 30 of 2025 discussing this possible rescission?

46REPORT001317

THE WITNESS:  I didn't attend anything.  In fact, the first time I had heard Sergeant Englebeck's name was when he emailed me on -- I think that was March 10.

MR. PETERS:  Would you have any understanding on how that rescission would be transferred over to Sergeant Englebeck?

THE WITNESS:  I don't.  I don't know the mechanics of that at all.

MR. PETERS:  So let me ask you, would you have had any understanding or any knowledge of that direction being given to Commander Callahan from Conduct Resolution?

THE WITNESS:  I didn't give her any direction at all and I don't know where that came from.

MR. PETERS:  Okay.  Let me ask you this then.  What would be your thoughts if that notice were to leave MCSO under the signature of Commander Callahan on January 28 of 2025 but yet MCSO had not received -- from what I've seen anyway, MCSO has not received the decision from Chief Holmes until January 30, would you have any thoughts on that.

THE WITNESS:  I don't know what to say on that.  I wasn't involved in any of that.  I do know that former Chief Holmes and Denise Callahan worked pretty closely with each other.  They could have had a verbal conversation where he relayed a decision.  I don't know -- I don't even know who made the decision on Englebeck, whether it was Ken Holmes or a Merit

Commission.

MR. PETERS:  What would be your opinion, though, of Commander Callahan sending out that letter without the office actually having documentation from the Appointing Authority. Should that have occurred?

THE WITNESS:  I don't know.  It sounds like, you know, if that's all there is to it, then it sounds like the letter is premature but I don't have all of the information there that I would need to make a decision on that.

MR. PETERS:  So then -- and just to be clear, from your position then, would you be aware of any conversations, emails, text messages, between Chief Holmes and Ms. Callahan and possibly yourself discussing or describing any decision on the rescission hearing prior to the office actually receiving that?

THE WITNESS:  I can tell you that I have no text messages or emails or anything like that between me and anyone regarding Sergeant Engelbeck, or at least that decision, and I would not be aware of any -- any communications between Ken Holmes and Denise Callahan.

MR. PETERS:  Would you be aware of any direction from MCSO counsel in that regard?

THE WITNESS:  No.  Again, I don't mean to cut you short but literally the very first time I ever -- I've heard Sergeant Englebeck's name was in my in box when he emailed me.

MR. PETERS:  So have you ever seen the letter from the Appointing Authority, Ken Holmes, actually rescinding?

THE WITNESS:  I can't say that I have.  Is that part of the -- I can't say that I have seen it.

MR. ANDERS:  It was in the drop, yeah.

THE WITNESS:  It was?

MR. ANDERS:  Yeah.

MR. PETERS:  Have you had any participation in any discussions or meetings with any of the personnel to discuss another document, the Disciplinary Considerations and Decisions, prior to the receipt of the actual document?

THE WITNESS:  With regard to Englebeck?

MR. PETERS:  Yes.

THE WITNESS:  No, not at all.

MR. PETERS:  Are you familiar with what that document does?

THE WITNESS:  What document are we talking about?

MR. PETERS:  The Disciplinary Considerations and Decisions.

THE WITNESS:  Okay.  I believe I am familiar with the concept of the document.

MR. PETERS:  Could you explain it to us a little bit so we could just gauge that understanding?  What would be contained in that document?

THE WITNESS:  Typically, what's contained in that

document are the findings and the final findings, signatures from the Appointing Authority, dates, the allegation that was sustained or not sustained, some formalities before that.

MR. PETERS:  Okay.  So then with your understanding then, would you expect that that document would be provided to MCSO prior to any decision later going out?

THE WITNESS:  I think that would be a reasonable thing to do, yeah.  Again, I don't know if there was any other communication besides that letter that may have happened.  And the letter is a formality.

MR. PETERS:  Would you be aware of any instruction by the MCSO counsel providing a legal opinion to the Appointing Authority that in this particular case, no discipline is necessary?

MR. MASTERSON:  Wait a minute.  Are you asking him for communications between MCSO and its attorneys?

MR. PETERS:  No.  I'm asking him if he's aware of any information providing legal opinion to the Appointing Authority.

MR. MASTERSON:  Well, that sounds like -- I mean, unless I'm misunderstanding your question, which is certainly possible, that seems like you're asking for a communication by attorneys to someone at MCSO.

MR. PETERS:  Then let me rephrase then.

Would you have been present at a meeting where MCSO

counsel may have direction to the Appointing Authority prior to the hearing?

MS. BARNES:  It's the same thing.

MR. MASTERSON:  Well, I think he can say "Yes" or "No."

THE WITNESS:  I was not present.

MR. PETERS:  Are you aware of a meeting taking place?

THE WITNESS:  No.

MR. PETERS:  Okay.

THE WITNESS:  Again, I don't want to belabor the point at all, but I had literally nothing to do with Sergeant Englebeck or his case at all until the day he emailed me.

MR. PETERS:  Until the day emailed you what, sir?

THE WITNESS:  He emailed me the complaint that was the subject of most of our conversation here today.

MR. PETERS:  Okay.  So then would you be aware of any of the direction provided from the Appointing Authority in his response documents back to MCSO?  Would you have any knowledge of that?

THE WITNESS:  Not at all.  I'm not aware of any facts or information at all regarding Sergeant Englebeck prior to March 10.  Prior to March 10.  Okay.

MR. PETERS:  I don't have any further questions, Chief.  I think that's enough at this point.

46REPORT001322

MR. ANDERS:  Thanks, Major.

BY MR. ANDERS:

Q.    Just before we close, Undersheriff, just a couple of follow-up questions as they relate to Captain Morrison.

So you've expressed a desire to review previous sustained cases involving Captain Morrison.  Do you have intention on reviewing historical sustained cases on any current or former Sheriff's Office employees?

A.    I don't have any reason to.

MR. ANDERS:  Sherry, do you have anything?

BY MR. ANDERS:

Q.    Undersheriff, is there anything that I neglected to ask you that you want me to ask you?

MS. BARNES:  Lawyers always ask this at the end of the deposition and I always cringe.  I know.  But it's the experience with -- that type of question.

BY MR. ANDERS:

Q.    In other words, I guess if there's anything else that, you know, with regards to what it is that we've talked about today that I missed that you think is really important for us to know, please take advantage of the time and communicate that.

A.    Well, not really knowing what the topics were going to be coming over here, I can't think of anything other than to tell you there's nothing nefarious here.  Literally the only thing I ever wanted to do was the right thing by MCSO, and I thought

46REPORT001323

asking for an outside counsel or outside agency to look at that would be the right thing to do preliminarily and investigatory-wise.  That was it.

Q.    Okay.  Thank you very much for your time today.  Very much appreciate it and respect it and to counsel present as well.

We'll go ahead and go off the record and, again, it's April 21, 2025, and the time now is 3:16 p.m.

(Proceedings concluded at 3:16 p.m.)

46REPORT001324

60

C E R T I F I C A T E


        I, ELAINE M. CROPPER, Registered Professional

Reporter, certify that the foregoing is a correct transcript,

to the best of my skill and ability, produced via machine

shorthand from the audio/video recording of the proceedings in

the above-entitled matter.


        DATED at Phoenix, Arizona, this 12th day of November,

2025.


                                s/Elaine M. Cropper

                                _____

                                Elaine M. Cropper

46REPORT001325

Reporter's Transcript of Recorded Interview

In the Matter of:

Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with MELISSA PALOPOLI

April 21, 2025

_____

Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001326

**TRANSCRIPT OF INTERVIEW WITH MELISSA PALOPOLI**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001327

3

                    P R O C E E D I N G S

          MR. ANDERS:  Okay.  We're on the record.  Today is

April 21, 2025.  The time is 4 o'clock p.m.  We're in the

conference room of the Federal Monitor's office on the sixth

floor of the Luhrs Building in Phoenix, Arizona.

          On the phone is Major Peters.  With me is Chief

Sherry Kiyler.

          And can I ask the three of you to identify

yourselves, please.

          MR. SERBALIK:  Steve Serbalik, attorney for Melissa

Palopoli.

          THE WITNESS:  Executive Chief for MCSO, Melissa

Palopoli.

          MR. POPOLIZIO:  And Joseph Popolizio on behalf of the

Sheriff and Sheriff's Office.

          MS. KIYLER:  And may I ask for the spelling of your

name, please.

          MR. SERBALIK:  Sure.  S-E-R-B-A-L-I-K.

          MS. KIYLER:  I would never have gotten that.  Thank

you.

          MR. ANDERS:  And my name is Donald Anders.

                         EXAMINATION

BY MR. ANDERS:

Q.   Chief, thank you very much for being back here today.

We'll try to make this just as short as we can.

I just wanted to take an opportunity to allow you opportunity to provide some clarity with regards to some areas I just wanted to follow up on.

I've had the opportunity to read the supplementary -- I'll call it a memorandum that was sent out a short while ago and that may be the precipice for a couple of questions that I ask.

I just wanted to start off first, I saw the email string between yourself and Tiffany Shaw.  Where does Tiffany Shaw work?

A.   She works at the 550 West Jackson in headquarters.

Q.   In what division, department, or unit?

A.   I believe Conduct Resolutions.

Q.   Okay.  Is it Conduct or Conflict Resolution?

A.   Conduct.

Q.   Conduct Resolution?

A.   I believe so, yes, sir.  Yep.

Q.   So there was an email exchange.  You first reached out to Tiffany Shaw indicated by the emails on March 18 and you actually met it appears in person --

A.   Yes, sir.

Q.   -- on March 20.  Can you help me understand what the intent of that meeting was?

A.   Yes.  So she was providing me with the information as to who conducts conflict investigations.

46REPORT001329

Q.    Okay.

A.    And then she provided me with the Jensen Hughes contact information.

Q.    Okay.  About how long was that conversation?

A.    Five, ten minutes.

Q.    Okay.  And would she just know was Jensen Hughes as having a role in Conduct Resolution?

A.    It's a question you would have to ask her, sir.  I'm not sure.  I would believe that would be because of her role that she would have some involvement with Jensen Hughes.  I know that now.  Back then I wasn't here long enough to understand.

Q.    Great.  Did she give you contact information for Jensen Hughes?

A.    She did.

Q.    Did she give you the Joy Fitzgerald contact information?

A.    She did.

Q.    Okay.  Great.

      And Tiffany Shaw knew this involved allegations involving Captain Lugo?

A.    Yes.

Q.    Okay.

A.    She did not know the allegations but she knew that there was an allegation.

Q.    Okay.

A.    Sorry.

46REPORT001330

Q.   So regarding Jensen Hughes, the first email you sent to Jensen Hughes that I have or that I'm able to locate in the drop from several days ago was dated March 20 and that was to Joy Fitzgerald.  It was basically an introduction essentially.

A.   Yes, sir.

Q.   And that there was an allegation made against a PSB commander, and the way I interpret the email string is Joy then put you in touch with somebody named Mark.  Does that sound about right?

A.   Yes.  And I have no idea how to say his last name.

Q.   Okay.  You got her contact information from Tiffany Shaw.

Did you ever tell -- I guess the title has been changed -- Undersheriff Gentry now, did you ever tell Undersheriff Gentry that Lugo had assigned 0111 to Jensen Hughes?

A.   I'm sure at some point that I did because I had several conversations with him about what we were doing with the investigation.

Q.   And is your belief that Lugo assigned 0111 to Jensen Hughes?

A.   Formatively in IAPro or verbally, sir?  I'm confused with the question.

Q.   So my first question was, do you recall ever telling Undersheriff Gentry that Captain Lugo had assigned case number 2025-0111 to Jensen Hughes?

46REPORT001331

A.    I don't believe I said it -- framed it in that way.  I said to him that I reached out to Jensen Hughes then they would be taking the investigation.

Q.    So if Chief -- if Undersheriff Gentry would have told us that you told him that Captain Lugo had assigned case number 0111 to Jensen Hughes himself, would Undersheriff Gentry be mistaken?

A.    He may be referring to Lieutenant Porter.

Q.    He was not referring to Lieutenant Porter.

A.    No, I'm not saying that, sir.  If I could finish my statement, please.  He may be referring to the fact that -- now I've lost my thought, that Commander Lugo had Lieutenant Porter send the investigation plan over.  I'm really not sure exactly what you're talking about and I apologize.

Q.    One of the reasons I ask is Undersheriff Gentry was very clear in his statement to Major Peters, Chief Kiyler, and I that you had told him that Captain Lugo had assigned the case himself to Jensen Hughes.  But we also recall this being referenced on the April 7 call that the Monitor and the Monitoring Team had with yourself, Chief Summers, at that time Chief Deputy Gentry, and Mr. Popolizio where there was reference to effect that it was learned that Captain Lugo had interacted and/or assigned or influenced the investigation to Jensen Hughes.  So I was just looking for some clarity on that and wanted to give you an opportunity to respond to that.

8

A.    Yeah.  I'm sorry, I can't clarify that statement.  I don't recall ever making that statement to Undersheriff.

Q.    And one of the reasons I ask that is he appears to be left with the impression that that was the case and that this influences his perspective of what was ultimately 0139 and his subsequent conversation with the Sheriff.

Was Lieutenant Porter ever given an order regarding anything to do with 0111 or 0139?

A.    In reference to?

Q.    Anything with regards to 0111 or 0139.

A.    I guess I don't understand the question.  An order from me for those cases?

Q.    Yes.  M'hum.

A.    After he sent the investigative plan to me that he had sent to Jensen Hughes, that was for 111, I told him to stand down for the Monitor, that we would not be pursuing, using Jensen Hughes.

Q.    Okay.

A.    And as far as 139 goes, he is the acting PSB commander so we've had a few conversations as to how to get --

Sorry.  Do you want me to continue?

Q.    Please.  Go ahead.  I'm sorry, go ahead.  I don't mean to be disrespectful.

A.    Okay.  As far as getting that information to Arizona DPS, assisting with any other documentation regarding 139.

46REPORT001333

Q.    Okay.  So Lieutenant Porter sent Jensen Hughes an IA plan, an IA investigative plan?

A.    Yes, sir.  I believe March 30.

Q.    Chief, how is it you became aware that he sent the plan to Jensen Hughes?

A.    Because he sent it to me.

Q.    Okay.  But how is it that you became aware that he sent it to Jensen Hughes?

A.    I believe I was attached to the email that he forwarded me the email.  I would have to see it but Lieutenant Porter either -- I believe he forwarded me the email with the investigative plan that he had sent to Jensen Hughes.

Q.    Okay.

A.    So that is the only way that I knew that that had occurred.  I would need to look back at the email to see it exactly.

Q.    Is that the email there?

A.    Oh, thank you.

      Yes.

Q.    Can you just point out for me where it represents that he sent the investigative plan to Jensen Hughes?

A.    Investigation is assigned to Joy Fitzgerald with Jensen Hughes, assigned investigator Hughes for Joy Fitzgerald and then I believe I received an email from Mark from Jensen Hughes, and I don't know if it was related to the investigative

46REPORT001334

plan but Mark sent me an email saying that Lieutenant Porter had assigned the case to Joy Fitzgerald from Jensen Hughes and that marked some confusion as to why Joy Fitzgerald was involved when Mark had assigned it to different investigator with Jensen Hughes.

Q. Did -- again, I'm just asking. In this email, can you show me what represents Lieutenant Porter sent the IA investigative plan to Jensen Hughes?

A. Sir. I may have misspoken. I thought that was a forward from Jensen Hughes when I referenced it. But my assumption was that with the information in there and the fact that it lists Joy Fitzgerald as investigator for Jensen Hughes, that it had been sent to her.

I was unsure as to how those things take place because this was the very first time I've ever even learned of an investigative plan.

Q. So it was an assumption that he did it?

A. My belief was that because it was written the way it was that it was already sent to them so -- I'm not saying it was an assumption.

Q. I just want to read this into the record.

This is dated Sunday, March 30, at 8:17 p.m. It's Sunday night. It's from Frederick Porter, MCSO, to Melissa Palopoli. It's copied to Amy Gutierrez. I think Amy is a staff member, administrative staff member in PSB. And the

46REPORT001335

subject is investigative plan IA 2025-0111.

(As read)  Narrative.  Good evening, Chief Palopoli. Below is an investigative plan for IA 2025-0111.  Due to Captain Lugo being listed as a principal, I am sending this plan to you.  The investigation is assigned to Joy Fitzgerald with Jensen Hughes.  I have cc'd Amy Gutierrez who is the administrative supervisor that helps me out and assists Jensen Hughes with all of the documentation and files they need.  Let me know if you need anything added or clarified.  If you have any questions or need anything else, just let Amy or I know. Thank you.

And then I see an investigative plan attached.

What I get out of this -- and please correct me if I'm wrong -- is that this is being sent to you as represented in the narrative and that it's a draft.  Let me know if you need anything added or clarified.  I don't see anywhere in this that represents Lieutenant Porter sent an IA investigative plan to Jensen Hughes.

A.   I would agree with you and I would also say that there had been communication between Lieutenant Porter and Joy Fitzgerald prior to that date which is why Mark from Jensen Hughes sent me an email with the confusion as to why Lieutenant Porter was communicating with Joy.

So there was communication between the two of them prior to the sending of the investigative plan.

Q.   When did you get that communication from Mark?

A.   On March 28, sir.

Q.   And did he say that the IA plan had been sent to Joy?

A.   No.

Q.   So what's the right adjective I should use to describe how you came to believe the IA plan was sent to Jensen Hughes?  Is it a mistake, an assumption, a guess?  I don't understand because you've repeated this a few times.

A.   No, I haven't.  No, I haven't.  I misspoke.  Originally -- when we first interviewed, I had one hour and 20 minutes to prepare for that interview so I absolutely misspoke during our original interview.  And in looking at the email now that you've showed me, I see that it wasn't sent to Joy Fitzgerald so I made a mistake, sir.  I am human.  Humans make mistakes.

So you have proven me wrong and I accept that my responsibility in making a small error, that the fact that it was not sent to Jensen Hughes according to that email.

Q.   Let me offer this.  I don't know that it's apt to describe it as a small error.  In fact, you have cited it as supporting evidence that Captain Lugo influenced the communication with Jensen Hughes in the -- their interaction with this case.  You have said that Porter independently contacted Jensen Hughes.  Porter provided an IA investigative plan to Jensen Hughes.  This must have been done at the direction of his boss, Captain Lugo.  Nothing to support that it must have come at the

46REPORT001337

direction of the boss, Captain Lugo.

So the mistake or the misspoke about sending an IA plan to Jensen Hughes is not a small mistake.

A.   So I can clarify with this statement.

Q.   Please.

A.   And that is that Lieutenant Porter received some direction to be involved in this investigation.  I never gave him that direction.  Lieutenant Porter came up with an investigative plan.  I never gave him the direction to write an investigative plan.  Lieutenant Porter reached out to Joy Fitzgerald from Jensen Hughes.  I never provided him with that direction.  My direction to Captain Lugo was to provide me with a liaison lieutenant which I can direct on how to handle this investigation.  That never happened.

So an investigative plan was written, a reach out to Jensen Hughes was conducted.  And I don't know whose direction that was from and that is part of this investigation.  I do not know how Lieutenant Porter came to find out that he needed to do those things.  That is where the confusion is.  It is not that I said -- said to Captain Lugo or directed him to do so.  There is an assumption here that that may be the case.

Q.   I think more than an assumption.  I think in your first interview I think you made it clear that you believed Captain Lugo influenced Lieutenant Porter in reaching out to Jensen Hughes.  Now, if that was another misspoke.  But you

46REPORT001338

have lodged an internal complaint at PSB against Captain Lugo for just that supporting insubordination because you assume he's the one that facilitated Lieutenant Porter reaching out to Jensen Hughes.  I mean, do we initiate Internal Affairs investigations because we don't know and so we're going to take a shot in the dark?

A.    I'm assuming that's a rhetorical question, sir.

Q.    It's a literal question.  Do we initiate Internal Affairs investigations and identify somebody as a principal because we don't know the answer?

A.    There is multi layers to this investigation.  That is one layer.

Q.    On March 28, this Mark -- and I'll just attempt to -- last name is G-I-U-F-F-R-E.  March 28, 2:26 p.m. from him to you, Subject, forward, IA 2025-0111.  In the narrative:

(As read)  Hi, Chief.  Time permitting, can you give me call, question mark.  Reference below yesterday the captain case.  And it's IA 2025-0111 was assigned by Lieutenant Porter to Jensen Hughes Investigator Joy Fitzgerald. My understanding from your March 25 email was you assigned it to Jensen Hughes Investigator Frank Hoagland and that you would be overseeing it rather than Lieutenant but we are standing down pending your discussions with the Chief, question mark.

And the attachment that is sent here is something -- from somebody Anna Chacone, I'm assuming MCSO PSB, to Mark

46REPORT001339

copying Lieutenant Porter and Amy Gutierrez.  And this is on March 27 at 5 p.m.

(As read)  Good afternoon, Mark, IA 2025-0111 is assigned to Joy for completion.  The documents were uploaded to ShareFile.  Joy, please send your investigative plan to Lieutenant Porter.  Joy, please send your plan to Lieutenant Porter.

Any thoughts about you initially reaching out to Joy Fitzgerald and a few days later Lieutenant Porter having communication with Joy Fitzgerald?  Is there some communication going on in there that Lieutenant Porter is assuming Joy Fitzgerald has been assigned this case?

In other words, when you reached out to Joy Fitzgerald, is it possible that somebody in PSB knew of that, like one of the administrative assistants, like Amy Gutierrez?

A.   I have no idea.  I don't know how I would know that.

I'm not trying to be a smart ass.  I have no idea how that would happen.

Q.   What I'm just trying to offer is preliminarily when giving consideration to your formal allegation against Captain Lugo as part of the insubordination allegation that he essentially unduly influenced and directed PSB representatives to reach out to Jensen Hughes, are there other potential reasonable explanations for how this communication between Porter and Jensen Hughes occurred?

46REPORT001340

A.    I do not have any contact with anybody else in PSB other than Captain Lugo.

Q.    But is it possible that Joy Fitzgerald reached out to PSB assuming that Lieutenant Porter is the Jensen Hughes liaison with Jensen Hughes after you reached out to Joy Fitzgerald, could she have reached out to Lieutenant Porter?

A.    You would have to ask Lieutenant Porter that, sir.

Q.    Do you understand what I'm getting at here?

A.    That there's a possibility that Joy reached out to Lieutenant Porter and -- I would think that her boss, Mark, would tell her that she's not the investigator on the case since he assigned to it Frank Hoagland.  But I can't make assumptions for what Jensen Hughes is doing in their office.

Q.    But you've made a number of assumptions with regards to what Captain Lugo and Lieutenant Porter have done.  This is what I'm offering, is there are a number of plausible reasonable explanations and without knowing the answer, the PSB commander has been identified as a principal in an insubordination allegation.  And I'm just trying to figure out what got you to naming the PSB commander as the principal in an insubordination investigation, part of which involves he directed Lieutenant Porter to reach out to Jensen Hughes and Lieutenant Porter provided an IA plan to Jensen Hughes at Captain Lugo's direction.  Help me bridge that synapse.

A.    I can't.  It would have to come out during the

administrative investigation.  Short of interviewing Lieutenant Porter, Joy Fitzgerald, people from Jensen Hughes, I would not be able to answer that question.  It requires further investigation and that is not the position that I am in.

Q.    Help me to understand what your position would be.

A.    My position is that there's a presumption that there was a violation of policy and that needs to be investigated.

Q.    So you used a really important term there, presumption.  What is the root of the presumption?

A.    The root of the presumption?

Q.    You said there is a presumption.  What is the presumption?  How does something -- how does it evolve to a presumption?

A.    If you look at all of the facts, the totality of their circumstances, there is somehow a communication that Lieutenant Porter receives in which he then makes steps and decisions moving forward where he was supposed to be communicating with me.

        There's the insubordination but there are other allegations that are attached to this as well.  Insubordination is just one.  You're leaving out the failure to notify me in a timely manner of the investigation against him which is also a serious allegation.

Q.    What we're talking about right now is Jensen Hughes, Lieutenant Porter, Captain Lugo, Joy Fitzgerald, and the IA investigative plan; right?  I'm not talking about any of the

other allegations.

A.    Okay.

Q.    And so I'm just trying provide you an opportunity to explain what your thought process was here and I think what I'm taking away is by finding out that Lieutenant Porter had contacted Jensen Hughes, by Lieutenant Porter providing you with a draft copy of an IA plan, you presumed this was all done at the direction of Captain Lugo and it shows the name Captain Lugo as the principal for insubordination.

And if I misstate that, please correct me.

MR. SERBALIK:  Just so I'm clear with the record, do you want her to repeat all the same stuff that she said in her written submission and in the interview from last time or is that already assumed to be known with the investigators? Because I think last time she discussed the totality of the circumstances, multiple allegations to be investigated.  I'm assuming it's one record, that everything was submitted in writing and everything that was said yesterday still is part of the record.  Is that a correct understanding?

MR. ANDERS:  Absolutely, yeah.  There's no necessity to repeat it.  I'm just offering an opportunity for clarity.

Up until today's interview, the standing was the IA plan had been sent to Jensen Hughes.  We now know it was not sent to Jensen Hughes.

MR. SERBALIK:  I think we've covered that, yeah.  Got

46REPORT001343

it.

BY MR. ANDERS:

Q.   Now, with regards to the notification, what is MCSO policy regarding time liaison notification, the policy that is alleged to be violated by Captain Lugo?

A.   I believe it's under GH-2.  We would have to reference it. I don't have it memorized.

Q.   Do you recall enough of it that supported your naming Captain Lugo as a principal in violation of it?

A.   It's under -- sorry.  I can see it in my head but I can't.

Q.   I mean, I don't need to know it verbatim.  It doesn't have to be quoted.

A.   It basically says once you are aware of an allegation of misconduct against you -- not saying you.  It doesn't really say that, that that person then to notify their supervisor in a timely manner.

MR. PETERS:  Chief Anders, could I just get one point on the record while we're here?

MR. ANDERS:  Okay.  Go ahead, Major.

MR. PETERS:  Chief Palopoli, in regards to the policy itself, you stated that you have read the policy and you have gone through it and understand it.

THE WITNESS:  Yes, sir, but it's probably 40 pages long so I don't really have it memorized.

MR. PETERS:  No.  And I understand that exactly.

Have you attested to that?

THE WITNESS:  Have I --

MR. SERBALIK:  Can you repeat your question?  I'm sorry, sir.  You broke up.

MR. PETERS:  Have you attested to that fact that you have read and understand GH-2?

MR. ANDERS:  There's an attestation that's required.

THE WITNESS:  Oh, on like the hub or something?  I don't know what you're --

MR. PETERS:  Yes.  On the hub, have you --

THE WITNESS:  I don't remember, sir.  I don't remember, sir.  When I got hired, I had probably 20 or so hubs to sign.  So I don't remember if that was one specifically that I attested to or not.  Sorry.  I didn't understand your question at first.  I could -- I could find that out.  I could look back and let you guys know if I indeed attested to that one.

MR. PETERS:  Okay.  That would be fine.

THE WITNESS:  Okay.

MR. ANDERS:  Thanks, Major.

MR. PETERS:  Thanks, Chief.

BY MR. ANDERS:

Q.   So the notification policy will be the fundamentals of that.

A.   Yes, sir.

Q.    I'm sorry.  What would they be?

A.    Do you want me to repeat what I just said?  I can.  I was just asking you if that's what you're asking me for.

Q.    Please.

A.    That the -- this is -- don't quote me, please, say that this is exactly what it says; but it says if you are aware of an allegation made against you, that you're supposed to notify your supervisor in a timely manner.

Q.    Okay.  What would be the office's interpretation of a timely manner?

A.    If -- immediately upon -- from my interpretation would be? As soon as you know that you have an allegation against you, you should notify your supervisor.  It's not the next -- it's not the next day.  It's not 14, 15 hours later.  I don't even know if Captain Lugo would have reached out to me.  I reached out to him.

Q.    So that would be your interpretation.  But what is the office's standard?  There's a standard.  It's not applied individually by supervisors, managers and executives.  What's the office standard with regards to timely notification?  In other words, one sergeant can say it should be within six hours and another sergeant says I'm going in seven days.  What's the office standard?

A.    I don't know if it clarifies the office standard anywhere, sir, written.

Q.   Did you conduct any research into what the office standard might be or what past practice might be or what PSB cases have been investigated for failure to notify in a timely fashion and what ultimately was derived from those investigations?

A.   No, sir.

Q.   What was it that Captain Lugo failed to notify you about?

A.   That he was aware of an allegation involving himself and Sergeant Latham.

Q.   And what was that allegation?

A.   Tampering -- I have to look back, please.  Give me a second.  Intentional destruction or withholding of evidence.

Q.   Okay.  And who was making that allegation?

A.   Sergeant Engelbeck.

Q.   And when did Captain Lugo learn of that allegation?

A.   On March 10.

Q.   At what time?

A.   7:03 p.m.

Q.   And what would be your expectation with regards to notification -- timely notification?

A.   My expectation of somebody holding the office that he holds would be to notify me immediately, so within five, ten minutes of reading that, to at least reach out to me to say, "I need to speak to you about something."  And then for sure the next business day at the start of the day, had he not done that that night, then the start of the next business day would have

been appropriate as well.

Q.   And knowing what you know, what should he have advised you of in that notification?  What would you expect to hear?

A.   That there was you a new Blue Team complaint alleging that there was intentional destruction or withholding of evidence where he and Sergeant Latham were implicated as being potential principals.

Q.   So is the Blue Team entry, that the letter that Sergeant -- is it Engelbeck, that Sergeant Engelbeck sent to Chief Deputy Gentry and Chief Deputy Gentry sent you?

A.   He sent -- it had multiple documents attached to his email and one of them was the complaint that he copied and pasted into Blue Team.

Q.   Was that the narrative that he provided to Chief Gentry giving a history, his demotion?

A.   There were multiple narratives but that was one of them, yes, sir.  There was multiple attachments and there was one or two other additional narratives.

Q.   Can you show me where Sergeant Engelbeck identifies Captain Lugo?  Because we're talking about a criminal matter, I'll use this term, identifies Captain Lugo as a suspect in a criminal matter?

A.   The allegation talks about some potential criminal conduct related to the tampering of evidence; and in there he does not know who left or withheld that evidence and he names both Lugo,

46REPORT001348

24

Latham, there's multiple times that he speaks about them as well in there. I don't have it in front of me, sir.

Q. So I can appreciate that. But what I am asking is, you have said that Captain Lugo became aware of a criminal allegation where he's identified as a suspect in destroying, withholding, or tampering evidence; correct? If I misstated that, please tell me. Lugo became aware of this a little after 7 p.m. on March 10. Is that what you're telling me?

A. M'hum.

Q. How would Lugo know that he was identified as a suspect in those criminal allegations?

A. He read the complaint.

Q. And, again, I'm asking where in the complaint --

A. I would have to read it. It's very lengthy, sir, so I have to refresh my memory on that. If you would like to give me some time to do that, I'm happy to.

Q. Why don't we take a few minutes? Please go ahead and read it and if you can point out to me, let me know.

A. Can we take a break and I go sit in another room?

MS. KIYLER: Let me find you a place to reconvene here.

MR. ANDERS: We're going to go off the record here. The time is 4:37 p.m.

(Recess from 4:37 p.m.; resumed at 4:58 p.m.)

MR. ANDERS: Okay. We're back on the record. It's

46REPORT001349

approximately 4:58 p.m.

BY MR. ANDERS:

Q.    Chief, just prior to the break, I had asked if you could just help me to understand where in the complaint filed by Sergeant Engelbeck that Captain Lugo is identified as a suspect in the criminal matter.

A.    Sure.  So in reviewing it, Captain Lugo's name is peppered throughout the original complaint.  And in some of it his allegation, going back, Engelbeck says that his previous investigation during the interview that he had with Sergeant Latham, that he identified several allegations into Captain Lugo of policy violations.

And when he got a copy of the IA, all of that information was not in there.  And Captain Lugo was never -- what's the word I was looking for?  Captain Lugo was not investigated for those policy violations.

During his appeal process, he requested a copy of that video interview with Sergeant Latham where he made those allegations against Captain Lugo.  He says that he believes that Captain Lugo had more involvement in this investigation and should have recused himself.  He says that the video would show discrepancies in the report, possibly showing violations including violations of truthfulness.

When he asked for that video, he did not get it.  He said all of the documentation related to that investigation

should be stored in the same place. And he also alleges that the legal liaison for them is known to consult with PSB command, which is Captain Lugo. We identified that.

Q. I'm sorry. Could you say it one more time?

A. PSB command.

Q. But what led up to PSB command?

A. Let me go back. So a legal liaison is known to consult with PSB command to discuss what can and cannot be released.

Upon asking for that additional video, I believe it was the next -- he claims, and I'm -- again, this is an allegation, so none of it has been verified until the investigation takes place. But he believes that when he asked for that video, that it was the next day that the case was vacated, which is showing further proof that Captain Lugo had some involvement in that case being -- him not receiving that video.

Q. He said that it's further proof that Captain --

A. Yep. He said: It appears -- that's not it. He says: (As read) Furthermore, I believe the wish to vacate the appeal the day after I made it known I was aware of the incomplete case file is implicating as well. It appears to me that PSB was aware of the omission but I was waiting to see -- but was waiting to see if I actually discovered it, this.

Q. It sounds a little bit different than further proof.

A. I didn't write that.

46REPORT001351

27

Q.   No.  You said that.

A.   Well, I was paraphrasing.

Q.   You said further proof.

A.   I was paraphrasing, sir.  I was paraphrasing what -- he's generalizing that there was allegations related to that.

Q.   So in all of that, I need to ask you again, when you read the complaint, when Captain Lugo reads the complaint, when I read the complaint, where does it identify Captain Lugo as a suspect in a crime?  Where does it even provide reasonable suspicion that Captain Lugo is a suspect in a crime?

A.   Sir, the allegations --

Q.   If the fact that a legal liaison has conversation with PSB about documents and so forth, could legal liaison be suspect in a crime?  They were told by Captain Lugo to provide it and they refused to do it.  They destroyed it.  Why would Captain Lugo be any more suspect in this than Chief Summers, than Ms. Callahan, than Lieutenant Porter, than Tiffany Shaw?  I'm just curious.  You have said he is a suspect in a crime and I'm trying to figure out who identifies him as a suspect in a crime?

A.   The allegations are criminal in nature.

Q.   I understand the allegations.

A.   Sergeant Engelbeck -- sir, you asked me a question. Please give me the opportunity to answer it.  Thank you.

          Sergeant Engelbeck alleges that Commander --

Captain Lugo is retaliating against him in that complaint.  He is then naming him as being a key component in his complaint.

Q.   So am I hearing that in your review of the complaint, Captain Lugo was not identified as a suspect, in the criminal allegation?

A.   I did not say --

Q.   Or are you telling me he is your -- your understanding of law, of reasonable suspicion of probable cause of the identification of a suspect in a crime, that in that complaint, it is your belief Captain Lugo was identified as a suspect and that he, being Sergeant Engelbeck, is identifying Captain Lugo as a suspect?  It's just a yes or a no?

A.   Yes.

        MR. SERBALIK:  It's a multi-part question.  Are you asking about legal standard or are you asking --

        MR. ANDERS:  I'm asking her understanding of criminal law.

        THE WITNESS:  My understanding is that Sergeant Engelbeck is saying that there are multiple people involved in a cover-up of some sort or a -- not necessarily a cover-up but not providing him with a video related to an important interview for his IA case.

by MR. ANDERS:

Q.   Why would you identify -- why would you identify Captain Lugo as a suspect in this case?  Sergeant Engelbeck did

not identify him as a suspect in this case.

A.   I am going based off of the totality of the written complaint.

Q.   So are you making another assumption?

A.   No.  I am not.

Q.   Your interpretation of what Sergeant Engelbeck wrote makes it clear he's identifying Captain Lugo --

A.   Yes.

Q.   -- as the suspect in the case?

A.   As a key player, yes, sir.

Q.   As a key player?

A.   I'm not accusing Captain Lugo of a crime.  There is -- there is an allegation that a crime occurred with Captain Lugo being a possible investigative lead.  I never said he was a suspect.

Q.   Okay.  We need to sop right there.

A.   He's involved.

Q.   There is a huge chasm between an individual being an investigative lead.  My neighbor can be an investigative -- excuse me.  My neighbor can be an investigative lead in a neighborhood burglary.  That didn't make my neighbor a named suspect in that neighborhood burglary.

So I'm curious here, again, how is it we get to Captain Lugo being a suspect in this crime or is it Captain Lugo's name is floated many times throughout the

complaint and Captain Lugo is in charge of PSB so it's very clear Captain Lugo is a suspect?  I'm just looking for clarity as I think any reasonable person would.

And if you think there's been a mistake --

A.    No, sir.  We have a criminal allegation.

Q.    I have no argument with that at all.  There's clearly a criminal allegation.

A.    And a criminal allegation is not to be investigated by an administrative entity.  Criminal allegation gets investigated by criminal investigators.  So I leave it up to them to do that investigation.

Q.    So when I read the complaint, I really went through the complaint many, many times.  We're talking about 0111 trying to find any articulate identification of Captain Lugo being named as a suspect, any preponderance that Captain Lugo would be a suspect, any reasonable suspicion.  I couldn't find it.

And so I just extracted some quotes here, some phrases that are just about as close as I can get.

Sergeant Engelbeck wrote:  I believe the facts will show this was willful and willful knowledge by a person unknown at this time in PSB.

He wrote:  Someone, someone would have to deliberately omit the files, them which he referred to the files.  It appears to me PSB was aware of the omission but was waiting to see if I actually discovered this.

46REPORT001355

He believes the appeal was vacated and it was vacated because it was meant to cover up withholding the evidence. He said the video was not provided. Someone deliberately omitted them from discovery. In his narrative, he doesn't talk about destruction or tampering; he talks about it was omitted. It wasn't provided, to be honest with you, the A.R.S. he cites references destruction and withholding but I don't see that culled out in his complaint.

So I just -- I am just not seeing anywhere in there. I'm not going to berate this much longer.

A.    I would like to --

Q.    Captain Lugo has identified. Moreover -- moreover, in our conversations regarding this incident, on page one you told me that it may, in fact, be Conduct Resolution who did not provide the complaint in his interview because they decided to overturn the case.

On the first you also told me you don't think it's criminal but you don't think about. And on the first you told me you think it's Conduct Resolution that should have provided the interview to the complaint and you're not even sure that Lugo and Latham will end up being the principals.

So you can see where I'm really struggling in trying to understand how we got to Captain Lugo being named as a suspect to the Arizona Department of Public Safety when nobody in the complaint in any way, shape, or form has referenced him

46REPORT001356

as a suspect. Moreover, I'm trying to understand if, in fact, Captain Lugo read that complaint and he didn't see where he was being identified as a suspect in a crime, what urgency existed in notifying you, what timely notification requirement existed to tell you about yet another complaint being filed that is the same complaint that has been filed and previously investigated and closed. What would warrant that phone call within, to your point, five to ten minutes?

A. Is that a question?

Q. It is.

A. If you replaced Captain Lugo's name in there with Chief Palopoli, as many times as it is written in that complaint and the allegations surrounding it, I would be on the phone with Chief Gentry in a second saying, "I read this. It has my name in it. I am making immediate notification to you, sir, that this is a complaint that was just entered into Blue Team."

Q. And of course that sounds like it's a personal standard, not an organizational standard. That may be your level of consciousness. Moreover, you don't have knowledge of the history with regards to the complainant and Captain Lugo and Sergeant Latham and what has previously been investigated and closed. Is that true?

A. I don't understand the question. I'm sorry. Is there --

Q. Okay. So your thought is given all the circumstances then, Captain Lugo did not make a timely notification?

46REPORT001357

A.    Correct.

Q.    Okay.  Regarding 0139, this is the insubordination.  And the insubordination references failure the notify Lieutenant Porter reaching out to Jensen Hughes and providing an IA plan at the direction of Captain Lugo.  Captain Lugo accessing IAPro on March 21 at 10:26 a.m.

Is there anything else with regards to the insubordination?  As I recall, those were the three.

A.    Oh, yes.  I asked him to assign me a lieutenant liaison and he never provided with a lieutenant liaison.

Q.    How important would that be to have a lieutenant liaison assigned to you?

A.    It would be somebody that I could communicate with in PSB other than Captain Lugo.

Q.    How important would that be in a priority, one being just not a majority, 10 being it's of the highest priority?

A.    With the time liaison manner of needing to investigate these cases, I would say that it would be a 10.

Q.    It was a 10.  And you gave Captain Lugo that direction.  In our initial interview, you had said it was on -- you thought it was on March 11 but then in the supplement that you filed you changed that date to March 18?

A.    Yes, sir.

Q.    Ultimately you designated Lieutenant Porter, if I understand, as the contacting captain in PSB but there was a

meeting held on April 2 with yourself, the Sheriff, Chief Gentry, Captain Lugo in which I think you say you reminded Captain Lugo, hey, you're waiting for that name of that lieutenant.

A.    Yes, sir.

Q.    So let me ask you this.  On scale of 1 to 10 you've said the criticality, the importance of that lieutenant is a 10.  It can't be a higher priority than a 10.

How many times did you circle back to Captain Lugo saying, "Listen, this is really important.  I need the name of that lieutenant"?

A.    This, sir, is --

Q.    How many times?

A.    I don't recall if any.

Q.    So in 14 days, two weeks, on priority 10 you need the lieutenant ASAP, you didn't circle back to Captain Lugo and inquire, "What's the status of that lieutenant getting assigned to this case?"

A.    I can explain if you give me a second.

Q.    Please.

A.    So I did not inquire back on the lieutenant because if you recall, sir, during that time you and I had multiple conversations about Jensen Hughes not taking it.  Then it was getting contact with Baseline Investigations.  Then it was they were not available.  Then it was we might farm it out to AZ

46REPORT001359

DPS.

So at that point, even though I didn't have a lieutenant liaison, I didn't have a reason to converse with that lieutenant until I knew exactly who would be taking the investigation.

Q.   So I guess what I'm hearing is it really wasn't a 10.  It was -- I really don't need it right now but I'm going to file an insubordination complaint because I didn't get it.

A.   At the time that I asked for it, it was a priority and then I spoke with you and that is when there was a lot of confusion as to who would be taking the investigation.  I did not have a need to discuss that with a lieutenant at that very moment until it was figured out who was going to be investigating.

Q.   When you spoke with Captain Lugo on March -- on the morning of March 11 you represented in your supplement that Captain Lugo was making some reference to this should actually be a Conduct Resolution investigation or a Service Complaint. Why do you think he was making those -- providing you with that guidance?

A.   He stated that it should -- it should be more fitting as a Service Complaint or an investigation against Conduct Resolution based on his analysis of what he read.  I don't know.  I can't speak for Captain Lugo.

Q.   Did you ask Captain Lugo, "Greg, help me out.  I'm new

46REPORT001360

here.  Looking for some counsel.  You have said this should be a Conduct Resolution investigation.  Help me to understand why"?

A.   I believe I spoke with him about steps that would be taken and I believe that would be on the 18th that I had a discussion with him.

Q.   My question surrounds on the 11th he is saying this should be a Conduct Resolution investigation.  And my question is, did you ask him why?  What would be his reasoning?

A.   I don't remember.

Q.   Did you ask him why it should be a Service Complaint?

A.   At that point, being so new to the department, I didn't even know what a service complaint was other than --

Q.   So wouldn't an appropriate response have been, "Greg, what is a Service Complaint"?

A.   Again, I was new.  I was trying to absorb a lot of information in a very short period of time.

Q.   At some point you accessed case number 0555 but you wrote in the supplement that you did not get into individual files.  Why did you access 0555?

A.   It's not 0555.  Just to correct the record here.  It's 055.

         I went in to see if --

Q.   I apologize.  Is it Service Complaint 055?  Because usually 2025 is --

A.    This is a 2020 case, 055.

MS. KIYLER:  It has to have four numbers.

THE WITNESS:  2020-055?

MR. ANDERS:  I think it's 0555.

MS. KIYLER:  I think it has to have four numbers.

THE WITNESS:  Oh, I'm sorry.  Then I wrote it wrong. I apologize.

I went in there to see if I could -- this was probably my second time accessing IAPro and I was trying to see if that video existed that was being referenced.  But there were so many files in that case file that I have no idea what video Engelbeck was actually referring to.

by MR. ANDERS:

Q.    What date did you access -- I'll just call it 555?

A.    I don't know, sir.  I would have to pull the log and I didn't want to do that.

Q.    So throughout now what has probably been coming up on four hours of conversation and I think I've asked in variety of ways, what preliminary inquiry exploration did you conduct and the posture has been essentially criminal allegation been made, I can't do an investigation, I didn't do any investigative steps.  This needs to go out for investigation.

And I've asked what would be the difficulty in trying to locate the file.  Call Conduct Resolution.  "Did you guys keep the file?"  Access IAPro, "Hey, was this destroyed?  Has

it been accessed?" Again, those preliminary inquiries to see do we even have anything here or is this just a fantasy? Is this just a communication error, just a mistake or done intentionally by Conduct Resolution or what have you?

This is the first time now I'm hearing you tried to find the file. Is that true?

A.    Is this the first time that you're hearing of it?

Q.    Yes.

A.    Or when you read it prior to my interview?

Q.    Yes. Any idea why this hasn't been in your conversation up until now?

A.    Well, I had less than an hour to prepare for my first interview the other day, sir, so there really wasn't enough time to go back and think about every little step that I took. So when I was able to sit down and formulate what I did, I remembered being in there. But being overwhelmed at how many files were in there to the point where I was like I'm not -- this is bigger than me. I shouldn't -- I shouldn't be looking --

Q.    Are you familiar with IAPro?

A.    IAPro, 10 years ago.

Q.    It has evolved.

A.    We didn't have hard copies of our files in IAPro when I was back in IA.

Q.    But you did access IAPro case number 0555 with the intent

Q. of, hey, let me see if that file actually exists?

A. M'hum.

Q. And you got in and there's quite a bit of material there. This could be a little overwhelming.

A. Yeah.

Q. Is there somebody else who could have accessed IAPro on your behalf if you had an intent to do it? If you couldn't do it, you thought it was important enough that you would access the file and but mechanically, operationally you can't do it, could somebody do it on your behalf?

A. Who?

Q. Chief Summers.

A. I don't believe that he knows IAPro well.

Q. Tiffany Shaw?

A. I had barely just met her.

Q. Ms. Callahan?

A. Never met her.

Q. Lieutenant Porter?

A. Until the other day.

I did not know Lieutenant Porter at that moment either. I did not have any other contacts in PSB at that point other than Captain Lugo.

Q. As the Executive Assistant Chief, what I'm hearing is you did not have the capacity to find somebody to access IAPro on your behalf to complete a task that you were unable to complete

46REPORT001364

yourself?

A.    Once I went in there and I saw the volume of files, it was at that point that I realized this is going to take -- these are investigative steps for a potential criminal allegation that I should not be taking.  So that's when I took a step back and I realized that this needs to be investigated by someone else other than me.  That is why I did not do any preliminary -- any other preliminary steps, because I realized this is the to -- the totality of this is much bigger than just looking for a file.

Even if the file existed in there, I don't know where the miscommunication or if it was left out or if it wasn't provided, I don't know any of those, if any of those facts are true.  And I did not want to go down that road.  That was not my role as the Executive Chief.

Q.    So you initiated a preliminary inquiry by accessing 0555.  Your intent was to see if the file was in there.  When you got in there then, there was a lot of files, a lot of material in there.

But what I'm hearing is first I heard you got in there, overwhelming amount of material.  New to IAPro, this version of IAPro, I can't do it.  In fact, I think your supplement references I did not get into individual files.  But then I hear, well, that's not the reason.  The reason is I got in there and while I was in there, I realized, uh-oh, I

shouldn't be here.  So I'm just asking for clarity --

A.   No.   It was -- okay.  I'll give you clarity.  So I went in there.  I saw there was a ton of files and at that point, I said this is a big case.  I don't know much about it other than what was provided to me on the complaint and that this needed to be looked at by somebody other than me.

I also had in the back of my mind Lieutenant Bacardo's (phonetic) voice saying, "Hey, when you go into IAPro, be very careful what you click on because things could get deleted.  And once they are deleted, they are gone."  So I didn't want to be touching anything and have a possibility of something being further messed with.

MS. KIYLER:  May I ask a question?

MR. ANDERS:  Yes, please.

MS. KIYLER:  And I'm very familiar with the IAPro files so I get all the cases so I know what you're talking about in terms of many files.

If you had been able to immediately see that there was an interview of Engelbeck in the file, would that have changed your course of action?

THE WITNESS:  No.  Because I still don't know if it was provided to Engelbeck or not.  So I realized that as well when I was looking in there and I was like even if it exists here, I can't say to a fact whether or not it was provided to Engelbeck when he made those requests.

46REPORT001366

MS. KIYLER:  But wasn't the allegation that it was deleted, not that it wasn't provided?

MR. ANDERS:  Or destroyed.

THE WITNESS:  Yes, you're right.  Sorry, yes.

MS. KIYLER:  So if you had see the file in there and you clicked on it -- and it is in there, because I've seen it, and -- because I review cases and I have that one.  And you clicked on it and you say, well, here's the interview of Engelbeck, and maybe even listened to it, would that have changed what you did?  Because it's clearly not been deleted.

THE WITNESS:  At that point, then I still think it further warrants investigation because I wouldn't even know if it was a complete interview by looking at it and clicking on it, right, if it was the entire interview in there or not as far as the file goes, I don't know.

MS. KIYLER:  Are you asking me?

THE WITNESS:  No.  I'm saying even if I clicked on it and listened to it or clicked on it and saw that it was there, I wouldn't know if it was a complete interview.  I wouldn't know if parts of it had been omitted.  According to Engelbeck's complaint that not everything was in his case summary that was in the recorded interview.  I read that before.

So that's one.  It also could have been further alleged that it involved more than just Lugo and Latham.  I don't know.

46REPORT001367

At that point, not knowing any of the parties and not knowing exactly how things run yet at this point, I was like I'm stepping out.  I'm stepping back, and I'm going to go with the Chief Deputy's direction, that he wanted to provide this investigation to a conflict investigator and that's when I stopped everything.

MS. KIYLER:  And he wanted to do that even before you did your own inquiry?

THE WITNESS:  Yeah.

MS. KIYLER:  So why did you do the inquiry at all?

THE WITNESS:  I didn't.  I mean -- I didn't.  That was his -- his -- what he wanted to do but it was I think for even Chief Deputy, it was who takes it?  What do we do with it?  There was still a lot of confusion between him being new at his role and me being brand new at MCSO.  There was a lot of confusion.

MS. KIYLER:  So, I mean, he's already directed you to outsource it.  It needs to go to DPS.

THE WITNESS:  He asked me my thoughts on it and it was somewhere -- I don't know if I accessed the case prior to him providing me that.

MS. KIYLER:  Okay.  So that's --

THE WITNESS:  That's the part that I'm not sure of. Chief, did he provide me with saying it needs to be outsourced prior to me looking at it or after.  It may be after.  I don't

46REPORT001368

44

remember.  It was the same day.

MS. KIYLER:  So if you looked at it before, then your reason for doing it would be to do what?

THE WITNESS:  Just see if I could see it in there.  I did not expect --

MS. KIYLER:  If you had seen it in there?

THE WITNESS:  Had I seen it -- I'm sorry.  What's your question?  You're confusing me.

MS. KIYLER:  You were looking to see if there was an interview of Engelbeck in the file.

THE WITNESS:  Yes.

MS. KIYLER:  And, in fact, there were multiple interviews with him in the file.  But if you had seen that when you opened it and -- and I know that you are not familiar put you can click on it.  You can see the entire interview from start to finish, when they go on the record, they go off the record.  If you would have clicked on that and seen that, would it have changed your decision?

THE WITNESS:  No because we're -- there was still unsure as to -- because there's multiple layers to the allegation.  So that's one allegation.  Then there's the allegation that it wasn't a complete -- his complete interview wasn't in there so I would not have known that.  I don't know how you omit certain facts.  I don't know if that's possible.  So there was just -- for me there was a lot of layers to it and

46REPORT001369

45

that was just one piece.

So, no, it would not have changed my decision to keep it going on the investigation because that's not the only allegation.  He's saying that there was things --

MS. KIYLER:  That's the criminal allegation.  He said a file was deleted or omitted.

THE WITNESS:  Omitted so we can't say that it was provided.  If he's saying it wasn't provided to him, I can't prove that if it's in IAPro.

MS. KIYLER:  No.  I agree you can't prove whether or not it was provided to him.

THE WITNESS:  So omission is part of the tampering with evidence that there was -- that a file was omitted, then that's -- I can't prove that by just seeing a file being in IAPro.

MS. KIYLER:  Even knowing that Captain Lugo would not have been the person to provide the file anyway.

THE WITNESS:  I was unclear at that point of that.

MS. KIYLER:  Okay.

by MR. ANDERS:

Q.    Just seeking a little bit more clarity, you accessed that file on March 11.

A.    I don't know exactly what date.

Q.    It was March 11.  That's what you put in your supplementary memoranda.

46REPORT001370

46

A.    Right.  Right.

Q.    So it was very early on.  So why -- why did you access the file if it would not provide any value?  Why get in there if this is not going to have any impact on course of action here?  Still not going to answer, hey, did Lugo tamper with it?  Did he intentionally deny Conduct Resolution access to it?  Did Conduct Resolution intentionally deny the sergeant access?  Why even bother accessing it?  What was the intent?

A.    The intent?  Curiosity, to see if I would be able to readily identify the file that he was talking about, give me another case number to look through for IAPro to start to learn the system a little bit better.

Q.    Have you had any opportunity to talk with Chief Caputo about this?

A.    I did speak with Chief Caputo about his filing of this Service Complaint.

Q.    In person, by phone?

A.    Over the phone, sir.

Q.    Did he reach out to you or you reach out to him?

A.    I reached out to him.

Q.    Now, what was the nature of the conversation and the conclusions you drew from the conversation?

A.    I asked him about the -- when he completed the Service Complaint, just kind of trying to get an idea of the demeanor between -- of Sergeant Engelbeck at the time of the

investigation.  But what I learned about that was that that had happened in earlier 2024 so it didn't have relevance to this current allegation.  So we didn't talk about it any further after that.

Q.    The current criminal allegation?

A.    Yes, sir.

Q.    Did you get a sense that with regard to the allegation that Captain Lugo retaliated against Sergeant Engelbeck and that Sergeant Latham did not advance a complaint made by Sergeant Engelbeck, did you get sense that in fact those had been investigated by Chief Caputo?

A.    The conversation I had with Chief Caputo.  I'm not following you, sir, and I don't men to be disrespectful but if you can --

Q.    I understand.  So 0111, there's three primary allegations being made by Sergeant Engelbeck.  One allegation is that some unknown person tampered with, destroyed, omitted, withheld evidence that I had asked for.  Don't know who did it.

       Second allegation made, during an interview a long time ago, at the end of my interview, I complained about Captain Lugo and Sergeant Latham did not advance that complaint.

       The third, Captain Lugo has retaliated against me. Now, we all know that Chief Caputo did an investigation in 2024, if not earlier, possibly 2023, I don't recall.  So my

46REPORT001372

question is, when you reached out to Chief Caputo, was it just to discuss the criminal matter?  And if so, what would lead you to believe that Chief Caputo would know anything about the criminal matter?

Or did it also include conversation about, "Hey, this guy is alleging retaliation by Lugo and that Latham didn't," and Caputo said, "Oh, yeah, you know, repeat.  I investigated that."  "Oh, was that" -- do you know what I mean?  Where did you leave the conversation with Caputo with.

A.    So I did not discuss the criminal matter with Chief Caputo.  I discussed the Service Complaint that he wrote related to the retaliation -- the original allegation of retaliation from Sergeant Engelbeck and I believe I asked him when he completed the Service Complaint.

Q.    You wouldn't know that in the documents that Engelbeck provided; right?

A.    Yeah.  True.

Q.    And when you concluded the conversation with Chief Caputo, where it wasn't about the criminal complaint, were you satisfied that these other two administrative allegations that Engelbeck was making that those -- that essentially, my words, not yours, asked and answered, that Caputo had dressed this?

A.    Sir, at the time I don't remember exactly all of the conversation with Caputo and whether or not I was satisfied with the retaliation allegations because it appeared to be a

newer -- Sergeant Engelbeck's complaint for 111 was a new allegation of retaliation related to this withholding of evidence, that he believed that it was almost a continuation of retaliation related to -- between the two of them.

Q. So your interpretation in reading the complaint when he alleges retaliation is that he means retaliation because Lugo had withheld the evidence even though Lugo hasn't been identified as person he suspects as withholding the evidence and even though he references the previous investigation by Chief Caputo?

A. It's part of what he was saying in his complaint.

Q. I'm sorry. What was part of what he was saying?

A. In his newer complaint that there is -- I have to read it again. I'm sorry.

In the complaint he said Lugo had more involvement in the investigation and should have recused himself. I'm not sure if that's what you're looking for.

Q. That would be, what, 0555?

A. I don't know, sir. I'm starting to get -- maybe I need a five-minute break. I'm starting to get a little bit confused between numbers.

Q. Why don't we do that?

MR. ANDERS: The time is approximately 5:33 p.m. We're going to take a break.

We're getting real close to the end here.

MR. SERBALIK:  Did you shut it off this time?

MS. KIYLER:  I don't know.

MR. ANDERS:  Still with us, Major?

MR. PETERS:  Yes, sir, I am.  Can you hear me?

MR. ANDERS:  Yes, thank you.

MS. KIYLER:  Well, it says it's on hold.

(Recess at 5:33; resumed at 5:41 p.m.)

MR. ANDERS:  Okay.

We're back on the record.  Everybody is back in the conference room.  The time is approximately 5:41 p.m.

BY MR. ANDERS:

Q.   So Chief, oddly enough, I was just asking about your take-aways from the conversation with retired Chief Caputo, and you -- and I'm just curious what you were left with regarding the allegation made against Sergeant Latham and the administrative allegation made against Captain Lugo.

After talking with Chief Caputo, do you believe those allegations had, my term, previously been asked and answered, that this had been resolved with Chief Caputo?

A.   The answer is no.  So some of the allegations that Sergeant Engelbeck made in his complaint in 111 was previously investigated by Caputo.  However, there were new allegations related to -- one with the withholding of evidence where he didn't get the case file in the time that --

Q.   That's criminal, though; right?

46REPORT001375

A.    Yes.

Q.    I'm talking about the administrative allegations.  He's alleging retaliation -- let's just talk about Lugo.  We'll keep it down to that micro level.  He alleges administratively that Captain Lugo has retaliated against him and he's referencing this series of historical events and, in fact, there's references in there with regard to Chief Caputo's investigation and that investigation is attached to the email that Sergeant Engelbeck sent to Undersheriff Gentry.

So just with regards to that retaliation allegation and the way Sergeant Engelbeck outlines it, after your conversation with Chief Caputo, did you feel that this had already been previously addressed?

A.    The previous allegations of retaliation were investigated prior by Chief Caputo.

Q.    So with regards to Captain Lugo, what you then would be left with is naming Captain Lugo as a suspect in the criminal allegations.  Is that correct?

A.    No.  There are still -- in this new complaint there are a mixture of administrative policy violation allegations and criminal conduct allegations.

Q.    Made against Captain Lugo specifically or just what the criminal unknown who did this?

A.    Yes.  Sergeant Latham is named, Captain Lugo is named, potentially involving the people in Conduct Resolution.  The

allegation is pretty broad.

Q.   So I'm just trying to nail it down.  If there are new administrative allegations being made by Sergeant Engelbeck, is he identifying Captain Lugo as a principal in those new administrative allegations or is he just saying there are administrative violations here, administrative allegations, but I don't know who did it?

A.   He's claiming that Captain Lugo is involved in some of the administrative policy violations, sir.

Q.   And so help me to understand what those would be that are new.

A.   That he had involvement in the investigation where he should have recused himself.

        MS. KIYLER:  I'm sorry.  Which investigation?

        THE WITNESS:  555.

BY MR. ANDERS:

Q.   That was the previous one; right, 2020?

        MS. KIYLER:  Prior to him being assigned to PSB.

        THE WITNESS:  Well, he became assigned to PSB during the investigation of 555.  He became assigned to PSB in 2021. This investigation was yet to be closed.

        MS. KIYLER:  Right.  And Chief Caputo was overseeing that investigation.

        THE WITNESS:  555?

        MS. KIYLER:  Yes.

THE WITNESS:  Well, Lugo still --

MS. KIYLER:  Or am I not correct?

by MR. ANDERS:

Q.    Isn't that one that was provided by Engelbeck?

A.    555 is the one in which he was claiming is -- where the tampering of evidence.

Q.    That's brand new.  That's 111.  But the investigation related to that was 555.

MS. KIYLER:  I'm sorry.  What investigation was 555?

THE WITNESS:  The one in which Sergeant Engelbeck is requesting files from -- yes.

MS. KIYLER:  2020?

THE WITNESS:  Yes, because it then went to Conduct Resolution.

MS. KIYLER:  So that was the one that was under appeal?

THE WITNESS:  Yes.

MS. KIYLER:  And that investigation was done by PSB prior to -- or was begun prior to Captain Lugo even being in PSB, because he was in the district at the time.

MR. ANDERS:  What we're just trying to get at, is that a new allegation or is that an allegation that was made years ago?  That's my question is, did Caputo already investigate that allegation.

THE WITNESS:  So the -- 555 has to do with

46REPORT001378

Sergeant Engelbeck violating policy.  This is getting very confused when it's simple.  Engelbeck is investigated for 555.

BY MR. ANDERS:

Q.    Correct.

A.    He receives discipline for 555.  He then files an appeal. He actually gets suspension.

Q.    That's not correct.

A.    Okay.  Why don't you correct me then?  I will stop talking.

Q.    Because 0555 was an investigation from years ago, 2020. Engelbeck only had his PDH and suspension in late 2024; but prior to that, Engelbeck made allegations involving Latham and Lugo that are virtually identical to what he is citing here, that Lugo retaliated against me when he got into PSB and that Latham did not advance my complaint.

      And so Engelbeck's allegation against not advancing his complaint and Lugo retaliating not post-PDH and the not post-discipline.  This was from a couple of years ago.

      And so this is what I'm asking, is if that was already investigated by Caputo, I don't know what number Caputo assigned to that.  But if that was already investigated by Caputo, what would be the new administrative allegations where Lugo was specifically identified as the principal?

A.    Regarding -- the new allegations are regarding the withholding of evidence which in terms of leaving out sections

46REPORT001379

of an interview in the final investigation, that the -- I would have to review Chief Caputo's investigation again to see what was new and what wasn't. There's mixed -- I agree with you, in the complaint that Sergeant Engelbeck filed; there's mixture of new and old allegations. So it would have to be determined what are new and what are old and any of the ones that are new were already previously investigated.

Q. Regarding Arizona Department of Public Safety and their investigation, correct me if I'm wrong, they're investigating a criminal allegation against Captain Lugo where you've identified him as a suspect in that allegation; that they are investigating Captain Lugo's direction to Lieutenant Porter regarding supplying an IA investigative plan to Jensen Hughes and Porter also assigning the case to Jensen Hughes.

They are investigating a matter of delayed timeliness in notifying you of his knowledge of a complaint filed against him, although he's not identified as the suspect in the complaint. The complaint against him is something he recognizes I'm assuming -- I haven't talked to him about that in great detail and I don't know what he said to you. But I think we're all assuming here this was retaliation incident that had previously been investigated by Chief Caputo. And the IAPro access on March 21, 2025.

Arizona DPS is also investigating Sergeant Engelbeck's administrative allegation of retaliation

46REPORT001380

against Captain Lugo, the administrative allegation against Sergeant Latham regarding neglecting to advance a complaint.

Is there anything else that Arizona DPS is investigating?

A.    Not that I'm aware of.  I haven't spoken to them since.

MS. KIYLER:  May I ask a clarifying question?

MR. ANDERS:  Yes, please.

MS. KIYLER:  Sergeant Latham is also mentioned prominently.  Is Arizona DPS also investigating him?

THE WITNESS:  I don't know that yet, ma'am.  If they come to the conclusion that he needs to be investigated, they will add him as a principal or as a suspect.  We did not discuss whether or not that was what the direction that they were going to take.

MS. KIYLER:  But if he's accused as well as Captain Lugo, why would he not be automatically included?

THE WITNESS:  DPS was provided with all of the facts and documentation related to the investigation.  What they do with it is what they want to do with it.

MS. KIYLER:  Thank you.

MR. ANDERS:  Major Peters, do you have anything?

MR. PETERS:  No, Chief.  I'm fine with the questions and answers provided.

MR. ANDERS:  Thank you, Major.

Chief, anything else?

MS. KIYLER:  I have nothing else.

MR. ANDERS:  Chief, I think like I asked you last time, is there anything that I didn't ask you that I should have asked you or anything that you want to offer, any additional information or clarity about?  Please take advantage of the opportunity.

THE WITNESS:  Not that I can think of at the time. And I will give you same response as I did last time.  If I believe of anything, I'll reach out to you as I did this time.

MR. ANDERS:  Please do, absolutely.

THE WITNESS:  You already have my notes that I give you.

Oh, yes.  That's right.  I did forget.

I supplied -- while I was going through all of my documentation this weekend -- sorry, I did just remember this -- handwritten notes that I had were sent to CID today and uploaded into the --

MR. ANDERS:  Oh, great.

THE WITNESS:  Yeah, so you would have those.  So if you have any questions related to those, I'm happy to answer.

MR. ANDERS:  Will do.

THE WITNESS:  And then I think that was -- yeah, that's it.

MR. ANDERS:  Okay.  Again, thank you for your time today.  Very much appreciate it.

46REPORT001382

And we're going off the record.  The time is approximately 5:50 p.m.

(Proceedings concluded at 5:50 p.m.)

46REPORT001383

59

C E R T I F I C A T E


I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.


DATED at Phoenix, Arizona, this 11th day of November, 2025.


s/Elaine M. Cropper

_____

Elaine M. Cropper

# Introduction

This document addresses concerns and allegations raised primarily by Chief Donald Anders, a Federal Monitor Team representative, regarding Executive Assistant Chief Melissa Palopoli's handling of an internal investigation (IA2025-0111) involving Professional Standards Bureau (PSB) Commander Captain Greg Lugo and related insubordination allegations (IA2025-0139). The response provides a detailed timeline of events, clarifies Chief Palopoli's actions and decisions, and directly addresses Chief Anders' potential assertions, particularly those raised during the April 17, 2025, interview. Chief Palopoli's interview transcript and the information provided in this document demonstrate that Chief Palopoli acted in accordance with Maricopa County Sheriff's Office (MCSO) policies, her role's limitations, and Chief Deputy Jeff Gentry's guidance, ensuring transparency and compliance with federal oversight requirements.

---

# Role and Responsibilities of Chief Palopoli

As a non-sworn Executive Assistant Chief, Chief Palopoli oversees multiple MCSO divisions, including PSB, but she absolutely refrains from conducting investigations or canceling them unilaterally. Her role is administrative, involving oversight of investigation assignments, coordination with external entities (e.g., conflict investigators, the Federal Monitor Team), and ensuring compliance with MCSO policies and court orders. Having joined MCSO approximately 20 days before the initial complaint on March 10, 2025, Chief Palopoli relied on Chief Deputy Gentry's guidance and her (limited) understanding of established protocols to navigate PSB investigations and federal monitoring requirements. Chief Palopoli's actions reflect her commitment to ensuring serious allegations, even if unlikely to be borne out, are investigated thoroughly by impartial entities, particularly when involving PSB personnel. Her decisions prioritized integrity, avoided conflicts of interest, and aligned with MCSO's obligations under the court's third and fourth orders.

---

# Timeline of Relevant Events

The following timeline is constructed primarily from the significant points and Chief Palopoli's notes, with the interview transcript used only for consistent supplementary details. It outlines key events related to IA2025-0111 and IA2025-0139, providing context for Chief Palopoli's actions. The times are approximate.

- **March 10, 2025:**
  - **4:02 PM:** Sgt. Engelbeck enters a complaint into Blue Team, alleging "intentional destruction or withholding of evidence" between October 2024 and January 2025, naming Captain Lugo and Sgt. Leatham as potential

46REPORT001385

principals. The complaint, with attached documents, is emailed to Chief Deputy Gentry.

- **5:03 PM:** Chief Deputy Gentry forwards the email to Chief Palopoli, recommending an outside agency investigate due to PSB involvement.
- **5:52 PM:** Chief Palopoli responds, stating she will review the documents and provide thoughts the next day.
- **7:03 PM:** Captain Lugo reviews the Blue Team entry, noting he "briefly looked through it," but does not notify Chief Palopoli, despite MCSO policy requiring timely notification if under investigation.

- **March 11, 2025:**
  - **Morning:** Chief Palopoli and Chief Deputy Gentry discuss the complaint in person. Gentry reaffirms his direction for an outside agency investigation.
  - **11:11 AM:** Chief Palopoli texts Captain Lugo to discuss the investigation. They speak for 21 minutes around 11:13 AM. Lugo acknowledges seeing the Blue Team entry, suggests it may be retaliatory due to prior history with Engelbeck, and argues it should be a Service Complaint or an investigation against Conduct Resolution (instead of an IA against Lugo). Chief Palopoli listens but does not issue a directive to stay out at this time, contrary to her initial interview statements.
  - Chief Palopoli accessed IA2020-055 (a related case involving Engelbeck) in IA Pro, noting numerous files but unable to confirm if the specific video interview of Engelbeck and Leatham referenced in the BlueTeam was present, as she did not open individual files. This access was for review, not investigation, aligning with her non-investigative role.

- **March 18, 2025:**
  - Chief Palopoli meets Captain Lugo in her office to discuss PSB matters. After considering the attachments to the complaint contained in the email, she determines that she agrees with Chief Deputy Gentry's assessment that the allegations, even if unlikely, if true would be significant enough to warrant a formal investigation. Therefore, Chief Palopoli formally designates IA2025-0111 as an Internal Investigation and directs Captain Lugo to stay out of it, including not accessing IA Pro, due to his potential involvement. She requests Captain Lugo assign a lieutenant from PSB as a point of contact (POC) for coordination with Chief Palopoli, which Captain Lugo does not do. They also discuss adding a second PSB captain to mitigate operational risks, a non-punitive proposal to address the large workload of PSB and the potential dangers of a single point-of-failure.
  - Chief Palopoli emails Tiffani Shaw, Administrative Services Division Director MCSO HR (Conduct Resolution), to discuss conflict investigators, possibly misstating in her initial interview that Shaw initiated contact. Shaw is out sick.

- **March 20, 2025:**
  - Chief Palopoli meets with Shaw in-person

46REPORT001386

- Shaw provides Jensen Hughes' contact information, a firm previously used for conflict investigations.
- Chief Palopoli contacts Jensen Hughes, scheduling a virtual meeting for March 24.

- **March 21, 2025:**
  - Contrary to Chief Palopoli's directive to stay out of the investigation, and unknown to Chief Palopoli at the time, Captain Lugo accesses IA2025-0111 through IA Pro.

- **March 24, 2025:**
  - Chief Palopoli meets with Jensen Hughes representatives (Mark Giuffre and another) via Teams. They agree to take the conflict investigation, assigning investigator Frank Hoglund.

- **March 25, 2025:**
  - Chief Palopoli emails Chief Anders to notify him of the allegation and Jensen Hughes' willingness to investigate. This is the first time that Chief Palopoli had any direct contact with Chief Anders via email since Chief Palopoli's appointment to her position at MCSO. Chief Palopoli informs Chief Anders that she had a meeting with Jensen Hughes to discuss their availability to conduct the investigation since she does not want anyone from PSB involved. Chief Anders responds, requesting a pause on Jensen Hughes and scheduling a call for March 26.

- **March 26, 2025:**
  - **9:00 AM:** Chief Palopoli speaks with Chief Anders by phone, explaining the allegations received by Chief Deputy Gentry. She expresses doubts about their validity due to Sgt. Engelbeck and Captain Lugo's history but affirms the need for investigation. Chief Anders informs her that Jensen Hughes is inappropriate due to Captain Lugo's role and history and suggests Baseline Investigations. Chief Anders reveals Captain Lugo discussed the investigation with him, confirming Captain Lugo's prior knowledge. Chief Palopoli clarifies she did not conduct fact-finding, nor did Chief Anders ask her to, and Chief Anders did not advise against a conflict investigator.
  - **9:35 AM:** Chief Palopoli texts Baseline Investigations' Jim Egelston for assistance. By 2:17 PM, receiving no response, she emails him.
  - **3:07 PM:** Egelston informs Chief Palopoli he is too busy to take the case and that his contract expires April 19, 2025, with no renewal discussions.
  - Chief Palopoli emails Chief Anders, reporting the issue with Baseline and suggesting other agencies.

- **March 27, 2025:**
  - **9:49 AM:** Chief Anders calls Chief Palopoli to discuss renewing Baseline's contract. Chief Palopoli notes Egelston's unavailability and proposes alternatives.

46REPORT001387

- Chief Palopoli emails Captain Anders, confirming the contract could be renewed but highlighting concerns, offering further discussion.
- **March 28, 2025:**
  - **11:18 AM:** Chief Palopoli misses a call from Chief Anders, returning it for a 5-minute discussion. She reiterates concerns about Baseline and notes Chief Deputy Gentry's intent to contact Arizona Department of Public Safety (AZDPS).
  - Chief Palopoli receives an email from Mark Giuffre (Jensen Hughes), noting confusion because Lieutenant Porter assigned the case to investigator Joy Fitzgerald. Chief Palopoli clarifies that Jensen Hughes should stand down, as she did not authorize Lt. Porter's actions.
- **March 30, 2025:**
  - Lieutenant Porter emails Jensen Hughes' Joy Fitzgerald with an investigative plan, copying Chief Palopoli (received March 31). Chief Palopoli is concerned, as she did not direct Lt. Porter, and Captain Lugo had not assigned him as POC.
- **March 31, 2025:**
  - Chief Palopoli reviews Lt. Porter's email and plan, noting the unauthorized action.
- **April 1, 2025:**
  - Chief Palopoli emails Lt. Porter, thanking him for the plan but clarifying that Jensen Hughes is not being used per the Chief Anders' guidance and to stand down.
  - **1:31 PM:** Chief Palopoli speaks with Chief Anders for 18 minutes, discussing the unsuitability of Jensen Hughes and Baseline. She notes Chief Deputy Gentry's intent to request AZDPS conduct the investigation.
  - **4:09 PM:** Chief Anders confirms the Monitor Team's approval for AZDPS to take the conflict investigation, provided Captain Lugo is not involved.
- **April 2, 2025:**
  - **Morning:** Monthly PSB meeting with Chief Deputy Gentry, Sheriff, Captain Lugo, and Chief Palopoli. During this meeting, Captain Lugo expresses concerns about IA2025-0111 not being locked down in IA Pro, noting multiple accesses. Chief Palopoli reminds Captain Lugo she requested a lieutenant assignment, which he failed to provide.
  - **3:30 PM:** Chief Palopoli accesses the IA Pro audit trail for IA2025-0111, an idea triggered by Captain Lugo raising access issues in the earlier meeting. Chief Palopoli discovered Captain Lugo accessed the investigation on March 21, 2025, after her March 18 directive. She prints the log, noting other accesses by PSB admin and Lieutenant Porter.
  - Chief Palopoli briefs Chief Deputy Gentry on Captain Lugo's access that appeared to constitute insubordination.
- **April 3, 2025:**

46REPORT001388

- After consulting the legal team, Chief Deputy Gentry, and Chief Summers, the legal team is tasked with contacting Chief Warshaw (Monitor Team) to discuss Captain Lugo's actions, including likely insubordination (failure to assign a lieutenant, unauthorized IA Pro access), an allegation of failure to timely notify a supervisor (Captain Lugo not contacting Chief Palopoli on March 10 and Chief Palopoli needing to have the initial contact with Captain Lugo on March 11) and potential insubordination (directing Lt. Porter's plan). The legal team attempts to reach Warshaw without response by day's end.
- **April 4, 2025:**
  - After multiple unsuccessful attempts to contact Chief Warshaw, Chief Deputy Gentry places Captain Lugo on Administrative Leave with Pay (ALWP), consistent with MCSO policy for serious allegations. Chief Deputy Gentry contacts Captain Lugo, who agrees to go home.
  - Chief Palopoli accompanies Chief Deputy Gentry to Conduct Resolution to discuss ALWP paperwork, handled by Ryan Giguere.
  - **4:13 PM:** Chief Palopoli texts Lieutenant Porter requesting a call. During the subsequent phone call, Chief Palopoli appoints Lt. Porter acting PSB Commander due to Captain Lugo's ALWP.
- **April 7, 2025:**
  - **9:00 AM:** Meeting with Monitor Team, MCSO legal team, Chief Deputy Gentry, Chief Palopoli, and Chief Summers. The Monitor Team is updated on AZDPS's potential involvement, Captain Lugo's ALWP, and Lt. Porter's role as acting PSB Commander.
  - **10:45 AM:** Chief Deputy Gentry, Chief Palopoli, and Chief Summers meet with PSB staff to address concerns and confirm Lt. Porter's role. They discover Captain Lugo's office is locked, with Captain Lugo holding the only key, raising concerns about case file access.
  - Chief Palopoli forwards the ALWP packet to Lt. Porter, who handles the Notice of Investigation (NOI) and retrieves Captain Lugo's key and property.
- **April 8, 2025:**
  - Chief Palopoli emails Chief Anders, confirming AZDPS's willingness to investigate and scheduling a meeting for April 9 at 2:00 PM.
- **April 9, 2025:**
  - **2:00 PM:** In-person meeting at the Sheriff's office with Chief Palopoli, Chief Summers, Chief Deputy Gentry (partially), and AZDPS Sergeants Baum and another from Internal Affairs. AZDPS agrees to investigate IA2025-0111 (criminal first, then administrative) and IA2025-0139 (administrative). Chief Palopoli provides Sgt. Engelbeck's complaint documents and Lugo's NOI.
  - **2:28–2:47 PM:** Chief Palopoli sends electronic copies of the NOI and Engelbeck's files to AZDPS and instructs PSB's Amy Gutierrez to assist Sgt. Baum.
- **April 10, 2025:**

46REPORT001389

- Chief Palopoli responds to Chief Anders' document request for IA2025-0111 and IA2025-0139, providing details after consulting with MCSO's legal team.
- **April 17, 2025:**
  - Chief Palopoli is interviewed by Chief Anders and Major Al Peters at the Monitor Team's office, addressing her handling of IA2025-0111 and IA2025-0139.

---

## Explanation of Chief Palopoli's Positions

### 1. Non-Involvement in Investigations

As Executive Assistant Chief, Chief Palopoli does not conduct investigations or cancel them on her own authority. When Sgt. Engelbeck's complaint was received on March 10, 2025, Chief Deputy Gentry directed an outside agency investigation due to PSB involvement. Chief Palopoli, in consultation with both Chief Anders and Chief Deputy Gentry, pursued conflict investigators (Jensen Hughes, Baseline Investigations, AZDPS), ensuring impartiality. Her role was administrative, coordinating the assignment, not investigating.

Chief Anders questioned why Chief Palopoli did not conduct a preliminary inquiry (e.g., verifying Conduct Resolution's role). She clarified that such actions are investigative, which she is not authorized to perform, especially with PSB personnel involved. She followed Chief Deputy Gentry's directive to refer IA2025-0111 externally, maintaining integrity and avoiding conflicts.

### 2. Investigation of Serious Allegations

Chief Palopoli ensured Sgt. Engelbeck's serious allegations, despite her doubts about their validity, would be investigated thoroughly and impartially. She expressed skepticism to Chief Anders on March 26, 2025, due to Sgt. Engelbeck and Captain Lugo's history but she believed the allegations, even if unlikely, did merit investigation. Therefore Chief Palopoli supported the efforts to appoint AZDPS as the conflict investigator, approved by the Monitor Team.

Additionally, MCSO policies do not allow for complaints of employee misconduct to be addressed as Service Complaints (MCSO Policy GH-2-4(A) "...A Service complaint shall not include allegations of employee misconduct...")

Chief Anders suggested Chief Palopoli's doubts undermined the need for a criminal investigation. But Chief Palopoli believes that serious allegations, even if unlikely, require investigation, particularly when the allegations involve the PSB Commander and the integrity of the investigative files of PSB. She supported Chief Deputy Gentry's decision to

46REPORT001390

refer IA2025-0111 to AZDPS, ensuring compliance with MCSO's obligation to investigate thoroughly.

### 3. Captain Lugo's Non-Interference

The PSB Commander must not interfere with investigations involving himself. Chief Palopoli directed Captain Lugo on March 18, 2025, to stay out of IA2025-0111, including not accessing IA Pro. Lugo's access on March 21, 2025, was inappropriate and forms a basis for IA2025-0139 (insubordination).

Chief Anders noted Lugo's March 21 access occurred during a Monitor Team meeting. Chief Palopoli was unaware of this context and viewed the access as a violation of her March 18 directive. She maintains Captain Lugo should have assigned a lieutenant to handle such tasks, and AZDPS is investigating the intent and context.

Of particular note, Chief Palopoli absolutely recognizes and respects the important role that the Monitor plays, and is committed to cooperation with the Monitor Team. That said, in an investigation involving allegations against the PSB Commander - the Monitor Team should be briefing and discussing the investigation with other appropriate MCSO personnel - not the target of an ongoing investigation.

### 4. Accessing Restricted Investigations

Accessing an investigation after being ordered to stay out is inappropriate. Captain Lugo's March 21, 2025, IA Pro access, post-dating Chief Palopoli's March 18 directive, is a key allegation in IA2025-0139, as it violates her explicit order.

Chief Anders suggested the access might be explained by Captain Lugo's Monitor-discussion duties. Chief Palopoli acknowledges that Captain Lugo could meet with the Monitor even while under investigation (but before he was placed on ALWP) but notes Captain Lugo's failure to inform her or assign a lieutenant exacerbated the issue that no one but Captain Lugo could be available to brief the Monitor Team on this investigation. The AZDPS investigation will clarify whether this was insubordinate, or if it is, if there are appropriate factors to consider for mitigation (i.e. did the Monitor Team direct Captain Lugo to violate the direct order from Chief Palopoli, or was the Monitor Team unaware of Chief Palopoli's directive).

### 5. Monitor Notification

MCSO policies and court orders require notifying the Monitor Team of pending investigations. Chief Palopoli notified Chief Anders of IA2025-0111 on March 25, 2025, 15 days after receipt, due to her unfamiliarity with federal order protocols and expectations. For IA2025-0139, notification occurred on April 7, 2025, through Lieutenant Porter, as Captain Lugo was excluded.

7/10

46REPORT001391

Chief Anders highlighted the delayed IA2025-0111 notification. Chief Palopoli explained that no one informed her of paragraphs 346 and 347 of the court's third order. She notified Chief Anders upon realizing the requirement, possibly at Captain Lugo's suggestion, and ensured timely subsequent notifications.

### 6. Lugo's Policy Compliance

Captain Lugo must follow MCSO policies, including timely notification if he knew he was under investigation. He reviewed the Blue Team entry on March 10, 2025, but did not notify Chief Palopoli, a likely violation included in IA2025-0139.

Chief Anders did not directly address this in Chief Palopoli's initial interview, but Chief Palopoli included it in IA2025-0139, ensuring AZDPS investigates Captain Lugo's non-compliance.

### 7. Inaccuracies in Initial Monitor Interview

The initial interview with Chief Anders was unplanned, and Chief Palopoli's lack of a clear timeline led to inaccuracies (e.g., misstating Shaw's contact initiation, suggesting the Captain Lugo directive to stay out of the case file occurred on March 11). She submits this document to clarify these points, confirming the date of the directive was March 18 and that she contacted Ms. Shaw. Indeed, further basis materials or time to reflect on the matter could result in additional clarifications.

Although the Monitor Team requested a follow up-interview, Chief Palopoli wanted to proactively clarify issues, attributing errors to her newness to MCSO and the lack of time prior to the interview to review basis materials.

### 8. Directive Timing and Investigation Access

Although Chief Palopoli spoke with Captain Lugo on March 11, 2025, the directive to stay out of IA2025-0111 occurred on March 18. Captain Lugo's March 21 IA Pro access post-dates this directive, rendering the March 11 conversation immaterial to the insubordination allegation.

### 9. IA File Access

Chief Palopoli realized after her initial interview that she may have accessed IA2020-055 to review Sgt. Engelbeck's documents but did not open specific files (e.g., the Engelbeck-Leatham video), noting the volume of files and her limited IA Pro familiarity. She could not determine if files were missing, consistent with her non-investigative role.

Chief Anders questioned whether this access constituted a preliminary inquiry. Chief Palopoli would like to clarify that this access, if it occurred, was for document review, not investigation, per Chief Deputy Gentry's directive to refer the case externally.

8/10

**10. Lieutenant Porter's Unauthorized Actions**

Lieutenant Porter's March 30, 2025, investigative plan to Jensen Hughes was unauthorized, as Chief Palopoli did not direct it, and Lugo failed to assign Porter as POC (or if Captain Lugo did, he did not inform Palopoli). This is included in IA2025-0139 to investigate whether Captain Lugo directed Lt. Porter to take this (or other) step, potentially constituting insubordination.

Chief Anders challenged the basis for alleging insubordination, suggesting a call to Lt. Porter could have clarified what occurred. Chief Palopoli explained that, with AZDPS already tasked and Captain Lugo's other potential policy violations (IA Pro access, no POC, no notification), she included this for investigation. Chief Palopoli was unaware prior to her initial interview that Lt. Porter might be a Jensen Hughes liaison, but Captain Lugo's failure to assign a POC justifies scrutiny.

## Response to Chief Anders' Broader Allegations

Chief Anders' primary concerns, as expressed in the April 17, 2025, interview, seem to focus on Chief Palopoli's decision-making, particularly the referral of IA2025-0111 to AZDPS and the IA2025-0139 insubordination allegations.

- **Alleged Failure to Conduct Preliminary Inquiry:**
  - Chief Anders suggested Chief Palopoli could have resolved IA2025-0111 with minimal inquiry. However, Chief Palopoli is not in a position to investigate, especially with allegations related to potential misconduct by high-ranking PSB personnel. She followed Chief Deputy Gentry's directive to refer the case externally, ensuring impartiality, and had repeated contacts with Chief Anders - who at no point directed or suggested to Chief Palopoli that she should or otherwise must conduct any sort of inquiry.
- **Skepticism vs. Criminal Investigation:**
  - Chief Anders interpreted Chief Palopoli's doubts as undermining the criminal investigation. However Chief Palopoli never believed the allegations did not merit investigation. She supported Chief Deputy Gentry's referral to AZDPS, ensuring serious allegations were addressed.
- **Insubordination Allegations (IA2025-0139):**
  - Chief Anders questioned the foundation for alleging insubordination, particularly related to Lt. Porter's actions. Yet in Chief Palopoli's view there are three likely/probable policy violations (IA Pro access, no POC, no notification) and one potential violation (directing Lt. Porter) that are unrelated to the allegations in IA2025-0111 and cause significant concern for Chief Palopoli. These justify IA2025-0139 to investigate the totality of Captain Lugo's actions.
- **Appropriateness of AZDPS Meeting:**

46REPORT001393

- Chief Anders suggested Chief Palopoli's April 9, 2025, AZDPS meeting predisposed the investigation or was otherwise inappropriate. Yet Chief Palopoli's role was to provide initial background material as complainant (IA2025-0139) and coordinator (IA2025-0111), leaving findings to AZDPS, and actual conveyance of factual evidence to likely interviews for IA2025-0139.

---

## Conclusion

Chief Palopoli acted diligently, adhering to her non-investigative role, her understanding of MCSO policies, and Chief Deputy Gentry's guidance, all while facing a difficult circumstance (IA allegation against the PSB Commander) that then appeared to have been complicated by inappropriate actions by the PSB Commander after he knew he was under investigation. Chief Palopoli ensured serious allegations were investigated by AZDPS, notified the Monitor Team once aware of requirements, and addressed Captain Lugo's non-compliance through IA2025-0139. Inaccuracies in initial communications were unintentional, due to her newness to MCSO, and her inability to review basis materials and prepare for an interview regarding events that occurred weeks ago have been corrected. The AZDPS investigation will clarify the allegations' validity, affirming Chief Palopoli's commitment to transparency and accountability. She welcomes further dialogue with the Monitor Team to ensure compliance with federal oversight.

46REPORT001394

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with MONIQUE HABLETT

April 22, 2025


_____




Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com




Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001395

**TRANSCRIPT OF INTERVIEW WITH MONIQUE HABLETT**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001396

P R O C E E D I N G S

MR. ANDERS:  Okay.  We are on the record.  My name is Donald Anders.  With me on the phone is Major Peters.  In the room is Chief Kiyler.

The time is approximately 1:29 p.m. on April 22, 2025.  We are on the sixth floor of the Luhrs Tower in the Monitoring Team conference room.

Also present in the room are four individuals.  I'm going to ask them to identify themselves.

THE WITNESS:  Monique Hablett.

MR. HOLOHAN:  Brian Holohan.  I represent the witness.

MR. POPOLIZIO:  Joe Popolizio.  And with me is John Masterson on behalf of Gerard Sheridan in his official capacity as the Sheriff of Maricopa County.

MR. ANDERS:  Great.  Thank you, all, very much for being here, particularly you, Monique, on such short notice.  I really appreciate it.

                    EXAMINATION
BY MR. ANDERS:
Q.   A little bit about myself.  You know about Chief Kiyler.  I retired from full time law enforcement after 32 years.  I joined the Monitoring Team here in Maricopa County I think in late 2014, was on the team, gosh, if I had to guess, about three years, left for a while, came back in 2022 and have been

4

with the team since then.

Do you have any questions of us before we get started?

A.    No.

Q.    Okay.  Just right from the get-go, I want you to know you're not a principal.  You're not a subject.  There's been no accusation, no concern, no speculation that you've done anything wrong.  We're just trying to figure out a path of communications and just kind of different roles within the PSB office and processes, how certain things happen.

And if I ask any question and I am unable to express it in a way that you understand, please just let me know.  If it's just clunky, tell me, "Hey, that was clunky."  You've got to rephrase that for me.  And if you have any questions at any time or, "Hey, a couple minutes ago, you asked a question and I just thought of something else," absolutely.  This is really more of a conversation than anything else, okay?

A.    All right.

Q.    Great.  Monique, how long have you been with the Sheriff's Office?

A.    One year.

Q.    One year?  And did you work in a law enforcement capacity or for another law enforcement agency prior to that?

A.    No, I did not.

Q.    Okay.  And so the one year I'm going to assume has all

been in PSB?

A.   Correct.

Q.   Okay.  Great.  And so you would have kept -- Captain Lugo would have been the PSB commander the entire time you would have been employed there?

A.   Yes.

Q.   Lieutenant Porter has probably been there that entire time as well?

A.   Yes.

Q.   Okay.  Great.

What is your official job title?

A.   Management assistant.

Q.   Management assistant.  And so in general terms, what is the role and responsibilities of a management assistant?

A.   I review complaint intake, whether that's through Blue Team or through the website, and Captain Lugo would tell me basically what to do with those complaints, whether to open an external complaint, and I would open those cases and assign them to investigators.

Q.   Okay.  So process-wise, would you typically -- do you access view Blue Team like multiple times a day?  Or do you get a notice, "Hey, there's a new Blue Team entry"?  What's the mechanics of you accessing Blue Team?

A.   There's like an incoming bin for Blue Team so if you go to that home page, it will show me all of the incoming entries.

46REPORT001399

And so that's how I knew when there was a new one coming in.

Q.   Okay.  Do you have to actually check or do you get some sort of a notice or a --

A.   There's no notice.  I just have to refresh that page in order for them to populate.

Q.   Okay.  I imagine you do that several times a day?

A.   Yeah.

Q.   And then conversations with Captain Lugo, are you typically accessing Blue Team before he does?

A.   Sometimes.

Q.   Or sometimes he'll dive into Blue Team as well.

A.   Yeah.

Q.   And so the conversation between you and Captain Lugo, is this -- like are you presenting him a summary or is the expectation that he's already looked at these ten cases and so, "Hey, Captain, what do you want to do with case number 0001?" How does that work?

A.   I would wait until he had time to review them and he would send me an email and tell me this external complaint entered on such-and-such date entered by whoever and then he would tell me what to do with it, whether it was to open -- open an internal complaint or make it a Service Complaint, whatever he wanted to do with it, that's what he would tell me.

Q.   Okay.  Does he also send you stuff like a PD number?  Hey, let's make this a PD; it's an accommodation for Jane Doe; and

let's just make it a matter of record sort of thing?

A.    Yes.

Q.    And that would go to you.  Okay.  He and I have talked about those as well.

What is the role of Amy Gutierrez?  What is her job title and what does Amy do?

A.    She's an administrative supervisor.  I really don't know what she does.

Q.    Okay.

A.    Because she's not my supervisor so I don't know.

Q.    Sure.  Yeah.  And how about is it Anna Chacone?

A.    Yes.

Q.    Do you know what Anna does?

A.    Not really.  She's an administrative assistant.  I don't really know.

Q.    Okay.

A.    I don't know her job.

Q.    And once you get direction, Captain Lugo emails you and says -- and I'm paraphrasing, my words -- Monique, 2025-0999, let's make that a Service Complaint.  What do you then do with whatever guidance he provides you?  What do you do with that?

A.    So if that complaint is in Blue Team, I would go in, print the original summary of the entry and then -- that way before there's any changes at all, we have a record of the original entry as it was from the person who entered it into the Blue

8

Team.  So print that summary, add it to the case.  I release it into IAPro so that I can work on the case in there.  I assign it, the number, the SC 2025 number or IA number.

And I -- I add in any -- depending on what type of case it is, if it's a sworn case, I'll have to pull body-worn camera footage of the complaint intake and I'll load that into the case and then -- IAPro is kind of page by page so you have to say how we came to get the complaint, whether it was supervisor identified or if it was anonymous, whether it was a phone call, the assign date, when it's due, tasks that I have to do, like send the initial letter to the complainant.

And then the investigator that I'm assigning has tasks as well so I'll assign the tasks.  And then if it's going back out to the district for investigation, I'll have to release it back into Blue Team so that the captain out in the district can work on the case.

Q.   Okay.

A.   If it's staying in PSB for investigation, I just assign the investigator and they will get an alert that I assigned them a case.

Q.   Okay.

So it sounds like the entry into IAPro, like it happens right after Captain Lugo gives directions on here's the category or the routing that we're going to go with that case.

A.   Yes.

46REPORT001402

Q.    Blue Team is separate then IAPro; right?

A.    Yes.

Q.    Two entirely different software programs?

A.    Yes.

Q.    When you're making an entry into IAPro, are you just, like, dragging and dropping from Blue Team into IAPro or are you copying and pasting into IAPro?  So, for instance, Sergeant Kiyler here makes an internal complaint against Deputy John Doe.  She gets into Blue Team and, hey, failed to wash and gas up his car at the end of the shift.  So she makes that entry and so Tuesday morning you come to work, there's this entry from Sergeant Kiyler from the midnight shift.  How does that translate or transfer into IAPro?  Do you have to manually reference Blue Team?

A.    No.  Once -- once I'm in the, like, the home page or the incoming bin and I select "Release into IAPro," it will auto populate.

Q.    Oh, that's a really nice feature.

A.    Yeah.

Q.    Okay.  Very good.

So when Captain Lugo and I meet on Fridays and our typical format and we've got it down now after two and a half years and it's -- what's the case number, what was the date received, is it internal, external, does it involve sworn, civilian, or detention?  How was it received?  Here's a

10

summary.  I want to know what was the date assigned, where was it assigned, and that is the general outline of our conversation.

As we're having that conversation, is he looking at IAPro while he's giving me -- in other words, how would he know how arrived, date received, date assigned to PSB or district?

A.   I've never been in the room with him while he's having this meeting with you so I don't know if he's in IAPro or he could be referencing a weekly case report that I send him every Monday of the cases that were opened the week before.  So I'm not sure which one he's referencing.

Q.   Okay.  Sometimes I get the impression it must be IAPro because he'll say something like, "She just entered it into IAPro so hang on a second, I'll take a look at it," so I'm thinking "she" must be you just entered it into IAPro?

A.   Yeah.

Q.   Okay.  Got it.  So Captain Lugo sends you an email and is this like once a day, several times a day?  Is it kind of a rolling thing or does he try to do it in batches, like once or twice a week you'll get a batch?

A.   Most of the time it was in batches that he would do over the weekend.  So when I would come in on Mondays, I had several emails from him that he was working on over the weekend.  You know, 20, 25 emails on what to do with all of these complaints.  So beginning of the week was really busy on opening cases.

46REPORT001404

Sometimes if there was something urgent that needed to be opened right away is sometimes investigators would go to him and say, "This is going to be entered into Blue Team," and they would just say it needed to be opened right away.  He would send me an email immediately telling me to open it.

Q.   Because so I do notice when we talk, it seems to be in batches; right?  It's like all of a sudden here's 12 that were assigned on this same day and -- yeah.

So when you get direction from Captain Lugo, he'll say, "This one is going to go District 3.  This one is going District 7.  This one is going to Major Crimes.  These we're going to make Service Complaints.  This one is going to go for Crim Review.  This one is -- these seven are going to stay within PSB but we're going to do fast-track over here, detention over here, sworn investigators over here."

And then there's Jensen Hughes cases or previously -- currently there's Baseline, which is available, Conflict Investigator, which I don't know if Baseline has ever actually been used.  Prior to Baseline it was somebody else.  And so you would get that.

When you get direction or guidance, case number 0999, we're going to assign that to Jensen Hughes, what do you then do?

A.   Open the case is usual.  The extra step is to send Amy Gutierrez an email to let her know that it needs to go to

46REPORT001405

Jensen Hughes and then I'm not sure what she does with it after that.

Q.    Okay.  Is Amy -- I think Lieutenant Porter -- I think I'm recalling this right, indicated like Amy would be like kind of an administrative representative to Jensen Hughes, there to assist Jensen Hughes with paperwork, maybe making appointments for interviews, stuff like that?

A.    That's my understanding.

Q.    Yeah.  Okay.  All right.

So you just send an email to Amy?

A.    Yeah.

Q.    Okay.  What would that email typically read?  How does that email read?

A.    It says something like after reviewing with Captain Lugo we've decided to send this out to Jensen Hughes due to the backlog of administrative investigations, something like that.

Q.    Okay.  Is this like a standard form, standard format email like -- do you type that every single time?

A.    No.  No.

Q.    I'm not going to type this twice a week.  I'm just going to --

A.    No.  It's a signature.

Q.    It's a standard --

A.    Yeah.

Q.    So essentially fill in the blanks and that is the case

46REPORT001406

numbers?

A.    Yes.

Q.    Okay.  Got it.  All right.

There's a case 0111, which you're familiar with, and this is an allegation, a Blue Team entry that was made by Sergeant Englebeck on March 10, late afternoon, evening, something like that, and it was that time that he entered the complaint.  I think with some attachments.

When did you first become aware of 0111?  Now, you wouldn't know the case number when it was entered in Blue Team because there wasn't a case number assigned to it.  Do you recall when?  And if you don't remember, that's fine.

A.    I really don't remember.  I could have looked at it well before Captain Lugo told me to do anything with it.  If I remember that case, it took a while for him to give me any direction on it so I think it was sitting in Blue Team -- in the Blue Team bin for a while.

Q.    Okay.  So that was filed in Blue Team by the complainant on March 10.

Do you remember having any conversation with Chief Palopoli or any members of her staff with regards to 0111?

A.    I may have sent her -- I think I probably had to send her a commander notification that it was being opened because Captain Lugo was the principal in that case, so I would have sent her a commander notification of when I opened it.

46REPORT001407

Q.   Yeah.  And I'll talk about that in a second.  It wasn't a gotcha question.  Really what -- I should have been more clear in my question.

Any conversations, any exchange of emails besides that notification, any text messages, phone calls from Chief Palopoli or any member of her administrative staff regarding, "Hey, here's what's happening with Jensen Hughes.  Here's what I want you to do with Jensen Hughes," anything like that?

A.   No.  No.

Q.   Okay.  So this complaint was received late in the day on March 10.  On March 20, Chief Palopoli reached out to Jensen Hughes, introduced herself by email; and by the end of the day an investigator at Jensen Hughes has been assigned this case, 0111.  And there was some follow-up communication with Jensen Hughes and Chief Palopoli the following day and then -- that would be the 31st.

The following Monday, which was March 24, you sent an email, which is -- it's one I think we just talked about.  You sent an email to Chief Palopoli and copied Alice Cosmato (phonetic).  Who is Alice?

A.   She's my supervisor.

Q.   Okay.  And copied Alice Cosmato and in that email you told Chief Palopoli that -- rather Captain Lugo and Sergeant Latham had been identified as -- and I paraphrase, this is not verbatim -- have been identified as principals that the case

number was 2025-0111 and that the case was assigned to Jensen Hughes.

Do you remember that, sending that email?

A.    Yes.

Q.    Okay.  And I think you said the reason you would send that would be a command notification, basically sending it to the supervisor of the principal which is what the typical practice is?

A.    It's sent to the division commander.

Q.    The division commander.  Okay.

So no matter who it is, what division, a notification goes to the commander?

A.    Correct.

Q.    Okay.  This is the case number and this is -- or, plural, the principals.

And then just like one minute later, you sent an email to Amy Gutierrez and copied Lieutenant Porter, last name I think Kurakowski (phonetic)?  Does that ring a bell?

A.    M'hum.

Q.    Who would that be?

A.    Maureus.  He's a management analyst.

Q.    Okay.  And that read to the effect -- I think what he said before, after discussing with Captain Lugo or something?

A.    Yeah.

Q.    The following cases or following case would be assigned to

46REPORT001409

Jensen Hughes due to a backlog and that included 0111.

So how did that come about?  Sending that -- sending the email to Chief Palopoli and then sending the email to Amy and copies Lieutenant Porter?  What was the precipice or what generated those emails?

A.    So when Captain Lugo tells me what to do with the cases, he'll -- if he wants it to go to Jensen Hughes, he'll let me know that so I know that immediately once I send that commander notification, I have to send it to Jensen Hughes which I do through Amy.

Q.    And so would there be an email from Captain Lugo telling you regarding 0111, that's going to go to Jensen Hughes?

A.    I don't believe that he knew the IA number but he just -- I'm pretty sure he just sent me an email saying that Chief Palopoli wanted the case with him in it to go to Jensen Hughes; and if I had any other questions, that I was to reach out to Chief Palopoli.

Q.    Okay.  Would you have access to that email as we sit here today?

A.    Probably.  I don't really delete any emails from him, especially the ones that he tells me what to do in case --

Q.    Do you have a phone or something, some access that you could access it?

A.    I don't have a work cell and I don't access --

Q.    You would need a work cell?

A.    Yeah.  I don't access my work emails on my personal phone.

Q.    Very smart.

A.    Yeah, so . . .

Q.    So I'm going to ask you one more time.  I apologize.  I was thinking while listening.  What do you recall Captain Lugo sending you in that email regarding 0111?  You said something about at the direction of Chief Palopoli or Chief Palopoli wants -- what was that about?

A.    I think from what I can recall, I think it said the case that was entered by Engelbeck needs to be assigned to Jensen Hughes; and if you have any questions, reach out to Chief Palopoli.

Q.    And would it be possible for us to get a copy of that email?

A.    Yeah.

Q.    And so given that -- first you've got command notifications and then you're just notifying Amy because then Amy does the liaison with --

A.    Correct.

Q.    Do you have any idea who Joy Fitzgerald is from Jensen Hughes?  Does that name ring a bell at all?

A.    It rings a bell.  I think there may be an investigator there but I'm not sure.

Q.    Sounds like you may be just detached from Jensen Hughes other than the --

46REPORT001411

A.    Correct.

Q.    -- routing the case to Amy and Amy pretty much manages it from there.

A.    Right.

Q.    Okay.  Following that notification -- following the direction from Captain Lugo that Chief Palopoli wants this assigned to Jensen Hughes going forward, any communication would be with her, I think.  Is he saying don't talk to me about it?

A.    Correct.

Q.    Talk to Chief Palopoli about it?

A.    Yes.

Q.    And was there any additional conversation, interaction, communication between you and Chief Palopoli subsequent to that email that you sent out?

A.    Not that I can remember.

Q.    Have you had any additional involvement with the 0111?  Has Lieutenant Porter asked you to do anything with 0111?

A.    No, I don't think so.

Q.    So essentially these two emails on the 24th, sounds like that pretty much terminated your -- any involvement or knowledge of what's going on with 0111?

A.    Yeah.

Q.    Okay.  There was another case, 0139, and I think that Blue Team entry was done on Monday, April 7, in the afternoon or

early evening sometime.  Do you remember viewing that in Blue Team?

A.    Yes.

Q.    Do you know who entered that in Blue Team?

A.    It wasn't entered in Blue Team.  I generated the case in IAPro.

Q.    And so explain to me how that came about.

A.    Lieutenant Porter and Amy came into my office that afternoon and asked me to open an internal complaint with Chief Palopoli being the complainant and Captain Lugo being the principal.  They gave me a brief synopsis of what the case was about and what allegations to put.  And initially he had told me to assign it to him, Lieutenant Porter.  And --

Q.    This is kind of like a hold or something?

A.    Yeah.  I wasn't really sure what he was going to do with it from there.

Q.    Yeah.  Like a placeholder or something perhaps.  I can kind of guess.

        I have an email from Chief Palopoli to Lieutenant Porter and it's Monday, April 7.  This reads 9:47 p.m., but this could be like Zulu time or something.  I'm not sure why it reads that.  The subject, it reads:  "How's this," question mark, all in lower case.

        And Chief Palopoli wrote:  (As read)  It is alleged that Captain Lugo was insubordinate by failing to follow a

46REPORT001413

direct order regarding an internal investigation.  It is also alleged that he failed to notify his supervisor about a criminal allegation involving himself.

Does that sound familiar?

A.   Yes.

Q.   Do you know, did Lieutenant Porter, when he was talking with you as with Amy, was he holding a document and like reading -- like this is what Chief Palopoli wants entered in Blue Team?

A.   I believe he was looking at his phone and telling me.

Q.   Okay.  And I'm just trying to figure out what was translated from what Chief Palopoli wrote as compared to what was entered into Blue Team.

A.   So I had initially entered that narrative that you said and I was getting ready to leave for the day so I had saved the case.  I was done with it.  I logged out.  And Amy came into my office and she said, "I need to change the summary of what you put into IAPro but you're getting ready to leave for the day. Can Maura do it?"

And I said, "Yeah, definitely."

So she went back and talked to Maura, I guess, and Maura changed the summary in IAPro to -- it just says, "Confidential, see Chief Palopoli."

Q.   So what I just read, which you had entered, was excised?

A.   Yeah.

46REPORT001414

Q.    And just, "Confidential, see Chief Palopoli"?

A.    Yes.

Q.    Do you know where that direction came from that Amy was guiding Maura to do that?

A.    No.

Q.    Don't know if Lieutenant Porter told Amy or Chief Palopoli reached out to Amy?

A.    Not sure.

Q.    Okay.

      And since that, since the late afternoon, evening of April 7 when you made that entry for 0139, have you had any contact with Chief Palopoli regarding that case?

A.    No.

Q.    Has any what I'll call upper level management or executive staff of the officers, so captains or chief office, have they talked to staff, sworn and civilian staff, at PSB and explained what contemporary circumstances are?

A.    Not that I'm aware of.

Q.    Chief Palopoli or Undersheriff Gentry or anybody physically come to PSB and to an audience explained, as you may be aware, Captain Lugo was on administrative leave.  Here's what I can tell you.  Anything of that nature at all?

A.    Yeah.  They were there on the seventh I believe.  It was that Monday.  They only said that he was on admin leave.

Q.    Okay.

46REPORT001415

A.    They didn't say anything else.

Q.    Okay.

MR. ANDERS:  Major Peters, regarding a copy of the email that Monique has referenced and that is the email from Captain Lugo to Monique on March 24, if we wanted a copy of that email, do you make that request through Chief Summers?

MR. PETERS:  I can, yep.

MR. ANDERS:  Okay.  If we could please do that, I would appreciate it.

MR. PETERS:  And just to be clear --

MR. ANDERS:  Well, it is would be any and all emails, you know, associated with 0111 and 0139, which I think we've already asked for.  But there may have just been a miss on this.  There's also a possibility, quite frankly, we received it and just have not observed it.  I certainly haven't.

MR. PETERS:  Okay.  I'll just reaffirm then our prior request.

MR. ANDERS:  Okay.  Please, with specificity regarding this one particular email.

MR. PETERS:  Right.  And just to be clear, that was the Lugo one?

MR. ANDERS:  That was on March 24, from Captain Lugo, PSB commander, to Monique -- forgive me -- Hoblett?

THE WITNESS:  Hablett.

MR. ANDERS:  Hablett?

46REPORT001416

MR. PETERS:  Okay.

MR. ANDERS:  And do I have that date right, Monday, March 24?

THE WITNESS:  I don't remember.  Whenever I opened the case, that's when he would have sent it to me.  He wouldn't have referenced the IA number because he didn't know it at that point.

MS. KIYLER:  And the 24th would have been the dates of the email to Palopoli and then the follow-up.

MR. ANDERS:  Okay.  Good.

MR. PETERS:  And just to be clear, though, Chief, because as I am sitting here, I thought this email was from Lugo to Monique.  Am I incorrect in that?

MR. ANDERS:  That is correct.

MR. PETERS:  That is correct.  Okay.

MR. ANDERS:  Yes.

MR. PETERS:  Okay.  Got it.

MR. ANDERS:  Do you have --

MS. KIYLER:  Just a couple of questions.

EXAMINATION

BY MS. KIYLER:

Q.   When you talked about IAPro and you enter things into IAPro and an investigator is assigned, are you directed as to what investigator to assign a case?  Do you do it on a rotation basis or how is that decision made?

46REPORT001417

24

A.    It's both, either/or.  So he'll tell me assign it to the next civilian investigator on the list or sometimes if the principals -- like if we have another case open with the same principal, a lot of times he'll tell me assign it to a specific investigator because they are familiar with the people involved.

Q.    So it's a rotation unless otherwise directed?

A.    Yeah, correct.

Q.    I did have another question.  Just let me find it.

When you talked about the email that you sent where a case is going to be sent to Jensen Hughes due to the backlog or whatever the language is and you said that's kind of a standard that you use, is it a form or do you cut and paste from the last one to the new one or --

A.    It's a signature in Outlook.

Q.    Okay.  You confused me with it's a signature in Outlook.

A.    So you can set up different signatures to select and you can put your own text in there.  So when I select a signature to use, it just -- it like auto-generates an email and then I just fill in the blanks of the case.

Q.    So if you were -- I'm sorry.  If you were auto-selecting email to Jensen Hughes, it would bring up this information?

A.    Yes, m'hum.

Q.    And you would just put in the right numbers?

A.    Correct.

46REPORT001418

25

Q.   Okay.   That's what I thought.

MR. POPOLIZIO:   That's an email signature.   It's the thing at the bottom of the email.

MR. ANDERS:   It's more than that.   It also includes the form.

THE WITNESS:   It's like a template.

MR. ANDERS:   The narrative.

MR. POPOLIZIO:   The point is she can click on a signature and it auto-inserts it is.

MS. KIYLER:   I understand.   I'm not that technologically advanced.

And I have nothing else.

MR. ANDERS:   Monique, is there something that I should have asked you that I didn't ask you or anything that -- I just want to make sure you're aware of that.

THE WITNESS:   I don't think so.

MS. KIYLER:   Okay.   I can't thank you enough for being here today.   Again, short notice and you took the effort to be here.   I really, really appreciate it very much and I appreciate your candidness with us as well.

We're going to go off the record.   The time is approximately 2:04 p.m.

(Proceedings concluded at 2:04 p.m.)

46REPORT001419

26

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 10th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

46REPORT001420

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with CLINT DOYLE

April 22, 2025


_____


Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001421

**TRANSCRIPT OF INTERVIEW WITH CLINT DOYLE**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001422

P R O C E E D I N G S

MR. ANDERS:  Okay.  We're going to go on the record. My name is Donald Anders.  With me is Major Peters on the telephone.  Chief Kiyler is present in the room.

We are in the conference room of the Monitor's office on the sixth floor of the Luhrs Building in Phoenix, Arizona.

The date is April 22, 2025, and time is approximately 12:05 p.m.

With Chief Kiyler and I and Major Peters are four individuals.

I'm going to ask each one of you to please identify yourselves.

THE WITNESS:  Commander Clint Doyle with the Maricopa County Sheriff's Office.

MR. HOLOHAN:  Brian Holohan.  I represent the witness.

MR. POPOLIZIO:  Joe Popolizio on behalf of Gerard Sheridan, the Sheriff of Maricopa County in his official capacity.  And with me is my partner, John T. Masterson.

MR. ANDERS:  Great.  Hey.  Thank you so much.

EXAMINATION

BY MR. ANDERS:

Q.   And thank you in advance for joining us today.

A.   You bet.

Q.   Just to start, how long have you been with the office?

A.    So I was hired in February of this year.  Prior to that, I worked and was hired in 1993, April of 1993 and retired in May or June of 2015.

Q.    Okay.

A.    2017, I'm sorry.  So I did 24 years and then retired, was gone for eight years and then was retired.

Q.    Okay.  What rank did you enjoy when you retired?

A.    I retired as a sergeant with the Maricopa County Sheriff's Office.

Q.    Okay.  Great.

         Have you ever worked PSB in your career?

A.    No.

Q.    Okay.  And then came back earlier this year?

A.    That's correct.

Q.    Okay.  With the commander position?

A.    That's right.

Q.    Is it a civilian or a sworn position?

A.    It's a civilian position.

Q.    And where are you presently assigned?

A.    Presently assigned to the Court Implementation Division.

Q.    CID?

A.    That's correct.

Q.    And so what would the commander position be responsible for in CID?

A.    Sure.  So it's laid out in both Paragraph 9 and Paragraph

268 of the order.  I can quote it to you if you would like.

Q.   I'm familiar with the paragraph, yeah.

A.   So all of what -- in fact, the Paragraph 9 is specific to the Court Implementation Division and the requirements that are set forth there.  There's basically four requisites at a minimum that we coordinate with the defendants -- that we, as the defendants, coordinate the compliance and implementation activities, facilitate the provision of data, documents, materials, and access to defendant's personnel to the MCSO personnel and Monitor and plaintiff representatives, ensure that all of our data, documents, and records are maintained as provided in this order and assist in assigning activities, preliminary implementation and compliance activities relates to do this order.

Q.   How many people work in CID?

A.   I believe it's 24.

Q.   And you manage all 24?

A.   I have direct supervision over three lieutenants and then it's dispersed from there.

Q.   Is there sworn lieutenants?

A.   There are two sworn lieutenants and one civilian commander.  He's -- I'm sorry.  So when I say lieutenants, David Redpath is -- his peers are Todd Bryce and Mike Lawson.  But he's a civilian so he doesn't have the lieutenant.  He has a commander -- no.

MS. KIYLER:  Redpath.  Director.

THE WITNESS:  Director, yes, ma'am.  Thank you.

by MR. ANDERS:

Q.   You're familiar with Chief Palopoli?

A.   I am, yes.

Q.   Okay.  I think she's been with the office since late January or maybe early February of this year.

A.   That seems right.

Q.   Something like that.  Okay.

Do you have any impressions with regards to Chief Palopoli regarding subject matter expertise in the area of administrative investigations of personnel?

A.   You're asking if I have impressions.  So my personal opinion of Melissa Palopoli?  Is that what you're asking for?

Q.   With regards to expertise, capacity, skill sets as they relate to administrative investigations of personnel.

So in other words, these impressions may come from day to day interactions you may have with her, maybe in attendance at meetings, you may have had conversation with reliable individuals who have offered commentary.  Do you have any impression?

A.   I don't know if I -- let's see.  So --

Q.   So this is an opinion.

A.   Okay.  I hold her in high regard.  I think she's a very competent and well-spoken individual.  I don't know what her

46REPORT001426

background is other than she retired from Scottsdale Police Department and worked in a leadership role within Amazon for a number of years, and that my understanding is that she was the division commander or held a leadership role within their Internal Affairs or PSB.

Q.    You're familiar with Undersheriff Gentry.  You guys, in fact, worked or at least were employed at the office before both of you returning back to the office.

The same question regarding Undersheriff Gentry, just impressions with regards to your opinion and impressions with regards to his skill set as it relates to administrative investigation of personnel.

A.    I find Chief Gentry to be very thoughtful, to be very succinct in his conversations, to be a very fair person in my interactions with him.  From a -- you're asking specifically related to investigations, administrative investigations.  I have had some limited experience with him as he was my lieutenant prior to my leaving and found him to be exceptional to work for and very fair and by the book.

Q.    Do you have any impressions or understanding of Chief Palopoli or Chief -- Undersheriff Gentry's expertise and understanding of the administrative process, what I'll call the Internal Affairs/Administrative Investigative arena?  Do you have any impression with regards to -- they clearly understand it, they clearly understand what happens if a significant

administrative allegation is made or a significant criminal allegation is made against a sworn member of the department. They clearly understand it's mechanics, the process, policy, or not, they have much to learn.

Or they clearly understand issues as they relate to conflict of interest or how appeals and PDHs work, how Merit Commission appeals work.  I'm just asking for your personal and professional opinion with regard to those issues.

A.    I have not had any -- there's not been any indication to me that -- of anything adverse in the very limited time that I've worked with Chief Palopoli.  And, no -- I mean, I don't know that I have -- I don't have any exposure to what you're talking about when it comes to that to formulate a real opinion.

Q.    So some people could say if we're talking about John Doe, right, in this same topic, what are your impressions about John Doe as it relates to, you know, their capacity to understand and manage administrative investigative processes.  Some folks may say John Doe has got a firm grasp.  That guy clearly knows what time it is.  He knows exactly what's going on and, in fact, others seek out their counsel when it comes to these matters they are so good at it.  They have got a rich and robust history.

The paradox or the antithesis to that might be not a clue, never been involved with it whatsoever.  Don't have an

46REPORT001428

understanding, have much, much to learn, a whole new arena.

And I'm not putting words in your mouth and I'm not asking, I'm not saying it's binary, one or the other; but I'm just looking somewhere on that scale if you have impressions.

A.    I find both of them to be very competent individuals, both Melissa Palopoli and Jeff Gentry.

Q.    Okay.  Has -- in the time that you have returned to the office, has Chief Palopoli individually, or amongst other members of an audience, sought your counsel with regards to how an administrative or criminal allegation might be handled or managed?

A.    No.

Q.    Have you been present in any convention, in any meeting, involving Chief Palopoli and others where this has been a topic of conversation?  In other words, a criminal allegation has been made against an upper level manager in our organization. What exactly do we do with this?

A.    No.

Q.    Okay.  Do you have thoughts about -- again, the same question I asked about Chief Palopoli and Undersheriff Gentry, any impressions or opinions with regards to Chief Summers' expertise as it relates to administrative and/or criminal allegations against one personnel?

A.    I will reiterate what I said regarding the two others. Matt Summers has been -- is a wealth of information and

46REPORT001429

knowledge when it comes to the orders, to the responsibility of the Sheriff's Office. He's well-versed in the requirements that are meted out in each of the paragraphs and has been a very valuable resource for me in catching up to what's transpired over the last eight years.

From an administrative investigation standpoint, I have full faith and confidence in his understanding and in his abilities. I don't have any direct knowledge or -- that that opinion comes from but I find him to be very competent and well-spoken.

Q.   All right.  Thank you.

In the short time that you've returned to the office, have you formed any observations or opinions with regards to the professionalism and functionality of PSB?  In other words, do you or have you heard from others or is there a sense that -- I say an unprofessional terms, it's a train wreck -- as compared to this is a role model bureau that others should choose to emulate.  Anywhere along the scale have you formed any thoughts, opinions, or do you have a sense of how executive leadership in the organization has felt about PSB?

A.   I can't speak for an executive leadership.  I can speak of my own opinion.  Coming in, I recognize that Greg Lugo was very competent, is a very competent individual, very thorough.  The feedback that I received from his peers, from the people that report to him, has been nothing but.

46REPORT001430

And the leadership that is under Greg Lugo currently, that being Freddie Porter, and I've had limited contact with him, I just met him last month; Shawn Crosby I know for a long period of time. I'm not sure who else is down there. But I've heard nothing but good things about how things are working currently.

Q.   I'm not asking you to speak for others, just your observations, your opinion. Is there a sense that Captain Lugo is managing and leading PSB to a high degree of satisfaction with leadership? Is there disappointment with regards to managing and leading PSB? Do you have a sense of performance status of Captain Lugo?

A.   Here's what I'll say about Greg Lugo. I've known him four quite some time. We've never worked closely together. He is married to his wife and his father-in-law, who is now deceased, was somebody that mentored me and I have a great deal of respect for he and his family. I find Greg to be very meticulous and a hard worker and that's what I can say regarding Greg.

I don't know what executive staff's opinion is of him or how the office -- how PSB is running under him. I'm just not privy to those comments.

Q.   Sure. I appreciate that very much. So you're undoubtedly aware that Captain Lugo is presently on administrative leave. There was -- just to provide a little bit of history, as I

46REPORT001431

understand it, there's a sergeant by the name of Engelbeck, Sergeant Engelbeck. There was an administrative investigation involving Sargeant Engelbeck that commenced in 2020. That investigation concluded in 2024. PDH was held. Sergeant Engelbeck was found to be sustained with retired Chief Holmes and a 40-hour --

Oh, please. Absolutely.

MS. KIYLER: Do the rest of you want water?

THE WITNESS: I'm fine. Thank you.

BY MR. ANDERS:

Q. And Chief Holmes imposed a 40-hour suspension and Sergeant Engelbeck served that suspension in the latter half of 2024. In the meantime, Sergeant Engelbeck appealed to the Maricopa County Merit Commission and a hearing was scheduled.

Prior, just prior to that hearing occurring in very early February, Sergeant Engelbeck received notice from Conduct Resolution that the finding of the case whereby he has been sustained at the PDH and the discipline by which he had served were being rescinded and he was being made whole for the 40-hour suspension and the sustained finding was being changed to a non-sustained finding.

I'm just curious if you have any knowledge of that process, how that reversal, revocation of the finding and the discipline occurred, who may have had conversation or was involved in the contemplation of doing so?

46REPORT001432

A.    In 2020 I was an employee with the Wells Fargo Bank.  I had very limited contact with members of the Sheriff's Office.  I do not know Sergeant Engelbeck and I was -- as you gave significantly more information than I knew prior to coming in here.

Q.    Okay.  So then I would be left with the understanding that you haven't been privy to conversations or present at meetings or any discussions surrounding the situation with Sergeant Engelbeck as it relates to why his discipline had been rescinded?

A.    I've had no conversations of that kind, no, not with -- not regarding Sergeant Engelbeck or any other person within the Sheriff's Office.

Q.    Okay.  So an allegation -- actually, allegations have been made against Captain Lugo.  One is case number 0111.  The second is case number 0139, both prefaced by 2025.  Do you have any familiarity or knowledge of either one of those allegations?

A.    I do not know if that is something that has gone through CID as a matter of production.  I have not made it a habit of opening attachments that are sent to CID that are then forwarded to the Monitoring Team, especially related to PSB.  I figured that ignorance in those cases is -- for reasons like this, is much easier to land on.  So no.  I can say that perhaps I have touched those because they have been sent via

PSB through CID to you, but I -- I couldn't be sure.

Q.    Okay.

A.    I don't recognize them by number.  I don't recall seeing them specifically, and I don't have any knowledge of what's within those complaints.

Q.    Are you familiar in your history with the Office of Sustained Administrative Investigations where discipline has been served being ultimately reversed by executives within the office or the Appointing Authority?

A.    Has a case that has been overturned, is that what you're asking?

Q.    That you're aware of, after being sustained and discipline served.

A.    I can't think of one offhand but that doesn't mean that it's never happened.  I'm not aware of one specifically or personally.

Q.    Chief -- I'm sorry.  Undersheriff Gentry has explained to us that he is reviewing a number of previously sustained administrative investigations.

A.    Okay.

Q.    And is giving consideration whether or not the sustained findings ought to be reversed or changed.  And I'm curious if you're aware of at any time during your career if you know of -- and this doesn't mean it that didn't happen, it's just if you know of cases that have been sustained, discipline has been

imposed, and then those cases have been essentially shelved for a matter of years and then the finding and the discipline were subsequently changed or rescinded?

A.   I don't have any personal recollection or knowledge of such things but I was not involved in PSB and I don't -- nor within the executive leadership, both either now or in my previous employment.

So I just -- I don't have anything that I immediately recall.

Q.   Are you aware of any what I'll call contemporaries or current ongoing discussions, conversations, or considerations with regards to leadership in the organization, reviewing prior sustained cases and considering reversal of the findings and the discipline in those cases?

A.   I've not been privy to any conversations related to that, no.

Q.   Has anybody conveyed that to you?  So a hypothetical example.  Chief John Doe has said, hey, did you hear, Chief Jane Smith is taking a look at some cases involving, you know, Sergeant X, looks like they may be changing the finding and the discipline?

A.   I don't recall any conversation like that.

Q.   Okay.  Captain Lugo is presently on administrative leave as it relates to Case Number 2025-0139.  Do you know anything about the circumstances that led to Captain Lugo being placed

on administrative leave?

A.    I do not, no.  I -- I saw Captain Lugo and spoke with him on -- I want to say it was a Wednesday evening at our community meeting in Aguila and then I heard that he was on administrative leave following that.  I don't remember if it was the next day or that Friday.

MS. KIYLER:  Community meeting in Aguila?

THE WITNESS:  Yes, ma'am.

MS. KIYLER:  When did that occur?

THE WITNESS:  I want to say -- I have to look at my calendar to have a specific date, but it was held maybe two weeks ago.

MS. KIYLER:  It wasn't one of our community meetings.

THE WITNESS:  It was -- so we did a meeting in Gila Bend and a meeting in Aguila that was spurned by George Hawthorne.  So prior to him leaving, he had initiated the -- our community outreach to begin those meetings.

MS. KIYLER:  Thank you.

MR. ANDERS:  Major Peters, do you have any questions?

MR. PETERS:  I would just like to get a little bit of clarification, if I could, regarding the work that is going on at the implementation unit.

And just something caught my ear that you said, Mr. Doyle, and that was that you basically just handle the files but you never review them.  Is that correct?

46REPORT001436

THE WITNESS:  I've not made it a habit of opening the attachments that are associated with those files, no.

MR. PETERS:  Okay.  So then --

THE WITNESS:  Let me clarify that, however.  So there are monthly and quarterly productions that are occurring of which you guys are very well aware, and I have been peering into those to get a better idea of what information we're getting, how it correlates with the quarterly reports, both that you guys produce as well as our production of those reports and to get a better understanding of what the members of the production team specifically are doing.  I've opened up some of those.

So when they are providing -- and then you'll come back and you'll say, hey, it's numbers one through 15 or one through 26, I have reviewed those documents.

But when it comes to the PSB stuff, I have not purposefully not gotten myself -- I've not opened those documents.

MR. PETERS:  Okay.  And I understand it, the hesitancy with PSB.  So my question really goes with all of the other data.  I mean, how do you fulfill your responsibility, then, to ensure that all of the data and documents are maintained properly for the order and that are provided as requested by the Monitoring Team and in the -- in the format that the Monitoring Team has directed if you don't review them?

46REPORT001437

THE WITNESS:  So when I'm -- what I'm trying to say is that the PSB-related documents I do not involve myself in. I involve myself in the production information that is provided, the back and forth between Robin Busch-Wheaton and Matt Summers.  I have had some involvement in when there are the Paragraph 268 requirements that have been met for some of the transfers both in and out of CID, I have been involved in that.

So I am looking at and reviewing the documentation. What I'm saying is I don't open up the -- like when you're asking about the PSB cases specific to Captain Lugo or to Sergeant Engelbeck, I haven't opened those documents so that I have the ability to say I have -- I have no knowledge of what the information is within those documents.  Does that clarify?

MR. PETERS:  Well, it basically dances around it.  I said aside from the PSB stuff, all of the other data and the monthly Monitor production, how do you ensure that the defendants are responding appropriately to those requests if you don't read them?

THE WITNESS:  Yeah.  Okay.  So to make it more clear, I am reading those documents outside of the PSB documents.  Did I review both what is requested when we send out the requests, when we retrieve those requests, when those are sent to you for your review, I review all of that information, both in the monthlies and since then in the quarterlies.

46REPORT001438

So I have been involved in both March and April monthly requests and am intimately involved in reviewing those. Is that -- I don't want to give you the impression that I'm dancing around anything. I'm looking at those things. I do not look at the PSB stuff and I think it's --

MR. PETERS: Okay. Understood. And, again, I can understand with that, for sure.

And just another side question. In your duties so far, you mentioned Chief Summers has been invaluable to you and provided you some guidance along the lines. Just how often do you need, in your opinion, to seek his advice, you know, say, on a daily basis?

THE WITNESS: Matt has been available whenever I've needed him. So I -- if I have a question related to how he interacts with the Monitors or with the attorneys or with production, he's been an open book. He's been available whenever I've had a question. I've never not been able to approach him and ask questions related to that.

MR. PETERS: So is it fair then to say that that occurs daily, weekly, biweekly?

THE WITNESS: It's dependent on what's occurring at the time. I've never had an access problem with Matt Summers. I'm not sure how else to answer your question.

MR. PETERS: Yeah. I'm not questioning the access. I'm just trying to get a feel for you how often you need his

advice to move something.

THE WITNESS:  Well, there certainly is a learning curve to the interactions between the Monitor.  I mean, he's the single point of contact and has a year's worth of experience in it.  And so he's been a valuable resource when it comes to interactions within CID and outside of CID.

As I've not been with the Sheriff's Office, again, for a period of eight years so a number of the personnel, the people that I would contact, those things have changed.  So reestablishing that and then familiarizing myself with the Court order and the responsibilities within that order and the responsibilities of the CID, Matt's provided ample opportunities for training and understanding and continues to be available if I have questions.

MR. PETERS:  Thank you very much.

MR. ANDERS:  Chief Kiyler, anything?

MS. KIYLER:  I do have a couple of questions.

Commander, when you were with MCSO before, you retired as a sergeant; is that right?

THE WITNESS:  Yes, ma'am.

MS. KIYLER:  What assignments were you in as a sergeant while you were with MCSO?

THE WITNESS:  Sure.  So I started in patrol in 2009.  I was a patrol supervisor in District 1.  I spent probably two and a half years there.

46REPORT001440

(Coughing).

MS. KIYLER:  Sorry.

THE WITNESS:  It's going around.

Don't quote me on the two and a half years.  It could have been less.  I spent time in Enforcement Support, was in charge of the Reserve program and the Advisory Posse.  I spent time with the -- a large part of that was dealing with the Fallen Officers' Fund.  Carlos Desmond's family was one of recipients of the car washes that we did.  Dave Bagayo (phonetic) was a close friend of mine.

MS. KIYLER:  Still?

THE WITNESS:  Yes.  And then from there.  I was moved into the -- into the Squat Division where I was the bomb squad commander.  And then and there was a CAD RMS transition that was occurring before that, what we currently have with Tracks and the nightmare that that is.  But I was involved in that transition.  And then I was in Special Investigations Division as the Threat Management Unit Supervisor and the C.A.S.T. supervisor, Criminal Apprehension Surveillance Team supervisor.

MS. KIYLER:  In your chain of command now, you said you have direct oversight over three people.

THE WITNESS:  That's correct.

MS. KIYLER:  And the first is Director Redpath; is that correct?

THE WITNESS:  He's one of them.

MS. KIYLER:  And what does he do?

THE WITNESS:  He's the research -- he's head of the research, so a lot of the -- both -- well, the monthly, quarterly, and annual traffic stop reports.

MS. KIYLER:  Okay.

THE WITNESS:  They are involved in that as well as a slew of other research-related activities.

MS. KIYLER:  And then the two lieutenants are Bryce?

THE WITNESS:  Todd Bryce.

MS. KIYLER:  And what does he do?

THE WITNESS:  He's over the production group.  They are the ones who interact with you.  Veronica, Sergeant Levy, Kerry Addis, the two deputies, and then -- and then he's also in charge of the patrol.  We have patrol analysts that assist us in making sure that the SLAs that are involved in the -- that we're meeting those SLAs so we stay in compliance in several paragraphs.  And then Mike Lawson, I anticipate that you wanted to ask about him.

MS. KIYLER:  Also lieutenant?

THE WITNESS:  Yes, ma'am.

MS. KIYLER:  Sworn?

THE WITNESS:  Yes, ma'am.  He took now Captain Halverson's position when Halverson was promoted and is in charge of the TSAU sergeants who conduct the town halls.  And they deal with the traffic stop monthly reports and the outputs

of those reports.

MS. KIYLER:  And what's your reporting structure from you up?

THE WITNESS:  I report directly to Chief Summers.

MS. KIYLER:  And then who is your -- next in your chain of command?

THE WITNESS:  Chief Palopoli.

MS. KIYLER:  And then next?

THE WITNESS:  I believe she reports directly to Jeff Gentry.

MS. KIYLER:  Okay.  I don't have anything else, Chief.

BY MR. ANDERS:

Q.   Anything I should have asked you that I didn't ask you?

A.   Oh, my goodness.

Q.   Anything you want to clarify or qualify or enhance?

A.   I want to make it clear that I am intimately involved in the production activities, the monthly reports, the quarterly reports.  We are preparing the annual report right now.  I have in the intimate relationships with both the three individuals that have -- I have direct supervision over but beyond that, we hold meetings on a regular basis with the remainder of the group and we are currently in full and effective compliance on both Paragraph 268 and Paragraph 9 and have been for quite some time.

46REPORT001443

I know that there has been some -- like the one inference that is made in Paragraph 9 that touches on the access, your access to open cases, I think IA cases, there is a verbiage within that paragraph that has been -- I've noticed it in the last -- at least the last three quarterly reports that you guys are published. I think that maybe part of that has been because we've just provided you with an open case and established some of that criteria that is created for there, but --

MS. KIYLER: And I apologize. I'm not sure what you're talking about.

THE WITNESS: So within Paragraph 9 of your quarterly reports, both the 42nd, the 41st and your 43rd draft, there's a specific sentence that says that there are -- that we provide you with the -- and please don't quote me, and I don't have it in front of me, but we are adequately providing you with access and information, and then it's with the caveat, outside of a few open IA cases is the verbiage that is within that paragraph.

I would like to be able to see that whatever we need to do in order to be able to complete that requirement, if that requirement is something that we're not meeting, I'm very keen on the -- your quarterly reports, what is being written, the verbiage that is being used, and making note of when we are issued a warning for potentially coming out of compliance so

46REPORT001444

that we can rectify that as quickly as possible and maintain that compliance.  I believe that that -- although it's not required within the minimum requirements of CID there, I feel that that is a -- one thing that Matt -- one of the many things that Matt Summers had established within -- while he was head over CID and that I want to see that continued maturation of those things so that we're making sure that we gain compliance, that we remain in compliance, and that we gain full and effective compliance of the entire -- of all of the paragraphs.

MS. KIYLER:  And I will pass that information on on Paragraph 9.  It's not one that either Chief Anders or I are responsible for but I'll pass it on.

THE WITNESS:  Okay.  Fair enough.

MR. ANDERS:  Anybody that can cite those paragraphs, cite three different quarterly reports, and what was documented in those quarterly reports by the Monitor is clearly paying attention.

THE WITNESS:  It's my job to do so.

MR. ANDERS:  Thank you very much.

MS. KIYLER:  [inaudible] typos, did you?

THE WITNESS:  Do you want the truth?

MS. KIYLER:  No.  If you didn't, I would be surprised.

THE WITNESS:  I found a couple.

46REPORT001445

MR. ANDERS:  Thank you for your time today, sir. Very much appreciate it.

We're off the record.  It is approximately 12:46 p.m.

(Proceedings concluded at 12:46 p.m.)

46REPORT001446

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 10th day of November, 2025.


                                    s/Elaine M. Cropper

                                    _____

                                    Elaine M. Cropper

46REPORT001447

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with FREDERICK PORTER

April 22, 2025


_____

Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001448

**TRANSCRIPT OF INTERVIEW WITH FREDERICK PORTER**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001449

P R O C E E D I N G S

MR. ANDERS: Okay. We're on the record. The date is April 22, 2025. The time is approximately 10:34 a.m. We're located on the sixth floor of the Luhrs Building in downtown Phoenix, Arizona. We're in the Federal Monitor's conference room.

MR. PETERS: With me on the phone is Major Peters. Present in the room is Chief Kiyler.

And can I ask the three of you to identify yourselves, please.

MR. SULLIVAN: Robert Sullivan from Broening Oberg.

THE WITNESS: Lieutenant Frederick Porter, PSB, with the MCSO.

MR. POPOLIZIO: Joseph Popolizio on behalf of Gerard Sheridan, Sheriff, in his official capacity.

MR. ANDERS: And my name is Donald Anders.

EXAMINATION

BY MR. ANDERS:

Q. Lieutenant, thank you very much for being here today. I really appreciate it.

We talked to a number of people leading up to our interview with you and really my intent today is just to try to learn some processes and your role and your understanding of evolution of events over recent weeks, communications you've had with folks and so forth.

46REPORT001450

If at any time you don't understand what my question is, just let me know, if you need some clarification.

A.    Okay.

Q.    If you have any questions, please just ask.

A.    Okay.

Q.    How long have you been a lieutenant?

A.    I promoted in January of 2024 so just over -- a year and a couple months.

Q.    Yeah.  How long have you been with the office?

A.    Graduated the academy in October of 2007 so just over 17 years.

Q.    Okay.  And how long have you been with PSB?

A.    I came down to PSB as a sergeant in January of 2021.

Q.    Okay.  So just over four years?

A.    Yes.

Q.    Yeah.  As a sergeant then you were, want of a better term, a line-level investigator?

A.    Yes.

Q.    Did you have special expertise in any particular area?  In other words, did you focus on detention, sworn, criminal, or just a cornucopia of everything?

A.    Whatever was assigned to me, yes.

Q.    Sure.  Yeah.

Who were your lieutenants when you in PSB?

A.    When I first came over, it was Matt Hunter and then after

he was transferred out, Vasile Hiticas.

Q.    Has Captain Lugo been your captain the entire time or was there a different captain when you first started?

A.    When I first got there it was Captain Lee.

Q.    Lee?

A.    Yes.  It was a couple months and then Captain Lugo came on.

Q.    Is he recently assigned to Lake Patrol?

A.    Yes.

Q.    Yeah.  I think that's where I met him.  That's where the name is familiar.

And now I think he's back downtown?

A.    I think he's in Major Crimes.

Q.    Major Crimes, okay.

So I want to discuss some circumstances surrounding primarily Jensen Hughes and an investigation that you're aware of associated with PSB commander Captain Lugo.

What is your -- so let me back up just a bit.  My understanding is you are currently the acting commander for PSB; is that correct?

A.    Yes.

Q.    Do you remember what date you were assigned the role as acting commander?

A.    If I --

Q.    It doesn't have to be exact.

A.    It was a Friday.  I believe it was April.  April 4.

Q.    So April 4.  April 4 was the date that Captain Lugo was placed on administrative leave?

A.    That's what I was told.

Q.    Yes.  And who assigned you as acting commander?

A.    Chief Palopoli.

Q.    Okay.  And how did that happen?  By text, email, phone, personal meeting.

A.    I received a text message in the afternoon of April 4 and then she just asked me to give her a call and then when I gave her a call, that's when I was told.

Q.    And can you just generally recall what the content and context of the conversation was?

A.    Just that Captain Lugo was on administrative leave effective immediately and I was being placed as commander of PSB.

Q.    Okay.  Was there an estimate given how long it was anticipated you would be commander?

A.    I was just told until further notice.

Q.    Okay.

      How many lieutenants are presently in PSB including yourself?

A.    We have some detention lieutenants that are investigators down on the floor; but as far as reviewers, there's myself, Lieutenant Romney, Lieutenant Crosby; Lieutenant John Pilling,

46REPORT001453

and Lieutenant Hiticas.

Q.   And prior to being assigned as acting commander at PSB, what -- can you describe your role in PSB?

A.   Just -- I had my own squad of guys and just reviewing the investigations that they completed as far as assisting with Jensen Hughes, reviewing those reports and helping them out with anything needed.

Q.   How many people on your squad?

A.   I just got another new guy.  I want to say -- let's see -- I want to say eight or nine.

Q.   Okay.  And you talked about Jensen Hughes.  As I understand, Jensen Hughes is a firm that contracts with the office and with PSB and that they have civilian personnel who have expertise in conducting administrative investigations; is that right?

A.   Yeah.  They are a contract company that, yeah, assists us with investigations.

Q.   Can Jensen Hughes conduct criminal investigations?

A.   I don't believe that they have had a criminal investigation since I've been over them.

Q.   Do you know if in civilian capacity they have the authority to conduct a criminal investigation?

A.   I don't believe they would.  I believe criminal investigation would go to a sworn member of the office or a sworn investigator.

46REPORT001454

Q.    Does PSB have anybody who essentially serves as liaison between PSB and Jensen Hughes?

A.    What do you mean by liaison?

Q.    Like perhaps as a primary point of contact.

A.    Yes.   That was typically one of the admin supervisors, Amy Gutierrez.

Q.    Okay.   You mentioned that you review Jensen Hughes cases. Do you have any other role with Jensen Hughes?

A.    Yeah.   I mean, I would be a point of contact as well with them but typically it's Amy and Anna Chacone, she's another admin that is the go-between with -- and then any questions or anything like that, if they can't answer it, it would be forwarded to me for assistance.

Q.    Is it fair to say that the two administrative employees that you just referenced -- I apologize, I just forgot their names.

A.    No, that's all right.

Q.    But they are essentially administrative liaison to Jensen Hughes; but from a sworn command managerial perspective, you would be the liaison to Jensen Hughes?

A.    Yeah.   That would be correct.

Q.    In other words, they are not managing Jensen Hughes correct?   They are not telling them -- offering advice on how to machine a case or reviewing their IA plans or --

A.    No.   Any questions regarding the case would -- if they

46REPORT001455

couldn't assist them, whether -- they might be able to answer if it was a policy or something like that but, yeah, in regards to allegations or something like that, it would come to me.

Q. Okay. Have you been given any direction in the last six weeks in regards to the allegations and investigations associated with Captain Lugo? What I mean by that is, have you been given orders to not communicate, access, investigate, review, broadcast, in any way anything to do with the matters associated with Captain Lugo?

A. I was told to -- just to keep it under -- keep it quiet or copy it, you know -- not let it out to the whole division per se.

Q. But your professional activities haven't been curtailed. In other words, more specifically, have you been told: Do not discuss this case with anyone?

A. I don't know if I was told exactly do not discuss with anybody because -- yeah. I don't recall that.

Q. Sure. So if you were given an order, it sounds like there's some ambiguity and it's not something that resonates or would be remarkable that you can sit here and remember it today?

A. Yes.

Q. Okay. On --

MR. PETERS: Chief, could I interject here just for some clarity?

46REPORT001456

MR. ANDERS:  Please.

MR. PETERS:  Lieutenant, you said just a moment ago -- and correct me if I'm wrong, but you said that you were told to keep it quiet.  Who passed on that word to you?

THE WITNESS:  That would -- Chief Palopoli advised me -- I don't remember the exact wording but then at the same time Lieutenant Shawn Crosby went out and served him with the administrative paperwork.  So it was -- he was brought in the loop at that point.

MR. PETERS:  What was that second answer?  I couldn't hear you?  I'm sorry.

THE WITNESS:  Originally on the original phone call, it was just keep it -- keep it quiet or, you know, didn't know what was going on.  I don't remember the exact words.  And then that was -- I talked to her on the phone on that Friday.  And then on Monday they all came down and spoke to the division.  I don't remember what that Monday date was, the seventh.  They came down, Chief Gentry, Palopoli, and Chief Summers came down and spoke to the Commission along with the other lieutenants and the administrative supervisors in the office or in the division.

MR. ANDERS:  Great, thank you.

MR. PETERS:  Thank you very much.

BY MR. ANDERS:

Q.   So with regard to Jensen Hughes, on March 20, Chief

Palopoli reached out to someone named Joy Fitzgerald at Jensen Hughes via email.  Chief Palopoli introduced herself to Joy Fitzgerald?

A.    I have a question.  Is -- I don't know what this was all about.  Coming in here, is this similar to an admin where I have a choice like to personally record the interview or not?

Q.    If you would like to record the interview, you are very welcome to, yes.

A.    Okay.  Yes.  I would.

Q.    Yeah.

        And I want you understand you're not considered a principal or a subject of an investigation.

A.    Okay. All right.  There we go.

        I'm sorry.  So on the 20th.

Q.    On the 20th, Chief Palopoli sent an email to Joy Fitzgerald at Jensen Hughes essentially introducing herself?

A.    Okay.

Q.    Do you know who Joy Fitzgerald is?

A.    I do.

Q.    And tell me your professional relationship with Joy Fitzgerald?

A.    She's an investigator with Jensen Hughes, has done some -- several cases for us.

Q.    Any idea for years has she been an investigator?

A.    I know when Flowers was still up in PSB, before he got

46REPORT001458

transferred or promoted and transferred, she was there. I'm not sure how many years she has been a part of Jensen Hughes. But the entire time that I've handled or dealt with Jensen and Hughes.

Q. Okay. On March 27, Anna Chacone sent an email to Mark, and I'll just spell his last name, G-I-U-F-F-R-E at Jensen Hughes and to Joy Fitzgerald. Do you know who Mark is?

A. He is the main point of contact I guess with Jensen Hughes and then -- yeah, he's over the investigators.

Q. And she copied Amy and yourself on March 27 and the email reads, again, to Mark: (As read) Good afternoon, Mark. IA 2025-0111, that's the first PSB allegations involving Captain Lugo and Sergeant Latham. 0111 is assigned to Joy for completion. The documents were uploaded to ShareFile. Joy, please send your investigation plan to Lieutenant Porter.

And it gives the 85 date, due date.

So this was from Anna to Mark. Do you know how that came about?

A. So it was -- what happens is cases, when Captain Lugo was there, he would open it up and he would decide if it was going to go to Jensen Hughes or an investigator within the division. If it went to Jensen Hughes, he would have Monique, who opens the complaints, she would send an email to Amy, hey, that is case is being forwarded to Jensen Hughes and then ultimately it would be -- I would decide what investigator it would go to.

46REPORT001459

Q.   Okay.  How did this come about?  How does Anna send the email to Mark saying that Joy is the assigned investigator?

A.   So she would -- that's what I would decide, what investigator it would be assigned to.  Anna or Amy would send an email to Mark saying, hey, this case is being assigned to so-and-so, whatever investigator, and then they would up load files into whatever SharePoint or ShareFile that they have.

Q.   Okay.  So you told Anna that Joy was going to be the investigator.  Is that what I understand?

A.   I believe I told Amy.

Q.   Told Amy.  Who is Amy?

A.   Amy is the admin supervisor.

Q.   Okay.  And Amy would have told Anna?

A.   Amy and Anna work kind of side by side, yeah.  So . . .

Q.   And so how did you determine that Joy would be -- Joy at Jensen Hughes would be the investigator in the case involving Captain Lugo?

A.   It's kind of a case-by-case basis.  I believe -- Joy's husband is another investigator with Jensen Hughes.  I can't -- I think I gave him two cases.  There was an email with cases that included that 111 case and I believe Ed was handed two of those cases to investigate and Joy -- I just -- no rhyme or reason.  I just -- I was actually the one that assigned it to Joy.

Q.   Okay.  Were you ever told by Chief Palopoli that she had

Q.   contacted Jensen Hughes?

A.   I became aware that she had contacted Jensen Hughes.

Q.   About when?

A.   I don't recall the date.  I actually had spoke to Mark, the main contact with Jensen Hughes.  He had emailed me, asked me to call him; and when I finally did, he advised me that he had been in contact with Chief Palopoli.

Q.   Did he say anything else?

A.   He said that she originally assigned it to Frank Hoagland (phonetic), who is another investigator with Jensen Hughes, which I was unaware of.  That's why I assigned it to Joy.

Q.   So Chief Palopoli did not tell you initially that she had reached out to Jensen Hughes and that she had spoken to Mark and that they had decided upon an investigator?  You found that out from Mark?

A.   Yes.

Q.   Do you know the day that Mark asked you to give him a call and that you spoke?

A.   I believe I have an email, he sent me an email just asking if I could call him and I want to say it was the next day or within a day or two after that.

Q.   Who in the office decided that 0111 would be assigned to Jensen Hughes?

A.   That would have came from Captain Lugo.

Q.   Okay.  And so did Captain Lugo tell you 0111, the

46REPORT001461

investigation involving him, was going to be assigned to Jensen Hughes?

A.   From what I remember, he sent the normal process, he -- Monique sent the email to Amy.  I got with Amy.  I assigned -- I want to say there were four or five cases on there that were going to be assigned and I picked the investigators that they were assigned to, so it didn't come directly from Captain Lugo. It came from -- sent to Amy like normal practice and then sent to me, like these cases are being assigned.

Q.   So trying to understand the relationships.  Is Monique an administrative assistant to Captain Lugo?

A.   She is the -- I don't know what her official title is. She's the complaint intake.

Q.   She does complaint intake?

A.   She opens up all the complaints.

Q.   Does she work for Captain Lugo or is she a general administrative employee for PSB?

A.   I'm not sure who she's directly under as a subordinate but, yes, Captain Lugo's office is in the corner.  Hers is right next door.

Q.   Okay.  So she does complaint intake?

A.   Yes.  She opens up all the IA service complaints.

Q.   And then she sent an email to Anna?

A.   I would have to look at the emails.  I don't know she sent -- typically how it works is after -- and I can pull up

one of her sample emails.

Typically how it works is she will write up an email. Hey, after conferring with Captain Lugo or what, these cases are going to be assigned to Jensen Hughes, whether it was for backlog -- you know, due to the backlog or any other reason that she's provided from Captain Lugo. And then she sends an email to Amy typically and then Amy will send me that email or ask who the IA number cases are being assigned to or who I want them to go to.

Q. So just forgive me here. I'm just trying to connect the dots.

A. No. No. That's okay.

Q. We have the individual who is doing intake for complaints.

A. Yes.

Q. And that person's name is?

A. Monique.

Q. Monique?

A. Yes.

Q. Monique then sends an email to Amy?

A. Yes.

Q. Who is Amy?

A. Amy is the admin supervisor, one of the admin supervisors.

Q. Okay. Amy gets it. How does it end up with Anna?

A. Anna and -- Anna kind of works with Amy side by side. So I would describe it as Anna is kind of Amy's right hand when it

46REPORT001463

comes to Jensen Hughes, just another contact, just uploading the files to ShareFile or whatnot for Jensen Hughes.

Q.    Your understanding then is Monique sent an email to Amy. Somehow that information gets known to Anna and Anna then replies out to Joy and Mark at Jensen Hughes; is that correct?

A.    Or Amy could, either/or.  It depends if someone is off, either one of them could reach out.

Q.    But we have this email here from Anna to Mark.

A.    Yeah.  But I'm saying is Anna was off, Amy would do that.

Q.    Okay.  Do you know if that email from Monique to Amy or Monique to Anna or to both, has that been provided to the Monitor, do you know?

A.    I am sure.

Q.    Okay. And so then on March 30, you sent an email to Chief Palopoli.  That was a Sunday.  Sunday night.  I'll just read it.  You copied Amy Gutierrez:  (As read)  Good evening, Chief Palopoli.  Below is an investigative plan for IA 2025-0111. Due to Captain Lugo being listed as a principal, I am sending this plan to you.  The investigation is assigned to Joy Fitzgerald at Jensen Hughes.  I have cc'd Amy Gutierrez who is the administrative supervisor.  It helps me out and assists Jensen Hughes with all the documentation and files they need. Let me know if you need anything added or clarified.  If you have any questions or need anything else, just let Amy or I know.  Thank you.

And then what's attached to it is an investigative plan.  Did you author this investigative plan?

A.    I did.

Q.    Okay.  And Sunday night at 8:17 p.m. why would you send that to Chief Palopoli?

A.    There's timelines on the investigative plans and I hadn't talked to or got -- received one from Joy so I just -- I didn't want to be late on the timeline or anything like that.

Q.    Okay.  Would Jensen Hughes typically do the investigative plan?

A.    Jensen Hughes typically do an investigative plan and then send it to me, yeah.

Q.    So when Anna reached out to Joy on the 27th, three days prior, Joy please send me your investigative -- please send your investigative plan to Lieutenant Porter by Sunday, the 30th, you had not received that investigative plan?

A.    I had not.

Q.    You wanted to meet the timeline so you went ahead and drafted one and sent to it Chief Palopoli?

A.    I didn't remember.  I didn't look at the timeline.  I just know there's a timeline with the investigative plans and it was just one of those.

Q.    Did that get sent to anybody else?

A.    No.  Just to the ones on the -- on the email there.

Q.    Okay.  Chief Palopoli then sent an email back to you:  (As

read) Hello there.  Thank you for putting this together.  There was some confusion with Jensen Hughes as they had already assigned a different investigator.  That being said, as of right now the Monitor (Anders) is not in agreement with us using Jensen Hughes.  We are standing there for now.  I should know more by the end the day.  I will email you as soon as I know more.

This was dated Monday, March 31.  This was six days -- I'm sorry, five days after Chief Palopoli and I had talked and I had paused any involvement with Jensen Hughes.

Prior to getting this email from Chief Palopoli, were you told that Jensen Hughes had been contacted by Chief Palopoli?

A.    No.

Q.    Were you told that somebody had been assigned at Jensen Hughes involving Chief Palopoli?

A.    No.

Q.    Were you informed prior to this email by Chief Palopoli that Jensen Hughes was not going to be responsible for the investigation?

A.    No.

Q.    Do you know that it was Captain Lugo who directed Monique to send the email to Amy regarding the assignment of the case to Jensen Hughes or is it reasonable the Amy made an assumption?  I'm asking for do you know that that is what

46REPORT001466

occurred?

A.   I would have to pull up an email to see exactly what -- if it was sent from -- I'm just going off how it normally went and how they normally signed to Jensen Hughes.  So I would have to read the email that I received.  I have my phone here.

Q.   Is it fair to say that you know that Monique sent an email to Amy?

A.   I would have to double-check my email just to be sure.

Q.   Would you like to do that now?

A.   Sure.

(Brief time lapse.)

A.   So on March 24 --

Q.   That would be a Monday.

A.   On Monday, March 24, Monique sent an email to Chief Palopoli and cc'd Alice Kosmata, who is another admin supervisor, advising that Captain Lugo and Sergeant Latham were identified as principal in 25-111.  And then on March 24 at 3:19 p.m. Monique sent an email to Amy, cc'd me, Alice, Maura and Maureus saying:  (As read)  Good afternoon, Amy.  After consulting with Captain Lugo regarding the complaint and allegations made, it was determined this case would be forwarded to Jensen Hughes for completion due to the current PSB backlog of administrative investigations.

Q.   Great.  At some point we would like to get copies of those as part of this.

46REPORT001467

A.    Okay.

Q.    And so one of my primary focuses in speaking with you is just trying to determine how you came to liaise with Jensen Hughes and whether or not that was on your own volition, whether or not that was at the direction of Chief Palopoli, whether that was at the direction of Captain Lugo, or did Jensen Hughes reach out to you after speaking to Chief Palopoli?  I'm just trying to figure out what that avenue of communication was and what precipitated the outreach to Jensen Hughes so I think I have a better understanding of that now.

          MS. KIYLER:  May I ask a follow-up question?

          MR. ANDERS:  Yes, please.

          MS. KIYLER:  So on the 4th, and I may not have written this down right, Monique sends the email to Palopoli and Kosmata that Lugo and Latham were identified as principals.  And that was cc'd to you?

          THE WITNESS:  It was not cc'd to me.  Monique sent it to Chief Palopoli and cc'd Alice Kosmata advising that a new 25-0111 had been opened with Captain Lugo and Latham and an unknown employee listed as principals.  And then advising that it has been assigned to Jensen Hughes for investigation.

          And that string, once Monique sent the email to Amy, after that I can check the time here.  That was sent at 3:18 p.m. and then the email that I was cc'd on was sent at 3:19 p.m. so directly right after that to -- where I was cc'd and

Monique had sent to Amy.

MS. KIYLER:  Okay.  So in the first one, it was not sent to you?

THE WITNESS:  No.

MS. KIYLER:  But in a subsequent email you became aware of that because of what was sent to you?

THE WITNESS:  Yes, because I was tasked a while back with overseeing Jensen Hughes IAs, once Flowers had left.

MS. KIYLER:  Was there a response included from Chief Palopoli about Lugo and Latham being identified as principals?

THE WITNESS:  Not that I'm aware of, not that is in the email string, not that I'm aware of.

MS. KIYLER:  So then the email that Monique then sent to you, could you read that to me again?

MR. ANDERS:  Would it be reasonable for us to read those?

THE WITNESS:  Yeah, you can read them.

MR. SULLIVAN:  As long as there's no communications with counsel in any of them.

THE WITNESS:  No.  It wasn't sent to me.  Right after that Monique sent email to Amy Gutierrez and then I was cc'd on it.

BY MR. ANDERS:

Q.   So the first email --

A.   That's the one that I was cc'd on.

46REPORT001469

Q.   Was the first email that went -- so I'm looking for chronology.  What was the first one?

A.   That's the first email right there.

Q.   Okay.  So I'm going the read this just into the record from.  Monique, last name is H-A-B-B-L-E-T-T, to Melissa Palopoli, Alice Kosmata is copied, subject, new IA notification, IA 2025-0111 -- sorry, the screen is going blank here.  2025-0111.

(As read) Good afternoon Chief Palopoli.  IA 2025-0111 has been opened with Captain Lugo, ID or badge number S1480, Sergeant Latham, S1462, and an unknown employee listed as principal.  It has been assigned to Jensen Hughes for investigation.

And this is dated March 24 at 3:18 p.m.

So that's the first email that you're aware of?

A.   That is the first one.  And then this was the next follow-up one.

Q.   The second email, what is this up here at the top?  Is that the sender, Monique?

A.   Yes.

Q.   Okay.  From Monique H-A-B-B-L-E-T-T to Amy Gutierrez, copied Lieutenant Porter, Alice Kosmata, Maura Garcia.

A.   Maureus.

Q.   Maureus Coroski.  (As read) Good afternoon, Amy.  After consulting with Captain Lugo regarding the complaint and

24

allegations made, it was determined that this will be forwarded to Jensen Hughes for completion due to the current PSB backlog of administrative investigations.  Thank you, exclamation Mark.  Respectfully, and a standard form signatory, Monique, H-A-B-B-L-E-T-T, B6244.

Great.  Thank you very much.

A.    Absolutely.

MS. KIYLER:  And I'm just going to ask a follow-up to that.  Transfer -- forwarded to Jensen Hughes due to the backlog.

THE WITNESS:  That's what the original email said.

MS. KIYLER:  Does that make sense given the allegations and the principal?  I'm asking for your professional opinion, Lieutenant.

THE WITNESS:  I've seen that before in cases that have been assigned to Jensen Hughes so I didn't really think anything of it.  But I've seen them, yeah.

MS. KIYLER:  I'm sorry.  You've seen what before?

THE WITNESS:  I've seen Monique send an email with it's due to the backlog of administrative investigations or something along those lines.

MS. KIYLER:  No.  No.  I understand that.  I 100 percent agree with that.

Would it be PSB's practice to send a case to Jensen Hughes with allegations against the PSB commander?

46REPORT001471

25

THE WITNESS:  I have my -- I have my opinions on that but . . .

MS. KIYLER:  I would like to hear your opinion, Lieutenant.

THE WITNESS:  No.  I would think that it would need to go to someone else.

MS. KIYLER:  Okay.  Thank you.

MR. ANDERS:  Do you have any more questions?

MS. KIYLER:  I do not.

MR. ANDERS:  Major Peters, do you have any questions?

MR. PETERS:  None at this time, Chief.  Thank you.

BY MR. ANDERS:

Q.   Lieutenant Porter, is there anything that I didn't ask you that I should have asked you or any additional clarity or thoughts that you might have that you wanted to communicate to us?

A.   No.

Q.   Have you had any communication with Chief Palopoli with regards to you telling her the case had been assigned to Joy Fitzgerald?

A.   No.  And, again, I was unaware that she'd reached out to them or assigned it to Frank Hoagland.  I got that info from Mark and then -- yeah.  No, I --

Q.   Have they reached out to you at all and said, "Hey, how you did this go to Jensen Hughes?"  Or, "How was Joy assigned?"

Or, "Why are we assigning this to Jensen Hughes?"

A.    There was just that email.

Q.    Just that email, that's it?

A.    Yes.

Q.    Okay.

A.    And obviously I knew -- that was the weird part, is I knew I wasn't going to communicate with Captain Lugo when he's involved in the case.

Q.    Yeah.  Absolutely.

Okay.  We're going to go off the record. Lieutenant Porter, thank you very much.

(No ending time indicated on the record.)

46REPORT001473

27

C E R T I F I C A T E


I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.


DATED at Phoenix, Arizona, this 11th day of November, 2025.


                              s/Elaine M. Cropper

                              _____

                              Elaine M. Cropper

46REPORT001474

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with DENISE CALLAHAN

April 22, 2025


_____


Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001475

## TRANSCRIPT OF INTERVIEW WITH DENISE CALLAHAN

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001476

P R O C E E D I N G S

MR. ANDERS:  Okay.  We're recording and now we're on the record.  My name is Donald Anders, member of the Federal Monitoring Team.  The time is approximately 9:30 a.m. on April 22, 2025.

We're on the sixth floor of the Luhrs Building in downtown Phoenix, Arizona.  This is the primary office for the Federal Monitor.  With me is Chief Sherry Kiyler.

And could I ask the three of you to introduce yourselves?

THE WITNESS:  Denise Callahan.

MR. SULLIVAN:  Robert Sullivan from Broening Oberg.

MR. POPOLIZIO:  Joe Popolizio on behalf of Jerry Sheridan in his official capacity as the Sheriff of Maricopa County.

MR. ANDERS:  And we have Major Al Peters on the telephone.

                    EXAMINATION

BY MR. ANDERS:

Q.   Denise, thank you very much for being here today.

Let me just give you a little bit of background.  First of all, I want to emphasize to you, you're in no trouble whatsoever; all right?  I'm not here in any way, shape, or form to find out what Denise Callahan may or may not have done wrong at all.  Quite frankly, Chief Kiyler and I are just trying to

46REPORT001477

4

get some -- and Chief Kiyler knows more than I do just really -- background information about processes like how do things worked at Conduct Resolution, how are documents supplied, who makes decisions, what's history on how cases get processed and so forth.

So for want of a better term, you're an encyclopedia and I'm just trying to learn some things from more than anything.  If you have any questions at all, please don't hesitate to ask or if you need any clarity from Chief Kiyler or Major Peters and I, just let us know.

A.    Okay.

Q.    You know Chief Kiyler.  Of course she is an icon in the Valley.  Everybody knows Chief Kiyler and we all wish there were many more Chief Kiylers.

Myself, I retired law enforcement after 32 years, state of California, and I came on the Monitoring Team in later 2014.  I was here I think about three years or so and then left the team.  I went to work for Apple and did a few other things and then came back in 2022.

So that's just a little bit of history about myself.

Let me just start off with this is -- you're a commander in Conduct Resolution; is that right?

A.    Yes.

Q.    And so what does that role oversee?  What are you responsible for as a commander?

A.   So I have four conduct analysts and we're responsible to receive the investigations from PSB once they are completed and preliminary findings are signed.

Q.   Okay.

A.   They come over to Conduct Resolution.  My staff reviews the investigations and we're looking for that the correct policies are cited and that they are the right version as far as the date, time frame, the incident occurred.  And we summarize the investigation basically in some type of -- depending on what the disciplinary -- where it falls in the matrix and the person's history, my staff will prepare the anticipated disciplinary paperwork.

Q.   Oh.  Okay.  All right.

A.   So if it fits in the matrix for a written reprimand, we'll prepare a written reprimand.  Of course that's just us reviewing where it fits in the matrix.  The Appointing Authority is ultimately the one that decides if he wants a written reprimand, if he wants it aggravated to a PDH letter or if he's going down to a coaching.  We just kind of have a base for him to go off of.

Q.   Okay.  Regarding the -- I think you said preliminary approval for discipline or finding in discipline, is that the PSB commander who signs off on that?

A.   Yes, correct.

Q.   So the commander would -- let's say Sergeant Don Anders in

6

PSB conducts an administrative investigation.  I complete my investigation.  My lieutenant is probably going to look at it, review it, have some questions.  I may make some amendments based upon what my lieutenant directs.  Ultimately it ends up on the desk of the PSB commander.

The PSB commander then at some point approved the investigation.  His staff or her staff will put together a package.  We have a sustained finding here so then would -- would their preliminary approval also include information about the matrix or is that something solely left to Conduct Resolution?

A.    It comes over to us without anything with the matrix.

Q.    It's just the package?

A.    It's just the findings are signed by the PSB commander, the completed investigation.  We do our review.  We pull the discipline history so that we know where it's going to fit into the matrix and what their priors are.

Once my staff has the final draft approved by me of whatever they have prepared, I've done my review, then I move it on to the conduct -- or the Administrative Services Division Director, my boss.

Q.    And who is that?

A.    Tiffany Shaw.

Q.    Tiffany Shaw.  Okay.

And then what would Tiffany do with it?

46REPORT001480

A.   She does a review also.  She kind of just verifies the same thing that I do.  She then reviews the matrix and has a consistent section within the matrix that we've used for different violations.  And she prepares an email to the PSB commander and lists out the policies and the allegations that are in the investigation and gives him the change of discipline, where it falls, and she sends it to him.

Q.   The PSB commander or the Appointing Authority?

A.   It goes to the PSB commander.

Q.   Okay.  Typically, then, what would the PSB commander do with that information?

A.   It's my understanding he reviews what's been prepared by Director Shaw.

Q.   Okay.

A.   And then he -- if it's a range, like if it's Category 5, 7, or 7, he'll pick whatever range that he believes it falls into.

Q.   Okay.

A.   And he sends the email back to us -- or back to Tiffany Shaw and I with his range of discipline.

So then that's what the Appointing Authority receives is that range of discipline that has been approved by the PSB commander and he reviews the investigation of that.

Q.   And would that be the first time then that the Appointing Authority -- so we're talking about Chief Holmes?

46REPORT001481

A.    Yes.

Q.    Would that be the first time then that Chief Holmes would see that --

A.    Correct.

Q.    -- complete investigation?

So essentially he is getting -- my term -- a package?

A.    That's correct.

Q.    Here is the investigation, here's the sustained finding, here's the range of discipline and then Chief Holmes would get it.

Then there's some coordination, right.  If it's stayed with discipline and warrants PDH, then there would be a PDH.  How does that PDH process come about?  What are the mechanics in that?

A.    So once we provide the full package to Ken Holmes, at that time we do -- if it's for PDH, then we set the date the day. And me and my staff will coordinate the employee to receive the PDH letter being served to them or the written reprimand or coaching and we set up the PDH.  It's typically within one week, the following Thursday is when we --

Q.    Oh, that's quick.

A.    Yes.  We move very quickly in Conduct Resolution.

So we set the PDH one week out and then the following week after that is the decision meeting after they hold the PDH.

Q.    Oh.    Okay.    All right.

So the PDH occurs.    Does that typically all occur in person or do people request Zoom or Teams or anything like that?

A.    It's primarily all in person.

Q.    In person, okay.

A.    I think we've offered a virtual PDH for some people that have had some difficulty in the past making it to the location. But we have not yet had a virtual PDH.

Q.    All right.    Do you go to the PDHs?

A.    I attend all of the PDHs if I'm there.

Q.    Typically -- and I know Chief Kiyler knows this, but typically who would be in attendance in their role at a PDH?

A.    So it's just the Appointing Authority and myself.

Q.    Okay.

A.    I'm there running the recording system and I introduce the employee to the Appointing Authority.    I kind of give them -- when I meet them in the lobby, I walk them through the steps of what they can expect when they come into a PDH.

Q.    Oh, good.

A.    And if they have any questions or if they have brought any written statements, they would like a copy to be made for the Appointing Authority.    I'll do all of that before we actually go into the room.

Q.    Okay.    These are video recorded?

A.    They are.

Q.    Does an employee principal, do they typically have any kind of representative or support or are they --

A.    If they would like to bring their assistant, they are allowed to bring an assistant.  I think -- I can't remember the exact date but a few years back we put it into policy that they are not allowed to have an attorney or another supervisor within the office.

Q.    Oh, okay.  No attorney?

A.    No.

Q.    Okay.

So PDH happens and Chief Holmes makes -- I think I heard -- after the PDH there's then another meeting or gathering that occurs.  What's that?

A.    So following the PDH, while the principal is still in the PDH, we set up the following week for them to return so that the appointing authority can give them his decision on his discipline.

Q.    So he'll do that in person as well?

A.    Yes.

Q.    Okay.  And if the Chief upholds the sustained and upholds or imposes discipline, what would occur at that point regarding the mechanics?

A.    So the employee comes in -- well, Ken Holmes will tell me what his decision is.

46REPORT001484

Q.    Okay.

A.    After the employee has already left from their PDH.  He reviews whatever they have provided.  He reviews the investigation again if he needs to.  He'll go back and review anything within the case that he needs to.  And he provides me with the decision that he's planning on moving forward with.

Q.    Okay.

So the employee comes in.  He advises the employee, it's sustained,let's just say hypothetically 40-your suspension.  How does that go forward then?  Does the employee get some formal notification from Conduct Resolution?  Does the actual time for the suspension to be served, how does that liaison happen between the office and the employee?

A.    So once the Appointing Authority let's us know what his decision is, my staff prepares a suspension letter or if it's no longer going to be a suspension and the Appointing Authority decides he's going to do a reprimand.  My staff will prepare that.  And in that letter, it's basically the exact same information that's in the PDH letter except for now it explains the time frame of suspension dates that they are going to serve their suspension and then Ken Holmes will serve that to them.

Q.    Oh.  Okay.

Do you coordinate at all -- let's say it's a sergeant in District 3.  Do you coordinate at all with District 3 to say, hey, this principal is going to serve 40 hours suspension.

46REPORT001485

12

Do you try to coordinate schedules like is this going to leave you short-staffed?  Is it a high vacation time or whatever?

A.    Yes.  So once we know which direction it's going to go, if it's 40-hour suspension, my staff will reach out to the chain of command of the employee and say the Appointing Authority is proposing that he -- it's a possibility that there may be a 40-hour suspension.  Will these dates work for you?

Q.    Oh, okay.

A.    So they get a confirmation from the chain of command that, yes, these dates work or no, they will not.  And we go -- we work with the -- we understand they are short-staffed so we work with them and try to keep it within two to three weeks to serve the suspension.

Q.    Do you ever get an employee to request dates to serve a suspension?

A.    We have, yes.  If we've already worked with their division, then -- it just depends on the reason why the employee is wanting -- like if they are going to be -- if they have block training.  If they have something going on, then we wouldn't have them serve a suspension during that time.

Q.    Some organizations around the country historically have allowed employees to essentially buy their suspension.  So if I get a 40-hour suspension, can I just donate 40 hours of my compensatory time or my vacation time?  So I'm still sacrificing the fiduciary penalty but not actually taking time

46REPORT001486

off from work.  And some organizations have actually allowed that.

Has that ever been -- I'm just curious.  It really has no relevance to this at all.  I'm just curious if that has ever come up in conversations.

A.   Not since I worked there, it has not.

MS. KIYLER:  May I ask a quick clarification?

MR. ANDERS:  Please.

MS. KIYLER:  If a decision is dismissal versus suspension, does the process change in terms of who does what?

THE WITNESS:  Yes.  So if the employee comes in for PDH and Ken Holmes' decision is dismissal, he does not set up a new decision meeting with them the following week.  We provide the information and the letters to the PSB and they handle serving the dismissal at their location.

by MR. ANDERS:

Q.   If Sergeant Don Anders is a principal, he's sustained, he gets a 40-hour suspension and he gets notice that next Thursday there's going to be the PDH, do I also get a package?  Do I -- before my PDH, do I get access to the entire PSB investigation?

A.   They are provided with the PDH letter which states in there that they can -- if they wish to review their investigation prior to their PDH, then they can contact my staff.  Then we -- if they contact my staff, we'll set up a meeting time for them prior to their PDH for them to come in

14

and review the entire investigation.

Q.    But they are not given anything?  Provided anything?

A.    They are not given anything, no.

Q.    So it's voluminous; right?  This is a major investigation. There are tens and tens of hours of videotapes, of interviews, and on-scene video.  Would that employee be accommodated in, "Listen, you just gave me seven days' notice.  My schedule just doesn't allow me to come in and look at this entire investigation before."  So there's some flexibility in scheduling to ensure that opportunity is provided?

A.    Right.  Yes.  If they request to come in and review their investigation, per policy they have up to eight hours to review it.  If they need more than that they can certainly request. My staff will just let them know if they need more time to put in a written request to me.

        And we can, you know, work with them.  Or if it comes down to they did not have enough time to review everything and they request a new PDH date, we'll certainly work with them on that.

Q.    Is anybody allowed to accompany them when they are doing the review?

A.    They are allowed to have an assistant.

Q.    An attorney?

A.    No.

Q.    A family member?

46REPORT001488

15

A.   They are allowed to have a family member, yes.

Q.   You know, many, if not virtually all, principals now will attend their interview at PSB with, for want of a better term, a representative, maybe an -- oftentimes a sergeant from Detentions or otherwise.  Could that individual accompany them when they review their PSB investigation?

A.   Sorry.  If they are not involved with the investigation, then, yes.  If it is an office supervisor, they are not allowed to.

Q.   Okay.  It probably rules against if you're watching a videotape of an interview, you can't pull out your phone and videotape what it is you are observing?

A.   That's correct.

Q.   Okay.

     So advancing forward, Sergeant Kiyler completes her 40-hour suspension.  Sergeant Kiyler is also noticed that she has a right to appeal to the Maricopa County Merit Commission.  How does Sergeant Kiyler go about that if in fact she wants to appeal?

A.   So in the suspension letter or dismissal letter that they receive, there is instructions on the package that explains to them what they need to do, which is file a request for an appeal through the Maricopa County Merit Commission.

Q.   So that would go to the Commission --

A.   Yes.

46REPORT001489

16

Q.    -- where they file the appeal?

A.    Yes.

Q.    Is there a timeline, ten days or so?

A.    Ten calendar days.

Q.    Okay.

So Sergeant Kiyler files that appeal with the Merit Commission.  In the meantime, she serves her 40-hour suspension as well.  And I'm going to circle back to an actual case here. I'm just talking hypothetical now.

And Sergeant Kiyler is preparing for her hearing with the Merit Commission hearing officer but now she doesn't want to just look at her case.  She wants the case, right.  She wants hard copies, videos on a thumb drive or a compact disk if they even use those any more.  She wants the whole shooting match so that she can prepare.

How does Sergeant Kiyler get that information?

A.    So also included in their decision, suspension, dismissal letter, there's instructions if they would like a copy of their investigative file.  They put in a request to Director Tiffany Shaw.  Should Tiffany Shaw get that, she let's me and my staff know and we prepare the investigative file to provide it to the employee.

Q.    Okay.  And then how would it typically be provided to the employee?  And what I mean, is it, like, just hard copies of documents and video and audio loaded on thumb drive and

photographs reproduced and it's sent to them via UPS, or is it a hard copy package as I described and they are required to come and pick it up?  Or is it all electronic and sent to them in a link or via email?  How does that conveyance of the case occur?

A.    So it's typically put onto a disk or a thumb drive depending on the size.

Q.    Okay.

A.    And we reach out to the employee or the former employee and we just advise them that it's ready for pickup.

Q.    M'hum.

A.    And sometimes they have their attorney that wants to come pick it up.  Sometimes they will pick it up from us.

I don't know that we've had a request to mail it out. Normally it's just picked up from us.

Q.    Yeah.  So where is that case, all of that information we just talked about, everything from beginning to end that is now going to be provided to Sergeant Kiyler as she prepares for the Merit Commission hearing, where is all of that archived?  Where does your staff get access to -- where do they find it?

A.    IAPro.

Q.    It's in IAPro?

A.    Yes.

Q.    And this would be the same IAPro that PSB has access to?

A.    Correct.

46REPORT001491

Q.   So essentially you're going -- you're using the same software program, the same repository, just somebody logs in with a password and gathers all of that information that is logged into that case number and prepares it and ultimately provides it to the employee?

A.   That's correct.

Q.   Okay.  Are there restrictions with IAPro?  Even though somebody has access to IAPro, they may not have access to everything in IAPro; is that right?

A.   That's my understanding.

Q.   There are administrative walls within IAPro as well?

A.   Yes.

Q.   And I'm sorry, I think you said this but once that request comes in from the employee to Tiffany Shaw that ultimately makes its way to a staff member or members in Conduct Resolution with a request to gather everything and let's coordinate with the employee?

A.   Yes, that's correct.

Q.   Okay.  Great.  Good.

     How long have you been with the Sheriff's Office?

A.   27 years.

Q.   And how long with Conduct Resolution?

A.   Well, since 2005 was my first transfer to Conduct Resolution.

Q.   Okay.

A.   And, I mean, I was transferred out and then put back in there.

Q.   Okay.

A.   Would you like me to go through that?

Q.   Oh, no, that's fine.  Yeah.

So let's just say in an average year, let's take the year 2024, about how many Merit Commission appeal requests on average do you think?  Is it like three or is it like 30?

A.   It's less than ten typically.

Q.   Less than ten?

A.   Right.

Q.   All right.

So I wanted to talk about a specific case and I'm sure you're familiar with it.  It's a case involving Sergeant Engelbeck.

A.   Okay.

Q.   So the history, as I understand it, is Sergeant Engelbeck was -- a complaint was filed a few years ago.  Ultimately the investigation culminated in 2024.  There were some sustained findings.  It ultimately went to PDH with Chief Holmes about August of 2024.  There was some shifts or changes with regards to findings but ultimately there was at least one sustained finding, possibly more -- I honestly couldn't tell you exactly what -- that resulted in a 40-hour suspension.

So then Sergeant Engelbeck was, in fact, suspended.

He served 40 hours of suspension but did file a notice he wanted to appeal to the Merit Commission.

And then made a request to be provided everything in his investigation and, in fact, received the investigation. But what he has alleged is there is at least one piece of that investigation that he was not provided which was an audio and video of an interview in which he was the principal in that interview. And so he has expressed concerns with regards to this interview being omitted from what he was provided.

And so I guess I'll start with, are you familiar with any of that? Do you recognize any of that at all or is this the first time you're hearing this?

A.   I'm familiar with the case of Engelbeck.  I mean, I'm not familiar with the exact details of everything but certainly remember the case.

Q.   Yeah.  Not really important.

And so just thinking about that process, if, in fact -- I'll just call it the interview.  If, in fact, the interview was part of the IA file in IAPro, would that typically be provided to somebody who was appealing?

A.   Yes.

Q.   It would?  Okay.

In this particular case, the Merit Commission hearing was initially scheduled for late January and then it was rescheduled for early February.  Prior to the Merit Commission

hearing actually occurring -- and I think it may have even been the day before -- Sergeant Engelbeck was notified that the discipline that he had served was being essentially revoked or rescinded and he was being made whole and that he would be -- he would be provided recompense for the 40-hour suspension and, in fact, the finding in the case was changed as well.  It was no longer considered sustained.

Do you have any history or any knowledge of that, that process?

A.   Well, yes.  I mean, the Appointing Authority made the decision for that to occur so my staff, or mostly me, would probably be working between preparing a document or contacting the employee to sign something to make that happen --

Q.   Okay.

A.   -- once we were given that decision.

Q.   Can you just take some time and just explain to Chief Kiyler and I kind of how no decision came about, what you know of that, kind of a timeline and how Conduct Resolution became aware and Chief Holmes' role in that mix and how it eventually came to Sergeant Engelbeck getting this notification?

A.   Certainly.

So after his appeal, Ken Holmes will communicate with either myself or the County Attorney that's assigned to the appeal and make some discussion over which direction they are going to go with the appeal.

46REPORT001495

22

Q.   M'hum.

A.   I'm not involved in those conversations between Ken Holmes and the attorney so I don't know what they have discussed.

And Ken Holmes let's me know if there's going to be a change in anything and I just kind of facilitate and coordinate the paperwork.

Q.   So it sounds like he may very well have followed the process and that is liaise with the County Attorney.  A decision was arrived at somehow.  You don't know how that decision was arrived at?

A.   Yes.

Q.   But Ken Holmes then notifies you essentially we're going to rescind or revoke the discipline and we're going to change the finding in this case?

A.   Yes.

Q.   And then you facilitate that paperwork.  Are you then responsible for sending the letter to Sergeant Engelbeck in this case or where does that letter come from?

A.   I think the County Attorney -- you know, I can't really remember on this particular one which direction it was.

Q.   Sure.

A.   In the past I've provided the employee with it or I've had them sign their paperwork.  And I'm thinking in the past the County Attorney has also done the same thing.

Q.   Yeah, okay.  It sounds like you haven't been informed or

46REPORT001496

told we're revoking the discipline and changing the finding but nobody's told you why, just this is the decision?

A.    I don't know the exact reason why.  I do know the different information in the investigation was discussed and reevaluated and looked over.  So, I mean, I understand they were looking into it to take another look at it, which is very common.  We do that with everything, we triple and double-check everything.

So then Ken Holmes and the attorney come up with whatever decision they want us to go and . . .

Q.    So based upon a reconsideration of the PSB package, but it sounds like it has not been explained to you what the justifications was, in other words, what changed.  Hey, we took a look at the package and we found that, in fact, hey, there's a video that exonerates Sergeant Engelbeck or something of that nature?

A.    Well, certainly Ken Holmes and I will talk because we're very intertwined with this together.

Q.    M'hum.

A.    But he's just -- we're just kind of rehashing.  I'm helping him find things in the investigation or discussing it with him.  If he has a question, I'll find it for him or provide him with a document or a video or something for him to review.  But the decision itself, he's just voicing what he's reviewing to me.

46REPORT001497

Q.    Do you know why Ken Holmes made the decision?

A.    For?

Q.    To reverse the suspension and reverse the finding in the case?  I mean, I know it's based upon his re-review of the case.

A.    Sure.

Q.    But what did that review reveal?  What was the justification for the dismissal or reversal?

A.    So from what I can remember is the initial memorandum that discussed any misconduct and request for a demotion was all contained in the same memorandum.  And it was not separated. So initially he was demoted I believe in 2020 and it was based off of performance problems.

Q.    I think it was a probationary demotion.

A.    Yes.  There was also contained some misconduct allegations within that memorandum.  So it's my understanding that the misconduct portion of it was separated from the demotion part of it, and Ken Holmes took that into consideration.  Once it's going through the appeal process, that it was all in the same memorandum.  So it's my understanding that that is kind of the direction he was looking at is it was all together.

        So he got a demotion.  We need the 40-hour suspension on top of the demotion.

Q.    So in retrospect, it sounds like Chief Holmes may have viewed the probationary demotion as punitive in addition to the

46REPORT001498

25

40-hour suspension?  Would that -- and I don't want to put words in your mouth if I'm misinterpreting it.

A.    The demotion is not punitive.  It's based off of a performance issue.

Q.    Right?

A.    So the misconduct was addressed through the 40-hour suspension.

Q.    So forgive me.  I'm just not quite understanding.  So the original memorandum, complaint memorandum, incorporated information, one, about the probationary demotion and also included information about whatever the PSB complaint about; is that right?

A.    It was -- yes, it had a lot of information in it.

Q.    And so is -- in retrospect, is consideration that, well, because the probationary demotion and the complaint information were all in the aggregate in one document, that this may have unduly influenced Chief Holmes in the PDH that he actually should have been kept naive or part and parcel from the probationary demotion?  That's the part I'm trying to understand, is how was the blending of these two a factor in the rescinding or the reversal?

A.    I'm not sure exactly his thoughts on that.  That is from just the questioning and our discussions and preparing stuff to him, you know, him going over the memorandum.  That's what we discussed.

46REPORT001499

Q.   Okay.

A.   His final decision, I don't know if that was what ultimately caused the rescind the discipline.

Q.   Okay and.  I would not ask you to speak for him.

A.   Okay.

MS. KIYLER:  May I ask a follow-up question?

MR. ANDERS:  Yes, please.

MS. KIYLER:  Who writes the justification document?

THE WITNESS:  Ken Holmes.

MS. KIYLER:  He writes it himself?

THE WITNESS:  Yes.

MS. KIYLER:  Okay.  Thank you.

BY MR. ANDERS:

Q.   In this case involving Sergeant Engelbeck, do you know was he, in fact, provided the PSB package when he requested it?

A.   So I don't know if it actually went out to him.  I know that my staff prepared it once we found out that he is requesting it.  My staff immediately starts working on it.

Now, from my recollection, Engelbeck was on vacation when my staff reached out to him.  He asked if he could pick it up when he got back.  I don't recall, you know, following up with my staff, if Engelbeck picked it up from him; but I do remember several attempts being made to research out to him to come in and get it, that it was ready for him.

Q.   Okay.  Would there be a log or a record anywhere

46REPORT001500

representing case notes or anything similar that would represent on this particular date and time Sergeant Engelbeck and/or his representative, in fact, did pick up the package?

A.    We do not have a log of that.

Q.    Okay.

Do you know if this audio/video interview that he references, do you know if, in fact, that was provided to him?

A.    I don't know what he was provided but I know that my staff is directed to pull everything out of IAPro and provide it to the employee.

Q.    Would there be any sort of a record that would represent when your staff accessed IAPro and gathered or essentially downloaded, transferred the information in IAPro in preparation for Sergeant Engelbeck?

A.    There is a user log in IAPro and that would be the way to be able to tell.

Q.    So if IAPro were accessed and we wanted to know when did John Doe and Conduct Resolution access case 2020-0555 in preparation for providing that to Sergeant Engelbeck, that would be logged in the user log?

A.    Correct.

Q.    And do you know would it be at such a granular level that the log would record that, in fact, John Doe and Conduct Resolution gathered everything associated with it or is it just a drop and drag sort of a transfer?

46REPORT001501

A.    I don't know what the user log says, whether it says opened it or were downloading it.  I don't know what the user log would say.

Q.    Okay.  If I -- if I, meaning I'm a chief officer in the Sheriff's Office, and if I wanted to know the case, I wanted to read the case, I wanted to see all of the evidence.  I wanted to look at photos, I want to see closed circuit TV recordings.  I wanted to listen and review the audio interviews associated with Sergeant Engelbeck's case, where would I find all of that?

A.    Who are you asking me would --

Q.    Where would I find that?  If I were a chief officer and I said, "Hey, I would like to look at the Engelbeck case.  I would like to look at all of the evidence associated with the Engelbeck case," where would I find all of that information?

      I guess what I'm getting at is, I could go to IAPro, is that right?

A.    That's correct.

Q.    It would all be housed or archived in IAPro?

A.    Yes.  If you have access to IAPro, then, yes.

Q.    Then I could access it?

A.    That's correct.

Q.    Could I call you and say, "Hey, Denise, this is Don over here in" -- wherever.  "Listen, I'm not very familiar with IAPro, because I just don't use it all the time.  Could you access case number 2020-0555 for me and tell me if this and

this exists in IAPro?"  Is that something that you could do?

A.    For who?

Q.    For me as a chief officer in the organization.

A.    Like a Deputy Chief?

Q.    Yes.

A.    Yes.

Q.    Would Tiffany Shaw be able to do that if I called Tiffany, if I were a chief officer in the organization?

A.    Yes.  She has access to IAPro.

Q.    Okay.  All right.  So for somebody that is skilled in IAPro, not a difficult thing, just if I said, "Hey, I think there was a memo in a particular case that I really would like to take a peek at that memo," I could call you or I could call Tiffany or I'm sure virtually anybody in Conduct Resolution say, "I'm really clunky when it comes to use of IAPro, could you go in there and get there for me?"

        And you would be able to do that, as long as it was authorized and appropriate to do so?

A.    Yes.

Q.    Mechanically you could get it and do it?

A.    Yes.

Q.    Okay.  Great.

        If, in fact, Sergeant Engelbeck did not get this audio and video recording that he says was omitted in what was provided to him, do you have any explanation why he would not

46REPORT001503

have been provided that audio or video interview?

A.    So when there's a lot involved with an investigation and there's hours and interviews, sometimes when they are downloading there may be a glitch.  They may have a blank file.  If it's not caught on our end before we provide it to them, the employee or their attorney will say, "This is what we're missing."

We'll say, "No problem.  We can pull it for you again or recopy it for you," and provide it to them.

But if it's not provided on our end, it's not intentional.  We don't withhold anything.  We just -- there may be an accidental, you know, blank file for some reason.

Q.    Of course.  Technology; right?

A.    Yes.

Q.    How many times has this happened that you're aware of where there's been a request like, "Hey, we asked for but it seems like it's missing something in what we asked to be provided"?

A.    It doesn't happen very often.  But I would say probably three to four times in the last decade, 10 years.

Q.    Is that right?

A.    Yeah.  It's not very often.  We're pretty thorough.

Q.    But it has happened?

A.    It has, yes.

Q.    There has been some speculation expressed to the

46REPORT001504

Monitoring Team that perhaps Sergeant Engelbeck was not provided the interview that he says was omitted because a decision was made to reverse the discipline and reverse the finding and so thus there wouldn't be any merit hearing, Merit Commission hearing, so there would be no reason to provide him with what it was he requested.

I don't posit that.  That's just something that has been expressed to us.  Does that make any sense to you at all?

A.    No.

Q.    Is that a possibility?

A.    The investigative file was more than likely provided to him way before --

Q.    Well before?

A.    -- we knew of a decision that would be --

Q.    If in fact he picked it up.

A.    That's right.

Q.    Okay.

MR. ANDERS:  Do you have any questions with regards to that particular case?

MS. KIYLER:  I just have one question about justification documents.

If there is an initial decision and it's sustained and we're going to move forward with discipline, whatever, there is a justifications document that's prepared?

THE WITNESS:  That's correct.

32

MS. KIYLER:  And then when a decision is later made that that decision is going to change, there would be a second justification document?

THE WITNESS:  There's typically an amended justification, yes.

MS. KIYLER:  So should both the initial justifications and the amended justifications be in the file?

THE WITNESS:  Yes.

MS. KIYLER:  Okay.  Thank you.

THE WITNESS:  The only other area would be, like, on the final findings, that he may make a note in the final findings.  If he doesn't provide a justification, then it's noted on the final findings that were changed.

MS. KIYLER:  Okay.  You just confused me.  I'm sorry.

THE WITNESS:  I'm sorry.

MS. KIYLER:  So initially it's sustained, goes to PDH, decision is made for a suspension.  A justification document is authored justifying that decision?

THE WITNESS:  That's right.

MS. KIYLER:  Okay.  Person serves their suspension and then appeal.

THE WITNESS:  Yes.

MS. KIYLER:  As in the Engelbeck case.

Upon reconsideration, the decision is changed.  Is there a second justification document done?  Should there be

33

two in there is what I'm asking?  The first one, this is why we did this; and then the second one, this is why we're not doing this?

THE WITNESS:  I would like to say yes.  I don't know that we've done that.  We're fine-tuning things as years go by but in the past, I don't remember or recall if he always did a second justification.  There's some kind of explanation either on the findings or the justification.

MS. KIYLER:  But there is a second justification.  It's in the file.

THE WITNESS:  Okay.

MS. KIYLER:  But I'm looking for the first justification that would have justified the initial decision.

THE WITNESS:  That one should be in there.

MS. KIYLER:  Okay.

THE WITNESS:  I'm sorry.

MS. KIYLER:  Thank you.

BY MR. ANDERS:

Q.   So, Denise, it sounds like the Appointing Authority has the decision, has the authority to reverse not on the discipline but the finding when that original finding and discipline under appeal --

A.   Yes.

Q.   -- as in this case?

So Chief Holmes sustains, 40-hour suspension.  It's

under appeal.  Prior to the merit hearing, appeal hearing itself, he has the authority to say, "We're going to walk this back and we're going to change my finding and change it," and he has the authority to do that?

A.    That's correct.

Q.    Do you know, does the Maricopa County Attorney, do they have the authority to do that or are they -- do they provide counsel to the Appointing Authority?

A.    It's my understanding he provides legal advice.

Q.    Advice, okay.  But attorney, the Maricopa County Attorney could not autonomously say -- basically give direction to the office that, "You're going to change that finding and that suspension"?

A.    No.

Q.    Are you aware of any other cases where this has happened? Where virtually the same exact scenario, sustained finding, discipline, discipline served, the employee files for a merit hearing appeal process and then prior to that, it's been reversed?

A.    That's correct, yes.

Q.    How many times has this happened previously do you think?

A.    I don't have an exact number of how many times.

Q.    And so I'm not going to hold you to the number but like twice or 30 times?

A.    In what kind of time frame?

Q.    The time you've been in Conduct Resolution.

A.    Maybe five times.

Q.    And what's a typical reason?  Is there a common reason or is every one unique to its own circumstances?

A.    So it is unique to its own circumstances.  And certainly once the County Attorney receives the entire package from us and looks through things, he'll provide the Appointing Authority with his legal advice and they make that decision together.

Q.    Okay.  So I want to shift gears on you just slightly.

A.    Okay.

Q.    Let's suppose that it is -- we have Sergeant John Doe who, in 2010 was a principal in a PSB investigation, was sustained, served a 100-hour suspension and now it's 2024.  Is it possible -- are there any authorities that would allow anybody to go back and change that finding and make that employee whole with regards to the suspension they served essentially 14 years later decide, "I want to change that discipline.  I want to change that sustained finding to unfounded or not sustained"?  Do you know of any authority that allows anybody within the organization to do that?

A.    No.

Q.    Do you know of that ever having been done before in your time with the office?

A.    No, I do not.

46REPORT001509

Q.   Are you aware at the present time of any commander or executive officer in the organization giving consideration to reviewing and potentially changing what I'll call aged findings in discipline cases?

A.   No.

MR. ANDERS:  Major Peters, do you have any questions of Ms. Callahan?

MR. PETERS:  Actually, I do, Chief.  If I could.

And I'm just trying to understand a little bit better the timing of some correspondence because, Commander, it seems to me that you and the Appointing Authority work closely together.

But what I'm wondering, if you could just kind of enlighten me a little bit on, is it customary for suspension letters to go out from Conduct Resolution prior to any final decision or anything received and documentation form from the Appointing Authority?

THE WITNESS:  Are you asking if my staff would send out the rescission without getting the approval from the Appointing Authority?

MR. PETERS:  Well, I'm asking if one document from the Appointing Authority supports the creation and forwarding of another -- like a rescission letter.

THE WITNESS:  I'm sorry.  I don't understand the question.

46REPORT001510

MR. PETERS:  Okay.  In other words, would -- is it common practice for a rescission letter to go out to either the County or -- and/or the subject prior to Conduct Resolution receiving a final findings or disposition document from the Appointing Authority?

THE WITNESS:  With the authorization of the Appointing Authority, we would be able to provide the employee with the rescinded document.

Ken Holmes is only at MCSO typically once a week, so it would be the following week that he would provide me with his justification or sign the final findings.

BY MR. ANDERS:

Q.   But he could tell you verbally prior to you receiving?

A.   Yes.

Q.   Because he could say, "Here's what my decisions is.  Here's what I'm going to do.

A.   Yes.

Q.   But, "I got another appointment.  I'll see you next week and I'll give you my justification in writing"?

A.   That's right.

Q.   Okay.

MR. PETERS:  So that would account for a difference of dates in terms of one document going out, one document coming in.  Okay.  I understand that.

If the Appointing Authority -- I mean, you cited that

46REPORT001511

you probably only had maybe five cases reversed in your tenure there.  Would you know if the Appointing Authority was considering reversal and the case was coming up for a hearing, it was actually scheduled for a hearing, would the Appointing Authority reach out to the Merit Board and possibly postpone that hearing?

THE WITNESS:  He would work with our attorney that's assigned to that and they would discuss whether they need to push the appeal date out, but I don't believe that the Appointing Authority reaches out to the Merit Commission personally.

MR. PETERS:  Okay.  To follow up to Chief Kiyler's question about having two justifications in the case file, would it be -- and, again, I recognize that this doesn't happen frequently and there may not be any sort of a type of pattern that you could point to, but -- now I lost my train of thought actually.

Would the documentation and in particular this justification letter, have you seen them where dates would just simply be crossed out and altered?

THE WITNESS:  Yes.  If there's a typo on the justification and me and my staff will catch it, we'll let the Appointing Authority know and either he will prepare a new document or he will put a cross through the document and typically initial it.

46REPORT001512

MR. PETERS:  What about if there was no typo, no grammatical error whatsoever.  It was just simply a change to the decision that had already been indicated on that particular worksheet?

THE WITNESS:  Would it be crossed out?

MR. PETERS:  Yeah.  Would it be customary for that to be crossed out or would there be a second document to support the second finding?

THE WITNESS:  I don't know for certain if Ken would do that or provide a second document.  I just don't recall on all the different cases which direction he went with it.

MR. PETERS:  Okay.  When we talk about counsel providing legal opinion to the Appointing Authority, which counsel are we speaking about?  Are we talking about defense counsel?  Are we talk About County counsel?

THE WITNESS:  It's County counsel.

MR. PETERS:  So have you seen instances where the County counsel would advise the Appointing Authority that, "You know what, we don't really need a hearing on this.  It doesn't look like it would be a good thing to do"?

THE WITNESS:  That's legal advice between Ken and our County Attorney that I believe they discuss together, yes.

MR. PETERS:  Okay.  Even if they discussed it together, if that sort of language appeared on case documents -- and I mean Conduct Resolution case documents --

46REPORT001513

40

would that be open knowledge?

THE WITNESS:  Open knowledge to --

MR. PETERS:  In other words, anybody could read it. The file is open; right?

THE WITNESS:  I'm not exactly sure what you're talking about.

MR. PETERS:  Well, again -- and I know we're sensitive to attorney-client privilege and those discussions that take place between them.  But if that particular language appeared, say, on a justification or a final disposition form, I mean, it would be common knowledge to anyone who read that; right?

THE WITNESS:  Oh, yes.

MR. PETERS:  Have you seen -- have you seen many cases where the Appointing Authority would list on their final disposition form that the -- and this language so I'm not even sure if it would be something on different forms or if it's just in this particular case.  But the language such to the effect that advising someone that this would be a deviation from the disciplinary matrix?

THE WITNESS:  I don't know what the question is.  I apologize.

MR. PETERS:  On the final decision forms, the Appointing Authority usually lists out the different reasons for making their decision; right?

46REPORT001514

THE WITNESS:  That's correct.

MR. PETERS:  Okay.  So if they listed all of these reasons and then down at the bottom in the summary there they put a statement where it says:  This is a deviation from the disciplinary matrix.

THE WITNESS:  Yes.

MR. PETERS:  What would that mean to you?

THE WITNESS:  That would mean that the Appointing Authority is not following what the presumptive range of discipline is and he's deviating from that.

MR. PETERS:  Does that happen frequently?

THE WITNESS:  It's not frequent, no.

MR. PETERS:  In your tenure there, about how many times has that happened?

THE WITNESS:  Probably ten times if I had to guess.

MR. PETERS:  So approximately once a year since you've been there?

THE WITNESS:  It's possible that there may be more: Just -- I don't recall them all so I don't want to be stuck to a number.  I can't recall.

MR. PETERS:  Would that send up any sort of discussion between Conduct Resolution and the Appointing Authority just for further understanding of what was intended by the statement?

THE WITNESS:  Basically, the discussion would be Ken

46REPORT001515

Holmes advising us the direction that he would like to go so we know which documents to prepare.

MR. PETERS:  Okay.  When you say "us," are you referring to you and your folks?

THE WITNESS:  Yes.  Conduct Resolution and my staff.

MR. PETERS:  Okay.

Chief, I believe that's all I have.

MR. ANDERS:  Thank you, Major.

BY MR. ANDERS:

Q.   Denise, I apologize.  I wanted to just follow up with another question or two.

When we go back and talk about the merit hearing appeal process, so Sergeant Jane Doe has served their suspension but they have filed for a hearing with the Merit Commission, what role does PSB have in that as far as the mechanics of preparing for the merit hearing process?  More specifically, does Sergeant Jane Doe obtain her PSB package, investigation, evidence from PSB?  Would PSB provide to it Jane Doe?

A.   The employee requests the file to appeal through Director Shaw.  Then we provide the investigative file if they have requested it.  And PSB's role is basically handled.  If they are going to be called as a witness, our County Attorney will provide them with an exhibit book.  But that's all that I'm aware of that PSB is involved in the Merit.

46REPORT001516

43

Q.    So is my understanding correct that with regard to the merit hearing process, PSB has really nothing to do with that --

A.    That is correct.

Q.    -- other than they may provide testimony?

A.    That's right.

Q.    Or may somehow engage County counsel in preparation for their testimony?

A.    Yes.

Q.    But PSB would not have responsibility for ensuring the principal, the employee, gets all of their documents?

A.    That's right.

            MR. ANDERS:  Anything, Chief?

            MS. KIYLER:  I'm good.  Thank you.

            MR. ANDERS:  Denise, thank you very much for your time today.  I appreciate it very much.  I know your time is valuable.

            We're going to go off the record now.  The time is approximately 10:31 a.m.

            (Proceedings concluded at 10:31 a.m.)

46REPORT001517

44

C E R T I F I C A T E


        I, ELAINE M. CROPPER, Registered Professional

Reporter, certify that the foregoing is a correct transcript,

to the best of my skill and ability, produced via machine

shorthand from the audio/video recording of the proceedings in

the above-entitled matter.


        DATED at Phoenix, Arizona, this 10th day of November,

2025.


                                s/Elaine M. Cropper

                                _____

                                Elaine M. Cropper

46REPORT001518

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with TIFFANY SHAW

April 22, 2025


_____




Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com




Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001519

2

## TRANSCRIPT OF INTERVIEW WITH TIFFANY SHAW

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY,
NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001520

                    P R O C E E D I N G S

        MR. ANDERS:  April 22, 2025.  The time is approximately 2:45 p.m.  We are in the Monitor's conference room on the sixth floor of the Luhrs Tower in downtown Phoenix, Arizona.

        Present with me in the room is Chief Kiyler, and also in the room, I'm going to ask each individual to identify themselves, please.

        MS. SHAW:  Tiffany Shaw with the Sheriff's Office.

        MR. HOLOHAN:  Brian Holohan.  I represent the witness.

        MR. POPOLIZIO:  Joe Popolizio on behalf of Gerard Sheridan, the Sheriff of Maricopa County, in his official capacity in this lawsuit.

        (Phone ringing.)

        MAJOR PETERS:  Can you hear me?

        MR. ANDERS:  Hello, Major.  Yes, we have you and the call dropped.

        MAJOR PETERS:  Okay, Chief.  Thank you.  I can hear you loud and clear now.

        MR. ANDERS:  Great.  Thank you.  Also present in the room by phone is Major Peters.

                        **EXAMINATION**

BY MR. ANDERS:

Q.   Ms. Shaw, is that --

46REPORT001521

A.    Yes.

Q.    First, thank you for being here.

A.    Sure.

Q.    Very much appreciate it.  And I just want you to know from right from the beginning, you're not a principal.  You're not a subject.  You're not being investigated in any way, shape, or form.  There's absolutely no concern that you've done anything inappropriate or wrong whatsoever.

A.    Okay.

Q.    Really, we invited you here, we're trying to learn a little bit more about process and also about communication.  I know you had a conversation with Chief Palopoli regarding a particular case and I just wanted to talk about that a little bit as well.

A.    Okay.

Q.    But starting just with yourself, how long have you been with the Office?

A.    So I have been with the Office for 33 years.  I have been in my current position for probably about 20 years.

Q.    Oh, wow.  Fantastic.

A.    Yes.

Q.    And what is your current position?

A.    I'm the Director of the Administrative Services Division.

Q.    Okay.  And in general terms, what does that mean?

A.    So I have three different sections that report to me.  I

46REPORT001522

have the Policy Development Section, I have the -- it's just recently changed.  It's the Public Records and Request Management Section, formerly the Legal Liaison Section.  And then I have Conduct Resolution.

Q.    Okay.  So you have a lot of moving parts.

A.    I do.

Q.    Yes.  Absolutely.  My goodness.

And you have been doing that 20 years?

A.    Yes.  I mean, it's gradually -- they have added more to me over that 20 years ago.  I didn't just walk into the position with all of those sections.

Q.    Yeah.  Oh my goodness.

A.    Yeah.

Q.    So if I'm the Sheriff, I hope you never leave.

A.    Ha.  Ha.  Well . . .

Q.    I don't know how you get somebody to replace somebody who has been doing that for 20 years.  That's got to be a challenge.

I wanted to learn a little bit more about PDH processes and cases being overturned, what happens with merit hearings and things of that nature.

A.    Okay.

Q.    And this relates to a case involving a Sergeant Engelbeck.

A.    Okay.

Q.    And you may or may not be familiar with the case.  But

46REPORT001523

Sergeant Engelbeck was principal in a case going back to 2020. That case concluded in PSB in 2024. Chief Holmes conducted a PDH in August of 2024. He upheld a sustained finding, 40 hours of discipline was administered. Sargeant Engelbeck served the 40 hours of discipline.

Sargeant Engelbeck also capitalized on his right to appeal to the Merit Commission. He filed documentation in order to get all of the documents and investigation that would be afforded him legally.

And so I just had some questions about process, not necessarily specific yet to Sargeant Engelbeck.

When a principal, let's just say a principal that is Sergeant Kiyler, and she's served 40 hours suspension but she's going to go to the merit hearing -- Merit Commission for appeal. How does Sergeant Kiyler request the PSB investigation and all -- all evidence, all indicia, all audio, video, all photographs? How does she make that request?

A.    She submits a request in writing to the Conduct Resolution section. It's outlined in their PDH, their discipline letter that they get.

Q.    Okay. So it's pretty clear that, if you want it, if you're going to do it, this is how you would do it?

A.    Yes.

Q.    So it goes to Conduct Resolution and what happens when Conduct Resolution gets it?

46REPORT001524

A.   They work together the records and by statute, we have 14 days to get it to the employee.

Q.   Okay.  And typically how -- physically how does the employee, the principal, get it?  Do they -- is it common just to come pick it up?  Does it get mailed, UPS, electronically via email?  Any idea how that's done?

A.   I think it's done however the employee requests.

Q.   Okay.  In Sargeant Engelbeck's case, he has expressed concern about a particular interview that apparently was audio and video recorded in PSB.  He is saying that was omitted when he was provided documentation regarding this case, that interview was omitted.  He didn't get it.

If an appellant came to you and said, "Hey, I'm concerned.  I made a request and I got just about everything but I'm missing -- I'm missing an interview," what would be your immediate thoughts about possibilities about why they didn't get the interview?

A.   I would say that it was a clerical error and we would work to get them whatever they think they are missing.

Q.   Okay. Okay.  Have clerical errors occurred in your 20 years in your role?

A.   Of course.  It's human nature to make errors.

Q.   "Clerical error" meaning an oversight or a mistake?

A.   A mistake, yes, where they thought they had pulled everything and that one didn't download for whatever reason.

46REPORT001525

Q.   Okay.  Has there ever been a -- my term -- glitch in technology, like we did it but it just didn't do what we asked the software to do?

A.   There's always a possibility for that.

Q.   Okay.  When a principal decides to appeal to the Merit Commission and they file the request for documentation from Conduct Resolution, does that request also go to PSB?  Is PSB required to provide the appellant the principal documentation?

A.   No.

Q.   Is Conduct Resolution essentially the single point of contact for the appellant?  Is that kind of how it works?

A.   It would be us for gathering the records and then if they have additional questions, they can always either talk to their attorney if they get one or the County Attorney that is going to be representing the Sheriff's Office.

Q.   Okay.  Conduct Resolution -- and I don't want to put words in your mouth or speak for you, but Conduct Resolution wouldn't get the request and reach out to PSB and hypothetically say, "Hey, Lieutenant Porter, make sure you get the case to the appellant"?

A.   No.

Q.   It would be Conduct Resolution that does it?

A.   Yes, unless there was some reason that something wasn't downloaded that we knew about.

Q.   Always an exception?

46REPORT001526

A.   Yes.

Q.   So the envelope of a PSB case, such as an administrative case that sustained and a 40-hour discipline imposed, all of that indicia, all of the evidence, interviews, everything, where is that located?

A.   In IAPro.

Q.   Conduct Resolution has access to IAPro?

A.   Yes.

Q.   So you have people who are trained and whose responsibility is when this request comes in, they then access IAPro, gather it, and then figure out a way to convey that to the requester?

A.   Yes.

Q.   Is there ever a record, for instance, Sergeant Kiyler makes a request for her case and she comes down and picks it up.  Is that logged somewhere?  Is there a record anywhere that Sergeant Kiyler at 1530 hours on April 22 retrieved the package that Sergeant Kiyler requested?

A.   I don't know if there is one or not.

Q.   Okay.  In this case with Sergeant Engelbeck, what happened was prior to his hearing the hearing -- was initially scheduled for I believe late January, then it was rescheduled for early February.  And very shortly before the hearing was scheduled to occur, he received notice that the suspension was being rescinded and that he was going to be made whole and

essentially paid back or recompensed for the suspension that he served and that the finding was going to be changed. It was no longer going to be sustained.

Do you have any knowledge about how that came about, how that decision occurred?

A. It would have been discussions between the appointing authority and MCAO.

Q. So retired Chief Holmes?

A. Yes.

Q. And MCAO-designated attorney?

A. Correct.

Q. Okay. Did you ever have opportunity to learn of an explanation about why that case was -- why the discipline was rescinded and the case was reversed?

A. Do I know why it was --

Q. Yeah. Did you ever come to learn, like, hallway conversation or Chief Holmes mentioned, "Hey, here's why I decided to go ahead and reverse this sustained finding"?

A. No. The only thing I would have seen is the justification form that Chief Holmes filled out, and then there was some attorney-client privileged emails that went back and forth.

Q. Yeah. Okay. Great.

Have there been other cases in your 20 years in your role that prior to going to the Merit Commission, they were the -- discipline was rescinded and the findings overturned?

46REPORT001528

A.    I can say that the discipline was rescinded.  I can't say specifics on the -- what the findings ended up being.

Q.    Okay.  From your perspective, does the appointing authority have the authority to reverse the finding and rescind the discipline prior to the Merit Commission hearing?

A.    Yes.

Q.    And is that by department policy or county bylaws, do you know?

A.    I believe that if we change the discipline, it null and voids the need for the -- to go to the Merit Commission.  So the employee can withdraw and it can also go a different route as well.

Q.    Okay.

A.    So it works both ways.

Q.    Yeah.  Okay.

So I would imagine in your role you're at a, for want of a better term, pretty high elevation when it comes to leadership and management in the organization.  So you're probably not interacting with the appeal process, the production of documents, and a lot of the forms completed in a kind of a hands-on detailed way, are you?

A.    Correct.

Q.    Yeah.  It's kind of delegated to other folks?

A.    Yeah.

Q.    Would Denise Callahan be more involved with that process?

46REPORT001529

A.   Yes.

Q.   On March 18 Chief Palopoli emailed you -- I'm just going the read this.  It's March at 1:33 p.m. from Melissa Palopoli to Tiffany Shaw.  Subject, PSB investigation.  And it starts off:

(As read)  Hi, Tiffany, exclamation mark.  I'm reaching out due to an internal complaint with allegations against PSB Commander Greg Lugo.  I was hoping you would have a few minutes to chat as I need some guidance on a few things related to conflict investigations and the monitors.  Are you in the office today or tomorrow, question mark.

Is this the first you became aware of an allegation involving the PSB Commander?

A.   Yes.

Q.   And then you responded shortly thereafter:  I am in -- no.

(As read)  Hello, Chief.  I'm out sick today.  Not sure if I'll be in tomorrow.  I'll definitely be in on Thursday.  Can we meet then?  I have a meeting at 12. Otherwise open.

And Chief Palopoli responded:  (As read)  I am in a training class all day Thursday.  Out of town Friday.  If you're not back tomorrow, let's meet up Monday, question mark. Thank you.  Hope you feel better.

On the 19th you wrote to Chief Palopoli:  (As read) Hello, Chief.  I did not make it in today but will definitely

46REPORT001530

be in on Monday.  Let me know what time works for you Monday and I will be there.  Tiffany.

Chief Palopoli responded on March 19:  (As read)  Oh, man, I'm sorry you're still sick.  My all-day training was canceled for tomorrow so let's see if you're back in the office.  We can figure out a time if you make it in.

On the 20th -- I'll just summary.  You replied you're in today.  Can we meet?  And ultimately you told Chief Palopoli in the email:  (As read)  I will come to you.  I will head your way about 9:30.  Does that work?

And that was on March 20.  So it sounds like you and the Chief met in her office?

A.    Yes.

Q.    And this surrounds an allegation made against Captain Lugo and PSB Commander.

Can you tell me the nature of the conversation and what it was that Chief Palopoli explained to you?

A.    Well, what I remember is her asking about conflict-of-interest investigations and where those go.  And I told her I wasn't exactly familiar but I did look up one of the outside agencies that the Sheriff's Office sends cases to.  So I provided her that information and that's pretty much it.

And then she asked me what the process was to have one of the conflict-of-interest groups do an investigation and I said that I was not familiar with that because I didn't get

46REPORT001531

14

involved in that.

Q.   Okay.   Does the name Jensen Hughes ring a bell?

A.   Yes.

Q.   Is that the name that you provided her?

A.   I believe so.

Q.   Okay.   Any discussion about this involves a PSB Commander and we shouldn't go to Jensen Hughes because they contract with PSB or any conversation regarding that?

A.   I don't recall anything more specific other than that's what I was mainly there to provide her, was that.

Q.   Yeah.

Did you provide her a contact to Jensen Hughes? There's a name Joy Fitzgerald that arises.

A.   I don't think I provided her anything specific.   I think I found like on another case where they had put their like name -- the name of the firm, their address, phone number. That was really all I provided to her.

Q.   Okay.  Yeah.  Okay.

A.   So I don't really even know who all the investigators are over there.

Q.   Okay.

Other than this conversation with Chief Palopoli, did she tell you the nature of the allegations against Captain Lugo?

A.   She did No.   The only thing she referred to was something

about A.R.S. and I didn't ask questions.  I didn't -- I didn't want to know what was going on.

Q.    Sure.

A.    I just wanted to provide her the information about the conflict of interest.

Q.    Do you recall if Chief Palopoli said anything with regards to, "This is an administrative allegation.  This is a criminal allegation," anything of that nature?

A.    There might have been a statement about criminal and then A.R.S. but, again, nothing more than that.

Q.    Sure.  Okay.  Subsequent to this conversation, have you had any additional conversations with Chief Palopoli about the allegations against Captain Lugo?

A.    No.

Q.    Any conversations with Chief Summers?

A.    No.

Q.    Undersheriff Gentry?

A.    No.

Q.    Sheriff Sheridan?

A.    No.

Q.    Lieutenant Porter?

A.    No.  The only thing that -- the only additional information I got was that -- I would have to look at a calendar but one day I was told that Lieutenant Porter was going to be the point of contact so I think Captain Lugo went

out on admin leave on Friday. On the Monday when we got back to work, it was we're going to go talk to PSB. And then when we get -- and this is who your point of contact is. And I'm not sure if that was -- I believe Kelly Grennan, my chief, told me that information.

Q. Okay. And regarding we're going to go talk to PSB, that would be who?

A. I think it was -- well I don't know who for sure. This is hearing the information from my chief.

Q. I got it. Okay. All right. Great.

MR. ANDERS: Chief, do you have any?

MS. KIYLER: Yes. Just a couple of follow-ups, Director.

**EXAMINATION**

BY MS. KIYLER:

Q. You referred to attorney-client privileged communications between MCAO attorney and the appointing authority. Is there a single attorney that does all of your appeals? Does it go to a group? Do you know who it goes to?

A. I think it goes to the main HR attorney, which I believe is Brandon Newton, and then he decides which attorney it goes to.

Q. Does Landeen ring a bell with you?

A. Yes.

Q. Are you aware that he does some of the appeals?

46REPORT001534

A.   Yes.

Q.   Or has done appeals?

A.   Yes.  He has done quite a few appeals.

Q.   So he could be but you don't know if that's who was involved.

A.   I'm sorry.  What was your question?

Q.   Do you know if he was the one involved in the Engelbeck appeal?

A.   He was.

Q.   And can you tell me how you know that?

A.   Because of just the back-and-forth communication that goes on.

Q.   And I know you're not as detailed in terms of the communication and paperwork and processes as Commander Callahan is.

A.   M'hum.

Q.   But do you review the justification documents that are written regarding -- because I know Callahan said everything kind of gets forwarded to you.  You do a last review of it. Does that include justification documents or what is it that you review?

A.   I review the predetermination hearing letter before it goes to the employee.  As far as the documentation that Ken puts together, the appointing authority, I do not review that.

Q.   So you would have no reason to, nor do you typically look

at the justification documents, the final findings, anything like that?

A.   Correct.

Q.   So your last time of seeing it is review PDH, prior to PDH?

A.   Yes.

          MS. KIYLER:   That's all I had.

                         EXAMINATION

BY MR. ANDERS:

Q.   Just one additional question, or maybe two.

          I think that our Conduct Resolution meeting on April 15 there was reference to a case involving Captain Morrison and that case had gone to PDH.  After PDH, it was sent back to PSB for further review or investigation.  I don't know exactly why.  And then it maybe yourself or somebody else who then represented the case was now back in Conduct Resolution.

          Has there been -- upon your receipt in Conduct Resolution, has that case advanced any further beyond that or do you know what next steps would be in that case?

A.   Next steps would be Ken Holmes reviewing the addendum and making a decision on what he's going to do.

Q.   Okay.  Do you know if that's happened yet?

A.   It has not happened yet.

Q.   Okay.  Do you have any inclination about Chief Holmes'

disposition with regards to the case?

A.    I cannot speak for him.  I don't know.

Q.    Okay.

A.    There has been some discussions but I don't know what his final resolution is going to be.

Q.    Do you know the nature of those discussions, what's being considered?

A.    Just the additional information that came from PSB and then written response that came from Captain Morrison.

Q.    Okay.

        MS. KIYLER:  May I clarify?

        When we were talking about next steps, you said Holmes would review the addendum.  But you didn't think that has happened yet or it has?  Do you know if he's reviewed those?

        THE WITNESS:  I don't know if he's reviewed it yet.

        MS. KIYLER:  Okay.  Thank you.

        MR. ANDERS:  Major Peters, anything before we conclude?

        MAJOR PETERS:  No, sir.  We're good.

        MR. ANDERS:  Great.  Thank you.

        Anything I should ask you that I didn't ask you?

        THE WITNESS:  Not that I'm aware of.

        MR. ANDERS:  No?  Thank you again very much for being able to join us today on relatively short notice.

46REPORT001537

20

THE WITNESS:  Sure.

MR. ANDERS:  I very much appreciate the information that you provided.  It helps us just understand the process quite a bit better.

THE WITNESS:  Great.

MR. ANDERS:  Thank you so much.  We're going to go off the record.

46REPORT001538

21

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 7th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

46REPORT001539

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with KEN HOLMES

April 23, 2025


_____




Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com




Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001540

### TRANSCRIPT OF INTERVIEW WITH KEN HOLMES

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001541

3

P R O C E E D I N G S

MR. ANDERS:  We're going to go on the record.  Great. Thank you.  My name is Donald Anders and today's date is April 23, 2025.

We are presently on a Zoom call.  The time is approximately 12:59 Arizona time.

With me on the Zoom call is Major Al Peters who is also remote as I am.

In the conference room on the sixth floor of the Luhrs Tower in downtown, Phoenix, Arizona, is Chief Kiyler, also a member of the Monitoring Team.  And my understanding is there are three other individuals present in the conference room.

Could I please ask you to identify yourselves?

THE WITNESS:  Ken Holmes.

MS. BARNES:  Sarah Barnes, Broening, Oberg, Woods & Wilson, outside counsel for Ken Holmes.

MR. POPOLIZIO:  Joe Popolizio, counsel for Gerard Sheridan, Maricopa County Sheriff, in his official capacity.

MR. ANDERS:  Great.

THE WITNESS:  Great.

MR. ANDERS:  Well, thank you very much everybody for being here today.

\\\

\\\

4

EXAMINATION

by MR. ANDERS:

Q.    Chief Holmes, thank you in particular for being here today, particularly with regards to relatively short notice so we appreciate you being able to accommodate us.  And I know it is a very busy schedule for you.

A.    Thank you.

Q.    As we go through our conversation today, I would just ask, first of all, we're all sensitive to technology glitches.  So if something arises where you can't hear me or you can't see me or Major Peters, please let Chief Kiyler know.  She can text me so we can address whatever technology complication might have arisen.

And if at any time today I'm not offering enough clarity, if I ask a question or make a comment and you don't understand what it is that I've said, please just let me know. And if -- as we're continuing in our conversation, if you think about something that we previously discussed and you want to add some additional information, you are absolutely free to do that as well.

Chief, before we continue, do you have any questions?

MR. ANDERS:  Chief, before we continue, do you have any questions of myself or Major Peters?

THE WITNESS:  Not at this time.

\\\

by MR. ANDERS:

Q.    Okay.  Great.  Thank you.  Chief, just by way of introduction, a little bit of background, how long were you a full-time sworn employee with the Maricopa County Sheriff's Office?

A.    25 years.

Q.    Okay.  And what rank did you retire at?

A.    Deputy Chief.

Q.    And during your time as a sworn employee of the Sheriff's Office, did you ever have the opportunity to be assigned full time to an Internal Affairs or a PSB function?

A.    Quite a bit of the time, yes.

Q.    Okay.  Just very approximate.  Couple of years, five years?

A.    Five -- well, maybe five as an investigator, five as the captain, and then about a year and a half or so even as the Deputy Chief.

Q.    Okay.  When you were the captain at PSB, was it still referred to as PSB at the time?

A.    No.  It was Internal Affairs.

Q.    Internal Affairs.  And do you remember when you rotated out of Internal Affairs as a captain what year that would have been?

A.    I'm going to guess, maybe 2014.

Q.    Okay.  So approximately 10 to 11 years ago?

46REPORT001544

A.    That's correct, yeah.

Q.    Okay.  And Chief, how long have you been designated as the Appointing Authority for the Sheriff in Maricopa County?

A.    It will be -- it's eight years.

Q.    Eight years?

A.    Yes.

Q.    How did that appointment come about?  Who initially appointed you to it and is it like an open application process or is it just a reach out and connect and request for you to serve?  How does that happen?

A.    I think I just reached out at the time that I was going to retire.  There were some issues with just consistency in the disciplinary part of it.  Because in the day, each Chief would do discipline for their employees within the Bureau and for consistency purposes and the new Sheriff that was coming in to the office.  I think I reached out to Leanne Bohn (phonetic) at the time.  I'm not sure who else but I told them I would stick around and at least maybe put some consistency to the discipline.  So that took eight years now.

Q.    Yeah.  So that new Sheriff, was that Sheriff Penzone coming in?

A.    That was Sheriff Penzone, yes.

Q.    Okay.  And so was the Appointing Authority position here before did that not exist and was that like a concept you had envisioned and recommended, hey, for the purposes of

consistency, standardization or whatever else the issue maybe, would the Sheriff consider creating an Appointing Authority position that might be able to bring those elements to the process?

A.    Yes.   You know, I don't know.   I don't believe -- I mean, the Appointing Authority is always out there for the Sheriff to do what he does or have other people do something on his behalf.

But with regards to this particular idea, no.   It was -- not that I can think of.   I don't know.

Q.    Okay.   As part of the role of the Appointing Authority obviously is to conduct PDHs, right, or predetermination hearings.   In the approximate eight years that you have be doing this, again, not a hard and fast number, but approximately how many PDHs do you think you've done over a period of about eight years?

A.    I am really guessing.   Several thousand.

Q.    Several thousand?

A.    Yes.

Q.    Okay.   Virtually every one of those are audio and video recorded or is the video component relatively new to the process?

A.    No.   I believe they have always been audio/video.

Q.    Just in short summary, it doesn't have to be elongated but what would be the fundamental responsibilities of the

46REPORT001546

Appointing Authority in the Sheriff's Office?

A.    Primarily I review the PSB investigations.  They are provided to me, and the audio/video with respect to the specific employee, and the role is to ultimately take that, whatever the misconduct may be, and apply it to the policy GC-17 and actually coming up with discipline, looking for a category, ultimately finding whatever the range of discipline would be under that category.  But it's reviewing all of the documents coming from today PSB.

Q.    Okay.  With regards at the Appointing Authority position, what is the source of the authorities for the Appointing Authority?  Is it Sheriff's Office policy?  Are there county bylaws or ordinances?  Is it state law?  Where do your authorities come from?

A.    From the Sheriff and it's -- I think they identify in the policy as well as the Appointing Authority.

Q.    Yeah.  I have seen it in policy.

A.    Yes.

Q.    So just with regard to process, let's just take a hypothetical.  Let's assume that PSB is in receipt of a misconduct complaint.  Over a period of six months, the complaint is investigated.  Ultimately, the investigation is reviewed by the PSB commander.  PSB commander puts forward a sustained finding, provides information with regards to the span of potential discipline from the discipline matrix and it

ultimately ends up at a Conduct Resolution.  And then at some point you would be noticed that Conduct Resolution is in receipt of this hypothetical case.

Can you then take me through the process?  What are the mechanical steps, you know, going forward as far as what you do, how the employee -- the principal is noticed, what happens in a PDH and what happens post-PDH?

A.   The Conduct Resolution does receive the documents from PSB.  They have analysts that review all of the documents that come from PSB.  They prepare documents for me as well.  And they then provide them to me, these documents, and in order to set up a PDH.

And after that PDH is set, then it's a matter of listening to what the employee has to say in regards to the investigation because they have also had the opportunity to review the investigation if they chose to do so.

And then we'll conduct a PDH.  I will then re-review and see if any of it is relevant to the investigation or it's important to the investigation.

If there are things that they may have added through their PDH, I would send that back to the Internal Affairs and they would have to re-review whatever the documentation was that was provided to me and maybe there's more to the investigation.

Ultimately then, we schedule them out for a week from

46REPORT001548

that date and in that meantime I'm reviewing documents and I ultimately put together a justification letter and have a decision meeting that we have which is ultimately me telling them what the discipline is that they are going to receive and explaining to them how I got to where I got to.

And then the only other area would be should they decide to appeal that discipline, they can do so and; then I am part of that appeal process, representing the Sheriff as to -- well, Compliance and Internal Affairs with regards to what the hearing office comes up with.

Q.    Okay.  I've had the opportunity, we spoke with Ms. Shaw and Ms. Callahan and learned a little bit about the Conduct Resolution piece of this and their responsibilities.

And I think it was Miss Callahan who typically also attends the PDH.  Does that sound right?

A.    She does, yes.

Q.    When the PDH concludes, do you complete what is called a Predetermination Hearing Worksheet?

A.    I do, yes.

Q.    Is that done with every PDH?

A.    Every PDH, that's correct.

Q.    And then there's another document.  I think it's called an Employee Disciplinary Considerations and Decision Sheet.  Does that also get done for every PDH?

A.    Yes.  I'm -- yeah.  I would have to look at it to see if

46REPORT001549

that's the case, but yes.

Q.   Okay.  When those are completed post-PDH by yourself, where do they go?  Are they archived somewhere?  Does policy require them to be provided to other entities within the organization?

A.   No.  And, honestly, I would say it just goes into their personnel file ultimately.  But if it's a disciplinary issue, like they may receive 40 hours of discipline, those documents -- I'm not sure which files they would go into.  I would be guessing.

Q.   Sure.  Sure.

Let's take this hypothetical case.  An employee attends the PDH,the principal.  Are they allowed to have any sort of legal representation or non-legal representation or just peer support?  Can they bring anybody with them I guess?

A.   Yes, they can except for not allowing an attorney to be present.

Q.   Okay.  How much interaction is there with the employee?  In other words, we know that in a PSB interview they are permitted five minutes at the end of the interview.  Is it formalized at the PDH where at the end they get an opportunity for a closing statement?  Is it a conversation?  Are you -- you've reviewed the case and then do you have questions of them?  What's the mechanics of the format of a PDH?

A.   Generally, they will provide whatever information they

46REPORT001550

believe is important to their case. I don't interact with them unless there's just something that I just can't figure out what they were saying. We give them at least 30 minutes. Most are much less than that and we've had some that have been beyond that; but for the most part, they are allowed a 30-minute time frame.

Q.    Okay. And at the end of course then you ultimately make your decision and their notice with regards to do they remain sustained or not. If sustained and what the discipline would be. And if it's -- I think I saw in a letter in the event of it's going to be a suspension, they are actually at some point provided dates on which they are going to be required to serve the suspension. I think Ms. Callahan said she coordinates typically with the chain of command to make sure that the dates that are served accommodates the needs of the organization as well.

When you are making these decisions with regards to a finding and discipline, obviously facts come into play. Do you take anything else into consideration besides facts?

A.    No. That's the driving force. I don't know if you had any other -- I mean, if you have anything specifically that you're saying that other than facts.

Q.    I can probably be more clear. At the PDH they express extreme remorse and are very emotional and regretful about what they did or, gosh, if you suspend me for 80 hours, that's going

46REPORT001551

to be -- cause economic harm to my family and I'm a single patient and I just can't afford that or avow to never ever engage in this type of misconduct again in the future or -- they just seem like a very genuine sincere person that made a mistake. So those might be separate from facts as they relate to did the violation of the policy or regulation occur. I'm just curious if those have any bearing as well.

A.   Again, you know, it's driven by facts and it's true. There are people that come in and are -- it's a hardship to them and, yeah -- yeah, it's mostly fact driven.

Q.   Because I take it we can agree in the industry, facts allow for standardization, right, from case to case to case. But when we start giving consideration to some of these other hypothetical factors that I named, how do we standardize those; right, from person-to-person?

A.   Correct.

Q.   Yes. And so you have conducted thousands of PDHs which means there have probably been thousands of sustained findings and quite a bit of discipline imposed on employees of the office.

         Subsequent to essentially ruling that a finding is sustained and that discipline is going to be imposed and, in fact, the discipline being imposed, after discipline has been served, do you recall ever essentially, my word, circling back and saying, "Nope. I'm going to reconsider that discipline

46REPORT001552

that was imposed and you served or separate consequence of. We're going to change that and we're going to reduce it or we're going to rescind it"?

A.   It's pretty rare that would happen.  Has it happened over the years?  I would -- I would say yes.  I'm looking now -- at least what I'm looking at is this is something that they have received discipline for but they are also appealing it.  So it's still a case that is live, if you will.  And something may come up in that time frame before the hearing is actually had. Sometimes those hearings are a couple of months out.  So things happen and, you know, we would address it if it was the proper thing to do.

Q.   Yeah.  That was going to be my next question would be, again, hypothetically, and we're going to talk about a genuine case here in just a minute but hypothetically, have there been cases where they have not only had their discipline imposed and they served or suffered the consequence of discipline but then they have chosen to appeal to the Merit Commission and whether prior to the hearing there has been a reversal of that discipline.

And I'm curious if that's a common occurrence or that might be considered kind of a, quote, a one-off, highly unusual.  In your eight years, do you recall that happening?

A.   It's happened, yes, but it's not many.  If there were half a dozen of those, I would be surprised.

46REPORT001553

Q.    Okay.

A.    Out of the thousands.

Q.    So very, very unusual?

A.    It is unusual, yes.

Q.    Okay.  Do you -- as the Appointing Authority, you would have the authority to do that, though, to rescind the discipline that you imposed?

A.    With advice of counsel, yes.

Q.    But is it fair to say not to the direction of counsel but after receipt of advice from counsel?

A.    Well, counsel would be involved in it at that point in time so it would be a discussion with counsel with regards to if we were going to change something.

Q.    Does Maricopa County counsel who would liaise with you on, say, an appeal process, do they possess the authority to direct you to change discipline or is it, in fact, counsel and they are providing you guidance and counsel, a recommendation, some considerations but in the end, that decision would rest with you or the Sheriff?

        MS. BARNES:  I think the last question was kind of on a slippery slope getting into the attorney-client privilege and I think this question clearly invades it.

        MR. ANDERS:  And I'm going to object to that.  I don't think so at all.  I've not asked for any specificity or articulation regarding a conversation.  I'm asking about

46REPORT001554

process.

MS. BARNES:  You're not.  You're asking about -- with all due respect, you're asking about the substantive import of conversations between this witness and counsel for the County/Sheriff's Office, whether or not they say a certain thing to him and then whether or not he makes the decision or he, you know, adheres to what their advice might be.  Those are substantive questions that invade the attorney-client privilege and I'm going to stand by my assertion of that privilege.

MR. ANDERS:  So with regards to my inquiry about process, in other words, does an attorney from the County have authorities to give direction, not inquiring about did they give direction, not inquiring about what conversations or communications led to the direction, just from a 50,000-foot perspective do, they have the authority to give direction?  Are you asserting that that is privileged?

MS. BARNES:  If you are asking him if an attorney has authority to give him direction, he can answer that he knows without divulging.

MR. ANDERS:  I think that was my question.

by MR. ANDERS:

Q.   Does a County Attorney have the authority to give you direction to tell you to rescind discipline that has been imposed or is that a decision that you -- rests with you or the Sheriff?

46REPORT001555

MS. BARNES:  So I want you to answer that question to the extent that you can without divulging anything that might be said to you by any such County Attorney.  In other words, do you have independent knowledge that a County Attorney does or does not have the authority that he's asking about?

THE WITNESS:  Could -- just put it in a question form again.

MS. BARNES:  But I want to guide the question so that we're on the same page that it's not invading the attorney-client privilege, because to the extent that you're being told something by counsel in any of those discussions about what they can or cannot tell you, then that is an attorney-client privileged communication.

So what I'm asking you is, in order to answer his question about the process, his global 50000-foot question is: Do you know whether County Attorneys with whom you discussed these questions, do you know, independent of anything they are telling you, whether or not they have the authority to direct you on how to make a decision?  Do you know independently of that?

THE WITNESS:  No.  No.  They don't do that.

MS. BARNES:  Your understanding is they don't have that authority?  I don't want you to divulge what they are telling you.  Do you see where the slippery slope is?

THE WITNESS:  Yeah.  I -- do they have the authority?

46REPORT001556

It's difficult to answer that only because I don't know what their authority would be with respect to --

MS. BARNES:  Then that's the answer to the question.

THE WITNESS:  Okay.

MS. BARNES:  I don't want you to go beyond that to discuss anything that they are talking with you about is what I'm saying.

THE WITNESS:  Okay.

MS. BARNES:  So you don't know whether they do or they don't?

THE WITNESS:  I don't know.

by MR. ANDERS:

Q.    Okay.  Just so I am clear and I'm leaving with the correct impression, certainly the Sheriff would have the authority and I think we all understand that.  You, as the Sheriff's Appointing Authority, do have the authority to rescind discipline that's already been served but you don't know if a County Attorney would have that authority; is that correct?  Do I understand that correctly?

A.    Yes.

Q.    Okay.  Thank you.

MS. KIYLER:  Does that battery look okay?

MS. BARNES:  The battery is not showing on this screen and the gallery screen is not shared.

MS. KIYLER:  Hang on a second.

46REPORT001557

MS. BARNES:  There is something that's green, a dot.

MS. KIYLER:  Let me just check that.

THE WITNESS:  Sure.

MS. KIYLER:  Yeah, we're good.

MR. ANDERS:  Thank you, Chief.

by MR. ANDERS:

Q.   Chief, Mr. -- I'm not asking for content.  I'm just curious.  So if we get this hypothetical situation I've talked about, once the PDH is concluded, sustained, perhaps the employee receives a 40-hour, 80-hour suspension, they serve the suspension.  In meantime, the employee has exercised their right to request a hearing with the Merit Commission and so that process is in progress.  As you stated before, you're involved in that process.  Who do you liaise with during that process leading up to the actual hearing?  I would imagine there's some liaison that occurs, some coordination, some -- somebody is representing the Sheriff's Office.

A.    That's again, the County Attorney is -- they have a couple of three of attorneys that a case may get farmed out to I think in part of their Civil Division.

Q.   Okay.  Does Conduct Resolution have a role in that also?

A.    Providing documents.

Q.    Okay.  Do you know if PSB provides any documents or are they just essentially in the margins awaiting perhaps testimony?

20

A.   I wouldn't know that for certain.  Most of the documents are provided to Conduct Resolution as a point and then it goes to the County Attorney from there.

Q.   Okay.  Great.

So I wanted to talk, Chief, about a specific case which I don't think is going to be any surprise to you.  This is a case involving a Sergeant Aaron Engelbeck.  Forgive me if I'm mispronouncing his name.  A general outline.  In 2020, it's actually PSB IA number 2020-0555.  And this was a situation where Sergeant Engelbeck was a lieutenant working Queen Creek, was on probation, ultimately was demoted back to sergeant while on probation at the recommendation of his captain, also came out of that process was this investigation at PSB with that assigned PSB IA number.

That, for whatever reason, I can't speak to it, that case protracted out for about four years or so and the investigation concluded in 2024.

What was advanced by PSB were sustained findings and of course the discipline matrix and recommendations with regards to that.

Sergeant Engelbeck was noticed with regards to intent and a pending PDH with yourself and then you hosted the PDH on October 10, 2024.  Sergeant Engelbeck was present and Ms. Callahan was present.  If any of this doesn't sound accurate, please don't hesitate to let me know that I'm

46REPORT001559

misstating.

A.    I'll do that.

Q.    The PDH lasted about 13 minutes.  The following week, on October 17, there was the discipline meeting.  You sustained two of the findings -- two of the allegations you sustained and you imposed a 40-hour suspension upon Sergeant Engelbeck.  In the documents that you authored, you provided supporting facts regarding your suspension and supporting the findings of sustained in the two allegations.

The suspension was actually served beginning on October 28.

But in the meantime, on October 30, Sergeant Engelbeck filed an appeal.  He wanted a hearing with the Merit Commission.  And so just to lead up to some of this, I think Chief Kiyler has some documents she's going to share with you which I have copies of in front of me.  So the first document is dated October 24.  It's on memoranda letterhead from the Maricopa County Sheriff's Office and it's addressed to Sergeant Aaron Engelbeck, 1673, an address on Jackson Street and then it begins:  Dear Sergeant Engelbeck.  After giving due consideration, et cetera.  So this document -- letter was actually four pages long and it's signed by yourself and also signed by what I believe is Sergeant Engelbeck.  I can't read the signatory, but it does have his badge number and that's dated October 24, 2024.

46REPORT001560

Do you have that document in front of you, Chief?

A.    I do.

Q.    It says: (As read) I decided to proceed with discipline. It's based on sustained findings on allegation number one and allegation number five, three others are not sustained. And that the suspension is going to be served starting on October 28. This is on the very first page, kind of in the center of the page.

And then when we look at the top of the third page, it provides the supporting facts and there are five paragraphs regarding allegation number one and at the very bottom of the third page, allegation number five, it starts supporting facts and there is one paragraph associated with that.

So that discipline was ultimately served.

And like I said before, Sergeant Engelbeck then applied for appeal to Merit Commission.

The next document I'm just going to ask Chief Kiyler to present to you is a memoranda also on Sheriff's Office letterhead. And this is dated November 6, 2024. It's addressed to Neil Landeen from the MCAO, Maricopa County Attorney's Office, and it's dated November 6, 2024. It's from Denise Callahan from the Administrative Services Division, which I believe is Conduct Resolution. And it just references -- the subject is merit appeal, Aaron Engelbeck, his badge number, and the PSB number, IA 2020-0555.

And it just essentially is a roster of what Ms. Callahan references as copies of documents regarding the appeal of Aaron Engelbeck, personnel file, investigative file, copies of policies, similar discipline over the past two years. There is no similar discipline, et cetera. And then a contact number for Ms. Callahan.

Do you have that with you there, too?

A.    I do.

Q.    Okay. The next document I'm going to ask Chief Kiyler to present is a document from the Merit Systems Commission dated November 12, 2024, and just in summary, this document is advising Sergeant Engelbeck that his hearing is scheduled for January 10 at 9 a.m. I think you have that with you, Chief?

A.    I do.

Q.    And then next document is the same letterhead from the Merit Systems Commission and this just advises Sergeant Engelbeck that the hearing has been changed and it's not scheduled for January 10 as originally done but now has been changed to February 7, 2025 at 9:30 a.m.

I think you have that with you, Chief?

A.    I do.

Q.    And I'm going to stop right there with the documents. A PDH with Sergeant Engelbeck occurred on October 10, 2024. The disciplinary meeting was October 17, 2024. It was noticed that it was going to proceed on October 24, 2024, and then he began

46REPORT001562

to served 40 hours of suspension on October 28, 2024.

Following the PDH and following the disciplinary meeting in October of 2024, was there a Predetermination Hearing Worksheet that was completed by yourself?

A.    I'm sure there was.

Q.    We've -- we have asked for all documents associated with this matter and we have been unable to locate a Predetermination Hearing Worksheet that seems to relate to the original PDH.

A.    The document that was -- well, I would know it as being completed after the PDH.

Q.    Okay.  Contemporaneous to the PDH would it have been completed?

A.    Just after.  Yes, just after, yes.

Q.    Okay.

A.    After the -- his PDH.

Q.    And then my understanding is contemporaneous, subsequent to the PDH, there would have been aspect employee disciplinary considerations and decision document put together.  And again, we're unable to locate that particular document authored by yourself at least dated contemporaries to the PDH that occurred in October.  Do you have any independent recollection whether or not that one was completed?

A.    No.  That's pretty standard practice.  I would recommend that maybe you either reach out to Tiffany Shaw or one of the

others there at the Conduct Resolution.  Denise Callahan.

Q.    Okay.  Great.  I will definitely do that.

The next document that I'm going to ask Chief Kiyler to show you, Chief, is Sheriff's Office letterhead.  It's a memoranda.  It's dated January 28, 2025.  It's addressed to Michelle Patrick at County Human Resources from Ms. Callahan and the subject is rescission, 40 hours suspension, Sergeant Aaron Engelbeck.

And in summary, it's one paragraph, Ms. Callahan is advising Ms. Patrick that Sergeant Engelbeck was suspended on January 28, the date of this memoranda.  The Sheriff's Office rescinded the 40-hour suspension.  So essentially it's a request to make administrative records updated and contemporary.

Do you have that in front of you there, Chief?

A.    I do.

Q.    Okay.  And then the next document I would ask Chief Kiyler to show you is also on Sheriff's Office letterhead.  This does not appear to be a memorandum, dated January 28, that same day, 2025, addressed to Sergeant Aaron Engelbeck.  And in summary, it acknowledges that on October 24 he was suspended for 40 hours without pay and that is suspension was appealed.

The last two sentences of that first paragraph read:

(As read)  This letter is to notify you that after further consideration, the office has decided to modify the

46REPORT001564

disciplinary action imposed to no discipline. The office will thus rescind the 40-hour suspension and file a motion to vacate the pending Merit Commission hearing.

Do you have that there with you, Chief?

A. You were on the first paragraph?

Q. The first paragraph, yes. The last two sentences of the first paragraph.

A. I was trying to find where you were at on the second paragraph.

Q. I can reread that if you want or you can read it yourself if you like.

A. No, I'm familiar with it. I understand.

Q. Okay. The first question is, what got you to rescind the disciplinary action and change it to no discipline? So we have up until January 28 the discipline, the finding has been sustained, discipline has been imposed. There's a pending Merit Commission hearing scheduled for February 7 and then on the 28th a decision has been made to modify the disciplinary action.

Can you just explain to me how that decision was arrived at?

A. Some of this is under the advice of counsel so I just -- just so you're aware of that as well.

MS. BARNES: So I want to -- can we just take like a one- to two-minute recess so that I can have a quick

46REPORT001565

conversation with him before he answers that question based on the preface that he just gave?

MR. ANDERS:  Yes, please do, away from Zoom because we're going to continue with the Zoom.

MS. BARNES:  Yep.

MS. KIYLER:  Are you staying here, Mr. Popolizio, or are you going out with them?

MR. POPOLIZIO:  Are you kicking me out?

MS. KIYLER:  No.  You are welcome to stay here.  I just don't want them to say anything in front of you.

MR. POPOLIZIO:  Oh, no.  They know I'm here.

MS. KIYLER:  Mr. Popolizio is still in the room.

MR. ANDERS:  Okay.

I'm going to cite the time.  The current time is approximately 1:42 Arizona time.

MS. KIYLER:  Do you need me to go off recording or can I just leave it and oh?

MR. ANDERS:  Please leave it on, Sherry.  That's fine.

MS. KIYLER:  Okay.  All day long you hear that, the sirens.

MR. POPOLIZIO:  You get used to it I guess.

MS. KIYLER:  Chief Anders, Chief Holmes and his attorney are back in the room.

MR. ANDERS:  Great.  Thank you.  Time is

46REPORT001566

approximately 1:46 p.m. Arizona time.

by MR. ANDERS:

Q.   So, Chief, I think we left off with regards to, I'm trying to understand what it was that occurred, the decision-making process, how we got from October 24, when discipline was officially imposed, to January 28, 2025, when it is being rescinded.

A.   In the documentation that was being provided to -- and prepared for the merit hearing, there's some information that Engelbeck provided.  I had seen the documents to where what was -- the investigation was bifurcated into two parts.  There was a long memorandum provided by Captain Lugo sometime back to support the fact that he would not promote.  In the there -- it was bifurcated to the point that there were administrative issues and then there were some misconduct.

        And I felt that the misconduct had already been used in order to demote him and for that reason, it was my reasoning to not move forward with a -- he was demoted with the information already and not go after him again for insubordination.  I consulted with the County Attorney in regards to that.

Q.   The administrative issues that you reference, is that the probationary demotion?

A.   That is correct, yes but --

Q.   And then misconduct allegations, those would be policy

violations associated with insubordination that you sustained?

A.    That is correct, yes.

Q.    Okay.  And were all of -- both of those, I'll just call them topics, the administrative and the misconduct, were those enveloped all in one memoranda?  Is that what I'm hearing?

A.    Yes, it was.

Q.    Okay.  And so am I correct in understanding that Lieutenant Engelbeck failed probation and was demoted to sergeant?

A.    That's correct, yes.

Q.    Okay.  Can an employee be -- can an employee fail probation and be demoted without cause?

A.    Not I'm aware of.

Q.    In other words, could a deputy hypothetically, a Sheriff's deputy who is on probation, be dismissed from probation without cause?

A.    I'm not certain.  I don't know.

Q.    If the lieutenant is demoted during probation, they fail probation and that's administrative in nature, is that then considered to be punitive in nature or is it they just failed a test during their probationary period?

A.    Do you want me to speculate on that?

Q.    I'm just asking if you know.

A.    I'm sure it feels like discipline.  I don't know what more to say about that.

46REPORT001568

Q.    The blending of these two topics into the same memoranda and then your reflection on this pending Merit Commission appeal.  And so it sounds like -- I think what I'm hearing, these were blended together and he was already demoted so that would be considered discipline.  Is that an appropriate interpretation?  If not, please correct it.

A.    Right.  There was a memo item drafted by Captain Lugo that was very detailed.  It included a lot of administrative things that Engelbeck was not doing.  He added in the letter insubordination issues as well.  And he submitted it to his command staff.  It was bifurcated to where they took the administrative aspect of it and demoted him, and then they took the insubordination fact and sent it to Internal Affairs for misconduct.

But -- well, go ahead.

Q.    And so the demotion would be an administrative action, on probation, failed probation; and then the separate issue of insubordination, that went to PSB for investigation and then was ultimately sustained by yourself and discipline imposed.

Were you aware of that bifurcation?  Were you aware that there had been an administrative action and that he had been demoted at the time of the PDH?

A.    I -- yes.  I think I was aware of it.  I mean, are you talking about the -- how it was divided or bifurcated the case?

Q.    So I think what I'm getting at is what new knowledge did

46REPORT001569

you accrue awaiting the Merit Commission hearing that ultimately resulted in discipline being rescinded, what was the new knowledge that you did not have at the time of the October 10 PDH?

A.   I'm not sure there was a lot -- it was already presented I believe in the PDH.  Yeah.  I can't think of any new knowledge -- well, I can't recall as to when I knew or when I looked at that, that I realized what the command staff had done and the reaction of what happened.

So -- and it was brought to the attention during his PDH, he brought it forward, and it was, as we were continuing to move down and provide discovery and do the things that we needed to do for the merit appeal, it was one of these issues that I thought this probably isn't right.

Q.   And help me to understand a little bit better.  So this is probably not right, what's not right?

A.   That the information about the insubordination was used in order to demote him.  And now it's back to PHB-- to -- yeah, to penalize him for 40 hours of misconduct on the very information that was used in order to demote him.

Q.   So a double jeopardy circumstance?

A.   Exactly.

Q.   So a hypothetical, probationary sergeant becomes engaged in a high-speed vehicle pursuit as a result of somebody who just failed to stop when the red light was activated.

46REPORT001570

High-speed vehicle pursuit reaches over 100 miles an hour, goes past a school, major injury accident occurs in front of the school, patrol car is totaled, innocent stand-by citizens, their vehicles are wrecked to the tune of tens of thousands of dollars.  The Sheriff's deputy is terribly injured and a determination made they not pass their probationary test.  They should not be a supervisor so they are demoted to deputy.

Should there then not be a PSB investigation and discipline imposed for policy violations if there were policy violations as a result of the high-speed vehicle pursuit and the consequences of that pursuit?

A.   Well, I think if you're using the damage and the reckless driving, if you will, by the deputy in order to demote him and you use that, I guess then can you then take the same information and give him discipline for maybe 40, 80 hours off.

Q.   So, Chief, I'm going to ask Chief Kiyler to show you a document.  This is titled Predetermination Hearing Worksheet, and at the top there it says employee name, Sergeant Engelbeck with his badge number.  Investigation number, 2020-0555.  The hearing date was October 10, 2024.  You were present, Ms. Callahan was present, Sergeant Engelbeck was present.  And then we see a line that says proposed action, colon, and what was typed was:  Suspension, slash, 40 hours, parenthesis, Category 6, 29.8 first offense, end parenthesis, and then that's crossed out and handwritten is:  Not sustained, slash,

46REPORT001571

no discipline.  And then a signature and date of January 30, 2025, two days after Sergeant Engelbeck was -- a letter was written to him saying that the discipline was going to be rescinded.

Chief, is that your handwriting there?

A.   Yes, it is.

Q.   And is that your signature there?

A.   Yes, it is.

Q.   Okay.  And then on the last page, on page four I think, it reads:  Typed discipline, colon, and then handwriting, no discipline, and I believe your signature with the date also 1-30-25.

So, Chief, this is a Predetermination Hearing Worksheet with date of January 30, '25, about three months and three weeks approximately subsequent to the original PDH for this particular case number.

So is this a new Predetermination Hearing Worksheet that was authored and dated by you?

A.   This is the original one or something close to the original one that has just -- just reflects what actually happened.

This was done on October 10.  This was more of -- nothing more of a -- nothing more of a housekeeping as to what we ultimately did.

Q.   Okay.  So I'm just trying to understand the paperwork that

we got here and the chronology and sequencing.

So this highlights that the hearing date was on October 10. But this document is signed January 30, 2025.

A.   That's correct. Well, my signature is.

Q.   Yes, on fourth page. And so that's why I'm asking is this a new Predetermination Hearing Worksheet? Because it does not have a date contemporaneous to the PDH that occurred in October. So again I'm just trying to understand the chronology of the documents.

A.   I understand. It is not new.

Q.   It is not new?

A.   That was simply a housekeeping measure.

Q.   Okay. This would be the original PDH worksheet?

A.   This is the one that ultimately -- well, I don't know but that's the one that went in the file. What actually happened was the not sustained and no discipline on that date and Compliance would have just put the fourth page on and signed it as the date that that action took place.

Q.   So aside from the line on the first page there where it says "proposed action" or it's crossed out and you've written in "not sustained, no discipline," am I hearing that this is the document that you did shortly after the PDH in October?

A.   No. This would have been done on January 30 of '25?

MS. BARNES:   I don't think he's understanding your question.

46REPORT001573

MR. ANDERS:  I apologize.

by MR. ANDERS:

Q.  So this document would be -- I think we talked earlier, when you conduct PDH, contemporaneous to the PDH, shortly thereafter, you complete a Predetermination Hearing Worksheet and we're unable to find that worksheet.  It may exist but it has not been provided to us.  We talked about that earlier.

But we do have this worksheet, but this worksheet is dated approximately three months and three weeks after the PDH and it represents information that is a change from what was decided after the PDH in October of '24.  And so I'm just trying to figure out is this the PDH worksheet that actually was done in approximately October 2024 and it's just being updated, or was this worksheet created in January 2025?

A.  No.  This was updated.

Q.  Okay.

A.  The original.

Q.  So is there like a fourth page that exists anywhere that would have your signature with a date sometime in October of 2024?

A.  I guess I would refer you to Denise Callahan or Tiffany Shaw for those -- if there is.  I don't know.

Q.  Okay.

Chief, then the next document that I'm going to ask Chief Kiyler to show you is just an email string and at the

46REPORT001574

very top it says Jack Greer and this is just I think an administrative process document.  Initially at the bottom of this one-page document, Merit Commission sent an email to Mr. Landeen just saying that the appeal regarding Sergeant Engelbeck has been closed.  Mr. Landeen then sent that to Ms. Callahan on February 6, it has been closed.  And then Ms. Callahan sent it to Mr. Giguere and Mr. Greer, essentially just forwarding what Mr. Landeen had said.

Was Mr. Landeen the counsel that you were liaisons on in this case?

A.   That's correct.

Q.   That's on February 6.  And then the next document I would ask you to take a look at, Chief Kiyler will provide you, this is an Employee Disciplinary Considerations and Decision document.  It lists the employee name as Aaron Engelbeck.  IA number 2020-0555.  And down the left-hand side are a series perhaps of, I don't know, 12, 15 bullet points.  Above that it's listed:  The following information was considered when making the decision to impose the discipline.

Is this a document that would have been completed contemporaneous to the PDH that occurred in January?  I'm not saying this document but this type of document, would it have been completed in October of 2024?

A.    No.  This -- this would be done -- well, it's dated 2-6.  So it would be done just before -- or just after what was

decided from the Merit Commission.

Q.   Okay.  So you made the decision to rescind I think of 2025.  Other documentation went out on February 6.  Housekeeping essentially administrative documentation and then this document is also dated January 6.

But would an Employee Disciplinary Considerations and Decision document be completed by you after a PDH?  Contemporaneous?  In other words, a PDH for Mr. Engelbeck occurred on October 10, 2024?  Within a couple of weeks, within a month, would you have done an Employee Disciplinary Consideration or is this very first one that was done?

A.   Well, this would be the only one that was done.

Q.   Okay.

MS. BARNES:   Just to point out, you said January 6 but this is February 6.

MR. ANDERS:   I apologize.  Thank you for that.  Yes.  February 6.

by MR. ANDERS:

Q.   So one would not have been done when discipline was meted out in October of 2024, there would not have been an Employee Disciplinary Consideration and Decision Worksheet done?

A.   No.  There wouldn't have been another one like this, no.

Q.   Okay.  If we go down to the first page, the third bullet from the bottom, Chief, the last sentence in that third bullet reads:  (As read)  This demotion was perceived by the employee

as serious discipline for the misconduct although it was a failure to meet his promotional probation.

So I think what we're referencing there is this is how the employee feels about it, that their demotion was serious discipline.  They are apparently not representing that they merely failed the test and they were demoted and can be demoted without cause.

The next -- pardon me?

A.   So what was the question?

MS. BARNES:  He hasn't asked one yet.

THE WITNESS:  Oh.

by MR. ANDERS:

Q.   Then the next bullet says:  (As read)  Then as such, could you please provided a legal opinion regarding this matter that no discipline is necessary and that proceeding with a Merit Commission appeal hearing would not be in the best interest of the Sheriff's Office or the employee at issue.

So I think we're recognizing here that there's no privilege with counsel.  We've documented here what counsel said, what counsel communicated, that counsel provided an opinion that no discipline necessary.

I'm trying to understand, why is no discipline necessary?  I mean, what's the -- what are your thoughts about that?  How is discipline not necessary?

A.   Because the behavior -- the behavior was addressed in his

39

demotion.

Q.   Proceeding with a Merit Commission appeal would not be in the best interest of the Sheriff's Office.

Why do you think it would not be in the best interest of the Sheriff's Office?

A.   Well, it was language from the MCAO, so I'll start there. But other than that, it would be -- we're disciplining an employee who is valuable to the MCSO twice for the same kind of conduct, and that is not in the best interest of MCSO.

Q.   And why would it not be in the best interest of the employee?  Sergeant Engelbeck?

A.   Because he's getting himself demoted and then receive another 40 hours suspension.

Q.   So in the end, Chief, I think what I'm left with is if an employee is on probation and they complete what you wrote in a document on October 24, if they commit actions that constitute a serious violation of department policies and regulations, if they commit actions that are serious violations of policies and procedures and regulations, as long as they are demoted, then there's no subsequent PSB investigation, sustained finding, or discipline.  The demotion serves as the discipline for the serious violation of policy and regulations.

Is that what I'm hearing the standard is?

A.   Well, what I'm saying is that the insubordination was used to demote him.  And then the insubordination was sent to PSB to

provide discipline.

Q. Chief, another document I'm going to ask Chief Kiyler to present to you, it's a Notice of Findings and it's dated February 12, 2025. This is from Captain Lugo and PSB to Sergeant Engelbeck referencing PSB IA number 2020-0555. It's a form letter, Notice of Findings, and it represents to Sergeant Engelbeck that all five findings are now not sustained.

In none of the previous documents that I've been able to peruse is there any reference to the findings being changed. It just talks about a rescission of the 40-hour discipline. And I'm curious if you know how this got to all of the sustained findings being changed to not sustained?

A. I don't -- I don't know. This is a document created by Captain Lugo. I think some of those -- and I'm speculating here. Like truthfulness were already not sustained even when I received it.

Q. I think that's correct, yes.

A. And what I received were insubordination I think, pretty much two counts worth -- or not sustained, yes.

Q. But your decision was on January 28, 2025, was to rescind the discipline. Did you also make a decision to also change your sustained findings to not sustained? Or did somebody else make that decision?

A. No. I did that.

Q.    You decided to change the sustained to not sustained?

A.    That's correct.

Q.    So this is a bit a separate topic; right?  It's not the discipline.  It's now the finding.  And so I understand that you have said -- and it was a sustained finding but the discipline would be inappropriate.  It's essentially double tap or a double jeopardy.  He's being punished twice.

        But what -- when I read your supporting facts about why you sustained the two allegations, I'm trying to figure out what facts changed that then would reverse the sustained findings and make them not sustained.  And how that would somehow impact the discipline that has already been rescinded.

A.    I'm not sure I fully understand what you asked.

Q.    Okay.  I apologize.  On October 10 there was the PDH.  You sustained two of the allegations.  Going forward, based upon that sustaining the two allegations, a 40-hour discipline was imposed and served.  A Merit Commission appeal was filed by the principal.  The principal was notified on January 28, 2025, that essentially the Sheriff's Office is going to walk back the imposed discipline and make the employee whole.  The discipline is no longer applicable.

        You explained the reasons why you made the decision to rescind the discipline.

        So I think what I'm asking is, what facts changed that precipitated the reversal of the sustained findings to not

sustained?

A.    I don't think the facts changed.  They were still -- the facts were there.  I think this all took place during the preparation for the merit hearing.

MS. BARNES:  He still doesn't understand your question.  Do you want me to try to clarify or do you want to have another shot at it?

MR. ANDERS:  I'll try one more time.

by MR. ANDERS:

Q.    Why did the findings get changed from sustained to not sustained?

A.    Well, I guess the simple answer would be because he shouldn't have been sustained or not sustained from the beginning.  All of that findings was used to demote him.

So to sustain something on the misconduct side, we already used what we had to support that in the demoting him.

Q.    So if the decision is made to not sustain the allegation, what does that mean?  What's the definition of not sustained?

A.    There is -- well I don't have it here but it is defined in our policy.  But for the most part, it's -- there's not enough facts to support a sustained violation, sustained.

So it's not sustained.  But there are some facts to support it, just not enough.

Q.    Were there enough facts to support the sustained finding in these cases?

46REPORT001581

43

A.    Had we gone forward in the misconduct side?

Q.    The misconduct side did go forward; right?

A.    Yes.

Q.    Yeah.  And so what I'm asking is --

         MS. KIYLER:  Okay.

by MR. ANDERS:

Q.    -- the complaint was filed.  You sustained the complaint based upon facts.  You documented the supporting facts.  So what that means is allegation is true, allegation occurred, violation of -- serious violation of policy and regulations occurred.  You've documented that?

A.    Yes.

Q.    To then reverse to not sustained, doesn't that mean it didn't happen?  How do we go from it did happen and facts support it did happen to now ruling facts don't support that it happened?

A.    So the question again, just so that I'm clear.

Q.    Sure.  I apologize if --

A.    No, it's okay.

Q.    -- if I'm asking compound questions here.

         An investigation occurred, an allegation was made, and you ruled yes.  That allegation is true.  It happened.  The support -- the facts support it happened.  You documented the facts that support that it happened and then over three months later you changed and said it didn't happen, that the facts

46REPORT001582

don't support that it happened.

So I'm just trying to figure out what changed from ruling it did happen to ruling it didn't happen?

A.    The only -- the difference would be only in the two areas in which we approached the misconduct.  It happened.  He was insubordinate and that information was used to demote him.

I think the use of not sustained on the disciplinary side was simply a way of saying that it's not something that would be decided in that arena, if that makes any sense.

Q.    You express concern that he's essentially being punished twice for the same act.  Would the --

MS. KIYLER:  Let me interrupt you for just a second, Chief.  I need to fix this screen.  Just for the record, you both are on screen now.  Major Peters and Chief Anders, you are both going to be on screen.

MR. ANDERS:  Okay.  Thank you.

by MR. ANDERS:

Q.    Would the rescission of the 40 hours and making the employee whole, would that have sufficiently addressed the fact that there was not punitive consequence to serious violations that had occurred or is the -- are you considering the fact that there was an investigation and there was a sustained finding and that is also punitive?

A.    I was looking at it as punitive when he was demoted.

MR. ANDERS:  Chief, is there anything that I didn't

ask you that I should have asked you or anything that you want to elaborate on?

THE WITNESS:  No.

MR. ANDERS:  Major Peters, do you have any questions about --

MR. PETERS:  I do, Chief, if I may.

Chief, good afternoon.  Thank you for coming down to us.

THE WITNESS:  Good afternoon.

MR. PETERS:  I'm trying to wrap my head around the process as it relates to policy and more specifically the documentation of that process as it relates to a case file. And the first thing I would like to find out, though, is by policy -- and I know you're familiar with GC-17 because if I recall correctly, you were actually involved in helping us draft that originally.

But by policy, a promotional probationary employee who fails to complete that probationary period may be, without right of appeal, reverted to a position of the class previously occupied or to another suitable position.

So taking that language, is it possible that Engelbeck should not even have been afforded an appeal process?

THE WITNESS:  Well, I guess I'm thinking of two different things when you say that.  As an employee that is in this particular case, he was from lieutenant back to sergeant.

46REPORT001584

Maybe I didn't quite follow that.  Could you help me out here a little bit?

MR. ANDERS:  Generally, the probationary period for a sworn employee is 12 months unless extended.

THE WITNESS:  Right.  They would have no right for appeal.  If it was -- if it hadn't been bifurcated, it would -- it would be just an appeal -- not an appeal but a demotion and there would be no right for appeal.

MR. PETERS:  Okay.  I'm just a little bit confused with this bifurcation and maybe you could clarify that a little bit further because I believe you said that it was bifurcated and then sent back to PSB for continued investigation.

THE WITNESS:  There is a document in this file that was generated by Captain Lugo.  And there's a signature section in the back to where one of the Chiefs or two of the Chiefs identified what would be used to demote him and what would be used to provide discipline.  And that's what I am meaning by bifurcating it.  They split it up.

Greg Lugo did not believe -- everything that he wrote he did to demote him.  He had no intent of having a document used to provide discipline.  The letter was written with the intent to demote him.  And all of the things that were written in there were used to demote him.

MR. PETERS:  Is that your opinion of how that letter was written or have there been any conversations with

46REPORT001585

Captain Lugo where he presented that opinion?

THE WITNESS:  Yes.  I spoke to Greg Lugo about that.

MR. PETERS:  And, again, just for us, for our record and everything, do you recall when that occurred?

THE WITNESS:  No, but it happened in the preparation of the merit hearing.

MR. PETERS:  Okay.  So would it be safe to say that it occurred then somewhere between January 30 and February 7?

THE WITNESS:  That is correct because Greg -- Greg was looked at as being a witness in the hearing.

MR. PETERS:  Fair enough.  Okay.  I'm assuming that -- and just tell me if I'm wrong, if my assumption is wrong.  I'm assuming that based upon PDH and the results of the PDH in October, that you believed that these were grave acts of misconduct by policy.

THE WITNESS:  Well, insubordination is, that's correct.

MR. PETERS:  So then that's why the sustainment of the allegations and then the ultimate decision on the discipline?

THE WITNESS:  That's correct, yes.

MR. PETERS:  Back at the PDH and actually before the PDH when you were working on your Predetermination Hearing Worksheet, is it safe to say that you believed that the original case was clearly defined within the Attachment

46REPORT001586

48

B category of offenses as a Category 6 offense?

THE WITNESS:  Yes, I did.

MS. BARNES:  I just want to pause for a second.  You have text messages that are popping up on here at the top.  If this is your -- if this is your tablet, like from your phone.  So I couldn't read the last two that popped up but they are popping up, so I just wanted you to know that since you have personal whatever.

MS. KIYLER:  Yeah, I do actually.  I'm not sure how to stop that.

MR. POPOLIZIO:  You can silence your phone if you have.  You can silence the notifications on your phone if you have an iPhone.  I think you do.

MS. KIYLER:  Okay.  Go ahead.  Thank you for that.

MR. PETERS:  Okay.  So I think my question was, were you convinced that these violations constituted a Category 6 as defined by policy?

THE WITNESS:  Yes, I did.

MR. PETERS:  So did anything change then between that original review and the considerations decision of February 6?

THE WITNESS:  Not with the facts of the case.  What changed was how the insubordination was used.

MR. PETERS:  Some of my questions Chief Anders has addressed already so I don't want to be redundant so just give me a moment to go through some of these.

46REPORT001587

49

And I think you answered this but I just wanted to get some clarity.  There was not a secondary PDH; correct?

THE WITNESS:  No.  Well, I honestly don't know but I can't think of -- I don't believe we had but one and then there was a discipline meeting after that.

MR. PETERS:  Okay.  So then there wouldn't be a second audio/video record of any sort of a PDH occurring?

THE WITNESS:  No.

MR. PETERS:  Okay.

THE WITNESS:  But you can check that with Denise Callahan and/or Tiffany.

MR. PETERS:  Because this was allowed to go to appeal, was Captain Lugo ever consulted prior to the appeal on the modification of the discipline and the findings?  Or was that just a decision that you arrived at?

THE WITNESS:  No.  He was notified.

MR. PETERS:  And how was he notified?

THE WITNESS:  I spoke to him on the phone.

MR. PETERS:  Okay.  So it was a verbal notification.  Do you remember when that occurred?

THE WITNESS:  January maybe.  I don't remember.

MR. PETERS:  Would that have been when he told you or at least expressed his opinion that this was going to go just for the insubordination?

THE WITNESS:  He didn't say that.  I'm not sure I

46REPORT001588

understand question.

MS. BARNES:  Could you just reask that question, Major Peters?

MR. PETERS:  Would that also have included -- you mentioned to us that you -- that Captain Lugo was aware of the allegations going strictly for discipline on insubordination. Am I correct on that?

THE WITNESS:  No.  He was -- he was not under the impression it was going to be used for misconduct violation. He wrote that memo which included the insubordination in order to have him demoted.

MR. PETERS:  With the changes to the findings and the discipline, was any of that captured -- the departure from presumptive range of discipline justified in writing?

MS. BARNES:  Can you repeat that question?

MR. PETERS:  Was any -- was change in the findings and the discipline, that's a departure from the policy and was any of that departure and the reasons for that justified in writing for the case file?

THE WITNESS:  Unless we're referring to the document that says Employee Disciplinary Considerations and Decisions, and the bullet points that go with that.  And it is a deviation from the disciplinary matrix.

MR. PETERS:  Okay.  And is that why you placed that note at the bottom of the second page of that document?

46REPORT001589

THE WITNESS: Yes. Monitor Kiyler watches me on that. So I write it in there so it's a big -- it says, oh, this is a deviation.

MR. PETERS: So when a deviation -- and help me to understand this. So when a deviation from the discipline matrix is undertaken, is that something that you would undertake on your own or is that something that you would have discussions with the Sheriff being she's the only other one that can do that?

THE WITNESS: I didn't have any discussions with any of -- well Sheriffs, no. I haven't had any conversation with the Sheriffs. That goes for both Sheriffs at this point.

That would have been just myself in consult with counsel as well, MCAO in regards to the decision.

MR. PETERS: One of the things I picked up on with these documents, and I know there was some discussion of it with Chief Anders, but I'm curious as to why there would be so many differences in dates considering this is a case file and it is ultimately returned back to PSB and filed in IAPro under this case. Maybe you could just kind of clarify for me why there would be such a difference in the dates of all of this.

THE WITNESS: I don't know the answer to that for certain. All of the dates surround the time frames from the PDH hearing up until the merit appeal which we didn't quite get to.

46REPORT001590

So this was deviating from the matrix to not provide any discipline for this particular matter.

MR. PETERS:  Is it customary in your dealings with CRS and in particular, Ms. Callahan, is it customary for her to be sending out documentation from MCSO on a particular date and then having subsequent supporting documentation from you for the reasons that are placed into that original correspondence not coming into the department until after the fact, how is that information transmitted to her to be able to produce a correspondence absent those documents?

THE WITNESS:  I do not know how to answer that.  You would have to really speak with Ms. Callahan with regards to that.

MR. PETERS:  In your normal course of business, do you -- would you converse with her on it?  Would you do it verbally?  Would you say, "Hey, I've already made this decision on this.  This is what it's going to be.  Go ahead and send the letter out"?

THE WITNESS:  That we do, yes.

MR. PETERS:  And in the course of those discussions, has it you ever occurred, to your knowledge, where a letter may have gone out that was inconsistent with what your findings or your supporting documentation would demonstrate?

THE WITNESS:  Not that I'm aware of.

\\\

46REPORT001591

MR. PETERS:  Would it be safe to say there really wasn't a second review of the case materials and the supporting materials, that it was predominantly guidance by the MCAO counsel that led to the ultimate change?

THE WITNESS:  No, not at all.  This -- this was on me.  Counsel was just in concurrence with it.

MR. PETERS:  So basically it was a conversation where you presented this to MCAO counsel or was it vice versa?

THE WITNESS:  This would have come from me, to my best recollection, to Neil Landeen, who was the attorney that's representing us for this case.

MR. PETERS:  The legal opinion that was provided that is noted on the Employee Disciplinary Considerations and Decision document, was that a written opinion?

THE WITNESS:  It is, yes.

MR. PETERS:  Do you know if that was provided to the Monitoring Team?

THE WITNESS:  I do not know.

MR. PETERS:  On that sort of a document, would it be included in the case files?

THE WITNESS:  It should be.  I don't know, though.

MR. PETERS:  I guess that would be something to go back to Ms. Callahan and speak to her about?

THE WITNESS:  Probably would be the best source. Maybe Tiffany Shaw.

MR. PETERS:  Okay.  Chief Anders, I believe that answers all of my questions.  Most were answered by your interview.

MR. ANDERS:  Thank you, Major.

Chief, I understand this could not have been a comfortable experience and I hope we have not made it unnecessarily uncomfortable.  I'm impressed that -- I think you're very forthright, transparent, candid; and on behalf of the Monitor and the members of the team, I truly do appreciate that and respect it.

So I thank you very much for your time today, the time of your counsel.

And with that, we'll go ahead and conclude.  We'll go off the record.  The time is approximately 2:40 p.m. Arizona time.

(Proceedings concluded at 2:40 p.m.)

46REPORT001593

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 10th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

46REPORT001594

## Introduction

This document addresses concerns and allegations raised primarily by Chief Donald Anders, a Federal Monitor Team representative, regarding Executive Assistant Chief Melissa Palopoli's handling of an internal investigation (IA2025-0111) involving Professional Standards Bureau (PSB) Commander Captain Greg Lugo and related insubordination and other misconduct allegations (IA2025-0139). Chief Palopoli was interviewed for the first time on April 17th, 2025. Subsequent to that interview, Chief Palopoli voluntarily provided a supplemental statement to investigators on the morning of April 22nd, 2025. Chief Palopoli was interviewed for a second time in the afternoon of April 22nd, 2025. This response is intended to provide additional clarity and context for the issues raised during the course of the second interview.

To reiterate what Chief Palopoli said - both in interviews and in her prior written submission - when she was new to her position, she was forwarded a complaint by Deputy Chief Gentry in which Sgt. Engelbeck alleged a refusal of MCSO to investigate Captain Lugo and mishandling of a disciplinary matter. Even though Chief Palopoli believed that - on their face - the allegations by Sgt. Engelbeck may not be true, she supported Chief Deputy Gentry's direction that they warranted an independent review. Then, after she noted multiple examples of potential misconduct by Captain Lugo, Chief Palopoli supported him being placed on administrative leave to avoid further impediments or interference with this ongoing matter.

## Issues Raised by Investigators During April 22nd Interview

### 1. Chief Palopoli's claim that Lt. Porter forwarded the "Investigative Plan" to Jensen Hughes

At the time of her initial interview, Chief Palopoli was under the impression that Lt. Porter forwarded an "Investigative Plan" to Jensen Hughes. The "Investigative Plan" was related to both IA 2025-0111 and IA2025-0139. This was based on a flawed recollection of an email she received with the plan from Lt. Porter with the "plan" as an attachment, and her belief at the time that it was previously sent to Jensen Hughes.

This information was the subject of conversation during the second interview. Chief Palopoli acknowledges that her recollection of events is inconsistent with the records she was provided *during her second interview.* Chief Palopoli was not provided with these records prior to the interview, and her statement was based on a review of an email weeks prior.

46REPORT001595

That said, Chief Palopoli reiterates that she requested that Captain Lugo provide her with a lieutenant point of contact within PSB so that the allegations made by Sgt. Engelbeck could be addressed and routed without any involvement from individuals who were related to the complaint (more on this later in the document). This point of contact was *never* provided by Captain Lugo, yet steps were being taken by PSB personnel to prepare an "Investigative Plan" and establish an assigned investigator within Jenson Hughes. None of these actions were undertaken at the direction or with the approval of Chief Palopoli. This assertion is supported by the following communication from Mark Giuffre, a Senior Director with Jensen Hughes, to Chief Palopoli on March 28th, 2025:

> From: Giuffre, Mark
> To: Melissa Palopoli (MCSO)
> Subject: FW: IA2025-0111
> Date: Friday, March 28, 2025 2:26:17 PM
>
> Hi Chief,
> Time permitting, can you give me a call? Ref below yesterday the Capt case (IA2025-0111) was assigned by Lt. Porter to Jensen Hughes Investigator Joy Fitzgerald. My understanding from your March 25 email was you assigned it to Jensen Hughes Investigator Frank Hoglund and that you'd be overseeing it rather than Lt, but we are standing down pending your discussions with Chief?
>
> Thanks,
> -Mark
> MARK GIUFFRE, CFE, CAMS, CPP
> Senior Director, Security Risk Consulting

Chief Palopoli reached the reasonable conclusion that these steps were likely taken at *someone's* direction, and at the time, Chief Palopoli believed the person providing that direction *may have* been Captain Lugo. The basis for this belief was largely that Lt. Porter would only receive direction from a superior, and Captain Lugo was the only superior to Lt. Porter within PSB with knowledge of Sgt. Engelbeck's complaint.

As noted by Chief Anders, there may have been protocols and practices in place within MCSO at the time which would have provided an alternate opportunity for Lt. Porter's involvement, but they were not known to Chief Palopoli. From Chief Palopoli's perspective, if Lt. Porter was being directed to take action by Captain Lugo after March 18, that would be misconduct. If Lt. Porter was not being directed by Captain Lugo, this could easily be established by investigators during the "conflict" investigation. And as stated previously, and explained further below in this document, this was not the only basis for Chief Palopoli to believe that Captain Lugo potentially engaged in misconduct.

## 2. Chief Palopoli's "identification" of Captain Lugo as the "subject" of Sgt. Engelbeck's complaint

46REPORT001596

During the second interview, Chief Anders affirmed that *some* of the allegations in Sgt. Engelbeck's complaint were criminal in nature. There was significant discussion about how Chief Palopoli identified Captain Lugo as a "suspect" related to these allegations. It was Chief Anders' claim that after reading the complaint "many, many, times" he did not find any articulation which would indicate that Captain Lugo was "named as a suspect," and did not locate any "preponderance" which would lead to "reasonable suspicion" related to Captain Lugo.

Chief Palopoli maintains that a plain reading of the complaint led her to the conclusion that the complaint was about Captain Lugo. A further review of the records related to the complaint provide even more information to support Chief Palopoli's answer to this question.

Chief Palopoli first learned of Sgt. Engelbeck's complaint from an email she received from Chief Deputy Gentry on March 10th, 2025. The email from Chief Deputy Gentry contained a forwarded message directly from Sgt. Engelbeck to Deputy Chief Gentry. Below is the email exchange from Sgt. Engelbeck to Deputy Chief Gentry:

> From: Aaron Engelbeck (MCSO) <A_Engelbeck@MCSO.maricopa.gov>
> Sent: Monday, March 10, 2025 4:02 PM
> To: Jeff Gentry (MCSO) <Jeff.Gentry@MCSO.maricopa.gov>
> Subject: Request for outside agency criminal investigation
>
> Chief Deputy Gentry:
>
> Please observe the attached documents outlining my criminal complaint against the Professional Standards Bureau (PSB) for the intentional destruction or withholding of evidence between October 2024 and January 2025.
>
> Attached documentation:
> Formal statement of criminal complaint
> PDH findings
> PDH response
> Timeline of events
> Email correspondence with (then) Chief Deputy Russ Skinner
> Email correspondence with (then) Chief Michael Caputo
> Service Complaint authored by (then) Chief Michael Caputo
> Original Complaint authored by myself provided to PSB
>
> The Professional Standards Bureau has continually shown conspiratorial behavior at every level in resisting an investigation of its commander Captain Greg Lugo. I have attached correspondence with the former chief deputy (and later Sheriff) Russ Skinner in which he states an investigation will be conducted involving Greg Lugo. This investigation never occurred. I have also attached an email to former Chief Michael Caputo advising him of malfeasance within PSB, as a sergeant refused to open an investigation on Captain Greg Lugo after being advised both verbally and in writing of misconduct. The sergeant failed to investigate these allegations and further threatened me with new allegations of retaliation if I proceeded. In addition, I have attached a service complaint authored by former Chief

3/9

46REPORT001597

Caputo dismissing the behavior. A service complaint to resolve this matter is also counter to MCSO policy. MCSO policy states any supervisor advised of misconduct shall open an administrative investigation. Policy also states that a service complaint cannot be utilized to clear matters of misconduct. As you can see, for the above reasons, I cannot in any way trust our PSB division to handle a proper and impartial investigation. This is the reason I am requesting an outside agency investigate. I am, of course, available to discuss this matter further with you.

I have also added the criminal complaint in Blue Team.

Thank you for your consideration,
Sgt. Aaron Engelbeck #S1673
Maricopa County Sheriff's Office
District 1
Desk: 602-876-3774
Cell: 602-291-7485

There is no doubt that this communication names Captain Lugo as the subject of the complaint. This alone should satisfy the question related to how Chief Palopoli reached the conclusion she did related to Captain Lugo's involvement. But there are additional records which continue to validate Chief Palopoli's position.

Below is the IA Pro Audit Trail for Sgt. Engelbeck's complaint. As you can see, Sgt. Engelbeck linked Captain Lugo and Sgt. Leatham to his complaint *at the time it was filed* as "involved employee(s)". Of note, there are no additional linked employees. If it was Sgt. Engelbeck's belief at the time that someone other than Captain Lugo and Sgt. Leatham were involved, it would serve to reason he would have linked them as well.

When Chief Palopoli accessed Sgt. Engelbeck's complaint on March 11th, 2025, she would have immediately seen the section of the complaint with the "linked Involved Employees." To be clear, she has no independent recollection of this now - weeks later - but believes it is almost certain she observed this on March 11th, 2025 at the time she first accessed the complaint.

It would be incredible to believe that during Captain Lugo's initial review of the complaint on March 10th, 2025, he failed to review both the narrative portion of the complaint and the linked "involved employees." Upon information and belief, Captain Lugo is extremely familiar with IA Pro *and* the review of complaints and the manner in which they are processed.

4/9

46REPORT001598

```
Accces to Internal Complaint IA2025-0111 Received on: 03/10/2025

2025-03-10    Sergeant Aaron Engelbeck created new Internal Complain    Engelbeck, Aaron
16:03         t Incident                                                 Michael Sergeant
                                                                         [S1673]
2025-03-10    Sergeant Aaron Engelbeck viewed Incident                   Engelbeck, Aaron
16:03                                                                    Michael Sergeant
                                                                         [S1673]
2025-03-10    Sergeant Aaron Engelbeck updated Incident                  Engelbeck, Aaron
16:03                                                                    Michael Sergeant
                                                                         [S1673]
2025-03-10    Sergeant Aaron Engelbeck updated Incident                  Engelbeck, Aaron
16:04                                                                    Michael Sergeant
                                                                         [S1673]
2025-03-10    Sergeant Aaron Engelbeck linked Complainant Employee S     Engelbeck, Aaron
16:04         ergeant Aaron Engelbeck to incident                        Michael Sergeant
                                                                         [S1673]
2025-03-10    Sergeant Aaron Engelbeck linked Involved Employee Capt     Engelbeck, Aaron
16:04         ain Gregory Lugo to incident                               Michael Sergeant
                                                                         [S1673]
2025-03-10    Sergeant Aaron Engelbeck linked Involved Employee Serg     Engelbeck, Aaron
16:05         eant Robert Leatham to incident                            Michael Sergeant
                                                                         [S1673]
2025-03-10    Sergeant Aaron Engelbeck marked incident entry complet     Engelbeck, Aaron
16:05         e                                                          Michael Sergeant
                                                                         [S1673]
2025-03-10    Investigator assigned: Un-assigned                         Captain Gregory
19:03                                                                    Lugo
2025-03-10    Incident access by a user.                                 Captain Gregory
19:03                                                                    Lugo
2025-03-11    Incident access by a user.                                 Exec Chief
11:01                                                                    Melissa Palopoli
2025-03-18    Incident access by a user.                                 Exec Chief
09:05                                                                    Melissa Palopoli
2025-03-19    Incident access by a user.                                 Mgt an Monique
14:04                                                                    Habblett
2025-03-19    Viewing linked employee folder Sergeant Aaron Michael      Mgt an Monique
14:09         Engelbeck [S1673]                                          Habblett
2025-03-21    Incident access by a user.                                 Captain Gregory
10:26                                                                    Lugo
2025-03-24    Incident access by a user.                                 Exec Chief
08:55                                                                    Melissa Palopoli
2025-03-24    Incident access by a user.                                 Exec Chief
11:24                                                                    Melissa Palopoli
2025-03-24    Incident access by a user.                                 Mgt an Monique
13:58                                                                    Habblett
2025-03-24    IA No changed from BLANK (NULL) to IA2025-0111             Mgt an Monique
13:59                                                                    Habblett
2025-03-24    Mgt an M Habblett viewed printable report                  Mgt an Monique
14:00                                                                    Habblett
```

### 3. Chief Palopoli's belief that Captain Lugo failed to provide her with a timely notification

In the second interview, there was discussion related to what constituted a "timely" notification, and the basis for Chief Palopoli's assertion that Captain Lugo failed to provide her with a timely notification upon being aware of the pending complaint against him. The premise to excuse Captain Lugo from this allegation would necessarily be that when he reviewed the complaint, he did not derive from the complaint it was about him.

Based on Captain Lugo's familiarity with IA Pro, it is incredibly unlikely that when Captain Lugo reviewed the complaint he did not see the "linked Involved Employees." It is reasonable to believe that during Captain Lugo's initial review, he was aware of both the narrative portion containing the allegations - and the involved employees section. At the time this occurred, it would have triggered the requirement for notification to his chain of command that Captain Lugo was the subject of a complaint. This did not occur. While there

5/9

46REPORT001599

may be context and information which would shed light as to why this did not occur, the proper place for this to be established would be within the confines of an investigation.

As a preliminary matter, MCSO Policy GH2 explicitly prohibits an involved employee from investigating *or even reviewing* an investigation. As soon as Captain Lugo opened this investigation in IAPro, he would have seen himself listed as an "involved employee" - therefore, per policy, he should have declined to access the investigation further (even without any directive from a higher authority).

> 1.  No employee who was involved in an incident shall be involved in or review a misconduct investigation arising out of the incident.

Additionally, during her second interview, Chief Palopoli was asked multiple questions about why she believed that Captain Lugo's failure to make a timely notification constituted a policy violation, and whether her understanding of timeliness was subjective or consistent with MCSO's view on notification requirements. Although Chief Palopoli was questioned related to the contents of GH2 during her second interview, investigators declined to provide her with a copy of this policy during questioning. But after the second interview, Chief Palopoli reviewed MCSO Policy GH2 and notes the following on page 25 -

> 4.  If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief-level position or, if there is no non-conflicted chief-level position, an outside authority.

Chief Palopoli points out that the discovery of a conflict of interest requires *immediate* notification - and there is an obvious conflict of interest in the PSB Commander being involved in an allegation against himself.

Additionally, It would seem disingenuous to suggest that Captain Lugo did not recognize a conflict of interest while he was facilitating the outsourcing of this investigation to Jensen Hughes. In Chief Palopoli's communications with Chief Anders on March 25th, 2025, she notified Chief Anders of the pending complaint against Captain Lugo and Sgt. Leatham, and within about twenty minutes of sending this email Chief Anders directed that any advancement of this investigation in the direction of Jensen Hughes be paused pending additional conversation.

The obvious nature of this conflict was directly addressed by Chief Anders during his interview with Chief Palopoli on April 17th, 2025, when he made the following statement on the record:

6/9

46REPORT001600

Chief Donald Anders (36:22):

So when you and I talked on the 26th, in fact, when I sent an email back to you on the 25th, I asked that you not advance that investigation, with Jensen Hughes. And then when we spoke on the phone on the 26th, I explained why and the, uh, managerial administrative and operational history that Captain Lugo had with Jensen Hughes, and that that would be entirely inappropriate for that investigation to go to Jensen Hughes for those reasons. Clearly a conflict. Um, and in light of that managerial administrative and operational and training history that PSB has with Jensen Hughes, the responsibilities Captain Lugo has with regards to managing investigators and the, and the completed investigations from Jensen Hughes, what are your thoughts about Captain Lugo then guiding you to utilize Jensen Hughes as the investigative entity for 0111?

Despite the clarity Chief Anders had on this issue, Captain Lugo not only communicated to Chief Palopoli that Jensen Hughes was the proper conflict investigator(s) for Sgt. Engelbeck's complaint, he facilitated this further in his email to Monique Habblett on March 24th, 2025.

From: Gregory Lugo (MCSO)
To: Monique Habblett (MCSO)
Cc: Melissa Palopoli (MCSO)
Subject: IC - BT - 03/10 - D1
Date: Monday, March 24, 2025 10:12:16 AM
Attachments: image001.png

Good morning, Monique.
Chief Palopoli has requested the IC in BT from 03/10 entered by D1 be made an IA and be assigned to Jensen Hughes. Please defer any questions on this matter to Chief Palopoli.
Thank you,

Greg Lugo
Captain
Professional Standards Bureau
Maricopa County Sheriff's Office
550 West Jackson Street
Phoenix, AZ 85003
Office : 602-876-1656
E-mail

Chief Palopoli can attest that Captain Lugo *never* informed her of this apparent conflict, though this potential misconduct was not alleged within Chief Palopoli's complaint.

### 4. Chief Palopoli's position on whether Sgt. Engelbeck's administrative allegations were addressed by (former) Chief Caputo

During the second interview, there was discussion related to whether (former) Chief Caputo's investigation had previously resolved Sgt. Engelbeck's allegations (with the exception of the new criminal allegations). Again, referring to the email sent from Sgt. Engelbeck to Chief Deputy Gentry, Sgt. Engelbeck makes the assertion that (former) Chief

7/9

Caputo resolved his allegations in a manner contrary to MCSO policy. This is a potential independent claim of misconduct, albeit against a former employee. The relevant portion is as follows:

> "In addition, I have attached a service complaint authored by former Chief Caputo dismissing the behavior. A service complaint to resolve this matter is also counter to MCSO policy. MCSO policy states any supervisor advised of misconduct shall open an administrative investigation. Policy also states that a service complaint cannot be utilized to clear matters of misconduct. As you can see, for the above reasons, I cannot in any way trust our PSB division to handle a proper and impartial investigation. This is the reason I am requesting an outside agency investigate. I am, of course, available to discuss this matter further with you."

While Chief Palopoli is not taking a position on whether this allegation is true, *if* the "responsible" thing to do was to conflict this investigation out (Which Chief Deputy Gentry suggested at the time he brought this issue to Chief Palopoli's attention), Chief Palopoli would assert that the investigation should be referred out completely. The conflict investigation should attempt to resolve all allegations made by Sgt. Engelbeck in order to conclude this matter definitively.

**5. Chief Palopoli's position on the "totality of the circumstances"**

It appears all agree that some of the allegations in Sgt. Engelbeck's complaints were criminal in nature - and that was certainly Sgt. Engelbeck's position as the subject of the email is titled "Request for Outside Agency Criminal Investigation." It is clear that Captain Lugo was the MCSO employee referenced in the email from Sgt. Engelbeck to Chief Deputy Gentry. Captain Lugo and Sgt. Leatham were the only MCSO employees added to this complaint as "involved employees." After this complaint was received and elevated, it was Chief Gentry's position that "the responsible thing to do would be to ask an outside agency to investigate."

Subsequent to this email, Chief Palopoli conducted a preliminary review of the complaint and associated materials. Chief Palopoli then provided directives to Captain Lugo on March 18. These directives were not ambiguous. Captain Lugo was to remove himself from the investigation, and provide Chief Palopoli with a lieutenant point of contact within PSB as the complaint was evaluated and next steps were considered. Captain Lugo accessed the complaint after the directive (and inconsistent with MCSO's conflict-of-interest policy), and failed to provide Chief Palopoli with the requested point of contact.

As next steps were being considered by Chief Palopoli, Chief Deputy Gentry, Chief Anders and others, it was brought to Chief Palopoli's attention that there were communications from PSB to Jensen Hughes. These communications were not directed or even informed by Chief Palopoli. Again, there may have been mitigation and context for why these actions

8/9

were taken - but Chief Palopoli maintains the proper place for this information to come to light would be within the sheltered transparency of an outside investigation.

## Conclusion

A full and fair review of Chief Palopoli's actions will show that any assertion that her actions were targeted toward Captain Lugo are false. To the contrary, Chief Palopoli's actions were based on communications and materials from Chief Deputy Gentry, her review of materials, and follow up communications with the command staff of MCSO and the Monitor Team. The direction(s) she provided after her review were intended to facilitate an independent outside investigation so the truth of these matters could be properly established.

46REPORT001603

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with TIFFANY SHAW

May 13, 2025


_____


Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001604

**<u>TRANSCRIPT OF INTERVIEW WITH TIFFANY SHAW</u>**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001605

P R O C E E D I N G S

MR. ANDERS:  Okay.  We're on the record.  The time is approximately 3:56 p.m. on Tuesday, May 13, 2025.

My name is Donald Anders.  We are in the Luhrs Tower building in downtown Phoenix, Arizona, sixth floor, the Federal Monitor's conference room.

With me today from the Monitoring Team is Major Al Peters.  There are two other individuals with us here in the conference room and I'll ask them to identify themselves.

MS. SHAW:  Tiffany Shaw, Maricopa County Sheriff's Office.

MR. POPOLIZIO:  And Joe Popolizio, counsel for the Sheriff, Jerry Sheridan, in his official capacity.

EXAMINATION

BY MR. ANDERS:

Q.   Great.  Can I call you Tiffany?

A.   Yes.

Q.   Tiffany, thank you very much for being here today.

A.   Sure.

Q.   And we'll try to be as quick as possible.

If I ask a question and I don't ask it the right way, I am ambiguous, twist my words, it comes out as verbal spaghetti just tell me, "Hey, ask that again, will you?"  If you think of something that, "Oh, five minutes ago I said this," and you want to add to it, just go ahead and do so.  If

4

you need to take a break at any time, just let us know --

A.    Okay.

Q.    -- we'll take a break.

        I also want you to know are you not in trouble.

A.    Okay.

Q.    You are not a principal.  We have no concerns that Tiffany Shaw has done anything wrong whatsoever.  And I'm not here to discover if Tiffany Shaw did anything wrong.

A.    Okay.

Q.    The purpose of the questioning today surrounds the email that you sent Lieutenant Porter regarding the decision meeting involving Chief Holmes and Captain Morrison and the issues surrounding Captain Morrison's reference to executive command and that how he got commissions to waive NOI, et cetera.

A.    Okay.

Q.    So you authored an email to Lieutenant Porter who was the acting commander of PSB.  I have that email here and that is dated April 29, 2025.  Does that look familiar to you?

A.    It does.

Q.    Okay.  Can you just -- an open-ended question.  Tell us what the circumstances were that led up to that email being sent to Lieutenant Porter.

A.    Can I just read it real quick again?

Q.    Please.  Absolutely.

A.    Okay.  So the purpose of it was to let PSB know of a

concern that Ken Holmes had brought up after he had a meeting with Captain Morrison and it was just to bring it to their attention similar to any other time we have PDHs or any other meetings in which Ken has concerns, that he brings them to either myself or Commander Callahan's attention and we will draft an email and send it over to PSB for them to look into what the topic is.

Q.    Okay.  Do you attend the decision meetings?

A.    No.

Q.    Okay.  That decision meeting with Captain Morrison and Ken Holmes occurred on April 24, five days before this email.  Do you recall when Chief Holmes contacted you about the decision meeting and his concerns?

A.    Does anybody have a calendar that I could look at, what that date is?

Q.    Let me pull one up here.  That would be April.

A.    So this occurred on the 24th.  So -- that's so funny.

        The 24th --

Q.    That was the decision meeting.

A.    That was -- can I look at my calendar?

Q.    Please.  Of course.

A.    So April 24.  I was on a vacation day and then I was out of town the 25th, the 26th, and the 27th.  So then when I got back on the 28th, Ken and I probably had a discussion about it. And then if I recall correctly, he and I worked on what this

email would say; and once we landed on what we wanted the language to include, I sent the email to Lieutenant Porter.

Q.   Okay.  And I think you said earlier that would not be untypical.  It wouldn't be unusual for Ken Holmes to approach you with a concern that he had resulting from a PDH or a decision meeting?

A.   That is how the process works.

Q.   That's how it works?

A.   M'hum.

Q.   Okay.

Do you recall, did he approach you in person?  Do you know?

A.   No.  He would not -- it would have been a phone call because he's not in.

Q.   And do you recall what it was he said, how he approached the topic with you?  Was it like, "Hey, I think an NOI policy has been violated and I'm not sure what to do about it," or what was the tenor or the nature of his contact with you?

A.   Just to tell me that he wants this information sent to PSB.

Q.   Okay.  Did he show you a memo from Captain Morrison to Chief Holmes where these three areas are identified in the memo?

A.   So the attachment that -- addendum, I don't know what it's titled, what Captain Morrison titled it, but that information

comes to us and so I did have a chance to look at it.

Q.    Okay.

A.    I don't know which day but I did look at it.

Q.    Okay.

A.    Did that answer your question?

Q.    Yeah.  You sent this to Lieutenant Porter on the 29th. Have you had any return communication with PSB since then? Have you heard anything?

A.    No.

Q.    And have you contacted PSB at all since the 29th regarding this matter?

A.    No.

Q.    Based upon what -- I'm just asking for your opinion, not a conclusion, based upon the information that was provided you by Chief Holmes, he had been in the office at least 30 years, do you have any concerns about -- it could be an issue here with a violation of the NOI policy?

A.    I mean -- yes.  I guess that's why we sent it over to PSB. I mean I didn't tell Ken that I didn't agree with him, that it needs to be looked into.

Q.    In your 30 plus years, do you ever recall an instance -- you have been 20 years in Conduct Resolution?

A.    Yes.

Q.    Or at least overseeing Conduct Resolution.

A.    M'hum.

46REPORT001610

Q.    Are you familiar with a circumstance where an active NOI has been waived by somebody with authority within the organization?

A.    I'm not aware but that doesn't necessarily mean it hasn't occurred.

Q.    Yeah.

A.    Because conversations occur way above my head or with PSB directly so nothing that I'm aware of.

Q.    Yeah.

         We've spoken with Chief Holmes.  He said that at some point relatively contemporaneous to the decision meeting on the 24th he had questions so he reached out to Ryan -- what's Ryan's last name?

         MR. POPOLIZIO:  Giguere.

Q.    Giguere?

A.    Yes.

Q.    How do you spell Ryan's last name?

A.    For as many years as he's worked for me, I still say it wrong.  I think it's G-I-E-G-U-R-E.

Q.    Okay.

         MR. POPOLIZIO:  We weren't sure.

BY MR. ANDERS:

Q.    Is my understanding right that he's like a staff analyst?

A.    Yes.

Q.    In Conduct Resolution?

46REPORT001611

A.    Yes.

Q.    So he said he reached out to Ryan and asked Ryan about this circumstance, probably identified Captain Morrison and Undersheriff Gentry as being involved in this, that Ryan reached out to counsel or an attorney, got some kind of an opinion and then provided that opinion regarding NOIs back to Ken Holmes.  This comes from Ken Holmes.

And I summarized but that was the instance of the presentation.  And I asked Chief Holmes, what are your thoughts about the appropriateness of identifying potential principals, one being the Undersheriff and serious allegation of misconduct to a staff analyst in Conduct Resolution.

And I'm curious what your thoughts are regarding the appropriateness of that.  In other words, can that be done like hypothetically without identifying anybody?  Is it appropriate to tell a staff analyst in Conduct Resolution that essentially there's a real possibility the Undersheriff could be a principal in an administrative investigation?

A.    So what you're asking me, is it inappropriate for Ken to talk to Mr. Giguere about this?

Q.    About this, yes.  In your opinion.

A.    I would say no because in our pattern of practice of how we handle matters in the Conduct Resolution section, we see a lot of sensitive information.  So it's -- it's -- this isn't really anything that would be necessarily alarming for him to

talk to Ryan about.

Q.   What is your confidence level that if a conversation like that occurred and if Chief Holmes talked to Ryan and -- my words, not Chief Holmes -- if he said, listen, I have some questions here.  It looks like an active NOI could have been violated.  Looks like a Captain may have violated it and it looks like the Undersheriff may have facilitated that violation.  I'm not saying that happened.  Let me be clear. I'm not saying that is the allegation.  This is just an example.

If he made a statement like that to Ryan, what is your confidence level that that would remain confidential with Ryan?

A.   I feel confident that it would.

Q.   I think I touched on this a little bit earlier.  Are you aware of any authority, any policy -- any policy, any ordinance, any bylaw, any code that would allow anybody in the organization other than the PSB commander to waive an NOI, to advise a principal in an administrative investigation that the NOI is no longer applicable?

A.   Do I know of any policy or procedure --

Q.   Or ordinance or law that says any chief officer in the organization can waive an NOI, just by way of example?

A.   I don't know of anything.  And that's part of why this was sent, so that it could be looked into.

46REPORT001613

11

Q.   Absolutely understood.   Yeah.

Major Peters, do you have anything?

MAJOR PETERS:   No.

BY MR. ANDERS:

Q.   I told you it would be quick.   You're not in any trouble.

A.   I would not think that I would be.

Q.   I would also say that you did the right thing, absolutely.
Yeah.   Thank you very much for your time today.

MR. ANDERS:   We're going to go off the record and the
time is approximately 4:09 p.m.

46REPORT001614

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 7th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with KEN HOLMES

May 13, 2025

_____


Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001616

## TRANSCRIPT OF INTERVIEW WITH KEN HOLMES

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001617

3

                    P R O C E E D I N G S

          MR. ANDERS:  Okay.  We are on the record and
recording.  My name is Donald Anders.

          THE WITNESS:  I'm with the federal Monitoring Team.

          With me today is Major Al Peters also with the team.
We're presently located in the Monitor's office on the sixth
floor of the Luis Tower in downtown Phoenix, Arizona.

          With us today are three individuals.  I just ask you
to identify yourself, please.

          MS. BARNES:  Sarah Barnes of Broening, Oberg, Woods &
Wilson for Mr. Holmes.

          THE WITNESS:  Ken Holmes, the Appointing Authority
for the Sheriff's Office.

          MR. POPOLIZIO:  Joe Popolizio of Jones, Skelton &
Hochuli on behalf of Jerry Sheridan in his official capacity as
the Sheriff of Maricopa County.

          MR. ANDERS:  Great.  Thank you very.  The time is
approximately 11:03 a.m. on Tuesday, May 13, 2025.

                         EXAMINATION
BY MR. ANDERS:
Q.   Quick housekeeping, anytime anybody wants to take a break
please say so and we'll be sure that happens just as soon as
possible.  We have water here if you are so inclined.

          Chief, as I ask questions today, if I'm not asking
with an appropriate level of clarity or too much ambiguity, if

46REPORT001618

you want me to repeat or try a different approach, please just say so.  No offense taken whatsoever.

A.    Thank you.

Q.    Chief, regarding PDH, you're the Appointing Authority for Maricopa County Sheriff's Office and we had a conversation about that during your past interview.  And as I recall, you had represented you had conducted thousands of PDHs.  Does that sound about right?

A.    Yeah, a little more than 2000.

Q.    Have you ever reversed a PSB finding in those PDHs?

A.    Yes.

Q.    So a PDH -- you conducted a PDH prior to that.  You would be in receipt of a completed investigation by PSB.  PSB would forward that investigation through Conduct Resolution to you with a recommended finding.  Is that -- does that sound accurate?

A.    Yes.

Q.    Of those approximate 2000 PDHs, about how many findings do you think you may have reversed?

A.    I don't even think I could get -- not a lot.  Very few, but it does happen.

Q.    Okay.

A.    As far as the number having to do with 2000, it's 2000 -- I think cases as opposed to PDHs.  I don't think all of those were PDHs.

46REPORT001619

Q.    Okay.

A.    Just for clarity.

Q.    I want to talk a little bit about Captain Morrison. You're familiar with a recent case involving Captain Morrison. PDH for that particular case was held on August 29, 2024. Does that ring a bell?

A.    Date not so much put I do know the case.

Q.    Okay.

Do you recall what the allegations were in that case?

A.    For Captain Morrison, it was a failure to meet standards I believe by not -- not recognizing an alcohol violation.

Q.    Okay.

Are you aware of any previous misconduct complaints that had been made against Captain Morrison?

A.    I had him for two others.  So this would be his third.

Q.    His third?  Okay.  Those two previous, do you recall what the find -- ultimate findings were that you determined?

A.    Well, they are on his record so I believe it was sustained.  Yeah, both of them.

Q.    Before you conduct -- so let's just talk specifically about the Captain Morrison PDH, and that was held on August 29, 2024.  You would review the investigation conducted by PSB prior to that PDH; correct?

A.    That's correct.

Q.    And as I recall, that investigation was actually conducted

46REPORT001620

6

by Jensen Hughes.  Does that ring a bell?

A.    The investigation?

Q.    Yes.

A.    Yes.

Q.    It was an investigator by the name of Joy Fitzgerald.

A.    That's correct.

Q.    Prior to the PDH, when you were in receipt of the investigation and you reviewed the investigation, did you have any concerns before the PDH about the investigation or the recommended sustained finding?

A.    Initially?  I don't know what my initial thoughts were necessarily but it was -- you know, like all of them, not just Jensen Hughes but I just dig into it and see what they have to say about this particular case.

Q.    Okay.

You don't recall that initially you had concerns about any facts in the case or absence of facts or the conduct of the investigation, comprehensiveness of the investigation?

A.    Not so much in the beginning.  You know, I just take it for face value as to what I'm receiving.

Q.    In all of the PDHs that you have conducted as the Appointing Authority, have you ever been in receipt of a case completed by PSB, you've reviewed the case pre-PDH, and then had concerns about the investigation and sent it back to PSB for supplementary investigation before the PDH even occurred?

A.    If I did that, it would be rare.  I can't even think of one but I'm sure that we've had something like that out of the numbers we've had.

Q.    So if you can recall, what would be -- would be your preparation for Captain Morrison's PDH in August of 2024?

A.    Well, it isn't so much as a preparation on my part as it is on theirs.  This is their time to say whatever they are going to say in addition to whatever the investigation has to say.  So it's a time that I listen to them and see what they have that they may add to this case or maybe they come up with different -- something else that's -- those are the cases then that end up being moved back to PSB.

Q.    You would have read the PSB case?

A.    Yes.

Q.    Before the PDH?

A.    Yes.

Q.    Looked at perhaps -- if there was video of an incident --

A.    Yes.

Q.    So if a principal, hypothetically, came to PDH and said, "I wasn't even working that day," your thought is, well, in fact you were because I've looked at the video?

A.    Well, sure.  But I would also just double-check that.  If that's something that they feel strongly about, that's something I would check.

Q.    Okay.  PDHs are typically videotaped?

A.    Yes.    They all are.

Q.    And is some from -- remind me.  I apologize.  I mean, you may have answered this already before.  Is somebody from Conduct Resolution present at the PDH also?

A.    Yes.

Q.    Is that Denise Callahan?

A.    It is.

Q.    Captain Morrison wrote a memorandum, several-page memorandum, and it's addressed to you from him and it's dated August 29, 2024, which is the day of the PDH.  Do you remember receipt of that memorandum?

A.    I do, yes.

Q.    Was it presented to you in person at the PDH?

A.    My recollection is yes.

Q.    Okay.

A.    And it's easy to tell by looking at the video.  You can confirm that.  And I'm not sure whether he read from it or he spoke about it.  I think he read from some of it.

Q.    You anticipated my next question and that is --

A.    It would be on the PDH.

Q.    On the video?

A.    On the video, yes.

Q.    Do you recall in summary the issues or concerns that Captain Morrison raised in that -- I'll call it a memorandum or in his presentation of the PDH?

A.    Do I remember --

Q.    In summary what his concerns may be?

A.    I think it's more of a he didn't believe he did anything wrong pretty much.

Q.    Okay.

A.    And was giving explanations as to where he was and what he was saying.  And I think he brought up things that the investigator didn't provide in the report and was wanting that to be handled as well.

Q.    Okay.  When you were employed full time with the office, was Captain Morrison an employee of the office at that time, too?

A.    Yes.

Q.    You guys have any -- how would you describe your relationship with him?

A.    I think fine.  I mean, I don't -- he's been in some divisions or Bureaus that I've worked in so I'm familiar with him.

Q.    Professional relationship, not a personal relationship?

A.    Yeah.

Q.    The documents reveal that at the conclusion of the PDH on August 29, 2024, you then sent the PSB investigation back to PSB?

A.    That's correct.

Q.    Do you recall why?

46REPORT001624

A.    My recollection is that he raised some issues that were -- could potentially change the findings, different evidence, and that -- that's the reason why I sent it back.

Q.    What did the mechanics of sending it back to PSB -- how does that happen?

A.    Well, I mean, I'm probably once removed from that.  But Denise generally takes it.

Q.    So you would give it to --

A.    Denise.

Q.    -- Denise Callahan?

A.    Callahan.

Q.    And she would convey it to PSB.

When PSB gets it, do they know why it's being returned?  In other words, do you document something saying I'm sending this back post-PDH.  I am requesting A, B, and C, or I have concerns about A, B, and C, or A, B, and C, were presented by the principal and these are not appropriately addressed?

A.    I didn't.  I would probably point you in the direction of Denise Callahan because I -- there was additional evidence that was being brought forward, and I'm sure that there's a memo that goes along with that, and it was probably pretty brief but it's just that and then she ends up submitting it to PSB.  It isn't detailed from me.

Q.    So it's a memo she would write?

A.    An email.

46REPORT001625

Q.    An email?  Okay.  You would be the one with concerns.  It wouldn't be Ms. Callahan?

A.    Correct.

Q.    And so I'm just trying to figure out if I'm, say, lieutenant in PSB and this case gets returned to me and there's a memo from the principal that was present at the PDH, I have a question.  Why is Chief Holmes sending this back to me?  How does that question get answered?

A.    Not looking at that email, I would imagine it has been sent out that there was additional evidence that was presented by the employee and we would like to have it looked into.

Q.    I think it was in a supplementary memo that Captain Morrison wrote.  That memo is dated April 21, 2025.  And in that supplementary memo -- I have it here.  You can look at it if you would like.  This is the supplementary memo.  He wrote to you --

A.    This is the second one.  Okay.

Q.    April 21, 2025.

A.    Right.

Q.    In that memo he references to the effect of PSB investigation was completed on April 8, 2025.  Does that sound about right?

A.    That the investigation was done on the eighth?

Q.    The supplementary PSB investigation.

A.    Is it supplementary or do they identify it as an addendum.

46REPORT001626

My recollection is it was an addendum that came back from the investigators, Jensen and Hughes.

Q.    I'm reading from the memo that Captain Morrison wrote and in the first paragraph he writes:  (As read)  For this reason, on 4-8-2025, paren, after the investigation had been completed and resubmitted to you, meaning Chief Holmes, for determination.

So it doesn't necessarily say that it was completed on April 8, 2025, just that on that date that was after it had been completed.  I just wanted to be clear with that because I'm going to talk about some additional timelines here in just a minute --

A.    Okay.

Q.    -- between August 9 of 2024 when the PDH occurred --

MS. BARNES:  29th.

MR. ANDERS:  You're right.  I stand corrected.

BY MR. ANDERS:

Q.    -- August 29, 2024, when the PD occurred and April 29 -- April 24, 2025, when the decision meeting was held --

A.    That was the 24th.  It was a Thursday.  I do know that.

Q.    April 24, 2025, yeah.  Between that time, approximately eight months, did you have contact with anybody in the office, in the Maricopa County Sheriff's Office, regarding Captain Morrison's case?

A.    Well, the answer would be no.  For the most part, I just

left it off to the side because I think he had some [inaudible] matters or things of that nature.  But I had a very brief conversation with one of the -- I'll wait for you to get to that point.

Q.    So conversation with one individual in the office?

A.    One.

Q.    Between PDH in August of 2024 and the decision meeting in late April 2025?

A.    Yes.  In fact, I think that one discussion was maybe two weeks earlier.  I think around the tenth.  Does that -- does that fit within the time frame, the 10th of April?  Not looking at a calendar.

Q.    So who is the individual that you had the conversation with?

A.    Jeff Gentry.

Q.    The Undersheriff?

A.    Yes.

Q.    So I'll call this second memorandum that Captain Morrison wrote.  It's dated April 21, 2025, as I mentioned earlier. It's addressed to you from him.  It's a multi-page memo.  It has some attachments.  There are like some emails or letters from three individuals.  I think one is a retired Sergeant Kelleher.  Another is a former Chief Letourneau and then Captain Morrison's wife.  It's dated three days before the decision meeting that you hosted with Captain Morrison.

46REPORT001628

Q.    Do you recall when you got this memorandum?

A.    I think the 24th.

Q.    The 24th?

A.    Yes.

Q.    The day of the decision meeting?

A.    Wasn't it the 26th was the decision meeting?

Q.    The records I have represent the 24th but I could be wrong.

A.    It was earlier in the week, my recollection.  This is April of '25 when we're talking?

Q.    Yes.

A.    So, yeah, the 24th, yes, the 24th was the day of the PDH -- or the discipline meeting.  I received it on the 22nd.

Q.    On the 22nd.  Okay.

A.    The 22nd.  It was a Tuesday I think.

Q.    Do you recall how you received it?  Was it emailed or --

A.    It was emailed to me by Denise because I don't know when she got it.  But I think maybe the day before.

Q.    Okay.  So two days before the disciplinary?

A.    Yes.

Q.    Our decision meeting.

A.    Decision meeting, correct.

Q.    So just recounting the chronology, PDH in August of 2024, Captain Morrison wrote a memo and submitted it at that PDH in 2024.

A.    That's the first one.

Q.    Then we advance to April 21, 2025.  That's the day that the second memo is dated?

A.    Right.

Q.    You received it one day later, April 22, then the decision meeting was April 24 with Captain Morrison.

A.    Right.

Q.    What are your thoughts about receiving information or statements or memos or letters from a principal about their case post-PDH?

A.    Again, I don't think this happens very often.  In this particular case, that made no difference in my decision.  I had already made the decision.  That's why we're having a disciplinary meeting.  It was over.

This just comes in and it had no bearing, there was no additional facts that were helping me to make a decision for him, so that is the reason why this didn't go back anywhere. It just -- it's over.

Q.    So for all intents and purposes, this is moot.  In other words -- did you read this?

A.    I did.  I did read it.

Q.    It didn't inform or influence in any way your -- the decision had been made prior to your receipt of this on April 22 --

A.    That's correct.

46REPORT001630

16

Q.    -- of 2025?

Did you have any conversation or communication with Captain Morrison between the time of his PDH and the time of the decision meeting other than being in receipt of this second memorandum that he wrote?

A.    No.

Q.    You've read the addenda to the original PSB investigation; correct?

A.    Yes.  That's the one I think you referred to as a supplemental.

Q.    Yeah.  And you read that prior to the decision meeting?

A.    Yes.

Q.    And it sounds like you read it before you were in receipt of the second memo from Captain Morrison dated April 21?

A.    Yes.  Yes.

Q.    Do you recall when you read that?

A.    No.  No.  I don't.

Q.    Do you recall what was included or what was different or what was added to the original investigation?

A.    In this particular memo?

Q.    No.  I'm sorry.  The original PSB investigation, sent back to PSB and then it came back and you read it again, do you recall what was added, what the addenda was?

A.    There was an interview with Bailey, Captain Bailey I think at the time.

46REPORT001631

Q.   Do you recall who did that interview?

A.   No.  I was going to guess, which is no great place to guess, but I was thinking it was Joy.  But I'm looking at the video in my head and I can't remember if it was a male or female, because there is a male and female that do the investigations.

Q.   What was the final decision that you made regarding Captain Morrison's case?

A.   Not sustained.

Q.   And he was informed of that at the decision meeting on April 24, 2025?

A.   Yes, he was.

Q.   And do you recall why you came to a conclusion of not sustained as compared to the PSB recommendation twice of sustained?

A.   It was a lousy case.  There were just -- a lot of it relied on people's memories and what they said.  It was really not a wealth of physical evidence.  This just wasn't one of those cases.  So somebody's memory says he does this on this day and somebody says, "No, I didn't.  I did it on that day," and somebody -- it just was scattered everywhere.

Q.   What were your impressions of the quality of the investigation?

A.   Well, it was good enough for me to understand that it was a bad one.  It was just not -- I mean, we've had some with them

46REPORT001632

before and they are good.  I'm not sitting here complaining about that.  But this one, just given the nature of it, was too much he said/she said.

Q.   So let me just bifurcate that a little bit.  Was it a bad investigation or was the nature of the allegation and the evidence bad?

A.   I think the nature was bad.  It would be just pretty much testimonial evidence.  "I said this."

"No, you didn't."

There's nobody to say, "Okay, well this is" --

Q.   But you're not casting fault to Jensen Hughes or PSB that it could be a better investigation?

A.   I'm not sure what else you could have done.

Q.   When you reach that conclusion, what documentation do you do to make it a matter of record?  What does policy require?

A.   Justification memo.

Q.   And that is returned back to PSB?

A.   Yes, and ends up in the file eventually.

Q.   Okay.  I'm sure that was done in this case.

A.   It was.

Q.   In that justification memo, would it outline the reasons why you came to the conclusion of not sustained?

A.   There's some bullet points that would explain that.

Q.   Between the PDH August of 2024 and the decision meeting on April 24, 2025, were there any communications between you and

any members within the office or outside of the office that in any way informed, altered, or influenced your decision to come to a not sustained finding?

A.   No.

Q.   Now, in the memo, when I read the memo and I believe, based upon another document I've seen, you called out the same, there are at least three areas where Captain Morrison references contact with executive command and requesting to be released from the Notice of Investigation or language very similar to that.  And this is -- he documents this in the memorandum that he authored to you dated April 21, 2025.

You would have read this on April 22 of 2025 or at least that's when you received it?

A.   Yes.  I received it then.

Q.   Okay.  When you read the memo, did you have any concerns?

A.   Yes.

Q.   And what would those concerns be?

A.   Well, it's written at least three or four times.  Being slow that I am, I picked it up probably on the third time. What is this?  What is this?  And so I was concerned, just from the standpoint of what it is.  How -- why is he writing it in there?

Q.   And when you looked at it and you're asking yourself what is this, what prompts that, what causes you concern about it?

A.   Because there's other people getting involved in a case

that's still under investigation basically.  It hasn't finished yet.  It's not closed.

Q.    And I don't want to put words in your mouth.  Would that be a potential violation of office policy?

A.    Notice of investigation.  NOI.

Q.    Do you recall what the terms and conditions are with regards to an NOI when a principal is served?  In other words -- I'll save you some time.  When does an NOI become inactive and no longer imposed upon a principal?

A.    It's in GH-2 and it's about one sentence.  You have GH-2 here, that's relatively a newer version.

Q.    Do you know what it says?

A.    Yes.  It's closed until PSB says it's not.

Q.    Until PSB notifies the principal that the case is closed.

A.    Right.  Yes.  Yes.

Q.    And what appears to be referenced in the memorandum written to you from Captain Morrison is, as far as you know, the case is still open?

A.    I believe it's still open.  I mean, it's open until PSB says it's closed.

Q.    Sure.  Haven't had the decision meeting yet?

A.    Sure.  But even after I have the decision meeting, it's still open until PSB says it's not.

Q.    Correct.  Okay.  So what did you do when you read this?

A.    Well, I already made up my mind with respect to the

decision on that case and so I asked him on this either who or what is this?  What do you mean by executive command?

Q.    And what was his reply?

A.    It was Undersheriff Gentry.  He had spoken to him about this.

Q.    Did he say when he had spoken to Undersheriff Gentry?

A.    No, because I didn't want to get any further into it.  I could see as soon as he said this and I saw that this was something that needs to go back to PSB, this issue.

Q.    You knew that right away?

A.    Right away.

Q.    Why would that be?

A.    Because it's a violation of his NOI.  It wasn't clear.  I think it came up in our brief conversation about that and he was -- he sends -- he sensed -- it was justified because he got clearance by Gentry.

Q.    Okay.  What are your thoughts about the Undersheriff providing a release or permission or consent to violate an NOI?  Is that authorized in policy anywhere?

A.    Only PSB can close the case.  It doesn't say anybody else in policy.  It doesn't even say the Sheriff can close it.  So just PSB.

Q.    So as a retired Chief in the Maricopa County Sheriff's Office, is my understanding that your sense is there is a strong possibility of a policy violation here?

22

A.    Yes.

Q.    What did you do at that point?

A.    I brought it to the attention of Tiffany Shaw who is over the Compliance Division.  I told her what happened.  And together we just crafted an email and sent it to -- that information to PSB.

Q.    When you contacted Tiffany Shaw, do you remember when that was?  The decision meeting was April 24.  Was it the same day, days later, the 24th?

A.    The 24th.  Just right after it was done.

Q.    And met in person?

A.    Tiffany?

Q.    Yes.

A.    Yes.

Q.    I'll express my naivete.  Why approach Tiffany Shaw rather than directly notifying PSB?

A.    That would be my way into PSB, that she would get to them to tell them this is what I came up with.  It wasn't -- I'm not -- I don't necessarily reach out personally to PSB or Greg Lugo or anybody like that.  I do with Greg sometimes, just depending on what the cases are.  But, yeah, I think it was done that day or maybe it was the day after.  No, it was probably done that day.

Q.    You said you helped craft an email with Ms. Shaw?

A.    Yes.

46REPORT001637

Q.   Were you there when she sent it to PSB?

A.   We were -- I told her where in that I found the problem and then I briefly said what I received as information and she drafted the email.  I proofed it and then she sent it to PSB.

Q.   Okay.  Do you know who she sent it to in PSB?

A.   I do not.

Q.   Okay.  But what was in the email you proofed and agreed with?

A.   Yes.

Q.   The content?

A.   Yes, except I think I maybe missed one of the executive command.  There's four of them I believe in that paper.

Q.   When you explained the situation to Ms. Shaw, did she have a reaction?

A.   Yes.  I mean, my recollection is that she also knew it was a policy violation potentially.

Q.   Given what you learned at the decision meeting, who would you identify as potential principal or principals of the policy violation?

A.   I'm speculating because I don't know.

Q.   It just is speculation.

A.   Yes.  It just is speculation?

Q.   Yes.

A.   And it's Corey Morrison.  He's the one that actually sent me bits of it.  It's pretty much written in there and then he

identifies Gentry as the command staff. I don't know if anybody else is involved in it. I don't know if Gentry talked to anybody else.

Q. Just based upon what you knew that day.

A. I just know those two.

Q. Fair enough. Absolutely.

Other than Ms. Shaw, have you spoken with anybody about the -- anybody in the office about this memo and the concerns you had regarding the NOI and the Undersheriff and the Captain?

MS. BARNES: Hold on just one sec. By "the office," you mean MCSO?

MR. ANDERS: Yes.

MS. BARNES: And make sure you limit it only to any non-attorney.

THE WITNESS: Oh, non-attorneys.

I may have mentioned it to Ryan Giguere. He works there. He's an analyst. Because initially I had a question as to when is this NOI done. I think I know, just let's find it.

BY MR. ANDERS:

Q. Where does Ryan work?

A. He works right there on the fourth floor.

Q. Conduct Resolution?

A. Yeah. Yeah.

Q. Okay. Did Ryan have a response or provide any information

as to what led to the reply?

A.    I think he had a legal opinion that came from Brandon but the policy overbites that, I'm just saying.  The policy is pretty clear.

Q.    So help me out.  Are you saying that you approached -- who in Conduct Resolution?

A.    Ryan Giguere.

Q.    Ryan Giguere?

A.    Yes.

Q.    And then are you saying Ryan did research and came back to you?

A.    Well, that's what they do.  As analysts, they are looking at these --

Q.    Sure.  I'm not asking what counsel said.  I'm just trying to figure out the mechanics.

        MS. BARNES:  Right, but to the extent --

        MR. ANDERS:  He raised it; I didn't raise it.

        MS. BARNES:  I understand that.  But the privilege still exists.  It doesn't go away just because he brought it up.

        So I just want to make sure that you're not communicating anything that Ryan communicated to you about what he may have received by way of communications from the lawyer.  So -- okay.

        THE WITNESS:  No.  No.

46REPORT001640

BY MR. ANDERS:

Q.    You just said Ryan had a legal opinion and he told you what it was, not that you agree with it.

A.    Not that it sounds like he had a legal opinion.  He had some information that was provided by the County Attorney's office as to when the NOI would be -- it wouldn't be held upon the NOI.

Q.    But your thought was, well, but there's policy.  Is that what you said?

A.    Oh, yeah.  Yeah.

Q.    Are you aware of intentions or efforts for Captain Morrison to be transferred?

A.    No.

Q.    Have you ever spoken with Undersheriff Gentry about any of Captain Morrison's PSB cases?

A.    Briefly.

Q.    Can you help me out a little bit more with that?

A.    Yeah, sure.  It was when I came -- I was out for a couple of weeks and he was acting as the Appointing Authority and I came back on the tenth of April.  That would be the first Thursday I was there.  And I was told by Tiffany that the Undersheriff wanted to talk to me and he was in conference room on the fourth floor, in Compliance at the time, actually providing a discipline meeting to somebody, somebody that trailed over from the previous week.

46REPORT001641

So I went in to the office afterwards and I noticed he had a couple of cases in front of him. I don't know if he had all three of Corey cases but he did have this one, because we briefly talked about that. And I think he may have talked about the other two as the discipline he didn't think was -- I sense he just didn't like the discipline on the other two which I gave him the discipline. I wasn't going to get into an argument with him or a discussion about it. It's over. So that was it.

Q. So he had possession of the open case, Morrison's open case?

A. Yes.

Q. May or may not have had possession of the other two closed cases?

A. Yeah. I think it had to do -- they were there only because his question was or having to do with the other cases and the discipline that was provided to him on those other cases.

Q. What was his question?

A. Well, it was more rhetorical because he just didn't like it. He thought it was too harsh.

Q. Did he provide any thoughts with regards to remedy?

A. No, I didn't get into it. I didn't even bother to discuss it.

Q. Didn't ask why was it so harsh --

46REPORT001642

A.    No.

Q.    -- from his perspective?

A.    It would do no good.  It's over.  It's done.

Q.    Why would the Undersheriff be in possession of an open PSB case that has not gone to a decision meeting or been closed yet?

A.    I don't know.  I have no idea.  It didn't concern me a lot only because he was the Appointing Authority at moment, so I'm sure he had access to anything and -- that I would have had access to.  But I -- I have no idea.

Q.    Did you have a conversation about the open case?

A.    Briefly.

Q.    What would be the nature of that conversation?

A.    I think I -- I actually was kind of happy he pulled it.  A lot of people don't pull the cases that I look at.  I'm always open to a discussion about it if that's the case.  And I said I'm glad he got it.  I didn't -- I told him -- I told I didn't think it was a good case and I think I'm looking at not sustained on that case.  Don't tell anybody.  And that's just -- I don't even know I need to say that necessarily when we have cases like that and we're kind of a peer to peer on the issue but I did.

Q.    Have you revealed your intentions about other open cases before the decision meeting?

A.    No.

46REPORT001643

Q.    This was the first.

A.    This was a first?

Q.    Any thought about the appropriateness of that?

A.    Probably wasn't -- well, you know, I take that back. Again, he's a peer.  He was -- at the moment he would have been the Appointing Authority so here we are.  We have a case in front of us.  Would we discuss it?  Sure.  What's your thoughts about it?

Q.    This was on April 10, the first day that you came back?

A.    That is correct, yes.

Q.    Is it safe to assume you had not seen the addenda authored by PSB at that time?

A.    Yes.  I didn't read the second memo either.  It hadn't gotten there yet.

Q.    The Monitoring Team has interviewed Undersheriff Gentry and Chief Summers.  Chief Summers represents that the status of the Morrison case per Chief Gentry is that it looks like it may be overturned; that it appears there's insufficient evidence to conclude that something did occur; and that someone was aware. Chief Gentry confirmed with us that, in fact, he did have a conversation with Summers about the open Morrison case.

Undersheriff Gentry told us that when he spoke with you, you told him that they, parenthesis, PSB, didn't establish what should be a sustained finding and that you were going to overturn it.

Does that sound accurate?

A.   I mean, the gist of it is.  I mean, I didn't specifically say it that way but it was a matter of --

Q.   I guess what I'm trying to get at is -- I'm not trying to play gotcha, so please understand that.

A.   Play what?

Q.   I'm not trying to play gotcha.  I'm just trying to connect the dots.  The PDH is in August of '24.  You come back on April 10.  You have a conversation with Chief Gentry on April 10.  On April 10 you're representing that you're not happy with the case.  Looks like you're going to reverse what PSB's finding was.

A.   Correct.

Q.   But you had not yet reviewed the addenda that had been submitted by PSB.  And so I'm trying to get at how is it that this conclusion is made prior to the absorption of all of the information relative to the investigation?

A.   It wasn't entirely just -- you know, that's the direction I was going based upon the information that I had.  Other stuff shows up between -- it was quite some time between the time we initially had the PDH and when the discipline meeting was going to be happening.

So what information I have was the decision that I was going to do.

Q.   I just want to ask you this again.

46REPORT001645

In our previous interview you represented you have worked in PSB throughout your career about 11 and a half years, about five years as an investigator, about five years as a captain, and then about a year and a half or so as a chief. So about a 11 and a half years. And if that's inaccurate, please let me know.

During your time in PSB in those three different capacities, are you aware of an NOI ever being waived, voided, permission given, consent given to essentially deactivate an active NOI by any executive member of the organization?

A.    No.

Q.    So do you recall what Morrison did once he allegedly received consent to exceed the terms and conditions of the NOI?

A.    Yeah.  He reached out to three other individuals.  That's what's in his memo that he provided.

Q.    So he reached out to three individuals and got statements from these individuals?

A.    Yes.

Q.    My understanding is that Captain Morrison at one time was a chief within MCSO; is that correct?

A.    I believe so.

Q.    Is it reasonable to believe that member of upper level management, being a captain or a member of the executive staff, meaning a chief officer, is it reasonable to believe that they should have knowledge regarding policy as it relates to an NOI?

46REPORT001646

A.    I mean, should they know an NOI is in play?

Q.    Should they know the NOI policy?

A.    Yes.

Q.    Have you had any contact with Undersheriff Gentry since the decision meeting?

A.    No.

Q.    Do you know if Tiffany Shaw has had contact with anybody besides yourself with regards to the content of that email that was sent to PSB?

A.    I don't know.  No, I don't.

Q.    Do you know what, if anything, is resulted from the email being sent to PSB from Ms. Shaw?

A.    I have not heard.

Q.    Regarding the decision meeting and the content associated with Captain Morrison's memo and his reference to executive staff, him identifying Undersheriff Gentry as the individual who essentially consented, gave permission, or waived the NOI, did you take any notes with regards to that conversation?

A.    I did.

Q.    And have those notes been shared with anybody?

A.    No other than some of it got transposed into the email that was sent to the PSB.

Q.    Will the notes be preserved going forward?

A.    Yes.

Q.    You told Undersheriff Gentry that, my words, I'm not

46REPORT001647

quoting you, but, in essence, the open investigation against Morrison is going to be not sustained.  Did Undersheriff Gentry had have a reaction to that?

A.   No, he did not.  And it wasn't that it was going to be overturned.  I'm looking at that as being potentially where we're going with that.  He didn't respond.

Q.   In the second memo Captain Morrison wrote to you dated April 21, 2024, there were some attachments to it -- 2025. There were some attachments to it, one from Captain Morrison's wife or an individual who identifies herself or themselves as his wife, retired Chief Letourneau --

A.   Yes.

Q.   -- and a retired Sergeant Kelleher.

A.   Correct.

Q.   Did you read all of those?

A.   I didn't.

Q.   Do you recall with regards to Sergeant Kelleher's -- I'll call it an email, I'm not sure if it's an email or a letter as I recall.  Do you recall if he made any allegations against anybody in that email?

A.   Not specifically but he was ranting about the office is my recollection of that.

Q.   In reference to Chris and forgive me if I'm mispronounce his last name, Hoak (phonetic)?

A.   I don't know if I would get it right either.  I don't know

46REPORT001648

34

him.  I think it's somebody that was in the case.

Q.    Somebody he identifies, I mean, as a Lieutenant?

A.    Yes, he was in that case.

Q.    He states that Hoak committed a crime when he recorded a conversation.  Do you know if any of that information was forwarded to PSB?

A.    I don't know.  I don't know if the entire --

MS. BARNES:  That was not intentional.

THE WITNESS:  No, I know it wasn't.

I -- well, I don't know.

BY MR. ANDERS:

Q.    You didn't notify PSB of the [inaudible]?

A.    I did not.  It may have gone in the memo.

Q.    Would it be a fair assumption that memo number two from Captain Morrison would have eventually made its way through Conduct Resolution back to PSB?

A.    That would be what I would have expected.

MR. ANDERS:  Can we go ahead and take about a five-minute break?

MS. BARNES:  Sure.

MR. ANDERS:  Great.

We'll go off the record.  The time is approximately 11:58.

(Recess at 11:58 p.m.; resumed at 12:03 p.m.)

MR. ANDERS:  We're back on the record.  The same five

individuals are in the Monitor's conference room, sixth floor of the Luhrs Tower on May 13, 2025.  The time is approximately 12:03 p.m.

BY MR. ANDERS:

Q.    Chief, I want to ask you a couple more questions.  With regards to the information about the NOI that was included in Captain Morrison's second memo and which you discussed with Captain Morrison at the decision meeting on April 24, 2025, you made a decision to notify Tiffany Shaw.  Is there -- I guess my question is why Tiffany Shaw?  Why not PSB?  Why Tiffany Shaw and not Denise Callahan?

A.    Denise Callahan wasn't there and Tiffany Shaw is the Director of the Compliance Division so I talked to the Director of the Compliance Division.

Q.    So forgive me.  You contacted Ryan and I forget Ryan's last name.

A.    Giguere.

Q.    Giguere.

A.    Common spelling.

Q.    What is it?

        MR. PETERS:  Thank you.

BY MR. ANDERS:

Q.    Ryan is essentially a staff analyst in Conduct Resolution?

A.    I believe that he is, yes.  Reviewed many of these cases. This wasn't his particular case but they are the ones that

receive the information from PSB.  They are mulling through it and then put together letters.

Q.   Okay.  Do you recall the content of your conversation with Ryan?

A.   Only that I thought it would be an NOI violation and it was one of those dates.  What do you know -- when is it not there any longer?  Is it an A.R.S. statute?  Initially I was thinking there was something in A.R.S.  I mean, it could be definitely policy.  Is it just a legal opinion that has come to us?  And so he just was looking at it from an analyst standpoint.

Q.   I'm curious the level of detail regarding the conversation with Ryan.  In other words, was it a conversation, "Ryan, regarding" -- my words.  "Ryan, regarding the NOI policy, was there ever a time that an NOI policy can be waived?  Who is responsible for deactivating NOI?"  Or was Ryan made aware of -- "I just had a decision meeting.  I've got a memo.  Captain Morrison was the principal and he is alleging that Undersheriff Gentry waived an NOI."

What was the level of detail?

A.   I don't think that latter part was the level of detail.  It was more along the lines of I was looking for some information regarding that, because I sensed by reading this, this was an NOI violation.  I couldn't recall if it was specifically in policy.  I thought it was.  Or it was part of

46REPORT001651

37

Title 38. I just -- I didn't know so I'm reaching out to him to say, "Hey, what is this?"

Q. So I understand your motive in talking to Ryan. I'm trying to find out was, did you know that Captain Morrison was involved in this?

A. Yeah, because Captain Morrison [inaudible].

Q. Did he know that Undersheriff Gentry was identified in this?

A. Maybe. I mean I only say that because, you know, there's -- counting Denise there's one, two, three, four, five, maybe five analysts and they talk about cases amongst themselves all the time. I wasn't sure who did this case, who -- which one was the analyst. Ryan was not. It ended up being somebody else.

Q. This was not a case; right?

A. It's not a case.

Q. The concerns you had about the NOI was not yet a case.

A. Well, no, but it was part of the case that we were dealing with.

Q. So what I'm trying to get at is, what concerns would you have revealing Captain Morrison's name and Undersheriff Gentry's name to a staff analyst as it relates to a potential serious misconduct allegation?

A. What concerns would I have?

Q. In other words, would it compromise the investigation in

46REPORT001652

any way?  Are you ensured that that information is going to remain in a silo with absolute confidentiality?

A.   I do.  I do.  They have a lot of confidential information that goes through that floor and there are times when you need to talk about something specific and it's a way of bouncing off information.  But there's six or seven of them in there.

Q.   But information can be asked in a hypothetical way, right, without identifying individuals?

A.   Sure.

Q.   Do you know if anybody else besides Ryan and Tiffany were aware of your concerns?

A.   Not that I'm aware of.

Q.   I want to move on to a topic we had discussed during the previous interview and this has to do with the sustained finding you made for insubordination involving a principal, Sergeant Englebeck, and then the 40-hour suspension that you imposed on Sergeant Englebeck, and then that suspension was served.  Sergeant Englebeck filed intent to appeal to the Merit Commission.  A hearing was scheduled.  Before the hearing occurred, you reversed the 40-hour suspension that had already been served and Sergeant Englebeck was made whole.  But then you reversed the finding that you had made at the PDH regarding the insubordination and changed the finding from sustained to not sustained.

          We discussed this on our Zoom interview on April 23,

46REPORT001653

2025.  I reviewed the transcript of your interview and when I asked regarding the reasons why the 40-hour suspension was reversed by you after you had imposed the suspension and the suspension had been served, you said this was due to your belief that essentially a double jeopardy situation had occurred, that because insubordination was part of his failure to complete probation and he was demoted, you then felt that essentially upon reflection, that he also should not receive a 40-hour suspension.

If any of that sounds inaccurate, please correct me.

A.    Well, I think it was you that brought up the idea that it was double jeopardy but, yes, pretty much.

Q.    During that interview, you acknowledge that you had said you had done thousands of PDHs and you had only reversed discipline approximately one-half dozen times.  Does that sound about right?

A.    Could be.  I don't know.  There's just not that many.

Q.    When we talked about reversal of the finding that you had made, you acknowledge that no facts had changed that precipitated the reversal of the finding.  What you represented was because, again, he had been demoted, there should not have been an investigation in the first place and this is why you changed the finding.

Does that sound accurate?  I can read it to you if you want.

A.   No.   That's fine.   I'm not denying that part of it.   I guess this was precipitated with a conversation with Greg Lugo as well and with the County Attorney on the issue.

Q.   Your statement was it should not have been an investigation because he had been demoted for the same offense, insubordination.   I think there were other allegations as well but just sustained on the insubordination.

Who has the authority to reverse a finding after a finding has been determined at a PDH other than, say, the courts or the Merit Commission?

A.   I believe the PDH can be overturned by the Appointing Authority and it can by the Sheriff as well.

Q.   So the Appointing Authority can make a decision at the PDH and then later reverse their finding decision of the PDH?

A.   Well, I'm not sure I fully understand that, what you're saying.

Q.   Okay.   We'll use dates there.   So Sergeant Englebeck's PDH was in October of 2024.   You sustained.   You imposed discipline.   He served the discipline.

In very late January or early February of 2025 you changed your mind and you said you're going to reverse the suspension and you're going to reverse the finding.   So my question is, what authority -- who has authority to reverse a sustained finding that has been made and concluded at a PDH?

A.   I believe either myself, the Appointing Authority, or the

Sheriff could do that.

Q.    And by policy?

A.    It would be by policy, yes.

Q.    Do you know where that policy would be located?

A.    Not off the top of my head, no.

Q.    If you sustained against Sergeant Anders five years ago for is insubordination, could you reverse that sustained finding today?

A.    I'm assuming the case is closed.  No.

Q.    Regarding the reversal of the 40-hour suspension, again, you said only done half a dozen times in thousands of cases. Were there any influences or innuendo, any new information provided you that influenced your decision to reverse the 40-hour suspension?

A.    On this case?  On this case?

Q.    Yes.

A.    Only -- and I think we may have discussed it last time. It was the discussion I had with Greg Lugo, captain at the time are.  He was going to be brought in as a witness to the merit hearing that was scheduled.  And we talked about that and that's when it became a little more clear to me that his intent initially when he wrote that letter or memo, that he thought the insubordination and all the administrative things that he wrote that Englebeck didn't take care of was the intent to demote him, his probation, take his probation away from him and

46REPORT001656

42

send him back to his sergeant.  It was that information that I provided the County Attorney.

Q.  So let's take a few minutes and unpack that because we didn't talk about that in the last interview in the level of detail that I think you just provided.

A.  I don't know why we wouldn't have.  I thought the name came up and I . . .

Q.  Do you remember when you had the conversation with Captain Lugo?

A.  I don't remember the day.  I can tell you that I had the conversation initially in the conference room on the fourth floor with Greg, letting him know he was going to be a witness.  And then I spoke to Greg -- then I talked to the County Attorney at the same location, and then I talked to Greg again while driving home, 202 and about 32nd Street going eastbound, but I couldn't tell you the day.

Q.  What is the -- what's the reason of the conversation with Captain Lugo?

A.  I let him know that he was going to be a -- someone that would need to come to the merit appeal and answer questions from Englebeck.

Q.  And what was his response?

A.  Well, that was the intent.  He said, "I never really intended that to happen.  My intent with that letter was demotion and the administrative things were going to demote

46REPORT001657

him."  And the whole idea of getting discipline again, like a 40 hours for the exact same thing he thought was part of the -- his memo was just -- he wasn't expecting that.

Q.   Was he interviewed in the Englebeck case?

A.   I don't know.

Q.   This the first time that this information from Captain Lugo was being revealed to you, that you had any knowledge of it?

A.   I know he wrote the memo and that was part of the complaint initially about Englebeck, so he was the complainant in the case.  I'm not sure he was.  I mean I'm not sure he was interviewed or not on that other than the fact that he provided a written document and -- yeah.

Q.   So I think what I'm hearing is you notify Captain Lugo that he was going to have to testify at Sergeant Englebeck's Merit Commission hearing?

A.   Correct.

Q.   And during that conversation, Captain Lugo said when he wrote the memorandum, i.e, the one that resulted in the demotion of Lieutenant Engelbeck to Sergeant Englebeck, he did not intend for Sergeant Englebeck to experience any --

A.   It wasn't --

Q.   -- discipline?

A.   It was -- he didn't expect that.  I don't know how to say it any differently but it just surprised him.

46REPORT001658

Q.   And this influenced your decision to reverse the 40 hours?

A.   Yeah.  It had some impact with it that -- and again, the information was getting from the County Attorney as well.

Q.   Well, a hypothetical.  A resident in downtown Phoenix makes a complaint against Lieutenant Anders.  Lieutenant Anders is investigated.  He gets a three-day suspension.  The letter, closing letter is sent to the complainant and the complainant gets ahold of the Sheriff and says, "Wait a minute.  I didn't know that was going to happen.  I didn't want Sergeant Anders to get suspended for three days.  I just wanted somebody to talk to him."

     Should the Sheriff reverse the three-day suspension?

A.   Not necessarily, no.  No.

Q.   Why in this case?  I'm trying to understand even though Captain Lugo is saying, "I didn't mean for this guy to get suspended," how that bears upon the facts of the case that resulted in a sustained finding and then a recommendation for discipline.  Is the intent of the complainant a determining factor in the subsequent discipline?

A.   No.  But if he's receiving a demotion as a result of insubordination, do we then go back and say, well, you know what, we can go back and do a PSB investigation on him and get another 40 hours out of him.  Do you think that's fair?

Q.   So was the demotion only for insubordination or were there several other allegations of things as well?

46REPORT001659

A.    There was a minister of issues which would be part of the entire -- that's PSB investigation as well.

Q.    So I think we discussed this before, right, with regards to --

A.    We talked about --

Q.    -- serious misconduct --

MS. BARNES:  Wait.  Wait.

BY MR. ANDERS:

Q.    If there was serious misconduct while on probation, does a failure of probation, one, equate to discipline?  And I think the answer to that is no.  It's a failure of a test.

And second is, if the individual fails probation, are they then immune from any subsequent administrative investigation and discipline imposed as a result of that investigation?

And I think what I'm hearing from you is yes.  He was demoted so he was disciplined and there was no reason for there to be a case and no reason for the discipline to be imposed and, in fact, the complainant didn't want discipline to be imposed.

If I misstate anything there, please let me know.

A.    I don't think so.  I don't know.

MS. BARNES:  I can't tell you that answer.  If you want him to repeat what he said and then decide if there's anything inaccurate about it, you can do that.

46REPORT001660

THE WITNESS:  I think I know the answer to it, at least what I was going to respond, but just go ahead if you could repeat roughly what you were saying.

BY MR. ANDERS:

Q.   So I think what I'm hearing is what you are saying, if a lieutenant is on probation, a lieutenant is sustained for misconduct but that lieutenant had been demoted because they failed the probationary test, they then should not have been investigated nor experienced any discipline because they have already been disciplined.

A.   I guess I would say that, yes, to a degree I suppose.

Does it happen -- this doesn't happen very often so I can't think of another case that we've had that has been similar to this.

But in this particular case I don't know how to say it any differently but, yes.  He served his discipline as a result of his demotion.

Q.   Just so we're clear, a demotion is not discipline when an individual is on probation.  That failed the test and they can be demoted without cause.  As an attorney, you know this; right?

A.   Sure.  I mean, can they be demoted or just -- you're saying that from a test standpoint only.  This isn't a test.

Q.   Probation is a test period; correct?

A.   It's a review period, sure.  Is it something that's going

to -- could he go back to the level he started with to begin with?  Yes, he could, with certain facts and things of that -- maybe not any facts at all.  Maybe it's just, you know, we want to move him back to that position without having anything for cause.

And, in essence, that's what we did, yes.

Q.   So I'm just seeking that clarity.  What's the threshold, what's the organizational standard or the organizational policy with regards to somebody who is on probation, they engage in misconduct.  As a result of the conduct, they fail probation and are reverted back to their former rank.

When should there be an administrative investigation for that misconduct and when shouldn't there be an administrative misconduct for the misconduct?  It sounds like if it's for insubordination, there shouldn't be an administrative investigation.

A.   No, I don't think it's that black and white.  I think it's -- it's someone that has failed to make his probation --

Q.   Due to misconduct?

A.   -- and there was an investigation that was looked at to come up with that conclusion, and now it's a matter of do we go back and discipline him as well.

Q.   Which you did.

A.   Yeah.  Well, yes.

Q.   And then following a conversation with Captain Lugo, the

alleged complainant, changed your mind because that wasn't the complainant's intent.

A.   Yes.

Q.   Forgive me.  We may have talked about this before but regarding reversing the finding, you acknowledge that there were no changes in facts.

Have you reversed the finding in any other cases post-PDH?  We've talked about in half a dozen cases you have changed the discipline.  But have you ever changed the finding?

A.   Yeah, there's been some findings changes along the way, yes.

Q.   Without naming anybody, can you recall the circumstances where PDH, you made a ruling, the finding is this.  Discipline is imposed and at some point down the road you reversed your PDH finding?

A.   Right.  It would I guess hinge -- I can't think of anything off the top of my head.  I know that it's happened.  I do know that.  So there are cases out there where I have reversed the finding.

Sometimes that applies to maybe there's something that comes in the PDH through the hearing that we have.

Q.   We're talking post-PDH; right?

A.   Yes, correct.

Q.   This is a document.  It's on Sheriff's Office letterhead dated January 28, 2025.  It's written to Sergeant Aaron

Englebeck and it's signed by you.  I'll let you read it if you want.  But what you write here on January 28, 2025, one sense you'll see I have underlined here is:  This letter is to notify that after further consideration, the office has decided to modify the disciplinary action imposed to no discipline.  The office will thus rescind the 40-hour suspension.

You can look at that if you like.

A.    Okay.

Q.    Then a document titled the Employee Disciplinary Considerations and Decision signed by you on February 6, 2025, employee named Aaron Englebeck, IA 2020-0555.  (As read)  The following information was considered when making the decision to impose discipline.

In here I've underlined in red, you can see it, you wrote:  (As read)  This demotion was perceived by the employee as serious discipline for the misconduct although it was a failure to meet his promotional probation.  As such, counsel provided a legal opinion regarding this matter that no discipline is necessary and proceeding with a Merit Commission appeal hearing would not be in the best interest of MCSO or the employee at issue.

And I guess that's going to remain a mystery.  It's incredibly ambiguous and vague.  It doesn't say why no discipline is necessary, just no discipline is necessary.

So who knows why it's not necessary.

46REPORT001664

But when I read his, it's still a sustained case; right?  This is February 6, 2025.

A.    Yes.  I believe that they both got -- they both got changed from the discipline and the findings in the final.

Q.    Right.  But this is -- this document and this document references discipline; is that correct?  The finding is still sustained.  It just changes the discipline.  Nothing in those two documents references the finding.

A.    Well, that was a difference -- the GPS.  That was the changing of the finding for the GPS part of it, because I wrote in there not sustained.

Q.    Yeah, but that was your original determination at the PDH; right?

A.    That's correct.  That's correct, yeah.

Q.    And so my question is, in those two documents there that I just referenced, there is no change in the finding that you made at the PDH regarding sustained for insubordination; is that correct?

A.    I believe that's correct, yes.  I don't know.

Q.    You're welcome to take some time to read the documents.

A.    No.  I just know the letter that was sent to him --

Q.    I understand that.  But in these two documents, as of the sixth, it just references the discipline.

A.    Okay.

Q.    Okay?  So in a document that you dated about six to seven

46REPORT001665

days earlier, this is a Predetermination Hearing Worksheet where you've crossed out the suspension and you've written "Not sustained, no discipline." We talked about supporting facts in here. None of the facts changed. And then you wrote in handwriting "No discipline," signed on January 30, 2025.

So what I'm trying to figure out is from this right here dated January 28, to this right here dated January 30, what got us from a reversal of the suspension to a reversal of the finding?

A.    All I can tell you -- I'm not sure when I had that conversation with Greg but it had to have prefaced this decision was the discussion with Greg and with the County Attorney on the matter.

Q.    Okay.

A.    Yes.

Q.    So your counsel is not going to allow me to ask you what the County Attorney said so that will remain a mystery, but I think we can agree the County Attorney does not have the authority to make the decision. The decision comes within the office. They can provide counsel, advice, mentorship, guidance. And so forgive me if I misunderstood. When we talked earlier about your conversation with Captain Lugo, I understood that as a result of that conversation, that is why you reversed the discipline, that Captain Lugo said he didn't intend for the principal to experience a 40-hour discipline on

top of a demotion and so that's why you reversed the discipline.

Are you now saying that based on the conversation with Captain Lugo, you -- that's why you also reversed the finding in the case?

A.    It was.

Q.    Even though the facts didn't change, just that the complainant -- did Captain Lugo tell you that he did not intend for there to be an investigation?  There should not have been an investigation?

A.    No, I don't believe that's true.

Q.    Then how would that conversation result in the reversal of the finding?  This is where I'm confused.  I just don't understand.  Captain Lugo did not provide any new information regarding facts, did he?

A.    Not to the case itself, no.  I mean, and he stands by what he wrote as far as the acts that got him demoted to where he was.  So there was nothing more than that.

Q.    If it was late October 2024, again, and the PDH had been held and there was an appeal to the Merit Commission, would you do the exact same thing?  Would you change the finding and would you change the suspension that you imposed or do you have different thoughts about it today?

A.    This was before that.  We had -- this decision was made before we had a hearing.

Q.    Not before the PDH?

A.    Not before the PDH --

Q.    Correct.

A.    -- but before the merit hearing.

Q.    Right.

A.    Right.

Q.    So the PDH was in October of 2024?

A.    Right.

Q.    There had not been a merit hearing?

A.    No.

Q.    If we were to go back in time and you had made the sustained finding, you had imposed a 40-hour discipline, you were noticed that there was going to be a Merit Commission appeal, would you do the same exact thing?

A.    For these particular facts, yes.

Q.    Okay.  Great.

       Is there anything I should have asked you today that I haven't asked you today?

A.    I don't know.  But you're more than happy to ask more.

Q.    It's your opportunity to provide any clarity to anything we've discovered today.

A.    No, I don't have anything else.

Q.    Okay.

       MR. ANDERS:  Major, anything?

54

MR. PETERS:  No.  I'm good.  Thank you.

MR. ANDERS:  Okay.  With that we're going to go off the record.  The time is approximately 12:37 p.m.

(Proceedings concluded at 12:37 p.m.)

46REPORT001669

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 13th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

46REPORT001670

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

with JERRY SHERIDAN

May 13, 2025



_____




Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001671

**TRANSCRIPT OF INTERVIEW WITH JERRY SHERIDAN**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001672

P R O C E E D I N G S

MR. ANDERS:  Okay.  Time is approximately 2:16 p.m. on Tuesday, May 13, 2025.  My name is Donald Anders.  We're presently in the Federal Monitoring team's conference room on the sixth floor of the Luhrs Tower, downtown Phoenix, Arizona.

With me is Major Al Peters as is --

And I'll ask you folks to introduce yourself, please.

MR. MASTERSON:  John Masterson.

THE WITNESS:  Jerry Sheridan, Sheriff.

MR. POPOLIZIO:  And Joe Popolizio of Jones, Skelton & Hochuli, on behalf of the Sheriff, Jerry Sheridan, in his official capacity.

MR. ANDERS:  Great.  Thank you very much for being here, Sheriff, particularly you, thank you for being here today.

EXAMINATION

BY MR. ANDERS:

Q.   Sheriff, I wanted to take a little bit of time first and talk a little bit about some members of your executive team, particularly Undersheriff Gentry and Executive Chief Palopoli.

What were your considerations, prerequisites, or qualifications you were interested in bringing them into the office?

A.   Can -- I have no idea why I'm here today so can you give me an idea what we are going to be talking about?

4

Q.    Absolutely.  I want to talk a little bit about a couple of different internal investigations.  One is 2025-0111.  The other one is 2025-0139.  0111 has to do with administrative and criminal allegations against PSB Captain Lugo.  2025-0139 has to do with internal administrative allegations against Captain Lugo in which he's on administrative leave for.

I would like to have a little bit of a conversation with regards to an investigation associated with Captain Corey Morrison and then as a prerequisite to each one -- and a little bit of conversation with regards to a sustained finding, an imposed discipline, and a reversal of that discipline and finding as it relates to a Sergeant Aaron Englebeck and that was done by the Appointing Authority, retired Chief Ken Holmes.

A.    Okay.

Q.    And so prior to that, just looking for a little bit of background with regards to staff because they are integral to some of the questions that deal with these cases.

So, Sheriff, just with regards to, say, Undersheriff Gentry, what were your considerations?  What qualifications are you looking for in an Undersheriff?

A.    M'hum.  Well, Jeff had worked under me for many years and so I had an opportunity to watch him and he's got a very good degree of personal integrity.  He is very personable with people.  He's fair, open minded, a hard worker.  That was one of the big things that I was looking for because that job as

the Undersheriff is a huge undertaking.  I know that.  I had that job for six years.

So you also need to have some political savvy in dealing with, you know, mayors and governors and things like that and so Jeff had that whole package and Jeff -- I didn't really know Palopoli that well.  Jeff had worked with her over at Amazon -- I think it's Amazon -- and he spoke very highly of her.  A lot of the things that I just mentioned.  And so we brought her on.

Q.   When we think about all of the professional characteristics and disciplines and requirements of members of an executive staff, in particular Undersheriff Gentry and Chief Palopoli, how important in your mind are skill sets associated with managing and meeting human resource issues?  In particular, managing and leading administrative investigations and criminal allegations against sworn personnel?

A.   I think it's a key.  You know, and again to go back to Jeff's history, as a deputy Sheriff, he ran a lot of very complex investigations.

Q.   Are you familiar with Chief Palopoli's history with regards to managing and leading administrative and criminal allegations against sworn personnel?

A.   No.

Q.   Chief Summers, are you familiar with Chief Summers' history and demonstrated history with regards to managing

46REPORT001675

administrative and criminal matters?

A.   No.

Q.   Captain Greg Lugo, are you familiar with his demonstrated history with regards to managing administrative and criminal matters involving sworn personnel?

A.   Yes.

Q.   Do you have some thoughts or opinion?  If you were writing an annual performance evaluation for Captain Lugo, what would be some bulleted points?

A.   Hard working, dedicated, knowledgeable, conscientious, focused.  As a matter of fact, every time I saw him, I would thank him for what he was doing to get rid of the backlog, working hard and setting the plans out for that.  As a matter of fact, the last time I saw him we were at a meeting and I asked him -- we were sitting across the table like this and, you know, he was talking about the backlog.  It was under a thousand now and all of that.  And I said, "Hey, would it be a policy violation if I got up and gave you a big hug?"

        And he looks at me and the way Greg does it and says, "Oh, yes."

        I said, "Okay, well then it will be virtual."  I always went out of my way to make sure he knew how much I appreciated what he was doing.

Q.   Okay.  Thank you for that.  We all understand the fundamentals of supervision and demand are three primary areas,

46REPORT001676

right:  The administration of our personnel, supervision of day-to-day operations of our personnel, and then the training, mentorship, guiding of our personnel.

Who is Chief Palopoli's immediate supervisor?  Is it -- is it Undersheriff Gentry or is there somebody intermediate?

A.    No.  It would be Gentry.

Q.    Undersheriff Gentry.  Okay.  And then you of course would be Undersheriff Gentry's immediate supervisor?

A.    Correct.

Q.    Undersheriff Gentry has been out of full-time law enforcement for a number of years.  Chief Palopoli, as I understand, retired or resigned from Scottsdale Police Department about eight or nine years ago as a Lieutenant.

When they were hired, do you know or do you recall if you provided them any guidance or direction regarding orientation, familiarity with office policies and procedures, office practices?  Was anybody directed to figuratively envelope these folks for a couple of days and get them exposed to the real critical policies of the organizations?

A.    Not that I'm aware of.

Q.    Okay.  If Chief Palopoli had questions, doubts, felt she was a bit naive about policies or practices, as the Sheriff, what would be your expectation?  How should she manage that?

A.    Well, she should go to the policy itself.  If she had

46REPORT001677

questions about it, she could go either to me or Undersheriff Gentry.

Q.    And I would assume the same with Undersheriff Gentry, if he had questions, concerns, seeking guidance, he should go to you?

A.    Sure.  Just like I do.  You know, I don't remember them all either.

Q.    Sure.  I just want to give you a couple hypotheticals and you'll understand why I'm asking these.  So just a hypothetical.  Let's say a patrol deputy is standing in front of a Wal-Mart out in the Valley somewhere and a resident approaches the patrol deputy and says, "Hey, that man standing 30 feet away just smashed out a big window in front of the Wal-Mart here."

What would be the reasonable expectations of that deputy at that point?

A.    I don't know why you're asking me hypotheticals.  I would rather not answer hypothetical questions.  But let's get down to what you want to talk about instead of playing games around a hypothetical.  I mean, because we could go down this rabbit hole forever.

Q.    And so the intent of the hypothetical -- and, again, I'm not here to play gotcha in any way.  It's just to get an understanding of what your expectations would be if a sworn member of the organization was presented with a circumstance.

And if you would rather not talk about hypotheticals, if an Executive Chief in the organization learns of information that a crime may be committed by a sworn member, what would be your expectation of that Executive Chief?  What should they do?

A.    That we would take that individual, put them on leave and assign it to an investigation.

Q.    Should there be any preliminary inquiry such as did a crime occur?

A.    I guess it really depends on the crime we're talking about here.

Q.    So this goes to my hypothetical earlier, right.  Wouldn't we want the deputy to go, well, let's see if a window got broken, right, establish the corpus of the crime.  If an Executive Chief is informed that, hey, there may have been a crime committed.  If there are reasonable efforts to be made, can we confirm whether or not a crime got committed?  Would that be a reasonable step?

A.    Sure it would.  At least the allegations were there.

Q.    Are you familiar with office policy as it relates to giving an order, an enforceable order, what the criteria for that would be?

A.    I really am not fairly sure of it.

Q.    If an administrative investigation was presented to you and it's because Sergeant Anders was given an order and he violated that order, what would you be looking for?  How was

the order given?  Was the -- in other words, was the order legal?  Was the order documented?  Was the order clearly articulated?  Did Sergeant Anders understand the nature of the order?  Did he agree to not violate the order?  Would those be some factors that you would take into consideration?

A.    Sure.

Q.    If it was a lieutenant who gave Sergeant Anders the order, would you expect the lieutenant to document the circumstances in which they gave that order?

A.    Not necessarily.  I guess it depends on what kind of order we're talking about.

Q.    So probably if I gave somebody an order to go lay a flare pattern out at an intersection, we're not going to document that we gave somebody that order.  If we gave somebody an order that we're conducting a very high-level sensitive investigation and you're not to discuss in any way what you know about this investigation with anybody, is that something that ought to be documented from your perspective?

A.    Well, I don't think it would be necessary to document it.  Probably would be prudent, best practice to do that.  But, again, depending on the circumstance, the exigency of the order, those kinds of things, what else is going on.

Q.    If Chief Gentry opens up his email one day and Deputy Jane Doe alleges that Undersheriff Gentry has retaliated against Deputy Jane Doe and Undersheriff Gentry says I'm very familiar

46REPORT001680

with this complaint.  This is a perpetual complaint.  I've seen this before and, in fact, this complaint has been previously investigated and closed, and Deputy Jane Doe was provided notice by the investigating body that it was investigated, categorized and closed, what would be your expectation with regard with regards to Undersheriff Gentry making any notifications about that communication from Deputy Jane Doe?

A.    Well, I would expect since I'm his immediate supervisor, that he would notify me of the complaint.

Q.    And is there a degree of exigency, urgency, emergency that that notification be made to you?

A.    I would think so.  We're not -- we're not dealing with a rank and file now.  We're dealing with executive staff.

Q.    Administrative investigation 2025-0111, this was, in summary, an email that Chief Gentry received from Sergeant Aaron Englebeck.  Undersheriff Gentry received this. He forwarded it to Executive Chief Palopoli.  They had a bit of a conversation about the next day.  Chief Palopoli had a conversation with Captain Lugo.  There's an administrative allegation regarding retaliation against Captain Lugo and then Sergeant Englebeck references the fact that a crime may have occurred.  He thinks that there may have been some documents that were destroyed or removed for some reason he was not provided documents.

Do you recall being briefed by anybody about that --

those allegations made by Sergeant Englebeck?

A.    I was not.

Q.    Okay.  As of today, has anybody spoken with you, Undersheriff Gentry, Chief Palopoli, Chief Summers, or any other individual about those allegations?

        MR. MASTERSON:  Other than any discussions that you had with lawyers.

        THE WITNESS:  The day we had that meeting with Captain Lugo, after Greg left, they talked about that issue, not in detail.

BY MR. ANDERS:

Q.    Okay.  So I apologize.  I'm not familiar with a meeting with Captain Lugo.

A.    We had a meeting with Captain Lugo when we wanted to discuss with him having two captains at PSB.  And I think that was the same day that the Sergeant Englebeck thing happened or something like that.

Q.    Okay.

A.    It was right around the same time.

Q.    And so I apologize.  Are you saying that that was then conversation about Sergeant Englebeck's allegation at the meeting with Captain Lugo or subsequent to that?

A.    It was subsequent to that and there was a very high-level thing about Englebeck had made a complaint against Greg and Greg had -- and I'm not going to be accurate because I don't

46REPORT001682

13

remember it exactly.  But Greg had opened up the Blue Team note, something like that, and he probably shouldn't have and that was the conversation basically.

Q.    Okay.  Do you know about when that conversation happened?

A.    I thought that was the same time that we had that meeting with Greg about the two captains.  I don't remember when.  It was about three, four weeks ago.

Q.    Okay.  And do you recall who was present at the meeting and where the meeting occurred?

A.    Yeah.  It was in the conference room on the fifth floor. It was -- Greg was there obviously, myself, Chief Gentry, Chief Palopoli and I believe the other Chief.  I can't think of his name right now.

Q.    Summers?

A.    Summers, yeah.  Sorry.  I don't know if there was anybody else there.  I'm not sure.

Q.    So the purpose of that meeting was to discuss with Captain Lugo the possibility of two captains going to PSB?

A.    Yes.

Q.    What was his reaction to that?

A.    He did not like it.  He was pretty upset.

Q.    Did he represent why?

A.    I don't think so.  You could tell he was physically upset. Well, maybe this is -- this would be something.  He said that we're not going to be able to keep up with getting rid of the

46REPORT001683

old cases if we put another captain in there.  It would screw everything up basically was his point of view.  You know, my point of view was very simple.  I think I was the one that came up with that idea because, you know, we have Greg.  He has so much institutional knowledge and he's so critical to the organization.  God forbid, what happens if he fell and broke his leg or got hurt or, God forbid, even worse, then we would really be out.

So my thought process is to get somebody else that can help him share the load plus he was putting in so much overtime, I wouldn't ask that of any of my people.  That was my position and it didn't go over very well with Greg.  I think he felt that we were coming after him.

Q.    And it was at that meeting -- there was no discussion about the Sergeant Englebeck allegations at that meeting in Captain Lugo's presence; is that right?

A.    Correct.

Q.    That conversation happened at a subsequent meeting or gathering.  Do you recall when that was, a matter of days, weeks?

A.    I hate to guess.  It might have been later that day.  I don't really remember.

Q.    Do you remember where that meeting happened and who was present?

A.    No.

46REPORT001684

Q.   How did you come to learn about it?  Did somebody present it, hey, Sheriff we need to make you aware?

A.   No.  I think we were all talking after Greg left.  That's the way I remember it happened.  I could be wrong but that's the way I kind of remember it happening.

Q.   It would have been Chief Palopoli or Chief Summers who presented that information?

A.   I don't remember.

Q.   So in 2025-0111 where Sergeant Englebeck makes an administrative allegation against Captain Lugo regarding retaliation, are you aware that Captain Lugo has been identified by executive staff as a criminal suspect in a crime that Sergeant Aaron Englebeck identified in his complaint?

A.   As I'm sitting here right now or when I first learned of that or what?

Q.   Are you aware of that?

A.   Yes.

Q.   Okay.  And when did you learn of that?

A.   It was on a Friday I believe, the day I told Chief Gentry to put Greg on admin leave.

Q.   I think that would have been Friday, April 4 is the day he was put on admin leave so I'm going to assume it was the same day, yeah.  That would be the first time you had heard that Captain Lugo was identified as a criminal suspect in a crime alleged by Sergeant Aaron Englebeck?

A.    Correct.

Q.    Okay.  So that would be about 24 or 25 days after Englebeck had alleged that a crime had been committed.  Is that something you think you -- is appropriate to wait 24 or 25 days to notify the Sheriff that his PSB commander is considered a criminal suspect?

A.    No.

Q.    Sheriff, did they explain to you why they -- meaning members of the executive staff -- considered Captain Lugo to be a criminal suspect, what the allegations were?

A.    It was allegations about tampering with evidence was the words that I remember hearing.

Q.    Okay.  I've interviewed -- Monitoring Team has interviewed Undersheriff Gentry, Chief Summers, Chief Palopoli.  We've read the complaint lodged by Sergeant Aaron Englebeck that was sent to Chief Gentry on April 10.  I've told Chief Gentry and I've told Chief Palopoli nowhere in that complaint can I even -- can I conclude that a crime has in fact occurred, nor that Sergeant Englebeck has accused Captain Lugo or anybody of actually committing the crime, identifying them as the suspect who committed a crime.

        And so I'm just trying to find out if it's been explained to you why it is Executive Chief Palopoli and Undersheriff Gentry have referred Captain Lugo as a criminal suspect to the Arizona Department of Public Safety, what the

46REPORT001686

synapse is, what the connection is between what Sergeant Aaron Englebeck wrote in his complaint to PSB commander Captain Lugo being identified as a suspect in a crime and being investigated.

Do you know what those circumstances are?

A.   Well, maybe I do because I may have been the individual that said we need to put Greg on leave, because my thought process as I was standing there listening to, you know, the potential of criminal allegations against our PSB commander, the person of all people in the organization that needs to be clean, clear, unblemished, that if there's an allegation made against my PSB commander, of all people, I am going to err on the side of caution and put him on leave, because he is like the beacon to the entire organization, to the Monitor Team obviously because you're here defending him I think, and to the Court, that I had no choice whether the allegation is true or accurate.  The allegation was made.  The allegation was made that he disobeyed a direct order not to go back into that Blue Team and he did that again.

So I had no choice but to put him on admin leave. Now, if it all comes out and it's fine, you know what, we'll dust him off and say, "Greg, I'm sorry," and we'll go on.  But until that happens, until DPS -- and of course you want us to use an outside investigator especially for somebody in Greg's position.

46REPORT001687

18

So I don't see where we had any choice or at least I don't see where I had any choice.

Q.    We should probably take an opportunity to offer some clarity.  You had mentioned that you think we're here to defend Captain Lugo and that is not the intent of this at all.  What we're exploring is what was known and what were the circumstances that led up to Captain Lugo being investigated for criminal and administrative allegations.

A.    To what end?  To what end?  What you're doing looks like to me you're second-guessing my decision to place one of my commanders on admin leave while we do an internal investigation.  I thought that's what you wanted us to do.

Q.    My question surrounded what was it that you believe -- what were you told that made you believe or understand that Captain Lugo was a criminal suspect, not that he was a criminal suspect and the right thing to do was put him on admin leave.  What was your understanding?  In other words, was the question tell me what crime he is alleged to have committed?  How have you identified him as a criminal suspect?  Who alleges that he is the one who committed the crime?  That's what I'm trying to find out.

A.    Well, I'll go back again to the whole issue of the PSB commander needs to be as pure and holy as anybody in that organization; and if an allegation is made against him, I think we need to at least put him on leave until we find out what's

46REPORT001688

going on, like we would many other -- any other employee.  And probably quicker to pull that trigger, in my mind, would be with somebody like Greg or somebody else, the lieutenants, the sergeants, deputies, detention officers that work at PSB, an allegation is made against them we should pull them out of the pool and investigate it because, again, it goes back to the way the 4,000 employees look at these individuals at PSB, they need to be like -- I don't know, preachers where the word that they speak, the job that they do should be exemplary for everyone.

Q.    I very much appreciate that.

(Phone ringing).

Q.    My question surrounds who alleged that Captain Lugo committed a crime?  Who identified Captain Lugo as a criminal suspect in a crime?  I understand what you're saying if somebody is identified as a suspect, you want to take affirmative action.  I'm trying to get to the prerequisite to that.  Who identified he was a suspect in a crime and who made any reasonable effort to confirm that a crime even happened?

A.    Well, two different issues you're talking about here right now.  The way I understood it, Sergeant Englebeck made the allegations.  It was incumbent upon me again for that allegation of him tampering with evidence and then the other allegation made by Chief Palopoli that Captain Lugo did not obey her order to stay away from that file and for those two issues, I had no choice, in my mind, other than to put him on

leave.

Now, investigating the allegations is something that happens when you're on admin leave.

Do you guys have a water by any chance?

MR. PETERS:  Here's one right here, Sheriff.

THE WITNESS:  Okay.  Thank you.

BY MR. ANDERS:

Q.   Your understanding at the time you directed that Captain Lugo be put on admin leave was that Sergeant Englebeck had identified a crime and identified Captain Lugo as a suspect in that crime?

A.   Yes.

Q.   Do you recall who provided you that information?

A.   It was Undersheriff Gentry.

Q.   Okay.  Would it surprise you if I said we're having difficulty finding any allegation from Sergeant Aaron Englebeck identifying Captain Lugo as a suspect in a crime?

A.   Would it surprise -- well, since I didn't see the written allegation and all of that, I was verbally briefed on it, I don't know if I would be surprised or not.

Q.   About 24 days after the allegation was made.

When Captain Lugo was put on admin leave was Friday, April 4, which I think we can agree was probably the day that you were briefed.  I apologize if you answered this and I have just forgotten.  Who was present at the time you were briefed?

46REPORT001690

It sounds like Undersheriff Gentry was present?

A.    I think it was just him that afternoon because we were in my office.  We had talked about the failure to obey a direct order when we were in that meeting.  After Greg left, we talked about that, because I was actually pretty taken aback by Greg's actions that day, that afternoon.  You know, I had never seen him react like that and it was just off [inaudible] was my point of view.

So that's when we talked about him going back into the file.  And I don't think the Englebeck thing came up until later that day if I'm remembering it right, too.  And I could be remembering wrong.

Q.    So the general chronology, it sounds like, is your recollection is a meeting with Captain Lugo and other members of your staff on Friday, April 4, to discuss two captains going into PSB?

A.    Well, yeah.  It was the general -- the monthly, biweekly PSB update, You know.  It's very important to this organization that this gets done and I know Greg briefed us on that and that's when he came up with the we're under a thousand and I was very happy with him.  I already explained that.

And then we talked about getting him some help over there.

Q.    And then it would be later in the day is when you were first informed of these allegations made by Sergeant Englebeck

46REPORT001691

that Greg, Captain Lugo, was being identified as a criminal suspect, administrative, and Executive Chief Palopoli raised internal concerns with regards to violation of an order accessing information.  All of that happened on the same day?

A.    I believe so.

Q.    Okay.  Did you express to anybody, like, why are we well over three weeks that these allegations have been made and I'm just -- as the Sheriff, I'm just hearing about it now?

A.    I don't recall there being a time given when the complaint was made.

Q.    When a sworn member, as you all know, is placed on administrative leave, they are provided a document advising them they are on administrative leave.  The document that we have been provided that Captain Lugo was provided by Undersheriff Gentry, it outlines, in summary, he is placed on administrative leave regarding PSB case number 2025-0139. 2025-0139 is the internal complaint made by Chief Palopoli. She is the complainant.  She filed that complaint on Monday, April 7, alleging that acts occurred by Captain Lugo on March 11, almost an entire month prior.  So almost an entire month after she alleges one of the acts occurred either she decides independently or there was conversation that she would file a complaint in PSB making administrative allegations against Captain Lugo.

          I'm just curious what your thoughts are about

46REPORT001692

Executive Chief having knowledge of an alleged act of misconduct by the PSB commander and not filing a complaint with PSB almost an entire month later?

A.    I would want to know why that occurred.

Q.    The Notice of Administrative leave to Captain Lugo represents case, as I said, 0139 which is administrative only. It doesn't reference 0111 which is the criminal allegations that the executive staff has identified Captain Lugo as a suspect in.

And so I just am seeking clarity.  Is it your understanding that your direction was he needs to be placed on administrative leave for the criminal and the administrative even though the administrative leave document only outlines one administrative case; is that correct?

A.    Yes.

Q.    So that administrative document would not be -- would not accurately represent what your direction was.  It was to be for the criminal as well?

A.    Correct.

Q.    Okay.  Sheriff, if I asked this, and I don't it with any disrespect whatsoever, trust me, please.  But is there like -- you have been emphatic in your posture as Chief Executive of an exceptionally large Sheriff's Department, your thoughts about the pristine nature of your PSB commander; right?  You have, my impression is, exceptional standards for your PSB commander.

Do you think your expectations of your PSB commander are congruent with those that your Undersheriff and Executive Chief Palopoli has?

The reason I ask is criminal allegations on March 10. The Sheriff finds out about it on April 4, 24 days later. Not only that, but Chief Palopoli and most probably Chief Gentry believe that Sergeant Aaron Englebeck has identified the PSB commander as a criminal suspect and throughout this entire period of time he's been allowed to continue to command PSB, thus, I think you and I could agree, placing PSB product in jeopardy.

So you have this perspective but what's the perspective of your Undersheriff and your Executive Chief?

A.    For some reason I'm sitting here remembering that criminal complaint was new.

Q.    Yeah.  It came in on March 10 Undersheriff Gentry's email and there was also a Blue Team entry done by Sergeant Aaron Englebeck on March 10 which is the criminal allegation.  But I would say to you Sergeant Aaron Englebeck is alleging that a crime may have happened because he was not provided documents and they may have been destroyed.  But he does not identify anybody as a suspect in that crime.  In fact, his language is someone or PSB did this but does not articulate in any way that any member of the Monitoring Team can identify Captain Lugo destroyed documents and committed a crime against me.

25

And so that is the reason for our inquiry, is just trying to figure out how we got from Sergeant Aaron Englebeck's Blue Team entry and email to Undersheriff Gentry to Captain Lugo being categorized as a criminal suspect and referred out for criminal investigation. We can't find where he's been identified as a suspect, nor that an effort was made to qualify that a crime even occurred.

Now, the crime alleged is an interview had occurred at PSB involving Sergeant Aaron Englebeck as a principal. Sergeant Englebeck requested a copy of his entire PSB package which would include that interview. He was appealing his case to the Merit Commission.

A.    M'hum.

Q.    He did not get it. He surmised he didn't get it so it must have been destroyed or removed or perhaps somehow tampered with. He cites the Arizona criminal statute but he doesn't identify who would have done it.

A.    Do you know what was Englebeck's, what was the allegation against Englebeck? Do you know?

Q.    Well, Sergeant Englebeck had been a lieutenant out at Queen Creek a few years ago, failed probation; and the documentation supporting or corroborating the reasons for his failing probation and being remanded back to the rank of sergeant included a number of administrative allegations, one being insubordination. So that was investigated by PSB.

46REPORT001695

A.   Okay.

Q.   So he was appealing that sustained finding, asked for that package and did not get this interview, assumed destroyed, tampered with or whatever the language of the statute is, but didn't identify who might have done that.

So what I'm getting at is, would it have been reasonable if a chief officer in the organization became aware of this information of Sergeant Englebeck to establish the corpus of a crime.  "Let me make a phone call to Conduct Resolution or PSB.  Is that interview still in IAPro?  Do you have a log in there where somebody excised it from IAPro?"  I mean, quite frankly, literally a three-minute effort.

Sheriff, I'm just asking would that be reasonable?

A.   Sure.

Q.   I think so if I can take the liberty to opine.

Are you aware that anybody checked to see if this interview, in fact, still existed and it had not been tampered or destroyed, that there might have been another reason why it wasn't provided?

A.   (No verbal response).

Q.   And in fact members of the Monitoring Team say the interview exists.  In fact we have the interview.

I've had many conversations with Chief Palopoli and the Monitoring Team has also interviewed Chief Palopoli twice. Chief Palopoli, when she became aware of the complaint filed by

46REPORT001696

Sergeant Aaron Englebeck, she did not know what to do and in fact, had never heard of Baseline Investigations, the conflict contract investigator.

She contacted Tiffany Shaw in Conduct Resolution. Tiffany told Executive Chief Palopoli of Jensen Hughes and knew that sometimes PSB utilized the contract agency Jensen Hughes.

Chief Palopoli emailed and reached out to Jensen Hughes, had a conversation first via email with an investigator and then with a manager. Ultimately, an investigator from Jensen Hughes was assigned. Chief Palopoli said she was looking forward to working with them. They provided her information so she could access Secure File, the files with Jensen Hughes.

My first question, Sheriff, is, can Jensen Hughes, as a civilian contract investigative agency, can they investigate criminal allegations?

A.    Well, they could always investigate them but they couldn't charge them if it got that far.

Q.    So they would have legal authority to conduct a criminal investigation of a criminal suspect as civilians?

A.    That happens all the time. DIs do it all the time and then they will turn the case over to law enforcement to charge so it does happen.

Q.    What are your thoughts about an administrative allegation being made against the PSB commander, members of your executive

staff, not the complainant, members of your executive staff identifying Captain Lugo as a criminal suspect, and then your Executive Chief essentially, not literally but essentially contracting with Jensen Hughes to conduct that investigation?

Are there any concerns with regards to conflict?

A.    Maybe I'm a little conflicted because I thought that the investigation was given to DPS to do that, not Jensen Hughes.

Q.    Ultimately it was because I frustrated the Jensen Hughes investigation.

A.    Okay.  Okay.

Q.    Yeah.  So my role with Paragraph 346 and 347 is routing an intake.  And so when I first spoke with Chief Palopoli via email on March 25, by phone on March 26, she had already reached out to Jensen Hughes, had assigned an investigator, was given protocols to access their Secure Files and then when I learned of it, I frustrated that effort and said Jensen Hughes was not an appropriate organization to be conducting an investigation involving the PSB commander because he was their operational manager.

A.    M'hum, right.

Q.    So then we had conversation about Baseline and ultimately things resulted with the Arizona Department of Public Safety.

Sheriff, are you aware how the allegations involving Captain Lugo ultimately ended up being adopted or assigned encompassed by Arizona Department of Public Safety?  Was that

your recommendation?  The Undersheriff's recommendation?  Do you know how that happened?

A.    I don't know.

Q.    Okay.  Have you met or had any conversation with Arizona Department of Public Safety regarding the case?

A.    No.

Q.    Forgive me just a second.

When we spoke with -- I'll come back and revisit this in a couple of minutes.  But when we spoke with Undersheriff Gentry, I asked him about your training, expertise, and experience in administrative and criminal investigations of sworn personnel.

He said I have very little experience in investigating sworn personnel.  In my previous assignment with the Sheriff's Office, I had to do just a couple of internal investigations that would be administrative and I was part of a couple of criminal ones, mostly as a reporter and once as a witness.

I asked him was there ever any contact or communication with the Sheriff where case number 0111 and these criminal allegations as have been identified were communicated to the Sheriff?

He said yes.  I asked him can you tell me when and where.

He said I spoke with him, the Sheriff, directly in

46REPORT001699

his office.

He didn't recall the exact day.  He said it was very casual.

I told him that we received this, we're going to send it to an outside agency to investigate it and that was pretty much it.  I asked did the Sheriff provide any opinion and any commentary or provide you with any guidance or direction?

He said not at that time, no.  At a later time he did provide -- and I asked at a later time did he provide opinion, direction or commentary?  He said the only other time the Sheriff gave me any kind of direction on this at all was after it came to light that Chief Palopoli had identified that Captain Lugo accessed the case in April after he had been told not to.

When I told the Sheriff that, the Sheriff then said, "We have to put him on admin leave.  He said if we don't do something, if we don't show action right now, the Monitors, the Court are going to tear us apart.  That's the only other direction I've gotten from the Sheriff."

A.   I thought that part of that, too, was the criminal allegation also.

Q.   Okay.  Sheriff, I want to move on to a different case. This involves retired Chief Ken Holmes, who is your Appointing Authority, and this goes back to an original case with Sergeant Aaron Englebeck.  So again just by way of history,

Sergeant Englebeck was a probationary lieutenant.  He worked for Captain Lugo in Queen Creek I believe.  There were a number of allegations of misconduct that resulted in Captain Lugo documenting those.  Sergeant Englebeck failed probation, reverted back to his role as -- rank as sergeant.

A decision was made by somebody that based upon Captain Lugo's documentation, an internal investigation for a number of administrative allegations should be opened in PSB against Sergeant Englebeck.

That investigation then protracted out over a few years.  Ultimately, that investigation was completed by PSB.  There were sustained recommendations.  Appointing Authority Ken Holmes got receipt of case, a PDH was scheduled.  The PDH between Chief Holmes and Sergeant Aaron Englebeck occurred in October of 2024.  Chief Holmes sustained insubordination.  He then imposed 40-hour suspension.

Sergeant Englebeck then served the 40-hour suspension.  Sergeant Englebeck gave notice he wanted to appeal to the Merit Commission.

A.    Okay.

Q.    Between the time that Sergeant Englebeck served the 40-hour suspension, it was either late October or early November of 2024, to early February 2025, Appointing Authority Holmes reversed the suspension.

A.    After Englebeck --

46REPORT001701

Q.    After Englebeck served it.

A.    Okay.

Q.    He reversed the suspension and made him whole to be paid back for the 40-hour suspension he served.

A.    Okay.

Q.    We have had robust conversation with Chief Holmes with regards to how did he arrive at that decision after he had sustained and imposed the discipline, what would cause him then to reverse the discipline.

He has explained he believed that Englebeck felt that his demotion was essentially punishment or discipline and this was another round of discipline now getting a 40-hour suspension.

So we have had conversation about probationary periods, testing periods, the difference between failing probation, failing the testing, being able to be demoted without cause as compared to misconduct.

That aside, Chief Holmes then reversed the finding that he had sustained for insubordination in October of 2024 but on January 30, 2025, he reversed that sustained finding and changed it to not sustained.

His explanation for doing that was he didn't believe there should have been an investigation to begin with, that since Sergeant Englebeck had been demoted, there should not have been a complaint generated, and there should not have been

an investigation that even occurred, so essentially he was making it go away.

A.    M'hum.

Q.    Sheriff, you have been with the Sheriff's office for a long time, critical roles particularly as Chief Deputy.  Are you aware of any case post-PDH where the PDH ruling was sustained and then the Appointing Authority later reversed that sustained finding to a different finding?

A.    I can't think of one.

Q.    Moreover, when I asked Chief Holmes what facts changed from the PDH where you sustained to approximately four months later when you made it not sustained, what facts changed?

He acknowledged no facts changed.  So again I'm just asking you are you aware of that ever happening in your knowledge in your history in the Sheriff's Office?

A.    Not that I'm aware of.

Q.    Do you know of any reason why Chief Holmes would not only reverse a suspension that had already been served but would change a sustained finding to not sustained if facts had not changed?

A.    You know, next to PSB commander's job, I think Ken Holmes has the second most difficult job in the organization, disciplining everybody.  I don't -- I don't want to speak for him, why he would do that.

Q.    But you're not aware of it ever having been done

46REPORT001703

34

previously.

Sheriff, do you know what authority, what policy, county ordinance, bylaw, what authority your Appointing Authority would have to reverse a finding post-PDH ruling? In other words, just by way of example, five years ago Sergeant Anders was sustained for violating driving policy. Five years later the Appointing Authority says I'm going to change that finding. We're going to make it not sustained. No facts have changed. What authority does the Appointing Authority have to do that?

A.    Well, I guess Appointing Authority does have the authority to do that because it's delegated to him by the Sheriff and let's face it, sometimes things are not black and white like on our paper and in our investigations. You know, I don't want to answer for Ken and why he did this, but maybe he felt it was the wrong thing to do and he wanted to right a wrong. I don't know. I would hope that would be the reason that he did that, to do the right thing by an individual and to do right thing, sometimes you don't always follow what's happened in the past.

Q.    Sheriff, do you believe that Captain Lugo has a firm understanding of policy and practice as it relates to conflict investigations in PSB?

A.    Yes.

Q.    Do you have any reason to believe that Captain Lugo would consciously sabotage a conflict investigation?

46REPORT001704

A.    I would hope not.

Q.    You've known Captain Lugo for a long time?

A.    M'hum.

Q.    Your knowledge of Captain Lugo regarding his demonstrated work history, are you aware of any policy violations associated with conflict of interest investigations?

A.    No.

Q.    With -- has he ever been insubordinate?

A.    Not that I'm aware of.

Q.    Are you aware if he's ever failed to make a timely notification in a serious matter?

A.    Not aware of it.

Q.    Are you aware if he's ever been considered a criminal suspect?

A.    Now you're talking about other than --

Q.    Other than the current circumstance.

A.    No.

Q.    I want to give you a hypothetical.  I'm going to ask you to bear with me.  You'll understand why I'm asking.

A.    All right.

        MR. MASTERSON:  Could we pause the hypothetical and just take a short break?

        MR. ANDERS:  Yes, please.  Absolutely.  We're going to go off the record.  The time is approximately 3:17 p.m.

        (Recess at 3:17 p.m.; resumed at 3:28 p.m.)

46REPORT001705

MR. ANDERS: Okay. We're back on the record. All five of us are back in the conference room and the time is approximately 3:28 p.m.

BY MR. ANDERS:

Q. Sheriff, we're getting close to wrapping this up. So this hypothetical I wanted to talk about, you've talked about some bulleted thoughts you have with regards to Captain Lugo. Don't know him to ever have violated policy associated with conflict of interest, with insubordination, failure to notify, never been a criminal suspect that you're aware of.

If there were a very serious incident that occurred within the office, where there could be some real serious discipline meted out if sustained, maybe a very public event, media found out about it, perhaps even the possibility of criminal allegations resulting, criminal charges being filed. If you're sitting in your conference room on the fifth floor and you've just been informed of this incident and sitting at your conference table with Chief Summers, Undersheriff Gentry, Chief Palopoli, Captain Lugo and you're looking for guidance and advice and counsel with regards to how is this best managed? What are the investigative processes? What are the human resource policies, ordinances, processes associated with all of this, who are you relying on primarily to give you the best advice regarding process?

A. Captain Lugo.

Q.   So I just want to get to this, Sheriff.  In a very compressed period of time, Captain Lugo, the PSB commander, has been identified by your executive staff as a criminal suspect in a crime and they have referred him to the Arizona Department of Public Safety to be criminally investigated.  In that same compressed period of time, we're talking a matter of weeks, he has also been accused of administrative violations by your executive staff and those allegations have also been referred to the Arizona Department of Public Safety for investigation.

As the Chief Executive of the organization, does this pique your curiosity at all?  How is this happening in such a compressed period of time knowing what you know and what you have said you feel or you evaluate Captain Lugo to be?

A.   It's very simple for me and I kind of touched on it earlier.  That position that Greg Lugo is in has to be held to the highest standards of integrity; and if anybody makes an allegation against him, I think the prudent thing to do was -- and I actually made that decision, was to put him on leave until this gets cleared up.  Because even -- even if there's nothing to any of this stuff, if we didn't, if I didn't do that, I would have been scrutinized and you guys probably would have been talking about something else in this room today.  I don't want to put -- now it may look -- you know, I'm sure Greg is not happy right now.  But everything gets cleared away, just like what's happened with many other people throughout the

years, throughout law enforcement agencies across this country. Okay, you get clear, sustained, we dust you off and say, "Sorry about that," and we move on.

But the way that I looked at this was very simple. Greg is our guy. He's in charge of PSB. Allegation has been made against him, maybe two allegations, maybe a criminal allegation, let's just put him on leave and figure it out because that's the safest way to do this, not play a game, not find out later, yes, it's true, no, it's not true. It doesn't matter. The fact that the allegations are out there and I did something about it.

Sorry, Greg, you know, comes out and it's not sustained or he's exonerated and all of these things, I'll try to give him that hug that I tried to give him the other day and say, "Hey, man, I'm sorry."

It's the integrity of the organization that we're talking about here. And he's been -- and you've got to know this from being in law enforcement. You know everybody in that organization is watching what we do to the PSB commander, absolutely they are. And if we didn't put him on leave with these allegations out there, then we all -- the rest of the organization would -- we would lose -- we would lose the discipline and order in the organization.

Q.   I think you can understand the tenor of much of my questions of you surround the veracity or comprehensiveness of

46REPORT001708

the information presented to you when you made that decision; right?  So you may have an understanding.  My question is, what's the veracity of the information that's being provided to you?  What crime occurred?  How did he become identified as a criminal suspect?  That still remains a mystery.

Moreover, I would offer if you got an email today, if your executive assistant opened an email, you got access to it and it said somebody on the fifth floor stole $400 worth of books and manuals, would you put Undersheriff Gentry out on admin leave?

A.    No.

Q.    Probably first want to confirm were manuals stolen?

A.    Probably.

Q.    Who might have been responsible for the manuals?  Did Gentry have any connection or nexus to those manuals?  Sheriff, you wouldn't leap to put Sheriff Gentry -- Undersheriff Gentry out on administrative leave and identify him as a criminal suspect, contact the colonel at Arizona Department of Public Safety and request that he investigate Undersheriff Gentry for $400 worth of stolen manuals.  Is that fair?

A.    That's fair.

Q.    Sheriff, last thing, and I truly want to emphasize with all sincerity, I mean no disrespect and this is not an accusation.  But I'm compelled to ask if we look at the timeline you've identified that you've identified, there was a

conversation with Captain Lugo that you believe happened on Friday, April 4, regarding two captains going into. That's introduced to him and my interpretation by your statement is he had quite a negative reaction to this?

A.   Correct.

Q.   He was not enamored?

A.   No.

Q.   He then left?

A.   M'hum.

Q.   There was then one or two follow-up conversations later that day.

A.   M'hum.

Q.   And this is the first you're learning about, well, there were these allegations that came in from Englebeck on March 10. Captain Lugo is a criminal suspect in those allegations from March 10. Chief Palopoli also introduces, you know, he violated an order. He failed to notify. He accessed IAPro or Blue Team and then he's placed on admin leave.

Is there any connection at all between Captain Lugo's negative response to two captains coming into PSB and suddenly you being informed of all of these allegations that you have no knowledge of up until that point?

A.   I don't believe so because one of the things that we left it with Greg was he wanted a period of time -- and I'm trying to remember. It was six weeks or so. It was a little bit

46REPORT001710

longer than I thought that he wanted to present plan on how he was going to deal with this without a second captain there. And, you know, I wasn't really fond of that idea but, you know, what, again, in deference to the great job Greg had been doing, like okay, you know.

So he left with the plan that he was going to put together a plan and, I don't know, six weeks or so. I don't remember the time period but it was over a month.

Q.   Sheriff, has any member of the leadership executive team in the Sheriff's Office in the last month or so opined, commented, even with innuendo said Captain Lugo has got to be removed from PSB?  We think Captain Lugo should not be the Captain of PSB?  Has this ever been a statement made or a topic of conversation at all?

A.   No.  The only conversation that we've had about PSB is putting another captain in there with Greg.

Q.   Sheriff, is there something I should have asked you that I didn't ask you or take an opportunity to provide clarity with regards to anything that we've discussed here today?

A.   I think I've pretty much told you the way I thought about Greg, the value he is to the organization.  You know, it's just like everything else.  None of this had even come up. Allegations have been made here and there.  I don't know.  So, no, I can't think of anything else.

Q.   Sheriff, let me ask you this.  I apologize.  I'm going to

46REPORT001711

take a couple more minutes.  You're familiar with Notices of Investigation, NOIs?

A.    M'hum.

Q.    As you can recall, when can a principal be released from an NOI?

MR. MASTERSON:  I'm sorry.  A principal what?

BY MR. ANDERS:

Q.    When can a principal be released from an NOI?

A.    I would believe from a letter from the commander at PSB.

Q.    That is correct, yeah.

A.    Is that good?

Q.    Yeah.

MR. MASTERSON:  That was a test.

THE WITNESS:  Okay.

BY MR. ANDERS:

Q.    Policy, as I understand, is that a principal must be notified by the PSB commander that their investigation is closed.

A.    Right.

Q.    And it's the PSB commander who provides that, for want of a better term, release from an NOI?

A.    M'hum.

Q.    Are you familiar with any circumstance in your history with the Sheriff's Office where a principal has been under the auspices of an active NOI and that NOI has been waived by a

43

member of executive or managerial staff?

A.   You know, I'm sure it's happened in the past.

Q.   Do you have any specific recollection of a particular time or circumstance when that may have happened?

A.   I'm trying to think about when I was the Chief Deputy if I did that.  I can't remember any specific circumstances, no.

Q.   Does anybody in the organization have the authority to waive an active NOI?  So by way example, Sergeant Anders is under investigation for serious misconduct.  He's been served an NOI by PSB and Sergeant Anders would like a member of the executive staff to essentially make the NOI go away.  So I can go out and have conversations and conduct my own investigation that I can't do under the NOI.

Are there any policies, bylaws, ordinances, any authorities that would allow anybody other than the PSB commander to waive that NOI?

A.   Well, this is the kind of question where you are really asking about the authority of the Sheriff and the Undersheriff because the Sheriff and the Undersheriff, PSB commander works for them.  Maybe there is a circumstance that we could do that. You know, and I go back to the policy that ever since I came here, it was a front page, and I don't know what policy it is currently.  I hope it's still in there where it talks about policies, guidelines, common sense shall prevail, something to that effect.  And sometimes there's just some things that

46REPORT001713

policy doesn't cover.  Some circumstances that there may be some reason why Ken Holmes did what he did; that, you know, common sense for the good of the order should prevail.  So it's possible.  Probably not happened very often.

MR. ANDERS:  Major Peters, anything?

MR. PETERS:  No.  I'm good.

MR. ANDERS:  Sheriff, thank you very much for your time today.

THE WITNESS:  Thank you.

MR. ANDERS:  I genuinely appreciate it.

We're going to go off the record.  The time is approximately 3:45 p.m.

(Proceedings concluded at 3:45 p.m.)

46REPORT001714

45

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 13th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper

Reporter's Transcript of Recorded Interview


In the Matter of:


Manuel de Jesus Ortega Melendres, et al.,

and United States of America

vs.

Gerard A. Sheridan, et al.

CV-07-02513-PHX-GMS

_____

*Reporter's Transcript of Recorded Interview*

SCHEDULED WITH JERRY SHERIDAN

May 13, 2025


_____




Elaine M. Cropper, RDR, CRR, CRC
Registered Professional Reporter, AZ CSR #51046
E.M. Cropper, LLC

591 E. Plaza Circle, #2535
Litchfield Park, AZ  85340
ecropper24@gmail.com


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

46REPORT001716

**TRANSCRIPT OF SCHEDULED INTERVIEW WITH JERRY SHERIDAN**

**TRANSCRIBER'S NOTES:  TO BE USED FOR READER ASSISTANCE ONLY, NOT AS LEGAL INTERPRETATIONS OR DEFINITIONS**

If this transcript contains quoted material, such material is reproduced as read or quoted by the speaker.

"M'hum" and "huh-uh" denote different utterances or exclamations. "M'hum" is used to indicate affirmation, agreement, or ratification.  "Huh-uh" is used to indicate non-affirmation, disagreement, or non-ratification

(Phonetic) denotes a phonetic spelling.

This transcriber uses [indiscernible]/[inaudible] to designate an area on the recording that is not recognizable or audible.  Dashes are not utilized for this purpose.  Dashes in this transcript are utilized in the customary English usage, as set-off statements or interrupted speaking.  Dashes do NOT indicate missing dialogue.

This transcriber uses paragraphing for long pauses and/or dialogue, not recorded/inaudibles.

46REPORT001717

P R O C E E D I N G S

MR. ANDERS:  Okay.  We're on the record.  Today is May 13, 2025.  The time is approximately 1:30 p.m.  We are presently in the conference room of the Federal Monitoring Team's office located on the sixth floor of the Luhrs Tower building located in downtown Phoenix, Arizona.

My name is Donald Anders.  With me today is Major Al Peters and Chief Sherry Kiyler.

We're present in the conference room today for the purpose of interviewing Maricopa County Sheriff Jerry Sheridan. At approximately 3 minutes before 1 p.m. on today's date, Chief Kiyler responded to the lobby of the Luhrs Tower, as she typically does for guests, and waited there for approximately 13 minutes.  During that time there were no representatives of Maricopa County, the Maricopa County Sheriff's Office, nor Sheriff Jerry Sheridan who appeared in the lobby.

Chief Kiyler returned back to the Monitor's office and at approximately 1:22 p.m., returned back to the first floor lobby of the Luhrs Tower to check and see if any members of Maricopa County and Maricopa County Sheriff's Office or Sheriff Jerry Sheridan were present, and they were not.

We have not been in receipt of any notice or communication regarding the nonappearance of Sheriff Jerry Sheridan for today's interview.

Several emails have been sent to the Maricopa County

Sheriff's Office regarding scheduling the interview with Sheriff Sheridan and those emails are available for production and review.

The time is approximately 1333 hours.  Sheriff Sheridan has not appeared, nor has a proxy, and we will go off the record.

46REPORT001719

C E R T I F I C A T E

I, ELAINE M. CROPPER, Registered Professional Reporter, certify that the foregoing is a correct transcript, to the best of my skill and ability, produced via machine shorthand from the audio/video recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 13th day of November, 2025.

s/Elaine M. Cropper

_____

Elaine M. Cropper