**Maricopa County Sheriff's Office**
**Comments on the Monitor's Forty-Sixth (46th) Quarterly Draft Report**
**July 1, 2025–September 30, 2025**

The Monitor's 46th Quarterly Draft Report covers the time from July 1, 2025, to September 30, 2025. Maricopa County Sheriff's Office ("MCSO") continues to work with the Monitor, the American Civil Liberties Union ("ACLU"), and the United States Department of Justice ("DOJ") to achieve compliance with the Court's Orders. MCSO is dedicated to complying with the Constitution, following best police practices, and attaining Full and Effective Compliance with the Court's Orders.

MCSO has submitted and filed with the Court its 46th Quarterly Report, which delineates the steps that MCSO has taken to implement the Court's Orders and its plans to address problems and responses to concerns raised in the Monitor's previous Quarterly Report and during ongoing communications with the Monitor. MCSO requests that the content of that 46th Quarterly Report be considered as comments to the Monitor's Draft Report as it contains relevant feedback. MCSO's additional comments to the Monitor's compliance findings and other issues in the Draft Report are listed below.

## <u>The Monitor's Investigatory "Findings."</u>

The Monitor's Draft 46th Report is unique in that it addresses an "inquiry" the Monitor initiated in the second quarter of 2025, its findings stemming from that investigation, and its holding MCSO out of compliance on various paragraphs of the Court's Orders as a result. Specifically, the Monitor's draft report reaches five "findings" as follows:

1. Defendants inquired about reopening final disciplinary decisions made by MCSO to accomplish various purposes; these cases were already closed. Defendants had no authority to reopen or attempt to reopen any closed cases.
2. Kenneth Holmes has been serving as the Pre-Determination Hearing Officer at MCSO, in violation of MCSO policy and applicable law.
3. Had Kenneth Holmes been qualified to serve as the Pre-Determination Hearing Office at MCSO, he nevertheless failed to comply with MCSO policy and applicable law when he vacated the discipline and findings against Sergeant Engelbeck.
4. Executive Chief Palopoli, under instruction from the Sheriff, allowed an attorney to be present during a PSB investigative interview, in violation of MCSO policy and applicable law.
5. MCSO failed to engage in appropriate, uniform, and fair discipline as required by the Court Orders.

MCSO respectfully submits that these "findings" have nothing to do with events occurring within MCSO between July 1, 2025, and September 30, 2025. Rather, MCSO believes the Monitor's discussing these issues in its Draft 46th Report has everything to do with providing inflammatory soundbites calculated to aid Plaintiffs' opposition to Maricopa County's pending Rule 60 motion filed on April 14, 2026 (Doc. 3459).[1]

---

[1] The Monitor's circulation of this draft report to various individuals within and outside of MCSO has already caused irreparable harm to the reputation of those directly named in the Monitor's draft report and impeded MCSO's operations and timely compliance with the Court's Orders.

As more fully set forth below, MCSO vehemently disagrees with the Monitor's investigation, its improper factual findings and legal analysis, speculative conclusions, and its preliminary decision to remove MCSO from compliance with various paragraphs of the Court's Orders. [*See e.g.,* Draft 46th Report at 176; *id.* at 176-194].

Moreover, the findings are flawed because the Monitor repeatedly attempts to exceed its authority by attempting to be the final arbiter of Arizona law on issues such as employment of law enforcement officers, the statutory powers of the Sheriff, and the interplay between MCSO policy and statutory law. This pronouncement of Arizona law and policy not only defies the Court's admission that many of these issues are in areas of unresolved Arizona law, it *far* exceeds the Monitor's authority. The Court's Monitor cannot ever *adjudicate* the law or decide contested facts. Indeed, a monitor lacks authority "to adjudicate violations of the order as 'a roving federal district court.'" *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1150 (D.C. Cir. 2009) (quoting *Cobell v. Norton,* 334 F.3d 1128, 1143 (D.C. Cir. 2003); *see Emma C. v. Torlakson*, 621 F. Supp. 3d 982, 990 n.2 (N.D. Cal. 2018) ("Although the court monitor's conclusions have been described as 'findings' at various points, it is worth recalling that the court monitor's conclusions serve only as recommendations to the Court about whether the state is in compliance with its legal obligations."); *see also Indep. Living Ctr. of S. California v. City of Los Angeles*, No. CV 12-0551 FMO (PJWX), 2025 WL 1712398, at *4 (C.D. Cal. Mar. 31, 2025) ("The Monitor is an agent of the Court" and "as an 'agent of the Court, the Monitor is like the law clerk and the fellow judge who acts as a confidential advisor of the court." (cleaned up)). To this point, the Monitor was not appointed to act as a special master on contested issues of fact or law, as its Draft 46th Report now purports to do. Instead, "a monitor's 'primary function is to monitor compliance'" whereas "a [special] *master's* role is broader: to 'report [ ] to the court and, if required, make [ ] findings of facts and conclusions of law.'" *Cobell,* 334 F.3d at 1146 (emphasis added). But this Court did not appoint the Monitor as a special master. Despite these specific limitations, the Monitor's Draft Report improperly attempts to do both.

The Monitor also attempts to direct MCSO how to handle its own affairs. Although "a monitor may report on a defendant's compliance with the district court's decree and help implement that decree," a monitor lacks "authority to direct a defendant to take or to refrain from taking any specific action to achieve compliance with the court's order." *Philip Morris USA Inc.*, 566 F.3d at 1150 (cleaned up); *Ruiz v. Estelle,* 679 F.2d 1115, 1162 (5th Cir.), *amended in part, reh'g denied in part on other grounds,* 688 F.2d 266 (5th Cir. 1982) (A monitor may not "intervene in the administrative management of [the department or] direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance."). Although a monitor has less authority than a special master, even "Masters may not be placed in control of governmental defendants for the purpose of forcing them to comply with court orders" and thus they cannot "control or administer" compliance efforts. *Nat'l Org. For the Reform of Marijuana L. v. Mullen* (NORML), 828 F.2d 536, 545 (9th Cir. 1987); *see also Reynolds v. McInnes*, 338 F.3d 1201, 1219 (11th Cir. 2003) ("Federal courts should not be in the business of running important functions of state government for decades at a time.").

These issues are present throughout the entirety of the Section 12 "findings," and are addressed more fully in the sections below.

**I.    MCSO'S INQUIRY ABOUT DISCIPLINARY DECISIONS, WITHOUT TAKING ANY FURTHER ACTION, DOES NOT VIOLATE THE COURT'S ORDERS OR PROVIDE A BASIS FOR THE MONITOR TO ESTABLISH NON-COMPLIANCE WITH THE COURT'S ORDERS.**

The Monitor identified three requests MCSO made to Captain Lugo, which the Monitor mischaracterized as executive command's "revisiting internal administrative findings or discipline," as follows: (a) a question from Chief Rollie Seebert and former Chief George Hawthorne regarding *whether* PSB could reinvestigate closed complaints; (b) a March 2025 meeting where Undersheriff Gentry *inquired* about an investigation involving Deputy Ryan Lowry (which was on appeal); and (c) Undersheriff Gentry's inquiring whether the discipline matrix for a DUI citation could be changed.[2] In all three instances, the Monitor errs by attributing *any* fault to MCSO for simply asking questions of Captain Lugo about these various topics.

As a threshold issue, it is improper for the Monitor to attribute wrongdoing to MCSO simply based on mere inquiries of its personnel, especially inquiries directed to those who are viewed as subject matter experts on the Court's Orders. Although the Monitor's findings do not amount to civil contempt findings, civil contempt caselaw is instructive because "[t]o maintain an action for civil contempt, plaintiffs must show that a definite violation of an unequivocal court order has occurred." *Fujiwara v. Clark*, 477 F. Supp. 809, 818 (D. Haw. 1979); *see Equal Emp. Opportunity Comm'n v. Fotios*, No. CIV. A. SA-85-CA-448, 1987 WL 4781, at *2 (W.D. Tex. Feb. 2, 1987) ("In order to establish civil contempt, plaintiff must show by clear and convincing evidence, a definite violation of a clear and unequivocal order." (citations omitted)). Specifically, a "Defendant may not be held in contempt for actions which were not expressly written in the court order." *Fujiwara*, 477 F. Supp. at 818 (citing *H. K. Porter v. Nat. Friction Products*, 568 F.2d 24 (7th Cir. 1977)); *see Serv. Emps. Int'l Union, Loc. 722, AFL-CIO v. Children's Hosp. Nat. Med. Ctr.*, 640 F. Supp. 272, 278 (D.D.C. 1984) (denying motion for contempt when an order was unclear because "[t]o support a contempt citation, however, the Order, not its context, is the key"); *Cancer Rsch. Inst., Inc. v. Cancer Rsch. Soc., Inc.*, 744 F. Supp. 526, 528 (S.D.N.Y. 1990) ("A party may be held in civil contempt 'only if there is a clear and unambiguous order, noncompliance is proved clearly and convincingly, and 'the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered.'" (quoting *Drywall Tapers, Local 1974 v. Local 530,* 889 F.2d 389, 394 (2d Cir. 1989))).

- Here, the Monitor does not identify any specific part of this Court's orders that these mere inquiries supposedly violated. Specifically, nowhere in this Court's order prohibits MCSO personnel from seeking advice within MCSO about whether a proposed course of action complies with this Court's order or other policies. Moreover, the Monitor does not find any of the inquiries lacked a good faith basis, nor does the Monitor find that any MCSO staff ignored the advice they received after being told such action does not comply with this Court's order. *See Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 953 (9th Cir. 2014) ("If a defendant's action appears to be based on a good faith and reasonable interpretation of (the court's order), he should not be held in contempt." (citation omitted)). In other words, the Monitor's finding of non-compliance is speculative, hinders MCSO's

---

[2] Throughout this section, MCSO refers to Undersheriff Gentry as "Chief Deputy/Chief Gentry" or "Undersheriff Gentry" depending on the date relevant to the issue related to the Monitor's finding on which MCSO is commenting. However, please note that despite the title used, MCSO is referring to the same Jeff Gentry.

ability to ensure its personnel comply with this Court's order, and should not be adopted. And it effectively adopts a standard that command staff may not ask any questions of Captain Lugo, or any other individual within MCSO, whatsoever.

Moreover, the Monitor equally errs in its assessment of the three examples it listed in its Draft Report. Again, the MT based Finding 1(a)–(c) on a subjective misinterpretation of the new administration's executive command's intent, penalizing MCSO for administrative due diligence and institutional fact-finding that resulted in no operational violation, as MCSO took no action regarding narratives 1(a)–(c). The following points broadly apply to each of the Monitor's purported findings:

- **Obtaining Institutional and Background Knowledge:** The new administration's executive command has an inherent duty to inquire into policy positions and obtain background knowledge to understand the "institutional landscape" it has inherited. This was a legitimate fact-finding exercise to ensure future directives are well-informed.
- **Subject Matter Expert ("SME") Consultation:** The new administration's executive command sought expert advice from SMEs, such as the PSB Commander or the Policy Development Section's commanders. These are legitimate processes of responsible leadership intended to ensure no action is taken that might conflict with the Court's Orders.
- **Absence of a Violative Act:** The Monitor acknowledges the administration never followed through on reopening any cases. Once briefed on legal constraints or corrected about the specific facts of a case, leadership ceased proceeding with these actions about which they merely inquired and took no further action. Merely inquiring whether changes could occur or asking for clarification of the facts of a case, but ultimately taking no action, proves that internal safeguards are effective and command listens to and respects the guidance of its SMEs; an inquiry is not evidence of a violation of any order.
- **Subjective Opinion vs. Objective Fact:** A finding of non-compliance should be based on an executed act—such as a directive given or a system record altered. The Monitor's finding rests entirely on a subjective interpretation of conversations regarding intent, rather than an operational failure.

With regard to each instance the Monitor identified, MCSO responds as follows:

**First**, the Monitor appears to entirely take out of context the questions posed by Rollie Seebert and former Chief George Hawthorne to Captain Lugo. This meeting occurred on December 11, 2024, as new members of MCSO command were coming online after Sheriff Sheridan was elected and before he would assume office. These individuals simply asked Captain Lugo if PSB *could* reinvestigate closed complaints. Interestingly, the Monitor simply takes Captain Lugo's account of this discussion at face value and failed to interview either Rollie Seebert or George Hawthorne—negating any value the Monitor's purported "fact finding" might, but does not, have.[3] In any event, as articulated above, even assuming Captain Lugo's articulation of this meeting was accurate (and the Monitor's one-sided investigation undermines such a conclusion), there is simply nothing wrong with asking a question

---

[3] An issue throughout the Monitor's draft report is MCSO is being found out of compliance on multiple issues based solely on the statements of one individual, none of which have been corroborated by any other witnesses, and some of which were directly contradicted by other witnesses. This is highly improper and cannot serve as a basis to hold MCSO out of compliance with the Court's Orders.

related to compliance with the Court's orders from someone knowledgeable at MCSO on the subject. This is especially true when it is asked by incoming members of MCSO command, before they had even assumed their positions. Moreover, despite these questions being asked, no further related action was taken after Captain Lugo responded that closed investigations are not reinvestigated. Thus, the Monitor is effectively attributing fault to MCSO command for simply asking questions. That is entirely improper and lacks any basis in fact or law to hold MCSO out of compliance with this Court's Orders.

MCSO also notes that Captain Lugo's articulation of whether closed investigations can be reinvestigated under Arizona law is incorrect. Curiously, the Court raised the same question *prior* to MCSO's receiving the Monitor's draft report and before MCSO had any context as to why the Court was inquiring on this issue. [*See* Docs. 3422, 3447 at 2-5]. Indeed, the issue was not raised in any briefing filed with the Court. Despite raising this objection, nevertheless, MCSO filed briefing with the Court addressing this issue, stating that: (1) the Sheriff undisputedly has the power to amend discipline for any investigation that is not yet closed (which includes the running of any and all appellate rights); (2) the Sheriff has express and implied powers to reopen closed IA investigations; and (3) A.R.S. § 38-1110(B) authorizes the filing of a new investigation (effectively reopening a closed one) upon the discovery of new material evidence. [*See* Doc. 3447 at 5-9]. Upon receipt of MCSO's filing, the Court ruled that it would "withhold ruling" on this issue "until such point as these issues are presented to the Court as a live controversy in this case." [Doc. 3448]. Again, there was no live controversy or filing by any party which would have raised this seemingly advisory issue.

The Monitor attempts to define Arizona law and, critically, by finding that the act of posing internal compliance questions itself violates this Court's order, the Monitor functionally steps beyond assessing compliance to directing compliance. In sum, by finding that MCSO personnel's mere internal inquiry violates this Court's order without regard to the content or context of the questions and without any subsequent related act, the Monitor effectively prohibits MCSO personnel from asking any internal compliance questions.

**Second**, the March 2025 meeting, as articulated in the Monitor's Draft 46th Report, simply involved members of MCSO command (who were new to their roles and the subject matter of the inquiry) asking Captain Lugo questions without taking *any* further action. Yet again, this is not a basis to hold MCSO out of compliance with the Court's Orders or to make speculative findings about MCSO command's intent.

Moreover, on page 178 of its report, the Monitor improperly states the status of Arizona law. The investigation discussed during the March 2025 meeting was, as the Monitor articulates in its report, an IA that was "in the appeals process." Even the Court recently recognized that an IA is not closed or final until the appeal process has been completed, and that the Sheriff or his designee can modify discipline at any time before that process becomes final. [*See* Doc. 3422 at 4-6]. The Monitor's statement to the contrary, "[a]fter the expiration of the 10 days, or if an appeal is filed, the Sheriff can no longer make any unilateral changes on the discipline" flies in the face of what the Court has articulated Arizona law provides. Moreover, it also appears to be based on *Legacy Found. Action Fund v. Citizens Clean Elections Comm'n,* 254 Ariz. 485, 493 (2023). But *Legacy* has absolutely nothing to do with a sheriff rescinding discipline during an employee's appeal to the merit commission. Rather, the Court in *Legacy* was addressing the application of issue preclusion in a case involving whether a nonprofit organization violated the Citizens Clean Elections Act. Thus, the Monitor's draft report should not only abstain from performing an assessment on what Arizona law requires, as that exceeds the

5

Monitor's authority, but it certainly should not be making incorrect statements of law that the Court has previously contradicted.

Stated simply, there was nothing improper about incoming command simply asking questions of Captain Lugo regarding an investigation that was currently being appealed and still remained within the Sheriff's powers to alter discipline. Moreover, despite these questions being asked, MCSO command took absolutely no further steps to alter the discipline within the investigation at issue.

**Third**, the Monitor's example of Undersheriff Gentry's merely questioning whether an off duty DUI should result in the termination of an employee who self-reports the DUI and whether changing the DUI policy (not coincidentally, back to what it previously provided) was appropriate is yet another example of MCSO command's simply asking a legitimate question, receiving a response, and following the advice it received. Here, Captain Lugo informed MCSO command that he did not have a view one way or the other, but that the Monitor would not likely grant the requested change and MCSO command did not request that change to be made as a result. MCSO is unclear on how the Monitor could interpret this exchange—to which Captain Lugo did not take a stance one way or the other but simply noted the Monitor's potential objection—as any intent to defy the Court's orders or Arizona law. Thus, the Monitor errs in faulting MCSO for simply asking Captain Lugo questions related to the DUI policy.[4]

**CONCLUSION:** Finding 1 is just the Monitor's subjective disagreement with the new administration's executive command's internal research process—indeed, seemingly a dislike that MCSO's new executive command staff asked any questions at all. Because the command sought expert advice and correctly chose not to act, there is no body of offense to support a violation. But at a bare minimum, unless and until the legal issue of the Sheriff's powers to alter or rescind discipline is resolved, the Monitor cannot hold MCSO out of compliance as the basis for the Monitor's comment is subject to disputed legal issues that must be adjudicated by the Court. The MT must entirely omit Finding 1 from its report.

## II.   KENNETH HOLMES HAS BEEN PROPERLY SERVING AS THE APPOINTING AUTHORITY AT MCSO, WITH THE MONITOR'S EXPRESS APPROVAL.

Next, the Monitor does an about-face on its approval of Kenneth Holmes to serve as MCSO's Appointing Authority. Finding 2 states that Kenneth Holmes had been serving as MCSO's Appointing Authority, and shortly after his retirement from MCSO, under the incumbency of former Sheriff Paul Penzone, he reached an agreement to continue as such. **At the time of these events, Hearing Officer Holmes held the position for nearly eight years**. Given that Kenneth Holmes was not a designated member of the Sheriff's command staff, the Monitor's Report now takes the position that his appointment as Appointing Authority violates the Court's Orders and MCSO policy.

---

[4] MCSO also notes that its position on the DUI policy is that this was a change made by the prior administration by Sheriff Penzone. Changes to the discipline matrix have been made throughout the imposition of the Court's Orders, and the Monitor never held such changes (let alone questions about proposed changes) constituted a basis to hold MCSO out of compliance with the Court's Orders, until now.

The Monitor's position is incorrect, let alone eight years past due even if it was correct. The MT's Finding 2 implies that because Kenneth Holmes is a contracted employee, he is an "unqualified non-employee" lacking the authority to serve as the Appointing Authority ("AA"); thus, he violates the Court's Orders and MCSO policy. This conclusion is factually inaccurate, ignores nearly a decade of established practice that the Monitor sanctioned, as well as the Monitor's explicit acknowledgement it had no concerns with Kenneth Holmes remaining in the AA position. Accordingly, MCSO requests that the Monitor rescind and remove Finding 2 from its 46th Draft Report.

To start, the Monitor has been reviewing and approving Mr. Holmes' work for over eight years. At no time has the Monitor ever challenged his authority to exercise the appointing authority powers of the Sheriff, until now, in the face of a pending Rule 60 motion seeking to end the Monitorship of this case. The timing cannot be ignored. In this regard, MCSO asserts that the Monitor's current challenge to Holmes's status is barred by the principle of equitable estoppel:

- **Established Practice:** In 2016–17, the Sheriff approved, and the Monitor was explicitly notified of, Holmes' transition from a permanent employee to a contracted employee specifically to continue his duties as the AA. Indeed, in a June 6, 2017, email from Monitor Kiyler, she directly acknowledged this issue and expressly failed to raise any issue with Holmes' transition: "As we discussed, the Monitor is aware of the intent of MCSO to continue to use former Chief Holmes to conduct PDH's and currently has *no position or opposition* to this decision." (emphasis added).
- **Informed Consent:** For nearly nine years, the MCSO operated under this stable framework with the MT's full knowledge. The Monitor's continued concurrence with the disciplinary process across dozens of Quarterly Reports constitutes informed consent. The Monitor cannot now retroactively claim this appointment violates a policy it sanctioned through years of oversight.
- **Policy GH-2 Definition and Status:** MCSO Policy GH-2 defines the AA as the "designated member of Office command staff, appointed by the Sheriff, whose duties include: being responsible for conducting the Pre-Determination Hearing (PDH); and providing the employee with an opportunity to be heard." Holmes' status as a command staff member as the AA has not changed, other than moving into the position as a contracted employee in the 2016–17 timeframe. His role and responsibilities have remained identical, a fact the Monitor has known for nearly a decade.

In addition, the Monitor's finding entirely disregards the legal framework of the Sheriff's powers under Arizona law. The Sheriff has express powers to, among many things: preserve the peace, arrest all persons who attempt to commit or who have committed a public offense, prevent and suppress breaches of peace, riots and insurrections that may come to the knowledge of the Sheriff, and take charge of and keep the county jail. A.R.S. § 11-441(A)(1)-(3), (5). In exercising these powers, the Sheriff "may command the aid of as many inhabitants of the county as the sheriff deems necessary." A.R.S. § 11-441(B) (emphasis added); *see also* A.R.S. § 11-409 (the Sheriff has the express power under A.R.S. § 11-409 to "appoint" deputies that are "necessary to conduct the affairs of [his] respective office[]."). This also includes requesting the aid of volunteer posse and reserve organizations located in the County. A.R.S. § 11-441(D).

When it comes to employing individuals, the Sheriff chooses whom to employ "to conduct the affairs" of his office. *See* A.R.S. § 11-409. And again, the Sheriff is the exclusive appointing authority when it comes to discipline of his employees. A.R.S. § 11-356; *Hounshell v. White*, 220 Ariz. 1 (App. 2008).

Consistent with Arizona law and this Court's orders, an Arizona Sheriff, or his designee "is the appointing authority over certified employees in the MCSO, and he has unique disciplinary authority over all deputies within the MCSO, according to state law." [Doc. 1765 at 14:21–23 (citing *Hounshell*)]; *see also* A.R.S. § 11-356(A). Accordingly, for those employees subject to the disciplinary matrix, the Sheriff, or his designee "have the authority to ignore the matrix and impose whatever discipline they deem appropriate." [Doc. 1765 at 15:3–5]. Thus, the Sheriff clearly has the right to appoint an AA to conduct Pre-Determination Hearings and manage disciplinary outcomes.

The validity of Holmes's role is further fortified by his legal standing to manage incomplete investigations. Because investigations under appeal are legally "not complete," the designated AA maintains the authority to modify findings. To suggest Holmes is "unqualified" would invalidate years of Merit System adjudication that the Monitor previously accepted as compliant. MCSO also maintains that the Monitor was fully advised of Chief Holmes's retirement and transition in 2016–17. Holmes is an independent contractor appointed by the Sheriff, designated to perform the role of the appointing authority. MCSO would not appoint/designate a clerk to do these tasks, it would be assumed it is a command level position. Thus, for all intents and purposes he is a designated member of the Sheriff's command staff, appointed by the Sheriff. The lack of any voiced concern at that time of Holmes' transition supports the argument that Holmes has the legal standing to exercise the powers of the AA.

The Monitor also has far too narrow of a reading of MCSO policy. Policy GC-17 definition of Appointing Authority is: "For the purpose of this Office Policy, the designated member of Office command staff, appointed by the Sheriff, whose duties include: being responsible for the conducting of the Pre-Determination Hearing; and providing the employee with an opportunity to be heard." Had the Monitor *ever* previously raised this issue, MCSO would have said the same. Moreover, if there was any dispute regarding Mr. Holmes' authority, MCSO would have taken the additional step to avoid any ambiguity and formally appointed Mr. Holmes with a designated position in MCSO command. MCSO has now made corrections to its organizational chart to avoid any continued argument by the Monitor on this issue.

Finally, the Monitor made this determination without <u>*any*</u> prior warning to MCSO and without providing MCSO any notice or opportunity to ameliorate this concern. In the past, when the Monitor intends to take MCSO out of compliance, and partially out of FEC compliance, it issued significant warnings in its reporting. It entirely failed to do so here, only further compounding its error.

**CONCLUSION:** The Monitor appears to have been sitting on a longstanding "gotcha" moment, waiting in the wings to employ it when it wanted to string together a litany of criticisms against MCSO, as it has done in its Draft 46th Report. The Monitor's criticism of Holmes is entirely contradictory to its existing approval of his position, his work, and the long history of compliance in this case. Holmes is a qualified AA whose status was established in good faith and with the Monitor's explicit knowledge. MCSO acted in reliance on the Monitor's years of silence, and his standing is fortified by the Sheriff's right to delegate command authority under Arizona law. The Monitor now raises this issue as a basis for not only failing to warn MCSO that it will hold it out of compliance, but actually to unilaterally take it out of compliance. Again, the timing of the Monitor's decision to raise this issue and take such drastic action seriously calls into question the Monitor's motivations in light of the pending Rule 60 motion. The MT must omit and rescind Finding 2 entirely from its report.

**III.    CHIEF HOLMES DID NOT FAIL TO COMPLY WITH MCSO POLICY AND APPLICABLE LAW WHEN HE VACATED THE DISCIPLINE AND FINDINGS AGAINST SERGEANT ENGELBECK.**

Finding 3 claims that Holmes had no authority to alter the findings or modify the discipline in the Sergeant Engelbeck case once an appeal was filed before the Merit Commission. Sergeant Engelbeck was issued a 40-hour suspension for insubordination on October 24, 2024, which he served. Approximately one month after the new Sheriff took office, Holmes issued a letter overruling his previous decision and rescinding the discipline, alleging he acted upon the advice of MCAO counsel. Holmes acknowledged that no facts had changed between the time he sustained the case and the time he changed it to "not sustained." However, the Monitor's Draft Report argues that only the Sheriff may reopen a disciplinary matter pursuant to the narrow exception under A.R.S. § 38-1106(I), and the statutory requirements for that exception were not met. Moreover, it argues that Holmes' initial decision was neither arbitrary nor without reasonable justification; therefore, the subsequent reversal constitutes a failure to comply with MCSO policy and applicable law.

Once again, as a threshold issue, the Monitor attempts to assign fault to MCSO based on its improper and unlawful interpretation of Arizona law. It is not the Monitor's place to interpret or apply Arizona law. Its role is to monitor MCSO for compliance. If legal issues arise then the issues should be raised with the Court for it to resolve disputed legal issues—not for the Monitor to unilaterally make determinations based on that improper and flawed interpretations of the law. But more importantly, if the law is unclear, that is yet another reason MCSO should not be held out of compliance for acting in what it believes at the time in which the conduct occurred, was a correct interpretation of law. This is true even if, at a later date, that interpretation is subsequently determined to be inaccurate. Put simply, the Monitor is not the Judge in this circumstance and egregiously oversteps in its misguided attempt to interpret Arizona law to reach "Findings" to support the incorrect conclusions in its report.

To be clear, however, the Monitor errs in its understanding and discussion of Arizona law on when the Sheriff or his designee can vacate discipline while an employee has not yet received a final decision or taken an appeal with the merit commission. As already noted above, the Monitor's conclusion that the Sheriff or his designee's window to rescind discipline does not close when an employee elects to take an appeal with the merit commission. Rather, even under the Court's articulation of the law, that power remains in full force and effect while an appeal remains outstanding.

In addition, MCSO's position, as already articulated to the Court, is that the Sheriff or his designee retains his power to modify discipline even after it becomes final as to the employee. The vast majority of the limitations on challenging discipline described by the Monitor arise out of the Police Officer's Bill of Rights ("POBR") and associated County Merit System. *See* A.R.S. §§ 38-1001-1020, 11-356. But nothing in the POBR addresses the Sheriff's powers as the appointing authority or prevents the Sheriff from expanding an employee's rights beyond those enshrined in the POBR. A.R.S. § 38-1102 ("This article does not preempt agreements that supplement or enhance the provisions of this article, including written agreements between the employer and the law enforcement officer or the law enforcement officer's lawful representative association."). The POBR provides "minimum rights for all peace officers in Arizona." *McMichael-Gombar v. Phoenix Civil Serv. Bd.*, 256 Ariz. 343, 347, ¶ 11; *see also* A.R.S. § 38-1102. Under certain circumstances, it expressly authorizes an employer to amend, modify, reject, or reverse a decision by a hearing officer, administrative law judge, or appeals board. *See e.g.,* A.R.S. § 38-1106. It also recognizes the need to reopen final, closed investigations when newly discovered evidence is found. A.R.S. § 38-1110(B) (permitting an employer to initiate "a new

9

investigation of the employee for misconduct upon newly discovered material evidence that could not with reasonable diligence have been discovered during the initial one hundred eighty-calendar-day limitation or any extension."). And as the Monitor has even recognized, it permits the Sheriff or his designee to entirely reverse a final decision after it is made when an employer determines a decision was "arbitrary and without reasonable justification." *See* A.R.S. § 38-1106(I).

