**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>and<br><br>United States of America,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Defendants' Motion for Relief from Judgment under Federal Rule of Civil Procedure 60(b). (Doc. 3368). For the reasons stated below, the motion is denied without prejudice. Nevertheless, the parties are further directed to meet and confer to determine whether they can reach any agreement as to paragraphs that the Court should terminate or make inactive pursuant to the terms further outlined below.

## I. BACKGROUND

### A. Factual and Procedural History

Plaintiffs in this lawsuit—Manuel de Jesus Ortega Melendres, David and Jessica Rodriguez, Manuel Nieto, Jr., Velia Meraz, the organization Somos America, and a class of Latino motorists in Maricopa County—initially alleged that Sheriff Arpaio and the

MCSO had a "custom, policy and practice of racial profiling toward Latino persons in Maricopa County and an unconstitutional policy and practice of stopping Latino drivers and passengers pretextually and without individualized suspicion or cause, and of subjecting them to different, burdensome, stigmatizing and injurious treatment once stopped, under the auspices of enforcing federal immigration laws and/or Arizona state immigration-related laws." *Melendres v. Arpaio* (*Melendres I*), 695 F.3d 990, 994 (9th Cir. 2012) (internal quotation marks omitted).

The Court issued a preliminary injunction on December 23, 2011, when it held that Plaintiffs "provide[d] evidence from which a finder of fact could conclude that MCSO racially profiles Latinos." (*Id.* at 27). The Ninth Circuit affirmed the preliminary injunction in full, reasoning that "because mere unauthorized presence is not a criminal matter, suspicion of unauthorized presence alone does not give rise to an inference that criminal activity is 'afoot.'" *Melendres I*, 695 F.3d at 1001 (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

After a seven-day bench trial, the Court, in a 142-page decision, issued its First Findings of Fact and Conclusions of Law on May 24, 2013. (Doc. 579). The Court "concluded that Defendants employed an unconstitutional policy of considering race as a factor in determining where to conduct patrol operations, in deciding whom to stop and investigate for civil immigration violations, and in prolonging the detentions of Latinos while their immigration status was confirmed." *Melendres v. Arpaio* (*Melendres II*), 784 F.3d 1254, 1258 (9th Cir. 2015). Finding violations of the Fourth Amendment, the Fourteenth Amendment's Equal Protection Clause, and Title VI of the Civil Rights Act of 1964, the Court permanently enjoined Defendants from: "(1) detaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more, that such persons are in the country without authorization; (2) using race or Latino ancestry as a factor in deciding whether to stop any vehicle with a Latino occupant, or in deciding whether a vehicle occupant was in the United States without authorization; (3) detaining Latino occupants of vehicles stopped for traffic violations for a period longer

than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of them have committed or are committing a violation of federal or state criminal law; (4) detaining, holding or arresting Latino occupants of a vehicle for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that, under all the circumstances, the necessary elements of the crime are present; and (5) detaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act." *Id.* at 1258–59 (citation modified).

The Court further determined that—despite the Court's preliminary injunction prohibiting such conduct—MCSO continued to detain individuals based solely on a belief that the person was in the country without authorization. (Doc. 579 at 112–15 (discussing MCSO's "LEAR" Policy,[1] under which MCSO deputies detained persons whom they believed to be unauthorized aliens but could not be arrested on state charges)). Noting at the time that "MCSO is aggressively responsive to the wishes of a significant portion of the Maricopa County electorate that desires vigorous law enforcement operations against unauthorized residents by state and local law enforcement authorities," the Court stated that it would confer with the parties about the need for additional injunctive relief. (*Id.* at 139). After that conferral, the Court requested the parties to submit a consent decree to completely resolve the question of the stops necessary to resolve the discrimination; however, if the parties were unable to agree on the terms of an injunctive order, the Court requested that they submit a proposed order that denoted areas of agreement and disagreement. (Doc. 586 at 30).

The parties were unable to fully agree on an order, and they submitted a joint report (Doc. 592) that, in the Court's review, constituted an "agreement about a general framework through which supplemental injunctive relief could go forward." (Doc. 603 at 5:07–16). The parties disagreed on a range of matters, including the appointment and scope of an independent Monitor, the creation of a Community Advisory Board, and increased

---

[1] "LEAR" stands for Law Enforcement Agency Response.

supervision over MCSO's internal affairs ("IA") disciplinary process. (*See* generally Doc. 592-1). Following an evidentiary hearing on the parties' proposals, the Court issued the First Supplemental Injunctive Order (the "First Order") on October 2, 2013. (Doc. 606).[2]

"This injunction required Defendants, among other things, to increase training, improve traffic-stop documentation, develop an early identification system for racial profiling problems, enhance supervision and evaluation of MCSO deputies, and improve reporting of misconduct complaints. The supplemental injunction also directed the appointment of an independent Monitor to assess and report on Defendants' implementation of the original and supplemental injunctions." *Melendres II*, 784 F.3d at 1259. The Ninth Circuit largely affirmed the First Order, save for two provisions regarding internal investigations and officer misconduct that were not narrowly tailored to the violations of federal law at issue.[3, 4] *Id.* at 1267.

Nevertheless, the Court later discovered that MCSO had never complied with the ordered injunctive relief and had also deliberately withheld from providing discovery requested by Plaintiff in the initial trial that demonstrated additional constitutional violations being committed against the Plaintiff class. *Melendres v. Maricopa County* (*Melendres IV*), 897 F.3d 1217, 1219 (9th Cir. 2018), *cert. denied*, 589 U.S. 915 (2019).

---

[2] The First Order has been amended four times. (*See* Doc. 670 (amending ¶¶ 1(r), 38, 39, 107–18, 126, 136, 141); Doc. 748 (amending ¶¶ 1(r), 57, 61–63); Doc. 1270 (amending ¶ 136); Doc. 2431 (amending ¶¶ 109–12, 115–18)).

[3] In light of the Ninth Circuit's directive, the Court—after discussing proposed amendments with the parties at a status conference—amended these two provisions to ensure proper tailoring to the violations of federal law found in the First Findings of Fact and Conclusions of Law. (Doc. 1270).

[4] In *Melendres II*, the Ninth Circuit also substituted the MCSO with Maricopa County as a party in this lawsuit because the MCSO, under Arizona law, is a non-jural entity that is incapable of being sued in its own name. 784 F.3d at 1260 (citing *Braillard v. Maricopa County*, 224 Ariz. 481, 487, 232 P.3d 1263, 1269 (Ct. App. 2010)). Maricopa County then appealed the Court's preliminary injunction, First Findings of Fact and Conclusions of Law, and the First Order. The Ninth Circuit rejected the appeal, reasoning that Maricopa County's presence in this lawsuit "assure[s] a meaningful remedy for the plaintiffs despite MCSO's dismissal" and holding that Maricopa County's appeal was untimely under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a). *Melendres v. Maricopa County* (*Melendres III*), 815 F.3d 645, 648–51 (9th Cir. 2016).

After 21 days of additional evidentiary hearings conducted between April 2015 through November 2015,[5] the Court in May 2016 issued its Second Findings of Fact (Doc. 1677) that detailed "particularly egregious and extraordinary" conduct by the Defendants. (Doc. 1765 at 2). In addition to finding that Sheriff Arpaio and members of his Command Staff—including then-Chief Deputy Gerard Sheridan—knowingly failed to implement the Court's preliminary injunction, the Court also determined that Defendants: (i) failed to disclose thousands of relevant items of requested discovery that they were legally obligated to disclose, such as audio and video recordings of traffic stops (ii) deliberately violated court orders after the post-trial disclosure of additional evidence, and (iii) prevented a full recovery of relevant evidence in this case that impeded the litigation, thus "resulting in a trial that did not completely address—and remedies that did not fully repair—the MCSO's violations of Plaintiffs' constitutional rights." (*Id.* at 1–2 (citing Doc. 1677 ¶¶ 165–217, 239–94)).

In 162 pages, the Second Findings of Fact detailed, among other items, the bad faith of MCSO's misconduct investigations and disciplinary process as it pertained to the

[5] While these contempt proceedings were ongoing, the United States moved to intervene in this action as of right. (Doc. 1177 at 1 (citing 42 U.S.C § 2000h-2 and Fed. R. Civ. P. 24(a)(1))). Months after the Court issued its preliminary injunction in this case, the United States separately filed suit against Sheriff Arpaio and Maricopa County alleging, among other things, the discriminatory traffic enforcement actions that this Court ultimately found unlawful. (*Id.* at 2). In that separate action, the district court granted summary judgment for the United States on its discriminatory policing claim. (*United States v. Maricopa County*, Case No. 2:12-cv-981 (D. Ariz.), ECF No. 379). The parties in the separate action reached settlement agreements on all claims in that case except the discriminatory policing claims. (Doc. 1177 at 2).

In its motion to intervene in this case, the United States remarked that if the motion were to be granted, it would not pursue any further relief in its parallel case beyond that provided by its settlement agreements with Sheriff Arpaio and Maricopa County. (*Id.* at 5). It claimed that its "active participation in the remedial phase of this action as a plaintiff-intervenor is necessary to protect the United States' interests in the effective nationwide enforcement of civil rights laws relating to police misconduct and in ensuring that the defendants' equal protection violations are remedied through vigorous enforcement of the remedial orders in this case." (*Id.* at 2). The Court granted the United States' motion to intervene on August 13, 2015, noting that the parties did not raise objections to the United States' intervention. (Doc. 1239 at 2).

Plaintiff class. (*See* Doc. 1677). The Court found that MCSO—under the leadership of Sheriff Arpaio and Chief Deputy Sheridan—engaged in "manipulation and misconduct that [] prevented the fair, uniform, and appropriate application of discipline on MCSO employees as that misconduct pertains to the members of the Plaintiff class." (Doc. 1765 at 15).

Specifically, the Court determined that:

- MCSO deputies wrongfully took personal property of members of the Plaintiff class including forms of identification, credit cards, license plates, money, bank cards, cell phones, purses, wallets, weapons, memory cards, passports, religious statuettes, CDs, and homemade footwear that were not turned into property and evidence. (Doc. 1677 ¶¶ 616–40, 659, 681).
- The MCSO's Professional Standards Bureau ("PSB")[6] did not conduct adequate investigations of those charged with misconduct for the wrongful seizure of personal property from the Plaintiff class. (*Id.* ¶¶ 648–54, 718–51).
- MCSO promulgated a special discriminatory policy pertaining only to misconduct investigations arising from this case. According to this *Melendres*-only policy, multiple independent violations of MCSO policies committed by MCSO personnel in *Melendres*-related traffic detentions counted as only one policy violation for purposes of applying MCSO's disciplinary matrix. (*Id.* ¶¶ 509, 571–72). This policy discriminated against the Plaintiff class.
- MCSO, and Chief Deputy Sheridan specifically (*id.* ¶ 576; Doc. 1043 at Trial Tr. 977–78), manipulated the timing of investigations in this case so as to prevent officers guilty of misconduct from being disciplined due to state law limits in which investigations are to be completed if discipline is to be imposed. (Doc. 1677 ¶¶ 574–83, 714, 717).
- MCSO intentionally created conflicts by designating subordinates and personal friends to decide on the discipline of their commanding officers. (*Id.* ¶¶ 484, 707–11, 769–73, 775).

---

[6] "The PSB is a division within MCSO that ensures that MCSO employees adhere to the highest ethical standards. It handles internal investigations and complaints regarding officer conduct, ensuring accountability and transparency within the department." (Doc. 3307 at 2 n.1 (citations and internal quotation marks omitted)).

- PSB investigations were completed in compliance with the pre-dispositions of members of the MCSO Command Staff that no discipline should be imposed. (*Id.* ¶¶ 684–89).
- Chief Deputy Sheridan inappropriately intervened in PSB investigations and their parameters. (*Id.* ¶¶ 610–12, 614, 616, 628–29). For example, Chief Deputy Sheridan ordered that disciplinary records reflecting the imposition of previous discipline be expunged so as not to reflect that he overturned discipline that has been previously sustained. (*Id.* ¶¶ 756–58).
- Sheriff Arpaio and Chief Deputy Sheridan promoted and gave pay raises to persons who were under investigation for misconduct involving failure to comply with the Court's orders in this case. (*Id.* ¶¶ 499–500).
- MCSO did not provide adequate training on how to conduct an internal investigation (*id.* ¶¶ 862–67), nor were PSB investigators adequately trained to conduct competent investigations of misconduct involving the Plaintiff class (*id.* ¶¶ 584-91). PSB investigators offered false reasons for the detention of the Plaintiff class's property in their investigations. (*Id.* ¶¶ 616–90).
- MCSO did not track complaints registered against MCSO officers. (*Id.* ¶¶ 550–51, 853–64). MCSO attempted to blame the Monitor for MCSO's own investigative inadequacies. (*Id.* ¶ 675).
- MCSO policy, at the time, failed to require any written justification for the Sheriff or his designee to explain employee grievance decisions, nor did the Sheriff or his designee actually explain such decisions, even when deciding not to impose discipline. (*Id.* ¶ 760).
- MCSO did not adequately train its leaders on how to supervise subordinates. (*Id.* ¶¶ 838–49).
- MCSO had inadequate internal affairs ("IA") policies. (*Id.* ¶¶ 868–75).[7]

The Court held Sheriff Arpaio, Chief Deputy Sheridan, and two other members of MCSO Command Staff in civil contempt. To properly cure the MCSO's constitutional violations, which were "broad in scope, involve[d] its highest ranking command staff, and flow[ed] into its management of internal affairs investigations" (Doc. 1765 at 2), the Court issued the Second Supplemental Injunctive Order (Doc. 1765, the "Second Order") in this

[7] *See also Melendres IV*, 897 F.3d at 1219–20 (summarizing the Court's Second Findings of Fact).

case.[8] The Order "mandate[s] reforms of the MCSO's internal affairs system in order to ensure the MCSO's continued compliance with the Court's permanent injunction (Doc. 606) and to coerce the MCSO's compliance with the Court's previous orders, as well as with orders the Court may enter in the future as the need arises." (Doc. 1765 at 6). As the Ninth Circuit previously summarized, the Second Order:

> revised MCSO's disciplinary matrix, conflict of interest and whistleblower policies, training requirements for internal affairs staff, and complaint intake and tracking procedures. The injunction also vested the independent monitor with the authority to supervise and direct internal investigations related to the Plaintiff class and to inquire and report on other internal investigations. It ordered the appointment of an independent investigator with disciplinary authority to investigate and decide discipline for internal investigations deemed invalid by the court. The district court also directed the County to implement a victim compensation program for individuals injured by MCSO's violations of the first injunction.

*Melendres IV*, 897 F.3d at 1220 (citations omitted).

The Second Order required the Sheriff and the MCSO to ensure that *all* allegations of employee misconduct are fully, fairly, and efficiently investigated in an objective, comprehensive, and timely manner. (Doc. 1765 ¶¶ 163, 183). The Court expanded the scope of the Monitor's authority to inquire and report on all MCSO internal affairs investigations and not those merely related to the members of the Plaintiff class, "because absent such reforms, there is no way to determine whether policies or practices that insulated those who violated the constitutional rights of the Plaintiff class from investigation and discipline would continue to do so." (Doc. 1765 at 5 ("[T]he reforms are aimed at eliminating a condition that flows from the MCSO's violation of the constitutional rights at issue—namely, the tacit authorization and condonation that the MCSO conveys to its deputies when police misconduct related to members of the Plaintiff class is exempted from the normal internal affairs system and is treated with special leniency or is entirely

---

[8] Certain provisions of the Second Order have been amended over time. (*See* Doc. 3076 (amending ¶ 204); Doc. 3422 (amending ¶ 268); Doc. 3448 (amending ¶ 228)).

swept under the rug.”)).

On appeal, the Second Order was affirmed in full. The Ninth Circuit held:

> [W]e are satisfied that the challenged provisions flow from MCSO’s violations of court orders, constitutional violations, or both. Each challenged provision addresses the internal affairs and employee discipline process, which the district court found based on ample evidence MCSO had “manipulated” to “minimize or entirely avoid imposing discipline on MCSO deputies and command staff.” The district court explained that it “would have entered injunctive relief much broader in scope” had it known about “the evidence withheld by the MCSO and the evidence to which it led” when imposing the first injunction. MCSO’s repeated bad-faith violations of court orders and Judge Snow’s seven years of experience with this case at the time he issued the challenged orders lead us to believe that the district court chose the remedy best suited to cure MCSO’s violations of court orders and to supplement prior orders that had proven inadequate to protect the Plaintiff class.

*Melendres IV*, 897 F.3d at 1222 (citations omitted).

Sheriff Arpaio left office at the end of 2016, and Chief Deputy Sheridan retired from the MCSO. Sheriff Paul Penzone assumed office, but his tenure was also marked by significant violations of the Court’s injunctive orders. The MCSO, under Sheriff Penzone’s leadership, continually failed to complete timely investigations of employee misconduct, resulting in a mammoth backlog of police misconduct cases left unresolved. In November 2022, the Court observed how the MCSO’s failure to complete investigations in a timely manner became so extreme as to render IA investigations completely ineffectual and render no service to either the complainant or MCSO personnel:

> [S]ince the Court entered th[e] [Second Supplemental Injunctive] order the Defendants have continually failed to complete their investigations in a timely manner. . . . In 2018, two years after the Court entered its order, the average closure of a case took 204 days—about two and a half times the maximum permitted by this Court’s order. This, in itself, violated the Court’s order and state law. That number, however, continued to increase. In 2019 the average closure ballooned to 499 days and 552 days in 2020. . . . [T]he timeline

> to complete an investigation has grown to approximately 600 days per investigation. . . . For full administrative cases involving sworn personnel, the timeline to complete an investigation is now apparently in excess of 800 days. . . . MCSO now has 2,137 pending investigations.

