John T. Masterson, Bar #007447
Joseph J. Popolizio, Bar #017434
Justin M. Ackerman, Bar #030726
Daniel A. Shudlick, Bar #035950
Ashley E. Caballero-Daltrey, Bar #036449
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1741
Fax: (602) 200-7876
jmasterson@jshfirm.com
jpopolizio@jshfirm.com
jackerman@jshfirm.com
dshudlick@jshfirm.com
adaltrey@jshfirm.com

Attorneys for Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Manuel De Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al,

Plaintiffs,

and

United States of America,

Plaintiff-Intervenor.

v.

Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona, et al.,

Defendant,

No. CV-07-2513-PHX-GMS

**SHERIFF SHERIDAN'S BRIEF REGARDING PRIVILEGE AND COMMUNICATION ISSUES RAISED DURING THE SEPTEMBER 24, 2026, STATUS CONFERENCE**

Sheriff Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona ("MCSO") submits this brief in response to the Court's invitation at the September 24, 2026, status conference. The Court asked MCSO to explain why it did not waive privilege by providing the files for four internal investigations to its conflict investigators. The answer is found in the Court's own Orders.

The Court held, after extensive briefing, that an independent investigator "stands in the shoes of a PSB investigator," that disclosure of privileged material to such an investigator waives nothing because she or he "acts as a member of the MCSO," and that work-product protection is lost only through disclosure to an adversary. Keith Sobraske and AZ Truth Finder were retained under MCSO's own policy to conduct conflict investigations; thus, they occupy the same position the Court has assigned to Shaneeda Jaffer. It would be anomalous, and contrary to the law of the case, to treat the Court's appointee as a member of MCSO while treating MCSO's own chosen investigators as strangers to it.

MCSO identified only two email chains, totaling seven Bates-stamped pages out of more than 200,000, as privileged. Those emails convey counsel's advice on a document request and went only to personnel who needed to know it, including the investigator whose file the request concerned. They satisfy every step of the framework in this Court's Orders regarding privilege. Moreover, waiver also requires an act by someone with authority to make legal decisions for the entity, and no such act occurred. Should the Court find otherwise, the Rule 502(d) Order already entered in this case protects any resulting disclosure as inadvertent. Finally, MCSO will provide the emails to Ms. Jaffer, as the Order requires. They remain properly withheld from the Monitor.

Despite the foregoing, this dispute should not have required the Court's attention. The Monitor bypassed the Court Implementation Division ("CID") and MCSO's counsel, directed the production of these files through a captain in the chain of command, and then told the Court that counsel's "polite but persistent correspondences" amounted to months of unexplained delay. In truth, MCSO's counsel invoked the controlling Orders in writing, diligently reported the progress of a review of more than 200,000 pages in detail, and

invited a conversation that never took place. That failure is not isolated. It is part of a pattern, documented below, in which the Monitor's silence on matters of compliance has repeatedly forced MCSO to seek the Court's intervention. MCSO therefore asks the Court to confirm that the privilege was not waived and to direct the Monitor to fulfill its obligation under Doc. 606 ¶ 140 to communicate with the Parties.

## I. <u>RELEVANT FACTUAL BACKGROUND.</u>

This briefing arises from the Monitor's directive that MCSO produce documents regarding four internal investigations ("IAs"), 16-0514, 16-0438, 15-0849, and 21-0179, "without delay." [Ex. 1, Monitor Directive.] Neither CID nor MCSO counsel received notification of the Monitor's directive. [*See id.*; *see also* Ex. 2, Letter from Popolizio to Monitor dated Aug. 17, 2026.] Instead, the Monitor (specifically Deputy Monitor Chief Donald Anders) directly contacted PSB Captain Gregory Lugo and gave him a directive to produce the information. [*See id.*] The IAs at issue were previously investigated by two outside investigators, Keith Sobraske and AZ Truth Finder, both of whom MCSO chose to conduct these investigations due to an internal conflict. [*See* Ex. 3, RT 9/24/26 at 17:14–18:18.] The Monitor directed Captain Lugo to send the IAs to it, as well as to the Court's Independent Investigator, Shaneeda Jaffer. [*Id.*] It is unclear why Ms. Jaffer is reviewing these IAs, but it appears that the Monitor wants Ms. Jaffer to review or finish those investigations. Deputy Monitor Chief Anders also informed the Court that of the four IAs, three were completed. [*Id.*]