The Sheriff also has additional implied powers to effectuate those powers expressly granted. *See Clayton v. State*, 38 Ariz. 135, 141 (1931) (recognizing as a source of authority powers "necessarily or fairly implied in or incident to the powers expressly granted"); *McMichael-Gombar*, 256 Ariz. at 347, ¶ 12 (noting that city board "can also exercise powers necessarily implied to effectuate powers expressly granted."); *City of Flagstaff v. Associated Dairy Prods. Co.*, 75 Ariz. 254, 257 (1953) ("Implied powers do not exist independently of the grant of express powers and the only function of an implied power is to aid in carrying into effect a power expressly granted." (quoting *Associated Dairy Prods. Co. v. Page*, 68 Ariz. 393, 395 (1949))); 80 C.J.S. Sheriffs and Constables § 52 ("When sheriffs are granted an express power or given an express duty by a state general assembly, a court of appeals, or the common law, they are also given all powers that are fairly implied to exercise or fulfill that express power or duty."). Consistent with these implied powers, the Sheriff or his designee has the power to modify discipline of his deputies since the ability to do so directly implicates his authority to conduct the affairs of his office and manage the appointment of his deputies. *See Hounshell*, 220 Ariz. 1.

Thus, given the Sheriff's powers to alter discipline both expressly as identified by A.R.S. § 11-356, and impliedly to ensure his office can carry out the duties of the Sheriff as set forth by A.R.S. § 11-441(A)(1)-(8), 11-409, 38-1106, and 38-1110, as well as the provisions of the POBR on overriding final decisions, the Sheriff or his designee has the authority to modify discipline (especially when that modification may favor an employee) even after it may become final as to an employee. This includes, at a minimum, when new evidence comes to light or reversing discipline that results in expanding an employee's rights. And consistent with A.R.S. § 11-356(A) and Paragraph 228, when the Sheriff or his designee exercises this authority, he must still provide a thorough written basis for that action that goes into the employee's file and is subject to public request.

Therefore, not only is it clear that the Sheriff or his designee has the ability to modify discipline while an employee's appeal of that discipline is pending, but also that the Sheriff also maintains he or his designee has the power to alter discipline, even after the decision becomes final as to the employee, and particularly when the exercise of that power favors the employee by virtue of reducing the discipline originally recommended. Thus, in the context of the issue raised in the Monitor's draft report Holmes was well within his granted authority to exercise his appointing authority powers to rescind discipline while an appeal was pending.

In addition, the Monitor's conclusion is flawed for a variety of other reasons:

- The Monitor's reliance on A.R.S. § 38-1106(I) is simply wrong. That subsection governs the reopening of an investigation that has already reached legal finality. Reopening a case is only necessary if the investigation is "complete" and the appeal window has expired or the appeal process has ended. In the case of Sergeant Engelbeck, the matter was never closed. Because a timely appeal was filed under A.R.S. § 38-1003, the investigation remained in an active administrative state. Therefore, the "reopening" requirements of § 38-1106(I) were never triggered.

- The Monitor fails to address the explicit language of A.R.S. § 38-1109(B), which is the controlling statute for all cases currently under appeal to a Merit Commission established pursuant to A.R.S. § 38-1002: "*If the law enforcement officer has timely appealed a disciplinary action, the investigation is not complete until the conclusion of the appeal process.*" Once again, the Court previously recognized this to be the case, something the Monitor's Draft 46th Report entirely ignores. Because the investigation is legally "not complete" during the pendency of an appeal, the AA (Chief Holmes) retains the inherent authority to manage the disciplinary findings as the "owner" of the action. Thus, the AA's ability to rescind the suspension is not a "reopening" of a closed matter, but a modification of an active one. This is a standard procedural right used to ensure that the final MCSO action meets the "just cause" standard before the Merit Commission scrutinizes it.
- The Monitor's claim that the AA "failed to comply with MCSO policy" also ignores the fundamental right to settlement established in Policy GC-17 and the Maricopa County Law Enforcement Officers Merit System Rules. Policies governing administrative appeals favor the resolution of disputes before a formal hearing. The AA's decision to enter a stipulated agreement—rescinding the suspension while maintaining the probational demotion—is a valid exercise of delegated power to settle a claim based on collaboration with legal counsel (MCAO). The AA's duty is also to ensure the MCSO's position is legally defensible. If the AA determines, upon review with MCAO, that the discipline lacks "reasonable justification" under A.R.S. § 38-1106(I), the AA has a duty under GC-17 to correct the discipline rather than knowingly proceed to a failed hearing.
- At a bare minimum, *even assuming the Court ultimately disagrees with MCSO's view of Arizona law on this subject*, what cannot be disputed is that no clearly established law at the time Holmes made his determination on this particular IA with Sergeant Engelbeck prohibited Holmes from rescinding discipline while the appeal was outstanding and unresolved. In this instance Holmes and MCSO are entitled to qualified immunity for such decision and it certainly cannot provide a basis for the Monitor to hold MCSO out of compliance with laws and policies that did not expressly prohibit the conduct at issue.

Finally, MCSO also notes that the Monitor later uses this issue as a basis to hold MCSO out of compliance with various Paragraphs of the Court's Orders and in part to conclude that command and the Sheriff are violating the Court's Orders. However, as the Monitor's Draft 46th Report plainly states, "Officer Holmes added that he did not have any discussions with Sheriff Sheridan about" his decision to reverse discipline. [Draft Report at 180]. Therefore, the Monitor's use of this issue as a basis to impute malintent on Sheriff Sheridan and MCSO command is, by its own words, improper.

**CONCLUSION:** Holmes did not "vacate" a final decision; rather, he exercised his distinct authority to amend an investigation that remained legally "incomplete." An investigation is only officially closed after the entire appeal process is concluded. By utilizing the "incomplete" status of this disciplinary determination, the AA aligned the discipline with legal requirements before the Merit Commission assumed final jurisdiction. These actions align with MCSO Policy GC-17 and are legally fortified by A.R.S. §§ 38-1001 through 38-1020 and the Sheriff's powers under Arizona law as the appointing authority. The Monitor's position is a misinterpretation of existing Arizona law and the Sheriff's express and implied powers derived from it, as well as the Law Enforcement Bill of Rights that would effectively strip all delegated Appointing Authorities of their power to settle or amend active appeals. The Monitor's misinterpretation of Arizona law is a prime example of why it should *never* construe Arizona law in the first place (especially without prior guidance from the Court and after the Court

provides MCSO with reasonable notice and opportunity to be heard) when assessing MCSO's compliance. It is also why reviewing Courts have admonished other monitoring teams for attempting to do so. *Cobell*, 334 F.3d at 1142 ("Regardless whether the district court has any inherent authority to appoint an agent to monitor the conduct of a party in litigation before it, it was surely impermissible to invest the Court Monitor with wide-ranging extrajudicial duties over the Government's objection. The Monitor's portfolio was truly extraordinary; instead of resolving disputes brought to him by the parties, he became something like a party himself. The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system."). Accordingly, the MCSO requests that the Monitor rescind and remove Finding 3 from the 46th Report.

## IV.    CHIEF PALOPOLI DID NOT VIOLATE MCSO POLICY AND APPLICABLE LAW WHEN PERMITTING AN ATTORNEY TO BE PRESENT DURING A PSB INVESTIGATIVE INTERVIEW.

In late February 2025, the Sheriff and MCSO executive command permitted an attorney to attend a PSB interview of a former employee. Although Captain Lugo (PSB Commander) initially attempted to disallow the attorney's participation based on Policy GH-2—which states an observer must be an employee and not an attorney—Executive Chief Palopoli overruled him under the Sheriff's direction. The Monitor alleges this act violated MCSO policy and Arizona law. The Monitor further asserts that the PSB Commander is vested with the **sole** authority to exclude observers, making Executive Chief Palopoli's intervention a violation of established disciplinary safeguards.

The Monitor's position is incorrect. The decision by Executive Chief Palopoli, acting under the direction of the Sheriff, to allow an attorney to be present as an observer was a lawful exercise of MCSO's discretion as an employer under the POBR. *See* A.R.S. § 38-1104. This administrative choice did not constitute a violation of any Court-mandated directive.

The POBR explicitly authorizes a law enforcement officer to have an attorney present if "agreed to by the employer." A.R.S. § 38-1104(a)(1). Executive Chief Palopoli followed the instruction of the Sheriff, who, as the elected official in charge of the Sheriff's Office, exercised this statutory discretion as "the employer." There is thus no question that MCSO (and Executive Chief Palopoli, on the Sheriff's order) acted pursuant to express statutory authority in its decision to allow an attorney in the interview.

The Monitor, however, argues that the Sheriff is *incapable* of making such a decision because MCSO maintains GH-2, which states that "the PSB Commander shall have the final authority to determine whether the prospective observer shall be excluded from participation as an observer." It would be nonsensical to claim that, in writing that policy, the Sheriff divested himself of authority bestowed upon him by statute. The policy delegates that decision to the PSB Commander, but that does not mean that the PSB Commander is free to make decisions without oversight from his superior officers and the chain of command. That reading would also be contrary to the POBR, which allows the "employer" to make the decision, and the PSB Commander is **not** the employer.

Additionally, even if the Monitor maintains this is a policy violation, it must be viewed within the context of GC-17, Attachment B. Consistent with that policy, Category 1 Offenses are defined as conduct having a "minimal negative impact on overall operations." This decision resulted in no operational breach and is instead a minor, technical deviation, which is consistent with the POBR. In

fact, here, the attorney was permitted strictly in an observer capacity and a formal agreement was signed to ensure no interference with the investigative process. This was a documented administrative decision, consistent with Arizona law. Moreover, there is no claim that this decision somehow affected or even could negatively affect the Plaintiff Class's rights, as it has no bearing on their Constitutional rights. The mere *presence* of an attorney does not hinder any aspect of operations.

The Monitor's Finding also lays the blame for this decision entirely on Executive Chief Palopoli even though the Monitor recognizes that: a) Chief Palopoli acted pursuant to the Sheriff's order; and b) the PSB Commander had final authority. In essence, the Monitor blames Chief Palopoli for refusing to overrule her supervisor but exonerates Captain Lugo's decision to do the same. The inconsistent nature of this finding is emblematic of the Monitor's approach to Section 12, as well as the Sheriff and command staff's authority and actions writ large. The "finding" itself is based entirely on Captain Lugo's descriptions and testimony. [*See* Draft Report nn. 36–40]. And, although the Monitor interviewed Executive Chief Palopoli *twice* in April 2025,[5] the Monitor did not once ask for Chief Palopoli's position on this issue whatsoever, nor did it ask for the Sheriff's position regarding the same, despite the importance the Monitor now gives to it. It is difficult to conceive how the Monitor could come to an allegedly unbiased finding when it stands on such an uneven and unsupported foundation.

Finally, and most egregiously, the Monitor's decision to remove Full and Effective Compliance based on this flawed, legally deficient finding is both logically and fundamentally incorrect. As the MT is well aware, FEC is strictly predicated on Phase 2 (Operational) Compliance, which requires a demonstrated failure rate of greater than 6% in actual practice (or 94% compliance). An isolated administrative decision to allow an observer *in one case* does not constitute an operational failure. Removing FEC for 14 paragraphs based on this purported, *single*, minor policy deviation clearly contradicts the principle of "sustained systematic compliance." It is a punitive, draconian overreach that ignores the agency's 100% operational success rate (Phase 2) in maintaining constitutional safeguards during this period. Nor was it preceded by any warning of any kind, as the Monitor has done in prior reports before taking MCSO out of compliance on a particular paragraph. Thus, the Monitor deprived MCSO of a notice and opportunity to address this purported issue before the Monitor decided to take MCSO out of FEC status, despite the fact that the alleged policy violation occurred over a year ago and prior to the relevant Reporting Period.

**CONCLUSION:** Chief Palopoli acted under the direct order of the Sheriff, whose decision was clearly within applicable statutory law and policy. But even if it could even possibly be seen as a policy violation, the act is minor in nature and has no indicated impact—nor can the Monitor cite any. There is no logical or principal basis under Phase 2 standards to justify the removal of FEC status for a technicality that did not impact the rights of the Plaintiffs or the integrity of the Court Order or the MCSO. MCSO requests that the Monitor rescind and remove Finding 4 from the 46th Report.

---

[5] This date is, of course, well before the Reporting Period of the 46th Report, which is Third Quarter 2025.

13

**V.**      <u>**MCSO ENGAGED IN APPROPRIATE, UNIFORM, AND FAIR DISCIPLINE AS REQUIRED BY THE COURT ORDERS.**</u>

As a threshold issue, there is nothing in the Monitor's Report in this section that addresses any issue other than the specific issues with placing Captain Lugo on leave. Thus, the Monitor's attempt to enlarge what MCSO will deem the "Lugo issue" to be anything more than a *singular* dispute is simply nonsensical. As a result, MCSO objects to the entirety of the Monitor's report on the "Finding 5" because the Monitor's own methodology does not require 100% compliance, but a 94% compliance rate, with the Court's orders on any individual IA investigation. The Monitor's report utterly fails to reconcile this core methodological requirement with its draconian and unsubstantiated decision to remove compliance based on a *<u>single</u>* IA investigation.

With that in mind, MCSO addresses the litany of falsehoods, unsubstantiated speculation, and outright incorrect statements contained in the Monitor's "Finding 5" as follows:

**A.**      <u>**The Monitor's "State Of Play" During The Time MCSO Filed The Captain Lugo Complaints Is Misleading And Unsubstantiated.**</u>

The issues referenced in the first section of the Monitor's draft report under Finding 5(a) involve five examples of Captain Lugo's receiving inquiries about the PSB process and whether final decisions could be further reviewed. As addressed in response to Finding 1 above, MCSO personnel asking Captain Lugo questions and not taking any further action based on his advice is simply not a basis to hold MCSO out of compliance or to even find MCSO was not complying with the Court's orders.

However, for sake of completeness, MCSO addresses each of the five examples provided by the MT as follows:

**MCSO RESPONSE to 5(a)(1):** MCSO formally disputes the Monitoring Team's characterization of the interaction between former Chief Hawthorne, Chief Pepe, and Captain Lugo as an act of interference.

- **Routine Administrative Clarification:** The Chief Hawthrone's inquiry was a legitimate exercise of leadership due diligence. The new administration's executive command was responding to internal concerns raised by a sworn employee. Seeking institutional knowledge from the PSB Commander to determine if a matter has been previously addressed is a responsible management function. The inquiry was resolved immediately upon receiving PSB's clarification; it is logically impossible for this interaction to constitute a failure to engage in appropriate, uniform, and fair discipline, as no disciplinary process was ever initiated, altered, or impeded.
- **Absolute Deference to PSB Finality:** The narrative confirms that once Captain Lugo clarified the matters had been addressed in prior, closed Service Complaints, the executive command took no further action. There was no directive to alter findings, no demand to reopen cases, and no interference with the PSB's prior determinations.
- **Confirmation of Safeguards:** This interaction proves that the MCSO's internal safeguards are effective. Executive command sought information, received a compliance-based response from the PSB Commander, and immediately deferred to the PSB Commander's guidance.
- **Resolution and Professionalism:** Chief Hawthrone's subsequent apology and expression of appreciation to Captain Lugo demonstrate a commitment to maintaining a professional,

compliant relationship between executive command and the PSB. To frame a corrected administrative inquiry as a "violation" is a punitive misinterpretation of a standard leadership transition and, contrary to the goal of cooperation, the Monitor's conclusion undermines the progress made.

In sum, Finding 5(a)(1) describes a successful administrative exchange whereby the new administration's executive command sought clarification and immediately respected the finality of the PSB's prior work. Because administrative exchange neither influenced investigative activity, nor subverted any disciplinary process, there is no factual basis for a finding of non-compliance. Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(a)(1) from the 46th Report.

**MCSO RESPONSE to 5(a)(2):** MCSO formally disputes the Monitoring Team's characterization of the discussion between Undersheriff Gentry and Captain Lugo as an act of interference.

- **Executive Review of Employee Concerns:** The new administration's executive command maintains an "open door" policy to ensure that employee concerns are heard, especially during a transition period when staff are airing grievances regarding the inherited institutional landscape. Undersheriff Gentry's inquiry into the grievance was a good-faith effort to understand the administrative process and ensure the employee was treated fairly.
- **Discussion of Process vs. Violation of Policy:** A mere discussion regarding the *possibility* of returning a grievance for further review does not constitute a violation. The narrative confirms that Undersheriff Gentry was "thinking of sending the grievance back," a thought-process shared with the PSB Commander to solicit expert feedback.
- **Deference to Expert Guidance:** Once Captain Lugo provided the necessary clarification that returning the grievance would, in his view, violate policy, the Undersheriff did not proceed with the action. This demonstrates that the new administration's executive command clearly seeks to act within the bounds of policy by consulting with the MCSO's internal "gatekeepers."
- **No Operational Failure:** Because the grievance was never actually returned and the original disciplinary determination remained untouched, the inquiry resulted in no operational change and demonstrates no failure to engage in appropriate, uniform, or fair discipline.

In sum, Finding 5(a)(2) describes a proactive leadership exchange intended to ensure administrative accuracy. Because the executive command sought guidance, listened to the PSB Commander's policy explanation, and ultimately took no action to circumvent the rules, there is no factual basis for a finding of non-compliance. Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(a)(2) from the 46th Report.

**MCSO RESPONSE to 5(a)(3):** MCSO formally disputes the Monitoring Team's characterization of the Sheriff's request for information as a violation.

- **Legitimate Leadership Due Diligence:** The new administration's executive command has a duty to understand the extent and limitations of its administrative authority during a leadership transition. Seeking clarification on the "parameters" of Policy GH-2 regarding disciplinary review is a responsible fact-finding exercise, particularly when leadership is being presented with employee concerns about the inherited institutional landscape.
- **Discussion of Policy Parameters is not a Violation:** Inquiring about a policy's existence or its historical application is a fundamental right of an elected official. The narrative confirms that the Sheriff asked **"if"** he could overturn a decision and "whether" there was a timeframe

to do so. This is a request for institutional knowledge, not a directive to violate the Court Order.

- **Deference to Internal Gatekeepers:** The Sheriff sought this information directly from the PSB Commander, MCSO's primary internal "gatekeeper." By seeking expert guidance on the "parameters" of the policy before taking any action, the Sheriff demonstrated a commitment to following established protocols.

- **Absolute Preservation of Finality:** The narrative admits that while the Sheriff inquired about the process, no disciplinary decision was overturned. The status quo remained untouched. Because the inquiry neither resulted in operational change, nor altered a finalized case, it demonstrates no failure to engage in appropriate, uniform, or fair discipline.

In sum, Finding 5(a)(3) penalizes the Sheriff for the simple act of asking a question about his administrative purview. Seeking to understand the parameters of Policy GH-2 is an essential part of responsible leadership and transition research. Because the Sheriff sought guidance from the PSB Commander and took no action to circumvent the policy, there is no factual or legal basis for a finding of non-compliance. Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(a)(3) from the 46th Report.

**MCSO RESPONSE to 5(a)(4):** MCSO formally disputes the Monitoring Team's characterization of a uniform change as a disciplinary or Court Order violation.

- **Executive Purview Over Administrative Operations:** Decisions regarding the appearance and identification of the Posse—an auxiliary volunteer organization—fall within the broad administrative purview of the Sheriff. A directive to update a uniform is a management function intended to distinguish volunteer units and does not inherently constitute a violation of the constitutional principles governing the Court's Orders.

- **Correction and Adherence to Process:** Once this issue was raised, the Sheriff proactively required a formal rescission of the verbal directive to be disseminated Office-wide. This corrective action demonstrates that the new administration's executive command is committed to following established protocols when policy gaps are identified.

- **Ongoing Policy Integration:** MCSO has since incorporated the proposed uniform changes into the annual policy review for GJ-27 (Sheriff's Posse Program), which has been formally submitted to the Monitor for approval. However, because the Monitor maintains that it possesses approval authority over the entirety of the GJ-27 policy—a position MCSO views as an expansion of the Monitor's intended scope—the matter currently remains unresolved.

- **Absence of Disciplinary Impact:** The Monitor's inclusion of this event under "Misconduct Investigations and Discipline" (Finding 5) is a categorical error. A change in volunteer attire is not an act subject to discipline. This administrative decision resulted in no operational change to the disciplinary process and demonstrates no failure to engage in appropriate, uniform, or fair discipline.

- **Proactive Internal Oversight:** The narrative confirms that the PSB Commander was able to freely inquire about the status of Monitor notification. This exchange proves that the Office's internal "gatekeeper" functions remained active and vocal, ensuring that any perceived policy gaps were addressed through internal dialogue and subsequent formal submission.

In sum, via Finding 5(a)(4), the Monitor attempts to frame a standard administrative uniform/equipment decision as a breach of court-mandated disciplinary integrity. Because the uniform change involved no violation of constitutional rights, had no impact on the disciplinary framework,

and involved no operational failure of the PSB, there is no factual basis for a finding of non-compliance.

**MCSO RESPONSE to 5(a)(5):** MCSO formally disputes the inclusion of this meeting for any purpose in the Monitor's report.

- **Duplicative Allegation:** The substantive issue regarding the presence of an attorney as an observer was already addressed in Finding 4. Its inclusion here is redundant and appears to serve no purpose other than to bolster a narrative of "intentionality" without providing new evidence of an operational failure.
- **Irrelevance of Subjective Observations:** The Monitor narrative includes a subjective description of the Sheriff's facial appearance ("his face turned red"). This detail is professionally irrelevant and has no place in an objective compliance report. A leader's physical reaction during a high-stakes meeting regarding complex court mandates is not a metric for measuring the MCSO's adherence to the Court's Orders. Thus, there does not appear to be any link to compliance related issues in this Monitor example, other than for the Monitor to attempt to embarrass the Sheriff.
- **Direct Inquiry as Due Diligence:** The Sheriff's direct question— "So I violated the court order"—demonstrates a leader seeking immediate clarification on the legal standing of a management decision.[6] Inquiring about the implications of an act is a hallmark of responsible leadership during a transition, not evidence of a "blatant disregard" for the law.
- **Adherence to Documentation Standards:** The narrative confirms that Captain Lugo informed the command that the presence of counsel would be noted in the investigative report. Executive command accepted this process, allowing the PSB to maintain the integrity of its documentation. This proves that the internal "gatekeeper" system worked as intended.
- **No Operational Failure:** As established in MCSO's response to Finding 4, this administrative decision resulted in no interference with the investigation or the final disciplinary outcome. The inquiry and subsequent meeting resulted in no operational change and demonstrates no failure to engage in appropriate, uniform, or fair discipline.

In sum, Finding 5(a)(5) relies on subjective observations and redundant facts to create a narrative of misconduct. Seeking clarification from the PSB Commander and ensuring that all investigative steps are transparently documented is consistent with the MCSO's compliance mission. Because this action did not subvert any investigative outcome, there is no factual basis for a sustained violation. Accordingly, the MCSO requests that the Monitor rescind and remove Finding 5(a)(5) from the 46th Report.

---

[6] The Monitor quotes Captain Lugo's interview on this subject as absolute fact, when Captain Lugo clearly stated he would have to check his notes on what he wrote down was stated during this conversation with the Sheriff and that he was paraphrasing the Sheriff in his comments. [*See* 3-3 Lugo Interview at 139:7-10 ("And at one point he does say, *and I'll have to look at my notes exactly*, but he *sort of* says out loud, 'So I violated the court order.' *I don't know if he said we or I violated the court order, meaning him*.") (emphasis added).

**B.** **Sergeant Engelbeck's Administrative Complaint Against Lugo Was Not Simply A "Refile" Of A Prior Resolved Complaint.**

The Monitoring Team ("MT") concludes that in March 2025, Sergeant Engelbeck inappropriately reraised an administrative complaint against Captain Lugo that had been previously investigated and closed as a Service Complaint in July 2024. The MT emphasizes that this prior resolution had been approved by the former executive command and reviewed by the Monitoring Team itself, meaning no further investigation should have occurred, citing to Service Complaint 2024-0168. MCSO disputes that IA 2025-0111 was merely a simple "refile" of SC2024-0168 and cannot comprehend how the MT could reasonably arrive at their conclusion. Indeed, the MT did note that Sergeant Engelbeck alleged that his digital appeal file from IA 2020-0555 was missing an interview with Capt. Lugo from 2020 and implied that the evidence was "deliberately" omitted from his appeal file. Although the Monitor claims that IA 2025-0111 does not contain an explicit accusation that Captain Lugo was the individual responsible for the alleged withholding of or tampering with evidence, MCSO wholly disputes that characterization of IA 2025-0111.

### 1. Necessary Factual Background:

In early 2020, then Lieutenant Aaron Engelbeck was assigned to Patrol District VI in Queen Creek. Captain Gregory Lugo was the District VI Commander. [Doc 3504, at 14:20-21]. During Sergeant Engelbeck's probationary period as a lieutenant, Captain Lugo documented performance concerns, including Sergeant Engelbeck's repeated absence from his assigned patrol district during duty hours, despite Captain Lugo's directives that lieutenants remain physically within district boundaries. [Doc. 3504, at 14:22-15:1]. Based on the alleged absences, Captain Lugo submitted a memorandum recommending Sergeant Engelbeck's demotion, and MCSO demoted Sergeant Engelbeck shortly thereafter. [Doc. 3504, at 15:1-3]. In addition to the demotion, an internal affairs ("IA") case 2020-0555 opened against Sergeant Engelbeck that contained allegations of insubordination and untruthfulness related to Sergeant Engelbeck's location reporting in the CAD system. The investigation was assigned to PSB Sergeant Robert Leatham. [Doc. 3504, at 15:3-7].

During the investigation into IA 2020-0555, Sergeant Leatham interviewed both Captain Lugo and then Sergeant Engelbeck. Following his interview, Sergeant Engelbeck provided documents to Sergeant Leatham, including a twelve-page written memorandum disputing the allegations and asserting misconduct by Captain Lugo and others. [Doc. 3504, 15:12-14]. Sergeant Leatham declined to treat the memorandum as a formal complaint or include it in the IA file. [Doc. 3504, 15:14-15.] On June 13, 2024 Sergeant Engelbeck emailed then Chief Michael Caputo inquired about the status of IA2020-0555 and further inquired if any new IAs had been opened on Captain Lugo related to complaints made by Sergeant Engelbeck in his interview with Sergeant Leatham and included in his twelve-page written memorandum. [Report App'x 2-1, SC2024-0168]. He further alleged that an investigation should be opened against Sergeant Leatham for not opening an investigation into Capt. Lugo. [Report App'x 2-1, SC2024-0168]. The associated policy concerns contained in the allegations related to GB-2, CP-5, CP-2, and GC-11. [MT Appendix 2-1, SC2024-0168.] After investigating the allegations, MCSO determined that the allegations were without merit. [Report App'x 2-1, SC2024-0168].

In September 2024, PSB notified Sergeant Engelbeck that the investigation was completed and that 3 allegations of insubordination would be sustained. Following a pre-determination hearing before AA

Holmes, he sustained two insubordination allegations and imposed a forty-hour suspension without pay. [Report App'x 2-8]. Sergeant Engelbeck appealed. [Report App'x 2-8]. When Sergeant Engelbeck received access to the investigative file for appeal purposes, he noticed that the file omitted audio-video recordings of his interview and Captain Lugo's 2020 interviews—which he believed were necessary for his appeal to the Merit Board. [Report App'x 2-8.] He immediately notified County officials of the omission in January of 2025. [Report App'x 2-8]. The next day, Conduct Resolution advised Sergeant Engelbeck that there would be a change in his suspension and that the appeal would be vacated. [MT Appendix 2-8.]

On March 10, 2025, Sergeant Engelbeck alleged that the PSB had violated A.R.S. § 38-1106(A)(1), which required MCSO provide a copy of his investigative file to the appeal within fourteen calendar days of the request from the appellant. He also alleged that PSB violated A.R.S. § 13-2809(A)(1), which forbids a person tamper with evidence with the intent that it be used, introduced, rejected, or unavailable in an official proceeding which is then pending. He alleged that tampering with evidence includes when a person destroys, mutilates, alters, conceals, or removes physical evidence with the intent to impair its verity or availability. [Report App'x 2-8]. Captain Lugo and Sergeant Leatham were the only named "involved employees" except for Sergeant Engelbeck, who was the reporting employee. [Report App'x 2-8].

### 2.    IA 2025-0111 Contains Distinct Allegations from those Contained in SC2024-0168.

The Monitor's assertion that IA 2025-0111 and SC2024-0168 were the same is simply incorrect.

**First,** the allegations contain wholly different elements. In fact, MCSO's investigation into IA 2025-0111 is consistent, if not entirely analogous, with Captain Lugo's example of when to investigate a new claim that he shared with the Monitor during his interview:

> I did give him [MCSO Chief Rollie Seebert] one example of an instance that I recall we had, and I don't know if that's what he was referring to, but that instance was in the jail where it was an anonymous complaint and it basically became not sustained because the video footage was gone. It was an internal matter, and basically yet he said -- he said/she said had occurred. So we had -- basically we were at a not sustained.
>
> Well, that got closed and published on the website and then the anonymous person submitted a copy—they actually filmed a copy of the video footage of it occurring and had it and submitted that, and so we opened a case into the fact that those employees— the employee lied about it occurring, you know, to the PSB investigators because they were adamant that it didn't occur and we had video footage of it occurring.
>
> So that wasn't the same allegation and I gave him that example and he didn't really tell me if that's what he was referring to or not but I said, So we've had like a situation of

that nature but we don't reinvestigate the same complaints.[7] [Report App'x 3-3, pg. 18:6-23].