(Doc. 2830 at 2–4 (citations omitted)). The Court thus held Sheriff Penzone in civil contempt and issued the Third Supplemental Injunctive Order (Doc. 2830, the "Third Order")[9] "to protect the interests of the Plaintiff class" and "ensur[e] that investigations are completed in sufficient time to administer discipline." (Doc. 2830 at 6; *see also* Doc. 2681 at 3 ("delays in investigation have the tendency to deny justice because the matter remains unresolved, memories fade, and witnesses become unavailable")).

Central to the Third Order's remedial structure was the additional designation of the Monitor as the Constitutional Policing Authority ("CPA"). As the CPA, the Monitor has the "authority to oversee all of MCSO's complaint intake and routing." (Doc. 2830 ¶ 346).[10] With this authority, and in consultation with the PSB Commander, the Monitor "shall make determinations and establish policy decisions pertaining to backlog reduction regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts[11] for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases." (*Id.*). The Monitor is required to consult with the PSB Commander on these policy decisions, and the "Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing." (*Id.* ¶¶ 346–47). Furthermore, the Monitor has the authority to "audit and review [MCSO's intake and routing] decisions made with respect to individual cases and, if necessary, to change such designations." (*Id.* ¶ 347). Once the backlog is

---

[9] Certain provisions of the Third Order were later amended in 2024 and in 2026. (*See* Doc. 3076 (amending ¶¶ 356–58); Doc. 3497 (amending ¶ 345 and ¶ 358)).

[10] In the Third Order, the Court also created a "PSB Staffing Fund" to ensure that the PSB was adequately staffed and funded to meet the Court's backlog reduction requirements. Defendants did not appeal the provisions of the Third Order relating to the PSB Staffing Fund. (*See generally* Doc. 3497 at 5–6).

[11] "Districts" refer to the police service areas of MCSO. (Doc. 606 ¶ 1(n)).

eliminated, the Monitor's authority as the CPA is no longer applicable.[12] However, if the backlog reemerges while Defendants remain under monitoring, the Monitor's authority as the CPA will be reinstated. (*Id.*). A case is added to the "backlog" if it is not completed within the 180-day state law time limit and the Monitor has not granted an extension of the investigation deadline. (Doc. 2830 ¶ 356).

The Ninth Circuit fully affirmed the Third Order. Determining that the Court "acted within the general bounds of its inherent powers," the Ninth Circuit concluded that the Court appropriately vested the Monitor with control over narrow areas of MCSO's operations, and that the Court maintained its ability to conduct judicial review of the Monitor's decisions as CPA. *Melendres v. Skinner* (*Melendres V*), 113 F.4th 1126, 1134–39 (9th Cir. 2024).[13]

Issues with the backlog continued to persist after the issuance of the Third Supplemental Injunctive Order. The Court thus issued the Fourth Supplemental Injunctive Order (the "Fourth Order"), which (i) granted Defendants relief by increasing the timeline for the completion of IA investigations and (ii) set a timeline for backlog reduction that would lead to the elimination of the backlog by 2026. (Doc. 3076). If MCSO fails to reach its backlog reduction targets, it must invest additional resources into the PSB. (*Id.*; *see also* Doc. 3497 (granting in part Defendants' motion for relief for failure to hit backlog reduction targets during 2025 and 2026 and amending the Third and Fourth Orders to reduce the required quarterly case reduction figures)). Defendants did not appeal any provisions in the Fourth Order.

**B. The Sheridan Administration**

In November 2024, former Chief Deputy Sheridan was elected Sheriff, and he rejoined the MCSO in 2025. So far, during his tenure, the parties have litigated a broad range of issues beyond the instant motion, including: (i) the cost of compliance with the

---

[12] MCSO is on track to eliminate the backlog sometime in early 2027. (Doc. 3497).

[13] During the pendency of the appeal of the Third Order, Sheriff Penzone resigned from office, and the newly appointed Sherriff, Russ Skinner, was substituted in this case for Sheriff Penzone. *Melendres V*, 113 F.4th at 1132.

Court's orders in this case (*see* Docs. 3263, 3301, 3396); (ii) MCSO's progress in reducing the PSB backlog (*see* Doc 3497); (iii) the appointment of an Independent Investigator and an Independent Disciplinary Authority (*see* Docs. 3191, 3297, 3448, 3504), including the scope of the attorney-client privilege as it relates to the Independent Investigator's ability to conduct her investigations (*see* Docs. 3307, 3334, 3487, 3551); (iv) key personnel staffing decisions and routing the investigation of PSB complaints to district sergeants (*see* Docs. 3305, 3497); (v) the appointment of the Commander of the PSB (Doc. 3422); and (vi) whether the Sheriff has the authority under state law to alter a final disciplinary finding sustaining allegations of serious misconduct against an MCSO officer (*see* Docs. 3422, 3425, 3448, 3509).

**C. Current State of Compliance**

The Monitor assists the Court in assessing MCSO's compliance with the requirements in the Court's supplemental injunctive orders. The Monitoring Team makes quarterly visits to Maricopa County to meet with MCSO's Court Implementation Division ("CID") and other personnel. During these visits, the Monitoring Team observes MCSO practices, reviews MCSO's policies and procedures, and collects and analyzes data from MCSO activities covered by the Court's orders using appropriate sampling and analytic procedures. The Monitor then issues a quarterly report that summarizes the status of MCSO's compliance. (*E.g.*, Doc. 3509).

The Court's injunctive orders span 368 paragraphs. Not all paragraphs require or are subject to the Monitor's assessments.

The Monitor assesses compliance in two phases for each paragraph monitored.[14] For Phase 1 compliance, the Monitor evaluates whether MCSO has developed and approved requisite policies and procedures, and whether MCSO personnel have received documented training on those policies and procedures. For Phase 2 compliance—generally considered "operational implementation"—MCSO must demonstrate that it is complying

---

[14] Not all paragraphs assessed for Phase 1 compliance are assessed for Phase 2 compliance, and vice versa.

with applicable order requirements more than 94% of the time, or in more than 94% of the instances under review.[15]

Since September 2024, MCSO has attained 100% Phase 1 compliance. For Phase 2, based on the most recent quarterly report issued by the Monitor for the third quarter of 2025 (the "Forty-Sixth Quarterly Report"), MCSO has reached the following levels of operational compliance: 84% for the First Order; 79% for the Second Order; 68% for the Third Order; and 75% for the Fourth Order. (Doc. 3509 at 6–7).[16] MCSO has yet to reach operational compliance for 46 paragraphs (*see* **Appendix C**), and the Monitor has deferred assessment of 3 paragraphs (*see* **Appendix D**).

The Monitor can find that MCSO is in Full and Effective Compliance with a given provision and then later reassess that determination upon concluding that the agency is no longer in compliance with the provision. For example, in the Forty-Sixth Quarterly Report, the Monitor determined that 14 paragraphs that were previously found to be in Full and Effective Compliance were no longer in compliance after the Monitoring Team initiated and concluded a special inquiry pursuant to its authority under the Third Order. (Doc. 3509

---

[15] The Monitor uses four levels of compliance: (1) "In compliance"; (2) "Not in compliance"; (3) "Deferred"; and (4) "Not applicable." "Deferred" is used in circumstances in which the Monitoring Team is unable to fully determine the compliance status, or in situations where MCSO is fulfilling the requirements of a paragraph in practice but has yet to memorialize the requirement in a formal policy. "Not applicable" is used for Phase 1 compliance for a paragraph where a policy is not required; and for Phase 2 compliance for a paragraph that does not necessitate a compliance assessment.

[16] These percentages include both paragraphs that are in "Compliance" and in "Full and Effective Compliance." Generally, MCSO asserts to the Monitoring Team that a paragraph is in "Full and Effective Compliance," and the Monitor either concurs or rejects MCSO's assertion. As of the Forty-Sixth Quarterly Report, the Monitor has deemed MCSO to be in Full and Effective Compliance with 156 paragraphs. The full list of the paragraphs that the Monitor has deemed MCSO to be in Full and Effective Compliance can be found in **Appendix A**.

Even if MCSO does not assert that a paragraph in "Full and Effective Compliance," the Monitor still assesses each paragraph in the Court's injunctive orders for "Compliance." In addition to the paragraphs where MCSO is in Full and Effective Compliance, there are 32 paragraphs where MCSO is currently in operational compliance (i.e., Phase 2 compliance), as found in **Appendix B**.

at 3–4; Doc. 2830 ¶¶ 346–47).

Under the First Order, the Court maintains jurisdiction over this action until Defendants have achieved Full and Effective Compliance and maintained such compliance for no less than three years. (Doc. 606 ¶ 3). In this context, Defendants can only reach "Full and Effective Compliance" once they are in compliance "*with all relevant provisions*" of the Court's injunctive orders. (*Id.* ¶ 1(r) (emphasis added)). The Court has further specified the procedure by which the parties may seek termination of the injunctive orders if they disagree on whether Defendants have achieved Full and Effective Compliance. That procedure includes a 60-day meet-and-confer process involving the parties and the Monitor to determine whether any disagreements can be resolved before a motion to terminate is filed with the Court. (*Id.* ¶¶ 4–5). And at all times, Defendants bear the burden of demonstrating Full and Effective Compliance with the Court's orders. (*Id.* ¶ 6).

**D. The Instant Motion**

Despite having not yet reached Full and Effective Compliance with the Court's injunctive orders. Defendants now move under Federal Rule of Civil Procedure 60(b) to terminate the Court's orders in this case. (Doc. 3368, "Defs.' Mot.").[17] Calling the litigation in this case a "success," Defendants contend that the MCSO has achieved sustained constitutional compliance, implemented durable institutional reforms, and maintained long-term compliance with most of the provisions in the Court's injunctive orders. (*Id.* at 2–3). Specifically, Defendants identify four items that, in their view, warrant relief: (1) MCSO has completely changed their written and operational policies and practice from the Arpaio-era; (2) MCSO's traffic stop data analysis suggests that deputies operate bias-free; (3) MCSO has "embraced" the structural and management reforms required under the Court's orders; and (4) federalism concerns and democratic accountability are heightened in this case. (*Id.* at 11–14). Claiming that "continued federal

[17] Though the Rule 60(b) motion was initially brought by Defendant Maricopa County, on January 13, 2026, Defendant Sheriff Sheridan gave notice that the MCSO was joining "in the entirety" of Maricopa County's motion. (Doc. 3361).

monitoring" is "inequitable" in light of this "success," Defendants ask this Court to vacate the entirety of the injunctive orders in this case or, in the alternative, grant partial relief by dissolving those provisions that they contend have been satisfied or are duplicative, vague and untethered from the constitutional violations at issue, beyond the Court's jurisdiction, or arbitrarily assessed. (*Id.* at 2, 14–30).

Plaintiff-Intervenor United States supports Defendants' motion. (Doc. 3383, "DOJ's Resp."). The United States argues that relief is warranted here on three grounds: (1) MCSO is in Full and Effective Compliance with significant portions of the Court's injunctive orders; (2) MCSO has achieved "substantial compliance" with other portions of the injunctive orders; and (3) the Court should terminate the provisions related to the internal affairs backlog (i.e., the Second, Third, and Fourth Orders) because MCSO has implemented a "durable remedy" to address the constitutional violations that gave rise to this case. (*Id.* at 5).

Plaintiffs oppose Defendants' motion on the merits. (Doc. 3459, "Pls.' Resp."). They further reject any partial termination of the Court's injunctive orders, but they indicate that they are amenable to meeting with opposing counsel and submitting a joint proposal for reducing the monitoring of certain paragraphs. (*Id.* at 46–48).

The motion was fully briefed on May 22, 2026 (Doc. 3496, "Defs.' Reply"), and the Court held oral argument on the motion on June 26, 2026 (Docs. 3519, 3544, "Oral Arg. Tr.").

## II. LEGAL STANDARD

Relief under Federal Rule of Civil Procedure 60(b) "is an extraordinary remedy and may be granted only in exceptional circumstances." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1191–92 (10th Cir. 2018). Here, Defendants move for relief pursuant to Rules 60(b)(5) and 60(b)(6).

### A. Federal Rule of Civil Procedure 60(b)(5)

Under Rule 60(b)(5), a party may be relieved from an injunctive order if it can demonstrate that the order (i) "has been satisfied, released, or discharged," (ii) "it is based

on an earlier judgment that has been reversed or vacated," or (iii) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). "[E]ach of the provision's three grounds" is "independently sufficient" to warrant relief. *Horne v. Flores*, 557 U.S. 433, 454 (2009). Defendants rely primarily on the provision's third ground regarding the equitability of prospective application, but they also ask the Court, in the alternative, to find certain injunctive paragraphs "satisfied" under the first ground.

### 1. Equitability of Prospective Application

#### a. Changed Circumstances

A party can obtain relief from a judgment if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). This provision "provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). Defendants, as the parties seeking relief, bear "the burden of establishing that changed circumstances warrant relief." *Id.* (citing *Rufo*, 502 U.S. at 383). Upon making such a showing, "a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Id.* (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

Critically, a motion brought under a theory of changed circumstances through Rule 60(b)(5) cannot "challenge the legal conclusions on which a prior judgment or order rests." *Id.*; *see also* 11 *Wright & Miller's Federal Practice & Procedure* § 2863 (3d ed. 2026) ("The fact that [Rule 60(b)(5)] allows relief if it is 'no longer equitable' for the judgment to have prospective application is not a substitute for an appeal. It does not allow relitigation of issues that have been resolved by the judgment." (footnotes omitted)). Instead, in resolving such a motion, the reviewing court is required to take a "flexible approach" that considers whether "changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights" exist such that "reexamination of the original judgment" is warranted. *Horne*, 557 U.S. at 447–

50. Such flexibility is required because "institutional reform injunctions"—such as the Court's injunctive orders in this case—"often raise sensitive federalism concerns" and involve "areas of core state responsibility." *Id.* at 448.

Partial compliance with the terms of an injunction, standing alone, does not establish the "significant change" in "factual conditions or in law" required for relief under Rule 60(b)(5). *Id.* at 454 (holding that "an inquiry into whether the original order had been satisfied" did not constitute a Rule 60(b)(5) "changed circumstances" inquiry); *see also Rufo*, 502 U.S. at 383 (stating that Rule 60(b)(5) does not provide a vehicle for relief merely when "it is no longer convenient to live with the terms of a consent decree"); (Doc. 3544 at 26:21-23 (counsel for Maricopa County recognized that "satisfaction" and "changed circumstances" are different inquiries)). Instead, changed circumstances cognizable under Rule 60(b) generally involve developments independent of those that the district court may have required under its injunctive orders. *See, e.g.*, *Horne*, 557 U.S. at 465–66 (identifying structural and management reforms beyond those required by the district court as a "relevant change in circumstances"); *Rufo*, 502 U.S. at 384–93 (finding that an "unanticipated increase in jail population" constituted a significant change in factual conditions because it could render compliance with a consent decree requiring inmates to be housed only in single cells—as opposed to "double bunking"—"substantially more onerous" (emphasis removed)).

For example, in *Horne*, the Supreme Court considered whether continued enforcement of a series of injunctions and a contempt order requiring the State of Arizona to remedy deficiencies in its English Language-Learner (ELL) programs—which the district court held inadequate under the Equal Educational Opportunities Act of 1974 (EEOA)—was inequitable in light of changed circumstances. 557 U.S. at 439–43. There, in evaluating the defendants' Rule 60(b) motion, the lower courts had primarily focused on whether the amount of funding provided by Arizona for ELL programs was rationally related to the cost of such programs. *Id.* at 444. This was an explicit requirement in the district court's orders. *Id.* at 441. Yet the Supreme Court held that the lower courts

committed legal error by "focus[ing] excessively on the narrow question of the adequacy of the State's [] funding for ELL instruction instead of fairly considering the broader question whether, as a result of *important changes during the intervening years*, the State was fulfilling its obligation under the EEOA *by other means*." *Id.* at 439 (emphasis added). The Supreme Court then identified "four important factual and legal changes that may warrant the granting of relief from the judgment: [1] the State's adoption of a new ELL instructional methodology, [2] Congress' enactment of [the No Child Left Behind Act], [3] structural and management reforms in [the school district], and [4] increased overall education funding." *Id.* at 459. These changes represented "new means that reflect new policy insights and other changed circumstances." *Id.* at 439.

**b. Objective of the Court's Orders**

Once changed circumstances have been identified, the appropriate inquiry is to determine whether, in light of these changed circumstances, the "objective" of the Court's injunctive orders "has been achieved." *Id.* at 450. To determine this, the Court must "ascertain whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454 (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)); *see also Jackson*, 880 F.3d at 1202 (stating that, under *Horne*, courts "must broadly inquire whether the party obligated by the decree is at that time in compliance with federal law"). Importantly, the party seeking relief under Rule 60(b) still has the burden of proof in demonstrating that it is in compliance with federal law. *See Horne*, 557 U.S. at 447; *Jackson*, 880 F.3d at 1203 (placing the onus on the "Rule 60(b)(5) movant" to establish "the absence of an ongoing violation of federal law"). Any rule to the contrary would improperly require plaintiffs to reprove federal law violations they have already established. *See Rufo*, 502 U.S. at 390 (rejecting the position of Rule 60(b)(5) movants that "would make necessary . . . a constitutional decision every time an effort was made to . . . modify the decree by judicial action"); *see also Tapper v. Hearn*, 833 F.3d 166, 170 (2d Cir. 2016) ("Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments." (citations omitted)).