When counsel for MCSO became aware of this issue, it contacted the Monitor Team. [*See* Ex. 2.] Counsel for MCSO reached out to the Monitor after learning about this directive and reminded the Monitor that MCSO is entitled to review documents that the Monitor requests for privilege under the Court's Orders (i.e., Doc 606 ¶¶ 146 and 148 and Doc. 3160). [Ex. 2; *see also* Ex. 4, Aug-Sept Emails RE: Privilege Review.] MCSO also reminded the Monitor that it was entitled to review documents that Ms. Jaffer requests under the procedures outlined in the Court's Order (Doc. 3487). [Ex. 2; *see also* Ex. 4.] MCSO kept the Monitor apprised of its detailed efforts to review the files, which were massive and included

over 200,000 Bates-stamped pages of documents (some documents contained only one Bates stamp for hundreds of pages). [*See* Ex. 4.] During the September 24, 2026, status conference, the Monitor characterized all of these efforts as a request with no response for months, despite the communications from counsel to the contrary. [*See* Ex. 3, RT 9/24/26 at 15:15–17:7 (explaining that the IAs "for reasons best known by counsel have yet to be sent to us, have yet to be sent to the independent investigator").]

During the September 24, 2026, status conference on this issue, this Court asked MCSO to explain why it had not waived privilege purely by previously giving these IAs to Mr. Sobraske and AZ Truth Finder. [*Id.* at 23:19–25.] It also directed MCSO to continue completing its review of the documents. [*Id.* at 24:2–8.] Of course, MCSO continued its review as pledged. During its review, MCSO identified two chains of emails (or 7 individual Bates-stamped pages) subject to attorney-client privilege and the work product doctrine protection, which are part of IA2016-0514. [Ex. 5, Privilege Log.] Those emails involve communications from counsel regarding a document request in a separate lawsuit. [*Id.*] The emails and the advice therein were disseminated to employes who would help prepare the documents for the request, including Mr. Sobraske. [*Id.*] The emails are part of Mr. Sobraske's file for the IA precisely because they sought information pertaining to the IA. [*Id.*] As important to this briefing, MCSO is not claiming privilege as to *any of the other* 200,000+ documents in any of the four IAs at issue.[1]

## II. MCSO HAS NOT WAIVED ITS PRIVILEGE SIMPLY BY GIVING THE DOCUMENTS TO ITS CONFLICT INVESTIGATORS.

Under this Court's Orders, MCSO cannot waive privilege based on the mere fact that it gives documents to an outside investigator. After extensive briefing regarding privilege and outside investigators, this Court specifically held that an independent investigator for MCSO "stands in the shoes of a PSB investigator." [*See* Doc. 3487 at 3; Doc. 3307 at 6–

[1] While conducting its review, counsel learned that the Monitor had previously directed the production of five additional IAs. Should MCSO determine that any of the documents in that production are privileged, it will seek to claw back those documents from the Monitor. MCSO does not waive an argument as to those additional five IAs about which its counsel has just learned. Moreover, the Monitor failed to inform the Court about those IAs at the status conference, as they are subject to the same Orders which allow review for privilege.

13, 18–19; Doc 3292 at 2.] The Court recognized that sharing documentation with an independent investigator is the same as any other PSB investigation, "with all associated procedures *and protections*." [Doc. 3292 at 2 (emphasis added).] In coming to its conclusion, the Court explained that MCSO policy specifically allows for an outside investigator to investigate due to a conflict or potential conflict, and that the provisions of GH-2 still apply. [*Id.* at 4.]

In response to MCSO's concern that submitting documents to Ms. Jaffer would waive privilege, this Court explained that "[t]he Independent Investigator is duty-bound to comply with all applicable MCSO policies and procedures, and MCSO is required to cooperate with the Independent Investigator in the same way that it would cooperate with a PSB investigator conducting an internal affairs investigation," and stated that MCSO's arguments to the contrary "are *all clearly refuted* by the Court's previous orders." [Doc. 3307 at 6–7 (emphasis added).] It later reiterated this holding: "disclosure of privileged material to the Independent Investigator that is relevant to her investigation would not waive any privilege, because the Independent Investigator acts as a member of the MCSO." [Doc. 3334 at 6 & n.4.] After all, "[d]isclosure of relevant privileged communications enables her to act for the organization, within the scope of her duties and responsibilities, as she carries out her internal affairs investigation." [*Id.*]

Separately, this Court also addressed the work-product protection doctrine as it pertains to independent investigators. As this Court recognized, the work-product protection is not waived unless the disclosure is made to an adversary in litigation. [Doc. 3307 at 16.] The Court specifically recognized that an independent investigator is not an "adversary" or a "conduit to an adversary" such that MCSO could waive the privilege by giving it to the independent investigator. [*Id.* at 18–19.] Thus, MCSO could not have waived the work-product protection, and no further analysis is necessary. [*Id.*]