Indeed, nowhere in SC2024-0168 did Sergeant Engelbeck allege that tampering with evidence or failure to provide documents for his appeal. [Report App'x 2-1, SC2024-0168]. The SC2024-0168 involved allegations against Capt. Lugo for failure to appropriately train him, creating a hostile workplace, and failing to first implement corrective actions and interventions. [Report App'x 2-1, SC2024-0168]. He also alleged retaliation by PSB in light of the above allegations and Capt. Lugo's subsequent transfer to PSB Commander. [Report App'x 2-1, SC2024-0168]. Conversely, by the Monitor's own admission in the Draft 46th Report, Sergeant Engelbeck alleged that evidence had been "deliberately omitted" from his digital appeal file. This allegation of intentional tampering or destruction of records introduced a potential criminal element and a breach of investigative integrity that was not part of the prior administrative closure. [Report App'x 2–8; Report App'x 3-1 at 14:19-23].

**Second**, the alleged act of withholding the interviews from Sergeant Engelbeck as he prepared for his appeal occurred over six months after initiation of SC2024-0168. The criminal allegation related to an alleged act that occurred nearly a half a year after resolution of SC2024-0168 simply cannot be an investigation into the "same" act. To be sure, the inquiry into IA2025-0111 focused on the integrity of the digital discovery process—and not anything related to SC2024-0168. Such an inquiry could not reasonably result an operational change to the previous Service Complaint and simply cannot demonstrate a failure to engage in appropriate, uniform, or fair discipline.

Indeed, Chief Palopoli spoke to former Chief Caputo about SC 2024-0168. [Report App'x 3-5 at 46:13-18]. She learned through Chief Caputo that he investigated alleged acts that occurred earlier in 2024 and that had no bearing on what occurred in late 2024-2025. [Report App'x 3-5 at 47:7-14]. Chief Palopoli, despite the Monitor's unreasonable and indecipherable questioning, maintained that the new allegations contained in IA 2025-0111 contained administrative and criminal allegations. Consistent with Chief Palopoli's reading of IA 2025-0111, the independent investigator identified IA 2025-0111 as criminal and administrative in nature and did not conclude that the investigation was not redundant. Indeed, even the Monitor-selected Independent Investigator recognized that a violation of A.R.S. § 34-1106 occurred when Sergeant Engelbeck did not receive the interviews for his appeal.[8] The clear violation of A.R.S. § 34-1106 and policy necessitated an investigation distinct from anything associated with SC 2024-0168.

---

[7] As stated in Doc. 3447 at 8-9, when new evidence comes to light MCSO's, position is that the new information may warrant re-investigating previously unsustained findings. The Sheriff has the power to modify discipline of his deputies since the ability to do so directly implicates his authority to conduct the affairs of his office and manage the appointment of his deputies. [Doc. 3447 at 8]. In fact, MCSO submits that reinvestigating upon discovering new evidence that otherwise was unavailable or kept hidden during the investigation is required by the Court's Orders, MCSO policies, state law, and common sense to ensure the fair, objective, application of MCSO's policies and discipline. [Doc. 3447].

[8] Although MCSO maintains that the Independent Investigator's investigation and report was deficient in many ways, MCSO agrees that Sergeant Engelbeck did not receive his complete investigative file and that a violation of A.R.S. § 34-1106 and MCSO policy occurred.

In sum, upon receiving a specific allegation of destroyed or tampered evidence in an active Merit Commission appeal, MCSO had a mandatory duty to perform due diligence to thoroughly vet and investigate the allegations. [*See e.g.*, Doc. 1765 ¶ 170; GB-2, Command Responsibility at 7; GH-2]. The Court's Orders and MCSO policies mandate that the "Sheriff *shall* investigate *all* complaints and allegations of misconduct, including third-party and anonymous complaints and allegations." [Doc. 1765, ¶ 170; Doc. 2938 at 4]. Inquiring into a new allegation of criminal-nature misconduct was not only appropriate but also mandated.

### 3.     IA 2025-0111 Directly Implicated PSB Command.

The MT's conclusion that there was no "explicit" accusation against Captain Lugo is simply not supported by reasonable inferences and IA 2025-0111's plain language.

**First,** the email that Sergeant Engelbeck sent to the Undersheriff and subsequent interviews that the MT conducted confirm that Sergeant Engelbeck clearly implied Captain Lugo had tampered with the file. [Report App'x 3-13 at 3-4]. Indeed, Sgt Engelbeck "linked" Captain Lugo to the complaint. [Report App'x 3-13 at 3-4]. Furthermore, as the PSB Commander with ultimate custody over these records, any allegation of deliberate omission naturally and directly implicates the bureau's leadership. Indeed, Captain Lugo determined that IA 2025-0111 had alleged allegations against him, stating: "I can see who he's alleging, me plus a whole bunch of other people generally." [Report App'x 3-3 at 68:20-69-11]. MCSO simply cannot understand why the Monitor has determined that Captain Lugo was not a clearly defined principal in IA 2025-0111, when even Captain Lugo had determined he was.

**Second**, IA2025-0111 alleges that withholding the interviews was done to ensure that factual discrepancies within the interviews would not come to light in the Appeals proceeding. The allegations suggest that the missing video of Capt. Lugo's interview would show discrepancies that would invoke consideration as to whether Capt. Lugo violated MCSO's truthfulness requirement—as well as other allegations of retaliation and procedural unfairness. The allegations only name Captain Lugo and Sergeant Leatham as having any interest in the outcome of Sergeant Engelbeck's IA2020-0555 appeal. Furthermore, as the Commander of PSB, he would have access to the records and be able to delete a record. A reasonable, logical inference from the Complaint was that Sergeant Engelbeck identified Capt. Lugo as someone who he believed had tampered with the evidence.

**CONCLUSION:** The Monitor incorrectly conflated a new allegation of evidence tampering with a previously closed administrative matter, effectively penalizing MCSO for acknowledging a serious allegation that the PSB Commander destroyed evidence. Because the 2025 complaint included a criminal element—the "deliberate omission" of evidence—and occurred after the completion of the 2024 investigation, it was never part of the original 2024 investigation. Given the explicit implication that Captain Lugo was responsible for the missing files, MCSO acted appropriately. As a result of IA2025-0111's going forward, the independent investigator did not determine that IA2025-0111 was unauthorized and there were no administrative findings at issue—much less overturned. There is simply no factual or legal basis for a finding of non-compliance. Accordingly, the MCSO requests that the Monitor rescind and remove Finding 5(b) from the 46th Report.

MCSO interprets the Monitor's findings in this section as retaliating against and punishing new members of command for taking all allegations of misconduct seriously, including those that may implicate PSB procedures, as well as that Monitor's review and competency. MCSO asserts that the Monitor's withholding compliance on any Paragraph as a result of actions taken in a handful of IAs

wholly violates the Monitor's own stated methodology. Based on the Monitor's diverting from stated methodology and practice, the Monitor's determination expressed in 5(b) appears to be retaliation against MCSO for its joining in Maricopa County's Rule 60(b) Motion.

### C.    MCSO Command Staff Handled Sergeant Engelbeck's Complaint Pursuant To Court Ordered Policy.

MCSO incorporates its response from 5(b) here, including the factual background and the fact that Chief Palopoli and Undersheriff Gentry reviewed IA 2025-0111 and determined it contained new and criminal allegations not previously alleged or resolved. Additionally, the routing of IA 2025-0111 as a criminal complaint with an administrative component to an outside, qualified, and Monitor-approved conflict investigator with experience in internal affairs complied with the Court's Orders and MCSO policy to ensure that there was no appearance of impartiality. Indeed, the Monitor's determination that MCSO improperly handed IA 2025-0111 dismisses MCSO's stated desire to ensure the appearance of impartiality *in all cases* and misrepresents MCSO's policies. The Monitor's criticism of MCSO's handling of IA 2025-0111 is wholly unfounded and is retaliatory against MCSO's taking all complaints seriously, as required by the Court's Orders and MCSO's policies. MCSO is concerned and suspicious as to why the Monitor has taken certain positions regarding the handling of IA 2025-0111.

First, no PSB investigator could have investigated IA 2025-0111 due to the allegations against the PSB Commander and others:

> No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

[*See e.g.*, Doc. 1765 ¶ 167; GH-2 ¶ 4(D)(3)].

Next, and as recognized by the Monitor, Chief Gentry was concerned about the impartiality of MCSO—i.e., his investigating IA 2025-0111—especially regarding MCSO's agents' allegations of MCSO's improper tampering with or otherwise withholding evidence. Consistent with MCSO policy, MCSO attempted to send the investigation to an "outside law enforcement agency" or a "a qualified outside investigator."

> 5. Where appropriate to ensure the fact and appearance of impartiality, the PSB Commander or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.

> 6. Any outside authority retained by the Office must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest. The PSB shall determine if an outside investigator

22

possesses the requisite background and level of experience of internal affairs and the absence of any actual or perceived conflicts of interest.

[GH-2 ¶ 4(D)(5)-(6)].

Here, in an effort to ensure the fact and appearance of impartiality in an investigation of its PSB Commander, MCSO made the prudent decision that it would seek an outside investigator. Although MCSO had initially reached out to Jensen Hughes to conduct the investigation, it could engage them because they had a conflict with PSB. [*See, e.g.*, Report App'x 3-1 at 7:17–24; 22:2–19]. Additionally, the Monitor-suggested agency, Baseline, could not agree to conduct the investigation because its contract was nearing its end and it was not going to renew its contract with MCSO. [*Id.* at 12:4-11.] Despite apparently having read the Complaint, the MT never suggested an outside law enforcement agency in light of the criminal complaint—despite the fact that only law enforcement agencies can conduct criminal investigation. [*See, e.g.*, *id.* at 22:2-19.] Eventually, MCSO contacted the Arizona Department of Public Safety ("ADPS") to conduct the administrative and criminal investigation for IA 2025-0111. [*See, e.g.*, *id.* at 26-28.]

MCSO complied with the Court Orders and MCSO policy in sending the investigation to the Arizona Department of Public Safety. The Monitor did not pull the investigation from ADPS even after conducting its investigations and despite having authority under the Court's Orders "to audit and review decisions made with respect to individual cases and, if necessary, to change such designations. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision." [Doc. 2830 ¶ 347]. Thus, under the Court Order, while the Monitor can "audit and review" individual routing decisions, MCSO does not need Monitor permission to route to an external law enforcement agency or make any other routing decision. The Court's Orders only allows the Monitor to "audit and review" routing decisions and to require a change in those decisions only when necessary. The MT cannot use MCSO's initial routing to Jensen Hughes and subsequent rerouting to ADPS as a means to hold MCSO out of compliance as MCSO complied with the plain language of the Court's Orders and MCSO policy. The Monitor's contention to the contrary clearly evidences the Monitor's unreasonable interpretation of the Court's Orders and MCSO policies.

Nevertheless, the Monitor concludes that executive command improperly reraised a previously resolved administrative matter. As stated above, the Monitor is incorrect. Nowhere in SC2024-0168 did Sergeant Engelbeck allege tampering with evidence or failure to provide documents for his appeal. [Report App'x 2-1, SC2024-0168]. The SC2024-0168 involved allegations against Captain Lugo for failure to appropriately train him, creating a hostile workplace, and failing to first implement corrective actions and interventions. [*Id.*]. He also alleged that PSB retaliated against him in light of the above allegations and Captain Lugo's subsequent transfer to become the PSB Commander. [*Id.*]. Conversely, by the MT's own admission in the Draft 46th Report, Sergeant Engelbeck alleged that evidence had been "deliberately omitted" from his digital appeal file. This allegation of intentional tampering or destruction of records introduced a potential criminal element and a breach of investigative integrity that were not part of the prior administrative closure. [IA 2025-0111.] MCSO further incorporates its comments in 5(b) *supra* here and reiterates its concerns over the Monitor's ability to objectively, logically, and reasonably investigate and weigh the PSB matters subject to these findings.

The Monitor also concluded that MCSO attempted to restructure PSB and that the proposed restructuring was contrary to the Court's Orders and MCSO policy. Although these allegations will be handled more fully, *infra,* in response to the Monitor's findings at 5(e), MCSO approached Captain

23

Lugo to discuss transferring a second captain to PSB to ensure: 1) the PSB Commander was not perpetually overworked; 2) MCSO's continuity of command; 3) MCSO's continuity of unwritten and undocumented efficiencies within PSB that were within the knowledge of the then PSB Commander only;[9] 4) MCSO's consistency in PSB's findings; and 5) MCSO's expedient clearing the PSB backlog while maintaining investigative compliance. None of the above reasons would violate the Court's Orders or MCSO policy; rather, they would ensure and effectuate compliance with them and avoid a single-point-of-failure in the PSB Commander. Furthermore, the Court's Orders and MCSO policy was ambiguous regarding the ability of MCSO to bifurcate certain duties of the PSB Commander. Indeed, the Court did not hold that a second captain was not allowed in PSB. Rather, it held that the Court's Orders required a single captain responsible for limited, express duties as the "PSB Commander." The Monitor's refusal to recognize, let alone even consider, the efficacy of the proposed redundancy and to work with a second Captain calls into question the Monitor's reasonableness, objectivity, and impartiality in its investigation and resulting conclusions. The Monitor's analysis appears to be arbitrarily retaliatory in light of a dispute about an ambiguity in the Court's Orders. The Court has approved a dual captaincy and a PSB Commander/Deputy Commander structure.

In addition, the Monitor's narrative further alleges that Executive Chief Palopoli and later Chief Summers asked Captain Lugo to train a "co-commander" to take over specific investigative duties, characterizing these actions as a violative of the Second Order, noting that these personnel notifications occurred before any written requests for Monitor approval were submitted. MCSO questions how having the PSB Commander train another MCSO employee about PSB operations, the Court's Orders, and PSB-related policies—which forms a limited and not exclusive list of training subject areas—could violate the Court's Orders, MCSO policies, or state law. Furthermore, discussing a proposed transfer of a second captain into a division with a current captain in that division is not the same as a transfer into the division. It makes operational sense that a captain obtain a certain amount of training and familiarity with contemporary Orders, policies, and processes **before** being transferred into a new division like PSB. Indeed, a critical element of the Court's misconduct-related Orders requires MCSO to consistently apply policies and impose discipline. [Doc. 1765 ¶¶ 219, 288.]

Moreover, discussing a potential transfer of a second captain into PSB constituted internal discussions regarding a proposed plan. At no point was this potential transfer operationalized or finalized before the required Court-ordered process. A discussed potential, but unexecuted personnel, move neither constitutes an actual transfer nor an operational failure. In fact, the discussion regarding training a second captain to possibly implement a potential dichotomy of responsibilities within a dual captain system to conduct "sworn" vs. "detention/civilian" investigations was a legitimate exercise to consider a way to ensure continuity of operations, facilitate clear clearing of investigations, and reduce the pressure on and overtime required of a single commander. Furthermore, preparing for leadership contingencies (i.e., illness, leave, or emergency), in addition to reducing the time and responsibility

---

[9] Indeed, upon Captain Lugo's placement on administrative leave, no lieutenant or other captain had the institutional knowledge of PSB's operation to ensure continuity of the bureau. Too many PSB policies and procedures to ensure efficient operational capacity were lost upon Captain Lugo's going on administrative leave. The dual captaincy, in part, would have ensured the equal exchange of information and ensured that if the PSB Commander were ever sick, on vacation, transferred, etc. then there would be operational continuity and consistency. Absent some operational redundancy with the co-captaincy, MCSO loses that continuity and consistency, as occurred when Captain Lugo was placed on leave.

required of a single captain, is a standard management function and does not constitute a disciplinary act or a subversion of PSB independence. The Monitor's Draft 46th Report narrative simply confirms that when the topic of a possible transfer was raised, Captain Lugo reminded MCSO command of the pre-approval process. MCSO deferred to his guidance, proving that the internal "gatekeeper" system worked exactly as intended to ensure compliance before any action was taken. The Monitor's allegation that MCSO's discussion that Captain Lugo train a second captain on PSB-specific matters in early March 2025 violated a Court's Order is nonsensical and appears to have been divined solely to manufacture discontent. In coming to its conclusion, the MT:

- Wholly ignores the operational realities of running a law enforcement agency;
- Ignores interviewee statements;
- Ignores other communications, including emails from MCSO outside counsel;
- Ignores the PSB Commander's effectiveness in guiding MCSO through PSB-related issues;
- Ignores MCSO's listening to the PSB Commander;
- Ignores MCSO's attempts to seek approval; and
- Improperly, arbitrarily, and capriciously weighs interviewee responses in contradiction to the mass amounts of contrary testimony and other physical evidence.[10]

Also in the Draft Report at 183, the Monitor asserts that Undersheriff Gentry referred the Engelbeck complaint to an outside agency despite personally believing it was a "redundancy" and potentially retaliatory, stating the referral was to ensure the MCSO did not "look bad." But MCSO's sending the investigation to an outside law enforcement agency to complete the investigation, including any preliminary inquiry, complied with MCSO's policies and the Court's Orders. When an internal complaint includes allegations of misconduct, the complaint can either go forward with a preliminary inquiry or an investigation. [*See* GH-2(B)(3)(a)(2) at 16]. Conversely, when MCSO receives a Service Complaint as defined by GH-2, a supervisor "shall conduct a preliminary inquiry." [*See* GH-2(B)(4)(a)-(b) at 16–17]. Critically, when the internal allegation is one for misconduct, including a criminal internal complaint, GH-2 does not mandate a "preliminary inquiry."

Even so, as stated above, GH-2 requires that "[w]here appropriate to ensure the fact and appearance of impartiality, the PSB Commander or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation." Here, it was reasonable for MCSO to send IA 2025-0111 to an outside law enforcement agency in light of the accusations against PSB and MCSO—and where even Captain Lugo acknowledged he was implicated. With an allegation of criminal misconduct against high-ranking members of MCSO and PSB, Undersheriff Gentry stated that he did not think it mattered what he thought as to whether the allegation warranted a criminal investigation. Indeed, the thought was that it was best for MCSO to "farm that out" to another agency "to investigate to see if there is any merit to that or not or if it is retaliation." [Report App'x 3-4 at 29:18-30:1]. Simply, because the complaint alleged criminal-nature misconduct (evidence tampering) against the current PSB Commander, referring the matter to an outside agency was the only way to avoid a conflict of interest. Indeed, Chief

---

[10]    In other areas, the Monitor's Draft 46th Report is simply incorrect. For instance, the Monitor's Draft Report at 184 states that on March 21, 2025, an IA number had not yet been assigned to IA 2025-0111; however, Chief Palopoli stated that the IA had received an IA # on March 18, 2025. [Report App'x 3-6 at 2].

Palopoli's instruction for Captain Lugo to "stay out of it" was a necessary procedural safeguard to protect the integrity of that external investigation.

This makes sense. On the one hand, MCSO needs to take all complaints seriously, even if they may not *believe* that the complaint has merit. MCSO policy mandates that MCSO must ensure "the fact and appearance of impartiality." To effectuate the policy's mandate "to ensure the fact and appearance of impartiality," Undersheriff Gentry determined that an outside agency must conduct the investigation into IA 2025-0111. Such action is within policy and necessary. Indeed, rather than using his position to summarily dismiss the matter, Chief Gentry insisted on an outside referral to ensure absolute impartiality and to protect the MCSO's reputation. This is the definition of fair and uniform leadership—prioritizing a neutral, external process over personal bias. The conduct was consistent with the requirements of the Court's Orders, specifically Paragraphs 170 (requiring all allegations of misconduct be investigated) and Paragraph 167 (avoiding conflicts of interest) as well as GH-2.

**CONCLUSION:** The Monitor's failure to recognize MCSO's stated desire and obligation to "to ensure the fact and appearance of impartiality" not only demonstrated that the Monitor improperly weighed facts, but also improperly weighed facts arbitrarily and capriciously. Indeed, in its Draft 46th Report, the Monitor continuously quotes both Chief Palopoli and Chief Gentry in that they needed to comply with MCSO policy regarding IA 2025-0111, especially considering the allegations against MCSO and its PSB Commander. Had MCSO handled the matter internally and expeditiously resolved IA 2025-0111's allegations against Captain Lugo, MCSO submits that the Monitor would very likely find MCSO out of compliance for failing to ensure the appearance of impartiality. At the very least, it would set a precedent for potentially individualized and non-uniform summary resolution of complaints—one of the very purposes MCSO's revised policies are intentionally designed to prevent. Thus, the Monitor's Finding 5(c) penalizes the executive command for performing due diligence and following both the plain language and spirit of Court Orders and MCSO policy by ensuring that a neutral investigator conduct an investigation involving MCSO command personnel. Because the command prioritized impartiality over personal beliefs and refrained from operationalizing personnel changes without following the Second Order, there is no factual basis for a finding of non-compliance based on the Monitor's narrative in Finding 5(c). Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(c) from the 46th Report.

> **D.** **Chief Palopoli's Personal Views About The Complaints That Sergeant Engelbeck Filed Were Irrelevant To MCSO's Obligation To Process All Complaints And Chief Palopoli Was Not Required To Conduct A Preliminary Inquiry.**

The Monitor narrative refers to an April 1, 2025 meeting with Chief Palopoli and Chief Anders but does not explain the circumstances of that meeting, provide any notes from that meeting, or otherwise discuss the context of that meeting. Indeed, additional conversations took place between Chief Anders and Chief Palopoli that provide context to and contradict the Monitor's narrative regarding the April 1, 2026 conversation.

On March 25, 2026, Chief Palopoli emailed Chief Anders regarding IA 2025-0111 and her assigning the case to Jensen Hughes due to the clear conflict. [Report App'x 3-6 at 3]. Chief Anders responded to that email the same day; in that email, Chief Anders told Chief Palopoli to pause the investigation's going to Jenson Hughes and scheduled a telephone call for March 26, 2025. [Report App'x 3-6 at 3]. The next day, Chief Palopoli and Chief Anders discussed IA 2025-0111, including that while Chief

Palopoli had doubts about the investigation, she affirmed the need for MCSO to investigate the allegations. [Report App'x 3-6 at 3]. Chief Anders advised that Jensen Hughes would be an inappropriate choice to investigate this complaint as Captain Lugo oversees Jensen Hughes and suggested Baseline Investigations which was ultimately too busy to take the case. [Report App'x 3-6at 3]. During this phone call, Chief Anders revealed that Captain Lugo had discussed IA 2025-0111 with Chief Anders despite Chief Palopoli's command to "stay out of it" and despite Capt. Lugo's conflict of interest. [Report App'x 3-6 at 3].

On March 28, 2025, Chief Palopoli spoke with Chief Anders and discussed Chief Gentry's intent to contact ADPS to inquire about their investigating IA 2025-0111. [Report App'x 3-6 at 4]. On April 1, 2025, Chief Palopoli and Chief Anders spoke again for 18 minutes, discussing Jensen Hughes' unsuitability, Baseline's unavailability, and the Undersheriff's intent to request ADPS conduct the investigation of IA 2025-0111. [Report App'x 3-6 at 4]. Later that afternoon, Chief Anders confirmed approval of ADPS's investigating IA 2025-0111. [Report App'x 3-6 at 4].

MCSO is concerned with the Monitor's disclosure of and reliance on uncontextualized portions of a conversation from more than a year ago. Critically, on page 185 of the Draft 46th Report, the Monitor states that in the April 1, 2025 call, Chief Palopoli told Chief Anders that she "did not believe the allegations were criminal in nature." However, on that same page, the MT also stated that prior to a March 25, 2025 call, Chief Palopoli had already determined that the allegations of IA 2025-0111 were criminal in nature. The Monitor's Draft 46th Report is inconsistent regarding these issues. To clarify, during her interview, Chief Palopoli clearly expressed that the allegations on their face were criminal in nature, but she did not know if there was any truth to the allegations. [*See, e.g.*, Report App'x 3-1 at 19:22–20:6]. Based on the new, criminal allegations, she knew that the allegations needed to be criminally investigated. [*See, e.g.*, Report App'x 3-1 at 48:21-49:9].

Additionally, MCSO has serious concerns about the Monitor's narrative that Chief Palopoli did not believe the allegations were different from the Service Complaint. As explained above in its response to Finding 5(b), it is clear that IA 2025-0111 was different and during her interview it was clear that Chief Palopoli clearly found that the allegations of tampering with evidence to be different than the Service Complaint. [Report App'x 3-1 at 14:11–23]. A complete review of the information would have shown that Chief Palopoli had reviewed the Service Complaint and determined that it differed from IA 2025-0111.

Next, Chief Palopoli's personal opinions of the allegations neither imply nor infer malfeasance in determining that an outside agency needed to investigate IA 2025-0111 needed to be criminally investigated by. As stated above in MCSO's Comments to Finding 5(c), the Court's Orders and MCSO policy required a law enforcement agency to investigate criminal allegations. Chief Palopoli, although she had reservations about the allegations, determined in compliance with MCSO policy and the Court's Orders that she must investigate the allegations despite her doubts. [*See, e.g.*, Report App'x 3-1 at 48:21-49:9]. As stated above, no PSB investigator could have investigated IA 2025-0111 due to the allegations being against the PSB Commander and others:

> No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and

27

level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

[*See e.g.*, Doc. 1765 ¶ 167; GH-2, ¶ 4(D)(3)].

As made clear by the Court's Orders and GH-2, a member of PSB could not investigate or make any criminal decisions regarding IA 2025-0111. Nevertheless, a lieutenant or other PSB staff could certainly be a liaison for Chief Palopoli regarding facilitating communications with a conflicts investigator and the Monitor as it related to IA 2025-0111—the Court's Order and GH-2 only preclude a subordinate from investigating or making any disciplinary decisions involving a superior in rank or in the chain of command. [*See e.g.*, Doc. 1765 ¶ 167; GH-2, ¶ 4(D)(3)].

Next, and as Monitor recognized, Chief Gentry was concerned about the impartiality of MCSO—i .e., his investigating IA 2025-0111—especially regarding MCSO's agents' allegations of MCSO's improper tampering with or otherwise withholding evidence. Consistent with MCSO policy, MCSO attempted to send the investigation to an "outside law enforcement agency" or a "a qualified outside investigator."

> 5. Where appropriate to ensure the fact and appearance of impartiality, the PSB Commander or the Chief Deputy may refer administrative misconduct investigations to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.

> 6. Any outside authority retained by the Office must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest. The PSB shall determine if an outside investigator possesses the requisite background and level of experience of internal affairs and the absence of any actual or perceived conflicts of interest.

[GH-2, ¶ 4(D)(5)-(6)].

Here, in an effort to ensure the fact and appearance of impartiality in an investigation of its PSB Commander, MCSO made the prudent decision to seek an outside law enforcement agency to conduct the investigation. Accordingly, MCSO contacted ADPS to conduct the administrative and criminal investigation for IA 2025-0111. [*See, e.g.*, Report App'x 3-1 at 26-28].

The Monitor further asserts that Chief Palopoli's initial, brief search into IA 2020-0555 for the allegedly missing video in IAPro was insufficient and suggests that had Chief Palopoli further inquired she would have found that the alleged missing interviews were in IAPro. However, Chief Palopoli was new to IAPro and was concerned about reviewing information and accidentally deleting it—i.e., the very conduct the new IA complained of. [Report App'x 3-5 at 41:2–12]. Furthermore, Chief Palopoli's continued involvement with any inquiry could be seen as having the appearance of partiality that MCSO must and desired to avoid in the first place. MCSO's outsourcing the complaint to an outside law enforcement agency to review the allegations was mandated notwithstanding MCSO's opinions of the allegations of the Complaint. MCSO submits that had MCSO unilaterally inquired into and summarily dismissed any other complaint, as the Monitor suggested, the Monitor would have found that MCSO had violated the Court's Orders and MCSO policy. To further compound the issue, the fact that the interviews were ultimately found on IAPro did not necessarily absolve any and all actors'

28

potential malfeasance. Simply, Chief Palopoli would have needed to investigate and request audit logs for all evidence and determine what had been provided and when. It was reasonable for MCSO to outsource the investigation, especially in light of MCSO's belief that the allegations may have been retaliatory to ensure the fact and appearance of impartiality regarding the investigation.

**CONCLUSION:** In Finding 5(d), the Monitor appears to penalize Chief Palopoli for voicing her personal opinions of allegations while still complying with the Court's Orders and MCSO policy regarding routing IA 2025-0111. Despite first hearing about MCSO's plan to route IA 2025-0111 on April 1, 2025 and Chief Anders' agreeing to the plan, neither Chief Anders nor any other member of the Monitoring Team immediately pulled the investigation from ADPS. The Monitor had the authority to review and pull the investigation from ADPS at any time but waited until October 2025 to do so. It is clear that the Monitor believed, at least in part, that sending IA 2025-0111 to ADPS was appropriate under the circumstances known at the time that MCSO routed the complaint to ADPS. If the Monitor actually believed otherwise, then the Monitor should have required MCSO to re-route the investigation or should have changed IA 2025-0111 to an unauthorized investigation **a year ago**. The Monitor's choice to do neither demonstrates that MCSO properly applied the Court's Orders and MCSO's policies in analyzing IA 2025-0111 and sending it to ADPS. The fact that the independent investigator did not sustain the allegations—which is what MCSO employees believed would be the outcome—does not somehow transmute an appropriate action into one tinged with malfeasance. Accordingly, the MCSO requests that the Monitor rescind and remove Finding 5(d) from the 46th Report.