**c. Durable Remedy**

If the Rule 60(b) movant demonstrates that the objective of the injunctive orders has been achieved, then the final inquiry is whether a "durable remedy has been implemented." *Horne*, 557 U.S. at 450. If one has been implemented, then "continued enforcement of the order is not only unnecessary, but improper." *Id.* (citing *Milliken*, 433 U.S. at 282).

A remedy is sufficiently "durable" if—absent federal monitoring—it is unlikely that Defendants will resume the violations that led to the issuance of the injunctive orders. *See id.*; *Bd. of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89, Okla. Cnty., Okla. v. Dowell*, 498 U.S. 237, 247 (1991) (holding in a case seeking to terminate a desegregation consent decree that it was "unlikely" that a school board previously engaging in segregation "would return to its former ways"); *John B. v. Emkes*, 710 F.3d 394, 412 (6th Cir. 2013) (defining the durable remedy inquiry as considering "whether the [defendant] would continue that compliance [with federal law] in the absence of continued judicial supervision"); *Jackson*, 880 F.3d at 1202 (interpreting the *Horne* Court's "reference to a 'durable remedy' as recognition that fleeting federal compliance is insufficient to warrant relief"); *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011) (remanding to the district court to assess "the likely risk of imminent harm to plaintiffs" if "court supervision [were] to be withdrawn"). In assessing whether a durable remedy exists, "factors that a district court may consider include the party's commitment to compliance, the duration of the party's compliance with federal law, and whether or not the effects of the violation of federal law persist." *Jackson*, 880 F.3d at 1200–01 (first citing *Freeman v. Pitts*, 503 U.S. 467, 490–91 (1992); and then citing *Dowell*, 498 U.S. at 249–50). "Ultimately, the district court's wealth of experience overseeing the litigation should inform its assessment of whether the Defendants are now in compliance with federal law, and whether they are committed to remaining in compliance." *Id.* at 1203; *see also Petties*, 662 F.3d at 571.

**2. Satisfaction, Release, or Discharge**

A party can independently obtain relief under Rule 60(b)(5) if "the judgment has

been satisfied, released, or discharged." Fed. R. Civ. P. 60(b)(5). This ground for relief "has been relied on very rarely." 11 *Wright & Miller's Federal Practice & Procedure* § 2863 (3d ed. 2026). In context of relief from an injunctive order, the Ninth Circuit has not yet defined "satisfaction" under Rule 60(b)(5).[18]

Black's Law Dictionary defines "satisfaction of judgment" as "[t]he complete discharge of obligations under a judgment." *Satisfaction of judgment*, Black's Law Dictionary (12th ed. 2024). "Generally, a satisfaction of a judgment is the final act and end of a proceeding." 47 Am. Jur. 2d Judgments § 1006, at 443 (1995). In this case, Defendants will be completely discharged of their obligations in this case—and proceedings will thus end—once they have reached "compliance with all relevant provisions" of the Court's orders and "maintained such compliance for no less than three years." (Doc. 606 ¶¶ 1(r), 3; *see also id.* ¶ 5 (requiring compliance with all relevant provisions of the Court's orders before Defendants can move for partial termination)). And though the Monitor aids the Court in assessing MCSO's compliance with the Court's orders, the "ultimate arbiter of compliance is the Court." (*Id.* ¶ 128). Thus, as the Court's orders currently stand, Defendants can only demonstrate that the Court's judgment has been "satisfied" under Rule 60(b)(5) if they can demonstrate to the Court that they are in compliance with *all* provisions in the Court's injunctive orders.

**B. Federal Rule of Civil Procedure 60(b)(6)**

Under Rule 60(b)(6), the Court may also relieve a party from an injunctive order for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). In situations where more than one year has passed since judgment was entered—as is the case here—courts consider whether "extraordinary circumstances" justify the movant's requested relief. 11 *Wright & Miller's Federal Practice & Procedure* § 2864 (3d ed. 2026) (first citing *Klapprott v.*

[18] In *Zamani v. Carnes*, the Ninth Circuit stated that the "'satisfied, released, or discharged' clause of Rule 60(b)(5) is generally invoked when a party seeks entry of satisfaction of judgment because no acknowledgment of satisfaction has been delivered due to an *ongoing dispute over the judgment amount*." 491 F.3d 990, 995 (9th Cir. 2007) (emphasis added). This rule is inapplicable to this case where the Court's remedies are equitable, rather than legal, in nature.

*United States*, 335 U.S. 601 (1949); and then citing *Ackermann v. United States*, 340 U.S. 193 (1950)); *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 210–14 (2025). "This very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved." *Honickman*, 605 U.S. at 213 (citation modified). "[R]elief under Rule 60(b)(6) is available only when Rules 60(b)(1) through (b)(5) are inapplicable." *Id.* at 211 (citation modified). Under this stringent standard, courts have only found "extraordinary circumstances" met "in a limited number of cases," which have included "cases in which there was inaction by the government and unusual delays by the courts, and when there is a strong public interest in the case and the conduct of the parties is egregious." 11 *Wright & Miller's Federal Practice & Procedure* § 2864 (3d ed. 2026) (footnotes omitted).

## III. DISCUSSION

### A. Continued Enforcement of the Court's Orders is Equitable

Defendants' request under the third prong of Rule 60(b)(5) for full termination of the Court's injunctive orders is denied. Defendants have failed to demonstrate that the objectives of the Court's orders have been achieved. Nor have they established a durable remedy sufficient to ensure that, absent the Court's orders, they will not resume the violations that led to the issuance of those orders.

Defendants identify four categories of "changed circumstances" that, in their view, justify full termination. *First*, they contend that they have achieved 100% Phase 1 compliance, resulting in a complete change in written and operational policies. None of the offending Arpaio-era policies, such as the LEAR Policy, remain in effect today. (Doc. 3368 at 7, 13). *Second*, they argue that racial bias no longer infects MCSO's operations because data analyses from the Traffic Study Annual Reports ("TSARs") and Traffic Stop Monthly Reports ("TSMRs")—which are prepared by the MCSO—only demonstrate a statistically significant difference in arrest rates between White and Hispanic drivers. And even then, Defendants aver that any indicia of bias do not directly represent discriminatory policing. (*Id.* at 7–8, 13–14). *Third*, they highlight the low number of recent complaints of misconduct by deputies against the Plaintiff class and emphasize that the remaining PSB

backlog of investigative complaints contains no cases involving the Plaintiff class. (*Id.* at 8–11, 14). *Fourth*, they assert that MCSO has embraced structural and management reforms under the leadership of three different Sheriffs, each of whom has been committed to unbiased policing. (*Id.* at 14). In light of these changes, Defendants claim that full relief "is appropriate in this case because the objective of bringing MCSO's policing into constitutional compliance is achieved." (*Id.* at 15).

Yet, Defendants have not yet carried their burden of establishing their entitlement to the "extraordinary remedy" of complete relief under Rule 60(b).

**1. Objectives of the Court's Orders**

The Court's orders serve two overarching objectives. The First Order is intended to remedy MCSO's unconstitutional and discriminatory policing practices that resulted in the unlawful detention, arrest, and racial profiling of members of the Plaintiff class. (*See generally* Doc. 606). The Second, Third, and Fourth Orders are intended to reform MCSO's internal affairs system by ensuring that allegations of police misconduct are investigated in an appropriate, uniform, and fair manner, thereby fully vindicating the rights of the Plaintiff class. (*See generally* Docs. 1765, 2830, 3076). Neither objective has yet been fully achieved.

**a. Discriminatory Policing**

Defendants have not met their burden of proving that the purpose of the First Order—eliminating racial bias in MCSO's police operations—has been achieved. Evidence produced by Plaintiffs indicates that large, statistically significant disparities exist between Hispanic and White drivers in Maricopa County for three key traffic stop outcomes: (a) arrest rates, (b) stop duration, and (c) search rates. These disparities are substantial: based on all traffic stops conducted by MCSO deputies and controlling for relevant variables, Hispanic motorists are (a) approximately 40% more likely to be arrested than White motorists, (b) stopped approximately 30% longer than White motorists, and (c) approximately 2.5 times more likely to be searched than White motorists. (Doc. 3459 at 24–25).

While Defendants correctly note that disparities, alone, do not prove intentional racial discrimination in the first instance, Defendants—not Plaintiffs—bear the burden at this stage of setting forth legitimate, alternative explanations for why such large disparities remain. *See Horne*, 557 U.S. at 447; *Jackson*, 880 F.3d at 1203 (placing the onus on the "Rule 60(b)(5) movant" to establish "the absence of an ongoing violation of federal law"). Defendants bear the burden because they are already subject to a federal civil rights judgment in which the Court found "direct evidence of discriminatory intent based on the MCSO's policies, operations plans and procedures." (Doc. 579 at 125). They have failed to do so. After reading the briefing of the parties on this issue, the Court indicated to the Defendants the factual record was underdeveloped and suggested the possibility of evidentiary hearings. Defendants, nevertheless, indicated that they wanted to submit the arguments on the factual record set forth with the briefs. (Doc. 3544 at 30:14–32:03, 40:05-13, 61:24-25). The factual record, absent more, is simply inadequate to meet their burden under Rule 60(b).

The arguments in the briefs are as follows: Every year since July 2014, MCSO has published a TSAR that conducts analyses of MCSO patrol activity to determine whether racial disparities exist in MCSO traffic stop enforcement outcomes. The TSAR looks at five benchmarks: stop length, citation rate, search rate, arrest rate, and seizures. It compares outcomes of Hispanic, Black, and all racial and ethnic minority drivers to those of White drivers in Maricopa County after controlling for confounding variables.[19] MCSO

[19] The TSAR relies on "propensity score matching"—rather than regression models—to control for confounding variables. (Doc. 3459-3 at 7–8). Propensity score matching aims to match individuals across racial groups with similar "propensity scores"—i.e., similar characteristics—so that any remaining differences in outcomes can be more directly attributed to race rather than other factors. (*Id.*). By contrast, linear regression estimates racial disparities by including race as a predictive factor—alongside other "control" factors—to isolate race's association with the outcome. (*Id.*). Both of these approaches are "widely used, conceptually similar in their goals, and acceptable in this setting." (*Id.* at 7); *see also* Joshua D. Angrist & Jörn-Steffen Pischke, *Mostly Harmless Econometrics: An Empiricist's Companion*, Princeton Univ. Press 59–66 (Mar. 2008), https://www.dsecoaching.com/pdf/2008%20Angrist%20Pischke%20MostlyHarmlessEconometrics.pdf.

releases the TSAR pursuant to Paragraph 70 of the First Order, which requires MCSO to investigate indicators of bias or unlawful conduct and implement documented interventions, corrective actions, or discipline if such bias or unlawful conduct exists. (Doc. 606 ¶ 70). During the entire course of federal monitoring, MCSO has never demonstrated operational compliance with Paragraph 70.

**i. Arrest Rates**

Arrest rates (defined as the percentage of traffic stops resulting in an arrest) are a central issue in this case. During the initial trial, the Court found that, during the MCSO's "saturation patrols"—in which deputies conducted traffic enforcement operations for the purpose of detecting unauthorized aliens during routine traffic stops—officers were more likely to investigate and arrest passengers if they were Hispanic. (Doc. 579 at 11, 71–74). Those disparities remain. The TSAR has found statistically significant disparities[20] in arrest rates between Hispanic and White drivers in every year except 2023.[21, 22] In the most

[20] "In research, statistical significance measures the probability of the null hypothesis being true compared to the acceptable level of uncertainty regarding the true answer." Steven Tenny & Ibrahim Abdelgawad, *Statistical Significance*, StatPearls (Nov. 23, 2023), https://www.ncbi.nlm.nih.gov/books/NBK459346/. In other words, a finding that something is "statistically significant" indicates that an observed outcome is unlikely to be explained by random chance.

[21] *See generally Traffic Stop Reports*, Bureau of Internal Oversight: Maricopa Cnty. Sheriff's Off., https://www.mcsobio.org/traffic-stop-data (last visited July 30, 2026).

[22] In the TSAR for 2023 ("TSAR 9"), MCSO found no statistically significant difference in arrest rates between Hispanic and White drivers, reporting a 0.91-percentage-point disparity. *Traffic Stop Annual Report January 2023–December 2023*, CNA 27, https://www.mcsobio.org/_files/ugd/b6f92b_8b0225bf8d7f4067913eee84b9618294.pdf (last visited July 30, 2026) [hereinafter TSAR 9]. However, in TSAR 9, MCSO controlled for a categorical variable called "Stop Classification" that represents whether a traffic stop is criminal or civil in nature. *Id.* at 9, 11, 20–21. This control variable—"essentially a proxy for arrests"—uses a *post*-stop outcome that might itself "be the product of racial bias." (Doc. 3459-3 at 10, 13). Controlling for a proxy for an outcome variable (arrest rates) is an example of using "bad controls" that can lead to overcontrol bias. Angrist & Pischke, *supra*, at 47 ("Bad controls are variables that are themselves outcome variables in the notional experiment at hand. That is, bad controls might just as well be dependent variables too."). Tellingly, MCSO stopped controlling for "Stop Classification" in subsequent TSARs, thus recognizing that the variable should not have been used when analyzing arrest rate disparities. (Doc. 3459-3 at 17).

recent TSAR for 2025 ("TSAR 11"), MCSO reported a 2.61-percentage-point disparity in arrest rates between Hispanic and White drivers.[23] In 2024 ("TSAR 10"), this disparity was 3.86 percentage points.[24] And in regression analysis conducted by Dr. Emma Pierson—an Assistant Professor of Computer Science at the University of California, Berkeley who submitted an expert report on Plaintiffs' behalf (Doc. 3459-3, "Pierson Report")—after controlling for confounding variables, the disparity from 2023-2024 was 2.0 percentage points and statistically significant.[25] These disparities are also substantively large, given the fact that the arrest rate for White drivers in Maricopa County was 4.99% in 2025 (TSAR 11 at 33), 4.78% in 2024 (TSAR 10 at 26), and 4.6% from 2023 to 2024 (Doc. 3459-3 at 13). These large, statistically significant disparities thus suggest at least the potential for racial bias in the decision to make an arrest during a traffic stop.

Defendants do not contest that these arrest-rate disparities exist. Instead, they ask the Court to merely ignore them, contending that the disparities can be explained by "a host of reasons." (Doc. 3496 at 13). They identify only one such reason, and only speculatively: they contend that Hispanic drivers are statistically more likely to have outstanding warrants and that, when a driver has an active warrant, arrest is mandatory. (*Id.* (citing A.R.S. § 13-3897(A))). But arrests stemming from warrants constitute a relatively small portion of total arrests conducted by MCSO. For example, in 2024, warrant arrests without additional charges constituted only 4.03% of all traffic stop arrests.[26] Thus, Defendants have not put

[23] *Traffic Stop Annual Report January 2025–December 2025*, CNA 33, https://www.mcsobio.org/_files/ugd/b6f92b_3e383ec250b64d78bb9cc9bca423e8fc.pdf (last visited July 30, 2026) [hereinafter TSAR 11].

[24] *Traffic Stop Annual Report January 2024–December 2024*, CNA 26, https://www.mcsobio.org/_files/ugd/b6f92b_67bf9768cf3c474888c562442a393dab.pdf (last visited July 30, 2026) [hereinafter TSAR 10].

[25] Dr. Pierson validated her results using propensity score matching, which demonstrated that "estimated disparities remain similar and statistically significant." (Doc. 3459-3 at 15).

[26] *Traffic Stop Quarterly Report 20: 2024 Traffic Stop Arrests*, Maricopa Cnty. Sheriff's Off. 15 (Dec. 2025), https://www.mcsobio.org/_files/ugd/b6f92b_6555aa3bd7b1470f9fb41be985d00c87.pdf [hereinafter TSQR 20].

forth sufficient evidence explaining the reason why the arrest rate for Hispanic drivers is higher than that for White drivers.

**ii. Stop Lengths**

Another central issue in this case is prolonged traffic stops stemming from racial bias. The Court previously found that MCSO improperly used race as a factor, to the detriment of the Plaintiff class, in deciding to prolong traffic stops without a sufficient legal basis. (Doc. 579 at 131–34). Significant disparities in traffic stop durations persist when all of MCSO's traffic stop data are considered.

TSAR 11 and TSAR 10 both found no statistically significant disparities in stop duration between Hispanic drivers and White drivers. TSAR 11 at 32 (finding a -1.80-minute difference in stop length between Hispanic and White drivers, which suggests that White drivers are stopped for a longer duration than Hispanic drivers, all else equal); TSAR 10 at 25 (finding a 0.23-minute difference in stop length between Hispanic and White drivers). However, the TSAR does not capture the full picture.