Here, the Court's concern regarding whether MCSO could have waived its privilege by submitting the documents to its independent investigators is contrary to the established law of this case and the precedent this Court relied upon. If the Court were to rule that MCSO had in fact waived privilege, that ruling would create *two* separate categories of

investigators: the Court's appointed investigator—Ms. Jaffer, who *is* irrefutably a PSB investigator—and MCSO's chosen independent investigators who are paradoxically *not PSB investigators*, despite the Court's own acknowledgement that MCSO is entitled to use investigators in this way under its own policies. It makes no sense that the Court's appointed investigator would be in closer privity with MCSO than MCSO's own investigator, chosen because of an internal conflict.[2]

Moreover, this Court *rejected* every citation MCSO produced regarding a situation in which a privilege is waived and stated those cases were *inapplicable* to situations regarding independent investigators such as Ms. Jaffer. [*See, e.g.*, Doc. 3307 at 9.] That is because, as the Court explained, "[s]he is instead acting as a member of MCSO *itself* as a PSB investigator." [*Id.* at 9 n.7.] Respectfully, this is the exact kind of scenario MCSO wanted to avoid with its briefing on that issue. The Court's Order on that briefing faulted MCSO for its concerns regarding privilege, accusing MCSO of misreading Orders, selectively quoting them, marshalling arguments contrary to their clear text, and concluded, ultimately, that MCSO's arguments *lacked merit*. [*Id.* at 12.] Now, MCSO is instructed to brief the *opposite* and prove why it *did not waive privilege*—the very issue it was criticized for raising before. MCSO's concerns, previously lacking in merit in the Court's eyes, have come full circle; MCSO is now being asked to explain why it did not waive privilege conducting itself in the exact way this Court directed.

Accordingly, under the law of this case and all of the authorities that this Court relied upon in its previous Orders regarding Ms. Jaffer, MCSO did not waive attorney-client privilege or work product doctrine protection merely by turning over the information to Mr. Sobraske and AZ Truth Finder as conflict investigators pursuant to its own policy. [*See* Doc. 3334 at 8 ("Thus, the 'need-to-know' standard constitutes the 'law of the case,' and, as such, that standard 'should continue to govern the same issues in subsequent stages in the same

---

[2] If anything, the opposite is true. MCSO argued as much in its briefing regarding privilege with Ms. Jaffer. An investigator that MCSO itself hires is certainly in the shoes of a PSB investigator. Ms. Jaffer, on the other hand, has taken positions directly contradicting MCSO on multiple occasions. [*See, e.g.*, Docs. 3271, 3328, 3329.] And, as MCSO previously argued, Ms. Jaffer's role is closer to that of the Monitor, and MCSO is of course entitled to review documents for privilege before submitting them to the Monitor. [*See* Doc. 606 ¶¶ 146, 148; Doc. 3160 at 2; *see also* Ex. 3 at 19:18–20.]

case.'" (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)).] They stand in the same shoes as a PSB investigator, just as Ms. Jaffer does, and this Court's Orders regarding Ms. Jaffer therefore apply equally to Mr. Sobraske and AZ Truth Finder.

## III. MCSO DID NOT WAIVE THE PRIVILEGE THROUGH DISCLOSURE BEYOND WHAT EMPLOYEES NEEDED TO HAVE KNOWN.

### A. Attorney-Client Framework Under the Court's Orders.[3]

Whether MCSO waived the privilege purely by disclosing the information to Mr. Sobraske and AZ Truth Finder does not end the analysis. This Court has created a three-step process to determine whether information is privileged and whether it must be disclosed to an independent investigator, such that it would not waive privilege to do so. [Doc. 3307 at 15.] Privileged information does not need to be disclosed to the Monitor. [*See* Doc. 606 ¶¶ 146, 148; Doc. 3160 at 2; *see also* Ex. 3 at 19:18–20.] But privileged information relevant to Ms. Jaffer's investigations must be disclosed to her, and that disclosure does not waive privilege. [Doc. 3307 at 15.]

At the first step, "MCSO must make a prima facie case that the information in the withheld documents is covered by the attorney-client privilege." [*Id.*] Then, if communications are between non-attorney MCSO employes, MCSO must show that the transmittal of any legal advice "was to employees who had a 'need to know' the content of such communications while acting in the scope of their duties for MCSO." [*Id.*] For the purposes of this issue, that appears to be both a question of whether the underlying documents went to employees who had a "need to know" *and* whether the conflict investigators (Mr. Sobraske and AZ Truth Finder) also had a "need to know" them; that is, whether they were relevant to the investigation. If those two things are true, the privilege has not been waived. The Court "is simply requiring MCSO to show that the privileged communications are not being distributed such that confidentiality would be destroyed." [Doc. 3334 at 9.] Those documents need not be disclosed to the Monitor. [*See* Doc. 606 ¶¶ 146, 148.]

[3] As above, no further analysis is necessary for the work-product protection under this Court's Order. [Doc. 3307 at 18–19.] This analysis is included because the Court explained that the "need to know" standard is relevant to waiver of attorney-client privilege.