### E.    The Proposed Co-Captaincy Was A Valid Measure To Ensure Institutional Function And Facilitate Compliance With The Court's Orders.

The Monitor concludes that executive command bypassed Court-ordered procedures by verbally *proposing* a dual co-captaincy in PSB and suggesting to transfer Captain Morrison into the Bureau of Internal Oversight ("BIO"). The MT asserts that command ignored Captain Morrison's disciplinary history—which included a demotion and an 80-hour suspension for inappropriate touching—and that Deputy Chief Summers provided "mitigating factors" contrary to MCSO policy. The Monitor highlights that these proposals were made verbally before MCSO submitted written requests, and that the Court ultimately upheld the Monitor's denial of the co-captaincy, viewing the move as an attempt to undermine the established investigative structure. The Monitor is incorrect.

**MCSO RESPONSE to Finding 5(e):** MCSO formally disputes the Monitor's characterization of these personnel proposals as a violation of the Court's Order.

MCSO raised a legitimate concern regarding the need for additional command within PSB. As MCSO previously articulated (and the Monitor entirely ignored in its report), MCSO sought a dual captain structure within PSB to: (1) alleviate the need for a single captain to work nonstop, excessive overtime; (2) avoid MCSO being made vulnerable in the event that captain becomes unavailable and having that captain be a single point of failure for MCSO's compliance with the Court's Orders; and (3) the proposed dual PSB command would also facilitate the processing of IAs and the reduction and ultimate elimination of the IA backlog. [Doc. 3217 at 6-9]. These were legitimate concerns that were the genesis of MCSO's requests to the Monitor and ultimately its briefing before the Court. The Monitor's Draft 46th Report entirely ignores these concerns in its attempt to impart some unfounded nefarious basis behind this request.

In addition, the following points are germane to why Finding 5(e) is improper:

- **Transparency and Early Communication:** Executive Chief Palopoli and Deputy Chief Summers' initial outreach was an act of proactive transparency. Rather than submitting formal paperwork without context, MCSO command sought to advise the Monitor of their vision for a more efficient PSB structure (proposing to assign the oversight of sworn investigations to one captain and detention/civilian investigations to the other). The Monitor's framing early verbal notification as a "failure to follow procedure" penalizes the agency for engaging in any type of open dialogue with the Monitor—which is contrary to the Monitor's role and responsibility to assist in implementing the Court's Orders under Paragraph 119, and just the opposite of promoting cooperation between MCSO and the Monitor. Indeed, MCSO is entitled to seek the Monitor's technical assistance under the Court's orders. [*See* Doc. 606 at ¶ 139 ("In addition to making recommendations, the Monitor may also, at the request of the Parties, provide technical assistance directly to the MCSO consistent with the Monitor's responsibilities under this Order.")]. Finally, at the recent April 2026 site visit, Chief Kiyler invited MCSO to ask questions of the Monitor and stated MCSO would not be held out of compliance for asking questions of the Monitor. Yet, that is exactly what the Monitor is now appearing to do and sowing distrust by penalizing MCSO for reaching out, seeking its assistance, and asking questions calculated to facilitate compliance with the Court's Orders and, specifically, proposing a way to streamline PSB function and eliminate the backlog.
- **No Policy Violation in Personnel Requests:** The submission of a transfer request for Captain Morrison was a procedural act permitted under the Second Order. The Monitor fails to identify any policy that prohibits the MCSO from *requesting* a transfer or providing context for that request. Seeking a transfer for an employee who has already served their discipline is a management right, not a "violation" of the disciplinary framework. Moreover, the Monitor ignores correspondence from legal counsel on May 4, 2025, that clearly indicated the dual captain proposal did not depend on Captain Morrison's transfer, but that MCSO would provide alternatives if the Monitor felt Captain Morrison was not an appropriate candidate for transfer. Again, a mere inquiry does not equate to a violation. The Monitor's logic is misplaced.
- **Proactive Disclosure vs. Disregard for Policy:** Deputy Chief Summers' memorandum was a comprehensive disclosure, not a circumvention of policy. Deputy Chief Summers' memo was written to address requirements within the order as Paragraph 174 of the Second Order (Doc. 1765) requires that an employee's disciplinary history "shall be considered in all hiring, promotion and transfer decisions. Employees and applicants whose disciplinary history demonstrates multiple sustained allegations of misconduct, or one sustained allegation of a Category 6 or Category 7 offense from MCSO's disciplinary matrices, shall be *presumptively ineligible* for hire or promotion." Paragraph 174 also requires "MCSO shall provide a written justification for hiring or promoting an employee or applicant who has a history demonstrating multiple sustained allegations of misconduct or a sustained Category 6 or Category 7 offense. This written justification shall be included in the employee's employment file and, during the period that the MCSO is subject to Monitor oversight, provided to the Monitor." Thus the Court's Orders do not automatically disqualify an individual with a Category 6 or 7 offense as ineligible, but presumptively ineligible, and subject to written explanation if deemed appropriate by the Monitor. By proactively documenting Captain Morrison's past cases— including closed investigations for which he had served his discipline--the new command ensured the Monitor had a full record for review, *as required by the Court's Orders*. Providing

"mitigating factors" is a standard part of an administrative evaluation to determine current fitness for duty and does not undermine the validity of the original sustained findings.[11]

- **Legitimate Operational Strategy:** As noted above, the "co-captaincy" proposal was simply a good-faith effort to increase oversight capacity. MCSO discussed this concept openly with the Monitor not only in MCSO's communications with the Monitor, but also later in legal briefing before Judge Snow, demonstrating that MCSO was seeking a judicial and collaborative path forward. Disagreeing with the Monitor's initial stance and asking the Court for a final ruling is a recognized legal right within the *Melendres* framework. [Doc. 606 at ¶ 17 ("If either Party does not agree with the Monitor's determination, then the Party may make a motion directly to the Court for resolution of the dispute.")]. MCSO cannot be penalized for seeking clarification from the Court (which as discussed below did ultimately provide some of the requested relief).
- **Absolute Deference to Judicial Finality:** Because MCSO deferred to the Court's final November 2025 denial and never operationalized the discussed, potential transfers or the co-captaincy, the operational status quo was preserved. The proposal and subsequent judicial review resulted in no operational change to the disciplinary process and does not demonstrate any failure to engage in appropriate, uniform, or fair discipline. In fact, it demonstrated the opposite.

Finally, the Monitor entirely mischaracterizes the Court's ruling on this issue. Specifically, the Monitor inaccurately refers to MCSO's motion on this issue as "denied." While the Court did deny MCSO's request for a *dual commander*, the Court did recognize MCSO concerns in this regard and *agreed* to MCSO's having a *deputy commander* in PSB, subject to the Monitor's approval. [Doc. 3305 at 14:12–17 ("Yet, subject to ¶ 268, there is nothing in the Court's Orders that prevents the MCSO from appointing a true Deputy Commander to PSB in lieu of or in addition to filling the lieutenant positions. The Deputy Commander may do work and make recommendations on individual investigations, as well as the Commander's other responsibilities, but the Deputy Commander may not assume the ultimate responsibility for PSB operations and decisions that lie with the PSB Commander.")]. In making this determination, the Court was "mindful of the demands placed on the Commander of the PSB and would take appropriate action if supported by sufficient information, to cure excessive demands on the Commander" and noted that excessive overtime hours worked by a PSB commander "are concerning." [Doc. 3305 at 12:22–24]. Thus, the Court recognized the validity of MCSO's concerns surrounding its request for a dual commander and functionally granted MCSO's request by authorizing a deputy commander. Then, on November 8, 2025, the Monitor subsequently approved the transfer of Captain Reaulo into PSB to act as the "Deputy Commander." It is, therefore, disingenuous for the Monitor to state that MCSO's request was denied, and that MCSO did not have a good faith basis for this request in the first place. The Monitor simply ignores or fails to recognize the full scope of the Court's ruling on this issue, as well as the Monitor's very own approval of Captain Reaulo's transfer into PSB as the Deputy Commander.

**CONCLUSION:** Finding 5(e) penalizes the executive command for utilizing the established legal and administrative processes to propose organizational changes. MCSO simply followed the required path of written submission and judicial review for its proposal. Because no unauthorized transfers

---

[11] MCSO also disputes that Deputy Chief Summers ever told Captain Lugo that MCSO would transfer Reaulo. Rather, Deputy Chief Summers was clear that MCSO intended to seek the Monitor's approval for that transfer.

occurred, no operational change occurred without Court approval, and MCSO adhered to the Court's final ruling, there is no factual or legal basis for a finding of non-compliance. Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(e) from the Monitor's 46th Report.

F.     **In the Draft Report, the Monitor entirely misrepresents MCSO's April 2, 2025 meeting between command staff and Captain Lugo.**

The Monitor claims this meeting between Captain Lugo and MCSO command (in which it did not participate) was tense, but it is unclear what the Monitor believes was in fact *wrong* with this meeting, other than its account of Captain Lugo's side of the story. A "tense" meeting does not equate to a constitutional violation. Nothing in subsection 5(f) explains—or attempts to explain—what the Monitor believes happened that was inappropriate. The Monitor rehashes the testimony of a single participant in a meeting to explain that the meeting involved a difference in opinion. Such differences in opinion are normal in an organization the size of MCSO—in fact, Captain Lugo testified that he fully expected to be removed as head of PSB upon the change in administration, [*see* Report App'x 3-3 at 12:13–20], and he testified multiple times that he was "okay" with the idea that MCSO might go in a different direction than it had in the past, [*id.*; *see also id.* at 15:9–14 ("If he wants to go a different direction with regard to PSB, that's certainly I understand that that is the case that what he wants.")]. The Monitor's attempt to cast this meeting as anything other than a collaborative discussion (or at worst a dispute between colleagues) should be disregarded, especially given that the Monitor was not even present at the meeting.

Moreover, it would be highly inappropriate for the Monitor to identify a perceived wrong based on the account of only a single person present at the meeting.[12] This finding (like many of the findings before it) relies entirely on Captain Lugo's interview, perspective, and opinion, and utilizes his statements without their context. For example, in the Report, the Monitor highlights Captain Lugo's concerns about the dual-captain system, but it omits testimony wherein Captain Lugo explained that if MCSO were to have someone else be responsible for another captain's decisions, that would be fine. [*See* Report App'x 3-3 at 111:1–16]. The Monitor, however, appears to set up this conversation to make it seem as though the entire meeting was tense and, most importantly, the meeting resulted in some unspecified harm. Whatever the Monitor's motivations are, they do not appear supported by Captain Lugo's testimony.

Most notably, however, the Monitor focuses on Captain Lugo's *perception* that the meeting involved a "veiled threat," apparently in relation to Sergeant Engelbeck's complaint. [Draft Report at 188]. Sheriff Sheridan, however, testified that he was not even aware of that complaint until *after* the meeting. [Report App'x 3-16 at 12:20–13:3, 14:14–15:5]. Sheriff Sheridan described that Captain Lugo was upset about the idea of having two captains. [*Id.* at 13:17–14:13]. Nevertheless he testified—and Captain Lugo confirmed that Undersheriff Gentry stated—that he was concerned about the number of hours that Captain Lugo was working and did not want Captain Lugo to be overworked. [*Id.* at 14:9–11; *see also* Report App'x 3-3 at 110:17–19; Report App'x 3-4 at 7:1–12]. And even at the time of his interview, which was not long after the meeting, Sheriff Sheridan agreed that Captain Lugo had a firm

---

[12] Undersheriff Gentry was not asked about this meeting in his interview, nor was Executive Chief Palopoli, even though she included it in her supplemental submission prior to her second interview. The Monitor's failure to ask Undersheriff Gentry and Chief Palopoli about the same meeting the Monitor relies on Captain Lugo's testimony regarding, is deeply troubling to MCSO.

understanding policy and practice, [Report App'x 3-16 at 34:20–23], and that no member of the leadership executive team had commented "even with innuendo" that Captain Lugo should not be PSB Commander. [*Id.* at 41:9–16; *see also* Report App'x 3-4 at 7:1–12].

These ignored interviews and perspectives do not demonstrate a "tense" meeting or anything about the meeting that warrants this finding.[13] At a minimum, however, there are material issues of fact regarding the meeting requiring unbiased investigating. The Monitor did not attend the meeting and did not ask everyone involved in it about what occurred, despite the fact it was aware who was present. The Monitor simply cannot use this "finding" to hold MCSO out of compliance, especially as it relies on the interview and perspective of Captain Lugo and completely disregards the interviews and perspectives of his Executive Chief Palopoli, Undersheriff Gentry, and Sheriff Sheridan.

**CONCLUSION:** To arrive at Finding 5(f), the Monitor relies on Captain Lugo's subjective perceptions and the MT's interpretation of "tense" dialogue rather than objective violations of policy. The Sheriff's documented respect for Captain Lugo and the 30-day window, which provided for time to develop an alternative plan, prove that the command acted with administrative fairness. Because the meeting upheld the internal oversight framework and resulted in no operational failure, there is no factual basis for a finding of non-compliance. Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(f) from the 46th Report.

### G.    MCSO Placed Captain Lugo On Administrative Leave Pursuant To Policy.

On March 10th at 7:03 pm, while working from home during what Capt. Lugo described as a typical review of incoming IA complaints, Capt. Lugo first read and identified Sergeant Engelbeck's complaint that became IA 2025-0111. He immediately saw that the complaint referred to him and that he needed to recuse himself. [Report App'x 3-3 at 68:14-69:11]. He further stated that he read to the bottom and saw that the allegations were against him and addition unnamed members of MCSO, that Sergeant Engelbeck alleged evidenced for his IA 2020-0555 had been destroyed, and that the Complaint had been send to Chief Gentry. [Report App'x 3-3 at 68:14-69:11]. Nonetheless, Captain Lugo did not notify Chief Palopoli via text, email, or phone call that Sergeant Engelbeck had filed a complaint in which he was implicated. [Report App'x 3-3 at :14-69:11].

Late in the morning of March 11, 2025, Chief Palopoli spoke with Captain Lugo about the Sergeant Engelbeck complaint only after Chief Palopoli texted Captain Lugo, prompting him to call her and discuss the complaint. [Report App'x 3-3 at 69:13]. A week later on March 18, 2025, Chief Palopoli and Capt. Lugo discussed IA 2025-0111 in Chief Palopoli's office. After considering all of the attachments to the complaint, Chief Palopoli advised Captain Lugo that she agreed with Undersheriff Gentry that although the allegations are not likely to be sustained against Capt. Lugo, they do necessitate an investigation. [Report App'x 3-6 at 2]. Due to Captain Lugo's conflict with the case,

---

[13] MCSO also objects to any attempt to use Captain Lugo's testimony to insinuate that there was some manner of organizational miscommunication regarding Chief Smith. Captain Lugo provided updates during that meeting, showing that the process (which included regular PSB meetings) was working as intended. Regardless, that fact is irrelevant—the Monitor has not argued that MCSO had done something out of policy in promoting Chief Smith or that any other harm arises from the decision.

Chief Palopoli told Captain Lugo to "stay out of it" and requested that Capt. Lugo appoint a PSB lieutenant as a point of contact for her. [14], [15] [Report App'x 3-6 at 2].

Following the meeting, Chief Palopoli tried to contact Director Tiffany Shaw at CRS. [Report App'x 3-11 at 12]. The March 18, 2025, email requests information regarding an internal complaint against Capt. Lugo and requested operational guidance related to conflict investigations and the Monitor. [Report App'x 3-11 at 12] .However, Dir. Shaw was unavailable until March 20 when she first received contact information about Jensen Hughes. [Report App'x 3-11 at 12]. On March 20, 2025, Dir. Shaw and Chief Palopoli met and discussed the process of having MCSO's conflict investigators conduct the investigation into Capt. Lugo, as well as the potential nature of the allegation. [Report App'x 3-11 at 13-14].

Despite Chief Palopoli's plain, direct order that Captain Lugo stay out of IA 2025-0111, Captain Lugo accessed IA 2025-0111 during his meeting with Chief Anders. [Report App'x 3-6 at 7; Report App'x 3-13 at 5]. On March 24, 2025, Captain Lugo again involved himself with IA 2025-0111 and sent an email to Monique Habblett, copying Chief Palopoli, regarding Jensen Hughes' handling IA 2025-0111, but never mentioned that Jensen Hughes would be conflicted or otherwise unable to handle the IA 2025-0111. [Report App'x 3-13 at 7]. Most importantly, despite Chief Palopoli's conversation with Captain Lugo to stay out of the IA, Captain Lugo not only accessed the IA on March 21, 2025, **but did so again on March 28, 2025**.[16] [Doc. 3504, at 19:27-20:23]. On March 30, 2025, Chief Palopoli received an email from Lt. Porter with an investigative plan regarding IA 2025-0111 that concerned Chief Palopoli as she did not tell Lt. Porter to send the email to Jensen Hughes. [Report App'x 3-6 at 4].

On April 2, 2025 and based on statements made by Captain Lugo to Chief Palopoli regarding not having IA 2025-0111 locked down, Chief Palopoli accessed IA Pro audit trail for IA 2025-0111 and discovered that Captain Lugo had accessed IA 2025-0111 on March 21, 2025, three days after the day she had ordered him to stay out of the IA. [Report App'x 3-6 at 4]. Chief Palopoli immediately called her supervisor about what appeared to constitute insubordination of a plain, clear verbal order. [Report App'x 3-6 at 4]. The next day, April 3, 2025, MCSO, through legal counsel, attempted to contact the MT about the allegations of insubordination and conflict of interest. [Report App'x 3-6 at 5]. After multiple failed attempts to contact Chief Warshaw, Captain Lugo was placed on administrative leave on April 4, 2025. [Report App'x 3-6 at 5].

---

[14] As will be explained more fully *infra* in addressing the Monitor's finding 5(h), Captain Lugo disputed that Chief Palopoli provided the command to stay out of it on March 18, 2025; rather, he claims that Chief Palopoli told him to "stay out of" IA 2025-0111 on March 24, 2025. Regardless of when he was told to "stay out it," he should have stayed out all his own to avoid any appearance of impropriety or conflict.

[15] The March 18, 2025 meeting also included the first time that MCSO informed Captain Lugo that it wanted a second captain in PSB to minimize operational risk. [Report App'x 3-6 at 2].

[16] Thus, even assuming Capt. Lugo's timeline that Chief Palopoli to be true, Captain Lugo ignored Chief Palopoli's orders to "stay out of it" and to put her in touch with someone at PSB who will handle IA 2025-0111 in light of Captain Lugo's conflict of interest, and again accessed the IA on March 28, 2025—which Capt. Lugo said was at the behest of Monitor Anders. Both Monitor Anders and Captain Lugo should have known better than to have Captain Lugo access an IA which included accusations against Captain Lugo.

The reason that Captain Lugo was placed on leave was based on the combination of IA 2025-0111 and Captain Lugo's subsequent actions resulting in Chief Palopoli having to file a complaint alleging insubordination, which was IA 2025-0139. [Report App'x 3-4 at 26:17–27:5]. Indeed, Sheriff Sheridan did not believe that he had any choice in whether he could or could not put him on administrative leave in light of the critical responsibilities placed on the PSB Commander, the severity of a criminal allegation and, critically, the subsequent allegations of conflict of interest and insubordination related to the PSB Commander's handling of a complaint against him, for which the subordination allegation carried a minimum disciplinary category of Category 6. [*See* GC-17, Employee Disciplinary Procedures, Attachment B at 45; Report App'x 3-16 at 17:5-18:3]. As Sheriff Sheridan noted in his interview with the Monitor, the Monitor holds Captain Lugo in high regard—as MCSO holds its PSB Commander in high regard—and was defending him from the allegations of IAs 2025-0111 and 2025-0139. Accordingly, MCSO needed to err on the side of caution to ensure the fact and appearance of impartiality and that MCSO was enforcing its policies as it would for anyone else. [Report App'x 3-16 at 17:5-18:3; Report App'x 3-4 at 26:17–27:5].

Indeed, under GC-1, *Leaves and Absences*, administrative leave with pay shall be granted to an employee when the Office determines that an employe should be removed from the workplace for allegedly engaging in misconduct that will likely result in discipline as specified in GH-2. [*See* GC-1(1)(G)(1)(c), at 9]. In relevant part, GH-2 states:

> The purpose of administrative leave is to manage risk and to protect employees, victims, and the integrity of an investigation. Employees may also be placed on administrative leave with pay due to a critical incident. The following procedures specify when and how an employee may be placed on administrative leave:

> A. Command personnel of the rank of lieutenant or above, or their civilian counterparts may place an employee on administrative leave with pay for the remainder of a shift for alleged infractions of the law, Maricopa County Merit System Rules, or Office Policy. The incident shall immediately be reported to the bureau commander, who shall review the facts of the incident and, if necessary, extend the administrative leave up to a maximum of three working days. The Chief Deputy or the PSB Commander or designee must authorize leave to exceed three working days. Once authorized, the employee shall be advised of the administrative leave in writing.

[GH-2, Internal Investigations at 42 § 15].

Because Captain Lugo's was the PSB Commander and because of the allegations of his accessing IA 2025-0111 after being told not do so via a direct order from his supervisor, it was reasonable and appropriate for MCSO to place Captain Lugo on leave to ensure the integrity of the investigation and the fact and appearance of impartiality. Consistent with GH-2 § 15, then Chief Deputy Gentry advised that Captain Lugo would be placed on leave and then advised Captain Lugo in writing that he would remain on leave pending investigation. MCSO simply complied with the Court's Orders and policies in placing Captain Lugo on leave pending resolution of the investigations.

Nevertheless, on page 191 of the Report, the Monitor states at that "[n]o credible complaints were lodged against Captain Lugo that would have justified placing him on administrative leave." MCSO

vehemently disputes the Monitor's position because it defies the facts. IA 2025-0139 contained allegations that Capt. Lugo had a conflict of interest and continued to access IA 2025-0111 and that he was insubordinate in doing so. IA 2025-0139 also alleged that Capt. Lugo failed to provide Chief Palopoli with the name of a lieutenant with whom she could confer regarding IA 2025-0111. To safeguard the investigations and to manage risk during the pendency of the investigations, as well as to comply with the Court's Orders and MCSO policy, MCSO determined that placing Captain Lugo on leave was necessary. Indeed, Undersheriff Gentry's reference to advice from legal counsel regarding appearance before Judge Snow exhibits that MCSO was acting with the specific intent to stay in compliance with the Court's Orders **and avoid a conflict**. Seeking to "handle it like any other case" clearly demonstrates a commitment to uniform and fair discipline, treating a high-ranking official with the same standard of investigative separation applied to any other employee under similar allegations.

Next, the Monitor's narrative characterizes the restrictions placed on Captain Lugo—including network lockouts and equipment surrender—as excessive and highlights the Undersheriff's request for Captain Lugo's assistance in processing his own leave status as evidence of administrative incompetence or bad faith. However, the restriction of network access and the surrender of equipment are standard MCSO procedures for any employee placed on administrative leave during an active investigation. These measures ensure the security of investigative files and prevent any unauthorized access to sensitive systems while a principal is away from his or her duty post. And this was particularly important here where issues regarding Captain Lugo's unauthorized access to his own IA existed.

Last, the Monitor concludes that the decision to place Captain Lugo on administrative leave on April 4, 2025, was procedurally irregular and retaliatory. The Monitor asserts that the leave was initiated before Executive Chief Palopoli had filed her formal complaint (IA2025-0139) and noted that the paperwork omitted Sergeant Engelbeck's original complaints. MCSO formally disputes the Monitor's characterization that Captain Lugo's placement on administrative leave was a violation of the Court's Orders. When placed on leave, Captain Lugo knew the allegations of IA 2025-0139. In addition to complying with MCSO policy as stated above, during his interview, the Sheriff stated that the decision to place Captain Lugo on leave was made to "err on the side of caution." [Report App'x 3-16 at 17:5-18:3; Report App'x 3-4 at 26:17-27:5]. Because Captain Lugo then served and still serves as PSB's primary liaison to the Court and Monitor, the Sheriff determined he had no choice but to ensure a conflict-free environment once criminal-nature allegations (tampering) and insubordination were raised. This was a protective measure for the agency's integrity—not a retaliation against Captain Lugo.

MCSO is very concerned that the Monitor has exceeded its authority in weighing facts and evidence to come to arbitrary and capricious conclusions. Indeed, the Monitor's Draft 46th Report is devoid of any citations to MCSO policy, the Court's Orders, or Arizona law when claiming that MCSO—specifically its executive command—violated policy, the Court's Orders, or Arizona law. The MT does not consider any policy when determining whether MCSO took proper steps regarding IAs 2025-0111 and 2025-0139. These failures to identify such policies, Arizona law, or Court Orders in this instance is particularly troubling where the Monitor elsewhere in the Draft 46th Report seemingly has no issue citing and propounding (incorrectly) on Arizona law. The Monitor's inquiry here is simply deficient because it improperly makes factual findings, including:

- Improperly weighing facts and concluding that no complaint against Capt. Lugo was credible;
- Improperly weighing facts and concluding disciplinary ranges;
- Improperly weighing facts and concluding whether discipline was reasonably expected;
- Improperly weighing facts and making conclusions regarding intent as to

- o    Sheriff Sheridan;
  - o    Chief Palopoli;
  - o    Undersheriff Gentry; and
  - o    Captain Lugo;
- Improperly weighing contrary testimony and concluding Captain Lugo's testimony to be more accurate without considering more reasonable and plausible testimony; and
- Improperly applying facts to MCSO policy and Court Order in coming to its findings.

**CONCLUSION:** In Finding 5(g), the Monitor ***penalizes MCSO for taking the most transparent and cautious path*** available when faced with allegations against the Commander of the PSB. By placing Captain Lugo on leave with pay, MCSO ensured that the subsequent external investigation could proceed without even the appearance of internal conflict or partiality. Because MCSO acted on legal advice and followed standard administrative safeguards, there is no factual basis for a finding of non-compliance. Accordingly, the MCSO requests that the Monitor rescind and remove Finding 5(g) the 46th Report.

### H.    MCSO Was Required To File An Insubordination Complaint Against Lugo Based On Then Existing Information And MCSO Policy.

MCSO had no option but to file a complaint against Captain Lugo for conflict of interest and insubordination based on how he handled the Sergeant Engelbeck complaint that became IA 2025-0111 and how he communicated with—rather, failed to communicate with—his superior, Chief Palopoli. To conclude otherwise, the Monitor inappropriately weighed facts and came to conclusions to support its findings as stated *supra* in MCSO's comments to 5(C) and (G) and *infra* in comment to 5(I). As stated in its Objection to Ms. Jaffer's continued appointment as an independent investigator, the Court mandates that a supervisor report policy violations, lest the supervisor violate policy themself. [Doc. 2025-0111].

Captain Lugo did not immediately notify Chief Palopoli, or any other chief, of his conflict of interest with IA 2025-0111. In relevant part, CP-2, Code of Conduct, requires the following:

> 4. Conflict of Interest: Employees shall not involve themselves in any matter that may involve a conflict of interest or appear to be a conflict of interest. Should a conflict of interest arise, employees shall notify their supervisor as soon as practical. Employees who are not sure if a conflict of interest exists should make the declaration.
>
>> A. In matters involving misconduct or discipline, employees shall notify the Professional Standards Bureau (PSB) Commander. If the PSB Commander also suffers from a conflict, the highest-ranking, non-conflicted Office chief or, if there is no non-conflicted Office chief, an outside authority shall make the determination. The outside authority for matters involving discipline will be the Maricopa County Attorney's Office – Civil Division.
>
>> A conflict of interest as defined in this policy: A conflict that involves, but is not limited to, nepotism, bias of any kind, an external business relationship, a close personal relationship, or superiority in rank in an individual's chain of command.

[CP-2, Code of Conduct, pg. 3].

Additionally and as stated above, GH-2, *Internal Investigations*, also provides:

D. Conflict of Interest: Conflict of interest in administrative investigations is prohibited.

4. If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief level position or, if there is no non-conflicted chief-level position, an outside authority.

Here, Captain Lugo stated that during his typical complaint review time, he read what would become IA 2025-0111. Nevertheless, despite his access to text, phone, and email, Captain Lugo did not inform Chief Palopoli of his clear conflict.

The Second Order mandates that conflicts of interest in investigations are prohibited. Indeed, an employee "shall not involve themselves in any matter that may involve a conflict of interest or appear to be a conflict of interest." [CP-2, Code of Conduct at. 3]. As Captain. Lugo's direct supervisor, Chief Palopoli was obligated to ensure that Capt. Lugo was responsible for complying with MCSO policy and, of course, the Court's Orders. [GB-2, Command Responsibility at 7]. Thus, Chief Palopoli was obligated to tell Captain Lugo to "stay out" of IA 2025-0111, which she did on March 18, 2025. [*See e.g.*, Doc. 1765 ¶ 167(a), (b), (d), (f); CP-2, §4, pg. 3; GH-2, Internal Investigations, at 25 § 4(D)(4)–(6); and GB-2, Command Responsibility at 7]. Captain Lugo again violated a clear, direct Order when he again accessed IA 2025-0111 on March 28, 2025, when he failed to provide the name of a PSB lieutenant, and when he failed to inform Chief Palopoli of the Court's Orders' requirements and relevant MCSO policy and state law.