In conducting the TSAR analysis for stop duration, MCSO *excludes* stops where an "ETSI" (Extended Traffic Stop Indicator) has been marked by the deputy conducting the traffic stop. There are seven ETSI categories: (1) DUI stop, (2) language barrier, (3) technical issue, (4) training stop, (5) vehicle towed, (6) driver documentation, and (7) other issue. TSAR 11 at 24. Two of these categories ("driver documentation" and "other") were introduced in 2022. (Doc. 3459-3 at 19).

MCSO introduced ETSIs into the TSAR analysis "to identify when circumstances prolong a typical traffic stop" and "extend the stop length beyond what is typical."[27] Yet ETSIs now account for a majority of all traffic stops. In 2024, MCSO deputies conducted 20,265 traffic stops and marked 10,194—or 50.30%—as ETSIs. TSAR 10 at 18. And in 2025, MCSO deputies conducted 24,647 traffic stops and marked 13,631—or 55.30%—as

---

[27] *Traffic Stops Quarterly Report: Extended Traffic Stop Indicator Use*, Maricopa Cnty. Sheriff's Off. 1–2 (Mar. 2021), https://aea232ab-5659-4c2d-bc16-d074bd7f96e0.filesusr.com/ugd/c866a6_f37279fd33394818bb370ab6af46820e.pdf [hereinafter TSQR 3].

ETSIs. TSAR 11 at 24. In other words in these years: when analyzing whether disparities in stop duration exist, MCSO (1) *excluded the longest stops from the analysis* and (2) *excluded the majority of all stops from the analysis*.

The usage of ETSIs, upon an initial analysis, presents at least three potential problems. First, since the majority of all traffic stops are marked with an ETSI, MCSO uses only a minority of traffic stops in evaluating whether disparities in stop duration exist. This casts doubt on whether ETSIs truly capture circumstances where a traffic stop is extended "beyond what is *typical*." *Contra* TSQR 3 at 1–2 (emphasis added). Dr. Pierson, after evaluating all of MCSO's stop length data from 2023 to 2024 (a dataset of 38,897 stops that included stops marked as ETSIs), found statistically significant and substantively large disparities in stop duration. After applying controls, Dr. Pierson found a 4.7-minute difference in stop duration between Hispanic drivers and White drivers. (Doc. 3459-3 at 12). These figures differ drastically from the relatively minute, statistically insignificant differences that the TSAR found when excluding ETSIs from the analysis.[28]

Second, the use of ETSIs has grown dramatically year over year, creating a "moral hazard"[29] problem. In 2021—the year prior to the addition of the "driver documentation" and "other" categories—deputies marked 3,442 stops, or 20.4% of all stops, as ETSIs.[30] Since introducing the "driver documentation" and "other" categories in 2022, the percentage of traffic stops marked with an ETSI has increased every year:

---

[28] In TSAR 11, in a secondary analysis that did not control for ETSIs, researchers found a statistically significant difference in stop length—1.84 minutes—between Hispanic and White drivers in 2025. TSAR 11 at 32. This represents a 3.64-minute increase in the disparity when compared to the figure that excludes ETSIs from the analysis (-1.80 minutes).

[29] "Moral hazard" refers to the tendency of individuals or institutions to engage in riskier behavior when they are shielded from the potential consequences of their actions. Will Kenton, *Moral Hazard: Meaning, Examples, and How to Manage*, Investopedia (Apr. 30, 2026), https://www.investopedia.com/terms/m/moralhazard.asp.

[30] *Traffic Stop Annual Report January 2021–December 2021*, CNA 16 https://aea232ab-5659-4c2d-bc16-d074bd7f96e0.filesusr.com/ugd/c866a6_8933296049054c60802affad84436943.pdf (last visited July 30, 2026) [hereinafter TSAR 7].

| Year | Number of Stops Marked ETSI | Percentage of Stops Marked ETSI |
|---|---|---|
| **2022** | 5,366 | 27% |
| **2023** | 6,956 | 37% |
| **2024** | 10,194 | 50% |
| **2025** | 13,631 | 55% |

(*See* TSARs 8–11). Moreover, the frequency with which MCSO deputies classify ETSIs as involving "driver documentation" or "other issues" has increased dramatically year over year since 2022 (note: multiple ETSI categories can be marked for one traffic stop):

| ETSI Category | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|
| **Driver Documentation** | 14% | 25% | 37% | 44% |
| **Other Issues** | 3% | 7% | 13% | 17% |

(*See* TSARs 8–11).

These trends cast doubt on whether ETSIs have been applied correctly and consistently across time. (Doc. 3459-3 at 19). As Dr. Pierson explains:

> If ETSIs are not being recorded consistently across years, it means that analyses of disparities using ETSIs will not be comparable across years. For example, it is impossible to reliably conclude that disparities have been reduced, because *the underlying data are not comparable*. This is a known issue in analyses of policing data, where changes in data recording and analysis practices have contaminated past analyses of racial disparities: for example, when the Texas Department of Public Safety changed its policies for recording driver race in response to public scrutiny, it significantly affected downstream analyses of disparities.

(*Id.* (emphasis added) (footnote omitted)). Inconsistent or discretionary use of the ETSI designation creates a moral hazard by incentivizing MCSO to classify lengthy traffic stops as ETSIs to avoid their inclusion in the TSAR dataset, thus artificially reducing measured traffic stop lengths and creating the appearance of diminished disparities without any corresponding change in actual enforcement practices. This risk is exacerbated by the growing use of the "other issues" category and the potential for that category to become a catch-all mechanism for removing lengthy traffic stops from the analysis.

And finally, the decision whether to classify a traffic stop as an ETSI is itself

associated with racial disparities. Since 2023, MCSO has observed statistically significant differences in ETSI classifications between minority drivers—including Hispanic drivers—and White drivers. Minority drivers are more likely to have their stops marked as ETSIs. The table below demonstrates the percentage of total stops for each racial or ethnic group that were marked as ETSIs in the last three years:[31]

| Race/Ethnicity | 2023 | 2024 | 2025 |
|---|---|---|---|
| **Hispanic** | 52% | 64% | 69% |
| **Black** | 52% | 62% | 68% |
| **All Minorities** | 51% | 62% | 68% |
| **White** | 32% | 47% | 51% |

Dr. Pierson finds that these differences "emerge consistently for almost every type of ETSI and every race group, even for ETSIs where it is very unclear why racial disparities should occur." (Doc. 3459-3 at 20). The problem with the inconsistent use of ETSIs across racial groups is that the TSAR is more likely to exclude longer stops involving Hispanic drivers than those involving White drivers, thus underestimating disparities in stop durations. Dr. Pierson illustrates the issue:

> [T]he primary concern is not that ETSI use is itself an indicator of racial bias; rather, it is that *inconsistent use of ETSIs across race groups renders downstream analyses of racial disparities that rely on ETSIs unreliable*. Consider a hypothetical but plausible example to make this point: imagine that when ETSIs truly occur, they are always correctly recorded for Black and Hispanic drivers, but recorded only 80% of the time for white drivers. (A gap like this would explain the observed pattern of disparities in ETSI use.) MCSO then discards all ETSIs in its primary analyses of stop duration. *This will result in*

[31] MCSO's quarterly analyses provide these figures. *Traffic Stops Quarterly Report 13: 2023 Extended Stop Indicator Use*, Maricopa Cnty. Sheriff's Off. 15 (Mar. 2024), https://www.mcsobio.org/_files/ugd/b6f92b_ac4262279ed84a10b0815b362e687837.pdf [hereinafter TSQR 13]; *Traffic Stops Quarterly Report 17: 2024 Extended Stop Indicator Use*, Maricopa Cnty. Sheriff's Off. 22 (Mar. 2025), https://www.mcsobio.org/_files/ugd/b6f92b_b8a448b652854dfebe00cb2c2109b283.pdf [hereinafter TSQR 17]; *Traffic Stops Quarterly Report 21: 2025 Extended Stop Indicator Use*, Maricopa Cnty. Sheriff's Off. 22 (Mar. 2026), https://www.mcsobio.org/_files/ugd/b6f92b_624516127a9d44898ac44f9ab2788e8c.pdf [hereinafter TSQR 21].

> *disproportionately discarding long stops of Black and Hispanic drivers (who are more likely to have ETSIs correctly marked) relative to white drivers; and that will lead to an underestimate of disparities in stop length*.

(*Id.* at 20–21 (emphasis added)).

Defendants present three points in rebuttal, each largely conjectural. First, they argue that the increased use in ETSIs is attributable to the introduction of the "driver documentation" category in 2022. (Doc. 3496 at 14 (arguing that "Hispanic motorists are more than ten times likelier to lack a license than white drivers")). However, the introduction of the category does not explain why use of the "driver documentation" category has *increased* every year. Defendants present no evidence indicating that the rate at which Hispanic drivers carry a driver's license has increased over time at a rate commensurate with the increase in the "driver documentation" ETSI category. Second, they point to the "vehicle towed" ETSI category as a primary driver in stop duration disparities because "Arizona law requires a vehicle to be towed if the driver lacks a license," and, as mentioned, Hispanic motorists are relatively more likely to lack a license. (*Id.* at 13). But tows constitute one of the least used ETSI categories—from 2022 to 2025, the category has been marked for 1.73% to 1.99% of stops. TSQR 21 at 15. Defendants fail to reconcile the large increase in use of the "driver documentation" category with the relatively *stable* instances of tows over time. *See id.* at 17. And third, they contend that ETSI use has increased because—after reviewing body worn camera footage—MCSO determined that deputies were underutilizing ETSIs. (Doc. 3496 at 14). Even if that were so, Defendants present no evidence—such as an expert report or an affidavit from a member of the Command Staff—that gives this Court assurance that the increased use of ETSIs is commensurate with any purported underutilization observed by MCSO. It also undercuts Defendants' assertion that "MCSO has identified that deputies utilize ETSIs with fidelity when documenting delays during traffic stops" (Doc. 3459-6 at 2)—both cannot be true.

Defendants have not met their burden of adequately explaining the rapid increase in

the use of ETSIs. Nor have they satisfactorily explained why statistically significant and substantively large disparities in stop duration exist between Hispanic and White drivers when all traffic stops are analyzed. As Plaintiffs correctly note, "it would be premature to terminate this case under Rule 60(b) based on stop duration data infected by this as yet suspicious and uninvestigated ETSI racial disparity." (Doc. 3459 at 22).

**iii. Search Rates**

Lastly, monitoring disparities in traffic stop search rates plays a key role in evaluating whether Defendants have satisfied the First Order's objective of eliminating racially discriminatory policing. (Doc. 494 at 39 (defining the Plaintiff class, in part, as Latino motorists who have been or will be searched by MCSO officers); *see also* Doc. 606 ¶¶ 28(f), 51(i), 54(k), 67(c), 70, 75(h), 81(b)). Both TSAR 11 and TSAR 10 found no statistically significant disparities in search rates between Hispanic and White drivers. TSAR 11 at 33 (-0.05-percentage-point difference); TSAR 10 at 26 (0.06-percentage-point difference). But MCSO excludes "incidental searches"—defined as searches incident to arrest or tow—from the TSAR analysis, which constitute the vast majority of searches. Instead, MCSO only analyzes discretionary searches. TSAR 11 at 28–30.

This, according to Dr. Pierson, has the potential to mask racial bias, because the decision to arrest a driver "is itself a decision that may result from racial bias." (Doc. 3459-3 at 7). And, as no party contests, significant racial disparities exist for arrest rates between Hispanic and White drivers. When including all searches in the dataset and applying controls, Dr. Pierson found 3.5-percentage-point disparity in search rates for Hispanic and White drivers from 2023 to 2024. (*Id.* at 13). This result was statistically significant and substantively large, given the search rate for White drivers during that period was 1.4%. (*Id.* at 14).

The relevant question is whether Defendants have met their evidentiary burden. They have not on this issue. Defendants criticize Dr. Pierson's decision to include incidental searches in her analysis of search rate disparities here, stating that, "[i]n her seminal paper, Dr. Pierson *excluded* incidental searches for the very reasons the TSARs

do." (Doc. 3496 at 14 (citing Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Hum. Behav. 736, 739 (2020))). Defendants selectively quote Dr. Pierson's seminal paper and ignore her stated reason as to why she excluded incidental searches in her previous analysis.

There, Dr. Pierson and her team found that, in certain jurisdictions, stopped Black and Hispanic drivers were searched at approximately twice the rate of stopped White drivers. To determine whether these search-rate disparities resulted from bias, the researchers applied a test examining the proportion of searches that successfully yielded contraband. The team theorized that, even if minority drivers were more likely to possess contraband, in the absence of discrimination, searched minority drivers should still be found to possess contraband at the same rate as searched White drivers because officers should apply the same discretionary standard when deciding whether to initiate a contraband search. If searches of minority drivers yielded contraband at lower rates than searches of White drivers, that would suggest that officers applied a different, biased standard to minority drivers by initiating searches based on less evidence. The team therefore excluded searches incident to arrest from their analysis because those searches are not discretionary and are not conducted for the purpose of discovering contraband. Pierson, *supra*, at 739. Dr. Pierson highlights this distinction in her expert report:

> It is true that some past analyses of search rates exclude incidental searches, although the literature is mixed in this regard. However, generally the motivation for excluding incidental searches is to assess whether there are different thresholds in searching for contraband (in which case incidental searches, whose *purpose is not to search for contraband*, should arguably be excluded). *That is not MCSO's purpose here.*

(Doc. 3459-3 at 16 (emphasis added) (footnote omitted)). Indeed, even the Court in the First Order has recognized that disparities in contraband seizure during discretionary searches can represent indicia of racial profiling. (Doc. 606 ¶ 67(c) ("[W]arning signs or indicia of possible racial profiling or other misconduct include . . . a low rate of seizure of contraband or arrests following searches and investigations[.]")).

Thus, Plaintiffs have put forth at least a plausible basis for including incidental searches in the search rate analysis. Defendants do not rebut Plaintiffs' argument that the decision to conduct an arrest—and thus a search incident to arrest—can itself be motivated by racial bias and merely assert that "arrests are measured separately." (Doc. 3496 at 13).[32] That response does not address the underlying point and therefore fails to undermine the probative value of Plaintiffs' analysis.

**iv. MCSO's Burden of Proof**

Taken together, the record before the Court does not indicate that Defendants have satisfied their burden under Rule 60(b)(5) to demonstrate that the objective of the First Order has been achieved. Although the Court must apply the "flexible" inquiry required by *Horne*—which does not turn on compliance alone, *see* 557 U.S. at 447–50—that flexibility does not relieve Defendants of their burden of proof. Plaintiffs, though it is not their burden of proof, have put forth significant, probative evidence that racial bias may continue to affect MCSO's traffic stop operations. Defendants have not presented sufficient evidence for the Court to conclude that the underlying violation of federal law is no longer ongoing.

To be clear, evidence of racial disparities does not, by itself, establish intentional racial discrimination. Nor must MCSO eliminate every statistical disparity before it can establish that prospective enforcement of the First Order is no longer warranted. But further explanation is needed. Where the Court has previously found that MCSO engaged in intentional racial discrimination, and where Plaintiffs have produced substantial evidence that indicators of bias persist, Defendants must do more than ask the Court to ignore these metrics without presenting sufficient explanation why the Court should do so.

Most notably, Defendants offer limited evidence explaining the disparities identified by Plaintiffs. They do not, for example, introduce any declarations or testimony from MCSO Command Staff explaining why Hispanic drivers continue to be arrested and

---

[32] And as discussed in the section on arrest rates, *see supra* Section III(A)(1)(a)(i), Defendants do not adequately explain why the arrest rate for Hispanic drivers is higher than that for White drivers.

searched at higher rates than similarly situated White drivers, or why they continue to be stopped for longer periods. Nor do Defendants offer any expert testimony or an expert report rebutting Plaintiffs' expert analysis. And when the Court offered the parties the opportunity to further develop the factual record through an evidentiary hearing, both Defendants and the United States declined. (Doc. 3544 at 30:14–32:03, 40:05-13, 61:24-25).

The evidence Defendants do emphasize is likewise insufficient. They point to MCSO's 100% Phase 1 compliance and the removal of the LEAR policy. However, compliance, standing alone, is not the relevant benchmark—a proposition Defendants themselves acknowledge. *Horne*, 557 U.S. at 454; (Doc. 3544 at 26:21-23). And even if compliance were the relevant benchmark, MCSO's task would still be far from complete, given that it never has been found in full and effective compliance. (Doc. 3459 at 13).

Nor is it the Court's responsibility to scour the record, much less materials outside the record, to find evidence supporting Defendants' arguments. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). For example, Defendants point to the required monthly analyses of traffic stop data—the TSMRs—and state that they demonstrate an absence of discriminatory policing:

> MCSO reviews twelve-month data for every deputy and flags any aberrant statistics. Deputies who have been flagged are then investigated by the Traffic Stop Analysis Sergeant, who reviews body worn camera footage in a process agreed to by the parties and the Monitor. Since it began this process in 2021, MCSO has *never* identified discriminatory or biased policing, and neither has the Monitor.

(Doc. 3496 at 15 (citing Doc. 3199-1 at 10)). Defendants' assertion here is bootstrapped from its own contention in TSAR 10, in which MCSO claims: "Upon review of statistically significant TSMR findings from ongoing research, the Court Monitor has concurred with MCSO that the inequalities in traffic stop outcomes were not associated with bias." (Doc. 3199-1 at 10). But MCSO does not identify that part of the factual record where the

Monitor made such concurrence, and the Court has not found it.[33] Nor do Defendants place any of the TSMRs into the record as exhibits, summarize their results or methodologies, document or explain the interventions[34] provided to deputies whose traffic-stop data identified them as outliers, or identify how TSMR interventions are considered by supervisors in assessing deputy performance and promotions.