The last step is relevant only to Ms. Jaffer. To withhold documents from her, "MCSO must also demonstrate that the Independent Investigator would not have a separate 'need to know' the content in the privileged communications in order to properly effectuate her internal affairs investigation." [Doc. 3307 at 15.] In this case, because Ms. Jaffer appears to seek the documents for the same reasons as Mr. Sobraske and AZ Truth Finder—to complete the underlying investigations—if the documents were relevant to the investigators in step 2, they are necessarily relevant to Ms. Jaffer in step 3 and must be disclosed to her.

**B. The Orders Do Not Discuss *Who* Can Waive Privilege.**

This Court's prior orders have never identified *who* at MCSO can waive the privilege. MCSO previously raised this issue and asserted that an individual employee (including an independent investigator) cannot waive the privilege. [Doc. 3261 at 7 n.4.] This Court has never analyzed this issue.

In the corporation setting, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985); *see also United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("It follows *a fortiori* that since a corporate employee cannot waive the corporation's privilege, that same individual as an ex-employee cannot do so. An employee must generally keep an employer's confidences."); *see also United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169–70 (2011) (recognizing that attorney-client privilege applies to governmental clients). District Courts have properly found that even employees who may be protected by attorney-client privilege cannot necessarily waive the privilege. *See, e.g.*, *United States v. Leong*, No. CR 21-00142 LEK, 2023 WL 8878946, at *7 (D. Haw. Dec. 22, 2023) (acting chief of police did not have authority to waive city's attorney-client privilege); *Binelli v. Charter Twp. of Flint*, No. 09-CV-10385, 2010 WL 11544976, at *3–4 (E.D. Mich. June 7, 2010) (township's treasurer did not waive privilege). Instead, only a person (or council or board collectively) who has "authority to make legal decisions on behalf" of the governmental entity can waive the privilege. *Young v. City & County of Honolulu*, No. CIV 07-00068 JMS-LEK, 2008 WL 2676365, at *7 (D. Haw. July 8, 2008).

MCSO asserts that only Sheriff Sheridan may waive the privilege as he is the head of the office, and is the only person empowered, as an individual, to make legal decisions on behalf of MCSO. Sheriff Sheridan (and his predecessors) did not waive the privilege or send these investigations to any chosen or court-appointed investigator, or to the Monitor. There is no evidence that any other individual has such power or that the Sheriff delegated such power to any individual. Moreover, MCSO asserts that no delegation has occurred. Thus, privilege could not have been waived when other individuals sent the documents to Mr. Sobraske or AZ Truth Finder.[4]

### C. <u>The Orders Create an Impossible Standard for PSB.</u>

MCSO would also be remiss if it did not point out a practical issue with interpreting the Court's Orders to find waiver in this circumstance. If MCSO (through any employee other than Sheriff Sheridan) can waive privilege when it sends irrelevant privileged communications to Ms. Jaffer, who is nothing more than a member of PSB, then that means that any attorney-client privileged information irrelevant to any investigation would be waived any time it is disclosed to *any* PSB investigator. Practically speaking, that would require MCSO to conduct a full privilege review *prior to any investigation to avoid internally waiving the privilege*. That is contrary to the Court's explanation that the standard is manageable because "[t]ransmitted communications to employees for whom the information is needed to effectively carry out their work and make or assist in making decisions for the organization would indeed be covered under the need-to-know test." [Doc. 3334 at 12 n.9 (cleaned up).]

The issue in front of the Court now illustrates that point, because Ms. Jaffer, Mr. Sobraske, and AZ Truth Finder are all essentially PSB employees. If this is the proper analysis for them, then the same must be true of disclosure to *any* PSB investigator.[5] These investigations can involve hundreds of thousands of documents, as here. Requiring counsel to conduct review for privilege in every PSB investigation is an impossibility and any attempt to

---

[4] The same is true to the extent that either Mr. Sobraske or AZ Truth Finder sent anything *to* the Monitor. Neither had the ability to waive the privilege.

[5] MCSO maintains that Ms. Jaffer occupies a different position from an investigator picked by MCSO but, again, recognizes this Court's orders otherwise.

do so would only further entrench the backlog and would materially hinder MCSO from being able to meet the goals of compliance in this case.

### D. MCSO Did Not Waive Privilege As To The Documents At Issue.

The documents at issue are also protected by attorney-client privilege and work-product doctrine protection, were relevant between the employees in the communications, and were relevant to Mr. Sobraske and AZ Truth Finder in their respective investigations. [Ex. 5.] Accordingly, even under the Court's test articulated in Doc. 3307 and without regard to the above issues, MCSO did not waive privilege as to the documents at issue.