Violating Chief Palopoli's clear order, as well as his obligations to his chain of command, Captain Lugo was insubordinate under MCSO policy, which defines insubordination as:

the willful refusal to order a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, Command Responsibility. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

[CP-2, Code of Conduct, at 19 § 40. Insubordination].

Upon discovering that the PSB Commander had accessed an investigative file in which he was the principal—specifically after being directed to remain detached from (i.e., to stay out of) the matter—Chief Palopoli had a mandatory, administrative duty to document the concern. Filing a complaint to allow for a neutral investigation into potential insubordination is a requirement of the Court's Orders and MCSO policy, not a "violation" of the disciplinary process. Furthermore, by filing a formal complaint rather than taking summary action, Chief Palopoli ensured the matter was moved into the established disciplinary framework where it could be vetted by an unbiased *independent investigator*. This demonstrates a commitment to uniform and fair discipline by following the same process for a Commander that would be applied to any other employee. Furthermore, Chief Palopoli's concern regarding the "IA Investigative Plan" that Lt. Porter sent without Chief Palopoli's authorization was rooted in the need to maintain separation between the principal and the outside vendor. If a subordinate of the principal is seen communicating with, or drafting plans for, that principal's own investigation, it creates an immediate appearance of impropriety and a conflict of interest as the subordinate is involved in the principal's investigation and not merely administrative. Chief Palopoli's

inquiry was a proactive effort to protect the integrity of the external referral and MCSO's process in vetting and routing complaints against a bureau-level commander.

Nevertheless, the Monitor refers to independent investigator Shaneeda Jaffer's report for the proposition that Chief Palopoli provided Captain Lugo with the order to stay out of it on March 24 and not March 18 as meaning that the insubordination complaint was inappropriate. But the Independent Investigator's purportedly finding a discrepancy as to whether Chief Palopoli provided the "stay out of it" order on March 18 or March 24, that ex post facto finding does not invalidate the complaint. Indeed, at the time of filing—and even now, Chief Palopoli maintains that she provided the order on March 18. Even so, the purpose of an independent investigation was precisely to resolve such factual disputes (and even then, MCSO disputes Ms. Jaffer's wholesale adoption of Captain Lugo's testimony). Indeed, the filing of an internal complaint is a procedural step, not a final disciplinary outcome. The complaint resulted in no unauthorized change to the disciplinary process and demonstrates no failure to engage in appropriate, uniform, or fair discipline.

Furthermore, like Ms. Jaffer, the MT's failure to appropriately resolve conflicts in testimony through documentary evidence, which even further calls doubt to Ms. Jaffer's findings and the veracity of testimony on which the Monitor alleges to rely to reach its findings. [*See* Doc. 3504, at 20:1-29:22]. Too much in IA 2025-0139 was left unknown and unverified, as is the case here. In concluding that there was no credible insubordination and conflict of interest complaint to be made, the Monitor appears to have simply chosen the interview supposedly reflecting the greatest quantity of (post-hoc) notes (Captain Lugo's) without review of the qualitative veracity of the notes themselves without making any effort to reconcile apparent differences. To ensure an objective, fact-based, impartial investigation, the Monitor should have made additional inquiries to reconcile differences and verify timelines.

Critically, the Monitor failed to identify additional, obvious insubordinate actions and lacked objective analysis of available evidence. Indeed, even presuming Captain Lugo's timeline to be correct, the Monitor failed to document or address further acts of insubordination by Captain Lugo, including failure to provide Chief Palopoli with the name of a PSB lieutenant and his admittedly accessing IA 2025-0111 on March 28, 2025. Coincidentally, the MT failed to document and report that Chief Anders facilitated Captain Lugo's continued access to IA 2025-0111, which violated a direct command from his superior.

Indeed, Chief Palopoli needed to ensure that Capt. Lugo performed his duties appropriately, including recognizing when he could not participate at all in reviewing a complaint due to a conflict of interest. [*See, e.g.*, Doc. 1765 ¶ 167(a), (b), (d), (f); CP-2, at 3 §4; GH-2, Internal Investigations, at 25 § 4(D)(4)-(6); and GB-2, Command Responsibility at 7]. The Monitor's conclusion that Chief Palopoli's complaint was not credible conflicts with the Court's Orders and MCSO's policies.

Moreover, as a matter of professional responsibility and policy requirement, Captain Lugo had an obligation to communicate necessary information to his chain of command and his failure to do so could be considered an act of insubordination and negligence. The Monitor's failure to inquire or address Captain Lugo's failure to provide critical, necessary information to his chain of command exhibits a critical omission and exhibits the Monitor's improper weighing for facts and coming to conclusion. Indeed, the Court's Orders did not remove Captain Lugo from MCSO's chain of command. Instead, Captain Lugo had an obligation as MCSO's PSB Commander to share with other MCSO employees, especially in his chain of command, the necessary processes to comply with MCSO

policies and the Court's Orders. The Monitor's failure to review those acts with a modicum of objectivity is untenable. Instead of objectively reporting on disputed facts, the Monitor improperly weighs facts and makes conclusions as follows:

- Improperly weighed conflicting testimony from Captain Lugo and Chief Palopoli;
- Improperly disregarded evidence that would support Chief Palopoli's timeline of events;
- Improperly refused to consider Chief Palopoli's and Director Shaw's communication in support of Chief Palopoli's timeline;
- Improperly weighed evidence to conclude the testimony of Captain Lugo credible;
- Improperly relied on an ex post facto report to conclude that IA 2025-0139 was not credible;
- Improperly weighed evidence and concluded additional apparent evidence of insubordination was not "credible;" and
- Improperly weighed their own actions in facilitating Captain Lugo's clear insubordinate acts as being proper and concluded that MCSO's concern about the Monitor's actions facilitating a conflict of interest and insubordination to not be credible and in so doing, appear to unilaterally absolve themselves of all wrongdoing.

In coming to the predicate conclusions necessary for Finding 5(h), the Monitor clearly engages in the "investigative, quasi-inquisitorial, quasi-prosecutorial role" that is "unknown in our adversarial legal system." *Cobell*, 334 F.3d at 1142 ("Regardless whether the district court has any inherent authority to appoint an agent to monitor the conduct of a party in litigation before it, it was surely impermissible to invest the Court Monitor with wide-ranging extrajudicial duties over the Government's objection. The Monitor's portfolio was truly extraordinary; instead of resolving disputes brought to him by the parties, he became something like a party himself. The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system."). The Monitor has far exceeded its authority in weighing facts and making conclusions in what appears to be its effort to hold MCSO out of compliance with a host of Paragraphs because of a single incident and in retaliation to MCSO's joining in Maricopa County's Rule 60 Motion.

**CONCLUSION:** In Finding 5(h), the Monitor penalizes Chief Palopoli for fulfilling her administrative responsibility to report potential insubordination and file-access violations. The fact that an independent investigation was used to clarify the timeline and details proves that the agency's oversight system functioned exactly as intended. Because the command utilized the formal disciplinary process to address legitimate concerns regarding investigative boundaries, there is no factual basis for a finding of non-compliance. Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(h) from the 46th Report.

## I.    MCSO Properly Referred The Complaints To ADPS With The Monitor's Approval.

In Finding 5(i), the Monitor simply repackages the alleged findings into full-blown, and wholly inappropriate conclusions. The Monitor's conclusions are ex post facto, rely on Ms. Jaffer's questionable (at best) investigation, and are ripe with improper factual determinations and legal conclusions, all of which falls outside the limited powers the Court has granted its Monitor. The objective reality is in stark contrast to the Monitor's findings.

At page 191 of the Draft 46th Report, the Monitor refers to the ADPS's investigations and Ms. Jaffer's findings and recommendations to conclude that no "credible complaints were lodged against Captain

Lugo that would have justified placing him on administrative leave." The Monitor's ex post facto conclusion is simply incorrect for multiple reasons. In fact, the Court Orders and MCSO policy clearly require the allegations to be investigated. The Monitor waited until after Ms. Jaffer's report, which clearly shows that the Monitor at least believed that the allegations had some credibility and needed to be investigated before drafting this report.

Indeed, as stated above, on March 10, 2025, Sergeant Engelbeck alleged that the PSB had violated A.R.S. § 38-1106(A)(1), which required MCSO to provide a copy of his investigative file to the appeal within fourteen (14) calendar days of the request from the appellant. He also alleged that PSB violated A.R.S. § 13-2809(A)(1), which forbids a person from tampering with evidence with the intent that it be used, introduced, rejected, or unavailable in an official proceeding which is then pending. Sergeant Engelbeck further alleged that tampering with evidence includes when a person destroys, mutilates, alters, conceals, or removes physical evidence with the intent to impair its verity or availability.

Notwithstanding the Monitor's claim otherwise, the allegations could not be easily resolved. Even if Chief Palopoli had seen the interviews in IAPro when she looked, an investigation needed to occur to determine when the files were added to the IAPro, whether they had been removed from IAPro, or otherwise made inaccessible to Conduct Resolution Section ("CRS"). The allegations were clearly criminal in nature.

Furthermore, MCSO had a mandatory duty to refer criminal allegations to an outside law enforcement agency and for those allegations to be wholly investigated. As stated above, no PSB investigator could have investigated IA 2025-0111 due to the allegations being against the PSB Commander and others:

> No employee shall be involved in an investigation, whether criminal or administrative, or make any disciplinary decisions with respect to any persons who are superior in rank and in their chain of command. Thus, investigations of the Chief Deputy's conduct, whether civil or criminal, must be referred to an outside authority. Any outside authority retained by the MCSO must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest.

[*See e.g.*, Doc. 1765 ¶ 167; GH-2, ¶ 4(D)(3)].

As the Court's Orders and GH-2 make clear, a member of PSB could not investigate or make any criminal decisions regarding IA 2025-0111. Nevertheless, a lieutenant or other PSB staff could certainly be a liaison for Chief Palopoli regarding facilitating communications with a conflicts investigator and the Monitor as it related to IA 2025-0111; the Court's Order and GH-2 only preclude subordinates from investigating or making any disciplinary decisions involving a superior in rank or in the chain of command. [*See e.g.*, Doc. 1765 ¶ 167; GH-2, ¶ 4(D)(3)].

Next, and as the Monitor recognized, Chief Gentry was concerned about the impartiality of MCSO— i.e., his investigating IA 2025-0111—especially regarding MCSO's agents' allegations of MCSO's improper tampering with or otherwise withholding evidence. Consistent with MCSO policy, MCSO sent the investigation to an "outside law enforcement agency:"

> 5. Where appropriate to ensure the fact and appearance of impartiality, the PSB Commander or the Chief Deputy may refer administrative misconduct investigations

to another law enforcement agency or may retain a qualified outside investigator to conduct the investigation.

6. Any outside authority retained by the Office must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest. The PSB shall determine if an outside investigator possesses the requisite background and level of experience of internal affairs and the absence of any actual or perceived conflicts of interest.

[GH-2, ¶ 4(D)(5)-(6)].

Here, the allegations against the PSB Commander necessitated that an outside agency investigate, making MCSO's decision to contact ADPS a mandatory response to the allegations. As the Monitor indicates in Finding 5(b), once a bureau-level commander—especially the PSB Commander as it relates to the specific allegations—is identified as a criminal suspect, MCSO has a duty to ensure an independent agency determined if a crime occurred. This is a requirement of transparency and Arizona law. The independent investigator's ultimate determination did not negate the fact that the referral to ADPS was required under the Court's Orders and MCSO Policy.

Nevertheless, on page 191 of the Report, the Monitor claims that "MCSO has no authority to reopen or re-investigate matters once they have been investigated by MCSO and closed" and concluded that Undersheriff Gentry's determination that an outside agency needed to investigate Sergeant Engelbeck's complaint violated "Arizona law." The Monitor is incorrect. First, the Monitor does not state identify the Arizona law to which he refers, nor explains this unidentified law's applicability. But more importantly, the complaint alleged new criminal and administrative allegations. As stated above in response to Finding 5(b), nowhere in SC2024-0168 did Sergeant Engelbeck allege tampering with evidence or failure to provide documents for his appeal. [Report App'x 2-1, SC2024-0168]. The SC2024-0168 involved allegations against Captain Lugo for failure to appropriately train him, creating a hostile workplace, and failing to first implement corrective actions and interventions. [Report App'x 2-1, SC2024-0168]. In addition, in SC2024-0168, Sergeant Engelbeck also alleged retaliation by PSB in light of the above allegations and Captain Lugo's subsequent transfer to PSB Commander. [Report App'x 2-1, SC2024-0168].

Conversely, as the Monitor admits in the Draft 46th Report, Sergeant Engelbeck alleged that evidence had been "deliberately omitted" from his digital appeal file. This allegation of intentional tampering with or destruction of records introduced an alleged criminal element and a breach of investigative integrity that was not part of the prior administrative closure. [Report App'x 2-8; Report App'x 3-1 at 14:19–23.] The alleged act, withholding the interviews from Sergeant Engelbeck as he prepared for his appeal, occurred over six months after initiation of SC2024-0168. The criminal allegation related to an alleged act that occurred nearly a half a year *after* resolution of SC2024-0168 simply cannot be an investigation into the "same" act. Indeed, even the Monitor-selected Independent Investigator recognized that a violation of A.R.S. § 34-1106 occurred when Sergeant Engelbeck did not receive the interviews for his appeal. The clear violation of A.R.S. § 34-1106 and policy necessitated an investigation distinct from anything associated with SC 2024-0168. MCSO questions why the Monitor is penalizing MCSO for complying with the Court's Orders and MCSO policy. MCSO questions why the Monitor is choosing to ignore testimony, physical evidence, and other circumstances in coming to its meritless conclusions. MCSO further questions the authority that allows the Monitor to make findings of fact and conclusions of law and withhold compliance on those purported bases.

Next, the Monitor claims that no "criminal allegations" should have been filed against Captain Lugo given the "generalized and unsupported assertions." But Captain Lugo himself identified that the allegations implicated him. Furthermore, the MT ignored the operational reality that Sergeant Engelbeck had listed Captain Lugo as part of his Complaint and makes allegations as against "PSB."

The Monitor further suggests that a "simple phone call" to CRS would have resolved the matter. However, when faced with an allegation of evidence destruction by a PSB Commander, an informal "quick check" is insufficient and could be viewed as a "cover-up" and a partial rather than impartial act. Utilizing a formal, independent investigation to verify file integrity is the only compliant path during a leadership transition in light of MCSO's requirement to ensure the fact and appearance of impartiality.

Furthermore, it does not matter that the Monitor was able to determine that the documents were in IAPro at some later date, as that neither explains nor clarifies that there had not been a violation of Arizona law or MCSO Policy when Sergeant Engelbeck did not receive the interviews. Indeed, investigation into whether the files were improperly restricted to certain users or otherwise not made available to Sergeant Engelbeck still needed to occur. An investigator needed to follow through with an audit log of the file, as well as interviews regarding Sergeant Engelbeck did not receive the information. MCSO simply could not summarily resolve the allegation in light of the severe accusations against MCSO and PSB, which along with CRS, is responsible for dutifully maintaining and providing investigative files. [*See* Doc. 3504, at 20:1-29:22]. In fact, the independent investigator never resolved why or how Sergeant Engelbeck failed to receive all of the necessary documents despite maintaining that such a violation occurred. Furthermore, the mere fact that an independent process by the Independent Investigator and ADPS —free from MCSO command influence—took significant time to complete evidences the fact that the matter was not a "simple phone call" fix, and that MCSO correctly "stayed out of it" once the referral was made.

In addition to treating IA 2025-0111 as a criminal complaint and sending the complaint to ADPS, Chief Palopoli had no option but to file a complaint against Captain Lugo for conflict of interest and insubordination based on how he handled the Sergeant Engelbeck complaint that became IA 2025-0111 and his communications with her (or lack thereof). MCSO needed to place Captain Lugo on leave pending investigations into the allegations against him. As stated above, the Court Orders mandate that supervisors report policy violations.

Here, Captain Lugo did not immediately notify Chief Palopoli, or any other chief of his conflict of interest stemming from IA 2025-0111. In relevant part, CP-2, Code of Conduct, requires the following:

> 4. Conflict of Interest: Employees shall not involve themselves in any matter that may involve a conflict of interest or appear to be a conflict of interest. Should a conflict of interest arise, employees shall notify their supervisor as soon as practical. Employees who are not sure if a conflict of interest exists should make the declaration.
>
>> A. In matters involving misconduct or discipline, employees shall notify the Professional Standards Bureau (PSB) Commander. If the PSB Commander also suffers from a conflict, the highest-ranking, non-conflicted Office chief or, if there is no non-conflicted Office chief, an outside authority shall make the determination. The outside authority for matters involving discipline will be the Maricopa County Attorney's Office – Civil Division.

43

A conflict of interest as defined in this policy: A conflict that involves, but is not limited to, nepotism, bias of any kind, an external business relationship, a close personal relationship, or superiority in rank in an individual's chain of command.

[CP-2, Code of Conduct at 3].

Additionally and as stated above , GH-2, *Internal Investigations*, also provides:

D. Conflict of Interest: Conflict of interest in administrative investigations is prohibited.

4. If an internal affairs investigator or a commander has knowledge of a conflict of interest affecting their involvement, they should immediately inform the PSB Commander or, if the holder of that office also suffers from a conflict, the highest-ranking, non-conflicted chief level position or, if there is no non-conflicted chief-level position, an outside authority.

Captain Lugo stated that during his typical complaint review time, he read (at least in part) what would become IA 2025-0111. [Report App'x 3-3 at 68:7–69:11.] Nevertheless, despite his access to text, phone, and email, Captain Lugo did not inform Chief Palopoli of the clear conflict. As Captain Lugo's direct supervisor, Chief Palopoli was obligated to ensure that Captain Lugo complied with the MCSO policy and, of course, the Court's Orders. GB-2, Command Responsibility, pg. 7. Thus, Chief Palopoli was obligated to tell Captain Lugo to "stay out of" IA 2025-0111, which she did on March 18, 2025. [*See e.g.*, Doc. 1765, ¶ 167(a), (b), (d), (f); CP-2 at 3 §4; GH-2, Internal Investigations, at 25 § 4(D)(4)-(6); GB-2, Command Responsibility at 7]. Captain Lugo again violated a clear, direct Order when he again accessed IA 2025-0111 on March 28, 2025, when he failed to provide the name of a PSB lieutenant, and when he failed to inform Chief Palopoli of the Court's Orders' requirements and relevant MCSO policy and state law.

Violating the clear order he received from Chief Palopoli, as well as his obligations to his chain of command, Captain Lugo was insubordinate under MCSO policy, which defines insubordination as:

the willful refusal to order a reasonable and lawful order. A reasonable and lawful order given to a subordinate shall be followed regardless of the method of conveyance, as specified in Office Policy GB-2, Command Responsibility. The willful failure to obey an order constitutes grounds for discipline, up to and including dismissal from employment.

[CP-2, Code of Conduct, § 40. Insubordination at 19].

Upon discovering that the PSB Commander had accessed an investigative file in which he was the principal—specifically after being directed to remain detached from (i.e., to "stay out" of) the matter—Chief Palopoli had a mandatory administrative duty to document the concern. [*See e.g.*, Doc. 1765, ¶ 167(a), (b), (d), and (f); CP-2, §4, pg. 3; GH-2, Internal Investigations, § 4(D)(4)-(6), pg. 25; and GB-2, Command Responsibility, pg. 7].

Chief Palopoli simply complied with the Court's Orders and MCSO's policy requirements when she filed her complaint; she did not violate the disciplinary process as claimed by the Monitor. Chief Palopoli ensured the matter moved into the established disciplinary framework where it could be vetted by an *independent investigator*. Her actions demonstrate MCSO's commitment to uniform and fair discipline by following the same process for a PSB Commander that would be applied to any other

44

employee. Chief Palopoli's concern regarding the "IA Investigative Plan" that Lt. Porter sent without Chief Palopoli's authorization was rooted in the need to maintain separation between the principal and the outside vendor. If a subordinate of the principal is seen communicating with, or drafting plans for, that principal's own investigation, it creates an immediate appearance of impropriety and a conflict of interest as the subordinate is involved in the principal's investigation and not merely administrative. Chief Palopoli's inquiry was a proactive effort to protect the integrity of the external referral and MCSO's process in vetting and routing complaints against a bureau-level commander.

Furthermore, to ensure the fact and appearance of impartiality, MCSO needed to place Captain Lugo on administrative leave based on Captain Lugo's status as PSB Commander, his not notifying Chief Palopoli of the apparent conflict of interest with IA 2025-0111, his continued unauthorized involvement with IA 2025-0111, and his alleged insubordinate acts regarding his accessing IA 2025-0111 and involving himself in that action. As stated above, the reason that Capt. Lugo was placed on leave was based on the combination of IA 2025-0111 and Capt. Lugo's subsequent actions resulting in Chief Palopoli's having to file a complaint alleging insubordination, which was IA 2025-0139. [Report App'x 3-4 at 26:17-27:5]. Indeed, Sheriff Sheridan did not believe that he had any choice in whether he could or could not put him on administrative leave in light of the critical responsibilities placed on the PSB Commander, the severity of a criminal allegation and, critically, the subsequent allegations of conflict of interest and insubordination related to the PSB Commander's handling of a complaint against him, for which the subordination allegation carried a minimum disciplinary category of Category 6. [*See* GC-17, Employee Disciplinary Procedures, Attachment B at 45; Report App'x 3-16 at 17:5–18:3]. Again, as Sheriff Sheridan noted in his interview with the Monitor, the Monitor holds Capt. Lugo in high regard—as MCSO holds its PSB Commander in high regard—and was defending him from the allegations of IAs 2025-0111 and 2025-0139. Accordingly, MCSO needed to err on the side of caution to ensure the fact and appearance of impartiality and that MCSO was enforcing its policies as it would for anyone else. [Report App'x 3-16 at 17:5–18:3; Report App'x 3-4 at 26:17–27:5].

The placement of Captain Lugo on administrative leave complied with MCSO policies and is the usual, customary course taken under the circumstances. Under GC-1, Leaves and Absences, administrative leave with pay shall be granted to an employee when the Office determines that an employe should be removed from the workplace for allegedly engaging in misconduct that will likely result in discipline as specified in GH-2. [*See* GC-1(1)(G)(1)(c) at 9]. In relevant part, GH-2 states:

> The purpose of administrative leave is to manage risk and to protect employees, victims, and the integrity of an investigation. Employees may also be placed on administrative leave with pay due to a critical incident. The following procedures specify when and how an employee may be placed on administrative leave:

> A. Command personnel of the rank of lieutenant or above, or their civilian counterparts may place an employee on administrative leave with pay for the remainder of a shift for alleged infractions of the law, Maricopa County Merit System Rules, or Office Policy. The incident shall immediately be reported to the bureau commander, who shall review the facts of the incident and, if necessary, extend the administrative leave up to a maximum of three working days. The Chief Deputy or the PSB Commander or designee must authorize leave to exceed three working days. Once authorized, the employee shall be advised of the administrative leave in writing.

[GH-2, Internal Investigations § 15].

Consistent with GH-2 § 15, then Chief Deputy Gentry advised that Captain Lugo would be placed on leave and then advised Captain Lugo in writing that he will remain on leave pending investigation. MCSO simply complied with the Court's Orders and MCSO policies in placing Captain Lugo on leave pending resolution of the investigations. Because Captain Lugo then served and still serves as PSB's primary liaison to the Court and Monitor, the Sheriff determined he had no choice but to ensure a conflict-free environment once criminal-nature allegations (tampering) and insubordination were raised. This was a protective measure for the agency's integrity—not a retaliation against Captain Lugo.

Indeed, Chief Anders approved the investigation going to ADPS. Even after their initial inquiry into the routing of IAs 2025-0111 and 2025-0139, the Monitor did not immediately use its authority under Paragraph 347 to immediately reroute the complaints. The Monitor did not do so because it knew that MCSO had not violated a Court Order or its own Policy.

In its Draft Report at page 190, the Monitor contends that Chief Palopoli's participation in the first discussion with ADPS and Undersheriff Gentry's allowing her to do so were inappropriate. However, her presence was necessary to provide the specific details of the directives she issued. Providing information to an independent outside investigative body is a standard role for a complainant; it does not constitute "influence" over a separate state agency. The referral resulted in an independent vetting of serious allegations and the process demonstrates compliance with the Court's Orders and MCSO policies.

The Monitor's determination that there was no "good faith basis" for MCSO to refer the Sergeant Engelbeck Complaint to an outside investigation is contrary to the Court's Orders, MCSO's policies, the MT's own review and oversight, and without merit. The newly elected Sheriff and new members to MCSO made good-faith inquiries into PSB-related Court Orders and policies. As the PSB Commander, Captain Lugo was tasked with providing guidance in difficult conversations and to inform his chain of command as to the Court-Order requirements and MCSO policies. Even more so, it is the duty of the PSB Commander to advise the Sheriff so as to facilitate and move forward any of the Sheriff's desired policy changes such as permitting attorneys to attend investigative interviews and decreasing the disciplinary matrix for off-duty DUIs to the extent possible. Ultimately, under the specific circumstances here, the Court **may** deny the requested policy change; however, the PSB Commander was obligated to assist the Sheriff in identifying pathways for requesting the proposed policy change—not accuse the Sheriff and Undersheriff of attempting to violate or otherwise subvert the Court's Orders.

The Monitor's promulgation of the narrative that the Sheriff and his executive command were trying to subvert the Court's Orders is simply preposterous. Requests and inquiries simply are not nefarious conduct from which bad faith or unlawful purpose can be implied. Indeed, MCSO did not take any of its proposed actions while Captain Lugo was on leave. The Monitor's narrative is farcical in that it presumes **MCSO's complying with the Court's Orders and MCSO policies** as nefarious.

Furthermore, in coming to its conclusions, the Monitor:
- Improperly weighed conflicting testimony from Captain Lugo and Chief Palopoli;
- Improperly disregarded evidence that would support Chief Palopoli's timeline of events;
- Improperly refused to consider Chief Palopoli's and Director Shaw's communication in support of Chief Palopoli's timeline;

- Improperly weighed evidence to find the testimony of Captain Lugo credible that:
    - MCSO wanted to reopen closed discipline cases;
    - MCSO violated Arizona Law and MCSO policies in inquiring about ability to change policy and discipline of certain cases;
    - MCSO violated policy or acted nefariously when requesting Captain Lugo train a second captain;
    - MCSO sought to retaliate against Captain Lugo
- Improperly weighed facts and concluded that "there was no good faith Basis for MCSO command staff to refer Sergeant Engelbeck's complaint to ADPS;
    - Improperly weighed facts and concluded that IA 2025-0111 was duplicative;
    - Improperly weighed facts and concluded that allegations "could have easily been resolved;"
- Improperly weighed facts and concluded that the facts support contention that MCSO removed Captain Lugo from PSB Command unlawfully;
    - Improperly weighed facts and concluded that Captain Lugo pointed out violations of policies and procedures;
    - Improperly weighed facts and concluded that Captain Lugo rebuffed attempts to change policy;
    - Improperly weighed facts and concluded that facts support Captain Lugo's belief that MCSO was coming after him; and
    - Improperly weighed facts and concluded that MCSO removed Captain Lugo because he advised MCSO command of requirements to transfer a second command into PSB.

The above is certainly not an exhaustive list. Nevertheless, it certainly evidences that the Monitor has inappropriately stepped into the "investigative, quasi-inquisitorial, quasi-prosecutorial role" that is "unknown in our adversarial legal system." *Cobell*, 334 F.3d at 1142. The Monitor has far exceeded its authority in weighing facts and making conclusions solely in an effort to hold MCSO out of compliance with a host of Paragraphs because of a single incident.

**CONCLUSION:** In Finding 5(i), the Monitor penalizes MCSO for utilizing external investigative safeguards to prevent conflicts of interest. By referring a criminal-nature allegation to ADPS, MCSO ensured a transparent process to investigate a bureau-level commander. There is simply no basis for the Monitor to hold MCSO out of compliance based on the specious findings announced in 5(i). Accordingly, the MCSO requests that the Monitor rescind and remove Finding 5(i) from the 46th Report.

> **J.**     **MCSO's Request To Transfer Captain Lugo From PSB Into The Court Security Division Reflected A Previous Discussion And Not Any Alleged, Nefarious Purpose.**

As an initial matter, the transfer request from which this issue occurred in First Quarter 2026, which is *well* outside of the reporting period (Third Quarter 2025). Additionally, this section, like the other sections of the Monitor's Draft Report, involves the Monitor's one-sided investigation which ignores genuine disputes of fact in favor of determining the Monitor's absurd conclusion that MCSO retaliated against Captain Lugo. MCSO specifically informed the Monitor of its desire to transfer Captain Lugo and then reached out to the Monitor with a letter on February 27, 2026, regarding this issue. In that letter, MCSO described the reasoning behind the transfer and requested that the Monitor explain the basis of its claims of retaliation. The Monitor **never** responded to that letter. And, although other

47

subsections of Finding 5 contain at least cursory references to Captain Lugo's interview (without reference to other testimony), subsection 5(j) is devoid of citation to *any* fact.