The Court last had occasion to address the TSMR program nearly five years ago, when it was still a "pilot program." (Doc. 2718 at 3 (noting that the TSMR program "is not impervious to testing and improvement")). At the time, Plaintiffs and the United States argued that the TSMR's methodology did not properly flag potentially "problematic officers." (*Id.*). The Court held a hearing on the issue, at which it heard from experts from the United States, MCSO, and the Monitoring Team. (*Id.*). The Court—and the public—would benefit from a similar update on the program before granting the full relief Defendants now seek, including through the presentation of expert testimony or further factual development regarding the program's methodology and effectiveness.

Furthermore, Defendants' contrary framing of the Rule 60(b)(5) inquiry is misplaced. At oral argument, Defendants suggested that the relevant question is whether Plaintiffs could prevail if they filed this case today. (Doc. 3544 at 11:13-15). That framing reads *Horne* far too expansively and flips the 60(b)(5) inquiry on its head. Such a standard would improperly shift the burden to Plaintiffs to reprove a constitutional violation each time Defendants seek relief from an institutional injunction. However, *Horne* is clear: Defendants have the burden of proof. 557 U.S. at 447.

Finally, Defendants are not required to prove a negative—that no constitutional violation has occurred during every traffic stop conducted over the past fourteen years.

---

[33] And in the Forty-Sixth Quarterly Report, the Monitor notes that "the findings of disparities *continue to identify possible systemic racial bias in MCSO's patrol function*." (Doc. 3509 at 89 (emphasis added)).

[34] "An intervention educates deputies on how to correct their conduct, using a range of methods such as formal and informal training, supervisor ride-alongs, action plans, review of implicit bias videos, and/or review and discussion of the deputy's own body-worn camera recordings." (Doc. 2718 at 2 n.2 (citation modified)).

(Doc. 3544 at 15:13-21). Indeed, the Seventh Circuit has held as much. *See Shakman v. Pritzker*, 43 F.4th 723, 730 (7th Cir. 2022).[35] But even then, Defendants must still demonstrate that the MCSO has satisfied the objective of the First Order. *Id.* Even assuming the Defendants could make such a showing, they have not done so on the present record.

**b. Appropriate, Uniform, and Fair Discipline**

Defendants have similarly not shown (and do not even attempt to demonstrate) that the purpose of the Second, Third, and Fourth Orders (collectively, the "Internal Affairs Orders")—ensuring a constitutionally adequate internal investigation process for officer misconduct—has been achieved.

As summarized at length in the background section, *see supra* Section I.A, the Court, through the Second Order, developed a comprehensive remedial scheme to address the "particularly egregious and extraordinary" conduct by the Defendants. (Doc. 1765 at 2). The Second Findings of Fact, in nearly 500 paragraphs, set forth how Sheriff Arpaio, Chief Deputy Sheridan, and the MCSO, in conducting internal investigations of extensive misconduct against members of the Plaintiff class, "manipulated all aspects of the internal affairs process to minimize or entirely avoid imposing discipline on MCSO deputies and command staff whose actions violated the rights of the Plaintiff class." (*Id.* (citing Doc. 1677 ¶¶ 387–875)). Then Chief Deputy, now Sheriff, Sheridan in particular was found to have abused his authority over MCSO's internal affairs process by obstructing and

---

[35] *Shakman* involved the requested termination of a consent decree. 43 F.4th at 728. Notably, and without detailed explanation as to why, the Seventh Circuit applied *Horne*'s two-step inquiry analysis to the *first* prong of Rule 60(b)(5), which allows a party to move to terminate a consent decree based on *satisfaction*. *Id.*; Fed. R. Civ. P. 60(b)(5). Yet the Supreme Court explicitly stated in *Horne* that "petitioners' Rule 60(b)(5) claim [was] not based on satisfaction of the judgment." 557 U.S. at 446 n.2; *id.* at 454 (noting that "each of [Rule 60(b)(5)]'s three grounds for relief is *independently sufficient* and therefore that relief may be warranted even if petitioners have not 'satisfied' the original order" (emphasis added)). And the Seventh Circuit's observation in *Shakman* that a party need not "prove a negative" arose in its discussion of whether the defendants had "satisfied" the consent decree. 43 F.4th at 728, 730.

manipulating misconduct investigations and disciplinary proceedings—including those involving himself—to shield deputies and Command Staff from accountability and undermine the enforcement of remedies designed to address the constitutional violations against the Plaintiff class. (Doc. 1677 ¶¶ 389, 397, 435–55, 574–83, 752–64).

The Court expressly made findings that "the scope of Defendants' constitutional violation [was] broad" and "permeate[d] the internal affairs investigatory processes, which have been manipulated to provide impunity to those who violate the rights of the Plaintiff class." (Doc. 1765 at 11). The Court determined that the appropriate remedy—the Second Order—"must reach as far as the violation flows." (*Id.* (first citing *Missouri v. Jenkins*, 515 U.S. 70, 98 (1995); and then citing *Milliken*, 433 U.S. at 282)). The Court further determined that, based on the MCSO's history of noncompliance with the Court's injunctive orders, the scope of the remedies needed to encompass the entire internal affairs system to adequately protect the rights of the Plaintiff class. (*Id.* at 5). The Monitor's supervisory authority of the entire internal affairs process was then temporarily expanded through the Third and Fourth Orders because MCSO failed to complete investigations in a timely manner so as to be effective under state law. (Doc. 2830 at 2–4). These "extreme" delays rendered MCSO's internal investigations "completely ineffectual" and deprived the Plaintiff class of its right to have misconduct complaints investigated and, when appropriate, disciplinary action imposed on the offending officers. (*Id.* at 4).

The objective of the Internal Affairs Orders, thus, is to ensure that MCSO investigates allegations of misconduct by its deputies in an appropriate, uniform, and fair manner. Defendants contend that they need not establish whether that objective has been achieved. Instead, they argue that because the "objectives of the Plaintiffs' Complaint"—which did not allege the internal affairs violations established in the later contempt proceedings—"have been achieved" (a position the Court has now rejected), federal monitoring is no longer appropriate. (Doc. 3368 at 13, 15). Relying on *Horne*, they further argue that it is inappropriate for the Court to consider whether the objectives of "additional orders and injunctions" have been achieved under the equity prong of Rule 60(b)(5). (Doc.

3496 at 11–12). Defendants' argument is unpersuasive.

It is true that the Supreme Court in *Horne* did not separately consider whether the objective of a contempt order issued by the district court had been achieved. 577 U.S. at 441–42. But there was good reason for that. The contempt order in *Horne* served the same objective as the initial injunction: ensuring that defendants were in compliance with the EEOA. The district court, in its initial findings, determined that the defendants were violating the EEOA by not adequately funding certain language instruction programs. *Id.* at 441. The district court, after giving Arizona time to appropriately fund those programs (which it failed to do), held the State in contempt and established an escalating schedule of fines for each day the State failed to comply with the district court's funding requirements. *Id.* at 441–42. The Supreme Court reasoned that since it was possible for Arizona to fulfill its obligation under the EEOA by "other means," the appropriate 60(b)(5) inquiry was whether the State was taking "appropriate action" to comply with the EEOA. *Id.* at 439, 450. Accordingly, there was no need to separately consider whether the objectives of the later contempt order or other "additional orders and injunctions" had been independently achieved.

The contempt orders in this case do not resemble the one in *Horne*. Rather than simply levying fines, the Internal Affairs Orders set forth a detailed remedial scheme that requires changes in policy and training and imposes supervision over the entire internal affairs process. *Melendres IV*, 897 F.3d at 1220; *Melendres V*, 113 F.4th at 1130–32. Their purpose is to cure a condition that "flows" from the initial constitutional violations: "the tacit authorization and condonation that the MCSO conveys to its deputies when police misconduct related to members of the Plaintiff class is exempted from the normal internal affairs system and is treated with special leniency or is entirely swept under the rug." (Doc. 1765 at 5). This objective differs from the First Order's objective. The *Horne* Court was not presented with a circumstance in which later remedial orders imposed additional obligations designed to remedy later-discovered conditions flowing from the underlying federal violations. But as *Horne* nonetheless recognizes, "federal-court decrees" are within

"appropriate limits" when they are directed at remedying conditions that "flow" from violations of federal law. *See* 577 U.S. at 450 (citing *Milliken*, 433 U.S. at 282); *Milliken*, 433 U.S. at 282 ("[W]here, as here, a constitutional violation has been found, the remedy does not exceed the violation if the remedy is tailored to cure the condition that offends the Constitution." (internal quotation marks omitted)). And in this case, the Ninth Circuit stated it was "satisfied that the challenged provisions [in the Second Order] flow from MCSO's violations of court orders, constitutional violations, or both." *Melendres IV*, 897 F.3d at 1222; *id.* at 1220 (rejecting Defendants' argument that the Court failed to tailor the terms of the Second Order to remedy the violations found).

Because the Internal Affairs Orders are themselves prospective equitable orders, the *Horne* inquiry applies to them as well under Rule 60(b)(5). To hold otherwise would require the Court to dissolve those Orders without first determining whether the condition they were designed to remedy has been eliminated. As Defendants have not even attempted to answer a "critical question in th[e] Rule 60(b)(5) inquiry"—"whether the objective" of the Internal Affairs Orders "has been achieved," *see Horne*, 557 U.S. at 450—they have failed to carry their burden.

And to the extent that Defendants argue that enforcement of the "backlog" provisions in the Third and Fourth Order is no longer prospectively equitable, that argument likewise fails. (*Contra* Doc. 3496 at 11). Those Orders arose in the context of the explosive growth in the PSB backlog. Their purpose is to eliminate the backlog—cases in which the MCSO has exceeded state law time limits in which they can enforce effective discipline-- insofar as a massive backlog prevents MCSO from administering discipline in a fair, uniform, and appropriate manner. (Doc. 2830 ¶¶ 346–49, 352; Doc. 3076; Doc. 3497). At the time of the Third Order, the backlog was over 2,100 cases. (Doc. 2830 at 4). As of July 31, 2026, 256 cases remained in the backlog. (Doc. 3558). MCSO is on track to eliminate the backlog in early 2027. (Doc. 3497 at 18). Thus, the backlog still remains, but it should be eliminated soon. The Court has instituted a self-terminating mechanism in the Third Order that extinguishes the Monitor's authority as the CPA once

the objective of backlog reduction has been accomplished. (Doc. 2830 ¶¶ 346–49, 352).[36] Defendants' insistence that "continuing federal oversight based on the (disappearing) backlog is inequitable" is therefore misplaced. (Doc. 3496 at 11).

**2. Durable Remedy**

Even if Defendants could demonstrate that the objectives of the Court's orders have been achieved, they still have not carried their burden of establishing that a durable remedy is in place. The record does not support a finding that, absent federal monitoring, Defendants are unlikely to resume the conduct that necessitated the Court's injunctive orders.

As previously noted, Defendants did not accept the Court's offer to conduct further factual findings. *See supra* Part III(A)(1)(a)(iv). Yet in a number of Rule 60(b)(5) cases cited by Defendants in support of termination, the district court conducted an evidentiary hearing in the first instance or was ordered by the appellate court to conduct further factual development. *Horne*, 557 U.S. at 455–56, 469–70 (eight-day evidentiary hearing); *Jackson*, 880 F.3d at 1207 (remanding to the district court to "make up-to-date findings" through "necessary proceedings to develop a record that would allow it to make [a determination as to whether Defendants are currently violating class members' rights]"); *Peery v. City of Miami*, 977 F.3d 1061, 1068 (11th Cir. 2020) (seven-day evidentiary hearing); *John B.*, 710 F.3d at 399 (18-day evidentiary hearing); *Petties*, 662 F.3d at 571 ("we remand the case for the district court to conduct the necessary factual inquiry"). *But see Shakman*, 43 F.4th at 732 (reversing the denial of a Rule 60(b)(5) motion and remanding the case with instructions to vacate 50-year-old consent decree without requiring an evidentiary hearing). Here, without conducting an evidentiary hearing, the Court is unable to make an "assessment of the likely risk of imminent harm to plaintiffs" if "court supervision [were] to be withdrawn." *Petties*, 662 F.3d at 571. Full termination of the Court's orders is thus not appropriate.

---

[36] Moreover, upon elimination of the PSB backlog, Defendants are authorized to return any unused payments in the PSB Staffing Fund to their source of origination

**a. Discriminatory Policing**

MCSO has not yet demonstrated that it has implemented a durable remedy sufficient to prevent the recurrence of the constitutional violations involving discriminatory policing and racial profiling that gave rise to this lawsuit. Defendants primarily contend that a durable remedy exists because they have achieved 100% Phase 1 compliance. (Doc. 3496 at 5–7). Of course, such Phase I compliance is welcome. Nevertheless, Phase 1 compliance, as defined by the Monitoring Team, evaluates whether MCSO has developed and approved requisite policies and procedures, and whether MCSO personnel have received documented training on their contents. (Doc. 3509 at 5). It is, as Plaintiffs frame it, proof of "compliance on paper." (Doc. 3459 at 15). By contrast, Phase 2 compliance evaluates "operational compliance"—in other words, whether MCSO is actually implementing the Court's requirements in practice. (Doc. 3509 at 5). As of the Monitor's most recent quarterly report, MCSO has achieved 84% compliance with the First Order. (*Id.* at 6).

In assessing the *durability* of such reforms, Defendants must present evidence that answers a hypothetical question: if supervision were withdrawn, would the reforms endure? *E.g.*, *Jackson*, 880 F.3d at 1207 (district court needs to analyze whether defendants "are likely to maintain compliance with federal law absent continued oversight"); *Petties*, 662 F.3d at 571. In *Jackson*, the Tenth Circuit held that "there is no one way for a movant to show that its federal compliance is fleeting." 880 F.3d at 1203. It identified two examples of a party's commitment to future compliance: (1) the adoption of a "statute designed to cure the specific federal violation" and (2) "a record of sustained good-faith efforts to remedy federal violations and, to the extent possible, eliminate the vestiges of the federal violation." *Id.* But ultimately, it is "the district court's wealth of experience overseeing the litigation" that informs the assessment of "whether [Defendants] are committed to remaining in compliance." *Id.*

Neither of the two examples offered in *Jackson* are present here. First, Defendants do not identify any statute designed to cure the specific federal violations regarding

discriminatory policing. Second, the record, on the whole, does not indicate a history of sustained, good-faith efforts by Defendants to remedy the federal violations. Defendants completely omit in their papers any discussion of the Second Findings of Fact, in which Sheriff Sheridan—then, Chief Deputy Sheridan—was held in civil contempt for failing to implement the Court's preliminary injunction. (Doc. 1677 ¶¶ 1–164) During the contempt hearing, "Chief Deputy Sheridan made multiple intentional misstatements of fact while under oath." (*Id.* at 3). He knowingly and intentionally failed to implement the preliminary injunction. (*Id.* at 16). Specifically, the Court found that "Chief Deputy Sheridan was fully apprised of the terms of the preliminary injunction and fully informed of Sheriff's Arpaio's decision to ignore it. He was responsible for implementing its terms, and he did nothing to do so." (*Id.* ¶ 92). This lack of implementation caused great harm to the Plaintiff class—including illegal traffic stops and detentions—and led to the issuance of a victim compensation plan. (Doc. 1791). Then Chief Deputy Sheridan was also found to have manipulated the internal affairs investigation process in a number of different ways already detailed on pages 6-8 above to avoid providing the members of the Plaintiff class with appropriate remedies for the MCSO's violations of Plaintiffs' rights.

Defendants ask the Court to ignore these "prior bad acts", (Doc. 3496 at 17) while giving credence to their previous good faith efforts. (*See* Doc. 3496 at 6). Certainly, the Court agrees, the Court must consider the totality of the Defendants' conduct in considering whether the Defendants have established the durability of their reforms to include both their good and their bad acts.[37]

---

[37] Defendants ask this Court to "presume elected officials' good faith and lawful performance of their work." (Doc. 3368 at 14 (citing *Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025)). *Cruz* discusses the "presumption of regularity," under which courts presume that "official acts of public officers, in the absence of clear evidence to the contrary, properly discharged their official duties." 146 F.4th at 739 (citation modified). The presumption is not applicable here. First, the presumption is retroactive, not prospective. *See id.* Defendants' Rule 60(b) motion evaluates prospective equitability through the durable remedy analysis. *Jackson*, 880 F.3d at 1207; *Petties*, 662 F.3d at 571. Second, even if the presumption was available, it cannot be found here when looking at MCSO's past misconduct of civil contempt and noncompliance, which is "clear evidence"

Defendants next aver that, even putting aside *Jackson*'s "good faith" framework, courts still find that "constitutionally sufficient policies and procedures—*standing alone*—establish a durable remedy." (Doc. 3496 at 6–7 (citing *Peery*, 977 F.3d at 1075) (emphasis added)). That is incorrect. The Eleventh Circuit, in *Peery*, demanded more than the presence of "policies and procedures" to establish a durable remedy. In that case, the City of Miami moved to terminate a consent decree designed to protect the constitutional rights of homeless persons. *Peery*, 977 F.3d at 1068. In affirming the district court's finding of a durable remedy, the Eleventh Circuit determined that the City of Miami was unlikely to return to its former ways because it had "developed a wide array of programs" to "provide shelter, medical care, and other services, as well as to avoid putting the mentally ill in jails." *Id.* at 1076 (internal quotation marks omitted). It was those programs, "along with formal police policies," that constituted a durable remedy. *Id.*

Under the Eleventh Circuit's reasoning, policies alone were insufficient. Instead, it was the City's actual actions and practices—akin to operational compliance in this case—that demonstrated "it [was] unlikely to revert to arresting or mistreating the homeless." *See id.* The Eleventh Circuit emphasized that "[t]he City provided 'ample evidence' [that its] procedures [and training] *were followed*, such as through the placement of notices in advance of clean-ups and the provision of shelter beds for the displaced homeless." *Id.* (emphasis added). Hence, under *Peery*, Defendants must show more than the mere adoption of new policies. They must demonstrate that such policies will persist and continue to be followed once federal oversight ends.[38] *But see infra* Section

---

that the agency has not "properly discharged [its] official duties." 146 F.4th at 739.