As described above, MCSO has identified two chains of emails subject to attorney-client privilege and the work-product protection doctrine, which are part of IA2016-0514. Those emails involve communications from counsel regarding a document request in a separate lawsuit. [*Id.*] The emails and the advice therein were disseminated to employes who needed to know the information, as those employees would help prepare the documents for the request. [*Id.*] Under the Court's Orders and MCSO policy, Mr. Sobraske stood in the shoes of one of those employees, because the request sought information pertaining to the IA he was investigating. [*Id.*] Thus, the emails are privileged under the first step, which asks whether the documents are subject to privilege, and the privilege was not waived under the second step because the emails were sent only to need to know employees. Additionally, the privilege was not waived because the emails were relevant to Mr. Sobraske's (and, later, AZ Truth Finder's) investigation as an independent investigator, because the emails pertained to legal advice regarding a response to a document request. Thus, MCSO is entitled to withhold those emails from the Monitor based on attorney-client privilege because MCSO did not waive the privilege by giving the emails to Mr. Sobraske and AZ Truth Finder.

MCSO will, however, send the emails to Ms. Jaffer because they are relevant to her investigation just as they were to Mr. Sobraske's investigation. It appears that Ms. Jaffer intends to review or otherwise complete the investigations at issue, as she has not identified any other investigation for which she needs these documents. If she sought them for some other reason, she would be required to identify her investigations under this Court's Orders

and she has not done so. [Doc. 3487 at 8.] Thus, at this juncture, MCSO can only assume that Ms. Jaffer assumed the same role that Mr. Sobraske formerly held, and the emails would be part of her file as they involve advice regarding document production from the investigation.

Accordingly, the emails at issue are protected by attorney-client privilege and the work-product protection doctrine. MCSO is entitled to withhold them from the Monitor but, consistent with this Court's Orders, will disclose them to Ms. Jaffer as relevant to her investigation.

## IV. THE DISCLOSURE SHOULD ALSO BE PROTECTED AS INADVERTENT UNDER THE COURT'S RULE 502(d) ORDER.

Finally, even if the Court were to find that MCSO had somehow waived the privilege (which it did not), that disclosure should be protected under this Court's Rule 502(d) Order. [*See* Doc. 3307 at 20–21.] Under that Order, the Court has protected any "inadvertent production of any privileged and protected materials made by MCSO to the Independent Investigator, where such disclosure would ordinarily result in waiver of any privilege or protection by MCSO." [*Id.*] There is no reason why that Order should not apply equally to disclosure by Mr. Sobraske and AZ Truth Finder as outside investigators. Again, under the Court's Orders, Ms. Jaffer, Mr. Sobraske, and AZ Truth Finder all stand in the same shoes: they are members of PSB. [*See* Doc. 3487 at 3; Doc. 3307 at 6–13, 18–19; Doc 3292 at 2.] The Court recognized the need for such an order to streamline disputes if MCSO learned that it accidentally disclosed privileged or protected materials. [Doc. 3307 at 21.] That is the case here. MCSO could not have known that disclosure of information *essential* to an investigation to a person standing in the shoes of PSB would constitute a waiver of privilege. [*See* Doc. 3334 at 12 (MCSO is entitled to transmit communications to "employees for whom the information is needed to effectively carry out their work and make or assist in making decisions for the organization" (cleaned up)).] And, again, this Court repeatedly explained that MCSO's fears to the contrary were completely unfounded. [Doc. 3307 at 12.] Against that backdrop, MCSO is protected from any inadvertent disclosure under the Court's Rule 502(d) Order.

## V. THE MONITOR FAILED TO PROPERLY COMMUNICATE ON THESE ISSUES WITH MCSO (AS IT HAS DONE IN THE PAST).

During the Court's hearing on this privilege issue, counsel for MCSO raised an issue with the lack of communication from the Monitor and the Monitor's inaccurate characterization of the facts and issues that led to this briefing. As this Court recognized, the performance of the Monitor "is a matter of great public concern . . . and the public's entitled to evaluate that." [Ex. 3 at 11:25–12:3.] For some time now, however, the Monitor has refused to communicate with MCSO or discuss issues with it, regardless of the amount of detail MCSO provides in its communications. The Monitor is required to "maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of Defendants' implementation of and compliance with [the] Order[s]." [*See* Doc. 606 ¶ 140; *see also id.* ¶¶ 119, 125–27, 129.] Moreover, the Parties, "shall attempt to resolve such disputes cooperatively prior to seeking the assistance of the Court." [*Id.* ¶ 125.] As MCSO's counsel has informed the Court, counsel has tried to resolve issues by communicating with the Monitor, but in response, the Monitor delivers silence. As a result, the Court invited MCSO to provide correspondence regarding this issue so that it could review it and address this ongoing issue. [Ex. 3 at 23:22–25.] It does so now.