Instead, and perhaps most egregiously, the Monitor references the Court's Orders appointing Investigator Jaffer (Doc. 3191) and determining that the Monitor must approve appointment of a candidate to lead PSB (Doc. 3422[17]). In this section, the Monitor explains that "The Court further affirmed that Captain Lugo, as the only candidate approved by the Monitor, was the current PSB Commander." [*See* Draft Report at 194]. Because this sentence appears in a section regarding the transfer of Captain Lugo *from* PSB, the reference to the Court order makes it sound as if the Court *denied* a request regarding Captain Lugo. Doc. 3422 does not reference any attempt to transfer Captain Lugo from PSB to CSD. It did not address the Monitor's retaliation or pretext arguments. Instead, it simply affirmed that Captain Lugo was the present captain of PSB. It is inapposite, and wholly and knowingly inappropriate, to cite the Order as evidence of retaliation or pretext. It is also disingenuous to cite the order of Investigator Jaffer as proof of retaliation or pretext because the Court did not itself make any findings regarding the transfer and, instead, simply appointed an investigator to *investigate* potential conduct.

The fact is that MCSO followed the Court's guidance and deferred to its rulings regarding PSB. Indeed, to MCSO's knowledge, it has *never* finalized a transfer against judicial or Monitor direction, nor has it actually transferred Captain Lugo to CSD as the Monitor explains it intended to do. The request and subsequent legal clarification demonstrate no failure to engage in appropriate, uniform, or fair discipline and, thus, cannot have any bearing on MCSO's compliance. It would be improper for the Monitor to hold MCSO out of compliance for the attempt to gain Court clarification (especially, as described above, as the Court's Order does not even address the transfer of Captain Lugo) would deprive MCSO of the ability to do nearly anything, as it would have to weigh its choices against the possibility that the mere attempt to involve the Court means that it is non-compliant or that a mere "question" or "inquiry" will result in an adverse finding of nefarious intent. That is contrary to due process and the Court's orders in this case, and it is contrary to the goal of an independent, cooperative Monitor.

**CONCLUSION:** In Finding 5(j), the Monitor penalizes MCSO for utilizing legal and administrative processes to determine the scope of its management authority. The finding is wholly unsupported and rests solely on the Monitor's unfounded conclusions, which have never been explained despite MCSO's requests that the Monitor provide some basis for these accusations. That finding should be removed or, at a minimum, the Monitor should provide the evidence it believes supports such a serious allegation. Accordingly, MCSO requests that the Monitor rescind and remove Finding 5(j) from the 46th Report

***

Based on the foregoing, and as more individually addressed in the next section, MCSO objects to the Monitor's holding MCSO out of compliance regarding Paragraphs 14–17, 29–30, 32, 102, 163, 165–169, 172, 219–221, 223, 226–228, 266–267, 288–289, 291–293, 346, 347, and 353 and demands the Monitor hold it in or restore compliance or full and effective compliance with these Paragraphs, as

---

[17] The Monitor's Draft Report states that this Order was entered on May 13, 2026. It was entered March 13, 2026.

previously determined. Having addressed the Monitor's "inquiry" and "key findings," MCSO addresses the remainder of the Monitor's Draft 46th Report as follows:

## Section 1: Introduction

MCSO again suggests that the Monitor update its table of contents to include specific sections for the Third and Fourth Orders. Doing so will help readers more readily locate the paragraphs subject to those most recent Orders. This simple, requested update will facilitate reader access to and understanding of compliance information.

## Section 2: Methodology and Compliance Summary

MCSO has also repeatedly requested that the Monitor reevaluate its methodology and confine its compliance determination to particular requirements of each individual Paragraph. Prime examples of this involve the Monitor's assessment of MCSO's compliance with Paragraphs 32 and 33 (addressed more fully below), as well as Paragraphs 72, 79, and 81 (addressed more fully below). The Monitor has stated in its Report that it documents MCSO's compliance with applicable Order requirements or Paragraphs. Thus, MCSO's position is that the Monitor must address whether MCSO has complied with each individually applicable Paragraph as a distinct Order requirement. MCSO asserts that the Monitor's refusal to do so violates its own methodology because it conflates the requirements of multiple Paragraphs and imports the requirements of unrelated paragraphs into any given analysis. This means a single dispute over an unrelated issue could unjustifiably hold MCSO out of compliance with multiple Paragraphs. MCSO asks the Monitor to adhere to the Court's Orders and its own methodology, and analyze MCSO's compliance with each particular Paragraph according to that Paragraph's own, unique requirements without reference to unrelated Paragraphs.

In addition, in its Comments to the Monitor's 43rd Report, Plaintiff/Intervenor the United States objected "to the 94% compliance threshold. The Monitor's methodology does not provide an objective basis for this required score. At this stage in the case, MCSO submits that the Monitor should reevaluate its compliance methodology and focus resources on the key outstanding areas. Instead of applying a rigid numerical threshold, the Monitor should apply an objective, practical approach to determine whether MCSO has implemented the Orders." (Doc. 3198-3 at 1.) MCSO agrees with the United States that the Monitor should apply an objective, practical approach to determine MCSO's compliance with the Court's Orders. (Doc. 3205-1 at 2.)

## Section 3: Implementation Unit Creation and Documentation Request

MCSO does not have any comments relevant to the Paragraphs under Section 3. MCSO is in Full and Effective Compliance with all the Paragraphs under Section 3.

## Section 4: Policies and Procedures

**Paragraphs 14–17:** Paragraphs 14–17 relate to the Court-ordered review process for Monitor and Party review of MCSO's proposed policies. On page 23 of the Monitor's Draft Report, the Monitor states that "we have not previously considered these Paragraphs for purposes of compliance" as they are of an administrative nature. The Monitor provides **no reason** as to why it has suddenly decided— after a *decade* of assessment—to consider these paragraphs.

During the 3d Quarter 2025, MCSO provided the Monitor with proposed policy updates pursuant to the Annual Review process of Paragraphs 14–17 as follows:

- ED-3, Review of Cases Declined for Prosecution (2024/2025)
- GB-2, Command Responsibility (2024/2025)
- GC-4, Detention/Civilian Employee Performance Appraisals
- GC-4 (S), Sworn Employee Performance Appraisals and Management
- GC-13, Awards (2024/2025)
- GD-9, Litigation Initiation, Document Preservation, and Document Production Notices
- GF-5, Incident Report Guidelines (2024/2025)
- GH-2, Internal Investigations (2024/2025)
- GJ-3, Search and Seizure (2024/2025)
- GJ-27, Sheriff's Posse Program (2024/2025)
- GJ-35, Body-Worn Cameras

[Doc. 3234-1 at 42.] Additionally, MCSO published three administrative broadcasts and briefing boards during the subject timeframe. [Doc. 3234-1 at. 43.] None of the policy changes—including briefing board or administrative broadcasts—relate to the Monitor's commenting on Paragraphs 14–17 for this subject quarter. MCSO maintains that these Paragraphs are purely administrative and MCSO has continued to comply with the annual review process required of Paragraphs 14–17.

Nevertheless, in its 46th Draft Report, the Monitor holds *for the very first time* that it is now assessing compliance with these Paragraphs and identifies four bases for its determination that MCSO is out of compliance:

1. MCSO's handling of DUI offenses under GC-17;

2. MCSO's Appointing Authority pursuant to GH-2;

3. A single instance of allowing an attorney to observe an interview pursuant to GH-2 and Arizona law;

4. Captain Lugo's investigation.

Each of these instances are discussed at length in response to the Monitor's Section 12, above. None of these are a proper basis to hold MCSO out of compliance with Paragraphs 14–17.

**First**, single instances of alleged policy violations do not demonstrate that MCSO is failing its obligations regarding Paragraphs 14–17, which involve the *promulgation* of policies. An alleged violation does not amount to a change in policy.

**Second**, throughout the Third Quarter of 2025, the Monitor recognized that MCSO personnel sought to uniformly apply its policies and procedures and comply with the requirements of Paragraphs 14-17 to report alleged or apparent violations of policy. Certainly, a single incident does not justify the Monitor's finding MCSO out of compliance on more than 94% of instances specifically subject to any given Paragraph. Indeed, every command staff interviewed by the MT stated their goal to comply with the policies and procedures and acted with those requirements in mind. Accordingly, MCSO requests that the Monitor rescind and remove its findings of noncompliance with Paragraphs 14-17.

**Third**, as described in detail above, the Monitor's investigation and findings go beyond its role. The Courts are clear, when a Monitor unilaterally takes on "investigative, quasi-inquisitorial, and quasi-prosecutorial role" it does so without any recognizable legal authority. *Cobell*, 334 F.3d at 1142.

**Fourth**, no reasonable, objective fact finder would find that MCSO actually violated a policy. MCSO addressed this at length in response to its Section 12 findings. Additionally, MCSO provides the following summary:

- **As to # 1,** a mere inquiry regarding a potential policy change is simply not a violation of the Court's Orders or MCSO policy.
- **As to #2**, Chief Holmes has been acting as the Appointing Authority for almost a decade and for a total of three Sheriff's administrations without ever being questioned by the Monitor and with the Monitor's knowledge and failure to object. His appointment is not a basis to hold MCSO out of compliance.
- **As to #3**, Chief Palopoli acted under a direct order of the Sheriff, whose decision was clearly within applicable statutory law and policy and did not impact the rights of the Plaintiff Class.
- **As to #4,** MCSO complied with the Court's Orders and MCSO Policy when it identified credible allegations against Captain Lugo, placed Captain Lugo on administrative leave with pay, and had an outside law enforcement agency investigate the allegations against him.

None of these provide a basis to hold MCSO out of compliance for these or any other Paragraph.

**Lastly,** the Monitor has previously stated that GH-2 and GC-17 must be updated through the Court process. [Doc. 3388 at 14–15]. MCSO understood the Monitor's position but still requested input from the Monitor and the parties for proposed changes before taking GH-2 to the Court for modification. [Doc. 3388 at 14–16]. MCSO's request was intended to streamline the process and safeguard the Court's time and resources. It appears that the Monitor has taken that request as proof that MCSO has changed its policies without the Court's input. It has not, and, indeed, the Monitor cites to no evidence to show that the policies have been changed during the relevant Quarter other than its bald assertion that single instances of alleged policy violations could be a *de facto* change in policy. That is not the case for all of the reasons discussed above. Although not within this reporting period, as the Monitor well knows, during the May 15, 2026 hearing, the Court addressed this issue and directed the Monitor and the parties to engage in discussions regarding the proposed changes to these policies. After the Monitor and the Parties engage in this process, the Court is the final arbiter regarding any proposed policy change.

**In sum**, The Monitor's novel assessment of Paragraphs 14-17 is simply contrary to the history of this case and MCSO's compliance efforts to date. There is no legitimate basis to find MCSO out of compliance with these Paragraphs and MCSO requests the Monitor maintain the status quo and not assess compliance with these Paragraphs (or at the very least hold MCSO in compliance with these Paragraphs).

**Paragraphs 29–30:** MCSO has been in compliance with these Paragraphs for over a decade and has been in Full and Effective Compliance since December 28, 2018.

Nevertheless, without any warnings in any previous Quarterly Report, on pages 36–37 of its Draft Report, the Monitor finds that MCSO is out of compliance for the alleged four bases discussed in MCSO's Comment to Paragraphs 14–17. As discussed in detail above, the Monitor lacks any foundation for its finding.

Moreover, when MCSO sought clarification regarding Paragraphs 29–30, the Monitor stated: "After further review, I would refer you to the language referencing the ignorance of established policies which does not speak of Policy Division activities."

The requirements of Paragraph 29 only go to the establishment of Policies and Procedures that:
- Clearly define terms;
- Comply with applicable law and the Courts Orders; and
- Comport with current professional standards.

The requirements of Paragraph 30 go to the establishment of Policies and Procedures within 90 days of the Effective Date of the Order.

*The Monitor has not found that a single provision of MCSO's policies and procedures falls short of the above requirements.* Rather, the Monitor's determination is based on the alleged "ignorance" of the established policies. Since the Monitor has conceded that the Policy Division has done nothing to violate the provisions of these Paragraphs, the Monitor simply cannot hold MCSO out of compliance for these Paragraphs. Accordingly, MCSO requests that the Monitor rescind and remove its findings regarding Paragraphs 29–30 and again hold MCSO in Full and Effective Compliance.

**Paragraph 32.** This Paragraph requires all Patrol Operation personnel to report policy violations and Supervisors to uniformly identify, respond to and hold accountable personnel under their command who violate MCSO Policies and Procedures. As articulated in its Reports to the Court, MCSO satisfies these requirements. (*See e.g.,* 3025-1). MCSO repeats its continued objection to the Monitor's method of assessment for compliance with Paragraph 32 because it far exceeds the actual requirements of Paragraph 32 (*see* Doc. 606 at ¶ 32) and, instead, imports requirements from other, unrelated Paragraphs, including the timeliness requirements of Paragraph 204, as amended.

In its Draft Report at 41, the Monitor stated that it continues "to believe that the increased oversight at the Deputy Chief level played a significant role in the overall improvement of District and Division cases." MCSO believes that the best person to identify deficiencies would be the PSB Commander. Any deficiencies discovered by the PSB Commander and sent back for correction should not be included as a deficient case under this Paragraph because MCSO is identifying any deficiency through its internal control process.

The Monitor also discussed the investigative and timeliness of cases completed. However, Paragraph 32 does not contain investigative timeliness or quality requirements; nor can these requirements be reasonably be applied to Paragraph 32. Since either PSB or a separately appointed district sergeant conducts the investigations, Patrol Operations personnel and Patrol Operations supervisors do not necessarily have control over investigations into potential policy or procedure violations or control to timely hold those under their command accountable for policy and procedural violations. Thus, imposing timeliness and investigative quality requirements as compliance benchmarks for Paragraph

32 is inappropriate. Thus, MCSO again requests the Monitor amend its Draft Report and find MCSO in Phase 2 compliance with Paragraph 32.

Also in this Quarter, on page 43 of his Draft Report, the Monitor finds that MCSO is out of compliance for the alleged four bases discussed in MCSO's Comment to Paragraphs 14–17. As discussed in detail above, the Monitor lacks any foundation for its finding.

**Paragraph 33.** Like Paragraph 32, MCSO again asserts that the Monitor inappropriately assesses compliance with this Paragraph through references to other, unrelated Paragraphs. Here, the Monitor scrutinizes completed misconduct investigations and whether those investigations met the requirements of other Paragraphs that specifically govern misconduct investigations, including the timeliness requirements of Paragraph 204, as amended. That is an incorrect reading of the Order's requirements. Paragraph 33 only applies to MCSO personnel *after* a completed Discriminatory Policing investigation in which MCSO Personnel were found to have engaged in alleged Discriminatory Policing. Imposing Paragraph 204's timeliness requirement is illogical and inappropriate, because Paragraph 33 only applies *after* the completion of the investigation. Indeed, by scrutinizing the investigation as to whether Discriminatory Policing occurred via timeliness and other metrics, the Monitor essentially presumes a principal's guilt upon the filing of the complaint, violating the Peace Officer's Bill of Rights. *See* Ariz. Rev. Stat. §§ 28-1101 through 1120.

MCSO has continuously complied with the specifics of Paragraph 33—as the Monitor has found in this and other reports. MCSO asserts that in addition to having clear, written guidelines, MCSO disciplines its personnel who engage in Discriminatory Policing and refers its personnel for criminal prosecution when appropriate. Therefore, MCSO requests that the Monitor find MCSO in Phase 2 compliance with Paragraph 33 and amend its Draft Report accordingly.

## Section 5. Pre-Planned Operations

MCSO does not have any comments relevant to the Paragraphs under Section 5. MCSO is in Full and Effective Compliance with all the Paragraphs under Section 5.

## Section 6. Training

**Paragraph 46.** Since 2019, MCSO had been in Full and Effective Compliance with Paragraph 46. In its 45th Report, the Monitor deferred compliance with this Paragraph 46 for concerns related to DSA and Posse members. [Doc. 3381 at 50–52]. MCSO disagreed with the findings as stated in Doc. 3381-2, at 3-6, including that the Monitor exceeds his authority under the Court's Orders in deferring compliance for this Paragraph based on non-Order related issues.

On page 55 of the Draft Report, the Monitor states that of "we saw certain Posse personnel who we believe are not associated with the MCSO, responding to calls for service. We are requesting added documentation to confirm this observation and will revisit this issue during our upcoming site visit." MCSO submits that any self-proclaimed "posse" who do not belong to MCSO are simply outside the scope of this Order. Specifically, the self-proclaimed "Sun City Posse" is not affiliated with and does not fall under the auspices of MCSO. MCSO has no control over this unrelated entity or its members.

On page 56 of the Draft Report, the Monitor states that when "aiding sworn law enforcement personnel in the delivery of Patrol Assistance services, there are no activities that can be classified as 'non-law enforcement activities,' and the policy specifies that it only applies to Posse volunteering in a patrol assistance function. MCSO incorrectly conflates the Patrol Assistance function (Intermediate and QAP Posse members who volunteer in a patrol environment) who are required to use a body-worn camera, with activities assigned to Community Based Assistance (Intermediate Posse members who volunteer in a 'non-patrol environment' who are not required to use a body-worn camera.[)]" MCSO is not conflating Patrol Assistance with the Community Based Assistance. A posse member's status (Basic, Intermediate, QAP) is indicative only of their level of training within the posse program. It is not an automatic indicator of their function. As listed in policy GJ-27 Intermediate Posse members may engage in Community based assistance activities that do not require a BWC, PAL, or Shift Roster. These activities include: "reporting irrigation leaks to HOAs, reporting streetlight outages to utility companies, providing neighborhood patrol for open garage doors, vacation watch duties to includes removing flyers and junk mail from homeowner's porches, etc. These volunteer services are non-law enforcement activities and are not directly assisting a patrol district or investigative division. Community Based Assistance Posse Members would not be considered part of the span of control." These are separate from Patrol Assistance functions. MCSO agrees that posse members assisting in patrol based activities should have a BWC and be on the shift roster, but believe that the Monitoring Team has the mistaken understanding that *every* call entered or taken by an Intermediate or QAP Posse member automatically initiates these requirements but it does not.

Also on page 56 of the Draft Report, the Monitor states "[w]e believe that, in every instance, there should be a BWC recording associated with an MC number unless there is a body-worn camera malfunction while a Posse member in a Patrol Assistance function." The Monitor is simply incorrect and in previous discussions with the Monitor on this issue, MCSO repeatedly provided examples to demonstrate why the Monitor is incorrect. For example in accordance with current MCSO Policy GJ-27 Attachment A, a posse member should activate their BWC when they have arrived on scene and exited their vehicle. If a Posse member is dispatched to a call they will automatically be attached to that MC#. If they are then cancelled prior to arrival, either their assistance is no longer needed or the event has been resolved, or they get diverted to a different call the event would be closed 4X (Unit cancelled prior to arrival) there would be no recording because recording is not required until they arrive on scene and exit the vehicle. This is the simplest example of a clear instance in which there will be an MC# but no recording. Others include certain call types of generalized patrol in an area, and disposition code 3 (unable to locate).

MCSO maintains that the Monitor's deferral of compliance under this Paragraph is based on considerations that fall outside the Paragraph's language and intended scope. The Paragraph is designed to assess the quality and delivery of training, ensuring instruction is policy based, taught by Monitor-approved instructors, and updated annually. MCSO has consistently taught Monitor-approved courses, delivered by Monitor-approved instructors, and revised training materials when a need was identified. The only Monitor comment that directly relates to the Paragraph's language is the recommendation to tailor learning activities to the duties of DSA and Posse personnel, a need that MCSO has already acknowledged and addressed through revised instructional content.

MCSO continues to meet each of these requirements. The Monitor's concerns regarding policy interpretation, potential policy changes, or the operational use of Posse personnel are unrelated to whether the training itself satisfies the express requirements of the Paragraph. As such, these considerations do not provide a valid basis for deferring compliance under this Paragraph.

54

Accordingly, MCSO asserts that the Monitor exceeded the authority granted under the Court's Orders by deferring compliance based on issues unrelated to the Paragraph's express requirements. MCSO therefore requests that the Monitor amend its finding to reflect continued Full and Effective Compliance with this Paragraph.

**Section 7. Traffic Stop Documentation and Data Collection.**

**Paragraph 54.k.**[18] MCSO requests clarification on this Paragraph's assessment, as it strives to attain the shared goal of the parties and the Monitor: Full and Effective Compliance under the Court's Orders. On page 74 of the Draft Report, the Monitor found MCSO noncompliant with the requirements of this Paragraph because MCSO has attained a compliance rate of 67%. In the sample of traffic stops that the Monitor reviewed to assess compliance with 54.k, the MT identified only 3 searches of drivers or passengers. Because the Monitor assessed MCSO to be out of compliance with one of the three searches, it was held out of compliance with this subsection of Paragraph 54—the only subsection the Monitor held MCSO out of compliance with this Paragraph. As stated in its previous Comments to the Monitor's draft report, it is MCSO's position that the Monitor's imposition of a 94% compliance requirement is inappropriate for this Paragraph and sub-Paragraph in light to the small sample size.

Additionally, on page 73 when discussing MCSO's implementing revisions to the VSCF, the Monitor states that "we noted that there appears to have been a technical issue during the implementation of the revised form—as we noted that several traffic stops that involved passengers that indicated that the passengers had been searched. However, based on the review of body-worn camera recordings, there was no search of the passengers." This issue has been remedied.

**Paragraph 56.** Paragraph 56 does not regulate the everyday minutia of deputy and driver interactions. Paragraph 56 requires MCSO's "traffic stop data collection system shall be subject to regular audits and quality control checks. MCSO shall develop a protocol for maintaining the integrity and accuracy of the traffic stop data, to be reviewed by the Monitor pursuant to the process described in Section IV." Paragraph 56 requires high-level institutional functionality and does not require any singular act of data collection. In particular, Paragraph 56 requires MCSO's traffic stop data collection to be subject to regular audits and quality control checks, and for MCSO to develop a "protocol" for maintaining the integrity and accuracy of the traffic stop data. That protocol is to be reviewed by the Monitor pursuant to Section IV. Protocol is not a defined term in the Court's Order, but under ordinary definitions it refers to a procedure or code of conduct to ensure the continuous integrity and accuracy of the traffic stop data. Moreover, the Monitor has continuously recognized the robust protocol that MCSO established to ensure that its traffic-stop data is accurate and true, including the advent of TSMR, TSAU and the Technology Bureau's monthly meeting, its regular audits, and inspections of the searches taken place during traffic stops each month.

---

[18] MCSO has raised concerns regarding the Monitor's discussion of Paragraph 54.k in previous Comments related to the Monitor's insistence that MCSO use a consent to search form for each consent search, most recently in Doc. 3381-2 at 7–10. However, the Monitor has not included a statement that it will assess compliance with Paragraph 54.k on MCSO's mandatory use of a consent to search form. MCSO and the Monitor are now in alignment on this issue.

MCSO has developed a robust protocol to ensure that its traffic-stop data is accurate and true and should be found in Full and Effective Compliance with this Paragraph.

**Paragraph 65.** In the Draft Report at 90, the Monitor states the following:

> MCSO also makes a startling claim for this analysis in both the Executive Summary and Introduction, "MCSO does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order." We agree that one cannot know the extent of potential bias without investigating individual stops; however, while we agree that ETSIs provide the ability to document why stops are extended, this does not mitigate the potential for bias. To begin an analysis with that supposition, we believe, is inappropriate.

MCSO continues to reiterate that the quoted material was made in the TSAR 10's Executive Summary, which summarizes findings; thus, the statement is a conclusion, not a supposition. Indeed, an ETSI is purely for documentation and, therefore, is not a "traffic stop outcome" under the Court's Order. Because it merely describes factors that extended the traffic stop, it provides no value in determining potential bias. Although MCSO recognizes that inappropriate ETSI use can impact the outcomes that may indicate potential bias, that was not found in our research, which was complete prior to the introduction to the report being written. MCSO does not believe that ETSI use or nonuse alone could reasonably indicate potential bias. MCSO's statement that it "does not consider does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order" merely means that MCSO does not presume, one way or another, whether potential bias exists if it identifies disparities in ETSI use. The traffic stop outcomes the Monitor has operationalized as a result of the order are Stop Length, Citation Rates, Search Rates, Arrest Rates, Seizures following a Search.

MCSO, however, does want to expressly note its appreciation for the Monitor's recognizing that MCSO's TSMR process prompts a deputy's immediate supervisor to intervene quickly when issues arise as a result of the in depth TSMR review process. As noted by the Monitor on page 92, MCSO's ability to expediently address potential issues at the deputy level results from its incredible efforts of data collection and analysis and refinement of same. MCSO maintains that as the process continues to be refined and streamlined, TSAU along with a deputy's immediate supervisor will continue to monitor, identify, and intervene more expeditiously than any other law enforcement agency that MCSO is aware of. This monitoring, identifying, and intervening on deputy-level traffic stops goes to the core of the *Melendres* case and shows the incredible strides that MCSO has made—elevating MCSO to a national frontrunner in depth of traffic stop analysis and subsequent intervention.

Accordingly, MCSO believes that the Monitor should find MCSO in Full and Effective Compliance with this Paragraph.

**Paragraph 69.** In the Draft Report at 100–01, the Monitor discusses MCSO's history of asserting Full and Effective Compliance and what it believes must be resolved before finding MCSO is Full and Effective Compliance. As previously stated in it Comments to the Monitor's draft report, MCSO asserts that the Monitor conflates the requirements of this Paragraph with perceived requirements of other Paragraphs. This Paragraph requires MCSO supervisors to review collected data for the deputies under their command monthly for warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of Immigration-Related Laws. MCSO already does

this, has been in compliance with these requirements as determined by the Monitor for over three years and is, therefore, entitled to FEC status on this Paragraph.

Any issue the Monitor has with how MCSO documents or collects data on its NTCF or other form has absolutely no impact on compliance with Paragraph 69, which only assesses the actions of MCSO Supervisors. To date, the Monitor has not squarely addressed MCSO's objections to the Monitor's incorporation of other Paragraph requirements into this Paragraph. Again, MCSO requests that the Monitor limit its assessment methodology for Paragraph 69 to the specific requirements of Paragraph 69 and not include requirements specifically addressed in other Paragraphs.

MCSO continues to actively address the Monitor's concerns and has implemented all data points required by the Monitor in MCSO's NTCFs. Although MCSO has agreed to perform the NTCF analysis, MCSO maintains that the analysis required by the Monitor goes beyond the limitations of the Court's Orders, which must be limited to the harms alleged in the initial complaint. [Doc. 606 at 1–2:21-2:7; Doc. 1765 at 6:7-16; *see also* Docs. 2830, 3076]. MCSO has and continues to actively engage the Monitor, the parties, and the parties experts to determine how to analyze the NTCFs.

MCSO reiterates its previous concern that it cannot constantly be subject to moving goalposts, as has been the case with this Paragraph. The Monitor should not hold MCSO out of compliance every time it identifies a new data point and analyzes it. Otherwise, MCSO will *never* be in compliance because, under that framework, each new data point would necessarily imply that it is out of compliance. Rather, MCSO's continued process of identifying additional points of analysis and identifying an analytical framework in and of itself puts MCSO in Full and Effective Compliance with the requirements of the Paragraph. Accordingly, MCSO requests that the Monitor amend its Draft Report and find that MCSO is in full and effective compliance with Paragraph 69.

**Paragraph 70.** MCSO disagrees with the Monitor's conclusion that MCSO is not in compliance with Paragraph 70. MCSO also requests that the Monitor clarify the standard for compliance for Paragraph 70. MCSO contends that to comply with Paragraph 70, it must: (1) conduct the required traffic-stop analyses; (2) closely monitor disparities identified in the analyses that show evidence of potential bias; and (3) identify and follow through on actions to attempt to reduce disparities. As discussed in MCSO's most recent Quarterly Reports Docs. 2994, 3043, 3086, 3115, 3145, 3205, 3332, 3424), MCSO is completing all required traffic stop reports and taking actions in response to the information in those reports. Compliance with Paragraph 70 is not measured by whether the disparate outcomes identified in the statistical studies are reduced or eliminated in subsequent traffic stop analyses. Rather, it requires reasonable monitoring and follow up regarding identified disparities. [*See* 11/26/2019 Tr. at 36 (Court noting that if MCSO is "taking all reasonable steps and all actions [MCSO] can in implementing that plan and − . . . the statistics still are not moved, then I think that's something that goes to MCSO's credit, not . . . detriment")]. To hold otherwise creates an impossible standard that will all but ensure MCSO will never reach compliance with this Paragraph.

In prior reports, the Monitor has described compliance as "[b]ased on the agency's own analysis of traffic stop data." (Doc. 3074 at 94.) As discussed above, that is an incorrect measure of compliance with Paragraph 70. The fact that MCSO is conducting the analysis, monitoring disparities, identifying ways to follow through on understanding disparities and attempt to reduce them, and intervening at the deputy level when appropriate is enough to comply with the requirements of this Paragraph. **Based on the appropriate standard, MCSO asserts that it is in compliance with Paragraph 70**

**as explained in MCSO's 41st, 42nd, 43rd, 44th, 45th, and 46th Quarterly Reports** (Docs. 3086, 3115, 3145, 3205, 3332, and 3424).

Finally, in the Draft Report at 100, the Monitor states that "In TSAR 8, published in June 2023, and TSAR 10, published in June 2025, MCSO reported finding some significant outcome disparities that may indicate bias within the patrol function." However, MCSO has investigated all disparities and do not identify bias as the cause of the disparities. MCSO has a comprehensive understanding of the causes of disparities and have concluded that they are not caused by bias and indicated that in the TSAR 10 report "Through our quarterly reports, ongoing Traffic Stop Monthly analyses and reviews of deputy activity, MCSO is able to identify disparities across these benchmarks that are the result of factors other than bias or discriminatory policing. Upon review of statistically significant TSMR findings from ongoing research the Court Monitor has concurred with MCSO that the inequalities in traffic stop outcomes were not associated with bias." (pg. 34).