[38] Defendants assert that since *Peery* (1) involved training requirements—such as body-camera-usage and better documentation—"similar to the systems MCSO created to achieve Phase 1 compliance" and (2) "arose in the more-demanding context of showing a consent decree's satisfaction rather than changed circumstance for relief from an involuntary order," the case demonstrates that MCSO's "materially identical reforms" are "more than enough to show changed circumstances." (Doc. 3496 at 6–7). This argument is wrong on both counts. First, just because the training requirements between this case and *Peery* are "similar" does not make them "materially identical." Second, though the Eleventh Circuit did determine that the City of Miami had "satisfied" the consent decree

III(A)(2)(b)(iii) (discussing the Monitor's Forty-Sixth Quarterly Report, which "found blatant disregard by MCSO of longstanding policies, their review and approval, and of the policy development process").

The Court's First Order sets forth certain supervisory requirements that MCSO must follow, if it is to enforce immigration-related laws, that ensure that such enforcement does not run afoul of the Constitution and violate the rights of the Plaintiff class. (*E.g.*, Doc. 606 ¶¶ 12, 26, 28, 35, 40, 49–54, 67, 69–70, 72, 81, 85, 88–89, 101, 103); *see also Trump v. Illinois*, 607 U.S. ----, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J., concurring) ("The Fourth Amendment requires that immigration stops must be based on reasonable suspicion of illegal presence, stops must be brief, arrests must be based on probable cause, and officers must not employ excessive force. Moreover, the *officers must not make interior immigration stops or arrests based on race or ethnicity*." (emphasis added)).

Defendants have given this Court no evidence—either through affidavits, testimony, or exhibits—to make an assessment that, upon termination of the *Melendres*-orders, a durable system is in place that will mitigate the risk of the unconstitutional actions that led to this lawsuit, such as the racial profiling of Hispanic motorists, from reappearing. Further factual findings are necessary before the Court can relieve Defendants from the judgment against them.

**b. Appropriate, Uniform, and Fair Discipline**

Nor is the remedy yet durable in the case of MCSO's internal affairs disciplinary

---

under the first prong of Rule 60(b)(5), it still—like the Seventh Circuit in *Shakman*—applied elements of *Horne*'s standard for the equitability of prospective application, including the "durable remedy" analysis. *Peery*, 977 F.3d at 1075; *but see Horne*, 557 U.S. at 446 n.2, 454. And under *Horne*, the "durable remedy" analysis does not hinge on whether the order at issue is a consent decree or involuntary judgment. *Jackson*, 880 F.3d at 1198–99 (discussing *Horne*'s interchangeable use of the two terms). It is only when evaluating the threshold inquiry of *changed circumstances* that modification of a consent decree arises in a more-demanding context. *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (citing *Rufo*, 502 U.S. at 384–85, for the proposition that a party moving under the third prong of Rule 60(b)(5) to modify a consent decree must demonstrate the "changed conditions" were not "anticipated at the time it entered into a decree").

system. Defendants contend that a durable remedy is in place because there are a low number of pending internal affairs cases involving Class Remedial Matters ("CRMs"), and that no CRMs are in the PSB backlog. (Doc. 3368 at 8–11, 14; Doc. 3496 at 8). These arguments too are insufficient.

CRMs are defined in the Second Order as "possible misconduct involving members of the Plaintiff class and the MCSO or the remedies to which such class members are entitled as set forth in the Findings of Fact and various supplemental orders of this Court." (Doc. 1765 ¶ 162(i)). The Second Order vests the Monitor with the authority to supervise and direct all of the MCSO's internal affairs investigations pertaining to CRMs. (*Id.* ¶ 275). The Monitor's authority over such investigations is "plenary," and he may "conduct whatever review, research, and investigation he deems necessary to determine whether such matters qualify as Class Remedial Matters and whether the MCSO is dealing with such matters in a thorough, fair, consistent, and unbiased manner." (*Id.* ¶¶ 277, 279; *see also id.* ¶¶ 274–88 (defining the full scope of the Monitor's authority and duties over CRM investigations)).

The Monitor's authority over all CRM investigations ceases when the Court determines that for a period of three continuous years the MCSO has, among other requirements, "adequately investigated and adjudicated all matters that come to its attention that should be investigated no matter how ascertained, has done so consistently, and has fairly applied its disciplinary policies and matrices with respect to all MCSO employees regardless of command level." (*Id.* ¶ 288). For the Court to be able to make this determination, the Monitor has the authority to inquire and report on *all* MCSO internal affairs investigations—not just those involving CRMs. (*Id.* ¶ 289). This requirement was "necessitated" by the facts that showed that MCSO "manipulate[d] internal affairs investigations other than those that ha[d] a direct relation to the Plaintiff class." (*Id.* ¶ 290). The Monitor has "full access to all MCSO internal affairs investigations or matters that might have been the subject of an internal affairs investigation by the MCSO." (*Id.* ¶ 292). Furthermore, as the temporary Constitutional Policing Authority while the backlog

remains, the Monitor has the "authority to oversee all of MCSO's complaint intake and routing," which includes the ability to "make determinations and establish policy decisions pertaining to backlog reduction." (Doc. 2830 ¶ 346). The Monitor has the "power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations." (*Id.* ¶ 347).

In light of the Monitor's mandate under the Internal Affairs Orders, the relevant "durable remedy" inquiry is whether Defendants have established that, absent judicial supervision, MCSO will continue to uniformly investigate misconduct and apply appropriate, uniform, and fair discipline at all levels of command. *See, e.g.*, *Malley v. Briggs*, 475 U.S. 335, 353 n.9 (1986) (Powell, J., concurring) ("It is of course true that actions by police must comport with the Constitution. Police departments and prosecutors have an obligation to instill this understanding in officers, and to discipline those found to have violated the Constitution."); *Madrid v. Gomez*, 889 F. Supp. 1146, 1181 (N.D. Cal. 1995) (In addition to written policies, training, supervision, and investigation, "a meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, [an organization's] policies and procedures become a dead letter."). The answer is currently no.

**i. *Jackson*'s Good-Faith Framework**

First, under *Jackson*'s good-faith framework, Defendants' argument falls flat. Here, the record does not demonstrate a history of "sustained good-faith efforts to remedy federal violations and, to the extent possible, eliminate the vestiges of the federal violation." *Jackson*, 880 F.3d at 1203. Defendants claim that the Court "ordered MCSO to track CRMs in response to *former Sheriff Arpaio's failure* to follow the Court's first order." (Doc. 3496 at 7 (emphasis added)). This framing completely omits the role that Sheriff Sheridan—then, as Chief Deputy—played in the manipulation of the disciplinary process for misconduct levied against members of the Plaintiff class.

At the time, Sheriff Arpaio and MCSO policy had delegated "all authority regarding internal affairs investigations within the MCSO" to Chief Deputy Sheridan. (Doc. 1677

¶ 389). He had the "authority to make all findings in internal affairs investigations." (*Id.* ¶ 397). Yet Chief Deputy Sheridan misused that authority to the detriment of the Plaintiff class. He personally obstructed disciplinary hearings against himself for his failure to implement the Court's preliminary injunction. (*Id.* ¶¶ 435–55). He manipulated the timing of major investigations into misconduct against the Plaintiff class to prevent the imposition of any discipline. (*Id.* ¶¶ 574–83). He even went so far as to direct—without any written decision or factual inquiry—the vacatur of final disciplinary records reflecting sustained allegations of misconduct against the Plaintiff class in an attempt to, as described by the Court, "change history." (*Id.* ¶¶ 752–64). The Court found that "Chief Deputy Sheridan's directive" to "change the already established facts of the disciplinary adjudication" transcended "the authority given to Sheriff Arpaio or his designee by MCSO policy and [was] an abuse of that authority." (*Id.* ¶ 759).

In sum, Chief Deputy Sheridan "manipulated the Internal Affairs process at the MCSO to ensure that many employees"—including himself—"were disciplined in a relatively lenient manner or not at all for violating the right of the Plaintiff class." (Doc. 1765 at 15). This weighs strongly against the finding of a durable remedy under *Jackson*. Considering this history of "egregious and extraordinary" misconduct (Doc. 1765 at 2), more is needed from Sheriff Sheridan to demonstrate that the Court's internal affairs reforms are durable. The Court has not been able to weigh any future commitment from Sherrif Sheridan to continue these reforms absent Court supervision. He has not submitted an affidavit or testified in support of this motion.

**ii. Durability of Reforms Absent Supervision**

Second, the durability question is—itself—built into the Court's orders. Paragraph 288 considers the durability of reforms and returns the final authority of the Sheriff over CRMs when MCSO has demonstrated, for a period of three continuous years, that it appropriately, uniformly, and fairly applies its disciplinary policies with respect to all MCSO employees. (Doc. 1765 ¶ 288). It has not yet been able to make that showing. (Doc. 3509 at 306–07 (finding MCSO not in compliance with the provision)). By contrast,

in *Shakman*—which found that the Governor of Illinois had "identified and instituted durable remedies to help ensure that compliance sticks"—though the district court had "expanded the special master's duties to include review of *all* positions under the Governor's authority," it "*set no deadline* for either the special master to complete her review or for the Governor to demonstrate sufficient compliance with the decree." 43 F.4th at 726 (emphasis added). There is no similar concern in this case: the Court has set forth what a durable remedy looks like and imposed a clear expiration date of when PSB oversight will end.

Defendants highlight that the Monitor has concurred with MCSO's handling of all CRMs. (Doc. 3496 at 8). They point out that there have been 162 CRMs involving the Plaintiff class in the last decade, of which ten resulted in a sustained finding of misconduct. (*Id.*). Certainly, MCSO has dedicated substantial efforts towards prioritizing CRMs and ensuring that it is working side-by-side with the Monitoring Team to investigate complaints of misconduct against the Plaintiff class. But as Plaintiffs point out, Defendants' own description of the process demonstrates that it is substantially aided by federal supervision itself:

> MCSO works closely with the Monitoring Team on Class Remedial Matters ("CRMs"), which receive investigative priority. Every complaint with a Latino surname goes through the CRM vetting process. The complaint is initially put onto the CRM list, reviewed, and briefed. . . . The Monitor Team meets with PSB every two weeks to track the progress of CRMs under investigation, review, and finalization. The Monitor Team must approve all steps of the process.

(Doc. 3459 at 35 n.11 (quoting Doc. 3399 at 11)).

That is not to fault Defendants for working with the Monitoring Team. That is a fact to be commended. But again, the Rule 60(b)(5) inquiry here is not whether the "changed circumstances" are a by-product of compliance with the Court's order. *See Horne*, 557 U.S. at 454, 465–66; *Rufo*, 502 U.S. at 383–93. Defendants must be able to demonstrate that the reforms are durable once compliance *is no longer required*. At a minimum, Defendants needed to have provided evidence—either through a transition plan,

affidavit, or testimony—demonstrating how they plan on broadly maintaining the PSB reforms upon termination of federal supervision. They have not made that showing.

Defendants also argue that a durable remedy exists because there are no CRMs in the backlog. The Monitor rejected this assertion in the latest Quarterly Report, stating that "there have been numerous occasions where PSB would bring a [CRM] case forward months – or in some cases, years – after the initial complaint was made." (Doc. 3509 at 303). The Monitor explained that this occurs because backlog cases—which have been pending for months, if not years—may not initially be identified as CRMs, but when the case is finally reviewed during the investigation, the PSB discovers that the allegations include bias affecting members of the Plaintiff class. (*Id.*). While the Monitor did not find MCSO noncompliant for these failures, the Monitor notes that, while the backlog remains, it is not feasible to make the determination that no CRM cases are in the backlog. (*Id.*). Defendants have not yet established that a durable remedy exists by virtue of any lack of CRMs in the backlog.

**iii. Monitor's Forty-Sixth Quarterly Report**

Finally, Defendants have not demonstrated that, even under current judicial supervision currently, MCSO applies appropriate, uniform, and fair discipline at all levels of command. As a part of the Forty-Sixth Quarterly Report, the Monitoring Team conducted an inquiry pursuant to its authority under the Third Order. (Doc. 2830 ¶¶ 346–47). The inquiry— initiated in April 2025 after the Monitoring Team learned about the filing of certain complaints of misconduct against the Commander of the Professional Standards Bureau, Captain Gregory Lugo—"found blatant disregard by MCSO of longstanding policies, their review and approval, and of the policy development process." (Doc. 3509 at 23). The Monitor concluded that "MCSO failed to engage in appropriate, uniform, and fair discipline as required by the Court Orders." (*Id.* at 179).[39] Based on the Monitor's report, the Court has serious questions as to the durability of the PSB reforms in

[39] The full report can be found at Doc. 3509, pp. 159 to 197. MCSO's response is available at Doc. 3509-4, pp. 1 to 48.

this case. Two areas in particular stand out.

**Manipulation of Prior and Ongoing Disciplinary Proceedings**: The Monitor's Report identified several instances where members of MCSO Command Staff either inquired into the possibility of reversing disciplinary decisions, actually reversed such decisions without a change in circumstances, or sought to change MCSO policy to affect the outcome of an ongoing investigation. These included:

- Members of incoming MCSO Command Staff inquired into whether the PSB could investigate closed complaints. (Doc. 3509 at 180).
- Undersheriff Jeffrey Gentry requested Captain Lugo to bring to a meeting the disciplinary records of two deputies who were found to have been untruthful as a result of disciplinary violations and placed on the "Brady List."[40] (*Id.*). At the meeting, Executive Chief Melissa Palopoli inquired about PSB's role in placing members on the Brady List. (*Id.*).
- After a detention sergeant was arrested for driving under the influence and placed on administrative leave, Undersheriff Gentry informed Captain Lugo that he and Sheriff Sheridan were considering changing MCSO's DUI policy and inquired into whether changing the policy would prevent the sergeant from being terminated. (*Id.* at 181). In response, Captain Lugo stated that he would need to apply the policy in a uniform manner to the facts of the investigation. (*Id.*).
- Captain Lugo previously recommended that Sergeant Aaron Engelbeck, who was then serving as a probationary lieutenant under Captain Lugo, not complete his probationary period based on deficient performance issues. (*Id.* at 182). Sergeant Engelbeck was then the subject of a PSB investigation for insubordination. (*Id.*). After a disciplinary hearing in front of Hearing Officer Kenneth Holmes, the allegations of insubordination were sustained in October 2024, and Sergeant Engelbeck received a one-week suspension. (*Id.*). While Sergeant Engelbeck's suspension was pending appeal before the Maricopa County Merit

---

[40] Under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), prosecutors must disclose evidence favorable to criminal defendants. This includes impeachment evidence that affects the credibility of government witnesses, including law enforcement officers. In Arizona, prosecutors use the "Rule 15.1 Disclosure Database" to track the list of officers who have potential impeachment or credibility information. Prosecuting agencies—like the Maricopa County Attorney's Office—make the determination on whether to place a law enforcement officer's name in the Rule 15.1 Disclosure Database. *See* A.R.S. § 38-1119.

Systems Commission,[41] in January 2025, Hearing Officer Holmes issued a letter to Sergeant Engelbeck overruling his previous decision imposing discipline. (*Id.* at 182–83). Hearing Officer Holmes later acknowledged that such reversal was "very unusual" and that there were no changes in circumstances between his initial findings and the later reversal. (*Id.* at 183). The reversal in discipline occurred after Sheriff Sheridan took office.

- Sergeant Engelbeck—after his discipline was reversed by Hearing Officer Holmes—submitted a complaint against Captain Lugo with Undersheriff Gentry for a matter that had previously been resolved during the previous Sheriff's administration. This complaint was investigated by MCSO, even though it had previously been finalized. (*Id.* at 186).

These events served as the basis, in part, for the Monitor to hold MCSO out of operational compliance with Paragraph 219. (Doc. 3509 at 252). That paragraph of the Court's order states, in full:

> The Sheriff shall ensure that discipline for sustained allegations of misconduct comports with due process, and that discipline is consistently applied, fair, and based on the nature of the allegation, and that mitigating and aggravating factors are identified and consistently applied and documented regardless of the command level of the principal of the investigation.

(Doc. 1765 ¶ 219).