### A. Exemplars Of The Monitor's Failure To Adequately Communicate.

Specifically, during the September 24, 2026, status conference, MCSO was surprised by the Monitor's comments claiming that there was no "settlement" on MCSO's privilege review in this matter, given MCSO's detailed communication and the lack of any Monitor response. [*Id.* at 15:15–16.] After all, a settlement would imply that the parties engaged in more than one-sided communications. Although MCSO's counsel tried earnestly to communicate with the Monitor, the Monitor chose not to engage in any effective communication. Instead, the Monitor dismissively referred to counsel's expressed concern regarding MCSO's right to review for privilege under the Court's orders and insinuated that MCSO was taking too long to produce the documents for the first time during the hearing. [*Id.* at 15:15–17:7.] The Monitor referred to counsel's "polite but persistent correspondences" and stated that the documents "for reasons best known by counsel have yet to be sent to us."

[*Id.*] The Monitor's statements and complete disregard for the MCSO's counsel's detailed written communications and attempts to confer with the Monitor on this issue are appalling.

The Monitor's contemptuous comments completely disregarded the incredibly detailed communications it directly received from MCSO counsel in this case. As an initial matter, in a letter and in follow-up emails, MCSO referred to the Court's Orders at Doc. 606 at ¶¶146 and 148, and Docs. 3160 and 3487 regarding its right to review for privilege and the fact that MCSO can conduct a privilege review when the Monitor makes a document request—a fact this Court again recognized during the hearing. [Ex. 3 at 19:18–20.][6] MCSO was completely within its right to assert its right to review for privilege, as discussed above and in this Court's Orders regarding privilege. MCSO also painstakingly described its efforts to undertake that review to comply with the Monitor's directive with multiple emails describing how many documents were at issue, what it was doing with those documents, and any problems that arose as part of the uploading and review process in an effort to comply with the Monitor's directive, and to protect MCSO's rights under the Court's Orders. [*See*, Ex. 4.] *The Monitor did not respond substantively to <u>any</u> of those emails—something that MCSO often encounters.*

Instead, the Monitor attempted to circumvent MCSO's well-established right to review for privilege in two ways. First, it sought to have documents sent *directly* to the Monitor without a privilege review and ignored any attempt to discuss privilege—a fact the Monitor acknowledged during the hearing. [Ex. 3 at 16:23–17:3.][7] Second, it also directed MCSO to

---

[6] As the Court well knows, in April 2025, the Monitor (specifically, Monitor Team Members Chief Anders and Major Peters) previously demanded documents and refused to acknowledge MCSO's right to review for privilege. Instead, Chief Anders and Major Peters threatened counsel and MCSO personnel that they would be in violation of the Court's Orders if they refused. The Court ultimately determined that MCSO was justified to assert its right to review documents for privilege, despite the Monitor's disregard for that right. [*See* Ex. 6, RT 04/17/25 at 12:13–19, 19:15–24.] Yet the Monitor, specifically Chief Anders, again overlooked MCSO's right to review for privilege and, therefore, this Court's Orders in this instance.

[7] The Monitor stated: "We are aware that Captain Lugo communicated that to the CEO of Arizona TruthFinders (sic). It was copied to Captain Lugo's immediate superior, Deputy Chief Chagolla; and we received that material very quickly and we received it then with no fanfare, with no assertions of any privileges, any attorney-client issues." [*Id.*] The Monitor's comments highlight its brazen attempts to disregard the binding orders involving privilege in this case. The Monitor points out that it previously requested and received documents by circumventing CID, the Sheriff, MCSO's counsel and, thus, the Court's Orders which

send the information directly to the Independent Investigator, Ms. Jaffer, without affording MCSO its right to review even though this Court outlined and directed a review process in Doc. 3487. The Monitor simply ignored controlling Orders acknowledging MCSO's right to review for privilege under these circumstances, counsel's invocation of those Orders, and counsel's requests to confer with the Monitor regarding these orders and associated issues.

Additionally, the Monitor should have routed the document production directive through CID, as it typically does for any other requests, but it did not do so in this instance. The Monitor did not properly and fully explain the issue to the Court during the hearing, which raises serious concerns about its candor to the Court, the public, and counsel. Indeed, as counsel for MCSO explained to the Monitor (and the Monitor did not address), the request placed "Captain Lugo and others in the untenable position of having to disobey a directive from their chain of command which would allow Sheriff's counsel to review the requested documents for privilege" as permitted by the Court's Orders. [Ex. 2.] Of course, the Monitor chose not to respond.