The other aspect of compliance with Paragraph 70 is the CPP, approved in 2017. As described in MCSO's nine, recent Quarterly Reports (Docs. 2957, 2994, 3043, 3074, 3115, 3145, 3205, 3332, and 3424), MCSO has completed the goals of the CPP and is in compliance with the goals that require ongoing action. Nevertheless, the Monitor has not found MCSO in compliance with the CPP. MCSO requests that the Monitor articulate the standard for assessing compliance under Paragraph 70 and the CPP. In the meantime, MCSO offers the following comments on some of the Monitor's assessment of the CPP goals:

Under Goal 1 of the CPP, the Monitor in the Draft Report at page 104 suggests additional reporting measures for MCSO's town hall meeting "will better serve MCSO as it seeks compliance with this Paragraph." MCSO, though, has informed the Monitor that it utilized the sworn component of TSAU to physically meet with MCSO personnel at Districts 1, 2, 3, 4, and 7, and Lake Patrol. The meetings provided hands-on, one-on-one mentoring to deputies, supervisors, and command personnel and covered the topics of TSQR17, TSQR18, TSAR10, and the search information compiled in VSCF. MCSO submits that it is in compliance with Goal 1 of the CPP.

Under Goal 2 of the CPP, "MCSO will ensure that supervisors are held accountable for deputy outcomes through the Employee Performance Appraisal process." (Doc. 2120-1 at 6.) MCSO continues to hold supervisors accountable through the Employee Performance Appraisal ("EPA") process, with EPAs showing significant improvement. The Employee Retention and Performance Division ("ERPD") continued its review of EPAs for all sworn supervisors and for deputies who received an overall rating of Exceptional, Improvement Needed, or ratings that were inconsistent with individual section scores. These audits provide constructive feedback to raters and their chain of command, ensuring EPAs for sworn employees meet the quality standards outlined in MCSO Policy GC-4(S), Sworn Employee Performance Appraisals and Management, and align with the intended use of the Performance Management Guide. Thus, MCSO asserts it is in compliance with Goal 2.

Under Goal 3, MCSO was developing a CPP Enhanced Training program during this Quarter. On page 104 of the Draft Report, the Monitor states that MCSO did not "produce any new materials to support roll call briefing or Captains' meetings materials during this reporting period." In accordance with previous agreements, published and acknowledged in the 38th Quarterly report by the Monitoring Team, the training division will produce roll call briefings and or Captain's Meetings when it identifies appropriate topics related to TSAR or Traffic Stops. There is no quarterly requirement or specific number of briefings required anymore. Regarding the training, the 2025 TSAR enhanced training class

58

was under development during this quarter which is a well understood cycle since the TSAR is published in June at the end of 2nd QTR and development starts after that. MCSO sought approval for the completed content in Q4 2025. This is consistent with past years. However, the Monitor reviews additional data to determine that MCSO has provided the required training. The Monitor does not state that the enhanced training was not provided; thus, MCSO asserts that it is in compliance with Goal 3.

Under Goal 4, "MCSO will develop training and roll call briefing that addresses lawful factors to rely on when taking discretionary law enforcement action and the importance of the guardian mindset." MCSO has been consistently providing the required Goal 4 trainings, and it will continue to do so. Because of its work over the past several years to provide the trainings required by Goal 4, MCSO asserts that it is in compliance with Goal 4 and the Monitor's report does not provide any basis for why it has not held MCSO in compliance with this goal and what basis it is using to measure compliance.

Under Goal 5, "MCSO will provide deputies and supervisors with enhanced cultural competency training and roll call briefings based on community input." [Doc. 2120-1 at 12]. MCSO's ongoing training, including the trainings described above, fulfills its responsibilities under Goal 5. The Draft Report at 105 states that someone "asserted" that MCSO that other distribution methods for the survey may intimidate persons from participating in the survey. To be clear, MCSO invites a survey response on every traffic stop receipt produced, including citation, warnings, incidental contacts, and passenger contacts and has not received any complaints regarding the survey.

Additionally, the Monitor states at 105 of the Draft Report that despite the "dismal returns of the traffic survey, MCSO has not changed its distribution method." This is inaccurate. MCSO has made several efforts to increase response rate years ago, including adding a QR code and providing and bolding an invitation to the survey to every person with whom deputies interact on traffic stops on the citation, warning, and passenger contact receipts and incidental contact forms. But MCSO has no control over whether the general population fills out traffic surveys. Furthermore, the .2% response rate is right at expected results for receipt-based surveys. The Monitor's description is inappropriate. Again, the Monitor's Draft Report does not provide any basis for why it has not held MCSO in compliance with this goal or what basis it is using to measure compliance.

Under Goal 6 of the CPP, the Monitor in the Draft Report at 105 report states of the latest annual report: "The report highlights significant differences between all minority drivers and white drivers for stop length and citation rate." This is incorrect. There were no disparities identified for citation rate. There were disparities between Black and Hispanic drivers and white drivers for stop length. MCSO also found differences in arrests for all three comparisons with White drivers: Black, Hispanic, and all Minorities. MCSO also had statistically significant differences in Search rates for all Minorities.

MCSO agrees with the Monitor's assessment of Goals 7–8.

Finally, under Goal 9, "MCSO will support best practices that result in the hiring and retention of personnel who believe in constitutional policing and working to define and deliver a vision of community safety that is shared by Maricopa County's diverse populations." (Doc. 2120-1 at 17.) MCSO continues its ongoing efforts to address staffing issues. Staffing issues are not peculiar to MCSO but plague agencies across the country. Employee referral incentives also continue. Command

staff continues ongoing discussions with the County related to step-plans and law enforcement/detention compensation increases.

MCSO continues to utilize a variety of advertising venues and markets to enhance and expand recruiting efforts—primarily for Detention Officer and Deputy Sheriff positions. The expansion of digital marketing is working to attract candidates from states bordering Arizona. Additionally, the Community Outreach Unit assumed responsibility for community outreach, engaging new applicants through targeted outreach, and arranging interviews with the Sheriff on new media channels. This extended outreach enables the Sheriff and Undersheriff to encourage more interest in the law enforcement profession overall and continues to encourage applicants. The Community Outreach team conducted several recruiting events at sports venues, schools, and various career fairs.

Although the Monitor's Draft Report notes a variety of statistics involving MCSO's hiring during the relevant period both in the new employees hired as well as its sworn and detention academy, the Report does not indicate how or why MCSO is not in compliance with Goal 9. MCSO asserts that it is in compliance.

As in other recent Quarterly Reports, the Monitor notes that MCSO and the other parties have been discussing Paragraph 70 and the CPP. The Draft Report at page 107 states: "Our compliance assessment remains based on the existing Constitutional Policing Plan and the results of traffic stop data analysis reports, as well as MCSO's response to those reports—both operationally and with training." As stated in previous Comments, MCSO has tried to elicit a written response from ACLU regarding why Plaintiffs' contend that MCSO is not compliant with the P70/CPP. The ACLU has historically been quiet regarding the issue. In the Third Quarter 2025, the ACLU did not provide any written commentary on MCSO's compliance efforts regarding P70/CPP, stating only that it would provide a comment on MCSO's position that it complies with P70/CPP as "part of a motion to the Court." MCSO has had great difficulty with Plaintiffs' position that they do not need to weigh in on issues related to P70/CPP especially since the Court has repeatedly commented that input from the Parties is a critical component to assessing compliance with P70/CPP. [*See e.g.*, Doc. 2401 – 4/22/19 RT at 20:12-14.]

**In sum, MCSO is in compliance with the requirements of Paragraph 70, including the CPP.** MCSO has and continues to complete all required analyses and has provided written responses to all disparities identified in the analyses. The identified disparities are miniscule, and MCSO has taken action to respond to and correct the disparities. The Court's Order does not require reduction or elimination of all disparities. Paragraph 70 requires that MCSO take **"_reasonable steps_"** to measure, monitor, and intervene, which MCSO has been doing since April of 2021 when the TSMR program was established. Even before then, MCSO complied with all TSAR and TSQR requirements.

Nevertheless, on page 107 of the Draft Report the Monitor states that "We believe that the work and suggestion of the IRG to these ongoing analytical reports is crucial in supplying the direction of changes needed to training, policy, and practice." MCSO agrees that the suggested work is useful but just because MCSO's work is ongoing does not mean MCSO has not complied with the requirements of Paragraph 70. MCSO has completed the requirements of CPP and Paragraph 70 years ago and should, accordingly, be held in compliance with this Paragraph.

Indeed, MCSO is already doing more to evaluate, monitor, and intervene when necessary than most, if not all, other agencies in the United States, and more than that is required by the Court's Orders in

this case. MCSO's traffic stop outcomes exceed what typical agencies that attend the National Association for the Civilian Oversight of Law Enforcement Agencies conference have been doing. Those who refuse to believe these contentions have not provided any information to the contrary, despite MCSO's request that they do so. Nevertheless, MCSO's continuing efforts and results should be recognized as part of any critique.

**Paragraph 71.** As it has with previous drafts, on page 108 of the Draft Report, the Monitor states that "MCSO claims that the agency 'do[es] not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order.' MCSO does not agree with the placement of this statement at the outset of the investigation and have raised the issue with MCSO. MCSO believes that this is an empirical question that should be answered through analysis – and not something that should be stated as an *a priori decision*."

Although MCSO acknowledges and understands the Monitor's concern—preconceived notions can bely empirical evidence—MCSO continues to reiterate that an ETSI is purely for documentation and, therefore, is not a "traffic stop outcome" under the Court's Order. Indeed, because ETSIs merely describe factors that extended the traffic stop, they provide no value in determining potential bias. MCSO recognizes that ETSI use can capture the outcomes that may indicate potential bias, but MCSO does not believe that use or nonuse of ETSIs in and of itself could reasonably indicate potential bias. MCSO's statement that that it "does not consider racial/ethnic difference associated with Extended Traffic Stop Indicator use as a measure of potential bias as defined by the Second Order" merely means that MCSO does not presume, one way or another, whether potential bias exists as a result of an ETSI's use. The traffic stop outcomes the Monitor has operationalized as a result of the order are Stop Lengths, Citation Rates, Search Rates, Arrest Rates, Seizures following a Search. The documentation of an ETSI has no impact on the community member and they will have no idea that ETSI has been documented. Accordingly, MCSO asks that the Monitor rescind its above statement on 108 of its Draft Report.

## Section 8. Early Identification System ("EIS")

**Paragraph 72.** MCSO has been and is using the EIS as intended by this Paragraph and continues to make improvements and, therefore, asserts that it is in Phase 2 compliance with this Paragraph. Compliance with Paragraph 72 is not contingent upon completion and implementation of any singular project. Paragraph 72 merely requires MCSO to develop, implement, and maintain a computerized EIS, but does not require specific protocol for using the EIS, which is the subject matter of a different paragraph, Paragraph 81.a. and 81.b.

The Monitor has never adequately addressed MCSO's objections to the Monitor's incorporation of other Paragraphs' requirements into this Paragraph. MCSO again requests that the Monitor limit its assessment methodology for Paragraph 72 to the specific requirements of Paragraph 72 and not include requirements specifically addressed in other Paragraphs. MCSO therefore requests the Monitor amend its Draft Report and find that MCSO complies with Paragraph 72.

**Paragraph 74.** MCSO notes that it remains in Full and Effective Compliance with Paragraph 74. But to address the Monitor's continued comment about concerns that the Monitor has about data collection without a Consent to Search Form, MCSO provides the following note.

As previously stated, to the extent that a Consent To Search Form ("CTSF") collects data that the BWC or other forms cannot collect, MCSO has already informed the Monitor that it is willing to include the data points in other forms or engage in further training to address any implementation issues. Moreover, MCSO has already explained that it captures the 26 discrete data points currently identified by the Monitor Team in the CTSF on either the VSCF or the NTCF, which the Monitor Team believes are required under the Court's Orders. When MCSO requested that the Monitor identify which data is supposedly not currently tracked by the VSCF or NTCF, the only data point mentioned by the Monitoring Team during the February site visit was the "Revoked" option on the CTSF, which is not currently on either the VSCF or the NTCF. This data point was added to both on August 28, 2025, and permits documentation of all possible outcomes, which the review of the BWC or other digital recording device can confirm, further evidencing MCSO's compliance with this and other Paragraphs, including Paragraphs 72, 79, and 81. Additionally, Paragraph 74 merely requires MCSO to develop and implement 1) a protocol setting out the fields for historical data; 2) deadlines for inputting data; and 3) individuals specifically responsible for capturing and inputting data. The Paragraph simply put does not require a specific protocol or MCSO to complete the implementation of a specific project, which—if relevant under the Orders—would be the subject matter of a different paragraph, Paragraph 81.a. and 81.b.

MCSO agrees with the Monitor that it remains in Full and Effective Compliance with this Paragraph.

**Paragraph 79.** As MCSO has previously commented, Paragraph 79 merely requires that the "EIS computer program and computer hardware will be operational, fully implemented, and be used in accordance with policies and protocols that incorporate the requirements of this Order within one year of the Effective Date." Paragraph 79 does not require specific protocol for using the EIS, which is the subject matter of different Paragraphs 81.a. and 81.b.

Nevertheless, the Monitor appears to hold MCSO out of compliance as MCSO is working on an analytical plan for NTCFs. MCSO has actively engaged in producing an analytical plan and has, in subsequent quarters, provided the Monitor and parties drafts of the plan for comment. Nevertheless, although MCSO has agreed to perform the analysis, MCSO maintains that the analysis that the Monitor requires goes beyond the limitations of the Court's Orders, which must be limited to the harms alleged in the initial complaint. [Doc. 606 at 1–2:21-2:7; Doc. 1765 at 6:7-16; *see also* Docs. 2830 and 3076]; *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (the Court's Injunctive Orders must be narrowly tailored to give only the relief to which plaintiffs are entitled); *Melendres v. Arpaio* (*Melendres II),* 784 F.3d 1254, 1265 (9th Cir. 2015) (it has long been "held that injunctive relief must be tailored to remedy the specific harm alleged." (cleaned up)); *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 729 n.1 (9th Cir. 1983) ("[I]njunctive relief should be narrowly tailored to remedy the specific harms shown by plaintiffs, rather than to enjoin all possible breaches of the law." (cleaned up)).

The fact that MCSO has engaged with the Monitor and the Parties to develop and place into production of an analytical approach for review of the VSCF and NTCF does not mean that the Monitor's requirement of same falls under the Court's Orders. The Monitor, Parties, and MCSO's actions cannot, in effect, unilaterally modify or otherwise establish the terms of the Court's Injunctive Orders. Only the Court can do that. Because the Monitor's requirement goes beyond relief that the Court can and has mandated, MCSO maintains and asserts that it is in compliance with Paragraph 79.

To date, the Monitor has not adequately addressed MCSO's objections to the Monitor's incorporating other Paragraphs' requirements into this Paragraph or otherwise imposing requirements that go

beyond the limitations of the Court's Orders. MCSO again requests that the Monitor limit its assessment methodology for Paragraph 79 to the specific requirements of Paragraph 79 and not include requirements specifically addressed in other Paragraphs. The Monitor's Draft 46th Report shows how MCSO continues to use the EIS as required by this Paragraph. Thus, MCSO requests that the Monitor modify its finding that MCSO is not in compliance with Phase II of this Paragraph to finding that MCSO is in compliance with Phase II of this Paragraph.

**Paragraph 81.a. and 81.b.** According to the Draft Report, MCSO is in compliance with all subparts of Paragraph 81, except for a and b. The barrier to compliance appears to be MCSO's completion of the NTCF analytical plan. MCSO has been and continues to make progress on the work that needs to be done on the NTCF, including updated the NTCF and VSCF forms to include all data points requested by the Montor. MCSO has finalized the NTCF form and published it in April of 2025 and provided it to patrol deputies. Modifications to the form capturing the additional consent search questions requested by the Monitor, an attachment to the NTCF policy (EA-3) providing procedures for filling out the form have been deployed in subsequent quarters, along with an analysis plan. Additionally and as stated above in its Comment to Paragraph 79, while MCSO has agreed to perform the analysis, MCSO maintains that the analysis that the Monitor requires goes beyond the limitations of the Court's Orders, which must be limited to the harms alleged in the initial complaint.

## Section 9: Supervision and Evaluation of Officer Performance

MCSO does not have any comments to Section 9 of the Monitor's Draft Report.

## Section 10: Misconduct and Complaints

**Paragraph 102.** MCSO has been in Full and Effective Compliance since December 16, 2020. During Third Quarter 2025, MCSO received 60 internally generated complaints. On page 164 the Monitor states, "MCSO has continued to identify and address misconduct that is raised by other employees or identified by supervisory personnel. While some of these investigations did not meet all requirements for the proper reporting or completion of misconduct investigations, we address these failures in other Paragraphs in this report." Accordingly, MCSO maintains that it should be held in Full and Effective Compliance.

Nevertheless, without any warnings in any previous Quarterly Report, on pages 164–165 of his Draft Report, the Monitor finds that MCSO is out of compliance for the alleged four bases discussed in MCSO's Comment to Paragraphs 14–17. As discussed in detail above, the Monitor lacks any foundation for its finding.

Moreover, this Paragraph places requirements on MCSO personnel, including Chief Palopoli and Undersheriff Gentry (as well as Captain Lugo), to report alleged and apparent misconduct. The Monitor inexplicably punishes Chief Palopoli and Undersheriff Gentry for complying with the mandates of this Paragraph, for all of the reasons discussed in response to the Monitor's Section 12.

**In sum**, The Monitor has no legitimate basis to find MCSO out of compliance with this Paragraph. MCSO requests that the Monitor rescind and remove its findings as part of this Paragraph and again

find MCSO in Full and Effective Compliance with Paragraph 102 as it has been since December of 2020.


**Section 11: Community Engagement**

**Paragraph 115.** In the Draft Report at 169 the Monitor explains that, during the last reporting period, it determined that MCSO is not in compliance with this Paragraph, "due to MCSO's failure to attend the CAB's community meeting to hear concerns from the members of the Plaintiffs' class who attended." The Monitor provides no other reason for holding MCSO out of compliance with Paragraph 115. MCSO disagrees and asserts that not only did it comply with the requirements of this Paragraph in this Quarter, but it should be in Full and Effective Compliance with this Paragraph as previously stated. [Doc. 3268-2 at 17–18; Doc. 3205 at 91–93; 3198-2 at 10–13; 3145-1 at 86].

To reiterate, MCSO's not attending a CAB meeting in Fourth Quarter 2024 should not mean MCSO is not in compliance with this Paragraph in the *Third Quarter 2025*. MCSO understands the regrettable decision not to attend that meeting; however, that decision came from different leadership, liaisons, and much progress has been made since then. In addition, the Monitor appears to be holding MCSO out of compliance for failing to attend a single CAB meeting – something the Court's orders were expressly modified to no longer require. [*See* Doc. 2431]. Given that MCSO does not have mandatory attendance at CAB meetings (but of course always attempts to attend), there is no justification (nor has there ever been justification) to take MCSO out of compliance with this Paragraph for this reason. Once again, a single instance of non-required non-attendance over two years ago is continuing to serve as the basis for the Monitor's continued assertion of non-compliance. This is entirely improper.

The Monitor's assessment does not mention or address the number of times MCSO has requested to attend CAB meetings and not been allowed to or the number of meetings that were dismally attended by CAB members while trying to build bridges. In fact, MCSO has not missed a CAB meeting in the relevant Quarter, or previous two quarters, and has engaged with the CAB in various capacities, including continually providing the CAB with Order-related policies. TSAU has held special presentations to teach CAB Members about the TSMR Process and every request for information from the CAB has been addressed. In fact, meetings between the CAB and the Sheriff have been scheduled and are now being held on a regular basis.

MCSO will continue to engage the CAB and seek the CAB's input regarding its compliance with the Court's Orders and engage with the CAB regarding the CAB's facilitating communications between community members and MCSO, as it has done in this Quarter. MCSO continues to recognize and acknowledge the harms to the Plaintiff Class as found by the Court with every single policy revision, every update to forms, every traffic stop study, every follow-up, and every misconduct investigation and the attendant time, effort, resources, and manpower used to implement the changes. MCSO further recognizes the diverse voices of the Plaintiff Class, the CAB, and the community and will continue to engage in an open, honest, and transparent communal dialogue whereby members of the community and MCSO, along with the Monitor, can exchange information and ideas related to the *Melendres* case.

MCSO finds the Monitor's statement that "only when MCSO leadership acknowledges that and approaches the CAB with a genuine desire to listen and learn will MCSO and the CAB–and by extension, the affected community–begin to rebuild trust" to be somewhat disingenuous. As said

above, MCSO leadership and the CAB Liaisons have been communicative, helpful, and trying to work with the CAB for over a year despite inconsistent responses from the CAB. MCSO has been and continues to operate with the CAB in a good-faith effort and with a genuine desire to listen and learn from them. The quarterly Site Visit Meetings related to the CAB are always cordial.

The Monitor's punitive finding of "not in compliance" due to a decision that was made so long ago is not simply reflective of MCSO's efforts. Accordingly, MCSO requests the Monitor amend its Draft Report and find, at a minimum, that MCSO has complied with the requirements of Paragraph 115 for this Quarter.

**Section 12: Misconduct Investigations, Discipline, and Grievances**

**Paragraph 163.** The Monitor has not previously assessed compliance for this Paragraph and does not provide a basis for doing so now. [*See, e.g.*, Doc. 3381; Doc. 3268].

Indeed, finding MCSO out of compliance with this Paragraph and Paragraphs 168, 169, 219–21, 288–89, and 291–92, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. These findings also involve the same issues as discussed regarding paragraphs 14–17. The bottom line is this: even if the Monitor were correct about the events regarding Sgt. Engelbeck's complaint (which it is not), this single instance is not sufficient to find that MCSO failed to comply with these paragraphs. Moreover, MCSO has documented the failures of the Monitor's investigation regarding this issue. The Monitor's findings lack any foundation.

Here, as in many other places in this Draft Report, the Monitor overlooks the realities of chain of command and MCSO employees' ability to communicate with each other about MCSO policies and procedures and the Court's Orders. Accordingly, MCSO requests that the Monitor rescind and remove its findings as part of this Paragraph.

**Paragraph 165:** MCSO has provided the Monitor with the policies for review as required by this Paragraph. MCSO has been in Full and Effective Compliance with this Paragraph since December 12, 2025. Nothing has changed in the 3rd Quarter 2025.

Nevertheless, on page 197 of the Draft Report, the Monitor finds that MCSO is out of compliance for the alleged four bases discussed in MCSO's Comment to Paragraphs 14–17. As discussed in detail above, the Monitor lacks any foundation for its finding.

Moreover, the specific requirements of this Paragraph have already been completed. This Paragraph's requirements set a specific protocol for MCSO's comprehensive review of then existing policies, procedures, manuals, and other applicable written directives to incorporate the requirements of the Court's Orders, which was completed years ago. MCSO requests that the Monitor rescind and remove its assessment and finding for this Paragraph and again find MCSO in Full and Effective Compliance with this Paragraph.

**Paragraph 166:** The Monitor never previously assessed this Paragraph for compliance.

Nevertheless, for the first time and without providing a reason to do so, on pages 197–98 of the Draft Report, the Monitor finds that MCSO is out of compliance for the alleged four bases discussed in MCSO's Comment to Paragraphs 14–17. As discussed in detail above, the Monitor lacks any foundation for its finding.

Moreover, the Monitor fails to state why he is now assessing this Paragraph when it had not done so in the past, much less stating a reasonable basis in his just now starting to assess this Paragraph. The Monitor further fails to state a methodology in assessing the requirements of this Paragraph. Accordingly, MCSO requests that the monitor rescind and remove its assessment and finding for this Paragraph.

**Paragraph 167.** This Paragraph and its subparts prohibits conflicts of interest of all internal investigations and in those assigned by MCSO to hold hearings and make disciplinary decisions and sets forth certain requirements when a conflict is identified. MCSO has been in Full and Effective Compliance with the requirements of this Paragraph since December 21, 2021. Nevertheless, the Monitor at page 200 of the Draft Report has taken MCSO out of compliance for this Paragraph, allegedly due to the agency "no longer in compliance with the requirements of Subparagraph 167.1.i.iii and therefore not in compliance with Paragraph 167." Paradoxically, however, Monitor states that the "our standard of review for this reporting period did not identify concerns with this subparagraph."

It appears Monitor has taken MCSO out of compliance for the issues regarding Captain Lugo and Sgt. Engelbeck, which are addressed in lengthy detail above. Here, the Monitor faults Chief Palopoli for *contacting* Jensen Hughes when she was trying to find an appropriate conflict investigator. MCSO quickly identified an independent law enforcement agency to conduct the investigation compliant with MCSO policies as stated above in response to the Monitor's Finding #5.

The Monitor on page 200 also alleges that MCSO violated this Paragraph when Chief Palopoli was allowed to meet with ADPS agents to discuss the allegations of IA 2015-0139 with them. However, Undersheriff Gentry appropriately had Chief Palopoli explain the details of her interactions with Capt. Lugo in order for ADPS to independently determine the scope of their investigation into IA 2025-0139. Chief Palopoli's presence was necessary because she was the complainant. Chief Palopoli had no further contact with ADPS.

Regardless, isolated (and unfounded) allegations alone should not take MCSO out of compliance with this Paragraph. Throughout the Third Quarter of 2025, the Monitor recognized that MCSO personnel sought to uniformly apply its policies and procedures and comply with the requirements of this Paragraph to report alleged or apparent violations of policy. Indeed, countless other actions— including those taken by MCSO command staff—have been to apply the policies and procedures uniformly. Accordingly, MCSO requests that the Monitor rescind and remove its findings for this Paragraph and again find MCSO in Full and Effective Compliance with the requirements of this Paragraph.

**Paragraph 168.** MCSO has been in Full and Effective Compliance with the requirements of this Paragraph since December 23, 2021. As stated on page 201 of its Draft Report, the Monitor did not identify any issues that would affect MCSO's compliance with this Paragraph during the reporting period.

Nevertheless, on page 201–02 of his Draft Report, the Monitor, once again, discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. Accordingly, MCSO requests that the Monitor rescind and remove this finding of noncompliance from its Report and again find MCSO in Full and Effective Compliance with the requirements of this Paragraph.

**Paragraph 169.** MCSO has been in Full and Effective Compliance with the requirements of this Paragraph since December 23, 2021. On page 202 of his Draft Report, the Monitor stated that there were no sustained findings of retaliation and apparently agreed with MCSO's assessment. Accordingly, MCSO should once again be found in Full and Effective Compliance with this Paragraph.

Nevertheless, on page 201–02 of his Draft Report, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above.. Accordingly, MCSO requests that the Monitor rescind and remove this finding of noncompliance from its Report and once again find MCSO in Full and Effective Compliance with the requirements of this Paragraph.

**Paragraph 173.** During Second Quarter of 2025, MCSO was in compliance with the requirements of this Paragraph. [Doc. 3381 at180.] During this Quarter, MCSO provided 44 files for review, 8 of which the Monitor advised were incomplete or lacked the required justification memorandum. MCSO provided the justification memorandums and corrected the errors long before the Monitor circulated this Draft Report.

Nevertheless, the Monitor has found MCSO out of compliance with this Paragraph. Critically, the Monitor points to the promotion of a detention captain to deputy chief during the first or early second quarter when MCSO never provided documentation as being "extremely concerning." But an isolated incident cannot take MCSO out of compliance with this Paragraph. Throughout the Third Quarter of 2025, the Monitor recognized that MCSO personnel provided all necessary documentation at the request of the Monitor and ensured all justification memorandum were part of every personnel file reviewed by the Monitor. In every instance in the Third Quarter of 2025, MCSO has provided the required information and ensured a complete file upon the Monitor's subsequent requests. The Monitor's taking MCSO out of compliance for an isolated mistake violates the Monitor's stated methodology. Accordingly, MCSO requests that the Monitor rescind and remove its findings as part of this Paragraph and find MCSO in compliance with the requirements of this Paragraph.

**Paragraph 194.** The Monitor based Phase 2 compliance with this Paragraph on "a review of completed misconduct investigations conducted by MCSO, the review of attendance by internal investigators at required Misconduct Investigative Training, the disciplinary backgrounds of internal investigators, and the efforts being made by the PSB Commander to reach compliance." (Draft Report at 194.) For this Paragraph, which addresses the PSB commander's responsibilities, if PSB is identifying and correcting deficiencies in District investigations, those investigations should be compliant. This Paragraph is not an evaluation of the districts' work, but the work of the PSB Commander. MCSO requests that the Monitor amend its methodology to reflect the requirements of this Paragraph. Based on the Paragraph's requirements, MCSO is in compliance with this Paragraph.

As stated in the Draft Report at 220, the Monitor found 28 of 186 administrative misconduct investigations non-compliant for deficiencies "other than timeliness." Except for timeliness, MCSO

investigations which the Monitor reviewed had a compliance rate of more than 85%. Even so, investigative compliance is not a requirement of this Paragraph, except as it relates the PSB Commander's identifying and correcting deficiencies that are not harmless errors. As discussed in its quarterly reports, MCSO considers a "harmless error" for purposes of this Paragraph as an error that would not affect the substantive rights of a principal or complainant nor would the error impact the outcome of the investigation.