The harms from the manipulation of law enforcement misconduct investigations are severe and pose a great risk to the Plaintiff class and, by extension, the public. *See, e.g.*, *Golodner v. Berliner*, 770 F.3d 196, 204 (2d Cir. 2014) ("[I]t is axiomatic that misconduct

[41] Pursuant to A.R.S. § 11-353 and A.R.S. § 38-1002, Maricopa County created the "Maricopa County Merit Systems Commission." *Merit Systems Commission*, Maricopa Cnty., https://www.maricopa.gov/380/Merit-Systems-Commission (last visited Aug. 6, 2026). The Commission oversees both the Employee Merit System (under the provisions of A.R.S. §§ 11-351 through 11-357) and the Law Enforcement Officers' Merit System (under the provisions of A.R.S. §§ 38-1001 through 38-1007). *Id.* "Any appeal concerning demotion, dismissal or suspension shall be filed . . . not later than ten (10) days following the date of receipt by the employee of a written order from the appointing authority." *Law Enforcement Officers' Merit System Resolution*, Maricopa Cnty. 8 (Apr. 2018), https://www.maricopa.gov/DocumentCenter/View/16949/Law-Enforcement-Officers-Merit-System-Resolution-.

within a police department implicates a matter of public concern, especially when it is traceable to potentially unconstitutional policies."); *Gwynn v. City of Philadelphia*, 719 F.3d 295, 304 (3d Cir. 2013) ("When a citizen lodges a credible complaint of police misconduct, it is imperative that it is investigated, both to protect the citizen who may be wronged and the officers who may be falsely accused."). As this Court explained at length in the Second Order, the Court had "previously fashioned less intrusive remedies" after the issuance of the First Order, "but those remedies were not effective due to Defendants' deliberate failures and manipulations." (Doc. 1765 at 10). The Court, in its Second Findings of Fact, determined that Chief Deputy Sheridan sought to "change history" by vacating the previous disciplinary factual findings in cases sustaining allegations of misconduct against the Plaintiff class. (Doc. 1677 ¶ 756). Chief Deputy Sheridan then sought to conceal this reversal from the Court, even though the Court had ordered MCSO to contemporaneously advise it of any disciplinary decisions and the results of any appeals involving misconduct against the Plaintiff class. (*Id.* ¶¶ 756–58). The Court also found that members of the MCSO Command Staff improperly manipulated the application of disciplinary matrices "so as to render" any discipline imposed "meaningless." (*Id.* ¶ 536).

The manipulation of discipline can have wide-ranging effects. It heightens the risk of impunity for sustained findings of serious misconduct. For example, the Sheriff has maintained the authority to vacate final disciplinary findings that, if otherwise sustained, would require the Maricopa County Attorney's Office under A.R.S. § 38-1119 to place a law enforcement officer on the Rule 15.1 "Brady List" database for impeachment/credibility issues. (Doc. 3447 at 11–12). Inquiring into the reopening of final disciplinary decisions, or modifying policies while investigations are ongoing to avoid certain disciplinary outcomes, is inconsistent with the principles of fair, appropriate, and uniform discipline. While the Court's orders permit the Sheriff or his designee to rescind, alter, or revoke disciplinary decisions when acting under his authority under state law (*see* Doc. 3448 ¶ 228), the Sheriff is not permitted under the Court's orders to "alter discipline in a way that violates" the above principles or state law.

Defendants must demonstrate that they will not, once supervision is released, revert to practices in which internal affairs investigations are improperly conducted, resolved arbitrarily, or result in inadequate discipline for sustained findings of serious misconduct as it pertains to members of the Plaintiff class. The Monitor's Forty-Sixth Quarterly Report casts serious doubts on whether they can indeed do so.

**Integrity of the PSB's Structure and Leadership**: The Monitor also identified several incidents that demonstrate ongoing risks to the durability of PSB's structure and leadership. These include:

- Deputy Chief Matthew Summers proposed to install Captain Dominick Reaulo as a co-commander for the PSB in March 2025. Captain Reaulo previously was the Commander of the Bureau of Internal Oversight ("BIO). Deputy Chief Summers proposed appointing Captain W. Cory Morrison as Captain Reaulo's replacement in BIO. (Doc. 3509 at 187).[42] Deputy Chief Summers authored a memo in support of Captain Morrison's transfer to BIO to influence the Monitor's approval of the transfer, even though he was aware that Captain Morrison's prior disciplinary history made him ineligible for the position. *Id.* at 189–90).
- Captain Lugo, in a meeting with Command Staff, expressed concerns with the proposed PSB dual-commander structure. He also expressed concerns with Sergeant Engelbeck's March 2025 complaint, believing that it was motivated by retaliation for his previous recommendation that Sergeant Engelbeck not receive a promotion due to performance issues. (*Id.* at 191–92).
- Two days after the meeting with Command Staff, Captain Lugo was placed on leave. Executive Chief Palopoli also filed a complaint for insubordination against him for allegedly accessing the Engelbeck complaint. The two complaints were investigated by the Arizona Department of Public Safety for any criminal violations. None were found. (*Id.* at 192–93). The complaints were also reviewed by an independent investigator to determine whether Captain Lugo committed any administrative violations. The independent investigator determined that any allegations involving violations of MCSO policy were either unfounded, not sustained, or required exoneration. (*Id.* at 194).

---

[42] The Court denied MCSO's request for the proposed co-captaincy structure in November 2025, finding that the Court's orders did not provide for such a structure. (Doc. 3305 at 11–14).

- After the independent investigator's findings, Captain Lugo returned from his leave of absence. However, MCSO Command Staff sought to transfer Captain Lugo out of PSB and into the Court Implementation Division ("CID"). The Monitor denied the request transfer, finding that it was retaliatory. (*Id.* at 196). Then, without the Monitor's approval, MCSO placed Captain Reaulo—who was the Deputy Commander of the PSB—as the PSB Commander and placed Captain Lugo as the PSB Deputy Commander. (*Id.* at 197). The Court determined on March 13, 2026, that Captain Reaulo's elevation and Captain Lugo's demotion were in violation of the Court's orders. (Doc. 3422).

As a result of these events, MCSO was deemed out of operational compliance with a number of provisions in the Court's orders prohibiting retaliation in the context of the IA system. (Doc. 3509 at 167, 204–05 (holding MCSO out of compliance with ¶ 102, ¶ 168, and ¶ 169)).

Under the Court's orders, the PSB Commander is tasked with the important role of ensuring that MCSO is complying with the Court's IA requirements. The Commander of the PSB is charged with ensuring that IA "investigations comply with MCSO policy and all requirements" of the Court's orders, "including those related to training, investigators' disciplinary backgrounds, and conflicts of interest." (Doc. 1765 ¶ 194). He has the "ultimate authority within the MCSO for reaching the findings of investigations and preliminarily determining any discipline to be imposed." (*Id.* ¶ 197).

Lack of stability at the top of command at the PSB poses substantial risk to the timely and thorough completion of internal affairs investigations. For example, during Captain Lugo's absence from the PSB during his administrative leave, the MCSO fell well short of their PSB backlog reduction requirements under the Third and Fourth Orders. (Doc. 3497). While the Sheriff has the authority to manage his office and appoint a "qualified Commander" of the PSB (Doc. 1765 ¶ 197), MCSO must still comply with the remaining provisions of the Court's orders to durably remedy past defects that "permeate[d] the internal affairs investigatory processes." (*Id.* at 11). The Commander of the PSB must be able to carry out of his duties—and effectuate the Court's requirements—to ensure the organization continues to meet its mission of "ensur[ing] that MCSO

employees adhere to the highest ethical standards." (Doc. 3307 at 2 n.1). These recent events involving Captain Lugo do not give the Court confidence in MCSO's continued ability to do so, absent oversight.

If Defendants wish to rebut the Monitor's report for the purposes of finding a durable remedy, further proceedings—involving testimony or presentation of evidence from MCSO Command Staff and key PSB personnel—are necessary to demonstrate MCSO's commitment to ensuring discipline is appropriately, uniformly, and fairly imposed.[43]

* * *

Defendants' request for full termination of the Court's orders under the equity prong of Rule 60(b)(5) is denied.

### B. Partial Relief is Not Warranted

Defendants are not entitled to any partial relief under Rule 60(b)(5). First, Defendants have not demonstrated full compliance with all provisions of the Court's orders, so the judgment against them has not yet been satisfied. Fed. R. Civ. P. 60(b)(5). Second, Defendants' arguments for partial termination based on the equity prong of Rule 60(b)(5) and Rule 60(b)(6) largely repeat their previous arguments seeking full termination or improperly attack prior legal conclusions.

#### 1. Satisfaction

Defendants list a host of paragraphs that the Court should terminate on an individual basis for satisfaction. Fed. R. Civ. P. 60(b) ("[T]he court may relieve a party or its legal representative from a final judgment, order, or proceeding" if "the judgment has been satisfied, released, or discharged."). They first state the Court should terminate all paragraphs for which the Monitor has concurred in MCSO's assertions of Full and Effective Compliance. (Doc. 3368 at 16). They next ask the Court to terminate all

---

[43] To the extent that Defendants allege that the issuance of the Monitor's Forty-Sixth Quarterly Report was aimed at deterring the success of this Rule 60(b) motion (Doc. 3544 at 31:03-07), the special inquiry began before (April 2025) Defendants filed this present request (December 2025) for relief. (Doc. 3509 at 349).

paragraphs with which MCSO is in compliance, even if MCSO has not yet asserted Full and Effective Compliance or maintained compliance for the required three-year period. (*Id.* at 16–18). Finally, they ask the Court to terminate a separate set of provisions that are either definitional or impose one-time obligations on MCSO. (*Id.* at 19).

The Court's orders in this case establish a highly integrated remedial framework in which many provisions serve as the foundation for others. As a result, the provisions are not necessarily severable. Defendants have not undertaken the analysis necessary to demonstrate which provisions can be terminated without impairing the continued implementation of the remaining remedial scheme. Accordingly, partial termination is not warranted at this stage. The Court has below, however, recommend a framework for the parties to consider as they move forward. *See infra* Section III.D.

Furthermore, Defendants do not address Paragraph 1(r) and Paragraph 3, which define when Defendants' obligations in this case will be discharged. (Doc. 606 ¶¶ 1(r), 3). Only once Defendants have reached "compliance with all relevant provisions" of the Court's orders and "maintained such compliance for no less than three years" can they demonstrate that their obligations in this case have been fully discharged. (*Id.*); *Satisfaction of judgment*, Black's Law Dictionary (12th ed. 2024); 47 Am. Jur. 2d Judgments § 1006, at 443 (1995). They have not met that level of compliance to warrant the judgment "satisfied."

Defendants' argument that "Rule 60 relief is available on a partial basis if relief from the entire order or judgment is unavailable" is incorrect here. (*Contra* Doc. 3368 at 16 (citing *United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 855 (9th Cir. 1992))). Defendants elide a key distinction between *Paymaster Corp.* and this case. In *Paymaster Corp.*—which involved legal, rather than equitable, remedies (i.e., money damages)—the parties disputed the remaining judgment amount in light of two post-judgment settlement agreements. 962 F.2d at 855. The defendant therefore moved for partial relief under Rule 60(b)(5), arguing that the agreements reduced the amount of compensatory and punitive damages it owed. *Id.* *Paymaster Corp.* thus demonstrates that

partial relief based on "satisfaction" may well be available where portions of a court's judgment are severable or reducible, as is often the case for monetary judgments. But it does not stand for the broad proposition that partial relief based on "satisfaction" is always available, particularly in the context of equitable remedies that require compliance with all injunctive provisions before the proceedings may be terminated.

Defendants cite no authority holding that, in the context of an injunctive judgment, partial termination is always available, even if the Court's orders define when the parties' obligations will be satisfied. The doctrine of "substantial performance" is not applicable here either. (*Contra* Doc. 3368 at 16). In the context of consent decrees, the Ninth Circuit construes "satisfaction" to mean "substantial compliance" or "substantial performance." *Jeff D. v. Otter*, 643 F.3d 278, 283–84 (9th Cir. 2011) (defining the doctrine as "something less than a strict and literal compliance with the contract provisions," such that "any deviation from literal compliance [does] not defeat the essential purposes of the decrees"). "Because consent decrees have many of the attributes of ordinary contracts and should be construed basically as contracts," contract law principles—such as substantial performance—generally govern requests to modify a consent decree. *Id.* (citation modified). However, this case does not involve a consent decree. Thus, the "substantial performance" standard does not govern here because the Court's injunctive orders cannot be construed as "contracts" in any sense.

At oral argument, the United States claimed that the "substantial compliance" standard applies to involuntary judgments. (Doc. 3544 at 35:12-19 (citing *Spangler v. Pasadena City Bd. Of Educ.*, 611 F.2d 1239 (9th Cir. 1979)). But *Spangler*, which dealt with an institutional reform injunction remedying *de jure* public school segregation, makes no mention of Rule 60(b)(5). Instead, the Ninth Circuit's analysis involved an "[a]pplication of equitable principles" that more closely resembles the framework that the *Horne* Court set forth under the *third ground* of Rule 60(b)(5)—equity. *See Spangler*, 611 F.2d at 1241 (considering "the nature and scope of the constitutional violation," the "remedial objective" of the injunction, and "the interests of state and local authorities in

managing their own affairs."). Satisfaction, however, is covered under the first ground in Rule 60(b)(5). *Spangler* thus is inapposite here as well.

And finally, Defendants contend that other circuit courts apply the doctrine of substantial performance to involuntary judgments. (Doc. 3368 at 16 (first citing *Jackson*, 880 F.3d at 1198; and then citing *Chisom v. Louisiana*, 116 F.4th 309, 318 (5th Cir. 2024) (en banc))). But the cases Defendants cite do not so hold. In *Jackson*, while the Tenth Circuit stated that it "considers a consent decree and an injunctive order equivalent for purposes of evaluating a Rule 60(b)(5) motion for modification," it made that statement in reference to the Supreme Court's decision in *Horne*, which used "consent decree" interchangeably with "injunction." 880 F.3d at 1198–99. But *Horne* only clarified the legal standard for the third ground for relief under Rule 60(b)(5) (equity), and it did not set forth any legal standard for "satisfaction" under the first ground for relief. And in *Chisom*, the Fifth Circuit held that the appropriate standard in assessing satisfaction under Rule 60(b)(5) for consent decrees is "substantial compliance." 116 F.4th at 318–19 (reaffirming "the application of state contract law to motions to dissolve consent decrees under the first prong of Rule 60(b)(5)"). *Chisom* does not address whether that standard for "satisfaction" applies to involuntary judgments.[44]

Defendants' request for partial termination based on satisfaction is denied.

**2. Equitability of Prospective Relief or Lack of Justification**

Lastly, Defendants ask the Court to terminate certain provisions on the basis that enforcement is no longer equitable or justified. (Doc. 3368 at 21–30). They state that these paragraphs are untethered to the initial violations that gave rise to this case and thus exceed

---

[44] Defendants cite *Chisom* for the proposition that some circuits "require only the elimination of the prior constitutional violation and good faith compliance with prospective requirements." (Doc. 3368 at 16 (citing *Chisom*, 116 F.4th at 318)). This misreads *Chisom*. There, the Fifth Circuit explicitly *rejected* a standard for satisfaction that considered "good faith" compliance with a consent decree because it "ignore[ed] basic contract principles and instead impos[ed] a new burden of proof on the State." *Chisom*, 116 F.4th at 318 (finding that the district court erred when assessing the State's argument for satisfaction under the first prong of Rule 60(b)(5) by using the "flexible standard" typically applied to institutional reform decrees).

the Court's jurisdiction, or that the provisions are vague or arbitrarily assessed by the Monitor. (*Id.* at 21).

Defendants' arguments here relitigate what has already been decided and ask the Court to retrace old legal ground. This is improper in a Rule 60(b) inquiry. *Horne*, 557 U.S. at 447; 11 *Wright & Miller's Federal Practice & Procedure* § 2863. The Ninth Circuit has already rejected Defendants' arguments here. *Melendres IV*, 897 F.3d at 1220 (rejecting Defendants' argument that the "district court failed to tailor the terms of the second supplemental injunction to remedy the constitutional and court order violations it found"); *Melendres V*, 113 F.4th at 1139 (rejecting Defendants' vagueness arguments against the Third Order under Federal Rule of Civil Procedure 65, which requires that "an injunction order must state its terms specifically and describe in reasonable detail the act or acts restrained or required" (citation modified)). Defendants are not entitled to a third bite at the apple.

**C. Relief Under Rule 60(b)(6) is Denied**

Defendants half-heartedly assert that relief under Rule 60(b)(6) is warranted "based on extraordinary circumstances, including prolonged and burdensome processes covering even the most minute aspects of running a democratic institution long after Sheriff Arpaio and his immigration policies are no longer effective." (Doc. 3496 at 21). But this barebones, one-sentence argument found on the last page of Defendants' reply brief is legally insufficient to satisfy the "extraordinary circumstances" test. Courts "will not manufacture arguments" for a litigant, and "a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." *See Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994). No relief under Rule 60(b)(6) can thus be granted here.

**D. Reduced Monitoring May Be Appropriate**

Lastly, the Court addresses Defendants' arguments concerning the dynamics of institutional reform litigation and federalism. (Doc. 3368 at 12). These considerations, while important, do not carry as much weight here as they might under other facts.