The Monitor's failure to acknowledge MCSO's right to review, or *any* of the detailed communications from MCSO's counsel regarding this issue, calls into question the truthfulness of Monitor's statements during the September 24, 2026, hearing. Far from participating to reach a "settlement" on this issue, the Monitor completely avoided the questions, inquiries, and statements in MCSO counsel's letter and emails. As Counsel for MCSO expressed in his email to the Monitor: *"I am disappointed that you did not accept my invitation to discuss this matter. I expect that a discussion would certainly have been productive and, I suspect, encouraged by the Court."* [Ex. 4, at 12 (Email from Popolizio to Busch-Wheaton Aug. 24, 2026 at 12:53 pm).] He went on to reiterate, as he had before: *"In addition, although you do not expressly acknowledge MCSO's right to review document requests pursuant to the Court's Orders, it appears that we are on the same page in this regard. Accordingly, we will review the requested documents for attorney-client privilege and work product."* [*Id.* (emphasis added).] Despite these emails and MCSO's numerous

---

acknowledged MCSO's right to review. Yet the Monitor still faults MCSO for asserting its right to review for privilege.

reminders regarding the Court's Orders, Monitor Warshaw made it sound as if MCSO was baselessly and frivolously referring to privilege and other issues as if those are not important concerns. [*See* Ex. 3 at 15:15–17:7.] That undermines MCSO's faith that its concerns, which are protected by Court Order, are being taken seriously.

The Monitor also ignored numerous emails from MCSO's counsel asserting MCSO's right to review for and assert privilege, and explaining all of the steps MCSO was taking to address the over 200,000 Bates-stamped pages of documents (which, again, some of those Bates numbers included documents containing hundreds of pages that were not stamped). These emails also detailed MCSO's significant time and effort required to upload, scan and Bates those documents, when the Monitor was well aware from the briefing and Orders in this case that privilege remains an important issue. Chief Warshaw and Deputy Monitor Robin Busch-Wheaton were on these emails and none of them addressed MCSO's concerns, responded to MCSO's presented inquiries, or acknowledged MCSO's efforts.

This is not the first time that MCSO has encountered the Monitor's refusal to communicate on important issues. MCSO first tried to discuss this issue with the Court over half a year ago during the March 12, 2026, hearing. [Ex. 7, RT 03/12/26 at. 18:21–20:1.] As the Monitor made apparent during the September 24, 2026 hearing, little has changed in the Monitor's willingness to communicate with MCSO since that March 12, 2026 hearing. Even so, issues with the Monitor's willingness to communicate with MCSO existed long before March 2026.

In a February 28, 2025 letter, MCSO sought Monitor input on an unresolved issue related to the Monitor's requiring the use of a consent to search form on all consent searches. [Ex. 8, GJ-3 Communications.] MCSO provided a detailed 10-page letter explaining that there was no basis to require the use of the form in all instances involving consent searches, why the Monitor's requiring it for compliance was inappropriate, and proposed a reasonable, appropriate solution. [*Id.* at 3–12.] The Monitor insufficiently addressed the contents of that letter, prompting MCSO to provide the Monitor with another letter in November 2025. [*Id.* at 25–28.]

In another example, as MCSO informed the Court in its Motion for Relief from the Third and Fourth Order, the Monitor refused to engage MCSO in reviewing the GH-2 policy in preparation for MCSO's submitting it to the Court. [Doc. 3388 at 13–15.] As stated in that Motion, it was clear in June–August of 2025 that the Monitor Team was unwilling to work with MCSO in a cooperative effort to address any concerns it had with a critical policy. [*Id.*] The Monitor's failure to engage in a colloquy frustrated MCSO's compliance efforts.

The Monitor remained silent as to why it would not approve MCSO's dual PSB captain proposal or otherwise consider it. [Ex. 9, Dual Captain Emails.] As MCSO detailed to the Monitor, having a dual captain in PSB would foster institutional continuity, consistency in applying MCSO policies in misconduct cases, and reasonable hours for the PSB Commander. [*Id.*] Nevertheless, the Monitor refused to meaningfully discuss the issue with MCSO regarding this critical issue, necessitating MCSO seeking Court intervention. More recently, when MCSO reached out in writing to the Monitor to discuss issues MCSO had with implementing the reorganization of PSB command (i.e. the Commander and Deputy Commander, including the circumstances involving the current commander), the Monitor remained largely silent stating that it cannot address the issue (despite previously meeting and discussing the issue with counsel at length in person)—only to set up interviews with executive command to "study" PSB months later. [Ex. 10, Email RE: PSB Structure.] Also, in December 2025, MCSO inquired about the Monitor's position on the PSB Commander's ability to modify findings and other issues, requesting the Monitor point to the Court Orders and MCSO policies for its positions. [Ex. 11, December 2025 Letters RE: PSB.] The Monitor responded to only a fraction of MCSO's inquiries. [*Id.*]

The Monitor overwhelmingly refuses to acknowledge MCSO's comments to their Quarterly Reports, even though this Court allows for a comment process.[8] For example,

---

[8] Also, on February 27, 2026, MCSO requested that the Monitor substantiate why it denied it requested transfer of Captain Lugo out of PSB—as the Monitor had never done so. [Ex. 12, February 2026 Transfer Letter.] The Monitor did not do so until it provided MCSO with its DRAFT 46th Report over a month later. On the same day, MCSO sent another detailed letter about the Monitor's activities and lack of communication. [Ex. 13, Letter to Monitor.] Despite counsel's request, the Monitor never met with counsel to discuss the issues therein.