On page 222 of his Draft Report, the Monitor states that "[I]n many cases, there are also deficiencies such as administrative failures, or incomplete paperwork, to include but not be limited to: failure to offer an in-person interview; failure to complete all required notifications; failure to record all interviews; failure to separate allegations; failure to document all witness information; and failure to include all information required for review. While we note these deficiencies in the appropriate Paragraphs, we do not generally find these cases noncompliant unless there are numerous deficiencies. MCSO's overall compliance findings would be far lower than they currently are if we found MCSO out of compliance for every deficiency we identify." MCSO agrees with those particulars listed by the Monitor as being "harmless errors." It may very well be that MCSO and the Monitor are on, or at least very close to being on, the same page regarding what constitutes a "harmless error" for purposes of this Paragraph. Starting in the Second Quarter 2026, MCSO will track the investigations that the Monitor identifies as not being in compliance and will review if they fit into the "harmless error" definition and discuss with the Monitor as appropriate.

Next, although timeliness of investigations remain a paramount concern that MCSO has addressed through various proposals to increase PSB personnel working on misconduct cases, Paragraph 204, as amended, establishes the appropriate timeliness requirements and not Paragraph 194. MCSO asserts that the Monitor has and is violating its own methodology by conflating the requirements of multiple Paragraphs and importing the requirements of unrelated Paragraphs into this Paragraph. MCSO asks that the Monitor adhere to the Court's Orders and its own methodology and analyze MCSO's compliance with each particular Paragraph according to that Paragraph's own, unique requirements without reference to unrelated Paragraphs.

**Paragraph 211.** MCSO continues to object to the Monitor's method of assessment for compliance with Paragraph 211 because it far exceeds the actual requirements of Paragraph 211 and, instead, imports requirements from other Paragraphs. For example, the Monitor's assessment of compliance with Paragraph 211 includes a timeline evaluation for completion of administrative investigations, which is a requirement of Paragraph 204, not Paragraph 211.

MCSO maintains that the Monitor is holding MCSO out of compliance based on a timeliness requirement to complete the misconduct investigations. The timely completion of all misconduct investigations is a paramount concern to MCSO. Nevertheless, Paragraph 204 as amended establishes the appropriate timeliness requirements and not Paragraph 211. MCSO asserts that the Monitor has and is violating its own methodology by conflating the requirements of multiple Paragraphs and imports the requirements of unrelated Paragraphs into this Paragraph. MCSO asks that the Monitor adhere to the Court's Orders and its own methodology and analyze MCSO's compliance with each particular Paragraph according to that Paragraph's own, unique requirements without reference to unrelated Paragraphs.

**Paragraph 219.** The Monitor has not traditionally assessed MCSO for compliance with Paragraph. Nevertheless, on page 249 of his Draft Report, the Monitor once again discusses the issues

surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. Moreover, the Monitor provides no basis, much a reasonable and good faith basis, for now assessing compliance for this Paragraph.

The Monitor discusses an issue regarding the *Brady* list and reopening of investigations. MCSO addressed this issue at length in its discussion in Section 12. Again, it is improper for the Monitor to find MCSO out of compliance based purely on questions its personnel ask, especially of those who are subject matter experts on the Court's Orders.

The Monitor also suggests that "Deputy Chief Summers violated Paragraph 219 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with the knowledge that Captain Morrison was not a qualified candidate." The Monitor's blatant mischaracterization of Chief Summer's communications with the Monitor must be rescinded. Indeed, not shared in the Monitor's report is that MT member Chief Rojas had advised Chief Summers that the MT would need to conduct a re-review of the referenced cases as part of their reviewing Capt. Morrison's personnel file. Moreover, MCSO fails to see how Chief Summer's submitting a memorandum as part of the Paragraph 268 request process violated the Court's Order, much less the requirements of this Paragraph. The submission of a transfer request for Captain Morrison was a procedural act permitted under the Second Order. The MT fails to identify any policy that prohibits MCSO from requesting a transfer or providing context for that request—indeed the Court's Orders recognize that justification memorandum can be attached to the files. Deputy Chief Summers' memorandum constituted a comprehensive disclosure in compliance with the requirements of Paragraphs 268, not a circumvention of policy. By proactively documenting Captain Morrison's past cases—including closed investigations for which he had served his discipline—MCSO ensured that the Monitor had a full record for review. Providing "mitigating factors" is a standard part of an administrative evaluation to determine current fitness for duty and does not undermine the validity of the original sustained findings or this Paragraph.

**In sum**, the Monitor has not articulated any basis to suddenly hold MCSO out of compliance with this Paragraph and MCSO requests that the Monitor rescind its findings for this Paragraph.

**Paragraph 220.a and 220.g.** Paragraph 220 places requirements on the Sheriff to ensure consistency in the imposition of discipline, including review of MCSO's "current disciplinary matrices and, upon approval of the parties and the Monitor, amend them." MCSO complied with the requirements of this Paragraph and has been in Full and Effective Compliance since April 8, 2024.

On page 253, the Monitor states that "[d]uring this reporting period, all of the sustained investigations were both initiated and completed after May 18, 2017; and are subject to all the requirements relative to investigations and disciplinary procedures contained in policies revised on that date and have both a discipline range and a presumptive discipline. The Appointing Authority provided a written justification in all sustained cases where he made the final decision." The Monitor disagreed with only *one* action by the AA, accordingly, MCSO should remain in Full and Effective Compliance with this Paragraph.

Nevertheless, the Monitor has found MCSO out of compliance with this Paragraph as a result of its inquiry, including subparagraph 220.a, which requires the Sheriff "establish a presumptive range of discipline based on an employee's prior violations," and subparagraph 220.g, which requires the Sheriff "clearly define forms of discipline and define classes of discipline as used in policies and operations

manuals." MCSO discussed the issues around the DUI policy and questions arising to that policy at length in its Section 12 findings. The Monitor has not identified any other reason for its finding. MCSO should remain in Full and Effective Compliance with this Paragraph.

**Paragraph 220.i.** The Monitor has found MCSO out of compliance with subparagraph 220.i based on its Findings from Section 12, especially those related to Chief Holmes, which are discussed at length above. Again, inquiries simply do not amount to a violation of a Court Order or MCSO Policy, and the Monitor fundamentally misunderstands Chief Holmes's authority. Accordingly, MCSO requests that the Monitor rescind and remove its finding of noncompliance from its Report and find MCSO in compliance with this subparagraph.

**Paragraph 220.k.** The monitor again references Deputy Chief Summers P.268 transfer memo related to Captain Morrison, which is addressed at length above in MCSO's response to the Monitor's Findings from Section 12 and in MCSO's specific response to Paragraph 219 above. Thus, the Monitor's criticism is entirely unfounded in this regard. MCSO requests that the Monitor rescind and remove this finding of noncompliance from its Report and find MCSO in compliance with this subparagraph.

**Paragraph 220.l and Paragraph 220 generally.** On Page 253 and 254 of his Draft Report and after it's normal assessment of Paragraph 220's subparts, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. Accordingly, MCSO requests that the Monitor rescind its findings for this subparagraph and Paragraph and again find MCSO once again in Full and Effective Compliance with Paragraph 220.

**Paragraph 221.** MCSO has been in Full and Effective Compliance since September 24, 2021, and as the Monitor concedes on page 254, "met the requirements for compliance with this Paragraph" during the reporting period.

Nevertheless, on Page 254 after its normal assessment of this Paragraph, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. Accordingly, MCSO requests that the Monitor rescind and its finding of noncompliance for this Paragraph and once again find MCSO in Full and Effective Compliance with this Paragraph.

**Paragraph 223.** MCSO has been in Full and Effective Compliance with this Paragraph since September 24, 2021. During this reporting period, the Monitor states on page 255 that a Pre-Determination Hearing occurred for all 16 sustained investigations as required by the Paragraph. Accordingly, MCSO should again be found in Full and Effective Compliance with this Paragraph.

The Monitor nevertheless determines that MCSO is not in Full and Effective Compliance based on its Findings from Section 12, especially those related to Chief Holmes, which are discussed at length above. Again, inquiries simply do not amount to a violation of a Court Order or MCSO Policy, and the Monitor fundamentally misunderstands Chief Holmes's authority. Accordingly, MCSO requests that the Monitor rescind and remove its finding of noncompliance from its Report and find MCSO in compliance with this subparagraph. Accordingly, MCSO requests that the Monitor acknowledge its approval of Mr. Holmes as the AA since 2026 and its silence on this issue and Paragraph until now

70

choosing to penalize MCSO for something it condoned for 10 years. MCSO should again be found in Full and Effective Compliance with this Paragraph. MCSO requests that the Monitor rescind and remove this finding of noncompliance from its Report.

**Paragraph 226.** MCSO has been in Full and Effective Compliance since January 6, 2023. As stated on page 257, the AA imposed serious discipline on 15/16 cases he heard and provided a written justification for all 16 cases. Accordingly, MCSO should again be found in Full and Effective Compliance with this Paragraph.

Nevertheless, on pages 257–58, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. These findings also involve the same issues as discussed regarding Paragraphs 14–17. The bottom line is this: even if the Monitor were correct about the events regarding Sgt. Engelbeck's complaint and Chief Holmes's actions (which it is not), this single instance is not sufficient to find that MCSO failed to comply with these paragraphs. Moreover, MCSO has documented the failures of the Monitor's investigation regarding this issue. The Monitor's findings lack any foundation.

Accordingly, MCSO requests that it again be found in Full and Effective Compliance with this Paragraph, and that the Monitor rescind and remove its finding of noncompliance from its Report.

**Paragraph 227.** MCSO has been in Full and Effective Compliance since March 16, 2021. During this reporting period, the Monitor has stated that there have been no indications or instances of violations of the discrete requirements of subparagraphs a through c.

Nevertheless, on page 259, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. These findings also involve the same issues as discussed regarding paragraphs 14–17. The bottom line is this: even if the Monitor were correct about the events regarding Sgt. Engelbeck's complaint and Chief Holmes's actions (which it is not), this single instance is not sufficient to find that MCSO failed to comply with these paragraphs. Moreover, MCSO has documented the failures of the Monitor's investigation regarding this issue. The Monitor's findings lack any foundation.

Accordingly, MCSO requests that the Monitor again find MCSO in Full and Effective Compliance with this Paragraph and that the Monitor rescind and remove its finding of noncompliance from its Report.

**Paragraph 228.** This Paragraph clarifies when the Sheriff or his designee has authority to rescind, revoke or alter disciplinary decisions and provides limitations of his doing so that is consistent with Arizona law. MCSO has been in Full and Effective Compliance since March 16, 2021. During this reporting period, the Monitor has stated that there have been no indications or instances of violations of the discrete requirements of this Paragraph.

Nevertheless on page 260, the Monitor stated that it is finding MCSO out of compliance based on its Findings from Section 12, especially those related to Chief Holmes, which are discussed at length above. Again, inquiries simply do not amount to a violation of a Court Order or MCSO Policy, and the Monitor fundamentally misunderstands Chief Holmes's authority. In fact, the Monitor's Findings 1–5 cannot be the basis for the Monitor's findings MCSO not in compliance of the requirements of

71

this, or any, Paragraph. Accordingly, MCSO requests that the Monitor rescind and remove its finding of noncompliance from its Report and find MCSO in compliance with this paragraph.

## Section 13: Community Outreach and Community Advisory Board

MCSO does not have any comments to Section 13.

## Section 14: Supervision and Staffing

**Paragraph 266.** As a result of MCSO's duties to continually monitor, identify, and intervene, MCSO has similarly identified multiple instances per quarter where posse members worked full shifts in districts on patrol assistance and responded to calls for services without having been entered onto the shift roster. MCSO is addressing the issue. However, MCSO notes and submits that any self-proclaimed "posse" who do not belong to MCSO are simply outside the scope of this Order. Specifically, the self-proclaimed "Sun City Posse" is not affiliated with and does not fall under the auspices of MCSO. MCSO has no control over this unrelated entity or its members.

**Paragraph 268.** This Paragraph requires the Monitor's approval before transferring someone in or out of the Court Implementation Bureau, the Professional Standards Bureau, and Bureau of Internal Oversight. MCSO has been in Full and Effective Compliance with this Paragraph since January 6, 2023. Nevertheless, on page 289 of his Draft Report, the Monitor has found MCSO out of compliance based on Chief Summers's memorandum. That issue is discussed in response to Paragraph 219.

Furthermore, as stated specifically in its response to the Monitor's Finding 5(J), MCSO's request to transfer Captain Lugo from PSB into the Court Security Division reflected a previous discussion and was not made for any alleged, nefarious purpose. Additionally, MCSO did not transfer Captain. Lugo to the Court Security Division prior to obtaining the Monitor's approval for the transfer. In fact, the Monitor's Findings 1–5 cannot be the basis for the Monitor's findings to hold MCSO not in compliance of the requirements of this, or any, Paragraph. Accordingly, MCSO requests that the Monitor rescind and remove its finding that MCSO is not in compliance with this Paragraph and requests that the Monitor again find it in Full and Effective Compliance with the requirements of this Paragraph.

## Section 15: Document Preservation and Production

MCSO does not have any comments to Section 15.

## Section 16: Additional Training

MCSO does not have any comments to Section 16.

**Section 17: Complaints and Misconduct Investigations Relating to Members of the Plaintiff Class.**

**Paragraphs 288 and 289.** In the 45th Report, the Monitor found MCSO in compliance with Paragraph 288 (and had done so for over three years straight) and found Paragraph 289 to be inapplicable. The Monitor has clarified that it does not independently assess Paragraph 289, but rather assesses the requirements of 289 as part of 288(a), thereby denying MCSO's assertion of Full and Effective Compliance.

On page 303 of his Draft Report, the Monitor again found MCSO in compliance with all investigative outcomes and concurred with the outcome of three CRMs submitted during the relevant time period, finding MCSO in compliance with Paragraph 288(a). Nevertheless, on pages 303–04 of the Draft Report, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. These findings also involve the same issues as discussed regarding paragraphs 14–17. The Monitor also references Deputy Chief Summers P.268 transfer memo related to Captain Morrison, which is addressed at length above in MCSO's response to the Monitor's Findings from Section 12 and in MCSO's specific response to Paragraph 219 above. Thus, the Monitor's criticism is entirely unfounded in this regard.

Finally, the Monitor cannot logically find both Paragraph 288(b) and Paragraph 289 out of compliance. Here, the Monitor's stated methodology is to assess Paragraph 288(b) as clarified by Paragraph 289 and not independently assessed 289. Based on this methodology, the inquiry into non-CRM cases cannot hold both Paragraphs 288 and 289 out of compliance. If so, Paragraph 289 would be superfluous to 288, which cannot be correct. The Monitor's assessment of Paragraph 289 in contravention of its stated methodology appears to be done in bad faith and for simple optic of having MCSO be "out of compliance" of more Paragraphs. Accordingly, MCSO requests that the Monitor rescind and remove its finding that MCSO is not in compliance with these Paragraphs. MCSO requests that the Monitor again find MCSO in compliance with Paragraph 288 and Paragraph 289 to be inapplicable.

**Paragraph 291.** The Monitor has not traditionally assessed Paragraph 291 for compliance. Indeed, Paragraph 291 places requirements on the Monitor, not MCSO.

Nevertheless, on page 307 of his Draft Report, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. Moreover, the Monitor has failed to provide any reason as to why it is assessing this Paragraph, much less a good faith reason. Even more so, the Monitor has failed to state its methodology in assessing this Paragraph.

Also on page 307, the Monitor contends that "MCSO had requested that the Monitor consider Captain Morrison to be BIO Commander. Deputy Chief Summers violated Paragraph 291 when he authored a memo in support of Captain Morrison to influence the Monitor's approval of Captain Morrison's transfer into BIO with knowledge that Captain Morrison was not a qualified candidate." The Monitor's finding is improper, for the reasons stated above in Paragraphs 219 and 268. Additionally, the process related to transferring in and out of BIO are entirely unrelated to the requirements of this

73

Paragraph. Accordingly, MCSO requests that the Monitor rescind and remove its finding that MCSO is not in compliance with this Paragraph.

**Paragraph 292.** MCSO has been in Full and Effective Compliance with the requirements of Paragraph 292 since December 16, 2020. No process has changed since then, and MCSO provides full access to its investigations.

Nevertheless, on page 308 of his Draft Report, the Monitor once again discusses the issues surrounding Sgt. Engelbeck's complaint and issues arising from inquiries around that situation, which are addressed in lengthy detail above. These findings also involve the same issues as discussed regarding paragraphs 14–17. Also on page 308, the Monitor again discusses the Captain Morrison issue discussed in Paragraph 291. None of these findings are basis to hold MCSO out of compliance. Accordingly, MCSO requests that the Monitor rescind and remove its finding that MCSO is not in compliance with this Paragraph.

**Paragraphs 346 and 347.** The Monitor has not previously assessed compliance for Paragraph 346 and 347 and does not provide a basis for doing so now. [*See, e.g.*, Doc. 3381]. Nevertheless, on pages 321 322, the Monitor finds MCSO out of compliance for Paragraphs 346 and 347 due to MCSO's routing IA 2025-0111 to Jensen and Hughes without first consulting the Monitor. However, as stated above in MCSO's response to the Monitor's Finding 5, while the Monitor can "audit and review" individual routing decisions, MCSO does not need Monitor permission before making routing decisions. [*See* Doc. 2830, ¶ 347]. The Court's Orders only allow the Monitor to "audit and review" routing decisions and to require a change in those decisions, "if necessary." The MT cannot use MCSO's initial routing to Jensen Hughes and subsequent rerouting to ADPS as a means to hold MCSO out of compliance as MCSO complied with the plain language of the Court's Orders and MCSO policy. The Monitor's contention to the contrary clearly evidences the Monitor's unreasonable interpretation of the Court's Orders and MCSO policies. Moreover, a single instance is not sufficient to find that MCSO failed to comply with Paragraphs 346 and 347. Indeed, assessing MCSO and holding MCSO out of compliance for Paragraphs 346 and 347 violates the Monitor's stated methodology. Accordingly, MCSO requests that the Monitor rescind and remove its finding that MCSO is not in compliance with the Paragraphs 346 and 347 and refrain from assessing compliance for Paragraphs 346 and 347 as these Paragraphs impose requirements on the Monitor, not MCSO.

**Paragraph 353.** MCSO was in compliance with the requirements of this Paragraph in the Second Quarter of 2025. [Doc. 3381, pg. 294.] Nevertheless, the Monitor has found MCSO out of compliance with Phase II of this Paragraph based on its discussion of the DUI policies. MCSO addressed those issues in its response to Section 12 and in its response to Paragraphs 14–17. Accordingly, MCSO requests that the Monitor rescind and remove its finding that MCSO is not in compliance with this Paragraph.


**Fourth Supplemental Permanent Injunction/Judgment Order**

**Paragraph 204 as Amended:** MCSO recognizes the need to comply with this Court's Orders regarding timely investigations and continues to make significant progress in this endeavor. MCSO

74

simply has a significant caseload of administrative investigations. MCSO informs the Monitor that reducing that caseload and shortening the time required to complete investigations remains a priority.

Also, as previously reported and commented, MCSO Command Staff determined the need to add an additional captain to PSB. MCSO believed that the additional captain would facilitate a greater PSB efficiency by establishing a dual command, with one captain overseeing investigation of sworn personnel, while the other captain overseeing investigations of civilian and detention personnel. MCSO has also sought to temporarily transfer five district sergeants into PSB to perform district investigations and work on the PSB backlog, rather than patrol duties, when otherwise not focusing on district investigations as stated in MCSO's 44th Quarterly Report. (Doc. 3205-1 at 36–37.) The proposed transfer would have hopefully ensured the reduction and elimination of the backlog, while simultaneously improving the quality of district investigations. The dual captain and five additional sergeant proposals presented a win-win situation. The Monitor denied both requests and MCSO sought the Court's intervention.

Although the Court denied the exact relief requested by MCSO, the Court suggested mechanisms for MCSO to accomplish its requests. First, as to MCSO's request to transfer five sergeants into PSB, "the Court would consider, with the approval of the parties, revising paragraphs 190, 209-17 and any other necessary paragraphs to allow the Sheriff to assign PSB investigations to district investigators whose competency and efficacy has been approved by the Monitor. In that manner, district investigators can do what the Sheriff proposes: they can continue to investigate minor discipline arising from their districts, can be removed from patrol duties, and can be assigned serious cases by the PSB. Discipline in minor cases would still be imposed by district commanders, and in major cases by the PSB commander. In that way, the Court believes at least initially, that the purposes of the Sheriff and the concerns of the Monitor can both be accommodated." [Doc. 3305 at 10-11].

Next, the Court also found that a Deputy Commander in lieu of or in addition to hiring two lieutenant positions was permissible. [*Id.* at 14.] Since the Court's November 3, 2025 Order, MCSO has requested and the Monitor has approved the transfer of a second captain into PSB to function as a Deputy Commander. Although not part of the reporting period, MCSO continues to take all reasonable steps to ensure Compliance with this Paragraph. Additionally, MCSO would like to remind the Monitor and the Parties, in light of the Court's recent Order, the shared goal of compliance with this Paragraph— and others—as the Parties work through "revising paragraphs 190, 209–17 and any other necessary paragraphs to allow the Sheriff to assign PSB investigations to district investigators whose competency and efficacy has been approved by the Monitor." Indeed, the Court recently approved this request, subject to Monitor approval. [Doc. 3497 at 20:8-22:5].

It is the responsibility of the Monitor and the Parties, when applicable, to correct the false impression that the misconduct cases and the backlog are made up primarily of misconduct investigations involving the Plaintiff Class. Informing the community is an important and indispensable step toward community healing and establishing a trusting community-MCSO relationship. MCSO is attempting to inform the community accurate facts regarding the backlog in its Town Hall Meetings but is otherwise limited in its ability to communicate at public meetings, including CAB Meetings. CAB, along with the Monitor, must facilitate communication between MCSO and the community, not hinder or limit it. For just and orderly community dialogue to occur, all Parties and the Monitor must take proactive steps to inform the community about the current status of the MCSO's compliance with the Court's Orders, including permitting MCSO to speak on issues it has identified.

75

**Section 18 Concluding Remarks**

MCSO objects that any singular issue can keep MCSO out of compliance with multiple Paragraphs. Although MCSO has agreed to the procedures related to NTCFs, MCSO maintains that the requirement goes beyond the requirements of the Courts Orders. Last, although not within this reporting period, MCSO has completed a methodology for the type of statistical analysis requested and will be providing it to the Monitor's in Fourth Quarter 2025.

On page 344 of his Draft Report, the Monitor states, "We also noted that since the revised VSCF was implemented there are a number of traffic stops involving passengers in which the form indicates that the passengers were search (sic); however, based on review of the body-worn recordings, there was no search of the passengers." MCSO responds that this is a very small number of stops and the result of a technological error with MCSO's TRACS program that has since been resolved. The actual VSCF were accurately filed out correctly, the printing function erroneously printed searches for passengers when they were for drivers.

On page 345, the Monitor states that "Recently, MCSO published TSAR 10 and TSQR18 (sic), for 2024 data, which found more disparities in traffic stops than were reported in 2023." This is because MCSO changed the methodology and the Monitor must acknowledge this.

MCSO also objects with the Monitor's exceeding his limited jurisdiction under the Court's Orders. As stated above, MCSO specifically opposes the Monitor's exceeding its limited jurisdiction under the Court's Orders when it makes legal determinations and attempts to enjoin non-Order-related issues related to the Sheriff's ability to call on the aid of a Posse under A.R.S. § 11-441 and to what authority the Sheriff may give his Posse.

Finally, the Monitor's sweeping characterization of a "disturbing pattern of behaviors" and pervasive violations has absolutely no basis in fact and is fundamentally at odds with the Monitor's *own provided record.* As detailed in MCSO's extensive response above, the Monitor's conclusions repeatedly rest on improper speculative inferences, subjective interpretations of intent, and uncorroborated testimony from a *single source*, rather than identifiable violations of Court Orders or executed acts of non-compliance. The document makes clear that the Monitor has failed to ground its findings in objective evidence, instead extrapolating from isolated conversations—many of which did not result in any action—to construct a narrative of systemic failure. Such conjecture cannot support the extraordinary claims advanced in the report, particularly where the Monitor itself does not identify any definite violation of a clear and unequivocal Court's Orders.

Equally problematic is the Monitor's conflation of internal inquiries and administrative due diligence with misconduct. The record demonstrates that MCSO leadership—particularly during a transition period—engaged in good-faith efforts to understand policy constraints and ensure compliance through consultation with subject-matter experts. MCSO reframed from action once advised of limitations. Far from evidencing a culture of impropriety, these actions confirm the effectiveness of internal safeguards: leadership *asked questions, received guidance, and deliberately chose not to act* where a potential compliance issue was identified. The Monitor's effort to reframe this conduct as evidence of unethical behavior lacks factual support, and improperly penalizes the very processes designed to ensure adherence to Court Orders.

76

Many of the Monitor's purported findings also criticize MCSO for engaging in an effort to avoid a conflict of interest and the appearance of impropriety for certain investigations occurring within PSB. Effectively, the Monitor attempts to hold MCSO out of compliance for simply following the mandate of the Court's Orders. MCSO and its leadership simply did nothing wrong in attempting to comply with the Court's Orders in extremely difficult circumstances.

The assertion that the identified issues demonstrate a broader "culture" of favoritism, reprisal, or systemic dysfunction is similarly wholly unsupported. These comments establish that the Monitor's findings overwhelmingly arise from *isolated, fact-specific incidents or a single internal affairs matter,* rather than any demonstrated pattern of operational failure. Indeed, the Monitor's own methodology requires assessment based on aggregate compliance rates, yet it repeatedly departs from that framework by extrapolating generalized conclusions from a handful of disputed events, many of which resulted in no change to disciplinary outcomes or operational practices. This methodological inconsistency entirely undermines the Monitor's attempt to concoct a broader narrative and reflects an analytical approach driven by outcome rather than objective metrics.

Moreover, the Monitor's repeated invocation of legal and ethical violations ignores the fundamental limitation on its authority. The Monitor is not empowered to adjudicate disputed issues of Arizona law or to render binding determinations of legal compliance; its role is limited to monitoring and reporting compliance, not deciding contested legal questions, or issuing quasi-prosecutorial findings. Yet the challenged language is premised on precisely such impermissible determinations, including definitive pronouncements regarding statutory interpretation of Arizona law, resolving contested material facts (many of which are entirely ignored in its one sided inquiry) and the legality of internal administrative decisions. This overreach renders the conclusions inherently unreliable and outside the proper scope of the Monitor's function.

The report's suggestion that the alleged misconduct has impeded the reform process is likewise contradicted by the record. MCSO's comments emphasize that personnel across all levels—including deputies, supervisors, and command staff—have continued to *implement reforms, maintain operational compliance, and improve institutional processes*, even while navigating disputed legal interpretations and administrative challenges. The Monitor's failure to reconcile these undisputed indicators of progress with its negative conclusions reflects a one-sided and outcome determinative evaluation that disregards substantial evidence of continued compliance efforts.

Finally, the attribution of "full responsibility" to senior leadership is untenable in light of the Monitor's own factual record. The document demonstrates that many of the challenged actions were either: (1) never implemented; (2) undertaken in reliance on legal advice or subject-matter expertise; (3) consistent with a reasonable interpretation of unsettled law; or (4) an earnest attempt to uniformly and properly implement the Court's Orders on conflict of interest issues. Indeed, in several instances, the Monitor itself cannot support its own narrative and had to expressly acknowledge the absence of directive involvement by senior leadership. Yet it nonetheless imputes intent and responsibility without evidentiary basis. Such conclusory attribution underscores the broader analytical flaw in the report—substituting assumption for proof—and cannot sustain the weight assigned to it.

Those reading these comments may wonder, why is the Monitor taking such great lengths and risks to its reputation? To MCSO, it's simple. Maricopa County has a pending Rule 60 motion seeking to terminate this action, and in turn, the Monitor's involvement in MCSO. Many if not nearly all the issues identified by the Monitor do not relate to MCSO's compliance with the Court's Orders during the Third Quarter of 2025. That is what the Monitor's 46th Report was *supposed* to address. The fact

77

that the Monitor issued its Draft Report shortly before the Plaintiff's Response to the pending Rule 60 motion makes clear the Monitor's intent. MCSO is deeply disturbed by this Draft Report and what future recompence the Monitor may now attempt to bring that MCSO has been forced to defend against the Monitor's incendiary and outlandish accusations. Yet, some of the damage has already been done, as the dissemination of this Draft Report within MCSO has created irreparable harm to MCSO and its leadership.

MCSO today bears no resemblance to the agency described in the Monitor's rhetoric—its leadership has demonstrated, through its actions and adherence to established processes, an unwavering commitment to constitutional policing, full transparency, and the faithful execution of the Court's Orders, and it will continue to do so until full and effective compliance is not merely achieved, but sustained.

*MCSO reiterates its request that the Monitor ensure that it evaluates MCSO's compliance based on the requirements of each Paragraph, individually, and not to conflate the requirements of multiple, separate Paragraphs. MCSO has identified no less than 7 paragraphs in which it believes that the Monitor has conflated the requirements of a singular Paragraph to include the requirements of other Paragraphs.*