Several of the concerns with "the dynamics of institutional reform litigation" that animated the Supreme Court's decision in *Horne* are not present in this case. *See Horne*, 557 U.S. at 448–49. As the *Horne* Court observed: "Scholars have noted that public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Id.* at 448; *id.* at 449 ("Nominal defendants [in institutional reform cases] are sometimes happy to be sued and happier still to lose." (citing Donald L. Horowitz, *Decreeing Organizational Change: Judicial Supervision of Public Institutions*, 1983 Duke L.J. 1265, 1294–95)). Critically in *Horne*, "[t]he defendants did not appeal any of the District Court's orders, and the record suggest[ed] that some state officials supported their continued enforcement." *Id.* at 442.

In many respects, this case could not be more different, particularly given the vigorous opposition demonstrated by Defendants. The parties have vigorously litigated the Court's orders—including the preliminary injunction, First Order, Second Order, and Third Order. The Court held not one but two trials to resolve the initial complaint and the later-discovered misconduct. The Ninth Circuit has issued five published decisions in this case. Accordingly, the Court's remedial orders have been repeatedly tested through extensive litigation and appellate review.

Defendants' federalism objections are also attenuated under these facts. As the Court explained in the Second Order:

> Under the facts of this case, the Court has fashioned remedies which account for and balance the need to respect the prerogatives of state officials with the need to prevent them from exercising their discretion in a way that violates Plaintiffs' constitutional rights and the need to provide a remedy for the past deprivation of those rights. The Court previously fashioned less intrusive remedies, but those remedies were not effective due to Defendants' deliberate failures and manipulations. The Court must do what is necessary to achieve the end goal of "restoring the victims of discriminatory conduct to the position they would have occupied in the absence of that conduct" and eventually restoring authority to MCSO command staff, once there is a "system that is operating in compliance with the Constitution."

(Doc. 1765 at 10–11 (citations omitted)). Certainly, once a party has demonstrated that "the objects of the [injunction] [has] been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew ex rel. v. Hawkins*, 540 U.S. 431, 442 (2004). However, Defendants have not demonstrated that the objects of the Court's orders have been obtained. *See supra* Section III(A)(1). And while the Sheriff of Maricopa County is elected and democratically accountable to the people, federal courts must still utilize "whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992). To be sure, "federal courts should exercise the least possible power adequate to the end proposed." *Id.* (citation modified). But considering the "extraordinary circumstances" necessitating the remedies imposed in this case, *cf. Shakman*, 43 F.4th at 731, continued judicial supervision remains appropriate.[45]

Nonetheless, the Court is mindful of the passage of time. When the Court issued its First Order, it could not have anticipated either the breadth of the remedial measures that would ultimately prove necessary or the duration of these proceedings. Although the passage of time alone does not guide the Court's analysis, the Court recognizes the burdens that continued monitoring may impose when it is no longer necessary in light of sustained compliance. Accordingly, the Court has conducted a preliminary analysis of the severability of the provisions in its orders. The Court has identified three broad categories of provisions: (1) paragraphs that may be appropriate for termination; (2) paragraphs that

---

[45] Defendants, citing *Horne*, 557 U.S. at 448, claim that the Court's orders "have the effect of dictating state or local budget priorities." (Doc. 3368 at 15 (citation modified)). But Defendants do not—and did not when offered the opportunity by the Court—grapple with the Monitor's previous finding in October 2025 that approximately 72% of MCSO's operational expenses from 2014 to 2024 it publicly attributed to this case were "misattributed or improperly prorated." *Melendres v. Sheridan*, 2026 WL 411745, at *2 (D. Ariz. Feb. 13, 2026). As this Court previously held in February 2026, "the issue of costs cannot be used as an argument against implementing necessary constitutional reforms." *Id.* at *4 (D. Ariz. Feb. 13, 2026) (citing *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963)).

may be appropriate for placement in "inactive" status; and (3) paragraphs that may be appropriate for continued monitoring at this time.

In the first category listed above, the Court tentatively identifies 27 paragraphs that may be appropriate for termination without impacting the assessment of other active paragraphs. These paragraphs are listed in **Appendix E**.

In the second category listed above, the Court tentatively identifies 57 paragraphs that may be appropriate for "inactive" status. Under this status, the Monitor would discontinue actively monitoring these requirements because there has been asufficient duration of performance and compliance on the part of MCSO. If the Court, through the Monitor or the parties, later learns of any future issue that arises with these "inactive" provisions while the monitoring of the other active provisions is ongoing, any inactive provision will reactivate as necessary. These paragraphs are listed in **Appendix F**.

In the third category listed above, the Court tentatively identifies—in addition to the other 128 paragraphs that are administrative or define the Monitor's duties—156 paragraphs that may be appropriate to be maintained for monitoring at this time. These paragraphs either provide a foundation for the core issues in the case (bias in traffic stops and appropriate internal affairs investigations); have a significant nexus to other paragraphs where assessment is still active; relate to MCSO's capacity to achieve compliance; pertain to the duties of the Monitor; are currently noncompliant; have not been in Full and Effective Compliance for three years; or were previously in Full and Effective Compliance but had the designation rescinded recently. These paragraphs are listed in **Appendix G**.

Using these categories as a framework, the parties are directed to meet and confer and issue a joint notice indicating whether they agree to a modification of the Court's orders in respect to any of these provisions. The parties shall include whether they have reached any agreement as to the severability of certain provisions in the Court's orders. Furthermore, if the parties are unable to agree on a framework for severability of the Court's orders, the Court will discuss setting a hearing with the parties at which they may argue severability and satisfaction.

## IV. CONCLUSION

For the reasons discussed, Defendants' motion for relief is denied for a failure to meet their burden of proof with respect to their obligations under Rule 60(b). The parties shall submit their joint notice concerning modification or partial modification of any of the paragraphs of the Court's orders contained within these exhibits within sixty days of the date of this order. Upon submission of this notice, the Court will schedule a status conference if necessary to set a further hearing or hearings.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Relief (Doc. 3368) is **DENIED without prejudice**.

Dated this 10th day of September, 2026.

G. Murray Snow
Senior United States District Judge

# APPENDIX A

The 156 paragraphs in the Court's supplemental injunctive orders which the Monitor has found MCSO to be in Full and Effective Compliance, as of the Forty-Sixth Quarterly Report issued on June 12, 2026. (Doc. 3509).

| | | | |
|---|---|---|---|
| ¶ 9 | ¶ 61 | ¶ 176 | ¶ 218 |
| ¶ 10 | ¶ 62 | ¶ 177 | ¶ 222 |
| ¶ 11 | ¶ 63 | ¶ 178 | ¶ 224 |
| ¶ 12 | ¶ 66 | ¶ 179 | ¶ 225 |
| ¶ 13 | ¶ 68 | ¶ 180 | ¶ 229 |
| ¶ 19 | ¶ 71 | ¶ 181 | ¶ 230 |
| ¶ 21 | ¶ 73 | ¶ 182 | ¶ 231 |
| ¶ 22 | ¶ 74 | ¶ 184 | ¶ 232 |
| ¶ 23 | ¶ 75 | ¶ 185 | ¶ 233 |
| ¶ 24 | ¶ 76 | ¶ 186 | ¶ 234 |
| ¶ 26 | ¶ 77 | ¶ 187 | ¶ 235 |
| ¶ 27 | ¶ 78 | ¶ 188 | ¶ 236 |
| ¶ 28 | ¶ 80 | ¶ 189 | ¶ 238 |
| ¶ 31 | ¶ 83 | ¶ 190 | ¶ 239 |
| ¶ 34 | ¶ 84 | ¶ 191 | ¶ 240 |
| ¶ 35 | ¶ 85 | ¶ 192 | ¶ 241 |
| ¶ 36 | ¶ 86 | ¶ 193 | ¶ 242 |
| ¶ 37 | ¶ 88 | ¶ 196 | ¶ 243 |
| ¶ 38 | ¶ 89 | ¶ 197 | ¶ 244 |
| ¶ 39 | ¶ 90 | ¶ 198 | ¶ 245 |
| ¶ 40 | ¶ 91 | ¶ 199 | ¶ 246 |
| ¶ 43 | ¶ 93 | ¶ 200 | ¶ 247 |
| ¶ 44 | ¶ 94 | ¶ 201 | ¶ 248 |
| ¶ 45 | ¶ 101 | ¶ 202 | ¶ 249 |
| ¶ 47 | ¶ 103 | ¶ 203 | ¶ 250 |
| ¶ 48 | ¶ 104 | ¶ 205 | ¶ 251 |
| ¶ 49 | ¶ 105 | ¶ 206 | ¶ 252 |
| ¶ 50 | ¶ 106 | ¶ 207 | ¶ 253 |
| ¶ 51 | ¶ 113 | ¶ 208 | ¶ 254 |
| ¶ 52 | ¶ 114 | ¶ 209 | ¶ 255 |
| ¶ 53 | ¶ 116 | ¶ 210 | ¶ 256 |
| ¶ 55 | ¶ 170 | ¶ 212 | ¶ 257 |
| ¶ 57 | ¶ 171 | ¶ 213 | ¶ 258 |
| ¶ 58 | ¶ 172 | ¶ 214 | ¶ 259 |
| ¶ 59 | ¶ 174 | ¶ 215 | ¶ 260 |
| ¶ 60 | ¶ 175 | ¶ 217 | ¶ 264 |

| | | | |
|---|---|---|---|
| ¶ 265 | ¶ 273 | ¶ 279 | ¶ 286 |
| ¶ 271 | ¶ 276 | ¶ 282 | ¶ 287 |
| ¶ 272 | ¶ 278 | ¶ 284 | ¶ 337 |

**APPENDIX B**

The 35 paragraphs in the Court's supplemental injunctive orders which the Monitor has found MCSO to be in Phase 2 compliance, but MCSO has not asserted or achieved Full and Effective Compliance. (Doc. 3509).

| | | | |
|---|---|---|---|
| ¶ 25 | ¶ 95 | ¶ 270 | ¶ 350 |
| ¶ 42 | ¶ 96 | ¶ 338 | ¶ 355 |
| ¶ 56 | ¶ 97 | ¶ 339 | ¶ 356 |
| ¶ 64 | ¶ 98 | ¶ 340 | ¶ 357 |
| ¶ 65 | ¶ 99 | ¶ 341 | ¶ 358 |
| ¶ 67 | ¶ 100 | ¶ 342 | ¶ 364 |
| ¶ 69 | ¶ 216 | ¶ 343 | ¶ 365 |
| ¶ 87 | ¶ 267 | ¶ 344 | ¶ 368 |
| ¶ 92 | ¶ 269 | ¶ 345 | |

**APPENDIX C**

The 46 paragraphs in the Court's supplemental injunctive orders which the Monitor has found MCSO to not be in Phase 2 compliance. (Doc. 3509).

| | | | |
|---|---|---|---|
| ¶ 14 | ¶ 81 | ¶ 211 | ¶ 289 |
| ¶ 15 | ¶ 102 | ¶ 219 | ¶ 291 |
| ¶ 16 | ¶ 163 | ¶ 220 | ¶ 292 |
| ¶ 17 | ¶ 165 | ¶ 221 | ¶ 293 |
| ¶ 29 | ¶ 166 | ¶ 223 | ¶ 346 |
| ¶ 30 | ¶ 167 | ¶ 226 | ¶ 347 |
| ¶ 32 | ¶ 168 | ¶ 227 | ¶ 348 |
| ¶ 33 | ¶ 169 | ¶ 228 | ¶ 353 |
| ¶ 54 | ¶ 173 | ¶ 266 | ¶ 361 |
| ¶ 70 | ¶ 194 | ¶ 268 | ¶ 362 |
| ¶ 72 | ¶ 195 | ¶ 281 | |
| ¶ 79 | ¶ 204 | ¶ 288 | |

**APPENDIX D**

The 3 paragraphs in the Court's supplemental injunctive orders which the Monitor has deferred assessment. (Doc. 3509).

| | | |
|---|---|---|
| ¶ 46 | ¶ 115 | ¶ 300 |

**APPENDIX E**

The 27 paragraphs in the Court's supplemental injunctive orders that may be appropriate for dismissal.

| | | | |
|---|---|---|---|
| ¶ 23 | ¶ 177 | ¶ 236 | ¶ 257 |
| ¶ 58 | ¶ 198 | ¶ 242 | ¶ 258 |
| ¶ 78 | ¶ 218 | ¶ 244 | ¶ 259 |
| ¶ 83 | ¶ 229 | ¶ 247 | ¶ 260 |
| ¶ 93 | ¶ 230 | ¶ 254 | ¶ 272 |
| ¶ 103 | ¶ 231 | ¶ 255 | ¶ 273 |
| ¶ 106 | ¶ 235 | ¶ 256 | |

**APPENDIX F**

The 57 paragraphs in the Court's supplemental injunctive orders that may be appropriate to be placed in a newly-designated "inactive" category.

| | | | |
|---|---|---|---|
| ¶ 24 | ¶ 80 | ¶ 192 | ¶ 233 |
| ¶ 26 | ¶ 85 | ¶ 193 | ¶ 234 |
| ¶ 27 | ¶ 88 | ¶ 199 | ¶ 238 |
| ¶ 28 | ¶ 89 | ¶ 201 | ¶ 239 |
| ¶ 35 | ¶ 101 | ¶ 203 | ¶ 240 |
| ¶ 36 | ¶ 104 | ¶ 205 | ¶ 241 |
| ¶ 37 | ¶ 105 | ¶ 207 | ¶ 243 |
| ¶ 38 | ¶ 113 | ¶ 208 | ¶ 245 |
| ¶ 39 | ¶ 114 | ¶ 212 | ¶ 246 |
| ¶ 40 | ¶ 175 | ¶ 215 | ¶ 250 |
| ¶ 57 | ¶ 182 | ¶ 217 | ¶ 271 |
| ¶ 61 | ¶ 186 | ¶ 222 | ¶ 287 |
| ¶ 63 | ¶ 187 | ¶ 224 | |
| ¶ 68 | ¶ 190 | ¶ 225 | |
| ¶ 77 | ¶ 191 | ¶ 232 | |

**APPENDIX G**

The 156 paragraphs in the Court's supplemental injunctive orders that may be appropriate for maintaining monitoring at this time.

| | | | |
|---|---|---|---|
| ¶ 9 | ¶ 64 | ¶ 171 | ¶ 252 |
| ¶ 10 | ¶ 65 | ¶ 172 | ¶ 253 |
| ¶ 11 | ¶ 66 | ¶ 173 | ¶ 264 |
| ¶ 12 | ¶ 67 | ¶ 174 | ¶ 265 |
| ¶ 13 | ¶ 69 | ¶ 176 | ¶ 266 |
| ¶ 14 | ¶ 70 | ¶ 178 | ¶ 267 |
| ¶ 15 | ¶ 71 | ¶ 179 | ¶ 268 |
| ¶ 16 | ¶ 72 | ¶ 180 | ¶ 269 |
| ¶ 17 | ¶ 73 | ¶ 181 | ¶ 270 |
| ¶ 19 | ¶ 74 | ¶ 184 | ¶ 276 |
| ¶ 21 | ¶ 75 | ¶ 185 | ¶ 278 |
| ¶ 22 | ¶ 76 | ¶ 188 | ¶ 279 |
| ¶ 25 | ¶ 79 | ¶ 189 | ¶ 281 |
| ¶ 29 | ¶ 81 | ¶ 194 | ¶ 282 |
| ¶ 30 | ¶ 84 | ¶ 195 | ¶ 284 |
| ¶ 31 | ¶ 86 | ¶ 196 | ¶ 286 |
| ¶ 32 | ¶ 87 | ¶ 197 | ¶ 288 |
| ¶ 33 | ¶ 90 | ¶ 200 | ¶ 289 |
| ¶ 34 | ¶ 91 | ¶ 202 | ¶ 291 |
| ¶ 42 | ¶ 92 | ¶ 204 | ¶ 292 |
| ¶ 43 | ¶ 94 | ¶ 206 | ¶ 293 |
| ¶ 44 | ¶ 95 | ¶ 209 | ¶ 300 |
| ¶ 45 | ¶ 96 | ¶ 210 | ¶ 337 |
| ¶ 46 | ¶ 97 | ¶ 211 | ¶ 338 |
| ¶ 47 | ¶ 98 | ¶ 213 | ¶ 339 |
| ¶ 48 | ¶ 99 | ¶ 214 | ¶ 340 |
| ¶ 49 | ¶ 100 | ¶ 216 | ¶ 341 |
| ¶ 50 | ¶ 102 | ¶ 219 | ¶ 342 |
| ¶ 51 | ¶ 115 | ¶ 220 | ¶ 343 |
| ¶ 52 | ¶ 116 | ¶ 221 | ¶ 344 |
| ¶ 53 | ¶ 163 | ¶ 223 | ¶ 345 |
| ¶ 54 | ¶ 165 | ¶ 226 | ¶ 346 |
| ¶ 55 | ¶ 166 | ¶ 227 | ¶ 347 |
| ¶ 56 | ¶ 167 | ¶ 228 | ¶ 348 |
| ¶ 59 | ¶ 168 | ¶ 248 | ¶ 350 |
| ¶ 60 | ¶ 169 | ¶ 249 | ¶ 353 |
| ¶ 62 | ¶ 170 | ¶ 251 | ¶ 355 |

| | | | |
|---|---|---|---|
| ¶ 356 | ¶ 358 | ¶ 362 | ¶ 365 |
| ¶ 357 | ¶ 361 | ¶ 364 | ¶ 368 |