MCSO spent considerable time and effort writing detailed comments to the Monitor's 46th Report, addressing the Monitor's citations and purported evidence and pointing out where that evidence was insufficient. [*See* Doc. 3509-4.] However, the Monitor simply ignored MCSO's efforts and detailed comments and made no substantive modifications to the Report based on those comments or in any way addressed MCSO's comments, nor has the Monitor done so in *any* Report in recent memory. [*See generally* Doc. 3509.] Instead, MCSO's efforts were met, once again, only with the Monitor's silence.

In a final example, the Monitor's comments provided during the traffic stop report process, policy review process, and training review process remains wanting. The Monitor frequently finds MCSO's explanations simply "insufficient" to address the Plaintiff class's concerns without stating more. MCSO has asked for explanations as to why their response was insufficient to further the colloquy in an effort to understand the Monitor's reasoning behind its determination.

**B. <u>The Monitor Needs To Adequately Communicate With MCSO.</u>**

As explained above, MCSO sent detailed letters and emails with its positions to meaningfully confer and come to a mutual agreement with the Monitor, or, at the very least, to understand the basis of Monitor's position—all to no avail.

As apparent from MCSO's communications sent to the Monitor, MCSO makes every effort to share its positions, provide specific questions for the Monitor to answer, and inquire regarding the Monitor's positions. Yet the Monitor simply refuses to respond to MCSO's communications and requests to confer. When MCSO asks for the Monitor's availability to speak on a specific issue, the Monitor does not respond. And many of the issues, questions and inquiries that Monitor ignored ultimately required this Court's intervention after the Monitor's inexcusable silence.

The Monitor has an important role in this action to oversee MCSO's compliance with the Court's Orders, but the Monitor's communication with MCSO and its counsel has been utterly deficient. Communication is key to any relationship because it safeguards against misunderstandings, provides clarity as to the positions and thoughts, avoids

conflict, clarifies expectations, and fosters trust between those involved. The Monitor's deficient communication ensures that these undesired results occur, although members of the Monitor Team oft repeat that they wish to "help facilitate that process" and are "open to any suggestions or recommendations" that MCSO might have, they refuse to actually engage in those dialogs. [*See* Ex. 14, Sheridan Interview at 4:1–24.]. The situation has become so untenable that, before the Court's invitation to brief this issue, counsel was contemplating filing a motion to compel the Monitor to respond to MCSO's inquiries—something that will repeatedly occur if this exercise does not result in a Court-ordered remedying of the Monitor's persistent violation of its responsibility to communicate.

The Monitor and MCSO should share the same goal: MCSO's Full and Effective Compliance with all aspects of the Court's Orders. In order to attain that goal, communication must occur and it must be substantive and without delay. However, attempts to engage the Monitor in essential communication is an exercise in futility, which only breeds distrust and further entrenches a feeling that this process is purely adversarial rather than cooperative. It makes one justifiably wonder whether the Monitor shares MCSO's goal of achieving Full and Effective Compliance with this Court's Orders.

Once again, MCSO respectfully requests that this Court review the attached communications and instruct the Monitor to engage in a healthy, open dialogue with MCSO regarding the issues that MCSO raises, and the inquiries and questions that it presents, and communicate the Monitor's thoughts and positions in response to correspondence from MCSO or its counsel. This is crucial to ensuring MCSO and Monitor work cooperatively and collaboratively towards a shared goal of MCSO's attaining Full and Effective Compliance under this Court's Orders.

## VI. <u>CONCLUSION</u>

Based on the foregoing, MCSO requests the Court find it has not waived privilege by transmitting documents to its independent investigators, as the Court has previously held with production to Ms. Jaffer. Moreover, MCSO requests that the Court require its Montior to communicate with MCSO and its counsel on ongoing compliance issues.

DATED this 8th day of October, 2026.

JONES, SKELTON & HOCHULI, P.L.C.

By /s/ Joseph J. Popolizio
John T. Masterson
Joseph J. Popolizio
Justin M. Ackerman
Daniel A. Shudlick
Ashley E. Caballero-Daltrey
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Attorneys for Gerard A. Sheridan, in his official capacity as Sheriff of Maricopa County, Arizona

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of October, 2026, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

/s/ Megan Axlund